UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. _____ |
| | ) | |
| THE UNITED STATES OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | | |

## **COMPLAINT**

The State of North Dakota files this action against the United States of America, acting through the U.S. Army Corps of Engineers ("USACE"), and states as follows:

### INTRODUCTION

1.       This is an action seeking damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, for creation of a public nuisance, negligence, negligence in failing to adhere to an assumed Good Samaritan duty, gross negligence, and civil trespass stemming from the actions and inactions of the United States of America, by and through its executive agency USACE, which are detailed below and which resulted in $38,005,071.66 of damages to the State of North Dakota.

2.       During the construction of the Dakota Access Pipeline ("DAPL"), protesters conducted a prolonged illegal occupation of and trespass on federal lands, from which lands these trespassers launched often combative and violent protests on federal, State and private lands in

North Dakota that spanned 233 days, from August 10, 2016, when protesters initiated confrontations with law enforcement, until on or about March 31, 2017, when the trespassers had largely disbanded and traffic was restored on a major arterial highway near vacated unlawful encampments. This organized and orchestrated activity, launched from large-scale but makeshift encampments illegally located on federal lands, with frequent outbreaks of illegal, dangerous, unsanitary, and life-threatening activity on federal, State and private property, resulted from and was aggravated by USACE's tortious conduct described below.

3.      USACE, working in conjunction with other federal agencies, maintained an ongoing presence at and around the DAPL protest site, and by issuing directives and making other affirmative statements described below, assumed a legal duty to protect the DAPL protesters and to prevent unlawful and dangerous activity, including trespass on federal lands. USACE completely failed to fulfill that legal duty, thereby aggravating the harm that some of the trespassers inflicted on persons and property in the vicinity of the protests.

4.      USACE's tortious conduct included i) USACE's complete failure to enforce mandatory legal requirements governing private access to and conduct on the federal lands under USACE's jurisdiction, which, if enforced, would have prevented or minimized the civil unrest and resulting damages to North Dakota, ii) USACE's violation of the legal duty it assumed to protect DAPL protesters and the public generally and prevent unlawful and dangerous protest activity, a duty that, had USACE fulfilled it in a responsible manner, would have prevented or minimized the unlawful activity and resulting damages to North Dakota.

5.      Among other things, USACE did not fulfill its mandatory obligations set forth in regulations at 36 C.F.R. Part 327 that require USACE to issue and enforce use permits that persons must have to conduct organized activities on federal lands. Accordingly, the

trespassers' long-term sprawling encampments on federal land, with virtually no sanitation facilities, and their contamination of the land and water during their "occupation," were all in violation of federal law.  Moreover, USACE did not address or prevent the trespassers' violations (and in fact encouraged the violations) in contradiction to its mandatory duty to remedy such violations.

6.     USACE's tortious conduct, which included outright abdication of federal law enforcement responsibility, required North Dakota to provide a sustained, large-scale public safety response to prevent deaths, and protect property and public safety, including that of the protesters. North Dakota's response eventually consumed thousands of person-days of law enforcement and first responder time and cost North Dakota $38,005,071.66.

7.      Though the unlawful activities and structures began on federal land, they expanded to envelop, contaminate and cause damage to State and private land as well.  As a result of USACE's failure to remove or control the trespassers and enforce the law, North Dakota was obligated to step in to protect public safety and provide necessary law enforcement, sanitation services, and first responder services, resulting in the significant costs and damages incurred by North Dakota.

8.     Ultimately, three main illegal encampments were established by trespassers on USACE-managed federal property near the DAPL Construction route and adjacent to the Cannonball River and Lake Oahe: the Seven Council (Oceti Sakowin), Rosebud, and Sacred Stone encampments.  At their peak, encampment populations grew to approximately 5,500 people, with some estimates of up to 8,000 people.  The combined population of these trespasser camps at the time would have constituted the 10th largest city in the State of North Dakota.

9.     These unlawful, sprawling encampments became small towns with poorly-erected and unsafe structures and unsanitary waste systems.  In addition to the mere presence of these unpermitted encampments violating federal law, the conduct of the trespassers violated federal and State law governing living in permanent or semi-permanent structures, sanitation, waste disposal, open burning, etc.  These conditions were not only illegal, but they also threatened the safety of the occupiers, including children.  When the trespassers finally left, they left behind a spoiled environment and a vast quantity of noxious waste, garbage, and debris to be cleaned up by the State at considerable cost.

10.     Central to this claim, many (though certainly not all) of the trespassers at these unlawful encampments engaged in disruptive, illegal and sometimes violent conduct on federal, State and private lands, including blocking public highways, threatening individuals working on the DAPL pipeline and the local population (such as ranchers), and directly initiating violence against law enforcement personnel and first responders.  This violent and illegal activity extended beyond the illegally occupied federal land and onto State land, and increased the damages incurred by North Dakota.

11.     Throughout this eight-month illegal occupation, law enforcement made a total of 761 arrests.  Only 51 of the arrested individuals (6.7 percent) called North Dakota home; the others were from 47 states and four countries.

12.     Even though senior USACE officials issued directives and took other actions demonstrating that USCAE assumed responsibility for protecting the protesters and preventing unlawful and dangerous conduct, USACE never fulfilled that responsibility. To the contrary, federal support was extremely limited, and non-existent other than minimal technical and liaison work, even though the trespassers were illegally occupying federal lands, were violating federal

land use, environmental, and public health laws and regulations, and were using the unlawful encampments on USACE-managed property as their base of operations for their often violent and frequently illegal conduct on federal, State, and private property.  Activities on State and private land that were launched from the trespassers illegal encampments on federal land included: unpermitted protests on private property requiring law enforcement response and removal; destruction of State property and roadblocks, including fires on two separate bridges; destruction of DAPL construction equipment; creation of illegal roadblocks on public roads and train tracks; protests in local communities including the State Capitol building in Bismarck, multiple courthouses, the Bismarck Kirkwood Mall, and area banks, including the Bank of North Dakota, which is an entity of the State of North Dakota; illegal butchering of livestock on nearby private lands; and illegal possession and killing of deer.

13.    USACE's abdication of the responsibility it undertook to maintain public safety at the protest site left North Dakota, at both the State and local level, with the entire burden to protect public safety and maintain law and order in the face of the brazen illegal conduct.

14.    Because of USACE's overwhelming failure to fulfill its legal obligations to enforce the law and protect public safety and the environment on federal land, North Dakota was required to mobilize its resources, including all of the major State law enforcement and emergency response agencies, the National Guard, as well as major support from local (county and municipal) law enforcement and first responder (e.g., ambulance, fire, medical, emergency response) agencies. Responding to this emergency cost North Dakota $38,005,071.66.

## IDENTITY OF PARTIES

15.     Plaintiff the State of North Dakota is one of the States of the United States of America.  The following State executive agencies took part in remedying the failures of the federal government:  the Governor's Office, Air National Guard, Army National Guard, Adjutant General, Attorney General (including the Bureau of Criminal Investigation), Bank of North Dakota, Department of Corrections and Rehabilitation, Division of Homeland Security, North Dakota Forest Service, Game and Fish, Health Department, North Dakota Highway Patrol, State Historical Society of North Dakota, Department of Human Services, Indian Affairs Commission, Information Technology Department, Parks and Recreation Department, Parole and Probation, Public Service Commission, the State and Local Intelligence Center, State Radio, Transportation Department and State Water Commission.

16.     Defendant United States of America, by and through its agency the USACE, is liable under the FTCA for North Dakota's significant monetary damages caused by the negligent or wrongful acts or omissions of United States of America' employees.  USACE employees were acting within the scope of their office or employment under circumstances where the United States of America, if a private person, would be liable to North Dakota in accordance with the laws of the State of North Dakota. USACE is an executive agency of the United States of America in charge of implementing 36 C.F.R, Part 327, and other laws and regulations that govern the USACE's management of certain public project lands, including the federal lands unlawfully occupied by the DAPL protesters.

## JURISDICTION

17.      This action is made pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80.

18.      North Dakota submitted a Notice of Federal Tort Claim (Standard Form 9S and Attachment A) to the USACE on July 23, 2018.  The USACE acknowledged receipt of North Dakota's Federal Tort Claim on July 23, 2018 in a letter dated July 26, 2018.  The USACE did not approve or otherwise respond to North Dakota's Notice of Claim.

## STATEMENT OF FACTS

### *The Dakota Access Pipeline Project Background*

19.      In 2014, Dakota Access, LLC ("Dakota Access") announced that it would be building the DAPL, a 1,172-mile-long (1,886 km) interstate underground oil pipeline.

20.      The DAPL was plotted to traverse lands near (but not on) portions of the Standing Rock Sioux Indian Reservation near the Cannonball River in North Dakota.

21.      In June of 2014, Dakota Access began the process of obtaining all necessary federal approvals for moving forward with the construction of the portion of DAPL at issue in the protests. As a part of this process, the USACE published and sought comment on a draft Environmental Assessment ("EA") in December of 2015, resulting in comments and participation from many interested parties including the Standing Rock Sioux Tribe, other federal agencies, and interested environmental and industry groups.  Importantly, any interested party had the opportunity to comment on the draft EA at this stage.

22.      On July 25, 2016, USACE published a final EA and a Mitigated Finding of No Significant Impact ("Mitigated FONSI") which imposed mitigation measures on the construction of the DAPL that were, in part, a result of comments by interested parties on the draft EA.   The

final EA concluded that an Environmental Impact Statement ("EIS") was not required for the DAPL.

23.    Disagreeing with the result of the final EA and Mitigated FONSI, the Standing Rock Sioux Tribe engaged in the legal process and filed suit for declaratory and injunctive relief on July 27, 2016, seeking in part to halt construction of the relevant portions of the DAPL and hoping to require preparation of a full EIS.  The Cheyenne River Sioux Tribe intervened as a plaintiff in this suit on August 10, 2016.

24.    Around the same time protesters began unlawfully occupying and trespassing on USACE property in the vicinity of the relevant DAPL construction site, resulting in the first confrontations with law enforcement on August 10, 2016.  Dakota Access filed suit on August 15, 2016, seeking in part a temporary restraining order ("TRO") against the protesters unlawfully interfering with its DAPL construction operations.

25.    Legal processes continued throughout the entirety of the illegal occupation of USACE lands, resulting in legal victories for both sides.  On August 16, 2016, U.S. District Judge Daniel Hovland issued a TRO against protesters unlawfully interfering with DAPL operations. Case No. 1:16-cv-00296.  In granting the TRO, Judge Hovland noted that "it appears that Dakota Access has a clear legal right to construct the Pipeline," and that "it does not appear that Defendants have any valid legal basis for interfering with Dakota Access' construction of the pipeline."  *Id.* at Dkt. No. 7.  The TRO was later vacated on September 16, 2016, with Judge Hovland noting that while "scores of protestors have been arrested since the Court issued its [TRO]," protesters would face criminal charges for illegal protest activities regardless of the TRO: "[i]t is clear the criminal justice system is currently addressing, and will continue to address, the mindless and senseless

criminal activity of the hooligans that choose to accompany the protest movement." *Id.* at Dkt. No. 45.

26.     On September 6, 2016, U.S. District Court for the District of Columbia Judge James Boasberg granted a TRO requested by the Standing Rock Sioux Tribe limiting DAPL construction activities.  Three days later, Judge Boasberg denied the Tribe's request for an injunction against pipeline construction while the tribal lawsuit proceeded against the USACE.

27.     As the USACE was intimately involved in the DAPL approval process and subsequent challenges to the same, the USACE was at all times aware of the dangerous and illegal actions of the trespassers' actions on USACE-managed land.  That awareness, and the fact the protesters were illegally trespassing on federal land, is what led the USACE to state that it accepted responsibility for protecting them and preventing dangerous activity, but ultimately USACE actively chose not to fulfill that duty or to enforce its own regulations and requirements.

28.     In light of the Court's September 6, 2016 order, the United States Department of Justice ("DOJ") and USACE issued a joint press release on September 9, 2016, stating their policy that while they recognized protesters' right to free speech, "anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities. The Departments of Justice and the Interior will continue to deploy resources to North Dakota to help state, local, and tribal authorities, and the communities they serve, better communicate, defuse tensions, support peaceful protest, and maintain public safety."  Thus, very shortly after the protests erupted, Federal authorities including USACE publicly announced their intention to enforce federal law to prevent violent and destructive acts.

29.     On September 13, 2016, the Governor of North Dakota recognized and confirmed the federal government's press release, stating "I'm going to hold the federal government to its

word, when the Corps and the departments of Interior and Justice delayed a decision on the pipeline's construction, and offered to deploy resources to North Dakota to help 'defuse tensions, support peaceful protest, and maintain public safety . . . '."  On September 16, 2016, Standing Rock Sioux leader David Archambault followed suit in recognizing that USACE and DOJ had committed to protecting the land and preventing violent and destructive acts.  He stated that the Tribe "appreciate[s] the cooperation of the Corps in protecting the First Amendment rights of all water protectors."

### *Trespassers' Activities*

30.     The United States of America and North Dakota Constitutions protect the right of individuals to conduct peaceful public assembly.  However, such rights do not include conducting an assembly at which there is a clear and present danger of riot, disorder, or interference with traffic on public streets, or other immediate threats to public safety or order.  Moreover, the federal government as landowner, and USACE as the agency responsible for overseeing the federal lands where the illegal encampments were located, had a responsibility to not knowingly allow the federal land to be used as a base for violent, unlawful, and dangerous conduct.  Yet that is what occurred, as detailed below.

31.     Initial reports indicated the Tribes who initially organized the DAPL protests wanted a peaceful, prayerful event when protesters began organizing on August 10, 2016, in Morton County just north of the Standing Rock Sioux Indian Reservation.

32.     As the protest evolved, a group of extremists and "professional protesters" used the event to advance their own causes, fostering large-scale civil unrest and violent confrontations with law enforcement and citizens of North Dakota.  Biased, inaccurate and false social media accounts were used to recruit protesters from throughout the nation and world.  Many of these

trespassers had criminal backgrounds, as evidenced by the *National Sheriff's Association: Pipeline Protest Reports*, including one dated February 10, 2017, that indicated 212 arrestees had a total of 1,396 previous citations and charges for illegal activity. Their criminal histories included a number of offenses such as domestic violence, child abuse, theft, robbery, burglary, driving under the influence of alcohol or drugs, and possession of drugs.

33.     As the protests expanded beyond the unlawful encampments on federal land and became disruptive and violent, seldom did a week pass without a staged protest or riot in one of North Dakota's communities, which often disrupted commerce, resulted in lock downs at government offices and schools, and impeded traffic, endangering both protesters and the traveling public.  Time and again, the trespassers would mobilize within one of their unlawful encampments, and then travel en masse to a nearby North Dakota community to engage in violent and unlawful conduct.  After State and local law enforcement intervened, the trespassers would retreat back to their unlawful encampments on USACE lands, effectively using federal lands as "safe havens" for their unlawful conduct.

34.     Trespassers also traveled from their unlawful encampments to DAPL construction sites, where protest activity turned violent between protesters and security personnel hired by Dakota Access to protect construction workers.  One of the first reports of violence occurred August 15, 2016 – five days after the protests began – when rioters on horseback aggressively pushed back the law enforcement officers manning a barricade line near the DAPL construction site, stormed the construction site, damaged equipment, and reportedly struck a private security guard.

35.     These protests persisted at DAPL construction sites, including a September 6, 2016 incident, where two trespassers attached themselves to construction equipment.

36.     On September 25, 2016, a convoy of 60 passenger vehicles and three school buses traveled from the unlawful encampments to block access to a DAPL construction site.   The trespassers staged and organized these illegal activities from the USACE-managed lands where trespassers' unlawful encampments were located, retreating back to USACE lands after conducting illegal activities, apparently using the illegally occupied federal lands as a safe haven due to the failure of the USACE to enforce the law.   Three security officers were attacked by protesters brandishing a knife and handgun.   Time and again, trespassers deployed the tactics of vandalizing property and attaching themselves to construction equipment.

### *The United States of America's Failures to Enforce the Law and Protect Public Health, Safety, and the Environment*

37.     In the face of this civil unrest and other unlawful, violent and often dangerous conduct by the protesters, the United States of America, by and through USACE, engaged in acts and omissions that not only allowed the increasingly dangerous situation in Morton County to persist for more than eight months, but aggravated the civil unrest and actively encouraged the trespassers.

38.     The lands surrounding Lake Oahe and the Cannonball River through which the DAPL was expected to cross are considered public project lands that are managed by USACE. USACE has a legal responsibility, and specific mandatory legal duties, to enforce the law, protect public safety and the environment, and maintain public order on these public lands.

39.     For example, USACE has a legal obligation to fulfill the mandatory duties outlined in its regulations at 36 C.F.R. Part 327, Guidance ER 1130-2-550, Guidance EP 1130-2-550 and Guidance EC 1130-2-550, which govern the agency's management of certain public project lands.

40.     The USACE's own longstanding regulations state that "[i]t is the policy of Secretary of the Army, acting through the Chief of Engineers, to manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." 36 C.F.R. § 327.1.  The USACE failed to uphold this policy by allowing the unlawful, dangerous and damaging (both to public health and the environment) occupation of federal lands to continue and expand over time, and serve as a base from which unlawful activities on State and private property would be planned and initiated.

41.     The regulations and Guidance mandate that for any activity occurring on USACE-managed land, USACE must issue proper permits in accordance with 36 C.F.R. § 327.19, § 327.21, Guidance, ER 1130-2-550 Appendix N.   The regulations under 36 C.F.R. Part 327 explicitly "prohibit," among other things: i) the construction or existence of any structure; ii) camping in non-designated areas; iii) the occupation as a full- or part-time residence on project lands; and iv) the organization of special events on USACE-managed land, without a lawful permit from USACE.  Implementing Guidance requires that any sponsor of an event "must obtain a receipt/permit" from USACE.  Implementing Guidance states that for all special events with over 50 participants, "liability insurance, obtained by the event holder, that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event is mandatory."  EC 1130-2-550.

42.     As detailed below, at no point in time did the trespassers obtain or USACE issue the required permit to hold a special event, to construct structures on, to set up camps on, or to occupy USACE-managed land.  Not only was it therefore illegal to build the encampments on federal land and use them as staging areas for violent and illegal protests, but USACE's failure to

13

enforce the mandatory permitting requirements were the direct cause of that ongoing illegal conduct.  Had USACE not violated its legal duties, the protesters would have either not been granted permits or been required to disperse and leave, and if granted permits they would have been required to honor permit conditions (including conducting their activities in a manner that was sanitary, safe and did not threaten public health or the environment) and would not have been able to engage in the civil unrest and other unlawful conduct that persisted for nearly a year.

43.    The regulations dictate that "[a]ny violation of any section of this part 327 shall constitute a separate violation for each calendar day in which it occurs." 36 C.F.R. § 327.1. Implementing Guidance 1130-2-550 Chapter 6 specifies that USACE employees' citation authority under 36 C.F.R. § 327.25 to fine or cite individuals who violated 36 C.F.R. Part 327 on USACE-managed land.  The Implementing Guidance states that officials with citation authority "shall . . . enforce 36 CFR Chapter III, Part 327 (Title 36)."  Guidance ER 1130-2-550, Chapter 6. USACE failed to fulfill its mandatory duty to remedy these violations each day that it knew that protesters were violating 36 C.F.R. Part 327.

44.    Implementing guidance for these regulations states that USACE "[o]perations project managers and park rangers shall strive to be visible to the public, primarily to help and assist them, and secondarily, to enforce 36 C.F.R. Chapter III, Part 327 (Title 36)."  Guidance, ER 1130-2-550, Chapter 6(b).  USACE operations managers were neither visible to the public, nor did they take any efforts to enforce 36 C.F.R. Part 327 or to otherwise maintain public order and avoid civil unrest and other unlawful conduct by the trespassers.

45.    Implementing guidance for these regulations also states that "[c]ooperation and continuous coordination shall be maintained with other governmental agencies having collateral interests in parks, recreation, natural resources, law enforcement, and other matters which are of

concern in proper management of the project." Guidance, ER 1130-2-550, Chapter 6(m). USACE failed to maintain appropriate cooperation with local law enforcement to manage USACE lands when the DAPL emergency ensued.

46.     From August 2016 to March 2017, USACE knew that the trespassers were using federal lands as a staging area to conduct illegal activities, that the trespassers long-term occupation of the land was itself illegal, and that the trespassers were violating public health and environmental laws during their unlawful occupation. USACE and Tribe leaders discussed USACE issuing a special use permit for protest activities on many occasions, thus demonstrating USACE's awareness of the permit requirement and its duty to enforce applicable federal requirements and thereby ensure that any activity on federal land was conducted in a lawful manner. However, at no time did USACE issue a permit as required by law.

47.     Furthermore, USACE had early and ongoing access to the same intelligence reports that North Dakota law enforcement agencies were receiving from federal agencies such as the Federal Bureau of Investigation and the Bureau of Indian Affairs, appraising USACE of the extent of the unlawful activity of the trespassers. Those agencies were providing those reports to USACE on the mutual understanding of all three agencies that USACE had undertaken an affirmative duty to protect the protesters, public, and the environment and prevent unlawful and dangerous activities.

48.     On or around August 18, 2016, Errol Doug Crow Ghost Jr. of the Standing Rock Sioux Tribe submitted an application for a Special Use Permit for protest-related activities.

49.     On September 16, 2016, the Corps misleadingly and falsely announced that it had offered a limited Special Use Permit to the Standing Rock Sioux Tribe to occupy federal land south of Cannonball River. However, USACE never actually issued that permit to the Tribe because,

among other things, the Tribe never provided the USACE with the bond required by law to cover any damages from the use and occupation of the federal land.

50.     USACE acknowledged in an October 26, 2016 email that the trespassers had no permit, stating that the Tribe "never completed their application and we are working with an individual to possibly obtain one in the future."  The agent for USACE continued, describing the trespassers, "[b]asically these people are breaking the law."  USACE thus knowingly allowed the trespassers to violate mandatory legal requirements that USACE was responsible for enforcing.

51.     In the meantime, and knowing that applicable law mandated that the trespassers have a permit, USACE negotiated with LaDonna Brave Bull Allard, the property owner of adjacent lands and historian of the Standing Rock Sioux, to potentially issue a different permit on the Sacred Stone Camp she had unlawfully established on USACE property adjacent to her land.  Ms. Allard submitted a second permit application by oral request on or about October 7, 2016.  As with the first announced – but never issued – permit, on October 31, 2016, USACE provisionally announced that Ms. Allard's permit would be issued provided that she obtained the performance bond required by law.  The Tribe never obtained this bond and, again, no valid permit was issued, and the Sacred Stone Camp remained a camp of unlawful trespassers on federal lands.

52.     Indeed, agents of USACE knew that continuing to allow federal lands to be occupied by a large number of trespassers living in unsanitary conditions and despoiling the environment, to be used as staging areas for violent and unlawful activity, and failing to remedy ongoing violations of the same would lead to personal injury and environmental and property damage, and would impose burdens and costs on State and local law enforcement.  During this time, USACE was involved in several planning meetings with State and local law enforcement to manage the crisis.  Nevertheless, USACE legal counsel Thomas Tracey anticipated that issuing

16

*any* permits would enable trespassers to use the land "as a staging area for their illegal activities" and would make "local law enforcement [blame] us for the lack of action in solving the problem." Email from Thomas Tracey, USACE District Counsel, to USACE Staff (October 26, 2016, 11:01 AM).

53.     On or around November 1, 2016, trespassers began using boats and began building an illegal, man-made wooden bridge to cross the Cantapeta Creek setting up additional unlawful encampments in areas north of the Cantapeta Creek on federal USACE-managed land.   In response to this activity, Colonel John Henderson, on behalf of USACE, sent a letter on November 1, 2016 to Morton County Sheriff Kyle Kirchmeier, noting that "[t]he Corps of Engineers has not provided any permits or permissions for anyone to access that area of the federal property that we manage . . . as such the [USACE] would consider these individuals to be trespassers."   USACE Letter to Morton County Sheriff Kyle Kirchmeir (November 1, 2016).   Colonel Henderson, on behalf of the USACE and for the first time since the unlawful protest activities began, requested North Dakota law enforcement assistance, stating that "as a property owner, I am requesting law enforcement assistance in this matter, as needed."   However, the letter specifically noted that it was limiting the request to the area north of the Cantapeta Creek, and not requesting any law enforcement assistance at the other existing unlawful encampments on federal lands, stating that the USACE "is not asking for assistance at this time regarding the inhabitants of the camps south of the Cannonball River, called the Sacred Stone Camp and the Rosebud Camp, or at the Seven Councils Camp (Oceti Sakowin Camp)."   This request for help was thus extremely limited, and did not allow for any meaningful response by North Dakota law enforcement to the trespassers unlawful encampments to the south of the Cantapeta Creek.   Further, the letter was an acknowledgment that the USACE

continued to take responsibility for the Sacred Stone, Rosebud, and Seven Councils (Oceti Sakowin) Camps south of the Cantapeta Creek.

54.     Despite not requesting North Dakota law enforcement assistance south of the Cantapeta Creek, the USACE continued to fail uphold its duties to enforce the law at the Sacred Stone, Rosebud, and Seven Councils (Oceti Sakowin) Camps.  For example, USACE indicated that it wanted to allow a Prayer Event on a tactically sensitive parcel of federal USACE managed land in mid-November 2016, assuring North Dakota law enforcement that "we do not believe that this particular group is a threat for committing crimes."  On November 14, 2016, the Morton County Sheriff's Office advised USACE and the U.S. Marshall Service that it did not have the law enforcement personnel to keep everyone safe at the Prayer Event USACE proposed allowing, which would bring protesters close to the DAPL construction site, and could not support any such event.  USACE stated it would go forward with the event.  U.S. Marshall Paul Ward told USACE officials that its decision to allow protesters "behind all law enforcement defenses" was "disappointing to say the least" and left him "amazed that no one agreed with law enforcement."

55.     Around November 21, 2016, Colonel John Henderson sent a letter to Morton County Sheriff Kyle Kirchmeier rescinding USACE's prior request for North Dakota law enforcement assistance north of Cantapeta Creek.  USACE Letter to Morton County Sheriff Kyle Kirchmeir (Undated).  Colonel John Henderson's letter backtracked, claiming that the State of North Dakota maintains criminal jurisdiction over USACE lands, despite never previously requesting or allowing North Dakota law enforcement personnel to enforce that jurisdiction.  Then, Colonel John Henderson's letter went on to state that "[a]ny request for non-emergency control measures, such as the placement of permanent or temporary structures on the Corps property, to protect adjacent private lands are required to be approved by me after your office has made a

written request."   The letter therefore acknowledged that any structures on the federal land unlawfully occupied by the trespassers required a permit and approval from the USACE, and that the trespassers on the USACE lands were in violation of the USACE's own laws and regulations.

56.    On November 25, 2016, after months of illegal protest activity, Colonel John Henderson, on behalf of USACE, sent a letter to Chairman Dave Archambault II of the Standing Rock Sioux Tribe advising the Tribe that the USACE was closing USACE-managed lands north of the Cannonball River to trespassers pursuant to 36 C.F.R. § 327.12.  USACE Letter to Chairman Dave Archambault II, November 25, 2016.  The letter stated that this closure was "necessary to protect the general public from the violent confrontations between protesters and law enforcement officials that have occurred in this area, and to prevent death, illness, or serious injury to inhabitants of encampments."  It also stated unequivocally that "no member of the general public, to include Dakota Access pipeline protestors, can be on the[] Corps' lands."   USACE warned that any protester found on this land "will be considered trespassing and may be subject to prosecution under federal, state, and local laws."  USACE conceded that at the time it issued this letter "[t]here currently are many Title 36 violations occurring on the Corps' lands north of the Cannonball River, including, but not limited to, unauthorized structures, fires, improper disposal of waste, and camping."

57.    That directive was a further manifestation of USACE's awareness that these violations, including the trespassing, unauthorized structures, fires, improper disposal of waste, and camping had been going on for months and their November 25, 2016 letter could and should have been issued at the outset of the illegal occupation of federal lands, as well as acceptance of responsibility to protect the protesters (as well as the general public).  USACE thereby expressly acknowledged its duty and responsibility to prevent civil unrest and other dangerous unlawful

conduct by the protesters that USACE knew would result in personal injury and property damage. This was reaffirmed when USACE Omaha District Commander Henderson claimed that he was "very concerned for the safety and well-being of all citizens at these encampments on Corps-managed federal land, and we want to make sure people are in a safe place for the winter."

58.    However, in that same letter, USACE immediately undermined any beneficial effect of the closure of federal lands by establishing a so-called "free speech zone" on federal land south of the Cannonball River, which amounted to a federally authorized staging area to conduct the ongoing protests.  The letter suggested that this area was better suited to the provision of health, police, and fire services.  Its contention that this area was safer was knowingly false: the same dangerous, unsanitary, polluted, and unlawful conditions of occupation applied with equal measure to areas south of the Cannonball River.

59.    This "free speech zone" was not a validly permitted area in accordance with 36 C.F.R. Part 327 and its Implementing Guidance, thus USACE effectively invited mass unpermitted trespassing on federal property.  The "free speech zone" had a capacity for more than 50 people, triggering liability insurance and bond requirements that were not complied with by any sponsoring party.  Moreover, protesters continued to violate USACE's regulations in the "free speech zone" by engaging in unpermitted or illegal activities such as residing on the land, erecting structures and residences, digging trenches for the disposal of human and other types of wastes, mutilating animals, destroying grazing lands, releasing pollutants that threatened nearby waters, and creating noise and pollution nuisances.

60.    The USACE's unlawful establishment of the "free speech zone," based on a disingenuous premise, together with USACE's more general failure to fulfill the duty it undertook to prevent dangerous and unlawful protest activity, imposed an extensive burden on the State of

North Dakota and local authorities to provide public services (including medical assistance) to those who were illegally trespassing on federal and State land.  Not only were the trespassers illegally occupying the "free speech" zone, but USACE's letter had the effect of unlawfully and irresponsibly inviting illegal activity to the area as well.  The USACE's letter "encourage[d] members of [the] Tribe, as well as any non-members who support [the Tribe] who are located in the encampments north of the Cannonball River on Corps' lands *to immediately and peacefully move to the free speech zone south of the Cannonball River.*"  USACE Letter to Chairman Dave Archambault II, November 25, 2016.

61.     Even apart from the "free speech zone," USACE did not even enforce its November 25, 2016 letter as to the prohibited areas north of the Cannonball River.  On November 27, 2016, USACE admitted in a press release it could not enforce its letter by stating it "is seeking a peaceful and orderly transition to a safer location, and has no plans for forcible removal" but those trespassers who stayed did so at their own risk and liability.  USACE noted that it could only "encourage" cooperation of protesters to willfully and peacefully move to the "free speech zone" and suggested USACE was coordinating with Tribal leadership to facilitate this encouragement.  But no such fruitful cooperation and encouragement took place.  USACE repeated these sentiments on November 29, 2016, in a list of talking points.  It acknowledged in these talking points that in creating these guidelines for protesters "[t]he U.S. Army Corps of Engineers is required to follow laws and statutes with regard to Title 36 Code of Federal Regulations."

62.     Trespassers continued to unlawfully occupy areas north of the Cannonball River, as well as occupy the unlawfully authorized and unpermitted "free speech zone," and USACE continued to turn a "blind eye" to unlawful occupation and activities by the trespassers.  USACE's failure to enforce its own directive – to say nothing of the regulations and Guidance discussed

above – emboldened trespassers to spill over their unlawful activities to State-owned and private lands.  Essentially, USACE's nonexistent enforcement attracted a host of illegal activities not only to the "free speech zone" but to surrounding areas as well.  Had USACE fulfilled the responsibility it undertook to prevent dangerous unlawful conduct, and performed its mandatory duties under the applicable regulations against the unlawful occupation of trespassers, North Dakota would not have had to expend significant State resources to respond to the emergency that was created, and aggravated, by the federal government.  USACE chose, instead, to let the situation "play out" as a dangerous experiment threatening North Dakota's environment, economy, and the health and welfare of its citizens.  USACE did so despite repeated calls to USACE by State and local law enforcement complaining about – and requesting federal assistance to halt – the use of the illegal encampments as staging areas for violent and unlawful activities.

### *The Trespassers' Violent Tactics and the Need for a Law Enforcement Response*

63.     As the illegal encampments grew in size, and protests continued, so did the magnitude of violent and illegal activity outside of the federal land.  In the face of USACE's abdication of responsibility described above, North Dakota State and local law enforcement and first responders were compelled to protect public safety and uphold the law.

64.     From the onset of the crisis, North Dakota law enforcement officers and state and local officials were brought in to attempt to contain the unlawful encampments.  Those officers were outnumbered and constantly under siege by trespassers based out of the illegal camps on federal property, who used a variety of weaponry, including lasers deployed to blind law enforcement pilots conducting surveillance flights.   The trespassers fired guns; shot arrows at an aircraft; threw Molotov cocktails, rocks, sticks, frozen water bottles, cans and feces at officers; and slashed their vehicle tires.

65.     North Dakota law enforcement encountered one of its most complex and multi-faceted riots on October 27, 2016, when they were forced to deploy non-lethal munitions as rioters threw Molotov cocktails and rocks at officers.  The October 27 event began as officers removed rioter roadblocks used to obstruct and seize North Dakota Highway 1806, as well as removing hundreds of additional trespassers from private property.  Although officers consistently conveyed the message to protesters that they would be arrested if they did not comply, their efforts were met with resistance as rioters ignited fires.

66.     As officers cleared the private property at the roadblock on North Dakota Highway 1806, trespassers erected teepee poles, chained themselves to a vehicle and placed large logs in the middle of North Dakota Highway 1806.

67.     Concurrent with the October 27 event, trespassers deployed the same tactics at another roadblock on a bridge of Morton County Road 134, igniting blockade materials, and damaging construction equipment located northeast of their unlawful Seven Councils (Oceti Sakowin) Camp.  Trespassers on horseback chased a large herd of privately owned buffalo in an attempt to stampede law enforcement.  A State of North Dakota helicopter and airplane assisted in redirecting the buffalo from the law enforcement officers, likely saving many lives (including those of the protesters).

68.     The same day, North Dakota law enforcement arrested a rioter who drew a handgun and fired shots toward officers.  In the evening of October 27, law enforcement encountered rioters at the Backwater Bridge on North Dakota Highway 1806 who set ablaze two large trucks that law enforcement were using to block the highway so additional rioters could not drive to the conflict.

69.     As law enforcement moved forward toward the Backwater Bridge, rioters threw Molotov cocktails and rocks.  Law enforcement moved out of range to a location north of the

Backwater Bridge that thereafter remained a line of demarcation between rioters and law enforcement officers until the following February.

70.     Rioters started numerous fires, including on North Dakota Highway 1806, the Backwater Bridge on North Dakota Highway 1806, a bridge on Morton County Road 134, three pieces of DAPL construction equipment, and numerous vehicles.  During this episode on October 27, 141 individuals were arrested and charged with a myriad of criminal violations.  Local law enforcement was forced to close the Backwater Bridge on North Dakota Highway 1806.  All of these events that took place on October 27 were initiated primarily by protesters using their "safe haven" illegal camps on federal property that was the responsibility of USACE.

71.     Trespassers consistently deployed convoys of school buses, vehicles and horseback riders to block access to DAPL construction sites and North Dakota State roadways.  They frequently conducted simultaneous unlawful actions in an attempt to overwhelm law enforcement resources required to protect public safety.  While protesters primarily targeted Morton County public offices, and in particular the Morton County Law Enforcement Center, they staged countless protests at other communities in North Dakota including the State Capitol and Bank of North Dakota buildings, various courthouses, law enforcement buildings, the Kirkwood Mall, and area banks.

72.     On November 15, 2016, law enforcement responded to protest activity in which approximately 300 protesters, primarily from the "safe haven" of the illegal camps on federal property that was the responsibility of USACE,  blocked interstate commerce on the Burlington Northern Santa Fe railroad tracks west of Mandan, first with a vehicle and then with tree branches and other debris.  They threatened potential derailment of inbound and outbound trains, many of which routinely carry Bakken crude oil.  The event resulted in 25 arrests.  Later that day about 100

protesters marched from the area of the United Tribe Technical College to the offices of the USACE in Bismarck.  These protestors primarily came from the "safe haven" of the illegal camps on federal property that was the responsibility of USACE.

73.     On Thanksgiving Day in 2016, protestors, primarily from the "safe haven" of the illegal camps on federal property that was the responsibility of USACE, attempted to disrupt law enforcement's efforts by conducting concurrent protests in three different locations; the Backwater Bridge, Turtle Hill, and East Main and Memorial Highway in Mandan, where law enforcement observed protesters wearing holsters, gas masks, and carrying slingshots as they blocked roadway intersections.  Protesters' intentional efforts of intimidation were evident when they were seen carrying a dead pig's head mounted on a pole.

74.     On the day after Thanksgiving, protestors, primarily from the "safe haven" illegal camps on federal property that was the responsibility of USACE, conducted additional disruptive protests at the Kirkwood Mall.

75.     The intensity of the confrontations continued to grow throughout fall and early winter, with barbed wire placed between law enforcement and trespassers based in their illegal safe haven camps on federal property, standoffs with North Dakota law enforcement in the vicinity of the Cannonball River, and unsuccessful attempts by trespassers to ignite fires in the proximity of officers.  The most heartbreaking riots occurred when children, some as young as three-years-old, being forced to live in unsafe and unsanitary conditions in the illegal camps, were used as human shields. For example, during an October 22, 2016, standoff, law enforcement reported several small children were present.  On Thanksgiving Day, children were also in attendance when protesters wearing holsters, carrying slingshots, and wearing gas masks staged a protest in Mandan.

25

76.     North Dakota residents were also randomly intimidated by agitators.  For example, 75 rioters on horseback, primarily from the "safe haven" of the illegal camps on federal property that was the responsibility of USACE, invaded a private farm in the North Dakota town of St. Anthony.  North Dakota parents complained that protest activities placed their children under stress because of repeated North Dakota school lock downs for schools as far away as Bismarck and Mandan.  After protests began, Morton County law enforcement officials reported an increase in vandalized equipment, stolen hay, trespassing on private lands, and missing livestock.  The North Dakota Stockmen's Association relayed that butchered cattle and bison, and other dead and missing livestock were reported near the site of the illegal camps on federal lands.  In late December 2016 and again in early January 2017, the North Dakota Game and Fish Department released photos and video of two separate incidents that indicated illegal possession or killing of deer, in or near the main illegal camp on USACE lands on the north side of the Cannonball River in southeastern Morton County.

***Further Detail on North Dakota's Response***

77.     From the onset of this emergency, the Governor of North Dakota and local and State law enforcement officials stated unequivocally their overarching goal was simply to  protect public safety, environment and natural resources, and uphold the law.  That effort came at considerable cost, taxing both responders and resources.  Measures required to prevent and respond to violent attacks readily surpassed local, and State resources.  This emergency would not have occurred, and North Dakota would not have had to expend these resources had USACE fulfilled its legal responsibility to enforce mandatory permitting and other legal requirements and not allow those who engaged in unlawful and violent conduct to use illegal camps on federal property as their safe haven and center of operations.

78.     Because USACE abdicated its responsibility to prevent and then close the illegal encampments on federal land, and otherwise to enforce law and order, most of the burden of keeping the peace and protecting public safety (including that of the trespassers) fell on local law enforcement and other emergency response officials in Morton County, North Dakota.  Morton County Sheriff's deputies, police officers, North Dakota Highway Patrol troopers, National Guardsmen, and emergency response and medical personnel, working exhaustive hours under strenuous circumstances, exemplified the best in law enforcement by diffusing tense situations and protecting both residents and protesters.  Their efforts required tactical and technical public safety support from North Dakota's law enforcement agencies, State's Attorneys Offices, ambulance services, fire departments and emergency management agencies.

79.     Several North Dakota State agencies as well as several county, municipal and tribal jurisdictions supplemented the efforts by Morton County public safety agencies.

80.     Given the technical expertise required for protest response, the Morton County Sheriff requested the Cass County Sheriff to provide incident command response and to collaborate on the development of strategies that effectively diffused many tense standoffs with protesters.

81.     North Dakota Governor Dalrymple activated a North Dakota National Guard military police unit to provide administrative duties and support traffic control points, required due to multiple occasions where protesters would impede traffic or otherwise physically obstruct North Dakota Highway 1806.  Law enforcement established traffic control points, a Tactical Operations Center and a Forward Operating Base for field logistical support including refueling, communication, and meals for responders and medical resources, as required.

82.     Assistance also came from other States whose Governors authorized the deployment of law enforcement resources through the Emergency Management Assistance Compact.  Wisconsin law enforcement personnel arrived on October 9, 2016, followed by ten other States:  Alabama, Indiana, Kentucky, Louisiana, Minnesota, Montana, Nebraska, Ohio, South Dakota and Wyoming.  Approximately 1,700 personnel from 11 States and 23 State agencies were involved at one point or another during the response.  Their support reinforced efforts by North Dakota's officers to prevent and respond to unlawful and violent activities and keep North Dakota's communities safe.  However, North Dakota incurred substantial costs for this assistance. North Dakota has reimbursed these entities for their assistance and these costs are included in the damages asserted herein.

83.     As the protests grew increasingly more violent, a variety of declarations and orders were issued in addition to the lawful deployment of law enforcement and first responder resources. Specifically:

84.     The Morton County Commission issued an emergency declaration on August 15, 2016 (followed by Sioux County on February 24, 2017, and Emmons County on February 27, 2017).

85.     On August 16, 2016, U.S. District Judge Daniel Hovland issued a temporary restraining order against protesters unlawfully interfering with DAPL construction operations.

86.     Governor Dalrymple issued Executive Order 2016-04 on August 19, 2016, proclaiming an emergency, thereby enacting utilization of the State Emergency Operations Plan.

### *USACE Confirms the Responsibility it Undertook by Belatedly Taking Some Action as the Protests Wind Down*

87.     On January 20, 2017, the Standing Rock Sioux Tribal Council issued Resolution 007-17 requiring all individuals at the illegal encampments on federal land in and around the Cannonball area to vacate, in response to extreme winter conditions, unsafe environment for elders and youth, and declining revenues at Prairie Knights Casino, a major source of funding for the Tribe.

88.     To this point, USACE – despite its constant presence at and around the protest site, and despite its legal duty to prevent unlawful encampments on federal land – had completely failed to prevent or respond to the ongoing illegal occupation of federal lands being used as staging areas for the violent protests, riots, and other unlawful conduct, and as set forth above, by its actions and inactions had actually aggravated and encouraged the unlawful conduct and allowed the trespassers, including their children and elderly, to reside on federal lands in unsafe and unsanitary conditions in violation of applicable federal regulations.

89.     Despite failing to respond to illegal activity directly, USACE continually acknowledged the severity of the ongoing crisis to North Dakota, and reaffirmed its intention and obligation to prevent unlawful activity on federal land.  For example, on January 24, 2017, the Deputy District Commander inquired to the Morton County Sheriff regarding dump trucks being used by the trespassers to carry fill material to their illegal camps.  The Commander noted that USACE would issue a cease and desist for this unpermitted activity to the entity responsible.

90.     Finally, on February 3, 2017, USACE took action to begin to clear the illegal encampments and associated unlawful activities that it had encouraged and/or ignored in the

preceding months.  It issued a letter to the Standing Rock Sioux Tribe leader David Archambault II advising him to assist clearing the area by February 22, 2017.

91.    Pursuant to USACE regulations, this letter acknowledged what North Dakota had been saying all along.  The letter stated:

> Safety remains our number one priority. Due to record snowfall and long periods of frigid temperatures in the Bismarck and Fort Yates area this year, there is a high potential for spring flooding at the mouth of the Cannonball River due to spring runoff and ice jams.  We fear that without closing the floodway, there will be injuries and loss of life due to flooding.  We also fear that - absent remediation - there will be risk of environmental damage due to debris and waste being washed into the Cannonball River and Oahe Reservoir. Therefore, we are extending the closure of Corps-managed federal property described in the notice I provided to you by letter dated November 25, 2016 to include specifically the Corps-managed federal property adjacent to the Cannonball River on the south bank. For your reference, please find enclosed a map which delineates the Corps-managed property adjacent to the Cannonball River. There are currently multiple violations of the regulations governing public use of these Corps-managed federal lands (36 C.F.R. §327 et seq.) both south and north of the Cannonball River, which pose a threat to the fragile ecosystem in this area. Specifically, these violations include unauthorized vehicles, improper disposal and burning of trash, improper disposal of human waste, unauthorized fires, unauthorized structures, and unauthorized habitation that create a high likelihood that garbage, debris, building materials, vehicles, personal property, and hazardous materials will be washed into the Cannonball River and Oahe Reservoir creating an unacceptable level of environmental damage.

The letter further confirmed USACE's responsibility to manage the land from the beginning to end:

> In an effort to support ongoing initiatives to clean these areas, prevent injury and loss of life, and mitigate the high risk of environmental impacts to the waters of the Cannonball River and Oahe Reservoir, we are providing notice to camp inhabitants that all personal property will be removed immediately from this area so that remediation of the property prior to any spring flooding can continue to move forward. Owners of personal property, vehicles, or structures currently located on these lands may contact the Oahe Project Office at (605) 224-5862, extension 3420, to coordinate a time to enter this property to retrieve these items.

92.     Only after that time did the several month-old emergency begin to subside as trespassers began to leave the area.  On February 23, 2017, USACE directly addressed the trespassers who remained in the area and finally stepped in to assist State and local law enforcement.

93.     However, not all illegal activity stopped immediately.  On February 22, 2017, the morning the Seven Councils (Oceti Sakowin), Rosebud and Sacred Stone illegal encampments on federal land were to be vacated, the trespassers refused access to cleanup crews and set approximately 20 fires.  Throughout the morning and early afternoon, fires continued, often accompanied by explosions as structures and debris burned.  Unfortunately, a 17-year-old girl and 7-year-old boy suffered serious burns during one explosion and were transported to a Bismarck hospital by North Dakota medical personnel.  A group of 100 trespassers emerged shortly after noon to leave the unlawful Seven Councils (Oceti Sakowin) Camp.  However, a short time later, other trespassers blocked the north entrance of the illegal camp with a metal gate and barbed wire. Trespassers who gathered in front of the camp ignored lawful orders by North Dakota law enforcement personnel to disperse, and ten were subsequently arrested.  Staff from the North Dakota Departments of Health, Human Services and Emergency Services established a Travel Assistance Center so trespassers who wanted to voluntarily leave the area could receive assistance.

94.     The following day, with minimal support from USACE, North Dakota law enforcement began to systematically clear the illegal camps, inspecting each structure to ensure it was unoccupied and arresting 47 trespassers who refused to disperse.  Construction equipment followed, as North Dakota law enforcement personnel and workers demolished wooden structures, while appropriately disassembling and moving structures and items determined to have cultural or ceremonial significance.  Cleanup of illegal camp sites, primarily done by North Dakota law

enforcement personnel and contractors hired by North Dakota and local governments, but assisted by USACE personnel, continued through March 9, 2017.

95.     It is not surprising, given the federal government's authority and duty with respect to the management of federal lands, that some active involvement by USACE was necessary to end the illegal and unsafe occupation of federal lands.   Had USACE fulfilled its legal obligations earlier and enforced mandatory federal legal requirements sooner, the illegal safe haven camps and much of the associated illegal and dangerous activity would have been avoided.

96.     In the aftermath of the illegal occupation, cleanup crews from North Dakota and local agencies disposed of 21,480,000 pounds of trash and debris generated by trespassers who placed in jeopardy the very land and water they had espoused to protect, as well as their own health and safety (including that of their children and elders). In addition to large volumes of human waste and trash, trespassers abandoned approximately 45 large apparatuses such as generators, cars, vans, trucks, trailers, buses, campers, motor homes, snow machines, and log splitters.

97.     In February 2017, law enforcement allowed emergency vehicles through a traffic control point south of the Backwater Bridge.  In the next phase, pilot cars escorted northbound and southbound traffic between the Cannonball Bridge and Fort Rice before re-opening the Backwater Bridge portion of North Dakota Highway 1806 to regular traffic on March 21, 2017.

98.     USACE's assistance during this winding down period was far too little and too late – North Dakota had already expended very substantial resources protecting public safety, cleaning debris, and remedying severe environmental and property damage stemming from USACE's failure to act earlier to fulfill its mandatory duties under its own regulations and allowing unpermitted activity to flourish.  Despite nominal support from USACE during this period, North

Dakota shouldered the majority of the burden to clear the area of protesters and clean up the aftermath of their eight-month-long occupation.

### *Resources Deployed by North Dakota*

99.     As a result of the USACE supported and unchecked illegal activity on USACE lands, and the significant law enforcement resources necessary to address the illegal activity, the State of North Dakota was forced to expend significant State resources at a cost of $38,005,071.66. This was particularly burdensome because it occurred during an economic downturn as Bakken oil production slowed considerably and generated less revenue for the State.   The unlawful activities also placed North Dakota law enforcement officials, first responders, and citizens in life-threatening situations, and also threatened the health and safety of the protesters themselves, including those protesters who did not engage in unlawful conduct.

100.     Volunteers are always at the heart of response to natural and man-made emergencies, providing support to both responders and survivors.   However, adversarial threats such as unlawful and violent activity are not within the scope of the mission of most volunteer organizations or private individuals.   Hence, response by volunteer organizations was limited to sheltering protesters who were unprepared for extreme winter conditions.   Local North Dakota churches provided resources, and Lutheran Social Services of North Dakota mobilized resources to support these efforts, if required.

101.     Unlike other emergencies North Dakota has addressed, response to the violent and unlawful activities described in this Complaint focused primarily on utilizing law enforcement and emergency response-related resources to prevent deaths or widespread injuries, and to provide necessary sanitation and other support services.   The support from State (both North Dakota and

neighboring States) and local authorities was impressive. Approximately 1,400 law enforcement officers assisted with maintaining public safety, dedicating over 300,000 hours to the effort.

102. The adverse effects of the emergency created by USACE's tolerance for illegal encampments on federal land occurred at the State and local levels. Morton County, which was at "ground zero," reports the emergency adversely affected virtually every one of the county's 185 employees, with costs to date estimated at $3.4 million. Local in-state resources supporting Morton County's efforts included: 26 County Sheriff's Departments, 16 local police departments, two Local State's Attorneys Offices, four Local Emergency Management Offices, and 13 local ambulance service providers. These efforts have been supported by 23 North Dakota State agencies, three Congressional Offices, eleven other States and 13 agencies staffing the State Emergency Operations Center.

103. State agencies deployed to protect public safety included: the Governor's Office, Air National Guard, Army National Guard, Adjutant General, Attorney General (including the Bureau of Criminal Investigation), Bank of North Dakota, Department of Corrections and Rehabilitation, Division of Homeland Security, North Dakota Forest Service, Game and Fish, Health Department, North Dakota Highway Patrol, State Historical Society of North Dakota, Department of Human Services, Indian Affairs Commission, Information Technology Department, Parks and Recreation Department, Parole and Probation, Public Service Commission, the State and Local Intelligence Center, State Radio, Transportation Department and State Water Commission. As an example of commitment by these agencies, the North Dakota Highway Patrol logged 612 aircraft hours during the emergency, an amount pilots typically fly in the course of four years.

104.     North Dakota also received support from its Congressional delegation, United States Senator John Hoeven, United States Senator Heidi Heitkamp and United States Representative Kevin Cramer.

105.     Additional resources were provided by North Dakota partners including: Chaplain Services, the National Sheriffs Association, North Dakota Association of Counties, Emergency Management Assistance Compact, Ambulance Services, North Dakota Stockmen's Association and the North Dakota Incident Management Assistance Team.

106.     Throughout the protest, State and local law enforcement officials worked hard to maintain peace and public safety.  State and local leaders worked with the Standing Rock Sioux Tribe to peacefully end the illegal occupation and restore relationships.  North Dakota ensured the inspection and eventual reopening of the Backwater Bridge to allow more direct routes for emergency vehicles and enable commerce between Bismarck-Mandan and southern Morton County and Sioux County.  The State continued to expend significant resources to clear and clean the camps on USACE-managed land before spring melting would have introduced enormous volumes of hazardous waste into the Missouri and Cannonball Rivers.

## SUM CERTAIN

107.     North Dakota incurred $38,005,071.66 that it was forced to expend due to the federal government's refusal to enforce the law, prevent illegal conduct that was openly conducted on and from federal property, and respond for over eight months to an increasingly dangerous emergency.  This includes the environmental and property damages that North Dakota is still remedying due to this lack of response as estimated and budgeted by North Dakota staff, and interest appurtenant to loans taken out to fund the cost of law enforcement and emergency

personnel.  North Dakota demands recovery of all damages described herein in the sum certain amount of $38,005,071.66.

## CLAIM ONE
*Public Nuisance*
*N.D. Cent. Code. Section 42-01-07*

108.    Plaintiff North Dakota incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

109.    North Dakota law imposes a duty of care on individuals and entities to not create a public nuisance by either act or omission.

110.    The failure by the United States of America, by and through its agency USACE, to prevent violent, dangerous and unlawful activities emanating from illegal encampments on federal land, including by not performing USACE's mandatory duty to issue proper use permits to protesters created a public nuisance that annoyed, injured, or endangered the health and safety of others, unlawfully interfered, obstructed, and rendered dangerous for passage State lands, and rendered other persons insecure in life or in the use of property.

111.    Pursuant to USACE regulations, the USACE had a mandatory duty to fulfill its obligations outlined in 36 C.F.R. Part 327 and Implementing Guidance, which govern prohibitions of activities on federal land without a proper permit.

112.    The failure of USCAE to issue required permits and/or fulfill its mandatory duties pursuant to 36 C.F.R. Part 327 and Implementing Guidance directly led to the nuisance that such unlawful activities created.

113.    This nuisance affected the entire community surrounding the protest area, specifically Morton County.

114.    This public nuisance caused by the United States of America required North Dakota, by and through its agencies, to expend significant State resources on abating the nuisance totaling $38,005,071.66.

## CLAIM TWO
*Negligence*

115.    Plaintiff North Dakota incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

116.    The United States of America, by and through its agency USACE, must fulfill its mandatory duties pursuant to C.F.R. Part 327 and Implementing Guidance, which govern prohibitions of activities on federal land without a proper permit.

117.    The United States of America, by and through its agency USACE, was negligent in breaching this duty by failing to fulfill its obligations under these regulations and Implementing Guidance.  USACE continued to negligently breach its duty every day that it stood by while trespassers brazenly and openly violated federal law that USACE was responsible to enforce.

118.    Because of the USACE's actions and inactions, North Dakota, by and through its agencies and local governments within the State, was forced to expend $38,005,071.66 in State resources to remedy the emergency and repair property damage resulting from such emergency created by USACE's failure to fulfill its duties under the law.

## CLAIM THREE
*Negligence – Good Samaritan*

119.    Plaintiff North Dakota incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

120.    The United States of America, by and through its agency USACE, by reason of its ongoing presence at and near the DAPL protest site and explicit statements regarding its intent to

protect the DAPL protesters and prevent unlawful dangerous activity, and through specific affirmative directives aimed at such protection and prevention, affirmed that it had a legal duty to responsibly and effectively protect the protesters and the nearby public and prevent property damages at and near the DAPL protest site.

121.    State, local and tribal authorities, and other third parties, all recognized and understood, based on the actions and active involvement USACE described in this complaint, that the United States of America, by and through USACE, had  assumed the legal duty mentioned in paragraph 119, and North Dakota and Morton County in particular relied on their objective understanding that the United States of America, by and through USACE, would responsibly and effectively fulfill the legal duty it had undertaken to enforce the law and protect public health, safety and the environment on federal lands.

122.    In fact, however, the United States of America, by and through USACE, was negligent in performing the legal duty it had undertaken, in that, among other things, it failed to take appropriate measures, including but not limited to the enforcement of applicable federal law with respect to trespass, and failed to maintain safe, sanitary, and environmentally correct conditions on federal property, to protect the DAPL protesters, and the nearby public and prevent property damage at and near the DAPL protest site.

123.    Because of the negligence of the United States of America, by and through USACE, in performing the legal duty it undertook, North Dakota and Morton County were required to provide necessary law enforcement and other emergency services and in doing so incurred very substantial costs that would have been avoided had the United States of America, by and through USACE, performed the duty it undertook with reasonable care.

## CLAIM FOUR
*Gross Negligence*

124.    Plaintiff North Dakota incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

125.    The United States of America, by and through its agency USACE, must fulfill its mandatory duties pursuant to C.F.R. Part 327 and Implementing Guidance, which govern prohibitions of activities on federal land without a proper permit or that violate health, safety or environmental requirements.

126.    The United States of America, by and through its agency USACE, recklessly breached this mandatory duty when it took no care to fulfill its duties under the regulations and Implementing Guidance.  USACE continued to recklessly breach its duty every day that it stood by while trespassers brazenly and openly violated federal law that the USACE was tasked to enforce.

127.    USACE was willful in its omission of due care. Through its own observations and contact with local law enforcement, USACE was aware that trespassers were engaging in unlawful conduct and using their unlawful occupation of federal lands a base for that unlawful conduct, and knew that the trespassers unlawful conduct was damaging State land and depleting State resouces. Further, USACE encouraged trespassers to engage that unlawful conduct by failing to enforce its own laws and regulations, making affirmative statements setting up "free speech zones" and indicating that permits (which were never issued, and were never planned to be issued) were pending for the unlawful encampments.

128.    Because of the USACE's actions and inactions, North Dakota, by and through its agencies and local governments within the State, was forced to expend $38,005,071.66 in State

resources to remedy the emergency and repair property damage resulting from such emergency created by USACE's failure to fulfill its duties under the law.

## **CLAIM FIVE**
### *Civil Trespass*

129.    Plaintiff North Dakota incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

130.    The United States of America, by and through its agency USACE, must fulfill its mandatory duties pursuant to C.F.R. Part 327 and Implementing Guidance, which govern prohibitions of activities on federal land without a proper permit.

131.    The United States of America, by and through its agency USACE, failed to fulfill its mandatory duty under regulations requiring a permit for the protest activities occurring after August 2016.  Further, it announced an unlawful and unpermitted "free speech zone."

132.    By intentionally ignoring its permitting regulations and establishing an unlawful "free speech zone," the United States of America, by and through its agency USACE, caused and encouraged trespassers to use federal property as a base for illegal conduct on federal, State land, and to overflow and trespass onto State-owned land.  Through both its own observations and contact with local law enforcement, the agency was aware that trespassers based on federal land were engaged in illegal conduct on, and damaging State land.

133.    Because of the USACE's actions and inactions, North Dakota, by and through its agencies and local governments within the State, was forced to expend $38,005,071.66 in State resources to remedy the emergency and repair property damage resulting from such emergency created by USACE's failure to fulfill its duties under the law.

## CONCLUSION

For the reasons stated herein, the State of North Dakota respectfully asks the Court to find the United States of America, by and through the Department of the Army and the United States Army Corps of Engineers, liable for the tort claims asserted herein and to promptly pay all damages incurred by North Dakota in the sum certain amount of $38,005,071.66.

Respectfully submitted this 18th day of July, 2019.

WAYNE STENEHJEM
ATTORNEY GENERAL

Paul M. Seby
Special Assistant Attorney General
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

Matthew Sagsveen
Solicitor General
500 N. 9th Street Bismarck, ND 58501
Phone: (701) 328-2595
Email: masagsve@nd.gov

COUNSEL FOR PLAINTIFF
STATE OF NORTH DAKOTA