**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:19-cv-150-DLH- |
| | ) | CRH |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**UNITED STATES' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

## **Table of Contents**

Table of Authorities ........................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

   I.   Factual Allegations ...................................................................................................... 2

      A.  Protesters Gathered on Corps-Managed Land Without Permission................................ 2

      B.  The Corps Communicated With Local Law Enforcement and Tribal Leadership Concerning Problems the Protesters Caused. ........................................................... 3

      C.  The Corps Assisted with the Clearing and Clean-Up of the Protest Camps on Corps-Managed Property. .................................................................................................. 4

   II.  Statutory and Regulatory Overview......................................................................... 4

      A.  The Corps has Authority to Manage Certain Federal Lands and Issue or Deny Special-Use Permits. .............................................................................................. 4

      B.  The Corps Has Limited Authority to Enforce its Rules and Regulations on Corps-Managed Lands. ...................................................................................................... 6

      C.  Corps Officers Have Many Tools Available in Exercising Their Limited Enforcement Authority. .............................................................................................................. 8

LEGAL STANDARDS ........................................................................................................ 9

ARGUMENT ....................................................................................................................... 9

   I.   The FTCA's "Discretionary Function Exception" Bars North Dakota's Claims. .............. 9

      A.  Overview of the Discretionary Function Exception......................................................... 9

      B.  The Corps' Response to Trespassers Involves Judgment and Choice. ........................ 11

      C.  The Corps' Permitting and Enforcement Decisions Are Susceptible to Policy Analysis....................................................................................................................... 17

   II.  North Dakota's Claims Fall Outside the Scope of the FTCA's Waiver of Sovereign Immunity Under 28 U.S.C. § 1346(b)(1). ................................................................... 21

      A.  North Dakota's Claims for Recovery of Emergency Response Costs Are Not Cognizable Claims for "Injury or Loss of Property." ......................................................... 22

      B.  North Dakota's Public Nuisance Claim is Not Cognizable Under the FTCA Insofar as the Claim is Not Premised on Negligent Conduct. .......................................................... 24

      C.  North Dakota's Claims Do Not Give Rise to Liability "In Accordance With the Law of the Place Where the Act or Omission Occurred." ........................................................ 26

      D.  North Dakota's Claims Do Not Satisfy the FTCA's "Private Analog" Requirement. .. 33

CONCLUSION...................................................................................................................... 34

## Table of Authorities

<u>**Cases**</u>

*A.O. Smith Corp. v. United States*,
   774 F.3d 359 (6th Cir. 2014) ................................................................................ 19

*Adams v. United States*,
   319 U.S. 312 (1943) ................................................................................................ 6

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ................................................................................................ 9

*Barnes v. United States*,
   448 F.3d 1065 (8th Cir. 2006) .............................................................................. 33

*Bellecourt v. United States*,
   994 F.2d 427 (8th Cir. 1993) ................................................................................ 23

*Berkovitz v. United States*,
   486 U.S. 531 (1988) .............................................................................................. 10

*Blackfeet Hous. v. United States*,
   No. CV 13-66-GF-BMM-JTJ, 2015 WL 8751652 (D. Mont. Dec. 14, 2015) ........ 23

*Buckler v. United States*,
   919 F.3d 1038 (8th Cir. 2019) .............................................................................. 33

*Chamley v. Khokha*,
   730 N.W.2d 864 (N.D. 2007) ............................................................................... 31

*Charles Burton Builders, Inc. v. United States*,
   768 F. Supp. 160 (D. Md. 1991) .......................................................................... 23

*City of Imperial v. Dep't of the Navy*,
   No. 3:15-cv-02149-L-KSC, 2016 WL 3419220 (S.D. Cal. June 22, 2016) ...... 23, 24

*CNA v. United States*,
   535 F.3d 132 (3d Cir. 2008) ................................................................................ 21

*Dakota Access, LLC v. Archambault*,
   No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sept. 16, 2016) ............................. 19

*Dalehite v. United States*,
   346 U.S. 15 (1953) ........................................................................................... 25, 26

*Demery v. U.S. Dep't of Interior*,
   357 F.3d 830 (8th Cir. 2004) ............................................................................... 10

*Deuser v. Vecera*,
    139 F.3d 1190 (8th Cir. 1998) ........................................................................ 13, 17

*Dist. of Columbia v. Air Fla., Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984) ........................................................................ 24

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006) ........................................................................................ 21

*Drevlow v. Lutheran Church, Mo. Synod*,
    991 F.2d 468 (8th Cir. 1993) ............................................................................ 9

*Duff v. United States ex rel. U.S. Air Force*,
    999 F.2d 1280 (8th Cir. 1993) .......................................................................... 25

*Dunaway v. United States*,
    136 F. Supp. 2d 576 (E.D. La. 1999) ................................................................ 13

*Dykstra v. U.S. Bureau of Prisons*,
    140 F.3d 791 (8th Cir. 1998) ............................................................................ 19

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994) .................................................................................... 9, 21

*Fla. Auto Auction of Orlando, Inc. v. United States*,
    74 F.3d 498 (4th Cir. 1996) .............................................................................. 30

*Flynn v. Nickerson*,
    177 A.3d 468 (R.I. 2018) ................................................................................. 28

*Ga. Cas. & Sur. Co. v. United States*,
    823 F.2d 260 (8th Cir. 1987) ............................................................................ 17

*Gelley v. Astra Pharm. Prods., Inc.*,
    610 F.2d 558 (8th Cir. 1979) ............................................................................ 34

*Glaude v. United States*,
    No. 4:07-CV-069, 2009 WL 2513613 (D.N.D. Aug. 12, 2009) ............................ 32

*Green Acres Enters., Inc. v. United States*,
    418 F.3d 852 (8th Cir. 2005) ............................................................................ 34

*Hart v. United States*,
    630 F.3d 1085 (8th Cir. 2011) .......................................................................... 17

*Herden v. United States*,
    726 F.3d 1042 (8th Cir. 2013) ........................................................ 10, 11, 16, 18

*Hurt v. Freeland*,
    589 N.W.2d 551 (N.D. 1999) ................................................................. 27, 28

*Hydrogen Tech. Corp. v. United States*,
    831 F.2d 1155 (1st Cir. 1987) ..................................................................... 25

*Kappenman v. Klipfel*,
    765 N.W.2d 716 (N.D. 2009) ...................................................................... 26

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ...................................................................................... 6

*Klett v. Pim*,
    965 F.2d 587 (8th Cir. 1992) ................................................................. 27, 33

*Knoff v. Am. Crystal Sugar Co.*,
    380 N.W.2d 313 (N.D. 1986) ................................................................. 24, 25

*Laird v. Nelms*,
    406 U.S. 797 (1972) .................................................................................... 25

*Lesoeur v. United States*,
    21 F.3d 965 (9th Cir. 1994) ........................................................................ 21

*Loeffler v. Frank*,
    486 U.S. 549 (1988) .................................................................................... 21

*Luoni v. Berube*,
    729 N.E.2d 1108 (Mass. 2000) ................................................................... 28

*Madler v. McKenzie Cty.*,
    467 N.W.2d 709 (N.D. 1991) ...................................................................... 29

*Mayfield v. United States*,
    365 F. Supp. 3d 791 (W.D. Tex. 2019) ....................................................... 19

*McDowell v. Gillie*,
    626 N.W.2d 666 (N.D. 2001) ...................................................................... 29

*Metter v. United States*,
    785 F.3d 1227 (8th Cir. 2015) ............................................................... 10, 18

*Myers v. United States*,
    17 F.3d 890 (6th Cir. 1994) ........................................................................ 32

*Navarette v. United States*,
    500 F.3d 914 (9th Cir. 2007) ...................................................................... 13

*Palmer v. 999 Quebec, Inc.*,
    874 N.W.2d 303 (N.D. 2016) ........................................................ 26, 27

*People of California v. United States*,
    307 F.2d 941 (9th Cir. 1962) ........................................................ 22

*Pierce v. Staley*,
    587 N.W.2d 484 (Iowa 1998) ........................................................ 28

*Pierce v. United States*,
    804 F.2d 101 (8th Cir. 1986) ........................................................ 12

*Prelvitz v. Mislop*,
    831 F.2d 806 (8th Cir. 1987) ........................................................ 18

*Rassier v. Houim*,
    488 N.W.2d 635 (N.D. 1992) ........................................................ 24, 26

*Redmond v. United States*,
    518 F.2d 811 (7th Cir. 1975) ........................................................ 13

*Riley v. United States*,
    486 F.3d 1030 (8th Cir. 2007) ........................................................ 18, 19

*Sagan v. United States*,
    342 F.3d 493 (6th Cir. 2003) ........................................................ 31

*Saltsman v. Sharp*,
    803 N.W.2d 553 (N.D. 2011) ........................................................ 27

*Schaefer v. Indymac Mortg. Servs.*,
    731 F.3d 98 (1st Cir. 2013) ........................................................ 31

*Smith ex rel. Fitzsimmons v. United States*,
    496 F. Supp. 2d 1035 (D.N.D. 2007) ........................................................ 14, 15, 16, 17

*Sorace v. United States*,
    788 F.3d 758 (8th Cir. 2015) ........................................................ 27, 33

*Stables v. United States*,
    366 F. Supp. 2d 559 (S.D. Ohio 2004) ........................................................ 30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    205 F. Supp. 3d 4 (D.D.C. 2016) ........................................................ 20

*State of Idaho ex rel. Trombley v. U.S. Dep't of Army, Corps of Eng'rs*,
    666 F.2d 444 (9th Cir. 1982) ........................................................ 23

*State of Oregon v. United States*,
  308 F.2d 568 (9th Cir. 1962) ............................................................... 22

*Sutton v. Earles*,
  26 F.3d 903 (9th Cir. 1994) ................................................................. 14

*Tibert v. Slominski*,
  692 N.W.2d 133 (N.D. 2005) .............................................................. 32

*Tracor v. United States*,
  933 F.2d 663 (8th Cir. 1991) ............................................................... 13

*Turbe v. Virgin Islands*,
  938 F.2d 427 (3d Cir. 1991) ................................................................ 31

*United States v. Faneca*,
  332 F.2d 872 (5th Cir. 1964) ............................................................... 18

*United States v. Gaubert*,
  499 U.S. 315 (1991) ............................................................... 9, 10, 16

*United States v. Mitchell*,
  463 U.S. 206 (1983) ............................................................................. 9

*Utah Power & Light Co. v. United States*,
  243 U.S. 389 (1917) ................................................................... 6, 7, 8

## Statutes

16 U.S.C. § 460d ................................................................. 5, 6, 7, 15

28 U.S.C. § 1346(b) ................................................................. 21, 26

28 U.S.C. § 1346(b)(1) ............................................................... passim

28 U.S.C. § 2674 ............................................................................. 33

28 U.S.C. § 2680(a) ........................................................................... 1

33 U.S.C. § 2328a(a)(1) ............................................................... 5, 12

40 U.S.C. § 3112(c) .......................................................................... 6

## Rules

Fed. R. Civ. P. 12(b)(1) ................................................................. 1, 9

**Regulations**

36 C.F.R. Part 327 .................................................................... 11, 12, 13, 14, 27

36 C.F.R. § 327.1 ............................................................................................ 20

36 C.F.R. § 327.1(a) ..................................................................................... 5, 17

36 C.F.R. § 327.1(g) ................................................................................... 12, 13

36 C.F.R. § 327.19 ....................................................................................... 5, 11

36 C.F.R. § 327.21(b) ........................................................................................ 6

36 C.F.R. § 327.25 ...................................................................................... 7, 15

36 C.F.R. §§ 327.21(a) ..................................................................................... 5

36 C.F.R. §§ 327.8 ............................................................................................ 6

36 C.F.R. Chapter III ...................................................................................... 13

**Other Authorities**

Pub. L. No. 78-534 ............................................................................................ 6

## INTRODUCTION

This case arises out of the United States Army Corps of Engineers' ("Corps") management of federal land and the Corps' response to the unauthorized occupation of certain Corps-managed lands. For more than eight months in 2016 and 2017, protesters gathered on property near the Standing Rock Sioux Reservation in North Dakota—including private property, state property, tribal property, and federal property managed by the Corps—to oppose construction of the Dakota Access Pipeline ("DAPL"). Protesters did not receive permission from the Corps before setting up camps on Corps-managed property. Indeed, North Dakota repeatedly and correctly refers to the protestors as trespassers throughout its Complaint. Although the protests began peacefully, tensions escalated due to conflicts between protesters, private security firms, and state and local law enforcement agencies, resulting in hundreds of arrests and several dangerous incidents involving firearms and other weapons. The State of North Dakota brings this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680, seeking reimbursement from the United States for more than $38 million in expenses that the State allegedly incurred in responding to the protests. North Dakota asserts state-law claims for public nuisance, negligence, negligence under a good Samaritan theory of liability, gross negligence, and civil trespass.

The United States moves to dismiss this case under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction for two reasons. First, the United States has not waived sovereign immunity for any claim based on the performance or non-performance of "a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Second, none of North Dakota's claims are within the scope of the waiver of sovereign immunity under 28 U.S.C. § 1346(b)(1).

## BACKGROUND

I.     **Factual Allegations**[1]

    A.     **Protesters Gathered on Corps-Managed Land Without Permission.**

Around August 10, 2016, members of the Standing Rock Sioux Tribe and other individuals and groups began migrating onto Corps-managed property, without first obtaining permission from the Corps, to protest construction of the DAPL under Lake Oahe near the Standing Rock Sioux Reservation in North Dakota.  Doc. 1 ¶ 24.  Although the protests began as a peaceful, prayerful event, the protests turned violent at times, and on several occasions in August and September 2016, protesters damaged equipment at the DAPL construction site and reportedly struck private security guards at sites off of Corps-managed property.  *Id.* ¶¶ 34–36.  On September 9, 2016, several federal agencies, including the Department of the Army and the Department of Justice, issued a joint statement, explaining that although the agencies recognized protesters' free speech rights, "anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities."  *Id.* ¶ 28.

Shortly after the protests began, members of the Standing Rock Sioux Tribe applied to the Corps for special use permits to occupy Corps-managed lands.  *Id.*  ¶ 48–49, 51.  From August through October 2016, the Corps reminded tribal leaders of the requirements for obtaining a permit to occupy Corps-managed property.  *Id.* ¶¶ 49–51.  The Corps explained that before a permit could be issued, the permit applicants needed to obtain a performance bond.  *Id.* ¶ 51.  Because members of the Tribe never completed their permit applications and never obtained the requisite bond to cover any damage from the protest, the Corps did not issue a special use permit.  *Id.* ¶¶ 49–51.

---

[1] For purposes of this Motion only, the United States accepts as true North Dakota's factual allegations.

2

On October 27, 2016, protesters confronted North Dakota law enforcement officers at several locations and engaged in violent conduct.  *Id.* ¶¶ 65–70.  This conduct included throwing Molotov cocktails and rocks at officers, constructing roadblocks, igniting fires at roadblocks, and chasing a large herd of buffalo in the direction of law enforcement.  *Id.*  Also on October 27, North Dakota law enforcement officers arrested a protester who drew a handgun and fired shots toward officers.  *Id.* ¶ 68.

**B.    The Corps Communicated With Local Law Enforcement and Tribal Leadership Concerning Problems the Protesters Caused.**

Throughout the protests, the Corps received intelligence reports from the Federal Bureau of Investigation ("FBI") and Bureau of Indian Affairs ("BIA"), and the Corps maintained an ongoing presence near the protest sites.  *Id.* ¶¶ 3, 47.  The Corps also was involved in several planning meetings with state and local law enforcement throughout the protests, and the Corps made a request to the Morton County Sheriff Department for law enforcement assistance in an area of Corps-managed property.  *Id.*  ¶¶ 52–53.  The Corps later rescinded its request for law enforcement assistance, and sent a letter to Morton County Sheriff Kyle Kirchmeier explaining that the State of North Dakota retained criminal jurisdiction over Corps-managed lands.  *Id.* ¶ 55.

On November 25, 2016, the Corps sent a letter to Standing Rock Sioux Chairman David Archambault, explaining that the Corps was closing federal property north of the Cannonball River to protesters.  *Id.*  ¶ 56.  In this letter, the Corps explained that it was establishing a "free speech zone" on Corps-managed lands south of the Cannonball River, an area that was safer and more suitable for the provision of police, fire, and medical response.  *Id.* ¶ 58.  The Corps explained that the closure of Corps-managed lands north of the Cannonball River and the creation of the "free speech zone" was "necessary to protect the general public from the violent confrontations between protesters and law enforcement officials that have occurred in this area, and to prevent death,

illness, or serious injury to inhabitants of encampments" due to harsh North Dakota winter conditions. *Id.* ¶ 56–57. The Corps did not make any statements in this letter regarding the status of protesters as trespassers south of the Cannonball River, but the Corps emphasized that protesters who remained on Corps-managed property north of the Cannonball River would be "considered trespassing and may be subject to prosecution under federal, state, and local laws." *Id.*

### C. The Corps Assisted with the Clearing and Clean-Up of the Protest Camps on Corps-Managed Property.

Subsequently, on February 3, 2017, the Corps sent a second letter to Chairman Archambault, advising him that the Corps was closing areas of Corps-managed property to protesters south of the Cannonball River because of ongoing violations of Corps regulations and the potential for spring flooding in the coming months. *Id.* ¶¶ 90–91. On February 23, 2017, the Corps directly addressed the remaining protesters, and began assisting efforts to clear and clean the camp areas. *Id.* ¶ 92. These clearing and clean-up efforts continued through March 9, 2017. *Id.* ¶ 94.

North Dakota alleges that in responding to the protests on federal, state, and private land, it mobilized state law enforcement response agencies, the National Guard, and local law enforcement and first responder agencies. *Id.* ¶¶ 14, 81, 103. North Dakota alleges that more than a dozen state agencies participated in the response, and that this response cost North Dakota $38,005,071.66. *Id.* ¶¶ 6, 14, 101, 103.

## II. Statutory and Regulatory Overview

### A. The Corps has Authority to Manage Certain Federal Lands and Issue or Deny Special-Use Permits.

The Corps Chief of Engineers, "under the supervision of the Secretary of the Army, is authorized to construct, maintain, and operate public park and recreational facilities at water

resource development projects under the control of the Department of the Army."  16 U.S.C. § 460d.  The Secretary of the Army has authority under 16 U.S.C. § 460d to promulgate rules and regulations for the management of the Corps' water resource development projects in the public interest.  Federal regulations promulgated pursuant to that statutory authority provide that the Corps' policy is to "manage the natural, cultural, and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources."  36 C.F.R. § 327.1(a).

The Secretary of the Army "may issue special permits for uses such as group activities, recreation events, . . . and [] other specialized recreation uses as the Secretary determines to be appropriate, subject to such terms and conditions as the Secretary determines to be in the best interest of the Federal Government."  33 U.S.C. § 2328a(a)(1).  Federal regulations provide that the Corps has authority to set fee requirements and other terms or conditions for special use permits, and that it is a violation of Corps regulations for any user of a water resource project to refuse or fail to comply with these fee requirements or other conditions.  36 C.F.R. § 327.19.

Corps regulations further provide that users of water resource projects cannot hold special events or occupy property at water resource projects for either full- or part-time residency without the written permission of the district commander in charge of the project.  36 C.F.R. §§ 327.21(a), 327.22(a).  Implementing Guidance provides that the Corps can deny special use permits for a variety of reasons, including if "[t]he proposed event is inconsistent with the project purposes and authorities," or if the applicant "fails to provide acceptable proof of required insurance and/or performance bond or fails to pay required fees."  Army Corps of Eng'rs, Dep't of the Army, Engineering Circular ("EC") 1130-2-550, *Recreation Operations and Maintenance Guidance and Procedures* App. §§ D-6 and E-9 (2015) (Attached as Ex. A, EC 1130-2-550), *available at*

5

https://www.publications.usace.army.mil/Portals/76/Publications/EngineerCirculars/EC_1130-2-550.pdf.  The district commander may revoke permission to use an area if a sponsor fails to comply with the conditions of a permit.  36 C.F.R. § 327.21(b).

> **B.    The Corps Has Limited Authority to Enforce its Rules and Regulations on Corps-Managed Lands.**

The federal government's authority to enforce criminal law on federal property may be exclusive or concurrent with a state's authority.  *Kleppe v. New Mexico*, 426 U.S. 529, 542 (1976).  Alternatively, the federal government may acquire property as the proprietor without accepting any special criminal jurisdiction over it.  *See* 40 U.S.C. § 3112(c); *Adams v. United States*, 319 U.S. 312, 313–14 (1943).  The federal government acquired the Corps-managed land around Lake Oahe without accepting any special criminal jurisdiction over this property.  *See* Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887 (Dec. 22, 1944).  Thus, North Dakota has the authority and responsibility to enforce criminal law on the Corps-managed lands at Lake Oahe.  *See* 36 C.F.R. §§ 327.8, 327.26;  U.S. Army Corps of Eng'rs, Dep't of the Army, Engineering Regulation ("ER") 1130-2-550, *Recreation Operations and Maintenance Policies* § 6-2 (c) (2013) (Attached    as    Ex.    B,    ER    1130-2-550),    *available    at* https://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1130 -2-550.pdf ("In the acquisition of land at Civil Works installations, the Corps of Engineers obtains proprietary interests only.  Individual states and their political subdivisions retain the statutory authority, and inherent responsibility, to enforce state and local laws.").

Congress provided the Corps limited authority to issue and enforce regulations and rules concerning Corps-managed property.  16 U.S.C. § 460d; *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917).  Under 16 U.S.C. § 460d, the Chief of Engineers can exercise and delegate authority to enforce Corps rules and regulations.  Section 460d provides that "[a]ll persons

designated by the Chief of Engineers for that purpose shall have authority to issue a citation for violation of the regulations adopted by the Secretary of the Army." 16 U.S.C. § 460d; *see* 36 C.F.R. § 327.25 (providing that district commanders can further delegate authority to issue citations). Under section 460d, violators of Corps regulations may be fined up to $500 or imprisoned up to six months. 16 U.S.C. § 460d; 36 C.F.R. § 327.25.

Chapter 6 of ER 1130-2-550 provides guidance on the Corps' enforcement authority. Chapter 6, titled "Visitor Assistance Program," sets forth "the policy for providing assistance to visitors at [the Corps'] Civil Works water resource projects." ER 1130-2-550 § 6-1. Chapter 6 restates that major subordinate commands and district commands have authority to delegate citation authority to operations project managers ("OPMs") and park rangers. *Id.* § 6-2(a). Additionally, district commands are generally responsible "for ensuring adequate order, discipline and protection of resources at Corps projects." *Id.* Chapter 6, however, makes clear that the enforcement of rules is "secondary to the safety of Corps personnel, contract employees and visitors." *Id.* § 6-2(b). Chapter 6 further provides that enforcement of Corps rules and regulations is secondary to OPMs and park rangers' primary duty to "help and assist" visitors. *Id.*

Following these general policy statements, Chapter 6 emphasizes several limitations on the Corps' enforcement authority. Chapter 6 provides that "[OPMs] and park rangers are employed as natural resource, recreation, environmental, and public relations specialists, and are not law enforcement officers." *Id.* § 6-2(e). OPMs and park rangers cannot arrest, search, or seize individuals or their property, and cannot carry, transport, or use weapons. *Id.* "An [OPM] or park ranger may request visitors to stop but cannot physically detain them." *Id.* Moreover, "use of force options are limited to verbal persuasion/verbal detention and self-defense measures, including unarmed self defense and, where authorized, the use of an approved chemical aerosol

spray."  *Id.* § 6-2(d).  OPMs and park rangers' enforcement authority is further "limited to the enforcement of rules and regulations as designated in Title 36, and does not extend to arrest authority or the enforcement of state and local laws."  *Id.*  Chapter 6 makes clear that "[t]he role of the park ranger is defined as a regulation enforcer with full citation authority of Title 36."  *Id.*

### C.    Corps Officers Have Many Tools Available in Exercising Their Limited Enforcement Authority.

In addition to outlining the limitations of Corps officers' enforcement authority, Chapter 6 provides OPMs and park rangers a menu of enforcement options, rather than specific and mandatory directives on how to implement the Corps regulations.  These "enforcement options include visual presence, verbal warnings, written warnings, collateral forfeiture citations and mandatory appearance citations."  *Id.* § 6-2(c).  Chapter 6 provides OPMs and park rangers the following guidance in exercising these enforcement options:

> The use of Title 36 citation authority shall be considered one of many tools for use in management of water resource development projects.  The lowest level of enforcement shall be used to resolve a problem.  Maximum use of oral and written warnings shall be made for minor infractions.  Employees with citation authority shall, in order of priority, attempt to resolve the problem by effective communication, verbal warning, written warning, collateral forfeiture citation, and mandatory appearance citation.  Normal citation procedures are provided in Chapter 6 of EP 1130-2-550.  Alternative management techniques, in addition to the issuance of citations, should be considered in the implementation of the Visitor Assistance Program.

*Id.* § 6-2(f); U.S. Army Corps of Eng'rs, Dep't of the Army, Engineering Pamphlet ("EP") 1130-2-550, *Recreation Operations and Maintenance Guidance and Procedures* App. G (2013) (Attached as Ex. C, EP 1130-2-550), *available at* https://www.publications.usace.army.mil/Portals/76/Publications/EngineerPamphlets/EP_1130-2-550.pdf (list of alternative management techniques, including closing of areas, separation of user types, providing overflow areas, citizen committees, and expanded public information programs).

Chapter 6 also encourages Corps project managers to use "cooperative law enforcement contracts and agreements," and states that "maximum use of local law enforcement services . . . shall be made at areas which have a history of excessive violations and during those periods when rangers are not readily available."  ER 1130-2-550 § 6-2(j).

## LEGAL STANDARDS

A party may challenge a court's subject matter jurisdiction through a motion under Fed. R. Civ. P. 12(b)(1) at any stage in the litigation.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). A district court may look outside the pleadings to affidavits or other documents in ruling on a motion to dismiss under Rule 12(b)(1).  *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 470 (8th Cir. 1993).

## ARGUMENT

**I.     The FTCA's "Discretionary Function Exception" Bars North Dakota's Claims.**

**A.     Overview of the Discretionary Function Exception**

Absent a waiver, sovereign immunity shields the federal government and its agencies from suit.  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  The FTCA contains several exceptions to its waiver of sovereign immunity under 28 U.S.C. § 1346(b)(1), including that the waiver does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This provision is referred to as the "discretionary function exception."  *United States*

*v. Gaubert*, 499 U.S. 315, 322 (1991); *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013).

A two-part test guides the determination of whether the discretionary function exception applies. *Metter v. United States*, 785 F.3d 1227, 1230 (8th Cir. 2015). "The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.'" *Herden*, 736 F.3d at 1046 (quoting *Gaubert*, 499 U.S. at 328).

If the challenged conduct involves judgment or choice, the second inquiry requires the court to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "Because the purpose of the exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323 (citations omitted). When established policy affords a government agent discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004) (quoting *Gaubert*, 499 U.S. at 324)). The plaintiff has the burden to rebut this presumption. *Id.* Furthermore, as long as a discretionary decision is "susceptible to policy analysis," the exception applies whether or not the defendant actually conducted a policy analysis. *Herden*, 726 F.3d at 1047 (quotations omitted). Where, as here, both parts of the test are satisfied, the discretionary function exception acts as a jurisdictional bar to suit. *Id.* at 1046.

**B.    The Corps' Response to Trespassers Involves Judgment and Choice.**

Trying to side-step a discretionary function defense, North Dakota asserts that its injuries were the result of the Corps' failure to carry out two alleged mandatory duties in response to the protests.  First, North Dakota alleges that "mandatory permitting requirements" required the Corps to either issue protesters a special use permit and enforce the requirements of that permit, or deny protesters a permit and remove the protesters from Corps-managed property.  Doc. 1 ¶¶ 41, 42, 77.  Second, North Dakota alleges the Corps had a mandatory duty to "enforce the law, protect public safety and the environment, and maintain public order" on Corps-managed property.  *Id.* ¶¶ 38, 54.  Both attempts to strip the Corps of its discretion fall short.

Relying on 36 C.F.R. Part 327 and Implementing Guidance, North Dakota alleges that the Corps had a mandatory duty to issue proper use permits to protestors.  Doc. 1 ¶ 41 (citing 36 C.F.R. §§ 327.19, 327.21; EP 1130-2-550 App. N;[2] EC 1130-2-550 App. E); *see also id.* ¶¶ 110–12, 130– 32.  But neither source mandates that the Corps issue a permit to every permit applicant.  Instead, these regulations simply outline the requirements for obtaining special event permits, and provide that visitors cannot refuse to comply with permit requirements, including payment of fees and the purchase of liability insurance for events with more than 50 participants.  36 C.F.R. §§ 327.19, 327.21; EP 1130-2-550 App. N; EC 1130-2-550 App. E.  The Corps' Implementing Guidance frames the agency's permitting process in discretionary terms, providing that special use permits "may be issued" for certain purposes.  EC 1130-2-550 § 5c.(1)(a); *Id.* App. E.  Furthermore, the Corps' decision whether to grant or deny a special use permit involves a determination of whether the Secretary of the Army would deem the special use "appropriate," and OPMs have discretion

---

[2] North Dakota cites to Appendix N of ER 1130-2-550, Doc. 1 ¶ 41, but ER 1130-2-550 does not contain an Appendix N.  *See* ER 1130-2-550.  Rather, the language quoted in North Dakota's Complaint appears in Appendix N to EP 1130-2-550.  EP 1130-2-550 App. N.

to deny special use permits for a variety of reasons.  33 U.S.C. § 2328a(a)(1); EC 1130-2-550 App. D-6 and E-9.  Like adjudicatory decisions of other agencies, the Corps' process of determining whether to issue a permit involves elements of judgment and choice.  *See*, *e.g.*, *Pierce v. United States*, 804 F.2d 101 (8th Cir. 1986) (holding denial of benefits by Social Security examiner was a discretionary function).  Thus, the Corps' permitting process constitutes a discretionary function.

As North Dakota alleges, the Corps denied protesters a special use permit because the protesters never met the requirements for obtaining a permit.  Doc. 1 ¶¶ 49–51.  It is unclear why North Dakota challenges the Corps' decision whether to issue a permit, because North Dakota fails to articulate how the existence or lack of a permit would have altered the course of events or in any way impacted the Corps' response to the trespassers.  In any event, the decision whether to issue a permit is committed to the discretion of the Corps, so whatever causal theory North Dakota may have regarding the lack of a permit is of no moment.

North Dakota's claims each turn on the theory that the Corps abdicated a mandatory duty to enforce regulations and guidance regarding use of federal property by failing to "remove or control the trespassers" and to "otherwise [] enforce law and order" on Corps-managed property. Doc. 1 ¶¶ 7, 14, 38, 62, 78, 110, 116–17, 120–22, 126, 130.  Specifically, North Dakota alleges the Corps had a mandatory duty to "enforce the law, protect public safety and the environment, and maintain public order" on Corps-managed property.  *Id.* ¶¶ 38.  Again, North Dakota relies on 36 C.F.R. Part 327 and Implementing Guidance.  *Id.* ¶¶ 43–45 (citing 36 C.F.R. § 327.1(g); ER 1130-2-550 §§ 2-2(m),[3] 6-2(b)).  Again, neither source mandates specific conduct by the Corps.

---

[3] North Dakota cites to ER 1130-2-550 § 6-2(m) for the proposition that the Corps shall maintain "[c]ooperation and continuous coordination" with other governmental agencies.  Doc. 1 ¶ 45.  The quoted language appears not in ER 1130-2-550 § 6-2(m), but in section 2-2(m).  *See* ER 1130-2-550 §§ 6-2(m) (providing that "vehicle, radio, and equipment requirements shall be in accordance with" Chapter 6), 2-2(m) ("[c]ooperation and continuous coordination" provision).

Indeed, far from establishing mandatory enforcement directives, the provisions that North Dakota cites from Corps regulations and the Implementing Guidance of ER 1130-2-550 outline general policies regarding violations and enforcement of the Corps' rules and regulations, and management of Corps resources. *See* 36 C.F.R. § 327.1(g) (any violation of Corps regulations "shall constitute a separate violation for each calendar day in which it occurs"); ER 1130-2-550 § 6-2(b) (stating that OPMs and park rangers "shall strive to be visible to the public, primarily to help and assist them, and secondarily, to enforce 36 CFR Chapter III, Part 327 (Title 36)"); ER 1130-2-550 § 2-2(m) (stating that the Corps shall maintain "[c]ooperation and continuous coordination" with other governmental agencies); *Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2007) (holding that policy statements in 36 C.F.R. § 327.1 regarding management of Corps resources are discretionary); *Dunaway v. United States*, 136 F. Supp. 2d 576, 583 (E.D. La. 1999) (explaining that regulations in 36 C.F.R. § 327.1 are "devoid of specific directives prescribing the behavior of the Corps or its employees"). Those policies in turn guide the Corps in the exercise of its considerable discretion in determining how to enforce its rules and regulations.

In the absence of a statute, rule, regulation, or policy that mandates the specific manner in which a federal agency must enforce the law or its own regulations, an agency's enforcement actions are a product of judgment or choice. *See Deuser v. Vecera*, 139 F.3d 1190, 1195 (8th Cir. 1998) (quoting *Redmond v. United States*, 518 F.2d 811, 816–17 (7th Cir. 1975) ("It cannot be denied that the Government has a duty to maintain law and order, but how best to fulfill this duty is wholly within the discretion of its officers")); *see also Tracor v. United States*, 933 F.2d 663, 667 (8th Cir. 1991) (holding that inspector's checklist did not specify how to check the enumerated

items nor what action to take in the event of a violation); *Smith ex rel. Fitzsimmons v. United States*, 496 F. Supp. 2d 1035, 1042 (D.N.D. 2007).[4]

In *Smith*, the minor plaintiff was burned while playing with gasoline that he found in an abandoned vehicle on the Fort Berthold Reservation. *Smith*, 496 F. Supp. 2d at 1037. The plaintiff argued that the BIA, which had law enforcement authority on the Reservation, "completely ignored the enforcement of certain laws" concerning abandoned vehicles, and that "the failure to enforce those laws eliminates the discretionary function exception to liability under the FTCA." *Id.* at 1040. To support his argument, the plaintiff cited a federal statute, two regulations, and a Memorandum of Understanding ("MOU") between the Three Affiliated Tribes of the Fort Berthold Reservation and the BIA. *Id.* In evaluating these sources, the Court explained that "[t]he relevant inquiry" was whether they "mandated that BIA law enforcement employees investigate and enforce, in a specific manner, the violations of crimes and ordinances." *Id.*

The Court determined that they did not. *Id.* at 1041. The relevant statute and regulations provided "the authority that may be given to BIA law enforcement employees," but did not "mandate the manner in which BIA officers investigate and enforce laws." *Id.* at 1041. The MOU provided "a general overview of the assistance that the BIA [would] provide," but it did not dictate the manner in which BIA should enforce laws. *Id.* at 1042. Because the sources "d[id] not mandate

---

[4] None of the Corps regulations or Implementing Guidance state that Corps rules or regulations "shall be enforced" by an agency official. The Implementing Guidance provides only that Corps OPMs and park rangers "shall strive . . . to enforce" 36 C.F.R. Part 327, along with performing their primary duty to help and assist visitors. ER 1130-2-550 § 6-2(b). But even when an agency's regulations state that the regulations "shall be enforced" by an agency official, this does not rise to the level of a mandatory directive unless the regulation removes all enforcement discretion. *Sutton v. Earles*, 26 F.3d 903, 909 (9th Cir. 1994) (holding that general provision that Commanding Officer "shall enforce '[t]he regulations in this section' is not, in our view, sufficiently specific to deprive the Commander of all discretion whether to enforce every provision in the section").

the manner in which a BIA law enforcement officer must enforce the laws on the reservation" or "the priority of enforcement of the laws, " the Court concluded that "the actions of BIA law enforcement employees must be considered a product of judgment or choice." *Id.* at 1041–42.

As in *Smith*, North Dakota alleges that the Corps failed to enforce its rules and regulations, and failed generally to "enforce the law and protect public safety" on Corps-managed property. Doc. 1 ¶¶ 14, 44. And as in *Smith*, the controlling statutes, regulations, or administrative policies do not mandate that Corps employees "investigate and enforce, in a specific manner, the violations of" Corps rules and regulations. *See Smith*, 496 F. Supp. 2d at 1040.

As mentioned earlier, *see supra*, Statutory and Regulatory Overview, at 6–9, the statutes and regulations that address the Corps' enforcement authority outline "the authority that may be given to" Corps officers. *See Smith*, 496 F. Supp. 2d at 1041. Specifically, the Chief of Engineers can delegate to Corps officers the authority to issue citations for violations of Corps rules and regulations. 16 U.S.C. § 460d; 36 C.F.R. § 327.25. But they by no means *require* Corps officers to investigate or enforce violations in a specific manner. *See Smith*, 496 F. Supp. 2d at 1040. Instead, these sources simply provide that certain Corps officers "shall have authority" to issue citations for violations of Corps rules and regulations. 16 U.S.C. § 460d; 36 C.F.R. § 327.25.

North Dakota alleges that the Implementing Guidance under Chapter 6 of ER 1130-2-550 imposed mandatory directives concerning the Corps' enforcement of its rules and regulations. Doc. 1 ¶ 43. But the plain language of this Implementing Guidance demonstrates that OPMs and park rangers have considerable discretion in determining how to exercise their enforcement authority. Chapter 6 emphasizes several limitations on Corps officers' enforcement authority, including that OPMs and park rangers are "not law enforcement officers," they cannot detain or arrest individuals, and they cannot use physical force other than unarmed self-defense. ER 1130-

2-550 §§ 6-2(d), (e).  But chapter 6 also clarifies that Corps officers have "many tools" beyond citation authority in resolving problems with visitors at Corps-managed lands.  *Id.* 1130-2-550 § 6-2(f).  These tools include "visual presence, verbal warnings, written warnings," and several "alternative management techniques."  *Id.* § 6-2(c); EP 1130-2-550 App. G.

Chapter 6 does not prescribe a one-size-fits-all approach to enforcement, and it does not couch the available enforcement options in mandatory terms.  *See*, *e.g.*, ER 1130-2-550 § 6-2(c) ("enforcement options include visual presence, verbal warnings, written warnings, collateral forfeiture citations and mandatory appearance citations").  Nor does Chapter 6 require that the Corps use any particular enforcement tool in response to a given violation of Corps rules and regulations.  *See id.* § 6-2(c), (f).  Instead, OPMs and park rangers are encouraged to consider all available enforcement options and alternative management techniques, and then choose a path using their best judgment.  *See id.* § 6-2(f); *see also Gaubert*, 499 U.S. at 325 ("A discretionary act is one that involves choice or judgment.").  As the guidance in Chapter 6 contemplates, Corps officers must exercise judgment and choice in appropriately tailoring their enforcement response to each violation of Corps rules and regulations, while also carrying out their primary duty to "help and assist" visitors.  *Id.* § 6-2(b).

The regulations and Implementing Guidance on which North Dakota relies do not dictate how the Corps addresses violations of its rules and regulations.  *See Smith*, 496 F. Supp. 2d at 1041–42.  North Dakota cannot meet its burden "to link [its] claims with any facts, statutes, rules, regulations, or policies that would call into doubt the discretionary nature of" the Corps' enforcement actions.  *See id.* at 1042 (citation omitted).  Therefore, the Corps' response to the protests must be considered a product of judgment or choice.

C.    **The Corps' Permitting and Enforcement Decisions Are Susceptible to Policy Analysis.**

The Corps' discretionary permitting and enforcement decisions in responding to the protests are precisely the kind of judgments the discretionary function exception was designed to shield. Public policy analysis is inherent in the Corps' permitting process. In determining whether to grant or deny special use permits, OPMs are encouraged to consider whether a "proposed event is inconsistent with the project purposes and authorities." EC 1130-2-550 App. D-6 and D-9. Further, a permit application can be denied if "[t]he activity cannot be accommodated in the area desired by the applicant due to logistical, safety, environmental, legal, or operational concerns." *Id.* These guidelines demonstrate that the Corps' overarching policy of managing project resources "in the public interest" is intertwined with all permitting decisions. 36 C.F.R. § 327.1(a).

Public policy analysis also is at the heart of the Corps' enforcement decisions. As explained above, the Corps' enforcement authority is limited to enforcement of Corps rules and regulations; the Corps' authority does not extend to enforcement of federal, state, or local laws generally. *See supra*, Statutory and Regulatory Overview, at 6–9; ER 1130-2-550 §§ 6-2(d), (e) (explaining that OPMs and park rangers "are not law enforcement officers"). Courts have made clear that even where a federal agency has full law enforcement authority, the manner in which the agency exercises its enforcement authority is inherently policy based. *See Hart v. United States*, 630 F.3d 1085, 1090–91 (8th Cir. 2011) (explaining that law enforcement decisions related to restraint, supervision, control, or trust of an arrestee "are quintessential examples of the permissible exercise of policy judgment"); *Deuser v. Vecera*, 139 F.3d 1190, 1195 (8th Cir. 1998) (explaining that decision by park rangers to terminate arrest of intoxicated person was susceptible to policy considerations); *Ga. Cas. & Sur. Co. v. United States*, 823 F.2d 260, 263 (8th Cir. 1987) ("the means chosen by the Government to enforce the law are protected by the discretionary

17

function exception") (citation omitted); *Prelvitz v. Mislop*, 831 F.2d 806, 810 (8th Cir. 1987) (holding that decision to allow intoxicated person to drive in lieu of detaining all passengers was a discretionary function); *United States v. Faneca*, 332 F.2d 872, 874–75 (5th Cir. 1964) (holding that decisions of United States Marshals Service in enforcement of court orders were committed to discretion of agency officials and susceptible to policy judgment).  Although the Corps' enforcement authority is confined to its own rules and regulations, the Corps' enforcement decisions are inherently policy based in the same way as enforcement decisions of federal agencies that have full law enforcement authority.

As the Eighth Circuit has explained, a federal agency's decisions are clearly susceptible to public policy analysis when competing policy interests permeate the decision making process. *Herden v. United States*, 726 F.3d 1042, 1050 (8th Cir. 2013) (explaining that government employee's "need to balance competing interests is what primarily distinguishes this case from others where decisions involving the exercise of professional judgment *did not* fall within the protection of the discretionary function exception") (emphasis in original); *see Metter v. United States*, 785 F.3d 1227, 1233 (8th Cir. 2015) (describing how agency had to balance several competing policy interests).  Here, the Corps' enforcement decisions were susceptible to competing policy interests.

The Corps' enforcement decisions are informed not only by the public's interest in having the Corps enforce its rules and regulations, but also by the Corps' need to balance numerous other complex public policy considerations.  First, the Corps' enforcement decisions had to account for the safety of its employees.  The "safety of Corps personnel, contract employees and visitors" is a paramount consideration in how the Corps formulates enforcement responses.  ER 1130-2-550 § 6-2(b); *see Riley v. United States*, 486 F.3d 1030, 1034 (8th Cir. 2007) (citing safety as a

compelling policy rationale).  As North Dakota alleges, the protests turned violent and dangerous, and law enforcement officers were "under siege" by protesters who used "a variety of weaponry," including firearms, arrows, Molotov cocktails, and lasers used to disrupt the vision of law enforcement pilots.  Doc. 1 ¶¶ 2, 10, 33–34, 63–65, 75.[5]  Unlike traditional law enforcement officers, Corps OPMs and park rangers cannot carry or use "weapons, stun-guns, nightsticks, or other similar equipment," and they cannot arrest, search, seize, or physically detain individuals on Corps-managed property.  ER 1130-2-550 § 6-2(e).  Thus, any decision to deploy unarmed Corps personnel into the allegedly large and violent protest camps would be susceptible to significant concerns regarding Corps employee safety.

Further, the DAPL protests lasted for several months and involved thousands of protesters. The duration and scope of the protests thus posed real resource utilization concerns and personnel issues.  *See Riley*, 486 F.3d at 1034 (holding that government's decision involved balancing of "personnel" and other policy considerations); *see also Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998) (explaining that decisions concerning supervision of inmates were based on available resources and other policy factors); *A.O. Smith Corp. v. United States*, 774 F.3d 359, 371 (6th Cir. 2014) ("[D]ecisions concerning the allocation of limited agency resources, . . . time constraints and the availability of personnel with experience, . . . and decisions relating to the amount of personnel to assign to a particular task, . . . all are policy considerations that trigger the discretionary function exception.") (citations and internal quotation marks omitted); *Mayfield v. United States*, 365 F. Supp. 3d 791, 800 (W.D. Tex. 2019) (holding Corps' responsibility under

---

[5] This Court previously found that the protests included at least some "unlawful and violent protesters," and it described protesters as engaging in "mindless and senseless criminal mayhem."  *Dakota Access, LLC v. Archambault*, No. 1:16-cv-296, 2016 WL 5107005, at *2 (D.N.D. Sept. 16, 2016).

36 C.F.R. § 327.1 to provide "the public with safe and healthful recreational opportunities" must be balanced with policy factors concerning "when, where and how to allocate limited resources").

Second, the Corps' enforcement decisions had to balance the Corps' safety and land management responsibilities with the rights and safety of the protesters. As North Dakota acknowledges, the United States and North Dakota Constitutions protect the right of individuals to peaceably assemble. Doc. 1 ¶ 30. Although the protests allegedly included violent elements, any response by the Corps needed to both respect protesters' constitutionally protected speech and assembly rights and avoid portraying "an aggressive law enforcement response." ER 1130-2-550 § 6-2(b). North Dakota alleges the Corps' creation of a "free speech zone," which was done in conjunction with the Corps' efforts to close areas of federal property to protesters, encouraged protesters to gather on Corps-managed property. Doc. 1 ¶¶ 58–62. Rather than encouraging the gathering of protesters or acquiescing to their conduct and presence, the creation of the "free speech zone" was an additional alternative management technique—one of the "many tools" available to the Corps—to help manage the issues created by the protests. *See* EP 1130-2-550 App. G-2(d), (g), and (h) (listing "[s]eparation of user types," "[p]roviding overflow areas," and "[e]stablishing areas for special uses" as alternative management techniques).

Third, the Corps' enforcement decisions were susceptible to policy considerations concerning tribal relations. Members of the Standing Rock Sioux Tribe and other Tribes participated heavily in the protests, which centered on tribal concerns regarding construction of the DAPL. As another federal district court recognized in the context of litigation concerning the DAPL, "the United States' relationship with the Indian tribes has been contentious and tragic." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 7–9, 33 (D.D.C. 2016). The Corps' enforcement decisions in response to the DAPL protesters did not occur in a

vacuum, but instead took place in the context of this complex and contentious history. *See Lesoeur v. United States*, 21 F.3d 965, 968–69 (9th Cir. 1994) (holding National Parks Service's discretionary decision to exempt Hualapai Indian Tribe from certain regulations "was based on the underlying policy concerning the relationship between the United States and Indian tribes").

In sum, the Corps' response to the protests was susceptible to the balancing of myriad public policy considerations. Thus, the discretionary conduct alleged in North Dakota's Complaint is quintessentially the kind of conduct the discretionary function exception was designed to protect.

## II.    North Dakota's Claims Fall Outside the Scope of the FTCA's Waiver of Sovereign Immunity Under 28 U.S.C. § 1346(b)(1).

The FTCA's jurisdictional grant applies to a certain category of claims for which the United States has waived sovereign immunity. *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994). This category includes only claims that are:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

*Id.* (internal quotations omitted). A claim comes within the FTCA's jurisdictional grant—and thus is "cognizable" under section 1346(b)(1)—only if it alleges the six elements outlined above. *Id.* (citing *Loeffler v. Frank*, 486 U.S. 549, 562 (1988)); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 484–85 (2006) (summarizing jurisdictional conditions under section 1346(b)(1)); *CNA v. United States*, 535 F.3d 132, 142 (3d Cir. 2008) ("the conditions laid out in the FTCA are jurisdictional in nature, as jurisdiction for courts to hear suits against the Government have their threshold set out in [section] 1346(b)(1)"). None of North Dakota's claims are cognizable under the FTCA because they each fail to satisfy at least one of the jurisdictional elements under section 1346(b)(1).

A.     **North Dakota's Claims for Recovery of Emergency Response Costs Are Not Cognizable Claims for "Injury or Loss of Property."**

North Dakota seeks recovery of its alleged expenditures in responding to the DAPL protests on federal, state, and private land, claiming that because of the Corps' conduct, the State "was obligated to step in to protect public safety and provide necessary law enforcement, sanitation services, and first responder services, resulting in the significant costs and damages incurred by North Dakota." Doc. 1 ¶ 7. North Dakota's alleged emergency response expenses do not constitute "injury or loss of property" within the meaning of section 1346(b)(1). Accordingly, the Court lacks jurisdiction over North Dakota's claims for reimbursement of its response costs.

The Ninth Circuit addressed the contours of the "injury or loss of property" requirement under the FTCA in three cases involving claims for reimbursement of state expenses in fighting wildfires. In *People of California v. United States,* the State of California brought a claim under the FTCA to recover expenses California incurred in fighting a fire that began on federal property. 307 F.2d 941, 942 (9th Cir. 1962). In affirming dismissal for lack of subject matter jurisdiction, the Ninth Circuit held that a state's expenditure of funds in suppressing a fire did not constitute an "injury or loss of property" under the FTCA. *Id.* at 943–44. The court grounded its holding in the text of section 1346(b)(1) and a review of FTCA cases, which revealed that no court had allowed recovery "in the absence of injury to person or property." *Id.* at 944. That same year, the Ninth Circuit reiterated its holding in another case involving a claim for firefighting expenses, explaining that "the jurisdiction of the court under the Tort Claims Act is limited to claims for property damage and personal injury or death." *State of Oregon v. United States*, 308 F.2d 568, 569 (9th Cir. 1962). Two decades later, the Ninth Circuit affirmed dismissal of a claim by the State of Idaho for recovery of firefighting expenses under the FTCA, holding that these expenses did not

represent "money damages" for "injury or loss of property." *State of Idaho ex rel. Trombley v. U.S. Dep't of Army, Corps of Eng'rs*, 666 F.2d 444, 446 (9th Cir. 1982).

Following the Ninth Circuit's firefighting cases, other courts have dismissed FTCA claims that do not claim an "injury or loss of property." *E.g.*, *City of Imperial v. Dep't of the Navy*, No. 3:15-cv-02149-L-KSC, 2016 WL 3419220, at *2 (S.D. Cal. June 22, 2016) (dismissing FTCA claim for recovery of city's costs in emergency response to airplane crash within city); *Blackfeet Hous. v. United States*, No. CV 13-66-GF-BMM-JTJ, 2015 WL 8751652, at *1 (D. Mont. Dec. 14, 2015) (adopting report and recommendation dismissing FTCA claim for expenses housing entity incurred in clearing snow-covered BIA access roads); *Charles Burton Builders, Inc. v. United States*, 768 F. Supp. 160, 163 (D. Md. 1991) (dismissing FTCA claim for expenses incurred in testing to determine effects of dumping of hazardous waste). These cases show that claims for reimbursement of emergency response costs are not "cognizable as loss of property damages under the FTCA." *City of Imperial*, 2016 WL 3419220, at *2.

Neither this Court nor the Eighth Circuit has had occasion to address whether a claim for reimbursement of emergency response costs qualifies as a claim for "injury or loss of property" under the FTCA. The United States Supreme Court also has not reached the issue. As the Eighth Circuit has explained, however, the FTCA is a limited waiver of sovereign immunity, and its conditions must be "construed narrowly." *Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir. 1993). One of these conditions is that the plaintiff allege an "injury or loss of property." 28 U.S.C. § 1346(b)(1). North Dakota's request—like a request for expenses incurred in responding to a

23

fire, airplane crash, or other public safety episode—is "not cognizable as loss of property damages

under the FTCA." *See City of Imperial*, 2016 WL 3419220, at *2.[6]

**B.    North Dakota's Public Nuisance Claim is Not Cognizable Under the FTCA Insofar as the Claim is Not Premised on Negligent Conduct.**

North Dakota alleges the DAPL protesters' activities constituted a public nuisance.  North

Dakota law defines "nuisance" as follows:

> A nuisance consists in unlawfully doing an act or omitting to perform a duty, which
> act or omission . . . [a]nnoys, injures, or endangers the comfort, repose, health, or
> safety of others; . . . [u]nlawfully interferes with, obstructs or tends to obstruct, or
> renders dangerous for passage, any . . . street, or highway; or . . . renders other
> persons insecure in life or in the use of property.

N.D. Cent. Code Ann. § 42-01-01.  A "public nuisance" is one that "affects an entire community

or neighborhood or any considerable number of persons."  *Id.* § 42-01-06.

Under North Dakota law, "[t]he duty which gives rise to a nuisance claim is the absolute

duty not to act in a way which unreasonably interferes with other persons' use and enjoyment of

their property."  *Rassier v. Houim*, 488 N.W.2d 635, 637 (N.D. 1992) (citation omitted).  This

absolute duty differs from the "relative duty" underlying a negligence claim, which rests on "the

failure to use the degree of care required under particular circumstances."  *Id.*  (quoting *Knoff v.

Am. Crystal Sugar Co.*, 380 N.W.2d 313, 317 (N.D. 1986)).  Although negligent conduct may

result in a nuisance, a nuisance claim may be maintained under a theory of strict or absolute

liability, without a showing of negligence.  *See id.* (explaining that "[n]uisance is a condition and

---

[6] As a matter of state law, no North Dakota statute or case law allows for recovery of
public services expenses against a private party who creates the need for the services.  Indeed,
under the widely adopted free public services doctrine, "the cost of public services for protection
from fire or safety hazards is to be borne by the public as a whole, not assessed against the
tortfeasor whose negligence creates the need for the service." *E.g.*, *Dist. of Columbia v. Air Fla.,
Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984) (citation omitted).   Thus, even assuming arguendo
that the Corps' alleged conduct created the need for the emergency response expenses here, these
expenses are not recoverable under North Dakota law.

not an act," and that "a nuisance may be created wholly without negligence"). Indeed, because the duty that gives rise to a nuisance claim is absolute, "a person who creates or maintains a nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised to avoid the injury." *Id.* (quoting *Knoff*, 380 N.W. 2d at 317).

As the United States Supreme Court explained in rejecting the argument that the United States could be liable based on the theory that its production of a dangerous commodity constituted a "nuisance," the FTCA's jurisdictional grant does not extend to absolute or strict liability:

> [The FTCA] is to be invoked only on a "negligent or wrongful act or omission" of an employee. Absolute liability, of course, arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that doctrine. But the statute requires a negligent act.

*Dalehite v. United States*, 346 U.S. 15, 44–45 (1953); *Laird v. Nelms*, 406 U.S. 797, 803 (1972) (explaining that under the *Dalehite* holding, "the [FTCA] d[oes] not authorize the imposition of strict liability of any sort upon the Government"); *Duff v. United States ex rel. U.S. Air Force*, 999 F.2d 1280, 1282 n.6 (8th Cir. 1993) ("To the extent that state law imposes strict liability on an employer, the United States cannot be liable because it has not waived sovereign immunity for absolute liability.") (citing *Laird*, 406 U.S. 797); *cf. also Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1160 (1st Cir. 1987) (explaining that FTCA does not waive sovereign immunity for claims premised on "acts where there is no negligence") (citations omitted).

North Dakota does not specify whether its public nuisance claim relies on alleged negligent conduct on the part of the Corps, or instead rests on a theory of absolute liability without regard to the degree of care the Corps exercised in response to the protests. Insofar as North Dakota asserts a public nuisance claim that is not premised on negligent conduct, its claim must be dismissed

25

because it is not a claim for a "negligent or wrongful act or omission."  28 U.S.C. § 1346(b); *see*

*Dalehite*, 346 U.S. at 44–45.

> **C.      North Dakota's Claims Do Not Give Rise to Liability "In Accordance With the Law of the Place Where the Act or Omission Occurred."**

Federal district courts have subject matter jurisdiction over FTCA claims only if the United

States' conduct gives rise to tort liability under "the law of the place where the act or omission

occurred." 28 U.S.C. § 1346(b)(1).  The Corps' alleged conduct here occurred in North Dakota.

Thus, the Court's exercise of subject matter jurisdiction over North Dakota's FTCA claims

depends on whether North Dakota law would impose liability for the Corps' conduct.  Because

North Dakota's claims each fail to meet required elements under North Dakota law, its claims are

not cognizable under the FTCA.

> **1.      North Dakota's Public Nuisance, Negligence, and Gross Negligence Claims Fail Because North Dakota Has Not Identified an Actionable Duty Under North Dakota Law.**

North Dakota's public nuisance, negligence, and gross negligence claims each fail under

North Dakota law because North Dakota does not identify an actionable duty under North Dakota

law that supports these claims.  To state a plausible negligence or gross negligence claim under

North Dakota law, a plaintiff must allege the breach of an actionable duty.  *Palmer v. 999 Quebec,*

*Inc.*, 874 N.W.2d 303, 309 (N.D. 2016) (citations omitted).  The same is required for a public

nuisance claim premised on negligent conduct.[7]  *See Kappenman v. Klipfel*, 765 N.W.2d 716, 729

(N.D. 2009) ("[b]reach of a duty sounding in tort will give rise to an action based upon nuisance"

(citations omitted)); *Rassier v. Houim*, 488 N.W.2d 635, 637 (N.D. 1992) (recognizing that

---

[7] As discussed above, if North Dakota's claim is premised on a strict liability rather than a negligence theory of liability, North Dakota's claim must be dismissed for failure to satisfy the FTCA's "negligent or wrongful act or omission" requirement.  *See supra* Part II.B.

negligent conduct may result in creation of nuisance); *Sorace v. United States*, 788 F.3d 758, 766 (8th Cir. 2015) (holding South Dakota's nuisance statute, which mirrors North Dakota's nuisance statute, did not impose special duty owed to individuals killed in drunk driving accident). "When a duty does not exist, there is no negligence." *Palmer*, 874 N.W.2d at 309.

North Dakota alleges the Corps had a duty to enforce its rules and regulations, and federal law generally, based on its "mandatory duties pursuant to C.F.R. Part 327 and Implementing Guidance." Doc. 1 ¶¶ 116, 125. As discussed *supra*, Part I.A., none of the Corps regulations or Implementing Guidance that North Dakota references constitute mandatory directives that required the Corps to respond to the protests in a particular manner. But even if these federal sources purported to impose some duty on the Corps, this would not form the basis of an actionable duty under North Dakota tort law. *See Klett v. Pim*, 965 F.2d 587, 589 (8th Cir. 1992) ("Federally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon private persons." (citation omitted)). The State does not identify any basis under North Dakota law for imposing a duty similar to the duty it alleges exists under federal regulations and the Corps' Implementing Guidance.

Additionally, there is no basis under North Dakota law for imposing a duty to control the conduct of a third party, especially where, as here, the third party is a trespasser. *Id.* ¶¶ 2–3, 34–37, 50–53, 92–93 (repeatedly referring to the protesters as trespassers). North Dakota law follows the rule under Restatement (Second) of Torts § 315 that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless" a special relationship exists between the actor and the third person or the actor and the injured person. *See Saltsman v. Sharp*, 803 N.W.2d 553, 557 (N.D. 2011) (citing Restatement (Second) of Torts § 315 (1965)); *Hurt v. Freeland*, 589 N.W.2d 551, 558–59 (N.D. 1999).

A possessor of land may have a duty to exercise reasonable care to control the conduct of a licensee or invitee if the possessor of land "knows or has reason to know that he has the ability to control the third person, and knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 318 (1965). The rule stated in section 318 does not address whether a duty exists to control the conduct of trespassers, and courts have been reluctant to extend the rule to trespassers. *Id.* (explaining in caveat that Restatement does not address whether there is a duty of reasonable care to control conduct of a third person "where the third person is a trespasser"); *e.g.*, *Flynn v. Nickerson*, 177 A.3d 468, 477 (R.I. 2018) (holding no duty of care existed to control conduct of thief who broke in to community center and who was trespassing when he stole vehicle); *see Pierce v. Staley*, 587 N.W.2d 484, 488 (Iowa 1998) ("[T]he duty to control third persons under section 318 of the Restatement is directed at those coming on the property with consent."). No North Dakota cases extend the duty stated under section 318 to the conduct of trespassers.

Furthermore, even if North Dakota law recognized a duty to control trespassers under some circumstances (it does not), this duty would not apply to the circumstances alleged here, where the possessor of land has no ability to control or prevent the conduct of the trespassers. *See* Restatement (Second) of Torts § 318 (1965) (stating that actor is "under a duty to exercise reasonable care so to control the conduct of the third person . . . if the actor . . . knows or has reason to know that he has the ability to control the third person"); *Luoni v. Berube*, 729 N.E.2d 1108, 1112 (Mass. 2000) (explaining that duty imposed under "[section] 318 presupposes a landowner's ability to control or prevent the conduct of third persons, an ability which . . . the defendants did not have over their guests"). As explained above, the Corps had no authority to detain or physically control the conduct of the trespassers here. *See supra*, Statutory and Regulatory Overview, at 7–

8; ER 1130-2-550 § 6-2(e) ("An [OPM] or park ranger may request visitors to stop but cannot physically detain them.").  North Dakota law does not provide any basis for imposing an actionable duty on the Corps to control the conduct of the trespassers or enforce their compliance with Corps rules and regulations.  North Dakota's public nuisance, negligence, and gross negligence claims thus fail to identify a basis for liability under "the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

> **2.     North Dakota's Good Samaritan Negligence Claim is Not Actionable Under North Dakota Law.**

In addition to alleging negligence and gross negligence claims, North Dakota asserts a negligence claim under a good Samaritan theory of liability, alleging that the Corps assumed a duty to "enforce the law and protect public health, safety and the environment on federal lands." Doc. 1 ¶¶ 119–23.  The "good Samaritan" doctrine, as articulated in Restatement (Second) of Torts § 323, provides that

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *McDowell v. Gillie*, 626 N.W.2d 666, 669 (N.D. 2001) (recognizing good Samaritan doctrine under Restatement (Second) of Torts § 323).[8]  Thus, a person who undertakes to perform services to another may incur a duty to exercise reasonable care in performing the undertaking.  *See Madler v. McKenzie Cty.*, 467 N.W.2d 709, 714–15 (N.D.

---

[8] Good Samaritan liability also exists if an actor's negligent undertaking for another injures a third person.  Restatement (Second) of Torts § 324A (1965).  North Dakota does not allege third party good Samaritan liability, *i.e.*, that it was injured because of the Corps' negligence in performing an undertaking for another individual or entity.  Accordingly, section 324A does not apply to this case.

1991) (holding that plaintiff had raised genuine issues of fact as to whether contractor, in performing contractual duties for State, had incurred a duty to plaintiff to exercise reasonable care for plaintiff's safety under good Samaritan doctrine) (citing Restatement (Second) of Torts § 324 (1965)).

Here, the good Samaritan doctrine does not provide the basis for a duty under North Dakota law because North Dakota's allegations do not reflect that the Corps "undert[ook], gratuitously or for consideration, to render services to" North Dakota. Restatement (Second) of Torts § 323 (1965). North Dakota alleges the Corps undertook general law enforcement duties by communicating with the Standing Rock Sioux Tribe, by receiving intelligence reports from federal agencies, and by making a joint statement with other federal agencies that "anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities." *See* Doc. 1 ¶¶ 28, 46, 47, 53, 57, 89, 90–91. Far from evidencing that the Corps undertook a service to North Dakota, these alleged actions and statements simply reflect that the Corps was performing its responsibility as a steward of federal land. Additionally, a federal agency's efforts to enforce its own regulations does not qualify as "render[ing] services" under section 323. *See Fla. Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498, 504–05 (4th Cir. 1996) (explaining that enforcement of Customs regulations did "not represent an effort specifically to 'render services' to Appellees"); *Stables v. United States*, 366 F. Supp. 2d 559, 571 (S.D. Ohio 2004). Accordingly, North Dakota has not plausibly alleged that the Corps undertook to "render services" to North Dakota.

Additionally, North Dakota fails to allege any of the other conditions that would give rise to a good Samaritan claim. First, although North Dakota courts have not addressed whether economic losses are recoverable under the good Samaritan doctrine, a large majority of courts have

30

read the references to "physical harm" in section 323 as affirmatively precluding recovery for solely economic losses in good Samaritan cases.  *E.g.*, *Schaefer v. Indymac Mortg. Servs.*, 731 F.3d 98, 104–05 (1st Cir. 2013) (collecting cases).  North Dakota's claims for recovery of law enforcement expenses do not qualify as claims for "physical harm."

Moreover, North Dakota does not allege that the Corps' actions "increase[d] the risk of [] harm" beyond the risk that would have existed if the Corps had not acted at all.  *See* Restatement (Second) of Torts § 323(a) (1965); *see also Chamley v. Khokha*, 730 N.W.2d 864, 878 (N.D. 2007) (quoting *Sagan v. United States*, 342 F.3d 493, 498 (6th Cir. 2003)) ("The test is not whether the risk was increased over what it would have been if the defendant had not been negligent, but rather whether the risk was increased over what it would have been had the defendant not engaged in the undertaking at all."); *Turbe v. Virgin Islands*, 938 F.2d 427, 432 (3d Cir. 1991).

North Dakota alleges one of the strategies the Corps used to manage the protests, the creation of a "free speech zone," had the effect of "inviting illegal activity to the area" and "emobolden[ing] trespassers to spill over their unlawful activities to State-owned and private lands."  Doc. 1 ¶¶ 60–62.  North Dakota does not allege the creation of the "free speech zone" increased the risk of harm beyond the level of risk North Dakota would have faced in the absence of the "free speech zone."  As the State's allegations suggest, nothing short of forcible removal or physical control of the trespassers would have prevented the protesters' unlawful conduct.  *See id.* ¶ 7 (alleging North Dakota's injuries were the result of "the Corps' failure to remove or control the trespassers and enforce the law").  The Corps' limited enforcement authority does not extend to forcible removal, detention, or control of individuals.  *See supra*, Statutory and Regulatory Overview, at 7–8.   North Dakota has not alleged that any of the Corps' efforts to manage the

protests, including creation of the "free speech zone," increased the risk of harm beyond what it would have been if the Corps had done nothing in response to the protests.

Finally, North Dakota does not allege it suffered harm because of its reliance on any of the Corps' actions. Restatement (Second) of Torts § 323(b) (1965); *see Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) ("The comments to the Restatement with respect to the element of reliance make clear that the reliance must have induced the [plaintiff] 'to forgo other remedies or precautions against the risk.'" (citation omitted)). North Dakota does not allege it took, or declined to take, any actions in reliance on a belief that the Corps would enforce federal or state laws or protect North Dakota property. To the contrary, North Dakota alleges it mounted a significant law enforcement and clean-up response, incurring more than $38 million in expenses. Therefore, North Dakota cannot assert that good Samaritan liability applies on the basis of reliance.

### 3. North Dakota's Claim for Civil Trespass Fails Under North Dakota Law.

Under North Dakota law, civil trespass is defined as "an intentional harm, where a person intentionally and without a consensual or other privilege . . . enters land in possession of another or any part thereof or causes a thing or third person so to do." *Tibert v. Slominski*, 692 N.W.2d 133, 137 (N.D. 2005) (internal quotations and citation omitted). "If there is no intent or 'affirmative voluntary act' by the alleged wrongdoer, there cannot be a claim for trespass." *Id.* (citation omitted). North Dakota alleges the Corps' permitting and enforcement conduct caused third persons, the protesters, to "overflow and trespass onto State-owned land." Doc. 1 ¶ 132. North Dakota, however, has not alleged that the Corps' actions were intentional, or that the Corps took any "affirmative voluntary act" that caused the protesters to trespass on state land. *Tibert*, 692 N.W.2d at 137; *see Glaude v. United States*, No. 4:07-CV-069, 2009 WL 2513613, at *6 (D.N.D. Aug. 12, 2009) (finding that even if BIA employees entered plaintiff's lands, they did not

do so intentionally).  Because North Dakota cannot establish that the Corps intentionally caused protesters to trespass onto state property, North Dakota's civil trespass claim must be dismissed.

    **D.**    **North Dakota's Claims Do Not Satisfy the FTCA's "Private Analog" Requirement.**

FTCA jurisdiction exists only if a plaintiff alleges "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674 (FTCA allows for tort recovery against United States only "in the same manner and to the same extent as a private individual under like circumstances").   This provision is known as the "private analog" requirement.  *Sorace v. United States*, 788 F.3d 758, 763 (8th Cir. 2015) (citing *Barnes v. United States*, 448 F.3d 1065, 1066 (8th Cir. 2006)).  If a private person acting in similar circumstances would not be liable under state law for the alleged harm, then there is no private analog and the FTCA does not waive sovereign immunity.  *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (citing 28 U.S.C. § 1346(b)(1)).  Because North Dakota law does not impose liability on private parties for failing to enforce federal, state, or local laws, no private analog exists here.

North Dakota alleges the Corps failed to enforce its regulations regarding permitting and private use of Corps-managed property, thereby allowing protesters to engage in civil unrest and unlawful conduct for several months.  The Eighth Circuit has explained that "[f]ederally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon private persons."  *Klett v. Pim*, 965 F.2d 587, 589 (8th Cir. 1992) (citation omitted).  Thus, even if federal law required the Corps to enforce its regulations, which it does not, there is no jurisdiction under the FTCA unless North Dakota law imposes a duty on private parties to enforce regulations under circumstances similar to those alleged here.  *See id.*

33

In *Gelley v. Astra Pharmaceutical Products, Inc.*, the Eighth Circuit held that the United States Food and Drug Administration ("FDA") could not be held liable under the FTCA for failure to enforce compliance with its labeling regulations because no cause of action existed under Minnesota law, against either public entities or private persons, "for violations of governmental duties owed the public in general."  610 F.2d 558, 560–63 (8th Cir. 1979) (citation omitted).  In so holding, the court expressed "substantial doubt" that "tort law principles in *any* state would hold a private person liable for conduct similar to that of the FDA in this case."  *Id.* at 563 (emphasis added); *see also Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 857 (8th Cir. 2005) (holding that no private analog existed under Missouri law for action against Corps for wrongful determination that certain excavation projects were subject to Clean Water Act, "[b]ecause the Corps alone has the authority to enforce the Clean Water Act and to make permit decisions").

There is no support in the case law for the assertion that in North Dakota a private person can be held liable for failing to enforce a regulatory scheme.  Indeed, "the Corps alone has the authority to enforce" its rules and regulations.  *See Green Acres*, 418 F.3d at 857.  Thus, no private party analog exists for failing to enforce third parties' compliance with laws or regulations.

## CONCLUSION

This Court lacks subject matter jurisdiction over North Dakota's claims because the discretionary function exception bars each of its claims and because North Dakota's claims all fall outside the scope of the FTCA's waiver of sovereign immunity.  For these reasons, this action must be dismissed.

Dated: September 17, 2019                 Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General
                                          Civil Division

                                          THOMAS G. WARD
                                          Deputy Assistant Attorney General
                                          Civil Division

                                          JAMES G. TOUHEY, JR.
                                          Director, Torts Branch
                                          Civil Division

                                          ROGER D. EINERSON
                                          Deputy Director, Torts Branch
                                          Civil Division

                                          PHILIP D. MACWILLIAMS
                                          Trial Attorney, Torts Branch
                                          Civil Division

                              By:         */s/ Grant E. Treaster*
                                          GRANT E. TREASTER
                                          Trial Attorney, Torts Branch
                                          United States Department of Justice
                                          Civil Division
                                          175 N Street, NE
                                          Washington, D.C. 20002
                                          (202) 616-2359
                                          grant.treaster@usdoj.gov

                                          *Counsel for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 17, 2019, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and any other electronic filer as of the time of the filing.  I further certify that on the same date copies of the foregoing document and the notice of electronic filing will be mailed by first-class mail to the following counsel for Plaintiff:

Paul M. Seby
Special Assistant Attorney General
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202

Matthew Sagsveen
Solicitor General
500 North 9th Street
Bismarck, ND 58501

<div style="margin-left:50%">

_____
GRANT E. TREASTER
Trial Attorney, Torts Branch
*Attorney for Defendant*

</div>