**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| State of North Dakota, | |
| Plaintiff, | |
| vs. | Case No. 1:19-cv-00150 |
| United States of America, | |
| Defendant. | |

---

**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

---

[¶1]     THIS MATTER comes before the Court on a Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by the Defendant, the United States of America, on September 17, 2019. Doc. No. 5. Plaintiff, State of North Dakota filed an Opposition to Defendant's Motion to Dismiss on November 7, 2019. Doc. No. 14. The United States filed a Reply in Support of Motion to Dismiss on November 21, 2019. Doc. No. 16. North Dakota was allowed to file a Sur-Reply, a corrected version of which was submitted on December 13, 2019. Doc. No. 18-1; Doc. No. 29. The United States' Response to the Sur-Reply was filed on December 30, 2019. Doc. No. 21-1; Doc. No. 30. The Court held hearing for oral argument on July 22, 2020, in Bismarck, North Dakota. For the reasons set forth below, the United States' Motion to Dismiss is **DENIED, in part, and GRANTED, in part**.

<u>**INTRODUCTION**</u>

[¶2]     North Dakota brought a five-count Complaint against the United States, acting through the U.S. Army Corps of Engineers ("Corps"), to recover more than $38 million dollars in damages to the State resulting from and arising out of more than seven months of protests to the construction

-1-

of the Dakota Access Pipeline ("DAPL"). The Complaint alleges claims for public nuisance, negligence, Good Samaritan negligence, gross negligence, and civil trespass. The United States' Motion to Dismiss challenges this Court's subject matter jurisdiction. The United States asserts North Dakota's claims are barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"). Additionally, the United States argues the State's claims do not come within the waiver of sovereign immunity provided in the FTCA.

## FACTUAL BACKGROUND

[¶3]    For purposes of this motion, the United States has accepted as true the allegations set forth in North Dakota's Complaint. Several exhibits were received into evidence at the July 22, 2020 hearing, and those exhibits are also considered by the Court. See Buckler v. United States, 919 F.3d 1038, 1044 (8th Cir. 2019) (providing that courts may receive and consider evidence by any rational mode of inquiry in determining whether subject matter jurisdiction exists).

[¶4]    From about August 10, 2016, to approximately March 31, 2017, DAPL protesters occupied Corps-managed land near Lake Oahe and the Oahe Dam in Morton County, North Dakota. Doc. No. 1, ¶¶ 2, 8. The protesters established three main encampments adjacent to the Cannonball River and Lake Oahe: the Seven Council (Oceti Sakowin), Rosebud, and Sacred Stone encampments. Id. at ¶ 8. North Dakota alleges the encampment populations at their peak grew to approximately 5,500 people with some estimates as high as 8,000 people. Id.

[¶5]    While there, some of the protesters engaged in unlawful and dangerous activities both on and off Corps-managed land, including blocking public highways and bridges, threatening individuals working on the DAPL pipeline and local residents, initiating violence against law enforcement personnel and first responders, damaging State and private property, destroying personal property and equipment, and killing cattle and local wildlife. Id at ¶¶ 9, 34. These actions

required sustained law enforcement efforts to enforce state law, curb illegal conduct, protect persons from harm, and protect State and private property. During this time, law enforcement made 761 arrests, less than 7% of those arrested were North Dakota residents. Id. at ¶11. The vast majority of arrests were of people who had traveled to North Dakota to engage in the protests. Id.

[¶6]      North Dakota alleges the Corps, through its actions, assumed a legal duty to protect the protesters and to prevent unlawful dangerous activities, including trespass on federal lands, and that failing in that duty, the Corps aggravated the harm caused by some of the protesters to persons and state and private property in the area. Id. at ¶3. The Complaint alleges the Corps' tortious conduct included failing to enforce mandatory legal requirements governing access to and conduct on Corps-managed land, violating the legal duty it assumed to protect protesters and the public generally from unlawful and dangerous protest activity, failing to fulfill its mandatory regulatory obligations that require the Corps to issue and enforce use permits that are required to hold activities on Corps-managed land, and failing to address or prevent the protesters' violations of the regulations and restrictions on use of Corps-managed land. Id. at ¶¶ 4-5.

[¶7]      North Dakota further claims the Corps invited, enabled, and encouraged the protestors to pour into Corps-managed land by making a public announcement that a special use permit had been issued authorizing the Tribe to engage in lawful free speech demonstration in the areas identified in the permit. See id. at ¶ 49. The announcement, published on September 16, 2016, stated:

> Today the U.S. Army Corps of Engineers (Corps) issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe. Omaha District Commander, Col. John W. Henderson, informed Standing Rock Sioux Tribal Chairman Dave Archambault II, that the Tribe's Spiritual gathering, located south of the Cannonball River, has been granted a Special Use Permit, which allows the Tribe to gather to engage in lawful free speech demonstration on Federal lands designated in the permit.

Doc. No. 35-2.

[¶8]      The United States now contends this announcement was incorrect.[1] Despite issuing a press release to the contrary, the Corps now asserts it had not granted any special use permits for the encampments south of the Cannonball River. See Doc. No. 1, ¶¶ 46, 49-51. The Corps also argues it had not granted permits or permission for anyone to access the area north of the river, although groups of people had set up camp in that area too, including the Seven Councils Camp. See, e.g., Doc. No. 35-3. At hearing, the United States claimed the Corps viewed the people in the encampments as trespassers and contends this was the legal status also recognized by North Dakota in the Complaint. Despite claiming to view the protesters as trespassers, the United States admitted at the hearing the Corps did not request any immediate assistance from state or local authorities to remove the protesters from Corps-managed land.

[¶9]      A few weeks later, on November 1, 2016, Colonel John W. Henderson, District Commander of the Omaha Department of the Army Corps of Engineers ("District Commander Henderson"), by letter requested state law enforcement assistance from the Morton County Sheriff's Department. Doc. No. 1, ¶ 53; Doc. No. 35-3. The letter was at least partially in response to protesters moving up a branch of the Cantapeta Creek, a tributary of the Cannonball River, to camp in an area closer to where the DAPL project had proposed to place the pipeline. Doc. No. 35-3. The letter asserted the Corps had not provided any permits or permission for anyone to access that area, which was not opened or designated for use by the public. Id. District Commander Henderson requested law enforcement assistance from the Morton County Sheriff's Department

---

[1] The United States asserts, and North Dakota does not dispute, the misrepresentation exception to the FTCA may protect the Corps from claims arising out of the dissemination of a false statement. See 28 USC § 2680(h); United States v. Neustadt, 366 U.S. 696, 698 (1961); Block v. Neal, 460 U.S. 289, 294 (1983).  However, as explained herein, the Court finds the announcements by the Corps were written permissions or permits and were not misrepresentations.

to address the issues occurring in that area. Id. Around November 21, 2016, District Commander Henderson had a change of heart and rescinded the request for law enforcement assistance in a follow-up letter to the Morton County Sheriff. Doc. No. 1, ¶ 54.

[¶10]     A few days later, on November 25, 2016, District Commander Henderson wrote to the Chairman of the Standing Rock Sioux Tribe, Dave Archambault II, informing him that all Corps-managed land north of the Cannonball River would be closed for all use effective December 5, 2016. Id. at ¶ 56; Doc. No. 35-5. District Commander Henderson explained closure was "necessary to protect the general public from the violent confrontations between protesters and law enforcement officials that have occurred in this area, and to prevent death, illness, or serious injury to the inhabitants of the encampments." Doc. No. 35-5. The letter advised Chairman Archambault the Corps had "established a free speech zone on land south of the Cannonball River for anyone wishing to peaceably protest the Dakota Access pipeline project, subject to the rules of 36 C.F.R. Part 327." Id. District Commander Henderson further advised that anyone found on land north of the Cannonball River would be subject to prosecution and assumed all risk and liabilities for their unlawful presence on such lands. Id. Chairman Archambault was urged to encourage protesters to move to the designated free speech zone on Corps lands south of the Cannonball River. Id.

[¶11]     As a result, some of the protesters moved to the established free speech zone, but others continued to unlawfully occupy areas north of the Cannonball River. Doc. No. 1, ¶ 62. North Dakota alleges thereafter the Corps "continued to turn a 'blind eye'" to the unlawful use, occupation, and activities of the protesters. Id. North Dakota claims the Corps' nonexistent enforcement of the laws and regulations "attracted a host of illegal activities not only to the 'free speech zone' but to surrounding areas as well." Id. The Complaint alleges that rather than address the problems, the Corps chose to let the situation "play out," despite requests from State and local

law enforcement for federal assistance to curb the use of illegal encampments which were being used as staging areas for violent and unlawful activities by some of the protesters. Id.

[¶12]     Federal law enforcement assistance was not forthcoming. North Dakota alleges State and local law enforcement and first responders were compelled to protect public safety and uphold the law. Id. at ¶ 63. Many violent confrontations ensued with officers being outnumbered and under siege by the protesters who used a variety of weapons to engage law enforcement, including lasers, guns, arrows, Molotov cocktails, rocks, sticks, frozen water bottles, cans, and feces. Id. at ¶ 64. The encounters between the violent protesters and law enforcement culminated on October 27, 2016, when law enforcement officers were attempting to remove rioter roadblocks on North Dakota Highway 1806 and remove hundreds of persons trespassing on private land. Id. at ¶ 65. North Dakota alleges this was one of its most complex and multi-faceted riots between law enforcement and protesters. Among other things, rioters started numerous fires on the Highway 1806, the Backwater Bridge, a bridge on Morton County Road 134, three pieces of DAPL construction equipment and numerous vehicles. Id. at ¶ 70.

[¶13]     On November 15, 2016, law enforcement responded to another serious incident involving about 300 protesters attempting to block the Burlington Northern Santa Fe railroad tracks west of Mandan, which threatened to derail a number of inbound and outbound trains, many of which contained crude oil. Id. at ¶ 72.  Additional confrontations with State and local law enforcement occurred on Thanksgiving Day 2016, when protesters conducted three concurrent protests involving the Backwater Bridge, Turtle Hill, and East Main and Memorial Highways in Mandan. Id. at ¶¶ 73-75. Other skirmishes between protesters and law enforcement are detailed in the Complaint. See id. at ¶¶ 71, 74-76. North Dakota alleges the protesters were able to use the

illegal encampments on Corps-managed land as a "safe haven" from which to initiate their illegal and violent activities and then retreat. See id. at ¶¶ 72-76.

[¶14]     On January 20, 2017, the Standing Rock Sioux Tribal Council issued a resolution requiring all individuals at the illegal encampments to vacate out of concerns for the extreme winter conditions, unsafe environment, and declining revenues at a major tribal casino. Id. at ¶ 87. On February 3, 2017, the Corps took action to begin clearing the illegal encampments as well. Id. at ¶¶ 90-91.  The Corps indicated to Chairman Archambault that all areas needed to be cleared by February 22, 2017 due to concern for a high potential of record spring flooding of the Cannonball River. Id.

[¶15]     When the protesters finally vacated the encampments, North Dakota alleges it was left with a spoiled environment and vast quantities of noxious waste, garbage, and debris that was cleaned up at a considerable cost to the State. Id. at ¶ 96. The protesters left behind 21,480,000 pounds of trash and debris to be cleaned up in addition to generators, cars, vans, trucks, trailers, buses, campers, motor homes, and other apparatuses. Id. North Dakota further alleges it was forced to expend significant State resources for law enforcement and emergency-response-related services. Id. at ¶¶ 99-103.  North Dakota claims damages in the sum certain amount of $38,005,071.66. Id. at ¶ 107.

## STANDARD OF REVIEW

[¶16]     The United States challenges the subject matter jurisdiction of the Court to adjudicate North Dakota's Complaint pursuant to Rule 12(b)(1), Fed. R. Civ. P. The burden of demonstrating subject matter jurisdiction is on North Dakota as the Plaintiff. See Herden v. United States, 726 F.3d 1042, 1046 (8th Cir. 2013). The Court has an obligation to decide the jurisdictional issue and may not simply rule that there is or is not enough evidence to have a trial on the issues. Osborn v.

United States, 918 F.2d 724, 730 (8th Cir. 1990). The Court may look outside the pleadings to determine whether jurisdiction exists, allow an evidentiary hearing, and receive evidence by any rational mode of inquiry. Buckler v. United States, 919 F.3d 1038, 1044 (8th Cir. 2019).

## ANALYSIS AND DISCUSSION

[¶17]      The United States, as a sovereign entity, is immune from suit except to the extent that it has waived sovereign immunity. Pursuant to the FTCA, 28 U.S.C. § 1346(b)(1), the United States has waived

> claims against the United States for money damages…for injury or loss of property…caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Id.  "The FTCA serves as a limited waiver of sovereign immunity, opening the door to state-law liability claims against the federal government for harm caused by government employees." Buckler, 919 F.3d at 1044. To proceed, North Dakota's claims must come within section 1346(b)(1)'s waiver requirements, otherwise such claims are barred by sovereign immunity.

[¶18]      The FTCA's waiver of sovereign immunity is further limited by an exception for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception is referred to as the discretionary function exception. Herden, 726 F.3d at 1046. "If the FTCA's discretionary function exception applies, it is a jurisdictional bar to suit." Id.

[¶19]      Here, the United States first argues the discretionary function exception in 28 U.S.C. § 2680(a) protects the Corps' decisions and conduct that is the basis for North Dakota's claims. Next,

the United States argues North Dakota's asserted claims do not come within the statutory limitations of the waiver of sovereign immunity in 28 U.S.C. § 1346(b)(1).

## I.  **Discretionary Function Exception**

[¶20]     "A well-established legal framework applies to determine whether the discretionary function exception bars a party's suit under the FTCA." Herden, 726 F.3d at 1046. "The contours of the discretionary function cannot be defined with precision. Thus, each case must be analyzed individually based upon relevant criteria in determining whether the acts of the government employees are protected from liability under section 2680(a)." Buckler, 919 F.3d at 1047 (quoting Aslakson v. United States, 790 F.2d 688, 691 (8th Cir. 1986)).

[¶21]     "The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being controlled by mandatory statutes or regulations." Id. (citing United States v. Gaubert, 499 U.S. 315, 328, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). "If the challenged conduct is not discretionary, the exception does not apply." Id. at 1046-47. In other words, if the statutes and regulations impose a mandatory obligation upon the government there is no discretion to act contrary to or ignore such an obligation, and the discretionary function exception is not implicated.

[¶22]     Only when the challenged government or agency action is truly discretionary, the Court then moves onto the second inquiry: "whether the government employee's judgment or choice was 'based on considerations of social, economic, and political policy.'" Id. (citing Layton v. United States, 984 F.2d 1496, 1499 (8th Cir.1993)). "Not all discretionary decisions are immune from suit because the Congressional purpose of the exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy[.]" Id. (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984). "However, as long as a

discretionary decision is 'susceptible to policy analysis,' the exception applies 'whether or not [a] defendant in fact engaged in conscious policy-balancing.'" Id. "When established policy affords a government agent discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Demery v. U.S. Dep't of Interior, 357 F.3d 830, 833 (8th Cir. 2004). The plaintiff bears the burden of rebutting this presumption. Id.

[¶23]    North Dakota argues the Corps had three mandatory obligations giving rise to the claims alleged in the Complaint. First, North Dakota argues the Corps' authority to allow group activities on Corps-managed land is limited to recreational uses. Doc. No. 14, p. 38. Second, North Dakota asserts the Corps had no discretion to allow protesters onto the land because they did not have a permit and permits are required to use Corps-managed land. Id. at p. 39. Third, North Dakota claims the Corps had a mandatory obligation to enforce its use regulations of Corps-managed land and failed to do so. Id. at p. 41.

[¶24]    Prior to addressing the Corps' alleged non-discretionary obligations, a review of the governing statutory and regulatory authority is needed.

### A. Statutory and Regulatory Authority

[¶25]    The Corps has the authority to manage federal land in a water resource development project, like the project area here at Lake Oahe and the Oahe Dam. 16 U.S.C. § 406d. Section 406d provides in relevant part:

> ***The Chief of Engineers . . . is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army,*** to permit the construction of such facilities by local interests (particularly those to be operated and maintained by such interests), and to permit the maintenance and operation of such facilities by local interests. * * * The water areas of all such projects shall be open to public use generally for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such areas along the shores of such projects shall be maintained for general public use, when such use is determined by the Secretary of the Army not to be contrary to the

-10-

> public interest, all under such rules and regulations as the Secretary of the Army may deem necessary, including but not limited to prohibitions of dumping and unauthorized disposal in any manner of refuse, garbage, rubbish, trash, debris, or litter of any kind at such water resource development projects, either into the waters of such projects or onto any land federally owned and administered by the Chief of Engineers. Any violation of such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any persons charged with the violation of such rules and regulations may be tried and sentenced in accordance with the provisions of section 3401 of Title 18. * * *

Id. (emphasis added).

[¶26]    The Corps' statutory authority to allow special uses of managed land is governed by

33 U.S.C. § 2328a, which provides in part:

> The Secretary may issue special permits for uses such as group activities, recreation events, motorized recreation vehicles, and such other specialized recreation uses as the Secretary determines to be appropriate, subject to such terms and conditions as the Secretary determines to be in the best interest of the Federal Government.

33 U.S.C. § 2328a(a)(1).

[¶27]    Title 36, Code of Federal Regulations, Part 327, regulates the management at water resource development projects administered by the Corps. See 36 C.F.R. § 327.0. "It is the policy of the [Corps] to manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." Id. § 327.1(a). Camping on Corps land is limited to areas and sites designated by the District Commander and unauthorized camping is prohibited. Id. § 327.7(a), (c). Camping for a period of longer than 14 days is prohibited unless the written permission of the District Commander has been provided. Id. § 327.7(b). The District Commander has the authority to close or restrict the use of a project "when necessitated by reason of public health, public safety, maintenance, resource protection or other reasons in the public interest." Id. § 327.12(a). "Any act or conduct . . . which interferes with, impedes or disrupts the use of the project or impairs the safety

of any person is prohibited. Individuals who are boisterous, rowdy, disorderly, or otherwise disturb the peace on project lands or waters may be requested to leave the project." Id. § 327.12(c).

[¶28]    Section 327.19 addresses permits and provides "[i]t shall be a violation of this part to refuse to or fail to comply with the fee requirements or other terms or conditions of any permit issued under the provisions of part 327." 36 C.F.R. § 327.19(a). Use of Corps-land for special events is addressed in § 327.21, which provides:

> Special events including, but not limited to, water carnivals, boats regattas, fishing tournaments, music festivals, dramatic presentations or other special recreation programs are prohibited **unless written permission has been granted by the District Commander**.

Id. § 327.21(a). (Emphasis added). Unauthorized occupation is prohibited as follows:

> Occupying any lands, buildings, vessels, or other facilities within water resource development projects for the purpose of maintaining the same as a full-or part-time residence **without the permission of the District Commander is prohibited**.

Id. § 327.22(a). (Emphasis added).

### i.    Recreational use

[¶29]    The State argues the use of Corps-managed land is limited to recreational uses and the Corps had no discretion to allow non-recreational uses of the land in the Lake Oahe project area. The United States in response asserts the statutory language, properly understood, does not limit group activities solely to recreational uses. According to the United States, the Corps has broad authority to allow group activities. The Court agrees that the Corps' authority is not limited solely to recreational uses.

[¶30]    The language of § 460d imbues the Corps with the authority to maintain and operate public park and recreational facilities and to permit the operation of facilities by local interests. 16 U.S.C. § 460d (providing "[the Corps] is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects"). Section 2328a(a)(1) provides that special use permits **may** issue for "uses **such as group activities**, recreation events, motorized

recreation vehicles, and such other specialized recreation uses" as the Corps determines to be appropriate. 33 U.S.C. § 2328a(a)(1) (emphasis added). The term *may* is permissive and connotes discretion on the part of the Corps. Additionally, § 2328a(a)(1) refers to permitted uses **"such as** group activities, recreation events, motorized recreation vehicles, and such other specialized recreation activities." (emphasis added). The phrase "such as" denotes that examples follow, but these examples are not limitations. Moreover, the term "recreational" does not precede or modify "group activities" that may be permitted. Thus, the Court concludes the governing statutes do not restrict the Corps' authority to issue special permits to solely recreational uses.

[¶31]     The Court next examines whether the regulations and Implementing Guidance[2] restrict the Corps' authority to issue special use permits solely to recreational uses and concludes they do not.

[¶32]     Section 327.21(a), 36 C.F.R., like the statutes, provides similar discretion to the Corps in authorizing special events. See 36 C.F.R. § 327.21(a). The regulation states: "Special events **including, but not limited to,** water carnivals, boat regattas, fishing tournaments, music festivals, dramatic presentations or other special recreation programs are prohibited unless written permission has been granted." Id. (emphasis added).

[¶33]     Taking a closer look at the Implementing Guidance of the two types of special use permits, special event and special activity, reinforces the conclusion that uses are not restricted solely to recreational activities. The Corps' Implementing Guidance indicates that a special activity permit "*may* be issued for the specific use of project resources benefitting an individual or small

---

[2] The Corps' Implementing Guidance include the Engineering Regulations ("ER") 1130-2-550 (Nov. 15, 1996 (as updated)), Doc. No. 6-2, the Engineering Circular ("EC") 1130-2-550 (Nov. 30, 2015), Doc. No. 8, and the Engineering Pamphlet ("EP") 1130-2-550 (Nov. 15, 1996 (as updated)), Doc. No. 6-3.

group" and a special event permit "*may* be issued for the organized use of project resources for a specific purpose and limited duration, beyond that normally engaged in by individuals or groups on a day-to-day basis." E.C. 1130-2-550 §§ 15(b)(1), (d)(1) (emphasis added); Doc. No. 8, pp. 10-12. Examples of special activities noted therein include: "hunting, off-road vehicle use, academic research, backcountry use, limited access to closed areas, small weddings, small fishing tournaments, or any unique activity that requires administrative oversight." Id. § 15(b)(2). The Implementing Guidance instructs that an activity that has a significant impact, may be treated as a special event instead of a special activity. Id. § 15(d)(3). Again, the regulations and Implementing Guidance uses permissive language.

[¶34]     As the above review demonstrates, the statutes, regulations and Implementing Guidance do not restrict the special uses of Corp-managed land solely to recreational uses. Thus, the Court concludes the Corps did not violate a mandatory duty to limit use of Lake Oahe and Oahe Dam to recreational uses.[3] Instead, the Corps has discretion to determine whether special activities or events should be allowed on Corps-managed land in accordance with the Corps' permitting authority, which the Court considers next.

### ii.     Permitting

[¶35]     The Complaint alleges the Corps failed to fulfill its mandatory duty to prohibit activities on Corps-managed land without a proper permit outlining the restrictions for use. Doc. No. 1, ¶¶ 110-111. North Dakota claims the governing laws and regulations in 36 C.F.R. Part 327 require the Corps to issue and enforce use permits to conduct organized activities on federal lands. Id. at ¶ 5. In response to the United States' Motion to Dismiss, the State further argued the United States

---

[3] North Dakota and United States at hearing agreed that protesting could be considered "recreation" by some of the protesters.

invited, enabled, and encouraged the activities of the protesters. See, e.g., Doc. No. 14, pp. 8, 36-37. It is unclear whether the Corps' alleged invitation and encouragement of protestors is related to the public press statement on September 16, 2016, that a special use permit had been granted to the Standing Rock Sioux Tribe or the November 26, 2016 correspondence from the District Commander establishing the free speech zone south of the Cannonball River. Doc. Nos. 35-2, 35-5. But, in any event, this Court finds both actions by the Corp were a "written permission . . . granted by the District Commander," neither of which were predicated by a properly-submitted permit application. 36 C.F.R. § 327.21(a).

[¶36]     The first prong of the discretionary function exception is to determine whether the challenged conduct is truly discretionary rather than mandatory. Herden, 726 F.3d at 1046-47. Even assuming the statutes and regulations provide the Corps discretionary authority to approve special activities and uses of Corps-managed land through the issuance of special use permits, the Corps' discretionary authority may nevertheless be restricted or conditioned by mandatory directives and obligations adopted in the Corps' Implementing Guidance.

[¶37]     Special use permits are addressed in EC 1130-2-550 § 15(d) and Appendix E. A special event permit "may be issued for the organized use of project resources for a specific purpose and limited duration, beyond that normally engaged in by individuals or groups on a day-to-day basis." Id. §15(d)(1), Doc. No. 8, p. 12. "A Special Event often requires Corps support and/or oversight that convey special benefits to an identifiable recipient or recipients beyond those afforded to the general public." Id. § 15(d)(2). Special events are administered by issuing a permit in accordance with guidance in Appendix E. Id. § 15(d)(4). "To qualify for issuance of a special event permit, an event must contribute to the enjoyment of the visiting public and be consistent with established land use classifications." Id. § E-3, Doc. No. 8, p. 44.

[¶38]     Before a permit for a special event may issue, section E-4 states "an application ***must*** be obtained, completed, and submitted to the [Corps]." Doc. No. 8, p. 45 (emphasis added). Such application "will describe the nature of the event, the starting and closing dates and times, the location or area desired for the event, and any other pertinent information." Id. The Implementing Guidance provides: "It is the Operations Project Manager's ***responsibility*** to determine if the requested activity is a special event; to assure the activity is consistent with current project land use classifications and . . . to specify general criteria and site-specific stipulations based upon criteria in this appendix." Id. § E-6 (emphasis added). The Operations Project Manager may require a performance bond to cover maintenance, damage and restoration costs for government resources and facilities. Id. § E-6(a). Liability insurance in the minimum amount of $1,000,000 is mandatory and must be obtained when the expected group is over 50 participants. Id. § E-6(c)(1), Doc. No. 8, p. 46.

[¶39]     An approved application form is provided in Appendix E, which requests information such as the name of the organization holding the event, contact information, an event description, dates of the event, number of participants, number of vehicles, whether fees or donations will be collected from participants, whether vendors will be allowed, how access to the event will be controlled, whether first-aid stations and other safety measures will be required, whether special equipment be required, whether security measures will be required. Doc. No. 8, pp. 49-50.

[¶40]     The above described provisions demonstrate the Corps has discretion to decide whether to grant or deny a special use permit. See EC-1130-2-550, Appendix E, §§ E-1, E-2, E-6, Doc. No. 8, pp. 44-45. The question for the Court, however, is whether the Corps has discretion to intentionally disregard the permitting process altogether or whether following the process is mandatory.

[¶41]     The United States argues the permit application process imposes no mandatory obligation upon the Corps but is mandatory only for the person seeking the permit. In this, the United States essentially concedes a permit is required for use of Corps-managed land. This conclusion is consistent with 36 C.F.R. § 327.19(a) which provides: "[i]t shall be a violation of this part to refuse to or fail to comply with the fee requirements or other terms or conditions of any permit issued." While recognizing that the permit application process is mandatory for the user, the United States maintains the Corps need not require the steps of the application process. This argument is disingenuous.

[¶42]     To reiterate, Section E-4 specifically states, "[a]n application **_must_** be obtained, completed and submitted to the Operations Project Manager." EC 1130-2-550, Appendix E, § E-4; Doc. No. 8, p. 45 (emphasis added). Once submitted the Operations Project Manager must make a decision on the application and determine whether the application meets the qualifications and criteria for issuance of a special use permit. See id. §§ E-2(a) (listing criteria for issuance of special use permit); E-3 (noting to qualify for special event permit, an event must contribute to the enjoyment of the visiting public and be consistent with established land use classifications). If following the permit application process itself is discretionary, the process does not serve a purpose. There is no reason to have a permit application process and requirements for issuance of a permit unless the process has to be followed by both the applicant and the Corps. In other words, the Corps cannot exercise its discretion to grant or deny a permit for special uses on Corps land until such time as it has actually received a permit application. The regulations make clear the permit application triggers their discretion in issuing or denying it. Absent a permit application, the Corps does not have discretion to grant a permit, as happened here.  This is confirmed by the

United States' concession that there is no authority for the Corps to offer permits for use without first receiving a completed permit application.

[¶43]     To determine whether to grant or deny a special use permit, the Corps must be presented with the information necessary to determine whether the requested use is appropriate. This information is obtained only through the permit application process. The Corps has a "**responsibility** to determine if the requested activity is a special event; to assure the activity is consistent with current project land use classifications…and to specific general criteria and site-specific stipulations based upon criteria in [Appendix E]." See EC 1130-2-550, Appendix E, § E-6; Doc. No. 8, p. 44 (emphasis added). And, at a minimum, accompanying the permit when issuing for groups of fifty people or more, at least $1,000,000 liability insurance is **required**. Id. § E-6(c)(1), Doc. No. 8, p. 46.  The mechanism to fulfill the Corps' responsibility in these two important aspects is by following the Corps' adopted permit application process. By circumventing the permit process and allowing protesters to occupy Corps-managed land, the Corps' negated the very mandatory protections that process provides. For instance, the Corps did not review or establish whether any site-specific restrictions and safety requirements were warranted for the proposed group activity. No performance bond was obtained to cover maintenance, damage, and restoration costs. Id.  Nor was the mandatory liability insurance obtained. Id. § E-6(c)(1). The Corps cites no authority, and the Court has found no authority, that it is allowed to circumvent the permit process and allow persons to use Corps land without a valid permit.

[¶44]     By failing to follow these processes, the Corps' conduct is alleged to have proximately caused the damages at issue. Doc. No. 1, ¶ 42. The process allows for the establishment of protections such as requirements for camp security, sanitation and portable toilet facilities, garbage removal services, medical and first-aid services, and remediation/repair. The purpose of these

types of requirements is abundantly demonstrated in the instant case where protestors set up encampments, caused damage to property, and left behind a noxious environment necessitating remediation, including over 21,000,000 pounds of garbage, human waste, and personal belongings. Moreover, had the process been followed there would have been a bond to cover remediation, cleanup, and repair costs to restore the property to its prior condition. In short, had the process been followed, protective mechanisms would have been in place to prevent or reduce the type of harm and damages sustained by North Dakota.

[¶45]    While the Corps may have had discretion in how to enforce permit violations on its property, it did not have discretion to forego the permitting process entirely and issue a de facto permit to the protestors in the form of (1) a press release stating the Corps had issued a special use permit to the Protestors and (2) a letter to Chairman Archambault stating the protestors could use the "free-speech zone" on Corp-managed property. Both of these were written permission granted to the protestors to use Corps land, which circumvented the mandatory permit process requirements.

[¶46]    In Berkowitz v. United States, 486 U.S. 531 (1988), the United States Supreme Court held that a cause of action based on the National Institute of Health's alleged failure to license a polio vaccine without first receiving the required safety data was not barred by the discretionary function exception. The licensing process for manufacturing and marketing a live oral polio vaccine is highly regulated. Federal regulations set forth the safety criteria for the original strain, seed virus, and the vaccine monopools that are used to develop the vaccine. Id. at 540-41. The regulations required the manufacturer to conduct a variety of tests to measure the safety of the product at each stage of the manufacturing process. Id. at 541. After completing the manufacturing process and required testing, the manufacturer was required to submit an application for a product

license to the Division of Biological Standards (DBS). <u>Id.</u> The licensing Act provided "[l]icenses . . . may be issued only upon a showing that … the products for which a license is desired meet standards, designed to insure the continued safety, purity, and potency of such products, prescribed in regulations…." <u>Id.</u> at 541-42. The applicable regulation provided "[a] product license shall be issued only upon examination of the product and upon a determination that the product complies with standards prescribed in the regulations." <u>Id.</u> at 542.

[¶47]     The petitioners in <u>Berkowitz</u> alleged the polio vaccine, Orimune, was issued a product license by DBS without first receiving the data that the manufacturer was required to submit in its licensing application. <u>Id.</u> The Supreme Court held that DBS had no discretion to issue a license without first receiving the required data, and the discretionary function exception imposed no bar to suit. <u>Id.</u> at 543-43.  Furthermore, the Court held in so far as petitioners averred that DBS licensed the vaccine "either without determining whether the vaccine complied with the regulatory standards or after determining that the vaccine failed to comply, the discretionary function exception does not bar the claim." <u>Id.</u> at 543. The discretionary function exception was rejected because the Court concluded the agency had no discretion to deviate from its mandated licensing procedures. <u>Id.</u>

[¶48]     Similarly, in <u>Buckler v. United States</u>, the Eighth Circuit Court of Appeals reversed a dismissal based on the discretionary function exception where there was a factual question whether the governmental agency, in fact, followed its inspection protocol. <u>919 F.3d 1038,</u> 1053-54 (8th Cir. 2019). The court in <u>Buckler</u> acknowledged that mine inspectors had discretion in conducting safety inspections including inspecting equipment and worker training documents. Both parties agreed that at least some level of examination of the training records was required but differed on the manner of examination. <u>Id.</u> at 1050. The Eighth Circuit held that while the mine inspector had

discretion in the manner of conducting the review, i.e., whether to review all records or just a sampling, the government employee lacked discretion to entirely forego the inspection of the training records. Id. at 1053. The court stated: "we believe it is permissible, when analyzing the discretionary function exception, to recognize that some duties are mandatory in that they must be performed *in some fashion*, even if the manner in which they are performed involves protected discretion." Id. (emphasis in original). See also Appley Bros. v. United States, 164 F.3d 1164, 1172 (8th Cir. 1999) (holding the discretionary function exception did not apply where a federal grain inspector entirely failed to conduct an investigation).

[¶49]     Even if the Court were inclined to conclude the Corps had some discretion not to follow the permit application process, it must still conclude the discretionary function exception does not apply. The second prong of the discretionary function analysis is whether the conduct is "susceptible to policy analysis." Herden, 726 F.3d at 1046. Whether to follow the application process that has been adopted and set out in the Corps' Implementing Guidance materials is not a decision "susceptible to policy analysis." Any policy analysis involved in the permit application process itself was made at the time the process was established and adopted, not when it is followed. Again, though the outcome of the process results in a discretionary decision whether to issue a special use permit, no decision "susceptible to policy analysis" is made in how to *follow* an already established permit application process.

[¶50]     While every discretionary function exception case turns on its own unique facts and circumstances, the instant case is also similar to Berkowitz and Buckler.  The Corps had a process to follow when an application for a special use permit was made. Instead of following the process, the Corp simply gave written permission in the form of a press release and a letter allowing the protestors to use Corps-managed land.  The Corps failed to follow the process that was adopted,

resulting in the DAPL protesters being able to use Corps-managed land without the restrictions, protections and liability/bond requirements that a proper permit would have required.  As a result, there was no limitation on the gathering and no bond available to clean up the spoiled environment that was left. For these reasons, the Court concludes the discretionary function exception does not apply because the Corps failed to follow a mandatory permit application process at the outset.

### iii.   *Enforcement of Regulations*

[¶51]      The Complaint asserts the Corps had a legal responsibility and specific mandatory legal duties to enforce the law, protect public safety and the environment, and maintain public order. Doc. No. 1, ¶ 38. North Dakota alleges the Corps failed to fulfill its mandatory duty to enforce the restrictions and remedy the violations of 36 C.F.R. Part 327, and to otherwise maintain public order, avoid civil unrest, and other unlawful conduct by the protestors. Id. at ¶¶ 43-44. In its motion, the United States argues the Corps' law enforcement abilities are substantially limited by Congress and the decisions of whether and how to respond to the protesters are subject to judgment and choice; therefore, those decisions are protected by the discretionary function exception. Doc. No. 6, pp. 6-8, 11-12.

[¶52]      Turning to the first prong, the Court must determine whether the challenged conduct is actually discretionary. See Herden, 726 F.3d at 1046-47.  According to the United States, the federal government acquired the Corps-managed land around Lake Oahe without accepting any special criminal jurisdiction over the property, citing Flood Control Act of 1944, Pub. L. No. 78-544, 58 Stat. 887 (Dec. 22, 1944). The authority and responsibility to enforce criminal law on the Corps-managed land rests with North Dakota, argues the United States. Section 327.26 of 36 C.F.R. provides that state and local laws and ordinances apply on Corps projects and lands, and that such "state and local laws and ordinances are enforced by those state and local enforcement

agencies established and authorized for that purpose." 36 C.F.R. § 327.26. The Corps'

Implementing Guidance similarly confirms the Corps has acquired a proprietary interest only in

managed land, and individuals States and political subdivisions retain authority and responsibility

to enforce state and local laws. ER-1130-2-550, § 6-2(c), Doc. No. 6-2, p. 28.

[¶53]     Designated Corps personnel, like park rangers, have authority to issue citations for

regulatory violations of Part 327 and can require a person charged with a violation to appear before

a United States Magistrate. 36 C.F.R. § 327.25(a). A violation may be punished by a fine of not

more than $5,000 or imprisonment for not more than six months or both. Id.  The primary role of

the park ranger, however, is to be visible to the public and strive to help and assist the public. ER-

1130-2-550, § 6-2(b), Doc. No. 6-2, p. 28. Enforcement of the regulations is a secondary concern.

Id.

[¶54]     A park ranger has full citation authority but is not a law enforcement officer and is

prohibited from portraying an aggressive law enforcement image. Id. A park ranger's enforcement

options are limited to visual presence, verbal warnings, written warnings, collateral forfeiture

citations and mandatory appearance citations. Id. § 6-2(c). A park ranger's ability to use force "[is]

limited to verbal persuasion/verbal detention and self defense measures, including unarmed self

defense and, where authorized, the use of an approved chemical aerosol spray." Id. Park rangers

cannot arrest, search or seize individuals or their property, cannot physically detain visitors, and

are prohibited from carrying, transporting or using weapons, stun-guns, nightsticks, or other

similar equipment associated with law enforcement. Id. § 6-2(e), Doc. No. 6-2, p. 29. Though the

Implementing Guidance directs "[t]he lowest level of enforcement shall be used to resolve a

problem," Corps personnel must determine which management technique to use in the situation at

hand, starting with attempts to resolve the problem by effective communication, verbal warning,

written warning, collateral forfeiture citation, and mandatory appearance citation, among other alternative management techniques. Id. § 6-2(f).

[¶55]     While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protesters' conduct, the Court concludes the Corps failure to comply with the mandatory permitting process tainted all other decisions made by the Corp. Here, the maxim applies: "You break it, you bought it."

[¶56]     This conclusion is supported by caselaw. In Appley Bros. v. United States, the Eighth Circuit considered an analogous situation to the present matter. 7 F.3d 720 (8th Cir. 1993).[4] In Appley Bros., the Plaintiffs commenced an action "against the United States for losses as a result of the United States Department of Agriculture's negligent inspection of the Bird Grain Company warehouse, a federally licensed warehouse." Id. at 721.  When a federally-licensed grain company failed to correct reported shortfalls from an initial grain inspection, the UDSA's policy "required that a new form be issued." Id. at 725. The ultimate decision to close a warehouse, such as Plaintiff's, was a discretionary function of the USDA. Id. However, before exercising that discretion, the USDA "had no discretion . . . as to whether they should check to see if Bird Grain had cured the deficiencies found on April 1 and to issue a new TW-125 reporting information."

_____

[4] The Eighth Circuit reversed and remanded the District Court's finding of a discretionary function. On remand and in a lengthy Order, the District Court found, "The government has produced evidence substantially different than what was before Judge Jones and the Eighth Circuit, and more importantly, the government's is uncontroverted." Appley Bros v. United States, 924 F.Supp. 944, 949 (D.S.D. 1996). The court noted that with the new evidence, the Eighth Circuit before would have found discretionary function; however, the Court went on to find based on the new facts that the discretionary function nevertheless provided no protection to the United States in certain respects. Id. at 955 ("The undisputed evidence now paints an entirely different picture of what happened in this case, and the Eighth Circuit panel likely would not have ruled the same way had it had before it the facts now before the Court."); 960 (Therefore, the Court holds that the discretionary function exception does not protect the United States from liability for the Bird Grain inspection conducted by Examiner Iten on August 5, 1988."). The Eighth Circuit affirmed. Appley Bros v. United States, 164 F.3d 1164 (8th Cir. 1999).

Id. In other words, even though the ultimate decision to close a storage facility was discretionary, the agency failed to perform a prerequisite mandatory duty under the agency's policies. See id. Because of this failure, the Eighth Circuit found the district court had jurisdiction and the discretionary function exception did not bar the Plaintiffs' claims. See id.

[¶57]     In Appley Bros., the USDA's failure to report the continuing deficiency resulted in Bird Grain Company's continuing operations and ultimately, increased damages to the plaintiffs. Id. at 725-726.  "Although the revocation order itself is discretionary, the inspector's failure to see if Bird Grain cleared the violations noted in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license."  Id.  The same is true in this case. While the Corps may have had discretion over how to enforce permit violations, in the unique circumstances of the present matter, where the Corps issued permits without the prerequisite application, the result was a lawless free-for-all.  The permits were issued without no limitations or protections, creating an impossibility of enforcement and resulting in greater damage to North Dakota.

[¶58]     The purpose of the discretionary function exception is to prevent judicial second-guessing regarding administrative decisions grounded in social, economic, and political policy. Herden, 726 F.3d at 1047. It is not a bar to decisions made without regard to mandatory procedures and the bad consequences resulting from not following those mandatory procedures.

## II.     Analysis of State Law Claims

[¶59]     Having concluded the Corps had a non-discretionary obligation to follow its own permit application process, the Court now turns to whether the claims asserted by North Dakota meet the requirements of the FTCA's waiver of sovereign immunity. The United States argues North Dakota's state tort law claims failed to meet the criteria for the FTCA's waiver of sovereign

immunity, specifically because (1) the claims are not for "money damages," (2) for "injury or loss of property," (3) the Corps' conduct does not give rise to liability "in accordance with the law of the place where the act or omission occurred," and (4) the alleged wrongful conduct does not have a private analogue.

[¶60]     At hearing, the United States conceded some of the damages North Dakota seeks to recover in this suit constitute "money damages" for "injury or loss of property." Because of this concession, the Court concludes that, at this stage of the litigation, there are sufficient allegations of "money damages" for the claims in this regard to fall within the FTCA's waiver of sovereign immunity. Consequently, the Court's analysis focuses on whether North Dakota's claims are cognizable under state law and satisfy the private analogue requirement.

[¶61]     The United States argues North Dakota's public nuisance, negligence, and gross negligence claims fail under North Dakota law because the State has not identified any actionable state law duty to support these claims. Doc. No. 6, p. 34. According to the United States, North Dakota improperly attempts to use a non-existent federal duty to support its state law claims, which is unavailing under the FTCA. See Klett v. Pim, 965 F.2d 587, 589 (8th Cir. 1992) ("Federally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon a private person." (citation omitted)). The Court agrees that federal laws and regulations may not form the basis for the duties asserted by North Dakota. Nevertheless, the United States is not entitled to dismissal because North Dakota state law supports the duties asserted by North Dakota in the public nuisance, negligence, gross negligence, and civil trespass claims.

[¶62]     Central to the United States' arguments is the assertion the United States had no duty under state law to control trespassers. Throughout the Complaint the term "trespassers" is used to

describe the DAPL protesters. The United States argues North Dakota law does not impose any duty on landowners as regards trespassers except use ordinary care to avoid harming them. <u>See</u> <u>O'Leary v. Coenen</u>, 251 N.W.2d 746 (N.D. 1977) (stating standard of care owed to trespassers). Since there is no duty under state law to control trespassers, the United States contends, North Dakota's claims premised on a non-existent duty to control trespassers is not "in accordance with the law of the place where the act or omission occurred." North Dakota contends the term "trespassers" was used in a colloquial sense in the Complaint and not meant to refer to the legal status of the protesters. According to North Dakota, state law supports the premise that the Corps had a duty to control the trespassers citing various sections of the Restatement (Second) of Torts, which are addressed below.

[¶63]    The Court agrees the Complaint could have used more precise terms to describe the protesters. However, it is not inclined to dismiss North Dakota's claims based on the use of a misnomer. North Dakota has abandoned the legal distinction between invitees and licensees, adopting a general duty of care owed to all lawful entrants. <u>O'Leary</u>, 251 N.W.2d at 752; <u>Doan ex</u> <u>rel. Doan v. City of Bismarck</u>, 2001 ND 152, ¶ 13, 632 N.W.2d 815. Though the Complaint uses the term "trespasser," it also states facts supporting an inference that the protesters, in whole or in part, were lawful entrants on Corps-managed land. <u>See</u> Doc. No. 1, ¶ 49 (announcing that a limited Special Use Permit had been issued), ¶ 58 (establishing a free speech zone on Corps-land south of the Cannonball River), ¶ 60 (inviting and directing protesters to relocate to the free speech zone).

[¶64]    North Dakota asserts the negligence, gross negligence, and third-party trespass claims are consistent with North Dakota law based on Section 318 Restatement (Second) of Torts (1965), which provides:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to

control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a)  Knows of has reason to know that he has the ability to control the third person, and

(b)  Knows or should know of the necessity and opportunity for exercising such control.

Id.

[¶65]      North Dakota argues its public nuisance claim may be brought against the United States in accordance with Section 838 Restatement (Second) of Torts. Section 838 provides:

A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and

(a)  the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and

(b)  he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

Id.

[¶66]      North Dakota courts frequently look to the Restatement (Second) of Torts in outlining the duties owed in various circumstances giving rise to tort liability. See, e.g., Collette v. Clausen, 2003 ND 129, ¶¶ 13, 22, 667 N.W.2d 617; Barsness v. General Diesel & Equip. Co., Inc., 383 N.W.2d 840, 845 (N.D. 1986). This Court concludes that the duties outlined in sections 838 and 318 of Restatement (Second) of Torts are consistent with North Dakota law for purposes of concluding that North Dakota's claims for public nuisance, negligence, gross negligence, and third-party trespass claims satisfy the FTCA's requirement that the claims be "in accordance with the law of the place where the act or omission occurred." See 28 U.S.C. § 1346(b)(1).

[¶67]      With respect to the third-party trespass claim, the United States argues trespass is an intentional tort and there is no evidence to suggest the Corps intended protesters to trespass on State and private property. This argument, however, fails. Section 318 states the actor, here the

Corps, "is under a duty to exercise reasonable care so ***to control the conduct of the third person as to prevent him from intentionally harming*** others." Restatement (Second) Torts § 318.   As § 318 indicates, the intentional conduct is on the part of the third person, here the protesters, not the Corps. The duty on the actor/landowner, like the Corps, is "to exercise reasonable care so to control the conduct" of the protesters under the specific qualifications and limitations of § 318.

[¶68]     The United States also contends it has not waived sovereign immunity to absolute or strict liability claims, as may be at issue in the public nuisance claim. Section 838, in fact, incorporates a negligence standard with respect to the liability of the possessor of land who "fails to exercise reasonable care to prevent the nuisance." Restatement (Second) Torts § 838. In light of the United States' concerns, the Court will limit any liability to "negligent or wrongful act or omission" of the Corps. Accordingly, dismissal of the public nuisance claim is not warranted based on failure to waive sovereign immunity for strict or absolute liability claims.

[¶69]     Lastly, turning to the Good Samaritan negligence claim, North Dakota alleges the Corps undertook a duty to protect the DAPL protesters, failed to do so, and this failure caused damages to North Dakota. Section 324A, Restatement (Second) of Torts recognizes that Good Samaritan liability can arise in favor of a third person, providing:

> One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

[¶70]    The case of <u>Weber v. Towner County</u>, 565 F.2d 1001 (8th Cir. 1977) provides an example of third-party Good Samaritan liability. In <u>Weber</u>, a father and his three minor children were injured when their bus encountered a washed-out portion of a township road. <u>Id.</u> at 1003. The road had washed out approximately six weeks earlier and had been immediately discovered by the Township Board. <u>Id.</u> The township requested road work be completed by the county, which was ordinarily hired to do repair and maintenance work on township roads. <u>Id.</u> Several obstacles delayed the county from taking prompt action to make repairs, but a portable road closed sign was allegedly erected. <u>Id.</u> When the Webers' bus appeared on the scene six weeks later, the road remained unrepaired and no warning sign was visible. <u>Id.</u> at 1003-04. In reversing summary judgment, the Eighth Circuit Court of Appeals, applying North Dakota law, relied upon Section 324A to conclude the county could be held liable. <u>Id.</u> at 1010. The court reasoned the county undertook to repair the washed-out road for the township, which was necessary for the protection of third persons, like the Webers, and the county permitted the road to remain impassable for several weeks. <u>Id.</u> Those facts, concluded the court, raised factual issues of the county's liability to the Webers for damages. <u>Id.</u>

[¶71]    A similar example of third-party Good Samaritan liability is included in the Comments to § 324A, which illustrates:

> A operates a grocery store. An electric light hanging over one of the aisles of the store becomes defective, and A calls B Electric Company to repair it. B Company sends a workman, who repairs the light, but leaves the fixture so insecurely attached that it falls upon and injures C, a customer in the store who is walking down the aisle. B Company is subject to liability to C.

Restatement (Second) Torts § 324A, Comment c, Illustration 1.

[¶72]    In the present case, the Court noted concerns at the hearing regarding the third-party Good Samaritan claim because it is unclear how the Corps assumed a duty to the protesters that increased the risk of harm to North Dakota, rendered services to the protesters that were necessary

to protect North Dakota from suffering harm, or how the State relied upon the Corps to protect it from harm.[5] At hearing North Dakota was provided an opportunity to elaborate, however, the State's theory of third-party Good Samaritan negligence remains unclear. North Dakota has not clearly articulated a viable third-party Good Samaritan claim. Therefore, the Court concludes the claim is not viable under North Dakota law.

[¶73]     The United States argues North Dakota's claims do not come within the FTCA's waiver of sovereign immunity based on the private analogue requirement. The private analogue requirement is closely associated with the "in accordance with the law where the act or omission occurred" requirement. See Buckler, 919 F.3d at 1044 (addressing the state-law, private analogue duty together). FTCA jurisdiction exists only if a plaintiff alleges "circumstances where the United States, if a private person, would be liable to the claimant" in accordance with the law of the place where the acts occurred. 28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674 (FTCA allows for tort recovery against United States only "in the same manner and to the same extent as a private individual under like circumstances").

[¶74]     The United States argues the private analogue requirement is not satisfied because North Dakota law does not impose liability on private parties for failing to enforce federal, state, or local laws. Doc. No. 6, p. 33. The Court has already addressed the tort duties owed under North Dakota law and concluded the private nuisance, negligence, gross negligence, and civil trespass claims are consistent with North Dakota law. Those decisions sufficiently address the United States' private analogue argument and further repetition at this juncture is unnecessary.

---

[5] The Court notes that section 324A requires "physical harm" to result from the actor's failure to use reasonable care. The Complaint, here, alleges loss and injury to property and requests reimbursement for law enforcement expenses. Such damages and expenses may not satisfy section 324A's requirement for "physical harm." The Court's decision, however, obviates the need to decide that issue.

## CONCLUSION

[¶75]      Accordingly, regarding the FTCA's discretionary function exception, the United States' Motion to Dismiss is **DENIED**. As it pertains to Claim One (Public Nuisance), Claim Two (Negligence), Claim Four (Gross Negligence), and Claim Five (Civil Trespass), the United States' Motion to Dismiss is also **DENIED**. However, regarding Claim Three (Negligence – Good Samaritan), the United States Motion to Dismiss is **GRANTED**. Claim Three of the Complaint is, therefore, **DISMISSED**.

[¶76]      **IT IS SO ORDERED**.

DATED August 19, 2020.

Daniel M. Traynor, District Judge
United States District Court