UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:19-cv-00150-DMT-ARS |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**STATE OF NORTH DAKOTA'S RESPONSE IN OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR A PROTECTIVE ORDER (ECF No. 260)**

Contrary to the United States constant mischaracterizations in its Motion for a Protective Order ("Motion," ECF No. 260), the 30(b)(6) discovery North Dakota seeks from the United States is relevant to North Dakota's Federal Tort Claim Act ("FTCA") claims against the United States. Topic 20, the primary 30(b)(6) topic at issue in the United States' Motion, reads:

> Decisions by USA to provide or withhold law enforcement assistance to State and local authorities during the [Dakota Access Pipeline ("DAPL")] Protests.[1]

Topics 10, 13, and 18, which the United States' Motion also now asserts should be included in the protective order, read:

> 10. Actions considered and taken by USA in response to use/occupation of Corps-managed lands by someone without either written permission or a Special Use permit.
>
> 13. Actions taken by the United States (limited to USACE, Department of Interior, and Department of Justice) during the DAPL Protests regarding Corps-managed lands used or affected by the DAPL Protests to:
>
> > i. protect the health and safety of persons on Corps-managed lands;
> > ii. protect Corps-managed lands from environmental harm or degradation;

---

[1] Topic 20 was originally Topic 48 in North Dakota's initial 30(b)(6) notice. Motion at 8, FN3.

      iii.    prevent unlawful or unsafe activities on Corps-managed lands;
      iv.    clear Corps-managed lands in the first quarter of 2017; and
      v.    prevent the use of Corps-managed lands as a camp, base or staging area from which potentially dangerous or unlawful activities may have been conducted on or off Corps-managed lands.

18. Resources of any sort provided, or decisions or considerations regarding whether or how to provide such resources, to North Dakota from August 1, 20156 through March 1, 2017 related to the DAPL Protests and the occupation of Corps-managed Oahe Project lands, including the cleanup of such lands after the occupiers left, by any department, agency or any other source of USA. This topic is limited to USACE, Department of Interior and Department of Justice.

North Dakota's 30(b)(6) topics are directly relevant to the United States' conduct that invited, enabled, and encouraged the occupation of public lands during the DAPL Protests. This includes the U.S. Army Corps of Engineers' ("Corps" or "USACE") failure to follow its mandatory, non-discretionary duties relating to the issuance of special use permits, and the United States' subsequent conduct (via the Corps and the several other non-Corps agencies present at the DAPL Protests) which continued to invite, enable, and encourage the protestors. This Court has already held that "There is no real question that discovery from [the non-Corps agencies] meets the Rule 26 threshold for relevance." Order on Motion to Compel Discovery, ECF No. 77 at 10; *see also* ECF No. 96 at 5 ("other non-USACE may possess relevant information to the claims asserted in the Complaint").

This Court has already held that North Dakota's nuisance, negligence and trespass claims against the United States sound in North Dakota tort law. Order Denying Motion for Partial Summary Judgment, ECF No. 106 at ¶¶ 40-43. For these tort claims, North Dakota seeks damages from the United States arising from its failure to mitigate, control, and otherwise reduce the harm third party actors (the protestors) inflicted upon North Dakota. Order Denying in Part and Granting in Part Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss Order"),

ECF No. 38 at ¶ 67.  There is also no doubt that these damages resulted from the comprehensive actions of the United States, not isolated actions of the Corps.  This fact was plainly recognized by General Todd Semonite, Chief of Engineers for the Corps[2] during the DAPL Protests in 2016-2017, who testified that the United States' response to the DAPL Protests "was much more of an interagency and Administration decision" and that "DOI, DOJ, in close coordination with the Department of Defense, were *really the drivers behind those decisions*," (emphasis supplied), and that "the Corps was really out of the process of determining how to resolve this" as "early as the middle of October."  Exhibit 1 (Semonite Depo. Excerpt) 98:6-16.

After conducting fourteen (14) depositions of both Corps and non-Corps witnesses as part of its fact discovery, North Dakota now seeks to conduct 30(b)(6) depositions relevant to its claims and related damages. Producing witnesses on topics 10, 13, 18 and 20, when the United States has already produced extensive discovery from non-Corps agencies that inform the custodians best suited to testify on these issues, is not unduly burdensome.  Because North Dakota's 30(b)(6) topics seek discovery already authorized by the Court's prior orders and are properly tailored and proportional to the needs of the case, the United States Motion should be denied.

## PROCEDURAL BACKGROUND

The relief the United States is now seeking in its Motion is materially different than what the Parties conferred on during negotiations over both Parties' 30(b)(6) topics, and materially different than what was presented to the Court at the September 23, 2022 status conference. Instead of seeking a protective order solely on Topic 20, as the Parties had discussed during conferral and with the Court, the United States now seeks a protective order governing the additional North Dakota topics 10, 13, and 18.

---

[2] The Chief of Engineers commands the United States Army Corps of Engineers.

3

Prior to bringing this dispute over 30(b)(6) topics to the Court, the Parties conferred for over two months on both the United States' and North Dakota's list of 30(b)(6) topics. In these discussions North Dakota's proposed topics were reduced from 67 down to 23. During the extensive conferral process, the United States initially objected to producing any non-Corps witnesses on any of North Dakota's proposed 30(b)(6) topics. However, during conferral the United States agreed to adjust the scope of its objections to separate 30(b)(6) topics (namely, Topics 10, 13, and 18), stating "we are otherwise willing to adopt the scope for these topics that you proposed—that is, the scope would cover the Corps from the Northwest Division down, the Department of the Army, Department of the Interior, Department of Justice including its relevant components, and Department of Homeland Security." Exhibit 2 (September 19, 2022 Email from J. Bobet to P. Seby) at 1. The United States' assertion in its Motion that the remaining topics are "sweepingly broad" (Motion at 1) belies the Parties' conferral discussions.

The United States now seeks a blanket Protective Order for Topic 20 (and now alleges it overlaps with Topics 10, 13, and 18) limiting North Dakota's ability to seek discovery from non-Corps actors on all of those topics. The United States' materially changed position is now delaying North Dakota's efforts to timely conduct its 30(b)(6) depositions and could delay the trial date set by the Court.

Further, the United States' assertion in its Motion that it "has offered and intends to provide 30(b)(6) testimony as to a number of non-Corps agencies in this case on relevant subject matters— and on subject matters that, while arguably not relevant, would not be unduly burdensome to prepare for" is belied by the United States' actions to date. Motion at 15, FN 9. To this point, the United States has only designated three 30(b)(6) witnesses:

4

- Heath Kruger (Corps): As a Corps representative, Mr. Kruger presumably cannot testify as a 30(b)(6) representative as to non-Corps federal agencies;

- Col. John Henderson (retired) (Corps): As a Corps representative, Colonel Henderson presumably cannot testify as to non-Corps federal agencies

- Terry Van Horn (Department of Homeland Security): Asserted by the United States to be designated to testify to topics solely "as they relate to the U.S. Attorney's Office for the District of North Dakota only."

Exhibit 3 (September 30, 2022 Email from J. Bobet to P. Seby) at 1-2. Simply put, the United States has designated a single non-Corps 30(b)(6) witness and has not designated any 30(b)(6) witnesses outside of the U.S. Attorney's Office for the District of North Dakota who can testify to the other 30(b)(6) topics North Dakota has designated.

The United States' continued efforts to delay and impede North Dakota's discovery should be rejected. The Court should deny the Motion in full for the reasons set forth herein, and require the United States to produce 30(b)(6) witnesses that can speak to both Corps and non-Corps actions relating to Topics 20, 10, 13, and 18 and any other topics to which non-Corps conduct is relevant.

## ARGUMENT

### I. The 30(b)(6) Discovery North Dakota Seeks Is Plainly Authorized By The Court's Prior Orders

Just as in its prior Motion for Case Management Order Concerning Political-Question Defense (ECF No. 209), the United States is again collaterally attacking and relitigating this Court's Motion to Dismiss Order (ECF No. 38), the Court's discovery orders (ECF Nos. 77, 96), and the Court's Orders on the United States Motion to Amend (ECF No. 129, 161, "Motion to Amend Orders") by seeking a protective order limiting North Dakota's F.R.C.P. 30(b)(6) rights to

5

discovery to support its FTCA claims against the United States.[3]  For the reasons set forth below, the United States mischaracterization several of the Court's prior orders should be rejected.

### A. North Dakota's FTCA action is against the United States

North Dakota's complaint is based on the tortious conduct of the United States.  The central claims in this case involve torts committed by the United States, acting primarily through the Corps.  *See* Complaint, ECF No. 1 at ¶ 1.  While the United States acts by necessity through its component federal agencies, an agency itself cannot be the defendant or "party" in an FTCA action: only the United States can be the defendant in an FTCA action.  *FDIC v. Craft*, 157 F.3d 697, 706 (9th Cir. 1998).  Neither the Corps nor any other federal agency that participated in the torts at issue here or that possesses information relevant to those torts can be a "party" in this case. *Id.*  The Court's jurisdiction is over (and the FTCA's waiver of sovereign immunity applies to) the only possible defendant in this case: the United States.

Further, North Dakota's Notice of Federal Tort Claim and Complaint alleged that several federal agencies of the United States were involved in, aware of, and contributed to the Defendant's tortious conduct with respect to the unlawful occupation of federal lands by the DAPL protestors.  This included the Federal Bureau of Investigation ("FBI"), the Department of Interior ("DOI"), the Bureau of Indian Affairs ("BIA"), and the Department of Justice ("DOJ").  *See* ECF No. 277, at 5-7.

Contrary to the United States' assertion, North Dakota's FTCA claim is not limited to "alleged tortious acts by employees of the Corps." Motion at 11.  North Dakota's FTCA claims are, as required by statute, against the United States.  *See* 28 U.S.C. § 2675; *see also FDIC*, 157

---

[3] These United States' mischaracterization of the Court's prior orders was already extensively covered in North Dakota's Response (ECF No. 227) to the United States' prior Motion for Case Management Order Concerning Political-Question Defense (ECF No. 209).

F.3d at 706 ("Although such claims can arise from the acts or omissions of United States agencies (28 U.S.C. § 2671), an agency itself cannot be sued under the FTCA."). The tortious conduct at issue includes the Corps' failure to enforce its mandatory, non-discretionary duty to require special use permits, the subsequent contributory actions by the Corps and other non-Corps federal agencies to continue to invite and encourage the protestors, and the United States' failure to control or mitigate the actions of the protestors who occupied public lands, including the decisions to withhold federal law enforcement at the DAPL protest sites. Discovery obtained in this matter thus far has demonstrated that several federal agencies were closely involved in the United States' tortious conduct that caused the damages suffered by North Dakota. This includes testimony from the Corps' leadership that other federal agencies played leading roles in directing the United States' actions with respect to the extended occupation of public lands by the DAPL protestors.

The United States' continued efforts to limit the "relevance" of North Dakota's FTCA claims to "(1) whether the Corps is liable for that alleged breach and, (2) if so, what damages flow from that breach" must again be rejected. *Id.* Neither the Corps nor any other agency is "liable" under the FTCA. The issue is whether the *United States* is liable under the FTCA, which in this case involves not only the Corps but the several other federal agencies that participated in or directed the United States' actions related to the occupation of public land by the DAPL protesters. Further, what "damages flow from" that conduct must be determined under North Dakota tort law and must include damages suffered due to United States' failure to exercise reasonable care to control the DAPL protestors that proximately caused North Dakota's abatement and emergency response costs. The topics on which North Dakota seeks discovery under F.R.C.P. 30(b)(6), including Topics 10, 13, 18 and 20, are directly relevant to North Dakota's case.

Accordingly, the argument that the Defendant in this FTCA case is any party other than the United States must be rejected, and the United States' effort to limit North Dakota's case and discovery to a fictious hypothetical world in which only the actions and decisions of a regional office of the Corps are relevant defies the facts and common sense and must be rejected.

    **B.**    **The Court's ruling on the United States Motion to Dismiss confirmed that the contributing conduct of other federal agencies is relevant to North Dakota's claims**

The Court's Motion to Dismiss Order held that the Corps' failure to follow its mandatory permitting requirements deprived the United States (not the Corps) of sovereign immunity and concluded that this failure "tainted *all other decisions*" made by the Corps"(ECF No. 38 at ¶ 55) (emphasis added). The Court invoked the maxim "[y]ou break it, you bought it." *Id.* at ¶ 55. Thus, the FTCA's discretionary function exemption does not serve as "a bar to decisions made without regard to mandatory procedures *and* the bad consequences resulting from not following those mandatory procedures." *Id.* at ¶ 58.

It is these "bad consequences" that North Dakota properly seeks to continue to examine through discovery, and specifically, through 30(b)(6) depositions. In the Motion to Dismiss Order, the Court explained how North Dakota's damages grew out of the Corps' failure to follow its nondiscretionary duties, stating:

> While the Corps may have had discretion over how to enforce permit violations, in the unique circumstances of the present matter, where the Corps issued permits without the prerequisite application, the result was a lawless free-for-all. The permits were issued without . . . limitations or protections, creating an impossibility of enforcement *and resulting in greater damage to North Dakota*.

ECF No. 38 at ¶ 57 (emphasis added); *Id.* at ¶ 58.

It was this lawless free-for-all and total lack of control over federal property that contributed to North Dakota's damages. Once the Court rejected the United States' discretionary

function defense, the actions of all of the United States' agencies that contributed to North Dakota's damages, including non-Corps agencies, were directly relevant to North Dakota's claims. *See* ECF No. 106 at ¶ 43 ("A fact-finder could reasonably conclude the expenditure of approximately $38 million in response to the unlawful activity caused in part by the United States' negligence was a 'loss or harm suffered in person or property' proximately caused by the United States."). That includes non-Corps federal agencies contributing to the Corps' initial actions circumventing its non-discretionary special use permitting requirements, the directions given by several non-Corps agencies to the Corps throughout the DAPL Protests, and the subsequent actions and decisions of these non-Corps agencies with respect to the unlawful actions by the protestors that resulted in North Dakota's emergency response to the protests. Thus, discovery regarding what types of federal law enforcement resources were available at the protest sites, and why, when, and how it was not provided or withdrawn, is relevant to North Dakota's claims regarding the damages it suffered associated with its own emergency response to the unfolding events, just as the Court previously found in ruling on prior discovery motions. *See* ECF No. 77 at 9; ECF No. 96 at 5 ("In other words, even assuming the claims alleged in the complaint are limited to USACE employees' actions, other non-USACE [employees] may possess relevant information to the claims asserted in the Complaint."). Topics 10, 13, 18, and 20 all focus on exactly this type of discovery and are directly relevant to North Dakota's claims.

## II. North Dakota Continues To Seek Discovery Proving The State Law Torts Committed By The United States, And Not Solely The Corps

For the past year and a half, North Dakota has conducted the tailored discovery that this Court allowed in its discovery orders, which encompasses selected non-Corps agencies (the DOI, DOJ, BIA, and FBI) that were indisputably directly involved in the DAPL situations and thus have information relevant to North Dakota's claims.

The Court's Motion to Dismiss Order clarified (and confirmed) the Court's subject matter jurisdiction over North Dakota's claims by finding that the Corps had violated mandatory, non-discretionary duties, recognizing that all of "the bad consequences resulting from [the Corps] not following those mandatory" special use permitting requirement were a part of North Dakota's claims. ECF No. 38 at ¶ 58. Later, this Court's decision to grant North Dakota's Motion to Compel Discovery of Four Federal Agencies with Knowledge of the United States' Tortious Conduct (ECF No. 77) recognized that the conduct of those non-Corps federal agencies which contributed to the alleged state law torts would be relevant to North Dakota's claims. The Court noted that regardless of whether North Dakota could "recover for any acts of employees of agencies other than the [Corps]," "that would not foreclose North Dakota from seeking discovery from other federal agencies who possess relevant information." *Id.* at 9. As such, "to limit discovery to certain employees, agencies, and events identified by the United States 'is clearly improper and would prevent [the plaintiff] from discovering information to which it is entitled under Rule 26.'" *Id.* at 7.

Similarly, the District Judge held that North Dakota's emergency response costs were "permissible under North Dakota law but are subject to the fact-finder's determination that the *United States* proximately caused the emergency response when it *allowed and encouraged* protestors on federal land without requiring the requisite permit." ECF No. 106 at ¶ 43 (emphasis added). Under the District Judge's ruling, it is the United States' comprehensive actions, not just the Corps', that is relevant to North Dakota's claims and damages and therefore permissible under the Federal Rules of Civil Procedure.

Consistent with the Court's discovery orders, North Dakota has consistently sought discovery related to the *United States'* actions surrounding its invitation and encouragement of the

10

occupation of public lands by the protesters – all of which contributed to North Dakota's damages. North Dakota's discovery taken thus far shows that agencies of the United States other than the Corps were closely involved in, and have information relevant to, the tortious conduct and damages suffered about which North Dakota complains.

The importance and relevance of the participation of these other federal agencies is demonstrated by the testimony of General Todd Semonite, Chief of the Corps during the relevant period, who testified that the United States' involvement was an "interagency" process under the direction, not of the Corps, but rather the DOI, DOJ and the Department of Defense, and that by early October of 2016 the Corps was essentially "out of the process." Exhibit 1 (Semonite Depo. Excerpt) at 98:6-16; *id.* at 100:7-10 ("[W]e got most of our direction from Ms. Darcy either – verbally on either what to do or, primarily, maybe what we were not going to do."). This testimony undercuts the United States' efforts to exclude discovery of non-Corps federal agencies and their implication that this case is just about the Corps. When and how North Dakota was required to expend its own resources for an emergency response and whether that emergency response was justified are borne out by the United States' comprehensive actions and inactions surrounding the DAPL Protests. Additional examples derived from discovery to date include:

- FBI Special Agent Jacob O'Connell testified that he had requested the FBI drone unit from Quantico, Virginia "to assist the local authorities with maintaining some form of visual surveillance of the protesters in the camp" (Exhibit 4 (O'Connell Depo. Excerpt) at 30:18-25), and that after the drone unit had arrived at the DAPL Protests site, other FBI officials called and cancelled the drone unit's assistance and required them to return to Quantico, Virginia (*id.* at 36-37). Specifically, Mr. O'Connell was told that

Andrew McCabe had called [Rick Thornton – FBI special agent in charge of the FBI's Minneapolis Division] and told him that we couldn't have the drones." *Id.* at 37:7-9.

- Former U.S. Marshall Paul Ward testified that he requested federal law enforcement assistance throughout the entirety of the DAPL Protests, which was never provided by the United States.  Exhibit 5 (Ward Depo. Excerpt) at 109-110.  At one point, Mr. Ward stated that the United States' "response was nonexistent." *Id.* at 110:20-21.

- Former Director of the BIA Law Enforcement, Darren Cruzan, testified that he requested assistance law enforcement personnel from the National Park Service, United States Fish and Wildlife, United States Park Police, and the Department of Interior Law Enforcement Services and that "with certainty" personnel were at the DAPL Protests site but were limited to solely responding to issues within the Standing Rock reservation's borders.  Exhibit 6 (Cruzan Depo. Excerpt) at 38:17-25; 39:1-7.

### III. Law Enforcement Decisions By The Non-Corps Federal Agencies Are Directly Relevant To North Dakota's FTCA Claims

In the Motion to Dismiss Order, the Court acknowledged that the state law torts North Dakota alleged involved complex issues of negligence, abatement, and reasonable care that came into play once the United States had violated its non-discretionary duties.  ECF No. 38 at ¶ 66 ("This Court concludes that the duties outlined in sections 838 and 318 of Restatement (Second) of Torts are consistent with North Dakota law for purposes of concluding that North Dakota's claims for public nuisance, negligence, gross negligence, and third-party trespass claims satisfy the FTCA's requirement that the claims be 'in accordance with the law of the place where the act or omission occurred.' *See* 28 U.S.C. § 1346(b)(1)"); *id.* at ¶ 67 (recognizing the "duty on the . . . Corps, is 'to exercise reasonable care so to control the conduct' of the protesters under the specific qualifications and limitations of [Restatement (Second) Torts]§ 318"); *id* at ¶ 68 ("Section 838, in

fact, incorporates a negligence standard with respect to the liability of the possessor of land who 'fails to exercise reasonable care to prevent the nuisance.'"); *see also* ECF No. 14 at 10-29 (discussing and applying North Dakota tort law to explain how the *impacts* of the United States' failure to perform a mandatory duty give rise to damages); *id.* at 13 (discussing how "abatement" is relevant to determining the extent of public nuisance damages); *id.* at 14 (discussing the United States' duty to abate damages in the context of North Dakota's negligence and gross negligence claims); *id.* at 16-17 (discussing whether the United States had the "ability to control the DAPL protestors" in relation to the negligence and gross negligence claims). Thus, these state law torts all involve elements that go to liability *and* damages based on the contributory actions of other non-Corps federal agencies, including any failure to mitigate or control the protestors' actions.

Discovery of the United States' response to the DAPL Protests is relevant to North Dakota's claims that the United States "proximately caused the emergency response" (ECF No. 106 at ¶ 43) that North Dakota engaged in and the related costs North Dakota incurred. The United States' response necessarily includes not just the Corps, but also the other federal agencies who participated in and directed the United States' response to the DAPL Protests. Such involvement encompasses decisions to continue, enable and encourage the occupation of public lands by the protesters through decisions to deploy or withdraw federal resources concerning the DAPL Protests. The United States' decisions speak directly to the United States' failure "to exercise reasonable care to prevent the nuisance," the United States' failure to "control the conduct' of the protesters under the specific qualifications and limitations of [Restatement (Second) Torts] § 318" (ECF No. 38 at ¶¶ 46-47), and the damages suffered by North Dakota because of these failures. Thus, North Dakota's Topics 10, 13, 18 and 22 are relevant to North

Dakota's FTCA claims, because they are relevant to the proximate and exacerbating causes of North Dakota's emergency response damages.

Similarly, the United States is incorrect to assert that "[t]o support its purported mitigation argument, the only information the State would need is what federal law enforcement support was in fact provided." Motion at 12. This is disingenuous given the United States' own affirmative defenses accuse North Dakota of failing to mitigate damages. *See* United States' Answer (ECF No. 44) at 63 ("North Dakota has failed to mitigate damages, if any."); *id.* at 62 ("The actions or omissions of the United States' employees were not the proximate cause of North Dakota's injuries, if any."); *id.* at 63 ("In the event the United States is found to be negligent, the negligence of third parties was the proximate cause of and contributed to any alleged injuries or damages sustained, thereby mandating that any recovery be proportionately reduced."). How and when federal law enforcement assistance was requested, what federal law enforcement resources were available, the times when the United States' refused to provide law enforcement assistance despite its availability, and whether those actions contributed to the need for North Dakota to provide its own law enforcement response (a large portion of North Dakota's damages), are directly relevant to North Dakota's response to the United States' assertion that North Dakota failed to mitigate its damages.

Finally, the United States' assertion that the Corps "has extremely limited law enforcement authority" only serves to underscore the need for North Dakota's discovery on Topic 20. *See* Motion at 6-7. Assuming that assertion is true, that means that the United States concedes that the primary source of relevant information about the United States' failure to provide law enforcement assistance or response, which was a proximate cause of North Dakota's damages and thus relevant to this case, is to seek discovery from the other, non-Corps federal agencies who were intimately

involved in the DAPL Protests. Those non-Corps federal agencies, according to the discovery completed to date, had the authority and the ability to provide a federal law enforcement response but declined to do so. In its Order Denying Motion for Partial Summary Judgment, this Court noted that while North Dakota's emergency response costs were "permissible under North Dakota law," whether such costs were justified "are subject to the fact-finder's determination that the United States proximately caused the emergency response" that North Dakota engaged in (ECF No. 106 at ¶ 43). As such, discovery on that topic is relevant and permissible.

### IV. The Discoverable Information North Dakota Continues To Seek Is Proportional To The Needs Of The Case

The information North Dakota seeks in Topics 10, 13, 18 and 20 is not only relevant to North Dakota's claims, it is also proportional to the needs of the case under Rule 26(b)(1). Rule 26(c) considers the following factors in assessing proportionality: the importance of the issues at stake, the amount in controversy, the parties' resources, the importance of the discovery to resolve the issues in the case, and the burden or expense of obtaining the discovery. Each of these factors weighs in North Dakota's favor.

First, as to the importance of the issues, the United States mischaracterizes this entire action by asserting that "this is simply a tort case." Motion at 13. The DAPL Protests spanned eight months, involved of several federal agencies, and caused extensive damages to the State of North Dakota. Novel issues related to the application of the Federal Tort Claim Act are at play. The United States recognized the significant issues at play in this case in its Motion for Case Management Order Concerning Political-Question Defense, frequently lamenting the cases complexity. ECF No. 209 at 11 ("This is already a very complex case."); *id.* at 12 ("The Magistrate Judge's decision to hold status conferences every three-to-four weeks . . . is further evidence of the complexity of this case."). This case is anything but simple.

Second, as to the amount in controversy, $38 million in damages is undoubtedly a large sum, and it is irrelevant for the United States to compare it to North Dakota's biannual budget. It is inappropriate for the United States to minimize the impact of $38 million of hard-working taxpayers' money being diverted from socially valuable and necessary programs to respond on an emergency basis to a problem that was wholly of the United States' making. North Dakota's citizens' loss of $38 million merits the United States putting in the effort to produce a handful of witnesses from non-Corps federal agencies. And as the Court already recognized in weighing Rule 26's proportionality factors in the Order on Motion to Compel Discovery, "the issues at stake are important, as evidenced by the amount in controversy." ECF No. 77 at 11.

Third, as to the Parties' resources, this is a complex case, and it continues to require the expenditure of substantial resources from both parties, as evidenced by the discovery conducted to date. Yet the additional burden of producing non-Corps agency actors who are familiar with Topics 10, 13, 18 and 20 is not as severe as the United States asserts. The United States has been aware of North Dakota's theories of the case for some time and has already been producing evidence from non-Corps federal agencies. The United States will not have to start from scratch: it can work with the personnel who have already been responding to discovery requests and review evidence that has already been collected to date to determine the best non-Corps personnel who are responsive to the request.

Fourth, as to the importance of discovery to resolve the issues, North Dakota has shown that the information it seeks regarding the actions (and inactions) of non-Corps federal agencies directly involved in the United States' conduct regarding the occupation of public lands related to the DAPL Protests relevant to North Dakota's claims and its response to the United States' affirmative defenses.

Fifth, the burden or expense of obtaining this particular discovery is not nearly as burdensome as the United States suggests. The United States' claims (via declarations) that there is no central repository within the non-Corps agencies to find the information North Dakota seeks is misdirection. The substantial discovery production materials already compiled to date are a clear starting point for any such inquiry. The United State has produced thousands, if not hundreds of thousands of documents from non-Corps federal agencies to date. There already is a central repository from which each non-Corps agency can determine a representative with relevant knowledge on North Dakota's topics – the discovery produced to date. That discovery was already compiled and reviewed in coordination with those non-Corps federal agencies (including reviews for responsiveness and privilege). Instead of starting from the depositions and discovery conducted to date, the United States appears to have not made any such inquiry, instead refusing to even begin the search. Simply put, the United States would not be starting from scratch for each agency, and to claim that it would have to do so conflicts with the discovery already produced to date.[4]

---

[4] Meanwhile, North Dakota has timely identified eleven 30(b)(6) witnesses covering all of topics the United States has requested, and the United States to date has been able to take eight of those eleven depositions.

<table>
<tr><td>Dated: October 5, 2022</td><td>DREW H. WRIGLEY<br>ATTORNEY GENERAL<br><br>/s/ *Paul M. Seby*<br>Paul M. Seby<br>Special Assistant Attorney General<br>Greenberg Traurig, LLP<br>1144 15th St, Suite 3300<br>Denver, CO 80202<br>Phone: (303) 572-6584<br>Email: sebyp@gtlaw.com<br><br>Matthew Sagsveen<br>Solicitor General<br>500 N. 9th Street Bismarck, ND 58501<br>Phone: (701) 328-2595<br>Email: masagsve@nd.gov<br><br>COUNSEL FOR PLAINTIFF<br>STATE OF NORTH DAKOTA</td></tr>
</table>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 5th day of October 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Paul Seby*