# REDACTED

# Exhibit 1

# To North Dakota's Response in Opposition to the United States of America's Motion for a Protective Order (ECF No. 264)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 1:19-cv-00150-DMT-ARS
_____

VIDEOTAPE DEPOSITION OF:
LIEUTENANT GENERAL TODD T. SEMONITE (RET.)
July 26, 2022
(via RemoteDepo)
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.
_____


        PURSUANT TO NOTICE, the videotape
deposition of LIEUTENANT GENERAL TODD T. SEMONITE
(RET.) was taken on behalf of the Plaintiff in
Prince William County, Virginia, by remote means,
on July 26, 2022, at 8:34 a.m. MDT, before Gail
Obermeyer, Registered Professional Reporter and
Notary Public within Colorado, appearing remotely
from Douglas County, Colorado.

Lieutenant General Todd T.  Semonite (Ret.)
July 26,  2022

Page 2

```
 1                 REMOTE APPEARANCES
 2  For the Plaintiff:
 3            PAUL M. SEBY, ESQ.
              PAUL B. KERLIN, ESQ.
 4            Greenberg Traurig, LLP
              1144 15th Street, Suite 3300
 5            Denver, Colorado 80202
              Email:  sebyp@gtlaw.com
 6                    kerlinp@gtlaw.com
 7  For the Defendant:
 8
              ERICA ZILIOLI, ESQ.
 9            TIMOTHY B. JAFEK, ESQ.
              United States Attorney's Office/
10             District of Colorado
              1801 California Street, Suite 1600
11            Denver, Colorado 80202
              Email:  erica.m.zilioli@usace.army.mil
12                    timothy.jafek@usdoj.gov
13
    Also Present (Remotely):
14
              Michael Banks, Remote Video Technician
15            Rachel Hymel
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              I N D E X (Continued)
 2                                            INITIAL
    DEPOSITION EXHIBITS:  (Previously marked)   REFERENCE
 3
    Exhibit 26   Email to Archambault from        154
 4               Henderson, 9/16/16, Subject:
                 FW:  Press Release
 5               (UNCLASSIFIED), Bates Nos.
                 USACE_00003114 - USACE_00003115
 6
    Exhibit 420  (Confidential document)          149
 7               Bates Nos. ARMY_0011059 -
                 ARMY_00110567
 8
    Exhibit 429  (Confidential document)          163
 9               Bates Nos. ARMY_00110568 -
                 ARMY_00110570
10
    Exhibit 494  Email to SRJ2@ios.doi.gov from   142
11               U.S. Department of the Interior,
                 9/9/16, Subject:  Joint
12               Statement from the Department of
                 Justice, the Department of the
13               Army and the Department of the
                 Interior regarding Standing Rock
14               Sioux Tribe v. U.S. Army Corps
                 of Engineers, Bates Nos.
15               DOI_00000001 - DOI_00000002
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 I N D E X
 2  EXAMINATION OF LIEUTENANT GENERAL        PAGE
    TODD T. SEMONITE (RET.):
 3  July 26, 2022
 4  By Mr. Seby                               7
 5  By Ms. Zilioli                           --
 6
                                           INITIAL
 7  DEPOSITION EXHIBITS:                   REFERENCE
 8  (Exhibits provided electronically to the
    reporter.)
 9
    Exhibit 684  (Confidential document)      111
10               Bates Nos. USACE_00044967 -
                 USACE_00044968
11
    Exhibit 686  (Confidential document)      115
12               Bates Nos. USACE_00002482 -
                 USACE_00002484
13
    Exhibit 688  (Confidential document)      124
14               Bates No. USACE_00049705
15  Exhibit 689  (Confidential document)      126
                 Bates Nos. USACE_00026566 -
16               USACE_00026569
17  Exhibit 690  Email to Tedeschi from Turner, 129
                 9/8/16, Subject:  FW:
18               LTG SEMONITE TASKER - LAYDOWN OF
                 PROTEST SITE - 8 SEP 2016 MRD
19               Morning Report (UNCLASSIFIED)
                 Bates Nos. USACE_00027169 -
20               USACE_00027207
21  Exhibit 694  (Confidential document)      146
                 Bates Nos. ARMY_00078874 -
22               ARMY_00078879
23
24
25
```

Page 5

```
 1            WHEREUPON, the following proceedings
 2  were taken pursuant to the Federal Rules of Civil
 3  Procedure.
 4            *     *     *     *     *     *
 5            THE VIDEOGRAPHER:  We are now on the
 6  record.  Participants should be aware that this
 7  proceeding is being recorded, and as such, all
 8  conversations held will be recorded, unless there is a
 9  request and agreement to go off the record.  Private
10  conversations and/or attorney-client interactions
11  should be held outside the presence of the remote
12  interface.
13            This is the remote video-recorded
14  deposition of General Todd Semonite, being taken by
15  counsel for the plaintiff.  Today is Tuesday, July 26,
16  2022.  The time is now 2:34 p.m. UTC, 8:34 a.m.
17  Mountain.  We are here in the matter of State of North
18  Dakota versus The United States of America.
19            My name is Michael Banks, remote video
20  technician on behalf of U.S. Legal Support.  I am not
21  related to any party in this action, nor am I
22  financially interested in the outcome.  At this time
23  will the reporter, Gail Obermeyer, on behalf of
24  U.S. Legal Support, please enter the statement for
25  remote proceedings into the record.
```

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 6

1       THE REPORTER:  The attorneys participating
2  in this deposition acknowledge that I am not physically
3  present in the deposition room and that I will be
4  reporting this deposition remotely.  They further
5  acknowledge that, in lieu of an oath administered in
6  person, the witness will verbally declare his testimony
7  in this matter is under penalty of perjury.  The
8  parties and their counsel consent to this arrangement
9  and waive any objections to this manner of reporting.
10  Please indicate your agreement by stating your name and
11  your agreement on the record.
12       MR. SEBY:  This is Paul Seby, counsel for
13  the plaintiff, State of North Dakota, and we agree.
14       MS. ZILIOLI:  This is Erica Zilioli,
15  counsel for the defendant, United States, and we agree.
16       THE REPORTER:  And, General Semonite, do
17  you declare your testimony in this matter is under
18  penalty of perjury?
19       THE DEPONENT:  I understand and I agree.
20       THE REPORTER:  Thank you.
21       MR. SEBY:  You ready?
22       THE REPORTER:  Yes.
23
24
25

Page 7

1  LIEUTENANT GENERAL TODD T. SEMONITE (RET.),
2  having verbally declared his testimony in this matter
3  is under penalty of perjury, testified as follows:
4              EXAMINATION
5  BY MR. SEBY:
6       Q.  Okay.  Good morning, Mr. Semonite.  May I
7  refer to you as -- as Mr. or General, sir?
8       A.  General is probably great, sir.
9       Q.  That's -- that's fine.  I'm happy to do
10  that.  Good morning, General Semonite.  I -- my name is
11  Paul Seby.  I'm an attorney with the law firm of
12  Greenberg Traurig and also a Special Assistant Attorney
13  General for the State of North Dakota, and we represent
14  the State in this proceeding.  My co-counsel, Paul
15  Kerlin, is on the Zoom with us today.  And today, we'll
16  refer to our client collectively as "North Dakota" or
17  the "State."  Do you understand, sir, that you have
18  just been sworn in this morning?
19       A.  I do.
20       Q.  Would you please state your full name for
21  the record.
22       A.  Todd Thurston Semonite.
23       Q.  And the middle name was Thurston?
24       A.  Thurston.
25       Q.  Got it.  Thank you.  Before we begin, sir,

Page 8

1  I'd like to go over a few just basic ground rules for
2  the deposition, most of which are simply intended to
3  help the court reporter take down everything we say.
4  Everything we say today is being written down and
5  videotaped.  And because of that, if you'd please
6  verbalize your responses with a yes or no or other
7  manner of answer, and not nodding your head, one way or
8  the other, so that's a nonverbal communication.
9       Likewise, it's difficult for the court
10  reporter to take down what we say -- as saying if we
11  happen to inadvertently talk over each other.  So I'll
12  do my best not to interrupt you; if you would do the
13  same, if that's acceptable.  And if you need a break,
14  please just let me know.  Otherwise, I suggest we take
15  a short break every hour or so.  If you do not
16  understand a question that I've posed, please just let
17  me know, and I'll -- and ask me to repeat it or
18  rephrase it, and I'll do my best to clarify what I'm
19  trying to ask you.  Okay?
20       A.  Sounds good.
21       Q.  And if you answer a question I've asked,
22  I'm going to assume that you've understood the question
23  that I am asking.  Is that understood?
24       A.  Understood.
25       Q.  Okay.  General, is there anyone with

Page 9

1  the room -- in the room with you this morning?
2       A.  Erica is here.
3       Q.  Okay.  And are you relying upon any
4  documents in front of you during the deposition today
5  to answer any questions or refresh your recollection on
6  anything?
7       A.  No documents.
8       Q.  Okay.  And you understand, sir, that
9  you're obligated by oath to tell the truth this
10  morning?
11       A.  I do.
12       Q.  Okay.  General, what did you do to prepare
13  for your deposition today?
14       A.  So I've never been deposed, so Erica asked
15  me to come in to help me understand the process of a
16  deposition.
17       Q.  And you met with her to do that?
18       A.  I did, in person.  I did, twice.
19       Q.  Did you meet with anyone else, with or
20  without Erica?
21       A.  There was Tim, who's on the -- on the
22  video teleconference.  He and one of his counterparts
23  were on the -- on virtual.
24       Q.  Yeah.  Okay.  When did you meet, sir, with
25  your counsel?

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

1      A.   Last week was one session.  I think the
2  one before that was two weeks ago, it might have been
3  three weeks ago.  But both of these probably happened
4  in the last two or three weeks, two times.
5      Q.   How long did you meet on each occasion?
6      A.   I think anywhere from two to three hours.
7  The first one might have been three hours.  The second
8  one was perhaps a little shorter.
9      Q.   Okay.  Did you talk to anyone else, other
10 than your counsel, in preparation for your deposition
11 today?
12     A.   I don't believe I did, other than my wife
13 and maybe somebody just in my office that knows that
14 I'm out of the net all day today.
15     Q.   Sure.  Are you aware that North Dakota has
16 taken the sworn depositions of Major Startzell; former
17 United States Marshal for the State of North Dakota,
18 Paul Ward; Corps of Engineers employees Eileen
19 Williamson and Eric Stasch; and Colonel John Henderson
20 and General Scott Spellmon; Mr. Lowry Crook; former
21 Secretary of the Interior, Sally Jewell; and former
22 Assistant Secretary of the Army for Civil Works,
23 Jo-Ellen Darcy?  Are you aware of that?
24     A.   A lot of names.  The first four or five I
25 do not recognize.  Obviously, I know Crook, Darcy,

1  Spellmon, Henderson, and I understand Jewell.  The
2  first several names, I didn't understand who those
3  were.
4      Q.   Okay.  No -- no problem.  The -- the
5  question was, are you aware that they have been
6  deposed?
7      A.   I understood there were some depositions
8  that have been done already.
9      Q.   Okay.  Have you spoken to any of the
10 individuals that I identified to you about their
11 depositions in this matter, prior to this morning?
12     A.   Absolutely not.
13     Q.   Okay.  Have you reviewed any of their
14 deposition transcripts or videos?
15     A.   Absolutely not.
16     Q.   Okay.  Did you review any documents, prior
17 to today's deposition, in preparation for the -- the
18 deposition this morning?
19     A.   There were a couple documents that Erica
20 showed me that I think had been introduced in
21 discovery, so I am aware that there was some email
22 traffic.
23     Q.   Sure.  Did you review documents on your
24 own or always with your attorney?
25     A.   Only with my attorney.  And I did not

1  take -- I did not have copies of those documents.
2      Q.   Okay.  Well, what happened?  They were
3  projected on the Zoom?
4      A.   Right.
5      Q.   Sure.
6      A.   They were projected up on the screen.
7      Q.   Okay.  Did you do any research on your own
8  about the issues in this case?
9      A.   I did not, and I was specifically
10 instructed to not go into a lot of detail.
11     Q.   Yeah.  Okay.  Did you refer to any notes
12 from the past that you may have maintained with respect
13 to your involvement in the DAPL-related protests in the
14 state of North Dakota in 2016 and '17?
15     A.   I did nothing to research my notes.
16     Q.   Okay.  All right.  General, are you aware
17 that your deposition today pertains to North Dakota's
18 case against the United States under the Federal Tort
19 Claims Act, involving $38 million in damages that the
20 State of North Dakota seeks to recover from the United
21 States as a result of the Corps of Engineers' and other
22 federal officials' actions associated with the protests
23 against the Dakota Access Pipeline?  Do you understand
24 that, sir?
25     A.   In a very vague context, but I do not

1  understand the details of the tort claim.  I'm not an
2  expert on legal actions.
3      Q.   No.  You understand, though, your
4  deposition today is in relation to that matter?
5      A.   I do.
6      Q.   Okay.  Are you aware of any of the United
7  States District Court for the District of North
8  Dakota's rulings in the case thus far?
9      A.   So I don't understand the question,
10 exactly.  I understand some rulings that the federal
11 government made several years ago.  I don't know of any
12 of the North Dakota rulings.
13     Q.   These are -- the ones I referred to, sir,
14 are from the United States District Court, Federal
15 Court, in North Dakota with respect to this case.  Are
16 you aware of any of those orders or decisions?
17     A.   I remember that some of those rulings were
18 made, but I don't have any specific details on where or
19 how they were done.
20     Q.   Have you read any of the court's orders or
21 determinations in this case to date?
22     A.   Not at all.
23     Q.   Okay.  Okay.  General, what is your
24 current residence address?  Where do you reside, sir?
25 I don't need a street address.

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 14

1    A.   I live at -- yeah.  15 -- or 13159 Lake
2  Hill Drive, Manassas, Virginia 20181.
3       Q.   Thank you.  And where are you from,
4  General?
5    A.   Let me back up.  It's not Manassas.  It's
6  Nokesville.  It's in a vicinity of Manassas.  But it's
7  N-o-k-e-s-v-i-l-l-e.  I was born and raised in Bellows
8  Falls, Vermont.
9       Q.   Bellows Falls?
10   A.   Correct.
11      Q.   Would you describe and summarize your
12  education, please.
13   A.   Following high school, I went to West
14  Point United States Military Academy for four years.
15  And then I have several civilian degrees and military
16  degrees -- I can go into more detail -- both on -- in
17  civil engineering and also in military arts and
18  sciences.
19      Q.   And are those degrees from West Point or
20  other institutions?
21   A.   Bachelor of science is from West Point, a
22  master's of science in civil engineering from the
23  University of Vermont, a master's of science in
24  military arts and sciences from the Command and General
25  Staff College, Fort Leavenworth, Kansas.  And I also

Page 15

1  went to the Army War College.  At the time I went,
2  there was not a degree given.  They gave a degree about
3  a year after.
4       Q.   I see.  Have you always been employed with
5  the United States military?
6    A.   Until I retired in November of 2020.
7       Q.   And what do you do as post-government-
8  service work?
9    A.   I took a job as president of a large
10  architect/engineering firm that does federal work.
11      Q.   And is that located in Virginia?
12   A.   I think the headquarters office is
13  actually in New York City, but our federal office is
14  here in Washington, D.C.
15      Q.   I see.  Okay.  Now, I'd like to go back to
16  your time as -- in the -- the Army Corps of Engineers.
17  Would you describe your -- the evolution of your career
18  in the -- in the United States Army.
19   A.   So all second lieutenants start out pretty
20  much as a tactical officer working with troop units.
21  But in the Corps of Engineers, we cycle our officers
22  back and forth between troop duty and with the
23  U.S. Army Corps of Engineers, which is much more of an
24  engineering firm.
25           I think my first job in the Corps of

Page 16

1  Engineers was helping to build Fort Drum, as a major,
2  in 1987.  I did work in building the grid in Baghdad,
3  in 2003, as a colonel; and then from 2006 on, pretty
4  much uninterrupted, as a general officer working as,
5  initially, a division commander in charge of six or
6  seven states, then ultimately as the number two person
7  in the Corps of Engineers, called the deputy chief of
8  engineers; a short deployment to Afghanistan for
9  13 months, and then I was brought back in 2016 to serve
10  as the chief of engineers and basically served a
11  four-year tour and then was extended by the
12  Administration for another five months.
13      Q.   I see.  Okay.  Thank you for that.  Would
14  you describe your position as the chief of engineers
15  with respect to the Dakota Access Pipeline project?
16   A.   So the chief of engineers really wears two
17  hats.  Number one, the senior engineer in the
18  Department of Defense for all engineering matters, both
19  tactical, strategic; and with respect to the Corps of
20  Engineers, anything that the Corps of Engineers has to
21  do to be able to support deployed soldiers or
22  construction of installations, Civil Works,
23  environmental, et cetera.  The second hat is actually
24  the commander of the Corps of Engineers, a
25  36,000-person organization that does roughly about a

Page 17

1  $68 billion portfolio a year.
2       Q.   Okay.  And, sir, if you would describe
3  the -- your position, specifically with respect to the
4  period of time March of 2016 to 2017, involving the --
5  the United States Government's consideration and review
6  of the Dakota Access Pipeline project.
7    A.   So I didn't actually take command until
8  May, so I won't go to March and April.  I was preparing
9  for command.  And then, basically, the first several
10  months of my command were orienting myself to the task
11  and missions of the command, sending a strategic
12  vision, trying to put systems in place; what you would
13  expect most senior leaders, like a CEO of large
14  organizations, to do.
15           The Corps has thousands of projects.  I
16  pride myself on not getting deeply involved in any
17  projects, so I probably didn't do anything with this
18  particular mission until sometime when we began to see
19  activity.  I think it was somewhere around the end of
20  August or maybe even September.
21      Q.   Okay.  So you -- you became chief of
22  engineers in May of 2016?  Make sure I understand that.
23   A.   That's correct.  May 19, 2016.
24      Q.   Okay.  Okay.  And -- and who was your
25  immediate predecessor as chief of engineers?

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 18

1       A.   Lieutenant General Thomas Bostick.
2       Q.   And where did Mr. -- or General Bostick go
3   after he left the chief of engineers position?
4       A.   I think he stayed physically in the D.C.
5   area.  I believe he took a private job.  And I have not
6   had a lot of contact with him, so I don't -- I'm not
7   prepared to answer that question in any detail.
8       Q.   So are you saying he retired?
9       A.   He did.  I'm sorry.  He retired.
10       Q.   Okay.  Thank you.  So I -- I want to
11   understand the -- the command structure of the -- the
12   military command structure, basically, and -- and
13   who -- who you report to and who reports to you.  Would
14   you help me understand your relation in the United
15   States Army and who your superiors were?
16       A.   So the Corps of Engineers is a --
17   basically, a standalone unit that reports to the number
18   two general in the Army.  It's called the Vice Chief of
19   Staff.  And that person reports to the Chief of Staff.
20   So my direct report was a four-star general in the
21   Army.  And then underneath me I have -- all of those
22   36,000 employees are primarily broken into a
23   headquarters element here in Washington, D.C.
24           And then it's important that you remember
25   these next terms of reference.  We have divisions which

Page 19

1   are normally -- they're commanded by a general officer,
2   either a one- or a two-star, and they normally go
3   anywhere from six to eight states.  Underneath the
4   division, the main unit of operation of the Corps of
5   Engineers is a district.  Some districts might have one
6   or two states, some might have five or six states.  We
7   have 43 district commanders in the Corps of Engineers.
8   They are worldwide, but most of them remain here in the
9   continental United States, commanded by a colonel.  But
10   they're made up about about 99 percent U.S. Army
11   civilians.  The Corps only has maybe 500 military, the
12   other 35,000-plus are civilian employees.
13       Q.   Thank you.  And then with respect -- those
14   are the individuals that report to you, sir, I
15   understand.  How about above you?  What is -- you
16   indicated the Vice Chief of Staff or the -- of the Army
17   is your immediate direct report.  And above that person
18   is the -- is the Chief of Staff?
19       A.   That's correct.
20       Q.   Okay.  And during the period of time
21   2016 -- August 2016 through summer of 2017, what were
22   the names of the people that held the Vice Chief of
23   Staff position, singular or plural, just to make sure
24   we capture all who were in there?
25       A.   So the Vice -- the Vice Chief of Staff was

Page 20

1   a general, J-E- -- or G-E-N Dan Allyn.  I think he only
2   stayed there for about a year.  And the Chief of Staff
3   was General Mark Milley, who is currently the Chairman
4   of the Joint Chiefs of Staff.
5       Q.   Yes.  Okay.  And where does the Secretary
6   of the Army fit in that regard?
7       A.   So this is a -- kind of a dual chain of
8   command.  The military reported up to the four-star
9   general, General Milley, at the time.  And at the same
10   time, we, of course, are subservient to the civilian
11   control of the government.  So the Secretary of the
12   Army -- basically, General Milley reports to the
13   Secretary of the Army.  At the time, it was
14   Mr. Fanning.
15           And then the Secretary of the Army has
16   several, maybe seven or eight, what's called Assistant
17   Secretary of the Army.  And at the time, the Assistant
18   Secretary of the Army for Civil Works was Ms. Jo-Ellen
19   Darcy.  So while I didn't report to her directly, I
20   always listened to her guidance.  I felt like we had a
21   very strong relationship; but it was not a hard line,
22   it was much more of a dotted line.
23       Q.   Thank you.  Where -- where does Major
24   General Ed Jackson fit into that schematic?
25       A.   So I talked about there being a

Page 21

1   headquarters element here in Washington, D.C.
2   Underneath me, I had three two-star generals.  They're
3   major generals.  One of them was the deputy chief of
4   engineers, which mainly performed day-to-day activities
5   of running a command.  And then there are two
6   operational components in the headquarters; one which
7   does all military construction, think of that as DOD
8   work and other federal agency work.  The second
9   component was Civil Works.  General Jackson was the
10   two-star who was the director of Civil Works.
11           And I'd do a lot of delegation.  Most of
12   the time, if the division commanders, those 9, or those
13   43 district commanders had specific issues or needed
14   guidance in the Civil Works arena, then they would go
15   up through General Jackson and seek help from him and
16   his staff.
17       Q.   I see.  What was the name of the
18   individual that held the deputy chief of engineers
19   position during your tenure, sir?
20       A.   I think the first -- when I came in, I
21   think it was Major General Rick Stevens, but I -- he
22   was at some point, but it might have been a couple
23   months after.  It was somewhere in that period Rick
24   Stevens was the deputy chief of engineers.
25       Q.   Okay.  And how about the major general

Page 22

1  that -- that oversaw the military construction
2  component of the Corps?  What was that individual's
3  name?
4       A.   I think -- I think, initially, it was
5  Major General Ken Cox, but I might be off by one
6  general.  It ended up eventually being Major General
7  Tony Funkhouser afterward.  They'd rotate about every
8  two years.  They'd rotate out of those jobs.
9       Q.   I see.  Okay.  Okay.  You mentioned
10  interacting with -- with Jo-Ellen Darcy, the Assistant
11  Secretary of the Army for Civil Works.  What was
12  your -- what was the nature of your interaction with
13  her?  Did you office in the same location as Ms. Darcy
14  or -- or not?
15       A.   Her office was in the Pentagon with a very
16  small staff, maybe 15 or 20 people.  I delegated most
17  of the Civil Works actions to General Jackson, his
18  deputy, who was a senior civilian executive.  And they
19  would have meetings, at least once a week, face to
20  face.  We would -- Ms. Darcy and I would probably meet
21  maybe once a month to have a very, very high-level
22  review of issues, but it was much less frequent than
23  perhaps what I was doing more on the military side.
24            I think it's important to also realize
25  that as the chief of engineers, I also responsible

Page 23

1  for the training and resourcing of 90,000 soldiers.
2  That's a different -- those are troop units.  We're
3  talking about -- the Corps of Engineers, right now, is
4  a command.  But most of -- a lot of my duties were
5  going to visit troop units and helping the Army
6  understand how to fight the wars in Iraq and
7  Afghanistan.  So that's another critical component of
8  what I did as really a dual-hatted military leader.
9       Q.   Thank you.  Did you also office at the
10  Pentagon, sir?
11       A.   I had two staffs, two offices; one here in
12  downtown D.C., one in the Pentagon.  Most times, I
13  would do two or three visits back and forth during,
14  actually, a day.
15       Q.   And you did that routinely?
16       A.   Mainly stayed in Washington on Mondays and
17  Fridays.  I'm a muddy boots guy that likes to be on the
18  ground.  So almost every Tuesday to Thursday, for four
19  years, I traveled.
20       Q.   Okay.  So you were -- when you became the
21  chief of engineers in May of 2016, had the -- the
22  issues surrounding the -- the Waters of the United
23  States rulemaking that was developed in 2015, had that
24  whole experience already occurred, the Corps' position
25  on the rulemaking and EPA's position?  Was that all

Page 24

1  your predecessor's involvement, or did that carry over
2  into the beginning of your tenure?
3            MS. ZILIOLI:  Objection, relevance.
4       A.   So I got several onboarding classes.
5  Because I was in Afghanistan for 13 months, I was out
6  of the net for quite a while.  Obviously, rulemaking
7  and ROTUS (phonetic) were things that I wanted to be
8  informed of.  I think the other thing is -- is, that
9  was not necessarily a finite event.  It continued to
10  evolve.  Different states had different opinions, there
11  was different litigation.  So I think it would be best
12  to characterize to say that we were always interested
13  or aware of where the Administration was going with
14  respect to Waters of the United States.
15       Q.   (BY MR. SEBY)  Yeah.  Was that a
16  controversial topic at the time you took your position
17  as chief?
18            MS. ZILIOLI:  Same objection.
19       A.   I don't believe it was real controversial.
20  I don't remember the details.  It continues to be law,
21  based on different Administrations.  And as the Corps,
22  we took our lead from where the Administration wanted
23  to go.  But I was -- it was not something I laid awake
24  worrying about, necessarily.
25       Q.   (BY MR. SEBY)  Okay.  Was it -- was it

Page 25

1  something that was a matter of friction within the
2  Corps --
3            MS. ZILIOLI:  Same objection.
4       Q.   (BY MR. SEBY)  -- and the Army?
5       A.   I think -- without going into a lot of
6  detail, I think there was some degree of confusion,
7  based on Supreme Court decisions.  And I think a lot of
8  the people in the Corps wanted to be able to make sure
9  that it was cleared up.  Now, regardless of what that
10  meant with respect to, what does that mean, we just
11  don't like to work in an ambiguous environment.  I
12  think at some point the lack of clarity caused our
13  people to be in a position to have to make decisions
14  which were probably judged several different ways.
15       Q.   Yeah.  Okay.  Understand.  Did part of
16  your responsibilities as chief of engineers involve
17  serving as a liaison of sorts with other federal
18  agencies?
19       A.   Not necessarily in a description of
20  duties.  I felt it incumbent on the Corps to really
21  almost serve as the federal engineer at certain times.
22  So there were times when the Corps had capabilities
23  that no one else in the federal government could do.
24  For instance, we did a lot of emergency management
25  work, so we were an unbelievable partner with FEMA in

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 26

1 the big storms of '17 and '18.  We ended up doing a lot
2 of work with Customs and Border Patrol, a lot of work
3 with the NEXUS administration.
4          But it was not necessarily a task that was
5 given to me.  It was much more that we had a
6 capability, and we were -- we wanted to continue to be
7 able to provide both the taxpayers and the
8 Administration the best engineering advice possible.
9      Q.   Sure.  Okay.  So you worked with those
10 agencies that you mentioned.  Did you interact with the
11 Department of the Interior in any respects?
12      A.   Not specifically.  There were different
13 things that happened on my four years where I might
14 have had more involvement.  But I would say that the
15 Department of the Interior was much further down on the
16 list versus the Veterans Administration or CBP.
17      Q.   Okay.  But you did interact with them to
18 some degree, you're just telling me that on a -- on a
19 hierarchy scale, it was less than others?
20      A.   I would concur with that.
21      Q.   Okay.  All right.  With respect to the
22 Department of the Interior, do you recall interacting
23 with an individual who held the title Assistant
24 Secretary of the Department of the Interior,
25 Mr. Michael Connor?

Page 27

1      A.   I don't believe I ever worked with him or
2 was really aware of him at that time.
3      Q.   Never?
4      A.   I don't believe I knew who he was.
5      Q.   Okay.  How about the Secretary of the
6 Interior, Sally Jewell?  Did you interact with her in
7 any regard?
8      A.   I don't believe I ever interacted with
9 her, either.
10      Q.   How about Mr. Larry Roberts of the
11 Department of the Interior?
12      A.   I might have heard the name, but I
13 couldn't tell you what he did, and I don't think I ever
14 talked to him.
15      Q.   Okay.  How about in your capacity as chief
16 of engineers, did you interact with any of the state
17 governments or representatives where the Corps' mission
18 was -- was ongoing?
19      A.   So because I traveled a lot, wherever we
20 were doing big projects, many, many times I would fly
21 in to see a governor, a governor's staff.  I think,
22 more importantly, when you talk about representatives,
23 I was the chief of engineers.  I had to testify several
24 times in Congress.  As a result, I got to be very, very
25 close to almost every member of both the Senate and the

Page 28

1 House Civil Works Committees.  So a good example is,
2 some of the representatives from North Dakota, I got to
3 know quite well.
4      Q.   For -- for example, who -- what
5 individuals are you referring to?
6      A.   I think in North Dakota -- and this
7 relationship evolved, if you're talking '16 and '17, I
8 was aware of Senator Hoeven.  But it really came to the
9 later years when we were doing a couple big projects in
10 North Dakota, where he was probably one of the top
11 seven or eight senators that I knew, especially when I
12 left here in 2020.
13      Q.   Sure.  And you said you met with --
14 occasionally with governors of states where the Corps
15 had project work.  Do you recall meeting with the
16 governor -- governor or governors of the State of North
17 Dakota?
18      A.   I don't think I ever did, but there could
19 have been a time where we had some big event in -- I
20 think Fargo-Moorhead was the billion-dollar project we
21 were doing, where I think there might have been a
22 ribbon-cutting or something.  But it was not something
23 that I necessarily remember.  I don't even remember who
24 the first governor of North Dakota was.  I think the
25 person changed.  But I don't have any specific

Page 29

1 involvement with the two -- with the governors of North
2 Dakota.
3      Q.   Okay.  And that was true during the
4 DAPL -- the period of the DAPL protests, approximately
5 August of 2016 through, say, March or April of 2017?
6 You'd never met or spoke with, on the phone, either
7 governor of the State of North Dakota?
8      A.   I don't believe so.  There were times
9 where I think some members of the Administration were
10 working as a team, there could have been a time; or
11 there might have been a VTC or a call, I might have
12 been in a room.  But I don't -- most of the engagements
13 I had with governors I remember.  I don't ever remember
14 specifically meeting or who that person was.
15      Q.   Okay.  Okay.  Now, I want to talk about
16 the DAPL protests themselves; again, the August 2016
17 time period through mid- -- mid-year 2017.  Were you --
18 were you confident, as chief of engineers, that the
19 information you were receiving was -- about the
20 protests and the situation in North Dakota -- that you
21 were receiving was timely, accurate, and complete?
22      A.   I had confidence that my team was telling
23 me their -- what they saw on the ground.  But I have to
24 be honest with you, after 41 years in the military as a
25 general, I always like to verify.  I always like to

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 30

1 question and double-check.  So I'm not sure that every
2 single thing I always heard was necessarily true.  It
3 was probably what my team felt was their perception of
4 what was happening on the ground.
5      Q.   Okay.  And that -- I appreciate that.  Are
6 you thinking of anything in specific with respect to
7 the -- the DAPL protest-related events that cause you
8 to say that, or is that just a general observation?
9      A.   It's just a general observation of always
10 checking and double-checking.
11      Q.   Yeah, sure.  Especially with a lot of
12 moving parts, right?
13      A.   There's always a lot of things that you
14 know, and there's normally a lot of things you don't
15 know.
16      Q.   Yeah, yeah.  General, what sources of
17 information did you rely upon for updates on the DAPL
18 protests in the state of North Dakota?
19      A.   I don't remember, exactly.  We had a
20 series of weekly SITREPS that every district, those
21 colonel-level districts, sent to their generals.  I
22 never saw those district reports, because there were 43
23 of them.  My division commanders would then send me a
24 SITREP, some two- or three-page paragraph of actions
25 that was happening.  They would send me routine updates

Page 31

1 every -- every other week.  General Scott Spellmon was
2 the division commander of the Northwest Division, so
3 I'm assuming he continued to send me updates, like he
4 would every two weeks.  And at some given point, as an
5 issue either evolved and got resolved, at some point
6 if it got more intense, then that would trigger either
7 a question from me or my staff.
8           General Jackson was on those SITREPS.  And
9 because I was working a very, very hectic pace, I tried
10 to triage everything we were doing and delegate and
11 empower to my team the ability to resolve, at the
12 lowest level, to be able to put things where they
13 needed to be.  So most of the time my division
14 commanders or my generals here in the headquarters were
15 the day-to-day go-to people to provide updates.
16      Q.   Sure.  And when you were walking me
17 through the -- the hierarchy chart of -- of -- that you
18 described, when you were talking about Major General
19 Jackson, I just want to ask a question about that.
20 Major General Jackson was a direct report to you or
21 Ms. Darcy?
22      A.   All the generals reported direct to me.
23 So he was a direct report to me, was here in my
24 headquarters.  I saw him two or three times,
25 personally, every Monday and Friday when I was here in

Page 32

1 town.
2      Q.   Right.  Okay.  And General Jackson's
3 reporting duty or -- to -- to Ms. Darcy was -- was the
4 same as yours, sort of a collaborative relationship, or
5 was it a -- a boss relationship?
6      A.   I'm not sure that either one of those
7 would be right.  The bottom line is, I would call it
8 more of a partnership.  If there was ever a time where
9 there was a conflict, we always strived to somehow
10 defuse a conflict.  But most of the time when the
11 military, working with a civilian leadership, we take
12 their guidance.  But they normally give us concepts of
13 what they'd like to do, but the execution is normally
14 administered by the military.
15      Q.   Sure.  Did you ever direct that the Corps
16 should independently monitor the DAPL protests
17 occurring on Corps of Engineers property?
18      A.   So I don't understand the question.  What
19 do you mean "independently monitor"?
20      Q.   Versus rely upon other sources of
21 information.  Did you -- did you ever insist that the
22 Corps place monitors to firsthand observe the protests?
23      A.   I certainly never directed that.  I had --
24 I know that another key name here is Colonel John
25 Henderson, who was the district commander of the Omaha

Page 33

1 District.  He was probably the most visible and was on
2 the ground.  So when you talk about monitoring, he
3 definitely had insights, both of the people and of the
4 issues and of the actions.  So I always was very
5 attuned to what Henderson's perceptions were of what
6 was happening.
7           But I don't think -- we never wanted to do
8 things independent.  We always strived to be a federal/
9 state integrated team, where everybody understands
10 others' authorities and we try to work as best we can
11 as a collaborative body.
12      Q.   Thank you.  And what -- do you recall
13 directing General Spellmon or Colonel Henderson to do
14 anything specific with regard to that striving to be a
15 federal/state team with regards to the North Dakota
16 DAPL protests?
17      A.   I'm not sure that I remember any specific
18 actions, but -- and I might have alluded to this.  Most
19 of the time, I did not get involved in day-to-day
20 activities.  Probably 80 percent of the Corps' actions
21 that happened were executed inside the districts and
22 resolved inside the districts.  Whatever the 50 percent
23 that were not done by districts, were probably resolved
24 by the different divisions.  So that allowed me to --
25 instead of worrying about a hundred percent of issues,

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 34

1   I was able to focus on really the strategic direction
2   where the Corps was going.  But then when there was a
3   tactical issue, which DAPL started out at, then I was
4   able to direct my focus at those very, very few things
5   which needed the commander to get involved.
6        Q.   Okay.  And are -- are you aware that
7   the -- whether the -- the Corps of Engineers manages
8   a project in the state of North Dakota on the Missouri
9   River in the southeastern part of the state?
10       A.   I am aware.
11       Q.   And is it correct that the lands and
12  project that you're referring to being aware of is
13  called the Oahe Project?
14       A.   It is.  But it's important to point out
15  that I've never been there.  And in the last six years,
16  I've not seen a map.  So anything with respect to the
17  orientation or the physical layout is something I'm not
18  very knowledgeable of.
19       Q.   Okay.  But is it correct that your
20  understanding is that the Corps of Engineers manages
21  that -- that property and project on behalf of the
22  United States Government?
23       A.   That's correct.
24       Q.   Does anyone else manage or control that
25  project, in addition to the Corps?

Page 35

1        A.   I don't know that.  There are times where,
2   on some of our federal areas, we might lease parts of a
3   recreation area to a concession; that we might allow
4   local and state organizations to come and do things
5   like upgrade trails and other stuff.  So I'm not -- it
6   wouldn't be fair to probably say that we solely
7   organize it, but most of the time we have partnering
8   agreements with other entities.  So sometimes it might
9   be where we seek or receive assistance from either
10  state or local officials or organizations.
11       Q.   And do you know that was the case with
12  regard to the Oahe Project or -- or not?
13       A.   I don't know that.
14       Q.   Okay.  Do you recall the -- the function
15  and purpose of the Oahe Project?
16       A.   I don't know exactly what those functions
17  are.  Every one of our federal lands has different
18  authorities.  Some are flood control; some are based on
19  when you have a water control structure, like a dam, to
20  be able to control water for either hydro or for
21  environmental reasons.  Most of those rec areas are
22  associated with a Civil Works project that had been
23  constructed earlier.  And as I recall, I think that's
24  what caused the actual lake or the water structure to
25  be formed.

Page 36

1        Q.   Okay.  Do you agree with me that the Oahe
2   Project is a flood control project along the Missouri
3   River?
4        A.   A lot of our projects have five or six
5   different purposes, so I can't answer that.  I think
6   the primary reason was a flood control project, but
7   there are several of our reservoirs that actually have
8   four or five authorized purposes.  And I don't know the
9   details of that particular project.
10       Q.   Okay.  Are you aware that there is a -- a
11  hydropower function to the Oahe Dam that's part of the
12  Oahe Project?
13       A.   I'm not aware of that.  It doesn't
14  surprise me, though.
15       Q.   Okay.  And, of course, there's
16  recreational aspects to the Oahe Project as well that
17  are ancillary to flood control and power generation
18  purposes.  Is that a fair understanding as well?
19       A.   I was aware that there was a recreation
20  function, only because as this process evolved,
21  obviously we had park rangers that were involved.  So
22  when I heard the word "park rangers," we only put our
23  park rangers normally where there's a recreational
24  authorization.
25       Q.   And what does a park ranger duty mean to

Page 37

1   you, sir, generally speaking?
2        A.   I'm going off my gut here, but mainly it's
3   a trained civilian who allows the project to be done
4   under authorized purposes; anywhere from managing
5   the -- the operations that are performed, like
6   recreational services, taking care of the environment.
7   There's probably some type of capability of making sure
8   that we have nature, Boy Scout troops get tours.  Very,
9   very similar to, like, I think the average American
10  would think of as a U.S. Park Service park ranger.
11       Q.   Okay.  Would that include making sure
12  that -- that rules are followed on -- on Corps property
13  and that peaceful enjoyment of the property for all
14  lawfully using it would -- would ensue?
15            MS. ZILIOLI:  Objection to the extent it
16  calls for a legal conclusion.
17       Q.   (BY MR. SEBY)  As a practical matter?
18       A.   I would say that that's generally correct.
19  I have never been a park ranger, and I'm not
20  necessarily an expert on the duties and functions of a
21  park ranger.  But normally, yes, we want -- the Corps
22  is an institution where we want to continue to be able
23  to make sure that we have accountability and the rules
24  are followed.
25       Q.   Yeah.  That's sort of a central -- central

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 38

1  value of the Corps and its properties and purposes,
2  right?
3          A.   I think that taking care of our
4  responsibilities is something that we hold very dear to
5  where we're at.  So I would say, generally, yes.
6          Q.   Okay.  Do you know whether the -- the
7  United States ever delegated responsibility for the use
8  or management of the Corps Oahe Project lands to the
9  State of North Dakota?
10         MS. ZILIOLI:  Objection, legal
11 conclusion.
12         A.   I don't know that.
13         Q.   (BY MR. SEBY)  Okay.  How about to the
14 Standing Rock Sioux Tribe or any other tribe?
15         MS. ZILIOLI:  Objection, legal
16 conclusion.
17         A.   I don't know that, either.
18         Q.   (BY MR. SEBY)  Okay.  To any of the
19 protesters?
20         MS. ZILIOLI:  Same objection.
21         A.   I know at one point there was a standing
22 use permit.  So I'm not sure that that answers your
23 question.  But I know that there was some ability that
24 was being worked to be able to allow freedom of speech.
25 So that -- I'm not sure that answers your question, but

Page 39

1  I -- I don't want to say no.  I know there was some --
2  some issue there.
3          Q.   (BY MR. SEBY)  Yeah.  Do you recall,
4  General Semonite, when you first learned that
5  protesters were physically present on Corps of
6  Engineers-managed lands in North Dakota?
7          A.   I think it's sometime around Labor Day
8  weekend of 2016, when I -- I think there was one of the
9  first occurrences of something.  But I'm not sure
10 whether that was a demonstration or, you know, a march
11 or what it was.  But I think it's sometime around Labor
12 Day.
13         Q.   Yeah.  Do you recall how you learned that,
14 sir?
15         A.   So, I don't; but normally, we have a
16 system in the Army that establishes critical
17 information requirements.  It's documented.  It's
18 actually on one page, and it says, if someone dies in
19 the Corps, then you notify and send up a flash report
20 to leadership to say, somebody -- one of our -- one of
21 our team died.  If there's a specific thing where we
22 think we're going to be national news, the district
23 is required to send something up.
24         So if it was something where it was a
25 protest or something that was relevant, then I would

Page 40

1  certainly assume that my district sent to the division
2  that trigger.  And inside of my headquarters, there's
3  actually a command post.  I call it the Emergency
4  Operations Center, EOC, that normally gathers that
5  data.  And a lot of times in our Monday morning
6  meeting, I would, then, have been briefed on it.  Now,
7  if Labor was a Monday, then it was probably the next
8  Tuesday.  But I probably either got an email or a
9  briefing on what had transpired over the weekend.
10         Q.   I see.  And what did you do after you
11 received that first indication that protesters were
12 accessing and using Corps of Engineers property?
13         A.   I don't remember that.  I would normally
14 have asked my two-star, General Jackson, who was
15 probably sitting at the table, "Okay.  What does that
16 mean?  What's the plan?  What are we going to do?  And
17 do you need any help?"
18         Most of the time, like I said earlier, I
19 try to delegate and empower.  And unless they either
20 don't have the resources or they don't have the
21 authorities, I let them execute what they feel is the
22 best-laid-out plan.
23         Q.   Yeah.  Do you know why DAPL-related
24 protesters chose to enter onto and stay on Corps of
25 Engineers property?

Page 41

1          MS. ZILIOLI:  Objection, speculation.
2          A.   So I don't know any specific details, but
3  I think it was because of their objection of putting
4  the pipeline underneath the waterway.
5          Q.   (BY MR. SEBY)  The -- the crossing of the
6  Waters of the U.S.?
7          A.   That is correct.
8          Q.   Yeah.  Do you have a thought, though, why
9  they chose Corps of Engineers property and not some
10 other property?
11         MS. ZILIOLI:  Objection; assumes facts not
12 in evidence, and speculation.
13         A.   I don't know that.
14         Q.   (BY MR. SEBY)  Okay.  Do you know, was --
15 was anyone inviting or encouraging or calling for
16 protesters to come and stay on the Corps property?
17         A.   I can't -- I can't comment on anybody
18 external to the Corps.  Certainly, the Corps did not do
19 that.  There could -- there's a lot of players in this
20 equation.  There could have been other elements in, I
21 don't know, America that felt that this was an
22 appropriate gesture and could have then made
23 recommendations accordingly; for instance, different
24 types of Native American tribes, at some point there
25 were people from Hollywood involved.  So I don't know

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 42

1  who recommended what.  I just know that it did not come
2  from the Corps.
3      Q.   Do you agree with me that you -- you
4  learned around Labor Day that people were -- protesters
5  were -- were entering on and staying on Corps property?
6      A.   I'm not sure I know if they were
7  physically on the property.  I know that there was
8  definitely some type of -- I'm not sure "altercation"
9  is the -- is the right word -- some type of an incident
10  that happened there, either on property or external.
11  But I don't physically know -- I don't know if they
12  were physically on the property at that time.  They
13  very easily could have been.
14      Q.   Okay.  Do you agree that at some point
15  thereafter they were -- they did enter onto and stay on
16  Corps property?
17      A.   So I know that this continued to evolve
18  and the numbers continued to get higher.  And as a
19  result, we continued to get more worried.
20      Q.   As the numbers grew higher and the -- the
21  presence of people on Corps property increased, were
22  you aware that those people were using the Corps
23  property as a base of sorts and would go off of the
24  Corps property to private property in the vicinity?
25          MS. ZILIOLI:  Objection, assumes --

Page 43

1  objection, assumes facts not in evidence.
2      Q.   (BY MR. SEBY)  I'm asking that -- whether
3  you knew that, sir?
4          MS. ZILIOLI:  Same objection.
5      A.   So I don't have the details on that.  I
6  know that there was one portion, which I believe was
7  Corps property, which was leased out to some farmer for
8  grazing.  I'm -- I'm imagining what you stipulate could
9  have happened on private property.  I just don't have
10  the personal knowledge of where exactly they went and
11  what their target of operation was.
12      Q.   (BY MR. SEBY)  Okay.  Are you aware that
13  individuals residing on Corps property left the Corps
14  property to travel to public roads and bridges?
15          MS. ZILIOLI:  Objection, assumes facts not
16  in evidence.
17      A.   I know that there were protesters on
18  public roads and bridges.  It could have very easily
19  been that they did come off of Corps property, some of
20  them might have come from other places.  I just don't
21  know the details.
22      Q.   (BY MR. SEBY)  Okay.  How about with
23  respect to the same residents on Corps property
24  traveling from the Corps property to the cities of
25  Bismarck or Mandan, North Dakota and then returning to

Page 44

1  the Corps property?
2          MS. ZILIOLI:  Same objection.
3      A.   So I have no knowledge of that.
4      Q.   (BY MR. SEBY)  Okay.  Okay.  Are you
5  aware, sir, how the Corps of Engineers administers the
6  public use of Corps property for recreational
7  activities?  What -- what -- what form of -- of rules
8  and regulations and administration of those rules does
9  the Corps use to manage its property?
10          MS. ZILIOLI:  Objection to the extent it
11  calls for a legal conclusion.
12      A.   So the Corps has hundreds of publications.
13  We pride ourselves on having systems in place.  So
14  while I don't know the regulation -- the recreation
15  regulations very well, I know that as I have visited
16  many of these places, there are certain things that
17  involve putting boats in, fishing contests, people
18  going swimming, hunting.  We have rules for all that.
19  So most of the time there is some documented regulation
20  that those park men -- those park rangers try to use --
21  they use to administer the proper use of those
22  facilities.  But I probably don't have anywhere near
23  the level of detail that you're looking for.
24      Q.   (BY MR. SEBY)  No -- no problem.  But
25  you're aware that the Corps of Engineers -- or are you

Page 45

1  aware that the Corps of Engineers has a title in the
2  Code of Federal Regulations, known as Title 36, that
3  spells out the permissible use and manner of use for
4  Corps property and the types of permissions that are
5  necessary to conduct those activities?
6      A.   I'm vaguely aware of Title 36.  I probably
7  became aware of it more when we were in the middle of
8  September '16 and we were faced with some of these
9  questions as, what were our authorities and what were
10  our options when it came to the ability to keep good
11  order and discipline.  But I probably couldn't quote
12  you anything with respect to what's in Title 36.
13      Q.   Right.  General, is it fair to say that
14  that DAPL protest-related situation was your
15  introduction to the -- the Corps regulations,
16  authorities if you will, for the use and management of
17  its properties?
18      A.   I think it's fair to say that it was the
19  first time that we probably had been faced with an
20  issue where it wasn't easy to resolve.  There were
21  other times where we might have to worry about -- at
22  one point we had people that were -- somebody committed
23  suicide in one of the -- you know, the parks; so what
24  were the authorities there on calling police.  There
25  were other times where we might find people stealing

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 46

1  lumber or other things.

2          So, I was the division commander for six

3  years, I was the deputy for two years, so I'm not sure

4  it's fair to say I'd never been involved in it.  But

5  most of the times, none of those had to do with willful

6  disobedience on Corps land.

7      Q.   Okay.  And was that -- unlike the DAPL

8  experience, are you -- are you contrasting your -- your

9  past experience with your experience in the DAPL

10  protests?

11     A.   I'm not sure what you mean.

12     Q.   I was -- I was just trying to understand

13  the choice of words that you used, civil disobedience

14  and that kind of thing.  Were you suggesting that that

15  was occurring during the DAPL protests on the Corps

16  land?

17          MS. ZILIOLI:  Objection, misstates

18  testimony.

19     Q.   (BY MR. SEBY)  I'm asking you just to

20  clarify, so I understand.

21     A.   Yeah.  It was my understanding, as this

22  evolved into September, that we were in a scenario

23  where we had willful disobedience of certain functions

24  that were against the way we wanted to manage that

25  land.

Page 47

1      Q.   (BY MR. SEBY)  Would that include

2  disobedience with directives by the Corps to those

3  people on Corps property?

4          MS. ZILIOLI:  Objection to the extent it

5  calls for a legal conclusion.

6      A.   I think they got much, much more evident

7  in a couple months later.  I still think this was an

8  evolving situation in September, so I would not

9  necessarily equate it as a -- as a crisis in September.

10  It was something we were concerned about.

11     Q.   (BY MR. SEBY)  Okay.  Are you aware that

12  the Standing Rock Sioux Tribe sought a special use

13  permit from the Corps to conduct a protest on --

14  against the Dakota Access Pipeline on Corps of

15  Engineers property?

16     A.   I was aware that there was a request and,

17  I believe, initial actions to be able to set the

18  conditions for the approval of a special use permit.

19     Q.   Did you have any involvement in the Corps'

20  consideration of the special use permit application

21  submitted by the Standing Rock Sioux Tribe?

22     A.   Not at all.  I believe those permits are

23  approved by the district commander.  In this case, that

24  would have been Colonel Henderson.

25     Q.   And -- thank you.  And do you know, on

Page 48

1  that issue, who made the decision to pull the Corps'

2  consideration from the normal process, sir, that you

3  mentioned concerning the Standing Rock Sioux Tribe's

4  special use permit application, up to the Corps

5  headquarters?

6          MS. ZILIOLI:  Objection, assumes facts not

7  in evidence.

8      A.   So I'm not sure I knew that that happened.

9  It doesn't necessarily surprise me.  There were -- we

10  always try to, again, align as a federal government.

11  And there could have very easily been times where the

12  discussions between Ms. Darcy's office and General

13  Jackson might have recommended that some of these

14  actions be elevated to a more strategic level.  So it

15  doesn't surprise me that happened, but I'm not sure I

16  was aware that happened.

17     Q.   (BY MR. SEBY)  Do you know, sir, who made

18  the decision to involve others in the Obama

19  Administration with respect to the -- to the special

20  use permit sought by the Standing Rock Sioux Tribe,

21  outside the Corps?

22          MS. ZILIOLI:  Objection, assumes facts not

23  in evidence.

24     A.   I know that there was a lot of interest by

25  a lot of federal agencies as to what was occurring on

Page 49

1  the ground.  So while I didn't personally talk to any

2  of these people, I'm very aware that DOJ was involved,

3  DOI was involved, DIH was involved, other elements.

4  And so what we don't ever want to do is either

5  embarrass the Administration or work outside the intent

6  of the Administration.

7          So when I felt that there was ever a time

8  we were going to do something, most of the time we do

9  in the Army kind of what's called an ask-it check; go

10  to senior leaders and say, "I'm about ready to do

11  something.  Do you have any issues with that?"

12          And this is where we wanted to make sure

13  that we acted as an aligned Administration team.  And

14  so at -- somewhere in the middle of September, we were

15  doing a lot of that coordination with echelons above my

16  level; mainly, Ms. Darcy and other probably political

17  leaders, but also maybe staff in those other agencies,

18  including the Department of the Army.

19     Q.   (BY MR. SEBY)  Yeah.  Were you ever told

20  that the Corps believed that the Standing Rock Sioux

21  Tribe's special use permit application initially lacked

22  required information for approval?

23     A.   I don't believe I was ever told that.  I

24  do believe at some point, while the intent was to issue

25  the permit, I believe remembering that there were some

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 50

1  conditions of that permit that were not met.  I think
2  it mainly had to do with -- something with insurance
3  and maybe something else.  But I don't know if it
4  actually was a valid permit; because while I think it
5  was our intent to issue it, I'm not sure that those
6  conditions were carried out as -- as stipulated in the
7  permit, if you understand what I'm saying.
8        Q.   I think I do.  Do you know what period of
9  time that circumstance evolved, when you realized that
10 was the case?
11       A.   I believe this was all in about the same
12 time, early September.  I think it's important to also
13 inform you that there -- there was a very, very strong
14 desire, both on the Administration and even in the
15 Army, to continue to deescalate this, to not have a
16 conflict that was going to continue to get worse and
17 worse.  So either Colonel Henderson -- or it might have
18 been the chief, Archambault, I think his name is,
19 basically said, let's have this standing use permit, so
20 that if the -- if the Native Americans are there and
21 we -- I guess you could almost say retroactively gave
22 them a permit, then, theoretically, they could be
23 allowed to be there under the parameters of certain
24 things, which were -- I think we were very concerned
25 about health, very concerned about safety.  I think we

Page 51

1  also were getting very concerned at this point about
2  construction or permanent presence.
3            So I think that's where the standing use
4  permit was kind of an innovative tool to be able to
5  provide some degree of top cover, so that the Native
6  Americans -- this all went back to free speech -- so
7  that the Administration could support the Native
8  Americans' desire to be able to exercise their First
9  Amendment rights.
10       Q.   And that -- that was the hope, is what
11 you're saying?  That was the intent?
12       A.   I think that was the intent, to be able to
13 somehow find a -- and I'm going to probably use this
14 analogy a couple of times -- but this is a -- this was
15 a incident that didn't necessarily have a plain
16 solution.  So every time we looked at options, we
17 always tried to pick the best of the bad options.
18       Q.   Understand.  And that intent, how did that
19 intent square with the reality that -- I believe you
20 mentioned that the -- the permit conditions were never
21 actually met by -- by the permittee, which was the
22 Standing Rock Sioux Tribe.  How did that square with
23 the intent?
24       A.   Well, I don't think it met the intent.
25 The bottom line is, I think that the -- the protests

Page 52

1  continued to get more violent.  There were -- clearly
2  when it came to sanitary conditions, I know there was a
3  lot of issues there.  And so at some point, I think it
4  got to the point where because they had not met their
5  end of the bargain, that's where the permit, I think,
6  continued to evolve in the next couple of months.
7        Q.   Yeah.  So -- so you'll agree with me, sir,
8  that the -- there never actually was a final effective
9  in-place special use permit for the Standing Rock Sioux
10 Tribe to use and be on Corps property?
11            MS. ZILIOLI:  Objection, legal
12 conclusion.
13       A.   So I'm not sure I would say I disagree
14 with you.  I would say that there were probably a
15 couple phases of this where, I think at some point, the
16 Tribe had to apply for it, and then we would basically
17 grant it, given these extra conditions.  And at some
18 given point when those conditions were either not or --
19 intentionally not met or by default not met, then that
20 permit, in my understanding, was not necessarily a
21 legal binding permit and was, therefore, then,
22 reconsidered.
23       Q.   (BY MR. SEBY)  Okay.  I guess the question
24 is -- and I'm not asking for a legal conclusion -- but
25 the permit was offered by the Corps to the Tribe,

Page 53

1  correct?
2        A.   I thought it was requested by the Tribe
3  and -- and willing to be supported by the Corps.  So
4  that's a little bit different way of saying it.
5        Q.   Yeah.  And I -- I -- I agree that the
6  Tribe sought the permit.  But they applied, right?  And
7  it's just like you apply for a driver's license.  And
8  then the Corps gave -- tendered a permit, an unsigned
9  permit, to the Tribe and said, "You need to sign this
10 and you need to meet these conditions, and then we'll
11 countersign and then you have an effective permit."  Do
12 you know whether that happened?
13       A.   So that basically sounds like the process,
14 but I'm not sure I know what order the signatures were
15 there.  You might be correct.  It might have been in a
16 different order.  But basically, I think what you're --
17 what you're summing up is relatively accurate.
18       Q.   Did you ever see a signed, by Colonel
19 Henderson or other Corps official, special use permit?
20       A.   I never did.
21       Q.   Okay.  Were you told there was one?
22       A.   I'm pretty sure I was told that the
23 process was underway.  I don't know, at the time, if I
24 was fully aware that the permit conditions had not been
25 met.  So I could have been under the impression that

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 54

1 the permit was working or okay, but I'm not sure I had
2 that level of fidelity to understand whatever these
3 insurance-embodied requirements were.
4      Q.  Okay.  Sure.  And you mentioned earlier,
5 sir, the -- the free speech rights of the Native
6 Americans.  How did that square with the fact that the
7 protesters on Corps land were not uniquely Native
8 Americans?
9      A.  So I'm not sure I understand.  I think the
10 free speech rights would imply to any American, be they
11 Native Americans or non-Native Americans.  And if, in
12 fact, there were non-Native Americans there, our
13 obligation to continue to support that balance, I think
14 would still be honored.
15      Q.  In your experience with the Corps, prior
16 to being the chief, I believe you said you were a
17 division commander, correct?
18      A.  Six years --
19      Q.  Did you --
20      A.  Six years.
21      Q.  Six years as -- six years as division
22 commander.  What -- what division was that, sir?
23      A.  The first three years, 2006 to 2009, it
24 was called the North Atlantic Division; Virginia to
25 Maine, Europe, and Africa.  '09 to '12, it was the

Page 55

1 South Atlantic Division; Louisiana to North Carolina,
2 and South America.
3      Q.  With respect to your tenure as -- as a
4 division commander in those two jurisdictions, did you
5 ever decree or grant the use of Corps property as a
6 free speech effort?
7      A.  I don't believe I ever had any involvement
8 in it.  When I was in the South Atlantic Division was
9 when the water wars of Florida, Georgia, and Alabama
10 were going.  There was a lot of significant
11 environmental impacts.  There were a lot of people that
12 were -- wanted to protest, to a degree, on how the
13 Corps managed those lands.  I'm not sure that -- if
14 they were ever on Corps property, and I'm not sure we
15 ever did anything.  But there were other times during
16 my career where I had seen people want to have a very,
17 I think, pronounced opinion of how the Corps was doing
18 business.
19      Q.  Yeah.  But did anyone ask you or -- or did
20 you ever designate the use of Corps property as a free
21 speech zone in connection with any of your past
22 experiences?
23      A.  So again, those permits are approved at
24 the colonel level.  We did 80,000 different types of
25 permits a year.  That could have happened under my

Page 56

1 watch; I just can't validate, one way or the other.  I
2 never personally did anything to do with a special use
3 permit that involved free speech.
4      Q.  Okay.  Or -- or not even involving a
5 special use permit, just the idea that you said -- or
6 one of your district commanders, when you were the
7 division chief.  That would be the right way to say it,
8 sir, I think.
9      A.  Correct.  I -- I had nothing to do with
10 special use permits.
11      Q.  Okay.  And you don't recall any being
12 granted for purposes of free speech demonstrations?
13      A.  I don't.
14      MR. SEBY:  Okay.  All right.  Sir, I'd
15 like to suggest we take a short break, Ms. Zilioli, for
16 ten minutes.  It's been just over an hour.  Let's do
17 that, please.
18      MS. ZILIOLI:  Sounds good.
19      THE DEPONENT:  So probably one hour from
20 right now, then -- I mean, ten minutes from now?  Top
21 of the hour?
22      MR. SEBY:  Ten minutes from now.  So
23 the -- yes, top of the hour.
24      THE DEPONENT:  Great.
25      THE VIDEOGRAPHER:  Going off the record.

Page 57

1 The time is 3:49 p.m. UTC, 9:49 a.m. Mountain.
2      (Recess, 9:49 a.m. to 10:01 a.m. MDT.)
3      THE VIDEOGRAPHER:  We're back on the
4 record.  The time is 4:01 p.m. UTC, 10:01 a.m.
5 Mountain.
6      Q.  (BY MR. SEBY)  General Semonite, we're
7 back after a short break.  And just -- just before the
8 break, we were talking about the free speech concept
9 for use of the Corps property.  I wanted to back up.
10 Do you -- I know you said you had never been to the
11 Oahe Project.  Did you become familiar with the -- the
12 Corps property through maps and others telling you
13 about it; the layout of the land, so to speak?
14      A.  I don't believe I did early on, September.
15 At some point, when it got to the point where we were
16 worried about the impending flood and the water levels
17 and the ramifications of a water increase in certain
18 areas, as normal, I had the team come in and lay out
19 for me the hydrographic issues.  And I think at some
20 point, and when or if, I think there was a couple times
21 when some of these road junctions or bridges got to be
22 flashpoints.  I certainly wanted to understand the
23 orientation of those as to how it got done.  So yes,
24 over time I continued to get more and more involved.
25      Q.  Do you recall directing your staff within

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

1 the Corps to develop and provide you with maps
2 indicating where protesters were encamped on Corps
3 property?
4         A.   I don't, but it certainly sounds like
5 something I would do.  I want to make sure that at some
6 point as this gets to be more and more intense, that I
7 have a good situational awareness of what's happening
8 on the ground.
9         Q.   Yeah.  Do you recall the -- the basic
10 geographic feature of the Cannonball River running
11 approximately east/west on the -- the Corps property
12 that was part of the Oahe Project?
13         A.   So I know that -- a lot of discussions on
14 the north side and the south side of the Cannonball,
15 but I -- I probably couldn't draw you a diagram.  But I
16 certainly know that there was differences in those two
17 geographies.
18         Q.   And what was the point of referencing
19 north of the Cannonball River and south of the
20 Cannonball River?  Was that relative to denoting the
21 location of camps on Corps -- Corps property?
22         A.   I think Colonel Henderson referred to
23 those mainly when it came to where he was going to
24 allow the standing use permit.  And then over time --
25 we can talk more about this later, but I think

1 over time there was one of those areas, I believe it
2 was the north, that were more susceptible to water
3 rise.  And there was also some, I think, difference in
4 where municipal facilities were and where -- the best
5 place to be able to allow the Native Americans to
6 reside, if there was a choice between one or the other.
7         Q.   Were there encampments on both the north
8 and south side of the Cannonball River on Corps
9 property?
10         A.   I don't know exactly where they were, but
11 I -- I tend to understood (sic) -- and again, six years
12 ago --
13         Q.   Sure.
14         A.   -- it probably does make sense that there
15 were encampments on both sides.
16         Q.   Okay.  And do you recall where the special
17 use permit was -- was intended to apply?
18         A.   I don't.  I guess I thought at one point
19 it might have been for both sides, but it could have
20 very easily been either one or the other.
21         Q.   Okay.  And do you recall the Corps, at
22 some point, announcing the designation of a free speech
23 zone on the south side of the Cannonball River for,
24 quote, all who wished to protest the Dakota Access
25 Pipeline?

1         A.   As I recall, at some point -- and I think
2 it was later on, maybe November -- Colonel Henderson
3 did get worried about the north side.  And in a manner
4 or try to move people out of the north, I think his
5 thought was to stand up this free speech zone so that
6 there would be more of a density on the south side.
7 Now, maybe that was in September.  I don't have a real
8 clear recollection.  But I do know that Colonel
9 Henderson thought the south side was a better place for
10 there to be any type of a consolidation point, free
11 speech zone.
12         Q.   Would it surprise you, sir, that the free
13 speech area designated as such was the same as the
14 failed special use permit area?
15         MS. ZILIOLI:  Objection, assumes facts.
16         A.   So, I don't know that.
17         Q.   (BY MR. SEBY)  Okay.  Do you recall, sir,
18 that during the course of the -- the protest period,
19 August of 2016 through mid-2017, that the Standing Rock
20 Sioux Tribe and other tribes sued the Corps of
21 Engineers in the United States Federal Court with
22 regard to the decisions being made by the Corps
23 concerning the Dakota Access Pipeline crossing?
24         A.   I'm definitely aware that there was legal
25 action taken against us.

1         Q.   Yeah.  By the Standing Rock Sioux Tribe
2 and other tribes?
3         A.   And again, it might have been a
4 consolidation of tribes, it might have been several
5 different lawsuits, but I know that there definitely
6 was legal action where the Standing Rock were involved
7 in some manner, either by themselves or with others.
8         Q.   Sure, sure.  And do you recall one
9 particular decision by a United States District Court
10 judge in Washington, D.C., where he denied an attempt
11 by the Standing Rock Sioux Tribe and other tribes,
12 acting together, seeking to obtain a preliminary
13 injunction against the Corps regarding the permits and
14 approvals the Corps had already issued to the Dakota
15 Access Pipeline developer?
16         A.   So I remember that happened.  I am not
17 real familiar where the different court systems and
18 where the judge was.  He could have been in D.C.  I
19 don't know what circuit court that works, but I
20 know that there was a -- a decision made.
21         Q.   Does the name Boasberg, Judge Boasberg,
22 ring a bell?
23         A.   It definitely does.
24         Q.   Yeah.  And I -- I'm talking about the
25 September 9th decision by Judge Boasberg denying the

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 62

1  Tribe's motion for preliminary injunction.  The Corps
2  won.  And the court found -- Judge Boasberg found that
3  the tribes did not demonstrate substantial likelihood
4  of success in challenging the Corps' actions.  And the
5  reason that's -- that's of interest to my question is,
6  that same day, the Department of the Army, the
7  Department of Justice, and the Department of the
8  Interior issued a Joint Statement -- notwithstanding
9  the judge's order and decision and the Corps' victory,
10 those three departments issued a Joint Statement on
11 September 9th.  Do you recall that?
12      A.  I remember that happened, yes.
13      Q.  Okay.  Do you know who made decision for
14 the Department of the Army that is part of the
15 September 9th Joint Statement?
16      A.  I don't, but I imagine that was either
17 recommended by Ms. Darcy, the Assistant Secretary for
18 Civil Works, and that might have been a decision that
19 probably the Army General Counsel, the lawyers in the
20 Army, would have been -- embraced.  And it might have
21 had to go to the Secretary of the Army.  I don't know
22 whether Darcy was the decision-maker, but I know that
23 that was -- I'm not sure that was a surprise to us, but
24 I don't think that was something that we recommended
25 happen.

Page 63

1      Q.  Do you recall recommending that they not
2  do it?
3      A.  I don't recall that, either.  However, I
4  was worried, to a degree, what that would have meant to
5  future actions.  In other words, what's the step ahead?
6  What's going to continue to evolve?
7      Q.  So does that mean, General Semonite, that
8  before that action was taken, that you were consulted
9  for your opinion on whether or not to do it?
10      A.  I don't remember being consulted.  Again,
11 General Jackson was probably working this six or eight
12 hours a day.  He might have certainly thought through
13 this and voiced any comments we had.  I don't remember
14 any of the dialogue.  I do know that -- I don't know
15 how we knew if -- or if we knew the judge was going to
16 make that decision.  But I tend to think that they had
17 anticipated this, because it takes days, normally, for
18 those agencies to agree on something.  And the fact
19 that -- it sounds like that joint press release, or
20 whatever it was, was the same day.  So that must have
21 been perceived and concocted a couple days ahead of
22 time.
23      Q.  Are you saying that the -- while you --
24 while the judge did announce that that was the date
25 that he was going to issue his decision, you're not

Page 64

1  saying that you knew -- you or anyone in the Department
2  of the Army knew what that -- the basis or nature of
3  the decision was going to be, do you?
4      A.  No, I don't.  But a lot of times in the
5  Army, I mean, we pride ourselves on always having a
6  plan on the shelf.  If -- if there are times when we
7  anticipate some future actions, we don't want to
8  necessarily have to react to that.  We just execute
9  whatever that plan is.  And I think at some point after
10 the Labor Day weekend, I imagine some of those
11 discussions were to say, "If, in fact, a judge were to
12 execute this course of action, what should we do?  And
13 let's figure out how to do it ahead of time."  And
14 that -- that's conjecture on my part.  So I'm just
15 trying to help you understand, but I don't know any of
16 that in detail.
17      Q.  Okay.  Okay.  And so you do not know that
18 the idea of having a contingent plan on the shelf
19 included that, well, if the judge rules in our favor
20 and we win, we're still going to issue a Joint
21 Statement that says, "Notwithstanding the court's
22 decision, we're going to pause and reconsider what we
23 did"?
24      A.  Yeah, that's correct.
25      Q.  Okay.  Are you aware, General, that

Page 65

1  General Spellmon and Colonel Henderson were surprised
2  and/or frustrated by the September 9th Joint Statement,
3  in that they were not aware of it and that they were
4  frustrated by the substance of it, which was to
5  announce a reconsideration of the decisions that
6  Colonel Henderson had already made?
7      MS. ZILIOLI:  Objection; assumes facts,
8  misstates evidence.
9      A.  So I'm not aware that they didn't have
10 knowledge ahead of time.  I guess I would have thought
11 that that would have been coordinated.  You said
12 Henderson and Spellmon, but I'm going to assume maybe
13 General Jackson had prior knowledge.
14      Whenever we have one of our very, very
15 deliberate procedures that I trust and have executed --
16 and that was the analysis by Colonel Henderson --
17 either delayed, questioned, or even to give the
18 perception to the American people that there's a
19 challenge with our Corps decision-making process, I
20 certainly would have been frustrated.  And so,
21 therefore, it doesn't surprise me that Henderson and
22 Spellmon were surprised.  It's not normal that
23 Ms. Darcy would do something behind our back; but if
24 what you're saying is true, then that could have
25 happened.

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 66

1    Q.   (BY MR. SEBY)  You're not surprised that
2 she did something behind your back?
3    A.   There's times in the federal government
4 when people might do something that is not necessarily
5 the way you would have done it, but most of the time we
6 always get together ahead of time and everybody has the
7 ability to put their opinion in.  And being good
8 soldiers, if a decision is going to go some way that we
9 might not like, we still drive on, especially when
10 it's -- it's the political arm of the Department of
11 Defense.
12    Q.   Yeah.  And you mentioned something earlier
13 that -- that I wanted to come back to.  I think when we
14 were talking about the hierarchy and the chain of
15 command, that you, thankfully, explained -- I
16 understand it -- you made a point that the -- the
17 military, the Army, is subservient to civilian control.
18 You -- you really emphasized that point, right?
19    A.   That's correct.  And that's not, of
20 course, just the Army.  It also applies at the
21 Department of Defense level; the Chairman and the Joint
22 Chiefs who work for the Secretary of Defense.
23    Q.   Right, right.  And they all work for the
24 President, correct?
25    A.   They do.

Page 67

1    Q.   Yeah.  And so when Ms. Darcy, the civilian
2 Assistant Secretary of the Army for Civil Works, does
3 something you don't care for, perhaps personally or
4 professionally, your institutional parameter is to, as
5 you said, I believe, salute and drive on, right?
6    A.   With a very strong exception.  If it
7 basically is either doing something which is against
8 some -- something about our values, something to do
9 with integrity, in the occasion of something on the
10 battlefield that would end up being an illegal order;
11 or on this one specifically, if it gets to a point
12 where we feel that the law is not being done in
13 accordance with our normal established procedures.
14    Q.   Did you feel that that circumstance was
15 approaching a trigger point in the context of how
16 Ms. Darcy was considering and addressing the DAPL
17 protests while she was in office?
18    MS. ZILIOLI:  Objection; ambiguous,
19 vague.
20    A.   So at this time, probably not.  And I
21 think it's key to make sure in my testimony -- we keep
22 talking about the word "evolve."  This continued to get
23 worse and worse.  So when that first statement came
24 out, this was probably a good low shot under the bow to
25 keep everybody, without getting a lot more -- almost

Page 68

1 like a tinder -- a tinderbox.  I mean, we didn't want
2 to have the fire fueled here, so we were certainly
3 willing to do that.
4    There is time, and as we talked, in the
5 next couple months after that, where there was a very,
6 very growing concern, both on my part and my staff's
7 part, that we were beginning to deviate from normal
8 established regulatory procedures.
9    Q.   (BY MR. SEBY)  And what -- can you give me
10 an example or two of -- of that happening in the DAPL
11 protest context or DAPL -- I guess the consideration of
12 the easement, which was pending for quite some time
13 with Ms. Darcy and was called back by the September 9th
14 Joint Statement?  Can you elaborate on -- on -- on that
15 consideration that you're raising; where there was a
16 growing concern, to use your word, of deviating from
17 normal established Corps regulatory procedure?
18    MS. ZILIOLI:  Objection, misstates
19 evidence.
20    A.   So it did not involve the protests or
21 really anything on the ground.  So what I'm talking
22 about, the Corps is charged to be able to execute the
23 regulatory process in accordance with our rules and
24 procedures that are established in law.  And so -- and
25 without making a -- a stupid analogy, the bottom line

Page 69

1 is, is that we have a set of procedures that says,
2 "Here is what we have to do to be able to approve an
3 easement."  It's a little bit different for
4 different-sized pipelines.  We go through our
5 procedure, and then we basically execute that procedure
6 based on the results of our analysis.
7    If, in fact -- so we have an obligation to
8 both parties.  We have an obligation to the United
9 States public to be able to make sure we're doing it
10 right.  And just as important -- not more important,
11 but just as important -- is an obligation to the
12 applicant to be able to make sure that the applicant is
13 getting a permit, if the Corps decides the applicant
14 deserves a permit.
15    So at some given point in this process
16 when we were just going to say we were going to
17 continue to study it, the question is, we -- we didn't
18 necessarily feel we needed to study it.  We did our due
19 diligence.  We knew what our answer was.  Our answer
20 didn't change.  So the ability in echelons above me --
21 and I don't know where that happened -- but to delay
22 the execution of that permit, we felt was not
23 necessarily in keeping with our obligations to the
24 applicant.
25    Q.   (BY MR. SEBY)  Yeah.  And do you think

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 70

1  that was the reason for General Spellmon's and Colonel
2  Henderson's surprise and frustration by that
3  September 9th announcement?
4         MS. ZILIOLI:  Objection; speculation,
5  assume facts not in evidence.
6         A.   I think what we were all worried about in
7  September was, what was the trajectory of this action.
8  And given that this -- we were getting into the winter
9  season, the protests were getting bigger, more unruly,
10 more violent, more law enforcement, we felt that this
11 action, if anything, just to continued to embolden
12 protesters to stay on the ground and continue to make a
13 very, very visible statement to the Administration not
14 to approve the permit.
15        Q.   (BY MR. SEBY)  I see.  And so, General, I
16 have to ask, then, why did you entertain the Corps
17 considering whether or not to give a permit to use
18 the Corps land and stay on the Corps land to
19 protesters, when those protesters were a -- a fraction
20 of the larger protesters who the Corps was recognizing
21 was violent and using the Corps property for trespass
22 and attacking public property and private property?
23 Why -- why did -- why did the Corps allow that track to
24 go forward when you had that concern?
25        MS. ZILIOLI:  Objection; assumes facts,

Page 71

1  misstates evidence.
2         A.   So I would say that this was a series of
3  different steps.  Perhaps the statement you mentioned
4  in early September was one step.  There were other
5  actions taken by the District Court.  There were
6  actions taken to try to mitigate this to defuse the
7  situation.  As those different steps failed to
8  materialize in getting the results on the ground, then
9  we had to continue to look at what other options there
10 were.
11        Again, I don't believe I was necessarily
12 the decision-maker on the special use permit.  We
13 thought all along -- I guess we probably hoped all
14 along that had we issued that, at some given point the
15 protesters would have gone away.  And, therefore, by
16 giving them that venue, we would have allowed this to
17 defuse as the winter months came on.
18        Q.   (BY MR. SEBY)  I see.  Do you think that
19 when you were talking about normal Corps procedures for
20 permits and approvals and -- of the like, that when the
21 September 9th joint agency -- three-agency statement
22 came out, that the Corps lost or conceded some of its
23 authority for the easement, because it was now subject
24 to a three-party federal agency process?
25        MS. ZILIOLI:  Objection, legal

Page 72

1  conclusion.
2         A.   I'm not sure that I felt we lost any of
3  our authority or jurisdiction.  And again, vague
4  memory, but I think, in retrospect, what it looked like
5  was that the Corps' decision was being questioned,
6  which put our credibility on the line.
7         Q.   (BY MR. SEBY)  Is that -- is that
8  something that concerned you?
9         A.   So my entire tenure of my time, not only
10 in the Army, but in the Corps, was to always maintain
11 the reputation of the U.S. Army and the U.S. Corps of
12 Engineers as the most trusted federal engineering firm
13 in the world.  And so any time we ever had any question
14 with our reputation or our credibility, our ethics, our
15 values, that always was one of my highest concerns.
16        Q.   Yeah.  Did you ever have a discussion with
17 Ms. Darcy about that very topic?
18        A.   So, I don't remember that.  I probably
19 did, but I don't remember it coming to a head until
20 sometime probably in November or December.
21        Q.   Did you ever have that discussion with
22 anyone other than Ms. Darcy in September or October
23 2016?
24        A.   I think internal to my very close staff,
25 which would have included Colonel Henderson at the

Page 73

1  district level, General Spellmon at the division level,
2  we were worried about if, in fact, the Administration
3  continued to maintain that same position, then where
4  would this get resolved.
5         Q.   So it was an open and lingering topic of
6  concern within the Corps and yourself and your staff
7  for a significant period of time, it sounds like?
8         MS. ZILIOLI:  Objection, mischaracterizes
9  testimony.
10        Q.   (BY MR. SEBY)  I'm asking.  I'm not trying
11 to put words in your mouth.  I'm just trying to
12 appreciate, understand precisely what you're saying; is
13 that there was a passage of several weeks, if not
14 months, where this announcement in the September 9th
15 Joint Statement to look back at and evaluate the
16 decisions the Corps had already made concerned you for
17 several weeks or months.  And it was an open issue,
18 because the consideration -- reconsideration was
19 ongoing for a while.  Is that accurate?
20        MS. ZILIOLI:  Same objection.
21        A.   It -- it definitely continued to get to be
22 more of a concern as time evolved.  Again, the first
23 couple weeks of September, it was probably much more
24 contained to a very small internal group.  But as we
25 got to be in the national press and there was -- and I

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

1  don't know the details, but at some given point, the
2  permittee -- that would have been Energy Transfer
3  Partners or whatever -- was continuing to push us to be
4  able to resolve it.  And so we were clearly caught in
5  the middle of being asked to continue to study this
6  longer delay of decision, when, I think in fairness to
7  my team, we felt we had done due diligence, and there
8  was no viable reason that we could justify delaying a
9  recommendation.
10      Q.    (BY MR. SEBY)  Yeah.  And when you say you
11  met with Ms. Darcy with some manner of frequency -- not
12  as much as your -- your staff, but you met with her, I
13  don't know, maybe -- maybe once a month, I think you
14  said, was -- was that frequency of meeting with her,
15  did that carry through during this time period, or was
16  it less or more?
17      A.    I don't remember.  Normally, I have a
18  very, very consistent battle rhythm, so I would have
19  envisioned it would have been the same.  And I remember
20  those discussions; very cordial.  Again, we wanted to
21  continue to try to find an acceptable solution for
22  everybody.  So there was a lot of discussions as to the
23  variables in this equation.  But I -- I think as time
24  went on and we didn't necessarily see a path forward,
25  that concern got more intense for me.

1      Q.    Yeah.  Was -- was part of that concern
2  exacerbated by a perception, perhaps, of Ms. Darcy
3  being less available or less responsive than you felt
4  she should, given the -- pendency of that lingering
5  question?
6              MS. ZILIOLI:  Objection, assumes facts not
7  in evidence.
8      A.    So, certainly not less available.  I don't
9  think availability was ever an issue.  I think the
10  concern was, is that we just didn't feel that we had
11  clarity on what she felt was lacking in our initial
12  analysis.  And it was almost more of, I think, a
13  stalling tactic.
14      Q.    (BY MR. SEBY)  Yeah.  Do you think
15  Ms. Darcy owned the stalling tactic, or was she merely
16  carrying it through at the behest or in concert with
17  other federal representatives?
18              MS. ZILIOLI:  Objection, speculation.
19      A.    I don't know this.  I think it's important
20  for this deposition to realize, also, that this was
21  getting closer and closer to a national election.  So
22  people that might have been more politically involved,
23  I think were continuing to look at how this might play
24  out, had this protest and issue continued to merge
25  right up into the national election.

1      Q.    (BY MR. SEBY)  Can you help me understand
2  why that mattered?  I don't appreciate why what happens
3  every four years in the United States, as a matter of
4  our constitutional course, would make any difference to
5  the execution of the Corps' mission and function.
6      A.    So it doesn't matter at all to the Corps.
7  We pride ourselves on being apolitical.  We don't have
8  a party.  We don't have a position on this stuff.  It
9  is our charter and our oath to administer the law as is
10  written and established by Congress.
11              On the other hand, there were, at this
12  time, growing concerns in the Department of Defense
13  that the Department of Defense might be asked to step
14  in with respect to law enforcement activities, either
15  done by National Guard under state authority or under
16  federal authority.  And I think that the optics of a
17  continued protest on the nightly news could have been
18  played by the political parties, either for or against
19  in different manners.  Our job is to stay out of that,
20  but I'm not convinced that that was not a consideration
21  by elements higher than me.
22      Q.    Help me understand that.  Why would the
23  incumbent Administration delay a decision and
24  exacerbate an ongoing protest on federal property?  I
25  don't see the connection there.  What is -- what is it

1  that you're thinking?
2              MS. ZILIOLI:  Objection; misstates
3  evidence, assumes facts.
4      A.    So I don't know if I can connect the dots
5  for you, whether it's a Native American issue or a
6  pipeline issue or a green energy issue.  I just know
7  that we got to the point where we were past regulatory
8  thinking, and some of the guidance we got, I think I
9  just was worried that it was -- had some degree of
10  political connotation.
11      Q.    (BY MR. SEBY)  Yeah.  And that's really --
12  my question is, why?  Why -- why was -- why did anybody
13  look at these issues and feel the need to ascribe a
14  political connotation to them?  That's the part I don't
15  understand.
16              MS. ZILIOLI:  Objection, speculation.
17      A.    Well, if there's a perception in the
18  Administration that this pipeline should not have been
19  approved -- I don't know there was -- but if there was,
20  and for some reason if the Corps made a recommendation
21  to approve it, the Corps is an element of the
22  Administration, I think that that would have put
23  certain players in uncomfortable positions.
24              That is truly my speculation only.  But
25  any -- I've been through this for a couple different

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 78

1 elections.  Any time you're close to a national
2 election, no one wants to be able to be the lightning
3 rod to bring attention to either something that could
4 be perceived as going not necessarily in the direction
5 that somebody wants it to go.
6      Q.   (BY MR. SEBY)  Yeah, and I can appreciate
7 that.  The part I don't understand is, this wasn't
8 happening in a vacuum.  There were several thousand
9 people resident on Corps property with no -- no legal
10 authorization to be there.  And meanwhile, the --
11 Ms. Darcy, or others were asking her to, delay the
12 decision on the pipeline.  How did that help the fact
13 that you had people setting up residence and building
14 stuff on Corps property?  How did that help things?
15      I only can -- can appreciate the
16 perspective that it made it worse.  And so I -- I'm
17 trying to understand what the motive or rationalization
18 would be from a political person to say that, "We're
19 going to not make a decision while we have that problem
20 going on right now in North Dakota on our property.
21 And just -- just let it ride until the election in a
22 couple of months."
23      MS. ZILIOLI:  Objection; assumes facts,
24 misstates evidence, speculation, ambiguous.
25      A.   Yeah.  So I can't speculate on exactly

Page 79

1 what all the factors were involved.  I just know that I
2 encourage and almost mandate my team that you follow
3 the law, you follow policy, you follow regulation.  We
4 had done that, up until September.  And then we had a
5 hard time continuing to do due diligence and support
6 the regulatory system with some of the guidance we were
7 getting.  And it's -- we'll leave it up to history to
8 figure out why the actions taken above me were taken
9 the way they were.
10      Q.   (BY MR. SEBY)  Sure, yup.  So back to the
11 situation on the ground in North Dakota, as of August,
12 with the protesters arriving on Corps property.  Do you
13 recall whether you or other Corps officials referred to
14 those protesters on Corps property as trespassers?
15      MS. ZILIOLI:  Objection; assumes facts,
16 legal conclusion.
17      A.   So --
18      Q.   (BY MR. SEBY)  I'm not asking you to make
19 an assumption, General.  I'm asking you if you,
20 personally, or in the presence of other Corps
21 representatives, referred to those people as
22 trespassers?
23      A.   So I don't believe we did in the
24 September-October time frame.  And we talked about an
25 hour ago about the fact that the special use permit was

Page 80

1 in a working status.  I believe Colonel Henderson gave
2 the Standing Rock some period of time to come through
3 on those conditions.  So while that permit still had a
4 probability of approval, then we looked at them as just
5 having their ability to do -- to be able to have their
6 First Amendment rights and, to a degree, some degree of
7 clearance to be able to be on the land.
8      There -- there was some point, and I don't
9 remember when, when it appeared that the Standing Rock
10 was not going to honor those commitments.  And I don't
11 know whether the permit, then, was withdrawn, canceled,
12 or just null and void.  But at some given point when
13 they were on the land, and it was not in the way the
14 Corps wanted them to be, we could talk north and south,
15 then I do believe we certainly considered them as being
16 on the land with -- without valid authorization.
17      I'm not sure the legal term of "trespass";
18 but when we ask somebody to remove themselves from our
19 land and they fail to do that, it clearly was a concern
20 to us, mainly due to their own life safety.
21      Q.   And so I understood your -- your response
22 and -- and appreciate that during the pendency of the
23 special use permit consideration, you didn't -- you're
24 saying you didn't view the Standing Rock people as
25 trespassers, because they were the applicant for the

Page 81

1 special use permit; is that correct?
2      MS. ZILIOLI:  Objection, legal
3 conclusion.
4      A.   Yeah, I think that's the way I remember
5 it.  Now, there could have been times where we might
6 have written letters to them or we might have said, "If
7 you don't do this by day X, then we're going to
8 consider . . ."
9      At lower levels, there could have been
10 more use of the word "trespass."  I think we wanted to
11 continue to look at how we could consider them as
12 authorized to be there within some very, very fenced
13 parameters.  And I believe the parameters were that
14 none of the state and local laws were broken, that they
15 had to -- there were definitely some health
16 considerations with respect to conditions on the
17 ground.  I -- I think that those are the things that we
18 wanted to make sure were being done right.
19      Q.   (BY MR. SEBY)  Sure.  And that's as to the
20 Standing Rock people, because they were the ones that
21 actually applied for such a permit, right?
22      A.   So, I think they were the ones that
23 applied, but I think -- and I don't know this -- the
24 permit could have been able to cover other tribes that
25 were there.  So, in other words, I'm not sure you had

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

1 to show an ID card to say, "I'm Standing Rock and,
2 therefore, I'm able to be there." I think the Standing
3 Rock applied for the permit, but I don't know the
4 specific parameters of what the -- who the permit
5 allowed to be on there. Good example, if you're not a
6 Native American, and you're a Hollywood actress, are
7 you able to be on there under the grace of the Standing
8 Rock -- of the standing permit? I don't know that.
9       Q.   Okay. You don't know. You don't know
10 where the -- whether the special use permit was an
11 everybody who is protesting authorization or just
12 the -- just Standing Rock tribal members. You don't
13 know that?
14       A.   I don't know that. But my guys do
15 unbelievable detailed work, and I'm sure that it's easy
16 to read the permit and figure out what the conditions
17 of the permit were. I'm sure we stipulated what those
18 were in the document.
19       Q.   Yeah, of course, indeed. Okay. So that
20 was for the -- pendency of the consideration of the
21 Standing Rock Sioux Tribe application for a special use
22 permit. And we'll leave open the question of for whom
23 the permit covered. And the document certainly speaks
24 for itself. But earlier, I heard you acknowledge that
25 there never actually became an effective special use

1 permit, and I agree with you.
2            What about, though, the issue of the
3 protesters encamped on the north side of the Cannonball
4 River, on Corps property, that were never part of the
5 Standing Rock Sioux Tribe's permit application for a
6 use area on the south side of the river? What did you
7 consider those people?
8       A.   So I just don't know the details of who
9 was there, how many people, why they were there, how
10 long they were there. I just don't have some graphic
11 array that shows me exactly who's what. I just can't
12 answer that question.
13       Q.   Yeah. Do you think that you ever knew the
14 answer to that question about the -- there never was
15 even an attempt to get a special use permit applied for
16 by the large number of people on the north camp --
17 otherwise known as the Main Camp or the Oceti Sakowin
18 or the Seven Councils Camp?
19            MS. ZILIOLI:  Objection, assumes facts.
20       A.   So you're using terms I'm not aware of. I
21 don't recognize any of those names. I do believe -- I
22 remember at some point, when it looked like the
23 conditions were not going to be met for the -- the
24 permit on the south side, that Colonel Henderson met
25 with the chief and said something like, "Hey, you know,

1 either get everybody off the north side, or we're going
2 to have to start enforcing removal."
3            And -- and I think this is where it began
4 to start working with law enforcement officials. This
5 is when we began to start modeling, if the water comes
6 up and if, in fact, those people are still in that
7 camp -- you called it the Main Camp -- that,
8 theoretically, that was a dangerous place to be. And
9 the worst thing that can happen -- it's one thing if
10 you're seeing people protest on TV at night, perhaps
11 illegally; it's something else to see violence. What
12 we were very, very afraid of is that we were going to
13 have somebody that got hurt on Corps property by being
14 in a place where we couldn't control the water and
15 their safe conditions.
16       Q.   (BY MR. SEBY)  Yeah. Do you recall,
17 General, how long the Corps engaged in the pendency of
18 the special use permit, hoping the Tribe would meet the
19 conditions in the permit that the Corps tendered to
20 them? How long did that all go on from the application
21 in -- in August and the presentation of a proposed
22 unsigned permit to the Tribe in -- in the third week of
23 September? How long after that did you -- did the
24 Corps officials under you try to get the Standing Rock
25 to meet their obligations under the permit for it to be

1 effective? How long did that go on?
2       A.   So I don't have a tick-tock laydown of all
3 the dates. From what we're saying, it sounds to me
4 like it was probably four to six weeks, something on
5 that order, because I know that somewhere this
6 materialized probably the end of October, of telling
7 them to get off. So if they applied for the permit in
8 mid-September, 30 to 45 days, something like that.
9       Q.   Okay. And what do you mean by telling
10 them to get off?
11       A.   Well, I think, again, to -- to leave the
12 Corps land and -- and get off. And I'm assuming you're
13 talking the -- the north side?
14       Q.   Yes, yeah, for example. Would it surprise
15 you if that direction to get off the property didn't
16 actually occur until November 25th, by letter from
17 Colonel Henderson, then providing a date of December 5
18 in which to get off; but very much at the behest of
19 others in the Administration making clear that you
20 wouldn't actually force them to get off or evict them;
21 that there was quite a discussion between Ms. Darcy and
22 the Department of the Interior cautioning the Corps
23 against using any language that could be inferred to
24 indicate that you would actually mean it and tell
25 people not only to get off, but get off now, or we're

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 86

1  going to make you get off?

2          MS. ZILIOLI:  Objection; assumes facts,

3  misstates evidence.

4          A.    So it doesn't surprise me.  Obviously,

5  you've got a much better handle on the dates.  And if

6  it was a November time, I understand that.  We were

7  extremely cautious here to try to find a path of least

8  resistance where we could support the Administration

9  while, at the same time, minimizing issues on the

10 ground.  So a November time frame doesn't necessarily

11 surprise me.  And I'm not sure I know the last part of

12 your question, where we basically were told not to do

13 law enforcement.  If that happened, it certainly

14 doesn't surprise me, but I'm not sure I remember

15 specific direction not to do that.

16         Q.    (BY MR. SEBY)  Yeah.  Thank you.  And I

17 appreciate the Corps is operating within the larger

18 Administration and subservient to civil control and

19 command.  I appreciate that.  You've made that very

20 clear.

21         Do you know, General -- do you recall when

22 the Corps made a decision to let the protesters, the

23 DAPL protesters on Corps land, remain there?  Was that

24 a -- was that a conscious decision, discrete decision,

25 or was it sort of a -- it just played out that way?

Page 87

1          MS. ZILIOLI:  Objection; assumes facts,

2  legal conclusion.

3          A.    So I just don't remember, even if you were

4  to ask me, when did the protesters leave.  I mean, I

5  guess I kind of thought it was somewhere before

6  Christmas.  But if it was into, you know, January or

7  February, that doesn't surprise me, either.  I think at

8  some point it just got so cold, that I think some of

9  them migrated back to the reservation.  But I just

10 don't have a good understanding of those dates.

11         Q.    (BY MR. SEBY)  Okay.  So that was going to

12 be my next question, is, do you recall how long

13 protesters remained on Corps property?

14         A.    I'm guessing anywhere from two to three to

15 four months, but I -- I don't have a good understanding

16 of that.

17         Q.    Would it surprise you, sir, to hear that

18 it was actually on the order of eight months?

19         MS. ZILIOLI:  Objection, assumes facts.

20         A.    Yeah, I think I would be surprised to hear

21 eight months.

22         Q.    (BY MR. SEBY)  Okay.  So the idea that

23 protesters were on Corps property in August of 2016 and

24 stayed there, uninterrupted, through March or April of

25 2017, that surprises you?

Page 88

1          MS. ZILIOLI:  Objection, assumes facts.

2          A.    So those dates, those are probably

3  different than what I would have recollected.  I would

4  have thought that this was resolved somewhere in

5  January.  There was a time, at some point, where the

6  easement was approved.  The company went in and did the

7  boring and, by default, this was fait accompli.  Now, I

8  think that must have been after the new Administration

9  was in play.  So I would have thought at some point

10 this would have been pretty much resolved by the end of

11 January.

12         Q.    (BY MR. SEBY)  Okay.

13         A.    But I'm not disagreeing.  If you've got

14 facts that say March, then I certainly understand that.

15         Q.    No, I understand.  We're not -- you're not

16 being argumentative in the least.  Sir, with respect to

17 the several thousands of protesters and the eight-plus

18 months that they occupied Corps lands, do you know how

19 many Title 36 or other types of citations the Corps

20 issued to DAPL protesters present on its lands in North

21 Dakota; how many citations?

22         MS. ZILIOLI:  Objection --

23         A.    So, I have no idea.

24         Q.    (BY MR. SEBY)  Okay.  Would it surprise

25 you?

Page 89

1          A.    You need to elaborate.  I'm not sure I

2  even know what the authority a citation has.  I just

3  don't have that level -- I don't know whether it's a

4  traffic ticket or a summons.  I just don't have any

5  understanding of how that potential citation action

6  plays out.

7          Q.    Sure.  And I wasn't so much focusing on

8  what the -- what the nature of a citation is or what it

9  means and what it -- what it -- what it sets in motion

10 when one is written.  But do you agree with me the

11 Corps has the authority to issue citations to people

12 who are present on its land that the Corps believes are

13 not appropriately there or behaving appropriately while

14 they're there?  We agree that the Corps has such

15 authority, correct?

16         MS. ZILIOLI:  Objection, legal

17 conclusion.

18         A.    I believe we do have that authority.  I'm

19 sure, though, that with all the -- all of the

20 discussions in the interagency, either -- at some point

21 we were probably given either guidance not to do that

22 or some parameters as to how to not make the problem

23 worse by issuing citations.  It could very easily be

24 that we were told, "Leave them there and don't do any

25 citations."  I don't know that, but we would have

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 90

1 followed whatever the Administration's guidance was.
2 And most of that would probably come from the Bureau of
3 Indian Affairs.
4       Q.    (BY MR. SEBY)  And I certainly am not
5 asking you to speculate what -- what might have
6 happened.  I'd rather just stick to what you recollect.
7 And do you recall any instances where -- you know, I'm
8 thinking about this in the context of what you told me
9 earlier, which makes complete sense and is part of the
10 discipline of the Corps and the transparency of the
11 Corps -- where you -- you have a job that's spelled out
12 by law and your regulations and custom and practice for
13 executing and administering those things.
14          But here, there were people on your land
15 who you didn't give permission to be there.  And you
16 have the ability to -- to issue citations when people
17 aren't playing by the rules on your property.  Why did
18 you not do that, is the question?  Was it because you
19 were, in fact, told not to; or because you, as the
20 chief of engineers, said, "Let's not do that in this
21 instance"?
22          MS. ZILIOLI:  Objection; assumes facts,
23 misstates testimony, legal conclusion.
24       A.    So I never gave any specific guidance as
25 to what to do or not do with respect to that.  I think

Page 91

1 it's incumbent to realize that while the Corps has
2 certain authorities and opinions, perhaps, of what the
3 ramifications could be, we want to continue to work
4 within the umbrella of the Administration.  And so this
5 is where we were a tool and had tools available, but
6 when you look at the larger context of life safety,
7 Native American rights, the right to protest, free
8 speech, I don't think that the Corps' ability to -- to
9 issue a citation is more important than any of those
10 other things.
11          And so this is where we take our guidance
12 from where the Administration wanted to balance all
13 those interests.  And at some point, we -- because I'm
14 not sure that the citation would have had any real
15 ability to do anything, I'm sure we followed whatever
16 guidance we got.  But I do not know if we got specific
17 guidance with respect to citations or not.
18       Q.    (BY MR. SEBY)  Yeah, and I -- I appreciate
19 all that.  That's -- you've said that; that, you know,
20 the Corps doesn't operate in a vacuum.  You're part of
21 the Administration.  And while you have your rules and
22 custom and practice for administering the law with
23 regard to your property, you're also a piece of the
24 larger Administration.
25          And so my question, I'm just going to ask

Page 92

1 it another way, because it's -- it's really the
2 question that's -- that's been out there.  Are you
3 aware of anyone telling the Corps not to issue
4 citations to protesters on Corps property?
5          MS. ZILIOLI:  Objection, asked and
6 answered.
7       A.    I just don't know the answer to that.
8       Q.    (BY MR. SEBY)  Okay.  I understand.  Thank
9 you.  And do you know why the Corps didn't issue any
10 citations?
11          MS. ZILIOLI:  Objection; assumes facts,
12 mischaracterizes testimony.
13       A.    I think we got to a point where at some
14 given point, if people are going to be there doing
15 things which were probably close to illegal -- they
16 were not following law enforcement guidance, they were
17 not following our guidance -- by giving them some
18 ticket, I'm not sure we thought was going to be good.
19 If we had done that -- and we might variously have
20 issued citations -- I'm not sure that the average
21 person who was in noncompliance is going to be impacted
22 or affected by having a citation.
23          So it's probably a good question.  I just
24 don't know the parameters of how some of that was
25 either played out or thought through that.  I think if

Page 93

1 it was something -- somebody said, "Go write them all
2 up and give them citations," we certainly would have
3 done it.  I think we were much more interested in
4 trying to come to a conclusion which was, like I said
5 at the very beginning, the best possible outcome of all
6 bad courses of action.
7       Q.    (BY MR. SEBY)  And I appreciate that.  So
8 basically, the Corps -- is it fair to say -- let me --
9 let me rephrase my -- my question.  Is it fair to say
10 that the Corps, in the face of several thousand people
11 without permission on Corps property and in a state of
12 anarchy, the decision was made to not use traditional
13 enforcement tools, but to try and -- and approach the
14 problem in a different way?
15          MS. ZILIOLI:  Objection; assumes facts,
16 ambiguous, misstates evidence.
17       A.    I'm not sure I would agree with your word
18 "anarchy."  There's probably a lot of definitions of
19 that.  And so I think it's best to say that they were
20 not necessarily in accordance with the manner we wanted
21 them to behave and under the special use permit.
22          I do remember that at some point Colonel
23 Henderson -- and I'm not going to say it was an
24 edict -- but at some point you mentioned a November
25 letter, when he basically said, "Hey, listen.  It's

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

1  time to leave."  I do believe he discussed with local
2  law enforcement officials, "Hey" -- and I don't know
3  the CFR very well at all.  Like I told you, I probably
4  couldn't recite any of it.  But I think the way that
5  that document or that law or that regulation is written
6  allows local enforcement, whatever the state capability
7  is, to come on federal land and to be able to enforce
8  that.
9       So the question that you have asked
10  several times about citations, I think Colonel
11  Henderson continued to recommend to the local law
12  enforcement officials, "You have the authority, under
13  the CFR, to come on our land and to be able to
14  enforce."  I think -- I think somewhere in the CFR it
15  talks about civil disobedience; if things are not being
16  done in accordance with state or local laws, then it's
17  your responsibility to come in and do it.  Because the
18  bottom line is, the Corps does not have an enforcement
19  capability.  Now, maybe my words are off here, maybe a
20  citation is enforcement.  But the ability to actually
21  rectify behavior through law enforcement-like
22  capabilities, we don't possess that.  We have to rely
23  on state and local authorities to be able to put that
24  discipline back in on the ground.
25       Q.   (BY MR. SEBY)  Would it surprise you, sir,

1  to learn that Colonel Henderson actually did not do
2  that?  He did not ask law enforcement in the state of
3  North Dakota to come on and remove people who were
4  unlawfully present on your property, that no such
5  request was ever made.  Would it surprise you to know
6  that today?
7       MS. ZILIOLI:  Objection; assumes facts,
8  misstates evidence.
9       A.   So I guess the answer is yes, because that
10  was not necessarily my understanding.  I believe that
11  there was a lot of discussions back and forth between
12  the district, Colonel Henderson, and -- and I don't
13  know exactly what parts of the state law enforcement,
14  but I know that there was a lot, a lot of discussion.
15       And I think, at the time, I remember it
16  being much more of a partnership.  It was not where,
17  "Hey, you know, you're asking us to do something we
18  can't do."  It was much more of, "How are we going to
19  take and combine state enforcement, along with what
20  you're asking us to do, to be able to get the situation
21  under control?"
22       I don't know the details, but I know that
23  at some point there were also requests for federal
24  enforcement, and I don't think that ever materialized;
25  it might have.  And I don't know whether I'm talking

1  marshals or whatever it is, but at some given point,
2  there was a lot of law enforcement people from local,
3  state, and the interagency trying to figure out how to
4  put a law enforcement package together to be able to
5  help mitigate this on the ground.
6       Q.   (BY MR. SEBY)  Would it surprise you, sir,
7  to learn that Colonel Henderson's letters and
8  correspondence to the State of North Dakota and the
9  political subdivisions of Morton County actually
10  contained express statements saying, "We are not asking
11  you to assist with protesters on the north camp or some
12  of the south camp properties"?  Not only did he not
13  invite them or request them, but he said, "Do not help
14  us with respect to those camps."  Would that surprise
15  you to know that was the case?
16       MS. ZILIOLI:  Objection; assume facts,
17  misstates evidence.
18       A.   So I would say yes.  And I think that it's
19  important to point out that I have the utmost respect
20  for Colonel Henderson.  And it's important at this
21  point to say that of the 43 colonels I had working for
22  me, he was, without a doubt, my number one colonel.
23  Had it not been for his kids, he would have stayed on
24  and probably could have been a general officer.
25       But this guy was above reproach.  He was

1  very, very well schooled on the authorities.
2  Obviously, he must have gotten advice from counsel or
3  other parts of the Administration on why not to do
4  that.  But I'm not necessarily tracking with exactly
5  what you're saying.  But I think, more importantly, if
6  that's true, which I have no reason to doubt what
7  you're saying, then I'm sure he did that because he was
8  either worried about escalation or, you know, the
9  appearance of violence or other things.
10       There was a very, very large concern --
11  and I had this by senior militaries of the Department
12  of Defense -- with having soldiers go head to head with
13  Native Americans and the optics of how that would play
14  out on TV.  And so even though -- and I don't know for
15  sure, but I think at some point there were National
16  Guard who were under the authority of the State --
17  don't forget, National Guard could be federalized and
18  work for DOD, or they could work for the State -- but
19  there were a lot of concerns with the National Guard
20  leadership to keep National Guard in the back doing
21  traffic control, helping with housing, helping with
22  other type stuff, and never get a flashpoint of where
23  somebody in a military uniform is enforcing a law
24  enforcement activity with a Native American.  We
25  just -- we were very, very concerned about those

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 98

1  optics.

2  Q.  (BY MR. SEBY)  So is that the reason why
3  you let the protesters stay so long?

4  MS. ZILIOLI:  Objection; assume facts,
5  misstates evidence.

6  A.  So we didn't do anything in a vacuum.
7  Again, I think that this was an interagency decision.
8  They were -- DOI, DOJ, in close coordination with the
9  Department of Defense, were really the drivers behind
10  those decisions.  Had we been told to do something else
11  or we had been given other venues available, we
12  certainly would have done that.  But at this point, and
13  probably as early as the middle of -- middle of
14  October, the Corps was really out of the process of
15  determining how to resolve this.  This was much more of
16  an interagency and Administration decision.

17  Q.  (BY MR. SEBY)  And what was the day -- the
18  date that you said the Corps was really out of the
19  process and the interagency decision took -- took over?

20  A.  Well, I don't know the date you said of
21  that -- that announcement, but I would say that --

22  Q.  September 9th.

23  A.  -- this all started probably with that
24  joint announcement that took the Corps kind of out of
25  it in early September.  So this was a -- this was the

Page 99

1  beginning of something that continued to get, I think,
2  more and more out of our control.

3  Q.  Yeah.  September 9th was the Joint
4  Statement.

5  A.  That's correct.

6  Q.  Sure, sure.  Thank you for that.  That was
7  helpful to understand.  So -- and I -- we got to that
8  point of discussion because I had asked, at what point
9  did the Corps let those people stay.  And I think
10  you've clarified that, you know, it got to
11  September 9th and the -- off the shelf came the Joint
12  Statement, on the same day that the Corps' decisions
13  were upheld against a challenge by the -- by the
14  tribes, including the Standing Rock Sioux Tribe.  And
15  that even though you put one, the Administration,
16  through the interagency decision-making process, that's
17  when they decided to let those people stay, right?

18  MS. ZILIOLI:  Objection; misstates
19  evidence, assumes facts.

20  A.  So again, I think this was getting to be a
21  national strategic problem.

22  Q.  (BY MR. SEBY)  Yeah.

23  A.  And so as a result, I don't know for sure,
24  but I think at some point I remember the National
25  Security Council was involved.  I know the White House

Page 100

1  was involved.  In later years, I did a lot of work
2  personally with the White House and some of these
3  interagencies.  At this point, I had been in command, I
4  guess, three to four to five months.  I was not well
5  known by the White House, the Obama Administration, or
6  probably any of the secretaries of the interagency.  I
7  didn't work at that level at this point.  And so as a
8  result, we got most of our direction from Ms. Darcy
9  either -- verbally on either what to do or, primarily,
10  maybe what we were not going to do.

11  Q.  General -- and so Ms. Darcy gave you
12  direction on what to do?

13  A.  I think she -- this probably goes back to
14  the discussion we had earlier on continuing to study
15  the issue and come back and give us more of your
16  decision -- more of your evidence on -- with respect to
17  the approval of the permit.  I'm not sure Ms. Darcy
18  ever gave us any specific direction on the protest.  I
19  believe most of that came through DOJ and probably
20  through DOI.

21  Q.  The what to do with respect to the protest
22  direction came from Department of the Interior?

23  A.  So I just don't know where that came from.
24  I know that most of this was a working group of about
25  five or six different agencies who, I'm assuming, met

Page 101

1  either daily or weekly, whatever.  But we would come up
2  with some recommendations, to a degree -- be it the
3  standing use permit or other options -- on where we
4  could either relocate or move people.  And either we
5  briefed that to this working group, or they told us
6  what to do.  But most of that, I think, was much more
7  driven by national level agencies as to how to resolve
8  this.

9  Q.  And you mentioned five to six different
10  agencies.  Which -- which ones come to mind?  I mean,
11  you said a couple, but just to round out, who all that
12  might be?

13  A.  So I think, clearly, there was the
14  Department of Defense, really executed by the
15  Department of the Army, Office of General Counsel.  We
16  talked about the Assistant Secretary of the Army for
17  Civil Works, DOI.  But probably internal to DOI was --
18  I think it's Bureau of Indian Affairs, maybe it's BIA.
19  At some point, I think there was some degree of FBI
20  involvement.  I don't know that, but I think at some
21  point they were part of this team.

22  And then, honestly, the State of North
23  Dakota was a player in a lot of this.  I don't think
24  the federal government did anything in a vacuum.  But
25  at some given point, I would have thought that the

Page 102

1 county, the local officials, the State, the Tribe -- I
2 mean, everybody was trying to figure out how to find
3 the best solution available.
4       Q.   Sir, the question was, you mentioned five
5 to six different federal agencies.  And my -- my
6 question was, could -- could you just identify who --
7 who you had in mind when you used the -- the numbers
8 five to six as federal agencies?
9       A.   Yeah, so I thought I did.  Department of
10 Defense.
11       Q.   Got it.
12       A.   Department of the Army; Department of the
13 Interior, specifically DIH; Department of Justice; the
14 FBI.  That's four.  Maybe four is the right answer,
15 then.
16       Q.   Okay.
17       A.   But on some of those, like the Department
18 of Defense, there were three or four different
19 subagencies --
20       Q.   Yes.
21       A.   -- that were on that team.  So DOD General
22 Counsel was there with Department of Army General
23 Counsel.  And I think it's important to say that I also
24 tell my guys, "You're my team.  Stay in your lane.
25 You're engineers.  You worry about water, you worry

Page 103

1 about federal land.  When it comes to exactly how we're
2 going to resolve, you know, political situations, then
3 we defer to those that have the authority to be able to
4 resolve those."
5            And we basically went and said, "We have a
6 challenge.  Here are some tools we have available."
7 And at that point, I think the interagency took over
8 control and basically said, you know, "Either you're
9 going to execute what we tell you to do, or don't do
10 anything without informing us and make sure that we're
11 a consolidated team versus the Corps trying to resolve
12 it."  This is where, in September, it was pretty much
13 my, I think, belief that this was going to truly be an
14 Administration's resolution versus the Corps of
15 Engineers'.
16       Q.   Yup.  Thank you.  Do you recall the
17 President of the United States making a public comment
18 on one or more occasions about the Dakota Access
19 Pipeline and the protests associated with it?
20       A.   I don't, but it's certainly -- I would
21 expect at some point he would have certainly made
22 some -- some comments in a press conference or
23 whatever.
24       Q.   Do you recall an instance where the
25 President of the United States made a comment in

Page 104

1 response to an interviewer's question about the -- the
2 consideration by the interagency team to look at
3 decisions that have already been made by the Corps?  Do
4 you recall the president, as part of his remarks,
5 indicating that the Army Corps is examining ways to
6 reroute the pipeline?  Do you recall that instance?
7            MS. ZILIOLI:  Objection; assumes facts,
8 misstates evidence.
9       A.   So I actually do remember discussions
10 about rerouting.  I don't remember that the President
11 said it, but I do know that there were some
12 proponents -- maybe press, maybe protesters -- maybe
13 environmental groups -- who, at some point, brought the
14 idea up of rerouting.  So yes, I do know that that was
15 a variable.  I don't remember the time, though.  That
16 could have been in the summer before the protest, it
17 could even have been after the Administration change.
18 And I just don't remember the -- the dialogue.
19       Q.   (BY MR. SEBY)  Do you recall having an
20 opinion, one way or the other, on the concept of the
21 Corps examining rerouting the pipeline that had already
22 been permitted and approved on the land route, which
23 was the majority of the pipe in North Dakota, by the
24 State of North Dakota Public Service Commission and not
25 the Army Corps of Engineers?

Page 105

1            MS. ZILIOLI:  Objection; misstates
2 evidence, legal conclusion.
3       A.   I don't remember any of the details of
4 what you're talking about.  I do remember, at some
5 point, asking logical questions to my team, "Hey, can
6 we still move this?"  And I don't know the exact
7 numbers here, but I think at some point the vast
8 majority of this pipeline had already been in the
9 ground.  All the permits had been done.
10           We got down to the very, very last permit,
11 I think, or close to it, which was called this
12 408 easement, under the water of that particular
13 waterway.  And so at that given point, I think there
14 was something called, like, the 20-mile limit or
15 something, but most of this pipe was already in the
16 ground.  So the ability to flex this or to flux it with
17 any given area, I think my -- my team came back and
18 said, "This is the environmentally safest, logical
19 position to put this to balance both the needs of the
20 pipeline, but, more importantly, the protection of the
21 environment."  I think my team pretty much said that's
22 not a viable solution.
23       Q.   (BY MR. SEBY)  And did you make that --
24 that position known within the Administration?
25       A.   I certainly did not, no.  I might have --

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 106

1  this is, again, where Ms. Darcy, being the political
2  appointee, she would have either carried that water or
3  represented our interest back up to somewhere else.
4  And it's probably important to realize, when was that
5  actual recommendation made.  Obviously, with pipe going
6  in the ground every single day throughout the summer,
7  had that recommendation been made early on, there was
8  probably more ability to accommodate it.  When that
9  recommendation was down to where the pipe was only
10  20 feet, 20 miles apart, then very, very little ability
11  to reroute.
12      Q.  Sure.  And were you aware that the Corps'
13  interest or federal interest and involvement in the
14  pipeline only pertained to the federal Waters of the
15  United States for which it crossed?
16          MS. ZILIOLI:  Objection; assume facts,
17  legal conclusion.
18      A.  So, I am aware of that.
19      Q.  (BY MR. SEBY)  Okay.  It's pretty commonly
20  observed by the Corps on their daily SITREPS for the
21  DAPL.  It's just -- it's just, you know, there's
22  probably 50 of them where it acknowledges that.  So
23  it's not speculative.
24          Are you aware of -- so if the Corps' role
25  was right there in that zone of federal interest, who

Page 107

1  decided where to put the pipeline, site it, why to
2  locate it where, and why not to locate it other places?
3  Who made that decision?
4      A.  So I don't know the answer, but our
5  doctrine normally has the applicant figure out what
6  they want to do.  And then -- and this is much more of
7  a consultation.  So as we talk -- and this is a whole
8  part of the dynamic that we can certainly talk about,
9  but there were many, many different deliberations with
10  the Tribe, and with any pipeline developer, as to where
11  does that route go, what are the ramifications with
12  historic sites, where there's urban areas.  So I was
13  not involved in any of that.  That probably happened
14  years before I got here.
15          But at some given point, I know that there
16  was a lot of discussions with Colonel Henderson and the
17  Tribe, prior to any of this, as to what their concerns
18  were.  And I tend to remember that Colonel Henderson
19  said most of the time the Tribe didn't show up to
20  participate, because they didn't want to look like they
21  were part of the decision.  So the best way to do that
22  is plausible deniability by saying, "We're not even
23  going to go."
24      Q.  Would it surprise you that the evaluation
25  and determination of whether to authorize the 90

Page 108

1  some-odd percent of the route of the Dakota Access
2  Pipeline in North Dakota was not evaluated and
3  determined by the Corps of Engineers or any other
4  federal agency?
5          MS. ZILIOLI:  Objection; assumes facts,
6  legal conclusion.
7      A.  It doesn't surprise me; but again, it goes
8  back to, we stay in our lane.  Whatever our authorities
9  are, that's where we would have a vote.  If there are
10  other federal interests that have decisions on those
11  other parts, then that's out of my scope.
12      Q.  (BY MR. SEBY)  So are you aware, sir, that
13  with respect to the siting of -- of oil pipelines in
14  the United States, that that decision is left to the
15  traditional land use authority of the state?
16          MS. ZILIOLI:  Same objections.
17      A.  I thought there was some federal agency,
18  maybe in DOE, that has some jurisdiction over
19  underground pipelines that don't affect waterways.  But
20  I -- I don't think that's only a state authority.  I
21  thought there was some -- not a bureau, but some agency
22  that has to do with -- I think it also goes back to
23  mining and ability to do subsurface emplacement.
24      Q.  (BY MR. SEBY)  Would you -- would you be
25  surprised to understand that the siting of a pipeline

Page 109

1  is actually conducted by the agencies and authorities
2  of the state within the United States when there is no
3  federal interest involved?
4          MS. ZILIOLI:  Objection; assumes facts,
5  legal conclusion.
6      A.  I'm not surprised by that.
7      Q.  (BY MR. SEBY)  Okay.  Are you aware that
8  the State of North Dakota Public Service Commission, an
9  independent elected body, conducted a several-month-
10  long adjudication where a docket was opened and the
11  applicant, Energy Transfer, sought a permit from the
12  State of North Dakota Public Service Commission to
13  designate a -- an approved route, after an evaluation
14  of alternative routes and the State-evaluated criteria
15  that are set in the State's constitution and statutes,
16  which define the jurisdiction of the Public Service
17  Commission, which includes the siting of oil pipelines
18  within the State for public interest criteria?
19          MS. ZILIOLI:  Objection; assume facts,
20  legal conclusion.
21      A.  So I've never heard of that agency, the
22  Public Service Commission.  It doesn't surprise me that
23  any state would have such a similar capability.  I have
24  no knowledge of anything of what you just said.
25          MR. SEBY:  Okay.  Okay.  We've now gone

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 110

1  for more than an hour.  I'd like to take another
2  ten-minute break, if we may, sir, and Ms. Zilioli.
3       THE DEPONENT:  So let's come back right at
4  the bottom of the hour.  How does that sound?
5       MR. SEBY:  Great.  That -- that's great.
6  That sounds good.  See you then.
7       THE DEPONENT:  Okay.
8       THE VIDEOGRAPHER:  Going off the record.
9  The time is 5:19 p.m. UTC, 11:19 a.m. Mountain.
10      (Recess, 11:19 a.m. to 11:33 a.m. MDT.)
11      THE VIDEOGRAPHER:  We're back on the
12  record.  The time is 5:33 p.m. UTC, 11:33 a.m.
13  Mountain.
14      Q.  (BY MR. SEBY)  General, we're back on the
15  record after a short break.  And I provided to your
16  counsel certain emails.  They're -- they're emails that
17  the United States produced to the State of North
18  Dakota.
19      MR. SEBY:  And the first one is
20  Exhibit 684, if we could put that on the screen,
21  please, for the General to see and for me to ask you
22  about, sir.
23      THE REPORTER:  And, Mr. Seby, are these
24  new exhibits or previously marked?
25      MR. SEBY:  This is a new -- new exhibit.

Page 111

1       THE REPORTER:  Thank you.
2       (Deposition Exhibit 684, remotely
3  introduced and provided electronically to the court
4  reporter.)
5       Q.  (BY MR. SEBY)  General, this is an email
6  from Donald Jackson to General Spellmon, dated
7  August 22, 2016.  And I just wanted to ask you --
8  you're not copied on this email, but I wanted to show
9  it to you, because -- and, first of all, would you
10  read -- there's -- there's two parts here.  I only want
11  to ask you about the -- well, I think it's fair if we
12  start with the -- the one below, the first email in the
13  string.  It's from General Jackson to Scott Spellmon,
14  copy to John Henderson.  John Henderson is removed in
15  the final communication above, but the middle one is
16  what I want to ask you about.
17      But here, I just -- just for context,
18  General Jackson is asking General Spellmon, at your
19  behest, it says, the "Chief asked me what position
20  Governor Dalrymple had taken on this issue."  And
21  that's the -- the issue I think that they're talking
22  about is the Corps was evaluating whether to transfer
23  lands to the three affiliated tribes, which is not
24  involving the DAPL protest.
25      But the interesting thing is that there

Page 112

1  was a -- a response from General Spellmon to General
2  Jackson, that is the -- is the email above, which is
3  the one I want to ask you about.  If you'd read that
4  for a minute.  It's a short email.  If you'd just check
5  it out, please.
6       A.  (Deponent examined document.)
7       So can you go down one more line -- a
8  couple more lines, please?
9       (Deponent examined document.)
10      Okay.  I got it.
11      Q.  Okay.  So the -- here we are in (sic)
12  August 22nd and the -- General Spellmon is telling
13  General Jackson that he has -- relaying Colonel
14  Henderson's interactions with the Governor that
15  morning.  And that while the email from General Jackson
16  was concerning the three affiliated tribes land
17  transfer, General Spellmon got into the Governor's
18  position on DAPL and the protests.  And here at the end
19  of, well, the third week of August, General Spellmon is
20  telling General Jackson, "In short, his primary concern
21  is upholding the right to peaceful protest-AND-public
22  safety."
23      He goes on to say, "The common assessment
24  from the field is the Standing Rock Sioux Tribe
25  protests have crossed the line and are no longer

Page 113

1  completely peaceful in nature."  Do you see that?
2       A.  I do.
3       Q.  And he goes on to say the Governor has
4  made an emergency declaration that provides additional
5  resources to state agencies to deal with the protests.
6  It does not include activation of the National Guard.
7       And from Colonel Henderson's notes earlier
8  today, you saw where he asked that we -- "he,"
9  referring to the Governor -- he asked that we strongly
10  consider denying any permits for staging/protest areas
11  on Corps property.  Then he goes on to say, "I
12  understand Northwest District" -- that would be
13  Omaha -- "has received its first Special Use Permit
14  application and is working through that process now."
15      So here at the third week of August, you
16  know, a couple weeks after these people showed up on
17  the Corps property, the, quote, common assessment from
18  the field is that they've crossed the line and are not
19  peaceful.  Why on earth would the Corps consider giving
20  that type of entity a special use permit to be on the
21  property?  Do you know?
22      A.  So I've never seen this email trail.  We
23  do have an obligation to work with the -- I think
24  several entities all together; the tribal nation, the
25  state, and the federal agencies.  We try to find

Page 114

1 consensus. Just by reading this email, it sounds like
2 the State is not a fan. I imagine -- because the Tribe
3 must have either -- asked for the special permit. So
4 therefore, I'm not sure it's fair to the Tribe just to
5 completely deny it. So obviously, at this point, we're
6 probably trying to figure out how to proceed. But
7 that's only my conjecture.
8     Q.   Okay. Here we have the quote, "common
9 assessment from the field [that] the Standing Rock
10 Sioux Tribe protests have crossed the line and are no
11 longer completely peaceful in nature." Are you saying
12 that you're -- notwithstanding the behavior of the
13 applicants, that you're obligated to work with them
14 towards giving them a permit if they can rightfully
15 obtain one?
16     A.   I think we have fairness to any applicant
17 to try to go through that due diligence. I'm not sure
18 exactly what the elements of approval are for a permit.
19 I think it's key to remember that the line you just
20 highlighted, "The common assessment from the
21 field . . .," I read that as an extension of his
22 primary concern, i.e., the Governor; so, therefore, the
23 Governor's common assessment -- and probably "the
24 field" means North Dakota -- that it's not -- did cross
25 the line. So I don't think that's General Spellmon's

Page 115

1 assessment. I think that's based on the discussions
2 that Henderson had with the Governor.
3     Q.   Okay. So you don't interpret the phrase
4 "the common assessment" to include any federal opinion,
5 then?
6     A.   I don't think it does. I think it would
7 have said something different than what it says here.
8     Q.   Okay. All right. Let's go on
9 to -- the next exhibit that I'd like to show you is
10 Exhibit 686.
11         (Deposition Exhibit 686, remotely
12 introduced and provided electronically to the court
13 reporter.)
14     Q.   And this is an email with an attachment
15 that I want to show you in a moment.
16         MR. SEBY: But if we could blow up the --
17 Rachel, please blow up the "To" and "From" for a
18 moment. There we are.
19     Q.   (BY MR. SEBY) So this is from
20 Ms. Durham-Aguilera, transmitting a Dakota Access
21 Pipeline Protest Storyboard dated August 23, 2016. And
22 it's addressed to Donald Jackson and you, sir, General
23 Semonite, and Ms. Darcy and Lowry Crook. Those are the
24 addressees of the email. And so the transmittal
25 message from Ms. Aguilera is short, and it says,

Page 116

1 Ms. Darcy, Chief, and Major General Jackson, "First
2 storyboard attached for the Dakota Access Pipeline
3 issue. Omaha District and Northwest Division [real
4 estate] were critical to its assembly. We intend to
5 generate [the] daily for now, and will endeavor to do
6 so by [the] end of the business day. Storyboard
7 addresses many of the questions being asked, including
8 background/nature of the protest, impact to [Corps
9 property], impact to DAPL construction, location of
10 protests relative to [the] Three Affiliated
11 Tribes . . ., and [the] way ahead. Thanks also to
12 Colonel Henderson and" -- "for his Commander's
13 assessment."
14         So now I'd like to look at the actual
15 storyboard that is being transmitted to you and
16 Ms. Darcy, collectively, the Corps' leadership. So on
17 this, if we could get to the map.
18         MR. SEBY: And, Rachel, could you --
19 before we talk about the text -- well, let's talk about
20 the text.
21     Q.   (BY MR. SEBY) You see the -- it talks
22 about the "Situation" up in the first --
23         MR. SEBY: Can you highlight that for the
24 General?
25     Q.   (BY MR. SEBY) Can you see that, General?

Page 117

1     A.   I can.
2     Q.   Okay. So here, it talks that the Corps
3 granted, as in has granted, two Section 408 permissions
4 for the DAPL project; already occurred July 25. So
5 here we are, approximately a month later, and that has
6 happened. And one gave consent for the flowage
7 easements held at the lake by the Corps, and the other
8 provided an easement to cross federal property for
9 flood control and navigation at Lake Oahe, North
10 Dakota.
11         On August 10th, protesters started showing
12 up and beginning to interfere with the DAPL
13 construction on private land near Lake Oahe crossing.
14 ████████████████████████████████████████████████████
15 ████████████████████████████████████████
16
17         And then it says, "Additional Background."
18 Protesters set up, quote, spirit camps, plural, on
19 Corps property south of the pipeline construction site.
20 It does not say south of the Cannonball River. It says
21 south of the construction site. So the river -- both
22 north and south of the river are south of the
23 construction site. So that's a very general reference.
24         Here, we then go to the map that's
25 provided as part of the -- the storyboard developed by

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 118

1  the Corps, as Ms. Aguilera described it.
2           MR. SEBY:  Rachel, yeah, could we blow
3  that up a little bit so we could look at the legend?
4        Q.   (BY MR. SEBY)  So there, it denotes the
5  Corps property.  U.S. Corps [Reservation] Project is
6  noted in blue.  And then when we look at the -- the
7  inset map on there --
8           MR. SEBY:  Rachel, if you could go to that
9  smaller inset right there.
10        Q.   (BY MR. SEBY)  -- we see that on the date
11  of this storyboard, which is the very first storyboard
12  that Corps staff -- coming from Colonel Henderson, who
13  gets a lot of credit for its development, and the Corps
14  resources in the -- in the division, real estate
15  division.  So people who know what their property looks
16  like have assembled this map and are providing it to
17  you, as the chief, and to Ms. Darcy, as the Assistant
18  Secretary of the Army for Civil Works.
19           And the very first report that you and
20  Ms. Darcy receive about the status of the Corps
21  property is to note that there is a camp located on
22  Corps property called "Camp North," and there's a camp
23  located on Corps property called "Camp South."  Do you
24  see those?
25        A.   So I see Camp North.  This makes me think

Page 119

1  that Camp South is on the Reservation.
2        Q.   It's -- it's not clear, though, is it,
3  sir; because it's right there -- the arrow -- the tip
4  of the arrow is right there on the border.  So we --
5  you don't know that it's on the Reservation, and I
6  don't know that it's on the Corps property.  Can we
7  agree on that?
8        A.   So I guess the question is, what's the
9  blue?  Is the blue actually the water line?  So when
10  you say, "Camp South," by this graphic, it would look
11  like Camp South is in the water.
12        Q.   Sir, back at the legend, the Corps legend
13  says Corps Reservoir Project.  It does not say only the
14  water.  So it includes the water and the project lands,
15  would be the way I read that.
16        A.   Okay.  I understand that.  I understand.
17        Q.   You disagree with that?
18        A.   So that's probably the boundary of the
19  Corps project.  And the water is either -- it's hard to
20  tell.  The water is either inside where the dotted line
21  is or something less than that.  So I understand it's
22  hard to understand by this graphic.
23        Q.   Are you going to disagree with me that
24  Camp North is clearly on Corps-managed property?
25        A.   I don't have a clue of exactly what this

Page 120

1  graphic shows.  I've never seen this -- I haven't seen
2  this storyboard in six years.  Now, if it came to me, I
3  certainly saw it six years ago.  But you're giving me a
4  lot, a lot of information here that I don't know if I
5  can quickly analyze what you're trying to -- what
6  you're trying to show.  It looks like there's some
7  area, obviously south of the water, that is called
8  "Camp South."
9        Q.   Okay.  Well, my view, because I'm reading
10  the legend where it says, "Reservoir Project," it
11  doesn't say "Reservoir Waterway" or anything like that.
12  And so I -- I believe "Project" is referring to the
13  Oahe Project, which includes water and project lands as
14  part of the project.  And so I believe what you are
15  being told with this graphic and the narrative text is
16  that there were camps on Corps property, and that's a
17  depiction of them, camps plural.
18        A.   So a storyboard is a tool we use, put
19  together by my ops team, to be able to give me a
20  graphic array for things like hurricanes, tornadoes,
21  and these kind of things.  It's clearly the first one.
22  Most of the time it's about two weeks into this when we
23  get everything right.
24           I probably would have asked the same
25  questions you were.  Let's blow it up more, let's have

Page 121

1  very clear graphics.  I think it's -- if you're making
2  the argument that this is saying it is or not, I'm not
3  sure I understand the accuracy of these graphics.  But
4  I'm not trying to say that -- it's just hard to tell by
5  looking at this graphic, by some captain who did this
6  in a PowerPoint shot, probably at 3 o'clock in the
7  morning.
8        Q.   Okay.  Earlier, you told me you had a lot
9  of faith in -- in the professionalism of Colonel
10  Henderson.  And that includes his -- the nature of his
11  assessments.  He didn't -- would you say Colonel
12  Henderson was prone to hyperbole?
13        A.   I don't know what that means.
14        Q.   Do you think he made -- did you ever find
15  him to gratuitously say things or make things up?
16        A.   Not at all.
17        Q.   Okay.
18        A.   I also want to clarify, the Corps is a
19  very, very professional place.  But most of the time,
20  the first time I either see something or I hear
21  something, it's always the first report.  So I put very
22  little credibility into the first things I see.  But
23  keep going.  I certainly will entertain whatever you
24  want me to try to answer here.
25        Q.   Okay.  I just want to show you one thing,

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 122

1 and that is --
2        MR. SEBY:  Rachel, could we go back to
3 the -- to the narrative text the Corps used on the
4 right side?  And come down to "Northwest Omaha
5 Commanders Assessment."  And could we blow that up for
6 the General?
7    Q.    (BY MR. SEBY)  So, General, the northwest
8 commander in this instance is Colonel Henderson,
9 correct?
10    A.    Yes.
11    Q.    Okay.  So what we're going to read here is
12 his assessment, correct?
13    A.    Correct.
14    Q.    Okay.  So here is what Colonel Henderson
15 says as his assessment.  "We expect the size and
16 intensity of the protests to grow over the next 2 days
17 leading into the Preliminary Injunction hearing."
18 That's the September 9th decision that was ultimately
19 made that you won.  "The location of these
20 encampments" -- plural -- "on U.S. Corps managed
21 lands -- without a special use permit -- is considered
22 trespassing and is effectively preventing DAPL from
23 working in the area."
24        First report you get, Colonel Henderson is
25 telling you and Ms. Darcy, we have people camping on

Page 123

1 our lands, in more than one location, and these people
2 do not have permission from me, the person who normally
3 gives it, for them to be there.  Attention, I'm
4 reporting that to you, sir.  That's what -- that's
5 what -- the information that you're provided on this
6 date, August 24th.  And the report comes from the day
7 prior, August 23.
8        You, sir, did you not read this?  I'm not
9 going to assume that you did; so I want to ask, would
10 it -- would it have been unusual for you not to have
11 read this?
12    A.    I normally peruse these documents.  The
13 volume of what I was running at that time probably
14 never let me have more than, you know, five minutes on
15 some of these.  At this point, I would probably have
16 gotten a perception that Henderson knows what he's
17 doing here and will let the staff continue to work it
18 out.
19    Q.    Did you ever recall you or Ms. Darcy
20 disputing the veracity of the information that was
21 being provided to you?
22    A.    I don't think so, no.
23    Q.    Okay.  I understand.  All right.  Thank
24 you.
25        MR. SEBY:  Could we please go to

Page 124

1 Exhibit 688.
2        (Deposition Exhibit 688, remotely
3 introduced and provided electronically to the court
4 reporter.)
5    Q.    (BY MR. SEBY)  And this -- this is an
6 email from Lowry Crook that is responding to an email
7 from General Jackson, reporting to you and Ms. Darcy.
8 And Crook weighs in that's it's okay with him if -- if
9 you move to more periodic reports versus these daily
10 storyboards.  But that's not what I want to ask you
11 about.  What I want to ask you about is General
12 Jackson's email to you and Ms. Darcy, where -- if you
13 would take a moment and read -- read that, please.
14 Come down to the body of General Jackson's email that
15 begins "Madam Secretary/Chief."
16    A.    Yeah, got it.  I'm working my way through
17 it.
18    Q.    Yes, sir.  Take your time.
19    A.    (Deponent examined document.)  Okay.
20    Q.    Earlier, sir, I asked you if you knew who
21 Mr. Michael Connor, the Assistant Secretary of the
22 Department of the Interior was, and I believe you told
23 me, "Don't recall his name.  I just don't know who that
24 guy is."  And I appreciate that six years later you've
25 moved on and -- but here, Mr. -- or General Jackson is

Page 125

1 saying that, "Tracking your call" -- he's referring
2 to -- the "your" is at least Ms. Darcy and yourself --
3 "call with Mr. Connor following his discussion with
4 Governor Dalrymple."
5        Now that you've seen this and are
6 refreshed about having had a call with the Assistant
7 Secretary of the Department of the Interior regarding
8 his discussion with the Governor of the State of North
9 Dakota, what can you tell me about your call with
10 Mr. Connor?
11    A.    Yeah.  So I don't believe I ever had a
12 call.  It's not abnormal that when somebody writes
13 somebody, they put the other counterpart on the "To"
14 line.  So here, I think we're talking about Darcy's
15 call with Connor.  I think Connor came back alive here
16 about a year ago, and I believe that might be the same
17 Conner that's now the ASA (CW).  But I don't think I
18 ever knew Connor's name or BIA.
19        So I'm not sure -- I don't think I ever
20 had that call.  And this is a regular update from Ed to
21 Ms. Darcy, and I would almost consider me as a "cc."  I
22 don't think I ever acted on this email whatsoever.  I
23 don't know if I responded or not.
24    Q.    Okay.  All right.  But the bottom line is,
25 this reference to "your call," it did not include you,

1 even though you're being addressed as an -- as an
2 addressee, right?
3        A.   Yeah.  Ms. Darcy and I very, very seldom
4 ever did joint calls.  It would either be normally her
5 or me.  But very seldom did we both have a call.  And I
6 think this is clearly her phone call with Connor.
7        Q.   Okay.  Got it.  All right.  Okay.
8             MR. SEBY:  If we could go to Exhibit 689,
9 please.
10             (Deposition Exhibit 689, remotely
11 introduced and provided electronically to the court
12 reporter.)
13             MR. SEBY:  If we can come down to the
14 bottom of the email.  That's the only thing I really
15 want to ask you about.  Oh, I'm sorry, not -- not that
16 storyboard.  We've already looked at that in the
17 previous email.  Right there.
18        Q.   (BY MR. SEBY)  Mr. -- or Major General
19 Jackson is conversing with -- it starts off with Lowry
20 Crook talking about a conversation he had.  And that's
21 not what I want to ask you about.  I want to ask you
22 about the one just above it, where General Jackson, on
23 September 5, 2016 -- and I know you're not copied on
24 this email, but I'm going to ask you about the subject
25 matter.

1             On August -- or, pardon me, September 5,
2 2016, General Jackson says to Karen, who is Karen
3 Aguilera, "Karen, Need an update on DAPL from Omaha
4 before noon tomorrow.  Secretary Darcy has a
5 1300 Principals Meeting with Department of Interior" --
6 using the acronym DOI -- "and they follow on at the
7 White House" -- I don't know what "o/a" means --
8 "1500."
9        A.   On or about.
10        Q.   On or about 1500.  "I told the G3" -- what
11 is the G3?
12        A.   So the G3 is the terminology in the Army
13 for the Operations section.  So in USACE, that is the
14 same as when I said a couple hours ago about the
15 Emergency Operations section.  Ms. Karen D-A, she was
16 the leader of the Operations team.
17        Q.   Okay.  Okay.  So here we have General
18 Jackson telling Ms. Aguilera that the Secretary,
19 Ms. Darcy, has a meeting with the Department of the
20 Interior and a follow-up at the White House tomorrow,
21 which would be on September 6th.  And, "I told the G3
22 to begin the daily updates once we get word [on] a
23 decision is imminent on the Injunction.  Could be as
24 early as Wednesday."
25             And that's right, because the court

1 announced it was going to decide on September 9th.  So
2 Ms. Darcy meeting with the Secretary of the Interior
3 and then heading over to the White House, is this a --
4 an indication, do you believe, sir, to the workings of
5 the interagency group that was putting together what
6 ultimately became the September 9th announcement just a
7 few days later; notwithstanding the outcome of the
8 court case -- and, geez, you won -- but notwithstanding
9 that, Ms. Darcy made that, was party to -- committed
10 the Army to be party to the Joint Statement on
11 September 9th with the Department of the Interior and
12 the Department of Justice?
13             MS. ZILIOLI:  Objection; speculation,
14 foundation.
15        Q.   (BY MR. SEBY)  I'm not asking you to
16 speculate.  I'm asking you whether you know that?
17        A.   So, I don't know that.  But by the way I'm
18 reading this, it appears that what I said a couple
19 hours ago has some credibility.  Clearly, the
20 interagency was thinking through what was going to
21 happen in that announcement and prepping the
22 battlefield to be able to react.  Clearly, we know they
23 did issue a statement, but I would have envisioned that
24 they would have an alternative position, given the fact
25 that the decision was the other way around.

1             I don't read this to say principals, as in
2 the Secretary of DOI.  A lot of times the principals,
3 just like how we wouldn't have the Secretary of the
4 Army go into that meeting, I imagine the principal is
5 probably some high-level staffer inside DOI, a
6 Ms. Darcy equivalent.
7        Q.   Sure.  So maybe not the Secretary, but
8 maybe the Secretary's Chief of Staff, for example?
9        A.   Or, you know, I don't know what you said
10 Jewell's job was.  Maybe -- I don't know whether she
11 was DOI.  It might have been a BIA guy or whatever it
12 is; but somebody obviously important enough to act on
13 behalf of the Secretary.
14        Q.   Yeah, yup, yup.  Okay.  All right.
15             MR. SEBY:  If we could go to Exhibit 690,
16 please.
17             (Deposition Exhibit 690, remotely
18 introduced and provided electronically to the court
19 reporter.)
20        Q.   (BY MR. SEBY)  Okay.  If we could go down
21 to the -- in the chain where there is -- hold up there
22 for a second.  What this is a -- and I don't want to
23 ask you about this, because it's long and has a bunch
24 of things that are not relevant.  But there is a -- a
25 document being transmitted by an individual in the

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 130

1  Corps, Patrick Seiber, Seiber (pronouncing), to the
2  Secretary of the Army, Eric Fanning, and General
3  Milley.  And it's entitled "September 8th MRD
4  [Monitoring] Report."  What does that mean, MRD?
5        A.  So every morning, the Public Affairs team
6  in the Army informs the Secretary and the Chief of
7  Staff of the Army of critical articles that probably
8  have happened in the last 24 hours.  I don't know the
9  date of this.  It looks like -- I don't know whether
10  this is a midweek.  If it's a Monday morning, then it
11  would have been Saturday and Sunday.  I think it's --
12  MRD is something like morning -- I don't know what that
13  means.  But the -- Seiber is not a Corps person.  Pat
14  was actually the colonel that put this together on the
15  Army staff for the senior leadership of the Army.  This
16  comes out every morning at about 6 o'clock or 7 o'clock
17  in the morning.
18        Q.  Sure.  And the date says, right there,
19  it's on a Thursday.  Thursday morning, 6:46 p.m. --
20  a.m., so it's early.  And what you just said makes
21  sense, that it's a -- a -- it's a -- kind of a
22  chronology of articles that appeared in the media in
23  the last 24 hours, provided as a report to the
24  Secretary of the Army and the Chief of Staff, General
25  Milley.  So I don't want to ask you about that.

Page 131

1              But somehow you got this.  And you're not
2  copied on the distribution, but you got it.  And I know
3  that, and you know that, because you took it and
4  forwarded it on in the next email.
5              MR. SEBY:  If we could go up, Rachel, the
6  next email from General Semonite to General Jackson,
7  copied to some people.
8        Q.  (BY MR. SEBY)  But you changed the subject
9  line from that "MRD" line, you changed it, sir, to say,
10  "Lieutenant General Semonite Tasker - Laydown of
11  Protest Site."  And then you kept the MRD reference.
12  But you go on to say in the email, "ED:" -- Ed
13  Jackson -- "Please see #4 below . . .," referencing the
14  articles in the -- the MRD report.  And No. 4 happens
15  to talk about the title of it.  All I want to mention
16  is the title, "WHILE AWAITING PIPELINE RULING, NORTH
17  DAKOTA RECRUITS LAW OFFICERS TO HELP GUARD SITE OF
18  PROTEST THAT TURNED VIOLENT OVER THE WEEKEND."
19              So that's the article being given to the
20  Secretary of the Army and the Chief of the Staff --
21  Chief of Staff.  And you are calling out that article
22  and tasking staff to get you a map, "a big map that I
23  can see both the TRAIL of the PIPELINE . . . the
24  3 percent that we control, the actual site of the
25  protests, the 20 mile exclusion zone.  I would like you

Page 132

1  to get this to the PENTAGON by 0800 tomorrow and give
2  to ALLAN WEBSTER so I can have at the 0900 session
3  with" the Secretary of the Army and the Chief of Staff
4  of the Army.
5              So you're -- if I understand this
6  correctly, the next day, you're wanting a map, because
7  you have a meeting in the morning with Secretary
8  Fanning and Chief of Staff of the Army, General Milley;
9  is that correct?
10        A.  So just a couple things.  I definitely got
11  this message every single morning.  Most of the time
12  the Army doesn't like to put 50 people on the "cc"
13  line, so they put it on a blind line.  So I -- I was
14  routinely getting this.  Every single day, I would
15  probably forward anything that had to do with the
16  Corps, to my team.  I always wrote on the subject line,
17  is this for information, is it guidance, is it a
18  tasker, or is it a calendar issue.  So this is very
19  routine of how I work, what's going on.  This gives me
20  the impression that I either didn't see that first
21  storyboard or I didn't really read it, because I'm
22  actually asking something very similar to what was on
23  the storyboard.
24              I also remember every single -- I think at
25  the time it was Monday, Wednesday, and Friday, we had a

Page 133

1  routine Army staff meeting with the Secretary of the
2  Army, the CSA, and all of the Army staff.  So this is
3  not a special DAPL meeting.  This was the regular,
4  normal 9 o'clock meeting.  But I wanted to always have
5  a graphic.  So at some time during these meetings,
6  the -- you know, General Milley would say, "Todd,
7  what's going on here?  See me afterward and show me
8  what's happening."
9              So Allan Webster was the colonel that was
10  currently in the Pentagon, worked there all the time,
11  and he was my inside guy to be able to ensure the
12  Pentagon leadership understood what was happening.  So
13  this is probably exactly as you summed it up; what's
14  going on, give me the map so I can understand how this
15  is playing out.
16        Q.  Yup.  And I wasn't suggesting that even
17  though you were given the storyboard two weeks
18  earlier -- because that's August 24th and here we are
19  September 8th, by my count, that's two full weeks
20  later -- I wasn't suggesting that you didn't know what
21  it said and the camps and all that stuff.  But all I'm
22  saying is that -- and thanks for that clarification.
23  You were bcc'd this, so it was normal for you to get
24  it.  But you did change the subject line to add to
25  General Jackson a -- you reference it as a "Tasker."

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 134

1  What is a tasker?

2      A.   So the worst thing a leader can do is to
3  be vague and ambiguous.  So like I told you, every
4  single email of mine -- you can go back and look -- I
5  would say, "Semonite info.  Here is something that's
6  happening.  It's for your information.  Here is
7  guidance."

8          Okay.  If it's a tasker, it means you owe
9  me a product.  I normally am very clear with the
10  person's first name.  I normally give them a suspense.
11  And all of my staff knew that if there was ever a time
12  I gave them a tasker and they didn't understand it, it
13  was on them to come back and to ask for more -- more
14  operations -- or for more clarity.  I was doing about a
15  hundred emails a day during this period, or my entire
16  tenure, so I had to write relatively short and
17  succinct.  But that set the conditions for the staff
18  now to act on this, so I could then have a product,
19  when needed, to be able to brief Army leadership.

20      Q.   Yeah, I -- I understand.  So a tasker,
21  which is the question, is a directive from the chief of
22  engineers, to the addressee; in this case, General
23  Jackson?

24      A.   Exactly right.  And I think it's also
25  important to amplify here, you know, some people have

Page 135

1  different ways of -- of working.  I have been using
2  capital letters for 20 years.  Okay.  It's kind of like
3  how I talk.

4      Q.   Yeah.

5      A.   I want to amplify certain things, so
6  that's why you'll see certain words that are out here
7  so that -- I always try to communicate so as to not be
8  misunderstood.

9      Q.   Yeah.  You -- you prefer to be candid
10  and -- and clear?

11      A.   I do.

12      Q.   Of course.  And that's sort of a value
13  that is inherent in military command structures, too,
14  isn't it?

15      A.   It is.  I think the other thing to note,
16  I've been in the Army for 41 years and 4 months.  You
17  can't be successful by trying to work all actions.  I
18  told you a couple hours ago, I probably worked about
19  5 percent, but I waited for those to escalate to where
20  I thought it was at the point that me, as a three-star
21  general, needed to be involved.

22          So at this point now, the Army leadership
23  appears -- and I didn't read Article 4, I'm not sure
24  exactly what it says, No. 4 below, but at some point
25  now, the Army leadership is aware something is

Page 136

1  happening.  So I want to make sure that I'm setting the
2  stage to be able to either advise them what to do or
3  make sure that they're aware that something could
4  happen on their watch.

5      Q.   Yup, I understand.  I understand.  I got
6  that impression loud and clear from your email
7  directing General Jackson to get you a map so you could
8  see from that map where certain things were going on,
9  right?

10      A.   Correct.

11      Q.   And so you say, "On the map" -- and I'm
12  referring to the second paragraph of your email to
13  Major General Jackson, you say, "On the map . . . or
14  some other GRAPHIC . . . make sure I know WHERE the
15  protesters are . . . and WHOSE LANDS is our land."  So
16  you were trying to assess whether or not protesters
17  were on your land, correct?

18      A.   I think that's what I was trying to get to
19  here.  And I do much, much better with -- with maps.
20  When we talk about graphics, the military uses a lot of
21  sketches, PowerPoint graphics.  I don't want to use
22  words; I want to see a -- a laydown.

23      Q.   Yeah, yeah.  So you weren't expecting
24  anything but a visual that -- that answered your
25  directive to say, "I want to know where our land is,

Page 137

1  and I want to know where the protest camps are relative
2  to it."  Is that right -- is that what you're saying?

3      A.   That's correct.

4      Q.   And did you get that material from General
5  Jackson in time for your meeting on the next day;
6  which, wow, was September 9th, an interesting day of
7  parallels?  Did you meet with the Secretary of the Army
8  that morning and give them a -- show them a map?

9      A.   So, I don't remember that.  But these
10  meetings were almost always on time, almost never
11  canceled.  If somebody couldn't go, they would have a
12  deputy there.  So unless you show me something
13  otherwise, I'm assuming I went.  And I hate to say it
14  like this, but normally when a three-star asks a
15  two-star to do something, everybody reacts.  I mean, we
16  were exceptionally responsive.  I imagine they probably
17  used a graphic that was in that storyboard as a
18  starting point.  But I'm assuming that I got what I
19  asked for here.

20      Q.   Yeah, sure.  And I can't tell you for
21  sure, because we weren't given the -- the information
22  from your counsel as to what General Jackson did in
23  response to this.  We just know that he forwarded it on
24  and got -- got the staff busy working on getting you
25  what you asked for and --

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 138

1    A.   Yeah.  Mr. Seby, real quick, in case I
2  need to know, have your staff just scroll down to show
3  me No. 4, so I know what's in the context of that
4  paragraph, please.
5    Q.   Oh, the -- the reference to the -- the
6  email below that references the article?
7    A.   Yeah.
8    Q.   Yeah, sure.  Here we go.
9    A.   (Inaudible.)
10    Q.   We're on our way down.  I read it, too,
11  earlier, General.  I -- I read the -- the title.  I
12  don't have the article, so I can't share it with you.
13  But -- I'd be happy to, but I don't have it.  I just
14  know what the title of No. 4 is.  And I knew to look at
15  it, because your email referenced No. 4 below.  And
16  unless you tell me otherwise --
17    A.   (Inaudible) they're getting ready for
18  whatever the decision is, and they're -- they're
19  mobilizing enforcement officers.  I got it.
20    Q.   Yeah, that -- that's right.  That's right.
21  So you -- you don't recall this meeting, but do you
22  recall General Jackson failing to do what you asked?
23    A.   I doubt he failed to do that.
24    Q.   Yeah.  Okay.  So --
25    A.   The other thing you need to know is

Page 139

1  although -- these are summary paragraphs.  So what
2  you're showing me here, down at the bottom of this --
3  and maybe you didn't get that in the thing -- the full
4  articles are all the way down there.  So this is just a
5  rolldown, or maybe that's a link.  You click on that
6  title, and all of the -- so I'm sure I went down and I
7  read whatever that entire article was.
8    Q.   Oh, no doubt.  I'm not questioning it.
9    A.   If you go all the way down, somewhere in
10  there the entire article is laid out, probably.
11    Q.   That's great.  And I'm not asking about
12  the article.  I'm just reading what you wrote; and that
13  is, in response to your observation of that number
14  article, whatever it said, you directed General
15  Jackson, "Tomorrow morning, because I'm meeting with
16  General Milley and Secretary Fanning, I want a map that
17  shows our lands relative to where the protesters are."
18  And you told me that you have no recollection of
19  General Jackson failing to give you what you asked for.
20    A.   It is not -- I would never have predicted
21  that he would have failed to do this.  Now, again, we
22  let the staff do all this.  So it says, I think, get it
23  to Allan Webster.  So I certainly would anticipate that
24  all of those actions were followed through.
25    Q.   Yeah.  And I'm not questioning it.  I'm

Page 140

1  just saying, unless you tell me otherwise, it would be
2  fair to understand that as of the morning of
3  September 9th, you went to a meeting and were armed
4  with what you were asking be prepared for you and the
5  Secretary and General Milley to know, or at least have
6  the ability and option to discuss, where the protest
7  camps, plural, were located relative to Corps of
8  Engineers property.  Is that fair?
9    A.   It is.  And I think the other thing is,
10  this meeting was a joint meeting of the military
11  members of the Army staff and the secretariat.  So at
12  this time, I would have been sitting next to Ms. Darcy,
13  and it was everybody in a big room.  A lot of times we
14  did our coordination there.  So I probably would have
15  brought the map out, given her a copy of it, and I
16  said, "Hey, if we get a question on it, you handle the
17  political side, I'll handle the operational side."
18  That's how we probably coordinated.
19    Q.   Okay.  So you -- unless she was, you know,
20  not there, she normally would have been there, right?
21    A.   If not her, then Lowry Crook would have
22  been there.
23    Q.   Lowry Crook (pronouncing)?
24    A.   Lowry Crook.
25    Q.   Yeah.  Okay.  I just want to point out

Page 141

1  that the -- your request for the -- the tasker request
2  for the map showing the attributes that you requested
3  was made on September 8th of 2016.  And your meeting
4  was the following morning, which happened to be the
5  morning of September 9th; which is also a date of
6  interest, because that's the date that the Joint
7  Statement from the three agencies or departments of the
8  United States Government chose, after receiving a
9  favorable ruling from the United States District Court,
10  Judge Boasberg, denying it an effort to grant a
11  preliminary injunction against the Corps -- he won --
12  that that was the date that the Joint Statement says,
13  "Well, all the decisions we've made to date, we're
14  going to relook at and decide whether or not we need to
15  change them or just not allow them to go forward."
16    Same day, Ms. Darcy would have,
17  conceivably, been shown the map that you asked yourself
18  to be -- asked that your staff be -- arm you with to
19  discuss with not only the Secretary of the Army, but
20  General Milley and Ms. Darcy.  And all of you,
21  collectively, would have had the ability to know where
22  the protesters were and whether -- and where on your
23  land they were, is what I'm getting at.  Is that
24  correct?
25    MS. ZILIOLI:  Objection, misstates

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 142

1  evidence.
2      A.   So I haven't seen these emails in six
3  years.  But this is normally the way I operate, so this
4  is all very consistent with my command philosophy and
5  how I do things.  So I think everything you're saying
6  right now is -- is exactly right on track.
7      Q.   (BY MR. SEBY)  Okay.  Thank you, sir.
8  I -- I just was trying to get some clarification about
9  the situation.  I wasn't being argumentative or
10  disagreeable to you; just trying to get to the bottom
11  of it.
12          MR. SEBY:  Let's go to 494, Exhibit 494.
13     Q.   (BY MR. SEBY)  Okay.  This is an exhibit
14  that is a -- a release by the United States Department
15  of the Interior, dated Friday, September 9th, 2017 --
16  2016.  And it's addressed to Sally Jewell's email
17  address in the Department of the Interior.  SRJ is
18  Ms. Jewell, her email.  We know that from her
19  deposition.  And Ms. Jewell was sent this announcement,
20  which is a presentation of the Joint Statement from the
21  Department of Justice, the Department of the Army, and
22  the Department of the Interior, regarding Standing Rock
23  Sioux Tribe versus United States Army Corps of
24  Engineers.
25          And I was interested in this particular

Page 143

1  document, because when you get down below, the -- the
2  heading on the Joint Statement, if you can see it right
3  there -- I'm sorry, it's right --
4          MR. SEBY:  Rachel, it's the upper part of
5  the screen now.  Right there.
6      Q.   (BY MR. SEBY)  The Joint Statement from
7  the three departments, it says -- in addition to the
8  Corps -- pardon me, in addition to the Department of
9  the Interior and Justice, it says, plainly, the
10  Department of the Army, correct?
11     A.   That's correct.
12     Q.   Okay.  And so what I want to show you is
13  why I'm puzzled.  If we could go back up to the top of
14  the email where the agencies' crests are displayed, we
15  all see the Department of the Interior; buffalo, famous
16  buffalo, pointing -- pointing to the left.  And then we
17  see the crest of -- of the Department of Justice,
18  but -- which matches the title of the Joint Statement.
19  But I'm wondering if you know the answer to why, when
20  this is apparently a Joint Statement of the Department
21  of the Army, why is the unitary crest of the Army Corps
22  of Engineers there and not the Department of the Army
23  crest?
24          MS. ZILIOLI:  Objection; speculation,
25  foundation.

Page 144

1      Q.   (BY MR. SEBY)  Do you know, sir?
2      A.   So I'm speculating, but I will tell you
3  there doesn't have -- the renowned expert in water
4  areas is the Corps of Engineers; 247 years, everybody
5  knows the Army Corps crest.  I think that this was done
6  either by mistake or an attempt to give credibility to
7  the document that the leadership of the Corps of
8  Engineers, which is a self-contained organization that
9  works for the Army, is making this statement.
10         So I -- I don't know where you're going
11  with it, but if somebody were to ask me, "Are you going
12  to allow your crest to be up there," I would say, "Put
13  the Army crest up there."
14     Q.   Yeah.  I just was curious, because the
15  title of the statement says the Department of the
16  Interior, Justice, and Army, but then the crest doesn't
17  match consistent with that.  I don't know why, I was
18  just wondering if you knew.
19         So anyhow, and then when you look at the
20  Joint Statement text itself, it says -- if you would,
21  sir, and just read it.  I know it's been six years since
22  you have, probably, but if you would take a moment and
23  read it.  It's -- it's pretty short.
24     A.   (Deponent examined a document.)
25         Okay.  Go ahead.

Page 145

1      (Pause.)
2      A.   Okay.
3      Q.   So that's the end of it.
4      A.   So I read that pretty fast.  I certainly
5  understand the general message there.  But if we need
6  to, we might have to go back, if there's -- if you're
7  going to ask me specifics on something.
8      Q.   No.  I just wanted to ask you, do you
9  recall this now?  Up until now, I've been asking you
10  about the -- the infamous September 9th Joint
11  Statement.  Now that you've read it, do you recall it
12  as correct with what we've been talking about?
13  That's -- that's the statement?
14     A.   Yeah.  So if you were to ask me an hour
15  ago, "What would the statement look like," I wouldn't
16  be able to answer the question.  But clearly, I read it
17  and I certainly understand and know that this document
18  came out.
19     Q.   Yup, yup.  And I -- I'm just observing
20  with you that the title says that it's the Army --
21  Department of the Army.  And then in the body of the
22  text of the statement itself, second paragraph, it
23  says -- well, the last sentence of the first paragraph
24  says, "Therefore, the Department of the Army, the
25  Department of Justice, and the Department of the

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 146

1  Interior will take the following steps."
2          Second paragraph, "The Army will not
3  authorize constructing the DAPL pipeline on Corps land
4  bordering or under Lake Oahe until it can determine
5  whether it will need to reconsider any of its previous
6  decisions regarding the Lake Oahe site under" -- "under
7  the National Environmental Policy Act or other federal
8  laws."
9          It talks about the Army this and the Army
10 that.  It does not say the Corps of Engineers, does
11 it?
12     A.   It does not.
13          MR. SEBY:  Okay.  If we could go to
14 Exhibit 694, please.
15          (Deposition Exhibit 694, remotely
16 introduced and provided electronically to the court
17 reporter.)
18     A.   I think while you're doing that, it's also
19 critical to point out that this is what I was
20 remembering, where I talked about consultation and the
21 need for -- should the federal government reconsider
22 some of the parameters as to how these pipelines are
23 approved.
24     Q.   (BY MR. SEBY)  What do you mean by making
25 that additional comment, sir?  I -- I -- I

Page 147

1  understand --
2      A.   I wasn't sure where I remembered that
3  coming up, but I think this is what I was alluding to;
4  is that there was some question on consultation with
5  the tribes that was introduced into this particular
6  memo.
7      Q.   Yup.  I think earlier you also told me
8  that Colonel Henderson attempted, during the course of,
9  I don't know, a couple years prior to this, to consult
10 with the tribes.  But they didn't have a lot of
11 interest, did they?
12     A.   That was my understanding.
13     Q.   Yup.  Understand, sir.  Okay.  We're at --
14 we're at Exhibit 694, which is a very long distribution
15 list email from you, sir, dated September 11th, on a
16 Sunday.  And it's sent -- the addressees are really
17 only two people, copied to an enormous number of
18 people.  I only want to point out, one of the copy
19 recipients is Ms. Darcy.  But the addressees are
20 Patrick Murphy and General Allyn.  You've told me who
21 General Allyn is.  Could you advise me who Mr. Murphy
22 is?
23     A.   Mr. Murray -- Murphy was Secretary
24 Fanning's deputy.  He was called the Assistant
25 Secretary of the Army.

Page 148

1      Q.   Oh, okay.  All right.  So you are sending
2  to those gentlemen, copying a very large group, an
3  email from you entitled:  Chief of Engineers and the
4  U.S. Army Corps of Engineers Update for September 11,
5  2016.  And you are reporting on a number of topics.
6  And one of them that you mentioned is, "We're . . .
7  closely monitoring the DAKOTA ACCESS PIPELINE situation
8  and [the] Friday" -- "Friday's court decision."  And
9  then you talk about the 1200-mile pipeline and so
10 forth.
11         So I -- and this follows the meeting that
12 you would have had two days prior with the Secretary.
13 Do you think that General Allyn would have been present
14 in that meeting you had on September 9?
15     A.   He normally would go along with
16 Secretary -- Assistant Secretary Murphy.  Now, again,
17 somebody might have been out of town.  But just to
18 clarify, every member of the Army staff normally wrote
19 a SITREP every two weeks.  So I, personally, wrote
20 this.  And this -- because there's so many on the "cc"
21 line, that is the Army staff.
22         And it was our battle rhythm to continue
23 to make sure that the secretariat and the generals on
24 the Army staff understood what each of the other
25 commands were doing.  This got to be a lot, a lot of

Page 149

1  reports.  I'm not sure how many people ever read them.
2  But this is my attempt to inform Army leadership of
3  either good things the command was doing or potential
4  issues that might cross their desk.
5      Q.   Yeah, yup.  Okay.
6          MR. SEBY:  If we could go to Exhibit 420,
7  please.  And if we go to the attachment to this email.
8  It's just a transmittal email.  It's got some --
9  Rachel, if we could go to the end there, please.
10     Q.   (BY MR. SEBY)  After the social media
11 graphics is a letter.  General, this is a letter I'm
12 going to ask you to please read in a moment, but let me
13 just introduce it.  Letter dated September 14, 2016
14 from -- and it's on a letterhead that is interesting,
15 in that it has the congressional delegation; the
16 Republican United States Senator, a Democrat United
17 States Senator, and a Congressman, North Dakota's only
18 Congressperson, Kevin Cramer.  And then, also, it's
19 joined by the Governor of the State of North Dakota,
20 Jack Dalrymple, on September 14th.
21         The addressees of the letter are Attorney
22 General of the United States, Loretta Lynch; Sally
23 Jewell, the Secretary of the Department of the
24 Interior; and Jo-Ellen Darcy, the Assistant Secretary
25 of the Army for Civil Works.  And then if you would,

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 150

1  please, read the letter from the three Congresspeople
2  and the Governor.
3      A.   (Deponent examined document.)  Okay.  Go
4  ahead.
5      Q.   Okay.  Did you see this letter?
6      A.   I don't remember this specific letter, but
7  these things crossed my desk quite often.  The person
8  that sent this, Jen Greer, was the equivalent of a --
9  she was my congressional liaison.  I don't know whether
10 I'm on that "cc" or not, but I probably was certainly
11 informed on it.  But I think at some point this request
12 is what Senator Hoeven and eventually Congressman
13 Cramer, who became Senator Cramer, continued to act on
14 through the tenure of my four years in command.
15     Q.   Yeah.  So you read that -- the statement
16 that these individuals, the elected Senators and
17 Congressman and the Governor of the State, are not
18 happy with the September 9th announcement, are they?
19     A.   So I'm not sure I see that in there.  It
20 says that we urge you to follow through on your joint
21 release and immediately start thinking cost share.  So
22 "unhappy" is maybe a stretch.  I will let the letter
23 stand for itself.  But I think the bold letters are
24 relatively self-explanatory.
25     Q.   Yeah, they are.  I agree.  "As a result of

Page 151

1  your delay . . .," so that's referring to the
2  September 9th announcement, that the final
3  authorization would be withheld indefinitely, is what
4  they say.  So they say, "As a result of that delay,
5  North Dakota is experiencing a strain on its law
6  enforcement resources."  And they go on to say, "We
7  urge you to follow through on your joint release and
8  begin planning immediately to cost share reimbursement
9  and manpower that will be needed to support [us] . . .
10 as [we] continue to provide public safety."
11         In addition, we want a meeting with you to
12 discuss this matter and work a solution, ". . . as the
13 Administration's unprecedented announcement warrants
14 further [consideration]."  I take that as being -- this
15 is a -- a letter expressing strong concern.  Would you
16 agree with me on that?
17         MS. ZILIOLI:  Objection, speculation.
18     A.   I do.  I think it's also interesting to
19 note that, going back to your earlier point, we request
20 a meeting with the Department of Justice, that's a
21 political appointee, the Department of the Interior.
22 It doesn't say the Department of the Army.  They now
23 have converted to the Army Corps of Engineers.  I think
24 a lot of that goes back to the reputation the Corps has
25 of working with the states.  But notice how that

Page 152

1  narrative is different than the three icons or the
2  three people in that press release.
3      Q.   (BY MR. SEBY)  Sure; because the Corps put
4  its logo up there, not the Army.  Does the -- does the
5  Army -- Department of the Army not have a logo?
6      A.   Let me rephrase that.  The Corps didn't
7  put the logo up.  Whoever caused -- whoever generated
8  that press release put the Corps up.
9      Q.   Yeah.  All I'm saying is, I don't -- I
10 don't want to speculate why they chose to reference the
11 Corps; but so what, it really doesn't matter.  They're
12 asking to meet with the Corps.  And Ms. Darcy is an
13 addressee of the letter and a subject of the request
14 for a meeting, right?
15     A.   Correct.
16     Q.   Okay.  So I asked -- I deposed Ms. Jewell
17 and I deposed Ms. Darcy.  I talked to them about this
18 letter, and neither of them recalled any measure of
19 action to acknowledge it to the two Senators, the
20 Congressman, or the Governor.  Do you believe
21 differently?  Did they -- did they respond in any
22 manner?
23         MS. ZILIOLI:  Objection; misstates
24 evidence, assume facts.
25     A.   I just don't know.  I just don't know.

Page 153

1  When we get a letter from an elected official, it is
2  not our desire, it is incumbent on my staff or my
3  previous staff to be able to be responsive and to
4  answer back.  So our normal process would have been to
5  follow up, even if not asked, knowing that Hoeven and
6  the rest of the team are asking for a meeting to be --
7  certainly be available for a meeting; and probably even
8  to the point of saying, "If you're not going to have a
9  meeting, then you need to -- you need to respond to
10 the letter," because I don't want the Corps to be the
11 one with a black eye of not meeting with these four
12 elected people.
13     Q.   (BY MR. SEBY)  Yup.  And I gathered that
14 from other correspondence of yours I've read, that that
15 was a stated position of yours.  I saw it on several
16 occasions.  So I -- I appreciate that's your view.
17 Would you be irritated, then, General, to know that
18 nobody responded to -- to this letter and that there
19 never was facilitation of the meeting that the two
20 Senators, the Congressman, and the Governor requested,
21 ever?
22         MS. ZILIOLI:  Objection; assume facts,
23 misstates evidence.
24     Q.   (BY MR. SEBY)  If you know otherwise --
25     A.   I think I --

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 154

1    Q.   -- please -- please enlighten me.
2    A.   I think I would probably use a more
3 politically sensitive word, as opposed to being
4 "irritated."  I think it's bad policy on behalf of the
5 federal government of not acting on, in some manner,
6 even to say no, to a request from four distinguished
7 people from that state.
8    Q.   Yes, sir.
9        MR. SEBY:  If we could go to -- to
10 Exhibit 26, please.
11   Q.   (BY MR. SEBY)  And you're not copied on
12 this, but I want to point it out to you.  It's an email
13 from Colonel John Henderson, dated Friday,
14 September 16th, 4:59 p.m., to Dave Archambault, who is
15 the Chairman at this time of the Standing Rock Sioux
16 Nation.  And it's a -- the subject is "Press Release."
17 And it's a forwarded press release.  We don't know what
18 Colonel Henderson is forwarding, other than the
19 attachment.  But this was given to Colonel Henderson to
20 forward, and he did.
21        And it says, "Mr. Chairman, I hope all is
22 well for you.
23        "Our staff will be sending you a copy of
24 the permit by email soon; official copy [will] be sent
25 by certified mail on Monday."  So after the weekend is

Page 155

1 over, we're going to send you the official copy by
2 certified mail.
3        And, "We will send the attached" --
4 "attached press release out this evening . . ."  So
5 while the chairman of the Sioux Tribe hasn't been given
6 the permit, the press release is going out in two
7 hours.  And, "I wanted to give you the courtesy of
8 reviewing it . . . prior to our release."
9        And then, "Have a good weekend; thanks
10 again for your partnership."
11        MR. SEBY:  So if we could turn to the
12 attachment, which is the next page.  If you could blow
13 that up, Rachel, so the General can read it, top to
14 bottom.
15   Q.   (BY MR. SEBY)  This is Army Corps of
16 Engineers.  There's that official Army Corps crest
17 again, isn't it?  And it's entitled --
18   A.   True, but this one was -- this one was
19 apparently a news release of the Corps of Engineers,
20 not the Department of the Army.
21   Q.   Oh, I understand.  I understand.  I'm not
22 suggesting otherwise.  This is an official -- it's a
23 pretty official-looking news release, isn't it?
24   A.   Standard format.
25   Q.   Yeah.  And we know this went out to a

Page 156

1 number of news organizations and out on the Corps of
2 Engineers website; which, fascinating to me, to this
3 day, you can still see it on the Corps of Engineers
4 website.  Maybe it will now get taken down.  But as of
5 today, July 26, 2022, it's still there.  And this
6 announces, using very specific language somebody
7 decided to purposely use, the title, "U.S. Army Corps
8 of Engineers grants Special Use Permit . . ."
9        "OMAHA, NEBRASKA - Today the . . .
10 Corps . . . issued a Special Use Permit to the Standing
11 Rock Sioux Tribe to use Federal lands managed by the
12 Corps near Lake Oahe."  So I guess, as misleading as
13 this language that was chosen to be used, it does
14 answer the question you asked earlier, "Well, we don't
15 know who the permit was allowed for people to -- you
16 know, was it just the Tribe, or was it other?"
17        Here it says in the title and in the first
18 paragraph, the Tribe.  It doesn't say all-comers, even
19 another tribe.  It says the Standing Rock Sioux Tribe.
20 That's the entity that was purportedly given
21 permission.  And it says the -- Colonel Henderson
22 informed Standing Rock Sioux Tribe Chairman Archambault
23 that the Tribe's spiritual gathering, located south of
24 the Cannonball River, has been granted a special use
25 permit, which allows the Tribe to gather and engage in

Page 157

1 lawful free speech on federal lands designated in the
2 permit.
3        The Tribe's special use permit application
4 requested to use the lands to the north and south;
5 however, there's a grazing lease on the northern
6 portion, so we're not giving it to you at this time.
7        And then it says in the third paragraph --
8 fourth paragraph, the special use permit allows the
9 Tribe to use the lands, subject to the code.  And
10 several activities require additional permission;
11 building structures, temporary or permanent, within the
12 area of the special use permit.
13        So what I want to ask you about is,
14 Colonel Henderson hadn't even sent the permit to the
15 Tribe.  And the -- the document that he sent was not
16 signed.  And it says:  Chairman, you sign this and
17 comply with the terms and conditions, then I'll sign
18 it, and then there will be an effective permit.
19        So do you think that whoever wrote this
20 press release got way ahead of their skis and used
21 language that was not correct or misleading, saying
22 that it was a done deal, when, in fact, nobody had even
23 signed the document, and the compliance with the terms
24 and conditions in the -- in the -- in the document
25 itself hadn't even been given a chance to be met, and

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 158

1 never were met, weeks later, by the Standing Rock Sioux
2 Tribe? Do you disagree with any of that?
3      A. So I disagree with a lot of that. You
4 have a lot in that -- packed into that one statement.
5 And we can take it piece by piece, but just --
6      Q. Yes, sir.
7      A. -- a couple things.
8      Q. Yup.
9      A. First of all, it says in the third major
10 paragraph, subject to federal rules and regulations of
11 Title 36. It doesn't say it's -- it's, you know, a
12 freebie. It says there are still going to be
13 conditions that are in there. It could have said -- we
14 like to always keep these to one page. It could have
15 said things like insurance and bonding. It doesn't say
16 that. But, on the other hand, it also says we --
17 you're going to have to come back to us if you have the
18 desire to have construction, permanent, et cetera, or
19 structures in the area. So those are still things
20 that, I think in this press release, are things that
21 still have to be worked out.
22      When it comes to the scope of the
23 Department -- and the way I read this, but it's
24 strictly my interpretation, in the fourth line down
25 where it says, ". . . Dave Archambault, that the

Page 159

1 Tribe's Spiritual gathering . . .," I don't know how
2 you define that, but at some point, what it is
3 attempting to say, apparently, is that whatever that
4 gathering is now, we're going to allow that to go to
5 this other place. So that must be defined either as
6 members of a special council or whatever it is.
7      But it doesn't appear to me to say,
8 "Anybody that wants to come protest with us has the
9 ability to do so under this special use permit." It's
10 really narrowed down at the very, very specifics of
11 whatever the Tribe's spiritual gathering is.
12      And then I think the other thing is, you
13 made some inference that Henderson would sign it and
14 then -- no, I guess that -- I don't know how the order
15 of signatures goes. I think what happens is, he is
16 sending the permit down. The person that is asking for
17 the permit, that would be the Chief, would send it
18 back, and then it would be acted on by Henderson. So I
19 don't want to say that I know exactly what the process
20 is. I trust Henderson. And whatever the rules for a
21 special use permit, I would expect him to do it in
22 accordance with our process.
23      Q. Expectation?
24      A. I have no reason to doubt that
25 expectation. Henderson is a super solid officer.

Page 160

1      Q. Yeah. And I'm not -- I'm not questioning
2 his integrity. I'm just asking you about the -- the
3 statements in the document. And one -- one statement I
4 want to ask you about, where it talks about additional
5 permission will be required for activities identified
6 in Title 36; such as construction, either temporary or
7 permanent, or any structures within the area identified
8 in the special use permit. Is it your understanding,
9 as of September 16th, the date that this statement
10 about additional permission would be necessary to have
11 temporary or permanent structures, is it your position,
12 General, that you know or knew that as of that date,
13 not a single temporary or permanent structure existed
14 on the area identified in the special use permit?
15      A. So I don't know any of that answer. I
16 would tell you that I think my -- my interpretation is
17 that Colonel Henderson put that specific sentence in
18 there as to not get a perception of a blank check. In
19 other words, we're going to allow you to have this
20 permit; however, I want the -- in the public release,
21 to say anything you do that has to do with temporary
22 permit is an additional requirement for you to come
23 back. So I don't know why that was in there, but it's
24 probably just to be able to make sure that was clear.
25      I would also predict, and it's strictly my

Page 161

1 conjecture, that we probably got pressure to put this
2 out within a couple hours -- this was, I guess, sent on
3 the night of that same decision of the overturn of the
4 injunction -- so that we would not have a lot of
5 protesting the next couple days. So I guess this is
6 16 September. But I imagine this is the order to
7 appease the Tribe to be patient, get the permit, and,
8 therefore, not protest.
9      Q. Are you aware, General, that this document
10 was written by several other persons not employees of
11 the United States Department of the Army or the Corps
12 of Engineers?
13      A. No, I have no idea.
14      MS. ZILIOLI: Objection; assumes facts,
15 misstates evidence.
16      A. I don't know that.
17      Q. (BY MR. SEBY) General -- General, would
18 you be surprised to learn that this document was
19 exchanged and commented on and edited by the Chief of
20 Staff of the Secretary of the Interior and several
21 staff people in the White House in the executive office
22 of the President?
23      MS. ZILIOLI: Objection; assumes facts,
24 misstates evidence.
25      A. That doesn't surprise me. That doesn't

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 162

1 surprise me.

2       Q.   (BY MR. SEBY)  All right.  And the
3 Department of Justice, by that -- by that measure, that
4 wouldn't surprise you either?

5            MS. ZILIOLI:  Same objections.

6       A.   No.

7       Q.   (BY MR. SEBY)  Okay.  Maybe even
8 Ms. Zilioli had a hand in it.

9            MS. ZILIOLI:  Same objections.

10           MR. SEBY:  Thank you for laughing.  That's
11 all it was intended for.

12      Q.   (BY MR. SEBY)  So on this press release,
13 would you agree with me that it's -- it's confusing?

14      A.   So I'm not going to use that word.  I
15 think it probably was intended to have a certain
16 effect.  And perhaps whoever contrived what that effect
17 was, they felt that this language did that.  So we
18 might have done it a little different if, in fact, what
19 you say is true, that we did not write it.  So,
20 therefore, the question is, whoever the authors were,
21 did this achieve their end state?

22      Q.   Well, I appreciate that it was intended to
23 have a certain effect.  I totally agree.  What effect
24 do you think that was?

25      A.   Again, I think this was a stalling action

Page 163

1 or a -- no, that's not right.  This was an action to
2 make -- make the tribes feel that they were getting
3 some degree of accommodation.

4       Q.   Yup.  And, in fact, being told that,
5 "We're giving you a permit," right?

6       A.   Apparently.

7       Q.   Yeah.  Okay.  And the question of whether
8 you think it's unclear, or worse, misleading, which
9 implies some intent -- and I don't know that, I just
10 know that it's -- what I do know is it generated some
11 interesting confusion.  And I want to show you an
12 example of that that's not a man-on-the-street kind of
13 confusion.  But let's look at Exhibit 429.

14           MS. ZILIOLI:  Counsel, I'm going to
15 object.  I believe we're over the four hours.  We can
16 take a -- go off the record if you want to confirm
17 that.

18           MR. SEBY:  Let's go off the record.

19           THE VIDEOGRAPHER:  Going off the record.
20 The time is 6:43 p.m., 12:53 p.m. Mountain.

21           (Discussion off the record.)

22           THE VIDEOGRAPHER:  We are back on the
23 record.  The time is 6:57 p.m. UTC,
24 12:57 p.m. Mountain.

25      Q.   (BY MR. SEBY)  So, General, we have

Page 164

1 Exhibit 429 on the -- on the screen.  If we could go to
2 the email that is attached to that cover email.  And --
3 so this is an email from Ms. Darcy, Wednesday,
4 September 21, 2016.  And it's addressed to Major
5 General Jackson and Lowry Crook.  And she simply says,
6 after General Jackson, in the email below, reported to
7 her that the Corps of Engineers had issued the permit
8 to the Standing Rock Sioux Tribe -- and the report from
9 General Jackson below says that -- this is under the
10 "Omaha responses" section of the email, the bottom
11 there.  General Jackson is saying that -- saying
12 something that's not in the press release, General.
13 "The permit is only for the south side of the river,
14 with associated conditions.  The Tribe has not signed
15 the acknowledgment for this permit yet not met the
16 liability requirements, so there is currently no permit
17 in place."

18           And no permit in place is different than
19 the language that the kitchen of cooks that wrote the
20 press release used imprecisely.  And then General --
21 or, pardon me, Ms. Darcy writes back to General Jackson
22 saying, simply, "So, there's no permit in place for
23 this south encampment, even though we announced
24 Friday . . . that there was?"

25           So when I asked you whether you thought

Page 165

1 anybody could be confused by this, you -- you didn't
2 answer it.  And here, I'm showing you that the
3 Assistant Secretary of the Army for Civil Works was
4 confused by the press release and the way in which the
5 cabal of cooks wrote it and came away with a very
6 different impression than you did when you tried to
7 explain what it really meant, when it doesn't say that.
8 And I would just say that Ms. Darcy is the evidence of
9 that confusion, in her own words, so --

10           MS. ZILIOLI:  Objection, misstates
11 evidence.  Sorry (inaudible).

12           MR. SEBY:  Great.

13           THE REPORTER:  Hold on.  Excuse me.  I
14 couldn't hear you, Ms. Zilioli.

15           MS. ZILIOLI:  I withdrew my objection,
16 because he wasn't finished.

17           THE REPORTER:  Okay.  Thank you.

18      Q.   (BY MR. SEBY)  So, General, do you recall
19 a time when the U.S., as a whole, ever made a statement
20 that resulted in a deescalation of the DAPL protests?

21           MS. ZILIOLI:  Objection; misstates
22 evidence and testimony.

23      Q.   (BY MR. SEBY)  I'm asking --

24      A.   I'm sorry.  I just don't understand the
25 question.

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 166

1   Q. I'm just asking you if you can identify
2 any instance when the United States, writ large, ever
3 did anything, statement or action, that resulted in a
4 deescalation of the DAPL protests occurring for months
5 on Corps property?
6   A. So I think there were actions taken with
7 respect to, you know, certain things we were trying to
8 do with the State and law enforcement, the National
9 Guard, et cetera, that I think attempted to do
10 deescalation.  But I'm not sure that any of those were
11 manifested.
12   Q. "Manifested" meaning ever actually caused
13 a deescalation?
14   A. Yeah, actually -- actually implemented.
15   Q. Okay.  General, I don't have any further
16 questions for you.  And I've understood that all of
17 your answers are your answers, unless you choose now to
18 clarify or withdraw or add to any of them.  Do you wish
19 to do any of those things?
20   A. I don't.  I think it's just fair to say
21 that that last set of emails, there was a lot on there,
22 and I didn't really have a chance to review the whole
23 document.  But I -- I think I understand the context of
24 it, but in no way have I ever seen that document
25 before.  And I did not -- was not able to internalize

Page 167

1 some of the messages that Ms. -- that was underneath
2 Ms. Darcy's note.
3   Q. Well, I would just point out that General
4 Jackson's email explaining that Ms. -- that there is
5 actually no permit, because the Corps hadn't signed it
6 as of almost a week later and -- acknowledging it, and
7 they've not met the liability requirements, so there's
8 no permit in place.  That email, sir, includes you as
9 a -- as an addressee, after Ms. Darcy.  And so you did
10 get it.
11   And September 21st, whatever you may not
12 have known before then, here was another instance to
13 let you know that there is no permit.  And whatever
14 confusion you had, if any, isn't the question that I
15 asked.  I was just pointing out Ms. Darcy's response,
16 which I don't understand -- I don't take it that you're
17 arguing those.  That's actually not what she said.  But
18 what she said is, "Really?  There is no permit in place
19 for the south encampment, even though we said there
20 was?"
21   And my point was, is that the confusion --
22 I asked you whether it was possible to read that press
23 release -- existed.  You had a ready explanation why I
24 was wrong.  Yet, I showed you Ms. Darcy totally
25 indicating confusion about what the press release said,

Page 168

1 relative to Ed Jackson's clarification.  That -- that's
2 all I'm making a point of, and I'll leave it there.
3   A. I would just end by saying that I think
4 where there was an intent to issue the permit, and then
5 the question is, was it actually done in accordance
6 with the conditions of the permit, those are two
7 different things.  And I could understand how an
8 uninformed political appointee might not have
9 understood the nuances of not following through with
10 the rest of the permit.  So I'll leave it there.
11   Q. Yeah, sure, sure.  And along -- along with
12 the thousands of protesters who probably were also led
13 to believe something that wasn't true.
14   MR. SEBY:  All right.  That's -- that's
15 the end of my questions, General.  Thank you for your
16 time today.  I appreciate it.
17   THE DEPONENT:  Thank you for yours.
18   MR. SEBY:  Thank you, sir.
19   THE VIDEOGRAPHER:  Before we go -- sorry.
20   MS. ZILIOLI:  I was just going to say,
21 this is Erica Zilioli.  We have no questions for
22 General Semonite.  We'll read and sign.
23   THE VIDEOGRAPHER:  And would you like a
24 copy of the video?
25   MR. SEBY:  Yes.

Page 169

1   MS. ZILIOLI:  We -- we just order the
2 transcript.  So I'll defer to --
3   THE DEPONENT:  Oh, I would like a copy.
4   THE REPORTER:  I'm sorry.  Who is -- who
5 is talking right now?
6   THE DEPONENT:  Yeah.  General Semonite.
7 If it's available or acceptable, I'd like a copy.
8   THE VIDEOGRAPHER:  It's if your attorney
9 would like it and . . .
10   MS. ZILIOLI:  Mr. Banks, we'll -- we'll go
11 through the U.S. Attorney's Office on any order for
12 that.  Thank you.
13   THE VIDEOGRAPHER:  Okay.  Great.
14 Mr. Jafek?
15   MR. JAFEK:  I think we'll just do our
16 standard, what we've done in other depositions.
17   THE VIDEOGRAPHER:  All right.  We are
18 going off the record.  This concludes the remote
19 video-recorded deposition of General Todd Semonite.
20 The time is 7:04 p.m. UTC, 1:05 (sic) p.m. Mountain.
21 We are off the record.
22   (The following proceedings were held
23 outside the videotape portion of the deposition.)
24   THE REPORTER:  Mr. Seby, would you like a
25 copy of the transcript?

Lieutenant General Todd T. Semonite (Ret.)
July 26, 2022

Page 170

1        MR. SEBY:  Yes, please.
2        THE REPORTER:  And do you need another
3  copy of the exhibits with the sticker on them?
4        MR. SEBY:  Ms. Hymel will help us with
5  that answer, please.
6        MS. HYMEL:  I would say yes.  And can we
7  make sure the video for our copy is synchronized,
8  please, Mr. Banks?
9        THE VIDEOGRAPHER:  Absolutely.
10        MS. HYMEL:  Thank you, sir.
11        THE REPORTER:  Ms. Zilioli, did you say
12  you were ordering a copy at this time, or you needed to
13  check?
14        MS. ZILIOLI:  We do order a copy of the
15  transcript, yes.  I do need to check on the video,
16  because I don't believe we have traditionally ordered
17  the video.  So we'll have to look into that before
18  responding.
19        THE VIDEOGRAPHER:  You can always let us
20  know.
21        THE REPORTER:  Would you like another copy
22  of the exhibits with the sticker on them as well?
23        MS. ZILIOLI:  Can we get back to you on
24  that?  I don't know what the standard order has been.
25  I don't handle those.  I'm sorry.

Page 171

1        THE REPORTER:  Okay.  No problem.  Thank
2  you.
3        MS. ZILIOLI:  I took down your email.
4  Thanks so much.
5        WHEREUPON, the within proceedings were
6  concluded at the approximate hour of 1:04 p.m. Mountain
7  on the 26th day of July, 2022.
8             *     *     *     *     *

Page 172

1        I, LIEUTENANT GENERAL TODD T. SEMONITE
2  (RET.), do hereby certify that I have read the above
3  and foregoing deposition and that the same is a true
4  and accurate transcription of my testimony, except for
5  attached amendments, if any.
6        Amendments attached    (  ) Yes    (  ) No
7
8
9

_____
10        LIEUTENANT GENERAL TODD T. SEMONITE (RET.)
11
12
13        The signature above of LIEUTENANT GENERAL
14  TODD T. SEMONITE (RET.) was subscribed and sworn to or
15  affirmed before me in the county of _____, state of
16  Colorado, this _____ day of _____, 2022.
17
18
19
20  _____
        Notary Public
21        My commission expires
22
23
24
25  State of North Dakota, 7/26/22 (go)

Page 173

1             REPORTER'S CERTIFICATE
2  STATE OF COLORADO        )
                            ) ss.
3  CITY AND COUNTY OF DENVER )
4        I, GAIL OBERMEYER, Registered Professional
   Reporter and Notary Public ID 19994012647, State of
5  Colorado, do hereby certify that previous to the
   commencement of the examination, the said LIEUTENANT
6  GENERAL TODD T. SEMONITE (RET.) verbally declared his
   testimony in this matter is under penalty of perjury;
7  that the said deposition was taken in machine shorthand
   by me at the time and place aforesaid and was
8  thereafter reduced to typewritten form; that the
   foregoing is a true transcript of the questions asked,
9  testimony given, and proceedings had.
10        I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of this
   litigation.
12
        IN WITNESS WHEREOF, I have affixed my
13  signature this 3rd day of August, 2022.
14  My commission expires May 20, 2023.
15
16        Gail Obermeyer, RPR
        Registered Professional Reporter
17        Notary Public, State of Colorado
18
19
20  __X__ Reading and Signing was requested.
21  _____ Reading and Signing was waived.
22  _____ Reading and Signing is not required.
23
24
25

Lieutenant General Todd T.  Semonite (Ret.)
July 26, 2022

Page 174

```
1   Errata Sheet

2

3   NAME OF CASE: Plaintiff vs UNITED STATES

4   DATE OF DEPOSITION: 07/26/2022

5   NAME OF WITNESS: Lieutenant General Todd T.  Semonite (Ret.)

6   Reason Codes:

7       1. To clarify the record.

8       2. To conform to the facts.

9       3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                  _____
```