**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-150-DMT-ARS |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANT UNITED STATES OF AMERICA'S RESPONSE TO PLAINTIFF STATE OF NORTH DAKOTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In cross motions, the parties each request summary judgment under Federal Rule of Civil Procedure 56(a) on two essential elements of the State's case: (1) whether the discretionary function exception, 28 U.S.C. § 2680(a), bars the State's claims; and (2) whether a private person would owe a duty to the State under similar circumstances as a matter of North Dakota law.

As set forth below (and established in the United States' motion for summary judgment), the State has not—and cannot—carry its burden on either issue. Indeed, the undisputed evidence establishes the opposite, that: (1) the discretionary function exception bars this action; and (2) there is no actionable duty under North Dakota law that could support the State's claims. As such, the State's Motion for Partial Summary Judgment must be denied.

### RESPONSE TO STATE'S STATEMENT OF UNCONTESTED MATERIAL FACTS

**I.    The Court should not consider factual assertions for which the State provides no support.**

Federal Rule of Civil Procedure 56(c)(1) requires that an undisputed fact be supported by evidence. Therefore, the Court should not consider any fact for which the material in the record

does not support the claimed fact. Specifically, the State fails to support the following facts in its statement of uncontested material facts (State's SUMF):

- State's SUMF ¶¶ 3, 7, 11, 17, 19, 21, 22, 25, 44, 46, 50, 54, and 67. In these facts, the State repeatedly refers to "DAPL protesters" as a single entity and alleges that they committed certain acts. However, the evidence cited by the State does not support that the "DAPL protesters" were a single group or acted as a unit.

- State's SUMF ¶¶ 3, 11. In these facts, the State implies that protesters left Corps land and committed certain acts, but in the supporting documents, there is no evidence offered regarding where the protesters came from.

- State's SUMF ¶¶ 17, 47. Here, the State alleges that "protestors organized in camps on Corps lands" and that a convoy "traveled from the DAPL protest encampments on Corps land." But the documents cited provide no such evidence.

- State's SUMF ¶ 27. The State alleges that the September 9 joint statement "called for the Corps to find 'a path forward'" to take certain actions, but the joint statement does not say that. ECF No. 341-17, Ex. 17 to State MPSJ.

- State's SUMF ¶ 29. The State asserts that Lowry Crook, former Deputy Secretary of the Army for Civil Works, testified "that Secretary Darcy for the Corps made the decision to join the September 9 Joint Statement." He did not. Mr. Crook clarified that the joint statement did not come from the Corps, testifying that "people often confuse the Army Corps of Engineers and the Department of the Army at large; and so if I was making that statement, I would refer to the Department of the Interior, Department of the Army and the Department of Justice." Ex. 57[1], Dep. of Lowry Crook (May 26, 2022) at 184:18-185:14.

- State's SUMF ¶ 50. The State refers to "DAPL protestors['] . . . most serious violent protests yet," which implies that previous violent protests occurred, but the document cited provides no evidence of that.

- State's SUMF ¶ 67. The State asserts that protesters left Corps land in February 2017 "as a result of clearing actions carried out almost entirely" by North Dakota law enforcement. But the record shows that these "clearing actions" were coordinated between both federal and state officials. *See, e.g.*, Ex. 58, Email from Peter Gautier to Major General (MG) Alan Dohrmann (Feb. 10, 2017) at ND_000147247-48 (MG Dohrmann requesting federal support for a "███████████████████████" and NSC official responding that 40 additional federal law enforcement officers would be mobilized); *see also* ECF

---

[1] The exhibit numbering here continues the numbering used for the United States' Memorandum in Support of its Motion for Summary Judgment, ECF No. 350. The last exhibit for that filing was Exhibit 56. The first exhibit for this response is Exhibit 57. The State's SUMF cites the rough version of Mr. Crook's deposition transcript that was previously filed on the docket; the United States includes the official transcript as Exhibit 57.

No. 338-28, Ex. 26 to U.S. MSJ at 65:4-6, 66:12-21[2]; 76:1-11; 84:10-21 (Governor Burgum testifying that State and federal officials worked "in coordination" on the effort to clear the camps, including by aligning the deadline in the Governor's evacuation order with the date by which the Corps required protesters to vacate its lands); ECF No. 338-14, Ex. 12 to U.S. MSJ at 181:8-14 (MG Dohrmann testifying that the decision to issue the February 2017 evacuation order was the result of "ongoing conversations" between the State Incident Command and Unified Command team and the Corps).

## II.   The Court should not consider factual assertions based on inadmissible evidence.

An undisputed fact must be supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).

The Court should not consider the following facts because they are not supported by admissible

evidence:

- State's SUMF ¶ 29. The State relies on a statement by the White House Press Secretary that the September 9 joint statement "was a decision that was made by the Army Corps of Engineers and the Department of the Interior" and "based on their own judgement." This is not admissible because there is no evidence that the White House Press Secretary would know such a thing. *See* Fed. R. Evid. 602 (personal knowledge required).

- State's SUMF ¶ 73. The State's assertion that "FBI agents 'knew that the [Morton County] sheriffs didn't know that they [the alleged FBI informants] were there" is not admissible because there is no evidence the source of the alleged fact, Paul Ward, a U.S. Marshal, knew what FBI agents knew. (First alternation original.) *See* Fed. R. Evid. 602.

## III.   The remainder of the State's factual assertions are not disputed; however, many of these facts lack context and are not material.

The United States does not dispute the State's SUMF ¶¶ 1-2, 4-6, 8-10, 12-15, 16, 18, 20,

23-24, 26, 28, 30-43, 45, 48-49, 51-53, 55-66, 68-72. However, many of these factual assertions

lack essential factual context necessary to resolve the issues presented on summary judgment.

Moreover, many of these factual assertions are not material to the issues presented. The United

States provides a Counterstatement of Undisputed Material Facts ("CSUMF") to provide the

necessary context for the Court's consideration of the State's factual allegations.

---

[2] "U.S. MSJ" refers to the United States' Motion for Summary Judgment; "State's MPSJ" refers to the State's Motion for Partial Summary Judgment.

**UNITED STATES' COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     The United States incorporates by reference the statement of undisputed material facts set forth in its Memorandum in Support of its Motion for Summary Judgment (U.S. SUMF). ECF No. 350 at 7-25.

**I.     The DAPL protests started on land not owned or controlled by the Corps but later grew to include camps on Corps land.**

2.     In March or April 2016, small numbers of protesters first began gathering to protest the proposed pipeline at a "Spirit Camp" on bluffs overlooking the Cannonball River on Standing Rock Sioux Tribe (Tribe) land just south of Corps land. ECF No. 338-7, Ex. 5 to U.S. MSJ, Dep. Of COL (Ret.) John Henderson (Apr. 6, 2022) at 48:1-16; ECF No. 338-9, Ex. 7 to U.S. MSJ, Dep. of Sheriff Kyle Kirchmeier (Apr. 29, 2022) at 42:7-46:2; ECF No. 336-8, Ex. 8 to U.S. MSJ, Email from Lynn Woodall to Kyle Kirchmeier (Apr. 15, 2016) (Kirchmeier Dep. Ex. 21) at ND_000093897; ECF No. 350-15, Ex. 27 to U.S. MSJ, Email from Arlo Reese to COL Henderson (Aug. 23, 2016) at USACE_00002467.

3.     In the summer of 2016, the Spirit Camp on private land grew in size and began to overflow onto Corps land south of the Cannonball River. ECF No. 338-12, Ex. 10 to U.S. MSJ, Dep. of Eric Stasch (Jan. 21, 2022) at 42:8-16.

4.     Additionally, in the week after their first clash with pipeline company's private security contractors on August 10, 2016, protesters established a new camp on Corps land on the north side of the Cannonball River in Morton County. ECF No. 350-6, Ex. 11 to U.S. MSJ, Email from Jay Gruebele to Kyle Kirchmeier (Aug. 10, 2016); ECF No. 350-15 at USACE_00002467-68; ECF No. 350-16, Ex. 28 to U.S. MSJ, Email from Chad Harmon to Darren Cruzan (Aug. 17, 2016) at DOI_00007642.

5.     From the summer of 2016, when the camp began to overflow onto Corps land,

until February 23, 2017, protesters were located in camps both on and off of Corps land and on both sides of the Cannonball River. *E.g.*, Ex. 59, Dakota Access Pipeline (DAPL) SITREP (Aug. 23, 2016), at USACE_00002471; Ex. 60, Email from Terry Van Horn to William Klug, et al., (Aug. 30, 2016) at MYERS_00000033; Ex. 61, Dakota Access Pipeline (DAPL) SITREP (Nov. 4, 2016), at USACE_00017386; Ex. 62, DAPL Situational Awareness Map, at USACE_00010305; ECF No. 338-12, Ex. 10 to U.S. MSJ, Dep. of Eric Stasch (Jan. 21, 2022) at 42:8-16; Ex. 63, Dep. of LTC James Startzell (May 16, 2022) at 41:3-16; ECF No. 338-7, Ex. 5 to U.S. MSJ at 108:11-17; 123:7-18, 125:3-19; Ex. 64, Dep. of Darren Cruzan (Aug. 23, 2022) at 41:21-42:12, 43:16-44:4; 226:5-227:10; ECF No. 338-18, Ex. 16 to U.S. MSJ, Dep. of Paul Laney (June 24, 2022), at 105:5-16.

6.     During the protests, all relevant surface pipeline construction sites were located off of Corps land. Ex. 65, Email from Eileen Williamson to LTC James Startzell et al. (Oct. 18, 2016), at USACE_00016028, USACE_00016034 (maps from Environmental Assessment, reflecting the pipeline workspace was outside federal land and the pipeline was only above ground on private land); ECF No. 220, Dep. of LTG Scott Spellmon (Apr. 22, 2022) at 52:18-25.

**II.     Many protesters decided to occupy Corps land without considering whether the federal government granted them permission to do so.**

7.     Protester Chase Iron Eyes explained that he did not receive any message or permission from the federal government that impacted the decision to establish the Oceti Sakowin Camp, because he and other like-minded protesters "d[id]n't see [them]selves as needing any kind of permission or – or consent from the United States." ECF No. 338-32, Ex. 30 to U.S. MSJ at 17:3-18:6.

8.     As protester Winona LaDuke testified, she believed that the "Lakota people" have rightful authority over who can be present and what can happen on the land in question and that

she therefore was not concerned about receiving any permission from the Corps to gather on

Corps land. ECF No. 338-33, Ex. 31 to U.S. MSJ at 24:20-25:23.

9.      As protester Dr. Nicholas Estes testified, the Corps's authority over the land did

not impact his decision to come to or to stay at the protest camps. ECF No. 338-34, Ex. 32 to

U.S. MSJ at 62:2-6.

**III.    Some protesters acted peacefully and lawfully while some others did not.**

10.      Morton County Sheriff Kyle Kirchmeier agreed in his deposition that "peaceful

protesters weren't the issue." ECF No. 338-9, Ex. 7 to U.S. MSJ at 18:22-19:7. He observed that

there were "three different groups of people involved" in the protests: "the peaceful protesters

that did want to remain peaceful and prayerful," "the bystanders who then get involved if

something happens," and "the agitators." *Id.* at 72:19-73:10.

11.      Cass County Sheriff Paul Laney testified that "at the height when there was over

10,000 protesters, and again, it's speculation, 90 percent of them were peaceful protesters that

just wanted to get their . . . message across. And that's – we have that right in America. I have no

problem with any of those. But there was a hardcore element within looking for a fight . . . and

so that was the hard part." ECF No. 338-18, Ex. 16 to U.S. MSJ at 31:3-33:21.

12.      Similarly, MG Dohrmann testified that "not every protester was created equally

down there. Some were truly there just to follow the laws and peacefully protest. Some were

kind of along for the ride. Some were there to violate the law." ECF No. 338-14, Ex. 12 to U.S.

MSJ at 124:8-24.

13.      Recognizing this, State and local law enforcement issued operations briefings

during the protests stating that one of the "████████████" of the protest response was to ensure

that "███████████████████████████████████████████████████████████

████" *E.g.*, ECF No. 350-8, Ex. 14 to U.S. MSJ at USACE_00201683; *see also* 338-14, Ex. 12

to U.S. MSJ at 16:22-17:10 (MG Dohrmann testifying First Amendment rights were among the considerations the National Guard balanced to meet strategic objectives in its protest response).

14.     As Sheriff Kirchmeier testified, the Morton County Sheriff's Office's goal in responding to the protests was to ensure that the protests remained peaceful, did not bother workers building the pipeline, and remained off the highway running through the area. ECF No. 338-9, Ex. 7 to U.S. MSJ at 40:18-22.

## IV.     The State was unwilling to enforce violations of Corps regulations.

15.     State and local law enforcement have authority to enforce violations of Corps regulations upon the Corps's request. *See* ECF No. 338-40, Ex. 38 to U.S. MSJ at 74:3-76:15 (Corps 30(b)(6) representative testifying that the Corps's ordinary practice is to "work with the local sheriff's department for removal" when the Corps, in consultation with local authorities, determines that it is necessary to remove individuals from Corps land).

16.     As explained in the United States' Statement of Undisputed Material Facts, however, the State's protest response was designed to minimize conflict. ECF No. 350, U.S. SUMF ¶¶ 18-39.

17.     MG Dohrmann's view was that even if clearing the camps "would be a way to bring [the protests] to an end," "the sheer numbers of people that [we]re in those camps, questionable authority to clear land where the landowner had not asked us to clear, and just the size of the force that would be required and just the potential for injury and loss of life in [his] opinion was just too high to contemplate such an action." ECF No. 338-14, Ex. 12 to U.S. MSJ at 21:17-22:1.

18.     Later in the protests, as reported by Corps personnel, North Dakota Highway Patrol Captain Eric Pederson stated that the State "███████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████" ECF No. 350-13, Ex. 23 to U.S. MSJ at USACE_00008612.

19.     Cass County Sheriff Paul Laney said to law enforcement officers at a morning briefing during the protests that "the idea that we're going to go push a whole lot of people off Corps land for camping without a permit is actually kind of ludicrous." ECF No. 338-26, Ex. 24 to U.S. MSJ at 00:14.

20.     Omaha District Commander Colonel John Henderson also testified that, after Governor Doug Burgum was elected, Governor Burgum said that "████████████████████ ███████████████████████████████████████████████████████████████████████ ████████" ECF No. 338-7, Ex. 5 to U.S. MSJ at 276:21-277:5; *see also* ECF No. 350-14, Ex. 25 to U.S. MSJ at USACE _00001781 (recounting meeting with Governor Burgum where the Governor said "███████████████████████████████████████████████████████████ ████████████████████████████████████████████████" (first ellipsis added)).

21.     Governor Burgum testified that COL Henderson's summary of this meeting was accurate and elaborated that he was worried about "trying to avoid, you know, arm[ed] . . . confrontation between, you know, federal and state authorities and protesters." ECF No. 338-28, Ex. 26 to U.S. MSJ at 41:4-43:10.

22.     Governor Burgum also testified that part of the State's approach was to "move forward with – you know, diplomatic relationships with the [T]ribe" in light of the "tinderbox" situation following the forcible removal of protesters from private land on October 27, 2016.[3] *Id.*

---

[3] On October 27, 2016, state and local law enforcement, reinforced with out-of-state law enforcement personnel, forcibly dispersed the North Camp, located on private land north of Corps land, at the request of the pipeline company. ECF No. 338-9, Ex. 7 to U.S. MSJ, at 99:13-100:2; ECF No. 338-20, Ex. 18 to U.S. MSJ, at 31:7-32:11; ECF No. 350-28, Ex. 48 to U.S. MSJ, Email from Donnell Hushka to Kyle Kirchmeier (Oct. 28, 2016) (Kirchmeier Dep. Ex. 24) at ND_000095815-16. The event came to be known as the "Big Push" operation. ECF No. 338-9, Ex. 7 to U.S. MSJ at 80:22-81:6.

at 43:11-47:14.

23.     In light of this approach by the State, COL Henderson's understanding from speaking with law enforcement leaders was that no local, state, or federal law enforcement agency was willing to enter Corps land to evict protesters or otherwise enforce violations of Corps regulations. *E.g.*, ECF No. 338-7, Ex. 5 to U.S. MSJ, at 171:6-178:21.

24.     As to why the Corps did not close the land to all public use in August or September 2016, COL Henderson explained that:

> [W]e asked the question, said, If we go in and declare everybody as trespassers; if we close the land or issue an eviction notice, we [the Corps] don't have law enforcement authority; how would we handle that; how would we actually – how would we enforce that. And at all levels – federal, state, and local – there was a general feedback, both from the legal channels and the law enforcement channels to say, That is a very bad idea; that is not enforceable at this time because of the size, because of the constitutional issues at play; so therefore, we strongly advise against that.

ECF No. 338-24, Ex. 22 to U.S. MSJ at 91:6-94:13. His assessment was that closing the land at that point "would [have] put law enforcement in a terrible position." *Id.*

## V.     The Tribe's lawsuit and the September 9, 2016, joint statement from the Department of Justice, Department of the Interior, and Department of the Army.[4]

25.     As the protests were happening, the Tribe sued the U.S. Army Corps of Engineers in the U.S. District Court for the District of Columbia concerning its decision-making on the pipeline. *See* Complaint, ECF No. 1, *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 16-cv-01534-JEB (D.D.C.) ("*SRST v. Corps*"), filed July 27, 2016.

26.     On August 4, 2016, before protesters first clashed with pipeline security, the Tribe filed a motion in the district court for a preliminary injunction to require the Corps to withdraw

---

[4] As explained below, the United States contends that the September 9 joint statement is not material to this dispute and includes the following facts solely to provide necessary context in response to the State's SUMF.

the permit for the pipeline, which would enjoin further pipeline construction pending resolution of the case on the merits. *SRST v. Corps*, ECF No. 5.

27.     Law enforcement intelligence indicated that if the ruling went against the Tribe, there would be violent protest activity in North Dakota. Ex. 66, Email from Terry Van Horn to Gary Delorme, et al. (Aug. 22, 2016), at MYERS_00032883.

28.     On August 24, 2016, the district court had informed the parties that it expected to rule on the motion for preliminary injunction on September 9, 2016. *See* State's SUMF ¶ 13; ECF No. 352-5, Ex. 8 to State's MPSJ, at ARMY_00117773.

29.     In the days leading up to the ruling, law enforcement intelligence continued to show that a ruling against the Tribe would spark violence at the protests. On September 2, the U.S. Attorney's Office learned from a source that "███████████████████████ ███████████████████████████████████████████" that was "███████████ ███████████████████████████████" Ex. 67, Email from Terry Van Horn to Chris Myers (Sept. 2, 2016), at MYERS_00032975.

30.     In his 30(b)(6) deposition, MG Dohrmann confirmed that the intelligence about a potentially violent reaction to a negative court ruling influenced the State's decision to deploy National Guard troops on September 8, 2016, to free up other law enforcement to respond. ECF No. 338-20, Ex. 18 to U.S. MSJ, at 23:17-25:16. He also confirmed that the potential for violence was a significant matter of concern for the State as it formulated its protest response. *Id.*

31.     On September 9, 2016, the district court denied the Tribe's motion for preliminary injunction. *SRST v. Corps*, ECF No. 38. Later that day, the Department of Justice (DOJ), Department of Interior (DOI), and Department of the Army (Army) issued their joint statement

stating that the Army would not issue an easement for the pipeline before conducting a review of prior decision making on the pipeline. ECF No. 341-17, Ex. 17 to State MPSJ.

32.     The September 9 joint statement was an action of the DOJ, DOI, and Army, not of the Corps. *Id.* at ND_000169105; *see also* Ex. 57 at 184:23-185:14 (Lowry Crook testifying that Department of the Army and Corps are not the same and that he would refer to Department of the Army when asked who at the Corps decided to join the joint statement).

33.     The purpose of the statement was to deescalate tensions in light of the danger of violence that an adverse court ruling created. Ex. 68, Rule 30(b)(6) Dep. of Patrick Wynters Hornbuckle (Dec. 15, 2022) at 60:15-61:4, 62:6-64:6.

34.     The Corps personnel who had decision-making authority over how the Corps would handle the presence of protesters on Corps land were not involved in the preparation or release of the statement. ECF No. 220 at 33:3-34:18; Ex. 69, Dep. of MG (Ret.) Donald E. Jackson (July 29, 2022) at 73:11-24.

## VI.    The Tribe's request for a special use permit

35.     As these events were unfolding, the Corps worked with the Tribe on a proposed special use permit for lawful protest activity to occur on a limited area on Corps land. On August 15, 2016, the Tribe's counsel, Peter Capasella, first contacted Eric Stasch, the Corps's Lake Oahe Project Manager, to request a "special event permit," with initial placement south of the Cannonball River on Corps land. ECF No. 350-20, Ex. 36 to U.S. MSJ at USACE_00031883.

36.     Mr. Stasch and his team helped the Tribe work through the permit application process to try to get a permit in place with the appropriate terms and conditions. ECF No. 338-7, Ex. 5 to U.S. MSJ, at 74:14-75:6; 85:4-86:2.

37.     A couple days after the Corps received the Tribe's request, COL Henderson personally retained the ultimate decision-making authority over whether to grant a permit. *Id.* at

81:16-82:14. He did so "███████████████████████████████████████████

████████████████████████████████████████" ECF No. 350-21, Ex. 37 to

U.S. MSJ, at USACE_00011530.

38.     At the time, COL Henderson explained to his leadership within the Corps that

"████████████████████████████████████████" and that he would monitor

the protests, report on developments, and defer to local law enforcement on the best response.

ECF No. 350-12, Ex. 21 to U.S. MSJ, at USACE_00014061.

39.     On August 18, 2016, the Tribe submitted a formal application for a permit for a

"████████████████" located "████████████████████████████████████"

ECF No. 350-22, Ex. 39 to U.S. MSJ, at USACE_00058025-26.

40.     On August 22, 2016, COL Henderson explained to Governor Dalrymple that he

would "██████████████████████████████████████████████████

█████████████████" of those present in deciding whether and to what extent to grant the

Tribe's request for a permit. ECF No. 350-23, Ex. 40 to U.S. MSJ, at USACE_00002439.

41.     In the ensuing weeks, the Corps had conversations back and forth with the Tribe

about its permit application, including requests for the Tribe to resolve inaccuracies in the

requested location and size of the camps, and about whether and how the Tribe would comply

with insurance and bonding requirements for the permit. *E.g.* ECF No. 338-7, Ex. 5 to U.S. MSJ,

at 87:25-89:10; ECF No. 350-24, Ex. 41 to U.S. MSJ, at USACE_00138214; ECF No. 350-25,

Ex. 42 to U.S. MSJ, at USACE_00068809-10.

42.     On September 7, 2016, Mr. Stasch stated that the draft special use permit to the

Tribe was designed to take into account concerns Governor Dalrymple had raised about

protesters building structures on Corps land. Ex. 70, Email from Eric Stasch to James Startzell, et

al. (Sept. 7, 2016) at USACE_00057893-94.

43.     While the conversations with the Tribe were ongoing, on September 13, 2016, State law enforcement reported that protesters marched from the main camp north on Highway 1806, blocking traffic for approximately two hours. In response, law enforcement converted its traffic information point on Highway 1806 into a traffic control point for that period of time.[5] ECF No. 350-4, Ex. 4 (part 2 of 3) to U.S. MSJ, at USA_00001661.

44.     On September 16, 2016, COL Henderson, after consulting with his command chain and law enforcement, offered the Tribe a special use permit for a limited area south of the Cannonball River for the Tribe to gather and engage in a free speech demonstration. ECF No. 338-45, Ex. 43 to U.S. MSJ, Email from John Henderson to Dave Archambault II (Sept. 16, 2016) at USACE_00003114; ECF No. 338-46, Ex. 44 to U.S. MSJ, Email from James Startzell to Dave Archambault II (Sept. 16, 2016) at USACE_00023968; ECF No. 350-26, Ex. 45 to U.S. MSJ, Email from John Henderson to James Startzell (Sept. 15, 2016) at USACE_00050725.

45.     COL Henderson did not grant the Tribe's request for a permit north of the Cannonball—where the Oceti Sakowin Camp was located—because this area was subject to an existing grazing lease. ECF No. 338-46, Ex. 44 to U.S. MSJ, at USACE_00023969.

46.     The Corps offered the permit contingent on the Tribe providing a $100,000 performance bond and a $5,000,000 insurance policy. *Id.* at USACE_00023969-70.

47.     Assuming the Tribe met these requirements and signed the permit, COL Henderson would then countersign the permit, and it would be valid for 30 days thereafter. *Id.* at USACE_00023970.

---

[5] This is the only instance in the State's SUMF in which the State has provided evidence to demonstrate that protesters left Corps land to engage in activity elsewhere.

48.     On the same day that COL Henderson offered the permit, the Corps Omaha District (which COL Henderson commanded) issued a press release stating that the Corps "issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe" and identified the permit's geographical limitations (south of the Cannonball River). ECF No. 338-45, Ex. 43 to U.S. MSJ, at USACE_00003115.

49.     The press release stated the Tribe was allowed to "gather to engage in a lawful free speech demonstration on [the] Federal lands designated in the permit." *Id.* The press release further stated that the Tribe's use of federal land was subject to Title 36 of the Code of Federal Regulations and "applicable Federal, state and local regulations." *Id.*

50.     As COL Henderson explained in his deposition, he issued this statement in an effort to put the public immediately on notice that rules governed conduct on Corps-managed lands, and because he believed that the permit and press release were tools that could help maintain control by explaining that protesters' First Amendment rights would be accommodated within a defined area on defined terms. ECF No. 338-7, Ex. 5 to U.S. MSJ at 79:8-81:15; 87:20-89:10; 100:4-102:24. COL Henderson testified that "minus an executed [permit] by policy," he considered the September 2016 press release the "next best fallback position" to communicate how members of the general public could engage in lawful free speech demonstrations on Corps-managed land. *Id.* at 102:21-24.

51.     COL Henderson testified that his office was "working with the [T]ribe in good faith where we at least had the verbal agreement where the protest should take place inside certain terms and conditions." *Id.* at 80:14-81:15.

52.     The Tribe, however, never met the permit requirements, and COL Henderson never countersigned the permit. *Id.* at 77:13-79:3, 85:4-86:2.

53.     COL Henderson explained that "we got halfway through a permitting process, and then [the Tribe] walked away." *Id.* at 80:14-81:15.

54.     In a September 21, 2016, email to Assistant Secretary of the Army (Civil Works) Jo-Ellen Darcy, MG Ed Jackson of the Corps explained that COL Henderson "███████████████████████████████████████████████████████████████" and that "█████████████████████████████████" ECF No. 352-22, Ex. 33 to State's MPSJ, at ARMY_00070506. In an earlier email the same day, MG Jackson said that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* at ARMY_00070507-08.

55.     Sheriff Kirchmeier could recall no change in activity on the ground as a result of the Corps's press release. ECF No. 338-9, Ex. 7 to U.S. MSJ, at 119:18-22.

56.     Sheriff Laney could not recall the press release causing any change to what he was seeing on the ground. ECF No. 338-18, Ex. 16 to U.S. MSJ at 131:11-16.

57.     Governor Dalrymple's Chief of Staff, Ron Rauschenberger, testified that he had no knowledge of any effect that the press release had on the protest situation on the ground. ECF No. 338-48, Ex. 46 to U.S. MSJ, at 92:5-8.

58.     When asked about the September 2016 press release, protester Chase Iron Eyes explained that "it didn't one way or the other, you know, make us comfortable or – or embolden us." ECF No. 338-32, Ex. 30 to U.S. MSJ, at 82:12-85:21. He further explained that the press release "did not impact [him] nor any – anybody who's there to express, you know, the Sioux Nation's sovereign right to be there and the Sioux nation's treaty rights." *Id.* Rather, according to Iron Eyes, the "pipeline was still being constructed and, you know, had not been called off, and

so we were – we were there as – so long as that was going on." *Id.*

59.     Protester Winona LaDuke "was already there" when the press release came out. ECF No. 338-33, Ex. 31 to U.S. MSJ, at 47:15-17. It did not cause her to come to the protest camps because she "followed the leadership of the Lakota people." *Id.* at 47:9-14.

60.     Ms. LaDuke also testified that the press release did not cause her to stay any longer than she otherwise would have. *Id.* at 48:8-11.

61.     Protester Dr. Nicholas Estes testified that the September 2016 press release "didn't really have an effect, I would say, on . . . my perspectives on things." ECF No. 338-34, Ex. 32 to U.S. MSJ, at 58:1-10. It did not cause him to come to the protest camps or to engage in any activities in opposition to the pipeline. *Id.* at 58:11-59:8.

**VII.     COL Henderson's November 25, 2016, letter**

62.     On November 25, 2016, COL Henderson sent a letter to Chairman Archambault stating that he was closing Corps land north of the Cannonball River to all public use, but that protesters wishing to continue the peaceful exercise of their right to protest could do so in a free speech zone south of the Cannonball. ECF No. 350-2, Ex. 3 to U.S. MSJ at USACE_00009614-16. As stated in the letter, COL Henderson determined the closure of Corps land north of the Cannonball River was "necessary to protect the general public from violent confrontations between protestors and law enforcement officials that have occurred in [that] area, and to prevent death, illness, or serious injury to inhabitants of encampments due to the harsh North Dakota winter conditions." *Id.* at USACE_00009614. Ultimately, COL Henderson authored the letter out of "genuine[] concern[] for the safety and well-being" of the Tribe and general public. *Id.* at USACE_00009615.

63.     The free speech zone that COL Henderson offered was the same area he had offered to Tribe in the September 2016 special use permit that was never completed. *Compare*

16

*id.* at USACE_00009616 *with* ECF No. 338-46, Ex. 44 to U.S. MSJ, at USACE_00023974.

64.     COL Henderson's letter stated that the offer of a free speech zone was made

"████████████████████████████" which sets forth various rules for conduct on Corps

land, provides that "state and local laws and ordinances shall apply" on Corps land, and provides

that these "laws and ordinances are enforced by those state and local enforcement agencies

established and authorized for that purpose." ECF No. 350-2, Ex. 3 to U.S. MSJ, at

USACE_00009614; 36 C.F.R. § 327.26(a), (b).

65.     As COL Henderson testified, he issued the letter to Chairman Archambault to

"honor an area as a free speech zone to not trample on that right" while ensuring the area would

be "accessible by the road and a place where we could provide emergency services." ECF No.

338-24, Ex. 22 to U.S. MSJ, at 44:8-46:6. He further testified that he had authority as the district

commander to allow access or close access to Corps land apart from the special use permitting

process. ECF No. 338-7, Ex. 5 to U.S. MSJ at 107:9-108:8.

66.     COL Henderson testified that while there were some "encampments that were

rogue" by this time, there were also camps south of the Cannonball River where there was "tribal

leadership that was at least trying to act in good faith, keep bad actors out, and protect the people

in there." *Id.* at 266:5-267:23.

67.     At the same time that he issued the letter to Chairman Archambault,

COL Henderson sent a letter to Sheriff Kirchmeier reiterating that local law enforcement had, at

all times, the authority under Title 36 of the Code of Federal Regulations to enforce state law on

Corps land, including the authority to act in response to "████████████████████████████"

ECF No. 350-2, Ex. 3 to U.S. MSJ at USACE_00009617. While explaining that local law

enforcement "████████████████████████████████████

17

████████████████████████████████████████

████████████████████ " the letter also asked that law enforcement coordinate with the

Corps before implementing any "████████████" on Corps land. *Id.*

68.    COL Henderson testified that one of the "control measures" he was concerned

with was the State's deploying water cannons to disperse protesters, which "continued to inflame

the violence." ECF No. 338-7, Ex. 5 to U.S. MSJ at 229:12-231:7. COL Henderson wanted law

enforcement to coordinate with the Corps before deploying those sorts of measures in future. *Id.*

69.    On November 28, 2016, Governor Jack Dalrymple issued a mandatory evacuation

order requiring all members of the public to vacate the protest area on Corps land north of the

Cannonball River. ECF No. 350-30, Ex. 50 to U.S. MSJ at ND_000152407-08.

70.    The authority the Governor relied on for his evacuation order was not contingent

on the Corps closing its land. *Id.* at ND_000152408. Indeed, the evacuation order stated that the

evacuation area "shall remain in effect even if" the Corps "redefines or removes" its closure of

the protest area north of the Cannonball. *Id.* at ND_000152407.

71.    As Sheriff Kirchmeier testified, the November 2016 letter to Chairman

Archambault "didn't make a difference. . . because nothing changed at that point." ECF No. 338-

9, Ex. 7 to U.S. MSJ, at 133:13-23.

72.    Sheriff Laney recalled no change in activity on the ground that resulted from the

letter. ECF No. 338-18, Ex. 16 to U.S. MSJ, at 146:1-22.

73.    MG Dohrmann agreed "that statements from the Corps of Engineers didn't really

have an effect one way or the other as to what was happening on the ground." ECF No. 338-14,

Ex. 12 to U.S. MSJ, at 36:4-8.

74.    Protester Chase Iron Eyes was "not at all willing to go south of the Cannonball

River" as the November 2016 letter required. ECF No. 338-32, Ex. 30 to U.S. MSJ, at 86:19-21.

75.     Protester Winona LaDuke testified regarding the November 2016 letter that "the reality on the ground [was] that most of the people there were – were gonna stay as long as they could." ECF No. 338-33, Ex. 31 to U.S. MSJ, at 50:18-52:10.

76.     The letter did not cause Ms. LaDuke to stay at the protests any longer than she otherwise would have. *Id.* at 52:19-53:14.

77.     The letter did not cause protester Dr. Nicholas Estes to come to the camps, or to stay at the camps any longer than he otherwise would have. ECF No. 338-34, Ex. 32 to U.S. MSJ, at 61:19-62:1.

78.     The Corps's authority over the land had no influence over Dr. Estes's decision to come or to stay. *Id.* at 62:2-6.

79.     No protester who testified in this case has said that either the Corps's September 2016 press release or its November 2016 letter to Chairman Archambault had any effect on their decision to come to, stay at, or leave the protest camps.

80.     In its after-action report on the protests, the State did not mention the September 2016 press release or the November 2016 letter. *See generally* ECF Nos. 350-3, 350-4, & 350-5, Ex. 4 to U.S. MSJ.

**VIII.     The Corps and State's coordination to remove protesters from the protest camps**

81.     On a call on January 3, 2017, Governor Burgum asked COL Henderson for the Corps's assistance in developing a ██████████████████████████████████" ECF No. 350-14, Ex. 25 to U.S. MSJ, at USACE_00001781. The Governor asked COL Henderson to work with MG Dohrmann:

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

*Id.*

82.     In addition, the Corps believed that at this time, due to a pause in pipeline construction activity and winter weather, the number of protesters was low enough to allow the camps to be cleared without a significant risk of violence. Ex. 71, Email from LTG Todd Semonite to GEN Daniel Allyn (Jan. 20, 2017), at USACE_00038857.

83.     When asked when the concept of clearing the camps by force first came up among state and local leadership, MG Dohrmann testified that "[i]t was around that February [2017] time frame," because, among other things, the change of presidential administrations led to a change in policy on the pipeline itself, the weather had reduced the camp population, and the weather service was projecting flooding in the area where the camps were. ECF No. 338-14, Ex. 12 to U.S. MSJ, at 164:11-166:12.

84.     The Corps wrote a letter to Chairman Archambault closing all Lake Oahe project lands to public use, citing imminent spring flooding and the potential for environmental contamination. ECF No. 341-46, Ex. 46 to State's MPSJ, at ND_000093442-43. In addition to closing the Corps-managed lands to public use, the letter required all members of the public to remove any personal property from Corps land by February 22, 2017. *Id.* at ND_000093443.

85.     The Corps sent the letter to Chairman Archambault on February 3, 2017. *Id.* at ND_000093442.

86.     On February 15, 2017, Governor Burgum issued an emergency evacuation order requiring the public to vacate Corps land both north and south of the Cannonball River. Ex. 72, Executive Order 2017-01 (Feb. 15, 2017) (Burgum Dep. Ex. 63). The order would "remain in

effect even if the United States Army Corps of Engineers redefines the prohibited areas." *Id.* At ND_000112819.

87.     On February 23, 2017, state and local law enforcement, reinforced with National Guard troops and federal law enforcement and other personnel from the Bureau of Indian Affairs, the National Park Service, the U.S. Fish and Wildlife Service, and the wildland firefighting community, as well as air support from U.S. Customs and Border Protection, began clearing the remaining protesters from the protest camps. ECF No. 338-9, Ex. 7 to U.S. MSJ, at 110:11-25; Ex. 58, at ND_000147247; Ex. 73, Rule 30(b)(6) Dep. of Douglas Walker (Nov. 29, 2022) at 34:5-25, 91:12-15.

88.     As of March 1, 2017, all protest camps were cleared of protesters. ECF No. 350-5, Ex. 4 (part 3 of 3) to U.S. MSJ, at USA_00001697.

## IX.    The State seeks damages for activity occurring off of Corps land.

89.     According to Sheriff Kirchmeier, the Incident Commander for the protests, the State "didn't enforce [violations of state law] on the – on the Corps land. . . . It was when it was outside of Corps land when – when arrests or activities took place. . . . When the camp was put on the Corps land, that – law enforcement didn't go into that camp." ECF No. 338-9, Ex. 7 to U.S. MSJ, at 74:25-75:12.

90.     The State claims $38,005,071.66 in damages from the protests, almost all of which are for law enforcement activities and equipment. *See* ECF No. 338-53, Ex. 51 to U.S. MSJ, at 16-17.

91.     Of the State's claimed damages, only $428,601.85 are for cleanup costs for the Oceti Sakowin Camp on Corps land. ECF No. 338-54, Ex. 52 to U.S. MSJ at 17:11-18:6, 19:21-25:4.

92.     Neither the State's damages expert nor the State's damages documents separate

the State's claimed expenditures and/or costs according to the State's response for activity occurring on federal land versus other land. ECF No. 338-55, Ex. 53 to U.S. MSJ at 35:19-23; ECF Nos. 350-31 – 350-47, Ex. 54 to U.S. MSJ.

93.     The State's damages expert also did not otherwise separate the State's claimed expenditures according to whether they resulted from activities of protesters who came from Corps land or elsewhere. *See id.* at 3:8-14.

## ARGUMENT

The Court previously limited the State's claims to the Corps's allegedly negligent issuance of two "de facto" permits in the form of its September 2016 press release and November 2016 letter to Chairman Archambault. ECF No. 38 at 15, 19; ECF No. 280 at 6. Thus, the State cannot prevail on its motion for summary judgment—(1) that the discretionary function exception does not bar its claims, and (2) that it has established the duty element of its tort claims under North Dakota law—unless the State proves liability stemming from the Corps's issuance of those two statements.

After discovery, it is clear the State cannot carry that burden. First, the undisputed facts show that the September 2016 press release and November 2016 letter were not "de facto" permits but discretionary announcements of policy judgment issued by the Corps as a landowner. The FTCA retains the United States' sovereign immunity for claims "based upon" the exercise or non-exercise of "a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Because the State's claims run afoul of that principle, the discretionary function exception bars this case. Second, the State cannot show that North Dakota law would impose a duty on the United States, where the undisputed material facts show that nearly all of the State's damages were caused by protester-conduct occurring *off* the Corps-managed land. An FTCA claim can only be brought against the United States "under

circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the North Dakota Supreme Court has never imposed (and would not impose) liability on a private landowner under similar circumstances, the State cannot carry its burden to show the undisputed facts warrant imposing a duty on the United States here.

Accordingly, as set forth below and established in the United States' motion for summary judgment, the Court should deny the State's Motion for Partial Summary Judgment in full.

## I.   The State is not entitled to summary judgment because the undisputed facts establish that the discretionary function exception bars the State's claims.

The State first requests summary judgment that the discretionary function exception does not bar its claims. ECF No. 352 at 2, 51. In its order on the motion to dismiss, the Court previously concluded, based on the allegations in the Complaint, that the discretionary function exception did not apply at the pleading stage because the Corps did not have discretion to forego its mandatory permitting regulations and issue "de facto" permits to protesters in the form of the September 2016 press release and the November 2016 letter. ECF No. 38 at 19. The State now asks the Court to enter summary judgment on those same grounds. *See* ECF No. 352 at 34-43.

Yet, after discovery, the undisputed facts show that the September 2016 press release and November 2016 letter were not "de facto" permits issued in violation of the Corps's permitting regulations but discretionary announcements of policy judgment issued by the Corps as a landowner. No statute, regulation, or policy constrained the Corps from announcing how the public could use its land during the DAPL protests. The Corps issued the September 2016 press release and November 2016 letter pursuant to that discretionary authority after weighing numerous policy considerations. And, even if the Corps violated a mandatory duty in issuing those two statements, the State's claims are still "based upon" other discretionary decisions about

enforcement of Corps regulations. Thus, because the undisputed facts establish that the discretionary function exception bars the State's claims, the Court should reject the State's request for summary judgment on this issue.

**A.      The discretionary function exception bars claims that are based upon an act or omission that is (1) discretionary and (2) susceptible to policy analysis.**

Courts use the two-pronged test from *Berkovitz v. United States*, 486 U.S. 531 (1988), to determine whether the discretionary function exception is a jurisdictional bar to suit. First, the Court must decide "whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.'" *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (quoting *United States v. Gaubert*, 499 U.S. 315, 328 (1991)). Second, if the conduct is discretionary, the court must determine whether the exercise of judgment or choice was "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. When established policy affords a government agent discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004) (quoting *Gaubert*, 499 U.S. at 324)). The plaintiff has the burden to rebut this presumption. *Id.*

In determining whether the discretionary function exception applies, "the Eighth Circuit has strongly hinted that the burden rests with the plaintiff." *Keller Special Tr. v. United States*, No. 16-5014, 2017 WL 4785450, at *5 (D.S.D. Oct. 20, 2017). Accordingly, it is the State's burden to show neither prong of the *Berkovitz* test is met. Because the undisputed evidence shows the State cannot meet its burden—and, indeed, establishes the opposite, that the Corps's actions are shielded by the discretionary function exception—the Court should deny the State's motion for summary judgment on this ground.

**B.      The Corps's permitting regulations do not constrain its general discretion to announce how the public can use Corps land.**

The Court previously identified the "challenged conduct" under the first prong of the discretionary function exception as whether the Corps had discretion to issue the September 2016 press release and November 2016 letter granting protesters written permission to use its land without following the Corps's special use permitting process. ECF No. 38 at 19, 21-22. The State argues the Corps's permitting process is mandatory and the Corps lacked discretion to allow protesters to occupy Corps land without a valid special use permit. ECF No. 352 at 35-36. But this overlooks the United States' status as a landowner and the Corps's resulting discretion to announce—separate from the permitting process—how the public can use its land.

The Corps has plenary authority as a landowner to decide how members of the public may use its land for public purposes. The United States is the fee owner of the relevant land here; namely, the property at the confluence of the Cannonball and Missouri Rivers in North Dakota, which the Corps manages as part of the Lake Oahe Flood Control Project. CSUMF ¶ 1; U.S. SUMF ¶¶ 1, 7. "It must be remembered that the ownership of property is absolute." *Johnson v. Johnson*, 85 N.W.2d 211, 224 (N.D. 1957). Therefore, the United States has "absolute dominion" over the Lake Oahe Flood Control Project lands and—through the Corps—"may use it . . . subject only to general laws." *Id.*

Congress has provided the Corps broad statutory authority to operate Corps-managed land. The Chief of Engineers has authority to "construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army." 16 U.S.C. § 460d. Federal regulations further articulate the Corps's policy to "manage the natural, cultural, and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." 36 C.F.R. § 327.1(a); *see generally* 36 C.F.R. Part 327.

25

Pursuant to this broad authority, the district commander has discretion to open portions of land to public use on the Corps's own initiative. *See* CSUMF ¶ 65. The Corps does this regularly on its lands around the country. *See, e.g.*, Carlyle Lake Summer Series, U.S. Army Corps of Engineers (last visited: June 23, 2023) *available at*: https://www.mvs.usace.army.mil/Missions/Recreation/Carlyle-Lake/Events/Leisure-Summer-Series/; U.S. Army Corps of Engineers to hold events for National Public Lands Day, Sept. 26, 27 (Sep. 22, 2020), *available at*: https://www.usace.army.mil/Media/News-Releases/News-Release-ArticleView/Article/2358227/us-army-corps-of-engineers-to-hold-events-for-national-public-lands-day-sept-26/; News Release: Coralville Lake to Host Halloween Haunted Trail Event, U.S. Army Corps of Engineers (Oct. 23, 2018), *available at*: https://www.mvr.usace.army.mil/Media/News-Releases/Article/1670109/coralville-lake-to-host-halloween-haunted-trail-event/.

The Corps also has discretion to decide how to use its land to address special user issues or conflicts. Corps guidance explicitly states that providing an overflow area or separating different types of users are "alternative management technique[s]" that can be "effective in reducing visitor problems." U.S. Army Corps of Eng'rs, Dep't of the Army, Engineering Pamphlet ("EP") 1130-2-550, *Recreation Operations and Maintenance Guidance and Procedures* (2013), at 6-3, App'x G, *available at*: https://www.publications.usace.army.mil/Portals/76/Publications/EngineerPamphlets/EP_1130-2-550.pdf.

Thus, just like any landowner, the Corps has discretion to announce that members of the public can gather on its land. Those invitees may not have any special contractual rights like a permittee would. But no statute or regulation prevents the Corps from exercising that

discretion[6] or requires that the Corps issue a permit before doing so.

Part of the Corps's land-management authority does involve issuing or denying special use permits when members of the public request permission to hold special events on Corps property. The Secretary of the Army "may issue special permits for uses [of Corps land] such as group activities, recreation events, motorized recreation vehicles, and such other specialized recreation uses as the Secretary determines to be appropriate," for which the "Secretary may . . . collect fees." 33 U.S.C. § 2328a(a)(1), (2)(A)(i). Federal regulations further specify that "[s]pecial events" like "water carnivals, boat regattas, fishing tournaments, music festivals, dramatic presentations or other special recreation programs are prohibited unless written permission has been granted by the District Commander." 36 C.F.R. § 327.21(a). And Engineering Circular (EC) 1130-2-550, a Corps guidance document on the "Recreation Use Fee Program," defines three types of special use permits—(1) special activity permits, (2) special facility permits, and (3) special event permits—for which the Corps has authority to charge fees. ECF No. 8 §§ 1, 10(c).

However, EC 1130-2-550 does not restrain the Corps's broad discretion to let people gather on Corps land outside of the permit process. Rather, it outlines how the Corps may generate revenue through the recreational use of Corps property. The stated purpose of EC 1130-2-550 is to "establish the Recreation Use Fee Program at civil works water resources projects under the administrative jurisdiction of the [Corps]." *Id.* at § 1. EC 1130-2-550 details, among other things: (1) the types of fees available through the Recreation Use Fee Program and the Corps's statutory authority to assess such fees, *id.* at § 10; (2) how the Corps establishes fee

---

[6] The only restrictions that do exist are not relevant in this case; for example, the Corps must make project lands available regardless of race, creed, color, or national origin, 36 C.F.R. § 312.2.

rates, *id.* at § 16; (3) how the Corps collects fees, *id.* § 17; and (4) how the Corps must use the different types of fees collected through the Recreation Use Fee Program, *id.* at § 23. There is no language in EC 1130-2-550 that constrains the Corps from announcing how the public may use Corps land *outside* of the permitting process. And nowhere does EC 1130-2-550 discuss, let alone prohibit, public announcements about special use permits. Indeed, as the Court has recognized, EC 1130-2-550 does not even mandate when the Corps must issue a permit for recreational use of its land but grants the Corps "discretion to decide whether to grant or deny a special use permit." ECF No. 38 at 16.

In sum, while the Corps has authority to issue special use permits, and must follow its permitting regulations when doing so, the Corps—like other landowners—has discretion to let members of the public gather on its land without issuing a special use permit. The State has not, and cannot, identify a statute, regulation, or policy that constrained the Corps from exercising that discretion.

### C.     The September 2016 press release and November 2016 letter were discretionary announcements of policy judgment.

Without acknowledging the Corps's general discretion to allow public use of Corps land without a permit, the State then argues the Corps violated its mandatory permitting requirements by granting protesters "de facto" written permission to occupy Corps land without first issuing a special use permit. ECF No. 352 at 37, 39-40. In support of this position, the State recognizes that the Tribe submitted a permit application, but it argues that inaccuracies and omissions in that application, as well as the violent and unlawful acts of protesters, prevented the Corps from issuing a valid special use permit. *Id.* at 37-39, 42. The State further identifies three public statements—the September 9 joint statement, the September 2016 press release, and the November 2016 letter—through which the Corps allegedly allowed and

encouraged the unlawful occupation of Corps land by protesters. *Id.* at 39-40.

Those arguments do not support the State's request for summary judgment. First, the undisputed facts establish that the Corps processed the Tribe's permit application pursuant to its permitting process, thus fulfilling the only mandatory duty identified by the Court in its previous ruling on the discretionary function exception. Second, the Corps did not otherwise violate its permitting process by publicly announcing how protesters could use Corps land, since the Corps issued the September 2016 press release and November 2016 letter—the only potential liability-producing statements made by the Corps—pursuant to its discretionary authority as a landowner. Because the Corps weighed numerous policy considerations in deciding whether to exercise that discretion, the Corps's issuance of those two statements is protected by the discretionary function exception. Third, the undisputed facts show that neither the September 2016 press release nor the November 2016 letter actually encouraged the unlawful occupation of Corps land, since those statements had no impact on protesters' actions and only announced how protesters could lawfully exercise their First Amendment rights.

i.     **The Corps followed its permitting policies in processing the Tribe's permit application.**

First, the undisputed evidence shows the Corps followed its permitting policies in processing the Tribe's special use permit application and offering the Tribe a permit on September 16, 2016. The Corps first received the Tribe's request for a special use permit on August 15, 2016, after which the Corps's local project manager began processing the request. CSUMF ¶¶ 35-36. As the protests continued to grow in size and volatility, COL Henderson, personally retained ultimate decision-making authority over whether to grant a permit, "based on life, health, and safety concerns and on available information about potential extremist group involvement at these encampments." *Id.* ¶ 37.

Shortly after first requesting a special use permit, the Tribe submitted a formal permit application for a "Spiritual encampment" located "immediately north of the mouth of the Cannon Ball River." *Id.* ¶ 39. The State highlights alleged deficiencies with the formal application that, according to the State, should have precluded its approval, including: (1) an underreported number of protesters; and (2) purportedly inaccurate requests for a permit to engage in "daily prayers, ceremonies, and peaceful protest, overnight camping" when protesters were routinely engaged in "violent and unlawful protest activities." ECF No. 352 at 39, 43. But the State fails to acknowledge the undisputed facts showing the Corps had numerous conversations with the Tribe about its application, including requests for the Tribe to resolve inaccuracies in the requested location and size of the camps, and about whether and how the Tribe would comply with insurance and bonding requirements for the permit. CSUMF ¶ 41.

Following those conversations, COL Henderson offered the Tribe a special use permit on September 16, 2016, *id.* ¶ 44, the conditions of which complied with the Corps's own permitting policies. The offered permit only authorized the Tribe to gather to engage in a lawful free speech demonstration on a limited area south of the Cannonball River. *Id.* ¶¶ 44-45. The Corps also offered the permit contingent on the Tribe providing a $100,000 performance bond and a $5,000,000 insurance policy. *Id.* ¶ 46. Assuming the Tribe met these requirements and signed the permit, COL Henderson would then countersign the permit, and it would be valid for 30 days thereafter. *Id.* ¶ 47. Ultimately, the Tribe never met those permit requirements, and COL Henderson never countersigned the permit. *Id.* ¶ 52. However, the undisputed facts establish that the Corps followed its permitting policies in processing the Tribe's application

30

and offering the Tribe a permit.[7]

The Corps's compliance with its own permitting policies also undercuts the State's reliance on *Berkovitz* and *Buckler v. United States*, 919 F.3d 1038 (8th Cir. 2019). In *Berkovitz*, the Supreme Court concluded the discretionary function exception did not apply to the extent plaintiffs' claims were based upon the agency's failure to follow its regulatory standards before licensing a vaccine. 486 U.S. at 542-43. Similarly, the Eighth Circuit in *Buckler* concluded the agency did not have discretion to entirely forego a mandatory inspection of training records. 919 F.3d at 1053. Here, there is no dispute that the Corps followed its mandatory permitting procedures in processing the Tribe's application and offering it a special use permit.

> ii.   **The Corps exercised its lawful discretion to publicly announce how protesters could use Corps land after weighing numerous policy considerations.**

Second, the Corps did not violate its permitting policies by publicly announcing how protesters could use Corps land during the DAPL protests. The State identifies three statements through which the Corps purportedly allowed and encouraged protesters to remain on its land without having a valid special use permit: (1) the September 9 joint statement from the Army, DOJ, and DOI; (2) the September 2016 press release; and (3) the November 2016 letter. ECF No. 352 at 39-40. However, the Court previously identified only the September 2016 press release and November 2016 letter as written statements issued by the Corps that could potentially result in tort liability for the United States. ECF No. 38 at 15, 19. Further, the Corps

---

[7] In its order on the motion to dismiss, the Court concluded that the discretionary function did not bar the State's claims "because the Corps failed to follow a mandatory permit application process at the outset." ECF No. 38 at 22. After discovery, the opposite has proven true: Not only did the Corps receive a permit application from the Tribe, but it processed that application in accordance with EC 1130-2-550, CSUMF ¶¶ 39, 41, 44-47, thereby complying with the single mandatory duty identified by the Court, *see* ECF No. 38 at 22 ("The Corps had a process to follow when an application for a special use permit was made.").

issued the September 2016 press release and November 2016 letter pursuant to its discretionary authority as a landowner—not its regulatory authority to issue permits—after weighing numerous policy considerations. The Corps's issuance of those two statements is, therefore, protected by the discretionary function exception.

*September 9 joint statement.* In its order on the motion to dismiss, the Court identified the September 2016 press release and November 2016 letter as the only written statements granting protesters permission to occupy Corps land that could potentially result in tort liability for the United States. ECF No. 38 at 15, 19. That decision forecloses the State from now arguing the September 9 joint statement also qualifies as a potential liability-inducing written statement. In addition, it is undisputed that the joint statement was issued by three *other* agencies—the Army, the DOJ, and the DOI—and the relevant Corps personnel played no role in its issuance. CSUMF ¶¶ 31-32, 34. None of the Corps personnel with decision-making authority over how to handle the presence of protesters on Corps land were involved in the joint statement. *Id.* ¶ 34. And the State only administratively exhausted its claims against the Corps. *See* ECF No. 209 at 2-3. Therefore, the United States cannot be held liable in this suit for the conduct of any agency other than the Corps. ECF No. 280 ¶ 17. Finally, the September 9 joint statement did not grant protesters "permission" to occupy Corps land but listed steps the three issuing agencies would take in connection with the pipeline construction and stated support for the First Amendment rights of free speech and assembly. *See* ECF No. 341-17, Ex. 17 to State MPSJ. Accordingly, the September 9 joint statement is not evidence that the Corps unlawfully allowed protesters to occupy Corps land without a special use permit.

*The September 2016 press release.* The September 2016 press release was not a permit, de facto or otherwise. Rather, in issuing the September 2016 press release, COL Henderson

exercised his discretion to announce, *outside* the permitting process, how protesters could use Corps land. COL Henderson issued the September 2016 press release to inform the general public that: (1) the Corps was working through the permitting process with the Tribe; and (2) protesters could exercise their lawful First Amendment rights on Corps land, but only subject to terms and conditions. CSUMF ¶¶ 50-51. "[M]inus an executed [permit] by policy," COL Henderson considered the September 2016 press release the "next best fallback position" to communicate how members of the general public could engage in lawful free speech demonstrations on Corps-managed land. *Id.* ¶ 50.

Further, COL Henderson actually weighed policy choices in deciding whether to exercise that discretion. He considered the press release a tool to help control the situation and inform the public that the Corps would accommodate protesters' First Amendment rights within a defined area of Corps land on defined terms. *Id.* Given his understanding that no law enforcement was willing to enter Corps land and law enforcement's general de-escalatory posture, *id.* ¶¶ 16-24, the press release was an exercise of broad, congressionally bestowed discretion to operate Corps land in the public interest. 16 U.S.C. § 460d; *see also* EP 1130-2-550 at 6-3, App'x G (stating that providing an overflow area and separating different types of users are acceptable management techniques to address visitor issues).

*The November 2016 letter.* Like the September 2016 press release, the Corps issued the November 2016 letter pursuant to its discretionary authority to announce how the public can use Corps land. CSUMF ¶ 65. COL Henderson sent the letter to Chairman Archambault to "honor an area as a free speech zone to not trample on that right" while ensuring the area would be "accessible by the road and a place where [the authorities] could provide emergency services." *Id.* As stated in the letter, COL Henderson determined the closure of Corps land north

of the Cannonball River was "necessary to protect the general public from violent confrontations between protestors and law enforcement officials that have occurred in [that] area, and to prevent death, illness, or serious injury to inhabitants of encampments due to the harsh North Dakota winter conditions." *Id.* ¶ 62. Ultimately, COL Henderson authored the letter out of "genuine[] concern[] for the safety and well-being" of the Tribe and general public. *Id.*

A similar policy analysis motivated the November 2016 letter. After protest and weather conditions became increasingly difficult for the life, health, and safety of the public, COL Henderson made a policy judgment to allow protesters to gather in a free speech zone south of the Cannonball River. *Id.* ¶¶ 62-65. The letter announcing the free speech zone was designed to inform protesters of a safe space to exercise their free speech and assembly rights. *Id.*

Thus, the Corps issued the September 2016 press release and November 2016 letter in an effort to address the presence of a large, diverse group of protesters on its land through its discretionary authority as a landowner, in light of numerous policy considerations. Even if the Corps abused its discretion in issuing those two statements, its decision to do so is still shielded from liability. *See Buckler*, 919 F.3d at 1053 ("[T]he FTCA itself provides that the exception is to apply '. . . *whether or not the discretion involved be abused.*'" (emphasis in original) (quoting 28 U.S.C. § 2680(a)). And the State, operating from its misconception that the Corps has no authority to allow public use of Corps land outside the permitting process, does not address this second prong of the discretionary function exception. *See* ECF No. 352 at 44. Accordingly, it cannot carry its burden on summary judgment.[8]

      **iii.**      **The September 2016 press release and November 2016 letter did not**

---

[8] The State's contention that the Corps also violated its mandatory permitting process because the September 2016 press release misrepresented to protesters that the Corps had granted a special use permit is equally unsuccessful. ECF No. 352 at 39-40. Under 28 U.S.C. § 2680(h), the State's claims cannot "aris[e] out of . . . [a] misrepresentation."

**encourage the unlawful occupation of Corps land.**

Third, contrary to the State's assertions, the undisputed facts show that neither the September 2016 press release nor the November 2016 letter encouraged the unlawful occupation of Corps land. Rather, those statements had no impact on protesters' actions and only announced how protesters could lawfully exercise their First Amendment rights.

There is no evidence that either statement actually encouraged protesters to unlawfully occupy Corps land. To the contrary, every protester that has testified confirmed the statements had no effect on their decision to come to, remain at, or leave the protests. CSUMF ¶¶ 58-61, 74-79. In addition, state officials—including law enforcement leaders at the DAPL protests— observed that neither statement caused any change in protester activity. *Id.* ¶¶ 55-57, 71-73. And the State did not mention either statement in its after-action report on the protests. *Id.* ¶ 80. Thus, the September 2016 press release and November 2016 letter actually played no role in encouraging the unlawful occupation of Corps land.

Further, even if the State *could* show those statements affected protester activity, there is no evidence that any protester who acted in accordance with those statements committed the violent and unlawful acts described by the State. The Corps's statements offered, at most, limited permission for protesters to use a certain part of Corps land for lawful free speech activity. *Id.* ¶¶ 49, 62, 64. Those statements cannot, therefore, have given protesters permission to "occupy public lands in order to conduct unlawful and frequently violent activities," as the State argues. ECF No. 352 at 41. And the State has come forward with no evidence that any protester, violent or otherwise, knew about and acted upon either statement.

**D.    The State's alleged injuries are "based upon" other discretionary decisions about whether and how to enforce the Corps's regulations.**

Finally, even if the Corps's issuance of the September 2016 press release and November

2016 letter violated a mandatory duty, the State's claimed injuries are still "based upon" other discretionary decisions about enforcement of Corps regulations.

"The applicability of the discretionary function exception to a particular 'claim' turns on what it is 'based upon' and whether *that* specific wrongful action involves 'a discretionary function or duty.'" *Miller v. United States*, 992 F.3d 878, 887 (9th Cir. 2021) (emphasis in original) (quoting 28 U.S.C. § 2680(a)). Even if the government takes some negligent action that is not discretionary, the discretionary function exception still applies "when a robust exercise of discretion intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1285 (9th Cir. 1998). Thus, the plaintiff must show that its injury resulted directly from a negligent decision not protected by the discretionary exception function. *See Berkovitz*, 486 U.S. at 547-48 & n.13 (concluding the discretionary function exception did not apply because the agency's failure to comply with its mandatory testing procedures was alleged to have directly caused the plaintiff's harm); *see also Buckler*, 919 F.3d at 1054 (allowing a claim based on a government inspector's failure to inspect training records but "mak[ing] no comment as to the difficult issue of whether a failure to inspect training records can be shown as a proximate cause of plaintiff's injuries"); *Appley Bros. v. United States*, 164 F.3d 1164, 1173 (8th Cir. 1999) (holding that the discretionary function exception did not apply because an agency's failure to comply with its mandatory inspection regulations was a direct, but-for cause of the plaintiff's injury).

Thus, the question here is whether the State can show there was no "robust exercise of discretion" between the Corps's purported permissions (in the September 2016 press release and the November 2016 letter) and the State's harms. *Gen. Dynamics*, 139 F.3d at 1285. The State cannot meet this burden.

The State challenges the Corps's decision to allow protesters to occupy Corps land even though they were violating the Corps's Title 36 regulations, as well as the terms and conditions of any potential special use permit. ECF No. 352 at 37, 39, 40, 42. To the extent the State's claims are based upon these *other* Corps decisions regarding whether to enforce its Title 36 regulations or remove non-compliant protesters from its property, such decisions are discretionary.

First, it is undisputed that the Corps has discretion to determine the appropriate enforcement action under the laws and regulations that apply on its land. As the Court has recognized, the relevant statutes, regulations, and guidance "do not require any specific enforcement conduct by the Corps in response to . . . protesters' conduct." ECF No. 38 at 24.

Second, the Corps's discretionary decisions about how to enforce its regulations in response to the protests are susceptible to a policy analysis. Corps personnel have a limited enforcement function that is "secondary to the safety of Corps personnel, contract employees and visitors." U.S. Army Corps of Eng'rs, Dep't of the Army, Engineering Regulation (ER) 1130-2-550, *Recreation Operations and Maintenance Policies* at 6-2(b) (2013), *available at* https://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1130-2-550.pdf; *see also id.* at 6-2(e) (Corps "park rangers . . . are not law enforcement officers."), *and* 36 C.F.R. §§ 327.8, 327.26. Corps personnel have a menu of options to choose from when dealing with a violation of Corps regulations, of which issuing citations under Title 36 is only one. ER 1130-2-550 at 6-2(f). Notably, arresting people or forcibly removing them are not among the options. *See id.* at 6-2(e).

Given these considerations, the Corps routinely relies on state and local authorities for law enforcement activities on its land, as it did in this case. *See id.* at 6-2; CSUMF ¶ 15. And the

37

Corps's discretionary decision to do so clearly implicates considerations of public policy, including "competing and legitimate concerns of public safety," the prioritization of "threat[s] to public health, and the allocation of limited law enforcement resources." *Smith ex rel Fitzsimmons v. United States*, 496 F. Supp. 2d 1035, 1043-44 (D.N.D. 2007) (concluding, "as a matter of law, that decisions of Bureau of Indian Affairs law enforcement employees pertaining to the prioritization of the investigation and enforcement of laws, are directly related to policy analysis and considerations of public policy" and therefore protected by the discretionary function exception). As evidenced by the State's motion, the State's claims are really "based upon" such discretionary decisions regarding enforcement of Corps regulations. As such, the State's claims should be dismissed under the discretionary function exception.

*     *     *

In sum, after discovery, the undisputed facts shows that the September 2016 press release and November 2016 letter were discretionary announcements of policy judgment issued by the Corps as a landowner. And, even if the Corps violated a mandatory duty in issuing those two statements, the State's claims are still "based upon" other discretionary decisions about enforcement of Corps regulations. As such, the discretionary function exception bars the State's claims and the Court should reject the State's request for summary judgment on that issue.

## II.  The State has failed to establish an actionable duty stemming from the September 2016 press release or November 2016 letter.

The State also moves for summary judgment that it has established the duty element of its tort claims. ECF No. 352 at 2, 51. In its order on the motion to dismiss, the Court concluded the State's claims satisfied the FTCA's private analogue requirement because sections 318 and 838 of the Restatement (Second) of Torts are consistent with North Dakota law. ECF No. 38 at 26, 28. The State now argues the undisputed material facts satisfy the duty elements of sections 318

38

and 838 and that it is entitled to summary judgment that the duty elements of its negligence, gross negligence, third-party civil trespass, and public nuisance claims are satisfied. ECF No. 352 at 43-51. Yet, as established in the United States' motion for summary judgment, the State cannot show that North Dakota law would impose a duty on the United States here, where the undisputed material facts show nearly all of the State's damages were caused by protester conduct occurring *off* Corps-managed land. Further, even if sections 318 and 838 of the Restatement applied to the State's claims, the State has failed to show the undisputed material facts establish an actionable duty under either section. Thus, because the undisputed facts show the State cannot meet its burden—indeed, they establish the opposite, that there is no duty under North Dakota law supporting the State's claims—the Court should deny the State's motion for summary judgment on this ground.

> **A.      North Dakota law does not impose tort liability on landowners for the off-premises conduct of third parties.**

Relying on the Court's previous order, the State argues that sections 318 and 838 of the Restatement are consistent with North Dakota law and supply the necessary private analogue for its claims. ECF No. 352 at 44-46. This position, however, overlooks precedent from the North Dakota Supreme Court indicating that it would not impose a duty here, where the undisputed material facts show that nearly all of the State's claimed damages were caused by protester conduct occurring *off* Corps-managed land. CSUMF ¶¶ 89-93.

In North Dakota, whether a landowner has a duty of care to an injured party is "an initial question of law for the court." *Bjerk v. Anderson*, 911 N.W.2d 343, 348 (N.D. 2018) (citation omitted). In evaluating when landowners have such a duty, the North Dakota Supreme Court has set forth several principles that, together, make clear that a landowner is not liable to the State for the wrongful conduct of entrants occurring off the landowner's premises.

*First*, under North Dakota law, landowners generally are not liable for conduct that occurs *off-premises*. Landowners do not owe a duty where the injury occurs on property they do not control: "'Under premises liability law, a defendant must have had control over the property where the injury occurred in order to find the defendant owed a duty to an injured party.'" *Saltsman v. Sharp*, 803 N.W. 2d 553, 559 (N.D. 2011) (quoting *Groleau v. Bjornson Oil Co.*, 676 N.W. 2d 763, 768 (N.D. 2004)); *see also Holter v. City of Sheyenne*, 480 N.W.2d 736, 738 (N.D. 1992) (concluding landowner owed no duty for off-premises conduct since it had no control over "the property where the injury occurred" and declining to impose duty to mitigate dangerous off-premises conduct by asking authorities for assistance). Thus, under North Dakota law, a landowner does not have a duty to control activity off its land where the activity is not within its control—even if the landowner could ask others to take steps to control the activity.

*Second*, the North Dakota Supreme Court has indicated that a landowner cannot ordinarily be held liable for wrongful conduct by third parties unless the landowner was *itself engaged in*, or had a commercial interest in, the wrongful activity. The court addressed this question in *Bjerk*, where the parents of a man who died after consuming illegal drugs brought a negligence action against the owner of the house where the man consumed the drugs. 911 N.W.2d at 345. The owner did not reside at the house, was not present during the drug consumption, and did not engage in or profit from the conduct. *See id.* at 345, 349-50. Although the conduct was on the premises, the court declined to impose a duty on the landowner. *Id.* at 350. The court emphasized the lack of precedent for such a duty: "No case has been cited to us, and we have found none that would extend premises liability to a person in control of property *who was not engaged in the activity that caused the harm.*" *Id.* at 349 (emphasis added).

The *Bjerk* court listed several factors that informed its decision whether to impose a duty:

40

(1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost, and prevalence of insurance for the risk involved.

*Id.* at 349-50. In concluding the landowner owed no duty to prevent unlawful on-premises conduct, the court focused on the significant burdens of such a duty, observing that "the asserted duty to stop the dangerous activity of drug use by removing known or suspected drug users is a significant burden." *Id.* at 351. Imposing such a duty on landowners could lead them to refuse entry to "anyone with a history of drug use. *A landowner does not reasonably expect to become the police officer or probation officer for all who live on—or merely enter—his property.*" *Id.* (emphasis added). The court declined to create such a duty, explaining that doing so was "a policy-laden question better suited to legislative judgments." *Id.* It was not ready to "make [the landowner] a mandatory reporter of all suspected dangerous illegal activity or convert him from a landowner into something akin to a police officer or probation officer with respect to those on his property." *Id.* at 351.

The court identified other factors also counseling against requiring landowners to prevent potential unlawful conduct by third parties on the premises. Doing so could lead to the exclusion of individuals who bear even a slight chance of breaking the law. As the court explained, "the only practical response . . . [a] landowner would have in these circumstances would be to evict or otherwise remove a drug user from the property at the first sign of use." *Id.* at 352. The court also reasoned that the decedent's history of drug use was not enough to make the drug use at the house "highly foreseeable." *Id.* at 350-51 (emphasis added). It cited with approval *Castaneda v. Olsher*, 162 P.3d 610 (Cal. 2007), where that court declined to impose a duty on a mobile home park owner not to rent to gang members where "there was not such a pattern of prior similar

incidents from which the property owner should have found [a shooting] *highly* foreseeable."
*Bjerk*. 911 N.W. 2d at 350 (emphasis added). Thus, *Bjerk* demonstrates that the North Dakota
Supreme Court likely would not impose a duty on a landowner to control third-party conduct that
the landowner was not also participating in.

 *Third*, the North Dakota Supreme Court has emphasized that whether a party owes a duty
depends on the identity of the injured party, because "the plaintiff must show the defendant had a
duty to protect *the plaintiff* from injury." *Saltsman*, 803 N.W. 2d at 558 (emphasis added)
(quoting *Botner v. Bismarck Parks & Rec. Dist.*, 782 N.W. 2d 662 (N.D. 2010)). Negligence
requires "a duty on the part of an allegedly negligent person to protect the plaintiff from injury."
*Hurt v. Freeland*, 589 N.W. 2d 551, 555 (N.D. 1999) (quoting *Diegel v. City of West Fargo*, 546
N.W. 2d 367, 370 (N.D. 1996)). Here, there are no cases from the North Dakota Supreme Court
suggesting that landowners owe a common-law duty to the State, whether viewed in its capacity
as a property owner or as a law enforcement entity, to exclude or control third parties who may
engage in off-premises unlawful conduct.[9]

 *Finally*, the U.S. Supreme Court has recognized that states may not impose tort liability
in a way that intrudes on First Amendment rights, including the right to peaceable assembly. *See*
*McKesson v. Doe*, ___ U.S. ___, 141 S. Ct. 48, 51 (2020) (concluding the Fifth Circuit erred by
imposing a tort duty advising "the Fifth Circuit should not have ventured into so uncertain an
area of tort law—one laden with value judgments and fraught with implications for First
Amendment rights"); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918 (1982) (holding
that liability could be imposed only for protesters' violent actions, not for peaceful organizing or

---

[9] Nowhere has the State suggested that it is an adjoining landowner to which the United States
would owe a duty. Nor has the State articulated any reason why it should be treated like one.

picketing activities, which were protected by the First Amendment). Under that precedent, it is unlikely the North Dakota Supreme Court would impose a tort duty under these circumstances, since doing so would carry significant First Amendment concerns.

Together, these principles signal that the North Dakota Supreme Court would not find that landowners owe a duty to protect the State from injuries caused by the actions of third parties who may engage in tortious conduct off the landowner's premises—the private analogue necessary to support the State's claims. Absent that private analogue duty, the State is jurisdictionally barred from pursuing its FTCA claim against the United States and not entitled to summary judgment that it has established the duty element of its tort claims. *See Brownback v. King*, 141 S. Ct. 740, 749 (2021) ("[I]n the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional.").

**B.    The undisputed material facts do not establish an actionable duty under sections 318 and 838.**

Even if—as the State contends in its motion—sections 318 and 838 supply the necessary duty standard for the State's claim, the State cannot carry its burden to show the undisputed material facts establish an actionable duty under either section.

**i.    The State cannot show the undisputed material facts establish a negligence-based duty under section 318.**

The State argues the undisputed material facts satisfy the duty element of its negligence, gross negligence, and civil trespass claims under section 318, which states:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
> (a) Knows of has reason to know that he has the ability to control the third person, and
> (b) Knows or should know of the necessity and opportunity for exercising such control.

In support of this position, the State identifies three "prongs" of section 318, which it alleges are satisfied by the undisputed facts: (1) whether an actor "permits a third person to use lands or chattel"; (2) whether that actor "knows or has reason to know that he has the ability to control the third person"; and (3) whether the actor "knows of or should know of the necessity and opportunity for exercising such control." ECF No. 352 at 44 (quoting § 318).

Yet the State's summation of section 318 omits crucial language that limits its reach to conduct occurring *on the landowner's premises*. Section 318, by its own terms, applies when the landowner "permits a third person to use land . . . in his possession" when the landowner is "present." Restatement (Second) of Torts § 318. The comments to section 318 confirm that it applies only where the third person is *actually on* the property in the landowner's presence. Comment b states, in relevant part, that the section applies when  "the possessor of . . . land is present when . . . the activity is being carried on with his permission, and when, therefore, he not only has the ability to control the conduct of the third person as possessor, but also the opportunity to do so." *Id*. § 318 cmt. b. The comments do not suggest the landowner has a duty with respect to off-premises conduct. Similarly, the Reporter's Notes for section 318 observe that "the basis of the liability is the possessor's responsibility for what is done *upon his land*, together with the opportunity for exercising control" and point to cases involving *on-premises* misconduct. *Id*. § 318 Reporter's Notes (emphasis added).

Courts from other jurisdictions also apply section 318 to only impose a duty for on-premises conduct, explaining that, when entrants leave land, the landowner has no duty with respect to their off-premises conduct. *See, e.g.*, *Davis v. Kwik-Shop, Inc.*, 504 N.W.2d 877, 879 (Iowa 1993) (citing § 318 and explaining that once invitees leave the land, they no longer have a special relationship with the landowner, so the landowner has no duty to control their conduct);

44

*accord Chouinard v. N.H. Speedway*, 829 F. Supp. 495, 499 (D.N.H. 1993) (citing *Holter* and collecting cases for proposition that "there is no duty to protect against the negligent acts of third parties on uncontrolled public ways"). Thus, even if section 318 is considered, it would not impose a duty on the United States in this case.

Further, the State disregards undisputed material facts showing that North Dakota would not apply section 318 to impose a duty on the United States. First, while the State argues that the Corps knew that it had the "authority, obligation, and ability" to control protesters through removal or enforcement of Corps regulations, ECF No. 352 at 47, as established above, the Corps has discretion to determine any appropriate enforcement action under the laws and regulations that apply on its land. So, its decision whether to exercise those powers is protected by the discretionary function exception and cannot establish that the prongs of section 318 are met. The Corps also routinely relies on state and local authorities for law enforcement activities on its land given the limited authority its own park rangers have. *See* ER 1130-2-550 at 6-2; CSUMF ¶ 15. And, as the undisputed evidence now establishes, conditions during the protests made enforcement difficult, which contributed to the State's decision to *not* remove protestors from Corps land. CSUMF ¶¶ 13-24. Thus, the Corps's general knowledge of its enforcement authority does not, as the State contends, mean the Corps knew it could (or should) actually exercise those powers to control the protesters.[10]

Second, the undisputed facts indicate the actions the Corps did take had no impact on whether protesters remained on Corps-managed land. The protesters who testified in this case

---

[10] Indeed, the State's SUMF ¶ 69—noting that COL Henderson stated "the message . . . from the U.S. Attorney's Office" was to not "waste [the Corps's] time writing a citation" under Title 36 because the U.S. Attorney's Office "would not prosecute any citations"— undercuts the State's own assertion that the Corps had the ability to control protesters through issuing Title 36 citations. ECF No. 352 at 49.

stated they decided to occupy Corps land without considering whether the Corps granted them permission to do so. *Id.* ¶¶ 7-9. Further, neither the September 2016 press release nor the November 2016 letter—the two potential liability-inducing statements by the Corps—impacted whether those protesters remained at or left the protests. *Id.* ¶¶ 58-61, 74-79.

And the February 2017 statement discussed by the State is not, contrary to the State's assertions, proof that the Corps could have "required" protesters to leave Corps land at any time during the protests. Rather, the February 2017 letter, was: (1) issued by COL Henderson in coordination with the State after both parties decided that construction, protest, and weather conditions made it an optimal time to remove protesters from Corps land, *id.* ¶ 81-82, 84; (2) sent to Chairman Archambault on February 3, 2017, and did not require that protesters leave Corps land until February 22, 2017, *id.* ¶¶ 84-85; (3) followed by a separate emergency evacuation order issued by Governor Burgum, which also required protesters to vacate Corps land, *id.* ¶ 86; and (4) immediately enforced on February 23, 2017, by state and local law enforcement, National Guard troops, federal law enforcement from outside the Corps, and other non-Corps federal personnel, who began clearing the remaining protesters from camps, *id.* ¶ 87. Indeed, MG Dohrmann testified that it was not until the February 2017 time frame when state and local leadership began discussing the concept of clearing the camps. *Id.* ¶ 83. The coordinated removal of protesters in late-February 2017 is not, therefore, proof that the Corps knew of its ability to control protesters from the outset of the DAPL protest.[11]

---

[11] The State also faults the Corps for not making an ESF #13 request for additional federal aid or resources from other federal agencies. ECF No. 352 at 49. But, as the State notes in its own SUMF ¶ 9, the Department of Justice is "the primary agency" for ESF #13 requests. Further, the webpage cited by the State in that paragraph (https://www.fema.gov/pdf/emergency/nrf/nrf-esf-13.pdf) expressly states: "In most incident situations, *local jurisdictions* have primary authority and responsibility for law enforcement activities." (Emphasis added.) ESF #13 requests are not, therefore, evidence that the Corps knew of its ability to control protesters.

Third, the undisputed facts do not show the Corps knew of the necessity for exercising control over protesters through its discretionary enforcement authority. Contrary to the State's summary of material facts under prong three, it is undisputed that:

- Not all protest camps were on Corps land. CSUMF ¶ 5.

- During the protests, all relevant pipeline construction sites were located off Corps land. *Id.* ¶ 6.

- Not all protesters were violent; in fact, the Cass County sheriff testified that, "at the height" of the protests, "when there was over 10,000 protestors," approximately "90 percent of them were peaceful." *Id.* ¶¶ 10-12.

- The stated goal of state law enforcement was—not removal of the protesters, but—ensuring the protests remained peaceful and did not obstruct pipeline construction or the public highway. Indeed, the State pursued a strategy of nonconfrontation with protesters, because it wanted to avoid armed confrontations that could be seen as "another Wounded Knee." *Id.* ¶¶ 13-14, 16-22.

- COL Henderson's understanding from speaking with law enforcement leaders was that no local, state, or federal law enforcement agency was willing to enter Corps land to evict protesters or otherwise enforce violations of Corps regulations. *Id.* ¶ 23.

- It was COL Henderson's understanding from discussions with federal, state, and local officials that closing Corps land "would [have] put law enforcement in a terrible position." *Id.* ¶ 24.

As these facts establish, the Corps did not know of the necessity or opportunity to exercise control over the protesters by forcibly removing them (or causing them to be forcibly removed). Rather, the undisputed facts show the Corps was advised against doing so. Considering this, it is clear North Dakota would not apply section 318 to impose a duty on the United States here.

### ii. The State cannot show the undisputed material facts establish a nuisance-based duty under section 838.

The State also seeks summary judgment that the undisputed material facts satisfy the duty element of its public nuisance claim under section 838, which states:

A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and (a) the possessor knows or has reason to know that the activity is being carried on

and that it is causing or will involve an unreasonable risk of causing the nuisance, and

(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

In support of this position, the State identifies two "prongs" of that section—whether the actor: (1) knew or had reason to know that the activity is being carried on; and (2) that it is causing or will involve an unreasonable risk of causing the nuisance. ECF No. 352 at 46.

While the State makes a conclusory allegation that the undisputed facts satisfy those two prongs of section 838, it does cite any undisputed facts to support that allegation. In doing so, the State fails to carry its burden to prove the undisputed facts establish the duty element of its public nuisance claims. Accordingly, the Court should summarily reject the State's request for summary judgment on this issue.

Further, the State's summation of section 838, again, omits crucial elements necessary to impose a duty under that section. Like section 318, section 838 only imposes a limited duty on "[a] possessor of land *upon which* a third person carries on an activity that causes a nuisance . . . ." *Id.* (emphasis added). Thus, section 838 only applies where a third person carries on a nuisance-causing activity *on the landowner's property*. As explained by the comments to section 838, this is because a landowner is "normally" in a position to prevent the conduct of an entrant by virtue of the landowner's "rights in the land and his control of it." *Id.* § 318 cmt. g.

This limitation—that there is nuisance liability only for conduct *on the possessor's land*—is reflected in case law from other jurisdictions. *See, e.g.*, *City of St. Louis v. Varahi, Inc.*, 39 S.W.3d 531, 538 (Mo. Ct. App. 2001) (declining to hold hotel owner liable for prostitution that occurred on adjacent street because there was no evidence that the owners controlled the prostitutes); *Fla. Fish & Wildlife Conservation Comm'n v. Daws*, 256 So. 3d 907, 916 (Fla. Dist. Ct. App. 2018) (declining to impose duty on state agency where third parties engaged in activity

on and off agency's land in violation of agency's rules because in Florida "there is no common law duty to prevent the misconduct of third persons" (quotation marks and citation omitted)); *see also Bellflower v. Pennise*, 548 F.2d 776 (8th Cir. 1977) (finding "no case" supporting the finding that a public nuisance could be found under Missouri law based on "the continuing and repeated congregation of unsupervised trespassing young people . . . who used the property to operate their motorbikes and as a visiting place" (citation omitted)). As the Eighth Circuit explained in *Bellflower*, a landowner is not ordinarily liable for nuisance "where his property is, by the act of independent third parties, made the instrumentality of a nuisance, since their act is the proximate cause." *Id.*

The State's argument that protesters used Corps land as a "safe haven" to launch illegal protest activities *outside* Corps land does not change this analysis. The Corps gave no permission for this activity, nor is there any evidence that evicting protesters from Corps land would have stopped the activity. And, as made clear by *Bjerk*, the North Dakota Supreme Court would not apply section 838 to impose liability for such conduct that the Corps neither condoned nor participated in. 911 N.W.2d at 351 (declining to impose duty on landowner to control or report on-premises illegal conduct that landowner did not condone or participate in).[12]

Section 838 also incorporates a negligence-based duty by stating the possessor of land must "consent[] to the activity or otherwise fail[] to exercise reasonable care to prevent the nuisance." Restatement (Second) of Torts § 838(b). That standard aligns with this Court's previous determination that the State's nuisance (and trespass) claim requires a showing of negligence. ECF No. 38 at 29; *see also Kappenman v. Klipfel*, 765 N.W.2d 716, 729 (N.D. 2009)

---

[12] Indeed, at all times, the State had jurisdiction to enter Corps land to arrest protesters engaging in a criminal conspiracy if it had wanted to, but it did not do so. 36 C.F.R. § 327.26(a), (b).

(holding that where a landowner is determined to owe no common-law duty for purposes of a negligence claim, it is proper to dismiss a nuisance claim against the landowner based on the same conduct).[13] Accordingly, none of the State's claims may proceed unless it establishes the United States has a negligence-based duty under these circumstances. Since, as explained above, there is no basis in either North Dakota law or section 318 to impose such a duty on the United States, the Court cannot grant summary judgment for the State on *any* if its tort claims.[14]

*     *     *

In sum, the North Dakota Supreme Court has neither held nor suggested that a landowner owes the State a duty to either impose conditions on, or refuse to permit, unaffiliated third-party occupancy of the land to prevent harm from occurring *off* the land. As such, the State cannot show that North Dakota law would impose a duty on the United States here, and the Court should deny the State's motion for summary judgment on this ground.

**CONCLUSION**

For the reasons set forth above, and those articulated in the United States' motion for summary judgment, the Court should deny the State's Motion for Partial Summary Judgment.

---

[13] The State's argument that the "duty" involved in nuisance claims is "simply the duty not to take action or create conditions that cause a nuisance, and need not even constitute 'negligence'" directly conflicts with the Court's prior determination that it would "limit any liability" to "'negligent or wrongful' acts or omission[s] of the Corps." ECF No. 38 at 29; *see also id.* at 28-29 (concluding at pleadings stage that negligence principles in § 318 of the Restatement apply to the State's trespass claim).

[14] This principle supports dismissal of the State's nuisance claim (and its trespass claim) to the extent it is based on a failure to exclude or control third parties. As explained above, the North Dakota Supreme Court has not recognized such a duty. Nor is there a North Dakota case of which the United States is aware permitting a nuisance claim against the landowner based on a failure to control *someone else* who might cause a nuisance through conduct *off* its land.

Dated: August 4, 2023   Respectfully submitted,

COLE FINEGAN
United States Attorney, District of Colorado


*s/ Alexandra J. Berger*
Alexandra J. Berger
Timothy B. Jafek
Jane Bobet Rejko
V. William Scarpato III
Erica M. Zilioli
Special Attorneys to the United States
Attorney General
United States Attorney's Office for the
District of Colorado
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
Fax: (303) 454-0407
alexandra.berger@usdoj.gov

Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that on August 4, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to such filing to any party who has entered an appearance in this matter to the e-mail addresses provided in CM/ECF.


*s/ Alexandra J. Berger*
Alexandra J. Berger