# EXHIBIT 63

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DISTRICT

Civil No. 1:19-cv-00150-DMT-ARS,

_____

VIDEOTAPE DEPOSITION OF:
LIEUTENANT COLONEL JAMES STARTZELL
May 16, 2022
(Via RemoteDepo)

_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

_____


            PURSUANT TO NOTICE, the videotape
deposition of LIEUTENANT COLONEL JAMES STARTZELL was
taken on behalf of the Plaintiff in Fort Hood, Texas,
via remote means, on May 16, 2022, at 8:59 a.m.,
Mountain Time, before Tiffany D. Goulding, Registered
Professional Reporter and Notary Public within
Colorado, appearing remotely from Arapahoe County,
Colorado.

Lieutenant Colonel James Startzell
May 16, 2022

Page 2

```
 1              REMOTE APPEARANCES
 2   For the Plaintiff:
 3           PAUL M. SEBY, ESQ.
             Greenberg Traurig, LLP
 4           1144 15th Street, Suite 3300
             Denver, Colorado 80202
 5           sebyp@gtlaw.com
 6
     For the Defendant:
 7
             JANE BOBET, ESQ.
 8           Special Attorney to the United States
             Attorney General
 9           United States Attorney's Office
             District of Colorado
10           1801 California Street, Suite 1600
             Denver, Colorado 80202
11           jane.bobet@usdoj.gov
12
13   Also Present:
14           John Jensen, Videographer
             Erica Zilioli
15           Rachel Hymel
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Exhibit 392  E-mail to Startzell from Gaskill,     43
                  11/18/16, Subject: Can You Call Me -
 2                DAPL Talking Point
 3   Exhibit 405  E-mail to Voeller from Startzell,     97
                  3/8/17, Subject: Re: DAPL AAR
 4                Comments - Short Suspense
 5
 6   DEPOSITION EXHIBITS: (Previously marked)
 7   Exhibit 138  E-mail to Arlo, et al. from           37
                  Spellmon, 9/22/16, Subject: Re:
 8                DAPL Daily Update 22SEP16
 9   Exhibit 318  E-mail to Fink, Henderson, and        79
                  Thomas from Startzell, 9/25/16,
10                Subject: Re: LE Update on Protest
                  Camps
11
     Exhibit 344  E-mail to Kirchmeier from Hushka,     75
12                9/9/16, Subject: FW: Press Release
13   Exhibit 345  E-mail to Spellmon, et al. from       70
                  Crook, 9/12/16, Subject: Re: 1415
14                Telecon
15   Exhibit 347  E-mail to Semonite and Jackson from   88
                  Spellmon, 10/13/16, Subject: Re:
16                LTG Semonite Concern: DAPL Update
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION OF COLONEL JAMES STARTZELL:         PAGE
     May 16, 2022
 3
     By Mr. Seby                                        7
 4
     By Ms. Bobet                                     113
 5
 6                                               INITIAL
 7   DEPOSITION EXHIBITS:                       REFERENCE
 8   (Exhibits provided electronically to the reporter.)
 9   Exhibit 371 E-mail to Startzell from Henderson,   15
                 9/7/16, Subject: FWD: Request for
10               Information on DAPL, Suspense
11   Exhibit 372 E-mail to Kramer, et al. from         20
                 Janis, 9/7/16, Subject: Re:
12               Request for Information on DAPL,
                 Suspense
13
     Exhibit 375 E-mail to Williamson and O'Hara       61
14               from Startzell, 9/12/16, Subject:
                 Re: Calls (unclassified)
15
     Exhibit 376 E-mail to Roby from Startzell,        47
16               9/14/16, Subject: Re: Security
                 Office Roll (Unclassified/FOUO)
17
     Exhibit 377 E-mail to Fink, Thomas, Chipman,      32
18               Startzell, et al. from Henderson,
                 9/22/16, Subject: Re: Camp Photos
19               9/22/16 (Unclassified)
20   Exhibit 379 E-mail to Eckert Uptmor, et al. from  25
                 Henderson, 10/3/16, Subject: Re:
21               Senator Heitkamp Information
                 Request
22
     Exhibit 381 E-mail to Startzell from              86
23               Williamson, 10/11/16, Subject: DAPL
                 (Unclassified)
24
25
```

Page 5

```
 1       WHEREUPON, the following proceedings
 2   were taken pursuant to the Federal Rules of Civil
 3   Procedure.
 4            *    *    *    *    *
 5       THE VIDEOGRAPHER:  We are now on the
 6   record.  Participants should be aware that this
 7   proceeding is being recorded, and as such all
 8   conversations held will be recorded unless there is a
 9   request and agreement to go off the record.  Private
10   conversations and/or attorney-client interactions
11   should be held outside the presence of the remote
12   interface.
13       For the purpose of creating a
14   witness-only video recording, the witness is being
15   spotlighted or locked on all video screens while on
16   speaker view.  We ask that the witness not remove the
17   spotlight setting during the deposition, as it may
18   cause other participants to appear on the final video
19   rather than just the witness.  For anyone who doesn't
20   want the witness video to take up the large part of
21   your screen, you may click the gallery view button in
22   the upper right corner of the remote depo interface.
23       This is the remote video deposition of
24   Lieutenant Colonel James Startzell being taken by
25   counsel for the plaintiff.  Today is May 16, 2022, and
```

Lieutenant Colonel James Startzell
May 16, 2022

Page 6

1 the time is 3 p.m. UTC, 10 a.m. Central.  We are here
2 in the matter of State of North Dakota versus the
3 United States of America.
4           My name is John Jensen, remote video
5 technician on behalf of U.S. Legal Support.  I am not
6 related to any party in this action, nor am I
7 financially interested in the outcome.  At this time
8 will the reporter, Tiffany Goulding, on behalf of U.S.
9 Legal Support please swear -- or please read the
10 statement for remote proceedings into the record.
11           THE REPORTER:  The attorneys
12 participating in this deposition acknowledge that I am
13 not physically present in the deposition room and that
14 I will be reporting this deposition remotely.  They
15 further acknowledge that, in lieu of an oath
16 administered in person, the witness will verbally
17 declare his testimony in this matter is under penalty
18 of perjury.  The parties and their counsel consent to
19 this arrange and waive any objections to this manner
20 of reporter.
21           Please indicate your agreement by stating
22 your name and your agreement on the record.  Mr. Seby
23 first.
24           MR. SEBY:  Paul Seby.  Yes, I agree.
25           THE DEPONENT:  James Startzell.  I agree.

Page 7

1           MS. BOBET:  Jane Bobet.  I agree.
2           THE REPORTER:  Lieutenant Startzell, I
3 will also ask you to agree and declare that the
4 testimony you are about to give will be under the
5 penalty of perjury.
6           THE DEPONENT:  Yes, I understand.
7           LIEUTENANT COLONEL JAMES STARTZELL,
8 having verbally declared that his testimony in this
9 matter is under penalty of perjury, testified as
10 follows:
11                EXAMINATION
12 BY MR. SEBY:
13      Q.   All right.  Good morning, Colonel
14 Startzell.
15      A.   Good morning.
16      Q.   Good to see you again.  This is your
17 second deposition.  And as the first, my name is Paul
18 Seby.  I'm both an attorney with the law firm of
19 Greenberg Traurig and a Special Assistant Attorney
20 General for the State of North Dakota.  And today I'll
21 refer to North Dakota as "the state" or "North
22 Dakota."  Do you understand that you have been sworn
23 in this morning?
24      A.   Yes.
25      Q.   Okay.  Please state your full name again

Page 8

1 for the record.
2      A.   James Thane Paulding Startzell.
3      Q.   Thank you.  Before we begin, like last
4 time, let's just go over a few ground rules, if we
5 may, for the deposition, most of which are intended
6 just to help the court reporter take down everything
7 we say, which is being written down and videotaped.
8 Because of that, just to please ask you to verbalize
9 your responses with a yes or a no or other answer as
10 opposed to just nodding your head up and down or side
11 to side.  Also, no shorthand "uh-huh" or "huh-uh," if
12 that's acceptable to you.
13      A.   I understand.
14      Q.   Likewise, it's difficult for the court
15 reporter to take down what you are saying -- what we
16 are saying if we happen to be inadvertently talking
17 over each other.  So I'll do my best not to interrupt
18 you if you would do the same.
19           And if you need a break, just please let
20 me know.  And if there's a question pending, please
21 just answer it first.  Then we can take a break.  And
22 let's plan on maybe a break every hour or so.  This is
23 a four-hour deposition today.  So we will be moving
24 quickly, and breaks to a minimum, if we could.
25           If you don't understand a question I've

Page 9

1 asked, just let me know.  I'll repeat it or rephrase
2 it and do my best to clarify what I'm trying to ask
3 you.  And if you understand -- if you don't understand
4 a question, I'm going to ask you just to clarify it,
5 if you would.  And if you answer a question I've
6 asked, I'm going to assume that you have understood
7 that question that I'm asking, if that's understood.
8      A.   I understand.
9           MS. BOBET:  I'll just note -- I'm sorry.
10 I don't mean to interrupt.  I think you said this is
11 four hours.  I believe it's three, just so we're all
12 on the same page.
13      Q.   (BY MR. SEBY) And is anyone in the room
14 with you, Colonel?
15      A.   No.
16      Q.   And if you'd just please turn off
17 electronic devices so you're not distracted, that
18 would be great.  Thank you.  And do you have any
19 documents in front of you?
20      A.   No.  Just a little notepad.
21      Q.   Sure.  Okay.  Just the last couple of
22 things, do you understand that you're obligated by
23 oath to tell the truth today?
24      A.   Yes.
25      Q.   All right.  Colonel Startzell, what did

Lieutenant Colonel James Startzell
May 16, 2022

Page 10

1   you do to prepare for your deposition today?
2       A.   So Jane Bobet and I met on Thursday of
3   last week for about an hour to discuss the upcoming
4   deposition.
5       Q.   Did you meet in person or remotely?
6       A.   Remotely.
7       Q.   Okay.  Did you meet with anyone else?
8       A.   Erica Zilioli was on the line as well.
9       Q.   Okay.  Any other times besides that one
10  preparation session?
11      A.   No.
12      Q.   Okay.  Did you talk to anyone else other
13  than your counsel after your first deposition?
14      A.   No.
15      Q.   Are you aware, Colonel, that after your
16  first deposition that North Dakota has taken the sworn
17  deposition of the following core individuals:  Eileen
18  Williamson, Eric Stasch, Colonel John Henderson, and
19  General Scott Spellmon?
20      A.   Yes.  Jane Bobet told me that last week.
21      Q.   Okay.  And have you had any communication
22  with any of those individuals since your first
23  deposition?
24      A.   No.
25      Q.   I'm sorry?

Page 11

1       A.   No.
2       Q.   Did you review any documents prior to
3   today's deposition?
4       A.   I reviewed my deposition from the last
5   time.
6       Q.   Okay.  Did you review the transcript of
7   your deposition by yourself or with your attorneys?
8       A.   I reviewed it by myself.
9       Q.   Okay.  After your first deposition, did
10  you do any research about the issues in this case?
11      A.   I did look at the latest news on the
12  status of the case, but I think that was it.
13      Q.   And what news are you referring to?
14      A.   So the Corps of Engineers sends out a
15  daily summary of news, nationwide news.  And so I
16  looked at the next few daily updates that came out to
17  see if there were any updates about the status of the
18  DAPL case.
19      Q.   Do you recall which daily reports you
20  reviewed?
21      A.   No.
22      Q.   Were they recent?
23      A.   No.  They were -- this was back when we
24  first did the deposition.
25      Q.   And so as the court reporter indicated,

Page 12

1   like your first deposition in this case, this
2   deposition today pertains to North Dakota's case
3   against the United States under the Federal Tort
4   Claims Act involving $38 million in damages that North
5   Dakota seeks to recover as a result of the Corps' and
6   other federal official's actions associated with the
7   protests against the Dakota Access Pipeline.  Do you
8   understand that?
9       A.   Yes.
10      Q.   Colonel, are you still stationed at Fort
11  Hood, Texas?
12      A.   Yes.
13      Q.   Has your address changed since your first
14  deposition?
15      A.   No.
16      Q.   Has your position with the army changed
17  since your first deposition?
18      A.   Yes.
19      Q.   In what regard, sir?
20      A.   So when we last met I was a battalion
21  commander and I recently gave up my command.
22      Q.   And what does that mean in terms of a
23  transition?  Did you transition to some other
24  responsibility?
25      A.   I gave up the command to an incoming

Page 13

1   officer and I'm preparing to move.  So that's why I
2   gave it up.
3       Q.   Do you know where you'll be moving?
4       A.   Yes.
5       Q.   And where is that?
6       A.   To Stuttgart, Germany.
7       Q.   Will you be taking a new post?
8       A.   Yes.
9       Q.   And what is that?
10      A.   It's on the staff of the European
11  command.
12      Q.   With the Corps or with the Department of
13  the Army?
14      A.   It's a joint headquarters under -- yeah.
15  Department of the Army, joint headquarters, though.
16      Q.   Including the Corps?
17      A.   The Corps of Engineers is not really
18  involved in it.
19      Q.   And so what does joint command mean?
20  Army and who else?
21      A.   What that means is it's a multiservice,
22  so army, navy, and air force.
23      Q.   I see.  Is there a time period that
24  you'll be in that position?
25      A.   I will start in that position on July 6.

Lieutenant Colonel James Startzell
May 16, 2022

Page 14

1      Q.   And the time period for the position was
2   the question.
3      A.   Yeah.  It's unclear, but I think it
4   should be around two years.
5      Q.   I see.  Okay.  So you'll be in Germany
6   for that period of time?
7      A.   Yes.
8      Q.   Okay.  Let's see.  So turning to the DAPL
9   protests and your role in the Corps, let's start with
10  just asking you to speak to your understanding of the
11  purpose of Corps-managed lands that are part of the
12  Oahe project?
13     A.   Can you elaborate on that?  What is --
14     Q.   I'm asking what your understanding of the
15  Corps lands, lands that the Corps is responsible for,
16  is in connection with what is referred to as "the Oahe
17  project."
18     A.   Yeah.  So the Corps-managed lands are
19  lands where the Corps owns and manages the land on
20  behalf of the government for the purposes of the
21  project.
22     Q.   And what is the Oahe project's purpose?
23     A.   Yeah.  In this case the Oahe project has
24  eight authorized purposes by congress to include flood
25  risk reduction, water supply, recreation, and several

Page 15

1   others.
2      Q.   And your understanding of the others is
3   available or not?
4      A.   I'd have to go back through the list, but
5   those are the three that come to mind most readily.
6      Q.   Are there lands associated with the water
7   aspect of the project?
8      A.   Yes.  So the lake itself is part of the
9   project and the land under the water, and it also
10  includes flowage easements that account for the
11  changing elevation of the lake and then other areas
12  around the project that are necessary to maintain it.
13         (Deposition Exhibit 371 was remotely
14  introduced and provided electronically to the court
15  reporter.)
16     Q.   Okay.  So we're going to go through a
17  number of exhibits this morning, Colonel.  And if we
18  could turn to -- the first one is Exhibit 371.  And,
19  Colonel, this is an e-mail chain.  It's got two parts.
20  The first one is an e-mail from Mark Kramer.  Do you
21  recognize that individual?  If you go down to the
22  bottom, please, the start of it.  Pardon me.  It's
23  actually three e-mails on this chain.  I misspoke.
24         MR. SEBY:  The very bottom one, if you
25  could blow that up, Rachel, the bottom one.  It starts

Page 16

1   "Larry."
2      Q.   (BY MR. SEBY) Colonel, do you know Mark
3   Kramer?
4      A.   I do remember his name, but I don't
5   remember a lot of details about him.
6         MR. SEBY:  Rachel, if we could go one or
7   a couple of lines below Mark Kramer's name at the
8   bottom.
9      Q.   (BY MR. SEBY) What is the Northwest
10  Division/Ocean Division Regional Integration
11  Team Headquarters, U.S. Army Corps?
12     A.   Yeah.  So that is what we colloquially
13  refer to as the RIT, R-I-T, regional integration team.
14  And that is a liaison that sits in the headquarters of
15  the Corps of Engineers.
16     Q.   A liaison to what?
17     A.   In his case, the liaison to the
18  northwestern division.
19     Q.   Okay.  And who does he report to?
20     A.   I believe he's responsible to the
21  northwestern division leadership.
22     Q.   And who would that be at this period of
23  time in 2016, September?  Would that be Spellmon?
24     A.   That would be General Spellmon and
25  Colonel Becerro.

Page 17

1      Q.   Becerro.  And does he have a counterpart
2   to report to in headquarters as well?
3      A.   I believe he worked closely with any
4   personnel in the headquarters USACE that he needed to
5   interface with, yes, but I don't know who that was.
6      Q.   So looking at his e-mail here, if you
7   could please take a moment and read that, that would
8   be great.
9      A.   Okay.
10     Q.   So he says in -- this e-mail is to Larry
11  Janis in the Corps.  And he says in the e-mail, "We
12  are looking to gather some information related to the
13  DAPL protests that are current occurring at the Lake
14  Sakakawea/Garrison project area."
15         Who do you think he's referring to when
16  he says "we are looking"?
17         MS. BOBET:  Objection; calls for
18  speculation, foundation.  You can answer.
19     Q.   (BY MR. SEBY) If you know.
20     A.   I would assume he's talking about the
21  regional integration team at headquarters.
22     Q.   So this is a, you think -- in your
23  opinion, is this an inquiry that's coming from the
24  headquarters of the Corps?
25         MS. BOBET:  Objection; calls for

Lieutenant Colonel James Startzell
May 16, 2022

Page 18

1  speculation.
2         Q.   (BY MR. SEBY) Please answer the question.
3         A.   Yes, that would be my guess, that he is
4  trying to gather information to provide to
5  headquarters on behalf of the northwestern division.
6         Q.   Okay.  And when he's talking about
7  protests -- DAPL protests currently occurring at the
8  Lake Sakakawea/Garrison project area, do you think
9  he's intending to refer to the Oahe project?
10             MS. BOBET:  Objection; calls for
11  speculation.
12        A.   I don't know.  I'm not sure if he had
13  gotten news about protests at Lake Sakakawea or if he
14  was referring to Oahe.
15        Q.   (BY MR. SEBY) Would you take a look at --
16  if you've read it already, great; if not, please do --
17  the questions he poses below.  There's three of them.
18        A.   Yes.
19        Q.   Have you read those?
20        A.   Yes.
21        Q.   So based upon his questions, do you think
22  he's referring to anything other than the Oahe
23  project?
24             MS. BOBET:  Objection; calls for
25  speculation.

Page 19

1         A.   I'm not aware of any other protests at
2  Lake Sakakawea.
3         Q.   (BY MR. SEBY) The question, sir, was are
4  you thinking this could pertain to any other area
5  besides the Oahe project?
6              MS. BOBET:  Same objection.
7         Q.   (BY MR. SEBY) Your answer?
8         A.   No.
9         Q.   Okay.  So this e-mail then was forwarded
10  on to you at the top there from Colonel Henderson on
11  September 7.  Do you see that?
12        A.   Yes.
13        Q.   And what does FSYA mean?
14        A.   That stands for for your situational
15  awareness.
16        Q.   Okay.  Do you know why Colonel Henderson
17  was sending this to you?
18        A.   Probably just to make sure that I was
19  aware of the conversation between some others.
20        Q.   Okay.  What did you do to provide input
21  on the responses from Mark Kramer below to Larry
22  Janis?
23        A.   I don't remember.
24        Q.   You don't remember doing anything or you
25  don't remember what you did?

Page 20

1         A.   I don't remember what I did in relation
2  to this particular e-mail.
3         Q.   Do you recall receiving the e-mail?
4         A.   No.
5              (Deposition Exhibit 372 was remotely
6  introduced and provided electronically to the court
7  reporter.)
8         Q.   So if we could go to the next exhibit,
9  which is 372.  So this is a two-part chain e-mail.
10  The first of the e-mail is the same beginning e-mail
11  from Mark Kramer to Larry Janis.  And an individual
12  who was copied on that chain is Mark -- pardon me.
13  Larry Janis responded to Mark Kramer and added a few
14  people, including yourself.  Do you see that there on
15  the top e-mail?
16        A.   Yes.
17        Q.   Okay.  Have you read that e-mail from
18  Larry Janis to Mark Kramer?
19        A.   Yes.
20        Q.   Okay.  So just a moment ago you told me
21  you don't recall what you did in response, but I just
22  want to point out this e-mail, which was the same day
23  an hour or two later.  And so Larry Janis is saying to
24  Mark Kramer, "It would be best to provide one
25  response."  We received this a couple different spots.

Page 21

1  Colonel Henderson got it.  And so he's adding you to
2  this with the message, "I have copied our Deputy,
3  Major Startzell who is head -- who is leading the
4  response effort, so he can include you on his
5  response."
6              Did you respond to this e-mail or the
7  questions from Mr. Kramer?
8         A.   I don't remember.
9         Q.   You were leading the response effort,
10  though; right?
11        A.   So I think what Larry Janis is referring
12  to, and in our last deposition what I explained was, I
13  would on a daily basis get the team together to
14  synchronize what information had come out.  And then I
15  would provide summaries to the headquarters about the
16  latest information.  So I assume that is what he's
17  talking about.
18        Q.   Okay.  So with respect, though,
19  separately to the questions that Mr. Kramer has asked
20  of Larry Janis that Janis is responding to, you see
21  those questions there below?
22        A.   Yes, I saw them.
23        Q.   Okay.  What do you think the answers to
24  these questions were, if you don't recall what you
25  did?

Lieutenant Colonel James Startzell
May 16, 2022

Page 22

1     A.   So are you asking me to recount what I
2  think I wrote back, if I wrote something back?  Are
3  you asking me my current understanding?
4     Q.   Well, as of September 7, 2016, what do
5  you recall your understanding of the response to those
6  questions, whether you did or not?
7     A.   So I do not recall what I answered back
8  with at that time.
9     Q.   Okay.  Then what do you think the answers
10 were, whether you responded or not?  Number one, let's
11 take one at a time.  What was your thought in response
12 to No. 1, if you don't know whether you responded or
13 not?
14    A.   So I think I had become aware that there
15 were protesters gathering on Corps-administered lands,
16 yes.  At that time I don't know if I understood
17 whether or not they were on grazing lands or lands
18 covered under a grazing lease.
19    Q.   So you knew they were on Corps land, you
20 just didn't know where?
21    A.   Right.
22    Q.   Let's look at No. 2.
23    A.   No. 2, I do not recall if I was aware
24 that they were intent on building structures.  So I
25 don't have a recollection of at that time what I knew

Page 23

1  about that effort.
2     Q.   And No. 3?
3     A.   No. 3, I do not recall if -- I don't
4  think we saw this as a safe haven for the protests,
5  but I don't know at the time what I understood.
6     Q.   So, Colonel, would you describe your
7  position with the Corps with respect to the protests
8  against the Dakota Access Pipeline for the period of
9  March 2016 to March 2017?
10    A.   Yes.  So at that time I was the deputy
11 commander and chief of staff.  And so my daily
12 activities related to the Dakota Access Pipeline
13 protests would be coordinating efforts with our field
14 offices, trying to gather the latest information that
15 we had on the situation, providing that information to
16 the commander for decision-making, and providing that
17 information to our headquarters for awareness and
18 decision-making.
19    Q.   Okay.  When you say you gathered daily
20 information to inform the Corps, what -- where did you
21 gather information from?
22    A.   So I gathered it largely from our field
23 office reports, occasionally from integration with the
24 North Dakota Emergency Operations Center, sometimes
25 from contact with the sheriff of Morton County, and

Page 24

1  then sometimes through my security office, who was in
2  contact at times with other security entities.  And
3  then we would also monitor the news to see what the
4  news was telling us so that we could confirm or deny
5  what was in the news.
6     Q.   When you say -- in one of the five
7  sources of information you mentioned the Corps field
8  office reports.  Can you elaborate on what you mean by
9  that?
10    A.   Our primary conduit for information was
11 the Oahe project and the Oahe project manager, Eric
12 Stasch.  And so he was the one most closely on the
13 ground there with the events as they were unfolding.
14    Q.   Okay.  How about the Corps security
15 office?  Can you describe that?
16    A.   Yeah.  So my Corps security manager
17 Mr. Roger Roby was in contact with local law
18 enforcement, and the North Dakota EOC on a weekly
19 basis.  About a weekly basis he was in contact with
20 them.
21    Q.   Okay.  And how was he in contact with
22 them?
23    A.   There was a web tool where local law
24 enforcement reports were published, and so he would
25 see the updates to that information as it was

Page 25

1  published.  And I believe he also actually called the
2  North Dakota EOC at times and called the local law
3  enforcement, when appropriate.
4          (Deposition Exhibit 379 was remotely
5     introduced and provided electronically to the court
6     reporter.)
7     Q.   Okay.  If we could turn to Exhibit 379,
8  please.  Colonel, will you take a minute and read this
9  e-mail chain.  It's got several parts.  I apologize.
10 This is how your counsel provided it.  It's got four
11 different e-mails in this chain here.
12          If you would go to the beginning, which
13 is the way this is structured, it's the back one from
14 Kayla Eckert Uptmor with the Corps to Colonel
15 Henderson.  And there's an e-mail or three that are
16 not sent to you.  You're added later.  And I'll let
17 you have a look to see that in a moment.
18    A.   Let me see if I can move this.  The
19 window is partially covering the e-mail.  So I'm going
20 to see if I can move it.  Okay.  There we go.  Okay.
21    Q.   Great.  Have you read the whole -- read
22 the whole chain.  Just let us know when you need to
23 move up one.
24    A.   Okay.  So I just read that first one.
25    Q.   Keep going.

Lieutenant Colonel James Startzell
May 16, 2022

Page 26

1    A.   Keep going up, please.  Okay.  Keep
2  going.  Okay.  Stop there, please.  Thank you.  Okay.
3  All right.  I'm reading the top e-mail now.
4    Q.   Great.
5    A.   Okay.
6    Q.   Are you done?  You're done reading the
7  whole chain?
8    A.   Yes.
9    Q.   Okay.  I just want to ask you about the
10  Colonel Henderson e-mail to Kayla Eckert Uptmor with
11  the Corps where he added you to this entire string.
12  Do you see that?
13    A.   I'm trying to see where I was added.
14    Q.   It's the top e-mail, right there at the
15  top.  You're in the cc list, if you see --
16    A.   I see that.
17    Q.   Okay.  So are you familiar with what
18  Colonel Henderson is talking about in this e-mail?
19    A.   I can vaguely remember this situation,
20  yes.
21    Q.   Okay.  Can you elaborate on what you read
22  here and talk about what Henderson is referring to as
23  "the Chairman and I"?  Is he referring to Chairman
24  Archambault of the Standing Rock Sioux Tribe?
25    MS. BOBET:  Objection; compound, calls

Page 27

1  for speculation.  You can answer.
2    A.   Yes, I believe that's who he's referring
3  to.
4    Q.   (BY MR. SEBY) And what does he mean by
5  tribal led migration off of U.S. Army Corps of
6  Engineers-managed land?
7    MS. BOBET:  Objection; calls for
8  speculation.
9    A.   I believe what he's referring to is he
10  was trying to get the tribe leadership to support
11  moving any protesters off of USACE-managed land onto
12  tribal-owned land.
13    Q.   (BY MR. SEBY) Just certain kinds of
14  protesters or everybody?
15    A.   I don't remember if there were any
16  particulars discussed, but I would guess the goal was
17  to move everybody.
18    Q.   And when he says, "We have made great
19  progress on this, the SRST Council has decided to
20  support this," what "great progress" is he referring
21  to, if you know?
22    MS. BOBET:  Objection; calls for
23  speculation.
24    A.   I don't know in detail what he's -- what
25  progress he's referring to.

Page 28

1    Q.   (BY MR. SEBY) And what does he mean by
2  "the SRST Council has decided to support this," if you
3  know?
4    MS. BOBET:  Same objection.
5    A.   I don't know.
6    Q.   (BY MR. SEBY) Come down, if you would, to
7  the third paragraph.
8    A.   Okay.
9    Q.   And the second sentence, Colonel
10  Henderson says, "If his campers perceive that he is
11  buckling to Corps or State pressure, then the
12  Tribal-led idea will likely fail."  What is he talking
13  about?
14    MS. BOBET:  Objection; calls for
15  speculation.
16    A.   My guess is he was referring to campers
17  that were sponsored by or were tribal members for the
18  Standing Rock Sioux Tribe.
19    Q.   (BY MR. SEBY) Just those people?
20    A.   That would be my guess.
21    Q.   What does it mean for him to say "his
22  campers," if they're on Corps land?
23    MS. BOBET:  Objection; calls for
24  speculation.
25    A.   I don't know.

Page 29

1    Q.   (BY MR. SEBY) Okay.  And then next
2  sentence, "This will cause us to actually go through
3  with an eviction notice and a court-ordered removal
4  which is something that we are trying to avoid," what
5  is that all about, in your opinion?
6    MS. BOBET:  Objection; calls for
7  speculation.
8    A.   So my guess would be at the time we were
9  trying to balance the free speech of the protesters
10  with the need to keep them from trespassing.
11    Q.   (BY MR. SEBY) Keep them from trespassing,
12  or were they already doing that because they were on
13  Corps land?
14    A.   Yes, technically they were.
15    Q.   They were what?
16    A.   Trespassing.
17    Q.   Why do you say that?
18    A.   Because they did not have a permit to be
19  on the land and were using it for purposes other than
20  the normal recreation purposes.
21    Q.   And what do you mean by that?
22    A.   Well, normally people would go to the
23  lake to use the boat slips or to do some kind of
24  temporary camp, you know, the duration, like a day or
25  so, but it was clear that they didn't intend on using

Lieutenant Colonel James Startzell
May 16, 2022

Page 30

1   it for those normal purposes.
2        Q.   Why do you say that?  Because you
3   observed them doing things other than those normal
4   purposes?
5        A.   Well, so our understanding was they were
6   there to protest the Dakota Access Pipeline, so yes.
7        Q.   And at this point on October 3, protests
8   had been going on Corps property for almost two months
9   by now, hadn't it?
10       A.   I don't remember the start, but it had
11  been several weeks at least, yes.
12       Q.   Those folks, many of them had been there
13  for several weeks without a permit already at this
14  point; right?
15       A.   Yes, I believe that's accurate.
16       Q.   Okay.  If we could go on to talk about --
17  when did you first learn that the DAPL protesters were
18  physically present on Corps property?
19            MS. BOBET:  I'll just object here, lodge
20  an objection to this line of questioning which we
21  covered in Lieutenant Colonel's last deposition.  So
22  I'll object to it as asked and answered, as well as
23  outside the limited scope of this reopened deposition,
24  which was just to address newly produced materials
25  after that full-day deposition we already had with

Page 31

1   this witness.
2            MR. SEBY:  If we're going to have a
3   debate, I'll go off the record so we don't waste my
4   time.  But I'm talking about topics that are related
5   to the documents that were produced after his first
6   deposition.  And I'm not replowing old ground.  It
7   wastes my time to do that.  So I have no incentive or
8   interest in doing that, Ms. Bobet.
9            MS. BOBET:  I've lodged my objections.
10  I'm not instructing the witness not to answer your
11  question, but I'm entitled to make my record and I'm
12  doing that.
13            MR. SEBY:  And that's fine.  I'll just
14  ask you on the record not to waste my time anymore.
15            MS. BOBET:  I don't agree that I've
16  wasted your time at all, but let's proceed.
17       Q.   (BY MR. SEBY) Please answer the question,
18  Colonel.
19       A.   So I think based on the last deposition,
20  I think what I remember is sometime in August I
21  learned that there were protesters encamped on Corps
22  land.
23       Q.   Okay.
24       A.   Maybe as late as -- or as early as late
25  July, but definitely by August.

Page 32

1        Q.   How did you learn, Colonel?
2        A.   I don't remember the way the report came
3   to me, but it was reported either through the project
4   office or through local law enforcement, something
5   like that.
6        Q.   Okay.  Do you recall who you told when
7   you first learned that?
8        A.   I don't recall, no.
9        Q.   Do you know, Colonel, or do you recall
10  when the DAPL protesters started camping overnight on
11  Corps lands?
12       A.   No, I don't know.  I don't distinguish
13  between overnight and just camping in general.
14            (Deposition Exhibit 377 was remotely
15  introduced and provided electronically to the court
16  reporter.)
17       Q.   If we could go to Exhibit 377, please.
18            MS. BOBET:  So I'll just note here this
19  exhibit was produced before Lieutenant Colonel
20  Startzell's prior full-day deposition.  So, again, on
21  the basis of the limited scope of this reopened
22  deposition, we'll lodge an objection to this exhibit
23  and related questions.
24            MR. SEBY:  Are you done?
25            MS. BOBET:  Just for the record, we

Page 33

1   received the potential exhibits to be used today this
2   morning shortly before the deposition.  So we haven't
3   had an opportunity to go document by document, but I
4   just want to lodge that objection.  But with that, you
5   can ask your questions.
6        Q.   (BY MR. SEBY) Colonel, if you'd please
7   look at this e-mail, which is a five-part e-mail.
8   It's a page and a half.  So it will go quickly.
9        A.   Okay.  I'm looking at the -- okay.  Is
10  that the bottom that's the first in the chain?
11       Q.   The first one is from Tonya Jahner with
12  Cass County, North Dakota, to a number of federal and
13  state representatives.  There's FBI people, DOJ, and
14  Kyle Kirchmeier.  It's a camp photo and the text of
15  the e-mail simply says "Items of note:  Road grater
16  building roads on core land and tactical looking van."
17  And this is September 22, 2016.  Do you see that?
18       A.   Yes.
19       Q.   Okay.  And then that e-mail is forwarded
20  by one of the recipients, Lynn Woodall with Morton
21  County, to a Corps individual, Todd Lindquist.  Do you
22  know Mr. Lindquist?
23       A.   Yes.  I believe he was the manager of the
24  Garrison project --
25       Q.   Okay.

Lieutenant Colonel James Startzell
May 16, 2022

Page 34

1    A.    -- in North Dakota.
2    Q.    All right.  And Mr. Lindquist forwarded
3 it on to Keith Fink.  Do you know Mr. Fink?
4    A.    Yes.
5    Q.    And he is?
6    A.    Keith Fink was the chief of the
7 operations division in our district.
8    Q.    Okay.  In the Omaha district?
9    A.    Correct.
10   Q.    Then Mr. Lindquist says to Mr. Fink,
11 Sheriff Danzeisen called to ask me if I was aware the
12 folks at the demonstration were building a road at
13 their campsite?  I told him that the permit I saw, and
14 the letter forwarding the permit, made it clear that
15 the tribe was not to build any structures on Corps
16 owned property without prior approval of the
17 Commander.  Do you see that?
18   A.    Yes.
19   Q.    Do you know as of September 22 what
20 permit he's referring to?
21        MS. BOBET:  Objection; calls for
22 speculation.
23   A.    No, I don't.  I don't recall a permit for
24 that.
25   Q.    (BY MR. SEBY) Okay.  It's a

Page 35

1 Corps-to-Corps communication, so I'm assuming he's
2 referencing a Corps permit of some kind.  Do you
3 disagree with that?
4        MS. BOBET:  Objection; calls for
5 speculation.
6    A.    Yeah.  I would guess yes, but I don't
7 recall it, a permit.
8    Q.    (BY MR. SEBY) So Mr. Lindquist -- I'm
9 sorry.  Mr. Fink then forwarded that e-mail -- this
10 whole e-mail string on to you, to a couple people,
11 Colonel Henderson and others, including yourself.  Do
12 you see that?
13   A.    Yes.
14   Q.    And Mr. Fink said Todd Lindquist of the
15 Corps "has forwarded the attached photos from the DAPL
16 protest camp showing road construction underway."  Do
17 you have any reason to believe that that's not road
18 construction on Corps property?
19   A.    No.
20   Q.    And then that e-mail, which was of course
21 sent to Colonel Henderson and you, was responded to by
22 Colonel Henderson, copied to you on that response.
23 And he thanks Mr. Fink and he says, "Any
24 recommendations on how to handle this."
25        Did you provide any suggestions to

Page 36

1 Colonel Henderson on how to handle this, being the
2 photo proof of road construction on Corps property?
3    A.    I don't recall.
4    Q.    Okay.  You were the deputy district
5 commander; right?
6    A.    Yes.
7    Q.    Was this a low-priority topic on your
8 radar at the time or was it a big deal?
9    A.    I would say this was of concern, yes.
10   Q.    Do you recall doing anything in response
11 to this e-mail or just reading it and moving on?
12   A.    Well, so as I said, I was in charge of
13 getting the team together to gather information on a
14 daily basis or at least a biweekly basis, but I don't
15 recall specific to this e-mail what actions I took.
16   Q.    How about specific to the fact that you
17 received a report that people were building roads
18 using a road grader on Corps of Engineer's property
19 and, as you've said, nobody had a permit to do that?
20   A.    Yeah.  I don't recall exactly what
21 actions I took based on that information.
22   Q.    Do you recall doing anything at all?
23        MS. BOBET:  Objection; asked and
24 answered.
25   A.    Yeah.  I don't recall what actions I took

Page 37

1 based on this information.
2    Q.    (BY MR. SEBY) Okay.  All right.  Well,
3 let's move on to Exhibit 138, please.  This is an
4 e-mail from -- it's an e-mail chain and it starts
5 with -- it's two e-mails.  The first one is from you,
6 Colonel, to a large number of Corps individuals, which
7 include Colonel Henderson, your boss, and Colonel
8 Henderson's boss, Brigadier General Spellmon.  And
9 you're giving a report entitled "DAPL Daily Update,"
10 September 22, 2016.  And the update for today follows.
11 Is this an example of one of your daily updates to a
12 large group of people --
13   A.    Yes.
14   Q.    -- in the Corps?
15        All right.  And if we could look at
16 No. 4, please, of your report, item No. 4.
17   A.    Okay.
18   Q.    "Omaha District confirmed that there are
19 no law enforcement contracts in place with Morton
20 County (Only with Burleigh County, which is farther
21 north and across the river)."
22        Why were you providing that point of
23 information to your Corps colleagues?
24   A.    So that they understood what law
25 enforcement capabilities we had in place at that

Lieutenant Colonel James Startzell
May 16, 2022

Page 38

1 project site.

2     Q.   Well, that's not what your sentence is
3 about.  There's no law enforcement contracts in place
4 with Morton County.  What would have been a law
5 enforcement contract?

6     A.   So some of the project sites would pay
7 the local police to have them patrol more often along
8 the recreation site areas, especially in times of high
9 traffic like in the summer when there were a lot of
10 personnel using the lake facilities.

11     Q.   And why would you tell this group about
12 that, that you didn't have a contract for local law
13 enforcement to conduct patrols of the Oahe project
14 area?

15     A.   I think probably so that they understood
16 that our ability to cite personnel was going to be
17 limited to our park rangers.

18     Q.   What does local law enforcement have
19 anything to do with that?

20     A.   So local law enforcement, the reason that
21 they would be called in is to enforce any kind of
22 criminal concerns or to assist with a situation that
23 our park rangers could not handle.

24     Q.   What situations did your park rangers
25 handle at the Oahe project during the DAPL protests?

Page 39

1     A.   I don't remember specific incidents, but
2 I know that they had engaged some of the protesters
3 early on.  And I don't remember what resulted in that,
4 but I know that early on, we were concerned with how
5 we were going to be able to control -- if the crowd
6 was drawing, how we'd be able to manage that.

7     Q.   And so what did you do or conclude based
8 upon those concerns?

9     A.   I don't understand the question.

10     Q.   You said you had concerns about growth of
11 the protest camps.  And so what did you do in response
12 to those concerns is the question.

13     A.   So I think we were in dialogue with the
14 tribes, as the earlier e-mails pointed out.  And I
15 believe that we were in contact with the State of
16 North Dakota and with the Morton County Sheriff and
17 then providing updates to our headquarters as well.

18     Q.   So you just talked to other people, but
19 what did the Corps do?  I'll ask the question a third
20 time:  What did the Corps do, based upon the concerns
21 that you identified with the risk and the threat of
22 growing protests on Corps prompt?

23     MS. BOBET:  Objection; asked and
24 answered.

25     MR. SEBY:  No, it wasn't.

Page 40

1     MS. BOBET:  Objection stands.

2     A.   So I know at one point we closed the land
3 north of the river to try to create a space south of
4 the river to limit the footprint that the protesters
5 were on.

6     Q.   (BY MR. SEBY) Colonel Startzell, this
7 e-mail is dated September 22.  So when you're talking
8 about later on you closed the river, what date are you
9 referring to now?

10     A.   I don't remember what date it was, but I
11 just know it was some weeks later.

12     Q.   Does November 22 or 25 ring a bell,
13 almost over two months later?

14     A.   It's possible that it was then.

15     Q.   So that's different than your couple of
16 weeks later; right?  Two months is much more?

17     A.   Well, I mean, as I said, I don't remember
18 exactly what date it was, but it was some weeks later.

19     Q.   You're the deputy commander of the
20 district; right?

21     A.   Yes, at that time I was.

22     Q.   Why do you think that the DAPL protesters
23 chose to enter onto Corps land?

24     MS. BOBET:  Objection; calls for
25 speculation, foundation.

Page 41

1     A.   Yeah.  I don't really know why they chose
2 that land.

3     Q.   (BY MR. SEBY) Do you know why they chose
4 not to set up instead on private property?

5     MS. BOBET:  Same objections.

6     A.   So I believe there were encampments on
7 private property as well as Corps land and tribal land
8 at various times during the protests.

9     Q.   (BY MR. SEBY) Which ones?

10     A.   Which what?

11     Q.   Which camps are you referring to not on
12 Corps land, and when?

13     A.   I don't remember the specifics about
14 which camps.  I just know that over time there were
15 camps in various places and not all of them were on
16 Corps land.

17     Q.   You can't identify any one in particular
18 or when?

19     A.   No, not to my recollection right now.

20     Q.   Okay.  Can you describe your role in
21 working with the Standing Rock Sioux Tribe Chairman
22 Archambault?

23     MS. BOBET:  Again, I'll just object.  I
24 think this is a line of questioning we covered in the
25 prior deposition.  So I'll just lodge a standing

Lieutenant Colonel James Startzell
May 16, 2022

1  objection.
2      A.  Yeah.  So my role in interfacing with
3  Chairman Archambault was limited.  Normally Colonel
4  Henderson would be the one to talk to him directly.  I
5  think it did come to my attention during the last
6  deposition when we talked about this that I had
7  e-mailed him at one point in time to provide some
8  documents regarding a special use permit.
9      Q.  (BY MR. SEBY) And did you believe that
10 Chairman Archambault was publicly calling for people
11 to come to North Dakota to protest against the Dakota
12 Access Pipeline?
13         MS. BOBET:  Objection; asked and answered
14 in the prior deposition.
15     A.  Yes.  That was my understanding, is that
16 he was supportive of people coming to protest.
17     Q.  (BY MR. SEBY) Okay.  And when was he
18 making those appeals for people to come to North
19 Dakota to join the protest against the Dakota Access
20 Pipeline?
21     A.  I don't remember when, but it must have
22 been sometime in late summer, August or July.
23     Q.  Okay.  And where was he calling for the
24 protesters to gather?
25     A.  I don't remember specific locations that

1  he was asking people to come to, but in the vicinity
2  of the Cannonball River and the pipeline location.
3      Q.  Is the Corps a major landowner in that
4  area?
5      A.  Yes.
6      Q.  And who else owns land in that area?
7  When you say the vicinity of the Cannonball River, who
8  are the other landowners?  The Standing Rock Sioux
9  Tribe themselves?
10     A.  So there were tribal lands in that area
11 and there were also private landowners.
12     Q.  Who were the private landowners you're
13 referring to?
14     A.  I don't remember their names.  I know the
15 gentleman who had the grazing lease, I believe, was --
16 his name was mentioned before.  I can't recall his
17 name, but it was David something.
18     Q.  And David Meyers had a grazing lease from
19 the Corps of Engineers on Corps property; right?
20     A.  Yes.
21     Q.  Is that what you're suggesting was a
22 private property owner?
23     A.  I believe he also had private land
24 somewhere in that area.
25         (Deposition Exhibit 392 was remotely

1  introduced and provided electronically to the court
2  reporter.)
3      Q.  Okay.  If we can go to Exhibit 392,
4  please.  This is a single e-mail exhibit.  If you
5  could read that, please.  Let me know when you're
6  done, please.
7      A.  Okay.  Can you scroll down?  That will
8  work.  Okay.
9      Q.  So this is mid-November, November -- I
10 think it says 18.  Ms. Gaskill is communicating with
11 you exclusively and DAPL talking point is -- "can you
12 call me" is the re line.  What were you working on
13 with her?
14     A.  I don't remember specifically what this
15 was about, but Amy Gaskill was the public affairs
16 officer for the division, so my higher headquarters.
17 So any kind of discussion about talking points or
18 information that we could release to the media would
19 have been discussed with her, most likely.
20     Q.  I understand that generally, but this is
21 an e-mail that's very specific.  Let's talk about the
22 e-mail, if we could.
23     A.  Okay.
24     Q.  I'm asking a question about this e-mail,
25 not generally.

1      A.  Okay.  Can you ask that question again?
2      Q.  The question, again, sir, is what does
3  this pertain to?
4      A.  I mean, it sounds like --
5      Q.  Have you read the e-mail?
6      A.  Yes, I have.
7      Q.  Okay.  Please answer my question.  What
8  does this e-mail pertain to?
9      A.  Well, from reading this it looks like
10 she's trying to answer questions to headquarters, but,
11 I mean, I don't know specifically beyond that.
12     Q.  She's asking for your input, it looks
13 like; right?
14     A.  Yes.
15     Q.  And what did you give as input?
16     A.  I mean, I don't recall other than what is
17 written here.
18     Q.  Okay.  Colonel, are you aware of whether
19 Corps officials referred to protesters on
20 Corps-managed land as trespassers in August of 2016?
21     A.  It sounds likely, yes.
22     Q.  And what do you base that off of?
23     A.  Just my recollection of the conversations
24 at the time, that we understood that they were -- they
25 did not have a permit to be on Corps land.

Lieutenant Colonel James Startzell
May 16, 2022

Page 46

1     Q.   Okay.  Are you aware, Colonel, of what
2 protest camps were established on Corps lands that
3 were south of the Cannonball River?
4     A.   I know that there were camps, but I
5 cannot remember which named camps they were.
6     Q.   How about north of the Cannonball River?
7     A.   I believe the big one north of the
8 Cannonball River was the Oceti Sakowin camp.
9     Q.   Does that go by any other names?
10     A.   I think the Seven Councils Camp,
11 something like that.
12     Q.   Okay.  When you say "big one," what do
13 you mean by that?
14     A.   That was one of the larger camps, from
15 what I understand.
16     Q.   "Large" as in how big?
17     A.   A couple thousand people at its maximum.
18     Q.   That was on Corps property?
19     A.   Yes.
20     Q.   And did that camp ever receive a permit
21 from the Corps of Engineers to be there?
22     A.   No.
23     Q.   Okay.
24     A.   It was offered, but never completed.
25     Q.   Okay.  And what did the Corps do to

Page 47

1 monitor the protest camps on Corps property and the
2 activities taking place in those camps or coming from
3 those camps?
4     A.   So on just about a daily basis our
5 project personnel would drive around the area and look
6 at any updates to the situation or changes and then
7 our project office personnel were on the phone quite a
8 bit with Sheriff Kirchmeier as well.
9          (Deposition Exhibit 376 was remotely
10 introduced and provided electronically to the court
11 reporter.)
12     Q.   If we could go to Exhibit 376.  If you'd
13 please read that exhibit, it's two e-mails.  It's one
14 from Mr. Roby, the security manager of the Omaha
15 district, to you and your response to him.
16     A.   Okay.
17     Q.   And if you'd read your response to him,
18 please.
19     A.   Can you go up in that e-mail?  I can't
20 see the top.
21          MS. HYMEL:  I'm having a problem.  Just
22 one second.
23          THE DEPONENT:  Okay.
24     A.   Okay.
25     Q.   (BY MR. SEBY) All right.  So I'm going to

Page 48

1 ask you about both of these e-mails, the one that
2 Mr. Roby sent to you and then your response.  So
3 Mr. Roby is -- the title of Mr. Roby's e-mail to you
4 is "Security office roll."  And he sends this just to
5 you, and he says, "Sir, it appears I may not be
6 sufficiently monitoring and reporting on this DAPL
7 issue."  He says that on September 14.  "I am
8 constantly being told by Matt this is all my issue
9 since it is being caused by protesters and is a
10 security issue.  I would say Matt does not understand
11 the team concept of managing a non-flood emergency."
12          Who is the Matt that he's referring to?
13     A.   I believe that he is referring to Matt
14 Krajewski, spelled Krajewski, who was our emergency
15 management officer.
16     Q.   For the Omaha district?
17     A.   Correct.
18     Q.   And so what does Roby mean by "I would
19 say Matt does not understand the team concept of
20 managing a non-flood emergency"?
21          MS. BOBET:  Objection; calls for
22 speculation.
23     A.   Yeah.  I think Roger Roby's concern was
24 that the -- was that Matt Krajewski felt that it
25 was -- because it was not a flood, that it was simply

Page 49

1 a security office issue.  And Mr. Roby feels that it
2 is still a consolidated team effort to deal with
3 situations like this, whether they're flood or not.
4     Q.   (BY MR. SEBY) So what does it mean to be
5 the security manager of the Omaha district of the
6 Corps of Engineers?  What is the function of that
7 office?  Why does it exist?
8     A.   Several things.  Number one, to ensure
9 that personnel in the district have appropriate
10 clearances for the work they're doing; number two, to
11 ensure that the project offices are -- meet the
12 requirements of army force protection; and then the
13 third is just in general to handle any security
14 concerns that come up.
15     Q.   Security issues and concerns relative to
16 Corps property?
17     A.   As well as other things, yes.
18     Q.   Does it include security of Corps
19 property?
20     A.   Yes.  I would say that falls under the
21 scope.
22     Q.   Okay.  Why then, Colonel Startzell, did
23 you wave off Roger Roby from going to the DAPL
24 protests or to North Dakota?
25          MS. BOBET:  Objection; misstates

Lieutenant Colonel James Startzell
May 16, 2022

Page 50

1  evidence.
2      Q.   (BY MR. SEBY) You see your e-mail to him,
3  "Roger, I don't think this will require you to visit
4  up there."
5      A.   Uh-huh.  Yeah.  I think I was concerned
6  about just sending individuals up there unsupported
7  because the effect that he could have had would have
8  been somewhat limited just by himself.
9      Q.   And you say, "I'll have Matt tie-in with
10  the EOC there and ensure that he is monitoring."  What
11  does that mean?
12     A.   So one of the roles of the emergency
13  management office is to coordinate with state
14  emergency management offices, which is what I was
15  referring to there.
16     Q.   And so in the abstract was your answer.
17  How about specifically with respect to you will ensure
18  that he is monitoring?  What did Matt monitor?
19     A.   I think we ended up having someone
20  else -- we sent John Voeller to liaise with the state
21  instead.
22     Q.   And John Voeller is who?
23     A.   John Voeller worked for the Oahe project.
24  He was one of the specialists out there at the Oahe
25  project.

Page 51

1      Q.   Is he a park ranger?
2      A.   I believe so, yes.
3      Q.   Okay.  So you utilized resources for a
4  liaison -- instead of the Omaha district office, you
5  used a park ranger from the project to go and interact
6  with the state?
7      A.   Right.
8      Q.   Okay.  And what did that interaction
9  involve?
10     A.   He would attend meetings, I think, once
11  or twice a day.  When the state did their emergency
12  operation center update, he would attend meetings,
13  answer questions on our behalf, and then get
14  information from us to answer the state's questions.
15     Q.   And who directed John Voeller to do that?
16     A.   I think it was either myself or the
17  district manager.  One of us were supportive of him
18  being the one to go there.  I think it was initially
19  Eric Stasch's idea that he tie in, and we agreed that
20  it was a good choice.
21     Q.   So instead of having a park ranger at the
22  project where protests were going on, you took him
23  away from that and sent him to the state EOC?
24     A.   Yes.
25     Q.   All right.  Do you know who the assistant

Page 52

1  secretary of the army Jo Ellen Darcy was or is?
2          MS. BOBET:  Objection; asked and
3  answered.
4      A.   Yes, I do.
5      Q.   (BY MR. SEBY) How about a Lowry Crook?
6      A.   Yes.  I believe he worked up in the ASACW
7  office or in the Corps of Engineers civil works
8  headquarters, one of those two.
9      Q.   Did you ever interact with Ms. Darcy or
10  Mr. Crook?
11     A.   No.
12     Q.   Never?
13         MS. BOBET:  Objection; asked and
14  answered.
15     A.   Not to my recollection.
16     Q.   (BY MR. SEBY) Okay.  How about an
17  individual named Dan Uteckt?
18     A.   I don't recognize that name.
19     Q.   Okay.  As the deputy district commander
20  of the Corps overseeing the Oahe projects, when did
21  the Corps decide to allow DAPL protesters on its land
22  to continue to remain on those lands?
23         MS. BOBET:  Objection; assumes facts not
24  in evidence.
25     A.   So I think early on, I mean, we

Page 53

1  understood that they were on Corps land, but I don't
2  think there was, you know, a conscious decision to let
3  them stay there until later.
4      Q.   (BY MR. SEBY) Later than what?
5      A.   I mean, I just don't really remember the
6  timeline when we had that discussion.
7      Q.   A discussion of what?
8      A.   On whether or not they would be allowed
9  to stay there.
10     Q.   Okay.  Well, regardless of your timeline,
11  I'm asking you a question:  When did the Corps decide
12  to allow them to remain on the property?
13         MS. BOBET:  Objection; asked and
14  answered.
15     A.   So as soon as they started camping there,
16  you know, obviously we didn't evict them early on, so
17  that would be when.
18     Q.   (BY MR. SEBY) And so are you saying,
19  Colonel, that because you decided early on not to
20  evict them, that was when the decision to allow them
21  to stay was made?
22     A.   Well, I would say yes, but also the
23  special use permit that we were pursuing with them was
24  intended to be the follow-up decision tool.
25     Q.   I thought you said there never was a

Lieutenant Colonel James Startzell
May 16, 2022

Page 54

1  special use permit that was issued in final?
2      A.   Correct.  It was offered with the
3  expectation that the protesters would fulfill their
4  part of the deal.
5      Q.   So are you saying that you allowed them
6  to stay in hopes that they would be able to get a
7  permit from you?
8      A.   Yes.
9      Q.   Okay.  Are you aware of whether DAPL
10  protesters, using Corps of Engineers land to camp,
11  were using that land to organize and prepare for
12  leaving Corps property and travel off of Corps
13  property?
14      A.   I think we suspected that some of that
15  was happening, but I don't know if we ever saw proof
16  of that.
17      Q.   None?
18      A.   Like I said, I can't recall specific
19  proof for that.
20      Q.   Can you recall anyone in the Corps or
21  your colleagues or anyone in the state telling you
22  that there was such instances where people were
23  leaving their presence on Corps property to go do
24  things elsewhere?
25      A.   I know there were reports of that, but I

Page 55

1  don't remember the specifics of those reports.
2      Q.   Okay.  And were you ever there in North
3  Dakota during the period of the protests?
4      A.   Personally, no.
5      Q.   So how else would you know other than
6  receiving reports?
7      A.   That is how information was coming to us,
8  through those reports.
9      Q.   And to you individually, correct, as the
10  deputy district commander?
11      A.   Yes.
12      Q.   Okay.  Do you recall receiving reports
13  that DAPL protesters on Corps land were using that
14  land to organize and prepare to go onto private
15  property?
16          MS. BOBET:  Objection; asked and answered
17  in the prior deposition.  I'll just lodge an ongoing
18  objection to the extent this issue was already covered
19  as to the scope.
20      A.   Yeah.  I think -- can you ask that
21  question again one more time?
22      Q.   (BY MR. SEBY) A third time, sure.  I'm
23  asking a lot of questions a third time, Colonel.  Are
24  you aware of whether DAPL protesters used camps on
25  Corps land to organize and leave those camps and

Page 56

1  travel to private property?
2      A.   I am aware that there were reports of
3  that, yes.
4      Q.   Yes.  Okay.  How about to go onto public
5  roads and bridges?
6      A.   Yes.
7      Q.   And into Bismarck or Mandan, North
8  Dakota?
9      A.   I don't remember specifics about Bismarck
10  or Mandan, but they are in the vicinity of those other
11  places.
12      Q.   Do you recall how long protesters were
13  present on Corps-managed land?
14      A.   I believe it was somewhere in the
15  neighborhood of six months total.
16      Q.   Six months total?
17      A.   Yes.
18      Q.   Would you be surprised if you were told
19  it was closer to nine months?
20      A.   No, that would not surprise me.
21      Q.   Okay.  Do you recall when the Bureau of
22  Indian Affairs got involved in the protests against
23  the Dakota Access Pipeline?
24      A.   I don't.
25      Q.   Did you interact with anyone from the

Page 57

1  BIA?
2      A.   I believe I did have -- I can't remember
3  if I talked to them on the phone, but I know it was at
4  least some e-mail traffic with their representatives.
5      Q.   E-mails with you?
6      A.   Yes.
7      Q.   And who else from the Bureau of Indian
8  Affairs?
9      A.   From BIA, I don't remember who exactly it
10  was, but I know I was talking -- either myself or the
11  district manager or my security manager were talking
12  with one of their agents.
13      Q.   Why would your security manager have been
14  talking with the BIA agent?
15      A.   Just to understand the situation on the
16  ground as they saw it.
17      Q.   This is the same Roger Roby, the security
18  manager of the Omaha district?
19      A.   Right.
20      Q.   After you waved him off that one time in
21  the earlier exhibit we talked about, did you ever
22  change your mind and dispatch him to North Dakota?
23          MS. BOBET:  Objection; misstates
24  evidence.
25      A.   Yeah.  I mean, what I told him was he

Lieutenant Colonel James Startzell
May 16, 2022

Page 58

1  couldn't physically go to North Dakota.  I didn't tell
2  him that he couldn't coordinate with entities that
3  were involved.  So I would expect that he would still
4  continue his job coordinating with those offices.
5       Q.   (BY MR. SEBY) And what did he do with
6  respect to the BIA on coordination matters?
7       A.   I don't remember specifics, but I assume
8  that he was still coordinating with them to make sure
9  that he understood the situation on the ground and
10  then to see if there were any assets that they could
11  bring to bear on the situation, particularly as it was
12  related to convincing the tribes to move protesters to
13  tribal land.
14       Q.   Do you recall the specifics of what you
15  discussed with the Bureau of Indian Affairs?
16       A.   I know that we had discussions with them
17  about getting them to dialogue directly with the
18  tribal leadership to move protesters onto tribal-owned
19  land.  And then at one point there was -- I know the
20  tribe became concerned that the protest activity was
21  going to affect the productivity of their casinos.
22  And so they were becoming concerned of the disruptive
23  impact of the protesters.
24       Q.   Okay.  I'm going to ask you about the
25  special use permit that you mentioned.  You worked on

Page 59

1  that, you said?  I think you told me you e-mailed it
2  to Chairman Archambault in some fashion, but does that
3  mean you worked on the special use permit for the
4  Standing Rock Sioux Tribe?
5       MS. BOBET:  I'll just again lodge an
6  ongoing objection to this line of questioning which we
7  covered extensively in the witness's prior full-day
8  deposition.
9       A.   Yeah.  So based on the last deposition, I
10  remember seeing an e-mail where I transmitted that to
11  Chairman Archambault.
12       Q.   (BY MR. SEBY) Is that the first time you
13  knew anything about the special-use-permit process for
14  the Standing Rock Sioux Tribe or were you involved in
15  it more than that?
16       A.   No.  I was aware that our office was
17  preparing it in coordination with the tribe to offer
18  to them, and I probably reviewed it as part of that
19  process, but, I mean, I think that's -- that was the
20  extent of my involvement.  And I was probably
21  discussing the permit with Colonel Henderson also.
22       Q.   And because you were the deputy district
23  commander, others in the district you also discussed
24  it with?
25       A.   Yes.

Page 60

1       Q.   Okay.  Do you know how long the Corps
2  sought to work with the Standing Rock Sioux Tribe
3  regarding the development of a mutually acceptable
4  standing -- special use permit?
5       A.   I think it was over the course of several
6  weeks.
7       Q.   Several weeks?
8       A.   Yes.
9       Q.   Start to finish?
10       A.   Yes.
11       Q.   And what do you base that on?
12       A.   From the discussion during the last
13  deposition, I think the timeline was somewhere around
14  end of August or early September through October
15  before we realized that they would not be able to
16  provide the bond and the insurance required.
17       Q.   So several weeks, maybe actually a month
18  and a half?
19       A.   I mean, I guess it depends on how you
20  define "several," but yeah, a couple months.
21       Q.   "Several" could be more than one, so it
22  could be two, but you think actually it was six?
23       A.   That's -- yeah, that seems reasonable
24  based on the last deposition.
25       Q.   So several, many, six, thereabouts is

Page 61

1  your answer?
2       A.   Okay.
3       (Deposition Exhibit 375 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6       Q.   If we can go to Exhibit 375, please.  So
7  this is 375.  If you could read, please, that e-mail.
8       A.   Okay.  Should I read it from the back
9  forward?
10       Q.   Yes.  That way you know what it talks
11  about.
12       A.   Okay.  I think you can go up from here.
13  Okay.
14       Q.   So this first e-mail -- there's two in
15  here, and this first e-mail is from Eileen Williamson
16  to Amy Gaskill and others.  And you're copied on this
17  e-mail; correct?
18       A.   Yes.
19       Q.   Okay.  What is she referring to as "I
20  resent the joint statement on Friday," in the third
21  paragraph there, "after it was released by the U.S.
22  DOJ"?
23       MS. BOBET:  Objection; foundation, calls
24  for speculation.
25       Q.   (BY MR. SEBY) I wanted you to read the

Lieutenant Colonel James Startzell
May 16, 2022

Page 62

1  sentence, Colonel, so I could ask you what joint
2  statement do you think she's referring to?
3          MS. BOBET:  Objection stands.  You can
4  answer.
5          A.   Yeah.  I recall something about a joint
6  statement, but I can't remember if it was between us
7  and the tribe or us and the state of North Dakota or
8  all three entities.
9          Q.   (BY MR. SEBY) So you want to read the
10 rest of that paragraph and see if that refreshes your
11 understanding of what the joint statement was.
12         A.   Yeah.  I don't remember specifically who
13 it was between, but us and someone else obviously.
14 DOJ, maybe.
15         Q.   Okay.  Yeah.  That seems to make sense.
16 She goes on to say it was released by the DOJ.  I want
17 to ask you about some of the topics that
18 Ms. Williamson is bringing to your and others in the
19 Corps' attention.  If you come down to her No. 3, do
20 you see that?
21         A.   Yes.
22         Q.   And her question No. 3 says, "What are
23 the rules with respect to camping at the Beaver Creek
24 Area in the east side of the Missouri River in North
25 Dakota."

Page 63

1          A.   Uh-huh.
2          Q.   What is the Beaver Creek area in the east
3  side of the Missouri River in North Dakota?
4          A.   Beaver Creek must have been one of the
5  small recreation areas on the river.
6          Q.   Does it have anything to do with the Oahe
7  project?
8          A.   Yes.  I believe it would have been part
9  of the Oahe project or potentially part of the
10 Garrison project, but more likely Oahe.
11         Q.   Okay.  So she has that as the question
12 and an answer and she's saying by sending this to
13 you-all that these are her thoughts on responses and
14 asking for people to give feedback.  Do you recall
15 reading this e-mail -- receiving this e-mail and
16 reading it?
17         A.   I don't recall it at that time, but
18 clearly I'm on the traffic.  So I did receive it.
19         Q.   So if you look down, she's got a proposed
20 answer.  The last part of her answer says, "When
21 enforcing Title 36 rules and regulations, the
22 preferred approach is education first.  Beyond that,
23 the list of violations and fines for those violations
24 has not been shared."  What is she referring to?
25         MS. BOBET:  Objection; calls for

Page 64

1  speculation.
2          A.   Are you asking about the violations and
3  fines?
4          Q.   (BY MR. SEBY) Well, that's what she says.
5  My question to you, again, is, what is she referring
6  to?
7          MS. BOBET:  Same objection.
8          A.   Yeah.  I don't specifically know, but I'm
9  guessing she's referring to any kind of violations and
10 fines related to citations under Title 36.
11         Q.   (BY MR. SEBY) We're here talking about
12 the DAPL protests at the Oahe project in the time
13 frame we've already talked about.  So are you aware of
14 whether the Corps of Engineers ever issued any
15 citations to anyone on Corps property during that time
16 period of March 2016 to March 2017?  Any citations at
17 all?
18         MS. BOBET:  Objection; argumentative.
19         A.   I don't recall any specific citations,
20 no.
21         Q.   (BY MR. SEBY) Okay.  How about any fines
22 the Corps issued to any protester during that same
23 time period on lands within the Oahe project?
24         A.   No, I'm not aware of any fines levied.
25         Q.   Okay.  And then when she says, "However,

Page 65

1  our lack of ability to enforce these rules beyond a
2  citation and the public backlash we face if we attempt
3  to cite and enforce the rules makes it an even greater
4  challenge and may create further issues with
5  attempting to enforce with others," what does that
6  mean, in your understanding?
7          MS. BOBET:  Objection; calls for
8  speculation.
9          A.   Yeah.  I think so we had limited ability
10 to conduct any kind of law enforcement because our
11 park rangers were really only authorized to cite
12 members of the public.  And so we were concerned with
13 what would happen if we did cite the protesters and we
14 were concerned it would create a greater problem for
15 our park rangers.
16         Q.   (BY MR. SEBY) So if I understand what
17 you're saying is the authority the park rangers had --
18 limited, is what you said -- was the ability to cite
19 people who were in violation of Title 36 rules; right?
20         A.   Right.
21         Q.   But you were concerned with them
22 exercising that limited authority at all?
23         A.   Yes.
24         Q.   Why?
25         A.   Because we were concerned for their

Lieutenant Colonel James Startzell
May 16, 2022

Page 66

1 safety if they were to get around a crowd of people,
2 and we weren't really sure how, you know, a crowd
3 might react to that.
4     Q.  So that concern was after not citing
5 people for coming there in the first place; right?
6     A.  Right.
7     Q.  And then the concern arose because of the
8 number of people that came onto the property, citing
9 people late in the game would be perceived as a threat
10 and a security issue to the individual ranger?
11     A.  Yes.
12     Q.  How many rangers did the Corps assign to
13 the Oahe project?
14     A.  I don't remember specifically, but I
15 think we had somewhere between three and eight at that
16 project.  It was a small number.
17     Q.  And at least one of them, John Voeller,
18 you pulled off and sent to the EOC meetings; right?
19     A.  Yes.
20     Q.  Okay.  If we can come up, please, to the
21 e-mail from you in response to Ms. Williamson's
22 e-mail, please.
23     A.  Okay.
24     Q.  Before we do that, if you could look back
25 to Ms. Williamson's e-mail transmitted to that group

Page 67

1 which includes you.  If you could do that real quick,
2 please.
3     A.  Okay.
4     Q.  Look at the distribution on her e-mail,
5 if you would.  Do any of those people stand out to you
6 as lawyers advising the Corps?
7     A.  I don't remember who Doug Garman and
8 Eugene Pawlik were, but the others do not seem like
9 lawyers.  The others are not lawyers, but I don't
10 remember who those other two gentlemen are.
11     Q.  All right.  And now go back to your
12 response to Ms. Williamson.
13     A.  Okay.
14     Q.  If you could look at the distribution of
15 your response to Ms. Williamson.
16     A.  Okay.
17     Q.  Is Mr. O'Hara an attorney?
18     A.  No.
19     Q.  Is Ms. Williamson an attorney?
20     A.  No.
21     Q.  Okay.  I'm not asking you about the
22 content of the nature of your response which was
23 redacted, but you're not an attorney, are you, sir?
24     A.  No.
25     Q.  All right.  So in response to

Page 68

1 Ms. Williamson's detailed e-mail to you and questions
2 that she raised in proposed responses that we went
3 over, No. 3, you responded to Eileen, "Good questions.
4 We are have a meeting today at 3 p.m." -- and "today"
5 being September 12, 2016 -- "in the Commander's
6 Conference Room to discuss the special use permit."
7         What special use permit are you referring
8 to?
9     A.  I believe this was the special use permit
10 that the district commander had discussed with
11 Chairman Archambault basically allowing protesters to
12 be there for their freedom of speech.
13     Q.  Are you saying there's a permit that
14 allowed people to be on the Corps property?
15     A.  This is the development of a permit that
16 we were hoping would eventually be processed.
17     Q.  And was that -- are you referring to the
18 draft permit the Corps was developing for the Standing
19 Rock Sioux Tribe?
20     A.  Yes.
21     Q.  Okay.  So you said to Ms. Williamson,
22 "Please come to that meeting and bring these
23 questions.  Good stuff."  Do you recall that meeting?
24     A.  I don't.
25     Q.  You don't recall a meeting that you

Page 69

1 communicated with Ms. Williamson about, period?  Don't
2 recall it?
3         MS. BOBET:  Objection; asked and
4 answered.
5     A.  So I had meetings every day with staff,
6 and so I don't recall this particular meeting.
7     Q.  (BY MR. SEBY) Okay.  You don't recall
8 what was discussed with respect to the special use
9 permit being developed?
10     A.  No, not on this particular day.
11     Q.  Do you recall anything about this meeting
12 or the issue and discussing it with your staff as
13 deputy district commander?
14         MS. BOBET:  Objection; asked and
15 answered.
16     A.  So I've had a -- I had a lot of meetings
17 about the special use permit, but I don't recall what
18 this e-mail is referring to on that day.
19     Q.  (BY MR. SEBY) You did read her questions
20 and the topics involved in her questions; right?
21     A.  Yes.
22     Q.  And you don't recall discussing those
23 with your staff?
24         MS. BOBET:  Objection; asked and
25 answered.

Lieutenant Colonel James Startzell
May 16, 2022

Page 70

1      A.   No, I do not.
2      Q.   (BY MR. SEBY) Okay.  If we could go to
3  Exhibit 345, please.
4           MS. BOBET:  I'll note this is another
5  document that was produced before the time of Colonel
6  Startzell's prior deposition.  So my grounds of the
7  scope of this reopened deposition will have an ongoing
8  objection to this line of questioning and use of this
9  exhibit.
10      Q.   (BY MR. SEBY) Colonel, if you would look
11  at, please, this exhibit, which was used in General
12  Spellmon's recent deposition, that would be great
13  because I want to ask you about it.  It starts with an
14  e-mail from Scott Spellmon to Donald Jackson and
15  copied to Lowry Crook.  It's dated September 12.  And
16  keep going up the chain, if you would, and let Rachel
17  know when you're needing to move up so we can keep
18  moving.
19      A.   Okay.  You can move up now.  Okay.
20      Q.   All right.  Keep going.
21      A.   Okay.  Is there a way you can move that
22  to the left on the screen?  Thank you.  Yeah.
23  Perfect.  Okay.
24      Q.   Are you done?
25      A.   Yes.

Page 71

1      Q.   Okay.  So I want to have you please draw
2  your attention to the third e-mail in the chain.  If
3  you start counting the oldest -- the first is the
4  oldest coming forward, it would be number three in
5  that chain.  And it's from at the time Brigadier
6  General Scott Spellmon, who was the commanding general
7  of northwest division, which oversaw several districts
8  which included the Omaha district.  He wrote to
9  Mr. Crook in response to the e-mails below.
10           On September 12 Mr. Crook had asked below
11  there about, quote, Has there been any more
12  development on the special use permit application that
13  is under review?  And Brigadier General Spellmon
14  responds to him saying that Colonel Henderson has not
15  taken action yet on the application -- and I think
16  that's the Standing Rock Sioux Tribe unless you
17  correct me -- application for special use permit.
18           Then he says, "The most significant
19  issue" -- on September 12 -- "we are dealing with is
20  the information provided on the new application does
21  not match facts on the ground.  For example, at the
22  sites there is ongoing littering, dumping, destruction
23  of grazing land, unauthorized structures, and several
24  hundred more people above and beyond what the
25  application addresses.  Colonel Henderson is

Page 72

1  continuing to work through these issues with the
2  applicant.  At this point in time, we would like to
3  tie the way ahead on the Special Use Permit with the
4  overall way ahead as described in the interagency
5  memo."  Do you see all that?
6      A.   Yes.
7      Q.   So the head of the division is talking
8  about Colonel Henderson as the district commander and
9  you, sir, are the deputy district commander.  So I'm
10  assuming you were involved in all of this; is that
11  correct?
12      A.   Yes.
13           MS. BOBET:  Objection; vague.
14      Q.   (BY MR. SEBY) So you know what he's
15  talking about?
16      A.   I mean, yes, I understand the issues that
17  we were getting reports on at the time.
18      Q.   Okay.  Good.  So I want to ask you some
19  questions about those issues that you just mentioned
20  you understand.  Let's go back to Spellmon's e-mail,
21  second sentence.  He's talking about the special use
22  permit application that's pending as of September 12.
23  And he says, "The most significant issue we are
24  dealing with is the information provided on the new
25  application."  What is he referring to?

Page 73

1           MS. BOBET:  Objection; calls for
2  speculation.
3      A.   Yeah.  I don't know what "new
4  application" means because I don't recall more than
5  one application for that site.
6      Q.   (BY MR. SEBY) What does he mean by the
7  "application does not match facts on the ground"?
8           MS. BOBET:  Objection; calls for
9  speculation.
10      A.   Yeah.  My guess is what he's referring to
11  is the requirements for the permit would not be met at
12  that point in time, given what we were seeing from
13  reports on the ground.
14      Q.   (BY MR. SEBY) Why?
15      A.   Well, because his next sentence, there
16  was littering going on that we were aware of.  They
17  had tents and other kinds of makeshift structures up,
18  and the grazing land was not meant to be part of the
19  application.  So I think that's what he's referring
20  to.  And so those would be -- those would not meet the
21  requirements of the special use permit.
22      Q.   So the application was a mismatch in what
23  it requested with what you saw on the ground?
24      A.   Yes.
25      Q.   This is September 12, 2016.  Do you

Lieutenant Colonel James Startzell
May 16, 2022

Page 74

1  recall how many days later you wrote to Chairman
2  Archambault that you told me about sending him a
3  proposed special use permit?
4        A.   No, I don't remember how many days later
5  that was.
6        Q.   Within a week?
7        A.   Okay.
8        Q.   It's a question.  I'm not testifying.
9  You are.  Is it your position that it was less than a
10 week that you sent it to Chairman Archambault?
11       A.   I don't remember what day that was, but
12 it's possible.
13       Q.   Okay.  So in that period of time when you
14 did that, rolling back to September 12, a few days
15 earlier, how did you resolve these issues?
16       A.   I don't think the issues were resolved.
17       Q.   So why did you send them the proposed
18 permit?
19       A.   Our hope was in dialogue with the tribe
20 that they would be able to take care of some of these
21 actions and clean up some of these actions themselves,
22 and that's what Colonel Henderson had been working
23 towards for several weeks.
24            MR. SEBY:  Let's take a five-minute
25 break.  I know we've been going for an hour and a

Page 75

1  half, and I don't know about you, sir, but I could
2  stretch my legs for a minute.  Five minutes sound
3  good?
4            THE DEPONENT:  Sounds good.
5            THE VIDEOGRAPHER:  Going off the record.
6  The time is 4:49 p.m. UTC, 11:49 a.m. Central.
7            (Recess taken, 10:49 a.m. Mountain to
8  10:56 a.m. Mountain.)
9            THE VIDEOGRAPHER:  Back on the record.
10 The time is 4:56 p.m. UTC, 11:56 a.m. Central.
11       Q.   (BY MR. SEBY) Colonel Spellmon -- pardon
12 me.  Colonel Startzell, I wanted to ask you -- just to
13 clarify, earlier we were talking about a joint
14 statement and references to a DOJ and the Corps, but
15 there was some confusion, I think, about what that
16 joint statement was referring to.  So I want to call
17 your attention to Exhibit 344, please.  If we could
18 look at the attachment to this exhibit, please.  And
19 blow it up.  If you would take a moment and read that,
20 please.  It's a document on Department of Justice
21 letterhead dated September 9, 2016.
22            MS. BOBET:  I'll just note this is
23 another document that was produced prior to the
24 Lieutenant Colonel's original deposition in November.
25 So we'll object to the use of the exhibit and

Page 76

1  questions on the grounds of the scope of today.
2        Q.   (BY MR. SEBY) Tell me when you're done
3  reading it, please.
4        A.   Okay.  I will.
5        Q.   Thank you.
6        A.   Can you scroll down, please.  Okay.
7  That's perfect.  Okay.  Can you continue to scroll
8  down.  Thank you.  Okay.
9        Q.   You done?
10       A.   Yes.
11       Q.   Okay.  Does this clarify for you what a
12 joint statement -- do you recall this joint statement?
13       A.   Yes.
14       Q.   Okay.  And it's a joint statement here --
15 per the letterhead and the heading on this document,
16 joint statement from the Department of Justice, the
17 Department of the Army, and the Department of the
18 Interior regarding the Standing Rock Sioux Tribe
19 versus Corps of Engineers.  And then it talks about
20 the just-issued district court opinion finding the
21 Corps of Engineers in compliance with the National
22 Historic Preservation Act, but saying that the army's
23 determination authorizing construction of the pipeline
24 underneath the river would be reconsidered
25 nonetheless.  Do you see that?

Page 77

1        A.   Yes.
2        Q.   Okay.  Do you recall that development?
3        A.   Yes.  Now that I read this, yes.
4        Q.   Okay.  Before you saw this official joint
5  statement, were you involved in discussing that issue,
6  the content of this joint statement?
7        A.   I don't believe I was -- I may have been
8  aware that this -- that the discussion was happening
9  at higher echelons, but I don't recall being involved
10 in drafting any of this.
11       Q.   Okay.  So are you saying you were aware
12 of it before it was issued?
13       A.   Yes.  I was aware that there would be a
14 joint statement.
15       Q.   Did the fact that it was released without
16 your development of it or involvement -- did that
17 frustrate you?
18       A.   I mean, I don't think it was my place to
19 be frustrated, but I believe that leadership -- either
20 Colonel Henderson or Corps of Engineers leadership was
21 involved in drafting this.
22       Q.   So you're saying Colonel Henderson knew
23 about it prior to its release?
24       A.   I believe he did.
25       Q.   How about Brigadier General Spellmon,

Lieutenant Colonel James Startzell
May 16, 2022

1  Henderson's boss?
2      A.   Yeah.   He was aware that this was going
3  to be released as well.
4      Q.   Okay.   With respect to the several
5  thousand protesters and the eight to nine months that
6  they occupied Corps lands, how many Title 36 or other
7  citations did the Corps issue to DAPL protesters on
8  Corps lands?
9          MS. BOBET:   Objection; asked and
10 answered, assumes facts.
11     A.   I don't specifically remember any.
12     Q.   (BY MR. SEBY) Any?   So zero?
13     A.   Correct.
14     Q.   Colonel Startzell, do you recall anyone
15 telling you not to issue citations to the protesters?
16     A.   No.
17     Q.   Then why didn't the Corps issue any
18 citations to trespassers on its property, as you said?
19         MS. BOBET:   Objection; misstates
20 testimony.
21     A.   So as I mentioned before, we were
22 concerned about the safety of our park rangers should
23 they do that.
24     Q.   (BY MR. SEBY) To your knowledge, did the
25 Corps ever take any steps to communicate to the

1  protesters physically on Corps land that they needed
2  to leave?
3      A.   Yes, I believe we did, but I can't
4  remember the vehicle for that.   It probably would have
5  involved the project office personnel and rangers
6  telling them they weren't authorized to be there.
7      Q.   So are you speculating or do you know?
8      A.   That is speculation.
9      Q.   Okay.   So, Colonel, do you believe that
10 by late September of 2016 when you were a district --
11 deputy district commander watching the issue unfold in
12 North Dakota on Corps property, the protesters located
13 on Corp land, that those protests had gotten out of
14 control?   Do you believe that?
15     A.   Yes, I believe they were beyond what was
16 acceptable.
17     Q.   All right.   And, in fact, if we could
18 turn to Exhibit 318, please.
19         MS. BOBET:   This is another exhibit that
20 was produced before Lieutenant Colonel's prior
21 deposition.   So, again, we'll lodge another objection
22 on the basis of the limited scope of this deposition
23 to use of the exhibit and the line of questions about
24 it.
25     Q.   (BY MR. SEBY) You can take a moment and

1  read this exhibit from the back forward.   The first
2  part of this exhibit e-mail chain, it's five pieces,
3  but it's a two-page e-mail string.   It is from Joel
4  Rostberg at Morton County to Morton County people and
5  State of North Dakota people.   I see it's a large
6  group, FBI individuals and DOJ individuals, other
7  counties in North Dakota, officials and so on.   So a
8  large state/federal/county group there; right?   Morton
9  County is communicating that to the United States and
10 colleagues in North Dakota.   So it's an operational --
11 do you know what op ord stands for?
12     A.   Operational order.
13     Q.   Okay.   And what is an operational order,
14 to your understanding?   I know this isn't from you.
15 As a term, do you understand what that means?
16     A.   For the army it means a written order,
17 and I'm guessing it meant the same thing for the
18 state.
19     Q.   Okay.   And this gentleman that sent this,
20 Mr. Rostberg, his signature block on the e-mail says
21 that he is an assistant emergency manager for Morton
22 County.   Do you see that?
23     A.   Yes.
24     Q.   Okay.   So this was sent to a bunch of
25 federal officials, including individuals in the Corps.

1  One of them was Todd Lindquist, who forwarded it on in
2  the second e-mail of this chain to Dean Danzeisen.
3  Does that name ring a bell?
4      A.   I believe that name is one that I saw a
5  few minutes ago, but yeah, I don't really -- did not
6  recognize that name, no.
7      Q.   Okay.   Would you agree that it's the --
8  that gentleman is the sheriff of Mercer County, North
9  Dakota, at least at this time?
10     A.   I think that's -- a few minutes ago the
11 exhibit you showed, I believe that was correct.
12     Q.   Okay.   And then Mr. Lindquist also
13 forwards that e-mail to Mr. Fink, a Corps individual,
14 as we talked about before.   Then Todd Lindquist says,
15 "Keith, I haven't gotten a chance to read the attached
16 OPORD regarding DAPL.   I'm currently busy reviewing
17 the 776 page ECP I'm supposed to sign today for the
18 land transfer to the Three Affiliated Tribes."
19         And then the next e-mail, fourth in the
20 chain of five, is from Fink sending it up to Colonel
21 Henderson, the district commander, and to you, the
22 deputy district commander.   It says, "Sir, the
23 attached is a law enforcement update on the DAPL
24 Protest Camps" dated September 23, 2016.
25         And you are the other -- the last person

Lieutenant Colonel James Startzell
May 16, 2022

1  to respond in this chain of e-mails.  And you reply to
2  Mr. Fink, Colonel Henderson, and Thomas Tracy, and you
3  say, "Thanks, Keith.  I'll include some of the
4  highlights in the DAPL update on Monday.  All of this
5  information basically confirms the Commander's
6  assessment that the camps are growing out of SRST's
7  control, and the Chairman is probably going to try to
8  use the SUP as a way to regain control of what he sees
9  as legitimate protesters."
10      Do you remember sending that e-mail?
11      A.  I don't remember sending it, but yeah, it
12  looks like my words.
13      Q.  Yeah.  So you're saying to Mr. Fink that
14  what Morton County shared with a number of federal
15  representatives from multiple agencies, including the
16  FBI, the Corps, and the Department of Justice confirms
17  the commander -- I'm quoting you, sir, Confirms the
18  commander's assessment that the camps are growing out
19  of the Standing Rock Sioux Tribe's control, and the
20  Chairman is probably going to try to use the SUP on it
21  as a way to regain control of what he sees as a
22  legitimate protest.  That's on September 25, 2016.
23      So my question is, after you said you
24  recall stating it, was, do you have any reason to
25  disagree with Colonel Henderson's assessment that the

1  camps on Corps land were out of control by late
2  September of 2016?
3      A.  No.  I think our assessment at that time
4  was that Chairman Archambault was not able to control
5  the people coming to the camps anymore.  I would say
6  that's correct.
7      Q.  Okay.  So that was stated, at least in
8  this e-mail, on September 25.  Did that realization
9  occur on that same day or previously, prior to that?
10      A.  It was probably a series of events
11  leading up to that.
12      Q.  Okay.  And do you recall discussing those
13  circumstances with Colonel Henderson?
14      A.  Yes.  I don't remember specific
15  conversations, but I know that we had had discussions
16  about that.
17      Q.  Sure.  And what are the series of events
18  that led up to September 25 that caused you to say
19  what you did in this e-mail?
20      A.  I think we just -- it became more -- we
21  became more aware that many of the protesters were not
22  tribal members anymore and the chairman was starting
23  to become nervous about his ability to control their
24  activity.
25      Q.  Okay.  So we're talking about Corps land

1  here; right?
2      A.  Yes.
3      Q.  Was it the Standing Rock Sioux Tribe's
4  responsibility to keep control of the protests on
5  Corps property?
6      A.  So our expectation was, because he was
7  pursuing a special use permit, that the permit would
8  be granted for activities that he could control.  And
9  that's why -- I believe that's why it came up in this
10  e-mail.
11      Q.  Okay.
12      A.  And that he had initially called for some
13  of the protesters to comment.
14      Q.  And this all was on September 25, 2016,
15  right, when you made that observation with respect to
16  Colonel Henderson's assessment?
17      A.  Yes.
18      Q.  Okay.  So my question is after you -- if
19  Colonel Henderson did that earlier and you
20  acknowledged it in this September 25 e-mail, after
21  that did the Corps or the United States ever take any
22  responsibility for what was happening after that?
23      MS. BOBET:  Objection; vague, calls for
24  speculation, foundation.
25      Q.  (BY MR. SEBY) To your knowledge, as the

1  question is obviously phrased.
2      MS. BOBET:  Same objections.
3      A.  So I know that it was of concern to us in
4  our problem because it was on government-owned land,
5  but our authorities to influence it were limited.
6      Q.  (BY MR. SEBY) Okay.  That's -- what
7  authority then -- what ability does the Corps have to
8  address trespassers that come to its attention on its
9  property?
10      MS. BOBET:  Objection; asked and
11  answered.
12      A.  So the authorities that we had were the
13  limited authority of the park rangers, as discussed
14  before, and then I think in the future we eventually
15  closed the Corps land north of the river to try to
16  control where the protesters were camping.
17      Q.  (BY MR. SEBY) Perhaps on November 25 when
18  that was done?
19      A.  That sounds about right.
20      Q.  Okay.  So on September 25 you stated what
21  we just discussed, and then not until November 25, two
22  months later to the day, is when you decided to close
23  the land; right?
24      A.  That sounds right.
25      Q.  Okay.  Did you ever ask the United States

Lieutenant Colonel James Startzell
May 16, 2022

Page 86

1    Department of Justice to enforce Title 36 citations in
2    federal court?
3            A.    I don't think we specifically asked DOJ
4    to enforce that, not that I recall.
5            Q.    Did you ever discuss doing so, or try to?
6            A.    So I think at some point we had asked the
7    Department of Justice for assistance with law
8    enforcement capabilities.  I know that the commander
9    had had dialogue with others above him about trying to
10   get some more resources to the site to assist with
11   that, but I don't know if that -- I don't recall if
12   that took the form of a formal request or if it was
13   just verbal and e-mail communications.
14           Q.    How about did you or Colonel Henderson or
15   Brigadier General Spellmon ever ask the state of North
16   Dakota to come onto the property because you had
17   trespassers there that you wanted to be evicted?
18           MS. BOBET:  Objection; foundation,
19   personal knowledge.
20           A.    Yeah.  I don't remember if we formally
21   asked that of them.  I don't remember formally asking
22   them.
23           (Deposition Exhibit 381 was remotely
24   introduced and provided electronically to the court
25   reporter.)

Page 87

1            Q.    (BY MR. SEBY) Okay.  If we could turn to
2    Exhibit 381, please.  So this is an e-mail.
3    Thankfully, it's only one e-mail and it's from
4    Ms. Eileen Williamson, who's the public affairs
5    specialist in the Omaha district, e-mailed you on
6    October 11, and only you.
7            And she's talking about that joint
8    statement that we discussed earlier and that she's
9    getting calls from the public, quote, concerned about
10   construction at the camp on Corps property.  Reports
11   include fence construction, structures being built.
12   Right now we are unable to respond to these queries.
13           Why do you think she says right now we
14   are not able to respond to these queries?
15           MS. BOBET:  Objection; calls for
16   speculation.
17           A.    I don't really know.
18           Q.    (BY MR. SEBY) Okay.  So then she goes on
19   in the next paragraph -- this is an e-mail to you --
20   "Would like to have leadership consider coordinating
21   with HQ."  So I think she's possibly referring to --
22   and you tell me if I'm wrong.  She's referring to
23   leadership in the district or the division.  "Consider
24   coordinating with HQ to have a vetted message with
25   respect to the process we must follow for addressing

Page 88

1    Title 36 violations beyond the citation process."
2    When Title 36 violations occur, the Corps is
3    authorized to write citations.  "However, any further
4    action including resulting actions for nonpayment of
5    citations requires process which may include local law
6    enforcement or department of justice involvement."
7            Next paragraph, "If we can talk to
8    process without throwing others under the bus, then at
9    least the notion that, quote, we do not have the
10   physical ability to remove the protesters, end quote,
11   makes more sense."
12           Do you recall having that dialogue with
13   Ms. Williamson?
14           A.    I don't, but it's likely that I did,
15   based on this e-mail.
16           Q.    So you recall or think it was likely that
17   you talked about it as deputy district commander, but
18   you don't recall any details about it?
19           A.    Correct.
20           Q.    Okay.  All right.  If we can go to
21   Exhibit 347, please.  So this is an e-mail chain that
22   you're not copied on, but I'm going to ask you about
23   it because it's a series of communications.  And you
24   may have seen it.  I don't know.  But you're not
25   copied on it.  I just want to acknowledge that.  And

Page 89

1    it's a series of communications that start with Major
2    General Donald Jackson.  Do you know who he is?
3            A.    Yes.
4            Q.    And who is he, sir?
5            A.    General Jackson was the general in charge
6    of civil works, the civil works mission for the Corps
7    of Engineers at that time.
8            Q.    The whole Corps?
9            A.    Yes.  For the civil works portion of the
10   Corps mission.
11           Q.    Okay.  And he writes to Scott Spellmon,
12   brigadier general of the district -- pardon me -- the
13   division commander.  Can you provide an update to
14   John's -- he's talking about Colonel Henderson, I
15   think -- last message.  Interested in the outcome of
16   the tribal elder decision on camp support and the
17   proposed winter move to the reservation.  The chief
18   has called -- has a call with Senator Hoeven tomorrow.
19           Then Spellmon responds to General Jackson
20   and General Jackson acknowledges it.  And General
21   Jackson says, I met Archambault briefly.  And then
22   Spellmon responds to that saying -- he's talking about
23   the Dakota Access Pipeline construction, and it goes
24   on.
25           And then, interestingly enough, General

Lieutenant Colonel James Startzell
May 16, 2022

Page 90

1  Jackson forwards that e-mail communication with
2  Spellmon up the chain to Jo Ellen Darcy, who is the
3  assistant secretary of the Army for civil works,
4  you've said, and Todd Semonite, who I believe at that
5  time was the chief of engineers at the Corps of
6  Engineers, the whole thing; right?
7      A.  Yes.
8      Q.  So then Jackson says, "Madam Secretary
9  and Chief.  Wanted you both to have this in advance of
10  your engagements tomorrow."  And then to that, General
11  Jackson responds -- replies all.  Pardon me.  He
12  took -- he replied to everybody, but took Ms. Darcy
13  off.  And he talks about wanting to understand a few
14  issues.
15          If you look at No. 3, he's titled it in
16  all capital letters "Trespassing."  What is our
17  position to Congress why the Corps has allowed
18  trespassing and camping on government land on the
19  north side, effectively condoning the tribes to
20  violate the law both on our land as well as other
21  lands.  You see that?
22      A.  Yes.
23      Q.  So he's asking a question.  Do you
24  disagree with the way he phrased the question at all?
25      A.  No.  I mean, I don't know if -- are you

Page 91

1  asking why -- are you asking if I disagree with it?  I
2  don't understand.
3      Q.  I'm asking if you disagree with anything
4  that Major General Jackson -- the phrasing he has used
5  as asking a question that he wants more information on
6  on October 13, 2016, what is our position why the
7  Corps has allowed trespassing and camping on
8  government land to the north side, effectively
9  condoning the tribes to violate the law, both on our
10  land as well as other lands.  Do you see that?
11      A.  Yes.
12      Q.  Is he wrong?
13      A.  No, I don't think so.
14      Q.  Okay.  So he goes on to say, When is the
15  Corps going to do something to get this under control?
16  While many might move to other camps, some will stay
17  just to embolden the effort.  Is there some event that
18  will cause us, the Corps, to ask the sheriff to
19  enforce the law?
20          Okay.  So let's go to the next e-mail in
21  the chain.  And it's a lengthy one.  You can read the
22  whole thing because I don't want you to feel out of
23  context, but you tell me if you want to do that and
24  I'll pause.
25      A.  Okay.  Okay.  Can you scroll down a

Page 92

1  little bit.  Okay.
2      Q.  Okay.  So here on October 13 your boss's
3  boss -- and by that I mean you're the deputy district
4  commander of the Omaha district.  Omaha district is
5  part of the northwest division, which is multiple
6  districts.  Spellmon is the head of that and he's
7  reporting to the chief of engineers of the Corps and
8  Major General Donald Jackson, head of the civil works
9  division of the Corps, responding to the chief of the
10  Corps of Engineers' questions, one of which was
11  trespass.
12          And then with respect to trespass --
13  these responses are numbered in response to Chief
14  Semonite's questions.  No. 3, which is trespassing,
15  "Both Colonel Henderson and I shared with Governor
16  Dalrymple" -- that's the governor of North Dakota --
17  "and Senator Hoeven" -- that's a United States senator
18  from North Dakota -- "that it is best to leave the
19  camps on Corps property until the Chairman can make
20  the move onto tribal property.  We acknowledge the
21  trespassing."
22          On October 13, 2016, do you have any
23  reason to disagree with Brigadier General Scott
24  Spellmon, commanding general of the northwestern
25  division of the Corps of Engineers' statement

Page 93

1  acknowledging the trespassing on Corps property?
2      A.  No.
3      Q.  Okay.  Do you think that Spellmon was
4  referring to them as trespassers because the
5  protesters on the Corps property were there without
6  first obtaining a special use permit?
7          MS. BOBET:  Objection; calls for
8  speculation.
9      A.  Yeah.  I think the duration of their
10  stay, plus the fact that they had not gotten a permit
11  together.
12      Q.  (BY MR. SEBY) So here on October 13, that
13  would have been approximately a month after you
14  offered a permit to Chairman Archambault; right?
15      A.  Yes.
16      Q.  Okay.  It sat with them for a long time
17  and they never pulled it together and got it
18  finalized, which was on them; right?
19      A.  Yes.
20      Q.  Okay.  And the Corps waited while they
21  tried, right, or purported to try and told you they
22  were?
23      A.  Yes.
24      Q.  Okay.  So did you recall being part of
25  any discussions asking for other federal resources to

Lieutenant Colonel James Startzell
May 16, 2022

Page 94

1  help the Corps?
2       A.  Yes.
3       Q.  Can you tell me about that?
4       A.  Yeah.  So I don't recall a lot of
5  details.  What I know is we had talked about the
6  potential for federal law enforcement to assist with
7  this situation.  And I believe that we had sent
8  requests through headquarters USACE for either U.S.
9  marshals or some other BIA assistance to come to the
10  area.
11       Q.  And did that assistance ever arrive?
12       A.  I don't think so, or at least not in a
13  meaningful way.  There may have been some
14  additional -- I think the border patrol actually sent
15  some additional personnel to the state of North
16  Dakota, but I don't think there was a large increase
17  in law enforcement beyond that.
18       Q.  And what did the border patrol do and
19  when did they do it?
20       A.  I don't even remember the details of what
21  they were able to contribute.
22       Q.  Or how long?
23       A.  Right.  Same thing.  I do not remember
24  any details.  I think their authorities were limited
25  based on the fact that they're border patrol.  So I

Page 95

1  can't remember what they were able to contribute to
2  that.
3       Q.  Do you think there were any resources in
4  the United States government that could have assisted
5  the Corps during this eight-month or nine-month-long
6  process?
7       MS. BOBET:  Objection; foundation, calls
8  for speculation.
9       A.  I'm sure there was, but I don't know what
10  the most appropriate resource would have been.
11       Q.  (BY MR. SEBY) Okay.  Other agencies
12  perhaps in the United States government?
13       MS. BOBET:  Same objections.
14       A.  Yes.
15       Q.  (BY MR. SEBY) Okay.  You were nodding
16  your head.  I just want to make sure that we capture
17  that, as we just discussed.  Is that a yes?
18       A.  Yes.  And that's why we had requested
19  some assistance in the form of U.S. marshals or some
20  other asset like that.
21       Q.  And so I want to make sure I understand
22  your answer.  Are you saying that you asked up the
23  chain in the Corps to make that request?
24       A.  Yeah.  From my recollection, Colonel
25  Henderson had asked through headquarters if they could

Page 96

1  facilitate some kind of additional resources coming to
2  support the effort.
3       Q.  And do you know whether or not Colonel
4  Henderson's efforts to move it up the chain in the
5  Corps had any success?
6       A.  I don't know.
7       Q.  Do you know whether or not the Corps ever
8  made such requests outside of the Corps for other
9  federal resources?
10       MS. BOBET:  Objection; vague.
11       A.  Yeah.  I am not sure.  I don't know.
12       Q.  (BY MR. SEBY) So you don't know if it got
13  out of the Corps even?
14       MS. BOBET:  Objection; asked and
15  answered.
16       A.  Yeah.  I'm not sure how far the request
17  went.
18       Q.  (BY MR. SEBY) Okay.  Thank you.  And
19  indeed, Colonel Henderson's thought was to try and
20  get -- make it broader than just the Corps asking for
21  federal law enforcement resources; is that correct?
22       MS. BOBET:  Objection; calls for
23  speculation, foundation.
24       A.  Yeah.  I mean, I think he was looking for
25  any help that we could get, so whatever form that

Page 97

1  took.  I wasn't really in the conversation.
2       Q.  (BY MR. SEBY) I'm sorry.  Do you know,
3  was he trying to consider asking for North Dakota to
4  join him in that request up the chain?
5       A.  I don't recall specifically mentions of
6  North Dakota, but I'm sure any assistance would have
7  been welcome.
8       Q.  Are you aware personally whether or not
9  the governor and the county and agencies in the state
10  of North Dakota previously and repeatedly asked the
11  United States in different respects for federal law
12  enforcement assistance or resources?
13       MS. BOBET:  Assumes facts.
14       A.  I know on at least one occasion they
15  requested assistance from the U.S. government.
16       Q.  (BY MR. SEBY) Do you know whether or not
17  assistance was ever forthcoming based upon that
18  request?
19       A.  I don't believe so, or at least not -- at
20  least not enough resources to deal with the issue.
21       (Deposition Exhibit 405 was remotely
22  introduced and provided electronically to the court
23  reporter.)
24       Q.  Sure.  Okay.  If we could turn to
25  Exhibit 405, please.  This is an exhibit that is two

Lieutenant Colonel James Startzell
May 16, 2022

Page 98

1  pages and has five e-mail components to it.  Could you
2  take the time to start at the bottom, the beginning,
3  and move up and read it in completion and let me know
4  when you've done that.  Of course, let Ms. Hymel know
5  when you're ready to advance up the chain.
6       A.   Okay.  Can you scroll up, please.  Okay.
7  Please keep going.  Okay.  Okay.  Okay.  I think I
8  read it all.
9       Q.   Okay.  Good.  So the e-mail -- let's go
10  from the beginning -- is first an e-mail from you to a
11  number of Corps people, yeah, within the division, the
12  north -- pardon me; excuse me -- the Omaha district
13  and then others, I think, in the northwest division.
14  Your e-mail, it says "DAPL AAR Comments."  What is an
15  AAR?
16       A.   After-action review.  So it's basically
17  gathering lessons learned for the purpose of applying
18  those the next time around.
19       Q.   Is that a standard Corps practice?
20       A.   Yeah.  It's a standard army practice, and
21  I think the Corps also uses that tool.
22       Q.   Sure.  And lessons learned and kind of
23  this concept of continuous improvement; right?
24       A.   Yes.
25       Q.   And in order to have continuous

Page 99

1  improvement, what is -- are you gathering information
2  internally within the Corps?
3       A.   Yeah.  I mean, I think that's who this
4  was directed at, any kind of internal observations
5  about things that we could do better the next time
6  around.
7       Q.   And so with this e-mail, you're sending
8  it to this group.  And, you know, I guess it
9  includes -- how did you decide to pick the people you
10  sent this to?
11       A.   It looks like this is mostly the
12  corporate board, which included the division chiefs,
13  and then anyone who had a significant part to play in
14  coordination with other entities, other agencies.
15       Q.   Okay.  Including the state of North
16  Dakota?
17       A.   Yes.
18       Q.   Including other federal agencies?
19       A.   Yes.
20       Q.   Okay.  And you say in here that you'll
21  "roll up comments and submit top 3 to 5 comments.
22  Comments should come from anyone who was intimately
23  familiar with the DAPL permitting process or on the
24  PDT that we stood up."  What is the PDT?
25       A.   Project delivery team, so a

Page 100

1  multifunctional project team.
2       Q.   Got it.  "After it became a significant
3  issue in July/August of 2016."  All right.  And you
4  say the why is headquarters Corps will be putting
5  together an AAR this week to discuss lessons learned.
6  By the way, your e-mail here is dated March 6, 2016.
7  So did you do this because someone at the headquarters
8  asked you to help out on its effort or were you doing
9  something at the district level?  I'm confused by
10  that.
11       A.   This was probably in response to some
12  kind of conversation I had had with either
13  northwestern division or headquarters USACE that they
14  wanted to prepare an AAR.  And so obviously we were
15  going to be a large part of that process for the
16  Corps.
17       Q.   Yeah.  Did you think that was a good idea
18  or did you think this was a bad idea at the time?
19       A.   No.  I think it was a good idea.
20       Q.   And so your ability to provide input to
21  this larger effort at the headquarters Corps, the
22  national Corps office, you asked these people for
23  their input?
24       A.   Yes.
25       Q.   Okay.  And when you say you would "roll

Page 101

1  up comments," what does that mean?
2       A.   Meaning that I would collect them and
3  just edit them so that they were understandable to
4  anyone who might be viewing them at headquarters
5  level.
6       Q.   All right.  So the -- then you get -- you
7  sent that to the group and the one reply that's the
8  second e-mail in this chain is from Larry Janis.  Can
9  you remind me who Janis is.
10       A.   Larry Janis was the chief of the natural
11  resources division within the operations division of
12  the district.
13       Q.   The Omaha district?
14       A.   Yes.
15       Q.   Okay.  So he says, "Sir, the attached is
16  a work in progress, but does identify several AAR
17  issues in the format you requested.  This does
18  incorporate the information that Martha provided
19  earlier."
20       Do you recall what Martha Chieply
21  provided earlier?
22       A.   I don't, no.
23       Q.   Okay.  Then he goes on to say, "We have
24  also taken the liberty to identify five issues that
25  might warrant CG visibility."  Who is -- who or what

Lieutenant Colonel James Startzell
May 16, 2022

Page 102

1  is CG?
2        A.   The commanding general, so General
3  Semonite.
4        Q.   The chief?
5        A.   Yes.  Or he could have been referring to
6  General Spellmon, who's the commander of the
7  northwestern division, one of those two, but I think
8  he was referring to General Semonite.
9        Q.   Okay.  So what are the five issues that
10  he's referring to that might be worthy of the chief
11  knowing?
12        A.   I can't recall what he wrote on there.
13  I'm not really sure.
14        Q.   Okay.  So to that e-mail from Mr. Janis
15  to the group comes next an e-mail from David Chipman.
16  Who is Mr. Chipman?
17        A.   David Chipman was the real estate
18  division chief.
19        Q.   Okay.  What was his job?
20        A.   So as it pertains to DAPL, David
21  Chipman's team was responsible for investigating the
22  property ownership to make sure that we understood
23  where a Corps property ended and where private
24  property began and where tribal land was.  And so they
25  would help us develop the maps.

Page 103

1        Q.   Did any of the maps that Mr. Chipman
2  developed or oversaw the development of include the
3  location of protest camps on Corps property?
4        A.   Yes.
5        Q.   And how often did he update those?
6        A.   Any time there was a significant change
7  to the situation, but probably every two or three
8  weeks.
9        Q.   Okay.  And what tools and sources of
10  information did Mr. Chipman use to learn those things
11  within his responsibility?
12        A.   A lot of that information came from our
13  liaison with the state of North Dakota in the EOC.
14  Some of it came from Major Pope, who's included on
15  that cc line.  And then some of it came from the
16  project office leadership, Eric Stasch with his team.
17             And then if there was a reported -- some
18  kind of activity reported at a specific location via
19  the sheriff, they would take that into consideration,
20  too.
21        Q.   And where did Major Pope get his
22  information from?
23        A.   So Major Pope was -- he was actually on
24  ground in North Dakota for a period of two or three
25  weeks, I believe.  So he was engaging directly with

Page 104

1  the protesters and not project office.
2        Q.   Do you recall when Mr. Pope came into the
3  scene?  Was it early?
4        A.   I think it was sometime in early
5  September, maybe.  Early or mid-September.
6        Q.   2016?
7        A.   That would be my guess, yeah.
8        Q.   But you don't know?
9        A.   No.  I don't remember.
10        Q.   Okay.  Would it surprise you if that was
11  not correct?
12        A.   No.
13        Q.   Okay.  So the next corresponder in your
14  chain is John Voeller; right?
15        A.   Okay.
16        Q.   Do you see that?
17        A.   Yes.
18        Q.   And I think, but correct me, sir, Voeller
19  is a park ranger at the Oahe project; is that correct?
20        A.   Yes.
21        Q.   And he's a park ranger, but he's also the
22  person that you or Colonel Henderson directed be the
23  liaison to attend state of North Dakota EOC, Emergency
24  Operating Center, meetings; correct?  I'm sorry?
25        A.   Yes.

Page 105

1        Q.   Okay.  All right.  And so did you read
2  Mr. Voeller's response to you?  He seems to just
3  respond to you, I think; right?
4        A.   Yes.
5        Q.   Not the rest of the group.  He's dropped
6  the rest of the group and he just responds to you.
7  And he says, "I am not sure if this is the type of
8  comment you are looking for."  So he's asking you a
9  question, but he goes on to say, My comment would be
10  that the Corps, either on the district level -- so
11  that's in Omaha -- but specifically at HQ level, the
12  Corps of Engineers headquarters, Washington, D.C.,
13  would need to try to push for more federal law
14  enforcement assistance to assistance local agencies
15  involved in something like this protest in the future.
16             There are a lot of unhappy law
17  enforcement and citizens in general here in North
18  Dakota in regards to the fact that other than the BIA
19  and DOI, Department of Interior, they -- he's
20  referring to the unhappy law enforcement and citizens
21  in North Dakota -- they did not receive any federal
22  law enforcement support for actual boots on the ground
23  to help with protest activities.  This fact could have
24  large implications in the future for the working
25  relationships for the Corps field staff at the various

Lieutenant Colonel James Startzell
May 16, 2022

Page 106

1 projects, as well as other federal agencies with the
2 local law enforcement agencies that are relied on for
3 assistance.
4        And so did I read that accurately?
5    A.   Yes.
6    Q.   Then you replied to Mr. Voeller same day,
7 hour apart.  You said, "Okay.  Thanks, John.  I will
8 probably spin that as, quote, coordination with other
9 agencies, end quote, because even Lieutenant General
10 Semonite" -- that's the chief of the Corps of
11 Engineers; right?
12    A.   Yes.
13    Q.   -- "didn't have the ability to influence
14 the politics of that decision.  It certainly has had
15 an impact."
16        So I have a few questions about your
17 response.  You're saying that even the chief of the
18 Corps of Engineers didn't have the ability to
19 influence the politics of that decision.  What
20 decision are you referring to?
21    A.   So what I was referring to was providing
22 other federal support to the site.
23    Q.   Okay.  And why did you use the phrase "I
24 will probably spin that"?
25    A.   So when you're preparing an AAR, you want

Page 107

1 to make sure that the way that you're preparing it is
2 understandable to all entities, and at the
3 headquarters USACE level, the coordination with other
4 agencies was the real issue.
5    Q.   Well, did you feel as though the Corps
6 didn't do a good job in coordinating?  Is that what
7 you think Voeller is talking about?
8        MS. BOBET:  Objection; compound.
9    A.   No.  I don't necessarily think the Corps
10 didn't do a good job.  I just think that at the
11 federal government level, the support that we were
12 providing wasn't adequate to meet the needs.
13    Q.   (BY MR. SEBY) The needs of who?
14    A.   The needs of the protesters, the needs of
15 the state of North Dakota, the district, basically
16 just helping us with the situation.
17    Q.   But what did you mean by even the chief
18 of the engineers "didn't have the ability to influence
19 the politics of that decision"?  What decision are you
20 referring to?
21    A.   The decision to or to not provide other
22 federal law enforcement support.
23    Q.   To the Corps to evict people from the
24 property early on?
25    A.   Well, not specifically to evict them, but

Page 108

1 to provide other law enforcement support to either,
2 you know, prevent trespassing or to take care of the
3 larger problems on the site.  Not necessarily
4 specifically evicting the large camps.
5    Q.   Well, when you say "to prevent
6 trespassing," what about those people that are in the
7 act of already trespassing?  How would federal
8 assistance do that?
9        MS. BOBET:  Objection; calls for
10 speculation.
11    A.   So --
12    Q.   (BY MR. SEBY) I'm asking you a question
13 about the words you used in an e-mail that started in
14 a chain that you created.  So help me understand what
15 you are talking about.
16    A.   Well, what I'm talking about is any
17 additional federal law enforcement support would have
18 helped, whether that be preventing trespassing or
19 moving everyone off the site, or just assisting local
20 law enforcement with their roles.  So that is what I'm
21 talking about.
22    Q.   And so you're saying -- I want to make
23 sure I understand that you're saying -- you need a
24 minute there?
25    A.   No.  Just my motion light keeps turning

Page 109

1 off.
2    Q.   You're not moving around apparently
3 enough; right?  I'm just trying to understand, you
4 are -- a question:  Are you saying that even the chief
5 of engineers couldn't influence that issue?
6    A.   Yeah.  So as I said before, we had
7 requested support through the chain of command to try
8 to get additional assets.  And my impression was that
9 he wasn't able to get support from outside of the
10 Corps of Engineers.
11    Q.   So I'm just confused because you're
12 talking about within the Corps is one thing.  He's the
13 top of the Corps.  So are you referring to outside of
14 the Corps?
15    A.   Yes.
16    Q.   Okay.  So getting federal resources
17 outside of the Corps, he couldn't, in your words,
18 quote, influence the politics of that decision.  I'm
19 trying to understand what you mean, "the politics of
20 that decision" outside of the Corps.
21    A.   Yeah.  I mean, I don't know if I can say
22 it any other way.  I feel like I've already explained
23 that.  There were resources outside of the Corps of
24 Engineers' control that could have assisted with the
25 problems, but we were not able to get anything that

Lieutenant Colonel James Startzell
May 16, 2022

Page 110

1  was substantively effective.
2      Q.  So when you say "the politics of that
3  decision," what are you referring to?  Politics of the
4  decision outside of the Corps not to provide any
5  federal resources, is that what you're talking about?
6      A.  I'm saying the decision to commit
7  external resources or not.  That is the decision that
8  I'm talking about.
9      Q.  And what politics are you referring to?
10     A.  Well, so above the Corps of Engineers
11 level there were lots of considerations that
12 leadership was, I'm sure, weighing with regards to
13 what actions to take.
14     Q.  And would that include -- let's start
15 with where that may include and you tell me if it is
16 correct or not.  Would that include the civil works
17 component of the Corps?
18     A.  I'm talking about everything outside of
19 the control of the Corps of Engineers.
20     Q.  So still within the army or outside the
21 army, too?
22     A.  I'm just talking about the Corps of
23 Engineers, which is a small component of the army.
24     Q.  Okay.  So the army still; right?
25     A.  So the Corps of Engineers is just one

Page 111

1  portion of the army.  That's the part that I'm
2  referring to.
3      Q.  Okay.  And so when you say politics -- a
4  decision based on politics was made above the Corps,
5  the first next level would be within the army; right?
6      A.  Yes.
7      Q.  And then outside of the army, it would be
8  the larger administration at the time; is that
9  correct?
10     A.  Yeah.  It would be anything else in the
11 federal government, any other federal agencies.
12     Q.  In the executive branch?
13     A.  Yes.
14     Q.  Okay.  Are you familiar with any detail
15 in that regard?
16     A.  No.  I just know that we sent up a
17 request and, you know, weren't really able to get any
18 additional assistance.
19     Q.  We, the Corps, sent up a request or you
20 and Colonel Henderson and Spellmon sent a request to
21 the chief?  I'm trying to understand.  You keep
22 switching between within the Corps and outside of the
23 Corps, and I want to make sure I understand what
24 you're talking about or whether you're even answering
25 the question.

Page 112

1      A.  So what I can speak to --
2      MS. BOBET:  Objection; compound.
3      A.  What I can speak to is --
4      Q.  (BY MR. SEBY) I'm sorry.  Just let me
5  stop you for a minute.  When you're speaking, if one
6  of you -- your counsel or you -- could speak one after
7  the other and not on top of each other.
8      MR. SEBY:  Ms. Bobet, are you done?
9      MS. BOBET:  Yes.  To make sure it's
10 clear, I'll state my question again.  The question was
11 argumentative and compound.
12     Q.  (BY MR. SEBY) Colonel, would you clarify
13 for me whether we are -- whether your answers are
14 talking about what was sent up and so sent up within
15 the hierarchy of the Corps or the Corps sending
16 something outside of the Corps?
17     A.  So what I can speak to is that my
18 district commander had submitted a request for
19 assistance.
20     Q.  Yes.
21     A.  And that is all I can say for certain.
22     Q.  Okay.  And so you don't know if anything
23 at all happened after that, right, or do you?
24     A.  I don't.
25     Q.  Okay.  Colonel, can you recall a time

Page 113

1  when you or any of your Corps of Engineers or
2  Department of Army colleagues made a statement that
3  resulted in any deescalation of the DAPL protests?
4      A.  I don't remember any specific statement,
5  no.
6      Q.  How about any action taken that resulted
7  in any deescalation of the DAPL protests?
8      A.  No, not specifically.
9      Q.  Okay.  All right.  Unless you have
10 indicated otherwise throughout the deposition today,
11 have you understood my questions?
12     A.  Yes.
13     Q.  Is there anything further that you would
14 like to add?
15     A.  No.
16     MR. SEBY:  Okay.  At this time,
17 Ms. Bobet, I have no further questions and pass the
18 witness to you for United States.
19     MS. BOBET:  Thank you, Mr. Seby.
20                  EXAMINATION
21 BY MS. BOBET:
22     Q.  Just one question to follow up,
23 Lieutenant Colonel.  When you talk about the federal
24 government level of support not being adequate or
25 resources outside the Corps not being provided, I

Lieutenant Colonel James Startzell
May 16, 2022

Page 114

1  understand you to be speaking about federal law
2  enforcement assistance in particular; is that right?
3      A.   Yes.  That's correct.
4           MS. BOBET:  All right.  That was all the
5  clarification I had.  Unless Mr. Seby has anything
6  else, I think we're done.
7           THE VIDEOGRAPHER:  Counsel, before we go
8  off the record, may we please get orders on the
9  record.
10          MS. BOBET:  Yeah.  We'd like to read and
11 sign.  I will -- we'll need to obligate the funds for
12 the order, but I can tell you now that we'd like to
13 order the transcript.  I can e-mail you with the speed
14 that we need.  We'd like the exhibits as well.
15          THE VIDEOGRAPHER:  Mr. Seby.
16          MR. SEBY:  Same, please.  Same order and
17 same schedule as the United States for North Dakota,
18 please.
19          THE VIDEOGRAPHER:  Thank you.  Going off
20 the record.  This concludes the videotaped deposition
21 of Lieutenant Colonel James Startzell.  The time is
22 6:03 p.m. UTC, 1:03 p.m. Central.
23          WHEREUPON, the within proceedings were
24 concluded at the approximate hour of 12:03 p.m.
25 Mountain on the 16th day of May, 2022.

Page 115

1               I, LIEUTENANT COLONEL JAMES STARTZELL, do
2  hereby certify that I have read the above and
3  foregoing deposition and that the same is a true and
4  accurate transcription of my testimony, except for
5  attached amendments, if any.
6
               Amendments attached   (  ) Yes   (  ) No
7
8
               _____
9               LIEUTENANT COLONEL JAMES STARTZELL
10
11
12
13          The signature above of LIEUTENANT COLONEL
14 JAMES STARTZELL was subscribed and sworn to or
15 affirmed before me in the county of _____,
16 state of Texas, this _____ day of _____,
17 2022.
18
19
20
               _____
21          Notary Public
               My commission expires
22
23
24
25 State of North Dakota 5/16/22 (tdg)

Page 116

1              REPORTER'S CERTIFICATE
   STATE OF COLORADO      )
2                         )
                          ) ss.
3  COUNTY OF ARAPAHOE      )
4          I, TIFFANY D. GOULDING, Registered
   Professional Reporter and Notary Public ID No.
5  19984028637, State of Colorado, do hereby certify that
   previous to the commencement of the examination, the
6  said LIEUTENANT COLONEL JAMES STARTZELL verbally
   declared his testimony is under the penalty of perjury
7  in relation to the matters in controversy between the
   parties hereto; that the said deposition was taken in
8  machine shorthand by me at the time and place
   aforesaid and was thereafter reduced to typewritten
9  form; that the foregoing is a true transcript of the
   questions asked, testimony given, and proceedings had.
10
           I further certify that I am not employed
11 by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12 this litigation.
13         IN WITNESS WHEREOF, I have affixed my
   signature this 1st day of June, 2022.
14
15         My commission expires November 4, 2022.
16 x____ Reading and Signing was requested.
17 _____ Reading and Signing was waived.
18 _____ Reading and Signing is not required.
19
20         _____
21         Tiffany Goulding
           Registered Professional Reporter
22
23
24
25

Page 117

1  Errata Sheet
2
3  NAME OF CASE: Plaintiff vs UNITED STATES
4  DATE OF DEPOSITION: 05/16/2022
5  NAME OF WITNESS: Lieutenant Colonel James Startzell
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25         _____