# EXHIBIT 64
# (with redactions)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DISTRICT

Civil No. 1:19-cv-00150-DMT-ARS
_____

VIDEOTAPE DEPOSITION OF:   DARREN CRUZAN
                           August 23, 2022
                           (Via RemoteDepo)
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.
_____


          PURSUANT TO NOTICE, the videotape
deposition of DARREN CRUZAN was taken on behalf of the
Plaintiff in Huddleston, Virginia, via remote means,
on August 23, 2022, at 8:31 a.m., Mountain Time,
before Tiffany D. Goulding, Registered Professional
Reporter and Notary Public within Colorado, appearing
remotely from Arapahoe County, Colorado.

Darren Cruzan
August 23, 2022

Page 2

```
 1              REMOTE APPEARANCES
 2  For the Plaintiff:
 3          PAUL M. SEBY, ESQ.
            PAUL KERLIN, ESQ.
 4          Greenberg Traurig, LLP
            1144 15th Street, Suite 3300
 5          Denver, Colorado 80202
            sebyp@gtlaw.com
 6
 7  For the Defendant:
 8
            V. WILLIAM SCARPATO III, ESQ.
 9          Special Attorney to the United States
            Attorney General
10          United States Attorney's Office
            District of Colorado
11          1801 California Street, Suite 1600
            Denver, Colorado 80202
12          victor.scarpato@usdoj.gov
13
14  Also Present:
15          Gabe Seymore, Videographer
            Rachel Hymel
16          Adrienne DiCerbo
            Tony Irish
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2  EXAMINATION OF DARREN CRUZAN:            PAGE
    August 23, 2022
 3
 4  By Mr. Seby                                 9
 5
 6  DEPOSITION EXHIBITS:                     INITIAL
                                            REFERENCE
 7
    (Exhibits provided electronically to the reporter.)
 8
 9  Exhibit 722  Telephone Conference Invite, 9/1/16  136
10  Exhibit 739  E-mail to O'Neal, et al. from      55
                 Cruzan, 8/14/16, Subject: Re:
11               Standing Rock Sioux Tribe REF: DAPL
                 Protest - Council arrests by Morton
12               County Sheriff's Department
13  Exhibit 740  E-mail to Cruzan, et al. from      64
                 O'Neal, 8/14/16, Subject: Re:
14               Standing Rock Sioux Tribe REF: DAPL
                 Protest - Council arrests by Morton
15               County Sheriff's Department
16  Exhibit 741  E-mail to O'Neal, et al. from      69
                 Cruzan, 8/14/16, Subject: Re:
17               Standing Rock Sioux Tribe REF: DAPL
                 Protest - Council arrests by Morton
18               County Sheriff's Department
19  Exhibit 742  E-mail to Cruzan, et al. from      73
                 Lonewolf, 8/15/16, Subject: Re:
20               SRST updates
21  Exhibit 743  E-mail to Cruzan, et al. from      84
                 Lonewolf, 8/15/16, Subject:  Re:
22               SRST updates
23  Exhibit 745  E-mail to Roberts from Cruzan,     90
                 8/15/16, Subject: FWD: SRST updates
24  Exhibit 746  E-mail to Cruzan, et al. from Lynn, 93
                 8/15/16, Subject: Re: SRST updates
25
```

Page 4

```
 1  Exhibit 747  E-mail to Long, et al. from Cruzan,  96
                 8/17/16, Subject: Re: SRST updates
 2
 3  Exhibit 748  E-mail to Cruzan from Roberts,      103
                 8/18/16, Subject: Re: SRST updates
 4  Exhibit 749  E-mail to Lakota, et al. from       108
                 LaPointe, 8/18/16, Subject: FWD:
 5               Camp Sites in Cannonball Area
 6  Exhibit 750  E-mail to Black, et al. from        122
                 Cruzan, 8/18/16, Subject: Evening
 7               Update
 8  Exhibit 751  E-mail to Gallagher from Cruzan,    127
                 8/22/16
 9
10  Exhibit 752  E-mail to Black, et al. from        132
                 Cruzan, 8/22/16, Subject: Evening
11               Update
12  Exhibit 755  E-mail to Cruzan, et al. from       133
                 Gallagher, 9/1/16, Subject: DAPL
13               Briefing
14  Exhibit 756  E-mail to Cruzan from Doering,      139
                 9/3/16, Subject: DAPL EOC
15               Activation
16  Exhibit 757  E-mail to Roberts, et al. from      142
                 Cruzan, 9/4/16, Subject: Re: North
17               Dakota Protest
18  Exhibit 758  E-mail to Cruzan, et al. from       148
                 Roberts, 9/4/16, Subject: Re: North
19               Dakota Protest
20  Exhibit 759  E-mail to Bernstein and Darren      149
                 from Cruzan, 9/4/16, Subject: Re:
21               North Dakota Protest
22  Exhibit 760  E-mail to Black, et al. from Cruzan, 150
                 9/4/16, Subject: FWD: Sunday Evening
23               Report
24
25
```

Page 5

```
 1  Exhibit 761  E-mail to Toulou and Cruzan from    155
                 Delorme, 9/7/16, Subject: FWD:
 2               Letter to you from Congressman
                 Cramer regarding the Dakota
 3               Access Pipeline
 4  Exhibit 762  E-mail to Salamanca, et al. from    161
                 Baker, 9/9/16, Subject: Update from
 5               Tribe
 6  Exhibit 763  E-mail to Toulou, et al. from       165
                 Cruzan, 9/11/16, Subject: Sunday
 7               9/11/16 Update
 8  Exhibit 765  E-mail to Hirsch, et al. from       172
                 Hackworth, 9/14/16, Subject:
 9               Standing Rock: DOJ, Interior, and
                 Army Corps Call regarding Special
10               Use Permit
11  Exhibit 767  E-mail to Humbert from Benavidez,   178
                 9/15/16, Subject: Response
12
13  Exhibit 768  E-mail to Harman from Cruzan,       181
                 9/15/16, Subject: Re: Questions
14               about DAPL protests
15  Exhibit 770  E-mail to Cruzan, et al. from       188
                 Beaudreau, 9/15/16, Subject: Re:
16               BIA OJS concerns
17  Exhibit 772  E-mail to Cruzan from Toulou,       202
                 9/16/16, Subject: FW: Update
18  Exhibit 774  E-mail to Jackson, et al. from      204
                 Cruzan, 9/18/16, Subject: Re: Permit
19               Question
20  Exhibit 776  E-mail to Dohrmann, et al. from     211
                 Cruzan, 9/18/16, Subject: Re:
21               Meeting Today?
22  Exhibit 777  E-mail to Gerhart, et al. from      217
                 Salamanca, 9/20/16, Subject: Re:
23               Update to Volunteer Self Marshals
                 needs and concerns
24
25
```

Darren Cruzan
August 23, 2022

1    Exhibit 778   E-mail to Salamanca, et al. from    223
              Cruzan, 9/20/16, Subject: Re:
2             Update to Volunteer Self Marshals
              needs and concerns
3
     Exhibit 790   E-mail to Cruzan, et al. from      226
4             Beaudreau, 10/15/16, Subject: Re:
              Quick Question
5
     Exhibit 791   E-mail to Black, et al. from       236
6             Cruzan, 10/15/16, Subject: FWD:
              Saturday Update
7
     Exhibit 792   E-mail to Smith from Cruzan,       243
8             10/15/16, Subject: SRST DAPL
              Saturday Evening Report
9
     Exhibit 795   E-mail to Cruzan, et al. from      246
10            Cossey, 10/22/16, Subject: Update on
              today's Protest Activity
11
     Exhibit 797   E-mail to Perry from Cruzan,       251
12            12/16/16, Subject: Re: Meeting with
              ND Governor
13
14
15
16
17
18
19
20
21
22
23
24
25

1          WHEREUPON, the following proceedings
2    were taken pursuant to the Federal Rules of Civil
3    Procedure.
4              *    *    *    *    *
5          THE VIDEOGRAPHER:  We are now on the
6    record at 8:31 a.m. on August 23, 2022.  This is the
7    video-recorded proceeding of Darren Cruzan taken by
8    counsel for the plaintiff in the matter of State of
9    North Dakota versus the United States of America filed
10   in the United States District Court for the District
11   of North Dakota, Western Division.
12         This proceeding is being held by remote
13   video conference.  My name is Gabe Seymore and I'm the
14   videographer on behalf of U.S. Legal Support, located
15   at 16825 North Chase Drive, Suite 900, Houston, Texas
16   77060.  I am not related to any party in this action,
17   nor am I financially interested in the outcome.  The
18   court reporter is Tiffany Goulding on behalf of U.S.
19   Legal Support.
20         And, Counsel, will you please state your
21   appearances for the record.
22         MR. SEBY:  Good morning.  This is Paul
23   Seby, counsel for the plaintiff, State of North
24   Dakota, along with my cocounsel, Paul Kerlin.
25         MR. SCARPATO:  Good morning.  Bill

1    Scarpato from the United States Attorney's Office for
2    the District of Colorado on behalf of the defendant,
3    United States of America.  Also present at the
4    deposition today are Adrienne DiCerbo and Tony Irish
5    from the Department of Interior.
6          THE REPORTER:  The attorneys
7    participating in this deposition acknowledge that I am
8    not physically present in the deposition room and that
9    I will be reporting this deposition remotely.  They
10   further acknowledge that, in lieu of an oath
11   administered in person, the witness will verbally
12   declare his testimony in this matter is under penalty
13   of perjury.  The parties and their counsel consent to
14   this arrangement and waive any objections to this
15   manner of reporting.
16         Please indicate your agreement by stating
17   your name and your agreement on the record.  Mr. Seby
18   first.
19         MR. SEBY:  Sure.  This is Paul Seby,
20   counsel for the plaintiff, and I understand and
21   concur.
22         MR. SCARPATO:  Bill Scarpato for
23   defendant.  We agree.
24         THE REPORTER:  Mr. Cruzan, I will also
25   ask you to agree and declare that the testimony you

1    are about to give will be under the penalty of
2    perjury.
3          THE DEPONENT:  My name is Darren Cruzan.
4    I understand and I agree.
5              DARREN CRUZAN,
6    having verbally declared that his testimony in this
7    matter is under penalty of perjury, testified as
8    follows:
9              EXAMINATION
10   BY MR. SEBY:
11        Q.   All right.  Good morning, Mr. Cruzan.
12        A.   Good morning.
13        Q.   This will be a deposition of your
14   proceeding and taken pursuant to prior notice and
15   agreement of counsel.  My name is Paul Seby.  I'm both
16   an attorney with the law firm of Greenberg Traurig and
17   a special assistant attorney general for the State of
18   North Dakota.  And along with Paul Kerlin, we
19   represent the State of North Dakota, who I'll refer to
20   today as "the state" or "North Dakota."
21        Do you understand, sir, that you've just
22   been sworn in this morning?
23        A.   I do understand that, yes.
24        Q.   Would you please state your full name for
25   the record.

Darren Cruzan
August 23, 2022

1    A.    Sure.  My name is Darren Andrew Cruzan.
2         Q.    And before we begin, I just want to go
3  over a few ground rules for the deposition, most of
4  which are just intended to help the court reporter
5  take down everything we say properly.
6              Everything we say today is being written
7  down and videotaped, and because of that I'd ask you
8  to please verbalize responses with a yes or no or
9  other answer as opposed to nodding your head yes or
10 no.  Also, please no shorthand "uh-huh" or "huh-uh,"
11 if that's acceptable.
12        A.    Okay.  Understood.
13        Q.    Thank you.  Likewise, it's difficult for
14 the court reporter to take down what we're saying if
15 we inadvertently talk over each other.  So I will do
16 my best not to interrupt you; and if you would do the
17 same, not to interrupt me, let me finish my questions,
18 that would be great.  Does that work?
19        A.    Yes, sir.  Yes.
20        Q.    Okay.  If you need a break during the
21 deposition, just please let me know.  However, if
22 there's a question pending, I think we'd ask you to
23 please first answer that in a complete fashion.  Then
24 we can take a break, I think maybe a ten-, 15-minute
25 break on the hour every hour, if that works for you.

1  If you do not understand a question that I've asked,
2  just let me know and I will repeat or rephrase the
3  question and I'll do my best to clarify what I'm
4  trying to ask you.  Okay?
5         A.    Okay.  That sounds great.
6         Q.    And if you answer a question I've asked,
7  I'm going to assume that you have understood the
8  question I've asked.  Is that okay?
9         A.    Okay.  Sure.  Yes.
10        Q.    Is anyone in the room with you?
11        A.    No.  I'm out on my back deck, which may
12 be a problem for me as the heat comes up.  This was
13 the best place I could go to get some privacy.  So
14 I'll do my best to remain here for the remainder, but
15 it's supposed to get 80 degrees today.  Best I could
16 do to get some privacy.  So nobody is out here.  To
17 answer your question, nobody is out here with me.
18        Q.    Okay.  Do you understand, sir, that your
19 deposition today has the same force and effect as if
20 you were in front of a judge and a jury?
21        A.    Yes, I do.
22        Q.    And do you understand, Mr. Cruzan, that
23 portions of your videotaped deposition may be played
24 to the court if this case were to go to trial?
25        A.    Yes, I do.

1         Q.    And do you understand that if you fail to
2  tell the truth today that is considered perjury?
3         A.    Yes, I do.
4         Q.    Okay.  To that end, is there anything
5  today preventing you from providing complete,
6  accurate, and truthful testimony?
7         A.    No, sir.
8         Q.    Any questions about these basic ground
9  rules, instructions?
10        A.    No, sir, not from me.
11        Q.    Okay.  Mr. Cruzan, what did you do to
12 prepare for your deposition today?
13        A.    I met with Bill and Tim.  I'm sorry.  I
14 don't remember Tim's last name.  But as far as
15 reviewing documents, I didn't do any preparation
16 there.  I'm going to be relying on my memory.
17        Q.    Okay.  And you met with your counsel.
18 How did you meet?  Did you do it virtually or in
19 person?
20        A.    It was through a virtual.  I think it was
21 Zoom, but I'm not sure.  It was virtual for sure.
22        Q.    When was that interaction?
23        A.    I'd have to get some help with the dates,
24 but it was last week and I believe the week before,
25 once for a couple of hours and once for a little bit

1  less than an hour.
2         Q.    Okay.  Did you talk to anyone else other
3  than your counsel in preparation for your deposition
4  today?
5         A.    No, I haven't.
6         Q.    And you said you did not review any
7  documents at all?
8         A.    Well, let me take that back.  So I was
9  shown a couple of documents during those conversations
10 to refresh my memory.  So, yeah, I guess just that.
11 No independent searches or studies or sort of
12 reviewing, short of just that conversation I had with
13 them, DOJ attorneys.
14        Q.    Okay.  Did you make any notes about the
15 events involved in this case that you have in front of
16 you?
17        A.    I have no notes in front of me and I
18 don't believe that I have any notes at all from the
19 event.
20        Q.    Okay.  Do you understand, Mr. Cruzan,
21 that the purpose and reason for you being deposed
22 today is in connection with the State of North
23 Dakota's case filed against the United States under
24 the Federal Tort Claims Act involving the state's
25 claim for recovery of $38 million in damages as a

Darren Cruzan
August 23, 2022

Page 14

1  result of the U.S. Army Corps of Engineers and other
2  federal agencies and official's actions associated
3  with the protests against the Dakota Access Pipeline?
4      A.   That's a little more detail than I had,
5  but I generally did understand that that's what we
6  were here to talk about, was the actions from the
7  State of North Dakota.
8      Q.   Okay.  Are you aware of any of the
9  Court's rulings in the case thus far?
10     A.   I'm sorry.  I'm not.
11     Q.   Okay.  Are you aware this case is pending
12  in the United States District Court for the District
13  of North Dakota located in Bismarck, North Dakota?
14     A.   No, sir.  I'm not familiar with any of
15  the proceedings that have been ongoing.
16     Q.   Okay.  Mr. Cruzan, where are you from?
17     A.   Well, I'm from Joplin, Missouri.  Webb
18  City, Missouri, is where I was born and raised.
19     Q.   Okay.  And I believe you said you're
20  currently residing in Huddleston, Virginia?
21     A.   Yeah.  Yes, sir.  It's Huddleston,
22  H-u-d-d-l-e-s-t-o-n.
23     Q.   Got it.  How long have you lived in
24  Huddleston, Virginia?
25     A.   We have been here since January of this

Page 15

1  year.
2      Q.   Okay.
3      A.   Not quite a year.
4      Q.   I understand.  And would you go over your
5  education, your formal education since high school,
6  please.
7      A.   Sure.  So I did my post high school
8  education a little bit differently than a lot.  I got
9  straight into law enforcement.  I didn't get my
10  college degree until -- actually, I think it was much
11  later.  It was probably 2000 -- I'm guessing on the
12  date here -- probably 2006 or '7.  And I did that
13  online through Mountain State College in Beckley, West
14  Virginia.  And so I have a bachelor's degree in
15  criminal justice administration.  So that's my formal
16  education extent.
17     Q.   Okay.  And then if you would do the same
18  and explain to me your professional employment
19  history.
20     A.   Okay.  Sure.  So I started out as a --
21  how far would you like me to go back on that?
22     Q.   Well, I think you said after high school
23  you took a job in law enforcement.  So maybe --
24     A.   Yeah.  Okay.  I'll go all the way back
25  there.  So I started out as a police reserve, a

Page 16

1  reserve police officer, I guess, in Joplin, Missouri.
2  Then I was hired in -- and, again, I apologize for all
3  these dates.  It's been long enough I don't remember
4  specifically the dates and even years on some, but
5  that would have probably been 1997.  No.  It would
6  have been earlier than that.  '95 hired by the City of
7  Nevada, N-e-v-a-d-a.  That's in Missouri.  I was a
8  police officer there, and then got out of law
9  enforcement for just a little bit.
10     I had gotten married, and my wife and I
11  decided that working those night shifts and things
12  weren't the best for us.  So I got out of law
13  enforcement for just a few minutes and then was hired
14  by the Miami Tribe of Oklahoma, which is where I'm an
15  enrolled tribal member.  And I was a tribal police
16  officer for a couple of years and then hired by the
17  Bureau of Indian Affairs as a uniformed police
18  officer.  And that was probably 1997, '96 or '97.
19     And I did that for a number of years,
20  progressed through that organization to different
21  roles.  And then from the Bureau of Indian Affairs, I
22  was hired by the Pentagon Force Protection.  So this
23  was probably in I want to say 2000 -- probably 2005
24  hired by the Pentagon Force Protection as a criminal
25  investigator.  And then back to the Bureau of Indian

Page 17

1  Affairs in 2010 as the director of the Bureau of
2  Indian Affairs.
3      And then 2017 I went to the Bureau of
4  Indian Education for a short time as a senior adviser
5  to the director of Bureau of Indian Education, and
6  then from there was put into the position of director
7  of law enforcement for the Department of Interior.
8      And then in 2019, I think, I went to the
9  Department of Homeland Security Federal Law
10  Enforcement Training Centers as the assistant director
11  out of the Washington, D.C., field office.
12     And I'm happy to walk back through any of
13  those.  I know I kind of rushed through that, but I'm
14  happy to walk back through that if you need more
15  clarification or if the dates don't line up just
16  right.  That's the progression of my career.
17     Q.   Okay.
18     A.   Retired in May of last year.
19     Q.   And the position that you retired from?
20     A.   I was assistant director for FLETC,
21  Federal Law Enforcement Training Center.  It's a DHS
22  component.
23     Q.   Okay.  So you -- could you explain a
24  little bit more your role as -- with the Pentagon
25  Force Protection?

Darren Cruzan
August 23, 2022

Page 18

1    A.    Yes, sir.  Sure.  So I was a special
2  agent, sort of served as an assistant special agent in
3  charge role and oversaw the criminal investigations
4  and internal affairs investigations and executive
5  protection for the Pentagon Force Protection Agency.
6        So, you know, we would do mostly
7  low-level investigations, mostly, believe it or not,
8  parking pass fraud investigations or, you know,
9  missing computers, things like that.  Not much in
10  terms of crimes against people, but more those types
11  of things, and then also dignitary protection.  So we
12  had a role with the undersecretaries of defense.  And
13  then visiting dignitaries that were in the United
14  States to visit with DOD officials, we would often put
15  protection details on them.  So that was my primary
16  role there.
17    Q.    I see.  And then you were director of the
18  Bureau of Indian Affairs after that?
19    A.    Yes, I was.
20    Q.    And how long did that position entail?
21    A.    So from 2010 -- again, I don't recall
22  exactly the month, but from 2010 to 2017, sometime in
23  2017.
24    Q.    Okay.  So seven years?
25    A.    Yes.

Page 19

1    Q.    Okay.  Was that essentially the period
2  that President Obama was in office?
3    A.    Yeah.  Yes, I believe that's right.  So I
4  was at the Pentagon, I think -- the only reason I
5  remember that is because we did the inauguration there
6  at the Pentagon -- not the inauguration, but sort of
7  the staging area.  So during that period I was at the
8  Pentagon at the beginning, and I suppose at the end I
9  would have been at the Department of Interior.
10    Q.    Okay.  Were you BIA director through the
11  end of 2017 or at some point prior to that?
12    A.    Yeah.  You know, I'm sorry.  I don't know
13  that right off the top of my head.  I don't believe it
14  was through the end of 2017.  I just don't recall
15  exactly the month.
16    Q.    Okay.  And then after you were BIA
17  director, you went to the Department of Homeland
18  Security?
19    A.    Well, there was -- no, sir.  So I was
20  there as the -- and to be clear, to be very clear on
21  this, the director of the Bureau of Indian Affairs
22  Office of Justice Services is the law enforcement
23  component of that.  The official title is deputy
24  bureau director, but forever it's been just referred
25  to in the law enforcement as director of Bureau of

Page 20

1  Indian Affairs.
2        So there is a director of the Bureau of
3  Indian Affairs that was my director supervisor.  So I
4  just want to be clear on that so there's no confusion.
5  And I'll try to do a better job of classifying that
6  when I'm talking about the director of the Bureau of
7  Indian Affairs Office of Justice Services, that's what
8  I'll be referring to, is the law enforcement
9  component.
10        I had been there from 2010 to 2017, which
11  probably was a couple of times longer than any prior
12  director that we had had.  I approached the assistant
13  secretary about an opportunity to take a breather over
14  at the Bureau of Indian Education.  He and I had had a
15  conversation about some sexual assaults of students
16  that were at some of these Indian schools, Bureau of
17  Indian Education schools.
18        These students were there and I thought
19  that, you know, there was an opportunity to provide
20  some policies and procedures within the Bureau of
21  Indian Education to address some of the safety
22  concerns they were having.  And I thought that would
23  be a good opportunity for me to sort of get a
24  different look, you know, stay in this line of work,
25  but, you know, not at the same pace I had been.

Page 21

1        So he agreed and allowed me to lateral
2  over to a position within the Bureau of Indian
3  Education that reported to the director of Bureau of
4  Indian Education as a senior adviser focusing on
5  safety issues inside the BIE schools, or Bureau of
6  Indian Education schools.
7    Q.    So I'm clear, you were not the director
8  of the Bureau of Indian Affairs.  You were the
9  director of the Office of Justice Services?
10    A.    That's correct.  Yes, sir.  That's
11  correct.
12    Q.    Got it.  Then I think you said that you
13  went on at some point after that to be the director of
14  law enforcement for the Department of Interior; is
15  that correct?
16    A.    Yes, sir, I was.  After my time at the
17  Bureau of Indian Education, the position -- the
18  director position at the Office of Law Enforcement and
19  Security, which is at the department level, became
20  vacant.  And so I was moved from the BIE senior
21  adviser position into the director of law enforcement
22  for the Department of Interior.
23    Q.    And can you describe the nature of that
24  position.
25    A.    Yes, sir.  So it's predominantly an

Darren Cruzan
August 23, 2022

1  oversight and policy office.  There really is no
2  direct line of authority to the Department of Interior
3  bureaus themselves.  So there are seven, I think.
4  National Park Service -- and I'm talking about
5  agencies within the Department of Interior that have
6  law enforcement.
7       So there's National Park Service and
8  United States Park Police.  Fish and Wildlife has sort
9  of two different.  One is investigative.  One is
10  uniform.  Bureau of Indian Affairs, Bureau of
11  Reclamation, Bureau of Land Management.  And so each
12  one of those law enforcement organizations has a
13  director or chief of law enforcement that reports to
14  someone within that agency's line of authority.  So I
15  kind of always referred to it as the Department of
16  Interior had a dotted line, not a solid line, of
17  authority to the bureau chiefs of law enforcement.
18  Primarily oversight, policy development, those kind of
19  things is what we did.
20       Q.   Do you have a sense of approximately --
21  not specifically, but approximately.  All of those
22  agencies within the Department of Interior that you
23  mentioned that have law enforcement functions --
24  National Park Service, the park police, Fish and
25  Wildlife Service, the Bureau of Indian Affairs, the

1  Bureau of Reclamation, and the Bureau of Land
2  Management -- if you tallied up all those agencies,
3  how many law enforcement employees does the Department
4  of Interior have or did have at the time that you were
5  present?
6       A.   Yeah.  That said, you know, I do not know
7  exactly.  I do know that --
8       Q.   Several thousand?
9       A.   Yes, sir, I do believe that.  And, again,
10  I am -- I just don't know the exact number, but
11  several thousand.  And I am thinking the number that
12  comes to my mind that we may have used, you know, is
13  about 2500.  But I'm not sure.  And I know that ebbs
14  and flows.  And what it would have been then and what
15  it is now, certainly I wouldn't know, but I think the
16  number that we used was 2500.
17       Q.   Got it.
18       A.   As best I can recall.  Best I can recall.
19       Q.   So after you left the government service
20  that you just explained to me, did you retire, retire
21  or did you take a job in the private sector?
22       A.   Well, I didn't take a job, but we created
23  a -- you know, knowing that my background
24  predominantly was law enforcement in Indian country
25  and at a high level, and so I know a lot of sort of

1  the tribes and tribal leadership both at their
2  leadership level and at their law enforcement level.
3  And, again, my whole life has been law enforcement.
4  So I started a company called The Cruzan Group, and
5  our plan was to work with tribes and to improve law
6  enforcement in Indian country.
7       So we did that for about a year.  I'm not
8  doing that now.  I don't have that -- I still have
9  that business on the -- you know, I'm not incredibly
10  fluent in business acumen outside of the government,
11  but, you know, I think if you go to whatever systems
12  are out there for, you know, the EIN numbers and these
13  kind of things that show a business, I still have that
14  business in principal but not in practice.  I'm not
15  doing anything with that.
16       Q.   So you did that for a year and then what?
17  You retired or you did something different?
18       A.   Well, currently I am -- I'm the director
19  of safety for Mariner's Landing Country Club here in
20  Huddleston.  It's out on Smith Mountain Lake in
21  between Lynchburg and Roanoke.  We moved to Mariner's
22  Landing Country Club and the owner asked me if I would
23  serve as his director of safety out here in emergency
24  preparedness.  And that's what I'm doing.
25       Q.   I see.  Okay.  And you mentioned that you

1  are a member -- you're an enrolled member of a Native
2  American tribe?
3       A.   Yes, sir.  The Miami Tribe of Oklahoma.
4  It's spelled M-i-a-m-i, you know, just like Miami and
5  Miami.
6       Q.   Right.  And how did you -- can you
7  explain your affiliation with the tribe.  How did that
8  come about?
9       A.   Well, I mean, it's just part of my
10  family's lineage and it has been for generations, on
11  my mother's side and on her father's side.  So it's
12  been part of my life forever.
13       Q.   Sure.  Got it.  So in your position with
14  the Bureau of Indian Affairs as the director of the
15  Office of Justice Services, you were in that position,
16  it sounds like, for the period of the protests against
17  the Dakota Access Pipeline starting in 2016 through
18  your retirement from the BIA in that position in 2017.
19       A.   Well, no, sir.  I don't think -- not
20  through my retirement from that agency.  I didn't
21  retire from Indian Affairs.  I moved from the director
22  of BIA over to the adviser -- advisory role for BIE.
23       I mean, you know, if the dates line up
24  that way, I will agree to that.  I don't recall as my
25  time as the director of the Bureau of Indian Affairs

Darren Cruzan
August 23, 2022

Page 26

1  Office of Justice Services -- and I may have, but I
2  don't remember really any conversations about what was
3  going on there in North Dakota during my time as the
4  director of the Office of Justice Services.
5         It may have happened, but I don't think
6  it was quite at that point what it turned into.  The
7  first I really remember hearing about it or having any
8  involvement in it was during my time as the adviser of
9  Bureau of Indian Education that I can recall.
10     Q.  Are you saying that as the director of
11 the Bureau of Indian Affairs Office of Justice
12 Services you were not involved in the DAPL protests?
13     A.  What I'm saying is that I don't recall
14 having any conversations.  And it's very possible that
15 I did, that there was something that was happening up
16 there during that time, but my recollection is that --
17 and how I remember sort of my getting involved in it
18 was I was sitting in my office in the Bureau of Indian
19 Education hallway when the acting director of Bureau
20 of Indian Affairs Office of Justice Services, guy by
21 the name of Jason Thompson, came into my office and
22 asked me if -- and I don't know if he asked me or if
23 he told me I was going up there to provide some
24 leadership and some guidance.
25         So, you know, I could be shown, you know,

Page 27

1  the dates when that happened, and it may very well
2  line up that there were things that were happening,
3  but, you know, at that point when I was the director
4  of the Bureau of Indian Affairs Office of Justice
5  Services, I don't recall having any conversations
6  about what was going on with the reservation and the
7  protests.  I think it grew into something after I was
8  in the Bureau of Indian Education position.
9      Q.  I thought you told me that you were the
10 director of the Bureau of Indian Affairs Office of
11 Justice Services from 2010 to 2017?
12     A.  Yes, sir.  That is correct.
13     Q.  And so I asked you also that were you in
14 that position between 2016 and March of 2017.
15     A.  Well, again -- well, I don't remember
16 when I moved over to the Bureau of Indian Education.
17 And, you know, what was going on in North Dakota at
18 that time I don't think got my attention or -- you
19 know, we may have -- I just -- I don't remember having
20 any conversations about it when I was the director of
21 Bureau of Indian -- or with Office of Justice
22 Services.  When I first really became aware of what
23 was going on was when I was moved over to the BIE.
24     Q.  And what was your scope of your
25 responsibility at the BIE?

Page 28

1      A.  I was a senior adviser.  So I was really
2  looking at school safety and protocols and procedures
3  and assessments at the schools around Indian country.
4      Q.  You just don't recall that as Bureau of
5  Indian Affairs director of the Office of Justice
6  Services that you were in North Dakota for weeks in
7  time and sent e-mails with a signature block that
8  identified you as the director of the Bureau of Indian
9  Affairs Office of Justice Services?
10     A.  Yes, sir.  No.  That's exactly what I'm
11 saying.  I don't recall.  As I recall, as I remember
12 it -- and, again, if these dates don't line up
13 exactly, it's not that I'm not trying to be honest
14 with you.  I'm just saying I don't recall that.  What
15 I recall is being in the Bureau of Indian Education.
16 I don't remember being up there during that time.
17         Now, absolutely, I remember being up
18 there.  That's no question.  I'm just trying to make
19 sure that I am accurate with what my actual role was
20 at the time.  And, again, it's been that long ago.  So
21 I don't remember exactly what date I transitioned from
22 the Office of Justice Services over to the Bureau of
23 Indian Education.
24         If I have the dates wrong, I'm happy to
25 say, Okay, well, I must have had the dates wrong.  But

Page 29

1  what I'm saying is I don't remember -- as the director
2  of the Bureau of Indian Affairs Office of Justice
3  Services, I don't think that was my -- I don't recall
4  that being the role that I was in at the time that I
5  went up there.
6      Q.  Why did you go to North Dakota?
7      A.  The assistant -- well, he was my
8  assistant director when I was the director and was the
9  acting -- or the acting director of the Office of
10 Justice Services came into my office and asked me if I
11 would go up there and provide some supervision.  I was
12 still in a law enforcement role at the Department of
13 Interior.  And I think my authority still came from
14 the Bureau of Indian Affairs Office of Justice
15 Services.  I just don't think I was in that director's
16 role.
17     Q.  Okay.  So you're just belaboring the
18 distinction of the title name, but you really had a
19 law enforcement director function; right?
20     A.  Well, I think certainly that's what
21 people would have recognized me to be in.  Whether I
22 was in the Bureau of Indian Education role or not, I
23 think people there recognized that I was the senior
24 official there for the Office of Justice Services.
25 Most everybody there would have known me to be the

Darren Cruzan
August 23, 2022

1  director of the Bureau of Indian Affairs role prior to
2  that.
3          So I'm not sure that anybody there would
4  have had a distinction between my role in the BIE and
5  my role in the BIA OJS.  I'm not trying to belabor
6  that.  I'm just trying to be honest with you and say I
7  remember sitting in that office when they came and
8  asked me to go up there and provide supervision to
9  that.
10         Q.   Do you recall letting people know in
11 e-mails by using a signature block that identified you
12 as the director of the Bureau of Indian Affairs and
13 Office of Justice Services?
14         A.   I don't recall that exactly.  It may have
15 been that my title signature block hadn't changed.  I
16 hadn't changed it, but, I mean, if you have them, I'm
17 happy to say, you know, yeah, that's -- if you have
18 them, I wouldn't dispute that.
19         Q.   Okay.  All right.  We can talk about that
20 later.  No matter what the distinction you're making,
21 you were in North Dakota as a senior law enforcement
22 person for the Department of Interior, Bureau of
23 Indian Affairs; correct?
24         A.   Yes, sir, I was.  That's correct.
25         Q.   And in that capacity, Mr. Cruzan, did

1  your responsibilities include serving as a liaison
2  with anyone on behalf of the Department of Interior,
3  Bureau of Indian Affairs?
4          A.   Yes.  I definitely met with Sheriff
5  Kirchmeier and the adjunct general and colonel and
6  state police numerous times.  I know those were the
7  gentlemen that I liaisonned with most.  I may have had
8  conversations with other people, but as far as
9  representing anybody, that would have been who I would
10 have.
11         Q.   And with those individuals and others,
12 you were invited and indeed participated in meetings
13 held on a regular, if not daily, basis in the Morton
14 County and then the North Dakota emergency response
15 centers, right, law enforcement?
16         A.   Yes, sir.  That is correct.
17         Q.   Okay.  Do you recall when you first went
18 to North Dakota in connection with the Dakota Access
19 Pipeline protest?
20         A.   I really don't remember that date.  I
21 don't remember the date that that was.  I believe that
22 it was after the chairman of Standing Rock Sioux Tribe
23 got arrested.  I believe it was after that, but I
24 don't recall the exact date.
25         Q.   Okay.  Just after the chairman of the

1  Standing Rock Tribe was arrested?
2          A.   Sometime after.  I don't remember if it
3  was just after, but it was sometime after that.
4          Q.   Did you go to North Dakota because of
5  that?
6          A.   I don't recall.  It may have been because
7  of that.  It may have been that, you know, we were
8  seeing more people arrive, but I don't recall if it
9  was for that reason.
10         Q.   Okay.  All right.  And did your
11 responsibilities include being a Bureau of Indian
12 Affairs Department of Interior liaison with other
13 federal officials?
14         A.   Well, I don't recall it being anything
15 quite so official, but, you know, I did meet with
16 other people while I was there in the capacity that I
17 was there in.  You know, I don't remember ever -- you
18 know, it was a very fluid thing and people would come
19 and go.  So I had conversations with a lot of people,
20 but I don't remember it being so formal as sort of --
21 I don't know that I thought of myself as the liaison
22 for it, but I probably served in that role.
23         Q.   So yes?
24         A.   Yes.
25         Q.   And I'm not just limiting the question to

1  who did you meet with.  I'm asking who did you liaison
2  with in your capacity as a senior Bureau of Indian
3  Affairs law enforcement official with other federal
4  officials.  And that would include using the telephone
5  or e-mail, which you did quite often; correct?
6          A.   I did use the telephone and e-mail quite
7  often.  I guess maybe if you could help me understand
8  what your definition of "liaison" is because --
9          Q.   The act of interacting.
10         A.   Okay.  Then I did interact with lots of
11 people while I was there.
12         Q.   And who were those people and where were
13 they from?
14         A.   Gosh.  I mean, so I definitely interacted
15 with the leadership of the Standing Rock Sioux Tribe.
16         Q.   I'm talking about federal officials.
17 Let's get to the tribe later.
18         A.   Okay.  So -- and names, I don't remember.
19 I know that the U.S. Marshal was there.  I had
20 conversations with the U.S. Marshal.
21         Q.   I'm not just asking you about your time
22 in North Dakota.  During the period of the protest,
23 you were in your office in Washington, D.C. or
24 Virginia, whichever, and then you were in North
25 Dakota.  So I'm asking about who did you interact with

Darren Cruzan
August 23, 2022

1  from other federal agencies during your period of
2  employment as a senior law enforcement official with
3  the Bureau of Indian Affairs?
4       A.   You're not just speaking about my time in
5  North Dakota?  You want all of it?
6       Q.   I've said it twice now.  I'm asking you
7  about in your capacity, who did you -- for that period
8  of time, not your geographic location and limiting it
9  to being in North Dakota.  I'm asking you during your
10  period of employment, that period of time -- and I
11  said it again, 2016 to the end of 2017 -- regardless
12  of where you were sitting, who did you interact with?
13  And "interact with" means talk to on the phone,
14  e-mail, wave at, meet with, whatever.
15       A.   So I would have --
16            MR. SCARPATO:  Objection to form.  Paul,
17  give the witness an opportunity to answer the question
18  before rephrasing.  Thank you.
19       A.   So I would have met with senior officials
20  with U.S. Department of Interior.  I would have met
21  with officials, and not even senior officials, with
22  members and employees of the Department of Interior.
23  I would have met with and spoken to people in the
24  Department of Justice.  I would have met and spoken to
25  people -- you know, members of congress and their

1  staff.
2            I would have spoken to a lot of people in
3  my capacity in that position.  So I'm not trying to
4  not answer the question.  I just don't completely
5  understand what you're asking.  I know you've asked it
6  several times.  I just don't understand more than that
7  what it is that you are asking.
8       Q.   (BY MR. SEBY) Keep going then.  You're
9  listing federal officials and agencies.  Keep going.
10  What other federal officials and agencies as you're
11  starting to list off some.  You're starting, and I'll
12  bet you've got more in mind.  So carry on.
13       A.   Well, I'm trying to think.  During that
14  time frame I would have spoken with somebody with,
15  like I said, U.S. Marshal.  The Department of Justice
16  covers quite a few agencies.  And Army Corps of
17  Engineers.
18       Q.   And who from the Corps?
19       A.   Well, I wouldn't have remembered his name
20  until last week when it was mentioned.  Colonel
21  Henderson.
22       Q.   Okay.  Who else?
23       A.   Now you've got me just going through my
24  Rolodex of people that I might have met with.  Most of
25  my interactions would have been -- that I can think of

1  without just naming federal agencies -- employees of
2  the Department of Interior and Department of Justice.
3  That's who I would have had communications with
4  predominantly.
5       Q.   When you were in -- during the period of
6  the DAPL protests, not just when you were physically
7  traveling to North Dakota for a period of time --
8  periods of time, but when you were in your position
9  and then you went to North Dakota on trips; right?
10       A.   Which position are we talking about?
11       Q.   The one you were in for the Department of
12  Interior, Bureau of Indian Affairs Office of Justice
13  Services from 2016 to 2017.  Can we move on and
14  understand that's what the period of time we're
15  talking about is?
16       A.   Well, my recollection of that time frame
17  is that I was in a couple of different roles.  I was
18  with the Bureau of Indian Affairs Office of Justice
19  Services.  I was also with the Bureau of Indian
20  Affairs -- or Bureau of Indian Education.  So I'm not
21  trying to, you know, mince that.  I just want to make
22  sure you're talking about my time that I was
23  interacting in North Dakota or Bureau of Indian
24  Education or Bureau of Indian Affairs.
25       Q.   Because you're not clear about what

1  capacity you served in, can we stipulate that you were
2  a senior law enforcement official with the Bureau of
3  Indian Affairs?
4       A.   Absolutely.  That's helpful.  Absolutely.
5       Q.   Great.  Great.  So in that capacity in
6  the year 2016 through the end of 2017, when you went
7  to North Dakota, were you the senior Department of
8  Interior official in the state during the protests?
9       A.   I think for that protest, yes.
10       Q.   What other department --
11       A.   Let me specify that.  On the Standing
12  Rock Sioux Reservation.  I had no authority or context
13  or ability to speak about anything that was happening
14  there, short of what was occurring within the interior
15  boundaries of the reservation.  I would have had no
16  authority to speak to anybody about anything.
17       Q.   Got it.  And what other Department of
18  Interior persons were in North Dakota during that same
19  period of time on or outside the Standing Rock Sioux
20  Tribe Reservation?
21       A.   Certainly.  Certainly.  So there were
22  definitely Bureau of Indian Affairs law enforcement
23  that were from Standing Rock and then there were
24  Bureau of Indian Affairs Office of Justice Services
25  personnel that we detailed in from other reservations.

Darren Cruzan
August 23, 2022

1    And then eventually we requested
2  additional assistance from sister agencies within the
3  Department of Interior, National Park Service -- all
4  of those that I had mentioned earlier, National Park
5  Service, Fish and Wildlife, U.S. Park Police, BLM.  I
6  don't know that they were all able to send folks.  And
7  then we did have an individual --
8    Q.   Let me stop you.  Earlier you told me
9  that the Department of Interior has 2500 law
10 enforcement employees from the Park Service -- I'm
11 sorry -- the National Park Service, the Park Police,
12 Fish and Wildlife Service, the Bureau of Indian
13 Affairs, the Bureau of Reclamation, and the Bureau of
14 Land Management.  Which of those did you request and
15 receive additional law enforcement personnel in North
16 Dakota?
17    A.   Yes.  So the request went out to all of
18 those agencies.  I can tell you with certainty that we
19 had National Park Service law enforcement personnel
20 were there.  Fish and Wildlife uniform and maybe
21 agents -- we'll just say U.S. Fish and Wildlife
22 Service had folks there.  Bureau of Land Management
23 had some folks there.  United States Park Police had
24 folks there.  I don't believe Bureau of Reclamation
25 had anyone available to assist.

1    Q.   And those individuals when they were
2  there in North Dakota, were they limited like you to
3  just the Standing Rock Sioux Tribe?
4    A.   Yes, sir, they would have been.  They
5  were acting under the authority of Bureau of Indian
6  Affairs, our authority to enforce laws on the Indian
7  reservations.
8    Q.   Did they attend any of the State of North
9  Dakota Law Enforcement Center -- operation center
10 meetings like you did?
11    A.   Let me give you one more agency that was
12 there that I just remembered.  So the Department of
13 Interior Office of Law Enforcement Services had
14 personnel, one or two, that would come to assist.  And
15 those individuals would occasionally attend those
16 meetings with me or for me if I wasn't able to attend.
17 But I don't recall any of the bureau personnel
18 attending any of those meetings.  It's possible that
19 they did, but I don't recall that.
20    There was a time early when -- and it
21 kind of changed back and forth that we had folks from
22 the Bureau of Indian Affairs in the command structure
23 at Morton County that were doing things like -- as
24 part of their efforts, you know, working in
25 conjunction with them that would do intelligence

1  gathering and those kind of things.  So those
2  individuals may have attended some of those meetings,
3  because oftentimes those meetings were in the same
4  workspace that they were doing their work in.
5    So, yes, Department of Interior Office of
6  Law Enforcement and Security folks would have attended
7  those with me occasionally, but other than that, none
8  of the other bureau agencies that I can recall
9  attended them.
10    Q.   So you've had a long history in law
11 enforcement, haven't you?
12    A.   I think so, yes, sir.
13    Q.   In that long history, prior to the
14 protests against the Dakota Access Pipeline, what was
15 your experience with large public protests?
16    A.   Gosh, to that degree, none.
17    Q.   I didn't say same as the protest in North
18 Dakota.  I said other large.
19    A.   You know, I was part of a large gather --
20 was the question protests or gatherings?
21    Q.   Large public protests.
22    A.   None.
23    Q.   How about violent protests?  What was
24 your experience with violent protests?
25    A.   None.

1    Q.   Do you have any professional law
2  enforcement experience with complex law enforcement
3  situations?  You interpret that as you may and then
4  answer the question, please.
5    A.   Yes.
6    Q.   Okay.  Would you describe those for me?
7    A.   Sure.  So Indian Affairs is oftentimes
8  classified as a complicated jurisdictional maze where,
9  you know, an individual's affiliation with a Native
10 American tribe or a person's non-affiliation with a
11 Native American tribe within a boundary of a
12 reservation is incredibly complicated.
13    And managing the Bureau of Indian Affairs
14 Office of Justice Services, a nationwide program, is
15 very diverse and spread out.  Many will say
16 understaffed and difficult to manage.  So my
17 experience managing the Bureau of Indian Affairs, I
18 think, would fall into that classification as managing
19 a complicated situation, organization, however you
20 phrased that.
21    Q.   During the DAPL protests, whether you
22 were physically in North Dakota or elsewhere, did you
23 receive regular status reports from the State of North
24 Dakota law enforcement regarding the protesters'
25 presence on lands in North Dakota?

Darren Cruzan
August 23, 2022

Page 42

1     A.   Yes, I would say I did.
2         Q.   And what lands do you recall those
3   protesters being present on?
4         A.   Can you repeat that question?  Getting
5   details from the State of North Dakota on protesters
6   would have been on that property or on that land north
7   of the Cannonball River from the Standing Rock
8   Reservation.  And I think I have the direction right.
9   If I don't have it right -- but it was on the Army
10  Corps of Engineers land.  So if that's north of the
11  Cannonball River from the Standing Rock Reservation,
12  that's what I'm referring to.
13        Q.   Thank you.  You mentioned three gentlemen
14  with the State of North Dakota law enforcement.  Did
15  those people provide you with these status reports?
16        A.   Well, two of them were law enforcement.
17  One of them was national guard.  And those would have
18  been the individuals mostly that I would have gotten
19  information from like that on a reoccurring basis.
20        Q.   Okay.  Colonel Gerhart and Sheriff
21  Kirchmeier?
22        A.   Kirchmeier, yes, sir.
23        Q.   Did you ever ask for information or
24  intelligence from those individuals in North Dakota
25  for which you were not provided?

Page 43

1         A.   Not that I'm aware of, no.  We had a good
2   relationship and I think information passed back and
3   forth pretty well.  I don't know that I would have
4   been -- well, not that I'm aware of.
5         Q.   Okay.  All right.  So you sat for many
6   days with those gentlemen and their colleagues in
7   North Dakota law enforcement and received numerous
8   updates about the nature of the protests; right?
9         A.   Yes, sir.  As I recall, the meetings were
10  either daily or every other day, but I think they were
11  daily and they would typically last for about an hour
12  in the morning.  Most of the time we would -- because
13  I was staying in Bismarck, we would start our day at
14  that briefing early and then head down to the
15  reservation.  So, yeah, I did sit there.
16        Q.   Okay.  Along with -- in those daily
17  briefings that you attended, did you watch -- what did
18  you do during those meetings?  What did you -- what do
19  you recall your presence involving -- what did you
20  see, what did you hear from, that kind of thing?
21        A.   I was predominantly in listening mode to
22  see what was -- they had a much more robust ability --
23  robust ability to gather intel than I did.  And so I
24  was mostly in a listening mode to see what they were
25  seeing, to hear what they were seeing.  And then as I

Page 44

1   recall, we would give updates on what we were seeing
2   on the reservation side of the Cannonball River,
3   numbers of campers either growing or shrinking and
4   those kind of things.
5         Q.   Okay.  Do you also recall while you were
6   present in those law enforcement coordination and
7   activity sessions that you watched live real-time
8   footage of activities in the protest camp?
9         A.   I do recall watching, like, caravans of
10  vehicles.  I think there was a -- I don't know what
11  agency had it, if it was -- it may have been the coast
12  guard.  I don't recall exactly, but watching caravans
13  of vehicles traveling around.
14             I don't know that I -- I'm sure there
15  were videos of the campsite itself, too, but I
16  specifically remember watching -- because they were
17  very interested in that, as we were, where those
18  caravans were going, because oftentimes they would
19  come into the city and do their protesting there.  So
20  I do remember sitting in there and watching videos.
21        Q.   Are you thinking that that footage was
22  provided by the United States Customs and Border
23  Patrol?
24        A.   That is who I think it was.  I think I
25  said coast guard, but yeah, I do believe it was

Page 45

1   customs, now that you mention it.
2         Q.   That was footage from an aerial drone;
3   correct?
4         A.   That's correct.
5         Q.   And you also talked about that footage by
6   that federal agency showed caravans of vehicles
7   leaving the protest camps on Corps property; is that
8   correct?
9         A.   Yes, I do remember that.  Yes, sir.
10        Q.   Okay.  And those caravans would travel to
11  Bismarck and Mandan, North Dakota?
12        A.   Right.  I definitely do know that that
13  was what the concern was.  We also saw sometimes where
14  they would just drive in great big squares and come
15  back.  So I don't want to say that they always ended
16  up in Mandan and Bismarck, but on occasion they
17  certainly did end up.
18        Q.   They also went to go to the DAPL
19  construction site, too, didn't they?
20        A.   I'm sure that they did.  I don't recall
21  watching any video of that.  I know that that was -- I
22  feel like that was their goal, for sure.  I don't
23  remember seeing any video of that, getting to the
24  site, but I certainly know that they were trying.
25        Q.   Do you recall the footage provided by the

Page 46

1  drone operated by the United States Customs and Border
2  Patrol being present and then one day not being
3  present?
4      A.   I don't remember that.
5      Q.   Was it there throughout the period of the
6  protest?
7      A.   You know, I don't really remember how
8  often it was there.  I remember thinking that it was a
9  good tool, but I don't remember, you know -- I don't
10 remember time frames when I first saw it, how long I
11 saw it.  I don't remember anything like that.
12     Q.   Did you also watch live real-time footage
13 and photography provided by the State of North Dakota
14 Highway Patrol plane?
15     A.   I do remember something like that,
16 because -- I do remember something like that because I
17 think there was a report that a rifle or a handgun or
18 something had been pointed at it.  That's all that I
19 really remember about that.  I don't remember much
20 detail of it.
21     Q.   Okay.  So you mentioned that you would
22 provide to the North Dakota Law Enforcement Centers
23 that you participated in personally -- you provided
24 information from the Standing Rock Sioux Tribe
25 intelligence from campers, you said protesters; right?

Page 47

1  Is that a fair interchangeable word when you say
2  "campers," protesters?
3      A.   I think that's a fair statement.  You
4  know, I think it was all part and parcel of the same
5  group.  Maybe different tactics, but I think it's fair
6  that they were protesting the pipeline.  And, yes, I
7  would -- I recall, you know, as it would come around
8  the room -- I think at the end of each meeting it kind
9  of went around, does anybody have anything else and
10 they would talk to different people.  As I recall,
11 that was mainly what I would do, would be to just give
12 an update on what we're seeing.  Mostly that would be
13 numbers of campers on the south side of the Cannonball
14 River.
15     Q.   Numbers of campers?
16     A.   Numbers of campers.
17     Q.   And how did you determine those numbers?
18     A.   Rough estimate.  We weren't down there in
19 the camps.  So I wouldn't have had exact numbers, but
20 I think we -- it was basically, it looks like it's
21 bigger, it looks like it's smaller.  I think we would
22 also sort of look at the traffic on the road and the
23 number of people that were in and around the tribal
24 casino.  General estimations on size, not anything --
25 we would have had no way of knowing any specific

Page 48

1  numbers.
2      Q.   Okay.  You also sought and received
3  information on the protests from the pipeline company;
4  correct?
5      A.   Say that -- ask me that again.  I sought?
6      Q.   I'll ask it again.
7      A.   Please.
8      Q.   Did you also seek and receive reports and
9  other information on the protests from the pipeline
10 company, the company building the pipeline?
11     A.   I don't recall that at all.  I may have
12 received information through those briefings that were
13 being conducted at the sheriff's office, but I don't
14 recall any conversations with the builders of the
15 pipeline or asking information or receiving
16 information.  I don't recall that.
17     Q.   Okay.  You received information, you
18 said, from the Federal Bureau of Investigation;
19 correct?
20     A.   No.  I said that I had spoken with them.
21 You asked me if I had spoken with them.  I don't know.
22 That was a very general conversation.  So I don't want
23 you to make it sound as though I had asked the FBI for
24 any specific information.  We had had conversations,
25 I'm sure, because they were also at those meetings.

Page 49

1  And I'm sure during and after and before there were
2  conversations, but I just don't want it to be -- I
3  don't want you to think that I had deep, long
4  conversations with them about the protests.
5      Q.   I'm not asking if they were deep or long,
6  but you received information from the Federal Bureau
7  of Investigation; correct?
8      A.   I'm sure that I received information
9  through conversations that we had.



18     Q.   What is the "later" reference?  When in
19 2016 to the March/April time frame in 2017 are you
20 referring to?
21     A.   Well, it would have been close to
22 whatever the last day of the protests were.  And I
23 don't want to say it was the last day, but I think it
24 was -- I didn't -- I wasn't aware that there were FBI
25 informants in there for much of the time that I was

Darren Cruzan
August 23, 2022

1  there.

2  Q.  But you were --

3  A.  Towards the end of it, I certainly was.

4  Q.  I understand what you're saying now.  You

5  are aware, though, and were aware at the time that the

6  Bureau of Indian Affairs had informant sources located

7  on the reservation; correct?

8  A.  Certainly, yeah, for sure.  We had folks

9  that were -- yes, there was.

10  Q.  And those were people who were informants

11  that provided you information about happenings inside

12  the camps located on the Standing Rock Sioux Tribe

13  Reservation?

14  A.  Yeah.  They were more than informants.

15  It was a couple of our narcotics agents that just hung

16  around the casino, mostly.

17  Q.  Were they uniformed?

18  A.  At the time they were not, no.

19  Q.  So they were undercover?

20  A.  Yeah.  Well, yeah.  Okay.  Fair enough.

21  Q.  And did they report to you information

22  about behavior and types of people who were in the

23  reservation?

24  A.  Yeah, they did.  I don't -- you know, I

25  don't recall any real specific things that were said.

1  I think it was -- again, it was part of our effort to

2  gather intel on, you know, what was happening within

3  the boundaries of the reservation and if there were

4  any plans to move camps or add camps or those sorts of

5  things.

6  And I don't remember how long they were

7  there.  I don't think they were there for a long, long

8  amount of time.  I don't think we had them there the

9  entirety of the event or the time that I was there.

10  But we definitely did have a couple that were there

11  from our drug unit.

12  Q.  And they were letting you know about

13  campers present in the Standing Rock Sioux Tribe

14  Reservation?

15  A.  In general, yes.  That's right.

16  Q.  Campers, protesters also; right?

17  A.  Yes.

18  Q.  Okay.  And were they trained in narcotics

19  issues?

20  A.  Yes.

21  Q.  Alcohol?

22  A.  I mean, trained in recognizing alcohol

23  or --

24  Q.  Yes.  The presence and use thereof.

25  A.  Well, sure.  Lots of experience, for

1  sure.  I don't know if they --

2  Q.  Firearms?

3  A.  -- had lots of experience.  Certainly.

4  Q.  Weapons?

5  A.  Sure.

6  Q.  And, in fact, they relayed to you

7  information concerning the presence of all of those

8  things in the -- from the camps, the protesters, the

9  campers on the Standing Rock Sioux Tribe Reservation;

10  correct?

11  A.  I don't -- you know, again, I don't

12  remember exactly what was relayed to me from those

13  guys.  We did have conversations.  You know, specifics

14  of what was -- you know, you say weapons and those

15  kind of things.  I don't recall that conversation with

16  those guys.

17  Q.  What did they talk to you about?

18  A.  What they were seeing, you know, numbers

19  of people at the casino and at the camps and those

20  sort of things, but again, I don't really recall any

21  specific, you know, conversations and what was said.

22  Q.  You do recall, though, them telling you

23  that the protesters and campers that were coming on or

24  off the reservation were also affiliated with or

25  interchangeable with the protesters on the Corps of

1  Engineers property you mentioned?

2  A.  I don't know if I can say that I remember

3  them telling me that.  That was something that was

4  obvious to me.  You know, it wasn't -- you didn't have

5  reservation people and non-reservation people.  It was

6  fluid.  So I don't recall if they told me that or not.

7  Q.  Okay.

8  A.  But I knew that to be the case.

9  Q.  Yes.  Okay.  And were you also made aware

10  of sex trafficking on the reservation associated with

11  the DAPL protests?

12  A.  I was not aware of that.

13  Q.  How about the larger camps located on the

14  Corps property?

15  A.  I was not made aware of any sex

16  trafficking.

17  Q.  Drug trafficking?

18  A.  Well, I don't know that I was made aware

19  of it.  I think it was -- with my experience, it was

20  an understood that there was drugs in the camps.  I

21  don't recall a specific conversation where anybody

22  said that, but I certainly didn't believe that it

23  wasn't occurring.

24  Q.  Okay.  And you said that you were aware

25  in mid-August or early August of 2016 that protesters

Darren Cruzan
August 23, 2022

1  went onto the Corps of Engineers property north of the
2  Cannonball River?
3       A.   That I was aware that there were
4  protesters on the north side of the Cannonball River?
5  I was aware that there were protesters on site, but I
6  do think it's -- you know, that was not an area where
7  I had -- I want to be clear. I'm assuming you
8  understand Indian country jurisdiction and authority
9  and where my boundaries were. I had no authority
10  outside of the exterior boundaries. So anything that
11  I had was from what I could see or what I was being
12  told at these briefings.
13       Q.   And you were also aware that DAPL protest
14  camps were established on Corps of Engineers land
15  south of the Cannonball River; correct?
16       A.   I am, yes.
17       Q.   Okay. All right. Mr. Cruzan, we've been
18  going for a little bit more than an hour. How about a
19  ten-, 15-minute break?
20       A.   That sounds great.
21            MR. SEBY: Go off the record, please.
22            THE VIDEOGRAPHER: We are off the record
23  at 9:42 a.m.
24            (Recess taken, 9:42 a.m. to 9:57 a.m.)
25            THE VIDEOGRAPHER: We are back on the

1  record at 9:57 a.m.
2            MR. SEBY: And is the court reporter
3  present? I can't tell.
4            THE VIDEOGRAPHER: Yes.
5       Q.   (BY MR. SEBY) All right. Great.
6  Mr. Cruzan, we're back after a short break. I'm going
7  to show you exhibits now that I want to put up on the
8  screen and ask you to read them, and then I'm going to
9  ask you some questions about it. All right?
10       A.   Sure. Absolutely.
11            MR. SEBY: So this is -- if we could go,
12  Rachel, please, to the bottom of this e-mail string.
13            MR. SCARPATO: Paul, what exhibit is
14  this?
15            MR. SEBY: Thanks, Bill. It's
16  Exhibit 739.
17            MR. SCARPATO: Thank you.
18            (Deposition Exhibit 739 was remotely
19  introduced and provided electronically to the court
20  reporter.)
21       Q.   (BY MR. SEBY) So, Mr. Cruzan, this is
22  three parts -- four parts of an e-mail that I'm going
23  to talk to you about. It begins with an e-mail from
24  Chad Harmon, acting chief of police, Standing Rock
25  Agency, Fort Yates, North Dakota. That's the Standing

1  Rock Sioux Reservation; correct?
2       A.   Yes, sir. That is correct.
3       Q.   And acting chief of police, he is a BIA
4  agent; is that correct?
5       A.   He would have been a uniformed
6  lieutenant, yes. Police officer, yes, for the BIA.
7       Q.   And he's writing this to a Jeremiah
8  Lonewolf?
9       A.   Yes.
10       Q.   Who has a title of ASAC. What does that
11  stand for?
12       A.   So Jeremiah Lonewolf would have been
13  assistant special agent in charge. He would have been
14  at the district office in Aberdeen.
15       Q.   South Dakota?
16       A.   South Dakota, yes, sir.
17       Q.   Okay. And Mr. -- or Lieutenant Harmon
18  tells Mr. Lonewolf that -- on August 12 in the
19  afternoon, he sends an e-mail to Mr. Lonewolf and he
20  says that he is reporting that Morton County has
21  arrested and charged the chairman of the Standing Rock
22  Sioux Tribe, David Archambault, Junior, and a Standing
23  Rock Sioux councilman, Dana Yellow Fat. Both of those
24  individuals were arrested and charged with disorderly
25  conduct, and bonded out and released from custody.

1            And he says that he confirmed that their
2  arrests were from protest activities at the Dakota
3  Access Pipeline protest site located approximately
4  2 1/2 miles north of the Standing Rock Sioux
5  Reservation and off the Standing Rock Sioux
6  Reservation.
7            So this is that issue you were telling me
8  about, that the BIA doesn't have jurisdiction in this
9  setting, does it, because it's not on the reservation?
10       A.   Yes, sir. That's correct. And if I may,
11  the string that you had up prior where it's not so
12  blown up is a little easier for me to read. That one
13  right there.
14       Q.   Okay.
15       A.   It's a little easier for me to read.
16       Q.   You bet. Let's use that format then.
17       A.   Okay. Perfect. Thank you. Yes. That's
18  correct. That would be outside of the jurisdiction of
19  the Bureau of Indian Affairs.
20       Q.   Okay. But he's reporting the news
21  regardless; right?
22       A.   That's correct.
23       Q.   Okay. And so Mr. Lonewolf then forwards
24  that e-mail to a series of people, not you yet, but
25  it's addressed to DAD O'Neal?

Darren Cruzan
August 23, 2022

Page 58

1  A.   So Jason O'Neal is the deputy associate
2  director.  So his role would have been -- if you'll
3  allow me to sort of explain the structure of the
4  organization.  There are -- there were nine districts
5  across the United States.  District 1 would have been
6  in Aberdeen, South Dakota; District 2, Oklahoma;
7  District 3, Phoenix.  And so -- and I don't remember
8  at this time how they had these divided, but the
9  deputy associate director would have been -- would
10 have been provided oversight of three or four of those
11 districts.  I think there were two deputy associate
12 directors.
13      So my best estimation here is Jason
14 O'Neal would have been the deputy associate director
15 who would have been the first-line supervisor to the
16 special agent in charge of the -- of the District 1
17 office.  So the acting chief would have sent an e-mail
18 to his first-line supervisor, Jeremiah Lonewolf, who
19 then, it looks like, sent that to William McClure, who
20 I think was the -- he may have been out of the office
21 or something.  I don't know why.  But Jeremiah sent
22 this to his supervisor and his supervisor's
23 supervisor, which would have been Jason O'Neal.
24      Q.   Okay.  And Mr. O'Neal offices in
25 Washington, D.C.; correct?

Page 59

1      A.   You know, that's what it says, yes.
2  That's what it says.
3      Q.   All right.  So Mr. O'Neal then forwarded
4  it on to you.  And if we could go up to that e-mail,
5  that would be great.  And, Mr. Cruzan, you were
6  confusing me, confusing yourself.  And I just want to
7  be clear, you have a signature block here as of
8  August 14, 2016.  It says "Darren A. Cruzan, Director
9  Bureau of Indian Affairs Office of Justice Services."
10 Do you see that?
11      A.   Yes, I definitely do.  So I understand
12 what you're saying here.  So my recollection of the
13 dates and when I transitioned from one role to the
14 other is just what's blurry, in my opinion.  It may be
15 that I hadn't transitioned yet over to the BIE at this
16 point.
17      Q.   Do you have any reason to think that you
18 were using an inaccurate signature block as of this
19 date?
20      A.   No.  No, of course not.
21      Q.   Okay.  Do we need to spend any more time
22 on that issue?
23      A.   Not -- I don't, no.
24      Q.   Okay.  All right.  So here August 14,
25 it's a Sunday, at 9:46 in the morning.  And you are

Page 60

1  responding to Mr. O'Neal and the gentlemen who are
2  copied there.  And the first e-mail from Chad Harmon
3  was on August 12.  And here two days later, on Sunday
4  morning, you're sending an e-mail now to the group and
5  you're asking, Is there anything new here?
6      So I want to ask you, was this the first
7  time that you were made aware of the protests against
8  the Dakota Access Pipeline in North Dakota?
9      A.   Again, I don't remember the first time
10 that I heard about this.  I thought that it was when I
11 was with the Bureau of Indian Education.  That's my
12 first recollection of having any involvement in that
13 at all.  I see that that's not the case here.
14      I don't remember anything prior to this.
15 Nothing comes to mind.  So I just don't know if that's
16 the first I heard anything on this.  It's possible
17 that, you know, we knew that the Dakota Access
18 Pipeline was occurring.  You know, so we may have had
19 some conversations on it, but in terms of anything
20 that would -- you know, that I would remember hearing,
21 I just don't.
22      Q.   So you say -- I appreciate you don't
23 remember, but you agree with me that your e-mail says,
24 "Anything new here?"  You're asking if there's any
25 developments to something that I believe you already

Page 61

1  know about; correct?
2      A.   Well, I don't know.  You know, possibly.
3  I also may be asking -- I'm not sure what the dates
4  are on these e-mails.  And if it was 9:46 on Sunday, I
5  may have been asking about -- and I don't know when
6  Jason O'Neal sent me that e-mail, if it was Friday or
7  when that was.  So I may have been asking, do we know
8  anything new.
9      Q.   The date, you see it right there and so
10 do I.  The date O'Neal sent it to you was Friday.  So
11 two days later, you responded.
12      A.   Yeah.  That's -- I don't know.  That
13 makes sense to me that I'm asking, based on this
14 e-mail, on Friday is there anything new, because I'm
15 reading this and apparently I had received an e-mail
16 from the assistant secretary about busloads of people
17 possibly heading that way.  So I believe I'm asking if
18 there was anything new.
19      Q.   Is that what ASIA stands for?
20      A.   Assistant secretary of Indian Affairs.
21 That's correct.
22      Q.   Okay.  And that gentleman's name was
23 what?
24      A.   I believe that was Larry Roberts at the
25 time.

Darren Cruzan
August 23, 2022

1    Q.    Okay.
2    A.    They went through a transition as well.
3  They're in the H office.  So I'm just -- yeah.  I'm
4  positive that that would have been Larry Roberts.
5    Q.    Okay.  So he's the assistant secretary of
6  the Department of the Interior for Indian Affairs?
7    A.    That's correct.
8    Q.    Got it.  And so I don't have that e-mail
9  from Mr. Roberts to you.  So I don't know what it
10  says, but it says it came to your e-mail.  You think
11  it came to a personal e-mail or to your BIA?
12   A.    I didn't have a personal e-mail that any
13  e-mails came to me for work-related things.  So I can
14  only assume that it would have been to my work e-mail.
15   Q.    And do you recall that e-mail?
16   A.    I don't.  I don't.
17   Q.    You recount it, though, and say that "I
18  understand."
19   A.    Yeah, absolutely.  No.  There's no
20  question in my mind based on my e-mail here that I had
21  received an e-mail from him.  I'm just saying I don't
22  recall that e-mail.
23   Q.    Okay.  So what were you thinking about
24  the situation at this time; do you recall?
25   A.    I don't.  I don't recall this e-mail, but

1  I can assume that what my concern was, is busloads of
2  people coming that way, you know.  And at the time
3  early -- now, I'm jumping here a little bit.  Maybe I
4  shouldn't.
5    Q.    No, don't because we're talking about
6  this e-mail.  I'm not asking you to --
7    A.    Okay.  Yeah.  I would have been concerned
8  if I would have received it.  I'm not saying that I
9  didn't, but I would have been concerned about busloads
10  of people heading, you know, toward the reservation,
11  assuming that if the assistant secretary is the one
12  telling me that, I'm assuming I was thinking they
13  would have been Native Americans, which off the
14  reservation would not have been my jurisdiction,
15  but...
16   Q.    In fact, you say, "I understand it's off
17  the reservation."
18   A.    Yes.  I understand that the arrest was
19  off the reservation, that that's where that occurred.
20   Q.    You're not talking, sir --
21   A.    I'm sorry.  Go ahead.
22   Q.    Thank you.  You're talking about busloads
23  of people headed that way, and "I understand it's off
24  the reservation."  So we're not talking about the
25  arrest.  You're talking about busloads of people;

1  right?
2    A.    Right.
3    Q.    Where are they coming from?
4    A.    I don't -- I have no idea.
5    Q.    Where are they going?
6    A.    Well, again, I have no idea.  You know, I
7  see what you're saying.  I probably would have been
8  assuming that the protest would have been off the
9  reservation, but, you know, in my mind, you know,
10  proximity to the reservation with Native Americans --
11  reading this I can tell you it would have been on my
12  mind that busloads of protesters would have been
13  Native American and we would have had to have dealt
14  with that on the reservation, whether it be --
15  whatever.  We needed to be thinking about it.
16         (Deposition Exhibit 740 was remotely
17  introduced and provided electronically to the court
18  reporter.)
19   Q.    Yes.  Okay.  So let's go to Exhibit 740.
20  And this is an e-mail that Mr. O'Neal replies to your
21  "anything new here" e-mail.  And so we don't need to
22  look at the string that we've already looked at
23  because it's behind this e-mail.  So I'm asking you to
24  look at Mr. O'Neal's here and only that, and then I'd
25  like to talk to you about it.

1    A.    Okay.  Give me one second, then.  Okay.
2  I've read it through it.
3    Q.    Thank you.  So this looks like to me --
4  and you tell me if you agree -- this is an e-mail from
5  Mr. O'Neal, same day, same Sunday, August 14, couple
6  hours later, and still in the morning to you copied to
7  that same group that you were communicating with a
8  moment ago, Exhibit 739.  And what he says is a
9  two-sentence statement and then it looks like he's
10  cutting and pasting a report update he received from
11  acting police -- acting chief of police at the
12  Standing Rock Sioux Tribe, Chad Harmon; right?
13   A.    Okay.
14   Q.    You see that?
15   A.    Well, I mean, I read it.  You know, I
16  noticed the vehicle slowing, so I know that --
17   Q.    Let's go down.  Let's scroll down so you
18  can see it, right there.
19   A.    Okay.
20   Q.    Do you want to finish reading the piece
21  of the e-mail that carried over on the next page?
22   A.    Okay.
23   Q.    You read it?
24   A.    Yes, I did.
25   Q.    Okay.  So do you agree with me that

Darren Cruzan
August 23, 2022

Page 66

1  Mr. O'Neal is cutting and pasting Mr. Harmon -- Acting
2  Chief Harmon's report?
3       A.   That's what it looks like to me as well.
4       Q.   Okay.  So all O'Neal says to you is,
5  "Below is the last update I received," and, "Keep in
6  mind," he says, if we do get a call to assist it would
7  probably be because a state or local officer is facing
8  an immediate threat.
9       A.   "Immediate imminent threat."  Yes, I see
10  that.
11       Q.   "Immediate imminent threat"?
12       A.   Right.
13       Q.   So you read this report from the acting
14  chief; correct?
15       A.   I did read through that, yes.
16       Q.   And what it says is that at some day
17  prior, in the afternoon the North Dakota state radio
18  reported that Highway 1806 was blocked at the DAPL
19  protest site located off the Standing Rock Sioux Tribe
20  Reservation and it was blocked by 100 people.  And a
21  Lieutenant Eric Peterson from the North Dakota Highway
22  Patrol contacted the Bureau of Indian Affairs Office
23  of Justice Services, Standing Rock agency, and asked
24  if a BIA patrol unit could confirm this because the
25  state highway patrol didn't have anyone available;

Page 67

1  right?
2       A.   That's what it looks like to me, yes.
3       Q.   So what does that relationship tell you,
4  that the State of North Dakota wants to reach out to
5  the BIA for help?  Is that common?  Uncommon?
6       A.   No.  That's very common across Indian
7  country.  I would assume that, you know, Standing Rock
8  and the state and the county have a similar
9  relationship.  I know that, you know, at Standing Rock
10  at the time -- I don't remember exact numbers, but I
11  think it would be safe to say they probably had, you
12  know, fewer numbers of officers assigned to that
13  agency than needed -- than were needed, so
14  understaffed there.
15       I would assume, sounds like, that North
16  Dakota was the same way.  So across Indian country
17  it's good working relationships like that to assist in
18  those kind of situations -- can you look at this for
19  me, can you let me know what you're seeing.  I think
20  that would be a fairly common practice.
21       Q.   So he's just reporting a cooperative law
22  enforcement effort along with the state law
23  enforcement, correct, with regard to a circumstance
24  blocking a public highway and safety concerns?
25       A.   Yeah.  That's what it looks like happened

Page 68

1  to me.  Yes.
2       Q.   Sure.  Sure.  Okay.  And if you come down
3  a little bit towards the bottom of the e-mail, there's
4  a paragraph that says that -- the acting chief of
5  police says, "I also noticed some vehicles that were
6  not part of the protest group with men inside with
7  long range spotting scopes and digital cameras parked
8  on the west side of 1806 watching the protest group."
9  Two vehicles.  No.  These vehicles were two black SUVs
10  and one white Ford Taurus not affiliated with state
11  law enforcement.  Do you know who these people were?
12       A.   I don't.
13       Q.   The FBI has black SUVs, doesn't it?
14       A.   Well, I assume that they do throughout
15  their fleet.
16       Q.   And spotting scopes -- use of spotting
17  scopes was not uncommon by the FBI?
18       A.   Well --
19       MR. SCARPATO:  Object to foundation.
20       A.   I'm sorry.  I didn't hear what was said.
21       Q.   (BY MR. SEBY) I asked you if you thought
22  that spotting scopes were a common surveillance tool
23  by the FBI?
24       A.   I would say spotting scopes are not a
25  common surveillance tool used by FBI.  You know,

Page 69

1  you're talking about long-range spotting scopes.  I
2  don't know.  I mean, I have no -- I don't know.
3       Q.   I'm just asking if you know who these
4  people are.
5       A.   I absolutely do not know who those people
6  are.
7       Q.   Did it strike you as unusual?
8       A.   It strikes me as unusual.  Absolutely it
9  strikes me as unusual.
10       (Deposition Exhibit 741 was remotely
11  introduced and provided electronically to the court
12  reporter.)
13       Q.   Okay.  All right.  Let's go to
14  Exhibit 741.  It's coming up on the screen.  So here
15  we are again.  We're building on the same e-mail
16  chain.  So no need to go back and read the parts that
17  we've talked about that you've already read.
18       So you responded to Mr. O'Neal's e-mail
19  and you -- you're still on Sunday.  You're having a
20  busy Sunday on your e-mail.  Like an hour and a half
21  later, still midday, early afternoon.  And you say,
22  Chairman, FYI, and you're talking to Mr. O'Neal and
23  the other folks that are copied on here, BIA
24  colleagues.  And you say simply, "FYI, Chairman
25  Archambault just sent me an e-mail asking for my cell.

Darren Cruzan
August 23, 2022

Page 70

1   He and I are fairly close.  No idea what he may be
2   wanting to talk about."
3           So Chairman Archambault two days prior
4   had just been arrested; right?
5           A.   Yes.
6           Q.   And how did you feel about him being
7   arrested?
8           A.   Indifferent.  Honestly, indifferent.  I
9   don't give quarter on criminal behavior, you know.  So
10  I wouldn't have felt sorry for him if he goes up there
11  and gets himself arrested.
12          Q.   When you say he and you "are fairly
13  close," how so?
14          A.   Well, so I'm fairly close with a
15  number -- well, at the time, at the time.  In my role
16  I would travel -- I was on the road probably two to
17  three weeks a month traveling around Indian country.
18  So I would say -- you know, I would use that same type
19  of reference to, you know, describe my relationship
20  with many, many tribal leaders across Indian country
21  at the time.
22          So, you know, "fairly close" meaning, you
23  know, in Indian country -- and you may or may not get
24  this, but, you know, with the Bureau of Indian
25  Affairs, some tribal leaders don't necessarily have

Page 71

1   the fondest relationship, and in fact, adversarial
2   many times with Bureau of Indian Affairs for a litany
3   of things, they need more officers, whatever.  But
4   oftentimes it's not a real friendly relationship.
5           There are several who we do have a little
6   closer relationship with that, in my opinion,
7   understand the sort of -- the challenges that I face
8   as the director of Bureau of Indian Affairs and was a
9   little bit more understanding with me when we were
10  able to increase staff and those kind of things.
11          So I had met Chairman Archambault
12  probably -- you know, again, I hate to give you dates
13  and time frames, but it was probably -- it was during
14  my time as director of the Bureau of Indian Affairs.
15  And we did a recruitment campaign there at the --
16  whatever Standing Rock college was there for police
17  officers, correction officers, dispatchers.  We were
18  trying to recruit from the community.  And he came and
19  introduced himself to me.  We talked for a while.
20          Then we would see each other at different
21  things.  He would come to D.C. and he would schedule a
22  meeting with law enforcement to talk about those kind
23  of things.  So when I say "fairly close," I don't mean
24  friends necessarily, but pretty good working
25  relationship with him.  I felt like he would have

Page 72

1   conversations with me.
2           Q.   So what did you do when he asked you for
3   your cell phone?
4           A.   I don't remember exactly.  I'm sure that
5   I sent him my cell phone and I'm sure that we had a
6   conversation.  When I say "sure," you know, I'm almost
7   positive that that's what would have happened.  I
8   don't think I wouldn't have sent any tribal leader my
9   cell phone if they asked for it.
10          Q.   You would have or would not have?
11          A.   No.  I don't believe I would not have
12  sent one to any tribal leader.  I believe I would have
13  sent -- if the same request would have come from any
14  tribal leader, I believe that I would have -- as the
15  director of law enforcement for the Bureau of Indian
16  Affairs Office of Justice Services got a tribal leader
17  asking for my number, I'm sure that I would have
18  provided that.
19          Q.   Okay.  All right.  So you gave your cell
20  phone number to him and he called you; right?
21          A.   I don't remember the phone call, but I
22  suspect that he did.  I don't really honestly remember
23  if he did or didn't.  I assume that he did.  And I can
24  assume how that conversation went, but I don't
25  remember specifics of it.

Page 73

1           Q.   When was the last time you spoke to him
2   prior to this date?
3           A.   Prior to that date?  I wouldn't know.
4           Q.   Okay.  So you assume -- you said you
5   assume you spoke to him and you assume --
6           A.   I believe that, yes.  I don't doubt that
7   we had a conversation.  I sent him my number and then
8   we had a conversation.  I just don't remember the
9   specifics of it.
10          Q.   You recall nothing from that
11  conversation?
12          A.   I don't.  I recall nothing from that
13  conversation.
14          Q.   Okay.  He had just been arrested and he
15  was asking to talk to the director of the Bureau of
16  Indian Affairs Office of Justice Services and you
17  don't recall that conversation?
18          A.   I don't.  I don't.  We didn't arrest him.
19  And I don't.  I mean, I can imagine how that
20  conversation went, but I don't remember any details of
21  it.
22          Q.   What did he ask you for?
23          A.   I don't remember any details.
24          (Deposition Exhibit 742 was remotely
25  introduced and provided electronically to the court

Darren Cruzan
August 23, 2022

1     reporter.)

2          Q.    Okay.  Let's go to Exhibit 742.  And this
3     is a string -- an e-mail with a string.  And let's go
4     to the bottom of it because it starts with an e-mail
5     from you.  And we can't tell in the manner of how this
6     was produced to us, but we do know it's from you on
7     August 15, 2016, so Monday, the day after the string
8     we were just looking at in the evening, early evening.
9     And you say "Good evening Jay."  That's Jay Lonewolf;
10    right?

11         A.    That would have been Jeremiah Lonewolf,
12    the ASAC.  That's right.  That's correct.

13         Q.    And you say, "Good evening, Jay.  For the
14    next few days and until things settle down, can you
15    please provide a morning and evening briefing on how
16    things are going."  You go on to say, "I have the
17    Assistant Secretary and BIA Director cc'd as they are
18    briefing up to the Secretary's office."

19         A.    Okay.

20         Q.    Right?

21         A.    Yes.

22         Q.    And so can you elaborate on what the --
23    what you're doing here and why?

24         A.    Yeah.  I don't recall this, but I can
25    tell you what I'm doing here based on reading it, is

1     keeping our leadership informed on what's happening
2     down there.  When I say "down there," there at the
3     Standing Rock Sioux Tribe.  So what I'm asking for is
4     just is there anything new that happens.

5               And, again, I'm probably harkening
6     back -- and I, again, don't recall what that e-mail
7     said, but I saw it here where the assistant secretary
8     had told me that busloads of people are coming.  So
9     probably trying to get as much information on that as
10    we can to determine what we need to do --

11         Q.    Yes.

12         A.    -- in terms of staff.  So then I guess it
13    says that I've cced the assistant secretary and the
14    BIA director.  So probably just looking for ground
15    truth from our folks there at the district office as
16    to what's occurring.

17         Q.    Got it.  So the e-mail chain goes on and
18    it's an e-mail -- a lengthy e-mail from Mr. Lonewolf,
19    Jay?

20         A.    Jeremiah, Jay.  That's fine.  I know who
21    you're talking about.

22         Q.    Yeah.  And that's later that same
23    evening, August 15.  And he is writing to you and a
24    group of people which include Larry Roberts, Lawrence
25    Roberts, with the Department of Interior, the

1     assistant secretary, and a number of BIA people copied
2     on there up at top.  You'll see that.  And he says,
3     "Good Evening Sir.  Reports from the Agency."  He's
4     referring to Standing Rock; right?

5          A.    That's correct.  Yes.

6          Q.    It's an interesting e-mail because he
7     gives an introductory paragraph about a meeting he had
8     with Chairman Archambault and Greta Baker, who is the
9     Standing Rock Sioux Tribe internal affairs official.
10    He met with those people earlier that afternoon, and
11    he reports that Ms. Greta Baker with the tribe was
12    setting up a meeting to coordinate efforts regarding
13    the Dakota Access Pipeline protests with state law
14    enforcement, BIA law enforcement, and tribal programs
15    to come up with some sort of strategy for crowd
16    management.  Is that right?

17         A.    That's what it looks like to me, yes.

18         Q.    And then he indents the e-mail body and
19    he quotes Ms. Baker saying, quote, This is bigger than
20    Standing Rock now -- and, again, that's on
21    August 15 -- and it's growing.  The Chairman had some
22    concerns about non enrolled members attracted by the
23    protest and that people (tribal) are scared of the non
24    enrolled members staying at the Sacred Stone/Spirit
25    Camp and of the large number of people starting to

1     camp near the Cannonball River.  Right?

2          A.    Yes, I see that.

3          Q.    And then it goes on to say, There is now
4     a second camp on the north side of the Cannonball
5     River, both camp sites, this one -- this new one and
6     the Sacred Stone/Spirit Camp are located on Army Corps
7     of Engineers land; right?

8          A.    That's correct.

9          Q.    Is that consistent with your
10    understanding of things?

11         A.    That is consistent with my understanding
12    of the camps, yes.

13         Q.    Okay.  So the part I'd like you to speak
14    to is after Ms. Baker says both of those camps are on
15    Corps of Engineers property land, she goes on to say,
16    "The Sacred Stone/Spirit Camp is located on the south
17    side of the Cannonball River," on the Standing Rock
18    Reservation.

19         A.    Let me read this because I want to --

20         Q.    Please do.

21         A.    South side, which is the reservation
22    side.  Okay.  I'm with you.

23         Q.    So is what Mr. Lonewolf who is -- remind
24    me who Mr. Lonewolf is.  He's the --

25         A.    He's the assistant special agent in

Darren Cruzan
August 23, 2022

1  charge, right, ASAC.

2      Q.   He's saying that -- and you said it's
3  consistent with your understanding that the south side
4  of the Cannonball River includes land that is both
5  Corps of Engineers land and tribal land?

6      A.   Well, so it's my understanding, and that
7  had always been my understanding once I got there and
8  kind of saw it for myself, that there's a -- where
9  the -- and I don't have a map here to point to, but
10 where the Cannonball River separates the Army Corps of
11 Engineers on the north and on the south, there is a
12 strip, a small strip -- and I'll use, you know, very
13 standard language in Indian country -- exterior
14 boundaries, inside the exterior boundary.

15      So on the reservation there is a small
16 strip right along the Cannonball River on the
17 reservation side.  So it's on the reservation, Army
18 Corps of Engineers land, where that camp -- one of
19 those camps -- and if you say it's Sacred Stone/Spirit
20 Camp, I'll believe that.  I don't recall a lot of
21 names of camps.  But there was a camp on that Army
22 Corps of Engineers land on the reservation side of the
23 Cannonball River.

24      Q.   So you're saying and what's being said
25 here, and you agree, that that strip is both Corps of

1  Engineers-managed land and part of the Standing Rock
2  Sioux Tribe Reservation?

3      A.   See, that's what I don't know.  That
4  would take a more intelligent legal position than I
5  did.  What I can tell you, in talking to the -- to not
6  the acting chief of police, but Dave -- his name is
7  escaping me right now, is that -- because I asked that
8  question when I got there about that piece of land, Do
9  we typically patrol down there?

10      He told me that there had never been any
11 active patrol in that area, that Army Corps of
12 Engineers -- and, again, when I say it's a small
13 strip, it's pretty narrow and it doesn't go up into
14 the reservation community where the community is, the
15 Cannonball community, very far, that we, being the
16 Bureau of Indian Affairs Office of Justice Services,
17 didn't routinely patrol that area unless there was
18 some imminent threat of something happening down
19 there.

20      But as I recall, he couldn't recall ever
21 actively patrolling down there.  It's not in an area
22 where people normally were.  You know, it's outside of
23 the Cannonball community area.  And so I think that it
24 was one of those things that we hadn't patrolled and
25 frankly didn't know exactly what to do.  But it was

1  within the exterior boundaries.  My understanding is
2  that the Cannonball River was, I guess, the north
3  boundary of the Standing Rock Reservation.  So it was
4  a little confusing, that little piece of land right
5  there.

6      Q.   But the confusion was nonetheless you
7  understood that it was BIA jurisdiction at that place?

8      A.   Well, I don't think that I completely did
9  understand that.  It was within the boundaries.  So if
10 there were things that were going on down there that
11 needed law enforcement involvement within the
12 reservation boundaries, we were prepared to respond
13 there because it was within the exterior boundaries.
14 But, you know, it was new to me.  I had never dealt
15 with Army Corps of Engineers land like that before,
16 you know, and that sort of set of circumstances.

17      We were prepared to respond down there
18 into that camp.  We chose not to because there was no
19 reason to.  There was no -- you know, at the time
20 there was nothing imminent and kind of dangerous that
21 were happening down there.  So we chose not to go down
22 there, but we were prepared to do that if we needed to
23 on the reservation.

24      Q.   Why did you get prepared?

25      A.   Well, because there were protesters and

1  campers down there.  We saw what was happening on the
2  other side of the river.  And so, you know, any time
3  you have a group of people gathered like that were
4  there and doing what they were doing, it would be
5  silly not to be thinking about some type of emergency.

6      Q.   Which was what?

7      A.   They were protesting and, you know,
8  illegally camping, I guess, on the Army Corps of
9  Engineers land on the north side of the Cannonball
10 River.  So, you know, we didn't differentiate the
11 people that were on that side of the river to that
12 side of the river.

13      We were -- we had very clear, you know,
14 jurisdictional boundaries that we operate on all over
15 the United States in Indian country, and that's the
16 exterior boundaries -- inside the exterior boundaries.
17 So if something were to happen down there, there's
18 nobody else going there.  I knew that.  And so we
19 needed to be prepared and we had talked through how we
20 might do that.

21      Q.   But you do understand that you're saying
22 that this was overlapping -- apparently overlapping,
23 that it's both the Corps of Engineers-managed land and
24 inside the exterior boundaries of the Standing Rock
25 Sioux Tribe?

Darren Cruzan
August 23, 2022

Page 82

1    A.   Well, so I do understand that, but no
2  other law enforcement agency had any authority besides
3  the Bureau of Indian Affairs on that reservation if it
4  were Native Americans, you know, that were camping
5  there.  I don't believe that they were -- it was
6  exclusively Native Americans, but I do know that that
7  piece of land was within the exterior boundaries of
8  the reservation.
9         So we didn't actively patrol it, but we
10  were prepared if there was a situation down there that
11  required an emergency response.  That was the extent
12  of where we were prepared and thinking about going.
13    Q.   So if groups of people were to take a bus
14  and head into a reservation of a Native American tribe
15  in the United States that the BIA administers law
16  enforcement on and they were to just set up camp there
17  and start, you know, living there, habitating there,
18  vehicles, animals, cooking, disposing of waste, all of
19  those things, would that bother you elsewhere?
20    A.   Well, I know what this is going to sound
21  like, but it's not my responsibility to be bothered by
22  that.  You know, we would take our cue on sovereign
23  land from the leadership of the tribe.
24    Q.   Okay.
25    A.   So --

Page 83

1    Q.   So did they ask you, Don't pay any
2  attention to those people camping there?
3    A.   You know, that conversation happened, but
4  it happened in a lot of different ways.  There were
5  some that really wanted us to move those folks along.
6  There were some that didn't want us to move them
7  along.  And even with Dave Archambault, that
8  conversation changed several times during the -- I'm
9  talking about within the boundaries of the
10  reservation, the people that were camping there.
11    Q.   That's all I'm talking about, just that.
12    A.   If I could finish.  It was the -- you
13  know, not only in that area, not only on that Army
14  Corps of Engineers land, but at the casino, at the gas
15  stations, at the grocery stores, in communities.  So
16  it was never -- I never felt from tribal leadership
17  that there was ever one clear, concise direction that
18  their leadership wanted to go.  When I say
19  "leadership," I'm talking about certainly Chairman
20  Archambault and, you know, members of the general
21  council, which are the, you know, elected body there
22  and speak for the tribes.
23    Q.   So you said that they flip-flopped in
24  their position; right?
25    A.   I didn't say they flip-flopped, but I

Page 84

1  say -- that's not the word I used, but the opinions
2  changed.  And different people had strong opinions of
3  that.  So there was never, you know, any clearcut
4  guidance on, you know, those camps that were on the
5  reservation, what tribal leadership wanted to do with
6  that.  It was never portrayed to me as very clear.
7  So, you know, what we did was try to maintain order.
8  And that's what we did.
9    Q.   I thought you told me that you saw --
10  from the State of North Dakota Law Enforcement Center
11  with the federal drone footage and the highway patrol
12  footage, you saw caravans of people gathering and
13  leaving the protest camps; correct?
14    A.   I remember one time in particular seeing
15  a video of a caravan leaving.  It was a long line of
16  vehicles that stretched way deep into the camp that
17  was on the north side of the Cannonball River.  And,
18  you know, even as they were pouring out onto highway
19  whatever that was, whatever it was, a big long line of
20  vehicles in that camp, that's the one time that I can
21  recall seeing aerial footage of a caravan leave.
22         (Deposition Exhibit 743  was remotely
23  introduced and provided electronically to the court
24  reporter.)
25    Q.   Okay.  All right.  Let's go to

Page 85

1  Exhibit 743.  So here is a -- it's again that same
2  e-mail string in the prior -- the just prior exhibit,
3  742.  I just -- I only want to ask you about -- I only
4  want to ask you about Mr. Lonewolf's response to you.
5    A.   Okay.
6    Q.   He says again --
7    A.   Just so you know, that screen is the
8  least helpful to me right there.  If you could go back
9  to the smaller.  That screen right there is what I can
10  see the best.
11    Q.   So, again, this e-mail is from Jay,
12  Jeremiah, Lonewolf on August 15 in the evening now.
13  It's entitled "SRST updates."  Mr. Lonewolf says,
14  "Right now, I think it would be wise to identify
15  possible officers to deploy.  We are looking at
16  identifying officers within the District to deploy if
17  necessary as a contingency."
18         What's he reacting to, talking about the
19  need for contingency planning with law enforcement
20  resources from the Bureau of Indian Affairs?
21    A.   Well, I, again, don't remember the exact
22  details of this, but I think what I was asking is, you
23  know, in essence, do we have enough officers to meet
24  the demand of the influx of people that you're seeing
25  or not seeing.  Do we have enough officers there.  And

Darren Cruzan
August 23, 2022

1  he's responding, I think it would be wise to deploy
2  officers.
3          So, you know, as I mentioned earlier
4  today, one of the things that we did, and I'm assuming
5  they still do across the country, is when there are
6  events -- you know, large powwows or anything like
7  that, we'll detail officers from other reservations.
8  So when he says "deploy," he's really referring to
9  asking for assistance from other -- at this point in
10 time only Bureau of Indian Affairs personnel.
11     Q.   Okay.  He goes on to say at the bottom of
12 that e-mail, "I have the command center ready to move
13 into Fort Yates if needed."  So he's talking about
14 moving it into the reservation; right?
15     A.   Well, so the command center, it's a
16 unified command vehicle.  So think of it in terms of,
17 like, a bus that has, you know, panels that can extend
18 out and radio systems, things like that that can be
19 forward deployed to areas so as not to overburden a
20 police department.
21          So in this instance, so as not to
22 overburden the dispatch center at Standing Rock Sioux
23 Tribe, calls for service that are coming in -- and
24 keep in mind, we still had a very, very large
25 residential population on the reservation to service

1  and provide law enforcement response to.  And so the
2  mobile -- what's he call it?  The command center would
3  have been our mobile command center or our mobile
4  unified command.  And I think at the time we did store
5  it in South Dakota at the district office.  So that's
6  what he's talking about there.
7      Q.   So when you say "mobile unified command,"
8  "unified," what does that refer to?
9      A.   Well, that's what we call it.  So it's --
10 for instance, ultimately this did happen where we
11 requested assistance from our sister organizations
12 within the Department of Interior.  We also brung
13 folks with our land mobile radio.  So if a unified
14 command vehicle or the mobile command unit comes into
15 an area, we also deploy BIA land mobile radio
16 personnel with it.
17          So if we get National Park Service or
18 U.S. Park Police or, gosh, even, you know, BIA
19 officers from different districts that don't have, you
20 know, the district channels programmed into their
21 radios, they can put those together.  So it's really
22 just a kind of -- you know, it's more of a name than
23 anything else.  But that's what it is.  It's a mobile
24 command, unified command of some sort.
25     Q.   I understand.  So was it ever brought to

1  Fort Yates, Standing Rock Sioux Tribe Reservation?
2      A.   Yeah, it was.  And I think it was the
3  one -- I know it was because I remember the individual
4  that brought it up.  It was brought out of Oklahoma --
5  out of our Oklahoma District 2.  They brought their
6  unified command vehicle.  It was a little bit bigger
7  and had more capabilities, more radios, little more
8  space in it.  We brought that one and parked it
9  initially at the casino parking lot.  And then I think
10 we may have moved it once or twice somewhere on the
11 reservation.
12     Q.   You brought it up when?
13     A.   Goodness.  I was there when it arrived.
14 So sometime after I got there, if you know the date
15 when I got there, it would have been sometime after
16 that.
17     Q.   I'm asking you what that date was.
18     A.   I don't know.
19     Q.   And it was brought up because the
20 Department of Interior dispatched law enforcement to
21 help you?
22     A.   I don't think it was brought up at that
23 time.  I think it was brought up before that.  And
24 that was a BIA OJS resource.  So those unified
25 commands are things that we had.  And I think each

1  district had a smaller version of the larger one that
2  was in Oklahoma.
3          So that was probably brought up just
4  because, again, we didn't want to overburden the
5  Standing Rock Sioux dispatch center.  I think we
6  brought dispatchers as well to sit in there to the
7  dispatch specifically for the detail officers that we
8  had brought in.
9      Q.   And you chose to use and assign the
10 larger unified command mobile vehicle from Oklahoma,
11 which was larger than the one that resided nearby in
12 Aberdeen, South Dakota.  You called up instead the
13 bigger one because it was a bigger deal and you had
14 additional dispatchers to help the unified --
15     A.   Yeah.  I think more capabilities in that
16 larger vehicle, more space.  You know, in the back of
17 there, there was meeting space.  And, yeah, in front
18 there were two or three more areas for --
19     Q.   Yes.
20     A.   -- dispatch.  I'm sorry.  I live right
21 here.  I don't know if you can hear that.  It will
22 pass.  I apologize for that.
23     Q.   Your voice is now becoming strained and
24 unintelligible.  Do you need --
25     A.   Yeah.  If you can bear with me just --

Darren Cruzan
August 23, 2022

Page 90

1           MR. SEBY:  Let's go off the record,
2   please.
3           THE VIDEOGRAPHER:  We are off the record
4   at 10:50 a.m.
5           (Recess taken, 10:50 a.m. to 11:02 a.m.)
6           THE VIDEOGRAPHER:  We are back on the
7   record at 11:02 a.m.
8           (Deposition Exhibit 745 was remotely
9   introduced and provided electronically to the court
10  reporter.)
11      Q.   (BY MR. SEBY) So let's go to Exhibit 745,
12  please.  And this is an e-mail chain, you conversing
13  with Mr. Lonewolf some more and Jason Thomas.  I don't
14  want to ask you about the chain of e-mails.  I just
15  want to ask you about your e-mail at the top.
16      A.   Okay.  Could you just refresh my memory
17  what is below there?
18      Q.   You can skim it, if you'd like.  That's
19  not being concealed from you.
20      A.   I know.  I just can't see it.  I just
21  want to --
22      Q.   It has nothing to do with the question
23  about --
24      A.   Okay.  I'm familiar with what it's
25  attached to.

Page 91

1       Q.   Okay.
2       A.   I'm good.  Thank you.
3       Q.   So up at the top you are communicating
4   with -- again, this is Monday, August 15 in the
5   evening.  And you write, "Larry/Mike, here is just a
6   little more for your call in the morning.  We probably
7   won't have new information prior to the call with the
8   Secretary."
9       A.   Okay.
10      Q.   So Lawrence Roberts, Larry Roberts,
11  again, that's the assistant secretary of the Interior
12  for Indian Affairs; is that correct?
13      A.   That's correct.
14      Q.   And who is the Mike that you're referring
15  to?
16      A.   So Mike Black is the director of the
17  Bureau of Indian Affairs and would have been my
18  first-line supervisor.
19      Q.   Okay.  Got it.  So you're talking about a
20  call with the secretary.  Were you a participant in
21  that call?
22      A.   I was not, no.  I never had any
23  conversations with the secretary until after I was
24  back and the event was over.
25      Q.   You never talked to Secretary Jewell

Page 92

1   during the DAPL event?
2       A.   Not that I can recall at all.  I think
3   talking to the secretary, I would recall that, but I
4   don't recall having any conversations with her at all.
5       Q.   So what are you doing here with this
6   communication?  You're giving them the e-mail string
7   below for what purpose?
8       A.   For briefing purposes.  Apparently it's
9   the most updated information that we would have had, I
10  guess.  So they would be prepared to brief.
11      Q.   You're supporting them for briefing the
12  secretary?
13      A.   Yes.
14      Q.   Okay.  So the secretary of the Interior
15  was monitoring events as of August 15, 2016?
16      A.   Yeah.  I assume that's right.  I mean, I
17  am providing them information and I must have been
18  aware that they were briefing her.
19      Q.   Apparently, right.  Why was she -- why
20  did she care to spend any time on August 15, 2016,
21  about this time?  Why was she aware of -- or kept
22  aware of and briefed, updated, apprised, whatever as
23  of this date; do you know?
24      A.   I don't know what would have made
25  anything extra special.  I'm not sure it was extra

Page 93

1   special.  I thought we had talked about information
2   that had been earlier, as we spoke here today, that I
3   was providing them information and updated
4   information.  I was aware that they were speaking with
5   the secretary.  That is how that works, is keeping
6   your supervisors apprised of what's going on in your
7   organization.
8           So my assumption is that this was a
9   standard kind of a thing.  I don't recall if it was
10  something that, you know, we provided, I provided.
11  It's not uncommon for me, I will assure you -- for me
12  to keep my supervisors informed of what's going on.  I
13  make an assumption that they had a regular meeting
14  with her, but I don't know.  I wasn't part of any.
15          (Deposition Exhibit 746 was remotely
16  introduced and provided electronically to the court
17  reporter.)
18      Q.   Okay.  So let's go to Exhibit 746,
19  please.  So same thing.  There's this same e-mail
20  string that you're engaging with.  I'm not going to
21  ask you about that.  I'm going to ask you about the
22  e-mail at the very top from Tim Lynn, Department of
23  Interior.  Who is Mr. Lynn?
24      A.   So Tim Lynn was the director of law
25  enforcement for the Department of Interior Office of

Darren Cruzan
August 23, 2022

Page 94

1   Law Enforcement and Security.  It was a position that
2   I eventually moved into, as we talked about earlier
3   this morning.
4        Q.   Okay.  Got it.
5        A.   So that dotted line to the bureau
6   directors.
7        Q.   I understand.  So you're telling him --
8   or he's telling you, "Darren, don't hesitate to ask
9   for assistance from other DOI law enforcement
10  resources if you feel you're going to need them";
11  right?
12       A.   That's right.
13       Q.   So this guy, the director of law
14  enforcement for the entire Department of Interior, was
15  offering you the ability to ask for it; right?
16       A.   Well, that's correct.  And this was not
17  an uncommon thing at all.  You know, I can go back to
18  2010 right before I got there.  And as I was there, we
19  had a high-priority performance goal initiative where
20  we were trying to reduce violent crime at four
21  locations.  And in order to get our staffing up to the
22  correct levels, we asked our sister agencies within
23  the department if they could send us detail officers
24  to assist us to get our staffing levels to the level
25  that it should be.

Page 95

1        So, you know, sharing officers within the
2   Department of Interior was not uncommon.  I don't
3   remember ever sending BIA officers to other locations,
4   but it's not uncommon for the sister DOI agencies to
5   assist the BIA when we needed -- when we were short
6   staffed or needed a hand.
7        Q.   And, in fact, at some point you decided
8   it was needed and you asked for it; right?
9        A.   That's correct.  Yes.
10       Q.   So when was that?
11       A.   Well, I would have been there at that
12  point.  So whenever that was.  And, again, I don't
13  remember specifically.  I'm sure that there's a
14  document there that --
15       Q.   I don't have one.  That's why I'm asking
16  you.
17       A.   I'm just saying I'm sure somewhere
18  there's a document that shows us requesting additional
19  officers to assist.  That would have been after my
20  arriving there.  And, you know, I would say -- I don't
21  know -- maybe halfway to the end of the event, I
22  suppose.  I just don't remember the date.  I don't
23  know.
24       Q.   Let's go to --
25       A.   But I definitely did ask for additional

Page 96

1   resources.
2        Q.   From within the Department of Interior?
3        A.   From within the Department of Interior,
4   that's correct.  Yeah.
5        Q.   And you received it; correct?
6        A.   I did, yes.
7        Q.   Did you receive less or more than you
8   asked for?
9        A.   Gosh, I think I received what I asked
10  for.  I don't remember.  I don't remember specifically
11  requesting a number.
12            (Deposition Exhibit 747 was remotely
13  introduced and provided electronically to the court
14  reporter.)
15       Q.   Okay.  I get it.  Thank you.  747,
16  please.  So this is an e-mail that is an e-mail from
17  you at the top there on Wednesday, October 17, 2016,
18  so just a few days after the e-mails we've been
19  discussing.  And the attachment here is the "SRA
20  maps."  What does SRA maps mean?
21       A.   Gosh.  I don't know.
22       Q.   Okay.
23       A.   Standing Rock.  I don't know.  I'm not
24  sure.
25       Q.   Okay.  It goes on to say "Dakota Access

Page 97

1   Protest - Camp Sites."  We're going to look at the
2   attachment here in a moment, but this information that
3   you are reporting to this group, which includes a
4   large number of BIA individuals and Tim Lynn at the
5   Department of Interior, the head of the law
6   enforcement services group, and Department of Interior
7   watch office.  What's the watch office?
8        A.   So the watch office is a component of the
9   Department of Interior Office of Law Enforcement and
10  Security.  I actually don't have that right.  It is
11  actually part of the Department of Interior Emergency
12  Management Office, or it was at the time.  It was at
13  the time.  I don't know if that's changed.
14            And it was a 24-hour office that really
15  was a clearinghouse for any information of
16  significance that was, you know, happening within or
17  around Department of Interior resources or things that
18  could have impact, weather even included.  But that
19  was a component of the Department of Interior.  So the
20  watch office was just something that compiled reports
21  and things like that for briefing.
22       Q.   I understand.  So you are communicating
23  with those folks and a bunch of other senior managers
24  and others in the Department of Interior, including
25  the assistant secretary for Indian Affairs, Larry

Darren Cruzan
August 23, 2022

1  Roberts.  He's there in the distribution.  And you're
2  reporting that BIA District 1 and Standing Rock agency
3  met with tribal leadership that morning.
4      A.   Where are we looking at?
5      Q.   Right there in the e-mail.
6      A.   Okay.  All right.
7      Q.   Do you remember that?
8      A.   I don't remember that, but I see it.
9      Q.   Do you have any reason to think your
10 e-mail is wrong?
11     A.   No.
12     Q.   So you are reporting to the group --
13 you're talking about a number of things.  You're
14 reporting that the BIA estimated size of the protests
15 was 3 to 350 people.  Are you referring to the protest
16 camps located on the reservation?
17     A.   I don't know what I'm referring to there.
18     Q.   Earlier I thought you told me BIA
19 estimated people in camps, population numbers on the
20 reservation?
21     A.   Yeah.  I'm just trying to see -- I'm
22 reading above that just to make sure.  That's probably
23 what I'm talking about.  That seems like the right
24 numbers.  And then the next sentence, Earlier reports
25 by Morton County was much higher.  So, you know, right

1  there that's probably the population on the
2  reservation that I'm referring to, since I'm mostly
3  talking about reservation information.
4           And, again, you know, although the events
5  happening outside the reservation were impactful and
6  concerning to me, it's not something I had any, you
7  know, authority or jurisdiction over.  So I'm probably
8  talking right here strictly about what's happening
9  within the boundaries of the reservation.
10     Q.   Then you're reporting further about the
11 meeting that you noted that you didn't say was not
12 accurately stated, but you say "some of the tribe's
13 concerns are," bullet one, lack of control of the camp
14 sites, plural, by the tribe or tribes occupying the
15 sites.  That's -- again, that's as of August 17, 2016,
16 you're saying to the assistant secretary of the
17 Interior that there's -- the tribe lacks control of
18 the campsites or tribes occupying the sites.  You use
19 the word in the plural, don't you?
20     A.   Well, what I said there is some of the
21 tribe's concerns.  And these were the concerns that
22 they must have brought up with that meeting between
23 the BIA and tribal leadership.
24     Q.   Yeah.
25     A.   They're their concerns that there was

1  lack of control.
2      Q.   By them; right?
3      A.   By campsites and tribes or tribes
4  occupying the sites.
5      Q.   Correct.  And then a "lack of
6  communication with outside entities by the tribe, lack
7  of leadership in the camps," plural; right?
8      A.   That's what I'm seeing, yes.
9      Q.   Speeding in communities, weapons, drugs,
10 non-Indians and nonmembers.  So not tribal-affiliated
11 people; correct?
12     A.   Right.
13     Q.   In fact, most of these people weren't
14 even North Dakotans, were they?
15     A.   That was certainly my uneducated opinion
16 of it.  I mean, you know, it certainly appeared to me
17 that the incident started out as a Native American,
18 you know -- that was what I saw and that the whole
19 thing pretty quickly turned into people coming from
20 all over.  So it's my opinion.  I don't know that to
21 be accurate, but certainly my opinion that most people
22 were from somewhere else.
23     Q.   I understand.  Thank you.  So let's go to
24 the attachment.
25     A.   Can I go back to this just -- I want to

1  clarify that these were not -- I'm not saying these
2  were my concerns.  I was passing on -- or whomever, we
3  were passing information on what the tribes were
4  concerned about.
5      Q.   Yeah.  You were letting the assistant
6  secretary of the Department of Interior know that the
7  tribe told you in a meeting that there's a lack of
8  control of the campsite by the tribe or the tribes
9  occupying the sites and their lack of leadership in
10 those same camps, and there's weapons and drugs and
11 non-Native Americans present; correct?
12     A.   Right.  That's what I said that their
13 concerns were, yes.
14     Q.   So we're not disagreeing about what the
15 e-mail says.  So we can move on to the attachment,
16 which is a map.  Do you see that?
17     A.   I do, yes, sir.
18     Q.   Do you need that enlarged at all?
19     A.   Just depends how granular we're going.
20 That's good.  I can see that well.
21     Q.   Excellent.  So do you see -- this is an
22 e-mail that you sent and an attachment that you
23 attached to it.  And so let's just look at a couple of
24 things in there.  The yellow line is a line that you
25 are purporting to show what, the exterior boundary of

Darren Cruzan
August 23, 2022

1  the Standing Rock Sioux Tribe Reservation?
2        A.   I guess that's what I'm trying to show.
3  You know, I'm not completely familiar with that.  So I
4  don't think I would have drawn that.  I would have
5  presented that, but that's what it looks like to me on
6  the North and South Dakota sides of the states, the
7  boundaries of the reservation, or a general depiction
8  of what the boundaries are, yes.
9        Q.   And like you said, there's -- the
10 reservation straddles both the state of South Dakota
11 and the state of North Dakota; correct?
12       A.   Correct.
13       Q.   And then if you look on the South --
14 pardon me -- the North Dakota side, this document that
15 you presented to the assistant secretary of the
16 Interior and a large number of BIA and DOI people, in
17 fact it shows that the boundary of the reservation is
18 the Cannonball River to the north; correct?
19       A.   Can you point to where you're referring
20 to?
21       Q.   I don't have a pointer, but if you look
22 at the very top, there is the word "Cannonball."  Do
23 you see that?
24       A.   I do see that, yes.
25       Q.   So while we're looking there, you can see

1  a river that is going there.  Do you see that?  It's a
2  meandering river?
3        A.   I do.
4        Q.   What's that geographic location?
5        A.   Well, it's in North Dakota.
6        Q.   I'm asking about the geographic feature
7  of the northern boundary right next to the word
8  "Cannonball."
9        A.   Well, I'm not following your question.  I
10 don't know what you're asking.
11       Q.   Do you disagree that that's not the
12 Cannonball River?
13            MR. SCARPATO:  Objection; vague.
14       A.   Yeah.  I mean, I'm not -- I don't know.
15 If this was something I had provided, it was general
16 to provide the boundaries of the reservation.  It's
17 certainly not intended to be exact.  And I don't -- I
18 don't know where -- I'm not familiar enough with the
19 geography of North Dakota to be able to answer that
20 question fairly.
21            (Deposition Exhibit 748 was remotely
22 introduced and provided electronically to the court
23 reporter.)
24       Q.   (BY MR. SEBY)  Okay.  So let's go to
25 Exhibit 748.  Okay?

1        A.   Okay.
2        Q.   This is that same e-mail where you're
3  briefing people about the tribe's concerns that we
4  just talked about on August 17, 2016.  One of the
5  people that was copied in your e-mail on that date is
6  a fellow named Harry Humbert.  Do you know who
7  Mr. Humbert is?
8        A.   I do know who Harry Humbert is, yes.
9        Q.   Will you explain to me who he is?
10       A.   Yeah.  At that time Harry would have been
11 the deputy assistant secretary for -- gosh.  So I
12 don't remember the exact acronym, but he was -- his
13 portfolio included law enforcement for the department,
14 emergency management to include the watch office that
15 we talked about.
16       Q.   You're talking about within the
17 Department of Interior; correct?
18       A.   Department of Interior, yes.  Aviation
19 and wildland fires.  So Harry previously was the
20 director of law enforcement, the position that Tim
21 Lynn was in at the time.  So in hierarchy and how that
22 chain of command went, Tim Lynn, who was the director
23 of law enforcement for DOI OLES, or the Office of Law
24 Enforcement Security, reported directly to Harry
25 Humbert, who was the deputy assistant secretary.

1        Q.   Okay.  So Mr. Humbert writes back to you,
2  still on August -- pardon me.  This is on August 18
3  now when he responds to your e-mail from the prior
4  day.  He thanks you for the update, things are busy.
5  "After consideration, I am going to have Jim Gallagher
6  come out."  Who is Jim Gallagher?
7        A.   So Jim Gallagher was -- I think his title
8  was assistant director of DOI OLES.  So he would have
9  worked for Tim Lynn.
10       Q.   Okay.  Lots of Department of Interior
11 folks, huh?
12       A.   Well, I mean, all pretty law
13 enforcement-centric.  So, I mean, that's part of our
14 nature, is communicating those kind of things with our
15 law enforcement folks.  So everybody that, you know,
16 we're talking about right there -- Harry Humbert, Jim
17 Gallagher, Tim Lynn -- were all DOI OLES or above
18 that.  Harry was the deputy assistant secretary.
19       Q.   Got it.  So he's telling you how he's
20 going to dispatch Mr. Gallagher to North Dakota and
21 his role -- I'm quoting Mr. Humbert.  "His role will
22 be strictly to relate information back here to me so
23 that I can inform Department Senior Leadership on
24 activity on a real time basis in the event something
25 breaks."  And he puts that in bold and he underlines

Darren Cruzan
August 23, 2022

Page 106

1  it.  So he really means it, doesn't he?
2      A.  Well, I can only assume that.  He wanted
3  me to make sure I saw that.
4      Q.  So he was directing you -- taking
5  something off your plate, it sounds like, and defining
6  the allocation of Department of Interior resources;
7  correct?
8      A.  Well, maybe.  You know, as I had
9  mentioned earlier when you had asked me about
10  attending the Morton County daily meetings or
11  every-other-day meetings, that Jim would have been one
12  of those that attended those with me.
13      Q.  So Jim Gallagher from the Department of
14  Interior was dispatched to join you in the North
15  Dakota Law Enforcement Centers and briefings?
16      A.  Well, I don't know if it was for that
17  reason.  I think it was really to provide -- Jim
18  stayed right with me.  You know, everywhere I went he
19  was there and assisted, did some, you know, just
20  second looks at things to assist and...
21      Q.  But Mr. Humbert is saying here in bold
22  and underlined, "His role will be strictly to relate
23  information back here to me."  So he's telling you
24  that's what this new guy is going to do.
25      A.  Okay.

Page 107

1      Q.  Right?
2      A.  Okay.
3      Q.  Are we debating that or do you agree?
4      A.  I'm certainly not debating that with you,
5  no.
6      Q.  So that's an order from the Department of
7  Interior, at least that's Mr. Humbert's affiliated
8  title, is with the Department of Interior.
9      A.  He is, that's correct.  Yes.
10      Q.  And he goes on in this third paragraph of
11  his e-mail, "You have a law enforcement operation and
12  issues on the reservation to address and what you
13  don't need is to be addressing those issues while
14  simultaneously trying to keep folks back here
15  informed.  With all of the media interest coming to
16  bear on this, the Governors Office being in direct
17  connection with the Secretary" -- he's talking about
18  the secretary of the Interior, Sally Jewell; right?
19      A.  I can only assume that that's what he
20  means by that.
21      Q.  Then he goes on to say, "Not to mention
22  the White House interest in this," talking about the
23  White House where the President of the United States
24  resides; correct?
25      A.  That is where the President of the United

Page 108

1  States resides, yes.
2          (Deposition Exhibit 749 was remotely
3  introduced and provided electronically to the court
4  reporter.)
5      Q.  All right.  Those would also be folks
6  back here in the Washington, D.C., reference, I think.
7  749, please.  So this is a really interesting e-mail,
8  and it's got a bunch of title status reports attached
9  to it.  We are not going to read those.  They speak
10  for themselves.  I'm not going to ask you about them.
11          What I do want to ask you about is the
12  e-mail that passes them along.  And they were sent to
13  a group starting with the gentleman who was providing
14  them, Harold Molash with the BIA.  And the subject of
15  his e-mail at the very bottom of this before the
16  attachments start, if we can go down there --
17  Mr. Molash is a realty specialist, Standing Rock
18  Agency.  So he's not just BIA.  He's on site at
19  Standing Rock; right?
20      A.  I'm not familiar with Harold Molash.
21      Q.  Are we debating his signature block?  I
22  mean, that's what it says.
23      A.  No, but you asked me.  So I'm just not
24  familiar with him.  I don't know.  We're not disputing
25  that with what it says, but I don't know him.

Page 109

1      Q.  So we can stipulate he's at the Standing
2  Rock Sioux Tribe and his title is realty specialist.
3  What does the BIA realty specialist do generally when
4  staffed at a particular reservation?
5      A.  Well, I think --
6          MR. SCARPATO:  Objection; misstates.
7      Q.  (BY MR. SEBY) Sir?
8      A.  So I don't really know.  That is a
9  different side of the house, but I will tell you what
10  I have used them for in the past in other locations is
11  to -- in criminal investigations to certify, if you
12  will -- probably not the right word, but to land
13  status that it is indeed Indian country for purposes
14  of prosecution, that a crime occurred, that it was
15  Native American, and that it was -- it occurred on
16  Indian land.  That's what I've used Indian realty
17  specialists in the past in other districts before.
18  Other than that, I really couldn't tell you.
19      Q.  Okay.  Earlier we were -- you were not
20  sure what the acronym SRA meant?
21      A.  Correct.
22      Q.  Molash's signature block, it looks like
23  it means Standing Rock Agency?
24      A.  Yeah.  Makes perfect sense.  That is, I'm
25  sure, what that means.

Darren Cruzan
August 23, 2022

Page 110

1      Q.   Okay.  So on August 18 Mr. Molash, the
2  realty specialist with the Standing Rock Agency, sends
3  an e-mail and it says, "FYI:  Here is the information
4  that was requested, including the TSR's."  What's a
5  TSR?
6      A.   I don't know.  Sorry.  I'm not sure.
7      Q.   How about township, section, and range as
8  the acronym?
9      A.   Doesn't mean anything to me.  So I don't
10  know.  Not sure.
11      Q.   Those are terms that are used as
12  coordinates; right?
13      A.   I don't know.
14      Q.   Okay.  He says, "TSR's, Aerial Imagery of
15  the sites, plural, including the Pow Wow Grounds -
16  Cannonball."  He sends this to Rebecca Poitra and a
17  Dwight Archambault with the BIA.  Is Mr. Dwight
18  Archambault related at all to the chairman of the
19  Standing Rock Sioux Tribe?
20      A.   Yeah, I have no idea.
21      Q.   Okay.  All right.  And so Ms. Poitra, who
22  also apparently goes by Becky, sends that e-mail along
23  to a group of individuals in the BIA and she says on
24  the morning of August 18, "I worked with Sheila,
25  Dwight and Harold from the Standing Rock Agency

Page 111

1  regarding your request.  Please find attached a copy
2  of your map from this morning with notations,
3  additional maps received from the Standing Rock
4  agencies and TSR's.  I also sent the e-mail to Gary
5  Eldevik who was going to take a look at the map also.
6  This is information received from Standing Rock
7  Agency."
8           The first bullet is "Oglala Camp."  Do
9  you have any reason to believe that this is otherwise
10  known as the Oceti Sakowin Camp or eventually became
11  known as the Oceti Sakowin Camp north of the
12  Cannonball River?
13      A.   I don't have any reason to believe -- I
14  don't know that's what that is, but I do seem to
15  recall the Oglala Camp being in the Corps of Engineers
16  land north of the Cannonball River.  I'm sorry.  You
17  know what I mean.  On the Morton County side of the
18  Cannonball River.
19      Q.   Yes.  I appreciate you clarifying that,
20  because as of August 18 in the morning Ms. Poitra
21  says, "This is off reservation fee land.  The owner is
22  unknown."  So you just identified it likely as Corps
23  land, but Ms. Poitra didn't connect that?
24      A.   Well, I'm just saying it was in that same
25  area.  I'm not qualified to say who the owner is.  I

Page 112

1  just -- you know, generally speaking on that side of
2  the river.  So I would have no reason to know who the
3  owner is either.  I'm just generalizing that that was
4  the area on the other side of the Cannonball River.
5      Q.   Okay.  We're going to look at the
6  attachment to this e-mail in a minute, and it provides
7  a handwritten document that -- it's an aerial and it
8  shows the Cannonball River north and south and the
9  camp located north of the Cannonball River, just
10  north.  And it says Oglala Camp in the location that
11  is otherwise commonly referred to as the Oceti Sakowin
12  Camp.  So you can tell me if you have reason to
13  believe that's not correct when we get there.
14           I want to continue on.  She talks about
15  next the Sacred Stone Camp.  "This is Corps of
16  Engineers land."  In parentheses, "taken land."  What
17  does that mean?
18      A.   I don't have any idea.  No idea.
19      Q.   She goes on to say, "The Corp gave this
20  back to Tribe to manage.  The title may be in the name
21  of the United States of America.  There may be some
22  controversy on it.  Standing Rock Agency may be able
23  to provide additional information on this."
24           It's just interesting.  Then in response
25  to Ms. Poitra's e-mail, an individual who's copied on

Page 113

1  it, Timothy LaPointe, do you know who that fellow is?
2      A.   I do know who he is.  He was the -- I
3  believe he was the regional director.  I see it now.
4  I do see it now.
5      Q.   Of what?
6      A.   Of the Bureau of Indian Affairs.  Well,
7  it would be the Great Plains Region.  For us it would
8  be district one, but that's -- he's non-law
9  enforcement.
10      Q.   Non-law enforcement.  Okay.  And this is
11  how you come to get the e-mail.  He adds you to the
12  forward of this string of information, including the
13  maps and the title status reports.  And he sends it to
14  a woman named Misty Lakota.  Do you know her?
15      A.   I do know Misty Lakota.  She was former
16  Bureau of Indian Affairs Office of Justice Services
17  employee, and it looks like, based on her e-mail
18  address, that she did eventually go to the Department
19  of Interior Office of Law Enforcement and Security,
20  based on that e-mail.
21      Q.   Okay.  And so LaPointe says to Misty
22  Lakota, "Misty:  Pursuant to your request" -- and so
23  that's a request from the Department of Interior --
24  "attached is the information we were able to locate
25  concerning the land status of the (protest) campsites,

Page 114

1  plural, on/near the Standing Rock Reservation.  Let me
2  know if you have questions or need additional
3  information."  Let me just finish.
4         August 18, 2016, you were given this
5  information.  Do you recall having discussions with
6  your Department of Interior colleagues or other
7  federal agencies with respect to the information
8  provided to you on this date?
9      A.   I do not.  I am completely unqualified to
10  talk about any of the land status and those kind of
11  things.  So I see that I was courtesy copied on here.
12  I likely -- you know, I don't remember having any
13  conversations with anybody about any of this.
14      Q.   You just told me that in the past you had
15  used realty specialists so that you were clear for
16  purposes of law enforcement and the like that you
17  wanted to get clear on the status.  So here you've got
18  one of those same people starting -- the information
19  had been relayed to you.  My question was not do you
20  have an opinion about this, because I understand
21  you're not a specialist on that kind of information,
22  but why can't you tell me whether or not this became a
23  topic of discussion with respect to your official
24  position and why you were involved in the DAPL
25  protests?

Page 115

1      A.   That wasn't your question.  Your question
2  was did I speak to anybody about this.  I didn't.
3      Q.   You did not.  You were not --
4      A.   Did not.
5      Q.   Were you part of any discussions
6  concerning the land status information provided by
7  your agency, the Bureau of Indian Affairs?
8      A.   The only time would have been closer to
9  the end of the event when a document was provided to
10  us.  It was basically a flier that was provided to us
11  that said, Here's the status of the land.  And it was
12  presented to the folks that were camping on the
13  Standing Rock side of the Cannonball River.
14         I don't recall what that says.  I'm sure
15  my memory can be refreshed on that.  I don't recall.
16  But as far as having any substantive or even any that
17  I really recall, I wouldn't have been qualified to
18  even discuss this.  That wasn't an area that at that
19  time I was concerned with, and clearly other people
20  were.  But, you know, ours was at that moment making
21  sure that, you know, people remained peaceful.  So I
22  had no conversations about any of this and wouldn't
23  have completely understood it at the time.
24      Q.   So this flier that you're mentioning at
25  the end, who wrote the flier that you're referring to?

Page 116

1      A.   I don't recall, but I think it came from
2  Timothy LaPointe's office.  I think it was signed by
3  him, by the region director, but my mind could be
4  refreshed on that one.  I don't remember.  That's what
5  I seem to remember.
6      Q.   So the flier was developed by the Bureau
7  of Indian Affairs and given to protesters occupying
8  lands south of the Cannonball River, question; right?
9      A.   On the reservation side, yeah.
10      Q.   On the south side of the Cannonball
11  River?
12      A.   Correct.
13      Q.   Okay.  All right.  Help me understand,
14  when you say that you were the senior Department of
15  Interior person in North Dakota and you've made
16  several statements in e-mails we've shown and walked
17  through about your focus was on issues on the
18  reservation; right?  Is that a fair statement?
19      A.   Yeah, absolutely.  And I think -- you
20  know, I want to be careful about saying I was the
21  senior official because clearly additional folks from
22  the Department of Interior OLES were there.  How I
23  want to say it is that I was the senior law
24  enforcement official there.
25      Q.   I understand.  So I'm asking you then,

Page 117

1  based upon that and your emphasis to date about where
2  your jurisdiction is and where it's not, why wouldn't
3  you care for documents that are provided to you that
4  define the answer to that question?
5      A.   Well, I don't think in that e-mail that
6  you just showed me there was any clear -- that's
7  certainly not what I would have presented in a case
8  file for criminal prosecution from a realty office
9  based on land status, an e-mail with a lot of people
10  on that saying this -- you know, it could be there's
11  questions.  That would never have been enough for me
12  to, you know, confidently say in a prosecution.  So
13  when I say I use the realty office, that's what I use
14  it for.  If there was a Native American --
15      Q.   That's who developed the information
16  we're talking about.
17      A.   Well, in an e-mail, but it would have
18  been a much more clear document for me in the past
19  dealing with a realty office.  That, to me, looked
20  like an e-mail to a lot of people that says, We're
21  working on these things, we still don't have it sorted
22  out.  That's how I would have taken it.
23      Q.   The attachments speak for themselves.  So
24  I won't talk to you about those.  But let's go to the
25  attachments after the title status reports, which do

Darren Cruzan
August 23, 2022

1   state a position.  Let's go to the first picture.
2   It's a Google Earth image.  Do you see that?  Do you
3   want to have it blown up in any regards or flipped
4   around so you can --
5       A.   If it could be flipped, that would be...
6       Q.   There you go.
7       A.   Okay.
8       Q.   Okay.  So you see this -- you see the two
9   orange dots or orange areas?
10      A.   I do.
11      Q.   Okay.  You see the river flowing between
12  the north orange location and the south orange
13  location?
14      A.   Okay.  Yes.
15      Q.   Do you see that?
16      A.   Uh-huh.
17      Q.   Can we stipulate that's the Cannonball
18  River?
19      A.   I have no reason to believe that it's
20  not.
21      Q.   In fact, it says it right there on the
22  BIA's map.  It points to the river, that red line that
23  I asked you -- can we agree that's the Cannonball
24  River?
25      A.   Okay.  Yes.  Sure.

1       Q.   Okay.  So there is a handwritten notation
2   on here in black next to the large orange area denoted
3   north of the Cannonball River.  It says Oglala Camp.
4       A.   Yeah.  I see that, but that -- before you
5   showed me this picture that is not where I thought
6   that camp was located at.
7       Q.   Where did you think it was located?
8       A.   I thought it was located further north of
9   the Spirit Camp on the Cannonball River side -- other
10  side of the Cannonball River more in the middle of
11  that, the bigger camp there.  That's where I thought
12  that camp was located when I said I remember the
13  Oglala Camp being mentioned.
14      Q.   So is the BIA information wrong?
15      A.   No.  I'm not saying that is wrong, no.
16  I'm just saying that's not where I -- when you asked
17  me about it earlier and before we showed this picture,
18  that's not where I thought that was.  I thought it
19  was -- because I think there were several camps named
20  over there on that side.  I just misremembered, I
21  suppose, but where I thought it was was closer to
22  the -- how do I -- I don't know what you call them,
23  but the berms, the hills that went up on the far side
24  of that land where the big camp was.
25      Q.   So you -- when you were in North Dakota

1   several times, you told me you'd start your day at the
2   North Dakota Law Enforcement Center for hours, get
3   information, and relay anything that you knew on the
4   Standing Rock side.
5       A.   Yeah.
6       Q.   Then you would go down to the protest
7   camps; right?
8       A.   No, I would not go down to the protest
9   camps.  And, in fact, there was a very long time where
10  you couldn't really even get through there.  You would
11  have to come around and come through the back side.
12  But I've had occasion to drive down 1806 past the
13  camps.
14      Q.   Okay.  But there --
15      A.   But there were no camp signs that said,
16  This is Camp Such and Such and this is Camp Such and
17  Such.  So I think in my mind, I just thought that camp
18  was in a different location.
19      Q.   But you did drive by a camp located north
20  of the Cannonball River; correct?
21      A.   Yeah.  The big -- that's how we referred
22  to it, "the big camp."  And, you know, oftentimes it
23  was not referred to as individual camps, the big camp,
24  but yes, I drove past it.
25      Q.   Okay.  Thank you.  And so you see where

1   that orange marking is that someone wrote attributing
2   Oglala Camp to it?
3       A.   I do.  I do.
4       Q.   Do you have any reason to disagree with
5   me that's otherwise known as the Oceti Sakowin or the
6   big camp?
7       A.   No.  It's definitely referred -- I
8   definitely referred to it as "the big camp."
9       Q.   Are we talking about the same location?
10  That's the only question I'm asking.
11      A.   Well, it's just -- and I'm not trying to
12  be difficult here.  It's just perspective on how big
13  that camp was.  It's hard to give perspective on using
14  this map here.
15      Q.   Is that the location you saw the big
16  camp, plus or --
17      A.   Generally speaking, right.
18      Q.   Thank you.  Let's keep rolling.  I'd like
19  to go to exhibit -- let me put this back in my binder.
20           MR. SCARPATO:  While you're searching for
21  your next exhibit, Paul, I'll just note for the record
22  that there are additional maps on this exhibit that
23  Mr. Cruzan was not shown for purposes of that last
24  section of questioning.
25           MR. SEBY:  That's correct, Bill.  You're

Darren Cruzan
August 23, 2022

Page 122

```
 1   right.
 2          (Deposition Exhibit 750 was remotely
 3   introduced and provided electronically to the court
 4   reporter.)
 5          Q.   (BY MR. SEBY) Let's go to Exhibit 750.
 6   This is an e-mail from you to Michael Black, who you
 7   told me was with the BIA, and Lawrence Roberts, who
 8   you've told me about, and Tommy Beaudreau.  Who's
 9   Mr. Beaudreau?
10          A.   So Tommy, yeah, I don't know what his
11   exact title was, but I know that he worked for the
12   secretary of the Interior.  But I don't know what his
13   exact role was.
14          Q.   Do you know Mr. Beaudreau at all or you
15   just were told to include him on things?
16          A.   I don't know why he would be on there.  I
17   certainly did not know people up in that front office
18   that way.  So somebody would have had to say add him
19   to the distribution list, I guess, because I wouldn't
20   have known and certainly wouldn't have bypassed my
21   bosses without, you know, being told to put him on
22   there.  I didn't know him.  I'm aware who he is now,
23   but at the time I didn't.
24          Q.   You didn't know who he was at the time?
25          A.   Not really, no.  I really didn't.
```

Page 123

```
 1          Q.   Or what his purpose was?
 2          A.   Well, I mean, I think I must have at that
 3   point because I did know now that he's the -- was, you
 4   know, in the secretary's office, but I had no
 5   interaction with him whatsoever.  And, you know,
 6   there's a lot of people up in that office that I
 7   wouldn't have known.
 8          Q.   Do you have any reason to question that
 9   he was the chief of staff to the secretary of the
10   United States Department of the Interior?
11          A.   No.  No.  That does ring a bell to me.
12   So yeah.  Yeah.  It does ring a bell.
13          Q.   Great.  So your e-mail is entitled
14   "Evening Update," to the assistant secretary and the
15   chief of staff to the secretary of the Interior and
16   Mr. Black?
17          A.   Okay.
18          Q.   And you want to read the e-mail?  It's
19   your e-mail.
20          A.   I can.
21          Q.   Please.
22          A.   Okay.
23          Q.   Have you read it?
24          A.   I've read through it, yes.
25          Q.   Okay.  So it consists of several bullets
```

Page 124

```
 1   as part of your evening update.  And there is, let's
 2   see, one, two, three, four -- the fifth bullet, if
 3   you'd go there, please.  "US Army Corp of Engineers
 4   confirmed that they do not have any law enforcement
 5   resources to patrol their land (camp sites, plural).
 6   The US Army Corp of Engineers stated they have not
 7   granted any special use permit for camping to the
 8   Standing Rock Sioux Tribe."
 9          So this is your update to the assistant
10   secretary of the Interior and to the chief of staff to
11   the secretary.  So I want to ask you, what's the
12   context of this bullet talking about?
13          A.   Yeah.  I'm not sure.  I don't know where
14   I would have gotten that.  It looks to me -- I'm not
15   contesting the fact that it's sent from me to those
16   individuals, but it also looks like I cut and pasted
17   this from something, because it talks to me on the
18   fourth bullet in the third person.  So I'm not sure.
19          And, you know, as this may sound, you
20   know, the law enforcement piece of this was what we
21   were concerned about.  I'm not qualified to talk about
22   land status.  I am qualified to pass information
23   along.  I don't know where I got this and I don't know
24   where it came from.
25          Q.   I'm not asking you about land status.
```

Page 125

```
 1   Let's not --
 2          A.   Well, you sort of did.  You asked me
 3   about the context of that fifth bullet, and I don't
 4   know the context of it.  It would have been
 5   information that I would have been passing along.
 6          Q.   Okay.
 7          A.   And it appears to me to have been cut and
 8   pasted from something.
 9          Q.   All right.  So you don't know where you
10   got this.  You were just passing along whatever was
11   given to you?
12          A.   Well, I don't want to say anything that
13   was given to me was passed along.  It would have come
14   from some source.  I just don't know what it was.  I
15   don't recall.
16          Q.   Do you recall chastising a BIA
17   intelligence officer for giving you information that
18   he later withdrew and you got -- you chastised him
19   because you said, Hey, this needs to be accurate
20   because I pass this stuff up to the secretary's
21   office?  Do you recall that?
22          A.   I don't recall that.  Certainly not in my
23   nature to chastise.
24          Q.   That's my word.  Your communication to
25   that individual, which I know you don't see it, but
```

Darren Cruzan
August 23, 2022

1  I'm asking if you recall it?
2       A.   I don't recall that.
3       Q.   Telling the agent to be more careful?
4       A.   You know, being careful, I don't dispute
5  that I would some time tell people to be careful, but
6  I don't remember what you're referring to, no.
7       Q.   Okay.  So when I use the word, what's the
8  context of this, I was not asking about land status.
9  I was asking the context of you reporting information
10 coming or attributed to the Corps of Engineers.  Is
11 this the first time you became aware of the Corps of
12 Engineers' role or potential role?
13      A.   I'm not sure.  I doubt it was my first
14 time, you know, knowing that the Corps of Engineers
15 had a role in this situation, but I couldn't pinpoint
16 for you a date when I first knew the Corps of
17 Engineers was -- or if this was, you know, my first.
18      Q.   Well, which is it?  You've said
19 everything in between.  Is this the first time you
20 knew about the Corps of Engineers, you're relaying it
21 for the first time, or you're aware of the Corps' land
22 status north of the Cannonball River at least prior?
23      A.   Well, you're asking me a lot of questions
24 right there.  So I don't know if this is the first
25 I've heard of the Corps of Engineers.  I'm assuming

1  that it's not.  I'm assuming that, you know, because I
2  knew that the land that was within the exterior
3  boundaries of the reservation was Corps land, I doubt
4  that this is the first time that I've heard Corps of
5  Engineers mentioned.
6            (Deposition Exhibit 751 was remotely
7  introduced and provided electronically to the court
8  reporter.)
9       Q.   Got it.  So let's go to Exhibit 751,
10 please.  So this is an e-mail from you to
11 Mr. Gallagher, the individual that was directed to
12 accompany you so that he could report directly to the
13 Department of Interior official -- we talked about
14 that -- Harry.  And you're giving it to him.  It says
15 "Monday.doc" and it's dated Monday, August 22, 2016.
16 Would you look at the attachment, please.  I'm not
17 asking you to read it.  Just look at the top there,
18 the document.
19      A.   Okay.
20      Q.   What do you see that this is?  How do you
21 recognize that?
22      A.   Well, I think it was something that was
23 prepared -- this is from me to Jim, is that what
24 you're saying?
25      Q.   The e-mail is.  I'm asking you not about

1  the e-mail.  That's clear, unless you tell me you
2  didn't send the e-mail with your name on it.
3       A.   No, I'm sure I did.  I think this was
4  probably a standard briefing document that we would
5  write.  It doesn't -- I don't remember exactly, but
6  it's got Interior law enforcement security on there
7  and then Bureau -- I mean, it looks like to me like a
8  standard report that would be written and sent to, you
9  know, that chain.
10      Q.   I just want to ask you, because you said
11 it had -- it's from the Bureau of Indian Affairs.
12      A.   Well, it's got the seal on there.  That's
13 why I'm saying that.  And it doesn't, actually.  It
14 doesn't, actually.  It just looks like that.  They're
15 both Interior seals.
16      Q.   Let's be clear.  There is no Bureau of
17 Indian Affairs seal here, is there?
18      A.   No, there is not.  That was a mistake.
19      Q.   Got it.  Thank you.  And so it's dated --
20 it's called an "Office of Law Enforcement and Security
21 Executive Summary" and it's got two seals.  The one on
22 the left is the Department of Interior seal; right?
23      A.   It is.
24      Q.   And the one on the right is the Interior
25 Law Enforcement and Security Department?

1       A.   That's correct.
2       Q.   Okay.  And it's dated August 22, 2016;
3  correct?
4       A.   Yes, it is.
5       Q.   So is this the first time you're aware
6  this document was prepared regarding the Dakota Access
7  Pipeline protest?
8       A.   I have no idea if it is or if it isn't.
9       Q.   Okay.  And because this is not BIA, it's
10 not limited to just the Standing Rock Reservation.  It
11 says in the title the DAPL pipeline protest.  So what
12 do you know about this?  Did you participate in
13 writing this document?
14           MR. SCARPATO:  Paul, if you're going to
15 ask questions about the details of this document, it's
16 only fair for Mr. Cruzan to have the opportunity to at
17 least skim the document in its entirety before you ask
18 him those sorts of questions.
19      Q.   (BY MR. SEBY) Mr. Cruzan, are you going
20 to answer my question about the nature of the
21 document?  I'm not asking about any details of it.
22      A.   Yeah.  I will tell you what I think
23 without looking at it.  It's got -- and I was wrong.
24 It is Department of Interior seals and Office of Law
25 Enforcement and Security heading.  So I don't think I

Darren Cruzan
August 23, 2022

Page 130

1  would have had any hand in writing that per se because
2  I wasn't Department of Interior or Office of Law
3  Enforcement and Security.  I don't know what the
4  document is.
5        Q.   You don't?
6        A.   I haven't read it, no.  I have not read
7  it, but I see --
8        Q.   Sir, I'm not asking about the content.
9  I'm asking about this type of document in general,
10 what it's for and who wrote it and what's it used for.
11 That's all I'm asking.
12       A.   Yeah.
13            MR. SCARPATO:  Paul, if he could take the
14 opportunity to read the document in full, he could see
15 at the last page who the document lists as the author.
16 And I believe that if you want to get useful testimony
17 from this witness on this document that he hasn't seen
18 for at least six years, plus or minus, it would be
19 only fair for him to review the document so he knows
20 what's in there.
21            MR. SEBY:  I don't need to waste the
22 time, Bill.  You keep suggesting that.  I'm declining
23 that, because I'm not asking about the content.
24       Q.   (BY MR. SEBY) So we can go to the very
25 end, as your counsel --

Page 131

1            MR. SCARPATO:  Answer about the language
2  contained within the document, it is not fair or
3  appropriate for you to ask him these questions without
4  giving him the opportunity at least to review the
5  document briefly to understand what it contains.
6            MR. SEBY:  It's a seven-page document,
7  and you're wasting my time.  So if you want to look at
8  the very end of my document, I'm happy to have you
9  look at that.
10       Q.   (BY MR. SEBY) And so there you go.  It's
11 prepared by Deputy Director James Patrick Gallagher;
12 right?
13       A.   Okay.  Yes, I see that.
14       Q.   So why are you e-mailing it to him?
15       A.   That's a good question.  I don't know,
16 unless there's possibility that his -- you know, I
17 don't know.  His e-mail wasn't working?  I don't know.
18 He was one of the individuals that the department
19 sent --
20       Q.   Are you speculating?
21       A.   That's absolutely speculation.  I don't
22 know why I would have sent that to him.  He was one of
23 the individuals that was at the department -- we
24 talked about this earlier.  They sent him there to
25 assist, and this is assuming a report that he did.  I

Page 132

1  don't know why I sent that to him.
2        Q.   Okay.  I get it.
3        A.   I don't know.
4            (Deposition Exhibit 752 was remotely
5  introduced and provided electronically to the court
6  reporter.)
7        Q.   Okay.  So let's go to the next
8  Exhibit 752.  So short e-mail from you.  And the
9  attachment appears to be the very same August 22,
10 2016, DAPL protest, Office of Law Enforcement and
11 Security Executive Summary.  This time it has no seals
12 on it, does it?
13       A.   No.
14       Q.   Okay.  And your e-mail says, "Changes
15 from yesterday in red.  Harry will be sending to
16 Tommy."  So "Tommy" is Tommy Beaudreau, isn't it?
17       A.   I'm sure it is, yes.
18       Q.   The chief of staff of Secretary Sally
19 Jewell, Department of Interior?
20       A.   Okay.
21       Q.   Correct?
22       A.   Yes.  That's his role.
23       Q.   And so why are you sending an e-mail with
24 this document later to the assistant secretary of the
25 Department of Interior and others reflecting revisions

Page 133

1  from the earlier version that are in red?
2        A.   Yeah.  I couldn't -- I don't know.  I
3  don't know why I sent the first one unless there was
4  problems with his computer.  I don't know.  I'm not
5  sure.
6        Q.   Again, you're speculating, aren't you?
7        A.   I don't know.  I don't know why I would
8  have sent that for any other reason.
9            (Deposition Exhibit 755 was remotely
10 introduced and provided electronically to the court
11 reporter.)
12       Q.   Seven -- let's see here.  755.  Do you
13 want to take a moment, please, and read that.
14       A.   Sure.  I'll read this.
15       Q.   You're copied.  It's actually sent to you
16 from Mr. Gallagher, the individual with the Department
17 of Interior, deputy director, Office of Law
18 Enforcement and Security, that Mr. Humbert directed
19 and dispatched to North Dakota to sit with you so he
20 could hear from this individual reports directly;
21 right?
22       A.   Yeah.
23       Q.   Okay.  Please take a moment and read the
24 e-mail.
25       A.   Okay.

Darren Cruzan
August 23, 2022

1    Q.    Okay.  You done?

2    A.    I am.

3    Q.    Okay.  So this is interesting.
4    Mr. Gallagher is talking to you saying he went to a
5    DOJ domestic terrorism executive committee meeting and
6    heard a briefing from the FBI CTD chief.  Who is that
7    fellow?

8    A.    I have no idea.

9    Q.    He's some sort of chief in the FBI.  And
10   he asked about the situation with the DAPL and the
11   Standing Rock Sioux Tribe and he asked if we could
12   update -- I don't know what those acronyms stand for.
13   Do you know?

14   A.    Well, NJTTF, National Joint Terrorism
15   Task Force.  I don't know what the DTU is.  Domestic
16   terrorism.  I don't know what that is.

17   Q.    Okay.

18   A.    SVTC, I don't know what that is either.

19   Q.    Okay.  So he's asking if we, you and he,
20   could update that National Joint Terrorism Task Force
21   at least on the situation in North Dakota.  And he's
22   asking for your availability, basically a week from
23   then in the morning.  "I would drive you over to the
24   Hoover Building."  That's the FBI headquarters in
25   Washington, D.C.; right?

1    A.    It is, yes.

2    Q.    "And you would be back by 9:30."  So it's
3    an hour meeting.  And I am quite prepared to give a
4    general overview but would give you or your designee
5    an opportunity to address the two FBI sections I deal
6    with the most.  You probably have contacts there and
7    the new CTD Chief is a great guy and very supportive
8    of Department of Interior, unlike the local FBI rep in
9    Bismarck.  What is that referring to?

10   A.    I have no idea.  I have no idea.

11   Q.    Okay.  He says, "I didn't hand up the
12   Bismarck FBI rep by name but told Michael Paul."
13   Who's Michael Paul?

14   A.    I don't know.  Maybe the -- well, he's
15   right up there in the first e-mail.

16   Q.    Right.  He told Michael Paul that "we
17   didn't get the same cooperation we had from his office
18   during Malheur."  What is this referring to?

19   A.    Well, not anything that I was involved
20   in, but apparently they didn't have during the Malheur
21   standoff with, I think, the Bundy family.  That's --
22   you'll have to ask Jim Gallagher that.  I don't have
23   any context but beyond that.  They didn't feel like
24   they had a -- or that they had a good relationship
25   there, but not so much with the one in Bismarck.

1         I don't really remember that relationship
2    with the FBI guy in Bismarck.  I haven't given it much
3    thought.  I've always had good relationships with the
4    FBI.  And so I don't really remember, you know.

5    Q.    Is this a turf squabble?

6    A.    No.  It wouldn't have been a turf
7    squabble because they didn't -- no.  Are you talking
8    about -- I don't think so.  I wouldn't think so.  I
9    don't know.  You know, some people are more pleasant
10   to be around than others.  I think that may be what
11   he's referring to, but I don't remember there being
12   any problems between us and the Bismarck FBI.  Just
13   nothing comes to mind that there were any problems.

14        (Deposition Exhibit 722 was remotely
15   introduced and provided electronically to the court
16   reporter.)

17   Q.    All right.  Could we go to 722, please.
18   So this is a one-page document.  It's a calendar
19   invite, isn't it?

20   A.    Looks like a calendar invite, yes.

21   Q.    And the organizer of the call that's
22   being organized here is Chris Myers, the United States
23   Attorney for the District of North Dakota?

24   A.    Uh-huh.

25   Q.    And the subject is "Standing Rock -

1    Federal Partners Teleconference."

2    A.    Okay.

3    Q.    Seeking a 30-minute call on September 1,
4    2016.  And the required attendees, as Mr. Myers noted,
5    is other individuals from the United States Attorney's
6    Office for North Dakota, a Jacob O'Connell with the
7    Federal Bureau of Investigation, Paul Ward, the United
8    States Marshal for North Dakota, and a person from his
9    office, Dan Orr, and another FBI agent named Richard
10   Thornton and another FBI person named Robert Perry,
11   you, and another person from the U.S. Attorney's
12   Office.  Did you participate in this call?

13   A.    I don't remember if I did or not.  I
14   probably did.  I most likely did, but I don't
15   specifically remember the phone call.

16   Q.    Did you join any of these kinds of calls?

17   A.    I might have.  Seems like that there was
18   one, and if I recall there was an in-person call --
19   not in-person call -- an in-person meeting kind of
20   like this, but I don't remember exactly.  I don't
21   remember it being a reoccurring kind of a thing.

22   Q.    I asked neither of those things.  This is
23   a telephone call.

24   A.    You asked me if I had participated and I
25   said I don't recall if I participated in this one.

Darren Cruzan
August 23, 2022

Page 138

1        Q.    Then I asked you did you participate in
2  other similar calls.
3        A.    I don't recall participating in any of
4  these phone calls.
5        Q.    Okay.  So this is called a "federal
6  partners teleconference" and you've got a pretty
7  important group of people.  You're one of them?
8        A.    I think -- I mean, it's very possible
9  that I did.  I just don't recall specifically this
10 one.
11       Q.    So why isn't the Corps of Engineers
12 listed in here as one of the federal partners?
13       A.    I wouldn't have any idea.
14            MR. SCARPATO:  Objection; foundation.
15            MR. SEBY:  Okay.  All right.  It is now
16 11 minutes past noon in the Mountain Timezone.  I'm
17 going to call a lunch break for 45 minutes.  All
18 right?
19            THE DEPONENT:  Sounds good to me.  So
20 we're talking about 3 o'clock my time?
21            MR. SEBY:  That's correct.  1 o'clock
22 Mountain, 3 o'clock Eastern.
23            THE DEPONENT:  Okay.  Very good.  I will
24 see you guys there.
25            MR. SCARPATO:  Thank you.

Page 139

1            THE VIDEOGRAPHER:  We are off the record
2  at 12:12 p.m.
3            (Recess taken, 12:12 p.m to 1:01 p.m.)
4            THE VIDEOGRAPHER:  We are back on the
5  record at 1:01 p.m.
6        Q.    (BY MR. SEBY) Good afternoon, Mr. Cruzan.
7  We're back after a lunch break.
8        A.    Good afternoon.
9            (Deposition Exhibit 756 was remotely
10 introduced and provided electronically to the court
11 reporter.)
12       Q.    We'll continue with exhibits to talk
13 about.  756 is the one to focus on next.  So this is
14 an e-mail from Tom Doering, Morton County, North
15 Dakota, on Saturday, September 3 to you and it says
16 "DAPL EOC Activation," Emergency Operations Center
17 activation.  And do you know why you received this
18 e-mail?
19       A.    Yeah.  You know, the best of my
20 recollection, any time there was any incident
21 occurring, lots of people would get this.  I don't
22 remember this particular one, and I hadn't thought
23 about it until I just saw this, but it seems like
24 there were alerts that went out any time there was any
25 significant incident or activity happening.

Page 140

1        Q.    And, in fact, this one says -- this was
2  primarily intended for law enforcement, wasn't it?
3        A.    I don't know who they sent it to.
4        Q.    You probably received it because you were
5  the Bureau of Indian Affairs Office of Law Enforcement
6  Services, right, or Justice?
7        A.    Yeah, I'm assuming that's right.
8        Q.    Yeah.  And it says that -- this
9  particular one is on September 3.  Do you recall that
10 date?
11       A.    I don't.  I do not, no.
12       Q.    Or any incidents that occurred on that?
13       A.    On that date?
14       Q.    Yes.
15       A.    I don't.
16       Q.    Okay.
17       A.    Nothing comes to mind.
18       Q.    Did all of these notices that you
19 received say they were for code red notifications?
20       A.    I don't recall.  I don't know.
21       Q.    Okay.  Do you know what code red means in
22 North Dakota parlance?
23       A.    I don't.  I'm assuming that it's an
24 emergency, but I don't.
25       Q.    Okay.  What did you do when you received

Page 141

1  these notices?
2        A.    Well, it seemed to me like there was more
3  to it than just this notice.  I recall getting more
4  information than just this.  Seems like there was --
5  so I probably didn't do anything except pay a little
6  extra attention to what might be going on, that the
7  Morton County sheriff and his team might have had
8  going on.
9            It would have gotten my attention, for
10 sure.  I think I would have looked for more
11 information.  I didn't respond anywhere, if that's
12 what you're asking.  There was no -- it wasn't
13 necessary for me to respond to anything.
14       Q.    I asked what did you do when you received
15 it?
16       A.    I probably would have paid more attention
17 to what's going on.  It would have gotten my attention
18 and I would have looked for more information as to
19 what was happening.
20       Q.    But with respect to September 3, this
21 call for a code red notification, you don't recall
22 what that -- even though it got your attention, you
23 don't recall what it involved?
24       A.    No.  Any of these would have gotten my
25 attention.  So this one doesn't stand out to me, you

Darren Cruzan
August 23, 2022

Page 142

1   know, until I maybe have some more context.
2               (Deposition Exhibit 757 was remotely
3   introduced and provided electronically to the court
4   reporter.)
5       Q.   Let's go to 756 -- pardon me -- 757.  If
6   we could go to the bottom of this e-mail.  This is an
7   e-mail to you addressed to, "Darren, do you have" --
8   and this is from Ryan Bernstein.  Do you recall who
9   Mr. Bernstein is?
10      A.   Yeah.  I mean, I remember, you know,
11  being a senator or a staffer for the senator, because
12  I can see the e-mail there, but if you would have
13  asked me his name without this e-mail, I wouldn't have
14  known.
15      Q.   In fact, the parenthetical next to his
16  name says "Hoeven"; right?
17      A.   Hoeven.  Uh-huh.
18      Q.   Do you recognize who that individual is?
19      A.   Who Hoeven is?
20      Q.   Yes.
21      A.   I do know who Senator Hoeven is,
22  certainly.
23      Q.   And that would be who?
24      A.   Senator Hoeven from North Dakota.
25      Q.   The United States senator representing

Page 143

1   the State of North Dakota?
2       A.   Uh-huh.
3       Q.   Okay.  So he says, "Darren, do you have
4   time to talk to either me or Senator Hoeven about
5   getting more BIA law enforcement to North Dakota to
6   help with the protest?  The Governor may make a formal
7   request for more help in the next 2 days and we want
8   to know what is possible and what is the process for
9   such request."
10               He asks you some specific questions;
11  right?
12      A.   Well, he asks me if I had time to talk to
13  he or either -- either he or the senator.  Yeah.  He
14  asked me one and they want to know what the process is
15  for such a request.  Okay.
16      Q.   But they also start by -- he starts by
17  telling you the reason for wanting to talk with you is
18  about getting more BIA law enforcement to North Dakota
19  to help with the protests; right?
20      A.   Yes.
21      Q.   Okay.  And then curious -- if we can go
22  to your response, that would be great, please.  So you
23  didn't reply to him on your own.  You or a group of
24  people helped draft a response that you sent up to the
25  assistant secretary for Indian Affairs.  And you said

Page 144

1   are you "okay with this response to an out of the blue
2   e-mail?"
3       A.   Yeah.
4       Q.   Right?
5       A.   I don't remember that e-mail, but I'm not
6   contesting that I sent it.  I'm reading it.  I see it.
7       Q.   Yeah.  Why don't you go ahead and read
8   what you sent as a draft response to the United States
9   senator that you ran up the flagpole in the Department
10  of Interior to the assistant secretary.
11      A.   Okay.  I'm good.
12      Q.   Why is the font different in your
13  proposed draft e-mail?
14      A.   Yeah.  I'm not sure.  I'm not sure.
15      Q.   Is that because multiple people wrote it
16  for you?
17      A.   I doubt that.
18      Q.   I don't see any of your other e-mails
19  have alternating font like that.
20      A.   Well, there was.  There certainly was.
21  In an earlier document that you showed me there was
22  different fonts.
23      Q.   And why was that?  Because someone else
24  wrote it for you; right?
25      A.   Yeah.  But in this, this is exactly how I

Page 145

1   would have responded.  This does appear to be what I
2   would say.  And why the font is different, I really
3   couldn't tell you.  But, you know, a request like
4   that, I wouldn't immediately respond, nor would there
5   have been any -- you know, that wasn't something that
6   I was looking for.  I think at that time I wasn't
7   looking for more resources that I didn't have access
8   to.
9               You know, our jurisdiction falls strictly
10  within the boundaries of the reservation.  So I could
11  only assume that he is looking for additional help
12  outside the reservation.  So I'm certainly not going
13  to respond back to the senator's office without
14  getting some, you know, input and some thought anyway,
15  approval, if you will, from my leadership.  Why the
16  font is different, I really couldn't tell you, but
17  this looks like exactly how I would respond.
18      Q.   Is this the e-mail that you sent to the
19  senator's chief of staff?
20      A.   I'm not sure.
21      Q.   So what did Mr. Roberts say to you when
22  you asked him, Is this -- are you okay with this?
23      A.   Yeah.  I don't recall, you know, what
24  came of this e-mail here or my question to him about,
25  Are we okay with this response.

Darren Cruzan
August 23, 2022

Page 146

1      Q.   So you said this was an out-of-the-blue
2  e-mail.  Do you really think that a United States
3  senator from the state in which there's a raging
4  protest on federal property public lands that you as a
5  Bureau of Indian Affairs director of Office of Justice
6  Services -- you think that's out of the blue or odd?
7  I don't know what you're --
8      A.   Well, I guess I would look at it to be,
9  you know, a little unexpected e-mail in that, you
10 know, those officers -- I don't ever remember having a
11 conversation with him prior to this.  So, you know, if
12 I were to have said, Hey, I really need more officers
13 here, I wish I could get some, and then he asked me
14 that question, but I don't think this was ever
15 detailing officers.
16         At least, you know, early on, we were
17 bringing them from all over Indian country.  So why
18 somebody would ask me the process for bringing more
19 BIA officers in when I wasn't, you know, looking to
20 bring more officers in that I didn't already have, I
21 would think that would be -- it was unusual.
22     Q.   Do you think it would be possible that
23 North Dakota was just trying to contact every federal
24 law enforcement official in North Dakota known to the
25 state because you joined those efforts and they were

Page 147

1  appealing to you for help because of your position?
2      A.   Well, I couldn't say that was what -- I
3  don't know if they sent that to everybody.  And we
4  hadn't really joined the effort on the North Dakota
5  side to bring federal officers to help off the
6  reservation.  That was never something that we did.
7          You know, that wasn't the intent of why
8  we were there.  You know, ours was within the
9  boundaries of the reservation.  And any time I needed
10 officers to that point and beyond from Interior, you
11 know, that request was always met with support.  So I
12 couldn't tell you whether or not he sent that to
13 everybody or if that's what their thought process was.
14     Q.   Whose decision was it to limit the BIA's
15 jurisdiction to just the confines of the reservation?
16     A.   Congress, I would imagine.
17     Q.   I'm not talking about what a law says,
18 but I'm wondering why the Department of Interior
19 didn't allocate BIA resources outside of the Indian
20 tribes' boundaries when the event was a concurrent
21 one?
22     A.   I'm not sure that it ever was completely
23 concurrent.  And, again, I would just -- I'm not
24 trying to be argumentative with you, but that's the
25 law, is that our jurisdiction lies within the exterior

Page 148

1  boundaries of the reservation.  So in my opinion, we
2  wouldn't have even had the ability to enforce any laws
3  off the reservation, you know, and only in a couple of
4  instances when there was that imminent threat of life,
5  would we even consider that.
6      Q.   How about all the other Department of
7  Interior law enforcement people you've told me about?
8  Were they also limited the same way that the BIA
9  considered itself limited?
10     A.   I would say yes, they were there at our
11 request working under our authorities.  I'm not aware
12 of any special authorities that they have to enforce
13 laws outside of their area or where they've received,
14 you know, cross-deputization.
15         (Deposition Exhibit 758 was remotely
16 introduced and provided electronically to the court
17 reporter.)
18     Q.   Okay.  If we could go to Exhibit 758,
19 please.  So this one is a September 4 e-mail as well.
20 In fact, it's Mr. Roberts from the Department of
21 Interior responding to your request whether your draft
22 e-mail response was okay.  And he said, "I would tweak
23 it as set forth below if you are comfortable with the
24 language."
25     A.   All right.

Page 149

1      Q.   Do you want to read that for a moment and
2  tell me --
3      A.   Sure.
4      Q.   -- what the difference was.  What was the
5  point that the assistant secretary was trying to
6  update from your draft?
7          MR. SCARPATO:  Objection; foundation.
8      A.   Well, I would say they're virtually the
9  same.  I think it's wordsmithing and probably more
10 eloquently written.  It says the same thing, in my
11 opinion.  Doesn't deviate.  And I don't disagree with
12 what he's suggesting there.
13         (Deposition Exhibit 759 was remotely
14 introduced and provided electronically to the court
15 reporter.)
16     Q.   (BY MR. SEBY) Okay.  If we could go to
17 Exhibit 759, please.  So this is what you sent to
18 Mr. Bernstein and copied Pete Darren.  Who's Pete
19 Darren?
20     A.   Pete Darren was the congressional liaison
21 for the Bureau of Indian Affairs.
22     Q.   Okay.  And so it looks like you didn't
23 use Mr. Roberts' revised suggestion.  Why was that?
24     A.   I'm not sure.  I don't know.  To me they
25 look pretty similar with some minor tweaks.  I don't

Darren Cruzan
August 23, 2022

1  know why I didn't use it.  Apparently, I did not.
2      Q.   How come the font is funny -- different
3  funny, but funny with this one --
4      A.   I'm not sure.  I couldn't tell you.  I'm
5  not sure.
6      Q.   Who else gave you input on your draft?
7      A.   I didn't remember that the assistant
8  secretary had even.  So I don't know.  Like I said,
9  this looks how I would have written it, and apparently
10 what I stuck with.  So I don't know.  The assistant
11 secretary was two levels higher than me and if I
12 decided to go with my own, I suspect I was fairly
13 comfortable with that.  I don't know that anybody
14 helped me.
15          (Deposition Exhibit 760 was remotely
16 introduced and provided electronically to the court
17 reporter.)
18      Q.   Okay.  Looks like somebody did, at least
19 one person.  I was just asking you who else had a hand
20 in your paragraph response to the senator's chief of
21 staff.  760, please.  So David Lawrence in the BIA is
22 sending on the Sunday evening report to you and to
23 Mr. Thompson and others.  And you replied back to --
24 well, what the Sunday evening report is -- we can go
25 to the next page, please.  You'll see that it's this

1  document I was asking you about.  It's the Dakota
2  Access Pipeline protest Office of Law Enforcement and
3  Security -- that's the Department of Interior, of
4  course -- August 30, 2016.
5      A.   Okay.
6      Q.   So that summary is -- well, it says
7  August 30, 2016.  The summary is updated as of
8  September 4.  And you say, "All updates are
9  highlighted in red."  I see red on here, but it says
10 red only as to law enforcement sensitive.  Where is
11 the actual text in the document that's an update that
12 appears in red?
13     A.   Well, I can't see the whole document.
14     Q.   Let's scroll through it.  I'm not asking
15 you to read it.  I'm just asking you to point out --
16     A.   Well, you asked me what was red and I
17 couldn't see the whole document.
18     Q.   We're going to go page by page, not to
19 read it, but tell me where --
20     A.   Okay.
21     Q.   -- I'm missing red updates.
22     A.   Okay.  Yeah.  I don't see any red on this
23 one.  So that may have been boilerplate language.  Can
24 you go back to the top of that page?  The first top of
25 the document, I guess.  Yeah.  That may have just been

1  boilerplate language and we missed it that time, but I
2  do see the area that I sort of wanted to highlight and
3  emphasize was the camp sizes, but it's clearly not
4  marked in red.  That may have just been an oversight
5  on our part.
6      Q.   Okay.  But there is red ink or red print
7  on here and it says across the top and across the
8  bottom --
9      A.   Yeah.  I think -- my guess is that you
10 would find that on every single one of them.  So I
11 don't know.
12     Q.   Well, if red is there, why is it not
13 somewhere else?
14     A.   Yeah.  That's a good point.  I think it
15 was probably an oversight on our part.
16     Q.   Okay.  So your reply to getting that
17 document went to the assistant secretary of Interior
18 and some other Department of Interior people.  And it
19 says the "most significant piece is that the camps,
20 plural, have grown to 4000 to 4500."  Why are you
21 taking it on to report camps, plural, which would
22 include the camps on the Corps property, given the
23 size --
24     A.   That's a good question.  That was a
25 significant thing to us.  I mean, I had -- you know,

1  probably at the height of any of the days that we were
2  there we may have had, you know, 40 officers tops.
3  And half of them would have been off duty and resting
4  at hotels or wherever.
5          So, you know, because of the proximity to
6  the reservation and the proximity to the jurisdiction
7  that we have responsibility for patrolling, the
8  proximity for a group of any size to, you know, get
9  food or fuel or any of those kind of things,
10 absolutely the size of the camps that were on the
11 other side of the Cannonball River had an impact on
12 what we were doing, certainly, and sort of the thought
13 process on how many officers that we might need.
14         We were dealing with a resident
15 population.  We had homes and schools and businesses
16 within, you know, very, very short distance from where
17 this growing camp was at.  So those kind of things
18 certainly factored into our thought process in trying
19 to prepare.  You know, as you said earlier, you know,
20 a good number of those people were not from the area
21 and a good number of those people were non-Indian.
22         And so even on the reservation, my
23 ability to enforce law on non-Indians is severely
24 limited.  So, you know, the size of those camps that
25 were growing in close proximity to where our

Darren Cruzan
August 23, 2022

1  jurisdiction boundary started played a pretty
2  significant part.  So I was probably wanting to make
3  sure folks knew that camps are getting bigger and that
4  we might be asking for more help.
5          Q.   Do you recall the very first exhibit we
6  talked about was people letting you know about the
7  protests, which would have included not lands
8  associated with the Indian reservation on August 14,
9  2016?  Do you recall that generally?
10         A.   The first document that you showed me
11  today?
12         Q.   Yes.
13         A.   I don't exactly remember what you're
14  referring to.
15         Q.   It's Exhibit 739 and it's dated
16  August 14.  And so all I'm going to ask you is to fast
17  forward a couple of weeks, really.
18         A.   Well, I will say a couple of weeks were
19  16-, 17-, 18-hour days.  So a lot happened in between
20  those.  So I just want to be clear on that.  It's not
21  an eight-hour day and you can go home.  They were
22  very, very long days.
23         Q.   Okay.  I didn't even raise that topic.
24  So I don't want to diverge from the question asked.
25  I'm just saying that apparently you were first aware

1  of all of the protests and where they were located on
2  August 14.  Here, now fast forward a couple of weeks
3  to September 4, so three weeks forward, and isn't it
4  rather remarkable that in that short period of time
5  the camps grew so dramatically, camp support?
6          A.   Yes, absolutely remarkable that they grew
7  as quick as they did.  Yeah, for sure.  We were
8  surprised every day as they were growing how quickly
9  they grew.
10         Q.   Why did they grow so fast?
11         A.   Well, I've got speculation on it.  I
12  think social media played a big part on it.  I think
13  you had celebrities that were, you know, voicing their
14  opinions, and that drew attention and drew people
15  thoughts on it.
16              (Deposition Exhibit 761 was remotely
17  introduced and provided electronically to the court
18  reporter.)
19         Q.   If we could go to Exhibit 761.  And this
20  is an e-mail on September 7 from Gary Delorme with the
21  United States Department of Justice, the attorney --
22  the U.S. Attorney in North Dakota's office.  And it's
23  from Mr. Delorme, as I said, to you and Ms. Tracy
24  Toulou.  Who is Ms. Toulou?
25         A.   Mr. Tracy Toulou is a DOJ employee.  He

1  at the time -- I don't know if he's retired or not,
2  but he was the director of the Office of Tribal -- I
3  want to -- I think it was Office of Tribal Justice.
4  So sort of the DOJ clearinghouse for all things Indian
5  country would come through Tracy's office.
6          Q.   Okay.  So the letter -- or this e-mail
7  string starts from a gentleman who's in North Dakota
8  Congressman Kevin Cramer's office chief of staff, Mark
9  Gruman, and he's writing to Mr. Myers attaching a
10  letter from Congressman Cramer.  And that letter was
11  then forwarded on to you and Mr. Toulou.
12              Let's go look at the letters now.  So
13  there's an earlier letter that's the next one and then
14  we'll read them in chronological order.  The first one
15  from the congressman is a letter of August 18, 2016,
16  so right when the protests started occupying Corps of
17  Engineers land and some of the reservation land.
18              He's writing to the governor of North
19  Dakota and says, "Governor Dalrymple, as you well know
20  the highest priority of any government is public
21  safety.  With state and local law enforcement
22  resources becoming increasingly inadequate given the
23  enormity of the security threat to the Dakota Access
24  Pipeline, I respect your consideration of further
25  support to insure the safety of the workers and our

1  citizens.  Therefore, please know that you have my
2  full support for any federal law enforcement
3  assistance you may request to help insure public
4  safety.  Sincerely, Kevin Cramer, Member of Congress,"
5  copied to the FBI, United States Marshal Service,
6  BATF, BIA, and the National Park Service.
7              And Congressman Cramer writes three weeks
8  later on September 7 to Mr. Myers, the U.S. Attorney
9  for North Dakota, and says, Mr. Myers, I sent that
10  letter to Governor Dalrymple giving him my full
11  support for law enforcement systems.  "Among other
12  federal agencies, copies of that letter were provided
13  to agencies under the U.S. Department of Justice.
14  Unfortunately, on September 4, several hundred
15  protesters on foot and horseback trespassed upon
16  private property and assaulted civilian security
17  officers and their K-9 units.  In the words of Morton
18  County Sheriff Kirchmeier, quote, individuals crossed
19  onto private property and accosted private security
20  officers with wooden posts and flag poles, end quote,
21  characterizing the event as, quote, more like a riot
22  than a protest, and quote, and further stating, quote,
23  any suggestion that today's event was a peaceful
24  protest, is false, end quote."  Then he goes on to
25  reiterate his request for law enforcement for North

Darren Cruzan
August 23, 2022

Page 158

1    Dakota.  "Only an overwhelming law enforcement
2    presence will stem the tide of future lawlessness."
3         And so this letter was shared with you by
4    the U.S. Attorney's Office in North Dakota.  Why do
5    you think they wanted to get to you and to Mr. Toulou,
6    who is the director of tribal justice for the
7    Department of Justice?
8         A.   Yeah.  I don't know.  I mean, obviously
9    we would be an obvious federal, you know, law
10   enforcement organization in that area, but I will tell
11   you my sole focus, with the resources that I could
12   bring to bear, was providing public safety in the area
13   that we had jurisdiction in.  And it wasn't new
14   jurisdiction.  It was the Standing Rock Sioux Tribe
15   where we had a longstanding trust responsibility to
16   provide law enforcement.
17        So my focus was completely there.  And,
18   you know, at any -- and, you know, I completely agree
19   with his statement that, you know, the first order of
20   everything that we were doing down there was to make
21   sure people were safe.  That was the first order, but
22   I will tell you at any given time -- and I don't know
23   the numbers.
24        I'm sure that you could pull the numbers,
25   but my ability to muster law enforcement for an area

Page 159

1    that we have responsibility for probably never
2    exceeded 40 officers at any given time, maybe 50.  I
3    don't remember exactly the numbers we had, but that
4    was pale in comparison to what the Morton County
5    sheriff was able to pull with his, you know, partners
6    across the state and the national guard and the state
7    police.
8         So to think that I had any extra
9    resources to provide anywhere besides the area that we
10   had jurisdiction, it just wasn't an option.  And, you
11   know, as the groups grew bigger and bigger and the
12   concern of, you know, forcefully removing -- that
13   terminology got thrown around a lot.  And it was
14   pretty apparent that if that group was going to move,
15   they were going to move my direction.
16        And so sparing any officers for any place
17   else other than where we had jurisdiction and pretty
18   immediate potential threat, I just didn't have it.  So
19   I can see where, you know, the Bureau of Indian
20   Affairs would be somebody that would get copied on
21   there because we had people there, but we also had a
22   huge responsibility active in that area and were
23   pulling officers from our own organization to
24   supplement the staff that was permanently located at
25   Standing Rock.

Page 160

1         So I know that's a long -- and you don't
2    like those, neither does Bill, I'm sure, but that's my
3    perspective on that one, is I think because we were
4    already down there, that's why they put us on that
5    list.  I didn't have anybody I could send.
6         Q.   Okay.  I appreciate that.  I'm glad your
7    memory is good on that regard.
8         A.   Well, I will tell you, that is the one
9    thing that my memory is crystal clear on, is that our
10   constant thought was how do we prevent this from
11   blowing into an all-out mayhem.  So that is the one
12   thing that my mind is not foggy on at all.
13        Q.   How did you do that?  What did you do to
14   prevent this event from blowing into all-out mayhem?
15        A.   Well, yeah.  That is my -- that was my
16   fear.  I will tell you that I think that, you know,
17   there was a concerted effort by us to remain
18   professional, the law enforcement there and the BIA to
19   remain professional, not only with the people that
20   were coming to the area, but with our partners, our
21   law enforcement partners, Morton County Sheriff's
22   Department.
23        I will tell you, I think Sheriff
24   Kirchmeier probably contributed to it remaining calm,
25   by his willingness -- him and the colonel and the

Page 161

1    general, their willingness to continue to meet with
2    people not only, you know, in Morton County.  People
3    that were there protesting, he met with them there.
4    He met with them at the bridge.  He met with them
5    close to the camp.
6         And I think that, you know, sort of a
7    tempered response, you know, to continue to
8    communicate, I really think that's what it was,
9    because there were so many people there -- and I'm
10   sure you've seen the videos of what happened down
11   there.  But, you know, there wasn't really enough law
12   enforcement on our side to maintain that.
13        Had that spun around and come our
14   direction, we would have been in a lot of trouble.  So
15   I think good communication by the sheriff and
16   patience, and ultimately the concern of the Missouri
17   River flooding is really, I think, the biggest piece
18   of that that caused people to leave.  I'm going to
19   stop talking and let you ask your questions.
20        (Deposition Exhibit 762 was remotely
21   introduced and provided electronically to the court
22   reporter.)
23        Q.   Thank you.  Let's go to Exhibit 762.
24   Would you take a moment and read this e-mail that
25   Ms. Greta Baker, internal affairs director for the

Darren Cruzan
August 23, 2022

Page 162

1    Standing Rock Sioux Tribe, sent to you along with
2    Colonel Gerhart from North Dakota, General Dohrmann.
3    And it was sent from Ms. Baker to those individuals
4    and yourself and then a woman named Rosa Salamanca,
5    United States Department of Justice.  Who is
6    Ms. Salamanca?
7         A.   I have no idea.  The name doesn't even
8    ring a bell to me.
9         Q.   Never heard of her?
10        A.   Her name doesn't -- oh, you know what?
11   Maybe.  Maybe I have.  I'm going to ask you if this is
12   right.  And maybe it's not.  But I know DOJ sent
13   somebody from the -- I can't remember the office, but
14   resolution something to come down there and try to
15   negotiate some sort of something.  There's a DOJ
16   officer.  Is that who that is?  Can I just ask you
17   that?  I don't remember exactly, but as I kind of went
18   through there, seems like maybe that's who she was.
19        Q.   Well, I can see what you can see and it
20   says "rosa.salamanca@usdoj.gov."
21        A.   Yeah.  Fair enough.
22        Q.   You're not really making a guess.  It
23   says it right there in her e-mail.
24        A.   Well, I know she's with DOJ.  I see that.
25   I clearly see that.  And you had mentioned that when

Page 163

1    you read it.  But I don't remember what her role was.
2    And then as I'm thinking, I do know that they sent a
3    team -- I say a "team"; it was, I think, her and
4    another person maybe -- to come and try to meet with,
5    you know, who that week was being identified as the
6    leader of these camps.
7              And it always turned out to be that's not
8    really a role that anybody had within the camps to
9    speak for the group as a whole.  But it seems like
10   that's who that was possibly.  But I'm speculating.
11        Q.   Okay.  So this e-mail from Ms. Baker,
12   you've read it; right?
13        A.   I've read it, yes.
14        Q.   She mentions, "The Tribe is not in
15   agreement with a four day grace period at any time."
16   What was this grace period concept all about?
17        A.   I'm not sure what that is unless it
18   was -- you know, there was always conversation about
19   the Morton County Sheriff's Department and law
20   enforcement coming in and removing them, the
21   protesters.  And like I said, we would -- I say "we"
22   because I was invited to attend a couple of those with
23   the sheriff and the colonel and the general, where
24   they would talk to who they thought was the leader of
25   the group.

Page 164

1    So I don't -- I do remember something
2    about this.  I don't remember the details of it.  And
3    it seems like it was something about, you know, they
4    would have four days to go ahead and get packed up and
5    get out and law enforcement wouldn't come into the
6    camps.  But again, this is all a little bit fuzzy to
7    me, but I think that's what this is.
8         Q.   This is an official with the tribe that
9    you've got jurisdiction over.  So that's why I was
10   asking you about it.
11        A.   Well, you know, jurisdiction over and
12   input into -- I don't know if I've got jurisdiction
13   over.  We are invited by tribes to come in and provide
14   law enforcement.  There's a couple ways.  They can do
15   it themselves through their capacity to do 630
16   contracting or they can say, We want you to do it.
17   So, you know, to say "jurisdiction over," I wouldn't
18   refer to me having jurisdiction over Greta Baker or
19   the chairman or the council.
20        Q.   No, but you do over the Standing Rock
21   Sioux Reservation; correct?
22        A.   Well, again, I mean, context there is I
23   can't go in and tell the tribe, This is what you're
24   going to do and, Greta Baker, you're going to do this
25   and, Chairman, you're going to do this, Council,

Page 165

1    you're going to do that.  It's -- law enforcement,
2    we're really, because of treaties and trust
3    responsibility, more invited in to provide law
4    enforcement services.  The tribes can do it
5    themselves.  So I don't want you to get the impression
6    that when I tell Greta Baker to do something that she
7    has to do it.
8         Q.   I don't have that impression, nor was I
9    suggesting that in the question to you.  I was just
10   saying, you know, you've been very consistent.  You
11   remembered your limited role and defined that to me.
12   And this is a person from that reservation, an
13   official -- she's the internal affairs director --
14   telling you, by copying you on an e-mail from her,
15   that she's talking about a four day grace period
16   concerning a protest camp.  And I'm asking you what
17   this is all about.
18        A.   Yeah.  So that's -- to the best of my
19   recollection, that's what it was about.
20             (Deposition Exhibit 763 was remotely
21   introduced and provided electronically to the court
22   reporter.)
23        Q.   Okay.  All right.  If we could go to
24   Exhibit -- let's see.  Exhibit 763, please.  Would you
25   take a moment and look this over, please.  It's an

Darren Cruzan
August 23, 2022

1  e-mail from you to Mr. Toulou and Ms. Salamanca.
2  You're communicating with her.
3      A.   Okay.  Okay.  I've read through that
4  page.
5      Q.   It spills over on the next one just a
6  bit.
7      A.   Okay.  So that is what role Rosa
8  Salamanca, Rosa, community relations services.  Okay.
9  I've read through.
10     Q.   Okay.  So this is your e-mail; right?
11     A.   Yes.
12     Q.   Did you write this?
13     A.   I'm sure that I did.  I mean, I'm sure
14  that I did.
15     Q.   How did you know to write it?  Did people
16  give you input for doing so, or what?
17     A.   Possibly.  Possibly.  It's very possible.
18     Q.   You think that at least as of the time
19  you wrote this, September 11, 2016, you were aware of
20  the things that you're reporting; correct?
21     A.   Yeah, I think so.  Yeah, I think this --
22  I do.  And this was to Tracy Toulou, I guess, on my
23  observations of Rosa and what she had done there and
24  the luck that she had had.
25     Q.   The luck that she had had?

1      A.   Well, or the lack of -- you know, "luck"
2  is my terminology, but good fortune, able to move the
3  process along.  And I don't think she had much by way
4  of, you know, moving the process along.  I think she
5  went there and wasn't able to identify any, you know,
6  leader there also that could speak on behalf of the
7  larger community.
8      Q.   I don't see you mention Ms. Salamanca in
9  your e-mail at all until the very last sentence.
10     A.   Okay.
11     Q.   Where are you getting all of that?  I'm
12  asking about this e-mail and you're --
13     A.   Well, maybe I'm going down a rabbit hole
14  of just remembering sort of -- now that I remember
15  what she did, I did see that she's returning home and
16  will continue to monitor the situation as needed.  We
17  didn't get the results out of it that we wanted with
18  her being there.  So I'm just basing that off what I
19  read here.
20     Q.   Okay.  Let's stick to your e-mail,
21  please.  In your e-mail you talk about getting
22  updates.  Again, there's no red in here.  So I don't
23  know what you're updating, but I can tell what the
24  whole thing is that you're sending along.
25          And second paragraph you say that this

1  Phyllis Young, who is attributed by you to Standing
2  Rock Sioux Tribe, "emphasized that the camps, plural,
3  were now being referred to as a community."  Do you
4  think that you meant that the Standing Rock Sioux
5  Tribe person, Phyllis Young, whoever she is, is
6  correct that the camps were a community?
7      A.   I don't know because, as I recall,
8  Phyllis Young wasn't speaking on behalf of the tribe.
9  She was speaking on behalf of herself.  I think that
10  she owned some land or had some land in her possession
11  there on the reservation and was allowing people to
12  camp there.
13          And so I think there was a section of the
14  protests that looked at her as, you know, quasi-leader
15  there.  And so, you know, our effort was to talk to as
16  many people as we could to get as good an idea of what
17  was going on as we could.  So although I probably
18  wouldn't put much stock in what Phyllis Young said, I
19  did talk to her and passed along information that she
20  passed along.  That's what this looks like to me.
21     Q.   Yeah.  You're spending quite a bit of
22  time reporting to Mr. Toulou and Ms. Salamanca.
23     A.   I don't think I'm reporting to them.  I
24  think I'm informing them, but there is no, you know,
25  line of authority there.  I know Tracy probably was

1  the one that either suggested or assisted us in
2  getting Rosa to -- I wasn't even familiar that that
3  office existed and was probably informing him of my
4  observations of the previous few days and the
5  conversations that we had.
6      Q.   You said that Mr. Toulou "assisted us."
7  So I take it that means you?
8      A.   Well, I'm assuming that he did.  I mean,
9  he would have been the DOJ point of contact that I
10  would have talked to the most.  And I'm speculating
11  here that he was the one that must have mentioned
12  community relations to me.  He's DOJ.  She was DOJ.  I
13  wasn't aware of that office even existing prior to
14  this.
15     Q.   Thank you.  I was asking earlier about
16  did you agree with Ms. -- is Phyllis Young a woman, I
17  take it?
18     A.   Yes.
19     Q.   Do you agree with Ms. Young's comment
20  that the camps are now being referred to as a
21  community, camps plural?
22     A.   Well, I wouldn't know.  I mean, they
23  definitely had, we later learned, you know, built a
24  quasi school and a quasi these kind of things.  So
25  that would be a question for the campers, but they

Darren Cruzan
August 23, 2022

Page 170

1    were there a long time.  And, I mean, I don't know.
2    Probably they did look at themselves as a community.
3    I certainly didn't look at them as a community.  I
4    looked at them as people that were where they
5    shouldn't be and needed to go.
6        Q.   Okay.  So if you come down here after --
7    in your own e-mail after you are updating people about
8    the report that Joan Baez is coming to provide a
9    concert along with Carlos Santana -- did that ever
10   happen, by the way?
11       A.   You know, I don't know if Carlos Santana
12   ever showed up.  And I don't know who the other guy
13   is, to be honest with you.  I wouldn't know much about
14   hiphop, but there were plenty of celebrities that did
15   show up.
16       Q.   So after that reference to Ms. Baez and
17   Mr. Santana, you say that "the group extended an
18   invitation to BIA law enforcement to visit the Seven
19   Council Fires Camp so the community there could see
20   them and thank them."  And she asked that you come in
21   civilian clothes and "the invitation was not open to
22   civilian law enforcement.  Young said that she was an
23   advocate of BIA services as her family members had
24   worked for BIA law enforcement."
25            So what was that all about?

Page 171

1        A.   I don't know.  I would have not even
2    entertained that invitation.  I don't remember ever
3    going down there in that way and would not have
4    entertained that to go down there.  So I don't know.
5    I think, you know, there was a different approach.  I
6    will tell you there was a different approach.  We
7    didn't have the confrontations that unfortunately
8    Morton County and our partners on that side had, but
9    our approach was different.
10            We weren't seeing those same kind of
11   things.  And we took a more measured approach, not
12   push conversation.  And, you know, so I can see where
13   she might think that I would entertain going down
14   there to speak to them, but that would not have been
15   something I would have been willing to do or allow any
16   of our folks to do, go down into those camps.
17       Q.   So it didn't happen, is what you're
18   saying?
19       A.   I don't recall it happening at all, no.
20       Q.   Did you ever tell any of your BIA
21   colleagues, Hey, we're not doing this?
22       A.   Probably.  I mean, going down into the
23   camp and talking?
24       Q.   Yeah.
25       A.   I mean, if there was anybody around with

Page 172

1    me when that conversation happened, I'm sure that I
2    did.  Now, it was my absolute, you know, position that
3    we were going to have as many conversations as we
4    could with people.  Didn't need to be in the camps.
5    You know, I didn't feel like it was the right move to
6    go down there in the camps when the camps were
7    camping, only because I was trying not to incite some
8    sort of reaction from them, which we saw many, many
9    times on the other side of the river where law
10   enforcement would come in and it would elicit a
11   reaction -- a negative reaction from all of these
12   protesters.
13            So we were careful not to do that, but we
14   did make it a point to have as many conversations as
15   we could with people as we were out and about.  You
16   know, either they were passing through, you know,
17   checkpoints or they were at the casino and our folks
18   were there.  To go down into any camps, I don't recall
19   doing that.  And I can't imagine that I would allow
20   anyone else to do it.
21            (Deposition Exhibit 765 was remotely
22   introduced and provided electronically to the court
23   reporter.)
24       Q.   Okay.  I heard you now.  I get it.  So if
25   we could go to Exhibit 765, please.  Would you take a

Page 173

1    moment and look this e-mail over, please.  It's an
2    e-mail from Ms. Nekia Hackworth, who is the senior
3    counsel to the deputy attorney general and executive
4    director, Financial Fraud Enforcement Task Force,
5    Office of the Deputy Attorney General, U.S. Department
6    of Justice, Washington D.C.
7        A.   I've seen it and read it.
8        Q.   All right.  And she is inviting a number
9    of people from the Department of Justice and the Army
10   Corps of Engineers and the U.S. Attorney for North
11   Dakota, the FBI, and you from the BIA.  And it's --
12   the subject line is "Standing Rock:  DOJ, Interior,
13   and Army Corps Call regarding Special Use Permit."  Do
14   you see that?
15       A.   Yeah.
16       Q.   Thank you everyone -- "Everyone - thanks
17   very much for agreeing to discuss law enforcement and
18   public safety matters relating to Standing Rock's
19   Special Use Permit."  She then gives information for
20   participating in a call that afternoon.  Did you
21   participate in that call?
22       A.   I don't recall if I did or not.  I don't
23   remember being on that call, but I might have been on
24   it.  There's a lot of people higher up than me.  So I
25   wouldn't have had much to say on that call if I was on

Darren Cruzan
August 23, 2022

1  it, but I just can't recall if I was on there or not.
2       Q.  **This is another instance where the**
3  **Department of Justice -- a representative from the**
4  **department is inviting you to participate as a federal**
5  **representative along with other federal**
6  **representatives and you can't recall if you joined the**
7  **call, maybe you did, maybe you didn't.  A lot of your**
8  **answers are both.**
9       A.  Well, I'll tell you, it's the truth.  I
10  don't remember.  You know, so I don't want to say I
11  did and I don't want to say I didn't because I really
12  don't remember.  There were -- there was so much going
13  on there.
14       And I will tell you, as things
15  progressed, my concern over decisions that I didn't
16  really have any major control over -- I was really
17  focusing in on providing law enforcement, public
18  safety there.  Clearly there are a lot of other people
19  who know the law, you know, when it comes to land way
20  better than I do.  So I had a role there, and it was
21  not to make decisions on land status.  It was really
22  to maintain public safety.
23       Q.  **Mr. Cruzan, I'm not asking about land**
24  **status.**
25       A.  I understand that, but you're asking me

1  to remember a lot of stuff that I just -- I'm telling
2  you, there were so many things going on, I don't
3  remember if I was on that call or not.  And so I don't
4  want to say that I was.  I don't want to say that I
5  wasn't.  I don't remember if I was or not.
6       Q.  Okay.
7       A.  That's just --
8       Q.  **I don't need to hear that a third time.**
9  **So let me just ask you, this call is a discussion of**
10  **law enforcement and public safety matters relating to**
11  **Standing Rock's special use permit.  So this is more**
12  **germane to you than something -- some just general**
13  **Corps of Engineers permit.  This relates to the very**
14  **reservation that you've got -- the reason why you're**
15  **in North Dakota.  So based upon that, you don't recall**
16  **if you participated?**
17       MR. SCARPATO:  Objection.
18       A.  Same answer that I gave you three times
19  now.
20       Q.  **(BY MR. SEBY)  All right.  Notwithstanding**
21  **that it pertained to Standing Rock?**
22       A.  I will tell you -- I will tell you this,
23  and we've gone through it several times today, there
24  was a lot of briefings being provided to my senior
25  leadership up and they're all on this invite.  So it's

1  very possible that I was on that call.  You know, I
2  don't recall if I was or not, and I didn't take an
3  active role in it if I was on it.
4       Q.  **So who's your senior leadership that's on**
5  **this invite along with you?**
6       A.  Well, I see Larry Roberts on there.  I
7  guess that's the only person I see on here.  I'm
8  looking through to see if I see Mike Black on there.
9  I don't see him, but I do see Larry Roberts, who is my
10  boss's boss.  So that's who I'm referring to.
11       Q.  **So did you communicate with Mr. Roberts,**
12  **Hey, do you want me to be on this call since you're my**
13  **senior leadership or should I or what do you want to**
14  **do?  You asked him on a draft e-mail to respond to the**
15  **senator.  Why wouldn't you --**
16       A.  I've answered this question.  It's
17  irritating to you because I've said it three times,
18  but I don't remember if I was on that call.  I may
19  have been and I may not have been.  I just don't
20  recall.  I don't remember.  You did ask me.  That is
21  exactly what you asked me, if I said, Hey, Larry, do
22  you want me to be on this call.  I don't remember
23  that.
24       Q.  Okay.
25       A.  I don't know.  I don't know.

1       Q.  **You don't remember if you were on the**
2  **call and you don't remember discussing it with**
3  **anybody?**
4       A.  That's right.  That's right.
5       Q.  **Whether it was Mr. Roberts or anybody**
6  **else?**
7       A.  That's correct.
8       Q.  **Okay.  How about discussing the Standing**
9  **Rock special use permit with anybody?  Just kind of**
10  **same approach, you were, Hey, this doesn't pertain to**
11  **me?**
12       A.  I wouldn't say it doesn't pertain to me,
13  but it wasn't something I would be able to give a lot
14  of input into.  It's not my area.  So I don't recall
15  any specific conversation about that, asking my
16  opinion on it.
17       Q.  **So your jurisdiction is limited to the**
18  **Standing Rock Sioux Tribe Reservation; correct?**
19       A.  Well, no.  For this incident, yes.
20       Q.  **Thank you.  And so when another agency**
21  **proposes to issue a land use permit to an entity to**
22  **use property on the very reservation that you've got**
23  **jurisdiction over, you still don't care?**
24       A.  That's not what I said.
25       Q.  **So why don't you react to my question,**

Darren Cruzan
August 23, 2022

Page 178

1 then?
2        A.   Once a decision is made on that, I'm
3 going to be informed and I certainly care, but I will
4 tell you I care much more about the safety of the
5 folks that are there, the people that were there to
6 provide law enforcement services to and all the
7 officers that are there.
8        So I do care about that, but it was
9 bigger than that.  I mean, there were a lot of factors
10 in this that, you know, I'm sure will be talked about
11 for a long time.  One of them is the land use status
12 that you're talking about.  The other is -- one of the
13 others is, you know, the safety of everybody based on
14 resources that we had available there to do anything.
15        (Deposition Exhibit 767 was remotely
16 introduced and provided electronically to the court
17 reporter.)
18        Q.   Okay.  Let's go to Exhibit 767.  So I'm
19 very curious about this e-mail.  So let's make sure
20 you take the time to read this because I'm going to
21 ask you a bunch of questions about this.
22        A.   Okay.  I've read it.
23        Q.   Okay.  So this is an e-mail from Adolph
24 Benavidez with the Department of Interior; right?
25        A.   Yes.  That's correct.

Page 179

1        Q.   Sending an e-mail to Harry Humbert, also
2 of the Department of Interior, copied to you; right?
3 And it says "Response."
4        A.   Yeah.
5        Q.   Okay.  Tell me about this e-mail.  What's
6 this all about?  Why are you on it?
7        A.   I'm not sure.  So Adolfo Benavidez was
8 the Department of Interior Office of Law Enforcement
9 and Security employee who, if I'm not mistaken,
10 replaced Jim Gallagher.  Not replaced, but took his
11 turn in the rotation of coming down there to assist.
12        So I'm not sure what the context -- I
13 don't know if he was asked these questions by Harry
14 Humbert or what they -- I don't know.  I don't know
15 where the questions are coming from.  I'm assuming --
16 they seem like logical questions for briefing
17 purposes, information on what's going on.  But I don't
18 know the context of who asked the questions and why he
19 sent them.  They make sense to me, though.
20        Q.   So until you got this on your e-mail, you
21 had no idea what it was intended for, or what?
22        A.   I don't know if I received it.  It's
23 possible that Harry would have sent these questions.
24 I don't remember seeing these questions before.  I
25 don't know where they came from.

Page 180

1        Q.   What's the purpose of it?
2        A.   Well, I think the purpose of it -- the
3 first one is somebody wants to know, are there any
4 repercussions from the influx of people, so, you know,
5 what kind of impact is that having on the Standing
6 Rock community.  I think the second reason is what
7 kind of issues are there for the reservation.
8        So I think he's asking or letting
9 leadership know, you know, are there any issues, you
10 know, traffic, problems with, you know, people going
11 into homes, have crimes gone up.  And then the third
12 reason is that he wants to know where the protesters
13 are staying.  I think the purpose of it is to get
14 those questions answered.
15        Q.   You keep saying that it's to answer
16 questions.  Whose questions are --
17        A.   That I don't know.  Somebody must have
18 had these questions or these must have been things
19 that Ben thought were important to report.  They've
20 got a question mark on it.  So I'm assuming they're
21 questions from somebody.  I just don't know who.  But
22 I would assume they were from questions that Harry had
23 for Ben or Ben and I.  I just don't remember seeing
24 them prior to this.
25        Q.   Who's Ben?

Page 181

1        A.   I'm sorry.  Adolph Benavidez.  He goes by
2 Ben, Ben Benavidez.
3        (Deposition Exhibit 768 was remotely
4 introduced and provided electronically to the court
5 reporter.)
6        Q.   Okay.  All right.  If we could go to the
7 next exhibit, which is 768, please.  So would you
8 scroll back to the end of this exhibit, Mr. Cruzan,
9 and read an e-mail that was sent to you by a gentleman
10 named Matt Harman.
11        A.   You're asking me to read that?
12        Q.   Yes.
13        A.   I've read that.
14        Q.   All right.  So who is this fellow?
15        A.   Well, the Police Executive Research
16 Forum, I think they call it -- it's referred to as
17 PERF -- is sort of that Washington, D.C. think tank
18 for big city -- primarily big city law enforcement.
19        And I don't know who Matt Harman is.  I
20 met him apparently when he came there, but the
21 executive director from PERF is a guy by the name of
22 Chuck Wexler.  And I know Chuck from at the time being
23 a part of PERF, a member of PERF.  Not a real active
24 one, but a member.  They hold meetings, I think,
25 quarterly or biannually in Washington, D.C., invite

Darren Cruzan
August 23, 2022

Page 182

1  all of these law enforcement folks to come in.
2         And I was -- I received a phone call from
3  Chuck Wexler, who said, Hey, do you think that the
4  Sheriff Kirchmeier would have any interest in us
5  coming down, taking a look, providing our thoughts?  I
6  said, Well, I don't know, but I will let him know that
7  you're interested and that you want to talk.
8         And so I connected Chuck Wexler with
9  Sheriff Kirchmeier, and apparently they invited -- he
10 invited them down.  So they came with -- you know,
11 there was -- I think there were five or six folks that
12 traveled with him from -- you know, certainly Chuck
13 Wexler came down.  I guess Matt Harman must have been
14 there.
15        There was a gentleman from -- one or two
16 gentlemen from LAPD and I don't remember who the other
17 ones were, but similarly situated like LAPD, sort of a
18 bigger police department.  And they flew down, had a
19 conversation with the sheriff and with the colonel and
20 the general.  And these -- so these must have been
21 questions that Matt sent back to me after their visit
22 that for whatever reason he didn't get asked while he
23 was down there.
24        MR. SEBY:  Could you, Rachel, please
25 scroll up to Mr. Cruzan's response to Mr. Harman.

Page 183

1      A.   Okay.
2      Q.   (BY MR. SEBY) So you answered his
3  questions and then he wrote you back, if we could
4  continue to scroll up one.  There we go.  Can you read
5  that, Mr. Cruzan?
6      A.   The one "Good morning Darren"?
7      Q.   Yes.
8      A.   Okay.
9      Q.   And so he says, Got another question for
10 you.  "The main 7-Fires campsite - is that located on
11 Army Corps of Engineers land or is it located on
12 private property?"
13     A.   Yeah.
14     Q.   Let me finish.  "That is also the camp
15 that does not allow access to law enforcement and
16 prefers to police itself, correct?"  And then you
17 respond to that, "Hi Matt, that camp (the larger
18 one)" -- are you referring --
19     A.   I can't see.  I can't see.  Okay.
20     Q.   So my question is -- let me get my
21 question out.
22     A.   Sure.  Sure.
23     Q.   So you respond to his questions about the
24 Seven Fires campsite.  That's -- another phrase or
25 reference to that camp, do you know to be Oceti

Page 184

1  Sakowin?  I know you said they get lots of names.
2      A.   They do.  I commonly refer to this as
3  "the large camp."  And I know that there were several,
4  you know, names given to different sections of the big
5  camp.  And I have already demonstrated I can't point
6  to which ones they were and where they were located
7  inside that big camp.  So I would generally refer to
8  that as "the large camp," "the big camp."
9      Q.   That's the one north of the Cannonball
10 River; correct?
11     A.   Correct.
12     Q.   On Army Corps land?
13     A.   That's my understanding.
14     Q.   Okay.  So he asks you about that camp and
15 says is it on Corps land or private land.  He says,
16 "That is also the camp that does not" -- this is a
17 question he's asking you.
18     A.   Right.
19     Q.   "That is also the camp that does not
20 allow access to law enforcement and prefers to police
21 itself, correct?"  And you wrote back and said, "Hi
22 Matt, that camp" -- you're referring to the larger
23 one, you say -- "is located on Corps of Engineers
24 land, and is off the reservation, but we have a
25 gentleman's agreement to respond for emergencies if

Page 185

1  needed."
2         Who's "we"?  Who are you referring to as
3  the "we"?
4      A.   Yeah.  I really think what I meant right
5  there was that -- and we did this on two occasions
6  that I can remember.  Morton County didn't have the
7  ability or wasn't responding down to the camps for any
8  reason, my understanding.  And so there were two
9  instances where -- one was a pursuit that ended up
10 crashing into a teepee.  It was a pursuit that
11 initiated on the reservation side of the Cannonball
12 and proceeded into an area that we knew was blocked
13 off, had sped past people on the road, ran into the
14 camp, and crashed into a teepee, where there was a
15 child in it.
16        And the protesters surrounded that
17 vehicle, pulled the guy out of the car, and started
18 beating him.  The BIA officer who had pursued that car
19 threw himself on the guy, put him in handcuffs, put
20 him in the car, and got him out of there and I think
21 saved his life.  That would be one instance that I
22 would say sort of the gentleman's agreement is that
23 we're not going to allow a Morton County sheriff's
24 deputy to get injured in there in these emergency
25 situations where they get sort of -- you know, that

Darren Cruzan
August 23, 2022

Page 186

1  kind of a thing.
2          The other instance was -- and I don't
3  know this to be completely accurate, but this is the
4  story that I've got.  One of the Dakota Access
5  Pipeline-hired security guys had, for whatever reason,
6  driven through the reservation and onto the Morton
7  County side of the bridge and had gotten in some sort
8  of altercation there.  He had a rifle.  He had an
9  assault rifle.  And he was surrounded by people and
10 was, you know, walked into a pond or something in
11 there.  It wasn't the river, but I think it was a pond
12 and was surrounded by people.
13         I don't know how we got that call, if it
14 was Morton County dispatch that sent it to us and said
15 there was a guy with a gun surrounded.  And I don't
16 know if we had heard that shots had been fired.  It
17 seems like we had heard that.  So BIA officers
18 responded down there, took that guy into custody, and
19 turned him over to Morton County Sheriff's Department
20 back on the reservation side.
21         So when I say "a gentleman's agreement,"
22 a lot of times in Indian country there will be -- with
23 sheriff's departments and BIA and tribal police
24 departments, there will be a memorandum of agreement
25 where they cross-deputize each other.

Page 187

1          So the Crow Indian reservation, I'm just
2  going to give that example unless you stop me.  Big
3  Horn County, I was there as a chief of police.  We had
4  an agreement with Big Horn County Sheriff's
5  Department.  They gave us their deputization.  We gave
6  them BIA deputization so that -- not that we could go
7  off the reservation and enforce state law, but if
8  there was a non-Indian that would come onto the
9  reservation, we could detain them, charge them, cite
10 them into state court.  It just made the
11 jurisdictional boundaries a little smoother so that
12 when we had non-Indians come on the reservation who we
13 have no authority over without that cross-deputization
14 would happen.
15         So my understanding is that there was not
16 one in Morton County between Morton County and the
17 Standing Rock Sioux Tribe, and I think it was because
18 the Standing Rock Sioux Tribe chose not to do that.
19 That's a decision that is not solely exclusive to the
20 BIA giving their authority to enforce tribal law.  The
21 tribe has to be in agreement with that.  So I don't
22 think there was one in Morton County.
23         So when I say "a gentleman's agreement,"
24 you know, I probably could have phrased that a little
25 bit better, but we certainly were not going to let

Page 188

1  somebody lose their life without some sort of police
2  response.  And I know that the bridge was blocked and
3  they had roadblocks and things on the Morton County
4  side that either they chose not to come through or
5  they couldn't get through from that side.  So in
6  situations where there was an imminent threat of life
7  and safety, we were prepared to do that.  And we did
8  that on two separate occasions.
9          MR. SEBY:  Okay.  Thank you.  Let's go to
10 Exhibit 7 -- first of all, this would be a good time
11 to take a break.  It's an hour and 15 minutes since we
12 last broke.  Let's take ten minutes.  Off the record.
13         THE VIDEOGRAPHER:  Going off the record
14 at 2:16 p.m.
15         (Recess taken, 2:16 p.m. to 2:26 p.m.)
16         THE VIDEOGRAPHER:  We are back on the
17 record at 2:26 p.m.
18         (Deposition Exhibit 770 was remotely
19 introduced and provided electronically to the court
20 reporter.)
21  Q.    (BY MR. SEBY) Okay.  Mr. Cruzan, we're
22 back after a short afternoon break and I'd like to go
23 to Exhibit 770, please.  Would you take a moment and
24 read the e-mail, please.
25         A.    Sure.  Okay.  I've read it.

Page 189

1  Q.    Great.  Thank you.  This is an e-mail
2  chain that's two pieces.  The first is dated
3  September 15, 2016, and it's you sending a lengthy
4  e-mail to a number of people in the BIA and Department
5  of Interior.  And one of the people you sent it to was
6  Tommy Beaudreau.  Do you remember him?
7          A.    I do.
8  Q.    You communicated with him and he back to
9  you; right?
10         A.    He did.
11 Q.    And why did you -- and Mr. Roberts is on
12 here, of course, your boss's boss.  Why did you send
13 this e-mail?
14         A.    Well, I think this was probably one of
15 those e-mails that I had -- you had shown me earlier
16 where I had Larry Roberts, Mike Black, and Tommy
17 Beaudreau on those e-mails on kind of, sort of
18 reporting progress, different things that were
19 happening there.
20         As I mentioned, I'm not shy about keeping
21 my leadership, you know, my boss informed and what's
22 going on.  And, again, I don't know who asked me to
23 put Tommy Beaudreau on there.  Somebody must have
24 suggested it.  So that's the reason.
25 Q.    So you don't know why you sent these

Darren Cruzan
August 23, 2022

Page 190

1 people an update?

2     A.  Oh, just like I said, for that exact

3 thing you just mentioned, to update them on any

4 changes.  It was --

5     Q.  I know that, but I'm asking a specific

6 question:  Why did you choose to send it to these

7 people?  Did you unilaterally make that decision or

8 were you asked to give -- provide an update on a topic

9 or topics?

10     A.  Well, if you recall, I had sent Larry

11 Roberts and Mike and Tommy Beaudreau those briefings.

12 So my assumption is that was the process at that point

13 after I was apparently told, suggested, that Tommy

14 Beaudreau be on there.  I don't remember that

15 specifically, but that's my speculation, is that once

16 that happened, like you showed me earlier, it probably

17 continued to happen, just thinking that that was who

18 needed to be on the distribution list.

19     Q.  So I want to ask you about one thing in

20 your detailed e-mail.  You know, the subject of your

21 e-mail says "BIA OJS Concerns."

22     A.  Okay.

23     Q.  Why did you use that title?

24     A.  I don't know.  Looks like it may be in

25 response to something.  So I'm not sure what the

Page 191

1 previous -- maybe you have those, what the initial

2 e-mail string was.  That looks to me to be like a

3 "reply all."

4     Q.  I don't know anything about it because

5 your counsel gave us this document and this document

6 alone.  So that's all I have to go off of.  So I don't

7 have any other knowledge and I'm asking you for what

8 you know about it, because you're the person who sent

9 it, Mr. Cruzan.

10     A.  Cruzan.  Yeah.  I don't know what the BIA

11 OJS concerns were.  I don't know what the previous

12 e-mail was.

13     Q.  Well, you're with the BIA.  So you're

14 providing a detailed analysis and update.  So you

15 think --

16     A.  I can tell you what I think my concerns

17 at that time were, the time --

18     Q.  That would be great.

19     A.  Leadership -- and I think you've probably

20 heard this from the sheriff as well, it was very

21 difficult.  Leadership in these camps changed

22 regularly and we didn't know if we were talking to

23 anybody with any authority.  And so that was a concern

24 of mine.

25     The camp sizes, that would -- you know, I

Page 192

1 don't want to say that they grew and continued to

2 grow.  I think over the -- you know, they ebbed and

3 flowed.  Once they got to a certain level -- I don't

4 know -- 3 or 4,000 people, I don't think it ever went

5 under that even in the coldest part of the season.  So

6 that would have been a concern.  Those might have been

7 things that I was talking about.

8     Q.  Yeah, but you've taken --

9     A.  You're asking me to speculate.  So that's

10 all I'm doing.  I don't know what the BIA OJS concerns

11 ahead of this were.

12     Q.  You've gone to great lengths to tell me

13 that your role was very limited and that you really

14 only kept your eye on issues pertaining to the

15 Standing Rock Sioux Tribe where the BIA had

16 jurisdiction.  So why are you passing along a detailed

17 report that seemingly has very little to do with the

18 Standing Rock Sioux Tribe?

19     A.  As I mentioned earlier that the -- I

20 think everything that happened on the other side of

21 that river impacted the public safety on the

22 reservation side of it.  So I can imagine that camps

23 were growing.  I can imagine that it was in my mind to

24 have that request for additional DOI law enforcement

25 there.

Page 193

1     And so, you know, I think keeping my

2 leadership informed of what was going on in that area,

3 although it wasn't happening exclusively to things

4 happening on the Standing Rock Reservation, I think

5 because of the proximity it made a significant

6 difference what was happening around us.  This was --

7 you know, the real reason that this was all happening

8 was happening 2 1/2 miles off the reservation, but had

9 a huge impact on the safety of the community and the

10 officers and the people that were protesting there.

11     Q.  Why is that?

12     A.  Well, because, again, that many people

13 with that much passion around an issue, we had seen it

14 many, many times escalate into confrontations between

15 law enforcement and protesters.  And as I mentioned, I

16 may have had a total of 40 officers there, half of

17 which would have been, you know, most of the time off

18 duty resting to come on for the night shift.  So it

19 absolutely mattered to me what was happening around

20 the camps and letting my leadership know that if I

21 needed to request additional DOI law enforcement, why

22 I was doing that.

23     Q.  So most of the BIA law enforcement worked

24 at night?

25     A.  I don't want to say that.  I mean --

Darren Cruzan
August 23, 2022

Page 194

1      Q.   That's what you said.
2      A.   No, I didn't say "most."  I said, you
3  know, we probably had at most 40 or so, and half of
4  which would have been off duty resting.  If I recall,
5  we worked 12-hour shifts.  So half of them -- you said
6  most.  That's not most.  That would be half of them
7  would be working the day shift and half of them would
8  be working the night shift.
9      Q.   Okay.  Thank you.  So why did you feel
10  the need to include this very last paragraph?
11      A.   Well, so, you know, again, this looks
12  like a time when new leadership had been appointed
13  and -- gosh, I'm thinking --
14      Q.   I just want to make sure --
15      A.   I know.  I want to answer that question.
16  I'm thinking diplomacy.
17      Q.   Let me interrupt for a second because I
18  want to make sure that -- I asked you about the last
19  paragraph, just to point it to you, any attempts to
20  forcibly remove.
21      A.   Yeah.  I understand.  I completely
22  understand.
23           MR. SEBY:  Rachel, would you highlight
24  that for a second, please.
25      A.   Yeah.  I completely understand what

Page 195

1  you're asking there.  And, again, you know, as I
2  mentioned -- and it was a point of frustration
3  because you have --
4      Q.   (BY MR. SEBY)  What was?
5      A.   I'll get there.  You would have one
6  person or a few people who would identify themselves
7  as speaking on behalf of the camp and you would go
8  down a road with them on diplomacy and saying, Hey,
9  you know, these are our concerns, this is what all of
10  us hope the outcome is, that you go home and are safe
11  and nobody has to be arrested, nobody has to be
12  injured.
13           And then you would get so far down that
14  road and then you would find out, well, come to find
15  out that they're not speaking on behalf of anybody.
16  So it was frustrating, but at this point right here,
17  according to this e-mail, a new group had been
18  identified.  And I think we did, as did the sheriff,
19  used every opportunity for diplomacy.  And I think at
20  this moment there was a glimmer of hope that maybe
21  this would be the person or the people that were
22  speaking on behalf.
23           And, you know, I think based on what I'm
24  reading here, they were saying the right things about
25  more order in the camps and that they were at least

Page 196

1  having conversations about, Are we going to stay
2  through the winter, which to me had never -- I never
3  thought that that wasn't going to be their plan.  So
4  any idea that they might not seemed like a really good
5  opportunity to be diplomatic.
6           And so, you know, two things.  For all of
7  those reason, I thought any attempt to forcibly remove
8  campers was counterproductive to the diplomatic
9  efforts that were ongoing and hopefully to work here.
10  And then as I mentioned earlier, these -- if folks
11  were forcibly removed from this camp, they were going
12  to be forcibly removed onto the reservation.  And,
13  again, I have no authority over non-Indians on the
14  reservation.
15           And I'm also dealing with residential
16  communities, schools, churches, businesses just on the
17  reservation side of the river.  So to me any attempt
18  to forcibly remove -- and I had seen it and I'm sure
19  you have seen it in videos.  I saw it in person from a
20  distance what happens when force was attempted.  And
21  that wasn't, in my opinion, working very well.  And it
22  stood the chance of law enforcement and protesters
23  being injured.
24           So just like we had done, you know,
25  having dialogue and conversation and being okay with

Page 197

1  being frustrated with changing leadership, just the
2  same way that the sheriff felt was okay, any attempt
3  to forcibly remove them was going to result in folks
4  getting hurt.  That was my fear.
5      Q.   Okay.  All of that --
6      A.   All of that to say that's what that last
7  statement is meant.
8      Q.   You said nothing about the special use
9  permit, which is what that paragraph in your e-mail is
10  about.  So can we move on to answer the question I
11  asked?
12      A.   Well, so you've got highlighted "any
13  attempt to forcibly remove the camp or even allude to
14  that" could be detrimental to any progress.  So is
15  that not part of what you wanted me to answer?  If
16  it's not, I'm happy to read on down that paragraph.
17  That's just the first part I came to that was
18  highlighted.
19      Q.   I asked about the whole paragraph, sir.
20      A.   Yeah.  I think all that I said was the
21  same.  I think diplomacy and having conversations
22  about these things that were being decided -- even at
23  this point, my education on land use permits was
24  pretty limited, but I believe that there were people
25  who did have that ability to make those decisions.  I

Darren Cruzan
August 23, 2022

1   just was encouraging -- strongly, I think,
2   encouraging -- that diplomacy win the day and that it
3   not be said that this is when it's going to happen and
4   law enforcement is going to come in.
5            So in there, you know, I mentioned land
6   use permit because I knew that that's what was being
7   discussed by people that have the ability to discuss
8   that and issue those things, but I think I was
9   encouraging, you know, continued diplomacy versus
10  forced removal because I just wasn't seeing that as
11  being very effective.  And it made me very concerned
12  for the safety of everyone involved.
13       Q.   What does the Corps special use permit
14  have to do with anything and why are you talking about
15  it?
16       A.   Well, that must have been something that
17  was being talked about and that the Corps was talking
18  about it, and I heard that they were making decisions
19  on what was going to happen.  And I do recall that
20  there would be conversations with that that would come
21  with a decision and a date.  So less about the
22  decision -- I probably didn't worry myself as much
23  about the decision on what the status was at this
24  point.
25            With the groups being that big, I was

1   probably more concerned about an arbitrary date being
2   set that if people weren't out by this time, this was
3   going to happen, some sort of forced removal.  And I,
4   in my opinion -- and it was my opinion that that was
5   not a good idea based on the numbers that they had,
6   the numbers that Morton County and the State of North
7   Dakota had on that side and certainly the number of
8   folks that I had to respond to sort of any kind of...
9        Q.   So, Mr. Cruzan, what does forceable
10  removal have to do with the Corps' special use permit
11  that you talk about here?
12       A.   Like I said, I think that there was a
13  special use permit that was going to set a date that
14  they had to be off of that.
15       Q.   Off where?  Off where?
16       A.   Off -- that they had to be off or they
17  were going to be forcefully removed.  That's my
18  recollection of how that conversation was going.
19       Q.   From where?
20       A.   From the Army Corps of Engineers land.
21       Q.   Which location?
22       A.   On the North Dakota side of the
23  Cannonball River, the big camp and...
24       Q.   Really?  That was your understanding?
25       A.   That was my understanding, yeah.

1        Q.   That the permit was being talked about
2   issued for the north side of the Cannonball River?
3        A.   Well, if I'm wrong, I'm happy to be.
4        Q.   No.
5        A.   Let me just -- let me just finish my
6   answer, then.  Regardless, any Army Corps of Engineers
7   land, any kind of arbitrary date, we're going to
8   forcibly remove anybody, I certainly didn't have the
9   manpower.  And I don't know the numbers that were
10  there.
11            So let's just say maybe I have it wrong.
12  Maybe it was about the Standing Rock Sioux side of
13  the -- I wouldn't have had the resources to safely do
14  that.  There was -- I think the last number we talked
15  about was 350 to 450 people even on the Standing Rock
16  side.  So we hadn't had any sort of confrontations
17  between law enforcement and the protesters on our
18  side.  I wasn't super inclined to push that issue.
19            I was much more interested in diplomacy
20  and having conversations about people leaving, making
21  that decision.  So if it was about -- it doesn't
22  matter to me, honestly, on whether it was on the north
23  or south side of that with Army Corps of Engineers.  I
24  thought that any forceable removal was a bad decision
25  when diplomacy still had an option, when there was

1   still people who were willing to talk, whether or not
2   they had the authority to speak for everybody that was
3   involved.
4            And we certainly learned that oftentimes
5   that was not the case, but I felt it and I feel it
6   today that diplomacy was the absolute best measure
7   there because we didn't have the resources and the
8   numbers to forcefully remove anyone.
9        Q.   I still don't have any understanding of
10  why you keep talking about forceable removal in the
11  context of a special use permit.
12       A.   Well, I'm sorry.  That's my understanding
13  of it, is that that special use permit was going to be
14  issued with a date of you must be out or off or this
15  will happen, you will be forcefully removed.
16       Q.   Where did you get that idea?
17       A.   I don't know where I got that idea.  That
18  must have been something that I had heard or
19  understood to be the case.  I mean, if you set a
20  date -- you have a land use permit and you say, On
21  this date this will happen, you know, from my
22  perspective and what I was seeing then and what my
23  concerns were, the question would be, Okay, well, that
24  date gets here, then what are you going to do?
25            I don't -- it's my opinion we didn't have

Darren Cruzan
August 23, 2022

Page 202

1    the ability to do anything.  So if that's going to
2    escalate tensions when we have two people that have
3    just been identified as people who now may have some
4    kind of leadership role, I think that is right.
5    You've got it highlighted.  So I'm going to keep kind
6    of pointing back to that because that's how I feel.
7    Any attempt to forcefully remove was counterproductive
8    to what was happening at that time, in my opinion.
9             (Deposition Exhibit 772 was remotely
10   introduced and provided electronically to the court
11   reporter.)
12        Q.   Okay.  I think we've covered that a lot.
13   So let's go to Exhibit 772.  So this is -- it's a
14   chain of e-mails, but the one below is the same text
15   as the one we were just talking about where you
16   provided your update with respect to the new
17   leadership, Stephanie Hope Smith and Mekasi and his
18   wife Faith Spotted Eagle.
19        A.   We've already seen that one; correct?
20        Q.   Yes.  That's right.  That's right.  I
21   really want to ask you about Mr. Toulou -- well, you
22   took that e-mail and you sent it to Mr. Toulou, and
23   then Mr. Toulou responded to it.
24             And then he responded a second time at
25   the very top, Darren:  I am very sorry for the way

Page 203

1    this was handled -- clearly it was completely my
2    fault.  Apparently we have an internal DOJ
3    misunderstanding about what sharing, quote, very
4    judicially means, end quote (my thought was the
5    information would have been available for internal
6    conversations with their respective supervisors, i.e.
7    the Attorney General of the United States, Deputy
8    Attorney General of the United States, and Associate
9    Attorney General of the United States, all of whom are
10   very interested in this situation).  I view this as a
11   substantial breach of trust on my part, for which I am
12   very sorry.  Thank you for being gracious on the phone
13   today, but I am not over it yet.  I have reached out
14   to James, Nekia and Rita and ask that they further not
15   share this information.
16             So my question to you, quite simply,
17   please, is, what is this all about?
18        A.   I don't have any recollection of that at
19   all.  I don't know what was missing.  I don't recall
20   that.
21        Q.   Okay.
22        A.   No idea.  And I don't really recognize
23   either one of those two names at the bottom of this
24   e-mail that you've got highlighted.
25        Q.   I'm asking you what's Mr. Toulou pleading

Page 204

1    for forgiveness about and sorry he did something to
2    you?  You have no clue?
3        A.   I don't have any clue.  I don't.
4        Q.   Okay.
5        A.   It must not have been very significant to
6    me.  It may have been more irritating to him.  I don't
7    recall what it was.  I must have been gracious to him
8    on the phone, so apparently didn't bother me too much.
9             (Deposition Exhibit 774 was remotely
10   introduced and provided electronically to the court
11   reporter.)
12        Q.   All right.  If we could go to Exhibit 774
13   and go to the very bottom of this e-mail chain.  You
14   are writing to an individual by the name of Major
15   General Donald Jackson on Saturday, September 17, and
16   you copy it to Larry Roberts, Harry Humbert, Tommy
17   Beaudreau, Adolph Benavidez, and William McClure.
18   Your e-mail is entitled "Permit Question."  "Good
19   morning Major General Jackson."  And he, by the way,
20   is a senior official with the Army Corps of Engineers;
21   correct?
22        A.   I don't remember.  I see his e-mail.  He
23   was not somebody that I would have normally interacted
24   with.
25        Q.   So why did you?

Page 205

1        A.   I don't know.  I don't know what the
2    context of the -- if there's more e-mail to this.  I
3    don't recall this e-mail.
4        Q.   You keep asking me that, and this
5    document has been produced to us by your counsel.  So
6    I don't have a crystal ball about other stuff.
7        A.   That's the first time I've asked you
8    about this one.  I was interested if there was more to
9    this one.  I don't know.  I can assume that there may
10   have been a decision that had come out or that I heard
11   about and was asking for clarification to get a signed
12   copy of whatever it is, the permit that they're
13   talking about.  So it would have been something
14   that --
15        Q.   They aren't talking about anything.  This
16   is your e-mail.  I'm asking what you're talking about.
17        A.   Yeah.  I don't recall.  I'm saying
18   somebody -- there must have been a permit that was out
19   or that was floating around for draft, I suppose, and
20   that was signed.  And I was asking for a signed copy
21   of it.
22        Q.   I see.
23        A.   I don't remember much more about it.
24        Q.   Okay.  All right.  You were asking for it
25   because you say, "I think it would be helpful for us

Darren Cruzan
August 23, 2022

1  to understand the specifics."
2      A.   Yeah.  I would imagine that I had heard
3  about this or had -- the permit had come out and
4  somebody had asked me to see if I can get a signed
5  copy of it.
6      Q.   Why do you say somebody asked you?
7      A.   I said that might be what happened
8  because I don't recall this specific e-mail.  I'm
9  speculating.  I'm sorry.  I don't recall it.
10     Q.   I gather, or at least that's what you're
11 saying; right?
12     A.   I don't understand what that --
13     Q.   You're saying you don't recall this?
14     A.   Yeah.  That is what I'm saying, yes.
15     Q.   I understand.  So Major General Jackson
16 responds to you and said, "Circling back."  He does
17 this the next day on a Sunday.  "Did you get all you
18 needed from Colonel Henderson.  Please advise."  So
19 did you?
20     A.   I don't recall.  You know, Paul, this has
21 been six years ago, and as I said, there's been --
22 these were, you know, issues that -- to be honest with
23 you, the permit probably meant something to me, but
24 that was not first and foremost on my mind.
25          There may have been other people that

1  were interested in that and because I was there on the
2  ground might have access to it, might be able to get
3  it.  But, you know, the details of this, the land
4  status, what was Army Corps of Engineers, that was
5  something that somebody else needed to work on.
6          My concern -- and, you know, I understand
7  you're getting tired of hearing this, but that was not
8  my first concern.  My first concern was the safety of
9  the folks that were there.  So all of this stuff, to
10 me, was, you know, sort of secondary to the large
11 group of people that we had there that were doing, you
12 know, oftentimes, you know, pretty serious protests.
13 And that was my concern.
14          I wasn't overly concerned about a signed
15 permit.  So somebody, I'm sure, said, Hey, can you get
16 a copy of that?  And then I would have responded, but
17 I don't recall that.  And I apologize if that's hard
18 for you to understand, but that's the fact.  I don't
19 recall that issue.
20     Q.   Well, I want you to understand why I'm
21 asking about it, because we looked at an e-mail from
22 you to the assistant secretary of the Interior and the
23 chief of staff to the secretary of the Interior, and
24 you brought up the special use permit.  So it was on
25 your mind at least to tell them that.

1      A.   Well, it was very possible, as I said,
2  that somebody above me was interested in getting a
3  signed copy of that permit and that it might be easier
4  for me to get that.
5      Q.   Okay.  And based upon that, when I asked
6  you about Major General Jackson's circling back
7  message, he says, "Did you get all you needed from
8  Colonel Henderson."  I'm asking you, did you?
9      A.   Well, I don't recall.  I don't recall
10 what I said.  I'm assuming -- I'm assuming that I got
11 what I needed, but I'm hoping maybe you have an e-mail
12 there that tells me whether I did or not.  But I don't
13 recall whether I got that or not.
14     Q.   Okay.  So let me --
15     A.   I will tell you, you know, my -- go
16 ahead.
17     Q.   So your e-mail on Saturday morning to
18 General Jackson and copied to Larry Roberts, Harry
19 Humbert, Tommy Beaudreau, Adolph Benavidez, William
20 McClure, are any of these people attorneys?
21     A.   I know Larry Roberts is an attorney.  I
22 don't know about Tommy Beaudreau.  I think he is an
23 attorney.  Harry Humbert is not.  Adolph Benavidez is
24 not.  William McClure is not.
25     Q.   So do any of their positions -- chief of

1  staff to the secretary of the Interior and the
2  assistant secretary of the Interior for Indian
3  Affairs, do those positions call for them to provide
4  legal counsel to you or anybody else?
5      A.   Well, I mean, I don't know what their
6  position descriptions specifically say on that.  They
7  would be in a supervisory role to me.  So I would
8  assume if I need some help or some guidance, they
9  would be able to provide it to me.  Whether it's
10 because they're attorneys or not, I don't know.  You
11 know, I mean, they're not assigned to me to provide
12 legal guidance and counsel.
13     Q.   Do either of their titles, to your
14 knowledge, say, I'm a legal adviser to somebody or
15 counsel to somebody?
16     A.   No, not -- no.
17     Q.   So then why do you think that -- if we
18 could scroll up.  Are you an attorney?
19     A.   I am not.
20     Q.   So why do you think that whatever you
21 said back to General Jackson of the Corps, who's not
22 an attorney -- why do you think that in response to
23 his question about did you get what you needed with
24 respect to your permit -- your question asking for a
25 signed copy of a special use permit, why do you think

Darren Cruzan
August 23, 2022

Page 210

1  that that's been redacted?
2           MR. SCARPATO:  Foundation.
3      A.  I'm also not --
4      Q.  (BY MR. SEBY) Sorry?
5           THE DEPONENT:  I didn't hear what Bill
6  said.
7           MR. SCARPATO:  I made an objection for
8  foundation, but you can answer, Mr. Cruzan.
9      A.  Yeah.  Yeah.  I'm not a redaction FOIA
10  expert either.  So I would have no idea.
11      Q.  (BY MR. SEBY) This is not a FOIA
12  document.  This is a document your counsel produced in
13  discovery in a federal court case in the District of
14  North Dakota.  Why is this here?
15      A.  Yeah.  I would have no idea.
16           MR. SCARPATO:  Note the same objection.
17      Q.  (BY MR. SEBY) And let's see here.  So you
18  don't recall anything to do about this communication?
19      A.  I do not, no.
20      Q.  All right.  It seems any time you asked a
21  permit question, it's been redacted and I have no idea
22  why.  And we're going to pursue that.  So you may be
23  in need of talking about this further because it's
24  unclear to us why your e-mails about this permit
25  request that you made are hidden from us.

Page 211

1      A.  Well, I've always made myself available.
2  So if that needs to happen, I'm happy to do it.
3           (Deposition Exhibit 776 was remotely
4       introduced and provided electronically to the court
5       reporter.)
6      Q.  I'm just telling you.  I think that this
7  is a big deal to us and it's not just going to go by
8  the way.  The next deposition exhibit is Exhibit 776.
9  So would you take a minute and read this e-mail chain.
10  It's two e-mails and the first one is from you on
11  Sunday, September 18.  I don't know who you sent it
12  to.  And, again, this is the only e-mail I have.  So
13  I'm not going to show you another e-mail later about
14  this.  So this is all I know.  I'd really appreciate
15  you telling me if you recall anything about this or
16  it's another one of those that is not in your memory.
17           Okay.  Your first e-mail in this chain,
18  which is all I've got, it says, "I just got an e-mail
19  from Mekasi asking if I was coming to a meeting.  You
20  guys know anything about it?"  Who is Mr. Mekasi?
21      A.  Well, in an earlier e-mail it was the
22  individual that was identified as now speaking on
23  behalf of the big camp.  I don't know him other than
24  that.  I'm not sure who he is, but he was identified
25  as somebody that was speaking on behalf of the big

Page 212

1  camp.
2      Q.  You're a member of a tribe in Oklahoma,
3  aren't you?
4      A.  Yes.
5      Q.  Do you recognize this fellow or did you
6  share that in common?  I think I've read he's an
7  enrolled member of the Ponca tribe.
8      A.  Why would that ring a bell to me?  I'm
9  not an enrolled member of the Ponca tribe.
10      Q.  No, I know, but both tribes happen to be
11  in the state of Oklahoma and I wondered if you had any
12  familiarity with him for that reason?
13      A.  I don't know.  I don't know.
14      Q.  Okay.  I don't have any basis other than
15  the shared Oklahoma.
16      A.  There's probably hundreds of thousands of
17  Native Americans in Oklahoma, but I don't know him.
18      Q.  Yes.  So what meeting is he talking
19  about?
20      A.  I'm not sure what meeting he's talking
21  about.  I'm asking those guys if they knew anything
22  about it.  So apparently I was confused by it.
23      Q.  Well, the funny thing about this e-mail
24  chain is, I wonder why you responded to your own
25  e-mail?

Page 213

1      A.  That I responded to my own e-mail?
2      Q.  Yeah.  Roll up, would you, please.  So
3  there's two e-mails on this chain.  The first one is
4  from you and later that same day, September -- Sunday,
5  September 18, you -- it doesn't say you forwarded it.
6  It says "Re:  Meeting today."  At least I can tell now
7  you addressed this to General Dohrmann of North
8  Dakota, Sheriff Kirchmeier, Colonel Gerhart, and
9  there's Ms. Salamanca again -- you're communicating
10  directly with her -- and Greta Baker, the Standing
11  Rock Sioux Tribe official.  And you say, "He and I are
12  chatting via text."  I believe you're referring to
13  Mr. Mekasi?
14      A.  That's what it looks like to me, yes.
15      Q.  So did you text with him a lot?
16      A.  No.  I wouldn't have texted with him a
17  lot, but I will tell you this.  You know, as I
18  mentioned earlier with trying to have diplomatic
19  relations and contact and open communication, it would
20  not have been unusual for me to share my work phone
21  cell number.  So that's what it looks like to me, is
22  that, you know, we had had a conversation or meeting
23  somewhere.  He had been identified to this group as a
24  potential leader within the big camp and --
25      Q.  And by that --

Darren Cruzan
August 23, 2022

1    A.    -- I'm sure that I, you know, shared my
2    contact information with him.
3    Q.    Okay.  I get it.  So by saying he was the
4    speaker on behalf of the big camp, you're not talking
5    about a camp on the Standing Rock Sioux Tribe, are
6    you?
7    A.    No, I'm not.
8    Q.    What are you referring to?
9    A.    It would be the camp on the north side of
10   the Cannonball River.
11   Q.    Okay.  So you were texting with
12   Mr. Mekasi about the camp on the Corps of Engineers
13   property?
14   A.    Yes.  That's correct.
15   Q.    Okay.  I thought you tried to really keep
16   out of that?
17   A.    No, that's not what I said.  You know,
18   the general and the sheriff and the colonel and I all
19   had a good working relationship.  I think we all
20   shared the same desire to find a way to resolve the
21   protest safely and peacefully.
22         So I don't remember exactly how we were
23   all introduced to this gentleman, but it's apparent to
24   me by reading this that the way I said, I just got an
25   e-mail from Mekasi asking if I was coming to the

1    meeting, you guys know anything about it leads me to
2    believe that we had all met with him at some point.  I
3    don't know why he was communicating with me about a
4    meeting.  I don't know.  Maybe he felt more
5    comfortable with me.  I don't know, but...
6    Q.    So you were working as part of the
7    diplomacy effort that you were interested in; right?
8    A.    Well, when I was invited into those
9    conversations.  I know that there were a couple of
10   times when the sheriff and the colonel and the general
11   would meet with folks and would invite me to be there.
12   I know there were a couple of instances where -- one,
13   for instance, when they met with folks down at the
14   bridge to have a conversation.
15         It was -- I was not invited to that one.
16   So I don't want to give the impression that I was part
17   of every diplomatic conversation that those gentlemen
18   had with folks, but there were some that I was invited
19   to be a part of.
20   Q.    So you're reporting to those individuals,
21   which included a Department of Justice person and
22   Standing Rock -- you say that "He," Mekasi, "has a
23   jurisdiction question."  What was that that you -- you
24   were texting him.  So did he tell you or did --
25   A.    Yeah.  I don't recall what that was.  I

1    have no idea what question that was.  I don't
2    remember.
3    Q.    What did you mean by "jurisdiction"?
4    A.    Well, I don't know.  Whatever question he
5    had must have been about something about the
6    jurisdiction, law enforcement jurisdiction, I assume,
7    but I don't remember what the question was.  And I
8    think I say that right there, but I'm not sure what
9    that is yet.
10   Q.    My question is, so did you further chat
11   with Mr. Mekasi and talk about that issue?
12   A.    Yeah.
13   Q.    You don't know?
14   A.    I don't remember if we had any further
15   conversations.  I don't know where that went.
16   Q.    Okay.  Could anybody --
17   A.    But to your point, that was not -- you
18   know, negotiating on behalf of the sheriff would
19   certainly not have been something that I would have
20   done, or the general or the colonel.  You know, if
21   somebody reaches out to me like that, I'm going to
22   make those connections.
23         And that's what we're doing right there.
24   That was -- you know, to give the impression that I --
25   I don't want you to think that that's what I was

1    trying to do, negotiate something on their behalf,
2    because that was not anything that I was interested in
3    doing.
4    Q.    Okay.  Why were you talking to
5    Mr. Mekasi?
6    A.    Apparently he texted me.
7    Q.    Why didn't you tell him, Don't
8    communicate with me, I'm not associated with your
9    camp?
10   A.    Yeah.  Well, again, I don't remember.
11   Apparently those other three gentlemen were familiar
12   with him as well.  And I am certainly not going to be
13   dismissive of somebody who -- whether he does or
14   doesn't have any speaking power on behalf of the large
15   camp, I certainly wouldn't ever speak to him that way.
16   That was not what we were trying to do.  We were
17   trying to have an open line of communication and
18   diplomacy.  So to say, Don't call me, call him, I
19   don't think that's what I would have done.
20         (Deposition Exhibit 777 was remotely
21   introduced and provided electronically to the court
22   reporter.)
23   Q.    Okay.  So could we go to Exhibit 777,
24   triple seven.  Could you look at this e-mail from the
25   beginning.  It's an e-mail from Rosa Salamanca, senior

Darren Cruzan
August 23, 2022

1  conciliation specialist, community relations service,
2  United States Department of Justice.  Would you read
3  Ms. Salamanca's e-mail, please.  By the way, she sends
4  it to you.  And maybe go up to the start of the
5  e-mail.  Can you read that text okay?
6      A.  I can read that text okay, yeah.
7      Q.  Okay.  Great.
8      A.  Okay.  I'm at the bottom of the page.
9      Q.  Okay.  So I -- there's another e-mail
10  here.  And we'll get there, but I want to just ask --
11  are you okay if I ask you about just this e-mail,
12  please?
13      A.  Am I okay if you ask me about this
14  e-mail?  Sure.
15      Q.  All right.  So this e-mail is dated
16  September 6, 2016, Ms. Salamanca with the Department
17  of Justice to -- I don't know who it was sent to
18  because that apparently has been stricken from my
19  view.  Do you know who this was originally addressed
20  to?
21      A.  I don't.
22      Q.  It's weird, but you're a cc.  And it says
23  "Volunteer Self Marshals."  She says to the group, you
24  included, "I have completed Self Marshal Training for
25  the Oceti Sakowin Unified Nations Camp overflow and

1  Sacred Stone Security Volunteer."
2          Why in the world is a Department of
3  Justice person getting trained to be a civilian law
4  enforcement person in a protest camp on federal
5  property?
6          MR. SCARPATO:  Objection; misstates the
7  evidence.
8      A.  Yeah.  I think we had the same question
9  on that.  I think that was not something that I would
10  have been aware that she was doing.  And I remember
11  having conversations with the sheriff and the colonel
12  and the general, and we were all bothered by the fact
13  that she was in that camp.  You know, the training --
14  I vaguely remember this e-mail, but the fact that she
15  was even in the camp was troublesome to me.
16          It put her in a bad situation and, in my
17  opinion, could have put law enforcement in a bad
18  situation.  Had she been assaulted or something like
19  that, it would have forced us to go down there and get
20  her and could have -- just all sorts of bad things.
21  So I don't know and -- I don't know why she was down
22  there doing that.
23      Q.  (BY MR. SEBY) Everything you say makes a
24  lot of sense to me.  I don't know what a self-marshal
25  training is for the Oceti Sakowin Unified Nations

1  camp.  Did you happen to know what she's talking
2  about?
3      A.  Well, I don't specifically.  I'm not
4  familiar with that term, but as I recall, it was just
5  how to sort of police themselves but not something
6  that I would have endorsed or even allowed to happen
7  had I known that she was planning on going down there.
8          I say "allowed to happen."  That was out
9  of my area.  She could have gotten down there without
10  me, but I would have had a problem with that.  I think
11  we were surprised by the fact that she had gone down
12  there.
13      Q.  Yes.  Her e-mail then goes on to say,
14  "While walking with one of the volunteer, we had to
15  stop several times so that he could pick out weeds and
16  stickers from the soles of his shoes."
17          Do you think she's talking about a
18  protester in the camp?
19      A.  That's what it appears to me.
20      Q.  Yeah.  Same.  "Many of the other
21  volunteers" -- I just think it's interesting a
22  Department of Justice person getting trained in
23  self-policing in a camp talking about people in the
24  camp protesting something.  The north camp, we already
25  talked about, did not -- was not the subject of a

1  tendered special use permit.  So she's in there
2  hanging out in an illegal camp that the Corps referred
3  to as trespassers and she's getting training in how to
4  work together.  And I just don't know what in the
5  world that would involve.
6          And she goes on to say, I've got a need
7  for some resources I want to give to these people,
8  could you all help out.  Does that seem weird to you
9  as well?
10      A.  Well, it's certainly not a request that I
11  would have entertained.
12      Q.  Yeah.  She's trying to support and help
13  them, isn't she?
14      A.  I don't know what her intent there is.  I
15  mean, "Are there any local resources that could
16  possibly help them out?"  I can only take what she
17  wrote right there as what she was trying to do.  And,
18  again, I'm not really familiar with that office and
19  wasn't familiar prior to it.
20      Q.  I understand.  Yeah.  I appreciate
21  your -- the clarity of your responses here.  That's
22  great.  So can we go up.  So she sent that e-mail on
23  September 6, as we talked about.  And then several
24  days go by until she responds to her own e-mail, now
25  on September 6 -- the 20th.  Pardon me.  Two weeks

Darren Cruzan
August 23, 2022

1  later, basically.  And she says, "Update to Volunteer
2  Self Marshal's needs and concerns."  And, again, the
3  self-marshals she identifies with the Oceti Sakowin
4  Unified Nations Camp, the camp with no permission to
5  be on federal land, public land north of the
6  Cannonball River that is Corps of Engineers land.
7  She's giving an update to Ms. --
8      A.   Greta Baker.
9      Q.   -- Greta Baker.  I was trying to remember
10 her last name.  And Greta is with the Standing Rock
11 Sioux Tribe.  Why is she giving updates to the
12 Standing Rock Sioux Tribe about a protest camp that's
13 not on the reservation?
14     A.   Yeah.  I wouldn't know.
15     Q.   And I appreciate that.  So she says,
16 "FYI, update on security needs."  Why is she talking
17 about security needs for a camp without a permit on
18 public lands?  What's she doing?
19          MR. SCARPATO:  Objection; foundation.
20     A.   Yeah.  I wouldn't know.  I wouldn't know.
21     Q.   (BY MR. SEBY) Okay.  Then she gives an
22 updated equipment list that -- I think she's out here
23 soliciting donations to help the trespassers on Corps
24 property.
25          MR. SCARPATO:  Objection; argumentative

1  and calls for a legal conclusion.
2      Q.   (BY MR. SEBY) And she goes on to say
3  Sacred Stone -- and she's also here soliciting help.
4  She says the camp single security personnel needs --
5  quote, Needs help and would like some new recruits who
6  can be trained according to the philosophy of the
7  Sacred Stone Camp, quote, nonviolence and peaceful
8  protest.  He estimates that he will need about eight
9  to ten people to cover the camp effectively.  The
10 primary contact for this camp is LaDonna Allard.
11          Why is she posing this solicitation for
12 equipment to the State of North Dakota who's busy
13 dealing with the bad side of a riot protest occurring
14 on federal land?
15          MR. SCARPATO:  Objection; foundation,
16 argumentative.
17     A.   I'm not sure.
18          (Deposition Exhibit 778 was remotely
19 introduced and provided electronically to the court
20 reporter.)
21     Q.   (BY MR. SEBY) That's why I ask, because I
22 sure don't get it either.  I understand your response
23 and I appreciate it.  Could we go on to 778.  This is
24 the same e-mail that she sent around earlier.  You
25 responded that same day, and now I know why from your

1  response and our discussion just now on the prior
2  exhibit, which that e-mail string is repeated below.
3  So we don't need to talk about that.  It's clear what
4  Ms. Salamanca is doing.  You responded consistent with
5  the conversation we just had.  You say, "Rosa, I'm
6  confused, about this e-mail."
7      A.   My punctuation wasn't very good, but my
8  point was, yeah, I'm confused about it.  I didn't
9  understand what she was looking for.
10     Q.   And you copied everybody else.  So I do
11 not have any other e-mails on this topic.  So I'm
12 curious, what happened to this -- her efforts in this
13 e-mail?  Did others say, Hey, Mr. Cruzan, I don't know
14 what in the world she's doing as a Department of
15 Justice person?
16     A.   Yeah.  I don't recall exactly what
17 happened.  It appears to me -- and maybe this is just
18 normal, but that your exhibits are a little bit out of
19 order just from timeline, because I remember an
20 earlier one and it was the last paragraph.  And I
21 think it was the first mention of her and about her
22 going home.  I don't remember exactly, but I don't
23 think she stayed too awfully long.  And I don't know
24 if we said, Hey, thank you, you've done enough or if
25 DOJ sent her home.  And I don't know if it was because

1  of this e-mail string and her going down to the camp,
2  but as I recall, she didn't stay too awfully long.
3  But I don't remember what was -- I don't remember a
4  response from her.  I don't remember saying, I'm
5  confused about this e-mail, but certainly I was.
6          THE VIDEOGRAPHER:  Mr. Seby, sorry to
7  interrupt.  Can we take a quick ten-minute break for
8  technical difficulties.
9          MR. SEBY:  Yes.  Did you miss anything
10 that we just covered?
11          THE VIDEOGRAPHER:  About maybe five
12 seconds of it, five or ten.
13          MR. SEBY:  Tell me what the last thing
14 that you captured.  Ms. Goulding, you got it all;
15 right?
16          THE REPORTER:  I did.
17          MR. SEBY:  Okay.  That's fine.
18          THE VIDEOGRAPHER:  And it's still on the
19 Zoom recording itself.
20          MR. SEBY:  Thank you.
21          THE VIDEOGRAPHER:  We are off the record
22 at 3:22 p.m.
23          (Recess taken, 3:22 p.m. to 3:31 p.m.)
24          THE VIDEOGRAPHER:  We are back on the
25 record at 3:31 p.m.

Darren Cruzan
August 23, 2022

Page 226

1      (Deposition Exhibit 790 was remotely
2   introduced and provided electronically to the court
3   reporter.)
4      Q.   (BY MR. SEBY)  Mr. Cruzan, we were taking
5   a short technical break.  Now we're back.  I want to
6   ask you about Exhibit 790, which is on its way to
7   being put up.  So let's see.  This is two e-mails in a
8   chain, and the first one is from you on October 14.  I
9   don't know who it was sent to.  You say, "Good
10  evening, we plan on writing the daily brief at least
11  thru November 4 when Bill McClure is scheduled to
12  return to Albuquerque."
13          The daily brief, I want to make sure I
14  understand what that is.  Is that the --
15      A.   Yes, sir.  I think it's the document that
16  we looked at that we were -- and I feel confident that
17  we were bolding in red.  And if I'm remembering it
18  correctly, it was a running report, sort of, you know,
19  daily things that were happening.  Sometimes there
20  were significant events.  Sometimes there weren't.
21          And I feel strongly that we were pretty
22  good about highlighting those new things in red.  But
23  you have shown me documents that definitely have red
24  ink on them and nothing highlighted in red.  But that
25  was generally what that was, is we would create a

Page 227

1   document, you know, just a daily update of anything
2   significant that would happen.  I'm sure it included,
3   like, best estimations on camp sizes.
4           And that would have included, you know,
5   certainly the camps that we had on the reservation
6   side and our best estimation or, you know, even using
7   data that we had gleaned from the Morton County
8   Sheriff's Department on, you know, reports on camp
9   sizes and those kind of things.  Just daily updates on
10  what was going on.
11      Q.   Okay.  So that was something -- you say
12  "we plan on."  Who's the "we" that you're referencing?
13      A.   Yeah.  I probably was referring to us in
14  general, you know, we down here because there were,
15  you know -- and I don't have the -- I think I was
16  personally there for several months, but on and off.
17  And so when I would leave, I would oftentimes leave
18  Bill McClure, who was the special agent in charge of
19  that district -- I would leave him in my role.  And I
20  think when I say "we," I probably just meant we who
21  are down here, we'll make sure that those get updated.
22      Q.   So the general "we" that you're referring
23  to is the Bureau of Indian Affairs law enforcement
24  group?
25      A.   Yes.

Page 228

1      Q.   Okay.  And you were the top law
2   enforcement person for the Bureau of Indian Affairs?
3      A.   I was.  We eventually -- I'm sure we'll
4   get into it.  When we did eventually get additional
5   help from National Park Service on the reservation
6   side, we employed the incident command system, which
7   is something they're very good at.  And, you know, I
8   think prior to them getting there, we were doing the
9   very best that we could structurally, but they have a
10  very robust incident command structure.
11          So my title would have changed to
12  incident commander.  It would have been the same role
13  within the boundaries of the reservation, once we
14  start getting other folks there.  But yeah, I was the
15  senior law enforcement official there from the Bureau
16  of Indian Affairs.  And like I said, occasionally we
17  would have folks from the Department of Interior show
18  up, the Department of Interior Office of Law
19  Enforcement and Security, James Gallagher, Adolph
20  Benavidez and those.  But in terms of anybody there on
21  the ground from law enforcement, I would have been
22  clearly the senior law enforcement person for BIA.
23      Q.   So your e-mail referencing the "we" doing
24  the daily briefings is dated October 11 -- no -- 14.
25  Pardon me.  And so as of that date, the National Park

Page 229

1   Service incident command system was not in place?
2      A.   I would have to look.  I don't believe
3   so.  I don't believe they were -- I don't remember
4   exactly, but I don't believe they were there yet.  Was
5   it March when the thing came to a conclusion?  That's
6   a question.  I don't --
7      Q.   I think it's March, April.  I don't mean
8   to --
9      A.   Yeah.  So I think it was through -- I
10  think we got through the winter months because we saw
11  things sort of numbers-wise were probably holding
12  steady in those cold months.  You guys understand the
13  winters there.  So I don't think that we deployed
14  additional resources.
15          So the "we" there would have been BIA
16  OJS, whoever is running -- whoever is in charge at
17  that particular time.  I know I went home for
18  Thanksgiving and then back.  So I think Bill and I
19  probably did the handoff on who was in charge there a
20  few times.
21      Q.   Was the -- did you stay after the first
22  of the year?
23      A.   Yes.  I was there for quite a bit.
24  Several months I was there.  Again, I don't think I
25  strung them all together, but there were multiple

Darren Cruzan
August 23, 2022

1  weeks strung together.

2      Q.   So you were not a political appointee
3  that sunseted with the change in administrations?

4      A.   No.  I was never a political appointee.

5      Q.   Okay.  Professional law enforcement?

6      A.   Correct.

7      Q.   So these law enforcement summaries, then,
8  are the document we were talking about earlier, right,
9  the executive summary?  The question I have about the
10 format of that -- I know the red is not showing up, at
11 least in terms of updates.  It shows up as the law
12 enforcement sensitive, but not in the document.

13     A.   Right.

14     Q.   When you would write those, what was the
15 practice?  You would just have one document that you
16 continuously updated and the older stuff stayed, but
17 you updated it with new information?

18     A.   Yeah, I think that's right.  I think it
19 was -- I don't remember exactly, but I think it was a
20 running tally.  You know, I don't think we deleted and
21 rewrote it.  I feel like it was -- I feel like there
22 were dates on it, but I could be wrong on that.  Yeah.
23 It wasn't something new created every day.  We used
24 the previous report.

25     Q.   And you wouldn't drop the older stuff;

1  right?

2      A.   Well, I don't remember doing that.  Yeah.

3      Q.   What I'm getting at is if one were to
4  read a later report like -- I don't know -- December
5  of 2016 or January of 2017, would it carry forward the
6  first text of the first time it was done, whenever
7  that was?

8      A.   Well, I believe it was something like
9  that.  I don't know if it was a --

10     Q.   It got to be a pretty big document, then?

11     A.   Yeah.  I don't know if it was a 62,
12 100-page document.  I don't remember if it was that
13 way, but I do know that we just updated.  And it may
14 have been that we updated, put it in red, and that was
15 part of a file somewhere, you know, or an e-mail chain
16 or something like that.  But it seems like I think
17 that we -- it was a running -- at least at the
18 beginning, I know that it was sort of a summation of
19 the data.

20     Q.   In your group then, Mr. Cruzan, in the
21 BIA law enforcement group, the OJS, who -- it sounds
22 like there were multiple people that were contributing
23 to it as authors, if you will.  They wrote the
24 content; right?

25     A.   Well, I will tell you that I do remember

1  very clearly -- and this is, again, why I think
2  maybe -- earlier in our conversation when we were
3  speaking about Jim Gallagher and was unclear as to
4  why it would come from my e-mail, I do remember that
5  he was sort of the first one there with me that helped
6  me create this what would be kind of the report
7  process.

8          And I remember being at a hotel in
9  Bismarck.  I feel like it was downtown.  I can very
10 clearly picture the glass sort -- I can't remember
11 what they call it, but kind of like a little office
12 center there that you could use at the hotel, and him
13 typing out the initial structure of how that would
14 look.  And it may have been that, you know, through
15 conversations that he and I had -- and, again, he
16 would stay with me quite a bit.  Almost everywhere I
17 went, he would go.  And same with Ben when he was
18 there, that those guys would help craft that.

19         I probably took turns updating.
20 Sometimes they probably did.  Sometimes Bill McClure
21 would have done it.  So it wasn't just one person's
22 report, but it was a format that we had initially.
23 And that may very well have changed once the incident
24 command structure showed up.  I think they did show us
25 different formats that they used and we implemented

1  those, but in the beginning it was that report running
2  tally and then -- you know, there may have been
3  multiple people that had input and thoughts on it, you
4  know, jogging memories on what was said, Hey, this
5  would be important to put in there, this might be
6  important to put in there, those kind of things.

7      Q.   Right.  I'm sorry.  I don't think you've
8  spoken to this, but when you were talking about the
9  National Park Service incident command system, it was
10 a much better platform I think you said and it was
11 brought in eventually.  Do you recall when that was?
12 Was it before or after the beginning of the year?

13     A.   I think it was after the beginning of the
14 year.  It was probably as we were getting closer to
15 the end, probably maybe a month or month and a half, I
16 would guess.  I'm ballparking it.  And that's what
17 it is.  It's an incident command structure, and it is
18 just that.

19         You know, so you have folks that are
20 responsible for planning.  You have folks that are
21 responsible for scheduling.  You have folks that are
22 responsible for, you know, getting things like fuel
23 for vehicles, had to think through that kind of thing,
24 as opposed to just having one group there trying to
25 scramble.

Darren Cruzan
August 23, 2022

Page 234

1      As I mentioned, this wasn't something
2 that any of us at this scale were really familiar
3 with.  It's not uncommon for the BIA to have larger
4 scale incidents or incidents that require lots of
5 people to come in, but something like this, we didn't
6 have the incident command structure really in place
7 like National Park Service.  Now, that's changed to
8 some degree, but, you know, it's been a while since
9 I've been there.  I'm not sure how robust it is.
10     Q.   Okay.  So you -- what started this is
11 this e-mail from you to people I don't know on
12 October 14, because they're not identified.  And you
13 were asking them is this briefing helpful to you.  And
14 you got a response from Mr. Beaudreau.  And he wrote
15 to you on the next day, on a Saturday, and he said,
16 "Darren and team, For me, the daily reports are
17 extremely useful and much appreciated.  This situation
18 is front and center in everyone's mind, including the
19 Secretary's."
20     Is he referring to the secretary of the
21 Department of Interior?
22     A.   I'm sure that's right.
23     Q.   So he's telling you that the DAPL protest
24 situation is front and center in the secretary of the
25 Department of Interior's mind?

Page 235

1      A.   Well, that and the fact that we had so
2 many resources pouring into there and that it was, you
3 know, impacting our greater mission, you know, our
4 first mission, which is providing public safety on
5 Standing Rock.  So, you know, I would imagine that the
6 incident in its totality was front and center, but I
7 also took that to mean, you know, the fact that we had
8 so many resources there.
9      And, you know, I always found the
10 secretary prior to that to be very pro law
11 enforcement, supportive of, you know, anything that we
12 were doing around.  And so I took that to mean, you
13 know, front and center in everyone's mind, meaning our
14 well-being.  You know, I could have been wrong on
15 that, but that's how I took it.
16     Q.   When you say that Secretary Jewell is
17 "pro law enforcement," you're only talking about
18 federal law enforcement; right?
19     A.   Well, that's the only context that I have
20 with her.
21     Q.   Sure.  He goes on to say, "I appreciate
22 very much having current and accurate information."
23 There's a new paragraph.  He says, "Finally, we've
24 said it before, but it should be emphasized, the
25 Secretary on down appreciates greatly the fantastic,

Page 236

1 effective work you and BIA law enforcement is doing on
2 the ground under trying circumstances."
3      So a nice compliment for you and the OJS
4 from the secretary on down, it sounds like; right?
5      A.   Yes.  Yes, that's how I took that.
6      (Deposition Exhibit 791 was remotely
7 introduced and provided electronically to the court
8 reporter.)
9      Q.   Okay.  Could we go to Exhibit 791,
10 please.  This is an e-mail.  There's a lot of
11 individual -- this is a string of a lot of e-mails,
12 like -- I don't know -- 30 e-mails with entries from a
13 Barry Cossey.
14     A.   Yes, Barry.  Yeah, Barry was the -- I
15 mentioned earlier this morning about Sheriff
16 Kirchmeier and that team allowing us to put somebody
17 inside of their command structure there.  Not command
18 structure, but their --
19     Q.   Law Enforcement Center?
20     A.   Yeah.  On intel, gathering intel.  And
21 that's what Barry was doing.  He was part of that
22 group just scouring the Internet for, you know,
23 anything and everything.
24     Q.   By the way, he's the fellow that -- and
25 maybe I shouldn't have used the word "scolded" him,

Page 237

1 but you did respond to him and said, Hey, I use what
2 you give to me.
3      A.   Yeah.
4      Q.   Ended up at the secretary's office, so
5 let's be accurate.
6      A.   Yeah.
7      Q.   Just by point of reference.  But I don't
8 want to talk about the huge chain of individual
9 reports, hourly type stuff he's giving you.  I just
10 wanted to ask you about the very top line e-mail,
11 which is from you to Assistant Secretary of the
12 Interior Roberts, Mr. Humbert, and look, there's Tommy
13 Beaudreau, chief of staff to the secretary of the
14 Interior.
15     So your Saturday update on Saturday,
16 October 15, 2016, is very short.  So I'm going to read
17 it aloud and then ask you about it.  "A lot of
18 activity today.  The string of e-mails is attached but
19 to summarize; a hundred plus vehicles loaded with
20 people have left the camp.  At least one report of a
21 person attaching them self to equipment, and arrests
22 are being made...same sort of stuff that has been
23 happening.  The concern is always that single incident
24 of a protester going to far, or an over reaction from
25 an inexperienced officer could set things off.  The

Darren Cruzan
August 23, 2022

Page 238

1  'call to action date' they set is the 17th, and they
2  are asking for 30 days of this kind of 'Direct
3  Action.'  I am thinking it might be a good idea for me
4  to return maybe Wednesday of this upcoming week."
5         Return where?  You're talking about you
6  think it's a good idea to go back to North Dakota?
7     A.  Yes.  I think probably this was one of
8  the times when I was back home in Virginia, and I
9  think that based on the totality of all of that that
10  was happening, I thought, you know, senior leadership
11  probably should be there --
12     Q.  Yes.
13     A.  -- on the ground, on the front there with
14  them making these calls.  It appears to me that based
15  on this e-mail that tensions were getting high and
16  that they had called for, you know, direct action,
17  which I took to mean, you know, those sorts of overt
18  strapping yourself to equipment and pushing the
19  boundaries of just peaceful protests.  That's what I
20  took that all to mean.  Thought I needed to probably
21  get back there.
22     Q.  So this statement that you're making
23  about "a hundred plus vehicles loaded with people have
24  left the camp," are you referring to a camp on the
25  Standing Rock Sioux Tribe Reservation?

Page 239

1     A.  Well, I don't recall what camp I'm
2  talking about.  That would have come from somewhere.
3  That information would have come to me from somewhere.
4  So now, you know, I will tell you that I don't think
5  there were 100 cars on the North Dakota -- I mean on
6  the Standing Rock Sioux side.  I don't think there
7  could have been a hundred cars parked over there.  So
8  my best guess is that I'm talking about the larger
9  camp, but without more context...
10     Q.  So this is the camp that's located on the
11  Corps of Engineers land north of the Cannonball River?
12     A.  Yes, that's what I think.
13     Q.  Yes.  Yes.  And so this
14  hundred-plus-vehicle reference, that's the caravan
15  concept that you were talking about earlier; right?
16     A.  That's right.  And they would often do
17  that to go to do their protests wherever, and
18  sometimes they would just drive in big squares, you
19  know.
20     Q.  Yeah.  Why would they do that, do you
21  think?
22     A.  Well, I think it was just to harass and
23  mix up law enforcement and not let, you know, us get
24  kind of set on a pattern of what they were going to
25  do.  That's my thought.  They were trying to just be

Page 240

1  as disruptive and problematic as they could.  So maybe
2  driving around was -- struck me as interesting,
3  interesting tactic.
4     Q.  Yeah.  So let me pose a question.  I'm
5  not being snide in saying it at all.  So I don't want
6  to sound that way, but here we are in October, middle
7  of October, October 15, and there was an earlier
8  e-mail where you gave a very detailed report to
9  these -- basically these same people.  And it's that
10  e-mail where you said, You know, we don't want to do
11  anything that looks like we're forcibly going to
12  remove people because there's new camp leadership.
13  And that was back in mid-September, so a couple months
14  prior, two months, actually.  No.  A month.  Excuse
15  me.  Do my math there.  So one month prior here.  So
16  it's a month later after that you were expressing
17  optimism about new camp leadership maybe having
18  ability to be more -- get control over the camp;
19  right?
20     A.  I think just being there on the ground
21  observing what's going on was important to me at that
22  time.  I don't know that I had ever heard direct
23  action -- the phrase "direct action" ever used
24  anywhere before.  And the fact that we heard, you
25  know, "call to action" and "direct action" and certain

Page 241

1  days they're going to be doing this kind of stuff,
2  yeah, that was all concerning to me.
3     Q.  My point is that here we are a month
4  later and you were -- and I believe it was in good
5  faith -- you were hoping that, you know, this new
6  leadership, Mr. Mekasi and his wife Faith Spotted
7  Eagle, were going to be a new chapter in what you
8  said, I think, earlier was the leadership du jour,
9  constant change; is that right?
10     A.  Yeah.  I don't think that's what I said,
11  but that's what I meant.
12     Q.  I was using the "leadership du jour."  I
13  think you said something like from week to week, we
14  didn't really know who was in charge of this camp.
15     A.  That's right.  That's right.  And I don't
16  know if that guy was even still at the camp at this
17  point.  I'm not sure who was there --
18     Q.  But the --
19     A.  -- being the leader.
20     Q.  But the reality here is a month later
21  Mr. Mekasi and Ms. Spotted Eagle really didn't turn
22  out to be much different than the old?
23     A.  I think that's a fair statement, yeah.
24     Q.  Because you see caravans of a hundred
25  plus people, which is a pretty big deal to organize

Darren Cruzan
August 23, 2022

Page 242

1   100 vehicles packed with people.  There's probably
2   more than 100 people, but here they're using the Corps
3   land to get organized and parade out of and here
4   they're not just going in a circle, they're attaching
5   themselves to equipment.  I assume that's DAPL
6   construction equipment; right?
7            MR. SCARPATO:  Objection; assumes fact
8   not in evidence.
9        A.   Yeah.  I don't recall exactly what
10  equipment it was, but I think that's right.
11       Q.   (BY MR. SEBY) It's out on the North
12  Dakota prairie?
13       A.   Yeah.  I'm sure it was.  I'm sure it was
14  their stuff.
15       Q.   Yeah.  There's not much else out there to
16  attach to.
17       A.   Yeah.  Right.  Right.
18       Q.   Right.  Okay.  So here we've got the BIA
19  telling the chief of staff of the secretary of
20  Interior, We've got people using the Corps land to get
21  organized and go out, and I think you said not protest
22  peacefully; right?
23            MR. SCARPATO:  Objection; misstates the
24  evidence.
25       A.   Yeah.  I think that's the word I used,

Page 243

1   yes.
2            (Deposition Exhibit 792 was remotely
3   introduced and provided electronically to the court
4   reporter.)
5        Q.   (BY MR. SEBY) Okay.  I thought so.  So
6   it's accurate.  If we could go to Exhibit 792, please.
7   So this is a short e-mail.  It's dated October 15,
8   2016.  You're sending it on to Mr. Darren Smith, who's
9   with the BIA.  He's one of your -- one of your BIA law
10  enforcement OJS people?
11       A.   I don't recognize the name Darren Smith.
12  I don't know who that is.  Doesn't even ring a bell to
13  me who Darren Smith is.
14       Q.   But this is your e-mail; right?  It's got
15  your signature block.
16       A.   No.  It's from me, but I don't remember,
17  you know, why we did that or -- Darren Smith might
18  have been -- gosh, I would say almost certainly not a
19  law enforcement individual.  He may have worked at the
20  regional office, but with this e-mail saying, We've
21  changed the DOI seal to ours, I don't know why I would
22  send it to him.  So I just don't -- I don't know who
23  he is.  And I don't remember this e-mail.
24       Q.   Okay.  So you're right.  That's what your
25  e-mail says to Mr. Smith.  He's the only one you were

Page 244

1   communicating with here.  And it's the Saturday
2   evening report.  You say in the subject line "use this
3   one from now on" and the text of your e-mail says, "I
4   changed the Department of Interior seal to ours,"
5   "ours" being?
6        A.   I'm sure being the BIA OJS seal.  I'm not
7   sure why I did that, honestly.  Maybe because there
8   was no longer any DOI folks there and it doesn't make
9   any sense to me.  I don't remember why I would have
10  done that.
11       Q.   What do you mean -- yeah.
12       A.   Well, I just mean DOI OLES personnel
13  there.  I don't remember if there was still folks
14  there from the Office of Law Enforcement Security,
15  which are the seals that were on that other document
16  that you showed me, the other daily report document
17  you showed me.  Short of possibly branding, you know,
18  and liking to see our own seal on stuff, that may have
19  been why.
20       Q.   I understand that.  Why was the
21  Department of Interior Office of -- what's OELS stand
22  for?
23       A.   OLES, Office of Law Enforcement and
24  Security.
25       Q.   So why did those people leave?

Page 245

1        A.   I'm not saying that they did for sure.
2   I'm just sort of surmising why we would have changed
3   that.  I don't remember.  You know, after Adolph
4   Benavidez, Ben Benavidez, left, I don't remember if
5   anybody came in and backfilled that position.  I do
6   remember that I brought an individual in, a fellow by
7   the name of Troy Mills, who was, I guess, a policy
8   adviser that we had hired from the Department of
9   Defense, incredibly smart individual.  I brought him
10  there to assist me sort of in that same role that the
11  Department of Interior was.  And they may have just
12  been okay with that because the reports were coming up
13  timely and they felt like they had good information
14  coming in.  I don't know.  Again, I'm speculating as
15  to why we would have changed the seal on there.
16       Q.   Okay.  Let's go to the attachment, which
17  is the document.  And I don't want to talk about the
18  contents at all.  I just want to --
19       A.   I can tell you exactly.  So we just took
20  the OLES seal off of there and left the Department of
21  Interior seal on there.  So I made an assumption that
22  we just removed the seals off and put ours on there.
23  And I'm sure it was for branding purposes.  I like our
24  seal and I like to see it.  So I'm sure that I just
25  removed that and put that on there.

Darren Cruzan
August 23, 2022

Page 246

1     Q.   It is cool looking.
2     A.   Yeah.  It's a good-looking seal.  There's
3  no question about it.
4     Q.   It really is, and so is the Department of
5  Interior to the left there.  So did anybody give you a
6  hard time for doing that or did that just become the
7  deal?
8     A.   I don't recall ever having another
9  conversation about it.  I don't remember anybody
10  making a big deal about it.
11     Q.   Okay.  Let's see.
12     A.   And, again, I just don't understand -- I
13  feel confident that updates are highlighted in red.
14  We would have updated anything, you know, but I
15  clearly see that it's not.
16          (Deposition Exhibit 795 was remotely
17  introduced and provided electronically to the court
18  reporter.)
19     Q.   Okay.  Let's go to, Mr. Cruzan, 795.
20  This is an e-mail -- good.  It's only one e-mail.  I
21  associate Mr. Cossey with huge strings of e-mails.
22  It's just a single one.  It's dated October 22, which
23  is a Saturday.  And he's writing to you and copies
24  some colleagues in the Department of Interior, Bureau
25  of Indian Affairs.  He says, "Update on today's

Page 247

1  Protest Activity," October 22.
2          And he says, At 0545 protest activity was
3  identified at DAPL work site with individuals
4  vandalizing equipment, four individuals using Sleeping
5  Dragon devices to secure themselves to equipment and
6  digging activity.  Participants were arrested.
7          Those arrests would have been by the
8  State of North Dakota law enforcement; right?
9     A.   That's correct.  Yeah.
10     Q.   "At 0700 approximately 100 vehicles
11  departed the Seven Council Fires Camp."  That's the
12  one on Corps land; right?
13     A.   I believe that's right.  Yes.  Again, so
14  that one really stands out to me because I think that
15  was sort of in the center of that camp, Seven Councils
16  Fire, but yes, that would have been in the big camp.
17     Q.   What do you mean "in the center of" the
18  big camp?
19     A.   Well, I just recall that being one of the
20  campsites in the big camp, the Seven Council Fire.
21  And I always just in my mind -- it either was or I
22  pictured that it was right in the middle of that big
23  camp for whatever reason.  So that's why I can say
24  with certainty that that's in that camp.  Again, I
25  didn't often go by the smaller camp names and side.

Page 248

1  It was, you know, the big camp on the north side or
2  the south camp on our side, is how I would typically
3  refer to those.
4     Q.   Sure.  So we're talking about the Corps
5  of Engineers land, right, the camp on it?
6     A.   Yes.
7     Q.   Okay.  So it sounds as though Mr. Cossey
8  is saying a combination of trespassing activity on
9  private land, which is where the Dakota Access
10  Pipeline was being constructed, and people going there
11  very early in the morning, vandalizing equipment and
12  attaching themselves to the equipment with these
13  sleeping dragon-type devices, which is a locked arms
14  kind of device.  You know what I'm talking about;
15  right?
16     A.   I do.  I do.  I'm familiar.
17     Q.   And so that and the combination of
18  another -- yet another huge caravan of protesters
19  loading up on Corps of Engineers property is out there
20  and being used for this purpose and allowed to be
21  used, and these people are departing that camp.
22  They've departed.
23          And those two circumstances, it looks as
24  though Mr. Cossey is reporting that the State of North
25  Dakota law enforcement rang the bell.  They issued a

Page 249

1  code red.  And the purpose of that was to recall all
2  available officers to come to the event and position
3  themselves between protesters and the DAPL work site
4  that they were attacking.  Did the BIA participate in
5  this circumstance?
6     A.   No.
7          MR. SCARPATO:  Objection; misstates the
8  evidence.
9     Q.   (BY MR. SEBY) No, they did not?
10     A.   As far as a response to something like
11  this?  No.  You know, so Barry is BIA.  So he's
12  letting me know about it, but as far as a code red and
13  a response to it to a certain area, that wouldn't have
14  been something that a BIA officer participated in.
15     Q.   Sure.  So he's talking more about that
16  event and the people that were enjoying the freedom of
17  the Corps of Engineers property to get ready to do
18  this kind of stuff over and over.  And he's talking
19  about how they're just confrontational with law
20  enforcement, trying to protect public order here.  And
21  at the end of his e-mail he says, BIA involvement
22  consisted of supporting Morton County's closure of
23  Highway 1806 in the south due to protesting
24  activities.
25     A.   Yeah.  Right.  So I think on a couple of

Darren Cruzan
August 23, 2022

1   occasions -- and, you know, as we got closer to the
2   end, there was a desire to not allow more building
3   material to come into the big camp, you know, through
4   the reservation on county highways.  It was -- there
5   were a couple of occasions that I remember being
6   requested by Morton County, Hey, can you -- on the
7   reservation side can you close down that road and not
8   allow anybody to come in behind.  And we would do
9   that.  We would do that, but always, you know, like I
10  said, from within the boundaries of the reservation,
11  not outside the reservation.  But we would assist.
12       Q.   Sure.  So where the BIA involvement,
13  though -- that was supporting the county's closure of
14  the state highway.  This was one of those instances
15  where the BIA felt it could, in its discretion, help
16  out?
17       A.   Well, yeah.  I mean, I don't think there
18  was ever any question, I hope, not on anybody's mind
19  that we were a cooperative law enforcement partner,
20  you know, with an end goal of getting folks to go
21  peacefully and leave.
22            So, you know, it was never that I'm aware
23  of -- they may feel differently.  You know, Sheriff
24  Kirchmeier might feel differently.  But we tried to do
25  our very best within our authorities to assist, you

1   know, when things like this were happening.  So, you
2   know, if they were concerned about their flank or
3   their backs or whatever and thought that closing a
4   road for a certain amount of time was the right thing
5   to do, we would do that.
6            Now, I do remember many times that
7   highway patrol would be over there with us.  You know,
8   not a large contingency, but it was not an infrequent
9   thing to see the highway patrol on the county road on
10  the reservation, you know, at what we would call
11  "checkpoints."
12            (Deposition Exhibit 797 was remotely
13  introduced and provided electronically to the court
14  reporter.)
15       Q.   Okay.  But let's go to Exhibit 797,
16  please.  Let's see here.  This is a three-part e-mail.
17  Would you -- Mr. Cruzan, would you please read from
18  the bottom up.  It's an e-mail to you from Robert
19  Perry with the Federal Bureau of Investigation,
20  addressed to a group of other FBI people.  All of them
21  are.  You're not copied on that e-mail, but he says
22  that -- this e-mail date is December 16, 2016.
23            And he says, Yesterday morning the newly
24  installed North Dakota Governor, Doug Burgum, attended
25  the morning DAPL briefing.  After the briefing I had

1   an opportunity to speak with him one on one.  We
2   briefly discussed the FBI's limited role in the DAPL
3   issue and generally our plans moving forward.  It was
4   a positive discussion and he did not appear to have
5   specific expectations of the FBI.  He did ask about
6   our ability to gather information from potential
7   sources in the camp and I explained our limitations,
8   but assured him we would continue to assist local law
9   enforcement to the extent possible.
10            Additionally, he asked about our role
11  with tribal entities and -- in North Dakota and he
12  wished to improve state/tribal relationships.  He
13  asked if we'd be willing to give him and his staff a
14  general FBI and Indian country briefing at some future
15  date.  I relayed we would be willing to do so.
16            So that e-mail was then forwarded to you
17  from Mr. Perry who -- he's in the FBI branch office of
18  the Federal Bureau of Investigation.  And he says
19  "Director Cruzan," refers to you as "Director Cruzan."
20  See below.  I don't know if you or someone else wants
21  to arrange to be part of any future meeting with the
22  new North Dakota governor.  He seemed generally
23  interested in becoming more attuned to tribal
24  relationships and improving them.  Then you say to
25  him, "Can you give me a call."

1            Do you recall this interaction with
2   Mr. Perry?
3        A.   Yeah.  I don't remember the exact back
4   and forth on this e-mail.  I definitely do remember
5   having a conversation about the governor's desire to
6   understand Indian country and to have a conversation
7   with me.  I'm assuming that it was -- this was the
8   genesis of that, you know, being put into the works.
9        Q.   So what happened after you talked to him?
10       A.   Well, I did get the opportunity to meet
11  with the governor in his office.  I don't recall who
12  was all in there.  I think the -- I don't remember who
13  from my office was there.
14       Q.   Which governor are you talking about?
15       A.   Well, okay.  That's a good question.  So
16  I do know that there were two governors there.  This
17  is the one that was -- I think it's Burgum, I think.
18       Q.   It says that.
19       A.   Yeah.  The newly installed.  Yeah.  So I
20  think it was Governor Burgum and --
21       Q.   So you had already met with the governor.
22  Well, how could you have met with Governor Burgum
23  before this, because Governor Burgum took office on
24  December 15 and --
25       A.   Yeah.  I don't think it was before this.

Darren Cruzan
August 23, 2022

Page 254

1    I don't think I ever met with Governor Burgum before
2    this.  I definitely met with the governor in his
3    office.  And, you know, I hope I don't have the
4    governor wrong.  He's -- the governor has an IT
5    background.
6            Q.   Yeah.  Yes, that's --
7            A.   Yeah.
8            Q.   I believe that to be correct.  You're
9    right.  There were two governors and --
10           A.   Yeah.  I only --
11           Q.   Let me get this out.  The first governor
12   was Jack Dalrymple when the protests began, and his
13   term -- his second term, so he was term limited, ended
14   on December -- morning of December 15 and Governor
15   Burgum took office and was sworn in that afternoon.
16   And Mr. Perry's e-mail says he met with him the same
17   day he was installed as governor.  So I didn't think
18   you were telling me you met with Governor Burgum.
19           A.   No.  I didn't meet with him that day, no,
20   sir.  I did meet with him sometime later, the
21   governor.
22           Q.   Was that because of Mr. Perry's message
23   in reference to that?
24           A.   I think maybe it was.  I also know -- and
25   I can't remember his name.  I'm embarrassed that I

Page 255

1    can't remember his name.  But he was the Native
2    American coordinator for the governor.  He and I had
3    met.  I'm sorry?
4            Q.   You're talking about Scott Davis?
5            A.   Scott Davis.  Scott Davis, yes.  Very
6    nice young man.  We had conversations.  I don't
7    believe we knew each other prior to that, but I think
8    we hit it off well.  And so it may have been a
9    combination between this FBI and Scott, but...
10           Q.   You mind if I tell Mr. Davis that you
11   referred to him as "young man"?  I think he'd
12   appreciate that.
13           A.   Yeah.  You know, I mean, he's got an --
14   absolutely.  Absolutely.
15           Q.   All right.  He's a good guy.
16           A.   He's very, very nice, very nice man.  I
17   like him a lot.  But at some point we -- I say "we."
18   I did, and I think it was Adolph Benavidez was with
19   me, as I recall, because I remember making some
20   comment to him about something.  We were walking
21   around in the capitol building.  I can't remember what
22   it was about.  I'm almost positive it was Adolph
23   Benavidez, myself, I think Scott was there.
24               And I don't remember.  It wasn't a whole
25   lot of people.  I remember meeting with the governor,

Page 256

1    very, very friendly and good conversation.  I remember
2    him asking me about Indian country.  I do think that I
3    gave him sort of a thumbnail sketch of Indian country
4    jurisdiction and where ours -- our authority started
5    and stopped, sort of a background on Indian affairs
6    and staffing abilities.
7                And I know the meeting ended very well.
8    In fact, so well that he invited me -- he was doing a
9    town hall meeting somewhere, not down here at the
10   protest area, but it was a farming community kind of
11   off the beaten path.  I don't remember the name of the
12   town.  I think it was that night.  I think it was that
13   night or maybe the next night.  He said, Hey, if
14   you're interested and want to come, you know, you're
15   welcome to come and sit in.  So I got there and I sat
16   in the back, and I listened to him speak and I left.
17           Q.   Yeah.  Okay.  Mr. Cruzan, I am wrapping
18   up.  So I want to just ask you, unless you've
19   indicated otherwise throughout your deposition today,
20   have you understood my questions?
21           A.   I think, and those that I didn't
22   understand, I think we got to the point where I was
23   able to understand your questions, I think.
24           Q.   Okay.  Is there anything further that
25   you'd like to add to your testimony?

Page 257

1            A.   No, sir, I don't think so.
2            MR. SEBY:  Okay.  Thank you, sir.  I have
3    no further questions and, as the parlance is, I'll
4    pass the witness to counsel for the United States.
5            MR. SCARPATO:  Good afternoon.  I
6    actually don't have any questions.  There's just one
7    thing that I'd like to note for the record while I
8    have the floor.  Mr. Seby, you mentioned or discussed
9    a document with Mr. Cruzan earlier today where there
10   was a redaction and you were questioning why that
11   redaction existed.
12               I just wanted to note for the record that
13   the Court has had before it a version of that e-mail
14   chain.  It's at USACE 00004486, and she ruled on that
15   redaction and ruled that it should stay in place.  So
16   I just wanted to put that on the record.  Otherwise, I
17   have nothing further.  Thank you very much.
18           MR. SEBY:  Bill, would you be willing to
19   provide me with a copy of the version that you're
20   referencing, please?
21           MR. SCARPATO:  Yeah.  It's at that Bates
22   number.  If you'd like the ECF cite for the Court's
23   discussion, that's ECF 247, page 23.  And, again, the
24   Bates label is USACE 00004486.
25           MR. SEBY:  Thank you.

Darren Cruzan
August 23, 2022

Page 258

1          MR. SCARPATO:  You bet.
2          MR. SEBY:  Nothing further from me,
3  Mr. Cruzan.  Thank you for your time.
4          THE DEPONENT:  You're very welcome.
5  Thank you.
6          MR. SEBY:  Very well.
7          THE VIDEOGRAPHER:  We are off the record
8  at 4:20 p.m.
9          WHEREUPON, the within proceedings were
10  concluded at the approximate hour of 4:20 p.m. on the
11  23rd day of August, 2022.
12              *    *    *    *    *    *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

1          I, DARREN CRUZAN, do hereby certify that
2  I have read the above and foregoing deposition and
3  that the same is a true and accurate transcription of
4  my testimony, except for attached amendments, if any.
5
           Amendments attached   (  ) Yes    (  ) No
6
7
    _____
8    DARREN CRUZAN
9
10
11
12          The signature above of DARREN CRUZAN was
13  subscribed and sworn to or affirmed before me in the
14  county of _____, state of Virginia, this
15  _____ day of _____, 2022.
16
17
18
    _____
19    Notary Public
    My commission expires
20
21
22
23
24
25  State of North Dakota 8/23/22 (tdg)

Page 260

1              REPORTER'S CERTIFICATE
2  STATE OF COLORADO     )
                         ) ss.
3  COUNTY OF ARAPAHOE    )
4          I, TIFFANY D. GOULDING, Registered
   Professional Reporter and Notary Public ID No.
5  19984028637, State of Colorado, do hereby certify that
   previous to the commencement of the examination, the
6  said DARREN CRUZAN verbally declared his testimony is
   under the penalty of perjury in relation to the
7  matters in controversy between the parties hereto;
   that the said deposition was taken in machine
8  shorthand by me at the time and place aforesaid and
   was thereafter reduced to typewritten form; that the
9  foregoing is a true transcript of the questions asked,
   testimony given, and proceedings had.
10
          I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12  this litigation.
13        IN WITNESS WHEREOF, I have affixed my
   signature this 12th day of September, 2022.
14
15          My commission expires November 4, 2022.
16  x____ Reading and Signing was requested.
17  _____ Reading and Signing was waived.
18  _____ Reading and Signing is not required.
19
20
    _____
21        Tiffany Goulding
          Registered Professional Reporter
22
23
24
25

Page 261

1  Errata Sheet
2
3  NAME OF CASE: Plaintiff vs UNITED STATES
4  DATE OF DEPOSITION: 08/23/2022
5  NAME OF WITNESS: Darren Cruzan
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25  _____