# EXHIBIT 69

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 1:19-cv-00150-DMT-ARS
_____

VIDEOTAPE DEPOSITION OF:
MAJOR GENERAL DONALD E. JACKSON, JR. (RET.)
July 29, 2022
(via RemoteDepo)
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.
_____

PURSUANT TO NOTICE, the videotape deposition of MAJOR GENERAL DONALD E. JACKSON, JR. (RET.) was taken on behalf of the Plaintiff in Duval County, Florida, by remote means, on July 29, 2022, at 8:29 a.m. MDT, before Gail Obermeyer, Registered Professional Reporter and Notary Public within Colorado, appearing remotely from Douglas County, Colorado.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

## Page 2

REMOTE APPEARANCES

For the Plaintiff:

    PAUL M. SEBY, ESQ.
    PAUL B. KERLIN, ESQ.
    Greenberg Traurig, LLP
    1144 15th Street, Suite 3300
    Denver, Colorado 80202
    Email: sebyp@gtlaw.com
           kerlinp@gtlaw.com

For the Defendant:

    ERICA ZILIOLI, ESQ.
    V. WILLIAM SCARPATO III, ESQ.
    United States Attorney's Office/
     District of Colorado
    1801 California Street, Suite 1600
    Denver, Colorado 80202
    Email: erica.m.zilioli@usace.army.mil
           victor.scarpato@usdoj.gov

Also Present (Remotely):

    Dustin Lamb, Remote Video Technician
    Rachel Hymel

## Page 4

### I N D E X (Continued)

DEPOSITION EXHIBITS:  (Previously marked)          INITIAL
                                                 REFERENCE

Exhibit 494  Email to SRJ2@ios.doi.gov from         71
             U.S. Department of the Interior,
             9/9/16, Subject:  Joint
             Statement from the Department of
             Justice, the Department of the
             Army and the Department of the
             Interior regarding Standing Rock
             Sioux Tribe V. U.S. Army Corps
             of Engineers, Bates Nos.
             DOI_00000001 - DOI_00000002
Exhibit 684  (Confidential document)                56
             Bates Nos. USACE_00044967 -
             USACE_00044968
Exhibit 686  (Confidential document)                59
             Bates Nos. USACE_00002482 -
             USACE_00002484
Exhibit 688  (Confidential document)                63
             Bates No. USACE_00049705
Exhibit 690  Email to Tedeschi from Turner,         68
             9/8/16, Subject: FW:
             LTG SEMONITE TASKER - LAYDOWN OF
             PROTEST SITE - 8 SEP 2016 MRD
             Morning Report (UNCLASSIFIED)
             Bates Nos. USACE_00027169 -
             USACE_00027207

## Page 3

### I N D E X

EXAMINATION OF MAJOR GENERAL DONALD E.          PAGE
JACKSON, JR. (RET.)
July 29, 2022
By Mr. Seby                                       7
By Ms. Zilioli                                   --

                                                INITIAL
DEPOSITION EXHIBITS:                            REFERENCE
(Exhibits provided electronically to the
reporter.)

Exhibit 701  (Confidential document)               82
             Bates Nos. USACE_00125734 -
             USACE_00125737

Exhibit 705  (Confidential document)              104
             Bates Nos. USACE_00045315 -
             USACE_00045317

Exhibit 709  (Confidential document)              142
             Bates Nos. USACE_00045171 -
             USACE_00045172

Exhibit 711  (Confidential document)              151
             Bates Nos. USACE_00005454 -
             USACE_00005455

Exhibit 712  (Confidential document)              166
             Bates Nos. USACE_00016545 -
             USACE_00016546

DEPOSITION EXHIBITS:  (Previously marked)
Exhibit 318  (Confidential document)              122
             Bates Nos. USACE_00024035 -
             USACE_00024037
Exhibit 420  (Confidential document)               80
             Bates Nos. ARMY_0011059 -
             ARMY_00110567

## Page 5

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

        *     *     *     *     *     *

        THE VIDEOGRAPHER:  We are now on the record.  Participants should be aware that this proceeding is being recorded, and as such, all conversations held will be recorded, unless there is a request and agreement to go off the record.  Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

        For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while in speaker view.  We ask that the witness not remove the spotlight setting during the deposition, as it may cause other participants to appear on the final video, rather than just the witness.  For anyone who does not want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right-hand corner of the RemoteDepo interface.

        This is the remote video-recorded deposition of General Donald E. Jackson, being taken by counsel for the plaintiff.  Today is Friday, July 29,

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 6

1  2022.  The time is now 2:29 p.m. UTC, 8:29 a.m.
2  Mountain.  We are here in the matter of State of North
3  Dakota versus the United States of America.
4           My name is Dustin Lamb, remote video
5  technician on behalf of U.S. Legal Support.  I am not
6  related to any party in this action, nor am I
7  financially interested in the outcome.  At this time
8  will the reporter, Gail Obermeyer, on behalf of
9  U.S. Legal Support, please enter the statement for
10  remote proceedings into the record.
11           THE REPORTER:  The attorneys participating
12  in this deposition acknowledge that I am not physically
13  present in the deposition room and that I will be
14  reporting this deposition remotely.  They further
15  acknowledge that, in lieu of an oath administered in
16  person, the witness will verbally declare his testimony
17  in this matter is under penalty of perjury.  The
18  parties and their counsel consent to this arrangement
19  and waive any objections to this manner of reporting.
20  Please indicate your agreement by stating your name and
21  your agreement on the record.
22           MR. SEBY:  Good morning.  This is Paul
23  Seby, counsel for the plaintiff, State of North Dakota,
24  I agree.
25           MS. ZILIOLI:  This is Erica Zilioli,

Page 7

1  counsel for defendant, United States, I agree.
2           THE REPORTER:  And, General --
3           THE DEPONENT:  This is General Donald E.
4  Jackson, I agree.
5           THE REPORTER:  And, General Jackson, do
6  you declare your testimony in this matter is under
7  penalty of perjury?
8           THE DEPONENT:  I do.
9           THE REPORTER:  Thank you.
10    MAJOR GENERAL DONALD E. JACKSON, JR. (RET.),
11  having verbally declared his testimony in this matter
12  is under penalty of perjury, testified as follows:
13                  EXAMINATION
14  BY MR. SEBY:
15           Q.   All right.  Good morning, General Jackson.
16  My name is Paul Seby.  I'm both an attorney with the
17  law firm of Greenberg Traurig and a special assistant
18  attorney general for the State of North Dakota.  And
19  along with my co-counsel, Paul Kerlin, who is with us
20  for the deposition today, we represent the State of
21  North Dakota.  And today, we'll refer to our client
22  collectively as "North Dakota" or the "State."  Do you
23  understand, sir, that you've just been sworn in this
24  morning?
25           A.   Yes, sir, I do.

Page 8

1           Q.   Would you please state your full name for
2  the record.
3           A.   Yes, sir.  My name is Donald Edwin
4  Jackson, Jr.
5           Q.   And before we go over -- before we begin,
6  sir, let's go over a couple of ground rules for the
7  deposition, most of which are intended to help the
8  court reporter take down everything we say.  Okay?
9           A.   Yes, sir.
10           Q.   Everything we say today is being both
11  written down and videotaped.  And because of that,
12  please verbalize your responses with a yes or no or
13  other answer, as opposed to just a nod of the head, for
14  example, yes or no.
15           A.   Yes, sir.
16           Q.   Likewise, it's -- it's difficult for the
17  court reporter to take down what we're saying if we
18  inadvertently talk over each other.  So I will do my
19  best not to interrupt you, and if you would do the same
20  and let me finish my question, that would be great.
21  Does that work?
22           A.   Yes, sir.
23           Q.   And, General Jackson, if you feel as
24  though you need a break at any time during the
25  deposition, just please let me know, and we will do

Page 9

1  that.  And the only caveat, sir, is if there's a
2  question pending, let's -- let's please have you first
3  answer the question, and then we can take the -- the
4  necessary break.  Otherwise, I'll -- I'll try and
5  suggest we have a short break every hour or so.  If
6  you --
7           A.   Okay.
8           Q.   -- do not understand a question that I've
9  asked, just please let me know.  Ask me to repeat it or
10  rephrase it, and I will do my best to clarify the
11  question pending and make sure that you hopefully
12  understand what it -- what it is I'm trying to ask you.
13  Does that sound okay?
14           A.   Yes, sir.
15           Q.   Is anyone in the room with you this
16  morning, sir?
17           A.   Just Erica Zilioli, my counsel.
18           Q.   Okay.  Are you relying upon any documents
19  during the deposition today that you've got in front of
20  you or you have with you that you plan to put in front
21  of you?
22           A.   No, sir.
23           Q.   Okay.  General Jackson, do you understand
24  that you're obligated to tell the truth today under
25  oath?

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

1    A.   Yes, sir, I do.

2    Q.   And do you understand, sir, that your
3 deposition today has the same force and effect as if
4 you were in front of a judge or a jury?

5    A.   Yes, sir.

6    Q.   And do you understand that portions of
7 your videotape deposition today may be played in the
8 future to the court if this case were go -- were to go
9 to trial?

10    A.   Yes, sir.

11    Q.   Okay.  Do you have any questions about
12 these -- these instructions?

13    A.   No, sir.

14    Q.   All right.  Thanks.  General Jackson, what
15 did you do to prepare for your deposition today?

16    A.   Sir, I had two sessions with Erica.  One
17 was held on the 15th of July, and one was held
18 yesterday, to help me understand the nature of the
19 proceedings and the process that we would use to go
20 through this deposition.

21    Q.   Okay.  Did you meet with anyone else,
22 along with Ms. Zilioli?

23    A.   There was a -- an attorney present from
24 the Department of Justice.

25    Q.   Who was that individual?

1    A.   Tim and -- was with me on the 15th.  I
2 can't recall his last name.  And Bill, who is on the
3 call today, was here yesterday -- or over video.  It
4 was a video prep.

5    Q.   With both of those gentlemen?

6    A.   Yes, sir.

7    Q.   Okay.  How long did you -- how long were
8 your sessions with your counsel?

9    A.   Sir, on the 15th, two hours; and
10 yesterday, about three hours.

11    Q.   Okay.  Apart from interacting with your
12 counsel, what did you do to prepare for your deposition
13 today?

14    A.   I didn't do anything, sir.

15    Q.   Okay.  Did you talk to anyone else, other
16 than your counsel, in preparation for your deposition
17 today?

18    A.   No, sir.

19    Q.   Okay.  Let's see.  Are you -- did you
20 review any documents, prior to your deposition today?

21    A.   I just reviewed a few documents yesterday
22 as part of my prep with the attorneys.

23    Q.   Did you research, on your own, any issues
24 in this case?

25    A.   No, sir.

1    Q.   Okay.  Do you have any notes that you
2 referred to that you don't have with you at your
3 deposition today -- given your earlier response -- that
4 you used to refresh your memory or review?

5    A.   No, sir.

6    Q.   Okay.  And, General Jackson, are you aware
7 that, to date, North Dakota has taken the sworn
8 deposition testimony of Major Startzell; U.S. Marshal
9 Retired Paul Ward; Eileen Williamson and Eric Stasch;
10 Colonel John Henderson; General Spellmon; Lowry Crook;
11 Secretary Sally Jewell; former Assistant Secretary to
12 the Army, Jo-Ellen Darcy; and then, most recently,
13 General Semonite?

14    A.   I'm only aware that John Henderson and
15 General Semonite were interviewed, but I'm not aware of
16 anyone else.

17    Q.   Okay.  Did you review any of their
18 deposition transcripts or statements?

19    A.   No, sir.

20    Q.   All right.  Are you aware, sir, of the
21 case State of North Dakota versus the United States
22 that is the reason for the deposition today?

23    A.   I'm aware of the case, but I don't -- I'm
24 not aware of the details.

25    Q.   Okay.  I'll -- I'll just tell you, then,

1 this deposition pertains to the State of North Dakota's
2 action against the United States under the Federal Tort
3 Claims Act involving a $38 million -- $38 million in
4 damages the State seeks to recover from the United
5 States as a result of the Corps' and other federal
6 agencies' and officials' actions associated with the
7 protests against the Dakota Access Pipeline.  Do you
8 understand that?

9    A.   Yes, sir.  Thank you for explaining --

10    Q.   Did you understand that -- I'm sorry?

11    A.   I said, thank you for explaining that.

12    Q.   Yup.  And are you saying that you did not
13 understand that, prior to my asking that question?

14    A.   Not the details, no, sir.

15    Q.   Okay.  Are you aware of any of the court's
16 substantive rulings in the case to date?

17    A.   I -- I remember some of the court's
18 rulings as we were going through the permitting
19 process, but I don't recall specific dates or what the
20 specific judgments were.

21    Q.   Sure.  And just to clarify, I think you're
22 referencing judicial proceedings other than this one.
23 I'm asking about --

24    A.   Yes, sir.

25    Q.   -- are you aware of any of the court's

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 14

1 rulings, the U.S. District Court for the District of
2 North Dakota, which this case is being heard in front
3 of?  Are you aware of any of that court's substantive
4 rulings in the case to date?
5      A.   No, sir, I'm not.  Thanks for clarifying
6 that.
7      Q.   Sure.  General Jackson, what is your
8 current residence location?
9      A.   Sir, I live in Fernandina Beach, Florida.
10      Q.   Could you spell that first name of the
11 city?
12      A.   Yes, sir.  It's F-e-r-n-a-n-d-i-n-a, and
13 then second word is Beach.
14      Q.   Florida?
15      A.   Yes, sir.
16      Q.   Okay.  General Jackson, would you describe
17 your -- where you are from.
18      A.   Sir, where I'm originally from?
19      Q.   Yes.
20      A.   I was born in Anderson, South Carolina.
21      Q.   Okay.  And would you walk through your
22 education, your formal education after high school, if
23 you would.
24      A.   Yes, sir.  I attended Clemson University
25 and graduated in 1986 and then joined the Army as a

Page 15

1 second lieutenant.
2      Q.   And what -- what was the process of
3 joining the -- Army after you graduated from
4 college?
5      A.   Sir, I was on an Army ROTC scholarship, so
6 I was commissioned as a second lieutenant out of ROTC
7 following graduation.
8      Q.   Okay.  And continue, please, with your
9 education, if -- if there's any remaining.
10      A.   The only other education that I had,
11 outside of normal Army schooling, was I received a
12 master's degree in business administration from Webster
13 University that I received in 1994.  And I received a
14 master's in strategic studies from the U.S. Army War
15 College in 1997.
16      Q.   Okay.  And after you graduated from
17 Clemson and became an Army second lieutenant, would you
18 describe your further career development within the
19 United States military.
20      A.   Yes, sir.  Do you want me to go position
21 by position, or how much detail would you like for me
22 to provide?
23      Q.   Yes, if you would.  Just step me through
24 the -- the progression of your ascension in rank, if
25 you would, to where -- how you got to be general, let's

Page 16

1 put it that way.
2      A.   Yes, sir.  Okay.  Sir, I -- I was
3 commissioned as a second lieutenant in the Engineer
4 Regiment out of Clemson.  I reported to Fort Belvoir,
5 Virginia in 1986 and received my initial engineer
6 officer training.  Following graduation from that, I
7 reported to Fort Drum, New York to the 10th Mountain
8 Division in February of 1987, where I was a platoon
9 leader and a company executive officer.
10      I returned to Fort Leonard Wood, Missouri
11 in 1990 and went to the engineer officers advanced
12 course and graduated at the end of December and was
13 promoted to captain.  I was assigned in January of 1991
14 to the 554th Engineer Battalion, where I served as an
15 engineer instructor and small group leader.
16      In March of 1992, I was assigned as a
17 company commander with the 5th Engineer Battalion at
18 Fort Leonard Wood.  I was the Bravo Company, the
19 B Company commander.  In November of 1994, I was
20 reassigned to Washington, D.C., where I served as a
21 personnel assignment officer in the Total Army
22 Personnel Command in Alexandria, Virginia.  I remained
23 at that location until 1996, and I was reassigned to
24 the Army Command and General Staff College at Fort
25 Leavenworth, Kansas.  During that time, I was promoted

Page 17

1 to major.
2      When I graduated in 1997, I was assigned
3 to the 4th Engineer Battalion in Fort Carson, Colorado.
4 And I served for one year as the battalion operations
5 officer and one year as the battalion executive
6 officer.
7      In the summer of 1999, I was reassigned to
8 South Korea to the Combined Forces Command, where I
9 served as the fortifications officer on the Combined
10 Staff in South Korea from 1999 until 2001.
11      In July of 2001 -- or June of 2001, I was
12 promoted to lieutenant colonel and was reassigned to
13 the the U.S. Army Headquarters in Europe, in
14 Heidelberg, Germany, where I served as the engineer of
15 plans and strategy officer for one year.
16      And then I was reassigned in July of 2002
17 to the 54th Engineer Battalion in Bamberg, Germany,
18 where I served as the battalion commander.  During that
19 tour, I deployed to Iraq --
20      (At this time the deponent's remote video
21 connection froze.)
22      THE REPORTER:  I believe he froze.
23      THE DEPONENT:  Okay.  Can you still hear
24 me?
25      THE REPORTER:  For me -- for me, you froze

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 18

1  right after, "During that tour, I deployed to
2  Iraq . . ."
3          THE DEPONENT:  Okay.  Can you hear me now,
4  though?
5          THE REPORTER:  Yes.
6          THE DEPONENT:  Okay.  So I'll start back
7  at that point, Gail.
8          A.   So in -- during that tour in Bamberg, I
9  deployed to Iraq from February of 2003 until December
10  2003.  Then I returned back to Germany, and in the
11  summer of 2004 I was reassigned to the Pentagon, where
12  I served as a programs officer for the Office of the
13  Chief of Engineers.
14          In the summer of 2006, I was assigned to
15  the Army -- U.S. Army War College in Carlisle,
16  Pennsylvania.  And following graduation in 2007, I was
17  assigned as the commander of the Little Rock District,
18  U.S. Army Corps of Engineers in Little Rock, Arkansas.
19  I served there for three years.
20          Following that tour, I was reassigned to
21  South Korea, where I was assigned as the Chief of Staff
22  for the 8th U.S. Army in Seoul, Korea.  I served in
23  that role for two years, and then I was reassigned to
24  Atlanta, Georgia to command the South Atlantic Division
25  of the U.S. Army Corps of Engineers and was

Page 19

1  subsequently promoted to brigadier general.  I served
2  there for two years.
3          And in April of 2014, I was assigned to
4  Afghanistan, the U.S. Forces Afghanistan, as the Deputy
5  Chief of Staff for engineering for the Theater of
6  Afghanistan.  And I was there for almost one year,
7  returning back to the U.S. in December of 2014.
8          And in January of 2015, I was assigned to
9  the Headquarters U.S. Army Corps of Engineers as the
10  deputy commanding general for military and
11  international operations.  During that time I was
12  promoted to major general.  And in August of 2015, I
13  was reassigned as the deputy commanding general for
14  civil and emergency operations.  I held that position
15  until April of 2018, where I was reassigned to the Army
16  staff in the Pentagon as the deputy inspector general
17  for the U.S. Army.  And I held that position until my
18  retirement in December of 2020.
19          Q.   (BY MR. SEBY)  Thank you.  Have you
20  ever -- apart from that very distinguished career in
21  the military, have you ever worked in the private
22  sector?
23          A.   Sir, I currently work in the private
24  sector.
25          Q.   And what do you do?

Page 20

1          A.   Sir, I work as the Director of Federal
2  Solutions and Technology for Jacobs Engineering.
3          Q.   And what does your role in that capacity
4  involve?
5          A.   I am a program manager, responsible for
6  several portfolios.  One of those includes Army Civil
7  Works, one includes energy, one includes data and
8  cyber, one includes health, and the other one includes
9  climate response and ESG.
10          Q.   Okay.  Thank you.  And that -- Jacobs
11  Engineering is a -- does work for the United States
12  Government, and you help serve in that role for those
13  services?
14          A.   Yes, sir.  The U.S. Government, in the
15  business unit that I support, which is in the federal
16  business, the -- the federal government is our
17  client --
18          Q.   Yeah.
19          A.   -- or many -- many, many agencies from the
20  federal government are our clients.
21          Q.   Sure.  Which agencies would those be?
22          A.   Well, the Department of Defense, the
23  Environmental Protection Agency, Department of the
24  Interior, FEMA.  Those are the ones that come to mind
25  off the top of my head.

Page 21

1          Q.   Sure.  Okay.  Thank you.  Would you --
2  General Jackson, would you describe your position as a
3  federal official with the United States Army Corps
4  during the period of the protests against the Dakota
5  Access Pipeline -- and I'll give you some dates --
6  approximately March of 2016 to March of 2017.
7          A.   Yes, sir.  During that time, I was the
8  deputy commanding general for civil and emergency
9  operations for the U.S. Army Corps of Engineers.
10          Q.   And would you describe that role, please,
11  in that context.
12          A.   I was responsible for the execution of the
13  Army's Civil Works program; which generally covers
14  navigation, flood risk management, aquatic ecosystem
15  restoration, environmental stewardship, recreation,
16  hydropower, and environmental permitting.
17          Q.   Okay.  And would you describe the scope of
18  your authority in that position?  What decision could
19  you make with regard to the Government's involvement in
20  the DAPL protests or the protests against DAPL?
21          MS. ZILIOLI:  Objection to the extent it
22  calls for a legal conclusion.
23          A.   Sir, if you could be more specific on what
24  authority.  I had several authorities, but most of the
25  decisions were made by commanders at the district,

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 22

1  division, and Corps of Engineers Headquarters level.  I
2  served primarily as a staff officer with -- so my -- my
3  decision-making authority on many of those things was
4  more advisory, as opposed to decisive --
5       Q.   (BY MR. SEBY)  Thank you.
6       A.   -- if that makes sense.
7       Q.   It does.  No, that's appreciated.  So I
8  want to ask you about your chain of command, both up
9  and down, and then any lateral, if there is any.  So as
10  the deputy commanding general responsible for the
11  Army's Civil Works program, who did you report to?
12       A.   Sir, I reported to the chief of engineers,
13  Army chief of engineers.
14       Q.   And at the time of your position during
15  the DAPL protests, who was that individual?
16       A.   Sir, that individual was Lieutenant
17  General Todd Semonite.
18       Q.   Uh-huh.  Did you report to anyone else?
19       A.   No, sir.
20       Q.   Okay.  And then, General Jackson, who
21  reported to you?
22       A.   I had two officers that reported directly
23  to me, my executive officer and our direct executive
24  officer.  One was a major, one was a colonel.
25       Q.   So would you identify those individuals,

Page 23

1  please, by name.
2       A.   Ian O'Sullivan was the major.  Jeff
3  Anderson was the colonel.
4       Q.   Jeff Anderson was the executive officer?
5       A.   That was his title; yes, sir.
6       Q.   Okay.  And the other person, I'm sorry?
7       A.   Ian O'Sullivan.
8       Q.   Okay.
9       A.   He was my personal executive officer.
10       Q.   I see.  What was your interaction with
11  Ms. Jo-Ellen Darcy, the Assistant Secretary for Civil
12  Works?
13       A.   I advised her on the execution of the
14  Army's Civil Works program.
15       Q.   But you did not report to her; is that
16  correct?
17       A.   Technically, no, I did not.
18       Q.   Okay.
19       A.   Yes, sir.
20       Q.   All right.  Did you communicate frequently
21  with her?
22       A.   Sir, I communicated with Ms. Darcy as
23  often as I could, which was the -- the best way to keep
24  her advised of what was going on in the Army's Civil
25  Works program.  Formally, I would meet with her once a

Page 24

1  week; and informally, many times, just depending on the
2  circumstances and what information she needed at the
3  time.
4       Q.   Sure.  Okay.  And did you have any
5  oversight authority over any of the Corps division
6  directors or district directors, commanders?
7       A.   No, sir, I had no oversight, but I was --
8  as the commanding general, meaning General Semonite, as
9  his deputy commanding general for Civil Works and
10  Emergency Management, he held me responsible to manage
11  those programs.  So I worked very closely, very
12  frequently, with all the district and all the division
13  commanders who had Civil Works mission
14  responsibilities.
15       Q.   Collaboratively or as a superior officer?
16       A.   Usually, collaboratively; but I was a
17  superior officer, so there was deference involved.
18       Q.   Yeah, sure.  Okay.  All right.  Were you
19  involved in any of the Corps' regulatory rulemaking
20  development programs?
21       A.   No, sir, I wasn't involved in any of the
22  rulemaking.
23       Q.   Did you have anything to do with the 2015
24  final Waters of the United States rule that the Corps
25  of Engineers developed, along with the United States

Page 25

1  Environmental Protection Agency?
2       A.   No, sir.  I wasn't -- I don't believe I
3  was assigned to -- in that role when that ruling was
4  made.
5       Q.   Okay.  What major issues involving the
6  Dakota Access Pipeline were you involved in?
7       A.   I was involved in the Dakota Access
8  Pipeline from the moment it became an issue of national
9  significance with regard to its regulatory mission and
10  the regulatory actions that were ongoing to permit the
11  pipeline.
12       Q.   And when was that, sir?
13       A.   I first became aware that there were
14  concerns in -- with the permitting of that probably in
15  July of 2016.
16       Q.   By that time, had Colonel Henderson or --
17  or General Semonite made any determinations or
18  approvals concerning the Dakota Access Pipeline?
19       A.   I don't believe so, but I don't recall,
20  exactly.
21       Q.   So did you have a hand in any of the
22  permit approvals or authorizations that the Corps made
23  regarding the Dakota Access Pipeline?
24       A.   No, sir.
25       Q.   So when -- when those actions were made,

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 26

1  to the extent they were made by Colonel Henderson or
2  General Spellmon, you were made aware of them, but not
3  involved in the development or decisions regarding
4  them.  Is that what you're saying?
5       A.   Sir, what I'm saying is I did not -- I was
6  not the decision-making authority on those actions.
7  I -- I'm sure once the concerns were raised to my level
8  of the -- the concerns with the Standing Rock Sioux
9  Tribe, then I was involved in discussions with them,
10 but I was not part of the approval process.
11      Q.   Was it part of your job, General Jackson,
12 to liaison with any other federal officials --
13      A.   Yes, sir.
14      Q.   -- outside of the United States Army?
15      A.   Yes, sir.
16      Q.   And who would that be?
17      A.   Can you be more specific?
18      Q.   I'm asking you to identify the individuals
19 outside of the United States Army that you liaisoned
20 with, given that you've told me that was part of your
21 job.
22      A.   Sir, I -- I routinely liaised -- and I
23 don't remember specific names, so I apologize.  But I
24 routinely liaised with counterparts in the Department
25 of the Interior, because the Bureau of Reclamation and

Page 27

1  the Corps of Engineers shared very similar missions.  I
2  liaised with the Environmental Protection Agency for
3  the same reason.  And I liaised with FEMA as part of my
4  duties in the -- under the national response framework
5  for Emergency Management.  Those are the ones that I
6  recall liaising with the most.
7       Q.   And is that as a general matter or
8  specific to the Dakota Access Pipeline issues and
9  circumstances?
10      A.   Oh, sir, those were general matters.
11      Q.   Okay.  How about with respect to the
12 Dakota Access Pipeline?
13      A.   With respect to the Dakota Access
14 Pipeline, I don't recall liaising with anybody outside
15 of the -- outside of my chain of command in the Army.
16      Q.   Directly or indirectly, does that answer
17 pertain to?
18      A.   I'm not sure I understand your question,
19 sir.
20      Q.   I just want to make sure I understand what
21 you're telling me.  Are you telling me that outside of
22 the Army, you did not liaison directly with anyone in
23 other federal agencies, period?
24      A.   I attended a meeting that was held every
25 so often that was convened by the National Security

Page 28

1  Council, and it included other members of the federal
2  government.  I don't recall all of the agencies that
3  were there.  I certainly don't remember their names.
4  But I knew that I was the representative from the Army
5  Corps for that.
6       Q.   And that -- those meetings of the National
7  Security Council pertained to the Dakota Access
8  Pipeline?
9       A.   Yes, sir.
10      Q.   And when did those meetings start?
11      A.   Sir, I don't recall, exactly.  I do
12 believe they were held in late September and October
13 and maybe even into -- to November; but I don't recall,
14 exactly, the dates.
15      Q.   And what did the meetings involve?  Why
16 were they convened relative to the Dakota Access
17 Pipeline?
18      A.   So they were convened, I believe, because
19 there were multiple agencies that had some equity in
20 what was going on on the ground in North Dakota.  And
21 my understanding was that those meetings were designed
22 to ensure that everyone was -- had information and
23 understood what each of the other agencies were doing
24 or what their concerns were.
25           That -- that meeting was often attended by

Page 29

1  General Dohrmann, who was the State Adjutant General at
2  the time.  And -- and I recall, at least on one
3  occasion, the Governor of North Dakota attended or, in
4  several occasions, a representative from his office was
5  also there, all designed to share information and make
6  sure everybody had a common operational picture.
7       Q.   Are you -- are you telling me that the
8  Governor of North Dakota and Major General Dohrmann
9  attended a meeting of the National Security Council
10 with other federal agencies?
11      A.   Yes, sir.  They did it virtually by
12 telephone, as did I.  And I don't remember exactly how
13 many times the Governor was on.  I know he was on once,
14 because I remember that specifically.  But I know
15 General Dohrmann -- I believe he was on every time that
16 I was on.
17      Q.   And these meetings were -- the people that
18 convened these meetings in person were in Washington,
19 D.C.?
20      A.   Yes, sir.
21      Q.   Okay.  What other federal agencies were
22 present or represented at the meeting?
23      A.   Sir, the only ones that I can confirm, I
24 know that DOJ was -- was represented.  I know that the
25 Department of the Interior was represented, and I

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 30

1  don't -- and the Army, because I was participating.
2  But I don't recall, specifically, who else was -- was
3  in those meetings, because it was done virtually and
4  there was no roster published, that I could see, to
5  know who all was on the call.
6      Q.   I see.  Everybody participated by
7  telephone?
8      A.   Sir, I won't say that everybody did.  I
9  only know that I did.
10     Q.   Okay.  And -- and just to confirm, these
11 are meetings convened by the National Security Council?
12     A.   Yes, sir.
13     Q.    Okay.  As opposed to meetings convened by
14 the Governor or others in the State of North Dakota,
15 correct?
16     A.   Sir, I don't know who actually directed
17 that they be convened.  I just know that the ones who
18 led -- the one who led them was some element of the
19 National Security Council staff, and they did include
20 the leadership of North Dakota.
21     Q.   Okay.  Had you ever participated in such a
22 meeting like that before -- type of meeting forum?
23     A.   Yes, sir, I have; because when FEMA
24 operates in an emergency situation, it's a very similar
25 situation where the -- FEMA convenes meetings that

Page 31

1  include all federal agencies that have some equity or
2  some role in the disaster response.  And -- and they
3  convene that so that we can make it a whole of
4  government approach to whatever the problem is that
5  needs to be solved.  This was no different.
6      Q.   Okay.  So, in your mind, this was akin to
7  a national disaster and the mobilization and
8  implementation of whatever federal response was -- was
9  decided to be made available?
10     A.   No, sir.  I wasn't --
11         MS. ZILIOLI:  Objection, mischaracterizes
12 testimony.
13     A.   No, sir.  I wasn't -- I wasn't -- I wasn't
14 comparing it to a national disaster.  I was comparing
15 it to the way in which a whole of government team was
16 pulled together by one entity to facilitate
17 collaboration and communication.
18     Q.   (BY MR. SEBY)  And the -- and the entity
19 that pulled it all together that -- I'm trying to
20 understand your choice of words -- was the federal
21 entity that pulled it all together to have an all of
22 government response to the Dakota Access Pipeline
23 protests?
24         MS. ZILIOLI:  Objection, mischaracterizes
25 testimony.

Page 32

1      A.   Sir, it was a whole -- it was a federal
2  entity that was pulling together other federal agencies
3  that were involved in one way, shape, or form of what
4  was going on in North Dakota in order to make sure that
5  everybody was communicating effectively and that there
6  was a good common operational picture shared by
7  everyone in the federal government who participated and
8  the State of North Dakota.
9      Q.   (BY MR. SEBY)  And I apologize if you've
10 told me this, but who led the meeting -- meetings?
11     A.   Sir, I don't remember the name of the
12 individual, but it was an individual that was assigned
13 to the National Security Council staff.
14     Q.   And was that person the -- the person that
15 led each of the virtual calls that you participated in?
16     A.   Sir, I don't recall, because it's been
17 some time, if it was the same person.  But I believe it
18 was the same person or the same office that convened
19 those calls.
20     Q.   Okay.  All right.  And were they strictly
21 by telephone, or were you on any sort of video feed as
22 well?
23     A.   Sir, I recall always being connected via
24 telephone.
25     Q.   Okay.  Did anyone participate with you

Page 33

1  from the Corps when you participated in those -- those
2  meetings telephonically?
3      A.   No, sir.  I only recall being -- I recall
4  being the only one from the Corps that -- that sat in
5  on those meetings.
6      Q.   Okay.  And you recall they were occurring
7  from September through November of 2016?
8      A.   Sir, I don't remember the exact dates, but
9  it was roughly during that time frame.
10     Q.   Okay.  Were you asked to speak about
11 anything as a participant in those virtual calls?
12     A.   Yes, sir.  From time to time, I was called
13 to discuss what was -- what the Corps of Engineers was
14 doing at that -- at that time.
15     Q.   During that September through November
16 2016 period?
17     A.   Yes, sir.
18     Q.   And did others -- other federal agencies
19 speak up during those meetings in a similar fashion, as
20 to what they were doing?
21     A.   Yes, sir.
22     Q.   And who would those be?
23     A.   Sir, the only one that I recall
24 specifically was the Bureau of Indian Affairs from the
25 Department of the Interior.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 34

1    Q.   And what did they say?

2    A.   They were just providing updates from
3  their perspective and from what they were receiving
4  from their people on the ground.  I don't recall
5  specifically what information they provided.

6    Q.   How long would these meetings typically
7  last?

8    A.   Sir, I don't recall exactly, but probably
9  anywhere from 30 to 45 minutes.

10   Q.   And did the Governor speak up during any
11 of these calls that you participated in?

12   A.   Sir, I only remember hearing the Governor
13 once, and he did speak.

14   Q.   And I'm sorry, General Jackson, what was
15 the frequency of these meetings?  Were they regularly
16 held or ad hoc?

17   A.   Sir, I don't remember, exactly.  I think
18 there were certain times when they were held more
19 frequently; which would be maybe once a week, maybe
20 more than once.  I just don't recall, exactly.  But
21 they were -- they were -- I considered them routine for
22 a short period of time.

23   Q.   Okay.  And the other agencies that
24 participated were the Department of Justice, the
25 Department of the Interior, in addition to yourself,

Page 35

1  correct?

2    A.   Sir, those are the only ones that I
3  remember.  There may have been -- there may have been
4  others, but those are the only ones that I'm aware of
5  or that I remember hearing speak.

6    Q.   Did the Department of Homeland Security
7  participate?

8    A.   Sir, I don't know if they did or not.

9    Q.   And within the Department of the Interior,
10 there's several departments and bureaus, correct?

11   A.   Yes, sir, there are.

12   Q.   And you mentioned one of them is the
13 Bureau of Indian Affairs, correct?

14   A.   Yes, sir.

15   Q.   What other departments, divisions, or
16 bureaus of the Department of the Interior participated?

17   A.   Sir, the only -- the only one that I
18 recall is the Bureau of Indian Affairs.

19   Q.   Okay.  How about within the Department of
20 Justice?  There's, similarly, bureaus and divisions and
21 other subagencies.  Which of those participated?

22   A.   Sir, because I don't remember -- I don't
23 know who it was that was from the Department of
24 Justice, I couldn't answer exactly what direct
25 (inaudible) they came from.

Page 36

1    Q.   Did you ever receive any materials during
2  your participation in the National Security Council
3  briefings?

4    A.   No, sir.  These were all done by voice, or
5  at least my participation was voice only.

6    Q.   Okay.  Did you receive any email
7  communications from the National Security Council
8  staff, setting up the meetings?

9    A.   Sir, I received meeting invites, I'm sure.
10 That was standard practice.  But I don't recall
11 receiving anything else from anyone from the National
12 Security Council.

13   Q.   And those meeting invites came by email
14 from a person of the National Security Council's staff?

15   A.   Sir, I don't recall exactly how those
16 meeting invites came, whether they were called in by
17 phone or sent by email.

18   Q.   How would you know what number to dial to
19 get on the call?

20   A.   Either my executive officer or my
21 secretary, whoever was populating it on my calendar at
22 that time, would put it on my calendar so I knew which
23 number to dial.

24   Q.   And the person that was your secretary, is
25 that the Ian that you mentioned earlier?

Page 37

1    A.   Ian O'Sullivan.  He was my executive
2  officer.  And he may have put it on my calendar or my
3  secretary, Sharon Methina, may have put it on my
4  calendar.  I don't recall which.

5    Q.   Okay.  Were you ever asked to provide any
6  materials as a contribution to the workings of this
7  group?

8    A.   No, sir, I don't recall being asked to
9  provide any materials.

10   Q.   Okay.  And as a result of your
11 participation in the National Security Council calls
12 concerning the Dakota Access Pipeline protests, did you
13 share anything out of those discussions with others in
14 the Army or the Corps; either?

15   A.   The only ones that I would have shared
16 those discussions with would have been Secretary Darcy,
17 Secretary Crook, General Semonite, Colonel Henderson,
18 and now-Lieutenant General Spellmon.

19   Q.   Okay.  Do you recall what from the
20 National Security Council convening meetings that you
21 did share with those individuals that you just named?

22   A.   Sir, I don't recall any specific details.
23 But those meetings were really designed to share
24 information.  And since I regularly spoke with Colonel
25 Henderson and General Spellmon, it was just a great

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

1  opportunity to synchronize and make sure that the
2  information at their level was the same information
3  that was being reported up to the more-senior levels.
4  It was a great opportunity just to make sure that
5  everybody was operating off the same facts and
6  understanding of what was going on and what -- what
7  other -- what other agencies were doing.
8        Q.    Do you recall, though, what -- what you
9  did to share that information up your vertical chain of
10 command or with others that you collaboratively worked
11 with within the Department of the Army and the Corps?
12       A.    Sir, I -- I regularly had communications
13 with Colonel Henderson and General Spellmon, usually
14 every other day or so, depending on what was going on.
15 And I had the same level of frequency conversations
16 with General Semonite and either Ms. Darcy or
17 Mr. Crook.  I don't recall exactly, because there was
18 really no routine nature for that conversation.  It was
19 scheduled as often as we -- as our calendars would
20 allow, just to make sure that everybody had the same
21 information.
22       Q.    Were there any other means for you to
23 interact with other federal agencies, other than the
24 NSC -- NSC meetings and channel the communication that
25 you mentioned?  Anything else -- other types of similar

1  or related forums in which you participated with
2  others?
3        A.    Sir, are you refer -- are you referring
4  specifically to the Dakota Access Pipeline or just in
5  general?
6        Q.    Dakota Access Pipeline.  All of these
7  questions were prefaced by during the time period and
8  your involvement in the Dakota Access Pipeline
9  protests.
10       A.    Yes, sir.  No, there were no other forums
11 that I participated in, sir.
12       Q.    Okay.  Other than the NSC process and your
13 conversations with others in the Corps, what sources of
14 information did you rely upon for updates on the Dakota
15 Access Pipeline protests?
16       A.    Sir, mostly, I took my information from my
17 own chain of command; from what was being reported up
18 from the Omaha District, John Henderson's organization,
19 through his higher headquarters in Portland
20 Northwestern Division.  And so we used that information
21 that was reported as our basis of fact.
22       Q.    Okay.  Did you independently reach outside
23 of that -- that area of -- of communication and
24 individuals for anything else as a source of
25 information?

1        A.    Sir, I obviously read the news and read
2  the internet to see what others were saying.  But I
3  just was trying to understand what the perceptions were
4  out there of what was going on the ground.  But I
5  didn't use any of that as a basis of fact for
6  reporting.
7        Q.    Did the Corps or the Army independently
8  monitor the Dakota Access Pipeline protests?
9        A.    Sir, at some point, probably in the
10 October-November time frame, we -- we regularly
11 reported -- when it became a national news event, we
12 regularly reported to the Army Operations Center.
13 That's -- that's normal process for anything.  But
14 we -- we don't normally report on permitting actions.
15 But given the national media coverage that this was
16 getting, it was obviously necessary for us to keep the
17 Army leadership aware of what we were doing.  So we did
18 that through normal reporting channels from the Corps
19 of Engineers Operations Center.
20       Q.    I apologize for interrupting you, but
21 you're -- you're going in a different direction than
22 the question.  The question is, did the Corps or Army
23 independently monitor the DAPL protests?
24       A.    Can you -- can you explain what you mean
25 by "independently monitor"?

1        Q.    Did the Corps or the Army use its own
2  resources on the ground at the Dakota Access Pipeline
3  protests to assess their nature, size, and location?
4        A.    We used our personnel who were assigned to
5  the Lake Oahe Project office and folks who were with --
6  doing their normal duties.  Those were the ones that we
7  had.  And we sent at some point -- probably in the
8  December time frame or the November time frame, I don't
9  remember exactly, we put a liaison officer in the State
10 EOC so that General Dohrmann had someone there all the
11 time that he could turn to at all hours that could, you
12 know, reach Corps of Engineer decision-makers or other
13 leaders.
14       Q.    How about monitoring the protests
15 themselves; like I said, size, location, people in the
16 camps?  Did you have any people inside any of the camps
17 located on Corps property?
18       A.    I don't know specifically where our
19 project personnel were, but the project personnel who
20 were assigned to the Lake Oahe office were doing their
21 normal duties.  I don't know if they were in the camps.
22 They were certainly liaison -- liaising with the
23 Standing Rock Sioux leadership, but I don't recall
24 specifically having anything other than our normal
25 project team there on the ground.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 42

1    Q.   Did -- did the Corps use any technology to
2 monitor or surveil the camps?
3    A.   I don't recall us doing any of that, no.
4    Q.   Did you speak with any other federal
5 agency or individual representing a federal agency that
6 did?
7    A.   No, sir, I did not.
8    Q.   Did you receive any briefings or
9 information of any kind from the Federal Bureau of
10 Investigation?
11   A.   Sir, I don't recall receiving anything
12 from the FBI.
13   Q.   How about from the Bureau of Indian
14 Affairs?
15   A.   Sir, as part of the National Security
16 Council meetings that I described earlier, the Bureau
17 of Indian Affairs people that participated in that --
18 again, I don't know who they were, specifically -- but
19 they were reporting what their agents on the ground
20 were reporting.  And they were sharing that information
21 with -- with the folks on the -- on that National
22 Security Council call.
23   Q.   And were the Corps -- or the Bureau of
24 Indian Affairs agents on the ground, using your
25 words -- does "on the ground" mean inside the camps

Page 43

1 located on Corps property?
2    A.   Sir, they were on the ground -- they were
3 there physically in North Dakota.  I don't know
4 specifically where they were.
5    Q.   Okay.  But you don't know that they were
6 actually surveilling or monitoring the DAPL protests at
7 the location of the camps located on Corps property?
8    A.   No, sir, I don't know specifically what
9 they were doing.
10   Q.   Okay.  But you also don't know whether
11 they were even inside the camps, correct?
12   A.   No, sir.  I don't know where they were.
13   Q.   Okay.  General Jackson, when you've been
14 using the term, or do in your communications that we'll
15 go through in a moment, you use the term you "gathered
16 intelligence or gained intelligence."  What kind of
17 intelligence did you receive, other than the kind that
18 you've told me to date at this point of your
19 deposition?
20   A.   Sir, the only information that I received
21 was information that was passed up by word of mouth or
22 through situation reports that came from either John
23 Henderson and General Spellmon, that I received
24 telephonically, or that their operation centers put in
25 in official reports and sent up; or some of that

Page 44

1 communication was done via email as well.
2    Q.   Okay.  And when you talk about Colonel
3 Henderson being a -- a person that provided you
4 information, where did General Henderson get -- pardon
5 me, Colonel Henderson get his information if the Corps
6 was not otherwise independently monitoring or
7 surveilling the camps located on Corps property?
8        MS. ZILIOLI:  Objection, speculation.
9    A.   So, Colonel Henderson was very visibly
10 present.  He spent a good bit of time on the ground in
11 North Dakota.  I don't know specifically where he was,
12 but I do know that he liaised very closely with General
13 Dohrmann.  And he liaised very closely with the
14 Chairman of the Standing Rock Sioux Tribe, Dave
15 Archambault.  And he spent a lot of time, John
16 Henderson did, engaging with all of the tribal leaders
17 who were there and participating, all trying to work to
18 find a solution to the concerns that they had expressed
19 there on the ground.
20        So John was -- had the most authoritative
21 source of information; based on his presence, the
22 information he was receiving from his staff at the Lake
23 Oahe Project office, and from his ongoing conversations
24 with the leaders of North Dakota, and also of the --
25 the tribes that were involved in what was going on

Page 45

1 there in North Dakota.
2    Q.   (BY MR. SEBY)  Okay.  General Jackson, did
3 you independently ever speak with either Governor of
4 the State of North Dakota?
5    A.   I did not speak with the Governor of North
6 Dakota, no, sir.
7    Q.   Ever?
8    A.   Not about Dakota Access Pipeline, no, sir.
9    Q.   Okay.  Or the protests?
10   A.   No, sir.  I didn't speak with the Governor
11 of North Dakota about the protests.
12   Q.   Okay.  Do you know, General Jackson,
13 whether the other federal -- other agencies of the
14 United States Government independently monitored or
15 surveilled the camps located on Corps property?
16   A.   No, sir.  I have no idea of what the other
17 agencies did.
18   Q.   Are you aware of whether the United States
19 Government, through any of its associated agencies,
20 used any technologies to monitor inside or the
21 movements of the camps located --
22   A.   No, sir, I'm not aware.
23   Q.   Okay.
24   A.   No, sir, I'm not -- I'm not aware of
25 anything.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 46

```
1        Q.   No one ever told you that Bureau A or
2   Bureau B or Division X or Division Y was using any
3   technology to monitor the happenings inside the camps
4   located on Corps property?
5        A.   No, sir, I'm not aware of anything.  No,
6   sir.
7        Q.   So how did you know what was going on in
8   the camps?
9        A.   Sir, the only information that I received,
10  as I mentioned before, I received either from voice
11  reports from Colonel Henderson, which he gathered from
12  his frequent visits onsite and his conversations with
13  the leadership there in North Dakota and with the --
14  the tribes, or from the reports that came up from the
15  project office there at Lake Oahe that went through
16  Omaha District, Northwestern Division, and then up to
17  me.
18       Q.   No one ever told you, "Hey, Ed," or, "Hey,
19  General Jackson, we've got this agency of the federal
20  government with eyes on or informants in the camps
21  located on Corps property.  Here is what we're seeing
22  happening, and here's what those people are doing or
23  planning on doing"?  You never were aware of any of
24  that?
25       A.   I wasn't aware, sir, of any agencies that
```

Page 47

```
1   had anybody inside the camps that were doing any type
2   of -- I think you used the word "intel gathering."  But
3   I don't recall getting any information about anything
4   like that, other than what was -- what you could see
5   visually from our project office folks who were in Lake
6   Oahe doing their -- doing their job of managing that
7   project.
8        Q.   Did the Corps assign or direct Lake Oahe
9   Project people to stand on a hillside above the protest
10  camps, 24/7, with binoculars?  Is that how it worked,
11  or what did they -- what did those people do and with
12  what frequency did they monitor the camps?
13       A.   Sir, I don't know exactly what actions
14  were taken by the Lake Oahe Project office personnel,
15  so I can't answer that question.
16       Q.   Okay.  But you said they did something,
17  right?
18       A.   Sir, they reported what information they
19  knew, and that's what information was sent up to me.
20       Q.   Okay.
21       A.   How they -- how they did that, I don't
22  know, specifically.
23       Q.   Were you aware that the Corps leadership
24  directed the Lake Oahe Project personnel to stay away
25  from the camps?
```

Page 48

```
1        MS. ZILIOLI:  Objection, assumes facts not
2   in evidence.
3        A.   Sir, I'm not -- I'm not aware,
4   specifically, of -- of any directive like the one you
5   mentioned.
6        Q.   (BY MR. SEBY)  Nothing from Colonel
7   Henderson directing them to stay away for their safety
8   and to not engage with the Corps (sic)?
9        MS. ZILIOLI:  Same objection.
10       A.   Sir, I don't know specifically what
11  Colonel Henderson told his staff.
12       Q.   (BY MR. SEBY)  Okay.  But you weren't
13  advised of that by email or verbally?
14       A.   Sir, I don't recall if I was or not.
15       Q.   Okay.  How about with respect to Corps
16  properties around the United States due to opposition
17  to the Dakota Access Pipeline Project?
18       A.   Sir, I'm not sure I understand your
19  question.  Could you restate it, please?
20       Q.   What direction did you make to any Corps
21  individual or employee, in the entire country, with
22  regard to keeping distance or staying away from
23  protests, either in the state of North Dakota or any
24  state of the United States with respect to the Corps'
25  role in the Dakota Access Pipeline?
```

Page 49

```
1        A.   Sir, I don't recall any directive that was
2   given for people to do anything regarding the Dakota
3   Access Pipeline, as you describe.
4        Q.   Do you recall the -- the various protests
5   that occurred around the country and offices of the
6   U.S. Army Corps of Engineers concerning the Dakota
7   Access Pipeline?
8        A.   Sir, I am aware that there were protests;
9   yes, sir.
10       Q.   And what instruction did the Corps or the
11  Department of the Army give to personnel at Corps
12  offices around the country with respect to how to
13  conduct themselves at the time of those protests?
14       A.   Sir, I'm not aware of any specific
15  directive that was given.  Although, there are standard
16  protocols in place for force protection at all federal
17  facilities, and I'm sure that those were the ones that
18  were followed in this case.
19       Q.   Okay.  And have you ever been to the state
20  of North Dakota, General Jackson?
21       A.   Yes, sir, I have.
22       Q.   And what were the purposes of your trips
23  or trip?
24       A.   Sir, I visited North Dakota one time for a
25  Fargo-Moorhead Flood (sic) Diversion Project meeting.
```

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 50

1  It was unrelated to the Dakota Access Pipeline.  And
2  I -- after the protest was over, I recall visiting the
3  regulatory office of the Omaha District.  This was
4  probably in March or April of 2017, just to talk to
5  the -- the regulatory staff that was involved with the
6  permitting of the project.
7       Q.   Why did you make that trip?
8       A.   Sir, that was standard practice.  As the
9  deputy commanding general, I often visited projects,
10 visited districts, to check on our people, get a better
11 understanding of the missions that -- that they do and
12 to thank them for their service.  And that's what I did
13 there.
14      Q.   After the fact?
15      A.   It was after the fact; yes, sir.
16      Q.   Okay.  You're aware that the Corps of
17 Engineers is the manager of the Oahe Project -- what's
18 known as the Oahe Project?
19      A.   Sir, the -- the -- Lake Oahe is a federal
20 project managed by the U.S. Army Corps of Engineers;
21 yes, sir.
22      Q.   And what is the purpose of the Lake Oahe
23 Project?
24      A.   Sir, as I recall, it's a flood control
25 reservoir.

Page 51

1       Q.   And is there a dam associated with the
2  flood control reservoir?
3       A.   Sir, I believe there is.  I don't -- I
4  don't know the specifics or I can't recall the
5  specifics of Lake Oahe and -- and all the different
6  purposes that it has.
7       Q.   Are you aware of whether or not the Lake
8  Oahe Project is solely limited to the U.S. navigable
9  waterway known as the Missouri River, or are there
10 lands associated with the Corps' area of management
11 that's under the Lake Oahe Project title?
12      A.   Sir, most federal projects, like Lake
13 Oahe, have other lands associated with them, but it
14 varies from project to project.  So I don't know the
15 extent -- I can't recall, exactly, the extent of the
16 project boundaries associated with the federal project
17 at Lake Oahe.
18      Q.   And who is responsible for the management
19 of those associated lands with flood control projects?
20      A.   Sir, typically, the district that's
21 responsible geographically for that project is
22 responsible for the lands that are associated with that
23 project.
24      Q.   The district of the U.S. Army Corps of
25 Engineers?

Page 52

1       A.   Yes, sir.
2       Q.   So the Corps is the managing authority for
3  lands associated with and part of a water flood control
4  project?
5       A.   If it's a Corps of Engineers flood control
6  project, yes, sir.
7       Q.   Okay.  Do you know whether or not the
8  United States or the Corps ever delegated
9  responsibility for the use or management of the Corps
10 Oahe Project?
11      MS. ZILIOLI:  Objection to the extent it
12 calls for a legal conclusion.
13      A.   Sir, can you -- when you say "delegated,"
14 I'm not sure I understand.  It was the responsibility
15 of the Omaha District to manage, and they did so
16 through their staff at the -- that were onsite.  So I
17 don't know if that answers your question.
18      Q.   (BY MR. SEBY)  It -- it does not.  The
19 question is, did the Corps -- regardless of which
20 office in the Corps -- but did the Corps or the United
21 States ever formally delegate, i.e., give away,
22 responsibility for managing lands under the
23 jurisdiction of the Corps to anyone outside of the
24 Corps?  Let's start with anyone within the United
25 States Government.

Page 53

1       MS. ZILIOLI:  Same objection.
2       A.   Sir, I'm not aware -- I'm not aware of
3  that; no, sir.
4       Q.   (BY MR. SEBY)  So no -- no federal agency
5  was given authority, outside of the Corps, to manage
6  its property?
7       MS. ZILIOLI:  Same objection.
8       A.   Sir, I don't recall that being the case.
9  I don't recall ever hearing of an instance like that.
10      Q.   (BY MR. SEBY)  Okay.  How about same
11 question, General, with respect to the State of North
12 Dakota?  Did the Corps ever delegate management
13 authority for the Corps lands associated with the Oahe
14 Project to the State of North Dakota?
15      MS. ZILIOLI:  Objection, legal conclusion.
16      A.   Sir, I don't -- I don't recall that that
17 was ever done, but I don't know if it was some unique
18 waiver that was granted at some point in time.  I'm
19 just not aware of it.  But that's not normal process.
20      Q.   (BY MR. SEBY)  In fact, doing something
21 like that would be similar to granting an easement that
22 would require Congressional approval, would it not?
23      MS. ZILIOLI:  Same objection.
24      A.   There are easements granted over federal
25 property, and the Corps real estate and legal teams are

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 54

1 involved in assessing those when those requests are
2 made. And so I know that there is a provision for use
3 of, but not delegation of authority for, if that makes
4 a difference legally.
5     Q.   (BY MR. SEBY) How about same question,
6 General, with respect to, did the Corps or the United
7 States Government, at large, delegate any authority
8 management thereof of Corps properties associated with
9 the Lake Oahe Project to any federally recognized
10 Native American tribe?
11     MS. ZILIOLI:  Objection, legal conclusion.
12     A.   Sir, I'm not aware of that.
13     Q.   (BY MR. SEBY) Did the Corps ever formally
14 delegate authority for the management of its land
15 associated with the Lake Oahe Project to any protester
16 in the camps that were set up on Corps property during
17 the period of approximately August of 2016 through
18 approximately April of 2017?
19     MS. ZILIOLI:  Same objection.
20     A.   Delegate? I'm not sure I understand your
21 question. But if you're saying that, did the Corps
22 delegate authority to a tribe to manage the land, I
23 don't -- I'm not aware that that was the case.
24     Q.   (BY MR. SEBY) I'll interrupt you, sir,
25 just to clarify, so that we're -- we're getting the

Page 55

1 question understood so you can answer it. Did the
2 Corps or the United States Government ever delegate
3 authority to any protester or group of protesters to
4 manage the Corps property during the period of the
5 protests that I just identified, August 2016 to April
6 2017?
7     MS. ZILIOLI:  Objection, legal conclusion.
8     A.   Thanks for clarifying. No, sir, I'm not
9 aware of that. That would not be normal process.
10     Q.   (BY MR. SEBY) Sure.
11     MR. SEBY:  Let's take a break, General
12 Jackson, Ms. Zilioli, if that's acceptable? Ten
13 minutes?
14     THE DEPONENT:  Yes, sir.
15     MS. ZILIOLI:  Sounds good.
16     MR. SEBY:  Come back at 9:50 Mountain, if
17 we could, please.
18     THE DEPONENT:  Yes, sir.
19     THE VIDEOGRAPHER:  Going off the record.
20 The time is 3:37 p.m. UTC, 9:37 a.m. Mountain.
21     (Recess, 9:37 a.m. to 9:50 a.m. MDT.)
22     THE VIDEOGRAPHER:  We are back on the
23 record. The time is 3:50 p.m. UTC, 9:50 a.m. Mountain.
24     Q.   (BY MR. SEBY) General Jackson, we're back
25 after a short break. And I'd like to turn to some

Page 56

1 exhibits now, largely for the balance of the next
2 couple of hours, to walk through documents that have
3 been produced by your counsel for the United States,
4 many of which are your emails or email chains in which
5 you were a conversant, a participant.
6     MR. SEBY:  So if we could go to
7 Exhibit 684, please, to start.
8     Q.   (BY MR. SEBY) And this -- this exhibit
9 and email chain is -- is three pieces. The first one,
10 at the very bottom, you -- you asked General Spellmon
11 what -- you, on behalf of Chief -- the Chief -- you're
12 referring to Chief (sic) Semonite right there in that
13 opening sentence? If we could look at that email, the
14 bottom one.
15     A.   Yes, sir, I'm looking at it. I can see it
16 at the bottom.
17     Q.   Okay. It says, "Sorry to bombard you with
18 emails today. Chief asked me what position Governor
19 Dalrymple had taken on this issue." And the subject
20 matter is "Three Affiliated Tribes Land Transfer."
21 What does -- can you recall and tell me what that
22 involved?
23     A.   Sir, I don't -- I don't recall what that
24 involved at all. I recall the title, but I don't
25 recall what it was in reference to. And I'm not sure

Page 57

1 it had anything to do with DAPL, but I -- I can't
2 confirm that. I just don't remember.
3     Q.   Okay. Then General Spellmon responded to
4 you with an email, up the email above that.
5     MR. SEBY:  If we could blow that up a
6 little bit, Rachel, please.
7     Q.   (BY MR. SEBY) I want to make sure you can
8 read it, General Jackson. Right there. There it is,
9 middle piece right there.
10     A.   Can you -- can you bring it -- can you
11 make it smaller again, that way I -- oh, well, never
12 mind. It's good right there. Thank you.
13     Q.   Can you read that?
14     A.   Yes, sir. Give me just a second to take a
15 look at it.
16     Q.   Yup.
17     A.   (Deponent examined document.) Okay.
18     Q.   Okay. So I want to ask you a few things
19 about this and -- because above, you say -- there
20 appears to have been some confusion. General Spellmon
21 was giving you a DAPL update, when I think you were
22 asking him for an update on the three affiliated tribes
23 land transfer. Does that come back to you now? You
24 can see what your own words were, right?
25     A.   Yes, sir. That's -- as I mentioned, I

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

1 thought that was two separate issues.
2      Q.   Yeah, sure.  And so -- but General
3 Spellmon tells you, and you respond, ". . . tracking
4 his position on the DAPL."  I think you're referring to
5 the Governor, correct?
6      A.   Sir, that's -- that's what it appears I am
7 referring to.  I don't remember, specifically.
8      Q.   Sure.  In fact, the email says, from
9 General Spellmon, he's not spoken with the Governor,
10 but John Henderson spoke with him that morning of
11 August 22nd.  And -- and he's talking about
12 extrapolating the text of the Governor's executive
13 order and emergency declaration for the southwest and
14 south-central part of the state of North Dakota.
15           And the second paragraph of the -- of the
16 emails says, "In short, his" -- that would be Governor
17 Dalrymple -- "primary concern is upholding the right to
18 peaceful protest-AND-" -- in capitals -- "public
19 safety.  The common assessment from the field is [that]
20 the Standing Rock Sioux Tribe protests have crossed the
21 line and are longer completely peaceful . . ."
22           And you go down a paragraph -- two
23 paragraphs from there, and it says that Colonel
24 Henderson reported in correspondence to you, previous
25 to this correspondence, that the Governor has asked the

1 Corps of Engineers to -- or told the Corps of Engineers
2 that he strongly opposes the granting of any special
3 use permit for the staging of protest areas on Corps
4 property and that -- he tells you, you under -- he
5 understood that the Omaha District Office of the Corps
6 had received its first special use permit application
7 and is working through that process.
8           Last paragraph says -- Spellmon
9 acknowledges the requirement for a daily storyboard
10 beginning tomorrow, where ". . . we" -- the Corps --
11 "will capture any key updates."
12      MR. SEBY:  So the -- the next exhibit is
13 686.  And if we would go to that, please.
14      Q.   (BY MR. SEBY)  This is an email, the top
15 one, which is all that matters, and the attachment that
16 I'll show you in a moment, but Ms. Karen Aguilera --
17 Durham-Aguilera sends to you -- you're one of the
18 addressees, along with Ms. Darcy and Chief Semonite.
19 You're the Major J, right, Major General J?
20      A.   Yes, sir, it would appear that to me.
21      Q.   Yeah, me too, because you're the top
22 addressee of the email.  It says, the "First storyboard
23 attached for the Dakota Access Pipeline issue."  And
24 this is -- the email is dated August 24th and the
25 attachment, which is this first storyboard that we'll

1 look at now, is dated the day prior.  So it -- it was
2 the date that Colonel Spellmon said this would be
3 coming out.  And if we look at the storyboard
4 attachment here to --
5      A.   Can I -- can you go back, sir?  Can I --
6 can I read what that email said, real quick?  You were
7 going -- you were moving it too fast.  I'd just like to
8 read it just a second --
9      Q.   Yeah, you can read -- you can read it --
10 hold on, sir.  You can read the part I'm asking you
11 about.  The rest of it is unrelated.  And it's also
12 just transmitting the storyboard.  So I don't want to
13 burn up time reading stuff that's -- that's just
14 forwarding things.  Top email, the one addressed to
15 you, please read that, for sure.
16      A.   (Deponent examined document.)  Okay.
17 Thank you.
18      Q.   Now we'll go to the storyboard, which is
19 the first Corps storyboard, dated August 23rd.  Do you
20 know, General Jackson, how soon after the protesters
21 showed up on Corps of Engineers property at the Lake
22 Oahe Project that it took for the Corps to begin to
23 produce these storyboards reporting the situation and
24 get provided background?
25      A.   Sir, I don't remember specifically how --

1 what the time lapse was from the time they -- the first
2 protesters started showing up and when this was
3 produced.  We communicated regularly.  This was a
4 product that was developed to help keep everybody on
5 the same sheet of music and to provide some visual
6 reference to some of the locations that people had been
7 talking about and to try and deconflict some other
8 activities that were ongoing at the time, such as the
9 three affiliated tribes land transfer, which you
10 referred to in a previous email.
11      Q.   But you told me you didn't recall what
12 that involved at all, so I don't want to talk more
13 about stuff that you don't remember.  So let's go to
14 what this -- the text on the right says under
15 "Additional Background."
16      A.   Okay.  Can you -- are you going to blow
17 that up -- oh, thank you.
18      Q.   It is.  Right there, first bullet says
19 what, please?
20      A.   Are you asking me to read it back to you?
21      Q.   Yes.
22      A.   "Protesters set up a 'spirit camps' on
23 Corps property south of the pipeline construction
24 site."
25      MR. SEBY:  Okay.  Now, if we could go to

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 62

1 the "Legend," the inset of the map, please, to the
2 left.
3     Q.   (BY MR. SEBY)  So, do you see the blue --
4 robin's egg blue color there on the legend?
5     A.   Yes, sir.
6     Q.   And what does that blue stand for in the
7 Corps legend on the storyboard?
8     A.   It says it's the USACE Reservoir Project.
9          MR. SEBY:  Okay.  Now, if we could go to
10 the inset map diagram on the -- the map there, feature.
11 Right there.
12     Q.   (BY MR. SEBY)  Do you see that, sir?
13     A.   Yes, sir.
14     Q.   And you just talked about protesters
15 setting up camps on Corps property.  You see a Camp
16 North there within the robin's egg blue denoting Corps
17 property, Reservoir Project property?
18     A.   Yes, sir, I see that indication on the
19 map.
20     Q.   Does that, in your opinion, mean that
21 there is a protest camp set up on Corps of Engineers
22 property, at least as of August 23, 2016?
23     A.   Sir, if I'm reading this map correctly,
24 then it would appear that it's pointing into the blue
25 that would indicate Corps property; yes, sir.

Page 63

1     Q.   And -- and that means a Corps -- a protest
2 camp has been established on Corps of Engineers
3 property.  The Corps acknowledges it with a map that's
4 on the very first storyboard produced for Corps
5 leadership, addressed to Ms. Darcy, Chief Semonite, and
6 Major Jackson, correct?
7     A.   That would be Major General Jackson; yes,
8 sir.
9     Q.   Pardon me.  I apologize.  General Jackson.
10 Got it.  Okay.  Is that the same with respect to the
11 Camp South located on Corps property?
12     A.   Sir, by looking at this map, it would
13 appear that the arrow points into the Corps property.
14     Q.   All right.  Thank you.
15     A.   If that's accurately -- if that's
16 accurately displayed.
17     Q.   I appreciate the caveat, but it's a Corps
18 storyboard.  And I'm just asking you if that's what it
19 appears to you to read as, right?
20     A.   That's what it appears; yes, sir.
21          MR. SEBY:  Okay.  If we could go to
22 Exhibit 688, 6-8-8.
23     Q.   (BY MR. SEBY)  All right.  General
24 Jackson, this is a -- an email that starts with an
25 email from you to Madame Chief -- Madame Secretary and

Page 64

1 Chief.  So you are writing to Ms. Darcy and Chief
2 Semonite, and you talk about a -- your email right
3 there, the second paragraph, it says, "I was prepped
4 for the requested DAPL call this afternoon [and] was
5 just informed it was no longer required."  What DAPL
6 call was that referencing to?
7     A.   Sir, give me just a second to read this so
8 I can understand all the context, please.
9          (Deponent examined document.)
10          Okay.  Thank you for the time, sir.  I'm
11 not sure what DAPL call that was referencing, because
12 it doesn't allude to with whom it would be.  So I don't
13 know all who -- who that might have been with.
14     Q.   How about the next sentence?  What does
15 that pertain to?  Your words, sir.  If you will please
16 tell me what you're talking about.
17     A.   Where it says, "Tracking your call with
18 Mr. Connor . . ."?
19     Q.   Please continue.
20     A.   "Providing this" -- "Tracking your call
21 with [Mr] Connor following his discussion with
22 [General]" -- "Governor Dalrymple."
23     Q.   Yes.  What is that all about?
24     A.   Sir, if I recall, Mr. Connor was the
25 Deputy Secretary for Department of the Interior.  So

Page 65

1 that's -- that's the only relevance I can find.  As it
2 appears by this sentence, that Mr. Connor was -- had a
3 call with the Governor of North Dakota, and he had
4 requested to speak with General Semonite or Ms. Darcy.
5 I can't tell, by this note, who it was for.
6     Q.   And who spoke with -- when you say,
7 "Tracking your call" -- and that's in the past tense,
8 it's already happened -- so what call did Mr. Connor
9 have and with whom and why?
10     A.   Sir, I don't recall, specifically.  I can
11 read that.  And I addressed it -- since I addressed it
12 to Ms. Darcy and the Chief, I don't recall which one of
13 them or if both of them were on the call with Secretary
14 Connor, as this -- as this email note would allude to,
15 so . . .
16     Q.   Okay.  Last paragraph of the letter, you
17 say, "Request we hold off on the daily updates until we
18 get more activity, at which time we'll restart," right?
19     A.   Yes, sir, that's what it says.
20     Q.   General, can you explain why, after three
21 days of starting the storyboards, where it was directed
22 that they be done on a daily basis for Corps
23 leadership, you were recommending, after just a day or
24 two -- where the first storyboard reported, in fact,
25 just three days prior to this email -- two days --

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 66

1  where the storyboard says people were on Corps
2  property, north and south of the Cannonball River, and
3  they were not being peaceful, why did you feel it was
4  prudent to stop the daily updates to Corps leadership
5  or recommend stopping?
6      A.   Sir, I don't -- I don't remember why I
7  made that call.  I may --
8      Q.   But you did -- you see that you did
9  request that, right?  You just don't know why now or
10  won't be able to say?
11     A.   Well, I'm not withholding information from
12  you.  I just don't remember what the situation was that
13  caused me to make that comment and make that request.
14  And -- and it's unclear from this email, to me, what
15  daily update we're talking about; whether that's a
16  daily update that we were providing to somebody outside
17  the Corps, or if that's somebody that we are providing
18  a daily update to inside the Corps.  It's unclear, with
19  this out of context, exactly what daily update I'm
20  talking about.  And I apologize that I don't remember,
21  specifically.
22     Q.   It sure reads to me like you're talking
23  about the storyboards, the daily storyboards that were
24  just asked for a few days prior, that you started, and
25  then now you're suggesting that you hold off on doing

Page 67

1  it until some degree of activity that's -- that's
2  different in your mind, right?  That's the way it
3  reads.  I wasn't part of the discussion.  I'm not you.
4  I didn't write it, but you did.  So I'm asking you what
5  you meant?
6      A.   Well, just --
7          MS. ZILIOLI:  Objection, asked and
8  answered.
9          MR. SEBY:  Let's move on to 89.
10     A.   Sir, may I finish answering the question,
11  please?  You asked me a question, and I think I deserve
12  you -- I deserve to give you an answer.
13     Q.   (BY MR. SEBY)  I don't want to waste time
14  if you're just going to tell me the same thing over.
15  So if you have --
16     A.   Well, I think -- I think on the record --
17  I think, on the record, you need to get my response.
18  So let me give it to you, please.
19          So you -- you talked about a storyboard.
20  This particular comment doesn't mention a storyboard.
21  And there were many ways that we provided updates
22  during the course of this -- this time frame.  So I'm
23  not sure that your correlation between this, referring
24  specifically to the storyboard, is accurate.  So I just
25  wanted to get that on the record.  Thank you.

Page 68

1      Q.   What other kind of update were you
2  providing to the Chief and to Ms. Darcy, daily update?
3      A.   Sir, I provided routine verbal
4  communication to both Ms. Darcy and the Chief, as I
5  mentioned in the early portion of my statement -- or in
6  the earlier portion of the deposition.
7      Q.   So does that mean that you're telling them
8  that, "I'm not going to talk to you further about the
9  DAPL events until I feel like there's something worth
10  talking about"?  Is that what you're saying?
11          MS. ZILIOLI:  Objection -- objection,
12  mischaracterizes testimony and evidence.
13     A.   No, sir, that's not what I'm saying.
14     Q.   (BY MR. SEBY)  All right.  Let's move on.
15  I don't want to waste time.
16          MR. SEBY:  Exhibit 690, please.
17     Q.   (BY MR. SEBY)  So this is a -- an email
18  chain that starts with the provision by Army staff to
19  the Secretary of the Army and others, including General
20  Semonite.  General Semonite receives it and then
21  changes the "Re" line to say, "LIEUTENANT GENERAL
22  SEMONITE TASKER - LAYDOWN Of PROTEST SITE."  And he --
23  he asks for you to get him a map of the Corps property
24  and the location of the protesters and whether they're
25  on Corps property, so he can take it to a meeting at

Page 69

1  the -- with the Secretary of Army and General Milley
2  the next day.  Do you recall that direction, for you to
3  take an action under the auspices of a tasker?
4      A.   Sir, I don't recall specifically that
5  tasker; but it's certainly in this email, so I'm sure
6  that -- that I received it.  And I'm just trying to
7  read it right now to make sure I can familiarize myself
8  to it -- with it.
9          (Deponent examined document.)
10          Okay.  Thank you, sir.  I appreciate that.
11     Q.   Do you have anything to add?
12     A.   No, sir.  This -- this appears, to me, as
13  General Semonite is a very -- an excellent
14  communicator, that he was just trying to make sure that
15  the Army leadership understood, graphically, what they
16  were hearing in the news and what reports they were
17  getting in the media about -- about what was going on
18  and to clarify boundaries and -- and other things, so
19  they would understand where -- where these protesters
20  were in relation to our responsibilities.
21     Q.   What was wrong with the August 23
22  storyboard?  This is two weeks later, and you are being
23  asked to provide and develop a map that contains the
24  graphic information that the Corps had -- you,
25  Ms. Darcy, and General Semonite -- had two weeks prior.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 70

1 Why this?

2          MS. ZILIOLI:  Objection, calls for
3 speculation.

4          A.   Sir, you'll have to ask General Semonite.
5 I'm not sure, specifically.  It looks to me like he
6 wants something a little more than what we've been
7 providing already, so . . .

8          Q.   (BY MR. SEBY)  So what -- what did you
9 give him?

10         A.   Sir, I don't remember.  I'm sure I gave
11 him the map that he asked for.

12         Q.   Do you recall specifically doing that or
13 not?

14         A.   Sir, I don't remember specifically doing
15 that.

16         Q.   Okay.  Do you --

17         A.   I'm sure it would be standard practice.
18 It would have been standard for me to provide
19 information that he had asked for, so I'm sure I did.

20         Q.   So where is it?

21         A.   I don't know, sir.

22         Q.   Okay.  We don't have it, so I'm curious.
23 That's why I'm asking you.  I appreciate what you think
24 standard practice may have been; but I'm asking you, do
25 you know whether you did it here or not?

Page 71

1          A.   Without -- without evidence of it, I can't
2 confirm to you that I produced a map and gave it to
3 General Semonite, as this email suggests.  I'm just
4 saying that it would be unusual for me --

5          Q.   I don't -- I don't have an email from you
6 that shows that you ever did it.  So I'm not saying
7 anything.  But the fact is, I don't know whether you
8 did it.

9          A.   Nor do I.

10         Q.   Okay.  Even though you're the person
11 tasked with doing it, correct?

12         A.   Yes, sir, I was --

13         Q.   Okay.

14         A.   -- tasked with doing it.  As I mentioned,
15 I'm sure I did it.

16         MR. SEBY:  If we could go to Exhibit 494,
17 please.

18         Q.   (BY MR. SEBY)  If you'd take a moment and
19 read this document.  It's a copy -- this is an email
20 that came from Secretary Sally Jewell, the Department
21 of the Interior email production.  And it's -- the
22 subject line says, "Joint Statement from the Department
23 of Justice, the Department of the Army and the
24 Department of the Interior regarding Standing Rock
25 Sioux Tribe V. U.S. Army Corps of Engineers," dated

Page 72

1 September 9, 2016.  And the -- underneath that, the
2 crest of three federal agencies.  Do you see that; the
3 Department of the Interior, Department of Justice, and
4 the U.S. Army Corps of Engineers?

5          A.   Yes, sir, I see that.

6          Q.   Okay.  If you would read the introduction
7 by the Department of the Interior to the Joint
8 Statement that comes from you-all?

9          A.   You want me to read it to you, sir?

10         Q.   No.  I'd like you to read it so I can ask
11 you questions about it, please.

12         A.   Oh, okay.  Okay.  Thanks.

13              (Deponent examined document.)

14         Okay.  Thank you.

15         Q.   Have you read the entire statement, Joint
16 Statement?

17         A.   I read what you -- that -- those three
18 paragraphs at the very top that you're showing on the
19 screen; yes, sir.

20         Q.   Okay.  Any questions or comments you want
21 to make about that introductory piece?  I'm -- I'm not
22 going to ask you about that.  I want to ask you about
23 the statement below.  I just didn't want to go right to
24 it and have you tell me you needed to read the top part
25 first.  So please read, now, the Joint Statement from

Page 73

1 the Department of Justice, Army, and Interior.

2          A.   Okay.  Thank you, sir.

3              (Deponent examined document.)

4         Okay.  Sir, I've read down to that line
5 that says DOI, underscore --

6          Q.   We're scrolling up.  You can continue
7 reading, please.

8          A.   Okay.  Thanks.

9              (Deponent examined document.)

10        Okay, sir.

11         Q.   Okay.  That's now the end of the
12 statement.  So I want to ask you about the statement
13 itself.  Did you participate in the development of the
14 Joint Statement?

15         A.   No, sir, I did not.

16         Q.   In any manner?

17         A.   No manner whatsoever.

18         Q.   Were you aware of it, prior to it being
19 issued as a formal statement of the United States
20 Government by three agencies under their letterhead and
21 seals?

22         A.   No, sir, I was not.

23         Q.   Not aware at all prior to?

24         A.   Not at all aware prior to.

25         Q.   Got it.  Okay.  How does -- now that

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 74

1  you've read it, were you ever aware of it previously?
2  I appreciate you didn't know about it before it was
3  finalized and released, but did you subsequently become
4  aware of it?
5      A.  Yes, sir, I did.
6      Q.  And what was your feeling about it when
7  you first became aware of it?
8      A.  Well, my feeling was that I needed to go
9  back to Secretary Darcy, who I believe signed it, to
10  make sure I understood what information she needed for
11  that permit decision to be made; because that was
12  the -- that was the reason that this memo was created,
13  as I understand it.
14      Q.  When was it created?
15      A.  It's dated 9 September, according to this
16  email.
17      Q.  Was it written in one day?
18      A.  I had nothing to do with it.  I had
19  nothing to do with it, had no prior knowledge of it
20  before it was published, so I can't answer that
21  question.
22      Q.  Okay.  How do you feel about what you read
23  in this statement?
24      A.  It gives direction what the federal
25  government wants to do with regard to the environmental

Page 75

1  permitting.  And it gives clear direction that there's
2  more consultations that will have to occur before
3  that -- a determination is made.
4      Q.  Okay.
5      A.  It's giving me a task.
6      Q.  Yeah.  All right.  How do you feel about
7  the fact that earlier, the same day this was released,
8  a United States District Court judge in Washington,
9  D.C. ruled in the favor of the Corps and the Department
10  of the Army rejecting a challenge seeking a preliminary
11  injunction by the -- by several tribes, which include
12  the Standing Rock Sioux Tribe?  Is that contrast
13  apparent to you; that you won that case, the Government
14  won, yet this is being announced?
15      A.  Well, sir, I don't think it matters how I
16  feel, because the folks that have the authority to make
17  these decisions are --
18      Q.  It matters, because I'm asking you a
19  question and I'm entitled to do so.  So I'm asking you
20  for your position.  I'm not asking you whether it
21  matters or not.
22      A.  Well, my position would be that my senior
23  officials told me, "This is what we're going to do,"
24  and so that's -- that's what we're going to do --
25  that's what I do.

Page 76

1      Q.  All right.  Do you think that the Joint
2  Statement had the effect of emboldening and redoubling
3  the protest -- protests on Corps property?
4      MS. ZILIOLI:  Objection, assumes facts.
5      A.  Sir, I don't -- I don't have any idea what
6  this statement may have done.
7      Q.  (BY MR. SEBY)  Do you -- do you agree with
8  me that the overall tone of the press -- of this
9  September 9 release strongly favors the protesters on
10  Corps property?
11      MS. ZILIOLI:  Objection, misstates
12  evidence.
13      A.  No, sir, I do not.
14      Q.  (BY MR. SEBY)  Why not?
15      A.  Sir, in my opinion, this -- this Joint
16  Statement is asking us to do a level of due diligence
17  that the authors of this document felt needed to be
18  done, above and beyond what's required, for us to be
19  able to have the information needed for the permit for
20  the Dakota Access Pipeline construction project to
21  continue.  And so --
22      Q.  Were you puzzled by the -- I'm sorry.  Go
23  ahead.
24      A.  No.  Go ahead, sir.
25      Q.  I -- I didn't want to interrupt you if you

Page 77

1  were still talking.
2      A.  I forgot what I was going to say.  I'm
3  sorry.
4      Q.  Were you puzzled why this direction came?
5  I appreciate you -- you respected it as a directive
6  from -- from senior officials to you and others.  But
7  were you puzzled by it, given the fact that the Corps,
8  in the normal course through the district leadership of
9  Colonel Henderson -- given you'd also been a district
10  commander in the past, you told me, was it puzzling to
11  you that that -- those decisions by a peer, Colonel
12  Henderson, were being put on ice, asked to be suspended
13  or being reviewed?  You can characterize it however you
14  wish, but were you puzzled by that direction?
15      MS. ZILIOLI:  Objection, misstates
16  evidence.
17      A.  Sir, as I recall at the time, I wasn't
18  puzzled, because the level of authority required to
19  sign the documentation at question was at the Secretary
20  level -- secretariat level.  So it was just apparent to
21  me that there was more information -- more actions that
22  were needed to be taken for those officials -- or that
23  official, Ms. Darcy, to be comfortable in taking action
24  in -- on an issue that had obviously become very
25  complicated.

Page 78

1  And so I respect that decision.  And I
2  wasn't puzzled, I was just anxious to engage to get
3  started to do whatever she wanted me to do; because I
4  have trust and confidence that she was making the best
5  decision, given all the information that she knew at
6  the time about the situation.
7      Q.   (BY MR. SEBY)  What are the complications
8  of the issue that you were referring to?
9      A.   The complications are the views that the
10 Native Americans have about the Oahe Lake Project, in
11 general, and the sacred nature that they feel about the
12 land, for which I have great respect.  And obviously
13 with this protest, they were indicating to the federal
14 government that there was more work that we needed to
15 do.
16          And the complication that I referred to is
17 trying to figure out how best to do that, with all the
18 parties that were a part of these actions and these
19 decisions, as they were going to -- as we were going to
20 move forward on.  So that's -- that's -- that's what
21 I'm referring to.
22     Q.   Are you saying that the Oahe Project is
23 located on lands that belong to the Standing Rock Sioux
24 Tribe?
25     A.   The Lake Oahe Project is on federal

Page 79

1  property that belongs to the United States Government.
2  But if you go back in history, at one time, all of
3  those lands in that area belonged to the Sioux Nation.
4  And the Sioux people still feel very strongly and are
5  very well attached to that land.  And that's what I'm
6  referring to.
7      Q.   And so how do those concerns, the
8  historical concerns, respectfully relate to events of
9  the day in 2016 that are the subject of this Joint
10 Statement?
11     A.   I think -- I think the -- the relevance is
12 the federal government wanted to engage further with
13 the -- with the tribal leaders to try and find some
14 common ground.  They wanted to -- as this memo states,
15 if there were areas or something in our process for
16 making these types of determinations that needed to be
17 addressed, the federal government wanted to give the
18 tribal leaders the opportunity to identify those
19 concerns and allow us to take them into consideration,
20 respectfully, with all the other factors that go into
21 these type of environmental permit decisions.
22     Q.   Who wrote this Joint Statement?  Do you
23 know?
24     MS. ZILIOLI:  Objection, calls for
25 speculation.

Page 80

1      A.   Sir, I do not know.
2      Q.   (BY MR. SEBY)  Did Mr. Lowry Crook work on
3  this statement for Secretary Darcy?
4      MS. ZILIOLI:  Same objection.
5      A.   Sir, I don't know.  That's a question for
6  Lowry Crook.
7      Q.   (BY MR. SEBY)  I'm asking whether you know
8  whether he did or not.  I'm asking -- I'm not asking
9  for a question to Mr. Crook.
10     A.   Sir, I don't know if he did or not; no,
11 sir.
12     Q.   Okay.  Were you ever told that he did?
13     A.   No, sir, I was not.
14     MR. SEBY:  Okay.  All right.  If we could
15 go to Exhibit 420, please.
16     Q.   (BY MR. SEBY)  And, General, this is a
17 cover email with no text, followed by a couple of
18 symbols that are social media symbols.  So I want to go
19 right to the attachment, please.
20     A.   Yes, sir.
21     Q.   There we are.  This is a letter dated
22 September 14th, five days following the September 9th
23 Joint Statement.  It's a letter on letterhead of United
24 States Senator John Hoeven, United States Senator Heidi
25 Heitkamp, both from North Dakota; United States

Page 81

1  Congressman Kevin Cramer, North Dakota's only
2  Congressman; and the Governor of the State of North
3  Dakota, Jack Dalrymple; dated September 14th.
4          The addressees are the Attorney General of
5  the United States, Loretta Lynch; Jo-Ellen Darcy, the
6  Assistant Secretary of the Army for Civil Works; and
7  Ms. Sally Jewell, Secretary of the Department of the
8  Interior.  Are you aware of this letter?
9      A.   Sir, I don't recall.  I probably saw it,
10 but I don't recall.
11     Q.   Are you aware of any response made by any
12 of the addressees, those three individuals; including
13 the individual you told me you worked closely with, met
14 with at least on a daily basis and more, when
15 circumstances merited?  Are you aware of whether
16 Ms. Darcy ever acknowledged or responded to this
17 letter?
18     A.   Sir, I'm not aware if she formally
19 responded or not.  I can't recall.
20     Q.   Have you ever read the letter?
21     A.   Sir, I don't recall if I've read it or
22 not.  I don't remember.
23     Q.   Was it your practice of being in the Army
24 to receive letters from both Senators of the State and
25 the -- all of the Congresspeople from the State and the

Page 82

1  Governor, but not to respond, ever?
2           MS. ZILIOLI:  Objection, argumentative.
3       A.   Sir, this letter wasn't addressed to me.
4  If it was addressed to me, I would have responded.  I
5  don't know whether or not Ms. Darcy responded to this
6  or not.
7       Q.   (BY MR. SEBY)  Okay.  Thank you.  You
8  don't know that she did, right?
9       A.   Sir, I'm not aware if she did or not.
10          MR. SEBY:  Okay.  If we could go to
11  Exhibit 701, please, 7-0-1.
12          (Deposition Exhibit 701, remotely
13  introduced and provided electronically to the court
14  reporter.)
15      Q.   (BY MR. SEBY)  This is a September 29th,
16  2016 email from Chief Semonite, right, to --
17      A.   Yes, sir.
18      Q.   -- General Spellmon and you, General
19  Jackson, and Colonel John Henderson; again, dated
20  September 29, 2016.  And it says, "LIEUTENANT GENERAL
21  SEMONITE DAPL Assessment."  And he is responding to a
22  report provided to him from General Spellmon, a DAPL
23  assessment.  And General Jackson (sic) says -- you want
24  to read this email?  I want to make sure you are
25  recalling this.  I know there's not been a lot

Page 83

1  recollected from your own emails.  I'm wondering if you
2  recall this email to you from the Chief?
3       A.   If you give me a minute to read it, I'll
4  be able to respond.  So give me just a second.
5       Q.   I'm inviting -- I'm just inviting you to do
6  that very thing, please.
7       A.   Thank you.
8           (Deponent examined document.)
9       Q.   Will you let me know when you're done,
10  please?
11      A.   Yes, sir, I'll let you know.
12          (Deponent examined document.)
13          Okay.  Sir, I've read what's on the
14  screen.  Is there more?
15      Q.   All right.  We're -- we're going to scroll
16  down so you can finish it.  There's just a little left.
17      A.   Okay.
18          (Deponent examined document.)  Okay.
19      Q.   So let's go back up to the top of this.
20  General Semonite, the Chief of the Corps of Engineers,
21  is writing to you thanking General Spellmon for the
22  report on -- he calls it "ground truth" on what is
23  happening on the ground.  And what is -- next sentence,
24  he says, "I am getting some open source material . . .
25  hard to tell what is spin and what is truth."  What is

Page 84

1  an open source material, to your knowledge?
2       A.   Sir, I don't know what he refers to in
3  that note.  But as I mentioned before, I read the media
4  reports and watched the news about what was going on,
5  so that -- I would assume that's what he is referring
6  to, but I don't know for sure.
7       Q.   Okay.  Last -- last sentence of the first
8  paragraph, he says, "My concern" -- that's General
9  Semonite, Chief of Engineers -- "is just that most of
10  what is needed to do to bring this to successful
11  conclusion is OUT OF OUR HANDS" -- in all capital
12  letters -- "and I have no confidence that higher levels
13  of decision makers will bring this to a timely
14  resolution before we have a security issue on the
15  ground."
16          Do you have any reason to share or
17  disagree with the Chief's concern; either?  Sir?
18      A.   I'm -- I'm -- I'm reading and thinking.
19  The situation on the ground at that time, as I recall,
20  was very complicated.  And we -- Colonel Henderson and
21  his team on the ground -- working daily with the State
22  leadership and also with the tribal leaders, were
23  trying to get a good assessment of the situation and
24  figure out the best way to keep the escalation from
25  occurring or any damage from occurring.

Page 85

1           And so I don't -- I haven't read what is
2  at the bottom of this, General Spellmon's report, so I
3  can't recall exactly what he said.  But maybe there was
4  something in that report that -- that caused the Chief
5  concern.  But the real issue is just the complication
6  of the situation and him wanting to get a quick answer,
7  which was just not -- not available to anyone at that
8  time.
9       Q.   So how come you don't talk about a
10  complication being the several thousand people that
11  took residence on Corps of Engineers property at the
12  Lake Oahe Project and were noted as behaving badly and,
13  indeed, violently?  So how come that isn't a referenced
14  complication?
15          MS. ZILIOLI:  Objection; misstates
16  evidence, assumes facts not in evidence.
17      Q.   (BY MR. SEBY)  Are you -- sir, are you
18  aware that at the time of this communication, latter
19  part of September, several thousand people were
20  resident -- whether several thousand people were
21  resident on Corps property?
22      A.   Sir, at that point in time, I was aware
23  that there was a large number, but I don't have -- I
24  don't know how many, specifically.
25      Q.   Were any of them there with approval by

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 86

1  the United States Government?
2          MS. ZILIOLI:  Objection, legal
3  conclusion.
4          A.  Sir, they had not -- they had not had --
5  they did not have any type of approved -- they had not
6  any approval to be in those -- official approval to be
7  where -- where they were at the time, as I recall.
8          Q.  (BY MR. SEBY)  So do you know why the DAPL
9  protesters chose to enter onto Corps land?
10         MS. ZILIOLI:  Objection, speculation.
11         MR. SEBY:  No, it's not.
12         A.  Sir, I'm -- I do not -- I do not know why
13  they chose to be where they were.
14         Q.  (BY MR. SEBY)  Okay.  Am I correct in
15  recalling that you were advised previously that all --
16  that many protesters on the Corps property were
17  behaving and conducting themselves in a violent manner?
18         MS. ZILIOLI:  Objection; assumes facts,
19  mischaracterizes evidence.
20         A.  Sir, I don't remember specifically hearing
21  anything about violence.  I recall the numbers of
22  people and the concern that all parties had -- what I
23  mean "all parties," I'm talking about our Corps folks
24  and the State -- on safety that was associated with all
25  these folks gathering there and how -- how that was

Page 87

1  going to be managed or handled and what options were
2  available to our -- our group -- when I say "our
3  group," I define that as the State and the federal
4  government -- to deal with what was -- what was
5  starting to transpire.
6          Q.  (BY MR. SEBY)  Are you aware that as of --
7  whether -- whether as of September 29th protesters
8  resident in these camps on Corps property, as you've
9  said, without any authorization from the federal
10  government of the United States, were using that
11  property to organize and launch hit-and-run missions on
12  private and State lands and buildings and farms,
13  ranches, from those protest camps and returning to
14  there as a safe haven?
15         MS. ZILIOLI:  Objection; misstates
16  evidence, testimony, assumes facts.
17         Q.  (BY MR. SEBY)  Sir?
18         A.  Sir, I'm not -- I'm not -- I've never been
19  shown anything that suggested that they were conducting
20  themselves as you just described.
21         Q.  Is that because the Corps never bothered
22  to pay attention to that fact?
23         MS. ZILIOLI:  Objection; argumentative,
24  assumes facts, misstates evidence.
25         A.  Sir, I'm just relaying what I received

Page 88

1  through the reports from people that -- that were at
2  the project site.
3          Q.  (BY MR. SEBY)  As of September 9th, do you
4  know whether or not the Corps representative you
5  mentioned earlier, at -- present at on some occasions,
6  but I don't know when -- was involved in the State of
7  law -- State of North Dakota law enforcement centers,
8  plural, that existed, to be able to share information
9  between State and local law enforcement with the
10  federal government regarding the individuals in the
11  camps on Corps property?
12         A.  Sir, are you referring to the liaison
13  officers that I mentioned earlier?
14         Q.  Well, that's the only one you told me
15  about, yes.
16         A.  I don't remember -- I don't remember
17  exactly when we put somebody in there full-time.  I
18  can't remember if it was in September or October.  I
19  just remember that we -- we did that after
20  collaborating with General Dohrmann.  When I say "we,"
21  I mean Colonel Henderson, working with -- with the
22  State.  And it was determined that that would be
23  helpful to his staff, to have someone there that he
24  could turn to to liaise with the Army Corps of
25  Engineers, 24 of 7.

Page 89

1          Q.  What was the point of doing that?
2          A.  To just increase the communication between
3  the State and the Corps of Engineers.
4          Q.  Wasn't it also for the Corps to have some
5  means to know what was happening on its property?
6          A.  No.  The -- the purpose of the liaison to
7  the State, if that's the one you're referring to, was
8  to be able to continually report to the State what our
9  information -- what we were -- what we knew and what we
10  were doing on -- on the Lake Oahe Project; so that that
11  information could be disseminated, understood, and
12  considered in decisions that were made by the State.
13         Q.  Well, what information did you report to
14  the State on what you were doing at the Oahe Project?
15  I have no idea what that is, so please tell me.
16         A.  I don't recall, specifically, what -- what
17  that liaison officer reported on a daily basis.
18         Q.  No, no.  What is it that the -- what is it
19  that the Corps tasked that individual to report to the
20  State law enforcement officials, gathered on a daily
21  basis, monitoring a crisis occurring in the State of
22  North Dakota that was emanating from federal property?
23         MS. ZILIOLI:  Objection; misstates
24  evidence, assumes facts not in evidence.
25         Q.  (BY MR. SEBY)  Sir?

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 90

1    A.    That -- that individual is there just to
2  be a liaison for Colonel Henderson, so that we could
3  continue to make that State EOC and General Dohrmann
4  aware of what information we had, what we were seeing,
5  what actions we were taking on -- on the federal
6  property that was at Lake Oahe.
7    Q.    Yeah, but what were those things?  I
8  understand what you're telling me the generally stated
9  reason was.  But then what did you do to implement
10 that?  What did you tell the State officials you, the
11 Corps of Engineers, was doing, affirmatively; or did
12 you just say, "We're doing nothing, and wanted to keep
13 you posted on that"?
14   A.    No.  I don't have specific copies of the
15 reports or any of the communications that occurred
16 inside that EOC.  So I don't know, specifically, what
17 was said to the State on a day-to-day basis.
18   Q.    How about ever?
19   A.    I'm not sure.  You're going to have to be
20 more much specific than that.
21   Q.    No.  I'm asking you.  You're telling me
22 that one of the -- the reason the person was there was
23 to do something.  What did they do, relative to
24 reporting information that the Corps had?  If that was
25 the purpose of putting up that resource there, that

Page 91

1  singular resource there, what did that person -- what
2  was that person told to advise the State of?
3    A.    To keep him in communication with any
4  information that Colonel Henderson had that he thought
5  was -- was helpful to the actions that they were
6  ongoing and that State EOC.
7    Q.    Wasn't that individual just there to take
8  notes about what the State was doing, but had nothing
9  to say as a position of the federal government?
10       MS. ZILIOLI:  Objection; misstates
11 evidence, assumes facts.
12   A.    Sir, I have no knowledge of what that
13 individual did on a day-to-day basis.  I just know what
14 we put him in there for.
15   Q.    (BY MR. SEBY)  Got it.  At this time, the
16 end of September, you told me earlier that you had, by
17 this time, spent a month of weekly meetings, at least,
18 maybe more frequent, participating as the
19 representative of the United States Army in the
20 National Security Council telephone conferences,
21 correct?
22   A.    Sir, if I remember right, I told you it
23 started sometime in this time frame.  I don't know that
24 I'd been -- it had been ongoing for 30 days.  I don't
25 remember how many days or exactly when it started, so I

Page 92

1  can't answer that question.
2    Q.    Had you participated at all by this time?
3    A.    Sir, I don't recall exactly what date it
4  started, so I couldn't tell you if, by this time, I was
5  participating or not.
6    Q.    Well, as of September 29th, there weren't
7  many days left in the month of September.  You told me
8  it started in September.  So, yes or no, you had
9  already participated or not yet participated in the
10 National Security Council dialogue that you told me
11 about?
12       MS. ZILIOLI:  Objection, misstates
13 testimony and argumentative.
14       MR. SEBY:  It's neither.
15   A.    So what I --
16   Q.    (BY MR. SEBY)  Sir -- sir, do you want to
17 change your testimony or -- or speak to my question?
18   A.    If you'll let me, I will speak to your
19 question.  Are you done?
20   Q.    Please.  Go ahead.
21   A.    So what I recall -- are you done?
22   Q.    I'm waiting for you, sir.
23   A.    I was trying to, but you interrupted me
24 again.  What I told you before in my testimony was that
25 sometime in that time frame between September and

Page 93

1  November is when I recall beginning those meetings with
2  NSC.  I don't remember specifically what day -- I don't
3  remember if it started specifically in September or
4  October.  I have no recollection of the exact day.
5    Q.    Okay.  As of this time, though, you were
6  aware that there were people present on Corps property
7  without authorization to be there, is what I understood
8  you to have said.  Is that still correct, or do you
9  want to modify that?
10       MS. ZILIOLI:  Objection, legal
11 conclusion.
12   A.    No, sir.  It's -- it's obvious that I knew
13 that there were people on Corps property at this time.
14   Q.    (BY MR. SEBY)  Yeah.  Okay.  When did the
15 Corps decide to let the protesters on its property
16 continue to remain there?
17       MS. ZILIOLI:  Objection, assumes facts.
18   A.    I'm not sure I understand your question.
19   Q.    (BY MR. SEBY)  Do you recall the time
20 frame when the Corps of Engineers affirmatively decided
21 to allow the protesters to remain on its lands within
22 the Oahe Project in the state of North Dakota?
23       MS. ZILIOLI:  Same objection.
24   A.    I do not, no.
25   Q.    (BY MR. SEBY)  How long were the

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 94

1 protesters on the Corps of Engineers property in the
2 state of North Dakota on the Lake Oahe Project?
3      A.   Sir, my understanding was that the first
4 protesters arrived in the July time frame; at least
5 that's when I was first made aware of it.
6      Q.   Through what time frame were they last
7 there on the property of the Corps of Engineers?
8      A.   As I understood it, it was probably
9 sometime in January of 2017.
10     Q.   Are you sure about that?
11     A.   Not a hundred percent.  I said generally.
12 I think they could have been there a bit longer.  I
13 just know that that's about the time we started the
14 cleanup activities; which took place, I think, in
15 January and February of 2017, as I recall.  I don't
16 know the specifics.  I don't remember the specifics.
17     Q.   Am I correct in understanding from your
18 own communications that you were involved in the
19 cleanup activities, such as the Corps was, through
20 April of 2017?
21     A.   Sir, I wasn't directly involved in the
22 cleanup.  I was aware of the cleanup activities and
23 monitored the cleanup and the restoration of the lands
24 there.  And I don't remember exactly how long that took
25 to complete, but it would have been sometime

Page 95

1 thereabouts.
2      Q.   What is "thereabouts"?  What are you
3 referencing, what date?
4      A.   You said October -- you said April of
5 2017.  That would seem reasonable, given that I believe
6 the cleanup started sometime late January, early
7 February, and took probably a month or so to complete.
8      Q.   Right.
9           MR. SEBY:  Okay.  How about we take
10 another ten-minute break and come back at the top of
11 the hour?
12          THE DEPONENT:  Okay, sir.
13          MR. SEBY:  Thank you.
14          THE DEPONENT:  Thank you.
15          THE VIDEOGRAPHER:  Going off the record.
16 The time is 4:51 p.m. UTC, 10:51 a.m. Mountain.
17          (Recess, 10:51 a.m. to 11:00 a.m. MDT.)
18          THE VIDEOGRAPHER:  We are back on the
19 record.  The time is 5 o'clock p.m. UTC,
20 11 o'clock a.m. Mountain.
21     Q.   (BY MR. SEBY)  General Jackson, we're back
22 from a short break.  And I want to go back to your NSC,
23 National Security Council, calls that you participated
24 in.  And your -- your testimony has evolved to clarify
25 that you thought they started sometime in September.

Page 96

1 But at least as of September 29th, you don't recall
2 whether or not you'd even yet participated in one,
3 correct?
4      A.   Sir, I think when I first mentioned those
5 calls, that I gave you a general time frame.  I don't
6 recall exactly when they started.  I just remember
7 attending them.  And I know that they started somewhere
8 in that time frame, but not specifically.
9      Q.   You recall now that your -- so your -- I
10 just want to understand what you're really saying.  Are
11 you really saying now, after all this discussion, that
12 those calls sometime -- started sometime in the
13 September to November time frame, but you don't know
14 when and how many occurred?
15     A.   Sir, that's what I told you from the very
16 beginning.  So that part of my testimony hasn't changed
17 at all.
18     Q.   All right.
19     A.   You asked me specifically if they had
20 started on a certain date.  But since I told you that I
21 don't know specifically when they started --
22          MR. SEBY:  General Jackson, your audio is
23 not what it was prior to the break.
24          THE DEPONENT:  Okay.  I'm sorry.  Can you
25 hear me now?

Page 97

1          THE REPORTER:  Yes.
2          MR. SEBY:  Yeah, much better.  Thank you.
3          THE DEPONENT:  Okay.  I'm sorry.  Let me
4 answer your question.  I -- I apologize for that.
5      A.   No.  What -- since I gave you a general
6 time frame at the very beginning of my testimony about
7 when those NSC calls occurred, I haven't changed any of
8 my testimony to that end.  You asked me specifically in
9 the last round of questions about a very specific date.
10 And since I told you I don't know what specific dates
11 they started on, I can't confirm or deny that -- that I
12 had one before that date or not.  So I'm trying to be
13 truthful and specific, as much as my memory will allow.
14     Q.   (BY MR. SEBY)  Is your testimony still the
15 same with respect to the frequency of those calls that
16 you told me about?
17     A.   Sir, I told you in my testimony that they
18 were routine.  I didn't recall if they were weekly or
19 every other week or -- I don't recall the exact
20 frequency of when they occurred.  I knew that they were
21 routine for a period of time; meaning, they happened
22 more than one time over a period of time.  But I don't
23 recall, specific, how often they did.
24     Q.   Is it still your testimony that you recall
25 that the Governor of North Dakota participated and

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 98

1  spoke on at least one of those calls?
2       A.   I do recall the Governor -- if my memory
3  serves me correct, I do recall the Governor speaking on
4  one.  And I do recall that General Dohrmann was on a
5  call routinely, as I -- as I remember.
6       **Q.   So your recollection about the Governor**
7  **being on the call and you hearing him, what do you**
8  **recall the Governor said?**
9       A.   I don't recall the specifics of what he
10  said.  I know he was updating, as we all were, his --
11  his view of what was going on on the ground.  And
12  that's all that I remember.
13       **Q.   And what was his view of what was going on**
14  **on the ground?**
15       A.   Sir, I don't remember the specifics, but I
16  know it pertained to the -- the growing numbers of
17  people and his concerns on -- on what the State was
18  going to -- how the State was going to manage that and
19  wanted to continue to cooperate with the federal
20  government in trying to come to a joint solution that
21  would be helpful.
22       **Q.   So what did the federal government do to**
23  **cooperate with the Governor of the State of North**
24  **Dakota with regard to the growing number of people on**
25  **the ground?  And I'm using your words to ask you that**

Page 99

1  question.
2       A.   I don't know what other agencies did, sir.
3  I can only tell you what the Army Corps of Engineers
4  did.
5       **Q.   Please.**
6       A.   The Army Corps of Engineers, on the
7  ground, just continued to collaborate with the State of
8  North Dakota.  They continued to -- we continued to
9  collaborate with the tribal leaders to try to find a
10  peaceful resolution to the growing number of people who
11  were at that site at the time.
12       **Q.   At that site includes the Corps of**
13  **Engineers' own property, doesn't it?**
14       A.   It does; yes, sir.
15       **Q.   What did you do -- what contributions do**
16  **you recall you directing or being directed to deploy,**
17  **on behalf of the Army Corps of Engineers, to contribute**
18  **(sic) to the problem that we are talking about today?**
19       A.   Can you -- can you rephrase that?  I don't
20  understand what you mean "contribute to the problem."
21       **Q.   No, I didn't say that.  I said, what did**
22  **you do to contribute to addressing the problem that**
23  **we're discussing today?**
24       A.   We -- John Henderson and the staff at Lake
25  Oahe were there and engaging regularly with the --

Page 100

1  again, with the Standing Rock Sioux Tribe and other
2  tribal leaders.  The commanding general -- and then,
3  also, with the leadership of North Dakota.  The
4  Commanding General, General Spellmon, made several
5  visits to North Dakota to engage with the leadership
6  there, as you indicated in one of the previous exhibits
7  that you shared.  And I know that Ms. Darcy, Assistant
8  Secretary, when the listening sessions began,
9  participated in several of those personally --
10       **Q.   What listening discussions?**
11       A.   -- to demonstrate her commitment.  The
12  listening sessions that were indicated in that
13  9 September memo that you shared with me.
14       **Q.   Are those listening sessions regarding the**
15  **DAPL protest or something different?**
16       A.   They were listening sessions to talk with
17  various tribal nations, to include the Sioux Nation, on
18  the environmental permitting process that the federal
19  government used, in general.
20       **Q.   It's my impression from reading a lot of**
21  **your correspondence and your colleagues' correspondence**
22  **that there was at least a venire attempt to try and**
23  **distinguish those listening sessions from what was**
24  **going on with respect to the pending easement**
25  **consideration at the Dakota Access Pipeline.  Are you**

Page 101

1  telling me that one was part of the other?
2       A.   I'm not sure I understand what you mean by
3  "venire."
4       **Q.   The Corps and the Government took the**
5  **position, in my opinion, and I'm asking you if you**
6  **agree with me, that those were two separate**
7  **circumstances.  There was the DAPL protest issue**
8  **regarding and concerning the Corps' ongoing -- and the**
9  **Secretary -- Assistant Secretary's ongoing**
10  **consideration of the easement.  And then there**
11  **separately was the listening sessions regarding the**
12  **federal government's procedure nationally, at large,**
13  **with regard to Native American tribes.  Are you telling**
14  **me the first is part of the second?**
15       A.   I think -- I think one is related to the
16  other.  And this is how they're related.  One is, there
17  was still a decision that had yet to be made on the
18  granting of the easement for the Dakota Access
19  Pipeline.  That was the root cause of the protests to
20  begin with.  The purpose of the listening sessions was
21  to have that engagement with -- with the Native
22  American population to get their input to make sure
23  that the process that we use to make those
24  determinations included their views and their input.
25            And so Secretary Darcy -- and as I

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 102

1  understand, the Secretary of the Interior and the DOJ,
2  as laid out and directed by that 9 September memo --
3  the spirit and intent of that was to collect that
4  information and put that into our decision-making
5  process before a final determination was going to be
6  made on the environmental permit and the easement
7  that -- that was affecting the Dakota Access Pipeline.
8  So they weren't very -- they were related.
9         And -- and we had to do those listening
10  sessions, as I recall, before a permit decision would
11  be made by the Secretary.  That was her intent, as I
12  understand it and as I recall.  So they are -- they are
13  related in that regard.
14         Q.   So the pending DAPL issue was dependent
15  upon the outcome of the listening sessions and whatever
16  happened as a result, is what I understand you to be
17  saying; is that correct?
18         A.   Sir, what I'm saying is the -- the
19  listening sessions would provide input that was going
20  to be considered to determine if the process that we
21  had used to make the recommendations to Ms. Darcy, who
22  is the final decision-maker on the easement, were
23  sufficient enough to give her a level of comfort that
24  the decision that she made was -- was the right
25  decision.  And so that's why -- I believe that's what I

Page 103

1  said anyway, so . . .
2         Q.   Okay.  So you participated on behalf of
3  the Corps and the Department of the Army in those
4  listening sessions.  Maybe others joined you, but you
5  participated in those, didn't you?
6         A.   I did not, no.  Ms. Darcy participated in
7  them, and John Henderson participated in many of those
8  that were at the Sioux Tribe locations that he worked
9  with on a regular basis.  I don't recall who from the
10  Corps of Engineers attended the other ones.  It was
11  dependent on which region of the country they were
12  located in, and there were several.
13         Q.   Yeah.  So was it Ms. Darcy's decision
14  to -- for the pending DAPL easement evaluation and
15  consideration to be part of the process in the
16  conclusion of the listening sessions?
17         A.   That was an outcome, because that was
18  additional information that she wanted to get before
19  she felt like she had sufficient information on hand to
20  make the decision that she held at her authority.
21         Q.   I asked the question, was it her decision
22  for one to be part of the other?  And so what is your
23  answer to the question?
24         A.   Well, the answer to the question is, the
25  three-party letter that you showed me on the 9th of

Page 104

1  September, which was signed by the DOJ, the DOI, and --
2  you didn't show me who it was signed by, but I know it
3  was signed by Ms. Darcy --
4         Q.   It's not signed.
5         A.   -- because the subsequent memo --
6         Q.   It's not signed.
7         A.   But the -- that letter that you're talking
8  about directed the -- I lost my train of thought now.
9  I apologize.  That letter directed us to do the
10  listening sessions.  So those had to be done before a
11  permit decision or an easement decision could be made.
12  And I believe that was in that language that you showed
13  me, unless I'm mistaken.
14         MR. SEBY:  Okay.  If we could go to
15  Exhibit, please, 705.
16         (Deposition Exhibit 705, remotely
17  introduced and provided electronically to the court
18  reporter.)
19         Q.   (BY MR. SEBY)  If you would please,
20  General Jackson, review this chain of emails.  It's a
21  two-part email.  The first part is the part that's most
22  of this exhibit.  And it's an email from you to the
23  Chief of Engineers, dated October 18, now, 2016.  And
24  it says the subject is "Dakota Access Pipeline Updated
25  Talking Points (VCSA) Office Call."  What does that

Page 105

1  mean, VCSA?
2         A.   So that's the Vice Chief of Staff of the
3  Army.  It looks like it was John Allyn at the time.
4         Q.   Okay.  And he is the Vice Chief to the
5  Chief, and that would be General Milley, correct?
6         A.   Yes, sir.
7         Q.   Who is a member of the Joint Chiefs of
8  Staff of the United States, correct?
9         A.   Yes, sir.  As the Chief of Staff of the
10  Army, he's one of the -- one of the members of the
11  Joint Chiefs of Staff.  General Milley, that had been.
12         Q.   Yeah.  So you're developing talking points
13  for a VCSA office call.  What does that mean?
14         A.   Normally what that means is the Vice Chief
15  of Staff of the Army has asked General Semonite to come
16  give him an update on what's going on on something.
17  And so what we -- the terminology for talking points
18  are just, you know, bullets that will help a senior
19  leader be able to brief another senior leader in simple
20  language that's easy to follow and understand.
21         Q.   And so were you --
22         A.   That's what -- that's what a talking point
23  is.
24         Q.   Yeah.  Were you writing these for General
25  Semonite's use with Vice Chief of Staff of the United

Page 106

1 States Army, General Allyn?
2      A.   It appears that I was, based on this
3 email; yes, sir.
4      Q.   Okay.  And when you -- did you do this for
5 the first time here, or was this something that was
6 part of your normal duties on DAPL or any other topic
7 General Semonite was asking you to do it, so he could
8 make representations and brief the Vice Chief of Staff
9 of the United States Army?
10      A.   Sir, it's -- it's routine for -- our
11 senior leaders have many, many responsibilities.  And
12 so when there's a need for one of our senior leaders to
13 be made aware of something, or if they have a specific
14 question on something, then we prepare -- "we" meaning
15 the staff, which is what I was -- prepare some
16 information that would allow us to, number one, get our
17 boss up to speed with what he needed to know about the
18 situation, so that he can furthermore articulate that
19 to his boss in a way that the boss could understand it
20 strategically, but -- but have enough of a detail so
21 that he would have an understanding of whatever it was,
22 the topic.  So this was a standard -- this is a
23 standard thing in the military.
24      Q.   Was it standard for you to do it, is what
25 my question was a couple minutes ago?

Page 107

1      A.   If he asked me to, I did; yes, sir.
2      Q.   And did that happen, is the question?
3      A.   Did that happen -- did he ask for specific
4 talking points for this meeting?  I don't recall if he
5 asked me for them, but he may have; or I would have
6 just volunteered them, if I knew he had an office call
7 with the Vice.  But it was standard practice that
8 either General Semonite or one of his front office
9 staff would ask for some talking points on a topic that
10 that the Chief needed to know about, and that's what we
11 would do.  So I would do that; yes, sir.
12      Q.   Okay.  So if we just -- I want you to read
13 your response to the Chief, because it says right there
14 in the first sentence, "You asked" -- you, Chief --
15 "asked for some updated talking points in advance of
16 your scheduled meeting with the Vice Chief of Staff of
17 the Army this week.  I" -- you, meaning you, General
18 Jackson -- "tried to format this in . . . a way to make
19 it easier to walk General Allyn through the details in
20 a logical manner."
21           And then you copied David Cooper and
22 General Spellmon.  Who is David Cooper?
23      A.   David Cooper is the Chief Counsel for the
24 Army Corps of Engineers.
25      Q.   Okay.  So you copied these gentlemen and

Page 108

1 invited them to elaborate if you missed anything,
2 right?
3      A.   I can't read.  Can you down -- can you
4 scroll -- can you drop the blow-up so I can read the --
5 I'd like to read the document, if you don't mind.
6      Q.   Yeah.  Let's go to -- let's go to -- yeah.
7 Before you do that, I want to ask you another question,
8 though.  It's not related to the document itself, but
9 to the practice and what you just said about you would,
10 when asked, develop draft talking points for your boss.
11 And I believe that you said that the -- the preparation
12 of the information was to get your boss, the Chief of
13 Engineers, General Semonite, up to speed so that he
14 could articulate and accurately brief his boss, the
15 Vice Chief of Staff of the United States Army.  Do I
16 have that right?
17      A.   I believe; yes, sir.
18      Q.   And that's so he could understand the
19 detail and the nature of the topic being presented,
20 correct?
21      A.   Yes, sir.
22      Q.   So do you think that in your doing that,
23 it was incumbent on you to be, a, truthful; b,
24 accurate; and, c, complete?
25      A.   Sir, it was incumbent on me to be always

Page 109

1 truthful, which I always am.  It was incumbent upon me
2 to be accurate, based on the facts as I knew them at
3 the time.  And it was incumbent on me to be complete as
4 it pertains to the amount of information that I had
5 available to know at the time that I drafted up the
6 talking points.
7      Q.   Okay.  So as of October 18th, 2016, given
8 everything that's happened since the time that people
9 showed up and increasingly gathered on Corps property
10 and were violent, in the Corps' own estimation, and
11 trespassing on Corps property, causing a lot of
12 problems, that the State of North Dakota had to get an
13 emergency declaration to release funds for law
14 enforcement to address, as best they could.  Why would
15 you not include in talking points to your boss, for his
16 boss to have, a complete -- accurate and complete, and
17 truthful by the way, report -- why wouldn't you include
18 any reference to the thousands of people present on
19 Corps property behaving poorly, as of this time, in the
20 protest that had now about been going on for several
21 months?
22           MS. ZILIOLI:  Objection; assumes facts,
23 misstates evidence.
24      Q.   (BY MR. SEBY)  Would you please now read
25 your email and tell me where you bothered to include

Page 110

1 any reference to the protesters, sir?

2          MS. ZILIOLI:  Same objections and

3 argumentative.

4          MR. SEBY:  I'm just asking him to read the

5 email.

6     A.   I -- I understand what you said.  Give me

7 a chance to read it.

8          MS. ZILIOLI:  Counsel, you're not

9 letting -- you asked a question, and then you

10 interrupted, yourself, before he had a chance to

11 answer.  So please let him answer.

12          MR. SEBY:  I asked him if he'd please read

13 his email, Counsel.

14          MS. ZILIOLI:  The question before that was

15 a question.  I objected, and you didn't let him answer.

16 You moved on.

17          MR. SEBY:  I don't have to answer your

18 objections, ma'am.

19          MS. ZILIOLI:  You don't.  I'm just putting

20 it on the record.

21     A.   (Deponent examined document.)

22          Sir, can you -- can you scroll down to the

23 beginning of where it says "Litigation"?  Thank you.

24 That's good.

25          (Deponent examined document.)

Page 111

1          Sir, does this -- does this email contain

2 the request for information that was -- that prompted

3 me to make this response to General Semonite, if you

4 scroll all the way down, or does it not have that

5 aspect of it?

6     Q.   (BY MR. SEBY)  You'd have to direct that

7 question to your counsel, because this is what they

8 gave us.

9     A.   Okay.  No worries.  No worries.  So back

10 to your question of why I would not mention those

11 things.  First of all, I don't know what --

12 specifically what information General Semonite asked

13 for me to provide.  A lot of this email looks to be

14 technical background information that helped the Vice

15 Chief of Staff of the Army understand why the Corps was

16 involved in something of this type at all.

17          It's not uncommon for senior leaders in

18 the uniformed services to not understand the very

19 unique nature of the Army's Civil Works mission, which

20 is very much off the mainstream for what would be on

21 the minds of the -- the Army senior leadership;

22 specifically the uniformed members who are focused on

23 their Defend the Nation mission, specifically.

24          In this particular email, I talk about the

25 actions that John Henderson is taking.  I allude to

Page 112

1 some of the dialogue that he's had with the -- with the

2 leadership of the Standing Rock Sioux and other members

3 of federally recognized tribal nations who are

4 participating in this to find a peaceful way to address

5 their concerns; which we talk about in here with the

6 listening sessions.

7          And also, it was determined -- and this

8 was done in full coordination with the State, as I

9 understand it, between John and his collaboration with

10 the State -- is the best option -- and it's a very,

11 very complicated option -- was for the leadership of

12 the tribal nations to make the decision to do a

13 peaceful departure from the location.  And that's what

14 we were attempting to do.

15          So these are the facts that I was putting

16 down.  And this particular note, it covers mostly

17 technical information, technical background on Corps

18 authorities, and then, you know, some of the very

19 specific information that -- that was necessary for

20 General Semonite to articulate to General Allyn to let

21 him know what actions we were taking to try and get to

22 a peaceful resolution with the situation on the ground.

23     Q.   Thank you.  So, General Jackson, can

24 you -- since this is your email, would you explain what

25 you mean by, "Colonel Henderson continues to work with

Page 113

1 the leadership of the Standing Rock Sioux Tribe to

2 execute a peaceful, tribal led, move onto Federal lands

3 (under provisions of a heavily caveated Special Use

4 Permit) and/or back to the reservation which is in

5 close proximity"?  What -- what is that all about?

6     A.   So what Colonel Henderson was doing was he

7 recognized that the leaders -- the whole spiritual

8 leadership of this protest was all surrounding the

9 Standing Rock Sioux Tribe and the leadership there.

10 And Chairman Archambault was certainly seen, as we

11 understood it at the time, as the leader of this

12 protest.  And so we worked with him and had been

13 working with him.  And I say "we."  I really mean John

14 Henderson had worked very closely with Archambault and

15 also with the leadership of the State of North Dakota,

16 as I understand it, to try to figure out what the best

17 way was for all of this to deescalate.

18          Because what was happening at the time --

19 which was very, very complex -- was, what started out

20 as a -- as a peaceful protest of Native American tribal

21 personnel, became more complicated when others from

22 outside of the tribal nations arrived to join the

23 protest.  And so what John was attempting to do with

24 this, and working with the State and working with the

25 tribal leaders, was to separate the tribal -- the

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 114

1 peaceful tribal-led protests from those who were not.
2 And so that's what he was attempting to do with this.
3         And so we were looking at a number of
4 different things that we could do.  We did this in full
5 collaboration with the State of North Dakota to try to
6 find a way to deescalate the situation in a way that
7 was in the best interest of all parties.  And so that's
8 what this refers to.

9     Q.   Yeah.  And so the Corps was investing in
10 Colonel Henderson trying to get the -- the Standing
11 Rock to be a point of leadership, using your word, to
12 execute a plan, right?

13     A.   We were trying to develop a plan, I
14 believe, at this time.  I don't know that there had
15 been a plan established; but I don't remember exactly,
16 based on the timing of this.

17     Q.   And the date of your email reporting this
18 plan is October 18, 2016, right?

19     A.   That's what it says on this document; yes,
20 sir.

21     Q.   Why would you think it was appropriate
22 and/or prudent to invest in the leadership of the
23 Standing Rock Sioux Tribe to deal with a problem on
24 your property?

25     A.   In the Corps of Engineers, we value

Page 115

1 greatly our partnership and engagement with our Native
2 American partners.  We treat them as the federal
3 government does, as -- as their only federal entity.
4 So, in essence, they are a nation upon themselves.  So
5 it was in everyone's best interest -- and this was
6 discussed multiple times with the State -- on how best
7 to deescalate the situation; and that was, to work with
8 the leaders of the tribes and figure out a way to come
9 to terms with them so that this would be ended in a
10 peaceful way.  And that's -- that's what we did.

11     Q.   Okay.  And so you said -- used the word
12 "partnership," right?

13     A.   We worked together or tried to develop --
14 it was -- as I recall, Colonel Henderson worked very
15 hard during this time in a very, very difficult
16 situation to maintain good communication with the
17 tribal leaders; because he and all parties agreed --
18 and this was federal and State, as I remember -- agreed
19 that, you know, the tribal leaders were the keys to
20 ending the protest and -- and getting things back to
21 normal.  So there was great effort put in by John
22 Henderson to lead that.

23         He had a great relationship with the
24 leadership of the Standing Rock Sioux Tribe and with
25 others.  Even though he was under great personal duress

Page 116

1 as a result of his leadership role, he persevered
2 through all that and helped to develop, ultimately,
3 a -- a way out of the situation by executing the plan
4 that I recall all parties saying was the best option
5 available, given this very complicated situation that
6 everybody was a part of at that time.

7     Q.   I just asked the question of whether you
8 want to -- you want to stand on your use of the term
9 "partnership" with the Standing Rock Sioux Tribe as the
10 reason for October 18th, investing in a strategy of
11 having them take leadership to execute a peaceful
12 tribal-led move onto federal lands under a different
13 new special use permit with lots of caveats on it.  And
14 what does that mean, lots of caveats, heavily caveated?

15     A.   That means there were a lot of very unique
16 aspects of this situation that we were trying to
17 address as part of the special use permit.  So we
18 worked very carefully with our legal teams -- John did,
19 John Henderson did -- to try and craft something that
20 was executable that would allow the Standing Rock Sioux
21 to execute their First Amendment rights in a peaceful
22 manner and -- but they had to comply with certain
23 provisions that -- that were required of these type of
24 permits.  And that's what I believe you're referring
25 to.

Page 117

1     Q.   I'm asking you what you're referring to,
2 sir.  And so what -- now that we're -- you've -- you've
3 said it in response to the question, what are the
4 certain provisions required of a special use permit
5 that you're referring to?  I'm asking you, what do you
6 mean by calling it a heavy -- heavily caveated special
7 use permit?  What would those terms and conditions
8 involve?

9     A.   Sir, I don't recall exactly what those
10 terms and conditions were.  It's a legal document
11 that -- that I refer to our counsel to best answer for
12 you.

13     Q.   I'm -- I'm not asking you what your
14 counsel thinks or says.  I'm asking you what you meant
15 when you wrote the email that uses the phrase "under
16 provisions of a heavily caveated special use permit"?
17 What are you talking about?

18     A.   It's what I just told you.  It was a -- a
19 permit that had -- it was a permit that took into
20 consideration the very unique circumstances that were
21 being faced at the time the permit was requested and
22 being considered.

23     Q.   You know what I don't understand, General,
24 is that as of October 18th, 2016, a month had gone by
25 when you, the Corps, offered an unsigned special use

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 118

1  permit, requested a month before that, two -- two
2  months prior to this email, asking for a special use
3  permit.  The request was made by the Chairman of the
4  Standing Rock Sioux Tribe.  They failed to meet the
5  conditions -- the terms and conditions, the caveats, if
6  you will, of that permit.  Why did you think it was
7  reasonable or prudent to go to bat and try the same
8  thing that didn't work out the first time?
9         MS. ZILIOLI:  Objection, assumes facts.
10        A.  Well, we were trying to find the best
11  possible way to end this situation.  And there were --
12  there were no good options.  And so we had to rely on
13  the relationships that we had established, and we had
14  to work closely with the State to try to develop a good
15  plan that would be in the best interest of all parties.
16  And that's -- that's what we were trying to do.  So we
17  continued to work this, even though it was very, very
18  difficult, because we saw that as the best way to -- to
19  resolve the situation.
20        Q.  (BY MR. SEBY)  So you used the word
21  earlier, "partnership" with the Standing Rock Sioux
22  Tribe and that's why you thought to -- to do this.  Do
23  you really think that word fits, under the
24  circumstances at the time, October 18, 2016?  The
25  Standing Rock Sioux Tribe had repeatedly been suing the

Page 119

1  Corps and was also party to violence.  Members of the
2  Tribe, not all of them, some of them were being
3  violent, and they were also trespassers on your
4  property.  You viewed that as -- as qualifying to be a
5  partner?
6         MS. ZILIOLI:  Objection; assumes facts,
7  misstates evidence, legal conclusion.
8         A.  Yes, sir.  I mean, you know, when you are --
9  when you are in the business of environmental
10  permitting in the Army Corps of Engineers, there's
11  always two sides to -- to every issue.  And we have, in
12  the Army Corps of Engineers, only are able to do our
13  mission through partnering with those that we do
14  business with and that we do business for.  So it's not
15  uncommon for a partner to not agree with our position
16  on an issue in this environmental space or in other
17  spaces.  But that doesn't necessarily mean that we
18  don't retain our partnership.
19        Without -- and maybe "partnership" is the
20  wrong word.  I don't know how you're going to use it.
21  But for me, partnering is about building relationships
22  of trust and confidence and trying to work together to
23  resolve issues.  And that's what we were trying to do.
24  And that's what John Henderson, I thought, did very
25  effectively.  And he did this, again, through a lot of

Page 120

1  personal effort with the leadership of the Standing
2  Rock Sioux Tribe and others, other legitimate leaders,
3  and with the -- the State of North Dakota.
4         So we -- he did this in -- when I say
5  "partnership," he did it in partnership, in full
6  collaboration with the resources that he had available
7  to the best of his ability.  And I thought he did a
8  magnificent job overall, for the record.
9         Q.  (BY MR. SEBY)  So -- so you said the
10  reason you invested -- the Corps invested in this
11  partnership, as of October 18th, as the basis for the
12  plan that the Corps was pursuing.  All the while,
13  thousands of protesters without any authorization to be
14  on Corps property, including elements of the Standing
15  Rock Sioux Tribe and the Corps calling it the Standing
16  Rock Sioux Tribe protest, notwithstanding all of that,
17  you decided to roll the dice and give it a try, right?
18        MS. ZILIOLI:  Objection; assumes facts,
19  misstates evidence, legal conclusion.
20        A.  No.  Rolling the dice is your term, sir.
21        Q.  (BY MR. SEBY)  It is.  It is.
22        A.  What I said was -- no.  Let me finish,
23  please.  Don't interrupt.  What I would -- what I would
24  respond to that is that rolling the dice is your --
25  what you said.  That's not what I said.

Page 121

1         What I said was leveraging a partnership
2  that has existed for many years and will exist for many
3  years to come, in order to try find the most
4  reasonable solution to resolving the problem.  And
5  that's what -- that's what we did.  It was not a
6  rolling of the dice.  It was relying on a long-standing
7  relationship that was the only way out of a very, very
8  complicated situation, in our assessment, at the time.
9  And that's the reason that we went that route.
10        Q.  And -- and to do that, to go that route,
11  you assumed that the Standing Rock Sioux Tribe had the
12  capacity to be that partner, right?
13        A.  Sir, at the time, there weren't a lot of
14  options.  And so the best option was, legitimately, to
15  get to a point that the Standing Rock Sioux realized
16  that the extent of their protests had achieved what
17  they wanted to achieve.  And that's what we were
18  attempting to address with the listening sessions that
19  took place.
20        And then once they were able to get that
21  point across, they would peacefully leave and bring no
22  more risk to their people in being a part of this --
23  this activity.  And so we were trying to recognize the
24  legitimacy of the Standing Rock Sioux and what they
25  were attempting to do, exercising their First Amendment

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 122

1 rights in good faith, and work through that leadership;
2 because we saw that, again, as the best way to resolve
3 what was a very, very complicated situation.
4        Q.   So do you think that as of October 18,
5 2016, they had the capacity to do what you wanted them
6 to do?
7        A.   Yes, sir, I think they did.
8        Q.   Why do you say that?
9        A.   That's my assessment.
10       Q.   And you put a lot of faith in Colonel
11 Henderson, didn't you?
12       A.   I absolutely did.
13            MR. SEBY:  Okay.  Let's go to Exhibit 3 --
14 oh, pardon me -- yeah, 318, if you would, Ms. Hymel.
15       Q.   (BY MR. SEBY)  Okay.  I'd like you to read
16 this entire email, which is a -- is actually -- it's a
17 bunch of addressees at the bottom, but the -- the text
18 is short; because I want you to be a hundred percent
19 clear on what -- what this is, so we can talk about it.
20       A.   Okay.
21       Q.   If you'd start at the bottom there.  So it
22 starts off with an email from Mr. Joel Rostberg --
23 Rostberg on September 23, 2016.  And what's a
24 DAPL OPORD-33?
25       A.   Could you go -- could you scroll back

Page 123

1 down?  You're going too fast.  I'm sorry.
2        Q.   Yeah.  That's all Mr. Rostberg is doing,
3 is attaching an OPORD for the operational period
4 September 23 through September 24, 2016.  Who -- who
5 writes these OPORDS?  What are they?  Are they a Corps
6 of Engineers product?
7        A.   Is Mr. Rostberg part of the Army Corps?  I
8 can't tell.
9        Q.   No.
10            MR. SEBY:  We'll go all the way to the
11 bottom, if we could, Rachel.  There we go.
12       Q.   (BY MR. SEBY)  Mr. Ross -- Rostberg --
13       A.   He's the Morton County -- he's the Morton
14 County emergency management guy for North Dakota.
15       Q.   Yeah, I get it.
16       A.   So an OPORD would be just an
17 operational -- I mean, they -- it's not uncommon, sir,
18 in -- in emergency operations command and control
19 centers -- like it looks like the Morton County EOC
20 generated this -- to generate something called an
21 OPORD, which stands for Operations Order; which
22 basically provides, generally, situational update and
23 then any tasks that have been assigned to different
24 people inside that organization and any coordinating
25 instructions that need to be made so everybody is on

Page 124

1 the same sheet of music.
2        Q.   Okay.  So here you have -- thank you for
3 explanation; because I take it, then, you'll agree with
4 me.  Here is the Morton County Emergency -- Assistant
5 Emergency Manager sending this OPORD.  And look -- look
6 at that distribution group.  It's impressive.  It's
7 impressive, because it is a large representation of
8 North Dakota local and state officials.  You can see
9 that from the domain names on their email addresses.
10 And then you'll see that there are repeated individuals
11 from the United States Department of Justice, the
12 United States Federal Bureau of Investigation, the
13 Bureau of Indian Affairs, and Corps of Engineers, and
14 the United States Marshal, National Park Service,
15 multiple North Dakota counties; just a lot of people
16 being given this information.
17            And there's no attachment to the
18 Government's -- the United States' production, so I
19 can't tell you what the actual document says.  But if
20 we go up now in the list of the distribution of this
21 email, because one of the individuals -- one of the
22 several individuals copied on here are Corps of
23 Engineers people, which included a gentleman by the
24 name of Todd Lindquist from the Omaha District of the
25 Corps of Engineers; forwarded it on to another

Page 125

1 gentleman in the Corps of Engineers named Todd
2 Lindquist.
3            And Mr. Lindquist is also with the Omaha
4 District.  And he says, "Keith, I haven't gotten a
5 chance to read the attached OPORD regarding DAPL.  I'm
6 currently busy reviewing the 776 page ECP I'm supposed
7 to sign today for the land transfer to Three Affiliated
8 Tribes."
9            So Mr. Fink sends it really quickly, that
10 same day of September 23, up to Colonel Henderson, the
11 District Commander, his boss.  And he says, "Sir, The
12 attached is a law enforcement update on the DAPL
13 Protest Camps.  Keith."
14            And one of the people that is copied,
15 along with the District Commander, John Henderson, is
16 his Deputy District Commander, James Startzell.  And
17 Startzell replies to this OPORD being provided to them,
18 he and the District Commander, and he says, "Thanks
19 Keith."  He says this on Sunday, September 25, 2016, a
20 month before the last exhibit we looked at where you --
21 and again, I'll use my phrase, not yours -- roll the
22 dice with the Standing Rock Sioux Tribe as the -- as
23 the partner to lead the Corps' plan with everything
24 that was going on on the Corps property.
25            He says, "Thanks Keith.  I'll include some

Page 126

1  of the highlights in the DAPL update on Monday.  All of
2  this information basically confirms the Commander's
3  assessment that the camps are growing out of the
4  Standing Rock Sioux Tribe's control, and the Chairman
5  is probably going to try to use the SUP as a way to
6  regain control of what he sees as a legitimate" -- "as
7  legitimate protesters."
8           So my question, again, now that we've
9  looked at both emails, the one a month later from here
10  where you're banking on the Tribe being your partner in
11  dealing with this massive riot on your property, a
12  month prior, the District Commander and the Deputy
13  District Commander had made a determination, at least
14  as of a month prior, maybe a lot earlier, that the
15  Standing Rock Tribe had no control; lost control, lost.
16  I don't think they relinquished it.  It was taken from
17  them.  Lost control of the camps.
18           So a month later, you -- you authorized
19  and briefed a strategy to your boss so he could brief
20  the Vice Chairman of the Chief of Staff on a plan
21  that -- based upon a wrong assumption.  How does that
22  make any sense?  How is that reasonable, to use your
23  word?
24           MS. ZILIOLI:  Objection; assumes facts,
25  misstates evidence.

Page 127

1           A.   So if I can point you to the exact wording
2  on this, if you could blow up that note from Major
3  Startzell.  So, first of all, with regard to this
4  document, I don't -- I don't know what verbiage was in
5  there that they might refer to, so I can't speculate
6  on -- on that.  And I don't know, certainly, who all
7  those people were.  I think this -- this overall
8  communication that you reference is -- is a good
9  indication of the level of effort that was ongoing
10  across the State interagency to work together to
11  understand the situation on the ground and to try and
12  figure out the best way forward on it.
13           And as you look at this -- and it says,
14  right, that the terms are growing; not -- you used the
15  term "have lost control."  That's not what this says,
16  and that's not what I said.  But they are growing, not
17  yet to have gotten out of their control.  But there's
18  an instrument, this special use permit, that was also
19  referred to in my email, which we were looking at as a
20  tool to help the Chairman of the Standing Rock Sioux be
21  successful in achieving what it was that he was trying
22  to accomplish; which was to separate what we all
23  considered to be the legitimate protesters from those
24  who were not, and then allow him to use his leadership
25  to take this situation to a deescalated and safe

Page 128

1  conclusion.
2           And so to me, what you've shown me in
3  these two emails, they're complimentary and not at
4  odds, as you suggest.  But this just is, again, a
5  confirmation of -- of an ever-evolving situation, and
6  confirmation of the communication between all parties,
7  and the efforts that we went through to do so, and the
8  confirmation of why we were trying to do what we were
9  trying to do, working with the leadership of North
10  Dakota and with the leadership of the tribes.
11           Q.   (BY MR. SEBY)  Okay.  I'll let the
12  language speak for itself and the time and distance and
13  the context of all of this speak for itself, sir.  But
14  I do want to ask you one question.  This email from
15  Deputy District Commander Startzell is September 25th.
16  Do you agree with me that was approximately one week
17  after the Corps had offered a special use permit, yet
18  to be signed by Chairman Archambault, and yet to be
19  complied with in order for it to be a real special use
20  permit in the sense of being in effect?  Because I
21  don't think you would even tell me that a special use
22  permit is valid unsigned and uncomplied with, would
23  you?
24           A.   That's correct.
25           Q.   All right.  Did you ever see the Tribe --

Page 129

1  Standing Rock Sioux Tribe meet the conditions of the
2  permit that was tendered to them a week prior to this
3  date?
4           MS. ZILIOLI:  Objection, legal
5  conclusion.
6           A.   I don't believe they were ever able to
7  meet all the provisions at the -- at the end of the
8  day.  I know that they were trying to do that, and we
9  were working with them to try to help them do that,
10  because of the resources that they had at hand, but I
11  don't -- to answer your question, no.
12           Q.   (BY MR. SEBY)  Is it your practice in the
13  Corps, while you were there in any of your capacity --
14  you were a district commander, weren't you?
15           A.   Yes, sir, I was.
16           Q.   More than once?
17           A.   No, sir.  I was a district commander one
18  time.
19           Q.   And -- and remind me how long you were in
20  that capacity, sir?
21           A.   The district commander, for three years.
22           Q.   While you were a district commander, were
23  you educated or formally trained or did you take it
24  upon yourself to learn, either way, the requirements of
25  the Corps of Engineers Title 36 regulations?

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 130

1    A.   Sir, I became familiar with them, as do
2 all district commanders.  But we have very highly
3 trained staff in our legal office that -- that know
4 every word in all these regulations.  And we work with
5 them to help make the right decisions on how some of
6 these documents -- how some of these things go forward.
7    Q.   So that's the normal practice, right?
8    A.   Well, I don't know that in the Corps of
9 Engineers there's ever a day where there's something
10 absolutely normal.
11    Q.   I'm just trying to understand what you're
12 talking about when you say you have special knowledge,
13 at least being a district commander.  And you said you
14 were familiar with special use permits, but you have
15 highly trained staff and you rely on them to make these
16 decisions in processing special use permits.  Yes or
17 no?  Am I remembering what you said; if not, correct
18 it.
19    A.   I said the district commanders, including
20 myself, get familiar -- and I've certainly read the
21 regulations.  But those that -- that know them best and
22 are experts in those are our legal staff.  And we rely
23 on them to interpret the language in the regulations as
24 different issues arise with the missions that we face.
25    Q.   And would that include the -- whether and

Page 131

1 how to develop a draft special use permit for an
2 applicant, based upon their request?
3    A.   Yes, sir.
4    Q.   Okay.  Are you aware that the Standing
5 Rock Sioux Tribe submitted a permit application on or
6 about August 24, 2016?
7    A.   Sir, I'm aware that they submitted the
8 request, but I don't remember what date.  So I can't
9 verify that date, but I do know that they submitted
10 one, probably around that time.
11    Q.   Are you aware, sir, that the Corps of
12 Engineers, including senior Corps leadership, reported
13 that the Standing Rock Sioux Tribe submitted an amended
14 permit application that did not match facts on the
15 ground?
16         MS. ZILIOLI:  Objection, assumes facts.
17    A.   No, sir, I'm not aware of that.
18    Q.   (BY MR. SEBY)  Are you aware of whether or
19 not the decision to develop and offer a special use
20 permit, unsigned, to the Standing Rock Sioux Tribe
21 Chairman -- that the development of that draft permit
22 was overseen by individuals other than the district
23 commander?
24         MS. ZILIOLI:  Same objection.
25    A.   When you say "overseen," are you talking

Page 132

1 about his staff that was developing the special use
2 permit, or somebody outside of the Army Corps of
3 Engineers?
4    Q.   (BY MR. SEBY)  I'm asking outside of the
5 district commander and the Omaha District, which I
6 believe you told me or suggested was the typical manner
7 of addressing special use permits.
8    A.   Yes, sir.  I can't confirm that that did
9 not occur.  Sometimes on very complicated issues, like
10 this one was, it's very likely that other legal teams
11 outside of the District Counsel in Omaha may have
12 looked at this; but I can't confirm if that happened
13 and, if so, by whom.
14    Q.   How about --
15    A.   But it would not be uncommon -- it would
16 not be uncommon to -- to do that for situations like
17 this.
18    Q.   It's not uncommon?
19    A.   No.
20    Q.   So what other instances, as either
21 district commander or as the chief deputy to the chief
22 of engineers, can you tell me where that actually
23 happened, other than it being processed by the
24 district?
25    A.   I can't tell you specifics, but I can tell

Page 133

1 you -- because I don't recall any specifics.  But I
2 just know, having served as a district commander and as
3 a division commander, that oftentimes if there are
4 issues at the district level that are district
5 authority that may have national-level implications,
6 the Chief Counsel of the Army Corps likes to have
7 others look at it, just to make sure that folks are
8 making the right calls on the interpretation and such.
9 And that's just standard practice in the Corps.  It's
10 good common sense.  And that could have been the case
11 here, but I can't confirm it.
12    Q.   Okay.  Common -- you used the term
13 "common," but you can't recall any -- any specifics or
14 examples, right?
15         MS. ZILIOLI:  Objection, argumentative.
16    A.   I've been gone from the Army Corps of
17 Engineers for about four or five years, so my apologies
18 if I don't remember some of the specifics you're
19 looking for.  No, I can't, off the top of my head.
20    Q.   (BY MR. SEBY)  How many years, sir, did
21 you serve in the Army Corps of Engineers in any
22 capacity?
23    A.   I served three years as a district
24 commander; two years as a division commander, one year
25 in Afghanistan and then about three years at the

Page 134

1  headquarters.  So about nine years overall, spread out
2  over a 16-year period.
3       Q.   In your career with the Corps of
4  Engineers, how many special use permitting actions did
5  you participate in?
6       A.   I didn't participate in any.  I was
7  monitoring and aware of this particular one, just
8  because of the national significance of this, the
9  national media attention that was occurring, in my role
10  at the time.
11       Q.   I'm trying to understand how you can
12  reasonably venture and comment that it's not uncommon
13  for something to happen outside of the process of the
14  district commander in the district processing special
15  use permit.  You're telling me, no, it's not uncommon,
16  but you don't have any instances to identify and you
17  don't have any experience to fall back on to support
18  your statement, do you?
19            MS. ZILIOLI:  Objection; misstates
20  testimony, argumentative.
21       A.   All I'm saying is that I don't personally
22  recall a specific instance that I can share with you.
23  I just know that the -- having the experience of being
24  a commander at multiple levels, that very complicated
25  issues like this often get more legal reviews than just

Page 135

1  can be provided at the District Counsel's office.
2            I just don't remember specific -- or I
3  guess you could say that every feasibility study that
4  the Corps conducts as part of their Civil Works process
5  gets reviewed, as a matter of procedure, at multiple
6  levels; at the district, division, and national level.
7  Maybe that could be a good example for you to use.  But
8  that's an example of attorneys at different levels
9  looking at documents to make sure that they understand
10  the potential national and the regional implications of
11  a legal opinion that's made at a district level.
12       Q.   (BY MR. SEBY)  So given all of that and
13  our discussion about these issues and your testimony
14  here on the record, are you aware -- were you ever
15  aware that people, other than lawyers outside the
16  Corps, were looking at the special use permit and the
17  Corps' press release on September -- Friday,
18  September 18 or 19 had a hand in developing either of
19  those documents; non-lawyers?
20            MS. ZILIOLI:  Objection; assumes facts,
21  misstates evidence.
22       A.   I'm not aware -- I mean, obviously press
23  releases are handled by multiple people that are
24  outside of the legal channel.  So a press -- usually
25  press releases are coordinated amongst different

Page 136

1  staffs.  In this particular case, it's very likely that
2  this press release was coordinated with the Army Public
3  Affairs Office, because of the national significance of
4  it.
5       Q.   (BY MR. SEBY)  Yeah.
6       A.   And so it was probably -- before it was
7  released, it was probably, you know, synchronized or at
8  least socialized so folks were not surprised when the
9  Corps put that out.  The comment that I --
10       Q.   As part of -- I'm sorry, sir.  I thought
11  you were done.
12       A.   I am.
13       Q.   As part of your job as the -- General
14  Jackson, as the second-in-command under -- under the
15  Chief, was it your job to interact and communicate
16  occasionally or very frequently with Lowry Crook, the
17  Chief -- or Principal Deputy to the Assistant Secretary
18  of the Army for Civil Works, Ms. Jo-Ellen Darcy?
19       A.   No.  I -- I tried to communicate with
20  Lowry daily, every other day, as much -- as often as I
21  could, just because of the nature of our two positions.
22       Q.   Particularly during the DAPL protests
23  occurring on Corps land, wouldn't you say?
24       A.   I spoke with Lowry Crook almost daily,
25  regardless of DAPL.  But yes, it certainly was also

Page 137

1  during the DAPL time frame.
2       Q.   Okay.  So -- and the -- and the nature of
3  your professional relationship with Mr. Crook and the
4  frequency with which you communicated with him, during
5  and apart from the DAPL protest period, eight months,
6  but Mr. Crook would have only been there from the --
7  the period of the start through the end of the Obama
8  Administration, because he was an employee for a
9  political appointee, correct?
10       A.   Yes, sir.  The position that he occupied
11  was a political appointee; yes, sir.
12       Q.   And so with respect to the special use
13  permit, out for a week or so as of September 25, 2016,
14  I asked you whether it was common or uncommon for
15  special use permits at the district to be elevated
16  above that inside the Corps, and I think you said yes.
17  But are you familiar with instances where that
18  elevation of a special use permit included being shared
19  with multiple federal agencies?
20       A.   I -- I'm quite certain that we talked
21  about the special use permit with other federal
22  agencies; not for their approval, but so that they
23  understood what it was that we were doing.  Because a
24  special use permit, obviously, is an Army Corps of
25  Engineers instrument.  And so as part of our ongoing

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 138

1  collaboration and coordination with both the State and
2  other federal agencies, I'm sure that we talked about
3  what that was, what it was being used for. And
4  certainly the -- the timing that was associated with it
5  in that press release that you referenced, was
6  certainly socialized with others, just to make sure
7  that no one was surprised by any actions that -- that
8  the Corps took during this time frame.
9         Q.   Okay. How about, were you aware that
10 Mr. Crook was taking the Corps documents in draft and
11 sharing them with -- and discussing them and inviting
12 editing from one or ten individuals in the Office --
13 Executive Office of the President, in the White House?
14        MS. ZILIOLI: Objection; assumes facts,
15 misstates evidence.
16        Q.   (BY MR. SEBY) The question is, are you --
17 were you aware of that, sir?
18        MS. ZILIOLI: Same objections.
19        THE DEPONENT: Can I -- should I answer
20 this or --
21        MS. ZILIOLI: Go ahead.
22        THE DEPONENT: Okay, yeah.
23        A.   So I'm aware that he was sharing press
24 releases with the Executive Office of the President,
25 because as part of that National Security Council

Page 139

1  deliberation that I talked about earlier, we are asked
2  to make sure that all press releases that went out
3  were -- at least were synchronized with the -- with the
4  EOP to make sure that -- again, so no one -- they were
5  not surprised at -- at what we were putting out in our
6  press release; so, yes.
7         I'm not aware of any editing on the
8  special use permit. I am aware that they looked at our
9  press releases before -- before we sent them out.
10        Q.   (BY MR. SEBY) Okay. So we had quite a
11 discussion trying to understand what you were telling
12 me and the record with regard to your participation in
13 the NSC process and when that occurred and maybe when
14 it didn't. You gave me a several-month period that it
15 may have started and -- but you don't recall, I think.
16 But when -- when did that directive and the NSC process
17 about all press releases being synchronized with the
18 White House arise? Do you remember that?
19        A.   No, sir, actually, I don't. I'm sorry.
20        Q.   You do remember it, though, now, that you
21 did receive such direction, right?
22        A.   I -- I recall being directed by -- or
23 being told by Lowry Crook that that was -- that we
24 needed to make sure that that was synchronized. And so
25 that's why he was involved with that.

Page 140

1         Q.   Well, is that part of the NSC process, or
2  Mr. Crook just telling you, "That's what I want you to
3  do"?
4         A.   You know, now that I -- now that you
5  mentioned it, I believe I'd like to make that
6  correction to the record; that I don't think this press
7  release synchronization did occur out of that NSC
8  process. As I remember now, it was Lowry Crook and I
9  just making sure that -- he wanted to make sure
10 that inside the EOP, that there were no surprises
11 with -- with press releases that came out of the Corps
12 during this Dakota Access Pipeline timeline. So I
13 stand corrected. I apologize.
14        Q.   No, that's fine. I invited you to correct
15 your testimony if it -- if it was not accurate the
16 first time you said it. You've done that a couple
17 times, and we're -- we're all the better for it. So
18 that's good. When did Mr. Crook tell you that?
19        A.   I don't -- I don't recall when he told me
20 that.
21        Q.   Was the White House or, you know,
22 generally speaking, Executive Office of the President,
23 White House, did they participate in these NSC calls?
24        A.   I never saw a listing of who was on the
25 telephone calls. I do know that on one particular call

Page 141

1  I remember a gentleman by the name of Brian Deese who
2  spoke, but all he did was ask a clarifying question.
3  And he's the only one that wasn't representing a
4  specific agency that I or -- and/or the State of North
5  Dakota that I recall hearing speak on -- on those
6  sessions that I attended.
7         Q.   So when I asked, were there White House
8  representatives on the NSC call, and you've gone
9  through Mr. Deese's name, does that mean the answer to
10 my question is yes?
11        A.   Can you restate your question, please?
12        Q.   It's -- it's really short. It's, did the
13 White House also have representatives participating in
14 the NSC calls that you told me about?
15        MS. ZILIOLI: Objection, asked and
16 answered.
17        MR. SEBY: Well, he's asking me what was
18 asked. So let's move on and not waste time, please.
19        A.   You want me to answer the question or --
20        Q.   (BY MR. SEBY) Yes.
21        A.   -- you want to move on? Okay. No.
22 The -- the only one that I'm aware of is Brian Deese.
23 And I only knew he was from the White House, because I
24 recognized his name after I looked him up. I didn't
25 know who he was at the time.

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 142

1      Q.   What was his clarifying question?
2      A.   I don't recall.
3           MR. SEBY:  Okay.  Let's take another
4 ten-minute break, please.
5           MS. ZILIOLI:  Okay.
6           THE VIDEOGRAPHER:  Going off the record.
7 The time is 6:11 p.m. UTC, 12:11 a.m. (sic) Mountain.
8           (Recess, 12:11 p.m. to 12:23 p.m. MDT.)
9           THE VIDEOGRAPHER:  We are back on the
10 record.  The time is 6:23 p.m. UTC, 12:23 p.m.
11 Mountain.
12           MR. SEBY:  Okay.  Rachel, if we could
13 please go to Exhibit 709, 7-0-9.
14           (Deposition Exhibit 709, remotely
15 introduced and provided electronically to the court
16 reporter.)
17      Q.   (BY MR. SEBY)  General Jackson, this is an
18 email between you and General Spellmon, starting on
19 October 25, 2016, at the bottom.  If you would read
20 up -- up the chain here, so we can talk about it; the
21 first one being an email October 25, 4:43 in the
22 afternoon, from -- from you to Dave Meyer, asking
23 General Spellmon a question.  If you'd please look at
24 that.
25      A.   (Deponent examined document.)  Okay.

Page 143

1           Can you scroll up a little bit?  Okay.
2 Thanks.  That's good.
3           (Deponent examined document.)  Okay.
4      Q.   Okay.  So, thanks for reading that.
5 The -- after you asked -- you asked General Spellmon
6 for some information regarding the Corps' lessee on the
7 north area, north of the Cannonball River, the
8 gentleman's name is David -- Dave Meyer -- Spellmon
9 responds -- General Spellmon responds to your inquiry
10 saying, "Sir - I just got off the phone with David.  He
11 and I met during my visit, and we spent some [time]
12 together in the protest camps."
13           And so he says, "Really nothing new to
14 report here.  He" -- meaning Mr. Myers -- "like
15 everyone who lives in this area, are getting more and
16 more frustrated with the protests and their impact on
17 everyday life.  I don't mean to sound dramatic, but the
18 protests have become routine events with no end in
19 sight and tension is growing (this tension even came
20 through in our Seattle listening session today).
21           "David was unclear on the way ahead.  I
22 walked him through the general scheme of maneuver as I
23 understand it, and committed we would keep him better
24 informed with what we know."
25           You responded by saying, "Thanks Scott.

Page 144

1 Understand all and greatly appreciate you making the
2 call.  I think we are close.  [We] will try to
3 schedule . . . tomorrow afternoon if you are
4 [available.]"
5           So you say you understand all.  And that's
6 what I want to ask you about, because you're
7 acknowledging General Spellmon's email.  To what degree
8 did you appreciate the impacts of protesters being on
9 the Corps property in the several hundreds to several
10 thousands for, at this point, three, four months' time,
11 and no permits, no authorizations, just people out on
12 the North Dakota prairie, 24/7, using it as they did?
13 And the neighbors in the area, the residents in this
14 area, to what degree did you ever inquire about the
15 effects and impacts of the protest camps on Corps
16 property on your neighbors?
17           MS. ZILIOLI:  Objection; assume facts,
18 misstates evidence.
19      A.   You're asking --
20      Q.   (BY MR. SEBY)  No.  I'm asking you, sir,
21 what -- what did you do to learn -- to understand --
22 you were -- you were searching to understand a lot, you
23 told me.  So I'm asking you, very specifically, what
24 effort did you make, if any, to appreciate the problems
25 the Corps was being (sic), as a landowner in a

Page 145

1 neighborhood consisting of farmers and ranchers, apart
2 from your Native American -- the Native American
3 reservation that was located to the south of your
4 property?  Just -- if you'd just explain to me what you
5 did to understand all that was going on with the people
6 in the neighborhood, other than the tribes.
7      A.   No.  Sure.  We -- as part of the
8 discussions that we had between John Henderson and
9 General Spellmon -- and I -- I don't remember exactly
10 when, but we talked about some of those concerns that
11 had been expressed to Colonel Henderson.  And so I was
12 aware that -- of some of the impacts that were being
13 faced by some of the folks in the local area.
14           I think -- I mean, we routinely
15 communicated -- "we" being the Corps -- with the
16 Congressional delegation from North Dakota.  So I
17 think, you know, this was Senator Heitkamp, who had
18 reached out to me and asked -- you know, we tried to
19 keep them up to date with what we were doing, as we did
20 with everybody else that we were working with at the
21 time.  And she must have asked some very specific
22 questions about Mr. Meyer and his situation.
23           And that was the subject of this, just to
24 make sure that we were reaching out and he knew how to
25 get ahold of us if he had any questions and just to,

Page 146

1 you know, make sure that we were communicating
2 effectively with others as well.  So that's --
3 that's -- that's what this was all about.
4        Q.   You mentioned some of the impacts you
5 were -- you were aware of.  What impacts are you
6 talking that you were aware of?  What are you
7 referencing?
8        A.   I know that some of the -- there were
9 some -- some debris placed on some of the state roads
10 that were, you know, blocking traffic; which the State
11 Highway Department, I think, was -- was trying to keep
12 open.  I know that there were -- I had seen a report
13 of -- although I haven't confirmed anything, I had seen
14 reports that there had been some livestock that had
15 been slaughtered.  But I don't know the details, I just
16 remember vaguely hearing -- seeing that in a report,
17 that somebody had made that allegation.
18             And I also, you know, knew that obviously
19 they -- where the protest camps were, they were on this
20 grazing area, this grazing lease that we talked about
21 earlier.  So I was aware of -- of those types of
22 things.  And just with the descending of many people
23 onto the local towns, I was also aware that there were
24 impacts of just providing life support to all these
25 people that were descending on the prairie.  And that

Page 147

1 was something that we talked about, we in the Corps;
2 mostly John, some -- some General Spellmon, and then
3 with the -- with the folks in North Dakota, just so we
4 were, you know, understanding those impacts.
5             So that's -- we were just trying to -- and
6 you asked me, specifically for me.  So I just tried to
7 stay tuned into what those issues were and what those
8 concerns were, so I could make sure that my boss and
9 Ms. Darcy were aware of them as well.
10        Q.   So the answer to my question of what
11 impacts you were talking about, you told me debris on
12 the State roads, reports of livestock being
13 slaughtered, and grazing leases -- conflicts with --
14 with grazing leases, right?
15        A.   Right; because my understanding was that
16 some of the protesters were on these leased areas, and
17 obviously that was an issue with our -- the folks who
18 had those leases.  I think that's what -- I can't
19 remember -- I don't remember specifically where Dave
20 Meyer's property was in relation to the Corps property,
21 but I think he was one of those that had some concerns
22 about -- about grazing leases.  But I may be -- I may
23 be wrong.
24        Q.   Well, he's your lessee on the area that --
25 the -- the protest camp known as the North Camp, your

Page 148

1 first DAPL storyboard shows.  That's right on top of
2 his lease area, right?  That's -- that's that camp?
3        A.   It could be.  If that's depicted on that
4 storyboard, then that's -- that's confirmation of that;
5 yes, sir.  And I would have -- I would have known, I
6 just don't have that in front of me.
7        Q.   Any other impacts that you're aware of
8 that you care to round out your testimony?
9        A.   I'm not aware of any others; no, sir.
10        Q.   Trespassing on private lands, farm lands,
11 cutting fences?
12        A.   I'm not aware of that.  Although, I'm sure
13 if it happened, it would have been in a report and I --
14 I would have read it.  But I just don't recall any
15 specific instances; no, sir.
16        Q.   Okay.  Did you ever include that in your
17 briefing materials to your superior officers inside the
18 Army or outside with the other federal officials you
19 were talking to, "Hey, we've got people on our property
20 that are really harassing farmers and ranchers,
21 blocking roads, school buses can't move through,
22 children prevented from going to school, children in
23 fear of standing at a bus stop because people come up
24 and harass them, animals being killed by the dozens,"
25 that kind of thing?  Ever hear about that?

Page 149

1        MS. ZILIOLI:  Objection; assumes facts,
2 misstates --
3        Q.   (BY MR. SEBY)  I'm asking if you knew
4 about that or know of reports to that effect?
5        A.   I -- I had heard reports, as I mentioned
6 in my testimony just now, some of those things.  I
7 don't know where -- who did them or where they were
8 when they occurred, so -- but I did hear that those --
9 there were some instances like that that you described.
10 It was in my earlier testimony.
11        Q.   Anyone ever tell you, sir, that the
12 protesters that decided, on their own volition, to
13 trespass on Corps property for months on end decided to
14 use the safety of Corps property to go conduct trespass
15 and harassment throughout the county locally and then
16 even into the capital city of Bismarck and the
17 neighboring city of Mandan?
18        MS. ZILIOLI:  Objection; assumes facts,
19 misstates evidence, legal conclusion.
20        A.   No, sir, I'm not aware -- I'm not aware of
21 anybody staging out of the Corps property and doing the
22 things you just described; no, sir.
23        Q.   (BY MR. SEBY)  Did you tell me that you
24 had a Corps representative present in the State and
25 Morton County law enforcement Emergency Operations

Page 150

1 Center?

2    A.  Yes, sir, I did.

3    Q.  Did that individual ever report to you
4 what he saw projected on the screen on a daily basis?

5    A.  I don't recall specifically what he
6 reported to me; no, sir.  I'm sorry.

7    Q.  Were you advised ever, then, maybe to
8 further prompt your recollection, that footage was
9 shown on a repeated basis of individuals on the Corps
10 property convening caravans, preparing to -- and
11 training participants to conduct raids on neighboring
12 private property and into the capital city of Bismarck,
13 North Dakota?  Ever -- ever hear anything about that?

14        MS. ZILIOLI:  Objection; assumes facts,
15 misstates evidence.

16    A.  Never heard anything about that; no, sir.

17    Q.  (BY MR. SEBY)  What do you think they were
18 doing on the Corps property for a couple of months at a
19 time protesting the Dakota Access Pipeline; just
20 staying there and cooking meals and riding horses and
21 digging pits and putting waste into the pits just by
22 themselves and stayed on the Corps property 24/7?  Is
23 that what you think?

24        MS. ZILIOLI:  Objection, argumentative.

25    A.  All I know is what I -- what I received

Page 151

1 reports on, so . . .

2    Q.  (BY MR. SEBY)  And how do you think the
3 people who were on Corps property for months at a time,
4 with no authorization -- what do you think they were
5 doing there?

6        MS. ZILIOLI:  Same objection and assumes
7 facts, legal conclusion.

8    A.  Sir, I don't know specifically what
9 individual people were doing there, other than what was
10 reported.

11    Q.  (BY MR. SEBY)  How about groups of people,
12 not individuals?  I'm talking about large numbers of
13 people getting in large numbers of cars and driving out
14 of the Corps property to conduct hit-and-run missions
15 and coming back to the safety of the Corps property
16 because they knew you weren't going to do a darn thing
17 about it, and neither would any of your federal
18 partners?

19        MS. ZILIOLI:  Objection; assumes facts,
20 misstates evidence, argumentative.

21    A.  Sir, I don't recall ever hearing any
22 reports of that type of activity.

23        MR. SEBY:  Okay.  Could we go to
24 Exhibit 711, please.

25        (Deposition Exhibit 711, remotely

Page 152

1 introduced and provided electronically to the court
2 reporter.)

3    Q.  (BY MR. SEBY)  Before we talk about this
4 exhibit, I want to ask you something.  Did you ever
5 receive a briefing from the Federal Bureau of
6 Investigation with respect to the several-month-long
7 protests and camps on Corps property, ever?

8    A.  From the FBI?

9    Q.  Yup.

10    A.  I don't recall ever getting a briefing
11 from the FBI; no, sir.

12    Q.  Did you ever receive a written briefing
13 from the FBI; not verbal, but written?

14    A.  Sir, I don't recall seeing a report from
15 the FBI.  I may have, but I don't recall it.

16    Q.  Did you ever speak with the Chairman of
17 the Standing Rock Sioux Tribe, David Archambault?

18    A.  I spoke with Chairman Archambault, in
19 passing, at the National Congress of American Indians
20 conference that took place in Phoenix, Arizona that
21 year.

22    Q.  "In passing," what -- what does that mean?

23    A.  He was on the podium speaking, and I was
24 the follow-up speaker, and we shook hands as he was
25 leaving the stage.  And that was what I'm -- that's

Page 153

1 what I refer to.

2    Q.  So just a -- in passing, I appreciate your
3 comment.  It's literally a greeting and that was it,
4 right?

5    A.  Yes, sir.

6    Q.  Okay.

7    A.  Because I was -- I was next on the agenda
8 to speak.  So we didn't have a chance to talk for very
9 long and then he left.

10    Q.  He was getting down, and you were getting
11 up to speak?

12    A.  Yes, sir.

13    Q.  Okay.  So now we're going to talk about
14 711.  This is an email communication between you and
15 your boss, the Chief of Engineers.  You sent General
16 Semonite and General Spellmon an email, it's copied to
17 John Henderson, and it says, "DAPL Discussions (CLOSE
18 HOLD:  DO NOT DISTRO)."  Do not distribute?  Is that
19 the word you're abbreviating?

20    A.  Yes, sir.

21    Q.  And you put, again, "CLOSE HOLD PLEASE."
22 You say, Lieutenant General Semonite and Scott, I spoke
23 this evening with Lowry Crook.  He indicated . . . over
24 the weekend, he received clear intent from the
25 Administration on where they wanted to go on the next

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 154

1  steps for DAPL."
2              Remember that call with Lowry Crook, late
3  October?
4         A.   I don't recall it.  And the screen just
5  went blank, so I can't see the email.
6              MR. SEBY:  Hold on, please.  It's being
7  brought back up.  Rachel, do you need a minute, or are
8  you okay?
9              MS. HYMEL:  Yes, I need one second,
10 please.  Can we go off the record?
11             MR. SEBY:  Yes.  Ms. Zilioli, your
12 courtesy of going off the record, please?
13             MS. ZILIOLI:  Of course.
14             MR. SEBY:  Thank you.
15             THE VIDEOGRAPHER:  Going off the record.
16 The time is 6:41 p.m. UTC, 12:41 p.m. Mountain.
17             (Pause in the proceedings.)
18             THE VIDEOGRAPHER:  We are back on the
19 record.  The time is 6:43 p.m. UTC, 12:43 p.m.
20 Mountain.
21        Q.   (BY MR. SEBY)  General, if you would take
22 a minute and read your email message to your boss on
23 October 30th, 2016, please.
24        A.   Okay.  Thank you.
25             (Deponent examined document.)  Okay.

Page 155

1         Q.   Okay.  Thank you for reading that.  I was
2  asking you, now that you've read it, do you recall the
3  call that you're briefing your boss on, with Lowry
4  Crook, about the intent from the Administration?
5         A.   I -- I -- I don't recall the specifics,
6  but I recall having a call from him; yes, sir.
7         Q.   Now that you've read your own email, none
8  of that refreshes your memory?  Because you sure tried
9  to contrast what you heard from him, whenever it was,
10 and had a pretty clear statement of frustration with
11 offering a, "Hey, we need to know what it is we're
12 shooting for and what we're doing.  And if you don't
13 like it, tell us so we can come up with a different
14 approach."  Isn't that what you're saying?
15        A.   Yeah.  What I'm saying, this particular
16 conversation references the permit decision of the
17 easement decision.
18        Q.   I know that.  So I'm asking you, what did
19 it -- what else did it talk about?  You're talking
20 about they want to go on next steps for DAPL.  What
21 is -- what is that?
22        A.   They wanted us to do additional
23 environmental review; which is what, ultimately,
24 Ms. Darcy did.
25        Q.   An EIS?

Page 156

1         A.   The EIS decision was made much later.  I
2  think that was made in January.  But she issued a
3  statement, which I'm sure you have a copy of, in, I
4  think, early December, that directed us to do some
5  additional environmental work on -- on this project
6  before she would agree to sign the easement.
7         Q.   Well, this was --
8         A.   So this was a call -- this was a call with
9  Lowry that gave me some indication that that's the way
10 she was leaning, so . . .
11        Q.   So you're right.  I'm aware of the
12 December directive from Ms. Darcy.  And if Lowry knew
13 that was the clear intent from the Administration on
14 October 30th, or at least as of October 30th, because
15 you spoke that evening with Lowry Crook, why did it
16 take a month for that to be announced by Ms. Darcy?
17             MS. ZILIOLI:  Objection; misstates
18 evidence and testimony.
19        Q.   (BY MR. SEBY)  Well, this is October 30th.
20 So my understanding of the Roman calendar, which we
21 follow, is there's an intervening month -- whole month
22 of November, and then she made her letter in December.
23 So that's at least a month, Mr. -- General Jackson,
24 right?
25        A.   That's correct; yes, sir.  Your

Page 157

1  calendar -- your calendar recollection is correct.
2         Q.   Why did it take her a month to say
3  something that Lowry had a clear intent, understanding
4  of at the end of October?
5             MS. ZILIOLI:  Objection, misstates
6  evidence.
7         A.   Sir, that -- I have no idea.  That's a
8  question for Ms. Darcy.  I don't know why it took that
9  long.
10        Q.   (BY MR. SEBY)  Okay.  And am I right to
11 read some frustration in your -- your words here;
12 that -- that you're being asked to do something, but
13 you don't know, with any specificity, what it is and
14 whether or not what you do will hit the mark or just
15 receive a "bring me another rock" directive and
16 continue just to delay and waste time and ride out the
17 Administration, or not?
18        A.   Well, I won't comment to whether or not
19 there was frustration.  What we wanted to do was to
20 understand what task -- or what information the
21 Secretary needed in order to make her decision, one way
22 or the other.  And so that -- that was -- as I read it,
23 that was really what -- I was asking for something in
24 writing that would really help us know specifically
25 what -- what we were being asked to do.

Page 158

1 So I do want you to comment on
2 frustration.  You can't excuse yourself from commenting
3 on it.  I want you to tell me whether or not you agree
4 with the strong frustration expressed by the Chief and
5 others, including General Spellmon and Colonel
6 Henderson, that there was deliberate steps taken, over
7 the course of several months, to inject requirements
8 that you weren't even clear of (sic).  And all it did
9 is have the net effect of wasting time, delaying the
10 process.
11 Meanwhile, thousands of people were
12 gathered on your property causing havoc and conducting
13 riot activity inside the state and on the State of
14 North Dakota.  And those were concurrent events.  I got
15 the impression from those other gentlemen they were
16 extremely frustrated.  And I'm asking you, were you as
17 well?
18 MS. ZILIOLI:  Objection; assume facts,
19 misstates evidence.
20 A.   I don't recall being frustrated.  I just
21 wanted to get clear guidance so that we could get the
22 information that Ms. Darcy needed to help her make that
23 decision.  That was my job.  I don't get personally
24 frustrated over things like that.  I just -- sometimes
25 I get impatient, and maybe that's the tone that you

Page 159

1 picked up in this email.  Certainly, it was to
2 everybody's advantage to get the appropriate amount of
3 information that the Secretary needed to make the
4 decision as soon as possible.  And I was just
5 interested in getting that as soon as possible so we
6 could get started with it.
7 Q.   (BY MR. SEBY)  Okay.  You've read this
8 entire email, right?
9 A.   Yes, sir.
10 Q.   Okay.  So we don't need to reread stuff.
11 I want to talk about the second paragraph.  You
12 presented -- you say, "The Press Release we presented
13 on Friday for consideration was reviewed over the
14 weekend by the White House Comms folks."  Who's that?
15 I mean, I know they're in the White House, but who?
16 A.   Sir, I don't know, specifically.  You
17 would have to -- Lowry Crook would know specifically
18 who he worked with in the -- on the White House
19 Communications team.
20 Q.   So this is another example of Mr. Crook at
21 least following what he asked you to do; and that is,
22 run any of our press releases through the White House
23 for approval?
24 A.   That's correct; yes, sir.
25 Q.   Okay.  And Lowry told you they were not

Page 160

1 opposed to a release, asked you to clarify the
2 timeline.  ". . . we are working with Chairman
3 Archambault, and ensure we include that in the
4 release."  What working with Chairman Archambault is
5 being referenced here?  Is this still that idea that
6 you're investing in the Tribe to fix everything?
7 A.   Absolutely; yes, sir.
8 Q.   Okay.  And you said "They" -- I think
9 you're referencing the White House Comms folks --
10 "seemed a bit concerned over how discussion of the
11 Special Use Permit expiration might be received by some
12 parties???"  What special use expiration?
13 A.   Well, there was -- as I recall, there was
14 a period of time that the Standing Rock Sioux were
15 given to comply with the special use permit, provide
16 all the information that they needed to provide, and
17 that time had -- was about to expire or had expired.  I
18 can't recall, exactly.  And so -- and I don't -- I
19 don't recall specifically what this particular press
20 release was about.  Although, I think it probably had
21 something to do with saying that that special use
22 permit that had been requested had either been extended
23 or had expired.  I just don't remember which one it
24 was --
25 Q.   Are you -- are you talking --

Page 161

1 A.   -- what -- I'm sorry.  Go ahead, sir.
2 Q.   What special use permit are you talking
3 about?
4 A.   The one that the Standing Rock Sioux Tribe
5 had applied for.
6 Q.   Way back in August?  We're at -- we're at
7 the end of October, sir.  What are you talking about?
8 A.   I'm talking about the special use permit
9 that the Standing Rock Sioux Tribe submitted.  I don't
10 know if it was the original one that they submitted.  I
11 can't recall if they submitted a second one or not.  I
12 don't remember off the top of my head.  But I do know
13 that there was still a special use permit in play at
14 this time, and that's what this was in reference to.
15 Q.   So the special use permit, as you may
16 recall, was offered to the Tribe the third week of
17 September.  That would be six weeks prior to this
18 email.  So you're still dancing around thinking that
19 you can get the Tribe to meet the conditions of the
20 draft permit that you offered them six weeks prior?
21 MS. ZILIOLI:  Objection; ambiguous,
22 argumentative.
23 A.   Sir, it was in everyone's best interest at
24 the time, that this -- this course of action was the
25 best way forward.  And that was agreed upon by all

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 162

1 parties that -- that were part of this; to include the
2 Tribe, to include the Corps of Engineers.  And as I
3 recall, it included the State as well.
4        Q.   (BY MR. SEBY)  Well, wait a minute.  Very
5 beginning of this deposition, three hours ago, we read
6 an email that said the Governor quite clearly told
7 Colonel Henderson, reported to you and Chief Semonite,
8 he strongly opposed you granting a special use permit
9 to the Tribe.
10       A.    That's correct, but I think the change in
11 Administration in North Dakota had occurred by this
12 time.  I don't remember that exactly, but I knew there
13 was a different --
14       Q.   Huh-uh.
15       A.    -- different view on that when the new
16 Governor came into office.  I just don't remember
17 exactly when that was.
18       Q.   Who was Governor of the State of North
19 Dakota on October 30th, sir?
20       A.   I don't know.
21       Q.   It's Governor Jack Dalrymple, the same
22 Governor that you were reported advised the Corps of
23 Engineers he strongly opposed you giving a permit to
24 any protester, including the Standing Rock Sioux Tribe.
25 So we're not talking about a new Governor with a

Page 163

1 hypothetical different position, sir.
2             MS. ZILIOLI:  Objection, counsel is
3 testifying.
4        Q.   (BY MR. SEBY)  So I want to ask you, were
5 you laboring under the misimpression that there was a
6 special use permit and that it had expired?
7        A.   Was I laboring?  Can you define what you
8 mean by "was I laboring"?
9        Q.   Well, you're talking about -- this is your
10 email.  There seemed to be a bit of confusion over
11 how -- discussion of the special use permit expiration.
12 There was -- are you -- let me back up.  I thought you
13 and I agreed there never was a special use permit
14 issued that went into effect to the Standing Rock Sioux
15 Tribe.  So my question is, unless you're changing your
16 testimony, that there was nothing to expire.  So why do
17 you use that word here?
18             MS. ZILIOLI:  Objection, legal
19 conclusion.
20       A.   No, I don't -- I don't change my
21 testimony.  As I -- as I recall, there was a period of
22 time that the Standing Rock Sioux was given to comply
23 with the terms that were in the special use permit.
24 And as I recall, they had not yet been able to comply
25 with those.  And so the subject of this discussion was

Page 164

1 that we were going to withdraw that as an option and
2 look at other options or try to find some other
3 options, other than the special use permit.  That's
4 what I recall about this.  So there's no change in
5 testimony.
6        Q.   (BY MR. SEBY)  Where would we see and who
7 would tell us, if it's not in writing, that there was
8 some decision made -- some purposeful decision made in
9 the Corps, either by the Corps or at the direction of
10 the White House or anybody else, that -- that you were
11 giving the Standing Rock Sioux Tribe an express defined
12 period of time; and that here we are, six weeks later,
13 you're still within that period of time, and you're
14 debating whether or not to -- to move on and say, "Oh,
15 let's do something different"?  What -- what evidence
16 do you have, is my question?
17       A.   Oh, I don't have any evidence.  I would
18 tell you that I'm only aware of this from the
19 discussions that I recall having with General Spellmon
20 and with Colonel Henderson.
21       Q.   Okay.  So you were relying on what they
22 told you.  And if they were wrong, you just accepted it
23 and -- and that was the situation you were operating
24 under, right?
25             MS. ZILIOLI:  Objection, argumentative.

Page 165

1        A.   I had no reason to think that they were
2 wrong.  They were keeping me informed with what they
3 were doing, so . . .
4        Q.   (BY MR. SEBY)  As you sit here today, were
5 they wrong or were they right?
6             MS. ZILIOLI:  Objection, ambiguous.
7        A.   As I sit here today, knowing what I know
8 about the complexity of the situation on the ground,
9 those two gentlemen did the best they could do under
10 the circumstances.  They made the decisions that they
11 made based on the information that they had at the
12 time.  They made the best decisions that they could
13 based upon their ongoing collaboration with the
14 Standing Rock Sioux and other tribal leaders in the
15 state of North Dakota.
16             So I don't second-guess anything that
17 either one of those two gentlemen did throughout this
18 whole episode.  I'm grateful, and our nation should be
19 grateful, to have leaders like that in those positions.
20       Q.   (BY MR. SEBY)  Did those gentlemen receive
21 a commendation, an award, or a medal from the United
22 States Government for their service involving the
23 period of the DAPL protests?
24       A.   Both of those gentlemen probably got an
25 award for the overall period of service that they

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 166

1  served as commanders of their respective organizations.
2  The time that the DAPL protest went on was a part of
3  that time, but it wasn't given specifically for
4  anything that they did in the DAPL protest. But it
5  would have been for their period of service, which is a
6  standard for -- for military officers who spend two or
7  three or four years in a command location.
8          MR. SEBY: Okay. Let's go to Exhibit 712,
9  please.
10         (Deposition Exhibit 712, remotely
11  introduced and provided electronically to the court
12  reporter.)
13     Q.    (BY MR. SEBY)  So this is a short email.
14  It's from Lieutenant Colonel Tedeschi, to you, and
15  copied to a bunch of other folks in the Corps,
16  including the Deputy District Commander for the
17  District of Omaha and the Chief -- or, pardon me, the
18  District Commander, John Henderson. And so let's look
19  at this email addressed to you, Major General Jackson;
20  Ms. K. D-A, Karen Durham-Aguilera. It says, "Today's
21  DAPL Storyboard is attached." And the date of this
22  email is November 1, 2016.
23          "Colonel Henderson continues to report no
24  direct impact to Northwest Omaha Operations.
25  Headquarters USACE has received reports of the planning

Page 167

1  of protests at multiple [U.S. Corps] sites, throughout
2  the nation, on or about November 15. We expect Chief
3  of Engineers guidance to the workforce later this
4  week."
5          I want to ask you about the next sentence.
6  "The North Dakota Department of Public Health is
7  requesting that [Corps] determine if waste handling is
8  being conducted in accordance with applicable law and
9  to take action if it's not." So did the Corps
10  determine if waste handling on your property at the
11  Lake Oahe Project was occurring in accordance with
12  applicable law, and did the Corps take action if it
13  found it did not?
14          MS. ZILIOLI: Objection; legal conclusion
15  and attorney-client privilege to the extent the answer
16  would provide attorney-client advice.
17          MR. SEBY: Let's -- I'm not asking about
18  any of those things.
19     Q.    (BY MR. SEBY)  And so, General, let's
20  break down this sentence. It's one sentence, and I
21  want to ask you, did the Corps ever make any effort,
22  and if so what, to determine whether waste handling was
23  being -- occurring on its property at the Oahe Project
24  in the state of North Dakota?
25     A.    Sir, I don't -- I don't remember what we

Page 168

1  did. I don't remember how we responded to -- to that
2  request.
3     Q.    I'm asking not how you responded. Did you
4  make any effort, you or the Corps -- "you" being the
5  Corps. Did the Corps make any effort to determine
6  whether or not waste handling was being conducted on
7  the protest site?
8     A.    I don't have any direct knowledge of what
9  we did in response to that.
10    Q.    So you don't know whether any -- any
11  effort was made at all?
12    A.    I don't know what was done -- to answer
13  your question, I don't -- I don't know how we responded
14  to that. If a -- if a request was made, it's standard
15  process -- standard procedure that we would respond to
16  the requester. But I don't have any evidence to show
17  that -- that I know exactly what we did or didn't do.
18    Q.    Are you aware of what the -- with the
19  consequences of disposing waste on the banks of the
20  Missouri River are?
21    A.    Yes, sir --
22    Q.    What are they?
23    A.    -- in general terms.
24    Q.    What are they, sir?
25    A.    I would assume it would be contamination

Page 169

1  of the water source. So that would -- that would be
2  what I would expect it to be.
3     Q.    Do you find any irony, large or small, in
4  the fact that people were on Corps property digging
5  large holes in the ground, throwing dead animals,
6  waste, food, human waste, and just garbage into holes
7  on Corps property next to the Missouri River?
8          MS. ZILIOLI: Objection, assumes facts.
9     A.    I'm not sure I understand what your
10  question is.
11    Q.    (BY MR. SEBY)  Am I accurate in
12  understanding that the -- one of the leading cries and
13  charges of people gathering on the Corps property and
14  being allowed to stay there for months on end was to
15  protect water?
16    A.    Sir, that was the original intent of the
17  Standing Rock Sioux, who initiated the protest. But as
18  you know, many, many other people that were not related
19  at all to these tribes descended on this area. And I
20  can't -- all I know about what you just described is
21  that when we went through the cleanup, we found this
22  activity had taken place. But I don't know what was
23  done -- again, to answer your original question, I
24  don't know specifically what we were -- how we
25  responded to the North Dakota Department of Public

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

Page 170

1  Health, given this request that you highlighted in this
2  email.
3      Q.   Where do you think the thousands of people
4  on Corps property were throwing refuse?  Where do
5  you -- how do you think they were disposing of the
6  garbage and waste that comes from thousands of people
7  gathering the way they did on Corps property?  What did
8  the Corps think was going to happen?
9      A.   Sir, I can't -- I can't answer what I
10  thought the Corps thought of that, because I wasn't
11  aware, specifically, of what you described until we
12  began the cleanup operation.  Then, I became more aware
13  of what -- what debris and refuse was left on the site.
14     Q.   Would you kindly explain what you saw or
15  were told as to the kind of materials that were left
16  behind by the protesters after they were directed to
17  leave in January-February?
18     A.   Sir, there were -- there was garbage, just
19  general garbage; abandoned vehicles; abandoned
20  construction materials; and just human refuse, in
21  general terms.
22     Q.   So you -- you had some relation to the
23  cleanup effort, correct?
24     A.   Yes, sir.
25     Q.   And the manner -- I appreciate you don't

Page 171

1  know what you knew, but then -- or until you got to the
2  cleanup area on your property, because there really
3  wasn't much Corps attention to what was going on on its
4  land.  But later, you did learn, and you talked about
5  all that stuff strewn across your property, thousands
6  of tons of material that had to be taken off.  Who was
7  the entities that took off the material from the Corps
8  property, left behind by the thousands of people?
9          MS. ZILIOLI:  Objection, assumes facts.
10     A.   I know that -- based on my recollection,
11  we contracted out some of it, and I think the State did
12  some as well.  I don't remember, exactly, who all was
13  involved.  I just know that we participated in paying
14  for it and doing a cleanup after the protesters
15  departed.  I just don't -- I can't tell you exactly
16  what that -- what that amounted to and who else was
17  involved.
18     Q.   (BY MR. SEBY)  Do you recall being advised
19  that part of the pricing given to the Corps for the
20  small portion it expended for cleanup activities was
21  priced at a level due to the contractor telling the
22  Corps that this is because there are hazardous
23  materials and substances on your property that we need
24  to handle and dispose of in accordance with federal and
25  state law?

Page 172

1          MS. ZILIOLI:  Objection, assumes facts.
2      A.   I don't recall being advised of anything
3  specific along those lines.  But that would be
4  normal -- you know, normally what we would do when we
5  contract out any type of debris removal is -- you know,
6  the contractor that goes in would make the assessment
7  on what was actually there, and then we would, you
8  know, adjust the contracts accordingly, based on what
9  they found.  It's very similar to how we do some of our
10  debris operations in a post-storm operation as part of
11  our Emergency Management mission.
12     Q.   Do you recall being advised there were
13  waste pits that had to be excavated, and it contained
14  all that kind of waste and large amounts of it; human
15  waste, food waste, dead animals, carcasses of whatever,
16  clothing, propane tanks, all thrown into the ground on
17  Corps property in porous soils on the banks of the
18  Missouri River?  Do you recall that?
19     A.   Yes, sir.
20          MS. ZILIOLI:  Objection, assumes facts.
21          MR. SEBY:  He just answered yes.
22          MS. ZILIOLI:  Counsel, I believe we are at
23  four hours.  If you could please wrap up.
24          MR. SEBY:  Is that correct,
25  Mr. Videographer?

Page 173

1          THE VIDEOGRAPHER:  We have been going for
2  four hours, five minutes.
3          MR. SEBY:  All right.  Thank you.
4      Q.   (BY MR. SEBY)  General, I'm going to wrap
5  things up.  And I appreciate your time and your
6  engaging responses.
7          Can you recall a time, sir, when the
8  United States, as a whole, ever made a statement that
9  resulted in any deescalation of the protests occurring
10  against the Dakota Access Pipeline on property owned
11  and managed by the Corps of Engineers?
12     A.   The federal government making a statement?
13  I -- I know statements were made, but I don't remember
14  exactly what they were.  And I don't -- it was several
15  statements made, I know, to try to deescalate; but
16  again, I don't know what the cause and effect was.
17     Q.   So you don't -- you can't identify a
18  single statement, but you think that they resulted in
19  the act of deescalating the protests?
20          MS. ZILIOLI:  Objection, mischaracterizes
21  testimony.
22     Q.   (BY MR. SEBY)  Well, I don't understand
23  it, then.  Would you clarify, please?
24     A.   I don't -- I know there were statements
25  made.  I don't recall what the statements were.  And

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

---

Page 174

1  I'm not -- I don't recall exactly what happened as a
2  result of those statements.
3           MS. ZILIOLI:  Counsel, the witness has
4  another obligation to go to, so we really do need to
5  finish.
6           MR. SEBY:  The only thing keeping us from
7  doing that is you're talking.
8           Q.  (BY MR. SEBY)  So unless you've indicated
9  otherwise, General, throughout the deposition today
10 have you understood my questions today?
11          A.  Yes, sir.
12          MR. SEBY:  All right.  I don't have
13 anything further.  Thank you very much.
14          THE DEPONENT:  Thank you, sir.
15          MS. ZILIOLI:  I have no questions.  We'll
16 read and sign.  Thanks.
17          THE REPORTER:  And same orders as before;
18 the etran and the exhibits?
19          MR. SEBY:  Yes, ma'am.
20          THE REPORTER:  Thank you.
21          MS. ZILIOLI:  Yes, please.
22          THE VIDEOGRAPHER:  And real quick, Erica.
23 Did you need a copy of the video?
24          MS. ZILIOLI:  I don't -- whatever our
25 standing order is.  I don't believe we have, but I can

---

Page 175

1  double-check with the U.S. Attorney's Office.  Thank
2  you.
3           THE VIDEOGRAPHER:  Okay.  All right.
4  Thank you.  Going off the record.  This concludes the
5  remote video-recorded deposition of General Donald E.
6  Jackson.  The time is now 7:12 p.m. UTC, 1:12 p.m.
7  Mountain.  We are off the record.
8           WHEREUPON, the within proceedings were
9  concluded at the approximate hour of 1:12 p.m. Mountain
10 on the 29th day of July, 2022.
11          *     *     *     *     *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 176

1           I, MAJOR GENERAL DONALD E. JACKSON, JR.
2  (RET.), do hereby certify that I have read the above
3  and foregoing deposition and that the same is a true
4  and accurate transcription of my testimony, except for
5  attached amendments, if any.
6           Amendments attached    (  ) Yes    (  ) No
7
8
9  _____
10      MAJOR GENERAL DONALD E. JACKSON, JR. (RET.)
11
12
13          The signature above of MAJOR GENERAL
14 DONALD E. JACKSON, JR. (RET.) was subscribed and sworn
15 to or affirmed before me in the county of _____,
16 state of Colorado, this _____ day of _____,
17 2022.
18
19
20
21          _____
         Notary Public
22          My commission expires
23
24
25 State of North Dakota, 7/29/22 (go)

---

Page 177

1           REPORTER'S CERTIFICATE
2  STATE OF COLORADO       )
                          ) ss.
3  CITY AND COUNTY OF DENVER )
4           I, GAIL OBERMEYER, Registered Professional
   Reporter and Notary Public ID 19994012647, State of
5  Colorado, do hereby certify that previous to the
   commencement of the examination, the said MAJOR GENERAL
6  DONALD E. JACKSON, JR. (RET.) verbally declared his
   testimony in this matter is under penalty of perjury;
7  that the said deposition was taken in machine shorthand
   by me at the time and place aforesaid and was
8  thereafter reduced to typewritten form; that the
   foregoing is a true transcript of the questions asked,
9  testimony given, and proceedings had.
10          I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11 herein, nor otherwise interested in the outcome of this
   litigation.
12
            IN WITNESS WHEREOF, I have affixed my
13 signature this 8th day of August, 2022.
14          My commission expires May 20, 2023.
15          _Gail Obermeyer_
16          _____
            Gail Obermeyer, RPR
            Registered Professional Reporter
17          Notary Public, State of Colorado
18
19
20 __X__ Reading and Signing was requested.
21 _____ Reading and Signing was waived.
22 _____ Reading and Signing is not required.
23
24
25

---

Major General Donald E. Jackson, Jr. (RET.)
July 29, 2022

```
                                        Page 178
 1   Errata Sheet

 2

 3   NAME OF CASE: Plaintiff vs UNITED STATES

 4   DATE OF DEPOSITION: 07/29/2022

 5   NAME OF WITNESS: Major General Donald E. Jackson, Jr. (RET.)

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                      _____
```