# EXHIBIT 73
# (with redactions)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 19-cv-150-DMT-ARS

---

RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
DOUGLAS W. WALKER - DEPARTMENT OF HOMELAND SECURITY,
CUSTOMS AND BORDER PROTECTION
November 29, 2022
Via RemoteDepoTM

---

STATE OF NORTH DAKOTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

PURSUANT TO NOTICE AND AGREEMENT, the Rule 30(b)(6) videotaped deposition of DOUGLAS W. WALKER, DEPARTMENT OF HOMELAND SECURITY, CUSTOMS AND BORDER PROTECTION, was taken on behalf of the Plaintiff in Cascade County, Montana, by remote means, on November 29, 2022, at 9:00 a.m. Mountain Standard Time, before Tracy C. Masuga, Registered Professional Reporter and Certified Realtime Reporter, appearing remotely from Denver County, Colorado.

REMOTE APPEARANCES

For the Plaintiff:

PAUL M. SEBY, ESQ.
Greenberg Traurig LLP
1144 15th Street
Suite 3300
Denver, Colorado 80202
sebyp@gtlaw.com

PAUL B. KERLIN, ESQ.
Greenberg Traurig LLP
1000 Louisiana Street
Suite 6700
Houston, Texas 77002
kerlinp@gtlaw.com

For the Defendant:

JANE E. BOBET, ESQ.
TIMOTHY B. JAFEK, ESQ.
VICTOR WILLIAM SCARPATO III, ESQ.
Department of Justice
U.S. Attorney's Office
District of Colorado
1800 California Street
Suite 1600
Denver, Colorado 80202
jane.bobet@usdoj.gov
timothy.jafek@usdoj.gov
victor.scarpato@usdoj.gov

FRANK P. ALBI, ESQ.
U.S. Customs and Border Protection
Office of Associate Chief Counsel
Chicago, Illinois 60607

DAVID DUBAY, ESQ.
Department of Homeland Security

HANNAH JONES, ESQ.
U.S. Department of Homeland Security
Office of General Counsel
Washington, D.C. 20528

Also Present:

Michael Banks, Videographer
Jose Diaz
Corin Stigall

I N D E X

EXAMINATION OF DOUGLAS W. WALKER: PAGE
November 29, 2022

By Mr. Seby 7, 164

By Ms. Bobet 152

DEPOSITION EXHIBITS: INITIAL REFERENCE
(Exhibits provided electronically to the reporter.)

Exhibit 803 Second Amended Notice of 30(b)(6) Deposition of The United States of America, 11/23/22; with attachments 11

Exhibit 804 Email to Walker from Woodall, 1/31/17, Subject: RE: Customs and Border Protection Air and Marine Operations Aviation Support; with attached emails; ND_000111563 - ND_000111564 104

Exhibit 805 Email to Woodall from Walker, 2/1/17, Subject: RE: Customs and Border Protection Air and Marine Operations Aviation Support; with attached emails; ND_000111606 - ND_000111608 111

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

(Deposition Exhibits 803 through 805 were introduced by Mr. Seby and electronically provided to the court reporter for marking.)

THE VIDEOGRAPHER: We are now on the record. Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is an request and agreement to go off the record.

Private conversations and other attorney-client interactions should be held outside the presence of the remote interface.

This is the remote video-recorded deposition of Douglas Walker. Today is Tuesday, November 29, 2022. The time is now 4:00 p.m. UTC, 9:00 a.m. Mountain. We are here in the matter of State of North Dakota v. The United States of America.

My name is Michael Banks, remote video technician on behalf of U.S. Legal Support. I'm not related to any party in this action, nor am I financially interested in the outcome.

At this time will the reporter, Tracy

Masuga on behalf of U.S. Legal Support, please enter the statement for remote proceedings into the record.

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the room and that I will be reporting this proceeding remotely.

They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

Counsel, please indicate your agreement by stating your name and your agreement on the record.

MR. SEBY: This is Paul Seby, counsel for the plaintiff, State of North Dakota. We understand and consent.

MS. BOBET: And this is Jane Bobet, counsel for the defendant, The United States of America, and we agree.

THE REPORTER: Mr. Walker, do you solemnly state that the testimony you are about to give in the cause now pending will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

DOUGLAS W. WALKER,

having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. SEBY:

**Q. Good morning, Mr. Walker.**

A. Good morning.

**Q. This will be the deposition of Douglas Walker taken pursuant to prior notice and arraign- -- or agreement of counsel.**

**My name, sir, is Paul Seby. I'm both an attorney with the law firm of Greenberg Traurig and the Special Assistant Attorney General for the State of North Dakota; and together with my cocounsel and colleague, Paul Kerlin, we represent the State of North Dakota in this matter.**

**And today we'll refer -- I'll refer to my client as -- collectively as "North Dakota" or "the State."**

**Do you understand that you've been sworn in this morning?**

A. Yes.

**Q. Please state your full name for the record, sir.**

A. It is Douglas William Walker.

**Q. And where are you located this morning, sir?**

A. In my office in Great Falls, Montana.

**Q. Is that your regular place of -- of -- is that your regular office?**

A. That is correct, yes.

**Q. Okay. What is the name of that office jurisdictionallywise for the Customs and Border Patrol? Is that a regional office of any kind?**

A. We refer to it as the Montana Air Unit, which is part of the Bellingham Air and Marine Branch.

**Q. And what is your title, sir?**

A. I am a supervisory air interdiction agent.

**Q. With the United States Customs and Border Patrol?**

A. With U.S. Customs and Border Protection Air and Marine Operations.

**Q. Got it. Okay. And as part of which federal agency?**

A. Department of Homeland Security.

**Q. Okay. Thank you.**

**Before we begin this morning, let's go over a few ground rules, most of which are just intended to help the deposition for recording**

**purposes, the court reporter and the videographer, be able to accurately reflect what we're talking about.**

**And, obviously, everything we are talking about is being written down and videotaped, and because of that, I would like to ask you to please verbalize your responses with a "yes" or a "no" or other manner of answer as opposed to just simply nodding your head "yes" or "no" and -- and/or providing quasi-verbal responses like "uh-oh" or "uh-huh," if that's acceptable. Is that --**

A. I will do my best.

**Q. Okay. Thanks.**

A. Yes.

**Q. Likewise, it's difficult for the court reporter to take down what we're saying if we inadvertently happen to talk over each other, so I'll do my best not to interrupt you if you would please do the same and let me finish my questions and then provide your response, if that works.**

A. That works.

**Q. Okay. If you need a break -- break, sir, at all, just let me know, and I just ask if there's a question that's pending, you please answer it and then we can take a break. Otherwise, we can shoot for a break every hour or so, but don't hesitate**

to say otherwise.
And if you don't understand a question that I've asked, just let me know, and I'll repeat it or rephrase it, and I'll do my best to clarify what I'm trying to ask you about, okay?
A. Sounds good.
Q. And if you answer a question I've asked, I'm going to assume that you have understood the question I'm asking; is that understood?
A. Understood.
Q. Okay. Do you have any questions about the proceeding at all, formatwise or processwise, that we can speak to now before we start?
A. I don't have any questions at this time.
Q. Okay. Sir, you've been designated by counsel for the United States to speak to 30(b)(6) topics posed by the State of North Dakota, and specifically those are 6, 9, 13 through 16, 18, and 20, as they relate to the Customs and Border Protection Department of Homeland Security. Do you understand that?
A. Yes, I do.
MR. SEBY: Okay. And, Jose, would you please put up the Second Amended Notice of 30(b)(6) Depositions of the United States of America, State of North Dakota document, and we'll make that an exhibit.
(Deposition Exhibit 803 was remotely introduced.)
MR. SEBY: All right. If you could go to the -- to the first page of this document, Jose, before we talk about the Exhibit A to it. There you go.
Q. (BY MR. SEBY) Mr. Walker, I just want to make sure that you have this deposition notice, which was served on your counsel last week, before the holiday, on November 23. Would you look this over and let me know if this is the exact document that you've been provided a copy by your counsel.
A. I will, yes.
Q. Okay. While you're doing that, I'll ask that this be marked as an exhibit.
MR. SEBY: Jose, what -- what exhibit number will this be?
MR. DIAZ: 803, eight hundred and three.
MR. SEBY: Okay. Thank you.
MR. DIAZ: You're welcome.
A. Could I get the next page, please.
Q. (BY MR. SEBY) Okay.
A. Okay.
Q. Does this look familiar to you at all?

A. Yes, sir.
Q. Okay. And so you've had this deposition notice and designation of topics for several days, and you're aware of this, right?
A. Yes, sir.
Q. Okay. Have you made yourself familiar with the topics for which you've been designated?
A. I have.
Q. Can you tell me about the process and how you did that.
A. We've had multiple meetings with counsel back in early November. Talked with the CBP attorney Frank Albi for -- with the videoconference on these topics of the proceedings that were going to happen.
Then the 9th of November, another meeting where I met with DHS and CBP counsel, and Ryan Wentz from the DHS, intelligence officer, and also had that with Frank Albi, Michelle Tonelli, Eugene Mok, and Norman Lieberman. That was via telephone for about an hour.
On the 15th, I also met with the U.S. Attorney's Office, DHS and CBP counsel, Ms. Jane Bobet, Bill Scarpato, Timothy Jafek, Frank Albi, Michelle Tonelli, for another hour and 20 minutes.
And then yesterday, 11/28, another meeting with the DHS, CBP counsel, and members from the U.S. Border Patrol Grand Forks Sector.
Q. Okay. So you -- altogether, how much time would you say you spent preparing for the deposition?
A. Approximately six hours.
Q. Okay. And was it all -- all spent speaking with the various counsel that you mentioned?
A. That is correct.
Q. Okay. How about nonattorneys and -- and program officials in the Custom and Border Protection?
A. Could you repeat that? It blurred out there.
Q. Sure. And there seems to be a -- just to make an observation for the record, there is a significant delay between when you are verbalizing a response and your physical reaction on the video.
A. Understood.
Q. I was asking you, when you were -- this six hours of preparation, was that all spent with attorneys?
A. That was with attorneys and members from U.S. Border Patrol and a DHS Intelligence Officer.
Q. Okay. And would you identify again, please, just so I'm clear, the nonattorneys from those

Page 14

**agencies that you met with.**

A. Ryan Wentz from DHS. He's an intelligence officer in Bismarck.

**Q. Okay.**

A. And then we met with U.S. Border Patrol agents Adam Wright from the Grand Forks Sector. And Border Patrol agents James Malone, which is the deputy -- one of the deputies at the Grand Forks Sector, and Derrick Stamper, who's a division chief at the Grand Forks Sector Border Patrol station.

**Q. Okay. And who selected those individuals for you to speak to?**

A. That would be counsel.

**Q. Okay. Had you spoken to those people ever before?**

A. I have spoken with Malone and Derrick Stamper and Mr. Wright back when I was stationed in Grand Forks.

**Q. Okay. Were they colleagues of yours that you worked with closely?**

A. They were part -- part of the U.S. Border Patrol Grand Forks Sector, and we were in the same -- we supported their area of responsibility. So being on the staff that they were, that I had direct contact with them in -- in weekly meetings.

Page 15

**Q. Okay. Were they colleagues of yours during the period of 2016 and 2017, or did they join that unit after that period of time?**

A. I believe Mr. Wright and Mr. Malone were part of the Grand Forks Sector during that time period and were colleagues of mine.

**Q. Okay. Okay. Can you walk me through chronologically how you prepared for the deposition? What did you do to prepare for the topics that you were told would be the subject of the deposition today?**

A. Okay.

**Q. What did you -- let's start with -- I'll -- I'm sorry to interrupt you. Let me just elaborate on my question so it's -- it's clearer.**

**What did you -- what did you review in advance of telephone calls and discussions? Excuse me.**

A. I'm not sure the exact date, but about a year and a half ago I received notice to find documents relating to this -- this case from CBP counsel of the -- of this trial that may happen.

So at that point I was going through what documents I could find and locate that involved Customs and Border Protection Air and Marine

Page 16

Operations and the DAPL protest, to make sure that those were saved and to be provided, to share, if necessary.

And then back in --

**Q. That was -- that was a year and a half ago?**

A. Approximately, that I remember.

**Q. Okay. And the documents, did you retrieve any that -- that were responsive to that request?**

A. Yes.

**Q. And what did you do with those?**

A. Those were saved and shared with counsel.

**Q. Which counsel?**

A. The CBP -- CBP attorney and U.S. Attorney's Office.

**Q. Okay. Which CBP attorney did you provide those to?**

A. That would be Mr. Frank Albi.

**Q. And how do you spell that gentleman's name, A-l-b-e or A-l-v-e?**

A. It is A-l-b-i.

**Q. Got it. Okay. And where is Mr. Albi located?**

Page 17

A. I believe Mr. Albi's office is in Chicago.

**Q. Okay. And he's agency counsel for the Customs and Border Protection?**

A. That is correct.

**Q. I see. Okay. All right. And then you provided them to the U.S. Attorneys you mentioned. What -- who were those individuals?**

A. Specifically, my counsel Jane Bobet.

**Q. Okay. Okay. Did you have conversations over those documents at all, or just -- just forward them?**

A. We had conversations back in early November with Mr. Albi.

**Q. Okay. Early November of this year, just this month, right, earlier this --**

A. Correct, November of 2022.

**Q. Okay. And were those conversations limited to the documents that you found and provided to them approximately a year and a half ago, as you've testified?**

A. Yes.

**Q. Okay. Did you look at any other documents as part of your preparation, other than the ones that you retrieved and forwarded a year and a**

**half ago?**

A. Yes. The background material binder that was provided by the U.S. Attorney's Office, and --

**Q. And when did you receive that binder?**

A. I received the binder on 7 November 2022.

**Q. Okay. What materials are in the binder?**

A. My understanding is the information provided by the State of North Dakota.

**Q. Okay. You were -- you were glancing at something. Is there a -- is there a binder in front of you?**

A. It's the binder -- yeah, correct, it's the binder that's on my desk.

**Q. Okay. Could you hold that up so we could see that, please, sir?**

A. (Deponent complied.)

MS. BOBET: And while he's doing that, Paul, I'll represent this is the general case preparation binder that we have provided to other 30(b)(6) witnesses and which the State have already.

**Q. (BY MR. SEBY) Okay. Mr. Walker, I couldn't see the document label on the binder. You held it up and it was blurry. If you just kind of**

**keep it on the screen so I can see it.**

A. (Deponent complied.)

**Q. Okay. There I go. General 30(b)(6) prep material.**

MR. SEBY: And, Jane, you're saying that that's the exact same document and compilation of documents that you have provided to us previously?

MS. BOBET: Correct, yeah. This is the binder of documents that I believe we provided to you after the first of these 30(b)(6) deps at your request.

MR. SEBY: Right. And there are no differences, without exception, to that earlier document that you provided to us?

MS. BOBET: There may be a difference in font on the title sheet, but no substantive differences.

MR. SEBY: Okay. So the contents of Mr. Walker's binder are the exact same that you provided to us previously?

MS. BOBET: Correct. The substance of the binder is the same as the general prep binder that we've provided to you previously.

MR. SEBY: Okay. Thank you.

**Q. (BY MR. SEBY) And with respect to that**

**binder, Mr. Walker, you then spoke with U.S. Attorney counsel concerning the contents of that?**

A. That is correct.

**Q. And when did you do -- when did you first begin that discussion on that binder?**

A. That meeting was the November 15, 2022.

**Q. Okay. So between when you were provided the binder on November 7 and you discussed it with your counsel on November 15, had you completely gone through and read the contents of the binder?**

A. To the best of my ability, yes.

**Q. And did your ability allow you to read the entire binder?**

A. I reviewed the -- the binder and the items that counsel said pertained to what I needed to be familiar with.

**Q. Okay. When did your counsel tell you which specific contents of the binder should -- should get the priority of your attention?**

A. That was within email traffic that the binder was being sent to me and what pieces of information to review.

**Q. Was that on November 7 also?**

A. I don't remember the exact date I received the email.

**Q. Okay. Was it the email that transmitted the contents of the binder electronically that you then printed, or were you sent a hard copy of the binder?**

A. It was a physical hard copy of the binder.

**Q. Okay. And you received -- that's the one you received on November 7?**

A. That is correct.

**Q. Which areas were you asked to focus on?**

A. Off the top of my head, I don't remember.

**Q. Okay. And then when you spoke with the individuals from the Grand Forks Sector, Mr. Wright and Mr. Malone and Mr. Stamper, were those always with counsel present?**

A. That is correct.

**Q. Okay. And did you -- what did you discuss with them?**

A. The discussion was to make sure I understood what their involvement was during the -- the DAPL protest.

**Q. Okay. And did -- did you learn anything that you didn't previously know as a result of those discussions?**

A. Well, one thing that I found out, that Mr. Wright was actually involved as -- in response during part of the protest in their -- in the Border Patrol's participation; that I did not know that before.

**Q. Would you elaborate on what you mean by that? I want to make sure I understand what -- what you're speaking about.**

A. So my -- U.S. Border Patrol provided agents and officers to the DAPL protest on request of the State. Mr. Wright was physically present and participated in -- in one of the rotations down to the protest location, and that's -- I had -- I did not have that direct information before.

**Q. Okay. And when -- when was he involved in that manner, himself? When did you learn that?**

A. So I learned, as of yesterday, that he was part of that, and that was during the October through November participation that they were present in of 2016.

**Q. Yeah. Okay. Okay. I'm going to ask you about that in a little bit. Thank you.**

**All right. Did you speak with anyone outside of the Customs and Border Patrol or Border Protection to prepare for your deposition today?**

A. No.

**Q. Okay. Okay. So today you understand you're testifying in your capacity as a 30(b)(6) representative of the Department of Homeland Security; do you understand that?**

A. Yes, sir.

**Q. Okay. And you understand that that means that the answers you provide are provided on behalf of the United States and specifically the United States Customs and Border Protection, United States Department of Homeland Security, as a whole?**

A. Yes.

**Q. Okay. And if you are at any time not answering as a representative of those agencies and you are talking in your personal capacity only, please let me know when -- when you might happen to do that, when you switch.**

A. Understood.

**Q. Otherwise, I'm going to assume that you are testifying in your official capacity on behalf of those agencies. Correct?**

A. Correct.

**Q. Mr. Walker, let's start -- and these -- these are -- these questions are specific to some**

**topics, several, as a matter of fact, but I'm going to ask you some general questions.**

**But what was your role with respect to the protests against the Dakota Access Pipeline construction in 2016 and '17?**

A. Could you repeat the question, please.

**Q. Can you give me an understanding of your role with respect to the protests against the Dakota Access Pipeline in North Dakota in 2016 through '17?**

A. So my personal role in the protests in 2016 and '17 was I was a supervisory air interdiction agent for the National Air Security Operations Center in Grand Forks, which is part of Air and Marine Operations.

I was a command duty officer, which was in charge of the day-to-day flights of the MQ-9, unmanned-aircraft system, the UAS, and also our fixed-wing and rotary-wing aviation assets.

I was also a sensor operator for the MQ-9 UAS system, and I was also a pilot in command of our AS350 AStar helicopter.

**Q. Okay. So with respect to those, the various pieces of aerial technology, let's start with the -- what is an MQ-9 UAS? What does that mean?**

[REDACTED]

[REDACTED]

A. [REDACTED]

**Q.** [REDACTED]

[REDACTED]



**Q. Okay. Who actually owns the drone? Is that Customs and Border Patrol?**

A. Customs and Border Protection Air and Marine Operations, correct.

**Q. And how long had you been operating that vehicle -- that device prior to the start of the DAPL protests?**

A. Personally, I was operating it since 2014, and continued to operate it up until my transfer

to the Montana Air Unit. Customs and Border Protection Air and Marine Operations began operating that platform in 2009.

**Q. Okay. And what sort of training did you receive to be an operator of that device?**

A. So the operations center in Grand Forks, NASOC Grand Forks, is the training site for Air and Marine Operations for all MQ-9 operators, both pilots and sensor operators. So I underwent the -- the approved training syllabus to become a sensor operator.

I also went through the syllabus to become a mission control element pilot, which is the part where you fly it once it's at altitude, and then eventually we do a launch and recovery element training syllabus so you can actually take off and land the -- the -- the UAS.

**Q. Okay. And who are the instructors for the Customs and Border Protection unit in Grand Forks that run that training operations? Are those all officials, people within the agency, or are they -- are they from other federal agencies?**

A. The instructor staff at the NASOC Grand Forks is a combination of General Atomics, instructor pilot contractors and sensor operator

instructor contractors, and then we also have instructor pilots at Air and Marine, air interdiction agents that are instructor pilots and sensor operator instructors, respectively.

**Q. Uh-huh.**

A. So it's a mix.

**Q. And is General -- General Atomics the manufacturer of the device?**

A. That is correct.

**Q. Okay. Why are they there in Grand Forks? Is there a specific reason that the unit is stationed there?**

A. One of the main reasons is because of the Air Force base and the ability to access the National Airspace System easily. The original standup was kind of a Senate-and-Congressional-based push. And back then -- currently, you know, Senator -- now Senator Hoeven, back then, in the day, it was Governor Hoeven, supported the expansion of the UAS system to there.

**Q. Does it also happen to be that -- because the base is close to the international border with Canada?**

A. That is one of the primary locations, yes.

**Q. Okay. And so what's the mission of the -- of the unit there in Grand Forks? Is it -- is it -- what part of the mission is dedicated to monitoring the security of the United States border with Canada?**

A. That is the primary mission of NASOC Grand Forks, and with a secondary mission of being the schoolhouse for all MQ-9 UAS operators, both pilots

and sensor operators.

Q. Okay. Okay. And that schoolhouse, if you will, is so that the rest of the -- of the agents in the agency can be properly trained in consistent protocols for missions elsewhere?

A. That is correct. We have locations in Sierra Vista and San Angelo -- Sierra Vista, Arizona, and San Angelo, Texas.

Q. So the individuals that also trained in Grand Forks are not only trained for purposes of monitoring and protecting the security of the United States border with Canada, but also the United States border with Mexico?

A. That is correct.

Q. Okay. And do those -- those locations in Arizona and Texas also have stationed MQ-9s?

A. Yes, they do.





**Q. And -- and were you the pilot of that vehicle?**
A. I was a pilot of one of them during the -- the 21 February eviction process of the main Cannonball camp.

**Q. Okay. Had you operated that vehicle prior to that -- that aerial vehicle, the helicopter prior to that time frame?**
A. Yes, sir.
**Q. At the DAPL protests?**
A. Air and Marine Operations dispatched a heli- -- one of those helicopters to the DAPL protest in October of 2016.
**Q. Got it. Okay.**
**So would you walk me through the time frame that these -- I know you just did that for the helicopter, but when did the involvement of the MQ-9 begin in North Dakota concerning and with respect to the Dakota Access Pipeline protests?**
A. I believe the first flight was 22 August of 2016.
**Q. Okay. Can you walk me through how that device came to be deployed in North Dakota to monitor or observe the Dakota Access Pipeline starting on August 22, 2016?**
A. We received -- Air and Marine received a request to provide aviation -- or, you know, live downlink feed. We had an Office of Investigations agent that was part of our operations in Grand Forks that was involved with part of the protest -- or, I guess, not the protest, but the -- he had points of contact within the law enforcement network that we had -- and was requested to provide downlink source to the emergency operations center at the Morton County Sheriff's Office.

**Q. And that individual's name is who?**
A. That would be Chris Bacon, and he is deceased now.
**Q. Okay. And did any other individuals attend the Morton County Emergency Operations Center with Mr. Bacon?**
A. Not from Air and Marine until 2017, in February.
**Q. And Mr. -- Mr. Bacon, you mentioned he's passed away. Did he -- what was the duration of his presence in the North Dakota Emergency Operations Center?**
A. I believe he was there through the December time period, and was also --
**Q. December of 2016?**
A. Correct. He would -- he would go and visit and set up his -- he was more of a remote liaison in the ability to get the information and coordinate as necessary to get those links established.

**Q. Sure. And so -- and during that time, you, as the sensory operator, were located in Grand Forks?**
A. That is correct.
**Q. And was the pilot also located in -- in Grand Forks with you?**
A. Yes.



Page 38

Page 40

Page 39

Page 41

Q. Yeah. Okay. And so when you were --

Let's steer away from the border example, but when you are flying over the Dakota Access Pipeline protest camps -- let's use the main camp, the Oceti Sakowin. Does that name sound familiar to you?

A. I remember the name, correct.

Q. Yeah. Do you understand that name to be the main camp?

A. Yes.

Q. And do you understand that that was located on Corps of Engineers property?

A. Yes.

Q. Okay. And that would be the camp north of the Cannonball River?

A. If my geography is correct, yes.

**Q. Sure. So let me ask you a clarifying question. You -- I believe you said that the MQ-9 began to be in service relative to the Dakota Access Pipeline protests on August 2017 [sic] of 2016; is that correct?**

A. I believe it was 22nd of August of 2016, yes, was when we started flying.

**Q. Got it. And then I just heard you say a moment ago that you only did a couple of flights of that vehicle over the DAPL protests in 2017, correct?**

A. That is correct.

**Q. Okay. So that means, then -- or does that mean that a different colleague of yours was the first to be the sensory operator in -- in August -- starting August 22, 2016, and you came later?**

A. Yes.

**Q. Okay. So who was the individual that you know of to be the pilot and/or sensory operator, August 22 on?**

A. I don't have that information.

**Q. Did you -- did you talk about that with the gentlemen that you mentioned were part of your preparation?**

A. No.

**Q. How do you know what they saw and/or did?**

A. So part of my position was a command duty officer, so I was in charge of maintaining the flights of the day, which may have been the 22nd of August or the 23rd of August, depending on what duty officer was on that day.

So I also monitored the Bigpipe feed. That feed is also displayed in our operations center during the flight; and as a sensor operator, knowing how the system operates and how they would use that platform.

**Q. Oh, okay. So is it -- is what you're telling me that you weren't the actual sensory operator on duty utilizing the MQ-9 over the DAPL protests until 2017, some time frame, but that when those began in August -- on August 22 of 2016, you were back at the Grand Forks facility, and you were monitoring what those individuals were doing at that time in August and thereafter?**

A. That is correct.

**Q. Okay. Got it. And -- and you did that in your capacity as command duty officer, right?**

A. Correct.

**Q. And what --**

A. We had multiple -- multiple -- I'm sorry. It stuttered out. Go ahead.

**Q. Pardon me. This delay is making it -- we're tripping on each other because of the delay. I apologize for that, but it's a technical circumstance.**

**In your capacity as the command duty officer, were you a manager of sorts of the pilot and the sensory operators?**

A. Yes. That function also fell in -- as a supervisory air interdiction agent. And we can have other supervisory air interdiction agents or command duty officers assigned for the day or assigned for parts of the day to be in charge of the overall operations of the office and flights being conducted.

**Q. Can you -- I would like to understand the -- when you were the command duty officer and other people were piloting and/or the sensory operator of the MQ-9 drone, were you the person consistently in that position of -- or was there a rotation of that as well, given the duration that the vehicle is in place, operating?**

A. So, yes, the -- the duties would rotate between other command duty officers, or supervisory interdiction agents, and be in charge of the -- the flight during the day and the -- or night, depending on how long the flight went.

1    Q.   How many other people served in that
2  capacity of being the manager of the pilot and the
3  sensory operator while -- while it was in service?
4       A.   I believe at that time we had four to
5  five other supervisors and command duty officer
6  positions filled.
7       Q.   Okay.  And were those people all in
8  Grand Forks as well?
9       A.   That is correct.
10      Q.   Okay.  And so would you help me
11 understand how long, starting on August 22 of 2016,
12 how long did that -- did that vehicle deploy
13 in service relative to the Dakota Access Pipeline
14 protests?
15      A.   I believe we had flights that started
16 22 August 2016, and we continued to try and -- or
17 provide aviation support with the UAS up until
18 23 December 2016; and then we began again in 4 January
19 2017 up until approximately 20 February, if my memory
20 serves me right, of 2022 [sic].
21           Some of those days we did fly; some days
22 ███████████████████████████████████████████████
23 ███████████████████████████████████████████████
24 ████████████████████████████████
25 ████████████████████████████

1  ████████████████████████████████████████████
2  ████████████████████████████████████
3       Q.   Yeah.  Okay.  And so who had access --
4  who was provided access to the Bigpipe system with
5  respect to the feeds coming from the MQ-9 that was
6  deployed by the Customs and Border Protection
7  Grand Forks unit to monitor the DAPL protests?
8       A.   The feed was provided with the -- any
9  command duty officer would have access to that.  Our
10 operations center would maintain a -- a feed to
11 monitor the aircraft and to assist with the chat
12 function to relay to the sensor operator; if the
13 camera was requested to be moved to another location
14 or to help the pilot move the airframe to another
15 location; and a feed was provided to the Morton County
16 Sheriff's Office Emergency Operations Center.
17      Q.   Okay.  So let's break it down by --
18 within North Dakota, you -- you allowed access to the
19 feed to the Morton County Emergency Operations Center,
20 correct?
21      A.   Correct.
22      Q.   Anyone else in North Dakota?  Any other
23 location or persons?
24      A.   To my knowledge, other than what I've
25 stated, no.

1       Q.   Okay.  How about to the State Emergency
2  Operations Center?
3       A.   That might have -- they might have had a
4  feed, but I'm not sure if the State operations -- an
5  emergency operations center that was different from
6  the Morton County EOC.
7       Q.   Okay.  Do you -- do you know a location
8  by the name of Fraine Barricks?
9       A.   I do not.
10      Q.   Okay.  And so the -- the operations
11 center, the Customs and Border Protection Operations
12 Center in Grand Forks is what you're referring to
13 there in terms of the other -- other location?
14      A.   That is correct.
15      Q.   Okay.  And then was there a -- an
16 additional federal facility or location that also was
17 given a feed?
18      A.   The feed would also have been provided
19 or able to be accessed by Air and Marine Operations
20 headquarters personnel that had the authority to
21 access that -- that live feed as well.
22      Q.   And where is that facility located?
23      A.   That would be in Washington, D.C., the
24 Ronald Reagan Building.
25      Q.   And as part of the Department of

1  Homeland Security?
2       A.   Part of Customs and Border Protection
3  Air and Marine Operations.
4       Q.   Okay.  And so did -- did anyone else in
5  the federal government have the ability to view that
6  feed, apart from those locations -- those -- that
7  location in the Ronald Reagan Building in Washington,
8  D.C.?
9       A.   At that location, to my knowledge, no.
10      Q.   Could any others --
11      A.   The only other that would have been able
12 to view the feed would have been at the Morton County
13 EOC, those officers or agencies present at that
14 location.
15      Q.   How about the individuals at the
16 headquarters in Washington, D.C., at the Ronald Reagan
17 Building, the federal building, Customs and Border
18 Protection, could they provide and forward the feed to
19 anyone else?
20      A.   No.
21      Q.   Okay.  Was the feed provided to any
22 other federal agency during the time period of 2016 to
23 2017?
24      A.   To my knowledge, directly, no.
25      Q.   Did any other federal agencies or

officials request access to that footage?
A. To my knowledge, no.
Q. Do you know why the Customs and Border Protection did not share it with the Corps of Engineers?
A. I would have to say that the Corps of Engineers did not request access.
Q. Did they know that they could; that it was there?
MS. BOBET: Objection, calls for speculation. We're also pretty far outside the scope of any of the topics. If Mr. Walker knows in his personal capacity, he can answer.
MR. SEBY: These questions all pertain to topics 9, 13, 14, and others, Ms. Bobet. So I'm asking about them as an introduction to the topics to save us some time. So I can repeat this for each topic, if you would like, and then we'll be here for seven hours.
MS. BOBET: I mean, this is my first objection to your line of questions. I understand a reasonable introduction is necessary. But if we're getting into talking about especially "What did other agencies know," that calls for speculation. He can answer in his personal capacity if he knows.

Q. (BY MR. SEBY) Mr. Walker, let me rephrase that so I'm not asking you to speculate, which I wasn't.
Do you know whether the Corps ever asked for the feed?
A. I do not.
Q. Did any other federal agency ever ask Customs and Border Protection for the feed?
A. To my knowledge, no.
Q. Do you know whether or not any other federal agency was aware of the feed, of the availability of the feed?
A. I would have to say just those that were directly involved at the EO- -- the emergency operations center would know of the feed.
Q. Okay. And so there were -- is it your understanding that there were other federal officials present in the Morton County Emergency Operations Center who were aware of the footage provided through the Bigpipe feed to the Morton County facility, and they were aware that the Customs and Border Protection Grand Forks unit was providing that information?
A. That is correct.
Q. Do you know which other agencies, federal agencies and officials, that might be?

A. To my knowledge, the FBI, the U.S. Attorney's Office, the U.S. Marshals.
Q. And the Corps of Engineers, correct?
A. And the Corps of Engineers, yes, sir.
Q. Did you ever go to the emergency operations center yourself?
A. I did, yes.
Q. Okay. When did you go there?
A. I went in late February, approximately the 20th of February.
Q. Okay. And -- and the other gentleman was there routinely prior to that?
A. Mr. Bacon would -- correct. He would also go there and visit, be part of it, also do remote -- once the -- as downlink in the information was established and the -- they were able to operate the Bigpipe system, then he was able to come back.
We also did have one other agent from NASOC Grand Forks attend the DAPL -- or the EOC in early February. I relieved him in the 20 -- on the 20 February.
Q. Okay. So Mr. Bacon was the primary Customs and Border Protection individual first physically there on August 22 of 2016, and then once it was set up and functioning, he then monitored the

EOC on a daily basis but did so remotely from Grand Forks?
A. I believe so, yes.
Q. Okay. How did that interaction work? Was there pretty consistent service of -- of the information coming from the vehicle?
A. When we were able to fly and see the ground, yes.
Q. How much -- how -- how frequent were weather-related interruptions of service?
A. I don't have that information.
MR. SEBY: Okay. We've been going for more than an hour. Let's -- Mr. Walker, can we agree to take a break for 10, 15 minutes?
THE DEPONENT: I would love one.
MR. SEBY: Sure, sure. Don't ever hesitate to remind me. I just got -- got asking questions and I lost track of the time.
So let's come back in 15 minutes, if that's okay.
THE VIDEOGRAPHER: Going off the record. The time is 5:14 p.m. UTC, 10:14 a.m. Mountain.
(Recess taken 10:14 a.m. to 10:27 a.m. Mountain Standard Time.)
THE VIDEOGRAPHER: Back on the record.

Page 54

The time is 5:27 p.m. UTC, 10:27 a.m. Mountain.

**Q. (BY MR. SEBY) Mr. Walker, we're back after a short break. And you were telling me about the -- the other federal officials present at the Morton County Emergency Operations Center also in August of 2016 when the Customs and Border Protection joined those meetings on August 22.**

**Do you know when the Bigpipe feed was established in the Morton County EOC?**

A. I would have to say that it was the 22nd of August 2016 when we provided the first overflight with the UAS.

**Q. Okay. All right. And remind me again, if you would, you were requested -- Customs and Border Protection was requested to be there?**

A. That is correct.

**Q. And who -- who made that request, do you know?**

A. I do not know.

**Q. Was it the State of North Dakota or Morton County?**

A. I don't -- I don't remember who the initial request came from.

**Q. Okay. Do you know who the request was -- was made to in the Customs and Border**

Page 55

**Protection?**

A. That would have been direct to the National Air Security Operations Center Grand Forks, so NASOC Grand Forks.

**Q. Do you know who the individual that received the request was?**

A. I don't have the specific name, no.

**Q. Okay.**

A. As -- as a command duty officer, the request like that would have come through and been given to the -- the director of air operations, the -- the officer in charge, the agent in charge of NASOC Grand Forks at that time, which was Max Ratterman, who has since retired from CBP and Air and Marine Operations.

**Q. How do you spell Mr. Ratterman's last name?**

A. R-a-t-t-e-r-m-a-n.

**Q. Okay. He was the director of the whole Grand Forks Air Unit?**

A. That is correct.

**Q. So he was your boss, so to speak, right?**

A. Yes.

**Q. Was he your immediate boss, or was there a level between?**

Page 56

A. So I had a deputy director of air operations in between myself and the director.

**Q. And who was that individual?**

A. The deputy director of air operations was David Fulcher, F-u-l-c-h-e-r.

**Q. Fulcher.**

A. Yes, sir.

**Q. Okay. And you mentioned that the -- the Bigpipe feed for the Dakota Access protests that were monitored by the MQ-9, the Customs and Border Protection unit air ops, provided that information to the agency's office in Washington, D.C., headquarters building. Is that -- that Ronald Reagan office that you mentioned is the headquarters of the Customs and Border Protection?**

A. Yes.

**Q. Okay. Is that also the location of the Department of Homeland Security headquarters office?**

A. I do not believe so.

**Q. Where is that located?**

A. It's, my understanding, in Washington, D.C. I've never -- but the physical address, I'm unaware of it.

**Q. Okay. During your tenure as the command duty officer, did you report to anyone in the agency**

Page 57

**with respect to the operations of the MQ-9 and what it was seeing?**

A. I'm not sure I understand your question.

**Q. What was the --**

**In addition to managing the pilots and the sensory operator doing the -- the actual monitoring work with the drone, the aerial drone, the MQ-9, what sort of briefings or other discussions and meetings did you have with respect to what that device was observing in North Dakota? Did you do -- did you participate in -- in meetings or discussions apart from the physical operation?**

A. There may have been discussions with the deputy director and the director, along with our National Air Security Operations Center headquarters in Washington, D.C., of what we were providing in -- in regards to the Bigpipe, and coordinating the access for those that needed the access to the Bigpipe. And other than that, just our daily shift briefings in the morning and crew briefings as they went to do their duty.

**Q. You said there may have been discussions with the director and the deputy director. Is that you don't recall any specific ones, or do you?**

A. I don't -- I don't have specific dates

of when those meetings happened, but we would have morning shift briefs, and during those shift briefs is when the staff and pilots, everybody would discuss the mission for the day and as the ongoing missions were conducted.

**Q. And was the director and deputy director involved in those?**

A. Yes.

**Q. And those were pretty frequently on a daily basis?**

A. Yes, sir.

**Q. Okay. Did those individuals -- are you aware of whether those individuals communicated the information from those daily briefings to others in the chain of command of the Customs and Border Protection?**

A. I don't have a direct knowledge of that.

**Q. Did anyone from the headquarters of the Customs and Border Patrol ever participate in your daily briefings?**

A. From headquarters, no.

**Q. Okay. Do you know whether or not the director or the deputy director participated in discussions with the headquarters of the Customs and Border Protection concerning the -- the Bigpipe, the**

**information that was obtained and shown on the Bigpipe system?**

A. I don't know that I understand your question exactly on that one.

**Q. Did the director and the deputy director -- and/or the deputy director ever -- were you aware that either of those individuals was communicating the observations from the -- the MQ-9 in North Dakota to the headquarters office?**

A. As a supervisor or even in the deputy director role, director role, I would imagine they did daily discuss missions with the higher headquarters, Air and Marine Operations headquarters on how the mission was going and what was being provided.

**Q. On a daily basis?**

A. I can't -- I don't have that information if they did it daily or every other day or what their frequency of meetings were.

**Q. Would you -- would you characterize it as frequently?**

A. I would safely say frequently, yes.

**Q. Okay. Do you recall ever hearing or receiving -- directly receiving a request for information from headquarters, Customs and Border Protection?**

A. I do remember one back in early February 2017 as to what our involvement or how -- how involved we were in the emergency operations center on a day-to-day basis, as they were getting inquiries to what our involvement was in the protest.

**Q. And how did you respond to that inquiry at that time?**

A. We were -- we responded -- from what I remember, we responded of what we were doing on a daily basis, and at that point, they directed that an Air and Marine agent from Grand Forks be physically present in the operations center in Morton County.

**Q. Okay. So they -- they directed the dispatch of a -- of an official -- of a Customs and Border Protection individual back, like it started, in 2016, August 22?**

A. My understanding -- well, my understanding is that 2016, our agent, Chris Bacon, was providing that service to them.

**Q. Yeah.**

A. However, physical but remotely. But when -- in 2017, they directed that we send an -- basically an aviation liaison to the location to provide -- to make sure the Morton County Emergency Operations Center was getting the necessary products

that they were requesting or wanting, and that the higher headquarters could then say that they've -- we've got representation at the location.

**Q. Got it. Okay. Did -- did the -- apart from the -- providing the feeds directly to other federal agencies, did -- were you aware that Customs and Border Protection was ever providing any briefings to those other agencies?**

A. No.

**Q. Were you ever requested to do so?**

A. I do not believe so.

**Q. Did you ever attempt to contact other agencies and say, "We've got some information we would like to share"?**

A. No, not that I know of.

**Q. Okay. So you never shared -- Customs and Border Protection never shared its information with the Army Corps, correct?**

A. To the best of my knowledge, directly, no.

**Q. With the Department of Justice?**

A. Directly, no. Our information would have been shared -- our information would have been shared at the emergency operations center where that video feed was coming.

Q. Sure. And so whoever was there would have -- would have -- it would have been shared with?
A. Yes.
Q. Okay. Apart from that, though, you didn't share with it with the Corps apart from that, or the FBI apart from that, or the Department of Justice apart from that, correct?
A. That -- that is -- yes.
Q. Or with anyone else within the administration, the federal administration?
A. The feed -- the only information shared was the direct feed that those had access to --
Q. Right.
A. -- or -- and an end-of-shift report that rolled up the day, how much time we had spent flying. That's sent out daily by -- an end-of-shift report.
Q. And who do those -- what is -- what is the content of the end-of-shift report?
A. The total amount of hours flown for the day and any significant activity that might have required to be passed.
Q. To be passed as information to someone else?
A. To our headquarters personnel. Basically, our -- our -- the NASOC Grand Forks -- the

NASOC headquarters staff would get that report just so they knew what we flew for that day and if there was anything significant that they needed to be aware of: why we landed early, any kind of emergency we may have had to deal with, that -- that kind of -- the flight information.
Q. How about the nature of what was observed?
A. None of that information would have been passed.
Q. Would not have?
A. Correct.
Q. Okay. Does the Grand Forks unit maintain the daily shift reports from 2016 to 2017?
A. I do not believe we have those records anymore. They would have been . . .
Q. Would have been what?
A. They -- they have a -- a shelf life, after a certain amount of time, that those reports would be destroyed.
Q. And what is that shelf life?
A. I don't have that information.
Q. When you say "destroyed," what do you mean by that?
A. The flight sheets for that period would

be shredded.
Q. When did that practice begin?
MS. BOBET: I'm going to object here. This witness wasn't designated on document-retention issues or anything of the like. So I think it's outside the scope of -- of what he's been designated for. If he knows in his personal capacity, he can answer.
Q. (BY MR. SEBY) We'll wait until we get to a specific topic so Ms. Bobet's concern is resolved, because that comes up under a topic. So I'll just wait there.
Let's go back to the notice of the deposition, and we're going to go through the individual topics now. I've been asking general questions regarding those topics, 9, 13, 14, and several others, and now we're going to talk about the first topic that you've been designated for. It's topic 6 there at the bottom.
And I'll give you a moment, Mr. Walker, to refresh your review of that and so we can talk about it.
A. One second. My video screen is covering it up here. I've got to figure out how to --
MS. BOBET: I think on the upper left

there's a -- what looks like a little minimize button. If you see thumbnails, you can click "hide thumbnail video." That might help.
MR. DIAZ: Does it help if I lower it?
THE DEPONENT: Yes, please. That's good right there. Okay.
Q. (BY MR. SEBY) Okay. Do you -- are you aware of the -- prior to reading it just now, is it accurate that you've reviewed this before?
A. Yes, sir.
Q. And did you do any research on this topic?
A. Just what we've -- I discussed with counsel.
Q. Prior to discussing with your counsel, were you aware of any -- anything responsive to this topic?
A. I'm not aware of any statements made by Department of Homeland Security or Customs and Border Protection in regards to the permits.
Q. Okay. You said Mr. Bacon was the individual that first was dispatched to the Morton County EOC on August 22 of 2016. And how long did Mr. Bacon stay in his capacity as -- as the chief liaison with North Dakota?

A. Mr. Bacon was active during the entire situation.

**Q. Okay. So 2016 to 2017?**

A. Yes, sir.

**Q. Okay. And you indicated that he's deceased, right?**

A. Yes.

**Q. When did he pass away?**

A. He -- if memory serves me, it was 2018.

**Q. Okay. Was he retired from the agency, or was he still employed by the agency when he passed away?**

A. He was employed. It was a line-of-duty death.

**Q. How did he pass away?**

A. A vehicle accident.

**Q. In North Dakota?**

A. In Minnesota.

**Q. Ah. All right. So other than talking to your counsel, did you talk to the individuals in the Customs and Border Protection unit, that you indicated were active duty during the DAPL protest, with respect to this topic?**

A. No, I did not.

**Q. Mr. Wright -- Mr. Wright or Mr. Malone**

**or Mr. Stamper?**

A. We had our discussions yesterday.

**Q. Did you ask them about this topic?**

A. No, I did not.

**Q. So the only people that you talked to to prepare for this topic was your counsel, Ms. Bobet, and -- and the other attorneys?**

A. That is correct.

MS. BOBET: Objection, misstates testimony.

**Q. (BY MR. SEBY) Were any of those counsel present during the DAPL protest, present in their capacity as -- as employees of the Customs and Border Protection?**

A. I -- I do not know.

**Q. Did you review any documents in connection with this topic?**

A. Just those documents that were provided in the binder.

**Q. Okay. So is it accurate, as the representative of the United States for the Department of Homeland Security and Customs and Border Protection, that you have no knowledge about this topic?**

A. I have no --

MS. BOBET: Objection, misstates testimony.

**Q. (BY MR. SEBY) I'm sorry, Mr. Walker, what were you saying?**

A. I was interrupted there.

**Q. Right. Please answer, sir.**

THE DEPONENT: Ms. Bobet, could you repeat what -- I don't -- I missed that.

MS. BOBET: Oh, I'm sorry. My -- I was making an objection that the question misstates testimony, but you may answer.

**Q. (BY MR. SEBY) Yeah, she's not coaching you on your responses. I'm asking you for your response.**

A. Understood. I have a helicopter landing outside my window, so --

**Q. Okay. No problem.**

MS. BOBET: Fair enough.

**Q. (BY MR. SEBY) Repeat, sir.**

A. So to my knowledge, DHS and CBP, there was no public statements made about the application for special-use permits.

**Q. To your knowledge. But how about as testifying on behalf of the Customs and Border Protection, what --**

A. Sure. As -- as -- on behalf of Department of Homeland Security and Customs and Border Protection, I know of no public statements made --

**Q. Okay.**

A. -- by the agency.

**Q. Okay. And if we can go to topic 9, please. If you take a moment and refresh your understanding of that topic.**

A. Okay.

**Q. And did you do any research on this topic?**

A. Beings I was directly -- personally directly involved in the day-to-day operations, I was familiar with the encampments as we were given -- provided information from the State operations center of the location of those encampments, and their assessment of the -- the encampments, and also viewing the Bigpipe feed as it came down, as we were providing that resource to the State, and then also during my time as a pilot in command during the eviction process of the encampments in February of 2017.

[redacted]



Q. Okay. When you say "customer of interest," what does that mean?

A. Well, Air and Marine Operation provides a law enforcement platform for any entity, law enforcement entity, or even the Corps of Engin- -- Army Engineers to provide them aerial imagery. We've provided the Corps of Engineers imagery of flooding along the Red River from Fargo up to the northern border and Bismarck and the Mississippi River.

Q. So in the -- prior to the DAPL, and I'm

assuming after the DAPL, you have -- the Corps has been one of your customers of interest, right?

A. You would get -- that would be correct, the Corps or FEMA.

Q. Okay. And do they ask you for that information to be a -- do they ask to be a customer of interest?

A. I say "customer of interest," but a -- I'm trying to put it in a way that we can provide that service to other agencies or customers, if you will.

Q. Yeah, sure. I understand.

But did -- do you recall instances prior to 2016 where the United States Army Corps of Engineers asked the Customs and Border Protection aerial drone unit to provide information, aerial information?

A. That would -- if my memory serves me correctly, that would have been in 2014 and 2015 when there was flooding.

Q. And that was what? The Corps asked you for information, or you offered it?

A. I believe the Corps provided a request for that information through -- and in -- in association with FEMA.

Q. And did the Customs and Border Patrol

agree to do that?

A. Yes.

Q. And -- and the -- the information provided was from the MH-9 [sic]?

A. That would have been information -- the Bigpipe downlink from the MQ-9, yes.

Q. MQ-9, pardon me.

So just prior -- the year -- year or two just prior to the protests, you were providing -- the Corps of Engineers was a customer of interest to -- to the Border Protection aerial drone unit?

A. That is correct.

Q. Okay. How about after the DAPL protest, did you ever have occasion to be helpful to the Corps of Engineers in North Dakota?

A. Yes, we have.

Q. And what were those events?

A. One specifically that I was directly involved in was to fly members from the Corps of Engineers on the Fargo diversion project. So I took an AS350 helicopter from Grand Forks to -- up to Fargo, picked up three members of the Corps of Engineers leadership, and provided them an overflight of the Fargo diversion project that was being constructed, dropped them off, and then returned the

helicopter home.

**Q. So what was different about the Dakota Access Pipeline that the Corps wasn't a customer of interest?**

A. Well, I would have to say that they didn't ask for the -- the service.

**Q. They sure knew that it existed, though, right?**

A. To the best of my knowledge, yes.

MS. BOBET: Objection, calls for speculation, outside the scope.

**Q. (BY MR. SEBY) Okay. So you've had a chance to read topic 9, then, right?**

A. Yes.

**Q. Okay. And did you do any research about this topic prior to the deposition today?**

A. Just the going through the binder, and counsel, and going through my memory banks of participating in these operations.

**Q. How about talking with Customs and Border Protection personnel?**

A. We did have -- I did have a conversation yesterday with U.S. Border Patrol agents that were part of the response in October.

**Q. Okay. Were any of those individuals**

**the -- the director or the deputy director at the time?**

A. No.

**Q. Are those people still at the agency?**

A. The deputy director still -- has been promoted to the director of air operations for NASOC Grand Forks, and the director, Max Ratterman, who we talked about earlier, has retired.

**Q. But you didn't talk to the deputy -- to the director -- the former deputy director at the time of the protest, and now the director, you didn't speak with that person, or did you?**

A. The only discussions I've had with Director Fulcher is the fact that I was being -- that I was part of this deposition and going through this process, to make him aware of the -- the proceedings.

**Q. Did you consult with him on any of the topics?**

A. No.

**Q. Why not?**

A. Director Fulcher and I were both directly involved in all of this, so I believe -- personally, I did not need to -- deem it necessary to have a discussion with him.

**Q. You did not?**

A. Correct.

**Q. What did the Customs and Border Protection learn about the protest camps associated with the Dakota Access Pipeline?**

MS. BOBET: Objection, vague.

A. Customs and Border Protection, as operators of the -- local operators of the MQ-9, we would have had firsthand knowledge of what we viewed through the camera system or the video feed from Bigpipe. The briefings were provided by the State in their daily intelligence briefings that they provided to the partners.

**Q. (BY MR. SEBY) So let's break that down into two. What -- what did you -- what did the Customs and Border Protection learn or know based upon the firsthand knowledge of what was viewed by the Customs and Border Protection aerial drone as -- as information was shown to the pilot and the sensory operator, and then shared through the Bigpipe system?**

A. So as that's a live feed, the Customs and Border Protection NASOC Grand Forks would have learned locations of all of the encampments via the information provided by the State. We would have been able to -- we would have witnessed or viewed on the camera the activities being conducted at that

location. And the overall real role of that were for the -- you know, we would provide that video downlink to the State or the operations center for situational awareness so they can determine the responses or what they need to do to react accordingly.

**Q. Okay. The State and the other federal officials that were present in that same room, right?**

A. That is correct.

**Q. And, again, we've talked about -- you've told me that that was the -- included people from the U.S. Attorney's Office, Department of Homeland Security, the FBI, the Corps, the Marshals Service, for example, correct?**

A. Yes, sir.

**Q. Okay. And so you talked about the witnessed activity conducted in the camps, right?**

A. Yes.

**Q. What did you witness? Or more appropriately, what did the Customs and Border Protection aerial drone unit witness?**

A. So they would have witnessed the actual -- you know, the activities of those protesters at either the encampments or the drill sites or the traffic control points, wherever the emergency operations center deemed the video or the camera be

positioned, to review those.

I remember personally seeing individuals climbing on top of equipment within some of the drill sites where they had overrun and displaced the workers.

**Q. And what else?**

A. We would have saw the -- they would have seen the -- what the encampments looked like, the buildings or tents or vehicles that were positioned on lands that were being used; they would have saw, you know, the traffic control points; they would have saw the -- you know, basically, whatever the -- the State or -- wanted that to look at, what they were viewing at the time, would have been -- would have been viewed.

**Q. So with respect to observations that Customs and Border Patrol made of the camps that were located on Corps of Engineers land, you saw the presence of buildings?**

A. On the Corps of Engineer land, State land, and tribal land, correct, we -- we saw buildings, housing-type, you know, tents or travel trailers, vehicles.

**Q. A lot of -- how many? A couple or -- or a lot?**

A. Depending on the camp, it was a considerable amount of equipment and personnel and housing-type structures, tents, trailers, that kind of stuff.

**Q. Okay. Did you ever use that aerial imagery to count anything, vehicles, buildings, people, horses?**

A. I -- we would have given the State the ability to review that and determine the information that they wanted. That may have been -- that may have been transmitted across the chat function by the operat- -- you know, if somebody at the operations center was wanting a better clarification to the sensor operator of what they were viewing or what they thought they were viewing, and that might -- that would have been relayed back through the chat. But a specific -- specific information, I don't have that information.

**Q. So this -- this chat function, would the Customs and Border Protection agents field questions from people -- from people who were on the receiving end of the imagery?**

A. Yes.

**Q. And did you receive questions on the chat function from State of North Dakota representatives?**

A. Whoever was operating the Bigpipe feed at the operations center would have been who we would have got the information from. I don't have any way to identify who that or what agency that individual was part of.

**Q. So how did it look when the chat function was -- people typed in something that was posted on the chat board? You could tell where it came from?**

A. So the chat function identifies on one side of who is logged in to the system and their purpose or position within the agency or agent feed being supported; and then on the chat function would be the active communication back and forth by whoever was typing the question -- or whoever's account was being used to ask those questions.

**Q. So you could tell if a question originated from Morton County EOC, for example?**

A. If it came from -- correct.

**Q. Okay. How often did you follow the chat during the DAPL protests as the -- I apologize. I keep not recollecting the name of your position at that time.**

A. Command duty officer.

**Q. Command duty officer, yes. Pardon me.**

**You saw the chat entries from time to time, or pretty frequently?**

A. From time to -- yes, frequently and time to time --

**Q. Okay.**

A. -- depending on how my -- how much of my attention was provided to the Bigpipe between other duties I might be conducting at my desk.

**Q. Right. Right. And did you see Morton County EOC pose questions on the chat function?**

A. I do remember that, yes.

**Q. Okay. And what was the practice, then? Someone from the Customs and Border Protection would respond with -- with information relative to that Morton County EOC chat?**

A. A lot of it would be from the EOC. They would ask, you know, "Could we move the -- move the camera to a new location," a different encampment or a position, latitude, longitude, where they may have -- need to review something going on on the ground.

**Q. Uh-huh.**

A. A response from us would be a "Roger" or "Stand by."

Or they would ask how long before they



could get that picture. We would give an estimated time before we were able to give them that picture.

**Q. Would they ever ask questions about what was being observed?**

A. I would have to say yes. There were a couple times, it was like, "What was -- what was that?" Or "Do we know what kind of vehicle that might be?" that kind of questioning.

**Q. Uh-huh.**

A. Or "How many do you" -- you know, "How many individuals do you see?" Just to -- I don't want to say clarify, but to reassure or quantify what the operators were looking -- the individuals were looking at at the EOC.

**Q. Sure. Sure. And was the Customs and Border Protection willing to respond to those requests for information and clarification?**

A. Yes.

**Q. How about entities other than the Morton County EOC, did you oversee any other authorized Bigpipe account also put anything in the chat?**

A. I do not recall.

**Q. And you did see them?**

A. Yes.

**Q. Okay. Okay. Let's talk about topic 13.**

MR. SEBY: If we could put that up, Jose.

**Q. (BY MR. SEBY) This one reads, "Actions taken by the United States . . . during the DAPL Protests regarding Corps-managed lands used or affected by the . . . Protests to: protect the health and safety of persons on Corps-managed lands; or to protect Corps-managed lands from environmental harm or degradation; prevent unlawful or unsafe activities on Corps-managed lands; clear Corps-managed lands in the first quarter of 2017; and prevent the use of Corps-managed lands as a camp, base, or staging area from which potentially dangerous or unlawful activities may have been conducted on or off Corps-managed lands."**

**Did you -- what did you do to research and prepare for this topic?**

A. So it was, again, reviewed the binder

provided; my self-knowledge -- my own knowledge of activities we conducted as CBP, DHS; and discussion with my counsel.

**Q. Okay. Based upon --**

A. And discussions --

**Q. I'm sorry.**

A. That's okay. And then discussions again yesterday with U.S. Border Patrol agents that were present in the October through November time period.

**Q. And how long did you say you spent speaking with those gentlemen?**

A. Yesterday, it was close to an hour and a half.

**Q. Okay. Did you talk about this specific topic?**

A. We talked about their -- their actual activities that they -- they were conducting during the DAPL.

**Q. And did you do that on a topic-by-topic basis, or just a general conversation about, "Hey, do you remember when," kind of thing?**

A. That would have been a general conversation to make sure I understood what their -- their role and response was during the protest.

**Q. So when it came time to prepare for your**

**deposition, you didn't actually talk about the topics with your Customs and Border Patrol colleagues at all?**
A. We did.
MS. BOBET: Objection, misstates testimony.
A. We did. We went over some of these -- we went over some of these topics along with them.
**Q. (BY MR. SEBY) Why not all of them?**
A. As this one was one that they were directly involved with, I wanted to make sure I understood their participation since I had been designated to respond as the DHS and CBP representative.
**Q. So -- so great. So for this topic, you specifically discussed it with them, right?**
A. That is correct.
**Q. Okay. Good.**
**And based upon your personal knowledge and conversations with your Customs and Border Protection colleagues, what actions were taken by the Customs and Border Patrol Department of Homeland Security during the DAPL protests, regarding Corps-managed lands or affected lands by the protests? What did -- what was -- what actions were taken to protect the health and safety of people on the Corps-**

**managed lands?**
A. Well, for CBP and DHS, there was no direct actions to protect the health and safety of persons on Corps-managed lands or to protect the lands from the degradation. Our role was to -- the U.S. Border Patrol responded to a call for assistance as the activities were getting to an escalated point that the local and law enforcement agency were having a hard time managing it.
So the U.S. Border Patrol provided additional manpower that would be designated or dispatched by the command post or the emergency operations center to those -- to locations to allow the local law enforcement officers and agents to respond to provide this protection.
U.S. Border Patrol provided the ability -- you know, EOC security to allow those law enforcement officers that were pulling that duty to go do additional duties out on the protest sites.
They were -- patrol also provided agents to the observation posts that had been designated by the North Dakota National Guard. So they backfilled and assisted the North Dakota National Guard with observation points and equipment, FLIR cameras and EO -- EO cameras to give a better on-the-ground view

of what they were reviewing on Corps and in -- BIA and State lands.
They also provided officers or agents to the traffic control checkpoints, traffic control points to help monitor traffic that may be flowing into and out of those locations that were deemed important. And they also --
**Q. Can I interrupt you real quick? So you were -- is it -- is it fair to say -- and I appreciate your explanation. I just want to make sure I understand it.**
**The types of assistance, actions taken with respect to the DAPL and during the DAPL protest regarding the protest camps on Corps lands or areas affected by the protest camps on Corps land, Customs and Border Protection provided both what you did, that was aerial drone surveillance and information feedback to the State of North Dakota, but you also -- the agency also provided law enforcement personnel on the ground in certain select locations; is that accurate?**
A. That is accurate, yes.
**Q. Okay. And where were those physical on-the-ground locations, apart from the aerial assistance that the agency provided?**
A. Those were -- would have been -- as I

explained, that would have been dependent on where the command post or the emergency operations center would require those additional officers' assistance to relieve the local law enforcement officers to do additional duties within that.
So I don't -- I don't have -- other than traffic control points, observation posts, we did have a couple -- Mr. Wright, Adam Wright, was part of a group, with local law enforcement, that responded to a protester group that was trying to outflank or maneuver law enforcement line that was managing the protest, so they responded to where the protesters were trying to maneuver to get around and get on the back side of the law enforcement. They were able to deescalate the situation and -- verbally deescalate the situation and have the protesters return to where they started from.
**Q. Which was on Corps of Engineers land?**
A. I don't know if that was -- I'm not familiar if it was Corps of Engineer land, State land, or Tribal land.
**Q. And so the -- this on-the-ground resource assistance that Customs and Border Protection provided at traffic points and observation points and then the -- the certain instances that you mentioned,**

**when did that begin? When did that actually occur as a start time? August also?**

A. In the -- for the Border Patrol response, it would have been the middle -- there was multiple -- or I'm not sure the exact number of what they call a Signal 100, where the State radio was putting out a bulletin that they needed additional law enforcement assistance. So Border Patrol agents were responding to those directly; however, they're a three-to-four-hour response time due to their location along the border, cities along the border to the -- to the Bismarck/Mandan area.

And then the Border Patrol provided that additional resource during the October through November height of the protests in the -- in the area.

**Q. Yeah. How many individuals from Customs and Border Patrol would have been involved in that on-the-ground physical dispatch showing up?**

A. It was approximately -- there was approximately ten -- ten officers or ten agents on a weekly rotation to the location, to the -- to the EOC to provide that assistance for approximately four weeks.

**Q. Okay. Why did it -- why did it end, then, in November?**

A. My understanding is due to the cold and the protests taking a downturn, the necessity to have additional Border Patrol officers or agents present wasn't necessary, and they also had to return and conduct their primary mission of border security.

**Q. When you say a downturn in the protests, what does that mean?**

A. The downturn is the activities weren't as violent or agitated.

**Q. I see. Okay. All right.**

**Did you -- you physically ever do that?**

A. I was part of the AStar, the helicopter that provided overhead coverage during the eviction process in February when they went into the main camp to clean that camp out.

**Q. Uh-huh. Did Customs and Border Protection agents ever physically go into the camps at any time?**

A. To my knowledge, no.

**Q. Did Customs and Border Protection agents ever make any arrests of protesters for conduct of theirs?**

A. There was no arrests made by U.S. Border Patrol or Air and Marine Operations, DHS or CBP.

**Q. During any time of the -- of the**

**protests?**

A. During any time of the protests.

**Q. Okay. And then the heli- -- the helicopter that you mentioned piloting, what was that -- what was that -- how -- how was that used to clear the Corps-managed land in the first quarter of 2017?**

[redacted]

**Q. Sure.**

A. And part of it, just to be overhead and --

**Q. Yeah.**

A. -- provide that.

**Q. Okay. How about the last one there?**

MR. SEBY: Jose, if we could lift -- raise that up a little bit so -- so we can see at the bottom little Romanette v.

**Q. (BY MR. SEBY) "Prevent the use of" --**

**What actions were taken by the Customs and Border Protection during the protest on Corps land trying to prevent the use of Corps-managed land as a camp, a base, or a staging area from which potentially dangerous or unlawful activities may have been conducted on or off Corps-managed land?**

**Earlier I think you mentioned you were a witness to protesters leaving the Corps camp, going to attack, for example, the drill site; is that correct?**

MS. BOBET: Objection, misstates testimony.

A. Unless the sensor operator actually picked up or followed a group from a camp, base, or staging area to a location would be the only way to identify that. I don't know that that was done.

Otherwise, we were moving the cameras as requested by the State to those locations of people that were there or activities that were being conducted concurrently.

CBP or DHS didn't have any direct involvement in preventing the use of any lands, other than providing additional officers or agents, the U.S. Border Patrol specifically, to assist in traffic control points that -- to assist the State and locals in identifying personnel that were flowing through those areas.

**Q. (BY MR. SEBY) Is it fair to say that Customs and Border Protection did assist the State in preventing the people who were protesting on Corps of Engineers -- in Corps of Engineers camps and were gathering up to go behave elsewhere, that you -- that the agency did help prevent that by giving information back to the State?**

A. I would say yes, we were providing a downlink or a video feed of activities going -- for them to make the decisions of how to respond.

**Q. Yeah. Okay. Is it also fair to say that all of the actions taken were to provide the State of North Dakota and Morton County law enforcement with information, and that you did not**

**provide that information to other federal agencies because they didn't ask for it?**

MS. BOBET: Objection, misstates testimony and assumes facts.

**Q. (BY MR. SEBY) So, again, that was a question asking you if that's a fair summary of your testimony. I'm not misstating your testimony. I'm asking you if that's a fair summary of it.**

MS. BOBET: Same objection --

A. Yeah, correct. We --

MS. BOBET: -- misstates testimony and assumes facts.

MR. SEBY: Thank you.

**Q. (BY MR. SEBY) Mr. Walker?**

A. Yes.

**Q. Okay. Thank you.**

MR. SEBY: Let's take a break. It's been also more than an hour. Do you want to take a lunch break and then come back?

THE VIDEOGRAPHER: Going off the record. The time is 6:32 p.m. UTC, 11:32 a.m. Mountain.

(Recess taken 11:32 a.m. to 12:27 p.m. Mountain Standard Time.)

THE VIDEOGRAPHER: We're back on the record. The time is 7:27 p.m. UTC, 12:27 p.m.

Mountain.

**Q. (BY MR. SEBY) Mr. Walker, we're back after a lunch break. And I want to turn to topic 14.**

MR. SEBY: If you would please post that, Jose, so we can see that on the screen.

MR. DIAZ: I'm -- I'm trying to get this working. Give me a second. And, I'm sorry, what was the number? 14?

MR. SEBY: 14, yes.

MR. DIAZ: Thank you.

**Q. (BY MR. SEBY) Mr. Walker, if you would take a moment to -- and refresh your review of that.**

A. Okay. Okay.

**Q. Okay. Did you do any research on this particular topic?**

A. Just the information out of the -- the binder and consultation with counsel.

**Q. Okay. And just to be clear, you did not speak with the director of the Grand Forks Customs and Border Protection unit, Mr. Fulcher, correct?**

A. Correct.

**Q. Did you speak with anyone else at the Customs and Border Patrol with respect to this topic?**

A. Well, the ones that may have been available -- or involved in that would have been at

the meeting yesterday with the representatives from the U.S. Border Patrol.

**Q. And did you discuss this topic specifically with them?**

A. I believe we went over the question, but that would be the extent of it.

**Q. You went over it. Was there any discussion and feedback from them sought by you?**

A. To their knowledge, there was no assistance, nothing -- no requests from the U.S. Border Patrol for assistance from State and local.

**Q. Okay. Did they ever recall talking to any other federal agency or official with respect to the protest camps on federal Army Corps of Engineers land?**

A. Within their scope of law enforcement duties, I would expect that conversation to happen. As to the specifics of those conversations, I -- I do not have that information.

**Q. What is your expectation based on, then?**

A. I would expect, you know, being a law enforcement officer, I would ask kind of what the status is or if there's anything of concern, what they need to be aware of, or into -- in those regards as a law -- you know, how to be prepared, trying to prepare

yourself to -- if you had to deal with something that was going on with the protest or protesters.

**Q. And your -- the context of your comment is -- or your statement is that you would have expected Customs and Border Patrol people to have contacted the Corps of Engineers to ask them those things?**

A. No. I would expect the U.S. Border -- U.S. Border Patrol agents, they would have been discussing what was requested by the command post or the emergency operations center of what was required of them, but for a request by --

**Q. I asked --**

A. Yeah.

**Q. I misunderstood. You were talking about the -- your expectation was focused on their -- you would have expected there would have been a discussion with North Dakota as the requester for such assistance.**

A. Correct, yeah.

**Q. Okay.**

A. To my knowledge, there was no -- no CBP or -- CBP or DHS entities did not make any requests from State and local authorities to remove persons --

**Q. Okay.**

A. -- or deal with the actions of them.

**Q. Who -- who defined the mission of the Custom and Border Patrol agents that were part of the ground-based response? Who set the -- the conditions and parameters of service for those individuals?**

A. That would have been determined by the emergency operations center or the command post. However, North Dakota does recognize, in the Century Code, Border Patrol officers do have a peace-officer status that can respond to felonious acts that somebody may be doing.

**Q. How did you learn that?**

A. One is personal research in the Century Code on -- as an Air and Marine agent, or to know what State criminal codes or State authorities we may have, and to better, you know, broaden my horizon.

**Q. And when did you look into that and learn that?**

A. Oh, it's -- for me, it's been since I was part of the North Dakota Air Branch in 2008.

**Q. Okay. So prior to the DAPL protests, you were aware of that and made -- made that inquiry?**

A. Yes.

**Q. Okay. Back -- back to the question I**

**was asking, who would have -- who in the Customs and Border Protection unit would have made the decision to dispatch the ground-based agents for the roles that you have described?**

A. So that would be the leadership at the Grand Forks Border Patrol Sector headquarters located in Grand Forks, North Dakota, and they would have also notified their chain of command, so U.S. Border Patrol headquarters in Washington, D.C., that they were conducting those operations.

Border Patrol is very regimented in their operational directives and orders, so they would -- they would have conducted an op order that would have been forwarded up through the chain of command for knowledge and approval to respond to those requests.

**Q. And so was approval of that request positively made by the Customs and Border Protection headquarters in Washington, D.C.?**

A. That would be correct, because that would be the reason why the Border Patrol agents and officers -- or Border Patrol agents responded during the time of October through November.

**Q. Was there any -- any conditions put on their response?**

A. To my knowledge -- to the knowledge that I know of, no.

**Q. And what was the request made by the -- by the Grand Forks office in that operation request?**

A. The request was to provide agents on a rotational basis to report to the operations center command post for duties assigned by the State of North Dakota.

The limitations of their authority would be partly with the U.S. -- you know, their requirements of the U.S. Border Patrol, but also the peace-officer status provided to them in the Century Code.

**Q. Was that made a part of the request, to remind the Washington, D.C., headquarters that State law provided Customs and Border Patrol specifically with such status?**

MS. BOBET: Objection to the extent it calls for a legal conclusion. You may answer.

A. I believe their op order did specify that the Border Patrol agents in the state of North Dakota are offered peace-officer status.

**Q. (BY MR. SEBY) Okay. And who -- who maintains that OPORD?**

A. That would have went through the U.S.

Page 102

Border Patrol.
**Q. Where would one find that document today?**
A. I would have to get with CBP attorneys for the litigation-hold documentation.
**Q. Is that a document that you gathered and provided to your counsel a year and a half ago, as I think you said?**
A. I believe that is correct. That was provided to -- to legal counsel.
**Q. Okay. Who wrote the document?**
A. I do not have the name of the individual that wrote the document.
**Q. Did that document ask for legal advice?**
A. I can't speculate whether it did or not.
**Q. Have you seen it?**
A. I have read it. It's been a while.
**Q. Okay.**
MS. BOBET: Just so I'm clear, which of these topics are these questions on? I don't think it falls within topic 14, but if there's a different one you're thinking of.
MR. SEBY: No, I intended it to be topic 14.
**Q. (BY MR. SEBY) Now I would like to go**

Page 103

**to --**
MS. BOBET: The topic 14 is about requests made by the U.S. for State and local authorities' assistance. So if that's the topic this line of questioning falls under, I think it's outside the scope. But it sounds like you're moving on to another point, so we can go with that.
MR. SEBY: Are you done? Then I will do that. I take it --
MS. BOBET: Sure.
MR. SEBY: -- "yes," so let's -- let's go --
MS. BOBET: Yes, please proceed.
MR. SEBY: I'm going to do that. Ready?
**Q. (BY MR. SEBY) Let's go to --**
MS. BOBET: Yes.
**Q. (BY MR. SEBY) -- the two exhibits that were provided to your counsel earlier. They're just two emails. Let's go to the earlier of the two, which is an email conversation you were having with Lynn Woodall at Morton County. Do you remember Mr. Woodall?**
A. I do, yes.
MR. SEBY: Okay. Jose, can we put these documents up on the screen? Let's just -- let's go

Page 104

with -- the first one would be 804, I believe, which will be marked as 804.
(Deposition Exhibit 804 was remotely introduced.)
**Q. (BY MR. SEBY) There we go.**
**Mr. Walker, will you take a moment and familiarize yourself with the email. It's a two-page document, a series of emails. Let's go to the back and have you to read -- ask you to read those, please, just so you're refreshed.**
A. Okay.
**Q. You read the entire document or just the first part?**
A. The entire document.
**Q. Okay. Cool.**
**Let's go to the beginning, then, which is a -- a communication that, as far as I can tell, you initiated with Morton County on January 31 of 2017.**
**You -- I can't tell who your email is to. It says, "Good Morning Sir," but the way your counsel has produced this, it's chopped off the -- who you were communicating with. Do you know who you were talking to here?**
A. I believe if we -- in the -- for the

Page 105

email chain, it's Captain Woodall.
**Q. Sure. Anyone --**
MS. BOBET: Just so you know, I think just for -- for clarity -- I'm sorry to interrupt, but I think this is a document that the State produced based on the Bates number that starts "ND" underscore.
**Q. (BY MR. SEBY) So were you communicating with anyone other than Mr. Woodall at Morton County?**
A. At this part, I can't speculate on who else I was discussing it with.
**Q. Okay.**
A. I know in further communications, Chris Bacon is cc'd into -- into the conversation --
**Q. Yeah.**
A. -- along with additional -- the Morton County Sheriff.
**Q. Yeah. So the beginning of the conversation on January 31, 12:27, you say, "Good Morning . . . I am following up on our discussion yesterday as to what you would like from us and what we can provide you in regards to aviation support. Our headquarters wants to ensure that you are aware of our capabilities and availability of aviation assets in order for them to respond accurately to Congressional and Senate inquiries made -- being made**



Page 106

**[about] our involvement."**

**So this is in 2017, and it follows the period of August 22 through the -- you know, the day before this.**

**I just want to ask you about the nature of how you've phrased this as a, "what you would like from us and what we can provide you in regards to aviation support."**

**Hadn't the Customs and Border Protection been providing the State of North Dakota, for many months, as of now, when -- when you said this, with aviation resources and support?**

A. Yes, we have.

**Q. So why did you phrase it like that?**

A. Well, as in the second sentence indicates, our headquarters -- basically, we had a -- we had a call -- the director, deputy director, and supervisory staff had a call from our headquarters, so National Air Security Operations Center headquarters in Washington, D.C., the director there, called us and asked us to directly ask the State of North Dakota what they would like, as they were being requested their -- they were needing to respond to Congressional and Senate inquiries.

2017 being an inaugurational year, new

Page 107

Senate, new Congress, and President going in, and the volatility at this time for the pipeline, we wanted to make sure that we had, for record, what we could -- what Air and Marine could help the State of North Dakota in additional assets, if needed.

**Q. Okay. Notwithstanding the fact that you had already -- were in the course of providing them with such resources, right?**

**I -- what would -- what would -- what would have been any overage over what you had already been providing to them at their request earlier?**

A. Our headquarters wanted to make sure that the State command center, or the State, knew that we could bring additional resources if requested to assist them as to what is brought up in the next paragraph below.

**Q. Additional resources. Okay.**

A. Correct.

**Q. And those are additional fixed-wing aircraft and helicopter assets, right?**

A. That is correct.

[redacted]

Page 108

[redacted]

Page 109

[redacted]

**Q. I see. Okay. And then you go on to say, "your" -- talking about Morton County -- "OPORDs are law enforcement sensitive, I would like to extract**

information relevant to the situation that my headquarters can be [apprised] -- be made [apprised] of in order to maintain their situational awareness."

Were you asked by the headquarters of the Custom and Border Patrol to enhance or provide greater detail with respect to what North Dakota was doing?

A. That was my personal conversation with the captain, that I -- to make sure that our higher headquarters was appraised of the situation; that I would take information out of their operational directives and use that to build our Air and Marine aviation support request when it went up to headquarters for approval.

Like I say, the Blackhawk helicopter and the fixed-wing asset did not belong to North Dakota, so I would have to ask for that request up through headquarters and back to the regions. So we need to make sure that we accurately identified the reasoning why we were requesting that -- that support.

Q. Okay. And so later you have some back-and-forth with Mr. Woodall, Captain Woodall, and then the last communication in this chain is right there, and he asks you, "What type of streaming capabilities does your aircraft have and

restrictions?" Right?

A. Correct.

Q. And I -- let's move to Exhibit 805, because it's a continuation of this chain, and we'll talk about your answer to that question from the State here in a moment.

(Deposition Exhibit 805 was remotely introduced.)

Q. So this is a -- an email communication that is exactly the same as the exhibit that we just looked at; it's just a separate document produced that continues the conversation. If you want to take a minute and go to the full communication string here just to confirm that, that would be fine.

A. Can you scroll back up, please?

Q. It's just a continuation.

A. One more. I'm not saying anybody else needs to read it. Okay.

Q. So the bottom line is that headquarters asked you to tell North Dakota there were additional resources, and North Dakota asked some questions about the capabilities. And then, at least from the string we have, you conclude by saying that "Never -- never mind. Those resources are not available," for one reason or the other, right?

MS. BOBET: Objection, misstates --

A. If you would like --

Q. (BY MR. SEBY) I'm sorry?

A. I said, if you want to take that conclusion.

Q. Well, I'm asking you. I'm not -- I'm not -- I'm not testifying. I'm just saying, you offered some resources, answered some questions on them, and then said the downside is the helicopter is in a major inspection and won't be available for four to six weeks, and the airplane is tied up with other events, State of the Union and the Super Bowl; is that right?

A. That is correct.

Q. Okay. So at the end of the day, what

Page 114

**was available other than what you had already been providing for several months? Anything?**

A. As I stated in the next one, "If it's something you are interested in, we can -- we can talk," and I would get a request up for additional assets and let the -- basically, the headquarters determine the priority of those requests. I could only ask for the equipment.

**Q. Yep. Okay. Got it.**

**And so the -- earlier in this string you talk about Senate and Congressional inquiries were made about Custom and Border Patrol resources, right?**

A. Yes.

**Q. When were those inquiries made?**

A. Based on the messaging that I had with Captain Woodall, that would have had to have been that day, the 31st, or at least the day before, the January 30.

**Q. Okay.**

A. As to where they -- when they were -- the inquiries were pushed into Air and Marine headquarters, I don't have that information.

**Q. Okay. Are you aware of the actual inquiry or the request?**

A. Alls I'm -- one thing I'm aware of is

Page 115

that there was a request made of what Air and Marine was doing to support the State of North Dakota.

**Q. Are you aware of any earlier requests made by the State of North Dakota to the Customs and Border Patrol or the Homeland Security agency for support for North Dakota?**

A. In part of the litigation documentation, I was aware of the Governor of North Dakota requested assistance from Secretary, I believe, Kelly, at the time, if my memory serves me right, for the letter I read.

**Q. Yes. And in 2017, though, right?**

A. Correct.

**Q. And my question is, prior to that, are you aware of the State of North Dakota request to the Department of Homeland Security for law enforcement assistance in two thousand -- in 2016, for example?**

A. Other than the request for the ongoing UAS live -- live stream that we had given them already.

**Q. Okay. Was the -- the Customs and Border Patrol, Border Protection unit, Air and Marine resources out of the Grand Forks Sector ever interrupted in 2016? Was there ever a period when it was withdrawn or suspended?**

Page 116

[redacted]

**Q. Okay. Okay. Let's look at topic 15, please. Take a moment, please, and read that, refresh your reviewing that.**

A. Okay.

Page 117

**Q. Are you aware of any Customs and Border Patrol or Homeland Security official speaking with any person who was a protester in the camps or helping to organize and support the camps?**

A. The only communications I'm aware of for CBP or DHS was the active U.S. Border Patrol agents that were on traffic control points or the ones I spoke of earlier where they were assisting State and local agents when protesters were trying to outmaneuver the law enforcement line; and U.S. Border Patrol agents, I believe it was Mr. Wright actually was able to verbally deescalate the situation and get the protesters to return from where they came from.

**Q. And so on that event, can you explain what you did to prepare for inquiring about that and understanding it so you could speak to the topic on behalf of the Border Patrol -- Border Protection?**

A. This was, yes, the conversation that I had yesterday on the 28th of November with the Border Patrol agents from the Grand Forks Sector, and reviewing the information provided by counsel.

**Q. And remind me, was it Mr. Wright that you spoke to as part of the group yesterday?**

A. That was -- that is correct, Mr. Wright.

**Q. Okay. And what did he -- what did he**

**contribute to your understanding of the events where he was on the ground and -- and I think you said deescalated a situation? Tell me about that. What did you understand that to involve?**

A. My understanding is they were made aware of a group of protesters that were on the ground, on foot, moving to over by the Backwater Bridge. They were trying to move -- maneuver to flank or outflank the line of law enforcement officers that were holding the line there; and were able to intercept them on the ground and then have a conversation with them and get them to retreat from where they started their journey from.

**Q. And was Mr. Wright by himself when he came across these people?**

A. No. He indicated he was -- he was part of a group of other State and local officers that -- that responded to that -- to that group.

**Q. Okay. And I meant to ask this earlier. Mr. Wright, his last name is spelled W-r-i-g-h-t or differently?**

A. I believe that's correct, W-r-i-g-h-t.

**Q. Okay. And what was the date of that event?**

A. I don't recall the date. It would -- it

would have been between the dates of October and November. I just -- I don't remember what his date of deployment was.

**Q. How do you know it was between October and November?**

A. That was the dates given that they provided that they had personnel on the ground on those -- those ten-man details for a four-to-five-day rotation at -- in -- at the Morton County EOC.

**Q. Okay. Okay. And so what did Mr. Wright say happened? He -- he was the person who was leading the conversation with the protesters, or he was standing there doing that with a group?**

A. If my memory serves, in the discussion, he was part of the group that was able to deescalate the situation and get the protesters to return.

**Q. Okay. Where were the protesters coming from in that situation?**

A. If my memory serves me, it was at the checkpoint by the Backwater Bridge.

**Q. So they were coming from Corps of Engineer land?**

A. I believe you're correct.

**Q. And where were they headed?**

A. They were attempting to maneuver around

the line of law enforcement officers that were maintaining that checkpoint.

**Q. Right. Okay. And the -- Mr. Wright was part of the group that told them to "Back off and get -- go back where you came from," right?**

A. That is correct.

**Q. So he helped send them back to the Corps land where they were emanating from, correct?**

A. That would be correct.

**Q. Okay. Was Mr. Wright the -- and his Customs and Border Protection agent colleagues the only federal officials present at that event, along with the State of North Dakota, local and State law enforcement officials?**

A. He did not indicate other -- other agents accompanying him.

**Q. Do you know if other federal agencies provided law enforcement agents on the ground like Customs and Border Protection did?**

A. I'm only familiar with what Customs and Border Protection or DHS provided.

**Q. Yeah. Were those individuals armed or not armed, your -- your colleagues?**

A. Armed. Border Patrol agents and our Air and Marine agents are armed agents.

**Q. And are they trained in crowd control and use-of-force measures?**

A. Border Patrol and Air and Marine officers follow the Department of Homeland Security and Customs and Border Protection use-of-force documentation and are trained.

**Q. And under whose command and authority were they present at that -- those times, do you know?**

A. Restate your question, please.

**Q. The ten or so, you said, Border Patrol agents were there along with State and local law enforcement; is that correct?**

A. That is correct.

**Q. And they were part of that effort together. Were they under the direction of a senior law enforcement person from the State or County?**

A. The group, the Border Patrol agents, would have -- they had a Border Patrol agent supervisor that would have been in charge of that detail at that time, and as the group, they would report to -- they would be given their -- their taskings from the command post or the emergency operations center.

**Q. So they were -- they were under the direction of the Morton County Emergency Operations**

Center?

A. They were -- they were there to support the Morton County Operations Center, correct.

Q. Okay. Who was the Border Protection agent supervisor on that day that you're describing that they were interacting with protesters?

A. I don't have that name in front of me.

Q. Was Agent Wright a member of the group, or was he a supervisory person?

A. Agent Wright might -- might have been a supervisory Border Patrol agent at the time. I don't remember, though.

Q. Okay. If we could take a look at topic 16, please. What enforcement actions or investigations did the Department of Homeland Security and/or the Customs and Border Protection take at any time with respect to protesters on Corps-managed land during the protests?

A. There were no actions or investigations taken by the Department of Homeland Security or CBP in respect to the persons or Corps-managed -- on Corps-managed lands.

Q. How do you know that?

A. It was reviewed material provided with the counsel and discussions with them.

Q. So that your -- your talking with the attorneys forms the basis of your testimony on this topic?

A. To the best of our knowledge, there were no enforcement actions or investigations taken by the Homeland Security or the Border Patrol.

Q. And let me ask my question again, Mr. Walker. Are you relying upon the binder given to you by your counsel as the basis for your testimony and response on behalf of the U.S. Department of Homeland Security for this topic?

A. That and discussions with the OCC for CBP as well, yes.

Q. What does OCC stand for?

A. Office Chief -- Office -- Office of Chief Counsel.

Q. So same question: You're relying upon your counsel, whether the U.S. Attorneys or agency counsel, as the basis of your testimony on this topic?

A. That is correct.

Q. Okay. Did you make any other efforts to research this by talking with your Customs and Border Patrol colleagues yesterday?

A. That is correct, we did talk about it. And they made no arrests or enforcement actions or

investigative actions.

Q. So on the six hours you told me you spent preparing for this deposition, which is a 30(b)(6) deposition, four and a half of that was being counseled by your attorneys, several of them, and one and a half was spent yesterday, the day before today, with respect to preparing for your deposition. And that, together, is the sum basis of your preparation; is that accurate?

MS. BOBET: Objection, mischaracterizes testimony.

Q. (BY MR. SEBY) It's a question, Mr. Walker.

A. That would be correct.

Q. Okay. Did the Customs and Border Patrol or the Department of Homeland Security suggest any other federal agency or officials take any action against the protesters on Corps property associated with the DAPL protests?

A. Can you re- -- say that -- repeat that question?

Q. Did the United States Department of Homeland Security or its component agency, the United States Customs and Border Protection, ever ask other federal agencies or officials to take any action

against the protesters on Corps of Engineers property associated with the DAPL protests?

A. I do not believe the Department of Homeland Security or CBP made that request.

Q. And that -- that's despite what you saw for months upon end from the aerial drone and the helicopter?

MS. BOBET: Objection, vague.

A. Our participation was to provide the State the information as live data and live feed. As it had no border nexus, there's no enforcement action or investigation that the Homeland Sec- -- Department of Homeland Security or Customs and Border Patrol would take at that -- at the -- at the DAPL protest.

Q. (BY MR. SEBY) Well, what was the -- what was the border nexus for providing, on the ground, ten law enforcement agents to the State of North Dakota efforts? What was the nexus there?

A. That was based on a request to provide the additional resources; and that the U.S. Border Patrol officers are granted the peace-officer status of North Dakota; and as a neighbor, to help a neighbor.

Q. I'm not asking you a legal conclusion, but you said that you made efforts to identify, in the

North Dakota Century Code, the statutes of the State of North Dakota, that you were designated, as a federal law enforcement officer, as a peace officer in the state of North Dakota.

Do you happen to know if any other federal officer with any other federal entity also enjoys that designation under State law?

MS. BOBET: Objection, calls for a legal conclusion, and is outside the scope. It's asking about agencies that this witness is not testifying on behalf of.

If you know in your personal capacity, please answer.

THE DEPONENT: Thank you, Ms. Bobet.

A. So as a federal law enforcement officer myself, I researched where an Air and Marine agent would fall within the State Century Code, as within the State Century Code it actually specifically says "U.S. Border Patrol agents," not "Air and Marine officers or agents."

So from my personal understanding of the Century Code, only U.S. Border Patrol agents are granted that peace-officer status unless another agency has sworn officers that may get into a local task force.

Q. (BY MR. SEBY) When you were aware of this, was that something that you shared with other -- other colleagues in the Customs and Border Protection unit in Grand Forks?

A. Yes, that's correct.

Q. Did you ever bring that provision up or your understanding of it up during the DAPL protest period?

A. I don't believe I did.

Q. Okay. Did anyone ever bring it up with regard to the willingness to provide ten agents on the ground in support of the State?

A. As I indicated --

MS. BOBET: Objection, vague, calls for speculation.

Q. (BY MR. SEBY) I'm asking you if you ever recollect anyone bringing that up as part of conversation or discussion --

A. No.

Q. -- in the time when you were formulating how to respond to the State's request for assistance.

A. I don't recollect -- re- -- recollect any conversations with anybody about peace-officer status.

Q. Okay. That's just a personal

observation you carried, right?

A. That is correct.

Q. Okay. What provision of the North Dakota Century Code are you referring to?

A. I would have to research that, where it's stated exactly in the North Dakota State Century Code.

Q. But you're confident it's there?

A. I am, yes.

Q. Okay. Okay. If we could go to topic 18, please. Take a -- take a moment and review that. Have you read it?

A. Yes.

Q. Okay. So some of this I think we've covered, but I want to ask you to -- to tell me what we've covered with respect to this topic, which reads, "Resources of any sort provided, or decisions or considerations regarding whether or how to provide . . . resources, to North Dakota from August 1 of 2016 through August" -- or, pardon me, "through March 1 of 2017, related to the DAPL protests and the occupation of Corps-managed . . . lands," known as the Oahe Project, "including the cleanup of such lands after the occupiers left, by any department or agency . . . of the U.S." And this topic, of course,

is limited to the Department of Homeland Security and Customs and Border Protection.

So walk me through that, if you would, the first part. What -- any sort of resources, any, without limitation, did DHS and Customs and Border Protection provide to the State of North Dakota?

A. All right. Chronologically, we provided a -- or by topic, I guess, an MQ-9 UAS from the 22nd of August through the 23rd of December 2016; and then 4 January through 21 February of 2017. During that time period, that UAS flew almost 281 hours of flight time in support of the State of North Dakota in the DAPL protests.

And we had one intelligence agent that was providing direct consultation or liaison abilities with the State and the emergency operations center regarding the UAS and the Bigpipe feed and making sure that the State was getting the feed they needed and help with troubleshooting, if necessary.

In October, the U.S. Border Patrol provided agents, as we discussed earlier, through November, almost to the end, or right after Thanksgiving time period, to help augment the State of North Dakota with their surge of protesters at that time.

The Air and Marine office also provided an AS350 helicopter for four days at the -- at the DAPL, at the protest, from the 27th through the 30th, to provide aviation observation and support. And --

**Q. That's the 27th through the 30th of what month?**

A. Of October 2016.

**Q. Okay.**

A. In January, we -- in January and February, we continued to provide UAS Bigpipe downlink feeds.

And then in February of 2017, Air and Marine Operations from North Dakota provided an op agent to act as a liaison officer through the 21st of -- or 21st of February, 22nd of February, when the camp was -- or the 23rd of February when the camp was cleaned out or overflown.

And that would be our involvement to -- of resources provided.

**Q. Okay. The four days in October of 2016, why was the helicopter provided at that time for those limited period of days?**

A. One of the reasons was that was when the Border Patrol started responding to the additional requests, and a request was made -- and we provided an

additional helicopter to augment the North Dakota Highway Patrol's fixed-wing aircraft during that time period.

**Q. So you were responding to a specific request in October?**

A. That is correct.

**Q. And tell me about that request, if you would, please.**

A. That would have been the same request. And the Border Patrol would have shared -- would have shared information to us of their support down there into the DAPL. A decision was made -- I wasn't part of that decision, but a decision was made to provide a helicopter during that time period to -- to assist the -- the command post.

**Q. Who made the decision at that time for that particular provision of resources?**

A. I don't have the specific name of that requester.

**Q. No, who -- who authorized the additional resources, is what I'm asking.**

A. That -- that re- -- that request would have been approved by our director, Max Ratterman, for NASOC Grand Forks.

**Q. Was there a new request, or was that the**

**earlier same request, just you -- you decided to supplement the resources?**

A. I believe that was a supplement decision, to supplement the resources.

**Q. Okay. And why was that helicopter only provided for four days?**

A. I don't know. I do not have the reason why the helicopter was only there for four days.

**Q. Did you ask about that?**

A. No, I did not.

**Q. So what did you do to prepare for this topic?**

A. Part of it was to research what flight logs I could find for flights that had occurred during that time period of the responses; and those flight logs that were identified as the Bismarck -- what we deemed the Bismarck task force; and then in additional with U.S. Border Patrol and counsel.

**Q. So let's -- this is the first time I've heard you use the phrase "Bismarck task force." What does -- what does that mean?**

A. So it was one way that we were tracking part of -- when I say "we," the NASOC Grand Forks was tracking flights to identify those flights that were flown in support of either the pipeline protest or the

Bismarck task force. It just depended on what the pilot logged it as or their -- the operations officer had logged those flights as.

**Q. So it was a -- it was a type of mission designation, so you could -- you could allocate the resources, right?**

A. That's correct.

**Q. Okay. Obviously, you've explained that the Customs and Border Protection unit, Grand Forks, did provide resources, and you've just explained to me what those were. I appreciate that.**

**But were there -- were there any other resources that were available that you discussed but were not provided to North Dakota?**

A. The only ones would be the discussion we had earlier on the conversation in 2017 with Captain Woodall; that additional assets would have been -- could have been requested if they deemed it necessary.

**Q. Subject to their availability and all that, right?**

A. That is correct.

**Q. Okay. And then the -- the lending of the helicopter for the overflight when the camps were being disbanded and people had been told to leave, were the Customs and Border Patrol agents on the**

**ground present, or was the helicopter the resource available and provided during that time?**

A. The helicopter was what was provided.

**Q. Yeah.**

A. Myself and one other agent.

**Q. Yeah. Did you ever pilot the helicopter in a way that was used as a means to move people on the ground --**

A. No.

**Q. -- or influence their -- their behavior on the ground?**

A. No.

**Q. It was for monitoring and information purposes?**

A. That is correct.

[REDACTED]

**Q. What sort of things do you recall alerting them to while you were -- had the vantage point of being in the air?**

A. As they moved through the camp and various locations, we could tell them how many people on the ground we saw. If there was a group of law enforcement officers moving to an area where somebody had been and had moved, or they were looking for somebody, we could let them know -- we let them know where, you know, around the building they may be or where they moved to, to keep them apprised of the situation.

**Q. Yeah. What was your sense of the conditions on the ground in the camp? Was it -- was it a mess?**

A. My personal reflection on it, it was worse than some Third-World countries I've been to.

**Q. Why is that?**

A. A lot of garbage and waste left; and at that time, the grounds were thawing out, so of course all the vehicle movement scarred the ground; and just pretty ugly.

**Q. What kind of waste are you referring to?**

A. Empty propane bottles, garbage bags, vehicles, construction equipment, construction

materials.

**Q. Yeah. Did you see people in the camps that were not law enforcement?**

A. Yes.

**Q. And what were those people doing?**

A. From my observation in the helicopter, they weren't resisting, but they weren't assisting as well. Some were walking across the frozen Cannonball back to -- I believe it was tribal land.

There was one active resister that perched himself up on top of one of the buildings; that the law enforcement agents actually had to go up, climb up, and talk him off the building, which took quite some time.

**Q. So you saw structures in the camps when you were flying over them as the people were being directed to leave?**

A. Yes.

**Q. Were they hard -- hard structures, or were they just like a bunch of small, soft pup tents?**

A. No, they were -- they were hard soft -- they were hard shelters with metal roofs, just like you would build a shed or a house.

**Q. This is in the main camp on the Corps property just north of the Cannonball River?**

A. That is correct.

**Q. Yeah. Did you see lots of vehicles?**

A. There were numerous vehicles within the camp that were stuck because of the thawing of the ground.

**Q. What kind of large vehicles did you see, trailers, trucks, that kind of thing?**

A. The majority of it was small camp trailers or, yeah, pickup trucks, vans, cars.

**Q. Uh-huh. Still horses?**

A. I don't remember if there were -- seeing horses at that time or not.

**Q. Firewood? Firewood all over the place, that kind of thing?**

A. There was wood. Whether it was firewood or not, from the air, I wouldn't be able to identify it.

**Q. Were you communicating with any federal officials other than the -- outside of the Homeland Security, Customs and Border Protection, during that period of time?**

A. No.

**Q. To your knowledge, were there any other federal representatives present, or were you a lone wolf?**

A. For other law -- federal law enforcement agencies, I'm not -- I don't remember who else was involved in the evacuation of the camp. I just remember my -- my concern was the helicopter and my -- my other passenger agent.

**Q. Right. Were you concerned you would be shot at?**

A. There was a concern. What we do is risky, but that's -- that's part of the job.

**Q. Yeah. Were you aware of whether there were firearms in the camp?**

A. Only to the extent that information provided by the States, information that they were providing.

**Q. Yeah. Okay. Let's go to topic 20. Take a moment there and just refresh your recollection of that one.**

A. Okay.

**Q. Okay. This is, again, limited to the Homeland Security department and the Customs and Border Protection, but what -- what decisions are you testifying as to the Homeland Security and Customs and Border Patrol to provide or withhold law enforcement assistance to the State of North Dakota and its local authorities during the protests? Are you aware of**

**decisions to provide assistance to the State?**

A. The decisions by DHS and CBP to provide, and we've already discussed the -- what we -- what we were able to provide and when.

**Q. Yes. Anything you want to say further with respect to your testimony, which -- which we have?**

A. The only thing that I could reiterate was the amount of time that we did use the UAS, over 195 hours in 2016 and over 86 hours, 85 hours in 2017; and then we also provided the Border Patrol agents; and an additional 24 hours of helicopter support in October and in February to the State of North Dakota.

**Q. Okay. And how about decisions by the Department of Homeland Security and the Customs and Border Protection to withhold law enforcement to the State of North Dakota or local authorities during the DAPL protests?**

**Q. After?**

A. Correct.

**Q. So prior to the time which you flew over the camp in the helicopter as it was being cleared, that's when the US- -- UAS went away and never came back?**

A. That is correct.

**Q. Okay. So your preparation for this topic was -- was what? What did it involve for this specific topic?**

A. Again, we discussed the topics in the binder provided; talked with the U.S. Border Patrol agents that were part of the protest or response to it; and --

**Q. Yesterday?**

A. Yesterday. And, again, discussion with

CBP lawyers and DHS, along with the U.S. Attorney's Office.

**Q. Uh-huh.**

**Q. Did the change in administrations allow the Customs and Border Patrol any additional latitude that was not available or provided during the preceding administration?**

A. I don't -- I do not believe so.

**Q. So you didn't see a difference?**

A. The only -- the only difference DHS or CBP saw was the Senate and Congressional inquiries into what Air and Marine was doing directly to support the State of North Dakota in the DAPL proc- -- in the DAPL process.

**Q. Did you ever actually speak with the**



Customs and Border Patrol officials in the agencies, Washington, D.C., headquarters office, during any time of the DAPL protest?

A. I would have talked to, along with our supervisory staff, the director, deputy director, we would have -- we held meetings with the director of National Air Security Operations Center headquarters in D.C.

Q. Would have or did?

A. We did.

Q. And during those meetings, were they like a virtual meeting, a Zoom, like this is now, or were they on telephone?

A. No, the -- a teleconference call.

Q. Okay.

A. Multiple.

Q. Right, right, right. And were you ever asked to speak and provide information during those conferences?

A. Yes.

Q. And -- and when did that start?

A. That would have been in the end of January when I -- before I drafted that letter to -- or had the discussion with Captain Woodall. And we would have been discussing what we were doing, what we

were seeing, and our -- our thoughts of what we were providing to the State of North Dakota, to our higher headquarters.

Q. So who -- who would have participated and -- in those teleconferences prior to your participation in January of 2017? Who would have been advising the Customs and Border Protection headquarters in those calls in 2016, for example?

A. That would have been our director of National Air Security Operations Center headquarters director, and his -- parts of his staff, his operations, and his advisory staff there. And then he -- he would have relayed that information up to the executive director for Air and Marine Operations and worked through the chain of command at the headquarters.

Q. And were you a participant in those calls, just an observer at all, in 2016?

A. No. Those were above -- above my level of exposure.

Q. Uh-huh. At any time during 2016 did you ever hear concerns or otherwise with respect to the Customs and Border Patrol resources that were provided to North Dakota?

A. No.

Q. Okay. Did you ever hear any changes in the direction or nature of the resources that were provided coming from Washington, D.C., headquarters?

A. No.

Q. Did any other -- are you aware of any other agency in the United States expressing concern to or about the Customs and Border Patrol role and resources?

A. No. No, I do not.

Q. Okay. Can you tell -- detail the type of resources that Department of Homeland Security and Customs and Border Patrol has in that general geographic region, North Dakota, Montana, Minnesota border areas?

A. Are you wanting currently, current information, or 2017, '16?

Page 146

[transcript text redacted, lines 1–25]

Page 148

[transcript text redacted, lines 1–18]

19    Q.   Are you aware of whether the FBI sought
20  to supplement the monitoring equipment through
21  providing its own drones?
22    A.   I am not aware.
23           MS. BOBET:  Just to be clear, this
24  answer will need to be -- I'm sorry.  Just one second.
25           Just to be clear, this answer will need

Page 147

[transcript text redacted, lines 1–25]

Page 149

1  to be in his personal capacity since it's asking about
2  information from another agency.
3           But with that, you can answer, sir.
4    A.   Yeah.  I -- personally, I don't know of
5  any request or any FBI providing additional drone or
6  UAS support.
7    Q.   (BY MR. SEBY)  Are you aware of whether
8  or not the FBI maintains a drone unit of its own in
9  Quantico, Virginia?
10           MS. BOBET:  The same objection --
11    A.   Personally, I --
12           MS. BOBET:  -- same instruction
13  regarding testifying in his personal capacity.
14    A.   No.  Personally, I -- I can speculate
15  they would, but I can't confirm it.
16    Q.   (BY MR. SEBY)  Did you ever discuss the
17  FBI drones with FBI Agent O'Connell?
18    A.   No, I did not.
19    Q.   With Mr. Bob Perry of the FBI?
20    A.   No, I did not.
21    Q.   Do you know Mr. Perry?
22    A.   I've probably met Mr. Perry, but we're
23  going on, you know, seven years ago, so I don't know
24  if I met him or not or know him personally.
25    Q.   Why would you think you might have?



Page 150

A. If Mr. Perry was present at the command post during my time as a liaison officer, I more than likely shook his hand, said hi to him.

**Q. Okay.**

A. That would be my role in -- in -- in that.

**Q. So let me ask you about your role as a liaison officer in the EOC. You -- you weren't -- you weren't there very much, though, were you?**

A. At the EOC, I was only there for a couple days.

**Q. And what days would those have been, what period of time?**

A. The mission was the 23rd, 24th. I believe I was there a couple days before that. So I got there like a Sunday night, if I remember my dates correctly.

**Q. Help me with the month.**

A. Two thousand -- it was February of 2017.

**Q. Okay. So starting in -- on that date through the end, you were only there physically a couple of days, right?**

A. Correct.

**Q. Okay. Did you ever interact with other federal representatives of any kind related to the**

Page 151

**DAPL protest outside of your physical presence in the State Emergency Operations Center?**

A. No, I did not.

**Q. Never had follow-on calls with them to talk about anything or -- at all?**

A. Personally, I do -- I do not remember having follow-on conversations with them.

MR. SEBY: Okay. All right. Mr. Walker, I don't have any further questions for you.

Ms. Bobet, if you do, please feel free.

MS. BOBET: Thank you. I will have some follow-up matters. We've been going for about an hour and a half now. Perhaps we could take a ten-minute break, and then when we come back, I'll ask you some questions.

MR. SEBY: Sounds good. Ten minutes?

THE VIDEOGRAPHER: Going off the record. The time is 8:57 p.m. UTC, 1:57 p.m. Mountain.

(Recess taken 1:57 p.m. to 2:08 p.m. Mountain Standard Time.)

THE VIDEOGRAPHER: Back on the record. The time is 9:08 p.m. UTC, 2:08 p.m. Mountain.

Page 152

EXAMINATION

BY MS. BOBET:

**Q. I just have some follow-up matters to ask you about, Mr. Walker, if you'll bear with us here.**

**First, just some kind of clarifying questions about your preparation for your deposition today. I think you were asked earlier if you talked with anybody from outside CBP, that is, Customs and Border Protection.**

**You may have answered this already, but just so it's clear, I think I heard you say that outside of CBP, you also talked to Intelligence Officer Ryan Wentz, who is with DHS, as well as counsel from DHS that is not CBP counsel. Do I have that right?**

A. Yes, you do.

**Q. And in another -- for the deposition prep discussion yesterday, that we've talked about, we went through each of your designated topics with the group that participated in that discussion, right?**

A. Yes.

**Q. That is, we talked about each of those topics with the group, to include the individuals from the CB- -- CBP sector, which is Mr. Wright, correct?**

Page 153

A. Correct.

**Q. And as far as materials that you reviewed to prepare for your deposition, that -- that binder of background materials, did you review all the portions of that that you thought could be relevant to your testimony or that might refresh your recollection for today?**

A. Yes, that is correct.

**Q. I understand you reviewed some other documents to refresh your memory before today's deposition. Tell me if I have these right: That includes certain CBP flight logs; is that correct?**

A. That is correct.

**Q. And additionally to prepare for today and refresh your recollection, you reviewed some information regarding financial reimbursement for drone flights; do I have that right?**

A. Yes.

**Q. And then -- and this is all in addition to the relevant materials from that background binder that we provided. I understand you also -- this morning we received these -- the exhibits that the State planned to ask you about, and that you took a look at those this morning before the deposition; is that right?**

A. That is correct, yes.

**Q. Okay. You mentioned collecting some emails over a year ago potentially in connection with this case. Do you recall, was that to do with a particular -- with a deposition?**

A. The -- the emails and information that I remember collecting was due to a litigation hold that came through --

**Q. Okay. So --**

A. Yeah, I had received that litigation hold through Mr. Frank Albi. So I went back through and tried to find records that fell within that purview.

**Q. Okay. So those weren't -- weren't documents that you reviewed in connection with today's deposition, right?**

A. That is correct. Those were previous to the deposition, but just the information that we had -- that I could find for the litigation hold.

**Q. Okay. And about, sort of, the timing for -- or the amount of time for your deposition preparation, that -- and I think your estimate is different from mine.**

**So I have the -- you had a conversation with Mr. Albi, the CBP attorney, that was around an**

**hour; another conversation with DHS and CBP counsel and Officer Wentz that was another hour; a conversation with folks from my office, the U.S. Attorney's Office, and DHS and CBP counsel that was yet another hour and 20 minutes, approximately; and then a final meeting with individuals from my office, DHS and CBP counsel, and then individuals from Grand Forks Sector, and that that meeting was approximately three hours total, with the Grand Forks folks participating for about 1.5 hours of that conversation. Is that all correct as far as the timing for meetings to prepare for today?**

A. Yes, that is correct.

**Q. So just the time spent in meetings or discussions to prepare for today's deposition adds up to between six and six and a half hours, right?**

A. I believe so, yes.

**Q. And then in addition to that, you spent some time reviewing the documents that we've listed out?**

A. Yes.

**Q. About how much time, ballpark in time, would you say you spent looking at documents or researching things to -- to refresh your memory or prepare for today, separate from the discussions that**

**were around six or six and a half hours?**

A. The documents I received today was about 30 minutes to review those. And then the litigation-hold documents that I was researching was probably close to four hours, or finding all those and those flight logs.

**Q. And then just to be clear, when you say the litigation-hold documents that you were researching, I want to be very clear about what you did a year and a half ago, which I understand was not in connection with this deposition, because you didn't know about it then, versus what you did specifically to prepare for today.**

**So when you refer to reviewing litigation-hold documents to prepare for today, what do you mean by that?**

A. I think one of them was --

**Q. What documents were those?**

A. Yeah. One was the letter from the governor requesting assistance; one piece of documentation was also the operational directive that the Border Patrol created for their time period that they responded in October; the CBP flight logs, when we flew our helicopter on specific DAPL protest flight times, and the UAS flight logs to calculate how much

time we spent doing that; and then researching the -- what would normally be a reimbursement rate that another agency may have to pay for to use our UAS asset.

**Q. And did reviewing those documents refresh your memory for today?**

A. Yes, they did.

**Q. Okay.**

A. That didn't come through.

**Q. Let's talk about that -- oh, I'm sorry. Go ahead.**

A. There was -- your video was moving, but I didn't have any sound, so I don't know if I missed something.

**Q. All right. Hopefully you can hear me now.**

**Let's talk about that flight reimbursement that you mentioned. You said this is a cost that if CBP deployed an asset like the UAS drone on behalf of another agency, this is -- a reimbursement request would be made. Tell me about that.**

A. So my understanding, organizations like FEMA, and even the Army Corps of Engineers, have no aviation assets, so in order to access that -- that --

the ability for flight time, they need to -- and I'm not sure what the definition is of "nipper" (phonetic), but they actually set aside money to another agency to pay for that flight time.

So the one referenced flight where I flew the Army Corps of Engineers on the Fargo diversion, they actually gave them an estimated flight time, and they -- the best of my understanding is DHS or CBP received the amount of money in reimbursement for the flight time I spent giving them the -- their flight.

So there's calculated -- there's rates that are published every year. I had to use -- the only ones I could find were from 2011 and 2021, easily, so I was able to come up with an approximate value of about $5,000, $5,200 a flight hour for a UAS during that -- during that time period.

**Q. So that's the approximate reimbursement rate for the UAS flight hours during the 2016, 2017 time frame; is that right?**

A. Right. So the total amount flown, roughly 281 hours, at $5,200 is -- comes out to like 1- -- just a little over $1.5 million spent.

**Q. To your knowledge, did CBP seek that $1-million-plus in reimbursement from the State or**

**local government of North Dakota in connection with those drones?**

A. No.

**Q. Okay. And you testified earlier you didn't recall who the initial request for that drone support came from; that that's -- that's fine. I won't ask you that again. I just wanted to clarify.**

**Do you -- is it your understanding that the initial request for the drone support from CBP came from someone within North Dakota State or local government?**

A. It could have been inside the State and local; it could have been another federal agency, the Border Patrol; Mr. Bacon might have been -- he would have been assisting to get that -- that request -- I don't want to say "drummed up," but initiated to provide the support needed because of his intel- -- his points of contact that he had.

**Q. Okay. And I know we -- you discussed earlier with Mr. Seby that the information was provided via -- via that secure video link from the drones to the State or Morton County EOC; is that right?**

A. That is correct.

**Q. And you testified that individuals from**

**the Corps of Engineers, in addition to some other federal officials, were present at the EOC. Do you recall that?**

A. Yes.

**Q. So to your knowledge, did the Corps of Engineers have the same access to the drone feeds as all other entities or individuals who were also present at the EOC?**

A. Yes, they did. The drone feed was pushed up to a large screen monitor at the EOC, a TV, a large TV there.

**Q. Okay. So fair to assume anybody who was at the EOC, be they either federal officials or the State or local folks there, had access to view that information as it came in to that large screen?**

A. That is correct.

**Q. You discussed earlier, and Mr. Seby showed you an email chain. I believe it was Exhibit 805. I won't bring it up here unless you would like it as a refresher.**

**But as I recall it -- and it was you saying, essentially, if the State was interested in the additional resources, that your email kind of outlined, "Let -- let us know." Do you recall that discussion?**

A. Yes.

**Q. Did the State ever make such a request for those additional resources, to your knowledge?**

A. We did push an ASR, an aviation service request, up to headquarters for additional -- for -- that we were going to do the operation that we conducted in February, just so that there was a chain-of-command knowledge that we were doing that.

**Q. And was that based on a request by the State for that, or was that more organically coming from within CBP or someone else?**

A. That would have been organic.

**Q. Okay. So in response to -- to your email kind of outlining those -- those additional resources and discussing their capabilities, are you aware whether the State requested that CBP deploy those additional resources ever?**

A. I believe that in the ASR and talking with the captain there on that request, it was kind of a mutual thing that we would provide them a helicopter when the time came for the eviction of the camp.

North Dakota Highway Patrol was already providing downlink with their Cessna 206 aircraft at the time, so there was -- there was additional -- there were State resources already and another --

State resources were flying that over the protest.

Q. Okay. So if -- if the State had made a -- a specific request, sort of them independently making a request for one of these additional resources that your email had outlined, is it your understanding that CBP would have done whatever it could to provide that resource to the State, acknowledging the -- the realities and constraints on limited resources?

MR. SEBY: Objection to speculation.

Q. (BY MS. BOBET) Go ahead and answer, please.

A. I -- I believe Air and Marine would have done what they could with the available assets that they had on hand to -- to support the State.

Q. Okay. Just a few more questions about the -- the MQ-9 drones that were deployed throughout almost the entirety of the protest.

If those drones -- or if that drone had not been deployed here in North Dakota to surveil the protest, where would they be otherwise? What, in general, otherwise would they be doing?

A. So the drones would --

MR. SEBY: Objection, speculation.

[redacted]

[redacted]

Q. And because there was a drone, a CBP drone, deployed to monitor these protests in

North Dakota, those other activities had to be reduced; do I have that right?

A. Yes.

[redacted]

MS. BOBET: Okay. Give me a moment here. I think those are all the questions that -- that I had for you, sir, unless Mr. Seby has further redirect.

MR. SEBY: I do. Thank you.

EXAMINATION

BY MR. SEBY:

Q. Mr. Walker, you mentioned, in response to Ms. Bobet's question, that you did speak to one individual outside the Customs and Border Patrol as

part of your preparation, and that's a gentleman by the name of Ryan Wentz with the Department of Homeland Security. He's an intelligence officer; is that correct?

A. Yes, that's correct.

Q. And what did you learn from him?

A. I learned that Mr. Wentz is an intel officer for DHS. He was stationed there in Bismarck.

He reviews a lot of the information, I guess, that's being provided, as an intel officer. He collects that data, and anything that would have been pertinent to DTOs, drug-trafficking organizations, order nexus, or that sort of information, he would provide that up in reports to his higher chain of command.

Q. And what sort of information did he report up his chain of command based upon his presence at the time of the DAPL protest in 2016 and 2017?

A. I don't have the exact information that he provided, other than things that were -- he deemed significant that needed to be reported up.

Q. Did he report anything at all?

A. I believe he did. I just -- I don't know, off the top of my head, what -- what reports he generated.

Page 166

**Q. So he reported drug-trafficking organizations?**

A. If he felt it fell within his scope of responsibility, then he would write that -- that report; but it was more to provide a picture, but not law enforcement actions or any of that kind of information, so . . .

**Q. So what information did he provide you relevant to the topics, other than learning that he had -- he was present there and had his own job? Why was he involved?**

A. That was as a -- he is a DHS employee, and he was at the Fusion Center, so he was seeing a lot of those reports that were being produced by the State. So that was just -- it was information to further broaden my knowledge of DHS-CBP involvement.

**Q. Whose idea was it that he should be part of your review and preparation team, yours or your counsel?**

A. That was, then, counsel.

**Q. Okay. And so he was receiving information from the North Dakota State Law Enforcement Center, the NDSLIC, it sounds like, and he was reporting that information up to his chain of command?**

Page 167

A. My -- the information that I was informed of, yes.

**Q. Okay. So relevant to all of the topics we just went over for the last several hours, what did he provide you with that was responsive to those topics?**

A. I was not provided any topics from him.

**Q. What role did he play in your preparations and research?**

A. To the fact that DHS had an intel officer that was assigned there in North Dakota that worked out of the Fusion Center, and that his role was to monitor and -- as he does day-to-day, it's his day-to-day job, it wasn't just because of the protest, and that if anything fell within his purview of scope of responsibility, then he would extrapolate that information and provide it up.

**Q. So how can you be a witness speaking on behalf of the Department of Homeland Security when you spoke to the one person that you've identified from that agency stationed in North Dakota during the exact time period of the protest, yet you have nothing to advise came from your consultation with him? Is that correct?**

MS. BOBET: Objection, misstates the

Page 168

testimony, argumentative, and calls for a legal conclusion.

**Q. (BY MR. SEBY) Not argumentative. I just want to make sure I understand what you're telling me now is that you can attribute nothing to him relative to the topics, even though he was the person on the scene from the Department of Homeland Security of the Federal Government of the United States during the period.**

MS. BOBET: The objection stands, and I'll add that the question is now vague as well.

**Q. (BY MR. SEBY) Mr. Walker, would you please answer the question?**

A. Mr. Wentz had a job in North Dakota, not much unlike my job in Grand Forks, North Dakota. He did his job and reported those things that were within his scope.

As a receiver of the NDSLIC information myself personally, I -- and I also get the Minnesota information, as a law enforcement officer there, to be apprised of that stuff.

So whatever Mr. Wentz deemed appropriate to forward up his chain of command did not fall within my official title as a CBP Air and Marine officer or agent, so I didn't see those items, and he did not

Page 169

provide me any of that information during our discussion, other than the fact that he was doing his job during -- that concurrently ran during the DAPL.

**Q. And Mr. Wentz, when did you talk to him?**

A. That would have been early November of this month, during my prep that was --

**Q. And how long did you -- how long did you spend speaking with --**

A. November 9. That would have been one hour.

**Q. Okay. And was your counsel present for that call?**

A. That would have been the CBP and DHS attorneys, yes, correct.

**Q. And remind me who the DHS attorneys are.**

A. Michelle Tonelli, Eugene Mok, and Frank Albi, the CBP attorney.

**Q. Okay. Two specifically for DHS and one Customs and Border Protection, right?**

A. That is correct.

**Q. Okay. Did Mr. Wentz provide you with any information to review?**

A. No.

**Q. You just talked to him and --**

**Did you go over the topics with him?**

Page 170

A. This was a -- that meeting was a separate meeting that we had prior to talking to Ms. Bobet.

**Q. I'm not sure what that means, because my question had nothing to do with what you just said.**

**My question was, did you review the notice of depositions and the specific topics with Mr. Wentz?**

A. No.

**Q. Why not?**

A. I don't believe at that time I was -- had been selected to be the spokesperson, other than as we went through the -- the process.

**Q. So I'm puzzled, Mr. Walker, how you can testify that you prepared for your deposition by speaking to Mr. -- to Mr. Wentz, but you didn't even know or have the presence of mind to talk to him about specific things.**

**What -- how did you -- what was the pretext of getting on the call with that individual if you didn't know what you were talking about?**

MS. BOBET: Objection, misstates testimony, vague, and argumentative.

And I'll say if your answer, sir, would incorporate anything to do with the reasoning of

Page 171

counsel, I'll caution you not to reveal that because that is privileged. You may answer.

**Q. (BY MR. SEBY) I'm not asking for anything privileged. I'm asking you a basic question.**

**How in the world can you explain to me that you were supposed to prepare for specific topics if you didn't have the presence of mind to discuss them with the one person from the Department of Homeland Security you've identified who was in North Dakota during the period of the protest? How can that be?**

MS. BOBET: Objection, misstates testimony, argumentative.

**Q. (BY MR. SEBY) Your counsel doesn't like the question, but I'm not arguing with you. I'm just asking you a question.**

MR. SEBY: So stop shrouding it with that kind of objection, Jane.

**Q. (BY MR. SEBY) Would you please answer the question.**

MS. BOBET: Mr. Seby, I'm entitled to make objections and make a record here. The question is argumentative. The witness may answer it or you may move on.

**Q. (BY MR. SEBY) I'm not going to move on.**

Page 172

**I want an answer to the question because I'm puzzled by what you've just told us.**

MS. BOBET: Well, the objection stands, and the witness can answer.

MR. SEBY: Thank you.

A. So the meeting was set up by counsel. We met.

**Q. (BY MR. SEBY) And let me just stop you.**

A. We discussed --

**Q. Let me just stop you, if I may. What was the pretext for your counsel setting up the meeting with Mr. Wentz?**

A. Who informed me --

MS. BOBET: Objection, calls for information --

A. -- of Mr. Wentz.

MS. BOBET: Excuse me one second. One second.

Objection. That's getting into the territory of what was in counsel's mind, why they set up this meeting with that person, and that territory is privileged.

So you can talk about the facts of what you discussed with -- what you discussed with Mr. Wentz and the facts that you learned there. I

Page 173

think that's fair game. But why counsel chose to set up a meeting with him at that time is privileged, and I'll instruct you not to answer that.

MR. SEBY: Very well.

**Q. (BY MR. SEBY) What was your understanding of why you were having a call with Mr. Wentz on November 9?**

MS. BOBET: Same objection, and -- and --

**Q. (BY MR. SEBY) And I'm not asking -- haven't for --**

MS. BOBET: It's the same objection to the same question.

**Q. (BY MR. SEBY) I'm not asking for privileged information. I'm not asking you what your attorney told you.**

**I'm saying, what did you discuss with Mr. Wentz? What was the agenda, as it occurred, in your conversation with Mr. Wentz on November 9?**

MS. BOBET: To be clear, you may discuss --

**Q. (BY MR. SEBY) Why -- why were you there?**

MS. BOBET: -- the facts that you discussed with Mr. Wentz.

MR. SEBY: That's all I'm asking. Thank you, Jane.

MS. BOBET: That's a different -- that's a different question.

Mr. Seby is asking you questions, so I'll add a compound objection.

You may answer the facts about what you discussed with Mr. Wentz. You may not answer a question about why were you there, why did the attorneys choose to have that meeting. Does that make sense, Mr. Walker?

THE DEPONENT: It does. Thank you.

A. So at the meeting --

MS. BOBET: So you may -- you may proceed.

A. -- I learned about -- I learned about Mr. Wentz's position; I learned about what his position entailed; and to get a better understanding of the DHS intelligence officer's duties, and -- what he was being at the time.

He doesn't have any law enforcement authority, nor does he have -- conduct any investigations; just to relay his information. That's what I learned.

**Q. (BY MR. SEBY) Okay. So it's correct,**

**then, to say -- to understand that you did not speak to Mr. Wentz in preparation for the topics for which you've been designated as a representative of the entire Department of Homeland Security and the Customs and Border Protection unit thereof, correct?**

A. I didn't follow that question. You're going to have to ask that one again, please, sir.

**Q. Is it accurate to say that you did not prepare for the topics for which you've been designated by the United States, as a representative speaking on behalf of the Department of Homeland Security, you did not review those topics or prepare for your deposition by reviewing those topics with Mr. Wentz; is that correct?**

A. No, that's not correct.

**Q. Then tell me what is correct.**

A. I believe I prepared for the deposition as best as I could, and I was as prepared as I could be.

**Q. I don't doubt that, sir.**

**I'm asking you a specific question: Did your preparation for the topics for which you've been designated and that we discussed include discussing them specifically with Mr. Wentz?**

A. Yes, they did.

**Q. And when did you do that?**

A. That was on November 9.

**Q. And how did you do that?**

A. That was via telecommunica- -- or videoconferencing.

**Q. Did you have the deposition notice and the topics in front of you?**

A. I don't remember at that time if I did or not.

**Q. How do you know you --**

MS. BOBET: Just to be clear which notice we're talking about -- I'm sorry. Before you proceed, just to be clear which notice you're talking about, there's been multiple versions of the deposition notice received from the State. So the latest one was received on November 23, and I'll represent that Mr. Walker had seen a prior version at a date before that.

But just so we know there's not just one notice, there's a few different versions. What we've been talking about today is that later version.

**Q. (BY MR. SEBY) So which -- which document did you have physically present to review with Mr. Wentz when you spoke with him on November 9?**

A. It would have been the document

received, I believe, prior to that meeting. I don't remember the date I received it.

**Q. How do you know that Mr. Wentz had that document as well?**

A. I don't --

MS. BOBET: Objection, assumes facts.

**Q. (BY MR. SEBY) I'm sorry, I didn't hear your answer. Mr. Walker?**

A. I -- I don't know if he had that document or not.

**Q. Well, how did -- how did he know what the topics were?**

A. The discussion was led by counsel, and I don't know what he was given prior to the meeting; as -- as well as I didn't know either.

**Q. So you recollect that your counsel brought him into the conversation and talked to him about whatever, and I'm not asking about that.**

**But who read aloud -- since you were not in the same room with Mr. Wentz, who read aloud the topics one by one that you then discussed, if you did?**

A. I don't remember -- I don't recall discussing the actual topics in the deposition during the meeting.

**Q. Thank you. I want to move on, now that**

**that's clear, with you -- you -- Ms. Bobet asked you a question about the emails that you collected a year and a half ago that you said, and she -- she made clear, that that was in relation to a litigation request from Mr. Albi, right?**

A. That is correct. I received a notice from CBP counsel that there was to -- for a litigation hold on documents pertaining to the DAPL.

**Q. And when did you receive that notice?**

A. I don't have the actual date, but it was -- my memory is that almost -- almost a year and a half ago.

**Q. This litigation has been going on almost three years now. Did you not hold or retain all of your relevant documents to the DAPL protests that you were involved with, the agency was involved with, for -- as Ms. Jane Bobet noted was almost the entire duration of the protest? You didn't -- you didn't hold those things prior to a year and a half ago?**

A. The only time I was aware of the -- the --

MS. BOBET: Objection, vague.

A. -- litigation -- the only time I was aware of the litigation was once I -- or the litigation hold was once I received the notice from

Mr. Albi.

**Q. (BY MR. SEBY) What about all those records that existed prior to that, what -- what happened to them?**

MS. BOBET: Objection, calls for speculation, vague.

A. I talked to Mr. Albi's --

MS. BOBET: And I'll note also that this is -- this is well beyond the scope of the 30(b)(6) topics. He's welcome to answer in his --

MR. SEBY: No, I'm -- it's in response to a question you asked, so I get to redirect related to that, and that's what I'm doing. I'm pretty sure --

MS. BOBET: Certainly.

MR. SEBY: -- you can stop interrupting.

MS. BOBET: I'm just saying he's responding in his --

So for the last time, I'm allowed to make objections and make a record. We're not going to have a fight about that.

MR. SEBY: You're interfering with the deponent's responses.

MS. BOBET: He's testifying -- he's testifying. Excuse me. I'm sorry. I'm still

talking.

He's allowed to testify about this in his personal capacity. It's not discussed in any of the topics. And he answered those questions about his deposition preparation, which he's speaking for himself about. So he may answer the question in his personal capacity.

**Q. (BY MR. SEBY) So I'm asking you, did you take any careful precautions prior to a year and a half ago with respect to any of your records or documents regarding the protest?**

A. Personally, I -- I responded to Mr. Albi. I went in and tried -- attempted to locate all the records. I don't remember or recollect -- recollect -- recollect destroying any documents or deleting documents.

They wouldn't be a -- my understanding what I was able to do was pull all the documents from my emails that I could remember and get the documents and photos or correspondence that we might have had at the time to the best of my ability.

**Q. Okay.**

A. Prior to that, I don't know. I did not receive any other litigation information -- hold information.

**Q. At any time?**

A. Just the one that I received from Mr. Albi.

**Q. Got it. Okay. So you -- Ms. Bobet was asking you about the Customs and Border Protection practice of assigning a rate for reimbursement when other federal agencies use the UAS resources of your agency, correct?**

A. So there is certain agencies that, in order to use our assets, are required to fund it, if you would -- or want to say that, for -- of that flight time.

**Q. Yeah.**

A. Normally, part of our charter is to provide law enforcement agents our assets for law enforcement activities that they deem or -- you know, aviation assets that they may need to conduct law enforcement activities. Like surveillances or warrant execution, where they need that aviation asset, we would provide that. It's not a -- we're not charging anybody to do that.

**Q. Right.**

A. The Corps of Engineers and FEMA, particularly, are those -- and this is going back into some of my military, National Guard time, is those are

reimbursable-rate missions that they are funded and have to account for the use of those assets. So they are charged a rate that has -- that -- for each one of those flight hours.

There was no charge to anybody during the DAPL protest for the amount of flight time spent.

**Q. So the Corps never paid you back for all those hundreds of hours you were telling me about?**

A. For the hundred -- yeah, correct, the hundred hours we flew on the DAPL was not reimbursed by the Corps or the State of North Dakota, nor was any request to refund that money done.

The only reason we just bring it up is we did provide over 288 flight hours of UAS, which is very expensive, but didn't meet our core border security mission.

**Q. Did any other federal agency pay you for that time?**

A. No, they did not.

**Q. Have you ever known the Customs and Border Protection to be involved in a several-month-long protest that was sponsored and hosted by the federal government on federal property within the territory of the United States of America?**

MS. BOBET: Objection, assumes facts,

and argumentative.

A. CBP has not conducted month-long protest aviation support prior or since.

**Q. (BY MR. SEBY) So would you say that the events of the DAPL protest were exceptional and unique in your experience?**

A. In my personal experience, I would say they were very unique.

**Q. Yeah. And this -- this rate that you charge other agencies or that they should be paying to benefit from this -- the services and skill set of the Custom and Border Patrol, the Corps knows that, don't they, because they've paid you for those services in other contexts, correct?**

A. In prior -- or other natural disasters or BDNs (phonetic) of that respect, yes.

**Q. Uh-huh. Does the United States Government have other unmanned aerial surveillance drones that are used for domestic use?**

MS. BOBET: Objection --

A. I do know --

MS. BOBET: -- calls for speculation and outside the -- outside the scope to the extent it's asking about agencies other than DHS and CBP.

**Q. (BY MR. SEBY) I am asking about**

**agencies other than yours.**

**Do you know, as a UAS sensory pilot operator, do other agencies of the United States have those resources?**

A. I do know that NASA does because they do a bunch of testing. After -- going farther than that, I'm not familiar of any other agencies' UAS support.

**Q. And Ms. Bobet asked you a question about who was the originating requester for Customs and Border Protection presence, as you did arrive on August 22 of 2016, and I understood that you -- you couldn't recall whether it was the State of North Dakota or perhaps a federal representative asked for the agency to be there; is that correct?**

A. That is correct.

**Q. Okay. So you don't know whether or not the Customs and Border Protection was -- showed up to -- in response as an -- as a willingness to honor a request from the State of North Dakota or local government thereof?**

A. At that time, Mr. Bacon was our intel agent. Mr. Bacon had been in the North Dakota area for many years, knew many, many people within the law enforcement community.

**Q. Yeah.**

A. And so his approach was to basically help us find work with the UAS system. So if he could put us in contact with an agency that needed it, we would write up the support request and support that agency's request.

So this -- this 22 -- the first flight in 22 August could have been a combination of Mr. Bacon, the State of North Dakota, some state or federal entity that they were collaborating with, and we would have felt the need to respond.

**Q. Uh-huh. Okay. And you -- you mentioned also in response to a question from Ms. Bobet that -- that the period of time when you organically, meaning within the agency, decided to provide a helicopter to support the clearance of the camp on Corps property, the main camp, the one that was worse than a Third-World country, I think you said, when you did that organically. Were there any other instances where you did anything organically versus in response to a request for assistance?**

MS. BOBET: Objection, mischaracterizes testimony.

A. Are you ask- --

MS. BOBET: You can answer.

A. Are you asking in specific to DAPL, or

other organic requests that we may respond to?

**Q. (BY MR. SEBY) Yeah, thank you for clarifying that. Yes, I'm only asking with respect to the nearly two-year-long protest on federal property in the state of North Dakota in 2016 and '17, that's right.**

A. So the only other organic one that we would have responded to would have been the October time period.

**Q. Right.**

A. Well, the Border Patrol. Again, I'm not sure where that request generated. Mr. Bacon was part of that. The Border Patrol, because they were deploying their individuals, was part of the request to see if we could help make sure -- you know, we would help them out at the -- at the same amount of what we could.

**Q. For example, in instances dealing with camps of terrorists in locations around the world, for example, right?**

A. That is a primary mission that the U.S. Air Force and agencies deal with, correct.

**Q. Uh-huh. Yeah. Okay.**

MR. SEBY: Mr. Walker, thank you. I don't have anything further.

MS. BOBET: Nothing further here. Thanks very much for your time, Mr. Walker.

THE VIDEOGRAPHER: We're going off the record. This concludes today's deposition of Douglas Walker. The time is 9:57 p.m. UTC, 2:57 p.m. Mountain. We are off the record.

(At 2:57 p.m. Mountain Standard Time the proceedings were not being videotaped.)

THE REPORTER: I do need to get orders before you guys leave.

MS. BOBET: We'll read and sign. I think regular speed should be fine.

THE REPORTER: And did you need exhibits?

MS. BOBET: Yeah. If we could have marked versions of the exhibits, that would be great.

THE VIDEOGRAPHER: Would you like a copy

of the video?

MS. BOBET: I don't know if we ordered the video. Can I hold off on that and let you know later?

THE VIDEOGRAPHER: Yeah, of course.

THE REPORTER: And, Paul, I assume you're ordering the transcript?

MR. SEBY: Yes, please.

THE REPORTER: Is there a hurry on the turnaround for you?

MR. SEBY: No.

WHEREUPON, the within proceedings were concluded at the approximate hour of 2:58 p.m. Mountain Standard Time on the 29th day of November, 2022.

* * * * *

I, DOUGLAS W. WALKER, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached ( ) Yes ( ) No

___________________________
DOUGLAS W. WALKER

The signature above of DOUGLAS W. WALKER was subscribed and sworn or affirmed to before me in the county of __________________, state of ________________________, this ________ day of _______________________, 2022.

___________________________
Notary Public
My Commission expires:

State of North Dakota 11/29/22 (tcm)

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, TRACY C. MASUGA, Registered Professional Reporter and Certified Realtime Reporter, do hereby certify that previous to the commencement of the examination, the said DOUGLAS W. WALKER was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 13th day of December, 2022.

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

[signature]
_______________________________
Tracy C. Masuga
Registered Professional Reporter
Certified Realtime Reporter

Errata Sheet

NAME OF CASE: Plaintiff vs UNITED STATES
DATE OF DEPOSITION: 11/29/2022
NAME OF WITNESS: Douglas W. Walker
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________