IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

STATE OF NORTH DAKOTA,     )
     )
    Plaintiff,     )
     )
    v.     )     Case No. 1:19-cv-150-DMT-ARS
     )
UNITED STATES OF AMERICA,     )
     )
    Defendant.     )
     )
     )

**DEFENDANT UNITED STATES OF AMERICA'S TRIAL BRIEF**

Defendant United States of America submits this trial brief in advance of the upcoming bench trial set to begin February 15, 2024.

**I.      BACKGROUND**

The State of North Dakota seeks damages in this case for the allegedly negligent or wrongful conduct of U.S. Army Corps of Engineers employees in responding to the protests against the Dakota Access Pipeline (DAPL) in 2016 and 2017. It relies on the Federal Tort Claims Act (FTCA), which requires a showing of injury "caused by the negligent or wrongful act or omission of any employee of the Government." *See* 28 U.S.C. § 1346(b)(1). The State alleges that Corps employees, in managing Corps land, caused the State approximately $38 million in damages. Over $37 million of those claimed damages are emergency response costs the State alleges that it incurred deploying law enforcement to respond to the protests.

Four claims remain for trial: (1) negligence; (2) gross negligence; (3) third-party civil

1

trespass; and (4) public nuisance.  ECF No. 38 at 32.  The Court has explained that the questions of duty are addressed by duties imposed on possessors of land under the Restatement of Torts, while "breach and causation . . . will be resolved at trial."  ECF No. 383 at 9.

The Court has also explained that the Corps's potential liability is based on its issuance of two public statements during the protests: (1) a September 16, 2016, press release stating that the Corps had granted a special use permit to the Standing Rock Sioux Tribe for a spiritual gathering on a portion of Corps land; and (2) a November 25, 2016, letter to the Standing Rock Sioux Tribal Chairman that announced a free speech zone in the same area, while closing all other Corps land to such use.  ECF No. 38 at 19; ECF No. 383 at 12; *see also* ECF No. 280 at 7 (explaining that the claimed "basis for liability" is "the simple failure to follow the permitting procedures").

Thus, the State must prove at trial the remaining elements of its tort claims: breach, causation, and damages, including whether its claimed costs are recoverable as damages and how any such damages should be limited, apportioned, or offset.  This trial brief describes the legal standards governing those elements under the Restatement provisions, and identifies certain anticipated trial evidence that will be relevant under those standards.

## II.    BREACH

The Court has determined that Section 318 of the Restatement (Second) of Torts "provides the relevant duty of care for North Dakota's negligence, gross negligence, and third-party trespass claims," while Section 838 provides "the basis of liability for North Dakota's Nuisance claim."  ECF No. 383 at 7-8.

2

## A.     Section 318

Section 318 imposes liability under limited circumstances for harm caused by a third-person's use of a possessor's land.  In full, it states:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
> (a) Knows or has reason to know that he has the ability to control the third person, and
> (b) Knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 318 (Am. Law Inst. 1965).  Boiling that down, a possessor of land cannot be held liable under Section 318 unless: (1) it granted a third party permission to use its land; (2) it could control the third party's harmful conduct; and (3) it failed to use reasonable care to stop the third party's harmful conduct.

Two principles further limit when liability can be imposed on a possessor under Section 318.  First, the harmful third-party conduct must occur on the possessor's land.  *Id*. cmt. b (Section 318 is "applicable where the possessor . . . of land is present when . . . the activity is being carried on with his permission").  Second, the possessor must have the ability to control the third party's conduct.  *Id*. cmt. a ("The mere fact that the possessor . . . of land permits a third person to . . . conduct an activity upon the land is not regarded as sufficient to make the possessor liable for the manner in which the third person … carries on the activity.").  The Reporter's Notes to Section 318 confirm those principles, describing "the basis" for liability as "the possessor's responsibility for what is done upon his land, together with his opportunity for exercising control."

That evidence will show that the Corps employees managing the land where protestors gathered are not liable under Section 318.  First, the Court will hear evidence that the harmful protestor conduct that state and local law enforcement responded to did not occur on Corps land.  State and local law enforcement responded to protest activity occurring off of Corps land, including private and tribal land.

Second, the evidence will show the conduct of the protestors off Corps land was outside Corps control.  Corps employees who manage the Lake Oahe project do not have law enforcement authority to arrest, detain, or remove individuals from Corps land for violations of state law or the Corps's regulations.

Third, the evidence will also show that Corps employees used reasonable care to stop the protestors' harmful conduct.  The September 2016 press release and November 2016 letter informed protestors that they could lawfully and peacefully exercise their First Amendment rights in a limited area of Corps land.  The protestors had constitutional rights to free speech and assembly.  The Corps then acted reasonably by remaining in contact and coordinating with the State on its law enforcement response and requesting federal assistance.  State and local law enforcement had authority to enter Corps land during the protests to enforce state law or remove protestors.  They also had authority to enter Corps land in cases of "civil disobedience."  36 C.F.R. § 327.2(4).  State and local law enforcement concluded that entering Corps land could enflame historic tensions between the tribes and state and federal governments and lead to increased violence.

B.      Section 838

4

To establish fault for its public nuisance claim, the State must prove that, to the extent the protestors caused a public nuisance under North Dakota law by affecting a "considerable number" of other persons, N.D. Cent. Code § 42-01-06, the Corps violated a negligence-based duty under Section 838 in causing that nuisance, *see* ECF No. 383 at 6 (recognizing that "this Court has already determined the public nuisance claim requires a negligence-based duty").

Liability under Section 838 requires a showing that the nuisance was caused by conduct *on* a possessor's land.  In full, it states:

> A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
> (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and
> (b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

Restatement (Second) of Torts § 838 (Am. Law Inst. 1979).  First, this provision focuses on the location—the "land upon which a third person carries on an activity that causes a nuisance." *Id.*

Second, it requires a showing of negligence.  The possessor is not liable merely because he permitted the third party to come onto the land.  The comments to Section 838 explain that a possessor is not liable for "[t]he mere fact that he permits the third person to be upon the land or to do something there, or that he knows of his presence or even of the particular activity." *See id.* cmt. g.  A possessor seeking to reasonably address third party conduct must "at most" request law enforcement assistance.  *See id.* cmt. g (explaining a possessor of land is "not required in all cases to put a stop to the activity," but may be in a position to stop the activity, "*at most by calling the police*" (emphasis added)).

The evidence at trial will not establish that these elements under Section 838 are met.

First, the evidence will show that the harmful protestor conduct—for which the State now seeks to recoup its law enforcement response costs—occurred off of Corps land. Second, the evidence will show that the Corps exercised reasonable care to prevent any nuisance by contacting the state and local law enforcement and requesting federal assistance in responding to the protests. The evidence will further show that neither the September 2016 press release nor the November 2016 letter consented to that harmful protestor activity. Those announcements provided, at most, limited permission for protestors to lawfully and peacefully exercise their free speech and assembly rights, and to do so only on a defined area on Corps land.

## III.    CAUSATION

If the Court finds the Corps breached Sections 318 or 838 in issuing the September 2016 press release or November 2016 letter, it must then determine whether the issuance of those two statements was the "legal cause" of the State's claimed harms. *See* Restatement (Second) of Torts § 431 (Am. Law Inst. 1965).

An actor's conduct is not the legal cause of the claimed harm unless, as relevant here, "his conduct is a substantial factor in bringing about the harm." *Id*. In general, an actor's conduct is not a substantial factor "if the harm would have been sustained even if the actor had not been negligent." Restatement (Second) of Torts § 432(1) (Am. Law Inst. 1965). Section 433 then lists "considerations . . . important in determining whether an actor's conduct is a substantial factor" in causing the alleged harm, including:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation

6

harmless unless acted upon by other forces for which the actor is not responsible;
(c) lapse of time.

Restatement (Second) of Torts § 433 (Am. Law Inst. 1965).  A cause is not a "substantial factor" if other actions had a "predominant effect" of bringing about the harm.  *Id.* cmt. d.

The evidence at trial will show that, under these standards, the Corps's statements were not a legal cause of the State's claimed harms—the law enforcement costs it incurred responding to unlawful protestor activity off of Corps land.  The State would have suffered those harms even if the Corps had not released those statements.  Protestors first began gathering on private land on the Standing Rock Indian Reservation in spring 2016, approximately six months before the Corps issued the first statement in September 2016.  In those intervening months, more people came to protest and protest activity intensified, with clashes between protestors and the pipeline company and its private security contractors.  Those statements did not cause the protestor conduct.  Protestors generally paid no heed to either statement.  Other considerations—like protecting the Standing Rock Sioux Tribe's access to clean water and Native American tribes' historic presence on land surrounding the pipeline—motivated whether they stayed at the protest.

The evidence will also show that intervening events—like decisions by State and federal officials, the State's law enforcement response, the pipeline company's actions, media coverage, and protestors' independent decisions—had a predominant effect in causing the protest activity.  To the extent the Corps's statements had any impact on protestor behavior, the conduct resulting from those statements did not cause the State's claimed harms.  Both announcements directed protestors to obey relevant regulations and laws and clarified where on Corps land protestors could exercise their lawful First Amendment rights.  The State cannot recover for law

enforcement costs spent responding to conduct protected by the First Amendment.

Even if protestors gathered on Corps land and then left to participate in unlawful conduct elsewhere, the evidence will show the Corps gave no permission for such activity. And there is no evidence that evicting protestors from Corps land would have stopped that activity. Protestors stayed many places—on private, tribal, and Corps land, and in hotels as far as Bismarck. The evidence does not connect the Corps's two announcements with increased protestor activity off of Corps land.

## IV.  DAMAGES

If the Court finds liability, it then must: (1) determine the amount of damages proximately caused by the Corps's allegedly tortious conduct; (2) determine if others were also at fault for those damages, and apportion damages; (3) reduce the amount by payments received by the State from the United States or any collateral source; and (4) deduct the $801,950.71 in interest the State incurred on a loan it received from the Bank of North Dakota.

First, the Court must determine which damages were "proximately caused" by the Corps's allegedly tortious conduct. *See* N.D. Cent. Code § 32-03-20. The State's damages may not include emergency response costs for protest activity that occurred before the Corps issued its September 2016 press release. The State's damages should be limited to unlawful protester conduct that resulted in or risked bodily harm on the Corps-managed lands identified in the September 2016 press release and November 2016 letter. Any such damages may not include any transfers of funds between State agencies and political subdivisions that do not represent loss to the State caused by the Corps's conduct. And such damages must deduct the scrap or salvage

8

value of materials purchased during the protests.

Second, the Court must determine whether others were at fault for these damages. *See* N.D. Cent. Code § 32-03.2-02 ("any damages allowed must be diminished in proportion to the amount of contributing fault"). North Dakota law adopts a modified comparative fault rule, which provides for several—not joint—liability. *Id*.[1] Applying North Dakota law, the Court must "determine the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury." *Id*. The evidence at trial will show that multiple parties beyond the Corps bear fault, including the protesters, the pipeline company and its private security contractors, other landowners who allowed protesters to gather on their lands, and the State itself. After determining those whose fault was responsible for the damages, the Court must apportion damages among the parties and any non-parties at fault. It must "reduce the amount of such damages in proportion to the amount of fault attributable to" the State, and may order the United States to pay "only for the amount of damages attributable to the percentage of fault of that party." *Id*.

Third, the Court must reduce any damages to be paid by the United States to account for any offsets for payments to the State by the United States or payments from a collateral source. *See* N.D. Cent. Code § 32.03.2-06 ("[a]fter an award of economic damages, the party responsible

---

[1] Under North Dakota law, the one exception to this rule of several liability is where two or more tortfeasors "act in concert in committing a tortious act or aid or encourage the act, or ratif[y] or adopt[] the act for their benefit." N.D. Cent. Code § 32-03.2-02. The North Dakota Supreme Court has explained that this exception cannot be "broadly construe[d]" to include negligence that merely occurs concurrently with other tortious actions. *Reed v. Univ. of N.D.*, 589 N.W.2d 880, 888 (N.D. 1999). The evidence does now show that this exception should apply.

for the payment thereof is entitled to" such reductions of the damages amount (emphasis added));
ECF No. 106 at 18-19 ¶ 48 (Order denying United States' motion for partial summary judgment,
stating that the Court "will consider a request for reduction in damages only after a damages
amount has been determined").  The Court must offset any damages by the $10 million dollar
grant paid to the State by the federal government for the purpose of assisting North Dakota with
reimbursement for its law enforcement activities responding to the protests.  *See Overton v.
United States*, 619 F.2d 1299, 1308-09 (8th Cir. 1980) (requiring setoff of governmental benefits
under FTCA unless benefits "are attributable to a special levy or premium").  It also must reduce
the damages by the $15 million payment to the State from the pipeline company, which was
intended and used to reimburse the State for the same protest-response costs it seeks in this case.
*See* 2017 N.D. Session Laws Ch. 23 (H.B. 1024), sec. 8 (stating intent that the State "accept
reimbursement . . . from nonstate sources for state costs incurred relating to unlawful activity
associated with the construction of the Dakota access pipeline").

Finally, the Court must deduct from any award the interest the State incurred on a loan it
received from the Bank of North Dakota.  The State's claim for $801,950.71 in interest is a claim
for interest prior to the judgment, but the FTCA does not permit recovery of that amount.  28
U.S.C. § 2674 ("The United States . . . shall not be liable for interest prior to the judgment.").
The Court will also hear evidence that any interest payments made to the Bank of North Dakota
do not represent damages to the State because the State wholly owns that institution.

The United States appreciates the opportunity to present this trial brief discussing the
many legal standards at issue in the upcoming trial.

Dated: February 1, 2024     Respectfully submitted,

             COLE FINEGAN
             United States Attorney


             */s Alexandra J. Berger*
             Alexandra J. Berger
             Timothy B. Jafek
             Jane Bobet Rejko
             V. William Scarpato III
             Erica M. Zilioli
             Special Attorneys to the United States
             Attorney General
             United States Attorney's Office for the
             District of Colorado
             1801 California Street, Suite 1600
             Denver, CO 80202
             Telephone: (303) 454-0100
             Fax: (303) 454-0407
             alexandra.berger@usdoj.gov

             Counsel for Defendant

11

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to any party who has entered an appearance in this matter via the e-mail addresses provided in CM/ECF.

_s/ Alexandra J. Berger_
Alexandra J. Berger