UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

-------------------------------------x

STATE OF NORTH DAKOTA,

        Plaintiff,

v.               Civil No. 1:19-cv-00150-DMT-ARS

THE UNITED STATES OF AMERICA,

        Defendant.

-------------------------------------x

DATE: May 26, 2022

TIME: 10:00 a.m.

Videotaped Deposition of LOWRY CROOK, appearing on behalf of Defendant, taken by the Respective parties, held via videoconference by all participants, before MICHAEL WILLIAMS, a Notary Public of the State of New York and Registered Professional Court Reporter.

Lowry Crook
May 26, 2022

Page 2

```
2    A P P E A R A N C E S :
3
     FOR THE PLAINTIFF:
4
     GREENBERG TRAURIG, LLP
5    1000 Louisiana Street, Ste. 6700
     Houston, Texas 77002
6    BY: PAUL SEBY, ESQ.
         -and-
7        PAUL KERLIN, ESQ.
     sebyp@gtlaw.com
8    lerlinp@gtlaw.com
9
     FOR THE DEFENDANT:
10
     UNITED STATES ATTORNEY'S OFFICE
11   DISTRICT OF COLORADO
     1801 California Street, Ste. 160026 Court Street,
12   Denver, Colorado 80202
     BY: ERICA ZILLOLI, ESQ.
13       -and-
         LOGAN STEINER, ESQ.
14   erica.m.zilloi@usace.army.mil
     logan.steiner@usdoj.gov
15
16   FOR THE DEFENDANT:
17   OFFICE OF THE GENERAL COUNSEL
     104 Army Pentagon, Rm 3C546
18   Washington, DC 20310
     BY: ZAHEER H. TAJANI, ESQ.
19   zaheer.h.tajani.civ@army.mil
20
21   ALSO PRESENT:
22   James Soto, Jr. - Videographer
     Rachel Hymel - Trial Tech
23
24
25
```

Page 4

```
2              I N D E X
3    WITNESS         EXAMINATION BY          PAGE
4    Lowry Crook     Paul Seby               7
5            E X H I B I T S
6    PLAINTIFF     DESCRIPTION              PAGE
7    (All exhibits 318, 406-407, 410-417, 419-421,
8    423-425, 427-430, 432-433, 443 and 446 premarked
9    and referred to by attorney)
10     L I T I G A T I O N    S U P P O R T
11        M A R K E D   F O R   R U L I N G
12   QUESTION                          PAGE/LINE
13            (None)
14    R E Q U E S T S   F O R   P R O D U C T I O N
15   DESCRIPTION                       PAGE/LINE
16            (None)
17
18
19
20
21
22
23
24
25
```

Page 3

```
2      F E D E R A L    S T I P U L A T I O N S
3          IT IS HEREBY STIPULATED AND AGREED by and
4    between the counsel for the respective parties
5    hereto, that the filing, sealing, and
6    certification of the within deposition shall be
7    and the same are hereby waived;
8          IT IS FURTHER STIPULATED AND AGREED that
9    all objections, except as to the form of the
10   question, shall be reserved to the time of trial.
11         IT IS FURTHER STIPULATED AND AGREED that
12   the within deposition may be signed before any
13   Notary Public with the same force and effect as
14   if signed and sworn to before this court.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1               Crook
2          THE VIDEOGRAPHER:  Participants
3    should be aware that this proceeding is being
4    recorded and, as such, all conversations held
5    will be recorded unless there's a request and
6    agreement to go off the record.
7          This is the remote video-recorded
8    deposition of Lowry Crook.  Today is Thursday,
9    May 26, 2022.  The time is now 2:01 p.m. UTC,
10   10:01 a.m. Eastern.
11         We are here in the matter of the
12   State of North Dakota versus the United States of
13   America.  My name is James Soto, Jr., remote
14   video technician on behalf of U.S. Legal Support.
15         I am not related to any party in
16   this action, nor am I financially interested in
17   the outcome.
18         At this time, will the reporter,
19   Mikael Williams, on behalf of U.S. Legal Support
20   please enter the statement for remote proceedings
21   into the record.
22         THE REPORTER:  The attorneys
23   participating in this deposition acknowledge that
24   I am not physically present in the deposition
25   room and that I will be reporting this deposition
```

Lowry Crook
May 26, 2022

Page 6

1                   Crook
2    remotely.
3                   They further acknowledge that, in
4    lieu of an oath administered in person, I will
5    administer the oath remotely.
6                   The parties and their counsel
7    consent to this arrangement and waive any
8    objections to this manner of reporting.
9                   Please indicate your agreement by
10   stating your name and your agreement on the
11   record.
12            MR. SEBY:  This is Paul Seby,
13   counsel for the plaintiff, and I concur.
14            MS. ZILLOLI:  This is Erica Zilloli,
15   counsel for the United States, the defendant, and
16   I concur.
17            MR. KERLIN:  This is Paul Kerlin,
18   also for the plaintiff, and I concur.
19            MS. STEINER:  This is Logan Steiner,
20   also for the defendant, the United States, and I
21   concur.
22            MR. TAJANI:  This is Zaheer Tajani,
23   I concur.
24            THE REPORTER:  Will the witness
25   kindly present his government-issued

Page 7

1                   Crook
2    identification by holding it up to the camera for
3    verification.
4            (Witness complies.)
5            LOWRY CROOK,
6    called as a witness, having first been duly
7    sworn, testifies as follows:
8                   EXAMINATION
9    BY MR. SEBY:
10           MR. SEBY:  So this is the sworn
11   deposition of Lowry Crook taken pursuant to prior
12   notice and agreement of counsel.
13      Q.    Good morning, Mr. Crook.  My name is
14   Paul Seby.  I'm both an attorney with the law
15   firm of Greenberg, Traurig and a Special
16   Assistant Attorney General for the State of North
17   Dakota.
18           Together with Mr. Kerlin, we
19   represent the State of North Dakota in this
20   matter, and today I'll refer to North Dakota as
21   the State or North Dakota.
22           Do you understand that you've been
23   sworn in this morning?
24      A.    Yes.
25      Q.    And, please, state your full name

Object to all testimony as to hearsay, 802

Page 8

1                   Crook
2    for the record.
3      A.    Lowry Alexander Crook.
4      Q.    Thank you.
5            Before we go in, I'd like to go over
6    some basic ground rules for the deposition, most
7    of which are simply intended to help the court
8    reporter and videographer, for that matter, take
9    down everything we say, okay?
10     A.    Yes.
11     Q.    Everything we say is being written
12   down and videotaped and because of that, I would
13   ask you to verbalize your responses with a yes or
14   a no or other answer, as you may wish, as opposed
15   to simply just nodding your head up or down or
16   side to side.  Also, please, no uh-huhs or
17   nu-huhs, if that's acceptable to you, sir?
18     A.    Yes.
19     Q.    Okay.
20           Likewise, it's difficult for the
21   court reporter to take down what we are saying if
22   we inadvertently talk over one another.
23           So I will do my best not to
24   interrupt, and you if you would do the same that
25   would be great.  Please try not to interrupt me,

Page 9

1                   Crook
2    and let me finish any questions if I'm asking
3    one.
4            Is that acceptable?
5      A.    Yes.
6      Q.    And if you need a break, sir, just
7    let me know.  If there's a question pending, I'd
8    ask you to please answer it, and then we can take
9    whatever break is needed, and I think maybe we
10   should have a break every hour or so,
11   approximately.
12           So we'll just keep an eye out for
13   that and, otherwise, if you need one with any
14   different frequency, just let me know, please.
15           If you do not understand a question,
16   also, please just let me know.  Ask me to repeat
17   it or rephrase it, and I will do my best to
18   clarify what I'm trying to ask you; and if you
19   understand a question and answer it, I'm going to
20   assume that you have understood it and that there
21   is no feed for clarification.
22           Is that okay?
23     A.    Yes.
24     Q.    Okay.
25           Mr. Crook, is there anyone with you

Lowry Crook
May 26, 2022

Page 10

1                         Crook
2    in the room this morning?
3         A.    Yes.
4         Q.    And who would those individuals be?
5         A.    Counsel for the U.S. attorney's
6    office and for the Army.
7         Q.    And if you'd identify those
8    individuals by name.
9         A.    Sorry.  Erica Zilloli and Zaheer
10   Tajani.
11        Q.    Okay.
12              Would you please turn off your
13   electronic devices so that you're not distracted
14   during the deposition.
15              If I -- let's see, are you relying
16   on any notes with you this morning, sir?
17        A.    No.
18        Q.    Okay.
19              And, Mr. Crook, do you understand
20   that you're obligated by oath to tell the truth
21   today?
22        A.    Yes.
23        Q.    And do you understand that portions
24   of your videotaped deposition may be played to
25   the court if this case were to go to trial?

Page 11

1                         Crook
2         A.    Yes.
3         Q.    And do you understand your
4    deposition today has the same force and effect as
5    if you were in front of a judge or a jury?
6         A.    Yes.
7         Q.    And do you understand that if you
8    fail to tell the truth today that is considered
9    perjury?
10        A.    Yes.
11        Q.    So you will you agree to tell the
12   truth today?
13        A.    Yes.
14        Q.    And will you agree to provide
15   accurate testimony today?
16        A.    Yes.
17        Q.    To that end, is there anything today
18   preventing you from providing complete, accurate
19   and truthful testimony?
20        A.    No.
21        Q.    Do you have any questions, sir,
22   about these instructions?
23        A.    No.
24        Q.    Thank you.
25              Mr. Crook, what did you do to

Page 12

1                         Crook
2    prepare for your deposition today?
3         A.    Met with counsel and prepared.
4         Q.    Okay.
5               Who did you meet with?
6         A.    Counsel who's in the room with me
7    right now.
8         Q.    Anyone else?
9         A.    And Logan, who's on the I think
10   virtually here.
11        Q.    Yes.
12              When did you meet with any of those
13   individuals?
14        A.    I think we met two or three times
15   over the last couple of weeks.  I don't remember
16   the exact days.
17        Q.    Did you meet physically in person or
18   by telephone?
19        A.    I think twice over Zoom and once
20   physically in person but with Logan virtually.
21        Q.    How long did you meet on those
22   occasions?
23        A.    I think it was two or three hours
24   each time.
25        Q.    Okay.

Page 13

1                         Crook
2               Did you talk to anyone else other
3    than your counsel for preparing for this
4    deposition?
5         A.    No.
6         Q.    Are you aware that depositions have
7    been taken in this case of federal officials,
8    including Major Thane Startzel, Eileen
9    Williamson, Eric Stash, Colonel John Henderson
10   and General Scott Spellmon?
11        A.    I'm aware that some other
12   depositions have been taken.  I'm not -- I wasn't
13   aware of all of the depositions that you just
14   listed, just a couple of them.
15        Q.    Which ones were you aware of, sir?
16        A.    General Spellmon and Colonel
17   Henderson, and I'm not sure if I was aware of any
18   of the other ones.  I knew that there were other
19   depositions but just not specifically.
20        Q.    Did your counsel provide you the
21   transcripts of those depositions?
22        A.    No.
23        Q.    Did you view any videotaped excerpts
24   or in full portions of those depositions?
25        A.    No.

Lowry Crook
May 26, 2022

Page 14

Crook

1
2       Q.      Did you review any documents, sir,
3   prior to today's deposition?
4       A.      There were documents shown to me
5   during prep.
6       Q.      And which documents?
7       MS. ZILLOLI:  Objection.
8   Attorney/client privilege work product.  I'm
9   glowing to instruct the witness not to answer.
10      Q.      Other than documents prepared or
11  provided to you by your counsel, which documents
12  did you review?
13      A.      Only documents that were provided by
14  counsel.
15      Q.      And did you review those documents
16  on your own prior to a call or did you review
17  them concurrently with your meetings or video
18  link with counsel?
19      A.      Reviewed them during the prep
20  sessions with counsel.
21      Q.      Okay.
22              So how many hours total would you
23  say that you've prepared with counsel or apart
24  for your deposition today?
25      A.      I'd say eight to nine hours.

Page 15

Crook

1
2       Q.      Thank you.
3               Have you done any independent
4   research about the issues in this case?
5       A.      No.
6       Q.      Did you do any review of any prior
7   emails or information from your records?
8       A.      I, I, I looked for documents that
9   might be responsive or relevant to the case to
10  provide to attorneys, but that was it.
11      Q.      And when did you do that?
12      A.      I believe like two weeks ago, and I
13  guess I did a search several months ago, maybe in
14  December.
15      Q.      What kind of search?
16      A.      I just looked to see if I happened
17  to have any physical documents at home.
18      Q.      And did you find any?
19      A.      I found two documents that I shared
20  with our attorneys.
21      Q.      What were those documents?
22      A.      One was a printout of an email and
23  one was a memo.
24      Q.      What was the email involved?  What
25  did the email involve?

Page 16

Crook

1
2       A.      It was an email exchange with an
3   official at the White House from December 2016.
4       Q.      Can you describe the email, please.
5       A.      I mean, it would speak for itself,
6   but, as I recall, it was from Brian Deese,
7   Counsel to the President, to me and it said that,
8   I mean, again, it would speak for itself; but it
9   was stating that the decision on what to do about
10  an easement for Dakota's access pipeline was the
11  assistant secretary's decision.
12      Q.      The assistant secretary, who are you
13  referring to?
14      A.      I'm sorry.  The assistant secretary
15  of the Army for Civil Works.
16      Q.      Would you be referring to Miss
17  Jo-ellen Darcy?
18      A.      Yes.
19      Q.      And the memo that you mentioned,
20  what did that pertain to?
21      MS. ZILLOLI:  Objection.  The memo
22  contains deliberative process privilege.  We have
23  noted it on our privilege log.
24      MR. SEBY:  Thank you.
25      Q.      Mr. Crook, are you aware of the case

Page 17

Crook

1
2   that brings you here for your deposition today,
3   the State of North Dakota versus the United
4   States?
5       A.      Yes, I'm aware of the case.
6       Q.      Okay.
7               The case involves North Dakota's
8   claims against the United States under the
9   Federal Tort Claims Act involving $38 million in
10  damages that North Dakota seeks to recover as a
11  result of the Corps and other federal officials
12  and agencies actions associated with protests
13  against the Dakota access pipeline.
14              Do you understand that, sir?
15      A.      I didn't know all the details that
16  you just went through, but I knew that the state
17  was suing the federal government related to the
18  Dakota access pipeline and protests.
19      Q.      Are you aware that the United States
20  filed a motion to dismiss the case against the
21  State of North Dakota and that the United States
22  District Court for the District of North Dakota
23  denied that motion?
24      A.      I am generally aware of that, yes.
25      Q.      Have you read any of the pleadings

Lowry Crook
May 26, 2022

Page 18

```
1                    Crook
2   involved in that matter?
3        A.    No, I haven't actually.
4        Q.    Are you aware that the United States
5   sought a motion for partial summary judgment
6   against the State of North Dakota and the U.S.
7   District Court for the District of North Dakota
8   denied that motion?
9        A.    I was not aware of that.  I'm not
10  aware of that.
11       Q.    Are you aware that the United States
12  withheld access for discovery beyond officials
13  from the United States Army Corps of Engineers
14  and that as a result the State of North Dakota
15  sought a motion to compel discovery against other
16  agencies of the United States Government, and
17  that motion was granted.
18             Are you aware of that, sir?
19       A.    I'm only generally aware that there
20  was some litigation over the scope of discovery
21  but not the specifics.
22       Q.    In the context of your awareness,
23  were you aware that the United States was denied
24  its efforts to limit discovery?
25       A.    I'm just aware that, that some
```

Page 19

```
1                    Crook
2   additional discovery was allowed.  Like I don't
3   know the details.
4        Q.    Okay.
5              Mr. Crook, I'd like to ask you some
6   questions about your background, please.
7              Where are you from, sir?
8        A.    Texas.
9        Q.    Great big state.
10             Where in Texas?
11       A.    The city is called Plano.  It's just
12  North of Dallas.
13       Q.    Sure, okay.
14             And did you grew up there?
15       A.    Yes.
16       Q.    You went through high school there?
17       A.    Yes.
18       Q.    And did you stay in Texas for
19  college, university?
20       A.    Yes, I did.
21       Q.    Where did you go to university?
22       A.    University of Texas in Austin.
23       Q.    And beyond a bachelor's degree, did
24  you obtain any other degrees?
25       A.    Yes, I did.
```

19:21-20:4,
21:7-14,
22:10-13
401-402

Page 20

```
1                    Crook
2        Q.    And what would those be, sir?
3        A.    A masters in public affairs and a JD
4   from law school.
5        Q.    And where did you obtain those
6   degrees?
7        A.    Also at the University of Texas.
8        Q.    Both of them?
9        A.    Yes, the masters is from, it's
10  called the LBJ School of Public Affairs, and then
11  the law degree was from University of Texas Law
12  School.
13       Q.    Okay.
14             And when did you graduate -- which
15  of those degrees was the last that you obtained?
16       A.    So the law and the masters were a
17  joint degree, and I received my degree in 1999.
18       Q.    Your Juris Doctorate degree?
19       A.    Yes.
20       Q.    Thank you.
21             Any additional education beyond
22  those two degrees?
23       A.    No.
24       Q.    Okay.  That's plenty, isn't it?
25             How about, Mr. Crook, your
```

Page 21

```
1                    Crook
2   professional history after you graduated with
3   those degrees?
4        A.    I clerked for a year for the Texas
5   Supreme Court, and then I was at a law firm here
6   in Washington, D.C. for I believe nine years.
7        Q.    Which firm was that?
8        A.    It was called Wilmer, Cutler and
9   Pkckering and now it's called Wilmer, Hale.  It
10  changed to Wilmer, Hale while I was there.
11       Q.    And then after your period of time
12  at Wilmer, Cutler, Pickering, what did you do?
13       A.    I worked for the 2008 Barack Obama
14  campaign for President.
15       Q.    In what capacity were you part of
16  that campaign?
17       A.    I was counsel in North Carolina and
18  was in charge of voter protection.
19       Q.    And did you that for how long, sir?
20       A.    Like four months.
21       Q.    And then if you keep carrying
22  forward in your history, what did you do after
23  that?
24       A.    Then in the Obama administration, my
25  next role was at the office of presidential
```

Lowry Crook
May 26, 2022

Page 22

1              Crook
2    personnel where I was a vetting attorney.
3         Q.    You were a vetting attorney?
4         A.    Yes.  So you vet new or potential
5    political appointees in the administration.
6         Q.    And how long did you have that
7    position?
8         A.    Like five or six months, I believe.
9         Q.    Okay.
10              And then after that period of time?
11        A.    Then I was counsel to the chairman
12   and chief of staff at the Federal Maritime
13   Commission.
14        Q.    Okay.
15              And what did you do there?
16        A.    I helped manage the chairman's role
17   as managing the agency and also served as his
18   counsel.
19        Q.    Okay.
20              And what period of time did you have
21   that position?
22        A.    I believe I started in January 2010
23   until June of 2012.
24        Q.    And then after June of 2012, what
25   did you do, Mr. Crook?

Page 23

1              Crook
2         A.    I was deputy chief of staff at the
3    White House Council on Environmental Quality.
4         Q.    And how long did you serve in that
5    position?
6         A.    I served in that position from
7    June 2012 until I believe August 2015.  Also
8    during part of that period, I was acting general
9    counsel of the Council on Environmental Quality.
10        Q.    And both of those roles that you
11   served at the Seaview, they both went through
12   August of 2015.
13        A.    Yes, I believe it's August.  I'm
14   sorry.
15        Q.    Okay.
16        A.    August 2015, yes, that's right.
17        Q.    Okay.
18              And then after that, Mr. Crook, what
19   did you do?
20        A.    Then I was principal deputy
21   assistant secretary of the Army for Civil Works.
22        Q.    Okay.
23              And you stayed there through the end
24   of the Obama Administration?
25        A.    Right, until January 20, 2017.

Page 24

1              Crook
2         Q.    Would you -- that brings us to the
3    question of your involvement in the Army Corps of
4    Engineers involvement in the Dakota Access
5    Pipeline permitting process and protests.
6              So I want to ask you about your, if
7    you would, please describe your position with the
8    Corps with respect to the protests against the
9    Dakota Access Pipeline for the period of time of
10   March, approximately March 2016, to the time in
11   which you left the Obama Administration on
12   January 20th of 2017.
13              Can you -- would you please describe
14   the time in which you first became involved in
15   issues surrounding the Dakota Access Pipeline.
16        A.    I believe the first involvement or
17   that it came to my knowledge was when the chief
18   of the Standing Rock Sioux Tribe met with me in
19   the Pentagon in February or March 2016.
20        Q.    And did you seek the meeting or did
21   he seek the meeting?
22        A.    The tribe sought the meeting.
23        Q.    Okay.
24              And was your office, sir, when you
25   were principal deputy secretary of the Army for

Page 25

1              Crook
2    Civil Works, was your office located in the
3    Pentagon?
4         A.    Yes.
5         Q.    Okay.
6              And this meeting that you're telling
7    me about in February of 2016, that was your first
8    involvement with the Dakota Access Pipeline, any
9    issue related to the Dakota Access Pipeline?
10        A.    I believe that was my first
11   awareness of the pipeline and the issues.
12        Q.    Okay.
13              And what was the nature of the
14   meeting that you referenced with the chairman of
15   the Standing Rock Sioux Tribe?
16        A.    At the time, there was a draft,
17   environmental assessment that had been issued by
18   the Omaha District of the Army Corps of
19   Engineers, and the tribe and its counsel took
20   issue with some of the things that were in the
21   environmental assessment.
22        Q.    And so was the tribe counsel's
23   present in the meeting that you were telling me
24   about?
25        A.    Yes.

Lowry Crook
May 26, 2022

Page 26

1                          Crook
2         Q.    And what was that individual or
3    individuals' name?
4         A.    I, actually, I can't remember his
5    name right now.
6         Q.    Was it --
7         A.    There may have been two counsel and
8    I just, I just -- I don't remember their names.
9         Q.    William Perry?
10        A.    Yes, that is one of them.
11        Q.    Do you recall the other one now?
12        A.    I don't actually.  Sorry.
13        Q.    Okay.
14              What was the ask of the tribe when
15    they met with you?

**ND OBJ.:**
Hearsay

16        A.    They didn't want the pipeline to be
17    permitted to cross Lake Oahe at the location that
18    the draft EA was analyzing proposing for it to
19    cross.
20              The alternative crossing area was
21    just north of their reservation, and they didn't
22    want it to cross the river there.
23        Q.    Okay.
24              If I understood your earlier
25    response, the EA had already been finalized and

Page 27

1                          Crook
2    issued; is that correct?
3         A.    No, I believe that just at that time
4    a draft EA had been issued, and I don't think
5    that the final EA had come out yet, nor had the
6    permits been granted at that time.
7         Q.    And so what was the ask in that
8    context?
9         A.    That the Corps address the issues
10    that the tribe raised that they had with the EA.
11        Q.    Okay.
12              Who was present with the group that
13    you met other than the chairman and the two
14    counsel that you mentioned?  Was there anyone
15    else present?
16        A.    There was other staff for the
17    assistant secretary of the Army for Civil Works.
18        Q.    And who were they?
19        A.    I don't recall exactly who all was
20    there, but I believe Chip Klein, who was both
21    regulatory and tribal staff for the assistant
22    secretary, and I'm just not sure who else.
23              There may have been other staff from
24    the assistant secretary office there but I just
25    don't recall.

Page 28

1                          Crook
2         Q.    Was the assistant secretary present?
3         A.    No.
4         Q.    Was there anyone present from other
5    federal agencies?
6         A.    No.
7         Q.    Okay.
8              Were there any other tribes present?
9         A.    No.
10        Q.    Okay.
11              And was that the only time you met
12    with the Standing Rock Sioux Tribe?
13        A.    No.
14        Q.    There would be how many more times?
15        A.    I met with Chairman Archambault
16    probably two or three other times.
17        Q.    And with respect to the conclusion
18    of that meeting, did you make any commitments or
19    promises to the attendees that requested the
20    meeting with you?
21        A.    No, not that I recall.
22        Q.    How did the meeting end?
23        A.    They expressed their concerns about
24    the EA.  I can't recall if they raised other
25    issues that were unrelated to the Dakota Access

Page 29

1    Pipeline and, you know, I probably thanked them
2    for, you know, sharing their concerns but didn't
3    make any commitments that I recall.
4         Q.    Okay.
5              Did you promise to provide them with
6    any follow-up or evaluation to which you would
7    follow-up with them?
8         A.    No, I don't recall promising any
9    follow-up with them.
10        Q.    Okay.
11              So you were telling me that as the
12    first effort to respond to the question about
13    your role and position with the Corps concerning
14    issues regarding the Dakota Access Pipeline, and
15    I asked about the time frame of March 2016, and I
16    appreciate you telling me about this meeting,
17    which occurred prior to that.
18              So if you would continue to explain
19    your involvement in the DAPL process carrying
20    forward from February, the meeting you mentioned.
21        A.    I think that the next time that the
22    pipeline was on my radar was probably in the
23    summer of 2016.
24        Q.    And how was that so?

Lowry Crook
May 26, 2022

Page 30

Crook

1
2      A.      We began hearing about concerns
3  about the pipeline that were being raised, in
4  addition to the tribe, by people along this
5  route, and I believe in Iowa and some of the
6  other states that were along its path.
7      Q.      By people along its path, who are
8  you referring to?  What type of people?
9      A.      Well, generally, what I heard was
10  secondhand.  I heard that, yeah, the time
11  Secretary Vilsack from the Department of
12  Agriculture, who was former governor of Iowa, I
13  had heard that he was hearing concerns raised by
14  people in Iowa about the pipeline.
15      Q.      How did those -- how were those
16  relevant to the Corps?
17      A.      Because the Corps was responsible
18  for permitting the pipeline crossing of the
19  Missouri River, Lake Oahe, and the Corps also for
20  the permit to go forward was required to grant an
21  easement across the lake.
22      Q.      Okay.
23              The geographic location you're
24  describing is in the State of North Dakota, isn't
25  it?

**ND OBJECTION:**
Hearsay;
Foundation

Page 31

Crook

1
2      A.      Yes, that particular crossing is in
3  North Dakota.
4      Q.      So how is that germane to people in
5  Iowa expressing opinions about the pipeline?
6      A.      That's just, after hearing from the
7  Standing Rock Sioux Tribe in North Dakota, I just
8  recall hearing additional concerns being raised
9  from Iowa, different parts of its route where the
10  Corps also had a permitting role for the crossing
11  of any what's considered waters of the United
12  States where the federal government has
13  jurisdiction.
14      Q.      In Iowa?
15      A.      Yes.
16      Q.      Okay.  All right.
17              If you will continue to answer the
18  question about your involvement in DAPL.
19      A.      At some point in the summer, and I
20  don't remember the exact month.
21      Q.      Summer of 2016?
22      A.      Yeah, sorry.  Summer of 2016, I
23  spoke to people at the Army Corps of Engineers
24  about the timing of the permitting decisions for
25  the Dakota Access Pipeline.

Page 32

Crook

1
2      Q.      And who did you speak with?
3      A.      I believe I spoke to General
4  Jackson, Ed Jackson, the deputy commanding
5  general for civil works of the Army Corps of
6  Engineers.
7      Q.      And who else?
8      A.      I recall there was a conference
9  call, and I believe that it included General
10  Scott Spellmon, who was then northwest division
11  commander for the Army Corps of Engineers, and
12  Colonel John Henderson, who was district
13  commander for the Omaha District of the Army
14  Corps of Engineers.
15              There may have been other people on
16  the call.  I just don't recall today.
17      Q.      And what was the topic of that
18  discussion?
19      A.      The topic was that the permitting
20  decision was their decision, but I requested that
21  they time the permitting decision so that there
22  was one announcement of the decision and not a
23  series spreading out over time.
24      Q.      And why was that?
25      A.      Because I believed that that was the

Page 33

Crook

1
2  best way to avoid building controversy and
3  protests over the pipeline.
4      Q.      Protests where?
5      A.      At that time, I didn't know
6  specifically where, but I was generally worried
7  about any place along its path, whether it be
8  North Dakota or Iowa.
9      Q.      What caused you to have those
10  concerns in the summer of 2016?
11      A.      I've been hearing that there was --
12  it was growing controversial in both North Dakota
13  and Iowa.
14      Q.      And who -- where were you hearing
15  that from?
16      A.      I heard it from friends of mine who
17  were in the White House, and I don't know if
18  there were press reports about it at the time as
19  well.
20      Q.      Which friends in the White House did
21  you hear that from?
22      A.      I believe I first started hearing
23  about it from -- his name is Rohan Patel.  He was
24  in intergovernmental affairs in the White House.
25      Q.      And what did he tell you?

Lowry Crook
May 26, 2022

Page 34

Crook

1
2       A.      I believe he had formally worked for
3   Secretary Vilsack, and I believe he may have been
4   the one who relayed the concerns in Iowa that
5   Secretary Vilsack was hearing.

**ND OBJ.:**
Hearsay;
Speculation

6       Q.      How about your concerns that you
7   referenced relative to North Dakota, where did
8   you hear those from?
9       A.      Yeah, I first heard the concerns
10  from the tribe itself.  I don't recall if in the
11  summer there was additional follow-up from the
12  tribe.  I don't believe there was a meeting.
13  There may have been.
14          At some point after the meeting
15  there may have been some written letters from the
16  tribe about the issue.
17      Q.      And you referenced that as occurring
18  in the summer of 2017.
19          Are you recalling now with any
20  better specificity when in the summer?
21      A.      I can't recall if it's July or
22  August.
23      Q.      Okay.
24          And with respect to your concern
25  about protest gathering, if a decision was made,

Page 35

Crook

1
2   were you hearing threats or suggestions that a
3   protest would occur in North Dakota?

**ND OBJ.:**
After "... a protest at
the time." - Non-
Responsive.

4       A.      I don't believe at that time, at the
5   time we were talking about the permitting
6   decision that I was -- I don't recall hearing
7   threats about a protest at the time.  I was more
8   at that time just concerned about the
9   controversy, general controversy around it.
10      Q.      No one was threatening protest, to
11  your knowledge, at that time?
12      A.      Not that I recall?
13      Q.      Would you continue with your
14  explanation of your role and participation.
15          We're up to the summer of 2016.
16      A.      Okay.
17          After that call, at some point the
18  Corps published its final environmental
19  assessments for the various crossings of the
20  pipeline over where the Corps had, you know,
21  jurisdiction for permits and issued the permits
22  for the pipeline to proceed.
23      Q.      Okay.  And?
24      A.      And then after that, then I heard
25  that protests had begun in North Dakota.

Page 36

Crook

1
2       Q.      And if you could elaborate on what
3   you heard about that point, protests had begun.

**ND OBJ.:**
Hearsay

4       A.      At that time, and I believe this was
5   in August, I had heard that there was some
6   relatively small protests on the northern part of
7   the Standing Rock Sioux Reservation, and that's
8   all I heard at the time.
9       Q.      Okay.
10          With respect to the agency action
11  that you just referenced, the issuance of a final
12  environmental assessment and permits to proceed
13  with the pipeline, were you involved in those
14  decisions?

**36:10-19,
37:24-38:9,
40:10-18
401-402**

15      A.      As I said, I had a discussion about
16  the timing of the decisions but believed that the
17  decision on the merits of it was up to the Corps
18  of Engineers and specifically the district and
19  the division commanders.

**ND OBJ.:**
Relevance

20      Q.      Okay.
21          So when you heard about the final EA
22  being issued, you were advised that the Omaha
23  District and the Northwest Division had made a
24  decision?
25      A.      Yes.

Page 37

Crook

1
2       Q.      You were not or were you advised
3   prior to the decision being made by those
4   individuals what they were proposing to do?
5       A.      Yes, I believe so.
6       Q.      And did you have any response to
7   that proposal?
8       A.      No, only on the -- only that the --
9   on the timing of the announcement.
10      Q.      So is it your testimony, Mr. Crook,
11  that you did not influence the merits decision in
12  any way other than to influence the timing of
13  that decision?
14      A.      It's my testimony that I did not --
15  I don't recall expressing a view on the merits of
16  the permitting decision to the Corps of Engineers
17  chain of command.
18      Q.      Okay.
19          Did you express an opinion on
20  anything else?
21      A.      As I said, I expressed an opinion on
22  that the timing of the decision happened all at
23  once.
24      Q.      And what was your opinion expressed
25  as to the timing?  Did you have a position that

Lowry Crook
May 26, 2022

Page 38

Crook

1
2  differed than the proposed timing from the
3  division and district commanders?
4      A.    No, I just -- I just wanted it to be
5  one announcement, and I wanted to be able to have
6  notice of the announcement beforehand so I could
7  advise other people in the administration that it
8  was coming and that likely news reports were
9  likely coming about it.
10     Q.    And so did you -- your position was
11 expressed to whom?
12     A.    As I recall, it was expressed to
13 General Jackson, General Spellmon and Colonel
14 Henderson.  There may have been others, too.
15     Q.    Did you express that to anyone other
16 than General Jackson in the Corps of Engineers
17 leadership or the Department of Army?
18     A.    I don't recall specifically.  I may
19 have expressed it with the director of civil
20 works, and I talked about the timing and the need
21 for advanced notice with Assistant Secretary
22 Darcy and other staff in the assistant
23 secretary's office.
24     Q.    Okay.
25           And your opinion, did it differ from

Page 39

Crook

1
2  what Mr. or General Spellmon or Colonel Henderson
3  were intending to do?
4      A.    No, I didn't really have an opinion
5  on the merits of it at that time.
6      Q.    My question wasn't regarding the
7  merits.  It was the timing.
8      A.    Oh, no, I don't think I had an issue
9  with the timing because they did, as I recall, as
10 far as the permits at least, they were all
11 announced at the same time.
12     Q.    So in terms of your opinion, you
13 were -- you were happy with what was done then
14 and that comported with your opinion?
15     A.    The timing was consistent with the
16 discussions I had with them, yes.
17     Q.    And so you gave them an opinion and,
18 to your knowledge, they followed it?
19     A.    They agreed with what we discussed,
20 yes, and acted consistently with it.
21     Q.    Okay.
22           Was your opinion first shared with
23 Assistant Secretary Darcy?
24     A.    Yes, I did share it with her first.
25     Q.    And how did she feel about your

Page 40

Crook

1  opinion?
2      A.    I believe she agreed with me.
3      Q.    How about Major General Jackson, did
4  he agree with you?
5      A.    I don't know that he expressed
6  that -- his own opinion, but I believe that he
7  understood why I was asking for it and --
8      Q.    Okay.
9           And then with respect to that
10 decision on timing or the merits, did you discuss
11 that matter with the White House?
12     A.    Yes.
13     Q.    And who did you discuss that with?
14     A.    I believe at some point I discussed
15 it with Rohan Patel in intergovernmental affairs
16 and, also, with a special assistant to Brian
17 Deese, Counsel to the President.
18     Q.    And that individual's name?
19     A.    I'm forgetting his name right now.
20     Q.    Okay.
21           Did you have an existing friendly or
22 professional relationship with either of those
23 individuals?
24     A.    Yes.

Page 41

Crook

1
2      Q.    Okay.
3           Was it one of your job
4  responsibilities to be a liaison to the White
5  House?
6      A.    It was to inform them of anything
7  noteworthy or controversial that was happening
8  with the Army Corps of Engineer Civil Works
9  program.
10     Q.    And in conducting that effort, those
11 efforts, was that an official part of your job
12 description?
13     A.    I don't recall the specifics of my
14 precise written job description, but I did see it
15 as one of my responsibilities.
16     Q.    Okay.
17           And did you conduct that work with
18 the knowledge of Miss Darcy?
19     A.    Yes, generally, I did.
20     Q.    Okay.
21           Did the other people in the Corps of
22 Engineers that you worked with, were they aware
23 that one of your responsibilities to do what you
24 just mentioned?
25           MS. ZILLOLI:  Objection.

Lowry Crook
May 26, 2022

Page 42

1                           Crook
2    Speculation.
3         Q.      I'm asking whether you know that.
4         A.      I would make them aware of some
5    discussions or things being shared with the White
6    House generally.  I don't recall specifically,
7    you know, which conversations at that time they
8    were specifically aware of versus just generally
9    that the White House was being kept informed of
10   significant things.
11        Q.      Sure.  Okay.
12               Was your job responsibility to also
13   be a liaison to other federal agencies?
14        A.      Yes, I believe the office of the
15   assistant secretary generally is responsible for
16   engagement between the Corps of Engineers and
17   other federal agencies.
18        Q.      And what other federal agencies in
19   practice with such engagement -- did such
20   engagement involve?
21        A.      Do you mean generally or with
22   respect to the Dakota Access Pipeline?
23        Q.      The latter, with respect to the
24   Dakota Access Pipeline.
25        A.      The Department of the Interior and

Page 43

1                           Crook
2    Department of Justice were probably the two main
3    agencies that I dealt with during that time
4    regarding the Dakota Access Pipeline.
5         Q.      Okay.
6                When did you start speaking with
7    those agencies regarding the Dakota Access
8    Pipeline?
9         A.      It was in shortly after Labor Day in
10   September 2016 Assistant Secretary Darcy and I
11   went to a meeting at the interior department
12   about it.
13        Q.      And who did you meet with?
14        A.      John Cruden, the head of environment
15   natural resource -- assistant attorney general
16   for environment and natural resources; his
17   deputy, Sam Hirsch, from the interior department.
18   I recall that Tommy Boudreau, the chief of staff
19   was there.  I believe that the solicitor of the
20   Department of the Interior, Hillary Tompkins was
21   there.  There may have been other attorneys on
22   her staff there.
23               I believe that there was a detailee
24   from the Corps to the Department of Interior
25   Solicitor's Office who was there as well.

Page 44

1                           Crook
2                I don't recall if others were there
3    but I believe that all of those were there.
4         Q.      Who was the individual from the
5    Corps that was present at that meeting?
6         A.      And, again, she was at that time
7    serving as a detailee to the interior department,
8    so she really wasn't wearing her Corps of
9    Engineer's hat, and I am blanking on her name
10   right now.
11        Q.      What's a detailee?
12        A.      I'm sorry.  A detailee is when one
13   federal agency shares for a temporary period one
14   of their employees with another federal agency.
15        Q.      And was that detailee involved
16   specifically on the DAPL issue?
17        A.      She did engage on the DAPL issue,
18   yes.
19        Q.      Okay.
20               Is that Miss Zilloli?
21        A.      No.
22        Q.      Okay.
23               Did you work with Miss Zilloli at
24   the time?
25        A.      Not that I recall specifically.  We

Page 45

1                           Crook
2    may have been in group meetings on a couple of
3    occasions.
4         Q.      At what time period were those
5    meetings?
6         A.      There were meetings in the fall of
7    2016.
8         Q.      Okay.
9                Were you also at that time meeting
10   with individuals from the executive office of the
11   President?
12        A.      Yes.
13        Q.      And who?
14        A.      Again, you're specifically regarding
15   the Dakota Access Pipeline?
16        Q.      Yes.
17        A.      I met periodically with Dan Utech.
18   A couple of times with Brian Deese.
19        Q.      The counsel to the President?
20        A.      Yes.
21        Q.      And I'm sorry.
22               Mr. Utech is who?
23        A.      Dan Utech, I believe at the time he
24   was in the domestic policy council and was
25   responsible for climate and energy policy there.

Lowry Crook
May 26, 2022

Page 46

| | | Crook |
|---|---|---|
1
2    Q.    Okay.
3          And who else was a part of your
4    meetings with the executive office of the
5    President?
6    A.    Generally, there was staff from the
7    White House counsel's office.
8    Q.    And who else?
9    A.    Depending on the time, there may
10   have been other staff from the domestic policy
11   council.
12   Q.    Who would those individuals be?
13   A.    I'm forgetting the name of the chief
14   of staff of the domestic policy council, but she
15   was in some meetings but more -- those were more
16   generally on tribal engagement rather than
17   specifically on Dakota Access Pipeline generally.
18         There was also --
19   Q.    Would you be referring to Miss
20   Katherine Ferguson?
21   A.    Yes, that's right.
22   Q.    Okay.
23         And when did you meet with Miss
24   Ferguson?  Is that part of -- I apologize.
25         I asked you who did you meet with

Page 47

Crook

2    from the executive office of the President, the
3    White House, and you were telling me some names
4    and I appreciate that.
5          But when did you have those
6    meetings?
7    A.    In the fall of and into the winter
8    of 2016.
9    Q.    Okay.  All right.
10         And not to interrupt you, but you
11   left off with Miss Ferguson.
12         After that?
13   A.    There was a White House tribal
14   liaison, first name is Karen, I believe, and I'm
15   forgetting her last name.
16   Q.    Okay.
17         How about outside of the government
18   of the United States, who did you meet with
19   during those time periods concerning the Dakota
20   Access Pipeline?
21   A.    As I said, I met with the leadership
22   for the Standing Rock Sioux Tribe and their
23   counsel.  I met with leadership of the energy
24   transfer partners.
25   Q.    Okay.

Page 48

Crook

2    A.    And do you mean just physically met
3    with or?
4    Q.    Meet as in this day and age by
5    telephone, physically, Zoom, all of those things.
6    A.    Oh, okay.
7          And you said outside of government.
8    Q.    Outside of the United States
9    Government.  Any office of the United States
10   Government.
11   A.    I had phone calls and with, at least
12   one or two phone calls from the Governor of North
13   Dakota and many phone calls with his chief of
14   staff.
15   Q.    Okay.
16         Did you ever speak with physically
17   or on telephone or email correspondence with Miss
18   Jody Gillette?
19   A.    Ever?
20   Q.    Yes.
21   A.    Yes, because she used to work in the
22   White House when I was at the council of
23   environmental quality.
24   Q.    And did you meet with her regarding
25   the Dakota access issues, meet, correspond,

48:16-
49:9,
49:19-2
1,
50:2-14
401-
402

Page 49

Crook

2    communicate, meet, discuss, email?
3    A.    I don't recall any because during
4    the Dakota Access Pipeline I believe she was no
5    longer at the White House.  I don't recall having
6    any personal or telephonic discussions with her
7    about the pipeline.  She may have sent an email
8    or written correspondence but I don't recall
9    specifically.
10   Q.    So just to understand what you said,
11   do you or do you not or is your testimony that
12   you had no communications with Miss Gillette
13   regarding the Dakota Access Pipeline?
14   A.    It's that I don't recall specific
15   communications with her regarding the Dakota
16   Access Pipeline.  I was generally aware that she
17   was advocating with regard to tribal issues and
18   the pipeline.
19   Q.    And specifically what?
20   A.    That she was opposed to the pipeline
21   and supporting the tribes.
22   Q.    Supporting the tribes in what, their
23   opposition to the pipeline?
24   A.    I believe so, yes.
25   Q.    Okay.

Lowry Crook
May 26, 2022

**ND OBJECTION:**
Relevance

Page 50

```
1                      Crook
2                And after Miss Gillette left the
3    employ of the United States Government, the
4    executive office of the President, did you speak
5    with her outside or in her capacity as a lobbyist
6    or a government affairs consultant?
7         A.    I don't recall speaking with her,
8    no.
9         Q.    Are you aware of whether Miss
10   Gilette is the sister of Chairman Archambault of
11   the Standing Rock Sioux Tribe?
12        A.    I think I knew that they were
13   related.  I didn't recall -- I don't recall the
14   specific relationship.
15        Q.    Who is the secretary of the Army at
16   the time of your employ with the Corps?
17        A.    There was an acting secretary and
18   then Eric Fanning was confirmed while I was there
19   and during this period was the secretary.
20        Q.    During the August --
21        A.    2016.  I don't remember the exact
22   date of his confirmation.
23        Q.    Okay.
24              Did you interact in any way with the
25   secretary of the Army?
```

Page 51

```
1                      Crook
2         A.    Yes.
3         Q.    In what capacity?
4         A.    He was my boss.
5         Q.    And what does that mean in terms of
6    my question?
7         A.    I would inform him or his staff of
8    anything significant that was happening with the
9    Army Corps of Engineers and, also, would be in
10   just regular weekly meetings with the Army
11   secretary and uniform leadership.
12        Q.    Okay.
13              And then with respect to your
14   principal deputy position, you were a principal
15   deputy to whom?
16        A.    To the assistant secretary of the
17   Army for Civil Works Jo-Ellen Darcy.
18        Q.    And when you took your position, was
19   Miss Darcy in that position as assistant
20   secretary?
21        A.    Yes.
22        Q.    And had you known or worked with her
23   prior to that position?
24        A.    Yes.
25        Q.    In what capacity?
```

Page 52

```
1                      Crook
2         A.    When I was at the White House
3    Council on Environmental Quality, I worked on a
4    lot of the issues that related to the Army Corps
5    Civil Works program.
6         Q.    So you worked with Miss Darcy when
7    you were in the Council on Environmental Quality
8    when she was already at the Corps of Engineer as
9    assistant secretary?
10        A.    Yes.
11        Q.    Okay.
12              Did you -- what was your position at
13   CEQ, was that heavily involved in implementation
14   of the National Environmental Policy Act?
15        A.    That was a -- that's one of CEQ's
16   responsibilities and, therefore, one of the
17   things that I worked on, yes.
18        Q.    Would you consider yourself to be
19   pretty knowledgable about NEPA, the statute?
20        A.    Yes, I would consider myself fairly
21   knowledgeable about it.
22        Q.    How about with respect to the Clean
23   Water Act or otherwise known as the Federal Water
24   Pollution Control Act?
25        A.    I have experience with the Clean
```

Page 53

```
1                      Crook
2    Water Act as well, yes.
3         Q.    How about the Federal Rivers and
4    Harbors Act?
5         A.    Yes, I have some experience with
6    that as well.
7         Q.    What federal statutes would you say
8    are among your specialized knowledge?
9         A.    Some other statutes that I dealt
10   with fairly regularly would be the Stafford Act
11   for Disaster Recovery.
12              I'm not thinking of other ones that
13   I have specific, you know, background or
14   expertise on.
15        Q.    Okay.
16              And while you were at the CEQ, Mr.
17   Crook, did you become familiar with the statutes
18   governing the Corps of Engineers?
19        A.    I became more familiar with them
20   over time while I was at CEQ.
21        Q.    And that was because you were
22   working with and/or advising the Corps in that
23   capacity?
24        A.    I was, yes, working with and
25   coordinating with the Corps on some parts of
```

Lowry Crook
May 26, 2022

Page 54

Crook

1
2  their mission at the time that had sort of
3  concerned the environmental or disaster recovery
4  efforts.
5      Q.      When you were at the CEQ, did you
6  have any occasion to become aware of or familiar
7  with the regulations of the Army Corps of
8  Engineers?
9      A.      I became familiar with some of the
10 regulations of the Army Corps of Engineers, as
11 well as the CEQ.
12     Q.      Would those include regulations that
13 are located in the code of Federal Regulations at
14 Title 36?
15     A.      At the time, I didn't know they were
16 located in Title 36CFR, but, yes, those are some
17 of the regulations at the Corps that I gained a
18 growing familiarity with.
19     Q.      While you were at the CEQ?
20     A.      Yes.
21     Q.      Prior to your position with the
22 Corps?
23     A.      Yes.
24     Q.      Did you work on the administration
25 of those Title 36 regulations prior to taking

Page 55

Crook

1
2  your position at the Corps?  Any instance?
3      A.      I didn't work on the administration
4  of them.  I might have -- I worked on, sorry.  I
5  worked on interagency efforts that where -- that
6  may have been relevant to those regulations.
7      Q.      And what do you mean by that?
8      A.      So some of the -- one of the
9  inter-agencies effort that I worked on was the
10 Federal Flood Risk Management Standard for flood
11 readiness of disaster and other federal funded
12 projects, and I worked with the Corps to that
13 clarify that that standard didn't impact the
14 Section 404 permitting processes or standard for
15 the Corps or Section 408 permitting or other
16 permitting roles of the Corps.
17     Q.      Okay.
18             So by the time that you took your
19 position at the Corps and in the summer of 2016
20 when you were talking with the Corps leadership,
21 General Spellmon and Colonel Henderson, you were
22 aware of the land management regulations for the
23 Corps of Engineers?
24     A.      I was less familiar with the land
25 management regulations of the Corps of Engineers

Page 56

Crook

1
2  than I was with the permitting regulations of the
3  Corps of Engineers at the time.
4      Q.      Less familiar but you were still
5  familiar in some degree?
6      A.      I knew that there were regulations,
7  but I didn't know very much about their
8  substance.
9      Q.      Over time did you acquire greater
10 knowledge about their substance?
11     A.      My knowledge did grow.  I learned
12 some things about them over time, yes.
13     Q.      And what did you learn and when
14 about the Title 36 regulations?
15     A.      Again, and I don't think I knew or
16 know that land use regulations of the Corps are
17 at Title 36; but in discussions about the
18 pipeline, protests and Omaha's District response,
19 you know, I believe sometimes the Corps'
20 regulations would come up.
21     Q.      Did your knowledge, was it based
22 exclusively on what other people told you or did
23 you take it upon yourself to read those
24 regulations?
25     A.      It was mostly on what other people

Page 57

Crook

1
2  told me or written summaries that they may have
3  provided to me.
4      Q.      Did you read the Title 36
5  regulations independently of anyone else telling
6  you their opinion as to those regulations?
7      A.      I've read the -- I don't recall
8  specifically reading the Title 36 land management
9  regulations independently.
10     Q.      Okay.
11             Ever?  Is that your testimony?  You
12 do not recall ever reading the Title 36
13 regulations on your own?
14     A.      And I don't know if the Corps
15 permitting regulations are in Title 36 or not
16 because I certainly have read those regulations
17 many times, but I don't specifically recall
18 reading the land management regulations.
19     Q.      So help me understand the difference
20 between the permitting regulations and the land
21 management regulations in your opinion.
22             What is the difference between
23 those?
24             MS. ZILLOLI:  Objection to the
25 extent it calls for a legal conclusion.

Lowry Crook
May 26, 2022

Page 58

```
                          Crook
1
2      Q.     Mr. Crook --
3      A.     Go ahead.  I'm sorry.
4      Q.     I apologize.
5             My question is based upon the fact
6   that I understand you're an attorney, and you
7   were the principal deputy assistant secretary of
8   the Army for Civil Works.
9             The Army Corps of Engineers owns
10  land or manages lands associated with water
11  projects, and I'm just trying to understand, sir,
12  were you familiar with the rules and regulations
13  promulgated by the agency for which you were the
14  principal deputy assistant secretary for the Army
15  of Civil Works?
16     A.     And I think, as I said, I was less
17  familiar at the outset and gained some additional
18  familiarity over time from hearing about them
19  from others or from written summaries that other
20  people provided.
21     Q.     Okay, and I understand that.
22            I'm trying to understand what effort
23  did you personally make in understanding those
24  regulations firsthand?
25     A.     I participated in meetings where the
```

Page 59

```
                          Crook
1
2   regulations were part of the discussion about
3   what the Corps was going to do or could or
4   couldn't do, and I believe that there were some
5   written summaries of the issues that likely
6   referenced the regulations as well.
7      Q.     So that's another example of other
8   people giving you their opinion on those
9   regulations.
10            But my question continues to be,
11  sir, did you ever read them in the first person
12  yourself?
13     A.     I do not recall reading the land
14  management regulations specifically, you know,
15  separately from any written summaries that I've
16  received.
17     Q.     All right.  Thank you.
18            Now, I'd like to ask you some
19  questions to understand the nature of the Corps
20  of Engineers being a part of the Department of
21  Army; is that correct?
22     A.     Yes.
23     Q.     Okay.
24            So if there is a secretary of the
25  Army and Miss Darcy is the assistant secretary of
```

Page 60

```
                          Crook
1
2   the Army for Civil Works, where does that fit in
3   relative to the uniform military aspect of the
4   Corps?  I want to better understand that.
5             Would you explain that to me,
6   please.
7      A.     So the Corps has three different
8   primary missions.  One is the military program
9   side.  One is work that it does for other federal
10  agencies or governments, and then one is this
11  civil works program that's primarily focused on
12  domestic civil works infrastructure, and the
13  assistant secretary is responsible for policy for
14  the civil works part of the Corps' mission.
15     Q.     Okay.
16            Would there be an assistant -- how
17  many assistant secretaries are there?
18     A.     There may be six to eight.  I'm
19  not sure of the exact number.
20     Q.     So Miss Darcy was not the only
21  assistant secretary of the Army?
22     A.     That's correct.
23     Q.     Okay.
24            And you were not the only principal
25  deputy to the assistant secretary?
```

Page 61

```
                          Crook
1
2      A.     I was not the only principal deputy
3   and an assistant secretary, that's right.  There
4   were other principal deputies to other assistant
5   secretaries.
6      Q.     Got it.
7             And your principal deputy position
8   was with exclusively with respect to Miss Darcy
9   and the civil works portion of the Crops?
10     A.     Yes.
11     Q.     Okay.  So thank you for that
12  explanation.
13            With respect to how that is
14  organized, who did you -- who was your principal
15  report, to whom?
16     A.     Assistant Secretary Darcy.
17     Q.     Okay.
18            Exclusively or did any of your
19  responsibilities include obligations to report to
20  any military command?
21     A.     I didn't have a direct line of
22  report to the military command.  It was more of a
23  coordination role with the military.
24     Q.     All right.
25            And so in that capacity, how was
```

Lowry Crook
May 26, 2022

Page 62

Crook

2  your relation from a responsibility standpoint to
3  Major General Ed Jackson?
4      A.    He was my primary counterpart and
5  point of contact at the Corps of Engineers
6  because he was the deputy in charge of the Corps'
7  civil works program.
8      Q.    Yet he was a military member, right?
9      A.    Yes.
10     Q.    And so who -- was he your boss in
11 any respect?
12     A.    No.
13     Q.    Okay.
14           And your involvement with him was a
15 matter of required cooperation and involvement;
16 is that fair to say?
17     A.    I would say that a large part of my
18 role was working with General Jackson, yes.
19     Q.    Okay.
20           And that was in a constructive but
21 not obligatory sense; is that what you're saying?
22     A.    I viewed it as both because
23 Assistant Secretary Darcy when I first started on
24 the job said that one of my primary
25 responsibilities was to strengthen cooperation

Page 63

Crook

2  and teamwork between the assistant secretary's
3  office and the Corps of Engineers.
4      Q.    And why did she make that
5  observation, strengthen?  Was it weak?
6      A.    I think before I got there and
7  before General Jackson started, there were some
8  issues and disagreements over a particular
9  regulation that the Corps or the Army had issued.
10     Q.    And what regulation would that be?
11     A.    It was the definition of waters of
12 the United States that are regulated by the Clean
13 Water Act.
14     Q.    Okay.
15           Can you describe the nature of that
16 difference of opinion.
17     A.    The Clean Water Act is jointly
18 administered by the Environmental Protection
19 Agency and the Corps of Engineers, and there were
20 disagreements between the agency and between
21 different people at the agencies over how to
22 define the jurisdiction of the Clean Water Act.
23     Q.    And did that disagreement stem from
24 a prior administration.
25     A.    I would say that the jurisdiction of

63:4-13
401-402,
602, 802

Page 64

Crook

the Clean Water Act has been an issue -- has been
2  -- that administrators have struggled with since
3  the beginning of the Clean Water Act.
4      Q.    The '70s?
5      A.    Yes.
6      Q.    And if you would just, please, in
7  shorthand reference, what is the difference of
8  opinion that you are observing existed at the
9  time that you came into your position?
10     A.    The Corps of Engineers regulatory
11 team wanted to have a more fact specific, less
12 bright line approach to the Clean Water Act
13 following something called the significant nexus
14 standard and EPA and Assistant Secretary Darcy
15 favored a more bright line approach to defining
16 what was jurisdictional.
17     Q.    So Assistant Secretary Darcy had a
18 position that was consistent with EPA's and she
19 was asking you to help harmonize the Corps to
20 that position?
21     A.    At that time, I was at the White
22 House when the rule was issued and --
23     Q.    Are you referring to the rule being
24 issued being the 2015 Waters of the United States

Page 65

Crook

definition?
2      A.    Yes.
3      Q.    Okay.
4           Under the Obama Administration?
5      A.    Yes.
6      Q.    That Miss Darcy signed that
7  regulation that appeared in the Federal Register;
8  is that correct?
9      A.    I believe she did, yes.
10     Q.    So when you were hired as principal
11 deputy, one of your responsibilities was to help
12 the Corps get with that program under that
13 regulation?
14           MS. ZILLOLI:  Objection.  Vague.
15     A.    No, I think that the Corps, well,
16 the Corps was implementing the regulation to the
17 extent the courts allowed it.  There was written
18 criticism from the Corps that had been shared
19 with Congress that resulted in lengthy hearings
20 that Miss Darcy just participated in.
21           And I think, more generally, she
22 wanted my role to be repairing the relationship
23 between the assistant secretary's office and the
24 Corps in the wake of that, not just specifically

Lowry Crook
May 26, 2022

Page 66

Crook

1     on the Clean Water Act but just more general.
2
3     Q.     I see.  Okay.
4            When did Miss Darcy take the
5     position --
6     A.     I believe -- I'm sorry.
7     Q.     Go ahead.
8     A.     I believe it was in the fall of
9     2009.
10    Q.     So she had been there for quite
11    sometime prior to your arrival?
12    A.     Yes.
13    Q.     Okay.
14           What was your predecessor's name?
15    A.     There was a vacancy for a while, and
16    then before that it was Marie Teres Dominguez.
17    Q.     And why did Miss Dominguez leave?
18    A.     She moved over to be in charge of
19    the pipeline and hazardous materials, safety
20    administration at the Department of
21    Transportation.
22    Q.     PHMSA?
23    A.     Yes.
24    Q.     Okay.
25           MR. SEBY:  Mr. Crook, how about a

Page 67

Crook

1
2     short break?
3            THE WITNESS:  Okay.
4            MR. SEBY:  Miss Zilloli; is that
5     acceptable?
6            MS. ZILLOLI:  Yes, thank you.
7            MR. SEBY:  Shall we say 10 minutes.
8     Let's go off the record, please.
9            THE VIDEOGRAPHER:  We're off the
10    record 3:31 p.m. UTC. 11:31 a.m. Eastern.
11           (A break from the record was taken.)
12           THE VIDEOGRAPHER:  Back on the
13    record 11:41 a.m. Eastern, 3:41 p.m., UTC.
14    Q.     Mr. Crook, we're back on the record
15    after a short 10 minute break.
16           Before the break, I was asking you
17    about your familiarity with the Corps' land use
18    regulations governing the Corps' land properties
19    associated with water projects that the Corps
20    manages pursuant to the Federal Flood Control Act
21    as amended.
22           You received guidance you said from
23    people inside and outside the Corps concerning
24    those management authorities and regulations.
25           Who did you consider to be an expert

Page 68

Crook

1     in those regulations that you relied upon for the
2     --
3
4     A.     I considered --
5     Q.     I'm sorry.
6     A.     I'm sorry.
7     Q.     -- that you relied upon with respect
8     to the content and substantive nature of the
9     Corps' land use regulations founded Title 36 of
10    the Code of Federal Regulations?
11    A.     I believe that Colonel Henderson and
12    his district council and then --
13    Q.     Would that be Thomas Strahan?
14    A.     I actually don't -- I think any
15    communications that I recall were through Colonel
16    Henderson relying on his counsel.  I don't recall
17    specifically speaking directly with the district
18    council.
19    Q.     Okay.
20           How about anyone else that you would
21    say you consider to be an expert that you relied
22    upon with regard to the content and nature of the
23    Corps' regulations?
24    A.     The Army general counsel's office.
25    Q.     And who would that be?

Page 69

Crook

1
2     A.     The assistant general counsel who
3     deals with or deputy general counsel, I guess who
4     deals with civil works issues is Craig Schmander.
5     Q.     And you relied upon Mr. Schmander
6     with respect to the content substantive nature of
7     the Corps' regulations governing land use at
8     Corps projects?
9     A.     He and his staff were our counsel
10    and so, yes, for legal interpretations I relied
11    on him and his staff.
12    Q.     And did he provide you with such
13    guidance concerning the Corps' land use
14    regulations at its water projects?
15    A.     He provided either his view or
16    summary of what the regulations were, he or his
17    staff.
18    Q.     So you were specifically provided
19    legal counsel on the content of the Corps land
20    use regulations?
21           MS. ZILLOLI:  Objection.  We are
22    starting to get into attorney/client privilege.
23    If you can answer without disclosing the
24    substance of the communication, you can answer.
25    Q.     And that's what the question is all

Lowry Crook
May 26, 2022

Page 70

```
 1                    Crook
 2  about.  Not to get into that.
 3            I'm asking was such advice provided
 4  on that specific topic?
 5       A.    To the extent that the governing
 6  regulations were relevant to decisions about what
 7  to do regarding the protest on Corps property, I
 8  received legal advice from counsel.
 9       Q.    Which counsel?
10       A.    Craig Schmander and there were a
11  couple of other people on his team, but I don't
12  remember specifically which member of his staff
13  was most engaged on that issue.
14       Q.    Okay.  All right.
15            So with respect to the career
16  military people in the Corps that you interacted
17  with, let's go from the top of the Corps of
18  Engineers at the time, who I understand the chief
19  of the engineers at that time was Semonite, Todd
20  Semonite; is that accurate?
21       A.    Yes.
22       Q.    Was he your boss?
23       A.    No.
24       Q.    And in that respect, what
25  relationship professionally did you have to him
```

Page 71

```
 1                    Crook
 2  as a -- in relationship was one of respect or
 3  adherence to a chain of command?
 4       A.    I do and did respect him.
 5  Generally, I think, technically, General Semonite
 6  and I had the same rank the way they sort of
 7  compare the civilian and the military, but as a
 8  practical matter, he generally engaged with
 9  Secretary Darcy at her level and my main
10  counterpart was General Jackson, his deputy.
11       Q.    Okay.
12            And Jackson was the deputy to Todd
13  Semonite?
14       A.    The deputy for civil works.  He had
15  several deputies.
16       Q.    Okay.
17            So Jackson reported to Semonite?
18       A.    Yes.
19       Q.    Okay.
20            And then with respect to the
21  Northwest Division Commander, Todd Spellmon,
22  pardon me, Scott Spellmon, do you know him?
23       A.    Yes.
24       Q.    Okay.
25            What was your relationship with now
```

Page 72

```
 1                    Crook
 2  General Spellmon?  Was he your boss?
 3       A.    No.
 4       Q.    And -- so you didn't have to follow
 5  his direction?
 6       A.    No.
 7       Q.    How about Colonel Henderson, the
 8  commander of the Omaha District of the United
 9  States Corps of Engineers, was he your boss?
10       A.    No.
11       Q.    And you didn't have to follow his
12  direction?
13       A.    No.
14       Q.    All right.
15            How about Lieutenant Colonel James
16  Startzell, was he your boss?
17       A.    No.
18       Q.    And you didn't have to follow his
19  direction?
20       A.    No.
21       Q.    Okay.  All right.
22            Now I want to switch to some more
23  specific questions about the Dakota Access
24  Pipeline protests.
25            Mr. Crook, when did you first learn
```

Page 73

```
 1                    Crook
 2  that protesters opposing the DAPL pipeline were
 3  physically present on Corps of Engineers managed
 4  lands in the State of North Dakota?
 5       A.    It was either in August or September
 6  of 2016.
 7       Q.    And how did you learn that, sir?
 8       A.    I believe I learned at the protests
 9  themselves from news reports.  I don't recall
10  specifically when or how I learned that at least
11  part of the protests were on Army Corps of
12  Engineer's owned property.
13       Q.    At any time prior to that
14  circumstance occurring, did anyone warn or
15  threaten you of that risk occurring?
16            MS. ZILLOLI:  Objection.  Ambiguous.
17       A.    Before the protests started?
18       Q.    Yes.
19       A.    No, I don't recall any warning of
20  that nature.
21       Q.    Okay.
22            But you had already told me that you
23  were aware of the potential for that happening?
24       A.    I was aware generally of the
25  potential for controversy and potentially
```

Lowry Crook
May 26, 2022

Page 74

Crook

1
2 protests.
3    Q.    And I'm trying to understand how you
4 became aware of that generally.
5    A.    I think it was partially based on
6 news reports, partially based on information that
7 was relayed to me, as I mentioned before, from --
8 I recall specifically Rohan Patel at the White
9 House.  I don't recall specific other ways that
10 it got on my radar.
11    Q.    What is your testimony, Mr. Crook,
12 with respect to this question:  Did anyone ever
13 tell you that they were preparing to support or
14 engage in protests against the Army Corps of
15 Engineers with respect to the DAPL pipeline at
16 any time prior to your learning that they
17 actually occurred?
18    A.    I don't recall any specific
19 statements that people were planning to protest.
20    Q.    Okay.
21    A.    Before the protests started?
22    Q.    Were you aware of any efforts
23 outside the United States Government to organize
24 or support such protests?
25    A.    Not that I recall.

Page 75

Crook

1
2    Q.    Were you aware of any discussions
3 within the United States Government in advance of
4 the protests occurring with respect to their
5 threat?
6    A.    I only really recall general
7 concerns about controversy, not any specific
8 protest, plans or threats.
9    Q.    Were you aware of any
10 nongovernmental organization planning to support
11 or implement such protests?
12    Q.    Before the protests started?
13    Q.    Yes, sir.
14    A.    Not that I recall.
15    Q.    At all?
16    A.    I don't recall being aware before
17 they started.
18    Q.    All right.  Okay.
19          And so I asked you when did you
20 become aware of the protests, and you, I believe,
21 and correct me if I'm wrong, you said that you
22 first learned of them after they started to occur
23 from news reports; is that correct?
24    A.    Yes.
25    Q.    And what did you learn from those

Page 76

Crook

1 news reports?
2
3    A.    That the Standing Rock Sioux Tribe
4 was having regular protests or vigils either on
5 the north side of the reservation or, you know,
6 just south of the planned pipeline crossing.
7    Q.    And so my question that started this
8 issue was:  When did you first learn that the
9 protesters were present on Corps of Engineers
10 lands?
11    A.    It was after I first learned of the
12 protests, and I don't recall specifically when.
13 It would have been either late August or early
14 September.
15    Q.    So help me understand, what you're
16 telling me is you learned of the protests before
17 they were on Corps land?  Is that your testimony?
18    A.    No.  My testimony is when I first
19 learned of the protests, I didn't know who owned
20 the property that they were located on.
21    Q.    Okay.
22          And that was your first knowledge of
23 the protests; is that right?
24    A.    Right.
25    Q.    And then after that you subsequently

Page 77

Crook

1
2 learned it turns out they are on Corps property?
3    A.    I subsequently learned that at least
4 a portion of the protests were on Army Corps of
5 Engineers property.
6    Q.    And when was that?
7    A.    I don't recall whether it was late
8 August or early September but in that general
9 time period.
10    Q.    Any earlier than late August?
11    A.    No.
12    Q.    Okay.
13          And from whom did you learn that
14 they were partially located, as you said, on
15 Corps property?
16    A.    I don't specifically recall who I
17 learned it from.
18    Q.    And how did you know that they were
19 partially on Corps property and partially on some
20 other property?
21    A.    I think as we heard more about the
22 protests, you know, I learned, you know,
23 additional details about the location and the
24 property.
25    Q.    And whom --

Lowry Crook
May 26, 2022

Page 78

1                        Crook
2        A.      In the general time period.
3        Q.      Pardon.  Pardon me, sir.
4                Who did you learn those details
5    from?
6        A.      The details, I learned different
7    details at different times from different people.
8        Q.      Okay.
9                And what did you do once you learned
10   that protesters were locating themselves on
11   property managed by the Corps of Engineers?
12       A.      I participated in several meetings
13   and calls about the issue surrounding the
14   protests and the presence on at least a part of
15   them on Corps property.
16       Q.      Okay.
17               At that time your participation in
18   several meetings and calls, were those
19   exclusively within offices of the United States
20   Government?
21       A.      No.
22       Q.      Why not?
23       A.      Because I received calls and
24   communications from people outside the government
25   as well as inside the government.

Page 79

1                        Crook
2        Q.      And whom would that be?
3        A.      Specifically outside of the
4    government?
5        Q.      Yes.
6        A.      The Governor of North Dakota, the
7    governor's chief of staff.  There may have been
8    others, but those were the main people outside of
9    the government.
10       Q.      Okay.
11               So apart from your federal
12   colleagues in the Corps and other federal
13   agencies, your knowledge of the early aspects of
14   the protest came from the contacts initiated to
15   you from the State of North Dakota's government;
16   is that correct?
17       A.      That is one of the contacts outside
18   of federal agencies.
19       Q.      How about before we talk about the
20   other contacts that you've got in mind that I
21   know you'll tell me about in a minute, what did
22   the Governor of North Dakota say to you?
23       A.      What I recall, and I believe we had
24   a couple of conversations, I recall him saying
25   there are protesters on Army Corps of Engineers

79:19-80:2
802

Page 80

1                        Crook
2    land and I want to know what you're going to do
3    about it.
4        Q.      Anything else that you recall the
5    governor saying to you about the protesters?
6    Just, hey, you've got somebody on your land.
7    What are you going to do about it or did he say
8    anything more with respect to concerns or
9    requests made to you?
10       A.      I mean, he generally expressed
11   concerns about the protests, but I don't
12   specifically recall anything else he would have
13   raised beyond what I just said.
14       Q.      Okay.
15               With all respect, sir, why did he
16   talk to you?
17               MS. ZILLOLI:  Objection.
18   Speculation.
19       A.      He'd be the best person to know why
20   he called me.
21       Q.      Okay.  All right.
22               So when you spoke with the governor
23   of North Dakota, and I believe you're referring
24   to Governor Jack Dalrymple; is that correct?
25       A.      Yes, at the time.

Page 81

1                        Crook
2        Q.      At the time.
3                When you spoke with the Governor of
4    North Dakota, was anyone else part of that
5    conversation?
6        A.      I don't recall who or whether he had
7    other people on his end of the call.
8        Q.      I believe you meant --
9        A.      And I don't --
10       Q.      -- the chief of staff.  I believe
11   you mentioned the chief of staff.
12       A.      I had several conversations aside
13   from with the Governor with his chief of staff,
14   and so I don't recall specifically when the
15   Governor called whether he had the chief of staff
16   on the line or not on that specific call.
17               I also don't recall who from either
18   the Army or the Corps of Engineers would have
19   been on our side of the call.
20       Q.      Okay.
21               What did you tell the Governor you
22   would do with respect to his request?
23       A.      I don't recall specifically
24   committing to any action -- yes.  I don't recall
25   specifically any commitments that I made.

Lowry Crook
May 26, 2022

Page 82

```
Crook
1
2      Q.    Okay.
3            At that time, did you have any
4   strong opinions about the protesters being on the
5   Corps of Engineers property?
6      A.    No, I don't think I had strong
7   opinions.  I just understood that it was a
8   complex problem and issue.
9      Q.    Mr. Crook, when did the DAPL
10  protesters start camping overnight on Corps of
11  Engineers land?
12         MS. ZILLOLI:  Objection.
13  Foundation.
14     A.    I think it was sometime in August or
15  early September.  I'm not sure.
16     Q.    Okay.
17            Do you know whether those protesters
18  were sleeping in a designated camp ground on
19  Corps property?
20     A.    I don't believe it was a designated
21  camp ground.
22     Q.    Do you recall learning that
23  protesters built or were building structures and
24  roads in the protest camp located on Corps of
25  Engineers property?
```

Page 83

```
Crook
1
2         MS. ZILLOLI:  Objection.  Assumes
3   facts not in evidence.
4      A.    I recall receiving reports that
5   there were some wooden structu
6   built at some point in time on
7      Q.    Do you know why t
8   on to Corps land?
9         MS. ZILLOLI:  Objection.
10  Speculation.  Foundation.
11     A.    No, they'd be the best to answer
12  that.
13     Q.    Do you believe that Standing Rock
14  Sioux Tribe Chairman Archambault was publicly
15  calling for people to come to North Dakota to
16  protest against the Dakota Access Pipeline?
17         MS. ZILLOLI:  Objection.  Assumes
18  facts.
19     Q.    I'm asking your belief, sir.
20     A.    I believe, I believe that I saw news
21  reports in which he was calling for protests in
22  North Dakota.
23     Q.    And do you recall him asking those
24  protesters to gather in a specific location?
25     A.    I recall at times him asking
```

**ND OBJECTION:** Includes argument of counsel

Page 84

```
Crook
1
2   protests to move to a different location.
3      Q.    I'm talking about the location to
4   which they went.
5            Do you recall him encouraging people
6   to protest on Corps of Engineers property?
7      A.    I don't specifically recall that,
8   no.
9      Q.    What other lands do you think he was
10  encouraging people to attend and protest on?
11         MS. ZILLOLI:  Objection.
12  Speculation.
13     A.    I recall at some point later in the
14  fall him encouraging some of the protest to move
15  south of the Cannonball River I believe onto
16  Standing Rock Sioux reservation lands.
17     Q.    Do you know why Chairman Archambault
18  didn't specify the protesters coming to North
19  Dakota to oppose the Dakota Access Pipeline, why
20  he didn't ask them to come onto the Standing Rock
21  Sioux tribe reservation?
22         MS. ZILLOLI:  Objection.
23  Speculation.  Assumes facts.
24     A.    I don't know what his motivations
25  were, no.
```

Page 85

```
Crook
1
2      Q.    Mr. Crook, is the Standing Rock
3   Sioux Tribe responsible for the use or management
4   of the Corps of Engineers Oahe project?
5         MS. ZILLOLI:  Objection to the
6   extent it calls for a legal conclusion.
7      Q.    Mr. Crook?
8      A.    They have certain treaty rights
9   regarding Lake Oahe, but the Army Corps of
10  Engineers is primarily responsible for the
11  management of the lake.
12     Q.    How about for the project lands, the
13  dry land upon which borders the United States
14  waterway, the Missouri River, the land, is the
15  Standing Rock Sioux Tribe responsible in any
16  respect for the use or management of those lands?
17         MS. ZILLOLI:  Same objection.
18     A.    I know that there are lands along
19  the river that are the Corps of Engineers
20  property.
21            I don't recall if the tribe had, and
22  their former tribal lands, I don't recall if that
23  gave them any specific rights or responsibilities
24  regarding management of the land.
25     Q.    But you don't know one way or the
```

85:2-11 Calls for legal concl., 701-702

Lowry Crook
May 26, 2022

Page 86

Crook

1
2     other?
3              MS. ZILLOLI:  Same objection.
4        A.     Sitting here today, I don't no.
5        Q.     Okay.
6              Did you at the time have an opinion
7     as to that question, the time being August of
8     2016, Mr. Crook?
9        A.     I don't think I had an opinion.  I
10    may have had more specific knowledge of that
11    issue at the time.
12       Q.     Mr. Crook, are you aware of whether
13    any Corps of Engineers officials referred to the
14    protesters as trespassers in the month of
15    August 2016?
16       A.     I don't specifically recall the
17    Corps of Engineers referring to them as
18    trespassers at that time.
19       Q.     How about in the month of September,
20    2016?
21       A.     I don't recall in September the
22    Corps referring to them as trespassers, but I'm
23    not saying they didn't either.
24       Q.     But you're saying you don't know?
25       A.     I don't have a specific recollection

Page 87

Crook

1
2     of that today, right.
3        Q.     Right.
4              Mr. Crook, how about in the month of
5     October of 2016?
6        A.     Again, I don't have a specific
7     recollection of the someone at the Corps
8     characterizing them as trespassers.
9        Q.     And how about in the month of
10    November 2016?
11       A.     In late November Colonel Henderson
12    issued an announcement that after a certain date
13    the trespassers needed to leave Corps property
14    and move south of the Cannonball River.  I don't
15    know -- I don't know whether that announcement
16    referred to trespassing or not.
17       Q.     Okay.
18              You're referring to a letter from
19    Colonel Henderson in late November.
20              Would that be November 25th?
21       A.     I believe it was November 25th.  I
22    couldn't tell you right now whether it was a
23    letter or a press release or what form the
24    announcement took.
25       Q.     Okay.

Page 88

Crook

1
2              So you mentioned that was a
3     had-to-leave letter?
4        A.     It was some form of announcement
5     that by X date certain that the protesters needed
6     to leave the Corps property.
7        Q.     Okay.
8              So November 25th I think is what
9     we're talking about.
10              Do you think that in the month of
11    December the Corps considered the protesters on
12    the Corps' property to be trespassers?
13              MS. ZILLOLI:  Objection.
14    Speculation.
15       Q.     If you know?
16       A.     I don't know whether legally they
17    considered them trespassers.  I know that they
18    were strongly encouraging them to leave.
19       Q.     Strongly encouraging?
20       A.     Yes.
21       Q.     Okay.
22              How about in the month of
23    January 2017, did the Corps consider the
24    protesters located on any of its lands under its
25    jurisdiction to be trespassers?

Page 89

Crook

1
2              MS. ZILLOLI:  Objection.
3     Speculation and legal conclusion.
4        A.     At least up until January 20th I'm
5     not aware of whether there were still any
6     protesters on Army Corps of Engineers land.
7        Q.     Mr. Crook, did you ever go to the
8     State of North Dakota?
9        A.     Yes.
10       Q.     And when did you go?
11       A.     It was earlier in the year.
12       Q.     When?
13       A.     It was probably in the spring of
14    2016.
15       Q.     And why did you go in the spring of
16    2016 to the State of North Dakota?
17       A.     To sign up project partnership
18    agreement for a flood risk management project for
19    the Fargo Moorhead Community and to tour the
20    location of the project.
21       Q.     The Fargo Moorhead flood control
22    project?
23       A.     Yes.
24       Q.     And so in your capacity as principal
25    deputy assistant secretary of the Army, you had

Lowry Crook
May 26, 2022

Page 90

Crook

1      Crook
2   authorization to sign such agreements?
3       A.    I had authorization to sign that
4   agreement, yes.
5       Q.    I see.
6             Per a specific delegation?
7       A.    I believe there was some form of
8   delegation from the assistant secretary.
9       Q.    Okay.
10             Miss Darcy?
11      A.    Yes.
12      Q.    Okay.
13             How many other such delegations were
14   you afforded?
15      A.    Generally, I did not receive any
16   formal delegations.  I was more of an advisor to
17   the assistant secretary.
18      Q.    Okay.
19             Mr. Crook, do you recall knowing or
20   knowing today, recalling today, which protest
21   camps located on Corps land in opposition to the
22   Dakota Access Pipeline were located south of the
23   Cannonball River?
24      A.    Sitting here today, I don't remember
25   exactly where the property lines and the Corps

Page 91

1      Crook
2   versus the reservation lines were.
3       Q.    Same question, sir, with respect to
4   protest camps located on Corps of Engineers lands
5   protesting the Dakota Access Pipeline located
6   north of the Cannonball River?
7       A.    I recall that a portion of, at least
8   a portion of the protests locations was north of
9   at least a bend of the Cannonball River.  I know
10   that the river sort of has some tributaries or
11   meanders in that area, but I believe part of it
12   was north of the Cannonball River.
13      Q.    Yes.
14             Do you remember which camps you're
15   referring to?
16      A.    I don't remember any specific names
17   of the camps, if that's what you're asking.
18      Q.    Yes, sir.
19             But you do recall there was more
20   than one?
21      A.    I recall that there was more than
22   one location for the protest camps, yes.
23      Q.    Did you ever go to that area of the
24   State of North Dakota?
25      A.    No.

Page 92

Crook

1      Crook
2       Q.    Did you receive regular status
3   reports regarding the DAPL's protesters
4   occupation of Corps lands ever?
5       A.    During a period, that period in the
6   fall of 2016, I did receive fairly regular
7   reports and information regarding the protests
8   generally.
9       Q.    From whom?
10      A.    From General Jackson.  At times he
11   would have General Spellmon and Colonel Henderson
12   on the line.  I also received reports from people
13   at the Department of Interior.
14      Q.    Who would that be?
15      A.    In the department -- go ahead.
16      Q.    I'm sorry, Mr. Crook.
17             Who in the Department of Interior
18   did you receive reports from?
19      A.    There were different people at
20   different times, but one of them was Tommy
21   Boudreau, then the chief of staff.  Another was
22   Hillary Tompkins, the solicitor.  Sometimes a
23   person named Jody, who was her deputy or on her
24   staff and then Larry Roberts, who was the, I
25   think, assistant secretary in charge of an

Page 93

1      Crook
2   overseeing the Bureau of Indiana Affairs.
3       Q.    How frequently did you receive such
4   reports?
5       A.    From interior department or just in
6   generally reports on the status --
7       Q.    Both?
8       A.    -- from various sources?  I'd say
9   several times a week during the fall.  Sometimes
10   daily.
11      Q.    Did this become a big deal on your
12   other duties as assigned to responsibilities?
13      A.    It did start to take a growing part
14   of my time during that time period.
15      Q.    Okay.
16             Did your knowledge and understanding
17   of the protests against the Dakota Access
18   Pipeline include information provided to you by
19   the State of North Dakota?
20      A.    Yes.
21      Q.    And, specifically, from the State of
22   North Dakota law enforcement?
23      A.    My main contact with the State of
24   North Dakota was the governor's chief of staff.
25      Q.    Okay.

Lowry Crook
May 26, 2022

Page 94

1                        Crook
2              How about other manners of
3    communication provided to you from the State of
4    North Dakota, who did they come from?
5         A.       The direct communication -- so, in
6    addition to the couple of phone calls I mentioned
7    with the governor himself, the direct
8    communications I recall were through his chief of
9    staff.
10        Q.       And how often did you speak with
11   that gentleman?
12        A.       It varied whether we spoke or he
13   texted.  I would say we had communications
14   probably a couple --
15        Q.       I'm sorry.
16        A.       Probably a couple times a week.
17   Sometimes daily.
18        Q.       So it was pretty frequent then?
19        A.       As I -- yes.
20        Q.       And what was the, if you were to put
21   bookends around your time involved as principal
22   chief, pardon, principal deputy assistant
23   secretary of the Army, what are the period of
24   time that you're referring to having that
25   interaction with Mr. Rauschenberger, the chief of

Page 95

2    staff to Governor Dalrymple for the State of
3    North Dakota?
4         A.       I believe it started the first week
5    of September or the week after Labor Day and
6    continued into at least mid December.
7         Q.       Did you receive reports or briefings
8    on the protests against the Dakota Access
9    Pipeline from the pipeline company?
10        A.       Yes.
11        Q.       And what did that involve and when?
12        A.       My primary direct conversations with
13   energy transfer partners of the pipeline company
14   were at least two meetings that we had at the
15   justice department.  In the fall, I don't recall
16   the specific dates of them though.
17              In addition they fairly regularly
18   called the other staff members in our office.
19        Q.       And would those individuals relay
20   the information to you?
21        A.       I don't know if they relayed all of
22   the information, but it's something they thought
23   significant or, you know, merited raising they
24   would raise that with me, share it with me, yes.
25        Q.       And did that concern the protests?

ND OBJECTION:
As to 95:7-10,
96:2-18,
96:24-97:9,
97:15-24;
98:8-99:13 -
Relevance (not
responsive to the
subject matter of
the affirmative
designation at
94:20-95:6)

Page 96

1                        Crook
2         A.       At different times it concerned
3    either the status of the permitting, the status
4    of the easement, the protests or their
5    construction plans or schedules.
6         Q.       Did you receive information or
7    briefings from any tribes concerning the
8    protests?
9         A.       Yes, yes.
10        Q.       Okay.
11              And with whom did you receive such
12   briefings?
13        A.       Specifically on the protests?
14        Q.       Yes.
15        A.       I met with Chairman Archambault and
16   his council or staff.  I believe I got --
17   received phone calls from leaders from other
18   tribes in North Dakota.
19        Q.       And that was also during the
20   happening of the protests on Corps property?
21        A.       That was during the time of the
22   protests.
23        Q.       Okay.
24              And when you spoke with them, what
25   did you say?

Page 97

1                        Crook
2              Let's take the Standing Rock for
3    starters.
4         A.       Okay.  So my main two, during the
5    protests, my main two meetings with Chairman
6    Archambault I was exploring whether there was
7    some, sort of deal between the tribe and the
8    pipeline company that could resolve the matter
9    and cause the protests to end.
10        Q.       So you were exploring a negotiated
11   resolution between the tribe opposing the
12   pipeline and the pipeline company?
13        A.       A group of us was exploring that,
14   yes, with both the tribe and the company.
15        Q.       And who else was in your group, sir?
16        A.       So there were a series of meetings
17   at the Department of Justice, and it was Sam
18   Hirsch from the Justice Department.  There may
19   have been others on his staff at the environment
20   and natural resources at the Justice Department,
21   Assistant Secretary Darcy, myself, Tommy Boudreau
22   from the Department of the Interior, and I
23   believe Hilary Tompkins from the Department of
24   the Interior.
25        Q.       And you had that group that you just

Lowry Crook
May 26, 2022

Page 98

Crook

1
2  mentioned.
3          Anyone else involved?
4          A.    I believe that Craig Schmander, Army
5  counsel, came, and there may have been others
6  from the government at the meeting that I'm not
7  recalling at this time.
8          Q.    Who dispatched Mr. Boudreau or
9  Mr. or Miss Tompkins?
10         I'm sorry.  What do you mean by
11 "dispatched"?
12         Q.    On whose directions were they
13 attending those meetings?
14         MS. ZILLOLI:  Objection.
15 Speculation.
16         Q.    They just went because you asked
17 them?
18         A.    I think technically they got an
19 invitation from the Justice Department to attend
20 the meetings because the meetings were at the
21 Justice Department.
22         What additional direction they were
23 given from their leadership or others, I'm not
24 specifically aware.
25         Q.    Who is their leadership that you're

**98:8-100:9**
**401-402, 602**

Page 99

Crook

1
2  referencing?
3          A.    So their boss was the secretary of
4  the interior, at the time, Sally Jewell.
5          Q.    Okay.
6          Was she aware that they were
7  participating in those meetings?
8          MS. ZILLOLI:  Objection.
9  Speculation.
10         Q.    To your knowledge, sir.
11         A.    She was generally aware that they
12 were engaged on the issue.  I don't know specific
13 meetings, you know, what her awareness was.
14         Q.    And how do you know she was
15 generally aware, Miss Jewell that is?
16         A.    Because they, from time to time,
17 referred to conversations with her.  She spoke
18 sometime with Assistant Secretary Darcy about the
19 broader issues related to the pipeline.
20         Q.    What broader issues, Mr. Crook, what
21 broader issues are you referring to?
22         A.    Well, not just about the protests
23 but about tribal engagement, the Corps' decision
24 on the easements and permits.
25         Q.    Was Miss Jewell opposed to the

Page 100

Crook

1
2  Corps' issuance of the permits and the easement?
3          MS. ZILLOLI:  Objection.
4  Speculation.  Foundation.
5          A.    I would say generally the position
6  of the interior department staff, including
7  Miss Jewell, was that we should do more analysis
8  under NEPA of whether granting the permits and
9  easement was warranted.
10         A.    And you, sir, having worked at the
11 Council on Environmental Quality which, in many
12 respects, administers the NEPA statute that you
13 referring to, did you have an opinion with
14 respect to the Department of Interior's opinion
15 or position?  Excuse me.
16         A.    So that decision wasn't mine.
17         Q.    That wasn't the question.
18         A.    I'm sorry.
19         Q.    That wasn't my question.
20         A.    Okay.
21         Q.    Did you have an opinion on the
22 Department of Interior's position that you just
23 told me?
24         A.    I probably had an opinion that
25 evolved over time.

**100:21-101:11**
**401-402**

Page 101

Crook

1
2          Q.    And that was what?
3          A.    We announced in September that we
4  were reviewing the permitting decision for NEPA
5  for adequacy.
6          Q.    Who is the, who's the "we" that
7  announced that?
8          A.    It was -- I'm sorry.  It was a joint
9  announcement among the Department of Justice, the
10 Department of Army and the Department of
11 Interior.
12         Q.    So the administration on September
13 9th announced its position?
14         A.    It was generally that time period.
15 I don't remember the specific day.
16         Q.    Okay.
17         We can go to that in a moment, but
18 that announcement occurred after the Corps made a
19 decision with respect to the permits and the
20 easement; is that correct?
21         A.    After the Corps had made a decision
22 on the permits but not after the Corps had made a
23 decision on the easement.
24         Q.    Okay.
25         So the Corps had already granted

Lowry Crook
May 26, 2022

102:6-15,
102:23-103:9
602, 611,
calls for legal
conclusion
701-702

Page 102

Crook

1
2    permits for the Dakota Access Pipeline crossing
3    but not yet the easement; is that fair?
4         A.    Yes.
5         Q.    All right.
6              Mr. Crook, when did the Corps decide
7    to let the protesters in opposition to the Dakota
8    Access Pipeline that were present on the Corps
9    property, when did the Corps decide to allow
10   those protesters to remain on the Corps property?
11             MS. ZILLOLI:  Objection.  Assumes
12   facts not in evidence.  Speculation.
13        A.    I would say that the Corps issued a
14   special use permit I believe in September
15   regarding the protests.
16        Q.    Is that your testimony?
17        A.    Yes.  It may have been -- I don't
18   remember the specific date of the issuance, but I
19   do recall that a special use permit was issued.
20        Q.    Issued as in effect or proposed?
21             MS. ZILLOLI:  Objection.  Calls for
22   a legal conclusion.
23        Q.    In your capacity as principal deputy
24   to the assistant secretary to the Army for Civil
25   Works, is it your testimony at that a permit was

Page 103

Crook

1
2    issued or proposed?
3             MS. ZILLOLI:  Same objection.
4         A.    I believe I recall that the Omaha
5    District issued a permit.
6         Q.    To whom?
7         A.    I'd have to look at the permits
8    specifically, but I generally recall that it may
9    have been to the Standing Rock Sioux Tribe.
10        Q.    Were they the only protesters
11   located on Corps land?
12        A.    During the general period that we're
13   talking about?
14        Q.    The period which we are talking
15   about, sir, is August of 2016 to well after you
16   left the service of the United States but, yes.
17        A.    So early on I don't know if it was
18   just them or there were others involved.
19             As the protests grew, there were
20   definitely a lot of protesters that were not
21   members of the Standing Rock Sioux Tribe.
22        Q.    Okay.
23             Do you know, Mr. Crook, how long
24   protesters were present on United States property
25   managed by the Corps of Engineers?

Page 104

Crook

1
2         A.    I don't know specifically how long
3    there may have been one or more protesters.
4              I know generally how long the large
5    protests went.
6         Q.    Would you be surprised if it was
7    told to you that protesters were present on Corps
8    property belonging to the United States from mid
9    summer through 2016 to March and April of 2017?
10             MS. ZILLOLI:  Objection.  Assumes
11   facts.
12        Q.    Would that surprise you, sir?
13        A.    I don't know whether there were
14   protesters from mid December to January 20th, but
15   the rest of the time period you mentioned would
16   not surprise me.
17        Q.    Well, I didn't say mid December to
18   January.  I said mid summer, which is, let's say,
19   August, for sake of this questioning.
20             Would it surprise you that there
21   were protesters present in mid August, because I
22   think you already said that, through March or
23   April of the following year?
24             MS. ZILLOLI:  Objection.  Assumes
25   facts.

Page 105

Crook

1
2         A.    Again, I believe that there were
3    protests from August until mid September and I
4    believe there were protests after January 20th.
5              I actually don't know the status of
6    the protests from mid December to January 20th.
7         Q.    Mr. Crook, do you recall when you
8    first learned that the Standing Rock Sioux Tribe
9    submitted an application of sorts seeking a
10   special use permit from the Corps of Engineers?
11        A.    I believe I learned about a request
12   for a special use permit sometime in early
13   December.
14        Q.    Early December?
15        A.    I'm sorry, September.  I'm sorry.  I
16   misspoke.
17        Q.    Okay.
18             Mr. Crook, do you recall being
19   advised by the Army Corps of Engineers that a
20   permit application of sorts was submitted by the
21   Standing Rock Sioux Tribe for seeking a special
22   use permit but the Corps' position with respect
23   to that submittal was it lacked required
24   information for approval?  Do you know when you
25   first learned that?

Lowry Crook
May 26, 2022

Page 106

Crook

1                    Crook
2            MS. ZILLOLI:  Objection.  Assumes
3    facts.
4        A.      What I recall is learning that there
5    had been an application for a special use permit,
6    and there were questions about whether certain
7    conditions for that permit had been met or not.
8        Q.      Okay.
9                Would it surprise you if you were
10   told that in mid to late August of 2016 and not
11   September?
12       A.      No, I'm not certain as of the date.
13       Q.      Okay.  We'll go to that in a moment.
14               Do you recall who told you what you
15   just said with respect to the special use permit
16   application being sought by the Standing Rock
17   Sioux Tribe?
18       A.      I don't recall who specifically told
19   me.  I just remember it being a discussion in
20   meetings with a, you know, with a broader group
21   of people.
22       Q.      Would it surprise you that the
23   Standing Rock Sioux Tribe sought an application
24   or filed an application of sorts to the Corps
25   seeking a special use permit prior to August 25th

Page 107

Crook

1                    Crook
2    of 2016?
3        A.      That they submitted one?  That would
4    not surprise me.  I just don't recall the exact
5    date.
6        Q.      Well, the question is would it
7    surprise you if it was prior to August 25 of
8    2016?
9                MS. ZILLOLI:  Objection.  Asked and
10   answered.
11       Q.      I don't think so.
12       A.      Because I don't know the date, it
13   wouldn't surprise me if it was a different date
14   than August 25th.
15       Q.      Okay.
16               Do you know, Mr. Crook, how long the
17   Corps considered a request by the Standing Rock
18   Sioux Tribe for a special use permit?
19       A.      I don't specifically recall how long
20   they considered it.  I know that it was a subject
21   of discussion over several weeks.
22       Q.      Would it surprise you if it was
23   actually several months?
24       A.      No, I think it would -- issues
25   surrounding what to do was a subject of

Page 108

Crook

1                    Crook
2    discussion from at least September into December.
3        Q.      So, in deed, several months, sir?
4        A.      Yes, that is several months.
5        Q.      What was your role in the Corps
6    consideration of the request by the Standing Rock
7    Sioux Tribe for a special use permit from the
8    Corps?
9        A.      I believe that the responsibility
10   for that was with the district commander in
11   consultation with his chain of command.
12       Q.      Your role, sir.

ND OBJ.:
Non-Responsive

13               The question is --
14       A.      My role --
15       Q.      What was your role --
16               MS. ZILLOLI:  Paul, can you let him
17   answer the question, please, finish his answer, I
18   mean.
19       Q.      Pardon me, Mr. Crook.  I just want
20   to make sure when I ask a question and you
21   provide a response that you're responding to my
22   question.
23       A.      My role is to be aware of what
24   decisions that were being made potentially to
25   advise the assistant secretary, if any decisions

ND OBJ.:
Non-Responsive

Crook

1                    Crook
2    were hers and make sure that she and our office
3    had good information about what was happening.
4        Q.      Okay.
5                Mr. Crook, who in the Corps, or the
6    administration for that matter, made the decision
7    to pull the district commander's determination on
8    the special use permit up to the Corps
9    headquarters?
10               MS. ZILLOLI:  Objection.  Assumes
11   facts.
12       A.      Yeah, I don't know whether that -- I
13   don't know whether -- I know the Corps
14   headquarters was consulted.  I don't know
15   ultimately who issued the decision or made the
16   decision.
17       Q.      Were you involved in consideration
18   of whether to provide the Standing Rock Sioux
19   Tribe with a proposed special use permit subject
20   to conditions of compliance?
21       A.      I was briefed on the request for the
22   permit and surrounding the decision on the
23   permit.
24       Q.      Were you involved in the decision
25   making process, sir?

109:
5-16
602,
611

Lowry Crook
May 26, 2022

Page 110

1                           Crook
2       A.       I was involved in meetings
3   discussing the decision.
4       Q.       And what were those discussions?
5       A.       Just about the different factors and
6   legal issues that the Corps needed to weigh in
7   making that decision.
8       Q.       Okay.
9                With whom in the administration
10  outside of the Department of Army did you consult
11  in that process?
12      A.       Specifically regarding the special
13  use permit?
14      Q.       Yes, sir.
15      A.       I shared information about the
16  special use permit issues generally with
17  counterparts of the Department of the Interior
18  and at the Department of Justice.
19      Q.       Did you receive instructions from
20  those people that you collaborated with in the
21  Department of Interior or Department of Justice
22  with respect to the decision on the application
23  for a special use permit?
24      A.       I didn't receive instructions.
25      Q.       Did you receive positions from those

Page 111

1                           Crook
2   federal agencies?
3       A.       The specific people I was talking to
4   at the DOJ and Department of the Interior had
5   opinions and views.
6       Q.       And they were what?
7       A.       The interior department was
8   generally concerned about First Amendment issues
9   surrounding the protests and our handling of the
10  request for a special use permit and, generally,
11  their agencies responsibility to the tribes.  I
12  don't recall -- okay, sorry.
13      Q.       No problem.  Pardon me.
14               How does that opinion and view
15  relate to the decision of whether or not the
16  Corps of Engineers under its regulatory authority
17  should or should not propose a special use permit
18  to the Standing Rock Sioux Tribe as the tribe
19  applied for such permit?
20               MS. ZILLOLI:  Objection.  Legal
21  conclusion.  You can answer.
22      A.       I viewed it as a view shared by a
23  fellow federal agency and the decision maker.
24      Q.       Mr. Crook, I understand that they
25  shared views with you.  You've said that.

Page 112

1                           Crook
2               What was the view expressed to you
3   by those agencies concerning the Corps' decision
4   whether or not to issue, pardon me, to propose a
5   special use permit to the Standing Rock Sioux
6   Tribe based upon the tribe's application for one?
7               MS. ZILLOLI:  Same objection.
8       A.       I don't recall them having views on
9   the specifics of the special use permit, just
10  generally on our treatment of the tribes and
11  their First Amendment rights.
12      Q.       How did that view and opinion fit
13  within the context of you telling me that you
14  shared the special use permit proposal with them?
15               MS. ZILLOLI:  Objection.  Misstates
16  testimony.
17      Q.       Well, then, Mr. Crook, please
18  correct me then because I understood, because I
19  asked the question, whom did you consult with
20  concerning whether or not to issue a proposed
21  special use permit, and you told me that you
22  shared that information with the Department of
23  the Interior and the Department of Justice and
24  they provided views and opinions.
25               So what do I have wrong about what

Page 113

1                           Crook
2   you just told me if that's not correct?
3       A.       I shared generally that there was a
4   special use permit under consideration and
5   generally some of the issues surrounding it.  I
6   don't recall whether or not I shared anything
7   more specific than that.
8       Q.       What did the Corps ask the Standing
9   Rock Sioux tribe to do with respect to addressing
10  any problems or deficiencies the Corps noted on
11  the tribe's application for a special use permit?
12      A.       What I recall is there may have been
13  some issue regarding liability insurance or a
14  bond, and I believe there were other issues with
15  the permit application, but I just standing here
16  -- sitting here right now I don't remember
17  specifically what the other issues were.
18      Q.       So the question is what did the
19  Corps do to resolve those issues prior to
20  proposing a special use permit or did it?
21      A.       I know that Colonel Henderson had
22  several discussions with the tribe, but I wasn't
23  always aware of the specific either time or
24  substance of those discussions.
25      Q.       Mr. Crook, do you know as the

Lowry Crook
May 26, 2022

**Page 114**

Crook

1
2  principal deputy assistant secretary of the Army
3  for Civil Works what was the status of the
4  special use permit when it was provided to the
5  Standing Rock Sioux Tribe?  Was it a final permit
6  effective upon providing it to them or did it
7  require compliance?
8               MS. ZILLOLI:  Objection.  Legal
9  conclusion.
10       A.     I know that it had conditions and
11  requirements that there were issues with.  I
12  don't recall today what anybody's conclusion
13  about the legal status at the time was because of
14  those conditions and issues.
15       Q.     Earlier you mentioned an individual
16  by the name of Katherine Ferguson; is that
17  correct?
18       A.     Yes, you reminded me of her name.
19       Q.     Right, right, and you agreed to it?
20       A.     Yes.
21       Q.     Miss Ferguson I believe you said was
22  the chief of staff of the President's domestic
23  policy council; is that accurate?
24       A.     Yes.
25       Q.     Did you work with Miss Ferguson on

**Page 115**

Crook

1
2  the development of a map relative to the Corps'
3  property and the Missouri River and the Standing
4  Rock Sioux Tribe within the State of North
5  Dakota?
6       A.     I know someone developed a map.  I
7  don't remember what my role or her role was in
8  that was, yeah.
9       Q.     Okay.
10              And did you do that effort with Miss
11  Ferguson before or after the Corps proposed a
12  special use permit to the Standing Rock Sioux
13  Tribe?
14              MS. ZILLOLI:  Objection.
15  Mischaracterizes his testimony.
16       Q.     Please correct me where I'm wrong,
17  sir.  I apologize, if that's the case.
18       A.     I remember generally communicating
19  with her about these issues and, also, she was
20  responsible for coordinating some larger tribal
21  coordinations.  I don't remember the specifics or
22  timing of a map.
23       Q.     Why did Miss Ferguson want to work
24  with you and the Corps and the creation of a map
25  of that area?

**Page 116**

Crook

1
2               MS. ZILLOLI:  Objection.  Misstates
3  testimony in evidence, calls for speculation.
4       A.     I think you'd have to ask her
5  what her motivations are.
6       Q.     Okay.  We can look at some documents
7  in a moment and talk about that further.
8               By the way, putting that aside, do
9  you recall the area involved in the Corps'
10  provision of a proposed special use permit to the
11  Standing Rock Sioux Tribe?  What area did that
12  involve?
13       A.     I just recall that it was the area
14  of the Corps property near the Cannonball River.
15       Q.     But you don't recall which area it
16  involved in that area?
17       A.     Today I don't recall specifically
18  which it involved and didn't involve?
19       Q.     Okay.
20              Were you part of any discussion with
21  respect to what area to include in the proposal
22  to allow the Standing Rock Sioux Tribe to have a
23  special use permit to be on Corps property?  Do
24  you recall what area was discussed for inclusion?
25       A.     I recall that there were discussions

**Page 117**

Crook

1
2  about both the area and the condition of the
3  special use permit.
4       Q.     And my question then is -- thank you
5  for that because it makes clearer that you were
6  participatory -- what areas were discussed to be
7  included or not included?
8       A.     I don't specifically remember the
9  areas that were discussed either way.
10       Q.     Do you remember being involved in
11  such discussions though at one time?
12       A.     Yes.
13       Q.     Who else was involved with you in
14  discussions about what area specifically to
15  authorize in a proposed special use permit to the
16  Standing Rock Sioux Tribe?
17       A.     I remember that there were
18  discussions about the special use permit with
19  Colonel Henderson, General Spellmon, General
20  Jackson, Assistant Secretary Darcy and Army
21  counsel.
22       Q.     Mr. Schmander?
23       A.     Either Mr. Schmander or somebody who
24  reports to him.  I don't recall specifically.
25       Q.     Okay.

114:21-115:8
401-402

Lowry Crook
May 26, 2022

Crook

1        Crook
2        A.    He was at meetings about the special
3    use permit but -- okay.
4        Q.    Was Miss Zilloli at all involved in
5    those discussions?
6        A.    Not that I recall.
7        Q.    Did that proposed special use permit
8    include all of the areas where you knew that
9    protesters were present on Corps land in
10   opposition to the Dakota Access Pipeline?
11       A.    Again, I don't recall the specific
12   location that was either proposed or under
13   discussion in the special use permit.
14       Q.    The question is different though
15   than that, sir.
16             It's did it include less than all of
17   the areas where protesters were present on Corps
18   of Engineers property?
19       A.    I don't recall today.
20       Q.    Did the Corps of Engineers proposed
21   special use permit tender to the Standing Rock
22   Sioux Tribe only include plans south of the
23   Cannonball River?
24       A.    Again, I don't recall the specific
25   area proposed or not proposed in the special use

Crook

1        Crook
2    permit today.
3        Q.    Do you recall whether the special
4    use permit proposed and tendered to the Standing
5    Rock Sioux Tribe specifically denied the tribe's
6    request for the permit area to include existing
7    protest camps located to the north of the
8    Cannonball River?
9        A.    I don't recall what locations were
10   in and out of the special use permit that was
11   proposed.
12       Q.    Do you know, Mr. Crook, what is
13   referred to as the main camp when people were
14   referring to protest camps located on Corps
15   property?
16       A.    I recall that there were two primary
17   locations for camps.  I don't know which one they
18   referred to as the main camp or --
19       Q.    How about in your recollection of
20   the two primary camps, what were their names?
21       A.    I don't recall.
22       Q.    Where were they located?
23       A.    I believe that there was one north
24   of the Cannonball River and one or more south of
25   the Cannonball River.

Crook

1        Crook
2        Q.    And that camp that you're referring
3    to north of the Cannonball River, would that
4    surprise you if that was called or referred to
5    commonly as the Oceti Sakowin Camp?
6        A.    I don't recall that specific name.
7        Q.    How about do you recall the name --
8        A.    But I'm not saying it's not.
9        Q.    Okay.
10       A.    I'm sorry.
11       Q.    You just don't know?
12       A.    I just don't remember today.
13       Q.    How about do you remember a name of
14   Seven Fires Council Camp also known as the Oceti
15   Sakowin Camp located on Corps of Engineer
16   property north of the Cannonball River?
17       A.    I recall that they had names for the
18   camps but I don't recall the specific names, no.
19       Q.    Okay.
20             So when the Corps tendered a special
21   use permit to the Standing Rock Sioux Tribe,
22   would it surprise you if that was limited to land
23   specified plus or minus 42 acres south of the
24   Cannonball River?
25             MS. ZILLOLI:  Objection.  Assumes

Crook

1        Crook
2    fact.
3        A.    It wouldn't surprise me.  I don't
4    recall the specific area that was proposed to be
5    included or not included still.
6        Q.    Okay.
7             My question is why did the Corps
8    grant a proposed, not grant, but propose a
9    special use permit for a subset of the existing
10   protest camps located on its property?
11       A.    If that's what they did.  I know
12   that the locations were a subject of discussion.
13   I don't remember what dictated the final
14   conclusion on that.
15       Q.    Okay.
16             Would you agree that issuing a
17   proposed special use permit for a subset of the
18   land where protesters were present was an
19   authorization for the Oceti Sakowin Camp to
20   remain on Corps property?
21             MS. ZILLOLI:  Objection.  Asks for a
22   legal conclusion.
23       A.    Yes, I don't know whether, whatever
24   was said to the tribe, that the proposed special
25   use permit what -- with the conditions and issues

Lowry Crook
May 26, 2022

Page 122

1              Crook
2  it had what the legal conclusion or status of
3  that would be.
4          Q.     Mr. Crook, do you agree with me that
5  the Corps of Engineers never issued a final in
6  effect special use permit for occupation or use
7  of any Corps lands --
8              MS. ZILLOLI:  Objection.  Legal
9  conclusion.
10         Q.     -- with respect to that -- pardon
11  me, Miss Zillio.  I'm still asking my question.
12  Mr. Crook, I'll start over given that
13  interruption.
14             Do you agree with me that the Corps
15  of Engineers never issued an effective, final
16  special use permit to any protest group or
17  subgroup to be present on Corps of Engineers
18  property during the period of the Dakota Access
19  Pipeline protests?
20             MS. ZILLOLI:  Objection.  Legal
21  conclusion.
22         A.     Again, I don't know the final legal
23  status and whether it was effective or not of the
24  special use permit.
25         Q.     Okay.

Page 123

1              Crook
2             Did you ever know?
3         A.     I don't know.  Actually, I know that
4  lawyers had opinions about it, but I don't recall
5  specifically if there was a conclusion.
6         Q.     Mr. Crook, you talked about, we can
7  certainly look at it in a moment when we go
8  through some documents together, but you
9  referenced a joint statement by the Department of
10  the Army, the Department of the Interior and the
11  Department of Justice, I think -- September 9th
12  comes to mind.  You tell me if I'm wrong -- a
13  joint statement to reconsider the Corps Omaha
14  district granting of two Clean Water Act Section
15  408 permissions for the DAPL, Dakota Access
16  Pipeline, to cross the United States Government
17  flowage easement on the Missouri River at Lake
18  Sakakawea, and the Army Corps of Engineers two
19  verifications, meaning Nationwide Permit 12.
20             Do you recall that?
21         A.     I believe that we issued a joint
22  statement in early September.  I don't recall the
23  specific date or the specific language in the
24  announcement, but I do recall making an
25  announcement on that generally subject.

Page 124

1              Crook
2         Q.     Were you, sir, involved in the
3  development of that announcement?
4         A.     Yes.
5         Q.     And please explain and describe the
6  nature and extent of your involvement in that
7  announcement.
8         A.     I was involved in discussions and
9  meetings where it was -- where the agencies
10  decided to issue an announcement, and I reviewed
11  and edited drafts of the announcement.
12         Q.     When you had meetings and
13  discussions with the agencies involved in that,
14  and there are three:  Army, Justice and Interior,
15  who was present in your meetings or discussions
16  from the Corps?
17         A.     I don't recall, I don't recall in
18  the meetings other than the detailee from the
19  Corps to the Department of Interior that I
20  mentioned and I'm still forgetting her last name.
21             I don't recall there being somebody
22  from the Corps of Engineers specifically as
23  opposed to the Department of Army.
24         Q.     Okay.
25             If no one was from the Corps, and

Page 125

1              Crook
2  that's your testimony, then who from the
3  Department of the Army was present along with you
4  in those meetings and discussions?
5         A.     And the secretary --
6         Q.     I'm sorry.  Pardon me, sir.
7             You were saying the assistant
8  secretary?
9         A.     Yes, I'm sorry.  Assistant Secretary
10  Darcy, and I believe in some of the discussions
11  Craig Schmander was involved as well.
12         Q.     Was that it for the Department of
13  the Army?
14         A.     And me.
15         Q.     Of course, right.
16         A.     That's all I recall from the
17  Department of Army.
18         Q.     Okay.
19             And then let's go to the other
20  federal agencies from the administration that
21  were present for those meetings and discussions
22  with respect to the formation of the joint
23  statement that was finalized January -- pardon
24  me, September 9.
25             From the Department of Interior, who

123:6-124:11,
124:25-125:11,
125:19-126:18
401-402

Lowry Crook
May 26, 2022

Page 126

Crook

1
2 was present and participated in discussions?
3     A.    I recall Tommy Boudreau, the chief
4 of staff at the time.  Hillary Tompkins, the
5 solicitor.  I believe one of her deputies or
6 staff, and the detailee I mentioned from the
7 Corps from the interior department.
8     Q.    That's it from the interior
9 department?
10    A.    That's all I recall being involved
11 from the interior department, yes.
12    Q.    Not Miss Jewell, secretary --
13    A.    So the initial meeting on this was
14 in her conference room.
15    Q.    Whose conference room?
16    A.    Secretary's Jewell's conference
17 room, and I just don't recall whether she dropped
18 by or not during part of them.
19    Q.    Was she ever involved in the
20 discussions with respect to the development and
21 finalization of the joint statement on September
22 9, 2016?  Please.
23    A.    I don't recall whether she was
24 specifically involved or not.
25    Q.    She provided a conference room for

Page 127

Crook

1
2 you to meet but you don't recall if she was
3 present?
4     A.    Right.  Her staff provided, her
5 chief of staff convened the meeting in her
6 conference room that's in her suite of offices,
7 but I just don't recall whether that specific
8 meeting she participated or not.
9     Q.    Do you recall Miss Jewell ever
10 participating in the topic of the issues that
11 lead to the development and finalization of a
12 joint statement representing itself as being from
13 three federal agencies, one which she was
14 secretary of, ever?
15    A.    I'm not sure what her direct
16 involvement or lack thereof before the statement
17 was.
18    Q.    In any respect?
19    A.    Other than I was talking to her
20 chief of staff and her solicitor, but I don't
21 know what they were relaying to her, you know, in
22 addition to my discussions with them.
23    Q.    Was it your impression, Mr. Crook,
24 that Mr. Boudreau or Miss Tompkins or the staff
25 were there on their own volition for fun, or were

Page 128

Crook

1
2 they there at the direction of Secretary Jewell?
3     MS. ZILLOLI:  Objection.  Calls for
4 speculation.
5     A.    I believe that Secretary Jewell was
6 aware of their general involvement on the issue,
7 but I don't know what specific direction or
8 specifics was given to them.
9     Q.    Did Mr. Boudreau or Miss Tompkins
10 behave, in your opinion, as having authority from
11 Secretary Jewel to discuss the matter and to
12 finalize and put the Department of the Interior's
13 name on that joint statement?
14    MS. ZILLOLI:  Objection, vague.
15    A.    I believe that her chief of staff
16 understood he was acting -- yeah, had authority
17 to sign offer on the joint statement.
18    Q.    Authority from Miss Jewell,
19 Secretary of the Interior; is that your point?
20    MS. ZILLOLI:  Objection to the
21 extent it calls for a legal conclusion.
22    A.    I believe that he, yes, was acting
23 within his authority given his role in the
24 department.
25    Q.    And chief of staff to the secretary

*128:9-17 401-402, 602 611*

Page 129

Crook

1
2 of the Interior, is that what his title is?
3     A.    Yes, or was, yes.
4     Q.    And Miss Tompkins, remind me, you
5 said she was the Solicitor General of the United
6 States Department of the Interior?
7     A.    I think it's just called a
8 solicitor, but she's the top lawyer of the
9 Department of the Interior, yes, or was.
10    Q.    Okay.
11           You were telling me that there were
12 other agencies participating, mainly the United
13 States Department of Justice, right?
14    A.    Yes.
15    Q.    And what individuals do you recall
16 ever participating in discussions or meetings
17 concerning the formation and development and
18 finalization of the joint statement to reconsider
19 the Corps' decision?
20    A.    It was, I'm sorry, John Cruden, the
21 head of the Environment Natural Resources
22 Division; his deputy, Sam Hirsch and at some
23 point in time Rita Auguilar, who I don't remember
24 her official title, but she served as a
25 congressional and intergovernmental relations

*129:11-130:2, 131:4-10 401-402*

Lowry Crook
May 26, 2022

Page 130

Crook

1
2 role at the Justice Department.
3       Q.      Okay.
4               Anyone else from the United States
5 Department of Justice?
6       A.      There may have been other people on
7 the ENRD staff attorneys.  I just don't recall
8 beyond the two that I mentioned.
9       Q.      And like the Department of the
10 Interior, the Department of Justice has a cabinet
11 official I believe; is that correct?
12      A.      An attorney general, yes.
13      Q.      An attorney general of the United
14 States?
15      A.      Yes.
16      Q.      And that individual at the time was
17 whom?
18              I don't mean to trip you up.
19 Loretta Lynch --
20      A.      I'm actually blanking right now but
21 I --
22      Q.      Would you happen to recall whether
23 the name was Loretta Lynch or not?
24      A.      Yes, that was her.
25      Q.      Attorney generally of the United

Page 131

Crook

1
2 States Loretta Lynch?
3       A.      Yes, at that time that was her.
4       Q.      Mr. Crook, do you recall Miss Lynch
5 having any involvement direct or indirect in the
6 development and finalization of the joint
7 statement to reconsider the Corps' decisions?
8       A.      I have no knowledge of her
9 involvement directly or indirectly with that
10 statement.
11      Q.      And like the individuals below, the
12 cabinet level secretary from the Department of
13 the Interior and, frankly, the Department Of
14 Army, were Mr. Cruden, Mr. Hirsh or Miss Auguilar
15 present in those discussions for fun or were they
16 there in their official capacity as officials of
17 the United States Department of Justice?
18              MS. ZILLOLI:  Objection, speculation
19 and legal conclusion.
20      Q.      What was your perception of their
21 participation in a process that led to the
22 Department of Justice putting its name on a joint
23 statement along with two other United States
24 agencies?
25      A.      They represented the Justice

Page 132

Crook

1
2 Department at the meetings, and I believe were
3 expressing their views of their division of the
4 Justice Department, and they participated in the
5 drafting and editing of that announcement.
6       Q.      Would you say that was an action
7 taken by those DOJ representatives with or
8 without the authority of their positions and the
9 Attorney General Of the United States permission?
10              MS. ZILLOLI:  Objection,
11 speculation, foundation, legal conclusion.
12      A.      Again, I don't know what discussions
13 they had or didn't have with the attorney
14 general.  I had no reason to believe they weren't
15 acting within their authority, but I don't know
16 specifically what direction they were given.
17      Q.      Thank you.
18              Did all of the three signators to
19 that joint statement have an active role in its
20 development?
21      A.      The people I mentioned were involved
22 in the drafting and editing of that announcement.
23      Q.      So that would be all three of those
24 agencies, correct?
25      A.      Certain representatives of all three

132:18-
133:4
401-402

Page 133

Crook

1
2 of the agencies that I mentioned were involved in
3 it, yes.
4       Q.      Yes.
5               With respect to your role in that
6 process, you said you edited and met on it and
7 discussed on it.
8               Over the span of what time did that
9 process take place?
10      A.      Again, I don't recall the specific
11 dates.  I know that it was --
12      Q.      Was it a few days?
13      A.      Somewhere between a few days to a
14 week or so.
15      Q.      That's when that came together, and
16 you met on it and talked about it and exchanged
17 comments from the very beginning of that process
18 to the issuance of the document publicly it took
19 a total of one week?
20      A.      Again, I don't recall the specific
21 time frame.  I just know that the discussion --
22      Q.      Did it take more than a week?
23      A.      It could have.
24      Q.      During that time in which you and
25 Miss Darcy were involved in that process, did you

133:24-
134:6,
136:2-25
401-402

Lowry Crook
May 26, 2022

Page 134

Crook

2  ever think to coordinate with the people whose
3  decisions you were reversing within the Corps of
4  Engineers?
5       A.    During that process I did consult
6  with the Corps of Engineers.
7       Q.    And who did you consult with
8  specifically?
9       A.    David Cooper, the chief counsel for
10 the Corps of Engineers.  I believe some of his
11 staff and General Jackson.
12      Q.    And did you do that because Miss
13 Darcy told you to limit your involvement in the
14 Corps to those individuals?
15      A.    I don't recall her giving me any
16 instruction like that.
17      Q.    So the decision to limit your
18 coordination internal to the Unites States Army
19 Corps of Engineers to reverse earlier decisions
20 it made only you made the decision only to
21 consult with those two individuals?
22            MS. ZILLOLI:  Objection.  Assumes
23 facts.
24      A.    First of all, that announcement did
25 not reverse the decisions.  It announced that

Page 135

Crook

2  they were being placed under review and --
3       Q.    Does that mean that those decisions
4  no longer had the legal effect they did upon
5  issuance?
6            MS. ZILLOLI:  Objection.  Calls for
7  a legal conclusion and, counsel, please allow the
8  witness to finish his answers.
9       A.    I'm sorry.  Which question am I
10 answering here?
11      Q.    Yes, sir.  Let me restate it.
12            So it was -- I'm asking, it sounds
13 as though you're saying that it was your decision
14 as to whom you consulted in the Army Corps of
15 Engineers with respect to the joint statement,
16 development and finalization.
17      A.    I would say that I had a general
18 practice of my starting point for coordination
19 with the Corps of Engineers was General Jackson
20 and -- but in this case because they were legal
21 issues involved and there was litigation ongoing,
22 there was also discussions with Army Corps
23 counsel and Army Corps counsel's staff, and that
24 was my general line of communication with the
25 Corps of Engineers on issues like this.

Page 136

Crook

2       Q.    Did it ever occur to you to consult
3  with the individuals in the Corps who made the
4  decisions that your efforts announced a joint
5  statement to reconsider?
6       A.    I assumed at the time that my
7  discussions with General Jackson were being
8  relayed through the chain of command.
9       Q.    Do you know if that ever occurred?
10      A.    I recall that there was a breakdown
11 in communications before the announcement came
12 out.
13            I just recall there was an issue
14 with what was relayed to General Spellmon and
15 Colonel Henderson and the timing of it.
16      Q.    So would it surprise you to learn
17 that Colonel Henderson who made the decision with
18 the consent and approval of now General Spellmon
19 were very frustrated with your actions and
20 decision?
21            MS. ZILLOLI:  Objection.  Assumes
22 facts.
23      A.    I remember hearing that they were
24 concerned about being surprised at the
25 announcement.

136:16
-25
611,
802

Page 137

Crook

2       Q.    Mr. Crook, with respect to the
3  thousands of protesters and the eight to nine
4  months they occupied United States property
5  managed by Corps of Engineers, how many Title 36
6  or other citations did the Crops issue to those
7  present on Corps property?
8       A.    So, first of all, I don't know the
9  exact number of protesters there were over time,
10 and we've already discussed the time period and
11 what I recall and don't recall about that.
12      Q.    With respect to the period of time
13 that you were a United States employee in your
14 capacity as principal deputy to the assistant
15 secretary of the Army for Civil Works, during
16 your tenure, sir, how many citations are you
17 aware the Corps issued to protestors on the Corps
18 of Engineers' property?  Any?
19            MS. ZILLOLI:  Counsel, again, you're
20 interrupting his answers.  I'm going to ask you
21 to please allow him to finish answering his
22 questions.  It's becoming a pattern.
23      Q.    Mr. Crook, you heard my question?
24      A.    I don't know how many citations the
25 Omaha District issued or didn't issue.

Lowry Crook
May 26, 2022

Page 138

Crook

1                           Crook
2        Q.    Did you ever tell anyone, Mr. Crook,
3   not to issue citations to the protesters?
4        A.    I don't recall telling anybody,
5   giving any specific directions with recall to
6   citations.
7        Q.    Did Miss Darcy, to your knowledge?
8        A.    I don't recall her giving any
9   specific direction on that either.
10       Q.    Then why didn't the Corps of
11  Engineers issue any citations?
12       A.    Again, I don't know whether they did
13  or didn't or how many.  So I certainly
14  can't under -- I wouldn't know why because I
15  don't know whether.
16       Q.    To your knowledge, Mr. Crook, did
17  the Corps ever take any steps to communicate to
18  the protesters present on Corps managed property
19  that they needed to leave?
20       A.    Yes.
21       Q.    In what form and when?
22       A.    In the November 25th announcement
23  that they needed to leave the north property by
24  an X date certain in December.
25       Q.    How about prior to that, any

Page 139

1   particular -- we talked about mid August is when
2   they showed up.
3              So what about the months of August,
4   September, October, and a large part of November,
5   prior to the November 25th letter from Colonel
6   Henderson, did the Corps ever tell them that they
7   needed to leave?
8        A.    I know that Colonel Henderson had
9   several communications with the tribe, but I
10  don't know specifically what he said or didn't
11  say during all of those conversations.
12       Q.    How about to the protesters, any or
13  all of them, not just the tribe?
14       A.    Again, I don't know what specific
15  communications Colonel Henderson had with the
16  protesters.  I just know that he was in
17  communication with them.
18       Q.    Mr. Crook, you can look at a
19  document in a moment, but would it surprise you
20  that as early as September the poor Omaha
21  District which had principal and direct
22  involvement with the North Dakota Oahe projects
23  where these events were occurring concluded that
24  the Standing Rock Sioux Tribe had lost control of

Page 140

Crook

1                           Crook
2   the protests on Corps property?
3              MS. ZILLOLI:  Objection.  Misstates
4   evidence and assumes facts.
5        Q.    Why don't we hold that, Mr. Crook,
6   and I'll show you a document, and you let me know
7   if I'm telling you something different than what
8   it says.
9        A.    Okay.
10             MS. ZILLOLI:  Just, Mr. Seby, I was
11  curious if we could take a break soon.  I know
12  that there was a request made at the outset at a
13  time.  I think it's coming up.
14             MR. SEBY:  So let's go off the
15  record.
16             THE VIDEOGRAPHER:  We're off the
17  record 1:26 p.m. Eastern, 5:26 UTC.
18             (A break from the record was taken.)
19   A F T E R N O O N   S E S S I O N :
20             THE VIDEOGRAPHER:  Back on the
21  record 2:15 Eastern, 6:15 p.m. UTC.
22  BY MR. SEBY:
23       Q.    Mr. Crook, good afternoon.  We're
24  back on the record after a lunch break, and I
25  want to, for this portion of the deposition,

Page 141

1                           Crook
2   review some exhibits with you, which have been
3   provided prior to your deposition to your counsel
4   prior to the deposition.
5              And let's start with Exhibit 406, if
6   we could, please.  Put that on the screen.
7   Miss Hymel.
8              MS. HYMEL:  I'm having a technical
9   difficulty.  Give me one second, please.
10             MR. SEBY:  Sure.
11       Q.    Okay.  If you would go to, Mr.
12  Crook, I'm going to show you a series of emails.
13  They were produced to us with a cover that looks
14  like this but the body of that same to-from,
15  sent, attachment subject is all in the next page.
16             So would it be okay if we start with
17  the actual document versus this cover?
18       A.    Does the next page have who it's to
19  and from?  Okay, yes.
20       Q.    Fully.  Yes, it does.
21       A.    Okay.  Great.  Can we make it a
22  little bigger, my aging eyes.
23       Q.    We will blow it up and then have you
24  look at it.
25       A.    Great.

Lowry Crook
May 26, 2022

Page 142

Crook

1                Crook
2                MS. ZILLOLI:  We're seeing like a
3    really skinny window.
4                MR. SEBY:  She's working on it.
5    Rachel, are you able to enlarge that, please, and
6    move the document to the center so the whole
7    piece is in view, please.  There we go.
8          Q.    Mr. Crook, can you take a moment and
9    review that email, which is from you forwarding
10   an email below to a series of individuals in the
11   Corps, and it's a -- there are several
12   attachments we will get to in a moment.
13               One is a letter from the acting
14   assistant secretary of the interior, Larry
15   Williams -- Roberts, pardon me, Larry Roberts to
16   the Corps Omaha District and then there's a
17   response from the Omaha District Colonel
18   Henderson to Mr. Roberts, and General Jackson is
19   the email transmitting those to Mr. Roberts that
20   you have forwarded on to these other individuals
21   in the Corps.
22               If you would take a moment and read
23   Mr. -- pardon me, General Jackson's email, that
24   would be great.
25         A.    Oh, thank you.  I'm still reading it

Page 143

Crook

1                Crook
2    right now.
3          Q.    You bet.
4          A.    Okay.
5          Q.    You've read the email from Major
6    Jackson?
7          A.    From general Jackson, yes.
8          Q.    Major General Jackson.  Pardon me.
9                So the attachments are this letter
10   of March 29, 2016 from Mr. Roberts, Acting
11   Assistant Secretary of Indian Affairs in the
12   office of the secretary of the Department of
13   Interior, and the letter is giving comment on the
14   Corps of Engineers preparations under NEPA, for
15   the environmental assessment, and the department
16   is through Mr. Roberts' letter asking for an EIS
17   to fully evaluate, in his words, "To fully
18   evaluate the potential impacts of the DAPL
19   pipeline on the Standing Sioux Tribe
20   reservation," and he asks as a proxy for the
21   tribes that a full environmental impact statement
22   be developed; and the next letter is a Corps
23   response from Colonel Henderson, District
24   Commander Omaha District to to Mr. Roberts
25   explaining that the Corps process for developing

Page 144

Crook

1    the environmental assessment, and General Jackson
2    is sending those to Mr. Roberts because
3    apparently Mr. Roberts was not aware of the
4    Corps's response; is that your understanding of
5    this whole email?
6          A.    It's -- just from reading the email,
7    yes.
8          Q.    Okay.
9                So here Mr. Roberts is taking a
10   position on behalf of the Department of the
11   Interior in March of 29th of 2016 and the Corps
12   responded to it in the June 28, 2016, and General
13   Jackson was resending all of that to Mr. Roberts
14   on August 8th of 2016, and you were letting
15   people know.
16               Why did you feel the need to forward
17   this letter on to this group of individuals in
18   the Corps of Engineers?
19         A.    This is actually a group of
20   individuals in the office of the assistant
21   secretary, and the colonel and lieutenant colonel
22   were our staff officers in the assistant
23   secretary's office.  So this is just forwarding
24   to other people in my office who work with me.

*[Right margin annotation: 144:10-25  401-402]*

Page 145

Crook

1                Crook
2          Q.    What was your reason for sending it
3    to them?
4          A.    I don't recall other than I tried to
5    keep people in the office generally aware of, you
6    know, issues.
7          Q.    And what was the issue here that you
8    thought was necessary to keep them aware of?
9          A.    Just the exchange between General
10   Jackson and Larry Roberts of the interior
11   department.
12               I don't recall how this email lines
13   up with the timing of when the permit was issued
14   and when that was announced.
15         Q.    Which permit are you referring to?
16         A.    I mean, all the permits for the
17   Dakota Access Pipeline, the 408 or 404 or
18   nationwide permits that were invoked for it.
19         Q.    Well, General Jackson's email
20   advises that information, doesn't it?  It says
21   that I think he's telling Mr. Roberts that he
22   bumped into him at a meeting this past Friday he
23   says.  So he writes us on Monday, August 8th, and
24   says "This past Friday we met and you gave me a
25   copy of the letter you sent to the Corps at the

Lowry Crook
May 26, 2022

Page 146

Crook

1
2    end of March, and you said you hadn't received
3    the response."
4              So here's what the Corps sent you is
5    what Jackson says, and then he says as an update
6    the 408 permit from the Corps for the Lake Oahe
7    crossing has been granted along with the
8    nationwide permit 12 that was also required was
9    issued, and there's an outstanding real estate
10   easement at Lake Oahe that's spending.  And, so
11   let me know if you need any other questions
12   answered.  That's what Jackson's letter says.
13             So you wanted your colleagues in the
14   office of the secretary to be aware of that, the
15   assistant secretary, Miss Darcy, to be aware of
16   that?
17        A.    I didn't forward it to Miss Darcy
18   and I don't remember when I discussed it with
19   her, and I guess what I'm saying is I don't, I
20   don't know -- I don't know if I was just
21   forwarding the fact of this exchange with the
22   interior department or if General Jackson's
23   statement that the permits were granted was news
24   to me on that Monday, and I was forwarding it for
25   that reason as well.  I just don't recall.

Page 147

Crook

1
2        Q.    All right.
3              Is Mr. Roberts someone that you knew
4    prior to this email from General Jackson on
5    August 8th?
6        A.    I believe I had met him prior to the
7    email.  I didn't know him well before this time
8    period.
9        Q.    Had you spoken to him or worked with
10   him on any DAPL issue?
11       A.    I don't believe before this that I
12   had spoken with him about a DAPL issue.  I
13   believe General Jackson and I met with him about
14   something else before this.
15       Q.    Okay.
16             And when was that meeting?
17       A.    I don't recall.  Just at some point
18   between when I joined the Corps in 2015 and
19   before this August time period.
20       Q.    And your meeting with him, with
21   General Jackson pertained to the DAPL issues?
22       A.    No, I think, I think it was another
23   issue that was not on DAPL.  I just don't recall
24   what the issue is or was.
25       Q.    But you're certain it wasn't DAPL?

Page 148

Crook

1
2        A.    I believe before this time period it
3    was a meeting on another subject that was not
4    DAPL.
5        Q.    Okay.  All right.
6              So let's go to Exhibit 407, which
7    I'm bringing to your attention because the first
8    email in the chain, what this is is two emails in
9    a chain.
10             The first is Lieutenant Tedeschi,
11   who's a chief in the U.S. Corps Operations Center
12   Headquarters, Washington, D.C., and he's
13   forwarding an email with an attachment to a group
14   which the email -- I'm sorry.  His email was
15   forwarded by one of the recipients, Miss Karen
16   Durham Auguilera, and she forwarded it on to Miss
17   Darcy and Chief of Engineers Todd Semonite and
18   Major General Jackson, among others, which
19   includes you.
20             Do you see that?  You're in the cc
21   list?
22       A.    Yes, I see that I'm on the cc for
23   Assistant Secretary Darcy's response.
24       Q.    And she says thank you, thank you
25   all for the update, and the update that's being

Page 149

Crook

1
2    forwarded to her from Miss Aguilera is a -- she
3    says it's the first storyboard attached for the
4    Dakota Access Pipeline Issue, and the Corps Omaha
5    District and the Northwest Division put it
6    together, and we intend to generate these daily
7    and get them distributed.  Thanks to Cornell
8    Henderson for his commander's assessment.
9              So let's look at the attachment,
10   which is that story board that is the matter of
11   communication.
12             Oh, geez, it's not here.  Okay.  The
13   exhibit is not complete.  So let's go instead to
14   -- I take that back.  The exhibit that I want to
15   talk to you about, this first storyboard, is
16   actually Exhibit 408, if we could move that
17   forward.
18             MR. SEBY:  So if we could look at
19   the email first, Rachel, the email transmitting
20   that attachment.
21       Q.    Mr. Crook, this is a single email
22   from Michael James or James Michael Price in the
23   Corps headquarters for the assistant secretary to
24   you, and can you tell me who Mr. Price is.
25       A.    He was the commanding officer for

Lowry Crook
May 26, 2022

Page 150

Crook

1          Crook
2    our office that would do tours as XO or chief
3    commanding officer.  So he's the top active duty
4    military person that was serving in our office
5    under Secretary Darcy, Assistant Secretary Darcy.
6         Q.    Okay.
7               And he is sending you a, what looks
8    to be a draft.  It references the attached
9    storyboard of August 24, 2016, which we'll talk
10   about in a moment, but what -- can you explain
11   this email.  You're copied on it.
12              What do you recall this being?
13        A.    Give me a second to read the rest of
14   it.
15        Q.    Yeah, absolutely.
16        A.    If you don't mind.  Can you scroll
17   up just a little bit.  Great.  Okay.
18        Q.    So do you recall this, Mr. Crook?
19        A.    I don't recall it specifically.
20        Q.    What is this a draft of?
21        A.    It's a draft report to the secretary
22   of the Army on the situation regarding Dakota
23   Access Pipeline.
24        Q.    Okay.
25              So Mr. or Colonel Price sends this

Page 151

1          Crook
2    to you and says, sir, for your consideration I've
3    also included the place mat.
4               What's a place mat?
5         A.    It's generally an 11x17 document
6    that the Army and the Army Corps specifically
7    likes to produce to provide information on
8    projects or issues.
9         Q.    So is that another way of referring
10   to the storyboard that's attached?
11        A.    I believe so, yes.
12        Q.    Okay.
13              So who wrote this, the body of this
14   message that Colonel Price is sending to you
15   exclusively?  Did he put it together or somebody
16   else?
17              MS. ZILLOLI:  Objection.  Calls for
18   speculation.
19        A.    I mean, it looks like his wrote it.
20        Q.    Okay.
21              And did you have any comments or
22   concerns with it?
23        A.    I don't recall specifically.  I
24   don't recall specifically whether I had edits or
25   what I did with it.

Page 152

1          Crook
2         Q.    You do recall reading it though,
3    right?
4         A.    Now that looking at it, it's
5    refreshed my recollection that at some point we
6    did try to provide an update to the secretary.
7         Q.    Who's we?
8         A.    Our office, the office of the
9    assistant secretary.
10        Q.    Okay.
11              So you were being asked for your
12   consideration of this; is that correct?
13        A.    Yes.  That's what it says.
14        Q.    Okay.
15              Reading it again today, do you have
16   any reason today to doubt anything in this email
17   that you're reading?
18        A.    Yes.
19        Q.    What is it?
20        A.    The characterization of the
21   easements in the first paragraph may not have
22   been exactly correct.
23        Q.    Why not?
24        A.    It said one gave consent to, sorry.
25   My picture is covering part of the line.  If you

Page 153

1          Crook
2    could scroll down just at little bit or up a
3    little bit.  Okay.
4               It said we provided an easement, and
5    I think the easement had not been provided yet at
6    that time actually.
7         Q.    Okay.
8               Other than that, Mr. Crook, and, in
9    particular, the fourth full paragraph, protesters
10   are currently camping, and so the date of Colonel
11   Price's email is August 25 of 2016.
12              So you're being advised, at least to
13   my knowledge, for the first time on August 25,
14   "Protesters are currently camping on Corps
15   property south of pipeline construction site,
16   activity has been fairly quiet since construction
17   ceased and law enforcement has pulled back to
18   containment checkpoints.  The SRST, Standing Rock
19   Sioux Tribe, has submitted a special us
20   to camp on Corps property.  The Omaha D
21   processing the permit."
22              Is this the first time you were
23   advised of protesters on Corps property?  I had
24   asked you earlier and you didn't know.
25        A.    So it looks like it was around this

**ND OBJ.:** Introduces new material

**ND OBJ.:** Introduces new material

Lowry Crook
May 26, 2022

Page 154

                                    Crook

```
 1                        Crook
 2   time period that I was advised.  I don't know
 3   that this draft email to the secretary was the
 4   first time I heard about it, but it would have
 5   been in this general time period.
 6        Q.     Okay.  Let's have a look at the
 7   attachment to this document of this exhibit,
 8   which is a Dakota Access Pipeline protest, Corps
 9   Northwest Division and Northwest District.
10             So is this Omaha and the Northwest
11   Division reporting on the storyboard known as a
12   place mat you've said, and if you look down it
13   says in the last 24 hour section of this
14   document, there are a number of bullets.
15             So if you would come down, please,
16   to the third bullet.  Pardon me.  Let's look at
17   them all.
18             The last 24 hours, bullet one,
19   "Protester camps on Corps property.  South of
20   pipeline construction site continues to be
21   occupied.  Continues.  Activity has been fairly
22   quiet, et cetera.  Current estimates from law
23   enforcement places the camps at 500 to 2000
24   protesters with many protesters traveling to the
25   site during the day.
```

Page 155

```
 1                        Crook
 2             "Third bullet.  Standing Rock Sioux
 3   Tribe special use permit lacked required
 4   information for approval.  NWO will request
 5   additional information."
 6             So is this the first time, now that
 7   you're refreshed, all of this was news to you on
 8   this day?
 9        A.     I don't know whether this particular
10   document on this particular day was news to me.
11   I know that around this time period is when I
12   became aware of what's being described in this
13   document.
14        Q.     So here you're told on at least
15   August 25, 2016 there may be 2000 people on your
16   property.
17             What did you think?
18        A.     What do I think?
19        Q.     Yes.
20             How did you react to this?  Oh, my
21   gosh.  I just learned that there's 2000 people on
22   Corps property or did you know this already?
23        A.     I likely knew that there were some
24   protests around the time this document was
25   prepared.
```

Page 156

```
 1                        Crook
 2             Some of the facts that are described
 3   in this document, and the details were likely
 4   news to me.
 5        Q.     Like which?
 6        A.     Like the number of protesters, yes.
 7   I think that to be the main detail that would
 8   have been news to me.
 9        Q.     So that 500 and 2000 estimate, what
10   did you think was prior to learning this?
11        A.     I don't think I knew a number.  I
12   just knew that there was protesters that were
13   there.
14        Q.     And the number was news to you that
15   day?
16        A.     It was news to me on/or around this
17   day.  Again, I don't know if this specific
18   document or if I was told something shortly
19   before the document but around this time period
20   that would have been news to me.
21        Q.     Okay.
22             So in the third bullet, Standing
23   Rock Sioux Tribe special use permit lacked
24   required information for approval.
25             Was that news to you?
```

**ND OBJ.:** Introduces new material

Page 157

```
 1                        Crook
 2        A.     As with the others, I don't know if
 3   I was told shortly beforehand something or saw a
 4   different document, but, again, it would have
 5   been something I learned around this time period.
 6        Q.     So can we agree that at least as of
 7   this date you knew this?
 8        A.     I believe that I did review this
 9   document and, therefore, you know, had read this
10   information at this time, yes.
11        Q.     Okay.
12             So that clears up your earlier
13   testimony about not recalling anything, right?
14        A.     About not recalling specific time
15   periods.
16        Q.     Sure.
17             But now we have a specific time
18   period, at least was a date on which you knew
19   something now, and you may have known something
20   about it earlier but for sure you know it now is
21   what you're saying?
22        A.     I believe that I saw this document
23   and so was aware of what it described, on the
24   date of the document.
25        Q.     Okay.
```

Lowry Crook
May 26, 2022

Page 158

Crook

2  And can we agree that the document
3  that we are talking about is a Corps of
4  Engineers' storyboard dated August 24, 2016?
5      A.    That's what it appears to be from
6  the face of the document, yes.
7      Q.    Okay.
8            So let's go now to Exhibit 410,
9  please, and there we go.
10           So this email is an email from your
11  boss, Jo-Ellen Darcy, Assistant Secretary of the
12  Army for Civil Works to the secretary of the
13  United States Army, Eric Fanning, dated
14  August 26, the next day.  It says update on
15  Dakota Access Pipeline issues, and there's two
16  copies on this.  One is to you.
17           Do you see that?
18      A.    Yes.
19      Q.    So the day prior to the assistant
20  secretary briefing her boss, what information did
21  you provide to your boss on the draft that was
22  sent to you the prior day?
23      A.    This appears to be some, you know,
24  follow-on version of the draft that Colonel Price
25  said to me.  I don't recall what, if any, edits,

Page 159

Crook

1  specific edits I made to it before the assistant
2  secretary setup.
3      Q.    Okay.
4            Will you have a look at this email
5  and refresh your memory of it.  I know you're
6  copied on it, but I just want you to be clear on
7  what you received on August 26, 2016 from your
8  boss briefing her boss, the secretary of the
9  United States Army.
10      A.    Okay.  Can you scroll down.  Can you
11  scroll down a little bit more, please, yes.
12  Okay.
13      Q.    Mr. Crook, I know you are an
14  attorney, correct?
15      A.    Yes.
16      Q.    Your employment at this time with
17  the Army Corps of Engineers, were you employed in
18  the capacity to serve to provide legal advice?
19      A.    No.
20      Q.    Was Alex Wagner an attorney who
21  provided legal advice to the department?
22      A.    Alex was the secretary of the Army's
23  chief of staff.  I don't recall whether he was an
24  attorney, is an attorney or not, but he also was

**ND OBJ.:** Relevance

Page 160

Crook

1  not serving in a legal role.
2      Q.    Is Miss Darcy an attorney?
3      A.    No.
4      Q.    Is secretary Eric Fanning, Secretary
5  of the United States Army?
6      A.    No.
7      Q.    Where is the attorney on this email?
8      A.    Can you scroll up, please.  I don't
9  see an attorney on the email.
10      Q.    Okay.
11            I just asked because I don't know
12  why there's a redacted portion in here.
13            Anyhow, so you were given advanced
14  draft of this by an individual in your office and
15  the assistant secretary's office.
16            Whatever, if any, input you
17  provided, Miss Darcy the following day gave this
18  email to her boss, the Secretary of the United
19  States Army.
20            Do you have any reason today to
21  disagree with anything she told the secretary?
22      A.    Can you scroll down a little bit
23  again.
24            No, I have no reason to disagree

Page 161

Crook

1  with this email.
2      Q.    Okay.
3            Now I want to talk to you about --
4  thank you for that clarification.  The third
5  paragraph, Army Corps responsible for permitting.
6            Among the facts that Miss Darcy is
7  reporting to the secretary of the Army is that
8  what the Corps did with respect to granting the
9  "Bulk of the permits required for the Corps
10  project crossings," and then she recounts that
11  within days after that, "The Standing Rock Sioux
12  Tribe sued the Army claiming violations of the
13  National Historic Preservation Act and the
14  National Environmental Policy Act and sought an
15  injunction, and they," referring to the Standing
16  Rock Sioux Tribe, "Also began protest near the
17  site of a planned Lake Oahe crossing, and that
18  the protests have grown to approximately 1500
19  people."
20            Mr. Crook, a day prior an estimate
21  was provided that said 500 to 2000.  So do you
22  know why the secretary a day later was able to
23  offer a precise number that is at the upper end
24  of the estimate provided a day prior?

Lowry Crook
May 26, 2022

Page 162

Crook

2    A.    No, I don't know specifically why it
3  changed.
4    Q.    All right.  Thank you.
5          And then the briefing to the
6  Secretary of the United States Army also says
7  "They prompted, meaning again the Standing Rock
8  Sioux Tribe it, at least according to Assistant
9  Secretary Darcy, "Prompted the North Dakota
10  Governor to declare a state of emergency on
11  August 19"; and on August 20, "they," again, she
12  seems to be referring to the Standing Rock Sioux
13  Tribe, caused pipeline construction to stop on
14  private land.
15          Then the next paragraph talks about
16  some of the protesters are currently camping on
17  Corps property south of pipeline construction.
18          She seems to be repeating the
19  information that's in the storyboard she received
20  a day prior and talking about the protests have
21  effectively blocked access to three locally
22  managed Corps recreation areas, and then she goes
23  on to say on Monday evening, this briefing to the
24  secretary is Friday August 26th.
25          So a reasonable, I think, unless you

Page 163

Crook

2  disagree with me, a reasonable reading of this
3  she's referring to the prior Monday.
4          Can we agree on that?
5    A.    It appears to be so.
6    Q.    On "Monday evening the Standing Rock
7  Sioux Tribe submitted a special use permit
8  application to camp on 'Corps property'."
9  Skipping a sentence.  "The Omaha District has
10  told the tribe it needs to provide additional
11  information before a permit decision can be made.
12  Governor Dalrymple has contacted our district
13  commander in Omaha," I believe that's Colonel
14  Henderson, "and me, Miss Darcy, to request that
15  we deny the permit and not allow the protesters
16  to remain indefinitely on Corps property."
17          And then Miss Darcy goes on to say,
18  "We have explained that we are deferring to
19  federal, state and local law enforcement in the
20  region, who to date have counseled a strategy of
21  containment rather than confrontation.  The
22  governor, however, is becoming increasingly
23  concerned about the protests impact on the
24  pipeline's construction timeline," and she talks
25  about some services the state was providing.

Page 164

Crook

2          "The Governor is also concerned that
3  outside groups and agitators will be joining the
4  protesters growing the number and increasing the
5  volatility of the situation."
6          So you were copied on an email draft
7  of which you saw the day before, had some input
8  you said.  You see it again here and her message
9  is finalized, and you've told me you don't
10  disagree with any of this.
11          So when Miss Darcy is talking about
12  federal, state and local law enforcement have
13  counseled a strategy of containment, are you sure
14  about that with respect to North Dakota and what
15  she goes on to stay the Governor has expressed?
16    A.    Okay.  So that's kind of two
17  questions, right.  Am I sure about what law
18  enforcement counseled and then also what the
19  Governor expressed?
20    Q.    I apologize.  Let's break them into
21  parts.
22          The question is, who counseled the
23  strategy of containment versus confrontation?
24    A.    I don't know specifically.  This
25  would have been based on reports that came up

Page 165

Crook

2  through the chain of command through the Corps
3  from Omaha.  So I don't know specifically who
4  that's referring to.
5    Q.    Okay.
6          But you do see where it says
7  "Governor Dalrymple has contacted our Omaha
8  District commander and me."
9          So Governor Dalrymple picked up the
10  phone and talked to Miss Darcy, and then she goes
11  on to say that a group of entities counseled that
12  we do something.
13          And now you're saying you don't know
14  who said -- who counseled it, and it came up from
15  Omaha, but she says that she heard from the
16  governor directly, and then she goes on to say
17  the governor is very concerned and, in fact, by
18  this time the governor had issued an emergency
19  declaration.
20          Do you think Miss Jewell, pardon me,
21  Darcy just got it wrong?
22    A.    What are you referring to as "it"
23  that she got wrong?
24    Q.    That North Dakota and/or local law
25  enforcement said oh, no.  Don't worry.  We'll

Lowry Crook
May 26, 2022

Page 166

Crook

1
2    just keep an eye on them and contain them.  Seems
3    to me a gross mischaracterization.
4             I don't know if you have any comment
5    on that or not.  I just thought I would ask your
6    opinion.  I don't want to waste time further.
7             So let's move on to Exhibit 411,
8    please.  This will be quick.  There we go.
9             So, well, this is a calendar invite
10   from Miss Darcy to a number of Corps of Engineers
11   individuals, and I see it references you.  So I'm
12   going to ask you about this.
13            And she's inviting everybody, the
14   recipients, required attendees includes yourself,
15   and the subject on the calendar invite is DAPL
16   meeting with DOI.
17            Is that the Department of the
18   Interior?
19       A.    Yes, that would refer to the
20   Department of the Interior.
21            MR. SEBY:  Rachel, if we could go to
22   the next page, please.  There we go.
23       Q.    So the meeting date is September 6,
24   right.
25            Do you see that?

Page 167

Crook

1
2        A.    Can you make it a little bigger,
3    please.  Yes, thank you.
4             That's what it appears to show, oh,
5    yes.
6        Q.    Okay.
7             And that address that's on that the
8    location, DOI 1849 C Street Northwest, that's the
9    Department of Interior headquarters, is it not?
10       A.    Yes, that is the address of the
11   Department of Interior Headquarters.
12       Q.    Okay.
13            And I look at the required
14   attendees, and I don't see any Department of
15   Interior individuals copied on this.
16            Do you?
17       A.    No, I don't.
18       Q.    So who did you meet with?
19       A.    This would have been the time period
20   and -- of the meeting I referred to earlier with
21   the Department of the Interior and
22   representatives from the Department of Justice.
23       Q.    So it was a Department of Interior,
24   DOJ and Assistant Secretary Darcy and you
25   meeting?

Page 168

Crook

1
2        A.    And, again, Craig Schmauder may have
3    joined as well.
4        Q.    Sure, also from the Corps.
5        A.    And Colonel Vale, who is, you know,
6    the uniform staff assistant in the office at the
7    time tended to accompany Miss Darcy, Assistant
8    Secretary Darcy when she went to meetings off
9    site.
10       Q.    So Miss Darcy sent the calendar
11   notice to you and these other individuals from
12   the Corps.
13            Who requested the meeting?
14       A.    I don't recall who requested it.
15            MR. SEBY:  If you scroll down,
16   please, Rachel, to the bottom of this, right
17   there.  That's adequate.
18       Q.    There's a note attached to the
19   calendar invite that Miss Darcy appears to have
20   cut and pasted into the calendar invite and it's
21   from Molly Click.
22            Do you see that?
23       A.    Yes.
24       Q.    And it says special assistant to
25   Secretary Jewell.

Page 169

Crook

1
2        That's the Secretary of the United
3    States Department of Interior?
4        A.    Yes, she was secretary at the time.
5        Q.    Why is that on here?
6             MS. ZILLOLI:  Objection.  Calls for
7    speculation.
8        Q.    It's a question.
9        A.    Molly Click, this refreshes my
10   recollection, I mean, she worked for Secretary
11   Jewell at the time.
12       Q.    Okay.
13            Do you think Secretary Jewell and
14   Miss Darcy collaborated on setting this meeting
15   up on September 9, 2016?
16            MS. ZILLOLI:  Objection.
17   Speculation.
18       A.    You know, this refreshes my
19   recollection.  I want to go back and correct
20   something that I said earlier.
21       Q.    Sure.
22       A.    This appears to be a meeting with
23   legal representatives of the energy transfer
24   partners and not a meeting that I was thinking of
25   with the Department of Justice and the Department

Lowry Crook
May 26, 2022

Page 170

Crook

1        Crook
2   of the Interior.
3        Q.    Are you sure about that?
4        A.    Can you, sorry.  My screen is sort
5   of blocking some of the text of the email.  Can
6   you scroll down a little bit.  Okay.
7        Yes, I believe this is referring to
8   a meeting that we had with representatives of
9   Energy Transfer Partners at the Department of the
10  Interior.
11       Q.    Okay.
12       If we could go to Exhibit 412 and
13  the attachment to the exhibit, please.
14       Please read the next page, which is
15  just a short email, again, from Lieutenant
16  Tedeschi sending to Miss Darcy and you among
17  other cc groups: "Ma'am, here's the latest Corps
18  storyboard for the DAPL issue."
19       The DAPL storyboard according to
20  this email is dated September 6th.
21       Do you see that?
22       A.    Yes.
23       Q.    Okay.
24       And then if we go to the storyboard
25  itself, it's dated, indeed, September 26, 2016,

Page 171

Crook

1        Crook
2   and if we look at the storyboard broken into
3   three sections.
4        The first one is the situation and
5   the next one is, well, the situation talks about
6   the protests apparently as of September 6th, the
7   protest is an approximate size of 1500 people
8   camping on Corps property in protest of the
9   Dakota Access Pipeline, and then in the section
10  below that called last 72, I think the Corps is
11  referring to the last 72 hours.
12       Would you agree with me?
13       A.    Okay, yes, that would be the last 72
14  hours.
15       Q.    Thank you.
16       And if we look at the bullets under
17  the last 72 hours section, it notes bullet number
18  3 "That the tribe, Standing Rock Tribe, filed a
19  request for a temporary restraining order.  A
20  hearing was set and they want to halt
21  construction.  Is there a requested relief?"
22       The Corps did not take a position on
23  the TRO, and then the fifth bullet, the Northwest
24  District has not, and not is in full capitol
25  letters, do you see that, has not issued a

Page 172

Crook

1        Crook
2   special use permit for the camps pending
3   additional needed information from the SRST
4   regarding the size of the crowd, precise
5   locations and liability insurance.
6        Do you see that?
7        A.    Yes.
8        Q.    Okay.
9        So do you have any reason to dispute
10  that what this says is not accurate?  There was
11  no special use permit because there were
12  questions that persisted in terms of the Standing
13  Rock's application?
14       Do you agree with me, that's what it
15  says?
16       A.    I have no reason to dispute that.
17       Q.    Okay.
18       So Exhibit 413, please.  Would you
19  skip this email.  It's a series of emails you've
20  exchanged.  I think it started with one you were
21  sent from Miss Tara Billingsley, who by her
22  signature block identifies herself as Special
23  Assistant to the President, the White House.
24       Do you see that at the very bottom?
25       A.    I don't see it yet.  I know that she

Page 173

Crook

1        Crook
2   was.
3        Q.    Do you see that?
4        A.    Yes.
5        Q.    "Hi, Lowry, can you tell me how
6   Senator's Heitkamp's office is being informed of
7   this afternoon's announcement?"
8        And the date of Miss Billingsley's
9   email to you from the White House, Special
10  Assistant to the President of the United States
11  is dated September 9.
12       Do you see that?
13       A.    Yes.
14       Q.    And she says this afternoon's
15  announcement.
16       Just -- it's not a trick.  I'm going
17  to have you read the whole thing but, at this
18  point, do you recall what the September 9,
19  afternoon announcement is?
20       A.    Yes.
21       Q.    Okay.
22       So let's keep going then up the
23  chain.  You responded to her, and I think this
24  flow of emails just asking how Senator Heitkamp,
25  who is at the time a United States Senator from

Lowry Crook
May 26, 2022

---

Page 174

```
1                    Crook
2   the State of North Dakota, correct?
3        A.    Yes.
4        Q.    I think the White House from the
5   Office of the President is just asking how she
6   got briefed on the September 9th announcement
7   that we'll talk about here in a moment, right?
8        A.    Yes.
9        Q.    Okay, if we could go to, please,
10  Exhibit 414.  Next, page, please.
11              MR. SEBY:  If you could scroll down
12  to so that Mr. Crook can read the very beginning.
13       Q.    So this is from the office of public
14  affairs, and do you happen to know what office of
15  public affairs this is coming from?
16       A.    Let me finish reading this.  Just a
17  sec.
18              Where do you see department of
19  public affairs?  Is it down lower?
20       Q.    Yes, very bottom, sir.
21       A.    Okay.  I believe that that's the
22  Department of Justice Office of Public Affairs.
23       Q.    Okay.  This is the statement, the
24  joint statement.
25              Do you need to read it?  If so, take
```

---

Page 175

```
1                    Crook
2   a moment and do it.  It's dated September 9,
3   immediate release, 2016, joint statement from the
4   Department of Justice, the Department of Army,
5   Department of the Interior.
6        A.    If you're going to ask me questions
7   about specifics in it, then I'd like to read it.
8        Q.    I'm suggesting that you do it.  I'm
9   just asking.
10       A.    Okay.  Great.
11       Q.    I'm introducing what it is we're
12  talking about.
13       A.    Perfect, okay.  Can you scroll up a
14  little bit.  Okay.  Can you scroll up a little
15  bit more, please.  Just scroll up a little bit
16  more.  The way our screen is set up it's
17  blocking.  Thanks.  Okay.
18       Q.    Okay.
19              Does this look like the official one
20  to you?
21       A.    It does look like the announcement
22  that I recall.
23       Q.    Okay.
24              And so you're forwarding it on after
25  it's been sent to Senator Heitkamp from North
```

---

Page 176

```
1                    Crook
2   Dakota, right?
3        A.    I think I forwarded it to her staff
4   member Tracy.
5        Q.    Yes, yes, sure enough.
6              And, in fact, your statement to Miss
7   Sutton, Tracy Sutton, "We wanted to make you and
8   the senator, make sure you and the Senator had a
9   copy of the administration's statement."
10             Do you see where you said that?
11       A.    Can you scroll up?  I can't see my
12  email right now.
13       Q.    You bet.  We're getting there.
14  Right there.
15       A.    Yes.
16       Q.    The administration's statement on
17  the decision today, right?
18       A.    Yes.
19       Q.    So you're letting her know that
20  that's the administration's statement and -- on
21  these issues.
```

So if we could go to the Exhibit
415. The email -- this exhibit is a chain of
emails.  It starts again with a daily DAPL
update, Mr. or colonel, Lieutenant Colonel

---

Page 177

```
1                    Crook
2   Tedeschi is sending up to madam secretary and
3   chief.
4              Actually, Tedeschi sends it to a
5   number of people in the Corps, including those
6   who authored it, Colonel Henderson and
7   Mr. Startzell and others, and Ed Jackson forwards
8   it up to madam secretary and chief; and that
9   email is the one where not only is the assistant
10  secretary of the Army for Civil Works,
11  Miss Darcy, copied but so is Chief of Engineers
12  General Semonite.
13             Now and it says, "Latest update,
14  have been working across the staff to help define
15  the way ahead.  Spoke with Brigadier General
16  Spellmon and Colonel Henderson regarding the
17  special use permit.  We will delay final decision
18  a few days."
```

And then Miss Darcy is the last, if
you go up to the top of that, do you see where
she says, she responds to the briefing and says,
"So has the special use permit been elevated to
our office?"

Do you recall that, Mr. Crook,
you're copied on the, actually, Miss Darcy is

---

Lowry Crook
May 26, 2022

Page 178

Crook

1
2  writing back just to you.  She's not replying all
3  to the group.  She's asking you and the lawyer
4  Schmauder has the special use permit been
5  elevated to our office.
6       A.    Yes, it appears she's just emailing
7  me and counsel.
8       Q.    Either you didn't respond at all by
9  email or your counsel didn't provide it to us.  I
10  don't know.
11            But do you recall what you said to
12  Miss Darcy in any fashion in response to her
13  question to you?
14       A.    I don't recall this specific email
15  or this specific question.  I just generally
16  recall that there was discussions about the
17  special use permit during this time period.
18       Q.    You don't -- do you recall not
19  responding or responding some other way?
20       A.    I recall.
21       Q.    I have to assume --
22       A.    I recall there was some verbal
23  discussion around this time period, so, but I
24  don't recall specifically whether or how I
25  responded by email.

Page 179

Crook

1
2            I more recall verbal discussions of
3  these issues then other than the reports you're
4  showing me a lot of emails back and forth.
5       Q.    I'm just showing you your own email,
6  Mr. Crook.
7       A.    Yes, I'm just saying I don't
8  specifically recall this email or whether I
9  responded.
10       Q.    Were you in the habit of not
11  responding to your boss when she asked a specific
12  question?
13       A.    No, but sometimes I would respond in
14  person rather than by email.
15       Q.    Okay.
16            Do you recall what you responded to
17  her, your boss, in person on this request, which
18  seems to be a big deal.  I'm just wondering
19  whether your answer, your testimony is what?
20       A.    My testimony is that I recall
21  generally discussing this issue, but I don't
22  recall my specific response to this specific
23  question.
24       Q.    Could we go to, and let's just
25  remember what date Miss Darcy posed this question

Page 180

Crook

1
2  to you, right, Monday, September 12, 2016, 5:28
3  p.m.  Hold that thought.  We're going to go to an
4  exhibit, which is 416.
5            So if you would, please, read the
6  entirety of this email, not the attachments.
7            The attachments say pleading.  It
8  happens to be the emergency motion for in
9  junction pending appeal, filed by the Standing
10  Rock Sioux Tribe among others, challenging the
11  Corps of Engineers.
12            We're not going to talk about that,
13  so don't feel like you need to read that
14  document.  It's immaterial to the questions I
15  want to ask you.
16       A.    Okay.
17       Q.    So if you would read the body of the
18  email, which is a forwarded message to you,
19  pardon me.  You received this message, which was
20  September 13, 2016, from Sam Hirsch and the
21  environment natural resource division of the
22  Justice Department, and it's sent to a number of
23  people, and including your counsel today, Miss
24  Zilloli and yourself are among the parties copied
25  here.

Page 181

Crook

1
2            If you look two-thirds of the way
3  down this lengthy distribution list and the to
4  line you're noted.
5            And then we know you got it because
6  you forwarded it on to Ed Jackson, and the
7  attachment references the Standing Rock Sioux
8  Tribe motion for an injunction pending appeal,
9  but the email from Mr. Hirsch to you and a large
10  number of others, includes an interesting -- it's
11  an update from Mr. Hirsch to this group, a few
12  updates.
13            The first one is about the filing by
14  the tribe in the federal court in Washington,
15  D.C., and it says finally here's an exchange
16  from yesterday's White House press briefing.
17            Would you take a moment and review
18  that.  I know you've seen this before, just to
19  refresh yourself.
20       A.    Okay.  Okay.  Can you scroll down.
21  Okay.
22       Q.    What is this an exchange from the
23  press briefing?  Is this -- do you know an
24  individual named Mr. Earnest?
25       A.    That's referring to Josh Earnest,

181:22-
182:3,
182:20-
184:16
401-
402,
602

Lowry Crook
May 26, 2022

Page 182

1                        Crook
2    who was the press secretary for the White House
3    at the time.
4        Q.      So this would have been an in-person
5    briefing conducted in the White House press room?
6        A.      It appears to me to be a transcript
7    of a regular White House press briefing.
8        Q.      It would have occurred in the White
9    House press briefing room; is that fair?
10       A.      Yes.
11       Q.      So Mr. --
12       A.      As the agent really did.
13       Q.      Okay.
14               Mr. Earnest, the White House press
15   secretary, is being asked questions I presume
16   from reporters in the press briefing room; is
17   that fair for the context?
18       A.      That's what it appears to me to be,
19   yes.
20       Q.      And this email is dated
21   September 13, 2016.
22               The question that comes from a
23   reporter in the room, it's only identified by a
24   Q, "Let me ask you, Mr. Earnest, about the
25   pipeline project.  I think it surprised some

Page 183

1                        Crook
2    people that the administration would weigh in
3    after a judicial review had taken place and this
4    is a pause from what I understand.
5               "Can you explain why the President
6    and through the other agencies decided that this
7    was the right decision," and I -- you tell me but
8    it seems as though the question is based upon the
9    September 9th joint statement by what you just
10   testified is the administration's position.
11              Do you agree with me on that, sir?
12       A.      I agree that I referred to it as the
13   administration's statement because it was coming
14   from multiple agencies, and, I'm sorry.  What was
15   the second part or the other part of your
16   question?
17       Q.      The question was the reporter is
18   asking the White House press secretary why the
19   President and through the other agencies decided
20   that this was the right decision.
21              It seems to me that the reporter is
22   understanding that the September 9 joint release
23   is exactly how you characterized it, the
24   administration's position.
25              The administration being that

ND OBJ.:
Relevance

Page 184

1                        Crook
2    belonging to the President of the United States
3    at the time Mr. Obama.
4               MS. ZILLOLI:  Objection,
5    speculation.  Is there a question in it.
6        Q.      Do you disagree with anything I
7    said, Mr. Crook?
8        A.      Yes.
9        Q.      You do disagree?
10       A.      I don't -- the basis of the
11   reporter's assumption that the President decided.
12   I don't know what was shared and not shared with
13   the President, and I believe Mr. Earnest's
14   response is more consistent with my recollection
15   of events then the reporter's assumption, the
16   assumption in the reporter's question.
17       Q.      Okay.
18              And Mr. Earnest goes on to say,
19   "Well, this was a decision that was made by the
20   Army corps of engineers and the department of it
21   interior," right?
22       A.      Yes.
23       Q.      And then he goes on to say at the
24   end of that response, "So it really was based on
25   their judgment at the Department of the Interior

Page 185

1                        Crook
2    and the Army Corps of Engineers."
3               Mr. Earnest left off the Department
4    of Justice, which is, obviously, on the joint
5    statement but -- so the decision made by the Army
6    Corps of engineers, who in the Army Corps of
7    Engineers made the decision to join that
8    statement?
9        A.      So I would -- I would say that
10   people often confuse the Army Corps of Engineers
11   and the Department of the Army at large; and so
12   if I was making that statement, I would refer to
13   the Department of the Interior, the Department of
14   the Army and the Department of Justice.
15       Q.      Yes, but that's not what the White
16   House press secretary said, is it?
17       A.      No.
18       Q.      Okay.
19              So who made the decision in the
20   Department of the Army/Corps of Engineers to join
21   this because the White House secretary is either
22   wrong or correct that someone in the Department
23   of the Army, at what level I don't know, and I'm
24   asking you, who made the decision?
25       A.      The decision was Assistant Secretary

Lowry Crook
May 26, 2022

```
1                    Crook
2      Darcy's.
3      Q.    Thank you.
4            And then with respect to the
5  decision that was made by the Department of the
6  Interior, who made the Department of Interior
7  decision to join the September 9th statement?
8            MS. ZILLOLI:  Objection,
9  speculation, foundation.
10     A.    I don't know who made the decision.
11 I just know who I recall who communicated it to
12 me.
13     Q.    And who was that?
14     A.    Tommy Boudreau, the chief of staff.
15     Q.    Tommy Boudreau the chief of staff of
16 the secretary of the interior, Miss Sally Jewell?
17     A.    Yes.
18     Q.    Okay.  All right.
19           If we could go, please, to Exhibit
20 417.
21     A.    I'm going to need to take a break
22 soon.  It doesn't have to be after this but just.
23     Q.    I'm sorry.
24           Who's speaking?
25     A.    I'm sorry.  That's me.  I said I
```

```
1                    Crook
2  need to take a break relatively soon.
3      Q.    Can we get through this exhibit and
4  then take a break?
5      A.    Yes.
6            MR. SEBY:  Miss Zilloli?
7            MS. ZILLOLI:  That's fine with me.
8            MR. SEBY:  Okay.  Thank you both.
9      Q.    If we could turn to 417 and go right
10 to the body of the document, there is three
11 emails here.  Easy to get through them though
12 because your counsel has redacted them, and I
13 don't see any lawyers on here either but that's a
14 different issue for another time that we have
15 content of federal emails with no attorneys
16 present that's been chopped off from the state's
17 view.
18           So we'll take that up with court,
19 but let's go right to the top of the last email
20 in this chain; and, Mr. Crook, the last email in
21 this chain is from Major General Jackson to you.
22 Nobody else on the email and it says to you from
23 Ed Jackson, I'm going to tell you I've learned
24 that FYSA means for your situational awareness;
25 is that right?
```

```
1                    Crook
2      A.    Yes.
3      Q.    And it says, "In answer to the
4  questions you had last night, i.e, has the tribe
5  been consulted on the new plan and how might the
6  move from one site to the other be managed?"
7  Redacted, again, you're a lawyer but you're not
8  here in the capacity as providing legal advice,
9  so I continue to be puzzled by this extensive
10 redaction but oh, well.
11           My question is about what little we
12 have been allowed to see, and that is, you asked
13 the question.
14           Jackson is recounting it to you and
15 says, "What this email chain belows says it
16 answers your question," which was, "Has the tribe
17 consultant been consulted on the new plan?"
18           What is the new plan?
19     A.    Can I see Colonel Henderson's email
20 that was supposedly answering my question?
21     Q.    Yeah, you bet; you bet.  What little
22 there is to read because it's been chopped, too.
23     A.    Can you scroll up a little bit.  The
24 way our screen is set up it is cutting off part
25 of it.  Okay.  Thanks.
```

```
1                    Crook
2      Q.    Okay.
3      A.    I'm sorry.  Can I see General
4  Jackson's whatever there was of his question to
5  Colonel Henderson, if you scroll down.  Oh, okay.
6  Thank you.
7      Q.    Do you see my point, Mr. Crook, not
8  much to read because it's been chopped.  All
9  right.
10           So have you read the entirety of
11 what we can read out of this email stream?
12     A.    Yes.
13     Q.    Do you recall it before it was
14 redacted by your counsel?
15           MS. ZILLOLI:  Objection to the
16 extent you're asking for the content of something
17 that we have redacted.  He's not authorized to
18 provide that.
19     Q.    That wasn't my question.  So let's
20 keep moving on, please.
21           Do you recall receiving this email?
22     A.    This refreshes my recollection.  I
23 didn't recall it before.
24     Q.    Okay, good.
25           So you didn't get Colonel
```

Lowry Crook
May 26, 2022

Page 190

Crook

1                        Crook
2    Henderson's email.  You weren't in the
3    distribution.  Jackson was and so is Scott
4    Spellmon, General Spellmon, and Miss Auguliera.
5            So ever since talking about a
6    conversation he had with Chairman Archambault,
7    and he said "Explained our limitation for
8    providing a permit in the area north of
9    Cannonball."
10           Do you recall what that limitation
11   was?
12       A.     Not specifically no.  I just recall
13   that Colonel Henderson was working to try to get
14   the protest moved south.
15       Q.     The whole thing?
16       A.     Yes, I mean, that was -- his
17   intention was to try to do that.
18       Q.     But he's telling the chairman who
19   applied for a permit including areas on the north
20   side of the Cannonball River because, Mr. Crook,
21   the Oceti Sakowin Camp otherwise referred to as
22   the main camp was located there.
23           So what's the limitation for
24   providing a permit, at least in your colleagues
25   at the chorus bind, what was the issue there?

Page 191

Crook

1                        Crook
2        MS. ZILLOLI:  Objection.
3    Speculation.
4        A.     I don't recall or I don't know what
5    was in Colonel Henderson's mind, and I don't
6    recall what he's referring to when he uses the
7    word "limitation."
8        Q.     Okay.
9            And then Henderson goes on to say,
10   "We told him about that and we talked about the
11   issues to discuss the issue in the south with
12   caveats, which lead us to discussing a number of
13   concerns with activities that we are now seeing
14   on site."
15           What does that mean to you, sir?
16       A.     I guess it means what it says.
17       Q.     Okay.
18       A.     Is there a piece of it that you are
19   specifically asking about?
20       Q.     No, if it means what you said, you
21   don't disagree with it I guess is what you're
22   saying.  I'm just trying to understand what your
23   thought is on this.  Let's move on.
24       A.     Okay.
25       Q.     So Major Jackson, General Jackson is

Page 192

Crook

1                        Crook
2    saying to you, just you, "This answers your
3    questions you had last night.  Has the Prime been
4    consulted on the new plan?"
5            So why did you ask that question,
6    Mr. Crook, on September 14, 2016?
7            Remember that date because we will
8    talk about why I want to ask you about it
9    further.  Just remember September 14.
10       A.     Okay.
11       Q.     So let's carry on here.  I don't
12   want to keep stumbling.
13           So then on -- 419, please, which, if
14   you look at the cover email, it's a call with
15   Standing Sioux Tribe general counsel, and this is
16   on the calendar of Miss Jo-Ellen Darcy, assistant
17   secretary to the Army, and you were an invitee to
18   participate in this call along with other
19   individuals from the Corps; and the subject of
20   the call that you're noted as a required attendee
21   is call with Standing Rock's Sioux Tribe's
22   general counsel.
23           And the calendar invite says down
24   below, and, yes, it has been redacted and I
25   understand that because Mr. Schmauder's on here,

Page 193

Crook

1                        Crook
2    but we can see "I just spoke with Bill Perry's,
3    the tribe's general counsel here in D.C.  He said
4    that the Standing Rock Sioux tribe will be in
5    town next Thursday and Friday, September 22 and
6    23, and would like to meet then with the three
7    agencies in person.  Perry would join him and the
8    chairman wants a conference call this week."
9            That's Miss Darcy speaking, isn't
10   it?
11       A.     Actually, I don't know that.
12       Q.     She's identified as the organizer.
13       A.     Yes, yes, but that could have been
14   cut and pasted from the Department of Justice or
15   someone else.  I don't know if that's her.
16       Q.     I see.
17           In fact, it says thanks, Sam.
18           Who's that?
19       A.     I believe that's Sam Hirsch.
20       Q.     So Miss Darcy is -- got it; got it.
21           So the DOJ lawyer got a call from
22   the tribe's general counsel and --
23       A.     I don't know that.  I'm just saying
24   that I don't know also that that text was written
25   by Assistant Secretary Darcy or him.

Lowry Crook
May 26, 2022

Page 194

Crook

1                         Crook
2      Q.     Okay.
3             Did you go to this meeting?  I'm
4   sorry.  It's a call.
5             Did you participate in this call?
6      A.     I don't specifically today remember
7   a call.  I do remember an in-person meeting that
8   happened.
9      Q.     When?
10     A.     I believe it was during this time
11  period.  It may be one of the days that was
12  provided there.
13     Q.     What did you talk about?
14     A.     This was a meeting at the justice
15  department, and the chairman, I think, shared his
16  view of the protests and what was happening
17  there, the status of any discussions or lack of
18  discussions between the tribe and Energy Transfer
19  Partners; and I believe we asked some questions
20  about exploring whether there was some sort of
21  compromise with Energy Transfer Partners that
22  could help resolve the situation.
23     Q.     Did you have any manner of
24  discussion regarding the special use permit?
25     A.     I don't recall whether it was

Page 195

Crook

1                         Crook
2   discussed or not.
3      Q.     Really.
4             At all?
5      A.     No, I don't.
6      Q.     I asked, Mr. Crock, because it was
7   precisely in this week of September 2016 that the
8   Corps issued a press release announcing the Corps
9   had issued a special use permit and granted a
10  special use permit.
11            I know you're aware of that, aren't
12  you?
13     A.     Like I said, I don't remember the
14  specific status of the special use permit.  Just
15  that it was, you know, an issue that we were
16  discussing, but I don't remember the specifically
17  timing or status of the permit.
18     Q.     Or discussing it at this meeting, at
19  the Department of Justice is what I understood
20  you to have said?
21     A.     Right.  I don't recall whether it
22  was discussed or not at this meeting.
23     Q.     Okay.
24            If we could keep moving along to --
25            MS. ZILLOLI:  I'm sorry.  Mr. Seby,

Page 196

Crook

1                         Crook
2   I think Mr. Crook asked for a break.
3             MR. SEBY:  Sure did.  My apologies.
4   Let's take a break now.
5             MS. ZILLOLI:  Thanks.
6             MR. SEBY:  Mr. Crook, how much time
7   would you like?
8             THE WITNESS:  A few minutes.
9             MR. SEBY:  Let's take 10.
10            THE VIDEOGRAPHER:  We're off the
11  record 7:39 p.m. UTC.  3:39 Eastern.
12            (A break from the record was taken.)
13            THE VIDEOGRAPHER:  Back on the
14  record 7:51 p.m. UTC., 3:51 Eastern.
15     Q.     Mr. Crook, if we could refer,
16  please, to Exhibit 420.  Just by way of
17  introduction, this is another one of those
18  covers.  Well, here's the email transmittal.
19            It's from Miss Jennifer Greer to
20  General Jackson and you and Ms. Darcy, copy to
21  others and the email simply
22  reads,"Gentleman/Ma'am, please see the attached,"
23  and the attached is a referenced North Dakota
24  delegation letter to DOG, DOI, Army Corps, re:
25  Dakota Access Pipeline line, and there is the

Page 197

Crook

1                         Crook
2   letter.
3             Do you recall this letter, Mr. Crook
4   or would you like to read it?
5      A.     Give me a chance to read it, please.
6      Q.     You bet.  That's what I'm
7   suggesting, if you have not.
8             The letter is addressed from United
9   States Senator John Hoeven, United States Senator
10  Heidi Heitkamp, United States Congressman Kevin
11  Cramer and the Governor of the State of North
12  Dakota, Jack Dalrymple, all on the letterhead of
13  this letter dated September 14, 2016 to Loretta
14  Lynch, the Attorney General of the United States,
15  Sally Jewell, the Secretary of the Department of
16  the Interior and Jo-Ellen Darcy, the Assistant
17  Secretary for the Army of Civil Works.
18     A.     Okay.  Can you scroll down, please.
19  Can you scroll down a little bit more, please.
20  Okay.  A little bit more, please.  Okay.  And a
21  little bit more, please.  Okay.
22     Q.     Mr. Crook, do you remember this
23  letter?
24     A.     I do now.
25     Q.     Okay.

197:8-17,
197:22-198:8,
200:3-17,
201:15-21,
203:4-9,
204:2-12

401-402,
802

Lowry Crook
May 26, 2022

Page 198

```
              Crook
1
2            Do you recall the entire
3   congressional delegation and the Governor of
4   North Dakota expressing strong concern about the
5   September 9th joint statement that we've been
6   talking about?
7       A.    I recall that this letter was sent
8   and it does use the word "strong concerns."
9       Q.    And it goes on to say, and, in fact,
10  in bold in their letter to Miss Darcy is a
11  statement that says, "As a result of your delay,
12  North Dakota is experiencing a strain on its law
13  enforcement resources.
14            "The governor and tribal leaders
15  have requested assistance to help North Dakota
16  with its law enforcement efforts and to help with
17  public safety.  We urge you to follow through on
18  your joint release and begin immediately for cost
19  share reimbursement and manpower that will be
20  needed to support state and local law enforcement
21  as they continue to provide public safety."
22            Do you recall discussing this with
23  Miss Darcy?
24      A.    I recall discussing with her the
25  plans to set up a meeting, a briefing in response
```

Page 199

```
              Crook
1
2   to the letter.
3       Q.    And what was that discussion?
4       A.    I believe we ended up deciding to do
5   a call with the delegation and I believe for
6   scheduling reasons I was on the call and
7   Miss Darcy was not.
8       Q.    How did that go over?
9       A.    The call?
10      Q.    That fact that you were on the call.
11  I'm not suggesting you're not important, but this
12  letter was sent to Miss Darcy and she wasn't on
13  the call?
14      A.    Yes, I believe the call was me, Rita
15  Auguilar from DOJ, and I don't remember from the
16  interior department but --
17      Q.    Someone?
18      A.    I, frankly, don't recall anybody
19  complaining about who was on the call.  They were
20  more focused on the substance of their questions.
21      Q.    So what did you do to answer or
22  allay their concerns, if anything?
23      A.    I provided what information I could
24  or knew at the time in response to their
25  questions, and I also followed-up and shared
```

Page 200

```
              Crook
1
2   their request for additional federal resources.
3       Q.    Well, the September 9th joint
4   statement said, "DOJ and DOI will deploy
5   resources to North Dakota to help maintain public
6   safety."
7             What resources to maintain public
8   safety in North Dakota did the Department of
9   Justice provide?
10      A.    In addition to the U.S. attorney for
11  North Dakota who was there and whoever was on his
12  staff or team, I believe they sent a coordinator
13  from there.  I forget the name of the office, but
14  it's like, it's like a community response office,
15  or something like that, and I'm not aware of
16  other resources they may have or may not have
17  non-publicly provided, such as the FBI or others.
18      Q.    Did they?
19      A.    Did they what?
20      Q.    Did the FBI provide any resources?
21            MS. ZILLOLI:  Objection,
22  speculation, foundation.
23      Q.    I'm not asking him to speculate.
24      A.    I recall vaguely that there was some
25  involvement of FBI in some piece of this, but I
```

Page 201

```
              Crook
1
2   just don't recall specifically what or how much
3   or I don't think I ever knew any details of it.
4       Q.    I think you mentioned Miss Auguilar
5   was on the call you arranged with the delegation
6   and the governor.
7             What did Miss Auguilar say in
8   response to this letter from the State of North
9   Dakota highest elected officials?  Do you recall?
10      A.    I think she took the questions on
11  law enforcement support, and I believe she said
12  she would share those requests with the
13  Department of Justice, but I don't think she
14  responded substantively to the request or.
15      Q.    So you had a call to respond to a
16  letter that was very detailed, and you're telling
17  me that the DOJ got on the call with you and said
18  I'll listen to your questions and I'll get back
19  to you?
20      A.    Yes.  They didn't have an
21  announcement ready to make on that call.
22      Q.    When did you have the call?
23      A.    I don't know the specific date.  It
24  was at some point after this letter.
25      Q.    Obviously.
```

Lowry Crook
May 26, 2022

Page 202

Crook

1                          Crook
2             When?
3      A.    I don't recall.
4      Q.    Next day?
5      A.    I don't recall how much time passed
6   between receiving this letter and the call.  It
7   was probably more than a day, but I really don't
8   recall, you know, how much more it was.
9      Q.    Well, what did you say?  Did you
10  give the same I'll get back to you kind of
11  response?  Did you have anything material to say?
12            MS. ZILLOLI:  Objection.  Compound.
13     A.    If I recall the questions to me were
14  about our review process and, also, about the
15  broader tribal consultation and whether they were
16  related, and I provided what information I could
17  on where we were in the review process and, also,
18  answered questions clarifying that the broader
19  tribal consultation was separate from our process
20  reviewing the permits and DAPL that had been
21  done.
22     Q.    And what did the representative from
23  the Department of the Interior have to say?
24     A.    I don't recall who from Department
25  of the Interior was on the call or what they

Page 203

Crook

1   said.
2      Q.    Okay.
3      Q.    Why didn't Miss Darcy make a point
4   to be on a call with two United States senators,
5   a United States congressman and a governor of the
6   State of the United States.
7            Why couldn't she be on the call?
8      A.    I don't remember what the issue was.
9      Q.    Did she choose not to be on the
10  call?
11     A.    I don't know what -- a, I don't know
12  why she wasn't on the call, so I don't know.  I
13  don't recall what her thinking would have been.
14            I communicated directly with the
15  delegation numerous times and met with them in
16  person numerous times about these issues.
17            So it was not surprising to me that
18  I would be the one talking to them.
19     Q.    Well, the last sentence of the
20  letter from the two United States senators,
21  United States congressman and the governor of the
22  state of the United States, in the United States,
23  says, "Thank you for your attention to this
24  matter and we look forward to hearing from you."

Page 204

Crook

1                          Crook
2            And so in response to that letter to
3   those gentlemen and not a one of the addressees
4   could be bothered to be on the call to discuss
5   it; is that accurate?
6            MS. ZILLOLI:  Objection.
7   Argumentative.
8      Q.    What's the answer, Mr. Crook?
9      A.    On the call immediately after or
10  after this letter, Assistant Secretary Darcy was
11  not on it.  The attorney general as not on it,
12  and the secretary of interior was not on it.
13     Q.    I think we know that.  You've
14  already said that.  So let's move on to Exhibit
15  421.
16            Mr. Crook, if you'd please look at
17  the email chain that's here.  It's two emails and
18  there is an attachment we will get to.  It's a
19  September 14 storyboard and are update from the
20  Corps with regard to the DAPL situation.
21            The email is dated September 14,
22  2016.
23            Remember when I spoke a moment ago
24  with you about remembering this week in September
25  when you said --

204:2-
12
611

ND OBJ.:
As to
204:6-7,
Relevance

Page 205

Crook

1                          Crook
2      A.    Yes.
3      Q.    -- you were talking with the
4   chairman of the Standing Rock Sioux tribe.  In
5   fact, you met with him.
6            Here in the email, the first email,
7   again, this looks like Colonel Tedeschi is tasked
8   with sending up these daily reports.  He sends it
9   to major General Jackson and Miss KDA.  This time
10  he doesn't include the Assistant Secretary Darcy
11  on it and doesn't include you, but it's forwarded
12  on from Jackson to Miss Darcy and Chief Semonite
13  and copied to you, and if you take a look at
14  Tedeschi's email, there's an attachment that I
15  would like to go to, which is the Corps
16  storyboard.
17     A.    Could I read his email first?
18     Q.    Yeah, sure, of course.
19     A.    Thank you.  Can you scroll up a
20  little bit.  Not quite that far.  Thanks.  Okay.
21     Q.    Are you done with the email?
22     A.    Yes.  Thank you.
23     Q.    Okay.  Now we'll go to the
24  attachment.
25            So in this site, siterep, DAPL

Lowry Crook
May 26, 2022

Page 206

Crook

1
2  siterep dated September 14, 2016, in the
3  Northwest commander's assessment, this is --
4  that's Omaha, Omaha District commander's
5  assessment says, second sentence, "We will
6  continue to dialogue regarding the specialty use
7  permit to provide a unified response to the
8  SRST's request.  The special use permit and a
9  draft press release will be available for
10  vertical review on Thursday, 15 September before
11  publishing it on Friday, 16 September."
12         Do you see that?
13     A.    Yes, I do.
14     Q.    Okay.
15         And then in the section, sections of
16  the headings on the right side it says next 72
17  hours.  First bullet is draft special use permit
18  for DA, DOJ, BAI/DOI, U.S. Attorney office and
19  FBI review.
20         Who is DA?
21     A.    Department of the Army.
22     Q.    Okay.
23         And you see all the other agencies.
24     So you -- whose idea was it to get
25     the DOJ to look at a draft Corps special use

**206:24-207:12
602**

Page 207

Crook

1
2     permit and have the Department of the Interior
3     look at it and a U.S. Attorney's office and the
4     Federal Bureau of Investigation?  Whose idea was
5     that to have a Corps special use permit reviewed?
6         MS. ZILLOLI:  Objection,
7     speculation, foundation.
8     Q.    Do you know, Mr. Crook?
9     A.    No.  I just know that Colonel
10     Henderson was coordinating at the local level
11     with agency counterparts but I don't know the
12     specifics of it.
13     Q.    He mentioned in the email many just
14  read and asked to read, which I'm glad you did,
15  you saw Colonel Henderson's statement was a
16  vertical review.
17         Isn't that within the Corps itself?
18     A.    It can include also the Department
19  of the Army, just depending on what they're
20  referring to or it can just be the Corps going up
21  to headquarters.
22     Q.    So, in your experience, Mr. Crook,
23     being a principal deputy assistant secretary of
24     the Army for Civil Works, how many special use
25     permits did you see get referred outside of the

**ND OBJ.:
Relevance**

Page 208

Crook

1
2     Corps to the Department of Justice, the
3     Department of Interior, the U.S. Attorney's
4     Office and the FBI?  How many?
5     A.    I don't think I looked at another
6     special use permit when I was in the Army.
7     Q.    Ever?
8     A.    Not that I recall.
9     Q.    Why was that?
10     A.    Because generally a special use
11     permit is issued at the district level.
12     Q.    So this was not an ordinary special
13     use permit, was it?
14     A.    No.
15     Q.    By this time, Mr. Crook, had you
16  become, had you made the effort to become
17  personally aware of the content of the Corps of
18  Engineers land use regulations?
19     A.    As I said before, it was only part
20  of discussions where that would have been
21  discussed and I may have seen reports that, you
22  know, reference them if they were relevant to
23  what was being reported.
24     Q.    So as of this date, Mr. Crook,
25  September 14, 2016, how long had you been in your

Page 209

Crook

1
2  position with the Department of Army?
3     A.    A little over a year.  13 months.
4     Q.    And when this period was occurring,
5  had you been provided with opinions written or
6  verbal with respect to the requirements or
7  processes governing the Corps management of its
8  lands?
9     A.    Those were probably part of
10  discussions generally on the special use permit
11  and the protests.
12     Q.    Is that a yes or a no to my
13  question?
14     A.    That's a -- I believe there were
15  references to the governing regulations but I
16  don't remember specifically what was discussed.
17     Q.    I'm going to ask my question one
18  more time and I hope maybe this helps you answer
19  it.
20         Had you been provided with opinions
21  or positions with respect to the application of
22  the Corps special use regulations with respect to
23  this application by the Standing Rock Sioux
24  Tribe?
25     A.    I was part of meetings where the

Lowry Crook
May 26, 2022

Page 210

Crook

1
2  lawyers expressed opinions on the legal governing
3  regulations.
4       Q.     And so I'm not asking you about what
5  those expressions of legal positions were from
6  your counsel.
7              But did you rely upon that in making
8  your decision whether to support or oppose the
9  issuance of a proposed special use permit?
10      MS. ZILLOLI:  Objection as to facts
11 or misstates testimony.
12      A.     I don't recall supporting or
13 opposing a special use permit.
14      Q.     So what were you doing, just
15 observing the process, principal deputy just
16 observing how things were flowing?
17      A.     I would say that one of my roles is
18 to make sure that the proper information is being
19 shared.  So I wasn't just observing but I wasn't
20 the one deciding either.
21      Q.     Who was the one deciding, Mr. Crook?
22      A.     Generally, the decision is the
23 district commander.  Depending on what the
24 decision is, it could go up to division or
25 headquarters or the assistant secretary.

Page 211

Crook

2      Q.     Who made the decision with respect
3  to this particular request for a special use
4  permit?
5       A.     I believe that Colonel Henderson was
6  making the decision but was keeping his vertical
7  chain through the Corps and assistant secretary
8  and fellow agencies informed of what the decision
9  is.
10      Q.     Why did you have to have an unusual
11 process when your answer is, despite that usual
12 process, Henderson made the decision by himself;
13 is that really what you're saying?
14      A.     I would say that Henderson made the
15 decision after consultation from the group that I
16 just described.
17      Q.     And what was the nature of that
18 consultation, a direction to Colonel Henderson to
19 take a specific action or thanks for telling us,
20 good luck.  Let us know what you decide?
21      MS. ZILLOLI:  Objection to the
22 extent it asks for speculation.
23      A.     I don't think it was either
24 direction or him deciding alone.
25              I think there was a dialogue with

Page 212

Crook

1
2  people trying to understand what the decision was
3  going to be, what potential ramifications were,
4  what the response on the ground would be.  I
5  think people were just wanting to understand how
6  they were thinking about the potential
7  consequences of any move in this area.
8       Q.     What does that mean?
9              I'm not sure I even understand what
10 you said.
11      A.     I think there were discussions about
12 the decisions on the special use permit and its
13 potential consequences.
14      Q.     How did those relate to a decision
15 unless you're telling me that nobody else
16 participated in the decision and it was
17 exclusively made by Colonel Henderson,
18 notwithstanding all of the Corps storyboards we
19 just read that talk about it being above his
20 position?
21      MS. ZILLOLI:  Objection.  Misstates
22 evidence.
23      A.     I think that there was a desire by a
24 lot of levels and agencies to be informed and be
25 consulted, but we also tried to preserve the

Page 213

Crook

1  Corps uniform offices decision space and
2  authority.
3       Q.     Okay.
4              Earlier there was an exhibit that
5  Miss Darcy asked "Has the special use permit been
6  elevated to our office," right?
7              Do you remember that?
8       A.     Yes.
9       Q.     And at the time when we went through
10 that, you didn't recall what the answer was or
11 you didn't recall how you responded to
12 Miss Darcy's question to you.
13              Now do you recall?
14      A.     I recall that -- well, I don't
15 recall it being formally elevated to our office.
16      Q.     Okay.
17              Maybe -- do you think Miss Darcy
18 will know all these answers to these questions
19 that you're not remembering?
20      A.     Y'all have to ask her.
21      Q.     Okay.
22              We will.  We will.  We're speaking
23 with her next week, so we'll let her know we're
24 asking questions because we haven't gotten an

Lowry Crook
May 26, 2022

Page 214

1                              Crook
2      answer yet, okay.
3              Can we go to Exhibit 123 or 423.  So
4      short email here.  Next page, please.
5                      What this is is Amy Gaskill, who's a
6      chief of public affairs for the Northwest
7      Division of the Corps.
8                      She is writing to Moira Kelly in the
9      Corps in your office.  Miss Kelly forwards it on
10     to you and says can we talk to you and attached
11     to that short email is a draft press release
12     regarding special use permit.
13                     Mr. Crook, do you remember receiving
14     this draft special use permit on September 15th?
15     A.      I mean, this refreshes my
16     recollection that I did receive a draft and that
17     I opened it.
18     Q.      Okay.  Good.  I'm glad.
19             So do you want to read this draft
20     press release that was sent to you?
21     A.      Please.  Can you scroll down,
22     please.  Okay.
23     Q.      Are you done reading the draft?
24     A.      Yes.
25     Q.      And at the very bottom of this draft

Page 215

1                              Crook
2      it says, "The following paragraph will be
3      included in the press distribution but not the
4      press release that is placed on the website," and
5      then it says, "Because the litigation process
6      involving the Army Corps of Engineers is ongoing,
7      we must refer all queries from the media to the
8      Department of Justice."
9              Do you see that?
10     A.      Yes.
11     Q.      So does that mean this would be a
12     Corps of Engineers press release?
13     A.      It appears to me that it was going
14     to be a press release from the Northwest Division
15     of the Army Corps of Engineers.
16     Q.      Okay.
17             So, Mr. Crook, on September 15th,
18     was this the first time you had heard of a press
19     release and the idea that the Corps would be
20     developing and issuing one in conjunction with
21     proposing a special use permit to the Standing
22     Sioux Tribe?
23     A.      I believe an earlier email you
24     showed me referred to a press release being
25     prepared.

Page 216

1                              Crook
2      Q.      Yes.
3              Did Miss Gaskill cook this draft up
4      on her own or did she have any input in terms of
5      what type of content to develop in a proposed
6      draft that she would then show to you?
7      A.      I don't know what she did in
8      drafting this.
9      Q.      Okay.
10             You don't know who contributed to
11     the ideas that are set forth in this draft press
12     release or do you?
13     A.      I don't other than, I mean, she has
14     quotes from Colonel Henderson, but I don't know
15     if she drafted those or those came from him.
16     Q.      Right.  Me either.
17             So let's take a lack at the
18     language.  You're an attorney.  Let's take a look
19     at the language that's in this draft press
20     release.
21             How did this language strike you?  I
22     know you read it so I don't want to ask you to
23     reread it.  So I want you to comment on the
24     phrasing that was used and how you reacted to it.
25             "Special use permit granted to

ND OBJ.: Introduces new material

Page 217

1                              Crook
2      Standing Rock Sioux Tribe.  Today the Army Corps
3      issued a special use permit."  Later, third
4      paragraph.  "The special use permit allows."
5              Those are words of finality,
6      wouldn't you agree with me?
7              MS. ZILLOLI:  Objection. legal
8      conclusion and Mr. Crook has testified that he
9      was not acting in a legal capacity.
10     Q.      I'm not asking for his legal
11     capacity then.
12             I'm asking as a person who utilizes
13     the English language on an everyday basis, do
14     those words seem accurate to you or a little
15     ahead of the skis, like too strong, not accurate?
16     A.      I actually don't know what was done
17     after this draft, and so whether they were
18     accurately describing this data as a special use
19     permit or what was announced afterwards or not.
20     Q.      So at this time do you know whether
21     or not these words are accurate or you didn't
22     even think about it?
23     A.      I don't know what I specifically
24     thought when I was reviewing this document at the
25     time.

Lowry Crook
May 26, 2022

| Page 218 | Page 220 |
|---|---|

**Page 218**

1           Crook
2      Q.    Did you object to the use of these
3  words?
4      A.    I don't have a recollection of
5  having objections to anything in this document.
6      Q.    Okay.
7            So you were okay with that
8  terminology then?
9            MS. ZILLOLI:  Objection.  Misstates
10  testimony.
11      A.    I don't know if I edited this
12  document or what I did with this document.  I
13  just don't recall sitting here today.
14      Q.    Okay.
15            And if you edit it to address these
16  phrases I talked with you about, one would see
17  that in the final version of this document,
18  wouldn't they?
19      A.    If there were edits, one would see
20  them if there was a final version that was
21  issued.
22      Q.    Okay.
23      A.    But, again, I don't know whether I
24  edited it or somebody else did or what was done
25  with it afterwards.

**Page 219**

1           Crook
2      Q.    Okay.
3            So you saw this but you don't recall
4  what you did in response to receiving this; is
5  that what your testimony is?
6      A.    Yes.
7      Q.    So, okay.  Got it.  Well, okay.
8  So let's go to Exhibit 424, which is
9  an email which has two parts in it.  The first is
10  at the bottom.  I'm sorry.  We'll let Miss Hymel
11  transition us here.  Sorry, Rachel.
12            Mr. Crook, if you would read the
13  two-part email.  It's short.
14      A.    Okay.  Okay.
15      Q.    And then your email above that
16  because --
17      A.    Okay.
18      Q.    Mr. Crook, I'm confused by this
19  email strain because, if you look at Colonel
20  Henderson's email, the first one that is in the
21  exhibit, he starts off by saying "Roger on the
22  comments below."
23            Do you see any comments below?
24      A.    No.
25      Q.    Us either, and so we're puzzled by

**Page 220**

1           Crook
2  what appears to be -- there's no redaction
3  notification here.
4            Why don't we have the comments
5  below?
6            MS. ZILLOLI:  Objection.
7  Speculation.
8      A.    I don't know.  I'm sorry.
9      Q.    Okay.
10            MR. SEBY:  Another issue we'll have
11  to be taking up because this is a document that
12  was produced by your counsel and looks incomplete
13  by the terms of the people communicating the
14  emails itself.
15      Q.    So anyhow, let's continue.  Major
16  Jackson forwards this on to you.  It says "Lowry
17  more to follow in an hour.  So include a
18  potentially amended press release" -- "to include
19  a potentially amended press release."
20            Do you see that?
21      A.    Yes.
22      Q.    What do you think that means
23  relative to the portion of Henderson's email that
24  we can see?
25      A.    This chain reminds me that there is,

**Page 221**

1           Crook
2  that the Corps was talking to the tribe about
3  whether Chairman Archambault would sign on to a
4  joint press release.
5      Q.    Okay.  That's good that you're
6  refreshed again.
7            Can you elaborate now based upon you
8  being refreshed about all this stuff.
9            MS. ZILLOLI:  Objection, vague.
10      A.    I just recall that there was a
11  discussion to see if we would sign on to a joint
12  press release.
13      Q.    And what does signing on mean
14  relative to Jackson's comment that more to follow
15  in an hour to include a potentially amended press
16  release.
17            What does that mean relative to your
18  understanding now that you're refreshed about all
19  of this?
20      A.    I mean that to mean if Chairman
21  Archambault agreed to join the press release that
22  they would amend it to add that.
23      Q.    Who invited him to join the Corps
24  press release?
25      A.    It appears like from the email chain

Lowry Crook
May 26, 2022

Page 222

Crook

1                        Crook
2    that Colonel Henderson was speaking with him.
3         Q.    I know.
4               But who invited the chairman to
5    participate and consider joining a draft press
6    release announcing a proposed special use permit?
7               MS. ZILLOLI:  Objection,
8    speculation.
9         A.    I don't have knowledge of somebody
10   besides Colonel Henderson reaching out to him
11   about it.
12        Q.    And you say above, last, your
13   response to Ted Jackson is "Many thanks.  Look
14   forward to hearing his message back."
15              What was his message back?
16        A.    If I recall correctly, I believe
17   that Chairman Archambault decided not to join the
18   press release.
19        Q.    Okay.
20              He did not?
21        A.    I recall him having concerns about
22   it but I --
23        Q.    What were those concerns?
24        A.    I don't know what they were
25   specifically.

Page 223

Crook

1                        Crook
2         Q.    Right.
3               Mr. Crook, let's go to 425, Exhibit
4    425.  Okay.  There's an attachment here we'll go
5    talk about in a minute, the storyboard of
6    September 15, 2016; and, again, Colonel Tedeschi
7    is sending it to Major Jackson and Miss Auguliera
8    and then General Jackson forwards it on to Madam
9    Secretary and chief.
10              So here we are again Jackson sending
11   it to the Assistant Secretary of the Army for
12   Civil Works and to the chief of engineers copying
13   you and some other people.
14              So you --
15        A.    Can I finish reading his email?
16        Q.    Yeah.  Let me know when you're down.
17        A.    Can you scroll up a little bit.
18   Thank you.  Okay.  Can you scroll down a little
19   bit.  Actually, just up a little bit first.
20   Okay.  Thanks.  Okay.
21        Q.    Tell me when you're done.
22        A.    I'm sorry.  Can you go to the top of
23   General Jackson's email.  I didn't get a chance
24   to fully read that.  Okay.  Can you scroll up a
25   little bit.  It's partially obscured.  Thank you.

Page 224

Crook

1                        Crook
2    That's good.  Okay.
3         Q.    Did you read it?
4         A.    Yes.
5         Q.    Okay.  Not much to talk about in
6    Colonel Tedeschi's email because he just
7    basically reiterates what we will talk about in
8    the storyboard, but the Jackson's email to your
9    boss and to the chief of the entire Corps of
10   Engineers says "Passing along the daily DAPL
11   update"; and then he says, "Have provided a draft
12   of the press release to accompany the special use
13   permit decision.  Lowry will work this across the
14   IA."
15              What is IA?
16        A.    Interagency.
17        Q.    And what does that mean?
18        A.    Well, I mean, I guess he would best
19   know what it means, but, you know, I believe that
20   he's referring to the conversation that I was
21   having with the Department of Justice and
22   Department of the Interior.
23        Q.    And then so, okay.
24              We'll ask General Jackson what that
25   means, what he thought it meant, but he said you

Page 225

Crook

1                        Crook
2    are going to work this across, whatever that
3    means, and the White House tomorrow for final
4    clearance, right?
5         A.    I believe he is referring to the
6    White House, yes.
7         Q.    "We will adjust plans based on
8    guidance given."
9               So when I asked you about the draft
10   press release that was developed by Miss Gaskill
11   and forwarded to you, you weren't sure what you
12   did or had any further involvement in the press
13   release.
14              Here General Jackson is referring to
15   you as being the principal liaison on this issue
16   to a bunch of federal agencies and the White
17   House, right?
18        A.    Well, it says what it says, right.
19   That I will work this with the interagency and
20   the White House.
21        Q.    Is General Jackson just wrong and
22   making all this up or was that your role?
23        A.    He knew that I was having regular
24   communications with the interior department, DOJ
25   and the White House about these issues.

Lowry Crook
May 26, 2022

Crook

2      Q.      Did you have any reason to, when you
3  received this, because you're copied on this, to
4  say, wow, wait a minute.  That's suggesting
5  something that's not true?
6      A.      No, I believe that I did discuss
7  these issues with Interior, Justice and the White
8  House.
9      Q.      Well, it's not just discussing,
10 according to Jackson, because there's going to be
11 a final decision and the Corps storyboard we read
12 earlier talks about it being made on a Friday, an
13 Friday, September 16th as a matter of fact is
14 what the storyboard just told us.
15          Here we're talking about 7:12 p.m.
16 the day before, and you tell me what you're
17 really telling us that you had no involvement on
18 a deadline or you did; and if so, what did you
19 do?
20          MS. ZILLOLI:  Objection,
21 argumentative, misstates testimony.
22     A.      At this time period, I was having
23 daily discussions with staff at the White House
24 and the other agencies and I would have discussed
25 this issue with them.

Crook

2          I don't know whether I emailed them
3  a draft of the press lease, whether I called them
4  about it.  I just don't remember the specifics
5  discussions, but I have no reason to disagree
6  that I did, you know, engage in discussion or
7  ordination with the interagency group that was
8  involved in the White House.
9      Q.      So Ed Jackson says you will work
10 this across the agencies and the White House and
11 he says for final clearance.
12          So were you tasked with getting
13 their sign-off or final input on something?
14     A.      I was tasked with keeping them
15 informed and making sure we could address any
16 concerns and questions they had about our
17 proposed path forward.
18     Q.      Well, how about what General Jackson
19 says you were doing.
20          Did you do that or not?  Did you get
21 final clearance?
22     A.      I didn't ask them for final
23 clearance, no.
24     Q.      Did you ever respond to General
25 Jackson and said Ed, that's not right.  It's not

Crook

1  what I'm doing.  I'm just keeping them posted.
2          Did you ever see that?
3      A.      I don't recall saying that.
4      Q.      Okay.
5          Important because the chief of
6  engineers and the assistant secretary of the Army
7  are told by Jackson what you're doing and you
8  were doing it.  You were talking to those folks
9  right then and had been for a number of days you
10 said.
11          Now that you do remember doing that
12 and -- did they tell you don't do it or did they
13 say it looks okay, Lowry?
14          MS. ZILLOLI:  Objection.  Counsel is
15 testifying and misstates testimony.
16     Q.      It's a question, Mr. Crook.
17     A.      I recall that the White House had
18 questions about this planned announcement and the
19 potential impacts of it, but I don't recall
20 specifically what else was in the conversation.
21     Q.      Okay.
22          So as of 7/12/p.m., September 15th,
23 was a decision made to issue the special use
24 permit?

Crook

1      A.      I don't know and I don't know when I
2  saw this email either.
3      Q.      Okay.
4          Let's go to the attachment, which is
5  this daily DAPL report prepared by the Army Corps
6  of Engineers.
7          Would you read first the commanders,
8  the Northwest Omaha commander assessment.
9      A.      Okay.  Okay.
10     Q.      The last -- pardon me.  The
11 sentence, second sentence, "Based on personnel
12 personal correspondence with Chairman
13 Archambault."
14          This is personal correspondence by
15 Henderson is the way it reads, correct?
16     A.      Yes.
17     Q.      "It is expected that the SRST will
18 favorably receive the SUP.  The SUP will be
19 approved and a press release will be published on
20 Friday September 16.  The district will continue
21 to monitor media coverage of the SUP and press
22 release," right?
23     A.      That's what it says, yes.
24     Q.      Okay.

Lowry Crook
May 26, 2022

Page 230

```
 1                        Crook
 2           Is that wrong or is it right?
 3        A.     I don't recall -- I don't recall
 4   whether that Friday discussion or use permit or
 5   press release was issued or not.
 6        Q.     Can we go to Exhibit 428, please.
 7   If you just look at the email, there you go.
 8           Mr. Crook, take a moment and read
 9   this.  It starts with a Jackson email to you.
10   Press release final.  "Lowry, attached is the
11   final edition in the press release.  Spoke with
12   John."  I believe that's Henderson.  "He is being
13   pressed by delegation and Chairman Archambault to
14   send this out today, so he intends on doing so."
15           Looks like you immediately took,
16   literally immediately, took that email and
17   forwarded it on to Dan Utech in the Executive
18   Office of the President and Tommy Boudreau, the
19   Office of the Interior Secretary Chief of Staff,
20   and you said FYI on timing, right?
21        A.     Yes.
22        Q.     Then you forwarded -- that was
23   forwarded from Mr. Utech to a number of people,
24   including this Rohan Patel that you mentioned
25   earlier being friends with and also Tara
```

Page 231

```
 1                        Crook
 2   Billingsley, the Special Assistant to the
 3   President that you noted earlier in the White
 4   House, and you said or she asked you was the
 5   congressional delegation notified.
 6           So you were busy coordinating with
 7   inter-agencies and other, just as Ed Jackson said
 8   you were.  You were doing that, and here is the
 9   press release.
10           Had this press release that was
11   forwarded by Jackson been modified in any
12   respects?
13        A.     I would have to compare it to see.
14        Q.     Well, how about in terms of the
15   wording that I was asking you, if you had any
16   concerns about.  Let's look in the title.
17           The U.S. Army Crops Grants Special
18   Use permit.  First paragraph, "Today the Army
19   Corps issued a special use permit," and so same
20   thing, all that phrasing.
21           Anybody at this point take issue
22   with the use of those words?
23           MS. ZILLOLI:  Objection,
24   speculation.
25        Q.     To your knowledge?
```

Page 232

```
 1                        Crook
 2        A.     I don't recall somebody taking an
 3   issue with those words.
 4        Q.     Okay.  All right.
 5           If we could -- so, Mr. Crook, on
 6   Friday, September 16th, as the Corps indicated in
 7   its storyboard, which was sent to chief of
 8   engineers and Semonite and to Miss Darcy, did
 9   that hold true?
10        A.     I don't recall.  Things were very
11   fluid at that time, so I don't recall what
12   happened after that was sent around late Friday.
13        Q.     So you don't recall whether or not
14   the Corps issued a press release and sent
15   Chairman Archambault a proposed special use
16   permit?  You don't recall that at all?
17        A.     I just remember a lot of back and
18   forth about the special use permit during that
19   time, and so I don't remember what specifically
20   happened after that.
21        Q.     Can we look at, please, Exhibit 427.
22           Mr. Crook, this is an email from
23   Donald Jackson on Friday, September 16, 4:25 p.m.
24   to you and it's a short message:  "Lowry,
25   attached is the final edition of the press
```

Page 233

```
 1                        Crook
 2   release.  Spoke with John.  He is being pressed
 3   by the delegation and Chairman Archambault to
 4   send it out today, September 16th.  So he intends
 5   on doing so.  He is sending final copies to each
 6   of these folks at this time and will post at 2000
 7   EST today."
 8           So in the attached, attachment
 9   reference, it says SRST SUP with OGC edits.
10           Who's the OGC?
11        A.     I'm sorry.  Show me where you're
12   talking about.
13        Q.     If you look in the email.
14        A.     Oh, the name of the attachment.
15   Okay.
16        Q.     See right there.
17        A.     I actually don't know whether that's
18   office of general counsel of the Army or the
19   Corps of Engineers.
20        Q.     Do each have their own office of
21   general counsel?
22        A.     The Corps -- I think they call if
23   the chief counsel in the Corps but they both have
24   a, yes, they both have a counsel.
25        Q.     Are they both referred to the
```

Lowry Crook
May 26, 2022

Page 234

Crook

1       Crook
2  public as the office of general counsel?
3       A.    I don't think that's what the office
4  of chief counsel is normally referred to.
5       Q.    Okay.
6             What is your answer, Mr. Crook?
7  What does OGC stand for?
8             MS. ZILLOLI:  Objection.  Asked and
9  answered.
10            MR. SEBY:  No, it's not.
11      A.    Office of general counsel.
12      Q.    Where, in what agency is the OGC
13  being referred to here by Major Jackson to you?
14            MS. ZILLOLI:  Objection, speculation
15  and asked and answered.
16      A.    I guess what I'm getting at is
17  although the Corps technically office of chief
18  counsel, I don't know who named this document and
19  whether they may find distinctions or they know
20  which lawyer office had signed off.  I just don't
21  know.  That's why, you, I'm saying I don't know
22  that it was Department of the Army, but I would
23  refer to OGC as Army counsel, but I don't know
24  what the person drafting this document or naming
25  this document did.

Page 235

Crook

1       Crook
2       Q.    Okay.
3             Do you think Ed Jackson knew or
4  should we ask him?
5       A.    I don't know what he knew or didn't
6  know, as far as, you know, which office this was
7  referring to.
8       Q.    I don't know who else we could ask
9  because this email is only between the two of
10  you.
11            So you were the guy that, the chief
12  of the engineers and the assistant secretary was
13  told by General Jackson you were shepherding this
14  across the line.
15            So you don't know whose edits these
16  are?
17      A.    No.
18            MS. ZILLOLI:  Objection.
19  Argumentative.
20      Q.    Mr. Crook?
21      A.    I don't know who all edited this
22  document.
23      Q.    You do not?
24      A.    No.
25      Q.    Thank you.  All right.

Page 236

Crook

1       Crook
2       Could we go to Exhibit 429.
3             So, Mr. Crook, this exhibit is an
4  email that is originally from Major General
5  Jackson, and he is sending it to it's called a
6  DAPL sotrep.
7             What is spotrep?
8       A.    I know sitrep is situational report.
9  I don't remember what spotrep, what the spotrep
10  is an acronym for.  The Army uses a lot acronyms.
11      Q.    Okay.
12            So it is addressed to Madam
13  Secretary, Chief Semonite and Lowry.  You made
14  the headline here.
15            So Jackson is addressing this email
16  to you three, copying to some individuals, and
17  spotrep from Colonel Henderson, and I guess we
18  don't know what spotrep means, do we?
19      A.    It's some sort of report but I don't
20  remember what the spot stands for.
21      Q.    Okay.
22            May be helpful today in discussions
23  with the IA.  There's that interagency group
24  reference again I think, right?
25      A.    Yes, I believe that is referring to

Page 237

Crook

1       Crook
2  interagency.
3       Q.    Okay.
4             Next paragraph, "Colonel Henderson
5  received a call from Senator Heitkamp.  The
6  senator is of the opinion it's time to move
7  everyone off the north side of the river and is
8  asking us to work with the SRST, BIA," Bureau of
9  Indian Affairs, "and federal law enforcement to
10  develop a plan for this soonest."
11            Do you want to go ahead and read the
12  rest of the email, if you wish.
13      A.    Sure.  Can you scroll down, please.
14  Up a little bit.  Yeah, right there.  Can you
15  scroll down a little bit more, please.  Okay.
16      Q.    Mr. Crook, do you remember when we
17  were asked, we were talking about the draft of
18  the press release that was sent to you, the first
19  time at least per the exhibits that we've talked
20  about?
21      A.    Yes.
22      Q.    Do you remember me asking you about
23  the choice of the words that whoever wrote that,
24  and maybe Miss Gaskill started it because she
25  sent it to you.  We don't know though you said.

Lowry Crook
May 26, 2022

**Page 238**

Crook

1         Crook
2    We also don't know who edited the document as you
3    just testified.
4              And I asked you then where did those
5    words "issued," "granted," "permit allows," where
6    did they come from, and you didn't know, and you
7    told me that you didn't quibble with the use of
8    those terms.
9              So I want to ask you now, if we
10   could look above Major General Jackson's email to
11   the secretary, Chief Semonite and to you and
12   Miss Darcy on Wednesday September 21, which is
13   the Wednesday after the Friday when the press
14   release was put out and the proposed permit was
15   sent to Chairman Archambault, Miss Darcy
16   amazingly says back to Ed Jackson and to you
17   alone cuts off all the people that the General
18   Jackson's email was sent, which included the
19   chief of the engineers, and all the counsel
20   there, and Miss Darcy says, "So there is no
21   permit in place for the south encampment even
22   though we announced Friday night that there was."
23             What's that all about?
24        MS. ZILLOLI:  Objection, vague,
25   speculation.

238:9-239:8
602, 611

ND OBJ.:
Relevance

**Page 239**

Crook

1         Crook
2         Q.   What is she talking about?
3         A.   I believe the words speak for
4    itself, but it appears to express a concern that
5    there's inconsistency between the status of the
6    permit and what was announced the Friday night
7    before.
8         Q.   Yeah, it sure does.
9              In fact, you know, you look at the
10   provision of General Jackson's email where he's
11   giving background, and then he has a section that
12   says Omaha responses, and it says, number one,
13   "The permit is only for the south side of the
14   river with associated conditions."
15             Next sentence, Mr. Crook, "The tribe
16   has not signed the acknowledgment for this permit
17   yet," and we're talking on, I don't know, five
18   days later, "Nor met the liability requirements.
19   So there is currently no permit in place."
20             Do you think that's what Miss Darcy
21   is reacting to with her puzzlement about what's
22   going on?
23        MS. ZILLOLI:  Objection,
24   speculation.
25        Q.   I don't know.  She's asking you.

**Page 240**

Crook

1         Crook
2         A.   It appears -- that's what it appears
3    to me.
4         Q.   Well, what did you tell her?
5         A.   I don't recall how I responded to
6    this question or email.
7         Q.   Okay.
8              Just like the last time Miss Darcy
9    posed a question to you in an email you didn't
10   recall what you said or responded to her, right?
11        MS. ZILLOLI:  Objection.
12   Argumentative.
13        A.   Yeah, I don't recall the specific
14   conversation that followed.
15        Q.   At all?
16        A.   My general practice would have
17   responded somehow to this issue but I still don't
18   recall specifically how and when I did.
19        Q.   Mr. Crook, we have been assured by
20   your counsel and in front of the Court of the
21   United States Magistrate Judge the Government's
22   position in this case that all documents of yours
23   have been produced.
24             I don't have an email where you
25   responded to this by email.

**Page 241**

Crook

1         Crook
2              So what did you say to her verbally?
3         A.   I don't recall specifically what I
4    said to her verbally.
5         Q.   So we should ask her because I guess
6    she's the only one that would know, right?
7         MS. ZILLOLI:  Objection, speculation
8    and argumentative.
9         A.   About a specific conversation
10   between me and her I guess she would be the other
11   person who may know.
12        Q.   Thank you.  Okay.
13             Let's go to Exhibit 430.
14        MS. ZILLOLI:  I think we were going
15   to take a break, if that would be okay.
16        MR. SEBY:  I apologize, Ms. Zilloli.
17   Let's take our break and go off the record.
18        THE VIDEOGRAPHER:  We're off the
19   record at 9:01 p.m. UTC, 5:01 Eastern.
20             (A break from the record was taken
21   at this time.)
22        THE VIDEOGRAPHER:  Back on the
23   record 5:17 Eastern, 9:17 p.m. UTC.
24        Q.   Mr. Crook, I want to turn now to
25   Exhibit 430, please.

Lowry Crook
May 26, 2022

Page 242

1                      Crook
2      A.     Okay.
3      Q.     This is an email that is two parts.
4  It begins with email from you on Thursday,
5  September 22nd, and you send it to a number of
6  people in the executive office of the President
7  and the White House and the Department of
8  Justice, the chief of staff the secretary of the
9  interior, the solicitor of the secretary of the
10 interior, the assistant secretary of the
11 Department of the Interior, and some people I
12 don't, oh, at CEQ.
13            And your -- and Miss Darcy is copied
14 on your email and says, "The narrative in the
15 attachment is from last Friday," which by my
16 calculation was the day of September 16th, which
17 was the day that the Corps issued its press
18 release and sent Chairman Archambault a proposed
19 special use permit.
20            So you're saying "The narrative is
21 the attachment from last Friday but FYSA, here's
22 the map of the area that we are using."
23            What are you doing, Mr. Crook?  What
24 is that all about?  I'm confused by what you're
25 saying.

Page 243

1                      Crook
2      A.     And you had asked earlier about a
3  map and correspondence on a map.
4            I believe that there was a request
5  from the White House, now this refreshes my
6  recollection for a map of the area showing what
7  was Corps land, what was tribal reservation land
8  and where the protests were.
9      Q.     Does that mean they had no clue
10 before you asked or they asked you?
11     A.     I don't know exactly what different
12 folks in the White House knew or didn't know
13 other than what I had communicated to them.
14            So when you say they --
15     Q.     Well, I'm just using the "they" to
16 refer to the group you mentioned specifically,
17 folks in the White House.
18     A.     I think that there were differing
19 levels of knowledge of the details of the
20 protests and the locations and the property.
21     Q.     What does that mean?  They didn't
22 know who's land was which, where the camps were,
23 where the reservation was, wasn't, and that kind
24 of details; is that what you're talking about?
25            MS. ZILLOLI:  Objection,

Page 244

1                      Crook
2  speculation.
3            MR. SEBY:  I'm asking what he means.
4  I'm not speculating.
5      A.     I guess I mean that Dan Utech, for
6  example, was involved in regular communications
7  and updates about the situation.
8            There were other people at the White
9  House who had less regular involvement and
10 probably had less knowledge of the details.
11     Q.     Well, were these the same people you
12 were consulting with on weather the Corps should
13 issue a special use permit for allowing the use
14 of their property for protests that had been
15 going on for several months; is that what -- you
16 asked for their input, but they didn't have the
17 basic understanding of what you were asking their
18 input on?
19            MS. ZILLOLI:  Objection.  Assumes
20 facts.
21     A.     You'd have to ask them what their
22 understanding was at the time.  I only know what
23 I shared with different people that I can
24 remember during this time period.
25     Q.     So I don't have any other basis to

Page 245

1                      Crook
2  ask you this question.
3            So I'm going to ask it based upon my
4  limited knowledge about this instance, which is
5  here we are almost a week after the Corps issued
6  a public press release and sent Chairman
7  Archambault a proposed permit for his signature
8  and satisfaction of conditions of compliance.
9  Already, it's going on for a week and attached to
10 that was a map of the area to which the Corps was
11 purportedly proposing to give a special use
12 permit.
13            So you are taking that map and
14 saying here it is, what we sent, what we issued,
15 so to speak, or made a public announcement about,
16 and you're sending it to this group.
17            Why did you send it to this group?
18            MS. ZILLOLI:  Objection.  Misstates
19 testimony and evidence.  Assumes facts.
20     Q.     Mr. Crook, I don't know why you sent
21 it because there's no email below.  Nobody asked
22 to you, to my knowledge.
23            What it looks like to me, unless you
24 correct my understanding or inform my
25 understanding, you initiated this communication

Lowry Crook
May 26, 2022

Crook

1
2    and said here's a map.  What we've already used?
3          A.    I believe that I was responding to
4    an oral request from somebody at the White House
5    for a map.
6          Q.    Who?
7          A.    I don't recall whether it was Dan or
8    Katherine or somebody else, frankly, at the White
9    House.
10         Q.    I wonder if it's not Katherine
11   Ferguson.
12               Do you know?  Do you want to think
13   about that and make sure you comment accordingly
14   because the next, the only response you got was
15   from Katherine Ferguson to you and copied to
16   Larry Roberts at the Department of the Interior.
17   Do you see that?
18         A.    Yes.
19         Q.    A small chain to get us going, to
20   get us started on creating a map.  Lowry, I'm
21   guessing the BIA team has maps galore.
22               Could you ask them to pull and share
23   something that roughly corresponds with the area
24   on the attached?
25               Lowry, could you find a version of

246:19-247:8
401-402

Crook

1
2    this map with higher resolution and provide
3    clarity on Corps boundaries and borders, okay.
4               So is she the one that asked you to
5    spend a map in the first place?
6          A.    She is the one who followed up.  I
7    don't recall who made the initial request for the
8    a map in the first place.
9          Q.    And remind me, I think you said that
10   Miss Ferguson is the Chief of Staff for the White
11   House Domestic Policy Task force.
12         A.    Domestic policy council.
13         A.    Domestic policy council.
14               Is she the chief staff for that?
15         A.    That was her title, yes.
16         Q.    So she's an employee in the Office
17   of the President.
18               Is she located in the White House?
19         A.    She may be located in the Eisenhower
20   Executive Office Building next to the White
21   House.
22         Q.    The old executive office building?
23         A.    That's what they used to call the
24   old executive, right.
25         Q.    So if you're a chief of staff of the

Crook

1
2    President's domestic policy council, who do you
3    report to?
4               MS. ZILLOLI:  Objection,
5    speculation.
6          Q.    To your knowledge, Mr. Crook?
7          A.    You report to the chair of the
8    domestic policy council.
9          Q.    Do you know who that was at the
10   time?
11         A.    I'm sorry.  I'm blanking on her
12   name.  I can picture her but I just happen to be
13   blanking on her name right now.
14         Q.    Okay.
15               Do you recall any members of the
16   domestic policy council at this time?
17         A.    The domestic policy council is a
18   weird entity in that there's staff, and then
19   there is technically members that are cabinet
20   members of different agencies, but it doesn't
21   really convene in a council in that way and in
22   practice very often.  So there's other staff on
23   the domestic policy council in addition to the
24   chair.
25         Q.    You mentioned cabinet officials.

Crook

1
2               Which ones do you recall being on
3    the President's domestic policy council?
4          A.    I don't recall specifically all of
5    the cabinet members who are technically on it,
6    but it would be generally the major cabinet
7    domestic agencies, so.
8          Q.    Let me ask you this, Mr. Crook, do
9    you know whether Secretary Sally Jewell was a
10   member of that domestic policy council?
11         A.    I believe she was.
12         Q.    Was Secretary Eric Fanning?
13         A.    I don't know that the secretary of
14   the Army is a member of the council.
15         Q.    Was the Attorney General of the
16   United States?
17         A.    I believe that the attorney general
18   was.
19         Q.    Okay.
20               Anyone else stand out amongst those
21   that you do recall?
22         A.    Stand out.  I mean, there are other
23   domestic, you know, cabinet agencies that I think
24   are likely on the council but.
25         Q.    Who are you thinking of?

Lowry Crook
May 26, 2022

Page 250

Crook

1
2       A.      USDA, Department of Energy,
3  Department of Commerce.  I don't know.  I mean,
4  other domestic cabinet, you know, members.
5       Q.      Okay.
6               Anybody of a lessor officer than a
7  cabinet official?
8       A.      There may be other officials in the
9  White House that are technically listed as
10 members of the domestic policy council.  I just
11 don't remember who.
12      Q.      Would the Department of Homeland
13 Security secretary have been on that council?
14      A.      I don't know.
15      Q.      Do you know who the secretary was at
16 that time?
17      A.      I believe it was Jay Johnson, but I
18 don't recall the specific, who was specifically
19 there at that time.
20      Q.      Got it.
21              My understanding is accurate and
22 consistent with yours.
23      A.      Okay.
24      Q.      Consistent, excuse me.  That Mr.
25 Johnson was also there.

Page 251

Crook

1
2               Anybody from subagencies of any of
3  those cabinet officials present, like the
4  director of the Federal Bureau of Investigation,
5  for example?
6       A.      I'm sorry.  You said present?
7       Q.      The question was, to your knowledge,
8  was there any other federal official who was a
9  lessor executive officer than, and lessor by
10 terms of seniority not anything else, but lessor,
11 you know, the way that courts refer to as
12 inferior federal officers, noncabinet officials,
13 were there any those type of people on the
14 council and I use --
15      A.      I don't recall any specific
16 subcabinet officials, which I think listed
17 technically on the domestic policy council; but
18 again, I don't, I don't recall all the specific
19 members.
20      Q.      Okay.
21              So Miss -- your email to the group
22 that individuals in the Department of Interior,
23 Department of Justice and the CEQ and a group of
24 them from the White House included a map, and you
25 said that in your email to them, that this is the

Page 252

Crook

1
2  map from last Friday, which is September 16th,
3  and you're referring to information that was
4  provided detailing the special use permit area
5  and the proposed permits, and you say this is
6  what we are using.
7               And if we can go to the attachment
8  and, Mr. Crook, if you could note that we're
9  talking about a September 16th map, and you are
10 saying that this map is what you used and what
11 was from last Friday, September 16.  In fact,
12 it's dated that way.
13              MR. SEBY:  Could you Rachel hone in
14 on the map so we could see it just a little
15 better.  There's a legend and area specifically.
16 Great.  Oh, perfect.
17      Q.      Mr. Crook, let's look at the legend.
18 The legend is very important, And we have, first
19 off, we have a yellow dot that says protest
20 location.
21              Do you see that?
22      A.      Yes.
23      Q.      Did the special use permit that you
24 proposed, the Corps proposed to the Standing Rock
25 the week prior of this map, did it include the

Page 253

Crook

1
2  area where that dot is?
3       A.      I don't believe it did.
4       Q.      And that makes sense because if you
5  look at the legend, and it gives the boundary of
6  the Corps' property, which is a blue line, that
7  yellow dot is outside of that, isn't it?
8       A.      Yes.
9       Q.      Okay.
10              So there is a protest location
11 that's not featured on Corps property.  So we
12 don't need to talk about that.
13              Then there is an area, first of all,
14 let me ask you, do you see this meandering white
15 line, which is known on the legend as the
16 Cannonball River?
17      A.      Yes.
18      Q.      And it ultimately makes its way to
19 the Missouri River, doesn't it?
20      A.      Yes.
21      Q.      And there is an area north of the
22 Cannonball River and there's an area south of the
23 Cannonball River which is in the blue line which
24 is in the Corps of Engineers project boundary.
25              Do you see that?

Lowry Crook
May 26, 2022

**254:7-19**
**602, calls for**
**legal**
**conclusion**
**701-02**

Page 254

Crook

2  A.  Yes.

3  Q.  And there are areas that have a red

4  checked hash mark symbol placed on them that are

5  both north and south, aren't they?

6  A.  Yes.

7  Q.  And the legend in the Corps map of

8  September 16, 2016 says, "Unpermitted camp areas

9  -- area," right?

10  A.  Yes.

11  Q.  So is another way to interpret this,

12  let me know if you agree with me that this map

13  tells us that there are unpermitted camp areas

14  located as of September 16th on Corps of

15  Engineers properties both north of the Cannonball

16  River and south of the Cannonball River.

17  A.  It does show what it calls

18  unpermitted camp areas north and south of the

19  Cannonball River on Corps property.

20  Q.  Thank you.  Right.  Okay.

21  So back to Miss Ferguson's email to

22  you, responding to you and copying only Mr.

23  Roberts from the Department of the Interior.

24  I wonder if you could, please,

25  because I don't have any further emails related

Page 255

Crook

2  to this dialogue you're having with

3  Miss Ferguson.

4  What happened?  What did you do?

5  A.  I don't recall what followed this.

6  I think I sent what I had and I don't know what,

7  if any, follow-up there was between her and Larry

8  Roberts on making a better map.

9  Q.  In your career as the principal

10  deputy assistant secretary of the Army for Civil

11  Works, was this the last time you had any manner

12  of communication with Miss Ferguson?

13  A.  No.

14  Q.  What kind of communication did you

15  have with Miss Ferguson after the date of this

16  email with respect to the Corps property at the

17  Oahe project or the Dakota Access Pipeline?

18  A.  I think she was likely on, I think

19  she was on group, some group calls where I and

20  others would provide the status of what was going

21  on on the ground.

22  Q.  While she was on group calls, did

23  you have direct communication or discussion with

24  her ever again?

25  A.  Yes.

Page 256

Crook

2  Q.  And in the context of that, what was

3  she doing?  Why was she involved?

4  A.  She had been tasked with, I referred

5  earlier to the broader engagement with the tribal

6  community on policy issues and potential changes

7  to the law.

8  She had been tasked with

9  coordinating the interagency, the effort, that

10  effort for the White House.

11  Q.  Did her role include any manner of

12  consideration or discussion of whether or not to

13  continue to consider or grant or deny an easement

14  for the pipeline over Corps property or

15  management?

16  A.  I don't recall her specifically

17  engaging on that question.

18  Q.  Okay.

19  Ever?

20  A.  Like I said, she could have been on

21  group calls when the issue came up but --

22  Q.  No, no --

23  A.  -- I just don't recall that being

24  her focus ever.

25  Q.  I'm not asking whether she was on

Page 257

Crook

2  group calls where somebody else talked about

3  that.

4  I'm asking you about your direct

5  involvement in communications with Miss Ferguson

6  after this email with respect to the issue now of

7  whether the Corps should take any objection

8  positive or negative on the easement pending for

9  the Dakota Access Pipeline that was put in a mode

10  of reconsideration based upon the agency's, the

11  three agencies' September 9, 2016 press release

12  or joint statement?  Excuse me.

13  A.  And I'm saying that I don't recall

14  any specific conversations with her that were

15  focused on that issue.

16  Q.  Okay.

17  (Interruption from the record.)

18  MR. SEBY:  Can we go off the record

19  while this is fixed.

20  MS. ZILLOLI:  Yes.

21  THE VIDEOGRAPHER:  We're off the

22  9:38 p.m., UTC, 5:38 p.m. Eastern.

23  (A short break was taken at this

24  time.)

25  THE VIDEOGRAPHER:  Back on the

Lowry Crook
May 26, 2022

Page 258

Crook

1       Crook
2  record.  5:39 p.m., Eastern, 9:39 p.m., UTC.
3       Q.    Mr. Crook, I was asking you before
4  we needed to take a short break, technical
5  issues, whether or not you ever heard from
6  Miss Ferguson further with respect to her
7  interest in having additional maps of the area.
8       A.    I don't recall what any further
9  communications or efforts on the map were beyond
10  when I sent this over to her.
11      Q.    Okay.
12            Did you ever meet with her again in
13  person?
14      A.    Yes.
15      Q.    And she never brought up this map
16  issue or her interest in because she says "A
17  small chain to get us started on creating a map."
18            Sounds like she wanted to launch a
19  project involving development of avenue map and
20  she posted posed a question to Mr. Roberts and a
21  question to you.
22            And I understand you're telling me
23  even though you met and spoke with her on
24  multiple occasions after this email, this topic
25  never came up again?

Page 259

1       Crook
2       A.    I'm saying that I know she was
3  tasked with trying to get a better map.
4            I know that I sent her what -- this
5  refreshed my recollection what I sent her.  I
6  don't recall the specifics of any follow-up
7  beyond this.
8       Q.    So she asked you, "Can you send me a
9  higher resolution map?"
10            Did you do that?
11      A.    I don't recall whether or not I did.
12      Q.    Okay.
13            So we have emails to your boss that
14  you don't recall whether or not and how you
15  responded.
16            And now we have a request from the
17  chief of staff of the President's domestic policy
18  council and you also don't recall whether or how
19  you responded; is that correct?
20            MS. ZILLOLI:  Objection.
21  Argumentative.
22      A.    That is correct.  I do not recall
23  the specific response on the details of making
24  the map.
25      Q.    Okay.  All right.

Page 260

1       Crook
2            Let's go to Exhibit 400 -- pardon
3  me.  Let's go to Exhibit 318.
4            MS. HYMEL:  Give me one second.
5            MR. SEBY:  Says.
6       Q.    Mr. Crook, would you please take a
7  moment and read this email chain, which is an
8  email that starts with an email from an
9  individual named Joel Rostberg, whose title,
10  according to the email from him, is assistant
11  emergency manager, Morton County, North Dakota
12  and he's writing to you.
13      A.    I'm sorry.  Can you make it a little
14  bit bigger, please.  Thank you.
15      Q.    Do you see Mr. Rostberg in his
16  title?
17      A.    Yes.
18      Q.    Okay.
19            And his email simply says right
20  there, "subject DAPL Opord 33, attached is Opord
21  33 for the operational period September 23
22  through September 24."
23            Do you see that?
24      A.    Yes.
25      Q.    What's an opord?

Page 261

1       Crook
2       A.    I think op stands for operation or
3  operational, and I don't know what "ord" is
4  responding to or what the acronym stands for.
5       Q.    Mr. Crook, are you aware as the
6  principal deputy of the assistant secretary of
7  the Army Civil Works that the Corps of Engineers
8  prepares opords or not?
9       A.    Well, I don't know what it
10  specifically stands for, so I'm not aware whether
11  or not they have something that they call opord
12  or a different acronym.
13      Q.    Okay.
14            So Mr. Rostberg from Morton County,
15  North Dakota the distribution list here is
16  lengthy.  Just skimming it there are a tremendous
17  number of people within, a Morton County email
18  address, and DOI, Department of Interior,
19  Department of Justice, North Dakota State
20  University, Mandan Police Department; Dunn
21  County, North Dakota; Mandan City, Mandan; Cass
22  County, North Dakota, FBI, big group here.  Gosh,
23  keep going down, DOJ, FBI, big group, big mix of
24  state, local and federal people.  Looks like Mr.
25  Rostberg is being very liberal in his interest in

Lowry Crook
May 26, 2022

Page 262

Crook

1                        Crook
2    communicating with all manner of federal and
3    state and local officials.
4              Big deal issue time to North Dakota
5    we know, and so that email was one individual
6    included in Mr. Rostberg's email is an individual
7    by the name of Danzeisen.
8              Do you know who he is?  Pardon me?
9    I want to clarify my comment, which is a
10   question.
11             Pardon me.  One of the recipients of
12   this email is a Corps of Engineers individual
13   named Todd Lindquist.
14             Do you see that when you look up?
15       A.    Yes.
16       Q.    And Mr. Lindquist with the United
17   States Army Corps of Engineers forwarded
18   Mr. Rostberg's email to sheriff Dean Danzeisen,
19   who is a county sheriff in North Dakota.
20             Do you see that?
21       A.    I see it was forwarded to Danzeisen.
22   I don't think that I know that he was the sheriff
23   but.
24       Q.    All right.
25             So then Lindquist then forwards that

Page 263

Crook

1                        Crook
2    forward to a fellow name Keith Fink, a colleague
3    of yours at the Corps of Engineers, and Mr. Fink
4    receives it from Mr. Lindquist and the Corps.
5              Mr. Fink takes the email and sends
6    it to Colonel Henderson, who is the district
7    commander of the Omaha District with jurisdiction
8    over North Dakota and the OIE project.  He also
9    sends it to Thomas Tracy who is we talked about
10   before is the district counsel for the Omaha
11   District Corps of Engineers and copies it to
12   general, pardon me, Lieutenant Colonel Startzell,
13   who is the deputy district commander under
14   Colonel Henderson.
15             And Mr. Fink's message to Colonel
16   Henderson says simply, "Sir, the attached is a
17   law enforcement update on the DAPL protest
18   camps."
19       A.    Can you scroll up, please.  I'm
20   sorry.  I'm not seeing the part that you're
21   reading.  Okay.  Thank you.
22       Q.    I'm sorry.  There you go.
23             Do you see that?
24       A.    Yes.
25       Q.    So it's addressed again to

Page 264

Crook

1                        Crook
2    Henderson, Colonel Henderson, district council
3    Thomas Tracy and Colonel James Startzell, who is
4    the, I don't know if you know this or not, but he
5    was the deputy district commander; is that -- do
6    you agree with me?
7        A.    I believe that was his position in
8    Omaha, yes.
9        Q.    Okay, good.
10             So then if we go to the top of this
11   email chain, Major Startzell, pardon me.  I
12   miss-referred to him.  Major Startzell's replies
13   to the email that he received from Mr. Fink and
14   his, Major Startzell's email response includes
15   copying Colonel Henderson and Thomas Tracy and
16   Mr. Fink.
17             And he says, "Thanks, Keith,"
18   Mr. Fink.  "I'll include some of the highlights
19   in the DAPL update on Monday.  All of this
20   information basically confirms the commander's
21   assessment that the camps are growing out of
22   Standing Rock Sioux Tribe's control, and the
23   chairman is probably going to try to use the SUP
24   as a way to regain control of what he sees as
25   legitimate protesters."  Okay?

Page 265

Crook

2        A.    Yes.
3        Q.    All right.  Bear with me for a
4    moment.

**265:5-266:2 611, 802**

5              So with respect to Major Startzell's
6    email commenting on this law enforcement report
7    that has been forwarded to him that was
8    distributed by Morton County to a large group of
9    state, local and federal law enforcement
10   officials commenting on it as confirming the
11   commander's assessment, Colonel Henderson's
12   assessment.
13             On that, Mr. Crook, were you aware
14   that by September 25, 2016, it was the Army Corps
15   of Engineer's position per the leadership in the
16   Omaha District that the protest camp on Corps
17   lands had grown out of the Standing Rock Sioux
18   Tribe's control?
19             MS. ZILLOLI:  Objection.  Misstates
20   evidence.  Assume facts.
21        A.    I at some point in time was aware
22   that there were concerns about how much control
23   over the situation the tribes, Standing Rock
24   Sioux Tribe had, but, you know, I don't
25   specifically recall when I was made aware of

**ND OBJ.:**
As to
265:19-20,
Relevance

Lowry Crook
May 26, 2022

Page 266

1        Crook
2   those concerns.
3        Q.   Mr. Crook, do you have any reason to
4   disagree with the United States Army Crops of
5   Engineer's district commander John Henderson's
6   assessment on or prior to September 25, 2016 that
7   the camps on Corps land were out of the control?
8             MS. ZILLOLI:  Objection.  Misstates
9   evidence.  Assumes facts.
10       A.   I don't have any reason to disagree
11  with his understanding of the situation.
12       Q.   Mr. Crook, was it ever the Standing
13  Rock Sioux Tribe's responsibility to keep control
14  of protests occurring on Corps of Engineer's
15  property?
16            MS. ZILLOLI:  Objection to the
17  extent it calls for a legal conclusion.
18       A.   We wanted their assistance in trying
19  to keep the situation under control and we wanted
20  their cooperation.
21            What was their responsibility would
22  be a question for them.
23       Q.   For who?
24       A.   The tribe.
25       Q.   Well, did the Corps of Engineers

Page 267

1        Crook
2   ever ask them to be responsible for protesters on
3   Corps of Engineers' property?
4             MS. ZILLOLI:  Objection,
5   speculation.  Foundation.
6        A.   I know there was a lot of back and
7   forth between Colonel Henderson and the tribe,
8   but I don't know what the specific, you know, all
9   the specific requests that were made of the
10  tribe.
11            Just that he generally sought their
12  cooperation in dealing with the protests.
13       Q.   So you don't know whether or not the
14  Corps of Engineers explicitly told the Standing
15  Rock that, you know, it's our land but you be
16  responsible for what happens here?
17       A.   I don't know what the specific
18  conversations were.
19       Q.   One way or the other?
20       A.   Right.
21       Q.   Well, after September 25, 2016,
22  which, by the way, is, what, nine days later you
23  worked on finalizing a press release, which was
24  made public announcing in your words of the press
25  release, the Corps had granted a special use

Page 268

1        Crook
2   permit, the Corps had issued a special use
3   permit, and the special use permit allows
4   protesters to remain on Corps land.
5             Nine days later, at least nine days
6   later, perhaps earlier, the district deputy
7   district commander of the Omaha District is
8   saying the Corps has lost control of the camps.
9             What do you make of that?
10       A.   I don't read it to say the Corps has
11  last control.  It says the Standing Rock Sioux
12  controls.
13       Q.   Pardon me.  You're absolutely right
14  and I appreciate that really important
15  correction.
16            The district commander of the Corps
17  that worked with you on creating a proposed
18  permit and a press release concluded that the
19  Standing Rock Sioux Tribe given a proposed permit
20  didn't have control over the protest camps on
21  Corps land.
22            What do you mean make of that?
23            MS. ZILLOLI:  Objection.
24  Mischaracterizes testimony.
25       Q.   Well, correct me then, Mr. Crook.

Page 269

1        Crook
2        A.   I don't have knowledge of his
3   specific conclusion at this time beyond this.
4   Maybe between him and other people in the Omaha
5   office that I wasn't copied on.
6        Q.   Well, you're the principal deputy of
7   the assistant secretary of the Department of Army
8   for Civil Works and you don't know?
9             MS. ZILLOLI:  Objection.
10  Argumentative and this is starting to get
11  disrespectful.
12       Q.   I'm asking a question, Mr. Crook,
13  and I'm asking it respectfully, and I'm just
14  asking whether you will provide an answer or not.
15            MR. SEBY:  Miss Zilloli, your
16  characterization is inflammatory and improper.
17  I'm entitled to ask questions.
18            I'm happy to --
19            MS. ZILLOLI:  I'm entitled to state
20  for the record when your tone to the witness is
21  disrespectful throughout the entire day.  I'm
22  just putting it on the record.
23       Q.   Mr. Crook, I have zero intention of
24  being disrespectful to you, sir.  I'm asking you
25  if you know the answer to my question.

Lowry Crook
May 26, 2022

Page 270

Crook

1
2    A.    Can you restate the question,
3    please.
4    Q.    Yes.
5          This date of September 25th is the
6    district, deputy district commander is asserting
7    in response to information provided to him and
8    Colonel Henderson that the Standing Rock Sioux
9    Tribe did not have control over the protest camp,
10   and Major Startzell's remarks and reply to that
11   information is that's consistent with Colonel
12   Henderson's assessment.
13         And I'm asking you based upon that
14   email, which we can read in front of us together,
15   if you disagreed with that or if you were
16   concerned about the proximity of that time frame
17   with the fact that the Corps had just announced
18   granting and issuing a permit to the Standing
19   Rock Sioux Tribe to be on Corps property?
20   A.    And I said that I was generally
21   aware at some point in time that there were
22   concerns about the tribe's control over the
23   protests.
24         I don't specifically know what I
25   knew or didn't know at this time or what

Page 271

Crook

1
2    Henderson, Colonel Henderson did or didn't mean
3    on this email.
4    Q.    Okay.
5    A.    Beyond what's on its face.
6    Q.    Sure.  Thank you.
7          Let me ask you then, Mr. Crook,
8    after this email date of September 25, 2016, did
9    the Corps of Engineers or any agency with law
10   enforcement capability of the Federal Government
11   ever take any responsibility for what was
12   happening?
13         MS. ZILLOLI:  Objection.  Vague and
14   calls for a legal conclusion.
15   A.    I guess I'm not exactly sure what
16   you mean by "take responsibility."
17   Q.    Okay.
18         What steps or actions did the Crops
19   take to address trespassers on its property?
20         MS. ZILLOLI:  Objection.  Assumes
21   facts.
22   Q.    Did you take any steps?
23   A.    Regarding the protesters, eventually
24   the Corps of Engineers issued an announcement on
25   the November 25th that they needed to leave by a

271:18-272:4
611

**ND OBJ.:**
As to
271:20-21,
Relevance

Page 272

Crook

1
2    date certain in December, which caused a majority
3    of the protests to leave the site shortly
4    afterward.
5    Q.    I think you were asked this
6    question, but I can't recall your answer, so I'll
7    ask it again.
8          Did the Corps issue any citations to
9    any protesters?
10   A.    And I think I said I'm not aware of
11   whether or not they issued citations.
12   Q.    Okay.
13         Did the Corps of Engineers ever ask
14   the United States Department of Justice or the
15   U.S. Attorney's office for the District of North
16   Dakota to ever enforce the Corps Title 36
17   regulations in Federal Court?
18         MS. ZILLOLI:  Objection,
19   speculation, foundation.
20   Q.    I'm asking you, sir, as an officer
21   of the Corps of Engineers whether or not you are
22   aware of such a request ever being made?
23   A.    I don't know of what requests were
24   made from the Corps to the Department of Justice
25   regarding potential litigation.

Page 273

Crook

1
2    Q.    Well, my question is different than
3    your answer.  I just want to rephrase it because
4    perhaps you may not have understood it.
5          Did the Corps of Engineers ever ask
6    the U.S. Department of Justice through the
7    Justice Department itself or the U.S. Attorney's
8    Office in North Dakota to enforce any citations
9    that the Corps issued to protesters before a
10   Federal United States Magistrate Judge?
11         MS. ZILLOLI:  Same objections.
12   A.    I don't know.
13   Q.    You do not know?
14   A.    No.
15   Q.    Okay.
16         Did the Corps of Engineers ever ask
17   the State of North Dakota or local or state law
18   enforcement to ever enforce trespass law on the
19   Corps of Engineers property?
20         MS. ZILLOLI:  Objection, foundation,
21   speculation.
22   A.    I don't know what specific
23   conversations or requests were had between the
24   Omaha District and law enforcement in the area.
25   Q.    To your knowledge, is what I'm

Lowry Crook
May 26, 2022

Page 274

```
Crook
 1                          Crook
 2    asking, do you know that that was ever
 3    affirmatively done?
 4         A.    I don't know.
 5         Q.    Okay.
 6               Do you know, sir, did the Corps of
 7    Engineers ever ask North Dakota or Morton County
 8    to evict or arrest trespassers on the Corps
 9    property?
10         A.    There again I don't know what
11    conversations occurred between the Omaha District
12    and local law enforcement officials.
13         Q.    You do not know?
14         A.    Right.
15         Q.    Okay.
16               Mr. Crook, are you aware of whether
17    or not the chief of engineers, Todd Semonite, or
18    Major General Spellmon, the Division Commander of
19    the Northwest Division of the Corps of Engineers
20    ever referred to the protesters on Corps land as
21    trespassers?
22         A.    Sitting here today, I couldn't tell
23    you whether they ever used specific language.
24         Q.    You don't recall that being the
25    case?
```

Page 276

276:5-11
611, calls for legal
conclusion
701-702

```
 1                          Crook
 2    to remain on its property?
 3         A.    Yes.
 4         Q.    Okay.
 5               Who made the decision to allow
 6    protesters to remain on Corps property?
 7         A.    Well, the decision regarding the
 8    special use permit, as we've discussed, was
 9    Colonel Henderson but in consultation with, you
10    know, the vertical chain at the Corps and the
11    Army and other agencies.
12         Q.    If we could go to Exhibit 432.
13               Mr. Crook, this is an email chain
14    from Tracy Sutton, and I believe earlier we spoke
15    about her as being an assistant to the United
16    States Senator Heidi Heitkamp; is that correct?
17         A.    Yes.
18         Q.    So this email starts on October 2nd
19    of 2016.  She emails you, Mr. Crook, and she
20    says, "Mr. Crook, Senator Heitkamp has seen the
21    AP story where a spokesperson from the Corps has
22    indicated that folks won't be removed from the
23    protest site.  Is this accurate?  If so, where
24    does this leave the current leaseholder?"
25               And you replied to her the next day,
```

Page 275

```
 1                          Crook
 2         A.    I don't recall whether or not they
 3    would have used the word "trespassers" about
 4    them.
 5         Q.    Okay.
 6               Mr. Crook, do you recall whether the
 7    Corps ever considered and made a decision
 8    affirmatively to do it or affirmatively not to
 9    allow protesters on Corps land to stay?
10         A.    I now recall that the specific
11    announcement on the 16th that you showed me and
12    that, as I mentioned, I recall the announcement
13    that was made on November 25th.
14         Q.    I'm sorry.
15               You gave two examples in response to
16    my question, one was Colonel Henderson's
17    November 25 letter.
18               What was the first one?
19         A.    The announcement regarding the
20    special use permit on September 16th.
21         Q.    The press release?
22         A.    Yes.
23         Q.    And that's your answer to the
24    question of whether or not the Corps ever
25    affirmatively made a decision to allow protesters
```

Page 277

```
 1                          Crook
 2    in the morning saying "What's the best number to
 3    reach you?"  She gives it to you.
 4               And then you say, "It looks like I
 5    missed you earlier.  I just tried to call you
 6    back."  So that's all we know from that exchange.
 7               So if we could go to 433, please.
 8    Okay.  This is an email, two-part email, and it
 9    is the same day you were corresponding with Miss
10    Sutton from Senator Heitkamp's office, and it
11    looks like an individual with the Corps by the
12    name of Kayla Eckert Uptmor independently wrote
13    to Miss Sutton and the subject says "Response to
14    text inquiry."
15               "Good morning, Tracy.  You sent me a
16    text asking 'the same thing I just read from the
17    email that Miss Sutton send to you, my boss,
18    Senator Heitkamp has seen the AP story which says
19    the Corps isn't going to be removing people from
20    the protest site in North Dakota.  Is this true?
21    If so, where does that leave things with the
22    current lease header'."
23               And Miss Eckert Uptmor proceeds to
24    provide a response to the Senator's assistant,
25    which says, "In short, the Corps of Engineers
```

Lowry Crook
May 26, 2022

Page 278

Crook

1                           Crook
2   invokes only proprietary jurisdiction over its
3   project lands, which allow us to issue citations
4   for violations but not arrest or take any other
5   law enforcement action.
6                "For that reason, we, the Corps,
7   rely on local law enforcement to enforce state
8   and local law violations like trespassing.
9   Because it is a leased property to Mr. Meyer, as
10  the lessee, he is in the best position to request
11  assistance from the local law enforcement to have
12  the trespassers removed from the lands.  He has
13  indicated that he does not plan to do that,
14  anything.
15               "Currently, Colonel Henderson and
16  chairman Archambault are in daily contact and
17  working a path forward that will both anticipate
18  that they both anticipate will resolve the issues
19  in the near term," and then Miss Eckert Uptmor,
20  after she sends that message to the senator's
21  assistant, forwards it to you with no message.
22               Do you recall this communication?
23        A.    Just to correct, it looked like
24  Tracy Sutton, the senator's aide, forwarded it to
25  me.

Page 279

Crook

1                           Crook
2        Q.    Oh, you're correct.  The senator's
3   assistant, Miss Sutton, sent it to you, and she
4   sent it to you later that morning, and it seems
5   to be about the time that you were trading emails
6   about getting in touch to have a call; is that
7   right?
8        A.    Yes.
9        Q.    Did you ever speak with her?
10       A.    Many times.
11       Q.    Did you say or do anything to
12  clarify that the guidance that was provided and
13  that is to her question, are you and the Corps
14  going to do anything to get these people off your
15  land?
16       A.    I recall both Senator Heitkamp and
17  her staff raising the issue of the grazing lease
18  area of the land, but I don't recall specifically
19  what I said to her of the conversation on this
20  morning.
21       Q.    So do you recall ever answering her
22  question about whether or not the Corps was going
23  to remove trespassers?
24       A.    I don't recall specifically
25  answering that question for her.

Page 280

Crook

1                           Crook
2        Q.    Okay.
3              Or if you ever did?
4        A.    Right.
5        Q.    Okay.
6              But you talked to her all the time,
7   many times; is that what you're saying?
8        A.    I talked to her many times during
9   this period.
10       Q.    Okay.
11             So, let's see.  Let's go to Exhibit
12  441.
13             So, Mr. Crook, this is one of the
14  longer email chains we're going to go over
15  because I want to ask you about the final email
16  in this chain, which happens to be from the Chief
17  of Engineers of the United States Army Corps of
18  Engineers Todd Semonite to Major General Jackson
19  and Brigadier General Scott Spellmon and copied
20  to you.
21             Can you please take a moment and
22  read this email sting so that I can ask you about
23  this email to you from Chief of Engineer
24  Semonite, please.
25       A.    Can we start from the earlier part

Page 281

Crook

1                           Crook
2   of the chain and work upwards, if that's okay.
3        Q.    Here we go.
4        A.    Thank you.  Can you scroll up just a
5   little bit.  Our screen is covering something.  A
6   little bit.  That's fine, too.  Okay.  Can you
7   scroll up a little bit, please.  Okay.  Okay.
8   Okay.  Okay.  Can you scroll down a little bit.
9   Scroll up a little more, please.  Down a little
10  bit.  Just a little bit more, please.  Down a
11  little bit more, please.  Thank you.  Up a little
12  bit.  Sorry.  Okay.  A little bit higher.  Okay.
13       Q.    Good.  You made your way through
14  that lengthy chain?
15       A.    Yes, finally.
16       Q.    Thanks.
17             Mr. Crook, I want to ask you about
18  now just General Semonite, Chief of Engineer
19  Semonite's email, which is at the top of this
20  chain, and I just will observe that the email
21  started with General Jackson.  No, I take that
22  back.  It started with a -- yes, it did.  General
23  Jackson corresponding with Brigadier General
24  Spellmon, and that's the two of them on that
25  communication.  Then Spellmon responds and

Lowry Crook
May 26, 2022

Page 282

Crook

1          Crook
2   Jackson replies and then Spellmon -- Jackson then
3   responds to Spellmon and he adds Secretary Darcy
4   and the chief of engineers, "Madam Secretary and
5   chief, Wanted you both to have this in advance of
6   your engagements tomorrow."
7                This is October 13th.
8                To that, Chief of Engineer Semonite
9   responds to just you, Brigadier General Spellmon
10  and Major General Jackson, the three of you, and
11  he structured his email to the three of you with
12  specific questions before he gets into a request
13  for all of you have to huddle tomorrow before he
14  speaks with North Dakota, United States Senator
15  John Hoeven.
16               His note to you, which starts the
17  email, "Lowry, I am ready to get personally
18  involved here.  Current plan is not working.  Not
19  sure anything Has Gotten Better."  Since our last
20  meeting with Senator Hoeven, if anything,
21  situation has degraded.  If there is a Master
22  Strategy would like to know it.  I see this with
23  high potential for increased conflict.  Please
24  let me know what I can to assist in getting a
25  solution.  Can't sit on this much longer without

Page 283

1   a feasible Plan In A Timely Manner."
2
3                It seems like he's pretty wound up
4   using capital letters to you, don't you think?  I
5   mean, is that how he normally communicates to
6   you, randomly highlights words capitalizing them?
7        A.     Actually, that is a habit of his on
8   most of his written communications.
9        Q.     Okay.
10               And what is he trying to do with all
11  capping certain words?
12               MS. ZILLOLI:  Objection,
13  speculation.
14        Q.     Well --
15        A.     It appears to be, you know,
16  emphasizing those words.
17        Q.     Okay.  Thanks.  I figured you'd know
18  because you had at leat the knowledge to say,
19  yeah, he does it all the time, right?
20        A.     He does it very frequently, yes.
21        Q.     It doesn't sound like speculation to
22  me.
23               So, Mr. Crook, he then guess on to
24  say "Ed," he's referring to Ed Jackson or Scott,
25  and Scott Spellmon, "Tracking all, this is just

283:3-8,
283:17-20
401-402

Page 284

Crook

1   as we discussed a few days ago.  We need to keep
2   thinking through our responsibilities if we get a
3   course case option.  More arrests, no movement
4   off camp and the company starts working the 20
5   mile area.  More arrest and injuries.  Concrete
6   and structures go up on northern and southern
7   camp in prep for winter/national rally to cause
8   of Indians within three weeks of election."
9
10               And then he says to you all "Would
11  like to huddle tomorrow before the Hoeven call.
12  Please help me understand a few issues."
13               The chief of engineers is asking the
14  three of you to meet to help him understand some
15  issues, right?
16        A.     I don't know if he was expecting me
17  to huddle with him or just Jackson and Spellmon
18  with this email.
19        Q.     Okay.
20               What do you make of this?  You're
21  just identified by name with observations.  He's
22  talking about getting ready to talk with Senator
23  Hoeven, and you don't think he's asking you to be
24  part of the discussions on these five significant
25  issues he wants to know about?

Page 285

Crook

2        A.     I don't personally know his intent
3   behind it, but it's not clear to me whether he
4   was requesting that I join the prep for the
5   Hoeven call or just Jackson and Spellmon is all
6   I'm saying.
7        Q.     Did you participate or not with him
8   in response to this email?
9        A.     I don't recall whether I joined a
10  prep session the next day or not.
11        Q.     Do you recall speaking to any of the
12  issues that he's identified here below because
13  you've just read this email and know what they
14  are?
15        A.     I mean, I recall that there, you
16  know, subsequent to this email there were
17  numerous conversations about the various issues
18  that he covers in it.
19        Q.     Well, okay.
20               So you just don't know if you gave
21  any input to what he was asking for input on?
22        A.     I don't think I responded
23  specifically to this email.
24        Q.     Not the question.
25        A.     Okay.

Lowry Crook
May 26, 2022

Page 286

Crook

2    Q.    The question was did you participate
3  in a discussion or around communication with the
4  chief of engineers when he wrote to you and two
5  other gentlemen asking to help him understand a
6  few issues?
7    A.    We had conversations about these
8  issues subsequent to this email.
9    Q.    When?
10   A.    I don't know the specific time
11 period.
12   Q.    Okay.  Okay.
13         So you don't know if you spoke to
14 him to help him prepare for speaking with Senator
15 Hoeven or if it was after that, but you do recall
16 speaking with him at some time on these issues?
17   A.    I recall he and I attending meetings
18 with both Senators Hoeven and Senator Heitkamp
19 together and having discussions before and after
20 those meetings about the issues like these that
21 the senators were raising.
22   Q.    Okay.
23         So, Mr. Crook, based upon your
24 position and your knowledge of events and your
25 presence in communicating with the chief of

Page 287

Crook

2  engineers and Major Jackson and Scott Spellmon
3  and Miss Darcy, the chief of engineers is asking,
4  at least in this email, which is at issue, you
5  said you discussed later title trespassing.  It
6  is all caps and, as you said, he does that when
7  he wants to add emphasis.  He adds emphasis by
8  identifying trespassing.
9          He says "What is our position to
10 Congress?"  Our being I think you're all part of
11 the, at least, the Department of the Army and,
12 more specifically, the Corps of Engineers, right?
13 So that's ours.
14         Do you have any dispute with that?
15         MS. ZILLOLI:  Objection.  Misstates
16 evidence and testimony.
17   Q.    Mr. Crook, I'm asking --
18   A.    I mean beyond looking at his face, I
19 don't know what he had in mind for our, whether
20 he meant the Corps or the Army at large.
21   Q.    Well, keep reading the sentence
22 because it answers your question.
23   A.    Okay.
24   Q.    Why the Corps has allowed
25 trespassing and camping on government land on the

Page 288

Crook

2  north side.
3          What did you give him feedback on
4  that, whenever you talked to him, whenever that
5  was?
6    A.    I don't recall whether I had a
7  specific conversation with him directly answering
8  this.
9    Q.    Mr. Crook --
10   A.    Yes.
11   Q.    -- did you duck speaking with
12 general Semonite ever on this issue or -- I'm
13 sorry.
14         Did you duck out on ever speaking
15 about this issue with Chief Semonite or did you
16 ever have a conversation with him on this topic?
17 Here he's asking you for, but apart from this,
18 did you ever talk about this issue?
19         MS. ZILLOLI:  Objection.  Misstates
20 evidence.  Argumentative.
21   A.    I don't believe I ducked any
22 conversations with General Semonite.  It's just
23 there were many conversations at various levels
24 between him and Miss Darcy and me and the chief
25 of staff of the Army about these general issues,

Page 289

Crook

2  and I just don't remember specifically how and
3  whether I responded to this email directly to
4  him.
5    Q.    What was your position as principal
6  deputy on the question that General Semonite is
7  asking:  Why the Corps has allowed trespassing on
8  government land on the north side of the
9  Cannonball River?
10   A.    My position was that I understood
11 that there were First Amendment concerns that the
12 Corps was responding to; that there were
13 questions about the Corps having capacity to
14 enforce any demands it made, given that the Corps
15 generally doesn't have law enforcement, and that
16 there were concerns from Department of Justice
17 and other agencies with law enforcement expertise
18 about the potential results of a confrontation of
19 the protesters.
20   Q.    Earlier I asked you whether or not
21 you were aware the Corps ever issued citations,
22 and you, I believe, you told me you were not
23 aware?
24   A.    That's correct.
25   Q.    And I also asked you whether you

Lowry Crook
May 26, 2022

Page 290

Crook

2 were aware that the Corps asked any other federal
3 agencies to take measures to evict trespassers on
4 its property, and you said you were not aware of
5 any?
6          A.    I believe it was a more specific
7 question about going to federal court or
8 something but I --
9          Q.    That was a different question.
10         A.    Okay.  I may just be conflating
11 questions.
12         Q.    General Jackson, pardon me.  General
13 Semonite is saying with respect to why the Corps
14 has allowed trespassing on government land on the
15 north side, he goes on to say "Dot, dot, dot
16 effectively condoning the tribes to violate the
17 law both on our land as well as other lands.
18 When is the Corps going to do something to get
19 this under control?  While many might move to
20 other camps, some will stay just to embolden the
21 effort.  Is there some event that will cause us,
22 the Corps, to ask the sheriff to enforce the
23 law?"
24              What is your response to that series
25 of questions that is in an email to you from Todd

Page 291

Crook

2 Semonite, the Chief of the United States Army
3 Corps of Engineers?
4          A.    My response to the first question is
5 I wouldn't necessarily use those words to
6 describe what was happening.
7              The response to the next questions
8 about what might cause USACE to ask the sheriff
9 to enforce the law, I did not know the answer to
10 that question.
11         Q.    And so you don't agree, your first
12 point was you don't agree with the way the chief
13 of engineers was characterizing the circumstances
14 of what was happening is what I understand you
15 said or the description of what was happening?
16         A.    I wouldn't have used the same words
17 that he used.
18         Q.    Did you tell him you disagreed with
19 his characterization?
20         A.    I don't recall telling him that.
21         Q.    Why?
22         A.    There was a lot going on and,
23 usually, my conversations with him were very
24 focused on specifically preparing for, you know,
25 responding to one of the congressional

Page 292

Crook

2 delegations or preparing to, you know, brief the
3 Army leadership since characterizing or
4 responding to how he worded an email.
5          Q.    Mr. Crook, was the Chief of
6 Engineers Todd Semonite your boss?
7          A.    No.
8          Q.    Did you have to listen to what he
9 asked you to do?
10         A.    I did listen to his views.
11         Q.    Did you have to -- were you required
12 to follow his direction?
13         A.    No.
14              MS. ZILLOLI:  Counsel, can we go off
15 the record, please.
16              MR. SEBY:  Okay.
17              THE VIDEOGRAPHER:  We are off the
18 record 10:32 p.m. UTC, 6:32 p.m. Eastern.
19              (Off the record.)
20              THE VIDEOGRAPHER:  Back on the
21 record.  6:33 p.m. Eastern, 10:33 p.m. UTC.
22         Q.    Mr. Crook, if we could go to exhibit
23 443, please, and this is an email string that
24 starts with an email from John Henderson, Colonel
25 Henderson to Scott Spellmon.  You're not copied

Page 293

Crook

2 on this, but you're eventually forwarded the
3 whole thing and Colonel Henderson says, "Sir,"
4 addressed to Spellmon, "Attached is our draft
5 press release for your review and further
6 coordination.  The timing is not important.
7 We'll change the items related to the tense and
8 timing if it goes out later than today,
9 October 28, 2016."
10             Spellmon writes back, no, he
11 doesn't.  Spellmon forwards that email to Donald
12 Jackson and says, "Forwarding our recommendation
13 for your situational awareness.  This is working
14 its way through staff channels for interagency
15 review as we discussed earlier today."
16             Were you aware of this at that time
17 given your past role and responsibility for
18 advancing interagency review of Corps of
19 Engineers issues?
20         A.    I actually don't know what the press
21 release that he's referring to was about.  So
22 when say this issue, I don't yet remember what
23 the issue was that they were trying to announce.
24         Q.    Understand.
25             If we could go to the attachment to

Lowry Crook
May 26, 2022

Page 294

1                    Crook
2    deal with that question.
3         A.    Could you scroll up a little bit,
4    please.  Not quite that far.  Sorry.  That's
5    good.  Okay.  Could you scroll up a little bit
6    more, please.  Okay.  A little bit more, please.
7    A little bit more.  Okay.
8         Q.    Have you finished reading it?
9         A.    Yes.
10        Q.    Okay.
11              So you know what this draft is about
12   that you're ultimately getting a copy of from
13   General Jackson.
14              Do you recall it now?
15        A.    Can I read his email to me before we
16   proceed further?
17        Q.    You bet.  I'm sorry.  Please do
18   that.
19        A.    All right.  Thanks.  Just a little
20   higher.  Something is getting blocked.  Okay.
21        Q.    Do you see that.  Now your email
22   received from Jackson to you.
23              It reads to me like he's asking you
24   to do what you did before, and that is liaison it
25   with the appropriate folks.  I assume that's your

Page 295

1                    Crook
2    interagency coordination group and asking for
3    your feedback and wants to talk to you about it.
4              Tell me about your conversations
5    with General Jackson on this draft press release
6    from Colonel Henderson, October 28, 2016.
7         A.    Again, I don't recall the specifics,
8    but my general practice would have been to share
9    this with the other agencies that we discussed
10   and with the White House to both for their
11   awareness and to get any questions or concerns
12   they may have.
13        Q.    Okay.
14              So with respect to the draft press
15   release that you would share with those folks,
16   the title of it says Standing Rock Sioux Tribe
17   permit not renewed.  Corps concerned over
18   escalation and public safety.
19              In the first paragraph says, "The
20   Omaha district commander in coordination with the
21   Standing Rock Sioux Tribe has decided not to
22   renew the social use permit which authorized the
23   use of federal land for the peaceful
24   demonstration by members of the Standing Rock
25   Sioux Tribe against the Dakota Access Pipeline

Page 296

1                    Crook
2    project.  The permit is set to expire October 30,
3    and the commander has decided that recent events
4    have contributed to an environment that is
5    neither peaceful, nor safe," and then he down
6    below talks about some reported illegal
7    activities; but I want to ask you a fundamental
8    question, Mr. Crook.
9              What did you think about this, the
10   premise of this press release that's evident in
11   the title and the first paragraph of the draft,
12   how did you react when you read that?
13        A.    I don't know what my specific
14   reaction to the press release was.  It appears
15   consistent with concerns that I was hearing
16   during that general time period.
17        Q.    Mr. Crook, do you think that, do you
18   agree with me that that first paragraph in the
19   title assumes that there ever was a special use
20   permit issued in final to the Standing Rock Sioux
21   Tribe that provided them with permission to be on
22   Corps of Engineers property?  Do you agree with
23   me that that assumes that fact?
24        A.    It says renew and authorize, so,
25   yes, that appears implicit in the language.

Page 297

1                    Crook
2         Q.    Again, more specifically, and to
3    quote the document we're looking at, "The Omaha
4    district commander in coordination with the
5    Standing Rock Sioux Tribe has decided not to
6    renew the special use permit which authorized the
7    use of federal land."
8              Was there ever such a permit in
9    final place that authorized that use?
10             MS. ZILLOLI:  Objection to the
11   extent it calls for a legal conclusion.
12        A.    I know there were questions about
13   the status of the permit, you know, based on the
14   previous emails that you showed me.
15        Q.    Mr. Crook --
16        A.    I don't have a conclusion as to what
17   was operable or not operable regarding that
18   permit at that time.
19        Q.    Okay.
20             Did you ever have a position on
21   whether it was a final effective permit or not?
22        A.    I don't think I had position on
23   that.  I just recall it being a question.
24        Q.    Do you know, did you ever see the
25   Standing Rock Sioux Tribe comply with the

Lowry Crook
May 26, 2022

Page 298

Crook

1
2  conditions of the permit in order for it to be
3  finally and effective?
4        A.    I do not believe and in this
5  document says that there were conditions of the
6  permit with which they did not comply.
7        Q.    Did you ever read the special use
8  permit, Mr. Crook?
9        A.    I believe I did read the special use
10 permit at some point.
11       Q.    Were you ever affirmatively told
12 that the tribe complied with the requirements of
13 that permit, namely, providing liability
14 insurance and the size of the crowd to be on that
15 property?
16       A.    I do not recall being told that they
17 complied with those requirements.
18       Q.    Were you told that they did not
19 comply with those requirements?
20       A.    I believe that I was told that they
21 had not met those conditions.
22       Q.    So how did you ever conclude that
23 there was a permit in place?
24             MS. ZILLOLI:  Objection.  Misstates
25 testimony.

Page 299

Crook

1
2        A.    I think, as I said, I didn't have a
3  conclusion on that issue.  I knew that it was a
4  question.
5        Q.    You didn't have a position?
6        A.    No, not that I recall.
7        Q.    Okay.
8              What did you think of this idea of
9  revoking a permit that you didn't know was ever
10 final or not renewing?  Pardon me.
11       A.    I don't know that I had -- that I
12 was focused on that issue when I received this
13 email and draft.
14       Q.    Okay.
15             Now, if we could go to Exhibit 446,
16 please.
17             Mr. Crook, would you read the email
18 here in its entirety.  It's two component email.
19 The last, the first one is from General Jackson
20 to you and copied to Todd Semonite, the chief of
21 engineers, and Brigadier General Spellmon and
22 David Cooper, but Jackson's email is just
23 identified to you.
24             In fact, you're the only, well, you
25 and Miss Darcy are the direct recipients and then

Page 300

Crook

1
2  the other individuals that I mentioned are ccs.
3              So he says, so General Jackson says
4  to you, "Lowry, we need to be prepared to clarify
5  the record on this.  So need your thoughts on how
6  best to do so," and the subject line says
7  "President Obama video on Army Corps and
8  rerouting pipeline."
9              And the General Jackson's note to
10 you asking for clarification of the record on
11 this, the President's presentation remarks on the
12 video and asking you how best to do that, right?
13             And have you read the remarks
14 attributed to President Obama that are below that
15 hash line here?
16       A.    Can you give me a minute to read
17 them real quick?
18       Q.    Oh, yeah.
19       A.    Can you scroll down a little bit,
20 please.  Not quite that far.  Sorry.  Right.
21 Okay.
22       Q.    Okay.
23             So do you want to read anything else
24 or can I ask you a question?
25       A.    Go ahead, please.

Page 301

Crook

1
2        Q.    Okay.
3              So it looks like this, this is a --
4  it's got a series of quotes in here but the
5  sentence before the quote says "President Obama
6  addressed the Dakota Access Pipeline controversy
7  for the second time Tuesday," and saying his
8  administration is looking for a way to reroute
9  the pipeline.
10             And there's some quotes in there
11 and, apparently, this was on an MSNBC television
12 program called "The Last Word with Lawrence
13 O'Donnell."
14             And the President is, has a quote
15 here that's attributed to him from this video, "I
16 think right now that the Army Corps of Engineers
17 is examining whether there are ways to reroute
18 this pipeline."
19             Then the next sentence says,
20 "Tensions in North Dakota are rising between
21 police and pipeline protesters who have been
22 demonstrating for weeks."
23             And then there's another quote
24 attributed to the President below, "We're going
25 to let it play out for several more weeks and

301:3-302:12, 304:13-21, 306:23-307:4, 310:6-20
401-402, 602, 802

Lowry Crook
May 26, 2022

Page 302

Crook

1
2 then determine whether or not this can be
3 resolved in a way that I think is properly
4 attentive to the traditions of the First
5 Americans," Obama said.
6          So major General Jackson is sharing
7 that with you.
8          Were you aware of this Lawrence
9 O'Donnell program prior to General Jackson
10 forwarding it to you?
11      A.    I don't recall if I was aware before
12 or this is the first I heard of it.
13      Q.    Okay.
14          But you do recall the event?
15      A.    I do.
16      Q.    Did you ever watch the video?
17      A.    Actually, I don't know if I ever
18 watched it or just read the words.
19      Q.    Okay.
20          Well, nonetheless, Major General
21 Jackson, here at least in this instance,
22 abundantly clear "Lowry, we need to be prepared
23 to clarify the record on this.  Need your
24 thoughts on how best to do it."
25          What did you think needed to be

Page 303

Crook

1
2 clarified according to Major Jackson?
3      A.    I mean, he'd be best to answer what
4 he was most concerned about or thought needed to
5 be clarified beyond the, you know, what was
6 stated in his email.
7      Q.    Okay.
8          So we should ask General Jackson?
9      A.    What he means in his email?
10      Q.    Yes.
11      A.    Yes.
12      Q.    Is that right?  Is that what you're
13 saying?
14      A.    Yes, he would best know what he
15 meant.
16      Q.    Best know, sure, because he said it.
17          But did you know what he was talking
18 about, what needed to be clarified?
19      A.    I read it to be the statement that
20 the Corps is examining whether there are ways to
21 reroute the pipeline.
22      Q.    And what did you think needed to be
23 clarified about that?
24      A.    I believe at the time that our
25 announcement on the pipeline or statements on the

Page 304

Crook

1
2 pipeline was that we were reviewing -- that goes
3 beyond what we had publicly said we were doing,
4 and it's different from what we had publicly said
5 we were doing.
6      Q.    Okay.
7          So that needed to be clarified,
8 right?
9      A.    I believe, well, General Jackson was
10 asking for it to be clarified.
11      Q.    Well, he's asking for your thoughts
12 on how best to do that.
13          So what thoughts did you have with
14 Major General Jackson in response to his email to
15 you identifying you as the person that he was
16 asking you to share your thoughts on?
17      A.    I recall reaching out to the White
18 House, specifically Dan Utech and the Office of
19 Legislative Affairs at the White House, to talk
20 about the issue because I was also getting
21 congressional inquiries about it.
22      Q.    Yes.  In fact, the rest of this
23 email is your forwarded email to Mr. Utech saying
24 and Miss Billingsley, who was the special
25 assistant to the President, you were letting them

Page 305

Crook

1
2 know that General Jackson is asking about this
3 and wants to clarify it.
4          So you said let's discuss, and you
5 do mention you just got off the phone with
6 Senator Heitkamp also making similar inquiry.
7          So what happened?  What did you do?
8 What did you discuss with the White House, these
9 two senior officials in the White House?
10          Seems to me Jackson is telling you
11 that the President got ahead of his skis.
12      A.    Yeah or he got ahead of what we had
13 stated publicly, not ahead, but beyond or
14 different than what we had stated publicly.
15          I believe that, A, I wanted to know
16 if there was, you know, generally what the White
17 House position was and if it was different than I
18 had understood based on our previous
19 conversations.
20          So I believe I was as focused on
21 what it meant that the President said that as
22 whether we needed to get a clarification or not.
23      Q.    What did you learn from those
24 individuals at the White House?
25          MS. ZILLOLI:  Objection to the

Lowry Crook
May 26, 2022

Page 306

```
                        Crook
 1                      Crook
 2   extent the answer would implicate deliberative
 3   process materials.  If you could answer without
 4   disclosing deliberative process information, then
 5   you can answer.
 6        A.      I don't believe they gave me really
 7   any specific feedback or discussion of, you know,
 8   what may have been discussed or not discussed
 9   with the President about this.
10        Q.      Did they agree or disagree with the
11   statement you just made that you went to them
12   because you thought and, clearly, General Jackson
13   thought that the President made remarks on MSNBC
14   on video that said, in your opinion, I think you
15   just said went ahead, beyond or were different
16   than what the Corps was saying or doing publicly.
17            Did the people in the White House
18   that you brought that concern to share that
19   opinion or not?
20        MS. ZILLOLI:  Objection,
21   speculation.
22        Q.      Well, you spoke to them, sir.
23            What did they say?
24        A.      I believe I pointed out the
25   difference between what we had said and what the
```

Page 307

```
 1                      Crook
 2   President said.
 3            So, yes, they were aware there was a
 4   difference.
 5        MS. ZILLOLI:  Counsel, we are almost
 6   half an hour over the seven hours allotted time.
 7   I would just ask that you wrap it up.
 8        MR. SEBY:  Glad to.  I just want to
 9   finish this question.  It may be uncomfortable
10   but I want to hear the answer.
11        MS. ZILLOLI:  I'm not objecting to
12   the fact that the question is uncomfortable.  We
13   agreed at the break to 15 more minutes.  It has
14   been more than 15 minutes since that break, and
15   we are already over time.  I would just ask that
16   you finish this line of questioning soon.
17        Q.      Mr. Crook, I need your help to do
18   that.
19            Would you answer my question,
20   please.
21        A.      Sorry.  Can you restate the
22   question?
23        Q.      Yup.
24            Did, after you pointed out the
25   difference in what the Corps was saying and
```

Page 308

```
 1                      Crook
 2   compared to what the President was saying, how
 3   did they react?
 4        A.      I don't recall specifically how they
 5   reacted.
 6        Q.      Okay.
 7            So after you sought their discussion
 8   on this issue, when did you ever get back to
 9   General Jackson on his question to you for
10   thoughts on best to clarify the fact that the
11   president made remarks which were different than
12   what the Corps was saying publicly?
13        A.      I don't recall the specific
14   conversations or communications.  My general
15   practice would have been to share with him that I
16   shared this with the White House and was, you
17   know, waiting on additional feedback.
18            I would have given him status
19   reports of what I knew, but I don't recall
20   specifically what I said to answer his question.
21        Q.      You don't recall what you said in
22   response to the President's remarks that you
23   already observed were inconsistent and different
24   than what the Corps had been saying?  You don't
25   recall?
```

Page 309

```
 1                      Crook
 2        A.      Because I know that I shared the
 3   issue with the White House.  I don't recall
 4   getting a specific response from them or any
 5   details from them; and so other than sharing the
 6   fact that I shared this with the White House, I
 7   don't believe that we got anything back
 8   substantive from them to share with General
 9   Jackson.
10        Q.      So because of that, were you ever in
11   a position to respond to General Jackson's
12   question to you on thoughts on how best to
13   clarify the President's remarks, which were
14   different than what the Corps was saying?
15        A.      I don't think that -- I don't recall
16   that anybody clarified the remarks and so there
17   was not an answer to that question.
18        Q.      So it just died there with a lack of
19   follow-up from the White House?
20        MS. ZILLOLI:  Objection.  Asked and
21   answered.
22        A.      I -- at some point I believe it was
23   overcome by events.
24        Q.      Which events?  This was November --
25        A.      Announcements we made on --
```

Lowry Crook
May 26, 2022

Page 310

```
            Crook
 1
 2     Q.    Sorry.
 3     A.    I'm sorry.  Go ahead.
 4     Q.    I just wanted to point out to you
 5  this was November 2nd of 2016.
 6           After that, what events overcame the
 7  disparity between the President's remarks about
 8  the Corps and the Corps public statements about
 9  what it was doing?
10     A.    At some point we issued further
11  announcement about what we were doing that just
12  stated, rather than correcting the President,
13  just stated affirmatively what we were doing.
14     Q.    And what issued communication are
15  you referring to specifically that did that?
16     A.    There was an announcement that the
17  Army, Secretary Darcy released on December 6th, I
18  believe, about her decision on the easement and
19  additional environmental review that would be
20  done on the easement.
21     Q.    Basically running out the clock on
22  the Obama Administration, right?
23     A.    I would not characterize it that
24  way.
25     Q.    By that time a new president of the
```

Page 311

```
            Crook
 1
 2  United States had been elected and was awaiting
 3  January 20th to take office, correct?
 4     A.    That is correct.
 5     Q.    All right.
 6           Mr. Crook, I'm going to wrap up
 7  here.
 8           Can you recall the time when you or
 9  any of your Corps or Department of army
10  colleagues made a statement or took any action
11  that resulted in any deescalation of the DAPL
12  protests occurring on Corps property?
13     A.    Yes.
14     Q.    And what would that be?
15     A.    The December 6th statement caused,
16  helped caused the majority of the protesters to
17  leave ahead of the winter storm.
18     Q.    And majority of what amount?
19     A.    I don't know the specific amount but
20  large numbers of them.
21     Q.    Large numbers.
22           What portion of the amount that were
23  present on Corps land were caused to leave by
24  that December 6th announcement?
25     A.    I can't give you a specific
```

Page 312

```
            Crook
 1
 2  percentage other than more than half.
 3     Q.    More than half.
 4           And how do you know that amount?
 5     A.    Press reports and we were getting,
 6  you know, reports through the chain of command
 7  about what was happening.
 8           MS. ZILLOLI:  Counsel, I'm sorry.
 9  I'm going to have to insist that we end.  We have
10  given you many, many opportunities for leeway,
11  and I would just ask that you be respectful of
12  the witness' time.  We are already well over the
13  seven hours I think.
14     Q.    Mr. Crook, unless you've indicated
15  otherwise throughout this deposition today, have
16  you understood my questions?
17     A.    Yes, unless I've needed
18  clarification, yes.
19     Q.    Is there anything further you would
20  like to add to what you've said and testimony?
21     A.    Sorry.
22     Q.    I'm sorry.
23           What's the answer?  Did you hear the
24  question?
25           We talked over each other.  I'll
```

Page 313

```
            Crook
 1
 2  repeat it again.
 3     A.    Yes.  I'm sorry about that.  No
 4  thank you.  There's nothing I would like to add
 5  at this time.
 6     Q.    Okay.
 7           MR. SEBY:  At this time, Miss
 8  Zilloli, I have no further questions.
 9           MS. ZILLOLI:  Thank you.  I have no
10  questions and we will read and sign.
11           Thank you for this time and I
12  appreciate it, and I apologize for the time over
13  the seven hours.
14           THE VIDEOGRAPHER:  This concludes
15  the deposition.  Time is 7:02 p.m. Eastern, 11:02
16  p.m. UTC.
17           (Time noted:  7:02 p.m)
```

Lowry Crook
May 26, 2022

Page 314

2            ACKNOWLEDGMENT OF DEPONENT

3            I, LOWRY CROOK, do hereby certify that I

4    have read the foregoing pages and that the same

5    is a correct transcription of the answers given

6    by me to the questions therein propounded, except

7    for the corrections or changes in form or

8    substance, in any, noted in the attached Errata

9    Sheet.

10

11

12

13

14    _____        _____

15    Date              Signature

16

17

18

19    Subscribed and sworn to before me this _____

20    day of _____, 20_____.

21    _____

22          Notary Public

23

24

25

---

Page 316

2            C E R T I F I C A T E

3

4            I, MICHAEL WILLIAMS, a Registered

5    Professional Reporter and Notary Public of the

6    State of New York, do hereby certify that prior

7    to the commencement of the examination, the

8    witness was duly sworn by me to testify to the

9    truth, the whole truth and nothing but the truth.

10            I DO FURTHER CERTIFY that the foregoing is

11    a true and accurate transcript of the testimony

12    as taken stenographically by and before me at the

13    time, place and on the date hereinbefore set

14    forth, to the best of my ability.

15            I DO FURTHER CERTIFY that I am neither a

16    relative nor employee nor attorney nor counsel of

17    any of the parties to this action, and that I am

18    neither a relative nor employee of such attorney

19    or counsel, and that I am not financially

20    interested in the action.

21

22

23    _____

24    MICHAEL WILLIAMS, RPR

25

---

Page 315

2            E R R A T A   S H E E T

3    CORRECTION                 PAGE    LINE

4    - - - - - - - - - - - - - - - - - - - - - - - -

5    - - - - - - - - - - - - - - - - - - - - - - - -

6    - - - - - - - - - - - - - - - - - - - - - - - -

7    - - - - - - - - - - - - - - - - - - - - - - - -

8    - - - - - - - - - - - - - - - - - - - - - - - -

9    - - - - - - - - - - - - - - - - - - - - - - - -

10    - - - - - - - - - - - - - - - - - - - - - - - -

11    - - - - - - - - - - - - - - - - - - - - - - - -

12    - - - - - - - - - - - - - - - - - - - - - - - -

13    - - - - - - - - - - - - - - - - - - - - - - - -

14    - - - - - - - - - - - - - - - - - - - - - - - -

15    - - - - - - - - - - - - - - - - - - - - - - - -

16    - - - - - - - - - - - - - - - - - - - - - - - -

17    - - - - - - - - - - - - - - - - - - - - - - - -

18    - - - - - - - - - - - - - - - - - - - - - - - -

19    - - - - - - - - - - - - - - - - - - - - - - - -

20    - - - - - - - - - - - - - - - - - - - - - - - -

21    - - - - - - - - - - - - - - - - - - - - - - - -

22    - - - - - - - - - - - - - - - - - - - - - - - -

23    - - - - - - - - - - - - - - - - - - - - - - - -

24    - - - - - - - - - - - - - - - - - - - - - - - -

25    - - - - - - - - - - - - - - - - - - - - - - - -