Jo-Ellen Darcy
June 21, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DISTRICT

Civil No. 1:19-cv-00150-DMT-ARS

_____

VIDEOTAPE DEPOSITION OF:   JO-ELLEN DARCY
                           June 21, 2022
                           (Via RemoteDepo)

_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

_____


        PURSUANT TO NOTICE, the videotape
deposition of JO-ELLEN DARCY was taken on behalf of
the Plaintiff in Washington, D.C., via remote means,
on June 21, 2022, at 8:31 a.m., Mountain Time, before
Tiffany D. Goulding, Registered Professional Reporter
and Notary Public within Colorado, appearing remotely
from Arapahoe County, Colorado.

Jo-Ellen Darcy
June 21, 2022

## Page 2

REMOTE APPEARANCES

For the Plaintiff:

        PAUL M. SEBY, ESQ.
        PAUL KERLIN, ESQ.
        Greenberg Traurig, LLP
        1144 15th Street, Suite 3300
        Denver, Colorado 80202
        sebyp@gtlaw.com
        kerlinp@gtlaw.com

For the Defendant:

        ERICA ZILIOLI, ESQ.
        JANE BOBET, ESQ.
        Special Attorney to the United States
        Attorney General
        United States Attorney's Office
        District of Colorado
        1801 California Street, Suite 1600
        Denver, Colorado 802020
        erica.m.zilioli@usace.army.mil
        jane.bobet@usdoj.gov

Also Present:

        Michael Banks, Videographer
        Zacheer Tajani

## Page 3

                I N D E X

EXAMINATION OF JO-ELLEN DARCY:                    PAGE
June 21, 2022

By Mr. Seby                                          8

                                               INITIAL
DEPOSITION EXHIBITS:                          REFERENCE

(Exhibits provided electronically to the reporter.)

Exhibit 420  E-mail to Jackson, et al. from        68
             Greer, 9/14/16, Subject: FWD:
             ND Delegation letter to DOJ, DOI,
             Army Corps Re Dakota Access Pipeline
Exhibit 421  E-mail to Darcy and Semonite from      71
             Jackson, 9/15/16, Subject: FWD: 14
             Sep 16 DAPL Update
Exhibit 425  E-mail to Darcy and Semonite, et al.   73
             from Jackson, 9/15/16, Subject: 15
             Sep 16 DAPL Update
Exhibit 537  E-mail to Darcy and Semonite, et al.   49
             from Jackson, 8/22/16, Subject: DAPL
             notes 22 August
Exhibit 538  E-mail to Darcy and Semonite, et al.   51
             from Jackson, 8/22/16, Subject:
             24 August 16 DAPL Update
Exhibit 541  E-mail to Darcy from Price, 8/25/16,   55
             Subject: Update on Dakota Access
             Pipeline Issues
Exhibit 542  E-mail to Jackson and Darcy, et al.    58
             from Crook, 8/31/16, Subject:
             Standing Rock Principals Meeting
Exhibit 543  E-mail to Darcy from Vail, 9/1/16,     60
             Subject: Accepted: DAPL Meeting
             with DOI

## Page 4

Exhibit 546  E-mail to Diver, et al. from Patel,    66
             9/13/16, Subject: FWD: Gov
             Dalrymple (ND) Release Re: Dakota
             Access Pipeline
Exhibit 547  E-mail to Jackson and Cooper, et al.   73
             from Crook, 9/14/16, Subject:  FWD:
             Re: Standing Rock/Dakota Access
             Update
Exhibit 549  E-mail to Kelley and Darcy from        75
             Crook, 9/16/16, Subject: FWD: Press
             Release
Exhibit 550  E-mail to Darcy from Fanning,          77
             9/16/16, Subject: Dakota Pipeline
             update
Exhibit 551  E-mail to Darcy and Vail, et al.       80
             from Jackson, 9/21/16, Subject:
             DAPL SPOT REP
Exhibit 554  E-mail to Darcy from Crook, 9/30/16,   88
             Subject: DAPL Assessment 28
             September
Exhibit 561  E-mail to Darcy and Crook from         94
             Jackson, 10/10/16, Subject: SRST
             Visit
Exhibit 568  E-mail to Darcy and Crook,            105
             10/24/16, Subject: FWD: CCIR # 11
             Negative Media
Exhibit 569  E-mail to Henderson from Spellmon,    107
             10/28/16, Subject: DAPL 28 Oct
Exhibit 578  E-mail to Darcy and Semonite et al.   109
             from Jackson, 11/9/16, Subject: FWD
             8 November 16 DAPL Update
Exhibit 583  E-mail to Crook from Vail, 11/14/16,  110
             Subject: Signed Letter from
             Archambault
Exhibit 585  E-mail to Crook from Darcy,           112
             11/17/16, Subject: FWD: DAPL Update

## Page 5

Exhibit 600  E-mail to Sutton from Crook,          116
             12/4/16, Subject: Not Final
             Embargoed Draft Release
Exhibit 602  E-mail to Kelley and Smith, et al.    120
             from Vail, 12/13/16, Subject: FWD:
             NWO/NWD Easement Recommendation
             and Unexecuted Easement with
             Exhibits

DEPOSITION EXHIBITS:  (Previously marked)
Exhibit 318  E-mail to Fink, Henderson, and         85
             Thomas from Startzell, 9/25/16,
             Subject: Re: LE Update on Protest
             Camps
Exhibit 487  E-mail to Darcy from Connor,           45
             8/17/16, Subject:  Re: Dakota
             Pipeline
Exhibit 489  E-mail to Darcy from Connor            56
             8/26/16, Subject:  Re: Dakota
             Pipeline
Exhibit 493  E-mail to Schmauder, et al from        61
             Hirsch, 9/9/16, Subject: Judge
             Boasberg's Order/Opinion and Joint
             Army/Interior/Justice Statement
Exhibit 499  E-mail to Darcy, et al. from           77
             Jackson, 9/16/16, Subject: DAPL
             Storyboard
Exhibit 516  E-mail to Darcy and Schmauder from    102
             Crook, 10/14/16, Subject: FWD: LTG
             Semonite Concern: DAPL Update

Jo-Ellen Darcy
June 21, 2022

Page 6

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4         *   *   *   *   *
5    THE VIDEOGRAPHER:  We are now on the
6  record.  Participants should be aware that this
7  proceeding is being recorded, and as such all
8  conversations held will be recorded unless there is a
9  request and agreement to go off the record.  Private
10 conversations and/or attorney-client interactions
11 should be held outside the presence of the remote
12 interface.
13    This is the remote video-recorded
14 deposition of Jo-Ellen Darcy being taken by counsel
15 for the plaintiff.  Today is Tuesday, June 21, 2022.
16 The time is now 2:31 p.m. UTC, 8:31 a.m. Mountain.  We
17 are here in the matter of State of North Dakota versus
18 the United States of America.
19    My name is Michael Banks, remote video
20 technician on behalf of U.S. Legal Support.  I'm not
21 related to any party in this action, nor am I
22 financially interested in the outcome.  At this time
23 will the reporter, Tiffany Goulding, on behalf of U.S.
24 Legal Support please enter the statement for remote
25 proceedings into the record.

Page 7

1    THE REPORTER:  The attorneys
2  participating in this deposition acknowledge that I am
3  not physically present in the deposition room and that
4  I will be reporting this deposition remotely.  They
5  further acknowledge that, in lieu of an oath
6  administered in person, the witness will verbally
7  declare her testimony in this matter is under penalty
8  of perjury.  The parties and their counsel consent to
9  this arrangement and waive any objections to this
10 manner of reporting.
11    Please indicate your agreement by stating
12 your name and your agreement on the record.  Mr. Seby
13 first.
14    MR. SEBY:  This is Paul Seby, counsel for
15 the plaintiff, and I concur.
16    MS. ZILIOLI:  This is Erica Zilioli,
17 counsel for the defendant United States, and I agree.
18    THE REPORTER:  Ms. Darcy, I will ask you
19 to agree and declare that the testimony you are about
20 to give will be under the penalty of perjury.
21    THE DEPONENT:  I agree.
22    JO-ELLEN DARCY,
23 having verbally declared that her testimony in this
24 matter is under penalty of perjury, testified as
25 follows:

Page 8

1    EXAMINATION
2  BY MR. SEBY:
3    Q.   Good morning, Ms. Darcy.
4    A.   Good morning.
5    Q.   This will be the deposition of Jo-Ellen
6  Darcy taken pursuant to prior notice and agreement of
7  counsel.  And my name, Ms. Darcy, is Paul Seby.  I'm
8  both an attorney with the law firm of Greenberg
9  Traurig and a special assistant attorney general for
10 the State of North Dakota.  And I represent the State
11 of North Dakota here today.  And my cocounsel, who is
12 also present for the deposition and appearing, is Paul
13 Kerlin.  Today I will refer to our clients
14 collectively as "North Dakota" or "the state."
15    And do you understand that you've just
16 been sworn in this morning?
17    A.   I do.
18    Q.   Please state your full name for the
19 record.
20    A.   Jo-Ellen Darcy.
21    Q.   Do you go by any other names?
22    A.   No.
23    Q.   Okay.  Before we begin I'd like to go
24 over a few ground rules for the deposition, most of
25 which are intended just to help the court reporter

**Object to all testimony as to hearsay, 802**

Page 9

1  take down everything we say.  Okay?
2    A.   Okay.
3    Q.   Everything we say is being written down
4  and videotaped both; and because of that, please
5  verbalize your responses with a yes or a no or other
6  answer as opposed to just nodding your head yes or no.
7  Also, please do not use uh-huh or huh-uh, if that's
8  acceptable.
9    A.   Acceptable.
10    Q.   Likewise, it's difficult for the court
11 reporter to take down everything we are saying if we
12 inadvertently talk over each other.  So I'll do my
13 best not to interrupt you if you would do the same,
14 please, try not to interrupt me and let me finish my
15 questions.
16    If you need a break, please just let me
17 know and we can talk about timing of that.  However,
18 if there's a pending question I've asked, please
19 answer it first, then we can take a break.  Otherwise,
20 I'll suggest we take a short break approximately every
21 hour.  Does that sound okay?
22    A.   Sounds good.
23    Q.   If you happen not to understand a
24 question I've asked, please just let me know, and I'm
25 going to try to repeat or rephrase it.  I'll do my

Jo-Ellen Darcy
June 21, 2022

Page 10

1  best to clarify what I'm trying to ask you.  Okay?
2        A.    Okay.
3        Q.    And if you answer a question I have
4  asked, I'm going to assume that you have understood
5  the question I'm asking.  Is that understood?
6        A.    Yes.
7        Q.    Ms. Darcy, is there anyone in the room
8  with you this morning?
9        A.    Yes.  Counsel.
10       Q.    And who would that be?
11       A.    Erica Zilioli.
12       Q.    All right.  Thank you.  I'd ask that you
13 please turn off any electronic devices that you may
14 have with you so that you're not distracted during the
15 deposition.  And if you're relying upon some document
16 today during the deposition to answer a question --
17 for example, notes that you've made or an e-mail --
18 please let me know and identify that document for the
19 record just as if we were in the room together.  Is
20 that okay?
21       A.    Yes.
22       Q.    Do you understand that you're obligated
23 to tell the truth today?
24       A.    Yes.
25       Q.    And do you understand that your

Page 11

1  deposition today has the same force and effect as if
2  you were in front of a judge and a jury?
3        A.    Yes.
4        Q.    Do you understand that portions of your
5  videotaped deposition may be played to the court if
6  this case does go to trial?
7        A.    Yes.
8        Q.    Do you understand that if you fail to
9  tell the truth today that is considered perjury?
10       A.    Yes.
11       Q.    So you'll agree to tell the truth today?
12       A.    I can't hear anything or anyone.
13       Q.    Can you hear me now, Ms. Darcy?
14       A.    Yes.
15       Q.    I asked so you'll agree to tell the truth
16 today?
17       A.    Yes.
18       Q.    Okay.  And you'll agree to provide
19 accurate and complete testimony?
20       A.    Yes.
21       Q.    To that end, is there anything today
22 preventing you providing complete, accurate, and
23 truthful testimony?
24       A.    No.
25       Q.    Do you have any questions about these

Page 12

1  instructions?
2        A.    No.
3        Q.    Ms. Darcy, I want to ask you some
4  introductory questions about what you've done to
5  prepare for your deposition this morning.  Who did you
6  meet with to prepare for your deposition today?
7        A.    I met with counsel, Erica Zilioli, who is
8  here in the room with me this morning.
9        Q.    Anyone else?
10       A.    A counsel from DOJ via video last
11 Thursday.
12       Q.    And who is that?
13       A.    Bill Scarpoli, I believe.
14       Q.    Would that be Mr. Bill Scarpato?
15       A.    Scarpato, yes.
16       Q.    Thank you.  And when did you meet with
17 Ms. Zilioli?
18       A.    Last Wednesday and last Thursday.
19       Q.    Okay.  How long did you meet with both of
20 them?
21       A.    Ms. Zilioli on Wednesday for about four
22 hours, on Thursday Mr. Scarpato and Ms. Zilioli for
23 about four hours.
24       Q.    Was that virtual or in person?
25       A.    Wednesday was virtual.  Thursday was in

Page 13

1  person with Ms. Zilioli, not Mr. Scarpato.
2        Q.    Are you aware, Ms. Darcy, that North
3  Dakota has taken the sworn depositions to date of
4  Major Startzell, Eileen Williamson, Eric Stasch,
5  Colonel John Henderson, General Scott Spellmon, and
6  most recently Lowry Crook?
7        A.    I knew of the last three names you
8  mentioned.  Did not know the previous names.
9        Q.    So you were aware of Colonel Henderson,
10 General Spellmon, and Lowry Crook?
11       A.    Correct.
12       Q.    Okay.  Have you spoken with any of these
13 individuals about their depositions in this matter
14 prior to your deposition today?
15       A.    No.
16       Q.    Have you reviewed their deposition
17 transcripts?
18       A.    No.
19       Q.    Did you review the video recordings of
20 their depositions?
21       A.    No.
22       Q.    Did you review any documents prior to
23 today's deposition?
24       A.    No.
25       Q.    I'm sorry?

Jo-Ellen Darcy
June 21, 2022

Page 14

1    A.   No.  However, there was a document
2  presented in my preparation that was on the screen.  I
3  just briefly read one portion of it.
4    Q.   Okay.  Which documents are that?
5    MS. ZILIOLI:  I'm going to object,
6  attorney-client privilege, and instruct the witness
7  not to answer.
8    Q.   (BY MR. SEBY) Did you review any
9  documents on your own or just the one with your
10  attorney?
11    A.   Just the one.
12    Q.   Did you do any independent or yourself
13  research about the issues in this case?
14    A.   No.
15    Q.   Did you make any notes about the events
16  involved in this case that you used to refresh your
17  memory?
18    A.   No.
19    Q.   Do you have any documents or notes in
20  front of you today that you'll be using?
21    A.   No.
22    Q.   Ms. Darcy, this deposition, as you may
23  know, pertains to North Dakota's -- State of North
24  Dakota's case against the United States under the
25  Federal Tort Claims Act involving $38 million in

Page 15

1  damages that North Dakota seeks to recover as a result
2  of the Corps and other federal official's actions
3  associated with the protests against the Dakota Access
4  Pipeline.  Do you understand that?
5    A.   Yes.
6    Q.   Are you aware of the court's rulings to
7  date on the United States' motion to dismiss?
8    A.   No.
9    Q.   Are you aware that the court denied that
10  motion?
11    A.   No.
12    Q.   Are you aware of the United States'
13  motion for partial summary judgment?
14    A.   No.
15    Q.   Are you aware that the court denied that
16  motion?
17    A.   No.
18    Q.   Are you aware of the court's order
19  compelling discovery against individuals in the United
20  States government or former officials outside of the
21  Corps of Engineers?
22    A.   No.
23    Q.   Have you read any court decisions to date
24  in this case?
25    A.   No.

Page 16

1    Q.   Our deposition today -- your deposition
2  today will be seven hours in duration total
3  on-the-record time.  Are you aware of that?
4    A.   Yes.
5    Q.   Ms. Darcy, I just want to ask you some
6  background questions about yourself.  Where are you
7  currently residing?
8    A.   Washington, D.C.
9    Q.   And where are you from?
10    A.   I was born and raised in Fitchburg,
11  Massachusetts.
12    Q.   And can you give me an overview of your
13  education, please.
14    A.   I graduated from Fitchburg High School.
15  I have a bachelor's degree from Boston College.  I
16  have a master's degree from Michigan State University.
17    Q.   Okay.  And then would you do the same
18  with respect to your professional history.
19    A.   How far back do you want to go?  I was a
20  school teacher for five years.  I worked for -- I
21  worked in the United States House of Representatives
22  on the House Banking Committee.  After that I went to
23  Michigan and worked for the governor of Michigan while
24  getting my master's degree.  I came back to
25  Washington, D.C. and worked in the -- for the governor

Page 17

1  of Michigan in his Washington, D.C., office for a
2  couple of years.
3    Then I was a lobbyist for the financial
4  service -- for the mutual fund industry, the
5  Investment Company Institute.  And then I worked for
6  the Senate Environment and Public Works Committee for
7  almost 16 years.  I worked for the Senate Finance
8  Committee, and then I was appointed to be the
9  assistant secretary of the army for civil works by
10  President Obama in 2009.  And I retired from federal
11  service at the end of that, which was in 2016 -- 2017.
12    Q.   And, Ms. Darcy, after your -- the end of
13  your government service as assistant secretary of the
14  army, what did you do after that period?
15    A.   From then until now I've been working.
16  I'm a member of the board of directors for American
17  Rivers.  I serve on the board of directors for the
18  U.S. Endowment for Forestries and Communities.  I'm on
19  an advisory board to a waterworks company.  And I have
20  two clients that I consult with on a regular basis, or
21  not so regular basis.
22    Q.   Okay.  Would you please describe your
23  position as assistant secretary of the army for civil
24  works?
25    A.   The assistant secretary of the army for

Jo-Ellen Darcy
June 21, 2022

Page 18

1  civil works is tasked with overseeing the policy
2  development and the mission of the Army Corps of
3  Engineers.
4      Q.   And how about with respect to the Dakota
5  Access Pipeline?
6      A.   With respect to the Dakota Access
7  Pipeline, I was responsible for making a decision on
8  whether to grant an easement to cross Corps land at
9  Lake Oahe.
10     Q.   And that authority is defined where, the
11  ability to do that, take that action?
12     A.   It's in a regulation, the number of which
13  I don't recall.
14     Q.   Okay.  And that regulation specifies
15  that -- I'm sorry.  I was just going to complete the
16  question.  The question, Ms. Darcy, is the regulation
17  that you're referencing says that the authority for
18  determining whether to grant an easement to cross
19  federal property belongs to the assistant secretary of
20  the army for civil works?
21     A.   Yes.
22     Q.   Okay.  What decisions could you make with
23  regard to the Corps or army involvement in the DAPL
24  protests?
25     A.   Could you be a little more specific?  I'm

Page 19

1  not quite sure.
2      Q.   Sure.  I'm asking what is the -- what was
3  your area of responsibility and authority on behalf of
4  the Corps or the Department of the Army with respect
5  to the protests against the Dakota Access Pipeline?
6      A.   The protests that were occurring on Corps
7  land would have been ones that I was overseeing, but
8  that was in the district and division commander's
9  chain of command.
10     Q.   Then what would your role be relative to
11  those events if it was in the jurisdiction of the
12  regional or district commander?
13     A.   The protesters were protesting on Corps
14  land and that's my -- I was overseeing what was
15  happening on Corps land.
16     Q.   Okay.  As assistant secretary of the army
17  for civil works, what was your chain of command in
18  that position?  Who reported to you?
19     A.   The chief of engineers.
20     Q.   And at the time of the Dakota Access
21  Pipeline protests, that individual was who?
22     A.   General Semonite.
23     Q.   Did anyone else report to you?
24     A.   Others briefed me and advised me, but
25  their chain of command was through the chief of

Page 20

1  engineers.
2      Q.   So their chain of command came to General
3  Semonite and he reported to you?
4      A.   Yes.
5      Q.   Okay.  Who did you report to, Ms. Darcy?
6      A.   I report to the secretary of the army.
7      Q.   And during the period of the Dakota
8  Access Pipeline protests, who was that individual?
9      A.   Eric Fanning.
10     Q.   Okay.  What decisions concerning the
11  Dakota Access Pipeline protests did you send up that
12  chain of command?
13     A.   I did not.
14     Q.   You did not send up any decisions?
15     A.   The decision was mine to make.
16     Q.   Okay.  All right.  Was it also part of
17  your position as assistant secretary of the army for
18  civil works to liaison with other political appointees
19  in the executive branch?
20     A.   Yes, to consult with them.
21     Q.   Would that include individuals in the
22  Executive Office of the President?
23     A.   It did.
24     Q.   And who would those individuals be?
25     A.   The people in the White House who I

Page 21

1  briefed were Dan Utech and Bryan Deese.
2      Q.   How about with respect to other federal
3  agencies?
4      A.   Did I -- are you asking who I consulted
5  with at other federal agencies?
6      Q.   The question, Ms. Darcy, is, in your
7  capacity as assistant secretary of civil works, you
8  indicated part of your responsibilities were to be a
9  liaison with other political appointees in the
10  executive branch.  Which other federal agencies did
11  that extend to?
12     A.   Department of Interior and the Department
13  of Justice.
14     Q.   And who in those respective agencies?
15     A.   Within the Department of Interior, I
16  consulted with the head of the BIA and the chief of
17  staff to the secretary.
18     Q.   Secretary Jewell?
19     A.   Yes.
20     Q.   And the chief -- the head of the BIA was
21  who?
22     A.   Larry Roberts.
23     Q.   The head of the BIA was Larry Roberts?
24     A.   Bureau of Indian Affairs was Larry
25  Roberts at the time.

Jo-Ellen Darcy
June 21, 2022

Page 22

1      Q.   All right.  And then that's -- the chief
2  of staff for Secretary Jewell was who?
3      A.   Tommy Beaudreau.
4      Q.   Anyone else, Ms. Darcy?
5      A.   At Department of Interior I think there
6  were another attorney or two, but I don't recall their
7  names.
8      Q.   How about Secretary Jewell herself?
9      A.   I mostly dealt with Tommy Beaudreau.  I
10  don't recall having a -- we may have had one
11  conversation, but mostly it was with her chief of
12  staff.
13      Q.   All right.  Then how about at Department
14  of Justice that you mentioned?
15      A.   Sam Hirsch, I believe his name was, was
16  the major person within Department of Justice that I
17  recall dealing with.
18      Q.   Okay.  Any other federal agencies?
19      A.   No.
20      Q.   Okay.  How about with any member or staff
21  to the president's Domestic Policy Council?
22      A.   The two individuals I mentioned earlier
23  were the two I would brief on a regular basis.
24      Q.   All right.  Did you also receive
25  representatives of any nongovernmental entity?

Page 23

1      A.   Regarding the Dakota Access Pipeline?
2      Q.   Or the Standing Rock Sioux Nation?
3      A.   I did meet with them, yes.
4      Q.   Okay.  Which representatives of the
5  Standing Rock Sioux Tribe who were not tribe members
6  did you meet with?
7      A.   If they weren't who -- members of
8  Standing Rock who weren't tribal members?
9      Q.   Representatives of the Standing Rock
10  Sioux Tribe, lobbyists, attorneys, that sort of thing.
11      A.   There was an attorney for the Standing
12  Rock who I did meet with.  His name escapes me at the
13  moment.
14      Q.   Would that be William Perry?
15      A.   I'm not certain.
16      Q.   Okay.  All right.  Did you meet with any
17  lobbyists on behalf of the tribe?
18      A.   No.
19      Q.   You mentioned General Semonite, the chief
20  of engineers at the time.  What was your professional
21  relationship or responsibilities relative to the
22  career military professionals in the Corps of
23  Engineers?  Let's start with General Semonite.  He
24  reported to you, you said?
25      A.   Yes.

Page 24

1      Q.   Okay.  So you were his boss, essentially;
2  right?
3      A.   Essentially.
4      Q.   And how about Major General Jackson,
5  Donald Jackson?
6      A.   Yes.  He was General Semonite's deputy at
7  the time.  Yes.  We briefed one another almost weekly.
8      Q.   And did he report to you also, Ms. Darcy?
9      A.   He reported directly to General Semonite,
10  but we briefed -- I had regular briefings on all
11  subjects, including DAPL.
12      Q.   Okay.  And how about Brigadier General
13  Scott Spellmon?
14      A.   At the time he was the division commander
15  and he reported -- I think it was directly to General
16  Jackson.
17      Q.   And then Colonel Henderson?
18      A.   Colonel Henderson was the Omaha district
19  commander at the time and he -- his chain of command
20  was General Spellmon, then General Jackson, then
21  General Semonite.

**ND OBJ.: 611**

22      Q.   Okay.  Ms. Darcy, what decisions or
23  directives did you receive from your chain of command
24  with respect to the DAPL protests?  I guess that would
25  be from Army Secretary Eric Fanning.  Did he direct or

Page 25

1  have you do or take any actions?
2      A.   No.
3      Q.   Did you receive directives from anyone
4  else in the administration?
5      A.   No.
6      Q.   Ms. Darcy, what significant DAPL protest
7  events do you recall?
8      A.   A significant event that I recall was
9  when many more protesters were joining in from other
10  parts of the country and the world.  I remember when
11  the group of veterans came to help support the
12  protests.
13      Q.   And when was that, Ms. Darcy?
14      A.   I don't recall the exact date.  It was, I
15  think, around Thanksgiving, but I'm not certain.
16      Q.   Do you recall any significant events
17  occurring prior to the Thanksgiving of 2016?
18      A.   The protests themselves were significant.
19      Q.   Were you provided with briefings about
20  the Dakota Access Pipeline protests?
21      A.   Yes.
22      Q.   Were you confident that you were
23  receiving timely, accurate, and complete information
24  about the Dakota Access Pipeline-related protests on
25  Corps land?

Jo-Ellen Darcy
June 21, 2022

Page 26

1      A.   Yes.
2      Q.   Okay.  What sources of information did
3  you rely upon for updates on the DAPL protests?
4      A.   Mostly the briefings came from General
5  Jackson.
6      Q.   And what was the origin of that
7  information?
8      A.   I believe he would get his briefings from
9  Colonel Henderson.
10      Q.   Okay.  And where did Colonel Henderson
11  get his information from?
12      A.   I assume his people on the ground there
13  on the Corps land.
14      Q.   Corps people?
15      A.   That's my assumption.
16      Q.   Okay.  So is it your understanding,
17  Ms. Darcy, that the Corps and/or the Department of the
18  Army independently monitored the DAPL protests
19  occurring on Corps land?
20      A.   I believe they were monitoring the
21  protests on the Corps land.
22      Q.   Independently by themselves?
23      A.   I don't know what that means.  They could
24  have -- I don't know if they were independent or in
25  conjunction with others.

Page 27

1      Q.   Okay.  So you're not sure where the Corps
2  got its intelligence or information concerning the
3  Dakota Access Pipeline protests on Corps land?
4      A.   I believe they got it from Corps
5  employees on the ground on our land.
6      Q.   Okay.  Did you receive regular status
7  reports concerning the DAPL protests occupation of
8  Corps land from the State of North Dakota?
9      A.   No.
10      Q.   From the governor of the State of North
11  Dakota?
12      A.   There were occasional calls from the
13  governor to my office relaying concerns about the
14  protests as well as the status of the easement.
15      Q.   Did you ever ask for information or
16  intelligence from the State of North Dakota?
17      A.   No.
18      Q.   Did you ever receive reports or briefings
19  on the DAPL protests from the pipeline company or its
20  subcontractors?
21      A.   Yes.
22      Q.   And when did that occur?
23      A.   I don't recall the date, but there was a
24  meeting with representatives of the pipeline company
25  with myself and representatives from the Department of

Page 28

1  Justice and Department of Interior.
2      Q.   Did you receive reports or briefings on
3  the DAPL protests from any Native American tribe?
4      A.   Yes.
5      Q.   Which?
6      A.   Standing Rock Sioux Tribe.
7      Q.   Did you meet with them or have telephone
8  conferences or both?  How did it occur?
9      A.   I did meet with the chairman once or
10  twice and had a phone conversation as well.
11      Q.   How many instances did you speak by phone
12  with the chairman?
13      A.   I don't recall the number.
14      Q.   More than five?
15      A.   I don't recall the number.
16      Q.   Do you have any sense of the frequency?
17      A.   I don't recall the number.
18      Q.   How about did you speak with any protest
19  group or representative of any protest group?
20      A.   No.
21      Q.   Did you speak with any individual who
22  participated in the protests?
23      A.   No.
24      Q.   Did you speak with anyone outside the
25  United States government in Washington, D.C., about

Page 29

1  the protests?
2      A.   No.
3      Q.   Did you participate in any calls or
4  meetings with other federal officials during which you
5  discussed the DAPL protests?
6      A.   Yes.
7      Q.   And when did those occur?
8      A.   I don't recall the exact dates.
9      Q.   And who participated?
10      A.   The Department of Justice and the
11  Department of Interior.
12      Q.   Okay.  Ms. Darcy, would you describe your
13  role in directly working with the chairman of the
14  Standing Rock Sioux Tribe.
15      A.   The Army Corps of Engineers has a
16  longstanding relationship with many Native American
17  tribes, including the Standing Rock.  And in my role
18  as assistant secretary of the army for civil works, I
19  visited many tribes throughout the course of my
20  tenure.
21           The Army Corps of Engineers established a
22  Native American program with a native representative
23  in each of the district offices.  And I visited many
24  of those tribes, including the Standing Rock, but that
25  was before the DAPL pipeline.

ND OBJ.:
Introduces
new material

Jo-Ellen Darcy
June 21, 2022

Page 30

1    Q.   What was the topic or reason for meeting
2  with the -- at the Standing Rock Sioux Tribe prior to
3  the DAPL protests?
4        A.   It was at their invitation for me to see
5  their reservation and see some of the projects the
6  Corps of Engineers was involved in.
7        Q.   Okay.  Then how about with respect to
8  issues concerning the Dakota Access Pipeline?  When
9  did you first discuss or meet with the Standing Rock
10 Sioux Tribe concerning those issues?
11       A.   I don't recall.  Probably in the fall
12 time frame of that year, but I don't recall the exact
13 date.
14       Q.   Fall of what year?
15       A.   That would have been 2016.
16       Q.   Did you go to the Standing Rock Sioux
17 Tribe reservation in the fall of 2016?
18       A.   No.
19       Q.   My question was would you please describe
20 your role in directly working with the chairman of the
21 Standing Rock Sioux Tribe on the Dakota Access
22 Pipeline issues.
23       A.   It was briefing one another on the status
24 of the easement as well as what was going on on tribal
25 land that was Corps related.

**ND OBJ.:** Introduces new material

Page 31

1        Q.   And what was the topic of those
2  briefings?
3        A.   An update on what the situation was on
4  the ground.
5        Q.   So you relied upon the chairman of the
6  Standing Rock Sioux Tribe for your understanding of
7  what was going on on the ground during the DAPL
8  protests?
9        A.   I took their input.
10       Q.   Okay.  And what did you -- what
11 information did you provide to the chairman of the
12 Standing Rock Sioux Tribe during the protests?
13       A.   I would update him on the status of the
14 easement.
15       Q.   And what was there to update him on with
16 respect to that issue?
17       A.   Whether or not it was going to be granted
18 and what the timing was.
19       Q.   Ms. Darcy, do you believe that the
20 chairman of the Standing Rock Sioux Tribe was publicly
21 calling for people to come to the state of North
22 Dakota to protest against the Dakota Access Pipeline?
23       A.   I don't know what his intent was.
24       Q.   I wasn't asking about intent.  I just
25 asked do you know whether he was publicly calling for

Page 32

1  people to come to protest the pipeline in North
2  Dakota?
3        A.   I don't know.
4        Q.   Okay.  Did the United States, Ms. Darcy,
5  ever delegate responsibility for the use or management
6  of Corps lands to the State of North Dakota?
7        A.   Not to my knowledge.
8        MS. ZILIOLI:  Objection to the extent it
9  calls for a legal conclusion.
10       A.   I don't know.
11       Q.   (BY MR. SEBY) All right.  Same question,
12 Ms. Darcy:  Did the United States ever delegate
13 responsibility for the use or management of Corps
14 lands to the Standing Rock Sioux Tribe?
15       MS. ZILIOLI:  Objection to the extent it
16 calls for a legal conclusion.
17       A.   I don't know.
18       Q.   (BY MR. SEBY) Did the United States
19 government ever delegate responsibility for the use or
20 management of Corps lands to any DAPL protester?
21       MS. ZILIOLI:  Objection to the extent it
22 calls for a legal conclusion.
23       A.   I don't know.
24       Q.   (BY MR. SEBY) Ms. Darcy, what DAPL
25 protest camps were established on Corps of Engineers

Page 33

1  lands south of the Cannonball River in North Dakota?
2        A.   I don't know.
3        Q.   Do you think you ever knew?
4        A.   I may have, but I don't recall if it was
5  south of the river.
6        Q.   What DAPL protest camps were established
7  by protesters on Corps lands north of the Cannonball
8  River?
9        A.   I don't know.
10       Q.   Do you think you ever knew?
11       A.   Perhaps, but I don't recall.
12       Q.   Ms. Darcy, when did you first learn that
13 protesters protesting against the Dakota Access
14 Pipeline chose to physically enter onto Corps
15 property?
16       A.   I don't recall the date of that.
17       Q.   Do you have a sense of when that may have
18 occurred, not datewise, but generally?
19       A.   Perhaps fall of 2016.
20       Q.   And what month are you referring to when
21 you say "fall"?
22       A.   Fall is three months, so I'd say all
23 three.
24       Q.   And which would those be?
25       A.   September, October, November.

Jo-Ellen Darcy
June 21, 2022

**ND OBJ.: Introduces new material**

**ND OBJ.: Introduces new material**

**ND OBJ.: Introduces new material**

**ND OBJ.: Introduces new material**

**ND OBJ.: Introduces new material**

**ND OBJ.: Introduces new material**

### Page 34

1  Q.  Okay.  How did you learn that protesters
2  were choosing to enter upon Corps land?
3  A.  It was probably from General Jackson.
4  Q.  And do you recall when you learned that
5  from General Jackson?
6  A.  No.
7  Q.  Okay.  What did you do with that
8  information when you first learned it?
9  A.  I asked him to keep me apprised of the
10  conditions on the ground and the safety of the people
11  there.
12  Q.  And what did you do next after learning
13  of that information?
14  A.  I asked to be continually updated and
15  briefed on the situation on the ground.
16  Q.  Do you recall learning that protesters
17  built or were building structures, roads, other sorts
18  of structures or improvements in the protest camps
19  located on Corps land?
20  MS. ZILIOLI:  Objection; assumes facts
21  not in evidence.
22  A.  I don't recall.
23  Q.  (BY MR. SEBY) Do you know why DAPL
24  protesters chose to enter upon Corps land?
25  MS. ZILIOLI:  Objection; speculation.

### Page 35

1  A.  No.
2  Q.  (BY MR. SEBY) Do you have an opinion on
3  why protesters did not set up protest camps on private
4  land?
5  MS. ZILIOLI:  Objection; assumes facts
6  and speculation.
7  A.  No, I don't.
8  Q.  (BY MR. SEBY) Do you know why protesters
9  didn't choose to set up protest camps on the Standing
10  Rock Sioux Tribe nation land?
11  MS. ZILIOLI:  Objection; assumes facts
12  and misstates evidence.
13  A.  No, I don't.
14  Q.  (BY MR. SEBY) Ms. Darcy, do you recall
15  when you first learned that not all protesters on
16  Corps land were not members of the Standing Rock Sioux
17  Tribe?
18  A.  No.
19  Q.  Do you recall learning that at all?
20  A.  Yes.
21  Q.  Were you ever advised, Ms. Darcy, that
22  certain protesters on Corps land were violent?
23  A.  No.
24  Q.  You don't recall being advised of that?
25  A.  No.

### Page 36

1  Q.  Did you ever know that?
2  A.  I don't know.
3  Q.  Are you aware of whether protesters on
4  Corps land used that property to organize and prepare
5  to conduct missions off of the Corps property?
6  MS. ZILIOLI:  Objection; assumes facts
7  speculation.
8  A.  No.
9  Q.  (BY MR. SEBY) Are you aware of any
10  instance where protesters on Corps land prepared and
11  organized to enter onto private lands?
12  A.  No.
13  Q.  You were never aware of that?
14  A.  No.
15  Q.  Do you think you did know at one time?
16  A.  Perhaps, but I don't recall.
17  Q.  Are you aware of whether DAPL protesters
18  on Corps land used the camps there to travel to
19  Bismarck or Mandan, North Dakota?
20  A.  No.
21  Q.  Do you think you ever knew?
22  A.  No.
23  Q.  Are you aware of whether Corps of
24  Engineers officials referred to protesters on Corps
25  property as trespassers?

### Page 37

1  A.  No.
2  Q.  Do you think you ever knew that?
3  A.  No.
4  Q.  Ever?
5  A.  I don't believe so, no.
6  Q.  Do you know when the Corps or the army,
7  at your direction, decided to let DAPL protesters on
8  Corps lands remain?
9  MS. ZILIOLI:  Objection; misstates
10  testimony, foundation, assumes facts.
11  A.  Could you repeat the question?  I'm
12  sorry.
13  Q.  (BY MR. SEBY) I was asking when do you
14  recall the Corps or the Department of the Army decided
15  to let protestors on Corps property remain there?
16  MS. ZILIOLI:  Same objections.
17  A.  I don't recall.
18  Q.  (BY MR. SEBY) Ms. Darcy, do you recall
19  how long protesters occupied Corps of Engineers lands?
20  A.  No.
21  Q.  And you thought they were -- they arrived
22  on the property when?
23  A.  I believe I said in the fall timeframe.
24  Q.  And were they there when you left office?
25  A.  I don't believe so.

Jo-Ellen Darcy
June 21, 2022

Page 38

1    Q.   And when did you leave office?
2    A.   January 20, 2017.
3    Q.   And is it your testimony that the
4  protesters were gone by that time?
5    A.   No.  I don't recall exactly when they
6  were gone.
7    Q.   All right.  Do you recall them being
8  present when you left office?
9    A.   No, I don't recall.
10   Q.   All right.  Ms. Darcy, I'd like to ask
11 you about the Corps of Engineers.  You oversee the
12 Corps for policy matters, is what I understood your
13 testimony to be.  As assistant secretary of the army,
14 were you ever provided training on the Corps policies
15 and regulations governing the use or management of
16 Corps lands?
17   A.   Probably throughout my tenure there was a
18 time when I was briefed on that.
19   Q.   Can you describe when that was?
20   A.   No, I don't recall.
21   Q.   And what did your briefing on that topic
22 involve?  What did your briefing involve?
23   A.   I don't recall the specifics.
24   Q.   Do you recall learning that there were
25 such regulations and policies governing the use and

Page 39

1  management of Corps lands?
2    A.   Yes.
3    Q.   And what do you recall with respect to
4  those policies and regulations?
5    A.   What I do recall is many of the
6  recreational facilities we provided to the public on
7  many Corps lands.
8    Q.   And what about those recreational
9  facilities with respect to my question, policies or
10 regulations governing their use and management?
11   A.   Their use and management was determined
12 by the authorized use and the particular recreational
13 amenities that were provided, whether they be biking
14 trails or boating access or camping.
15   Q.   Okay.  Did you ever personally review
16 Corps policies and regulations governing the use or
17 management of Corps lands?
18   A.   No.
19   Q.   Okay.  What was your role in the Corps'
20 consideration of the Standing Rock Sioux Tribe
21 application for a special use permit from the Corps?
22   A.   I was not involved in that request.
23   Q.   You were not involved in any way?
24   A.   Special use permit is a determination
25 made by the district engineer.

**ND OBJ.:** Introduces new material

Page 40

1    Q.   Did you speak with the Standing Rock
2  Sioux Tribe before they submitted a special use permit
3  application?
4    A.   I don't recall.
5    Q.   Did you speak with them while it was
6  pending?
7    A.   I don't recall.
8    Q.   Okay.  Who made the decision to pull the
9  Corps' consideration of the Standing Rock Sioux Tribe
10 special use permit up to the Corps headquarters?
11   MS. ZILIOLI:  Objection; assumes facts.
12   A.   I don't know.
13   Q.   (BY MR. SEBY) Were you involved in any
14 other Corps special use permitting process?
15   A.   I don't recall, no.
16   Q.   Was the Standing Rock Sioux Tribe special
17 use permit application an unusual request?
18   A.   I don't know because I didn't review it.
19   Q.   Were you ever told that the Corps
20 believed that the Standing Rock Sioux Tribe
21 application lacked required information for approval?
22   MS. ZILIOLI:  Objection; assumes facts
23 not in evidence.
24   A.   I don't recall that.
25   MR. SEBY:  Okay.  All right.  Ms. Darcy,

40:19-24
611,
802

Page 41

1  I'd like to go through some exhibits with you and ask
2  you some questions about those, if you would.
3    Erica, let's go off the record.  Can we
4  take our break here?  I know it's a bit earlier than
5  an hour, but I'd like to do that just to get organized
6  a little bit.  Maybe five minutes, please?
7    MS. ZILIOLI:  Of course.
8    MR. SEBY:  Thank you.
9    THE VIDEOGRAPHER:  Going off the record.
10 The time is 3:21 p.m. UTC, 9:21 a.m. Mountain.
11   (Recess taken, 9:21 a.m. to 9:31 a.m.)
12   THE VIDEOGRAPHER:  We are back on the
13 record.  The time is 3:31 p.m. UTC, 9:31 a.m.
14 Mountain.
15   MR. SEBY:  Ms. Darcy, we're back from a
16 short break.  We're going to turn to some exhibits.
17   And I will note, Ms. Zilioli, for the
18 record we both have just received an order from the
19 United States District Court that Magistrate Judge
20 Senechal has limited this deposition to four hours.
21   And, Mr. Court Reporter, if you would
22 please advise how many minutes we've consumed thus
23 far.
24   THE VIDEOGRAPHER:  Been on the record for
25 51 minutes.

Jo-Ellen Darcy
June 21, 2022

Page 42

1    MR. SEBY:  All right.  Thank you.
2    Q.   (BY MR. SEBY) All right.  Ms. Darcy,
3  we're going to show you some exhibits and ask you some
4  questions about those.
5    MR. SEBY:  Ms. Hymel, would you put
6  Exhibit 1, please.
7    Q.   (BY MR. SEBY) Ms. Darcy, this is an
8  e-mail chain beginning on August 15 of 2016.  If we
9  could go to the bottom of the chain, please, to the
10  beginning so Ms. Darcy can see that.  If you would
11  just read this so you have the benefit of the entire
12  chain so I can ask you some questions about it, that
13  would be great.
14    This starts with a report from Jason
15  Renschler to Martha Chieply of the Corps noting on
16  August 15 that there are protesters outside of the
17  Corps office with signs.  Do you see that, Ms. Darcy?
18    A.   I do, yes.
19    Q.   So let's just go up the chain so you can
20  see the discussion on August 15 amongst those Corps
21  individuals.  If you'd just signal, Ms. Darcy, when
22  you've read the relevant section so we can keep
23  moving.
24    A.   Okay.  I've read that one.
25    Q.   Okay.  So then we're now coming to an

Page 43

1  e-mail from Eric Stasch, who's the Oahe project
2  manager, to Martha Chieply and a number of Corps
3  individuals.  And do you see this is August 15 and the
4  re line reads "DAPL" and it says -- under item No. 2,
5  Ms. Darcy, do you see that?
6    A.   Yeah.  Right there is good.  I can read
7  it now.
8    Q.   "Protesters are setting up encampments on
9  U.S. Government lands."
10    A.   I haven't gotten that far yet.
11    Q.   Ms. Darcy, are you reading the box that's
12  up there?
13    A.   Yes.  I just read that.
14    Q.   So you see where it says on August 15,
15  2016, "Protesters are setting up encampments on U.S.
16  Government lands," and it's under the topic "DAPL."
17  Do you see that?
18    A.   Yes.
19    Q.   Okay.  If we could go to the e-mail above
20  that, please, from Mr. Stasch there.  It's a further
21  update from Eric Stasch, project manager of the Oahe
22  district, August 15, 2016.  And if we scroll down just
23  a little bit, Rachel, please.  He's reporting now to
24  the Corps e-mail group that the attorney for the
25  Standing Rock Sioux Tribe has just called and we had

Page 44

1  discussed a special events permit for the protest
2  camps on Corps property and that the placement desired
3  is on the south side of the Cannonball River within
4  reservation boundaries, but on U.S. government land.
5  Do you see that?
6    A.   Yes.
7    Q.   The next paragraph is that Stasch says,
8  from his conversation with the Standing Rock Sioux
9  Tribe attorney, that he, the attorney, "Mentioned a
10  number of Non Standing Rock Sioux Tribe people coming
11  up to support the protest and the Standing Rock Sioux
12  Tribe wanting to cover the encampment.  I related
13  we would be getting him a Special Event permit to
14  cover this activity and that we would be looking for
15  information on logistics (sanitary facilities, et
16  cetera) and would be checking to make sure the area
17  doesn't have any archeological sites that could be
18  impacted."  Do you see all that?
19    A.   Yes.
20    Q.   And so then the e-mail in this chain
21  above that is the e-mail -- Colonel Henderson, the
22  district commander that you acknowledged earlier, is
23  copied on this.  And he responds to that e-mail there
24  you can see, if you read that e-mail.  It's the top
25  e-mail in the chain, please.

Page 45

1    A.   Okay.
2    Q.   Do you see that item No. 2, Ms. Darcy,
3  "The special event permit is the correct way to
4  address the encampment on U.S. lands."
5    A.   That's how it reads.
6    Q.   And then with regard to enforcing it, if
7  the need arises local law enforcement will be
8  involved, Colonel Henderson is saying; right?
9    A.   That's how it reads.
10    Q.   Okay.  Good.  If we could go to
11  Exhibit 487, please.  And these exhibits were produced
12  this way by your counsel.  So this is the cover page
13  of the e-mail.  And if we could go to the next page
14  which has content on it, please, and enlarge that so
15  Ms. Darcy can read that.
16    And the bottom -- so the e-mail I just
17  showed you was from August 15, 2016, the discussion in
18  Exhibit 1 concerning the Corps district commander
19  being advised protesters are on United States Corps of
20  Engineers land.  And here the next -- two days later
21  on August 17 an individual by the name of Michael
22  Connor writes an e-mail to you.  And I'll let you read
23  that e-mail to refresh your memory, please.
24    A.   Okay.  I've read it.
25    Q.   Ms. Darcy, are you done reading that?

Jo-Ellen Darcy
June 21, 2022

Page 46

1    A.    Yes.
2    Q.    Okay.  When I ask you to read something,
3 if you'd just let me know when you're done so we can
4 keep moving.
5    A.    I'm sorry.  Okay.  I'm done.
6    Q.    All right.  Thank you.  So do you recall
7 receiving this e-mail?
8    A.    I don't recall receiving it.  Having read
9 it now, I do remember that.  Yes, indeed, I did
10 receive that e-mail.
11    Q.    All right.  Did you speak with
12 Mr. Connor?
13    A.    I believe I did.
14    Q.    And who is Mr. Connor?
15    A.    At the time he was -- he was either the
16 director of the Bureau of Land Management or he was an
17 assistant secretary at some level within the
18 Department of Interior.  I'm not sure if he was still
19 with the BLM at that time or not.
20    Q.    Do you think he was the assistant
21 secretary of the interior?  There's only one of those,
22 I understand.
23    A.    No, he wasn't.  No.  That person was --
24 used to be Tom -- I don't recall.  It might say in his
25 e-mail up above.  He may have been.

Page 47

1    Q.    All right.  So here on August 17 of 2016,
2 you're advised by Mr. Connor that there are Standing
3 Rock Sioux Tribe and, quote, other activists
4 protesting against the Dakota Access Pipeline; right?
5    A.    That's what the e-mail says, yes.
6    Q.    And do you recall the topic of your
7 conversation with Mr. Connor?
8    A.    I believe he was updating me on the
9 situation on the ground as it was being reported to
10 him.
11    Q.    And how was he receiving those reports
12 that he relayed to you; do you know?
13    A.    I don't.  In reading this, it appears he
14 heard from me.  He said he was in contact with the
15 tribe and the governor's office.  So I'm assuming
16 that's where he got his information.
17    Q.    If we could go to Exhibit 7, please.  And
18 if you would take a moment and just familiarize
19 yourself with that e-mail.  It's an e-mail that's got
20 a bunch of pictures that don't pertain to the topic of
21 our deposition today, but there is a section in
22 Colonel Henderson's August 23, 2016, northwest Omaha
23 district.  This is a report on the entire Omaha
24 district events.
25    There's a section on the Dakota Access

**ND OBJ.:**
Hearsay

Page 48

1 Pipeline.  If you would scroll down, please, under
2 "Programs and Projects," there is a section on Dakota
3 Access Pipeline, if you'd read that, please.  Are you
4 done, Ms. Darcy?
5    A.    Yes.
6    Q.    Okay.  So were you aware of this report?
7    A.    No.
8    Q.    Okay.  Do you think by this time -- "this
9 time" being August 23, 2016, which is the date of this
10 e-mail -- that you were aware that there were
11 protesters who did not have any permission to be on
12 Corps land, but were present and protesting?
13    A.    This -- the date of this indicates that
14 perhaps I did before the September time frame that I
15 earlier talked about.
16    Q.    Okay.  So are you modifying your
17 testimony to bring it into August?
18    A.    I am.  My memory has been freshed by
19 looking at this document, so yes.
20    Q.    Okay.  So do you agree with me that in --
21 at least as of August 23, 2016, you were aware that
22 there were protesters, in the words of Colonel
23 Henderson, trespassing on Corps property?
24    A.    Yes.
25    Q.    All right.  And that they did not have a

Page 49

1 special use permit or other permission to be there?
2    A.    According to the report in front of me
3 that Colonel Henderson made, that they did not have a
4 special use permit, but it also says there are no
5 significant impacts to Army Corps of Engineers
6 missions.
7    (Deposition Exhibit 537 was remotely
8 introduced and provided electronically to the court
9 reporter.)
10    Q.    All right.  If we could go to
11 Exhibit 537, please.  This is an e-mail.  And, again,
12 it's got this cover page, but the "to" and "from" and
13 recipients are on the second page there.  Thank you.
14 And this is an e-mail dated August 22, 2016, from
15 General Jackson to you and to the chief of engineers,
16 Todd Semonite, General Semonite.  And it says "Madame
17 Secretary."  That would be you, Ms. Darcy; correct?
18    A.    Correct.
19    Q.    Madame Secretary and chief, that would be
20 Chief Semonite?
21    A.    Yes.  General Semonite.
22    Q.    Major -- pardon me.  General Jackson is
23 forwarding an e-mail he received from Scott Spellmon
24 below, also of August 22, that relays some notes from
25 a conversation that General Spellmon had with Governor

**ND OBJ.:**
Hearsay

Jo-Ellen Darcy
June 21, 2022

Page 50

1  Dalrymple, the governor of North Dakota.  If you'd
2  take a moment and read the bottom of this chain which
3  begins with General Spellmon's report to General
4  Jackson.
5        A.    You're going to have to scroll.  Can you
6  scroll up the document?  Thank you.
7        Q.    How are you doing, Ms. Darcy?  Have you
8  completed reading it?
9        A.    Not yet.  I'm finished.
10       Q.    All right.  So do you agree with me that
11  as of August 22 you were aware that there were reports
12  coming from the governor of North Dakota that protest
13  camps were present on Corps property and that they
14  were not peaceful?
15       A.    This e-mail refreshes that memory.
16       Q.    Okay.  And do you agree with me that the
17  governor of North Dakota is expressing concern about
18  the use of Corps lands to conduct trespass activities
19  on private property in North Dakota?
20       A.    From what's written in this e-mail, it
21  appears that is the case.
22       Q.    Okay.  And do you agree with me that the
23  governor of North Dakota is expressing concern that
24  the camps may grow quickly?
25       A.    It appears to me he's concerned about the

50:10-51:24
602, 802

Page 51

1  pipeline being completed.
2        Q.    That wasn't the question.  The question
3  was, do you agree with me that the governor is
4  expressing concern about the Corps -- the camps on
5  Corps property are expected to grow?
6        A.    That appears to be the governor's
7  concern.
8        Q.    All right.  And do you see that the
9  governor -- at least according to General Spellmon and
10  his conversation with the governor, the governor asked
11  the Corps to seek federal law enforcement assistance
12  to secure the Corps property?
13             MS. ZILIOLI:  Objection; misstates
14  evidence.
15       A.    I don't read it that way.
16       Q.    (BY MR. SEBY) All right.  How do you read
17  it?
18       A.    Let's see.  He asked for partnership and
19  information sharing with law enforcement leaders as
20  they develop an enforcement strategy.
21       Q.    The next bullet?
22       A.    He asked if there are historical
23  instances and General Spellmon says he would check,
24  but it's not common.
25             (Deposition Exhibit 538 was remotely

51:8-15
611

Page 52

1  introduced and provided electronically to the court
2  reporter.)
3        Q.    Right.  Okay.  If we could go to
4  August -- pardon me.  Exhibit 538, which is an e-mail
5  again from General Jackson to you and to Chief
6  Semonite dated August 24.  Take a moment and read that
7  short e-mail there, please, and then I want to refer
8  you to the attachment to General Jackson's e-mail to
9  you, which is a Corps of Engineers -- they call them
10  storyboards, I understand, or situation rep.  And so
11  we're going to look at that next.
12       A.    Okay.
13       Q.    So, Ms. Darcy, do you recall being
14  advised, at least as of August 24, that the United
15  States District Court was going to be issuing a
16  decision on September 9, which is -- the date of this
17  e-mail is August 24, but it looks like you were
18  advised to be expecting the court to issue a ruling on
19  September 9.  Do you see that in the first sentence
20  there?
21       A.    Yes.
22       Q.    Okay.  Do you recall what matter -- what
23  was involved in the matter that the court would be
24  issuing a decision on?
25       A.    I do not.

Page 53

1        Q.    Do you think it could be relating to
2  Judge Boasberg in the United States District Court for
3  the District of Columbia ruling on a pending motion
4  for a preliminary injunction against the Corps by the
5  Standing Rock Sioux Tribe?
6        A.    I don't recall.
7        Q.    You don't recall that?
8        A.    I don't.
9        Q.    Okay.  Let's look at the storyboard
10  that's attached to this e-mail.  It's a color map with
11  some briefing information.
12             MR. SEBY:  Rachel, if you could enlarge
13  that, please.  So before we get to the narrative that
14  the Corps is reporting on its document dated August 24
15  there in the bottom in yellow, if we could, Rachel,
16  the box that's inside the map.
17       Q.    (BY MR. SEBY) Ms. Darcy, if you'd take a
18  moment and look at the legend.  And do you see that
19  some of the legend markings identify the Corps
20  reservoir project in blue?  Do you see that box?
21       A.    Yes.
22       Q.    Okay.  If we could then go to the left
23  box inset.  There we are.  Thank you.  Enlarge that a
24  bit.  Do you see how the blue is then apparent there
25  that shows the Corps project boundaries in the blue?

Jo-Ellen Darcy
June 21, 2022

Page 54

1    A.   Yes.

2    Q.   And do you see that the river that goes
3  through there, that's the Cannonball River?  So that
4  flows into the Missouri, Lake Oahe there, and we also
5  see the route of the Dakota Access Pipeline to the
6  north of there.  Within the project lands of the Corps
7  of Engineers, there are -- it's Oahe Corps land in the
8  blue.  There is a south camp that straddles the
9  reservation and the Corps land.  Do you see that?
10 "Camp South" it says in the Corps' own language.  Do
11 you see that?

12   A.   I see "Camp South" and I see the arrow.

13   Q.   Yes.  Right there on the boundary of the
14 reservation and the Corps project lands; correct?

15   A.   Correct.

16   Q.   And then if we go above the Cannonball
17 River, there is a "Camp North."  Do you see that?

18   A.   Yes.

19   Q.   Okay.  So here you are on -- at least on
20 August 24 of 2016, you were provided with an e-mail
21 that had this map on it showing you that the Corps was
22 reporting there was a camp to the south of the
23 Cannonball River and a camp to the north of the
24 Cannonball River on Corps of Engineers Oahe project
25 lands.  Do you agree with me?

Page 55

1    A.   Yes, I can see that.

2    Q.   All right.  Thank you.  If we could go
3  to -- on that narrative on the right side, if we could
4  look at some of the bullets, please, the third bullet
5  down under the last 24 hours.  Do you see that?

6    A.   Yes.

7    Q.   The Corps is reporting in this storyboard
8  that the Standing Rock Sioux Tribe special use permit
9  application lacked required information for approval.
10 Do you see that?

11   A.   Yes.

12        (Deposition Exhibit 541 was remotely
13   introduced and provided electronically to the court
14   reporter.)

15   Q.   Okay.  And if we could go next to
16 Exhibit 541, please.  And do you recognize this
17 e-mail, Ms. Darcy?  It's from Colonel Price in your
18 office of the assistant secretary of the army to you.
19 Do you recall this e-mail dated August 25 of 2016?

20   A.   No.  I'd have to read it.

21   Q.   Please do.

22   A.   Can you enlarge it just a bit.  Thank
23 you.  Can you scroll it down?  I can't see that.
24 Thanks.  Scroll it up.  Scroll more.

25   Q.   Ms. Darcy, are you done?

Page 56

1    A.   Not yet.  I've finished.

2    Q.   Okay.  Do you recall receiving this
3  e-mail that your staff wrote for you to consider, your
4  staff being Colonel Price, and working with your
5  principal deputy, Lowry Crook?

6    A.   Reading it has refreshed my memory.

7    Q.   Okay.  And did you speak with them while
8  they were developing this or did they develop it on
9  their own and provide it to you?

10   A.   I don't recall.

11   Q.   Okay.  And do you see that they are
12 suggesting that you send this to the secretary of the
13 army?  Did you ask them to prepare this?

14   A.   I don't recall.

15   Q.   Did you often delegate to your staff to
16 create drafts of briefings that you could share with
17 your boss?

18   A.   On occasion.

19   Q.   Okay.  Is this one of those occasions?

20   A.   I don't recall.

21   Q.   If we could go to Exhibit 589,
22 please.  Pardon me.  489.  489.  And go to the text of
23 the e-mail, please.  Ms. Darcy, do you recall us
24 looking at an exhibit with Mr. Connor e-mailing you
25 wanting to speak to you about the DAPL protests?

Page 57

1    A.   Yes, earlier.

2    Q.   Okay.  This is that e-mail, now with
3  Mr. Connor following up on it basically 11 days later.
4  And he's asking if you're available for a five to
5  ten-minute call today for an update on the DAPL
6  situation.  Do you see that?

7    A.   I don't -- I see that is on August 26,
8  request for a phone call.

9    Q.   Yes.

10   A.   But the earlier e-mail you showed me,
11 what was the date on that, the 17th?

12   Q.   Yes.  You can see it right there.  It
13 says August 17.

14   A.   I couldn't see it until just now.  The
15 17th and 22nd.  Okay.

16   Q.   All right.  So here Mr. Connor is again
17 reaching out to you in his capacity as assistant
18 secretary of the interior; right?

19   A.   That's what it appears to suggest, yes.

20   Q.   Okay.  Did you have this second call?

21   A.   I don't recall.

22   Q.   Do you recall what you discussed with the
23 assistant secretary?

24   A.   I don't recall having the call.

25   Q.   Okay.  If we could go to Exhibit 410.

Page 58

```
 1   Exhibit 410.
 2           MS. HYMEL:  Mr. Seby, I have a 408 and
 3   413, but not 410.  If you need me to pull that up?
 4           MR. SEBY:  Let's see.  It's 410.  It's
 5   the Secretary Darcy -- Assistant Secretary Darcy's
 6   update to the army secretary.  I have it marked as
 7   410.
 8           MS. HYMEL:  I'm going to need a minute to
 9   grab that from elsewhere.
10           MR. SEBY:  Okay.  Why don't we keep
11   moving then.  Let's go to Exhibit 542.
12           (Deposition Exhibit 542 was remotely
13   introduced and provided electronically to the court
14   reporter.)
15       Q.   (BY MR. SEBY) Ms. Darcy, if you'd take a
16   look at this.  It's a chain -- short chain e-mail.
17   Begins with an e-mail from Lowry Crook to General
18   Jackson at the bottom there.  If we could go to the
19   next page so Ms. Darcy can see the bottom of that.
20       A.   Start at the beginning.
21       Q.   So this is the e-mail on August 30, 2016,
22   from Lowry Crook to General Jackson.  You're on this
23   string later.  So you would have at least had access
24   to this, but I just want to start with this.  What is
25   Mr. Crook referring to when it says, "It looks like it
```

Page 59

```
 1   may be landing tomorrow afternoon"?
 2           MS. ZILIOLI:  Objection; foundation,
 3   speculation.
 4       A.   I don't know.
 5       Q.   (BY MR. SEBY) Okay.  Do you see the
 6   second sentence, "Can we make sure Ms. Darcy has the
 7   latest on the situation before then," situation on the
 8   ground, status of the special use permit, et cetera.
 9   So he's asking for information for your benefit.  Do
10   you see that, your principal deputy?
11       A.   Yes.
12       Q.   Okay.  So let's keep going up the chain
13   where you're brought into the picture on the next one,
14   which is General Jackson responds to Mr. Crook's
15   e-mail by addressing it to you, madame secretary, and
16   you're copied on the e-mail.  You're an addressee.  So
17   he's providing an update from the Omaha district on
18   DAPL activity.  And No. 1 says, "Law enforcement
19   reports dwindling numbers of personnel at the
20   campsites and protest locations."
21           What law enforcement do you think he's
22   referring to?
23           MS. ZILIOLI:  Objection; speculation.
24       A.   I don't know.
25       Q.   (BY MR. SEBY) All right.  And then No. 2,
```

Page 60

```
 1   will you read No. 2 to yourself, please, so we can
 2   talk about it.
 3       A.   I've read it.
 4       Q.   Do you recall receiving this update at
 5   the end of August, August 31 to be exact?
 6       A.   I don't.  I do not recall.
 7       Q.   You don't recall.  Your staff, General
 8   Jackson, was gathering information for your benefit on
 9   a number of topics, including the special use permit.
10   So you were apprised of that with an update from
11   General Jackson on August 30.  So then -- pardon me?
12       A.   I'm just saying yes, that's what this
13   e-mail would suggest.
14           (Deposition Exhibit 543 was remotely
15   introduced and provided electronically to the court
16   reporter.)
17       Q.   Yes.  If we could go to 543, please.
18   This is a calendar note of yours which says that you
19   accepted to participate in a meeting with the
20   Department of Interior on September 1 of 2016.  Do you
21   recall that?
22       A.   No.
23       Q.   Your calendar accepted that meeting, but
24   you don't recall it?
25       A.   No.
```

Page 61

```
 1       Q.   Okay.  Exhibit 77, please.  Actually,
 2   let's skip 77, Ms. Darcy.  You're not copied on it.
 3   Your Corps colleagues are, and the exhibit speaks for
 4   itself.  So let's go to Exhibit 493, please.  So
 5   before we talk about this exhibit, Ms. Darcy, do you
 6   recall that on September 9, 2016, district Judge
 7   Boasberg issued an order denying the Standing Rock
 8   Sioux Tribe motion for a preliminary injunction
 9   against the Corps?
10       A.   I don't recall.
11       Q.   You don't recall.  Are you aware that the
12   Department of the Army and the Department of Justice
13   and the Department of Interior issued a joint
14   statement later that same day, September 9, 2016?  Are
15   you aware of that?
16       A.   This e-mail is refreshing my memory.
17       Q.   And what part of your memory is coming
18   back to you?
19       A.   Just what's written here, that there was
20   a ruling made that day.
21       Q.   Okay.  So do you recall the September 9
22   joint statement?
23       A.   No.  I would have to see it.  I don't
24   recall.
25       Q.   We'll go right to it here in a moment.
```

Jo-Ellen Darcy
June 21, 2022

Page 62

1   But so you see that -- well, let's do that.  Let's go
2   to the attachment to this e-mail, please.  The next
3   one.  There you go.  So this is on Department of
4   Justice letterhead, but the title of the document says
5   September 9, 2016, joint statement from the Department
6   of Justice, the Department of the Army, and the
7   Department of the Interior regarding Standing Rock
8   Sioux Tribe v. U.S. Corps of Engineers.  Do you see
9   that?
10       A.   Yes.
11       Q.   Are you now refreshed as to the army
12  lending its name to this release?
13       A.   I am now, yes.
14       Q.   Okay.  Were you involved in this matter?
15       A.   I was.
16       Q.   Were you the individual in the Department
17  of the Army that lent -- that approved the army
18  putting its name on this release?
19       A.   Yes.
20       Q.   Okay.  Was this being considered prior to
21  September 9, 2016?
22       A.   I don't recall.
23       Q.   How was it that this came out on the very
24  same day the court issued a ruling in favor of the
25  Army Corps of Engineers?

Page 63

1        A.   I don't recall.
2        Q.   Regardless of the court's decision, which
3   you knew about ahead of time -- at least as of
4   August 24 per your earlier e-mail -- did you
5   participate in a discussion that regardless of how the
6   court ruled, you would issue this nonetheless?
7             MS. ZILIOLI:  Objection; misstates
8   evidence.
9        A.   No.
10       Q.   (BY MR. SEBY) I'm sorry, Ms. Darcy?
11       A.   No.
12       Q.   You didn't plan to issue this
13  irrespective of the court's decision?
14       A.   The decision of the court was something
15  we would need to consider before making a statement.
16       Q.   Okay.  How is it that a favorable ruling
17  in the direction of the army caused you to take this
18  action?
19       A.   I don't recall.
20       Q.   When was this concept conceived,
21  Ms. Darcy?
22       A.   I don't recall.
23       Q.   You don't.  Okay.  You said you
24  participated in its development; correct?
25       A.   Correct.

63:2- 11
611

Page 64

1        Q.   Did you participate in developing it on
2   September 9 or did you do it prior to September 9?
3        A.   I don't recall the exact date.
4        Q.   How about yes before or no, not before?
5   Which was it?  Did you participate in the development
6   of this prior to, at any time, September 9?
7        A.   Yes.
8        Q.   Do you recall how much prior?
9        A.   I do not.
10       Q.   Okay.  Who wrote this document?
11       A.   I don't know.
12       Q.   Did your staff help participate in
13  writing it?
14       A.   I believe that we did.
15       Q.   And who would that be?
16       A.   I will say that I was part of that.  I
17  don't -- would be probably my deputy and my counsel.
18       Q.   Okay.  Did you approve it before it was
19  finalized?
20       A.   If it was, yes, I did.
21       Q.   Okay.  Did you check with the Corps of
22  Engineers in order to finalize this?
23       A.   I don't recall.
24       Q.   Did you check with Secretary Fanning?
25       A.   I don't recall.

Page 65

1        Q.   If we could go to Exhibit 345, please.
2   All right.  If you'd take a moment, please, and read
3   this e-mail.  You're not copied on it, but General
4   Jackson is, who reports to you.  If you would take a
5   minute and read this e-mail chain, it begins with an
6   e-mail from General Spellmon on September 12 to Lowry
7   Crook, your principal deputy, and to Donald Jackson,
8   your principal report.  If you'd take a moment and
9   read that, please, to the very end.  Let us know when
10  we can scroll up.
11       A.   You can scroll up.  Okay.  Scroll up.
12  Okay.  I'm finished reading.
13       Q.   Okay.  So this is General Spellmon
14  providing an update to your principal deputy and to
15  General Jackson with respect to the status of the
16  special use permit; correct?
17       A.   Yes.
18       Q.   Okay.  And did you regularly communicate
19  with your principal deputy and General Jackson with
20  respect to the DAPL protest and the Standing Rock
21  Sioux Tribe special use permit?
22       A.   Yes.
23       Q.   All right.  And here your principal
24  deputy is talking about his call with the governor of
25  North Dakota, Governor Dalrymple; right?

65:13-
66:11
602,
802

Jo-Ellen Darcy
June 21, 2022

Page 66

1    A.   Yes.

2    Q.   And General Spellmon is explaining to

3  your principal deputy that there is -- the most

4  significant issue we are dealing with with respect to

5  the pending Standing Rock Sioux Tribe special use

6  permit application is that the information that was

7  provided by the tribe on a new application does not

8  match the facts on the ground.  You see where it says

9  that?

10   A.   You'll have to scroll up, but yes, I

11 recall reading it in the second e-mail.

12        (Deposition Exhibit 546 was remotely

13 introduced and provided electronically to the court

14 reporter.)

15   Q.   All right.  Okay.  If we could go to

16 Exhibit 546, please.  And go to the next page, please.

17 There we go.  So you'll see that the -- do you see the

18 subject matter is Governor Dalrymple, North Dakota

19 release regarding the Dakota Access Pipeline.  And the

20 attachment is identified as a request for federal

21 resources news release; right?

22   A.   Okay.

23   Q.   And it's forwarded to you by an

24 individual named Rohan Patel.  Do you recognize that

25 gentleman's name?

Page 67

1    A.   It's familiar, but I don't remember him.

2    Q.   Do you see the acronyms after

3  Mr. Patel's --

4    A.   Yes.

5    Q.   -- name in the e-mail?  EOP WHO, what

6  does that refer to?

7    A.   White House Office, Executive Office of

8  the President.

9    Q.   Dated September 13, an individual in the

10 Executive Office of the President is forwarding you an

11 attachment, which if we can look at the attachment,

12 please, it's a news release from the governor of North

13 Dakota.  Would you take a moment and refresh your

14 memory with that, please.

15   A.   I've read that much.  Okay.  Okay.  I've

16 finished.

17   Q.   All right.  Ms. Darcy, you were forwarded

18 this release dated September 13 from the office of the

19 governor.  You received it on September 13 as well.

20 Do you recall receiving it?

21   A.   I don't recall.

22   Q.   You see that your e-mail is copied in the

23 forward of it from Mr. Patel in the Executive Office

24 of the President, the White House; right?

25   A.   I do see that, yes.

Page 68

1    Q.   Okay.  But you don't recall it.  You said

2  that you approved the army putting its name on the

3  September 9 release that Governor Dalrymple is issuing

4  this statement about and expressing strong concerns

5  and disagreement with it.  Do you recall having a

6  reaction to receiving this when you received it?

7    A.   No.

8    Q.   Do you see that he's articulating an

9  expectation of federal law enforcement support?

10   A.   That's what that paragraph reads, yes.

11   Q.   Okay.  All right.  But you don't recall

12 having ever received this information?

13   A.   I don't recall having it.

14   Q.   Do you ever recall the governor

15 expressing concern to you about the September 9 joint

16 statement that you participated in?

17   A.   I recall the governor having concerns

18 about the protests as well as the easement.

19   Q.   My question was different.  I asked you

20 do you recall the governor expressing concerns to you

21 about the September 9 joint statement?

22   A.   I don't recall him expressing concerns

23 about that specific statement.

24        (Deposition Exhibit 420 was remotely

25 introduced and provided electronically to the court

68:8-
10
602,
802

Page 69

1  reporter.)

2    Q.   Okay.  Let's go to Exhibit 420, please.

3  And this is an e-mail from -- it's from Jennifer

4  Greer, and it's addressed to General Jackson and

5  Mr. Crook and you.  Gentlemen and ma'am, please see

6  the attached.  And then if we could look at the

7  attachment, please, once we get past these social

8  media icons.  There we are.

9        If you'd take a moment and familiarize

10 yourself -- refamiliarize yourself with this, please.

11 It's a September 14 letter from North Dakota's two

12 United States senators and North Dakota's one

13 congressman, Kevin Kramer, at the time and the

14 governor of the state of North Dakota.

15        It's a letter dated September 14

16 addressed to the Attorney General of the United

17 States, Loretta Lynch; Sally Jewell, the Secretary of

18 the Department of Interior; and you, Ms. Darcy, as the

19 assistant secretary of the army for civil works.

20 Please take a moment and read this letter.

21   A.   Okay.  You can scroll.  You can scroll

22 up.  Okay.  Move up some more.  Okay.

23   Q.   All right.

24   A.   Finished.

25   Q.   Thank you.  Ms. Darcy, do you recall

69:25-
71:8
401-402

Jo-Ellen Darcy
June 21, 2022

Page 70

1  receiving this letter from the delegation of the State
2  of North Dakota and the governor?
3      A.   In reading it now, my memory has been
4  refreshed.
5      Q.   Okay.  Would you agree with me that the
6  individuals, the congressional delegation and the
7  governor, are expressing strong displeasure with your
8  statement dated September 9, 2016?
9      A.   Yeah.  That's not a supportive letter.
10     Q.   And they expressed expectations with
11 respect to follow-up by the signatories to the joint
12 statement.  Do you agree with me about that?
13     A.   Yes.
14     Q.   And they asked for a meeting.  Did that
15 ever happen?
16     A.   I don't recall.
17     Q.   Do you ever recall meeting with any of
18 these individuals regarding their letter?
19     A.   Not in person, no.
20     Q.   Do you recall speaking with them as a
21 follow-up to your receiving this letter as an
22 addressee, one of three?
23     A.   I don't recall.
24     Q.   Did you ever provide any written response
25 to this letter?

Page 71

1      A.   I don't recall.
2      Q.   What did you do with this letter after
3  you received it?
4      A.   I don't recall.
5      Q.   Were you in the practice of not
6  responding to letters from a governor or to senators
7  or a congressman all together?
8      A.   No.
9      Q.   You have no recollection of receiving
10 this letter, or do you not?
11     A.   In reading the letter today, my memory
12 has been refreshed.  I do not recall my response.
13     Q.   And what is it about your memory that's
14 refreshed?  Just the fact that you received it, but
15 nothing else?
16     A.   The particulars that are outlined there
17 have been refreshed by this letter -- by my reading
18 this letter today.
19     Q.   I understand.  And did you just set it
20 aside and go about other business or did you do
21 anything with respect to it?
22     A.   I don't recall.
23         (Deposition Exhibit 421 was remotely
24 introduced and provided electronically to the court
25 reporter.)

Page 72

1      Q.   Okay.  If we could go to Exhibit 421,
2  please.  And if you take a moment and read this, this
3  is an e-mail from Donald Jackson to you and to Chief
4  Semonite.  And he's forwarding a DAPL update on
5  September 14 of 2016.  Do you see that?  And there's
6  another one of these storyboards.
7          So if we could go to the attachment,
8  please, the storyboard.  So if we could -- here we
9  have another map that shows the Oahe project and,
10 again, the Cannonball River and the camp north of that
11 and the camp south of that inside the Corps project
12 boundary.
13         But I want to ask you about the third
14 bullet in the last 24-hour report on the situation
15 with the protests.  This is dated -- this map is dated
16 September 14.  And on September 14, this third bullet
17 says that the Omaha district discussed special use
18 permits with the Department of the Army, Department of
19 Justice, BIA, Interior, U.S. Attorney's Office, and
20 the FBI and addressed any concerns from the other
21 agencies.
22         Do you recall what concerns were
23 addressed that were voiced by any of those entities,
24 including the Department of the Army?
25     A.   I do not.

Page 73

1      Q.   Okay.  Do you recall receiving this
2  e-mail with this attachment?
3      A.   I do not.
4          (Deposition Exhibit 547 was remotely
5  introduced and provided electronically to the court
6  reporter.)
7      Q.   If we could go to Exhibit 547.  And this
8  is General Jackson --
9      A.   No, it isn't.
10     Q.   Pardon me.  This is a portion of a press
11 briefing by White House press secretary Josh Earnest
12 on September 14.  Do you recall this transcript at
13 all, Ms. Darcy?
14     A.   No.  No.
15     Q.   Did you recall telling me whether or not
16 you involved the Corps on your September 9 joint
17 statement or did you not?
18     A.   What's the question?
19     Q.   The question I just asked was would you
20 please remind me whether or not you said you involved
21 the Corps in formulating your position on the
22 September 9 joint statement?
23     A.   I don't recall.
24         (Deposition Exhibit 425 was remotely
25 introduced and provided electronically to the court

73:10-
14
401-
402,
602

Jo-Ellen Darcy
June 21, 2022

Page 74

reporter.)

2    Q.    Okay.  All right.  If we could go to

3 Exhibit 425, please.  Next, please, the cover.  There

4 we go.  So here's an e-mail also from General Jackson

5 dated September 15 to you and to Chief Semonite.  And

6 it says "Madame Secretary and Chief," the daily DAPL

7 update, and "have provided a draft of the press

8 release to accompany the special use permit decision.

9 Lowry will work this across the interagency and White

10 House tomorrow for final clearance."

11        So my question is, do you recall this

12 point in time where the special use permit was slated

13 for release and your office was working on a press

14 release to accompany it?

15    A.    I don't recall that.

16    Q.    Okay.  You don't have any recollection of

17 participating in this topic at all?

18    A.    I don't recall.

19    Q.    Okay.  Do you -- did you participate in

20 reviewing the draft press release in any way?

21    A.    I don't recall.

22    Q.    Okay.  Ms. Darcy, you said that you spent

23 a total of eight hours preparing for your deposition,

24 did you not?

25    A.    I met with counsel for eight hours, yes.

Page 75

1    Q.    Okay.  There's a lot that you don't

2 recall, though, even though you had that amount of

3 preparation; right?

4        MS. ZILIOLI:  Objection; argumentative.

5    A.    Correct.

6    Q.    (BY MR. SEBY) Okay.  I'm not being

7 argumentative.  I'm just asking to understand your

8 presence here today and your preparation related to it

9 and your answers to my questions thus far, which

10 heavily seem not to recollect anything.

11        MS. ZILIOLI:  Same objection.

12        (Deposition Exhibit 549 was remotely

13 introduced and provided electronically to the court

14 reporter.)

15    Q.    (BY MR. SEBY) Including your e-mails that

16 you're copied on directly from your subordinates in

17 the Department of the Army.  Ms. Darcy, if we could go

18 over to Exhibit 549, please.  And this is General

19 Jackson sending to Mr. Crook, your principal deputy,

20 the final addition of the press release.  And then

21 your deputy -- principal deputy sends it to you on

22 September 16, 2016.  Do you recall this press release?

23    A.    I do not.

24    Q.    Another e-mail of yours you don't recall

25 this press release.  If we can go to the exhibit,

Page 76

1 please.  There we go.  Take a moment and refresh your

2 memory of this, Ms. Darcy.

3    A.    Can you scroll it up, please.  Okay.

4    Q.    So now that you've read this, do you

5 understand and recall this event in this document?

6    A.    This has refreshed my memory.

7    Q.    Okay.  And what is it that your memory

8 now tells you that it's been refreshed?  Can you tell

9 me what you recall about this press release.

10    A.    That it was granting the special use

11 permit to the Standing Rock.

12    Q.    Ms. Darcy, how come in the press release

13 the Corps put together with your principal deputy and

14 involved the White House and the interagency review

15 process that Mr. Crook commented on in that previous

16 e-mail exhibit -- how come there's no mention in the

17 press release that the Standing Rock Sioux still had

18 to meet the conditions of the special use permit in

19 order for it to be effective?  Why is that not stated

20 in here?

21    A.    I don't know.

22    Q.    Did you participate in the selection of

23 the phrasing of this press release?

24    A.    I don't recall.

25    Q.    Okay.  Do you agree with me that it makes

76:12-
21,
76:25-
77:4
602,
802

Page 77

1 it sound like the permit was, just to use the phrase

2 of the document itself, granted, issued, allow?  Do

3 you agree with me it says that in there?

4    A.    Those words are there.

5    Q.    All right.  If we could go to

6 Exhibit 499, please.  This is an e-mail to you from

7 General Jackson on September 16 of 2016, same day as

8 the press release.  And General Jackson is reporting

9 to you and Chief Semonite, After getting the green

10 light from the White House and DOJ and DOI, Omaha

11 granted the special use permit of the Standing Rock

12 Sioux Tribe on the south side only.  Colonel Henderson

13 notified all members and the governor of North Dakota

14 to include tribal chairman prior to publication

15 tonight.

16        And so this continues that phrasing

17 "approved" and "granted"; right?

18    A.    It says "granted."  I don't see

19 "approved."

20    Q.    Right.  Granted.  Pardon me.  You're

21 right.  It says "granted."  So General Jackson is

22 telling you, the assistant secretary of the army, the

23 Corps has just granted a permit; is that fair?

24    A.    Yes.

25        (Deposition Exhibit 550 was remotely

77:20-
24
602,
802

Jo-Ellen Darcy
June 21, 2022

Page 78

1 introduced and provided electronically to the court
2 reporter.)
3          Q.    Okay.  And then on Exhibit 550, if we
4 could, please.  And on the same day as the issuance by
5 the Corps of the press release that your principal
6 deputy got a green light on from the White House and
7 the Department of Interior and Department of Justice,
8 presumably because he worked with them on it, then you
9 are sending here a Dakota Access Pipeline update to
10 the secretary of the army on that same day, right, a
11 little later in the evening?
12          A.    Appears to be, yes.
13          Q.    And your note says, "Just wanted to let
14 you know that this evening we will be granting a
15 special use permit to the standing rock Sioux tribe to
16 camp on Corps land on the southern portion of our
17 project on the Missouri River.  There are currently
18 encampments on the northern portion of our project
19 that are under grazing lease with a private landowner
20 that we will evaluate in consultation with the lease
21 holder and the tribe as to whether or not a permit can
22 be granted for encampments at this site.
23                "There are permit conditions, such as no
24 permanent structures can be constructed and no
25 firearms allowed, on the southern portion permit,

Page 79

1 which is good for 30 days.  Had conversations today
2 with the tribal chairman who expressed his
3 appreciation for the 'pause' we are taking regarding
4 the construction while we review decisions that have
5 been made.  Situation on the ground is expected to
6 have increasing numbers of protesters and having
7 regular communication with the governor and
8 congressional delegation with the departments of
9 justice and interior."
10                Was the secretary of the army aware of
11 all of this in motion prior to you issuing this update
12 to him?
13                MS. ZILIOLI:  Objection; speculation.
14          A.    I provided him updates.
15          Q.    (BY MR. SEBY) Prior to this one?
16          A.    I believe so.  There was a situational
17 e-mail I briefed him on.
18          Q.    Okay.  Why did you not include providing
19 the army secretary with information that there was an
20 existing camp on the south side of the Cannonball
21 River on Corps property?  Why didn't you include that
22 information?
23          A.    I don't know.  I included information
24 that I thought was relevant.
25          Q.    Okay.  Why did you not further tell the

79:10-14
602

Page 80

1 secretary about all of the other conditions that were
2 in the permit that needed to be complied with, such as
3 the requirement that the Standing Rock Sioux Tribe had
4 to first obtain an insurance certificate and bond in
5 order for the special use permit to be effective?  Why
6 didn't you tell him that?
7          A.    I don't know.  I gave him information
8 that I thought was relevant to him.
9          Q.    All right.  Did this briefing you gave to
10 the secretary of the army summarize your understanding
11 of the special use permit at the time of September 16
12 of 2016, at least as of 8:26 p.m.?
13          A.    I don't know the detail in there.  This
14 e-mail was sent at 4:51.  I don't recall what I was
15 thinking at 8:15 the night before, to answer your
16 question.
17          Q.    Well, no.  Right.  You sent the e-mail to
18 the army secretary at 4:51 a.m. on the following day.
19 I guess I'm confused because his reply thanking you is
20 dated the 16th.  I don't know how that could be.  Do
21 you?  How could your e-mail be dated the day after he
22 responds?
23          A.    I don't know.
24                (Deposition Exhibit 551 was remotely
25 introduced and provided electronically to the court

Page 81

1 reporter.)
2          Q.    Yeah.  Well, okay.  I just noticed that
3 as well.  If we could go to 551, please.  So this is
4 an e-mail from General Jackson -- pardon me.  It's a
5 string.  It's an e-mail string and it starts with an
6 e-mail from General Jackson to you and Chief Semonite
7 on Wednesday, September 21.  And it's a DAPL spot rep.
8 I think that's like a situational report.  And if you
9 look at the bottom, there is an Omaha responses
10 section.  Do you see that?
11          A.    Uh-huh.  Yes.
12          Q.    And just for purposes of this discussion,
13 if you look at point No. 1, "The permit is only for
14 the south side of the river, with associated
15 conditions.  The Tribe has not signed the
16 acknowledgment for this permit yet nor met the
17 liability requirements, so there is currently no
18 permit in place."  Do you see where it says that?
19          A.    I do.
20          Q.    And General Jackson is telling you that.
21 And you responded with a very short e-mail later that
22 same day, September 21, and you said, "So, there is no
23 permit in place for the south encampment, even though
24 we announced Friday night that there was?"
25                Do you recall posing that question?

Jo-Ellen Darcy
June 21, 2022

Page 82

1    A.   This e-mail refreshed my memory of that.
2         Q.   Okay.  What were you thinking about that?
3    You were puzzled, weren't you?
4         A.   I asked -- I raised a question.
5         Q.   Right.  And so you got a response, then,
6    at the top of the e-mail chain from General Jackson
7    also on September 21, 2016.  General Jackson says to
8    you, "Ma'am, I spoke with John Henderson today and
9    updated Lowry this afternoon.  We did grant a Special
10   Use Permit, but the administrative action has not been
11   fully completed."  So there's that word "granted"
12   again.  And then he caveats it by saying, but we've
13   got to still complete some administrative things.
14        Then General Jackson goes on to explain
15   that they gave the documents to the tribal chairman
16   and spoke with him, walked him through the final terms
17   and conditions of the permit and the media release --
18   that's the press release that Mr. Crook worked on --
19   and the Department of Interior and the Department of
20   Justice, the White House.
21        And then it says, The Chairman verbally
22   approved both documents.  What the Chairman was
23   supposed to do was sign the acknowledgment and return
24   this with proof of liability insurance to Omaha, as
25   required by the permit.  This was expected as early as

Page 83

1    Saturday, but not later than Monday which was the next
2    business day.  We expected some delay in lining up the
3    liability insurance, due to this happening over the
4    weekend, but expected the permit to be returned.
5         Apparently the Chairman passed the permit
6    document to his legal team without clear instruction
7    then left for Europe.  John is working with the
8    chairman and his legal team to finalize this and hope
9    to have it completed by today, Wednesday 21.  Sorry
10   for the confusion.  Will let you know when it is
11   administratively complete.
12        So, Ms. Darcy, do you recall this e-mail?
13        A.   You have refreshed my memory of this
14   e-mail.
15        Q.   Okay.  That's good.  That's good.  So now
16   that you're refreshed about your being puzzled about
17   what the permit was or was not and this clarification
18   that your General Jackson provided to you, since
19   you're his boss, do you ever recall ever being told
20   after this date, September 21, 2016, when it was
21   admitted -- when the permit the Corps tendered to the
22   Standing Rock Sioux Tribe was ever administratively
23   closed out, to use the words of General Jackson,
24   saying he would let you know when that happened?  Do
25   you recall when General Jackson informed you that it

Page 84

1    was closed out administratively?
2         A.   I do not recall.
3         Q.   Do you recall ever being told that?
4         A.   I don't remember.  No, I don't recall.
5         Q.   Ms. Darcy, do you regret the word choices
6    that the Corps used in phrasing the press release
7    talking about the special use permit?
8         A.   No.  They chose the words that they felt
9    best conveyed the situation, I think.
10        Q.   Do you think they were accurate?
11        A.   Because I don't recall the details, I
12   can't really comment on that.
13        Q.   You said that you oversaw the Corps of
14   Engineers; right?
15        A.   That was my responsibility.
16        Q.   And you had asked about whether or not
17   there really was a permit in place; right?
18        A.   In that e-mail I asked.
19        Q.   Right.  So you just forgot all about it
20   and moved on?  The topic didn't remain in your mind or
21   concerns to be addressed?
22        A.   I don't recall.  I don't recall what I
23   was thinking at that time.
24        Q.   Okay.  So you were told by the Corps that
25   there were people trespassing on property that was

Page 85

1    under the jurisdiction of the Corps.  You were told
2    that there was a special use permit applied for.  It
3    took several weeks for it to be processed because the
4    applicant didn't fill out the details that the Corps
5    required.  You were told that the revised permit
6    application didn't match conditions on the ground.
7         You were told that nonetheless a permit
8    was being developed and a press release went out
9    announcing that it had been granted.  And you asked
10   about that when you were told that it hadn't been
11   complied with yet and were puzzled by that.  You
12   were told it was not administratively complete, but
13   then you just didn't think or care to think about it
14   further.  Is that your testimony?
15        MS. ZILIOLI:  Objection; misstates
16   evidence and testimony.
17        A.   I don't recall.
18        MR. SEBY:  Right.  Okay.  If we could go
19   to Exhibit 318, please.  Actually, let's take a short
20   break.  We've been going for more than an hour and a
21   half, I think.  And let's take a break, Ms. Zilioli.
22        THE VIDEOGRAPHER:  Going off the record.
23   The time is 4:57 p.m. UTC, 10:57 a.m. Mountain.
24        (Recess taken, 10:57 a.m. to 11:17 a.m.)
25        THE VIDEOGRAPHER:  We are back on the

84:24-
85:17
602,
611,
802

Jo-Ellen Darcy
June 21, 2022

Page 86

1  record.  The time is 5:17 p.m. UTC, 11:17 Mountain.
2        Q.   (BY MR. SEBY) Ms. Darcy, we're back from
3  a short break.  We have an hour -- approximately an
4  hour and 45 minutes remaining in your deposition.  So
5  I want to go through a couple of additional exhibits
6  with you.  318 is the one that we talked about putting
7  up, please.  And if we could look at that, Ms. Darcy,
8  please.
9              This is -- you're not copied on this, but
10  it's dated September 25, 2016, and it's from the
11  deputy district commander of the Omaha district, James
12  Startzell, to Colonel Henderson and some other Omaha
13  Corps individuals.  And those -- Colonel Henderson and
14  the Deputy Startzell are forwarded a law enforcement
15  update on the DAPL protest camp.  It came from Morton
16  County, this update.
17            And I just want to ask you about whether
18  you were aware of this observation made by the
19  leadership in the Omaha Corps that as of September 25,
20  2016, Major Startzell says all of this information
21  being provided to them from Morton County basically
22  confirms the Commander's assessment that the camps are
23  growing out of the Standing Rock Sioux Tribe's
24  control, and the Chairman is probably going to use the
25  SUP as a way to regain control of what he sees as

Page 87

1  legitimate protesters.  Do you see that?
2        A.   I see that, yes.
3        Q.   Okay.  Were you aware of the Omaha
4  district's conclusions in this regard about the
5  Standing Rock Sioux Tribe not having control over the
6  camp?
7        A.   No.
8        Q.   Okay.  Did you ever give them control
9  over the camp?
10        A.   Give who?
11        Q.   The Standing Rock Sioux Tribe.
12        A.   The camp on Corps property?
13        Q.   Yes.
14        A.   Protests on Corps property?
15        Q.   Right.
16        A.   I did not give control, no.
17        Q.   Okay.  As far as you're concerned, you
18  still -- you and the Corps still governed the lands in
19  the possession -- under the jurisdiction of the Corps
20  at the Lake Oahe project; correct?
21        A.   Correct.
22        Q.   Okay.  As of this date, September 25,
23  2016, do you believe that General Jackson or anyone
24  else informed you that the, quote, administrative
25  details of the permit had been satisfied?

Page 88

1        A.   I don't recall.
2        Q.   Okay.  Do you recall knowing as of
3  September 25 whether or not the permit was in effect?
4        A.   No, I don't.
5        Q.   All right.  Is it that you don't
6  recollect or that you never quite knew?
7        A.   I don't recall.
8             (Deposition Exhibit 554 was remotely
9  introduced and provided electronically to the court
10  reporter.)
11        Q.   Okay.  Let's go to Exhibit 554.  So this
12  is an e-mail string that begins with an e-mail from
13  Colonel Henderson to General Spellmon, copied to
14  General Jackson, on Wednesday, September 28.  And the
15  subject matter reads "Standing Rock Sioux Tribe Way
16  Ahead."
17            And the general -- or pardon me --
18  Colonel Henderson is providing an update to Spellmon,
19  his superior, talking with Archambault about the camp
20  and the situation in the camp and that Colonel
21  Henderson also was in communication with the governor
22  of North Dakota.
23            And then Spellmon writes them back and
24  says -- he forwards Colonel Henderson's note to --
25  pardon me.  He does not write him back.  He forwards

Page 89

1  Colonel Henderson's message to Chief Semonite and
2  again copies Jackson.  And he says, I am forwarding a
3  note from Colonel Henderson below that explains our
4  current way forward on the DAPL encampments, from a
5  tactical perspective.  And he says, "There are forces
6  at play here that are beyond the Chairman's control."
7  And that's consistent with Colonel Henderson's report
8  about Standing Rock not having control.
9             Then Colonel Henderson says, I can't do
10  this by myself.  I need some help at the HQ levels.
11  HQ is plural.  So I imagine he's referring to you and
12  to the other agencies that you involved in the protest
13  matter.  And he is voicing concern about the need for
14  alignment on the way ahead at the secretariat level.
15  For example, he says, DOI's comments at the White
16  House earlier this week regarding, quote, check the
17  block consultation are not helpful for those in the
18  field.  Do you know who he's referring to?
19        A.   I have not been able to read
20  this entire e-mail chain.  So, you know, you're taking
21  snippets from something that I'm not able to read
22  here.
23        Q.   Okay.  Of course you need to read it,
24  then.  So please start at the bottom and work your way
25  up, because this is an important e-mail that gets

87:3-7
802

87:17-21
Calls for
legal
conclusion,
701-702

Jo-Ellen Darcy
June 21, 2022

Page 90

1  forwarded to you.
2      A.   Can you expand it, please, a little bit.
3  Thank you.  So I don't know who this is from.  Is this
4  from Henderson to -- this is from Henderson to
5  Spellmon; correct?  Okay.  Okay.  I've finished up
6  through four.  Thank you.  Okay.  I finished that part
7  of the e-mail.  Okay.  If you could go down past the
8  redacted.  You can scroll this one down a little bit.
9  Thank you.  Okay.  I've finished that.  Okay.  I've
10 finished that.
11     Q.   You're done with the whole thing now?
12     A.   Yes.
13     Q.   Okay.  Great.  So let's go to the section
14 that is General Spellmon's e-mail to Generals Semonite
15 and Jackson talking about the need for alignment at
16 the secretariat level.  That's plural, if I understand
17 it right.  So he's talking about you and Secretary
18 Jewell because he's saying that at the White House
19 earlier this week, the week of September 29 --
20 Thursday, September 29, that week he's talking about a
21 presentation at the White House regarding
22 "check-the-block consultation."  I imagine that's
23 check-the-box consultation.
24          But do you think he's referring to
25 Secretary Jewell, who spoke that week at the White

90:13-91:4
401-402,
602, 802

Page 91

1  House tribal conference?
2          MS. ZILIOLI:  Objection; speculation,
3  foundation.
4      A.   I don't know who he's referring to.
5      Q.   (BY MR. SEBY) Okay.  How about the last
6  paragraph before he signs off, "Sir, I'll end with a
7  request for any guidance you may have.  It would be
8  most welcome as this has been a challenge on many
9  fronts.  While we may disagree with our federal
10 partners on the quality of consultation, I think we
11 can all agree on safety which may help us move this
12 forward."
13          What's he referring to as a disagreement
14 between the Corps and, quote, other federal partners?
15 What does that refer to?
16          MS. ZILIOLI:  Objection.
17     A.   I don't know.
18          MS. ZILIOLI:  Speculation, foundation.
19     Q.   (BY MR. SEBY) You don't know, Ms. Darcy?
20     A.   I do not.
21     Q.   Who is the "we" that he's referring to?
22          MS. ZILIOLI:  Same objection.
23     Q.   (BY MR. SEBY) Do you think that's the
24 Corps?
25     A.   I don't know.

Page 92

1      Q.   It's just a question asking if you know.
2  Now, that e-mail, Spellmon's e-mail, got forwarded on
3  to Mr. Crook and then Mr. Crook, as you read,
4  forwarded that to you.  So you were given this e-mail
5  string on September 30 of 2016.  And Jackson's message
6  to Lowry says, "FYI as we continue to work with tribes
7  on a variety of issues.  They are no longer accepting
8  of consultation.  They now say for future action we
9  will require their consent."  And he talks about
10 visiting with his colleague Ponganis about that.
11          "Please ensure that those" -- he's
12 telling this to Lowry.  "Please ensure those with whom
13 you are working in the White House understand this
14 unintended consequence.  While I am certainly open to
15 refinement across the board in how the Feds consult,
16 not sure we can ever gain consent, especially among
17 the multitude of Tribes with vastly different views of
18 the world."
19          Do you recall receiving that information?
20     A.   I do not.
21     Q.   Right.  Okay.  Do you have a reaction to
22 it as you're reading it here today?
23     A.   My reaction is that at the time we within
24 the administration were doing a series of round tables
25 throughout the tribal communities across the country.

92:1-
93:5
401-
402,
602,
802

Page 93

1  And much of what was being debated was the use of the
2  word "consultation" versus the use of the word
3  "consent," much of it based on whether or not tribal
4  nations had sovereignty.  We were doing that outside
5  of the specifics of the Dakota Access Pipeline.
6      Q.   But it happened to also be at the same
7  time as your consideration of the easement for the
8  Dakota Access Pipeline; right?
9      A.   It did.
10     Q.   Are you saying that they're totally not
11 related?
12     A.   No.  What I'm saying is there's a larger
13 context than just the Dakota Access Pipeline resulting
14 in the words "consultation" versus "consent."
15     Q.   Yeah.  And so that's why I asked you what
16 was the -- with respect to DAPL, what was the point
17 that Spellmon was making about we disagree with our
18 federal partners on the quality of consultation?
19          MS. ZILIOLI:  Objection; speculation.
20     A.   I don't know, as I said earlier.
21     Q.   (BY MR. SEBY) So at this point in time,
22 you didn't see any difference of opinion between the
23 Corps and the secretary of the interior, for example?
24     A.   I did not say that.  I said I don't know
25 who the "we" is that he was suggesting.

Jo-Ellen Darcy
June 21, 2022

Page 94

1    Q.   Yeah.  I didn't say you said something.
2  I was asking you a question.
3          Could you repeat the question?
4    Q.   Sure.  I said do you believe that there
5  was any disagreement between the Corps and another
6  federal partner, agency or secretary?
7    A.   There could have been.  There's often
8  disagreements between agencies.
9    Q.   I'm not asking a hypothetical.  I'm
10  asking were you aware of any disagreement with respect
11  to the issue of consultation with another secretary of
12  a different agency?
13    A.   I don't recall.
14          (Deposition Exhibit 561 was remotely
15  introduced and provided electronically to the court
16  reporter.)
17    Q.   Could we go to Exhibit 561, please.  You
18  know what, Ms. Darcy?  This is a lengthy e-mail.  So
19  you've been reading a lot of things.  So let's not
20  talk about this exhibit.  I think it speaks for
21  itself.  Bear with me for a moment.  So let's use
22  Exhibit 347.  Let's go to the bottom because,
23  Ms. Darcy, I'd like you to read this exhibit.
24    A.   Okay.  Okay.  Go up.  Okay.  Okay.  Okay.
25    Q.   You done?

Page 95

1    A.   You have to move it up.  Okay.
2    Q.   Okay.  Are you ready to discuss the
3  entire exhibit?
4    A.   Yes.
5    Q.   Okay.  So what started as a DAPL update
6  that came from General Spellmon to --
7    A.   This top part -- excuse me.  This top
8  part I have not read.  These are the responses to
9  General Semonite.  This part I have not read yet.
10    Q.   Okay.  I just asked you if you had
11  finished.  So please do that.
12    A.   I had finished what was on the screen.  I
13  didn't see this part.  So now I have to read this part
14  as well so then I will be complete.  Can you move it
15  up a little.  Thank you.  Okay.  I'm finished.
16    Q.   Okay.  Good.  So what started as a
17  briefing from Spellmon to Jackson and some questions
18  back and forth, it was forwarded to you and to Chief
19  Semonite from General Jackson saying, "Madame
20  Secretary and Chief.  Wanted you both to have this in
21  advance of your engagements tomorrow."  And that was
22  on October 13, 2016.  What engagements do you think he
23  was referring to?
24    A.   I don't recall and I didn't see the top
25  of that e-mail.  So I guess I was copied on that.

Page 96

1    Q.   You certainly are copied on it.  Do you
2  not think you were?
3    A.   No, but now that I see it, okay.  I just
4  wasn't sure where in that chain I was involved, but
5  okay.
6    Q.   You leave the chain, which is what I want
7  to ask you about.  So Jackson forwarded to you and to
8  Chief Semonite and when Chief Semonite writes back, he
9  drops you off the chain, interestingly.
10    A.   Right.
11    Q.   And I'm not done speaking.  He changes
12  the title of the re line to General Semonite concerns,
13  DAPL update.  And he says, Lowry, I'm ready to get
14  personally involved here.  The current plan is not
15  working.  I'm not sure anything has gotten better
16  since our last meeting with Senator Hoeven, if
17  anything.  The situation has degraded.  Is there a
18  master strategy?  Would like to know it.  I see this
19  with high potential for increased conflict.  Please
20  let me know what I can do to assist in getting a
21  solution.  Can't sit on this much longer without a
22  feasible plan.
23          Then he goes on to talk to Ed and Scott,
24  and that's Ed Jackson and Scott Spellmon.  Tracking
25  all of this, I'd like to talk to you tomorrow before

Page 97

1  he meets with Hoeven.  Please help me understand a few
2  issues.  Would you please look at his paragraph No. 3,
3  trespassing?
4    A.   Whose paragraph 3?  Is this General
5  Semonite's paragraph 3 or General Jackson's paragraph
6  3?  I'm not sure whose paragraph we're talking about.
7    Q.   I just explained that we transitioned to
8  General Semonite's e-mail where he drops you.  So
9  we're talking about that e-mail, Ms. Darcy.  Have a
10  look at it, please.  Rachel has put it in a box on the
11  screen for you to focus on.
12    A.   I see that now.
13    Q.   What is our position to Congress why the
14  Corps has allowed trespassing and camping on
15  government land on the north side, effectively
16  condoning the tribes to violate the law both on our
17  land as well as other lands?  When is the Corps going
18  to do something to get this under control?  While many
19  might move to other camps, some will stay to embolden
20  the effort.  Is there some event that will cause us to
21  ask the sheriff to enforce the law?
22          Then he goes on to paragraph 5,
23  "Listening Sessions."  I believe this is the listening
24  session of the nationwide programmatic approach you
25  were telling me about.  And I asked you about is it

94:4-13
401-402,
602

96:6-
98:11
602,
802

Jo-Ellen Darcy
June 21, 2022

Page 98

1  separate from DAPL but concurrent and you said yes.
2  General Semonite, though, says, Concerned we are
3  giving a perception that tribes have a veto or consent
4  vote on DAPL.  Regardless of how this was envisioned,
5  afraid Department of Interior has created a perception
6  that all is on the table including DAPL permit.
7           So do you know why he dropped you off of
8  this e-mail question to Lowry Crook, your principal
9  deputy?
10          MS. ZILIOLI:  Objection; speculation.
11     A.   I do not know.
12     Q.   (BY MR. SEBY) How was your working
13  relationship with General Semonite?
14     A.   We had a very good working relationship.
15     Q.   Did he communicate with you often by
16  e-mail?
17     A.   More by usually e-mail or phone call.
18     Q.   Okay.  Did you office together in the
19  Pentagon?
20     A.   No.
21     Q.   Where did you office?
22     A.   His office -- my office is in the
23  Pentagon.
24     Q.   And his?
25     A.   His office is in the Corps of Engineers

Page 99

1  headquarters located in the GAO building.
2     Q.   So did you physically see him very often
3  during this time period?
4     A.   We saw each other not often, but
5  occasionally, both for this and other things related
6  to the Corps.
7     Q.   Did he ever express concerns to you about
8  your communication style or frequency?
9     A.   No.
10     Q.   Or your -- the manner in which you worked
11  on the DAPL issues?
12     A.   No.
13     Q.   Is it fair that as assistant secretary of
14  the army for civil works you had a number of matters
15  that were priority issues for you?
16     A.   I did have a number.
17     Q.   Would you consider DAPL to be one of
18  those principal issues that you were working on at the
19  time?
20     A.   Yes.
21     Q.   Okay.  If we could go, please, to the
22  next exhibit, which is 348.  And, Ms. Darcy, you don't
23  need to read this again because you just did.  It's
24  the same -- exact same string.  Take a minute to make
25  sure you agree with me that it's the exact same string

99:21-101:2
602, 802

Page 100

1  that we just reviewed in the prior exhibit, but
2  General Semonite responds to General Spellmon, and
3  that's what I want you to see here at the very top.
4           And it's General Semonite.  Again, this
5  is the e-mail that he changed the title to read
6  "General Semonite Concern:  DAPL Update."  And it's
7  the earlier chain that he dropped you off.  He replied
8  although to Lowry Crook, Spellmon, and Jackson.
9           He said, Scott, Ed:  Thanks.  We are
10  tracking.  Theme of my e-mail was not so much to you
11  two but to Lowry and to let him know I am not
12  satisfied with status.  Will see if he responds.  You
13  guys are all over this.  Just want to slowly raise the
14  bar as the chief that at some point, I will ensure
15  that the Corps doesn't get further wrapped in an
16  extended administration delay or blocking action.  You
17  guys need to stay consistent and measured.  Let me
18  push this.  Just want others to step up and do their
19  job.  Thanks.  Tight day today, but if we need to
20  talk, let me know.
21     Q.   Were you engaged in an administrative
22  delay or blocking action with respect to the easement?
23     A.   No.  No.
24     Q.   Do you think General Semonite is getting
25  a little upset with the administration's pace, you,

Page 101

1  and what's going on here?
2     A.   Those words would suggest that.
3     Q.   Okay.  Did you ever have a discussion
4  with him?  Did he raise these concerns to you?
5     A.   I don't recall that discussion.
6     Q.   Okay.  Did General Jackson?
7     A.   No.
8     Q.   How often did you speak with those
9  gentlemen during this time period?
10     A.   I spoke with General Jackson more than
11  I -- more frequently than I did with General Semonite.
12     Q.   And relatively speaking, what was that
13  like frequency-wise?  Once a month?
14     A.   Well, no.  More like more weekly at
15  least.
16     Q.   Okay.  So here we are October 14 and that
17  question is being raised and concern being stated
18  amongst the chief of the engineers and his principal
19  deputy and the general who oversees the northwest
20  region, which includes the Omaha district where the
21  Corps property on which the protest camps are sitting.
22           Is it your testimony that those gentlemen
23  never raised this with you personally, their concern
24  about administrative -- administration delay or
25  blocking action?  Pretty strong words.  I think he's

101:16
-102:9
602,
802

Page 102

1   only referring to -- at least within the Corps, to
2   you.  I don't know who he's referring to outside of
3   that, but seems pretty clear here he's not happy with
4   where things are sitting and delay or blocking action.
5   That's a mystery to you, or you had some intimation
6   that that was going on?
7          A.   This e-mail is conveying that extended
8   administration delay or blocking action to his
9   subordinates, not to me.
10          MR. SEBY:  Right.  Right.  Let's go to
11  Exhibit 516.  And if you go to the next page, please,
12  Rachel.
13          Q.   (BY MR. SEBY) So here we have that same
14  chain entitled Lieutenant General Semonite's concern
15  where he's saying, Lowry, I'm ready to get personally
16  involved.  So you've read that whole chain.  And here
17  on October 14 your principal deputy forwards that to
18  you.  So you now have it as of that date.  And so what
19  did you think about General Semonite's e-mail?
20          A.   I don't recall.
21          Q.   Didn't stand out in your mind?  You don't
22  remember it today?  You don't remember it then?  I
23  don't understand.  You were copied on all of these
24  things, but do you have any reason to dispute you
25  didn't receive it?

Page 103

1          A.   No.
2          Q.   Do you have any reason to dispute that
3   General Semonite expressed these concerns to your
4   principal deputy?
5          A.   No.
6          Q.   Okay.  Did you ignore the e-mail or did
7   you read it, do you think?
8          A.   I don't recall.
9          Q.   Right.  Okay.  Let's go to Exhibit 349.
10  If you would take a minute.  And what this is, is an
11  article that an individual in the Corps forwarded to
12  General Semonite.  It's a DAPL article.  It was
13  transmitted on October 19, 2016, and says, "North
14  Dakotans seek federal aid after livestock butchered
15  near pipeline protest."  And General Semonite sends
16  the article on to General Spellmon, General Jackson,
17  and Colonel Henderson.
18          And he says, Team, want to keep us all in
19  the loop.  See the article.  This will only get worse.
20  If we expect a drawn out administration approval of
21  the easement, in all capital letters, then more than
22  willing to have the sheriffs in our camp to do spot
23  checks for health/safety and to enforce discipline.
24  We still have a lot of risk on the North Camp.  Let's
25  ensure it doesn't get out of control without us asking

Page 104

1   for interdiction by local law officials.
2          Ms. Darcy, October 19, 2016, is it your
3   testimony that General Semonite never expressed
4   concern to you about a drawn-out administration
5   approval of the easement?
6          A.   I don't recall.
7          Q.   You spoke to General Semonite often, you
8   said?
9          A.   I didn't use that adjective -- that
10  adverb.
11          Q.   Tell me then.  Tell me so I understand.
12  It wasn't once a month, but it was what?
13          A.   It could be once a week.  It could be
14  once a month.  It could be every other day.  It
15  depended on what was going on with him or with me.
16          Q.   And DAPL was one of your major issues,
17  and you just don't recall this being a matter that you
18  discussed with General Jackson or General Semonite?
19          A.   I said I discussed it with General
20  Jackson frequently.  I don't know how frequently I
21  discussed it with General Semonite.
22          Q.   How about the concern about the time it
23  was taking for administration review of the easement?
24          A.   Are you asking me if I talked about the
25  length of time?

Page 105

1          Q.   Did they ever raise the issue of the
2   extended nature of the period of time it was taking to
3   review the easement?
4          A.   That was an issue of concern, yes.
5          Q.   Raised to you by them?
6          A.   It wasn't -- it was always discussed as
7   part of the ongoing issue of granting the easement.
8          Q.   Why do you think that General Semonite
9   was referring to "team," but didn't include you on
10  that?
11          MS. ZILIOLI:  Objection; speculation.
12          A.   I don't know.
13          (Deposition Exhibit 568 was remotely
14  introduced and provided electronically to the court
15  reporter.)
16          Q.   (BY MR. SEBY) Okay.  If we could go to
17  Exhibit 568, please.  This is an e-mail chain that is
18  a DAPL press review for Monday coming from Colonel
19  Henderson.  I don't want to talk to you about the
20  content of this e-mail, but I do want to ask you that
21  your administrative assistant, Executive Officer
22  Colonel Price, he was basically your lead
23  administrative assistant; is that fair?
24          A.   They're called executive officers.  Yes.
25          Q.   So you had a principal deputy, Mr. Crook.

104:2-6,
105:1-7
403

Jo-Ellen Darcy
June 21, 2022

Page 106

1  How is Mr. Price different than Mr. Crook?
2       A.   Mr. Price is military.  He's an executive
3  officer.  Lowry Crook is a principal deputy assistant
4  secretary of the army.
5       Q.   Okay.  So I just want to ask you about
6  Mr. Price's -- Colonel Price's message here.  It says,
7  "Ma'am, I searched your inbox and deleted files and
8  did not find the original so I am forwarding this to
9  you from Mr. Crook's inbox."  Did you delete files
10 often?
11      A.   No.
12      Q.   Why did you have deleted files?
13      A.   I didn't delete files.  He's saying that
14 he deleted files.  I didn't delete files.
15      Q.   "I searched your inbox and deleted
16 files."  He's saying that your in-box and your deleted
17 files, is the way I read that.
18      A.   That's not the way I read it.  He says,
19 "Ma'am, I searched your in box and deleted."  "I" is
20 the operative actor in that sentence.  He deleted.
21      Q.   I'm not debating it with you, but he says
22 he searched.  He didn't delete files.  He searched
23 your in-box and deleted files.  That's a reference to
24 a box where deleted files are put because someone
25 drops them.  So I'm asking you a question:  Did you or

Page 107

1  did you not delete files?
2       A.   I don't recall.
3            (Deposition Exhibit 569 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6       Q.   Exhibit 569, please.  So if you would
7  please look at this e-mail chain.  It's a short one,
8  thankfully.  It starts with an e-mail from General
9  Spellmon on Friday, October 28 to the chief of
10 engineers and Donald Jackson.
11           And it says -- General Spellmon is
12 reporting to them, "Sir, based on yesterday's
13 escalation of force incidents, we are going to revoke
14 the Special Use Permit for the Standing Rock Sioux
15 Tribe camp effective immediately.  Colonel Henderson
16 will inform Chairman Archambault later today, and we
17 will follow with a press release.  Our rationale:
18 Yesterday's events proved again this is not a peaceful
19 or prayerful protest.  Life, health, safety for all in
20 the area are at risk.  There has been much reckless
21 endangerment.  There has been damage and destruction
22 of private property.  All of this behavior is well
23 beyond our trust responsibilities with the Tribe."
24           Were you aware of the Corps' strong
25 reaction to what happened on October 27, 2016?

Page 108

1       A.   I don't recall that.
2       Q.   Did you feel as though you were not
3  frequently kept apprised of what was going on, or were
4  you?
5       A.   No.  I was.  I just don't recall this
6  particular date.
7       Q.   Okay.  Can you explain why General
8  Spellmon used the word "revoke" the special use permit
9  for the Standing Rock Sioux Tribe?
10           MS. ZILIOLI:  Objection; speculation.
11      A.   I don't know what his word choice
12 involved, his rationale.
13      Q.   (BY MR. SEBY) Did you tell me -- I
14 couldn't remember whether or not you were ever
15 informed after being informed that the Standing Rock
16 Sioux Tribe special use permit was not yet
17 administratively complete.  Do you recall ever
18 learning that it was made -- at some point after that
19 time made administratively complete?
20      A.   I believe it was, but I don't recall the
21 actual being notified of that fact.
22      Q.   Then what are you basing your statement
23 you believe it was on?
24      A.   Because if it's being revoked, it must
25 have been issued.

Page 109

1       Q.   So you're basing it upon what you're
2  reading here, not some other independent confirmation
3  that the administrative issues were resolved?
4       A.   Yeah.  I don't recall being informed of
5  administrative issues being resolved.  So, yes, I
6  guess that's what I'm saying.
7       Q.   Would you agree with me that if something
8  never went into effect, you can't actually revoke it
9  because it's not real?
10           MS. ZILIOLI:  Objection; calls for a
11 legal conclusion.
12      A.   That sounds logical to me.
13           (Deposition Exhibit 578 was remotely
14 introduced and provided electronically to the court
15 reporter.)
16      Q.   (BY MR. SEBY) All right.  Agreed.  Let's
17 go to Exhibit 578.  So this is an e-mail from General
18 Jackson to you and General Semonite on November 9 of
19 2016.  And it's got an attachment, another storyboard,
20 dated -- this one is not dated.  So let's not worry
21 about the storyboard because it doesn't have a date on
22 it.  He's asking -- General Jackson is talking about
23 scheduling twice daily tentative vertical calls with
24 the division and Omaha in the event we get future
25 guidance and direction.

Jo-Ellen Darcy
June 21, 2022

110:9-24, 111:7-25, 112:4-8 401-402

Page 110

```
1           Do you recall what was going on in early
2   November 2016 with regard to your role in the DAPL
3   process and permits and protest activity?
4       A.  No.  Those dates aren't ringing a bell
5   right now.
6           (Deposition Exhibit 583 was remotely
7   introduced and provided electronically to the court
8   reporter.)
9       Q.  Okay.  Let's go to Exhibit 583.  And this
10  is an e-mail which attaches a signed letter, which is
11  on the letterhead of your office of the assistant
12  secretary for civil works and it's signed by you.  Do
13  you recall this letter?  It's undated, interestingly
14  enough, but it's transmitted by Mr. -- by Colonel Vail
15  to Lowry Crook.  He says, "Signed letter -- will send
16  it to whomever you direct, sir."
17          So this is your letter to Chairman
18  Archambault, Kelcy Warren, who is the chairman of
19  Energy Transfer Partners, and Joey Mahmoud, executive
20  vice-president Dakota Access, LLC.  Do you want to
21  read this letter or do you recall the letter I'm
22  showing you?
23      A.  I don't recall it.  I would need to read
24  it if you want to ask me about it.
25      Q.  Yeah.  Let's do that.
```

Page 111

```
1       A.  If you could scroll it up just a bit,
2   please.  Scroll up a little, please.  Okay.  I've
3   finished.  Thank you.
4       Q.  Do you recall the letter, Ms. Darcy?
5       A.  I really don't, but reading it again, I
6   remember asking those questions.
7       Q.  You don't recall writing the letter?
8   It's your own letter.
9       A.  I know it was, but it was five and a
10  half, maybe six years ago.
11      Q.  Sure.  It's a major milestone, though,
12  don't you think?  It was after the election and you
13  were making an announcement that nothing is going to
14  happen until we have a conversation -- a further
15  conversation about terms and conditions for the
16  easement documents, and you invited that, for working
17  with the tribe on a timeline that allows for robust
18  discussion and analysis to be completed expeditiously.
19  Meanwhile, these discussions -- while these
20  discussions and analysis are ongoing, construction on
21  or under Corps land bordering or under Lake Oahe
22  cannot occur because the army has not made a final
23  decision on whether to grant an easement.
24          You don't recall any of that?
25      A.  The letter has refreshed my memory.
```

Page 112

```
1       Q.  How so, Ms. Darcy?
2       A.  As I said, it was almost six years ago
3   and I had not thought about this for a very long time.
4       Q.  What are you thinking about it now, now
5   that you're refreshed?
6       A.  I'm thinking that it was a decision I
7   made.  And I do wish the date was on there because
8   that would be helpful for us.
9       Q.  Did you often undate letters?
10      A.  No.  That's why I'm surprised there is no
11  date on it.
12          (Deposition Exhibit 585 was remotely
13  introduced and provided electronically to the court
14  reporter.)
15      Q.  Let's go to Exhibit 585, please.  And,
16  Ms. Darcy, this is going to be an e-mail from Donald
17  Jackson to you and Chairman -- Chief Semonite and
18  Lowry Crook, of course.  And would you take a moment
19  and read that e-mail that Jackson sends to you.
20      A.  Okay.
21      Q.  It's a DAPL update.  And you've got a
22  section in here -- the bottom line is that vandalism
23  and unauthorized building access occurred in North
24  Dakota locations, around the Corps, on the ground in
25  North Dakota, feedback from tribal engagements,
```

Page 113

```
1   meeting with the chairman, listening sessions.
2       A.  Could you scroll up a little, please.  Go
3   up, please.  Scroll, please.  Okay.
4       Q.  Now, let's go to the very top of this
5   chain, because you were copied on General Jackson's
6   e-mail and you wrote back a simple one line, "The
7   characterization of the events is inaccurate.  Call me
8   when you can."  So you're saying that not to the
9   people that sent you the e-mail, General Jackson and
10  Chief Semonite, but your principal deputy.  What is it
11  about what you just read, Ms. Darcy, did you feel was
12  not accurate?
13      A.  You'd have to scroll down through each
14  individual item for me to react to that question.
15      Q.  Well, you just read it.  Do you have
16  any --
17      A.  No.
18      Q.  We're not going to take time to reread it
19  and go through it like that.  I'm asking you -- you
20  just read it.  Do you recall what it was in what you
21  just read that you felt at the time was not accurate?
22      A.  Probably the feedback from tribal
23  engagements, because that's what I'm party to.  I
24  was not party to the other things represented here.
25      Q.  Okay.  What is your reaction, then, to
```

Page 114

1  the -- you sent the letter -- the undated letter that
2  we just talked about and you said you were going to
3  invite the chairman of the Standing Rock Sioux Tribe
4  to talk about terms and conditions.  And there's a
5  portion of what you just read in General Jackson's
6  report that Colonel Henderson met with Chairman
7  Archambault and said, Yeah, I got that letter and he
8  said, We're not negotiating.  And the only alternative
9  was a reroute of the pipeline north of Mandan and
10 Bismarck, North Dakota.  Do you recall that?
11       A.   No.  That perhaps is what -- I don't
12 recall there being that much of a direct line in the
13 sand, but that's my recollection.  That's my
14 recollection.
15       Q.   Do you recollect hearing that from the
16 chairman?
17       A.   No.  My recollection is that I don't
18 think it was that, as I said, strictly a line in the
19 sand.
20       Q.   Could you elaborate so I understand.  I
21 don't follow what you're saying.
22       A.   That's all that I have to say.
23       Q.   What are you referring to as "a line in
24 the sand," Ms. Darcy?
25       A.   That the nation would not negotiate.  I

Page 115

1  believe we still -- we were still able to talk.
2       Q.   Can you explain what you mean by that?
3       A.   I just said what I mean, that we were
4  going to be able to continue to talk about it.
5       Q.   And did you continue to talk about it?
6       A.   I don't recall.
7       Q.   Let's go to Exhibit 587.  Actually, let's
8  skip that.  I apologize.  Let's skip that.  363,
9  please.  Let's see.  Hold on.  Let me get my bearings
10 right.  Yeah, 363.
11            I just want to ask you -- I'm not going
12 to talk about the briefing here, the extensive
13 briefing, but there is a -- General Jackson responds
14 to General Spellmon.  And you were copied on an
15 earlier portion of this where General Jackson shared
16 with you the update from DAPL on November 25 and asked
17 a question about whether or not Colonel Henderson's
18 November 25, 2016, directive to tribal -- 16 tribal
19 chairmen -- do you remember that letter?  I don't have
20 it in front of me.
21            It's not an exhibit, but do you remember
22 Colonel Henderson sending a letter to 16 tribal
23 chairmen dated November 25, 2016, saying, I am closing
24 the north camp and Corps land north of the Cannonball
25 River and people need to be off there by December 5,

Page 116

1  2016?  Do you recall that letter?
2       A.   I don't recall that letter.
3       Q.   Okay.  You wrote back and said, I assume
4  the letters were coordinated with the Department of
5  Justice and Bureau of Indian Affairs.  I'd like to see
6  copies on what the communication plan is for these
7  actions.
8            And General Jackson says to Spellmon --
9  after he says, Let me know if you need me to talk, and
10 General Jackson says, I will drop you a note if we
11 need to catch up, and nothing heard since launching my
12 last note to the secretary.  Not unusual.  More
13 unusual she responded in the first place.  He's
14 referring to you.
15       A.   And who's saying that?  I have no idea
16 who you're talking about.  So this is General Jackson
17 saying that about me?
18            MR. SEBY:  Yeah.  Let's scroll down,
19 Rachel, the one right there.  It's right there.
20       A.   It's not a note I have seen before.
21            (Deposition Exhibit 600 was remotely
22 introduced and provided electronically to the court
23 reporter.)
24       Q.   (BY MR. SEBY)  Okay.  Let's go to
25 Exhibit 600.  If you would take a moment, please, and

**[116:8-20 401-402, 602, 802]**

Page 117

1  read this e-mail and the attachment to it, please,
2  which is an e-mail from Lowry Crook dated September --
3  pardon me -- December 4, 2016.  And your principal
4  deputy is sending this draft potential press release
5  to Tracee Sutton, who is an aide to Senator Heidi
6  Heitkamp of North Dakota.  "Tracee, here is the latest
7  draft of the release.  A version of this is planned to
8  go out at 4 p.m.  Please don't share outside as a word
9  may change here or there as higher ups review."
10           Were you a higher up that reviewed this
11 press release?
12       A.   I am.
13       Q.   So you read this press release?  Did you
14 read the attachment?
15       A.   I need to see the attachment to know if I
16 read it.
17       Q.   Here we go.
18       A.   That's the press release.
19       Q.   Yes.  It says, "Army will not grant
20 easement for Dakota Access Pipeline crossing."
21       A.   Okay.  You can scroll.  Okay.
22       Q.   Are you done?
23       A.   Yes.
24       Q.   Did you review this press release before
25 it went out?

**[116:24-117:20, 117:24-118:1, 118:15-120:7 401-402]**

Jo-Ellen Darcy
June 21, 2022

Page 118

1      A.   Yes, I did.

2      Q.   And was it finalized pretty much the way
3  it's written here?

4      A.   I believe so, but I'd have to compare it
5  to the final.

6      Q.   But you reviewed it?

7      A.   I did.

8      Q.   Do you stand behind the statement that
9  this announces in early December 4 or shortly
10  thereafter that the Department of the Army will not
11  approve an easement that would allow the proposed
12  Dakota Access Pipeline to cross under Lake Oahe in
13  North Dakota?

14      A.   Yes.

15      Q.   Do you agree with the statement
16  attributed to you that says, "Jo-Ellen Darcy said she
17  based her decision on a need to explore alternate
18  routes for the Dakota Access Pipeline crossing"?

19      A.   Yes.

20      Q.   Do you agree with the statement
21  attributed to you that says, "The best way to complete
22  that work responsibly and expeditiously is to explore
23  alternate routes for the pipeline crossing"?

24      A.   Yes.

25      Q.   Okay.  How did you reach that decision?

Page 119

1      A.   Considering a number of factors, and also
2  that I go on to say that the best way to accomplish
3  this was through an environmental impact statement
4  with full public input and analysis.

5      Q.   Did you rely upon anyone outside the
6  Department of the Army in making this decision?

7      A.   I consulted with many individuals within
8  the administration and my office and the Corps.

9      Q.   Which officials in the administration did
10  you consult with in making this determination?

11      A.   The ones that I previously talked about.

12      Q.   Tell me again so I'm clear.

13      A.   The Department of Justice and the
14  Department of the Interior.

15      Q.   All right.  Was this your idea or did
16  someone suggest it to you?

17      A.   The final decision was mine.

18      Q.   I understand.  Was the idea of looking at
19  alternatives to reroute the pipeline your idea or
20  someone else's?

21      A.   It was my idea along with others.

22      Q.   And who are those individual others?

23      A.   Many of the people who I've previously
24  talked about, people who we've talked about this
25  easement from the get-go, both my deputy, my principal

Page 120

1  deputy, my counsel, Department of Justice, Department
2  of Interior.

3      Q.   Okay.  Did you speak with Secretary
4  Jewell before you made this announcement?

5      A.   I don't recall.  I did speak with someone
6  within the Department of Interior.  I'm not sure it
7  was the secretary.

8           (Deposition Exhibit 602 was remotely
9  introduced and provided electronically to the court
10  reporter.)

11      Q.   Okay.  All right.  Let's go to
12  Exhibit 602.  This is an e-mail -- it's a string of
13  e-mails and a very lengthy attachment.  I just want to
14  note that it starts with an e-mail from Colonel
15  Henderson to General Spellmon and says at the very
16  bottom there -- if you'd please go there, right there,
17  yes -- "Sir, after extensive review and additional
18  coordination with the Standing Rock Sioux Tribe and
19  Dakota Access Pipeline with regard to the request for
20  an easement by DAPL at our Oahe project, my
21  recommendation is attached.  I have determined that
22  the issuance of the attached Unexecuted Easement to
23  Dakota Access would be consistent with the statutory
24  requirements of 30 U.S.C. Section 185."

25           General Spellmon responds to that and

120:11-
123:15
401-
402

Page 121

1  says -- forwards that to the chief of engineers, Todd
2  Semonite, and says, "Sir, attached please find our
3  easement recommendation for the Dakota Access Pipeline
4  crossing under Lake Oahe.  As you know, this
5  recommendation follows over 25 months of study,
6  analysis and consultation with numerous partners by
7  our Omaha District under the exceptional leadership of
8  Colonel John Henderson.  I fully endorse and concur
9  with Colonel Henderson's recommendation to begin the
10  notification process to Congress and the granting of
11  the easement to Dakota access."  I want to thank
12  everyone in the headquarters, Corps who have supported
13  us in our analysis in reaching this recommendation.

14           And then General Jackson forwards that
15  string on to you and says, Madame Secretary and Chief
16  Semonite, provided is the Corps recommendation which
17  has been reviewed by headquarters counsel.  Bottom
18  line recommended we initiate Congressional
19  Notification and proceed with the granting of an
20  easement across Lake Oahe.  Decision document signed
21  by Colonel Henderson and unsigned draft easement with
22  enclosed attachment.  Standing by for guidance.

23           Do you recall this e-mail?

24      A.   Now that you have put it up there, I
25  remember it, yes.

Jo-Ellen Darcy
June 21, 2022

Page 122

1      Q.   So they -- the professional staff of the
2  Corps of Engineers who's charged with reviewing and
3  making the recommendation presented it to you and
4  asked for your guidance.  Did you respond to this
5  letter in any manner?
6      A.   It's not a letter.  It's an e-mail.  And
7  I don't recall.
8      Q.   Pardon me.  Did you respond to this
9  communication?
10      A.   I don't recall.
11      Q.   So December 13 you would have been in
12  your position as a political appointee for
13  approximately one more month; right?
14      A.   Just about.
15      Q.   Did you just ignore this?
16      A.   I don't -- I did not ignore e-mails.  I
17  don't recall my response.
18      Q.   You ignored the letter from the
19  congressional delegation of the State of North Dakota.
20      MS. ZILIOLI:  Objection; argumentative,
21  misstates testimony.
22      A.   I did not say that I...
23      Q.   (BY MR. SEBY) You couldn't recall ever
24  doing anything after you received it, is what I
25  understood you to say.

122:18-22
611

Page 123

1      A.   I said --
2      Q.   I'm asking is this the same treatment,
3  you just ignored it?
4      A.   No.
5      Q.   What did you do?
6      A.   I don't recall.
7      Q.   Okay.  You do recall receiving it,
8  though; right?
9      A.   Now that you have put it in front of me,
10  I do recall that, yes.
11      Q.   Okay.  And does your refreshed
12  recollection now enable you to say what you did with
13  it, given it was one of the major issues on your plate
14  and you were actively corresponding on it?
15      A.   I will repeat, I do not recall.
16      MR. SEBY:  Okay.  All right.
17  Mr. Videographer, how much time remaining do we have?
18      THE VIDEOGRAPHER:  28 minutes.
19      MR. SEBY:  Let's take a short break,
20  please, ten minutes.
21      MS. ZILIOLI:  Okay.
22      THE VIDEOGRAPHER:  Going off the record.
23  The time is 6:32 p.m. UTC, 12:32 p.m. Mountain.
24          (Recess taken, 12:32 p.m. to 12:48 p.m.)
25      THE VIDEOGRAPHER:  We are back on the

Page 124

1  record.  The time is 6:48 p.m. UTC, 12:48 p.m.
2  Mountain.
3      Q.   (BY MR. SEBY) Ms. Darcy, with respect to
4  the thousands of protesters and the eight to nine
5  months they occupied Corps lands, at least the portion
6  of that time while you were the assistant secretary of
7  army for civil works, how many Title 36 or other
8  citations did the Corps issue to DAPL protesters who
9  were occupying Corps-managed lands?
10      MS. ZILIOLI:  Objection; assumes facts.
11      A.   Mr. Seby, I don't recall the exact number
12  that 36 -- Rule 36.  We have lots of regulations and
13  rules with different numbers.  I'm not quite sure what
14  that one was.
15      Q.   (BY MR. SEBY) That's the -- put aside
16  that, though.  I mean, it's the Corps' rules and
17  regulations governing the use and management of land.
18  That's where the special use permit approval process
19  is spelled out.  But putting that aside, with regard
20  to those protesters, hundreds and thousands of them,
21  how many -- the question is, how many citations did
22  the Corps issue to DAPL protesters on Corps land
23  during the DAPL protests while you were assistant
24  secretary of the army?
25      MS. ZILIOLI:  Same objection.

Page 125

1      A.   I don't know.
2      Q.   (BY MR. SEBY) Any?
3      A.   I don't know.
4      Q.   Okay.  Did anyone tell you to not have
5  the Corps issue citations to the protesters?
6      A.   No.
7      Q.   Did you tell the Corps not to issue
8  citations to protesters on Corps land?
9      A.   No.
10      Q.   Why didn't the Corps issue citations?
11      A.   I don't know.
12      Q.   Did you ever ask or direct others to --
13  in the Corps to ask the State of North Dakota or
14  Morton County to evict or arrest trespassers on Corps
15  property?
16      A.   No.
17      Q.   Why not?
18      A.   The protesters were exercising their free
19  speech.
20      Q.   All of them?  Excuse me.
21      A.   I would say most.
22      Q.   How could you tell?
23      A.   I could only tell by reports I heard.  I
24  was not there.
25      Q.   To your knowledge, did the Corps -- you

Jo-Ellen Darcy
June 21, 2022

Page 126

1   as the assistant secretary of the army for civil
2   works, did you ever take any steps to communicate to
3   DAPL protesters physically present on Corps land that
4   they needed to leave?
5       A.   No.
6       Q.   When did you make the decision to allow
7   them to stay?
8            MS. ZILIOLI:  Objection; assumes facts.
9       A.   I did not make a decision one way or the
10  other about their presence on Corps land.
11      Q.   (BY MR. SEBY)  Doesn't that mean that you
12  effectively let them stay, then?
13           MS. ZILIOLI:  Objection; assumes facts,
14  to the extent it calls for a legal conclusion.
15      A.   They, as I've said earlier, were
16  exercising their free speech rights.
17      Q.   (BY MR. SEBY)  And you let them stay to do
18  that?
19           MS. ZILIOLI:  Same objections.
20      A.   They stayed and continued to do that,
21  yes.
22      Q.   (BY MR. SEBY)  Because you allowed them to
23  do that?
24           MS. ZILIOLI:  Same objections.
25      A.   It wasn't -- as I say, they were

*126:6-10*
*611*

*126:11-16*
*611, calls for*
*legal conclusion*
*701-702*

Page 127

1   exercising their free speech rights.
2       Q.   (BY MR. SEBY)  And you allowed them to
3   remain for that purpose?
4            MS. ZILIOLI:  Asked and answered.
5       A.   Asked and answered.
6       Q.   (BY MR. SEBY)  Okay.  Ms. Darcy, can you
7   recall a time when you or any other Corps or
8   Department of the Army individuals made a statement
9   that resulted in any deescalation of the DAPL
10  protests?
11      A.   I don't recall.
12      Q.   Nothing stands out?  Anything you did
13  made a difference to the nature or magnitude of the
14  protests on Corps land?
15      A.   I can't really say.  I mean, I don't
16  know.
17      Q.   Okay.  Ultimately the State of North
18  Dakota ended up being left holding the bag for the
19  effort to protect public safety and peace, including
20  that of the protesters; right?
21      A.   I don't know the specifics of what
22  "holding the bag" means.
23      Q.   Left to be responsible for the costs.
24      A.   The costs, yes.
25      Q.   Do you think North Dakota should be paid

*127:6-16*
*602*

*127:17-128:11*
*602, 611, calls*
*for legal*
*conclusion*
*701-702*

Page 128

1   back by the federal government for allowing the use of
2   federal property that way?
3            MS. ZILIOLI:  Objection; calls for a
4   legal conclusion.
5       A.   I don't know.
6       Q.   (BY MR. SEBY)  I'm not asking you a legal
7   question.  How does it feel to you to have North
8   Dakota get stuck with those costs?
9            MS. ZILIOLI:  Objection; assumes facts.
10      A.   If North Dakota is stuck with those
11  costs, it's an unfortunate outcome for the situation.
12      Q.   (BY MR. SEBY)  Are you aware of any other
13  period in the history of our country where the federal
14  government allowed their lands to be used inside a
15  state for such a purpose?
16      A.   I'm not aware.
17      Q.   Are you aware you have a unique role in
18  history in that regard?
19           MS. ZILIOLI:  Objection; vague.
20      A.   I don't know about "a unique role in
21  history."  I know I made a decision that I needed to
22  at the time.
23      Q.   (BY MR. SEBY)  And what was the decision
24  that you're referring to?
25      A.   Not granting the easement to cross Lake

*128:12-16*
*401-402,*
*602*

*128:17-22*
*401-402,*
*602, 611*

Page 129

1   Oahe.
2       Q.   Ms. Darcy, unless you've indicated
3   otherwise throughout this deposition, have you
4   understood my questions today?
5       A.   Yes.
6       Q.   Okay.  I have one more for you.  During
7   the period of the protest, please explain to me what
8   federal resources you made available to address the
9   protests occurring on Corps land.
10      A.   The Corps of Engineers personnel who are
11  at Lake Oahe and Colonel Henderson's oversight of the
12  property are federal resources that came from the
13  Corps of Engineers.
14      Q.   Did those -- were those resources
15  diverted to be focused on the protest or did they
16  exist -- in other words, those aren't new resources.
17  Those are existing federal responsibilities for the
18  Oahe project and for Colonel Henderson as the district
19  commander of, including that project.  I'm asking a
20  question that is because the protests arose on Corps
21  land, what decisions to devote and divert federal
22  resources did you make to deal with that new
23  circumstances?
24      A.   I didn't decide to divert resources.
25      Q.   Okay.  Is there anything further you'd

Jo-Ellen Darcy
June 21, 2022

Page 130

1  like to add?

2       A.   No.

3       Q.   Okay.  Apart from checking with your

4  counsel, which you just did, I'm asking do you have

5  anything personally to add?

6       A.   I do not.

7       MR. SEBY:  Okay.  At this time I have no

8  further questions, Ms. Zilioli, and pass the witness

9  to you.

10       MS. ZILIOLI:  Thank you.  I have no

11  questions at this time, but we will read and sign.

12       THE VIDEOGRAPHER:  Before we go off the

13  record, can I please get transcript and video orders.

14  Mr. Seby.

15       MR. SEBY:  Both, please.

16       THE VIDEOGRAPHER:  And Ms. Zilioli.

17       MS. ZILIOLI:  Just the transcript,

18  please.

19       THE VIDEOGRAPHER:  We are going off the

20  record.  This concludes the remote video-recorded

21  deposition of Jo-Ellen Darcy.  The time is 6:57 p.m.

22  UTC, 12:57 p.m. Mountain.  We are off the record.

23       WHEREUPON, the within proceedings were

24  concluded at the approximate hour of 12:57 p.m. on the

25  21st day of June, 2022.

Page 131

1            I, JO-ELLEN DARCY, do hereby certify that

2  I have read the above and foregoing deposition and

3  that the same is a true and accurate transcription of

4  my testimony, except for attached amendments, if any.

5

            Amendments attached   (  ) Yes   (  ) No

6

7       _____

8       JO-ELLEN DARCY

9

10

11

12            The signature above of JO-ELLEN DARCY was

13  subscribed and sworn to or affirmed before me in the

14  county of _____, state of Colorado, this

15  _____ day of _____, 2022.

16

17

18

       _____

19       Notary Public
       My commission expires

20

21

22

23

24

25  State of North Dakota 6/21/22 (tdg)

Page 132

1            REPORTER'S CERTIFICATE

2  STATE OF COLORADO        )
                             )
3  COUNTY OF ARAPAHOE       ) ss.
                             )
4            I, TIFFANY D. GOULDING, Registered
   Professional Reporter and Notary Public ID No.

5  19984028637, State of Colorado, do hereby certify that
   previous to the commencement of the examination, the

6  said JO-ELLEN DARCY verbally declared her testimony is
   under the penalty of perjury in relation to the

7  matters in controversy between the parties hereto;
   that the said deposition was taken in machine

8  shorthand by me at the time and place aforesaid and
   was thereafter reduced to typewritten form; that the

9  foregoing is a true transcript of the questions asked,
   testimony given, and proceedings had.

10

            I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of

12  this litigation.

13            IN WITNESS WHEREOF, I have affixed my
   signature this 11th day of July, 2022.

14

15            My commission expires November 4, 2022.

16  x____  Reading and Signing was requested.

17  _____  Reading and Signing was waived.

18  _____  Reading and Signing is not required.

19

20            _____

21            Tiffany Goulding
            Registered Professional Reporter

22

23

24

25

Page 133

1  Errata Sheet

2

3  NAME OF CASE: Plaintiff vs UNITED STATES

4  DATE OF DEPOSITION: 06/21/2022

5  NAME OF WITNESS: Jo-Ellen Darcy

6  Reason Codes:

7       1. To clarify the record.

8       2. To conform to the facts.

9       3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25            _____