Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 19-cv-150-DMT-ARS
_____

RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
PATRICK WYNTERS "WYN" HORNBUCKLE -
U.S. DEPARTMENT OF JUSTICE, MAIN JUSTICE
December 15, 2022
Via RemoteDepoTM
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

_____


          PURSUANT TO NOTICE AND AGREEMENT, the
Rule 30(b)(6) videotaped deposition of PATRICK WYNTERS
"WYN" HORNBUCKLE, U.S. DEPARTMENT OF JUSTICE,
MAIN JUSTICE, was taken on behalf of the Plaintiff in
Washington, D.C., by remote means on December 15,
2022, at 8:59 a.m. Mountain Standard Time, before
Tracy C. Masuga, Registered Professional Reporter and
Certified Realtime Reporter, appearing remotely from
Denver County, Colorado.

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

## Page 2

```
                    REMOTE APPEARANCES
1
2   For the Plaintiff:
3               PAUL B. KERLIN, ESQ.
                Greenberg Traurig LLP
4               1000 Louisiana Street
                Suite 6700
5               Houston, Texas 77002
                kerlinp@gtlaw.com
6
                PAUL M. SEBY, ESQ.
7               Greenberg Traurig LLP
                1144 15th Street
8               Suite 3300
                Denver, Colorado 80202
9               sebyp@gtlaw.com
10
    For the Defendant:
11
                JANE E. BOBET, ESQ.
12              TIMOTHY B. JAFEK, ESQ.
                VICTOR WILLIAM SCARPATO III, ESQ.
13              Department of Justice
                U.S. Attorney's Office
14              District of Colorado
                1800 California Street
15              Suite 1600
                Denver, Colorado 80202
16              jane.bobet@usdoj.gov
                timothy.jafek@usdoj.gov
17              victor.scarpato@usdoj.gov
18              ERICA M. ZILIOLI, ESQ.
                U.S. Attorney's Office
19              District of Colorado
                1801 California Street
20              Suite 1600
                Denver, Colorado 80202
21              erica.m.zilioli@usace.army.mil
22
    Also Present:
23
                Michael Banks, Videographer
24              Rachel Hymel
                Corin Stigall
25
```

## Page 3

```
1                   I N D E X
2   EXAMINATION OF PATRICK WYNTERS "WYN" HORNBUCKLE:  PAGE
    December 15, 2022
3
    By Mr. Kerlin                              8, 103
4
    By Ms. Bobet                                  101
5
                                             INITIAL
6   DEPOSITION EXHIBITS:                     REFERENCE
7   (Exhibits provided electronically to the reporter.)
8   Exhibit 850  Email to Hirsch, et al., from      47
                 Hornbuckle, 9/6/16, Subject:
9                [Non-DoD Source] ABC Caution-news:
                 Judge Grants Partial Stop on North
10               Dakota Pipeline Work;
                 ARMY_00028388 - ARMY_00028389
11
    Exhibit 851  Telephone Conference Invite from   52
12               Hackworth to Hornbuckle, et al.,
                 9/7/16, Subject:  Standing Rock
13               Touch Base; MYERS_00010012
14  Exhibit 852  Email to Hackworth, et al., from   54
                 Hornbuckle, 9/7/16, Subject:  RE:
15               Standing Rock - Cell Phone
                 Numbers; with attached emails;
16               MYERS_00043796 - MYERS_00043797
17  Exhibit 853  Email to Hirsch and Tompkins from  56
                 Hornbuckle, 9/9/16, Subject:
18               [Non-DoD Source] RE:  FINAL Drafts
                 of Statements; with attached
19               emails (Redacted); ARMY_00117974-
                 ARMY_00117977
20
    Exhibit 854  Email to Hirsch and Tompkins from  73
21               Hornbuckle, 9/9/16, Subject:
                 [Non-DoD Source] RE:  FINAL Drafts
22               of Statements; with attached
                 emails (Redacted); ARMY_00117979-
23               ARMY_00117982
24
25
```

## Page 4

```
1   Exhibit 855  Email to Hirsch, et al., from      77
                 Hornbuckle, 9/9/16, Subject:  RE:
2                Judge Boasberg's Order/Opinion and
                 Joint Army/Interior/Justice
3                Statement; with attached emails;
                 MYERS_00010033 - MYERS_00010035
4
    Exhibit 856  Email to Diver, et al., from       80
5                Hornbuckle, 9/9/16, Subject:  RE:
                 Judge Boasberg's Order/Opinion and
6                Joint Army/Interior/Justice
                 Statement; with attached emails;
7                MYERS_00010036 - MYERS_00010037
8   Exhibit 857  Email to Wray from Hornbuckle,     81
                 9/9/16, Subject:  RE:  Standing
9                Rock - Possible state press
                 conference at 11:30 central; with
10               attached emails; MYERS_00045235 -
                 MYERS_00045238
11
    Exhibit 858  Email to Hackworth, et al., from   84
12               Hornbuckle, 9/12/16, Subject:  RE:
                 Standing Rock - Possible state
13               press conference at 11:30 central;
                 with attachments; with attached
14               emails; MYERS_00044231 -
                 MYERS_00044249
15
    Exhibit 859  Email to Ames, et al., from        89
16               Williamson, 9/12/16, Subject:  RE:
                 DAPL Daily Update Security
17               9 Sep 16 (UNCLASSIFIED); with
                 attached emails; USACE_00084181 -
18               USACE_00084182
19  Exhibit 860  Email to Keller from Kirchmeier,   96
                 12/14/16, Subject:  Re:  URGENT
20               Associated Press inquiry from
                 Blake; with attached emails;
21               ND_000256324 - ND_000256329
22
23
24
25
```

## Page 5

```
1   DEPOSITION EXHIBITS:  (Previously marked)
2   Exhibit 494  Email to SRJ2@ios.doi.gov from     59
                 U.S. Department of the Interior,
3                9/9/16, Subject:  Joint Statement
                 from the Department of Justice,
4                the Department of the Army, and
                 the Department of the Interior
5                regarding Standing Rock Sioux
                 Tribe v. U.S. Army Corps of
6                Engineers; DOI_00000001 -
                 DOI_00000002
7
    Exhibit 803  Second Amended Notice of 30(b)(6)  14
8                Deposition of The United States of
                 America, 11/23/22; with
9                attachments
10  Exhibit 821  Joint Statement from Department of 92
                 Justice, Department of the Army,
11               and the Department of the Interior
                 regarding D.C. Circuit Court of
12               Appeals Decision in Standing Rock
                 Sioux Tribe v. U.S. Army Corps of
13               Engineers, 10/16/16;
                 USACE_00015886
14
15
16
17
18
19
20
21
22
23
24
25
```

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 6

1          WHEREUPON, the following proceedings
2    were taken pursuant to the Federal Rules of Civil
3    Procedure.
4          *     *     *     *     *
5          (Deposition Exhibits 850 through 860
6    were introduced by Mr. Kerlin and electronically
7    provided to the court reporter for marking.)
8          THE VIDEOGRAPHER:  We are now on the
9    record.  Participants should be aware that this
10   proceeding is being recorded and, as such, all
11   conversations held will be recorded unless there is a
12   request and agreement to go off the record.
13          Private conversations and other
14   attorney-client interactions should be held outside
15   the presence of the remote interface.
16          This is the remote video-recorded
17   deposition of Wyn Hornbuckle.  Today is Thursday,
18   December 15, 2022.  The time is now 3:59 p.m. UTC,
19   8:59 a.m. Mountain.  We are here in the matter of
20   State of North Dakota v. United States of America.
21          My name is Michael Banks, remote video
22   technician on behalf of U.S. Legal Support.  I'm not
23   related to any party in this action, nor am I
24   financially interested in the outcome.
25          At this time will the reporter, Tracy

Page 7

1    Masuga on behalf of U.S. Legal Support, please
2    enter the statement for remote proceedings into the
3    record.
4          THE REPORTER:  The attorneys
5    participating in this deposition acknowledge that I am
6    not physically present in the room and that I will be
7    reporting this proceeding remotely.
8          They further acknowledge that in lieu of
9    an oath administered in person, the witness will
10   verbally declare his testimony in this matter is under
11   penalty of perjury.
12          Counsel, please indicate your agreement
13   by stating your name and your agreement on the record.
14          MR. KERLIN:  This is Paul Kerlin on
15   behalf of the plaintiff, North -- the State of North
16   Dakota, and we agree.
17          MS. BOBET:  And this is Jane Bobet on
18   behalf of the defendant, The United States of America,
19   and we agree.
20          THE REPORTER:  Mr. Hornbuckle, do you
21   solemnly state that the testimony you are about to
22   give in the cause now pending will be the truth, the
23   whole truth, and nothing but the truth?
24          THE DEPONENT:  I do.
25

Page 8

1          PATRICK WYNTERS "WYN" HORNBUCKLE,
2    having been first duly sworn to state the whole truth,
3    testified as follows:
4                    EXAMINATION
5    BY MR. KERLIN:
6      Q.   Good morning, Mr. Hornbuckle.  Did I
7    pronounce that right?
8      A.   That's correct.  Good morning,
9    Mr. Kerlin.
10     Q.   Good morning.  I'm -- I'm an attorney
11   with the law firm Greenberg Traurig and a Special
12   Assistant Attorney General for North Dakota.  I, along
13   with my colleague Paul Seby, who is also attending
14   this deposition, represent the State of North Dakota
15   in the action in which this deposition is being taken.
16          Today I'll likely refer to my client as
17   "North Dakota," just so that you're aware of that.
18          Would you state your full name.
19     A.   My name is Patrick Wynters Hornbuckle.
20     Q.   Okay.  And I'll also note that this
21   deposition of Mr. Hornbuckle is taken pursuant to the
22   notice that was served on counsel, and agreement of
23   the parties.
24          Mr. Hornbuckle, where are you currently
25   located?

> Object to all testimony as to hearsay, 802

Page 9

1      A.   I'm located in Washington, D.C., at the
2    Main Justice Department.
3      Q.   Anybody else in the room with you?
4      A.   No.
5      Q.   Okay.  Have you been deposed before?
6      A.   No.  This is my first time.
7      Q.   Okay.  I'm -- I'm sure some of this
8    you've been over with counsel, but we've agreed to
9    take this deposition, and a lot of these depositions
10   in this case, remotely.  If you have any issues with
11   any tech issues -- sometimes we have connectivity
12   issues, things of that nature -- just speak up, let us
13   know.  We can go off the record, try and get that
14   resolved, and then get -- get back to it.
15          I would ask that you wait until I finish
16   asking my question before you give your answer so we
17   can try and minimize any talking over each other so
18   the court reporter can take everything down.
19          I would also ask that you provide verbal
20   answers.  Sometimes we shake our head or nod our head.
21   If I prompt you for an answer, it's simply so that the
22   court reporter can get a verbal response and note that
23   in the written record, okay?
24     A.   Okay.
25     Q.   If at any time you don't understand my

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 10

1   question, please let me know; I'll try and rephrase
2   it.
3            We'll take a break at any time you need
4   to.  I would ask that we -- we try and -- I would ask
5   that you answer the question pending if there is one,
6   and then, you know, of course, we can accommodate any
7   need for any breaks that come up, okay?
8       A.   Okay.  Yes.
9       Q.   Good.  You've been -- you've been
10  designated as what we refer to as a 30(b)(6) or
11  representative witness.  Do you understand that?
12      A.   Yes.
13      Q.   For the topics on which you've been
14  designated, and those in the notice are 6, 10, 13, 15,
15  20, and 21.  You are the 30(b)(6) representative for
16  the Department of Justice, Main Justice, okay?  That's
17  the way the designation was given to us.
18      A.   Okay.
19      Q.   So you understand that when you provide
20  testimony with respect to those topics, that you are
21  speaking on behalf of the Department of Justice, and
22  your answers bind the Department of Justice with
23  respect to those topics?
24      A.   I do.
25      Q.   Okay.  Can you tell me what you did to

Page 11

1   prepare for your deposition?
2       A.   So I -- I reviewed materials; I met with
3   individuals in the department; met with counsel; and I
4   also looked at some of my own email traffic to -- to
5   refresh my memory of these events.
6       Q.   Okay.  I just want to go through those.
7   You said you -- you met with counsel.  How many times
8   did you meet with counsel?
9       A.   I met six times.
10      Q.   Remotely or in person?
11      A.   Remotely.
12      Q.   Approximately how long for the total
13  time of those six?
14      A.   Approximately seven and a half hours.
15      Q.   Okay.  Just so I'm clear, that's in
16  total time?
17      A.   Correct.
18      Q.   Okay.  And then can you tell me who was
19  present?
20      A.   Yes.  At each one, or --
21      Q.   Yeah.  I don't really need to go through
22  each six times, but if you can just tell me
23  generally --
24      A.   Correct.
25      Q.   -- who was in attendance at all, so kind

Page 12

1   of collectively.
2       A.   Sure.  So counsel was there in each one
3   of these, Jane Bobet from the U.S. Attorney's office.
4   There were also folks from the Environment and Natural
5   Resources Division, from the Community Relations
6   Service, also from the Army Corps of Engineers, the
7   Office of Tribal Justice, and -- yep, and that was --
8   that's generally the folks who were in these meetings.
9       Q.   And -- and for the --
10           Okay.  And just were those all
11  attorneys, or were some of them attorneys and some of
12  them not?
13      A.   I believe most were attorneys.  I'm not
14  an attorney, so -- but there are a lot of attorneys
15  here at -- at Justice in most of these positions,
16  so . . .
17      Q.   Sure.  You said you also spoke with some
18  individuals.  Was that separate and apart from the six
19  times that you had the -- the meetings over the seven
20  and a half hours?
21      A.   No, just the -- just the individuals in
22  the meetings.
23      Q.   Okay.  Can you tell me the names of the
24  individual -- I'm sorry.  I -- I can't read my notes
25  here.  You said Community Relations, was that right?

Page 13

1       A.   Community Relations Service.  It's the
2   Justice Department arm.  So that was Justin Lock;
3   Antoinette Barksdale, who's a general counsel; as well
4   as Karen Gibbs, also a deputy general counsel.
5       Q.   Okay.  And then the Office of Tribal
6   Justice?
7       A.   Yes.  The director of Office of Tribal
8   Justice is Tracy Toulou.
9       Q.   Okay.  And -- and it looks like you
10  might be reading from something.  Do you have some
11  documents in front of you?
12      A.   Just the notes that counsel provided me
13  in the binder -- binders that were the materials,
14  yeah.
15      Q.   Okay.  And it sounds like, you know, you
16  were reading that, so you were -- that forms some of
17  the basis of your testimony today so far?
18      A.   Yes, some of the basis, but I -- I
19  participated in all of these meetings.  I was also
20  involved in all of these events at the time and know
21  all of these individuals.
22           MR. KERLIN:  Okay.  We would make a
23  request for the notes that Mr. Hornbuckle is reviewing
24  that forms the basis of part of his testimony.
25           MS. BOBET:  No problem.

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 14

1    Q.   (BY MR. KERLIN)  Okay.  Okay.  I want to
2  pull up the notice.  So it's 803, Exhibit 3.
3         Mr. Hornbuckle, have you seen this
4  document before?
5    A.   Yes.
6    Q.   Okay.  What I would like to do is get
7  right to No. 6.  No. 6 is on the next -- there we go,
8  bottom of the page.  "Public statements made by
9  government officials about any applications for DAPL
10  Special Use Permits or any decisions made or actions
11  taken regarding such applications."
12         So for the Department of Justice, can
13  you tell me if there were any public statements made
14  by the Department of Justice about any applications
15  for DAPL special-use permits?
16    A.   No, there were not.
17    Q.   Okay.  What about the second part of
18  that, "any decisions made or actions taken regarding
19  such applications."  Did the Department of Justice
20  have any actions or -- or have any involvement with
21  any such application for a special-use permit?
22    A.   No.  That would -- that would fall
23  outside of the Department's authorities and -- and
24  rest with the -- with the Department of Army Corps.
25    Q.   Okay.  Let's look at No. 10.  No. 10 is

**ND OBJ.:**
**611**

Page 15

1  "Actions taken" -- excuse me.  Strike that.  Let me
2  start over.
3         "Actions considered and taken by the
4  U.S.A. in response to use/occupation of Corps-managed
5  land by someone without either written permission or a
6  Special Use Permit.  This request is geographically
7  limited to the Northwest Division of the U.S. Army
8  Corps of Engineers and includes the general or typical
9  policies, procedures, and practices as well as those
10  specifically for situations similar to the DAPL
11  protests . . . ."
12         With respect to the Department of
13  Justice, were there any actions considered or taken in
14  response to the use or occupation of Corps-managed
15  land by someone without either written permission or a
16  special-use permit?
17    A.   So the -- the Department considered a
18  number of -- of actions and -- and things in response
19  to the situation on the ground at that time in terms
20  of what sort of resources that we had to deploy to
21  support law enforcement and support the peaceful --
22  peaceful protest and a peaceful outcome to the
23  situation.
24         We were overall concerned with defusing
25  and deescalating the situation there.  So we looked at

**15:3-18:2**
**401-402**

Page 16

1  a number of the resources.  I meant folks were, like,
2  the Civil Rights Division, the Office of Tribal
3  Justice, the Community Relations Service.  These are
4  the kind of tools that the Department has -- the COPS
5  Office as well -- to assist in these -- these types of
6  situations.
7    Q.   Okay.  I want to go through the
8  resources that you -- you mentioned that were
9  considered, and then we can talk about whether any
10  were actually deployed.
11         So starting at the end there, you
12  mentioned the COPS Office.  What is the COPS?
13    A.   So that's the Office of Community
14  Oriented Policing Services.  And the COPS Office is --
15  assists law enforcement, generally state, local,
16  tribal law enforcement, in, you know, advancing the
17  practice of community policing.
18         Among other things, they provide
19  information to local law enforcement agencies who are
20  dealing with significant issues, such as this DAPL
21  protest.
22         So the COPS Office has expertise in
23  this.  They have -- you know, they have -- they have
24  worked with police departments across the country
25  about mass-protest situations to further

Page 17

1  Constitutional policing, to handle things peacefully
2  and lawfully.
3    Q.   When were -- when was anyone from the
4  Community Oriented Policing Services deployed out to
5  the DAPL protest area?
6    A.   So COPS officials met with some of the
7  local county sheriffs approximately September 2016.
8  They brought in other law enforcement officials who
9  had experience with large protests and dealing with
10  tribes.
11         So there was a meeting, for instance, at
12  the Morton County command center to introduce
13  themselves and suggest strategies to deescalate
14  tensions.
15    Q.   Okay.  And I want to know specifically
16  how many individuals.  So when you say "deployment," I
17  want to make sure I understand.  Was this one
18  individual?  Was this two individuals?  Was it more?
19    A.   I don't have a precise number, and --
20  and I don't have that information right at this
21  moment.
22    Q.   How long did they stay out there and
23  provide this -- this support to local law enforcement?
24    A.   I don't know precisely, but -- but I
25  don't think it was more than a couple of days,

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 18

1  although they may have continued to have
2  communications not in person.
3      Q.   And you understand that the protest
4  started sometime around the middle of August and
5  continued until February of 2017, so a protracted
6  period of time, correct?
7      A.   Yes.
8      Q.   Okay.  So we have the -- the Community
9  Oriented Policing Services that were out there for a
10  couple of days.  What else?
11      Q.   So in addition to that, the Community
12  Relations Service did also deploy and meet with many
13  stakeholders in that event.
14          So CRS provides -- you know, they are
15  the peacemakers of the department.  They were -- they
16  provide facilitated dialogue, mediation, consultation.
17          So they are not an investigatory or
18  prosecutory agency.  They would further the
19  nonviolent resolution of issues and problems related
20  to tensions, such as those that were at the DAPL
21  protest.
22          So they requested -- I believe they
23  were -- the Native American leadership requested their
24  services in August, and they deployed several
25  conciliators with tribal experience from their

**18:8-19:14**
**401-402**

Page 19

1  regional offices.  They're organized regionally and
2  have folks they are able to deploy in different parts
3  of the country.
4          And so several were sent to the Standing
5  Rock Reservation to facilitate dialogue and help with
6  deescalation.  So they were building up a rapport with
7  stakeholders, met with federal, state, and local
8  government, social services group, and -- and with --
9  and with tribal members.
10      Q.   How many individuals from the Community
11  Relations Service were sent out to the DAPL protest
12  area?
13      A.   Several, although I -- I don't have a
14  precise number.
15      Q.   And you mentioned some of the
16  individuals that they met with, and that they were out
17  there at the request of the -- of the tribe.  How long
18  were they out there?
19      A.   Well, they were requested by Native
20  American leadership, so there were also Native
21  organizations that -- that were also aware of the
22  situation there.  There are many different tribes
23  who -- who were -- who were concerned with this, so we
24  were -- they were not just from a single tribe.
25          But, I'm sorry, I -- what was the second

Page 20

1  part of your question?
2      Q.   I just wanted to know how long or how
3  many days they were out there.
4      A.   They were there on a number of
5  occasions, but I don't have a precise number.  I know
6  they exper- -- they -- they participated, for
7  instance, in a major meeting on September 5 with
8  all -- with as many stakeholders representing the
9  different groups, both law enforcement and tribe --
10  tribe, but also the camp folks who were from the
11  protest camps.
12      Q.   Okay.  Is it fair to say that they
13  didn't provide law enforcement support with respect to
14  local and state law enforcement?
15      A.   They're not -- they're there to support
16  dialogue and try to resolve differences.  So to that
17  extent, I think that that is a form of support.  But I
18  think that their -- you know, their mission is to
19  facilitate dialogue between groups who are having
20  tension.
21      Q.   And the Community Relations Service as
22  well as the Community Orienting [sic] Policing --
23      A.   Policing, yeah.
24      Q.   -- Policing Services --
25      A.   Yeah.

**20:2-21:22**
**401-402**

Page 21

1      Q.   -- both of those, they don't have sworn
2  peace officers; is that correct?
3      A.   That -- that is correct.  I mean, the
4  COPS Office sometimes has former police officers,
5  people with a lot of experience in police -- policing
6  services and community policing, but they don't have
7  enforcement authorities.
8      Q.   Okay.  What else?  We talked about those
9  two.  You had mentioned a couple of other resources
10  either considered or deployed.  So can you tell me
11  about the others?
12      A.   The Civil Rights Division was also
13  tasked to investigate certain allegations of
14  violations of protesters' civil rights.  So a DOJ
15  Civil Rights official traveled to North Dakota in
16  September of 2016 and conducted some fact-finding
17  following complaints of violations of protesters'
18  civil rights by the pipeline private security
19  personnel and state and local law enforcement.
20      Q.   Okay.  What was the result of -- I'm
21  sorry.  Was there something else?
22      A.   No.
23      Q.   So was that --
24      A.   Yeah, no.
25      Q.   -- all --

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

22:1-27:1
401-402

---

Page 22

1      A.   And then they just con-- and they
2    continued to monitor the situation, because there were
3    concerns raised about First Amendment rights being
4    violated and so forth.
5      Q.   Okay.  And what -- was that one
6    individual?
7      A.   I believe it was one individual.  I --
8    an official, although I don't -- I don't -- I was not
9    involved in that aspect, so I don't have my own -- my
10   own memory of that.
11     Q.   Okay.  Was there any resolution of the
12   investigation, any recommendation that there be any
13   actions taken by DOJ with respect to any of the
14   alleged civil rights violations?
15     A.   I'm not aware of any charges or -- that
16   were brought in that -- in that instance.  I -- but I
17   can't -- I also can't comment on -- on the process,
18   their investigative process, beyond that they did look
19   into these matters.
20     Q.   Okay.  What else?
21     A.   The other piece was -- I mentioned was
22   the Office of Tribal Justice, whose mission it is --
23   it's to be the point of contact here at the department
24   for Indian tribes, so -- and to provide advice on
25   legal and policy matters.

---

Page 23

1          So the Office of -- the director
2    traveled to North Dakota in September as well, met
3    with tribal members and protesters, and attended the
4    state command center on a couple of occasions.
5      Q.   Okay.  One individual or more than one?
6      A.   One individual that I'm aware of, yeah.
7      Q.   And a few days, is that fair to say, a
8    week or so?
9      A.   I think that's -- that's probably right.
10     Q.   Okay.  Anything else?
11     A.   Just give me a moment.  No.
12     Q.   Okay.
13     A.   Actually, I have one more, yeah.  I
14   wanted to -- to mention as well, because I know there
15   was -- there were -- there were requests for law
16   enforcement assistance --
17     Q.   Yes.
18     A.   -- so -- so that would -- those were
19   considered as well in terms of considerations.
20          We received a request, you know, to
21   assist State and local law enforcement agencies, but
22   also we received requests to protect protesters, you
23   know, who were concerned about civil rights
24   violations.  So we were responding to sort of both
25   sides of that.

---

Page 24

1          I think that our considerations in that
2    were, you know, that deploying federal law enforcement
3    assets could actually escalate or de- -- or
4    destabilize the situation and cause more harm than
5    good.  So although those requests were certainly
6    considered, deployment of actual federal law
7    enforcement agents or enforcement was not taken for
8    that reason.
9          And also they are very -- I would say
10   that federal law enforcement officers are also limited
11   in terms of their jurisdictional authority in that
12   kind of environment where State and local authorities
13   have the main responsibility.  And also just a general
14   sort of limitation of funding and -- and numbers
15   available for that type of deployment.
16          But, ultimately, our efforts were -- the
17   center of gravity of our efforts were deescalating the
18   situation, and so responding with additional --
19   additional law enforcement personnel was not the path
20   that we took.
21     Q.   Right.  With respect to law enforcement
22   assistance, the request that was received by the
23   Department of Justice, those were received from the
24   governor of North Dakota, correct?
25     A.   I believe the request came from -- I

---

Page 25

1    know law enforcement officials in North Dakota.  There
2    was a number of letters.  There were, I believe, a
3    letter from a member of Congress as well.  The
4    North Dakota congressional delegation sent a letter to
5    Attorney General Lynch and others.  There was a
6    Jan-- there was a letter from Sheriff Kirchmeier,
7    and there was a letter from Senator Heitkamp --
8      Q.   And then also --
9      A.   -- throughout that time.
10     Q.   And then also were you aware that
11   Attorney General Lynch had a telephone call that was
12   attended by some officials from North Dakota as well
13   as the State and local?
14     A.   I recall there were some phone calls
15   made by senior officials.  I didn't recall exactly if
16   it was Attorney General Lynch, but that's not
17   surprising that she would engage on the phone with the
18   leaders.
19     Q.   Okay.  And the requests were made
20   directly to her for law enforcement assistance during
21   that call?
22     A.   I'm not -- I don't have information
23   about exactly what was said on those calls.
24     Q.   Okay.  But ultimately, whether --
25   whether it was the letters that were received by the

---

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 26

1  Department of Justice, from the Congressional
2  delegation, from the sheriff of Morton County, Sheriff
3  Kirchmeier, or if it was with communications with
4  Attorney General Lynch, ultimately the Department of
5  Justice declined to send any law enforcement support
6  with respect to law enforcement officers, right?
7       A.   I think that -- again, I think support
8  comes in different forms, and so I think the support
9  that we provided was aimed at supporting the law
10 enforcement effort towards a deescalated situation and
11 towards resolving the situation nonviolently and
12 protecting -- and saving lives in that manner.
13      Q.   I understand what you described as the
14 efforts or the support that was for the resources that
15 the Department of Justice deployed that we discussed.
16 Outside of that, so -- there wasn't any other support
17 provided, correct?
18      A.   That's all I can recall at this time.
19      Q.   And -- and with respect to the -- the
20 requests that were received from Sheriff Kirchmeier,
21 Morton County, the Congressional delegation of
22 North Dakota, those requests specifically asked for
23 law enforcement support and not things such as Office
24 of Tribal Justice representatives, the Civil Rights
25 Division, Community Relations Service, or Community

Page 27

1  Orienting Policy [sic] Services, right?
2            MS. BOBET:  Objection, assumes facts not
3  in evidence.  You may answer.
4       A.   I believe the focus of those requests
5  was -- was for law enforcement resources to address
6  the protests and illegal activity, but that's -- that
7  was from the perspective of -- that was the
8  perspective of the request.
9            I think the response had -- was, you
10 know -- was informed by the Justice Department's
11 overall mission, which is not simply to -- which is --
12 which is certainly public safety, front and center,
13 but it also has to consider people's right to peaceful
14 protest.
15           The issue of the federal government's
16 relationship with Indian tribes, it has a long
17 history, and there's a trust responsibility there and
18 a responsibility to consult and -- and -- and take --
19 and listen to those concerns as well.
20           And then also the civil -- as, again,
21 the civil -- protecting civil people's civil rights.
22           So I -- we were trying to address many
23 sides to a complex problem, that was playing out on
24 the ground, towards a peaceful end that would -- would
25 ultimately save -- save lives on, you know, law

**27:4-28:2**
**401-402**

Page 28

1  enforcement and as well as protesters who were there
2  assembled peacefully.
3       Q.   (BY MR. KERLIN)  The Department of
4  Justice -- well, strike that.
5            Who at the Department of Justice made
6  the decision not to send law enforcement officers?
7       A.   I'm not aware of a single decision-maker
8  on this.  Obviously, the top leadership, the Attorney
9  General and the Deputy Attorney General and Associate
10 Attorney General are the top law enforcement officials
11 here, but also there is a -- there are many different
12 arms of the department that were working together to
13 form a consensus around what was the best approach
14 here.
15           So I think that -- that's the decision
16 representative of that deliberative process, the
17 outcome of -- of a ser--- of a lot of consultations
18 and meetings and so forth.
19      Q.   And so -- just so I'm clear, so it
20 sounds like, and I want to make sure I understand your
21 answer and unpack that a little bit, but that in
22 addition to the Department of Justice, was there other
23 departments that were consulted with and -- and
24 discussed with about whether to send law
25 enforcement -- and I'm specifically talking about law

**28:5-18**
**401-402**

Page 29

1  enforcement officers -- to North Dakota to support the
2  law enforcement efforts of the State of North Dakota?
3       A.   No, no one outside of the Department of
4  Justice, just components of the Department of Justice,
5  who would -- would -- would advise the Attorney
6  General, the Deputy, as to what is a recommended
7  course of action.
8            So that would be some of these same
9  offices I had mentioned, the -- you know, the Civil
10 Rights Division, the Office of Tribal Justice, but
11 also ENRB, the Environment Division, that had the
12 litigation.
13           So there were a lot of different parts
14 to this -- this particular problem set, and -- and so
15 we were considering all different parts of it, and
16 ultimately, you know, the decision was reached by the
17 department leadership to take the courses of action
18 that we -- that we took.
19      Q.   Okay.  I want to talk to you -- if we
20 bring up 13.  "Actions taken by the
21 United States . . . during the DAPL Protests regarding
22 Corps-managed land -- lands used or affected by the
23 DAPL Protests to" -- I'm going to go through each of
24 these, and I would like to know what the Department of
25 Justice did, if anything -- "protect the health and

**29:19-**
**30:25**
**401-402**

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 30

```
1    safety of persons on Corps-managed land."
2         A.   So I -- I think that our approach was --
3    was -- was not focused only on Corps-managed land; it
4    was focused on where the -- these protests and
5    protesters and clashes with -- with law enforcement
6    sometimes were occurring in different locations.
7              So we were concerned with the whole of
8    the situation, whether that was on State land,
9    Reservation land, pri-- you know, private land, or
10   on Corps land.
11             So I think that the actions that we --
12   we took were meant to protect the health and safety of
13   persons on Corps-managed lands and -- and elsewhere.
14        Q.   Okay.  Let me ask it this way:  Other
15   than what you've described when we were talking about
16   topic No. 10, Community Orienting [sic] Policies --
17   Policing Services, CRS, Civil Rights Division, and the
18   Office of Tribal Justice, is it fair to say that there
19   wasn't anything else that was done by the Department
20   of Justice to protect the health and safety of persons
21   on Corps-managed lands?
22        A.   I -- I think that I've described, you
23   know, the different tools that we deployed, but
24   that -- which were all meant to protect the health and
25   safety of -- of people in the area.
```

Page 31

```
1         Q.   Right.  Understood.
2              And just in the interest of time, I just
3    want to make sure that we've talked about everything
4    that the Department of Justice did and that you've
5    described, and so I just want to make sure.
6              We've covered it with respect to -- I
7    understand that you're saying that that's a larger
8    geographical area than the Corps-managed land; that,
9    you know, the Department of Justice looked at some
10   bigger picture or something.  That's fine and all.
11             But with respect to the actual question,
12   you've described some of those -- you've described,
13   and I just want to make sure that I have the
14   exhaustive list of it, the four things that you
15   mentioned with response to topic No. 10.  Anything
16   else besides that for this particular --
17        A.   No.
18        Q.   -- subtopic?  Okay.
19        A.   Nothing that I can recall.
20        Q.   Okay.  Little -- two little i's,
21   "protect Corps-managed lands from environmental harm
22   or degradation."  Is that the same as what you've
23   previously described would have been the actions
24   taken?
25        A.   Yes.  They -- I think that would lie
```

**31:2-17**
**106; 401-402**

**31:21-32:13**
**401-402**

Page 32

```
1    outside of -- of most of DOJ's authorities, but yes.
2         Q.   Okay.  You mentioned Natural Resources,
3    I think.  Did I have that right?  There was somebody
4    at DOJ with Natural Resources?
5         A.   The Environment and Natural Resources
6    Division was the division that was handling the
7    litigation by the Standing Rock Sioux Tribe against
8    the Army Corps of Engineers.  So the Army Corps was
9    our client in that litigation, although the litigation
10   was related to the pipeline, the legality of the
11   permitting decisions around the pipeline, not the --
12   not the decisions about the -- the Corps lands that
13   were occupied by protesters.
14        Q.   Perfect.  And we'll get to that a little
15   later.
16             Okay.  So then I want to talk about
17   three little i's, "prevent unlawful or unsafe
18   activities on Corps-managed land."  Is it the same
19   answer with respect to little i that you had; that
20   what you talked about earlier would have been the
21   actions taken by the Department of Justice?
22        A.   Yes.
23        Q.   Okay.  The next is "clear Corps-managed
24   land in the first quarter of 2017."  Any actions taken
25   by DOJ to help clear the land of the -- of the
```

**32:16-22**
**401-402**

**32:23-33:8**
**401-402**

Page 33

```
1    protesters in the camps?
2         A.   I believe that Community Relations
3    Service was involved in assisting the -- the plan --
4    the State's plan and the Corps' -- the Corps' plan
5    to -- to evacuate those areas in 2017, so in a way
6    that would be peaceful and would allow people to get
7    their property and -- and do that safely.  So I think
8    that there was some assistance from CRS in that.
9         Q.   Do you know how many -- do you know how
10   many individuals were sent to assist with that
11   process?
12        A.   I don't.  I think it would have been
13   primarily in planning and providing technical
14   assistance, but I don't have a number.
15             And do you know how long they were
16   there?
17        A.   And I don't right off the top of my
18   head, no.
19        Q.   Okay.  Let's look at the -- the next
20   subcategory.  It's on the next page.  The last one is
21   "prevent the use of Corps-managed land as a camp,
22   base, or staging area from which potentially dangerous
23   or unlawful activities may have been conducted on or
24   off Corps-managed lands."
25             Is what you described earlier the same,
```

**33:9-18**
**401-402,**
**602**

**33:19-**
**34:10**
**401-402**

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 34

1  in other words, the four things that you had mentioned
2  that the Department of Justice did provide, would that
3  be the same for this answer, or is there anything else
4  in addition to that?
5       A.   No.  Again, I think that our approach
6  was -- was wider than the Corps-managed land.  I think
7  it was concerned with addressing the issue in a -- in
8  a way that would have a nonviolent outcome in -- in
9  all of the -- the areas that -- all the affected areas
10 there.
11      Q.   Okay.  I would like to talk to you about
12 the next topic, which is topic No. 15.
13 "Communications between the United States and with,
14 to, or from persons on Corps-managed lands related to
15 the DAPL protests, or representatives or spokespersons
16 for such persons."
17           Can you tell me about the communications
18 the Department of Justice would have had with
19 protesters?  And for the purpose of this topic, you
20 know, you had mentioned one meeting.  What -- that's
21 what the focus is.  It's not that someone yelled -- a
22 protester yelled at someone who was out there and
23 that's a communication, okay?
24           What I'm -- what I'm trying to focus, on
25 this, is sit-down discussions.  It could be with their

Page 35

1  leadership or with whomever, but -- but something a
2  little bit more in depth than just yelling -- you
3  know, just a casual encounter, if that makes sense.
4  If it doesn't, let me know, and I'll try and clarify
5  it a little bit more.
6       A.   That makes sense.  And I think there was
7  communication by CRS officials, who on multiple
8  occasions met with tribal representatives, they met
9  with protesters and individuals who held themselves
10 out as -- as leaders of those camps, and other
11 stakeholders.  So those were -- there were
12 communication -- with folks in that regard.
13           I would say tribal justice as well
14 communicated with tribal members directly, some of
15 whom were involved in protest activity and some of
16 whom were not, who were just in tribal leadership, for
17 instance, who had equities in this.
18      Q.   For those discussions that was with --
19 that were with tribal leadership, was there any
20 discussion by the Department of Justice about the
21 special-use permit, or the conditions were not being
22 met of the special-use permit, that the size of the
23 protests had grown much larger than what was in the
24 application for the special-use permit, or things like
25 that?

Page 36

1       A.   I don't think I -- I don't have specific
2  knowledge of what discussions were taking place, and I
3  think that would be part of their -- that would not be
4  something that I -- I would have a lot of insight into
5  except that they were fulfilling their role, which is
6  to listen to tribal leaders and -- but I don't -- with
7  any -- I don't have any specificity about whether the
8  permit itself was -- was brought up.
9       Q.   Okay.  Would that be the same with any
10 of the requirements for insurance that would have been
11 part of the application for the special-use permit?
12      A.   Again, that would be an Army Corps
13 decision, not something that our Office of Tribal
14 Justice would have -- would have much say in or
15 much -- I don't think that would be the focus of their
16 discussions.
17      Q.   Okay.  But if -- if the Corps wanted to
18 initiate some type of legal action, wouldn't that be
19 done through the Department of Justice, like it was
20 with the ER- -- the ENR handling the litigation on
21 behalf of the Army Corps of Engineer?
22      A.   So in terms of where -- I guess to
23 return to the -- to the topic in terms of the
24 communications with protesters, I'm just -- I think
25 this was about tribal -- the Office of Tribal Justice

Page 37

1  meeting with tribal members who -- who were -- some of
2  whom were and some of who were not involved in -- in
3  protests.  So that would not -- OTJ is not a -- it's
4  not a litigative arm of the Department of Justice.
5  It's a point of contact with tribal governments at
6  DOJ.  So that's their -- that's their mission.  It's
7  not to enforce or negotiate litigative -- you know,
8  litigation.
9       Q.   Was there -- were there any requests
10 made by the Department of Justice through the -- the
11 different groups that you've mentioned, Tribal Justice
12 or -- or the others that met with tribal leaders, that
13 they needed to leave the Corps land?  Any requests
14 made to leave the Corps land?
15      A.   I'm not aware of the substance of those
16 discussions.
17      Q.   Okay.  Let's do this:  Let's talk about
18 number -- let's move on to No. 20, please.
19      A.   Okay.  I would -- just to com- -- I'm
20 sorry.  If I could -- just to complete the response, I
21 would say also the Civil Rights officials were
22 communicating with protesters in the course of their
23 investigations and potential violations of protesters'
24 civil rights.  So that would be one more contact, you
25 know, direct contact, communications with protesters.

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 38

1       Q.   Okay.  Just to kind of close that out,
2   with respect to any of the contents of those
3   communications that you mentioned, the details of it,
4   if there was any requests made by the Department of
5   Justice that, you know, "Hey, we respect your civil
6   right, but you can't stay here because you don't have
7   a permit," if there was any such discussions like
8   that, you're not aware of those, correct?
9       A.   I'm not.  I'm not.  I would -- yeah, I
10  would just add that -- that also -- I mean, there
11  were -- there were Main Justice attorneys who were
12  responsible for the litigation with the tribe that
13  had, you know, communications with counsel for the
14  tribe, to the extent that those attorneys for the
15  tribe are considered representatives of protesters, so
16  I just wanted to mention that.
17      Q.   Okay.  All right.  Let's talk about
18  topic No. 20, "Decisions by the United States to
19  provide or withhold law enforcement assistance to
20  State and local authorities during the DAPL protests."
21       We've talked a little bit, I think,
22  about this in a prior topic.  Do you have anything to
23  add to this with respect to the decision by the
24  Department of Justice to provide or withhold law
25  enforcement assistance to State and local authorities

Page 39

1   during the DAPL protests?
2       A.   No.  I believe I covered it in my
3   earlier answers; that the -- that the focus was to
4   defuse tensions and to deescalate, and there was a
5   concern that additional law enforcement resources,
6   federal law enforcement, could destabilize the
7   situation.
8       Q.   Okay.  Did that perspective that DOJ
9   had, did that change over time?  In other words, early
10  on in the protests, was that a concern, and was that
11  less of a concern, you know, closer to the end of the
12  protests in February?  Or was that the same decision
13  from beginning to end by Department of Justice:  "If
14  we send any law enforcement support, such as uniformed
15  officers or something like that, it will make -- we
16  believe it will make the situation worse, so we're not
17  going to do that"?
18      A.   I don't -- I don't believe we did.  I
19  think by the time winter -- you know, it was
20  January and February, I think, the pro- -- the size
21  had -- had -- had diminished significantly, and -- of
22  the protests, and there -- the focus was on the safe
23  evacuation of the remaining, you know, protesters in a
24  way that was orderly and safe.
25      Q.   And -- and I take it because law

Page 40

1   enforcement support -- and by that I mean officers --
2   were never sent by the Department of Justice, that
3   decision remained the same, correct?  In other words,
4   at the beginning, "We're not going to send it," at the
5   end, "We're not going to send it."  And is the reason
6   why is that the concern was that the Department of
7   Justice thought it would somehow increase tensions?
8       A.   I would say that that's correct.  I
9   can't -- I think by the time it was late, you know,
10  December, January, and February, again, it was not the
11  same -- the public safety aspect of it was less in
12  terms of direct clashes, and it turned to the
13  eventual -- you know, the de- -- the deescalation and
14  the eventual evacuation of -- of the area, to --
15      Q.   Did the --
16      A.   -- for the safety of everybody.
17      Q.   Did the Department -- excuse me.  I
18  didn't mean to interrupt.
19       Did the Department of Justice ever
20  direct any other agency not to send law enforcement
21  support, such as the Department of Homeland Security?
22      A.   Not that I'm aware, no.  And we -- we
23  wouldn't -- the Department of Justice wouldn't be able
24  to direct Homeland Security in that fashion.  I don't
25  know if Homeland Security received separate requests

Page 41

1   and -- or how that was handled.
2       Q.   Okay.  All right.  We're going to -- I
3   want to talk to you a little bit -- we can take this
4   down.
5       Mr. Hornbuckle, I want to talk to you a
6   little bit -- I want to -- I jumped right into the
7   topics.  I want to take a step back and talk to you a
8   little bit about your background and your involvement
9   with the Department of Justice and your employment
10  with the Department of Justice.
11       So briefly could you tell me what your
12  educational background is?
13      A.   Sure.  I have a bachelor's of the arts
14  degree in -- I was a history major.  I went to
15  Birmingham-Southern College.  And I have a master's of
16  public administration from Binghamton University in --
17  in Upstate New York.  And I recently completed a
18  master's of science at the National War College in --
19  in the National Defense University in 2021.  I was the
20  class of 2021.
21      Q.   Congratulations.
22      A.   Thanks.
23      Q.   Any particular focus for that master's
24  of science?
25      A.   I focused on -- it's a -- the focus is

38:17-39:7
401-402

39:25-40:16
401-402

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 42

1  national security strategy formulation, but I focused
2  on China and -- and some other information strategies,
3  influence strategies.
4          Q.  Okay.  When did you -- after --
5              Well, let me start this way, because you
6  did seem like you've had some education as you've been
7  employed as well, and usually I kind of take this and
8  say, "After your education, where did you work," but
9  you've been working during the same time, it sounds
10 like.
11             What was your first job in your
12 professional career?
13         A.  My first job was a newspaper journalist
14 for two years, back in -- and then I joined the U.S.
15 Foreign Service.  I was a Foreign Service officer for
16 seven years for the Department of State.
17             And then in 2006, I joined the Justice
18 Department at the U.S. Attorney's Office in Arizona
19 for four years as a public affairs and a law
20 enforcement coordination specialist there.
21             And then in 2010, I came to Main
22 Justice, to the Office of Public Affairs.
23         Q.  Okay.  And you've been there since?
24         A.  Yes.
25         Q.  And then let's just start in 2010, your

Page 43

1  titles.  So when you first joined Main Justice Public
2  Affairs, what was your title?
3          A.  I was a public affairs specialist.
4          Q.  Has that changed over the years?
5          A.  In 2014, I was promoted to be the -- the
6  Deputy Director of Public Affairs, so the career
7  deputy here.
8          Q.  Is that what you -- do you still have
9  that same role today?
10         A.  Yes.
11         Q.  Okay.  As Deputy Director of Public
12 Affairs, who do you report to?
13         A.  I report to the -- to the Director of
14 Public Affairs.
15         Q.  And in 2016 and 2017, who would have
16 that been?
17         A.  At the end of 2016, I believe we had an
18 acting director.  I know Kevin Lewis, I worked a lot
19 with, because our director was on maternity leave, I
20 think, at the end.  The director was Melanie Newman.
21             And then -- and then when the
22 administration changed, the first director, but I
23 don't think she came until Aug-- -- until March --
24 March, was Sarah Flores, so there was an acting
25 director, Peter Carr, in January and February, who was

Page 44

1  another career official here.
2          Q.  Okay.  So as Deputy Director of Public
3  Affairs in the 2016 time period, so during these DAPL
4  protests, what was your role?  Like what -- what did
5  you do?
6          A.  So in addition to being a public affairs
7  specialist or a spokesman -- spokesman for the office,
8  I have the portfolio of Native American issues, so
9  American Indian and Alaska Native affairs issues.  So
10 that was since about 2012, I think, I've had that
11 portfolio, and so I just carried that into that role.
12 But also as deputy, I would -- I would also be
13 expected to work with our leadership offices to solve
14 complicated problems, you know, communications
15 problems such as this.  So that's what -- it grew out
16 of that role of dealing with Native American issues.
17 I worked on Native American issues in Arizona a lot as
18 well, so I had a -- I just have a lot of background in
19 the area.
20         Q.  And prior to the DAPL protests, would
21 you ever have occasion to prepare press releases?
22         A.  Yes.
23         Q.  Is that something that you did in -- and
24 I'm going to describe it as the ordinary course of
25 your business?

44:20-
45:20
401-402

Page 45

1          A.  Yes.
2          Q.  Prior to the DAPL protests, did you
3  ever -- were you ever involved with preparing a press
4  release that would involve more than one agency?
5          A.  Yes.  On occasion, yeah.
6          Q.  And what would be an occasion that --
7  that you would prepare a press release that might
8  involve more than one agency?
9          A.  It could be any number of occasions
10 where -- where something is done in partnership with
11 other agencies, or is something that -- where we're
12 speaking with one voice with other executive agencies.
13             So that could be a law enforcement
14 operation with, you know, the DEA or the BIA or
15 something of that nature, or it could be something
16 with the Environmental Protection Agency that -- where
17 they have a lot of interest in -- in the issue and
18 want to be involved in -- in that.
19             So, yes, it's -- it's not our everyday
20 process, but it's not uncommon.
21         Q.  Okay.  And there's two joint statements
22 that were -- that I want -- that we're going to
23 specifically talk about today, but that were issued by
24 the Department of Justice, Department of the Interior,
25 and the Department of the Army, one on September 9,

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 46

1    2016, and the other on October 10, 2016.  Are you
2    familiar with those joint statements?
3         A.   Yes, I am.
4         Q.   And -- and are those joint statements
5    the type of statement that you are kind of describing
6    when you said "in partnership with other agencies" and
7    so that, I guess, the United States is speaking with
8    one voice on an issue?
9         A.   Yes.
10        MR. KERLIN:  Okay.  I tell you what,
11   it's a little short of an hour, but I think I'm going
12   to go ahead and take a break at this point, if we
13   could, and just maybe come back at 11 o'clock.
14        THE DEPONENT:  Okay.  Sure.  That --
15   that works for me.
16        THE VIDEOGRAPHER:  Going off the record.
17   The time is 4:51 p.m. UTC, 9:51 a.m. Mountain.
18        (Recess taken 9:51 a.m. to 10:02 a.m.
19   Mountain Standard Time.)
20        THE VIDEOGRAPHER:  We're back on the
21   record.  The time is 5:02 p.m. UTC, 10:02 a.m.
22   Mountain.
23        Q.   (BY MR. KERLIN)  Mr. Hornbuckle, we're
24   back after a short break.  Are you able to continue?
25        A.   Yep, I'm ready.

46:4-9
401-402

Page 47

1         Q.   Okay.  If we can bring up -- it's the
2    document labeled ARMY 28388, please.
3              And I would like to label it as the next
4    exhibit.  I'm not certain what exhibit we're up to.
5              THE REPORTER:  I believe on Tuesday we
6    introduced Exhibit 849.
7              MR. KERLIN:  Okay.  Thank you.  So we'll
8    call this 850.
9              (Deposition Exhibit 850 was remotely
10   introduced.)
11        Q.   (BY MR. KERLIN)  Mr. Hornbuckle, I have
12   an email on your screen.  Can you see that?
13        A.   Yes, I can.
14        Q.   Okay.  The date of it is September 6 of
15   2016.  It's from you, and it's to a very large --
16   large distribution list.  Do you see that?
17        A.   Yeah.  Yes, I do.
18        Q.   My question is -- and -- and if we could
19   scroll down to the -- what was sent.  Why did you send
20   this email?
21        A.   Well, in the course of my duties, this
22   is just something I would -- I would normally do when
23   something had attracted a lot of publicity and a lot
24   of people were watching it.  That's something that
25   involves -- Public Affairs would do, would circulate

Page 48

1    certain news articles that report on the situation
2    as -- as it's progressing so we have an awareness of
3    that external environment.
4         Q.   Okay.  So I want to go through some of
5    the individuals that are on the distribution list.  So
6    there's a lot of individuals from the Department of
7    Justice.  In addition to it, if we can -- we're going
8    to go down to probably about halfway through it,
9    there's an individual, Tommy Beaudreau, and then
10   Michael Connor.  Do you see those?
11        MS. BOBET:  While we're looking for
12   those, Paul, can you point me towards which topic in
13   particular this pertains to?
14        A.   Okay.
15        MR. KERLIN:  This one?  Yeah, this is
16   going to relate to the Court's ruling.  It's "Judge
17   Grants Partial Stop on North Dakota Pipeline Work," so
18   I believe this is the run-up to the September 9
19   statement.
20        A.   So I see it.  I see it now, yeah.
21        Q.   (BY MR. KERLIN)  Okay.
22        MS. BOBET:  Note that this is within
23   our -- are you talking about topic 21?
24        MR. KERLIN:  Yes.
25        MS. BOBET:  Okay.  I don't know if this

Page 49

1    is within our understanding or prior conferral about
2    topic 21, but it sounds like the questions are -- are
3    about Mr. Hornbuckle's own knowledge, at least so far,
4    so he can continue to testify for himself about this.
5         Q.   (BY MR. KERLIN)  Okay.  Mr. Hornbuckle,
6    and for this question and for this document, in your
7    personal capacity, do you -- I'm asking for -- not
8    necessarily in the representative capacity.
9              Tommy Beaudreau, is he with the
10   Department of the Interior?
11        A.   I don't recall him, yeah, but,
12   obviously, he is in this instance because he says
13   he -- the Interior Office of the Secretary, Department
14   of Interior, that's how I read the -- the -- the email
15   address.
16        Q.   Yeah.  The next one is Michael Connor.
17   Do you know who Michael Connor is?
18        A.   You know, it's been a long time, so if I
19   did interact with him, I don't -- I don't recall him
20   specifically.
21        Q.   If you go down two more lines, there's
22   Darren Cruzan with BIA.  I believe that's the Bureau
23   of Indian Affairs.  Do you see that?
24        A.   Yes.
25        Q.   Okay.  Jo-Ellen Darcy is the next one

49:5-
50:10;
50:18-21
401-402;
602

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 50

1  with the Army.  Do you see that?
2       A.  Yep, I see that.
3       Q.  Okay.  There's another, Jody Cummings
4  with the Department of the Interior.  Do you see that
5  one?
6       A.  Yes.
7       Q.  Okay.  Rosa Salamanca, who is Rosa
8  Salamanca?
9       A.  She is with CRS.  I believe she's a --
10  conciliator with CRS, but I'm not positive.
11       Q.  Okay.  Was she the individual, when you
12  were talking about CRS, that went into the -- went
13  into the camps and spoke with the -- with the Native
14  Americans?
15       A.  I'm just not sure.  I don't have
16  specific information about who -- who was in those
17  meetings.
18       Q.  If we keep going down, there's a couple
19  more on here.  There's a Lowry Crook.  Do you know who
20  Lowry Crook is?
21       A.  Just from email traffic.
22       Q.  Okay.  My question is, why is someone at
23  the Department of Justice sending out --
24           You know, it makes sense for you to send
25  it to the Department of Justice, but this distribution

**50:22-13:
401-402; 602;
802**

Page 51

1  list is much broader than that and includes other
2  agencies, okay?  Do you know why you were sending this
3  out to such a broad distribution group?
4       A.  You know, I don't recall sending this
5  particular email.  It's -- it's quite possible that I
6  simply replied all to a -- to a previous email that --
7  that had a lot of interested parties, and so it was
8  just spreading information.
9           It's public information.  It's an ABC
10  news story, so it's not something I would -- I would
11  be very concerned that it remained within the
12  department because it's just public-facing public
13  information.
14       Q.  Okay.  Do you recall if you had a
15  particular distribution list that you had prepared to
16  disseminate information about the DAPL protests or the
17  Court's rulings on any of the -- for instance, the
18  DAPL pipeline?
19       A.  I -- I don't recall originating a list.
20  I think there were a number of threads that I would
21  have been on in -- in some of these communications, so
22  I might have utilized those to just reach, you know,
23  the people I need to.
24           If I was originating something that was
25  purely within the department, I would have just -- I

Page 52

1  would have included many of these folks who were
2  within the department, but I -- I don't -- I don't
3  recall creating a list specifically for this, but
4  it's -- it's possible.  And I don't think this -- I
5  doubt this list, though.
6       Q.  If we can bring up MYERS 10012.  And
7  we'll label this 851.
8           (Deposition Exhibit 851 was remotely
9  introduced.)
10       Q.  Mr. Hornbuckle, this is a -- it looks to
11  be an invitation for a -- for a, I guess, call-in
12  invitation for a conference call or something of that
13  nature.  The date of this one is September 9 [sic] of
14  2016, and for required attendees, you're the first one
15  on the list.
16           Do you recall having a -- having either
17  an occasional call or a standing call where there
18  would be a discussion amongst a number of different
19  individuals at DOJ, the FBI, and others about the --
20  about the DAPL protests?
21       A.  Well, looking at the date -- well, we
22  would have had periodic calls on something of this
23  nature to share information and to coordinate.
24           But this one, it was on, it looks like,
25  September 7, and this was after the Labor Day weekend,

**52:8-
53:13
401-402;
602; 802**

Page 53

1  as I recall, when there were some videos that came out
2  where protesters were involved in an altercation with
3  some private security detail, and it was on --
4  captured on video where there were dogs involved,
5  canine security.
6           And so that was, I believe, one of the
7  precipitations of the need to -- that this was -- had
8  created, you know, a lot of concern about -- again
9  about things escalating in -- in that area, so there
10  was a desire to communicate.
11           So that's my -- that's my guess, but
12  this would not be unusual to have a conference call on
13  something of this nature.
14       Q.  Any discussion about the -- either the
15  ruling by Judge Boasberg to temporarily halt the DAPL
16  construction pipeline, or the soon-to-be-released
17  ruling by Judge Boasberg about the request for a
18  temporary injunction?
19           MS. BOBET:  I'll object here to the
20  extent the question is calling for the substance of
21  communications involving attorneys in the context of
22  litigation or -- or where legal advice might have been
23  provided.  That substance is privileged, and I'll
24  instruct Mr. Hornbuckle not to answer.
25           If it's not calling for the substance,

**53:14-18
401-402;
501;
602; 802**

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

**ND OBJ.:**
As to 53:19-54:1,
includes the
argument of
counsel

54:12-16:
401-402

56:11-14;
56:22-59:7
401-402;
403; 501;
802

55:12-56:10
401-402; 602;
802

Page 54

1    then you may answer aside from that.
2         A.   Okay.  Aside from that, I mean, and this
3    was certainly in the time frame between -- you know,
4    leading up to Judge Boasberg's ruling on the 9th.  So
5    I don't know if that -- again, I'm not going to
6    comment on the substance of that discussion.  For one,
7    I don't -- I don't have a recollection of exactly --
8    of that -- this particular call.
9              But this is not unusual for us to talk
10   about the various aspects and the updates of the
11   things that had occurred, the facts.
12        Q.   (BY MR. KERLIN)  Okay.  And just so I'm
13   clear, you wouldn't have been providing any legal
14   advice, right?  I mean, you're a Department of Justice
15   employee, but you're not an attorney, right?
16        A.   That's correct.
17        Q.   All right.  Let's pull up MYERS 43796,
18   please.
19             (Deposition Exhibit 852 was remotely
20   introduced.)
21        Q.   Mr. Hornbuckle, this is another email
22   from you to a number of individuals at various
23   agencies.  It's dated September 7, 2016, at 4:21 p.m.
24   Can you see that on your screen?
25        A.   Yes, I can.

Page 55

1         Q.   I'm going to go ahead and label this
2    852.  And --
3              MS. BOBET:  And is this -- again, is
4    there a nexus to topic 21 for this document or is
5    this --
6              MR. KERLIN:  No.
7              MS. BOBET:  -- another instance where he
8    can testify in his personal capacity?
9              MR. KERLIN:  This will be his personal
10   capacity for this document.
11             MS. BOBET:  Okay.
12        Q.   (BY MR. KERLIN)  Mr. Hornbuckle, the
13   substance of your email says, "Below are some recent
14   articles on the protests, et cetera, including a
15   statement by President Obama answering a question
16   during his trip to Laos."  Do you see that?
17        A.   Yes.
18        Q.   Okay.  And by this distribution, you
19   were making everyone aware of President Obama's
20   comments on the DAPL protests that he made in Laos,
21   correct?
22        A.   Correct.
23        Q.   Okay.  And -- and you -- and you mention
24   on here -- or it's one of the links that you have
25   included, but it actually includes the comments of

Page 56

1    President Obama on one of these links, correct?
2         A.   I don't recall which -- which link, but
3    I think that -- yeah, so I think just some of the
4    articles must have captured his -- his comments.
5         Q.   If we look at the first link, it appears
6    to be a C-SPAN video, and then it says
7    "obama-dakota-access-pipeline."  Do you see that?
8         A.   Uh-huh, yeah.
9         Q.   Okay.
10        A.   That might have been it.
11        Q.   So we're going to go to the next
12   document, and this is going to be back to your
13   representative capacity, I believe.  ARMY 117974.
14   We'll make this Exhibit 853.
15             (Deposition Exhibit 853 was remotely
16   introduced.)
17        Q.   Okay.  This is an email chain.  We can
18   start at the end and work our way up.  I'll tell you
19   there's not a whole lot of substance on it that I'm
20   going to be able to discuss with you because it's been
21   redacted.
22             But at the bottom, if we go to the
23   bottom, or at least the last -- there's a Hilary
24   Tompkins, Solicitor, Office of the Solicitor,
25   Department of the Interior.  Do you know who she is?

Page 57

1         A.   Yes.  She was the Solicitor -- Solicitor
2    at the time.
3         Q.   Okay.  Then if we go up to the next
4    page, there's Sam Hirsch.  Do you know who Sam Hirsch
5    is?
6         A.   Yeah, I know Sam.
7         Q.   Principal Deputy Assistant Attorney
8    General, Environmental and Natural Resources Division?
9         A.   Yes.
10        Q.   Okay.  Do you know if Mr. -- if Sam
11   Hirsch was the person with the Department of Justice
12   that was involved representing the Army Corps of
13   Engineers in the litigation that the Standing Rock
14   Sioux Tribe had initiated to try and stop construction
15   of the DAPL pipeline?
16        A.   Sam was the principal deputy, so he
17   would have been the number-two official in the ENRD at
18   the time.  So his -- he would have been over the
19   litigation team that was handling the DAPL case.  But
20   he wouldn't have been -- personally he wouldn't have
21   been on the case team, necessarily, but certainly in
22   charge.
23        Q.   Okay.  And then the substance has been
24   redacted, so I don't have anything to ask you there
25   because I don't have it.

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 58

1       If we go up a page, the start of his --
2  his email.  So it's Friday, September 9, at 10:02 a.m.
3  And it says -- just for the start, it says, "Dear
4  Corps, Interior, and Justice colleagues," and then
5  everything else is redacted.  Do you see that?
6       A.   Yes.
7       Q.   Okay.  When we go above -- at the top of
8  that page, it's an email from -- from Hilary Tompkins.
9  The cc list is extremely long, so I'm not going to go
10  through all of that.  But the subject is "Re:  Final
11  Drafts of Statements."  Do you see that?
12       A.   Uh-huh.
13       Q.   Okay.  Again, the substance is redacted,
14  so I -- but it does look like you're on that
15  particular distribution, okay?
16       A.   Okay.
17       Q.   All right.  And we'll go back one more
18  page, and now we're back at the top.
19       Oh, I'm sorry, there's one more I missed
20  in between.  There's an email from Sam Hirsch, and
21  then it says "Final Drafts," and it says, "Thanks,
22  Sam."  Again, it's redacted.  I don't have anything to
23  ask you there because I can't see it.
24       And then at the top is your email.  I
25  don't know if it's in reply to everyone -- it looks

Page 59

1  like it might be -- on the prior email, that is.
2       And it says, "Some news coverage," and
3  then it mentions the "key-ruling-dakota-access-
4  pipeline-due-end-of-friday," and -- in the link, that
5  is, so there's a link to an article that you sent out.
6  Do you see that?
7       A.   Yep.
8       Q.   Okay.  So I want to talk to you about
9  the September 9, 2016, statement.  Who drafted the --
10  the initial statement to that -- that --
11       And we can pull up -- just so that we're
12  clear, make sure we're talking about the same thing,
13  if we pull up Exhibit -- I think it's 494.
14       This is the statement.  It continues on
15  to the next page, okay?  You're familiar with this
16  particular statement, correct?
17       A.   Correct.
18       Q.   Okay.  So I --
19       When did you first hear about
20  preparation of a joint statement?
21       A.   So I think I received a draft of this --
22  the initial statement around the 7th, or late on the
23  7th, or the 8th, or the morning of the 8th.
24       Q.   Okay.  Who prepared the first draft?
25       A.   I don't know who prepared the first

Page 60

1  draft.  I received it as a -- as a -- as a draft from
2  the Associate Attorney General's office, which was
3  over ENRD; and then -- and then it was circulated with
4  a number of offices for input or -- or review.
5       Q.   Did the Department of Justice prepare
6  the initial draft, or the Department of the Interior,
7  or the Department of the Army?
8       A.   I -- I don't know who prepared the --
9  the initial draft.  I received it from within the
10  department, and then -- and then it was shared with --
11  with the Army and with the U.S. Attorney's Office and
12  other parts of the department for input and -- and
13  information over -- over the course of, you know, the
14  next day, the 8th.
15       Q.   Whose idea was it to prepare the joint
16  statement?
17       A.   I don't think it -- the idea originated
18  with any one person.  I think that we understood a
19  ruling was -- was imminent, and there was a desire to
20  have -- to address it in a way that would inform
21  people what had happened and to also promote -- try to
22  defuse tensions, talk about the action -- the review
23  that was taking -- that the Army would -- was
24  continuing to conduct.
25       So the overall, you know, intent was

Page 61

1  to -- to inform the public, defuse tensions, talk
2  about how the government was addressing these issues,
3  and -- and therefore explain, communicate this so
4  that -- in a way that would help promote nonviolence.
5       Q.   From the Department of Justice, who was
6  involved in reviewing and commenting on the draft
7  statement?
8       A.   There were a number of people.  There
9  was certainly Sam Hirsch in the Office of the
10  Associate -- in the Office of Associate Attorney
11  General, the COPS Office, CRS, OTJ, the
12  U.S. Attorney's Office in -- in North Dakota, and
13  others.  I could give you a little bit more -- more of
14  a list, if you would like.
15       Q.   Who from North Dakota?
16       A.   That would have been Chris Myers.  He,
17  you know --
18       Q.   Okay.
19       A.   -- as the -- as the U.S. Attorney at the
20  time.
21       Q.   Just to be clear, the Department of
22  Justice didn't get input or comment from anyone from
23  the State of North Dakota or any State or local
24  officials that were actually out there where the
25  protests were occurring; is that correct?

59:24-62:5;
401-402; 403

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 62

1     A.    That's correct, but -- but, again,
2   not -- not unusual.  This would be a -- our response
3   to -- to a federal court ruling, so something we would
4   coordinate among the federal partners who -- who --
5   involved in this issue, but not necessarily others.
6     Q.    Okay.  Any consideration that the
7   Department of Justice had regarding the impact that
8   this statement would have on the protesters to
9   embolden them?
10     A.    I think the concern was actually to --
11   the concern and the intent of the statement was to the
12   contrary.  It was not -- it was meant to dial things
13   down, to -- to communicate that there was an ongoing
14   review, to call for a pause in pipeline construction
15   near the lake, which was the source of -- of the major
16   concerns raised by the protesters and the tribe,
17   and -- and to -- so to deescalate tensions, not to --
18   to escalate or prolong or -- things.
19     Q.    So the Department of Justice, the
20   Environmental and Natural Resources Division,
21   represents the Army Corps of Engineers, okay, in this
22   litigation, right?
23     A.    Correct.
24     Q.    As part of representing the Army
25   Corps of Engineers, they are defending the Army

Page 63

1   Corps of Engineers' decision in the litigation, that
2   everything was done appropriately, and urging
3   Judge Boasberg to deny the request for a temporary
4   injunction so that the pipeline would not -- the
5   construction would not be stopped.  That's their
6   position in the case, correct?
7     A.    That was the --
8         MS. BOBET:  Objection, assumes facts not
9   in evidence.  You may answer.
10     A.    That was the litigation -- that was the
11   litigation position.  I think that this was -- this
12   issue was not just playing out in the courtroom,
13   though.  It was playing out as a much more complex
14   problem on the ground that involved imminent public
15   safety concerns and -- and other First-Amendment-
16   protected activities, and large numbers in tribal --
17   and tribal members and leaders, who were -- who were
18   clearly upset with this situation.
19         So the idea here was to meet that
20   concern and -- and to -- to -- to inform people of the
21   decision, but also to inform of other actions, beyond
22   just the litigation position, that the United States
23   was going to undertake to address the -- the issues
24   that had been raised by Standing Rock and by other
25   tribes about pipeline -- about the Dakota Access

Page 64

1   Pipeline in particular, but also about pipeline
2   decision-making more broadly, and -- and to announce
3   these -- a series of consultations toward that end.
4         So it had -- it had a purpose that went
5   beyond just the -- the -- explaining the litigation
6   position or status.
7     Q.    (BY MR. KERLIN)  While I appreciate --
8   while I appreciate your answer, I just want to make
9   sure that it's clear, the Department of Justice,
10   through its division with Environmental and Natural
11   Resources, was pushing for a particular position, and
12   that was that the Army -- defending the Army Corps of
13   Engineers' decisions and what had happened in order to
14   get the pipeline to the point it was so that it could
15   be appropriately permitted and constructed, right?
16     A.    From that -- from a litigation
17   standpoint, correct.
18     Q.    Yes.  Okay.  And now this joint
19   statement is being issued after the Department of
20   Justice won; they got the ruling that they were
21   seeking.  They are now issuing a statement with two
22   other agencies that are a contra-- that is in --
23   it's directly contradictory to the ruling they just
24   got from the Court, correct?
25         MS. BOBET:  Objection, misstates

Page 65

1   evidence, calls for a legal conclusion.  You can
2   answer.
3     A.    Right.  Beyond the -- the legal
4   consideration, I think that because of the -- I mean,
5   the history of the relationship between -- between the
6   federal and state governments, frankly, and private
7   industry with --
8     Q.    (BY MR. KERLIN)  I hate to cut you off,
9   Mr. Hornbuckle.
10     A.    Yeah.
11     Q.    I don't mean to.  We have limited time
12   here.  I only have about 30 minutes left with you, and
13   so I'm going to have to insist on direct answers to my
14   questions and not a lot of explanation that may or may
15   not, and likely isn't, responsive to my question,
16   okay?
17     A.    Okay.
18     Q.    My question --
19     A.    Could you repeat the question?
20     Q.    I can, if -- if you would please answer
21   it.
22         So the Department of Justice takes the
23   position, as they are defending the U.S. Army Corps of
24   Engineers in their decision-making process, to say,
25   "Deny the temporary injunction.  Construction should

*[left margin annotation]* 62:19-63:6;
63:10-64:17;
401-402; 611;
outside scope
of 30(b)(6)
notice

*[right margin annotation]* 65:22-66:
12
401-402;
611; 802

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 66

1    continue."
2              The judge rules in their favor, correct,
3    and says, "No temporary injunction issued.
4    Construction can continue," correct?
5         A.   Correct.
6         Q.   And then the Department of Justice
7    issues, along with two others agencies, this statement
8    that is contradictory to that and says, "Well, the
9    judge didn't pause it.  Now we, in fact, are going to
10   tell the pipeline construction company that it should
11   be paused."  "Voluntarily paused" is the words that
12   are used in this statement, correct?
13             MS. BOBET:  Objection, misstates
14   evidence.
15        A.   Yes.
16        Q.   (BY MR. KERLIN)  Okay.  So the victory
17   that the protesters did not get in court, the
18   Department of Justice and the Department of Army and
19   the Department of the Interior gave them in this
20   statement that we're looking at as Exhibit 495 -- 4,
21   correct?
22             MS. BOBET:  Objection, calls for
23   speculation, calls for a legal conclusion, and
24   argumentative.
25        Q.   (BY MR. KERLIN)  Correct?

ND OBJ.: Includes argument of counsel

66:16-68
401-402; 611;
701/702 calls
for legal concl.;
802

ND OBJ.: Includes argument of counsel

Page 67

1         A.   I -- I would not -- I would not assess
2    this and the statement in that way, that it was
3    putting forth a contrary -- the position or -- I think
4    that it was calling -- calling for a voluntary pause
5    while some of these issues were considered.
6              And I think the tribe had directly
7    challenged whether the -- whether the -- whether the
8    Army had -- had done an adequate consultation.  And
9    that that -- when that is an issue, other -- you know,
10   the -- there are -- there are other equities at play
11   in the department:  One is -- is this trust
12   relationship with tribes and making -- ensuring that
13   we are consulting appropriately.
14             And so I think that that prompted the --
15   the need for additional review because of the public
16   safety concern.  I think that a voluntary pause was
17   considered an appropriate thing to call for to
18   settle -- to defuse the situation and -- and give us
19   more time to -- to deescalate and consider all -- all
20   of these issues involved.
21             So I don't think it was stating a
22   contrary position or reversing.  I think it was -- it
23   was a strategic maneuver to try to defuse the public
24   safety crisis at the time and to also do the right
25   thing in terms of addressing some of these concerns

Page 68

1    that clearly many people in the tribe did not agree
2    had been addressed adequately.
3              So that's -- I think that was -- that
4    was the issue.
5         Q.   Are you finished?
6         A.   Yes.
7         Q.   Okay.  Do you know whether or not all
8    those issues that you just mentioned about whether or
9    not the -- that there was an adequate consultation
10   process, if all those issues were brought up by the
11   Standing Rock Sioux Tribe in the litigation in front
12   of Judge Boasberg so that he could consider it before
13   he made his ruling?
14        A.   I don't -- I don't feel like I'm in a
15   position to -- to -- to lay out all the legal factors
16   that were considered by Judge Boasberg in the
17   litigat- -- or to -- to really talk versantly about
18   the litigation itself.
19        Q.   Did Judge Boasberg issue a ruling that
20   provided for a voluntary pause on all construction?
21        A.   I think he -- he issued a ruling based
22   on -- on the facts before him in the litigation, so I
23   couldn't recall --
24        Q.   And I think -- and I think you'll agree
25   with me that the Department of Justice did not urge

68:7-
70:19
401-402;
602; 611;
802;
outside
scope of
30(b)(6)
notice

Page 69

1    Judge Boasberg to issue a ruling that called for a
2    voluntary pause of all construction activity.  Is that
3    correct?
4              MS. BOBET:  Objection, assumes facts not
5    in evidence.
6         Q.   (BY MR. KERLIN)  Is that what the
7    Department of Justice was asking Judge Boasberg to do?
8         A.   I think that -- you know, I think that
9    the statement clearly notes our appreciation of the
10   opinion, that it -- about the Corps of Engineers'
11   compliance with the National Historic Preservation
12   Act.  So under the particular legal issues at -- at
13   play in the litigation under the National Historic
14   Preservation Act, the opinion was -- was accepted, but
15   it says, however, there were important issues raised
16   by the Standing Rock Sioux Tribe, other tribal
17   nations, regarding this pipeline, and, you know,
18   our -- the process of pipeline decision more
19   generally, so --
20        Q.   Right.  All of which Judge -- all of
21   what was put before Judge Boasberg in the ongoing
22   litigation that the Department of Justice was fighting
23   against, right?
24             MS. BOBET:  Objection, assumes facts not
25   in evidence.  If we're talking about the substance of

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 70

1  what was happening in the litigation separate from the
2  statement here, I think that's outside the scope as
3  well.  He's welcome to answer in his personal
4  capacity.
5              MR. KERLIN:  I -- I vehemently disagree.
6  I believe it goes to the contents of this statement,
7  which is clearly part of the topic, and what we
8  provided additional guidance to -- to you so that you
9  could prepare, on behalf of the United States, a
10  witness from the Department of Justice that could
11  answer these questions.
12              I don't think he's sufficiently answered
13  any of my questions -- well, very few of them with
14  respect to this topic.  I think he's answered a few
15  direct that I asked a minute ago and insisted on
16  direct answers.
17              But I -- I think -- I think I'm going to
18  move on to another -- it's the second-to-last
19  paragraph in this statement.
20              MS. BOBET:  And I'll -- I'll -- I
21  disagree with the characterizations, but happy to move
22  on.
23              Did you -- I'm sorry.  Is there a
24  question pending, or were you just reviewing the --
25  the paragraph here?

**ND OBJ.:**
Includes
argument of
counsel

Page 71

1              MR. KERLIN:  Oh, no.  I'm sorry.  I was
2  just trying to get -- if we could bring up the
3  second-to-last paragraph on page 2 starting "Finally
4  we . . . support."
5              MS. BOBET:  Got it.
6         Q.   (BY MR. KERLIN)  It says, the last
7  sentence, "The Department of Justice and the Interior
8  will continue to deploy resources to the United States
9  [sic] to help state, local, and tribal authorities,
10  and to the communities they serve, better communicate,
11  defuse tensions, support peaceful protest, and
12  maintain public safety."  Do you see that?
13         A.   I do.
14         Q.   Okay.  No mention of supporting
15  North Dakota's State and local law enforcement
16  officers to maintain law and order, correct?
17         A.   I would not say that's -- that's
18  correct.  I think it -- it says clearly in the
19  previous sentence, "any- -- anyone who commits violent
20  or destructive acts may face criminal sanctions from
21  federal, tribal, state, or local authorities."
22              So that was very intentionally a
23  deterrent message to deter criminal activity and to
24  promote, in the previous sentence before that, the
25  principles of nonviolence, encouraging everyone to

71:6-72:12
106; 401-402;
611; 802

Page 72

1  adhere to those principles, which I think is also in
2  support of law enforcement and a peace- -- a peaceful
3  outcome.
4         Q.   Okay.  But there's no direct statement
5  of support that says, you know, "We respect Sheriff
6  Kirchmeier and his efforts to maintain law and order
7  while there's these protests going on on Corps-managed
8  land in Morton County, North Dakota.  We support the
9  State of North Dakota to try and maintain law and
10  order while all of this is going on."  None of that
11  was included, right?
12         A.   That's correct.
13         Q.   Okay.  And I think you mentioned
14  earlier, but just so that we're clear, no one at North
15  Dakota was consulted about the joint statement that
16  was going to be issued, correct?
17         A.   That's correct.
18         Q.   Did -- did anyone at Department of
19  Justice give North Dakota a heads-up that, "Hey, we're
20  going to release this joint statement just to make you
21  aware because -- you know, so you're aware, for your
22  situa- -- situational awareness, that it may or may
23  not have an impact on the protest and the protesters"?
24         A.   Not to my knowledge, but I don't have
25  complete knowledge of -- of who was communicated with,

72:13-
73:1
401-402

Page 73

1  you know, prior to the release.
2         Q.   Is the Department of Justice aware that,
3  after this statement was issued, that the protesters
4  viewed it as a victory?
5              MS. BOBET:  Objection, assumes facts not
6  in evidence, and calls for speculation.
7         Q.   (BY MR. KERLIN)  Okay.  Let's go ahead
8  and put that into evidence.  You don't have to answer
9  that question.  I'm going to ask you again in about
10  three minutes.
11              Can we bring up ARMY 117979?
12              Okay.  I guess I need to flip back to
13  494 just to point out one thing, and that's the timing
14  of this release.
15              Okay.  So the date of -- of this email,
16  September 9, 2016, 1:47 p.m.  Do you see that?
17              Okay.  I want to keep moving forward, so
18  I'm going to go back to 117979.  We're going to mark
19  it as the next exhibit.  I believe we're up to
20  Exhibit 853 [sic].
21              (Deposition Exhibit 854 was remotely
22  introduced.)
23         Q.   It's an email from you, again, to a
24  distribution list that includes individuals at the
25  Army, of course the Department of Justice, and the

73:12-
75:17:
401-
402

**Page 74**

1    Department of Interior.  Can you see that?
2        A.   Yes.
3        Q.   You state, "Interesting article . . . ."
4    Again, this is -- the subject of the -- you know, the
5    "Re" line, it's "Final Drafts of Statements."  You're
6    sending this out, and it says, "Interesting article in
7    the Atlantic on the legal case."  Do you see that?
8        A.   Yes.
9        Q.   Okay.  So this is after the statement
10   had been -- I guess this is shortly before the
11   statement had been issued, right?  It's 12:35 p.m.
12       A.   Yes.
13       Q.   Okay.
14       A.   I see it.
15       Q.   Just to understand the timeline a little
16   better, so we had the -- I think you said you first
17   saw a draft on either the 7th or 8th of September,
18   correct?
19       A.   Correct.
20       Q.   That statement was ready, had been -- in
21   other words, you had it in the ready, and you were
22   waiting for the Court's ruling, right?  And then was
23   the idea that, after the ruling came out, that the
24   statement -- the joint statement could immediately be
25   released?

**Page 75**

1        A.   Yes.
2        Q.   Was there more than one joint statement?
3    In other words, was there a statement that was
4    prepared in case Judge Boasberg ruled in favor of the
5    Corps, and then also one that was prepared in case
6    Judge Boasberg ruled in favor of the Standing Rock
7    Sioux Tribe?
8        A.   Yes, I believe there was two statements,
9    but that -- that is a -- that's a normal trade craft,
10   is that if you want to be prepared for an immediate
11   response to a ruling, you need to -- to be prepared
12   for either scenario.
13       Q.   Okay.  Were these statements prepared at
14   the same time or kind of together?  I mean, obviously
15   not at the same -- hours, but that day --
16       A.   I think throughout the course of the
17   8th, working on -- working on both contingencies.
18       Q.   Okay.  I don't think I've seen a copy of
19   those statements, but it's possible that it might
20   exist and has been produced in this litigation.
21            Can you tell me what the alternative
22   statement said?
23            MS. BOBET:  I'll object to the extent
24   the question is asking about an unfinal, draft version
25   that may reflect attorney comments or -- or work

**75:18-76:2**
**401-402; 501**

**Page 76**

1    product.  I'll instruct the witness not to talk about
2    the -- the substance of that nonfinal statement.
3            MR. KERLIN:  Ms. Bobet, has that been
4    produced in this case?
5            MS. BOBET:  Are you asking me, of the
6    300,000-some-odd documents, off the top of my head?  I
7    don't know what's been produced as it's -- I assume
8    that it would be privileged in many of its draft
9    forms, so if it's been produced, I would assume it's
10   been -- it's been produced in a redacted form with an
11   appropriate privilege redaction.
12           MR. KERLIN:  Yeah, I don't think it has.
13   I've personally gone through all the emails
14   Mr. Hornbuckle was on around this time period.
15       Q.   (BY MR. KERLIN)  Mr. Hornbuckle, were
16   you included on an email that included the draft
17   statements on either September 7 or September 8 of
18   2016?  And I'm talking about the alternative one that
19   would -- if Boasberg ruled for the tribe.
20       A.   I don't recall.  I mean, there were a
21   lot of emails on this, and so -- and the --
22   again, the statements themselves, I don't know how
23   they would -- how -- how much substantively different.
24   It's just that I think that the -- the step -- it's
25   main -- it probably had to do with just explaining

**76:15-77:15**
**401-402; 602**

**Page 77**

1    what had actually happened.
2            But -- but we also wanted to communicate
3    that we were going to have these consultations, that
4    we wanted to encourage nonviolence and all -- and all
5    of that, so I think that the intent was still to just
6    address the situation publicly and communicate
7    effectively.
8        Q.   Got it.  Do you -- did you lay eyes
9    on -- do you recall seeing two statements, one that
10   was the one that was ultimately released, and one that
11   was ready to be released if the Court ruled a
12   differently -- a different way than it did?
13       A.   I -- I -- I believe so, but I -- I
14   can't -- you know, I don't have a photographic memory
15   of these -- all these statements that day.
16       Q.   Understood.  Okay.  Let's -- let's go to
17   MYERS 10033, please.  And we'll label it as 854.
18           THE REPORTER:  I believe we had a 853
19   before, and that last one was 854.
20           MS. HYMEL:  I agree.
21           MR. KERLIN:  Okay.  So what am I up to
22   now?
23           MS. HYMEL:  855.
24           MR. KERLIN:  855.
25           (Deposition Exhibit 855 was remotely

Page 78

```
1    introduced.)
2         Q.   (BY MR. KERLIN)  An email that is an
3    email that you sent, okay?
4         A.   Okay.
5         Q.   All right.  I want to go to the end and
6    work my way up.  Okay.  This is the last one.  It's an
7    email from Sam Hirsch, a wide distribution list, a
8    number of folks.  In the interest of time, we're not
9    going through it.
10             The subject is "Judge Boasberg's
11   Order/Opinion and the Joint Army/Interior/Justice
12   Statement," okay?  And the time and date is
13   September 9 at 2:52 p.m., okay?
14             Hirsch says, "Attached please find Judge
15   Boasberg's Order and Memorandum Opinion denying the
16   plaintiff Standing Rock Sioux Tribe's motion for a
17   preliminary injunction entirely.
18             "Attached also please find DOJ's version
19   of the Joint Statement which we will send out
20   momentarily.  My understanding is that the Army and
21   the Interior will send out an identical statement,
22   each on their own letterhead."  Do you see it?
23        A.   I see it.
24        Q.   Okay.  So then we go up an email;
25   there's an individual named Dan Utech.  Do you see
```

78:10-79:13
401-402; 602;
611; 802

Page 79

```
1    that?
2         A.   Yes.
3         Q.   Do you know who Dan Utech is?
4         A.   I believe he was -- he was with the
5    White House, Executive Office of the President.
6    That's what the line says, and I vaguely recall him.
7    I don't know him.
8         Q.   Okay.  And the request comes in from
9    Mr. Utech on behalf of the Executive Office of the
10   President.  "Can you let us know when your statement
11   is actually out," question mark.  "Thanks."  Do you
12   see that?
13        A.   Yep.  I see it.
14        Q.   Is this again kind of consistent with
15   what you were saying earlier, if there's a joint
16   statement going out, we want to make sure that the
17   Department of the Interior, the Department of the --
18   of Justice, the Department of the Army, also Executive
19   Office of the President are all on the same page,
20   so -- I think you described it as a partnership, so
21   the federal government is speaking with one voice?
22        A.   I -- not necessarily with regard to the
23   Executive Office of the President.  That would be --
24   communications with the Executive -- with the
25   White House are about when -- about department actions
```

Page 80

```
1    or statements or -- or info.  They're info -- for
2    information.
3             So that this was a situation that had
4    garnered a tremendous, you know, public interest
5    and -- and -- and an outcry, and so it would not be
6    unusual for us to let folks know in the administration
7    of what we were doing.  But the statement itself was
8    not in concert with the White House.  It was a joint
9    statement with those three departments.
10        Q.   Okay.  But it was in concert with the
11   Department of the Interior and the Department of the
12   Army?
13        A.   Correct.
14        Q.   Okay.  And then if we go up one email,
15   you're responding to Mr. Utech and everyone else.  "We
16   are sending it now," correct?
17        A.   Uh-huh.
18        Q.   All right.  And if we go to the top,
19   that's -- that's your email with a link to the joint
20   statement.
21        A.   Right.
22        Q.   Okay.  All right.  That was 855.
23             Let's -- let's jump to 856, please.  I
24   mean -- I'm sorry -- we're going to call it 856.  It's
25   MYERS 10036.
```

Page 81

```
1             (Deposition Exhibit 856 was remotely
2    introduced.)
3         Q.   Okay.  This is an email from you, and it
4    just has the link to the statement.  Do you see that?
5         A.   Yes.
6         Q.   This is 1:08 p.m.  You're
7    responding to Karen Diver.  Do you know who Karen
8    Diver is?
9         A.   Again, another -- another White House
10   official.  I don't -- I don't recall.
11        Q.   Sure.  Fair enough.
12             Let's go to the next page.  We can look
13   at -- she sent an email, and then this is the --
14   the -- her text of her email is "Please confirm Press
15   Release publication as soon as possible," and then it
16   has her signature block, which -- which indicates
17   she's Special Assistant to the President for Native
18   American Affairs.  Do you see that?
19        A.   Yeah.  That makes sense.  Yeah.
20        Q.   Okay.  And so then you're sending it to
21   her as well, a different White House official,
22   providing a link to the joint statement that was
23   issued, correct?
24        A.   Correct.
25        Q.   Okay.  Let's go to MYERS 45235.
```

81:12-
24
401-402

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 82

1           (Deposition Exhibit 857 was remotely
2      introduced.)
3      Q.   All right.  I want to go to -- to your
4 email.  There's a -- well, we'll just have to start at
5 the top.  So you sent an email Friday, September 9,
6 2016.  It's 1:55 p.m.  The title of it is "Standing
7 Rock - Possible state press conference at 11:30
8 central."
9           You can go to the end again.  Nekia
10 Hackworth from the -- Senior Counsel at the Office of
11 the Deputy Attorney General is indicating that there's
12 going to be word -- that there's going to be a press
13 conference at 11:30.
14           Robert Perry then weighs in at the top
15 of that.
16           If we work our way up, eventually we get
17 to your email.  I guess it's the first one, the -- so
18 there -- September 9 at 2:49 p.m. from Wyn Hornbuckle.
19 So let's start at the bottom of that page.  I'm sorry.
20 It says, "See below . . . ."  You got it?
21           THE REPORTER:  Is this 857?
22           MR. KERLIN:  I believe so.  It would be
23 the next.
24           MS. HYMEL:  56.
25           MR. KERLIN:  I'm sorry.  It's 857,

Page 83

1 right?  857.
2      Q.   (BY MR. KERLIN)  "See below a query from
3 Reuters that word is going around that 'monitors' from
4 DOJ are on the ground in North Dakota as requested by
5 the Great Plains Council.
6           "I would like to use the following
7 background statement this afternoon to describe the
8 DOJ presence.  Let me know if any concerns asap.
9           "I can tell you, on background, that
10 'monitors' would be inaccurate.  We do have DOJ
11 personnel from Community Relations Service, the COPS
12 Office, the U.S. Attorney's Office, Office of Tribal
13 Justice, and others on the ground facilitating
14 communication, and working with tribal, state, and
15 local authorities to defuse tensions, support peaceful
16 protest, and maintain public safety."  Do you see
17 that?
18      A.   Yes.
19      Q.   Okay.  You talked about, I think, the
20 COPS, Community Relations.  You mentioned -- I don't
21 think you talked about the U.S. Attorney's Office
22 previously when it was "support."  Is that referring
23 to Chris Myers?
24      A.   Well, to the U.S. -- the U.S. -- to him
25 and his staff as he saw -- you know, as he would

Page 84

1 direct them.
2      Q.   Okay.  Got it.  Okay.  Let's go
3 to MYERS 41890.  Ah, we're -- we're going to skip
4 that.
5           Let's go to MYERS 44231.  I'm sorry.
6 And that will be Exhibit 858.
7           (Deposition Exhibit 858 was remotely
8 introduced.)
9      Q.   Okay.  Mr. Hornbuckle, there's a number
10 of things in here I would like to talk about.  It's a
11 rather lengthy, long -- it's a rather lengthy
12 document.  So what I would like to do -- well,
13 let's -- hmm.
14           We're going to briefly go through it
15 from the -- you've basically been forwarding -- it
16 looks like you've been forwarding emails and adding
17 things to it.  So it's an email that we've looked at
18 earlier if we go to the end.  Okay.  We looked at this
19 earlier.  Nekia Hackworth, "Good morning, everyone.
20 FYSA, we received word" that there's going to be this
21 press conference, all right?
22           And then I want to work our way up
23 because I don't have any questions about these, but
24 it's the document we looked at earlier, in part.
25           Then there's a forward of a -- of a --

84:9-
88:13
401-
402;
602;
611;
802;
outside
scope of
30(b)(6)
notice

Page 85

1 of a news article by you.  This is Friday,
2 September 9, at 3:59 p.m., is the date of your email,
3 and you've attached this -- this article, okay?
4      A.   Uh-huh.
5      Q.   Then I want to keep going up.  Then you
6 send a link to another article about 30 minutes later.
7           And then we go to the prior -- if we
8 go -- yeah, I think it's -- all the rest of it is --
9 is attachments to -- or the part that you've included
10 to the top email, okay?
11           Okay.  This is your email.  This is now
12 Monday, September 12, so it would be the Monday after
13 the -- the joint statement went out on the 9th.
14      A.   Okay.
15      Q.   In your email, it says "Press Clips,"
16 and then it -- it has joint statements from the
17 Department of Justice, Army, Interior, okay?  You have
18 these different news articles, all right?
19           I want to talk to you about one of them.
20 It's the PBS NewsHour.  It's the September 10, 2016,
21 that you've included in your email in your
22 distribution to everyone on the distribution list.
23           Okay.  If we -- yeah, if we go to the --
24 I'm sorry.  If we go to the actual -- I'm sorry, at
25 the top of that page -- let's go up one page.  Yep,

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 86

1  just the start of the article, "The smoldering fires
2  had been burning . . . ."
3          Yeah, I'm sorry, just that whole part.
4  I -- I don't need to get that granular.
5          "In his hand was an official statement
6  released about an hour earlier," okay, "by the
7  U.S. Department of Justice.  It regarded a lawsuit by
8  the Standing Rock Sioux Indian Tribe against the
9  U.S. Army Corps of Engineers.  The tribe claimed the
10 government agency inadequately consulted . . . them
11 about a multibillion-dollar pipeline project."  Are
12 you with me?
13     A.  Yep.
14     Q.  Okay.  Skip down to the next paragraph.
15 The second sentence says, "Anticipation over U.-" --
16 well, it mentioned -- let's just start with the
17 beginning of it.  I'm sorry.
18         "[Over] two hundred demonstrators,
19 mostly people who had been camping for weeks near the
20 Sacred Circle, had gathered there to eat and wait.
21 Anticipation over U.S. District Judge Boasberg's
22 ruling in the case had been mounting, even though the
23 tribe's chairman, David Archambault II, had tried to
24 downplay the significance of the decision.  '[What]
25 happens, there's going to be an appeal process,' said

Page 87

1  the chairman on Thursday before the ruling.  Now,
2  Eagle stood in the same spot, reading the DOJ
3  statement."  Okay?
4          If we go to the next paragraph, it says,
5  "'Construction of the pipeline on Army Corps land
6  bordering or under Lake Oahe will not go forward at
7  this time,' he read aloud.  Then he paused, looked
8  towards the crowd over the rim of his reading glasses
9  and declared, 'You Stopped It,'" okay?
10         According to this article, he was
11 telling all the protesters that they were able to stop
12 the pipeline construction.  Do you see that?
13     A.  I see it.  I see the quote, yeah.
14     Q.  And then the next sentence says, "Men
15 hooted and shot single fists into the air.  Women
16 lulu'ed calls of victory.  As Eagle read on, the
17 celebration grew.  Many people did their best to fight
18 off tears."  Do you see that?
19     A.  Yeah.
20     Q.  Okay.  And this is an article that you
21 disseminated to a number of individuals, I believe,
22 mostly at the Department of Justice; it looks like
23 also at the FBI.
24         Based on this article, would you agree
25 with me that at least some of the protesters viewed

Page 88

1  the joint statement, issued in part by the Department
2  of Justice, as a victory to their cause?
3          MS. BOBET:  I'll -- I'll object.  This
4  is outside the scope of the topic and what we
5  understood would be asked about, and also that it
6  calls for speculation.  But Mr. Hornbuckle may answer
7  for himself.
8      A.  I think that the articles reflect -- the
9  articles which were written by the press, you know,
10 reflect a particular glimpse into the way some people
11 perceived -- perceived it.  So some may have perceived
12 it as a victory, a temporary victory, but others
13 may -- may not have.
14         But, overall, I think that the -- it was
15 received as -- it was not a -- it was not a --
16 something that was going escalate the situation.  So I
17 think that that's -- that was my perception of what
18 was going on there, as things were settling down;
19 people thought they were being heard, and -- and so --
20 in that the government was hearing the concerns of the
21 tribes and -- and the protesters in -- in this regard,
22 in -- in taking the position and releasing this
23 statement.
24         How -- how everyone viewed it, I
25 don't -- I can't say.

Page 89

1          MR. KERLIN:  Object to the nonresponsive
2  portion.
3      Q.  (BY MR. KERLIN)  Mr. Hornbuckle, did you
4  ever go out to North Dakota to see the protests or the
5  protest response?
6      A.  I did not.
7      Q.  So when you say you had some basis on
8  it, where were you getting that information as far as
9  what was going on out at the protest sites?  News
10 articles?
11     A.  Actually, I believe the OTJ director may
12 have been there on the ground at the time; CRS, I
13 believe, may have been -- had personnel out there;
14 and -- and, of course, our -- I don't know if the
15 U.S. Attorney had people, but they certainly were
16 aware of what was going on.
17         So some things were being received from
18 the media, which was also observing the situation, but
19 also through some firsthand accounts as well.
20     Q.  Can we pull up USACE 84181.  We'll mark
21 this as the next exhibit, which I think we're up to
22 859.
23         (Deposition Exhibit 859 was remotely
24 introduced.)
25     Q.  It's an email from Eileen Williamson.  I

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 90

1  don't believe you're on the email, Mr. Hornbuckle, but
2  your name does appear on the -- in the email.
3          If we go to the second paragraph.  It
4  says, "I resent the joint statement on Friday after it
5  was released by the U.S. DOJ because we have contacts
6  for several small newspapers in North and South Dakota
7  that are not serviced by most press release
8  distribution services, like Vocus, PR Newswire,
9  BusinessWire, et cetera.  (It was about 200 contacts).
10 In that statement, I noted that 'The U.S. Army
11 Corps of Engineers is referring all queries related to
12 the Dakota Access Pipeline to the U.S. Department of
13 Justice Contact:  Wyn Hornbuckle . . . ."  It's got
14 your phone number and your email address, okay?
15         The date of this -- this is the Monday
16 after the press release.  Did you receive, on behalf
17 of the Department of Justice or the U.S. Army Corps of
18 Engineers, as it was directing them to you, questions,
19 requests for comments about the joint statement that
20 was issued?
21     A.   I don't remember the specific traffic,
22 but undoubtedly there were ongoing media inquiries
23 that were coming to -- to the department on this
24 issue.  So I -- I don't recall any other responsive --
25 responsive statements beyond what we had -- we had put

Page 91

1  out after the ruling.  But --
2      Q.   Okay.
3      A.   -- it was -- yeah, that's not uncommon.
4  I'm -- I'm often as the -- as sort of the client -- as
5  the lawyer for the government, often I am the person
6  that -- that our client agencies would refer me to on
7  various issues.
8      Q.   Okay.  And then would you address issues
9  regarding -- I mean, would you be the -- excuse me --
10 the point of contact consistent with what this is --
11 this stated, that -- for the U.S. Corps of Engineers
12 regarding queries about this statement?
13     A.   I would -- I would be for -- for the
14 media.  I -- I -- I don't think that I would -- our
15 office has the capacity to answer, you know,
16 everyone who has questions.
17         For instance, the department might
18 receive -- if it was calls from tribes or tribal
19 members, that might end up with the Office of Tribal
20 Justice, or if it was people calling to report civil
21 rights concerns, that might be, you know, funneled to
22 a different place.
23         So this is primarily about handling --
24 triaging the media inquiries.
25     Q.   Okay.  Sounds good.

Page 92

1          MR. KERLIN:  Let's take a quick break.
2  And if I can get a check on the time after we go off
3  the record.
4          THE VIDEOGRAPHER:  Going off the record.
5  The time is 6:02 p.m. UTC, 11:02 a.m. Mountain.
6          (Recess taken 11:02 a.m. to 11:14 a.m.
7  Mountain Standard Time.)
8          THE VIDEOGRAPHER:  We're back on the
9  record.  The time is 6:14 p.m. UTC, 11:14 a.m.
10 Mountain.
11     Q.   (BY MR. KERLIN)  All right,
12 Mr. Hornbuckle, we're back after a short break.  Able
13 to continue?
14     A.   Yes.
15     Q.   Okay.  Anything that you would change
16 about your prior testimony or add to it that we
17 haven't already discussed?
18     A.   No.
19     Q.   Okay.  If we could bring up Exhibit 821.
20 Okay.  This is another joint statement.  It's on the
21 Department of Justice letterhead.  Can you see that on
22 your screen?
23     A.   Yep, I see it.
24     Q.   Okay.  Do you recall this joint
25 statement?

*[Right margin annotation spanning lines 19-25: 92:19-93:15 401-402]*

Page 93

1      A.   Yes, I recall.
2      Q.   Were you involved with the process of
3  creating it?
4      A.   Yes, I was.
5      Q.   The same types of questions that we
6  talked about with the previous joint statement:  Do
7  you know which department kind of took the laboring
8  oar to prepare the first draft of this statement?
9      A.   Well, I reviewed my own email traffic,
10 and it was me.  I -- I knew that we, again, would
11 have, you know, a ruling coming from the Court, and so
12 thought it would be in the Department's interest that
13 we prepare for that and to have a public statement
14 prepared.  So -- so I took the first cut at it, I
15 believe, and then sent it around for review.
16     Q.   Okay.  Did you send it internal to the
17 Department of Justice or did -- did the
18 distribution -- I mean, did you send it to -- to
19 individuals outside of the Department of Justice?
20     A.   No, I -- I believe I sent it only
21 to within, which would be my normal practice.
22     Q.   Okay.  If we pull up the --
23     A.   I mean, I don't know if -- the Army
24 Corps was also probably involved in reviewing it at
25 some point.  I don't recall being the person who

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 94

1   distributed it to them, but it's -- it's possible.
2       Q.   Okay.  If we pull up -- one, two,
3   three -- the fourth paragraph that starts "The Army
4   continues."  Okay.  Did you have any specific
5   discussions with the Army about its review process
6   that was ongoing?
7       A.   I don't have -- recall having
8   substantive discussions about the -- their review, and
9   probably would defer to other folks who were in touch
10  with them on that from our department leadership.

**94:11-18 / 401-402; 611; 802**

11      Q.   And then it says, "In the interim" --
12  the second sentence, "In the interim, the Army will
13  not authorize constructing the Dakota Access Pipeline
14  on Corps lands bordering or under Lake Oahe.  We
15  repeat our request that the pipeline company
16  voluntarily pause all construction activity within
17  20 miles east or west of Lake Oahe."  Do you see that?
18      A.   Yes.
19      Q.   Okay.  So I guess what -- what I just
20  want to make sure I understand, the Department of
21  Justice is not -- I mean --
22           Let me see if I can ask it this way:
23  It's the U.S. Army Corps of Engineers that would be
24  the entity that would have oversight of this pipeline
25  crossing at --

Page 95

**95:1-20 / 401-402**

1            I guess what I'm trying to understand is
2   why did someone at the Department of Justice prepare a
3   joint statement that includes statements about what
4   the Army will or will not do?  Can you provide any
5   insight about that?
6       A.   Again, it was -- it was the -- it was in
7   this voice of all three departments.  That was the
8   intent of the -- the -- the release.  Very similar to
9   September 9, it was intended to -- to just inform the
10  public that this would -- of what happened, what the
11  Court decided, where we are in the process, and
12  what -- and what -- and that the Army's review
13  continued, and that -- you know, and -- and also sort
14  of a time -- an indication of that it would -- hopes
15  to conclude its review soon, and -- and to just
16  repeat.
17           So in other words, this was very much a
18  re- -- a restatement of where we stood in this process
19  -- and to communicate again in the wake of another
20  judicial decision.
21      Q.   Okay.  Okay.  Got it.
22           Let's -- let's take a look at -- it's
23  North Dakota -- I'm sorry, ND 256324.  And I guess
24  we're going to -- make sure I have this correct,
25  Exhibit 860?  Is that right?

Page 96

1            THE REPORTER:  Yes.
2            MR. KERLIN:  Thank you.
3            (Deposition Exhibit 860 was remotely
4   introduced.)
5       Q.   (BY MR. KERLIN)  Okay.  You're on some
6   of these emails but not all, so I'm going to -- I'm
7   not going to ask you questions about the -- about the
8   emails that are -- that are -- you're obviously not
9   on.  So what I would like to do is go to the
10  second-to-last page.  I guess if we just start at the
11  end, is probably the best place.
12           There's an email from you to Blake
13  Nicholson.  Do you know who Blake Nicholson is?
14      A.   Just -- I maybe recall this, but I saw
15  an earlier email that he was with the Associated
16  Press.  Is that correct?
17      A.   Yes, I believe so, but --
18      A.   Yes, I -- I -- I have some recollection
19  of dealing with him during the time.
20      Q.   Okay.  And you state, "I understand you
21  were asking for a response regarding the letter to the
22  Obama administration from North Dakota law
23  enforcement."  And you say, "Here's a statement
24  attributable to me, a Department of Justice spokesman,
25  if you can still work it in."

Page 97

**97:1-98:14 / 401-402; 611; 802**

1            And I'm not going to go through
2   everything that you included there, but I just want to
3   point out the date, December 12, 2016.  Okay.  So the
4   protest had been going on for three or four months,
5   okay?
6            And then Blake responds.  So you have
7   your statement, but that's not really the focus of
8   this.  It's -- I think you'll understand where I'm
9   going here in a minute.
10           If we go to the prior email.  So Blake
11  responds to you a day later on the 13th.  "Thank you.
12  Can you please elaborate on some things?
13           "ND law enforcement has specifically
14  requested 100 Border Patrol agents and members of the
15  U.S. Marshals Service Special Operations Group, along
16  with an unspecified amount of financial assistance.
17  Will those requests be considered?"
18           And then he asks, "What is meant by the
19  phrase 'committed to supporting local law
20  enforcement.'  Support in what form, exactly?
21           "What, exactly, are 'community policing
22  resources'?
23           "What are Community Relations Service
24  conciliators?  What do they do?  How many were/have
25  been deployed to North Dakota, and when?"

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 98

```
1              Some of this we've talked about, but I
2   want to go back to the -- if we go back one more page,
3   we have your response to it.  And with respect -- with
4   respect to the question from the -- from -- from
5   Mr. Nicholson with the AP about the request for Border
6   Patrol and U.S. Marshals Service SOG, or Special
7   Operations Group, I think your first bullet point
8   addresses that, okay, and so I want to ask you about
9   it.
10             "The Department continues to hold the
11  view that additional law enforcement resources on the
12  ground could serve to escalate, rather, than
13  deescalate tensions."  Do you see that?
14        A.   Yes.
15        Q.   So --
16             MS. BOBET:  I'm -- I'm so sorry to
17  interrupt.  I just want to make it clear.  I don't --
18  this is a couple of months after the October 10
19  statement, so I just want to know if we're on a
20  diff- -- different topic now or if this is in his
21  personal capacity.
22             MR. KERLIN:  No.  This is "withhold law
23  enforcement" support or "provide."
24             MS. BOBET:  Okay.  Topic 20.  Got it.
25             MR. KERLIN:  Yep.
```

Page 99

```
1              MS. BOBET:  Thank you.
2              MR. KERLIN:  Right.
3        Q.   (BY MR. KERLIN)  So Mr. -- the AP is
4   asking for clarity about North Dakota's request for
5   the U.S. Marshals SOG group and the Border Patrol
6   agents.
7              Is -- is -- your response to him, was
8   that the position of the Department of Justice still,
9   in December 13 of 2016, that it continues to hold the
10  view that additional law enforcement resources on the
11  ground can serve to escalate rather than to deescalate
12  tensions?
13        A.   Yes.  I think that's -- I wouldn't have
14  said it if it wasn't the Department's position.
15        Q.   I understand that, but by that, we can
16  take it to mean that the request for the U.S. Marshals
17  SOG group, as well as Border Patrol agents, those are
18  denied, right?
19        A.   I -- that -- those -- those -- those
20  resources were not deployed, so I -- I -- I don't -- I
21  don't know the decision -- precise decision-making
22  process behind that.
23        Q.   Okay.
24        A.   So I was trying to explain here what --
25  some of the resources that have been deployed, be more
```

99:3-22
401-402; 802

Page 100

```
1   specific about them, and -- yeah.
2        Q.   Okay.  And then I think the last
3   document that I have, it's MYERS 40535.
4              MS. HYMEL:  Paul, I'm looking, but I
5   don't think I have that.
6              MR. KERLIN:  MYERS, and then it's three
7   leading zeros, 40535?
8              MS. BOBET:  I don't see that in the
9   materials we got just before the deposition either.
10             I think we're also at the end of the
11  State's allotted time here.
12             MR. KERLIN:  Okay.
13        Q.   (BY MR. KERLIN)  All right.
14  Mr. Hornbuckle, I appreciate your time.  Have I been
15  respectful and courteous to you in this deposition?
16        A.   Yes, sir.
17             MR. KERLIN:  Okay.  With that, the State
18  would pass the witness.
19             MS. BOBET:  All right.  I know we just
20  took a break, but I'll take an additional five or so
21  minutes just to look over my notes.
22             I'll have a couple of follow-up
23  questions for you, Mr. Hornbuckle, and then we can let
24  you get on with your day.
25             THE DEPONENT:  Okay.
```

Page 101

```
1              THE VIDEOGRAPHER:  Going off the record,
2   the time is 6:26 p.m. UTC, 11:26 a.m. Mountain.
3              (Recess taken 11:26 a.m. to 11:34 a.m.
4   Mountain Standard Time.)
5              THE VIDEOGRAPHER:  We're back on the
6   record.  The time is 6:34 p.m. UTC, 11:34 a.m.
7   Mountain.
8                       EXAMINATION
9   BY MS. BOBET:
10        Q.   All right.  We are back after a short
11  break.  I'll thank you now, Mr. Hornbuckle, for -- for
12  your time in the deposition.
13             Just a few, kind of, follow-up matters.
14             You -- you were asked earlier about the
15  Department of Justice, Main Justice's decision
16  regarding requests to deploy law enforcement
17  resources.  Do you recall that line of questioning?
18        A.   Yes.
19        Q.   And I think you explained, correct me if
20  I'm -- I'm not summarizing this accurately, but I
21  think you explained that the ultimate decision on
22  whether to deploy resources, that Main Justice could
23  deploy, rested with department officials.  Do I have
24  that right?
25        A.   The ultimate decision, yes.
```

Patrick Wynters Hornbuckle   30(b)(6)
December 15, 2022

Page 102

1      Q.   And in the course of considering and
2  making those decisions, did DOJ Main Justice officials
3  consult with other federal agencies or components?
4      A.   Yes, I believe they did.
5      Q.   And you -- you testified shortly before
6  the break about the draft of the October 10 joint
7  statement.  I think perhaps you refreshed your memory
8  on -- on this a bit, and do you recall whether you
9  sent a draft of that joint statement in advance of
10  October 10 to anyone with the Corps of Engineers?
11      A.   Yes.  Yeah.  On further recollection,
12  since I -- I drafted that particular version of the
13  statement on -- on October 10, I was more involved in
14  clearing the statement through the -- all the
15  stakeholders who needed to look at it than I recalled
16  previously.  But, yes, I -- I sent it over to the
17  Corps and Interior.
18      Q.   Fair to say that you, yourself, were
19  closely involved with crafting both the September 9
20  and the October 10 joint statements?
21      A.   Yes, I think that's fair to say.
22      Q.   And is that -- that kind of, quote, role
23  with crafting those statements, is that typical in
24  your role as a public affairs officer for Main
25  Justice?

Page 103

1      A.   Yes, quite typical.
2      MS. BOBET:  Okay.  Those were my
3  follow-up questions.  I'll turn you back to Mr. Kerlin
4  if there's any redirect.
5      EXAMINATION
6  BY MR. KERLIN:
7      Q.   My only question would be -- is with
8  respect to the October 10 statement, so I just want to
9  make sure I understand.  So now you're saying that you
10  did send it to someone at U.S. Army Corps of Engineers
11  before it was released?
12      A.   Yes.  I think I -- I started to say that
13  when we talked previously, is that because I was
14  involved in clearing the statement and I -- I authored
15  it, I was more involved in getting consensus around
16  the -- the language than I was the first -- in the
17  first iteration.  So -- so, yeah, I shared it with --
18  with the Corps and the Interior because they were
19  coauthors on the statement.
20      Q.   Anyone in particular at the Corps that
21  you were -- you recall working with on that?
22      A.   I don't recall exactly who.
23      Q.   Do you recall who --
24      A.   It would have been --
25      Q.   I'm sorry.

Page 104

1      A.   It would have been the same -- the same
2  folks who were likely involved in the September 9.
3      Q.   And then do you recall about how far in
4  advance of when it was released that you had engaged
5  in this effort with the U.S. Army Corps to review it
6  or approve it?
7      A.   I think it was all in the course of
8  about 24 hours.  I don't think that it was -- it
9  was -- like the previous statement, it was on the eve
10  of this expected decision.
11      MR. KERLIN:  Okay.  That's all the
12  questions I have for you.
13      THE VIDEOGRAPHER:  Okay.  This
14  concludes --
15      MS. BOBET:  Nothing further for the
16  State.
17      THE VIDEOGRAPHER:  Okay.  This concludes
18  today's deposition of Wyn Hornbuckle.  The time is
19  6:39 p.m. UTC, 11:39 a.m. Mountain.  We are off the
20  record.
21      (At 11:39 a.m. Mountain Standard Time
22  the proceedings were not being videotaped.)
23      (Discussion off the record.)
24      MS. BOBET:  Tracy, anything else you
25  need from this witness before we let him go?

Page 105

1      THE REPORTER:  No.
2      MS. BOBET:  Okay.  Well, thank you
3  again, Wyn.  We appreciate your time.
4      (Discussion off the record.)
5      THE REPORTER:  I do need to get orders
6  on the record.
7      MS. BOBET:  We will read and sign for
8  any errata.
9      THE REPORTER:  And, Paul, are you
10  ordering the transcript?
11      MR. KERLIN:  Yes.  Our, just, usual
12  order.  Yeah, we get the same in all.
13      THE REPORTER:  And any hurry on the
14  final?  Any hurry on the timing of the transcript?
15      MR. KERLIN:  I don't think so.  I think
16  normal turnaround.  What would that be, about ten
17  days?
18      THE REPORTER:  Right now, this says
19  January 2.  I'm guessing it's because of the holidays,
20  but that's the last date that you would get it by.
21      MR. KERLIN:  That sounds fine.
22      THE REPORTER:  Okay.
23      MR. KERLIN:  Thanks again.
24      MS. BOBET:  Thank you.
25      WHEREUPON, the within proceedings were

Patrick Wynters Hornbuckle  30(b)(6)
December 15, 2022

Page 106

1  concluded at the approximate hour of 11:40 a.m.

2  Mountain Standard Time on the 15th day of December,

3  2022.

4        *      *      *      *      *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1            I, PATRICK WYNTERS "WYN" HORNBUCKLE, do

2  hereby certify that I have read the above and

3  foregoing deposition and that the same is a true and

4  accurate transcription of my testimony, except for

5  attached amendments, if any.

6            Amendments attached   ( ) Yes   ( ) No

7

8

9        _____

              PATRICK WYNTERS "WYN" HORNBUCKLE

10

11

12        The signature above of PATRICK WYNTERS

13  "WYN" HORNBUCKLE was subscribed and sworn or affirmed

14  to before me in the county of _____,

15  state of _____, this _____ day

16  of _____, 2023.

17

18

19        _____

              Notary Public

20        My Commission expires:

21

22

23

24

25  State of North Dakota 12/15/22 (tcm)

Page 108

1                REPORTER'S CERTIFICATE

2  STATE OF COLORADO      )
                          )  ss.
3  CITY AND COUNTY OF DENVER )

4

5        I, TRACY C. MASUGA, Registered
   Professional Reporter and Certified Realtime Reporter,
   do hereby certify that previous to the commencement of
6  the examination, the said PATRICK WYNTERS "WYN"
   HORNBUCKLE was duly sworn or affirmed by me to testify
7  to the truth in relation to the matters in controversy
   between the parties hereto; that the said deposition
8  was taken in machine shorthand by me at the time and
   place aforesaid and was thereafter reduced to
9  typewritten form; that the foregoing is a true
   transcript of the questions asked, testimony given,
10  and proceedings had.

11        I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
12  herein, nor otherwise interested in the outcome of
   this litigation.

13        IN WITNESS WHEREOF, I have affixed my
14  signature this 3rd day of January, 2023.

15

16

17  __X__  Reading and Signing was requested.

18  _____  Reading and Signing was waived.

19  _____  Reading and Signing is not required.

20        _____
21        Tracy C. Masuga
22        Registered Professional Reporter
          Certified Realtime Reporter

23

24

25

Page 109

1  Errata Sheet

2

3  NAME OF CASE: Plaintiff vs UNITED STATES

4  DATE OF DEPOSITION: 12/15/2022

5  NAME OF WITNESS: Patrick Wynters Hornbuckle

6  Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25        _____