Page 1

1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NORTH DAKOTA
2                 WESTERN DISTRICT

3   Civil No. 1:19-cv-00150-DMT-ARS

4   _____

    VIDEOTAPE DEPOSITION OF:  SALLY JEWELL - June 2, 2022
5                      (Via RemoteDepo)

6   _____

    STATE OF NORTH DAKOTA,
7
    Plaintiff,
8
    v.
9
    THE UNITED STATES OF AMERICA,
10
    Defendant.
11  _____

12

13          PURSUANT TO NOTICE, the videotape
    deposition of SALLY JEWELL was taken on behalf of the
    Plaintiff in Seattle, Washington, via remote means, on
14  June 2, 2022, at 8:29 a.m., Mountain Time, before
    Tiffany D. Goulding, Registered Professional Reporter
15  and Notary Public within Colorado, appearing remotely
    from Arapahoe County, Colorado.

16

17

18

19

20

21

22

23

24

25

Sally Jewell
June 02, 2022

2 to 5

## Page 2

```
 1              REMOTE APPEARANCES
 2    For the Plaintiff:
 3              PAUL M. SEBY, ESQ.
                Greenberg Traurig, LLP
 4              1144 15th Street, Suite 3300
                Denver, Colorado 80202
 5              sebyp@gtlaw.com
 6
      For the Defendant:
 7
                LOGAN STEINER, ESQ.
 8              V. WILLIAM SCARPATO III, ESQ.
                Special Attorney to the United States
 9              Attorney General
                United States Attorney's Office
10              District of Colorado
                1801 California Street, Suite 1600
11              Denver, Colorado 80202
                logan.steiner@usdoj.gov
12
13    Also Present:
14              Dustin Lamb, Videographer
                Tony Irish
15              Paul Kerlin
                Adrienne DiCerbo
16              Rachel Hymel
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2    EXAMINATION OF SALLY JEWELL:              PAGE
      June 2, 2022
 3
      By Mr. Seby                                 8
 4
 5                                            INITIAL
      DEPOSITION EXHIBITS:                   REFERENCE
 6
      (Exhibits provided electronically to the reporter.)
 7
      Exhibit  406  E-mail to Lee, Smith, Price, and    118
 8                  Vail from Crook, 8/8/16, Subject:
                    FWD: Follow Up from Lakota Youth
 9                  Runners Meeting
10    Exhibit  420  E-mail to Jackson, et al. from       191
                    Greer, 9/14/16, Subject: FWD:
11                  ND Delegation letter to DOJ, DOI,
                    Army Corps Re Dakota Access Pipeline
12
      Exhibit  486  E-mail to Roberts and Beaudreau      135
13                  from Jewell, 8/12/16, Subject:
                    Re: Tribal Chairman arrested for
14                  defending his homeland
15    Exhibit  487  E-mail to Darcy from Connor,         143
                    8/17/16, Subject:  Re: Dakota
16                  Pipeline
17    Exhibit  489  E-mail to Darcy from Connor          149
                    8/26/16, Subject:  Re: Dakota
18                  Pipeline
19    Exhibit  490  E-mail to Darcy, et al. from         153
                    Kinnison, 9/1/16, Subject: Oglala
20                  Sioux Tribe Requests Halt to Dakota
                    Access Easement
21
      Exhibit  491  E-mail to Roberts, et al. from       157
22                  Jewell, 9/7/16, Subject: Re:
                    President Obama
23
      Exhibit  492  E-mail to Jewell, et al. from        161
24                  Androff, 9/9/16, Subject: Joint
                    Statement on Dakota Access Pipeline
25
```

## Page 4

```
 1    Exhibit  493  E-mail to Schmauder, et al from      168
                    Hirsch, 9/9/16, Subject: Judge
 2                  Boasberg's Order/Opinion and Joint
                    Army/Interior/Justice Statement
 3
      Exhibit  494  E-mail to SRJ2@ios.doi. gov from     170
 4                  U.S. Department of Interior, 9/9/16,
                    Subject: Joint Statement from the
 5                  Department of Justice, The
                    Department of the Army and the
 6                  Department of the Interior
                    regarding Standing Rock Sioux Tribe
 7                  v. U.S. Army Corps of Engineers
 8    Exhibit  495  E-mail to Jewel from Roberts         180
                    9/11/16, Subject: Re: North Dakota
 9
      Exhibit  499  E-mail to Darcy, et al. from         198
10                  Jackson, 9/16/16, Subject: DAPL
                    Storyboard
11
      Exhibit  500  E-mail to Jewell, et al. from        202
12                  Beaudreau, 9/22/16, Subject: Re
                    September 23 Draft Weekly w SJ
13                  Edits
14    Exhibit  501  E-mail to Utech, et al. from         207
                    Crook, 9/22/16, Subject : Map of
15                  Oahe Crossing Area
16    Exhibit  502  E-mail to Perry, et al. from Hirsch, 212
                    9/22/16, Subject: Dakota Access
17                  Meeting with Standing Rock Sioux
                    Tribe
18
      Exhibit  504  E-mail to Darcy and Crook from       213
19                  Kelley, 9/23/16, Subject: Obama
                    agencies schedule tribal meetings
20                  amid Dakota Access controversy
21    Exhibit  505  E-mail to Beaudreau, et al. from     229
                    Jewell, 9/25/16, Subject: SJ TNC
22                  Speech - redline and latest clean
                    version
23
      Exhibit  507  E-mail to Darcy from Crook,          222
24                  9/30/16, Subject: FWD: DAPL
                    Assessment: 28 September
25
```

## Page 5

```
 1    Exhibit  509  E-mail to Darcy, et al. from         240
                    Kelley, 10/4/16, Subject: Response
 2                  to Mercer County Sheriff's Letter
                    re: Dakota Access protesters
 3
      Exhibit  516  E-mail to Darcy and Schmauder from   248
 4                  Crook, 10/14/16, Subject: FWD: LTG
                    Semonite Concern: DAPL Update
 5
 6    DEPOSITION EXHIBITS:  (Previously marked)
 7    Exhibit  318  E-mail to Fink, Henderson, and       203
                    Thomas from Startzell, 9/25/16,
 8                  Subject: Re: LE Update on Protest
                    Camps
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Object to designation of testimony as hearsay under FRE 801

Object to designation of testimony under FRE 401-402

Sally Jewell
June 02, 2022

6 to 9

Page 6

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4        *    *    *    *    *
5    THE VIDEOGRAPHER:  We are now on the
6  record.  Participants should be aware that this
7  proceeding is being recorded, and as such all
8  conversations held will be recorded unless there is a
9  request and agreement to go off the record.  Private
10  conversations and/or attorney-client interactions
11  should be held outside the presence of the remote
12  interface.
13    For the purpose of creating a
14  witness-only video recording, the witness is being
15  spotlighted or locked on all video screens while in
16  speaker view.  We ask that the witness not remove the
17  spotlight setting during the deposition, as it may
18  cause other participants to appear on the final video
19  rather than just the witness.  For anyone who doesn't
20  want the witness's video to take up the large part of
21  your screen, you may click the gallery view button in
22  the upper right-hand corner of the remote depo
23  interface.
24    This is the remote video-recorded
25  deposition of Sally Jewell being taken by counsel for

Page 7

1  the plaintiff.  Today is Thursday, June 2, 2022.  The
2  time is now 2:29 p.m. UTC, 8:29 a.m. Mountain.  We are
3  here in the matter of State of North Dakota versus the
4  United States of America.
5    My name is Dustin Lamb, remote video
6  technician on behalf of U.S. Legal Support.  I am not
7  related to any party in this objection nor am I
8  financially interested in the outcome.  At this time
9  will the reporter, Tiffany Goulding, on behalf of U.S.
10  Legal Support please enter the statement for remote
11  proceedings into the record.
12    THE REPORTER:  The attorneys
13  participating in this deposition acknowledge that I am
14  not physically present in the deposition room and that
15  I will be reporting this deposition remotely.  They
16  further acknowledge that, in lieu of an oath
17  administered in person, the witness will verbally
18  declare her testimony in this matter is under penalty
19  of perjury.  The parties and their counsel consent to
20  this arrangement and waive any objection to this
21  manner of reporting.
22    Please indicate your agreement by stating
23  your name and your agreement on the record.  Mr. Seby
24  first.
25    MR. SEBY:  Sure.  This is Paul Seby for

Page 8

1  the plaintiff, State of North Dakota, and I consent.
2    MS. STEINER:  This is Logan Steiner for
3  the United States defendant, and I consent.
4    THE REPORTER:  Ms. Jewell, I will also
5  ask you to agree and declare that the testimony you
6  are about to give will be under the penalty of
7  perjury.
8    THE DEPONENT:  Yes.  I consent.  My name
9  is Sally Jewell and I agree that this will be under
10  oath for my testimony.  Thank you.
11    SALLY JEWELL,
12  having verbally declared that her testimony in this
13  matter is under penalty of perjury, testified as
14  follows:
15    EXAMINATION
16  BY MR. SEBY:
17    Q.   All right.  Good morning, Ms. Jewell.  My
18  name is Paul Seby and I'm counsel for -- I'm an
19  attorney with the law firm of Greenberg Traurig, and
20  I'm also a special assistant attorney general for the
21  State of North Dakota.  And I represent the State of
22  North Dakota today.  And I will refer to the state as
23  "North Dakota" or "the state."
24    And this deposition, Ms. Jewell, is taken
25  pursuant to prior notice and agreement of counsel.

Page 9

1  And you understand that you've been sworn in this
2  morning, ma'am?
3    A.   I do.
4    Q.   Please state your full name for the
5  record.
6    A.   My legal name is Sarah, S-a-r-a-h,
7  Margaret Roffey, R-o-f-f-e-y, Jewell, J-e-w-e-l-l.  I
8  go by Sally Jewell.
9    Q.   Thank you.  Before we begin, I'd like to
10  go over a few ground rules for the deposition, most of
11  which are intended to help the court reporter take
12  down everything we say.  Okay?
13    A.   Fine.
14    Q.   Everything we say is being written down
15  and videotaped, and because of that I would ask that
16  you please verbalize your responses with a yes or no
17  or other answer as opposed to a physical gesture or
18  the like.  Also, please no "huh-uh" or "uh-huh," if
19  that's acceptable.
20    A.   That's acceptable.  Thank you.
21    Q.   Likewise, it's difficult for the court
22  reporter to take down what we are saying if we
23  inadvertently talk over one another.  So I will do my
24  best to not interrupt you, and if you would do the
25  same, that would be great.  And let me finish a

Page 10

1    question, if that's acceptable.

2         A.   That's acceptable.

3         Q.   Okay.  And, ma'am, if you need a break

4    this morning or when we get into the afternoon, just

5    let me know.  And the only consideration I'd ask is

6    that if there's a question pending, please first

7    complete your answer to the question, then we can take

8    whatever break is needed.  Otherwise, I suggest we

9    take a short break every hour or so.

10        If you happen to not understand a

11   question that I ask, just let me know also and I'm

12   happy to repeat it or rephrase it.  And I'll do my

13   best to clarify what I'm trying to ask you.  If you

14   answer a question I have asked, I'm going to assume

15   that you have understood the question I'm asking.  Is

16   that understood?

17        A.   That's understood.

18        Q.   Is anyone in the room with you this

19   morning?

20        A.   No.

21        Q.   And if you would, Ms. Jewell, turn off

22   your electronic devices so you are not distracted

23   during this deposition.  And are you relying upon any

24   documents in front of you this morning?

25        A.   No.

Page 11

1         Q.   Okay.  And, ma'am, do you understand that

2    you're obligated by oath to tell the truth today?

3         A.   I do.

4         Q.   Do you understand that your deposition

5    today has the same force and effect as if you were in

6    front of a judge or jury?

7         A.   I do.

8         Q.   Do you understand that portions of your

9    videotaped deposition may be played to the court if

10   this case were to go to trial?

11        A.   Yes, I understand.

12        Q.   Okay.  And, ma'am, do you understand that

13   if you fail to tell the truth today, that is

14   considered perjury?

15        A.   Yes.

16        Q.   To that end, is there anything today

17   preventing you from providing complete, accurate, and

18   truthful testimony?

19        A.   No.

20        Q.   Okay.  Ms. Jewell, do you have any

21   questions about these instructions or this morning's

22   deposition?

23        A.   No, I have no questions.

24        Q.   Okay.  Ms. Jewell, what did you do to

25   prepare for your deposition today?

Page 12

1         A.   I had an introductory meeting with

2    counsel and I had two preparatory sessions where they

3    helped me understand the documents that were being

4    used and just an understanding of what to expect in

5    this deposition.

6         Q.   And you had an introductory meeting with

7    counsel.  Which counsel did you meet with?

8         A.   Logan Steiner, Tony Irish, Bill Scarpato,

9    and Adrienne DiCerbo.  And they were not all at every

10   meeting, but over the three meetings that we had, one

11   or more of them were present for each of those

12   meetings.

13        Q.   And when was your introductory session

14   that you mentioned?

15        A.   I can consult my calendar, if you'd like.

16   You want me to do that?

17        Q.   Sure.

18        A.   Well, I had -- hang on.  I think it was

19   Wednesday, May 11, was the introductory meeting.

20        Q.   Okay.  And who was present with you for

21   that introductory meeting?

22        A.   I'll go actually to the date of that

23   meeting.  Hang on one second.  I recall it was Logan

24   Steiner, Adrienne DiCerbo, and Tony Irish.  I do not

25   believe Bill Scarpato was on that first call.

Page 13

1         Q.   I recognize Ms. Steiner's name, but I

2    don't recognize the other two individuals.  Who are

3    they with?

4         A.   They are attorneys representing the

5    Department of the Interior, and they are both on this

6    call with their videos off.

7         Q.   Okay.  Thank you.  And how long was your

8    meeting with the introductory session?

9         A.   Let's see.  It was scheduled for two

10   hours; and to my recollection, it went for that period

11   of time.

12        Q.   Okay.  And then you mentioned subsequent

13   meetings?

14        A.   Yes.  There was one on May 18.

15        Q.   How long did that last?

16        A.   Three hours.

17        Q.   And who was with you for that discussion?

18        A.   The same as the first call, plus Bill

19   Scarpato.

20        Q.   Okay.  And then did you have a third

21   session?

22        A.   I did.  It was on May 31.

23        Q.   And who was with you for that meeting?

24        A.   The same as the second meeting.

25        Q.   Okay.  Thank you, ma'am.  Did you talk to

Page 14

1  anyone else with respect to your preparations for this
2  meeting besides that group of people?
3      A.   I did not.
4      Q.   Okay.  Are you aware, Ms. Jewell, that
5  North Dakota has taken the sworn depositions of
6  several Corps individuals, individuals from the United
7  States Army Corps of Engineers and the Department of
8  the Army?  And have you spoken with any of those
9  individuals?
10     A.   I was made aware that there were others
11 being deposed.  I don't know what agencies and I have
12 not spoken with any of them.
13     Q.   Okay.  Thank you.  Did you say you
14 reviewed documents in preparation for your deposition
15 today?
16     A.   Counsel -- yes.  Counsel provided some
17 documents that they expect to be introduced in this
18 deposition today.
19     Q.   Okay.  Which documents are those?
20     A.   There was -- there were various.  I think
21 maybe two letters from a sheriff in North Dakota and
22 there was some e-mails.  I believe there was another
23 document, Department of the Interior document.  That's
24 about it.  There weren't a lot.
25     Q.   What was the Department of Interior

Page 15

1  document that you're referencing?
2      A.   I'm trying to remember.
3          MS. STEINER:  Objection.  This calls for
4  attorney-client-privilege information and I'm going to
5  instruct the witness not to answer.
6      Q.   (BY MR. SEBY)  Ms. Jewell, are you
7  referring to a document prepared for you by your legal
8  counsel?
9      A.   No.
10         MR. SEBY:  Okay.  Ms. Steiner, I don't
11 understand what the document is.  If it's
12 attorney-client privileged, I completely understand it
13 and will turn away from that, but it's not been
14 identified as such.  So I don't know if that objection
15 is even applicable.
16         MS. STEINER:  I am objecting that the
17 documents that counsel chose to review with the
18 witness, the choice of those documents is privileged
19 information.  And so I'm going to -- and attorney work
20 product.  So I'm going to instruct her not to discuss
21 the substance of those documents reviewed.
22         MR. SEBY:  I'm asking what the document
23 is.  I'm not asking about the substance, because I
24 don't know what it is.
25         MS. STEINER:  My objection stands.

Page 16

1      Q.   (BY MR. SEBY)  Ms. Jewell, are you going
2  to follow the advice of your counsel?
3      A.   I am.
4      Q.   Did you review any deposition transcripts
5  in preparation for today?
6      A.   No.
7      Q.   Did you do any research on your own about
8  the issues in this case?
9      A.   I did not.
10     Q.   Did you refer back to any notes or
11 e-mails or other records that you maintain?
12     A.   I did not.
13     Q.   So as was mentioned at the beginning,
14 this deposition pertains to an action brought by the
15 State of North Dakota in the United States District
16 Court for the District of North Dakota.  And it's an
17 action under the Federal Tort Claims Act against the
18 United States involving $38 million in damages that
19 the State of North Dakota seeks to recover as a result
20 of the United States' actions associated with the
21 protests against the Dakota Access Pipeline.  Do you
22 understand that, Ms. Jewell?
23     A.   I understand the broad topic as you've
24 explained it.  I have not read the specific complaint.
25     Q.   Okay.  Have you read any papers filed in

Page 17

1  connection with the case at all?
2      A.   The only paper I read was related to a
3  request for my deposition.
4      Q.   The notice for your deposition?
5      A.   Correct.
6      Q.   All right.  Are you aware otherwise that
7  the United States District Court for the District of
8  North Dakota denied a motion by the United States
9  seeking to dismiss this case?
10     A.   No, I was not aware.
11     Q.   Are you aware that the United States
12 District Court for the District of North Dakota denied
13 a motion for partial summary judgment filed by the
14 United States?
15     A.   No, I was not aware.
16     Q.   All right.  Are you aware that the United
17 States District Court for the District of North Dakota
18 granted the state's motion to compel discovery against
19 the United States beyond the Corps of Engineers?
20     A.   No.  I was not aware of the legal
21 proceedings leading up to this deposition.
22     Q.   Okay.  Are you aware that yesterday a
23 United States District Court judge magistrate denied a
24 motion by the United States seeking to limit your
25 deposition from seven hours to four hours?

Sally Jewell
June 02, 2022
18 to 21

Page 18

1      A.   I am aware of that.  I would have
2  appreciated a shorter deposition given the things on
3  my plate.
4      Q.   Yeah.  And the Court didn't find merit in
5  that.  So your deposition is allowed for up to seven
6  hours today, if that's understood.
7      A.   That's understood.
8      Q.   Yeah.  Ms. Jewell, could you give me some
9  background about yourself.  Where are you from, ma'am?
10      A.   How far back would you like me to go,
11  sir?
12      Q.   Where are you from?  Where did you
13  originate?  Where were you born?
14      A.   I was born in London, England, in 1956.
15  My parents immigrated to the United States in 1959.
16  So I was a small child.  We moved to Seattle,
17  Washington, and that is where I grew up.  I attended
18  Renton High School, the University of Washington,
19  moved away to -- after earning my degree in mechanical
20  engineering to the oilfields of southern Oklahoma and
21  later Denver, Colorado, and then moved back to
22  Seattle, which is where I continued the bulk of my
23  career.  So there you go.
24      Q.   What did you do in the oil and gas
25  industry?

Page 19

1      A.   I was a petroleum engineer in the
2  oilfield in southern Oklahoma and then what they
3  called a "special projects engineer" working on
4  planning, budgeting, acquisitions and dispositions of
5  oil and gas properties when I moved to Denver.  And
6  that's the position that I was in when I chose to
7  leave the company to move back to Seattle.
8      Q.   In your time in Denver you were employed
9  by a private company as well?
10      A.   Yes.  It was all with Mobil Oil
11  Corporation at that time.  Later merged with Exxon,
12  but it was Mobil Oil at that time.
13      Q.   Sure.  And your position in Denver was
14  for how many years?
15      A.   Total time with Mobil was three years,
16  one year as a field engineer -- I think field
17  production engineer.  I said petroleum engineer.  It
18  was field production engineer, I think, was the
19  technical title, and then two years as a special
20  projects engineer in Denver.
21      Q.   And then you moved to Seattle after that,
22  you said?
23      A.   That's correct.
24      Q.   Did you stay within the oil and gas
25  industry or did you transition?

19:8-12
FRE 401-402

Page 20

1      A.   I was hired by Rainier Bank to be an
2  expert in valuing collateral for energy loans.  And so
3  I did practice engineering for the bank.  I was an
4  assistant vice-president, slash, petroleum engineer.
5  I worked with companies around the United States that
6  were seeking loans and as well as with other banks
7  that were seeking participants in the loans they
8  originated in the energy sector broadly, but
9  particularly to oil and gas.
10      Q.   Okay.  And then how long did you have
11  that position with Rainier Bank?
12      A.   The time I was there was -- I moved back
13  to Seattle in 1981, and that was a time of tremendous
14  growth in the oil and gas portfolio followed by a
15  rapid decline.  So I was in that position and was
16  lauded not for making loans but for turning loans
17  down.
18          So after, I'd say, roughly a two-year
19  period -- two- to three-year period, I extended my
20  portfolio to banking in general, became a team leader
21  in the national banking group, so broadened beyond
22  doing more of the engineering work to doing pure
23  commercial banking.  And then my career was as a
24  commercial banker until I left that profession in
25  2000.

Page 21

1      Q.   And then what did you do?
2      A.   I had been on the board of directors of
3  REI, Recreational Equipment, Incorporated, a retailer
4  of outdoor gear and apparel around the country.  And I
5  was asked to join the organization as chief operating
6  officer, executive vice-president and chief operating
7  officer.  So I joined REI as an employee in 2000 and
8  subsequently became its CEO in 2005.
9      Q.   And then you had that position for how
10  long, Ms. Jewell?
11      A.   I had that position until I left to join
12  the Obama administration as U.S. Secretary of the
13  Interior.
14      Q.   And, Ms. Jewell, do you currently reside
15  in Seattle?
16      A.   I do.
17      Q.   How about your education from college
18  through completion?
19      A.   I have a bachelor's degree in mechanical
20  engineering from the University of Washington earned
21  in 1978.  That's the only degree that I hold post high
22  school graduation.  It's the only degree I hold.  I've
23  had multiple courses, you know, in business and
24  finance to help prepare me for my various jobs, but I
25  hold no other degrees other than a bachelor of science

21:1-8
FRE
401-402

Sally Jewell
June 02, 2022                                           22 to 25

Page 22

1  in mechanical engineering.
2       Q.   And your --
3       A.   There are honorary degrees that I've been
4  granted, of which there are four honorary doctorates,
5  but I'm not counting those.
6       Q.   And then your government service,
7  Ms. Jewell, that was exclusively as United States
8  Secretary of the Interior?
9       A.   That's correct.
10      Q.   And would you please remind me the dates
11  of that service.
12      A.   I was nominated in early February of
13  2013.  I was confirmed by the U.S. Senate in mid-April
14  and then sworn in shortly thereafter.  I want to say
15  the date was April 12 or 13 that I was sworn in.  And
16  I served in that capacity until the end of President
17  Obama's term.  So that would have ended with the
18  inauguration of President Trump in January of 2017.  I
19  think it was the 20th or 21st of January of 2017.
20      Q.   And what have you done since you left the
21  Department of Interior?
22      A.   My husband and I left Washington, D.C.,
23  by car and took a three-month-long road trip to
24  decompress after a very intense four years in
25  Washington, D.C.  When we returned to Seattle, I

Page 23

1  prepared to begin a fellowship with Harvard
2  University's Kennedy School of Government as a
3  resident fellow in the institute of politics, along
4  with five other resident fellows.
5            So in the fall of 2017, we moved to
6  Cambridge, Massachusetts, for three and a half months
7  or so, where I worked with students very closely,
8  hosted nine study groups along with the other resident
9  fellows.  Would you like me just to continue the
10  entire period from then until now?
11      Q.   If you would, that would be great just to
12  have you just walk us through that.
13      A.   Sure.  So I completed that in December of
14  2017.  I then joined the University of Washington as a
15  distinguished fellow in its college of the
16  environment.  Technically that began in March of 2018.
17  I continued in that role for -- until August of 2019,
18  but I had provided notice.  And that was technically a
19  half-time role.
20            In the midst of that I joined -- I can't
21  remember exact timing on boards, but I joined two
22  corporate boards, Symetra Financial Corporation, which
23  is a life insurance company, and Green Diamond
24  Resources Company, which is a good-sized privately
25  owned timber company.  Symetra is also privately

Page 24

1  owned.  It's a wholly owned subsidiary of Sumitomo
2  Life in Japan, so two corporate boards at that point.
3            In June of 2019 -- I had been serving
4  voluntarily as a board member of the nature
5  conservancy.  In June of 2019, because of a relatively
6  abrupt leadership transition, I volunteered to step
7  forward and lead the organization, if that was the
8  will of the board, which it was.  So I took over as
9  interim chief executive officer of the nature
10  conservancy globally.
11            In mid-June of 2019 -- and I did that
12  part time until September in order to wind down my
13  other activities at the University of Washington to be
14  able to make space.  So I worked in that role full
15  time until May of 2020, when we hired a permanent CEO.
16            I think it was in January of that year,
17  2020, I joined the Costco Wholesale Corporation board
18  of directors.  And I still serve on that board, along
19  with Symetra and Green Diamond.  Those are my
20  corporate boards.  I also continue to serve on the
21  board of the nature conservancy, but stepped down as
22  interim CEO when the permanent CEO was hired in May of
23  2020.
24            Today I am in another position at the
25  University of Washington, which I've held since July

Page 25

1  of last year.  It's an adjunct faculty position called
2  Fritzky Chair in Leadership.  That role will end in
3  July of this year.  I'll remain as adjunct faculty.
4  Both of those roles are not paid.  They're voluntary.
5       Q.   Okay.  So you've had a full plate since
6  you left being the secretary?
7       A.   Yes, I have.
8       Q.   Does that complete your answer to the
9  question about post-government service?
10      A.   Yes.
11      Q.   Okay.  Thank you.  With respect to your
12  cabinet-level position with the Obama administration,
13  how did that position, Ms. Jewell, relate to the
14  Dakota Access Pipeline generally?
15           MS. STEINER:  Objection; vague.
16      A.   Would you like to make it more specific?
17      Q.   (BY MR. SEBY) I can.  As secretary of the
18  interior, how did your position in that capacity
19  relate to the development of and siting of the Dakota
20  Access Pipeline?
21      A.   The role of the Department of the
22  Interior as it related to the Dakota Access Pipeline
23  was predominantly as a -- as the agency that is most
24  closely associated with upholding trust and treaty
25  obligations to Native American tribes, and in this

Page 26

1   case the Standing Rock Sioux Tribe.
2           We were notified by the tribe that they
3   felt that they had not been adequately consulted by
4   the pipeline company on the placement of the pipeline.
5   And they conveyed concerns through the Department of
6   the Interior that they felt that the pipeline had
7   impacts on the tribe that had not been adequately
8   considered by the pipeline company and they wanted to
9   rectify that.
10          So the role of the Department of the
11  Interior in these kinds of matters is the agency that
12  tribes often look to as their advocate within the
13  federal government to ensure that those obligations,
14  which are treaties between a sovereign nation, the
15  United States, and a sovereign nation in this case,
16  the Standing Rock Sioux Tribe, that we uphold the
17  treaty obligations we have with them.
18          So that was the primary role of the
19  Department of the Interior.  It wasn't on the pipeline
20  location specifically.  It was on the process followed
21  and whether the tribe was appropriately consulted.
22      Q.  Okay.  With respect to that capacity, how
23  did you personally as secretary of the interior
24  participate in that scope that you explained?
25          MS. STEINER:  Objection; assumes facts.

Page 27

1       A.  Would you like to restate that?
2       Q.  (BY MR. SEBY) No.  I think the question
3   is fairly straightforward.  It's asking you, you, as
4   secretary of the interior, as per your explanation
5   with regard to the department's role, how did you
6   participate as secretary in the implementation of that
7   role?
8       A.  I recall having a conversation with
9   Chairman Archambault of the Standing Rock Sioux Tribe
10  about his concerns that the pipeline route was
11  damaging sacred sites that were off the reservation,
12  but in their ancestral homelands.  He also conveyed
13  concerns to me about the risk of spills into Lake
14  Oahe, which is the primary water supply.
15          My relationship with Chairman Archambault
16  goes back to a visit that I made to his reservation.
17  And I don't remember the year, but it was early to mid
18  my tenure, I'm guessing 2014 or '15, and it was
19  related largely to schools.  But he talked about the
20  history of Lake Oahe and how the original Army Corps'
21  plan to dam the river was downstream and that the
22  settler families, the farming families, in I believe
23  it was the 1950s did not want their farmland flooded
24  and so it flooded the farmlands of the Standing Rock
25  Sioux Tribe.

Page 28

1           And so I just remember in our
2   conversation about -- knowing about the lake and
3   knowing that under the lake were burial grounds and
4   farms that had been on their original reservation had
5   been flooded.  So we had a relationship from my visit
6   before.
7           And President Obama also made a visit to
8   the reservation, which was well documented.  I think
9   that was 2015.  So the chairman and I knew each other.
10  And he shared his concerns with me, but also shared
11  them with others who took the primary responsibility
12  for investigating the situation, and, you know,
13  communicating as appropriate with other agencies.
14      Q.  Were you also in any communication with
15  Ms. Jodi Gillette?
16      A.  I mean, I was in communication with Jodi
17  on things such as the Tribal Nations Conference, but
18  not specific to the Standing Rock and Dakota Access
19  Pipeline, I don't believe.  I think she had left her
20  role with the Obama administration by the time that
21  happened.
22          So I know Jodi.  We worked together on
23  the president's visit and on other -- on the White
24  House Council on Native American Affairs and other
25  things, but I do not recall any other conversations

Page 29

1   with her that were related to the situation with the
2   pipeline.
3       Q.  So you were familiar with Ms. Gillette
4   and interacted with her, but nothing with regard to
5   DAPL or the DAPL protests.  Is that what your
6   testimony is?
7       A.  That is to the best of my recollection.
8   I don't remember having any calls with Jodi that
9   related to this issue.
10      Q.  And by "this issue," you're referring to
11  what?
12      A.  The Dakota Access Pipeline and the
13  protests associated therewith.
14      Q.  Okay.  And when you are referring to the
15  Department of Interior role as an advocate with
16  respect to Native American tribes and treaty interests
17  and obligations with regard to the Standing Rock Sioux
18  Tribe Nation, which treaty rights and interests are
19  you referring to having -- being relevant to your role
20  regarding the Dakota Access Pipeline?
21      A.  Typically tribes have formal sovereign
22  treaty obligations with the United States government.
23  I don't know what specific treaty was signed or if a
24  treaty was signed with the U.S. government, but there
25  is a formal relationship.  And I would rely on my team

Sally Jewell
June 02, 2022                                    30 to 33

Page 30

1   members in the Indian Affairs -- in this case it would
2   have been Larry Roberts -- along with the solicitor's
3   office that deals with Indian Affairs to understand
4   specifically the legal issues with those contracts --
5   I mean, with those treaties.
6           However, as a federally recognized tribe,
7   which the Standing Rock Sioux is, we have agreements
8   on what we must do.  And that's true for any kind of
9   action on their lands.  And that is, in this case,
10  tribal consultation.  And, you know, that was the
11  issue -- the concerning issue that was expressed by
12  Chairman Archambault in this situation when they
13  requested that we work with them on advocating for
14  appropriate consultation.
15      Q.   Okay.  And with respect to that advocacy
16  for appropriate consultation, to whom were you
17  advocating?  Who was the audience for your advocacy in
18  that capacity?
19      A.   I'm speaking not personally, but about
20  the role of the Department of the Interior.
21      Q.   Yes.
22      A.   So I did not personally advocate with any
23  entity on the outside.  I don't know -- I mean, the
24  company that would be required to consult would be the
25  pipeline company.  I know that there were questions

Page 31

1   about whether they had appropriately consulted.
2           Somewhere during the process, I became
3   aware of the Corps' role -- the Army Corps of
4   Engineers' role in permitting the water crossing of
5   the pipeline.  And so at some point -- and I don't
6   know exactly when -- my teammates were working with
7   the Corps on ensuring that the Corps was aware of what
8   the U.S. federal government's obligations were with
9   regard to tribal consultation and upholding the
10  National Environmental Policy Act and so on.
11      Q.   Okay.  Ms. Jewell, are you aware of the
12  permitting and siting process that was associated with
13  the Dakota Access Pipeline?
14      A.   I was peripherally aware.  My chief of
15  staff indicated to me that the Corps needed to provide
16  a permit for crossing the water body and that there
17  were questions about whether an appropriate
18  environmental analysis or environmental impact
19  statement had been done.
20           I believe the pipeline, for the most
21  part, crossed -- well, I don't know the property
22  ownership of the pipeline route.  I know that it
23  crossed sacred sites as determined by the tribe.  I
24  don't know if those were on private land or who the
25  landowner was, but I was aware during this process

Page 32

1   that the Corps' permit would be required to cross the
2   water body.
3      Q.   Yeah.  How about the nonfederal
4   permitting and siting and consideration of the Dakota
5   Access Pipeline?  Are you aware of that process?
6           MS. STEINER:  Objection; vague, compound.
7      Q.   (BY MR. SEBY) Please answer.
8      A.   I'm peripherally aware of the process,
9   not deeply aware.
10      Q.   Okay.  Are you aware of which entity
11  conducted that siting analysis and consideration for
12  the land-based route of the Dakota Access Pipeline?
13      A.   I don't know specifically.  I will say my
14  understanding from conversations was that there was a
15  route considered north of Bismarck that people
16  objected to upstream of the water supply of Bismarck
17  and that a second route was selected that was close --
18  that was less direct that bent south of Bismarck, but
19  ran very close to Standing Rock Sioux Tribe land and
20  was to cross a lake, a much larger water body, than
21  the Missouri River at an upstream location.
22           You know, who the landowners were along
23  that route, I'm not aware.  I do know that if sites
24  are crossed that are important to tribal communities
25  that they require consultation.  And that's the

Page 33

1   portion of this that really involved my awareness and
2   my peripheral engagement, as I've referenced before.
3      Q.   How about what is your understanding of
4   the State of North Dakota's role with respect to the
5   Dakota Access Pipeline siting?
6           MS. STEINER:  Objection; lack of personal
7   knowledge.
8      Q.   (BY MR. SEBY) Please answer.
9      A.   I don't know what the role of the State
10  of North Dakota is.
11      Q.   So are you aware at all of the
12  several-month-long proceeding that was held by the
13  Public Service Commission of the State of North
14  Dakota?
15           MS. STEINER:  Objection; mischaracterizes
16  the evidence, lack of personal knowledge.
17      Q.   (BY MR. SEBY) Ms. Jewell?
18      A.   I'm not aware of the process you're
19  talking about.
20      Q.   Okay.  Are you aware of whether the
21  Department of Interior participated in that Public
22  Service Commission process?
23           MS. STEINER:  Objection; vague.
24      Q.   (BY MR. SEBY) Ms. Jewell?
25      A.   I'm not aware.

33:3-10
FRE
401-402
; 602

33:11-19
FRE
401-402;
602

33:20-22
FRE 106;
401-402;
602

Sally Jewell
June 02, 2022

34 to 37

**34:1-12**
**FRE**
**401-402;**
**602**

**35:15-24**
**FRE 611**

**ND OBJ:**
Non-Responsive;
Introduces new
material

---

Page 34

1  Q.   Are you aware of the manner of
2  participation by the Standing Rock Sioux Tribe in the
3  State of North Dakota Public Service Commission
4  process?
5       MS. STEINER:  Objection; lack of personal
6  knowledge.
7  Q.   (BY MR. SEBY) Ms. Jewell?
8       A.   Chairman Archambault indicated that there
9  was some participation in some process by the tribe
10  and that they did not feel that they had been listened
11  to or heard.  I don't know if that's the process you
12  referenced or something else.
13       Q.   Okay.  But you don't know which process
14  he may have been referring to?
15       A.   I don't know.
16       Q.   Okay.  How about the participation by any
17  other federal agency in the state Public Service
18  Commission process?
19       MS. STEINER:  Objection; assumes facts
20  not in evidence, lack of personal knowledge.
21       Q.   (BY MR. SEBY) Ms. Jewell?
22       A.   I don't know.
23       Q.   Okay.  Did you do any other personal
24  investigation into the state's permitting and siting
25  process or did you direct any Department of Interior

Page 35

1  personnel to investigate that?
2       MS. STEINER:  Objection; vague, compound.
3       Q.   (BY MR. SEBY) Ms. Jewell?
4       A.   I don't remember any discussion.
5       Q.   That's fine.  I'm just trying to
6  understand the process.  Did you ever personally or
7  direct Department of Interior representatives to
8  investigate that process with the Army Corps of
9  Engineers?
10       MS. STEINER:  Objection; vague, assumes
11  facts.
12       A.   I personally did not direct anything of
13  that nature.  I can't speak to what my teammates may
14  have investigated.
15       Q.   (BY MR. SEBY) Okay.  All right.  I'd like
16  to ask a bit more about your position as a
17  cabinet-level secretary.  Ms. Jewell, as a secretary
18  in the president's cabinet, if I may ask, who do you
19  feel you report to in that capacity?  That's an
20  awfully senior position and in the executive branch of
21  the United States government.  Who would your boss be
22  at that point?
23       A.   My boss would technically be the
24  President of the United States.
25       Q.   Of course, yeah.

Page 36

1       A.   The president, regardless of who's in the
2  role, is an extremely busy person.  And so I think
3  it's fair to say that cabinet members coordinated on a
4  regular basis with members of the White House team.
5       Q.   Would that be the Executive Office of the
6  President?
7       A.   Yes, but there are many people in the
8  Executive Office of the President.  I would say the
9  primary contacts would be the chief of staff, the
10  deputy chief of staff.  There's oftentimes a -- I
11  don't know even know what the title was.  There were
12  people in the president's office that helped focus on
13  certain portfolios that he had and would be more
14  familiar with one area than the other.
15       So we would interact with those sorts of
16  people who would have greater familiarity and would
17  join the president in strategic discussions with us
18  because they would have, you know, more knowledge on a
19  specific lane, given the breadth of the president's
20  responsibilities.
21       Q.   Sure.  Sure.  And, Ms. Jewell, with
22  respect to your capacity as secretary of the interior,
23  on matters concerning the Dakota Access Pipeline, who
24  did you liaison with then at the White House on that
25  topic?

Page 37

1       A.   We provided weekly summaries of
2  activities for all activities to the White House.  I
3  don't know who the audience was for that.  I presume
4  the president saw it.  And that would cover, you know,
5  major matters that might come to his attention or
6  might be, you know, in the public's eye to ensure the
7  White House was aware.  So in terms of liaise -- did
8  you ask me about liaising regularly?  I'm sorry.  I
9  can't remember the whole question.
10       Q.   No problem.  I was asking about who
11  you -- the word seems a bit off calibration with
12  regard to this as being a cabinet-level secretary, but
13  when you -- and I was asking who your boss was, and
14  obviously it's the president.  And you were explaining
15  because the president is a very busy individual that
16  he has a staff that helps with the coordination and
17  communication with cabinet secretaries and agencies.
18  And I understand that.
19       So my question then was, when you were
20  secretary of the interior, concerning matters related
21  to the Dakota Access Pipeline, who were your principal
22  contacts with at the Executive Office of the
23  President?
24       A.   I don't recall having specific
25  conversations with people at the White House about the

Page 38

1    Dakota Access Pipeline situation.  However, as I
2    mentioned, we did provide a weekly update and there --
3    because of the activities, the camp that was
4    generated, the protests that were generated, it was in
5    the news media.  And so our team -- communications
6    team would have been in touch with the White House
7    press office to ensure that they were aware of what
8    was going on.
9              What's key in operating an entity as
10   large as the U.S. federal government is that there are
11   no surprises, but I also will say that the White
12   House, in the case of the Dakota Access Pipeline,
13   allowed the agencies to do their jobs and to work in
14   their respective areas of responsibility.  And it was
15   not a situation where the White House was providing
16   direction to us.  Our job was to keep them informed,
17   and we did that generally through this weekly process.
18        Q.   Okay.
19        A.   One amendment.  Karen Diver was the
20   tribal liaison for the president.  I don't recall
21   specific conversations with Karen on this, but I
22   suspect -- but she would have been interested because
23   of the nature of the tribal engagement --
24        Q.   And that's Karen --
25        A.   -- and the White House Office of the

Page 39

1    President.  Excuse me.
2         Q.   Pardon me.  I just was going to ask the
3    name.  Karen Diver, D-i-v-e-r?
4         A.   Correct.
5         Q.   Okay.  Was there anyone else that stands
6    out like Ms. Diver who was a principal point of
7    contact?
8         A.   No.  And even in the case of Karen, I
9    don't recall having conversations with her about this,
10   but given her role, she would have been informed.  And
11   we were in touch on a variety of things.  And I don't
12   recall specifically whether this came up, but it would
13   have been likely.  She replaced Jodi Gillette as the
14   president's primary liaison with native communities.
15        Q.   Okay.  And how about Valerie Jarrett?
16   Did you ever speak or interact with her with regard to
17   the Dakota Access Pipeline issues?
18             MS. STEINER:  Objection; assumes facts
19   not in evidence.
20        A.   I do not recall discussing this with
21   Valerie.  It doesn't mean that it happened or it
22   didn't happen.  I just don't remember this as
23   something that we talked about.
24        Q.   (BY MR. SEBY) Was it also your
25   responsibility as secretary of the interior to liaison

Page 40

1    with other federal agencies?
2              MS. STEINER:  Objection; vague.
3         Q.   (BY MR. SEBY) Ms. Jewell?
4         A.   When we had intersecting interests, it
5    was common that we worked together.  At the
6    president's direction there was an entity created at
7    the beginning of my term called the White House
8    Council on Native American Affairs, which was a
9    council that I chaired.
10             It was -- it brought together the cabinet
11   secretaries and sometimes their designees, but very
12   high-level members from multiple agencies across the
13   federal government.  And the topics were to help
14   educate the whole federal government about their roles
15   in upholding trust and treaty obligations to tribes.
16             So in that context, we had periodic
17   meetings, you know, three, four times a year and had
18   specific areas of focus.  For example, tribal
19   education, partnership with the Department of
20   Education and others, environmental cleanup.  EPA was
21   involved.
22             Transportation, Department of
23   Transportation was involved, rural development,
24   broadband, Department of Agriculture was involved, and
25   of course Health and Human Services, which has the

Page 41

1    Indian health service, and substance abuse and mental
2    health agency were involved in terms of health care.
3    So there was regular interaction between cabinet
4    secretaries and their designees as it related to
5    tribal issues.
6         Q.   Was the Department of the Army involved
7    in that task force?
8         A.   I don't believe that Defense Secretary
9    Carter -- Ash Carter joined for the meetings, but
10   certainly Department of Defense did have engagement
11   with tribal communities.  I don't believe the Corps of
12   Engineers participated, but I don't actually remember
13   who was attending those meetings.
14             As it relates to the Dakota Access
15   Pipeline situation at Standing Rock, my teammates were
16   in touch with the Army Corps of Engineers around
17   ensuring that they knew what our government's
18   responsibility was to the tribes.  So I know that
19   there were contacts between Interior and the Army
20   Corps, but they're not -- those were not meetings that
21   I was typically involved in.
22        Q.   So were you the chair of the White House
23   Council on Native American Affairs in 2016?
24        A.   I was.
25        Q.   And then you held that position through

Page 42

1 the end of the Obama administration, did you?

2      A.   I did.

3      Q.   And during that period of time, 2016

4 through the end of your -- the president's term, did

5 you have the Dakota Access Pipeline topic ever on your

6 agenda for the meetings of the White House Council on

7 Native American Affairs?

8           MS. STEINER: Objection; vague, assumes

9 facts not in evidence.

10      Q.   (BY MR. SEBY) Ms. Jewell?

11      A.   I don't even know if we had a meeting of

12 the council during that final period. If we did, I

13 would be -- it would not have been likely that this

14 would have been a topic on that agenda. The president

15 held a White House Tribal Nations Conference every

16 year of his presidency, and that would have included

17 in the fall of 2016.

18           And so the White House Council on Native

19 American Affairs was -- the people that worked at it

20 at the agencies were involved in engaging their folks

21 in that event. So that would have taken up most of

22 our time with regard to the council in that final year

23 of President Obama's presidency, but I do not recall

24 what was specifically on the agenda, nor when we met

25 during that year of 2016.

Page 43

1      Q.   But is it your testimony that the council

2 did not meet in the year of 2016 other than in

3 conjunction with the tribal conference that the White

4 House held?

5           MS. STEINER: Objection; misstates the

6 evidence.

7      A.   No, that is not my recollection. I am

8 pretty confident that we met over the course of the

9 year. I do not believe we would have had the Dakota

10 Access Pipeline as a topic, but I do not remember when

11 we met, nor what the agendas were. And those would

12 all be a matter of the public record. I just don't

13 have them and I don't know.

14      Q.   (BY MR. SEBY) Sure. Otherwise the

15 council worked on planning and preparation for the

16 tribal conference?

17           MS. STEINER: Objection; misstates the

18 evidence.

19      A.   And that's not what I said either. I

20 said there were multiple areas of focus that the

21 council had, that the Tribal Nations Conference

22 typically took place in the fourth quarter -- well,

23 calendar quarter of the year. And so there would have

24 been preparations for that, but I do not recall

25 whether the council itself met or whether people

Page 44

1 associated with the council were working on the Tribal

2 Nations Conference.

3           It feels, you know, kind of off topic.

4 The main areas of focus of the White House Tribal

5 Nations Conference were helping the agencies across

6 the government recognize that they had

7 responsibilities to tribes. That council collectively

8 came up with the areas that needed greatest focus and

9 we had consultation with tribes in that process.

10           And those involved some of the areas I

11 mentioned before around health care, education,

12 transportation, economic development, and so on. So I

13 do not recall that body discussing the Dakota Access

14 Pipeline. It doesn't mean it didn't come up. I just

15 don't remember.

16      Q.   (BY MR. SEBY) Thank you. Thank you for

17 that clarification. Do you recall your participation

18 in the Tribal Nations Conference in 2016?

19      A.   Yes, I think so. I mean, I participated

20 in every Tribal Nations Conference. What's not clear

21 to me is what was in '16 or '15 or '14 or '13. And I

22 know we had a youth gathering as well, a native youth

23 conference around that time.

24           So I just can't remember exactly what

25 happened in 2015 -- or '16, rather, versus the other

Page 45

1 years, but I believe there was a Tribal Nations

2 Conference. I absolutely would have participated.

3 And I'm sorry I didn't, you know, go back and look for

4 information on that or even -- I mean, it's in the

5 photographic record, but that's about it.

6      Q.   Sure.

7      A.   Yeah.

8      Q.   But you do recall participating in the

9 Tribal Conference -- Tribal Nations Conference in 2016

10 at the White House?

11      A.   I believe I participate -- I believe

12 there was a Tribal Nations Conference in 2016. I

13 absolutely would have participated. They're just kind

14 of running together. And I know we were running a

15 youth conference, and I believe it was the same year.

16 And there was a lot going on.

17           So I'm sorry. I'm just trying to -- I

18 don't want to get tripped up and have you say, Well,

19 the Tribal Nations Conference was different or it was

20 just a youth conference. There were a lot of things

21 going on to recognize our responsibilities with tribes

22 at that time. I believe there was a Tribal Nations

23 Conference. I would have participated actively. I

24 just don't remember exactly what was happening at that

25 very busy time.

Sally Jewell
June 02, 2022                                    46 to 49

Page 46

1      Q.   Sure.  Yeah.  There's no effort to trip
2  you up.  I'm just trying to ask about your capacity as
3  secretary of the interior and the things that you
4  worked on while you were secretary.  2016 was the last
5  year of your tenure?
6      A.   Correct.
7      Q.   So I was just asking if you had
8  recollections.  As the last Tribal Nations Conference
9  you would have participated in, did you recall whether
10  or not the Dakota Access Pipeline was a topic of that
11  conference?
12      A.   I don't recall.
13      Q.   Okay.  We can talk about it later, but
14  you gave a speech at that conference, and I want to go
15  over your dialogue with your Department of Interior
16  staff in preparing for that speech and show you your
17  own speech and where you led off with the Dakota
18  Access Pipeline as the topic.  We can come to that in
19  a moment.  I just wanted to kind of explain that
20  that's the context for these questions, is to
21  understand the manner in which you brought that up as
22  secretary of the interior.
23           So when your interactions -- you were
24  explaining a moment ago about your interactions with
25  the White House.  Did you also participate in any

Page 47

1  capacity with President Obama's domestic policy
2  council?
3      A.   Yes.  Cecilia Munoz was head of the
4  Domestic Policy Council, and there were a number of
5  interactions that we had with them over my tenure.
6      Q.   And what was the title of Ms. Munoz's
7  position as head of the White House Domestic Policy
8  Council?
9      A.   I believe it was director of the Domestic
10  Policy Council, but I actually am not sure what her
11  title was.  But she was the head of it, as you pointed
12  out.
13      Q.   Okay.  How about was there a chief of
14  staff position as well?
15      A.   The president had a chief of staff that
16  was Denis McDonough.
17      Q.   He was the big cheese chief of staff?
18      A.   Yeah.
19      Q.   Did you interact with him at all with
20  respect to the Dakota Access Pipeline?
21      A.   I don't recall direct interactions with
22  Denis on the Dakota Access Pipeline.  It doesn't mean
23  that we didn't have conversations about it.  I just
24  don't recall any specifically.
25      Q.   How about an individual by the name of

Page 48

1  Kathleen Ferguson?
2      A.   I don't remember.  Her name is familiar,
3  but I don't recall what interactions I might have had
4  with her.  Sorry.
5      Q.   That's -- I appreciate you telling me
6  that.  How about in terms of your role that you
7  explained about advocating for tribal interests?
8  Being an advocate, you're advocating to someone.
9  Who -- with regard to DAPL, who was the target of your
10  advocacy?  I use "target" as recipient or audience.
11  That's the question, if you can help me understand
12  that better.
13           MS. STEINER:  Objection; mischaracterizes
14  the evidence.
15      Q.   (BY MR. SEBY) Please.
16      A.   I may have used the word "advocate."  I
17  believe I did.  I'm not sure that appropriately
18  characterizes the role of the Department of the
19  Interior.  What I was trying to convey is that part of
20  the role of the Department of the Interior is to raise
21  awareness among groups that would be required to do
22  tribal consultation that this was actually an
23  expectation of our role as part of the federal
24  government.
25           So an appropriate audience for that would

Page 49

1  be anyone that would perhaps -- how do I want to say
2  this? -- anyone who would be taking actions that might
3  require that consultation.  So in the case of the
4  Dakota Access Pipeline, I don't know if the Army Corps
5  had a consultation role in terms of the pipeline
6  route, but it did have a role in doing appropriate
7  environmental review and conducting NEPA, National
8  Environmental Policy Act, analysis on the crossing of
9  the water body.
10           And that would also involve tribal
11  consultation.  So that's the primary audience that
12  Interior would have had.  And I know we did have
13  conversations to make sure they were aware of the U.S.
14  government's responsibility to the tribe in terms of
15  the environmental review and the tribal consultation.
16      Q.   Okay.  And so the audience, then, for the
17  Department of Interior's participation -- and I'm
18  trying not to use the word "advocacy" because I think
19  you've cautioned that that's probably too strong of a
20  word.
21      A.   Yeah.  It's the wrong word, really.  It's
22  more education and awareness and ensuring people know
23  what our responsibilities are.  So in many cases, the
24  tribe looks to the Department of the Interior to raise
25  awareness with other entities of our obligations as

Page 50

1   the federal government to the tribe.
2       Q.   And then you indicated with respect to
3   the Dakota Access Pipeline, you were fairly confident
4   that the Corps had such a role in the process for
5   considering whether or not to grant approvals for the
6   river crossing for the Dakota Access Pipeline; is that
7   fair?
8            MS. STEINER:  Objection; mischaracterizes
9   the evidence.
10      Q.   (BY MR. SEBY) Ms. Jewell.
11      A.   Just to be clear, I relied on my
12  teammates who were those in contact with others,
13  including the Army Corps of Engineers.  So I am not
14  deeply familiar with all the ins and outs of the law
15  and the consultation requirements.  That's why I rely
16  on others.  It's my understanding that we had
17  conversations with the Army Corps relating to their
18  responsibilities to the tribe in this process, but the
19  specifics of those discussions is something that I was
20  not involved in directly.
21      Q.   In your capacity as secretary of the
22  interior, how did you interact with secretary of the
23  army Eric Fanning, if at all?
24           MS. STEINER:  Objection; assumes facts.
25      Q.   (BY MR. SEBY) Ms. Jewell?

Page 51

1       A.   I don't recall interacting with Eric
2   Fanning.  In fact, I'm not sure that I've ever met
3   him.
4       Q.   Okay.  How about with the defense
5   secretary, Ash Carter, concerning DAPL?  Did that ever
6   come up as a topic of communication between the two of
7   you, verbally or otherwise?
8       A.   I don't recall having a conversation with
9   Secretary Carter about the pipeline.  Doesn't mean
10  that it might not have come up incidentally, but I
11  don't recall such a conversation.
12      Q.   Do you ever recall making any asks or
13  requests of Secretary Carter?
14           MS. STEINER:  Objection; vague.
15      Q.   (BY MR. SEBY) Concerning the Dakota
16  Access Pipeline, of course.
17      A.   I don't recall making any requests
18  directly of Secretary Carter.  I believe our -- my
19  department's interactions were largely with the Army
20  Corps, not moving it up the chain.
21      Q.   Okay.  In your capacity as secretary of
22  the interior, what was your relation relative to the
23  career military professionals in the Corps of
24  Engineers?  And I can give you some names if that
25  helps.

Page 52

1            MS. STEINER:  Objection; vague.
2       Q.   (BY MR. SEBY) Ms. Jewell, the chief of
3   the engineers at that time was Lieutenant General Todd
4   Semonite.  Does that name ring a bell?
5       A.   Not really.
6       Q.   Okay.  Major Ed Jackson?
7       A.   No.
8       Q.   Brigadier General Scott Spellmon?
9       A.   No.
10      Q.   Okay.  Colonel Henderson?
11      A.   His name is familiar.  I don't recall
12  having a conversation with him or meeting with him.
13      Q.   Okay.  So you mentioned you had several
14  advisers and that, of course, is the case with a
15  cabinet-level secretary.  What role in the Dakota
16  Access Pipeline federal consideration and approval
17  process or the DAPL protests did Deputy Secretary
18  Michael Connor at the Department of Interior have?
19           MS. STEINER:  Objection; lack of personal
20  knowledge, compound, vague.
21      Q.   (BY MR. SEBY) Ms. Jewell?
22      A.   In general, Mike Connor -- in general, I
23  do not recall Mike Connor being deeply involved in the
24  situation with Standing Rock and the Dakota Access
25  Pipeline.  He certainly would have been informed.  He

Page 53

1   and I met regularly, but the primary points of contact
2   were different than Mike Connor in this situation.
3       Q.   So you don't recall him having much of a
4   role or not deep -- I mean, I think you said "deeply
5   involved."  How about shallowly involved or any manner
6   in between?  I'm just trying to gauge was he just kept
7   apprised of it or was he given any responsibilities
8   relative to the topic?
9            MS. STEINER:  Objection; vague, compound.
10      Q.   (BY MR. SEBY) I'm sorry, Ms. Jewell.  I
11  didn't hear you.
12      A.   My primary points of contact were my
13  chief of staff and the head of Indian Affairs on the
14  Dakota Access Pipeline.  Mike Connor as deputy
15  secretary of the interior would have been well
16  informed, but I don't know the degree to which he was
17  working with my colleagues on this directly.
18           For the most part, he and I had other
19  pressing topics that we discussed.  And, you know,
20  this is not one that I recall Deputy Secretary Connor
21  being as involved with as some other issues, but I
22  don't remember the nature of all of our conversations.
23  We worked together on many things.
24      Q.   Okay.  Do you recall him bringing the
25  protests to your attention in mid-August of 2016?

Sally Jewell
June 02, 2022                                              54 to 57

Page 54

1          MS. STEINER:  Objection; assumes facts
2   not in evidence.
3          A.   I don't remember who brought the protests
4   to my attention and when exactly that was.
5          Q.   (BY MR. SEBY) All right.  With respect to
6   your team, did you rely upon them to receive
7   information concerning the Dakota Access Pipeline and
8   the protests?
9          MS. STEINER:  Objection; vague.
10         A.   I relied on my team to basically receive
11  all incoming information, not just specific to this,
12  but as you might imagine, it's an enormous job, 70,000
13  employees, ten bureaus, other activities, and there
14  are -- there's a lot of incoming.  So typically that
15  was -- anything of that nature, unless it was
16  immediate or life-threatening, would have been brought
17  to other people's attention before it came to my
18  attention.
19         Q.   (BY MR. SEBY) Of course.  And with
20  respect to the DAPL-related issues, is it your
21  testimony that you principally relied upon Larry
22  Roberts, Lawrence Roberts, and Tommy Beaudreau?
23         MS. STEINER:  Objection; misstates the
24  evidence.
25         Q.   (BY MR. SEBY) Ms. Jewell?

Page 55

1          A.   Tommy Beaudreau was my chief of staff.
2   Larry Roberts was leading Indian Affairs.  He was
3   technically the principal deputy assistant secretary,
4   but the assistant secretary before him had left and so
5   he was acting in that capacity.  They both were
6   important advisers through this process as it related
7   to the Standing Rock Sioux Tribe and the Dakota Access
8   Pipeline.
9              There would have been other people that I
10  would also have spoken with, including a solicitor of
11  the Department of the Interior, Hilary Tompkins, and
12  likely others, but please understand there was a lot
13  going on at this period of time.  I think we also had
14  the armed occupation of the Malheur National Wildlife
15  Refuge.
16             There were a lot of things happening.
17  And so I can't remember specifically all the names of
18  the people that were involved in the Dakota Access
19  Pipeline, but it is fair to say that Tommy Beaudreau
20  and Larry Roberts were the most frequent close staff
21  members that were keeping me informed on this issue.
22         Q.   And would those be your principal
23  representatives that you dispatched to interact with
24  the Army Corps of Engineers?
25         MS. STEINER:  Objection; assumes facts

55:22-56:9
FRE 602, 611

Page 56

1   not in evidence.
2          A.   I relied on them to keep me informed of
3   the process.  I don't know who was speaking with the
4   Army Corps directly, nor exactly who at the Army Corps
5   they were speaking with.  They were reporting to me
6   that there were conversations with the Army Corps.  I
7   don't -- you know, how much of that might have been
8   direct by Mr. Beaudreau or Roberts, I'm not exactly
9   sure.
10         Q.   (BY MR. SEBY) What direction did you give
11  those individuals, Ms. Jewell, when you were secretary
12  with respect to the Department of Interior's positions
13  for interacting with the Army Corps of Engineers?
14         MS. STEINER:  Objection; assumes facts
15  not in evidence, vague.
16         A.   The direction that I would give as
17  secretary of the interior would be to uphold the law.
18  That is my obligation as a public servant, and that
19  means all aspects of the law, you know, what is the
20  law in this case.  My team understood our obligations.
21  So I was not giving them direction different than
22  what, in their judgment, they believed were upholding
23  our responsibilities as the Department of the
24  Interior.  And I trusted them to do that.
25         Q.   (BY MR. SEBY) Okay.  Other than that

Page 57

1   broad charge, did you tell them that you wanted any
2   certain outcomes or goals accomplished or achieved in
3   interacting with the Army Corps of Engineers?
4          MS. STEINER:  Objection; misstates the
5   evidence.
6          A.   We shared an objective to make sure that
7   the law was upheld and that the appropriate process
8   was followed, and that related largely to tribal
9   consultation and environmental reviews.
10         Q.   (BY MR. SEBY) And that would be all
11  aspects of the law, right, not just certain ones, but
12  all aspects?  That's obviously the charge?
13         MS. STEINER:  Objection; misstates the
14  evidence.
15         A.   Can you help me understand what you're
16  trying to get at?
17         Q.   (BY MR. SEBY) I'm just trying to
18  understand the scope when you say of course your
19  direction was to your Department of Interior staff to
20  uphold the law.  And I'm just asking, by that do you
21  mean all aspects of the law?
22         MS. STEINER:  Objection; vague, misstates
23  the evidence.
24         A.   Let me be specific in what I'm referring
25  to in this case.

Sally Jewell
June 02, 2022                                    58 to 61

Page 58

1    Q.   (BY MR. SEBY) Okay.
2    A.   Tribal consultation is an obligation of
3  the U.S. federal government and other entities to
4  tribes.  And that's a key element that was at play
5  with the Dakota Access Pipeline, and environmental
6  review, which is the National Environmental Policy
7  Act.  That is specifically what I'm referring to in
8  this case.
9    Q.   All right.  And so you were aware, then,
10 that senior Department of Interior representatives,
11 including the assistant secretary, were communicating
12 with assistant secretary of the army Jo-Ellen Darcy
13 and her principal deputy?
14       MS. STEINER:  Objection; assumes facts
15 not in evidence.
16    Q.   (BY MR. SEBY) Is that fair to say?
17    A.   Which assistant secretary are you
18 referring to in your question?
19    Q.   I indicated, assistant secretary of the
20 army, Jo-Ellen Darcy.
21    A.   Before you that said assistant secretary
22 as it related to interior.
23    Q.   I'm sorry.  Yes.  Assistant secretary of
24 the interior, Mr. Connor.
25    A.   Mike Connor was deputy secretary of the

Page 59

1  interior.
2    Q.   I apologize.  I apologize.  By assistant
3  secretary I was referring to Lawrence Roberts.
4    A.   And he was not technically assistant
5  secretary.  He was acting in that capacity.  I just
6  want to make sure.  There are multiple assistant
7  secretaries.  There's only one deputy secretary.
8  Larry Roberts was the -- I don't know if he was
9  technically the acting assistant secretary or the
10 principal deputy assistant secretary.  And I say this
11 because you can only have a person in an acting role
12 for a certain number of months.
13    Q.   I see.
14    A.   And so I'm not trying to be difficult
15 here.  I'm just trying to explain.  It would be
16 helpful if you'd use the person's name so I know
17 specifically who you're referring to.
18    Q.   Yes.  Lawrence -- Larry Roberts.
19    A.   Yeah.  I do not know who spoke with
20 Jo-Ellen Darcy at the Army Corps.  I don't know
21 whether Mike Connor spoke to her or Larry Roberts
22 spoke to her or Tommy Beaudreau spoke to her or all
23 three of them.  I do know that my teammates were
24 involved in conversation with her, and I probably was
25 informed at the time, but I just don't remember.

Page 60

1    Q.   Okay.  You personally, what kind of
2  interaction did you have with the Army Corps of
3  Engineers regarding DAPL?
4        MS. STEINER:  Objection; assumes facts
5  not in evidence.
6    Q.   (BY MR. SEBY) To the extent you had any,
7  Ms. Jewell.
8    A.   I don't recall having a meeting with
9  Jo-Ellen Darcy about this.  I do know that on occasion
10 we would see each other at events and it would have --
11 the topic may well have come up, but I don't remember
12 and I don't have my calendar from that period of time.
13 So I was not personally involved in these discussions
14 around the role of the Army Corps and the Dakota
15 Access Pipeline and the tribe with Jo-Ellen Darcy.
16    Q.   So I asked about communications with
17 Ms. Darcy and you responded you don't recall meeting
18 with her.  How about communicating with her in other
19 manners?  Any other manner of communication with
20 Ms. Darcy?
21    A.   I may have.  I don't remember.  You know,
22 if I did, it would have been most likely e-mail, but I
23 don't remember.
24    Q.   Okay.  And which period of time would you
25 have been e-mailing with Ms. Darcy?

ND OBJ:
Introduces new
material

Page 61

1        MS. STEINER:  Objection; vague.
2    Q.   (BY MR. SEBY) If you did.  I'm just
3  trying to ask a question tied to your response.
4    A.   I remember infrequent communications with
5  her over the four years that I was in office.  We had
6  a cordial relationship, but we didn't have a lot of
7  interaction.  So I don't remember specifically.  There
8  were other projects the Army Corps was involved in
9  like restoring the Everglades and the channel -- you
10 know, removing the channelization of the rivers
11 leading to the Everglades and so on.  So there were
12 various reasons for us to connect, but yeah, I just
13 don't remember specifics.  It's not like we were
14 regular pen pals.
15    Q.   Yeah.  How about would your staff at the
16 Department of the Interior share with you information
17 from the Corps of Engineers concerning the DAPL
18 situation?
19       MS. STEINER:  Objection; vague.
20    A.   Can you help me understand what you mean
21 by --
22    Q.   (BY MR. SEBY) I'm just trying to
23 understand.  Were they given free rein to go with
24 their charge to uphold the law regarding tribal
25 consultation and NEPA, as I understood you to have

Sally Jewell
June 02, 2022
62 to 65

Page 62

1  said, and did they keep you posted along the way or
2  occasionally or did they share information with you
3  that came from the Corps?  I'm just trying to
4  understand how your staff, given the charge that you
5  gave them, provide feedback to you?
6          MS. STEINER:  Objection; vague, compound.
7          Q.   (BY MR. SEBY) Ms. Darcy.  Ms. Jewell.
8  Excuse me.  Pardon me.
9          A.   My staff was in regular touch with me on
10  all kinds of matters.  The chief of staff, if I was in
11  town, would have been daily.  I was out of town a lot
12  in the role.  We did, as I mentioned, a weekly update
13  to the White House on issues of importance.
14          And during the time of, you know, a lot
15  of media coverage around the Dakota Access Pipeline,
16  that would have been a fairly regular topic.  And I
17  was in contact with my team about the content of those
18  messages, generally reviewed them, might have edited
19  them if I felt something warranted editing.  When it
20  comes to specific -- review of specific documents
21  related to the Army Corps, that is not typically the
22  kind of detail I would have been involved with.
23          Q.   Yeah.  But you were involved in the
24  review and editing of weekly reports to the White
25  House; is that accurate?

Page 63

1          MS. STEINER:  Objection; misstates the
2  evidence.
3          Q.   (BY MR. SEBY) Ms. Jewell?
4          A.   If I was available and in town, typically
5  I would review the message before it went to the White
6  House.  That wasn't always the case.  So it depended.
7          Q.   Sure.  Who would construct those for your
8  review?
9          MS. STEINER:  Objection; vague.
10          A.   I'm not sure who-all had their hands on
11  those.  I know by the time they got to me they had
12  been reviewed by a number of people.  And I think
13  typically Tommy Beaudreau as chief of staff would have
14  had his eyes on them and I think it would have
15  originated within his staff, which would have included
16  a broad group of people, but I don't know specifically
17  who had the pen.  I suspect the pen was shared
18  depending on the topic and then synthesized into what
19  I saw.
20          Q.   (BY MR. SEBY) Okay.  Do you recall when
21  you raised DAPL-related concerns to the White House?
22          MS. STEINER:  Objection; assumes facts
23  not in evidence, misstates the evidence.
24          A.   I don't remember.
25          Q.   (BY MR. SEBY) Would it have been prior to

Page 64

1  the protests?
2          MS. STEINER:  Objection; vague, misstates
3  the evidence.
4          A.   I don't know.
5          Q.   (BY MR. SEBY) Okay.  Did you ever
6  interact with the attorney general of the United
7  States?
8          MS. STEINER:  Objection; vague.
9          A.   I knew both Attorney General Holder and
10  Attorney General Lynch as cabinet colleagues.
11          Q.   (BY MR. SEBY) Of course.  Did you ever
12  interact with them on matters concerning the Dakota
13  Access Pipeline?
14          MS. STEINER:  Objection; vague.
15          A.   I don't recall having a conversation with
16  Attorney General Lynch about the pipeline.  It doesn't
17  mean it might not have come up incidentally, but it
18  would have been others if there were interactions
19  between DOJ and Department of the Interior generally.
20          Q.   (BY MR. SEBY) Did you receive any
21  directives from the Executive Office of the President
22  concerning the Department of Interior's positions or
23  determinations on the Dakota Access Pipeline?  In
24  other words, did anyone in the White House and the
25  executive office direct you to take certain measures

Page 65

1  or positions?
2          MS. STEINER:  Objection; vague, compound.
3  And I'll instruct you not to answer to the extent that
4  executive privilege is implicated; but if you can
5  answer without implicating that privilege, you can go
6  ahead and answer.
7          Q.   (BY MR. SEBY) Ms. Jewell?
8          A.   I do not recall the White House providing
9  directives relating to this issue.
10          Q.   Are you aware, Ms. Jewell, whether the
11  White House and the Executive Office of the President
12  ever instructed the Department of the Army, or the
13  Army Corps of Engineers in particular, to indicate
14  that all decisions concerning the DAPL approval or
15  consideration process belonged primarily to you?
16          MS. STEINER:  Objection; vague, compound,
17  misstates the evidence.  I'll instruct you not to
18  answer to the extent that answering may implicate
19  executive privilege.  If you can answer without
20  implicating that privilege, you can answer.
21          A.   No.
22          Q.   (BY MR. SEBY) You do not recall ever --
23  such instruction ever being issued?
24          MS. STEINER:  Same objections.
25          Q.   (BY MR. SEBY) I'm just trying to

Page 66

1   understand your answer.  No?  No, you do not recall?
2        A.   No, I do not recall.
3             MR. SEBY:  Okay.  Ms. Jewell, it's the
4   top of the hour and we've been going for an hour and a
5   half.  Would you permit a ten-minute break?  Go off
6   the record, Ms. Steiner?
7             MR. STEINER:  Yes.  Fine by me.
8             MR. SEBY:  Okay.  We'll return at ten
9   minutes past.  Thank you.
10            THE VIDEOGRAPHER:  Going off the record.
11   The time is 3:59 p.m. UTC, 9:59 a.m. Mountain.
12            (Recess taken, 9:59 a.m. to 10:10 a.m.)
13            THE VIDEOGRAPHER:  We are back on the
14   record.  The time is 4:10 p.m. UTC, 10:10 a.m.
15   Mountain.
16        Q.   (BY MR. SEBY) Ms. Jewell, we're back on
17   the record after a short break.  I want to ask you
18   about now some more questions concerning the Dakota
19   Access Pipeline protests.  Do you recall speaking with
20   the governor of the state of North Dakota during the
21   protests?
22        A.   I do.  I had a relationship with Governor
23   Dalrymple from earlier visits to the state.  So, yes,
24   I do recall having a conversation with him.
25        Q.   And the relationship and earlier visits,

**66:25-67:13**
**FRE 401-402**

Page 67

1   can you elaborate on what those involved?
2        A.   I made my first visit to North Dakota
3   associated with the oil and gas industry there in the
4   Bakken area.  And I believe I met with the governor at
5   that time.  There was another subsequent visit.  I
6   know that Senators Hoeven and Heitkamp also -- I don't
7   recall how many visits.
8             I also saw the governor at the Western
9   Governors Association meetings which were held at
10   least once a year.  And we worked on things like the
11   protection of the Sagebrush Sea and the ecosystem
12   associated with the greater sage grouse.  So we had
13   multiple opportunities to interact.
14        Q.   Sure.  The first visit, you said that
15   pertained to oil and gas issues?
16        A.   That's my recollection.  The memory that
17   I have most vivid was having lunch with him and
18   drawing on a back of a napkin how fracking worked on
19   wells and, you know, what concerns and risks were and
20   also some of the equipment that we've seen out in the
21   field.  So, you know, with my background as an
22   engineer in oil and gas, he asked, you know, how this
23   all worked.  So I was helping explain that to him.
24        Q.   Was that in connection with a regulatory
25   initiative that you were pursuing at the time?

**67:14-23**
**FRE 401-402**

Page 68

1             MS. STEINER:  Objection; assumes facts
2   not in evidence.
3        Q.   (BY MR. SEBY) Ms. Jewell?
4        A.   I don't remember a regulatory issue being
5   primary.  It was more of a visit to the state to
6   understand the state and the energy activity that was
7   happening there.  That was my recollection, but I
8   don't have a complete recollection of the visit.  But
9   I do not remember the discussion being regulatory in
10   nature.
11        Q.   And then at that time did you talk about
12   the Dakota Access Pipeline at all?
13            MS. STEINER:  Objection; vague.
14        A.   I don't remember talking about the Dakota
15   Access Pipeline.
16        Q.   (BY MR. SEBY) Okay.  And then you
17   mentioned seeing the governor with other governors at
18   the meetings of the Western Governors Association.
19   How about any other in-person visits to the state of
20   North Dakota?
21        A.   I had a few visits.  I don't recall how
22   many.  I referenced previously that I had visited the
23   Standing Rock Sioux Tribe I believe twice, once on
24   education, the other when President Obama was there.
25   And I think I only had a meeting with the governor of

Page 69

1   North Dakota in North Dakota that one time.
2             And whether it was associated with the
3   visit to the rig or not, I can't specifically recall,
4   but I think we only sat down one on one or whatever --
5   not one on one, but had lunch together and discussed
6   things once that I recall outside of, you know, just
7   interacting at the Western Governors Association
8   meetings.
9        Q.   Okay.  Then when the DAPL events rolled
10   around, do you recall speaking with the governor by
11   telephone or other means?
12        A.   I do recall speaking with the governor by
13   phone.
14        Q.   And who initiated that communication?
15        A.   I don't recall whether I initiated it or
16   he initiated or somebody else did, but, you know, I
17   did want to speak with him.
18        Q.   Sure.  Sure.  And that call, one of you
19   called the other, and was it a call that had to be
20   arranged or was it a contact that was immediate?
21        A.   I don't remember.
22        Q.   Okay.  And that call was concerning the
23   Dakota Access Pipeline issues?
24        A.   Yes.  It's concerning the protests and
25   the camp related to the Dakota Access Pipeline

Page 70

1  situation.

2       Q.   Which camps are you referring to?

3           MS. STEINER:  Objection; misstates the

4  evidence.

5       A.   There were a growing number of protesters

6  that were well-documented in the media originally

7  camped out on Standing Rock Sioux land.  And, you

8  know, as more people arrived there were concerns.  And

9  I wanted to discuss with the governor how we handled

10  that in a way that did not escalate the situation.

11       Q.   (BY MR. SEBY) And speaking with the

12  governor on that topic, how did that relate to your

13  role as secretary of the interior?

14           MS. STEINER:  Objection; vague.

15       A.   I mentioned before that I had a

16  relationship with the governor from prior

17  interactions.  I was concerned about how the state

18  might react that could inflame tensions, and I felt

19  that my relationship with the governor was such that I

20  could convey that in a respectful and thoughtful way

21  and have a conversation to both listen to his

22  perspective but also share my perspective.

23       Q.   (BY MR. SEBY) Sure.  And did you feel as

24  though that occurred when you spoke with the governor?

25           MS. STEINER:  Objection; vague.

Page 71

1       A.   I recall having a conversation with him.

2  I feel as though he heard me, but I don't feel that he

3  gave me any conclusions about what he planned to do.

4  So it was a respectful call, but a call that did not

5  have what I expected as an outcome.

6       Q.   (BY MR. SEBY) What were your expectations

7  for an outcome?

8       A.   I was concerned that a strong and visible

9  response, particularly if it involved the national

10  guard, would inflame tensions, would invoke the

11  well-known tribal/U.S. federal army conflicts of the

12  past, and that to keep the protests peaceful and in

13  line with the First Amendment rights that we should be

14  very careful about those responses because they could

15  escalate actions.  So my request to the governor was

16  that any response be very measured so as not to create

17  escalation.

18       Q.   Okay.  Do you recall when that particular

19  conversation took place?

20       A.   I don't recall.

21       Q.   And you said you listened to what the

22  governor had to say.  Do you recall what that was?

23       A.   I recall the governor expressing concerns

24  about highway closures, access, about fears from

25  private property owners.  Those were the kinds of

**ND OBJ:** Introduces new material

Page 72

1  things that he expressed.  And I believe we spoke

2  about law enforcement and I believe -- I don't

3  remember the specifics, but shared the role that we

4  were playing in law enforcement on the reservation as

5  BIA law enforcement officers on scene.

6       Q.   And do you recall what the governor asked

7  of you?

8           MS. STEINER:  Objection; assumes facts

9  not in evidence.

10       A.   I don't remember specific requests.  I

11  got the impression the governor just wished the

12  situation would go away.

13       Q.   (BY MR. SEBY) Do you recall whether the

14  governor asked you to provide any enhanced federal law

15  enforcement assistance with the protests?

16           MS. STEINER:  Objection; vague, assumes

17  facts not in evidence.

18       A.   I recall the governor being concerned

19  about escalation and asking for help in preventing

20  that.  I don't recall specific requests.  Again, I

21  think it was very clear from our conversation that he

22  just wished the situation would go away.

23       Q.   (BY MR. SEBY) Which situation are you

24  referring to?

25       A.   The protests associated with the Dakota

**72:13-22** Calls for hearsay, FRE 801

Page 73

1  Access Pipeline and the escalation of more people

2  arriving.

3       Q.   But you don't recall when that

4  conversation took place?

5       A.   I don't.

6       Q.   Okay.

7       A.   There would be record of that at

8  Interior.

9       Q.   Yes.  Did you make any representations to

10  the governor in terms of what you might do as

11  follow-up to that call?

12           MS. STEINER:  Objection; assumes facts.

13       A.   I don't recall making, you know, any

14  commitments to the governor.  I recall explaining to

15  him, you know, the efforts that we had underway.

16       Q.   (BY MR. SEBY) What were those efforts

17  underway that you explained?

18       A.   The role of the Department of the

19  Interior in this situation was as law enforcement for

20  the Standing Rock Sioux Reservation.  Part of our

21  obligations as the federal government are around

22  safety and security of tribal communities.  Tribes can

23  do that themselves or they can rely on the federal

24  government through the Bureau of Indian Affairs, and

25  that was the case here.

Sally Jewell
June 02, 2022

Page 74

1   So the BIA, Bureau of Indian Affairs, law
2   enforcement specific role was to keep people safe on
3   the reservation and the -- that included the camp as
4   it began on the reservation.  They provided law
5   enforcement services.  And we actually took people
6   from other parts of the BIA and I believe other parts
7   of Interior to help beef up those forces so that the
8   standard law enforcement activities could continue,
9   but also they could uphold the law with the additional
10  surge of people that came that were associated with
11  the protests.

**74:12-23 FRE 602**

12      Q.   Okay.  Are you aware of whether the
13  protest camps in mid-August of 2016 and later on for
14  several months occurred on lands other than the
15  Standing Rock Sioux Tribe Reservation?
16          MS. STEINER:  Objection; vague, lack of
17  personal knowledge, misstates the evidence.
18      A.   I don't know the footprint of the camp or
19  the timing of that footprint.  I don't know the
20  landownership.  I do know that it began on the
21  reservation and there was a time when it was on Corps
22  land, but I don't know the timeline or the specific
23  landownership.

**74:24-75:7 Calls for hearsay, FRE 611**

24      Q.   (BY MR. SEBY) Okay.  Do you recall the
25  governor explaining to you that protest camps that

Page 75

1   became very large were located on lands managed by the
2   Army Corps of Engineers as part of the Oahe project?
3          MS. STEINER:  Objection; assumes facts
4   not in evidence.
5       A.   I don't recall the governor speaking to
6   that.  It doesn't mean he didn't.  I just don't
7   remember.
8       Q.   (BY MR. SEBY) Do you know when you first
9   learned that the camps were located on Corps of
10  Engineers property?
11          MS. STEINER:  Objection; misstates the
12  evidence.
13      A.   I don't remember.
14      Q.   (BY MR. SEBY) Do you recall, Ms. Jewell,
15  when the DAPL protesters first became physically
16  present on Corps-managed lands?
17          MS. STEINER:  Objection; assumes facts
18  not in evidence.
19      A.   I don't know.
20      Q.   (BY MR. SEBY) Do you recall from whom you
21  first learned that that was the case?
22          MS. STEINER:  Objection; vague, assumes
23  facts not in evidence.
24      A.   I don't recall who told me who the owners
25  were of the land that the camp was on or when or

Page 76

1   anything.  I didn't have that kind of information,
2   that detailed information.
3       Q.   (BY MR. SEBY) Did you ever -- do you ever
4   recall obtaining that information?
5          MS. STEINER:  Objection; asked and
6   answered.
7       A.   I don't know the landownership or the
8   location of the camps.  I don't know.
9       Q.   (BY MR. SEBY) Through the period of the
10  protests that was the case or just it's foggy at the
11  beginning, or was that your understanding for the rest
12  of your tenure?
13          MS. STEINER:  Objection; compound, asked
14  and answered.
15      A.   I know it started on the reservation.  I
16  know it migrated to land that included Corps land.
17  There could have been private lands.  It is not clear
18  to me where I got the information.  I certainly was
19  reading press accounts at the time and my staff was
20  informing me along the way, but you're asking for
21  specific dates and where the camp was located and I
22  cannot answer those kinds of questions.  I don't know.

**76:23-77:12 FRE 602, 611**

23      Q.   (BY MR. SEBY) I understand.  I
24  understand.  From all of that, is it fair to say that
25  you know that the camp protests started on Standing

Page 77

1   Rock Sioux Tribe Reservation land and that it later
2   migrated to Corps land?  Is that a fair understanding
3   of what you said?
4          MS. STEINER:  Objection; misstates the
5   evidence.
6       Q.   (BY MR. SEBY) Ms. Jewell?
7       A.   It's not a fair characterization because
8   I assume it also remained on tribal land.  I don't
9   know the footprints of the camp, whether it expanded,
10  whether it moved, what the ownership was underneath
11  the camp's footprint.  So I stand with what I've said
12  before.
13      Q.   Okay.  All right.  But you do know that
14  it migrated onto -- perhaps not exclusively, but
15  migrated onto Corps of Engineers property?
16          MS. STEINER:  Objection; misstates the
17  evidence, asked and answered.
18      A.   I stand by what I've said before.
19      Q.   (BY MR. SEBY) All right.  What
20  significant DAPL protest events do you recall?
21          MS. STEINER:  Objection; vague.
22      Q.   (BY MR. SEBY) Ms. Jewell?
23      A.   I'm thinking.
24      Q.   Sure.  Take your time.  I just wanted to
25  make sure that you understood my question.

Page 78

1      A.   You asked what DAPL protest information I
2  recall; is that correct?
3      Q.   Let me rephrase it.  What stands out in
4  your mind today, 2022, from your memory of that time
5  period?  What stands out in your mind regarding the
6  DAPL protests?
7           MS. STEINER:  Objection; vague.
8      A.   What stands out in my mind is that this
9  was a largely peaceful protest of what began to be a
10  tribe raising awareness of its rights.  And I thought
11  that it began as a very good illustration of our
12  country's commitment to First Amendment rights and
13  freedom of speech and the ability of people to convey
14  their feelings.  So that's my memory of, you know,
15  what stands out in my mind associated with this.
16           I will say that over time it got much
17  larger and I believe that there were other interests
18  that came to gain visibility for their causes.  And
19  that became difficult for the tribe to handle.  I
20  think that what they intended to do was raise
21  awareness of their rights, and I think that they did
22  that through their First Amendment rights at the
23  beginning as conveying their position as protectors of
24  their water supply.
25      Q.   (BY MR. SEBY) The comment you made about

Page 79

1  the protests got much larger and other interests came
2  to gain visibility for causes, who are you referring
3  to?
4           MS. STEINER:  Objection; vague.
5      Q.   (BY MR. SEBY) Ms. Jewell?
6      A.   Over the course of time, I recall
7  concerns being expressed by the tribe about the number
8  of people and the ability to continue to draw
9  attention to their primary efforts, which were the
10  safety and security of their water supply and tribal
11  consultation.
12           You know, news media reports were pretty
13  clear that there were celebrities involved.  There
14  were others that in some ways, I think, weren't
15  necessarily fully in understanding of the original
16  purpose that the tribal members had for conveying
17  their concerns about the pipeline and its location.
18      Q.   And what "others" are you referring to?
19  What other interests are you -- do you have any in
20  mind that you've been referring to?
21      A.   I think that there were -- I don't have
22  specific groups.  Okay.  I don't know who-all was
23  there.  I don't know who-all they represented.  So I'm
24  providing my own assessment of the situation which
25  were, there were some there that were using that

Page 80

1  situation to gain attention to a cause that they cared
2  about that may be different than what the tribe cared
3  about.
4           The tribe's objection and concern related
5  to the Dakota Access Pipeline passing under their
6  water supply and impacting their sacred sites.  That
7  was the tribe's concern and that was the purpose of
8  the people who protested to begin with.  I think there
9  were others that had other agendas, and this was a
10  large audience.
11           And so I don't know who all those groups
12  were, but I just sense from the news media and so on
13  that people were there that didn't necessarily align
14  fully with what the tribe's interests were.  And that
15  was -- you know, there were people there that, you
16  know, were there perhaps for other reasons to gain
17  attention to causes that they cared about.
18      Q.   What other agendas and interests that
19  they cared about different than the Standing Rock
20  Sioux Tribe's interests are you aware of and referring
21  to?
22           MS. STEINER:  Objection; lack of personal
23  knowledge, calls for speculation.
24      Q.   (BY MR. SEBY) Ms. Jewell?
25      A.   It does call for speculation.  I don't

Page 81

1  know who-all was there.  I do know from talking to my
2  team, who was in touch with Chairman Archambault and
3  others, that there were people there that, you know,
4  were not associated with the tribe and didn't
5  necessarily understand the tribe's interests, but what
6  they were advocating for, I can't speak to.
7      Q.   All right.  And is it accurate that all
8  of your understandings about those things stemmed from
9  reports you were provided by your staff and your team?
10           MS. STEINER:  Objection; misstates the
11  evidence.
12      A.   My team was an important source of
13  knowledge for me, but also I was reading the news
14  media.  So, you know, I can't remember specifically
15  what came from a meeting with a staff member, what
16  came from, you know, a briefing memo, what came from
17  reading news accounts; but certainly this was front
18  and center in the news on a regular basis.  So I was
19  following it closely.
20      Q.   (BY MR. SEBY) Were you ever provided with
21  any manner of information, briefings, reports by the
22  United States Department of Justice?
23           MS. STEINER:  Objection; vague, compound.
24      A.   I don't recall anything, you know, one
25  way or the other that I might have had from the

Page 82

1  Department of Justice.  Nothing sticks out in my
2  memory.
3       Q.   (BY MR. SEBY) Do you recall ever having
4  any briefings on the camps by the Federal Bureau of
5  Investigation?
6       A.   I don't recall getting a briefing from
7  the FBI, no.
8       Q.   Do you recall receiving any manner of
9  briefings about the camps from any other federal law
10 enforcement authority or agency?
11      A.   I did have conversations with Darren
12 Cruzan, who was the head of the Bureau of Indian
13 Affairs law enforcement, and actually physically was
14 present to help oversee the command structure there.
15 He and others in law enforcement would have known what
16 other collaborations with agencies they would have
17 had, but I would have relied on them to have those
18 kinds of interactions.  And I do not recall having any
19 conversations with law enforcement beyond with
20 Mr. Cruzan.
21      Q.   Okay.  Did Mr. Cruzan ever point out the
22 limitations on his law enforcement abilities in terms
23 of geographic locations?
24           MS. STEINER:  Objection; assumes facts
25 not in evidence.

Page 83

1       Q.   (BY MR. SEBY) Ms. Jewell?
2       A.   Mr. Cruzan was committed to ensuring that
3  they were carrying out their responsibilities for law
4  enforcement for the Standing Rock Sioux Tribe.  And
5  we, as I referenced before, were taking law
6  enforcement resources from other parts of the
7  Department of the Interior and the BIA because of the
8  additional activities going on at Standing Rock.
9           And so he certainly conveyed that he had
10 a balancing act to try and ensure that there
11 weren't -- we weren't shorting areas elsewhere within
12 his responsibility or elsewhere within the Department
13 of the Interior as a result of this.  So it was a
14 difficult time to accomplish their safety mission with
15 the additional number of people that were present on
16 the reservation and the impact to the reservation
17 itself.
18      Q.   Do you recall how many Bureau of Indian
19 Affairs law enforcement agents were present on the
20 Standing Rock Sioux Tribe Reservation during the
21 protests?
22      A.   I don't recall a number.  I believe the
23 number was shared with me.  I just don't remember what
24 it is.
25      Q.   Were you ever asked to approve a request

Page 84

1  for additional law enforcement resources?
2           MS. STEINER:  Objection; vague.
3       A.   I don't remember whether a request like
4  that would have required my approval.  So I don't
5  remember.
6       Q.   (BY MR. SEBY) Do you ever recall being
7  asked or discussed -- the topic being asked of you or
8  discussed with you?
9           MS. STEINER:  Objection; vague, compound.
10      Q.   (BY MR. SEBY) Ms. Jewell?
11      A.   The topic of?
12      Q.   Of additional Federal Bureau of Indian
13 Affairs law enforcement resources.
14           MS. STEINER:  Objection; vague.
15      Q.   (BY MR. SEBY) Ms. Jewell?
16      A.   I stand by what I said before.  There
17 were concerns about our ability to carry out our law
18 enforcement mission across Indian country with the
19 surge of people that were needed to address the
20 situation at Standing Rock.  I don't remember
21 specifically, but I believe we had law enforcement
22 resources that came from other entities of the
23 Department of the Interior to help with the situation.
24           And so there was a concerted effort
25 across the department to be supportive of this unusual

Page 85

1  situation, but not to the degree that it put other
2  entities at risk, particularly as it related to
3  safety.  So it was a difficult situation and I relied
4  on my team to manage their resources as effectively as
5  they could given the circumstances, but I think it is
6  fair to say that BIA law enforcement was stretched
7  thin during that time because of the additional
8  demands that were placed on them.
9       Q.   And which other parts of the Department
10 of Interior as a whole did you draw upon other law
11 enforcement resources to devote to the Standing Rock
12 Sioux Tribe or Dakota Access Pipeline protests?
13           MS. STEINER:  Objection; compound,
14 assumes facts not in evidence.
15      A.   I did not personally draw any.  I
16 remember, as I expressed, that I believed other
17 agencies of Interior may have been deployed to help,
18 but I don't have a specific recollection of which
19 agencies those would have been or how many people
20 would have been involved.  Probably the best answer is
21 I don't know.
22      Q.   (BY MR. SEBY) Okay.  And when do you
23 recall that diversion of additional resources
24 generally occurred?
25           MS. STEINER:  Objection; misstates the

Page 86

1    evidence.
2        A.   I don't know specific dates when there
3    were additional people coming to Standing Rock.  There
4    were -- you know, we worked with the tribe to provide
5    an effective law enforcement response.  I don't know
6    what the staffing levels were at what points in time
7    at all.  That would be detail that I would have relied
8    on others to piece out.
9        Q.   (BY MR. SEBY) Do you agree with me that
10   at some time you were aware that the Corps of
11   Engineers property became the location where
12   protesters camped?
13       MS. STEINER:  Objection; lack of personal
14   knowledge, misstates the evidence.
15       A.   I've said on a number of occasions that I
16   didn't know the ownership of the footprint of the
17   camp, nor where it was over time.  I am aware that at
18   some point there were people camped on Corps land, but
19   we've talked about this before and I don't really have
20   anything else to add beyond what I've already
21   conveyed.  That's as much as I know.
22       Q.   (BY MR. SEBY) Do you know why Dakota
23   Access Pipeline protesters chose to go onto Corps of
24   Engineers land?
25       MS. STEINER:  Objection; calls for

Page 87

1    speculation, lack of personal knowledge.
2        Q.   (BY MR. SEBY) Ms. Jewell?
3        A.   I don't know.  You're asking me to state
4    what's in the mind of a protester, and I don't know.
5        Q.   Do you have any ideas or thoughts on why
6    those protesters did not set up protest camps on
7    private property?
8        MS. STEINER:  Objection; calls for
9    speculation, lack of personal knowledge.
10       A.   I don't know.
11       Q.   (BY MR. SEBY) Do you have any thoughts on
12   why DAPL protesters did not confine their protest
13   camps to the Standing Rock Sioux Tribe Reservation?
14       MS. STEINER:  Objection; calls for
15   speculation, lack of personal knowledge, misstates the
16   evidence.
17       A.   I don't know.
18       Q.   (BY MR. SEBY) Are you aware of which
19   protest camps were established on Corps of Engineers
20   land south of the Cannonball River?
21       MS. STEINER:  Objection; lack of personal
22   knowledge, asked and answered, misstates the evidence.
23       A.   No, I don't know.
24       Q.   (BY MR. SEBY) How about north of the
25   Cannonball River on Army Corps of Engineers land?

Page 88

1        MS. STEINER:  Objection; lack of personal
2    knowledge, misstates the evidence, asked and answered.
3        Q.   (BY MR. SEBY) You don't know?
4        A.   I don't know.
5        Q.   Okay.
6        A.   I told you multiple times I don't know
7    the footprint of the camps.  I don't know why they
8    moved.  I can't speak for the protesters.
9        Q.   Okay.  I was asking relative to the
10   Cannonball River.
11       A.   No, I don't know.
12       Q.   Okay.  Thank you.  Did you ever believe
13   that Standing Rock Sioux Tribe Chairman Archambault
14   was publicly calling for people to come to North
15   Dakota to protest against the Dakota Access Pipeline?
16       MS. STEINER:  Objection; misstates the
17   evidence, lack of personal knowledge.
18       A.   I don't know.  I don't recall him doing
19   that.
20       Q.   (BY MR. SEBY) You mentioned having an
21   interaction of some kind with Chairman Archambault.
22   Could you tell us what your role was working with
23   Chairman Archambault or other Standing Rock Sioux
24   Tribe representatives, including legal counsel, once
25   the protests began?

Page 89

1        MS. STEINER:  Objection; vague, compound.
2        A.   Could you please ask that again?  Is it
3    just specific to DAPL and time frame?  If you could
4    rephrase it that way, because you began by saying my
5    interactions with the chairman, which I thought you
6    meant over time.  So if you could restate that with
7    specifically what you'd like me to answer, that would
8    be helpful.
9        Q.   (BY MR. SEBY) Certainly.  The question
10   is, with respect to the time frame, let's say, March
11   of 2016 through the completion of your tenure as
12   secretary of the interior, describe the nature of your
13   interactions with Chairman Archambault or his
14   representatives.

**ND OBJ:**
Hearsay

15       MS. STEINER:  Objection; vague.
16       A.   I do not recall the time frame of
17   conversations that I had with Chairman Archambault.
18   And I do know that he expressed concerns, as I believe
19   I have shared earlier, about the impact of the Dakota
20   Access Pipeline on sacred sites that were technically
21   off reservation but part of their ancestral homelands
22   and the concern about the pipelines crossing of the
23   Oahe River.
24       He did express that to me.  I don't
25   remember the time frame of that, whether it was just

Page 90

1    in 2016 or before or when.  I just don't remember
2    that.  I do not recall having conversations with
3    anybody else from the tribe other than Chairman
4    Archambault as it relates to this time frame or the
5    Dakota Access Pipeline specifically.
6        Q.   (BY MR. SEBY) Do you recall speaking with
7    legal counsel for the Standing Rock Sioux Tribe?
8            MS. STEINER:  Objection; vague.
9        A.   As I just said, the only person I
10   remember speaking to from the tribe was
11   Chairman Archambault.
12       Q.   (BY MR. SEBY) Okay.
13       A.   And I don't know if it was in the time
14   frame that you suggested before.
15       Q.   Right.  Is it your testimony that you had
16   no communications of any kind directly with Chairman
17   Archambault during the course of the Dakota Access
18   Pipeline protests?
19           MS. STEINER:  Objection; misstates the
20   evidence.
21       A.   And the answer is no, that's not what I
22   said.  I said that Chairman Archambault did speak with
23   me about concerns about crossing sacred sites and not
24   having appropriate tribal consultation and concerns
25   about the pipeline crossing their water supply.  I

Page 91

1    don't remember specifically the time frame of my
2    conversation with Chairman Archambault.  And I also
3    stated that I don't recall speaking with anyone else
4    from the tribe on this matter.
5        Q.   (BY MR. SEBY) Okay.  But the question was
6    during the course of the Dakota Access Pipeline
7    protests, did you have any such communications with
8    the chairman or his representatives?
9            MS. STEINER:  Objection; vague, asked and
10   answered.
11       Q.   (BY MR. SEBY) And I won't ask you again,
12   but that was the question.
13       A.   Well, actually, I believe your question
14   before was going back to March of 2016, but your
15   restated question just now spoke about the time during
16   the protests at Standing Rock.  So if you could help
17   me understand specifically what you're asking again, I
18   will do my best to answer it again.
19       Q.   Well, they're the same thing.  I asked it
20   a different way to try and clarify it for you.  And so
21   I'll try again.  And the question is -- the question
22   is, do you recall having any -- you personally having
23   any manner of communication with Chairman Archambault
24   or his representatives during the course of the
25   protests against the DAPL pipeline while you were

Page 92

1    secretary of the interior?
2            MS. STEINER:  Objection; vague, asked and
3    answered.
4        A.   I do not remember the timing of the
5    conversation I had with Chairman Archambault about his
6    concerns on tribal consultation and the crossing of
7    Lake Oahe.  I don't remember whether that was after
8    the protests began or before.  I'm assuming it was
9    2016, but I just don't remember the timing.  And as I
10   stated before, I only recall having a conversation
11   with Chairman Archambault and no one else from the
12   tribe.  That is my recollection.
13       Q.   (BY MR. SEBY) All right.  Thank you.  Did
14   you instead delegate the communications with the tribe
15   and its representatives to your staff?
16           MS. STEINER:  Objection; vague, assumes
17   facts not in evidence.
18       A.   I relied on my staff to do their jobs.  I
19   trusted that they would do their jobs well.  I did not
20   direct them to contact people.  They would -- I
21   trusted their judgment on knowing how to be engaged in
22   order to do their jobs effectively, and I expected
23   them to keep me informed to the extent that they felt
24   it was necessary to do so.  And I believe they carried
25   out those duties very well.

Page 93

1        Q.   (BY MR. SEBY) Are you aware of whether
2    your staff on their own volition, then, was in
3    communication with Chairman Archambault and his
4    representatives?
5            MS. STEINER:  Objection; lack of personal
6    knowledge.
7        A.   I recall that they reported on occasional
8    conversations with Chairman Archambault.  Beyond that,
9    I don't know who else they may have been speaking with
10   over the course of the pipeline protests.
11       Q.   (BY MR. SEBY) Okay.  Do you recall
12   allowing your conference room in the secretary's
13   office at the Department of the Interior in
14   Washington, D.C., to be used to host Standing Rock
15   Sioux Tribe representatives, including its legal
16   counsel, to meet with your staff?
17           MS. STEINER:  Objection; assumes facts
18   not in evidence.
19       A.   What you're calling my conference room
20   was a large conference room in the secretary's office
21   area.  It was used for many meetings.  And I was
22   generally not aware of who was meeting in that room or
23   the purpose of those meetings.
24       I only used it when the capacity of the
25   conference table in my office was insufficient, and

93:1-10
Calls for
hearsay,
FRE
801; 602

Page 94

1  that was not that often.  So it was a conference room.
2  What you're calling the secretary's conference room
3  was a conference room that was close to my office.
4          Q.   (BY MR. SEBY) Okay.  Ms. Jewell, are you
5  aware of whether the United States has ever delegated
6  responsibility for the use or management of the Corps
7  of Engineers Oahe project to any other party?
8          MS. STEINER:  Objection; vague.
9  Objection to the extent it calls for a legal
10 conclusion.  Objection; lack of personal knowledge.
11         A.   I don't know what you're talking about.
12 I'm sorry.
13         Q.   (BY MR. SEBY) The question was, are you
14 aware of whether the United States has delegated the
15 responsibility for determining the use and management
16 of Corps of Engineers project lands known as the Oahe
17 project --
18         MS. STEINER:  Same objection.
19         Q.   (BY MR. SEBY) -- to any other party --
20         MS. STEINER:  Same objection.
21         Q.   (BY MR. SEBY) -- outside the United
22 States government?
23         MR. SEBY:  I'm sorry.  Ms. Steiner, let
24 me finish my question.
25         A.   I'm not aware of the circumstances around

Page 95

1  the Army Corps and Lake Oahe and delegation of
2  authorities.  I don't know what you're talking about.
3          Q.   (BY MR. SEBY) Okay.  Are you aware of
4  whether the Corps of Engineers -- officials with the
5  Corps of Engineers referred to the Dakota Access
6  Pipeline protesters located on Corps of Engineers land
7  in August as being trespassers?
8          MS. STEINER:  Objection; assumes facts
9  not in evidence, lack of personal knowledge.
10         A.   I don't know.
11         Q.   (BY MR. SEBY) Are you aware of whether or
12 not Corps officials referred to DAPL protesters on
13 Corps land in September as trespassers?
14         MS. STEINER:  Objection.
15         MR. SEBY:  Excuse me, Ms. Steiner.
16         Q.   (BY MR. SEBY) These months, of course,
17 are in 2016.
18         MS. STEINER:  Objection; assumes facts
19 not in evidence, lack of personal knowledge.
20         A.   I don't know the Corps -- what terms
21 the Corps used.
22         Q.   (BY MR. SEBY) How about in the months of
23 October of 2016?
24         MS. STEINER:  Same objections.
25         A.   Same answers.

[margin note: 95:11-21 FRE 602, Calls for hearsay, 801]

Page 96

1          Q.   (BY MR. SEBY) All right.  Do you recall
2  receiving regular status reports regarding the DAPL
3  protesters' occupation of Corps land?
4          MS. STEINER:  Objection; assumes facts
5  not in evidence, lack of personal knowledge.
6          A.   I remember regular reports on the size
7  and nature of the protests.  I don't recall
8  specifically discussions about where those protests
9  were.  As I've stated previously, my information comes
10 not only from briefings, but also reading what I've
11 read in the newspaper.  So I don't recall
12 specifically, you know, where they were and so on.
13         Q.   (BY MR. SEBY) Did your knowledge and
14 understanding of the protests include information
15 provided by the State of North Dakota?
16         MS. STEINER:  Objection; vague.
17         A.   No.  I'm not aware.
18         Q.   (BY MR. SEBY) You're not aware of whether
19 or not you were provided with any information on the
20 protests by the State of North Dakota?
21         MS. STEINER:  Objection; vague, asked and
22 answered.
23         A.   I discussed previously my conversation
24 with the governor.  Is that what you're referring to?
25         Q.   (BY MR. SEBY) I asked about the State of

Page 97

1  North Dakota as the entity.  And if your answer is
2  just the governor, I'd understand.  I just don't know
3  if that's the case.
4          A.   I'm sorry.  Would you please ask it
5  again.  I'm just getting a little confused.
6          Q.   Yeah.  I'm glad to make sure it's clear.
7  Did your knowledge and understanding of the protests,
8  such as it was, include receiving information provided
9  by the State of North Dakota?
10         MS. STEINER:  Objection; vague, asked and
11 answered.
12         A.   My only recollection of a direct
13 interaction with the State of North Dakota was the
14 conversation I previously discussed with the governor.
15 Doesn't mean I didn't receive other information.
16 That's all I can remember.  I will say that I did also
17 speak with Senator Hoeven.  He would be, you know, a
18 representative through his position as a senator, but
19 he wasn't the State of North Dakota per se.
20         Q.   (BY MR. SEBY) Sure.  And what do you
21 recall learning or hearing from Senator Hoeven?
22         A.   My recollection of my conversation with
23 Senator Hoeven was quite similar and I believe in the
24 same time frame as my conversation with the governor.
25 It was around the senator wishing the situation would

[margin note: 97:6-19 Calls for hearsay, 801]

[margin note: 97:20-98:4 FRE 801]

Page 98

1   go away, which I certainly understand, also my request
2   that they not escalate the situation by using caution
3   in terms of the nature of their response because I
4   thought it might inflame tensions.
5          Q.   Do you ever recall yourself asking or
6   directing your staff to ask for information and
7   intelligence from the State of North Dakota for which
8   you were not provided?
9              MS. STEINER:  Objection; vague, compound.
10  A.   I don't recall.
11         Q.   (BY MR. SEBY) Ms. Jewell, do you recall
12  receiving reports or briefings on the DAPL protests
13  from the company developing the pipeline?
14  A.   I don't remember.
15         Q.   How about from any tribes?  If you'd
16  like, I can ask the question again.
17  A.   Yeah, please ask the question again.
18         Q.   Sure.  Do you ever recall receiving any
19  reports or briefings on the DAPL protests from any
20  tribe?
21             MS. STEINER:  Objection; vague.
22  A.   I have previously expressed that I had a
23  conversation somewhere along the way with
24  Chairman Archambault.  I don't recall what kind of
25  other information we would have received from the

Page 99

1   tribe.  That would have generally gone to others.  Are
2   you referring to tribes beyond Standing Rock?
3          Q.   (BY MR. SEBY) Yes.  I said "any tribe."
4   A.   I don't recall tribes other than Standing
5   Rock, and I've stated previously what my interactions
6   were with the tribe in that regard.
7          Q.   Ms. Jewell, do you recall when you were
8   first advised that certain DAPL protesters were
9   violent?
10             MS. STEINER:  Objection; assumes facts
11  not in evidence, lack of personal knowledge, misstates
12  the evidence.
13         Q.   (BY MR. SEBY) Ms. Jewell?
14  A.   I don't recall timing and I do recall
15  that there was an escalation in behaviors.  I also
16  recall, I think, an interaction with private security
17  and dogs that inflamed some tensions, but I don't
18  remember the timing or how I was informed.  I believe
19  it would have been from my staff, but I don't remember
20  the timing.
21         Q.   Okay.  Are you aware of whether or not
22  protesters on Corps of Engineers land used that
23  property to organize and prepare for leaving the camps
24  to conduct travel to private property located nearby?
25             MS. STEINER:  Objection; misstates the

99:21-100:5
FRE 692, 611

Page 100

1   evidence.
2   A.   As I've stated before, I don't know the
3   footprint of the land that people were on, nor do I
4   know what their -- the reasons were for their actions
5   or their intents.
6          Q.   (BY MR. SEBY) Are you aware, then,
7   whether or not protesters on Corps of Engineers
8   property left that property to conduct protests
9   elsewhere?
10             MS. STEINER:  Objection; misstates the
11  evidence, calls for speculation, lack of personal
12  knowledge.
13  A.   I don't know where they were and where
14  they went to.  I know that there was an escalation in
15  tensions.  I know there was some vandalism associated
16  with cutting fences and equipment.  I don't know what
17  the footprint of the land was, nor do I know the
18  intent of the people that were involved.
19         Q.   (BY MR. SEBY) Ms. Jewell, do you know how
20  long protesters were present on Corps of
21  Engineers-managed property?
22             MS. STEINER:  Objection; misstates the
23  evidence, lack of personal knowledge, asked and
24  answered.
25  A.   You keep asking me about on Corps

100:6-18
FRE 602

Page 101

1   property, and I keep answering that I don't know where
2   the camp was specifically located during what times,
3   including private property.
4          Q.   (BY MR. SEBY) Okay.
5   A.   With that as a backdrop, I know that
6   there -- that the camp was there into the beginning of
7   the winter months and that there was concerns about
8   personal safety associated with winter weather and
9   also later on associated with flooding.  So that is my
10  recollection.
11         Q.   Do you recall ever knowing property
12  locations?
13             MS. STEINER:  Objection; vague, asked and
14  answered.
15  A.   Can you help me understand what you mean
16  by "property locations."
17         Q.   (BY MR. SEBY) Well, we're going to look
18  at some documents here in a moment, but I wanted to
19  ask you generally before we do that, do you know where
20  the camps were, and you said you don't.  You heard
21  that some was on Corps land, and I understand that.
22  And you don't know where private property was and you
23  don't know where public property was, but you do know
24  that you expressed concern to the governor of the
25  state of North Dakota and the United States senator

Sally Jewell
June 02, 2022                                102 to 105

101:17-103:20
FRE 401-402;
602; 611; 801

Page 102

1  representing North Dakota that the state should not do
2  anything to escalate.
3          So within that context, I'm just trying
4  to understand where you think the state interests were
5  and where you think the tribal interests were relative
6  to the Corps of Engineers' decision of whether or not
7  to grant approval for the pipeline to cross the river.
8  And if your answer remains that you don't know, that's
9  fine.  That's your testimony.
10         I'm just asking, do you ever believe at
11  one time you knew or not where the property locations
12  that are relevant here to these questions were?
13         MS. STEINER:  Objection; vague, compound,
14  lack of personal knowledge, misstates the evidence.
15         A.  I know the protests began on tribal land.
16  I know it migrated from there to land that included
17  Corps land.  I recall that there were some concerns
18  about trespass on private land.  I also know there
19  were nervous neighbors on private land because of the
20  protesters in close proximity.
21         When I spoke with the governor, I believe
22  his concerns were about access and that was something
23  that he was hearing from property owners, because I
24  believe the highway was closed.  I don't remember.
25  This is a little bit fuzzy.  And I think that private

Page 103

1  property owners were basically asking for them to get
2  the situation to go away.  That is the nature of my
3  recollection.
4          You keep pressing me on Corps land,
5  private land, Standing Rock land.  I don't know
6  specifically where the camps were at what point in
7  time.  I don't know if the camps were ever on private
8  land.  I do know that there were people that
9  infiltrated the camp that were, you know, not
10  protesters.
11         And I know that there was some property
12  damage done by people.  And I don't know who the
13  underlying landowner was, but I mentioned fences cut,
14  equipment damaged.  I remember those things.  So that
15  is the summary of what I recall.
16         Your sort of line of questioning, I'm
17  trying to be cooperative, but I don't really
18  understand what you're trying to get at or whether
19  there's something you're trying to get me to say
20  beyond what I've already said.
21         Q.  (BY MR. SEBY) I'm just asking questions
22  to understand what you know and what you don't know.
23  I'm not trying to get you to go anywhere other than
24  what you understand to be the state of your knowledge.
25  I'm not leading you anywhere --

ND OBJ:
Introduces new
material

Page 104

1          A.  I believe I've given you a complete
2  understanding of what I recall of the situation.  I
3  don't recall maps showing property ownership, camp
4  location.  Doesn't mean they didn't exist.  I just
5  don't recall them.
6          Q.  I understand.  Thank you.  And from that
7  I appreciate that you have said you did have at least
8  some understanding that the protests migrated onto
9  Corps land?
10         MS. STEINER:  Objection; misstates the
11  evidence.
12         Q.  (BY MR. SEBY) Ms. Jewell, did you or did
13  you not say that?
14         A.  I said I understand that elements of the
15  protest migrated onto Corps land.  I don't know the
16  nature of that, whether they were camps or what they
17  were.
18         Q.  Okay.  Based upon that understanding, did
19  you have a role in the decision to allow those
20  protesters to remain on Corps property?
21         MS. STEINER:  Objection; assumes facts
22  not in evidence, lack of personal knowledge.
23         A.  I don't remember, you know, providing any
24  permissions or anything else.  I can't even quite
25  remember what your question is.

Page 105

1          Q.  (BY MR. SEBY) Okay.  Let's ask -- talk
2  about some related topics.  Will you agree with me
3  that the Department of Interior was involved in the
4  Corps of Engineers' consideration of an application
5  for a special use permit submitted to the Corps by the
6  Standing Rock Sioux Tribe?
7          MS. STEINER:  Objection; assumes facts
8  not in evidence, lack of personal knowledge.
9          Q.  (BY MR. SEBY) Ms. Jewell?
10         A.  Could you repeat the question again?  It
11  was pretty specific.
12         Q.  Sure.  Do you recall when you first
13  learned or were made aware that the Standing Rock
14  Sioux Tribe submitted an application for a special use
15  permit to use and occupy Corps of Engineers land?
16         MS. STEINER:  Objection; assumes facts
17  not in evidence, lack of personal knowledge.
18         A.  I don't recall.
19         Q.  (BY MR. SEBY) You don't recall first
20  learning when they submitted the application or you
21  don't recall knowing about that at all?
22         MS. STEINER:  Objection; assumes facts
23  not in evidence, lack of personal knowledge.
24         A.  I don't recall a special use permit
25  application.  It's a level of detail that I -- you

ND OBJ:
Relevance;
Introduces new
material

U.S. LEGAL SUPPORT, INC
713-653-7100

Page 106

1  know, a process that I wouldn't have been aware of.  I
2  don't remember what was happening specifically during
3  that time.
4      Q.    (BY MR. SEBY) Okay.
5      A.    Especially between the Corps and the
6  tribe.
7      Q.    Okay.  So no sense in talking about
8  anything to do with the special use permit because you
9  just were totally unaware of it?
10         MS. STEINER:  Objection; misstates the
11  evidence, asked and answered, lack of personal
12  knowledge.
13     A.    I said I don't recall.  So, yes, I think
14  it's not worth you going into detail on a special use
15  permit that I don't recall.
16     Q.    (BY MR. SEBY) Okay.  Do you recall
17  whether or not your staff participated in the Corps'
18  consideration of the special use permit application?
19         MS. STEINER:  Objection; assumes facts
20  not evidence, lack of personal knowledge.
21     Q.    (BY MR. SEBY) Ms. Jewell?
22     A.    As I stated before, I don't recall the
23  process or a process or whether there was a process
24  around a special use permit.  I would have relied on
25  my staff if it is the sort of thing that the

Page 107

1  Department of the Interior, you know, would have been
2  asked to weigh in on.  And I would have left that to
3  my teammates like, you know, my chief of staff Tommy
4  Beaudreau and the head of Indian Affairs, Larry
5  Roberts.
6      Q.    Are you aware of any other, apart from
7  DAPL, instances where the Department of Interior was
8  either asked to participate or inserted itself in a
9  Corps of Engineers special use permit?
10         MS. STEINER:  Objection; assumes facts
11  not in evidence, lack of personal knowledge, vague.
12     A.    I don't know enough about the special use
13  permit process to be able to answer that question.  So
14  I know, as I mentioned previously, we did work with
15  the Army Corps of Engineers in a number of places,
16  largely at the intersection of habitat and wildlife.
17  Whether that would have involved a special use permit
18  or whether we would have engaged in that, I do not
19  have any knowledge.
20         MS. STEINER:  Paul, I believe we've been
21  going for over an hour.  Whenever would be convenient
22  to take a break, if Ms. Jewell would like one.
23         MR. SEBY:  Sure.  Ms. Jewell, you're on
24  the Pacific time zone?
25         THE DEPONENT:  I am.

Page 108

1         MR. SEBY:  Why don't we talk a break now,
2  if that sounds amenable to you as well.
3         THE DEPONENT:  That would be fine.
4         MR. SEBY:  We'll reconvene in ten
5  minutes.
6         THE DEPONENT:  Sounds good.
7         MR. SEBY:  Thank you.
8         THE DEPONENT:  Thank you.
9         THE VIDEOGRAPHER:  Going off the record.
10  The time is 5:15 p.m. UTC, 11:15 a.m. Mountain.
11         (Recess taken, 11:15 a.m. to 11:29 a.m.)
12         THE VIDEOGRAPHER:  We are back on the
13  record.  The time is 5:29 p.m. UTC, 11:29 a.m.
14  Mountain.
15     Q.    (BY MR. SEBY) Ms. Jewell, we're back from
16  a short break.  And I was asking you some questions
17  about the Army Corps of Engineers special use permit
18  process that the Standing Rock Sioux Tribe sought.
19  And I was just asking whether or not you were aware of
20  the department's involvement in that process.  And I'm
21  not asking you -- re-asking you any questions that
22  we've already covered, but I do want to just ask one
23  question.  That is, do you recall whether or not the
24  Department of Interior ever, quote, gave a greenlight
25  to the Corps to provide such a permit to the Standing

Page 109

1  Rock Sioux Tribe on September 16, 2016?
2         MS. STEINER:  Objection; assumes facts
3  not in evidence, lack of personal knowledge.
4      A.    I don't recall, as I stated before our
5  break.  Is there something -- you were just looking at
6  a document then.  Is there something you want to share
7  that might help refresh my memory?  Because I don't
8  remember.
9      Q.    (BY MR. SEBY) I'm looking at my attorney
10  notes for this deposition, which are privileged.  So,
11  no, they're not available to you.  But I'm asking
12  you -- I'll repeat the question, which is, do you
13  recall ever being part of a decision-making process to
14  give the Department of Interior's position to the
15  Corps on whether or not to provide a special use
16  permit to the Standing Rock Sioux Tribe, in particular
17  on September 16 of 2016?
18         MS. STEINER:  Objection; asked and
19  answered, assumes facts not in evidence, lack of
20  personal knowledge.
21     A.    And I don't recall.
22     Q.    (BY MR. SEBY) Okay.
23     A.    But reiterating, if you've got a document
24  that's got my name on it that you want to share with
25  me that might help me understand the nature of this

Page 110

1  detail, I'm happy to review that.
2      Q.  Sure.  Sure.  Do you recall ever hearing
3  the name of a camp called Oceti Sakowin?
4      A.  Yes.  That is the name that I believe the
5  Standing Rock Tribe gave to the camp as it was
6  initially created or shortly thereafter on the
7  reservation.
8      Q.  Your testimony is that's your
9  understanding of where the Oceti Sakowin camp was
10  located?
11      MS. STEINER:  Objection; lack of personal
12  knowledge.
13      A.  I recall when there was initially a camp,
14  it was on the reservation, I believe, and I believe
15  its name was Oceti Sakowin.  I don't recall the
16  origins of the name, but that was the name that the
17  tribe typically used to refer to their water
18  protectors camp.  I don't remember what it translates
19  to.
20      Q.  (BY MR. SEBY) Right.  Are you familiar
21  with other names of that camp as well, such as Seven
22  Council Fires?
23      A.  I don't remember that.
24      Q.  Or the main camp?
25      A.  I don't remember that.

Page 111

1      Q.  Okay.  Are you aware of whether a special
2  use permit was ever finalized or made effective for
3  the Standing Rock Sioux Tribe with respect to use of
4  Corps land?
5      MS. STEINER:  Objection; vague, assumes
6  facts not in evidence, lack of personal knowledge.
7      A.  As I stated previously, I do not recall a
8  process around a special use permit.
9      Q.  (BY MR. SEBY) Okay.  Do you recall,
10  Ms. Jewell, a joint statement in which the Department
11  of the Interior was one of three agency signatories to
12  a statement concerning the DAPL pipeline?
13      MS. STEINER:  Objection; vague.
14      A.  Can you help provide me with a little
15  more information on what you mean when you say "joint
16  statement"?
17      Q.  (BY MR. SEBY) Sure.  Do you recall, as
18  you're sitting here today, a September 9 joint
19  statement issued by three federal agencies, one of
20  which included the Department of Interior?
21      A.  That sounds familiar.
22      Q.  Okay.  Would you like me to explain what
23  the joint statement says on its face?  We can look at
24  it here in a minute when we go through the exhibits,
25  but I'm just asking generally what your recollection

Page 112

1  of it is.  And maybe, if you'd like, we can save it
2  until we get to the document.
3      A.  I think if you don't mind it would be
4  helpful to refresh my memory with the document itself.
5      Q.  Sure.  Sure.  And why don't we wait,
6  then.  Do you recall a decision made by United States
7  District Court Judge Boasberg relative to the tribe's
8  request for a preliminary injunction against the Corps
9  of Engineers for processing further approvals for the
10  DAPL?
11      MS. STEINER:  Objection; misstates the
12  evidence.
13      A.  I know in general there were lawsuits
14  filed.  I don't know the detail of those lawsuits or
15  the conclusions.  Is this something that took place
16  after I left office?
17      Q.  (BY MR. SEBY) No.  It's also September 9,
18  the same date as your joint statement.
19      A.  I see.  Yeah.  I don't recall specifics
20  of that.
21      Q.  Okay.  Ms. Jewell, with respect to the
22  protesters who were located on Corps land, do you
23  recall you or anyone in the Department of Interior
24  ever directing or recommending to the Corps that they
25  not issue citations for being on their property

Page 113

1  without a permit?
2      MS. STEINER:  Objection; assumes facts
3  not in evidence, lack of personal knowledge.
4      A.  I don't recall anything of that nature.
5      Q.  (BY MR. SEBY) Do you recall anyone in the
6  administration suggesting or directing that the Corps
7  not issue citations to protesters?
8      MS. STEINER:  Objection; vague.
9      A.  I don't remember.  Similar to my last
10  question, I don't recall this particular issue.
11      Q.  (BY MR. SEBY) Okay.  To your knowledge,
12  did the Corps of Engineers -- pardon me.  Let me
13  restate the question.
14      To your knowledge, did the Department of
15  Interior ever take steps to communicate to DAPL
16  protesters on Corps land that they needed to leave
17  that property?

113:14-114:1
FRE 602

18      MS. STEINER:  Objection; vague.
19      A.  No, I don't recall that.  In terms of
20  interaction between the Department of the Interior
21  staff and people, there would have been primarily the
22  Bureau of Indian Affairs law enforcement action and
23  that was predominantly on the reservation.  I don't
24  know the extent to which they might have gone outside
25  of the reservation or what they would have said to

Sally Jewell
June 02, 2022                                              114 to 117

Page 114

1  protesters.  I don't have any knowledge of that.
2        Q.    (BY MR. SEBY) Did the -- to your
3  knowledge, did the Department of Interior take any
4  other steps or actions to address protesters who were
5  trespassing on United States property?
6              MS. STEINER:  Objection; vague, compound,
7  misstates the evidence.
8        A.    I don't know what kind of interactions
9  might have occurred.  Sorry.
10       Q.    (BY MR. SEBY) Okay.  Did you ever -- were
11  you ever asked to advocate for a federal law
12  enforcement effort to assist the Corps in enforcing
13  laws on its property during the protests?
14             MS. STEINER:  Objection; vague, assumes
15  facts not in evidence.
16       A.    I'm sorry.  The first part of your
17  question was did I authorize?
18       Q.    (BY MR. SEBY) Did you ever authorize a
19  federal request to the State of North Dakota or Morton
20  County to evict or arrest protesters who were
21  trespassing on Corps property?  Did you ever advocate
22  for such a request?
23             MS. STEINER:  Objection; assumes facts
24  not in evidence.
25       A.    I'm sorry.  I'm still trying to wrap my

Page 115

1  head around what you said.
2        Q.    (BY MR. SEBY) Let me try it again.
3        A.    Okay.  Thank you.
4        Q.    Let me break the question out.  Do you
5  recall ever receiving a request for the Department of
6  Interior to advocate for law enforcement assistance in
7  removing trespassing parties on Corps of Engineers
8  property?
9              MS. STEINER:  Objection; vague, assumes
10  facts not in evidence.
11       A.    I generally remember, as expressed in my
12  conversation with the governor, my concerns about
13  escalating efforts and his desire for the protests to
14  go away.  I'm sure that we were asked to provide help
15  and we were providing as much help as we could.  I
16  don't know specifics as it relates to any actions.
17  It's just, you know, a level of detail that I don't
18  remember being involved in directly.
19       Q.    (BY MR. SEBY) Ms. Jewell, I believe you
20  just said that you provided assistance as best you
21  could; is that right?
22       A.    Yeah.  To clarify, the Department of the
23  Interior, the Bureau of Indian Affairs law enforcement
24  had the resources that we could spare helping out the
25  situation at Standing Rock.

**ND OBJ:** Introduces new material

Page 116

1        Q.    Okay.  With respect to your ability to
2  provide resources as best you could, what limitations
3  did you feel were in place on your ability to do that?
4              MS. STEINER:  Objection; vague, assumes
5  facts.
6        A.    The Bureau of Indian Affairs has the
7  responsibility for safety and security on the Standing
8  Rock Sioux Reservation.  They are the law enforcement
9  body.  They are employees of the Department of the
10  Interior.
11             In some cases -- and I don't believe
12  that's the case here, but I don't know -- you know,
13  there are arrangements with other law enforcements to
14  assist each other.  To the extent Interior provided
15  people from other locations, they may have been
16  cross-deputized to do the work of the Bureau of Indian
17  Affairs, but I don't remember the specifics of those
18  kinds of arrangements.
19             And that's the sort of thing that would
20  have been the responsibility of Darren Cruzan as the
21  head of BIA law enforcement.  So he'd be a better
22  witness to ask these kinds of questions.
23       Q.    (BY MR. SEBY) Is it your testimony that
24  the BIA is available for providing law enforcement
25  assistance to other federal agencies, if asked and if

Page 117

1  consent to do so?
2              MS. STEINER:  Objection; misstates the
3  evidence.
4        A.    Are you asking in general?
5        Q.    (BY MR. SEBY) In general.
6        A.    In general, trained law enforcement
7  officers of various agencies are called upon to
8  provide assistance, and that may be to each other.
9  That may be to other agencies through these
10  cross-deputization relationships.
11             I don't know the extent to which those
12  kind of things were exercised as it relates to
13  Standing Rock, other than the ability of agencies
14  within Interior to loan resources to this
15  circumstance.  I just don't know the authorities that
16  were used or how they were used in that regard as it
17  relates to this level of detail; that, you'd have to
18  ask others.
19       Q.    And will do, but with respect to your
20  knowledge of that general capability, do you recall
21  ever being asked as secretary whether or not BIA law
22  enforcement resources could be made available to the
23  Army Corps of Engineers?
24       A.    I don't recall that specifically.
25       Q.    Okay.  All right.  I would like to go

Sally Jewell
June 02, 2022                                    118 to 121

Page 118

1  through some documents now with you.  And when we do
2  that, I'd like to stay on track and do that for a
3  while.  Do you prefer to take a lunch break now or in
4  an hour or so?  I'm recognizing you're on a different
5  timezone and I just want to coordinate that with you.
6  I'm glad to do that with you as you wish.
7      A.   I want to make sure that questioning
8  counsel and my counsel doesn't have a growling
9  stomach.  I don't think that helps anybody, but I'm
10 not hungry yet.
11     Q.   Okay.
12          THE DEPONENT:  It's only 10:45 my time,
13 but, Logan, any --
14          MS. STEINER:  Happy to wait an hour.
15     Q.   (BY MR. SEBY) All right.  Let's go
16 through some documents.  Just give me a moment to get
17 organized.  So we're going to start with -- we
18 provided some exhibits to your counsel, Ms. Jewell,
19 and I'm now going to go through them.  And the first
20 one I'd like to call your attention to is the exhibit
21 which is marked as 406.
22          (Deposition Exhibit 406 was remotely
23 introduced and provided electronically to the court
24 reporter.)
25     A.   Will you be doing a screen share or

Page 119

1  something?
2      Q.   Yes.  We'll be putting it up for you here
3  as we speak.
4      A.   Okay.  I'm looking up at another screen.
5  If you think I'm not paying attention, it's actually
6  because I'm looking at the document.
7      Q.   Thank you.  So this is the cover page the
8  way your counsel produced these.  This is an e-mail
9  that's provided from the Department of the Army.  And
10 if we could go to the next page, please, I want to
11 give you time to look through this document, but I'm
12 just going to give an introduction to it and then I'll
13 afford you whatever time you need to review it.
14          So this is a two-part e-mail, and the
15 main part of the e-mail is an e-mail from Donald --
16 Major General Donald Jackson with the Department of
17 the Army Corps of Engineers to Lawrence Roberts with
18 the Department of Interior dated August 8.
19          And you are going to have the opportunity
20 to read this in a minute, but just to give you
21 context, Major General Jackson met with Mr. Roberts as
22 part of an event, the follow-up from the Lakota youth
23 runners meeting the week prior.  So August 5 would
24 have been that Friday.
25          And they happened to see each other at

Page 120

1  that, and Major General Jackson is recounting that --
2  he referred to him as Secretary Roberts -- that
3  Mr. Roberts has provided a comment letter dated
4  March 29 of 2016 that Mr. Roberts submitted to the
5  Corps of Engineers as a comment letter.
6          And Mr. Roberts apparently was puzzled
7  because he didn't know if the Corps ever received it
8  or acknowledged it.  And Major General Jackson is
9  telling Mr. Roberts that yes, indeed, our records show
10 that we received it and in fact the Omaha district
11 commander, Colonel Henderson, provided a written
12 response to Mr. Roberts.
13          And Major General Jackson was providing
14 another copy for Mr. Roberts, as well as providing an
15 update that the Clean Water Act Section 408 permit for
16 the Lake Oahe crossing has been granted by the Corps,
17 along with authorization under Nationwide Permit 12
18 that was also required, and also lastly notes that
19 there's an outstanding real estate easement for
20 crossing the lake that the Corps is actively being
21 worked to resolution.  So he's letting Mr. Roberts
22 know that.
23          And then the attachments to this are
24 Mr. Roberts' letter, comment letter, and then of
25 course Colonel Henderson's response letter dated

Page 121

1  June 28, 2016.  Would you take a moment and
2  familiarize yourself, please, with both of those
3  attachments, and of course the e-mail.  Read that for
4  yourself.
5      A.   Okay.  Give me a minute.
6      Q.   Yes.
7      A.   You can scroll down, please.  You can
8  scroll down maybe to the top of that paragraph that
9  was truncated.  That's good.  Scroll down, please.
10 Could you just scroll up to the date of this memo,
11 please.  March 29.  Okay.  Thank you.  You can scroll
12 down.  Scroll down.  Hold there.  Okay.  Scroll down,
13 please.  Okay.  Scroll down.
14     Q.   Ms. Jewell, have you completed reading
15 the exhibit?
16     A.   I have.
17     Q.   Okay.  Thank you.  So the two letters
18 that we'll talk about here in a minute are being
19 provided to Mr. Roberts.  He apparently wasn't aware
20 that a response was sent to his letter, and so Major
21 General Jackson is making that clear and providing it
22 to him, along with the fact that the Corps had already
23 made -- by the time that Mr. Roberts raised this
24 issue, the Corps had already granted the Section 408
25 permit for the crossing and the nationwide permit

119:14-121:5
FRE 611, 801

Page 122

1  relative to the pipeline crossing and the easement
2  decision was pending.
3          And so in Mr. Roberts' letter commenting,
4  which was -- will you agree with me this was a
5  Department of Interior comment letter on the Corps of
6  Engineers proposed environmental assessment?
7          MS. STEINER:  Objection; vague, misstates
8  the evidence.
9      A.  Can you -- are you talking about this
10 letter from Mr. Roberts?
11     Q.  (BY MR. SEBY) Yes.  It's a comment letter
12 to the Corps of Engineers from the Department of
13 Interior; correct?
14     A.  I don't know what you would characterize
15 the letter as.  It is a message from the Corps of
16 Engineers -- I mean, excuse me -- from the Department
17 of Interior to the Corps of Engineers expressing
18 reservations about whether the Corps followed
19 appropriate process on tribal consultation.
20     Q.  If you look at the last paragraph of this
21 letter, which we're scrolling down to, right there,
22 right there, the last paragraph says, "We appreciate
23 the opportunity to provide comments on the EA.  Should
24 you have further questions or concerns, please contact
25 Mr. Miles Janssen, Counselor to the Assistant

**122:20-123:5 FRE 611**

Page 123

1  Secretary -- Indian Affairs."
2          So that's Mr. Roberts' own
3  characterization of the letter and why I referred to
4  it as a comment letter.  Does that make sense now?
5      A.  Yes.  That makes sense.  Thank you.
6      Q.  All right.  So Mr. Roberts' letter, if we
7  go back up to the top, second paragraph.  So this is
8  an expression of concern, why in the first paragraph
9  he's asking -- it is a comment letter to the EA saying
10 we want you to do a full environmental impact
11 statement because of the proposed Dakota Access
12 Pipeline on the Standing Rock Sioux Tribe Reservation.
13         And Mr. Roberts says, "The routing of a
14 12- to 30-inch crude oil pipeline in close proximity
15 to and upstream of the Reservation is of serious
16 concern to the department."
17         Is Mr. Roberts articulating a position
18 from the Department of Interior that the dispute was
19 with the route of the pipeline?
20         MS. STEINER:  Objection; calls for
21 speculation.
22     A.  The letter appears to me to be reflecting
23 concerns about the nature of the project relative to
24 the environmental review that was conducted and a
25 suggestion that they do a full environmental impact

**123:6-124:1 FRE 602, 611, calls for hearsay, 801**

Page 124

1  statement.
2      Q.  (BY MR. SEBY) Sure.  And I agree with you
3  that's what he says.  What is the driver of the
4  concern?  Is it the proximity of the crossing to the
5  Standing Rock Reservation?
6          MS. STEINER:  Objection; lack of personal
7  knowledge, calls for speculation.
8      A.  I'm reading the language of the letter.
9      Q.  (BY MR. SEBY) Yeah.  Do you recall being
10 involved?
11     A.  The proximity of the pipeline to the
12 reservation and its water supply is a serious concern.
13     Q.  Yes.  Yes.  Okay.  So in response to this
14 letter, the district commander of the Omaha district,
15 Colonel John Henderson -- I believe you said that name
16 had some familiarity to you from the past.  Does it
17 ring a bell now who Colonel Henderson is?
18     A.  No.
19     Q.  Okay.  He's the signatory of that letter.
20 He is responding to Mr. Roberts saying that the tribe
21 was afforded the opportunity to participate, like
22 Mr. Roberts did in the public comment process, and
23 tribes plural, not just the Standing Rock, and that
24 not only was there the right of public participation
25 by submitting of comments on the proposed Corps of

Page 125

1  Engineers action, but that the Corps, according to
2  Colonel Henderson -- if you look at the third full
3  paragraph -- during the development of the EA, there
4  were public comment opportunities.
5          And also, in addition, after the public
6  comment period had ended, the Corps held additional
7  meetings and conducted site visits with the tribes
8  during the course of five additional months of 2016,
9  January, February, March, April, and May, and that
10 based upon the submittal of the public comments from
11 the tribes and those meetings that occurred over the
12 span of five separate months, that the EA was revised
13 to reflect some of the comments that were received and
14 specifically to cover any corrective action areas,
15 preparation and testing areas of the pipeline that
16 would occupy lands with federal interest and requiring
17 robust spill prevention and response plans.  And at
18 that time he's saying we have not yet made a decision.
19         Were you aware of this correspondence
20 between Mr. Roberts and Colonel Henderson and the
21 actions taken by the Corps?
22         MS. STEINER:  Objection; vague, compound.
23     A.  I don't recall this specific letter.  I
24 do recall that there were comments made after the
25 comment period had closed.  And I also recall -- and,

Sally Jewell
June 02, 2022                                    126 to 129

**125:19-126:14**
**FRE 602**

**126:22-127:13**
**FRE 602, 611**

Page 126

1  you know, this happens -- that there is a comment
2  period.  A lot of organizations, companies in
3  particular, treat tribal consultation as what we'll
4  call a "check-the-box exercise," and that doesn't
5  reflect a view on the part of the tribe that that
6  consultation was authentic or that the input was
7  listened to.
8            And so I know from my conversation with
9  Chairman Archambault that as it relates to this
10 process, he did not feel that the tribe was listened
11 to by the pipeline company when they did what they
12 called "tribal consultation."  And that was an
13 objection that I believe prompted the tribe's response
14 and concerns.
15       Q.  (BY MR. SEBY)  Earlier I heard you say
16 something very similar to that, and I appreciate that.
17 I understand it.  I think you're making a
18 distinction -- if I can ask a question, a distinction
19 between on the one hand a consultation that a pipeline
20 company -- in this case Energy Transfer, I think --
21 and the federal government's consultation activities.
22           And so here I believe the Army Corps is
23 talking about the scenario where the federal
24 government is consulting with the tribes, not only
25 through taking public comment like anyone in the

Page 127

1  public has the opportunity to do, but in addition he's
2  saying we held meetings over the course of five
3  separate individual months.  And is that what you're
4  saying gave rise to the concern as to  being a
5  check-the-box exercise?
6       A.  I know Chairman Archambault did not feel
7  that the tribe's concerns had been adequately
8  considered or listened to.  I don't know whether those
9  concerns related to both a process by the Army Corps
10 or a process by the pipeline company, nor do I know
11 whether those were conducted in conjunction with each
12 other or whether they were separate processes.  I
13 wasn't involved in the details.  So, you know --
14           MR. SCARPATO:  Sorry to cut in here.
15 This is Bill Scarpato.  I've been listening in by
16 phone.  I just wanted to note for the record that I
17 believe during Paul's last question the Zoom platform
18 cut out and restarted.  So I'm not sure that my
19 colleague Ms. Steiner was able to hear that entire
20 question or all of Secretary Jewell's answer.  I
21 apologize for cutting in.
22           MS. STEINER:  Thanks, Bill.  That is
23 correct.  My Zoom cut out and restarted.  I am able to
24 hear and see now.
25           MR. SEBY:  Ms. Steiner, do you recall at

Page 128

1  what point you were not connected?
2            MS. STEINER:  I do not.  I believe it was
3  a couple of questions ago.
4            MR. SEBY:  Were we discussing these
5  letters?
6            MS. STEINER:  We were, yes.  And --
7            MR. SEBY:  I need you to tell me what you
8  heard last.  Otherwise, I'm challenged in being able
9  to help you.  I'm happy to do it.  I just want to
10 understand where you exited.
11           MS. STEINER:  Yes.  So you were in the
12 middle of a question about Colonel Henderson's letter
13 and I believe his intent, but I'm not positive what
14 the remainder of the question was.  It was midstream
15 and a long question.  So if we could perhaps have the
16 court reporter go back and read a couple of questions
17 ago and we can resume from there.
18           THE REPORTER:  It's true.  There are two
19 very long questions.  Would you like me to read both
20 of all of them?
21           MR. SEBY:  I'm willing to resolve this.
22 I don't want to waste a bunch of time.  It might just
23 be easier to start over.
24           MS. STEINER:  Begin over with the
25 deposition or you mean with this line of questioning?

Page 129

1            MR. SEBY:  With this line of questioning.
2  I'm not hearing from you anything that gives me a road
3  mark of where you exited.
4            MS. STEINER:  We were discussing Colonel
5  Henderson's letter.  And if the court reporter could
6  read back the start of the last question, I can let
7  you know if that was the question where my Zoom cut
8  out.
9            MR. SEBY:  Let's do that quickly, please.
10           THE REPORTER:  I'm going to have to
11 scroll back.  One moment.
12           (The last question was read back as
13 follows:  "Earlier I heard you say something very
14 similar to that, and I appreciate that.  I understand
15 it.  I think you're making a distinction -- if I can
16 ask a question, a distinction --")
17           MS. STEINER:  The question before that.
18 Excuse me.
19           (The question beginning on page 124, line
20 19, was read back as follows:  "He's the signatory of
21 that letter.  He is responding to Mr. Roberts saying
22 that the tribe was afforded the opportunity to
23 participate, like Mr. Roberts did in the public
24 comment process, and tribes plural, not just the
25 Standing Rock, and that not only was there the right

Page 130

1   of public participation by submitting of comments on
2   the proposed Corps of Engineers action, but that the
3   Corps, according to Colonel Henderson -- if you look
4   at the third full paragraph -- during the development
5   of the EA, there were public comment opportunities.
6            And also, in addition, after the public
7   comment period had ended, the Corps held additional
8   meetings and conducted site visits with the tribes
9   during the course of five additional months of 2016,
10  January, February, March, April, and May, and that
11  based upon the submittal of the public comments from
12  the tribes and those meetings that occurred over the
13  span of five separate months, that the EA was revised
14  to reflect some of the comments that were received and
15  specifically to cover any corrective action areas,
16  preparation and testing areas of the pipeline that
17  would occupy lands with federal interest and requiring
18  robust spill prevention and response plans.  And at
19  that time he's saying we have not yet made a decision.
20  Were you aware of this correspondence between Mr.
21  Roberts and Colonel Henderson and the actions taken by
22  the Corps?"
23           THE REPORTER:  And you did object as
24  vague and compound.
25           MS. STEINER:  Okay.  So it would have

Page 131

1   been just after that.  Thank you.
2        Q.   (BY MR. SEBY) Ms. Jewell, you're muted.
3   If you'd take your microphone off mute, please.
4        A.   Yeah.  I didn't know if she was going to
5   read my response or what.  What happens now if counsel
6   was not present for part of this?
7        Q.   We're going to pick up with the questions
8   starting at that point.  Your counsel objected to the
9   question, and so now I want to ask you the question
10  that was pending, and that is did you read that
11  paragraph where the Corps is providing that
12  information to Mr. Roberts?
13       A.   Yeah.  Just a clarification.  What I said
14  before, does that get struck from the record or does
15  it stay in the record?
16       Q.   It stays in the record.  We're just
17  picking up again so your counsel can be afforded the
18  opportunity to speak if they choose.
19       A.   Okay.  So you don't want to read my
20  answer and have the court reporter read my answer?
21  You want me to answer --
22       Q.   I do.
23       A.   -- the question again?
24       Q.   So Ms. Steiner can listen to it and then
25  provide whatever she may wish to do.

Page 132

1        A.   I don't remember exactly what I said.
2        Q.   The court reporter will handle that for
3   us.
4        A.   Okay.
5            THE REPORTER:  I'll have to scroll back
6   again.
7            (The answer beginning on page 125, line
8   23, was read back as follows:  "I don't recall this
9   specific letter.  I do recall that there were comments
10  made after the comment period had closed.  And I also
11  recall -- and, you know, this happens -- that there is
12  a comment period.  A lot of organizations, companies
13  in particular, treat tribal consultation as what we'll
14  call a "check-the-box exercise," and that doesn't
15  reflect a view on the part of the tribe that that
16  consultation was authentic or that the input was
17  listened to.  And so I know from my conversation with
18  Chairman Archambault that as it relates to this
19  process, he did not feel that the tribe was listened
20  to by the pipeline company when they did what they
21  called "tribal consultation."  And that was an
22  objection that I believe prompted the tribe's response
23  and concerns.")
24           MR. SEBY:  Ms. Steiner, are you current?
25           MS. STEINER:  I am thank you.

Page 133

1            MR. SEBY:  I'd just note for the record
2   we took over five minutes for that deviation and we're
3   going to take it back later on.  So we'll just proceed
4   from now.
5        Q.   (BY MR. SEBY) Ms. Jewell, now a question,
6   now that we're aligned with your counsel.  The
7   question was or is, when you're talking about
8   consultation and Chairman Archambault telling you that
9   he was concerned with the nature of consultation, you
10  referred to consultation with the pipeline company.
11  And do you agree with me this correspondence between
12  Mr. Roberts and Colonel Henderson and Colonel
13  Henderson and Mr. Roberts pertains to consultation
14  with respect to a proposed federal action, not the
15  pipeline company?
16           MS. STEINER:  Objection; lack of
17  foundation, vague, misstates the evidence, compound.
18       Q.   (BY MR. SEBY) Ms. Jewell?
19       A.   And I believe I did answer that question
20  while counsel was absent.  And my answer was that I
21  didn't know specifically whether the Corps' process
22  was independent of the pipeline company's process with
23  regard to tribal consultation or whether they
24  overlapped in some way.
25           So I don't know the specifics about these

Page 134

1    months and this consultation and how it relates to the
2    chairman's concerns that they weren't listened to,
3    whether it was to this or to a process with the
4    pipeline company.  I don't know the specifics of the
5    process with either one of the entities.
6         Q.   Earlier I believe you told us that you
7    were not familiar with in any manner the State of
8    North Dakota's permitting and siting procedure before
9    the North Dakota Public Service Commission, if I'm
10   recalling your comment correctly?
11             MS. STEINER:  Objection; misstates the
12   evidence.
13        A.   My recollection is that there was a
14   process -- I don't know if it was state or
15   otherwise -- that would have routed the pipeline north
16   of Bismarck and that that was rejected and it was
17   moved south of Bismarck.  What I was told was that it
18   could impact the water supply of Bismarck.  I don't
19   know the state process at all and what its role was or
20   might have been, or others for that matter.
21        Q.   (BY MR. SEBY) And your understanding of
22   the -- I think you said the route was originally
23   proposed for north of Bismarck but moved.  You're
24   relying upon whom for that understanding?
25        A.   I don't recall the source of that.  I

Page 135

1    just recall it being discussed.  I don't remember if
2    it was with the governor or with others or why it was
3    routed, but it is -- the route that was proposed by
4    the Standing Rock Reservation was certainly not the
5    shortest distance.
6         Q.   I'm sorry.  I don't follow that last
7    part.  The route proposed by the Standing Rock?
8         A.   No.  The route proposed for the pipeline
9    that goes by Standing Rock was not the shortest
10   distance that the pipeline was traveling from its
11   source to its terminus.
12        Q.   Are you aware if that routeing
13   consideration was central to the decision-making
14   process of the North Dakota Public Service Commission?
15             MS. STEINER:  Objection; misstates the
16   evidence.
17        A.   No.  I don't know the process.
18             (Deposition Exhibit 486 was remotely
19   introduced and provided electronically to the court
20   reporter.)
21        Q.   (BY MR. SEBY) Okay.  Okay.  All right.
22   If we could move, please, to Exhibit 486.  Ms. Jewell,
23   this is a single-page e-mail, two parts -- three
24   parts.  Pardon me.  It begins with an e-mail
25   apparently received by Mr. Roberts from a Gay Kingman,

Page 136

1    who is executive director for the Great Plains Tribal
2    Chairman's Association.  Excuse me.  Do you see that?
3         A.   Yes.
4         Q.   Very bottom.
5         A.   Make sure you go all the way down to the
6    bottom of this.  Is that the first part of the
7    exchange?
8         Q.   That's the end of it.
9         A.   Okay.  Thank you.  So pause on his
10   message.  So it doesn't say who it's to?
11        Q.   Apparently not.  It wasn't provided to us
12   in that regard.  So I don't know why that is an empty
13   box, the "to" box.  It's got an interesting looking
14   squiggle in there, and that's how your counsel
15   provided it to us.  So I don't know.  It was forwarded
16   to you.
17        A.   Okay.  Let me read it.  Roll down if
18   there's anything else.  Okay.  Then roll up, please.
19   Stop.
20        Q.   Mr. Roberts in response to Mr. Kingman's
21   e-mail says, I'll try to get more detail.  And
22   apparently he sent that to you and to Tommy Beaudreau.
23   And you responded, "Thanks.  Please do keep us
24   informed.  Given that the President visited Standing
25   Rock, Tommy may want to give the White House a heads

Page 137

1    up.  I assume this has to do with the pipeline
2    construction that the tribe has objected to?  Have we
3    taken any action with regard to the pipeline and the
4    tribe's position?  I'll keep checking messages in the
5    event you need me to do anything."
6              So, Ms. Jewell, was this the first time
7    that you were advised, such as this is, of a protest
8    or incident related to the protest of the Dakota
9    Access Pipeline?  This is dated August 12.  All of the
10   e-mails in this string are dated August 12, 2016.
11        A.   I'm not sure you, know, because this
12   deals with human remains.  I don't know about whether
13   my message -- I mean, obviously I knew that the
14   pipeline -- the tribe had objected to the pipeline
15   construction.
16             What I believe I'm asking is that -- what
17   I'm questioning is whether my message had to do with
18   the pipeline construction.  Sounds like it had to do
19   with the finding of the human remains.  So that's why
20   I was saying I assume it has to do with the pipeline
21   construction.
22             And I knew about the tribe's concerns
23   that it did not have adequate consultation before
24   that, which is why I refer to that.  I don't know the
25   timing of this relative to the protests.  So I'm

Page 138

1   sorry.  I'm trying to respond, but I have now
2   forgotten what your original question was.
3        Q.   My question, Ms. Jewell, was, is this the
4   first time you heard anything about the protests?
5        A.   Yeah.  So I don't know because this isn't
6   about the protests.  This is about the finding of
7   human remains and the chairman intervening.  So I
8   can't remember when the protests actually started.
9        Q.   Okay.  So let's go down to Mr. Kingman's
10  e-mail.  He says, "Breaking:  It is being reported
11  that DAPL workers during their illegal dig have
12  uncovered human remains, as they were warned they
13  would in violation of federal law.  The South Dakota
14  State Archaeologist and the Tribal Historic
15  Preservation Office are being called to verify the
16  site."
17       And then there's another -- the final
18  paragraph says, Meanwhile, Chairman Archambault and
19  Councilman Yellow Fat, Standing Rock Sioux Tribe, have
20  been arrested for crossing the fence to defend our
21  homeland and water.
22       What do you make of that paragraph?
23       MS. STEINER:  Objection; vague, lack of
24  personal knowledge.
25       Q.   (BY MR. SEBY) Do you know what that

*[Margin note: 138:3-8 FRE 106; 401-402]*

*[Margin note: 138:9-139:3 FRE 602; 611]*

Page 139

1   means, "arrested for crossing the fence to defend our
2   homeland and water"?
3        A.   No.
4        MS. STEINER:  Objection; calls for
5   speculation.
6        Q.   (BY MR. SEBY) Okay.
7        A.   I don't know Mr. Kingman.  If I met him,
8   I don't recall him.  And he's from tribal communities
9   and these are his words.  So you'd have to ask him
10  what he meant.
11       Q.   Sure.  Sure.  I'm just asking you if you
12  understood at the time what he meant.  Would you be --
13       A.   I don't remember.  I don't remember the
14  time frame relative to the other issues that went on.
15  I'm sorry.  It's just -- I don't have a detailed
16  timeline in my head and I don't have documents to
17  refer to.
18       Q.   Okay.  I'm just -- because you responded
19  to this e-mail is why I'm asking you about it.  And
20  you were wanting to be kept informed and suggesting it
21  might even rise to the level of letting the White
22  House know, apparently based upon this e-mail from an
23  individual who you have not met and says things that
24  are not true.  For example, are you aware that
25  Chairman Archambault was indeed arrested for

*[Margin note: 139:18-140:11 FRE 602, 611]*

Page 140

1   trespassing on private property?
2        MS. STEINER:  Objection; misstates the
3   evidence, lack of personal knowledge.
4        Q.   (BY MR. SEBY) Are you aware of that?
5        A.   I recall at some time during the course
6   of the protests that he was confronted by law
7   enforcement.  I didn't remember what that entailed.
8   But, you know, whether it was a formal arrest, I don't
9   recall whether he was jailed, but I do know that there
10  was a confrontation along these lines.  And I just
11  remember that.  I don't remember the time frame.
12       Q.   The confrontation was he was arrested
13  because he trespassed onto private property after
14  cutting a fence and then when he was confronted by law
15  enforcement on that private property where he was a
16  trespasser, he pushed, shoved a state of North Dakota
17  highway patrolman.  Are you aware of that?
18       MS. STEINER:  Objection; argumentative,
19  misstates the evidence.
20       A.   I don't recall those specifics, no.
21       Q.   (BY MR. SEBY) Okay.  All right.  Was it
22  your practice to suggest communicating with the White
23  House based upon e-mails like this that reported
24  information that you yourself didn't know to be true?
25       A.   Would you please bring up my e-mail.

*[Margin note: 140:12-20 FRE 602, 611]*

Page 141

1        MS. STEINER:  Objection; misstates the
2   evidence, argumentative.
3        A.   As I stated early on in my deposition,
4   it's important that the White House be informed of
5   things that could become problematic in terms of the
6   press.  And so just to read my own words in this
7   message, Given that the President visited Standing
8   Rock, Tommy, my chief of staff, may want to give the
9   White House a heads up, it's clear from the second
10  part of the message, "I assume this has to do with the
11  pipeline construction that the tribe has objected to?
12  Have we taken any action with regard to the pipeline
13  and the tribe's position?"
14       There is nothing in my message that
15  conveys whether the report -- or the message from
16  Mr. Kingman was accurate or inaccurate.  It had to do
17  with making sure the White House was aware that some
18  tribal chairman, that the president knew personally
19  from his visit, had had a situation reported as an
20  arrest.  You know, so you said am I forwarding on
21  information that is false.  And, no, I'm letting my
22  team know that I believe the White House should be
23  informed, as things appeared in this message to be
24  escalating.
25       Q.   (BY MR. SEBY) Ms. Jewell, this

**141:25-142:21**
**FRE 611**

Page 142

1  correspondence on this exhibit is four days after the
2  last -- the communication from Major General Jackson,
3  Exhibit 406 that we discussed, the correspondence from
4  Mr. Roberts and the response from Colonel Henderson.
5  You say in this e-mail, this Exhibit 486, that --
6  you're asking your chief of staff and Mr. Roberts,
7  "Have we taken any action with regard to the pipeline
8  and the tribe's position?"
9              What sort of action were you thinking was
10 potentially possible that the Department of Interior
11 could take with respect to the pipeline?
12             MS. STEINER:  Objection; misstates the
13 evidence, assumes facts not in evidence.
14       A.   As I stated early on, our role is to
15 ensure that the law is upheld by all government
16 agencies as it relates to things like tribal
17 consultation and making sure that those entities that
18 don't perhaps have as much interaction with tribes as
19 the Interior does know what their responsibilities
20 are.  That's the kind of action that I would have been
21 referring to.
22       Q.   (BY MR. SEBY) Okay.  So how would you
23 characterize that kind of action?  As an educational
24 role?  Advising?  I'm not sure what you mean.
25             MS. STEINER:  Objection; vague, compound.

Page 143

1       Q.   (BY MR. SEBY) Ms. Jewell?
2       A.   Is the Corps aware of their
3  responsibilities to appropriately consult with the
4  tribe, listen to their objections, and do their best
5  to address them.  That is the kind of responsibility
6  that an entity has, not just the federal government
7  but the pipeline company as well.
8              So, you know, when a tribal chairman
9  expresses to us that they do not feel they were
10 listened to, that's the sort of thing that we pass
11 along to make sure that other entities are aware of
12 their responsibilities.
13       Q.   So in that -- in your mind, then, at the
14 time of your e-mail to Mr. Roberts and Mr. Beaudreau,
15 you were recalling your conversation with Chairman
16 Archambault, or had it not yet occurred?
17             MS. STEINER:  Objection; misstates the
18 evidence.
19       A.   I don't remember when I had my
20 conversations with Chairman Archambault.
21             (Deposition Exhibit 487 was remotely
22 introduced and provided electronically to the court
23 reporter.)
24       Q.   (BY MR. SEBY) All right.  If we could go
25 to the next exhibit, Ms. Jewell.  It's 487.  And this

Page 144

1  is some -- a dialogue e-mail between Assistant
2  Secretary Michael Connor and Ms. Jo-Ellen Darcy, who
3  is the assistant secretary of the army for civil
4  works.
5              MR. SEBY:  If you could scroll down,
6  please, Rachel, just a bit so Ms. Jewell can read the
7  first piece of this e-mail chain.
8       Q.   (BY MR. SEBY) This is Mr. Connor writing
9  to Ms. Darcy.
10      A.   And let me just correct you.  It is
11 Deputy Secretary of the Interior Mike Connor.
12      Q.   Thank you very much.
13      A.   Not assistant secretary.  There are
14 multiple assistant secretaries and only one deputy.
15      Q.   I'm sorry.  Just so I get it straight,
16 it's deputy assistant secretary?
17      A.   Deputy secretary.  No assistant.
18      Q.   Deputy secretary.
19      A.   Deputy Secretary Connor.  It's a
20 senate-confirmed position.  It's the number two role
21 in the department, like the chief operating officer.
22      Q.   Okay.  Thank you.  So in that capacity as
23 deputy secretary, the number two in the department,
24 your immediate next in line, is Mr. Connor writing to
25 Ms. Darcy, who is the assistant secretary of the army

Page 145

1  for civil works, on August 17 of 2016.  So if you'd
2  take a minute and read Mr. Connor's message below.
3       A.   Yeah.  I haven't read the thing below
4  that we started with.  Okay.
5       Q.   Have you read the entire exhibit?
6       A.   No.  I was just looking at the --
7  rereading part of the bottom.  Hang on.  Okay.
8       Q.   Are you done?
9       A.   I am.
10      Q.   Okay.  So let me ask you about Mr. Connor
11 reaching out to Ms. Darcy on August 17.  Earlier I
12 think you mentioned -- and please correct me -- that
13 Mr. Connor really was briefed, kept apprised of the
14 DAPL protests, but really didn't play any role.  So I
15 would like to understand from you why, then, on
16 August 17 he's writing to the Army Corps of Engineers'
17 top official, the assistant secretary to the army for
18 civil works, letting her know about this and that the
19 department is in contact with the tribe and the
20 governor's office trying to provide appropriate
21 support for the situation to remain peaceful.  What
22 did he want to speak with Ms. Darcy about?
23             MS. STEINER:  Objection; lack of personal
24 knowledge, vague, compound.
25      Q.   (BY MR. SEBY) If you know, Ms. Darcy.

Page 146

1  Ms. Jewell.  Excuse me.
2       A.  As I believe I stated at the beginning of
3  the deposition, Mike Connor was deputy secretary and
4  informed about everything happening in the department,
5  but my two primary contacts as it related to Standing
6  Rock and DAPL were my chief of staff, Tommy Beaudreau,
7  and the assistant secretary -- acting assistant
8  secretary and principal deputy assistant secretary of
9  Indian Affairs, Larry Roberts.
10       I said that Mike Connor may well have
11  played a role, but that he was not the person that was
12  typically informing me.  Okay.  So I just want to
13  clarify that that's what I said earlier.  Not that he
14  was not informed, but that he was not the primary
15  contact and that he may well have been -- he would
16  have been aware and he may well have been engaged.  So
17  let me start with that.
18       It is entirely appropriate from a level
19  perspective to have the deputy secretary, the number
20  two person at the Department of the Interior,
21  connecting directly with the assistant secretary of
22  the army for civil works.  She is the top official for
23  civil works and would have been someone with whom
24  Tommy would have worked over the course of his time
25  both as deputy secretary and before that as

Page 147

1  commissioner of the Bureau of Reclamation.
2       So they had a personal relationship.  And
3  so it would be completely appropriate for Mike to have
4  reached out to Assistant Secretary Darcy around what
5  he felt was an escalating situation as determined and
6  a desire to have a phone call about it so that she was
7  aware of what Interior was aware of, and as it evolved
8  on the ground in Standing Rock.  That's how I read
9  this, and I read it as an entirely appropriate
10  exchange between two people of equal level about an
11  incident that involved both of them.
12       Q.  Yeah.  I'm not at all questioning the
13  appropriateness of it.  I'm just trying to understand
14  it relative to your earlier testimony and also ask you
15  were you aware of this communication from Mr. Connor
16  to the assistant secretary of the Corps?
17       MS. STEINER:  Objection; vague, compound.
18       A.  I don't recall specifically ever seeing
19  this e-mail, but it would be completely consistent
20  with how our department would have operated for this
21  to have occurred.
22       Q.  (BY MR. SEBY) Do you recall ever knowing
23  what Mr. Connor wished to speak to Ms. Darcy about,
24  given the other information being reported in his
25  e-mail?

Page 148

1       MS. STEINER:  Objection; vague.
2       A.  I just have to take at face value what he
3  says in his message.
4       Q.  (BY MR. SEBY) I understand that, but
5  there is a statement in the message that says, "If you
6  have a chance, it may be helpful for us to have a
7  quick chat."  Mr. Connor is saying that to Ms. Darcy.
8  My question to you, Ms. Jewell, is, did you know what
9  the issue he wanted to speak with Ms. Darcy pertained
10  to?
11       A.  I only know what I've just read in this
12  e-mail.  He wanted to speak with her about concerns
13  that the, you know, situation remain peaceful.
14       Q.  Sure.  And do you know why he was
15  concerned that there may be potential challenges to
16  keeping things peaceful?
17       MS. STEINER:  Objection; misstates the
18  evidence.
19       A.  I don't know anything beyond what I'm
20  reading here.
21       Q.  (BY MR. SEBY) Thank you.
22       A.  As I stated previously, the timeline of
23  events specifically when people started gathering,
24  when I spoke to people, those sorts of things are just
25  things that I don't have in my mind.

Page 149

1       (Deposition Exhibit 489 was remotely
2  introduced and provided electronically to the court
3  reporter.)
4       Q.  I understand.  All right.  If we could
5  turn to Exhibit 489.  And if you'll look down at the
6  bottom of this e-mail, which is another communication
7  from Mr. Connor to Ms. Darcy, and this one is dated --
8  the top of it is August 26.  The bottom portion is --
9  it looks like Mr. Connor went to that earlier chain of
10  communication that we were just discussing in the
11  previous exhibit where he was pointing out to
12  Ms. Darcy the emerging situation and asking to speak
13  with her.  And they correspond about logistics of
14  getting the call set up.
15       And so that all occurred on August 17,
16  but Mr. Connor utilized that existing e-mail chain --
17  I don't know -- nine days later.  On Friday,
18  August 26, he picked that chain up and replied back to
19  Ms. Darcy, "Good morning.  Any chance you're available
20  for 5 to 10 minutes today for an update on the DAP
21  situation?"
22       Do you recall Mr. Connor talking with you
23  prior to this communication concerning the Dakota
24  pipeline as Mr. Connor referred to it?
25       A.  I don't recall.  I don't even know if I

149:4-150:1
FRE 602, 611, calls for
hearsay, 801

Page 150

1   was in town.

2        Q.   Okay.  So the number two in the
3   department is continuing to converse with Ms. Jewell
4   and --

5        A.   Darcy.

6        Q.   Pardon me.  I'm sorry.  Ms. Darcy and
7   ongoing communication.  There's no issue or question
8   about whether it's appropriate or not.  I'm just
9   wondering if you were aware of this and what the -- I
10  appreciate this is a point in time and wondering
11  whether or not this was brought to your attention what
12  the issues were continuing to be and the need for
13  continued dialogue?

14       MS. STEINER: Objection; vague, compound,
15  lack of personal knowledge, asked and answered.

16       Q.   (BY MR. SEBY) Anything further,
17  Ms. Jewell?

18       A.   No.  I don't really have anything to add
19  beyond what I've said.  I knew that my team was
20  connecting with the Army Corps and I allowed them to
21  do their jobs.

22       Q.   Are you aware of whether or not
23  Mr. Connor was ever further involved in communicating
24  with the Corps after this communication?

25       MS. STEINER: Objection; vague, lack of

Page 151

1   personal knowledge.

2        A.   Mr. Connor is currently in the position
3   that Jo-Ellen Darcy occupied.  So certainly he's had
4   conversations with the Army Corps of Engineers.  He is
5   the assistant secretary for civil works now.  So you
6   didn't put any parameters timewise on your question.

7        Q.   (BY MR. SEBY) Okay.  Thank you for that.
8   I'm glad to clarify it.  Do you know of Mr. Connor in
9   his capacity as deputy secretary in the Obama
10  administration for the Department of Interior
11  corresponding or communicating in any manner with
12  Ms. Darcy at the Corps in her capacity as assistant
13  secretary?  Was that the last communication that
14  Mr. Connor had with her, or do you know?

15       MS. STEINER: Objection.

16       A.   I have no idea.

17       MS. STEINER: Objection; vague, compound.

18       MR. SEBY: Ms. Steiner, you are talking
19  over the witness.  I appreciate objections, but let's
20  keep them separate from the witness's testimony,
21  please.

22       MS. STEINER: Yes.  And I'm entitled to
23  get my objections on the record.  Thank you.

24       MR. SEBY: There's no dispute.

25       Q.   (BY MR. SEBY) Ms. Jewell, I'm sorry you

Page 152

1   were interrupted.  What were you saying?

2        A.   I said I have no idea what ongoing
3   communications would have taken place between
4   Mr. Connor and Ms. Darcy.

5        Q.   Okay.  Do you ever recall asking him to
6   focus on other responsibilities aside from DAPL?

7        MS. STEINER: Objection; vague, lack of
8   personal knowledge.

9        A.   No.

10       Q.   (BY MR. SEBY) Okay.  So he wasn't asked
11  to discontinue his role in DAPL at this point, as far
12  as you know?

13       A.   I don't recall anything of that nature.

14       Q.   Okay.  Do you recall continuing to rely
15  upon and utilize Mr. Connor on the DAPL situation for
16  the remaining period of time that you were with the
17  Obama administration?

18       MS. STEINER: Objection; vague.

19       A.   As stated previously, my primary points
20  of contact to keep me up to date were Tommy Beaudreau,
21  my chief of staff, and Larry Roberts with Indian
22  Affairs.  The degree of Mike Connor's involvement as
23  deputy secretary, I would expect to continue in the
24  way that it was, but I don't recall specifically who
25  was doing what as it related to this.

Page 153

1        Q.   (BY MR. SEBY) So there's no surprise to
2   you that Mr. Connor was engaged -- he may not have
3   been your primary point of information, but it's no
4   surprise to you that he was engaged on the issue now
5   and at this time, late August, and would continue to
6   do so?  Would not surprise you?

7        MS. STEINER: Objection; vague, compound.

8        Q.   (BY MR. SEBY) Ms. Jewell?

9        A.   My direct team, my chief of staff and my
10  deputy secretary and myself, had a very close working
11  relationship where we kept each other informed.  It
12  would not surprise me that given his involvement that
13  you've refreshed my memory with with these e-mail
14  exchanges that he would continue to be involved.

15       (Deposition Exhibit 490 was remotely
16  introduced and provided electronically to the court
17  reporter.)

18       Q.   All right.  If we could turn to
19  Exhibit 490, please.  And, Ms. Jewell, if you take a
20  moment and -- we can turn to the next page, which is
21  the actual e-mail itself.  If you look in the "to"
22  line, this is an e-mail from Akilah Kinnison, who is
23  an attorney in a firm in Washington, D.C. -- a law
24  firm in Washington, D.C. writing an e-mail to a number
25  of Corps of Engineers individuals and an individual in

Margin note (left of page 151):
150:22-151:6
FRE 602, calls
for hearsay,
801

Page 154

1  the department -- pardon me -- in the Executive Office
2  of the President.
3           And then you, Ms. Jewell, are a noted
4  addressee, as so is your chief of staff,
5  Mr. Beaudreau.  And Mr. Roberts is on there.  And then
6  earlier you mentioned Karen Diver in the Executive
7  Office of the President.  She's on there as well.
8           And the subject of the e-mail with an
9  attachment is "Oglala Sioux Tribe Requests Halt to
10 Dakota Access Easement."  And the message from
11 Ms. Kinnison, the attorney at a law firm in
12 Washington, D.C., is, Dear Assistant Secretary Darcy:
13 Attached please find the Oglala Sioux Tribe's letter
14 opposing the Dakota Access Pipeline and urging the
15 Corps not to write an easement allowing Dakota Access,
16 LLP to cross Lake Oahe.
17          And then there's this letter signed by
18 the president of the Oglala Sioux Tribe Nation in
19 South Dakota that contains a resolution of the tribal
20 counsel.  And the letter notes you as a cc as well,
21 along with the individuals from the Executive Office
22 of the President and Mr. Roberts, your assistant
23 secretary, so forth.  So were you aware of this
24 letter, being a recipient?
25          A.   I don't recall a letter specifically.  I

Page 155

1  do recall that there were other tribes that were
2  supportive of the Standing Rock Sioux Tribe's
3  interest, but I don't recall this letter specifically.
4           I'll also indicate that the e-mail
5  address that you first showed was not the e-mail
6  address that came to me personally.  It was Sally,
7  underscore, Jewell, which was not the one that I used.
8  It probably went to the department and would have gone
9  to our executive secretary's office.  So I'm not
10 surprised that there was a sympathetic letter sent
11 from another tribe, but I don't recall it
12 specifically.
13          Q.   So this e-mail is actually not your
14 e-mail or not -- wasn't your Department of Interior
15 e-mail address?
16          MS. STEINER:  Objection; misstates the
17 evidence.
18          A.   It says Sally, underscore, Jewell.  That
19 was more of the public-facing e-mail that was checked
20 by others.  So I'm just referring to that.  If you go
21 to other e-mails that you've referenced before, it's
22 at SRJ2, and that's the one that I would have seen
23 personally.  Others would have screened this, just so
24 that you're aware.
25          Q.   (BY MR. SEBY) Okay.  Thank you.  Yeah.  I

Page 156

1  appreciate that.  So this was more of a -- it's not
2  that it was a bad e-mail address.  It just was not
3  your working e-mail address in the Department of
4  Interior?
5           A.   That's correct.  It's an e-mail address
6  that was used when people wanted to reach the
7  secretary, and others would screen that before I would
8  see it.
9           Q.   I see.  Do you know, is that a common
10 practice for a cabinet-level official to do that just
11 because of the nature of electronic communications
12 that come in involuntarily?
13          A.   I think -- I don't know what sort of
14 public e-mail addresses others had.  I know that
15 the e-mail addresses that I used to reach cabinet
16 colleagues were typically not an easy one to replicate
17 so that they wouldn't get overwhelmed with the
18 thousands of messages that come in daily in order to
19 be able to respond.  So I suspect it was a common
20 practice, but I don't know what other cabinet
21 secretaries were doing.
22          Q.   Okay.  How about the e-mail -- the person
23 transmitting the e-mail, Akilah Kinnison?  Is that a
24 person that's known to you?
25          A.   No.

Page 157

1           Q.   She's apparently the legal counsel for
2  the Oglala Sioux Tribe.  You're not aware of her?
3           A.   (Deponent shook head from side to side.)
4           Q.   The Oglala Sioux Tribe was not foreign to
5  you, though, was it?
6           A.   It is a federally recognized tribe.  I
7  don't know the people there, but, you know, it's one
8  of the plains tribes with whom my department had a
9  relationship, I'm sure.
10          Q.   So you don't know President John Yellow
11 Bird Steele?
12          A.   I can't say.  I haven't met him.  I may
13 have, but I don't know him.  So I don't remember him
14 specifically.
15          (Deposition Exhibit 491 was remotely
16 introduced and provided electronically to the court
17 reporter.)
18          MR. SEBY:  Sure.  All right.  If we could
19 turn to Exhibit 491, please.  If we can enlarge this,
20 please.  There we go, Rachel.
21          Q.   (BY MR. SEBY) So this is an e-mail --
22 it's a two-piece e-mail, very brief, from Mr. Roberts
23 to you and to Tommy Beaudreau and Hilary Tompkins.
24 And it's attaching a link to a C-Span video of the
25 president speaking about the Dakota Access Pipeline.

157:21-158:3
FRE 401-402
602

Sally Jewell
June 02, 2022

158 to 161

**Page 158**

158:4-17
FRE
401-402;
611

1  Do you recall in early September when the president
2  made such a presentation and where he was?
3      A.  I don't recall.
4      Q.  Your response says, "Wow."  So you looked
5  at the link, it's clear from your response.  "Great
6  question from halfway around the world and I
7  appreciate the President's answer.  Thanks for
8  sharing."
9          Would it help your recollection -- I know
10  you can't access the link while we're here, but would
11  it help you to recall what you meant from halfway
12  around the world that the President of the United
13  States was in Asia speaking to a group of people and
14  was taking questions from them?
15      MS. STEINER:  Objection.
16      A.  It would certainly refresh my memory if I
17  saw the video.
18      MR. SEBY:  I don't know.  Rachel, can we
19  access the link, play the video?
20      MS. HYMEL:  I could probably do that on
21  the lunch break.
22      MR. SEBY:  Why don't we come back to
23  this.  And speaking of lunch breaks, it's 12:55
24  Mountain Time.  Why don't we take a 40-minute lunch
25  break, Ms. Jewell, Ms. Steiner, and come back at 1:35

**Page 159**

1  Mountain Time, 12:35 Pacific.
2      THE DEPONENT:  Does that get you back
3  your five minutes you wanted?  If not, I'd suggest 30
4  minutes after the hour so we can do it on the front
5  end instead of the back end.
6      MR. SEBY:  Well, that's fine with me.
7  Does that work for you, Ms. Steiner?
8      MS. STEINER:  It does.
9      MR. SEBY:  So we'll reconvene at 1:30
10  Mountain, 12:30 Pacific.  Thank you.
11      THE VIDEOGRAPHER:  Going off the record.
12  The time is 6:56 p.m. UTC, 12:56 p.m. Mountain.
13      (Recess taken, 12:56 p.m. to 1:30 p.m.)
14      THE VIDEOGRAPHER:  We are back on the
15  record.  The time is 7:30 p.m. UTC, 1:30 p.m.
16  Mountain.
17      Q.  (BY MR. SEBY) Ms. Jewell, we're back from
18  a lunch break and it's the afternoon now.  We were
19  talking about just before the break Exhibit 491 and I
20  was asking you about your response to your being sent
21  a link.  I want to show you as part of the exhibit the
22  video that's at the link in the site.  It's under
23  three minutes.  So let's watch that together and then
24  we can talk about your response to having viewed it.
25      (At this time the video was played.)

**Page 160**

1      Q.  Ms. Jewell, is there anything about the
2  president's remarks that we just observed while he was
3  on a trip to the country of Laos that you had in mind
4  pertaining to the Dakota Access Pipeline?  Was he
5  speaking with respect to the pipeline in any specific
6  manner, in your mind?

159:17-161:6
FRE 401-402;
602

7      A.  In my mind --
8      MS. STEINER:  Objection; lack
9  knowledge.
10      A.  In my mind the president was speaking to
11  exactly what I've been talking about, which is laws
12  that are in place, treaty obligations, complexity,
13  importance of upholding those treaty obligations.  And
14  I think he did a very good job of explaining that,
15  while also not getting into the detail as it related
16  to the Dakota Access Pipeline, saying that he wasn't
17  familiar with the details and how it related to treaty
18  obligations and laws and that he hadn't -- basically
19  relied on his staff to do that.  So I think his
20  comments were very consistent with exactly what I've
21  been saying to you throughout this.
22          And it also is, I think, a very helpful
23  illustration of the role of a president and the kinds
24  of things that he gets asked and why it is important
25  to make sure that the White House knows when there are

**Page 161**

1  things like the Dakota Access Pipeline situation that
2  are in the news media, because even halfway around the
3  world he may get asked a question in that regard.  So
4  I appreciate the video.  That was very helpful.  And
5  the president's remarks are very consistent with what
6  I've been saying.
7      Q.  (BY MR. SEBY) So this is your exchange in
8  Exhibit 491.  If we can go back to the e-mail just a
9  moment, the date of this exchange -- I don't know when
10  the president's remarks were made, but a day or two
11  prior to September 7, I believe.  But your
12  correspondence with Mr. Roberts is on September 7 of
13  2016.  Do you see that?

161:7-14
FRE 401-402

14      A.  I do see that.
15      (Deposition Exhibit 492 was remotely
16  introduced and provided electronically to the court
17  reporter.)
18      Q.  Okay.  And if we can go to Exhibit 492,
19  please.  If we could blow that up a little bit.
20  Enlarge it.  Thank you.  Do you see -- do you
21  recognize the individual Blake Androff?
22      A.  I do.
23      Q.  And he or she is who?
24      A.  He was the director of communications in
25  the last few years of my term.

Sally Jewell
June 02, 2022                                    162 to 165

Page 162

1      Q.   Okay.  Is this a person who you worked
2  with closely, knew?
3      A.   Yes.
4      Q.   And he is sending you -- it says
5  addressed to you, copied to Mr. Beaudreau and Hilary
6  Tompkins and Katherine Kelly and Jessica Kershaw.
7      A.   And Mike Connor.
8      Q.   And Mike Connor.  So Mr. Androff is
9  sending you, Attached is a joint statement that we'll
10  issue shortly from DOJ, U.S. Army Corps of Engineers,
11  and Interior this afternoon's decision on the
12  Dakota Access Pipeline.  Tommy and SOL -- I assume SOL
13  refers to solicitor?
14      A.   Yes.
15      Q.   -- can fill you in on the particulars,
16  but wanted you to see where this finally landed in
17  terms of the heavily, heavily negotiated language in
18  the statement.
19           So earlier I was asking you about the
20  September 9 statement.  This e-mail is dated
21  September 9, the joint statement of the three
22  agencies.  And we paused because we thought it would
23  be better to review the document together.  Do you
24  remember that discussion?
25      A.   I do.

162:8-25
FRE 611

Page 163

1      Q.   So attached to Mr. Androff's e-mail to
2  you on September 9 saying, here's a statement we'll
3  issue shortly from the three entities, if we could go
4  to that next.  It's attached to this e-mail.
5           MR. SEBY:  And if you would enlarge it,
6  please, just a bit, Rachel.
7      Q.   (BY MR. SEBY) Ms. Jewell, do you
8  recognize this document?
9      A.   I'm sure I saw it.  I don't remember it,
10  but let me read it.  I'm sure that will refresh my
11  memory.
12      Q.   Yeah.  Please.  Please refresh your
13  memory by reading it in its entirety.
14      A.   Can you scroll down to the paragraph
15  saying "The Army."  That's good.  Thank you.  Okay.
16  You can scroll down.  Okay.  I've read it.
17      Q.   Ms. Jewell, have you read the September 9
18  joint statement in its entirety?
19      A.   I have.
20      Q.   Okay.  So I want to ask you some
21  questions about that.  Who made the decision for the
22  Department of Interior that is announced in the
23  document you just read, which is a September 9 joint
24  statement to reconsider the Army Corps of Engineers to
25  408 permissions and the nationwide permit to cross the

Page 164

1  Corps of Engineers flowage easement at Lake Sakakawea?
2  Who made the decision at the Department of Interior to
3  put the department's name on this release?
4           MS. STEINER:  Objection; lack of personal
5  knowledge.
6      A.   I don't know.  You just mentioned Lake
7  Sakakawea, and Lake Oahe is what we're talking about
8  in this case.  So I'm not sure what you're referring
9  to.
10      Q.   (BY MR. SEBY) Pardon me then.  I don't
11  mean to create confusion.  Lake Oahe.
12      A.   Okay.  Sorry.  So could you just ask your
13  question again, please?
14      Q.   Yes.  I apologize.  Who made the decision
15  for the Department of Interior that's announced in
16  this joint press release of September 9 -- this
17  statement.  It's not a press release.  It's a joint
18  statement by three agencies, one of which, by
19  definition, includes the Department of Interior.  My
20  question is, who at the department made the decision
21  to enter onto this statement?
22           MS. STEINER:  Objection; lack of personal
23  knowledge.
24      Q.   (BY MR. SEBY) Ms. Jewell?
25      A.   We had a team working on this.  I think

Page 165

1  the language drafting would have involved our counsel,
2  the solicitor's office, as well as others, but I don't
3  know specifically who reviewed this.  I do know that
4  the joint statement involving three large, complicated
5  federal agencies is difficult and there's no one
6  author typically.
7           The language as referred to in
8  Mr. Androff's e-mail is a joint negotiation.  So in
9  terms of -- you know, I would take accountability for
10  anything that went out under the Department of the
11  Interior's banner, but I do not recall having a
12  specific delegated person but rather a team that would
13  have been working with others on drafting something of
14  this nature.  But I don't know specifically as it
15  relates to this document.
16      Q.   Ms. Jewell, my question was not whether
17  there were multiple authors or the complexity of
18  reaching such an agreement for a joint statement, but
19  my question was who made the decision for the
20  Department of Interior to join it?
21           MS. STEINER:  Objection; lack of personal
22  knowledge, asked and answered.
23      A.   I certainly would take accountability for
24  a statement of this nature going out under the
25  Department of the Interior.  I was not personally

165:16-
166:5
FRE
401-402
602

Page 166

1   involved in drafting the language, but I don't object
2   to the language and respect the process and the people
3   that were involved in pulling this together in a way
4   that I think provided clarity to the U.S. government's
5   position.
6        Q.   (BY MR. SEBY) Was that position something
7   that you saw prior to it being released as a public
8   document?
9             MS. STEINER:  Objection; vague.
10        A.   I don't recall whether I saw the language
11   of this in advance of its publication.
12        Q.   (BY MR. SEBY) Were you aware that it was
13   being developed with the participation of the
14   Department of Interior team of your staff?
15        A.   You know, reading this it reminds me that
16   we were working with these agencies.  So I'm going to
17   assume that I was aware that they were working on
18   this, but I don't recall the specifics.
19        Q.   Okay.  Do you recall who your team at the
20   Department of Interior worked with on this -- in this
21   heavily, heavily negotiated final document from the
22   Department of Justice?
23             MS. STEINER:  Objection; misstates the
24   evidence.
25        A.   As I said before, I don't know the

Page 167

1   specifics of who worked on something of this nature.
2   I would surmise that it would involve our solicitor's
3   office, Indian Affairs, potentially public affairs,
4   communications, but I don't know who specifically was
5   on the team that represented Interior in this
6   document.
7        Q.   (BY MR. SEBY) Yeah.  My question was not
8   that.  It was who did your team at Interior, whoever
9   that was -- and I appreciate it's all those people you
10   mentioned.  Who did they work with at the Department
11   of Justice, to your knowledge?
12        A.   I don't know.
13        Q.   How about at the Department of the Army?
14   Who did they work with at the Department of the Army?
15        A.   I don't know that either.
16        Q.   What events or circumstances, to your
17   knowledge, Ms. Jewell, prompted the development of
18   this joint statement?
19             MS. STEINER:  Objection; lack of
20   foundation.
21        A.   Sorry.  Could you repeat the first half
22   of the question again?
23        Q.   (BY MR. SEBY) Yes.  It's a short
24   question, and it's to your knowledge, what events or
25   circumstances led to the creation of this document?

Page 168

1             MS. STEINER:  Same objection.
2        A.   I don't know, but I can surmise from the
3   title that they were making a statement relative to a
4   lawsuit that the Standing Rock Sioux Tribe had brought
5   against the Corps of Engineers.
6        Q.   (BY MR. SEBY) Are you aware that on this
7   same day a United States district judge in Washington
8   D.C., by the name of Judge Boasberg denied a motion
9   for preliminary injunction against the Corps that was
10   filed by the Standing Rock Sioux Tribe, and so the
11   United States government won.  And so I want to
12   understand from you, to the extent you know, why given
13   that outcome, literally hours after it occurred, this
14   statement was released, which reconsidered decisions
15   previously made by the Corps of Engineers?
16             MS. STEINER:  Objection; misstates the
17   evidence, lack of personal knowledge.
18        Q.   (BY MR. SEBY) I'm sorry, Ms. Jewell.
19   Your counsel is talking over you.  I didn't hear your
20   answer.
21        A.   My answer was I don't know.
22             (Deposition Exhibit 493 was remotely
23   introduced and provided electronically to the court
24   reporter.)
25             MR. SEBY:  Okay.  If we could look,

168:6-21
FRE
401-402,
602. 611

Page 169

1   please, at the next Exhibit 493.  If you could turn to
2   the next page please, Rachel.  If we could zoom in on
3   the "from" and "sent" and "to" line up top.
4        Q.   (BY MR. SEBY) So this is an e-mail from
5   an individual named Sam Hirsch at the Department of
6   Justice on September 9.  It's at 12:52 p.m., so barely
7   afternoon on September 9.  And it's sent to a large
8   group of people at the army, the Department of
9   Justice, and the Department of Interior.  And I don't
10   see that you're copied on this e-mail, but your chief
11   of staff and the solicitor and Mr. Roberts are.  And
12   if we could go to the body of the e-mail, please.
13        A.   If you can hold.  I'm just taking a look
14   at this list.  Thank you.
15        Q.   So the body of the e-mail, if we could go
16   down to that, please.  There you go.  So Mr. Hirsch at
17   the Department of Justice to this large multiagency
18   distribution is sending a copy of Judge Boasberg's
19   order and opinion denying the Standing Rock Sioux
20   Tribe's motion for preliminary injunction entirely.
21   And so he's letting the group know that earlier that
22   day the court issued that order and denying the
23   injunction request by the tribe and also attaching in
24   the same breath the DOJ's version of the joint
25   statement, which we will send out momentarily.  My

Sally Jewell
June 02, 2022                                    170 to 173

Page 170

1   understanding is that army and interior will send out
2   identical statements each on their own letterhead.  Do
3   you see that?
4        A.   I do see that.
5        Q.   Do you recall being advised of Judge
6   Boasberg's order on September 9?
7        A.   I don't recall that specifically, but I
8   suspect that I would have been advised.
9        Q.   Okay.  And that was concurrent with you
10  being advised about the joint statement that the
11  Department of Interior was about to release; correct?
12       MS. STEINER:  Objection; vague.
13       A.   I don't know.  I don't remember
14  specifically what happened on September 9, 2016, nor
15  the times of day, as I expressed before.  So I'm not
16  sure what you're getting at.  I mean, I wasn't on the
17  e-mail.  Clearly there were a lot of people involved
18  in that just by the number of addressees on the
19  e-mail.  My --
20       (Deposition Exhibit 494 was remotely
21  introduced and provided electronically to the court
22  reporter.)
23       Q.   (BY MR. SEBY) So let's go to Exhibit 494.
24  And here we have -- I'm going to have you -- ask you
25  to please read it in a moment, but I'm just going to

**170: 5-8**
**FRE 401-402**

Page 171

1   explain what the exhibit is.  It's a U.S. Department
2   of Interior news update.  It's a distribution and it
3   is to your SRJ2 Interior department e-mail; correct?
4        A.   That's correct.
5        Q.   So you would have received this, to your
6   knowledge?
7        A.   It would have gone to my e-mail.
8        Q.   Yeah.  And so the e-mail was sent to you
9   1:47 p.m., so not too long after Mr. Hirsch's e-mail
10  and the earlier one we talked about in the two
11  previous exhibits.  You want to take a moment and read
12  what your Department of Interior published as a
13  news release about this -- about two things, about
14  Judge -- right there, Judge Boasberg's order and the
15  joint statement.
16       A.   Roll down to the top of the joint
17  statement.  Scroll down to the top of that next page.
18  Thank you.  Roll down, please, if there's more.  Thank
19  you.
20       Q.   So at least as far as you're concerned
21  and the Department of Interior is concerned, do you
22  agree with me this was the Department of the Interior
23  publication of the joint statement on September 9 of
24  2016?
25       MS. STEINER:  Objection; vague, misstates

Page 172

1   the evidence.
2        A.   It appears to be a joint statement.  It's
3   an e-mail to me, not a statement that, you know -- I
4   mean, not in a different venue, not in a public venue,
5   but I assume this resulted in the joint statement, as
6   noted here.
7        Q.   (BY MR. SEBY) So are you telling me that
8   you don't know whether or not this was actually
9   publicly issued by the Department of Interior?
10       A.   I assume it was publicly issued.  What
11  you're showing me is an e-mail.  And whether it
12  went out in that format or not -- I'm assuming it did,
13  but I don't know specifically.  I'm responding to the
14  exhibit in front of me, which was an e-mail to me with
15  the information attached.
16       Q.   Okay.  Do you have any reason to believe
17  that whomever the Interior news update was provided to
18  received something different than this e-mail, which
19  the subject line talks about joint statement, and then
20  under the symbol of each agency there's an explanatory
21  paragraph introducing the joint statement.  Do you
22  have any reason to believe that that was not publicly
23  issued by the Department of Interior to all who
24  receive the Listserv Interior news updates?
25       MS. STEINER:  Objection; vague, compound,

Page 173

1   lack of personal knowledge.
2        A.   Could you roll to the top just so I can
3   see the e-mail.  I don't have any reason to believe
4   that what actually went out was different from this.
5   I don't know who the recipients would have been --
6        Q.   (BY MR. SEBY) Sure.
7        A.   -- to this message.
8        Q.   Sure.  Did you often receive Department
9   of Interior news updates from a list service like
10  this?
11       A.   I think so.
12       Q.   Okay.
13       A.   I got a lot of incoming messages.  Yeah.
14  I'm not sure if I was on there as a Listserv recipient
15  or if this was specifically sent to me.  It does look
16  like it was a Listserv.  I had a lot of incoming
17  messages.  I don't think I got all of them.  So I'm
18  not sure.
19       Q.   With respect to this communication from
20  the Department of Interior, you don't have any reason
21  to doubt its authenticity, do you?
22       A.   No.
23       Q.   All right.  So if we could go down and
24  look at the actual language in the joint statement
25  that's here on Department of Interior letterhead,

**Page 174**

1  would you please look at the first paragraph?

2       A.   You mean the "We appreciate the District

3  Court"?

4       Q.   Yeah.

5       A.   Yeah.

6       Q.   "We appreciate," that's the three

7  agencies talking and expressing some manner of the

8  word "appreciation" for the district court's opinion,

9  which would be the same day, June -- pardon me --

10 September 9, 2016.  And that decision, that order

11 denied a request to preliminarily enjoin the Corps

12 with respect to the DAPL crossing.

13           And the press release -- or the joint

14 statement goes on to say, However, important issues

15 raised by the Standing Rock Sioux Tribe and other

16 nations, regarding the pipeline specifically and

17 pipeline-related decision-making generally, remain.

18 Therefore, the Department of the Army, the Department

19 of Justice, and the Department of Interior will take

20 the following steps.  And it talks in the first

21 paragraph after that about what the army will do or

22 won't do and goes on to talk about some other issues

23 and details.

24           And then in the one, two, three, four,

25 fifth paragraph, if we could go down to that, it says,

*174:6-176:1*
*FRE 401-402,*
*602, 611, calls*
*for hearsay, 801*

**Page 175**

1  "Finally, we fully support the rights of all Americans

2  to assemble and speak freely.  We urge everyone

3  involved in protest or pipeline activities to adhere

4  to the principles of nonviolence.  Of course, anyone

5  who commits violent or destructive acts may face

6  criminal sanctions from federal, tribal, state or

7  local authorities."

8           And here it says, the next sentence that

9  I want to ask you about, "The Departments of Justice

10 and the Interior will continue to deploy resources to

11 North Dakota to help state, local, and tribal

12 authorities, and the communities they serve, better

13 communicate, defuse tensions, support peaceful

14 protest, and maintain public safety."

15           So what sort of resources are you talking

16 about here?

17           MS. STEINER:  Objection; lack of personal

18 knowledge.

19       Q.   (BY MR. SEBY) At your Department of the

20 Interior?

21       A.   Well, as you stated and I'll reiterate,

22 this is a negotiated joint statement between three

23 federal agencies and you have to assume that the

24 language is from those federal agencies collectively.

25 So with that in mind, could you ask again your

**Page 176**

1  question?

2       Q.   The question was not what the other

3  agencies said or thought.  It's about this statement

4  here that says, "The Departments of Justice and

5  Interior" -- so now it's down to two, and it

6  specifically references the agency for which you were

7  the cabinet secretary -- will continue to deploy

8  resources to North Dakota to help state, local

9  authorities.

10      A.   And tribal.

11      Q.   And tribal.  So did you just help -- did

12 you just provide resources to help tribal or anyone

13 else that's listed there?

14      A.   No.  I think we were enormously helpful

15 to state and local authorities.  One of the, I think,

16 very clear situations that was happening at Standing

17 Rock was the need to maintain peace and security

18 within the camp.  And in general, the behavior of the

19 Bureau of Indian Affairs law enforcement officers was

20 holding people to account to be peaceful and if they

21 weren't, then they were taking appropriate action.

22           For the most part, they were trusted, and

23 I think that was very, very helpful in keeping the

24 large portions of this action peaceful.  And that's, I

25 think, a very important -- that was very important to

*176:2-177:3*
*FRE*
*401-402,*
*602, 611*

**Page 177**

1  the state and very important to local governments to

2  have a significant law enforcement presence there and

3  actions that were holding people accountable.

4       Q.   So that comment, I take it, just applies

5  to the protest camp or persons located on the Standing

6  Rock Sioux Tribe Reservation and nowhere else;

7  correct?

8           MS. STEINER:  Objection; misstates the

9  evidence.

10      A.   That's actually not what I said.  I said

11 to maintain peace within the camps.  I don't know the

12 extent to which they were across reservation boundary

13 or on reservation boundary when they were taking these

14 actions, and that would be something that would be

15 determined by, you know, the law enforcement folks on

16 hand there.

17           I don't know if there were formal

18 relationships that enabled them to go outside of

19 jurisdiction, but I do know they were working very,

20 very hard to keep people abiding by the law and

21 holding them accountable if they didn't.

22      Q.   (BY MR. SEBY) Ms. Jewell, I just want to

23 ask you because I didn't -- or I understood you

24 earlier to have said that you had no idea where the

25 camps were located on whose property.  And so with

Page 178

1  respect to camps that were not on Standing Rock Sioux
2  Tribe Reservation land where the BIA was asked to be
3  the law enforcement entity, I don't understand what
4  you mean then with respect to any camp that was not
5  located on the Standing Rock Sioux Tribe Reservation
6  and this statement that you're making.
7          MS. STEINER:  Objection; misstates the
8  evidence.
9          THE DEPONENT:  Thank you.
10  Q.    (BY MR. SEBY) Ms. Jewell?
11  A.    What I'm saying is that I don't know
12  specifically whether the BIA law enforcement officers
13  were taking exactly the same actions on
14  non-reservation land as they were on reservation land,
15  nor do I know the jurisdictional arrangements they
16  might have made with authorities for those lands in
17  order to be able to carry out the law on those lands.
18          So I hope you understand, it's a question
19  of jurisdiction and where were they, and I don't know
20  the answers to that.  I do know that they were working
21  very hard to keep the protests safe and peaceful
22  through their work.
23          And whether that was specifically -- I
24  mean, their role is on the reservation, but whether
25  they had been cross-deputized to go off the

Page 179

1  reservation to the extent the camp extended there and
2  took action is something you'd have to ask someone
3  that was involved in incident command that would have
4  the answer to that question.  I don't know.
5  Q.    (BY MR. SEBY) So who in the Department of
6  Interior that we should talk to would know the answer
7  to my question?
8  A.    I would suggest Darren Cruzan.

*[179:5-8 FRE 106, 401-402]*

9  Q.    Okay.  All right.  Thank you.  Do you
10  know if Mr. Cruzan had a role in drafting this
11  statement?
12          MS. STEINER:  Objection; lack of personal
13  knowledge.
14  A.    I don't know who drafted this statement.
15  Q.    (BY MR. SEBY) I thought --
16  A.    You can see his name on the long list of
17  to's, people who are addressees.
18  Q.    You did, yeah.
19  A.    That doesn't mean he drafted the
20  statement.  That just meant that he was sent an
21  e-mail.
22  Q.    Do you know if Mr. Beaudreau participated
23  in drafting the statement from the Department of
24  Interior?
25  A.    I don't know.

Page 180

1  Q.    This statement here that's on the screen
2  in highlighted text that we have been talking, "The
3  Departments of Justice and Interior will continue to
4  deploy resources to North Dakota to help state, local,
5  and tribal authorities, and the communities they
6  serve, better communicate, defuse tensions, support
7  peaceful protest, and maintain public safety," that's
8  on September 9, right, 2016?
9  A.    Yes.

*[180:1-9 FRE 401-402]*

10  Q.    Ms. Jewell, do you stand by that
11  statement as the former secretary of the interior at
12  the time this was released publicly?
13  A.    Yes.  That is consistent with my
14  understanding of what we were doing at Interior.

*[180:10-14 FRE 401-402]*

15          (Deposition Exhibit 495 was remotely
16  introduced and provided electronically to the court
17  reporter.)
18  Q.    All right.  If we could go to
19  Exhibit 495.  And before we talk about this, with
20  respect to the September 9 joint statement that starts
21  off recognizing Judge Boasberg denied the tribe's
22  request for preliminary injunction, meaning they
23  couldn't show irreparable harm in the court's view,
24  did you ever read Judge Boasberg's September 9 order?
25  A.    I don't recall.

Page 181

1  Q.    Ever reading it?
2          MS. STEINER:  Objection; asked and
3  answered.
4  A.    I don't recall.
5  Q.    (BY MR. SEBY) Are you aware that at a
6  status conference before the judge a few days after
7  the September 9 order and the joint statement that the
8  judge expressed confusion as to the reason behind and
9  purpose of the September 9 joint statement?  Are you
10  aware of that?
11          MS. STEINER:  Objection; misstates the
12  evidence, lack of personal knowledge.
13  A.    I do not recall that.
14  Q.    (BY MR. SEBY) Okay.  If we can go to 495,
15  please.  And if you would please review this e-mail,
16  it starts with an e-mail from Ms. Tracy Toulou with
17  the Department of Justice to Larry Roberts and Michael
18  Black at the Bureau of Indian Affairs.  Who's
19  Mr. Black?
20  A.    Mr. Black was the head of the Bureau of
21  Indian Affairs.  I think the official title is
22  director of the Bureau of Indian Affairs and he
23  reported to Larry Roberts.

*[181:14-23 FRE 401-402]*

24  Q.    Got it.  So Ms. Toulou is thanking Larry
25  for pushing through the DAPL press release.  This

181:24-182:3
FRE 401-402

Page 182

1  e-mail is dated September 9, the day after the joint
2  statement.
3       A.    September 10.
4       Q.    Pardon me.  Yes.  September -- excuse me.
5  September 10, which is a day after the September 9
6  joint statement.  And she says, Thank you for pushing
7  through the DAPL press release and the underlying
8  interagency agreement.  What is the underlying
9  interagency agreement?
10      MS. STEINER:  Objection; lack of
11 foundation.
12      Q.    (BY MR. SEBY) Ms. Jewell?
13      A.    I'm reading it.
14      Q.    Yeah.
15      A.    I don't know what she's referring to.
16      Q.    How about would you please read the rest
17 of her message before we go on to the next portion of
18 the e-mail chain.
19      A.    Hold there, please.  Scroll down.  Okay.
20 I've read that message.
21      Q.    Ms. Jewell, do you know what the mobile
22 emergency operations center is?
23      A.    I don't remember specifically what it is.
24 So I'd be speculating.
25      Q.    Don't do that.  I just asked you if you

Page 183

1  knew what it was.  So what do you make of Ms. Toulou's
2  message?  She is -- is she suggesting that this -- the
3  timing and content of this release was at least in
4  part targeted to appeasing the protesters so there
5  wasn't a confrontation?
6       MS. STEINER:  Objection; vague, calls for
7  speculation.
8       A.    I read this message as one of deep
9  appreciation for Darren Cruzan and his team on the
10 ground for working hard to keep the peace and to
11 communicate with the protesters.  That's what I read
12 in this letter.
13      Q.    (BY MR. SEBY) How did Mr. Cruzan and the
14 BIA for whom he worked keep the peace in North Dakota
15 with respect to the protests against the Dakota Access
16 Pipeline?  What do you mean by that specifically?
17      A.    I commented a few minutes ago that the
18 BIA had -- was trusted because of the work they were
19 doing to maintain peace in the camp and keep people
20 safe.  And when you have a large group of people, that
21 kind of presence is necessary.
22      Q.    So is it your testimony, Ms. Jewell, that
23 as of September 10, 2016, but for the BIA, there would
24 not have been any peace?
25      MS. STEINER:  Objection; misstates the

Page 184

1  evidence.
2       A.    The BIA was present on September 10 and
3  had been for some time.  And I believe their presence
4  was very, very important in keeping the protests as
5  peaceful as possible and keeping the people that were
6  there as safe as possible.  That's what I was meaning.
7       Q.    And does that statement
8  apply to all areas in which protests were occurring or
9  just on the reservation?
10      MS. STEINER:  Objection; vague, compound.
11      A.    As I stated previously, I don't know
12 specifically whether the Bureau of Indian Affairs was
13 carrying out its duties beyond the bounds of the
14 reservation through a cross-deputization or other
15 means.
16      I do know that their presence was
17 essential in defusing tensions, in holding people
18 accountable for activities that might have broken the
19 law, but allowing them to exercise their First
20 Amendment rights, and to do that in a tense situation
21 and one where there were many, many more people than
22 what they were used to dealing with.  So I think their
23 efforts were nothing short of heroic.
24      Q.    (BY MR. SEBY) The question, though,
25 Ms. Jewell, is not questioning any of the BIA's

Page 185

1  efforts on the Standing Rock Sioux Tribe Reservation.
2  It's just asking you whether or not you feel that the
3  BIA presence and work yielded similar results at
4  protest camps located on other properties apart from
5  the Standing Rock Sioux Tribe Reservation?
6       MS. STEINER:  Objection; vague.
7       A.    I don't know whether the BIA was carrying
8  out its activities outside of the bounds of the
9  reservation, and that would be a question better asked
10 of others who were on the ground.  I think they were
11 doing the best job they could to maintain the peace.
12 I don't know about the boundaries of the camp and the
13 cross-deputizations and where they were.  I can't --
14 I'm not sure where you're trying to lead me.  I'm just
15 telling you as much as I know.
16      Q.    (BY MR. SEBY) And, Ms. Jewell, you
17 responded to this e-mail being forwarded to you from
18 the director of the Office of Tribal Justice within
19 the Department of Justice.  That's Ms. Toulou,
20 according to Mr. Roberts' explanation to you.  And you
21 responded thanking him and recognizing Mr. Cruzan.
22 And then you say, "The next steps in the process of
23 consultation will be really important."  What were you
24 referring to?
25      A.    Can you show me what you're reading,

Page 186

1  please?

2      Q.   Yes.  If we can go up in the string of

3  e-mail.  Right there.  It's your response to

4  Mr. Roberts.  Larry, thanks for sharing this

5  information, if you'd please read that.

6      A.   If you could remove that box so I can see

7  the context.  Okay.  Your question again, please.

8      Q.   I asked you this first paragraph of your

9  note, the last sentence it says, "The next steps in

10 the process of consultation will be really important."

11 What are you referring to?

12     A.   I'm sure what I'm referring to is tribal

13 consultation.  Whether it's with the pipeline company

14 and the Corps, one or the other, I can't remember; but

15 it would be, I believe, the tribal consultation

16 process.

17     Q.   Is it your testimony that as of

18 September 11, 2016, that that had not already taken

19 place and that you were launching a new consultation

20 process?

21          MS. STEINER:  Objection; vague, compound,

22 misstates the evidence.

23     Q.   (BY MR. SEBY) Ms. Jewell?

24     A.   I believe that the joint statement

25 indicated that there was -- I can't remember the

Page 187

1  language, if you'd go back to that document, if you

2  want to take the time -- that there would be

3  additional consultation before the Corps would issue a

4  permit and that the request was that the construction

5  of the pipeline be paused.

6          I'm referring, I believe -- and this is

7  from my recollection -- to the tribal consultation

8  that would understand and satisfy the concerns that

9  were expressed by the tribe that had not been

10 adequately addressed.

11     Q.   What do you mean by to "satisfy the

12 concerns" of the Standing Rock Sioux Tribe "that had

13 not been adequately addressed"?

14     A.   Could you go back, please, to the justice

15 department exhibit?

16     Q.   Are you talking about the joint

17 statement?

18     A.   Yes.

19     Q.   Well, it's actually a joint statement by

20 the Department of Interior.

21     A.   I know.  I'm trying to remember the

22 language so that I don't --

23     Q.   Let's go back to Exhibit 494, which is

24 the Department of Interior publication of that joint

25 statement.  And you please point out to me where

Page 188

1  you're talking about that language being present in

2  the statement?

3          MS. STEINER:  And, Counsel, I would ask

4  that you not interrupt the witness.

5      Q.   (BY MR. SEBY) Ms. Jewell?

6      A.   Give me a minute to look at this.

7      Q.   You bet.

8      A.   Please go down.  Please go down.  Okay.

9  Is there any more?  I think that's it.

10     Q.   Ms. Jewell, I'm glad to have you correct

11 me, but I don't see the word "consultation" mentioned

12 anywhere in your joint statement.

13     A.   There is -- if you look at the first line

14 of the second paragraph, Federal agencies are inviting

15 all tribes to formal, government-to-government

16 consultations in the fall to address how the federal

17 government can better ensure meaningful tribal input

18 into infrastructure-related investments.

19 "Consultation" appears in that first line.

20     Q.   Yeah, but that's not talking about the

21 Dakota Access Pipeline.  You're --

22     A.   I know.  I don't -- well, that's related

23 to the process by which there are consultations and

24 whether they have meaningful tribal input, which is

25 the argument that the tribe -- the Standing Rock Sioux

Page 189

1  Tribe was making here.  So the reason I wanted to go

2  back to this document was to see whether consultation

3  was mentioned or whether it was implied in revisiting

4  the decisions that the Corps had made.  So if you

5  could go back to the document we were reviewing before

6  this, I'd appreciate it.

7      Q.   Well, I want to ask you about that

8  because -- so you're saying that your use of the word

9  "consultation" talking about satisfying the Standing

10 Rock Sioux Tribe's concerns -- your response when I

11 pointed out there's nothing in the statement itself

12 that talks about that, you are referring me to the

13 introductory statement in the paragraph of the news

14 release issued by the Department of Interior, but not

15 the statement itself; is that correct?

16     A.   That is correct.

17     Q.   Okay.  That's what I wanted to ask you

18 about.

19     A.   Excuse me.  I'm talking for a second

20 here.  What I'm trying to understand is you provided

21 me a brief e-mail.  I'm trying to go back to the

22 context to try and figure out -- because I don't

23 remember everything exactly as it occurred in

24 September of 2016.  I'm trying to figure out what I

25 meant by the word "consultation."  That's what you

186:17-187:10
FRE 602

Page 190

1    asked me.  So that's why I wanted to refer back to
2    this document.  So if you could go back to that, that
3    would be helpful.
4         Q.    I'm sorry.  Just so we're clear, you want
5    to go back to Exhibit 495?
6         A.    The one that was the e-mail where I
7    referenced "consultation."  I don't remember the
8    number.
9         Q.    Yes.  It's Exhibit 495.  So this all
10   started with the last sentence in your paragraph there
11   of your e-mail of September 11.  "The next steps in
12   the process of consultation will be very important."
13   I believe you're referring to the DAPL process; right?
14        MS. STEINER:  Objection; vague.
15        A.    I honestly -- having reread the other
16   document, I'm not sure if that's what I was referring
17   to or whether I was talking about the broader process
18   of consultation with regard to bringing tribes
19   together, which was a serious effort that we undertook
20   and resulted in a secretarial order that I issued.
21        So I don't remember specifically whether
22   I was talking about consultation with the tribe as it
23   related to the Corps' permit or whether I was talking
24   about consultation as it related to revisiting how
25   tribal consultation was conducted with input from

Page 191

1    tribes on infrastructure projects.
2         (Deposition Exhibit 420 was remotely
3    introduced and provided electronically to the court
4    reporter.)
5         Q.    (BY MR. SEBY) If we could go to
6    Exhibit 420, please, and scroll ahead to the e-mail
7    itself.  This is an e-mail you're not copied on here,
8    Ms. Jewell, but it's an e-mail from an individual in
9    the Corps to Major General Jackson, and Ms. Darcy is
10   listed there.  And it's entitled "North Dakota
11   Delegation Letter to DOJ, DOI, Army Corps re Dakota
12   Access Pipeline."
13        And if we could go to that letter which
14   is an attachment to this e-mail, once you get past
15   these social media images, logos.  So this letter,
16   Ms. Jewell, is dated September 14 of 2016 and it's
17   addressed to Loretta Lynch, the attorney general of
18   the United States; Jo-Ellen-Ellen Darcy, the assistant
19   secretary of the army for civil works; and you,
20   Ms. Sally Jewell, secretary, Department of the
21   Interior.
22        And it's on letterhead from four
23   individuals, Senator John Hoeven, Senator Heidi
24   Heitkamp, of North Dakota, both of them, and
25   Senator -- pardon me -- Congressman Kevin Cramer of

[margin note: 191:5-192:3 FRE 611]

Page 192

1    North Dakota and Jack Dalrymple, the governor of the
2    state of North Dakota.  Do you recall receiving this
3    letter, Ms. Jewell?
4         A.    Could you please show me the content?
5         Q.    Please take a moment to read it in its
6    entirety.
7         A.    Please scroll down.  Please scroll down.
8    Scroll down, please.  Okay is there anything further
9    beside the signatures?
10        Q.    No.
11        A.    Okay.
12        Q.    There is not.  So I want to ask you about
13   this letter, Ms. Jewell.  As secretary of the interior
14   as an identified addressee, do you recall receiving
15   this letter?
16        A.    I believe I did see this letter.
17        Q.    Do you recall discussing this with your
18   staff?
19        A.    I'm sure I discussed it with my staff.  I
20   don't remember the specifics of the discussion, but
21   this was a continual topic of discussion at that time.
22        Q.    Do you recall discussing any follow-up
23   with respect to the message in the letter?
24        A.    I don't recall specifically what our
25   follow-up was.  I'm sure there was follow-up.  I just

Page 193

1    don't remember specifically what it was.
2         Q.    How about follow-up with respect to the
3    delegations urging you to follow through on your joint
4    release statement, meaning the September 9 statement
5    we've been talking about, to begin planning
6    immediately for cost-share reimbursement and manpower
7    that will be needed to support state and local
8    enforcement as they continue to provide public safety.
9    What was the follow-up discussed on that?
10        MS. STEINER:  Objection; assumes facts
11   not in evidence, vague.
12        A.    I recall my conversation with the
13   governor -- I don't recall when that took place --
14   urging him not to escalate the situation, particularly
15   by calling out the national guard or having a
16   heavy-handed response, because I was concerned about
17   that escalating the situation.
18        I don't remember when that conversation
19   took place relative to this letter on September 14,
20   but we were doing the best job we could to keep
21   tensions low and to keep associated needs for law
22   enforcement response low.
23        Q.    (BY MR. SEBY) Well, I don't know when
24   your conversation was either because you have not told
25   me, but I do know that in the joint statement you,

[margin note: 193:2-22 FRE 611, calls for hearsay, 801]

Sally Jewell
June 02, 2022                                      194 to 197

**[margin annotation: 193:23-195:3 FRE 602, 611]**

Page 194

1  along with the Department of Justice, committed to
2  provide additional resources.  And the governor and
3  the two senators and the congressman for North Dakota
4  are asking you to follow through on your commitment in
5  that letter to provide support to state and local law
6  enforcement as they continue to provide public safety.
7  So my question is, what did you do in response to that
8  request?
9         MS. STEINER:  Objection; misstates the
10  evidence, lack of personal knowledge.
11      A.   As I have stated on several occasions, we
12  surged as many resources from the Department of the
13  Interior that we could to maintain the peace and
14  uphold the law to the Standing Rock Reservation.
15  Those are additional resources that were provided that
16  we paid for to do our best to keep the situation as
17  peaceful as possible.
18         And as I've stated before, I'm proud of
19  that response.  There was nothing that I recall
20  reading that you've shown me earlier that said that we
21  would pay for law enforcement resources provided by
22  the state, but that we would continue to work to
23  support, with resources in the joint statement,
24  correct, with the Department of Justice -- and I don't
25  know what they did -- to work with state, local,

Page 195

1  tribal entities to, you know, uphold the law and keep
2  the protests peaceful.  That's what I recall reading
3  from the documents you shared with me earlier.
4      Q.      (BY MR. SEBY) How about the two senators
5  and the congressman and the governor's request for a
6  meeting with you?  Did you honor that request and make
7  yourself available for a meeting with the
8  congressional delegation and governor of North Dakota?
9  It's in the final paragraph of the letter.
10      A.   What I see in that paragraph is they're
11  asking our departments to meet with them, not
12  specifically the individuals.  I do not recall
13  personally having a meeting, but I am confident that
14  we responded to their request.
15         I would also like to add that it's not
16  uncommon for states to request reimbursement for
17  things, whether that's fighting fires or law
18  enforcement support.  The request does not mean it's
19  appropriate to provide that.  And so I just want to
20  point that out, that we can ask for a lot of things,
21  but whether it's appropriate to support it or whether
22  it's possible to support it is another matter
23  entirely.
24      Q.      Do you recall directing your staff to
25  meet with these individuals as they requested if you

**[margin annotation: 195:24-196:7 FRE 602]**

Page 196

1  did not do so personally?
2         MS. STEINER:  Objection; misstates the
3  evidence, lack of personal knowledge.
4      A.   I would not expect to have to direct my
5  staff to respond appropriately to a letter of this
6  nature.  My assumption would be that they would have
7  the appropriate people respond.
8      Q.      (BY MR. SEBY) And did your assumption
9  bear out with reality in terms of did they do that?

**[margin annotation: 196:8-12 FRE 602]**

10         MS. STEINER:  Objection; vague, lack of
11  personal knowledge.
12      A.   I don't recall what happened.
13      Q.      (BY MR. SEBY) So you don't know as we're
14  sitting here today whether or not your staff honored
15  the request by two senators, the governor, and the
16  congressman to meet with them?
17         MS. STEINER:  Objection; misstates the
18  evidence, asked and answered, lack of personal
19  knowledge.

**[margin annotation: 196:13-24 FRE 602, 611]**

20      A.   I'm confident in my staff and their
21  responsiveness to elected officials and other
22  officials.  I do not recall the specifics of how they
23  may have responded or who may have responded or the
24  meetings specifically involved with that.
25         MR. SEBY:  And why don't we take a short

Page 197

1  break of ten minutes and come back.  It's been more
2  than an hour since we broke.
3         MS. STEINER:  Okay.
4         THE VIDEOGRAPHER:  Going off the record.
5  The time is 8:42 p.m. UTC, 2:42 p.m. Mountain.
6         (Recess taken, 2:42 p.m. to 2:52 p.m.)
7         THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 8:52 p.m. UTC, 2:52 p.m.
9  Mountain.
10      Q.      (BY MR. SEBY) Secretary Jewell, we're
11  back from a short break.  And earlier I had asked you
12  about the Corps of Engineers special use permitting
13  process relative to the DAPL protests and the Standing
14  Rock Sioux Tribe request in particular for such a
15  permit.  Do you recall that discussion?
16      A.   I recall you asking me about it and I
17  recall me suggesting that I didn't recall much about
18  the special use permit.
19      Q.      Okay.  Do you recall the Department of
20  Interior, your staff, having any role in that process?
21         MS. STEINER:  Objection; lack of personal
22  knowledge.
23      A.   Yeah.  I don't recall the process.
24      Q.      (BY MR. SEBY) Do you recall your staff
25  ever speaking with you about it?

**[margin annotation: ND OBJ: Relevance; Introduces new material]**

Page 198

1    MS. STEINER:  Objection; lack of personal
2  knowledge.
3    Q.   (BY MR. SEBY) Ms. Jewell?
4    A.   Yes.  I'm thinking.  I have vague
5  recollection that there were discussions about Corps
6  land, but I don't recall the permit process or if
7  there was a permit process required.
8         (Deposition Exhibit 499 was remotely
9  introduced and provided electronically to the court
10  reporter.)
11    Q.   Could we go to Exhibit 499, please.  And,
12  Ms. Jewell, this is an e-mail string, two e-mails,
13  that starts with a -- and you're not copied on this,
14  but there is an e-mail that begins from a Corps of
15  Engineers individual Major French Pope the third to
16  Donald Jackson, Major General Donald Jackson, and a
17  number of other people in the Corps, including the
18  district commander for the Omaha district and his
19  superior officer, Brigadier General Scott Spellmon.
20  And it provides a storyboard which the Corps created
21  on a daily basis to report information about the
22  protests and the pipeline circumstance.
23         So I want to call your attention to that
24  e-mail, and we'll look at the attachment in a moment,
25  but if you would please read the e-mail from

Page 199

1  Mr. French Pope to his Corps colleagues.  And then
2  there's an e-mail on top of that that I'll ask you to
3  please read, too, from Major General Jackson to
4  Ms. Darcy and Mr. -- or pardon me -- Lieutenant
5  General Semonite, who is the chief of the Corps of
6  Engineers at the time.  If we could please start
7  reading that first e-mail.
8    Q.   Could you scroll down to the bottom of
9  the document and then back up to the part so I can
10  sort of make sure this is the end and then where it
11  starts.
12    Q.   There is an attachment, as I mentioned.
13  I think it would be better if we looked at that
14  together after you read the text of the e-mail.
15    A.   That's fine.  I'm just trying to read the
16  e-mails in order, which would mean the bottom one
17  first.
18    Q.   Right.
19    A.   Yeah.  Scroll down, please.  I'll just
20  comment that the army is good at acronyms.  Can you
21  scroll back up to the e-mail at the top?  Is that the
22  very top?
23    Q.   Yes.
24    A.   Okay.  Okay.  I've read it.
25    Q.   So both e-mails that we just read

Page 200

1  together, the first one from Major French Pope and the
2  second one from Major General Jackson, both reference
3  a Corps of Engineers special use permit being approved
4  by a number of federal agencies:  Department of Army,
5  Department of Justice, BIA, DOI, and the U.S.
6  Attorney's Office, and the FBI.  Do you see that?
7    A.   No.  I see DOI, DOJ and that -- yeah.
8  Here we go.  They weren't on the right page.
9    Q.   See that sentence right there?
10    A.   I see it now.  I do.
11    Q.   BLUF, today?
12    A.   Yes.
13    Q.   Right there.
14    A.   Yes, I see it.
15    Q.   Okay.  So it says it there.  And then if
16  you look up in Major General Jackson's e-mail to
17  Assistant Secretary of the Army Darcy and chief of
18  engineers, the first sentence says, "After getting the
19  green light from the White House and DOJ/DOI, Omaha
20  granted the Special Use Permit request of the Standing
21  Rock Sioux (partial...south side only)."
22         So does that refresh your recollection
23  any further with respect to the DOI's participation in
24  the Corps of Engineers consideration of a special use
25  permit for the Standing Rock Sioux Tribe for protest

[margin annotation: 200:15-201:8 FRE 106, 602]

Page 201

1  purposes?
2    MS. STEINER:  Objection; misstates the
3  evidence, lack of personal knowledge.
4    A.   It does not refresh my memory because I
5  do not recall the special use permit process, as
6  previously indicated.  It appears from this message
7  that someone at DOI was involved.  It just wasn't me
8  personally, to my recollection.
9    Q.   (BY MR. SEBY) I appreciate you may not
10  have been personally involved, but do you recall
11  someone in your staff giving the green light to the
12  Corps to proceed to purportedly issue a special use
13  permit?
14    MS. STEINER:  Objection; misstates the
15  evidence, lack of personal knowledge.
16    A.   As I've stated before, I don't recall
17  anything about the special-use-permit process.  It
18  clearly states my department was involved.  I
19  appreciate that they were involved, but I don't know
20  what process they went through, who approved it, or
21  anything else.  It's clear that people were working
22  together.
23    Q.   (BY MR. SEBY) Okay.  You don't have any
24  reason to question these statements by the Corps
25  individuals, do you?

[margin annotation: 201:9-22 FRE 602, calls for hearsay, 801]

Sally Jewell
June 02, 2022                                          202 to 205

Page 202

1        MS. STEINER:  Objection; lack of personal
2   knowledge, lack of foundation.
3        A.   These are all messages from the Corps to
4   the Corps.  So I would have no comment.
5             (Deposition Exhibit 500 was remotely
6   introduced and provided electronically to the court
7   reporter.)
8        Q.   (BY MR. SEBY) Okay. if we could look at
9   the Exhibit 500, please.  There we go.  There's very
10  little to look at, Ms. Jewell, because your counsel
11  has redacted everything in the e-mail sent to you, and
12  actually everything in the e-mail which you sent to
13  your senior staff -- chief of staff Mr. Beaudreau.
14  Who is Nicole Buffa?
15       A.   Nicki Buffa was the deputy chief of staff
16  reporting to Tommy.
17       Q.   And who is Molly Click?
18       A.   Molly was my executive assistant.
19       Q.   And Kathleen O'Leary?
20       A.   I don't recall her role.
21       Q.   What is a September 23 draft weekly?
22       A.   I believe that is my weekly communication
23  to the White House or the department's weekly
24  communication to the White House that I referenced
25  earlier.  So this would be the draft of what we would

Page 203

1   have written for the week of September 23 to the White
2   House.
3        Q.   Are any of these individuals attorneys on
4   this e-mail?
5        A.   Tommy Beaudreau is an attorney.  Nicki
6   Buffa is an attorney.  I don't know Kathleen O'Leary.
7        Q.   And in their positions of chief of staff
8   and deputy chief of staff, is their job to provide you
9   with legal counsel?
10       A.   No.  I don't believe this is redacted for
11  that purpose.  It is communication to the President of
12  the United States.
13       Q.   To the President of the United States or
14  the White House?
15       A.   It's the White House, but the president
16  saw it.  That's how he was kept informed.
17       Q.   I understand.  If we could go to
18  Exhibit 318, please.  Ms. Jewell, the -- I'm sorry.
19       MR. SEBY:  If we can go back to the
20  beginning of the top of that e-mail, Exhibit 318.  So
21  I'd like to ask you, Rachel, to please go to the very
22  bottom of this e-mail.
23       Q.   (BY MR. SEBY) So this exhibit is an
24  e-mail chain that starts with an e-mail message to a
25  number of federal personnel and State of North Dakota

Page 204

1   personnel.  And it is from Joel Rostberg, who at the
2   time was the assistant emergency manager for Morton
3   County, North Dakota.
4             And he's writing to this group and
5   providing an OPORD, operational period report, for
6   September 23 through the 24th of September.  And he's
7   communicating the circumstances in the protest area,
8   and it's passed along to -- it was addressed to
9   individuals in the Corps that received it and they
10  started to pass it amongst themselves.  You'll see
11  that in the forwarding of the e-mail.
12       A.   Before you go down there, are there
13  people from Interior on this lengthy list of
14  recipients?
15       Q.   Why don't you skim the group and see if
16  you recognize, please, anyone from Interior.
17       A.   Okay.  Go back to where I can see the
18  very top, or maybe that's it.  Okay.
19       Q.   I see a --
20       A.   Adolph Benavidez.
21       Q.   Adolph Benavidez, yes.  Do you recognize
22  that gentleman?
23       A.   I don't.
24       Q.   There's a lot of FBI and...
25       A.   There's all kinds of stuff in here.

Page 205

1   Hotmail accounts, God knows what.
2        Q.   DOJ people.  These are all government
3   accounts.  Many are government accounts.  Excuse me.
4        A.   Not all of them, yeah.
5        Q.   Many are.
6        A.   Gmail.
7        Q.   Yes.  So anyhow, it's -- we've identified
8   together one Department of Interior individual who
9   received it, we know.  And what I want to point out to
10  you is that the top e-mail on the string, if we could
11  go there, please, is from Major James Startzell, who
12  was the deputy district commander for the Omaha
13  district of the Corps.
14            His boss, the colonel, who was the
15  commander of the Omaha Corps, John Henderson, who is
16  copied here, and Major Startzell, the deputy district
17  commander, says, Thank you, Keith.  "I'll include some
18  of the highlights in the DAPL update on Monday," but
19  he goes on to say, All of this information from the
20  county basically confirms the Commander's
21  assessment -- that's Colonel Henderson, the commander
22  of the Omaha district -- that the camps, plural, are
23  growing out of Standing Rock Sioux Tribe's control and
24  the chairman is probably going to try to use the
25  special use permit as a way to regain control of what

Page 206

1   he sees as legitimate protesters.
2        So I just wanted to ask you, Ms. Jewell,
3   are you aware that by late September of 2016, the
4   Corps had determined that the protests on Corps land
5   had gotten out of control?
6        MS. STEINER:  Objection; misstates the
7   evidence, lack of personal knowledge.
8        Q.   (BY MR. SEBY) And more specifically,
9   grown out of the Standing Rock Sioux Tribe's control?
10       MS. STEINER:  Objection; vague, misstates
11  the evidence, lack of personal knowledge.
12       Q.   (BY MR. SEBY) Are you aware of this,
13  Ms. Jewell?
14       A.   I'm not aware of this exchange.  I am
15  aware generally that as the protest numbers grew that
16  it became a worry to Standing Rock Sioux Tribe in
17  terms of, you know, how to keep it peaceful and the
18  resources that were being required and the impacts
19  that it was having on the environment and so on, but I
20  can't speak to this.
21       And I don't see the attachment, so I'm
22  not sure what's flying back and forth with all of
23  these -- in these e-mail strings.  So it's hard to
24  react to this in any way.
25       Q.   Let me ask you a question:  Was it only

**206:25-207:12**
**FRE 602, 701**

Page 207

1   the Standing Rock Sioux Tribe's responsibility to keep
2   control of the protests?
3        MS. STEINER:  Objection; calls for
4   speculation, lack of personal knowledge.
5        Q.   (BY MR. SEBY) Ms. Jewell?
6        A.   As stated before, I believe the BIA had
7   responsibility to try and maintain peace in the camps
8   to the extent that they could.  I can't speak to, you
9   know, the Corps' responsibility, the state's
10  responsibility, or, you know, what the lands were that
11  they were on.  So we're getting out of an area where
12  I've got direct knowledge.
13       (Deposition Exhibit 501 was remotely
14  introduced and provided electronically to the court
15  reporter.)
16       Q.   Okay.  That's the question.  I appreciate
17  the answer.  So if we could go to exhibit marked 501.
18  So excuse me.  This is an e-mail from an individual
19  whose name is Lowry Crook.  Do you recall Mr. Crook?
20       A.   No, I don't.
21       Q.   His position was principal deputy to the
22  assistant secretary of the army, Ms. Darcy, but in any
23  event, he is sending this e-mail to individuals in the
24  Executive Office of the White House -- pardon me, the
25  Executive Office of the President; I misspoke -- and

Page 208

1   individuals in the DOJ.  And then in addition to that
2   group, Mr. Beaudreau, Ms. Tompkins, and Mr. Lawrence
3   are receiving this e-mail, along with an individual
4   from the counsel on environmental quality.
5        And it says "DAPL Storyboard 16
6   September 2016."  And it says "Map of Oahe crossing
7   area," and, "The narrative in the attachment is from
8   last Friday," Mr. Crook says, "but for your
9   situational awareness" -- is what I've learned that
10  acronym is meant to sound -- "here's the map of the
11  area that we are using."
12       MR. SEBY:  So could we look at the map
13  together.  And could you rotate it, Rachel, by chance,
14  please.  Excellent.
15       Q.   (BY MR. SEBY) So, again, at the bottom of
16  the map, you'll see that it's dated September 16 of
17  2016.  It says in a box underneath the map,
18  "Commander's Assessment.  Based on personal
19  correspondence with Chairman Archambault it is
20  expected that the SRST will favorably receive the
21  special use permit."  And in the narrative on the
22  right of the map there's a section that refers to last
23  24 hours, which I believe means last 24 hours.  And it
24  says, Department of Army, DOJ, BIA, DOI, U.S.
25  Attorney's Office, and FBI approved special use permit

Page 209

1   allowing free speech zone on Corps property south of
2   Cannonball River.
3        MR. SEBY:  Okay.  If we could look at the
4   legend of the map and the map itself together, that
5   would be great.  Any chance a little greater -- that's
6   great.  A little bit more, Rachel, if possible.
7        MR. HYMEL:  That's it.
8        Q.   (BY MR. SEBY) Okay.  Ms. Jewell, can you
9   see that?  I can see it.
10       A.   Yeah.  Can you help me understand what
11  specific parts you want me to see?  Some of the words
12  aren't particularly clear, but I think I get the
13  overall gist.
14       Q.   Right.  So let's go to the legend for
15  that rule.  And in the legend it says -- it shows
16  where the pipeline is in that pink line in the
17  northern part of the map where it crosses the river.
18  And then there is a line which marks a blue hashmark
19  line which marks the Corps of Engineers property.  Do
20  you see that?
21       A.   That's the little dotted line that goes
22  around the rivers?
23       Q.   That's the Corps of Engineers property,
24  per this map.
25       A.   Okay.

Sally Jewell
June 02, 2022                                    210 to 213

Page 210

1        Q.   And then there is a red hashmark that
2   denotes, quote, un-permitted camp areas.  And you see
3   that it's --
4        A.   Yes, I see it.
5        Q.   Okay.  And that white water body that
6   goes through it marked "Cannonball River," do you see
7   that?
8        A.   I do.
9        Q.   Okay.  So the Corps legend here is
10  showing us un-permitted camp areas both north of the
11  Cannonball River and south of the Cannonball River.
12  Do you see that?
13            MS. STEINER:  Objection; lack of
14  foundation.
15       Q.   (BY MR. SEBY) I'm sorry.  Ms. Jewell,
16  your answer was interrupted by your counsel.  What was
17  your answer?
18       A.   I'd like my counsel's objection because I
19  didn't hear it.  If she could do that first and then
20  I'll answer.
21            MS. STEINER:  Objection; lack of
22  foundation, personal knowledge, misstates the
23  evidence.
24       Q.   (BY MR. SEBY) Ms. Jewell, we're looking
25  at a Corps of Engineers map and I'm asking you if you

Page 211

1   understand the legend to show the Corps is telling us
2   that there are un-permitted camp areas both north and
3   south of the Cannonball River?
4            MS. STEINER:  Objection; misstates the
5   evidence, lack of foundation.
6        Q.   (BY MR. SEBY) Ms. Jewell?
7        A.   I can respond to what you're showing me
8   on the screen.
9        Q.   That's all I'm asking you about.
10       A.   If north is up, then there is a
11  crosshatched area north of the river and there is a
12  crosshatched area south of the river.
13       Q.   Okay.  If you look at the upper left-hand
14  corner of this image that we're looking at, the Corps
15  of Engineers map, that tells us that indeed it is
16  north; correct?
17            MS. STEINER:  Objection; lack of
18  foundation, misstates the evidence.
19       A.   That's generally what one will assume
20  when looking at a map.
21       Q.   (BY MR. SEBY) Right.  And the Corps has
22  done that for us by putting that black marker up.  All
23  right.  So your staff was aware of the Corps' map at
24  least because they received the e-mail.  Did anyone
25  discuss this with you, the map?

Page 212

1            MS. STEINER:  Objection; lack of
2   foundation.
3        A.   I don't recall seeing this map at all.
4            (Deposition Exhibit 502 was remotely
5   introduced and provided electronically to the court
6   reporter.)
7        Q.   (BY MR. SEBY) All right.  If we could go
8   to Exhibit 502.  This is a calendar invite that was
9   sent by an individual in the Department of Justice,
10  Sam Hirsch, on Thursday, September 22.  And he sent it
11  to a number of individuals who have standingrock.org
12  in their e-mail address, including Dave Archambault
13  and William Perry.  Do you know an individual by the
14  name of William perry?
15       A.   His name is familiar.  I don't recall
16  why.
17       Q.   Okay.  And it's also sent to Ms. Darcy.
18  And why we're talking about it is because
19  Mr. Beaudreau and Mr. Roberts and Ms. Tompkins of your
20  staff are on here, along with other individuals.  And
21  it says "Meeting with Standing Rock Sioux Tribe."  And
22  this is a calendar invite requesting a meeting on
23  September 23, the following day, for two hours --
24  scheduled for two hours.  And the subject of the
25  meeting is "Meeting with Standing Rock Sioux Tribe."

*212:7-16 FRE 401-402, 602*

Page 213

1   And it was at the main justice building in Washington,
2   D.C.  And do you recall your staff going to this
3   meeting?
4            MS. STEINER:  Objection; lack of
5   foundation.
6        A.   I don't recall this meeting specifically.
7   I also will note that there is a conference code.  So
8   I don't think it's fair to make the assumption that
9   everyone was there in person.
10       Q.   (BY MR. SEBY) Right.  There was a
11  conference code provided.  And so you're right, it's
12  possible people could dial in, but the location says
13  "main justice building" in a specific room and then it
14  provides a conference call.  Is it possible some
15  people participated by phone and others met in person?
16            MS. STEINER:  Objection; calls for
17  speculation.
18       A.   I don't -- I wasn't invited and I don't
19  recall this specific meeting.  I think it is fair to
20  assume that it's not uncommon practice, particularly
21  when they're long distances, that some people
22  participate in person and some by phone.
23            (Deposition Exhibit 504 was remotely
24  introduced and provided electronically to the court
25  reporter.)

*212:17-213:9 FRE 401-402, 602*

Sally Jewell
June 02, 2022                                        214 to 217

Page 214

214:1-13
FRE 106,
401-402, 602

1      Q.   (BY MR. SEBY) So if we could go to
2   Exhibit 504, please.  And turn to the e-mail itself.
3   So this is an e-mail that was sent by a person in the
4   Army Corps to Ms. Darcy, Ms. Jo-Ellen-Ellen Darcy, the
5   assistant secretary of the army for civil works.  And
6   the subject matter says "Obama agencies schedule
7   tribal meetings amid Dakota Access controversy."  And
8   I can't tell you who wrote the article that's copied
9   in here authored by Elana Schor because it's not
10  provided to us in the document that was produced by
11  your counsel.  This is a document that came from the
12  Department of the Army, but would you take a moment
13  and read that article, please.
14      A.   So I am to assume this is an article
15  written by a third party that has nothing to do with
16  government?
17      Q.   I would agree with you that it's an
18  article written by a third party, but I don't know if
19  we should make that statement before you actually read
20  it, because it purports to talk about "Obama agencies
21  scheduled tribal meetings amid Dakota Access
22  controversy."  At least the subject line that the
23  Corps used says that, but I'd like you to read the
24  article and then I want to ask you about it.
25      A.   Is there anything below what I see here

Page 215

1   or is that it?  Could you go back up to the title?
2   Okay.  I've read it.
3      Q.   Do you ever recall seeing this article at
4   any time?
5      A.   I don't.
6      Q.   Okay.  I want to ask you about your

215:6-216:1
FRE 401-402,
602, 611

7   reaction to the content of the article.  The first
8   paragraph talks about the administration, it says,
9   scheduled a series of consultations with Native
10  American tribes that will run through November to
11  discuss infrastructure permitting concerns that have
12  flared up following protests against the Dakota Access
13  Pipeline, although the project's fate could be settled
14  before the meetings are complete.
15      Is there anything inaccurate in that
16  paragraph?
17      MS. STEINER:  Objection; lack of personal
18  knowledge.
19      A.   As I've read that paragraph, I think that
20  the comment -- that there's a conflation, in my view,
21  in the way it's written of the Dakota Access Pipeline
22  and the consultation around the process with
23  infrastructure projects and, you know, whether the
24  tribal consultations are accurate.  So I think there's
25  a conflation there in the first paragraph that might

Page 216

1   be a little misleading.  And as I --
2      Q.   (BY MR. SEBY) Could you elaborate on what
3   the conflation is?

216:2-16
FRE 401-402,
602, 801

4      A.   The author, whomever it is and for
5   whatever publication, says that they're scheduling a
6   series of consultations with tribes through November
7   to discuss infrastructure permitting concerns that
8   have flared up following protests, et cetera.
9      The Dakota Access Pipeline, in my view,
10  was an example of an inadequate process of tribal
11  consultation, but it was not the sole reason for going
12  through a process of working with tribes to say how is
13  the process working for you, should it be changed,
14  does it involve changing the law or does it more
15  involve changing the practices.  So that's what I
16  meant.
17      Q.   Okay.  All right.  And then the second
18  paragraph says, "In an announcement ahead of the White
19  House's Tribal Nations Summit that is set to begin
20  Monday" -- this e-mail at least is on a Friday and the
21  article is dated the same day, Friday, the 23rd.  This
22  article says that the summit is set to begin Monday.
23  The Interior Department, Department of Justice, and
24  the Army Corps scheduled six public meetings with
25  tribal representatives in Montana, Minnesota, New

Page 217

1   Mexico, South Dakota, Washington, and Arizona.  Not
2   listed is North Dakota, but I wanted to ask you about
3   the third paragraph.  Is that accurate, in your
4   opinion?
5      MS. STEINER:  Objection; lack of personal
6   knowledge.
7      A.   I believe that the issues are independent
8   of each other.  The tribal consultation process was
9   something that we were looking to review.  And as I
10  mentioned, I issued a secretarial order.  As you'll
11  recall, this is in the last six months of President
12  Obama's term.  So I think it is fair to say that, as
13  they quote an Interior spokeswoman, that the projects
14  are separate, that it's proceeding on a different
15  track and timeline.  And I think that's accurate.
16      Q.   (BY MR. SEBY) Okay.
17      A.   They were independent.
18      Q.   In your opinion, Ms. Jewell, did you and
19  the rest of your staff continue to maintain and
20  enforce that difference?
21      MS. STEINER:  Objection; vague, lack of
22  personal knowledge.
23      Q.   (BY MR. SEBY) Ms. Jewell?
24      A.   I stated previously the processes were
25  separate.  One was a review of the effectiveness of

Page 218

1  the tribal consultation process.  The other was
2  related to a specific project, the Dakota Access
3  Pipeline.  So the two were not conflated.  They were
4  separate.
5      Q.   Was one waiting for the outcome of the
6  other?
7      A.   No.
8      Q.   Okay.  Totally independent of each other?
9           MS. STEINER:  Objection; misstates the
10  evidence.
11      Q.   (BY MR. SEBY) Ms. Jewell?
12      A.   As I said before, the Dakota Access
13  Pipeline was a highly visible example of where we
14  believed there were challenges with the tribal
15  consultation process, but there are many, many other
16  examples.
17           And you referenced the locations.  Many
18  of the larger reservations happen in the west, and
19  those are regionally located to try and make it
20  convenient for tribes in those regions to participate
21  because of the nature of the infrastructure projects
22  that happen around the country.  That's where they are
23  dominant.
24      Q.   The holding of many meetings -- public
25  meetings and doing so in six states was independent of

Page 219

1  the -- that was a programmatic approach to tribal
2  consultation issues; correct?
3           MS. STEINER:  Objection; misstates the
4  evidence.
5      A.   We felt that there have been challenges
6  with how the tribal consultation process worked and
7  the tribes -- many tribes over my entire time at
8  Interior had expressed frustrations with the tribal
9  consultation process.  So it was an independent --
10  it's an effort independent of DAPL, Dakota Access
11  Pipeline, to take a look at the process and see if
12  there were some things that we could clean up during
13  the remainder of our term that would help clarify that
14  process for federal agencies, tribes, and any others
15  that might be involved in consultations with tribes.
16      Q.   (BY MR. SEBY) So I'm trying to
17  understand, Ms. Jewell, what's the relationship
18  between that process and the timing that you just
19  mentioned with respect to whatever process you felt
20  was necessary to employ pursuant to your September 9
21  joint statement with regards specifically to DAPL?
22           MS. STEINER:  Objection; vague.
23      Q.   (BY MR. SEBY) Because you talked about
24  consultation when we were talking about the content
25  and phrasing of the September 9 statement, and

Page 220

1  consultation is not mentioned in that statement, but
2  you made very clear that the Department of Interior
3  intended that's exactly the reason why you hit the
4  pause button and joined the September 9 joint
5  statement.  So what process were you using, apart from
6  this wholesale programmatic review of consultation on
7  infrastructure projects?
8           MS. STEINER:  Objection; misstates the
9  evidence, assumes facts not evidence, vague, and
10  compound.
11      Q.   (BY MR. SEBY) Ms. Jewell?
12      A.   The joint statement, as I remember it,
13  referred to the decision-making process.  There are
14  multiple issues, I believe, in the Dakota Access
15  Pipeline involved in the decision-making process, one
16  of which was a sense by the Standing Rock Sioux Tribe
17  that the consultation process had been inadequate; in
18  addition to that, that the environmental assessment
19  had been inadequate relative to the risk to Lake Oahe
20  and the water supply for downstream users, including
21  the tribe, for that crossing, which was much longer --
22  and if you recall that map, much longer water-based
23  crossing than would have been the case had it gone
24  further upstream on the river where there would have
25  been less risk.  So the joint statement, as you shared

Page 221

1  with me, talked about the decision-making process, but
2  it was broader than just tribal consultation.
3      Q.   So are you getting at one of the reasons
4  for the joint statement on September 9 was to review
5  the location of the crossing?
6      A.   My understanding is the review was to
7  determine whether an appropriate decision was made by
8  the Army Corps to permit the crossing.  There could be
9  a number of outcomes to that, but that was -- they
10  were revisiting that process of decision-making.  And
11  what I'm suggesting is that there were multiple
12  concerns that were expressed with regard to that
13  decision whether there was adequate NEPA assessment,
14  as well as whether there was adequate tribal
15  consultation.
16      Q.   So the adequacy of tribal consultation
17  was one of the objectives of the September 9 joint
18  statement, even though it doesn't say it anywhere in
19  it; is that correct?
20           MS. STEINER:  Objection; misstates the
21  evidence.
22      A.   The statement is what the statement is,
23  which is that they felt they needed to review the
24  decision-making process.  It's the Army Corps'
25  decision-making process.  You know, I recall reports

221:
3-15
FRE
401-402,
602

Page 222

1  back to me of concerns about both NEPA, National
2  Environmental Policy Act, compliance as well as tribal
3  consultation, but the decision and the process rested
4  in the hands of the Army Corps.
5           (Deposition Exhibit 507 was remotely
6  introduced and provided electronically to the court
7  reporter.)
8        Q.   (BY MR. SEBY) Okay.  So if we could go
9  to, please, Exhibit 507.  And go to the e-mail string
10 itself.  Ms. Jewell, this is a lengthy e-mail string,
11 probably the worst one we'll look at today, at least
12 getting it up and addressed.  Do you want to read the
13 whole thing?
14       A.   I think if you want me to comment on it,
15 I need to know the context.
16       Q.   Yes.  I'm just -- I want to offer that to
17 you.  And, of course, go to the bottom, which is an
18 e-mail from Colonel John Henderson, the district
19 commander, U.S. Army Corps of Engineers, Omaha
20 district.  If you would please start there.
21       A.   And who's it from?
22       Q.   I just told you.  It's Colonel John
23 Henderson.
24       A.   That's who it's from.  Okay.  No.  Okay.
25 I see.  And who's it to?

Page 223

1        Q.   It's to Brigadier General Scott Spellmon
2  and Major General Donald Jackson.
3        A.   It's all in the Army Corps.  What
4  happened?  Okay.  Scroll down to item 4, please.  Okay
5  I've read it relatively quickly.
6        Q.   I don't want you to be rushed, so take
7  your time.
8        A.   Well, I may refer back to it depending on
9  where you want to go with the questions.
10       Q.   Okay.  So let's go to the next e-mail up,
11 which is Brigadier General Scott Spellmon, who's the
12 commander of the northwest division, which encompasses
13 several districts of the Corps.  So he's, you know, a
14 pretty significant Corps of Engineers person,
15 Brigadier General Scott Spellmon.  He's responding
16 to -- forwarding Colonel Henderson's e-mail to the
17 chief of engineers, Todd Semonite, copied to Major
18 Jackson.  And he's saying to the chief -- he addresses
19 the chief by, sir, forwarding that note.  If you would
20 read that, please.
21       A.   Okay.
22       Q.   Keep going down.
23       A.   Go down to the "sir" below two.  Okay.
24 Okay.
25       Q.   Have you finished reading that e-mail

Page 224

1  from Mr. Brigadier General Spellmon?
2        A.   Yes.
3        Q.   Okay.  Now, one more to go.  There's one
4  above it from Major General Donald Jackson.  He
5  forwards that whole chain on to Lowry Crook, who, as
6  we talked about before, is the principal deputy to
7  Ms. Darcy.
8        A.   Okay.  Okay.
9        Q.   You done?
10       A.   I am.
11       Q.   Okay.  Ms. Jewell, the date of the top
12 e-mail is September 30, 2016.  Do you recall the date
13 of your speech at the White House Tribal Nations
14 Council?
15       A.   I don't recall.  You'd have to refresh my
16 memory.  It typically was later than that.
17       Q.   Okay.  Okay.  In Brigadier General
18 Spellmon's e-mail to the chief of engineers and Major
19 General Jackson --
20       A.   If you could scroll down to that, that
21 would be helpful.  Is that it?  Okay.
22       Q.   He says a couple of things I'd like to
23 ask you about.  He says that Colonel Henderson needs
24 support from a regional and national perspective if
25 his efforts on the ground are going to gain momentum

Page 225

1  and succeed.  And I believe generally it's fair to
2  characterize his efforts as trying to negotiate a
3  resolution to the protests on Corps property.
4        A.   If your assistant is looking for that, go
5  back up.  Keep going.  There.
6        Q.   There, "in the interim," that's where I
7  was referring to.
8        A.   Yeah.  Hold there.
9        Q.   And so that's what he says, John's plan,
10 Colonel Henderson's plan, to the current way forward
11 on the DAPL encampments.  And so he's talking about
12 working with Chairman Archambault on that effort.  And
13 he says Colonel Henderson's plan needs support from a
14 regional and national perspective and that, you know,
15 there are real issues in the field, if we go down
16 below the redacted box.  And the next paragraph he
17 says, "So, to support John's immediate plan at the MSC
18 level."  Do you know what MSC level means?
19       A.   I don't.
20       Q.   Okay.  "We will be working more with DOI
21 regional staff" -- that's Department of Interior
22 regional staff -- "counterparts to focus on safety and
23 security for all involved, while the larger issues on
24 tribal affairs are adjudicated nationally."
25           And Brigadier General Spellmon -- if you

Sally Jewell
June 02, 2022                                    226 to 229

**225:20-227:15 FRE 106, 401-402, 602, 611, 801**

Page 226

1   go down to "At the HQ level, HQs plural, We would
2   ask," this is the Corps of Engineers, Brigadier
3   General Spellmon, the head of the northwest division,
4   and Colonel Henderson, the district.  "We would ask:
5   To be consulted on any potential future interagency
6   memos/releases.  (this is happening -- thanks to Major
7   General Jackson and Mr. Crook)."
8               And the second one he says, I know this
9   is a tall order, but above HQ headquarters we must
10  achieve some alignment on the way ahead at the
11  secretariat level.  This will likely require your
12  engagement.  For example, the Department of Interior's
13  comments at the White House earlier this week
14  regarding, quote, check-the-box consultation is not
15  helpful for those in the field.  The statement is not
16  factual in the case of DAPL, but it gets repeated in
17  social media and becomes perceived fact, further
18  emboldening the more extreme factions.  Major General
19  Jackson is doing some heavy lifting here with
20  Mr. Crook.
21               And then the next paragraph, Sir, I'll
22  end this request with guidance you may have.  It would
23  be most welcome as this has been a challenge on many
24  fronts.  While we may disagree with our federal
25  partners on the quality of consultation, I think we

Page 227

1   can all agree on safety, which may help us move
2   forward.
3               So do you recall earlier in the
4   deposition you used the phrase, quote, check-the-box
5   block consultation, or check the box?  Maybe you said
6   box.  Do you recall that, Ms. Jewell?
7          MS. STEINER:  Objection; misstates the
8   evidence.
9          A.   I do recall, I believe, saying that one
10  of the concerns that was consistently expressed by
11  tribes was that tribal consultation was a
12  check-the-box exercise and not an authentic process of
13  actually listening to and responding to the concerns
14  expressed by the tribe.  And that was something that I
15  consistently heard across Indian country.

**227:16-228:5 FRE 401-402, 602, 611**

16         Q.   (BY MR. SEBY) The Brigadier General
17  Spellmon and Colonel Henderson are reacting to the use
18  of that phrase in the context of DAPL and they're
19  attributing the statement to Department of Interior
20  making a comment at the White House earlier this week.
21  Do you know who that was?
22         MS. STEINER:  Objection; lack of personal
23  knowledge, misstates the evidence.
24         A.   I don't.  I don't know the timing of, you
25  know, conversations that happened at that point.  I

Page 228

1   will say that the use of "check-the-box exercise" with
2   regard to tribal consultation is quite common and I
3   think that it's not inaccurate frequently, from what I
4   observed during my time as secretary of the interior.
5   Not specific to DAPL, but just in general.
6          Q.   (BY MR. SEBY) Okay.  The question was, do
7   you know who the person who is purported to be a
8   Department of Interior person making comments at the
9   White House earlier in the week of September 29?
10         A.   I don't know who that is or what the
11  meeting is they were referring to, no.

**228:12-229:22 FRE 401-402, 602, 611, 801**

12         Q.   Okay.  All right.  Thank you.  And then
13  with respect to Major General Jackson's taking that
14  e-mail string and forwarding it to Mr. Crook, who's
15  the principal deputy for Ms. Darcy, Major General
16  Jackson is explaining to Mr. Crook that he's meeting
17  with the chief of engineers and team this morning and
18  reports that General Spellmon and Colonel Henderson
19  are on the ground next week.
20               And "FYI, as we continue to work with
21  tribes on a variety of issues, they are no longer
22  accepting of consultation.  They now say for future
23  action we will require their consent.  Dave Panganis
24  walked me through this new dynamic last night.  Please
25  ensure those with whom you are working in the White

Page 229

1   House understand this unintended consequence.  While I
2   am certainly open to refinement across the board in
3   how the Feds consult, not sure we can ever gain
4   consent, especially among the multitude of Tribes with
5   vastly different views of the world."
6               What is your reaction to that statement,
7   Ms. Jewell?
8          MS. STEINER:  Objection; lack of
9   foundation.
10         A.   I am speculating here.  It is common in a
11  negotiating process to state an objective that may be
12  beyond what you expect that you might receive.  The
13  notion of informed consent is something that tribes
14  have talked about, and that has oftentimes been done
15  in the context of raising objections in a consultation
16  process that were not respected.
17               So I have heard tribes for a long time
18  talk about their desire to have prior informed consent
19  on projects.  And as we initiated the process of
20  listening to tribes, those are concepts that were
21  raised, not dissimilar from the kinds of positions
22  that one might take in a negotiation.
23               (Deposition Exhibit 505 was remotely
24  introduced and provided electronically to the court
25  reporter.)

Sally Jewell
June 02, 2022                                    230 to 233

Page 230

```
 1        Q.   (BY MR. SEBY)  Okay.  If we could go to
 2   Exhibit 505.  And earlier when we were talking about
 3   the Exhibit 507 just now, there was a reference by
 4   Colonel Henderson to DOI remarks being made at the
 5   White House.  And the date of that e-mail, referring
 6   to it earlier in the week was -- let's just refresh
 7   that.  It was -- Spellmon's e-mail is Thursday,
 8   September 29, 2016, if you'd remember that date for a
 9   moment, because he says earlier in the week from that
10   date -- DOI's comments at the White House earlier this
11   week regarding check-the-block consultation are not
12   helpful for those in the field.  He's referring to the
13   DAPL protest field.
14        So if we look at Exhibit 505, the
15   document -- before we look at the actual document, the
16   title of the subject is "SJ TNC speech -- red line and
17   latest version clean."  Would that be Sally Jewell
18   Tribal Nations Conference speech, Ms. Jewell?
19        A.   Yes, but I want to comment on something,
20   if I may, from your last -- our last exchange
21   regarding that document.
22        Q.   Sure.
23        A.   You focused in on one area, which was
24   this consultation and consent.  The lion's share of
25   that letter was around safety and security.  And so it
```

Page 231

```
 1   was not clear to me in reading a Corps letter whether
 2   they were talking about the process of the Dakota
 3   Access Pipeline permit.
 4        What I read in that letter was they were
 5   concerned about safety and security and different --
 6   and Chairman Archambault's concerns about some
 7   non-tribal factions.  I can't remember if that's the
 8   term that was used.
 9        So I just want to point out that there
10   was a lot more in that exchange.  And I read that as
11   how do we keep people safe and how do we wind this
12   down, because winter is coming on.
13        And I believe the other issue, which was
14   not explicitly mentioned, was the potential of
15   flooding and the risk to people in terms of their
16   present location.  So I just want you to know that you
17   picked up one area of that exchange, but I read that
18   whole exchange as how do we work with the tribe and
19   how do we keep people safe to over time enable these
20   protests to dissipate.
21        Q.   Okay.
22        A.   Okay.  Thank you.
23        Q.   So, again, the date of Brigadier General
24   Spellmon's e-mail was September 29, and he's
25   referencing earlier that week remarks made at the
```

Page 232

```
 1   White House by a Department of Interior person.
 2        A.   Correct.
 3        Q.   And now we're talking about Exhibit 505.
 4   And my question to you before you provided that
 5   clarification was "SJ TNC speech," is that Sally
 6   Jewell Tribal Nations Council speech?
 7        A.   Tribal Nations Conference.
 8        Q.   Conference.
 9        A.   That's correct.
10        Q.   And the attachment is White House Tribal
11   Nations Conference remarks?
12        A.   Yes.
13        Q.   With Sally Jewell.  TPB, is that Tommy --
14        A.   Tommy Beaudreau, my chief of staff.
15        Q.   Sure.  So in here, this Exhibit 505,
16   you -- the date of this e-mail is September 25.  You
17   are providing latest versions of my speech, you say,
18   incorporating some of the changes, et cetera.  So if
19   we look at the attachment, which is a version of the
20   remarks -- thank you -- at the top there it says,
21   "Remarks U.S. Secretary of the Interior Sally Jewell
22   8th White House Tribal Nations Conference
23   September 26, 2015."
24        So are you the person who spoke at the
25   White House earlier in the week prior to September 29
```

232:3-9
FRE 401-402

232:10-12
FRE 401-402

Page 233

```
 1   that Brigadier General Spellmon is talking about?
 2        MS. STEINER:  Objection; assumes facts.
 3        Q.   (BY MR. SEBY) Your counsel interrupted
 4   you again, Ms. Jewell.  What were you saying?
 5        A.   I just reflected that that says 2015.
 6        Q.   Okay.  Well, the e-mail attaching the
 7   redline document very clearly says 2016.  So would you
 8   agree with me that's a typo?
 9        A.   I'd need to read the content to see if
10   it's reflective of the period.
11        Q.   If we can scroll back up, though, before
12   we do that into the body of the e-mail and blow that
13   up, please.  "Here is the latest version of my
14   speech."  On September 25, 2016, you're passing that
15   back to your chief of staff and Mr. Roberts and
16   Ms. Tompkins and Ms. Kershaw.
17        A.   Okay.
18        Q.   So are you telling me that you're
19   questioning whether or not the prior -- the
20   attachment's got a typo in it or not?
21        A.   No, I'm not.  I just noticed that when I
22   saw it and, you know, you're telling me these
23   documents were attached, but, you know, I'm not seeing
24   the actual entity.  So I'm just pointing out that
25   there was 2015 at the top of that.
```

233:11-17
FRE 401-402

Page 234

1      Q.   Okay.  I have an idea.  Let's go to the
2  Bates number, bottom of the page of the initial e-mail
3  that is from you to these individuals.
4      MR. SEBY:  And, Rachel, if we can move
5  that over so it's not blocked by the side screen.
6      A.   It's not blocked on my upper screen.
7      Q.   (BY MR. SEBY) Okay.  So do you see the
8  number in the bottom right-hand corner?
9      A.   I do.
10     Q.   It says Department of Interior.  That's
11 who produced this document to us, and the number is
12 00021921; correct?
13     A.   Uh-huh.
14     Q.   Okay.  If we look at the attachment
15 that's referenced in the face of that e-mail, the page
16 of the attachment begins with one digit after the
17 number we just read, does it not?
18     A.   It does.
19     Q.   Okay.  So have we cleared up the
20 likelihood that the reference to 2015 was a typo?
21     A.   I don't know how the numbering system
22 works, but I take your word for it.  I will know as
23 soon as I get into the body of the speech --
24     Q.   Sure.
25     A.   -- whether the date was a typo or not.  I

Page 235

1  don't want to belabor this any further.
2      Q.   No.  That's great.  So these are your
3  remarks that you're exchanging comments with and so
4  forth.  So I'm just wondering if this -- and this is
5  a -- there's several sections in here.  And it was
6  interesting to read because clearly you were
7  presenting these remarks in mind with this being the
8  last such remarks you would be making as secretary of
9  the interior in the Obama administration, because
10 President Obama served two terms and no matter what
11 there was going to be a different president and
12 whether or not you would be a secretary of the
13 interior in the new administration was an open issue.
14 So you were experiencing the reality that this was, at
15 least as Obama's secretary of the interior, your last
16 such conference.  So you are preparing reflections in
17 your remarks in that capacity.
18     And earlier I had asked you about this
19 conference and you said, yeah, it's got a lot of
20 important issues and topics and whatnot.  You weren't
21 sure if DAPL was even part of it; right?
22     MS. STEINER:  Objection; misstates.
23     Q.   (BY MR. SEBY) I'm sorry.  Ms. Jewell, you
24 said something I couldn't hear because your counsel,
25 yet again, interrupted you.

Page 236

1      MS. STEINER:  And I will say, yet again,
2  that I'm entitled to put my objections on the record.
3      Q.   (BY MR. SEBY) Ms. Jewell, again --
4      MS. STEINER:  I objected that that
5  misstated the evidence.
6      Q.   (BY MR. SEBY) Ms. Jewell.
7      A.   Could you repeat the question, please.
8      Q.   Yes.  Due to the interruptions, I will
9  reask the question, which is, do you recall earlier
10 telling me that you weren't sure if you recalled
11 whether or not DAPL was even part of your agenda and
12 remarks at this conference?
13     MS. STEINER:  Objection; misstates the
14 evidence.
15     A.   I recall stating earlier in your
16 questions that I could not remember the content of my
17 remarks.  I assume there was a Tribal Nations
18 Conference.  It was a busy time of year.  We were also
19 doing a youth conference.  So I could not remember the
20 content of my speech and, you know, too many details
21 about the conference itself.  That's what I recall
22 telling you earlier today a few hours ago.
23     Q.   (BY MR. SEBY) Thank you.  So now we see
24 your remarks, at least a version of them, the night
25 before the conference convened the next day at the

236:8-22
FRE
401-402

Page 237

1  White House.  And after you introduce -- or pardon
2  me -- make acknowledgments of all of the people who
3  were, in your opinion, instrumental to the conference
4  and tribal issues, starting with the White House and
5  then there's the deep bench that you reference at the
6  Interior department on tribal issues and a long list
7  of people there.
8      And then after the acknowledgment
9  section, you have a personal reflection section.  And
10 then after that, after your personal reflections for
11 the last four years and thanking the community that
12 you're speaking to for your relationship with them,
13 you have a section entitled "Consultation."  Do you
14 see that?
15     A.   I do.
16     Q.   And here the first thing you say is,
17 Before I go any further, I want to talk about an issue
18 that's on everybody's mind, and that's the Dakota
19 Access Pipeline.  And you acknowledge Chairman
20 Archambault and solidarity across Indian country for
21 the Standing Rock Sioux Tribe through prayerful and
22 peaceful assembly.  Are you referring to all of the
23 protests at this point?
24     MS. STEINER:  Objection; vague.
25     A.   What do you mean by "all of the

Sally Jewell
June 02, 2022                                    238 to 241

237: 16-238:11
FRE 401-402, 611

**Page 238**

1   protests," please?
2        Q.   (BY MR. SEBY) Well, this second
3   sub-bullet that says, "And I want to acknowledge the
4   unprecedented solidarity that so many of you across
5   Indian Country have shown with the Standing Rock Sioux
6   Tribe over the past weeks through prayerful and
7   peaceful assembly and in making your voices heard."
8        What assembly are you referring to?
9        A.   I'm referring to the gathering at the
10  Standing Rock Sioux Tribe relating to the Dakota
11  Access Pipeline.

238:12-239:1
FRE 401-402

12       Q.   Would you agree with me that that was a
13  part, but not all of the protest activity against the
14  Dakota Access Pipeline?
15       MS. STEINER:  Objection; assumes facts
16  not in evidence.
17       Q.   (BY MR. SEBY) In late September of 2016?
18       A.   I don't remember specifically when things
19  got more violent.  For the most part -- and I'm
20  talking to tribal leaders here, and for the most part,
21  the participation of tribal members was prayerful and
22  peaceful and in solidarity with the concerns expressed
23  by the Standing Rock Sioux Tribe.  And I think that
24  that is -- largely defines the actions that were
25  occurring as thousands of people gathered in this

**Page 239**

1   site.

239:2-18
FRE 401-402, 611

2        Q.   Okay.  And so the second bullet says
3   further, regarding the Dakota Access Pipeline, "I
4   appreciate that the Army Corps, Department of Justice
5   and Interior Department have taken a pause and are
6   thoroughly evaluating whether to reconsider any of the
7   previous decisions made concerning that project and
8   the Lake Oahe site near Standing Rock."
9        So are you saying that the pause was
10  taken so that all of those three agencies could
11  reconsider the Corps' previous decisions?
12       MS. STEINER:  Objection; misstates the
13  evidence.
14       Q.   (BY MR. SEBY) Ms. Jewell?
15       A.   Whether I used artful language or not,
16  I'm referring to the joint press release and the work
17  of the agencies together to address the concerns
18  raised and the decision-making process.

239:19-240:4
FRE 401-402

19       Q.   My question wasn't that.  It was who is
20  thoroughly evaluating whether to reconsider any of the
21  previous decisions made concerning that project?  Are
22  you saying that the Department of Interior is part of
23  the reconsideration of the Corps' previous decisions?
24       MS. STEINER:  Objection; misstates the
25  evidence.

**Page 240**

1        Q.   (BY MR. SEBY) Ms. Jewell?
2        A.   The decision-making body regarding the
3   permitting of the Dakota Access Pipeline is the Corps
4   of Engineers.

240:5-19
FRE 401-402

5        Q.   Okay.  But I'm just asking what you mean
6   by your statement for the speech you were going to
7   give the next day.
8        A.   The Corps of Engineers was working
9   closely with the Department of the Interior.  I'm less
10  familiar with their interactions with the Department
11  of Justice on this issue.  And the Department of the
12  Interior is, as I mentioned, very closely involved
13  with tribal issues.
14       And so thorough evaluation could mean in
15  this context -- and I don't remember the specifics of
16  the speech I gave six years ago, but thoroughly
17  evaluating would mean the Corps working with us and
18  with others to assess its process and reach an
19  appropriate conclusion.
20       Q.   Okay.
21       A.   I will also point out to you, if I may,
22  that speeches are guidelines.  They're not legal
23  documents.  And in general in speaking, I use them as
24  a guide.  They're not necessarily exactly what I say.
25       (Deposition Exhibit 509 was remotely

**Page 241**

1   introduced and provided electronically to the court
2   reporter.)
3        Q.   If we could go to Exhibit 509, please,
4   509.  We're going to go ahead in time by a little more
5   than a week after your Tribal Nations Conference
6   speech that we just covered to October 4 of 2016.  And
7   this e-mail, you're not copied on it, nor is any of
8   your Department of Interior colleagues.  But I want to
9   bring it to your attention not because of what's in
10  the e-mail so much, but because of the attachment.

241:3-18
FRE 401-402
602, 611

11       If we could go to the attachment now,
12  please.  This is a letter from Mercer County, North
13  Dakota, Sheriff Dean Danzeisen.  Mr. Danzeisen,
14  Sheriff Danzeisen, is the elected sheriff of that
15  county.  Have you heard of Mercer County, North
16  Dakota?
17       A.   I don't know my North Dakota counties.
18  I'm sorry.
19       Q.   Okay.  On October 3 of 2016, Sheriff
20  Danzeisen wrote a letter that we have here on the
21  screen addressed to the Attorney General of the United
22  States, and second addressee is The Honorable Sally
23  Jewell, Secretary of the Interior.  And then the third
24  addressee is the chief of engineers, Lieutenant
25  General Todd Semonite.  So would you take a moment and

Page 242

241:19-
242: 12
FRE
401-402
602, 611

1    reread the letter the sheriff sent to you and these
2    other two individuals.
3         A.   You say "reread." I don't recognize
4    this. So let's just say "read."
5         Q.   Okay. So you don't recall receiving this
6    in the past even though it's addressed to you?
7         A.   It doesn't look familiar. There are a
8    lot of letters that we receive that I couldn't
9    possibly handle. So it doesn't mean I didn't know
10   about it or hadn't seen it, but it would not be
11   uncommon for others to field these and determine an
12   appropriate response. Let me read it.
13        Q.   Thank you.
14        A.   Scroll down, please. Okay. I've read
15   it.
16        Q.   Ms. Jewell, I appreciate your position at
17   the time of being secretary of the interior is very
18   busy and you receive lots of correspondence. At the
19   time DAPL was a big deal on your agenda -- on your
20   radar, wasn't it?
21             MS. STEINER: Objection; argumentative.

242:-22-243:3
FRE 106, 611

22        Q.   (BY MR. SEBY) I'm not arguing with you,
23   Ms. Jewell. I asked you a question. Was DAPL a big
24   deal on your radar as secretary of the interior in
25   October of 2016?

Page 243

1              MS. STEINER: Objection; vague.
2         A.   Yes, it was a significant issue. It
3    wasn't the only issue.
4         Q.   (BY MR. SEBY) Of course not. You're
5    secretary of the interior for the whole country, and
6    as you said, there were other incidents on federal
7    land and among the host of issues across all of the
8    responsibilities of the secretary of the interior, but
9    DAPL was one of those significant issues?
10        A.   Correct.
11        Q.   So does anything in Sheriff Danzeisen's
12   letter, reading it today in 2022, not sound accurate
13   to you?
14             MS. STEINER: Objection; lack of
15   foundation, calls for speculation.
16        Q.   (BY MR. SEBY) Ms. Jewell?
17        A.   I read this as a letter from the sheriff.
18   I can't get inside his head and say what was going on.
19   I think it is his characterization. It would not
20   be -- it would not be my characterization or some
21   other author. It's what he feels and what he chooses
22   to convey.
23             It is not uncommon, as I mentioned
24   before, for people to request federal services and
25   also to begin to set a record as they are seeking

Page 244

1    something that they feel will benefit them. So I
2    don't read too much into this letter. It's not
3    uncommon to have people request services.
4         Q.   In your experience as secretary of
5    interior, did you ever have any other instance like
6    the Dakota Access Pipeline protests where people
7    were -- large numbers of people were occupying federal
8    property and behaving in a violent manner and using
9    that property to conduct violent activities on
10   properties off of the federal property and return to
11   the safety of the federal property? Any other
12   instance come to mind?
13             MS. STEINER: Objection; vague, misstates
14   the evidence, argumentative.
15        A.   That is a very long and complicated
16   question with a lot of qualifiers.
17        Q.   (BY MR. SEBY) Did DAPL have any
18   precedence in your term as secretary of the interior,
19   the DAPL protests?
20             MS. STEINER: Objection; vague.
21        Q.   (BY MR. SEBY) Ms. Jewell?
22        A.   There are frequent situations where we're
23   dealing with people exercising their First Amendment
24   rights. Sometimes those remain peaceful and sometimes
25   they don't. The National Park Service is responsible

Page 245

1    for the national mall and permitting of events that
2    happen on the national mall. And there are many of
3    those that are tense.
4              We dealt with a situation on Bureau of
5    Land Management grazing lands involving the roundup of
6    cattle by a grazer that had not paid grazing fees in
7    years, and that ended up with an armed standoff in
8    Bunkerville, Nevada.
9              There was a group of armed protesters
10   that took over and occupied the Malheur National
11   Wildlife Refuge, timingwise I think earlier in 2016.
12   Very complicated in every case, walking a fine line
13   between ensuring that people have their right to
14   protest, but they don't have their right to break the
15   law. I hope that helps answer your question.
16        Q.   It helps me understand that while you
17   were secretary of the interior, you had other
18   circumstances where there were violent or potentially
19   violent issues involving federal property that was
20   under the jurisdiction of the Department of Interior,
21   unlike DAPL protest areas, which were Corps of
22   Engineers camps.
23             But my question is, did you have any
24   other circumstances where you had such a significant
25   role, either voluntarily or involuntarily because it

Page 246

1  raised federal interests under your jurisdiction, that
2  were on an apples-to-apples basis with the DAPL
3  protests? Anything remotely approach that? All the
4  other examples -- you tell me, but I believe all of
5  those were relatively smaller in comparison to the
6  number of people who were involved in the DAPL protest
7  camps on Corps property.
8              MS. STEINER: Objection; misstates the
9  evidence, vague, compound.
10             A.    First, I believe the camps were began on
11 Standing Rock Sioux property.  You've showed me maps
12 showing some camps on Corps property, but I don't
13 believe that's the extent of the camps that were
14 there.
15             Second, there are many more people
16 involved in issues on the national mall.  Every
17 incident is different.  So of course there's not an
18 identical situation to the situation that happened at
19 Standing Rock during the four years that I was there,
20 but there were multiple situations where my staff was
21 handling the very difficult job as public servants of
22 upholding people's First Amendment rights to protest
23 with public safety of them and of people around them,
24 and property rights, and upholding those property
25 rights, whether that be federal property or adjacent

Page 247

1  property or otherwise.
2              So I don't know quite what you're getting
3  at, but certainly the Standing Rock Sioux protests had
4  some elements of uniqueness.  But, you know, there was
5  the Occupy Wall Street movement.  That wasn't in my
6  watch, but it was earlier in President Obama's watch.
7  Most of that was on National Park Service lands,
8  thousands of people gathering.
9              So I'm not sure what you're getting at.
10 It is a very tricky balancing act with all of the
11 moving parts as public servants to uphold the various
12 parts of the law while trying to hold people
13 accountable when they break the law.
14             MR. SEBY: Thank you, Ms. Jewell.  I'd
15 like to take a ten-minute break, if we can, the last
16 one of the day.
17             THE DEPONENT: How much longer do we go
18 to the seven hours?
19             MR. SEBY: We'll go the full seven hours.
20             THE DEPONENT: Excuse me?
21             MR. SEBY: We'll take the full seven
22 hours.  Let's go off the record.
23             THE DEPONENT: How much longer is that?
24             MR. SEBY: Let's go off the record and
25 discuss remaining time.  We don't need to do it on the

Page 248

1  record.
2              THE VIDEOGRAPHER: Going off the record.
3  The time is 10:20 p.m. UTC, 4:20 p.m. Mountain.
4              (Recess taken, 4:20 p.m. to 4:31 p.m.)
5              THE VIDEOGRAPHER: We are back on the
6  record.  The time is 10:31 p.m. UTC, 4:31 p.m.
7  Mountain.
8              (Deposition Exhibit 516 was remotely
9  introduced and provided electronically to the court
10 reporter.)
11             Q.  (BY MR. SEBY) Ms. Jewell, if you would
12 please refer to Exhibit 516, which is up on the screen
13 now.  If we could go to the next page of the e-mail.
14 This has got a few parts to it.  So I'd ask you to go
15 to the very bottom, the beginning, and make your way
16 through the portions of it, because the part I want to
17 ask you about is not until the end or near the end.
18 And so if you will, please diligently but so you're
19 able to follow it, read the e-mail string and then I
20 will ask you some questions, which I would appreciate
21 your indulgence if you take all of the remaining time
22 and I still ask a question.  So let's just get through
23 this exhibit and then we'll be done.  Is that
24 acceptable to you?
25             A.  I'm not sure what you mean by me taking

Page 249

1  the remaining time.  I'll do my best --
2              Q.  If you take 17 minutes to read the
3  e-mail, then it's exhausted.  So I'm just asking for
4  your indulgence to get through this so I can ask a
5  question or two.
6              A.  Okay.
7              Q.  Thank you.
8              A.  Go ahead and scroll down.  Keep going so
9  I can see who the sender and recipient are.  Please
10 scroll down.  Okay.  Sorry.  That was the end of that
11 one?  No, I don't think I -- sorry.  I think that's it
12 there.  Okay.  Now, go ahead and scroll up to that
13 next message, please.  Okay.  Please scroll up.
14 Scroll up, please.
15             Q.  Can we scroll up, please.  This is a long
16 e-mail.  So I'd like to ask you to get all the way to
17 the top and then start reading.  Okay.  Thank you.
18 That's good.  This is an e-mail now from Lieutenant
19 General Todd Semonite, chief of engineers, to Donald
20 Jackson and Lowry Crook with the principal deputy to
21 Ms. Darcy in the Army Corps of Engineers.
22             A.  Scroll down, please, to No. 2.  Scroll to
23 No. 5, please.  Okay.  Is that it or is there more?
24             Q.  Yes.  Are you done?
25             A.  I think there was more after that.  There

Page 250

1   was another message, or no?  There.  Okay.
2        Q.   I think you read that.
3        A.   I think so.
4        Q.   Okay.  I want to ask you about -- pardon
5   me.  I'm sorry?
6        A.   It's okay.  I've read -- it's one
7   sentence.  I've read it now.
8        Q.   I want to ask you about the chief of
9   engineers Todd Semonite's e-mail to Corps colleagues.
10  I recognize you're not copied on this, but I want to
11  ask you what your reaction is to some of these
12  statements that are made by the chief of engineers.
13       He starts with this phrase, "I am ready
14  to get personally involved here -- current plan is not
15  working -- not sure anything has gotten better since
16  our last meeting with Senator Hoven, if anything --
17  situation as degraded.  If there is a master
18  strategy -- would like to know it.  I see this with
19  high potential for increased conflict.  Can't sit on
20  this much longer without a feasible plan in a timely
21  manner."
22       So, Ms. Jewell, I want to ask you about
23  several of Chief Semonite's issues.  The first is the
24  easement.  And he says, "What is our talking point on
25  why the easement hasn't been approved given the two

Page 251

1   legal decisions," which were favorable to the United
2   States.  "Ed told me yesterday that we sent the
3   request to approve the easement to the assistant
4   secretary of the army already -- I will be honest and
5   say that if asked.  Can't pretend to be studying this
6   if we aren't."
7        What is your reaction to that?
8        MS. STEINER:  Objection; lack of personal
9   knowledge, calls for speculation.
10       Q.   (BY MR. SEBY) Were you aware as of
11  October 13, 2016, that the chief of engineers and the
12  military arm of the Corps of Engineers approved the
13  easement and provided it to the assistant secretary of
14  the interior -- pardon me -- of the army?
15       A.   What was the time frame you just
16  referenced?
17       Q.   This is dated October 13, 2016.  So he's
18  saying as of that date they have already sent the
19  request to approve the easement to Secretary Darcy.
20  Can't pretend to be studying this if we aren't.
21       A.   Yeah.  I don't know what was happening
22  within the Corps specifically or if I was informed.  I
23  can't recall.  I do recall a concern about the
24  pipeline company continuing their activities when the
25  permit had not yet been approved.

251:10-25
FRE 106, 602

Page 252

1        Q.   And paragraph 3 in Chief Semonite's
2   e-mail, Trespassing.  What is our position to Congress
3   why Corps has allowed trespassing and camping on
4   government land on the north side, effectively
5   condoning the tribes to violate the law both on our
6   land as well as other lands?  When is the Corps going
7   to do something to get this under control -- while
8   many might move to other camps, some will just stay to
9   embolden the effort?  Is there something -- is there
10  some event that will cause us to ask the Sheriff to
11  enforce the law?
12       What is your comment on that, Ms. Jewell?
13       MS. STEINER:  Objection; lack of personal
14  knowledge, calls for speculation.
15       A.   Again, I don't know specifically what was
16  happening within the Corps at that time.  I do know
17  that there was interest in, you know, minimizing
18  conflict.  And, you know, that was true throughout.
19  And I do know that we were worried that if the
20  pipeline company kept working while the process had
21  not yet been resolved regarding a permit, that that
22  would likely increase the tensions and potentially the
23  risk to person --
24       Q.   (BY MR. SEBY) What do you think about
25  Chief Semonite's statement, though, that the Corps is

Page 253

1   effectively allowing trespassing to occur, condoning
2   the tribes to violate the law both on our land as well
3   as other lands?  Thoughts on that?
4        MS. STEINER:  Objection; lack of personal
5   knowledge.
6        A.   That's his statement.  I cannot comment
7   on what he meant by that or why he had that
8   interpretation.
9        Q.   (BY MR. SEBY) Paragraph 5, "Listening
10  Sessions.  Average American is connecting the
11  listening sessions with our easement decision -- I
12  still see these as completely separate.  Can't afford
13  for a position to evolve that any output of listening
14  sessions be applied to relook consultation of this
15  permit.  Concerned we are giving a perception that
16  tribes have a veto or consent vote on DAPL.
17  Regardless of how this was environed -- afraid
18  Department of Interior has created a perception that
19  all is on the table -- including the DAPL permit."
20       What is your comment on that, Ms. Jewell?
21       MS. STEINER:  Objection; calls for
22  speculation.
23       A.   I believe that is the opinion of the
24  person that wrote the letter.
25       Q.   (BY MR. SEBY) Do you disagree with it?

252:24-
253:8
FRE 602,
611

253:9-24
FRE 602,
611

Page 254

1            MS. STEINER:  Objection; vague, lack of
2       personal knowledge.
3            A.    I do not believe the intent of the
4       listening sessions around tribal consultation broadly
5       was intertwined with the DAPL decision.  As we've
6       stated -- I stated previously, they were two
7       completely separate entities.  DAPL was an example in
8       real time certainly, but the two were very separate
9       processes.
10           Q.    (BY MR. SEBY) The chief of engineers is
11      saying that he's afraid the Department of Interior has
12      created a perception that they're not intertwined,
13      that everything is on the table.
14           A.    That is his opinion as he wrote in the
15      letter.  I believe it is his opinion.
16           Q.    And I asked you do you disagree with it
17      and why?
18           MS. STEINER:  Objection; calls for
19      speculation, lack of personal knowledge.
20           A.    If I was having a conversation with him,
21      I think we probably could come to a meeting of the
22      minds, but it is very hard to respond to a paragraph
23      without knowing what was going on in the background
24      with the Army Corps as it related to these listening
25      sessions and why he would reach that conclusion.

253:25-254:9
FRE 602

254:10-15
FRE 602, 611

Page 255

1            Q.    Okay.  So I'm going to wrap up here with
2       a question or two.  Can you recall a time when you or
3       at your direction the Department of Interior made a
4       statement that resulted in any deescalation of the
5       DAPL protests occurring on Corps of Engineers
6       property?
7            MS. STEINER:  Objection; vague, compound,
8       lack of personal knowledge.
9            A.    Are you asking whether -- I'm sorry --
10      whether I was aware of a statement or an action?  I
11      believe that the actions of the Bureau of Indian
12      Affairs in their law enforcement efforts absolutely
13      deescalated what could have happened otherwise.  And I
14      also believe that my call to the governor warning him
15      about aggressive actions could result in an
16      escalation, and I think to a certain extent that
17      played out as well.
18           My experience with other very tense
19      situations like the Malheur National Wildlife Refuge
20      was that when you remove the aggression and the
21      visibility that that aggression may cause that it
22      tends to deescalate situations.
23           MR. SEBY:  Ms. Goulding, the court
24      reporter, would you read back my question, please.
25           Q.    (BY MR. SEBY) And, Ms. Jewell, would you

255:1-22
FRE 602

Page 256

1       please listen to it and let me know if the answer you
2       just gave is the same answer to my question as stated?
3            (The question beginning on page 254, line
4       25, was read back as follows:  "So I'm going to wrap
5       up here with a question or two.  Can you recall a time
6       when you or at your direction the Department of
7       Interior made a statement that resulted in any
8       deescalation of the DAPL protests occurring on Corps
9       of Engineers property?")
10           MS. STEINER:  Same objection.
11           Q.    (BY MR. SEBY) Ms. Jewell, do you have an
12      answer different from the one you just gave?
13           A.    You asked whether the Department of the
14      Interior made a statement; is that correct?  I
15      cannot -- I can't relate statements to actions on the
16      ground.  I believe there are a lot of actions we did,
17      as I stated, but I don't remember what all the
18      statements might have been at that time and what the
19      result may have been.
20           Q.    Well, I'm not asking about actions.  We
21      can ask that question next.  But my question as stated
22      and reread by the court reporter, again, pertains to
23      asking you when you or your Department of Interior
24      staff made a statement that resulted in any
25      deescalation of the DAPL protests occurring on Corps

256:11-19
FRE 602

Page 257

1       land?
2            MS. STEINER:  Objection; vague, compound,
3       misstates the evidence, asked and answered.
4            A.    I'm sorry.  I can't provide any more
5       information than I already have.  I just don't
6       understand what you're trying to get at.
7            Q.    (BY MR. SEBY) Okay.  So your answer is as
8       provided?
9            A.    Yes.
10           Q.    Okay.
11           A.    By my watch, we're down to 30 seconds.
12      And I'm not trying to be difficult here.  It's just
13      that I was hoping for a shorter session.  This has
14      been a very grueling day and I've got a full plate
15      when we're done.
16           Q.    Ms. Jewell, unless you've indicated
17      otherwise throughout this deposition, have you
18      understood my question today?  Questions, plural.
19           MS. STEINER:  Objection; vague.
20           A.    Sometimes I've understood your questions.
21      Sometimes I've done my best to answer what I think
22      your question was.
23           Q.    (BY MR. SEBY) Is there anything further
24      that you'd like to add to clarify anything that you
25      felt you did not answer correctly or clearly?

256:20-257:6
FRE

ND OBJ:
Relevance

Page 258

1     A.    No.  I have nothing further to add.
2           MR. SEBY:  Okay.  All right.
3  Ms. Steiner, I pass the witness to you.
4           MS. STEINER:  No further questions from
5  me.
6           MR. SEBY:  Ms. Jewell, thank you very
7  much for your time today.
8           THE DEPONENT:  Okay.  Thank you.  Can I
9  sign off now?
10          MS. STEINER:  We'd like to read and sign,
11 please.  And, yes, you can, Secretary.
12          THE DEPONENT:  I'm leaving then on both
13 screens.
14          MS. STEINER:  Thank you.
15          THE VIDEOGRAPHER:  Going off the record.
16 This concludes the remote video-recorded deposition of
17 Sally Jewell.  The time is now 10:48 p.m. UTC,
18 4:48 p.m. Mountain.  We are off the record.
19          WHEREUPON, the within proceedings were
20 concluded at the approximate hour of 4:48 p.m. on the
21 2nd day of June, 2022.
22          *     *     *     *     *     *
23
24
25

Page 259

1           I, SALLY JEWELL, do hereby certify that I
2  have read the above and foregoing deposition and that
3  the same is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5
           Amendments attached   ( ) Yes   ( ) No
6
7           _____
8           SALLY JEWELL
9
10
11
12          The signature above of SALLY JEWELL was
13 subscribed and sworn to or affirmed before me in the
14 county of _____, state of Washington, this
15 _____ day of _____, 2022.
16
17
18
           _____
19          Notary Public
           My commission expires
20
21
22
23
24
25 State of North Dakota 6/2/22 (tdg)

Page 260

1                    REPORTER'S CERTIFICATE
2  STATE OF COLORADO      )
                           ) ss.
3  COUNTY OF ARAPAHOE      )
4           I, TIFFANY D. GOULDING, Registered
   Professional Reporter and Notary Public ID No.
5  19984028637, State of Colorado, do hereby certify that
   previous to the commencement of the examination, the
6  said SALLY JEWELL verbally declared her testimony is
   under the penalty of perjury in relation to the
7  matters in controversy between the parties hereto;
   that the said deposition was taken in machine
8  shorthand by me at the time and place aforesaid and
   was thereafter reduced to typewritten form; that the
9  foregoing is a true transcript of the questions asked,
   testimony given, and proceedings had.
10
           I further certify that I am not employed
11 by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12 this litigation.
13          IN WITNESS WHEREOF, I have affixed my
   signature this 13th day of June, 2022.
14
15          My commission expires November 4, 2022.
16 x____  Reading and Signing was requested.
17 _____  Reading and Signing was waived.
18 _____  Reading and Signing is not required.
19
20          _____
21          Tiffany Goulding
            Registered Professional Reporter
22
23
24
25

Page 261

1  Errata Sheet
2
3  NAME OF CASE: Plaintiff vs UNITED STATES
4  DATE OF DEPOSITION: 06/02/2022
5  NAME OF WITNESS: Sally Jewell
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25          _____