IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 1:19-cv-00150-DMT-ARS

---

VIDEOTAPE DEPOSITION OF:
LIEUTENANT GENERAL TODD T. SEMONITE (RET.)
July 26, 2022
(via RemoteDepo)

---

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

---

PURSUANT TO NOTICE, the videotape deposition of LIEUTENANT GENERAL TODD T. SEMONITE (RET.) was taken on behalf of the Plaintiff in Prince William County, Virginia, by remote means, on July 26, 2022, at 8:34 a.m. MDT, before Gail Obermeyer, Registered Professional Reporter and Notary Public within Colorado, appearing remotely from Douglas County, Colorado.

REMOTE APPEARANCES

For the Plaintiff:

PAUL M. SEBY, ESQ.
PAUL B. KERLIN, ESQ.
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Email: sebyp@gtlaw.com
kerlinp@gtlaw.com

For the Defendant:

ERICA ZILIOLI, ESQ.
TIMOTHY B. JAFEK, ESQ.
United States Attorney's Office/
District of Colorado
1801 California Street, Suite 1600
Denver, Colorado 80202
Email: erica.m.zilioli@usace.army.mil
timothy.jafek@usdoj.gov

Also Present (Remotely):

Michael Banks, Remote Video Technician
Rachel Hymel

I N D E X

| EXAMINATION OF LIEUTENANT GENERAL TODD T. SEMONITE (RET.): July 26, 2022 | PAGE |
|---|---|
| By Mr. Seby | 7 |
| By Ms. Zilioli | -- |

| DEPOSITION EXHIBITS: (Exhibits provided electronically to the reporter.) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 684 | (Confidential document) Bates Nos. USACE_00044967 - USACE_00044968 | 111 |
| Exhibit 686 | (Confidential document) Bates Nos. USACE_00002482 - USACE_00002484 | 115 |
| Exhibit 688 | (Confidential document) Bates No. USACE_00049705 | 124 |
| Exhibit 689 | (Confidential document) Bates Nos. USACE_00026566 - USACE_00026569 | 126 |
| Exhibit 690 | Email to Tedeschi from Turner, 9/8/16, Subject: FW: LTG SEMONITE TASKER - LAYDOWN OF PROTEST SITE - 8 SEP 2016 MRD Morning Report (UNCLASSIFIED) Bates Nos. USACE_00027169 - USACE_00027207 | 129 |
| Exhibit 694 | (Confidential document) Bates Nos. ARMY_00078874 - ARMY_00078879 | 146 |

I N D E X (Continued)

| DEPOSITION EXHIBITS: (Previously marked) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 26 | Email to Archambault from Henderson, 9/16/16, Subject: FW: Press Release (UNCLASSIFIED), Bates Nos. USACE_00003114 - USACE_00003115 | 154 |
| Exhibit 420 | (Confidential document) Bates Nos. ARMY_0011059 - ARMY_00110567 | 149 |
| Exhibit 429 | (Confidential document) Bates Nos. ARMY_00110568 - ARMY_00110570 | 163 |
| Exhibit 494 | Email to SRJ2@ios.doi.gov from U.S. Department of the Interior, 9/9/16, Subject: Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, Bates Nos. DOI_00000001 - DOI_00000002 | 142 |

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

*   *   *   *   *

THE VIDEOGRAPHER: We are now on the record. Participants should be aware that this proceeding is being recorded, and as such, all conversations held will be recorded, unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

This is the remote video-recorded deposition of General Todd Semonite, being taken by counsel for the plaintiff. Today is Tuesday, July 26, 2022. The time is now 2:34 p.m. UTC, 8:34 a.m. Mountain. We are here in the matter of State of North Dakota versus The United States of America.

My name is Michael Banks, remote video technician on behalf of U.S. Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome. At this time will the reporter, Gail Obermeyer, on behalf of U.S. Legal Support, please enter the statement for remote proceedings into the record.

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. SEBY: This is Paul Seby, counsel for the plaintiff, State of North Dakota, and we agree.

MS. ZILIOLI: This is Erica Zilioli, counsel for the defendant, United States, and we agree.

THE REPORTER: And, General Semonite, do you declare your testimony in this matter is under penalty of perjury?

THE DEPONENT: I understand and I agree.

THE REPORTER: Thank you.

MR. SEBY: You ready?

THE REPORTER: Yes.

LIEUTENANT GENERAL TODD T. SEMONITE (RET.), having verbally declared his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. SEBY:

**Q. Okay. Good morning, Mr. Semonite. May I refer to you as -- as Mr. or General, sir?**

A. General is probably great, sir.

**Q. That's -- that's fine. I'm happy to do that. Good morning, General Semonite. I -- my name is Paul Seby. I'm an attorney with the law firm of Greenberg Traurig and also a Special Assistant Attorney General for the State of North Dakota, and we represent the State in this proceeding. My co-counsel, Paul Kerlin, is on the Zoom with us today. And today, we'll refer to our client collectively as "North Dakota" or the "State." Do you understand, sir, that you have just been sworn in this morning?**

A. I do.

**Q. Would you please state your full name for the record.**

A. Todd Thurston Semonite.

**Q. And the middle name was Thurston?**

A. Thurston.

**Q. Got it. Thank you. Before we begin, sir,**

**I'd like to go over a few just basic ground rules for the deposition, most of which are simply intended to help the court reporter take down everything we say. Everything we say today is being written down and videotaped. And because of that, if you'd please verbalize your responses with a yes or no or other manner of answer, and not nodding your head, one way or the other, so that's a nonverbal communication.**

**Likewise, it's difficult for the court reporter to take down what we say -- are saying if we happen to inadvertently talk over each other. So I'll do my best not to interrupt you; if you would do the same, if that's acceptable. And if you need a break, please just let me know. Otherwise, I suggest we take a short break every hour or so. If you do not understand a question that I've posed, please just let me know, and I'll -- and ask me to repeat it or rephrase it, and I'll do my best to clarify what I'm trying to ask you. Okay?**

A. Sounds good.

**Q. And if you answer a question I've asked, I'm going to assume that you've understood the question that I am asking. Is that understood?**

A. Understood.

**Q. Okay. General, is there anyone with**

**the room -- in the room with you this morning?**

A. Erica is here.

**Q. Okay. And are you relying upon any documents in front of you during the deposition today to answer any questions or refresh your recollection on anything?**

A. No documents.

**Q. Okay. And you understand, sir, that you're obligated by oath to tell the truth this morning?**

A. I do.

**Q. Okay. General, what did you do to prepare for your deposition today?**

A. So I've never been deposed, so Erica asked me to come in to help me understand the process of a deposition.

**Q. And you met with her to do that?**

A. I did, in person. I did, twice.

**Q. Did you meet with anyone else, with or without Erica?**

A. There was Tim, who's on the -- on the video teleconference. He and one of his counterparts were on the -- on virtual.

**Q. Yeah. Okay. When did you meet, sir, with your counsel?**

A. Last week was one session. I think the one before that was two weeks ago, it might have been three weeks ago. But both of these probably happened in the last two or three weeks, two times.

**Q. How long did you meet on each occasion?**

A. I think anywhere from two to three hours. The first one might have been three hours. The second one was perhaps a little shorter.

**Q. Okay. Did you talk to anyone else, other than your counsel, in preparation for your deposition today?**

A. I don't believe I did, other than my wife and maybe somebody just in my office that knows that I'm out of the net all day today.

**Q. Sure. Are you aware that North Dakota has taken the sworn depositions of Major Startzell; former United States Marshal for the State of North Dakota, Paul Ward; Corps of Engineers employees Eileen Williamson and Eric Stasch; and Colonel John Henderson and General Scott Spellmon; Mr. Lowry Crook; former Secretary of the Interior, Sally Jewell; and former Assistant Secretary of the Army for Civil Works, Jo-Ellen Darcy? Are you aware of that?**

A. A lot of names. The first four or five I do not recognize. Obviously, I know Crook, Darcy,

Spellmon, Henderson, and I understand Jewell. The first several names, I didn't understand who those were.

**Q. Okay. No -- no problem. The -- the question was, are you aware that they have been deposed?**

A. I understood there were some depositions that have been done already.

**Q. Okay. Have you spoken to any of the individuals that I identified to you about their depositions in this matter, prior to this morning?**

A. Absolutely not.

**Q. Okay. Have you reviewed any of their deposition transcripts or videos?**

A. Absolutely not.

**Q. Okay. Did you review any documents, prior to today's deposition, in preparation for the -- the deposition this morning?**

A. There were a couple documents that Erica showed me that I think had been introduced in discovery, so I am aware that there was some email traffic.

**Q. Sure. Did you review documents on your own or always with your attorney?**

A. Only with my attorney. And I did not

take -- I did not have copies of those documents.

**Q. Okay. Well, what happened? They were projected on the Zoom?**

A. Right.

**Q. Sure.**

A. They were projected up on the screen.

**Q. Okay. Did you do any research on your own about the issues in this case?**

A. I did not, and I was specifically instructed to not go into a lot of detail.

**Q. Yeah. Okay. Did you refer to any notes from the past that you may have maintained with respect to your involvement in the DAPL-related protests in the state of North Dakota in 2016 and '17?**

A. I did nothing to research my notes.

**Q. Okay. All right. General, are you aware that your deposition today pertains to North Dakota's case against the United States under the Federal Tort Claims Act, involving $38 million in damages that the State of North Dakota seeks to recover from the United States as a result of the Corps of Engineers' and other federal officials' actions associated with the protests against the Dakota Access Pipeline? Do you understand that, sir?**

A. In a very vague context, but I do not

understand the details of the tort claim. I'm not an expert on legal actions.

**Q. No. You understand, though, your deposition today is in relation to that matter?**

A. I do.

**Q. Okay. Are you aware of any of the United States District Court for the District of North Dakota's rulings in the case thus far?**

A. So I don't understand the question, exactly. I understand some rulings that the federal government made several years ago. I don't know of any of the North Dakota rulings.

**Q. These are -- the ones I referred to, sir, are from the United States District Court, Federal Court, in North Dakota with respect to this case. Are you aware of any of those orders or decisions?**

A. I remember that some of those rulings were made, but I don't have any specific details on where or how they were done.

**Q. Have you read any of the court's orders or determinations in this case to date?**

A. Not at all.

**Q. Okay. Okay. General, what is your current residence address? Where do you reside, sir? I don't need a street address.**

A. I live at -- yeah. 15 -- or 13159 Lake Hill Drive, Manassas, Virginia 20181.

**Q. Thank you. And where are you from, General?**

A. Let me back up. It's not Manassas. It's Nokesville. It's in a vicinity of Manassas. But it's N-o-k-e-s-v-i-l-l-e. I was born and raised in Bellows Falls, Vermont.

**Q. Bellows Falls?**

A. Correct.

**Q. Would you describe and summarize your education, please.**

A. Following high school, I went to West Point United States Military Academy for four years. And then I have several civilian degrees and military degrees -- I can go into more detail -- both on -- in civil engineering and also in military arts and sciences.

**Q. And are those degrees from West Point or other institutions?**

A. Bachelor of science is from West Point, a master's of science in civil engineering from the University of Vermont, a master's of science in military arts and sciences from the Command and General Staff College, Fort Leavenworth, Kansas. And I also

went to the Army War College. At the time I went, there was not a degree given. They gave a degree about a year after.

**Q. I see. Have you always been employed with the United States military?**

A. Until I retired in November of 2020.

**Q. And what do you do as post-government-service work?**

A. I took a job as president of a large architect/engineering firm that does federal work.

**Q. And is that located in Virginia?**

A. I think the headquarters office is actually in New York City, but our federal office is here in Washington, D.C.

**Q. I see. Okay. Now, I'd like to go back to your time as -- in the -- the Army Corps of Engineers. Would you describe your -- the evolution of your career in the -- in the United States Army.**

A. So all second lieutenants start out pretty much as a tactical officer working with troop units. But in the Corps of Engineers, we cycle our officers back and forth between troop duty and with the U.S. Army Corps of Engineers, which is much more of an engineering firm.

I think my first job in the Corps of

Engineers was helping to build Fort Drum, as a major, in 1987. I did work in building the grid in Baghdad, in 2003, as a colonel; and then from 2006 on, pretty much uninterrupted, as a general officer working as, initially, a division commander in charge of six or seven states, then ultimately as the number two person in the Corps of Engineers, called the deputy chief of engineers; a short deployment to Afghanistan for 13 months, and then I was brought back in 2016 to serve as the chief of engineers and basically served a four-year tour and then was extended by the Administration for another five months.

**Q. I see. Okay. Thank you for that. Would you describe your position as the chief of engineers with respect to the Dakota Access Pipeline project?**

A. So the chief of engineers really wears two hats. Number one, the senior engineer in the Department of Defense for all engineering matters, both tactical, strategic; and with respect to the Corps of Engineers, anything that the Corps of Engineers has to do to be able to support deployed soldiers or construction of installations, Civil Works, environmental, et cetera. The second hat is actually the commander of the Corps of Engineers, a 36,000-person organization that does roughly about a

$68 billion portfolio a year.

**Q. Okay. And, sir, if you would describe the -- your position, specifically with respect to the period of time March of 2016 to 2017, involving the -- the United States Government's consideration and review of the Dakota Access Pipeline project.**

A. So I didn't actually take command until May, so I won't go to March and April. I was preparing for command. And then, basically, the first several months of my command were orienting myself to the task and missions of the command, sending a strategic vision, trying to put systems in place; what you would expect most senior leaders, like a CEO of large organizations, to do.

The Corps has thousands of projects. I pride myself on not getting deeply involved in any projects, so I probably didn't do anything with this particular mission until sometime when we began to see activity. I think it was somewhere around the end of August or maybe even September.

**Q. Okay. So you -- you became chief of engineers in May of 2016? Make sure I understand that.**

A. That's correct. May 19, 2016.

**Q. Okay. Okay. And -- and who was your immediate predecessor as chief of engineers?**

A. Lieutenant General Thomas Bostick.

**Q. And where did Mr. -- or General Bostick go after he left the chief of engineers position?**

A. I think he stayed physically in the D.C. area. I believe he took a private job. And I have not had a lot of contact with him, so I don't -- I'm not prepared to answer that question in any detail.

**Q. So are you saying he retired?**

A. He did. I'm sorry. He retired.

**Q. Okay. Thank you. So I -- I want to understand the -- the command structure of the -- the military command structure, basically, and -- and who -- who you report to and who reports to you. Would you help me understand your relation in the United States Army and who your superiors were?**

A. So the Corps of Engineers is a -- basically, a standalone unit that reports to the number two general in the Army. It's called the Vice Chief of Staff. And that person reports to the Chief of Staff. So my direct report was a four-star general in the Army. And then underneath me I have -- all of those 36,000 employees are primarily broken into a headquarters element here in Washington, D.C.

And then it's important that you remember these next terms of reference. We have divisions which

are normally -- they're commanded by a general officer, either a one- or a two-star, and they normally go anywhere from six to eight states. Underneath the division, the main unit of operation of the Corps of Engineers is a district. Some districts might have one or two states, some might have five or six states. We have 43 district commanders in the Corps of Engineers. They are worldwide, but most of them remain here in the continental United States, commanded by a colonel. But they're made up about about 99 percent U.S. Army civilians. The Corps only has maybe 500 military, the other 35,000-plus are civilian employees.

**Q. Thank you. And then with respect -- those are the individuals that report to you, sir, I understand. How about above you? What is -- you indicated the Vice Chief of Staff of the -- of the Army is your immediate direct report. And above that person is the -- is the Chief of Staff?**

A. That's correct.

**Q. Okay. And during the period of time 2016 -- August 2016 through summer of 2017, what were the names of the people that held the Vice Chief of Staff position, singular or plural, just to make sure we capture all who were in there?**

A. So the Vice -- the Vice Chief of Staff was

a general, J-E- -- or G-E-N Dan Allyn. I think he only stayed there for about a year. And the Chief of Staff was General Mark Milley, who is currently the Chairman of the Joint Chiefs of Staff.

**Q. Yes. Okay. And where does the Secretary of the Army fit in that regard?**

A. So this is a -- kind of a dual chain of command. The military reported up to the four-star general, General Milley, at the time. And at the same time, we, of course, are subservient to the civilian control of the government. So the Secretary of the Army -- basically, General Milley reports to the Secretary of the Army. At the time, it was Mr. Fanning.

And then the Secretary of the Army has several, maybe seven or eight, what's called Assistant Secretary of the Army. And at the time, the Assistant Secretary of the Army for Civil Works was Ms. Jo-Ellen Darcy. So while I didn't report to her directly, I always listened to her guidance. I felt like we had a very strong relationship; but it was not a hard line, it was much more of a dotted line.

**Q. Thank you. Where -- where does Major General Ed Jackson fit into that schematic?**

A. So I talked about there being a

headquarters element here in Washington, D.C. Underneath me, I had three two-star generals. They're major generals. One of them was the deputy chief of engineers, which mainly performed day-to-day activities of running a command. And then there are two operational components in the headquarters; one which does all military construction, think of that as DOD work and other federal agency work. The second component was Civil Works. General Jackson was the two-star who was the director of Civil Works.

And I'd do a lot of delegation. Most of the time, if the division commanders, those 9, or those 43 district commanders had specific issues or needed guidance in the Civil Works arena, then they would go up through General Jackson and seek help from him and his staff.

**Q. I see. What was the name of the individual that held the deputy chief of engineers position during your tenure, sir?**

A. I think the first -- when I came in, I think it was Major General Rick Stevens, but I -- he was at some point, but it might have been a couple months after. It was somewhere in that period Rick Stevens was the deputy chief of engineers.

**Q. Okay. And how about the major general**

**that -- that oversaw the military construction component of the Corps? What was that individual's name?**

A. I think -- I think, initially, it was Major General Ken Cox, but I might be off by one general. It ended up eventually being Major General Tony Funkhouser afterward. They'd rotate about every two years. They'd rotate out of those jobs.

**Q. I see. Okay. Okay. You mentioned interacting with -- with Jo-Ellen Darcy, the Assistant Secretary of the Army for Civil Works. What was your -- what was the nature of your interaction with her? Did you office in the same location as Ms. Darcy or -- or not?**

A. Her office was in the Pentagon with a very small staff, maybe 15 or 20 people. I delegated most of the Civil Works actions to General Jackson, his deputy, who was a senior civilian executive. And they would have meetings, at least once a week, face to face. We would -- Ms. Darcy and I would probably meet maybe once a month to have a very, very high-level review of issues, but it was much less frequent than perhaps what I was doing more on the military side.

I think it's important to also realize that as the chief of engineers, I also was responsible

for the training and resourcing of 90,000 soldiers. That's a different -- those are troop units. We're talking about -- the Corps of Engineers, right now, is a command. But most of -- a lot of my duties were going to visit troop units and helping the Army understand how to fight the wars in Iraq and Afghanistan. So that's another critical component of what I did as really a dual-hatted military leader.

**Q. Thank you. Did you also office at the Pentagon, sir?**

A. I had two staffs, two offices; one here in downtown D.C., one in the Pentagon. Most times, I would do two or three visits back and forth during, actually, a day.

**Q. And you did that routinely?**

A. Mainly stayed in Washington on Mondays and Fridays. I'm a muddy boots guy that likes to be on the ground. So almost every Tuesday to Thursday, for four years, I traveled.

**Q. Okay. So you were -- when you became the chief of engineers in May of 2016, had the -- the issues surrounding the -- the Waters of the United States rulemaking that was developed in 2015, had that whole experience already occurred, the Corps' position on the rulemaking and EPA's position? Was that all**

**your predecessor's involvement, or did that carry over into the beginning of your tenure?**

MS. ZILIOLI: Objection, relevance.

A. So I got several onboarding classes. Because I was in Afghanistan for 13 months, I was out of the net for quite a while. Obviously, rulemaking and ROTUS (phonetic) were things that I wanted to be informed of. I think the other thing is -- is, that was not necessarily a finite event. It continued to evolve. Different states had different opinions, there was different litigation. So I think it would be best to characterize to say that we were always interested or aware of where the Administration was going with respect to Waters of the United States.

**Q. (BY MR. SEBY) Yeah. Was that a controversial topic at the time you took your position as chief?**

MS. ZILIOLI: Same objection.

A. I don't believe it was real controversial. I don't remember the details. It continues to be law, based on different Administrations. And as the Corps, we took our lead from where the Administration wanted to go. But I was -- it was not something I laid awake worrying about, necessarily.

**Q. (BY MR. SEBY) Okay. Was it -- was it**

**something that was a matter of friction within the Corps --**

MS. ZILIOLI: Same objection.

**Q. (BY MR. SEBY) -- and the Army?**

A. I think -- without going into a lot of detail, I think there was some degree of confusion, based on Supreme Court decisions. And I think a lot of the people in the Corps wanted to be able to make sure that it was cleared up. Now, regardless of what that meant with respect to, what does that mean, we just don't like to work in an ambiguous environment. I think at some point the lack of clarity caused our people to be in a position to have to make decisions which were probably judged several different ways.

**Q. Yeah. Okay. Understand. Did part of your responsibilities as chief of engineers involve serving as a liaison of sorts with other federal agencies?**

A. Not necessarily in a description of duties. I felt it incumbent on the Corps to really almost serve as the federal engineer at certain times. So there were times when the Corps had capabilities that no one else in the federal government could do. For instance, we did a lot of emergency management work, so we were an unbelievable partner with FEMA in

the big storms of '17 and '18. We ended up doing a lot of work with Customs and Border Patrol, a lot of work with the NEXUS administration.

But it was not necessarily a task that was given to me. It was much more that we had a capability, and we were -- we wanted to continue to be able to provide both the taxpayers and the Administration the best engineering advice possible.

**Q. Sure. Okay. So you worked with those agencies that you mentioned. Did you interact with the Department of the Interior in any respects?**

A. Not specifically. There were different things that happened on my four years where I might have had more involvement. But I would say that the Department of the Interior was much further down on the list versus the Veterans Administration or CBP.

**Q. Okay. But you did interact with them to some degree, you're just telling me that on a -- on a hierarchy scale, it was less than others?**

A. I would concur with that.

**Q. Okay. All right. With respect to the Department of the Interior, do you recall interacting with an individual who held the title Assistant Secretary of the Department of the Interior, Mr. Michael Connor?**

A. I don't believe I ever worked with him or was really aware of him at that time.

**Q. Never?**

A. I don't believe I knew who he was.

**Q. Okay. How about the Secretary of the Interior, Sally Jewell? Did you interact with her in any regard?**

A. I don't believe I ever interacted with her, either.

**Q. How about Mr. Larry Roberts of the Department of the Interior?**

A. I might have heard the name, but I couldn't tell you what he did, and I don't think I ever talked to him.

**Q. Okay. How about in your capacity as chief of engineers, did you interact with any of the state governments or representatives where the Corps' mission was -- was ongoing?**

A. So because I traveled a lot, wherever we were doing big projects, many, many times I would fly in to see a governor, a governor's staff. I think, more importantly, when you talk about representatives, I was the chief of engineers. I had to testify several times in Congress. As a result, I got to be very, very close to almost every member of both the Senate and the

House Civil Works Committees. So a good example is, some of the representatives from North Dakota, I got to know quite well.

**Q. For -- for example, who -- what individuals are you referring to?**

A. I think in North Dakota -- and this relationship evolved, if you're talking '16 and '17, I was aware of Senator Hoeven. But it really came to the later years when we were doing a couple big projects in North Dakota, where he was probably one of the top seven or eight senators that I knew, especially when I left here in 2020.

**Q. Sure. And you said you met with -- occasionally with governors of states where the Corps had project work. Do you recall meeting with the governor -- governor or governors of the State of North Dakota?**

A. I don't think I ever did, but there could have been a time where we had some big event in -- I think Fargo-Moorhead was the billion-dollar project we were doing, where I think there might have been a ribbon-cutting or something. But it was not something that I necessarily remember. I don't even remember who the first governor of North Dakota was. I think the person changed. But I don't have any specific

involvement with the two -- with the governors of North Dakota.

**Q. Okay. And that was true during the DAPL -- the period of the DAPL protests, approximately August of 2016 through, say, March or April of 2017? You'd never met or spoke with, on the phone, either governor of the State of North Dakota?**

A. I don't believe so. There were times where I think some members of the Administration were working as a team, there could have been a time; or there might have been a VTC or a call, I might have been in a room. But I don't -- most of the engagements I had with governors I remember. I don't ever remember specifically meeting or who that person was.

**Q. Okay. Okay. Now, I want to talk about the DAPL protests themselves; again, the August 2016 time period through mid- -- mid-year 2017. Were you -- were you confident, as chief of engineers, that the information you were receiving was -- about the protests and the situation in North Dakota -- that you were receiving was timely, accurate, and complete?**

A. I had confidence that my team was telling me their -- what they saw on the ground. But I have to be honest with you, after 41 years in the military as a general, I always like to verify. I always like to

ND OBJ: As to 30:19 (beginning "We had a...")-31:15, Non-Responsive

ND OBJ: As to 32:24-33:11, Non-Responsive

Page 30

question and double-check. So I'm not sure that every single thing I always heard was necessarily true. It was probably what my team felt was their perception of what was happening on the ground.

**Q. Okay. And that -- I appreciate that. Are you thinking of anything in specific with respect to the -- the DAPL protest-related events that cause you to say that, or is that just a general observation?**

A. It's just a general observation of always checking and double-checking.

**Q. Yeah, sure. Especially with a lot of moving parts, right?**

A. There's always a lot of things that you know, and there's normally a lot of things you don't know.

**Q. Yeah, yeah. General, what sources of information did you rely upon for updates on the DAPL protests in the state of North Dakota?**

A. I don't remember, exactly. We had a series of weekly SITREPS that every district, those colonel-level districts, sent to their generals. I never saw those district reports, because there were 43 of them. My division commanders would then send me a SITREP, some two- or three-page paragraph of actions that was happening. They would send me routine updates

Page 31

every -- every other week. General Scott Spellmon was the division commander of the Northwest Division, so I'm assuming he continued to send me updates, like he would every two weeks. And at some given point, as an issue either evolved and got resolved, or at some point if it got more intense, then that would trigger either a question from me or my staff.

General Jackson was on those SITREPS. And because I was working a very, very hectic pace, I tried to triage everything we were doing and delegate and empower to my team the ability to resolve, at the lowest level, to be able to put things where they needed to be. So most of the time my division commanders or my generals here in the headquarters were the day-to-day go-to people to provide updates.

**Q. Sure. And when you were walking me through the -- the hierarchy chart of -- of -- that you described, when you were talking about Major General Jackson, I just want to ask a question about that. Major General Jackson was a direct report to you or Ms. Darcy?**

A. All the generals reported direct to me. So he was a direct report to me, was here in my headquarters. I saw him two or three times, personally, every Monday and Friday when I was here in

Page 32

town.

**Q. Right. Okay. And General Jackson's reporting duty or -- to -- to Ms. Darcy was -- was the same as yours, sort of a collaborative relationship, or was it a -- a boss relationship?**

A. I'm not sure that either one of those would be right. The bottom line is, I would call it more of a partnership. If there was ever a time where there was a conflict, we always strived to somehow defuse a conflict. But most of the time when the military, working with a civilian leadership, we take their guidance. But they normally give us concepts of what they'd like to do, but the execution is normally administered by the military.

**Q. Sure. Did you ever direct that the Corps should independently monitor the DAPL protests occurring on Corps of Engineers property?**

A. So I don't understand the question. What do you mean "independently monitor"?

**Q. Versus rely upon other sources of information. Did you -- did you ever insist that the Corps place monitors to firsthand observe the protests?**

A. I certainly never directed that. I had -- I know that another key name here is Colonel John Henderson, who was the district commander of the Omaha

Page 33

District. He was probably the most visible and was on the ground. So when you talk about monitoring, he definitely had insights, both of the people and of the issues and of the actions. So I always was very attuned to what Henderson's perceptions were of what was happening.

But I don't think -- we never wanted to do things independent. We always strived to be a federal/state integrated team, where everybody understands others' authorities and we try to work as best we can as a collaborative body.

**Q. Thank you. And what -- do you recall directing General Spellmon or Colonel Henderson to do anything specific with regard to that striving to be a federal/state team with regards to the North Dakota DAPL protests?**

A. I'm not sure that I remember any specific actions, but -- and I might have alluded to this. Most of the time, I did not get involved in day-to-day activities. Probably 80 percent of the Corps' actions that happened were executed inside the districts and resolved inside the districts. Whatever the 50 percent that were not done by districts, were probably resolved by the different divisions. So that allowed me to -- instead of worrying about a hundred percent of issues,

I was able to focus on really the strategic direction where the Corps was going. But then when there was a tactical issue, which DAPL started out at, then I was able to direct my focus at those very, very few things which needed the commander to get involved.

**Q. Okay. And are -- are you aware that the -- whether the -- the Corps of Engineers manages a project in the state of North Dakota on the Missouri River in the southeastern part of the state?**

A. I am aware.

**Q. And is it correct that the lands and project that you're referring to being aware of is called the Oahe Project?**

A. It is. But it's important to point out that I've never been there. And in the last six years, I've not seen a map. So anything with respect to the orientation or the physical layout is something I'm not very knowledgeable of.

**Q. Okay. But is it correct that your understanding is that the Corps of Engineers manages that -- that property and project on behalf of the United States Government?**

A. That's correct.

**Q. Does anyone else manage or control that project, in addition to the Corps?**

ND OBJ: As to 35:11 (beginning "There are times...")-35:10, Non-Responsive

A. I don't know that. There are times where, on some of our federal areas, we might lease parts of a recreation area to a concession; that we might allow local and state organizations to come and do things like upgrade trails and other stuff. So I'm not -- it wouldn't be fair to probably say that we solely organize it, but most of the time we have partnering agreements with other entities. So sometimes it might be where we seek or receive assistance from either state or local officials or organizations.

**Q. And do you know that was the case with regard to the Oahe Project or -- or not?**

A. I don't know that.

**Q. Okay. Do you recall the -- the function and purpose of the Oahe Project?**

A. I don't know exactly what those functions are. Every one of our federal lands has different authorities. Some are flood control; some are based on when you have a water control structure, like a dam, to be able to control water for either hydro or for environmental reasons. Most of those rec areas are associated with a Civil Works project that had been constructed earlier. And as I recall, I think that's what caused the actual lake or the water structure to be formed.

**Q. Okay. Do you agree with me that the Oahe Project is a flood control project along the Missouri River?**

A. A lot of our projects have five or six different purposes, so I can't answer that. I think the primary reason was a flood control project, but there are several of our reservoirs that actually have four or five authorized purposes. And I don't know the details of that particular project.

**Q. Okay. Are you aware that there is a -- a hydropower function to the Oahe Dam that's part of the Oahe Project?**

A. I'm not aware of that. It doesn't surprise me, though.

**Q. Okay. And, of course, there's recreational aspects to the Oahe Project as well that are ancillary to flood control and power generation purposes. Is that a fair understanding as well?**

A. I was aware that there was a recreation function, only because as this process evolved, obviously we had park rangers that were involved. So when I heard the word "park rangers," we only put our park rangers normally where there's a recreational authorization.

**Q. And what does a park ranger duty mean to**

**you, sir, generally speaking?**

A. I'm going off my gut here, but mainly it's a trained civilian who allows the project to be done under authorized purposes; anywhere from managing the -- the operations that are performed, like recreational services, taking care of the environment. There's probably some type of capability of making sure that we have nature, Boy Scout troops get tours. Very, very similar to, like, I think the average American would think of as a U.S. Park Service park ranger.

**Q. Okay. Would that include making sure that -- that rules are followed on -- on Corps property and that peaceful enjoyment of the property for all lawfully using it would -- would ensue?**

MS. ZILIOLI: Objection to the extent it calls for a legal conclusion.

**Q. (BY MR. SEBY) As a practical matter?**

A. I would say that that's generally correct. I have never been a park ranger, and I'm not necessarily an expert on the duties and functions of a park ranger. But normally, yes, we want -- the Corps is an institution where we want to continue to be able to make sure that we have accountability and the rules are followed.

**Q. Yeah. That's sort of a central -- central**

**value of the Corps and its properties and purposes, right?**

A. I think that taking care of our responsibilities is something that we hold very dear to where we're at. So I would say, generally, yes.

**Q. Okay. Do you know whether the -- the United States ever delegated responsibility for the use or management of the Corps Oahe Project lands to the State of North Dakota?**

MS. ZILIOLI: Objection, legal conclusion.

A. I don't know that.

**Q. (BY MR. SEBY) Okay. How about to the Standing Rock Sioux Tribe or any other tribe?**

MS. ZILIOLI: Objection, legal conclusion.

A. I don't know that, either.

**Q. (BY MR. SEBY) Okay. To any of the protesters?**

MS. ZILIOLI: Same objection.

A. I know at one point there was a standing use permit. So I'm not sure that that answers your question. But I know that there was some ability that was being worked to be able to allow freedom of speech. So that -- I'm not sure that answers your question, but

I -- I don't want to say no. I know there was some -- some issue there.

**Q. (BY MR. SEBY) Yeah. Do you recall, General Semonite, when you first learned that protesters were physically present on Corps of Engineers-managed lands in North Dakota?**

A. I think it's sometime around Labor Day weekend of 2016, when I -- I think there was one of the first occurrences of something. But I'm not sure whether that was a demonstration or, you know, a march or what it was. But I think it's sometime around Labor Day.

**Q. Yeah. Do you recall how you learned that, sir?**

A. So, I don't; but normally, we have a system in the Army that establishes critical information requirements. It's documented. It's actually on one page, and it says, if someone dies in the Corps, then you notify and send up a flash report to leadership to say, somebody -- one of our -- one of our team died. If there's a specific thing where we think we're going to be in national news, the district is required to send something up.

So if it was something where it was a protest or something that was relevant, then I would

certainly assume that my district sent to the division that trigger. And inside of my headquarters, there's actually a command post. I call it the Emergency Operations Center, EOC, that normally gathers that data. And a lot of times in our Monday morning meeting, I would, then, have been briefed on it. Now, if Labor was a Monday, then it was probably the next Tuesday. But I probably either got an email or a briefing on what had transpired over the weekend.

**Q. I see. And what did you do after you received that first indication that protesters were accessing and using Corps of Engineers property?**

A. I don't remember that. I would normally have asked my two-star, General Jackson, who was probably sitting at the table, "Okay. What does that mean? What's the plan? What are we going to do? And do you need any help?"

Most of the time, like I said earlier, I try to delegate and empower. And unless they either don't have the resources or they don't have the authorities, I let them execute what they feel is the best-laid-out plan.

**Q. Yeah. Do you know why DAPL-related protesters chose to enter onto and stay on Corps of Engineers property?**

MS. ZILIOLI: Objection, speculation.

A. So I don't know any specific details, but I think it was because of their objection of putting the pipeline underneath the waterway.

**Q. (BY MR. SEBY) The -- the crossing of the Waters of the U.S.?**

A. That is correct.

**Q. Yeah. Do you have a thought, though, why they chose Corps of Engineers property and not some other property?**

MS. ZILIOLI: Objection; assumes facts not in evidence, and speculation.

A. I don't know that.

**Q. (BY MR. SEBY) Okay. Do you know, was -- was anyone inviting or encouraging or calling for protesters to come and stay on the Corps property?**

A. I can't -- I can't comment on anybody external to the Corps. Certainly, the Corps did not do that. There could -- there's a lot of players in this equation. There could have been other elements in, I don't know, America that felt that this was an appropriate gesture and could have then made recommendations accordingly; for instance, different types of Native American tribes, at some point there were people from Hollywood involved. So I don't know

who recommended what. I just know that it did not come from the Corps.

**Q. Do you agree with me that you -- you learned around Labor Day that people were -- protesters were -- were entering on and staying on Corps property?**

A. I'm not sure I know if they were physically on the property. I know that there was definitely some type of -- I'm not sure "altercation" is the -- is the right word -- some type of an incident that happened there, either on property or external. But I don't physically know -- I don't know if they were physically on the property at that time. They very easily could have been.

**Q. Okay. Do you agree that at some point thereafter they were -- they did enter onto and stay on Corps property?**

A. So I know that this continued to evolve and the numbers continued to get higher. And as a result, we continued to get more worried.

**Q. As the numbers grew higher and the -- the presence of people on Corps property increased, were you aware that those people were using the Corps property as a base of sorts and would go off of the Corps property to private property in the vicinity?**

MS. ZILIOLI: Objection, assumes --

objection, assumes facts not in evidence.

**Q. (BY MR. SEBY) I'm asking that -- whether you knew that, sir?**

MS. ZILIOLI: Same objection.

A. So I don't have the details on that. I know that there was one portion, which I believe was Corps property, which was leased out to some farmer for grazing. I'm -- I'm imagining what you stipulate could have happened on private property. I just don't have the personal knowledge of where exactly they went and what their target of operation was.

43:12-21
602, 611

**Q. (BY MR. SEBY) Okay. Are you aware that individuals residing on Corps property left the Corps property to travel to public roads and bridges?**

MS. ZILIOLI: Objection, assumes facts not in evidence.

A. I know that there were protesters on public roads and bridges. It could have very easily been that they did come off of Corps property, some of them might have come from other places. I just don't know the details.

**Q. (BY MR. SEBY) Okay. How about with respect to the same residents on Corps property traveling from the Corps property to the cities of Bismarck or Mandan, North Dakota and then returning to**

**the Corps property?**

MS. ZILIOLI: Same objection.

A. So I have no knowledge of that.

**Q. (BY MR. SEBY) Okay. Okay. Are you aware, sir, how the Corps of Engineers administers the public use of Corps property for recreational activities? What -- what -- what form of -- of rules and regulations and administration of those rules does the Corps use to manage its property?**

MS. ZILIOLI: Objection to the extent it calls for a legal conclusion.

A. So the Corps has hundreds of publications. We pride ourselves on having systems in place. So while I don't know the regulation -- the recreation regulations very well, I know that as I have visited many of these places, there are certain things that involve putting boats in, fishing contests, people going swimming, hunting. We have rules for all that. So most of the time there is some documented regulation that those park men -- those park rangers try to use -- they use to administer the proper use of those facilities. But I probably don't have anywhere near the level of detail that you're looking for.

**Q. (BY MR. SEBY) No -- no problem. But you're aware that the Corps of Engineers -- or are you**

**aware that the Corps of Engineers has a title in the Code of Federal Regulations, known as Title 36, that spells out the permissible use and manner of use for Corps property and the types of permissions that are necessary to conduct those activities?**

A. I'm vaguely aware of Title 36. I probably became aware of it more when we were in the middle of September '16 and we were faced with some of these questions as, what were our authorities and what were our options when it came to the ability to keep good order and discipline. But I probably couldn't quote you anything with respect to what's in Title 36.

**Q. Right. General, is it fair to say that that DAPL protest-related situation was your introduction to the -- the Corps regulations, authorities if you will, for the use and management of its properties?**

A. I think it's fair to say that it was the first time that we probably had been faced with an issue where it wasn't easy to resolve. There were other times where we might have to worry about -- at one point we had people that were -- somebody committed suicide in one of the -- you know, the parks; so what were the authorities there on calling police. There were other times where we might find people stealing

lumber or other things.

So, I was the division commander for six years, I was the deputy for two years, so I'm not sure it's fair to say I'd never been involved in it. But most of the times, none of those had to do with willful disobedience on Corps land.

**Q. Okay. And was that -- unlike the DAPL experience, are you -- are you contrasting your -- your past experience with your experience in the DAPL protests?**

A. I'm not sure what you mean.

**Q. I was -- I was just trying to understand the choice of words that you used, civil disobedience and that kind of thing. Were you suggesting that that was occurring during the DAPL protests on the Corps land?**

MS. ZILIOLI: Objection, misstates testimony.

**Q. (BY MR. SEBY) I'm asking you just to clarify, so I understand.**

A. Yeah. It was my understanding, as this evolved into September, that we were in a scenario where we had willful disobedience of certain functions that were against the way we wanted to manage that land.

**Q. (BY MR. SEBY) Would that include disobedience with directives by the Corps to those people on Corps property?**

MS. ZILIOLI: Objection to the extent it calls for a legal conclusion.

A. I think they got much, much more evident in a couple months later. I still think this was an evolving situation in September, so I would not necessarily equate it as a -- as a crisis in September. It was something we were concerned about.

**Q. (BY MR. SEBY) Okay. Are you aware that the Standing Rock Sioux Tribe sought a special use permit from the Corps to conduct a protest on -- against the Dakota Access Pipeline on Corps of Engineers property?**

A. I was aware that there was a request and, I believe, initial actions to be able to set the conditions for the approval of a special use permit.

**Q. Did you have any involvement in the Corps' consideration of the special use permit application submitted by the Standing Rock Sioux Tribe?**

A. Not at all. I believe those permits are approved by the district commander. In this case, that would have been Colonel Henderson.

**Q. And -- thank you. And do you know, on**

47:1-10
Calls for legal conclusion
701-702

**that issue, who made the decision to pull the Corps' consideration from the normal process, sir, that you mentioned concerning the Standing Rock Sioux Tribe's special use permit application, up to the Corps headquarters?**

MS. ZILIOLI: Objection, assumes facts not in evidence.

A. So I'm not sure I knew that that happened. It doesn't necessarily surprise me. There were -- we always try to, again, align as a federal government. And there could have very easily been times where the discussions between Ms. Darcy's office and General Jackson might have recommended that some of these actions be elevated to a more strategic level. So it doesn't surprise me that happened, but I'm not sure I was aware that happened.

**Q. (BY MR. SEBY) Do you know, sir, who made the decision to involve others in the Obama Administration with respect to the -- to the special use permit sought by the Standing Rock Sioux Tribe, outside the Corps?**

MS. ZILIOLI: Objection, assumes facts not in evidence.

A. I know that there was a lot of interest by a lot of federal agencies as to what was occurring on

48:17-
49:18
611

the ground. So while I didn't personally talk to any of these people, I'm very aware that DOJ was involved, DOI was involved, DIH was involved, other elements. And so what we don't ever want to do is either embarrass the Administration or work outside the intent of the Administration.

So when I felt that there was ever a time we were going to do something, most of the time we do in the Army kind of what's called an ask-it check; go to senior leaders and say, "I'm about ready to do something. Do you have any issues with that?"

And this is where we wanted to make sure that we acted as an aligned Administration team. And so at -- somewhere in the middle of September, we were doing a lot of that coordination with echelons above my level; mainly, Ms. Darcy and other probably political leaders, but also maybe staff in those other agencies, including the Department of the Army.

**Q. (BY MR. SEBY) Yeah. Were you ever told that the Corps believed that the Standing Rock Sioux Tribe's special use permit application initially lacked required information for approval?**

A. I don't believe I was ever told that. I do believe at some point, while the intent was to issue the permit, I believe remembering that there were some

conditions of that permit that were not met. I think it mainly had to do with -- something with insurance and maybe something else. But I don't know if it actually was a valid permit; because while I think it was our intent to issue it, I'm not sure that those conditions were carried out as -- as stipulated in the permit, if you understand what I'm saying.

**Q. I think I do. Do you know what period of time that circumstance evolved, when you realized that was the case?**

A. I believe this was all in about the same time, early September. I think it's important to also inform you that there -- there was a very, very strong desire, both on the Administration and even in the Army, to continue to deescalate this, to not have a conflict that was going to continue to get worse and worse. So either Colonel Henderson -- or it might have been the chief, Archambault, I think his name is, basically said, let's have this standing use permit, so that if the -- if the Native Americans are there and we -- I guess you could almost say retroactively gave them a permit, then, theoretically, they could be allowed to be there under the parameters of certain things, which were -- I think we were very concerned about health, very concerned about safety. I think we

also were getting very concerned at this point about construction or permanent presence.

So I think that's where the standing use permit was kind of an innovative tool to be able to provide some degree of top cover, so that the Native Americans -- this all went back to free speech -- so that the Administration could support the Native Americans' desire to be able to exercise their First Amendment rights.

**Q. And that -- that was the hope, is what you're saying? That was the intent?**

A. I think that was the intent, to be able to somehow find a -- and I'm going to probably use this analogy a couple of times -- but this is a -- this was a incident that didn't necessarily have a plain solution. So every time we looked at options, we always tried to pick the best of the bad options.

**Q. Understand. And that intent, how did that intent square with the reality that -- I believe you mentioned that the -- the permit conditions were never actually met by -- by the permittee, which was the Standing Rock Sioux Tribe. How did that square with the intent?**

A. Well, I don't think it met the intent. The bottom line is, I think that the -- the protests

continued to get more violent. There were -- clearly when it came to sanitary conditions, I know there was a lot of issues there. And so at some point, I think it got to the point where because they had not met their end of the bargain, that's where the permit, I think, continued to evolve in the next couple of months.

**Q. Yeah. So -- so you'll agree with me, sir, that the -- there never actually was a final effective in-place special use permit for the Standing Rock Sioux Tribe to use and be on Corps property?**

MS. ZILIOLI: Objection, legal conclusion.

A. So I'm not sure I would say I disagree with you. I would say that there were probably a couple phases of this where, I think at some point, the Tribe had to apply for it, and then we would basically grant it, given these extra conditions. And at some given point when those conditions were either not or -- intentionally not met or by default not met, then that permit, in my understanding, was not necessarily a legal binding permit and was, therefore, then, reconsidered.

**Q. (BY MR. SEBY) Okay. I guess the question is -- and I'm not asking for a legal conclusion -- but the permit was offered by the Corps to the Tribe,**

**correct?**

A. I thought it was requested by the Tribe and -- and willing to be supported by the Corps. So that's a little bit different way of saying it.

**Q. Yeah. And I -- I -- I agree that the Tribe sought the permit. But they applied, right? And it's just like you apply for a driver's license. And then the Corps gave -- tendered a permit, an unsigned permit, to the Tribe and said, "You need to sign this and you need to meet these conditions, and then we'll countersign and then you have an effective permit." Do you know whether that happened?**

A. So that basically sounds like the process, but I'm not sure I know what order the signatures were there. You might be correct. It might have been in a different order. But basically, I think what you're -- what you're summing up is relatively accurate.

**Q. Did you ever see a signed, by Colonel Henderson or other Corps official, special use permit?**

A. I never did.

**Q. Okay. Were you told there was one?**

A. I'm pretty sure I was told that the process was underway. I don't know, at the time, if I was fully aware that the permit conditions had not been met. So I could have been under the impression that

ND OBJ: Relevance

the permit was working or okay, but I'm not sure I had that level of fidelity to understand whatever these insurance-embodied requirements were.

**Q. Okay. Sure. And you mentioned earlier, sir, the -- the free speech rights of the Native Americans. How did that square with the fact that the protesters on Corps land were not uniquely Native Americans?**

A. So I'm not sure I understand. I think the free speech rights would imply to any American, be they Native Americans or non-Native Americans. And if, in fact, there were non-Native Americans there, our obligation to continue to support that balance, I think would still be honored.

**Q. In your experience with the Corps, prior to being the chief, I believe you said you were a division commander, correct?**

A. Six years --

**Q. Did you --**

A. Six years.

**Q. Six years as -- six years as division commander. What -- what division was that, sir?**

A. The first three years, 2006 to 2009, it was called the North Atlantic Division; Virginia to Maine, Europe, and Africa. '09 to '12, it was the

South Atlantic Division; Louisiana to North Carolina, and South America.

**Q. With respect to your tenure as -- as a division commander in those two jurisdictions, did you ever decree or grant the use of a Corps property as a free speech effort?**

A. I don't believe I ever had any involvement in it. When I was in the South Atlantic Division was when the water wars of Florida, Georgia, and Alabama were going. There was a lot of significant environmental impacts. There were a lot of people that were -- wanted to protest, to a degree, on how the Corps managed those lands. I'm not sure that -- if they were ever on Corps property, and I'm not sure we ever did anything. But there were other times during my career where I had seen people want to have a very, I think, pronounced opinion of how the Corps was doing business.

**Q. Yeah. But did anyone ask you or -- or did you ever designate the use of Corps property as a free speech zone in connection with any of your past experiences?**

A. So again, those permits are approved at the colonel level. We did 80,000 different types of permits a year. That could have happened under my

watch; I just can't validate, one way or the other. I never personally did anything to do with a special use permit that involved free speech.

**Q. Okay. Or -- or not even involving a special use permit, just the idea that you said -- or one of your district commanders, when you were the division chief. That would be the right way to say it, sir, I think.**

A. Correct. I -- I had nothing to do with special use permits.

**Q. Okay. And you don't recall any being granted for purposes of free speech demonstrations?**

A. I don't.

MR. SEBY: Okay. All right. Sir, I'd like to suggest we take a short break, Ms. Zilioli, for ten minutes. It's been just over an hour. Let's do that, please.

MS. ZILIOLI: Sounds good.

THE DEPONENT: So probably one hour from right now, then -- I mean, ten minutes from now? Top of the hour?

MR. SEBY: Ten minutes from now. So the -- yes, top of the hour.

THE DEPONENT: Great.

THE VIDEOGRAPHER: Going off the record.

The time is 3:49 p.m. UTC, 9:49 a.m. Mountain.

(Recess, 9:49 a.m. to 10:01 a.m. MDT.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:01 p.m. UTC, 10:01 a.m. Mountain.

**Q. (BY MR. SEBY) General Semonite, we're back after a short break. And just -- just before the break, we were talking about the free speech concept for use of the Corps property. I wanted to back up. Do you -- I know you said you had never been to the Oahe Project. Did you become familiar with the -- the Corps property through maps and others telling you about it; the layout of the land, so to speak?**

A. I don't believe I did early on, September. At some point, when it got to the point where we were worried about the impending flood and the water levels and the ramifications of a water increase in certain areas, as normal, I had the team come in and lay out for me the hydrographic issues. And I think at some point, and when or if, I think there was a couple times when some of these road junctions or bridges got to be flashpoints. I certainly wanted to understand the orientation of those as to how it got done. So yes, over time I continued to get more and more involved.

**Q. Do you recall directing your staff within**

ND OBJ: Speculation

Page 58

**the Corps to develop and provide you with maps indicating where protesters were encamped on Corps property?**

A. I don't, but it certainly sounds like something I would do. I want to make sure that at some point as this gets to be more and more intense, that I have a good situational awareness of what's happening on the ground.

**Q. Yeah. Do you recall the -- the basic geographic feature of the Cannonball River running approximately east/west on the -- the Corps property that was part of the Oahe Project?**

A. So I know that -- a lot of discussions on the north side and the south side of the Cannonball, but I -- I probably couldn't draw you a diagram. But I certainly know that there was differences in those two geographies.

**Q. And what was the point of referencing north of the Cannonball River and south of the Cannonball River? Was that relative to denoting the location of camps on Corps -- Corps property?**

A. I think Colonel Henderson referred to those mainly when it came to where he was going to allow the standing use permit. And then over time -- we can talk more about this later, but I think

Page 59

over time there was one of those areas, I believe it was the north, that were more susceptible to water rise. And there was also some, I think, difference in where municipal facilities were and where -- the best place to be able to allow the Native Americans to reside, if there was a choice between one or the other.

**Q. Were there encampments on both the north and south side of the Cannonball River on Corps property?**

A. I don't know exactly where they were, but I -- I tend to understood (sic) -- and again, six years ago --

**Q. Sure.**

A. -- it probably does make sense that there were encampments on both sides.

**Q. Okay. And do you recall where the special use permit was -- was intended to apply?**

A. I don't. I guess I thought at one point it might have been for both sides, but it could have very easily been either one or the other.

**Q. Okay. And do you recall the Corps, at some point, announcing the designation of a free speech zone on the south side of the Cannonball River for, quote, all who wished to protest the Dakota Access Pipeline?**

Page 60

A. As I recall, at some point -- and I think it was later on, maybe November -- Colonel Henderson did get worried about the north side. And in a manner to try to move people out of the north, I think his thought was to stand up this free speech zone so that there would be more of a density on the south side. Now, maybe that was in September. I don't have a real clear recollection. But I do know that Colonel Henderson thought the south side was a better place for there to be any type of a consolidation point, free speech zone.

**Q. Would it surprise you, sir, that the free speech area designated as such was the same as the failed special use permit area?**

MS. ZILIOLI: Objection, assumes facts.

A. So, I don't know that.

**Q. (BY MR. SEBY) Okay. Do you recall, sir, that during the course of the -- the protest period, August of 2016 through mid-2017, that the Standing Rock Sioux Tribe and other tribes sued the Corps of Engineers in the United States Federal Court with regard to the decisions being made by the Corps concerning the Dakota Access Pipeline crossing?**

A. I'm definitely aware that there was legal action taken against us.

60:17-25, 61:8-23 401-402

Page 61

**Q. Yeah. By the Standing Rock Sioux Tribe and other tribes?**

A. And again, it might have been a consolidation of tribes, it might have been several different lawsuits, but I know that there definitely was legal action where the Standing Rock were involved in some manner, either by themselves or with others.

**Q. Sure, sure. And do you recall one particular decision by a United States District Court judge in Washington, D.C., where he denied an attempt by the Standing Rock Sioux Tribe and other tribes, acting together, seeking to obtain a preliminary injunction against the Corps regarding the permits and approvals the Corps had already issued to the Dakota Access Pipeline developer?**

A. So I remember that happened. I am not real familiar where the different court systems and where the judge was. He could have been in D.C. I don't know what circuit court or how that works, but I know that there was a -- a decision made.

**Q. Does the name Boasberg, Judge Boasberg, ring a bell?**

A. It definitely does.

**Q. Yeah. And I -- I'm talking about the September 9th decision by Judge Boasberg denying the**

61:24-63:22, 64:17-66:11 401-402

**Tribe's motion for preliminary injunction. The Corps won. And the court found -- Judge Boasberg found that the tribes did not demonstrate substantial likelihood of success in challenging the Corps' actions. And the reason that's -- that's of interest to my question is, that same day, the Department of the Army, the Department of Justice, and the Department of the Interior issued a Joint Statement -- notwithstanding the judge's order and decision and the Corps' victory, those three departments issued a Joint Statement on September 9th. Do you recall that?**

A. I remember that happened, yes.

**Q. Okay. Do you know who made decision for the Department of the Army that is part of the September 9th Joint Statement?**

A. I don't, but I imagine that was either recommended by Ms. Darcy, the Assistant Secretary for Civil Works, and that might have been a decision that probably the Army General Counsel, the lawyers in the Army, would have been -- embraced. And it might have had to go to the Secretary of the Army. I don't know whether Darcy was the decision-maker, but I know that that was -- I'm not sure that was a surprise to us, but I don't think that was something that we recommended happen.

**Q. Do you recall recommending that they not do it?**

A. I don't recall that, either. However, I was worried, to a degree, what that would have meant to future actions. In other words, what's the step ahead? What's going to continue to evolve?

**Q. So does that mean, General Semonite, that before that action was taken, that you were consulted for your opinion on whether or not to do it?**

A. I don't remember being consulted. Again, General Jackson was probably working this six or eight hours a day. He might have certainly thought through this and voiced any comments we had. I don't remember any of the dialogue. I do know that -- I don't know how we knew if -- or if we knew the judge was going to make that decision. But I tend to think that they had anticipated this, because it takes days, normally, for those agencies to agree on something. And the fact that -- it sounds like that joint press release, or whatever it was, was the same day. So that must have been perceived and concocted a couple days ahead of time.

**Q. Are you saying that the -- while you -- while the judge did announce that that was the date that he was going to issue his decision, you're not**

**ND OBJ:** As to 63:10 (beginning "Again...")-63:22, Non-Responsive

**saying that you knew -- you or anyone in the Department of the Army knew what that -- the basis or nature of the decision was going to be, do you?**

A. No, I don't. But a lot of times in the Army, I mean, we pride ourselves on always having a plan on the shelf. If -- if there are times when we anticipate some future actions, we don't want to necessarily have to react to that. We just execute whatever that plan is. And I think at some point after the Labor Day weekend, I imagine some of those discussions were to say, "If, in fact, a judge were to execute this course of action, what should we do? And let's figure out how to do it ahead of time." And that -- that's conjecture on my part. So I'm just trying to help you understand, but I don't know any of that in detail.

**Q. Okay. Okay. And so you do not know that the idea of having a contingent plan on the shelf included that, well, if the judge rules in our favor and we win, we're still going to issue a Joint Statement that says, "Notwithstanding the court's decision, we're going to pause and reconsider what we did"?**

A. Yeah, that's correct.

**Q. Okay. Are you aware, General, that**

**General Spellmon and Colonel Henderson were surprised and/or frustrated by the September 9th Joint Statement, in that they were not aware of it and that they were frustrated by the substance of it, which was to announce a reconsideration of the decisions that Colonel Henderson had already made?**

MS. ZILIOLI: Objection; assumes facts, misstates evidence.

A. So I'm not aware that they didn't have knowledge ahead of time. I guess I would have thought that that would have been coordinated. You said Henderson and Spellmon, but I'm going to assume maybe General Jackson had prior knowledge.

Whenever we have one of our very, very deliberate procedures that I trust and have executed -- and that was the analysis by Colonel Henderson -- either delayed, questioned, or even to give the perception to the American people that there's a challenge with our Corps decision-making process, I certainly would have been frustrated. And so, therefore, it doesn't surprise me that Henderson and Spellmon were surprised. It's not normal that Ms. Darcy would do something behind our back; but if what you're saying is true, then that could have happened.

**Q. (BY MR. SEBY) You're not surprised that she did something behind your back?**

A. There's times in the federal government when people might do something that is not necessarily the way you would have done it, but most of the time we always get together ahead of time and everybody has the ability to put their opinion in. And being good soldiers, if a decision is going to go some way that we might not like, we still drive on, especially when it's -- it's the political arm of the Department of Defense.

**Q. Yeah. And you mentioned something earlier that -- that I wanted to come back to. I think when we were talking about the hierarchy and the chain of command, that you, thankfully, explained -- I understand it -- you made a point that the -- the military, the Army, is subservient to civilian control. You -- you really emphasized that point, right?**

A. That's correct. And that's not, of course, just the Army. It also applies at the Department of Defense level; the Chairman and the Joint Chiefs who work for the Secretary of Defense.

**Q. Right, right. And they all work for the President, correct?**

A. They do.

**Q. Yeah. And so when Ms. Darcy, the civilian Assistant Secretary of the Army for Civil Works, does something you don't care for, perhaps personally or professionally, your institutional parameter is to, as you said, I believe, salute and drive on, right?**

A. With a very strong exception. If it basically is either doing something which is against some -- something about our values, something to do with integrity, in the occasion of something on the battlefield that would end up being an illegal order; or on this one specifically, if it gets to a point where we feel that the law is not being done in accordance with our normal established procedures.

67:14-68:8
611

**Q. Did you feel that that circumstance was approaching a trigger point in the context of how Ms. Darcy was considering and addressing the DAPL protests while she was in office?**

MS. ZILIOLI: Objection; ambiguous, vague.

A. So at this time, probably not. And I think it's key to make sure in my testimony -- we keep talking about the word "evolve." This continued to get worse and worse. So when that first statement came out, this was probably a good low shot under the bow to keep everybody, without getting a lot more -- almost

like a tinder -- a tinderbox. I mean, we didn't want to have the fire fueled here, so we were certainly willing to do that.

There is time, and as we talked, in the next couple months after that, where there was a very, very growing concern, both on my part and my staff's part, that we were beginning to deviate from normal established regulatory procedures.

**Q. (BY MR. SEBY) And what -- can you give me an example or two of -- of that happening in the DAPL protest context or DAPL -- I guess the consideration of the easement, which was pending for quite some time with Ms. Darcy and was called back by the September 9th Joint Statement? Can you elaborate on -- on -- on that consideration that you're raising; where there was a growing concern, to use your word, of deviating from normal established Corps regulatory procedure?**

MS. ZILIOLI: Objection, misstates evidence.

A. So it did not involve the protests or really anything on the ground. So what I'm talking about, the Corps is charged to be able to execute the regulatory process in accordance with our rules and procedures that are established in law. And so -- and without making a -- a stupid analogy, the bottom line

is, is that we have a set of procedures that says, "Here is what we have to do to be able to approve an easement." It's a little bit different for different-sized pipelines. We go through our procedure, and then we basically execute that procedure based on the results of our analysis.

If, in fact -- so we have an obligation to both parties. We have an obligation to the United States public to be able to make sure we're doing it right. And just as important -- not more important, but just as important -- is an obligation to the applicant to be able to make sure that the applicant is getting a permit, if the Corps decides the applicant deserves a permit.

So at some given point in this process when we were just going to say we were going to continue to study it, the question is, we -- we didn't necessarily feel we needed to study it. We did our due diligence. We knew what our answer was. Our answer didn't change. So the ability in echelons above me -- and I don't know where that happened -- but to delay the execution of that permit, we felt was not necessarily in keeping with our obligations to the applicant.

69:25-70:14
602, 611

**Q. (BY MR. SEBY) Yeah. And do you think**

that was the reason for General Spellmon's and Colonel Henderson's surprise and frustration by that September 9th announcement?

MS. ZILIOLI: Objection; speculation, assume facts not in evidence.

A. I think what we were all worried about in September was, what was the trajectory of this action. And given that this -- we were getting into the winter season, the protests were getting bigger, more unruly, more violent, more law enforcement, we felt that this action, if anything, just to continued to embolden protesters to stay on the ground and continue to make a very, very visible statement to the Administration not to approve the permit.

Q. (BY MR. SEBY) I see. And so, General, I have to ask, then, why did you entertain the Corps considering whether or not to give a use permit to use the Corps land and stay on the Corps land to protesters, when those protesters were a -- a fraction of the larger protesters who the Corps was recognizing was violent and using the Corps property for trespass and attacking public property and private property? Why -- why did -- why did the Corps allow that track to go forward when you had that concern?

MS. ZILIOLI: Objection; assumes facts,

misstates evidence.

A. So I would say that this was a series of different steps. Perhaps the statement you mentioned in early September was one step. There were other actions taken by the District Court. There were actions taken to try to mitigate this to defuse the situation. As those different steps failed to materialize in getting the results on the ground, then we had to continue to look at what other options there were.

Again, I don't believe I was necessarily the decision-maker on the special use permit. We thought all along -- I guess we probably hoped all along that had we issued that, at some given point the protesters would have gone away. And, therefore, by giving them that venue, we would have allowed this to defuse as the winter months came on.

Q. (BY MR. SEBY) I see. Do you think that when you were talking about normal Corps procedures for permits and approvals and -- of the like, that when the September 9th joint agency -- three-agency statement came out, that the Corps lost or conceded some of its authority for the easement, because it was now subject to a three-party federal agency process?

MS. ZILIOLI: Objection, legal

71:18-72:6
Calls for legal conclusion
701-702

conclusion.

A. I'm not sure that I felt we lost any of our authority or jurisdiction. And again, vague memory, but I think, in retrospect, what it looked like was that the Corps' decision was being questioned, which put our credibility on the line.

Q. (BY MR. SEBY) Is that -- is that something that concerned you?

A. So my entire tenure of my time, not only in the Army, but in the Corps, was to always maintain the reputation of the U.S. Army and the U.S. Corps of Engineers as the most trusted federal engineering firm in the world. And so any time we ever had any question with our reputation or our credibility, our ethics, our values, that always was one of my highest concerns.

Q. Yeah. Did you ever have a discussion with Ms. Darcy about that very topic?

A. So, I don't remember that. I probably did, but I don't remember it coming to a head until sometime probably in November or December.

Q. Did you ever have that discussion with anyone other than Ms. Darcy in September or October 2016?

A. I think internal to my very close staff, which would have included Colonel Henderson at the

district level, General Spellmon at the division level, we were worried about if, in fact, the Administration continued to maintain that same position, then where would this get resolved.

Q. So it was an open and lingering topic of concern within the Corps and yourself and your staff for a significant period of time, it sounds like?

MS. ZILIOLI: Objection, mischaracterizes testimony.

Q. (BY MR. SEBY) I'm asking. I'm not trying to put words in your mouth. I'm just trying to appreciate, understand precisely what you're saying; is that there was a passage of several weeks, if not months, where this announcement in the September 9th Joint Statement to look back at and evaluate the decisions the Corps had already made concerned you for several weeks or months. And it was an open issue, because the consideration -- reconsideration was ongoing for a while. Is that accurate?

MS. ZILIOLI: Same objection.

A. It -- it definitely continued to get to be more of a concern as time evolved. Again, the first couple weeks of September, it was probably much more contained to a very small internal group. But as we got to be in the national press and there was -- and I

73:10-74:9
611

don't know the details, but at some given point, the permittee -- that would have been Energy Transfer Partners or whatever -- was continuing to push us to be able to resolve it. And so we were clearly caught in the middle of being asked to continue to study this longer delay of decision, when, I think in fairness to my team, we felt we had done due diligence, and there was no viable reason that we could justify delaying a recommendation.

**Q. (BY MR. SEBY) Yeah. And when you say you met with Ms. Darcy with some manner of frequency -- not as much as your -- your staff, but you met with her, I don't know, maybe -- maybe once a month, I think you said, was -- was that frequency of meeting with her, did that carry through during this time period, or was it less or more?**

A. I don't remember. Normally, I have a very, very consistent battle rhythm, so I would have envisioned it would have been the same. And I remember those discussions; very cordial. Again, we wanted to continue to try to find an acceptable solution for everybody. So there was a lot of discussions as to the variables in this equation. But I -- I think as time went on and we didn't necessarily see a path forward, that concern got more intense for me.

75:1-13
611

**Q. Yeah. Was -- was part of that concern exacerbated by a perception, perhaps, of Ms. Darcy being less available or less responsive than you felt she should, given the -- the pendency of that lingering question?**

MS. ZILIOLI: Objection, assumes facts not in evidence.

A. So, certainly not less available. I don't think availability was ever an issue. I think the concern was, is that we just didn't feel that we had clarity on what she felt was lacking in our initial analysis. And it was almost more of, I think, a stalling tactic.

75:14-25
602

**Q. (BY MR. SEBY) Yeah. Do you think Ms. Darcy owned the stalling tactic, or was she merely carrying it through at the behest or in concert with other federal representatives?**

MS. ZILIOLI: Objection, speculation.

A. I don't know this. I think it's important for this deposition to realize, also, that this was getting closer and closer to a national election. So people that might have been more politically involved, I think were continuing to look at how this might play out, had this protest and issue continued to merge right up into the national election.

**Q. (BY MR. SEBY) Can you help me understand why that mattered? I don't appreciate why what happens every four years in the United States, as a matter of our constitutional course, would make any difference to the execution of the Corps' mission and function.**

A. So it doesn't matter at all to the Corps. We pride ourselves on being apolitical. We don't have a party. We don't have a position on this stuff. It is our charter and our oath to administer the law as is written and established by Congress.

On the other hand, there were, at this time, growing concerns in the Department of Defense that the Department of Defense might be asked to step in with respect to law enforcement activities, either done by National Guard under state authority or under federal authority. And I think that the optics of a continued protest on the nightly news could have been played by the political parties, either for or against in different manners. Our job is to stay out of that, but I'm not convinced that that was not a consideration by elements higher than me.

76:22-77:10
602, 611

**Q. Help me understand that. Why would the incumbent Administration delay a decision and exacerbate an ongoing protest on federal property? I don't see the connection there. What is -- what is it**

**that you're thinking?**

MS. ZILIOLI: Objection; misstates evidence, assumes facts.

A. So I don't know if I can connect the dots for you, whether it's a Native American issue or a pipeline issue or a green energy issue. I just know that we got to the point where we were past regulatory thinking, and some of the guidance we got, I think I just was worried that it was -- had some degree of political connotation.

77:11-78:5
602

**Q. (BY MR. SEBY) Yeah. And that's really -- my question is, why? Why -- why was -- why did anybody look at these issues and feel the need to ascribe a political connotation to them? That's the part I don't understand.**

MS. ZILIOLI: Objection, speculation.

A. Well, if there's a perception in the Administration that this pipeline should not have been approved -- I don't know there was -- but if there was, and for some reason if the Corps made a recommendation to approve it, the Corps is an element of the Administration, I think that that would have put certain players in uncomfortable positions.

That is truly my speculation only. But any -- I've been through this for a couple different

78:6-79:9
602, 611

Page 78

elections. Any time you're close to a national election, no one wants to be able to be the lightning rod to bring attention to either something that could be perceived as going not necessarily in the direction that somebody wants it to go.

**Q. (BY MR. SEBY) Yeah, and I can appreciate that. The part I don't understand is, this wasn't happening in a vacuum. There were several thousand people resident on Corps property with no -- no legal authorization to be there. And meanwhile, the -- Ms. Darcy, or others were asking her to, delay the decision on the pipeline. How did that help the fact that you had people setting up residence and building stuff on Corps property? How did that help things?**

**I only can -- can appreciate the perspective that it made it worse. And so I -- I'm trying to understand what the motive or rationalization would be from a political person to say that, "We're going to not make a decision while we have that problem going on right now in North Dakota on our property. And just -- just let it ride until the election in a couple of months."**

MS. ZILIOLI: Objection; assumes facts, misstates evidence, speculation, ambiguous.

A. Yeah. So I can't speculate on exactly

Page 79

what all the factors were involved. I just know that I encourage and almost mandate my team that you follow the law, you follow policy, you follow regulation. We had done that, up until September. And then we had a hard time continuing to do due diligence and support the regulatory system with some of the guidance we were getting. And it's -- we'll leave it up to history to figure out why the actions taken above me were taken the way they were.

**Q. (BY MR. SEBY) Sure, yup. So back to the situation on the ground in North Dakota, as of August, with the protesters arriving on Corps property. Do you recall whether you or other Corps officials referred to those protesters on Corps property as trespassers?**

MS. ZILIOLI: Objection; assumes facts, legal conclusion.

A. So --

**Q. (BY MR. SEBY) I'm not asking you to make an assumption, General. I'm asking you if you, personally, or in the presence of other Corps representatives, referred to those people as trespassers?**

A. So I don't believe we did in the September-October time frame. And we talked about an hour ago about the fact that the special use permit was

**ND OBJ:**
As to 79:24 (beginning "And we talked...")-80:20, Non-Responsive

Page 80

in a working status. I believe Colonel Henderson gave the Standing Rock some period of time to come through on those conditions. So while that permit still had a probability of approval, then we looked at them as just having their ability to do -- to be able to have their First Amendment rights and, to a degree, some degree of clearance to be able to be on the land.

There -- there was some point, and I don't remember when, when it appeared that the Standing Rock was not going to honor those commitments. And I don't know whether the permit, then, was withdrawn, canceled, or just null and void. But at some given point when they were on the land, and it was not in the way the Corps wanted them to be, we could talk north and south, then I do believe we certainly considered them as being on the land with -- without valid authorization.

I'm not sure the legal term of "trespass"; but when we ask somebody to remove themselves from our land and they fail to do that, it clearly was a concern to us, mainly due to their own life safety.

**Q. And so I understood your -- your response and -- and appreciate that during the pendency of the special use permit consideration, you didn't -- you're saying you didn't view the Standing Rock people as trespassers, because they were the applicant for the**

Page 81

**special use permit; is that correct?**

MS. ZILIOLI: Objection, legal conclusion.

A. Yeah, I think that's the way I remember it. Now, there could have been times where we might have written letters to them or we might have said, "If you don't do this by day X, then we're going to consider . . ."

At lower levels, there could have been more use of the word "trespass." I think we wanted to continue to look at how we could consider them as authorized to be there within some very, very fenced parameters. And I believe the parameters were that none of the state and local laws were broken, that they had to -- there were definitely some health considerations with respect to conditions on the ground. I -- I think that those are the things that we wanted to make sure were being done right.

**Q. (BY MR. SEBY) Sure. And that's as to the Standing Rock people, because they were the ones that actually applied for such a permit, right?**

A. So, I think they were the ones that applied, but I think -- and I don't know this -- the permit could have been able to cover other tribes that were there. So, in other words, I'm not sure you had

to show an ID card to say, "I'm Standing Rock and, therefore, I'm able to be there." I think the Standing Rock applied for the permit, but I don't know the specific parameters of what the -- who the permit allowed to be on there. Good example, if you're not a Native American, and you're a Hollywood actress, are you able to be on there under the guise of the Standing Rock -- of the standing permit? I don't know that.

**Q. Okay. You don't know. You don't know where the -- whether the special use permit was an everybody who is protesting authorization or just the -- just Standing Rock tribal members. You don't know that?**

A. I don't know that. But my guys do unbelievable detailed work, and I'm sure that it's easy to read the permit and figure out what the conditions of the permit were. I'm sure we stipulated what those were in the document.

**Q. Yeah, of course, indeed. Okay. So that was for the -- the pendency of the consideration of the Standing Rock Sioux Tribe application for a special use permit. And we'll leave open the question of for whom the permit covered. And the document certainly speaks for itself. But earlier, I heard you acknowledge that there never actually became an effective special use permit, and I agree with you.**

**What about, though, the issue of the protesters encamped on the north side of the Cannonball River, on Corps property, that were never part of the Standing Rock Sioux Tribe's permit application for a use area on the south side of the river? What did you consider those people?**

A. So I just don't know the details of who was there, how many people, why they were there, how long they were there. I just don't have some graphic array that shows me exactly who's what. I just can't answer that question.

**Q. Yeah. Do you think that you ever knew the answer to that question about the -- there never was even an attempt to get a special use permit applied for by the large number of people on the north camp -- otherwise known as the Main Camp or the Oceti Sakowin or the Seven Councils Camp?**

MS. ZILIOLI: Objection, assumes facts.

A. So you're using terms I'm not aware of. I don't recognize any of those names. I do believe -- I remember at some point, when it looked like the conditions were not going to be met for the -- the permit on the south side, that Colonel Henderson met with the chief and said something like, "Hey, you know, either get everybody off the north side, or we're going to have to start enforcing removal."

And -- and I think this is where it began to start working with law enforcement officials. This is when we began to start modeling, if the water comes up and if, in fact, those people are still in that camp -- you called it the Main Camp -- that, theoretically, that was a dangerous place to be. And the worst thing that can happen -- it's one thing if you're seeing people protest on TV at night, perhaps illegally; it's something else to see violence. What we were very, very afraid of is that we were going to have somebody that got hurt on Corps property by being in a place where we couldn't control the water and their safe conditions.

**Q. (BY MR. SEBY) Yeah. Do you recall, General, how long the Corps engaged in the pendency of the special use permit, hoping the Tribe would meet the conditions in the permit that the Corps tendered to them? How long did that all go on from the application in -- in August and the presentation of a proposed unsigned permit to the Tribe in -- in the third week of September? How long after that did you -- did the Corps officials under you try to get the Standing Rock to meet their obligations under the permit for it to be effective? How long did that go on?**

A. So I don't have a tick-tock laydown of all the dates. From what we're saying, it sounds to me like it was probably four to six weeks, something on that order, because I know that somewhere this materialized probably the end of October, of telling them to get off. So if they applied for the permit in mid-September, 30 to 45 days, something like that.

**Q. Okay. And what do you mean by telling them to get off?**

A. Well, I think, again, to -- to leave the Corps land and -- and get off. And I'm assuming you're talking the -- the north side?

85:14-86:15
611

**Q. Yes, yeah, for example. Would it surprise you if that direction to get off the property didn't actually occur until November 25th, by letter from Colonel Henderson, then providing a date of December 5 in which to get off; but very much at the behest of others in the Administration making clear that you wouldn't actually force them to get off or evict them; that there was quite a discussion between Ms. Darcy and the Department of the Interior cautioning the Corps against using any language that could be inferred to indicate that you would actually mean it and tell people not only to get off, but get off now, or we're**

going to make you get off?
MS. ZILIOLI: Objection; assumes facts, misstates evidence.
A. So it doesn't surprise me. Obviously, you've got a much better handle on the dates. And if it was a November time, I understand that. We were extremely cautious here to try to find a path of least resistance where we could support the Administration while, at the same time, minimizing issues on the ground. So a November time frame doesn't necessarily surprise me. And I'm not sure I know the last part of your question, where we basically were told not to do law enforcement. If that happened, it certainly doesn't surprise me, but I'm not sure I remember specific direction not to do that.
Q. (BY MR. SEBY) Yeah. Thank you. And I appreciate the Corps is operating within the larger Administration and subservient to civil control and command. I appreciate that. You've made that very clear.
Do you know, General -- do you recall when the Corps made a decision to let the protesters, the DAPL protesters on Corps land, remain there? Was that a -- was that a conscious decision, discrete decision, or was it sort of a -- it just played out that way?

MS. ZILIOLI: Objection; assumes facts, legal conclusion.
A. So I just don't remember, even if you were to ask me, when did the protesters leave. I mean, I guess I kind of thought it was somewhere before Christmas. But if it was into, you know, January or February, that doesn't surprise me, either. I think at some point it just got so cold, that I think some of them migrated back to the reservation. But I just don't have a good understanding of those dates.
Q. (BY MR. SEBY) Okay. So that was going to be my next question, is, do you recall how long protesters remained on Corps property?
A. I'm guessing anywhere from two to three to four months, but I -- I don't have a good understanding of that.
Q. Would it surprise you, sir, to hear that it was actually on the order of eight months?
MS. ZILIOLI: Objection, assumes facts.
A. Yeah, I think I would be surprised to hear eight months.
Q. (BY MR. SEBY) Okay. So the idea that protesters were on Corps property in August of 2016 and stayed there, uninterrupted, through March or April of 2017, that surprises you?

MS. ZILIOLI: Objection, assumes facts.
A. So those dates, those are probably different than what I would have recollected. I would have thought that this was resolved somewhere in January. There was a time, at some point, where the easement was approved. The company went in and did the boring and, by default, this was fait accompli. Now, I think that must have been after the new Administration was in play. So I would have thought at some point this would have been pretty much resolved by the end of January.
Q. (BY MR. SEBY) Okay.
A. But I'm not disagreeing. If you've got facts that say March, then I certainly understand that.
Q. No, I understand. We're not -- you're not being argumentative in the least. Sir, with respect to the several thousands of protesters and the eight-plus months that they occupied Corps lands, do you know how many Title 36 or other types of citations the Corps issued to DAPL protesters present on its lands in North Dakota; how many citations?
MS. ZILIOLI: Objection --
A. So, I have no idea.
Q. (BY MR. SEBY) Okay. Would it surprise you?

A. You need to elaborate. I'm not sure I even know what the authority a citation has. I just don't have that level -- I don't know whether it's a traffic ticket or a summons. I just don't have any understanding of how that potential citation action plays out.
Q. Sure. And I wasn't so much focusing on what the -- what the nature of a citation is or what it means and what it -- what it -- what it sets in motion when one is written. But do you agree with me the Corps has the authority to issue citations to people who are present on its land that the Corps believes are not appropriately there or behaving appropriately while they're there? We agree that the Corps has such authority, correct?
MS. ZILIOLI: Objection, legal conclusion.
A. I believe we do have that authority. I'm sure, though, that with all the -- all of the discussions in the interagency, either -- at some point we were probably given either guidance not to do that or some parameters as to how to not make the problem worse by issuing citations. It could very easily be that we were told, "Leave them there and don't do any citations." I don't know that, but we would have

89:7-90:3 Calls for legal concl. 701-702

90:4-91:17
611, calls for legal conclusion
701-702

92:9-93:6
611

followed whatever the Administration's guidance was. And most of that would probably come from the Bureau of Indian Affairs.

Q. (BY MR. SEBY) And I certainly am not asking you to speculate what -- what might have happened. I'd rather just stick to what you recollect. And do you recall any instances where -- you know, I'm thinking about this in the context of what you told me earlier, which makes complete sense and is part of the discipline of the Corps and the transparency of the Corps -- where you -- you have a job that's spelled out by law and your regulations and custom and practice for executing and administering those things.

But here, there were people on your land who you didn't give permission to be there. And you have the ability to -- to issue citations when people aren't playing by the rules on your property. Why did you not do that, is the question? Was it because you were, in fact, told not to; or because you, as the chief of engineers, said, "Let's not do that in this instance"?

MS. ZILIOLI: Objection; assumes facts, misstates testimony, legal conclusion.

A. So I never gave any specific guidance as to what to do or not do with respect to that. I think

it's incumbent to realize that while the Corps has certain authorities and opinions, perhaps, of what the ramifications could be, we want to continue to work within the umbrella of the Administration. And so this is where we were a tool and had tools available, but when you look at the larger context of life safety, Native American rights, the right to protest, free speech, I don't think that the Corps' ability to -- to issue a citation is more important than any of those other things.

And so this is where we take our guidance from where the Administration wanted to balance all those interests. And at some point, we -- because I'm not sure that the citation would have had any real ability to do anything, I'm sure we followed whatever guidance we got. But I do not know if we got specific guidance with respect to citations or not.

Q. (BY MR. SEBY) Yeah, and I -- I appreciate all that. That's -- you've said that; that, you know, the Corps doesn't operate in a vacuum. You're part of the Administration. And while you have your rules and custom and practice for administering the law with regard to your property, you're also a piece of the larger Administration.

And so my question, I'm just going to ask

it another way, because it's -- it's really the question that's -- that's been out there. Are you aware of anyone telling the Corps not to issue citations to protesters on Corps property?

MS. ZILIOLI: Objection, asked and answered.

A. I just don't know the answer to that.

Q. (BY MR. SEBY) Okay. I understand. Thank you. And do you know why the Corps didn't issue any citations?

MS. ZILIOLI: Objection; assumes facts, mischaracterizes testimony.

A. I think we got to a point where at some given point, if people are going to be there doing things which were probably close to illegal -- they were not following law enforcement guidance, they were not following our guidance -- by giving them some ticket, I'm not sure we thought was going to be good. If we had done that -- and we might variously have issued citations -- I'm not sure that the average person who was in noncompliance is going to be impacted or affected by having a citation.

So it's probably a good question. I just don't know the parameters of how some of that was either played out or thought through that. I think if

it was something -- somebody said, "Go write them all up and give them citations," we certainly would have done it. I think we were much more interested in trying to come to a conclusion which was, like I said at the very beginning, the best possible outcome of all bad courses of action.

Q. (BY MR. SEBY) And I appreciate that. So basically, the Corps -- is it fair to say -- let me -- let me rephrase my -- my question. Is it fair to say that the Corps, in the face of several thousand people without permission on Corps property and in a state of anarchy, the decision was made to not use traditional enforcement tools, but to try and -- and approach the problem in a different way?

MS. ZILIOLI: Objection; assumes facts, ambiguous, misstates evidence.

A. I'm not sure I would agree with your word "anarchy." There's probably a lot of definitions of that. And so I think it's best to say that they were not necessarily in accordance with the manner we wanted them to behave and under the special use permit.

I do remember that at some point Colonel Henderson -- and I'm not going to say it was an edict -- but at some point you mentioned a November letter, when he basically said, "Hey, listen. It's

94:25-96:5
611

96:6-98:1
611

Page 94

time to leave." I do believe he discussed with local law enforcement officials, "Hey" -- and I don't know the CFR very well at all. Like I told you, I probably couldn't recite any of it. But I think the way that that document or that law or that regulation is written allows local enforcement, whatever the state capability is, to come on federal land and to be able to enforce that.

So the question that you have asked several times about citations, I think Colonel Henderson continued to recommend to the local law enforcement officials, "You have the authority, under the CFR, to come on our land and to be able to enforce." I think -- I think somewhere in the CFR it talks about civil disobedience; if things are not being done in accordance with state or local laws, then it's your responsibility to come in and do it. Because the bottom line is, the Corps does not have an enforcement capability. Now, maybe my words are off here, maybe a citation is enforcement. But the ability to actually rectify behavior through law enforcement-like capabilities, we don't possess that. We have to rely on state and local authorities to be able to put that discipline back in on the ground.

**Q. (BY MR. SEBY) Would it surprise you, sir,**

Page 95

**to learn that Colonel Henderson actually did not do that? He did not ask law enforcement in the state of North Dakota to come on and remove people who were unlawfully present on your property, that no such request was ever made. Would it surprise you to know that today?**

MS. ZILIOLI: Objection; assumes facts, misstates evidence.

A. So I guess the answer is yes, because that was not necessarily my understanding. I believe that there was a lot of discussions back and forth between the district, Colonel Henderson, and -- and I don't know exactly what parts of the state law enforcement, but I know that there was a lot, a lot of discussion.

And I think, at the time, I remember it being much more of a partnership. It was not where, "Hey, you know, you're asking us to do something we can't do." It was much more of, "How are we going to take and combine state enforcement, along with what you're asking us to do, to be able to get the situation under control?"

I don't know the details, but I know that at some point there were also requests for federal enforcement, and I don't think that ever materialized; it might have. And I don't know whether I'm talking

Page 96

marshals or whatever it is, but at some given point, there was a lot of law enforcement people from local, state, and the interagency trying to figure out how to put a law enforcement package together to be able to help mitigate this on the ground.

**Q. (BY MR. SEBY) Would it surprise you, sir, to learn that Colonel Henderson's letters and correspondence to the State of North Dakota and the political subdivisions of Morton County actually contained express statements saying, "We are not asking you to assist with protesters on the north camp or some of the south camp properties"? Not only did he not invite them or request them, but he said, "Do not help us with respect to those camps." Would that surprise you to know that was the case?**

MS. ZILIOLI: Objection; assume facts, misstates evidence.

A. So I would say yes. And I think that it's important to point out that I have the utmost respect for Colonel Henderson. And it's important at this point to say that of the 43 colonels I had working for me, he was, without a doubt, my number one colonel. Had it not been for his kids, he would have stayed on and probably could have been a general officer.

But this guy was above reproach. He was

Page 97

very, very well schooled on the authorities. Obviously, he must have gotten advice from counsel or other parts of the Administration on why not to do that. But I'm not necessarily tracking with exactly what you're saying. But I think, more importantly, if that's true, which I have no reason to doubt what you're saying, then I'm sure he did that because he was either worried about escalation or, you know, the appearance of violence or other things.

There was a very, very large concern -- and I had this by senior militaries of the Department of Defense -- with having soldiers go head to head with Native Americans and the optics of how that would play out on TV. And so even though -- and I don't know for sure, but I think at some point there were National Guard who were under the authority of the State -- don't forget, National Guard could be federalized and work for DOD, or they could work for the State -- but there were a lot of concerns with the National Guard leadership to keep National Guard in the back doing traffic control, helping with housing, helping with other type stuff, and never get a flashpoint of where somebody in a military uniform is enforcing a law enforcement activity with a Native American. We just -- we were very, very concerned about those

98:4-16
611

99:6-100:10
611

optics.

**Q. (BY MR. SEBY) So is that the reason why you let the protesters stay so long?**

MS. ZILIOLI: Objection; assume facts, misstates evidence.

A. So we didn't do anything in a vacuum. Again, I think that this was an interagency decision. They were -- DOI, DOJ, in close coordination with the Department of Defense, were really the drivers behind those decisions. Had we been told to do something else or we had been given other venues available, we certainly would have done that. But at this point, and probably as early as the middle of -- middle of October, the Corps was really out of the process of determining how to resolve this. This was much more of an interagency and Administration decision.

**Q. (BY MR. SEBY) And what was the day -- the date that you said the Corps was really out of the process and the interagency decision took -- took over?**

A. Well, I don't know the date you said of that -- that announcement, but I would say that --

**Q. September 9th.**

A. -- this all started probably with that joint announcement that took the Corps kind of out of it in early September. So this was a -- this was the

beginning of something that continued to get, I think, more and more out of our control.

**Q. Yeah. September 9th was the Joint Statement.**

A. That's correct.

**Q. Sure, sure. Thank you for that. That was helpful to understand. So -- and I -- we got to that point of discussion because I had asked, at what point did the Corps let those people stay. And I think you've clarified that, you know, it got to September 9th and the -- off the shelf came the Joint Statement, on the same day that the Corps' decisions were upheld against a challenge by the -- by the tribes, including the Standing Rock Sioux Tribe. And that even though you put one, the Administration, through the interagency decision-making process, that's when they decided to let those people stay, right?**

MS. ZILIOLI: Objection; misstates evidence, assumes facts.

A. So again, I think this was getting to be a national strategic problem.

**Q. (BY MR. SEBY) Yeah.**

A. And so as a result, I don't know for sure, but I think at some point I remember the National Security Council was involved. I know the White House

was involved. In later years, I did a lot of work personally with the White House and some of these interagencies. At this point, I had been in command, I guess, three to four to five months. I was not well known by the White House, the Obama Administration, or probably any of the secretaries of the interagency. I didn't work at that level at this point. And so as a result, we got most of our direction from Ms. Darcy either -- verbally on either what to do or, primarily, maybe what we were not going to do.

**Q. General -- and so Ms. Darcy gave you direction on what to do?**

A. I think she -- this probably goes back to the discussion we had earlier on continuing to study the issue and come back and give us more of your decision -- more of your evidence on -- with respect to the approval of the permit. I'm not sure Ms. Darcy ever gave us any specific direction on the protest. I believe most of that came through DOJ and probably through DOI.

**Q. The what to do with respect to the protest direction came from Department of the Interior?**

A. So I just don't know where that came from. I know that most of this was a working group of about five or six different agencies who, I'm assuming, met

either daily or weekly, whatever. But we would come up with some recommendations, to a degree -- be it the standing use permit or other options -- on where we could either relocate or move people. And either we briefed that to this working group, or they told us what to do. But most of that, I think, was much more driven by national level agencies as to how to resolve this.

**Q. And you mentioned five to six different agencies. Which -- which ones come to mind? I mean, you said a couple, but just to round out, who all that might be?**

A. So I think, clearly, there was the Department of Defense, really executed by the Department of the Army, Office of General Counsel. We talked about the Assistant Secretary of the Army for Civil Works, DOI. But probably internal to DOI was -- I think it's Bureau of Indian Affairs, maybe it's BIA. At some point, I think there was some degree of FBI involvement. I don't know that, but I think at some point they were part of this team.

And then, honestly, the State of North Dakota was a player in a lot of this. I don't think the federal government did anything in a vacuum. But at some given point, I would have thought that the

county, the local officials, the State, the Tribe -- I mean, everybody was trying to figure out how to find the best solution available.

**Q. Sir, the question was, you mentioned five to six different federal agencies. And my -- my question was, could -- could you just identify who -- who you had in mind when you used the -- the numbers five to six as federal agencies?**

A. Yeah, so I thought I did. Department of Defense.

**Q. Got it.**

A. Department of the Army; Department of the Interior, specifically DIH; Department of Justice; the FBI. That's four. Maybe four is the right answer, then.

**Q. Okay.**

A. But on some of those, like the Department of Defense, there were three or four different subagencies --

**Q. Yes.**

A. -- that were on that team. So DOD General Counsel was there with Department of Army General Counsel. And I think it's important to say that I also tell my guys, "You're my team. Stay in your lane. You're engineers. You worry about water, you worry

about federal land. When it comes to exactly how we're going to resolve, you know, political situations, then we defer to those that have the authority to be able to resolve those."

And we basically went and said, "We have a challenge. Here are some tools we have available." And at that point, I think the interagency took over control and basically said, you know, "Either you're going to execute what we tell you to do, or don't do anything without informing us and make sure that we're a consolidated team versus the Corps trying to resolve it." This is where, in September, it was pretty much my, I think, belief that this was going to truly be an Administration's resolution versus the Corps of Engineers'.

**Q. Yup. Thank you. Do you recall the President of the United States making a public comment on one or more occasions about the Dakota Access Pipeline and the protests associated with it?**

A. I don't, but it's certainly -- I would expect at some point he would have certainly made some -- some comments in a press conference or whatever.

**Q. Do you recall an instance where the President of the United States made a comment in**

**response to an interviewer's question about the -- the consideration by the interagency team to look at decisions that have already been made by the Corps? Do you recall the president, as part of his remarks, indicating that the Army Corps is examining ways to reroute the pipeline? Do you recall that instance?**

MS. ZILIOLI: Objection; assumes facts, misstates evidence.

A. So I actually do remember discussions about rerouting. I don't remember that the President said it, but I do know that there were some proponents -- maybe press, maybe protesters, maybe environmental groups -- who, at some point, brought the idea up of rerouting. So yes, I do know that that was a variable. I don't remember the time, though. That could have been in the summer before the protest, it could have even been after the Administration change. And I just don't remember the -- the dialogue.

**Q. (BY MR. SEBY) Do you recall having an opinion, one way or the other, on the concept of the Corps examining rerouting the pipeline that had already been permitted and approved on the land route, which was the majority of the pipe in North Dakota, by the State of North Dakota Public Service Commission and not the Army Corps of Engineers?**

104:19 -105: 22 401-402

MS. ZILIOLI: Objection; misstates evidence, legal conclusion.

A. I don't remember any of the details of what you're talking about. I do remember, at some point, asking logical questions to my team, "Hey, can we still move this?" And I don't know the exact numbers here, but I think at some point the vast majority of this pipeline had already been in the ground. All the permits had been done.

We got down to the very, very last permit, I think, or close to it, which was called this 408 easement, under the water of that particular waterway. And so at that given point, I think there was something called, like, the 20-mile limit or something, but most of this pipe was already in the ground. So the ability to flex this or to flux it with any given area, I think my -- my team came back and said, "This is the environmentally safest, logical position to put this to balance both the needs of the pipeline, but, more importantly, the protection of the environment." I think my team pretty much said that's not a viable solution.

**Q. (BY MR. SEBY) And did you make that -- that position known within the Administration?**

A. I certainly did not, no. I might have --

106:12-18, 106:24-107:23
401-402, 611, calls for legal conclusion
701-702

this is, again, where Ms. Darcy, being the political appointee, she would have either carried that water or represented our interest back up to somewhere else. And it's probably important to realize, when was that actual recommendation made. Obviously, with pipe going in the ground every single day throughout the summer, had that recommendation been made early on, there was probably more ability to accommodate it. When that recommendation was down to where the pipe was only 20 feet, 20 miles apart, then very, very little ability to reroute.

**Q. Sure. And were you aware that the Corps' interest or federal interest and involvement in the pipeline only pertained to the federal Waters of the United States for which it crossed?**

MS. ZILIOLI: Objection; assume facts, legal conclusion.

A. So, I am aware of that.

**Q. (BY MR. SEBY) Okay. It's pretty commonly observed by the Corps on their daily SITREPS for the DAPL. It's just -- it's just, you know, there's probably 50 of them where it acknowledges that. So it's not speculative.**

**Are you aware of -- so if the Corps' role was right there in that zone of federal interest, who**

**decided where to put the pipeline, site it, why to locate it where, and why not to locate it other places? Who made that decision?**

A. So I don't know the answer, but our doctrine normally has the applicant figure out what they want to do. And then -- and this is much more of a consultation. So as we talk -- and this is a whole part of the dynamic that we can certainly talk about, but there were many, many different deliberations with the Tribe, and with any pipeline developer, as to where does that route go, what are the ramifications with historic sites, where there's urban areas. So I was not involved in any of that. That probably happened years before I got here.

But at some given point, I know that there was a lot of discussions with Colonel Henderson and the Tribe, prior to any of this, as to what their concerns were. And I tend to remember that Colonel Henderson said most of the time the Tribe didn't show up to participate, because they didn't want to look like they were part of the decision. So the best way to do that is plausible deniability by saying, "We're not even going to go."

**Q. Would it surprise you that the evaluation and determination of whether to authorize the 90**

**some-odd percent of the route of the Dakota Access Pipeline in North Dakota was not evaluated and determined by the Corps of Engineers or any other federal agency?**

MS. ZILIOLI: Objection; assumes facts, legal conclusion.

A. It doesn't surprise me; but again, it goes back to, we stay in our lane. Whatever our authorities are, that's where we would have a vote. If there are other federal interests that have decisions on those other parts, then that's out of my scope.

**Q. (BY MR. SEBY) So are you aware, sir, that with respect to the siting of -- of oil pipelines in the United States, that that decision is left to the traditional land use authority of the state?**

MS. ZILIOLI: Same objections.

A. I thought there was some federal agency, maybe in DOE, that has some jurisdiction over underground pipelines that don't affect waterways. But I -- I don't think that's only a state authority. I thought there was some -- not a bureau, but some agency that has to do with -- I think it also goes back to mining and ability to do subsurface emplacement.

**Q. (BY MR. SEBY) Would you -- would you be surprised to understand that the siting of a pipeline**

**is actually conducted by the agencies and authorities of the state within the United States when there is no federal interest involved?**

MS. ZILIOLI: Objection; assumes facts, legal conclusion.

A. I'm not surprised by that.

**Q. (BY MR. SEBY) Okay. Are you aware that the State of North Dakota Public Service Commission, an independent elected body, conducted a several-month-long adjudication where a docket was opened and the applicant, Energy Transfer, sought a permit from the State of North Dakota Public Service Commission to designate a -- an approved route, after an evaluation of alternative routes and the State-evaluated criteria that are set in the State's constitution and statutes, which define the jurisdiction of the Public Service Commission, which includes the siting of oil pipelines within the State for public interest criteria?**

MS. ZILIOLI: Objection; assume facts, legal conclusion.

A. So I've never heard of that agency, the Public Service Commission. It doesn't surprise me that any state would have such a similar capability. I have no knowledge of anything of what you just said.

MR. SEBY: Okay. Okay. We've now gone

for more than an hour. I'd like to take another ten-minute break, if we may, sir, and Ms. Zilioli.

THE DEPONENT: So let's come back right at the bottom of the hour. How does that sound?

MR. SEBY: Great. That -- that's great. That sounds good. See you then.

THE DEPONENT: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 5:19 p.m. UTC, 11:19 a.m. Mountain.

(Recess, 11:19 a.m. to 11:33 a.m. MDT.)

THE VIDEOGRAPHER: We're back on the record. The time is 5:33 p.m. UTC, 11:33 a.m. Mountain.

**Q. (BY MR. SEBY) General, we're back on the record after a short break. And I provided to your counsel certain emails. They're -- they're emails that the United States produced to the State of North Dakota.**

MR. SEBY: And the first one is Exhibit 684, if we could put that on the screen, please, for the General to see and for me to ask you about, sir.

THE REPORTER: And, Mr. Seby, are these new exhibits or previously marked?

MR. SEBY: This is a new -- new exhibit.

THE REPORTER: Thank you.

(Deposition Exhibit 684, remotely introduced and provided electronically to the court reporter.)

**Q. (BY MR. SEBY) General, this is an email from Donald Jackson to General Spellmon, dated August 22, 2016. And I just wanted to ask you -- you're not copied on this email, but I wanted to show it to you, because -- and, first of all, would you read -- there's -- there's two parts here. I only want to ask you about the -- well, I think it's fair if we start with the -- the one below, the first email in the string. It's from General Jackson to Scott Spellmon, copy to John Henderson. John Henderson is removed in the final communication above, but the middle one is what I want to ask you about.**

**But here, I just -- just for context, General Jackson is asking General Spellmon, at your behest, it says, the "Chief asked me what position Governor Dalrymple had taken on this issue." And that's the -- the issue I think that they're talking about is the Corps was evaluating whether to transfer lands to the three affiliated tribes, which is not involving the DAPL protest.**

**But the interesting thing is that there**

**was a -- a response from General Spellmon to General Jackson, that is the -- is the email above, which is the one I want to ask you about. If you'd read that for a minute. It's a short email. If you'd just check it out, please.**

A. (Deponent examined document.)

So can you go down one more line -- a couple more lines, please?

(Deponent examined document.)

Okay. I got it.

112:11-114:7
602, 802

**Q. Okay. So the -- here we are in (sic) August 22nd and the -- General Spellmon is telling General Jackson that he has -- relaying Colonel Henderson's interactions with the Governor that morning. And that while the email from General Jackson was concerning the three affiliated tribes land transfer, General Spellmon got into the Governor's position on DAPL and the protests. And here at the end of, well, the third week of August, General Spellmon is telling General Jackson, "In short, his primary concern is upholding the right to peaceful protest-AND-public safety."**

**He goes on to say, "The common assessment from the field is the Standing Rock Sioux Tribe protests have crossed the line and are no longer**

**completely peaceful in nature." Do you see that?**

A. I do.

**Q. And he goes on to say the Governor has made an emergency declaration that provides additional resources to state agencies to deal with the protests. It does not include activation of the National Guard.**

**And from Colonel Henderson's notes earlier today, you saw where he asked that we -- "he," referring to the Governor -- he asked that we strongly consider denying any permits for staging/protest areas on Corps property. Then he goes on to say, "I understand Northwest District" -- that would be Omaha -- "has received its first Special Use Permit application and is working through that process now."**

**So here at the third week of August, you know, a couple weeks after these people showed up on the Corps property, the, quote, common assessment from the field is that they've crossed the line and are not peaceful. Why on earth would the Corps consider giving that type of entity a special use permit to be on the property? Do you know?**

A. So I've never seen this email trail. We do have an obligation to work with the -- I think several entities all together; the tribal nation, the state, and the federal agencies. We try to find

consensus. Just by reading this email, it sounds like the State is not a fan. I imagine -- because the Tribe must have either -- asked for the special permit. So therefore, I'm not sure it's fair to the Tribe just to completely deny it. So obviously, at this point, we're probably trying to figure out how to proceed. But that's only my conjecture.

**Q. Okay. Here we have the quote, "common assessment from the field [that] the Standing Rock Sioux Tribe protests have crossed the line and are no longer completely peaceful in nature." Are you saying that you're -- notwithstanding the behavior of the applicants, that you're obligated to work with them towards giving them a permit if they can rightfully obtain one?**

A. I think we have fairness to any applicant to try to go through that due diligence. I'm not sure exactly what the elements of approval are for a permit. I think it's key to remember that the line you just highlighted, "The common assessment from the field . . .," I read that as an extension of his primary concern, i.e., the Governor; so, therefore, the Governor's common assessment -- and probably "the field" means North Dakota -- that it's not -- did cross the line. So I don't think that's General Spellmon's

assessment. I think that's based on the discussions that Henderson had with the Governor.

**Q. Okay. So you don't interpret the phrase "the common assessment" to include any federal opinion, then?**

A. I don't think it does. I think it would have said something different than what it says here.

**Q. Okay. Okay. All right. Let's go on to -- the next exhibit that I'd like to show you is Exhibit 686.**

(Deposition Exhibit 686, remotely introduced and provided electronically to the court reporter.)

**Q. And this is an email with an attachment that I want to show you in a moment.**

MR. SEBY: But if we could blow up the -- Rachel, please blow up the "To" and "From" for a moment. There we are.

**Q. (BY MR. SEBY) So this is from Ms. Durham-Aguilera, transmitting a Dakota Access Pipeline Protest Storyboard dated August 23, 2016. And it's addressed to Donald Jackson and you, sir, General Semonite, and Ms. Darcy and Lowry Crook. Those are the addressees of the email. And so the transmittal message from Ms. Aguilera is short, and it says,**

**Ms. Darcy, Chief, and Major General Jackson, "First storyboard attached for the Dakota Access Pipeline** issue. Omaha District and Northwest Division [real estate] were critical to its assembly. We intend to generate [the] daily for now, and will endeavor to do so by [the] end of the business day. Storyboard addresses many of the questions being asked, including background/nature of the protest, impact to [Corps property], impact to DAPL construction, location of protests relative to [the] Three Affiliated Tribes . . ., and [the] way ahead. Thanks also to Colonel Henderson and" -- "for his Commander's assessment."

So now I'd like to look at the actual storyboard that is being transmitted to you and Ms. Darcy, collectively, the Corps' leadership. So on this, if we could get to the map.

MR. SEBY: And, Rachel, could you -- before we talk about the text -- well, let's talk about the text.

**Q. (BY MR. SEBY) You see the -- it talks about the "Situation" up in the first --**

MR. SEBY: Can you highlight that for the General?

**Q. (BY MR. SEBY) Can you see that, General?**

A. I can.

**Q. Okay. So here, it talks that the Corps granted, as in has granted, two Section 408 permissions for the DAPL project; already occurred July 25. So here we are, approximately a month later, and that has happened. And one gave consent for the flowage easements held at the lake by the Corps, and the other provided an easement to cross federal property for flood control and navigation at Lake Oahe, North Dakota.**

**On August 10th, protesters started showing up and beginning to interfere with the DAPL construction on private land near Lake Oahe crossing. The number of protesters grew to approximately 1500 and eventually caused pipeline construction to stop August 20, due to safety concerns.**

**And then it says, "Additional Background." Protesters set up, quote, spirit camps, plural, on Corps property south of the pipeline construction site. It does not say south of the Cannonball River. It says south of the construction site. So the river -- both north and south of the river are south of the construction site. So that's a very general reference.**

**Here, we then go to the map that's provided as part of the -- the storyboard developed by**

**the Corps, as Ms. Aguilera described it.**

MR. SEBY: Rachel, yeah, could we blow that up a little bit so we could look at the legend?

**Q. (BY MR. SEBY) So there, it denotes the Corps property. U.S. Corps [Reservation] Project is noted in blue. And then when we look at the -- the inset map on there --**

MR. SEBY: Rachel, if you could go to that smaller inset right there.

**Q. (BY MR. SEBY) -- we see that on the date of this storyboard, which is the very first storyboard that Corps staff -- coming from Colonel Henderson, who gets a lot of credit for its development, and the Corps resources in the -- in the division, real estate division. So people who know what their property looks like have assembled this map and are providing it to you, as the chief, and to Ms. Darcy, as the Assistant Secretary of the Army for Civil Works.**

**And the very first report that you and Ms. Darcy receive about the status of the Corps property is to note that there is a camp located on Corps property called "Camp North," and there's a camp located on Corps property called "Camp South." Do you see those?**

A. So I see Camp North. This makes me think

that Camp South is on the Reservation.

**Q. It's -- it's not clear, though, is it, sir; because it's right there -- the arrow -- the tip of the arrow is right there on the border. So we -- you don't know that it's on the Reservation, and I don't know that it's on the Corps property. Can we agree on that?**

A. So I guess the question is, what's the blue? Is the blue actually the water line? So when you say, "Camp South," by this graphic, it would look like Camp South is in the water.

**Q. Sir, back at the legend, the Corps legend says Corps Reservoir Project. It does not say only the water. So it includes the water and the project lands, would be the way I read that.**

A. Okay. I understand that. I understand.

**Q. You disagree with that?**

A. So that's probably the boundary of the Corps project. And the water is either -- it's hard to tell. The water is either inside where the dotted line is or something less than that. So I understand it's hard to understand by this graphic.

**Q. Are you going to disagree with me that Camp North is clearly on Corps-managed property?**

A. I don't have a clue of exactly what this

graphic shows. I've never seen this -- I haven't seen this storyboard in six years. Now, if it came to me, I certainly saw it six years ago. But you're giving me a lot, a lot of information here that I don't know if I can quickly analyze what you're trying to -- what you're trying to show. It looks like there's some area, obviously south of the water, that is called "Camp South."

**Q. Okay. Well, my view, because I'm reading the legend where it says, "Reservoir Project," it doesn't say "Reservoir Waterway" or anything like that. And so I -- I believe "Project" is referring to the Oahe Project, which includes water and project lands as part of the project. And so I believe what you are being told with this graphic and the narrative text is that there were camps on Corps property, and that's a depiction of them, camps plural.**

A. So a storyboard is a tool we use, put together by my ops team, to be able to give me a graphic array for things like hurricanes, tornadoes, and these kind of things. It's clearly the first one. Most of the time it's about two weeks into this when we get everything right.

I probably would have asked the same questions you were. Let's blow it up more, let's have

very clear graphics. I think it's -- if you're making the argument that this is saying it is or not, I'm not sure I understand the accuracy of these graphics. But I'm not trying to say that -- it's just hard to tell by looking at this graphic, by some captain who did this in a PowerPoint shot, probably at 3 o'clock in the morning.

**Q. Okay. Earlier, you told me you had a lot of faith in -- in the professionalism of Colonel Henderson. And that includes his -- the nature of his assessments. He didn't -- would you say Colonel Henderson was prone to hyperbole?**

A. I don't know what that means.

**Q. Do you think he made -- did you ever find him to gratuitously say things or make things up?**

A. Not at all.

**Q. Okay.**

A. I also want to clarify, the Corps is a very, very professional place. But most of the time, the first time I either see something or I hear something, it's always the first report. So I put very little credibility into the first things I see. But keep going. I certainly will entertain whatever you want me to try to answer here.

**Q. Okay. I just want to show you one thing,**

and that is --

MR. SEBY: Rachel, could we go back to the -- to the narrative text the Corps used on the right side? And come down to "Northwest Omaha Commanders Assessment." And could we blow that up for the General?

Q. (BY MR. SEBY) So, General, the northwest commander in this instance is Colonel Henderson, correct?

A. Yes.

Q. Okay. So what we're going to read here is his assessment, correct?

A. Correct.

Q. Okay. So here is what Colonel Henderson says as his assessment. "We expect the size and intensity of the protests to grow over the next 2 days leading into the Preliminary Injunction hearing." That's the September 9th decision that was ultimately made that you won. "The location of these encampments" -- plural -- "on U.S. Corps managed lands -- without a special use permit -- is considered trespassing and is effectively preventing DAPL from working in the area."

First report you get, Colonel Henderson is telling you and Ms. Darcy, we have people camping on

our lands, in more than one location, and these people do not have permission from me, the person who normally gives it, for them to be there. Attention, I'm reporting that to you, sir. That's what -- that's what -- the information that you're provided on this date, August 24th. And the report comes from the day prior, August 23.

You, sir, did you not read this? I'm not going to assume that you did; so I want to ask, would it -- would it have been unusual for you not to have read this?

A. I normally peruse these documents. The volume of what I was running at that time probably never let me have more than, you know, five minutes on some of these. At this point, I would probably have gotten a perception that Henderson knows what he's doing here and will let the staff continue to work it out.

Q. Did you ever recall you or Ms. Darcy disputing the veracity of the information that was being provided to you?

A. I don't think so, no.

Q. Okay. I understand. All right. Thank you.

MR. SEBY: Could we please go to

Exhibit 688.

(Deposition Exhibit 688, remotely introduced and provided electronically to the court reporter.)

Q. (BY MR. SEBY) And this -- this is an email from Lowry Crook that is responding to an email from General Jackson, reporting to you and Ms. Darcy. And Crook weighs in that's it's okay with him if -- if you move to more periodic reports versus these daily storyboards. But that's not what I want to ask you about. What I want to ask you about is General Jackson's email to you and Ms. Darcy, where -- if you would take a moment and read -- read that, please. Come down to the body of General Jackson's email that begins "Madam Secretary/Chief."

A. Yeah, got it. I'm working my way through it.

Q. Yes, sir. Take your time.

A. (Deponent examined document.) Okay.

Q. Earlier, sir, I asked you if you knew who Mr. Michael Connor, the Assistant Secretary of the Department of the Interior was, and I believe you told me, "Don't recall his name. I just don't know who that guy is." And I appreciate that six years later you've moved on and -- but here, Mr. -- or General Jackson is

saying that, "Tracking your call" -- he's referring to -- the "your" is at least Ms. Darcy and yourself -- "call with Mr. Connor following his discussion with Governor Dalrymple."

Now that you've seen this and are refreshed about having had a call with the Assistant Secretary of the Department of the Interior regarding his discussion with the Governor of the State of North Dakota, what can you tell me about your call with Mr. Connor?

A. Yeah. So I don't believe I ever had a call. It's not abnormal that when somebody writes somebody, they put the other counterpart on the "To" line. So here, I think we're talking about Darcy's call with Connor. I think Connor came back alive here about a year ago, and I believe that might be the same Conner that's now the ASA (CW). But I don't think I ever knew Connor's name or BIA.

So I'm not sure -- I don't think I ever had that call. And this is a regular update from Ed to Ms. Darcy, and I would almost consider me as a "cc." I don't think I ever acted on this email whatsoever. I don't know if I responded or not.

Q. Okay. All right. But the bottom line is, this reference to "your call," it did not include you,

Page 126

**even though you're being addressed as an -- as an addressee, right?**

A. Yeah. Ms. Darcy and I very, very seldom ever did joint calls. It would either be normally her or me. But very seldom did we both have a call. And I think this is clearly her phone call with Connor.

**Q. Okay. Got it. All right. Okay.**

MR. SEBY: If we could go to Exhibit 689, please.

(Deposition Exhibit 689, remotely introduced and provided electronically to the court reporter.)

MR. SEBY: If we can come down to the bottom of the email. That's the only thing I really want to ask you about. Oh, I'm sorry, not -- not that storyboard. We've already looked at that in the previous email. Right there.

**Q. (BY MR. SEBY) Mr. -- or Major General Jackson is conversing with -- it starts off with Lowry Crook talking about a conversation he had. And that's not what I want to ask you about. I want to ask you about the one just above it, where General Jackson, on September 5, 2016 -- and I know you're not copied on this email, but I'm going to ask you about the subject matter.**

Page 127

**On August -- or, pardon me, September 5, 2016, General Jackson says to Karen, who is Karen Aguilera, "Karen, Need an update on DAPL from Omaha before noon tomorrow. Secretary Darcy has a 1300 Principals Meeting with Department of Interior" -- using the acronym DOI -- "and they follow on at the White House" -- I don't know what "o/a" means -- "1500."**

A. On or about.

**Q. On or about 1500. "I told the G3" -- what is the G3?**

A. So the G3 is the terminology in the Army for the Operations section. So in USACE, that is the same as when I said a couple hours ago about the Emergency Operations section. Ms. Karen D-A, she was the leader of the Operations team.

**Q. Okay. Okay. So here we have General Jackson telling Ms. Aguilera that the Secretary, Ms. Darcy, has a meeting with the Department of the Interior and a follow-up at the White House tomorrow, which would be on September 6th. And, "I told the G3 to begin the daily updates once we get word [on] a decision is imminent on the Injunction. Could be as early as Wednesday."**

**And that's right, because the court**

Page 128

**announced it was going to decide on September 9th. So Ms. Darcy meeting with the Secretary of the Interior and then heading over to the White House, is this a -- an indication, do you believe, sir, to the workings of the interagency group that was putting together what ultimately became the September 9th announcement just a few days later; notwithstanding the outcome of the court case -- and, geez, you won -- but notwithstanding that, Ms. Darcy made that, was party to -- committed the Army to be party to the Joint Statement on September 9th with the Department of the Interior and the Department of Justice?**

MS. ZILIOLI: Objection; speculation, foundation.

**Q. (BY MR. SEBY) I'm not asking you to speculate. I'm asking you whether you know that?**

A. So, I don't know that. But by the way I'm reading this, it appears that what I said a couple hours ago has some credibility. Clearly, the interagency was thinking through what was going to happen in that announcement and prepping the battlefield to be able to react. Clearly, we know they did issue a statement, but I would have envisioned that they would have an alternative position, given the fact that the decision was the other way around.

Page 129

I don't read this to say principals, as in the Secretary of DOI. A lot of times the principals, just like how we wouldn't have the Secretary of the Army go into that meeting, I imagine the principal is probably some high-level staffer inside DOI, a Ms. Darcy equivalent.

**Q. Sure. So maybe not the Secretary, but maybe the Secretary's Chief of Staff, for example?**

A. Or, you know, I don't know what you said Jewell's job was. Maybe -- I don't know whether she was DOI. It might have been a BIA guy or whatever it is; but somebody obviously important enough to act on behalf of the Secretary.

**Q. Yeah, yup, yup. Okay. All right.**

MR. SEBY: If we could go to Exhibit 690, please.

(Deposition Exhibit 690, remotely introduced and provided electronically to the court reporter.)

**Q. (BY MR. SEBY) Okay. If we could go down to the -- in the chain where there is -- hold up there for a second. What this is is a -- and I don't want to ask you about this, because it's long and has a bunch of things that are not relevant. But there is a -- a document being transmitted by an individual in the**

**Corps, Patrick Seiber, Seiber (pronouncing), to the Secretary of the Army, Eric Fanning, and General Milley. And it's entitled "September 8th MRD [Monitoring] Report." What does that mean, MRD?**

A. So every morning, the Public Affairs team in the Army informs the Secretary and the Chief of Staff of the Army of critical articles that probably have happened in the last 24 hours. I don't know the date of this. It looks like -- I don't know whether this is a midweek. If it's a Monday morning, then it would have been Saturday and Sunday. I think it's -- MRD is something like morning -- I don't know what that means. But the -- Seiber is not a Corps person. Pat was actually the colonel that put this together on the Army staff for the senior leadership of the Army. This comes out every morning at about 6 o'clock or 7 o'clock in the morning.

**Q. Sure. And the date says, right there, it's on a Thursday. Thursday morning, 6:46 p.m. -- a.m., so it's early. And what you just said makes sense, that it's a -- a -- it's a -- kind of a chronology of articles that appeared in the media in the last 24 hours, provided as a report to the Secretary of the Army and the Chief of Staff, General Milley. So I don't want to ask you about that.**

**But somehow you got this. And you're not copied on the distribution, but you got it. And I know that, and you know that, because you took it and forwarded it on in the next email.**

MR. SEBY: If we could go up, Rachel, the next email from General Semonite to General Jackson, copied to some people.

**Q. (BY MR. SEBY) But you changed the subject line from that "MRD" line, you changed it, sir, to say, "Lieutenant General Semonite Tasker - Laydown of Protest Site." And then you kept the MRD reference. But you go on to say in the email, "ED:" -- Ed Jackson -- "Please see #4 below . . .," referencing the articles in the -- the MRD report. And No. 4 happens to talk about the title of it. All I want to mention is the title, "WHILE AWAITING PIPELINE RULING, NORTH DAKOTA RECRUITS LAW OFFICERS TO HELP GUARD SITE OF PROTEST THAT TURNED VIOLENT OVER THE WEEKEND."**

**So that's the article being given to the Secretary of the Army and the Chief of the Staff -- Chief of Staff. And you are calling out that article and tasking staff to get you a map, "a big map that I can see both the TRAIL of the PIPELINE . . . the 3 percent that we control, the actual site of the protests, the 20 mile exclusion zone. I would like you**

**to get this to the PENTAGON by 0800 tomorrow and give to ALLAN WEBSTER so I can have at the 0900 session with" the Secretary of the Army and the Chief of Staff of the Army.**

**So you're -- if I understand this correctly, the next day, you're wanting a map, because you have a meeting in the morning with Secretary Fanning and Chief of Staff of the Army, General Milley; is that correct?**

A. So just a couple things. I definitely got this message every single morning. Most of the time the Army doesn't like to put 50 people on the "cc" line, so they put it on a blind line. So I -- I was routinely getting this. Every single day, I would probably forward anything that had to do with the Corps, to my team. I always wrote on the subject line, is this for information, is it guidance, is it a tasker, or is it a calendar issue. So this is very routine of how I work, what's going on. This gives me the impression that I either didn't see that first storyboard or I didn't really read it, because I'm actually asking something very similar to what was on the storyboard.

I also remember every single -- I think at the time it was Monday, Wednesday, and Friday, we had a

routine Army staff meeting with the Secretary of the Army, the CSA, and all of the Army staff. So this is not a special DAPL meeting. This was the regular, normal 9 o'clock meeting. But I wanted to always have a graphic. So at some time during these meetings, the -- you know, General Milley would say, "Todd, what's going on here? See me afterward and show me what's happening."

So Allan Webster was the colonel that was currently in the Pentagon, worked there all the time, and he was my inside guy to be able to ensure the Pentagon leadership understood what was happening. So this is probably exactly as you summed it up; what's going on, give me the map so I can understand how this is playing out.

**Q. Yup. And I wasn't suggesting that even though you were given the storyboard two weeks earlier -- because that's August 24th and here we are September 8th, by my count, that's two full weeks later -- I wasn't suggesting that you didn't know what it said and the camps and all that stuff. But all I'm saying is that -- and thanks for that clarification. You were bcc'd this, so it was normal for you to get it. But you did change the subject line to add to General Jackson a -- you reference it as a "Tasker."**

**What is a tasker?**

A. So the worst thing a leader can do is to be vague and ambiguous. So like I told you, every single email of mine -- you can go back and look -- I would say, "Semonite info. Here is something that's happening. It's for your information. Here is guidance."

Okay. If it's a tasker, it means you owe me a product. I normally am very clear with the person's first name. I normally give them a suspense. And all of my staff knew that if there was ever a time I gave them a tasker and they didn't understand it, it was on them to come back and to ask for more -- more operations -- or for more clarity. I was doing about a hundred emails a day during this period, or my entire tenure, so I had to write relatively short and succinct. But that set the conditions for the staff now to act on this, so I could then have a product, when needed, to be able to brief Army leadership.

**Q. Yeah, I -- I understand. So a tasker, which is the question, is a directive from the chief of engineers, to the addressee; in this case, General Jackson?**

A. Exactly right. And I think it's also important to amplify here, you know, some people have

different ways of -- of working. I have been using capital letters for 20 years. Okay. It's kind of like how I talk.

**Q. Yeah.**

A. I want to amplify certain things, so that's why you'll see certain words that are out here so that -- I always try to communicate so as to not be misunderstood.

**Q. Yeah. You -- you prefer to be candid and -- and clear?**

A. I do.

**Q. Of course. And that's sort of a value that is inherent in military command structures, too, isn't it?**

A. It is. I think the other thing to note, I've been in the Army for 41 years and 4 months. You can't be successful by trying to work all actions. I told you a couple hours ago, I probably worked about 5 percent, but I waited for those to escalate to where I thought it was at the point that me, as a three-star general, needed to be involved.

So at this point now, the Army leadership appears -- and I didn't read Article 4, I'm not sure exactly what it says, No. 4 below, but at some point now, the Army leadership is aware something is

happening. So I want to make sure that I'm setting the stage to be able to either advise them what to do or make sure that they're aware that something could happen on their watch.

**Q. Yup, I understand. I understand. I got that impression loud and clear from your email directing General Jackson to get you a map so you could see from that map where certain things were going on, right?**

A. Correct.

**Q. And so you say, "On the map" -- and I'm referring to the second paragraph of your email to Major General Jackson, you say, "On the map . . . or some other GRAPHIC . . . make sure I know WHERE the protesters are . . . and WHOSE LANDS is our land." So you were trying to assess whether or not protesters were on your land, correct?**

A. I think that's what I was trying to get to here. And I do much, much better with -- with maps. When we talk about graphics, the military uses a lot of sketches, PowerPoint graphics. I don't want to use words; I want to see a -- a laydown.

**Q. Yeah, yeah. So you weren't expecting anything but a visual that -- that answered your directive to say, "I want to know where our land is,**

**and I want to know where the protest camps are relative to it." Is that right -- is that what you're saying?**

A. That's correct.

**Q. And did you get that material from General Jackson in time for your meeting on the next day; which, wow, was September 9th, an interesting day of parallels? Did you meet with the Secretary of the Army that morning and give them a -- show them a map?**

A. So, I don't remember that. But these meetings were almost always on time, almost never canceled. If somebody couldn't go, they would have a deputy there. So unless you show me something otherwise, I'm assuming I went. And I hate to say it like this, but normally when a three-star asks a two-star to do something, everybody reacts. I mean, we were exceptionally responsive. I imagine they probably used a graphic that was in that storyboard as a starting point. But I'm assuming that I got what I asked for here.

**Q. Yeah, sure. And I can't tell you for sure, because we weren't given the -- the information from your counsel as to what General Jackson did in response to this. We just know that he forwarded it on and got -- got the staff busy working on getting you what you asked for and --**

Page 138

A. Yeah. Mr. Seby, real quick, in case I need to know, have your staff just scroll down to show me No. 4, so I know what's in the context of that paragraph, please.

Q. Oh, the -- the reference to the -- the email below that references the article?

A. Yeah.

Q. Yeah, sure. Here we go.

A. (Inaudible.)

Q. We're on our way down. I read it, too, earlier, General. I -- I read the -- the title. I don't have the article, so I can't share it with you. But -- I'd be happy to, but I don't have it. I just know what the title of No. 4 is. And I knew to look at it, because your email referenced No. 4 below. And unless you tell me otherwise --

A. (Inaudible) they're getting ready for whatever the decision is, and they're -- they're mobilizing enforcement officers. I got it.

Q. Yeah, that -- that's right. That's right. So you -- you don't recall this meeting, but do you recall General Jackson failing to do what you asked?

A. I doubt he failed to do that.

Q. Yeah. Okay. So --

A. The other thing you need to know is

Page 139

although -- these are summary paragraphs. So what you're showing me here, down at the bottom of this -- and maybe you didn't get that in the thing -- the full articles are all the way down there. So this is just a rolldown, or maybe that's a link. You click on that title, and all of the -- so I'm sure I went down and I read whatever that entire article was.

Q. Oh, no doubt. I'm not questioning it.

A. If you go all the way down, somewhere in there the entire article is laid out, probably.

Q. That's great. And I'm not asking about the article. I'm just reading what you wrote; and that is, in response to your observation of that number article, whatever it said, you directed General Jackson, "Tomorrow morning, because I'm meeting with General Milley and Secretary Fanning, I want a map that shows our lands relative to where the protesters are." And you told me that you have no recollection of General Jackson failing to give you what you asked for.

A. It is not -- I would never have predicted that he would have failed to do this. Now, again, we let the staff do all this. So it says, I think, get it to Allan Webster. So I certainly would anticipate that all of those actions were followed through.

Q. Yeah. And I'm not questioning it. I'm

Page 140

just saying, unless you tell me otherwise, it would be fair to understand that as of the morning of September 9th, you went to a meeting and were armed with what you were asking be prepared for you and the Secretary and General Milley to know, or at least have the ability and option to discuss, where the protest camps, plural, were located relative to Corps of Engineers property. Is that fair?

A. It is. And I think the other thing is, this meeting was a joint meeting of the military members of the Army staff and the secretariat. So at this time, I would have been sitting next to Ms. Darcy, and it was everybody in a big room. A lot of times we did our coordination there. So I probably would have brought the map out, given her a copy of it, and I said, "Hey, if we get a question on it, you handle the political side, I'll handle the operational side." That's how we probably coordinated.

Q. Okay. So you -- unless she was, you know, not there, she normally would have been there, right?

A. If not her, then Lowry Crook would have been there.

Q. Lowry Crook (pronouncing)?

A. Lowry Crook.

Q. Yeah. Okay. I just want to point out

140:25-
142:5
611

Page 141

that the -- your request for the -- the tasker request for the map showing the attributes that you requested was made on September 8th of 2016. And your meeting was the following morning, which happened to be the morning of September 9th; which is also a date of interest, because that's the date that the Joint Statement from the three agencies or departments of the United States Government chose, after receiving a favorable ruling from the United States District Court, Judge Boasberg, denying it an effort to grant a preliminary injunction against the Corps -- he won -- that that was the date that the Joint Statement says, "Well, all the decisions we've made to date, we're going to relook at and decide whether or not we need to change them or just not allow them to go forward."

Same day, Ms. Darcy would have, conceivably, been shown the map that you asked yourself to be -- asked that your staff be -- arm you with to discuss with not only the Secretary of the Army, but General Milley and Ms. Darcy. And all of you, collectively, would have had the ability to know where the protesters were and whether -- and where on your land they were, is what I'm getting at. Is that correct?

MS. ZILIOLI: Objection, misstates

evidence.

A. So I haven't seen these emails in six years. But this is normally the way I operate, so this is all very consistent with my command philosophy and how I do things. So I think everything you're saying right now is -- is exactly right on track.

Q. (BY MR. SEBY) Okay. Thank you, sir. I -- I just was trying to get some clarification about the situation. I wasn't being argumentative or disagreeable to you; just trying to get to the bottom of it.

MR. SEBY: Let's go to 494, Exhibit 494.

Q. (BY MR. SEBY) Okay. This is an exhibit that is a -- a release by the United States Department of the Interior, dated Friday, September 9th, 2017 -- 2016. And it's addressed to Sally Jewell's email address in the Department of the Interior. SRJ is Ms. Jewell, her email. We know that from her deposition. And Ms. Jewell was sent this announcement, which is a presentation of the Joint Statement from the Department of Justice, the Department of the Army, and the Department of the Interior, regarding Standing Rock Sioux Tribe versus United States Army Corps of Engineers.

And I was interested in this particular

document, because when you get down below, the -- the heading on the Joint Statement, if you can see it right there -- I'm sorry, it's right --

MR. SEBY: Rachel, it's the upper part of the screen now. Right there.

Q. (BY MR. SEBY) The Joint Statement from the three departments, it says -- in addition to the Corps -- pardon me, in addition to the Department of the Interior and Justice, it says, plainly, the Department of the Army, correct?

A. That's correct.

Q. Okay. And so what I want to show you is why I'm puzzled. If we could go back up to the top of the email where the agencies' crests are displayed, we all see the Department of the Interior; buffalo, famous buffalo, pointing -- pointing to the left. And then we see the crest of -- of the Department of Justice, but -- which matches the title of the Joint Statement. But I'm wondering if you know the answer to why, when this is apparently a Joint Statement of the Department of the Army, why is the unitary crest of the Army Corps of Engineers there and not the Department of the Army crest?

MS. ZILIOLI: Objection; speculation, foundation.

Q. (BY MR. SEBY) Do you know, sir?

A. So I'm speculating, but I will tell you there doesn't have -- the renowned expert in water areas is the Corps of Engineers; 247 years, everybody knows the Army Corps crest. I think that this was done either by mistake or an attempt to give credibility to the document that the leadership of the Corps of Engineers, which is a self-contained organization that works for the Army, is making this statement.

So I -- I don't know where you're going with it, but if somebody were to ask me, "Are you going to allow your crest to be up there," I would say, "Put the Army crest up there."

Q. Yeah. I just was curious, because the title of the statement says the Department of the Interior, Justice, and Army, but then the crest doesn't match consistent with that. I don't know why, I was just wondering if you knew.

So anyhow, and then when you look at the Joint Statement text itself, it says -- if you would, sir, read it again. I know it's been six years since you have, probably, but if you would take a moment and read it. It's -- it's pretty short.

A. (Deponent examined a document.)

Okay. Go ahead.

(Pause.)

A. Okay.

Q. So that's the end of it.

A. So I read that pretty fast. I certainly understand the general message there. But if we need to, we might have to go back, if there's -- if you're going to ask me specifics on something.

Q. No. I just wanted to ask you, do you recall this now? Up until now, I've been asking you about the -- the infamous September 9th Joint Statement. Now that you've read it, do you recall it as correct with what we've been talking about? That's -- that's the statement?

A. Yeah. So if you were to ask me an hour ago, "What would the statement look like," I wouldn't be able to answer the question. But clearly, I read it and I certainly understand and know that this document came out.

Q. Yup, yup. And I -- I'm just observing with you that the title says that it's the Army -- Department of the Army. And then in the body of the text of the statement itself, second paragraph, it says -- well, the last sentence of the first paragraph says, "Therefore, the Department of the Army, the Department of Justice, and the Department of the

Interior will take the following steps."

Second paragraph, "The Army will not authorize constructing the DAPL pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under" -- "under the National Environmental Policy Act or other federal laws."

It talks about the Army this and the Army that. It does not say the Corps of Engineers, does it?

A. It does not.

MR. SEBY: Okay. If we could go to Exhibit 694, please.

(Deposition Exhibit 694, remotely introduced and provided electronically to the court reporter.)

A. I think while you're doing that, it's also critical to point out that this is what I was remembering, where I talked about consultation and the need for -- should the federal government reconsider some of the parameters as to how these pipelines are approved.

ND OBJ: Non-Responsive

Q. (BY MR. SEBY) What do you mean by making that additional comment, sir? I -- I -- I

understand --

A. I wasn't sure where I remembered that coming up, but I think this is what I was alluding to; is that there was some question on consultation with the tribes that was introduced into this particular memo.

Q. Yup. I think earlier you also told me that Colonel Henderson attempted, during the course of, I don't know, a couple years prior to this, to consult with the tribes. But they didn't have a lot of interest, did they?

A. That was my understanding.

Q. Yup. Understand, sir. Okay. We're at -- we're at Exhibit 694, which is a very long distribution list email from you, sir, dated September 11th, on a Sunday. And it's sent -- the addressees are really only two people, copied to an enormous number of people. I only want to point out, one of the copy recipients is Ms. Darcy. But the addressees are Patrick Murphy and General Allyn. You've told me who General Allyn is. Could you advise me who Mr. Murphy is?

A. Mr. Murray -- Murphy was Secretary Fanning's deputy. He was called the Assistant Secretary of the Army.

Q. Oh, okay. All right. So you are sending to those gentlemen, copying a very large group, an email from you entitled: Chief of Engineers and the U.S. Army Corps of Engineers Update for September 11, 2016. And you are reporting on a number of topics. And one of them that you mentioned is, "We're . . . closely monitoring the DAKOTA ACCESS PIPELINE situation and [the] Friday" -- "Friday's court decision." And then you talk about the 1200-mile pipeline and so forth.

So I -- and this follows the meeting that you would have had two days prior with the Secretary. Do you think that General Allyn would have been present in that meeting you had on September 9?

A. He normally would go along with Secretary -- Assistant Secretary Murphy. Now, again, somebody might have been out of town. But just to clarify, every member of the Army staff normally wrote a SITREP every two weeks. So I, personally, wrote this. And this -- because there's so many on the "cc" line, that is the Army staff.

And it was our battle rhythm to continue to make sure that the secretariat and the generals on the Army staff understood what each of the other commands were doing. This got to be a lot, a lot of

reports. I'm not sure how many people ever read them. But this is my attempt to inform Army leadership of either good things the command was doing or potential issues that might cross their desk.

Q. Yeah, yup. Okay.

MR. SEBY: If we could go to Exhibit 420, please. And if we go to the attachment to this email. It's just a transmittal email. It's got some -- Rachel, if we could go to the end there, please.

149:10-150:14 401-402, 602

Q. (BY MR. SEBY) After the social media graphics is a letter. General, this is a letter I'm going to ask you to please read in a moment, but let me just introduce it. Letter dated September 14, 2016 from -- and it's on a letterhead that is interesting, in that it has the congressional delegation; the Republican United States Senator, a Democrat United States Senator, and a Congressman, North Dakota's only Congressperson, Kevin Cramer. And then, also, it's joined by the Governor of the State of North Dakota, Jack Dalrymple, on September 14th.

The addressees of the letter are Attorney General of the United States, Loretta Lynch; Sally Jewell, the Secretary of the Department of the Interior; and Jo-Ellen Darcy, the Assistant Secretary of the Army for Civil Works. And then if you would,

Page 150

please, read the letter from the three Congresspeople and the Governor.

A. (Deponent examined document.) Okay. Go ahead.

Q. Okay. Did you see this letter?

A. I don't remember this specific letter, but these things crossed my desk quite often. The person that sent this, Jen Greer, was the equivalent of a -- she was my congressional liaison. I don't know whether I'm on that "cc" or not, but I probably was certainly informed on it. But I think at some point this request is what Senator Hoeven and eventually Congressman Cramer, who became Senator Cramer, continued to act on through the tenure of my four years in command.

Q. Yeah. So you read that -- the statement that these individuals, the elected Senators and Congressman and the Governor of the State, are not happy with the September 9th announcement, are they?

A. So I'm not sure I see that in there. It says that we urge you to follow through on your joint release and immediately start thinking cost share. So "unhappy" is maybe a stretch. I will let the letter stand for itself. But I think the bold letters are relatively self-explanatory.

Q. Yeah, they are. I agree. "As a result of

Page 151

your delay . . .," so that's referring to the September 9th announcement, that the final authorization would be withheld indefinitely, is what they say. So they say, "As a result of that delay, North Dakota is experiencing a strain on its law enforcement resources." And they go on to say, "We urge you to follow through on your joint release and begin planning immediately to cost share reimbursement and manpower that will be needed to support [us] . . . as [we] continue to provide public safety."

In addition, we want a meeting with you to discuss this matter and work a solution, ". . . as the Administration's unprecedented announcement warrants further [consideration]." I take that as being -- this is a -- a letter expressing strong concern. Would you agree with me on that?

MS. ZILIOLI: Objection, speculation.

A. I do. I think it's also interesting to note that, going back to your earlier point, we request a meeting with the Department of Justice, that's a political appointee, the Department of the Interior. It doesn't say the Department of the Army. They now have converted to the Army Corps of Engineers. I think a lot of that goes back to the reputation the Corps has of working with the states. But notice how that

Page 152

narrative is different than the three icons or the three people in that press release.

Q. (BY MR. SEBY) Sure; because the Corps put its logo up there, not the Army. Does the -- does the Army -- Department of the Army not have a logo?

A. Let me rephrase that. The Corps didn't put the logo up. Whoever caused -- whoever generated that press release put the Corps up.

Q. Yeah. All I'm saying is, I don't -- I don't want to speculate why they chose to reference the Corps; but so what, it really doesn't matter. They're asking to meet with the Corps. And Ms. Darcy is an addressee of the letter and a subject of the request for a meeting, right?

A. Correct.

Q. Okay. So I asked -- I deposed Ms. Jewell and I deposed Ms. Darcy. I talked to them about this letter, and neither of them recalled any measure of action to acknowledge it to the two Senators, the Congressman, or the Governor. Do you believe differently? Did they -- did they respond in any manner?

MS. ZILIOLI: Objection; misstates evidence, assume facts.

A. I just don't know. I just don't know.

Page 153

When we get a letter from an elected official, it is not our desire, it is incumbent on my staff or my previous staff to be able to be responsive and to answer back. So our normal process would have been to follow up, even if not asked, knowing that Hoeven and the rest of the team are asking for a meeting to be -- certainly be available for a meeting; and probably even to the point of saying, "If you're not going to have a meeting, then you need to -- you need to respond to the letter," because I don't want the Corps to be the one with a black eye of not meeting with these four elected people.

Q. (BY MR. SEBY) Yup. And I gathered that from other correspondence of yours I've read, that that was a stated position of yours. I saw it on several occasions. So I -- I appreciate that's your view. Would you be irritated, then, General, to know that nobody responded to -- to this letter and that there never was facilitation of the meeting that the two Senators, the Congressman, and the Governor requested, ever?

MS. ZILIOLI: Objection; assume facts, misstates evidence.

Q. (BY MR. SEBY) If you know otherwise --

A. I think I --

153:13-154:7
401-402, 611

Page 154

Q. -- please -- please enlighten me.

A. I think I would probably use a more politically sensitive word, as opposed to being "irritated." I think it's bad policy on behalf of the federal government of not acting on, in some manner, even to say no, to a request from four distinguished people from that state.

Q. Yes, sir.

MR. SEBY: If we could go to -- to Exhibit 26, please.

Q. (BY MR. SEBY) And you're not copied on this, but I want to point it out to you. It's an email from Colonel John Henderson, dated Friday, September 16th, 4:59 p.m., to Dave Archambault, who is the Chairman at this time of the Standing Rock Sioux Nation. And it's a -- the subject is "Press Release." And it's a forwarded press release. We don't know what Colonel Henderson is forwarding, other than the attachment. But this was given to Colonel Henderson to forward, and he did.

And it says, "Mr. Chairman, I hope all is well for you.

"Our staff will be sending you a copy of the permit by email soon; official copy [will] be sent by certified mail on Monday." So after the weekend is

Page 155

over, we're going to send you the official copy by certified mail.

And, "We will send the attached" -- "attached press release out this evening . . ." So while the chairman of the Sioux Tribe hasn't been given the permit, the press release is going out in two hours. And, "I wanted to give you the courtesy of reviewing it . . . prior to our release."

And then, "Have a good weekend; thanks again for your partnership."

MR. SEBY: So if we could turn to the attachment, which is the next page. If you could blow that up, Rachel, so the General can read it, top to bottom.

Q. (BY MR. SEBY) This is Army Corps of Engineers. There's that official Army Corps crest again, isn't it? And it's entitled --

A. True, but this one was -- this one was apparently a news release of the Corps of Engineers, not the Department of the Army.

Q. Oh, I understand. I understand. I'm not suggesting otherwise. This is an official -- it's a pretty official-looking news release, isn't it?

A. Standard format.

Q. Yeah. And we know this went out to a

Page 156

number of news organizations and out on the Corps of Engineers website; which, fascinating to me, to this day, you can still see it on the Corps of Engineers website. Maybe it will now get taken down. But as of today, July 26, 2022, it's still there. And this announces, using very specific language somebody decided to purposely use, the title, "U.S. Army Corps of Engineers grants Special Use Permit . . ."

"OMAHA, NEBRASKA - Today the . . . Corps . . . issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe." So I guess, as misleading as this language that was chosen to be used, it does answer the question you asked earlier, "Well, we don't know who the permit was allowed for people to -- you know, was it just the Tribe, or was it other?"

Here it says in the title and in the first paragraph, the Tribe. It doesn't say all-comers, even another tribe. It says the Standing Rock Sioux Tribe. That's the entity that was purportedly given permission. And it says the -- Colonel Henderson informed Standing Rock Sioux Tribe Chairman Archambault that the Tribe's spiritual gathering, located south of the Cannonball River, has been granted a special use permit, which allows the Tribe to gather and engage in

Page 157

lawful free speech on federal lands designated in the permit.

The Tribe's special use permit application requested to use the lands to the north and south; however, there's a grazing lease on the northern portion, so we're not giving it to you at this time.

And then it says in the third paragraph -- fourth paragraph, the special use permit allows the Tribe to use the lands, subject to the code. And several activities require additional permission; building structures, temporary or permanent, within the area of the special use permit.

So what I want to ask you about is, Colonel Henderson hadn't even sent the permit to the Tribe. And the -- the document that he sent was not signed. And it says: Chairman, you sign this and comply with the terms and conditions, then I'll sign it, and then there will be an effective permit.

So do you think that whoever wrote this press release got way ahead of their skis and used language that was not correct or misleading, saying that it was a done deal, when, in fact, nobody had even signed the document, and the compliance with the terms and conditions in the -- in the -- in the document itself hadn't even been given a chance to be met, and

never were met, weeks later, by the Standing Rock Sioux Tribe? Do you disagree with any of that?

A. So I disagree with a lot of that. You have a lot in that -- packed into that one statement. And we can take it piece by piece, but just --

Q. Yes, sir.

A. -- a couple things.

Q. Yup.

A. First of all, it says in the third major paragraph, subject to federal rules and regulations of Title 36. It doesn't say it's -- it's, you know, a freebie. It says there are still going to be conditions that are in there. It could have said -- we like to always keep these to one page. It could have said things like insurance and bonding. It doesn't say that. But, on the other hand, it also says we -- you're going to have to come back to us if you have the desire to have construction, permanent, et cetera, or structures in the area. So those are still things that, I think in this press release, are things that still have to be worked out.

When it comes to the scope of the Department -- and the way I read this, but it's strictly my interpretation, in the fourth line down where it says, ". . . Dave Archambault, that the

Tribe's Spiritual gathering . . .," I don't know how you define that, but at some point, what it is attempting to say, apparently, is that whatever that gathering is now, we're going to allow that to go to this other place. So that must be defined either as members of a special council or whatever it is.

But it doesn't appear to me to say, "Anybody that wants to come protest with us has the ability to do so under this special use permit." It's really narrowed down at the very, very specifics of whatever the Tribe's spiritual gathering is.

And then I think the other thing is, you made some inference that Henderson would sign it and then -- no, I guess that -- I don't know how the order of signatures goes. I think what happens is, he is sending the permit down. The person that is asking for the permit, that would be the Chief, would send it back, and then it would be acted on by Henderson. So I don't want to say that I know exactly what the process is. I trust Henderson. And whatever the rules for a special use permit, I would expect him to do it in accordance with our process.

Q. Expectation?

A. I have no reason to doubt that expectation. Henderson is a super solid officer.

Q. Yeah. And I'm not -- I'm not questioning his integrity. I'm just asking you about the -- the statements in the document. And one -- one statement I want to ask you about, where it talks about additional permission will be required for activities identified in Title 36; such as construction, either temporary or permanent, or any structures within the area identified in the special use permit. Is it your understanding, as of September 16th, the date that this statement about additional permission would be necessary to have temporary or permanent structures, is it your position, General, that you know or knew that as of that date, not a single temporary or permanent structure existed on the area identified in the special use permit?

A. So I don't know any of that answer. I would tell you that I think my -- my interpretation is that Colonel Henderson put that specific sentence in there as to not get a perception of a blank check. In other words, we're going to allow you to have this permit; however, I want the -- in the public release, to say anything you do that has to do with temporary permit is an additional requirement for you to come back. So I don't know why that was in there, but it's probably just to be able to make sure that was clear.

I would also predict, and it's strictly my

conjecture, that we probably got pressure to put this out within a couple hours -- this was, I guess, sent on the night of that same decision of the overturn of the injunction -- so that we would not have a lot of protesting the next couple days. So I guess this is 16 September. But I imagine this is the order to appease the Tribe to be patient, get the permit, and, therefore, not protest.

161:9-16
611

Q. Are you aware, General, that this document was written by several other persons not employees of the United States Department of the Army or the Corps of Engineers?

A. No, I have no idea.

MS. ZILIOLI: Objection; assumes facts, misstates evidence.

A. I don't know that.

161:17-162:1
611

Q. (BY MR. SEBY) General -- General, would you be surprised to learn that this document was exchanged and commented on and edited by the Chief of Staff of the Secretary of the Interior and several staff people in the White House in the executive office of the President?

MS. ZILIOLI: Objection; assumes facts, misstates evidence.

A. That doesn't surprise me. That doesn't

surprise me.

Q. (BY MR. SEBY) All right. And the Department of Justice, by that -- by that measure, that wouldn't surprise you either?

MS. ZILIOLI: Same objections.

A. No.

Q. (BY MR. SEBY) Okay. Maybe even Ms. Zilioli had a hand in it.

MS. ZILIOLI: Same objections.

MR. SEBY: Thank you for laughing. That's all it was intended for.

Q. (BY MR. SEBY) So on this press release, would you agree with me that it's -- it's confusing?

A. So I'm not going to use that word. I think it probably was intended to have a certain effect. And perhaps whoever contrived what that effect was, they felt that this language did that. So we might have done it a little different if, in fact, what you say is true, that we did not write it. So, therefore, the question is, whoever the authors were, did this achieve their end state?

Q. Well, I appreciate that it was intended to have a certain effect. I totally agree. What effect do you think that was?

A. Again, I think this was a stalling action

or a -- no, that's not right. This was an action to make -- make the tribes feel that they were getting some degree of accommodation.

Q. Yup. And, in fact, being told that, "We're giving you a permit," right?

A. Apparently.

Q. Yeah. Okay. And the question of whether you think it's unclear, or worse, misleading, which implies some intent -- and I don't know that, I just know that it's -- what I do know is it generated some interesting confusion. And I want to show you an example of that that's not a man-on-the-street kind of confusion. But let's look at Exhibit 429.

MS. ZILIOLI: Counsel, I'm going to object. I believe we're over the four hours. We can take a -- go off the record if you want to confirm that.

MR. SEBY: Let's go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 6:43 p.m., 12:53 p.m. Mountain.

(Discussion off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 6:57 p.m. UTC, 12:57 p.m. Mountain.

Q. (BY MR. SEBY) So, General, we have

Exhibit 429 on the -- on the screen. If we could go to the email that is attached to that cover email. And -- so this is an email from Ms. Darcy, Wednesday, September 21, 2016. And it's addressed to Major General Jackson and Lowry Crook. And she simply says, after General Jackson, in the email below, reported to her that the Corps of Engineers had issued the permit to the Standing Rock Sioux Tribe -- and the report from General Jackson below says that -- this is under the "Omaha responses" section of the email, the bottom there. General Jackson is saying that -- saying something that's not in the press release, General. "The permit is only for the south side of the river, with associated conditions. The Tribe has not signed the acknowledgment for this permit yet not met the liability requirements, so there is currently no permit in place."

And no permit in place is different than the language that the kitchen of cooks that wrote the press release used imprecisely. And then General -- or, pardon me, Ms. Darcy writes back to General Jackson saying, simply, "So, there's no permit in place for this south encampment, even though we announced Friday . . . that there was?"

So when I asked you whether you thought

anybody could be confused by this, you -- you didn't answer it. And here, I'm showing you that the Assistant Secretary of the Army for Civil Works was confused by the press release and the way in which the cabal of cooks wrote it and came away with a very different impression than you did when you tried to explain what it really meant, when it doesn't say that. And I would just say that Ms. Darcy is the evidence of that confusion, in her own words, so --

MS. ZILIOLI: Objection, misstates evidence. Sorry (inaudible).

MR. SEBY: Great.

THE REPORTER: Hold on. Excuse me. I couldn't hear you, Ms. Zilioli.

MS. ZILIOLI: I withdrew my objection, because he wasn't finished.

THE REPORTER: Okay. Thank you.

Q. (BY MR. SEBY) So, General, do you recall a time when the U.S., as a whole, ever made a statement that resulted in a deescalation of the DAPL protests?

MS. ZILIOLI: Objection; misstates evidence and testimony.

Q. (BY MR. SEBY) I'm asking --

A. I'm sorry. I just don't understand the question.

Q. I'm just asking you if you can identify any instance when the United States, writ large, ever did anything, statement or action, that resulted in a deescalation of the DAPL protests occurring for months on Corps property?

A. So I think there were actions taken with respect to, you know, certain things we were trying to do with the State and law enforcement, the National Guard, et cetera, that I think attempted to do deescalation. But I'm not sure that any of those were manifested.

Q. "Manifested" meaning ever actually caused a deescalation?

A. Yeah, actually -- actually implemented.

Q. Okay. General, I don't have any further questions for you. And I've understood that all of your answers are your answers, unless you choose now to clarify or withdraw or add to any of them. Do you wish to do any of those things?

A. I don't. I think it's just fair to say that that last set of emails, there was a lot on there, and I didn't really have a chance to review the whole document. But I -- I think I understand the context of it, but in no way have I ever seen that document before. And I did not -- was not able to internalize

some of the messages that Ms. -- that was underneath Ms. Darcy's note.

Q. Well, I would just point out that General Jackson's email explaining that Ms. -- that there is actually no permit, because the Corps hadn't signed it as of almost a week later and -- acknowledging it, and they've not met the liability requirements, so there's no permit in place. That email, sir, includes you as a -- as an addressee, after Ms. Darcy. And so you did get it.

And September 21st, whatever you may not have known before then, here was another instance to let you know that there is no permit. And whatever confusion you had, if any, isn't the question that I asked. I was just pointing out Ms. Darcy's response, which I don't understand -- I don't take it that you're arguing those. That's actually not what she said. But what she said is, "Really? There is no permit in place for the south encampment, even though we said there was?"

And my point was, is that the confusion -- I asked you whether it was possible to read that press release -- existed. You had a ready explanation why I was wrong. Yet, I showed you Ms. Darcy totally indicating confusion about what the press release said,

relative to Ed Jackson's clarification. That -- that's all I'm making a point of, and I'll leave it there.

A. I would just end by saying that I think where there was an intent to issue the permit, and then the question is, was it actually done in accordance with the conditions of the permit, those are two different things. And I could understand how an uninformed political appointee might not have understood the nuances of not following through with the rest of the permit. So I'll leave it there.

Q. Yeah, sure, sure. And along -- along with the thousands of protesters who probably were also led to believe something that wasn't true.

MR. SEBY: All right. That's -- that's the end of my questions, General. Thank you for your time today. I appreciate it.

THE DEPONENT: Thank you for yours.

MR. SEBY: Thank you, sir.

THE VIDEOGRAPHER: Before we go -- sorry.

MS. ZILIOLI: I was just going to say, this is Erica Zilioli. We have no questions for General Semonite. We'll read and sign.

THE VIDEOGRAPHER: And would you like a copy of the video?

MR. SEBY: Yes.

MS. ZILIOLI: We -- we just order the transcript. So I'll defer to --

THE DEPONENT: Oh, I would like a copy.

THE REPORTER: I'm sorry. Who is -- who is talking right now?

THE DEPONENT: Yeah. General Semonite. If it's available or acceptable, I'd like a copy.

THE VIDEOGRAPHER: It's if your attorney would like it and . . .

MS. ZILIOLI: Mr. Banks, we'll -- we'll go through the U.S. Attorney's Office on any order for that. Thank you.

THE VIDEOGRAPHER: Okay. Great. Mr. Jafek?

MR. JAFEK: I think we'll just do our standard, what we've done in other depositions.

THE VIDEOGRAPHER: All right. We are going off the record. This concludes the remote video-recorded deposition of General Todd Semonite. The time is 7:04 p.m. UTC, 1:05 (sic) p.m. Mountain. We are off the record.

(The following proceedings were held outside the videotape portion of the deposition.)

THE REPORTER: Mr. Seby, would you like a copy of the transcript?

MR. SEBY: Yes, please.
THE REPORTER: And do you need another copy of the exhibits with the sticker on them?
MR. SEBY: Ms. Hymel will help us with that answer, please.
MS. HYMEL: I would say yes. And can we make sure the video for our copy is synchronized, please, Mr. Banks?
THE VIDEOGRAPHER: Absolutely.
MS. HYMEL: Thank you, sir.
THE REPORTER: Ms. Zilioli, did you say you were ordering a copy at this time, or you needed to check?
MS. ZILIOLI: We do order a copy of the transcript, yes. I do need to check on the video, because I don't believe we have traditionally ordered the video. So we'll have to look into that before responding.
THE VIDEOGRAPHER: You can always let us know.
THE REPORTER: Would you like another copy of the exhibits with the sticker on them as well?
MS. ZILIOLI: Can we get back to you on that? I don't know what the standard order has been. I don't handle those. I'm sorry.

THE REPORTER: Okay. No problem. Thank you.
MS. ZILIOLI: I took down your email. Thanks so much.
WHEREUPON, the within proceedings were concluded at the approximate hour of 1:04 p.m. Mountain on the 26th day of July, 2022.

* * * * *

I, LIEUTENANT GENERAL TODD T. SEMONITE (RET.), do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached ( ) Yes ( ) No

________________________________________
LIEUTENANT GENERAL TODD T. SEMONITE (RET.)

The signature above of LIEUTENANT GENERAL TODD T. SEMONITE (RET.) was subscribed and sworn to or affirmed before me in the county of ________, state of Colorado, this _________ day of ____________, 2022.

__________________________
Notary Public
My commission expires

State of North Dakota, 7/26/22 (go)

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, GAIL OBERMEYER, Registered Professional Reporter and Notary Public ID 19994012647, State of Colorado, do hereby certify that previous to the commencement of the examination, the said LIEUTENANT GENERAL TODD T. SEMONITE (RET.) verbally declared his testimony in this matter is under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 3rd day of August, 2022.

My commission expires May 20, 2023.

Gail Obermeyer

Gail Obermeyer, RPR
Registered Professional Reporter
Notary Public, State of Colorado

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

Errata Sheet

NAME OF CASE: Plaintiff vs UNITED STATES

DATE OF DEPOSITION: 07/26/2022

NAME OF WITNESS: Lieutenant General Todd T. Semonite (Ret.)

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________