Lieutenant Colonel James T. Startzell
November 19, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 1:19-cv-00150-DMT-ARS
_____

DEPOSITION OF:  LIEUTENANT COLONEL JAMES T. STARTZELL -
                November 19, 2021
                (via RemoteDepo)
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.
_____


          PURSUANT TO NOTICE, the deposition of
LIEUTENANT COLONEL JAMES T. STARTZELL was taken on
behalf of the Plaintiff in Bell County, Texas, by
remote means, on November 19, 2021, at 8:34 a.m. MST,
before Gail Obermeyer, Registered Professional Reporter
and Notary Public within Colorado, appearing remotely
from Douglas County, Colorado.

Lieutenant Colonel James T. Startzell
November 19, 2021

---

Page 2

```
 1                 REMOTE APPEARANCES
 2  For the Plaintiff:
 3          PAUL M. SEBY, ESQ.
            PAUL B. KERLIN, ESQ.
 4          Greenberg Traurig, LLP
            1144 15th Street, Suite 3300
 5          Denver, Colorado 80202
            Email:  sebyp@gtlaw.com
 6                  kerlinp@gtlaw.com
 7
    For the Defendant:
 8
            JANE E. BOBET, ESQ.
 9          Assistant United States Attorney
            United States Attorney's Office/
10           District of Colorado
            1801 California Street, Suite 1600
11          Denver, Colorado 80202
            Email:  Jane.Bobet@usdoj.gov
12
13  Also Present:
14          Erica Zilioli, Esq.
            Thomas Tracy, Esq.
15          Rachel Hymel
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1              I N D E X
 2  EXAMINATION OF JAMES T. STARTZELL:          PAGE
    November 19, 2021
 3
    By Mr. Seby                                   7
 4
    By Ms. Bobet                                 --
 5
 6                                            INITIAL
    DEPOSITION EXHIBITS:  (Confidential)      REFERENCE
 7
    (Exhibits provided electronically to the
 8  reporter.  See separate Index of
    Confidential Exhibits for exhibit
 9  descriptions.)
10  Exhibit 1   (Confidential document)         74
                Bates Nos. USACE_00031882 -
11              USACE_00031884
12  Exhibit 2   (Confidential document)         93
                Bates Nos. USACE_00002235 -
13              USACE_00002241
14  Exhibit 3   (Confidential document)         97
                Bates Nos. USACE_00011546 -
15              USACE_00011547
16  Exhibit 4   (Confidential document)        106
                Bates Nos. USACE_00031828 -
17              USACE_00031829
18  Exhibit 5   (Confidential document)        112
                Bates Nos. USACE_00014069 -
19              USACE_00014074
20  Exhibit 6   (Confidential document)        132
                Bates Nos. USACE_00045055 -
21              USACE_00045056
22  Exhibit 9   (Confidential document)        123
                Bates Nos. MYERS_00032899 -
23              MYERS_00032910
24  Exhibit 18  (Confidential document)        138
                Bates Nos. USACE_00014660 -
25              USACE_00014661
```

---

Page 4

```
 1              I N D E X (Continued)
 2                                            INITIAL
    DEPOSITION EXHIBITS:  (Confidential)      REFERENCE
 3
 4  Exhibit 19  (Confidential document)        144
                Bates Nos. USACE_00014691 -
 5              USACE_00014693
 6  Exhibit 22  (Confidential document)        150
                Bates No. USACE_00014861
 7  Exhibit 23  (Confidential document)        153
                Bates Nos. USACE_00003112 -
 8              USACE_00003113
 9  Exhibit 24  (Confidential document)        159
                Bates Nos. USACE_00023968 -
10              USACE_00023978
11  Exhibit 25  (Confidential document)        177
                Bates Nos. USACE_00023990 -
12              USACE_00023993
13  Exhibit 26  (Confidential document)        166
                Bates Nos. USACE_00003114 -
14              USACE_00003115
15  Exhibit 27  (Confidential document)        175
                Bates No. USACE_00011780
16
17  Exhibit 28  (Confidential document)        186
                Bates Nos. USACE_00014931 -
18              USACE_00014932
19  Exhibit 29  (Confidential document)        188
                Bates Nos. USACE_00004504 -
20              USACE_00004508
21  Exhibit 30  (Confidential document)        191
                Bates Nos. USACE_00039177 -
22              USACE_00039183
23  Exhibit 37  (Confidential document)        196
                Bates Nos. USACE_00008641 -
24              USACE_00008642
25
```

---

Page 5

```
 1              I N D E X (Continued)
 2                                            INITIAL
    DEPOSITION EXHIBITS:  (Confidential)      REFERENCE
 3
 4  Exhibit 41  (Confidential document)        206
                Bates Nos. USACE_00009100 -
 5              USACE_00009104
 6  Exhibit 42  (Confidential document)        209
                Bates Nos. USACE_00026981 -
 7              USACE_00026985
 8  Exhibit 43  (Confidential document)        215
                Bates Nos. MYERS_00025380 -
 9              MYERS_00025381
10  Exhibit 45  (Confidential document)        222
                Bates Nos. USACE_00009270 -
11              USACE_00009271
12  Exhibit 46  (Confidential document)        225
                Bates No. USACE_00009272
13  Exhibit 47  (Confidential document)        203
                Bates Nos. USACE_00018345 -
14              USACE_00018353
15
16
17
18
19
20
21
22
23
24
25
```

---

Lieutenant Colonel James T. Startzell
November 19, 2021

**Page 6**

1          WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4          *     *     *     *     *
5          THE REPORTER:  The attorneys participating
6   in this deposition acknowledge that I am not physically
7   present in the deposition room and that I'm not
8   reporting this deposition remotely.  They further
9   acknowledge that, in lieu of an oath administered in
10  person, the witness will verbally declare his testimony
11  in this matter is under penalty of perjury.  The
12  parties and their counsel consent to this arrangement
13  and waive any objections to this manner of reporting.
14  Please indicate your agreement by stating your name and
15  your agreement on the record.
16         MR. SEBY:  This is counsel for the
17  plaintiff, Paul Martin Seby, and I consent and agree.
18         MS. BOBET:  Counsel for the United States,
19  Jane Bobet, and I agree.
20         THE REPORTER:  And, Mr. Startzell, do you
21  declare your testimony in this matter is under penalty
22  of perjury?
23         THE DEPONENT:  Yes.
24         MR. SEBY:  This will be the deposition of
25  James T. Startzell, taken pursuant to prior notice and

**Page 7**

1   agreement of counsel.  Ms. Bobet, can we agree that all
2   objections, except as to form of the question,
3   privilege, and responsiveness of the answer shall be
4   reserved until the time of trial or first use of this
5   deposition?
6          MS. BOBET:  Under the rules, I will agree
7   that, obviously, objections not to be waived, won't be
8   waived.  I certainly won't be making gratuitous
9   objections, but I reserve the right to make objections
10  as they come up.
11         LIEUTENANT COLONEL JAMES T. STARTZELL,
12  having verbally declared his testimony in this matter
13  is under penalty of perjury, testified as follows:
14              EXAMINATION
15  BY MR. SEBY:
16         Q.  Lieutenant Colonel Startzell, my name is
17  Paul Seby.  I'm both an attorney with the law firm of
18  of Greenberg Traurig and a Special Assistant Attorney
19  General for the State of North Dakota.  And I represent
20  the State of North Dakota.  And today, I will refer to
21  my clients collectively as "North Dakota" or the
22  "State" -- or "State of North Dakota."  You understand
23  that you've been sworn in this morning?
24         A.  Yes.
25         Q.  Please state your full name for the

**Page 8**

1   record, if you would.
2          A.  James Thane Paulding Startzell.
3          Q.  James Thane --
4          A.  -- Paulding Startzell.
5          Q.  Would you spell that, please.
6          A.  Yes.  P-a-u-l-d-i-n-g.
7          Q.  Thank you.  And you're in the United
8   States Army?
9          A.  Correct.
10         Q.  What is your title, sir?
11         A.  Currently, I'm a battalion commander.
12         Q.  And your rank, please?
13         A.  Lieutenant colonel.
14         Q.  Thank you.  Before we begin, I'd like to
15  go over a few ground rules, most of which are intended
16  to help the court reporter take down everything we say.
17  Everything we say is being written down.  Because of
18  that, I would like you to verbalize your responses,
19  please, with a yes or a no or other answers, as opposed
20  to a nod of your head yes or no.  Also, please no
21  uh-huhs or huh-uhs.  Is that acceptable?
22         A.  I understand.
23         Q.  Likewise, it's difficult for the court
24  reporter to take down what we're saying if we talk over
25  each other.  I will do my best not to interrupt you,

**Page 9**

1   and if you would please do the same, try not to
2   interrupt me and let me finish my questions.  Is that
3   acceptable?
4          A.  Yes.
5          Q.  If you need a break, please let me know.
6   I just ask that if there's a question pending, that you
7   answer it, then we can take a break.  I will suggest we
8   take a break every hour or so.  Is that acceptable?
9          A.  Yes.
10         Q.  If you do not understand a question,
11  please just let me know, ask me to repeat it or
12  rephrase it, and I will do my best to clarify what I'm
13  trying to ask you.  Okay?
14         A.  Yes.
15         Q.  And if you answer a question I have asked,
16  I'm going to assume that you have understood the
17  question that I'm asking.  Is that understood?
18         A.  I understand.
19         Q.  Is anyone in the room with you today?
20         A.  Yes.
21         Q.  Would you please identify the individuals
22  that are present with you?
23         A.  Jane Bobet.
24         Q.  And Ms. Bobet is your counsel?
25         A.  Yes.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 10

1      Q.   I'd ask you please to turn off your
2  electronic devices so that you're not distracted or
3  distracting me during the deposition.  I'd ask that if
4  you're relying upon some document during the deposition
5  to answer a question -- for example, notes that you've
6  made or emails that you have -- please let me know and
7  identify that document for the record, just as you
8  would if we were in a room together.  Okay?
9      A.   Understood.
10      Q.   Do you have any questions about these
11  instructions?
12      A.   No.
13      Q.   And, Lieutenant Colonel Startzell, do you
14  understand that you're obligated to tell -- by oath to
15  tell the truth today?
16      A.   Yes.
17      Q.   Do you understand that your deposition
18  today has the same force and effect as if you were in
19  front of a judge or a court?
20      A.   Yes.
21      Q.   Do you understand that portions of your
22  deposition may be shown to the court if this case were
23  to go to trial?
24      A.   Yes.
25      Q.   Do you understand that if you fail to tell

Page 11

1  the truth today, that is considered perjury?
2      A.   Yes.
3      Q.   So you'll agree to tell the truth today?
4      A.   Yes.
5      Q.   So you'll also agree to provide accurate
6  testimony?
7      A.   Yes.
8      Q.   To that end, is there anything today
9  preventing you from providing complete, accurate, and
10  truthful testimony?
11      A.   No.
12      Q.   Is there anything preventing you from
13  recalling or relating details?
14      A.   Only that it's been some time since the
15  incident.
16      Q.   Lieutenant Colonel Startzell, have you
17  ever given a deposition before?
18      A.   No; first time.
19      Q.   Have you ever testified under oath before?
20      A.   No.
21      Q.   Have you ever testified in court before?
22      A.   No.
23      Q.   Do you understand that your testimony is
24  under oath, the same as if you were in court and giving
25  your testimony?

Page 12

1      A.   Yes.
2      Q.   Before your deposition, had you or I ever
3  met or spoken?
4      A.   No.
5      Q.   Okay.  What did you do to prepare for your
6  deposition today, sir?
7      A.   So I met with my counsel on a couple
8  occasions to talk about the process and the questions
9  that might come up.
10      Q.   You met with them in person or otherwise?
11      A.   I met with them remotely, twice, over
12  videoconference; and then I met with Jane Bobet
13  yesterday in person.
14      Q.   And who was your videoconference with?
15      A.   The videoconference was with Jane Bobet,
16  Ian Kellogg, and I believe in attendance was Erica
17  Zilioli.
18      Q.   How long did you speak with them?
19      A.   Probably in the neighborhood of two to
20  three hours each.
21      Q.   Each time?
22      A.   Right.
23      Q.   Did they show you documents?
24      A.   Yes.
25      Q.   Did you talk to anyone else about this

Page 13

1  deposition?
2      A.   I informed my boss that I would be doing
3  it, but none of the content.
4      Q.   And your boss/commanding officer is who?
5      A.   My boss is a guy named Colonel Justin
6  Reese, R-e-e-s-e.
7      Q.   Is he at Fort Hood?
8      A.   He is.
9      Q.   How about anyone else besides Colonel
10  Reese?
11      A.   No.
12      Q.   Did you review any documents prior to this
13  deposition?
14      A.   Yes.
15      Q.   Which ones did you review?
16      MS. BOBET:  Objection.  To the extent the
17  answer calls for privileged communications, as far as
18  documents reviewed with counsel, I'll instruct the
19  witness not to answer.
20      MR. SEBY:  At all, or with respect to that
21  issue?
22      MS. BOBET:  To the extent the answer would
23  include documents reviewed with counsel, I'll instruct
24  him not to answer, as those are privileged and work
25  product.

Lieutenant Colonel James T. Startzell
November 19, 2021

---

**Page 14**

1    Q.   (BY MR. SEBY)  Lieutenant Colonel
2  Startzell, what documents that are not privileged did
3  you review yourself or with your counsel?
4         MS. BOBET:  Objection.  To the extent the
5  question is asking what documents the Lieutenant
6  Colonel reviewed with us as counsel, I'll instruct him
7  not to answer, because the answer would be covered by
8  attorney-client privilege and work product.
9    Q.   (BY MR. SEBY)  What documents, other than
10 those prepared by your counsel or other attorneys, did
11 you review?
12   A.   None.
13   Q.   Are you taking the advice of your counsel,
14 Lieutenant Colonel?
15   A.   Yes.
16   Q.   Did you review any documents on your own?
17   A.   I didn't, any time recently.  I may have
18 looked at documents for this back in -- late last year
19 when I was initially interviewed by the U.S. Attorney's
20 Office.
21   Q.   And "late last year" being 2020?
22   A.   Yes, approximately November or December of
23 2020.
24   Q.   And who did you speak with at that time?
25   A.   I believe it was Jane Bobet or maybe Erica

---

**Page 15**

1  Zilioli, one of the two.
2    Q.   Do you remember which?
3    A.   I don't.
4    Q.   Did you do any research about this
5  issue -- the issues in the current case?
6    A.   Can you explain what you mean by
7  "research"?
8    Q.   Did you do any investigation on the
9  internet or looking at files of any kind, other than
10 those provided by your counsel?
11   A.   No.
12   Q.   Did you make any notes about the events
13 involved in this case, such as a timeline or a
14 chronology of events?
15   A.   I did.
16   Q.   And where are those notes located?
17   A.   In my work notebook.
18   Q.   And where is your work notebook?
19   A.   It's here.
20   Q.   What does "here" mean?
21   A.   Here in the room.
22   Q.   Do you have it open and in front of you?
23   A.   I do not.
24   Q.   Okay.  Are you the sole author of that
25 document, of that notebook?

---

**Page 16**

1    A.   So the notes that I took were part of a
2  discussion with my attorneys regarding trying to
3  solidify the timeline of events.
4    Q.   And so you -- you wrote them and showed
5  them to your attorney or attorneys, or created them as
6  a result of discussions with your attorneys?
7    A.   Created them as a result of the
8  discussion.
9    Q.   Okay.  Lieutenant Colonel Startzell, your
10 name is James, as I understand.  And your middle name
11 is Thane, one of your middle names?
12   A.   Correct.
13   Q.   Do you often go by Thane?
14   A.   I do.
15   Q.   Okay.  Are you aware, Lieutenant
16 Startzell, of North Dakota's case against the United
17 States under the Federal Tort Claims Act, involving
18 $38 million in damages North Dakota seeks as a result
19 of the Corps and other Federal officials' actions
20 associated with the protests against the Dakota Access
21 Pipeline?
22   A.   Yes.
23   Q.   Have you ever seen a copy of the Complaint
24 filed by the State of North Dakota in this case?
25   A.   I don't think so.

---

**Page 17**

1    Q.   Is that a yes or a no?
2    A.   I don't recall seeing it; so, no.
3    Q.   Are you aware the United States District
4  Court for the District of North Dakota denied a motion
5  to dismiss this case filed by the United States?
6    A.   Yes.
7    Q.   Have you read the court's order denying
8  the United States' motion to dismiss?
9    A.   No.
10   Q.   Are you aware the court's -- the United
11 States District Court for the District of North Dakota
12 compelled discovery against the United States based
13 upon a motion filed by the State of North Dakota?
14   A.   I understand that's what happened, but I
15 don't know any details behind it.
16   Q.   Are you aware the United States District
17 Court for the District of North Dakota recently denied
18 a motion for partial and summary judgment filed by the
19 United States?
20   A.   Yes.
21   Q.   Have you read the court's order denying
22 the United States' motion for partial summary judgment?
23   A.   No.
24   Q.   Okay.  Lieutenant Colonel Startzell, can
25 you tell me about yourself, starting with, where were

---

Lieutenant Colonel James T. Startzell
November 19, 2021

1  you born?

2      A.   I was born in Frankfurt, Germany.

3      Q.   And in what year?

4      A.   1980.

5      Q.   And what is your current address, sir?

6      A.   7193 Tunisia Loop -- Tunisia, like the

7  country, T-u-n-i-s-i-a -- Fort Hood, Texas 76544.

8      Q.   How long have you lived at that address,

9  Lieutenant Colonel?

10      A.   Two-and-one-half years.

11      Q.   Where did you live prior to that

12  residence?

13      A.   I lived in Omaha, Nebraska.

14      Q.   Can you, Lieutenant Colonel, explain and

15  describe your educational background?

16      A.   Went to the U.S. Military Academy at West

17  Point, bachelor's of science in civil engineering; and

18  then after that got a master's from the Missouri

19  University of Science and Technology in engineering

20  management.

21      Q.   Any other post-doctorate degrees?

22      A.   Post-doctorate?

23      Q.   I'm sorry.  Post-university degrees?

24      A.   Yes.  Master of the arts in organizational

25  psychology from Columbia University.

1      Q.   And was that the most recent of your

2  degrees that you obtained?

3      A.   Yes.

4      Q.   And when did you obtain that degree in

5  operational (sic) psychology?

6      A.   Just to clarify, organizational

7  psychology.

8      Q.   Pardon me.  Organizational.

9      A.   That was in 2013.

10      Q.   Okay.  And what does that discipline

11  involve, sir?

12      A.   Primarily concerned with leadership,

13  organization change, organization development.

14      Q.   And with respect to your military service,

15  Lieutenant Colonel, when did you enter the United

16  States Army?

17      A.   2002.

18      Q.   And that was upon graduation from West

19  Point?

20      A.   Yes.

21      Q.   What locations have you served since you

22  graduated from West Point?

23      A.   Fort Hood, Texas, first, from 2002 to

24  2007.  Fort Leonard Wood, Missouri, 2007 to 2008.

25  Schweinfurt, Germany, 2008 to 2010.  Norfolk, Virginia,

1  2010 to 2011.  West Point, New York, 2011 to 2012.

2  Fort Bliss, Texas, 2013 to 2016.  Omaha, Nebraska, 2016

3  to 2019.  And Fort Hood, Texas, 2019 to the present.

4      Q.   Thank you.  Have you received any

5  commendations or awards in your career, sir?

6      A.   Yes.

7      Q.   Can you please explain and describe what

8  those are?

9      A.   So there's an Army Achievement Medal, and

10  I received maybe four or five of those.  Army

11  Commendation Medal, I received three or four of those.

12  Meritorious Service Medal, three.  The Bronze Star

13  Medal, one.  And the Defense Meritorious Service Medal,

14  one.

15      Q.   Did you receive any of those as a result

16  of your service in Omaha, Nebraska?

17      A.   Yes.

18      Q.   And what time period did you receive those

19  while you were stationed in Omaha, Nebraska?

20      A.   I believe one was in 2019 -- or, actually,

21  it was 2020; and then one as I left the district in

22  2020 -- correction, it was 2017 and then 2020 --

23  2019 -- sorry, 2017 and 2019.

24      Q.   Okay.  And those two medals or two

25  commendations and medals that you received in Omaha in

1  2017 and 2019, is what I heard say, what were those

2  associated with?

3      A.   One was for the Dakota Access Pipeline

4  space that we're talking about, and one was for service

5  to the district for the three years that I was there.

6      Q.   And what year was the one received with

7  respect to the Dakota Access Pipeline matter that you

8  mentioned?

9      A.   2017.

10      Q.   And can you explain what that commendation

11  was with regard to the Dakota Access Pipeline, or DAPL?

12  Was there any specific subject matter recognition

13  associated with that commendation, sir?

14      A.   I think the best way to describe it was

15  just leadership through the challenging situation.

16      Q.   And what events are you referring to as

17  "the challenging situation"?

18      A.   Pretty much longer than normal hours,

19  working and dealing with a problem set that was

20  unconventional or not normal.

21      Q.   Okay.  Have you ever received any demerits

22  or been the subject of disciplinary action?

23      A.   No.

24      Q.   Do you have any certifications or

25  licenses, other than your degrees?

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 22

1    A.  Yes.  Professional engineer, licensed in
2  the state of Virginia, and a project management
3  professional.
4        Q.  I'm sorry.  That last one?
5    A.  Project management professional.
6        Q.  And who issues that license or
7  certification?
8    A.  It's the Project Management Institute,
9  PMI.
10       Q.  Are you a member of any professional
11  organizations?
12   A.  Yes.
13       Q.  Which ones?
14   A.  PMI, American Society of Civil Engineers,
15  the Society of American Military Engineers, and
16  Association of the United States Army.
17       Q.  With respect to the various commissions
18  you mentioned a moment ago, Lieutenant Colonel, what
19  are -- what are -- what were your responsibilities at
20  each of those service locations?
21   A.  For my first assignment at Fort Hood,
22  Texas, I was a platoon leader, company executive
23  officer, battalion logistics officer, and a battalion
24  operations officer.  For my assignment at Fort Leonard
25  Wood, I was an engineer/officer/student.  For my

Page 23

1  assignment at Schweinfurt, Germany, I was a company
2  commander.
3            The next assignment in Norfolk, Virginia,
4  I was a project manager.  The next assignment at West
5  Point, New York, I was a student.  My assignment at
6  Fort Bliss, Texas, I was an engineer operations
7  officer, a brigade engineer, and a battalion operations
8  officer.  My assignment in Omaha, I was a deputy
9  district commander.  For assignment here most recently
10  at Fort Hood, I was the division engineer and then
11  battalion commander, to the present.
12       Q.  With respect to your period of service in
13  Omaha, who reported to you, sir?
14   A.  So I supervised the Public Affairs Office,
15  the tribal liaison, the small business deputy, the
16  training manager for the district, the executive
17  staff -- maybe a couple others, I'm trying to
18  remember -- the IT Department and the Human Resources
19  Department.
20       Q.  Okay.  And you mentioned among that list
21  that you gave, Lieutenant Colonel, the Public Affairs
22  Office.  Who, in particular, while you were in Omaha,
23  did you -- who reported to you from that office?
24   A.  The first chief was, I believe, Thomas
25  O'Hara.  For a time, it was Captain Ryan Hignite.  And

Page 24

1  I believe that was it.
2        Q.  And then did those individuals have staff
3  as well?
4    A.  Yes.
5        Q.  Would one of those persons on that staff
6  of that office have been Ms. Eileen Williamson?
7    A.  Yes.
8        Q.  And is Ms. Williamson -- was she present
9  in the Omaha District for your entire period of being
10  there?
11   A.  Almost the entire period.
12       Q.  And what do you mean by that?
13   A.  As I recall, I think she went to work for
14  our division towards the end of my time there.  And our
15  division was our higher Headquarters.
16       Q.  Was she in her position under your
17  supervision during the entire period of the protests
18  associated with the Dakota Access Pipeline?
19   A.  I believe so.
20       Q.  Okay.  And another entity you listed being
21  under your supervision in Omaha as the assistant
22  district commander was the tribal liaison, I believe;
23  is that correct?
24   A.  Yes.
25       Q.  And can you explain what that office did

Page 25

1  and who reported to you from that office?
2    A.  Yeah.  Our tribal liaison was named Joel
3  Ames.
4        Q.  I'm sorry?
5    A.  Joel Ames, A-m-e-s.
6        Q.  Thank you.
7    A.  And he was the primary conduit for
8  coordinating with tribal governments.
9        Q.  And was he present in that position for
10  your entire station in the Omaha District?
11   A.  Yes.
12       Q.  And who -- who did you report to,
13  Lieutenant Colonel, while you were stationed in Omaha,
14  Nebraska as the associate district commander?
15   A.  Colonel John Henderson was my direct
16  supervisor.
17       Q.  And was he your direct supervisor for your
18  entire period while stationed in Omaha, Nebraska?
19   A.  No.
20       Q.  Can you explain what period of time he was
21  present or not present?
22   A.  He was my commander from when I arrived in
23  2016 until 2017.  And after that, Colonel John Hudson
24  took command of the district for the remainder of my
25  time.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 26

1    Q.   Do you recall, in 2017, the specific date
2  that Colonel Henderson was no longer your direct
3  supervisor?
4        A.   I cannot, but I think it was June of 2017.
5        Q.   And he was no longer your direct
6  supervisor after June of 2017 because of what?
7        A.   He had completed three years in district
8  command.
9        Q.   And is there something special about three
10 years in district command that you can explain further?
11       A.   So it's typical for a district commander
12 to be in command for three years.  And I might actually
13 be wrong about that.  He may have only done two years
14 in command, but I'm not a hundred percent on that.
15       Q.   Did he leave the district after June of
16 2017, the Omaha District?
17       A.   Yes.
18       Q.   Did he leave under any circumstances that
19 you're aware of, other than being reassigned to a
20 different location?
21       A.   He was in the process of retirement, so he
22 retired at that time.
23       Q.   He retired from the United States Army?
24       A.   Yes.
25       Q.   Do you stay in touch with Colonel

Page 27

1  Henderson?
2        A.   I've corresponded with him maybe twice,
3  maybe three times, since he departed Omaha.
4        Q.   Since June of 2017?
5        A.   Yes.
6        Q.   Do you recall when those instances were
7  that you communicated with him?
8        A.   I don't.
9        Q.   Were any in the last two years?
10       A.   I can't recall.
11       Q.   How did you communicate with him?
12       A.   Christmas cards, usually family Christmas
13 cards.  And I think he reached back out to me at one
14 point for something that he was looking for, as far as
15 a product from his time with me in the district.
16       Q.   Can you explain what that means, looking
17 for a product?
18       A.   Yeah.  I think he may have asked me for
19 some information that we had talked about, but I don't
20 remember the contents.  I don't remember what it was.
21       Q.   Did it pertain to the Dakota Access
22 Pipeline protest or matter?
23       A.   I don't remember.
24       Q.   Have you spoken with him about your
25 deposition today?

Page 28

1        A.   No.
2        Q.   Have you spoken to him about North
3  Dakota's suit against the United States?
4        A.   No.
5        Q.   Lieutenant Colonel, can you describe what
6  you did -- your duties and responsibilities with
7  respect to the Dakota Access Pipeline matter?
8        A.   So I was the deputy district commander.
9  And my -- in that role, my primary responsibilities
10 were acting as the chief of staff and coordinating with
11 the division chiefs for our district and providing
12 information and recommendations to the commander.
13       Q.   To Colonel Henderson?
14       A.   Yes.  And then natural to the job was
15 solving problems that were day-to-day problems that
16 came up.
17       Q.   Was Colonel Henderson ever absent from the
18 Omaha District for any period of time greater than a
19 week during your service as deputy district commander?
20       A.   I don't recall, but it is likely.
21       Q.   And how did you first get involved with
22 the Dakota Access Pipeline matter?
23       A.   When I started as the deputy commander, I
24 had heard that there were some -- some Native American
25 tribes that were protesting the construction of the oil

Page 29

1  pipeline.  And so that's when I first learned about the
2  controversy.
3        Q.   And when would that have been?
4        A.   That was probably June or July -- probably
5  June of 2016.
6        Q.   Do you recall what -- with more
7  specificity what you're referring to?
8        A.   Can you explain your question again?
9        Q.   I'm asking, Lieutenant Colonel, for you to
10 elaborate on what you meant by you heard there was
11 Native American protesting of the construction of the
12 DAPL pipeline.  What does that mean?
13       A.   My predecessor, when I was doing my job
14 handover with him, had told me that there was a Native
15 American group that was doing a run to Omaha -- similar
16 to the Olympic relay where you hand off things along
17 the way -- and that they had completed a run, and the
18 ending destination was our Omaha District Headquarters.
19       Q.   Had that run occurred by the time you took
20 your position, or was it after that?
21       A.   It was shortly before I took the position.
22       Q.   Okay.  I'd like to ask you about certain
23 personnel I understand are associated with or employed
24 by the United States Army Corps of Engineers or the
25 United States Department of the Army during the period

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 30

1 of time of March of 2016 to March of 2017.  So I'm
2 going to indicate their name.  If you would tell me if
3 you know of or know the person and what their position
4 and responsibilities are.  Okay?
5     A.   Understood.
6     Q.   Todd Semonite?
7     A.   Yes.  Lieutenant General Semonite was the
8 chief of engineers, the senior officer in charge of the
9 Corps of Engineers.
10     Q.   The whole Corps?
11     A.   Yes.
12     Q.   And did you know Mr. -- or Lieutenant
13 General Semonite?
14     A.   Yes.
15     Q.   Do you still maintain communications with
16 him?
17     A.   No.
18     Q.   Donald Jackson?
19     A.   Yes.  He was the deputy commander for the
20 Corps of Engineers for the Civil Works mission, I
21 believe.
22     Q.   Do you know Mr. Jackson?
23     A.   I have worked with him, but not much.  I
24 would not say that I know him, other than working with
25 him a couple times.

Page 31

1     Q.   Scott Spellmon?
2     A.   Yes.  He was our division commander.
3     Q.   And can you explain the relationship
4 between the Omaha District and the division led by
5 Mr. Spellmon?  And I apologize, I don't know his rank
6 at the moment.
7     A.   Yeah.  Major General Spellmon, he was the
8 division commander, which is the Headquarters above the
9 district.
10     Q.   Is that defined by a region, the division?
11     A.   Yes, yes.  He was the commander for the
12 Northwestern Division.
13     Q.   And how many districts are comprised
14 within the division?
15     A.   Five.
16     Q.   And so there are five district commanders
17 that report to Major General Spellmon?
18     A.   Correct.
19     Q.   Colonel Henderson, at that time, being
20 one?
21     A.   Yes.
22     Q.   Okay.  And what was your professional
23 relationship with Major General Spellmon?
24     A.   He was my senior writer.  As the division
25 commander, he was my boss's boss.

Page 32

1     Q.   And would protocol have been that you
2 communicated with Major General Spellmon or always
3 through Colonel Henderson?
4     A.   Normally, communications would be through
5 the district commander.  However, if the district
6 commander were traveling or if there was an urgent
7 requirement, there were times when I would communicate
8 directly with Major General Spellmon.
9     Q.   Did some of those times occur during the
10 DAPL protest events of March 2016 to March 2017,
11 approximately?
12     A.   I believe there were a few, yes.
13     Q.   Do you stay in communication with Major
14 General Spellmon?
15     A.   No.
16     Q.   Craig Schmauder?
17     A.   Can you say that name again, please?
18     Q.   Craig Schmauder, S-c-h-m-a-u-d-e-r.
19     A.   I don't recall that name.
20     Q.   David Cooper?
21     A.   Yes.  I believe he was the Corps of
22 Engineers' counsel, potentially.
23     Q.   Can you elaborate on what you mean by
24 that?
25     A.   I think he was a lawyer at the Corps of

Page 33

1 Engineers Headquarters.
2     Q.   Located in Washington, D.C.?
3     A.   Correct.
4     Q.   And did you interact with Mr. Cooper
5 during the DAPL protest events of approximately March
6 of 2016 to March of 2017?
7     A.   I don't think so.
8     Q.   Milt Boyd?
9     A.   I'm not a hundred percent certain, but I
10 believe he was also a member of the counsel at USACE
11 Headquarters.
12     Q.   Also an attorney for the Corps of
13 Engineers?
14     A.   Yes.
15     Q.   Jennifer Greer?
16     A.   I remember her name, but I can't remember
17 her position.
18     Q.   Did you ever work with Ms. Greer?
19     A.   I don't recall.  Not closely.
20     Q.   Lowry Crook?
21     A.   The name is familiar, but I don't recall
22 the relationship.
23     Q.   Thomas Tracy?
24     A.   Yes.  Tom Tracy was the chief of our
25 counsel at the Omaha District.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 34

1    Q.   And did you frequently interact with
2  Mr. Tracy?
3    A.   Yes.
4    Q.   Did that interaction include the period of
5  March of 2016 to March of 2017, approximately?
6    A.   Yes.
7    Q.   And did the subject matter include the
8  Dakota Access Pipeline?
9    A.   Yes.
10    Q.   And do you recall the last individual --
11  actually, near the last individual I'm going to ask
12  you -- Karen Durham-Aguilera?
13    A.   Yes.  I remember her being an SES, Senior
14  Executive Service employee.  And I believe she worked
15  at Corps of Engineers Headquarters as the SES for Civil
16  Works.
17    Q.   I'm sorry.  SDS?
18    A.   SES, Senior Executive Service.  That's the
19  general officer level equivalent to civilian rank.
20    Q.   Do you recall what Ms. Durham-Aguilera's
21  role and involvement with you was, involved?
22    A.   I don't think that I ever worked with her
23  closely.  But as the SES in charge of Civil Works, she
24  would have had knowledge of the Dakota Access Pipeline.
25    Q.   So she was the -- if I understand what you

Page 35

1  were saying -- let me explain to you what I understand
2  you've said.  Tell me if this is accurate, please.  She
3  was the officer level equivalent, but a civilian, and
4  in charge of the Civil Works?
5    A.   I believe that was her position, yes.  The
6  civilian counterpart to Major General -- I forgot his
7  name.  You just said it a minute ago.
8    Q.   Todd Semonite?
9    A.   No.
10    Q.   Donald Jackson?
11    A.   Jackson, yes.  I believe she was the
12  civilian counterpart to Major General Jackson, with
13  oversight for Civil Works in the Corps of Engineers.
14    Q.   Lieutenant Colonel Startzell, can you
15  explain what the Civil Works is within the Army Corps
16  of Engineers or the Department of the Army?  I'm not
17  sure which way to characterize it.  If you'd correct me
18  on that, please.
19    A.   Yeah.  So the Corps of Engineers is a
20  direct reporting Headquarters to the Department of the
21  Army.  And its responsibilities include military
22  construction and Civil Works missions.
23    MR. SEBY:  I've lost the audio.
24    MS. BOBET:  Can you hear us?
25    MR. SEBY:  Yes.  I could tell Lieutenant

Page 36

1  Colonel Startzell was speaking, but I did not hear what
2  he said.
3    A.   The Civil Works mission is primarily
4  oriented towards projects and maintenance with the
5  nation's ports and rivers.
6    Q.   (BY MR. SEBY)  Okay.  And does that have
7  its own command structure, if you will, civilian
8  structure?
9    A.   No.  It's all part of the Corps of
10  Engineers.
11    Q.   Who led the Civil Works -- do you call it
12  a Civil Works division or section?  What's the proper
13  way to refer to the Civil Works?
14    A.   I would just say it's the Civil Works
15  mission within the Corps of Engineers.
16    Q.   And does it have its own leadership, at
17  least within the Civil Works mission?
18    A.   Major General Jackson and Karen
19  Durham-Aguilera were the officers and civilians
20  responsible for oversight of that mission.
21    Q.   And is there anyone above a civilian,
22  above Ms. Karen Durham-Aguilera, at the time of your
23  service in Omaha and concurrent with the DAPL protests?
24    A.   I don't recall.
25    Q.   Do you know who Jo-Ellen Darcy is?

Page 37

1    A.   Yes.
2    Q.   And who is she, sir?
3    A.   From my recollection, she was the
4  assistant secretary of the Army for Civil Works.
5    Q.   Would she have been a senior person above
6  Major General Jackson or Ms. Karen Durham-Aguilera?
7    A.   Yes.
8    Q.   So she was at least Ms. Aguilera's boss?
9    A.   I would not say she was her boss.  I would
10  say she was a senior executive branch civilian with
11  oversight of the Army's Civil Works mission.
12    Q.   What would be her relationship to
13  Ms. Aguilera, hierarchy-wise, within the Department of
14  the Army?
15    A.   I don't think there was a formal
16  supervisory relationship, but she was the senior
17  elected representative that would provide guidance to
18  the Army on Civil Works.
19    Q.   Who's the "she" that you're referring to?
20    A.   Ms. Jo-Ellen Darcy.
21    Q.   Okay.  And where does -- where did --
22  during her position while you were at the Omaha
23  District, where did Ms. Karen Durham-Aguilera office?
24    A.   I believe her office was in USACE
25  Headquarters in Washington, D.C.

37:19-20
106
(offer
37:12-18
for neces-
sary
context)

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 38

1    Q.   She was at the Army Corps of Engineers
2  Headquarters in Washington, D.C.?
3    A.   Yes, to my recollection.
4    Q.   And how about -- thank you.  How about
5  Jo-Ellen Darcy?  Where did she office?
6    A.   I don't know where, but it was -- it was
7  in Washington, D.C.  I don't remember if she was in the
8  Pentagon or a different building.
9    Q.   All right.  I believe this is the last
10 person I want to ask you about.  Jason Dedosa,
11 D-e-d-o-s-a?
12   A.   I don't recall that name.
13   Q.   Do you recall ever meeting that individual
14 during the DAPL protests?
15   A.   No.
16   Q.   Do you recall working with an individual
17 by that name during the DAPL protests?
18   A.   No.
19   Q.   Do you recall that individual accompanying
20 Colonel Henderson to meet with the governor of North
21 Dakota during that protest?
22   A.   No.
23   Q.   So are you aware of why he would have
24 attended that meeting with Colonel Henderson and the
25 governor of North Dakota?

Page 39

1    A.   No.
2    Q.   Okay.  Lieutenant Colonel Startzell, I'd
3  like to ask, for my benefit and the benefit of the
4  record, what several acronyms are that appear to be
5  Corps- or Army-related.  If you'd help me explain what
6  those acronyms stand for, please.  CG?
7    A.   CG stands for commanding general.
8    Q.   SITREP?
9    A.   SITREP is situation report and update,
10 essentially.
11   Q.   FYSA?
12   A.   That stands for "For Your Situational
13 Awareness."
14   Q.   BLUF?
15   A.   Bottom line up front.
16   Q.   I'm sorry.  Bottom line up front?
17   A.   Bottom line up front.
18   Q.   TAG?
19   A.   I believe that stands for "The Adjutant
20 General," but I'm not a hundred percent sure on that.
21   Q.   GO?
22   A.   Can you say that one more time?
23   Q.   Two letters, G and O.
24   A.   Probably general officer.
25   Q.   CRS?

Page 40

1    A.   C, as in Charlie --
2    Q.   C, as in Charlie, Ronald, Sierra.
3    A.   I don't recall what that stands for.
4    Q.   NWD?
5    A.   That stands for Northwestern Division.
6    Q.   CCIRS?
7    A.   I believe what you said was Charlie,
8  Charlie, India, Romeo, Sierra?
9    Q.   Yes.
10   A.   So that would stand for Commander's
11 Critical Information Requirements.
12   Q.   And can you explain what that means?
13   A.   Essentially, it means anything that is an
14 important piece of information for the commander to
15 know to make decisions.
16   Q.   Are they defined categories of types of
17 information?
18   A.   Sometimes they're defined and documented,
19 other times they are informal.
20   Q.   I understand that there are defined
21 categories of CCIRS's by numeric reference -- or,
22 pardon me, alphabetic reference.  Do you recall what
23 CCIRS "c" stands for?
24   A.   I don't recall what that CCIRS was.
25   Q.   Or "k," CCIR "k"?

Page 41

1    A.   I don't recall.
2    Q.   How about CCIRS "s"?
3    A.   I don't recall.
4    Q.   Lieutenant Colonel Startzell, how about
5  the acronym OPSUM?
6    A.   OPSUM stands for Operational Summary.  It
7  is usually just a summary of what has happened.
8    Q.   How about the acronym NOW?
9    A.   I believe that should be NWO, which is the
10 abbreviation for Omaha District.
11   Q.   Thank you.  WWD?
12   A.   I don't recall what that is.
13       MR. SEBY:  Okay.  Would you like to take a
14 short break?
15       THE DEPONENT:  That would be great.
16       MR. SEBY:  Sure.  Why don't we plan a
17 break of ten minutes, if that's okay with you,
18 Ms. Bobet?
19       MS. BOBET:  That's all right with me.
20 Thank you.
21       MR. SEBY:  Lieutenant Colonel, does that
22 sound okay?
23       THE DEPONENT:  Sounds good.
24       MR. SEBY:  Thank you.
25       (Recess, 9:40 a.m. to 9:52 a.m. MST.)

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 42

1     MR. SEBY:  We're back from break.
2     Q.   (BY MR. SEBY)  Lieutenant Colonel
3  Startzell, I appreciate the explanations you gave about
4  the various individuals within the Corps -- within the
5  Department of the Army.  Is there an organizational
6  chart, that you're aware of, that puts all this
7  relationship between these various individuals in the
8  hierarchy that existed at the time of your service in
9  the Omaha District?
10    A.   I know there are.  I just couldn't tell
11  you where they exist right now.
12    Q.   Okay.  Have you ever been to the state of
13  North Dakota?
14    A.   Yes.
15    Q.   Do you recall when you went to North
16  Dakota?
17    A.   I went there once or twice as the deputy
18  district commander and then once on vacation.
19    Q.   And the two times -- the one or two times
20  that you mentioned going there as district commander,
21  do you recall when that was?
22    A.   I don't remember the timeline.
23    Q.   Was it during the period of the DAPL
24  protest?
25    A.   No.  It was after.

Page 43

1     Q.   Do you recall when?
2     A.   Sometime in 2017 or '18.
3     Q.   Did you go to the site of the DAPL
4  protests?
5     A.   No.
6     Q.   Do you recall what the subject of your
7  trip was; trips, plural?
8     A.   Yes.  I visited the Garrison Project once,
9  which is one of the lakes up there; and I visited
10  Minot, North Dakota, which is an Air Force base where
11  we had construction projects.
12    Q.   And then your time on vacation, where in
13  North Dakota did you go?
14    A.   I think I just drove through the state.
15    Q.   Do you recall your route?
16    A.   I don't.
17    Q.   Did you go to the capital city of
18  Bismarck, North Dakota?
19    A.   I did go to Bismarck once, and I believe
20  that was on the way to the Garrison Project.
21    Q.   Did you go to any part of the state of
22  North Dakota south of the capital city, south of
23  Bismarck?
24    A.   I can't remember the geography, what
25  direction the Garrison Project was.  But the only place

Page 44

1  I went was the Garrison Project and then returned to
2  Bismarck.
3     Q.   How about the Oahe Project?  Have you ever
4  been to the Oahe Project, O-a-h-e?
5     A.   I believe I did, yes.
6     Q.   And when was that, sir?
7     A.   I cannot remember, but it was after the
8  events of the Dakota Access Pipeline.
9     Q.   And was that part of the one or two trips
10  you took there as deputy district commander?
11    A.   I think the Oahe Project Office is
12  actually in South Dakota.  I'm trying to remember my
13  facts.  But I went to the project Headquarters, which I
14  believe is in South Dakota, but I could be wrong on
15  that.
16    Q.   Have you ever been to or visited the
17  Standing Rock Sioux Tribe reservation?
18    A.   I don't believe so.
19    Q.   Lieutenant Colonel Startzell, when did you
20  first become familiar with the Corps of Engineers
21  regulations and policies regarding and governing the
22  use of its lands, or lands that Congress has directed
23  that it be responsible for?
24    MS. BOBET:  Objection, foundation.  You
25  can answer.

Page 45

1     A.   It would be sometime around the time that
2  I became the deputy district commander.
3     Q.   (BY MR. SEBY)  And can you describe and
4  elaborate on the beginning of your familiarity, how
5  that occurred?
6     A.   I probably learned about those regulations
7  as I came on board and had discussions with the
8  division chiefs and project managers for the Natural
9  Resource Project.  And then I attended a new deputy
10  course for two or three days where we were given some
11  kind of training on that particular part of the Corps'
12  mission.
13    Q.   And where was the training held?
14    A.   It was in Louisville, Kentucky.
15    Q.   Do you recall attending that -- that
16  training in person?
17    A.   Yes, I did.
18    Q.   What did the course material involve?
19    A.   There was a block of instruction that
20  talked about each of the major mission areas that the
21  Corps of Engineers is responsible for.  And the Civil
22  Works' mission was one of those blocks of instruction.
23  And beyond that, I don't remember much about it.
24    Q.   Who were the teachers of the training
25  program?

Page 46

1    A.   I believe for that week it was the -- it
2 was probably the Civil Works chief for the Louisville
3 District, since they were the host for the training.
4         Q.   Is that where all of these trainings
5 occur, in Louisville?
6    A.   Every year a different district hosts it,
7 and the district determines who the subject matter
8 experts are who are going to teach the courses.  And
9 that year just happened to be the Louisville District.
10         Q.   Okay.  Do you recall who your -- the
11 training instructors were with respect to the Civil
12 Works subject matter?
13    A.   I don't.
14         Q.   Do you recall the course including
15 instruction on the Corps regulations, as published in
16 the Code of Federal Regulations?
17    A.   There was some discussion of it, but I
18 don't remember to what extent.
19         Q.   Did the coursework include a copy of the
20 Code of Federal Regulations?
21    A.   No.
22         Q.   Have you ever obtained, on your own, a
23 copy of the Corps regulations published in the Code of
24 Federal Regulations?
25    A.   I've seen excerpts, but I've never had a

Page 47

1 personal copy of the full document.
2         Q.   Did you do any self-training or self-
3 instruction on those -- the subject matter of the Corps
4 of Engineers regulations?
5    A.   I reviewed portions of it.  I would say
6 that was the extent of my self-training.
7         Q.   Do you recall which portions?
8    A.   I don't.
9         Q.   Were you -- did you receive instructions
10 in Louisville at that time with respect to the Corps
11 policies or regulations governing the use of Corps
12 properties?
13    A.   I don't recall.  There was probably some
14 brief discussion about it.
15         Q.   Including the use of the properties by
16 third parties?
17    A.   I don't know if that was discussed as part
18 of it.
19         Q.   How about the Corps of Engineers
20 regulations with respect to special use or special
21 event permits?
22    A.   I don't recall if that was discussed.
23         Q.   Apart from your training in Louisville,
24 what instruction did you receive with respect to the
25 Corps policies or regulations concerning special event

Page 48

1 or special use permitting?
2    A.   So I think I first became aware of the
3 special use permits as a tool during the Dakota Access
4 Pipeline events.
5         Q.   And can you elaborate on what you mean by
6 becoming aware of those types of permits and permitting
7 efforts?
8    A.   Yeah.  I believe when Chairman Archambault
9 was trying to do some kind of gathering or
10 demonstration on Corps lands, I believe one of our
11 employees raised the special use permit as a tool to
12 allow him to do that legally.  And I think that was the
13 first time I learned of that particular tool.
14         Q.   Someone told you about it, made reference
15 to it?  Is that what you're saying?
16    A.   Yes.
17         Q.   And upon hearing that, did you undertake
18 any training with respect to that tool or those types
19 of permitting processes?
20         MS. BOBET:  Objection, compound.
21         MR. SEBY:  Let me rephrase it, Lieutenant
22 Colonel Startzell.
23         Q.   (BY MR. SEBY)  Upon hearing about it, did
24 you conduct any research into what that involved?
25    A.   So I think the process for getting a

Page 49

1 special use permit was described for me by either the
2 project manager or potentially one of our division
3 chiefs.
4         Q.   And upon receiving that description, did
5 you undertake reviewing the actual policies or
6 regulations of the Corps of Engineers?
7    A.   I think I did see the title -- I think
8 it's Title 36.  I believe I did see the Title 36
9 excerpts that governed that.
10         Q.   And how did you see that?
11    A.   Can you ask the question again?
12         Q.   Let me back up.  Who was the individual
13 that told you about the Title 36 regulations?
14    A.   I don't recall, but it was probably --
15 probably the project manager, Eric Stasch, S-t-a-s-c-h.
16         Q.   And what did Mr. Stasch, or Stasch
17 (pronouncing), say to you with respect to Title 36
18 permitting?
19    A.   I think he just described the process for
20 getting a permit, special use permit.  But I don't
21 recall any more detail than that.
22         Q.   And did he give you excerpts of Title 36?
23    A.   I don't know if it was him or if it was
24 someone else who provided that to me.
25         Q.   Did you obtain or were you provided any

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 50

1 other Corps policy documents with respect to special
2 use permitting?
3        A.   I think it was just excerpts for Title 36
4 governing special use permits.
5        Q.   Any -- after Mr. Stasch gave you the
6 information you've described, did anyone else provide
7 you with information with respect to special use
8 permitting?
9        A.   I don't remember, but it's highly likely.
10       Q.   Do you recall it being highly likely that
11 you received additional information with respect to
12 special use permitting?
13       A.   Yes.
14       Q.   Who from?
15       A.   Probably our real estate division or our
16 counsel.
17       Q.   With respect to the real estate division,
18 who are you referring to?
19       A.   Our real estate division chief at the time
20 was Mr. David Chipman.
21       Q.   I'm sorry.  Can you spell that gentleman's
22 name?
23       A.   Charlie, hotel, India, papa, Mike, alpha,
24 November.
25       Q.   Thank you.  Do you recall what Mr. Chipman

Page 51

1 gave or told you about the special use permitting
2 process?
3        A.   I cannot recall any specifics.  I'm just
4 guessing that he would be the one to do it.
5        Q.   Do you recall when Mr. Chipman told you
6 about that?
7        A.   No.
8        Q.   Do you recall if Mr. Chipman's explanation
9 to you about that involved the events surrounding the
10 Dakota Access Pipeline protests?
11       A.   I think that was the reason we were
12 discussing the special use permitting.
13       Q.   Based upon your understanding of the
14 special use permit process, Lieutenant Colonel
15 Startzell, can you explain what you believe to be the
16 purpose of such permits?
17       A.   Yeah.  I would say the purpose was to
18 ensure that activities occurring on public lands that
19 are managed by the Corps of Engineers do not harm the
20 intended purposes of the project.
21       Q.   Are you familiar with who issues special
22 use permits?
23       A.   Can you ask that again?
24       Q.   Are you familiar with who is supposed to
25 issue special use permits?

Page 52

1        A.   My understanding is the district commander
2 normally approves those.
3        Q.   Would you agree that the purpose of a
4 special use permit is to protect the environment,
5 maintain law and order, and prevent damage to property
6 owned by the United States and managed by the Army
7 Corps of Engineers?
8        A.   That sounds like an accurate description,
9 yes.
10       Q.   Would you agree that a permit may include
11 conditions to prevent harm; and if harm occurs, to
12 remediate such harms?
13       A.   Yeah.  I think you can build in
14 stipulations to the special use permit to prevent the
15 project from being harmed.
16       Q.   Would you agree that a special use permit
17 should be sought and obtained prior to an activity
18 occurring on Corps-managed lands owned by the United
19 States?
20            MS. BOBET:  I'm sorry, Paul, can you
21 repeat the question?  I missed a word in there.
22            MR. SEBY:  Would the court reporter please
23 read back my statement?
24            (The last question was read back as
25 follows:  "Would you agree that a special use permit

Page 53

1 should be sought and obtained prior to an activity
2 occurring on Corps-managed lands owned by the United
3 States?")
4        A.   Yes, that would be the normal process.
5        Q.   (BY MR. SEBY)  Have you ever been involved
6 with special use permitting issues, other than those
7 associated with the Dakota Access Pipeline protests?
8        A.   No.
9        Q.   Okay.  Lieutenant Colonel Startzell, did
10 you ever meet with the chairman of the Standing Rock
11 Sioux Tribe?
12       A.   No.
13       Q.   Did you ever speak with him on the
14 telephone?
15       A.   I don't think so.  I don't recall speaking
16 to him.
17       Q.   Did you ever correspond with chairman --
18 the chairman of the Standing Rock Sioux Tribe?
19       A.   I don't recall it.  I don't think I did,
20 not directly.
21       Q.   Did you meet with or speak with -- pardon
22 me.  Did you meet with any other chairman of any other
23 Native American tribe in the district?
24       A.   I did.
25       Q.   And who would those individuals be?

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 54

1      A.   I believe I met with Chairman Fox of the
2   Mandan, Hidatsa, Arikara Tribe.  And that was sometime
3   later after the Dakota Access Pipeline.  I think he's
4   the only one I met directly.
5      Q.   Did you speak with any other individuals
6   who are chairmen or heads of any other Native American
7   tribe in the district?
8      A.   No, not that I recall.
9      Q.   At any time?
10      A.   Correct.
11      Q.   Do you believe that Chairman Archambault
12   of the Standing Rock Sioux Tribe directly called for
13   protesters to come to North Dakota to protest the
14   Dakota Access Pipeline?
15      A.   My understanding was that he encouraged
16   peaceful protests.
17      Q.   And what was the subject of the protest
18   that he was encouraging?
19      A.   My understanding was that he did not want
20   the pipeline crossing Lake Oahe near tribal lands.
21      Q.   Is the pipeline located on tribal lands?
22      A.   To my knowledge, it doesn't cross any
23   tribal lands.
24      Q.   What does it cross?
25      A.   So, to my awareness, it crossed Lake Oahe

Page 55

1   north of reservation lands.
2      Q.   Is the pipeline above ground or below
3   ground?
4      A.   I believe it's both.
5      Q.   Both?
6      A.   Both above and below ground.
7      Q.   And what evidence do you have, sir, for it
8   being above ground?
9      A.   I don't have any.
10      Q.   Okay.  How about where the pipeline
11   crosses Lake Oahe or the Missouri River?  Is it above
12   water or below?
13      A.   It's below.
14      Q.   What is your understanding of the
15   configuration of it being below the river?
16      A.   So what I understand is using horizontal
17   directional drilling, the pipeline was placed
18   underneath the lake through that means.
19      Q.   The area where the pipeline crosses the
20   lake, below the lake, are there other utilities or
21   construction projects located in the vicinity of where
22   the pipeline crosses underneath the Missouri River and
23   Lake Oahe?
24      A.   I believe there was another pipeline that
25   had been put in previously in the same vicinity that

Page 56

1   went under the lake, also, if I'm recalling correctly.
2      Q.   Are you familiar with what kind of
3   pipeline that is?
4      A.   I seem to remember it was a natural gas
5   pipeline, but I can't be sure.
6      Q.   How about above ground, above water, are
7   there any other utility structures or crossings, that
8   you're aware of?
9      A.   Not that I know of.
10      Q.   You've never been to the site?
11      A.   Correct.
12      Q.   Not during your tenure as deputy district
13   commander?
14      A.   I don't think I've ever been to the site.
15      Q.   Have you ever visited any of the protest
16   encampments associated with protesting the Dakota
17   Access Pipeline?
18      A.   I don't think so.
19      Q.   Are you familiar with where those
20   encampments were located?
21      A.   On the map, yes.
22      Q.   Okay.  Are you aware of the Bureau of
23   Indian Affairs?
24      A.   Yes.
25      Q.   Which agency of the United States is the

Page 57

1   Bureau of Indian Affairs associated with?
2      A.   Department of the Interior, I think.
3      Q.   What is the law enforcement role of the
4   Bureau of Indian Affairs?
5      A.   My understanding is that they are -- their
6   authorities involve regulating activities and personnel
7   on tribal lands.
8      Q.   And in that regard, do they perform a law
9   enforcement function on tribal lands?
10      A.   To my knowledge, yes.
11      Q.   Okay.  Are you familiar with the name of
12   the county within the state of North Dakota where the
13   Corps of Engineers Oahe Project lands are included?
14      A.   I believe Morton County was the county
15   that we dealt with most for this project.
16      Q.   I'm sorry.  With respect to my question,
17   please answer the question.
18      A.   Can you ask it again?
19      Q.   Sure.  Which county in the state of North
20   Dakota is the Dakota Access Pipeline crossing located?
21      A.   I can't be sure.
22      Q.   How about the Corps-owned and -managed
23   lands associated with that site?
24      A.   I don't remember what counties.
25      Q.   Do you know who Darren Cruzan is?

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 58

1     A.   The name does not ring a bell.
2     Q.   Are you familiar with the geographic
3  location of the Standing Rock Sioux Tribe reservation?
4     A.   In general, yeah.  It has been some time
5  since I've seen a map with it; but, yes.
6     Q.   Were the encampments protesting -- were
7  the encampments, consisting of individuals, protesting
8  the Dakota Access Pipeline located on Corps of
9  Engineers property?
10     A.   I believe some of them were.
11     Q.   Which ones?
12     A.   Which encampments?  Is that what you're
13  asking?
14     Q.   Yes, sir.
15     A.   So I think there was an encampment on the
16  south side of the Cannonball River and on the north
17  side.  And there were several smaller encampments,
18  but -- the details of which I can't describe right now.
19     Q.   Are you familiar with them by name?
20     A.   I can remember some of the names, yes.
21     Q.   Which were -- which camps were on the
22  north side of the Cannonball River?
23     A.   I think the Oceti Sakowin Camp was north
24  of the river.  And that may be the same as the Seven
25  Council Camp, or that may be different.  I'm a little

Page 59

1  fuzzy on that.
2     Q.   And when did you become aware of the camps
3  located on Corps land?
4     A.   Sometime around August of 2016, I believe,
5  maybe July.
6     Q.   Does that mean you became aware of them
7  after they began to exist?
8          MS. BOBET:  Objection; foundation, assumes
9  facts.
10     A.   So I knew there were encampments that were
11  starting that summer, but I cannot remember when I
12  became aware of encampments that were on Corps-managed
13  land.
14     Q.   (BY MR. SEBY)  But when you became aware,
15  were they in existence?
16     A.   I don't remember exactly, but probably.
17     Q.   Are you aware of any camps located on
18  lands other than owned by the Corps of Engineers?
19     A.   Yes.
20     Q.   What evidence do you have for that?
21     A.   At the time of the events, I remember
22  hearing reports from law enforcement and media and our
23  own Project Office that some of the camps were off of
24  Corps land as well.
25     Q.   So others told you that?

**ND OBJ:**
Hearsay

Page 60

1     A.   Yes.
2     Q.   And which ones are you referring to
3  understanding?
4     A.   Which camps?
5     Q.   Yes.
6     A.   I can't remember the names of them.
7     Q.   With respect to the camps located on the
8  Corps properties, were you involved in the
9  establishment of any conditions or requirements for the
10  operation of those camps?
11     A.   Not establishing the camps, no.  I was
12  involved with the special use permit discussion later
13  after they started.
14     Q.   Which discussion?
15     A.   Whatever discussions we had about special
16  use permitting.  I don't think there was just one
17  discussion.  I think it was many.
18     Q.   And how many special use permits are you
19  referring to?
20     A.   So I believe there were a total of three,
21  two or three.
22     Q.   So you were involved in the permitting
23  process for those instances?
24     A.   I would say I was aware of the permitting
25  action and I provided recommendations.

Page 61

1     Q.   And who did you provide the
2  recommendations to?
3     A.   To the district commander.
4     Q.   Colonel John Henderson?
5     A.   Yes.
6     Q.   To your knowledge, did the Corps provide
7  for the following things at such camps.  Did the Corps
8  provide for areas for the parking of vehicles?
9     A.   I don't think so.
10     Q.   How about for the disposal and burning of
11  trash?
12     A.   No.
13     Q.   How about for the management or disposal
14  of human waste?
15     A.   No.
16     Q.   How about for the provision of medical
17  services?
18     A.   No.
19     Q.   How about for the management of the safety
20  of structures erected?
21     A.   So -- no, I don't think so.
22     Q.   How about for the provision of care for
23  children or elderly individuals?
24     A.   No.
25     Q.   Are you aware of the Corps imposing any

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 62

1  requirements for preventing environmental damage to the
2  Corps-managed properties?
3        A.   Yes.  Through the special permitting
4  process there was -- there were explanations in there
5  of what was acceptable and what was not acceptable for
6  those things.
7        Q.   What evidence do you have for that, sir?
8        A.   When the special use permit is requested
9  and processed, there are -- on a form you fill out
10 there are specific rules that are required to be
11 followed.
12       Q.   And I understood you to say you made
13 recommendations with respect to special use permitting
14 to Colonel Henderson?
15       A.   Yes.
16       Q.   Lieutenant Colonel Startzell, how did you
17 make those recommendations, in what form?
18       A.   Sometimes verbal, sometimes written.  I
19 mean, I don't think I recall specifically for these
20 special use permits, how that discussion happened.
21       Q.   And you mentioned, I believe, and correct
22 me if I'm wrong, that there were two to three special
23 use permits that you were involved in?
24       A.   Yes.
25       Q.   Would you please identify each of them,

Page 63

1  who you're referring to.
2        A.   Sure.  The first one was Chairman
3  Archambault's request to have a space to demonstrate.
4  I believe the second one was a special use permit for
5  LaDonna Brave Bull Allard.  And the third was a special
6  use permit for a prayer ceremony for some elders.
7        Q.   Okay.  Colonel -- Lieutenant Colonel
8  Startzell, were you familiar with the demographics of
9  the people in the camps located on Corps land?
10       A.   Can you describe what you mean by
11 "familiar"?
12       Q.   Who were these people?
13       A.   So my understanding was it was a mix of
14 people partially composed of tribal members, partially
15 composed of people who claimed Native American descent,
16 but weren't officially tribal members, and then some
17 were not related to the tribes at all.
18       Q.   Which of those categories comprised the
19 majority of the occupants of the camps, to your
20 knowledge?
21       A.   I'm not very sure, but I believe most of
22 the demonstrators were not members of the tribe.
23       Q.   Are you familiar with a camp called the
24 Red Warrior Camp?
25       A.   I remember the name, yes.

Page 64

1        Q.   Are you familiar with it beyond recalling
2  the name?
3        A.   No, not really.  I mean, I can't really
4  remember where it was located, exactly, and I don't
5  remember who exactly occupied that camp.
6        Q.   Does a person by the name of Cody Hall
7  refresh your recollection?
8        A.   No.
9        Q.   Is it your understanding that the Red
10 Warrior Camp was located within another camp?
11       A.   I don't remember.
12       Q.   Are you familiar with an organization
13 known as the AIM, or the American Indian Movement?
14       A.   Yes.
15       Q.   What's your understanding of that
16 organization?
17       A.   My understanding of AIM was that it was a
18 group of Native Americans who -- or people who were
19 sympathetic to Native Americans who espoused violent
20 means of protesting.
21       Q.   How did you become familiar with that
22 organization?
23       A.   I believe I learned about it during the
24 Dakota Access Pipeline.
25       Q.   Did you ever meet or speak with any

Page 65

1  individual associated with that organization?
2        A.   No.
3        Q.   Was it your understanding that members of
4  that association were present in camps located on Corps
5  property?
6        A.   My understanding was there were a small
7  number of people who were associated with that
8  movement.
9        Q.   When did you -- when did you first learn
10 that?
11       A.   I don't remember.
12       Q.   How did you learn that?
13       A.   I can't remember the details, but it's
14 possible that I learned it through discussions with
15 either the North Dakota EOC or the local law
16 enforcement.
17       Q.   What is the North Dakota EOC?
18       A.   The North Dakota EOC is the Emergency
19 Operations Center.
20       Q.   Where is that located?
21       A.   I believe it's in Bismarck, North Dakota.
22       Q.   Did you ever attend in-person meetings of
23 the North Dakota EOC?
24       A.   I don't think so, no.
25       Q.   Do you know what EOC stands for?

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 66

1       A.   Emergency Operations Center.
2       Q.   What is your understanding of why that EOC
3  was created?
4       A.   I think the governor stood up the EOC to
5  deal with the protests.
6       Q.   Did you ever participate in discussions
7  during meetings of the EOC, by phone?
8       A.   It's possible one or two teleconferences;
9  but I don't recall, exactly.
10      Q.   You don't know?
11      A.   Yeah.  I don't recall, exactly.
12      Q.   I'm trying to understand, when you say you
13  learned about it from the North Dakota EOC, the means
14  by which you learned of it?
15      A.   So if I learned about it through the North
16  Dakota EOC, I would have gotten that information
17  through my security manager.
18      Q.   Who is that individual?
19      A.   Mr. Roger Roby, R-o-b-y.
20      Q.   And did Mr. Roby, to your knowledge,
21  attend meetings of the North Dakota EOC?
22      A.   I think he did once or twice.  But
23  typically, he would call in, and he would be part of
24  their online -- their online significant activities
25  reports.

---

**66:10**
**106 (offer 66:11 for necessary context)**

**ND OBJECTION:** As to 66:20-67:6, Foundation; Speculation

---

Page 67

1       Q.   Was he an active participant on behalf of
2  the Corps of Engineers in the State of North Dakota's
3  Emergency Operations Center?
4       A.   He actively communicated with them, I
5  would say, yes.  But I don't think he attended in
6  person but once or twice, maybe.
7       Q.   Who did the Army Corps of Engineers assign
8  to participate in person in those EOC meetings?
9       A.   Eventually, we assigned a man named John
10  Voeller, who was one of the employees at the Oahe
11  Project Office.
12      Q.   What is your understanding of
13  Mr. Voeller's role in participating in the State's EOC
14  meetings?
15      A.   He was our liaison, so he would attend
16  meetings there once or twice a day, and he would share
17  information back and forth between our district and the
18  State EOC.
19      Q.   And you say he eventually became that
20  person who liaisoned.  What do you mean by
21  "eventually"?
22      A.   We determined we weren't getting enough
23  information and dialogue with the State, so we decided
24  it was necessary to have someone tied in with them on
25  the ground.

Page 68

1       Q.   What do you mean you weren't getting
2  enough information, if you weren't there?
3       A.   So most of our information was telephonic
4  or by email, and we wanted someone who was there face
5  to face with the State.
6       Q.   Are you being critical of North Dakota?
7       A.   No.
8       Q.   Lieutenant Colonel Startzell, during your
9  involvement in the protests on Corps property
10  associated with the Dakota Access Pipeline, did you
11  author and circulate reports on -- with any frequency?
12      A.   So I would generally collect information
13  and provide that to my commander and his boss, yes.
14      Q.   And in what form did you do that?
15      A.   At first, I think it was just an email
16  update to my boss and to our division chiefs.  And then
17  eventually I started putting together a daily SITREP or
18  it was possibly a SITREP two to three times a week.
19      Q.   Were you the creator and distributor of
20  documents known as, quote, DAPL daily updates, end
21  quote?
22      A.   Yes.
23      Q.   And were those done as the name suggests,
24  on a daily basis?
25      A.   In general, yes.

Page 69

1       Q.   When did you start doing that?
2       A.   I don't remember the first one.  I don't
3  remember when we started them.
4       Q.   When did you stop doing that?
5       A.   I can't recall the date.
6       Q.   Did anyone else assist you in compiling
7  those?
8       A.   Yes.  I would get information from various
9  people to include in the update.
10      Q.   So is it fair to say that not all of the
11  information that you included you had firsthand
12  knowledge of?
13      A.   Yeah, I think it's fair, as I got my
14  updates from many different sources.
15      Q.   Who received your daily updates?  Was
16  there a standard distribution?
17      A.   Yes.  I believe it always went to my
18  commander, and probably the Northwestern Division, and
19  the Headquarters USACE.
20      Q.   Why did it go to the Headquarters of the
21  Army Corps of Engineers?
22      A.   We were trying to pass information faster,
23  and my commander was often traveling.
24      Q.   Did someone request that you include it --
25  include the Headquarters of the Army Corps of

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 70

1  Engineers?
2       A.   I don't remember, but it's very possible
3  that my commander told me that or that someone from
4  Headquarters requested to be added.
5       Q.   In your prior work as deputy division
6  commander, was that the first time that you were asked
7  or directed to include Senior Headquarters United
8  States Army Corps of Engineers officials?
9       A.   I think it was the first time that I
10  regularly did that, yes.
11       Q.   Had you ever had any communication
12  directly with that entity prior?
13            MS. BOBET:  Objection, vague.
14       Q.   (BY MR. SEBY)  Had you ever communicated
15  with the Headquarters of the United States Army Corps
16  of Engineers prior to your creation and distribution of
17  DAPL daily reports or updates?
18       A.   I don't remember.
19       Q.   Did anyone outside of the Corps receive
20  your DAPL daily updates?
21       A.   I don't remember if there was anyone else
22  on the list, outside of the Corps.
23       Q.   Anyone else in the United States
24  Government?
25       A.   It's possible, but I can't remember.

Page 71

1       Q.   Did you share it with the Standing Rock
2  Sioux Tribe?
3       A.   I don't remember.
4       Q.   Did you share it with any non-governmental
5  organization?
6       A.   I don't remember.
7       Q.   Did you share it with the State of North
8  Dakota?
9       A.   I can't remember.
10       Q.   You mentioned earlier the Oceti Sakowin
11  Camp; is that correct?
12       A.   Yes.
13       Q.   And where is that camp located -- or where
14  was it located?
15       A.   I seem to remember that being on the north
16  side of the Cannonball River and the largest camp.
17       Q.   I'm sorry.  That last part?
18       A.   I believe it was also the largest camp, if
19  I remember correctly.
20       Q.   Okay.  And I had asked, where do you
21  understand that camp was located?
22       A.   Yeah.  I think it was on the north side of
23  the Cannonball River.
24       Q.   And whose property was it located on?
25       A.   I believe, at least some of it, was Corps

Page 72

1  of Engineers land.
2       Q.   When you say "some," do you mean not all?
3       A.   Yeah.  I don't remember the details, but I
4  believe at least part of it was on Corps of Engineers
5  land.
6       Q.   Have you seen pictures of the camp?
7       A.   Yes.
8       Q.   Have you seen video of the camp?
9       A.   I think I did see video at the time, yes.
10       Q.   Are you familiar with the road that was
11  constructed on the Corps property within the Oceti
12  Sakowin Camp?
13       A.   I vaguely remember some discussion about a
14  road.
15       Q.   What do you recall that road looked like?
16       A.   I can't remember details.
17       Q.   Was it paved?
18       A.   I don't remember.
19       Q.   Who paid for the road?
20       A.   I don't know.
21       Q.   Who constructed the road?
22       A.   I don't know.
23       Q.   Did you authorize the construction of the
24  road?
25       A.   No.

Page 73

1       Q.   Did the Corps of Engineers authorize the
2  construction of the road?
3       A.   No.
4       Q.   Is the road located on Corps of Engineers
5  property?
6       A.   I don't remember details about the
7  location, so I'm unclear about that.
8            MR. SEBY:  Okay.  We are another hour into
9  the deposition.  Would you like to take a break for
10  lunch?
11            THE DEPONENT:  Yeah, that would be good.
12            MR. SEBY:  Okay.  Ms. Bobet?
13            MS. BOBET:  Sure.  How long are you
14  thinking for the break?
15            MR. SEBY:  I think 30 minutes, at a
16  minimum, would be reasonable.
17            MS. BOBET:  Thirty minutes sounds good to
18  me.  Is that good for you, Lieutenant Colonel?
19            THE DEPONENT:  Sounds good.
20            MR. SEBY:  Thank you.  We'll resume in
21  30 minutes.
22            (Recess, 10:50 a.m. to 11:25 a.m. MST.)
23            MR. SEBY:  We're back after a brief lunch
24  break, Lieutenant Colonel Startzell.
25       Q.   (BY MR. SEBY)  I would like to now turn to

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 74

1  some exhibits that we provided to your counsel that are
2  marked numerically.  And we're doing this deposition
3  remotely, as you know, and we're doing that because of
4  the pandemic.  And so normally I would hand you a
5  document and ask you about it.  Here, we're going to
6  put them up on the screen.  And I want you to let me
7  know if you have any challenges in seeing them as we go
8  through them.  There's several of them.
9           And I want to make sure you have time to
10 review them and we have time to discuss them, so I
11 don't want you to feel rushed.  If there's anything you
12 need assistance with to enable you to better read them,
13 just let us know, and we'll do our best to accommodate
14 that.
15       A.  Sounds good.
16       Q.  Thank you.  I'm going to turn now to
17 what's marked -- we've marked as Exhibit 1.
18           MR. SEBY:  If you'd put that up on the
19 screen.
20           (Deposition Exhibit 1, remotely introduced
21 and provided electronically to the court reporter.)
22       Q.  (BY MR. SEBY)  This is an email,
23 Lieutenant (sic) Startzell, that is from Colonel John
24 Henderson.  The email is dated August 15, 2016.  And
25 you are noted as a recipient in the "Cc" block, amongst

74:22-75:13
401-402; 403;
602

Page 75

1  several individuals.  Do you recognize this email?
2       A.  I don't -- I don't really remember it; but
3  yeah, it looks like something we would have had.
4       Q.  Do you have any reason to believe it's not
5  an email that is something you received?
6       A.  No.
7       Q.  Okay.  Will you take a moment, please, and
8  read it.  It's fairly short.
9       A.  Can you go to the top, please?  I'm just
10 trying to see the date on this so that it helps me
11 place it.
12       Q.  You bet.
13       A.  August 15th.  Okay.
14           (Deponent examined document.)  Okay.
15       Q.  And if we could go down further,
16 Lieutenant Colonel Startzell, this is a string of
17 emails that your counsel produced to us.  And I'd like
18 to go to the very beginning of it; which is at the end,
19 of course.  And just refresh yourself with that, if you
20 would.  It starts with another August 15 email, 2016,
21 that you're not copied on, but you did get this whole
22 string forwarded to you.  So if you'd take a moment to
23 orient yourself with the chain, please.
24       A.  Okay.  Yeah.  Can you go up from there?
25           (Deponent examined document.)  Okay.

Page 76

1           MR. SEBY:  So if we could start on the
2  very bottom of the email chain, please.  Thank you.
3       Q.  (BY MR. SEBY)  I'm referring to the email
4  that's from Martha Chieply to Eileen Williamson, who
5  is, as I believe you said, an individual who works in
6  the Omaha Division and is an individual that reported
7  to you; is that correct?
8       A.  Eileen Williamson is, yes.  But I have a
9  question about which segment you're referring to,
10 because the one highlighted is not to Eileen
11 Williamson.
12       Q.  Right.
13           MR. SEBY:  The one above that, please.
14 Yes, right there, August 15th.
15       A.  Okay.
16       Q.  (BY MR. SEBY)  And she says -- Ms. Chieply
17 is sending this to Ms. Williamson and several other
18 individuals, including Colonel Henderson.  You are not
19 on this string, but I just want to ask you if you are
20 aware of what is meant by, "Jason - you have the
21 talking points"?  Did you ever see or contribute to
22 whatever is being referred to as the "talking points"?
23       A.  I believe -- I think the answer is yes.
24 These were probably either talking points that we
25 developed locally within the district, or they are

Page 77

1  USACE talking points that they distributed to us.  But
2  I don't remember the exact talking points.
3       Q.  Are they written down in physical form
4  somewhere?
5       A.  I don't know; but chances are that they
6  would be, yes.
7       Q.  So a document?
8       A.  Most likely.
9       Q.  Okay.  Do you recall who the author of
10 them was?
11       A.  I don't.  But normally, Public Affairs
12 would draft talking points and the commander would
13 approve them.
14       Q.  Okay.  Did you ever discuss these with
15 Colonel Henderson?
16       A.  Yes, I believe so.
17       Q.  And what did you discuss?
18       A.  Normally, we wanted to make sure that the
19 talking points were reflective of our positions, I
20 guess.  That's pretty general, but that's what they
21 were -- the discussions were about, generally.
22           MR. SEBY:  Okay.  So if we could go up one
23 of the emails in the chain, please, to the email that's
24 just above this one from Eric Stasch.
25       Q.  (BY MR. SEBY)  This is another email,

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 78

1  Lieutenant Colonel Startzell, that you were not copied
2  on.  It is a reply to the one below.  And then there
3  are several individuals that have been added in the
4  "Cc" group.  Do you see all that?
5      A.   Yes.
6          MR. SEBY:  And if we could go down to the
7  paragraph that is numbered 1 in that email.  Right
8  there.  If you could highlight that, please.  Thank
9  you.
10     Q.   (BY MR. SEBY)  Have you read this
11 paragraph?
12     A.   I'm reading it right now.
13     Q.   Sure.  Take your time and let me know.
14     A.   (Deponent examined document.)  Okay.
15     Q.   So the first sentence says, "DOJ has
16 requested a daily observation and report on no DAPL
17 work on US Government Property."  Are you aware of what
18 that is referring to?
19     A.   I am not.
20     Q.   Are you aware of who at the DOJ is the
21 source of that request?
22     A.   No.
23     Q.   Are you aware of why the request was made?
24     A.   No.
25         MR. SEBY:  Okay.  Then if we could

Page 79

1  highlight the paragraph below it that's numbered 2.
2      Q.   (BY MR. SEBY)  What does that first
3  sentence of the paragraph say?
4      A.   "Protesters are setting up encampments on
5  US Government lands."
6      Q.   Lieutenant Colonel Startzell, is this the
7  first time you were told about that circumstance, in
8  this email -- by receiving this email?
9      A.   I don't remember.
10     Q.   This is from Eric Stasch, who is the
11 project manager of the Oahe Project.  Is that what I
12 understood you to have said earlier?
13     A.   Yes, that was his position.
14     Q.   Okay.  Do you know what he's referring to
15 by saying that -- in the couple of sentences down, that
16 this is similar to another protest on Corps property?
17 Are you familiar with that reference to LaFramboise
18 Island?
19     A.   No, I'm not.
20     Q.   Were you ever told more about that than
21 reading about it in this email?
22     A.   Not that I can recall.
23     Q.   Okay.  So you're not familiar with how
24 that event was handled?
25     A.   No.

Page 80

1          MR. SEBY:  Okay.  If we could go up,
2  please, to the email just above this, the next email in
3  the chain, which is another email from Mr. Stasch to a
4  number of Corps personnel.
5      Q.   (BY MR. SEBY)  And again, this does not
6  include you in the distribution.  Would you take a
7  moment, please, and read that -- the text of that email
8  starting with "All."
9      A.   (Deponent examined document.)  Okay.
10     Q.   So this is explaining that an individual
11 called Mr. Stasch, represented themselves as an
12 attorney representing the Standing Rock Sioux Tribe,
13 and that there were discussions of a special events
14 permit.  Are you aware of that conversation?
15     A.   I don't remember specifics about that
16 conversation, but it seems to fit the timeline for the
17 special use permit.
18     Q.   Are you familiar in the -- or, actually,
19 when did you become aware of that conversation and the
20 discussions that are referenced there?
21     A.   I don't have any recollection of when.
22     Q.   Okay.  Is it your understanding that this
23 email occurs the same day that Mr. Stasch had just
24 reported to Colonel Henderson and others that there
25 were protesters on United States Government property?

Page 81

1      A.   It appears that way from the email, yes.
2      Q.   And then back to the email concerning
3  Mr. Stasch above there, where it's discussing the
4  conversation Mr. Stasch had with the attorney
5  representing the Standing Rock Sioux Tribe.  Had you
6  ever spoken with that individual, Peter Capasella?
7      A.   No, I never talked to him.
8      Q.   Are you familiar where he offices?
9      A.   I would -- I think I remember his office
10 not actually being in North Dakota, but I can't
11 remember specifics.
12     Q.   Did you ever hear that his office was in
13 Eugene, Oregon?
14     A.   That -- yeah, that matches what I
15 remember.
16     Q.   Okay.  Who told you that?
17     A.   Either -- it was probably our counsel that
18 told us -- told me that.  That would be my guess.
19     Q.   And who are you referring to?
20     A.   Potentially, Tom Tracy; maybe our tribal
21 liaison, Bill Ames.
22     Q.   And then the second paragraph below
23 Mr. Capasella's name, "He mentioned a number of Non
24 SRST people coming up to support the protest and the
25 SRST wanting to cover the encampment."  What does that

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 82

1 mean?

2      MS. BOBET:  Objection, foundation.  You

3 can answer.

4      Q.  (BY MR. SEBY)  I'm asking you, what do you

5 believe the meaning is of that latter part of the

6 sentence, where there is a desire expressed by

7 Mr. Capasella about the SRST wanting to cover the

8 encampment?  What is that referring to, in your

9 understanding?

10      A.  Yeah.  The way I read that, it means that

11 the Standing Rock Sioux Tribe wanted to get a special

12 use permit that would cover not just their tribal

13 members, but also other people who came up for that

14 protest.

15      Q.  And is that asking for permission to

16 create a camp, or is it with respect to an existing

17 camp?

18      MS. BOBET:  Objection, foundation.

19      Q.  (BY MR. SEBY)  Answer the question,

20 please.

21      A.  I don't know.  I read it to mean the -- to

22 cover the personnel that are already on the site and

23 anyone else who might come up.

24      Q.  Okay.  And then what does Mr. Stasch say

25 in the sentence after that?

Page 83

1      A.  Which sentence?

2      Q.  The sentence following the one we just

3 discussed.

4      A.  Okay.  "I related that we would be getting

5 him a Special Event permit to cover this activity and

6 that we would be looking for information on logistics

7 (sanitary facilities etc.) and would be checking to

8 make sure the area doesn't have any archeological sites

9 that could be impacted."

10      Q.  Lieutenant Colonel Startzell, what is your

11 understanding of the actions taken to effect the

12 statements Mr. Stasch made in that paragraph?

13      A.  I don't understand the question.  Can you

14 ask that again?

15      Q.  What is your understanding of Mr. Stasch's

16 actions taken, if any, to implement the statements in

17 that paragraph?

18      A.  I don't recall exactly what actions were

19 taken with regard to archeological sites; and the

20 logistics, the same.

21      Q.  So you don't know that anything was done?

22      A.  So I know that he performed fairly regular

23 visits to the project site; but outside of that, I

24 can't speak in detail.

25      Q.  Who's "he"?

Page 84

1      A.  Mr. Stasch.

2      Q.  Okay.  And then the last sentence of that

3 email paragraph, please.

4      A.  "We will process locally in the normal

5 manner.  Will keep all informed on how this moves

6 forward."

7      Q.  What is the normal manner -- what do you

8 understand the normal manner that he's referring to?

9      A.  The way I read that, it refers to the

10 normal process for a special use permit.

11      Q.  Is it your understanding this was a normal

12 process with respect to getting a special use permit or

13 not normal?

14      A.  I don't think it's something that we did

15 often.  However, I know that it was a tool that was

16 known to be available.

17      Q.  Is it normal to volunteer to provide

18 someone with a special use permit just based upon a

19 conversation?

20      A.  I don't know.  I would not say it happened

21 commonly, but I don't know.

22      Q.  Is it normal to suggest you would get

23 someone a special use permit for an event that is

24 already underway?

25      A.  I can't really say from personal

Page 85

1 experience, but this is the first time I encountered

2 this.

3      MR. SEBY:  Okay.  And then if we could go

4 to the email at the very top of the chain, please.

5      Q.  (BY MR. SEBY)  So this is the email from

6 Colonel Henderson to a number of Corps individuals.

7 You are copied on this distribution, correct?

8      A.  Yes, it looks like I am.

9      Q.  Paragraph 1, if you could take a moment

10 and read that, please.

11      A.  (Deponent examined document.)  Okay.

12      Q.  Colonel Henderson references -- he says,

13 "I do know that we are reporting on DAPL activities in

14 the area back to DOJ . . ."  Were you involved in those

15 types of communications?

16      A.  Not directly.

17      Q.  What is your knowledge of them?

18      A.  I think what this is referring to is

19 office of counsel at Headquarters USACE corresponding

20 with DOJ, but I can't be certain.

21      Q.  Well, that last sentence of that

22 paragraph, who is the "Tom" that Colonel Henderson is

23 asking to confirm what exactly DOJ is requesting?  Do

24 you know who that individual is?

25      A.  I would guess Tom Tracy, our district

**85:5-86:4**
**401-402;**
**403; 602**

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 86

1  counsel.

2       Q.  So Mr. Tracy is not part of the
3  Headquarters USACE counsel office, is he?

4       A.  No, he's not.

5       Q.  Do you know what those discussions
6  involved?

7       A.  Not really.

8       Q.  Not at all?

9       A.  No.  I really don't have any recollection
10  of details of those.

11       Q.  Okay.  Is this the first time you were
12  aware of the offering of a special use permit for the
13  existing encampments?

14       A.  I believe so.

15       Q.  Next paragraph, please, paragraph No. 2 in
16  that email.  If you could read that, please.

17       A.  (Deponent examined document.)  Okay.

18       Q.  So Colonel Henderson says there, "The
19  special event permit is the correct way to address the
20  encampment on US lands."

21           Would you explain what Colonel Henderson's
22  knowledge is of the special use permitting regulations
23  at Title 36 and Corps policies involving special use
24  permits.  Did he have any training different than
25  yours?

Page 87

1           MS. BOBET:  Objection; foundation,
2  compound.

3           MR. SEBY:  Let me break up the question.

4       Q.  (BY MR. SEBY)  Lieutenant Colonel
5  Startzell, are you aware that Colonel Henderson ever
6  had any training with regard to special use permitting?

7       A.  So he attended a new commander course,
8  much like I attended a new deputy commander course.
9  And he had the benefit of having some year or year-plus
10  of experience as a district commander at this point.

11       Q.  Did he ever discuss special use permitting
12  in other instances with you?

13       A.  Not that I can recall.

14       Q.  Are you aware of any special use
15  permitting or special event permitting that Colonel
16  Henderson was responsible for?

17       A.  Not that I'm aware of.

18       Q.  Are you aware of Colonel Henderson having
19  any additional training on special use permitting?

20       A.  Not that I'm aware of.

21       Q.  Are you aware of whether Colonel Henderson
22  ever read Title 36 regulations or Corps policies with
23  respect to special use permitting?

24       A.  I don't know.  Not that I'm aware of.

25       Q.  Okay.  Next sentence.

Page 88

1       A.  (Deponent examined document.)  Okay.

2       Q.  He's saying -- what is your understanding
3  of what his instruction is?

4       A.  The way I read this is to have law
5  enforcement with any future visits if -- you know, if
6  there is a violation of the permit.  That's the way I
7  read that.

8       Q.  And not just any law enforcement.  Doesn't
9  it say a specific type of law enforcement?

10       A.  Yes.  Local law enforcement.

11       Q.  What do you understand that to be
12  referring to?

13       A.  I would -- I would say that means the
14  local police department or sheriff's office.

15       Q.  And who would that be?

16       A.  I believe it's Morton County Sheriff's
17  Office.

18       Q.  At this time, would you know who the
19  sheriff of Morton County is?

20       A.  I don't know if I knew at the time, but I
21  believe I did.  I believe I knew at this time that it
22  was Sheriff Kirchmeier.

23       Q.  Did you ever -- were you ever involved in
24  any communications with Sheriff Kirchmeier as to this
25  day and this suggestion about a potential issuance of a

Page 89

1  special use permit?

2       A.  I don't recall the details.  I know that
3  we were in communication with him from the Project
4  Office level and at my level, but I don't remember the
5  timeline with those communications.

6       Q.  At your level means, were you speaking
7  with him?

8       A.  I talked and corresponded with him a
9  couple times.

10       Q.  How about at this time?

11       A.  I don't remember.

12       Q.  What is Colonel Henderson referring to,
13  "if this becomes a problem"?  What does that mean?

14           MS. BOBET:  Objection, foundation.

15       Q.  (BY MR. SEBY)  Well, read the sentence, if
16  you would, because I think that may help.

17       A.  "With regard to enforcing the provisions
18  of the permit, if this becomes a problem, I'd ensure
19  that local law enforcement is involved with any site
20  visit that we are required to make."

21       Q.  What does that mean, in your
22  understanding?

23           MS. BOBET:  Objection, foundation.

24           MR. SEBY:  I'm asking for his
25  understanding of what that means.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 90

1    A.   Yeah.  I mean, the way I read that, if
2    there's any concerns with the protesters becoming
3    unruly or meeting the requirements of the permit, that
4    law enforcement should accompany USACE personnel.
5        Q.   (BY MR. SEBY)  Local law enforcement?
6        A.   Yes.
7        Q.   And "enforcing the provisions of the
8    permit," that's referencing a permit that's just being
9    requested verbally, right?
10           MS. BOBET:  Objection, foundation.
11       Q.   (BY MR. SEBY)  Is that your understanding?
12       A.   Can you ask that question again?
13       Q.   What permit is he referring to?
14           MS. BOBET:  Objection, foundation.
15       A.   So the way I read this, he's referring to
16   the special use permit that is going to be processed.
17       Q.   (BY MR. SEBY)  Has it been issued?
18       A.   At this point in time, I don't think it's
19   been issued, no.
20       Q.   Okay.  And if we could go to the
21   concluding paragraph of that email, please.
22       A.   Okay.
23       Q.   There's a reference to, "The rest of us
24   will work to provide the support you need when you need
25   it in conjunction with Operations Division

Page 91

1    leadership."  Who is that referring to?
2            MS. BOBET:  Objection, foundation.
3        A.   The Operations Division leadership, is
4    that your question?
5        Q.   (BY MR. SEBY)  Yes.  I'm asking what
6    reference that is -- who is the Operations Division
7    leadership?
8        A.   That would be Keith Fink and his support
9    staff.
10       Q.   And we've not spoken about Mr. Fink.
11   Could you explain who he is and what his role was?
12       A.   Yes.  Keith Fink was the Operations
13   Division chief, so his division was responsible for the
14   existing projects along the river, the lakes and bank
15   stabilization projects along the river.
16       Q.   Is Mr. Fink part of the Omaha District?
17       A.   Yes.
18       Q.   Okay.  And wrapping up the discussion of
19   Exhibit 1, if we could go back to paragraph 2 above,
20   please, just for a moment.  That first sentence,
21   please, if you would read that.
22       A.   (Deponent examined document.)  Okay.
23       Q.   Based on your experience and your
24   training, do you agree with that statement, that, "The
25   special event permit is the correct way to address the

Page 92

1    encampments on US lands"?
2        A.   At the time, that was the tool that I knew
3    of that was available for use.
4        Q.   Yes?  Is that a yes?
5        A.   At the time, I probably agreed with that
6    statement.
7        Q.   How about today?
8        A.   Yeah, I think the special use permit still
9    has merit.
10       Q.   Did you believe at the time that there
11   were any other options or ways to address the
12   circumstances?
13       A.   Yes.
14       Q.   And what were those other ways?
15       A.   The other options were to call some law
16   enforcement entity and have them remove trespassers.
17       Q.   What law enforcement entities are you
18   referring to?
19       A.   Normally, that would be local law
20   enforcement.
21       Q.   And in this instance, that would have been
22   who?
23       A.   I believe that would have also been
24   Sheriff Kirchmeier's office.
25       Q.   Morton County, North Dakota?

Page 93

1        A.   Yes.
2        Q.   And did you do that or did Colonel
3    Henderson do that?
4        A.   I don't recall.
5        Q.   Did anyone in the Corps do that?
6        A.   I don't have a recollection of that.
7        Q.   Now, a moment ago you said that -- when
8    talking about other options, you would call law
9    enforcement -- you clarified that as local law
10   enforcement -- for removal of trespassers.  Why do you
11   use that word, "trespassers"?
12       A.   Because at the time when they set up, they
13   didn't have a permit approved.
14       Q.   A permit approved?
15       A.   Right.
16       Q.   Okay.  Lieutenant Colonel Startzell, are
17   there any other options that were discussed at this
18   time?
19       A.   Not that I can remember.
20           MR. SEBY:  Okay.  If we could turn
21   to Exhibit -- what's marked Exhibit 2, please.
22           (Deposition Exhibit 2, remotely introduced
23   and provided electronically to the court reporter.)
24       Q.   (BY MR. SEBY)  Can you read that?
25       A.   Can you increase the -- yeah, there we go.

Page 94

1  Thank you.

2      Q.   This is an email chain, also.  The latest
3  one is Monday, August 15th of 2016.  Do you see that?

4      A.   I do.

5      Q.   And it's from Colonel Henderson to
6  BG Scott Spellmon.  Does that mean Brigadier General?

7      A.   Yes.

8      Q.   At the time, that was his title, right?

9      A.   Right.

10     Q.   And at the time of this, what was the
11 Brigadier General's position or responsibility at the
12 Corps?

13     A.   Brigadier General Spellmon was the
14 division commander for the Northwestern Division.

15     Q.   And what is the subject matter of this
16 email chain?

17     A.   That would be the Omaha District SITREP.

18     Q.   What does SITREP mean?

19     A.   SITREP means situation report.

20     Q.   And he's giving a situation report of
21 events in the Omaha District.  Is that a fair way to
22 characterize what this is?

23     A.   Yeah, that looks about right.

24     Q.   And is it your understanding this is the
25 same day Mr. Stasch was reporting to Colonel Henderson

Page 95

1  and you and talking about the Exhibit 1 issues we just
2  discussed?

3      A.   It looks like the same day; August 15th,
4  yes.

5          MR. SEBY:  Could we scroll down, please;
6  just a little bit up, please.  That paragraph after the
7  hash marks is where I'd like to discuss.  There you go,
8  right there, "In other news."

9      A.   (Deponent examined document.)  Okay.

10     Q.   (BY MR. SEBY)  So is it fair to say that
11 Colonel Henderson is reporting to the division
12 commander, his boss, about the situation in the
13 district on August 8th?  And he is supplementing that
14 with a report on August 15th, right?

15         MS. BOBET:  Objection; compound,
16 foundation, and lack of personal knowledge.

17     Q.   (BY MR. SEBY)  I'm asking, is that your
18 understanding?

19     A.   Which -- which -- what happened on
20 August 8th?

21         MR. SEBY:  Withdraw the question.

22     Q.   (BY MR. SEBY)  Would you read the first
23 sentence of the paragraph that's on the screen.

24     A.   Yeah.  "In other news, there appears to be
25 significant protest activity brewing at Standing Rock

Page 96

1  Sioux Tribe today in addition to the smaller protests
2  that are ongoing at a DAPL work site near their
3  reservation and at our Oahe office today."

4      Q.   Do you agree with that statement, there is
5  significant protest activity brewing at Standing Rock
6  Sioux Tribe?

7      A.   I don't know.  I mean, I don't know.  I'm
8  not sure what he's talking about, exactly.

9      Q.   Okay.  Do you agree with it?

10         MS. BOBET:  Objection, asked and answered.

11         MR. SEBY:  I didn't hear the answer.

12     A.   Yeah.  I mean, I don't know what to think
13 about that.

14     Q.   (BY MR. SEBY)  And then the last sentence
15 of that paragraph, "We'll generate a CCIR if one is
16 triggered as this develops."  What do you understand
17 that to be referring to?

18     A.   So the way I read that, if any of the
19 CCIR -- the critical information requirements -- are
20 met, then we will generate the report to send to our
21 Headquarters.

22     Q.   And his reference to "as this develops,"
23 what is the "this" that's being referred to --

24         MS. BOBET:  Objection, foundation.

25     Q.   (BY MR. SEBY)  -- do you believe?

Page 97

1      A.   I interpret that to mean the protest
2  activity with regard to DAPL.

3      Q.   Do you think that that reference includes
4  the protest encampments that are on Corps property at
5  this time?

6      A.   I would read that to mean, yeah, any
7  protests regarding the DAPL work.

8          MR. SEBY:  All right.  I'd like to go,
9  please, to what's marked Exhibit 3.

10         (Deposition Exhibit 3, remotely introduced
11 and provided electronically to the court reporter.)

12     Q.   (BY MR. SEBY)  This is a chain of three
13 emails.  If you could go to the bottom of the chain,
14 the beginning correspondence in the chain, please.

15 This is an email from Eric Stasch to Eileen Williamson
16 and Colonel Henderson and other Corps individuals,
17 including Mr. Fink, who you've identified, and
18 Mr. Roby, who you've identified; is that correct?

19     A.   Yeah, that looks correct.

20     Q.   Would you read that email and let me know
21 if you are familiar with what is being referred to
22 there?

23     A.   (Deponent examined document.)  Yeah.  I
24 don't recall what that video was about.

25     Q.   Okay.  And then the second sentence, "The

97:15-
19;
99:4-7;
100:10-
12
401-402;
403; 602

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 98

1 law enforcement people on site are dealing with a
2 dynamic situation."  What is your understanding of who
3 the law enforcement people on site are referring to?
4         A.   To me, that means the local law
5 enforcement.
6         Q.   Okay.  And what do you think Mr. Stasch
7 meant by referring to it as a "dynamic situation?"
8              MS. BOBET:  Objection; foundation, lack of
9 personal information.
10             MR. SEBY:  I'm asking for what he thinks
11 that means.
12             MS. BOBET:  The objection stands.  You can
13 answer.
14        A.   Yeah.  I mean, the way I read this, that
15 was referring to the fact that there were daily changes
16 to the situation.
17        Q.   (BY MR. SEBY)  Is this dated August 16th,
18 a day after the exhibits we just discussed?
19        A.   Yes.
20        Q.   How many days prior to this do you think
21 there were where there were changing situations?
22        A.   I don't know.
23        Q.   If you could go up one email, please.  It
24 starts on the page above.  This email is from Colonel
25 Henderson on Wednesday, August 17, 2016, to Mr. Stasch,

Page 99

1 replying to his email below.  You're also not copied on
2 this; is that correct?
3         A.   That's correct.
4         Q.   Were you blind copied on this email?
5         A.   No, but I was a member of the corporate
6 board, so my email address was probably included in
7 that distribution.
8         Q.   I'm sorry.  I don't understand what that
9 means.  Would you explain what that reference is?
10        A.   The corporate board was the senior
11 advisory board for the district commander.
12        Q.   Are you the only member of that advisory
13 board?
14        A.   No.
15        Q.   Who else was on that board with you at
16 this time?
17        A.   It included the division chiefs, and
18 office of counsel, and possibly one or two others.
19        Q.   Which others?
20        A.   The senior civilian leader in the district
21 was on the corporate board as well.
22        Q.   Who is that individual?
23        A.   His name is Ted Streckfuss,
24 S-t-r-e-c-k-f-u-s-s.
25        Q.   Okay.  So there was no need to reference

Page 100

1 individuals who are a member of that board, you could
2 just do it as a group reference by adding that
3 recipient?
4         A.   Yeah.  That was the distribution list for
5 the members of the corporate board.
6         Q.   So you did receive this email that way?
7         A.   I can't verify with a hundred percent, but
8 it's likely that I did, because I believe I was on that
9 distribution list.
10        Q.   Do you have any reason to believe you
11 didn't receive this email?
12        A.   No.
13        Q.   Okay.  If we could go up above this email
14 for a moment.  This is you replying to that group,
15 isn't it?
16        A.   Yes.
17        Q.   So you did receive it, and you "Replied
18 All," right?
19        A.   That looks right.
20             MR. SEBY:  Okay.  If we could go back to
21 Colonel Henderson's email below, please.
22        Q.   (BY MR. SEBY)  And I'll give you a moment,
23 sir, to read that, please.
24        A.   (Deponent examined document.)  Okay.
25        Q.   Colonel Henderson is referencing, in the

Page 101

1 first sentence after saying "Team," "Based on our
2 earlier TELECON . . ."  What does "TELECON" mean?
3         A.   Teleconference.
4         Q.   Okay.  ". . . teleconference [sic] today
5 with the US Attorney in North Dakota . . ."  Were you
6 part of that teleconference, Lieutenant Startzell?
7         A.   I don't remember.
8         Q.   Do you recall being told about the
9 teleconference?
10        A.   I don't remember.  I mean, it looks like I
11 was aware of it, because I was on the email at least.
12        Q.   Well, Colonel Henderson says "our earlier
13 teleconference."  So "our" to the team, I'm wondering
14 if that included you.  That's the question.
15        A.   Yeah.  It's possible, but it's also
16 possible that it just included a subset of the people
17 on the email.
18        Q.   Okay.  So the balance of that one-sentence
19 paragraph, if you'd please read that.
20        A.   (Deponent examined document.)  Okay.
21        Q.   Colonel Henderson, again, refers to the
22 demonstrations as the SRST demonstrations, right?
23        A.   Yes.
24        Q.   Why does he do that?
25             MS. BOBET:  Objection; personal knowledge,

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 102

1  calls for speculation.
2      Q.   (BY MR. SEBY)  If you know, Lieutenant
3  Colonel.
4      A.   I don't know why he picked that
5  terminology.
6      Q.   And then he goes on to say there's a
7  potential "to trigger a few NWD CCIRs over the next
8  several days . . . specifically CCIRs c, k, or s,"
9  right?
10     A.   Yes.
11     Q.   Earlier, I asked you if you knew what
12 those sections were, right?
13     A.   Yes.
14     Q.   And you said that you did not recall?
15     A.   Correct.
16     Q.   Okay.  Coming down to the paragraph that
17 begins, "A few items of guidance here," from Colonel
18 Henderson.  Have you read that paragraph numbered 1?
19     A.   Yes.
20     Q.   Who is Colonel Henderson, to your
21 knowledge, referring to as the PAO?
22     A.   That would be our Public Affairs Officer
23 (sic).
24     Q.   And who is that?
25     A.   At this time, it was either Tom O'Hara or

Page 103

1  Eileen Williamson.
2      Q.   Well, in fact, Ms. Williamson is copied on
3  this email, isn't she; or an addressee, more
4  specifically, right there (indicating)?
5      A.   Okay.
6      Q.   Is that the reference to the PAO?
7      A.   I don't know if he was referring to her or
8  her boss, Tom O'Hara.
9      Q.   Okay.
10     A.   But the office, in general, I think is who
11 he was referring to.
12     Q.   Oh, he's referring to the Public Affairs
13 Office?
14     A.   Yes.
15     Q.   All right.  What does he mean, keep them
16 in the loop on any decisions on special use permits?
17          MS. BOBET:  Objection; calls for
18 speculation, personal knowledge.
19     Q.   (BY MR. SEBY)  To your knowledge, sir.
20     A.   I think he just wanted to be sure that
21 they were aware of what the situation was with any
22 special use permits that were requested or granted.
23     Q.   Have you read the balance of that
24 paragraph numbered 1, two sentences?
25     A.   Yes.

Page 104

1      Q.   Right after the "kept in the loop on any
2  decisions on special use permits," it says "vice."  Is
3  it possible that means -- that's a typo; meaning, vs or
4  versus?
5      A.   I don't know.
6      Q.   How would you explain that word, then, in
7  the sentence?
8      A.   I mean, vice generally means against or,
9  you know, as opposed to.
10     Q.   Okay.  So if we were to go with that
11 interpretation, "as opposed to what may be trespassing
12 on government lands for these events," what is your
13 knowledge or understanding of what he's referring to?
14     A.   He seems to be talking about any
15 activities that were permitted versus not permitted.
16     Q.   So would it be accurate to say -- would it
17 be accurate to understand what you've said as referring
18 to the protesters that are presently, at this time, on
19 U.S. Government property?
20          MS. BOBET:  Objection, vague.
21     Q.   (BY MR. SEBY)  Do you understand the
22 question, Lieutenant Colonel?
23     A.   No.  Can you say it again?
24     Q.   Who is he referring to?
25          MS. BOBET:  Objection, calls for

Page 105

1  speculation.
2      Q.   (BY MR. SEBY)  If you know, sir.
3      A.   I mean, I think he's referring to the
4  people that are setting up camps.  But more
5  specifically, I don't know beyond that.
6      Q.   Okay.  All right.  If we could go up to
7  your email, which is the top of this chain, please.
8  It's from Thomas -- from James T. Startzell, replying
9  to Colonel Henderson's email and the group copied on it
10 below, correct, Wednesday, August 17?
11     A.   Yes.
12     Q.   Would you please read your email below.
13     A.   "All, Just to clarify the NWD CCIRs that
14 are of particular interest here are."  Okay.
15     Q.   And after that sentence that you just read
16 from your email, there are three lines below that.  The
17 first one starts with the letter "c."  What is that
18 referring to?
19     A.   I believe that refers to CCIR, some number
20 (sic), "c."
21     Q.   All right.  And the next one?
22     A.   CCIR, something, "k," yeah.
23     Q.   Okay.  And the last one?
24     A.   CCIR, something "s."
25     Q.   Okay.  So earlier, you did not recall

105:6-
106:6
401-
402;
403; 802

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 106

1  these specific provisions that I asked you about; is
2  that correct?
3       A.   Yes.
4       Q.   Is your recollection refreshed now from
5  your own email?
6       A.   Yes.
7            MR. SEBY:  All right.  If we could go,
8  please, to what's marked Exhibit 4.
9            (Deposition Exhibit 4, remotely introduced
10  and provided electronically to the court reporter.)
11            MR. SEBY:  If you could please enlarge
12  that so the Lieutenant Colonel can see Exhibit 4 text,
13  which consists of two emails.  If we could go the
14  bottom, please, of Exhibit 4.  Exhibit 4.  I'm sorry.
15  we're on Exhibit 3.  If you could transition to
16  Exhibit 4, please.  Is Exhibit 4 possible, please?
17  There we go.  Enlarge that, please, for the Lieutenant
18  Colonel to read, the first email at the bottom of the
19  screen.
20       Q.   (BY MR. SEBY)  If you would, sir, read the
21  beginning of that email; which is an email from Colonel
22  Henderson, dated August 18, 2016, to Brigadier General
23  Spellmon, copied to a number of Corps individuals,
24  which included you, Lieutenant Colonel Startzell,
25  correct?

106:20-107:9;
108:25-109:7;
109:16-20
401-402; 403;
802

Page 107

1       A.   Yes.
2       Q.   And there, the email begins with a
3  reference to "Sir."  So is he reporting to his --
4  Colonel Henderson reporting to his superior?
5       A.   Yes.
6       Q.   And he's copying you as the deputy
7  district commander so you're aware of it as well,
8  correct?
9       A.   Yes.
10       Q.   All right.  And others, of course.
11  There's that acronym you told me about means bottom
12  line -- refresh my recollection, please, what that BLUF
13  means.
14       A.   Bottom line up front.
15       A.   Bottom line up front.  Okay.
16       A.   (Deponent examined document.)
17       Q.   Again, Colonel Henderson refers to these
18  as the SRST protests.  Why does he do that again, to
19  your knowledge?
20            MS. BOBET:  Object --
21            THE REPORTER:  Ms. Bobet, did you object?
22            MS. BOBET:  No, I'm sorry.  He finished
23  the question, so no objection.
24       A.   Yeah.  My guess is that because Chairman
25  Archambault was involved in calling for protests.

Page 108

1       Q.   (BY MR. SEBY)  What basis do you say that
2  on?
3       A.   Just recollection.
4       Q.   And do you know what Colonel Henderson is
5  referring to, "growing larger, and more hostile"?
6       A.   No, not specifically.
7       Q.   Are you aware there was a protest on the
8  Standing Rock Sioux Tribe reservation?  Was there?
9       A.   I don't recall specifics.
10       Q.   You're aware, sir, that there was a
11  protest going on on the Corps land, though, right?
12       A.   Yes.
13       Q.   Okay.  Is it possible that's what Colonel
14  Henderson meant?
15            MS. BOBET:  Objection, calls for
16  speculation.
17       Q.   (BY MR. SEBY)  I'm just asking if you
18  believe that or not?
19       A.   It's possible, yeah, but I don't know
20  specifically.
21       Q.   All right.  If we could come down, please,
22  to the next paragraph, which is captioned
23  "DETAILS."  Read that paragraph, please.
24       A.   (Deponent examined document.)  Okay.
25       Q.   Colonel Henderson is talking about

Page 109

1  ". . . a large encampment of protesters (over 1500
2  people by recent estimates) near the mouth of the
3  Cannonball River which has spilled over to Corps land
4  in this area.  They are technically trespassing on
5  Government Property since they do not have a Special
6  Use Permit."  Is that what it says?
7       A.   Yeah, that's what I read.
8       Q.   What does he mean, then, in the next
9  sentence?
10            MS. BOBET:  Objection; calls for
11  speculation, lack of personal knowledge.
12       Q.   (BY MR. SEBY)  Colonel (sic) Startzell,
13  were you part of the telephone conference with the
14  U.S. Attorney's Office the day prior to this email?
15       A.   I don't remember, specifically.
16       Q.   Do you recall being made aware of the
17  situation in the camps that is being reported here by
18  Colonel Henderson and copied to you?
19       A.   Yeah.  At some point I became aware of
20  this, yes.
21       Q.   When?
22       A.   I don't remember.
23       Q.   How did you become aware, Lieutenant
24  Colonel Startzell?
25       A.   Again, I don't remember.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 110

1    Q.   Did it take you much after this date to
2  become aware -- or when you became aware?
3    A.   Well, if I was not aware before this date,
4  then I was after reading this email.
5    Q.   And when did you read this email?
6    A.   I don't remember, but it's highly likely
7  it was the day of.
8    Q.   Thank you.  The next paragraph is entitled
9  "WAY AHEAD."  Do you see that?
10   A.   I do.
11   Q.   What does "WAY AHEAD" mean, do you
12 believe?
13   A.   "WAY AHEAD" means how we plan on
14 proceeding with the situation.
15   Q.   And then the next sentence, if you'd read
16 that, please.
17   A.   (Deponent examined document.)
18   Q.   Would you read it aloud, sir.
19   A.   "We are taking a posture to just monitor
20 and report.  Law enforcement appears to be taking more
21 of a containment posture (as opposed to intervening).
22 We have advised our team to minimize (mission essential
23 only) or eliminate our presence in this area, and I
24 have retained the decision authority on any special use
25 permits based on our call yesterday (we do not want to

Page 111

1  give any appearance to condoning/facilitating violent
2  activity).  Therefore, law enforcement considers this
3  an 'unlawful protest.'  We will coordinate CCIRs with
4  Torrey as needed.
5    Q.   This is Lieutenant Colonel -- this is
6  Colonel Henderson reporting to his superior, correct?
7    A.   Yes.
8    Q.   And the "we" that Colonel Henderson is
9  referring to here, do you understand that to be "we" in
10 the district?
11   A.   I understand that to be among the
12 district, yes.
13   Q.   And at this time, sir, you are the second
14 in command of that district, correct?
15   A.   Correct.
16   Q.   Thank you.  And the last sentence of the
17 paragraph, please.
18   A.   (Deponent examined document.)
19   Q.   Would you read it aloud, "My
20 assessment . . ."
21   A.   "My assessment is that this will get worse
22 before it gets better; believe DAPL and law enforcement
23 are taking the right approach right now . . . just to
24 stay out of their way.  I anticipate that this will
25 continue to be a problem for the next week or two

**111:19-112:2
403; 602; 802**

Page 112

1  (until after the PI hearing).  We will likely have a
2  mess to clean up after they depart the area."
3    Q.   I know Colonel Henderson doesn't have a
4  crystal ball, but what do you think, looking back at
5  that statement, "We will likely have a mess to clean up
6  after they depart the area"?  Did the protest last for
7  just a few days?
8         MS. BOBET:  Objection, compound.
9    A.   No, it did not.
10   Q.   (BY MR. SEBY)  How long did it last,
11 Lieutenant Colonel Startzell, approximately?
12   A.   Several months, through approximately
13 February.
14   Q.   So how many months do you estimate that is
15 from this time till the time you just mentioned?
16   A.   About six months.
17   Q.   Thank you, sir.
18        MR. SEBY:  If we could go to Exhibit 5,
19 please, what's marked Exhibit 5.
20        (Deposition Exhibit 5, remotely introduced
21 and provided electronically to the court reporter.)
22        MR. SEBY:  And if we could -- this is an
23 email string, also.  Could you please go to the
24 beginning email before the attachment.  Up, please, up.
25 Right there.

**112:3-7
602;
611
com-
pound**

Page 113

1    Q.   (BY MR. SEBY)  The first email in this
2  string is from a gentleman named Jeffrey Wells, Project
3  Manager, Police Intelligence Cell, Retired Special
4  Agent, Army Threat Integration, known as ARTIC,
5  Washington, D.C., at the Pentagon.  Is that correct,
6  Lieutenant (sic) Startzell?
7    A.   Yes, that appears to be correct.
8    Q.   Okay.  Let's look at Mr. Wells' email,
9  which is August 18, 2016, addressed to Richard Roberts,
10 copied to Matthew Crosby.  Do you know who those
11 gentlemen are, your colleagues in the Corps and the
12 Army?
13   A.   I don't know who they are.
14   Q.   Are you familiar with ARTIC?
15   A.   Not really.
16   Q.   Do you know who they are?
17   A.   I mean, I think they're one of the
18 intelligence organizations at higher Headquarters in
19 the Army.
20   Q.   And, in fact, Mr. Wells' signature block
21 says that, doesn't it?
22   A.   Uh-huh, yes.
23   Q.   And so above this email is an email from
24 Richard Roberts responding to his colleague, Mr. Roby,
25 Roger Roby.  Actually, he's not responding.  He's

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 114

1  forwarding this email.  If you could go up there and
2  let me know if you agree with that.
3      A.   Yeah, that looks right.  He's forwarding
4  it.
5      Q.   So at the end of this email, before we
6  talk about it, it appears from this email that
7  Mr. Roberts -- can you tell me what his signature block
8  says his role and title is?
9      A.   Richard L. Roberts, Command Criminal
10  Intelligence Officer, Headquarters, U.S. Army Corps of
11  Engineers Office of the Provost Marshal, Operational
12  Protection Division.
13      Q.   Operational Protection Division, what is
14  your understanding of that division within the United
15  States Army?
16      A.   Well, it looks like a sub branch within
17  the Corps of Engineers Headquarters.
18      Q.   I understand.  What is your responsibility
19  for the function of that division?
20      A.   Force protection, which is protection of
21  personnel.
22      Q.   And property?
23      A.   Yeah, that would be fair.
24      Q.   Why is he writing to Richard Roby?
25      A.   I mean, he was probably concerned about

Page 115

1  something that he read in the intel report.
2      Q.   Could you take a moment and read his
3  communication, in his words, to Roger Roby, who I
4  understand, from what you said earlier, is the manager
5  of security within your district in Omaha at the time;
6  is that correct?
7      A.   Yes.
8      Q.   All right.  Have a look, please, and read
9  the text of that email to that gentleman.
10      A.   Do you want me to read this aloud, or can
11  I read it to myself?
12      Q.   If you would read it to yourself, please,
13  and then let's discuss it.
14      A.   (Deponent examined document.)  Okay.  I
15  read that page.
16      Q.   All right.  Do you disagree with anything
17  in that report?
18      A.   I don't really have any grounds to
19  disagree with it.  I mean, this is an intel report from
20  someone gathering the intel.
21      Q.   Yeah.  Did you read this email at the time
22  you received it?  Because you were copied on the latest
23  email and the chain, which we'll get to in a moment.
24      A.   I think it's highly likely I did, yeah.
25      Q.   All right.  So the email above the one

Page 116

1  that we're looking at is from Mr. Roby to -- back to
2  Richard Roberts, and you are now copied on this email;
3  is that correct?
4      A.   Yes.
5      Q.   Again, this is Thursday, August 18th,
6  2016.  And Mr. Roby replies to Mr. Richard Roberts, who
7  is the Command Criminal Intelligence Officer in the
8  Operational Protection Division of the United States
9  Army Corps of Engineers, and says that the BIA was
10  calling, asking if the Corps, your district, had issued
11  a permit or a campsite on Corps property; is that
12  correct?
13      A.   Yes, it looks like that's what's in there.
14      Q.   He goes on to say, "We have not issued a
15  permit although we are aware that one is being
16  prepared."
17      A.   Okay.
18      Q.   And that -- what does he say in the next
19  paragraph?
20      A.   "According to this BIA officer there is no
21  Law Enforcement agency that is willing to go near the
22  protest/camp sites [sic].  They have closed off the
23  local HWY leading into the area and are rerouting
24  traffic.  All USACE employees have been instructed to
25  stay away from the area."

Page 117

1      Q.   Dangerous situation going on here, isn't
2  there?
3      A.   I mean, we were definitely concerned with
4  public safety there.
5      Q.   Because?
6      A.   Because of all the events that had
7  happened.
8      Q.   Including the protesters on Corps land?
9      A.   Yes.
10      Q.   Including the fact that you've not issued
11  a permit at this time?
12      A.   Well, I don't think we were concerned
13  about safety from that perspective, but we were
14  concerned about the safety, in general.
15      Q.   I didn't ask about safety.  I asked
16  whether you agreed that no permit had been issued at
17  this time?
18      MS. BOBET:  Objection, mischaracterizes
19  the testimony.
20      MR. SEBY:  Well, I'm objecting to the
21  mischaracterization of my question.
22      (BY MR. SEBY)  Answer the question,
23  please, sir.
24      A.   Yeah.  Can you ask the question again?  I
25  just want to make sure I'm answering the right one.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 118

1    Q.   Do you agree, Lieutenant Colonel
2 Startzell, that the chief of security in your district
3 has observed that you've not issued a permit?
4    A.   Yes.
5    Q.   Okay.  So the next and last email in this
6 chain, which is the most recent one, if we could go up
7 there.  And, sir, if you'd read that email.  The email
8 is from Aaron Hoffman to Mr. Roby and yourself,
9 correct?
10   A.   Yes.
11   Q.   Mr. Hoffman, do you recognize him?
12   A.   I do.
13   Q.   His title is in the signature block below,
14 isn't it, sir?
15   A.   Are you asking me what his title is?
16   Q.   Yeah.  From his signature block below, he
17 is the Chief, Security and Law Enforcement for the
18 Northwestern Division.  Is that what it says?
19   A.   Yes, that's correct.
20   Q.   Which includes your district?
21   A.   Yes.
22   Q.   Why isn't Colonel Henderson copied on this
23 email?
24        MS. BOBET:  Objection, calls for
25 speculation.

Page 119

1    Q.   (BY MR. SEBY)  I'm asking if you know,
2 sir?
3    A.   I don't know.
4    Q.   If you'd come down to the third full
5 paragraph, "Let me know if you need my help with
6 anything."  Let me know when you've read that to
7 yourself.
8    A.   (Deponent examined document.)  Okay.
9    Q.   What does the acronym EM stand for?
10   A.   Emergency management.
11   Q.   What how about the couple words later,
12 ENGLink?  What does that refer to?
13   A.   ENGLink is the software application where
14 you can report incidents that are occurring.
15   Q.   What kind of incidents are meant to be
16 reported in this system?
17   A.   All kinds of things; from natural
18 disasters, to terror threats, to sighting of a drone.
19   Q.   And who has access to make such reports?
20   A.   Typically, it was the emergency manager,
21 or the security chief, or myself.
22   Q.   In this instance, did you report this to
23 ENGLink?
24   A.   I don't know about this specific email,
25 what this is referring to, but I put a lot of incidents

Page 120

1 into ENGLink.
2    Q.   A lot of incidents relating to DAPL
3 protests?
4    A.   Yes.
5    Q.   When did you start doing that?
6    A.   I don't remember.
7    Q.   Would this have been the first possible
8 time you did it, or did you do it prior to this?
9    A.   I don't remember.
10   Q.   Would you know if any of these other
11 individuals, the emergency manager or the security
12 chief, would have done that?
13   A.   Usually, we would tell each other when we
14 entered incidents in.  So at the time, I probably would
15 have known.
16   Q.   Do you recall any of these other two
17 individuals telling you that they had done so?
18   A.   I don't.
19   Q.   Is there a record of entries made in
20 ENGLINK?
21   A.   Through ENGLink, you can pull a record,
22 yes; should be able to.
23   Q.   Is that information stored somewhere?
24   A.   Yes, but I can't remember who manages
25 ENGLink.  Someone has access to that, yes.

Page 121

1    Q.   What does ENGLink stand for, please?
2    A.   I think it just stands for engineer link.
3    Q.   And when one makes a report on ENGLink,
4 where does that report go?  Does someone monitor that,
5 or what's the -- what's the purpose of that?  Who is
6 alerted by such reports?
7    A.   At the higher Headquarters, the division
8 and the Headquarters USACE emergency management or
9 security offices would have visibility of that and
10 would be alerted.
11   Q.   Okay.  So again, this email is from the
12 Chief, Security and Law Enforcement for the
13 Northwestern Division, which is the office within the
14 Corps management structure above.  Your level is the
15 deputy division commander, correct?
16   A.   Yes.
17   Q.   And he's asking you -- because you're the
18 "sir" being referenced as the addressee, correct?
19   A.   Yes.
20   Q.   He's asking you, ". . . has your EM shop
21 put this one in ENGLink," right?
22   A.   Yeah, it looks like that's what he's
23 asking in that part.
24   Q.   Did you respond to this email?
25   A.   I don't remember.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 122

1  Q.  Do you agree that's a pretty big deal --
2  question from a superior of yours, asking about an
3  action taken or not?
4  A.  No.
5  Q.  You don't think it's a big deal?
6  A.  Well, I wouldn't call him a superior of
7  mine.
8  Q.  Is he a civilian?
9  A.  He is, but he's a staff officer conducting
10  staff coordination.  That's why I say that.
11  Q.  But he works within an office that is
12  superior to your office in the district command,
13  correct?
14  A.  Yes.
15  Q.  Did you feel it was appropriate or not to
16  respond to him?
17  A.  I think, normally, responding is
18  appropriate, yeah, for situations like these.
19  Q.  And do you recall providing any response?
20  A.  I don't recall.
21  Q.  Did you ever pick up the phone and discuss
22  these events with him at the time?
23  A.  Yes.
24  Q.  In response to this email?
25  A.  I talked to Mr. Hoffman quite often, so --

Page 123

1  I don't remember if any of them were specifically
2  related to this email.
3  Q.  Had you spoken with him at the time of
4  this email on anything else, or had you yet to talk
5  with him?
6  A.  I don't remember.
7  Q.  You don't recall ever -- when you first
8  communicated with this gentleman?  He knew you and
9  referred to you as "Sir."
10  A.  Oh, yeah.  I spoke with Mr. Hoffman quite
11  often, so -- I just don't remember specific timing for
12  those conversations.
13  Q.  Would you have ever talked to him previous
14  to this date?
15  A.  It's likely.
16  Q.  Did you speak with him often about the
17  DAPL protests?
18  A.  Yes.
19  Q.  Particularly the protest encampments
20  located on Corps land?
21  A.  Yeah, I think we talked about a lot of
22  things related to DAPL.
23  MR. SEBY:  Okay.  If we could go, please,
24  to Exhibit 9 for a moment.
25  (Deposition Exhibit 9, remotely introduced

Page 124

1  and provided electronically to the court reporter.)
2  Q.  (BY MR. SEBY)  And the United States
3  produced a document that's at the end of this string of
4  emails.  I'm not going to ask you about -- your counsel
5  has stricken from view or redacted a large amount of
6  the content of the email, but attached to the email is
7  a document I want to ask you about.
8  MR. SEBY:  If you could blow that up,
9  please, enlarge it for the Lieutenant Colonel to see.
10  Q.  (BY MR. SEBY)  If you would describe what
11  you're seeing, sir.
12  A.  This looks like a letter from the Standing
13  Rock Sioux Tribe to Mr. Stasch, our project manager.
14  Q.  And what does the "RE" line say?
15  A.  Attachment J.
16  Q.  Okay.  This email, at the very beginning,
17  references this attachment by the name "SRST Special
18  Use Permit Application, DAPL protest camps."  So do you
19  have any reason to believe that that attachment is
20  different than what the "RE" line of the email labels
21  it?
22  A.  No.
23  Q.  Okay.  And who is the signator on this
24  letter, sir?
25  A.  Chairman Archambault.

No object-
ion to
admitt-
ing the
version
of this
exhibit
at
USACE
_000521
32

Page 125

1  Q.  Who is?
2  A.  The Chairman of the Standing Rock Sioux
3  Tribe.
4  Q.  And if we could turn to the next page of
5  the -- or the page of the attachment, please, just
6  continue down.  Do you recognize the block with the "US
7  Army Corps of Engineers" and the symbol of the Corps
8  there?
9  A.  Yes.
10  Q.  Okay.  And what is the name of the
11  document, if you would?
12  A.  Special Event Application.
13  Q.  How about the block above?
14  A.  Special Event Application Form, Permit and
15  Assessment of Fees.
16  Q.  All right.  And the -- there's some
17  smaller language below that, "Project Operations."  And
18  then it says, "USACE Guide for Implementation of
19  EC 1130-2-550, Chapter 9."  Lieutenant Colonel
20  Startzell, are you aware of what that refers to?
21  A.  No.
22  Q.  Have you ever read those documents?
23  A.  I don't know.
24  Q.  I thought you said you had a training
25  session prior to becoming district commander on this

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 126

1  special use permit process.
2          MS. BOBET: Objection, mischaracterizes
3  evidence. You can answer.
4      A.  I did.
5      Q.  (BY MR. SEBY) As part of your training,
6  did you read this document?
7      A.  I don't remember, but there's a lot of
8  documents out there.
9      Q.  Do you have any personal recollection of
10 this document and its contents?
11     A.  No.
12     Q.  Do you think you ever did?
13     A.  I don't recall.
14         MR. SEBY: All right. If we could go down
15 a little bit on the document. And perhaps -- I'm
16 sorry. I want to go from the beginning of the
17 applicant that's listed there at the top, just below
18 the block there. Stop, and maybe blow that up a little
19 bit so we can talk about what it says.
20     Q.  (BY MR. SEBY) If you'd look at that,
21 Lieutenant Colonel Startzell, and just read that for a
22 moment, over the -- before the numbered paragraphs
23 below the introductory paragraph there.
24     A.  (Deponent examined document.) Okay.
25     Q.  All right. So is it fair to say the

Page 127

1  applicant is Dave Archambault, the Chairman of the
2  Standing Rock Sioux Tribe, and that the entity for
3  which the application is submitted is the Standing Rock
4  Sioux Tribe?
5      A.  Yes.
6      Q.  And the event description is a, "Spiritual
7  encampment to protest the Dakota Access Pipeline."
8      A.  Okay.
9      Q.  And the application is -- describes the
10 event date as, "August 15 until the pipeline
11 construction ceases or operations cease." Is that what
12 it says?
13     A.  Yes.
14     Q.  Going back to the letter transmitting this
15 application, it's dated August 18th. Why was -- why
16 was this being a request backdated for a permit?
17         MS. BOBET: Objection, calls for
18 speculation.
19     Q.  (BY MR. SEBY) If you know.
20     A.  I mean, I think they had already occupied
21 the site before submitting a permit.
22     Q.  Who is "they"?
23     A.  Protesters.
24     Q.  Which would include non-Standing Rock
25 Sioux Tribe individuals?

Page 128

1      A.  Probably.
2      Q.  All right. If we could go back to that
3  paragraph at the beginning of the application. The
4  location that's being sought for permission to have the
5  protest activity is 20 acres immediately north of the
6  Cannonball River. Is that what it says?
7      A.  Yes.
8      Q.  Is that Army Corps of Engineers property?
9      A.  I don't know.
10     Q.  Does it stand to reason that the answer is
11 yes, given that he's asking for Corps permission to be
12 there?
13     A.  Possibly, yeah. I don't know without
14 seeing a (inaudible) statement.
15     Q.  We're going to get to that in a moment.
16 So he also requests permission for a protest that's
17 already there for 300 people, correct? That's what it
18 says?
19         MS. BOBET: Objection, mischaracterizes
20 the evidence.
21     Q.  (BY MR. SEBY) The number of participants
22 line is filled out by Chairman Archambault as
23 approximately, "App 300," right?
24     A.  Yes.
25     Q.  The number of vehicles, just below that,

Page 129

1  75?
2      A.  Yes.
3      Q.  At this time, sir, did you have any idea
4  whether those numbers had already been grossly exceeded
5  by people at the camps on Corps land?
6      A.  I don't remember.
7      Q.  Did you ever evaluate whether that was
8  true or not with respect to this application?
9      A.  Probably did, yes.
10     Q.  And you don't recall what you concluded?
11     A.  No; I mean, not right now.
12     Q.  All right. Not right now as we're talking
13 at the moment?
14     A.  Right.
15     Q.  All right. What was your role with
16 respect to the submission of this application? Did
17 you -- were you unaffiliated with how to handle it, or
18 were you involved with the internal processing of this
19 document forward?
20     A.  From my recollection, I had it for
21 visibility, but I wasn't personally involved in the
22 processing of it.
23     Q.  Throughout any period of time, or are you
24 limiting that to any initial period of time?
25     A.  I mean, in general, I don't think I had

127:14-128:1
602

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 130

1 direct hands-on processing this, but I did have
2 visibility of it.
3      Q.   What does "visibility" mean?
4      A.   Meaning, I probably saw it and read it.
5      Q.   Read what?
6      A.   The document.
7      Q.   Are you referring to the exhibit we're
8 talking about now?
9      A.   Yes.
10     Q.   How about future Corps correspondence and
11 processing-related documents and communications?
12          MS. BOBET:  Objection, vague.
13     Q.   (BY MR. SEBY)  Sir?
14     A.   Yeah.  I mean, I can't remember everything
15 processed after this.
16     Q.   Do you recall anything specifically where
17 you were firsthand involved in next steps with respect
18 to this permit application?
19     A.   No.
20     Q.   Nothing at all?
21     A.   No.
22     Q.   I'm sorry.  Is that your answer?
23     A.   Yeah.  I do not recall.
24     Q.   All right.  We've passed another hour, but
25 before we take a break for another ten minutes, do you

Page 131

1 recall who processed this upon receipt?  It was
2 addressed to Mr. Stasch, correct?
3      A.   Yes.
4      Q.   And who processed it, sir?  Mr. Stasch?
5      A.   I mean, I believe the way those were
6 normally processed is they went from the project
7 manager, to the division chief, to the district
8 commander.
9      Q.   Okay.  And with respect to that process
10 over this application, how did it turn out?
11     A.   So, I think the special use permit was
12 never finalized.
13     Q.   What do you mean by "finalized"?
14     A.   So, it was never fully granted.
15     Q.   Fully granted or granted at all?
16     A.   Fully granted.
17     Q.   Never fully granted.  Not granted at all?
18     A.   It was never granted.
19     Q.   Thank you.
20          MR. SEBY:  Ms. Bobet, I'd like to take a
21 ten-minute break, please.
22          MS. BOBET:  Sounds good.  Thank you,
23 Mr. Seby.
24          MR. SEBY:  Thank you.  Thank you,
25 Lieutenant Colonel Startzell.  We'll be back in ten

Page 132

1 minutes.
2          (Recess, 1:09 p.m. to 1:21 p.m. MST.)
3          MR. SEBY:  We're back after a break,
4 Lieutenant Colonel Startzell.  If we could please go,
5 briefly, to Exhibit 6, what's marked Exhibit 6.
6          (Deposition Exhibit 6, remotely introduced
7 and provided electronically to the court reporter.)
8      Q.   (BY MR. SEBY)  And this exhibit is two
9 emails.  I'd like to focus on the latest email at the
10 top, which is Monday, August 22nd, 2016, from Colonel
11 Henderson to Brigadier General Spellmon.  Lieutenant
12 Colonel Startzell, you are copied on this email.  And
13 this email is a -- can you see the opening sentence
14 there in Colonel Henderson's note, which is the "BLUF"
15 section?
16     A.   Yes.
17     Q.   Okay.  As a matter of protocol, why does
18 Colonel Henderson say to his superior officer that --
19 actually, if you could just explain what that -- to
20 your understanding, what he's doing and saying in that
21 bottom line up front executive summary, is what I
22 understand that's akin to.
23     A.   Yes.  It sounds like he's just trying to
24 summarize a conversation for situational awareness.
25     Q.   On behalf -- and the conversation that

Page 133

1 he's summarizing is with the governor of North Dakota,
2 Jack Dalrymple.  And he's doing that through his
3 superiors so that they can provide that information to
4 Ms. Jo-Ellen Darcy, who is the head of the Civilian
5 Civil Works within the Corps.  Is that accurate?
6      A.   Yeah, that sounds like what is written,
7 yes.
8      Q.   So then there's a "DETAILS" section below
9 that.  Do you see that?
10     A.   Yes.
11     Q.   It's talking about Ms. Darcy speaking with
12 the governor and this being a briefing for their
13 benefit -- Ms. Darcy's benefit.  And he's -- Colonel
14 Henderson is recounting his conversation with Governor
15 Dalrymple, in paragraph 2, with several bullets of
16 topics within Colonel Henderson's conversation with
17 Governor Dalrymple.  Is that how you're reading this
18 email?
19     A.   Yeah.  Do you mind if I just --
20     Q.   Take your time to --
21     A.   -- take a look at this?
22     Q.   Yes, of course, please.
23     A.   (Deponent examined document.)  Okay.
24     Q.   All right.  So under paragraph No. 2, that
25 reads, "A few notes from my call with Governor

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 134

1  Dalrymple are listed below."  If you would go down to
2  what Colonel Henderson has noted as his fifth bullet.
3  And there, he's recounting --
4           MR. SEBY:  If you could put that up.
5  There we go.
6      Q.    (BY MR. SEBY)  -- that the "he" that that
7  refers to is Governor Dalrymple.  Do we agree?
8      A.    Yes.
9      Q.    And he's talking about any permit --
10  special use permit from the Standing Rock Sioux Tribe
11  at this point, right?
12      A.    Right.
13      Q.    And that second sentence, the "I" is
14  Colonel Henderson, right?  "I relayed to him . . ."
15      A.    Yes.
16      Q.    But the governor in the first sentence is
17  asking for the Corps -- Colonel Henderson, in
18  particular, at the district, your superior officer --
19  to deny that permit, as long as the encampment is
20  there.  And so Colonel Henderson's response is that
21  he's saying, "I would balance certain things in making
22  a decision on whether to issue a permit."  Is that what
23  the context of that is about?
24      A.    Yes, I believe so.
25      Q.    And so the things he says there to balance

Page 135

1  are life, health, safety, sanitation, risk with freedom
2  of speech and freedom of assembly rights.  Is that
3  accurate?
4      A.    Yes.
5      Q.    Are you aware of anything in the Army
6  Corps of Engineers special use regulations or policies
7  that call for such balancing?
8      A.    Not specifically, but I would say that the
9  Federal government has an interest in upholding all of
10  those.
11      Q.    And what evidence do you have for that in
12  the Corps regulations that govern the special use
13  permitting process?
14      A.    I don't think anything specifically in
15  special use permitting process talks about this.
16      Q.    Do we agree that there are very specific
17  provisions in the regulations and policies that
18  implement them?
19      A.    I would agree there are specific
20  requirements.
21      Q.    Thank you.  Earlier, Lieutenant Colonel
22  Startzell, I understood you, when we were talking
23  about -- you mentioned, I think, a special use permit
24  is a tool that's available.  And we talked about other
25  options, and you recognized there was at least one

**ND OBJ:**
Introduces new material

Page 136

1  other option.  And you said that your goal was to
2  provide guidance and recommendation to your commanding
3  officer, Colonel Henderson.  What was your
4  recommendation on which tool to use?
5      A.    I don't recall specifically providing a
6  recommendation in this case to him.
7      Q.    You don't recall, among the options that
8  you mentioned, a special use permit route or notifying
9  local law enforcement to have the trespassers removed?
10  You don't recall making a recommendation between those
11  two options that you identified?
12      A.    No.  I think -- I think he was already --
13  he already thought the special use permit was the way
14  to go in this case.
15      Q.    And by that, do you mean you believe he
16  rejected the other option?
17      A.    I think he had considered both and thought
18  the special use permit was the way to go.
19      Q.    So he made a decision to go the special
20  use permit route?
21      A.    Yes.
22      Q.    Okay.  Do you know what the basis of that
23  decision was?
24      A.    I think, based on the size of the crowd,
25  there was a concern that -- and their conduct, there

Page 137

1  was a concern that forcibly removing them was not up to
2  us at this point.
3      Q.    Well, I thought you said the other option
4  was to contact local law enforcement and to advise them
5  that they were trespassing on Corps property; and, as
6  the landowner, you were asking them to be removed as
7  such.
8      A.    I think that was an option, yes.
9      Q.    And are you telling me that you didn't
10  have a recommendation between those two options?
11           MS. BOBET:  Objection, asked and
12  answered.
13      Q.    (BY MR. SEBY)  Did you, sir, make a
14  recommendation to your commanding officer?
15           MS. BOBET:  Objection, asked and
16  answered.
17      Q.    (BY MR. SEBY)  Did he ask for your input
18  on those options?
19      A.    I don't remember.  I don't remember if he
20  directly asked for input on that decision.
21      Q.    And you did not provide any, correct?
22      A.    Not that I can remember.
23      Q.    So just to clarify your earlier testimony,
24  you did not provide a recommendation or have one?
25           MS. BOBET:  Objection, asked and

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 138

1  answered.
2       Q.   (BY MR. SEBY)  Please answer the question.
3       A.   So, in general, I provided
4  recommendations.  That was one of my jobs.  However, I
5  don't know if I provided one specifically between those
6  two choices.
7       Q.   Okay.  Are you aware whether Colonel
8  Henderson was provided any guidance amongst those two
9  choices by anyone, other than yourself?
10      A.   I think he received some -- I think from
11  the Project Office and the Operations Division he
12  received -- he got information that that was a tool
13  that they could use for this situation.
14      Q.   Okay.
15      A.   But outside of that, I don't know.
16           MR. SEBY:  All right.  If we could please
17  move to -- bear with me one moment, please.  If we
18  could move to Exhibit 18, please.
19           (Deposition Exhibit 18, remotely
20  introduced and provided electronically to the court
21  reporter.)
22      Q.   (BY MR. SEBY)  Colonel -- Lieutenant
23  Colonel Startzell, was one of your responsibilities as
24  deputy district commander at the time to create or
25  review drafts of what are called "Corps storyboards"?

Page 139

1       A.   Yes.
2       Q.   What is the purpose of a Corps storyboard?
3       A.   They were to consolidate a bunch of
4  information and provide a summary of things going on.
5       Q.   And who was the recipient of -- or who had
6  access to the Corps storyboards?
7       A.   I would usually email them to a
8  distribution list whenever I created them.  It sounds
9  like the one that (inaudible) has some addressees on
10  it.
11      Q.   Sure, it does.  Do you select the
12  recipients, or is there a protocol for that?
13      A.   So I think, initially, I selected some
14  recipients.  And then Colonel Henderson or other
15  leaders above him would ask to add some additional
16  personnel, for their awareness.
17      Q.   So in this instance at Exhibit 18, this
18  email is from a Lieutenant Colonel Frank Tedeschi to
19  Donald Jackson -- Major General Donald Jackson; is that
20  right?
21      A.   Yes.
22      Q.   And do you see that you're copied on this
23  email there, down at the bottom of the "Cc" list?
24      A.   Yes.
25      Q.   And so in this instance, Lieutenant

Page 140

1  Colonel Tedeschi is transmitting the Corps storyboard
2  of September 11, 2016, right?
3       A.   Yes.
4       Q.   And now let's go to the -- the storyboard
5  board which is attached, right?  And it's dated, at the
6  bottom, September 16th.  And that's a -- that's a
7  representation of events and happenings in the district
8  with respect to Dakota Access Pipeline, as of that
9  date.  Is that a fair way to understand what this is?
10      A.   Yes, as of 11 September on this one.
11      Q.   Yeah.  Well, actually, it's -- yeah,
12  November 11th -- pardon me, excuse me.  September 11,
13  2016; is that correct?
14      A.   Yes.
15      Q.   And then it says, category, "Situation."
16  "Last 72," does that mean 72 -- last 72 hours?
17      A.   Yes, that's what "Last 72" means.
18      Q.   And then the next category, it says, "Next
19  72."  Again, that's the next 72 hours?
20      A.   Right.
21      Q.   Okay.  And can you see there under the
22  "Next 72" hours it says NWQ (sic), NWD, and HQUSACE?
23  So the NWO, I think you've told us that's the district,
24  right?
25      A.   Yes.

Page 141

1       Q.   And NWD is the division?
2       A.   Yes.
3       Q.   And HQUSACE is United States Army Corps of
4  Engineers Headquarters?
5       A.   Right.
6       Q.   Okay.  And so it goes on to say those
7  entities, all three of them, ". . . will continue to
8  monitor the situation and consider Special Use Permits
9  and secondary access points to campsites."  What does
10  that mean, in your understanding?
11      A.   So the way I read it now, it means that we
12  would continue to consider special use permits where
13  appropriate.  And the secondary access points, I don't
14  recall what that was about.
15      Q.   And "to campsites," what is that referring
16  to?  Is this referring to the protest encampments
17  located on Corps land?
18      A.   Probably.
19      Q.   Who wrote this?
20      A.   I probably drafted this.
21      Q.   Okay.  Why did you use the -- why did you
22  call the protest encampments that you referred to as
23  containing trespassers because no permit had been
24  issued, why do you now call them "campsites"?
25      A.   I don't know.

141:6-
18
602

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 142

1    Q.   All right.  Under the "NWO Commanders
2  Assessment," is that referring to Colonel Henderson?
3    A.   Yes.
4    Q.   And so if you wrote this, Lieutenant
5  Colonel Startzell, and you're making a characterization
6  of your commanding officer's assessment, how did you do
7  that?  How did you arrive at understanding what his
8  assessments was?
9    A.   Normally, I would have discussions with
10  him or I would -- given his intent and discussion with
11  the staff, I would draft what I think his assessment
12  would be.
13    Q.   Did you ever confirm it with him before
14  finalizing the storyboard?
15    A.   Yes.
16    Q.   So he approved this language, is what
17  you're saying?
18    A.   I don't know if he approved this
19  particular day.  Sometimes he was traveling, and I
20  would write it; sometimes he would review it.  But
21  generally, he would come back to me and tell me if
22  there was a problem with what I was drafting on his
23  behalf.
24    Q.   Were you in the habit of issuing
25  characterizations of your commanding officer's

Page 143

1  assessment without his approval?
2    A.   I think there were times when he couldn't
3  review it in a timely manner, so I would draft it and
4  send it.
5    Q.   Well, was this one of those times?
6    A.   I don't remember, specifically.
7    Q.   So you don't recall whether or not you
8  were authorized to make this statement?
9    A.   I think he gave me latitude to do things
10  like this on his behalf when he was not available.
11    Q.   Did he ever object to your using this
12  language later on after you issued it?
13    A.   Not that I can recall.
14    Q.   Okay.  So that last sentence of the
15  Northwest District Commander's assessment reads --
16  would you read that aloud, please, "Chairman
17  Archambault . . ."
18    A.   "Chairman Archambault again requested a
19  Special Use Permit on Friday, and we continue to
20  reserve the right to grant a SUP, but will need
21  dialogue with higher level leadership before making any
22  decisions."
23    Q.   Who is the higher-level leadership that
24  you are referring to needing to speak with?
25    A.   That could be Northwestern Division or

Page 144

1  Headquarters USACE.
2    Q.   And were you involved in such dialogue
3  with those superior entities within the Corps of
4  Engineers?
5    A.   I was involved from a staff level.  I was
6  not involved in the commander-to-commander discussions
7  at that level.
8    Q.   Were you involved in dialogue with
9  higher-level leadership before making any decisions on
10  the special use permit application sought by Chairman
11  Archambault?
12    A.   I don't believe that I was.
13    Q.   Ever?
14    A.   Not that I can recall.
15    Q.   Did anyone tell you about such dialogue
16  that you did not participate in with higher-level
17  leadership before making any decisions regarding a
18  special use permit sought by Chairman Archambault?
19    A.   Not that I can recall.
20    MR. SEBY:  Okay.  If we could go to
21  Exhibit 20, please.  I apologize, everyone.  Let's go
22  to Exhibit 19 first.  I'm sorry.
23    (Deposition Exhibit 19, remotely
24  introduced and provided electronically to the court
25  reporter.)

Page 145

1    MR. SEBY:  It's being pulled up.
2    Q.   (BY MR. SEBY)  Exhibit 19 is an email from
3  Frank Tedeschi again, Lieutenant Colonel, from the Army
4  Corps Headquarters, to Major General Donald Jackson,
5  copied to a large list of Corps individuals.  And,
6  Lieutenant Colonel Startzell, you are among the
7  recipients of this as a "Cc"; is that correct?
8    A.   Yes.
9    Q.   And the transmittal here is another
10  storyboard from the day following the day we just
11  discussed, the September 11th storyboard.  Now we're
12  looking at a storyboard for the next day; is that
13  correct?
14    A.   Yeah, it looks like it.
15    Q.   Okay.  Did you author this storyboard,
16  sir?
17    A.   I can't see it, but chances are, yes.
18    Q.   Okay.  I apologize.  We're going to go
19  forward to that.
20    MR. SEBY:  Blow that up, if we can.  Okay.
21    Q.   (BY MR. SEBY)  So here is a storyboard
22  dated September 12th, 2016.  Do you see that?
23    A.   Yes.
24    Q.   Okay.  So again, there's those same
25  headings as the one the day before:  "Situation,"

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 146

1  "Last 24," and "Next 24 (sic)."  In the Next 24 (sic),
2  the first bullet there says, "Omaha District will
3  consider contacting SRST" -- Standing Rock Sioux
4  Tribe -- "Chairman regarding the way ahead for the
5  Special Use Permit and request for a second access
6  point to the camp sites [sic]."
7        So the day before, your -- the storyboard
8  that you created said that the District, the Division,
9  and Headquarters would consider what to do with the
10  special use permit with respect to the Standing Rock
11  Sioux Tribe; here, it says the Omaha District.  Did
12  something change in the way in which the Corps decided
13  to proceed?
14        A.  I don't know.  I can't remember why the
15  verbiage would have changed.
16        Q.  Your third bullet, sir, on the document
17  you wrote notes a planned protest at the White House
18  the following day.  Do you see that?
19        A.  Yes.
20        Q.  How did you become aware of that?
21        A.  I can't remember.  Potentially through
22  social media.
23        Q.  Were you in the practice of monitoring
24  social media with respect to the events concerning the
25  DAPL protest, generally?

Page 147

1        A.  Our Public Affairs Office would normally
2  monitor it and let us know if they saw anything of
3  significance.
4        Q.  Okay.  Over in the block that's on the
5  left-hand side of the document is the -- again, the
6  "NWO Commanders Assessment."  For this particular day,
7  did you consult with Colonel Henderson on the language
8  that you used here characterizing his assessment?
9        A.  I don't know.
10        Q.  Do you recall not talking to him about
11  this or getting approval?
12        A.  I don't recall, one way or another.
13        Q.  You don't recall not talking to him about
14  it, though, do you?
15        A.  No.  I don't recall, one way or the other.
16        Q.  That last sentence says, "We will" --
17        A.  I'm looking at it right now.
18        Q.  Yeah.  Check it out.
19        A.  (Deponent examined document.)  Okay.
20        Q.  So the -- I take it the first sentence is
21  concerning litigation that's going on in Federal
22  Courts, which is of no concern to this question.  But
23  the next sentence says, "NWO will continue to monitor
24  the increasing size of the encampments located on USACE
25  lands through the local law enforcement and social

Page 148

1  media.  We will continue to dialogue with" -- the
2  district and Headquarters -- "regarding the Special Use
3  Permit to provide a unified response to the SRST's
4  request."  Are you involved at this point in the
5  dialogue with the division and Headquarters regarding
6  the special use permit?
7        A.  I think my role was providing
8  informational updates and answering questions.
9        Q.  To whom?
10        A.  To whatever staff entities asked questions
11  about it, NWD or Headquarters.
12        Q.  You were in dialogue with them in that
13  regard?
14        A.  Yes.
15        Q.  Who, in particular?
16        A.  There could be a lot of individuals that I
17  discussed this with.  It could have been the division
18  deputy commander.  It could have been security, Public
19  Affairs, any of the staff entities that had questions
20  that may relate to their jobs.
21        MR. SEBY:  Okay.  If we could go back to
22  the email that transmits this storyboard, your
23  storyboard, Frank Tedeschi's email of September 12,
24  please.  And blow that up, enlarge it, please.
25        Q.  (BY MR. SEBY)  So it looks like Lieutenant

Page 149

1  Colonel Tedeschi is summarizing elements of your
2  storyboard.  Is that fair?
3        A.  Yes.
4        Q.  Do you agree with those statements?
5        MS. BOBET:  Could we see the bottom part
6  of that email as well, please?
7        A.  Yeah.  I mean, they look -- they seem to
8  align with the storyboard, but I could be wrong on some
9  of the -- I don't know if he cut-and-pasted or if he's
10  summarizing.
11        Q.  (BY MR. SEBY)  At the very end there, if
12  we can go down just a spot.  There, that last sentence
13  before "Respectfully."  "The UOC continues to monitor
14  and is in synch [sic] with NWD, NWO, and HQ efforts."
15  Who is the UOC -- or what is it?
16        A.  UOC is the USACE Operations Center.
17        Q.  How is that different than the
18  Headquarters or the district or the division?
19        A.  The UOC is the current Operations Center
20  within Headquarters USACE.  So they deal with daily
21  reporting and daily events.  They're basically the
22  emergency management (inaudible) for the Headquarters.
23        Q.  And who -- who is the leadership of the
24  UOC?
25        A.  Lieutenant Colonel Tedeschi was the

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 150

1  current operations chief.
2        Q.   Okay.
3        A.   So he ran -- on a day-to-day basis, he was
4  in charge of it.
5        Q.   So he's reporting that he's doing that.
6  He continues to monitor and is in sync with the
7  division, the district, and HQ efforts?
8        A.   Right.
9        Q.   What efforts is he referring to?
10            MS. BOBET:  Objection, calls for
11 speculation.
12            Q.   (BY MR. SEBY)  If you know.
13       A.   I think he just means to say that he's
14 staying in close contact with us and continuing to help
15 leadership understand what's going on.
16       Q.   Okay.  So what's the date of this email,
17 sir, if you can identify it at the top?
18       A.   Can you go up to the very top?  So the
19 date of the email is September 12th.
20       Q.   Time of day?
21       A.   4:10 p.m.
22       Q.   And if we could please turn to Exhibit 22.
23            (Deposition Exhibit 22, remotely
24 introduced and provided electronically to the court
25 reporter.)

Page 151

1            MR. SEBY:  If we could just enlarge that.
2        Q.   (BY MR. SEBY)  There's no attachments to
3  this email.  It's from Eileen Williamson, dated
4  Thursday, September 15th.  And it's addressed to a
5  number of Corps people.  And you are one of the
6  addressees, Lieutenant Colonel Startzell.  And in the
7  "Cc" list I see your commanding officer John Henderson,
8  Colonel Henderson, correct?
9        A.   Yes.
10       Q.   And the subject matter says, "DAPL Daily
11 Update PAO."  And so that's the Public Affairs Office,
12 or officer, providing an update, right?
13       A.   Yes.
14       Q.   So three days after the storyboard that
15 you authored saying that you're working on the --
16 thinking about what to do with the SUP and how to move
17 forward, the individual who works for you, Eileen
18 Williamson, sends this email, which says, simply -- if
19 you would read, please, what the text of the email
20 says.
21       A.   It says, "Draft Press release submitted
22 for Special Use Permit.  Continue to screen calls to
23 triage media queries although the number has dropped
24 significantly since Friday."
25       Q.   That first sentence, what does that mean,

Page 152

1  to your knowledge, that one of your direct reports
2  says?  Had you discussed this with her prior to this
3  email?
4        A.   I don't remember.  It's very likely.
5        Q.   Yes?
6        A.   Again --
7            MS. BOBET:  Objection, asked and
8  answered.
9        A.   -- I don't remember.
10       Q.   (BY MR. SEBY)  Would it have been unusual
11 for her to have sent this email without discussing the
12 topic with you at all, especially since you were
13 working on the storyboard saying it?
14       A.   Yeah.  This is the type of thing that
15 would normally have been discussed, yes.
16       Q.   With you?
17       A.   Yes.
18       Q.   Among others?
19       A.   Correct.
20       Q.   Do you know what she's referring to here
21 with that first sentence statement?
22       A.   It looks like she -- it looks like it's
23 the draft of a press release that will be released
24 announcing the special use permit.
25            Well, there's no attachment to this email.

Page 153

1            MS. BOBET:  Do you have a question related
2  to that, Mr. Seby?
3            MR. SEBY:  Yeah.  I'm trying to understand
4  what the witness is saying, because there's no
5  attachment that indicates what he just said.  So I'm
6  asking him to clarify his testimony.
7        A.   I mean, I don't know why there's nothing
8  attached.  I'm not sure if it was submitted as a hard
9  copy to someone for review, you know, or otherwise.
10       Q.   (BY MR. SEBY)  Well, what is she being
11 submitted?
12            MS. BOBET:  Objection, calls for
13 speculation.
14       Q.   (BY MR. SEBY)  To the extent you know,
15 sir.  Your subordinate stated she submitted a draft
16 press release regarding the special use permit.  What
17 do you make of that, to the extent you know?
18       A.   I don't really know.  I can't recall what
19 exactly she was talking about.
20            MR. SEBY:  Okay.  Exhibit 23, please.
21            (Deposition Exhibit 23, remotely
22 introduced and provided electronically to the court
23 reporter.)
24       Q.   (BY MR. SEBY)  So here are two emails in a
25 string in Exhibit 22 -- pardon me, 23.  We're on

151:2-13
602; 802

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 154

1  Exhibit 23.  There is an attachment to this.  The
2  attachment is referred to in the email as a special use
3  permit map.  Do you see that?
4      A.   Yes.
5      Q.   And the top email in the chain of two is
6  from Colonel John Henderson to you, Lieutenant Colonel
7  Startzell, and some of your colleagues in the Corps,
8  attaching a special use permit map.  And Colonel
9  Henderson is sending the map to the distribution group,
10  which includes you.  Do you see that?
11      A.   I do.
12      Q.   And the map came to Colonel Henderson, per
13  the email below, from Ms. Diane McGee, who is the real
14  estate division staff member in the Omaha District.  Do
15  you recognize that name?
16      A.   I don't remember that specific name.
17      Q.   Okay.  But you don't dispute the map
18  that's attached here and copied to you, do you?
19      A.   No, I don't.
20      Q.   And what is this map on the exhibit?  If
21  we could go to the exhibit screen.  What is the title
22  of the map there noted as Exhibit A?  Do you know what
23  that refers to, sir?
24      A.   The title is "Oahe Dam and Reservoir
25  Special Use Permit."

Page 155

1      Q.   And what is Exhibit A referring to?
2      A.   I don't know, but if I had to guess, I
3  would say that was an exhibit for -- that was included
4  with the special use permit; Exhibit A of the special
5  use permit.
6      Q.   And what's the date of the map there on
7  the bottom?
8      A.   13 September.
9      Q.   Had you seen this map prior to receiving
10  it from Colonel Henderson via this email and the
11  exhibit on September 15th?
12      A.   I don't remember.
13      Q.   And were you involved in the development
14  of this map?
15      A.   I don't remember.
16      Q.   Were you involved in the development of
17  the special use permit?
18      A.   So as I said before, I was -- I coordinate
19  a lot with the staff, but I don't recall specifically
20  processing the permit myself.
21      Q.   Do you recognize the areas depicted on the
22  map that's up on the screen that you're viewing?
23      A.   Yes, it looks familiar.
24      Q.   And do you see that --
25      A.   Can we expand that?

Page 156

1      Q.   Yes.
2      MR. SEBY:  Can we show the legend first,
3  please?  There we go.
4      Q.   (BY MR. SEBY)  So the very first
5  colored --
6      MR. SEBY:  I'm sorry.  The legend below
7  that.  There you go, that area.
8      Q.   (BY MR. SEBY)  Do you see the legend that
9  is a Corps depiction of certain features on the map?
10      A.   Yes.
11      Q.   Do you see the blue boundary that's
12  entitled "USACE Project Boundary"?
13      A.   Yes.
14      Q.   Does that mean those are Corps of
15  Engineers-managed lands owned by the United States, but
16  under the supervision and control of the Army Corps of
17  Engineers?
18      A.   Yes.
19      Q.   All right.  And do you see the area below
20  that, which is a yellow hash mark line entitled
21  "Special Use Permit Area (plus or minus 41.34 Acres)"?
22      A.   Yes.
23      Q.   All right.  Is the yellow area marked on
24  this map, sir, within the Corps project boundary
25  denoted by the blue hash line?

Page 157

1      A.   Yeah, it appears that it is.
2      Q.   Okay.  And, sir, let's go back to the
3  legend.  Do you see where it identifies the special use
4  permit area as plus or minus 41.34 acres?
5      A.   Yes.
6      Q.   How can it be that the Corps of Engineers
7  would propose a map of approximately twice the size of
8  the property that Colonel Archambault's permit
9  application sought from the Corps?  How did that
10  happen?
11      MS. BOBET:  Objection, mischaracterizes
12  the evidence.
13      MR. SEBY:  The permit application speaks
14  for itself, and it says that number, Ms. Bobet.  And
15  I'm asking how this document now says something twice
16  as large.  The permit application didn't seek this
17  amount.
18      MS. BOBET:  The objection stands.  You can
19  answer.
20      A.   Yeah.  I'm not sure why we selected that
21  amount of land, that parcel.  I'm not sure.
22      Q.   (BY MR. SEBY)  Were you involved in that
23  topic of discussion?
24      A.   Probably at some point, but I don't
25  remember specifics about selecting those parcels.

157:2-10; 157:20-158:11 602

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 158

1    Q.   Who selected that number?
2    A.   I think it was probably our real estate
3  division, as they were trying to find land that was
4  appropriate for the permitting area.
5    Q.   Was it because you were trying to capture
6  the existing or preexisting protest camp on Corps
7  property?
8    A.   I don't know.
9    Q.   Do you have any reason to believe that
10  wasn't the case?
11   A.   No.
12   Q.   Okay.  Do you have any explanation for why
13  this map was created concurrent with your storyboards
14  that we just talked about as prior exhibits?
15   A.   Can you ask that again?
16   Q.   Can you provide any explanation for the
17  date of this map of September 13, 2016 in conjunction
18  with your earlier statements noted on the storyboards
19  that you have advised that you authored?
20        MS. BOBET:  Objection, ambiguous.
21   Q.   (BY MR. SEBY)  Do you view this in
22  conflict with anything that you've said in prior
23  emails, sir?
24   A.   No.
25   Q.   All right.  Sir, if we could please go to

Page 159

1  Exhibit 24.
2        (Deposition Exhibit 24, remotely
3  introduced and provided electronically to the court
4  reporter.)
5        MR. SEBY:  And blow that up, enlarge it,
6  so you can see who the email transmitter --
7    Q.   (BY MR. SEBY)  Who is it from and who are
8  you sending it to, if I can ask you to explain that?
9  Who is it from?
10   A.   It is from myself to Chairman Archambault.
11   Q.   And copy to Colonel Henderson?
12   A.   Yes.
13   Q.   And the date, sir?
14   A.   It looks like Friday, September 16th.
15   Q.   And the date -- or the time?
16   A.   5:22 p.m.
17   Q.   Okay.  And read aloud what the content of
18  your email to the chairman says.
19   A.   It says, "Chairman Archambault:  Attached
20  you will find the special use permit for your
21  signature, along with a notification letter, a map of
22  the approved site, and the pamphlet for public use of
23  projects.  We will follow this up with a mailed copy to
24  you on Monday."
25   Q.   Why did you say as part of what is

Page 160

1  attached is an approved map of the site?
2    A.   I don't understand your question.
3    Q.   Why did you choose the word "approved" map
4  of the site?
5        MS. BOBET:  Objection, mischaracterizes
6  evidence.
7    Q.   (BY MR. SEBY)  Your word -- Lieutenant
8  Colonel Startzell, the words you just read are,
9  "Attached you will find the special use permit for your
10  signature, along with a notification letter, a map of
11  the approved site, and the pamphlet for public use of
12  projects.  We will follow this up with a mailed copy to
13  you on Monday."
14   A.   Yeah.  I think what I was trying to show
15  him was the land that was available for the special use
16  permit.
17   Q.   Why did you send this to the Chairman and
18  not Colonel Henderson?
19   A.   I have trouble remembering, but it's quite
20  possible he was traveling.
21   Q.   Was he unavailable?
22   A.   Possibly.
23   Q.   Do you recall, yes or no?
24   A.   I don't recall.
25   Q.   Can you explain why on September 16th you

Page 161

1  did this, when two days prior you were advising the
2  other members -- senior members of the Corps that you
3  were working -- that at least the district -- because
4  you didn't recall ever having any involvement in this,
5  other than monitoring or whatever the word you used.
6  But why is it now that you're the one transmitting it
7  to the applicant?
8        MS. BOBET:  Objection; compound,
9  mischaracterizes the evidence.  You can answer.
10   A.   Yeah.  My guess is that my boss was
11  traveling and, you know, he wanted me to go ahead and
12  send this to get it to Chairman Archambault as soon as
13  possible.
14   Q.   (BY MR. SEBY)  And what is the attachment,
15  sir, to your email?  If you'd just look for a minute at
16  what this is and tell me what it is and who is it from
17  and who it is addressed to.
18   A.   It's from the district commander to
19  Chairman Archambault.  And then it looks like it's an
20  explanation that this is the package for the special
21  use permit.
22   Q.   And so this is from District Commander
23  Colonel Henderson, right?
24   A.   Yes.
25   Q.   Would you read the second paragraph of

160:25-
161:7;
161:10-
13
401-
402;
602;
611

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 162

1  that letter from Colonel Henderson to Chairman
2  Archambault.
3       A.  "Enclosed for your review and execution is
4  the Special Use Permit."
5       Q.  I'm sorry, sir.  The second sentence of
6  the first paragraph.
7       A.  Okay.  "I have decided to grant a Special
8  Use Permit for the location south of the Cannonball
9  River that you requested from the United States Army
10 Corps of Engineers, so that the Standing Rock Sioux
11 Tribe can gather and engage in a free speech
12 demonstration."
13      Q.  Do you know why he granted a special use
14 permit that was transmitted unsigned and had not yet
15 received the demonstration of compliance with the
16 conditions of the permit that you sent?
17      A.  I don't know.
18      Q.  Do you agree that grant suggests that it
19 was final?
20      A.  Yeah.  I think our intention was to offer
21 it, and the expectation was that it would be followed
22 up on by the tribe.
23      Q.  The act of granting a special use permit,
24 sir, what does that mean to you?  Final or not yet?
25      A.  It implies that it's final.

Page 163

1       Q.  Implies?  Are you familiar with that term
2  in Corps regulations?
3       A.  No.
4       Q.  You're not?  I'm sorry?
5       A.  No.
6       Q.  Thank you.  Could you come down to the
7  second paragraph.  Colonel Henderson does say,
8  though -- his letter does, at least -- that the special
9  use permit is transmitted for his review and execution,
10 right?
11      A.  Yes.
12      Q.  What does review and execution mean to
13 you?
14      A.  I don't know.  I mean, I think I interpret
15 that as he'll review it and then carry it out.
16      Q.  Do you know why this letter has no date on
17 it?
18      A.  I don't.
19      Q.  Did you write this letter, Lieutenant
20 Colonel Startzell?
21      A.  I don't think so, but I can't remember for
22 sure.
23      Q.  Did you have any hand at all in any manner
24 of writing it or reviewing it prior to it being signed?
25      A.  I probably reviewed it.

163:19-164:9
401-402; 403;
602

Page 164

1       Q.  Did you sign it for Colonel Henderson?
2       A.  I don't know.
3       Q.  Did you ever sign letters for Colonel
4  Henderson in his absence?
5       A.  Yes, there were times.
6       Q.  Is this one of those instances, sir?
7       A.  I don't know.
8       Q.  Is it possible?
9       A.  It's possible.
10           MS. BOBET:  Can you scroll down so the
11 witness can see the bottom of the letter, the full
12 document with the signature on it?
13      Q.  (BY MR. SEBY)  Lieutenant Colonel
14 Startzell, as we are looking at that signature, in the
15 instances where you, quote, signed letters or documents
16 for Colonel Henderson, did you do it in freehand, or
17 did you have an auto-pen stamp?
18      A.  No, I don't believe ever used a stamp for
19 him.
20      Q.  So in the instances where you did sign
21 letters on his behalf in his name, you did it freehand?
22      A.  What I would do is I would sign my name
23 for, and I would write "for" above his block.
24      Q.  Do you recall any instances where you used
25 that manner of signing a letter for Colonel Henderson?

164:10-
23
Offer if
prior
testimony
comes
into
evidence

Page 165

1       A.  I don't recall any specifics.
2       Q.  But you're saying they exist?
3       A.  What I'm saying is that is the normal
4  practice that I would have done.
5       Q.  Did you ever deviate in any instance from
6  that normal practice?
7       A.  Not that I can recall.
8       Q.  Does that look like Colonel Henderson's
9  signature, to you?
10      A.  I have no idea.  I mean, it looks close.
11      Q.  Really?
12      A.  Yeah.  I'm not sure.
13      Q.  All right.  Do you believe that Colonel
14 Henderson signed this letter and left it with you prior
15 to you transmitting it to Chairman Archambault?
16      A.  I can't recall.
17      Q.  Well, how did you have it to send to
18 Chairman Archambault?
19      A.  I don't know.
20      Q.  Well, you did send it, sir.
21      A.  Yes, apparently.
22      Q.  But you don't recall anything associated
23 with how you got it and in what condition you received
24 it for transmittal?
25      A.  No, I don't.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 166

```
1              MS. BOBET:  Objection, compound.
2         Q.   (BY MR. SEBY)  Do you recall Colonel
3   Henderson discussing you doing this, with you?
4         A.   I don't.
5              MR. SEBY:  Could you please go to
6   Exhibit 26.
7              (Deposition Exhibit 26, remotely
8   introduced and provided electronically to the court
9   reporter.)
10             MR. SEBY:  Can you enlarge it so the
11  witness can read the "To" and "From" and "Re" line and
12  "Date."
13        Q.   (BY MR. SEBY)  So this is from Colonel
14  Henderson, as you can see, to Chairman Archambault on
15  Friday, September 16, 2016, at 4:59 p.m.  Lieutenant
16  Colonel Startzell, is that the same day you transmitted
17  the special use permit to Chairman Archambault?
18        A.   I think it was the same Friday -- was it
19  Friday or Saturday?
20        Q.   Well, we can go back to the exhibit we
21  just discussed and identify the date on Exhibit 24;
22  because you did note that it was Friday, September 16,
23  sir, and we discussed the time.  Do you recall that?
24        A.   Okay.
25        Q.   So, yes, you agree it's the same day?
```

Page 167

```
1              MS. BOBET:  The exhibit is not up on the
2   screen, if you're trying to go back to Exhibit 24.
3              MR. SEBY:  Oh, we sure can.
4         A.   Okay.  Yes, so I see the email.
5         Q.   (BY MR. SEBY)  Okay.  Again, sir, note the
6   time of day.
7         A.   I see it.
8         Q.   5:22 p.m.; is that correct?
9         A.   Yes.
10        Q.   And you sent it to Chairman Archambault,
11  you copied Colonel Henderson, correct?
12        A.   Yes.
13        Q.   Okay.  Now let's go back to -- or return
14  to Exhibit 25.
15             THE REPORTER:  I believe we were on 26.
16             MR. SEBY:  Yes, ma'am.  Yes, that's
17  correct.  Let's return to Exhibit 26.
18        Q.   (BY MR. SEBY)  Okay.  Same day, Lieutenant
19  Colonel Startzell, an hour earlier, approximately,
20  right?
21        A.   Yes, that looks right.
22        Q.   And same day, an hour earlier, your
23  commanding officer, Colonel Henderson, sends Chairman
24  Archambault an email.  And would you please read the
25  second line of that email.
```

Page 168

```
1         A.   It says, "I hope all is well for you.  Our
2   staff will be sending you a copy of the permit by email
3   soon; official copy with [sic] be sent by certified
4   mail on Monday."
5         Q.   And then the next sentence.
6         A.   "We will send the attached press release
7   out this evening at 7:00pm.  I wanted to give you the
8   courtesy of reviewing it a final time prior to our
9   release."
10        Q.   So Colonel Henderson sent this email at
11  4:59 p.m., and he's telling the chairman, "We have a
12  press release, it's attached, and we're going to send
13  it out in two hours.  Wanted to give you the courtesy,
14  a final time, prior to releasing it," correct?
15        A.   Yes, that looks right.
16        Q.   So you suggested earlier, didn't know,
17  that Colonel Henderson wasn't in the office or was
18  traveling.  Is that -- did I understand what you said
19  correctly?
20        A.   Yes.  I mean, it's possible.
21        Q.   Well, he was able to communicate -- were
22  you instructed to send that and not him, or why the two
23  emails an hour apart?
24        A.   I don't remember.
25        Q.   Well, his email says his staff -- "Our
```

Page 169

```
1   staff."  I assume that includes you as the senior
2   person amongst that group, right?
3         A.   Yes.
4         Q.   And you don't recall ever discussing this
5   coordination for transmitting a special use permit to
6   the Standing Rock Sioux Tribe chairman with respect to
7   the protests ongoing on Corps property?
8         A.   I don't recall details of it, no.
9         Q.   Can we please look at the attachment
10  together, sir, to this email.  Can you identify what
11  you're seeing?
12        A.   Yes.  So this looks like the draft press
13  release.
14        Q.   Does it say "Draft" on this, to you?
15        A.   No.
16        Q.   What does it say under the Corps logo?
17        A.   "For Release at 7 PM September 16, 2016."
18        Q.   Do you believe this to have been a draft?
19        A.   Well, I guess it depends on how you define
20  "draft."  But until it goes out and actually is
21  published, it's still a draft.  But this is probably
22  very close to what actually went out, if not the same.
23        Q.   Do you have any reason to believe it's
24  different than the one that was posted publicly?
25        A.   No, I don't.
```

168:10-
15
602; 802

U.S. Legal Support | www.uslegalsupport.com  166 to 169

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 170

1    Q.  Did you write this draft or this document?
2    A.  I believe our PAO wrote it, and I probably
3  reviewed it.
4    Q.  When did you review it?
5    A.  I don't remember.
6    Q.  Do you recall reviewing it?
7    A.  Not specifically, but I would normally
8  review this type of document before it went out.
9    Q.  You're not aware that it was a surprise to
10  you, then, or you didn't review it?
11    A.  No.
12    Q.  Okay.  Do you know who wrote it for your
13  review in the PAO?
14    A.  Probably Eileen Williamson.
15    Q.  Did she receive any input from commenters
16  on drafts?
17    A.  Normally, yes.
18    Q.  Do you know who provided comment on this
19  draft?
20    A.  I don't.
21    Q.  Colonel Henderson saw it before it was
22  finalized, correct?
23    A.  I don't know.
24    Q.  Well, he's transmitting it to the
25  chairman.  Don't you think he would have known what he

Page 171

1  was transmitting?
2    A.  Normally he would, yes.
3    Q.  Who else, sir, would have reviewed it?
4    A.  Probably counsel, potentially real estate,
5  and our Operations Division.
6    Q.  Above the district level, who reviewed it
7  at the division?  Let's start there.
8    A.  I think the standard practice was the
9  public affairs chief at the Northwestern Division would
10  normally review these as well.
11    Q.  And who is that individual?
12    A.  I can't recall.  I think her name was Amy,
13  Amy something.
14    Q.  How about at Corps Headquarters?  You were
15  saying in your storyboards that you were consulting
16  with them.
17    A.  I don't know if they would have reviewed
18  this one.
19    Q.  Do you have any personal explanation for
20  why this press release draft or final did not mention
21  any of the outstanding conditions stated in the permit
22  provided to Chairman Archambault or Colonel Henderson's
23  transmittal message -- letter transmitting it?
24    A.  I don't, no.
25    Q.  Can you read the press release, please, to

171:19-24
602

Page 172

1  yourself so we can discuss it.
2    A.  (Deponent examined document.)  Okay.
3  Could you go down?  Okay.
4    Q.  In what you just read in this document, do
5  you see any reference to the conditions precedent that
6  are specified for the permit to be granted?
7    A.  No.
8    Q.  Why does the language of this press
9  release say that Colonel Henderson informed Chairman
10  Archambault that he has been granted a special use
11  permit which allows the tribe to gather?  Why would you
12  issue a press release that says something different
13  than the underlying permit itself requires in order for
14  it to be in effect?
15    MS. BOBET:  Objection, mischaracterizes
16  evidence.
17    MR. SEBY:  It's exactly what it says.
18    A.  Can you ask the question again?  I don't
19  understand.
20    Q.  (BY MR. SEBY)  Why does this use the word
21  "granting" a special use permit allowing activity?
22  Twice it uses the word grant -- or "granting."
23    A.  Okay.
24    Q.  Your answer, please?
25    A.  I really don't understand that question.

Page 173

1    Q.  Why is the word "grant" used an hour after
2  you transmitted a special use permit that was unsigned
3  and required the performance of certain activities by
4  the applicant before it could be granted under the
5  Corps procedures?
6    A.  I think there was a -- there was an
7  expectation that the applicant would follow up with
8  their end of the deal.
9    Q.  Why would you tender a permit to an
10  ongoing raging protest where you and other Corps
11  officials recognized the growing and violent nature of
12  the camps?
13    MS. BOBET:  Objection, mischaracterizes
14  evidence.
15    Q.  (BY MR. SEBY)  Answer, please.
16    A.  So I think -- I think, given all of the
17  activity at this time, this was a way to permit the
18  action in a more constrained area, not north of the
19  Cannonball.
20    Q.  But still on Corps land where existing
21  protest camps existed?
22    A.  Correct.
23    Q.  Was this press release a mistake?
24    A.  No, I don't think so.
25    Q.  Do you understand that it was issued to

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 174

1  media outlets and posted on the Corps of Engineers'
2  website?
3       A.   Yes.
4       Q.   In retrospect, do you think it was a
5  mistake or an error?
6       A.   I think it was a -- it could cause some
7  confusion and the timing wasn't perfect.
8       Q.   What do you mean by it "wasn't perfect"?
9       A.   Well, I think we could have held off on
10  publishing it.
11      Q.   Why?
12      A.   Until the applicant had fulfilled their
13  end of the deal.
14      Q.   Did they ever?
15      A.   To my knowledge, no.
16      Q.   Why wasn't the press release withdrawn?
17      A.   I don't know.
18      Q.   Are you aware that that press release, in
19  final form, remains today, November 19, 2021, on the
20  Corps of Engineers' public website today?
21      A.   No, I'm not aware of that.
22      Q.   Do you regret the issuance of this press
23  release?
24      A.   No.
25      Q.   Are you aware that this press release

174:16-21
602

Page 175

1  became a matter of public record shortly after it was
2  posted on the Corps of Engineers' website on
3  September 16, 2016?
4       A.   Yes.  That's pretty common for all of our
5  documents.
6       Q.   Was it purposely released for public
7  awareness and consumption?  Was that an intentional
8  action?
9       A.   I'm sorry.  I don't understand your
10  question.
11      Q.   Was this news release created for the
12  purpose and intention of making a public announcement?
13      A.   I believe so.
14      Q.   And are you aware that the Corps took
15  affirmative steps to make it publicly available,
16  starting on September 16th, 2016?
17      A.   I don't know -- I guess I don't know what
18  you're asking.
19      Q.   Was it created and intended to be released
20  as a public statement by the United States Army Corps
21  of Engineers?
22      A.   Yes, I believe so.
23           MR. SEBY:  Could we go to Exhibit 27,
24  please.
25           (Deposition Exhibit 27, remotely

Page 176

1  introduced and provided electronically to the court
2  reporter.)
3       Q.   (BY MR. SEBY)  Are you familiar with this
4  email?  You're copied on it.  It's an email from
5  Colonel Henderson to Ms. Eileen Williamson, who you've
6  identified previously as one of your reporting staff
7  people.  And you are copied, sir, on this email; is
8  that correct?
9       A.   Yes.
10      Q.   This is an email from Colonel Henderson to
11  Eileen that is redacted by your counsel.  We don't know
12  what it says.  And we will later be informed the basis
13  for the redaction, so I'm not going to ask you about
14  that.  But if you would go down below, on
15  September 18th, which is a Sunday, in the evening, at
16  8:45 p.m., Colonel Henderson was sent a letter -- or,
17  pardon me, an email entitled "Special Use Permit to the
18  Standing Rock Sioux Tribe."  So this is two days after
19  the media release that we just discussed was issued to
20  the public.  Colonel Henderson received an email from
21  the representative of the independent Lakota Nation.
22  Do you see that?
23      A.   I do.
24      Q.   Do you have any information about this
25  communication and who this entity is?

Page 177

1       A.   I don't recall who this is or what this is
2  about.
3       Q.   Are you familiar with this entity?
4       A.   No.  It doesn't ring a bell.
5       Q.   Does the Corps recognize this entity as a
6  recognized tribal nation or government?
7       A.   I don't recall.  I don't remember the
8  name.  The name does not sound familiar as a recognized
9  tribe.
10      Q.   Did you ever have any discussions with
11  Colonel Henderson with respect to this email?
12      A.   Not that I can recall.
13           MR. SEBY:  If we could please go to
14  Exhibit 25.
15           (Deposition Exhibit 25, remotely
16  introduced and provided electronically to the court
17  reporter.)
18      Q.   (BY MR. SEBY)  This exhibit consists of
19  two emails, Lieutenant Colonel Startzell.  The first
20  one is Thursday, September 15th, 2016, at 6:12 p.m.,
21  and it is to Colonel Torrey DiCiro and Ruddell.  Do you
22  know those individuals?
23      A.   I do.
24      Q.   Who are they?
25      A.   Colonel DiCiro was the deputy commander

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 178

1  for the Northwestern Division, and Major Christian
2  Ruddell was the emergency operations chief for the
3  Northwestern Division.
4       Q.   And you copied a number of individuals.
5  But your email at 6:12 p.m. says, "ALLCON."  What does
6  that refer to?
7       A.   That just stands for all concerned.
8       Q.   And you're alerting them to Corps
9  visibility, also submitted through ENGLink.  Did you do
10 that?
11      A.   Yes.
12      Q.   Did you do that?
13      A.   The submission through ENGLink was either
14 by me or by one of the other authorized people in the
15 district.
16      Q.   Okay.  And you've got here -- the day
17 prior to the issuance of the media release you're
18 noting it as a pending press release on special use
19 permit for Standing Rock Sioux Tribe, correct?
20      A.   Yes.
21      Q.   And then you state a heading called
22 "WHEN," and you say that the goal is to publish the
23 special use permit and associated press release on
24 Friday, the 16th.
25      A.   Yes.

Page 179

1       Q.   Why did you make a point of issuing an
2  email notification ahead of time to these people?  Were
3  they aware of this, or was this their first news of it?
4       MS. BOBET:  Objection, compound.
5       A.   Yeah.  I think this was probably
6  socialized verbally before I sent this email.  But this
7  email is to call their attention to it, just so they
8  knew who was coming.
9       Q.   (BY MR. SEBY)  And then down in the
10 section below entitled "WHY" -- do you see that?
11      A.   Yes.
12      Q.   Would you read the first line of the
13 section entitled "WHY."
14      A.   In close coordination with all partnering
15 agencies and with the SRST, the Omaha District
16 developed a Special Use Permit to provide a Free Speech
17 Zone on USACE land south of the Cannon Ball [sic] River
18 near Cannon Ball, ND."
19      Q.   Second sentence, please?
20      A.   "The permit provides the Tribe with a
21 designated area to camp and exercise their 1st
22 Amendment rights, while protecting the government's
23 interests by denying their permit request to the north
24 of the Cannon Ball [sic] River, an area covered under
25 an existing grazing lease."

Page 180

1       Q.   At the time you wrote this email to your
2  colleagues in the Corps, did you believe the permit was
3  final?
4       A.   I believed that we were going to offer the
5  permit, yes.
6       Q.   Unsigned, yet to be complied with by its
7  own terms, correct?
8       A.   Yes.
9       Q.   And in the first sentence, you used, in
10 your words, Lieutenant Colonel Startzell -- who are the
11 "partnering agencies" that you were in close
12 coordination with to develop this?
13      A.   I'm not sure, specifically, but I think I
14 was just referring, in general, to anyone with a stake
15 that we had been in discussions with.
16      Q.   Sir, you say, "partnering agencies."  That
17 means outside the Corps of Engineers.  Who are you
18 referring to?
19      MS. BOBET:  Objection, asked and
20 answered.
21      Q.   (BY MR. SEBY)  Is it your testimony you
22 have no idea who you were referring to?
23      A.   Well, I think, you know, I was probably
24 referring to Bureau of Indian Affairs, potentially the
25 U.S. Attorney's Office.  And, I mean, that's all I can

Page 181

1  think of right now, as far as who I was referring to.
2       Q.   Who did the close coordination with those
3  entities, sir?
4       A.   The district and probably State of North
5  Dakota as well.
6       Q.   What do you mean by that?  Are you
7  suggesting the State of North Dakota participated in
8  the creation of this special use permit?
9       A.   No.  What I meant was we had just been in
10 coordination with them.
11      Q.   Who are you referring to?
12      A.   The State of North Dakota with the EOC and
13 the Sheriff's Office.
14      Q.   Are you testifying, Lieutenant Colonel
15 Startzell, that you coordinated with the sheriff of
16 Morton County, Kirchmeier, and the participants in the
17 State of North Dakota's Emergency Operations Center
18 about the issuance of a special use permit?  Is that
19 what you're saying?
20      A.   So no, that's not what I'm saying.  But
21 what I'm saying is we had been in coordination with
22 them up to this point.
23      Q.   Well, your own words reflect the
24 coordination is with respect to the development of the
25 special use permit.  I'm trying to understand, did you

181:23-
182:1;
182:9-12
602; 611

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 182

1  mean that, or now do you mean something differently?
2        MS. BOBET:  Objection, mischaracterizes
3  testimony and evidence.
4        MR. SEBY:  Well, it's very confusing what
5  the witness is saying, and I'm trying to clarify it.
6        Q.   (BY MR. SEBY)  Would you please do so,
7  sir.
8        MS. BOBET:  Objection stands.
9        A.   So I'm not exactly sure who I was talking
10 about; but I think it's, you know, possible BIA and
11 then, you know, the U.S. Attorney's Office.  And then
12 that's probably it at this point.
13       Q.   (BY MR. SEBY)  Did you do any of the
14 coordinating that you're referring to?
15       A.   I was not referring to just my
16 coordination, but I was referring to the coordination
17 that the district had done.
18       Q.   As part of your reference to the district
19 doing coordination, did you participate in that course
20 of events?
21       A.   I'm not really sure what you're asking.
22       Q.   Were you a participant in the district's
23 efforts to closely coordinate with all partnering
24 agencies?
25       A.   Yes.

Page 183

1        Q.   And what was your role in doing so?
2        A.   I think my biggest role was facilitating
3  communications within the district and with our
4  Headquarters.
5        Q.   And what were you facilitating within the
6  district and with Headquarters?
7        A.   Information.
8        Q.   Regarding?
9        A.   Regarding the special use permit.
10       Q.   And what time periods did you do that,
11 Lieutenant Colonel Startzell?
12       A.   I'm not really sure what you're looking
13 for from a timeline perspective; but up to this point,
14 up to the point of this email.
15       Q.   Did you do it that day, or did you do it
16 several days prior, or longer periods of time?  I'm
17 trying to understand.  You've earlier said you weren't
18 involved in the special use permit, and now you advised
19 your superiors that you were in close coordination with
20 respect to its development.  I'm trying to understand
21 what your story is.  What is your testimony?
22       MS. BOBET:  Objection; misstates the
23 evidence, argumentative.  You can answer.
24       Q.   (BY MR. SEBY)  I'd like an answer.
25       A.   The district was in close coordination.

Page 184

1  That's what I was trying to say in this email.
2        Q.   And you were part of the district effort
3  to do that, is what you've said.
4        A.   Correct.
5        Q.   Are you willing to tell me about what that
6  involved?
7        A.   Yes, if I understand your question.
8        Q.   I'm trying to ask you and receive an
9  answer to, will you explain to me what the nature of
10 your involvement was specifically and over what time
11 period?
12       A.   So I thought I explained, up to this
13 point, what my role was in the process.  So I'm just
14 unclear what the question is.
15       Q.   What was the scope of your close
16 coordination within the district regarding the special
17 use permit?
18       A.   So my role is to keep our Headquarters
19 informed as to what was going on and make sure that our
20 project office understood what was going on as well.
21       Q.   And over what time frame did you perform
22 those functions?
23       A.   Since the beginning of the protests.
24       Q.   With regard to the -- sir, we're talking
25 about the development of the special use permit,

Page 185

1  because that's your own words.  I'm trying to
2  understand, what was the time frame during which you
3  were closely involved with partnering agencies, within
4  the district, in the development of a special use
5  permit for the Standing Rock Sioux Tribe?
6        A.   A time frame?  It must have been at least
7  two or three weeks before.  I think the discussions
8  about the permit were developing for at least a month,
9  probably.
10       Q.   Okay.  Can we go to your second email in
11 the string within Exhibit 25, please, which is the
12 email we're on.  And again, that paragraph entitled
13 "WHY," if we could go to the second page where that
14 "WHY" is present.  It looks to me like you're, again,
15 referencing the close coordination with partnering
16 agencies and the Standing Rock Sioux Tribe, that the
17 district developed a special use permit; is that
18 correct?
19       A.   Yes.
20       Q.   And the second sentence, again, talks
21 about "the permit provides the Tribe," but it doesn't
22 identify any qualifications about the non-final nature
23 of the permit or the unsigned nature of the permit.
24 But you state, as a matter of current -- at this time,
25 it provides the tribe with a designated area for

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 186

1  exercising of certain behavior, right?

2       A.   Yes.

3       Q.   The next sentence says, "The permit has

4  been vetted through vertical channels and discussed

5  with interagency partners . . ."  What are the vertical

6  channels that you're referring to?

7       A.   I believe what I was referring to there

8  was through Northwestern Division and Headquarters

9  USACE.

10       Q.   Do you recall why you didn't mention in

11  this email to a very long list of Corps personnel why

12  there's no reference to the fact that the permit was

13  provided, tendered, not even signed by Colonel

14  Henderson, not signed by Chairman Archambault, and the

15  tribe didn't yet have any opportunity to comply with

16  the requirements in the permit proposed?

17       A.   No, I don't.

18       Q.   You don't what?  You don't know?

19       A.   I don't know.

20            MR. SEBY:  Could you please go to

21  Exhibit 28.

22            (Deposition Exhibit 28, remotely

23  introduced and provided electronically to the court

24  reporter.)

25            MR. SEBY:  And if we could enlarge that

**186:10-17**
**602; 611**

Page 187

1  for the witness to see, please.

2       Q.   (BY MR. SEBY)  So you'll see, Lieutenant

3  Colonel, this is an email from the security specialist

4  for your Omaha District, Mr. John Ruden, to you,

5  correct?  Do you see that?

6       A.   I do.

7       Q.   Copied, again, to a number of individuals

8  in the district and in the Corps.  And the email is a

9  daily DAPL update.

10       A.   Yes.

11       Q.   Okay.  And if you'd come down to the

12  paragraph that talks about the special use permit,

13  please.  It's midway down.  If you'd read that

14  paragraph, please.

15       A.   "Special use [sic] Permit Received

16  approval letter for south of the Cannonball, requiring

17  $100,000 performance bond, $5,000,000 in insurance,

18  waiving $75 application fee.  If the Tribe signs it,

19  and provides the appropriate proof of insurance, etc.

20  the Corps will countersign it and it will be valid for

21  30 days after the Corps signature."

22       Q.   And this email is dated September 19th,

23  2016, which is a Monday.  And it followed the release

24  of -- the media release that we've been discussing in

25  final and to the public.  When you read this email,

Page 188

1  Lieutenant Colonel Startzell, was that paragraph you

2  just read news to you?  Was that information you

3  previously did not know or understand?

4       A.   No.

5       Q.   So you are aware of everything that that

6  gentleman says there?

7       A.   Yes.

8       Q.   Do you believe that to be an accurate

9  statement of circumstances?

10       A.   Yes.

11            MR. SEBY:  All right.  If we could go to

12  Exhibit 29, please.  And enlarge it for Lieutenant

13  Colonel Startzell to see the "From" and "To" and

14  "Date."

15            (Deposition Exhibit 29, remotely

16  introduced and provided electronically to the court

17  reporter.)

18       Q.   (BY MR. SEBY)  This is an email from

19  Colonel Henderson, dated Wednesday, September 21, 2016,

20  5:01 a.m., to a number of Corps recipients, which

21  includes you, Mr. -- Lieutenant Colonel Startzell; is

22  that correct?  Do you see your name there?

23       A.   Yes.

24       Q.   Okay.  And the email begins, "Team."

25  Colonel Henderson is referring to the recipients as a

**188:18-1**
**89:10**
**No object-**
**ion to**
**admitt-**
**ing the**
**version**
**of this**
**email at**
**USACE**
**_000240**
**09**

Page 189

1  team, his team.  Is that accurate?

2       A.   Yes.

3       Q.   And the email starts off, "I received a

4  call from Senator Heitkamp yesterday reference the

5  encampment area north of the River."  Who is Colonel

6  Henderson referring to, Senator Heitkamp?

7       A.   Senator Heitkamp was the senator for North

8  Dakota.

9       Q.   United States Senator?

10       A.   Yes.

11       Q.   One of two?

12       A.   Yes.

13       Q.   Colonel Henderson references his

14  conversation with the Senator and some of the things

15  that she was calling to speak about.  And then there's

16  a section within the background where he says, "My

17  responses."  Do you take that to be my responses to the

18  United States Senator -- his responses to the United

19  States Senator?

20       A.   Correct.

21            MS. BOBET:  Where are you looking in this

22  document?  I apologize.  In the back?

23            MR. SEBY:  No.  I'm sorry.  Pardon me.

24  This is a string of emails.  I'm talking about the top

25  one.  I identified the date of Wednesday,

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 190

1  September 21st, at 5:01 a.m.  It's the very top.  There
2  you go.  That's where I'm at, Ms. Bobet.  Come on down
3  to -- under "BACKGROUND," there are four numbered
4  paragraphs.  And then, as the exhibit on the screen
5  shows, "My responses" is in yellow highlight.  I'm
6  asking the witness if the statement "My responses" is
7  Colonel Henderson referencing what he said to the
8  Senator.
9       A.   I don't know.
10      Q.   (BY MR. SEBY)  Well, this email is from
11 Colonel Henderson, correct?
12      A.   Yes.
13      Q.   And he's talking about receiving a call.
14 And she, the United States Senator, had several topics
15 for discussion.  Then in the email after explaining
16 those topics that were asked about by the Senator, the
17 email says, "My responses."  And I'm asking you if you
18 have any reason to believe that that's Colonel
19 Henderson's reference to what he told the Senator in
20 response to the topics he notes she raised just prior?
21 Do you have any reason to believe that's not what that
22 means?
23      A.   No.  I believe that is probably what he
24 meant by that.
25      Q.   What is the first of the statements under

Page 191

1  "My responses"?
2       A.   "The permit is only for the south side of
3  the river, with associated conditions.  The Tribe has
4  not signed the acknowledgement for this permit yet nor
5  met the liability requirements, so there is currently
6  no permit in place."
7       Q.   Why, then -- on September 21st, 2016, why
8  then previously, and in the Corps' media release and in
9  your correspondence that we've discussed, is that not
10 clearly stated?
11      A.   Yeah.  I think the verbiage was confusing,
12 and we could have been a little bit clearer about
13 (inaudible) time.
14           MR. SEBY:  Thank you.  Could you please go
15 to Exhibit 30.
16           (Deposition Exhibit 30, remotely
17 introduced and provided electronically to the court
18 reporter.)
19           MR. SEBY:  Enlarge the top there, please.
20      Q.   (BY MR. SEBY)  This is also a compound
21 email.  I want to ask about the top one, Thursday,
22 September 22, 2016, 7:25 a.m., from Joel Ames; who is,
23 by designation in his signature block in the email
24 below, the Tribal Liaison.  And he is reporting to
25 Colonel Henderson.  And would you please read the

Page 192

1  statements that Mr. Ames made to Colonel Henderson in
2  this email, "I just spoke with . . ."
3       A.   "Sir, I just spoke with Dean - The
4  document has been signed by the Chairman, currently
5  still at the SRST DC Office.  The bond and the
6  insurance matter is being worked and Dean is hoping
7  that he will have all the information needed to present
8  it to the Tribal Council later today or early tomorrow.
9  Dean agreed to keep me informed along the way . . .
10 Joel."
11      Q.   There's a reference to an individual by
12 the name of "Dean" three times in the two sentences --
13 three sentences you just read.  Who is this "Dean"?
14      A.   I don't recall who Dean was, specifically,
15 but it's probably the Chairman's chief of staff or
16 public relations person.
17      Q.   Did you ever hear any further updates from
18 Mr. Joel Ames with respect to updates concerning the
19 movement of the special use permit within the Standing
20 Rock Sioux Tribe?
21      A.   I believe I did, yes, but I don't remember
22 specifics as far as time or content.
23      Q.   Were you ever informed, after this date,
24 that the outstanding compliance requirements in the
25 special use permit itself were ever complied with by

Page 193

1  the tribe?
2       A.   No.
3       Q.   I'm sorry?
4       A.   No.
5       Q.   No, you're not aware of ever hearing such
6  news?
7       A.   No.  What I'm saying is, yes, I am aware
8  that they were never complied with.
9       Q.   When did you become aware that they were
10 never complied with?  At what point and how did you
11 realize that?
12      A.   I don't remember the exact timing, but I
13 do believe at some point the district commander had a
14 discussion with the staff about the fact that the tribe
15 could not afford the bond or the insurance.
16      Q.   And what did that discussion consist of on
17 that circumstance?
18      A.   That's all I remember about it.
19      Q.   Was that discussion, "What do we do about
20 this, given the fact that they're not performing or
21 complying with the permit?"
22      A.   I don't remember.
23      Q.   Did you ever discuss, "Oh, well, let's
24 just disregard it and move on"?
25           MS. BOBET:  Objection, vague.

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 194

1    A.    No, I don't recall that discussion,
2 either.
3    Q.    (BY MR. SEBY)  How long -- what amount of
4 time passed after you providing the permit
5 application -- or the permit -- tendering the permit
6 with the attachments -- which you did, the rules and
7 regulations of the Corps and the user pamphlet -- how
8 long after you did that, sir, did you come to realize
9 that they were not capable or unwilling to meet the
10 conditions in the document you transmitted?
11    A.    I don't remember an exact date, but it was
12 a matter of, I would say, a few weeks, three or four
13 weeks.
14    Q.    What was going on during that period of
15 time?  Was the protest continuing?
16    A.    Yes.
17    Q.    The camps on Corps property remained?
18    A.    Yes.
19    Q.    Ongoing conflicts with law enforcement or
20 the State of North Dakota?
21    A.    I believe there were some, yes.
22    Q.    Are you aware of whether or not
23 individuals within the camp left the camp at any time?
24    A.    I don't know specifics, but I know that
25 there were people going in and out.

Page 195

1    Q.    To do what?
2    A.    I don't know.
3    Q.    Are you aware of any individuals in the
4 camp organizing and conducting activities against
5 private property and otherwise general areas of the
6 state using the camps as a safe haven?
7         MS. BOBET:  Objection; compound, assumes
8 facts not in evidence.
9         MR. SEBY:  I'm asking for his knowledge.
10    A.    So I know that there were demonstrators
11 who conducted those events, but it was -- there was
12 never any proof that they came from certain camps, that
13 I can remember.
14    Q.    (BY MR. SEBY)  What evidence do you have
15 for that?
16    A.    I don't have evidence for that.
17    Q.    What do you base that statement on, then,
18 sir?
19    A.    Well, we were aware that there were some
20 demonstrations on private land; but as far as the
21 reporting that we were hearing, it wasn't always clear
22 where the people were coming from for those events.
23    Q.    So did you form -- is one of the bases of
24 your assertions now based upon your interactions and
25 monitoring the North Dakota Emergency Operations

Page 196

1 Center?
2    A.    Can you ask that question again?
3    Q.    Are you basing your statement upon
4 continued knowledge and monitoring of events within the
5 North Dakota Emergency Operations Center?
6    A.    Some of the information we got was from
7 them, yes.
8         MR. SEBY:  Would you turn to Exhibit 34
9 (sic), please.
10         MS. BOBET:  Before we do that, if you
11 don't mind, I just wanted to discuss our timing a
12 little bit.  I'm happy to go off the record, if that's
13 easiest for folks.  Up to you, Mr. Seby.
14         MR. SEBY:  Yes.
15         (Discussion off the record.)
16         (Recess, 3:14 p.m. to 3:30 p.m. MST.)
17         MR. SEBY:  Exhibit 37, please.
18         (Deposition Exhibit 37, remotely
19 introduced and provided electronically to the court
20 reporter.)
21         MR. SEBY:  If you could enlarge that.
22 This is two emails in this chain.  If we could go down
23 to the first one from -- go up a little bit, please.
24    Q.    (BY MR. SEBY)  Do you see that, Lieutenant
25 Colonel Startzell, the email from Brigadier General

Page 197

1 Scott Spellmon, dated October 28, to Lieutenant -- is
2 that LTG, lieutenant general?
3    A.    Yes.
4    Q.    -- Lieutenant General Todd Semonite.  You
5 are not copied on this email.  Several other senior
6 Corps civilian and military officers are copied on it.
7 Can you read, please, the first sentence of Brigadier
8 General Spellmon's email to Lieutenant General
9 Semonite, what that says?
10    A.    It says, "Sir - based on yesterday's
11 escalation of force incidents, we are going to revoke
12 the Special Use Permit for the Standing Rock Sioux
13 Tribe camp effective immediately."
14    Q.    And Brigadier General Spellmon is the --
15 at this point, still the division commander?
16    A.    Yes, correct.
17    Q.    And Lieutenant General Todd Semonite is
18 who again?
19    A.    He's the commander of the Corps of
20 Engineers.
21    Q.    The entire Corps of Engineers?
22    A.    Yes.
23    Q.    And earlier, you testified that you
24 believed that the events that we have discussed with
25 respect to the tendering of the special use permit to

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 198

1 the Standing Rock Sioux Tribe and the failure to comply
2 with the requirements of the permit that you
3 tendered -- namely, the insurance and reclamation and
4 other requirements to guarantee that United States
5 property was not damaged, and if it was, there was
6 funds available to deal with that -- that the series of
7 events, you testified, created some confusion.  Is that
8 accurate?
9        A.   Yes.
10       Q.   Is that the explanation for why the head
11 of the division reported to the head of the Corps of
12 Engineers' operational efforts?  Is that why Brigadier
13 General Spellmon suggests to his superior that there is
14 a special use permit that could be revoked?
15       A.   I'm not sure what the question is.  Can
16 you --
17       Q.   Do you think that the confusion that you
18 testified arose in September, a month prior, created
19 confusion for your commanding senior officers within
20 the division and within the Corps itself?
21       A.   I do think there was general confusion,
22 yes.
23       Q.   How else would you explain that the head
24 of the Corps' Northwest Division suggested to his
25 commanding officer, the chief of the Army Corps of

Page 199

1 Engineers, that there was even a permit in existence
2 that could be revoked?
3       A.   Well, I think, in general, you know, we
4 authored the permit.  We expected the applicant to
5 follow through with it.  Eventually, it became clear
6 that they were not going to be able to, and then there
7 was a leadership decision to revoke the permit.
8       Q.   There was no existing permit, is what I
9 understood your testimony to be.
10      A.   Yeah, the process was not completed.
11      Q.   I'm sorry?
12      A.   The process was not completed for the
13 permitting.
14      Q.   So what was there to revoke?
15      A.   The offer for the permit was revoked.
16      Q.   So is what you're saying this concerns is
17 a withdrawal of the tendered permit?
18      A.   I'm not sure what "tender" means in a
19 legal sense; but, yes, that sounds right.
20      Q.   Okay.  And here we are, a month and ten
21 days later after it was offered, right?
22      A.   Yes.
23      Q.   Okay.  And that action that the Brigadier
24 General is reporting up the chain, way up the chain,
25 says it's based on yesterday's escalation of force

Page 200

1 incidents.  What is he referring to?
2        MS. BOBET:  Objection; calls for
3 speculation, lack of personal knowledge.
4        Q.   (BY MR. SEBY)  Do you know, Lieutenant
5 Colonel Startzell, what events the Brigadier General is
6 referring to?
7        A.   I can't remember, specifically.  I do know
8 that there were a couple of flashpoints in the
9 protests.  So my --
10       Q.   The Brigadier General's email -- pardon
11 me.  I didn't mean to interrupt you.
12       A.   So my best guess is there was --
13 eventually there was a -- there was a blockage of the
14 bridge on one of the highways.  And that would be my
15 guess as to what this incident was about or what he's
16 referring to.
17       Q.   On your screen is a statement within the
18 Brigadier General's email.  Can you see it?  It's
19 entitled "Our rationale."
20       A.   Yes, I see that.
21       Q.   Okay.  Colonel Henderson is not on this
22 email, nor are you.  But were you aware of these events
23 on -- it would have been October 27th?
24       A.   Probably, yeah.  Without knowing exactly
25 which event this is, it's hard to say, but I think I

Page 201

1 was probably aware of it, yes.
2        Q.   So the first bullet under the "Our
3 rationale" in Brigadier General Spellmon's report up
4 the chain, high up the chain, says, number one,
5 "Yesterday's events proved again this is not a peaceful
6 or prayerful protest."  Is that accurate?
7        A.   That's what it says, yes.
8        Q.   Do you have any reason to dispute the
9 Brigadier General's statement?
10       A.   I think there were incidents that were not
11 peaceful, yes, that is correct.
12       Q.   Okay.  And the second bullet, "Life,
13 health, safety for all in the area are at risk."  Do
14 you disagree or agree with that statement?
15       A.   I mean, that was his assessment.  I would
16 say that there were definitely life, health, and safety
17 concerns.
18       Q.   Third bullet, "There has been much
19 reckless endangerment."  Do you have any reason to
20 agree or disagree with that statement?
21       A.   No.
22       Q.   Next one, next and last rationale reported
23 by Brigadier General Spellmon to his superiors, Corps
24 leadership, "There has been damage and destruction of
25 private property."  Do you have any reason to disagree

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 202

1  with that?
2        A.   No.  That is true.
3     Q.   Thank you.
4        MR. SEBY:  Please go to Exhibit 47.
5     Q.   (BY MR. SEBY)  Before we discuss
6  Exhibit 47, I want to conclude discussion of the
7  Standing Rock Sioux Tribe special use permit.  I
8  understand your testimony, in short, to be that there
9  was no final valid permit issued to the Standing Rock
10  Sioux Tribe, because they were provided a permit and
11  did not comply with the requirements of the permit;
12  and, therefore, no special use permit was ever granted.
13  Apart from the language used by certain Corps
14  individuals, the Standing Rock Sioux Tribe were never
15  granted a valid existing and final special use permit;
16  is that correct?
17        A.   Yes, that's correct.
18     Q.   Did the Corps of Engineers grant a special
19  use permit in August or September or October to any
20  other entity to which they complied with the terms of
21  the permit in order to be able to have a special use
22  permit authorizing their presence on Army Corps of
23  Engineers property associated with lands owned and
24  managed by the Corps of Engineers in Morton County,
25  North Dakota?

Page 203

1        A.   I don't believe any of the special use
2  permits were finalized.
3     Q.   Thank you.  Okay.  Now I would like to
4  discuss Exhibit 47, please.
5        (Deposition Exhibit 47, remotely
6  introduced and provided electronically to the court
7  reporter.)
8     Q.   This is an email of -- a string of emails
9  consisting of two emails.  Could we go to the first of
10  the two.  Pardon me, this is three emails; yes, three
11  emails.  The first in the chain is an email from
12  Phillip Sheffield to LaDonna Brave Bull.  And it's
13  copied to Eric Stasch, the Oahe Project Manager, and
14  John Voeller, also with the Oahe Project; is that
15  correct?  Do you see that?
16        A.   Yes.
17     Q.   You were not copied on this particular
18  email, but when we get to the top of the chain, you are
19  copied on the email transmitting these two earlier
20  ones.  Do you know who Phillip Sheffield is?
21        A.   I don't remember his position, but I
22  believe that he worked at the Oahe Project Office.
23     Q.   Okay.  And there in front of us on the
24  screen is an email from Mr. Sheffield to LaDonna Brave
25  Bull.  Do you see that right there?

Page 204

1        A.   I do.
2     Q.   Could you read the first sentence, please.
3        A.   "Enclosed for your review and execution is
4  a Special Use Permit."
5     Q.   And the second sentence.
6        A.   "This Permit application is in response to
7  the request that you made to Colonel Henderson,
8  District Commander and Eric Stasch, Oahe Project
9  Manager in a meeting at the SRST Tribal Headquarters on
10  October 7, 2016."
11     Q.   And the date of this email from
12  Mr. Sheffield to LaDonna Brave Bull is November 1st,
13  2016, right?
14        A.   Yes.
15     Q.   So basically a month later, Mr. Sheffield
16  is sending a permit application to LaDonna Brave Bull
17  referencing a conversation Ms. Brave Bull had with
18  Colonel Henderson on October 7th.  Is that how you read
19  the email introduction?
20        A.   Yeah, that looks right -- that sounds
21  right.
22     Q.   Are you -- why is it that the Corps is
23  providing a permit application and map to an applicant?
24        A.   I mean, I think because she asked for it.
25     Q.   Okay.  Would you agree with me that the

Page 205

1  normal course is that an applicant retrieves the
2  application form the Corps posts on its website, fills
3  it out, and then submits it, not the other way around?
4        A.   Yes, that would be, normally, the process.
5     Q.   Thank you.  Did this permit application
6  get returned to the Corps signed and with demonstrated
7  satisfaction of any of the financial security,
8  insurance, or reclamation bonds required?
9        A.   I don't think it did.  I don't recall it
10  being finalized.
11     Q.   So in that respect, it's similar to the
12  Standing Rock Sioux Tribe permit that was offered to
13  them but not finalized, ever?
14        A.   Yes.
15     Q.   All right.  And just to finish out this
16  string, the top email, which you are copied on, from
17  Mr. Stasch, the Project Manager for the Oahe Project,
18  to a number of individuals, which include you in that
19  list, this distribution.  Mr. Stasch is reporting that
20  Mr. Sheffield, after not hearing from Ms. Brave Bull
21  for 17 days, sent her a follow-up email which said --
22  do you see it there, just down below?  "LaDonna Brave
23  Bull:  Oahe Project, Corps of Engineers is still
24  awaiting the proof of the required Bond and insurance
25  for your requested Special event permit.  At this time,

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 206

1 we have not received any documents other than the
2 permit previously submitted.  We also need you to
3 verify that the map provided is the area you want to
4 permit."  Is that accurate?
5          A.    Yes, that's how it reads.
6          Q.    Do you have any reason to disagree with
7 that statement made in that email by Mr. Sheffield to
8 Ms. Brave Bull?
9          A.    No.
10         Q.    Did you ever speak with Ms. Brave Bull?
11         A.    Not that I can recall.
12         Q.    Have you ever met her?
13         A.    I don't remember meeting her, no.
14         MR. SEBY:  Okay.  All right.  If we could
15 go to Exhibit 41, please.
16              (Deposition Exhibit 41, remotely
17 introduced and provided electronically to the court
18 reporter.)
19         Q.    (BY MR. SEBY)  This is an email from
20 Colonel Henderson to an individual known as Faith
21 Spotted Eagle.  The email is dated Friday,
22 November 11th, 2016.  Do you see that?
23         A.    Yes.
24         Q.    And do you note that you're copied on this
25 email?

Page 207

1          A.    Yes.
2          Q.    Amongst a host of Corps colleagues.
3 Colonel Henderson's email is -- the text of which is
4 below right there, it says, "Faith, Thank you for
5 coordinating this request to conduct a prayer service
6 on Corps-managed federal lands near Oahe."
7              Are you aware of what Colonel Henderson
8 is referring to as thanking Ms. Spotted Eagle for
9 coordinating?
10         A.    I know the event that it's referring to,
11 but I don't remember the details about how that
12 coordination happened.
13         Q.    Next sentence, please, if you could read
14 that in full.
15         A.    "All that is left for you to do is review
16 and sign the attached request; we tried to input as
17 much of the data as we could ascertain to make it
18 easier for you."
19         Q.    Is this another instance where the Corps
20 filled out and provided a draft permit without an
21 applicant -- submitting a completed form application?
22         A.    Yes, I believe it is.
23         Q.    And the third sentence of Mr. -- Colonel
24 Henderson's communication that we're looking at as
25 Exhibit 41, do you see that?

Page 208

1          A.    The one that starts, "On Tuesday"?
2          Q.    No.  The paragraph below that, sir.
3          A.    Okay.  "We have coordinated this with
4 Morton County law enforcement as well as DAPL; they are
5 aware of this ceremony and support our efforts to
6 facilitate this."
7          Q.    Who is the "we" that Colonel Henderson is
8 referring to, as you understand it?
9          A.    I'm not certain.  I'm not sure if that
10 is --
11         Q.    Could he be referring to the Oahe Project?
12         A.    He could be referring to the Oahe Project
13 and/or the District Headquarters.
14         Q.    In Omaha?
15         A.    Right.
16         Q.    At which you're the deputy district
17 commander --
18         A.    Right.
19         Q.    -- at this time?  Is it your understanding
20 and position that the district coordinated with Morton
21 County law enforcement as of the date of this email?
22         A.    I believe we had.
23         Q.    Are you also in agreement with Colonel
24 Henderson -- the rest of his statement in that
25 sentence, ". . . they are aware of this ceremony and

Page 209

1 support our efforts to facilitate this"?
2          A.    I believe that's correct.
3          Q.    You do.  Okay.  Lieutenant Colonel
4 Startzell, how did you or others in the district, over
5 which you're the deputy district commander, how did you
6 make Morton County law enforcement officials aware of
7 this?
8          A.    I can't remember the specifics, but it's
9 likely that we called Sheriff Kirchmeier to talk to him
10 about the request and our assessments of it.
11         Q.    And as of the date of this email, Friday,
12 November 11th, 2016, at 2:28 p.m., you had done that?
13         A.    I can't say for sure the timing, but I
14 believe so.
15         Q.    Well, the way Colonel Henderson's email
16 reads, sir, right there in the box in front of us on
17 the screen, they are aware, not -- not, we will make
18 them aware.  They are aware, as in, it has happened
19 already, right?
20         A.    That's how it sounds in the email.
21         Q.    Okay.  Thank you.
22         MR. SEBY:  Could you please turn to
23 Exhibit 42.
24              (Deposition Exhibit 42, remotely
25 introduced and provided electronically to the court

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 210

1 reporter.)

2      Q.   (BY MR. SEBY)  Exhibit 42 is an email --
3 an exhibit with one email communication on it.  And
4 before we discuss that, I want to reiterate the date of
5 the exhibit we just discussed, Exhibit 41, which is
6 Colonel Henderson's email to Faith Spotted Eagle
7 providing a completed permit for her to review and
8 sign.  And he said, "All that is left for you to do is
9 review and sign . . ."; dated November 11, 2016.

10           Exhibit 42 is an email, Lieutenant Colonel
11 Startzell, from you to Sheriff Kirchmeier, dated
12 November 14th, three days later than Colonel
13 Henderson's email to Faith Spotted Eagle.  And your
14 message to the Sheriff says, "I've attached a copy of
15 the . . . permit that Colonel Henderson sent [sic] to
16 Faith Spotted Eagle a couple of days ago.  We still do
17 not have her returned signed copy."

18           What I'd like to understand, please, and
19 have you answer, is, if Colonel Henderson said to Faith
20 Spotted Eagle, three days before your communication
21 with Sheriff Kirchmeier, how could Colonel Henderson
22 have told her you had already coordinated with Sheriff
23 Kirchmeier and he was aware and okay with it?  How
24 could that be?

25      A.   I don't understand the question.

Page 211

1      Q.   I'm trying to understand how you
2 communicated with Sheriff Kirchmeier three days after
3 Colonel Henderson told Faith Spotted Eagle that you had
4 done it.  It seems to me that that was not an accurate
5 statement.  And I'm trying to understand, from you,
6 whether that's true or you have an explanation for the
7 disparity.

8           MS. BOBET:  Objection, mischaracterizes
9 the evidence.

10      A.   Yeah.  It's possible I talked to him on
11 the phone the week before.  I don't remember the
12 details, though, timing-wise.

13      Q.   (BY MR. SEBY)  Well, your email says,
14 ". . . thank you for taking the time to give me a call
15 back."  Did that telephone call take place other than
16 the day that you're sending him the email to confirm
17 it?

18      A.   I don't know.

19      Q.   Had you, prior to this email of
20 November 14th, provided the copy of the permit that was
21 tendered or offered to Faith Spotted Eagle, prior to
22 the time that you're providing it here?

23      A.   I don't know.

24      Q.   Your email, sir, says, "We still do not
25 have her returned signed copy"; is that correct?  Do

Page 212

1 you see that?

2      A.   Yes.

3      Q.   And the day of your saying that to the
4 sheriff is November 14th, 2016, correct?

5      A.   Yes.

6      Q.   And the attachment to your letter is a
7 special use permit, which you've testified the Corps
8 completed and filled out for Ms. Faith Spotted Eagle.
9 And it says the permit is issued to Faith Spotted Eagle
10 "For the period of 1 day (November 15, 2016) from
11 9:00 a.m. to 5:00 p.m."  That is the attachment to your
12 email, the day prior, to Sheriff Kirchmeier.  Do you
13 agree with that?

14      A.   Yes.

15      Q.   So one day before the event to occur, by
16 the special use permit that you've offered that she
17 needs to sign and return, you're giving a copy to the
18 sheriff, correct?

19      A.   Yes, for his awareness.

20      Q.   Okay.  Would you look at the attachment,
21 please, to the email, both of which are Exhibit 42.
22 Second page, please -- third page.  Is this document
23 signed?

24      A.   No.

25      Q.   Is it signed by Faith Spotted Eagle, the

Page 213

1 applicant?

2      A.   No, it's not.

3      Q.   Is the permit signed by the commander of
4 the Omaha District?

5      A.   No.

6      Q.   Is it signed by any Corps individual or
7 representative?

8      A.   No.

9      Q.   Do you know, Lieutenant Colonel Startzell,
10 that Ms. Faith Spotted Eagle ever returned the signed
11 permit offered to her?

12      A.   I do not remember, but I don't recall
13 seeing it.

14      Q.   Were you ever told that she did?

15      A.   Not that I remember.

16      Q.   Did you participate in this permit
17 consideration and process?

18      A.   I believe on this one I recommended that
19 the permit be offered, because of -- the purpose was --
20 it didn't seem very harmful, didn't seem harmful at
21 all, given the number and the demographic that we were
22 dealing with.

23      Q.   What do you mean by "number"?

24      A.   It was a small group of people, and they
25 were mostly elderly people.

Lieutenant Colonel James T. Startzell
November 19, 2021

---

Page 214

1      Q.   How did you know how to fill out the
2 permit for Ms. Faith Spotted Eagle?  Based upon
3 conversations with her?
4           MS. BOBET:  Objection, foundation.  You
5 can answer.
6      A.   So I did not -- I did not fill this out
7 for her.
8      Q.   (BY MR. SEBY)  Who did?
9      A.   I don't know for sure, but I believe it
10 was the Project Office.
11     Q.   Okay.  Did the Project Office ever tell
12 you where they got the information to put in the
13 document?
14     A.   I believe they did, but I don't remember
15 the details.
16     Q.   Okay.  Did the event take place?
17     A.   Yes.
18     Q.   Did it take place after the Corps had a
19 signed and returned permit document?
20     A.   No, I don't believe so.
21     Q.   Did Colonel Henderson ever sign this
22 document?
23     A.   I don't know.  Not that I'm aware of.
24          MR. SEBY:  Would you please turn to
25 Exhibit 44 -- excuse me, Exhibit 43.  I skipped one.

---

Page 215

1           (Deposition Exhibit 43, remotely
2 introduced and provided electronically to the court
3 reporter.)
4           MR. SEBY:  Please, if you could enlarge
5 that for Mr. -- Lieutenant Colonel Startzell to see.
6      Q.   (BY MR. SEBY)  And please go -- there's
7 two emails in this string.  Please go to the first one
8 down below.  This email is from an individual by the
9 name of James P. Thomas, Assistant United States
10 Attorney, United States Attorney's Office, Bismarck,
11 North Dakota.  Do you see that?
12     A.   Yes.
13     Q.   And Mr. Thomas is writing to Mr. Tracy,
14 the district counsel.  You've identified him earlier.
15 Do you see that?
16     A.   Yes.
17     Q.   And Mr. Thomas from the United States
18 Attorney's Office for the District of North Dakota is
19 asking the district's counsel, Mr. Tracy, "Any word on
20 the status of the application re activities tomorrow on
21 Corps land east of the drill pad?"  What drill pad is
22 he referring to?
23     A.   I think he's referring to the drill pad
24 that's on the western side of the river.
25     Q.   What is a drill pad, sir?

---

Page 216

1      A.   The drill pad is where they position the
2 hydraulic horizontal drilling machinery.
3      Q.   For?
4      A.   So that they can drill under the river.
5      Q.   Who is "they"?
6      A.   The "they" is Dakota Access.
7      Q.   So are you saying this was the Dakota
8 Access Pipeline construction drill pad location?
9      A.   Yes.
10     Q.   Okay.  And that is the subject area for
11 the special use permit that the Corps tendered to Faith
12 Spotted Eagle?
13     A.   No, it was not the same location.
14     Q.   I'm not following what you're saying.
15     A.   The drill pad was west of the actual
16 prayer site, from my understanding.  It wasn't on-site
17 at the drill pad, from my understanding.
18     Q.   The drill pad is not located on Corps of
19 Engineers property; is that correct?
20     A.   Correct.
21     Q.   So I believe -- and you tell me if I don't
22 have it right -- but that's not what this is talking
23 about.  It's talking about Corps land east of the drill
24 pad.  So it's Corps land that's near that private
25 property where the drill pad is located, is where the

---

Page 217

1 application for activities is referenced?
2      A.   Yes, that sounds right.
3      Q.   Okay.  And that inquiry is coming from an
4 Assistant United States Attorney to the Corps, through
5 its counsel, asking for an update.  And he says, "I'd
6 like to be able to report back to law enforcement."  Do
7 you see that?
8      A.   Yes.
9      Q.   So that same day -- well, let me back up.
10 The United States Assistant U.S. Attorney's email
11 copies -- in addition to Mr. Tracy, copies the United
12 States Attorney, Chris Myers, for the District of North
13 Dakota, as well as an individual named Paul Ward.  Do
14 you know who Mr. Ward is?
15     A.   I can't remember his position, but
16 U.S. Marshals Service.
17     Q.   Okay.  I think if we scrolled up you would
18 see his title in the signature block.  Do you see that?
19     A.   Okay.
20     Q.   He's the United States Marshal for the
21 District of North Dakota, is the way I read his
22 signature block.  Do you agree that's what it says?
23     A.   Yes.
24     Q.   In Mr. Thomas's email to Mr. Tracy, and
25 copied to the U.S. Attorney and to the United States

---

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 218

1 Marshal for the District of North Dakota, before the
2 Marshal responds, there's an interim email just above
3 the one we're on from Mr. Thomas to Mr. Tracy.  And
4 it's an email replying to Mr. Thomas's inquiry.  And
5 could you read what Mr. Voeller says to the group,
6 including those gentlemen we've just mentioned?
7        A.   "Sir, The Corps is going to allow Prayer
8 Ceremony to take place tomorrow on the USACE property
9 to the east of the drill pad.  Individuals will be
10 accessing the area by boat instead of by land.  Major
11 [sic] Startzell will be notifying Sheriff Kirchmeier of
12 this.  There will be 3 USACE personnel escorting the
13 group into the site for the ceremony."
14        Q.   Okay.  "The Corps is going to allow the
15 Prayer Ceremony to take place tomorrow . . ."  Was that
16 after a valid special use permit had been obtained?
17        A.   I think that was after it was offered.
18        Q.   Again, never signed by Ms. Spotted Eagle
19 or Colonel Henderson?
20        A.   Correct, to my knowledge.
21        Q.   On what basis does Mr. Voeller say to the
22 U.S. Attorney for the District of North Dakota and the
23 head of the United States Marshals Service for the
24 District that the Corps is going to allow that to
25 happen, then?

Page 219

1             MS. BOBET:  Objection; calls for
2 speculation, lack of personal knowledge.
3        Q.   (BY MR. SEBY)  I'm asking you, Lieutenant
4 Colonel Startzell, on what basis do you understand the
5 Corps' decision to allow the prayer ceremony to take
6 place on Corps property was issued?  What authority?
7        A.   The district commander was aware of the
8 ceremony and approved it.
9        Q.   The District Commander Colonel Henderson,
10 is that who you're referring to?
11        A.   Yes.
12        Q.   And he did so in the absence of a special
13 use permit, is what I understand your testimony to be.
14        A.   A completed permit, yes.
15        Q.   A non-final permit?
16        A.   The permit had been offered, but was not
17 finalized.
18        Q.   Okay.  Can you go to the top line,
19 Mr. Ward's -- Marshal Ward's reply to Mr. Voeller's
20 statement indicating the Corps was going to allow it to
21 occur, and read that aloud, if you would, please.
22        A.   "With all due respect, this is
23 disappointing to say the least.  You have just allowed
24 protesters behind all law enforcement defenses.  I
25 disagree wholeheartedly and I am amazed that no one at

Page 220

1 the corps [sic] agrees with law enforcement."
2        Q.   Were you aware of that statement at the
3 time it was made?
4        A.   Yes, I believe I did see this.
5        Q.   What is your opinion with respect to the
6 statement by the United States Marshal?
7        A.   My opinion was that we had assessed the
8 risk, and that this was a very low-risk activity.  And
9 we did not agree that these seven individuals were a
10 threat.
11        Q.   Again, this was before it occurred, right?
12        A.   Yes.
13        Q.   How many people accompanied the Corps at
14 this event?
15        A.   I don't know.
16        Q.   How did you know it was seven individuals?
17        A.   Based on the permit request.
18        Q.   Were there any invited guests that joined
19 the event?
20        A.   I don't know, but it is possible.
21        Q.   Are you aware that the permit that the
22 Corps filled out and offered to Ms. Spotted Eagle on
23 the day before it occurred, per your email transmitting
24 it to Sheriff Kirchmeier, if it had been signed and
25 finalized would have authorized 30 additional guests to

Page 221

1 accompany the event?
2        A.   I did not hear that detail, no.
3        Q.   Who was responsible for evaluating whether
4 this was an acceptable low-risk event, as you
5 estimated, as it occurred?  Whose judgment was that
6 placed upon?
7        A.   So I believe it was a discussion between
8 the Project Office personnel and Colonel Henderson.
9 And I believe I was involved in that discussion as
10 well.
11        Q.   Who on the ground accompanying the group
12 that went to use this area at the location noted in our
13 discussions -- who was responsible for determining if
14 the facts on the ground met compliance with the Corps'
15 expectations for the event?
16        A.   Eric Stasch was on the ground, John
17 Voeller was on the ground, and I believe we had one
18 other Project Office employee there.
19        Q.   Were they in touch with you prior to the
20 event occurring with regard to the assessment of risk?
21        A.   Yes.
22        Q.   And what were those communications to you
23 and the Colonel?
24        A.   We told our employees there to evaluate
25 the situation when they got to the meet-up location and

291:18-220:4
602; 802

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 222

1 to assess the risk, based on what they saw with the
2 crowd.  And if they felt safe at all -- or unsafe at
3 all, that we would call it off.  And that morning, I
4 believe they called us to give us their assessment of
5 the situation.
6          MR. SEBY:  Would you turn to Exhibit 45,
7 please.
8          (Deposition Exhibit 45, remotely
9 introduced and provided electronically to the court
10 reporter.)
11     Q.   (BY MR. SEBY)  This is an exhibit with
12 three emails in it -- or four, pardon me.  One, the
13 second from the top, is from Colonel Henderson to
14 Ms. Faith Spotted Eagle on Tuesday, November 15th.
15 Would that be -- 2016.  Was that the day after the
16 event took place?
17     A.   I forget the day of the event, but around
18 the same time.
19     Q.   I think the event took place on the 15th
20 of November, so the day prior.  Are we in agreement
21 about that?
22     A.   I'd have to go back and look at it; but
23 yeah.
24     Q.   What does the second paragraph of Colonel
25 Henderson's short email say?

Page 223

1     A.   It says, "I understand that we have a plan
2 to accommodate this event tomorrow in spite several
3 obstacles.  Thanks for your patience; hope everything
4 goes well tomorrow."
5     Q.   And the date of Colonel Henderson's email
6 in which he says that?
7     A.   On the 15th.
8     Q.   Okay.  So he's saying the event is going
9 to take place tomorrow, right?
10     A.   That's how it sounds.
11     Q.   Which would be Wednesday, November 16th.
12 What is your understanding of what Colonel Henderson
13 was referring to, "I understand that we have a plan to
14 accommodate this event tomorrow in spite several
15 obstacles"?  What obstacles might he be referring to?
16          MS. BOBET:  Objection, calls for
17 speculation.
18          MR. SEBY:  I'm asking him to identify
19 whether he knows what the reference to "obstacles" may
20 be; and if so, what they are.
21     A.   I'm not sure exactly, but I would guess
22 the coordination with Dakota Access and the local law
23 enforcement to make sure they were aware of it.
24     Q.   (BY MR. SEBY)  Well, you made them aware.
25 We just talked about your communications to Sheriff

Page 224

1 Kirchmeier belatedly.  And so what obstacles exist?
2          MS. BOBET:  Objection, mischaracterizes
3 evidence.
4     A.   Yeah.  I don't know what other obstacles
5 he'd be referring to.
6     Q.   (BY MR. SEBY)  Okay.  Bottom line, though,
7 is, at this time, "Thanks for your patience; hope
8 everything goes well tomorrow."  At that time Colonel
9 Henderson made that statement, there was no special use
10 permit issued to Ms. Faith Spotted Eagle signed or in
11 final form; is that correct?
12     A.   I believe that's correct.
13          MR. SEBY:  Okay.  Could you turn to
14 Exhibit 46, please.  Before we do that, I'm sorry, if
15 we could put Exhibit 45 back up.
16     Q.   (BY MR. SEBY)  Just to confirm our
17 discussion and my understanding, Colonel Henderson's
18 November 15th, 2016 email says, "I understand we have a
19 plan to accommodate this event tomorrow in spite
20 several obstacles."  The "tomorrow" to which Colonel
21 Henderson is referring is Wednesday, November 26th
22 (sic), as the date of the event, correct?
23     A.   I'm not really sure November 16th is --
24     Q.   Well, we're going to go back over what we
25 just talked about again.  On Tuesday, November 15,

Page 225

1 2016, at 4:21 a.m., Colonel Henderson's email says, "I
2 understand that we have a plan to accommodate this
3 event tomorrow in spite several obstacles . . . hope
4 everything goes well tomorrow."  So if this email was
5 sent on November 15th, what date would "tomorrow"
6 reference?
7     A.   I suppose it would be November 16th.
8     Q.   Thank you.
9          MR. SEBY:  Now, please turn to Exhibit 46.
10 If you could enlarge that for the witness to see.
11          (Deposition Exhibit 46, remotely
12 introduced and provided electronically to the court
13 reporter.)
14     Q.   (BY MR. SEBY)  Okay.  This is an email,
15 Lieutenant Colonel Startzell, that is from Colonel
16 Henderson.  What is the reference to Exchange
17 Administrative Group?  Is that a group that you're part
18 of?
19     A.   No.  I don't know what that group is.
20     Q.   So in any event, Colonel Henderson's email
21 is to Lowry Crook.  And you've told us that the SES is
22 a reference to what?
23     A.   Senior Executive Service.
24     Q.   And HD -- or HQDA ASA means?
25     A.   That is Headquarters Department of the

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 226

1  Army, Assistant Secretary of the Army.
2      Q.   So Mr. Crook is in that office?
3      A.   Yeah.  It looks like he is in the
4  Assistant Secretary of the Army's Office.
5      Q.   And the email is copied to Brigadier
6  General Spellmon and Major General Donald Jackson,
7  correct?
8      A.   Yes.
9      Q.   And it says, "FW:  Check In."  What
10 document is being forwarded here?  What email string is
11 being forwarded?  I only see one communication on this
12 email string at this exhibit.  Do you know what that
13 is?
14     A.   No.
15     Q.   Okay.  If we could look at the text of
16 Colonel Henderson's email to the Office of the
17 Assistant Secretary of the Army and Brigadier General
18 Spellmon and Major General Donald Jackson.  What does
19 the first paragraph of Colonel Henderson's report to
20 those individuals say?
21     A.   "Ms. Darcy asked me to send you some
22 information on the prayer service that we facilitated
23 for the Yankton Sioux Tribal elders and religious
24 leaders yesterday on USACE-managed federal land
25 immediately in front of the drill pad on the west side

Page 227

1  of Oahe reservoir."
2      Q.   And the next paragraph uses that acronym
3  BLUF again, doesn't it?
4      A.   Yes.
5      Q.   Apologize, but will you refresh my memory
6  what BLUF stands for?
7      A.   Bottom line up front.
8      Q.   And continue reading with the sentence
9  there.
10     A.   "[Bottom line up front] is that we issued
11 a special use permit for Faith Spotted Eagle and up to
12 30 people to conduct a prayer ceremony on USACE land in
13 vicinity of the pipeline trace.  The prayer group had
14 to transit by private boat because DAPL denied access
15 to cross their land to get to the site (after approving
16 our request last week).  They were escorted by Corps
17 personnel in a government owned boat, and they did not
18 leave USACE land at any time.  We accompanied this
19 group to ensure no interaction between them and DAPL
20 security or Morton County law enforcement."
21     Q.   Do you agree with Colonel Henderson's
22 statement to those individuals on this email that the
23 Corps issued a special use permit for this event?
24     A.   I agree that it was offered, but not
25 completed.

Page 228

1      Q.   Thank you.  Just to understand this, what
2  you're saying is there was no final permit issued or
3  granted to Ms. Spotted Eagle or her guests?
4      A.   Not that I'm aware of.
5      Q.   Thank you.  Lieutenant Colonel Startzell,
6  have you understood my questions during this deposition
7  today, unless in circumstances where you've indicated
8  otherwise to me and we've clarified them and discussed
9  them?
10     A.   Yes.
11     Q.   Is there anything, sir, that you'd like to
12 add?
13     A.   Just one thing.  At the beginning of the
14 conference you asked if I had discussed this deposition
15 with anyone, and I said my boss.  I also discussed it
16 with my wife.  So I just want to clarify that she knew
17 that I was coming in to do this.
18     Q.   Sure.  Thank you.  You also said earlier
19 that -- I asked you if you had any blame assigned to
20 the State of North Dakota, and I understood your answer
21 to be no.  Do you -- were there any instances during
22 the DAPL protest where you felt law enforcement in
23 North Dakota did not do what you specifically asked
24 them to do?
25     A.   No.  I'd say, in general, they were very

Page 229

1  supportive.  And they had their own tough mission going
2  on.  I think they -- on a couple cases, they probably
3  didn't render as much aid as they could have; but, in
4  general, I think they were supportive.
5      Q.   Render aid to whom?
6      A.   With regard to encouraging people to leave
7  USACE land.
8      Q.   What authority does the State of North
9  Dakota have with regard to federal property managed by
10 the Corps?
11         MS. BOBET:  Objection, to the extent it
12 calls for a legal opinion.
13     Q.   (BY MR. SEBY)  Did the Corps of Engineers
14 ever ask the State of North Dakota to encourage people
15 to leave Corps property?
16     A.   I believe at some point the district
17 commander asked them to enforce state laws as
18 necessary.
19     Q.   Did -- to your knowledge, did you or
20 Colonel Henderson ever tell the State of North Dakota
21 at any level that you wanted, as the landowner, to have
22 trespassers removed from the property?
23     A.   I don't remember.  I don't remember if we
24 ever asked them to remove trespassers.
25     Q.   Then what do you mean by you don't think

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 230

1  they rendered aid adequately in the form of encouraging
2  people to leave?  Wouldn't it have been more proper if
3  you had asked them to do that?

**ND OBJ:**
Improper Lay
Opinion

4        MS. BOBET:  Objection, compound.
5      A.   So I believe what we told them was that
6  they had the authority to go onto federal land to
7  enforce local and state laws.  And they were, in some
8  cases, hesitant to do that.
9      Q.   (BY MR. SEBY)  At what point?
10      A.   I would say through much of the time of
11  this protest activity.
12      Q.   What evidence do you have for suggesting
13  that North Dakota, at any level, was asked by the Corps
14  to remove trespassing individuals on its property?
15      A.   I don't have any evidence of that.
16      Q.   All right.  Thank you.  Lieutenant Colonel
17  Startzell, have I been respectful and courteous to you
18  throughout this deposition?
19      A.   Yes.
20        MR. SEBY:  At this time, Ms. Bobet, I have
21  no further questions and pass the witness to you.
22        MS. BOBET:  Thank you.  Just give me one
23  moment here.  Can you hear me?
24        MR. SEBY:  Yes.
25        MS. BOBET:  I don't have any questions for

Page 231

1  the Lieutenant Colonel at this time.
2        MR. SEBY:  And I don't have any further
3  follow-up questions.  So, Lieutenant Colonel Startzell,
4  thank you for your time today.
5        THE DEPONENT:  Thank you.  Thank you,
6  Gail.
7        THE REPORTER:  You're welcome.  Ms. Bobet,
8  would you like Lieutenant Startzell to read and sign
9  his transcript?
10        MS. BOBET:  Yes, please.
11        THE REPORTER:  Would you like an etran,
12  and do you need another copy of the exhibits scanned to
13  you?
14        MS. BOBET:  We don't need the exhibits.
15  And an electronic transcript is perfectly fine.
16        THE REPORTER:  Mr. Seby, do you need
17  another copy of the exhibits, or just an etran?
18        MR. SEBY:  An etran, please.
19        THE REPORTER:  And no exhibits?
20        MR. SEBY:  Yes, ma'am.  No, thank you.
21        THE REPORTER:  Thank you.
22        WHEREUPON, the within proceedings were
23  concluded at the approximate hour of 4:31 p.m. MST on
24  the 19th day of November, 2021.
25              *   *   *   *   *

Page 232

1        I, LIEUTENANT COLONEL JAMES T. STARTZELL,
2  do hereby certify that I have read the above and
3  foregoing deposition and that the same is a true and
4  accurate transcription of my testimony, except for
5  attached amendments, if any.
6        Amendments attached   (  ) Yes   (  ) No
7
8
9        _____
10        LIEUTENANT COLONEL JAMES T. STARTZELL
11
12
13        The signature above of LIEUTENANT COLONEL
14  JAMES T. STARTZELL was subscribed and sworn to or
15  affirmed before me in the county of _____, state of
16  Colorado, this _____ day of _____, 2021.
17
18
19
20        _____
        Notary Public
21        My commission expires
22
23
24
25  State of North Dakota, 11/19/21 (go)

Page 233

1        REPORTER'S CERTIFICATE
2  STATE OF COLORADO      )
                          )  ss.
3  CITY AND COUNTY OF DENVER )
4        I, GAIL OBERMEYER, Registered Professional
   Reporter and Notary Public ID 19994012647, State of
5  Colorado, do hereby certify that previous to the
   commencement of the examination, the said LIEUTENANT
6  COLONEL JAMES T. STARTZELL verbally declared his
   testimony in this matter is under penalty of perjury;
7  that the said deposition was taken in machine shorthand
   by me at the time and place aforesaid and was
8  thereafter reduced to typewritten form; that the
   foregoing is a true transcript of the questions asked,
9  testimony given, and proceedings had.
10        I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of this
   litigation.
12
        IN WITNESS WHEREOF, I have affixed my
13  signature this 8th day of December, 2021.
14        My commission expires May 20, 2023.
15
16        Gail Obermeyer, RPR
        Registered Professional Reporter
17        Notary Public, State of Colorado
18
19
20  __X__  Reading and Signing was requested.
21  _____  Reading and Signing was waived.
22  _____  Reading and Signing is not required.
23
24
25

Lieutenant Colonel James T. Startzell
November 19, 2021

Page 234

```
 1   Errata Sheet
 2
 3   NAME OF CASE: Plaintiff vs UNITED STATES
 4   DATE OF DEPOSITION: 11/19/2021
 5   NAME OF WITNESS: Lieutenant Colonel James T. Startzell
 6   Reason Codes:
 7        1. To clarify the record.
 8        2. To conform to the facts.
 9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                    _____
```