Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NORTH DAKOTA
2                    WESTERN DIVISION

3    Civil Action No. 19-cv-150-DMT-ARS

4    _____

5           RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
       JASON N. O'NEAL - DEPARTMENT OF THE INTERIOR,
                  BUREAU OF INDIAN AFFAIRS
6                    December 6, 2022
                    Via RemoteDepoTM

7    _____

8    STATE OF NORTH DAKOTA,

9    Plaintiff,

10   v.

11   UNITED STATES OF AMERICA,

12   Defendant.
     _____

13

14              PURSUANT TO NOTICE AND AGREEMENT, the
     Rule 30(b)(6) videotaped deposition of JASON N.
15   O'NEAL, DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN
     AFFAIRS, was taken on behalf of the Plaintiff in
16   Washington, D.C., by remote means on December 6, 2022,
     at 8:59 a.m. Mountain Standard Time, before Tracy C.
17   Masuga, Registered Professional Reporter and Certified
     Realtime Reporter, appearing remotely from Denver
18   County, Colorado.

19

20

21

22

23

24

25

## Page 2

```
 1              REMOTE APPEARANCES
 2  For the Plaintiff:
 3              PAUL B. KERLIN, ESQ.
                Greenberg Traurig LLP
 4              1000 Louisiana Street
                Suite 6700
 5              Houston, Texas 77002
                kerlinp@gtlaw.com
 6
                PAUL M. SEBY, ESQ.
 7              Greenberg Traurig LLP
                1144 15th Street
 8              Suite 3300
                Denver, Colorado 80202
 9              sebyp@gtlaw.com
10
    For the Defendant:
11
                TIMOTHY B. JAFEK, ESQ.
12              JANE E. BOBET, ESQ.
                VICTOR WILLIAM SCARPATO III, ESQ.
13              Department of Justice
                U.S. Attorney's Office
14              District of Colorado
                1800 California Street
15              Suite 1600
                Denver, Colorado 80202
16              timothy.jafek@usdoj.gov
                jane.bobet@usdoj.gov
17              victor.scarpato@usdoj.gov
18              ANTHONY C. IRISH, ESQ.
                U.S. Department of the Interior
19              Office of the Solicitor
                Washington, D.C.
20              tony.irish@sol.doi.gov
21
    Also Present:
22
                Michael Banks, Videographer
23              Jose Diaz
24
25
```

## Page 3

```
 1              I N D E X
 2  EXAMINATION OF JASON N. O'NEAL:            PAGE
    December 6, 2022
 3
 4  By Mr. Kerlin                                 9
 5  By Mr. Jafek                                109
                                              INITIAL
 6  DEPOSITION EXHIBITS:                     REFERENCE
 7  (Exhibits provided electronically to the reporter.)
 8  Exhibit 833  Email to Cruzan from O'Neal,      21
                 2/14/17, Subject:  Re:  OPS Plan;
 9               with attached emails; with
                 attachments; DOI_00033754 -
10               DOI_00033777
11  Exhibit 834  Email to Smart and Lawrence from  40
                 O'Neal, 9/28/16, Subject:  Re:
12               9-28-2016; with attached emails;
                 DOI_00009107 - DOI_00009108
13
    Exhibit 835  Email to O'Neal, McClure, and     43
14               Cossey from Smith, 10/18/16,
                 Subject:  Tuesday Nightly Brief;
15               with attachment; DOI_00009745 -
                 DOI_00009754
16
    Exhibit 836  Email to Hudson, Armstrong, and   47
17               Smart from O'Neal, 9/27/16,
                 Subject:  Fwd:  Tribal Court
18               Jurisdiction over North Camp
                 (Redacted); with attached emails;
19               DOI_00027254 - DOI_00027257
20  Exhibit 837  Email to Salamanca from O'Neal,   74
21               9/23/16, Subject:  Re:  North Camp
                 Request for Dialogue; with
22               attached emails; DOI_00011791 -
                 DOI_00011793
23  Exhibit 838  Email to O'Neal from Cossey,      76
24               2/16/17, Subject:  Meeting Live
                 Feed; with attached emails;
25               DOI_00011084 - DOI_00011088
```

## Page 4

```
 1  Exhibit 839  Email to Gibson and Cruzan from   78
                 O'Neal, 3/21/17, Subject:  Fwd:
 2               Diamond Pipeline Protest Camp;
                 with attached emails; with
 3               attachments; DOI_00011686 -
                 DOI_00011700
 4
    Exhibit 840  Email to Mathis from O'Neal,      82
 5               1/26/17, Subject:  Re:  Update;
                 with attached email;
 6               DOI_00026858 - DOI_00026859
 7  Exhibit 841  Email to Cruzan from O'Neal,      84
 8               2/3/17, Subject:  Re:  News
                 Release:  Statement of Acting
 9               Assistant Secretary Michael S.
                 Black on the Standing Rock Sioux
10               Tribe and BIA Law Enforcement
                 Assistance; with attached emails;
11               with attachments; DOI_00019810 -
                 DOI_00019812
12  Exhibit 842  Email to Good from O'Neal, 2/3/17, 88
                 Subject:  Re:  FBI BIA memo on
13               response to civil disorder; with
                 attached email; with attachment;
14               DOI_00010611 - DOI_0001623
15  Exhibit 843  Email to O'Neal, et al., from     90
                 Cossey, 2/16/17, Subject:  webEOC
16               feed 2; with attached emails; with
                 attachment; DOI_00011094 -
17               DOI_00011099
18  Exhibit 844  Email to O'Neal from Keener,      92
                 10/3/16, Subject:  Re:  ESF-13:
19               Preemptive preparations for
                 Hurricane Matthew; with attached
20               emails; DOI_00009144 -
                 DOI_00009146
21
    Exhibit 845  Email to Cruzan from O'Neal,      95
22               12/22/16, Subject:  Re:  OJS
                 meeting with the Secretary; with
23               attached emails; DOI_00013061 -
                 DOI_00013065
24
25
```

## Page 5

```
 1  Exhibit 846  Email to Wendland from O'Neal,    99
                 2/3/17, Subject:  Re:  BIA to
 2               provide more officers to assist
                 Standing Rock Sioux tribe in
 3               closing protest camps on tribe's
                 land; with attached email;
 4               DOI_00019770
 5  Exhibit 847  Email to Cruzan from O'Neal,     100
                 3/14/17, Subject:  Re:  Please
 6               respond by Mar 31 - DAPL Unlawful
                 Protest Response After Action
 7               Review -
                 https://www.surveymonkey.com/r/
 8               DAPLProtestAAR; with attached
                 emails; DOI_00011645 -
 9               DOI_00011651
10
    DEPOSITION EXHIBITS:  (Previously marked)
11
    Exhibit 494  Email to SRJ2@ios.doi.gov from    53
12               U.S. Department of the Interior,
                 9/9/16, Subject:  Joint Statement
13               from the Department of Justice,
                 the Department of the Army, and
14               the Department of the Interior
                 regarding Standing Rock Sioux
15               Tribe v. U.S. Army Corps of
                 Engineers; DOI_00000001 to
16               DOI_00000002
17  Exhibit 739  Email to O'Neal from Cruzan,      31
                 8/14/16, Subject:  Re:  Standing
18               Rock Sioux Tribe REF:  DAPL
                 protest - Council arrests by
19               Morton County Sheriff's
                 Department; with attached emails;
20               DOI_00007736 - DOI_00007738
21  Exhibit 740  Email to Cruzan from O'Neal,      38
                 8/14/16, Subject:  Re:  Standing
22               Rock Sioux Tribe REF:  DAPL
                 protest - Council arrests by
23               Morton County Sheriff's
                 Department; with attached emails;
24               DOI_00007347 - DOI_00007351
25
```

**Page 6**

1   Exhibit 803   Second Amended Notice of 30(b)(6)    12
                  Deposition of The United States of
2                 America, 11/23/22; with
                  attachments
3
    Exhibit 821   Joint Statement from Department of    64
4                 Justice, Department of the Army,
                  and the Department of the Interior
5                 regarding D.C. Circuit Court of
                  Appeals Decision in Standing Rock
6                 Sioux Tribe v. U.S. Army Corps of
                  Engineers, 10/10/16;
7                 USACE_00015886
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1          WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4          *      *      *      *      *
5          (Deposition Exhibits 833 through 847
6   were introduced by Mr. Kerlin and electronically
7   provided to the court reporter for marking.)
8          THE VIDEOGRAPHER:  We are now on the
9   record.  Participants should be aware that this
10  proceeding is being recorded and, as such, all
11  conversations held will be recorded unless there is a
12  request and agreement to go off the record.
13         Private conversations and/or
14  attorney-client interactions should be held outside
15  the presence of the remote interface.
16         This is the remote video-recorded
17  deposition of Jason O'Neal.  Today is Tuesday,
18  December 6, 2022.  The time is now 3:59 p.m. UTC,
19  8:59 a.m. Mountain.  We're here in the matter of State
20  of North Dakota v. United States of America.
21         My name is Michael Banks.  I'm a video
22  technician on behalf of U.S. Legal Support.  I'm not
23  related to any party in this action, nor am I
24  financially interested in the outcome.
25         At this time will the reporter, Tracy

**Page 8**

1   Masuga on behalf of U.S. Legal Support, please enter
2   the statement for remote proceedings into the record.
3          THE REPORTER:  The attorneys
4   participating in this deposition acknowledge that I am
5   not physically present in the room and that I will be
6   reporting this proceeding remotely.
7          They further acknowledge that in lieu of
8   an oath administered in person, the witness will
9   verbally declare his testimony in this matter is under
10  penalty of perjury.
11         Counsel, please indicate your agreement
12  by stating your name and your agreement on the record.
13         MR. KERLIN:  This is Paul Kerlin on
14  behalf of the plaintiff, the State of North Dakota,
15  and we agree.
16         MR. JAFEK:  This is Tim Jafek on behalf
17  of the United States, and we agree.
18         THE REPORTER:  Mr. O'Neal, do you
19  solemnly state that the testimony you are about to
20  give in the cause now pending will be the truth, the
21  whole truth, and nothing but the truth?
22         THE DEPONENT:  Yes.
23              JASON N. O'NEAL,
24  having been first duly sworn to state the whole truth,
25  testified as follows:

**Page 9**

1                    EXAMINATION
2   BY MR. KERLIN:
3       Q.   Good morning, Mr. O'Neal.  My name is
4   Paul Kerlin, and I'm an attorney with the law firm
5   Greenberg Traurig, as well as a Special Assistant
6   Attorney General for North Dakota, and I represent
7   North -- the State of North Dakota in this action,
8   along with my colleague, Paul Seby.  Do you understand
9   that?
10      A.   Yes.  Good morning, Paul.
11      Q.   Good morning.  Would you state your
12  name.
13      A.   My name is Jason O'Neal.
14      Q.   And today I'll refer to my client as
15  "North Dakota" or "the State of North Dakota," okay?
16      A.   Okay.
17      Q.   You understand that you've been sworn in
18  and you're under oath, correct?
19      A.   Yes.
20      Q.   And you understand that some or all of
21  the testimony you give today may be played in front of
22  the judge at the trial of this matter?
23      A.   Yes.
24      Q.   And -- and you're doing a good job.
25  We're taking this deposition by agreement of the

*Objection to all testimony as hearsay, 802*

Jason O'Neal  30(b)(6)
December 06, 2022                    10 to 13

Page 10

1  parties remotely, so by Zoom.  If at any point you
2  have difficulty hearing, sometimes there could be some
3  audio issues, might be bandwidth limitations, just
4  let -- speak up, let us know, and we will do the best
5  we can to address any technical issues that arise.
6        A.    Yes.
7        Q.    Also, we'll be using some documents, I
8  think, throughout this deposition as exhibits, and we
9  will endeavor to share our screen so that you can see
10  it.  If it's too small, too large, you want us to
11  scroll up or down, just simply provide some verbal
12  instruction, and -- and we'll move it around to make
13  sure that you'll have a complete and full opportunity
14  to review the exhibit before or during the questions
15  that we ask about it, okay?
16        A.    Okay.  Thank you.
17        Q.    And you're doing a great job of letting
18  me finish my questions.  That's one of the other
19  things, both -- I mean, more often in person than
20  remotely, but frequently in the course of the
21  deposition the person being deposed will anticipate
22  where the questioner is going and might start their
23  answer before the question is finished.  It's
24  difficult and challenging for the court reporter to
25  take down a clean record, as we say, so that, you

Page 11

1  know, it gets the full question and the full answer if
2  we talk over each other.
3              I will do my best not to.  And if you
4  could just wait until my question is completed, if
5  there's an objection by your counsel, if there's an
6  objection lodged, and then provide your answer so that
7  we're not talking over each other as best as possible,
8  okay?
9        A.    Understood.
10        Q.    Great.  And the last thing I would
11  mention is verbal answers.  Sometimes we nod our head.
12  So I might prompt you for a verbal answer, if that's
13  the case, but it's simply so the court reporter can
14  get that answer down on the record rather than a head
15  nod or a head shake, okay?
16        A.    Yes.
17        Q.    If you need a break, let me know.  I
18  understand you have other obligations besides this,
19  and I appreciate your time today, and we'll respect
20  that.  If you have something that comes up, either for
21  work or for some other reason you need a break, just
22  let me know.  We'll typically take a break around --
23  probably the top of the hour.  If -- if you need one
24  sooner than that, let me know.
25              I would ask, you know, if we have a

Page 12

1  question pending, that we might want to get an answer
2  to that question before we then take the break, okay?
3        A.    Thank you, Paul.
4        Q.    Any questions about the proceedings so
5  far?
6        A.    No, sir.
7        Q.    Okay.  Do you understand that today you
8  are being -- you've been tendered as a -- as a witness
9  on behalf of the Department of the Interior in this
10  case on certain topics?
11        A.    Yes, sir.
12        Q.    Okay.  And I'm going to show you what's
13  been marked as Exhibit 803, as I recall.  And we can
14  zoom in on this, and I think you're on the next page,
15  but before we do, if you would just take a look at
16  this.  Do you recognize this document?
17        A.    Yes, I do.
18        Q.    Have you seen this before, then?
19        A.    I have.
20        Q.    Okay.  And if we turn to page 2, your
21  name appears as the designee for topics 6, 9, 10, 13
22  through 16, 20, and 21 as they relate to the
23  Department of the Interior or the Bureau of Indian
24  Affairs.  Do you see that?
25        A.    Yes, sir.

Page 13

1        Q.    And have you prepared to testify on
2  those topics?
3        A.    I have.
4        Q.    Can you give me an idea of the total
5  amount of time you spent preparing for your deposition
6  today.
7        A.    Yes, sir.  I had met with attorneys from
8  both the Department of Interior and the Department of
9  Justice on three different occasions for approximately
10  two hours each, reviewing materials; and as well spent
11  about 12 hours reviewing documentation that was shared
12  with me.  That would include a large electronic binder
13  of documents and a chronology of the incidents and
14  events, depositions from Darren Cruzan and Sally
15  Jewell, as well as a number of emails and other
16  documents.  That's all I can remember at the time.  I
17  know there was quite a few documents and quite a bit
18  of time spent reviewing.
19        Q.    Okay.  Other than counsel that you
20  mentioned, did you speak with anyone in preparation
21  for your deposition?
22        A.    I did not.
23        Q.    Okay.  So you didn't speak with either
24  Mr. Cruzan or Sally Jewell?
25        A.    I did not.

Jason O'Neal  30(b)(6)
December 06, 2022                    14 to 17

Page 14

1    Q.  Okay.  And so your testimony on these
2  topics will be based upon what you prepared.  So you
3  said there was an electronic binder that you reviewed,
4  materials, for about 12 hours, including some
5  depositions and some other documents, and you
6  specifically mentioned Darren Cruzan and Sally
7  Jewell's depositions.  And then you mentioned that on
8  three different occasions you met for two hours with
9  the Department of the Interior and Department of
10  Justice attorneys.  Do I have that correct?
11    A.  Yes, that is correct.
12        MR. KERLIN:  Okay.  And -- and,
13  Mr. Jafek, I'll ask you this, in the interest of time,
14  but are the electronic documents that were shared with
15  Mr. O'Neal in preparation for his deposition the
16  documents that have been provided to us that have been
17  shared with other witnesses in this case?
18        MR. JAFEK:  There are some that have
19  been not.
20        MR. KERLIN:  Okay.
21    Q.  (BY MR. KERLIN)  Okay.  And -- and I
22  guess in addition, Mr. O'Neal, you also have some
23  personal experience with some of the subject matter
24  that we're talking about, the DAPL protest and the
25  response to it, right?

Page 15

1    A.  Yes, sir, that is correct.
2    Q.  Okay.  Who are you currently employed
3  by?
4    A.  The U.S. Department of Interior, Bureau
5  of Land Management.
6    Q.  And what's your title?
7    A.  I am the director for the Office of Law
8  Enforcement and Security.
9    Q.  And how long have you had that position?
10    A.  Since April of this year.
11    Q.  Prior to that position, what
12  position did you hold and with which department?
13    A.  Prior to coming to the Bureau of Land
14  Management, I was the director for the Bureau of
15  Indian Affairs Office of Justice Services.
16    Q.  And how long were you in that role?
17    A.  I was in that role for approximately
18  14 months.
19    Q.  If my -- generally my calendaring is
20  correct, then I think that takes us back to about
21  February of 2021.  Would that be about right?
22    A.  (Deponent nodded head.)
23    Q.  Okay.  What was your prior -- prior role
24  or title?
25    A.  From 2012 until 2021, I held a number of

Page 16

1  titles within BIA, deputy assistant director, special
2  agent in charge, as well as assistant director.
3    Q.  During the time period of the -- of the
4  Dakota Access Pipeline protests, so from approximately
5  August of 2016 through March of 2017, what was your
6  role at BIA?
7    A.  I was the deputy associate director for
8  field operations.
9    Q.  And who did you report to at that time?
10    A.  My first-line supervisor at that time
11  would have been David Little.
12    Q.  And during the course of the DAPL
13  protest, what was your role with respect to the -- the
14  protest or the protest response?
15    A.  I had several roles.  Early on, in the
16  beginning, it was initially information sharing,
17  making sure that email communication that was coming
18  up to me was making its way up our chain of command.
19        At one point, our director decided to
20  respond out directly and spend time at the event, and
21  so as the event progressed, I did physically go up to
22  the area and take his place for a couple weeks when he
23  would be in break.
24        But primarily my role was ensuring the
25  information was being shared, and monitoring the --

Page 17

1  the situation and our resources nationwide.
2    Q.  And when you say "information sharing,"
3  is that sharing exclusively within the federal
4  government, so within the Department of the Interior
5  or with other federal agencies or departments?
6    A.  So there was two primary roles that I
7  had:  One was establishing a program analyst that
8  would be physically located with the State and Federal
9  partners to make sure that we were sharing
10  information.  And so I was the one that established
11  and ensured continued coordination of having a program
12  analyst there with the State.
13        And then the executive summary that was
14  developed and ultimately ran the course of the event,
15  I was responsible for establishing that and then
16  ensuring its continued upkeep throughout the duration
17  of the event.
18    Q.  I want to talk about both of those.  You
19  mentioned the program analyst.  Was it -- was that a
20  particular person during the course of the DAPL
21  protest response?
22    A.  There -- there were many, I believe
23  three that I can recall off the top of my head, those
24  being Barry Cossey, Cheryl Sam, and a third one would
25  have been Darren -- I can't recall Darren's last name,

Page 18

1  but I do recall his name being located in Mr. Cruzan's
2  deposition.
3        Q.   Was there overlap between these three?
4  In other words, were they working at the same time, or
5  was it that one would work, and then when that
6  individual completed or finished or left the agency,
7  that then it became someone else?
8        A.   There may have initially, or when one of
9  them was new, may have been some initial overlap just
10 to kind of show them the ropes, what -- what they were
11 doing day-to-day, but that probably would have been
12 limited.
13             Additionally, I believe towards the end
14 of the event, some of that was done remotely rather
15 than being physically on-site.
16        Q.   And what were they doing at the
17 response?
18        A.   So the program analyst had access to our
19 Incident Management System.  And so if the State or
20 Federal partners needed to know what was happening
21 from the reservation side, meaning the Bureau of
22 Indian Affairs law enforcement, any incident that we
23 were responding to or any information they needed out
24 of the DOI systems, those program analysts could
25 provide that.

Page 19

1             Additionally, their primary role was to
2  share information from the State and other Federal
3  partners back with the Department of Interior and BIA
4  for situational awareness.
5        Q.   Okay.  So kind of like a two-way street:
6  Information would be shared with State and local; and
7  State and local, if there was information that was
8  shared by State and local, then the program analyst
9  could then make sure that BIA had access to that
10 information; is that accurate?
11       A.   Correct.
12       Q.   Okay.  Would the program analyst have
13 access to -- you said the Incident Management System.
14 Would that be within the -- the BIA system, or would
15 that be broader than that and encompass other federal
16 law enforcement or -- or intelligence gathering?
17       A.   The Incident Management System is
18 actually owned and operated by the Department of
19 Interior for each of the Bureau law enforcement
20 programs, which included the Bureau of Indian Affairs.
21       Q.   Okay.  And the others, would that
22 include -- I think I've seen it as Parks.  Is there
23 a -- is there a Parks police?
24       A.   Correct.  The Department of Interior has
25 a number of law enforcement programs, which would

Page 20

1  include the Bureau of Land Management, National Parks
2  Service, U.S. Parks Police, U.S. Fish and Wildlife,
3  and each would use the same Incident Management
4  System.
5        Q.   Okay.  Do you know if any of those law
6  enforcement agencies, other than the BIA, were
7  involved with respect to the DAPL protests in any way,
8  shape, or form?
9        A.   Towards the conclusion of the event, the
10 Bureau of Indian Affairs did request operational
11 support from other DOI law enforcement programs, and I
12 believe there was a period of approximately 30 days in
13 which additional law enforcement officers were sent to
14 the Standing Rock Sioux Reservation from other Bureau
15 law enforcement programs.
16             MR. KERLIN:  Okay.  And I -- I want to
17 pick up at the next exhibit.  I'm not sure what was
18 the last exhibit that we used.  I don't know if the
19 court reporter has track of that.
20             THE REPORTER:  One minute.
21             MR. KERLIN:  Okay.
22             THE REPORTER:  I believe we went to 825,
23 and then we did enter 832, but not 826 through 831.
24             MR. KERLIN:  Okay.  I can either pick up
25 with 826 and then skip 832, or I can just go to 833.

Page 21

1  I just don't want to double-mark something.  Why don't
2  I just start at 833, if that's okay with everyone.
3              MR. JAFEK:  That's fine.
4              MR. KERLIN:  Okay.  Mr. Diaz, if you
5  could bring up -- it's ending Bates No. 33754.
6              (Deposition Exhibit 833 was remotely
7  introduced.)
8        Q.   (BY MR. KERLIN)  Mr. O'Neal, this is an
9  email.  There's an attachment to it.  And I want to
10 give you an opportunity to look through it, but I
11 think this might be, in part, what you were referring
12 to when you mentioned kind of around the tail end of
13 the event.
14             If we could maybe just scroll through
15 the document, so if we can continue, there's an
16 attachment.  Do you recall Operation Cannonball?
17       A.   Yes, sir, I do.
18       Q.   Okay.  And I think if we go to this --
19 if we go to the -- it's the bottom of this page.  It
20 says "Assisting Departments and Bureaus"?
21             It says "Law" -- excuse me.  It says,
22 "Law enforcement assistance will be provided to the
23 OJS from the following departments and bureaus:
24 Department of the Interior (DOI)" --
25             MR. JAFEK:  Yeah, I'm not -- I'm not

Page 22

1  seeing that part up on the screen.  If you could --
2  oh, I see.  I can scroll.  I apologize.  I have some
3  control over it.  Thank you.
4      MR. KERLIN:  Sure.  No problem.
5      Q.  (BY MR. KERLIN)  So I'm looking at the
6  section where it says "Assisting Departments and
7  Bureaus."  And so there's the Department of the
8  Interior.  Underneath the Department of the Interior,
9  I think there's some of the -- the law enforcement
10  agencies of the Department of the Interior that you
11  had mentioned, National Park Service, Bureau of Land
12  Management, and Fish and Wildlife Service.  Do you see
13  that?
14      A.  Yes, sir, I do.
15      Q.  Okay.  Is this what you were referring
16  to about other law enforcement from the Department of
17  the Interior that were requested at the tail end or
18  could have provided some support at kind of the end of
19  the DAPL protest and the response?
20      A.  Yes, sir.
21      Q.  Okay.  If we can go back to the first
22  page when it talks about the scope.  It says, "In
23  response to the Standing Rock Sioux Tribe's request
24  for additional law enforcement officers during DAPL
25  protests, the BIA have requested Intradepartmental law

*22:15-23:13 401-402*

Page 23

1  enforcement aid to assist with public safety and other
2  law-enforcement-related activities on or near the
3  Standing Rock Sioux Reservation in North and South
4  Dakota."  Do you see that?
5      A.  Yes, sir.
6      Q.  So was this Operation Cannonball, was it
7  created because of a request from the Standing Rock
8  Sioux Tribe for additional law enforcement, or from
9  anyone else that was requesting, for instance, State
10  and local or Corps requesting assistance with law
11  enforcement support?
12      A.  This would have been at the request of
13  the tribe.
14      Q.  Okay.  So I guess my question as to why
15  this wasn't done sooner than --
16         And if we go back to the email.  I
17  apologize to jump around.  It's a little harder to do
18  it remotely than if I had a paper copy to hand you.
19         But if we go back to the first page of
20  this exhibit, which is the email, okay, the date of it
21  is February 14, 2017.  So the protests were wrapping
22  up, right?
23      A.  That is correct.
24      Q.  Okay.  And so if my question -- my
25  question is, "Why wasn't this done sooner?" is the

*23:19-24:14 401-402*

Page 24

1  answer that Standing Rock Sioux Tribe didn't ask for
2  assistance before then?
3      A.  So previous, and throughout the duration
4  of the event, the Department, through the Bureau of
5  Indian Affairs, did ensure that additional law
6  enforcement presence was sustained on the reservation
7  and through a detail of BIA officers throughout the
8  country to the location.
9         This particular request, I believe, was
10  along the same time where the tribe was asking
11  protesters to leave the area.  There was concern over
12  flooding and cleanup efforts.  And so the tribe again
13  made a request for additional law enforcement on the
14  reservation.
15      Q.  Okay.  But I just want to understand,
16  the concern -- was the concern about the flooding some
17  of the issues that were raised by the executive order
18  issued by Governor Burgum in order to facilitate
19  protesters to leave Corps-managed land, or is it for a
20  different area and different camps?
21      MR. JAFEK:  Objection, may call for
22  speculation; vague and confusing.  But you can answer.
23      A.  My understanding is there was concern
24  from the tribe that any removal of the folks on the
25  Corps-managed lands would result in them transitioning

*24:15-25:3 602; 611*

-3

Page 25

1  over to reservation land, and that was part of what
2  was driving the request for additional law
3  enforcement.
4      Q.  (BY MR. KERLIN)  Okay.  And so Standing
5  Rock -- the Standing Rock Sioux Tribe did not want
6  those protesters that were leaving the Corps-managed
7  land then to end up on their reservation land; is that
8  accurate?
9      MR. JAFEK:  Objection, calls for
10  speculation, lack of foundation.  But you can answer.
11      A.  There was concerns within the tribe over
12  protesters moving on to the reservation.
13      Q.  (BY MR. KERLIN)  Okay.  I think those
14  are all the questions -- let me write down the exhibit
15  number on my document -- that I have on that one.  So,
16  yeah, we can take that down.
17      Did BIA ever provide any law enforcement
18  support with respect to protesters that were located
19  on Corps-managed land?
20      A.  The -- the Bureau of Indian Affairs did
21  respond off the reservation to Corps-managed lands on
22  two separate occasions.  One was the report -- one was
23  a report of a man with a gun shooting; and another
24  actually originated from the reservation of a vehicle
25  pursuit that traveled into the camp there and the

*25:4-12 401-402; 602*

Page 26

```
 1  Corps-managed lands.  Those are the two instances that
 2  I'm aware of that the Bureau of Indian Affairs law
 3  enforcement responded to Corps-managed lands.
 4       Q.   Okay.  Did the Bureau -- excuse me.
 5            Did the Bureau of Indian Affairs do any
 6  type of surveillance or information gathering with
 7  respect to camps that were not located on reservation
 8  lands, so that would have been -- those that would
 9  have been located on Corps-managed land?
10       A.   If there was any surveillance, it would
11  have been by individual officers, not any surveillance
12  directed by the Department or the Bureau specifically.
13            For instance, I am aware that the State
14  had requested from time to time if we would notify
15  them if we saw large caravans of vehicles, and so if
16  our officers were to observe some activity like that,
17  then that would be reported.  But there -- we did not
18  have the resources to dedicate to surveillance.
19       Q.   And so those caravans, would those
20  caravans be originating from Corps-managed land?
21       A.   That is correct.
22       Q.   And then headed off that Corps-managed
23  land onto some other area where the protesters would
24  then engage in protest activities?
25       A.   That is correct.
```

Page 27

```
 1       Q.   Okay.  With respect to the two separate
 2  occasions that you mentioned that you're aware of, you
 3  said there was a report of a man with a gun; that
 4  there had been a shooting.  Do you recall about when
 5  that would have occurred in the timeline of the -- of
 6  the protests?
 7       A.   I know that would have been 2016.  And I
 8  know that takes up a lot of time, but I don't -- I
 9  don't have that information in -- in front of me at
10  the moment.  I could certainly get that date for you,
11  though.
12       Q.   And was it -- was it an incident that
13  was -- I guess I'm trying to understand the scope of
14  the BIA's involvement in that particular incident.
15            Do you know if that was, the report came
16  in and they looked into it and it was resolved in a
17  few hours, or if it was something that had a more
18  lengthy investigation?
19       A.   After reviewing the incident report, it
20  was clear that BIA officers responded because they
21  were -- they were in fear, if they didn't, there would
22  be loss of life.
23            My understanding is they quickly located
24  a -- an individual who they believed was the reported
25  shooter and got him out of there, and it appears he
```

Page 28

```
 1  was turned over to the FBI.
 2            There was, to my underst- -- to the
 3  Department's understanding, no investigation or
 4  enforcement completed in that incident by the
 5  Department of Interior.
 6       Q.   Okay.  And with respect to the vehicle
 7  from the reserv- -- I guess originated on the
 8  reservation land and then ended up traveling over to
 9  Corps-managed land, can you tell me a little bit about
10  the details from that incident?
11       A.   Yes.  I believe it originated as a
12  reckless driver on the reservation and proceeded into
13  the camp.  The vehicle went through, I believe, a
14  tipi, and the BIA officer that responded saw a number
15  of protesters gathering around the vehicle, assaulting
16  the vehicle, assaulting the driver of the vehicle.
17            My understanding, the driver was
18  intoxicated and turned over to the sheriff's office
19  for criminal charges.  And there -- the -- there was,
20  again, no enforcement or investigative action there on
21  Corps-managed property, but that was turned over to
22  the State.
23       Q.   Okay.  Okay.  We've gone through a --
24  some different documents, and I got a little ahead of
25  myself, but I mentioned earlier, you're the
```

Page 29

```
 1  representative on behalf of the Department of the
 2  Interior.  And I wanted to say, and I should have said
 3  this at the outset, if you're answering in a capacity
 4  other than as a representative of the Department of
 5  the Interior, please, you know, let me know.
 6            I'm going to go through the topics, some
 7  of the -- you know, what we've talked about touches on
 8  a couple of the topics, but I did want to make that
 9  clear, so that your answers today, unless you indicate
10  otherwise, are as a representative of the Department
11  of the Interior, okay?
12       A.   Okay.  Thank you.
13       Q.   And when did you first have involvement
14  with the DAPL protests?
15       A.   So early in 2016 -- I don't have the
16  month directly in front of me -- the Bureau of Indian
17  Affairs was made aware of an incident that occurred
18  off the reservation, and as a result of that incident,
19  the tribal chairman was arrested.
20            That was something that -- that was
21  reported up the chain of command, per our policy,
22  any -- anytime a tribal leader or a significant event
23  occurs.  And that's when the Department first began
24  monitoring, if you will, the situation that was
25  ongoing.
```

Page 30

1        And from that point forward, we slowly
2   began to get additional reports of information, people
3   coming into the area, and that, of course, eventually
4   led to the establishment of the camps there off the
5   reservation.
6        MR. JAFEK:  Paul, if I could interject
7   and make an objection.  I realize I'm a little slow on
8   this, but you -- you asked the witness to say, you
9   know, unless he indicated otherwise, that he was
10  testifying on behalf of the Department of the
11  Interior.  I would just like to object to the extent
12  that that cannot expand the scope of the topics on
13  which he's been designated.
14       MR. KERLIN:  Sure.  That's fine.  Yeah.
15       MR. JAFEK:  Okay.  Thanks.
16       MR. KERLIN:  I understand your
17  objection.
18       Q.  (BY MR. KERLIN)  Okay.  And so -- and
19  just to be clear, when you said -- what we just
20  discussed, when you said you became aware of the DAPL
21  protests and the things that were being heard, that's
22  on behalf of the Department of the Interior and BIA
23  specifically, right?
24       A.  Yes, sir.
25       Q.  Okay.  And then the chairman, that would

Page 31

1   be Chairman Archambault, was the one who was arrested?
2       A.  Yes, sir.
3       Q.  And so how -- I guess what I'm trying to
4   understand is how high up in the organization of the
5   Department of the Interior did that go with respect to
6   his arrest?
7       A.  Generally, an arrest of the tribal
8   leader would have made it to the level of the
9   Assistant Secretary for Indian Affairs.
10      Q.  Okay.  Would it have been shared with
11  either the Assistant Secretary or the Secretary of the
12  Department of the Interior?
13      A.  It would have been shared with the
14  Assistant Secretary of Indian Affairs.  I'm unsure
15  whether that would have been shared with the Secretary
16  of the Interior.
17      Q.  I've seen the acronym ASIA in all caps.
18  Is that an acronym that is used by the Bureau of
19  Indian Affairs to refer to the Assistant Secretary of
20  Indian Affairs?
21      A.  That is correct.
22      Q.  Okay.  Can we bring up Exhibit 739.
23      Mr. O'Neal, this is an exhibit that was
24  marked for -- used in Mr. Cruzan's deposition.
25  It's an email and a forward, and I want to give you an

Page 32

1   opportunity to look through it before I have a couple
2   of questions about it.
3       A.  Okay.
4       Q.  Okay.  Did you make it through to the
5   end?
6       A.  I did, yes.  Thank you.
7       Q.  Perfect.  If we go to the -- the -- I
8   guess it's going to be the earliest email in the
9   chain, so the one that's going to be at the bottom of
10  page 2 and top of page 3, do you see the email from
11  Chad Harmon?
12      A.  Yes, sir.
13      Q.  Okay.  And is he someone that's assigned
14  to the Standing Rock Sioux Tribe or had a
15  responsibility with respect to the Standing Rock Sioux
16  Tribe?
17      A.  Yes, sir.  Chad Harmon would have been a
18  BIA law enforcement officer there on the Standing Rock
19  Sioux Reservation.
20      Q.  Okay.  And if we look at that second
21  paragraph, which starts out -- excuse me, which starts
22  off, "I have also confirmed that their arrests were
23  from protest activities at the Dakota Access Pipeline
24  protest site located approximately 2 1/2 miles north
25  of the Standing Rock Sioux Indian Reservation boundary

Page 33

1   along North Dakota Highway 1806 (off the SRST
2   reservation)."  Do you see that?
3       A.  Yes, sir.
4       Q.  Okay.  And so this email is -- is --
5   it's forwarded to you, and then you send that on as
6   well.  But I guess at least at the onset, the protest
7   activities were not occurring on the Standing Rock
8   Sioux Indian Reservation; is that accurate?
9       A.  That is correct, yes, sir.
10      Q.  Okay.  And so at this point in time,
11  you're just -- and by "you" I mean BIA -- is just
12  monitoring the situation, fair?
13      A.  That is correct.
14      Q.  And if we go to the top email, which is
15  the one from Director Cruzan -- I'm sorry, if we go
16  all the way back to page 1.  Director Cruzan, so this
17  is August 14, so a couple days later, asks if there's
18  "Anything new here?  I received an email from ASIA
19  that alludes that busloads of people are headed that
20  way."  Then he says, "I understand it's off the
21  reservation, but we should start thinking through what
22  happens if we get a request from State and local law
23  enforcement for assistance.  I've got no information
24  that it's going to come, but if it does, it will get
25  extremely political very quickly, and that decision

Page 34

1  will need to have come from me... either way we go.
2  We should plan on discussing tomorrow; just be
3  thinking about it."  Do you see that?
4       A.   Yes, sir.
5       Q.   Okay.  The first question is, how did
6  the Assistant Secretary of Indian Affairs have an
7  awareness about a busload of people that were headed
8  towards the -- I guess the protest area that -- do you
9  know where that information was coming from?
10           MR. JAFEK:  Objection, goes beyond the
11  scope of the notice.  You -- you can answer in your
12  personal capacity.
13           And I would also object on that basis on
14  speculation.
15       A.   All the email I'm reading from Darren
16  says "alludes" to a busload of people.  I -- I have no
17  record or I haven't seen any documentation that
18  supports the Assistant Secretary received that
19  information.
20       Q.   (BY MR. KERLIN)  Okay.  It then says, in
21  the second sentence, "I understand it's off the
22  reservation, but we should start thinking through what
23  happens if we get a request from State and local law
24  enforcement for assistance."
25           Did you have a discussion with anyone in

Page 35

1  Bureau of Indian Affairs, at around time period in
2  August, the start of the protests, about what to do if
3  there is a request from State and local law
4  enforcement for assistance?
5           MR. JAFEK:  Objection --
6       A.   Yes, there were multiple --
7           MR. JAFEK:  -- goes beyond the scope of
8  the notice.  But you can answer in your --
9           MR. KERLIN:  Okay.  Hold on.
10           MR. JAFEK:  -- personal capacity.
11           MR. KERLIN:  Hold on real quick.  I've
12  got an issue with that.  So let's look at the notice.
13           MR. JAFEK:  Okay.
14           MR. KERLIN:  Let's go to --
15           MR. JAFEK:  Yeah, if you could -- if you
16  could point me to the specific topic it relates to,
17  that would -- that would be helpful.
18           MR. KERLIN:  Specifically, for -- for
19  Mr. Cruzan, okay, we're talking about 20, 20 -- 20 and
20  21, okay?  And then there's also -- so 20, "Decisions
21  by USA to provide or withhold law enforcement
22  assistance . . . ."  So it's kind of hard to get one
23  that's a little bit more square than that one.  I think
24  two others touch on it, but I don't want to waste time
25  on the record.  Is that sufficient?

Page 36

1           MR. JAFEK:  On 20, I think -- I think
2  that's -- it refers to "provide or withhold law
3  enforcement assistance."  I think this is a
4  preliminary question to that, internal discussions,
5  "what happens if we get one."
6           Furthermore, I would object to the
7  extent of topic 20 if you're asking a specific
8  question with respect to a document.  That was
9  something that, according to the judge's ruling,
10  should have been provided to us ahead of time.
11           MR. KERLIN:  I disagree with that
12  interpretation, but I know we're going to have that
13  discussion tomorrow.
14           MR. JAFEK:  That's fine.  I just wanted
15  to officially get that objection on the record.
16           MR. KERLIN:  Okay.  I'm going to go back
17  to asking Mr. -- the witness a question.
18       Q.   (BY MR. KERLIN)  With respect to that
19  sentence I read, that specific email -- you know, so
20  it's an email from the director of BIA to you, and it
21  says, "if we get that request from State and local law
22  enforcement."
23           So my question is, did BIA ever get that
24  request from State and local for law enforcement
25  assistance at any point during the DAPL protests?

Page 37

1       A.   No, sir.  It's my understanding the
2  department received no request for law enforcement
3  assistance off the reservation.
4           There were a couple instances where the
5  State -- throughout the duration where the State asked
6  us to, I believe, close Highway 1806, and which we
7  assisted on, but it's my understanding we did not
8  receive any formal written request on behalf of the
9  Department from the State.
10       Q.   And I'm not limiting it just to written
11  requests, but any requests at all, whether in the form
12  of a request through -- through the Congressional
13  delegate or anything like that that was made to the
14  Department of the Interior, BIA.
15       A.   I am aware that the Congressional
16  delegation submitted two separate letters requesting
17  assistance, and I believe those were submitted to the
18  Department of Interior, the Department of Justice, and
19  the Corps of Engineers, I believe.
20       Q.   Did BIA ever receive any requests from
21  the Corps of Engineers to provide any type of law
22  enforcement assistance during the DAPL protests?
23       A.   No.
24       Q.   Did you ever discuss with Mr. Cruzan
25  about what he meant when he said "it [can] get

ND OBJ:
Introduces
new
material

Page 38

1   extremely political very quickly"?
2        A.   I did not.
3        Q.   Do you know what he was referring to in
4   any discussions you had with him?
5             MR. JAFEK:  Objection, calls for
6   speculation, and I think it goes beyond the scope of
7   the notice.  But you can answer.
8        A.   I would assume, because we had a tribal
9   chairman arrested and we were hearing that another
10  chairman was on his way with a van full of people,
11  that that may have been what he was referring to.
12       Q.   (BY MR. KERLIN)  Okay.  Can we go to
13  Cruzan Exhibit 740.  Okay.  Mr. O'Neal, this is the
14  next email, so --
15            MR. KERLIN:  Actually, Mr. Diaz, can we
16  just show the whole document?
17       Q.   (BY MR. KERLIN)  So if we can go a
18  couple pages later, you'll see that this is basically
19  the next email in the chain.  There's one that's been
20  added by you.
21            Okay.  So if we go to the third page at
22  the top, it's the "Anything new . . . I received an
23  email from ASIA," that A-S-I-A, that alludes to
24  busloads; and then the next email is the one that
25  starts on page 1 that is from you to Mr. Cruzan.

Page 39

1   Okay.  Do you recognize this email?
2        A.   I do.
3        Q.   Okay.  And it's -- it looks like it's
4   something that you forwarded that might include
5   information from, I guess, Lieutenant Chad Harmon?
6        A.   That is correct.
7        Q.   Okay.  Okay.  You say in that second
8   sentence, "Keep in mind if we do get a call to assist,
9   it would probably be because a State or local officer
10  is facing an immediate imminent threat."  What are you
11  referring to there?
12       A.   Nationwide and also at the Standing Rock
13  Sioux Reservation, BIA law enforcement at -- during
14  this time and historically has always been
15  significantly understaffed.  And so in general, our
16  ability to assist State and local was only in
17  emergency situations, and so that was what I was
18  referring to there.
19       Q.   Okay.  Were you aware that through the
20  course of protests that the State of North Dakota had
21  mobilized sheriff deputies and police officers from
22  all over the state to respond to law enforcement needs
23  during those eight months?
24            MR. JAFEK:  Objection, goes beyond the
25  scope of the notice.

**ND OBJ:**
Introduces
new
material

Page 40

1        A.   Yes, I was.
2             MR. JAFEK:  But you could answer.
3        A.   Yes, sir, I was.
4        Q.   (BY MR. KERLIN)  And were you also aware
5   that was something called EMAC that was implemented so
6   that law enforcement assistance could come from other
7   states and help provide law enforcement support during
8   the course of the DAPL protests?
9             MR. JAFEK:  Same objection.
10       Q.   (BY MR. KERLIN)  Were you aware of that?
11       A.   Yes, sir, I was.
12       Q.   Okay.  Okay.  I want to keep -- I want
13  to talk to you a little bit about movement of
14  protesters on Corps land, which is one of the topics
15  specifically.
16            If we can pull up -- it's going to be
17  DOI 9107.  And I'm going to mark this as Exhibit 30 --
18  834, excuse me.
19            (Deposition Exhibit 834 was remotely
20  introduced.)
21            Mr. O'Neal, we put up on the -- yeah,
22  we're displaying it.  It's a forward of an email.
23  There's some information that was provided by email by
24  Tom Doering at Morton -- Morton County.  Do you see
25  that?

Page 41

1        A.   Yes, sir.
2        Q.   And then that's forwarded by a Barry
3   Case -- Cossey, excuse me, a program analyst.  Is
4   he one -- he's one of the program analysts that you
5   mentioned earlier.
6        A.   Yes, sir.  He was the first.
7        Q.   And then on top of that is your email
8   that you sent out forwarding those.  It says, "Let's
9   make sure the northern units at least put eyes on the
10  campground each hour and report any unusual activity."
11            When you say -- when you're referring to
12  the northern units, can you tell me what you mean?
13       A.   Yes, sir.  The Standing Rock Sioux
14  Reservation is a significantly large reservation, and
15  so they had patrol zones.  And I believe they had a
16  northern and a southern patrol zone.  And of course
17  the northern units would have been part of that
18  northern patrol zone.
19       Q.   Okay.  And when you say, "put eyes on
20  the campground," would those be campgrounds that are
21  on Corps-managed land?
22       A.   Yes, that's correct.
23       Q.   Okay.  During the DAPL protests, how
24  many BIA law enforcement officers were either assigned
25  or provided to the Standing Rock Sioux Tribe and the

Page 42

1  related efforts by the BIA?
2       A.   At -- at the time, it's my understanding
3  there were approximately 20 full-time employee
4  positions, funded positions on the reservation.  I
5  believe about half of those, so probably 10 to 12,
6  were actually filled.  So there was an additional 12
7  to 18 on detail at any given time to try to remain
8  right around 30 law enforcement officers available.
9            I know that number fluctuated greatly
10  throughout the duration of the event up and down based
11  on resource availability nationwide.
12       Q.   Okay.  But just -- I guess to try and
13  have an understanding of -- of how many officers, I
14  just want to make sure I understand your answer.
15            So is it accurate to say that there's a
16  total of 30 that would --
17            I guess if all roles were filled or all
18  positions were filled, then there would be
19  approximately 30 officers.  And is that, you know,
20  during normal time periods or non-DAPL-type protest
21  periods at Standing Rock?
22       A.   No.  I believe at the time, Standing
23  Rock full-time would have had about 20 employees.  And
24  so that was likely ten additional law enforcement
25  officers more than what they would normally have.

Page 43

1       Q.   Okay.  Okay.  I want to show you one
2  other document while we're talking about the movement
3  and -- and things of that nature.
4            So DOI 9745.  And this will be marked as
5  Exhibit 835.
6            (Deposition Exhibit 835 was remotely
7  introduced.)
8       Q.   So this is an email.  There's an
9  attachment to it we'll look through in a minute, but
10  it's an email from Darren Smith, who I think is
11  another one of the program analysts you mentioned.
12       A.   Yes.  He was the Darren I couldn't
13  remember from earlier, Darren Smith.
14       Q.   And then we have -- if we go to this
15  page, "Law Enforcement Sensitive," do you see this?
16       A.   Yes.
17       Q.   Okay.  And -- and this is something that
18  would have been prepared by State and local about
19  what's going on?
20       A.   That is correct.
21       Q.   Okay.  Was there a -- you mentioned an
22  executive summary that would have been -- that you
23  would have had some involvement with during the course
24  of the protests.  Can you tell me what was the purpose
25  of that executive summary, and then also who that

Page 44

1  would have been disseminated to?
2       A.   Yes.  The primary purpose was to have
3  a -- one place where all information could be
4  collected and disseminated.  That would be a -- a very
5  broad update of activities occurring.
6            And so it began with an update of what
7  was going on, and then each day, additional
8  information would be added to that.  So if you -- if
9  you will, it was a rolling daily update, and so new
10  information was generally added, highlighted in red,
11  and all the older information in black.  And so the
12  newest information would be at the top of the
13  document.
14            That document was shared throughout the
15  Bureau of Indian Affairs up to the Assistant Secretary
16  of Indian Affairs, who I believe read that document to
17  periodically brief the Secretary's office.
18       Q.   Okay.  If we look at this document
19  prepared by Morton County law enforcement, or the law
20  enforcement -- I'm going to call it a summary
21  document, but "Ops Briefing" is, I think, what they
22  called it.
23            If we go to the second page of it, it
24  talks about current operations, and then underneath
25  that it has "Summary of Law Enforcement Resources

Page 45

1  Available."  I think I know the answer to this, and I
2  think it's clear from your testimony earlier, but I
3  just want to make it clear.
4            And then also could we pull up the one
5  underneath it, "Summary of other resources available."
6            I don't see anything on here, so a
7  summary of what the operations briefing was, and this
8  is dated October 18 of 2016, that there's any
9  resources from Department of the Interior or -- or
10  Bureau of Indian Affairs.  Would you agree with me
11  that there weren't law enforcement resources that were
12  made available to State and local?
13       A.   So there were certainly Bureau of Indian
14  Affairs officers available on the reservation.
15  However, resource dependent, unsure whether or not
16  they would have been available.
17            But they're clearly not indicated on
18  the -- the document here.
19       Q.   And I guess my question is, is that
20  because they would have been limited in some way to
21  only responding or conducting law enforcement
22  activities on the Standing Rock Sioux Indian
23  Reservation land as opposed to any other land?
24            MR. JAFEK:  Objection, may call for a
25  legal conclusion.

Page 46

1       Q.   (BY MR. KERLIN)  You can answer if you
2   know.
3       A.   I apologize, Paul and Tim.  I thought
4   you would indicate after an objection whether to
5   proceed with answering.
6            So, my -- my assumption on this, Paul,
7   is that the State either didn't ask the Department or
8   the Bureau for what our numbers were, or weren't aware
9   of what our numbers were.  But either way, clearly
10  whoever prepared the document didn't list those BIA
11  resources that may or may not be available.
12       Q.   Let me ask you this:  If the call came,
13  would BIA have been able to provide off-reservation
14  law enforcement support in a nonemergency role,
15  capacity?
16            MR. JAFEK:  Objection, calls for
17  speculation, may call for a legal conclusion.  You can
18  answer.
19            And, also, Jason, unless I tell you you
20  can't answer, go ahead and answer.  But I'll try to
21  remember to say you can answer so you can answer.
22            THE DEPONENT:  Okay.  Thank you, Tim.
23       A.   Yes.  There would have been officers
24  available.  However, I can tell you that each of those
25  would have been a case-by-case determination.  And so,

Page 47

1   you know, while there would have been officers there,
2   as you probably saw in my earlier email, we would
3   likely have only got a request or responded to a
4   request in an emergency situation.
5       Q.   (BY MR. KERLIN)  Okay.  Can we pull
6   up -- it's DOI 27254, and I'll mark that as
7   Exhibit 835 [sic], I think we're up to.
8            MR. JAFEK:  Did we mark -- was the last
9   one was with DOI 9745, was that marked with an exhibit
10  number?
11            MR. KERLIN:  834.
12            MR. JAFEK:  I have 834 as 9017 [sic].
13            MR. KERLIN:  So am I one off?
14            MR. JAFEK:  I think so.
15            MR. KERLIN:  Okay.
16            MR. JAFEK:  Maybe the court reporter can
17  help us.
18            MR. DIAZ:  Correct.  835 is 9745, and
19  836, which was called right now, is 27254.
20            MR. KERLIN:  Okay.  Thank you for that.
21  So 836.  Thank you for clarifying that.
22            (Deposition Exhibit 836 was remotely
23  introduced.)
24       Q.   (BY MR. KERLIN)  Mr. O'Neal, I'm showing
25  you an email that we have up on the screen.  If we go

Page 48

1   to the -- it's another forwarded email chain.  The
2   first one is from JH Wilson, Chief Prosecutor,
3   Standing Rock Sioux Tribe.
4            Eventually this works its way to you,
5   but he says, "Contrary to our conversation last week,
6   Judge Swallow has asserted the Tribal Court's
7   jurisdiction over the North Camp, as well as Rosebud
8   and Sacred Stone.  This means if Security from the
9   North Camp brings people to the Reservation and
10  asserts that a crime has occurred in the North Camp,
11  you are empowered to arrest that individual."  Do you
12  see that?
13       A.   Yes, sir.
14       Q.   Okay.  And we're going to work our way
15  up.  That's forwarded to -- it goes from Jeff Ward to
16  Eddie Smart, and then Eddie Smart to William McClure
17  and to you.
18            And then you send something that there's
19  a redaction.  Part of this is redacted.  It says
20  "Gentlemen, Redacted."  And then it says, "Eddie, Make
21  sure our guys do not arrest for tribal offenses off
22  the reservation."  Do you see that?
23       A.   Yes, sir.
24       Q.   Okay.  In this email, are you
25  instructing -- I'm looking for Eddie's last name, and

Page 49

1   I don't seem to see it at the moment.  But are you
2   instructing Mr. Smart that there shouldn't be arrests
3   for tribal offenses when they're not on Standing Rock
4   Sioux Indian Reservation land?
5       A.   Yes, sir, that is correct.
6       Q.   Okay.  So just to be clear, BIA, based
7   on what your directive is here, would not be able to
8   make arrests off of the reservation, so that would
9   include -- my question would be, would that include
10  protesters along 1806, protesters on Corps-managed
11  land, and protesters at other sites that wouldn't be
12  on the reservation or on Corps land?
13       A.   A little bit of a complicated question,
14  Paul.  The B- -- the tribe's criminal jurisdiction is
15  limited to offenses that occur on the reservation.
16  The Bureau of Indian Affairs' authority is also
17  limited to crimes that occur on the reservation.  The
18  BIA could make an arrest off the reservation for a
19  crime that occurred on the reservation.
20       Q.   Okay.  And then just to kind of complete
21  that, BIA, is it accurate, could not make arrests for
22  crimes that occurred off of reservation land?
23            MR. JAFEK:  Objection, calls for a legal
24  conclusion.  But you can answer.
25       A.   BIA's statutory authority does include

**ND OBJ:** Improper Lay Opinion

49:20-50:18 401-402; 701/702 calls for legal concl.

Page 50

1  assisting, upon request, any state, local, tribal, or
2  federal law enforcement agency with the enforcement of
3  their laws and regulations.  So I do believe we could,
4  upon request, assist another agency, which would
5  include enforcement and arrest.
6        Q.   (BY MR. KERLIN)  Great.  Would the
7  request have to be directly to BIA, or could the
8  request go to, for instance, the Secretary of the
9  Department of the Interior or another federal agency
10  and work its way down to BIA?
11        MR. JAFEK:  Objection, calls for a legal
12  conclusion.  But you can answer.
13        A.   In -- in general, we've always asked the
14  request be in writing, with the exception if it's an
15  emergency situation.  But I can tell you it's standard
16  practice if -- if a law enforcement agency in an
17  emergency situation requests our assistance, resource
18  dependent, we try to assist where we can.
19        MR. KERLIN:  I tell you what, we've been
20  going about an hour.  Why don't we take a ten-minute
21  break, and then we'll pick up from there, if that's
22  okay with everyone.  So maybe -- it's 11- -- it would
23  be 11:15 my time, 10:15 Mountain.
24        THE VIDEOGRAPHER:  Going off the record.
25  The time is 5:05 p.m. UTC, 10:05 a.m. Mountain.

Page 51

1        (Recess taken 10:05 a.m. to 10:15 a.m.
2  Mountain Standard Time.)
3        THE VIDEOGRAPHER:  We're back on the
4  record.  The time is 5:15 p.m. UTC, 10:15 a.m.
5  Mountain.
6        Q.   (BY MR. KERLIN)  Mr. O'Neal, back after
7  a short break.  Are you able to continue?
8        A.   Yes, sir.
9        Q.   Any testimony that you would add to,
10  change, or modify that you've already given today?
11        A.   No, sir.
12        Q.   Okay.  I want to pull up Exhibit 803,
13  which is the notice.  And if we can go to page 5, I
14  want to talk to you about one of the topics in
15  particular, topic No. 6.  "Public statements made by
16  government officials about any application for DAPL
17  Special Use Permits or any decisions made or actions
18  taken regarding such applications."
19        With respect to the Department of the
20  Interior, Mr. O'Neal, were there any public statements
21  made by the Department of the Interior about
22  applications for a DAPL special-use permit?
23        A.   No, sir.
24        Q.   Were there any decisions made or actions
25  taken regarding -- regarding such applications by

**ND OBJ:** Introduces new material

Page 52

1  anyone at the Department of the Interior?
2        A.   I apologize, Paul.  When you say
3  "decisions made or actions taken," that was in regards
4  to the special-use permit again?
5        Q.   Yes, sir.
6        A.   Okay.  No, I -- the Department did not
7  have any actions or decisions regarding the
8  special-use permit.
9        Q.   Okay.  Okay.  Thank you.  We can take
10  that down.
11        During the DAPL protests, did you
12  have -- did you receive any guidance or direction from
13  Larry Roberts?
14        MR. JAFEK:  And I would object that
15  that's beyond the scope of the topic, as far as I can
16  tell.  But you can answer in your personal capacity.
17        A.   It is my understanding that Director
18  Cruzan had discussions with Assistant Secretary
19  Roberts.  I do not believe any specific direction was
20  provided.
21        Q.   (BY MR. KERLIN)  Okay.  What about with
22  respect to Secretary Jewell?  What about her
23  involvement with the DAPL protests and the protest
24  response, any guidance or direction that -- that was
25  received from her?

Page 53

1        MR. JAFEK:  Same objection.  You can
2  answer.
3        A.   In my personal capacity, I would only be
4  able to reflect on what was in her deposition as far
5  as her involvement, which it does not appear she
6  provided any direction.
7        Q.   (BY MR. KERLIN)  Okay.  I want to talk
8  to you about topic 21.  It's "The decision to issue
9  and the contents of the Joint Statements released on
10  September 9, 2016, and October 10, 2016, from the
11  Department of Justice, Department of the Interior, and
12  Department of the Army."
13        I want to pull up first the earliest one
14  in time, which would be the September 9, 2016, one.
15  It's previously been marked as Exhibit 494.
16        Okay.  And this is the email that
17  forwards it.  It has the Department of the Interior
18  seal there on the left.  You'll see the last sentence
19  says, "See below a joint statement by the Department
20  of the Army, the Department of Justice, and the
21  Department of the Interior."
22        Before we get to the statement,
23  Mr. O'Neal, are you familiar with this statement?
24        A.   I am, yes, sir.
25        Q.   Did you have any involvement with this

**53:7-24 401-402**

Jason O'Neal 30(b)(6)
December 06, 2022                                    54 to 57

Page 54

1    statement before preparing for your deposition?
2         A.   I did not.
3         Q.   Were you aware of this -- the joint
4    statement at the time it was issued?
5              MR. JAFEK:  I would object to the extent
6    that this goes beyond the scope of the notice, but he
7    can answer in his personal capacity.
8         A.   Yeah, if this was an email sent to all
9    of DOI employees, Paul, I likely would have received
10   it, but I didn't recall seeing it prior to preparation
11   for the deposition.
12        Q.   (BY MR. KERLIN)  Okay.  And -- and it's
13   a statement that was issued -- if we go down now to
14   the statement, it's -- it's issued after there was a
15   decision from the District Court on the U.S. Corps --
16   U.S. Army Corps of Engineers.  It was a lawsuit
17   between Standing Rock Sioux Tribe and the U.S. Army
18   Corps of Engineers.
19             My first question is -- and I think it's
20   directly on topic of the -- and it's not
21   controversial, about the -- it's topic 21 -- who made
22   the decision to issue this joint statement on behalf
23   of the Department of the Interior?
24        A.   So, Paul, our solicitor's office was
25   able to research both the September and, I believe,

Page 55

1    October joint statements, and those statements
2    generally went through the Department's communication
3    office and made the rounds through senior leadership
4    and the Secretary's office before ultimately, I
5    believe, going back to the Corps of Engineers.
6              And from the communication that I
7    reviewed, it was a review and a clearance, meaning the
8    Department didn't have any edits to the release.
9         Q.   Okay.  So just so that I understand
10   correctly, one of the other agencies or departments,
11   so Department of Justice or Department of Army, would
12   have written it up, and then the Department of the
13   Interior agreed to it?  Is that accurate?
14             MR. JAFEK:  I -- I would object to the
15   extent that Mr. O'Neal is only designated with respect
16   to topic 21 as to the identity of whose decision
17   within the Department of the Interior it was to issue
18   each of those statements.
19             But you can answer, Mr. O'Neal, in your
20   personal capacity.
21             MR. KERLIN:  Well, hold on.  I don't
22   really want to go there yet.  I'm just trying to
23   follow up on what he just testified about when I asked
24   him who him made the decision.
25        Q.   (BY MR. KERLIN)  And so, again, this is

Page 56

1    in a representative capacity:  Who made the decision
2    to issue this joint statement on behalf of the
3    Department of the Interior?
4              MR. JAFEK:  And that's fine.  You can
5    answer that, Mr. O'Neal.
6         A.   Paul, I -- my understanding, and in
7    reviewing the information our solicitor's office was
8    able to research, was that the press release was
9    reviewed by a number of people, and so it did not
10   clearly indicate that there was one sole person from
11   the Department of the Interior that cleared the
12   language in the press release, but, rather, it went
13   through a number of offices before being returned.
14        Q.   (BY MR. KERLIN)  Okay.  Is there someone
15   at the Department of the Interior that would have to
16   have a certain level of authority to permit the
17   Department of the Interior to be part of the
18   statement?  In other words, would it have to be
19   someone of a particular status or a particular office
20   in order to be able to say, "This is, in fact, a
21   statement on behalf of the Department of the
22   Interior"?
23             MR. JAFEK:  And I would object that that
24   goes beyond the scope.  But you can answer,
25   Mr. O'Neal.

Page 57

1              MR. KERLIN:  I disagree with the
2    objection, but, yeah, we can take that up later.
3         A.   My -- my understanding -- my
4    understanding is the Department's deputy director of
5    communications would have been the individual that
6    communicated and was responsible for any type of press
7    release and circulating those to the appropriate
8    offices for review.
9              I'm -- I'm unaware of any official
10   department policy that would designate someone with
11   the sole authority of making that determination or
12   release.
13        Q.   (BY MR. KERLIN)  Okay.  But by issuing
14   this statement, it is, I guess, an authorized
15   statement on behalf of the Department of the Interior,
16   right?
17        A.   Correct.
18        Q.   And so that the Department of the
19   Interior would be bound by the words contained in it,
20   correct?
21             MR. JAFEK:  Objection, vague and
22   ambiguous.  But you can answer.
23             MR. KERLIN:  I want to rephrase the
24   question, then.
25        Q.   (BY MR. KERLIN)  This statement that's

54:12-55:8
401-402

55:25-56:13 401-402

Page 58

1  on Department of the Interior -- it has the seal, and
2  it says, "Joint Statement from the Department of
3  Justice, the Department of the Army, and the
4  Department of the Interior." Is the Department of the
5  Interior manifesting in it to be bound by what's
6  contained on the very words they put out there and
7  said it's their statement?
8          MR. JAFEK:  Same objection.  You can
9  answer.
10         A.   Paul, I believe the Department's, as far
11  as Interior's role in this release, was primarily
12  assisting the tribe and the other federal agencies.
13  And so in that respect, yes, you know, they -- the
14  information in the release would be accurate.
15         Q.   (BY MR. KERLIN)  And I understand, and I
16  want to make sure it's clear with Mr. Jafek.
17         MR. KERLIN:  So part of our topic, we
18  contend, includes input into this press release,
19  edits, words, who typed it up, that sort of thing,
20  what was considered before the words were put on the
21  page.
22         Is it my understanding, Mr. Jafek, that
23  Mr. O'Neal is not going to be providing testimony on
24  behalf of the Department of the Interior?
25         MR. JAFEK:  He's been designated with

Page 59

1  respect to topic 21 only with respect to the identity
2  of whose decision it was within the Department of the
3  Interior to -- to issue the joint statement.
4          So I think those specific questions you
5  have about, sort of, input, edits, those sorts of
6  things, I think it goes beyond the scope of that.
7          Of course, this became clear in the
8  deposition of Ms. Kelley Gipe.  We have a dispute as
9  to whether -- as to the -- as to the scope of topic 21
10  and -- in general, and I think we discussed that on
11  the record extensively in that other deposition.
12         MR. KERLIN:  Okay.  I understand your
13  objection.  I understand that you're hereby limiting
14  the witness to testify anything further than the
15  individual.  Now he said a number of individuals were
16  involved, so I don't think I have a clear answer on
17  that.
18         I do have a clear answer on who would
19  have been authorized, I believe, but I still don't
20  think I have specifically the person who said -- you
21  know, green-lighted it.  And so I don't think I've
22  gotten an answer to that.
23         And I don't want to give Mr. O'Neal a
24  hard time, but I just think we're entitled to know who
25  authorized it on behalf of the Department of the

Page 60

1  Interior specifically, so --
2          MR. JAFEK:  Yeah.  Could we -- could
3  we -- Paul, if possible, could we go off the record
4  for about five minutes?  And I would like to have a
5  brief conversation with Mr. O'Neal, and maybe we can
6  move forward on that issue as a result of that
7  conversation.
8          MR. KERLIN:  Yeah, sure.
9          MR. JAFEK:  Okay.  So we'll go off the
10  record.
11         THE VIDEOGRAPHER:  Going off the record.
12  The time is 5:28 p.m. UTC, 10:28 a.m. Mountain.
13         (Recess taken 10:28 a.m. to 10:31 a.m.
14  Mountain Standard Time.)
15         THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 5:31 p.m. UTC, 10:31 a.m.
17  Mountain.                          `60:18-61:16 401-402`
18         Q.   (BY MR. KERLIN)  Mr. O'Neal, we're back
19  after a break.  You had an opportunity to talk with
20  counsel.  Anything you want to add to your answers to
21  any of the questions today?
22         A.   Yes, Paul.  In respect to the joint
23  statement issued September 9, information our
24  solicitor's office was able to research is that DOI
25  Solicitor Hilary Tompkins emailed Sam Hirsch, who is

Page 61

1  the principal deputy attorney general at ENRD, on that
2  morning stating that DOI leadership had cleared the
3  final statement that Sam had sent earlier.
4          And so the leadership at that time that
5  that clearance had gone through was, of course, Hilary
6  Tompkins; Tommy Beaudreau, who is the chief of staff;
7  Michael Connor, who is the deputy secretary; Larry
8  Roberts, principal deputy assistant secretary of
9  Indian Affairs; and Blake Androff, who is the director
10  of communications.
11         And from -- from the review of the email
12  traffic, it appeared that each of those individuals
13  had reviewed this statement.
14         The Secretary was notified a release was
15  going out, but was not involved in the review or
16  clearance of that release.
17         Q.   Okay.  Thank you for that answer.
18         Was -- was there any -- and this is
19  based upon an answer that you provided earlier, but
20  was there any edits that were made by the Department
21  of the Interior to the joint statement, to your
22  knowledge?
23         MR. JAFEK:  I'm going to object that
24  that goes beyond -- beyond what he's been designated
25  for.

Page 62

1    But you can answer in your personal
2  capacity.
3       A.   I -- I am not aware, Paul.
4       Q.   (BY MR. KERLIN)  Okay.  Would the
5  individuals that you mentioned with respect to DO- --
6  Department of Interior leadership -- strike that.
7            Okay.  I want to talk to you a little
8  bit about the contents of Exhibit 494.  If we go to
9  page 2 of it.  All right.
10           So there's a paragraph that starts,
11  "Finally, we . . . support the rights of all Americans
12  to assemble and speak freely."
13           The last sentence of that paragraph
14  says, "The Departments of Justice and the Interior
15  will continue to deploy resources to North Dakota to
16  help state, local, and tribal authorities, and the
17  communities they serve, better communicate, defuse
18  tensions, support peaceful protest, and maintain
19  public safety."
20           My question is, with respect to the
21  resources that were deployed to North Dakota to help
22  state, local, and tribal authorities, what was
23  provided with respect to those resources from the
24  Department of the Interior?
25       A.   Paul, as I mentioned earlier, the

Page 63

1  additional law enforcement resources to the Standing
2  Rock Sioux Tribe; as well as key leadership from the
3  Bureau of Indian Affairs Office of Justice Services to
4  that area; and then finally the assignment of the
5  program analyst to aid in information sharing there,
6  were the additional resources that were currently
7  deployed and deployed throughout the duration of the
8  event.
9       Q.   Got it.  And with respect to the law
10  enforcement agents from the Department of the Interior
11  from BIA, those would have been primarily to focus
12  upon the Standing Rock Sioux Indian Reservation land
13  as opposed to the Corps-managed land, correct?
14       A.   That is correct.
15       Q.   But the analyst you mentioned, the
16  program analyst, that person or persons, because I
17  know there was more than one, did share information
18  back and forth between State and local and your --
19  your Information Management System for BIA?
20       A.   That is correct, yes, sir.
21       Q.   Okay.  I have some other questions about
22  the content of this exhibit; however, your counsel has
23  said that you're not designated on the content, just
24  the decision.  I think you've answered that for us,
25  which I appreciate.

Page 64

1            I want to move on to the next exhibit
2  that -- that was a joint statement, which is going to
3  be at Exhibit 821.  Mr. O'Neal, are you familiar with
4  this document?                      64:1-65:4 401-402
5       A.   Yes, sir.
6       Q.   Okay.  And this is the -- the joint
7  statement from the Department of Justice, Army, and
8  Interior, dated Monday, October 10, 2016.
9            Still -- still on topic 21:  Can you
10  tell me who made the decision about issuing this press
11  release?
12       A.   Yes, sir, if I could, similar to the
13  last one, the solicitor's office review and our
14  internal records.
15           So Wyn Hornbuckle from the Department of
16  Justice communications office sent the communication
17  to Jessica Kershaw, who is the Department of
18  Interior's deputy director of communications, and
19  other federal communication contacts with this
20  proposed statement.
21           And then Jessica Kershaw from DOI
22  replied that DOI was okay with the wording and the
23  statement.
24           Based on the email traffic, it looks
25  like Hilary -- again Hilary Tompkins, Tommy Beaudreau,

Page 65

1  and Larry Roberts reviewed that statement, so several
2  from the -- the previous -- and, again, the Secretary
3  was notified but was not involved in the review or
4  clearance.
5       Q.   Okay.  Did Jessica Kershaw make any
6  edits, changes, or modifications to this statement?
7            MR. JAFEK:  I would object that that's
8  beyond the scope of what he's been designated for for
9  topic 21.
10           But you can answer in your personal
11  capacity.
12       A.   I am unaware, Paul.
13       Q.   (BY MR. KERLIN)  Okay.  Wyn Hornbuckle,
14  he works for the Department of Justice; is that
15  correct?                           65:13-22 401-402
16       A.   That is correct, yes, sir.
17       Q.   Okay.  So DOJ sent the draft to Jessica
18  Kershaw; is that -- I was just trying to understand
19  your answer.
20       A.   Yes.  The research I was -- received
21  says "proposed," so I'm assuming that could be
22  replaced with "draft."
23           MR. KERLIN:  Okay.  Okay.  And with
24  respect to the -- with respect to questions regarding
25  the contents, is this witness also not designated

Jason O'Neal  30(b)(6)
December 06, 2022                          66 to 69

Page 66

1  to -- to answer questions about the contents of
2  Exhibit 821 and the press release issued on
3  October 10, 2016, on behalf of the three agencies?
4          MR. JAFEK:  That's correct.  To the
5  extent that the contents -- you know, the contents of
6  the joint statements per se.
7          You know, if there's -- if there's parts
8  of the joint statement that overlap with, you know,
9  information in other topics, you know, just because
10 it's in here doesn't mean that he couldn't answer it
11 if it was part of some other topic.
12         MR. KERLIN:  Okay.
13         Q.   (BY MR. KERLIN)  Well, let me ask you on
14 821, while we have it up here, it's the paragraph that
15 starts, "The Army."  It says, "The Army continues to
16 review issues raised by the Standing Rock Sioux Tribe
17 and other Tribal nations and their members and hopes
18 to conclude its ongoing review soon."
19         Were there any issues raised by the
20 Standing Rock Sioux Tribe to the Bureau of Indian
21 Affairs or the Department of the Interior?  I'm just
22 trying to understand why it was limited to the Army,
23 if you know.
24         MR. JAFEK:  And I would say beyond --
25 beyond the scope.  But if you know in your personal

Page 67

1  capacity, go ahead.
2          A.   Paul, only in my preparation and review
3  of the Secretary's deposition and some of her
4  communications.  And, you know, I think she did a good
5  job of representing that the Department's role in this
6  matter was really making sure that all executive
7  branch agencies were fulfilling their responsibilities
8  in consultations with tribes.
9          Q.   (BY MR. KERLIN)  And that kind of
10 targets a little bit of the last paragraph in this
11 press release, which is, "We also look forward to a
12 serious discussion regarding" -- excuse me, "during a
13 series of consultations, starting with a listening
14 session in Phoenix on Tuesday, on whether there should
15 be nationwide reform on the Tribal consultation
16 process for these types of infrastructure projects."
17         That is very similar to the testimony
18 that Ms. Jewell provided, correct, about listening
19 sessions and consultation with the tribes?
20         A.   That -- that is correct.  And,
21 generally, the Department of the Interior and Bureau
22 of Indian Affairs take a lead role in -- in those
23 consultations.
24         Q.   And that makes sense to me.  I was
25 just -- you know, part of this statement was -- you

Page 68

1  know, it's from all -- all the agencies, but then
2  there's specific things that are attributed to "the
3  Army does this" or "the Army is doing that," as
4  opposed to "the Department of the Interior and BIA."
5  But I would assume, since it does involve tribal
6  consultation and -- and Native Americans, that BIA
7  would, in fact, be involved with that, so -- okay.
8  Makes sense.
9          All right.  Let's -- let's keep moving.
10         With respect to the information
11 gathering that BIA was doing with respect to tribal --
12 excuse me, with respect to the protesters' movements,
13 was there any observed increase in the intensity of
14 the protests or the number of protesters after the
15 September 9, 2016, joint statement was issued?
16         A.   I would have to review back through the
17 materials.  I do know, as part of that daily briefing,
18 there was information reported up regarding estimated
19 size of the camps and -- and activity observed from
20 the Bureau of Indian Affairs from the reservation
21 side.  But I would -- would need to review a couple of
22 those dates directly after those releases were made.
23         Q.   And would that be the same for the
24 October 10, 2016, release?
25         A.   Yes, sir.

Page 69

1          Q.   Okay.  Okay.  I want to look at topic
2  No. 10.  And this states, "Actions considered and
3  taken by U.S.A. in response to the use or occupation
4  of Corps-managed lands by someone without either
5  written permission or a Special Use Permit."  And
6  there's some limitations to it with respect to the
7  area for the United States Corps of Engineers, their
8  Northwest Division.

**69:9-15 401-402**

9          With respect to the Department of the
10 Interior, were there any actions taken or considered
11 in response to the use or occupation of Corps-managed
12 land by someone without either written permission or a
13 special-use permit?
14         A.   No, there were no actions taken or
15 considered by the Department of Interior.

**69:16-70: 10 for completeness if objection above overruled**

16         Q.   And is that -- I mean, I kind of want to
17 understand the why, if -- if you know.  Is that
18 because it was Corps-managed land and it wasn't, for
19 instance, Standing Rock Indian Reservation land?  In
20 other words, it was not something that would kind of
21 fall inside of the BIA purview?
22         A.   That -- that is correct.  The Department
23 would be interested from a situational awareness,
24 particularly with the events that were happening at
25 the time, but would not have a direct role in -- in

Page 70

```
 1   that special-use permit.
 2        Q.   That would, in essence --
 3        It's Corps-managed land, and so the BIA
 4   doesn't have responsibility for law enforcement
 5   activities on, for instance, Corps-managed land --
 6        A.   Right.
 7        Q.   -- other than what you mentioned earlier
 8   on a couple of -- you know, there's some limitations
 9   to that, but in general, right?
10        A.   That is correct.
11        Q.   Okay.  Okay.  Let's take a look at
12   topic 13, just below it.  "Actions taken by the
13   United States . . . during the DAPL Protests regarding
14   Corps-managed land used or affected by the DAPL
15   Protests to," and I'm going to go through each of the
16   individual subcategories, the first being "protect the
17   health and safety of persons on Corps-managed land."
18   Anything that the Department of the Interior did with
19   respect to "protect the health and safety of persons
20   on Corps-managed land"?
21        A.   Paul, outside of the two instances I --
22   I related where our law enforcement did respond to
23   those -- those instances, the Department did not take
24   any -- any additional actions.
25        Q.   And I believe -- I just want to make
```

Page 71

```
 1   sure I have this answer correct.  Did the Corps of
 2   Engineers ever ask BIA or the Department of the
 3   Interior to take any such actions on Corps-managed
 4   land during the protests?
 5        A.   No, sir, they did not.
 6        Q.   Okay.  I just want to make sure you
 7   understood that.  I wasn't talking about the two
 8   instances you mentioned, but other than those, was
 9   there any Corps -- any Corps requests to BIA or
10   Department of Interior to help in "protect the health
11   and safety of persons on Corps-managed land"?
12        A.   No, sir, there were no requests to the
13   Department of Interior or the Bureau of Indian
14   Affairs.
15        Q.   Okay.  The next category, it would be
16   "Actions taken by the United States," Department of
17   the Interior or BIA, "to protect Corps-managed lands
18   from environmental harm or degradation."  Any such
19   actions taken?
20        A.   No, sir.  There were no actions by the
21   Department of Interior.
22        Q.   "Prevent unlawful or unsafe activities
23   on Corps-managed lands."  We've talked about the two
24   instances you mentioned, which could, I guess, in my
25   opinion, be unlawful or unsafe.
```

Page 72

```
 1             Anything other than those two that we've
 2   discussed?
 3        A.   No, sir, nothing other than those two.
 4        Q.   The fourth is "to clear Corps-managed
 5   lands in the first quarter of 2017."  Any -- any
 6   actions taken by the Department of the Interior or
 7   BIA?
 8        A.   No, sir, no actions by the Department of
 9   Interior or BIA.
10        Q.   And then the last is, "prevent the use
11   of Corps-managed lands as a camp, base, or staging
12   area from which potential -- potentially dangerous or
13   unlawful activities may have been conducted on or off
14   Corps-managed lands."  Any actions taken by the
15   Department of the Interior or BIA in that regard?
16        A.   No, sir, no actions by DOI or BIA.
17        Q.   I want to talk to you about 14.  This is
18   "Any requests" -- "Any requests made by the United --
19   by the U.S. for assistance from State or local
20   authorities to remove persons from Corps-managed land
21   or to deal with the actions of persons on or off
22   Corps-managed land."
23             Are you aware of any such requests made
24   by the United States for assistance from State and
25   local authorities to do those activities?
```

Page 73

```
 1        A.   Paul, I do recall a communication, I
 2   believe, from Corps of Engineers to the State.
 3   However, I don't have that in front of me, and I
 4   believe it was -- I don't believe it was necessarily a
 5   request for assistance as much as it was just
 6   identifying that the State did have jurisdiction in a
 7   trespass situation.
 8             But as I was not part of what the
 9   Department of Interior would normally be involved in,
10   other than briefly seeing the document, that I -- I
11   just recall something likely exists in some of the
12   materials that I reviewed.
13        Q.   Okay.  But nothing specific to the
14   Department of the Interior, the Department -- or,
15   excuse me, of -- or Bureau of Indian Affairs?
16        A.   No, sir.  DOI did not make any requests
17   for assistance from State or local authorities to
18   remove persons from Corps-managed lands.
19        Q.   Okay.  I want to talk to you a little
20   bit about 15.  "Communications between the
21   United States and with, to, or from persons on
22   Corps-managed lands related to the DAPL protests, or
23   representatives or spokespersons for such persons."
24             There's -- there's a number of -- I'm
25   sure there's a number of communications that occurred.
```

Page 74

1  I have a couple of exhibits I would like to -- to go
2  over with you that I think will kind of focus the
3  questions I have.
4          Let me start with DOI 11791. I believe
5  we're up to 837, so this will be Exhibit 837.
6          (Deposition Exhibit 837 was remotely
7  introduced.)
8      Q. Are you familiar with who Rosa Salamanca
9  is?
10     A. I did not recall her name until I was
11 reviewing that portion of Darren Cruzan's deposition,
12 and that refreshed my memory. I -- I still don't
13 recall having much interaction with her.
14     Q. Okay. She sent an email on the 23rd of
15 February [sic] that's up on the screen right now.
16 "North Camp leadership has stepped forward to ask for
17 a problem-solving dialogue regarding specific concerns
18 about their camp. General Dohrmann and Colonel
19 Gerhart have indicated a willingness to attend. Would
20 BIA and the Sheriff's Office be interested in
21 attending -- in attending the meeting?"
22         Would -- okay. Well, and I guess what
23 I'm trying to understand is why Rosa -- how Rosa
24 Salamanca gets involved from the Department of Justice
25 rather than, I guess, BIA. I mean, isn't this the

Page 75

1  type of thing that BIA would typically do when it's
2  communicating with tribal members and related issues?
3          MR. JAFEK: Objection, calls -- calls
4  for speculation, and the question is vague and
5  ambiguous. But you can answer.
6      A. So, Paul, I think, as we found
7  throughout this -- this event, a number of the
8  individuals were not tribal, and -- and the BIA did
9  not have an office similar to the office that Rosa was
10 from. And as, you know, this was Corps of Engineers
11 property, DOJ was -- was probably assisting, my
12 assumption is, because the Corps of Engineers also
13 didn't have an office similar to that.
14     Q. (BY MR. KERLIN) Okay. Do you recall --
15 if we go to the top, that first email.
16         Well, I guess I did skip one. We have
17 Rosa -- the one that was just up. "Rosa, I may not be
18 back in time, but I have cc'd DADs' McClure and
19 O'Neal." So that one might be referring to you.
20     A. Yes, sir.
21     Q. So then -- then we go back to the first
22 page -- there we go -- Friday, September 23 of 2016.
23 And you sent an email that said, "Hi Rosa, I'll be
24 getting up to speed on Monday and in the area the
25 remainder of the week. I can attend."

Page 76

1          Do you recall attending such a dialogue
2  session, or whatever it was referred to, meeting?
3      A. I do not. I do not believe such a
4  meeting occurred.
5      Q. Okay. So you expressed availability,
6  but, then, I guess, it never actually went forward?
7      A. That -- that is correct, not to my
8  recollection.
9      Q. Okay. Okay. The next one I would like
10 to talk to you about, it's DOI 11084. And this is now
11 going to be Exhibit -- where is that running list --
12 eight thirty- -- so we're at 838.
13         (Deposition Exhibit 838 was remotely
14 introduced.)
15     Q. And this is an email chain in
16 February of 2017. I want to go to the last page, so
17 it would be the earliest email in the thread.
18         You know, I think we need to see who it
19 came from as well, because I believe it's from Justin
20 Wendland. It looks like he's at BIA. Do you know who
21 he is?
22     A. Yes, sir. Justin was a law enforcement
23 officer for BIA.
24     Q. Okay. And then you're on this email, as
25 well as a number of other individuals from BIA. It

Page 77

1  says, "Good Morning, Just a heads up... Chief and I
2  met with and served LaDonna Allard the BIA notice of
3  trespass and violation paper regarding the land area
4  identified as Sacred Stone." Do you know what
5  Mr. Wendland is referring to when he talks about the
6  BIA notice of trespass violation paper?
7      A. Vaguely, yeah. I do recall reviewing
8  a -- a trespass notice that I believe was put together
9  by the BIA's regional office regarding an unauthorized
10 use of reservation land in the area.
11     Q. Okay. And in your experience, so --
12 with BIA, is that something that -- so who -- I guess
13 what I'm saying is, for this type of notice of
14 trespass, have you been involved in one of these
15 notice of trespass violations on other occasions?
16     A. I -- I have not. And trespass,
17 particularly on the reservation with the complex
18 jurisdictional matrix throughout the United States,
19 trespass is a very difficult issue, and I did not prep
20 for this deposition specifically to talk about
21 trespass in this situation. I apologize.
22     Q. Okay. Yeah, it's just -- it's one of
23 the communications with the -- with the individuals.
24         I guess if we can turn -- let's also --
25 we're going to go to what I think might be the letter

Page 78

1   you're referring to.  It's DOI 11686.  We'll mark that
2   as 839.
3            (Deposition Exhibit 839 was remotely
4   introduced.)
5        Q.   It's an email from you, and it says
6   "Monty" -- this is March 21, 2017.  "Monty, With Dave
7   Armstrong's initial opinion being the property is
8   Indian Country under 18 U.S.C. 1161 I'm looping in
9   Darren Cruzan to shed some light on how they went
10  about getting eviction/trespass notices issued through
11  the BIA realty as, dependent on upon the tribe's
12  wishes, this may be of interest to the tribe as a
13  route to pursue before the camps grow any larger.  I'm
14  attaching one of the letters from DAPL that BIA issued
15  for reference."
16           What I would like to do is flip to --
17  it's a number of pages down.  Let's see, one, two --
18  well, it's -- in the corner it's Bates-labeled 11698,
19  and it's got -- it's on the letterhead of the
20  United States Department of the Interior.
21           This is the attachment to your email.
22  Is this the -- the notice of trespass that would have
23  been related to the DAPL protest that you were
24  referring to in the other exhibit we looked at,
25  Exhibit 838?

Page 79

1        A.   Yes, sir, that's correct.
2        Q.   Okay.  And in that first sentence it
3   says, "It has come to our attention that you are
4   allowing individuals to move onto trust property
5   without proper authorization or without a valid lease.
6   This notice is being issued to you regarding a
7   possible trespass violation for utilizing trust
8   property without approved authorization or a valid
9   lease contract."
10           So this is telling them that they are
11  trespassing because they don't have a valid lease
12  contract, right?
13           MR. JAFEK:  And I would object that this
14  goes beyond the scope of the notice.  But you can
15  answer in your personal capacity.
16        A.   And I apologize, Paul, can you repeat
17  your question?
18        Q.   (BY MR. KERLIN)  Sure.  That this is the
19  notice -- I mean, it says the sentence, "This notice
20  is being issued to you regarding a possible trespass
21  violation for utilizing trust property without
22  approved authorization or a valid lease contract."
23           So since they didn't have authorization,
24  they didn't have a lease contract, this notice of
25  trespass was being issued to them, right?

Page 80

1        A.   That is correct.
2        Q.   Okay.  If we go down three -- it's the
3   last full paragraph on this page.  It says, "An Indian
4   owning a beneficial interest in trust property may
5   still be held liable for trespass on that property."
6   And then there's a quote:  "It is well-established
7   that one who commands, instigates, encourages,
8   advises, countenances, cooperates in, aids, or abets
9   the commission of a trespass is liable as a
10  co-trespasser with the person actually committing the
11  trespass, and is liable as a principal to the
12  statement extent and in the same manner as if he had
13  performed the wrongful act himself."  Do you see that?
14        A.   Yes, sir.
15        Q.   Okay.  So this letter is informing DAPL
16  protesters, if they come onto and did, in fact, come
17  onto Standing Rock Reservation land, that they are
18  trespassing, and informing them of the potential
19  consequences of being in trespass.  And then on the
20  next page there's a whole litany of the different
21  damages and consequences of doing so.
22           Do you recall that this was given to
23  Ms. LaDonna Allard?
24           MR. JAFEK:  I would object to the
25  question as vague and ambiguous.  Specifically it's --

Page 81

1   it's compound as to that last question, as to whether
2   it was given to Ms. Allard.  I don't -- I would only
3   object to that on the basis that it goes beyond the
4   scope of the notice.  And you can answer in your
5   personal capacity.
6        A.   So, Paul, I'm unaware that Ms. Allard
7   would have received a similar copy of this trespass
8   notice as this one, I believe, was addressed to -- to
9   someone else.
10           But I think these likely would have only
11  gone to tribal members that were residing there.  It
12  was not my understanding they were going to
13  protesters.
14        Q.   (BY MR. KERLIN)  I see.  So it was going
15  to the tribal members because the tribal members were
16  allowing or encouraging individuals to then camp or
17  occupy the Standing Rock Indian Reservation without
18  permission or a lease; is that right?
19           MR. JAFEK:  Objection, it goes beyond
20  the scope of the notice.  But you can answer in your
21  personal capacity.
22        A.   I -- I do not know, Paul.
23        Q.   (BY MR. KERLIN)  Okay.  So it's -- but
24  it's going to tribal members, I believe is what you
25  said.  They would have been directed to tribal

Jason O'Neal 30(b)(6)
December 06, 2022                      82 to 85

Page 82

1    members.  Okay.
2          A.   And if I could add one point of
3    clarification to that.  My assumption is it would have
4    went to people that were tribal members living on the
5    reservation, as I -- I don't believe we had
6    information as far as who the protesters were, names,
7    for instance, to issue such a notice to -- to
8    individual people that were not landowners or
9    occupiers there.
10         Q.   I see.  And so it would be directed to
11   those that might be instigating, encouraging,
12   advising, or cooperating or aiding others in
13   trespassing on the land, like the tribal members?
14         A.   That is correct.
15         Q.   Okay.  A couple more here.  DOI 26858
16   will be the next one.
17              (Deposition Exhibit 840 was remotely
18   introduced.)
19         Q.   Okay.  This is an email that was sent --
20   it looks like it was sent to you, and then you
21   responded to it, although I don't see the -- everyone
22   on the forward email as to who it went to.
23              If we go down to the first one in time,
24   or the earliest, you know, January 26, "Update of
25   today's events."  The first -- and I'm just going to

82:17-84:10
401-402

Page 83

1    read the first sentence, in the interest of time.
2    "The state is not going to set checkpoints on the
3    reservation."
4              The second is, "The state is planning to
5    start the process to open up the bridge as early as
6    tomorrow."  It goes through that.
7              And then the third one, it says, "The
8    Corps of Engineers have not issued an eviction notice
9    at this time."  Do you see that?
10         A.   Yes, sir.
11         Q.   And then it says, "They are attempting
12   to have DOJ write the eviction notice and have the
13   U.S. Attorney sign it.  The Corps has a contract in
14   place to have anything left behind by protesters
15   removed from the site."
16              Did the Department of the Interior know
17   that the Corps of Engineers had not issued an eviction
18   notice to the protesters for those that were on Corps
19   land as of January 26, 2017?
20         A.   I'm sorry, Paul.  I'm a little bit
21   confused.  I can't see the date of this email again.
22              But you're -- you're asking -- so you're
23   saying that Mathis sent this, notifying that they --
24   that there hasn't been an eviction notice yet, and
25   you're asking if the Department -- can you ask your

Page 84

1    question one more time?
2          Q.   Sure, sure.  It's just that, you know,
3    what this says that was updating as of today's events,
4    if we can get the date -- there it is, January 26,
5    2017, that as of that date, the Corps of Engineers had
6    not issued an -- an eviction notice at this time for
7    those protesters on Corps-managed land, and Department
8    of Interior was aware of that.
9          A.   Yes.  Based on this email, the
10   Department would have been aware, correct.
11         Q.   Okay.  And your email on the top of this
12   then says, "Thank you sir.  Thanks, Jason O'Neal."
13         A.   Yes, sir, that's correct.
14         Q.   All right.  I want to go to the
15   next one.  It's DOI 19811 [sic].  Okay.  We're still
16   pulling that one up.  And we'll mark that as
17   Exhibit 841.
18              MR. DIAZ:  I'm sorry.  Did you say
19   19811?
20              MR. KERLIN:  No.
21              MR. DIAZ:  I only have 10.
22              MR. KERLIN:  That's it, 10.  I'm sorry.
23   I was looking at the second page.
24              MR. DIAZ:  Oh, okay.  Okay.  Got it.
25              (Deposition Exhibit 841 was remotely

Page 85

1    introduced.)
2          Q.   (BY MR. KERLIN)  Okay.  Let's -- I think
3    the best way to do this -- I guess that we'll go to
4    the -- let's go to the press release.  Yeah, we'll
5    work our way up from the last page.
6              So there's this press release, and it
7    looks like, if we go to the prior page, it's on a
8    distribution of some sort.  Are you familiar with the
9    as-ia_opa@bia.gov distribution?
10         A.   I don't recall what OPA stood for.
11         Q.   Okay.  Well, but, I mean, is that
12   something that -- I'm just trying to understand if
13   it's kind of like disseminated from -- oh, okay.
14   Well, it looks like --
15         A.   I think that's probably like public
16   affairs, maybe.
17         Q.   But is that something that goes out
18   to -- that you would typically receive?
19         A.   I don't believe so.  It looks like this
20   has been forwarded, kind of, a couple times.  So, you
21   know, if it's -- if it's a news release, sometimes
22   those -- like if it came out from the Assistant
23   Secretary's office, sometimes those would go to all
24   Indian Affairs employees.  If it's a news release
25   coming out at the department level, sometimes those

Page 86

1  would go out to all department employees.
2          I -- this appears to be a news release
3  from the Assistant Secretary of Indian Affairs, so
4  that may or may not have gone out to all BIA and BIE
5  employees.
6      Q.   Okay.  Can we go to the release, and
7  then we'll come back to that -- that first email.  So
8  the release in its -- "For Immediate Release,
9  February 3, 2017."  The "Acting Assistant Secretary
10 Michael Black on the Standing Rock Sioux Tribe and BIA
11 Law Enforcement Assistance."
12          It starts off and says, "The Bureau of
13 Indian Affairs today responded to the Standing Rock
14 Sioux Tribe's request for BIA law enforcement support
15 and will assist them in closing the protest camps
16 within the Standing Rock Reservation boundary."
17          We looked at a document earlier that I
18 think we marked as -- where did I put it? -- well, it
19 was Operation Cannonball.  Do you remember that, when
20 we were talking about that earlier?
21     A.   Yes.
22     Q.   Okay.  So there's the press release, and
23 then that's dated a little bit later.  Is that what
24 was formulated in response to what the directive is
25 here from the assistant acting secretary?

Page 87

1      A.   And I apologize, Paul.  What -- what
2  directive are you referring to?
3      Q.   Well, I'm just referring to, I guess,
4  this public statement.  I'm calling it a directive,
5  but it seems like -- well, I guess he's just saying
6  that the Bureau of Indian Affairs responded to their
7  request, so that there is some action being taken by
8  BIA for law enforcement support for closing protest
9  camps, but it's clear that, I mean, what he says is
10 "within the Standing Rock Reservation boundary."
11     A.   That -- that's correct.  This more than
12 likely reflects the Operation Cannonball that we had
13 looked at earlier.
14     Q.   Yeah.  I think we marked it 832, just
15 for the record.  But okay.  Got it.
16          On the top of this, the top email, it
17 says -- it's an email from you, and it's Friday,
18 February 3.  It says, "Wow, she is really reading into
19 it."  Do you know what you were referring to?
20     A.   No, I don't.  And it's kind of odd that
21 there's not any more in the email chain, so perhaps
22 Darren and I were on a -- on a phone call together and
23 some comments were made and I sent him a -- a message
24 through email, but I -- I don't recall why I would
25 have wrote that.

Page 88

1      Q.   Okay.  Let me pull up 10611.  We'll make
2  it 842.
3          (Deposition Exhibit 842 was remotely
4  introduced.)
5      Q.   Okay.  If we go to the second email in
6  this, it's an email chain, but we don't have it up
7  yet.  There we go.
8          It says, from Mar-- -- excuse me, Marcia
9  Good.  "I've lost my copy of the January 1981 memo
10 between BIA and FBI on responding to civil disorder
11 in," it says, "IC . . . can either of you send me a
12 copy?  Thanks, m."
13          And if we go to the front page, you then
14 say, "Hi Marcia.  It's attached... Thanks Darren."
15 Oh, "It's attached... Thanks Darren," and then
16 "Thanks."
17          Okay.  And if we go to the third page,
18 we can look at the PDF, the attachment.  Have you seen
19 this document before?
20     A.   Yes, sir, I have.
21     Q.   So it -- it's a -- I mean, it's a
22 memo, it appears to be -- or could you tell me what it
23 is?  Let's -- let's go with it that way.
24     A.   Yeah.  I believe it's an MOU between the
25 Department of Justice and the Department of Interior

88:3-20
401-402;
611

Page 89

1  regarding any federal response to civil disorder on
2  Indian reservations.  And specifically, you know, the
3  support that DOJ could provide to the Department of
4  Interior for on-reservation disorder control.
5      Q.   Okay.  So if we go to page -- we're
6  going to go to the one -- it's the third page of this
7  memo, and it -- that second full paragraph says,
8  "Whenever" -- it starts "Whenever."  "Whenever any
9  civil disorder reaches a point beyond the control
10 capabilities of local and Bureau of Indian Affairs
11 resources, the Department of the Interior may elect to
12 request assistance from the Department of Justice."
13 Do you see that?
14     A.   Yes, sir.
15     Q.   Is that what you're referring to about
16 the Department of the Interior can request assistance
17 from the Department of Justice?
18     A.   Yes, sir.
19     Q.   Do you know if any such request was made
20 in this situation, so with respect to the DAPL protest
21 response, any request by the Department of the
22 Interior for assistance from the Department of
23 Justice?
24     A.   No, sir, there were no requests made
25 from DOI to DOJ for assistance under this MOU.

89:19-
25
401-
402

**Page 90**

1      Q.   Thank you.  That's all I have for that
2  one.  And I think I have one more.
3           It's going to be DOI 11094.  I think
4  that's going to be 843.
5           (Deposition Exhibit 843 was remotely
6  introduced.)
7      Q.   Do you recall that there was an
8  executive order issued by Governor Burgum in -- and
9  this would have been in February of 26 -- excuse me,
10  2017?  It was an evacuation order?
11     A.   Yes, sir, I do recall this.
12     Q.   Okay.  It says, if we go to the third
13  paragraph in a letter issued February 3, "the Corps
14  also ordered those camping on federal property to
15  vacate to prevent injuries and significant
16  environmental damage in the likely event of flooding
17  in the area."
18           I -- I guess my question is, is -- this
19  isn't about vacating Standing Rock Indian Reservation
20  land, right?  I mean, this is about Corps-managed land
21  being vacated?
22     A.   That -- that's correct, Paul.  My -- my
23  assumption, because Barry would have been our program
24  analyst sharing information to us received from the
25  State, that this would be information that he -- he

*90:5-91:3*
*401-402; 602*

**Page 91**

1  received through part of that joint information
2  sharing.  And he -- so he would be briefing this back
3  to DOI leadership that was coming from the State.
4      Q.   Okay.  And -- and it's not so much that
5  BIA -- that makes sense, and I appreciate that answer.
6           And I guess just to understand it, it's
7  along the same lines that you had testified earlier:
8  That BIA was monitoring what's going on, and then it's
9  not that you were necessarily going to be taking any
10  specific actions for the Corps-managed land to address
11  environmental or helping evacuate or remove those
12  individuals that were on Corps-managed land; it's more
13  of BIA keeping a -- kind of a situational awareness.
14  And then later we look at some of the documents --
15  or that, you know, you were working in tandem with
16  this about the Operation Cannonball, about how it may
17  affect Standing Rock Reservation land.  Do I kind of
18  have that correct?
19     A.   Yes, sir, that is correct.
20           MR. KERLIN:  Okay.  Okay.  Let's do
21  this.  Can we take a five-minute break?  We can kind
22  of keep it a short one.  I understand -- well, let's
23  go off the record, if that's okay.
24           THE VIDEOGRAPHER:  Going off the record.
25  The time is 6:19 p.m. UTC, 11:19 a.m. Mountain.

**Page 92**

1           (Recess taken 11:19 a.m. to 11:27 a.m.
2  Mountain Standard Time.)
3           THE VIDEOGRAPHER:  We're back on the
4  record.  The time is 6:27 p.m. UTC, 11:27 a.m.
5  Mountain.
6      Q.   (BY MR. KERLIN)  Mr. O'Neal, we're back
7  after a short break.  Able to continue?
8      A.   Yes, sir.
9      Q.   Anything else that you need to add to
10  the testimony you've already given or -- or change?
11     A.   No, sir.
12     Q.   Okay.  I would like to pull up DOI 9144.
13  Mark this as Exhibit 844.
14           (Deposition Exhibit 844 was remotely
15  introduced.)
16     Q.   It's an email chain.  So let's go to the
17  second email first, and then it's -- it's one that you
18  received, and then you have a response to.
19           Okay.  So the subject of this is
20  "ESF-13:  Preemptive preparations for Hurricane
21  Matthew."  And it's a -- it's from a, looks like,
22  Candace Shea at DOI.  "Good afternoon, As you are
23  likely aware, Hurricane Matthew is now a Category 4
24  storm, currently located approximately 220 miles
25  south/southeast of Kingston, Jamaica.  Several

*92:14-94:12*
*401-402;*
*611*

**Page 93**

1  forecasted tracks show Matthew as having a significant
2  impact on the eastern seaboard of the United States by
3  this weekend.
4           "Due to the projected impact of the
5  storm, and the potential for 'worse-case scenario' of
6  a landfall by this weekend, the ATF has asked all
7  ESF-13 stakeholders to begin searching their ranks for
8  deployable Federal LEOs.  This is a preparatory
9  measure; there is no activation at this time."
10           Then it says, "Please provide me with an
11  estimated number of LEOs your Bureau may be able to
12  commit NLT COB Wednesday, October 5."  I think NLT
13  means "no later than" and COB means "close of
14  business."
15           But my question for you is, does -- does
16  the Department of the Interior receive these at
17  different times about a request for availability of
18  law enforcement support?
19           MR. JAFEK:  Objection, it goes beyond
20  the scope of the notice.  But you can answer in your
21  personal capacity.
22     A.   Yes, sir.  ESF stands for Emergency
23  Support Function 13, which is the federal government's
24  law enforcement response.  That's managed by ATF.
25           Anytime there's a potential ESF

Page 94

1   deployment, the ATF will reach out to all federal law
2   enforcement agencies to begin preplanning for
3   available law enforcement officers for those
4   disasters.  And that is something the department
5   receives very often.
6        Q.   (BY MR. KERLIN)  Okay.  Do you know if
7   there was any such ESF-13 that was issued -- I don't
8   know if that's the right word, or "put out" is maybe a
9   different way to say it -- with respect to the DAPL
10  protests?
11       A.   No, sir.  There was no ESF-13 request
12  for DAPL.
13       Q.   Okay.  And just so that I understand
14  ESF-13, if that did go out, then that would have been
15  to all federal agencies to see who was available?  Or
16  is that just limited to DOI?
17            MR. JAFEK:  Objection, goes beyond the
18  scope of the notice.  But you can answer in your
19  personal capacity.
20       A.   All A- -- ATF is the SME for that
21  ESF-13, so that would be a question for DOJ.
22       Q.   (BY MR. KERLIN)  Okay.  Sounds good.
23            So then if we go to the top email --
24  well, there's one that says, "Can we support this?" at
25  the very bottom of that page -- or the top of that

Page 95

1   page.
2            And then your response at the top, it
3   said, "No, we wouldn't."
4            Well, I guess the first -- what you send
5   is, "Would we need to support a full 25-man team?  If
6   so, probably not with the DAPL protest operation."
7            And then the response above that, "No,
8   we would not.  The smallest element is a 5-man squad.
9   They would accept one or two squads, if we could field
10  them."
11           So in response to this ESF-13, I guess
12  BIA didn't have the resources to be able to try and
13  commit someone, or at least is that what -- what
14  you're indicating in your email?
15       A.   That's correct, Paul.  As I indicated
16  earlier, nationwide and historically, we've been -- or
17  the BIA has always been short-staffed.  And just
18  getting the detail of this number of people to the
19  Standing Rock Sioux Reservation was already a major
20  impact on our resources nationwide.
21       Q.   Okay.  If we could look at DOI 13061.
22  And this will be 845.
23            (Deposition Exhibit 845 was remotely
24  introduced.)
25       Q.   I want to -- there's a number of -- this

Page 96

1   is a long chain, and so I'm going to try and get
2   through it relatively quickly.
3            But let's go to the last page, and we'll
4   work our way up ultimately to your email.
5            It says -- December 9, the one I see, it
6   says, "Francis, We would like to schedule a meeting
7   with Secretary -- with the Secretary to acknowledge
8   the work of BIA Officers at Standing Rock.  My sense
9   is that there will be about 10 officers that will be
10  invited to attend.  Can you please let us know
11  available dates and times?"
12           We will work our way up.  "Best
13  times" -- excuse me.  "Best dates to make this happen
14  are January 6 and 13.  Please let me know if you'd
15  like us to hold some time."
16           We go on up to the next one.  "Great.
17  Thank you.  Let's target January 6th for a meeting
18  with the OJS team.  Do you need a list of names from
19  Darren?"
20           Your response is, "Yes."  I don't know
21  if you can see that.  That was actually on the -- just
22  underneath it.  "Yes."
23       A.   Yes.
24       Q.   And then if we go -- if we come up to
25  the prior page, "Mr. Roberts, Below are the names of

Page 97

1   the folks we recommend we bring in to meet with the
2   Secretary on the 6th.  It's difficult to name just a
3   few because so many have performed extraordinarily
4   well."
5            There's a number of BIA individuals.
6   Are these all individuals that were involved in the
7   DAPL protest response on behalf of the BIA?
8        A.   Yes, sir.
9        Q.   Is that first one, for BIA Special Agent
10  in Charge William "Bill" McClure, is that the -- it
11  says "Rifle Incident."  Was that the discharge of the
12  firearm that you mentioned?
13       A.   Yes, sir, it was.
14       Q.   Okay.  And then if we go down to the
15  fourth, it's BIA Police Officer Brian Clouston, the
16  "individual driving a stolen car sped into the camp
17  and crashed into a tipi."  Was that the other incident
18  you were -- you had mentioned about starting on
19  reservation land and then ending up on Corps land?
20       A.   Yes, sir.
21       Q.   Got it.  Okay.  And then if we go back
22  another email, it's -- it's, I believe, to you and to
23  Bill.  "Narrowed down list" to meet with the
24  Secretary.  It's directed to you.
25            And then if we go to the top --

Jason O'Neal 30(b)(6)
December 06, 2022                           98 to 101

Page 98

1          Oh, I'm sorry.  I've skipped one.  I'm
2   sorry.  I -- I left off one important detail.  The
3   second sentence says, "Can you guys please see to it
4   that these guys are notified, and make travel
5   arrangements to be here [by] Friday, January 6, for a
6   10:00 a.m. to 11:00 a.m. meeting with Secretary Sally
7   Jewell and other DOI leadership."
8          And now we go to the top email, which is
9   from you.  And it says, "Absolutely, I am certain they
10  will be excited and honored to be recognized."
11          Did -- did this meeting occur?
12      A.   I don't recall, Paul.  I know it wasn't
13  a meeting that I participated in, and I don't recall
14  whether or not it happened or not.
15      Q.   Okay.  And that was going to be my next
16  question, did you participate in the meeting or attend
17  it.  It sounds like you didn't.
18      A.   No, sir.
19      Q.   Okay.  Now, I guess the reason why I
20  found it --
21          Well, let me just put it this way:  The
22  protests weren't over in -- I mean, this is
23  December 22 of 2016.  The protests didn't conclude for
24  another month, month and a half, right?
25      A.   That is correct.

Page 99

1      Q.   I mean, did it seem a little premature
2   to be kind of I, I guess, celebrating or being
3   recognized before the protest response was concluded?
4          MR. JAFEK:  Objection, goes beyond the
5   notice -- it goes beyond the scope of the notice.  But
6   you can answer in your personal capacity.
7      A.   I -- I don't know, Paul.
8      Q.   (BY MR. KERLIN)  Okay.  I mean -- okay.
9   It just seems like you might want to wait until the
10  whole thing is done.  I didn't know if perhaps it had
11  to do with the fact that Secretary Jewell would likely
12  be leaving the Department of the Interior with the
13  change of administrations.  Any knowledge about that
14  one way or another?
15          MR. JAFEK:  The same objection.  You can
16  answer in your personal capacity.
17      A.   Paul, I can only assume from the BIA
18  side that you, you know, it's seldom that any of our folks
19  in the field would have an opportunity to meet with a
20  Secretary, and so that was likely what was driving our
21  trying to make it happen.  But beyond that, I don't
22  know.
23      Q.   (BY MR. KERLIN)  Okay.  Could we pull up
24  DOI 19770.  Okay.  We'll mark this as Exhibit 846.
25          (Deposition Exhibit 846 was remotely

Page 100

1   introduced.)
2      Q.   So Justin Wendland forwards a -- a link.
3   It says, "This release just came out a couple hours
4   ago...."  And the title of the link is "BIA to provide
5   more officers to assist Standing Rock Sioux Tribe in
6   closing protest camps on tribe land."
7          I think we looked at that press release
8   from the Assistant Secretary, but my question is about
9   your response to it.  And this is February 3, 2017.
10  "Thanks Justin, have you or anyone from the EOC seen
11  or corresponded with Heidi lately?  This is new info
12  for me."  Do you know who Heidi is?
13      A.   I do not.
14      Q.   Okay.  And then also, the cc on this --
15  well, strike that.
16          Do you know what EOC stands for?
17      A.   Typically, that would stand for
18  emergency operations center, which I'm assuming would
19  be the State, but that's just a guess.
20      Q.   Okay.  Got it.  Sounds good.
21          Let's go to DOI 11645.  Mark this as
22  847.
23          (Deposition Exhibit 847 was remotely
24  introduced.)
25      Q.   This is a -- this is a forward of an

Page 101

1   email that I think you received, but it could have
2   been forwarded to you.  It's from -- no, actually, I
3   think it went to Justin Wendland and then to you.
4          If we go to the start of the email
5   that's on the screen right now, so if we go up maybe
6   one more page.  Okay.  Perfect.
7          So this is an email from Justin
8   Wendland, March 14, 2017.  "FYI... not sure how many
9   of you are on the green team listing but just in case,
10  please do your part in this survey if you have
11  anything to add.  I too believe we," in parenthesis,
12  "(BIA) need to complete some type of debrief or an
13  after-action report," in parenthesis, "(probably not
14  as engaged or in-depth as the state's) in order to
15  better our next response by reviewing how this entire
16  operation from start to finish went including lessons
17  learned and how we can formulate a better more
18  efficient response in the next event.
19          "Please forward to anyone I have missed
20  in BIA and those in DOI that may have ended up on the
21  ground here . . . .  Thank you."
22          Do you -- and it's a forward of Sean
23  Johnson.  It's a -- the title of his email is "DAPL
24  Unlawful Protest Response After Action Review," and
25  "https://surveymonkey.com" for a survey that was set

Page 102

1  up on SurveyMonkey, which is a website.
2          And then this goes to you, if we go up a
3  page.  "Thanks, Justin, do you know who is championing
4  this effort from the state?  I would love to get a
5  copy of both their questions and responses."
6          Do you recall if you completed the --
7  the online after-action review SurveyMonkey that was
8  set up by Sean Johnson on behalf of the Department of
9  Emergency Services for North Dakota?
10     A.   No, sir, I -- I don't believe I would
11  have.
12     Q.   Did either the Department of the
13  Interior or BIA do any type of after-action review or
14  kind of after it's -- its resolved, any type of
15  look-back to see areas for improvement or things of
16  that nature with respect to the DAPL protest response?
17     A.   There was an after-action review of the
18  Operation Cannonball response.
19     Q.   Okay.  And was that it?
20     A.   Yes, sir.  I believe that's the only
21  after-action review that was conducted.
22     Q.   Do you happen to take place [sic] in the
23  after-action review or the -- I'm trying to think of
24  how to describe this.  There was a meeting of
25  North Dakota law enforcement individuals that

Page 103

1  responded to discuss it.  Did you attend anything like
2  that with respect to North Dakota law enforcement?
3      A.   No, sir, I did not.
4      Q.   Okay.  Okay.  I want to talk about a
5  couple other topics.  I think we left off -- if we go
6  back to 80- -- 803.  I want to pick up at topic 16.
7  "Enforcement actions or investigations taken by the
8  U.S.A. . . . at any time with respect to any of the
9  persons on Corps-managed land who were associated with
10  the DAPL protests."
11         Any enforcement actions or
12  investigations taken by DOI or BIA with respect to any
13  of the persons on Corps-managed lands who were
14  associated with the DAPL protests?
15     A.   No, sir, outside of the two responses
16  that I had indicated where we had law enforcement
17  officers respond.  I don't consider either of those
18  to -- to fit the definition of an enforcement action
19  or an investigation by the department regarding the
20  persons on Corps-managed lands.
21     Q.   Okay.  I want to talk to you about
22  topic 20.  "Decisions by U.S.A. to provide or withhold
23  law enforcement assistance to State and local
24  authorities during the DAPL protests."
25         Any law enforcement assistance that was

**ND OBJ:** Introduces new material

Page 104

1  withheld to State and local authorities by the
2  Department of the Interior or BIA during the DAPL
3  protests?
4      A.   All through all the research, we could
5  only identify one incident, and that had to do with
6  closure of the highway at the request of the State on
7  one particular date.  And the information I reviewed
8  at the time, Darren Cruzan, on-site, declined to close
9  the highway.  And that was the only withholding of
10  assistance that I could identify through my research.
11     Q.   Okay.  Just to talk about that one a
12  little bit, what was the rationale for not closing the
13  highway at the request of State and local?
14     A.   In -- in the materials I reviewed, it
15  cited jurisdictional operational concerns.  I am
16  unsure of the request itself, but at least from the
17  information I reviewed, it had the appearance that the
18  requested closure was off the reservation.
19     Q.   And is that the only request that you're
20  aware of that was made by local law enforcement, so
21  State and local authorities, to DOI or BIA?
22     A.   As I indicated earlier, I'm -- I know
23  that the State had asked for assistance, for instance,
24  in alerting them when we would see caravans.  I think
25  there was some times where we had stopped traffic on

Page 105

1  the reservation side of the highway.
2          So there -- there was some of those
3  instances that I was able to identify in the executive
4  briefings, but those seemed to be just sprinkled
5  throughout and likely were the result of, you know,
6  the -- the sheriff's office calling down, saying,
7  "Hey, can -- can you send an officer out and see if
8  anybody is moving?" or "Can you slow traffic down?
9  We've got an incident happening," something of that
10  nature.
11         Not -- it wouldn't have been, you know,
12  some -- some request that came all the way up, for
13  instance, to the Bureau or Department level.
14     Q.   Okay.  I want to change -- I'm not on
15  topic 20, but I do want to ask you about, you know,
16  this issue of just, you know, limiting -- well, let me
17  start over.
18         My understanding is on the south side of
19  the Cannonball River there's an overlap of Corps land
20  and Standing Rock Sioux Reservation land.  Are you of
21  a -- of a similar understanding?
22     A.   I tried to make heads or tails of that
23  in all the documentation and research and testimony,
24  but I -- I presume that's correct, yes.
25     Q.   Okay.  And so there was -- I believe the

Page 106

1   camps are called -- and they're sometimes referred
2   differently by different individuals, but there's the
3   Sacred Stone Camp.  And if that's on reservation land
4   as well as Corps-managed land, so there's overlap
5   there, did the Corps coordinate with BIA or the
6   Department of the Interior about that reservation land
7   and the camps that were on reservation land?
8           A.   I don't believe so.
9           MR. JAFEK:  I'm going to object.  I
10  think the question is non- -- vague and ambiguous.
11  But you can answer.
12          A.   I don't believe so.  I know throughout
13  the duration of the event, determining land statuses
14  was something ongoing from the beginning to the end.
15  And so it may very likely have been at the conclusion,
16  or even after, that it was realized that that may have
17  been both reservation and Corps property.
18          Q.   (BY MR. KERLIN)  Okay.  And then at one
19  point there was -- were you aware that the Corps had
20  an -- you know, they indicated that they wanted to
21  establish a free-speech zone?
22          A.   I did see that in the briefing
23  materials, yes.
24          Q.   And so if that free-speech zone was on
25  the south side of the Cannonball River, which would be

Page 107

1   an overlap of Corps-managed land and Standing Rock
2   Reservation land, any coordination with respect -- you
3   know, was the Corps saying, "Hey, BIA, this is what
4   we're going to do, and is this going to create any
5   issues for you?"  Or these are -- "We want to make you
6   aware of it," that sort of thing?
7           A.   No.  There -- and more than likely, that
8   would not have been something BIA would have been in
9   support if -- if it would have been known at that time
10  that that was joint property, or if it was -- if it
11  is, in fact, joint property.
12          Q.   And why is that?  Why wouldn't BIA be in
13  support of that?
14          A.   From a resource allocation, as I
15  indicated earlier, and, you know, our ability to
16  respond and provide services, I mean, is extremely
17  limited.
18          And any -- any time you know, even
19  in -- as I indicated earlier, when the -- when the
20  State was looking to remove people from the Corps of
21  Engineers properties, our concern was those people
22  being moved onto the reservation where then they would
23  become the responsibility of the Bureau of Indian
24  Affairs and then any impact to the tribal reservation
25  lands.

Page 108

1           Our -- our focus was providing adequate
2   resources, and our primary objection would be that we
3   lacked the appropriate resources should a location on
4   the reservation be established for a significant
5   higher number of people.
6           Q.   I -- I don't think I have -- well, I
7   have one more question.
8           Mr. O'Neal, have I been respectful and
9   courteous to you throughout the course of this
10  deposition today?
11          A.   Yes, sir.
12          MR. KERLIN:  With that, the Plaintiff
13  State of North Dakota would pass the witness to
14  counsel for the United States if they have any
15  questions at this time.
16          MR. JAFEK:  Thank you.  If we could just
17  take five, maybe ten minutes, I'll confer with
18  Mr. O'Neal, and then we'll be -- we'll be back with
19  any follow-up questions, if necessary.
20          THE VIDEOGRAPHER:  Going off the record.
21  The time is 6:53 p.m. UTC, 11:53 a.m. Mountain.
22          (Recess taken 11:53 a.m. to 12:00 noon
23  Mountain Standard Time.)
24          THE VIDEOGRAPHER:  We are back on the
25  record.  The time is 7:00 p.m. UTC, 12:00 p.m.

Page 109

1   Mountain.
2                   EXAMINATION
3   BY MR. JAFEK:
4           Q.   Thank you.  So I just have a couple
5   areas of questions.
6           Mr. O'Neal, if you recall earlier, you
7   were being asked questions by Mr. Kerlin regarding the
8   September 9, 2016, joint statement.  And that's
9   Exhibit 494, and that's being shown to you now on the
10  screen.
11          My first area of questions, you were
12  asked some questions by Mr. Kerlin asking whether the
13  Department of the Interior was bound by this exhibit,
14  and he used that term "bound" in a couple of different
15  questions.
16          In answering those questions, you
17  weren't commenting on any legal impact on the
18  Department of Interior by joining this statement,
19  correct?
20          MR. KERLIN:  Objection, form.
21          A.   That's correct.
22          Q.   (BY MR. JAFEK)  Okay.  And then also,
23  with respect to the statement, you're not fam- -- 
24  well, are you -- are you familiar with whether the
25  Department of the Army or the Department of Engineers

Page 110

1  had any input or what that input was into this
2  statement?
3         A.   I am not aware of any input they may
4  have had.
5              MR. JAFEK:  I don't have any further
6  questions.
7              MR. KERLIN:  Okay.  Nothing further on
8  behalf of the State.
9              MR. JAFEK:  Okay.  And I would just like
10  to briefly thank you, Paul, for getting this done in
11  time for Mr. -- for Jason to get on to his -- his
12  meeting.
13             THE VIDEOGRAPHER:  Okay.  This concludes
14  today's deposition of Jason O'Neal.  The time is
15  7:01 p.m. UTC, 12:01 p.m. Mountain.  We are off the
16  record.
17             (At 12:01 p.m. Mountain Standard Time
18  the proceedings were not being videotaped.)
19             MR. KERLIN:  Perfect.  And for the court
20  reporter, read and sign -- I'm sure that's what you
21  want -- Mr. Jafek?
22             MR. JAFEK:  Correct.
23             MR. KERLIN:  Perfect.  Okay.  Thanks
24  again, Mr. O'Neal.  Thanks for your time.
25             MR. JAFEK:  Yes, thank you.

Page 111

1              (Discussion off the record.)
2              THE REPORTER:  Is there any hurry on the
3  turnaround of the final?
4              MR. JAFEK:  Not from our side.
5              MR. KERLIN:  Yeah, not from plaintiff.
6              WHEREUPON, the within proceedings were
7  concluded at the approximate hour of 12:02 p.m.
8  Mountain Standard Time on the 6th day of December,
9  2022.
10             *    *    *    *    *

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1              I, JASON N. O'NEAL, do hereby certify
2  that I have read the above and foregoing deposition
3  and that the same is a true and accurate transcription
4  of my testimony, except for attached amendments, if
5  any.
6              Amendments attached  (  ) Yes  (  ) No
7
8
9  _____
   JASON N. O'NEAL
10
11
12             The signature above of JASON N. O'NEAL
13  was subscribed and sworn or affirmed to before me in
14  the county of _____, state of
15  _____, this _____ day of
16  _____, 2022.
17
18
19             _____
               Notary Public
20             My Commission expires:
21
22
23
24
25  State of North Dakota 12/6/22 (tcm)

Page 113

1              REPORTER'S CERTIFICATE
2  STATE OF COLORADO      )
                          )  ss.
3  CITY AND COUNTY OF DENVER )
4
              I, TRACY C. MASUGA, Registered
5  Professional Reporter and Certified Realtime Reporter,
   do hereby certify that previous to the commencement of
6  the examination, the said JASON N. O'NEAL was duly
   sworn or affirmed by me to testify to the truth in
7  relation to the matters in controversy between the
   parties hereto; that the said deposition was taken in
8  machine shorthand by me at the time and place
   aforesaid and was thereafter reduced to typewritten
9  form; that the foregoing is a true transcript of the
   questions asked, testimony given, and proceedings had.
10
              I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12  this litigation.
13             IN WITNESS WHEREOF, I have affixed my
   signature this 12th day of December, 2022.
14
15
16  __X__ Reading and Signing was requested.
17  _____ Reading and Signing was waived.
18  _____ Reading and Signing is not required.
19
20
21  _____
    Tracy C. Masuga
    Registered Professional Reporter
22  Certified Realtime Reporter
23
24
25

```
                                              Page 114
 1   Errata Sheet
 2
 3   NAME OF CASE: Plaintiff vs UNITED STATES
 4   DATE OF DEPOSITION: 12/06/2022
 5   NAME OF WITNESS: Jason O'Neal
 6   Reason Codes:
 7        1. To clarify the record.
 8        2. To conform to the facts.
 9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                   _____
```