IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 19-cv-150-DMT-ARS

_____

RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
DANIEL R. ORR - UNITED STATES MARSHALS SERVICE
November 30, 2022
Via RemoteDepoTM

_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

_____


          PURSUANT TO NOTICE AND AGREEMENT, the
Rule 30(b)(6) videotaped deposition of DANIEL R. ORR,
UNITED STATES MARSHALS SERVICE, was taken on behalf of
the Plaintiff in Cass County, North Dakota, by remote
means on November 30, 2022, at 9:01 a.m. Mountain
Standard Time, before Tracy C. Masuga, Registered
Professional Reporter and Certified Realtime Reporter,
appearing remotely from Denver County, Colorado.

Daniel R. Orr  30(b)(6)
November 30, 2022

## Page 2

```
 1                 REMOTE APPEARANCES
 2   For the Plaintiff:
 3             PAUL B. KERLIN, ESQ.
               Greenberg Traurig LLP
 4             1000 Louisiana Street
               Suite 6700
 5             Houston, Texas 77002
               kerlinp@gtlaw.com
 6
               PAUL M. SEBY, ESQ.
 7             Greenberg Traurig LLP
               1144 15th Street
 8             Suite 3300
               Denver, Colorado 80202
 9             sebyp@gtlaw.com
10
11   For the Defendant:
12             TIMOTHY B. JAFEK, ESQ.
               Department of Justice
13             U.S. Attorney's Office
               District of Colorado
14             1800 California Street
               Suite 1600
15             Denver, Colorado 80202
               timothy.jafek@usdoj.gov
16             MEREDITH A. MILLS, ESQ.
               United States Marshals Service
17             (Present by telephone)
18   Also Present:
19
               Michael Banks, Videographer
20             Jose Diaz
               Corin Stigall
21
22
23
24
25
```

## Page 3

```
 1                 I N D E X
 2   EXAMINATION OF DANIEL R. ORR:              PAGE
     November 30, 2022
 3
     By Mr. Kerlin                            8, 110
 4
     By Mr. Jafek                               104
 5
                                            INITIAL
 6   DEPOSITION EXHIBITS:                   REFERENCE
 7   (Exhibits provided electronically to the reporter.)
 8   Exhibit 806  Email to Thomas from Orr, 8/31/16,   28
                  Subject:  Re:  Standing Rock Sioux
 9                Tribe v. US Army Corps of
                  Engineers - Washington DC Case -
10                re Advance Notice; with attached
                  email; MYERS_00032968
11
     Exhibit 807  Email to Snelson from Ward,          73
12                11/20/16, Subject:  Re:  Urgent ND
                  Protest; with attached emails;
13                ND_000110345 - ND_000110347
14   Exhibit 808  Email to Bachmeier from Orr,         88
                  2/10/17, Subject:  Meeting
15                Follow-Up; MYERS_00005723
16   Exhibit 809  Email to Myers and Orr from Colon,   89
                  2/14/17, Subject:  RE:  Question
17                prep for meeting; with attached
                  emails (Redacted);
18                MYERS_00043362 - MYERS_00043363
19   Exhibit 810  Email to Myers from Gerhart,         90
                  2/15/17, Subject:  Re:  ESF
20                coordinator coming to Bismarck;
                  with attached emails;
21                MYERS_00005895
22   Exhibit 811  Email to Ansley, Warren, and Myers   91
                  from Orr, 2/16/17, Subject:
23                Contingency Plans for DAPL
                  Protests; MYERS_00036898
24
25
```

## Page 4

```
 1   Exhibit 812  Email to Ansley from Orr, 2/16/17,   93
                  Subject:  RE:  Contingency Plans
 2                for DAPL Protests; with attached
                  email; MYERS_00040621
 3
     Exhibit 813  Email to Myers and Ansley from       94
 4                Orr, 2/17/17, Subject:  RE:
                  Contingency Plans for DAPL
 5                Protests; with attached emails;
                  MYERS_00040628
 6
     Exhibit 814  Email to Orr, et al., from Orr,      96
 7                10/4/17, Subject:  FW:  Red Fawn
                  Fallis Trial Prep (organizational
 8                meeting); with attached email;
                  ND_000237423
 9
     Exhibit 815  Email to Orr, et al., from Orr,      98
10                10/26/17, Subject:  Red Fawn
                  Fallis Trial Preparation Meeting;
11                ND_000237801
12   Exhibit 816  U.S. Marshals Service Fact Sheet,    63
                  Tactical Operations, 2/25/20
13
14   DEPOSITION EXHIBITS:  (Previously marked)
15   Exhibit 325  Telephone Conference Invite from     86
                  Johnson to Reitan, et al.,
16                11/10/16, Subject:  FW:  Sheriffs
                  and Police Chiefs All Call - DAPL
17                Response; with attachment;
                  MYERS_00005203 - MYERS_00005204
18
     Exhibit 332  Email to Snelson from Ward,         110
19                11/20/16, Subject:  Urgent ND
                  Protest; with attached emails;
20                ND_000110339 - ND_000110337
21   Exhibit 722  Telephone Conference Invite from     27
                  Myers to Hochhalter, et al.,
22                9/1/16, Subject:  Standing Rock -
                  Federal Partners Teleconference -
23                call in number - 1-866-781-1118;
                  DOI_00008499
24
25
```

## Page 5

```
 1   Exhibit 803  Second Amended Notice of 30(b)(6)    11

                  Deposition of The United States of
 2                America, 11/23/22; with

                  attachments
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 6

1          WHEREUPON, the following proceedings
2 were taken pursuant to the Federal Rules of Civil
3 Procedure.
4          *    *    *    *    *
5          (Deposition Exhibits 806 through 816
6 were introduced by Mr. Kerlin and electronically
7 provided to the court reporter for marking.)
8          THE VIDEOGRAPHER:  We are now on the
9 record.  Participants should be aware that this
10 proceeding is being recorded and, as such, all
11 conversations held will be recorded unless there is a
12 request and agreement to go off the record.
13          Private conversations and/or
14 attorney-client interactions should be held outside
15 the presence of the remote interface.
16          This is the remote video-recorded
17 deposition of Dan Orr.  Today is Wednesday,
18 November 30, 2022.  The time is now 4:01 p.m. UTC,
19 9:01 a.m. Mountain.  We are here in the matter of
20 State of North Dakota v. The United States of America.
21          My name is Michael Banks, remote video
22 technician on behalf of U.S. Legal Support.  I'm not
23 related to any party in this action, nor am I
24 financially interested in the outcome.
25          At this time will the reporter, Tracy

Page 7

1 Masuga on behalf of U.S. Legal Support, please enter
2 the statement for remote proceedings into the record.
3          THE REPORTER:  The attorneys
4 participating in this deposition acknowledge that I am
5 not physically present in the room and that I will be
6 reporting this proceeding remotely.
7          They further acknowledge that in lieu of
8 an oath administered in person, the witness will
9 verbally declare his testimony in this matter is under
10 penalty of perjury.
11          Counsel, please indicate your agreement
12 by stating your name and your agreement on the record.
13          MR. KERLIN:  This is Paul Kerlin on
14 behalf of the plaintiff, the State of North Dakota,
15 and we agree.
16          MR. JAFEK:  This is Tim Jafek on behalf
17 of the defendant, The United States of America.  We
18 agree.
19          THE REPORTER:  Mr. Orr, do you solemnly
20 state that the testimony you are about to give in the
21 cause now pending will be the truth, the whole truth,
22 and nothing but the truth?
23          THE DEPONENT:  I do.
24
25

Page 8

1               DANIEL R. ORR,
2 having been first duly sworn to state the whole truth,
3 testified as follows:
4                EXAMINATION
5 BY MR. KERLIN:
6     Q.   Please state your name.
7     A.   Daniel Richard Orr.

Object to all testimony as to hearsay, 802

8     Q.   Mr. Orr, my name is Paul Kerlin, and I'm
9 an attorney with the law firm Greenberg Traurig and a
10 Special Assistant Attorney General for North Dakota,
11 and I represent the plaintiff, the State of
12 North Dakota, in this matter.  Also attending this
13 deposition is my colleague Paul Seby, who is -- who is
14 also a Special Assistant Attorney General for
15 North Dakota.
16          I also wanted to state for the record
17 that your deposition is taken pursuant to the notice
18 that was served by the plaintiff and agreement of
19 counsel.
20          Throughout the deposition I might refer
21 to my client as "North Dakota" but I'm referring to
22 North Dakota, the State, but also the individuals that
23 work on behalf of the State, okay?
24     A.   Yes, sir.
25     Q.   You understand that you've been sworn

Page 9

1 and you're under oath while you're giving your
2 testimony today, correct?
3     A.   Yes.
4     Q.   Okay.  Have you been deposed before?
5     A.   Yes.
6     Q.   Okay.  And so you're familiar with the
7 process.  Everything you say, the court reporter is
8 going to be taking -- taken down.
9          As we acknowledged on the record, this
10 has been agreed to be taken by remote means.  If you
11 have any difficulty hearing me or if you have any
12 audio issues or any video issues, we can't always see
13 them on our end, but if there's something that comes
14 up, please speak up and let us know, and we'll try to
15 address that as soon as practicable and to attempt to
16 make whatever arrangements are necessary.  I also
17 would ask --
18     A.   I will.
19     Q.   Great.  And I would also ask that if I
20 prompt you for a verbal answer, sometimes there's a
21 head nod or a head shake, it's just so the court
22 reporter can get an accurate and complete record, so I
23 might prompt you for a verbal response.
24          And I'll also -- if you will try to wait
25 until I finish my question before answering, I would

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 10

1    appreciate that.  I will try to do the same.
2    Inevitably we'll end up talking over each other a
3    little bit because of the limitations of doing this
4    remotely, but we'll do the best we can, okay?
5        A.   Okay.  Thank you.
6        Q.   Finally, if there's any -- if you need a
7    break or anything, just let me know.  If there's any
8    type of a work situation or something that arose, I
9    might ask that you finish the pending question or
10   answer the pending question before we take that break,
11   but typically we'll take a break about every hour and
12   try and move through this as expeditiously as
13   possible.
14            And the last thing I would mention is if
15   you don't understand my question, please let me know;
16   otherwise, there's an assumption that you understand
17   what's been asked, okay?
18       A.   Okay.
19       Q.   You said you had been deposed before.
20   Can you tell me approximately how many times?
21       A.   Ooh, I would say I recall one time, at
22   least, and it's been a long, long time ago.
23       Q.   Fair enough.  Did that have to do with
24   you in your capacity working for the U.S. Marshals?
25       A.   No, I don't believe so.

Page 11

1        Q.   Okay.  And, Mr. Orr, we met briefly --
2    or at least I said hello before the start of this
3    deposition.  We haven't spoken before, have we?
4        A.   Not that I recall, sir.
5        Q.   Do you understand that today you've been
6    designated as -- as we refer to as a 30(b)(6)
7    representative, but that you are a representative
8    speaking on behalf of the United States Marshals
9    Service on certain topics that have been identified
10   and provided to the United States through your
11   counsel?
12       A.   I do.
13       Q.   And have you had an opportunity to
14   review the topics on which you've been designated and
15   prepare for this deposition?
16       A.   I have.
17       Q.   Okay.  I want to show you what's been
18   previously marked as Exhibit 803.  And as we go
19   through the deposition, we'll -- we'll share our
20   screen and try and bring up the exhibits as we -- as
21   we go through them.
22            Mr. Orr, have you seen this document
23   before?
24       A.   I believe so.  I've -- I've -- I see
25   it's labeled as "Second Amended Notice."  I do have

Page 12

1    one printed off here.  It says "Amended Notice."  I
2    believe last night I might have received a second one
3    like this that -- yeah, I'm -- I'm not sure, but I
4    think last night Tim may have sent this amended
5    notice.
6        Q.   Yes.  And I'll tell you that the topics
7    are the same between the amended and the Second
8    amended, but we've adjusted the schedule, and that was
9    the reason.
10            But we'll go over the topics as we go
11   through them.  I wanted to go to the second page.  And
12   you're identified as addressing topics 6, 9, 10, 13
13   through 16, 19, and 20.  Do you see that?
14       A.   Yes, I do.
15       Q.   And are you prepared to provide
16   testimony on those topics?
17       A.   I am.
18       Q.   Okay.  And as I ask you questions
19   throughout the deposition, and as they pertain to
20   these topics, can we agree that you're testifying on
21   behalf of the United States Marshals Service unless
22   you indicate otherwise?
23       A.   Yes, sir.
24       Q.   Okay.  Because there might be a
25   situation where you have personal knowledge, and it

Page 13

1    doesn't specifically relate to the topic, but -- but
2    if we can just kind of do the best we can to keep that
3    clear, it will help, I think, keeping the record clear
4    as to what capacity you're speaking.
5            Can you tell me how much time you spent
6    preparing for your deposition?
7        A.   That's a good question.  I would say
8    somewhere in the neighborhood of maybe 8 to 16 hours.
9        Q.   And can you tell me how you spent
10   that -- if you can just kind of give me a breakdown of
11   that 8-to-16-hour time period.  What did you spend
12   doing in preparation for your deposition for that time
13   period?
14       A.   Well, I had a videoconference meeting
15   with the attorneys for the government.  That -- that
16   first one lasted about two hours.  And in that, we
17   reviewed some of the documents that they had provided
18   me, and the topics, this document.  We also talked
19   about -- I had questions about the case.  I wasn't
20   clear with --
21       Q.   I just want to be clear, and I'm -- I'm
22   going to interrupt you here --
23       A.   Okay.
24       Q.   -- as you give your answer.
25   Conversations with counsel, those are privileged.  I

Daniel R. Orr   30(b)(6)
November 30, 2022

Page 14

1  don't want to get into those.
2          I'm just curious about the breakdown of
3  the time.  So you said you spent about two hours on a
4  videoconference with counsel.
5          And what else did you do, without
6  telling me conversations with your counsel?  The
7  content, that is.  I can ask about the time limit.
8      A.   I read through volumes of documents that
9  they provided me.  I read through emails that they
10 provided me.  I looked at the complaint for the case
11 and several supporting documents for the case, most of
12 which were not directly related to Marshals Service
13 activities.  Yeah, I think that's what I can recall.
14     Q.   Okay.  Other than counsel, did you speak
15 with anyone?
16     A.   Other than counsel, did I speak with
17 anyone?
18     Q.   Yes.
19     A.   I spoke with Paul Ward only briefly
20 to -- we talk to each other occasionally.  Obviously,
21 we worked together and we're very good friends.
22          I only told him that I had been asked to
23 be deposed for the case, and that's as far as it went.
24 We didn't discuss any of the specifics of the case at
25 all.

Page 15

1      Q.   Okay.  Anyone else at the U.S. Marshals
2  Service that you spoke with, whether current or former
3  employees, in preparation for your deposition?
4      A.   Meredith Mills, the general -- the
5  Office of the General Counsel, who's on this phone
6  call.
7      Q.   Okay.
8      A.   I -- no, I don't think I talked to --
9  oh, yes, Bill -- Bill Klug, the judicial security
10 inspector for the Marshals Service at the time of this
11 event.  He's now -- he now works for Judicial Security
12 Division as the chief inspector.
13     Q.   Could you spell that last name for me?
14     A.   K-l-u-g.
15     Q.   Great.  Thank you.
16     A.   And that was on a phone call with
17 counsel --
18     Q.   Okay.
19     A.   -- after the first -- that would have
20 been, um, I think the third time that we met.
21     Q.   In preparation -- the third time you met
22 with counsel --
23     A.   Yes.
24     Q.   -- is that correct?  Okay.
25     A.   Yes.  That was a phone call.

Page 16

1      Q.   Okay.  So I have Bill Klug, and then
2  counsel, which would include Meredith Mills, as far as
3  your conversations.  You had a brief conversation with
4  Paul Ward, but it sounded like, and I want to make
5  sure I understand your conversation with -- with
6  Mr. Ward, you didn't discuss the specifics of this
7  case?
8      A.   No, sir.  I remember I was at the
9  phone -- or excuse me, outside the post office, and
10 he -- he had called me, and we just had a casual
11 conversation about normal things we discuss when we
12 talk to each other, and I had just mentioned briefly
13 that I had been asked to serve as a witness.
14     Q.   And had you -- did you speak with any of
15 your superiors, so anyone in the U.S. Marshals
16 Service, assistant director or anything like that?
17     A.   No, sir.
18     Q.   Okay.  Did you speak with anyone outside
19 of the U.S. Marshals Service in preparation for your
20 deposition that we haven't already discussed?
21     A.   No, sir.
22     Q.   Okay.  What is your current title?
23     A.   I am retired.
24     Q.   Okay.  And when did you retire?
25     A.   October of 2020.

Page 17

1      Q.   Prior to your retirement --
2          Actually, I'm kind of going about this
3  backwards, so I'm going to start earlier in your
4  career.  Let me just ask you about your educational
5  background.  Could you tell me about your educational
6  background starting at high school, if you graduated,
7  and then continuing on through college.
8      A.   Sure.  I graduated from high school.  I
9  went on to college, the University of North Dakota.  I
10 graduated there with a Bachelor of Science degree in
11 public administration.  My major was police
12 administration.
13     Q.   And then what did you do after you
14 graduated?
15     A.   I hired on with the Grand Forks Police
16 Department.
17     Q.   And how long did you serve with the
18 Grand Forks Police Department?
19     A.   A little over six years.
20     Q.   And what was your title while you were
21 there?
22     A.   Patrol officer.
23     Q.   And why did you leave?
24     A.   I -- I joined the U.S. Marshals Service.
25     Q.   Okay.  And then from -- from that time

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 18

1  period, I guess, when you transitioned from
2  Grand Forks to U.S. Marshals, did you continually work
3  for the United States Marshals Service until your
4  retirement in October of 2020?
5      A.  I did, in various capacities, yes.
6      Q.  And I want to go through those.  And I
7  don't know all the titles.  I've, of course, heard of
8  marshal and deputy marshal.
9          But could you take us through, I guess
10 it would be kind of your timeline for -- for your
11 service with the U.S. Marshals Service?
12     A.  Okay.  I started as a Deputy
13 U.S. Marshal in Fargo, North Dakota.  I spent my first
14 ten years in Fargo, and then I was promoted to a
15 supervisory inspector position at our training academy
16 in Glynco, Georgia.
17         I spent a little over two years there,
18 and then I was -- I took a -- I guess you would call
19 it a lateral position to a supervisory deputy position
20 in Billings, Montana.
21         And then I was there for -- oh, gosh,
22 let me think here -- approximately six years, I think
23 it was.  And then promoted to Chief Deputy
24 U.S. Marshal in North Dakota in 2010.
25         And I served a brief period as Acting

Page 19

1  U.S. Marshal from January 2017 until -- I believe that
2  was in the middle or so of October 2018.  And that was
3  during the transition from new U.S. Marshal with the
4  changeover at the administration of the President.
5          And then I retired in October as 2020 as
6  Chief Deputy U.S. Marshal.
7      Q.  And was -- was --
8          When you were Chief Deputy U.S. Marshal,
9  I think you said -- okay.  So you were at Billings,
10 Montana, and then -- then Chief Deputy U.S. Marshal in
11 2010.  Was that for North Dakota?
12     A.  Yes.
13     Q.  And then you continued in North Dakota
14 as Acting U.S. Marshal, and then back to Chief Deputy
15 U.S. Marshal until your retirement?
16     A.  That's correct.
17     Q.  Were you born in North Dakota?
18     A.  No, sir.
19     Q.  Okay.  Did you go to high school in
20 North Dakota?
21     A.  No.
22     Q.  Where did you go to high school?
23     A.  East Grand Forks, Minnesota.
24     Q.  Okay.  And do you -- where do you
25 currently reside?

Page 20

1      A.  West Fargo.
2      Q.  Okay.  Thank you for that.  I --
3          As U.S. Marshal, who did you report to?
4  Or, excuse me, Acting U.S. Marshal.
5      A.  Yes.  Thank you.  I reported directly to
6  the Attorney General, technically.
7      Q.  Okay.  And so that would have been --
8  who was that in 2017?
9      A.  Yeah, you know, I'm -- let me -- let me
10 back that up.  I'm a little unclear on that, actually,
11 because as Acting U.S. Marshal, I'm not certain.
12 During that time I never was, you know, for instance,
13 evaluated or anything like that, so I don't recall if
14 I directly reported to the Attorney General.  I
15 believe I would, based as -- the fact that I was an
16 Acting U.S. Marshal, but I'm not certain if I still
17 went through the Director's office and then to the
18 Attorney General's.
19     Q.  Okay.  And during that time period, was
20 David Harlow the Acting Director?
21     A.  I believe so, yes.
22     Q.  Did you ever have any conversations with
23 David Harlow, to your recollection?
24     A.  About -- about DAPL protests, you mean?
25     Q.  Yes.

Page 21

1      A.  I don't recall.
2      Q.  Okay.  Were you ever present when your
3  predecessor, Paul Ward, who was the U.S. Marshal, I
4  guess, until his retirement at the end of 2016, had
5  conversations with the Acting Director of the
6  U.S. Marshals at that time, so the fall of 2016?  It
7  would have been David Harlow.
8      A.  I recall having -- having a
9  conversation, the three of us, at one point, but I
10 don't know if it would have been during that time
11 frame or if it was at a management conference or
12 something like that.  And I don't recall if -- if it
13 would have been the discussion about these events or
14 about general staffing issues and that type of thing.
15 That's the only thing I can think of right now.
16     Q.  Okay.  All right.  I want to turn to
17 to your preparation.  You mentioned some documents
18 that you reviewed.  Could you tell me a little bit
19 about the documents that you reviewed in preparation
20 for your deposition.
21     A.  I read through the complaint that was
22 provided to me in this binder.
23     Q.  Uh-huh.
24     A.  I read through the government's response
25 to North Dakota's interrogatories, a general case

Daniel R. Orr  30(b)(6)
November 30, 2022

---

Page 22

1   summary, and then I glanced through dozens -- you
2   know, dozens of tabs of supporting documents, you
3   know.
4       Q.   Was there a -- a notebook that was sent
5   to you that contained all these documents?
6       A.   Yeah.  It was a binder.
7       Q.   Okay.  Okay.  I see.
8       A.   A binder here.
9       Q.   Okay.
10      A.   And then there was a smaller binder
11  provided to me a short time after that that
12  included --
13      Q.   Okay.
14      A.   -- some other things specific to -- to
15  emails that I had sent, that type of thing.
16      Q.   Okay.  And I think we're going to go
17  through some of those, but I might -- I might come
18  back to that later.
19           Did you take any notes in your review of
20  either the documents or even your conversations with
21  counsel that you are testifying from today?
22      A.   No.
23      Q.   All right.  I want to talk with you a
24  little bit about your involvement with -- with DAPL,
25  and then I'm going to move on to some of the topics.

---

Page 23

1           But when did you first become aware
2   of -- of -- and I call it "DAPL," but let me just
3   state for the record, Dakota Access Pipeline is what
4   I'm referring to, and that there was some protests,
5   okay.  So if I refer to it as "DAPL," that's what I'm
6   referring to, okay?
7       A.   I understand.
8       Q.   When did you first become aware of the
9   DAPL protests?
10      A.   It was when I received an email from the
11  Cass County Sheriff, Paul Laney.  That was August 13
12  of 2016, I believe.  And that email stated -- that
13  included several other law enforcement leaders and
14  sheriffs, police chiefs, throughout the -- throughout
15  the state.
16      Q.   And what did that email -- what was
17  it -- the -- the substance of it, if you can recall?
18      A.   It was a general request for assistance
19  for the Morton County Sheriff, asking -- just briefly
20  describing that they were dealing with a protest event
21  and were in need of additional help.
22      Q.   And on behalf of the U.S. Marshals
23  Service, was any assistance sent at that point?
24      A.   Yes.  I guess I would say that, yes, in
25  the term -- in the sense that Marshal Ward and myself

---

Page 24

1   responded.  I think it would have been either the --
2   probably the next day or very soon after, we went to
3   Morton County, to the Sheriff's Office Tactical
4   Operations Center.
5       Q.   Okay.  Was there anyone else from the
6   Marshals Service with you, or just the two of you?
7       A.   I remember assigning Bill Klug.  Bill
8   was our judicial security inspector at that time, and
9   I remember assigning him to also respond to the TOC.
10  I don't recall if that was immediately
11  or if it would have been after we learned more
12  information about what was going on, but I remember
13  assigning him to go to the TOC to assist in any way he
14  could and to develop more intelligence or information
15  as to how the protest events may have any impact on
16  the Marshals Service.
17      Q.   And when you say "TOC," you're referring
18  to T-O-C, is that correct, for the record?
19      A.   Yes.  Tactical operations center.
20      Q.   And -- okay.  Did you have any
21  interactions with Paul Laney prior to that email that
22  you received, I mean, just -- just in the course of
23  being a Deputy U.S. Marshal?
24      A.   I'm not clear on your question.  You
25  mean regarding the protests?

---

Page 25

1       Q.   No.  I just mean in general.  Had you
2   ever interacted with him before in law enforcement
3   activities?
4       A.   Oh, absolutely.  Paul and I have known
5   each other for many, many years, and we worked
6   together frequently on various law enforcement.
7       Q.   What do you think of his capabilities as
8   far as law enforcement?
9       A.   He's an outstanding law enforcement
10  professional.
11      Q.   Okay.  So you responded, along with the
12  other individuals you mentioned from the U.S. Marshals
13  Service, and you go to the TOC.  What did you learn at
14  that point?
15      A.   You know, this is a long time ago, so I
16  don't remember a lot of the specifics.  But it was
17  just general information gathering about what was
18  happening, what resources were needed.  I think it was
19  just generally getting information about what -- what
20  was occurring at that time.
21      Q.   Okay.  I want to show you what's --
22  well, before I bring up another exhibit, how long
23  did -- did you remain in the Morton County area along
24  with Marshal Ward and Mr. Klug?
25      A.   Marshal Ward was stationed in Bismarck

---

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 26

1  throughout his term as marshal.  I was -- my office
2  was in Fargo.  And so he would have been there, you
3  know, the whole time in the Bismarck-Mandan area.
4          I don't recall how long I was there
5  initially.  I would -- I could only guess.  I think it
6  was days, you know, a few days.  I -- yeah, I think
7  that's the best I can recall.
8      Q.  Okay.  After you left after this
9  initial -- you know, the email went out and y'all
10  responded and you left after a few days, did you
11  ever -- did you ever return back to the -- the Morton
12  County area?
13      A.  I did, yes.  And I'm -- I'm sure
14  Marshal Ward was also there frequently.
15      Q.  About how many times, if you recall, did
16  you return to Morton County during the course of the
17  DAPL protest?
18      A.  Yeah.  I -- I couldn't say specifically.
19  Again, it's been a long time.  I know it was -- it was
20  several times, yeah.
21      Q.  More than five?
22      A.  Again, I can't be specific, but I'm -- I
23  would tend to say yes to that.  I'm not sure, though.
24      Q.  And to have an idea, you know, would it
25  be more than ten?

**ND OBJ:**
As to
26:21-23,
Speculation

Page 27

1      A.  I -- I don't know, sir.  It's a long
2  time ago.
3      Q.  And on these visits, approximately how
4  long would you stay?  Would it be a day trip?  Would
5  you stay overnight?
6      A.  Normally when I went to the Bismarck
7  area, it was for general office things as well, so I
8  typically stayed at least overnight once, if not for a
9  couple of nights.
10      Q.  Okay.  Can we bring up Exhibit 722.
11          Mr. Orr, I'm showing you what's been
12  previously marked as Exhibit 722 in this case.
13  It's -- I believe it's a meeting invite, but I want to
14  show it to you.  You're on this as a required
15  attendee.  Do you recall that there was a -- that
16  there was a meeting that was organized by Chris Myers,
17  September 1 of 2016?
18      A.  Sitting here today, I don't recall.
19      Q.  Okay.  And let me -- let me ask this, I
20  guess.  We have this -- this meeting invite that was
21  organized by Mr. Myers, and then it has required
22  attendees.  Both you and Mr. Ward are on it, as well
23  as some other individuals that work for the federal
24  government; FBI, BIA are on there.
25          And then as far as the substance of it,

27:10-28:11
401-402;602;
611

Page 28

1  it says, "Good morning.  I would like to host a short
2  teleconference" -- excuse me, "telephone conference
3  today for our Federal partners to discuss the ongoing
4  matters [related to] DAPL matter and Standing Rock."
5          Was there any type of a recurrent phone
6  like, like a recurrent -- a teleconference that was
7  held by Mr. Myers with respect to just the federal
8  partners, as he referred to them, regarding the DAPL
9  protest and Standing Rock?
10      A.  I don't recall any recurrent phone
11  conferences in that respect.
12      Q.  Okay.  Okay.  I -- I would like to go
13  to -- and we're going to mark it as Exhibit 806, I
14  believe is what we're up to.
15          (Deposition Exhibit 806 was remotely
16  introduced.)
17      Q.  And this is an email, and then there's a
18  response to it from you.  Do you know who James
19  Patrick Thomas is?
20      A.  Yes.
21      Q.  And so he was an Assistant U.S. Attorney
22  at the time, I guess, in 2016?
23      A.  Yes.
24      Q.  Okay.  The date of his email is
25  August 31, 2016.  And I don't have who all it went out

Page 29

1  to, but then your response states that -- that you --
2  you know, "Thank you, James.  I notified Morton County
3  Sheriff command."  Do you recall getting this email?
4      A.  If you would give me a moment to read
5  through it.
6      Q.  Of course.
7      A.  Okay.
8      Q.  Okay.  Do you recall receiving this?
9      A.  I don't.
10      Q.  Okay.  And it's referring to -- when it
11  says -- in the parenthetical in that first paragraph,
12  it said, "Recall that this . . . decision and order
13  that the Court indicated would be issued on or before
14  September 9, 2016," it's referring to the Court's
15  decision for the Standing Rock Sioux Tribe's motion
16  for preliminary injunction that they were trying to
17  stop the pipeline from -- from continuing with
18  construction.  Do you recall that at all?
19      A.  I do recall from reading through some of
20  the materials that were provided to me that -- that
21  that was included in there.  There would be a
22  September -- September preliminary injunction date.  I
23  recall reading that.
24      Q.  Uh-huh.  With respect to your response
25  that you said you notified Morton County Sheriff's

29:24-
30:6
401-402

Page 30

1    command, do you recall then communicating with the
2    Morton County Sheriff about -- about what was
3    received; that there would be 24 hours' advanced
4    notice of a decision?
5         A.   No, I don't.  Sitting here today, I
6    don't recall that.
7         Q.   Okay.  Do you recall if there was any
8    type of similar email that was sent that -- that would
9    indicate whether or not the United States would be
10   issuing some type of press release as a result of the
11   decision that was coming out, whether in favor or
12   against it?
13        A.   No, I don't recall.
14        Q.   Okay.  And do you know whether or not
15   the United States Marshals Service had any input in
16   that press release with respect to any of the content
17   of the press release about the decision by
18   Judge Boasberg on the motion for a preliminary
19   injunction when it was denied?
20        A.   Okay.  Just to be clear, the press
21   release was issued by whom?
22        Q.   So there was a press release that was --
23   that was issued very shortly after the -- the decision
24   came out from the Court.  And it was from -- it
25   included the Department of Justice, as well as the

Page 31

1    Department of the Interior and the Department of the
2    Army.
3              Since the U.S. Marshals Service, you're
4    part of the Department of Justice, I was wondering if
5    you are aware, on behalf of the United States Marshals
6    Service, if there was any input from the United States
7    Marshals Service into that press release.
8         A.   No, I'm not aware of that.
9         Q.   Okay.  And on behalf of United States
10   Marshals Service as a 30(b)(6) representative, you
11   don't have any knowledge about that; is that correct?
12        A.   That's correct.
13        Q.   Okay.  And I just want to be clear here.
14   Well, we'll look at the specific topic in a minute.
15             But I just want to understand that it's
16   the position of the United States Marshals Service
17   that they did not have input into that press release;
18   is that correct?
19        A.   To my knowledge, there was no input in
20   that press release from the U.S. Marshals Service.
21        Q.   Okay.  Okay.  We can -- excuse me.
22             I guess that there's one last thing that
23   I wanted to mention on the bottom of -- if we could
24   bring that document back up, the last sentence from
25   Mr. Thomas.

Page 32

1              It says at the end, "This
2    information" -- that last sentence, "This information
3    can be shared with the EOC . . . ."  Do you know what
4    he's referring to when he says "EOC"?
5         A.   I -- I don't.  I can only speculate that
6    he perhaps was referring to the TOC, the command
7    center.
8         Q.   And then it continues and said, "and law
9    enforcement components for planning and operational
10   use."  Do you see that?
11        A.   Yes.
12        Q.   Okay.  And that's what you did, is you
13   shared that information with Morton County, right?
14   Well --
15        A.   I don't recall that.  But, again, the
16   emails says it, so I must have done it.
17        Q.   And kind of taking a step back, I mean,
18   it sounds like you had interactions with nonfederal
19   agents and law enforcement in North Dakota while you
20   worked at the U.S. Marshals Service.
21        A.   Yes.
22        Q.   We mentioned former Sheriff Laney, that
23   you had interacted with him.
24             Had you interacted with Sheriff
25   Kirchmeier prior to this?

32:17-33:25
401-402

Page 33

1         A.   Prior to this, I had known Sheriff
2    Kirchmeier for many years.  We -- I can't remember
3    exactly, but I think we first met in basic training
4    back in 1986.
5              But he was -- I had known him -- I
6    wouldn't say frequently known him, but we had seen
7    each other through -- through different law
8    enforcement events while he worked for the highway
9    patrol.
10             Until the DAPL protest, that's when we
11   were more acquainted more frequently, obviously.
12        Q.   Do you think he -- he was an effective
13   sheriff for Morton County?
14             MR. JAFEK:  Objection, vague and
15   ambiguous.  You can answer.
16        Q.   (BY MR. KERLIN)  Okay.  Based on your
17   experience and interactions with -- with Sheriff
18   Kirchmeier, Mr. Orr, what were your observations?
19        A.   The question again?
20             MR. JAFEK:  The same -- the same
21   objection.
22        Q.   (BY MR. KERLIN)  Sure.  Based on your
23   observations and interactions with Sheriff Kirchmeier
24   and your experience in law enforcement, what did you
25   think of Sheriff Kirchmeier as far as a law

Daniel R. Orr  30(b)(6)
November 30, 2022

**34:1-35:4**
**401-402**

Page 34

1   enforcement officer?

2          MR. JAFEK:  Same objection.  You can

3   answer.

4          THE DEPONENT:  Okay.  Thank you.

5       A.  I -- speaking for myself, and not the

6   government, obviously --

7       Q.  (BY MR. KERLIN)  Uh-huh.

8       A.  -- I thought -- I thought -- you know, I

9   didn't have a lot of -- if you're asking as a law

10  enforcement officer as a whole, or the sheriff in

11  Morton County?

12      Q.  Yeah, well as -- I mean, you said you

13  had interactions with him.  It sounded like a little

14  bit as highway patrol and not just as sheriff until

15  DAPL.  And so I was just trying to make it a little

16  broader so it would -- it would encompass your

17  observations or interactions with him throughout the

18  overlap of that, if you will.

19      A.  Yeah.  I -- I -- as I said, he and I

20  didn't have a lot of interaction when he was in the

21  highway patrol.  I don't remember if he was stationed

22  near me or not.  But my overall impression of him is

23  he's a good law enforcement officer, yes.

24          And as to sheriff in Morton County, I

25  can't really speak to that, because we -- you know,

Page 35

1   I'm not a resident of Morton County.  Other than this

2   particular event, I didn't have a lot of -- a lot of

3   information to -- to respond to that, if you know what

4   I mean.

5       Q.  Okay.  Thanks.

6          You know, the email had mentioned,

**35:6-15**
**401-402**

7   "shared with . . . law enforcement components."  I

8   just want to ask you generally, was it your experience

9   that the U.S. Marshals Service in North Dakota, and

10  law enforcement, State law enforcement or County law

11  enforcement, would interact whenever things would come

12  up, and that it was a collaborative relationship?

13      A.  Absolutely.  I mean, to the extent

14  possible.  We -- we certainly tried to work together

15  with our partners throughout the state all the time.

16      Q.  Yeah.  And I think I had heard Marshal

17  Ward -- excuse me, Marshal Ward refer to it almost

18  like a brotherhood of law enforcement in North Dakota;

19  that if there was a need that the U.S. Marshal, you

20  know, there might -- they might reach out from police

21  department to the U.S. Marshal or vice versa, if there

22  was something that came up, so that they could work

23  together.  Is that fair?

24      A.  Yes.

25      Q.  Okay.  And we can take this exhibit

Page 36

1   down.

2          I want to turn, if we can, to one of the

3   topics.  The first topic that you're identified on is

4   topic No. 6, "Public statements made by government

5   officials about any applications for DAPL Special Use

6   Permits or any decisions made or actions taken

7   regarding such applications."

8          My question is, on behalf of the

9   U.S. Marshals Service, are you aware of any public

10  statements made by anyone with the U.S. Marshals

11  Service regarding any applications for a special-use

12  permit or decisions made on any such applications?

13      A.  No, sir, I'm not.

14      Q.  Okay.  And you've had an opportunity to

15  review and prepare for this deposition, and you've

16  been provided, it looks like, a very thick binder of

17  documents.  You said you've spent, it sounded like,

18  one to two days in preparation for this deposition.

19          And so do you feel like you have

20  sufficiently checked around the different areas within

21  the U.S. Marshals Service to ensure that there isn't

22  any such public statements that were -- were made by

23  the United States Marshals Service with respect to the

24  special-use permit or any decisions or actions taken

25  regarding them?

**ND OBJ:**
Introduces
new material

Page 37

1       A.  I can only respond by saying the

2   materials that have been provided to me indicate no

3   such statements were made.

4       Q.  Okay.  I want to move on to the next

5   topic, which is topic No. 9.  Make sure I have that

6   right.  Yes.

7          This asks about encampments on

8   Corps-managed lands.  Before we -- we go through the

9   topic completely -- we can leave it up there.

10         Were you aware of where the protesters

11  were camping during the protests?

12      A.  Yes.

13      Q.  And were you aware that -- that they

14  were on -- it's U.S. Army Corps of Engineer-managed

15  land, but on -- on Army Corps of Engineer land is

16  where they were camping?

17      A.  Yes.

18      Q.  Okay.  And how did you become aware of

19  that?

20      A.  Through information gathered through

21  third-party sources, like the sheriff's office.  When

22  we -- again, when we first got there, we started to

23  learn, you know, more about what was happening.

24      Q.  And as a U.S. Marshal, was there any

25  requests made from the U.S. Army Corps of Engineers to

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 38

1  the U.S. Marshals Service for any type of an
2  assistance or law enforcement support or to maintain
3  law and order on the Corps-managed land where the
4  protesters were camping?
5      A.   None that I can recall.
6      Q.   Okay.  And -- and on behalf of the
7  U.S. Marshals Service, as a -- as a representative, is
8  it the same answer, that -- that you're not aware of
9  any requests that were made by the United States Army
10  Corps of Engineers to the U.S. Marshals Service for
11  any type of law enforcement support by the Marshals?
12      A.   Yes, sir.  Again, the materials that
13  I've been provided indicate -- I -- I have no
14  information that that happened.
15      Q.   Okay.  Do you recall having any
16  interactions with Custom and -- excuse me, Customs and
17  Border Patrol regarding the DAPL protests?
18      A.   Yes, I do.
19      Q.   Can you tell me about those?
20      A.   Sure.  Early on in the events, I don't
21  remember exactly when, but it was early in the --
22  after we learned what was happening, I was trying to
23  think in what ways federal agencies could assist the
24  sheriff with what was going on, and I was aware of the
25  fact that Customs and Border Protection had aerial

Page 39

1  surveillance capabilities, and I offered to put those
2  two agencies in contact with each other so they could
3  determine whether or not those resources might be
4  deployed to help with this -- the event.
5      Q.   And do you remember -- you said "pretty
6  early on."  Could you give me an idea of when, maybe
7  in relation to -- to Sheriff Laney's email that went
8  out?
9      A.   I -- I would say it would -- it had to
10  be, you know, within the -- probably the first week or
11  two, maybe, maybe a little longer.  It wasn't very
12  long into it, because, you know, they -- they didn't
13  really have the capabilities other than -- I think
14  they had the State airplane or something, but it would
15  have been pretty early on.
16      Q.   Okay.  And then after that point, any
17  other interactions with Customs and Border Patrol --
18  or Border Protection?  Excuse me.
19      A.   Nothing that I can recall right now.
20      Q.   Okay.  Did you ever see the -- I think
21  there was some -- some aerial videos of the
22  encampments.  Did you ever see any videos of what the
23  encampments looked like, you know, from an -- from an
24  aerial perspective?
25      A.   I probably did.  There was several times

Page 40

1  when I was in the TOC that -- you know, that live
2  feeds were going on.  So, yes, I would say I probably
3  did, but I don't specifically recall that right now.
4      Q.   Did you ever have any observations, when
5  there was encampments on Corps land, so the protesters
6  are on the Corps-managed land, and then in viewing the
7  video in the TOC, that protesters were loading up into
8  vehicles to then move from Corps land to another
9  location to protest?
10      A.   No, I don't ever recall seeing that.
11  I -- I remember hearing about it, but I don't recall
12  if I ever saw that.
13      Q.   And on one of those instances --
14      Well, let me ask you this:  Are you
15  familiar with the protests that were planned around
16  the courthouse in -- I believe it was in Bismarck?
17      A.   The federal courthouse?
18      Q.   Yes, sir.
19      A.   Yes, I'm aware of that.
20      Q.   Okay.  And -- and the protesters, were
21  you also aware that those protesters had come from
22  Corps-managed land to then protest there in Bismarck
23  at the federal courthouse?
24      A.   I don't know if that's the case or not.
25  I just knew there was a large group of people that

Page 41

1  came to protest.  I don't recall whether they came
2  from camps or not that particular day.  I'm not sure.
3      Q.   Were you involved in the preparation for
4  those protesters to protect the federal courthouse?
5      A.   Yes, I -- yes, I would say yes.
6      Q.   In what role?
7      A.   Well, I guess -- maybe I should ask you
8  if you could clarify your question.  You're saying
9  that particular day, or do you mean in general?
10      Q.   That particular -- I was thinking of
11  that particular day when there was an expected large
12  group.
13      A.   Okay.  Yeah.  I -- I remember being
14  present in the courthouse that day.  I wasn't there
15  for that particular reason, I don't believe, but it
16  would have been just during one of my visits.  And I
17  remember that there was a protest that began at the
18  capitol, and then that group of people eventually
19  started moving throughout the -- the downtown area,
20  and eventually ended up at our courthouse.
21      So in terms of preparations, it was more
22  or less on-the-fly preparing for -- once we saw that
23  they were coming our direction, there was preparation
24  at that point.
25      Q.   Was there additional either Marshal --

38:15-39:19
401-402

Daniel R. Orr   30(b)(6)
November 30, 2022

Page 42

1   well, did the U.S. Marshals Service send additional
2   resources to the -- to help support protecting the
3   federal courthouse there in Bismarck during the
4   protests, more than what would be the normal Marshals
5   Service presence?
6        A.   Yes.
7        Q.   And how so?
8        A.   Well, it would have been not -- I
9   wouldn't say they were permanently staged there, if
10  that's what you're asking.  We did have people who
11  came out to perform assessments or set up equipment to
12  enhance our capabilities, that type of thing.
13            But nobody -- if you're asking if
14  additional personnel were staged there permanently,
15  no, that didn't happen.
16       Q.   And so I was referring more to
17  temporary, so just during the protests, if there was
18  an increase in -- in law enforcement presence or
19  personnel that were deployed specifically to the
20  courthouse to protect the courthouse during the
21  protests.
22            MR. JAFEK:  Objection, vague and
23  ambiguous.  You can go ahead and answer.
24       A.   Yeah, again, I'm trying to -- we didn't
25  have a specific group of people that were deployed,

Page 43

1   like a -- if you're talking additional deputy
2   marshals, to station there and be ready for any
3   particular protests that might pop up, that didn't
4   happen.
5            But we did have several people from
6   divisions who had specialties that would come out and
7   assist with preparing our -- our communications
8   capabilities, for instance, providing additional
9   equipment that might be necessary to protect our
10  judges, that type of thing.
11       Q.   (BY MR. KERLIN)  Okay.  Was the -- was
12  the U.S. Marshals Service Special Operations Group
13  ever mobilized to that courthouse during the DAPL
14  protest?
15       A.   There was a small group that came out
16  early on, after we brought this to the attention of
17  our headquarters divisions.  There was a small group
18  that came out and conducted a survey, basically, to --
19  to determine what was going on to decide what
20  capabilities SOG might be able to bring to the event,
21  if necessary.
22       Q.   And when you said "small group," about
23  how large?
24       A.   I think it was four people.
25       Q.   And then was the -- the SOG, was it

Page 44

1   ever -- was there ever a larger tactical force that
2   was deployed?
3        A.   No, I don't believe there was.
4        Q.   Okay.  I want to go back to the topics.
5   I think the next one that you're designated for is
6   topic 13.  "Actions taken by the United States . . .
7   during the DAPL Protests regarding Corps-managed lands
8   used or affected by the DAPL Protests to protect the
9   health and safety of persons on Corps-managed land."
10            Let me ask you about that first one
11  before I go through the rest.
12            Any information that you are -- you were
13  able to locate or can provide any testimony about the
14  U.S. Marshals Service involvement regarding protecting
15  the health and safety of persons on Corps-managed land
16  during the DAPL protests?
17       A.   Could you be more specific?  I'm reading
18  the question.  Are you asking for actions taken or
19  considered?
20       Q.   Well, let's -- let's talk about any
21  actions taken first.
22       A.   Okay.  No, I wouldn't say there was any
23  actions directly taken regarding people on Corps land.
24       Q.   Okay.  What about any actions taken by
25  the U.S. Marshals Service during the DAPL protests to

Page 45

1   protect Corps-managed lands from environmental harm or
2   degradation?
3        A.   No.  Again, no direct actions that I'm
4   aware of.
5        Q.   And then the next one, "to prevent [any]
6   unlawful or unsafe activities on Corps-managed land"?
7        A.   The same answer:  None that I'm aware
8   of.
9        Q.   What about the "clear Corps-managed
10  lands in the first quarter of 2017"?  And by that I
11  mean to remove protesters.
12       A.   No, sir, none that I'm aware of.
13       Q.   What about "to prevent the use of
14  Corps-managed lands as a camp, base, or staging area
15  from which potentially dangerous or unlawful
16  activities may be conducted on or off Corps-managed
17  land"?
18       A.   Same answer:  No -- no direct action
19  that I'm aware of.
20       Q.   Okay.  So with respect to all those
21  subtopics that we discussed, there was no direct
22  actions that were taken by the U.S. Marshals Service
23  in any regard, correct?
24       A.   Correct.
25       Q.   What about any actions considered, that

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 46

1  you're aware of, with respect to the U.S. Marshals
2  Service on any of those -- those five subtopics?
3       A.   Well, I think -- I think in that regard,
4  it would have been shortly after we learned of the
5  events, you know, when the email came from
6  Sheriff Laney, when we gathered more information about
7  what was happening, and -- and then I recall -- I
8  don't recall the exact date or anything, but I'm --
9  I'm sure that the Marshal and I would have had phone
10  conversations with our headquarters leadership to
11  determine, you know, how the Marshals Service might be
12  able to be involved in these events to assist the
13  local law enforcement or, you know, what impact it may
14  potentially have on our -- on our missions.
15       Q.   Do you ever recall you yourself making
16  any specific requests for additional assets or law
17  enforcement resources on behalf of the U.S. Marshals
18  Service that could be provided to North Dakota to help
19  assist with the ongoing DAPL protests?
20       A.   I don't recall if we specifically asked
21  for additional deputies to assist with the protests,
22  or if we just were -- I don't recall if that specific
23  request was made, or if we just relayed information
24  about what was happening, and in general were
25  considering to what level we could respond.

**46:15-47:25**
**401-402**

Page 47

1       Q.   Okay.  Okay.  I want to keep going on
2  the topics, so we'll go to the topic 14, is the next
3  one.
4            Okay.  "Any requests made by the U.S.
5  for assistance from State or local authorities to
6  remove persons from Corps-managed land or to deal with
7  the actions of persons on or off of Corps-managed
8  land."
9       A.   Sir, could I -- could I back up for a
10  second?
11       Q.   Yes, of course.
12       A.   On the last question, another thing that
13  I recall here about "considered," I know Marshal Ward
14  made a request for a SOG extraction team at one point
15  to assist local authorities down on the protest line,
16  and that was when things were getting pretty violent
17  down there.
18            So in terms of actions considered, I
19  think that request would be -- would fall under that
20  category.  He made that request, and it was denied.
21       Q.   Do you know who denied it?
22       A.   I -- I can only say that I saw the email
23  about that, and that was Bill Snelson, the associate
24  director for operations, responded to his request
25  saying it was denied.

Page 48

1       Q.   Okay.  And when you say it was starting
2  to get kind of hairy down there, would that have
3  been -- what time frame are we talking?  September?
4  October?  November?
5       A.   Ooh, I would say maybe late October,
6  mid-October time frame.
7       Q.   Okay.  And I think those are a couple of
8  exhibits that we'll get to, but thank you for pointing
9  that out, and we'll -- we'll come back to that.
10            But before, I believe you said it was
11  denied, and while we're on the topic, did you ever
12  receive any type of explanation, or did the
13  U.S. Marshals Service have any explanation as to why
14  that request was denied?
15            MR. JAFEK:  I would object to the extent
16  that it's calling for an attorney-client
17  communication.
18            Mr. Orr, you can't -- if you got that
19  information through an -- through an attorney-client
20  communication, that, you can't -- you can't reveal.
21       Q.   (BY MR. KERLIN)  Okay.
22       A.   Could you ask the question again,
23  please?
24       Q.   Sure.  You had said that the request
25  that -- that at the time Marshal Ward made for an SOG

Page 49

1  extraction team, that it was denied.  My question
2  was -- the U.S. Marshals Service denied that request.
3  Do you know why the U.S. Marshals Service denied that
4  request?  With the admonition from counsel not to
5  reveal attorney-client privilege, of course.
6       A.   I think it was denied because it was
7  outside of our legal authority.  It had been
8  determined that it didn't fall within our statutory
9  authority to -- to do that.
10       Q.   Okay.  I will -- I will come back to
11  that, and I think we'll have a few more questions
12  about that later, but I want to actually bring up the
13  email as an exhibit.
14            But before I go there, anything else on
15  that topic as far as actions considered that we
16  haven't already discussed with respect to topic 13?
17       A.   No.  I would say -- like I said, there
18  were several actions taken, most of them specific to
19  our -- our needs and our missions.
20            Some of them, like the assistance with
21  the -- the aerial surveillance from Customs and Border
22  Protection, that was one example of assistance that we
23  provided.  You know, we tried to do anything we could,
24  and that was one example.
25            I know Marshal Ward at one point

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 50

1   provided help to the local law enforcement to be able
2   to get a temporary flying restriction order over the
3   protest site.
4           Judicial Security Inspector Bill Klug at
5   one point helped the Sheriff's Department by teaching
6   some of their deputies how they could do a security
7   survey of the sheriff's home for his -- you know, to
8   increase his -- or enhance his security.
9           Marshal Ward also at one point provided
10  a couple of armored SUVs to the sheriff's office.
11          Those are the things I can think of that
12  were actions we could take to assist.  But, again, no
13  direct personnel were assigned to help out with that
14  at all.
15      Q.   Okay.  Topic 14, "Any requests made by
16  the U.S. for assistance from State or local
17  authorities to remove persons from Corps-managed land
18  or to deal with the actions of persons on or off of
19  Corps-managed land."
20          Did the U.S. Marshals Service -- is it
21  aware of any requests that were made by the
22  United States, including the U.S. Army Corps of
23  Engineers, for assistance from North Dakota State or
24  local authorities to remove persons from Corps-managed
25  land?

Page 51

1       A.   I'm aware of some communications that --
2   that the U.S. Army Corps requested State or local
3   assistance.  Obviously, that's how this all kind of
4   started.
5           But as far as requests to the Marshals
6   Service, no.
7       Q.   Or requests made by the U.S. Marshals
8   Service.  You know, "federal" is the key here.  It's
9   federal-managed land by the U.S. Army Corps.
10          Are you aware, for the U.S. Marshals
11  Service, of any such request made to North Dakota?
12      A.   I'm sorry, I don't understand.  You mean
13  from the Marshals Service to the State?
14      Q.   Yes.
15      A.   No, I'm not aware of the Marshals
16  Service requesting any State intervention, other than
17  there was, you know, just during the protests, the
18  State officers did come to assist on the exterior of
19  the building, but I don't recall whether that was --
20  was actually requested, or if it was just they had --
21  they had what they -- I think they called them
22  quick-response forces or quick-response teams that
23  were kind of following around the group of large
24  protest -- the large group of protesters that day.  So
25  I don't know if they just showed up on-site, or if

[51:7-52:2
401-402]

Page 52

1   there was an actual request for assistance that day.
2   I don't recall.
3       Q.   Okay.  And -- and I guess with respect
4   to how it sounds like, that the U.S. Marshals Service
5   was viewing part of this, was keeping an eye on the
6   DAPL protest to see how that could impact protecting
7   the courthouses; is that fair?
8       A.   Yes, the courthouse, all of the judges,
9   you know, U.S. Attorneys, all the people that we're
10  charged to protect.
11      Q.   And then, I guess, in the course of
12  doing so and protecting those federal courthouses, did
13  you have an opportunity to interact with law
14  enforcement, such as Bismarck Police Department, if
15  the protest is going to be at the Bismarck federal
16  courthouse and you could ask Bismarck PD if you needed
17  assistance or if they could provide resources to help
18  deal with protesters that might show up there?
19      A.   Yes, we could.
20      Q.   Okay.  Anything else on topic 14 before
21  we move on?
22      A.   I don't believe so.
23      Q.   Okay.  Topic 15, "Communications between
24  the United States and with, to, or from persons on
25  Corps-managed land related to the DAPL protests, or

[52:11-19
401-402]

Page 53

1   representatives or spokespersons for such persons."
2           My question about this topic is, did the
3   U.S. Marshals Service have any communications with any
4   of the protesters or any representatives of the
5   protesters, that you're aware of?
6       A.   Yes.
7       Q.   Okay.  Could you tell me about those.
8       A.   I'm aware of two occasions in which
9   U.S. Marshal Ward had direct communication with
10  Chairman Archambault.  One of those occurred in a
11  large meeting that -- that was organized by -- I think
12  it was Attorney -- U.S. Attorney Chris Myers or Acting
13  U.S. Attorney Chris Myers.  I think that was organized
14  at the request of the tribe of Chairman Archambault.
15          I don't recall when that happened, but
16  it was a larger group of individuals that were brought
17  together to discuss the protests.  Marshal Ward
18  attended that.  I don't recall if I was at that one.
19  I don't know if I was in town or not.
20          The other one I do recall having --
21  attending a small meeting with Marshal Ward.  That was
22  probably no more than six to eight people.  Again, it
23  was organized at the request of Chairman Archambault.
24  I think U.S. Attorney Chris Myers contacted the
25  Marshal and I to attend a meeting.  It was -- I think

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 54

1  it was at Chairman Archambault's attorney's office in
2  downtown Bismarck.
3          I don't recall exactly when it happened,
4  but I did -- I do recall being at that meeting.
5          Other than that, Bill Klug informed me
6  that he had brief contact with people from the protest
7  site at the federal building post office, and the
8  reason for that was because at that time there were
9  packages flowing in from around the world to support
10 protest activity, and those were building up at the
11 courthouse and -- or at the post office, and Bill said
12 he was involved in a brief conversation with the
13 postmaster and a Federal Protective Service officer,
14 talking with at least one person from the camps to
15 discuss how to collect all of those packages and get
16 them out of the post office.
17         Those are the three that I'm aware of.
18    Q.   Okay.  Let me take them one at a time.
19 So the first one that you mentioned, and I -- and
20 forgive me if I mentioned this, but do you recall
21 approximately when that -- that conversation, the one
22 that -- that Mr. Myers was present with, when that
23 would have occurred?
24    A.   When you say "conversation," it would --
25    Q.   Meetings?

Page 55

1     A.   Meetings.  Yeah, it was a small meeting.
2  I don't remember when that happened.  Yeah, I don't
3  recall exactly when that happened.  It was -- it
4  was -- I think it was a pretty brief meeting.  But
5  like I said, all I remember is there was a small
6  number of people brought together in Chairman
7  Archambault's attorney's office, and I don't remember
8  the topics we even discussed.
9     Q.   Okay.  Okay.  And so you don't remember
10 if there was any discussion about special-use permits
11 or whether there was an application for one or the
12 status of special-use permits that came up in that
13 meeting?
14    A.   No, I don't recall.
15    Q.   Okay.  Is that the same for the meeting
16 that Mr. Ward had, that you said it was approximately
17 six people or so at the attorney's office in Bismarck?
18 Was there any discussion about special-use permits?
19    A.   I'm confused in your question.  I was
20 talking about the smaller meeting when I responded to
21 the last question.
22    Q.   Oh, okay.  I'm sorry.  So I had three
23 meetings in total.  The first one sounded like a
24 little bigger group, but was that not the case?
25    A.   I -- I -- I don't recall being at that

Page 56

1  one.  I can only go by the documents I've reviewed.
2  It looks like it was a large meeting with several law
3  enforcement officers present, including Marshal Ward.
4  There were representatives there from the tribe.
5     Q.   Okay.  And then you were at the second
6  meeting that you described?
7     A.   The smaller meeting I remember attending
8  myself, yes.
9     Q.   And no discussion of special-use
10 permits, that you recall?
11    A.   Not that I recall.
12    Q.   Any discussion about, you know, they
13 were trespassing or they weren't permitted, they
14 weren't allowed to be on that land?  Any discussion
15 like that?
16    A.   Not that I recall.
17    Q.   Any indication about how long they were
18 going to stay or any -- any type of request from --
19 from any of the protesters about, you know, "It's
20 lawless out there.  We need assistance to try and
21 maintain law and order," anything like that?
22    A.   Not that I recall.
23    Q.   And then it sounded like Mr. --
24 Mr. Klug's brief contact at the federal building had
25 to do more with, I guess, logistics of getting

Page 57

1  packages to the protesters?  Is that --
2     A.   Yeah.  Again, that's not really
3  something of our concern, other than the fact that it
4  was cluttering up the post office entries, and, you
5  know, from a security standpoint, perhaps, that was
6  it.  He was just concerned about, you know, the
7  clutter.
8          But that was, again, a very brief
9  conversation with those two other people involved from
10 the post office and the Federal Protective Service.
11    Q.   Anything else on topic 15, as far as any
12 communications that you're aware of between the
13 United States Marshals Service and -- and protesters
14 or representatives or spokespersons from the
15 protesters, that we haven't already discussed?
16    A.   Not that I recall.
17        MR. KERLIN:  Okay.  I tell you what.
18 We've been going a little over an hour, about an hour
19 and ten minutes.  Can we take about a five- or
20 ten-minute break?
21        THE DEPONENT:  Sure.
22        THE VIDEOGRAPHER:  Going off the record.
23 The time is 5:11 p.m. UTC, 10:11 a.m. Mountain.
24        (Recess taken 10:11 a.m. to 10:21 a.m.
25 Mountain Standard Time.)

Daniel R. Orr  30(b)(6)
November 30, 2022

```
 1              THE VIDEOGRAPHER:  We're back on the
 2    record.  The time is 5:21 p.m. UTC, 10:21 a.m.
 3    Mountain.
 4        Q.   (BY MR. KERLIN)  Mr. Orr, we're back
 5    after a short break.  Are you able to continue?
 6        A.   Yes.
 7        Q.   Okay.  Any testimony that you would like
 8    to add, change, or modify that you've given today?
 9        A.   No.
10        Q.   Okay.  I'm going to ask you some
11    questions about topic No. 16.  It asks about
12    "Enforcement actions or investigations taken by
13    U.S.A. . . . at any time with respect to any of the
14    persons on Corps-managed land who were associated with
15    the DAPL protests."
16              On behalf of the U.S. Marshals Service,
17    was there any investigations or enforcement actions
18    that were taken regarding the protesters?
19        A.   I guess it would depend on how you
20    categorize "enforcement action."  The day of the
21    protests, there were some of the protesters who were
22    able to get inside of the building, and so they were
23    removed and turned over to local law enforcement.
24    They were later charged by the Federal Protective
25    Service.
```

```
 1              Investigations, there was -- I seem to
 2    recall at some point there may have been some
 3    inappropriate communications that were identified
 4    either through social media or some other intelligence
 5    source, inappropriate communications toward one of our
 6    judges.
 7              I don't recall if there was an actual
 8    investigation initiated or not, but those are the only
 9    two things I could think of.
10        Q.   Okay.  With respect to the -- to the
11    actions that were taken to remove protesters, was that
12    at the federal courthouse?
13        A.   Yes.
14        Q.   Okay.  And that would be in Bismarck?
15        A.   Yes.
16        Q.   Okay.  So those -- those individuals
17    were, I guess, removed by force and then turned over
18    and then actually prosecuted?
19        A.   I don't -- I don't recall about
20    prosecution.  Again, I think Federal Protective
21    Service charged them, so I would assume those cases
22    moved forward, but I'm not sure.
23        Q.   Okay.  Any reason why the protesters
24    weren't removed from Corps-managed land that were
25    there without the special-use permit?
```

```
 1              MR. JAFEK:  Objection, vague and
 2    ambiguous.
 3        Q.   (BY MR. KERLIN)  Let me ask it this way:
 4    Was the U.S. Marshals Service ever asked to remove
 5    any -- any individuals from Corps-managed land?
 6        A.   No, not that I remember.
 7        Q.   Okay.  But they did remove individuals
 8    from the federal courthouse?
 9        A.   Yes.
10        Q.   And then with respect to the
11    communications or statements that you mentioned about
12    a judge, were those things in the nature of, for
13    instance, like a threat to the judge?
14        A.   I don't remember the specifics of that.
15    I -- all I can say is that, you know, in the process
16    of this event, like I said, one of our missions is to
17    protect our federal judges and U.S. Attorneys, our own
18    personnel, secure our courthouses.
19              So in the process of doing that, we were
20    monitoring social media.  We were, you know, sharing
21    intelligence information back and forth with State and
22    local law enforcement and other federal agencies.
23              And in that process, I think at one
24    point there was something identified, and I don't
25    recall if it was determined to be a threat or just
```

```
 1    maybe an inappropriate communication.  I don't
 2    specifically remember if there was any particular
 3    investigation opened.
 4        Q.   Okay.  Okay.  Anything else other than
 5    what we've talked about regarding enforcement actions
 6    or investigations taken by U.S. Marshals Service
 7    regarding any of the protesters?
 8        A.   No.
 9        Q.   Okay.  I believe the next topic that I
10    had for you was topic No. 19.  "The size, resources,
11    actions, and practices of the U.S. Marshals Service
12    rapid-response team and/or Special Operations Group
13    with respect to North Dakota in 2016 or 2017,
14    including any training, procedures, or practices
15    regarding responses to protests, and deployments that
16    were considered or planned . . . during the DAPL
17    Protests," and then in parentheses it says, "including
18    to protect the federal courthouse in Bismarck, ND."
19    Do you see that?
20        A.   Yes.
21        Q.   Okay.  I want to talk to you a little
22    bit about that topic.  Are you prepared to testify on
23    behalf of that topic for the U.S. Marshals Service?
24        A.   Yes, to the extent I can.
25        Q.   Okay.  Sounds good.
```

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 62

1    I'm going to skip some exhibits that
2  we're going to come back to; just the numbering is
3  going to make sense eventually.
4         But are you familiar with the U.S.
5  Marshals Service's Special Operations Group?
6    A.  Yes, generally.
7    Q.  Okay.  My understanding is that it was
8  created in 1971, and it's the nation's oldest federal
9  tactical unit.  Any knowledge about that?
10   A.  I think that's correct.
11   Q.  Okay.  My understanding is also that the
12 Special Operations Group can be deployed when either
13 United States Marshals Director, so the United States
14 Marshals Service Director, deploys them, or the
15 Attorney General.  Do you have any knowledge about who
16 can authorize deployment of the Special Operations
17 Group?
18      MR. JAFEK:  Objection to the extent it
19 calls for a legal conclusion.  But you can answer.
20   A.  I -- I can only say yes to the Director.
21 I don't know if the Attorney General would -- would
22 order that through the Director, you know what I mean?
23 I mean, there's an order of succession there, so I
24 don't know if the Attorney General would order the
25 Director, and the Director would then do it.  But I

**62:4-63:2 401-402; 701/702 calls for legal concl.**

Page 63

1  would assume that the Attorney General could -- could
2  certainly ask for those resources to be deployed.
3    Q.  (BY MR. KERLIN)  Okay.  And just to be
4  clear, and because your counsel made an objection
5  about a legal conclusion, which I'm not asking you
6  for, if we could bring up Exhibit 8-- 8- -- I
7  believe it's 817 is what we're looking for.  I'm
8  sorry, we're looking for 8- -- 816, the -- the prior
9  document.
10      (Deposition Exhibit 816 was remotely
11 introduced.)
12   Q.  Okay.  Before you -- let's zoom out for
13 a second here, and I just want to point out a couple
14 of things.
15      Mr. Orr, this is a document that I got
16 from the U.S. Marshals website, and the date on the
17 document is February 25, 2020.  I just want you to
18 know where it came from.
19 I mean, it's possible that -- the topic
20 asked for 2016, 2017, and I understand that you've
21 since retired, so there might be some changes.
22 But this is what the U.S. Marshals
23 website currently puts on their website regarding
24 tactical operations, okay?
25   A.  Yes.

**63:15-64:13 401-402; 611**

Page 64

1    Q.  If we go to the second bullet point, it
2  says, "The Special Operations Group is a specially
3  trained and equipped tactical unit deployed in
4  high-risk and sensitive law enforcement situations,
5  national emergencies, civil disorder, and natural
6  disasters."  Do you see that?
7    A.  I do.
8    Q.  So on behalf of the U.S. Marshals
9  Service, would you agree that the Special Operations
10 Group is a specially trained and equipped tactical
11 unit that can be deployed with respect to civil
12 disorder?
13   A.  Yes.
14   Q.  Okay.  Would you agree with me that the
15 DAPL protests that occurred on Corps-managed land was
16 civil disorder?
17      MR. JAFEK:  Objection, calls for a legal
18 conclusion; vague and ambiguous.
19   Q.  (BY MR. KERLIN)  You can answer.
20   A.  Okay.  Thank you.  Yes, I would agree.
21   Q.  Okay.  If we go down to the -- the last
22 sentence in that paragraph, it says, "Group members
23 also act as the agency's primary response force for
24 any critical incident nationally and worldwide as
25 ordered by the Attorney General or the Marshal

**64:14-20 401-402; 701/702 calls for legal concl.**

**64:20-65:15 401-402; 611; 701/702 calls for legal concl.**

Page 65

1  Service -- Marshals Service director."  Do you see
2  that?
3    A.  I do.
4    Q.  Okay.  Would you agree that the DAPL
5  protest was a critical incident nationally and also
6  had worldwide attention?
7      MR. JAFEK:  Objection with respect to
8  "critical incident," that that calls for a legal
9  conclusion.  Otherwise, you can answer, Mr. Orr.
10   A.  It's hard for me to answer that because
11 I'm -- because of the categorization of a national
12 incident.  Obviously, it had nationwide interest, but
13 it was never declared -- to my knowledge, it was never
14 declared a national emergency.  So that's why it's
15 hard for me to answer that.
16   Q.  (BY MR. KERLIN)  I see.  Did you
17 understand that there were protesters -- or did you
18 have knowledge that there were protesters that had
19 come from a variety of different states and not just
20 from the North Dakota area?
21   A.  I had no direct knowledge of that, but I
22 was aware of the intelligence that indicated that.
23   Q.  Okay.  During your time at the
24 U.S. Marshals Service, were you ever aware of an
25 incident where either the Attorney General or the

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 66

1    Marshals Service Director ordered a deployment of the
2    Special Operations Group?
3        A.   No.  For this incident?
4        Q.   Well, not just for this incident, but
5    I'm just -- I'm talking about more in general during
6    your career.  Were you ever involved in an incident
7    where -- or did you ever become aware of where the
8    Special Operations Group had been deployed?
9        A.   Yes, I -- I have been involved in an
10   incident when they were deployed, and I'm aware of
11   many deployments through the years of my career.
12       Q.   And I just want to talk about a few of
13   them just to go through the history of the Special
14   Operations Group, because my understanding is that the
15   way that it was created was really to address civil
16   disobedience after 1971.
17            MR. JAFEK:  I would object to the extent
18   that this goes beyond the scope of the -- of the
19   notice.  But to the extent you know in your personal
20   capacity, Mr. Orr, you can answer.
21       A.   I -- I think, yeah, I'm -- you know,
22   I -- my understanding, too, is it was created in the
23   1970s, and I -- I've never been a member of the
24   Special Operations Group, nor have I -- you know, am I
25   very familiar with their training and such.

**65:23-69:25 401-402**

**66:12-69:2 602; 611**

Page 67

1            But from pictures I've seen on their
2    website and various magazines and such that we've had,
3    yeah, I've seen pictures over the past where they were
4    training for civil disorder back in the early '70s.
5    So to that extent, I would say yes.
6        Q.   (BY MR. KERLIN)  Okay.  And one of the
7    earliest deployments occurred in 1971 for the May Day
8    demonstration in Washington, D.C.  Were you aware of
9    that?
10            MR. JAFEK:  Again, I would object that
11   it goes beyond the scope of the notice.  But you can
12   answer, Mr. Orr, based on your personal knowledge.
13       A.   Yeah, I'm not aware of that personally.
14       Q.   (BY MR. KERLIN)  And the Special
15   Operations Group was used to evict Indians from the
16   deserted Twin Cities Naval Air Station in Minne- -- in
17   Minneapolis in 1971 as well?
18            MR. JAFEK:  Same objection.
19       A.   I don't know.
20       Q.   (BY MR. KERLIN)  Were you aware that
21   they were used to expel another group of Native
22   Americans from the deserted Alcatraz Island prison
23   that had taken up occupation there?
24            MR. JAFEK:  Same objection.
25       A.   I -- I don't recall if I am aware of

Page 68

1    that or not.  I mean, it vaguely rings a bell, but
2    I -- I don't really know for sure.
3        Q.   (BY MR. KERLIN)  Were you aware of their
4    deployment with respect to the American Indian
5    Movement in 1973 where some individuals had taken
6    control of the Wounded Knee area of the Pine Ridge
7    Sioux Reservation in South Dakota?
8            MR. JAFEK:  Same objection.
9        A.   Yes, I'm aware of that.
10       Q.   (BY MR. KERLIN)  And that the SOG group
11   for U.S. Marshals responded to that incident?
12            MR. JAFEK:  Same objection.
13       A.   Again, my knowledge comes from just
14   articles and historical photos I've seen during my
15   time in the Marshals Service.
16       Q.   (BY MR. KERLIN)  I'll fast-forward a
17   couple of decades and get a little more recent.  Were
18   you aware that the United States Marshals Service
19   activated the SOG and deployed it to Los Angeles after
20   the Rodney King verdict was announced and the riots
21   commenced?
22            MR. JAFEK:  Same objection.
23       A.   Yes.
24       Q.   (BY MR. KERLIN)  Okay.  And that's the
25   type of civil disobedience or -- excuse me, or civil

Page 69

1    disorder that SOG is trained to deal with, right?
2        A.   Yes.
3        Q.   And you mentioned it earlier, but
4    Marshal Ward made a specific request for deployment of
5    the SOG group to help assist law enforcement regarding
6    the DAPL protest, correct?
7        A.   Yes.
8        Q.   And yet that request was denied, right?
9        A.   Yes.
10       Q.   Based on the fact sheet that we looked
11   at, it seems like, whether it's the Attorney General
12   directly or the Attorney General through the Marshals
13   Service Director, they have the ability to then deploy
14   SOG when needed, correct?
15            MR. JAFEK:  Objection, calls for a legal
16   conclusion.  But you can answer.
17       A.   Yes.
18       Q.   (BY MR. KERLIN)  Okay.  And for whatever
19   reason, either the Attorney General or the Marshals
20   Service Director made the decision not to deploy the
21   SOG to North Dakota to assist in law enforcement
22   response to the DAPL protest, correct?
23       A.   Correct.
24       Q.   Do you know approximately how many
25   members there are of the Special Operations Group?

**69:10-17 401-402; 701/702 calls for legal concl.**

**69:18-23 401-402; 602**

Daniel R. Orr  30(b)(6)
November 30, 2022

**Page 70**

69:24-60:25 401-402

```
 1      A.   I -- again, I was never in the group.  I
 2  would only estimate.  I would suggest that there may
 3  be -- oh, wow, I don't even -- I don't even know if I
 4  could be very accurate on that, to be honest.
 5          Q.   Okay.  Well, one of the topics,
 6  topic 19, had asked for the size and resources
 7  regarding the rapid-response team in 2016, 2017.
 8              I mean, do you know if there's -- if
 9  it's in -- if it's more than a thousand?
10      A.   I would -- no, it would not be that
11  much.
12          Q.   Okay.  Do you know where -- at least in
13  2016 and 2017, where the SOG group would be stationed?
14      A.   Yeah.  There would be a permanent force,
15  and I believe there still is today, in Louisiana.
16  Most of those individuals are the -- more the senior
17  leaders of the organization.
18              There's also another contingent that's
19  permanently stationed in Springfield, Virginia.  I
20  don't remember if they were there in 2016 or after.
21              But other than that, there are many
22  Deputy U.S. Marshals who belong to that unit who are
23  dispersed throughout the country in their various
24  offices, their home offices, who can be called upon
25  when necessary to respond.
```

**Page 71**

71:1-14 401-402; 602; 611 vague

```
 1          Q.   Would you agree with me that the SOG
 2  would be uniquely qualified to respond to something
 3  like the DAPL protest, especially when the encampments
 4  are occurring on federal land?
 5          MR. JAFEK:  Objection, vague and
 6  ambiguous.  But you can answer.
 7      A.   From my knowledge of the -- that group,
 8  I think they could.
 9          Q.   (BY MR. KERLIN)  And it would have been
10  a very beneficial asset for North Dakota to have to
11  respond to the protesters?
12          MR. JAFEK:  Objection, vague and
13  ambiguous.  But you can answer.
14      A.   Yes.
```

71:15-72:8 401-402

```
15          Q.   (BY MR. KERLIN)  Did Marshal Ward ever
16  express any frustration to you that his requests were
17  being denied?
18      A.   Yes.
19          Q.   Can you tell me about that?
20      A.   Well, we were both frustrated, I mean,
21  especially as it came to the point where, you know, in
22  terms of providing assistance, like we talked about
23  earlier.  We always want to help our local partners
24  whenever we can.
25              And Marshal Ward, if you -- I know he's
```

**Page 72**

```
 1  been deposed, and I know you met him, and he's a very
 2  passionate law enforcement professional.  And so, yes,
 3  he was frustrated when he was unable to provide
 4  additional resources.
 5              I guess we were -- we were both
 6  frustrated in the sense that we -- we thought there
 7  could be potentially means by which we could be
 8  engaged, but unfortunately those -- we couldn't be.
 9          Q.   Okay.  And I guess in 2016, the -- the
10  Attorney General would have been Loretta Lynch,
11  correct?
12      A.   I think that's correct.
13          Q.   Okay.  So either she or the Acting
14  Director at that time, David Harlow, could have
15  authorized the Special Operations Group to be deployed
16  there to help out law enforcement in North Dakota
17  during the DAPL protest, but that wasn't the decision
18  they made.
19          MR. JAFEK:  Objection, calls for a legal
20  conclusion.  But you can answer.
21      A.   Okay.  Yeah.  Somebody up there made the
22  decision -- I don't know whom -- but we were -- we
23  were not allowed to engage -- to deploy those
24  resources.
25          Q.   (BY MR. KERLIN)  Yeah.  Okay.  I want to
```

72:13-24 701/702 calls for legal concl.

**Page 73**

```
 1  direct you to a couple more exhibits we have.  So
 2  there is -- let me see if I can read the writing on
 3  this.  Let's look at 807.  I believe that's the next
 4  one.
 5              (Deposition Exhibit 807 was remotely
 6  introduced.)
 7          Q.   This is an email chain, and if we can go
 8  to the first -- well, I want to give you an
 9  opportunity to read over it, but I want to go back in
10  time and work our way to the earliest, so from the --
11  the last page to the front.
12      A.   Okay.
13          Q.   So it looks like on the last page,
14  there's the -- it's a Significant Incident
15  Notification.  Are you familiar with -- with that type
16  of notification inside the Marshals Service?
17      A.   Yes.
18          Q.   And the date of it is September 9 [sic]
19  of 2016, and it occurred -- excuse me -- in Alpine,
20  Texas, and it involved some type of shooting incident.
21      A.   Can I correct you?  It's September 8.
22      Q.   Oh, I'm sorry.  Yes.  Thank you.
23              And then if we go to the email above it,
24  it's a forward of that.  Excuse me.  And I believe
25  you're cc'd on this email, but I want to give you a
```

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 74

1  minute to read it.
2      A.  On my end, the document is partially cut
3  off by the -- oh, I've got to move that a little bit.
4  There you go.  Now I can see it.  Thank you.  Okay.
5      Q.  So Marshal Ward -- and this is
6  September -- again, September 8, 2016, so a few weeks
7  after the start of the protests, or when you first
8  became aware of it from Sheriff Laney's email.
9          Marshal Ward mentions that he thanks --
10  and he says, "Bill" here, and he's -- I believe he's
11  referring to William Snelson.
12      A.  Yes.
13      Q.  Okay.  And so he says he disagrees with
14  the -- with the OGC opinion.
15          If we continue on down, it says, "Our
16  situation is exactly the same, responding to help
17  local law enforcement in a time of need."
18          So would this have been around the time
19  when Sheriff -- or excuse me, Marshal Ward was making
20  a request for law enforcement -- excuse me, law
21  enforcement support up the chain of command at the
22  U.S. Marshals Service?
23      A.  Yes.
24      Q.  Okay.  We can go to the next -- we're
25  going to go up into -- excuse me, we're going to

Page 75

1  continue going forward in time, so the next email up
2  the chain.
3          A response from Mr. Snelson, "Hey
4  Marshal, I contacted DOJ today, but have not heard
5  back yet.  I will advise if/when I get a response.
6  Have a good night."
7          And then the next one we have, if we go
8  above that, is now six weeks later, October 25.
9  Marshal Ward is reaching out again.  "Bill, good
10  morning.  Below is a message I sent you in
11  September regarding providing support to locals.  I'm
12  not good with commuters but I don't think I have
13  received a response.  My message today is the same.
14  The locals are in need of SOG assistance in regards to
15  a major ops plan starting this week.  An extraction
16  team is needed for emergencies.  Can you advise me if
17  we can do anything to assist."  Do you see that?
18      A.  I do.
19      Q.  Okay.  So it's another request follow-up
20  by Marshal Ward again asking for assistance,
21  mentioning the SOG assistance, and then an extraction
22  team.  Similar to what we had discussed earlier,
23  right?
24      A.  That's correct.
25      Q.  Then if we go to the response from

Page 76

1  Mr. Snelson, he says, "Marshal Ward, I apologize for
2  not responding directly to you.  I have been working
3  through TOD . . . ."  Do you know what TOD is?
4      A.  Yes.
5      Q.  What is that?
6      A.  It stands for Tactical Operation
7  Division.
8      Q.  "And was advised that correspondence
9  [had] occurred on multiple occasions between
10  leadership of TOD (who by policy manages agency
11  response to events such as the one . . . in ND), and
12  ND district leadership, addressing the issue of
13  deploying USMS assets.  If that is not correct, then I
14  full -- I assume full responsibility for not following
15  up."
16          Before I get to the next paragraph, do
17  you know who would have been the leadership of TOD?
18      A.  I think at that time, the -- oh, what
19  would be -- I'm trying to think of what the title
20  would have been, but I think the leader -- leader of
21  that at the time was Neil DeSousa.  And I -- I'm
22  sorry, but I forget what his title would have been.
23      Q.  Okay.  And the next paragraph says, "As
24  to your request for SOG assistance to be used as an
25  'extraction team,' that request is denied.  As has

106 for completeness if next section admitted

Page 77

1  been previously noted, absent the President enacting
2  the Stafford Act, or an alternative order being issued
3  by the U.S. Attorney General, we will not be deploying
4  any USMS resources, for any missions, other than those
5  in direct support of court operations and associated
6  core missions.  Respectfully, Bill."  Do you see that?
7      A.  I do.
8      Q.  Okay.  So this is him making it clear
9  that the request for SOG assistance is denied, and he
10  mentions that it would require the President enacting
11  the Stafford Act or an alternative order being issued
12  by the U.S. Attorney General.
13          I want to go up the -- the email chain
14  to the front page, so we're going up to the next one.
15  So now we're at October 20.  At least just in this
16  one email, that would be the, now, third time that
17  Marshal Ward is reaching out to Mr. Snelson.
18          "I am sending this message with the
19  utmost urgency.  Local law enforcement in ND is about
20  to be overrun at the protest site located by the DAPL
21  pipeline."
22          Now, do you recall around this time
23  period, November 20 of 2016, if local law enforcement
24  was about to be overrun at the protest site?
25      A.  Yes.  I think that's the date when there

77:18-21
401-402; 611

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 78

1  was a violent confrontation at what they referred to
2  as Backwater Bridge.
3      Q.  Uh-huh.  And, again, that would be
4  something that if the SOG group had been deployed,
5  they would be, again, trained in civil disobedience
6  and be able to assist law enforcement to help maintain
7  the line and keep law and order, right?
8          MR. JAFEK:  Objection, calls for
9  speculation.  You can answer.
10     A.  Okay.  Yes, I believe so.
11     Q.  (BY MR. KERLIN)  And if we continue on
12 down, it says, "A statewide request for all assistance
13 has gone out and the U.S. Attorney has sent requests
14 to D.C. requesting any and all available federal
15 assistance."
16         Do you recall the -- the U.S. Attorney,
17 it would have been Mr. Myers, if he sent a request to
18 D.C. requesting any and all available federal
19 assistance around the time of the Backwater Bridge
20 incident?
21     A.  I don't recall that.
22     Q.  Then his last paragraph says, "Please
23 consider providing manpower to assist.  Politics
24 aside, lives are at stake."
25         Did you share that sentiment, that lives

**78:3-10**
**401-402; 602**

**78:22-79:13**
**401-402; 602;**
**611**

Page 79

1  were at stake during this protest in -- and as the
2  violence seemed to escalate around this time period?
3          MR. JAFEK:  I'll just make an objection
4  just to be clear that here he's not testifying on
5  behalf of the Marshals Service because it's beyond the
6  scope of the notice.
7          But in your personal capacity, you can
8  answer.
9      A.  Yeah, I was just about to say the same
10 thing.  From my perspective, yes, it was a very
11 dangerous, tense situation on the line down there, and
12 easily somebody could have been seriously injured or
13 killed.
14     Q.  (BY MR. KERLIN)  Now, it's about -- if
15 we go to the top email, and so this is the one from
16 Marshal Ward again to Mr. Snelson, and he cc'd David
17 Harlow.  We talked about him earlier.  He's the Acting
18 Director at the time of the U.S. Marshals Service,
19 right?
20     A.  Yes.
21     Q.  And then you're also on the email, and
22 so is Mr. Myers and Sheriff Kirchmeier.  Do you see
23 that?
24     A.  Yes.
25     Q.  So about an hour and a half later he

Page 80

1  sends another -- about an hour later, "Sir, I feel I
2  should update you.  As mentioned below in previous
3  emails, the Stafford Act would have to be enacted in
4  order for the Sheriff to receive federal assistance.
5  I have spoken with Lieutenant Governor Drew Wrigley
6  several times regarding this option.  He has informed
7  me that the State would lose the allocated emergency
8  funding if the Governor applies for the Stafford Act
9  and the request is denied.  The Governor feels that
10 for political reasons it is likely that the request
11 would be denied."
12         Then he continues, "Can you or possibly
13 Mr. Harlow preemptively inquire if there is a
14 possibility that the request may be approved if
15 submitted?"
16         Do you know if any such request was made
17 by either Mr. Snelson or Mr. Harlow?
18     A.  I don't know.
19     Q.  It says, "If there is a chance it would
20 be approved, perhaps the Governor would consider
21 submitting the paperwork and hopefully federal
22 assistance would be provided."
23         He then concludes, "Lieutenant Governor
24 Drew Wrigley is more than willing to speak with you or
25 Mr. Harlow regarding this situation," and then it

Page 81

1  provides his -- his cell phone number.
2          Again, do you know if any -- if either
3  Mr. Snelson or Mr. Harlow ever spoke with Lieutenant
4  Governor Drew Wrigley about this issue and the
5  requests that were being made for federal assistance?
6          MR. JAFEK:  I would object to the extent
7  that it goes beyond the scope of the -- the scope of
8  the notice.  But you can answer.
9          MR. KERLIN:  I'm just going to push back
10 on that a little bit, Mr. Jafek, and here's why:  I
11 haven't gotten to topic 20 yet, but it specifically
12 asks for "Decisions by the U.S.A. to provide or
13 withhold law enforcement assistance to State and local
14 authorities during the DAPL protests," and that
15 includes the U.S. Marshals Service.
16         And I think this email and this exhibit
17 is abundantly clear that the federal government
18 decided to abdicate its responsibility entirely and
19 not provide any support when the U.S. Marshal, in
20 fact, said, "Politics aside, lives are at stake."
21         So I want to know, from the 30(b)(6)
22 witness for the U.S. Marshals Service, about this
23 topic, and I think it's fair to ask him.  And if he's
24 not prepared to do so, that's fine.  But it clearly
25 relates to the topic.

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 82

1        MR. JAFEK:  With respect to the specific
2    question that you were asked -- you were asking, you
3    were asking this -- this email is talking about
4    requests under the Stafford Act.  I don't think that a
5    request under the Stafford Act necessarily implicates
6    law enforcement decisions.
7        The Stafford Act is a -- is a broad --
8    is a broad law that allows for access to all sorts of
9    federal -- federal assets.
10       So with -- to the extent that it's
11   asking about the Stafford Act, and I don't think the
12   Stafford Act, that's not direct -- that's not a law-
13   enforcement-assistance decision.  So in that respect,
14   I believe it is beyond the scope of topic -- of
15   topic 20.
16       Furthermore, the -- the Court, in its
17   order on denying the motion to compel, said that the
18   State would provide specific topics with respect to
19   topic 20 before the deposition, and this specific
20   topic was not something that was provided to -- to the
21   United States ahead of time.
22       Q.   (BY MR. KERLIN)  Mr. Orr, have you seen
23   this document in preparation for your deposition?
24       A.   I have seen portions of it.
25       Q.   Okay.  So you've seen the email we're

Page 83

1    talking about to prepare for your deposition, correct?
2        A.   Not the one that's on the screen right
3    now.
4        Q.   Okay.  You understand that topic 20, and
5    we haven't brought it up yet, but I know you have a
6    copy of the amended notice for you, and it
7    specifically talks about decisions by the U.S.A. to
8    provide or withhold law enforcement assistance.
9    That's what we're talking about here today.
10       I want to know if you're aware of the
11   reason why law enforcement assistance was not provided
12   by the U.S. Marshals Service after repeated requests
13   from the U.S. Marshal Paul Ward.
14       A.   I -- those decisions were made above my
15   level, above the Marshals level.  All I can say is I
16   think that it was -- I mean, what was relayed to us
17   was that we did not have a legal authority to -- to be
18   involved in the protests on that -- that Corps land.
19       Q.   Did you --
20       A.   And instead we had to focus on our core
21   missions involving protection of our judges, the
22   courthouse, et cetera.
23       Q.   Okay.  And it sounded like when we
24   talked about what you did to prepare for your
25   deposition, did you speak with anyone who was higher

83:4-85:24
401-402; 602

Page 84

1    up the chain of command in the U.S. Marshals Service
2    about this decision not to provide either the SOG
3    group, the SOG extraction group, or any other type of
4    U.S. Marshal asset to law enforcement with respect to
5    the DAPL protests?
6        A.   I'm sorry.  Could you repeat that?
7        Q.   Sure.  Did you speak with anybody,
8    whether it was Mr. Harlow, Mr. Snelson, or anyone that
9    they reported to, in preparation for your deposition
10   today, to address why the United States decided to
11   withhold law enforcement assistance to State and local
12   authorities during the DAPL protests on behalf of the
13   U.S. Marshals Service?
14       A.   No, I did not.
15       Q.   Other than what you've previously
16   testified, what -- what -- what --
17       Well, here's what I want to know,
18   Mr. Orr.  And it might be that you don't know, and
19   that's perfectly fine if that's true.  I want to know
20   the "why" for the U.S. Marshals Service not to provide
21   assistance, despite -- I mean, this one email, there's
22   another one we'll look at, but there's another two
23   requests, four, five, six requests from the
24   U.S. Marshal for North Dakota asking for law
25   enforcement support.  So can you answer the "why"?

Page 85

1    Why wasn't it provided?
2        A.   Again, all I can say is that we were
3    told we had no legal authority to be involved down
4    there.  And absent a federal court order or a
5    directive from the Attorney General or initiation of
6    the Stafford Act through the President's office, we
7    had no legal authority to intervene down there.  And
8    it was frustrating to hear that, but that's what we
9    were told.
10       Q.   Okay.  And that was the position of the
11   U.S. Marshals Service, is that law enforcement support
12   would not be provided to North Dakota for the DAPL
13   protests, correct?
14       MR. JAFEK:  I would object to the extent
15   that it misstates the testimony.  But you can answer.
16       A.   Could you ask it again, please?
17       MR. KERLIN:  Can you read it back,
18   please.
19       (The last question was read back as
20   follows:  "Okay.  And that was the position of the
21   U.S. Marshals Service, is that law enforcement support
22   would not be provided to North Dakota for the DAPL
23   protests, correct?")
24       A.   Correct.
25       MR. KERLIN:  We've been going almost

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 86

1   another hour.  I think I'm getting close to concluding
2   this deposition.  If we could take a break for ten
3   minutes, let me look over my notes, and -- and I don't
4   think it will be much longer.
5                THE VIDEOGRAPHER:  Going off the record.
6   The time is 6:00 p.m. UTC, 11:00 a.m. Mountain.
7                (Recess taken 11:00 a.m. to 11:10 a.m.
8   Mountain Standard Time.)
9                THE VIDEOGRAPHER:  We're back on the
10  record.  The time is 6:10 p.m. UTC, 11:10 a.m.
11  Mountain.
12               Q.   (BY MR. KERLIN)  Mr. Orr, back after a
13  brief break.  Able to continue?
14           A.   Yes, sir.
15           Q.   Okay.  If we could bring up Exhibit 325,
16  please.
17               Mr. Orr, I'm showing you -- it's a
18  document that's been marked as Exhibit 325.  It's a
19  meeting invite for -- the subject says, "FW: Sheriffs
20  and Police Chiefs All Call - DAPL Response."  It's got
21  a time of November 10, 2016.
22               If we go down to the attendees,
23  the organizer is Sean Johnson.  And required
24  attendees, it looks like you're the third person there
25  after Chris Myers.  Do you see that?

Page 87

1           A.   Yes.
2           Q.   Okay.  Do you recall a -- well, before I
3   get there, if we go down to the substance of the --
4   yes, the communication, it says, "Hello all,
5   Sheriff Kirchmeier and DES would like to hold a
6   conference call for all the Sheriffs and Chiefs in
7   North Dakota to update us all on the protests and
8   discuss the needs and plans for the next phase.
9               "If at all possible, please call in for
10  this update.  The conference call information is
11  listed below in the email from Sean Johnson.  I also
12  included the U.S. Attorney Chris Myers, U.S. Marshal
13  Ward, and BCI Director Carlson on the call as they
14  have stood by us through this long incident."
15               And at the end, if we go to the next
16  page, it says, "Stay Safe.  Sheriff Laney."  Here it
17  is.
18               Mr. Orr, do you recall attending a
19  conference call in -- it would have been the second
20  week of November, referenced here?
21           A.   No, I don't.
22           Q.   Okay.  All right.  We'll keep moving.
23               So just to kind of keep the time frame
24  here accurate, so end of 2016 was Sheriff -- excuse
25  me, "Sheriff" -- was Marshal Ward's last day the last

Page 88

1   day of 2016?
2           A.   I'm not sure.  It was -- you know, he
3   retired at the end of the year.  I don't remember what
4   specific date that was.
5           Q.   Okay.  And then you took over after
6   he -- I mean, so it was kind of seamless, I guess:  He
7   left and -- or retired, and then you -- you stepped in
8   as Acting U.S. Marshal?
9           A.   Yes.  The order of succession is that
10  when the Marshal is absent, the Chief Deputy is --
11  typically takes the Acting U.S. Marshal role.
12           Q.   Okay.  So I'm going to pull up
13  Exhibit 808.
14               (Deposition Exhibit 808 was remotely
15  introduced.)
16           Q.   Mr. Orr, do you recognize this email?
17           A.   Give me a moment, please.
18           Q.   Yes, sir.
19           A.   Yes, I -- I recall this vaguely.
20           Q.   Okay.  And what was your involvement
21  with -- with this meeting and the discussion of the
22  ESF-13 program and the Stafford Act?
23           A.   Well, I think Levi is -- yeah, it says
24  under there he's the Policy Director for Governor
25  Burgum.

Page 89

1               I think that was -- you know, I'm going
2   to have to -- I can't recall specifically, but I think
3   this would have been a meeting to discuss the steps
4   that would be necessary for the Governor to request
5   support under the Stafford Act.
6               I wasn't -- I wasn't an expert on how
7   that all was done.  I do recall having a telephone
8   call with people who do run that program, just to
9   clarify the details of it, so that -- and I don't know
10  if that was in conjunction with this meeting or not.
11          Q.   Okay.  Okay.  Let's -- and the date of
12  this, just for the record, February 10 of 2017, right?
13          A.   Yes.
14          Q.   Okay.  So let's go to -- the next
15  document I want to ask you about is Exhibit 809.
16  Excuse me, 809.
17               (Deposition Exhibit 809 was remotely
18  introduced.)
19          Q.   We can zoom out a little bit so we can
20  see the whole document.
21               I don't have much here because the --
22  the email is -- is redacted on this page and the next
23  page.  The date of this is February 14, so a few days
24  after the prior email we saw.
25               But what we can read is from Mr. Myers

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 90

1   there in the middle that says, "We look forward to the
2   meeting.... Terry VanHorn assists me as the CMC.  He
3   is detailed currently to the Tactical Operations
4   Center in Morton County.  Chris."  And it's -- that's
5   an email directed to Alan Colon.  Do you know who Alan
6   Colon is, or "Cah-lehn"?
7        A.   You know, sitting here today, I don't
8   recall who that is.
9        Q.   Okay.  Okay.  Let's keep moving.  So
10  we'll look at 810, which is another email.
11            (Deposition Exhibit 810 was remotely
12  introduced.)
13        Q.   Okay.  If we can go down to the -- the
14  earlier email is an email from Chris Myers, and that's
15  dated February 15.  It says, "As per our meeting last
16  week regarding the Stafford Act request, Mr. Colon
17  (who was on the phone) will be in Bismarck on Monday
18  to assess the situation in preparation for the
19  Stafford Act request and/or Executive Orders.
20            "Here is his name and title," and it's
21  provided.
22            And then it says, "Both Dan Orr and I
23  will be there Monday night/Tuesday as well."
24            Do you recall the -- the meeting that --
25  that he's referring to?

Page 91

1        A.   No, I'm sorry, I don't.  It was a long
2   time ago.
3        Q.   Okay.  Keep moving.  The next one is
4   811.
5            (Deposition Exhibit 811 was remotely
6   introduced.)
7        Q.   This is an email from you to Rob Ansley,
8   Wade Warren, and Chris Myers.  It's dated February 16
9   of 2017, and the subject is "Contingency Plans for
10  DAPL Protests."
11            I wanted to give you a minute to read
12  it, and I was going to ask you if you recall this
13  email and the contingency plans it's referring to.
14        A.   Okay.  Your question again?
15        Q.   Yeah.  So if we go to that -- that first
16  paragraph, it's asking for a time to do a short
17  videoconference with USMS, I guess USA would be
18  U.S. Attorney, clerk of the court, and a number of
19  other federal, you know, acronyms, USPPS, F- -- excuse
20  me, FPD, and then the magistrate judges and Chief
21  Justice Hovland.
22        A.   Yes.
23        Q.   Do you recall having any sort of
24  conference like that?
25        A.   No, I'm sorry, I don't.

Page 92

1        Q.   Okay.  The next paragraph says, "There's
2   a high probability that up to 200 federal
3   agents/officers will soon be deployed to support the
4   ongoing incident surrounding the DAPL -- the Dakota
5   Access Pipeline protests."  Do you know what you're
6   referring to there?
7        A.   I -- I could only speculate.  I don't
8   remember this for sure.  I -- I can -- you know, I'm
9   not sure how to respond to that.
10        Q.   Okay.
11        A.   I think this would have been, you know,
12  February.  It's -- by that time, there was a new
13  administration.  There was -- yeah, I -- I don't know.
14  I'm sorry.
15        Q.   Okay.  But to your recollection, there
16  wasn't any such deployment, right, of 200 federal
17  agents or officers?
18        A.   No, I don't recall this ever happening.
19        Q.   Okay.  If there were 200 federal
20  agents -- you know, when you say "up to 200 federal
21  agents or officers," would those have been part of the
22  U.S. Marshals Service?
23        A.   I don't know.
24            MR. JAFEK:  Objection, calls for
25  speculation.  Go ahead and answer.

Page 93

1        A.   Yeah, I don't know.  I -- I don't know
2   what I was referring to there.
3        Q.   (BY MR. KERLIN)  Okay.  Just -- I -- and
4   this -- I'm not trying to be cute here, but would
5   there ever be an occasion where you would indicate
6   that there would be federal agents from some other
7   agency or service that would be deployed, other than
8   the U.S. Marshals, since you were the Acting
9   U.S. Marshal for the District of North Dakota?
10            MR. JAFEK:  Objection, calls for
11  speculation.  You can answer.
12        A.   The only thing I could say is if -- if
13  there was a deployment under the Stafford Act, there
14  would be -- as I understand it, the Stafford Act
15  allows several different federal agencies to deploy
16  resources.  So that could be what I was referring to.
17        Q.   (BY MR. KERLIN)  Got it.  Okay.  Let's
18  go to the next one, Exhibit 812 -- excuse me, 812.
19            (Deposition Exhibit 812 was remotely
20  introduced.)
21        Q.   This is another email for contingency --
22  excuse me, "Regarding:  Contingency Plans for DAPL
23  Protests" is the subject.  It's dated February 16 of
24  2017.  Rob Ansley had emailed you and said, "Dan, Pick
25  a time after 10 and I'll work on getting the VCR lined

Marginalia:
92:1-18
401-402

91:5-92:9
401-402; 602;
611

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 94

1  up."

2           Your response is, you know, "10:15 or

3  10:30?"

4           Same question:  Does that help refresh

5  your recollection if any such meeting occurred and the

6  contents of any such meeting?

7       A.   No, sir.

8       Q.   Okay.  Let's go to 813.

9           (Deposition Exhibit 813 was remotely

10  introduced.)

11      Q.   This -- again, the subject is still "RE:

12  Contingency Plans for DAPL Protests."  I'm just kind

13  of reading up.  There's a response to you, "10:30,"

14  and you respond and say, "Done."

15           And then Chris Myers weighs in.  And

16  this is a day later, so we're now to Friday,

17  February 17.  "Frankly" -- I'm just going to read the

18  second paragraph.  "Frankly, I think this meeting is

19  premature -- we have no idea whether Federal agents

20  will be deployed in large numbers nor can we predict

21  what criminal activity will occur and what will be

22  charged in Federal court."  Any recollection?

23      A.   No.  I'm sorry, that doesn't do -- do

24  anything to -- I mean, these -- obviously, these

25  conversations happened, but I don't recall whether it

94:9-95:3
401-402; 602;
611

Page 95

1  was, you know -- was it in -- in anticipation that the

2  Stafford Act might be deployed?  I don't -- I don't

3  remember.  I'm sorry.

4       Q.   Okay.  Got it.  All right.  And you

5  respond, but if you have no recollection of that top

6  email, we'll keep moving.

7           So let's go to Exhibit 814.  I'm sorry.

8  Did I say 814?  I might mean 813.  Did I skip one?

9  Yes, 813.

10           MR. DIAZ:  You did an 813.

11           MR. KERLIN:  Oh, I did?  Okay.

12           MR. DIAZ:  We did look at the very last

13  email of 813.

14           MR. KERLIN:  Okay.  All right.  I guess

15  I'm looking for -- okay.  Got it.  I see.  Yep.  Skip

16  those two.

17      Q.   (BY MR. KERLIN)  Mr. Orr, were you ever

18  responsible for regarding and protecting Magistrate

19  Judge Senechal?

20      A.   I'm sorry, I didn't hear the last name.

21      Q.   Sure.  Judge Senechal.

22      A.   Are you saying Alice Senechal?

23      Q.   Senechal, yes.

24      A.   Yes, generally, as part of our mission.

25  She was a magistrate judge.

Page 96

1       Q.   And then what about Judge Traynor?

2       A.   Judge Traynor came on toward the end of

3  my career.  I don't recall if he was on before this

4  incident -- by the time this incident concluded or

5  not.

6       Q.   Okay.  All right.  Let's -- let's look

7  at -- there's two -- two more exhibits, then I think

8  we're pretty much done here.  8- -- if we go to 814.

9           (Deposition Exhibit 814 was remotely

10  introduced.)

11      Q.   Okay.  The date of this -- it's a -- it

12  looks like a meeting invitation.  There's an email, I

13  think, on the bottom, and there's a meeting

14  invitation.  But if we get kind of the bottom part of

15  it, it's from you.

16           In the subject -- so a number of

17  individuals, both inside the U.S. Marshals Service and

18  also outside of it, including Major General Alan

19  Dohrmann.  I see Sheriff Laney is on it as well.

20           And the subject is "Red Fawn Fallis

21  Trial Prep (organizational meeting)."  Do you recall

22  organizing a meeting with respect to that trial?

23           MR. JAFEK:  And I would just interject.

24  I would object that it goes beyond the scope to the

25  extent that this is topic 20, because topic 20 was

Page 97

1  limited in the order on the motion for protective

2  order to August 2016 to March 2017.  But you can go

3  ahead and answer.

4           MR. KERLIN:  Yeah, agreed.

5       Q.   (BY MR. KERLIN)  In your personal

6  capacity, do you recall this?

7       A.   I don't -- sitting here today, I don't

8  specifically recall the meeting.  Obviously, this

9  email shows that I organized something.  I -- I assume

10  that I was doing this with the trial coming up.  I'm

11  sure it was probably planning for a potential protest

12  or arrests that could occur.  That's -- that's all I

13  could suggest for this.

14      Q.   Okay.  And if we go to the last sentence

15  of your email, you say, "You will recall Fallis faces

16  federal charges for allegedly possessing and firing a

17  handgun at law enforcement officers when she was

18  arrested during the Dakota Access Pipeline protests."

19  Do you remember that incident?

20      A.   Yes, I do.

21      Q.   Okay.  Fortunately, no law

22  enforcement -- there were no serious injuries or

23  deaths that occurred with respect to law enforcement

24  during the protest time period, right?

25      A.   No deaths that I'm aware of.  I don't

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 98

1  recall if there were any serious injuries to law
2  enforcement.  As I said, I wasn't directly involved in
3  the -- the activities that were happening right on the
4  line.  I don't recall any -- any intelligence
5  briefings that I might have received that officers
6  were injured.
7      Q.    Okay.  And then if we go to 815.
8            (Deposition Exhibit 815 was remotely
9  introduced.)
10     Q.    This is another meeting invitation, I
11 believe, and it has a larger distribution list, but it
12 includes quite a few -- quite a few folks on the same
13 topic matter, you know, the same -- it's the -- the
14 Red Fawn Fallis trial.  And the substance -- and so
15 this is November 28 of 2017, is the time that it's set
16 for.
17           Just to go through this, it says, "You
18 are invited to the second organizational meeting for
19 the purpose of preparing for the Red Fawn Fallis trial
20 scheduled on January 29, 2018, in Fargo.  The three
21 main areas of discussion will include:  Intelligence
22 gathering; Quentin N. Burdick Federal Courthouse
23 exterior security planning; Preparations for protests/
24 demonstrations at the courthouse and other areas in
25 Fargo, West Fargo, and Moorhead."

Page 99

1            Then you say, "Please notify me if you
2  have additional areas of concern you would like to add
3  to the agenda for discussions."
4            And then you mention that she discharged
5  a firearm; trial was moved from to Bis- -- from
6  Bismarck to Fargo after Chief Judge Hovland granted a
7  change-of-venue request; trial is expected to last two
8  weeks.  "The trial is also likely to bring protesters
9  and demonstrations that may impact your agency."
10           My question -- again, let me start with,
11 do you recall the second -- holding a second
12 organizational meeting in preparation for the trial of
13 this individual?
14           MR. JAFEK:  With respect to these
15 questions, I would make the same objection as I did
16 with respect to Exhibit 814 with respect to the time
17 frame.  But go ahead and answer.
18           MR. KERLIN:  Agreed.
19     Q.    (BY MR. KERLIN)  In your personal
20 capacity, Mr. Orr.
21     A.    Yeah.  Sitting here today, I don't
22 recall that meeting.  Obviously, it was organized by
23 me and set.  But I don't recall the meeting.
24     Q.    And just to look at some of the
25 individuals that are on this email, so we have BCI, so

Page 100

1  that's -- that's with North Dakota, Lonnie Grabowska.
2  And we have a number of the U.S. Marshals Service
3  emails that we see there.  Then there's DHS, Cass
4  County, so a number of Cass County individuals,
5  including Sheriff Laney.  There's another for Cass
6  County, Jesse Jahner, who -- I think he's the current
7  sheriff, but at the time I think he was a deputy.
8            Here's my ques- -- and there's also
9  mention of the Moorhead police.

100:10-101:10 401-402

10           Here's my question, but -- so there's an
11 issue that you see, as the U.S. Marshal, apparently,
12 that the trial is coming; it's a protester that's
13 going to get tried; there was already protests where
14 she was when this incident occurred; you're
15 anticipating additional protests, potentially.  And
16 you're including a number of law enforcement,
17 including State and local, to communicate about what
18 might happen and organize a response for that, right?
19     A.    Yes.  I think, you know, this type of a
20 trial would be what we would consider to be a
21 sensitive for our -- potentially a high-threat trial.
22 And so this would be normally, you know, what we would
23 do to prepare for those types of events:  Notify the
24 local law enforcement agencies of how something like
25 this may impact their -- their operations; you know,

Page 101

1  just general -- general planning for what could occur.
2  It's -- it's something that would be done for this
3  type of trial.
4      Q.    And is it in line with the kind of
5  collaborative effort that you talked about with
6  respect to North Dakota and Federal and State, between
7  Federal and State law enforcement?

101:4-10 611

8            MR. JAFEK:  Objection, vague and
9  ambiguous.  But you can answer.
10     A.    Yes.
11     Q.    (BY MR. KERLIN)  And so if -- if there
12 was -- if, for instance, the U.S. Marshals needed
13 additional support, whether it be for this particular
14 trial or another incident, would you reach out to, for
15 instance, the sheriff of Cass County and say, "Hey, I
16 need help"?
17           MR. JAFEK:  Objection, calls for
18 speculation.  But you can answer.
19     A.    I don't think it would be in that
20 respect.  I think this would be more in the -- on the
21 line of, like I said, how it may impact their
22 operations, traffic control, various things that could
23 affect their departments.
24           If we needed additional personnel or we
25 determined we would need that for our trial, that

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 102

1  request would go through our headquarters, and we
2  would ask for support from other districts.  We
3  wouldn't be asking the sheriff's office or the police
4  department to come and provide us, you know,
5  additional security inside of our building or that
6  type of thing.
7       Q.   (BY MR. KERLIN)  Unless you have
8  indicated or your counsel has indicated that you're
9  answering in your personal capacity, have you answered
10  questions during the course of your deposition today
11  as the representative on behalf of the United States
12  Marshals Service?
13       A.   Yes.
14            MR. JAFEK:  Could -- could I just pause
15  there?  I -- I have to think about whether that's an
16  objectionable question.  So if you would just give me
17  the question.
18            Court Reporter, could you please reread
19  that?
20            THE REPORTER:  It was pretty fast.
21            MR. KERLIN:  I can ask it again.
22            THE REPORTER:  Sure.
23       Q.   (BY MR. KERLIN)  Mr. Orr, unless you've
24  indicated or your counsel has indicated, have you
25  answered questions during the course of this

**102:7-13**
**701/702 calls**
**for legal concl.**

Page 103

1  deposition as the representative of the United States
2  Marshals Service?
3            MR. JAFEK:  And I would object to the
4  extent that that calls for a legal conclusion.  But
5  you can answer, Mr. Orr.
6       A.   Yes.
7       Q.   (BY MR. KERLIN)  And you, in fact, have
8  been designated, just to be clear, as the
9  representative on behalf of the United States for the
10  U.S. Marshals Service on the topics that we
11  specifically discussed -- just so that it's clear, and
12  because of your counsel's objections -- and you were
13  prepared, you believe, to answer questions on those
14  topics today?
15       A.   Yes.
16       Q.   Okay.  Is there anything that you want
17  to add to your testimony with respect to your answer
18  to any of the questions that I've had?
19       A.   No.
20       Q.   Anything further that you would like to
21  say regarding this matter, this incident, the DAPL
22  protests?
23       A.   No.
24       Q.   Okay.  Have I been respectful and
25  courteous to you today?

Page 104

1       A.   Yes, sir.
2            MR. KERLIN:  I sure appreciate your time
3  as well as your service as a U.S. Marshal.
4            With that, the plaintiff doesn't have
5  any further questions for Mr. Orr, and we pass the
6  witness to the United States for any questions they
7  might have.
8            MR. JAFEK:  Thank you very much.  What I
9  would like to do is take a -- take a brief break, so
10  if we could go off the record.
11            THE VIDEOGRAPHER:  Going off the record.
12  The time is 6:36 p.m. UTC, 11:36 a.m. Mountain.
13            (Recess taken 11:36 a.m. to 11:52 a.m.
14  Mountain Standard Time.)
15            THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 6:52 p.m. UTC, 11:52 a.m.
17  Mountain.
18                 EXAMINATION
19  BY MR. JAFEK:
20       Q.   So, Mr. Orr, I have a few areas of
21  inquiry.  The first one is, at the beginning of this
22  deposition, Mr. Kerlin asked you about steps you had
23  taken to prepare for the deposition, and you mentioned
24  one meeting that you had, one video meeting you had
25  with attorneys to prepare.

Page 105

1            How -- how many meetings did you have
2  with attorneys by/through video in preparation?
3       A.   There were three separate video
4  meetings.
5       Q.   Okay.  So let's just briefly talk about
6  each one.  The first one, when was that?
7       A.   October 26.
8       Q.   Okay.  How long did that last?
9       A.   Roughly two hours.
10       Q.   And who participated in that?
11       A.   Myself, Meredith Mills, you, and
12  Ms. Bobet, I think it is.
13       Q.   Uh-huh.  Okay.  The second one, when did
14  that happen?
15       A.   That was the next day, October 27.
16       Q.   About how long did that last?
17       A.   The same thing, roughly two hours.
18       Q.   And who participated in that?
19       A.   The same people.
20       Q.   And then the third one, when did that
21  happen?
22       A.   That one was November 28.
23       Q.   About how long did that last?
24       A.   Roughly two hours.
25       Q.   And who participated in that?

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 106

1       A.    Myself; Ms. Mills; you, Mr. Jafek; and
2   Mr. Scarpato.
3       Q.    Thank you.
4             Moving on to a different topic.  In
5   response to Mr. Kerlin's questions, you've -- you've
6   mentioned a number of the resources that the Marshals
7   Service did provide regarding the DAPL protests.  But
8   if you could please just, you know, list all of those
9   various resources that were provided.
10      A.    Well, as I discussed early on, myself
11  and Marshal Ward responded to the tactical operations
12  center to talk with the sheriff and -- and Sheriff
13  Laney and try to just figure out what support we could
14  provide.
15            And I detailed JSI Klug to be there at
16  the TOC for -- I think it was a period of about two
17  weeks, if I remember.
18            The Judicial Security Division deployed
19  two people:  One of them was from the Office of
20  Protective Intelligence and one from the Office of
21  Protective Operations.
22            And they were -- I remember at one time
23  they were in the TOC.  I don't know how many -- how
24  many days they may have been there, but as I recall,
25  they were there to interact with the intelligence

Page 107

1   people from the State and local side to, you know, try
2   to make sure they could all information-share as best
3   we could.  And that was, obviously, together:
4             Information intelligence for our missions, as well as
5   to see if there's anything we could share with them.
6             The Tactical Operations Division
7   deployed their incident management team to our office.
8   As I recall, I think they were there for about a week.
9             The incident management team is
10  basically a -- they're all trained in the National
11  Incident Management System, and they have the ability
12  to support the District so the District can continue
13  doing their own operations without having to take on
14  any additional load in something like this type of an
15  incident.  So they were there for a while.
16            Special Operations Group sent that small
17  survey group out that I discussed earlier.  They were
18  there for two days, I believe.
19            They -- they sent two armored SUVs, and
20  I don't recall if they brought them with them when
21  they first came or if they were sent after they had
22  returned home after their survey, but they were there
23  for a while.
24            Marshal Ward, as I mentioned earlier,
25  provided two of those armored SUVs to the Morton

Page 108

1   County Sheriff for a period of time.  I don't know how
2   long that was.
3             The Tactical Operations Division also
4   sent people from their Office of Strategic Technology
5   to make sure that our radio communications were up to
6   par so that we wouldn't have any difficulties if any
7   incidents happened.
8             I mentioned earlier, I think, Marshal
9   Ward provided support for the temporary flight
10  restriction that the State requested.
11            I mentioned that I had helped to get the
12  U.S. Customs and Border Protection connected with
13  Morton County.
14            I think I mentioned that JSI Klug helped
15  the deputies from Morton County learn how to do a
16  security survey for the sheriff's residence.
17            And all through this event, myself,
18  JSI Klug, and, I'm sure, the Marshal monitored daily
19  intelligence reports.  You know, just about every day
20  I was reviewing those and reading through those.
21  Those were provided by the North Dakota State and
22  local intelligence center.
23            And then after -- toward the end of the
24  event, the Red Fawn Fallis trial you mentioned, so
25  that was one example of a person who was arrested as a

Page 109

1   result of these protests and charged with federal
2   crimes.
3             So when people were arrested from the
4   event and charge with federal crimes, there were
5   several of them that were turned over to our custody
6   to maintain them in custody until the completion of
7   their cases.
8             Additional security measures, we talked
9   about.  We just did some things to enhance the
10  security of our judges.
11            That -- that's, I think, all I can think
12  of right now.
13      Q.    Okay.  So one last area of inquiry, and
14  this is going to go back to that exhibit --
15      A.    Or forgive me.  I'm sorry.  I'm sorry.
16  There's one more thing I thought of.  I don't remember
17  if it was right after the protests at our courthouse.
18  I think it was.  I remember we had a meeting with the
19  Federal Protective Service.  Their director, I think
20  it was, came to Bismarck, and I'm sure Marshal Ward
21  and myself met with that person.
22            And I think at that time, we were
23  requesting that they deploy additional personnel to
24  our courthouse.
25            They're responsible for the exterior

Daniel R. Orr  30(b)(6)
November 30, 2022

Page 110

```
1   security of the building, and, like I say, I can't
2   remember if it happened right after the protests or
3   not, but I'm guessing that's probably when that
4   happened.  In response to the protests, we were asking
5   them to provide extra people so State and local
6   officers wouldn't be called on to assist in those
7   cases if -- if we could avoid it.
8         Q.  Okay.  So one last area of inquiry.  And
9   this relates to that exhibit that you saw,
10  Exhibit 332, if you recall the exchange between
11  Marshal Ward and Mr. Snelson about -- about SOG
12  resources?
13        A.  Yes.
14        Q.  Other than the request for SOG personnel
15  reflected in Exhibit 332, did the Marshals Service
16  make any other requests for Marshals Service personnel
17  to be deployed in the area of the protest camps?
18        A.  No, not that I can recall.
19        MR. JAFEK:  Thank you.  No further
20  questions.
21                    EXAMINATION
22  BY MR. KERLIN:
23        Q.  I just wanted -- I think I only have one
24  question.  But just to clarify, when you mentioned the
25  incident management team and the SOG that was deployed
```

110:8-20 106 completeness if testimony about Ex. 322 is admitted over objection

Page 111

```
1   for two days, as well as the -- the TOD Office of
2   Strategic Technology, those were all resources that
3   were deployed specifically to evaluate and protect
4   federal courthouses, right?
5         A.  They were deployed for -- yes, to -- I
6   guess to specifically -- it was not just for the
7   courthouse, but just in general our -- our missions,
8   protecting the judges, protecting the courthouses.
9   Not -- they weren't deployed -- with the exception of
10  the four or five things I mentioned he assisted the
11  sheriff with, those -- those other resources were
12  deployed to assist our missions.
13        MR. KERLIN:  Okay.  No further
14  questions.
15        MR. JAFEK:  I have no further questions.
16        THE VIDEOGRAPHER:  This concludes
17  today's deposition.  The time is 7:02 p.m. UTC,
18  12:02 p.m. Mountain.  We are off the record.
19        (At 12:02 p.m. Mountain Standard Time
20  the proceedings were not being videotaped.)
21        THE VIDEOGRAPHER:  Mr. Jafek, are you
22  going to want a copy of this video?
23        MR. JAFEK:  Yes.  Just the regular
24  orders we've been doing.
25        THE VIDEOGRAPHER:  Would you mind just
```

Page 112

```
1   putting your email address in the chat for me?
2         MR. JAFEK:  Sure.
3         THE VIDEOGRAPHER:  Thanks.
4         MR. JAFEK:  So, Mr. Orr, I think we're
5   done with you unless the court reporter has some
6   spelling questions.
7         THE REPORTER:  I just wanted to get
8   orders on the record.  Paul, were you ordering the
9   transcript?
10        MR. KERLIN:  Yes.  We'll take our usual
11  order.
12        THE REPORTER:  And is there any hurry on
13  the final?
14        MR. KERLIN:  No.
15        THE REPORTER:  And, Tim, were you
16  ordering a copy?
17        MR. JAFEK:  Yes.  Our usual order.
18        THE REPORTER:  And were you handling
19  signature, reading and signing by the witness?
20        MR. JAFEK:  Yes.  And just to clarify,
21  the usual order is the transcript and the marked
22  exhibits.
23        THE REPORTER:  Okay.
24        WHEREUPON, the within proceedings were
25  concluded at the approximate hour of 12:04 p.m.
```

Page 113

```
1   Mountain Standard Time on the 30th day of November,
2   2022.
3              *     *     *     *     *
4
5
...
```

Page 114

1        I, DANIEL R. ORR, do hereby certify that

2   I have read the above and foregoing deposition and

3   that the same is a true and accurate transcription of

4   my testimony, except for attached amendments, if any.

5        Amendments attached   (  ) Yes   (  ) No

6

7

8        _____

9        DANIEL R. ORR

10

11       The signature above of DANIEL R. ORR was

12   subscribed and sworn or affirmed to before me in the

13   county of _____, state of

14   _____, this _____ day of

15   _____, 2022.

16

17

18       _____

19       Notary Public

20       My Commission expires:

21

22

23

24

25   State of North Dakota 11/30/22 (tcm)

Page 115

1        REPORTER'S CERTIFICATE

2   STATE OF COLORADO      )

                           )  ss.

3   CITY AND COUNTY OF DENVER )

4

5        I, TRACY C. MASUGA, Registered
    Professional Reporter and Certified Realtime Reporter,
    do hereby certify that previous to the commencement of

6   the examination, the said DANIEL R. ORR was duly sworn
    or affirmed by me to testify to the truth in relation

7   to the matters in controversy between the parties
    hereto; that the said deposition was taken in machine

8   shorthand by me at the time and place aforesaid and
    was thereafter reduced to typewritten form; that the

9   foregoing is a true transcript of the questions asked,
    testimony given, and proceedings had.

10

11       I further certify that I am not employed
    by, related to, nor of counsel for any of the parties
    herein, nor otherwise interested in the outcome of

12   this litigation.

13       IN WITNESS WHEREOF, I have affixed my
    signature this 14th day of December, 2022.

14

15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20       _____

21       Tracy C. Masuga
         Registered Professional Reporter

22       Certified Realtime Reporter

23

24

25

Page 116

1   Errata Sheet

2

3   NAME OF CASE: Plaintiff vs UNITED STATES

4   DATE OF DEPOSITION: 11/30/2022

5   NAME OF WITNESS: Daniel R. Orr

6   Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25       _____