IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 19-cv-150-DMT-ARS
_____

RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
DOUGLAS W. WALKER - DEPARTMENT OF HOMELAND SECURITY,
CUSTOMS AND BORDER PROTECTION
November 29, 2022
Via RemoteDepoTM
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

_____


PURSUANT TO NOTICE AND AGREEMENT, the
Rule 30(b)(6) videotaped deposition of DOUGLAS W.
WALKER, DEPARTMENT OF HOMELAND SECURITY, CUSTOMS AND
BORDER PROTECTION, was taken on behalf of the
Plaintiff in Cascade County, Montana, by remote means,
on November 29, 2022, at 9:00 a.m. Mountain Standard
Time, before Tracy C. Masuga, Registered Professional
Reporter and Certified Realtime Reporter, appearing
remotely from Denver County, Colorado.

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 2

```
 1              REMOTE APPEARANCES
 2   For the Plaintiff:
 3              PAUL M. SEBY, ESQ.
                Greenberg Traurig LLP
 4              1144 15th Street
                Suite 3300
 5              Denver, Colorado 80202
                sebyp@gtlaw.com
 6
                PAUL B. KERLIN, ESQ.
 7              Greenberg Traurig LLP
                1000 Louisiana Street
 8              Suite 6700
                Houston, Texas 77002
 9              kerlinp@gtlaw.com
10
     For the Defendant:
11
                JANE E. BOBET, ESQ.
12              TIMOTHY B. JAFEK, ESQ.
                VICTOR WILLIAM SCARPATO III, ESQ.
13              Department of Justice
                U.S. Attorney's Office
14              District of Colorado
                1800 California Street
15              Suite 1600
                Denver, Colorado 80202
16              jane.bobet@usdoj.gov
                timothy.jafek@usdoj.gov
17              victor.scarpato@usdoj.gov
18              FRANK P. ALBI, ESQ.
                U.S. Customs and Border Protection
19              Office of Associate Chief Counsel
                Chicago, Illinois 60607
20
                DAVID DUBAY, ESQ.
21              Department of Homeland Security
22              HANNAH JONES, ESQ.
                U.S. Department of Homeland Security
23              Office of General Counsel
                Washington, D.C. 20528
24
25
```

Page 3

```
 1   Also Present:
 2              Michael Banks, Videographer
                Jose Diaz
 3              Corin Stigall
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   I N D E X
 2   EXAMINATION OF DOUGLAS W. WALKER:          PAGE
     November 29, 2022
 3
     By Mr. Seby                             7, 164
 4
     By Ms. Bobet                               152
 5
                                             INITIAL
 6   DEPOSITION EXHIBITS:                  REFERENCE
 7   (Exhibits provided electronically to the reporter.)
 8   Exhibit 803  Second Amended Notice of 30(b)(6)    11
                  Deposition of The United States of
 9                America, 11/23/22; with
                  attachments
10
     Exhibit 804  Email to Walker from Woodall,       104
11                1/31/17, Subject:  RE:  Customs
                  and Border Protection Air and
12                Marine Operations Aviation
                  Support; with attached emails;
13                ND_000111563 - ND_000111564
14   Exhibit 805  Email to Woodall from Walker,       111
                  2/1/17, Subject:  RE:  Customs and
15                Border Protection Air and Marine
                  Operations Aviation Support; with
16                attached emails; ND_000111606 -
                  ND_000111608
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              WHEREUPON, the following proceedings
 2   were taken pursuant to the Federal Rules of Civil
 3   Procedure.
 4            *      *      *      *      *
 5              (Deposition Exhibits 803 through 805
 6   were introduced by Mr. Seby and electronically
 7   provided to the court reporter for marking.)
 8              THE VIDEOGRAPHER:  We are now on the
 9   record.  Participants should be aware that this
10   proceeding is being recorded and, as such, all
11   conversations held will be recorded unless there is an
12   request and agreement to go off the record.
13              Private conversations and other
14   attorney-client interactions should be held outside
15   the presence of the remote interface.
16              This is the remote video-recorded
17   deposition of Douglas Walker.  Today is Tuesday,
18   November 29, 2022.  The time is now 4:00 p.m. UTC,
19   9:00 a.m. Mountain.  We are here in the matter of
20   State of North Dakota v. The United States of America.
21              My name is Michael Banks, remote video
22   technician on behalf of U.S. Legal Support.  I'm not
23   related to any party in this action, nor am I
24   financially interested in the outcome.
25              At this time will the reporter, Tracy
```

Douglas W. Walker  30(b)(6)
November 29, 2022

**Page 6**

1  Masuga on behalf of U.S. Legal Support, please enter
2  the statement for remote proceedings into the record.
3           THE REPORTER:  The attorneys
4  participating in this deposition acknowledge that I am
5  not physically present in the room and that I will be
6  reporting this proceeding remotely.
7           They further acknowledge that in lieu of
8  an oath administered in person, the witness will
9  verbally declare his testimony in this matter is under
10  penalty of perjury.
11           Counsel, please indicate your agreement
12  by stating your name and your agreement on the record.
13           MR. SEBY:  This is Paul Seby, counsel
14  for the plaintiff, State of North Dakota.  We
15  understand and consent.
16           MS. BOBET:  And this is Jane Bobet,
17  counsel for the defendant, The United States of
18  America, and we agree.
19           THE REPORTER:  Mr. Walker, do you
20  solemnly state that the testimony you are about to
21  give in the cause now pending will be the truth, the
22  whole truth, and nothing but the truth?
23           THE DEPONENT:  I do.
24
25

**Page 7**

1           DOUGLAS W. WALKER,
2  having been first duly sworn to state the whole truth,
3  testified as follows:
4           EXAMINATION
5  BY MR. SEBY:
6       Q.   Good morning, Mr. Walker.
7       A.   Good morning.
8       Q.   This will be the deposition of Douglas
9  Walker taken pursuant to prior notice and arraign- --
10  or agreement of counsel.
11           My name, sir, is Paul Seby.  I'm both an
12  attorney with the law firm of Greenberg Traurig and
13  the Special Assistant Attorney General for the State
14  of North Dakota; and together with my cocounsel and
15  colleague, Paul Kerlin, we represent the State of
16  North Dakota in this matter.
17           And today we'll refer -- I'll refer to
18  my client as -- collectively as "North Dakota" or "the
19  State."
20           Do you understand that you've been sworn
21  in this morning?
22       A.   Yes.
23       Q.   Please state your full name for the
24  record, sir.
25       A.   It is Douglas William Walker.

**Object to all testimony as to hearsay, 802**

**Page 8**

1       Q.   And where are you located this morning,
2  sir?
3       A.   In my office in Great Falls, Montana.
4       Q.   Is that your regular place of -- of --
5  is that your regular office?
6       A.   That is correct, yes.
7       Q.   Okay.  What is the name of that office
8  jurisdictionallywise for the Customs and Border
9  Patrol?  Is that a regional office of any kind?
10       A.   We refer to it as the Montana Air Unit,
11  which is part of the Bellingham Air and Marine Branch.
12       Q.   And what is your title, sir?
13       A.   I am a supervisory air interdiction
14  agent.
15       Q.   With the United States Customs and
16  Border Patrol?
17       A.   With U.S. Customs and Border Protection
18  Air and Marine Operations.
19       Q.   Got it.  Okay.  And as part of which
20  federal agency?
21       A.   Department of Homeland Security.
22       Q.   Okay.  Thank you.
23           Before we begin this morning, let's go
24  over a few ground rules, most of which are just
25  intended to help the deposition for recording

**Page 9**

1  purposes, the court reporter and the videographer, be
2  able to accurately reflect what we're talking about.
3           And, obviously, everything we are
4  talking about is being written down and videotaped,
5  and because of that, I would like to ask you to please
6  verbalize your responses with a "yes" or a "no" or
7  other manner of answer as opposed to just simply
8  nodding your head "yes" or "no" and -- and/or
9  providing quasi-verbal responses like "uh-oh" or
10  "uh-huh," if that's acceptable.  Is that --
11       A.   I will do my best.
12       Q.   Okay.  Thanks.
13       A.   Yes.
14       Q.   Likewise, it's difficult for the court
15  reporter to take down what we're saying if we
16  inadvertently happen to talk over each other, so I'll
17  do my best not to interrupt you if you would please do
18  the same and let me finish my questions and then
19  provide your response, if that works.
20       A.   That works.
21       Q.   Okay.  If you need a break -- break,
22  sir, at all, just let me know, and I just ask if
23  there's a question that's pending, you please answer
24  it and then we can take a break.  Otherwise, we can
25  shoot for a break every hour or so, but don't hesitate

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 10

1  to say otherwise.
2          And if you don't understand a question
3  that I've asked, just let me know, and I'll repeat it
4  or rephrase it, and I'll do my best to clarify what
5  I'm trying to ask you about, okay?
6      A.  Sounds good.
7      Q.  And if you answer a question I've asked,
8  I'm going to assume that you have understood the
9  question I'm asking; is that understood?
10     A.  Understood.
11     Q.  Okay.  Do you have any questions about
12 the proceeding at all, formatwise or processwise, that
13 we can speak to now before we start?
14     A.  I don't have any questions at this time.
15     Q.  Okay.  Sir, you've been designated by
16 counsel for the United States to speak to 30(b)(6)
17 topics posed by the State of North Dakota, and
18 specifically those are 6, 9, 13 through 16, 18, and
19 20, as they relate to the Customs and Border
20 Protection Department of Homeland Security.  Do you
21 understand that?
22     A.  Yes, I do.
23         MR. SEBY:  Okay.  And, Jose, would you
24 please put up the Second Amended Notice of 30(b)(6)
25 Depositions of the United States of America, State of

Page 11

1  North Dakota document, and we'll make that an exhibit.
2         (Deposition Exhibit 803 was remotely
3  introduced.)
4         MR. SEBY:  All right.  If you could go
5  to the -- to the first page of this document, Jose,
6  before we talk about the Exhibit A to it.  There you
7  go.
8      Q.  (BY MR. SEBY)  Mr. Walker, I just want
9  to make sure that you have this deposition notice,
10 which was served on your counsel last week, before the
11 holiday, on November 23.  Would you look this over and
12 let me know if this is the exact document that you've
13 been provided a copy by your counsel.
14     A.  I will, yes.
15     Q.  Okay.  While you're doing that, I'll ask
16 that this be marked as an exhibit.
17         MR. SEBY:  Jose, what -- what exhibit
18 number will this be?
19         MR. DIAZ:  803, eight hundred and three.
20         MR. SEBY:  Okay.  Thank you.
21         MR. DIAZ:  You're welcome.
22     A.  Could I get the next page, please.
23     Q.  (BY MR. SEBY)  Okay.
24     A.  Okay.
25     Q.  Does this look familiar to you at all?

Page 12

1      A.  Yes, sir.
2      Q.  Okay.  And so you've had this deposition
3  notice and designation of topics for several days, and
4  you're aware of this, right?
5      A.  Yes, sir.
6      Q.  Okay.  Have you made yourself familiar
7  with the topics for which you've been designated?
8      A.  I have.
9      Q.  Can you tell me about the process and
10 how you did that.
11     A.  We've had multiple meetings with counsel
12 back in early November.  Talked with the CBP attorney
13 Frank Albi for -- with the videoconference on these
14 topics of the proceedings that were going to happen.
15         Then the 9th of November, another
16 meeting where I met with DHS and CBP counsel, and Ryan
17 Wentz from the DHS, intelligence officer, and also had
18 that with Frank Albi, Michelle Tonelli, Eugene Mok,
19 and Norman Lieberman.  That was via telephone for
20 about an hour.
21         On the 15th, I also met with the U.S.
22 Attorney's Office, DHS and CBP counsel, Ms. Jane
23 Bobet, Bill Scarpato, Timothy Jafek, Frank Albi,
24 Michelle Tonelli, for another hour and 20 minutes.
25         And then yesterday, 11/28, another

Page 13

1  meeting with the DHS, CBP counsel, and members from
2  the U.S. Border Patrol Grand Forks Sector.
3      Q.  Okay.  So you -- altogether, how much
4  time would you say you spent preparing for the
5  deposition?
6      A.  Approximately six hours.
7      Q.  Okay.  And was it all -- all spent
8  speaking with the various counsel that you mentioned?
9      A.  That is correct.
10     Q.  Okay.  How about nonattorneys and -- and
11 program officials in the Custom and Border Protection?
12     A.  Could you repeat that?  It blurred out
13 there.
14     Q.  Sure.  And there seems to be a -- just
15 to make an observation for the record, there is a
16 significant delay between when you are verbalizing a
17 response and your physical reaction on the video.
18     A.  Understood.
19     Q.  I was asking you, when you were -- this
20 six hours of preparation, was that all spent with
21 attorneys?
22     A.  That was with attorneys and members from
23 U.S. Border Patrol and a DHS Intelligence Officer.
24     Q.  Okay.  And would you identify again,
25 please, just so I'm clear, the nonattorneys from those

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 14

1  agencies that you met with.
2      A.  Ryan Wentz from DHS.  He's an
3  intelligence officer in Bismarck.
4      Q.  Okay.
5      A.  And then we met with U.S. Border Patrol
6  agents Adam Wright from the Grand Forks Sector.  And
7  Border Patrol agents James Malone, which is the
8  deputy -- one of the deputies at the Grand Forks
9  Sector, and Derrick Stamper, who's a division chief at
10  the Grand Forks Sector Border Patrol station.
11      Q.  Okay.  And who selected those
12  individuals for you to speak to?
13      A.  That would be counsel.
14      Q.  Okay.  Had you spoken to those people
15  ever before?
16      A.  I have spoken with Malone and Derrick
17  Stamper and Mr. Wright back when I was stationed in
18  Grand Forks.
19      Q.  Okay.  Were they colleagues of yours
20  that you worked with closely?
21      A.  They were part -- part of the U.S.
22  Border Patrol Grand Forks Sector, and we were in the
23  same -- we supported their area of responsibility.  So
24  being on the staff that they were, that I had direct
25  contact with them in -- in weekly meetings.

Page 15

1      Q.  Okay.  Were they colleagues of yours
2  during the period of 2016 and 2017, or did they join
3  that unit after that period of time?
4      A.  I believe Mr. Wright and Mr. Malone were
5  part of the Grand Forks Sector during that time period
6  and were colleagues of mine.
7      Q.  Okay.  Okay.  Can you walk me through
8  chronologically how you prepared for the deposition?
9  What did you do to prepare for the topics that you
10  were told would be the subject of the deposition
11  today?
12      A.  Okay.
13      Q.  What did you -- let's start with --
14  I'll -- I'm sorry to interrupt you.  Let me just
15  elaborate on my question so it's -- it's clearer.
16          What did you -- what did you review in
17  advance of telephone calls and discussions?  Excuse
18  me.
19      A.  I'm not sure the exact date, but about a
20  year and a half ago I received notice to find
21  documents relating to this -- this case from CBP
22  counsel of the -- of this trial that may happen.
23          So at that point I was going through
24  what documents I could find and locate that involved
25  Customs and Border Protection Air and Marine

Page 16

1  Operations and the DAPL protest, to make sure that
2  those were saved and to be provided, to share, if
3  necessary.
4          And then back in --
5      Q.  That was -- that was a year and a half
6  ago?
7      A.  Approximately, that I remember.
8      Q.  Okay.  And the documents, did you
9  retrieve any that -- that were responsive to that
10  request?
11      A.  Yes.
12      Q.  And what did you do with those?
13      A.  Those were saved and shared with
14  counsel.
15      Q.  Which counsel?
16      A.  The CBP -- CBP attorney and
17  U.S. Attorney's Office.
18      Q.  Okay.  Which CBP attorney did you
19  provide those to?
20      A.  That would be Mr. Frank Albi.
21      Q.  And how do you spell that gentleman's
22  name, A-l-b-e or A-l-v-e?
23      A.  It is A-l-b-i.
24      Q.  Got it.  Okay.  And where is Mr. Albi
25  located?

Page 17

1      A.  I believe Mr. Albi's office is in
2  Chicago.
3      Q.  Okay.  And he's agency counsel for the
4  Customs and Border Protection?
5      A.  That is correct.
6      Q.  I see.  Okay.  All right.  And then you
7  provided them to the U.S. Attorneys you mentioned.
8  What -- who were those individuals?
9      A.  Specifically, my counsel Jane Bobet.
10      Q.  Okay.  Okay.  Did you have conversations
11  over those documents at all, or just -- just forward
12  them?
13      A.  We had conversations back in early
14  November with Mr. Albi.
15      Q.  Okay.  Early November of this year, just
16  this month, right, earlier this --
17      A.  Correct, November of 2022.
18      Q.  Okay.  And were those conversations
19  limited to the documents that you found and provided
20  to them approximately a year and a half ago, as you've
21  testified?
22      A.  Yes.
23      Q.  Okay.  Did you look at any other
24  documents as part of your preparation, other than the
25  ones that you retrieved and forwarded a year and a

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 18

1  half ago?
2      A.   Yes.  The background material binder
3  that was provided by the U.S. Attorney's Office,
4  and --
5      Q.   And when did you receive that binder?
6      A.   I received the binder on 7
7  November 2022.
8      Q.   Okay.  What materials are in the binder?
9      A.   My understanding is the information
10 provided by the State of North Dakota.
11     Q.   Okay.  You were -- you were glancing at
12 something.  Is there a -- is there a binder in front
13 of you?
14     A.   It's the binder -- yeah, correct, it's
15 the binder that's on my desk.
16     Q.   Okay.  Could you hold that up so we
17 could see that, please, sir?
18     A.   (Deponent complied.)
19          MS. BOBET:  And while he's doing that,
20 Paul, I'll represent this is the general case
21 preparation binder that we have provided to other
22 30(b)(6) witnesses and which the State have already.
23     Q.   (BY MR. SEBY)  Okay.  Mr. Walker, I
24 couldn't see the document label on the binder.  You
25 held it up and it was blurry.  If you just kind of

Page 19

1  keep it on the screen so I can see it.
2      A.   (Deponent complied.)
3      Q.   Okay.  There I go.  General 30(b)(6)
4  prep material.
5          MR. SEBY:  And, Jane, you're saying that
6  that's the exact same document and compilation of
7  documents that you have provided to us previously?
8          MS. BOBET:  Correct, yeah.  This is the
9  binder of documents that I believe we provided to you
10 after the first of these 30(b)(6) deps at your
11 request.
12         MR. SEBY:  Right.  And there are no
13 differences, without exception, to that earlier
14 document that you provided to us?
15         MS. BOBET:  There may be a difference in
16 font on the title sheet, but no substantive
17 differences.
18         MR. SEBY:  Okay.  So the contents of
19 Mr. Walker's binder are the exact same that you
20 provided to us previously?
21         MS. BOBET:  Correct.  The substance of
22 the binder is the same as the general prep binder that
23 we've provided to you previously.
24         MR. SEBY:  Okay.  Thank you.
25     Q.   (BY MR. SEBY)  And with respect to that

Page 20

1  binder, Mr. Walker, you then spoke with U.S. Attorney
2  counsel concerning the contents of that?
3      A.   That is correct.
4      Q.   And when did you do -- when did you
5  first begin that discussion on that binder?
6      A.   That meeting was the November 15, 2022.
7      Q.   Okay.  So between when you were provided
8  the binder on November 7 and you discussed it with
9  your counsel on November 15, had you completely gone
10 through and read the contents of the binder?
11     A.   To the best of my ability, yes.
12     Q.   And did your ability allow you to read
13 the entire binder?
14     A.   I reviewed the -- the binder and the
15 items that counsel said pertained to what I needed to
16 be familiar with.
17     Q.   Okay.  When did your counsel tell you
18 which specific contents of the binder should -- should
19 get the priority of your attention?
20     A.   That was within email traffic that the
21 binder was being sent to me and what pieces of
22 information to review.
23     Q.   Was that on November 7 also?
24     A.   I don't remember the exact date I
25 received the email.

Page 21

1      Q.   Okay.  Was it the email that transmitted
2  the contents of the binder electronically that you
3  then printed, or were you sent a hard copy of the
4  binder?
5      A.   It was a physical hard copy of the
6  binder.
7      Q.   Okay.  And you received -- that's the
8  one you received on November 7?
9      A.   That is correct.
10     Q.   Which areas were you asked to focus on?
11     A.   Off the top of my head, I don't
12 remember.
13     Q.   Okay.  And then when you spoke with the
14 individuals from the Grand Forks Sector, Mr. Wright
15 and Mr. Malone and Mr. Stamper, were those always with
16 counsel present?
17     A.   That is correct.
18     Q.   Okay.  And did you -- what did you
19 discuss with them?
20     A.   The discussion was to make sure I
21 understood what their involvement was during the --
22 the DAPL protest.
23     Q.   Okay.  And did -- did you learn anything
24 that you didn't previously know as a result of those
25 discussions?

Douglas W. Walker  30(b)(6)
November 29, 2022

**Page 22**

1   A.  Well, one thing that I found out, that
2   Mr. Wright was actually involved as -- in response
3   during part of the protest in their -- in the Border
4   Patrol's participation; that I did not know that
5   before.
6       Q.  Would you elaborate on what you mean by
7   that?  I want to make sure I understand what -- what
8   you're speaking about.
9       A.  So my -- U.S. Border Patrol provided
10  agents and officers to the DAPL protest on request of
11  the State.  Mr. Wright was physically present and
12  participated in -- in one of the rotations down to the
13  protest location, and that's -- I had -- I did not
14  have that direct information before.
15      Q.  Okay.  And when -- when was he involved
16  in that manner, himself?  When did you learn that?
17      A.  So I learned, as of yesterday, that he
18  was part of that, and that was during the
19  October through November participation that they were
20  present in of 2016.
21      Q.  Yeah.  Okay.  Okay.  I'm going to ask
22  you about that in a little bit.  Thank you.
23          All right.  Did you speak with anyone
24  outside of the Customs and Border Patrol or Border
25  Protection to prepare for your deposition today?

**Page 23**

1       A.  No.
2       Q.  Okay.  Okay.  So today you understand
3   you're testifying in your capacity as a 30(b)(6)
4   representative of the Department of Homeland Security;
5   do you understand that?
6       A.  Yes, sir.
7       Q.  Okay.  And you understand that that
8   means that the answers you provide are provided on
9   behalf of the United States and specifically the
10  United States Customs and Border Protection,
11  United States Department of Homeland Security, as a
12  whole?
13      A.  Yes.
14      Q.  Okay.  And if you are at any time not
15  answering as a representative of those agencies and
16  you are talking in your personal capacity only, please
17  let me know when -- when you might happen to do that,
18  when you switch.
19      A.  Understood.
20      Q.  Otherwise, I'm going to assume that you
21  are testifying in your official capacity on behalf of
22  those agencies.  Correct?
23      A.  Correct.
24      Q.  Mr. Walker, let's start -- and these --
25  these are -- these questions are specific to some

**Page 24**

1   topics, several, as a matter of fact, but I'm going to
2   ask you some general questions.
3           But what was your role with respect to
4   the protests against the Dakota Access Pipeline
5   construction in 2016 and '17?
6       A.  Could you repeat the question, please.
7       Q.  Can you give me an understanding of your
8   role with respect to the protests against the Dakota
9   Access Pipeline in North Dakota in 2016 through '17?
10      A.  So my personal role in the protests in
11  2016 and '17 was I was a supervisory air interdiction
12  agent for the National Air Security Operations Center
13  in Grand Forks, which is part of Air and Marine
14  Operations.
15          I was a command duty officer, which was
16  in charge of the day-to-day flights of the MQ-9,
17  unmanned-aircraft system, the UAS, and also our
18  fixed-wing and rotary-wing aviation assets.
19          I was also a sensor operator for the
20  MQ-9 UAS system, and I was also a pilot in command of
21  our AS350 AStar helicopter.
22      Q.  Okay.  So with respect to those, the
23  various pieces of aerial technology, let's start with
24  the -- what is an MQ-9 UAS?  What does that mean?
25      A.  So an MQ-9 UAS, unmanned-aircraft

24:22-
25:9;
25:21-
26:3;
26:17-
20;
30:18-
31:8
401-402

**Page 2**

1   system, is a large, fixed-wing, ground-based, launched
2   aircraft.  It weighs approximately 10,000 pounds.  We
3   fly that -- that aircraft is flown at altitudes in
4   what we call the civilian FAA Class Alpha, or Class A,
5   altitude, so it's operated above 18,000 feet.  It
6   requires a crew of two, a pilot and a sensor operator.
7   And it can remain aloft for approximately 18 hours.
8       Q.  Is that otherwise known as a drone?
9       A.  That is correct.
10      Q.  Okay.  And it's a very large drone at
11  that, isn't it?
12      A.  Yes, it is.
13      Q.  I've heard the phrase "Predator drone."
14  Is that an accurate -- another accurate descriptor of
15  that aerial technology?
16      A.  Yes, that's correct.  It's a military
17  carryover.
18      Q.  Is "Predator drone" accurate to use to
19  describe that?
20      A.  Yes, sir.
21      Q.  Okay.  And the particular one that you
22  were operating, you operate that -- since it's an
23  unmanned vehicle, you operate that from a computer
24  screen and command devices and whatnot in Grand Forks?
25      A.  That is correct.  The --

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 26

1    Q.   That was at the time of the protest when
2  you were doing that?
3    A.   That is correct.
4    Q.   Okay.
5    A.   The UAS is operated from a ground-
6  control station.  Basically, it looks like a shipping
7  container that houses all the computer equipment
8  necessary to operate it.
9         It requires a ground-based data link
10  antenna to get it launched and recovered locally, and
11  then uses a satellite link once it goes beyond line of
12  sight, which is approximately 80 to 100 miles.  Once
13  it's past that, then it uses a satellite link.  So as
14  long as the ground-control station satellite dish can
15  talk to the satellite orbiting, that could talk to the
16  airplane, the aircraft could be operated.
17    Q.   Okay.  Who actually owns the drone?  Is
18  that Customs and Border Patrol?
19    A.   Customs and Border Protection Air and
20  Marine Operations, correct.
21    Q.   And how long had you been operating that
22  vehicle -- that device prior to the start of the DAPL
23  protests?
24    A.   Personally, I was operating it since
25  2014, and continued to operate it up until my transfer

Page 27

1  to the Montana Air Unit.  Customs and Border
2  Protection Air and Marine Operations began operating
3  that platform in 2009.
4    Q.   Okay.  And what sort of training did you
5  receive to be an operator of that device?
6    A.   So the operations center in Grand Forks,
7  NASOC Grand Forks, is the training site for Air and
8  Marine Operations for all MQ-9 operators, both pilots
9  and sensor operators.  So I underwent the -- the
10  approved training syllabus to become a sensor
11  operator.
12         I also went through the syllabus to
13  become a mission control element pilot, which is the
14  part where you fly it once it's at altitude, and then
15  eventually we do a launch and recovery element
16  training syllabus so you can actually take off and
17  land the -- the -- UAS.
18    Q.   Okay.  And who are the instructors for
19  the Customs and Border Protection unit in Grand Forks
20  that run that training operations?  Are those all
21  officials, people within the agency, or are they --
22  are they from other federal agencies?
23    A.   The instructor staff at the NASOC
24  Grand Forks is a combination of General Atomics,
25  instructor pilot contractors and sensor operator

Page 28

1  instructor contractors, and then we also have
2  instructor pilots at Air and Marine, air interdiction
3  agents that are instructor pilots and sensor operator
4  instructors, respectively.
5    Q.   Uh-huh.
6    A.   So it's a mix.
7    Q.   And is General -- General Atomics the
8  manufacturer of the device?
9    A.   That is correct.
10    Q.   Okay.  Physically, what does one of
11  these devices look like?  I know you said it's
12  approximately 10,000 pounds.  Is it -- what would you
13  physically compare it to?  A car?  Larger?
14    A.   It would be comparable to a medium-sized
15  truck, not quite a semi.  It stands -- it's got a
16  60-foot wingspan, and it stands approximately 8 feet
17  tall, 15 feet at the tip of the tails.
18    Q.   Uh-huh.  Okay.  Is it -- is that the
19  largest UAS that's in the fleet of the Customs and
20  Border Protection?
21    A.   That is correct.  That is correct.
22    Q.   Okay.  How many of them does the agency
23  have in Grand Forks?
24    A.   I believe currently they have two, and
25  we had two during the time period between 2016 and

Page 29

1  2017.
2    Q.   Okay.  Why are they there in
3  Grand Forks?  Is there a specific reason that the unit
4  is stationed there?
5    A.   One of the main reasons is because of
6  the Air Force base and the ability to access the
7  National Airspace System easily.  The original standup
8  was kind of a Senate-and-Congressional-based push.
9  And back then -- currently, you know, Senator -- now
10  Senator Hoeven, back then, in the day, it was
11  Governor Hoeven, supported the expansion of the UAS
12  system to there.
13    Q.   Does it also happen to be that --
14  because the base is close to the international border
15  with Canada?
16    A.   That is one of the primary locations,
17  yes.
18    Q.   Okay.  And so what's the mission of
19  the -- of the unit there in Grand Forks?  Is it -- is
20  it -- what part of the mission is dedicated to
21  monitoring the security of the United States border
22  with Canada?
23    A.   That is the primary mission of NASOC
24  Grand Forks, and with a secondary mission of being the
25  schoolhouse for all MQ-9 UAS operators, both pilots

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 30

1  and sensor operators.

2      Q.  Okay.  Okay.  And that schoolhouse, if
3  you will, is so that the rest of the -- of the agents
4  in the agency can be properly trained in consistent
5  protocols for missions elsewhere?

6      A.  That is correct.  We have locations in
7  Sierra Vista and San Angelo -- Sierra Vista, Arizona,
8  and San Angelo, Texas.

9      Q.  So the individuals that also trained in
10 Grand Forks are not only trained for purposes of
11 monitoring and protecting the security of the
12 United States border with Canada, but also the
13 United States border with Mexico?

14     A.  That is correct.

15     Q.  Okay.  And do those -- those locations
16 in Arizona and Texas also have stationed MQ-9s?

17     A.  Yes, they do.

18     Q.  Can you talk about -- a little bit about
19 the technical capabilities of the MQ-9?

20     A.  Yes.  Excuse me.  So the MQ-9 provides
21 a -- a satellite or an Internet-based downlink system.
22 So once the video feed comes back to the ground-
23 control stations, that can be taken out and provided
24 through a program called Bigpipe that Air and Marine
25 operates, and it's a secure based Internet access

Page 31

1  point.

2      Q.  Okay.

3      A.  So people -- authorized users are able
4  to view the video downlink feed that comes from the
5  UAS and the location of where it is actually operating
6  at in real time.  It gives a chat function so that the
7  viewers can chat with other operators or personnel
8  that are logged in to the system.

9      Q.  Okay.  What is the -- and this is --
10     During the DAPL protests, you were
11 flying the device that -- the MQ-9 at 10,000 feet.
12 Was that a consistent altitude?

13     A.  No, sir.  The altitude would have been
14 at 18,000 feet or higher.  Normally -- normal flights
15 are operated at about flight level two zero zero,
16 20,000 feet.

17     Q.  Okay.  And when the device is at that --
18 at that altitude, can you hear it or see it, on a
19 clear day, of course?

20     A.  On a -- you might hear it.  If the
21 ambient sounds are low enough and it's in the proper
22 location, you might hear the airplane operating, or it
23 may leave a contrail, not unlike a commercial aircraft
24 or airliner might do.

25     Q.  Uh-huh.  Right.  How about at night,

Page 32

1  does it have lights on it?

2      A.  Yes, it does.  It complies with all of
3  the same FAA rules as any other air- -- airplane.

4      Q.  Right.  Right.  And how do you
5  coordinate that with other air traffic, the presence
6  of that vehicle?

7      A.  So when that aircraft is operating, we
8  coordinate through the FAA Air Traffic Control Centers
9  as to where that aircraft will be operating.

10     During the 2016, 2017 era, we had what
11 was called Certificates of Authorization, or COAs,
12 that we would get authorized by -- or through the FAA
13 to operate our aircraft in geographic locations.  And
14 when we would operate it within those COAs, we would
15 coordinate with the FAA, and, basically, they would
16 sanitize the airspace at our altitude with other
17 traffic to provide the separation necessary for us to
18 operate.

19     Q.  Yeah.  Okay.  And so what -- what is
20 the --

21     When the device is at that altitude,
22 what does it do?  I know you said that it provides a
23 video link back to authorized users on the Bigpipe
24 network, but what does -- what does one who has that
25 authorization see and/or hear or learn from what that

Page 33

1  device is monitoring?

2      A.  So the sensor operator -- the MQ-9 has a
3  EO/IR, so an electro-optical camera and infrared and
4  low-light cameras on board.  So depending on the time
5  of day it's flying -- daytime, we'll run the EO, the
6  electro-optical camera, so a daytime camera, not
7  unlike a news helicopter camera picture.

8      Q.  Okay.

9      A.  The sensor operator has the ability to
10 select infrared imagery, so heat sources, which can be
11 used also during the daytime.

12     And during the hours of darkness, they
13 could use a low-light camera that picks up -- it
14 amplifies the ambient light; or they could use the
15 infrared camera.  So that's --

16     Q.  So that's three --

17     A.  -- video from -- pardon me.

18     Q.  So there are three -- three principal
19 visual tools?

20     A.  That is correct.

21     Q.  Okay.  Pardon me for interrupting you.

22     A.  No, that's fine.

23     So the sensor operator has the ability
24 to select the camera and operate the system to get the
25 best picture that they can provide.  That video, of

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 34

1  course, is coming back into the ground-control
2  station, which is then broadcast into the Bigpipe
3  system.  So the access -- the authorized access users
4  can see that same video feed.
5        Q.    Okay.  All right.  And so did --
6              Let's go through the other devices that
7  you mentioned you -- you were involved with operating
8  or -- or utilizing.
9              So that's -- we talked about the -- and
10  we'll come back to it, but the UAS drone, the MQ-9.
11  And you mentioned a -- an additional device.
12             Did you operate any other devices or --
13  or means of monitoring the -- the protests in --
14  associated with the Dakota Access Pipeline?
15        A.    The only other platform we used was the
16  AS350 helicopter that's the size of your typical
17  Life Flight helicopter.  Ours has an EO/IR camera
18  system on it, not unlike the -- the UAS.  So it gives
19  us a daytime camera and an infrared camera.  And those
20  were operated in -- in 2016 and 2017.
21        Q.    And -- and were you the pilot of that
22  vehicle?
23        A.    I was a pilot of one of them during
24  the -- the 21 February eviction process of the main
25  Cannonball camp.

34:12-35:8
401-402

Page 35

1        Q.    Okay.  Had you operated that vehicle
2  prior to that -- that aerial vehicle, the helicopter
3  prior to that time frame?
4        A.    Yes, sir.
5        Q.    At the DAPL protests?
6        A.    Air and Marine Operations dispatched a
7  heli- -- one of those helicopters to the DAPL protest
8  in October of 2016.
9        Q.    Got it.  Okay.
10             So would you walk me through the time
11  frame that these -- I know you just did that for the
12  helicopter, but when did the involvement of the MQ-9
13  begin in North Dakota concerning and with respect to
14  the Dakota Access Pipeline protests?
15        A.    I believe the first flight was
16  22 August of 2016.
17        Q.    Okay.  Can you walk me through how that
18  device came to be deployed in North Dakota to monitor
19  or observe the Dakota Access Pipeline starting on
20  August 22, 2016?
21        A.    We received -- Air and Marine received a
22  request to provide aviation -- or, you know, live
23  downlink feed.  We had an Office of Investigations
24  agent that was part of our operations in Grand Forks
25  that was involved with part of the protest -- or, I

35:10-36:5
401-402

Page 36

1  guess, not the protest, but the -- had points of
2  contact within the law enforcement network that
3  we had -- and was requested to provide downlink source
4  to the emergency operations center at the Morton
5  County Sheriff's Office.
6        Q.    And that individual's name is who?
7        A.    That would be Chris Bacon, and he is
8  deceased now.
9        Q.    Okay.  And did any other individuals
10  attend the Morton County Emergency Operations Center
11  with Mr. Bacon?
12        A.    Not from Air and Marine until 2017, in
13  February.
14        Q.    And Mr. -- Mr. Bacon, you mentioned he's
15  passed away.  Did he -- what was the duration of his
16  presence in the North Dakota Emergency Operations
17  Center?
18        A.    I believe he was there through the
19  December time period, and was also --
20        Q.    December of 2016?
21        A.    Correct.  He would -- he would go and
22  visit and set up his -- he was more of a remote
23  liaison in the ability to get the information and
24  coordinate as necessary to get those links
25  established.

Page 37

1        Q.    Sure.  And so -- and during that time,
2  you, as the sensory operator, were located in
3  Grand Forks?
4        A.    That is correct.
5        Q.    And was the pilot also located in -- in
6  Grand Forks with you?
7        A.    Yes.
8        Q.    And who was the pilot during that period
9  of time that you were the sensory operator?
10        A.    I don't remember the pilots.  The
11  process is the pilots can -- being located where we're
12  at, the pilots and sensor operators can rotate
13  through the -- the ground-control stations, between an
14  hour to a two-to-three-hour rotation period where
15  multiple pilots, multiple sensor operators, will be
16  part of a mission of any extended duration.
17        Q.    That's because the capability of the
18  aerial device to stay up there doing its job is
19  greater than a -- than a shift for a -- perhaps,
20  right?
21        A.    That is correct.  Since the MQ-9 will
22  remain airborne for up to 18 hours before it needs
23  fuel, whereas a typical helicopter, airplane, is
24  anywhere from three to four hours before it needs a
25  refuel.

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 38

1      And once it's deployed, that -- that
2  crew is basically the primary crew for that -- that
3  platform whereas we can rotate pilots and sensor
4  operators through the UAS system.
5      Q.   Right.  Right.  Okay.  And as this --
6  given the fact that there's a sensory operator and a
7  pilot of these MQ-9s, are you always sitting next to
8  that person, or do you -- do you need to be?
9      A.   So the MQ-9 ground-control station, you
10  are sitting side by side, not unlike an airplane or a
11  helicopter.
12      Q.   Okay.  And that's for communication
13  purposes and congruity and that sort of thing?
14      A.   That, and the design -- the way the
15  ground-control stations are fabricated --
16      Q.   I see.
17      A.   -- does make the --
18      Q.   What does it look like?  Is it like
19  you're in the cockpit of an actual airplane of sorts,
20  or what does it look like?
21      A.   So the ground-control station is --
22  you're in a couple seats and are actually out of the
23  semi-truck-style seat, and you're facing a
24  three-screen computer system with the -- basically,
25  they're in -- they're in computer racks.

Page 39

1      So you have a mapping -- a mapping
2  screen that shows you where the UAS is located
3  physically over the ground; you have a screen right in
4  front of you that is either the nose camera for the
5  pilot of looking out the nose of the airplane, either
6  daytime or EO/IR camera; and then you have a
7  heads-down display that is providing you all your
8  engine and monitoring information of the airframe
9  itself with a yoke and throttle quadrant, not unlike
10  an aircraft simulator.
11      Both the sensor operator and the pilot
12  have the same rack system, and they can select
13  different camera views that they can view through.  So
14  the pilot can actually view the -- the EO/IR ball that
15  the sensor operator is viewing.  And off of the side
16  of the monitor, you also have an additional read --
17  basically a second monitor that shows the same
18  information that both stations are looking at, if that
19  makes sense.
20      Q.   Okay.  Okay.  So these three cameras are
21  the -- are the means, the sensory means, of looking
22  from those altitudes on the ground and seeing
23  activities?  That's how you do it with those three --
24  those three devices, that you can choose to use one or
25  the others, right?

Page 40

1      A.   Pretty close.  The pilot -- the pilot's
2  cameras are basically fixed cameras off the nose of
3  the airplane, so they're looking straight ahead, but
4  he does have the ability to select the camera that's
5  being operated by the sensor operator, so the sensor
6  operator is able to move that camera up, down, left,
7  right, as necessary to maintain the picture.
8      Q.   Sure.  When you're looking at -- so
9  for -- just to orient the understanding of what this
10  device can do, the aerial device as a whole can do,
11  let's just use an example of if you're flying over
12  across the -- monitoring the Canadian border, for
13  example, you've got different topography and different
14  terrains.  At those altitudes, what can you see
15  happening on the ground?  Can you see individuals,
16  people?
17      A.   If they come within the view of the
18  camera, yes.  So we kind of tongue-in-cheek the
19  viewing from the UAS as looking through the ground
20  through a paper-towel tube.  So if you think about
21  standing in your kitchen with an empty paper-towel
22  tube and you put it to your eye and you look at the
23  floor and you're trying to find a penny through that
24  tube, you have to do a lot of searching to actually
25  find that penny.  Whereas if somebody gives you an

Page 41

1  actual location to move that tube, then we can move
2  that -- that camera to that location.
3      So scanning, yes, we can see people, we
4  can see animals, vehicles, that kind of thing.  We
5  can't hear conversations.  We can't listen to phones.
6      Q.   Yeah.  So no audio?
7      A.   No audio.
8      Q.   Yeah.  Okay.  And so when you were --
9      Let's steer away from the border
10  example, but when you are flying over the Dakota
11  Access Pipeline protest camps -- let's use the main
12  camp, the Oceti Sakowin.  Does that name sound
13  familiar to you?
14      A.   I remember the name, correct.
15      Q.   Yeah.  Do you understand that name to be
16  the main camp?
17      A.   Yes.
18      Q.   And do you understand that that was
19  located on Corps of Engineers property?
20      A.   Yes.
21      Q.   Okay.  And that would be the camp north
22  of the Cannonball River?
23      A.   If my geography is correct, yes.
24      Q.   Okay.  And so when you were the sensory
25  operator of that aerial device -- large aerial device

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 42

1  with those sophisticated monitoring tools on board,
2  when you were telling me the idea of looking down on
3  the ground through a paper-towel tube, how did you
4  know how to move that to look at specific things
5  happening on the ground?
6        A.   Well, I only did a couple flights in
7  January 2017 as a sensor operator.  But as a trained
8  sensor operator and the command duty officer, knowing
9  how the system works, the -- once the air -- the
10  platform was overhead, we let the command center know,
11  one -- when I say "command center," the Morton County
12  Sheriff's Emergency Operations Center there -- that,
13  one, we were airborne and headed their way; the
14  estimated time of arrival we would be overhead.  And
15  we would ask for taskings from the emergency
16  operations center, where they would like to begin
17  their viewing.
18             We would take that tasking and use the
19  coordinates, latitude and longitude coordinates, to
20  find the encampments, starting out wide angle to get
21  overhead to make sure you had the picture that they
22  were requesting, and then the sensor operator would
23  begin to clean up the picture, or zoom in to the
24  location, to give them a better view of the camp and
25  the locations that they wanted to look at.

Page 43

1        Q.   Sure.  So let me ask you a clarifying
2  question.  You -- I believe you said that the MQ-9
3  began to be in service relative to the Dakota Access
4  Pipeline protests on August 2017 [sic] of 2016; is
5  that correct?
6        A.   I believe it was 22nd of August of 2016,
7  yes, was when we started flying.
8        Q.   Got it.  And then I just heard you say a
9  moment ago that you only did a couple of flights of
10  that vehicle over the DAPL protests in 2017, correct?
11        A.   That is correct.
12        Q.   Okay.  So that means, then -- or does
13  that mean that a different colleague of yours was the
14  first to be the sensory operator in -- in August --
15  starting August 22, 2016, and you came later?
16        A.   Yes.
17        Q.   Okay.  So who was the individual that
18  you know of to be the pilot and/or sensory operator,
19  August 22 on?
20        A.   I don't have that information.
21        Q.   Did you -- did you talk about that with
22  the gentlemen that you mentioned were part of your
23  preparation?
24        A.   No.
25        Q.   How do you know what they saw and/or

Page 44

1  did?
2        A.   So part of my position was a command
3  duty officer, so I was in charge of maintaining the
4  flights of the day, which may have been the 22nd of
5  August or the 23rd of August, depending on what duty
6  officer was on that day.
7             So I also monitored the Bigpipe feed.
8  That feed is also displayed in our operations center
9  during the flight; and as a sensor operator, knowing
10  how the system operates and how they would use that
11  platform.
12        Q.   Oh, okay.  So is it -- is what you're
13  telling me that you weren't the actual sensory
14  operator on duty utilizing the MQ-9 over the DAPL
15  protests until 2017, some time frame, but that when
16  those began in August -- on August 22 of 2016, you
17  were back at the Grand Forks facility, and you were
18  monitoring what those individuals were doing at that
19  time in August and thereafter?
20        A.   That is correct.
21        Q.   Okay.  Got it.  And -- and you did that
22  in your capacity as command duty officer, right?
23        A.   Correct.
24        Q.   And what --
25        A.   We had multiple -- multiple -- I'm

Page 45

1  sorry.  It stuttered out.  Go ahead.
2        Q.   Pardon me.  This delay is making it --
3  we're tripping on each other because of the delay.  I
4  apologize for that, but it's a technical circumstance.
5             In your capacity as the command duty
6  officer, were you a manager of sorts of the pilot and
7  the sensory operators?
8        A.   Yes.  That function also fell in -- as a
9  supervisory air interdiction agent.  And we can have
10  other supervisory air interdiction agents or command
11  duty officers assigned for the day or assigned for
12  parts of the day to be in charge of the overall
13  operations of the office and flights being conducted.
14        Q.   Can you -- I would like to understand
15  the -- when you were the command duty officer and
16  other people were piloting and/or the sensory operator
17  of the MQ-9 drone, were you the person consistently in
18  that position of -- or was there a rotation of that as
19  well, given the duration that the vehicle is in place,
20  operating?
21        A.   So, yes, the -- the duties would rotate
22  between other command duty officers, or supervisory
23  interdiction agents, and be in charge of the -- the
24  flight during the day and the -- or night, depending
25  on how long the flight went.

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 46

1    Q.   How many other people served in that
2  capacity of being the manager of the pilot and the
3  sensory operator while -- while it was in service?
4    A.   I believe at that time we had four to
5  five other supervisors and command duty officer
6  positions filled.
7    Q.   Okay.  And were those people all in
8  Grand Forks as well?
9    A.   That is correct.
10    Q.   Okay.  And so would you help me
11  understand how long, starting on August 22 of 2016,
12  how long did that -- did that vehicle deploy
13  in service relative to the Dakota Access Pipeline
14  protests?
15    A.   I believe we had flights that started
16  22 August 2016, and we continued to try and -- or
17  provide aviation support with the UAS up until
18  23 December 2016; and then we began again in 4 January
19  2017 up until approximately 20 February, if my memory
20  serves me right, of 2022 [sic].
21    Some of those days we did fly; some days
22  we didn't.  It just depended on weather.  The aircraft
23  can't fly in icing conditions or in the clouds.  We
24  can't see through clouds.  So if there was cloud
25  cover, we wouldn't -- we wouldn't have been able to

*46:10-47:16 Offer if other testimony re: CBP resource deployment comes into evidence*

Page 47

1  provide any overhead support or downlink imagery for
2  them, for the emergency operations center.
3    Q.   Yeah.  Okay.  And so who had access --
4  who was provided access to the Bigpipe system with
5  respect to the feeds coming from the MQ-9 that was
6  deployed by the Customs and Border Protection
7  Grand Forks unit to monitor the DAPL protests?
8    A.   The feed was provided with the -- any
9  command duty officer would have access to that.  Our
10  operations center would maintain a -- a feed to
11  monitor the aircraft and to assist with the chat
12  function to relay to the sensor operator; if the
13  camera was requested to be moved to another location
14  or to help the pilot move the airframe to another
15  location; and a feed was provided to the Morton County
16  Sheriff's Office Emergency Operations Center.
17    Q.   Okay.  So let's break it down by --
18  within North Dakota, you -- you allowed access to the
19  feed to the Morton County Emergency Operations Center,
20  correct?
21    A.   Correct.
22    Q.   Anyone else in North Dakota?  Any other
23  location or persons?
24    A.   To my knowledge, other than what I've
25  stated, no.

*47:17-21; 49:21-50:7; 51:7-52:4 401-402*

Page 48

1    Q.   Okay.  How about to the State Emergency
2  Operations Center?
3    A.   That might have -- they might have had a
4  feed, but I'm not sure if the State operations -- an
5  emergency operations center that was different from
6  the Morton County EOC.
7    Q.   Okay.  Do you -- do you know a location
8  by the name of Fraine Barricks?
9    A.   I do not.
10    Q.   Okay.  And so the -- the operations
11  center, the Customs and Border Protection Operations
12  Center in Grand Forks is what you're referring to
13  there in terms of the other -- other location?
14    A.   That is correct.
15    Q.   Okay.  And then was there a -- an
16  additional federal facility or location that also was
17  given a feed?
18    A.   The feed would also have been provided
19  or able to be accessed by Air and Marine Operations
20  headquarters personnel that had the authority to
21  access that -- that live feed as well.
22    Q.   And where is that facility located?
23    A.   That would be in Washington, D.C., the
24  Ronald Reagan Building.
25    Q.   And as part of the Department of

Page 49

1  Homeland Security?
2    A.   Part of Customs and Border Protection
3  Air and Marine Operations.
4    Q.   Okay.  And so did -- did anyone else in
5  the federal government have the ability to view that
6  feed, apart from those locations -- those -- that
7  location in the Ronald Reagan Building in Washington,
8  D.C.?
9    A.   At that location, to my knowledge, no.
10    Q.   Could any others --
11    A.   The only other feed that would have been able
12  to view the feed would have been at the Morton County
13  EOC, those officers or agencies present at that
14  location.
15    Q.   How about the individuals at the
16  headquarters in Washington, D.C., at the Ronald Reagan
17  Building, the federal building, Customs and Border
18  Protection, could they provide and forward the feed to
19  anyone else?
20    A.   No.
21    Q.   Okay.  Was the feed provided to any
22  other federal agency during the time period of 2016 to
23  2017?
24    A.   To my knowledge, directly, no.
25    Q.   Did any other federal agencies or

*49:4-14; 51:4-6 Offer if other testimony re: CBP feed comes into evidence*

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 50

1  officials request access to that footage?
2      A.   To my knowledge, no.
3      Q.   Do you know why the Customs and Border
4  Protection did not share it with the Corps of
5  Engineers?
6      A.   I would have to say that the Corps of
7  Engineers did not request access.
8      Q.   Did they know that they could; that it
9  was there?
10          MS. BOBET:  Objection, calls for
11  speculation.  We're also pretty far outside the scope
12  of any of the topics.  If Mr. Walker knows in his
13  personal capacity, he can answer.
14          MR. SEBY:  These questions all pertain
15  to topics 9, 13, 14, and others, Ms. Bobet.  So I'm
16  asking about them as an introduction to the topics to
17  save us some time.  So I can repeat this for each
18  topic, if you would like, and then we'll be here for
19  seven hours.
20          MS. BOBET:  I mean, this is my first
21  objection to your line of questions.  I understand a
22  reasonable introduction is necessary.  But if we're
23  getting into talking about especially "What did other
24  agencies know," that calls for speculation.  He can
25  answer in his personal capacity if he knows.

Page 51

1      Q.   (BY MR. SEBY)  Mr. Walker, let me
2  rephrase that so I'm not asking you to speculate,
3  which I wasn't.
4      Q.   Do you know whether the Corps ever asked
5  for the feed?
6      A.   I do not.
7      Q.   Did any other federal agency ever ask
8  Customs and Border Protection for the feed?
9      A.   To my knowledge, no.
10     Q.   Do you know whether or not any other
11  federal agency was aware of the feed, of the
12  availability of the feed?
13     A.   I would have to say just those that were
14  directly involved at the EO- -- the emergency
15  operations center would know of the feed.
16     Q.   Okay.  And so there were -- is it your
17  understanding that there were other federal officials
18  present in the Morton County Emergency Operations
19  Center who were aware of the footage provided through
20  the Bigpipe feed to the Morton County facility, and
21  they were aware that the Customs and Border Protection
22  Grand Forks unit was providing that information?
23     A.   That is correct.
24     Q.   Do you know which other agencies,
25  federal agencies and officials, that might be?

[margin annotation: 51:7-15
401-402; 602;
outside scope
of 30(b)(6)
notice]

Page 52

1      A.   To my knowledge, the FBI, the
2  U.S. Attorney's Office, the U.S. Marshals.
3      Q.   And the Corps of Engineers, correct?
4      A.   And the Corps of Engineers, yes, sir.
5      Q.   Did you ever go to the emergency
6  operations center yourself?
7      A.   I did, yes.
8      Q.   Okay.  When did you go there?
9      A.   I went in late February, approximately
10  the 20th of February.
11     Q.   Okay.  And -- and the other gentleman
12  was there routinely prior to that?
13     A.   Mr. Bacon would -- correct.  He would
14  also go there and visit, be part of it, also do
15  remote -- once the -- as downlink in the information
16  was established and the -- they were able to operate
17  the Bigpipe system, then he was able to come back.
18          We also did have one other agent from
19  NASOC Grand Forks attend the DAPL -- or the EOC in
20  early February.  I relieved him in the 20 -- on the
21  20 February.
22     Q.   Okay.  So Mr. Bacon was the primary
23  Customs and Border Protection individual first
24  physically there on August 22 of 2016, and then once
25  it was set up and functioning, he then monitored the

Page 53

1  EOC on a daily basis but did so remotely from
2  Grand Forks?
3      A.   I believe so, yes.
4      Q.   Okay.  How did that interaction work?
5  Was there pretty consistent service of -- of the
6  information coming from the vehicle?
7      A.   When we were able to fly and see the
8  ground, yes.
9      Q.   How much -- how -- how frequent were
10  weather-related interruptions of service?
11     A.   I don't have that information.
12          MR. SEBY:  Okay.  We've been going for
13  more than an hour.  Let's -- Mr. Walker, can we agree
14  to take a break for 10, 15 minutes?
15          THE DEPONENT:  I would love one.
16          MR. SEBY:  Sure, sure.  Don't ever
17  hesitate to remind me.  I just got -- got asking
18  questions and I lost track of the time.
19          So let's come back in 15 minutes, if
20  that's okay.
21          THE VIDEOGRAPHER:  Going off the record.
22  The time is 5:14 p.m. UTC, 10:14 a.m. Mountain.
23          (Recess taken 10:14 a.m. to 10:27 a.m.
24  Mountain Standard Time.)
25          THE VIDEOGRAPHER:  Back on the record.

Page 54

1  The time is 5:27 p.m. UTC, 10:27 a.m. Mountain.
2       Q.   (BY MR. SEBY)  Mr. Walker, we're back
3  after a short break.  And you were telling me about
4  the -- the other federal officials present at the
5  Morton County Emergency Operations Center also in
6  August of 2016 when the Customs and Border Protection
7  joined those meetings on August 22.
8            Do you know when the Bigpipe feed was
9  established in the Morton County EOC?
10      A.   I would have to say that it was the 22nd
11 of August 2016 when we provided the first overflight
12 with the UAS.
13      Q.   Okay.  All right.  And remind me again,
14 if you would, you were requested -- Customs and Border
15 Protection was requested to be there?
16      A.   That is correct.
17      Q.   And who -- who made that request, do you
18 know?
19      A.   I do not know.
20      Q.   Was it the State of North Dakota or
21 Morton County?
22      A.   I don't -- I don't remember who the
23 initial request came from.
24      Q.   Okay.  Do you know who the request
25 was -- was made to in the Customs and Border

Page 55

1  Protection?
2       A.   That would have been direct to the
3  National Air Security Operations Center Grand Forks,
4  so NASOC Grand Forks.
5       Q.   Do you know who the individual that
6  received the request was?
7       A.   I don't have the specific name, no.
8       Q.   Okay.
9       A.   As -- as a command duty officer, the
10 request like that would have come through and been
11 given to the -- the director of air operations, the --
12 the officer in charge, the agent in charge of NASOC
13 Grand Forks at that time, which was Max Ratterman, who
14 has since retired from CBP and Air and Marine
15 Operations.
16      Q.   How do you spell Mr. Ratterman's last
17 name?
18      A.   R-a-t-t-e-r-m-a-n.
19      Q.   Okay.  He was the director of the whole
20 Grand Forks Air Unit?
21      A.   That is correct.
22      Q.   So he was your boss, so to speak, right?
23      A.   Yes.
24      Q.   Was he your immediate boss, or was there
25 a level between?

Page 56

1       A.   So I had a deputy director of air
2  operations in between myself and the director.
3       Q.   And who was that individual?
4       A.   The deputy director of air operations
5  was David Fulcher, F-u-l-c-h-e-r.
6       Q.   Fulcher.
7       A.   Yes, sir.
8       Q.   Okay.  And you mentioned that the -- the
9  Bigpipe feed for the Dakota Access protests that were
10 monitored by the MQ-9, the Customs and Border
11 Protection unit air ops, provided that information to
12 the agency's office in Washington, D.C., headquarters
13 building.  Is that -- that Ronald Reagan office that
14 you mentioned is the headquarters of the Customs and
15 Border Protection?
16      A.   Yes.
17      Q.   Okay.  Is that also the location of the
18 Department of Homeland Security headquarters office?
19      A.   I do not believe so.
20      Q.   Where is that located?
21      A.   It's, my understanding, in Washington,
22 D.C.  I've never -- but the physical address, I'm
23 unaware of it.
24      Q.   Okay.  During your tenure as the command
25 duty officer, did you report to anyone in the agency

Page 57

1  with respect to the operations of the MQ-9 and what it
2  was seeing?
3       A.   I'm not sure I understand your question.
4       Q.   What was the --
5            In addition to managing the pilots and
6  the sensory operator doing the -- the actual
7  monitoring work with the drone, the aerial drone, the
8  MQ-9, what sort of briefings or other discussions and
9  meetings did you have with respect to what that device
10 was observing in North Dakota?  Did you do -- did you
11 participate in -- in meetings or discussions apart
12 from the physical operation?
13      A.   There may have been discussions with the
14 deputy director and the director, along with our
15 National Air Security Operations Center headquarters
16 in Washington, D.C., of what we were providing in --
17 in regards to the Bigpipe, and coordinating the access
18 for those that needed the access to the Bigpipe.  And
19 other than that, just our daily shift briefings in the
20 morning and crew briefings as they went to do their
21 duty.
22      Q.   You said there may have been discussions
23 with the director and the deputy director.  Is that
24 you don't recall any specific ones, or do you?
25      A.   I don't -- I don't have specific dates

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 58

1   of when those meetings happened, but we would have
2   morning shift briefs, and during those shift briefs is
3   when the staff and pilots, everybody would discuss the
4   mission for the day and as the ongoing missions were
5   conducted.
6        Q.   And was the director and deputy director
7   involved in those?
8        A.   Yes.
9        Q.   And those were pretty frequently on a
10  daily basis?
11       A.   Yes, sir.
12       Q.   Okay.  Did those individuals -- are you
13  aware of whether those individuals communicated the
14  information from those daily briefings to others in
15  the chain of command of the Customs and Border
16  Protection?
17       A.   I don't have a direct knowledge of that.
18       Q.   Did anyone from the headquarters of the
19  Customs and Border Patrol ever participate in your
20  daily briefings?
21       A.   From headquarters, no.
22       Q.   Okay.  Do you know whether or not the
23  director or the deputy director participated in
24  discussions with the headquarters of the Customs and
25  Border Protection concerning the -- the Bigpipe, the

Page 59

1   information that was obtained and shown on the Bigpipe
2   system?
3        A.   I don't know that I understand your
4   question exactly on that one.
5        Q.   Did the director and the deputy
6   director -- and/or the deputy director ever -- were
7   you aware that either of those individuals was
8   communicating the observations from the -- the MQ-9 in
9   North Dakota to the headquarters office?
10       A.   As a supervisor or even in the deputy
11  director role, director role, I would imagine they did
12  daily discuss missions with the higher headquarters,
13  Air and Marine Operations headquarters on how the
14  mission was going and what was being provided.
15       Q.   On a daily basis?
16       A.   I can't -- I don't have that information
17  if they did it daily or every other day or what their
18  frequency of meetings were.
19       Q.   Would you -- would you characterize it
20  as frequently?
21       A.   I would safely say frequently, yes.
22       Q.   Okay.  Do you recall ever hearing or
23  receiving -- directly receiving a request for
24  information from headquarters, Customs and Border
25  Protection?

Page 60

1        A.   I do remember one back in early
2   February 2017 as to what our involvement or how -- how
3   involved we were in the emergency operations center on
4   a day-to-day basis, as they were getting inquiries to
5   what our involvement was in the protest.
6        Q.   And how did you respond to that inquiry
7   at that time?
8        A.   We were -- we responded -- from what I
9   remember, we responded of what we were doing on a
10  daily basis, and at that point, they directed that an
11  Air and Marine agent from Grand Forks be physically
12  present in the operations center in Morton County.
13       Q.   Okay.  So they -- they directed the
14  dispatch of a -- of an official -- of a Customs and
15  Border Protection individual back, like it started, in
16  2016, August 22?
17       A.   My understanding -- well, my
18  understanding is that 2016, our agent, Chris Bacon,
19  was providing that service to them.
20       Q.   Yeah.
21       A.   However, physical but remotely.  But
22  when -- in 2017, they directed that we send an --
23  basically an aviation liaison to the location to
24  provide -- to make sure the Morton County Emergency
25  Operations Center was getting the necessary products

Page 61

1   that they were requesting or wanting, and that the
2   higher headquarters could then say that they've --
3   we've got representation at the location.
4        Q.   Got it.  Okay.  Did -- did the -- apart
5   from the -- providing the feeds directly to other
6   federal agencies, did -- were you aware that Customs
7   and Border Protection was ever providing any briefings
8   to those other agencies?
9        A.   No.
10       Q.   Were you ever requested to do so?
11       A.   I do not believe so.
12       Q.   Did you ever attempt to contact other
13  agencies and say, "We've got some information we would
14  like to share"?
15       A.   No, not that I know of.
16       Q.   Okay.  So you never shared -- Customs
17  and Border Protection never shared its information
18  with the Army Corps, correct?
19       A.   To the best of my knowledge, directly,
20  no.
21       Q.   With the Department of Justice?
22       A.   Directly, no.  Our information would
23  have been shared -- our information would have been
24  shared at the emergency operations center where that
25  video feed was coming.

59:22-60:5
401-402; 611
vague

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 62

1    Q.   Sure.  And so whoever was there would
2  have -- would have -- it would have been shared with?
3    A.   Yes.
4    Q.   Okay.  Apart from that, though, you
5  didn't share with it with the Corps apart from that,
6  or the FBI apart from that, or the Department of
7  Justice apart from that, correct?
8    A.   That -- that is -- yes.
9    Q.   Or with anyone else within the
10 administration, the federal administration?
11   A.   The feed -- the only information shared
12 was the direct feed that those had access to --
13   Q.   Right.
14   A.   -- or -- and an end-of-shift report that
15 rolled up the day, how much time we had spent flying.
16 That's sent out daily by -- an end-of-shift report.
17   Q.   And who do those -- what is -- what is
18 the content of the end-of-shift report?
19   A.   The total amount of hours flown for the
20 day and any significant activity that might have
21 required to be passed.
22   Q.   To be passed as information to someone
23 else?
24   A.   To our headquarters personnel.
25 Basically, our -- our -- the NASOC Grand Forks -- the

Page 63

1  NASOC headquarters staff would get that report just so
2  they knew what we flew for that day and if there was
3  anything significant that they needed to be aware of:
4  why we landed early, any kind of emergency we may have
5  had to deal with, that -- that kind of -- the flight
6  information.
7    Q.   How about the nature of what was
8  observed?
9    A.   None of that information would have been
10 passed.
11   Q.   Would not have?
12   A.   Correct.
13   Q.   Okay.  Does the Grand Forks unit
14 maintain the daily shift reports from 2016 to 2017?
15   A.   I do not believe we have those records
16 anymore.  They would have been . . .
17   Q.   Would have been what?
18   A.   They -- they have a -- a shelf life,
19 after a certain amount of time, that those reports
20 would be destroyed.
21   Q.   And what is that shelf life?
22   A.   I don't have that information.
23   Q.   When you say "destroyed," what do you
24 mean by that?
25   A.   The flight sheets for that period would

Page 64

1  be shredded.
2    Q.   When did that practice begin?
3    MS. BOBET:  I'm going to object here.
4  This witness wasn't designated on document-retention
5  issues or anything of the like.  So I think it's
6  outside the scope of -- of what he's been designated
7  for.  If he knows in his personal capacity, he can
8  answer.
9    Q.   (BY MR. SEBY)  We'll wait until we get
10 to a specific topic so Ms. Bobet's concern is
11 resolved, because that comes up under a topic.  So
12 I'll just wait there.
13   Let's go back to the notice of the
14 deposition, and we're going to go through the
15 individual topics now.  I've been asking general
16 questions regarding those topics, 9, 13, 14, and
17 several others, and now we're going to talk about the
18 first topic that you've been designated for.  It's
19 topic 6 there at the bottom.
20   And I'll give you a moment, Mr. Walker,
21 to refresh your review of that and so we can talk
22 about it.
23   A.   One second.  My video screen is covering
24 it up here.  I've got to figure out how to --
25   MS. BOBET:  I think on the upper left

Page 65

1  there's a -- what looks like a little minimize button.
2  If you see thumbnails, you can click "hide thumbnail
3  video."  That might help.
4    MR. DIAZ:  Does it help if I lower it?
5    THE DEPONENT:  Yes, please.  That's good
6  right there.  Okay.
7    Q.   (BY MR. SEBY)  Okay.  Do you -- are you
8  aware of the -- prior to reading it just now, is it
9  accurate that you've reviewed this before?
10   A.   Yes, sir.
11   Q.   And did you do any research on this
12 topic?
13   A.   Just what we've -- I discussed with
14 counsel.
15   Q.   Prior to discussing with your counsel,
16 were you aware of any -- anything responsive to this
17 topic?
18   A.   I'm not aware of any statements made by
19 Department of Homeland Security or Customs and Border
20 Protection in regards to the permits.
21   Q.   Okay.  You said Mr. Bacon was the
22 individual that first was dispatched to the Morton
23 County EOC on August 22 of 2016.  And how long did
24 Mr. Bacon stay in his capacity as -- as the chief
25 liaison with North Dakota?

Page 66

1    A.    Mr. Bacon was active during the entire
2  situation.
3    Q.    Okay.  So 2016 to 2017?
4    A.    Yes, sir.
5    Q.    Okay.  And you indicated that he's
6  deceased, right?
7    A.    Yes.
8    Q.    When did he pass away?
9    A.    He -- if memory serves me, it was 2018.
10    Q.    Okay.  Was he retired from the agency,
11  or was he still employed by the agency when he passed
12  away?
13    A.    He was employed.  It was a line-of-duty
14  death.
15    Q.    How did he pass away?
16    A.    A vehicle accident.
17    Q.    In North Dakota?
18    A.    In Minnesota.
19    Q.    Ah.  All right.  So other than talking
20  to your counsel, did you talk to the individuals in
21  the Customs and Border Protection unit, that you
22  indicated were active duty during the DAPL protest,
23  with respect to this topic?
24    A.    No, I did not.
25    Q.    Mr. Wright -- Mr. Wright or Mr. Malone

Page 67

1  or Mr. Stamper?
2    A.    We had our discussions yesterday.
3    Q.    Did you ask them about this topic?
4    A.    No, I did not.
5    Q.    So the only people that you talked to to
6  prepare for this topic was your counsel, Ms. Bobet,
7  and -- and the other attorneys?
8    A.    That is correct.
9         MS. BOBET:  Objection, misstates
10  testimony.
11    Q.    (BY MR. SEBY)  Were any of those counsel
12  present during the DAPL protest, present in their
13  capacity as -- as employees of the Customs and Border
14  Protection?
15    A.    I -- I do not know.
16    Q.    Did you review any documents in
17  connection with this topic?
18    A.    Just those documents that were provided
19  in the binder.
20    Q.    Okay.  So is it accurate, as the
21  representative of the United States for the Department
22  of Homeland Security and Customs and Border
23  Protection, that you have no knowledge about this
24  topic?
25    A.    I have no --

Page 68

1         MS. BOBET:  Objection, misstates
2  testimony.
3    Q.    (BY MR. SEBY)  I'm sorry, Mr. Walker,
4  what were you saying?
5    A.    I was interrupted there.
6    Q.    Right.  Please answer, sir.
7         THE DEPONENT:  Ms. Bobet, could you
8  repeat what -- I don't -- I missed that.
9         MS. BOBET:  Oh, I'm sorry.  My -- I was
10  making an objection that the question misstates
11  testimony, but you may answer.
12    Q.    (BY MR. SEBY)  Yeah, she's not coaching
13  you on your responses.  I'm asking you for your
14  response.
15    A.    Understood.  I have a helicopter landing
16  outside my window, so --
17    Q.    Okay.  No problem.
18         MS. BOBET:  Fair enough.
19    Q.    (BY MR. SEBY)  Repeat, sir.
20    A.    So to my knowledge, DHS and CBP, there
21  was no public statements made about the application
22  for special-use permits.
23    Q.    To your knowledge.  But how about as
24  testifying on behalf of the Customs and Border
25  Protection, what --

ND OBJ: Introduces new material

Page 69

1    A.    Sure.  As -- as -- on behalf of
2  Department of Homeland Security and Customs and Border
3  Protection, I know of no public statements made --
4    Q.    Okay.
5    A.    -- by the agency.
6    Q.    Okay.  And if we can go to topic 9,
7  please.  If you take a moment and refresh your
8  understanding of that topic.
9    A.    Okay.
10    Q.    And did you do any research on this
11  topic?
12    A.    Beings I was directly -- personally
13  directly involved in the day-to-day operations, I was
14  familiar with the encampments as we were given --
15  provided information from the State operations center
16  of the location of those encampments, and their
17  assessment of the -- the encampments, and also viewing
18  the Bigpipe feed as it came down, as we were providing
19  that resource to the State, and then also during my
20  time as a pilot in command during the eviction process
21  of the encampments in February of 2017.
22    Q.    You mentioned that one of the screens is
23  a -- an image of where the vehicle is -- the aerial
24  vehicle is at any given time on a -- on a map; is that
25  correct?

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 70

1    A.    That is correct.

2         Q.    And so that map wasn't provided to you
3    by the Morton County Emergency Operations Center, was
4    it?

5         A.    So the -- the map that is provided in
6    the UAS system, in the cockpit, as you -- if we will,
7    is a downloaded aviation or a typical geolocation map
8    that provides us a location where the airframe is
9    overhead or where it is flying physically in the
10   United States or wherever the aircraft is located.

11             The maps that were provided by the State
12   was their assessments, so those were separate
13   entities.  They -- they weren't the same maps.

14             There's a standoff -- there's a standoff
15   of the UAS as we can't fly directly over the location
16   and look, so the airframe has to physically be
17   somewhere between 5 to 10 miles offset from the area
18   it is looking at for the better -- for the better
19   picture.

20        Q.    So you look at it at an angle; is that
21   the --

22        A.    Yeah.

23        Q.    Okay.

24        A.    Yeah, correct.  So the location of the
25   encampments were provided to us by the State in their

Page 71

1    daily briefings.  Once -- once we get that -- that
2    information, the sensor operator is able to build a --
3    a list within their map system that gives them the
4    ability to cross-queue the camera to those items of
5    interest.

6             So once we've flown an area, identified
7    areas of interest that the State or the customer is
8    wanting to be looked at, we can -- we can mark those
9    as targets of interest, and then line that up with the
10   information provided by the customer.  So as the
11   customer is seeing that video and they want to look
12   somewhere else, alls they have to do is ask to go to a
13   different location, and then it gives the sensor
14   operator the ability to cross-queue the camera to that
15   physical location.

16        Q.    Okay.  When you say "customer of
17   interest," what does that mean?

18        A.    Well, Air and Marine Operation provides
19   a law enforcement platform for any entity, law
20   enforcement entity, or even the Corps of Engin- --
21   Army Engineers to provide them aerial imagery.  We've
22   provided the Corps of Engineers imagery of flooding
23   along the Red River from Fargo up to the northern
24   border and Bismarck and the Mississippi River.

25        Q.    So in the -- prior to the DAPL, and I'm

Page 72

1    assuming after the DAPL, you have -- the Corps has
2    been one of your customers of interest, right?

3         A.    You would get -- that would be correct,
4    the Corps or FEMA.

5         Q.    Okay.  And do they ask you for that
6    information to be a -- do they ask to be a customer of
7    interest?

8         A.    I say "customer of interest," but a --
9    I'm trying to put it in a way that we can provide that
10   service to other agencies or customers, if you will.

11        Q.    Yeah, sure.  I understand.

12             But did -- do you recall instances prior
13   to 2016 where the United States Army Corps of
14   Engineers asked the Customs and Border Protection
15   aerial drone unit to provide information, aerial
16   information?

17        A.    That would -- if my memory serves me
18   correctly, that would have been in 2014 and 2015 when
19   there was flooding.

20        Q.    And that was what?  The Corps asked you
21   for information, or you offered it?

22        A.    I believe the Corps provided a request
23   for that information through -- and in -- in
24   association with FEMA.

25        Q.    And did the Customs and Border Patrol

Page 73

1    agree to do that?

2         A.    Yes.

3         Q.    And -- and the -- the information
4    provided was from the MH-9 [sic]?

5         A.    That would have been information -- the
6    Bigpipe downlink from the MQ-9, yes.

7         Q.    MQ-9, pardon me.

8             So just prior -- the year -- year or two
9    just prior to the protests, you were providing -- the
10   Corps of Engineers was a customer of interest to -- to
11   the Border Protection aerial drone unit?

12        A.    That is correct.

13        Q.    Okay.  How about after the DAPL protest,
14   did you ever have occasion to be helpful to the Corps
15   of Engineers in North Dakota?

16        A.    Yes, we have.

17        Q.    And what were those events?

18        A.    One specifically that I was directly
19   involved in was to fly members from the Corps of
20   Engineers on the Fargo diversion project.  So I took
21   an AS350 helicopter from Grand Forks to -- up to
22   Fargo, picked up three members of the Corps of
23   Engineers leadership, and provided them an overflight
24   of the Fargo diversion project that was being
25   constructed, dropped them off, and then returned the

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 74

1  helicopter home.

2        Q.   So what was different about the Dakota
3  Access Pipeline that the Corps wasn't a customer of
4  interest?

5        A.   Well, I would have to say that they
6  didn't ask for the -- the service.

7        Q.   They sure knew that it existed, though,
8  right?

9        A.   To the best of my knowledge, yes.

10       MS. BOBET:  Objection, calls for
11  speculation, outside the scope.

12       Q.   (BY MR. SEBY)  Okay.  So you've had a
13  chance to read topic 9, then, right?

14       A.   Yes.

15       Q.   Okay.  And did you do any research about
16  this topic prior to the deposition today?

17       A.   Just the going through the binder, and
18  counsel, and going through my memory banks of
19  participating in these operations.

20       Q.   How about talking with Customs and
21  Border Protection personnel?

22       A.   We did have -- I did have a conversation
23  yesterday with U.S. Border Patrol agents that were
24  part of the response in October.

25       Q.   Okay.  Were any of those individuals

**74:7-9**
**602; outside**
**scope of 30(b)**
**(6) notice**

Page 75

1  the -- the director or the deputy director at the
2  time?

3        A.   No.

4        Q.   Are those people still at the agency?

5        A.   The deputy director still -- has been
6  promoted to the director of air operations for NASOC
7  Grand Forks, and the director, Max Ratterman, who we
8  talked about earlier, has retired.

9        Q.   But you didn't talk to the deputy -- to
10  the director -- the former deputy director at the time
11  of the protest, and now the director, you didn't speak
12  with that person, or did you?

13       A.   The only discussions I've had with
14  Director Fulcher is the fact that I was being -- that
15  I was part of this deposition and going through this
16  process, to make him aware of the -- the proceedings.

17       Q.   Did you consult with him on any of the
18  topics?

19       A.   No.

20       Q.   Why not?

21       A.   Director Fulcher and I were both
22  directly involved in all of this, so I believe --
23  personally, I did not need to -- deem it necessary to
24  have a discussion with him.

25       Q.   You did not?

Page 76

1        A.   Correct.

2        Q.   What did the Customs and Border
3  Protection learn about the protest camps associated
4  with the Dakota Access Pipeline?

5        MS. BOBET:  Objection, vague.

6        A.   Customs and Border Protection, as
7  operators of the -- local operators of the MQ-9, we
8  would have had firsthand knowledge of what we viewed
9  through the camera system or the video feed from
10  Bigpipe.  The briefings were provided by the State in
11  their daily intelligence briefings that they provided
12  to the partners.

13       Q.   (BY MR. SEBY)  So let's break that down
14  into two.  What -- what did you -- what did the
15  Customs and Border Protection learn or know based upon
16  the firsthand knowledge of what was viewed by the
17  Customs and Border Protection aerial drone as -- as
18  information was shown to the pilot and the sensory
19  operator, and then shared through the Bigpipe system?

20       A.   So as that's a live feed, the Customs
21  and Border Protection NASOC Grand Forks would have
22  learned locations of all of the encampments via the
23  information provided by the State.  We would have been
24  able to -- we would have witnessed or viewed on the
25  camera the activities being conducted at that

Page 77

1  location.  And the overall real role of that were for
2  the -- you know, we would provide that video downlink
3  to the State or the operations center for situational
4  awareness so they can determine the responses or what
5  they need to do to react accordingly.

6        Q.   Okay.  The State and the other federal
7  officials that were present in that same room, right?

8        A.   That is correct.

9        Q.   And, again, we've talked about -- you've
10  told me that that was the -- included people from the
11  U.S. Attorney's Office, Department of Homeland
12  Security, the FBI, the Corps, the Marshals Service,
13  for example, correct?

14       A.   Yes, sir.

15       Q.   Okay.  And so you talked about the
16  witnessed activity conducted in the camps, right?

17       A.   Yes.

18       Q.   What did you witness?  Or more
19  appropriately, what did the Customs and Border
20  Protection aerial drone unit witness?

21       A.   So they would have witnessed the
22  actual -- you know, the activities of those protesters
23  at either the encampments or the drill sites or the
24  traffic control points, wherever the emergency
25  operations center deemed the video or the camera be

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 78

1  positioned, to review those.
2          I remember personally seeing individuals
3  climbing on top of equipment within some of the drill
4  sites where they had overrun and displaced the
5  workers.
6      Q.  And what else?
7      A.  We would have saw the -- they would have
8  seen the -- what the encampments looked like, the
9  buildings or tents or vehicles that were positioned on
10  lands that were being used; they would have saw, you
11  know, the traffic control points; they would have saw
12  the -- you know, basically, whatever the -- the State
13  or -- wanted that to look at, what they were viewing
14  at the time, would have been -- would have been
15  viewed.
16      Q.  So with respect to observations that
17  Customs and Border Patrol made of the camps that were
18  located on Corps of Engineers land, you saw the
19  presence of buildings?
20      A.  On the Corps of Engineer land, State
21  land, and tribal land, correct, we -- we saw
22  buildings, housing-type, you know, tents or travel
23  trailers, vehicles.
24      Q.  A lot of -- how many?  A couple or -- or
25  a lot?

Page 79

1      A.  Depending on the camp, it was a
2  considerable amount of equipment and personnel and
3  housing-type structures, tents, trailers, that kind of
4  stuff.
5      Q.  Okay.  Did you ever use that aerial
6  imagery to count anything, vehicles, buildings,
7  people, horses?
8      A.  I -- we would have given the State the
9  ability to review that and determine the information
10  that they wanted.  That may have been -- that may have
11  been transmitted across the chat function by the
12  operat- -- you know, if somebody at the operations
13  center was wanting a better clarification to the
14  sensor operator of what they were viewing or what they
15  thought they were viewing, and that might -- that
16  would have been relayed back through the chat.  But a
17  specific -- specific information, I don't have that
18  information.
19      Q.  So this -- this chat function, would the
20  Customs and Border Protection agents field questions
21  from people -- from people who were on the receiving
22  end of the imagery?
23      A.  Yes.
24      Q.  And did you receive questions on the
25  chat function from State of North Dakota

ND OBJ:
As to 79:8-16
(ending "the
chat."),
Non-Responsive

Page 80

1  representatives?
2      A.  Whoever was operating the Bigpipe feed
3  at the operations center would have been who we would
4  have got the information from.  I don't have any way
5  to identify who that or what agency that individual
6  was part of.
7      Q.  So how did it look when the chat
8  function was -- people typed in something that was
9  posted on the chat board?  You could tell where it
10  came from?
11      A.  So the chat function identifies on one
12  side of who is logged in to the system and their
13  purpose or position within the agency or agent feed
14  being supported; and then on the chat function would
15  be the active communication back and forth by whoever
16  was typing the question -- or whoever's account was
17  being used to ask those questions.
18      Q.  So you could tell if a question
19  originated from Morton County EOC, for example?
20      A.  If it came from -- correct.
21      Q.  Okay.  How often did you follow the chat
22  during the DAPL protests as the -- I apologize.  I
23  keep not recollecting the name of your position at
24  that time.
25      A.  Command duty officer.

Page 81

1      Q.  Command duty officer, yes.  Pardon me.
2          You saw the chat entries from time to
3  time, or pretty frequently?
4      A.  From time to -- yes, frequently and time
5  to time --
6      Q.  Okay.
7      A.  -- depending on how my -- how much of my
8  attention was provided to the Bigpipe between other
9  duties I might be conducting at my desk.
10      Q.  Right.  Right.  And did you see Morton
11  County EOC pose questions on the chat function?
12      A.  I do remember that, yes.
13      Q.  Okay.  And what was the practice, then?
14  Someone from the Customs and Border Protection would
15  respond with -- with information relative to that
16  Morton County EOC chat?
17      A.  A lot of it would be from the EOC.  They
18  would ask, you know, "Could we move the -- move the
19  camera to a new location," a different encampment or a
20  position, latitude, longitude, where they may have --
21  need to review something going on on the ground.
22      Q.  Uh-huh.
23      A.  A response from us would be a "Roger" or
24  "Stand by."
25          Or they would ask how long before they

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 82

1  could get that picture.  We would give an estimated
2  time before we were able to give them that picture.
3       Q.   Would they ever ask questions about what
4  was being observed?
5       A.   I would have to say yes.  There were a
6  couple times, it was like, "What was -- what was
7  that?"  Or "Do we know what kind of vehicle that might
8  be?" that kind of questioning.
9       Q.   Uh-huh.
10       A.   Or "How many do you" -- you know, "How
11  many individuals do you see?"  Just to -- I don't want
12  to say clarify, but to reassure or quantify what the
13  operators were looking -- the individuals were looking
14  at at the EOC.
15       Q.   Sure.  Sure.  And was the Customs and
16  Border Protection willing to respond to those requests
17  for information and clarification?
18       A.   Yes.
19       Q.   How about entities other than the Morton
20  County EOC, did you oversee any other authorized
21  Bigpipe account also put anything in the chat?
22       A.   I do not recall.
23       Q.   Okay.  Did you see fires in the camps,
24  from the -- from the drone?
25       A.   Yes, you can see fires.

Page 83

1       Q.   Both at night and during the day?
2       A.   Daytime, it might have been a little
3  more difficult unless there was smoke, but if the
4  camera operator switched in between the daytime camera
5  and the infrared camera, then they can see the heat
6  signature of that fire.
7       Q.   Right.  Right.  Could you see pits in
8  the ground?
9       A.   That specific detail, I don't -- I don't
10  know.
11       Q.   Could you see horses?
12       A.   Yes.
13       Q.   And when you say you saw tents, large
14  and small, or were they all small?
15       A.   Multiple -- multiple sizes of tents.
16       Q.   Okay.  Do you ever recall seeing a
17  mess -- mess -- one or more mess tents, food- --
18  food-hall-type establishments?
19       A.   We wouldn't have been able to identify a
20  mess tent, per se.  It would have been just a tent to
21  us.
22       Q.   Okay.  How about telecommunications
23  equipment?
24       A.   I think all we would have been able to
25  see would have been telephone poles, but

Page 84

1  telecommunication equipment, no.
2       Q.   Okay.  How about roadways constructed
3  within the camps?
4       A.   Yes, we can see those.
5       Q.   And you did see them?
6       A.   Yes.
7       Q.   Okay.  Okay.  Let's talk about topic 13.
8       MR. SEBY:  If we could put that up,
9  Jose.
10       Q.   (BY MR. SEBY)  This one reads, "Actions
11  taken by the United States . . . during the DAPL
12  Protests regarding Corps-managed lands used or
13  affected by the . . . Protests to:  protect the health
14  and safety of persons on Corps-managed lands; or to
15  protect Corps-managed lands from environmental harm or
16  degradation; prevent unlawful or unsafe activities on
17  Corps-managed lands; clear Corps-managed lands in the
18  first quarter of 2017; and prevent the use of
19  Corps-managed lands as a camp, base, or staging area
20  from which potentially dangerous or unlawful
21  activities may have been conducted on or off Corps-
22  managed lands."
23       Did you -- what did you do to research
24  and prepare for this topic?
25       A.   So it was, again, reviewed the binder

Page 85

1  provided; my self-knowledge -- my own knowledge of
2  activities we conducted as CBP, DHS; and discussion
3  with my counsel.
4       Q.   Okay.  Based upon --
5       A.   And discussions --
6       Q.   I'm sorry.
7       A.   That's okay.  And then discussions again
8  yesterday with U.S. Border Patrol agents that were
9  present in the October through November time period.
10       Q.   And how long did you say you spent
11  speaking with those gentlemen?
12       A.   Yesterday, it was close to an hour and a
13  half.
14       Q.   Okay.  Did you talk about this specific
15  topic?
16       A.   We talked about their -- their actual
17  activities that they -- they were conducting during
18  the DAPL.
19       Q.   And did you do that on a topic-by-topic
20  basis, or just a general conversation about, "Hey, do
21  you remember when," kind of thing?
22       A.   That would have been a general
23  conversation to make sure I understood what their --
24  their role and response was during the protest.
25       Q.   So when it came time to prepare for your

Douglas W. Walker   30(b)(6)
November 29, 2022

Page 86

1  deposition, you didn't actually talk about the topics
2  with your Customs and Border Patrol colleagues at all?
3      A.   We did.
4           MS. BOBET:  Objection, misstates
5  testimony.
6      A.   We did.  We went over some of these --
7  we went over some of these topics along with them.
8      Q.   (BY MR. SEBY)  Why not all of them?
9      A.   As this one was one that they were
10  directly involved with, I wanted to make sure I
11  understood their participation since I had been
12  designated to respond as the DHS and CBP
13  representative.
14      Q.   So -- so great.  So for this topic, you
15  specifically discussed it with them, right?
16      A.   That is correct.
17      Q.   Okay.  Good.
18           And based upon your personal knowledge
19  and conversations with your Customs and Border
20  Protection colleagues, what actions were taken by the
21  Customs and Border Patrol Department of Homeland
22  Security during the DAPL protests, regarding
23  Corps-managed lands or affected lands by the protests?
24  What did -- what was -- what actions were taken to
25  protect the health and safety of people on the Corps-

Page 87

1  managed lands?
2      A.   Well, for CBP and DHS, there was no
3  direct actions to protect the health and safety of
4  persons on Corps-managed lands or to protect the lands
5  from the degradation.  Our role was to -- the U.S.
6  Border Patrol responded to a call for assistance as
7  the activities were getting to an escalated point that
8  the local and law enforcement agency were having a
9  hard time managing it.
10           So the U.S. Border Patrol provided
11  additional manpower that would be designated or
12  dispatched by the command post or the emergency
13  operations center to those -- to locations to allow
14  the local law enforcement officers and agents to
15  respond to provide this protection.
16           U.S. Border Patrol provided the
17  ability -- you know, EOC security to allow those law
18  enforcement officers that were pulling that duty to go
19  do additional duties out on the protest sites.
20           They were -- patrol also provided agents
21  to the observation posts that had been designated by
22  the North Dakota National Guard.  So they backfilled
23  and assisted the North Dakota National Guard with
24  observation points and equipment, FLIR cameras and
25  EO -- EO cameras to give a better on-the-ground view

Page 88

1  of what they were reviewing on Corps and in -- BIA and
2  State lands.
3           They also provided officers or agents to
4  the traffic control checkpoints, traffic control
5  points to help monitor traffic that may be flowing
6  into and out of those locations that were deemed
7  important.  And they also --
8      Q.   Can I interrupt you real quick?  So you
9  were -- is it -- is it fair to say -- and I appreciate
10  your explanation.  I just want to make sure I
11  understand it.
12           The types of assistance, actions taken
13  with respect to the DAPL and during the DAPL protest
14  regarding the protest camps on Corps lands or areas
15  affected by the protest camps on Corps land, Customs
16  and Border Protection provided both what you did, that
17  was aerial drone surveillance and information feedback
18  to the State of North Dakota, but you also -- the
19  agency also provided law enforcement personnel on the
20  ground in certain select locations; is that accurate?
21      A.   That is accurate, yes.
22      Q.   Okay.  And where were those physical
23  on-the-ground locations, apart from the aerial
24  assistance that the agency provided?
25      A.   Those were -- would have been -- as I

Page 89

1  explained, that would have been dependent on where the
2  command post or the emergency operations center would
3  require those additional officers' assistance to
4  relieve the local law enforcement officers to do
5  additional duties within that.
6           So I don't -- I don't have -- other than
7  traffic control points, observation posts, we did have
8  a couple -- Mr. Wright, Adam Wright, was part of a
9  group, with local law enforcement, that responded to a
10  protester group that was trying to outflank or
11  maneuver law enforcement line that was managing the
12  protest, so they responded to where the protesters
13  were trying to maneuver to get around and get on the
14  back side of the law enforcement.  They were able to
15  deescalate the situation and -- verbally deescalate
16  the situation and have the protesters return to where
17  they started from.
18      Q.   Which was on Corps of Engineers land?
19      A.   I don't know if that was -- I'm not
20  familiar if it was Corps of Engineer land, State land,
21  or Tribal land.
22      Q.   And so the -- this on-the-ground
23  resource assistance that Customs and Border Protection
24  provided at traffic points and observation points and
25  then the -- the certain instances that you mentioned,

**Page 90**

```
1   when did that begin?  When did that actually occur as
2   a start time?  August also?
3        A.   In the -- for the Border Patrol
4   response, it would have been the middle -- there was
5   multiple -- or I'm not sure the exact number of what
6   they call a Signal 100, where the State radio was
7   putting out a bulletin that they needed additional law
8   enforcement assistance.  So Border Patrol agents were
9   responding to those directly; however, they're a
10  three-to-four-hour response time due to their location
11  along the border, cities along the border to the -- to
12  the Bismarck/Mandan area.
13           And then the Border Patrol provided that
14  additional resource during the October through
15  November height of the protests in the -- in the area.
16       Q.   Yeah.  How many individuals from Customs
17  and Border Patrol would have been involved in that
18  on-the-ground physical dispatch showing up?
19       A.   It was approximately -- there was
20  approximately ten -- ten officers or ten agents on a
21  weekly rotation to the location, to the -- to the EOC
22  to provide that assistance for approximately four
23  weeks.
24       Q.   Okay.  Why did it -- why did it end,
25  then, in November?
```

**Page 91**

```
1        A.   My understanding is due to the cold and
2   the protests taking a downturn, the necessity to have
3   additional Border Patrol officers or agents present
4   wasn't necessary, and they also had to return and
5   conduct their primary mission of border security.
6        Q.   When you say a downturn in the protests,
7   what does that mean?
8        A.   The downturn is the activities weren't
9   as violent or agitated.
10       Q.   I see.  Okay.  All right.
11           Did you -- you physically ever do that?
12       A.   I was part of the AStar, the helicopter
13  that provided overhead coverage during the eviction
14  process in February when they went into the main camp
15  to clean that camp out.
16       Q.   Uh-huh.  Did Customs and Border
17  Protection agents ever physically go into the camps at
18  any time?
19       A.   To my knowledge, no.
20       Q.   Did Customs and Border Protection agents
21  ever make any arrests of protesters for conduct of
22  theirs?
23       A.   There was no arrests made by U.S. Border
24  Patrol or Air and Marine Operations, DHS or CBP.
25       Q.   During any time of the -- of the
```

**Page 92**

```
1   protests?
2        A.   During any time of the protests.
3        Q.   Okay.  And then the heli- -- the
4   helicopter that you mentioned piloting, what was
5   that -- what was that -- how -- how was that used to
6   clear the Corps-managed land in the first quarter of
7   2017?
8        A.   So one of -- one of our other pilots
9   flew that -- since I was part of the command post, I
10  coordinated to have the helicopter flown down to
11  Bismarck.  Our -- after our briefing discussion with
12  the North Dakota Highway Patrol aviation unit and the
13  other aviation entities that were providing service
14  there, came up with a plan.
15           Ours was to -- we had the communication
16  from radios that we could communicate to ground
17  agents.  Our process was to overfly the area and
18  observe as the law enforcement entered the camp, to
19  give them a -- information if they were being
20  surrounded or if we had witnessed where people might
21  have moved into locations that weren't seen, so
22  vehicles or tents or building structures, if we saw
23  somebody go in there, we could give them a notice or a
24  heads-up that they may come across somebody within a
25  location.
```

**Page 93**

```
1        Q.   Sure.
2        A.   And part of it, just to be overhead
3   and --
4        Q.   Yeah.
5        A.   -- provide that.
6        Q.   Okay.  How about the last one there?
7        MR. SEBY:  Jose, if we could lift --
8   raise that up a little bit so -- so we can see at the
9   bottom little Romanette v.
10       Q.   (BY MR. SEBY)  "Prevent the use of" --
11           What actions were taken by the Customs
12  and Border Protection during the protest on Corps land
13  trying to prevent the use of Corps-managed land as a
14  camp, a base, or a staging area from which potentially
15  dangerous or unlawful activities may have been
16  conducted on or off Corps-managed land?
17           Earlier I think you mentioned you were a
18  witness to protesters leaving the Corps camp, going to
19  attack, for example, the drill site; is that correct?
20       MS. BOBET:  Objection, misstates
21  testimony.
22       A.   Unless the sensor operator actually
23  picked up or followed a group from a camp, base, or
24  staging area to a location would be the only way to
25  identify that.  I don't know that that was done.
```

Page 94

1    Otherwise, we were moving the cameras as
2  requested by the State to those locations of people
3  that were there or activities that were being
4  conducted concurrently.
5    CBP or DHS didn't have any direct
6  involvement in preventing the use of any lands, other
7  than providing additional officers or agents, the U.S.
8  Border Patrol specifically, to assist in traffic
9  control points that -- to assist the State and locals
10  in identifying personnel that were flowing through
11  those areas.
12    Q.   (BY MR. SEBY)  Is it fair to say that
13  Customs and Border Protection did assist the State in
14  preventing the people who were protesting on Corps of
15  Engineers -- in Corps of Engineers camps and were
16  gathering up to go behave elsewhere, that you -- that
17  the agency did help prevent that by giving information
18  back to the State?
19    A.   I would say yes, we were providing a
20  downlink or a video feed of activities going -- for
21  them to make the decisions of how to respond.
22    Q.   Yeah.  Okay.  Is it also fair to say
23  that all of the actions taken were to provide the
24  State of North Dakota and Morton County law
25  enforcement with information, and that you did not

Page 95

1  provide that information to other federal agencies
2  because they didn't ask for it?
3    MS. BOBET:  Objection, misstates
4  testimony and assumes facts.
5    Q.   (BY MR. SEBY)  So, again, that was a
6  question asking you if that's a fair summary of your
7  testimony.  I'm not misstating your testimony.  I'm
8  asking you if that's a fair summary of it.
9    MS. BOBET:  Same objection --
10    A.   Yeah, correct.  We --
11    MS. BOBET:  -- misstates testimony and
12  assumes facts.
13    MR. SEBY:  Thank you.
14    Q.   (BY MR. SEBY)  Mr. Walker?
15    A.   Yes.
16    Q.   Okay.  Thank you.
17    MR. SEBY:  Let's take a break.  It's
18  been also more than an hour.  Do you want to take a
19  lunch break and then come back?
20    THE VIDEOGRAPHER:  Going off the record.
21  The time is 6:32 p.m. UTC, 11:32 a.m. Mountain.
22    (Recess taken 11:32 a.m. to 12:27 p.m.
23  Mountain Standard Time.)
24    THE VIDEOGRAPHER:  We're back on the
25  record.  The time is 7:27 p.m. UTC, 12:27 p.m.

Page 96

1  Mountain.
2    Q.   (BY MR. SEBY)  Mr. Walker, we're back
3  after a lunch break.  And I want to turn to topic 14.
4    MR. SEBY:  If you would please post
5  that, Jose, so we can see that on the screen.
6    MR. DIAZ:  I'm -- I'm trying to get this
7  working.  Give me a second.  And, I'm sorry, what was
8  the number?  14?
9    MR. SEBY:  14, yes.
10    MR. DIAZ:  Thank you.
11    Q.   (BY MR. SEBY)  Mr. Walker, if you would
12  take a moment to -- and refresh your review of that.
13    A.   Okay.  Okay.
14    Q.   Okay.  Did you do any research on this
15  particular topic?
16    A.   Just the information out of the -- the
17  binder and consultation with counsel.
18    Q.   Okay.  And just to be clear, you did not
19  speak with the director of the Grand Forks Customs and
20  Border Protection unit, Mr. Fulcher, correct?
21    A.   Correct.
22    Q.   Did you speak with anyone else at the
23  Customs and Border Patrol with respect to this topic?
24    A.   Well, the ones that may have been
25  available -- or involved in that would have been at

Page 97

1  the meeting yesterday with the representatives from
2  the U.S. Border Patrol.
3    Q.   And did you discuss this topic
4  specifically with them?
5    A.   I believe we went over the question, but
6  that would be the extent of it.
7    Q.   You went over it.  Was there any
8  discussion and feedback from them sought by you?
9    A.   To their knowledge, there was no
10  assistance, nothing -- no requests from the U.S.
11  Border Patrol for assistance from State and local.
12    Q.   Okay.  Did they ever recall talking to
13  any other federal agency or official with respect to
14  the protest camps on federal Army Corps of Engineers
15  land?
16    A.   Within their scope of law enforcement
17  duties, I would expect that conversation to happen.
18  As to the specifics of those conversations, I -- I do
19  not have that information.
20    Q.   What is your expectation based on, then?
21    A.   I would expect, you know, being a law
22  enforcement officer, I would ask kind of what the
23  status is or if there's anything of concern, what they
24  need to be aware of, or into -- in those regards as a
25  law -- you know, how to be prepared, trying to prepare

94:22-95:2;
95:10;
95:14-15
401-402; 611

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 98

1   yourself to -- if you had to deal with something that
2   was going on with the protest or protesters.
3       Q.   And your -- the context of your comment
4   is -- or your statement is that you would have
5   expected Customs and Border Patrol people to have
6   contacted the Corps of Engineers to ask them those
7   things?
8       A.   No.  I would expect the U.S. Border --
9   U.S. Border Patrol agents, they would have been
10  discussing what was requested by the command post or
11  the emergency operations center of what was required
12  of them, but for a request by --
13      Q.   I asked --
14      A.   Yeah.
15      Q.   I misunderstood.  You were talking about
16  the -- your expectation was focused on their -- you
17  would have expected there would have been a discussion
18  with North Dakota as the requester for such
19  assistance.
20      A.   Correct, yeah.
21      Q.   Okay.
22      A.   To my knowledge, there was no -- no
23  CBP or -- CBP or DHS entities did not make any
24  requests from State and local authorities to remove
25  persons --

Page 99

1       Q.   Okay.
2       A.   -- or deal with the actions of them.
3       Q.   Who -- who defined the mission of the
4   Custom and Border Patrol agents that were part of the
5   ground-based response?  Who set the -- the conditions
6   and parameters of service for those individuals?
7       A.   That would have been determined by the
8   emergency operations center or the command post.
9   However, North Dakota does recognize, in the Century
10  Code, Border Patrol officers do have a peace-officer
11  status that can respond to felonious acts that
12  somebody may be doing.
13      Q.   How did you learn that?
14      A.   One is personal research in the Century
15  Code on -- as an Air and Marine agent, or to know what
16  State criminal codes or State authorities we may have,
17  and to better, you know, broaden my horizon.
18      Q.   And when did you look into that and
19  learn that?
20      A.   Oh, it's -- for me, it's been since I
21  was part of the North Dakota Air Branch in 2008.
22      Q.   Okay.  So prior to the DAPL protests,
23  you were aware of that and made -- made that inquiry?
24      A.   Yes.
25      Q.   Okay.  Back -- back to the question I

Page 100

1   was asking, who would have -- who in the Customs and
2   Border Protection unit would have made the decision to
3   dispatch the ground-based agents for the roles that
4   you have described?
5       A.   So that would be the leadership at the
6   Grand Forks Border Patrol Sector headquarters located
7   in Grand Forks, North Dakota, and they would have also
8   notified their chain of command, so U.S. Border Patrol
9   headquarters in Washington, D.C., that they were
10  conducting those operations.
11      Border Patrol is very regimented in
12  their operational directives and orders, so they
13  would -- they would have conducted an op order that
14  would have been forwarded up through the chain of
15  command for knowledge and approval to respond to those
16  requests.
17      Q.   And so was approval of that request
18  positively made by the Customs and Border Protection
19  headquarters in Washington, D.C.?
20      A.   That would be correct, because that
21  would be the reason why the Border Patrol agents and
22  officers -- or Border Patrol agents responded during
23  the time of October through November.
24      Q.   Was there any -- any conditions put on
25  their response?

Page 101

1       A.   To my knowledge -- to the knowledge that
2   I know of, no.
3       Q.   And what was the request made by the --
4   by the Grand Forks office in that operation request?
5       A.   The request was to provide agents on a
6   rotational basis to report to the operations center
7   command post for duties assigned by the State of
8   North Dakota.
9       The limitations of their authority would
10  be partly with the U.S. -- you know, their
11  requirements of the U.S. Border Patrol, but also the
12  peace-officer status provided to them in the Century
13  Code.
14      Q.   Was that made a part of the request, to
15  remind the Washington, D.C., headquarters that State
16  law provided Customs and Border Patrol specifically
17  with such status?
18      MS. BOBET:  Objection to the extent it
19  calls for a legal conclusion.  You may answer.
20      A.   I believe their op order did specify
21  that the Border Patrol agents in the state of
22  North Dakota are offered peace-officer status.
23      Q.   (BY MR. SEBY)  Okay.  And who -- who
24  maintains that OPORD?
25      A.   That would have went through the U.S.

Page 102

1  Border Patrol.
2       Q.   Where would one find that document
3  today?
4       A.   I would have to get with CBP attorneys
5  for the litigation-hold documentation.
6       Q.   Is that a document that you gathered and
7  provided to your counsel a year and a half ago, as I
8  think you said?
9       A.   I believe that is correct.  That was
10  provided to -- to legal counsel.
11       Q.   Okay.  Who wrote the document?
12       A.   I do not have the name of the individual
13  that wrote the document.
14       Q.   Did that document ask for legal advice?
15       A.   I can't speculate whether it did or not.
16       Q.   Have you seen it?
17       A.   I have read it.  It's been a while.
18       Q.   Okay.
19       MS. BOBET:  Just so I'm clear, which of
20  these topics are these questions on?  I don't think it
21  falls within topic 14, but if there's a different one
22  you're thinking of.
23       MR. SEBY:  No, I intended it to be
24  topic 14.
25       Q.   (BY MR. SEBY)  Now I would like to go

Page 103

1  to --
2       MS. BOBET:  The topic 14 is about
3  requests made by the U.S. for State and local
4  authorities' assistance.  So if that's the topic this
5  line of questioning falls under, I think it's outside
6  the scope.  But it sounds like you're moving on to
7  another point, so we can go with that.
8       MR. SEBY:  Are you done?  Then I will do
9  that.  I take it --
10       MS. BOBET:  Sure.
11       MR. SEBY:  -- "yes," so let's -- let's
12  go --
13       MS. BOBET:  Yes, please proceed.
14       MR. SEBY:  I'm going to do that.  Ready?
15       Q.   (BY MR. SEBY)  Let's go to --
16       MS. BOBET:  Yes.
17       Q.   (BY MR. SEBY)  -- the two exhibits that
18  were provided to your counsel earlier.  They're just
19  two emails.  Let's go to the earlier of the two, which
20  is an email conversation you were having with Lynn
21  Woodall at Morton County.  Do you remember
22  Mr. Woodall?
23       A.   I do, yes.
24       MR. SEBY:  Okay.  Jose, can we put these
25  documents up on the screen?  Let's just -- let's go

Page 104

1  with -- the first one would be 804, I believe, which
2  will be marked as 804.
3       (Deposition Exhibit 804 was remotely
4  introduced.)
5       Q.   (BY MR. SEBY)  There we go.
6       Mr. Walker, will you take a moment and
7  familiarize yourself with the exhibit.  It's a two-page
8  document, a series of emails.  Let's go to the back
9  and have you to read -- ask you to read those, please,
10  just so you're refreshed.
11       A.   Okay.
12       Q.   You read the entire document or just the
13  first part?
14       A.   The entire document.
15       Q.   Okay.  Cool.
16       Let's go to the beginning, then, which
17  is a -- a communication that, as far as I can tell,
18  you initiated with Morton County on January 31 of
19  2017.
20       You -- I can't tell who your email is
21  to.  It says, "Good Morning Sir," but the way your
22  counsel has produced this, it's chopped off the --
23  who you were communicating with.  Do you know who you
24  were talking to here?
25       A.   I believe if we -- in the -- for the

Page 105

1  email chain, it's Captain Woodall.
2       Q.   Sure.  Anyone --
3       MS. BOBET:  Just so you know, I think
4  just for -- for clarity -- I'm sorry to interrupt, but
5  I think this is a document that the State produced
6  based on the Bates number that starts "ND" underscore.
7       Q.   (BY MR. SEBY)  So were you communicating
8  with anyone other than Mr. Woodall at Morton County?
9       A.   At this part, I can't speculate on who
10  else I was discussing it with.
11       Q.   Okay.
12       A.   I know in further communications, Chris
13  Bacon is cc'd into -- into the conversation --
14       Q.   Yeah.
15       A.   -- along with additional -- the Morton
16  County Sheriff.
17       Q.   Yeah.  So the beginning of the
18  conversation on January 31, 12:27, you say, "Good
19  Morning . . . I am following up on our discussion
20  yesterday as to what you would like from us and what
21  we can provide you in regards to aviation support.
22  Our headquarters wants to ensure that you are aware of
23  our capabilities and availability of aviation assets
24  in order for them to respond accurately to
25  Congressional and Senate inquiries made -- being made

105:17-
106:13
401-402;
802

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 106

1    [about] our involvement."
2              So this is in 2017, and it follows the
3    period of August 22 through the -- you know, the day
4    before this.
5              I just want to ask you about the nature
6    of how you've phrased this as a, "what you would like
7    from us and what we can provide you in regards to
8    aviation support."
9              Hadn't the Customs and Border Protection
10   been providing the State of North Dakota, for many
11   months, as of now, when -- when you said this, with
12   aviation resources and support?
13        A.   Yes, we have.
14        Q.   So why did you phrase it like that?
15        A.   Well, as in the second sentence
16   indicates, our headquarters -- basically, we had a --
17   we had a call -- the director, deputy director, and
18   supervisory staff had a call from our headquarters, so
19   National Air Security Operations Center headquarters
20   in Washington, D.C., the director there, called us and
21   asked us to directly ask the State of North Dakota
22   what they would like, as they were being requested
23   their -- they were needing to respond to Congressional
24   and Senate inquiries.
25              2017 being an inaugurational year, new

**106:14-107:21**
**401-402**

Page 107

1    Senate, new Congress, and President going in, and the
2    volatility at this time for the pipeline, we wanted to
3    make sure that we had, for record, what we could --
4    what Air and Marine could help the State of
5    North Dakota in additional assets, if needed.
6         Q.   Okay.  Notwithstanding the fact that you
7    had already -- were in the course of providing them
8    with such resources, right?
9              I -- what would -- what would -- what
10   would have been any overage over what you had already
11   been providing to them at their request earlier?
12        A.   Our headquarters wanted to make sure
13   that the State command center, or the State, knew that
14   we could bring additional resources if requested to
15   assist them as to what is brought up in the next
16   paragraph below.
17        Q.   Additional resources.  Okay.
18        A.   Correct.
19        Q.   And those are additional fixed-wing
20   aircraft and helicopter assets, right?
21        A.   That is correct.
22        Q.   "We can also provide airplane and
23   helicopter assets that can broadcast additional live
24   feeds to your command post or to responding units on
25   the ground via handheld monitors.  If things look like

**107:22-108:19**
**401-402; 802**

Page 108

1    they are going to get out of hand, we can access
2    Blackhawk helicopters to provide SWAT and/or tactical
3    response units for direct action . . . ."
4              What do you mean by "access Blackhawk
5    helicopters"?  Were they -- are they resources within
6    the Customs and Border Patrol or -- or elsewhere?
7         A.   So Blackhawk helicopters are within the
8    Air and Marine Operations inventory; they are just
9    located at major branch locations.  So to get a
10   Blackhawk helicopter, we would have to route that
11   request up through headquarters, NASOC Grand Forks.
12              NASOC is a -- I don't want to say
13   separate direct- -- directorate within Air and Marine
14   as it's a national asset.
15              So our request would have went up
16   through the headquarters, which would have been pushed
17   back into the Northern, Southwest, or Southeast Region
18   directors to ask to get a Blackhawk helicopter out of
19   their location to -- to assist us.
20        Q.   Yeah.  And the way you phrased it here,
21   it sounds like the headquarters, in wanting you to
22   tell North Dakota what additional resources were
23   available, that that was within the realm of
24   possibility, right?
25        A.   That is correct.

Page 109

1         Q.   Okay.  And then when you say, "we can
2    access Blackhawk helicopters to provide SWAT and/or
3    tactical response units," does the Customs and Border
4    Patrol maintain SWAT and/or tactical response units
5    for direct action?
6         A.   In 2016, 2017, we did not have direct
7    tactical response units.  That would -- the SWAT
8    and/or tactical response units would be from the State
9    and local, so either the -- like the Bismarck Police
10   Department SWAT team or a metropolitan SWAT team, or a
11   lot of the rural counties conglomerate a tactical unit
12   from multiple agencies, but they're not considered a
13   SWAT.
14              So the -- the -- that -- that line is
15   that we can get -- we could provide them a larger
16   helicopter if they had the necessity or the need to
17   use their SWAT or tactical response units.
18        Q.   I see.  So it wasn't a federal SWAT or
19   tactical response unit that was being offered.  It was
20   a helicopter to take North Dakota's SWAT or tactical
21   response units; is that correct?
22        A.   That is correct.
23        Q.   I see.  Okay.  And then you go on to
24   say, "your" -- talking about Morton County -- "OPORDs
25   are law enforcement sensitive, I would like to extract

**109:23-110:20**
**401-402; 802**

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 110

1  information relevant to the situation that my
2  headquarters can be [apprised] -- be made [apprised]
3  of in order to maintain their situational awareness."
4        Were you asked by the headquarters of
5  the Custom and Border Patrol to enhance or provide
6  greater detail with respect to what North Dakota was
7  doing?
8        A.   That was my personal conversation with
9  the captain, that I -- to make sure that our higher
10 headquarters was appraised of the situation; that I
11 would take information out of their operational
12 directives and use that to build our Air and Marine
13 aviation support request when it went up to
14 headquarters for approval.
15       Like I say, the Blackhawk helicopter and
16 the fixed-wing asset did not belong to North Dakota,
17 so I would have to ask for that request up through
18 headquarters and back to the regions.  So we need to
19 make sure that we accurately identified the reasoning
20 why we were requesting that -- that support.
21       Q.   Okay.  And so later you have some
22 back-and-forth with Mr. Woodall, Captain Woodall, and
23 then the last communication in this chain is right
24 there, and he asks you, "What type of streaming
25 capabilities does your aircraft have and

Page 111

1  restrictions?"  Right?
2        A.   Correct.
3        Q.   And I -- let's move to Exhibit 805,
4  because it's a continuation of this chain, and we'll
5  talk about your answer to that question from the State
6  here in a moment.
7        (Deposition Exhibit 805 was remotely
8  introduced.)
9        Q.   So this is a -- an email communication
10 that is exactly the same as the exhibit that we just
11 looked at; it's just a separate document produced that
12 continues the conversation.  If you want to take a
13 minute and go to the full communication string here
14 just to confirm that, that would be fine.
15       A.   Can you scroll back up, please?
16       Q.   It's just a continuation.
17       A.   One more.  I'm not saying anybody else
18 needs to read it.  Okay.
19       Q.   Okay.  So you say to Mr. -- to Captain
20 Woodall, Customs and Border Patrol has "both a
21 helicopter and a small fixed-wing that could provide a
22 single-channel broadcast via a Microwave Downlink
23 System."  Is that the same as the Bigpipe?
24       A.   No, it's not.  It's a separate entity as
25 the helicopter is acquiring its signal and

Page 112

1  broadcasting it through its own downlink system that's
2  not tied into a web based.  This is like a news
3  helicopter or --
4        Q.   Oh, I see.
5        A.   -- used for traffic.
6        Q.   Yeah.  Okay.  And the --
7        A.   And the airplane has the same --
8        Q.   Yeah.
9        A.   Yeah.  The airplane has the same system.
10 That's a Cessna 206 fixed-wing that holds about four
11 passengers -- a pilot and three passengers, but for
12 something like this, it would be a pilot and a sensor
13 operator.
14       The same as the helicopter, it's got the
15 HD FLIR/electro-optical camera.  It can down- --
16 downlink its system through that handheld monitor.
17 It's the size of a large iPad system.
18       Q.   Yeah.  Okay.  And then you go on in the
19 next paragraph to talk about limitations on both the
20 helicopter and the plane, right?
21       A.   That is correct.  The helicopter we had
22 at the time was going into a major inspection.  The
23 other -- we had two AStar helicopters.  The other
24 helicopter did not have that downlink system.  It had
25 a camera system on it that would record the video, but

112:18-
113:3
401-402;
802

Page 113

1  it could not broadcast it.  And as we didn't have that
2  airplane, I would have to request that again through
3  headquarters.
4        Q.   So the bottom line is that headquarters
5  asked you to tell North Dakota there were additional
6  resources, and North Dakota asked some questions about
7  the capabilities.  And then, at least from the string
8  we have, you conclude by saying that "Never -- never
9  mind.  Those resources are not available," for one
10 reason or the other, right?
11       MS. BOBET:  Objection, misstates --
12       A.   If you would like --
13       Q.   (BY MR. SEBY)  I'm sorry?
14       A.   I said, if you want to take that
15 conclusion.
16       Q.   Well, I'm asking you.  I'm not -- I'm
17 not -- I'm not testifying.  I'm just saying, you
18 offered some resources, answered some questions on
19 them, and then said the downside is the helicopter is
20 in a major inspection and won't be available for four
21 to six weeks, and the airplane is tied up with other
22 events, State of the Union and the Super Bowl; is that
23 right?
24       A.   That is correct.
25       Q.   Okay.  So at the end of the day, what

113:4-
10;
113:14-
15
401-
402;
611;
802

Page 114

1  was available other than what you had already been
2  providing for several months?  Anything?
3      A.   As I stated in the next one, "If it's
4  something you are interested in, we can -- we can
5  talk," and I would get a request up for additional
6  assets and let the -- basically, the headquarters
7  determine the priority of those requests.  I could
8  only ask for the equipment.
9      Q.   Yep.  Okay.  Got it.
10           And so the -- earlier in this string you
11  talk about Senate and Congressional inquiries are
12  made about Custom and Border Patrol resources, right?
13      A.   Yes.
14      Q.   When were those inquiries made?
15      A.   Based on the messaging that I had with
16  Captain Woodall, that would have had to have been that
17  day, the 31st, or at least the day before, the
18  January 30.
19      Q.   Okay.
20      A.   As to where they -- when they were --
21  the inquiries were pushed into Air and Marine
22  headquarters, I don't have that information.
23      Q.   Okay.  Are you aware of the actual
24  inquiry or the request?
25      A.   Alls I'm -- one thing I'm aware of is

Page 115

1  that there was a request made of what Air and Marine
2  was doing to support the State of North Dakota.
3      Q.   Are you aware of any earlier requests
4  made by the State of North Dakota to the Customs and
5  Border Patrol or the Homeland Security agency for
6  support for North Dakota?
7      A.   In part of the litigation documentation,
8  I was aware of the Governor of North Dakota requested
9  assistance from Secretary, I believe, Kelly, at the
10  time, if my memory serves me right, for the letter I
11  read.
12      Q.   Yes.  And in 2017, though, right?
13      A.   Correct.
14      Q.   And my question is, prior to that, are
15  you aware of the State of North Dakota request to the
16  Department of Homeland Security for law enforcement
17  assistance in two thousand -- in 2016, for example?
18      A.   Other than the request for the ongoing
19  UAS live -- live stream that we had given them
20  already.
21      Q.   Okay.  Was the -- the Customs and Border
22  Patrol, Border Protection unit, Air and Marine
23  resources out of the Grand Forks Sector ever
24  interrupted in 2016?  Was there ever a period when it
25  was withdrawn or suspended?

**115:3-20**
**401-402**

Page 116

1      A.   The only time it would have been
2  suspended was due to weather:  We couldn't see the
3  ground or we couldn't -- to launch the aircraft.  And
4  then the other time was during the Christmas holidays
5  when it was cold as we -- individuals had taken leave,
6  so we didn't have the availability to fly.
7           We also fall into the Grand Forks Air
8  Force Base airfield restrictions when they take their
9  holidays, so there was days within the Christmas
10  holidays there we did not fly.
11      Q.   So those -- those wouldn't have been
12  weather interruptions; they would have been just
13  federal officials and employees' holiday schedule,
14  correct?
15      A.   Correct.
16      Q.   And how long would that have limited the
17  availability of resources?
18      A.   We did not fly missions between
19  23 December and 4 January.
20      Q.   January 4?
21      A.   Correct, 2017.
22      Q.   Okay.  Okay.  Let's look at topic 15,
23  please.  Take a moment, please, and read that, refresh
24  your reviewing that.
25      A.   Okay.

**116:16-21**
**401-402**

Page 117

1      Q.   Are you aware of any Customs and Border
2  Patrol or Homeland Security official speaking with any
3  person who was a protester in the camps or helping to
4  organize and support the camps?
5      A.   The only communications I'm aware of for
6  CBP or DHS was the active U.S. Border Patrol agents
7  that were on traffic control points or the ones I
8  spoke of earlier where they were assisting State and
9  local agents when protesters were trying to
10  outmaneuver the law enforcement line; and U.S. Border
11  Patrol agents, I believe it was Mr. Wright actually
12  was able to verbally deescalate the situation and get
13  the protesters to return from where they came from.
14      Q.   And so on that event, can you explain
15  what you did to prepare for inquiring about that and
16  understanding it so you could speak to the topic on
17  behalf of the Border Patrol -- Border Protection?
18      A.   This was, yes, the conversation that I
19  had yesterday on the 28th of November with the Border
20  Patrol agents from the Grand Forks Sector, and
21  reviewing the information provided by counsel.
22      Q.   And remind me, was it Mr. Wright that
23  you spoke to as part of the group yesterday?
24      A.   That was -- that is correct, Mr. Wright
25      Q.   Okay.  And what did he -- what did he

**117:22-24**
**Offer if**
**next**
**designa-**
**ted**
**testimony**
**comes**
**into**
**evidence**

Douglas W. Walker  30(b)(6)
November 29, 2022

**117:25-118:13**
**401-402**

Page 118

1   contribute to your understanding of the events where
2   he was on the ground and -- and I think you said
3   deescalated a situation?  Tell me about that.  What
4   did you understand that to involve?
5        A.   My understanding is they were made aware
6   of a group of protesters that were on the ground, on
7   foot, moving to over by the Backwater Bridge.  They
8   were trying to move -- maneuver to flank or outflank
9   the line of law enforcement officers that were holding
10  the line there; and were able to intercept them on the
11  ground and then have a conversation with them and get
12  them to retreat from where they started their journey
13  from.

**118:14-119:3;**
**119:10-16**
**Offer if next**
**designated**
**testimony**
**comes into**
**evidence**

14       Q.   And was Mr. Wright by himself when he
15  came across these people?
16       A.   No.  He indicated he was -- he was part
17  of a group of other State and local officers that --
18  that responded to that -- to that group.
19       Q.   Okay.  And I meant to ask this earlier.
20  Mr. Wright, his last name is spelled W-r-i-g-h-t or
21  differently?
22       A.   I believe that's correct, W-r-i-g-h-t.
23       Q.   Okay.  And what was the date of that
24  event?
25       A.   I don't recall the date.  It would -- it

Page 119

1   would have been between the dates of October and
2   November.  I just -- I don't remember what his date of
3   deployment was.

**119:4-9**
**401-402**

4        Q.   How do you know it was between
5   October and November?
6        A.   That was the dates given that they
7   provided that they had personnel on the ground on
8   those -- those ten-man details for a four-to-five-day
9   rotation at -- in -- at the Morton County EOC.
10       Q.   Okay.  Okay.  And so what did Mr. Wright
11  say happened?  He -- he was the person who was leading
12  the conversation with the protesters, or he was
13  standing there doing that with a group?
14       A.   If my memory serves, in the discussion,
15  he was part of the group that was able to deescalate
16  the situation and get the protesters to return.
17       Q.   Okay.  Where were the protesters coming
18  from in that situation?
19       A.   If my memory serves me, it was at the
20  checkpoint by the Backwater Bridge.
21       Q.   So they were coming from Corps of
22  Engineer land?
23       A.   I believe you're correct.
24       Q.   And where were they headed?
25       A.   They were attempting to maneuver around

Page 120

1   the line of law enforcement officers that were
2   maintaining that checkpoint.
3        Q.   Right.  Okay.  And the -- Mr. Wright was
4   part of the group that told them to "Back off and
5   get -- go back where you came from," right?
6        A.   That is correct.
7        Q.   So he helped send them back to the Corps
8   land where they were emanating from, correct?
9        A.   That would be correct.
10       Q.   Okay.  Was Mr. Wright the -- and his
11  Customs and Border Protection agent colleagues the
12  only federal officials present at that event, along
13  with the State of North Dakota, local and State law
14  enforcement officials?
15       A.   He did not indicate other -- other
16  agents accompanying him.
17       Q.   Do you know if other federal agencies
18  provided law enforcement agents on the ground like
19  Customs and Border Protection did?
20       A.   I'm only familiar with what Customs and
21  Border Protection or DHS provided.
22       Q.   Yeah.  Were those individuals armed or
23  not armed, your -- your colleagues?
24       A.   Armed.  Border Patrol agents and our
25  Air and Marine agents are armed agents.

Page 121

1        Q.   And are they trained in crowd control
2   and use-of-force measures?
3        A.   Border Patrol and Air and Marine
4   officers follow the Department of Homeland Security
5   and Customs and Border Protection use-of-force
6   documentation and are trained.
7        Q.   And under whose command and authority
8   were they present at that -- those times, do you know?
9        A.   Restate your question, please.
10       Q.   The ten or so, you said, Border Patrol
11  agents were there along with State and local law
12  enforcement; is that correct?
13       A.   That is correct.
14       Q.   And they were part of that effort
15  together.  Were they under the direction of a senior
16  law enforcement person from the State or County?
17       A.   The group, the Border Patrol agents,
18  would have -- they had a Border Patrol agent
19  supervisor that would have been in charge of that
20  detail at that time, and as the group, they would
21  report to -- they would be given their -- their
22  taskings from the command post or the emergency
23  operations center.
24       Q.   So they were -- they were under the
25  direction of the Morton County Emergency Operations

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 122

1  Center?

2      A.   They were -- they were there to support
3  the Morton County Operations Center, correct.

4      Q.   Okay.  Who was the Border Protection
5  agent supervisor on that day that you're describing
6  that they were interacting with protesters?

7      A.   I don't have that name in front of me.

8      Q.   Was Agent Wright a member of the group,
9  or was he a supervisory person?

10     A.   Agent Wright might -- might have been a
11 supervisory Border Patrol agent at the time.  I don't
12 remember, though.

13     Q.   Okay.  If we could take a look at
14 topic 16, please.  What enforcement actions or
15 investigations did the Department of Homeland Security
16 and/or the Customs and Border Protection take at any
17 time with respect to protesters on Corps-managed land
18 during the protests?

19     A.   There were no actions or investigations
20 taken by the Department of Homeland Security or CBP in
21 respect to the persons or Corps-managed -- on Corps-
22 managed lands.

23     Q.   How do you know that?

24     A.   It was reviewed material provided with
25 the counsel and discussions with them.

[margin note: 122:14-22 401-402]

Page 123

1      Q.   So that your -- your talking with the
2  attorneys forms the basis of your testimony on this
3  topic?

4      A.   To the best of our knowledge, there were
5  no enforcement actions or investigations taken by the
6  Homeland Security or the Border Patrol.

7      Q.   And let me ask my question again,
8  Mr. Walker.  Are you relying upon the binder given to
9  you by your counsel as the basis for your testimony
10 and response on behalf of the U.S. Department of
11 Homeland Security for this topic?

12     A.   That and discussions with the OCC for
13 CBP as well, yes.

14     Q.   What does OCC stand for?

15     A.   Office Chief -- Office -- Office of
16 Chief Counsel.

17     Q.   So same question:  You're relying upon
18 your counsel, whether the U.S. Attorneys or agency
19 counsel, as the basis of your testimony on this topic?

20     A.   That is correct.

21     Q.   Okay.  Did you make any other efforts to
22 research this by talking with your Customs and Border
23 Patrol colleagues yesterday?

24     A.   That is correct, we did talk about it.
25 And they made no arrests or enforcement actions or

Page 124

1  investigative actions.

2      Q.   So on the six hours you told me you
3  spent preparing for this deposition, which is a
4  30(b)(6) deposition, four and a half of that was being
5  counseled by your attorneys, several of them, and one
6  and a half was spent yesterday, the day before today,
7  with respect to preparing for your deposition.  And
8  that, together, is the sum basis of your preparation;
9  is that accurate?

10         MS. BOBET:  Objection, mischaracterizes
11 testimony.

12     Q.   (BY MR. SEBY)  It's a question,
13 Mr. Walker.

14     A.   That would be correct.

15     Q.   Okay.  Did the Customs and Border Patrol
16 or the Department of Homeland Security suggest any
17 other federal agency or officials take any action
18 against the protesters on Corps property associated
19 with the DAPL protests?

20     A.   Can you re--- say that -- repeat that
21 question?

22     Q.   Did the United States Department of
23 Homeland Security or its component agency, the
24 United States Customs and Border Protection, ever ask
25 other federal agencies or officials to take any action

[margin note: 124:22-125:4 401-402]

Page 125

1  against the protesters on Corps of Engineers property
2  associated with the DAPL protests?

3      A.   I do not believe the Department of
4  Homeland Security or CBP made that request.

5      Q.   And that -- that's despite what you saw
6  for months upon end from the aerial drone and the
7  helicopter?

8          MS. BOBET:  Objection, vague.

9      A.   Our participation was to provide the
10 State the information as live data and live feed.  As
11 it had no border nexus, there's no enforcement action
12 or investigation that the Homeland Sec--- -- Department
13 of Homeland Security or Customs and Border Patrol
14 would take at that -- at the -- at the DAPL protest.

15     Q.   (BY MR. SEBY)  Well, what was the --
16 what was the border nexus for providing, on the
17 ground, ten law enforcement agents to the State of
18 North Dakota efforts?  What was the nexus there?

19     A.   That was based on a request to provide
20 the additional resources; and that the U.S. Border
21 Patrol officers are granted the peace-officer status
22 of North Dakota; and as a neighbor, to help a
23 neighbor.

24     Q.   I'm not asking you a legal conclusion,
25 but you said that you made efforts to identify, in the

Page 126

```
 1   North Dakota Century Code, the statutes of the State
 2   of North Dakota, that you were designated, as a
 3   federal law enforcement officer, as a peace officer in
 4   the state of North Dakota.
 5            Do you happen to know if any other
 6   federal officer with any other federal entity also
 7   enjoys that designation under State law?
 8            MS. BOBET: Objection, calls for a legal
 9   conclusion, and is outside the scope.  It's asking
10   about agencies that this witness is not testifying on
11   behalf of.
12            If you know in your personal capacity,
13   please answer.
14            THE DEPONENT: Thank you, Ms. Bobet.
15       A.  So as a federal law enforcement officer
16   myself, I researched where an Air and Marine agent
17   would fall within the State Century Code, as within
18   the State Century Code it actually specifically says
19   "U.S. Border Patrol agents," not "Air and Marine
20   officers or agents."
21            So from my personal understanding of the
22   Century Code, only U.S. Border Patrol agents are
23   granted that peace-officer status unless another
24   agency has sworn officers that may get into a local
25   task force.
```

Page 127

```
 1       Q.  (BY MR. SEBY)  When you were aware of
 2   this, was that something that you shared with other --
 3   other colleagues in the Customs and Border Protection
 4   unit in Grand Forks?
 5       A.  Yes, that's correct.
 6       Q.  Did you ever bring that provision up or
 7   your understanding of it up during the DAPL protest
 8   period?
 9       A.  I don't believe I did.
10       Q.  Okay.  Did anyone ever bring it up with
11   regard to the willingness to provide ten agents on the
12   ground in support of the State?
13       A.  As I indicated --
14            MS. BOBET: Objection, vague, calls for
15   speculation.
16       Q.  (BY MR. SEBY)  I'm asking you if you
17   ever recollect anyone bringing that up as part of
18   conversation or discussion --
19       A.  No.
20       Q.  -- in the time when you were formulating
21   how to respond to the State's request for assistance.
22       A.  I don't recollect -- re- -- recollect
23   any conversations with anybody about peace-officer
24   status.
25       Q.  Okay.  That's just a personal
```

Page 128

```
 1   observation you carried, right?
 2       A.  That is correct.
 3       Q.  Okay.  What provision of the
 4   North Dakota Century Code are you referring to?
 5       A.  I would have to research that, where
 6   it's stated exactly in the North Dakota State Century
 7   Code.
 8       Q.  But you're confident it's there?
 9       A.  I am, yes.
10       Q.  Okay.  Okay.  If we could go to
11   topic 18, please.  Take a -- take a moment and review
12   that.  Have you read it?
13       A.  Yes.
14       Q.  Okay.  So some of this I think we've
15   covered, but I want to ask you to -- to tell me what
16   we've covered with respect to this topic, which reads,
17   "Resources of any sort provided, or decisions or
18   considerations regarding whether or how to
19   provide . . . resources, to North Dakota from August 1
20   of 2016 through August" -- or, pardon me, "through
21   March 1 of 2017, related to the DAPL protests and the
22   occupation of Corps-managed . . . lands," known as the
23   Oahe Project, "including the cleanup of such lands
24   after the occupiers left, by any department or
25   agency . . . of the U.S."  And this topic, of course,
```

Page 129

```
 1   is limited to the Department of Homeland Security and
 2   Customs and Border Protection.
 3            So walk me through that, if you would,
 4   the first part.  What -- any sort of resources, any,
 5   without limitation, did DHS and Customs and Border
 6   Protection provide to the State of North Dakota?
 7       A.  All right.  Chronologically, we provided
 8   a -- or by topic, I guess, an MQ-9 UAS from the 22nd
 9   of August through the 23rd of December 2016; and then
10   4 January through 21 February of 2017.  During that
11   time period, that UAS flew almost 281 hours of flight
12   time in support of the State of North Dakota in the
13   DAPL protests.
14            And we had one intelligence agent that
15   was providing direct consultation or liaison abilities
16   with the State and the emergency operations center
17   regarding the UAS and the Bigpipe feed and making sure
18   that the State was getting the feed they needed and
19   help with troubleshooting, if necessary.
20            In October, the U.S. Border Patrol
21   provided agents, as we discussed earlier, through
22   November, almost to the end, or right after
23   Thanksgiving time period, to help augment the State of
24   North Dakota with their surge of protesters at that
25   time.
```

Page 130

1      The Air and Marine office also provided
2  an AS350 helicopter for four days at the -- at the
3  DAPL, at the protest, from the 27th through the 30th,
4  to provide aviation observation and support.  And --
5      Q.  That's the 27th through the 30th of what
6  month?
7      A.  Of October 2016.
8      Q.  Okay.
9      A.  In January, we -- in January and
10  February, we continued to provide UAS Bigpipe downlink
11  feeds.
12      And then in February of 2017, Air and
13  Marine Operations from North Dakota provided an
14  op agent to act as a liaison officer through the 21st
15  of -- 21st of February, 22nd of February, when the
16  camp was -- or the 23rd of February when the camp was
17  cleaned out or overflown.
18      And that would be our involvement to --
19  of resources provided.
20      Q.  Okay.  The four days in October of 2016,
21  why was the helicopter provided at that time for those
22  limited period of days?
23      A.  One of the reasons was that was when the
24  Border Patrol started responding to the additional
25  requests, and a request was made -- and we provided an

Page 131

1  additional helicopter to augment the North Dakota
2  Highway Patrol's fixed-wing aircraft during that time
3  period.
4      Q.  So you were responding to a specific
5  request in October?
6      A.  That is correct.
7      Q.  And tell me about that request, if you
8  would, please.
9      A.  That would have been the same request.
10  And the Border Patrol would have shared -- would have
11  shared information to us of their support down there
12  into the DAPL.  A decision was made -- I wasn't part
13  of that decision, but a decision was made to provide a
14  helicopter during that time period to -- to assist
15  the -- the command post.
16      Q.  Who made the decision at that time for
17  that particular provision of resources?
18      A.  I don't have the specific name of that
19  requester.
20      Q.  No, who -- who authorized the additional
21  resources, is what I'm asking.
22      A.  That -- that re- -- that request would
23  have been approved by our director, Max Ratterman, for
24  NASOC Grand Forks.
25      Q.  Was there a new request, or was that the

Page 132

1  earlier same request, just you -- you decided to
2  supplement the resources?
3      A.  I believe that was a supplement
4  decision, to supplement the resources.
5      Q.  Okay.  And why was that helicopter only
6  provided for four days?
7      A.  I don't know.  I do not have the reason
8  why the helicopter was only there for four days.
9      Q.  Did you ask about that?
10      A.  No, I did not.
11      Q.  So what did you do to prepare for this
12  topic?
13      A.  Part of it was to research what flight
14  logs I could find for flights that had occurred during
15  that time period of the responses; and those flight
16  logs that were identified as the Bismarck -- what we
17  deemed the Bismarck task force; and then in addition
18  with U.S. Border Patrol and counsel.
19      Q.  So let's -- this is the first time I've
20  heard you use the phrase "Bismarck task force."  What
21  does -- what does that mean?
22      A.  So it was one way that we were tracking
23  part of -- when I say "we," the NASOC Grand Forks was
24  tracking flights to identify those flights that were
25  flown in support of either the pipeline protest or the

Page 133

1  Bismarck task force.  It just depended on what the
2  pilot logged it as or their -- the operations officer
3  had logged those flights as.
4      Q.  So it was a -- it was a type of mission
5  designation, so you could -- you could allocate the
6  resources, right?
7      A.  That's correct.
8      Q.  Okay.  Obviously, you've explained that
9  the Customs and Border Protection unit, Grand Forks,
10  did provide resources, and you've just explained to me
11  what those were.  I appreciate that.
12      But were there -- were there any other
13  resources that were available that you discussed but
14  were not provided to North Dakota?
15      A.  The only ones would be the discussion we
16  had earlier on the conversation in 2017 with Captain
17  Woodall; that additional assets would have been --
18  could have been requested if they deemed it necessary.
19      Q.  Subject to their availability and all
20  that, right?
21      A.  That is correct.
22      Q.  Okay.  And then the -- the lending of
23  the helicopter for the overflight when the camps were
24  being disbanded and people had been told to leave,
25  were the Customs and Border Patrol agents on the

Page 134

1  ground present, or was the helicopter the resource
2  available and provided during that time?
3       A.  The helicopter was what was provided.
4       Q.  Yeah.
5       A.  Myself and one other agent.
6       Q.  Yeah.  Did you ever pilot the helicopter
7  in a way that was used as a means to move people on
8  the ground --
9       A.  No.
10      Q.  -- or influence their -- their behavior
11  on the ground?
12      A.  No.
13      Q.  It was for monitoring and information
14  purposes?
15      A.  That is correct.
16      Q.  And that information -- who were you in
17  communication with during that period of time from the
18  State or local law enforcement?
19      A.  We would have had a radio within the
20  helicopter that we would use to talk to ground agents
21  or the command center of what we were observing and
22  to have been able to relay that information.
23      Q.  And were you doing that during your
24  period of time in the air?
25      A.  That is correct.

Page 135

1       Q.  What sort of things do you recall
2  alerting them to while you were -- had the vantage
3  point of being in the air?
4       A.  As they moved through the camp and
5  various locations, we could tell them how many people
6  on the ground we saw.  If there was a group of law
7  enforcement officers moving to an area where somebody
8  had been and had moved, or they were looking for
9  somebody, we could let them know -- we let them know
10  where, you know, around the building they may be or
11  where they moved to, to keep them apprised of the
12  situation.
13      Q.  Yeah.  What was your sense of the
14  conditions on the ground in the camp?  Was it -- was
15  it a mess?
16      A.  My personal reflection on it, it was
17  worse than some Third-World countries I've been to.
18      Q.  Why is that?
19      A.  A lot of garbage and waste left; and at
20  that time, the grounds were thawing out, so of course
21  all the vehicle movement scarred the ground; and just
22  pretty ugly.
23      Q.  What kind of waste are you referring to?
24      A.  Empty propane bottles, garbage bags,
25  vehicles, construction equipment, construction

Page 136

1  materials.
2       Q.  Yeah.  Did you see people in the camps
3  that were not law enforcement?
4       A.  Yes.
5       Q.  And what were those people doing?
6       A.  From my observation in the helicopter,
7  they weren't resisting, but they weren't assisting as
8  well.  Some were walking across the frozen Cannonball
9  back to -- I believe it was tribal land.
10          There was one active resister that
11  perched himself up on top of one of the buildings;
12  that the law enforcement agents actually had to go up,
13  climb up, and talk him off the building, which took
14  quite some time.
15      Q.  So you saw structures in the camps when
16  you were flying over them as the people were being
17  directed to leave?
18      A.  Yes.
19      Q.  Were they hard -- hard structures, or
20  were they just like a bunch of small, soft pup tents?
21      A.  No, they were -- they were hard soft --
22  they were hard shelters with metal roofs, just like
23  you would build a shed or a house.
24      Q.  This is in the main camp on the Corps
25  property just north of the Cannonball River?

Page 137

1       A.  That is correct.
2       Q.  Yeah.  Did you see lots of vehicles?
3       A.  There were numerous vehicles within the
4  camp that were stuck because of the thawing of the
5  ground.
6       Q.  What kind of large vehicles did you see,
7  trailers, trucks, that kind of thing?
8       A.  The majority of it was small camp
9  trailers or, yeah, pickup trucks, vans, cars.
10      Q.  Uh-huh.  Still horses?
11      A.  I don't remember if there were -- seeing
12  horses at that time or not.
13      Q.  Firewood?  Firewood all over the place,
14  that kind of thing?
15      A.  There was wood.  Whether it was firewood
16  or not, from the air, I wouldn't be able to identify
17  it.
18      Q.  Were you communicating with any federal
19  officials other than the -- outside of the Homeland
20  Security, Customs and Border Protection, during that
21  period of time?
22      A.  No.
23      Q.  To your knowledge, were there any other
24  federal representatives present, or were you a lone
25  wolf?

Page 138

1    A.  For other law -- federal law enforcement
2  agencies, I'm not -- I don't remember who else was
3  involved in the evacuation of the camp.  I just
4  remember my -- my concern was the helicopter and my --
5  my other passenger agent.
6    Q.  Right.  Were you concerned you would be
7  shot at?
8    A.  There was a concern.  What we do is
9  risky, but that's -- that's part of the job.
10   Q.  Yeah.  Were you aware of whether there
11 were firearms in the camp?
12   A.  Only to the extent that information
13 provided by the States, information that they were
14 providing.
15   Q.  Yeah.  Okay.  Let's go to topic 20.
16 Take a moment there and just refresh your recollection
17 of that one.
18   A.  Okay.
19   Q.  Okay.  This is, again, limited to the
20 Homeland Security department and the Customs and
21 Border Protection, but what -- what decisions are you
22 testifying as to the Homeland Security and Customs and
23 Border Patrol to provide or withhold law enforcement
24 assistance to the State of North Dakota and its local
25 authorities during the protests?  Are you aware of

Page 139

1  decisions to provide assistance to the State?
2    A.  The decisions by DHS and CBP to provide,
3  and we've already discussed the -- what we -- what we
4  were able to provide and when.
5    Q.  Yes.  Anything you want to say further
6  with respect to your testimony, which -- which we
7  have?
8    A.  The only thing that I could reiterate
9  was the amount of time that we did use the UAS, over
10 195 hours in 2016 and over 86 hours, 85 hours in 2017;
11 and then we also provided the Border Patrol agents;
12 and an additional 24 hours of helicopter support in
13 October and in February to the State of North Dakota.
14   Q.  Okay.  And how about decisions by the
15 Department of Homeland Security and the Customs and
16 Border Protection to withhold law enforcement to the
17 State of North Dakota or local authorities during the
18 DAPL protests?
19   A.  Well, what I would say for DHS and CBP
20 to withhold it was dependent on the decisions of --
21 from the CBP headquarters, the time period for the
22 U.S. Border Patrol, where they provided support
23 between October and November, which we were limited by
24 weather for UAS aircraft to fly.  And then to -- at
25 the end of it, we had another operation that had been

Page 140

1  planned and was necessary for -- to end our UAS
2  coverage at the end of it, after the main camp had
3  been evicted.
4    Q.  After?
5    A.  Correct.
6    Q.  So prior to the time which you flew over
7  the camp in the helicopter as it was being cleared,
8  that's when the US- -- UAS went away and never came
9  back?
10   A.  That is correct.
11   Q.  But at no time prior was it withdrawn?
12   A.  There was no federal -- no -- no --
13 other than the time between Christmas holidays, the
14 23rd of December and the 4th of January, when we
15 didn't have personnel available to fly or we didn't
16 have the ability to fly during that time period.
17   Q.  Okay.  So your preparation for this
18 topic was -- was what?  What did it involve for this
19 specific topic?
20   A.  Again, we discussed the topics in the
21 binder provided; talked with the U.S. Border Patrol
22 agents that were part of the protest or response to
23 it; and --
24   Q.  Yesterday?
25   A.  Yesterday.  And, again, discussion with

Page 141

1  CBP lawyers and DHS, along with the U.S. Attorney's
2  Office.
3    Q.  Uh-huh.
4    A.  And then my personal understanding that
5  at the end of the -- February the 21st was the last
6  flight, because of weather, unable to fly during the
7  eviction; and then due to an operation that Air and
8  Marine was tasked with to do some studies and some
9  testing on the southwest border, which required a
10 majority of our agents to deploy to San Angelo, Texas,
11 to conduct that operation.
12   Q.  Southern-border related?
13   A.  That is correct.
14   Q.  Did the change in administrations allow
15 the Customs and Border Patrol any additional latitude
16 that was not available or provided during the
17 preceding administration?
18   A.  I don't -- I do not believe so.
19   Q.  So you didn't see a difference?
20   A.  The only -- the only difference DHS or
21 CBP saw was the Senate and Congressional inquiries
22 into what Air and Marine was doing directly to support
23 the State of North Dakota in the DAPL proc- -- in the
24 DAPL process.
25   Q.  Did you ever actually speak with the

Page 142

1  Customs and Border Patrol officials in the agencies,
2  Washington, D.C., headquarters office, during any time
3  of the DAPL protest?
4      A.   I would have talked to, along with our
5  supervisory staff, the director, deputy director, we
6  would have -- we held meetings with the director of
7  National Air Security Operations Center headquarters
8  in D.C.
9      Q.   Would have or did?
10      A.   We did.
11      Q.   And during those meetings, were they
12  like a virtual meeting, a Zoom, like this is now, or
13  were they on telephone?
14      A.   No, the -- a teleconference call.
15      Q.   Okay.
16      A.   Multiple.
17      Q.   Right, right, right.  And were you ever
18  asked to speak and provide information during those
19  conferences?
20      A.   Yes.
21      Q.   And -- and when did that start?
22      A.   That would have been in the end of
23  January when I -- before I drafted that letter to --
24  or had the discussion with Captain Woodall.  And we
25  would have been discussing what we were doing, what we

Page 143

1  were seeing, and our -- our thoughts of what we were
2  providing to the State of North Dakota, to our higher
3  headquarters.
4      Q.   So who -- who would have participated
5  and -- in those teleconferences prior to your
6  participation in January of 2017?  Who would have been
7  advising the Customs and Border Protection
8  headquarters in those calls in 2016, for example?
9      A.   That would have been our director of
10  National Air Security Operations Center headquarters
11  director, and his -- parts of his staff, his
12  operations, and his advisory staff there.  And then
13  he -- he would have relayed that information up to the
14  executive director for Air and Marine Operations and
15  worked through the chain of command at the
16  headquarters.
17      Q.   And were you a participant in those
18  calls, just an observer at all, in 2016?
19      A.   No.  Those were above -- above my level
20  of exposure.
21      Q.   Uh-huh.  At any time during 2016 did you
22  ever hear concerns or otherwise with respect to the
23  Customs and Border Patrol resources that were provided
24  to North Dakota?
25      A.   No.

Page 144

1      Q.   Okay.  Did you ever hear any changes in
2  the direction or nature of the resources that were
3  provided coming from Washington, D.C., headquarters?
4      A.   No.
5      Q.   Did any other -- are you aware of any
6  other agency in the United States expressing concern
7  to or about the Customs and Border Patrol role and
8  resources?
9      A.   No.  No, I do not.
10      Q.   Okay.  Can you tell -- detail the type
11  of resources that Department of Homeland Security and
12  Customs and Border Patrol has in that general
13  geographic region, North Dakota, Montana, Minnesota
14  border areas?
15      A.   Are you wanting currently, current
16  information, or 2017, '16?
17      Q.   Let's start with what it was like in
18  2016.
19      A.   2016, North Dakota had the National
20  Air Security Operations Center Grand Forks; we had two
21  MQ-9 UAS aircraft; and we had two AS350 helicopters
22  and one Beechcraft King Air civilian-style airframe.
23  I don't know what the Montana Air Unit had for assets
24  at that time.
25      Q.   Did the Montana office ever provide any

Page 145

1  resources to North Dakota --
2      A.   No.
3      Q.   -- office?
4      A.   No, they did not.  No.
5      Q.   Did the Montana office have UASs?
6      A.   No.  The only location with UAS is
7  San An- -- or at that time was Sierra Vista, Arizona;
8  Grand Forks, North Dakota; and Corpus Christi, Texas.
9      Q.   Okay.  How about today, what does it
10  look like in 2022?
11      A.   So 2022, National Air Security
12  Operations Center Grand Forks has two.  I think
13  they -- I believe they have two, and they have a third
14  MQ-9 UAS system; they have an H125 helicopter, which
15  is almost identical to the AS350 helicopter, just a
16  different avionics package; and they have one
17  Cessna 206 fixed-wing airplane, with no cameras or
18  anything, just a slick airplane.
19      Q.   As an agency that has a big monitoring
20  role, when you see incursions on the border, what do
21  you do?  Who do you call for law enforcement response?
22      A.   So an incursion on the border, we're
23  going to first rely on our Border Patrol partners.
24  That's their primary mission.  Of course, we've got
25  the Office of Field Operations that meet all our

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 146

1  travelers or pedestrians at the land -- the port of
2  entries at the land borders or the air borders.
3        For Air and Marine, if we see something
4  like that, if we have the ability -- the helicopter,
5  of course, can land, so if we have the ability to land
6  somewhere and intercept or discuss -- you know, talk
7  to the individuals that are coming across the border.
8        But most of the time that information
9  could be relayed to the Border Patrol or even a State
10  and local agency to respond and take care of that
11  information -- or talk to that individual or persons.
12      Q.  Did you have any other kind of sens- --
13  sensory devices in the Border Patrol in 2016, other
14  than visual and infrared?
15      A.  For the Border Patrol, that -- they have
16  additional resources that's border related.  But for
17  what they could provide to the State of North Dakota
18  would have been a vehicle-based, EO/IR-style camera on
19  an -- on an extending boom that would move -- be
20  deployed above a vehicle.
21      Q.  Are you able to tell when a vehicle
22  is -- has weapons in it that travels across the
23  international border?
24      A.  No.
25      Q.  What about if there were munitions in a

Page 147

1  vehicle traveling across the United States border,
2  could you tell?
3      A.  The only -- and back up on that other
4  question, is if the Office of Field Operations deems a
5  vehicle or individuals or a commercial transport is
6  suspect, they can take them into what's called a
7  secondary inspection and investigate the vehicle or
8  travelers further.
9        Commercial based, they have a --
10  basically, an X-ray truck that can X-ray those
11  vehicles and look for anomalies within the load.
12        But for an agent or officer or law
13  enforcement officer to look at a vehicle, we have --
14  until we have some reason to enter that vehicle,
15  there's no way to tell if it has munitions or armor --
16  arms within it.
17      Q.  How about the -- the equipment that the
18  Border -- Customs and Border Protections has:  Do you
19  have facial-recognition software?
20      A.  I believe they are starting to field
21  that facial-recognition software out there at the --
22      Q.  Was that available --
23      A.  -- ports of entry and --
24      Q.  Yeah.  I'm sorry.  Was that available in
25  2016 in Grand Forks?

Page 148

1      A.  No, I do not believe so at that time.
2      Q.  Okay.  How granular does the UAS get
3  with looking at that altitude, 20,000 feet down on the
4  ground?  What can you see, with what -- what
5  precision?  Can you read license plates?
6      A.  We can't read license plates.  On a good
7  atmospheric day, the sensor operator might be able to
8  tell the make and model of a vehicle.  He can tell --
9  on a good day, you might be able to tell the color.
10  When you start getting into your grays and your tans,
11  those all start blending together.
12        Depending on it, we can -- you can tell,
13  you know, the size of an individual, you know, whether
14  they're larger or smaller, petite.  You can tell the
15  difference between an adult male that's 7 -- 6 foot to
16  a child or a dog.  Like I say, if it's a real clear
17  day, we can get maybe the color of their clothing, but
18  that -- it's got to be perfect to do that.
19      Q.  Are you aware of whether the FBI sought
20  to supplement the monitoring equipment through
21  providing its own drones?
22      A.  I am not aware.
23        MS. BOBET:  Just to be clear, this
24  answer will need to be -- I'm sorry.  Just one second.
25        Just to be clear, this answer will need

Page 149

1  to be in his personal capacity since it's asking about
2  information from another agency.
3        But with that, you can answer, sir.
4      A.  Yeah.  I -- personally, I don't know of
5  any request or any FBI providing additional drone or
6  UAS support.
7      Q.  (BY MR. SEBY)  Are you aware of whether
8  or not the FBI maintains a drone unit of its own in
9  Quantico, Virginia?
10        MS. BOBET:  The same objection --
11      A.  Personally, I --
12        MS. BOBET:  -- same instruction
13  regarding testifying in his personal capacity.
14      A.  No.  Personally, I -- I can speculate
15  they would, but I can't confirm it.
16      Q.  (BY MR. SEBY)  Did you ever discuss the
17  FBI drones with FBI Agent O'Connell?
18      A.  No, I did not.
19      Q.  With Mr. Bob Perry of the FBI?
20      A.  No, I did not.
21      Q.  Do you know Mr. Perry?
22      A.  I've probably met Mr. Perry, but we're
23  going on, you know, seven years ago, so I don't know
24  if I met him or not or know him personally.
25      Q.  Why would you think you might have?

149:16-
20
401-402

Douglas W. Walker 30(b)(6)
November 29, 2022

Page 150

1      A.    If Mr. Perry was present at the command
2  post during my time as a liaison officer, I more than
3  likely shook his hand, said hi to him.
4      Q.    Okay.
5      A.    That would be my role in -- in -- in
6  that.
7      Q.    So let me ask you about your role as a
8  liaison officer in the EOC.  You -- you weren't -- you
9  weren't there very much, though, were you?
10     A.    At the EOC, I was only there for a
11 couple days.
12     Q.    And what days would those have been,
13 what period of time?
14     A.    The mission was the 23rd, 24th.  I
15 believe I was there a couple days before that.  So I
16 got there like a Sunday night, if I remember my dates
17 correctly.
18     Q.    Help me with the month.
19     A.    Two thousand -- it was February of 2017.
20     Q.    Okay.  So starting in -- on that date
21 through the end, you were only there physically a
22 couple of days, right?
23     A.    Correct.
24     Q.    Okay.  Did you ever interact with other
25 federal representatives of any kind related to the

Page 151

1  DAPL protest outside of your physical presence in the
2  State Emergency Operations Center?
3      A.    No, I did not.
4      Q.    Never had follow-on calls with them to
5  talk about anything or -- at all?
6      A.    Personally, I do -- I do not remember
7  having follow-on conversations with them.
8          MR. SEBY:  Okay.  All right.
9  Mr. Walker, I don't have any further questions for
10 you.
11         Ms. Bobet, if you do, please feel free.
12         MS. BOBET:  Thank you.  I will have some
13 follow-up matters.  We've been going for about an hour
14 and a half now.  Perhaps we could take a ten-minute
15 break, and then when we come back, I'll ask you some
16 questions.
17         MR. SEBY:  Sounds good.  Ten minutes?
18         THE VIDEOGRAPHER:  Going off the record.
19 The time is 8:57 p.m. UTC, 1:57 p.m. Mountain.
20         (Recess taken 1:57 p.m. to 2:08 p.m.
21 Mountain Standard Time.)
22         THE VIDEOGRAPHER:  Back on the record.
23 The time is 9:08 p.m. UTC, 2:08 p.m. Mountain.
24
25

Page 152

1               EXAMINATION
2  BY MS. BOBET:
3      Q.    I just have some follow-up matters to
4  ask you about, Mr. Walker, if you'll bear with us
5  here.
6          First, just some kind of clarifying
7  questions about your preparation for your deposition
8  today.  I think you were asked earlier if you talked
9  with anybody from outside CBP, that is, Customs and
10 Border Protection.
11         You may have answered this already, but
12 just so it's clear, I think I heard you say that
13 outside of CBP, you also talked to Intelligence
14 Officer Ryan Wentz, who is with DHS, as well as
15 counsel from DHS that is not CBP counsel.  Do I have
16 that right?
17     A.    Yes, you do.
18     Q.    And in another -- for the deposition
19 prep discussion yesterday, that we've talked about, we
20 went through each of your designated topics with the
21 group that participated in that discussion, right?
22     A.    Yes.
23     Q.    That is, we talked about each of those
24 topics with the group, to include the individuals from
25 the CB- -- CBP sector, which is Mr. Wright, correct?

Page 153

1      A.    Correct.
2      Q.    And as far as materials that you
3  reviewed to prepare for your deposition, that -- that
4  binder of background materials, did you review all the
5  portions of that that you thought could be relevant to
6  your testimony or that might refresh your recollection
7  for today?
8      A.    Yes, that is correct.
9      Q.    I understand you reviewed some other
10 documents to refresh your memory before today's
11 deposition.  Tell me if I have these right:  That
12 includes certain CBP flight logs; is that correct?
13     A.    That is correct.
14     Q.    And additionally to prepare for today
15 and refresh your recollection, you reviewed some
16 information regarding financial reimbursement for
17 drone flights; do I have that right?
18     A.    Yes.
19     Q.    And then -- and this is all in addition
20 to the relevant materials from that background binder
21 that we provided.  I understand you also -- this
22 morning we received these -- the exhibits that the
23 State planned to ask you about, and that you took a
24 look at those this morning before the deposition; is
25 that right?

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 154

1    A.   That is correct, yes.

2    Q.   Okay.  You mentioned collecting some

3    emails over a year ago potentially in connection with

4    this case.  Do you recall, was that to do with a

5    particular -- with a deposition?

6    A.   The -- the emails and information that I

7    remember collecting was due to a litigation hold that

8    came through --

9    Q.   Okay.  So --

10   A.   Yeah, I had received that litigation

11   hold through Mr. Frank Albi.  So I went back through

12   and tried to find records that fell within that

13   purview.

14   Q.   Okay.  So those weren't -- weren't

15   documents that you reviewed in connection with today's

16   deposition, right?

17   A.   That is correct.  Those were previous to

18   the deposition, but just the information that we

19   had -- that I could find for the litigation hold.

20   Q.   Okay.  And about, sort of, the timing

21   for -- or the amount of time for your deposition

22   preparation, that -- and I think your estimate is

23   different from mine.

24        So I have the -- you had a conversation

25   with Mr. Albi, the CBP attorney, that was around an

Page 155

1    hour; another conversation with DHS and CBP counsel

2    and Officer Wentz that was another hour; a

3    conversation with folks from my office, the U.S.

4    Attorney's Office, and DHS and CBP counsel that was

5    yet another hour and 20 minutes, approximately; and

6    then a final meeting with individuals from my office,

7    DHS and CBP counsel, and then individuals from Grand

8    Forks Sector, and that that meeting was approximately

9    three hours total, with the Grand Forks folks

10   participating for about 1.5 hours of that

11   conversation.  Is that all correct as far as the

12   timing for meetings to prepare for today?

13   A.   Yes, that is correct.

14   Q.   So just the time spent in meetings or

15   discussions to prepare for today's deposition adds up

16   to between six and six and a half hours, right?

17   A.   I believe so, yes.

18   Q.   And then in addition to that, you spent

19   some time reviewing the documents that we've listed

20   out?

21   A.   Yes.

22   Q.   About how much time, ballpark in time,

23   would you say you spent looking at documents or

24   researching things to -- to refresh your memory or

25   prepare for today, separate from the discussions that

Page 156

1    were around six or six and a half hours?

2    A.   The documents I received today was about

3    30 minutes to review those.  And then the litigation-

4    hold documents that I was researching was probably

5    close to four hours, or finding all those and those

6    flight logs.

7    Q.   And then just to be clear, when you say

8    the litigation-hold documents that you were

9    researching, I want to be very clear about what you

10   did a year and a half ago, which I understand was not

11   in connection with this deposition, because you didn't

12   know about it then, versus what you did specifically

13   to prepare for today.

14        So when you refer to reviewing

15   litigation-hold documents to prepare for today, what

16   do you mean by that?

17   A.   I think one of them was --

18   Q.   What documents were those?

19   A.   Yeah.  One was the letter from the

20   governor requesting assistance; one piece of

21   documentation was also the operational directive that

22   the Border Patrol created for their time period that

23   they responded in October; the CBP flight logs, when

24   we flew our helicopter on specific DAPL protest flight

25   times, and the UAS flight logs to calculate how much

Page 157

1    time we spent doing that; and then researching the --

2    what would normally be a reimbursement rate that

3    another agency may have to pay for to use our UAS

4    asset.

5    Q.   And did reviewing those documents

6    refresh your memory for today?

7    A.   Yes, they did.

8    Q.   Okay.

9    A.   That didn't come through.

10   Q.   Let's talk about that -- oh, I'm sorry.

11   Go ahead.

12   A.   There was -- your video was moving, but

13   I didn't have any sound, so I don't know if I missed

14   something.

15   Q.   All right.  Hopefully you can hear me

16   now.

17        Let's talk about that flight

18   reimbursement that you mentioned.  You said this is a

19   cost that if CBP deployed an asset like the UAS drone

20   on behalf of another agency, this is -- a

21   reimbursement request would be made.  Tell me about

22   that.

23   A.   So my understanding, organizations like

24   FEMA, and even the Army Corps of Engineers, have no

25   aviation assets, so in order to access that -- that

**ND OBJ:** Relevance; Introduces new material

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 158

1  the ability for flight time, they need to -- and I'm
2  not sure what the definition is of "nipper"
3  (phonetic), but they actually set aside money to
4  another agency to pay for that flight time.
5          So the one referenced flight where I
6  flew the Army Corps of Engineers on the Fargo
7  diversion, they actually gave them an estimated flight
8  time, and they -- the best of my understanding is DHS
9  or CBP received the amount of money in reimbursement
10  for the flight time I spent giving them the -- their
11  flight.
12          So there's calculated -- there's rates
13  that are published every year.  I had to use -- the
14  only ones I could find were from 2011 and 2021,
15  easily, so I was able to come up with an approximate
16  value of about $5,000, $5,200 a flight hour for a UAS
17  during that -- during that time period.
18      Q.  So that's the approximate reimbursement
19  rate for the UAS flight hours during the 2016, 2017
20  time frame; is that right?
21      A.  Right.  So the total amount flown,
22  roughly 281 hours, at $5,200 is -- comes out to
23  like 1- -- just a little over $1.5 million spent.
24      Q.  To your knowledge, did CBP seek that
25  $1-million-plus in reimbursement from the State or

Page 159

1  local government of North Dakota in connection with
2  those drones?
3      A.  No.
4      Q.  Okay.  And you testified earlier you
5  didn't recall who the initial request for that drone
6  support came from; that that's -- that's fine.  I
7  won't ask you that again.  I just wanted to clarify.
8          Do you -- is it your understanding that
9  the initial request for the drone support from CBP
10  came from someone within North Dakota State or local
11  government?
12      A.  It could have been inside the State and
13  local; it could have been another federal agency, the
14  Border Patrol; Mr. Bacon might have been -- he would
15  have been assisting to get that -- that request -- I
16  don't want to say "drummed up," but initiated to
17  provide the support needed because of his intel- --
18  his points of contact that he had.
19      Q.  Okay.  And I know we -- you discussed
20  earlier with Mr. Seby that the information was
21  provided via -- via that secure video link from the
22  drones to the State or Morton County EOC; is that
23  right?
24      A.  That is correct.
25      Q.  And you testified that individuals from

Page 160

1  the Corps of Engineers, in addition to some other
2  federal officials, were present at the EOC.  Do you
3  recall that?
4      A.  Yes.
5      Q.  So to your knowledge, did the Corps of
6  Engineers have the same access to the drone feeds as
7  all other entities or individuals who were also
8  present at the EOC?
9      A.  Yes, they did.  The drone feed was
10  pushed up to a large screen monitor at the EOC, a TV,
11  a large TV there.
12      Q.  Okay.  So fair to assume anybody who was
13  at the EOC, be they either federal officials or the
14  State or local folks there, had access to view that
15  information as it came in to that large screen?
16      A.  That is correct.
17      Q.  You discussed earlier, and Mr. Seby
18  showed you an email chain.  I believe it was
19  Exhibit 805.  I won't bring it up here unless you
20  would like it as a refresher.
21          But as I recall it -- and it was you
22  saying, essentially, if the State was interested in
23  the additional resources, that your email kind of
24  outlined, "Let -- let us know."  Do you recall that
25  discussion?

Page 161

1      A.  Yes.
2      Q.  Did the State ever make such a request
3  for those additional resources, to your knowledge?
4      A.  We did push an ASR, an aviation service
5  request, up to headquarters for additional -- for --
6  that we were going to do the operation that we
7  conducted in February, just so that there was a
8  chain-of-command knowledge that we were doing that.
9      Q.  And was that based on a request by the
10  State for that, or was that more organically coming
11  from within CBP or someone else?
12      A.  That would have been organic.
13      Q.  Okay.  So in response to -- to your
14  email kind of outlining those -- those additional
15  resources and discussing their capabilities, are you
16  aware whether the State requested that CBP deploy
17  those additional resources ever?
18      A.  I believe that in the ASR and talking
19  with the captain there on that request, it was kind of
20  a mutual thing that we would provide them a helicopter
21  when the time came for the eviction of the camp.
22          North Dakota Highway Patrol was already
23  providing downlink with their Cessna 206 aircraft at
24  the time, so there was -- there was additional --
25  there were State resources already and another --

1  State resources were flying that over the protest.
2    Q.  Okay.  So if -- if the State had made
3  a -- a specific request, sort of them independently
4  making a request for one of these additional resources
5  that your email had outlined, is it your understanding
6  that CBP would have done whatever it could to provide
7  that resource to the State, acknowledging the -- the
8  realities and constraints on limited resources?
9        MR. SEBY:  Objection to speculation.
10   Q.  (BY MS. BOBET)  Go ahead and answer,
11  please.
12   A.  I -- I believe Air and Marine would have
13  done what they could with the available assets that
14  they had on hand to -- to support the State.
15   Q.  Okay.  Just a few more questions about
16  the -- the MQ-9 drones that were deployed throughout
17  almost the entirety of the protest.
18       If those drones -- or if that drone had
19  not been deployed here in North Dakota to surveil the
20  protest, where would they be otherwise?  What, in
21  general, otherwise would they be doing?
22   A.  So the drones would --
23       MR. SEBY:  Objection, speculation.
24   A.  So the drones would have been used --
25  the drones would have been used for the primary

**ND OBJ:**
Relevance;
Speculation;
Improper hypothetical

1  mission of the border security and flying -- flying
2  the border and conducting that.
3        They also have an additional -- as the
4  schoolhouse, we had an additional necessity to provide
5  training for those pilots and sensor operators that
6  were stationed there.
7        Some of the flights that we did for the
8  protest did impact our training schedule as -- if one
9  aircraft was down, we were limited to one, so we would
10  have had -- we had to limit their training to smaller
11  portions, either immediately upon takeoff or in or
12  out, but not during the -- during the overfly of the
13  protest.
14   Q.  (BY MS. BOBET)  So just so I'm
15  understanding, because CBP had deployed a drone to
16  assist North Dakota with surveillance of the protest,
17  there was this impact on CBP's other missions,
18  particularly training?
19   A.  It would have been partially training,
20  where we would have done more flight hours during that
21  flight period for the training mission, or we would
22  have been primary -- patrolling the border between
23  Montana and Lake Superior.
24   Q.  And because there was a drone, a CBP
25  drone, deployed to monitor these protests in

1  North Dakota, those other activities had to be
2  reduced; do I have that right?
3   A.  Yes.
4   Q.  During the time of the protests in this
5  2016, 2017 time frame, how many of those MQ-9 drones
6  total did CBP have?
7   A.  I believe at that time we had five or
8  six in the inventory, two of which were stationed in
9  Grand Forks, the other two at Corpus Christi and
10  Sierra Vista.  We might have -- a third one would have
11  been stationed at Sierra Vista as an extra.
12   Q.  Okay.  So five or six of those drones
13  across the entire country in CBP's inventory; is that
14  right?
15   A.  Correct.
16       MS. BOBET:  Okay.  Give me a moment
17  here.  I think those are all the questions that --
18  that I had for you, sir, unless Mr. Seby has further
19  redirect.
20       MR. SEBY:  I do.  Thank you.
21            EXAMINATION
22  BY MR. SEBY:
23   Q.  Mr. Walker, you mentioned, in response
24  to Ms. Bobet's question, that you did speak to one
25  individual outside the Customs and Border Patrol as

1  part of your preparation, and that's a gentleman by
2  the name of Ryan Wentz with the Department of Homeland
3  Security.  He's an intelligence officer; is that
4  correct?
5   A.  Yes, that's correct.
6   Q.  And what did you learn from him?
7   A.  I learned that Mr. Wentz is an intel
8  officer for DHS.  He was stationed there in Bismarck.
9        He reviews a lot of the information, I
10  guess, that's being provided, as an intel officer.  He
11  collects that data, and anything that would have been
12  pertinent to DTOs, drug-trafficking organizations,
13  order nexus, or that sort of information, he would
14  provide that up in reports to his higher chain of
15  command.
16   Q.  And what sort of information did he
17  report up his chain of command based upon his presence
18  at the time of the DAPL protest in 2016 and 2017?
19   A.  I don't have the exact information that
20  he provided, other than things that were -- he deemed
21  significant that needed to be reported up.
22   Q.  Did he report anything at all?
23   A.  I believe he did.  I just -- I don't
24  know, off the top of my head, what -- what reports he
25  generated.

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 166

1    Q.   So he reported drug-trafficking
2  organizations?
3    A.   If he felt it fell within his scope of
4  responsibility, then he would write that -- that
5  report; but it was more to provide a picture, but not
6  law enforcement actions or any of that kind of
7  information, so . . .
8    Q.   So what information did he provide you
9  relevant to the topics, other than learning that he
10  had -- he was present there and had his own job?  Why
11  was he involved?
12    A.   That was as a -- he is a DHS employee,
13  and he was at the Fusion Center, so he was seeing a
14  lot of those reports that were being produced by the
15  State.  So that was just -- it was information to
16  further broaden my knowledge of DHS-CBP involvement.
17    Q.   Whose idea was it that he should be part
18  of your review and preparation team, yours or your
19  counsel?
20    A.   That was, then, counsel.
21    Q.   Okay.  And so he was receiving
22  information from the North Dakota State Law
23  Enforcement Center, the NDSLIC, it sounds like, and he
24  was reporting that information up to his chain of
25  command?

Page 167

1    A.   My -- the information that I was
2  informed of, yes.
3    Q.   Okay.  So relevant to all of the topics
4  we just went over for the last several hours, what did
5  he provide you with that was responsive to those
6  topics?
7    A.   I was not provided any topics from him.
8    Q.   What role did he play in your
9  preparations and research?
10    A.   To the fact that DHS had an intel
11  officer that was assigned there in North Dakota that
12  worked out of the Fusion Center, and that his role was
13  to monitor and -- as he does day-to-day, it's his
14  day-to-day job, it wasn't just because of the protest,
15  and that if anything fell within his purview of scope
16  of responsibility, then he would extrapolate that
17  information and provide it up.
18    Q.   So how can you be a witness speaking on
19  behalf of the Department of Homeland Security when you
20  spoke to the one person that you've identified from
21  that agency stationed in North Dakota during the exact
22  time period of the protest, yet you have nothing to
23  advise came from your consultation with him?  Is that
24  correct?
25         MS. BOBET:  Objection, misstates the

Page 168

1  testimony, argumentative, and calls for a legal
2  conclusion.
3    Q.   (BY MR. SEBY)  Not argumentative.  I
4  just want to make sure I understand what you're
5  telling me now is that you can attribute nothing to
6  him relative to the topics, even though he was the
7  person on the scene from the Department of Homeland
8  Security of the Federal Government of the
9  United States during the period.
10         MS. BOBET:  The objection stands, and
11  I'll add that the question is now vague as well.
12    Q.   (BY MR. SEBY)  Mr. Walker, would you
13  please answer the question?
14    A.   Mr. Wentz had a job in North Dakota, not
15  much unlike my job in Grand Forks, North Dakota.  He
16  did his job and reported those things that were within
17  his scope.
18         As a receiver of the NDSLIC information
19  myself personally, I -- and I also get the Minnesota
20  information, as a law enforcement officer there, to be
21  apprised of that stuff.
22         So whatever Mr. Wentz deemed appropriate
23  to forward up his chain of command did not fall within
24  my official title as a CBP Air and Marine officer or
25  agent, so I didn't see those items, and he did not

Page 169

1  provide me any of that information during our
2  discussion, other than the fact that he was doing his
3  job during -- that concurrently ran during the DAPL.
4    Q.   And Mr. Wentz, when did you talk to him?
5    A.   That would have been early November of
6  this month, during my prep that was --
7    Q.   And how long did you -- how long did you
8  spend speaking with --
9    A.   November 9.  That would have been one
10  hour.
11    Q.   Okay.  And was your counsel present for
12  that call?
13    A.   That would have been the CBP and DHS
14  attorneys, yes, correct.
15    Q.   And remind me who the DHS attorneys are.
16    A.   Michelle Tonelli, Eugene Mok, and Frank
17  Albi, the CBP attorney.
18    Q.   Okay.  Two specifically for DHS and one
19  Customs and Border Protection, right?
20    A.   That is correct.
21    Q.   Okay.  Did Mr. Wentz provide you with
22  any information to review?
23    A.   No.
24    Q.   You just talked to him and --
25         Did you go over the topics with him?

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 170

1     A.   This was a -- that meeting was a
2  separate meeting that we had prior to talking to
3  Ms. Bobet.
4     Q.   I'm not sure what that means, because my
5  question had nothing to do with what you just said.
6          My question was, did you review the
7  notice of depositions and the specific topics with
8  Mr. Wentz?
9     A.   No.
10     Q.   Why not?
11     A.   I don't believe at that time I was --
12  had been selected to be the spokesperson, other than
13  as we went through the -- the process.
14     Q.   So I'm puzzled, Mr. Walker, how you can
15  testify that you prepared for your deposition by
16  speaking to Mr. -- to Mr. Wentz, but you didn't even
17  know or have the presence of mind to talk to him about
18  specific things.
19          What -- how did you -- what was the
20  pretext of getting on the call with that individual if
21  you didn't know what you were talking about?
22          MS. BOBET:  Objection, misstates
23  testimony, vague, and argumentative.
24          And I'll say if your answer, sir, would
25  incorporate anything to do with the reasoning of

Page 171

1  counsel, I'll caution you not to reveal that because
2  that is privileged.  You may answer.
3     Q.   (BY MR. SEBY)  I'm not asking for
4  anything privileged.  I'm asking you a basic question.
5          How in the world can you explain to me
6  that you were supposed to prepare for specific topics
7  if you didn't have the presence of mind to discuss
8  them with the one person from the Department of
9  Homeland Security you've identified who was in
10  North Dakota during the period of the protest?  How
11  can that be?
12          MS. BOBET:  Objection, misstates
13  testimony, argumentative.
14     Q.   (BY MR. SEBY)  Your counsel doesn't like
15  the question, but I'm not arguing with you.  I'm just
16  asking you a question.
17          MR. SEBY:  So stop shrouding it with
18  that kind of objection, Jane.
19     Q.   (BY MR. SEBY)  Would you please answer
20  the question.
21          MS. BOBET:  Mr. Seby, I'm entitled to
22  make objections and make a record here.  The question
23  is argumentative.  The witness may answer it or you
24  may move on.
25     Q.   (BY MR. SEBY)  I'm not going to move on.

Page 172

1  I want an answer to the question because I'm puzzled
2  by what you've just told us.
3          MS. BOBET:  Well, the objection stands,
4  and the witness can answer.
5          MR. SEBY:  Thank you.
6     A.   So the meeting was set up by counsel.
7  We met.
8     Q.   (BY MR. SEBY)  And let me just stop you.
9     A.   We discussed --
10     Q.   Let me just stop you, if I may.  What
11  was the pretext for your counsel setting up the
12  meeting with Mr. Wentz?
13     A.   Who informed me --
14          MS. BOBET:  Objection, calls for
15  information --
16     A.   -- of Mr. Wentz.
17          MS. BOBET:  Excuse me one second.  One
18  second.
19          Objection.  That's getting into the
20  territory of what was in counsel's mind, why they set
21  up this meeting with that person, and that territory
22  is privileged.
23          So you can talk about the facts of what
24  you discussed with -- what you discussed with
25  Mr. Wentz and the facts that you learned there.  I

Page 173

1  think that's fair game.  But why counsel chose to set
2  up a meeting with him at that time is privileged, and
3  I'll instruct you not to answer that.
4          MR. SEBY:  Very well.
5     Q.   (BY MR. SEBY)  What was your
6  understanding of why you were having a call with
7  Mr. Wentz on November 9?
8          MS. BOBET:  Same objection, and --
9  and --
10     Q.   (BY MR. SEBY)  And I'm not asking --
11  haven't for --
12          MS. BOBET:  It's the same objection to
13  the same question.
14     Q.   (BY MR. SEBY)  I'm not asking for
15  privileged information.  I'm not asking you what your
16  attorney told you.
17          I'm saying, what did you discuss with
18  Mr. Wentz?  What was the agenda, as it occurred, in
19  your conversation with Mr. Wentz on November 9?
20          MS. BOBET:  To be clear, you may
21  discuss --
22     Q.   (BY MR. SEBY)  Why -- why were you
23  there?
24          MS. BOBET:  -- the facts that you
25  discussed with Mr. Wentz.

Page 174

1     MR. SEBY:  That's all I'm asking.  Thank
2  you, Jane.
3     MS. BOBET:  That's a different -- that's
4  a different question.
5     Mr. Seby is asking you questions, so
6  I'll add a compound objection.
7     You may answer the facts about what you
8  discussed with Mr. Wentz.  You may not answer a
9  question about why were you there, why did the
10  attorneys choose to have that meeting.  Does that make
11  sense, Mr. Walker?
12     THE DEPONENT:  It does.  Thank you.
13     A.   So at the meeting --
14     MS. BOBET:  So you may -- you may
15  proceed.
16     A.   -- I learned about -- I learned about
17  Mr. Wentz's position; I learned about what his
18  position entailed; and to get a better understanding
19  of the DHS intelligence officer's duties, and -- what
20  he was being at the time.
21     He doesn't have any law enforcement
22  authority, nor does he have -- conduct any
23  investigations; just to relay his information.  That's
24  what I learned.
25     Q.   (BY MR. SEBY)  Okay.  So it's correct,

Page 175

1  then, to say -- to understand that you did not speak
2  to Mr. Wentz in preparation for the topics for which
3  you've been designated as a representative of the
4  entire Department of Homeland Security and the Customs
5  and Border Protection unit thereof, correct?
6     A.   I didn't follow that question.  You're
7  going to have to ask that one again, please, sir.
8     Q.   Is it accurate to say that you did not
9  prepare for the topics for which you've been
10  designated by the United States, as a representative
11  speaking on behalf of the Department of Homeland
12  Security, you did not review those topics or prepare
13  for your deposition by reviewing those topics with
14  Mr. Wentz; is that correct?
15     A.   No, that's not correct.
16     Q.   Then tell me what is correct.
17     A.   I believe I prepared for the deposition
18  as best I could, and I was as prepared as I could
19  be.
20     Q.   I don't doubt that, sir.
21     I'm asking you a specific question:  Did
22  your preparation for the topics for which you've been
23  designated and that we discussed include discussing
24  them specifically with Mr. Wentz?
25     A.   Yes, they did.

Page 176

1     Q.   And when did you do that?
2     A.   That was on November 9.
3     Q.   And how did you do that?
4     A.   That was via telecommunica- -- or
5  videoconferencing.
6     Q.   Did you have the deposition notice and
7  the topics in front of you?
8     A.   I don't remember at that time if I did
9  or not.
10     Q.   How do you know you --
11     MS. BOBET:  Just to be clear which
12  notice we're talking about -- I'm sorry.  Before you
13  proceed, just to be clear which notice you're talking
14  about, there's been multiple versions of the
15  deposition notice received from the State.  So the
16  latest one was received on November 23, and I'll
17  represent that Mr. Walker had seen a prior version at
18  a date before that.
19     But just so we know there's not just one
20  notice, there's a few different versions.  What we've
21  been talking about today is that later version.
22     Q.   (BY MR. SEBY)  So which -- which
23  document did you have physically present to review
24  with Mr. Wentz when you spoke with him on November 9?
25     A.   It would have been the document

Page 177

1  received, I believe, prior to that meeting.  I don't
2  remember the date I received it.
3     Q.   How do you know that Mr. Wentz had that
4  document as well?
5     A.   I don't --
6     MS. BOBET:  Objection, assumes facts.
7     Q.   (BY MR. SEBY)  I'm sorry, I didn't hear
8  your answer.  Mr. Walker?
9     A.   I -- I don't know if he had that
10  document or not.
11     Q.   Well, how did -- how did he know what
12  the topics were?
13     A.   The discussion was led by counsel, and I
14  don't know what he was given prior to the meeting;
15  as -- as well as I didn't know either.
16     Q.   So you recollect that your counsel
17  brought him into the conversation and talked to him
18  about whatever, and I'm not asking about that.
19     But who read aloud -- since you were not
20  in the same room with Mr. Wentz, who read aloud the
21  topics one by one that you then discussed, if you did?
22     A.   I don't remember -- I don't recall
23  discussing the actual topics in the deposition during
24  the meeting.
25     Q.   Thank you.  I want to move on, now that

Page 178

1   that's clear, with you -- you -- Ms. Bobet asked you a
2   question about the emails that you collected a year
3   and a half ago that you said, and she -- she made
4   clear, that that was in relation to a litigation
5   request from Mr. Albi, right?
6       A.   That is correct.  I received a notice
7   from CBP counsel that there was to -- for a litigation
8   hold on documents pertaining to the DAPL.
9       Q.   And when did you receive that notice?
10      A.   I don't have the actual date, but it
11  was -- my memory is that almost -- almost a year and a
12  half ago.
13      Q.   This litigation has been going on almost
14  three years now.  Did you not hold or retain all of
15  your relevant documents to the DAPL protests that you
16  were involved with, the agency was involved with,
17  for -- as Ms. Jane Bobet noted was almost the entire
18  duration of the protest?  You didn't -- you didn't
19  hold those things prior to a year and a half ago?
20      A.   The only time I was aware of the --
21  the --
22           MS. BOBET:  Objection, vague.
23      A.   -- litigation -- the only time I was
24  aware of the litigation was once I -- or the
25  litigation hold was once I received the notice from

Page 179

1   Mr. Albi.
2       Q.   (BY MR. SEBY)  What about all those
3   records that existed prior to that, what -- what
4   happened to them?
5           MS. BOBET:  Objection, calls for
6   speculation, vague.
7       A.   I talked to Mr. Albi's --
8           MS. BOBET:  And I'll note also that this
9   is -- this is well beyond the scope of the 30(b)(6)
10  topics.  He's welcome to answer in his --
11          MR. SEBY:  No, I'm -- it's in response
12  to a question you asked, so I get to redirect related
13  to that, and that's what I'm doing.  I'm pretty
14  sure --
15          MS. BOBET:  Certainly.
16          MR. SEBY:  -- you can stop interrupting.
17          MS. BOBET:  I'm just saying he's
18  responding in his --
19          So for the last time, I'm allowed to
20  make objections and make a record.  We're not going to
21  have a fight about that.
22          MR. SEBY:  You're interfering with the
23  deponent's responses.
24          MS. BOBET:  He's testifying -- he's
25  testifying.  Excuse me.  I'm sorry.  I'm still

Page 180

1   talking.
2           He's allowed to testify about this in
3   his personal capacity.  It's not discussed in any of
4   the topics.  And he answered those questions about his
5   deposition preparation, which he's speaking for
6   himself about.  So he may answer the question in his
7   personal capacity.
8       Q.   (BY MR. SEBY)  So I'm asking you, did
9   you take any careful precautions prior to a year and a
10  half ago with respect to any of your records or
11  documents regarding the protest?
12      A.   Personally, I -- I responded to
13  Mr. Albi.  I went in and tried -- attempted to locate
14  all the records.  I don't remember or recollect --
15  recollect -- recollect destroying any documents or
16  deleting documents.
17          They wouldn't be a -- my understanding
18  what I was able to do was pull all the documents from
19  my emails that I could remember and get the documents
20  and photos or correspondence that we might have had at
21  the time to the best of my ability.
22      Q.   Okay.
23      A.   Prior to that, I don't know.  I did not
24  receive any other litigation information -- hold
25  information.

Page 181

1       Q.   At any time?
2       A.   Just the one that I received from
3   Mr. Albi.
4       Q.   Got it.  Okay.  So you -- Ms. Bobet was
5   asking you about the Customs and Border Protection
6   practice of assigning a rate for reimbursement when
7   other federal agencies use the UAS resources of your
8   agency, correct?
9       A.   So there is certain agencies that, in
10  order to use our assets, are required to fund it, if
11  you would -- or want to say that, for -- of that
12  flight time.
13      Q.   Yeah.
14      A.   Normally, part of our charter is to
15  provide law enforcement agents our assets for law
16  enforcement activities that they deem or -- you know,
17  aviation assets that they may need to conduct law
18  enforcement activities.  Like surveillances or warrant
19  execution, where they need that aviation asset, we
20  would provide that.  It's not a -- we're not charging
21  anybody to do that.
22      Q.   Right.
23      A.   The Corps of Engineers and FEMA,
24  particularly, are those -- and this is going back into
25  some of my military, National Guard time, is those are

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 182

1  reimbursable-rate missions that they are funded and
2  have to account for the use of those assets.  So they
3  are charged a rate that has -- that -- for each one of
4  those flight hours.
5          There was no charge to anybody during
6  the DAPL protest for the amount of flight time spent.
7      Q.  So the Corps never paid you back for all
8  those hundreds of hours you were telling me about?
9      A.  For the hundred -- yeah, correct, the
10 hundred hours we flew on the DAPL was not reimbursed
11 by the Corps or the State of North Dakota, nor was any
12 request to refund that money done.
13         The only reason we just bring it up is
14 we did provide over 288 flight hours of UAS, which is
15 very expensive, but didn't meet our core border
16 security mission.
17     Q.  Did any other federal agency pay you for
18 that time?
19     A.  No, they did not.
20     Q.  Have you ever known the Customs and
21 Border Protection to be involved in a several-month-
22 long protest that was sponsored and hosted by the
23 federal government on federal property within the
24 territory of the United States of America?
25         MS. BOBET:  Objection, assumes facts,

Page 183

1  and argumentative.
2      A.  CBP has not conducted month-long protest
3  aviation support prior or since.
4      Q.  (BY MR. SEBY)  So would you say that the
5  events of the DAPL protest were exceptional and unique
6  in your experience?
7      A.  In my personal experience, I would say
8  they were very unique.
9      Q.  Yeah.  And this -- this rate that you
10 charge other agencies or that they should be paying to
11 benefit from this -- the services and skill set of the
12 Custom and Border Patrol, the Corps knows that, don't
13 they, because they've paid you for those services in
14 other contexts, correct?
15     A.  In prior -- or other natural disasters
16 or BDNs (phonetic) of that respect, yes.
17     Q.  Uh-huh.  Does the United States
18 Government have other unmanned aerial surveillance
19 drones that are used for domestic use?
20         MS. BOBET:  Objection --
21     A.  I do know --
22         MS. BOBET:  -- calls for speculation and
23 outside the -- outside the scope to the extent it's
24 asking about agencies other than DHS and CBP.
25     Q.  (BY MR. SEBY)  I am asking about

Page 184

1  agencies other than yours.
2          Do you know, as a UAS sensory pilot
3  operator, do other agencies of the United States have
4  those resources?
5      A.  I do know that NASA does because they do
6  a bunch of testing.  After -- going farther than that,
7  I'm not familiar of any other agencies' UAS support.
8      Q.  And Ms. Bobet asked you a question about
9  who was the originating requester for Customs and
10 Border Protection presence, as you did arrive on
11 August 22 of 2016, and I understood that you -- you
12 couldn't recall whether it was the State of
13 North Dakota or perhaps a federal representative asked
14 for the agency to be there; is that correct?
15     A.  That is correct.
16     Q.  Okay.  So you don't know whether or not
17 the Customs and Border Protection was -- showed up
18 to -- in response as an -- as a willingness to honor a
19 request from the State of North Dakota or local
20 government thereof?
21     A.  At that time, Mr. Bacon was our intel
22 agent.  Mr. Bacon had been in the North Dakota area
23 for many years, knew many, many people within the law
24 enforcement community.
25     Q.  Yeah.

Page 185

1      A.  And so his approach was to basically
2  help us find work with the UAS system.  So if he could
3  put us in contact with an agency that needed it, we
4  would write up the support request and support that
5  agency's request.
6          So this -- this 22 -- the first flight
7  in 22 August could have been a combination of
8  Mr. Bacon, the State of North Dakota, some state or
9  federal entity that they were collaborating with, and
10 we would have felt the need to respond.
11     Q.  Uh-huh.  Okay.  And you -- you mentioned
12 also in response to a question from Ms. Bobet that --
13 that the period of time when you organically, meaning
14 within the agency, decided to provide a helicopter to
15 support the clearance of the camp on Corps property,
16 the main camp, the one that was worse than a
17 Third-World country, I think you said, when you did
18 that organically.  Were there any other instances
19 where you did anything organically versus in response
20 to a request for assistance?
21         MS. BOBET:  Objection, mischaracterizes
22 testimony.
23     A.  Are you ask- --
24         MS. BOBET:  You can answer.
25     A.  Are you asking in specific to DAPL, or

182:20-24;
183:2-3
401-402; 611

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 186

1   other organic requests that we may respond to?

2       Q.   (BY MR. SEBY)  Yeah, thank you for

3   clarifying that.  Yes, I'm only asking with respect to

4   the nearly two-year-long protest on federal property

5   in the state of North Dakota in 2016 and '17, that's

6   right.

7       A.   So the only other organic one that we

8   would have responded to would have been the

9   October time period.

10      Q.   Right.

11      A.   Well, the Border Patrol.  Again, I'm not

12  sure where that request generated.  Mr. Bacon was part

13  of that.  The Border Patrol, because they were

14  deploying their individuals, was part of the request

15  to see if we could help make sure -- you know, we

16  would help them out at the -- at the same amount of

17  what we could.

18      Q.   Yeah.  Okay.  Has the technology evolved

19  for these drones?

20      A.   The systems on -- for -- the EO/IR

21  systems have gotten a little better.  With better

22  Internet capabilities, we have faster bandwidth, so we

23  can provide a faster picture without a delay.

24      Q.   Okay.

25      A.   The capability to launch the aircraft

Page 187

1   remotely and have somebody else fly it, basically,

2   from the ground up into the National Airspace, has

3   progressed considerably.  So now alls it requires is

4   somebody to get the aircraft started and -- as an

5   example is we can -- crew can -- in North Dakota can

6   start the airplane, get it linked up on the satellite,

7   and a crew from San Angelo, Texas, or Sierra Vista can

8   link in to that airplane, ground taxi the airplane to

9   the runway, push a button, have the airplane -- the

10  heli- -- the UAS take off.  They can go fly it on

11  their mission for 13, 18 hours, bring it back in, push

12  a button and have it land, taxi it in, and shut it

13  down.

14           One thing is it has to depart and return

15  to the original location that it -- it -- you know, it

16  takes off from --

17      Q.   Right.

18      A.   -- for the ground-based --

19      Q.   Very -- very technologically advanced,

20  and similar to the types of drones that most of us

21  think about when the United States is dealing with

22  foreign threats, correct?

23      A.   It is -- we borrow or use a lot of the

24  same technology that the Air Force has developed with

25  their -- their drone -- their MQ-9.

Page 188

1       Q.   For example, in instances dealing with

2   camps of terrorists in locations around the world, for

3   example, right?

4       A.   That is a primary mission that the U.S.

5   Air Force and agencies deal with, correct.

6       Q.   Uh-huh.  Yeah.  Okay.

7           MR. SEBY:  Mr. Walker, thank you.  I

8   don't have anything further.

9           MS. BOBET:  Nothing further here.

10  Thanks very much for your time, Mr. Walker.

11          THE VIDEOGRAPHER:  We're going off the

12  record.  This concludes today's deposition of Douglas

13  Walker.  The time is 9:57 p.m. UTC, 2:57 p.m.

14  Mountain.  We are off the record.

15          (At 2:57 p.m. Mountain Standard Time the

16  proceedings were not being videotaped.)

17          THE REPORTER:  I do need to get orders

18  before you guys leave.

19          MS. BOBET:  We'll read and sign.  I

20  think regular speed should be fine.

21          THE REPORTER:  And did you need

22  exhibits?

23          MS. BOBET:  Yeah.  If we could have

24  marked versions of the exhibits, that would be great.

25          THE VIDEOGRAPHER:  Would you like a copy

Page 189

1   of the video?

2           MS. BOBET:  I don't know if we ordered

3   the video.  Can I hold off on that and let you know

4   later?

5           THE VIDEOGRAPHER:  Yeah, of course.

6           THE REPORTER:  And, Paul, I assume

7   you're ordering the transcript?

8           MR. SEBY:  Yes, please.

9           THE REPORTER:  Is there a hurry on the

10  turnaround for you?

11          MR. SEBY:  No.

12          WHEREUPON, the within proceedings were

13  concluded at the approximate hour of 2:58 p.m.

14  Mountain Standard Time on the 29th day of November,

15  2022.

16          *       *       *       *       *

17

18

19

20

21

22

23

24

25

Douglas W. Walker  30(b)(6)
November 29, 2022

Page 190

```
 1              I, DOUGLAS W. WALKER, do hereby certify
 2    that I have read the above and foregoing deposition
 3    and that the same is a true and accurate transcription
 4    of my testimony, except for attached amendments, if
 5    any.
 6              Amendments attached   (  ) Yes   (  ) No
 7
 8
 9              _____
               DOUGLAS W. WALKER
10
11
12              The signature above of DOUGLAS W. WALKER
13    was subscribed and sworn or affirmed to before me in
14    the county of _____, state of
15    _____, this _____ day of
16    _____, 2022.
17
18
19              _____
               Notary Public
20              My Commission expires:
21
22
23
24
25    State of North Dakota 11/29/22 (tcm)
```

Page 192

```
 1    Errata Sheet
 2
 3    NAME OF CASE: Plaintiff vs UNITED STATES
 4    DATE OF DEPOSITION: 11/29/2022
 5    NAME OF WITNESS: Douglas W. Walker
 6    Reason Codes:
 7         1. To clarify the record.
 8         2. To conform to the facts.
 9         3. To correct transcription errors.
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25              _____
```

Page 191

```
 1              REPORTER'S CERTIFICATE
 2    STATE OF COLORADO      )
                             ) ss.
 3    CITY AND COUNTY OF DENVER )
 4
 5              I, TRACY C. MASUGA, Registered
      Professional Reporter and Certified Realtime Reporter,
      do hereby certify that previous to the commencement of
 6    the examination, the said DOUGLAS W. WALKER was duly
      sworn or affirmed by me to testify to the truth in
 7    relation to the matters in controversy between the
      parties hereto; that the said deposition was taken in
 8    machine shorthand by me at the time and place
      aforesaid and was thereafter reduced to typewritten
 9    form; that the foregoing is a true transcript of the
      questions asked, testimony given, and proceedings had.
10
              I further certify that I am not employed
11    by, related to, nor of counsel for any of the parties
      herein, nor otherwise interested in the outcome of
12    this litigation.
13              IN WITNESS WHEREOF, I have affixed my
      signature this 13th day of December, 2022.
14
15
16    __X__ Reading and Signing was requested.
17    _____ Reading and Signing was waived.
18    _____ Reading and Signing is not required.
19
20              _____
21              Tracy C. Masuga
                Registered Professional Reporter
22              Certified Realtime Reporter
23
24
25
```