PAUL  WARD
April 20, 2022

UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  NORTH  DAKOTA
WESTERN  DIVISION

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) ) ) | Civil No. 1:19-cv-00150-DMT- |
| Plaintiff, | ) ) | ARS |
| vs. | ) ) | DEPOSITION OF: |
| THE UNITED STATES OF AMERICA, | ) ) ) | PAUL WARD |
| Defendant. | ) | |

THE  VIDEOCONFERENCE  DEPOSITION  OF  PAUL  WARD,

taken  before  Tracy  E.  Barksdale,  Registered

Professional  Reporter,  commencing  at  8:27

a.m.  MDT,  April  20,  2022.

Reporter:  Tracy  E.  Barksdale,  RPR,  CSR

PAUL WARD
April 20, 2022

Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:  Paul B. Kerlin
     (Via Zoom)          GREENBERG TRAURIG, LLP
 3                       1000 Louisiana Street,
                         Suite 1700
 4                       Houston, Texas 77002
                         713.374.3500
 5                       Kerlinp@gtlaw.com
 6   FOR THE PLAINTIFF:  Paul M. Seby, Special
     (Via Zoom)          Assistant Attorney
 7                       General
                         GREENBERG TRAURIG, LLP
 8                       1144 15th Street, Suite
                         3300
 9                       Denver, Colorado 80202
                         303.572.6584
10                       Sebyp@gtlaw.com
11   FOR THE DEFENDANT:  V. William Scarpato,
     (Via Zoom)          Special Assistant to the
12                       United States Attorney
                         General
13                       UNITED STATES ATTORNEY'S
                         OFFICE - DISTRICT OF
14                       COLORADO
                         1801 California Street,
15                       Suite 1600
                         Denver, Colorado 80202
16                       303.454.0100
                         Victor.scarpato@usdoj.gov
17
18   ALSO PRESENT:       Shawn Capron, videographer
     (Via Zoom)          Jose Diaz
19
20
21
22
23
24
25
```

Page 3

```
 1                INDEX OF EXAMINATION
 2                     PAUL WARD
 3                   April 20, 2022
 4   Examination by                      Page
 5   Mr. Kerlin              6, 83 (cont.)
     Mr. Scarpato                         146
 6
 7                INDEX OF EXHIBITS
 8   Exhibits               Marked on page
 9   311  (Email update on Dakota
          Access Pipeline and protest
          matter)                        48
10   312  (Email chain LE meeting
          with tribal leaders)           52
11   318  (Email chain update on
          protest camps)                 75
12   319  (Email chain shooting)         84
     320  (Email missing buffalo)        91
13   321  (Emails North Dakota TFR)      95
     322  (Emails North Dakota TFR)     101
14   323  (Emails North Dakota TFR)     102
     324  (Email investigative and
15        prosecution coordination
          meeting)                      105
16   325  (Emails police chiefs all
          call)                         106
17   326  (Emails prayer ceremony)      111
     327  (Email re DAPL Corps - day
18        of action)                    113
     328  (Emails DAPL Corps - day
19        of action)                    115
     331  (Emails DAPL Corps - day
20        of action)                    116
     332  (Emails significant
21        incident notification)        118
     343  (Email - Startzell with
22        letter from chief LE
          officers)                     134
23
     Exhibits             Referenced on page
24
     26 (Retained.)                      70
25   206                                 62
```

Page 4

```
 1              P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We are now on
 3   the record at 1427 UTC on April 20th, 2022.
 4   Audio and video recording will continue until
 5   all parties agree to go off record.
 6           Please note that the microphones
 7   are sensitive and may pick up whispering and
 8   private conversation.  Private conversation
 9   and/or attorney-client interaction should be
10   held outside the presence of this remote
11   interface.
12           For the purpose of today, the
13   witness-only video recording, the witness is
14   being spotlighted on all screens on speaker
15   view.  We ask that the witness not remove
16   this setting during this deposition, as it
17   may cause other participants to appear on the
18   final video.
19           For anyone who does not want the
20   witness video to take up a large part of your
21   screen, you may click the gallery view button
22   in the upper right corner of this remote depo
23   interface.
24           This is the video-recorded
25   proceeding of Paul Ward, taken by counsel for
```

Page 5

```
 1   the plaintiff in the matter of State of North
 2   Dakota versus the United States of America.
 3   This matter is filed in the United States
 4   District Court of North Dakota, Western
 5   Division.  This proceeding is being held
 6   remotely.
 7           My name is Shawn Capron.  I'm the
 8   videographer on behalf of US Legal Support,
 9   located at 16825 North Chase Drive, Houston,
10   Texas.  I'm not related to any party in this
11   action, nor am I financially interested in
12   the outcome.
13           The court reporter today is Tracy
14   Barksdale on behalf of US Legal Support.
15           Counsel will state their appearance
16   for the record, after which the court
17   reporter will enter a statement for this
18   remote proceeding into this record and swear
19   in the witness.
20           MR. KERLIN:  Paul Kern on behalf of
21   the plaintiff, the State of North Dakota.
22           MR. SCARPATO:  Bill Scarpato on
23   behalf of defendant United States of America.
24           MR. KERLIN:  Also attending is Paul
25   Seby, who also represents the plaintiff,
```

PAUL   WARD
April 20, 2022

Objection to all testimony as hearsay, 802

Page 6

1    State of North Dakota.
2           MR. SEBY:  Yes.  Sorry.  I was on
3    mute.  This is Paul Seby.  I'm not taking the
4    deposition, Mr. Kerlin is, but I'll be noting
5    myself as present.
6           PAUL WARD,
7           having been first duly sworn,
8        was examined and testified as follows:
9           MR. KERLIN:  Good morning.  This
10   will be the deposition of Paul Ward, taken
11   pursuant to the notice that was served on
12   defendants USA and agreement of counsel.
13              EXAMINATION
14   BY MR. KERLIN:
15   Q.   Mr. Ward, my name is Paul Kerlin.  I'm
16   both an attorney with the law firm, Greenberg
17   Traurig, and, along with my law partner, Paul
18   Seby, who is a special assistant attorney
19   general for North Dakota, we represent the
20   State of North Dakota.  Throughout the
21   deposition today, I'll refer to my client as
22   North Dakota.  Okay?
23   A.   Fine.  Is there any way that I can see
24   you as opposed to Bill on the screen when
25   you're speaking to me?

Page 7

1           MR. KERLIN:  Sure.  Is there anyone
2    that can help us with that?  Perhaps Shawn
3    could.
4           THE VIDEOGRAPHER:  Yeah.  Sounds
5    like they're on a video conference system, so
6    there should be another function to the video
7    conference to that.
8           MR. SEBY:  Paul, if you'd like to
9    give Mike a shout, he should be able to do
10   that.
11          THE VIDEOGRAPHER:  Is it okay if we
12   go off the record?
13          MR. SEBY:  Sure.
14          THE VIDEOGRAPHER:  We're going off
15   the record.  Universal coordinated time is
16   1421.  We're off the record.
17          (Discussion held off record.)
18          THE VIDEOGRAPHER:  We're now back
19   on the record.  Universal coordinated time is
20   1439.
21   BY MR. KERLIN:
22   Q.   Mr. Ward, we're back after a short
23   technical break.  Are you able to continue?
24   A.   Yes.
25   Q.   Okay.  You understand that you have been

Page 8

1    sworn in this morning to tell the truth?
2    A.   Yes.
3    Q.   And could you state your name for the
4    record.
5    A.   Paul Ward.
6    Q.   Do you go by any other names?
7    A.   No.
8    Q.   Have you been deposed or provided
9    in-court testimony before?
10   A.   No.
11   Q.   So I'm sure you're familiar with the
12   process, but, just to go over it briefly,
13   everything that we say is being written down
14   and videotaped.  We also are doing this by
15   Zoom, and I know we've already had a couple
16   little technical issues that I think we've
17   gotten resolved, but if I ask you for a
18   verbal response, it's only so that the court
19   reporter will have a verbal yes or no.
20   Sometimes we can, you know, nod our heads or
21   shake our heads, and the same thing with
22   uh-huhs or things of that nature; is that
23   acceptable?
24   A.   Yes.
25   Q.   Also, sometimes witnesses can anticipate

Page 9

1    the end of a question or where the question
2    is going and start providing an answer before
3    the question is completed.  I would ask that
4    you wait until I finish asking my question
5    before you start your answer; again, so the
6    court reporter will be able to have a clean
7    record.  Okay?
8    A.   Yes.
9    Q.   I'll do the best not to interrupt you
10   when you're providing answers.  If I do,
11   I'll, of course, give you an opportunity to
12   finish your answer so that I don't interrupt.
13   But, again, sometimes when we are doing this
14   by remote means, it can be -- there can be
15   some interruptions or inadvertent speaking
16   over each other.  I'll try to minimize that
17   as much as I can.
18          If you need a break, let me know.
19   I'd ask, if there's a question pending, that
20   you please answer the pending question, and
21   then we're happy to take a break as needed
22   throughout the course of the deposition.  I
23   would suggest a break about every hour or so
24   for everyone to have a chance to stretch
25   their legs, get something to drink, or that

PAUL   WARD
April 20, 2022

Page 10

```
 1    sort of thing; all right?
 2    A.    Fine.
 3    Q.    If you don't understand a question, just
 4    let me know.  I'll try to repeat it or
 5    rephrase it.  If you don't ask me to rephrase
 6    it or clarify, then the assumption is that
 7    you understand the question I asked.  Okay?
 8    A.    Yes.
 9    Q.    Is there anyone in the room with you?
10    A.    I'm sorry?  What?
11    Q.    Is there anyone in the room with you
12    today?
13    A.    No.
14    Q.    I would ask that you turn off any
15    electronic devices or put them on silent mode
16    so they won't be distracting or interrupt
17    you.  If there's something important that
18    you're expecting such as a call or a message,
19    that, of course, is okay.  Just let us know.
20    Again, I just wanted to minimize the
21    distractions, if possible.  Okay?
22    A.    Okay.
23    Q.    And if you're relying on some document
24    during the course of your deposition, I would
25    ask that you identify that document.  Any
```

Page 11

```
 1    question about that -- do you have any
 2    documents with you today?
 3    A.    No.
 4    Q.    Any questions about these instructions?
 5    A.    No.
 6    Q.    Court reporter swore you in.  You
 7    understand you're obligated to tell the truth
 8    today; right?
 9    A.    Yes.
10    Q.    Okay.  And you understand that your
11    deposition today has the same force and
12    effect as if you were in front of the judge
13    and jury?
14    A.    Yes.
15    Q.    You understand that portions of your
16    videotaped deposition may be played before
17    the Court at the trial of this matter?
18    A.    Yes.
19    Q.    And I assume, you know, you'll do the
20    best you can to provide accurate testimony to
21    the extent you can?
22    A.    Yes.
23    Q.    Are you on any type of medications or
24    any type of -- any doctors told you you have
25    any issues with respect to remembering things
```

Page 12

```
 1    or that would interfere with your ability to
 2    recall events other than the passage of time?
 3    A.    No.
 4    Q.    I think you mentioned earlier that
 5    you've testified under oath before; is that
 6    correct?
 7    A.    Yes.
 8    Q.    Can you tell me about when you have
 9    testified under oath.
10    A.    I'd been in law enforcement for almost
11    40 years at the time of my retirement.  I
12    testified numerous times in court
13    proceedings.
14    Q.    Prior to that, can you recall the last
15    time you provided testimony under oath?
16    A.    It wasn't while I was a marshal, so it
17    would have been prior to 2010.  Probably
18    about 2008 or '9, I would imagine, at my last
19    trial.
20    Q.    Before your deposition today, have you
21    or I ever met or spoken?
22    A.    No.
23    Q.    Could you tell me what you did to
24    prepare for your deposition today.
25    A.    I met with -- yesterday I met with
```

Page 13

```
 1    two -- doing the same video process with
 2    Bill, with the US Attorney, and for a short
 3    amount of time with Ian.
 4    Q.    Don't get into the content of those
 5    discussions, but can you tell me
 6    approximately how long that lasted.
 7    A.    The whole process lasted approximately
 8    two hours or so.
 9    Q.    Did you talk with anyone other than
10    those attorneys about your deposition today?
11    A.    Not other than mentioning to my wife
12    what I'd be doing today.
13    Q.    Fair enough.  Did you review any
14    documents prior to this deposition?
15    A.    The only one that I looked at yesterday
16    was in reference to an email that I
17    apparently had sent.
18    Q.    Okay.  Did you do any research about the
19    issues in this case?
20    A.    No.
21    Q.    We've requested and obtained some
22    documents, some of which are emails, press
23    releases, things of that nature through the
24    formal discovery process from USA that have
25    also been collected by the State of North
```

PAUL   WARD
April 20, 2022

Page 14

1    Dakota.  Outside of what was maintained by
2    the USA while you were an employee of USA,
3    did you keep any notes at home or on any
4    personal computers, devices, or things of
5    that nature?
6            MR. SCARPATO:  Objection, vague.
7            THE WITNESS:  No.  No.
8    BY MR. KERLIN:
9    Q.   Didn't take any notes at home or create
10   a timeline or anything like that?
11   A.   Not that I recall, no.
12   Q.   Okay.  Are you aware of North Dakota's
13   case against the United States which was
14   filed under the federal tort claims act that
15   involves $38,000,000 in damages North Dakota
16   seeks as a result of the US Army Corps and
17   other federal officials' actions and
18   inactions associated with protest against the
19   North Dakota Access Pipeline?
20   A.   Only what I've seen on the local news
21   reports or in the paper.  Other than that, I
22   know no detail.
23   Q.   And it's that lawsuit for which we're
24   here today and that you're a fact witness
25   that we're taking your deposition for.  So

**14:12-22**
**401-402**

Page 15

1    I'm curious, have you seen a copy of the
2    complaint that was filed by the State of
3    North Dakota in this case?
4    A.   No.
5    Q.   Have you seen the US District Court's
6    denial of a motion to dismiss the case that
7    was filed by the US?
8    A.   No.
9    Q.   Okay.  And so you haven't seen the order
10   that the court issued denying that motion and
11   allowing the case to proceed?
12   A.   No.
13   Q.   Are you aware of the court's order that
14   compelled discovery against certain federal
15   agencies and officials in addition to corps
16   witnesses?
17   A.   No.
18   Q.   And then are you aware of the United
19   States District Court denied a motion for for
20   partial summary judgment that was entered by
21   the United States.  Have you seen that order?
22   A.   No.
23   Q.   I want to talk to you a little bit about
24   your background and your education.  Could
25   you tell me where you're originally from.

Page 16

1    A.   I was born and raised in Massachusetts.
2    Q.   Did you move from Massachusetts at some
3    point?
4    A.   When I enlisted in the military, in the
5    Air Force, I moved away, ending up being
6    stationed in Minot, North Dakota.
7    Q.   How long were you stationed in Minot?
8    A.   I enlisted in 1976, I arrived in Minot
9    in 1977, and I was discharged from the
10   military in 1979.
11   Q.   What rank did you attain in the
12   Air Force?
13   A.   Airman First Class.
14   Q.   And then what was your assignment in the
15   Air Force?
16   A.   I was a member of the 91st Security
17   Police Squadron Tactical Neutralization Team,
18   which is equivalent of a civilian SWAT team.
19   Q.   Were you honorably discharged?
20   A.   Yes.
21   Q.   After you were honorably discharged,
22   what did you do next?
23   A.   I joined the Minot Police Department as
24   a police officer.
25   Q.   How long were you a police officer with

Page 17

1    the Minot Police Department?
2    A.   Two years.  Approximately two years.
3    Q.   And what did you -- what was your next
4    employment?
5    A.   I switched to the Ward County Sheriff's
6    Department mainly because I could work nights
7    and go to college during the day.
8    Q.   Is that something that you did?  Did you
9    attend college?
10   A.   I did.
11   Q.   And what college did you attend?
12   A.   Minot State University.
13   Q.   Did you receive any type of a degree?
14   A.   Bachelor's degree.
15   Q.   What was your focus of study?
16   A.   Criminal justice.
17   Q.   When did you receive that?
18   A.   1983.
19   Q.   And then after -- did you continue to
20   work at the -- in the sheriff's department
21   for Ward County?
22   A.   I did.
23   Q.   And when did you leave the sheriff's
24   department?
25   A.   You're trying my memory, but somewhere

PAUL   WARD
April 20, 2022

Page 18

1    around 1985.
2    Q.    What did you do next?
3    A.    I moved to the state of New Hampshire
4    and worked for the Nashua City Police
5    Department.
6    Q.    How long were you with the city police
7    department?
8    A.    Two years.
9    Q.    What did you do next?
10   A.    I was hired by the State of
11   North Dakota, the division of criminal
12   investigation, under the direction of the
13   attorney general.
14   Q.    And how long did you work for the State
15   of North Dakota in the criminal
16   investigations division?
17   A.    Until 1989, when I was -- went to the
18   federal level, worked for the office of
19   inspector general for USDA, and I did that
20   until 2010, when I was appointed by President
21   Obama as a US Marshal.
22   Q.    How long did you serve as the US Marshal
23   for North Dakota?
24   A.    2010 until December, end of December of
25   2016, at the end of President Obama's term.

Page 19

1    Q.    Have you -- have you returned to work in
2    any form after your retirement December of
3    2016?
4    A.    Work at the golf course fixing the
5    greens.  And I substitute taught in the
6    school system occasionally for two years
7    right after I retired.
8    Q.    So from 1976 through 2016, is it
9    accurate to say that you served continuously
10   in law enforcement?
11   A.    Yes.
12   Q.    I want to talk to you a little bit about
13   the work that you did for the State of
14   North Dakota in the criminal investigations
15   division.  Can you tell me a little bit about
16   the types of work that you were involved
17   with.
18   A.    Felonious investigations, criminal
19   investigations, ranging from thefts to
20   homicide.
21   Q.    And then when you started working for
22   the federal office of inspector general, what
23   types of things were you working on primarily
24   there?
25   A.    Mainly major white collar crimes

Page 20

1    involving program fraud with USDA programs.
2    Q.    Before I forget to ask, do you have any
3    certificates or licenses?
4    A.    I'm not sure if I understand what you
5    mean.  Such as what?
6    Q.    Sure.  Well, I mean, I'm just wondering
7    if you have any particular certifications
8    that would be applicable, and I'm not sure
9    what those might be in law enforcement, or
10   are you a member of any professional
11   organizations, or were you when you were in
12   law enforcement?
13   A.    I was a member of the North Dakota Peace
14   Officers Association.  Other than that, no.
15   Q.    I forgot to ask this earlier.  Where are
16   you located today for this deposition?
17   A.    I'm at the United States Attorney's
18   office in Bismarck, North Dakota.
19   Q.    And where do you currently live?
20   A.    Bismarck, North Dakota.
21   Q.    Did you ever receive any type of
22   demerits or disciplinary action during your
23   course either in service in the Air Force or
24   in any of your law enforcement roles?
25   A.    No.

Page 21

1    Q.    I want to talk to you a little bit more
2    about the time that you served as a United
3    States Marshal in North Dakota.  In order to
4    become a marshal, a US Marshal for the State
5    of North Dakota, was there a confirmation
6    process?
7    A.    Yes.
8    Q.    Okay.  Can you tell me a little bit
9    about how that worked.
10   A.    It started with a selection by the
11   congressional staff and then a confirmation
12   process leading up, you know, through the
13   senate, being confirmed by the senate, and
14   then on to appointment by the president.
15   Q.    Is there a marshal that's assigned or
16   appointed and then confirmed for each state?
17   A.    Each judicial district in the country.
18   There's 94.  So North Dakota is one district,
19   so there's one marshal.
20   Q.    Do you have an idea of how many were
21   potentially considered for US Marshal of
22   North Dakota at the time that you were
23   selected?
24   A.    No, I don't.
25   Q.    Is it accurate to say that it's a pretty

PAUL   WARD
April 20, 2022

Page 22

1  select group of law enforcement professionals
2  that are, I would think, had exhibited
3  exemplary service and excellent
4  qualifications?
5           MR. SCARPATO:  Objection, vague.
6  BY MR. KERLIN:
7     Q.   I'll ask it this way.  How do you think
8  you got selected by President Obama to be the
9  United States Marshal -- or put up for
10  confirmation for United States Marshal for
11  North Dakota?
12    A.   I wasn't selected by President Obama the
13  way you termed it.  I was appointed by
14  President Obama.  I was selected by Senators
15  Dorgan, Conrad, and Pomeroy.
16  Recommendations, I'm sure they did background
17  checks, checked around, and found out once I
18  was interested, that I would be the best
19  choice.  That's an assumption on my part, but
20  I don't know what else to tell you.
21    Q.   And then when you went through the
22  confirmation process, did you have to appear
23  in front of a senate committee?
24    A.   No.
25    Q.   Can you tell me how that process worked.

**22:7-20**
**401-402**

Page 23

1     A.   I don't know.  I'm not very political.
2     Q.   Well, I guess what I'm wondering is, you
3  did have to go through a confirmation
4  process; correct?
5     A.   They were provided the information, the
6  application process, the background check by
7  the FBI, and I guess they voted.  I wasn't
8  there.  I don't know.
9     Q.   Ultimately you were one of those 97 that
10  was selected to be the marshal for a judicial
11  district; right?
12    A.   94.
13    Q.   94.  Thank you for that clarification.
14    A.   94, not 97.
15    Q.   Tell me what you were responsible for as
16  the United States Marshal for North Dakota.
17    A.   Supervision of judicial district
18  personnel, the deputies, the administration,
19  the court security staff, safety of the
20  judges, security of the judges in the
21  courtroom and the court family.  I had
22  supervision of everything the deputies did.
23  There would serve warrants, civil process.
24    Q.   In your role as US Marshal, did you have
25  the ability to interface with other federal

Page 24

1  law enforcement agencies such as the FBI,
2  department of justice?
3     A.   Yes.
4     Q.   Can you give us an idea of how many
5  people or individuals that you supervised or
6  were under your direction as US Marshal.
7     A.   I think at the time I had 19 deputies,
8  maybe six or seven administrative staff
9  people, court security staff, which privately
10  contracted but generally under our
11  supervision of, I don't know how many guys
12  they had, 20 or so, maybe more.
13    Q.   And then your jurisdiction as US
14  Marshal, it would extend for that entire
15  judicial district which is the entire state
16  of North Dakota; is that correct?
17    A.   Yes.
18    Q.   Was there anyone in particular during
19  the course, when you were US Marshal, that
20  you reported to?
21    A.   Director of the marshal service would be
22  the only one that the marshals would report
23  to.
24    Q.   So if you had an issue that arose, for
25  instance, if you thought you needed more

Page 25

1  resources, who would you reach out to?
2     A.   It would be the deputy director.
3     Q.   And during the time period of 2010 to
4  2016, do you recall who that person was?
5     A.   No, I don't.  I can't recall his name.
6     Q.   If it comes to you, just let me know.
7           Did you ever make that request?
8           Did you ever ask for resources?
9     A.   Yes.
10    Q.   And I'll come back to that a
11  later in your deposition.
12           In addition to the deputy director
13  of the US Marshal Service, is there anyone
14  else to whom you might direct a request for
15  additional resources if something arose in
16  your jurisdiction, your law enforcement
17  jurisdiction?
18    A.   There were times when the deputy
19  director, if I had a question in regards to
20  additional personnel and that type of thing,
21  he might direct me to somebody that answered
22  to him that specialized in that particular
23  subject.  But I wouldn't go directly to that
24  person without first contacting the deputy
25  director.

**25:8-25**
**401-402**

PAUL   WARD
April 20, 2022

Page 26

1   Q.   Did you ever serve as a liaison when you
2   were US Marshal with respect to any other
3   federal agencies?  Was that ever part of what
4   you did?
5   A.   No.  If I understand your question
6   correctly.
7   Q.   Did you ever, as US Marshal, did you
8   ever have reason to interact with any of the
9   tribes in North Dakota?
10  A.   Yes.
11  Q.   Can you tell me the types of interaction
12  you would have with tribes, and right now I'm
13  not talking about the protests.
14  A.   I'm sorry.  You're not talking about
15  what?
16  Q.   The protests.  Anything, if you can give
17  me an idea of other interactions you might
18  have with the tribe as US Marshal.
19  A.   Generally meetings, come to an
20  understanding as to what we would do on the
21  tribal land, in the reservations, when we had
22  federal warrants to serve, what our role
23  would be on the reservation and how we would
24  interact.
25  Q.   So are you familiar with -- I'm going to

Page 27

1   refer to as the Dakota Access Pipeline or
2   DAPL.  If I use the term DAPL, do you
3   understand --
4   A.   Have I heard the term?  I have heard the
5   term, yes.
6   Q.   And when I say DAPL, I'm referring to
7   the pipeline, Dakota Access Pipeline, the one
8   that was there in North Dakota.  Okay?
9   A.   Yes.
10  Q.   During the time period that you were a
11  US Marshal, did you hear about protests
12  regarding the Dakota Access Pipeline or DAPL?
13  A.   Yes.
14  Q.   When did you first hear about the
15  protests?
16  A.   Summer of 2016, and that's when the
17  protests were starting.
18  Q.   What did you hear about it when it first
19  started?
20  A.   I don't know the specific date.
21  Q.   And what did you hear about the
22  protests?  In other words, how did you come
23  to find out that there were, in fact,
24  protests?
25  A.   I don't know.  I don't know if I heard

Page 28

1   it on the news or if I spoke with the sheriff
2   in Morton County.  Not sure.
3   Q.   At some point did you learn that the
4   protestors were located on US Army Corps of
5   Engineer land?
6   A.   Yes.
7        MR. SCARPATO:  Object, vague.
8   BY MR. KERLIN:
9   Q.   Do you recall about when that was?
10  A.   No, I don't.  It would have been the
11  same time period as the rest of it, though.
12  Q.   Okay.  And I have some documents that
13  may be helpful with respect to the particular
14  dates, but I wanted to kind of get your
15  understanding before we went over those.
16  Okay?
17       Did you at some point learn that
18  the protestors were camping overnight on
19  corps land?
20  A.   Yes.
21  Q.   To your knowledge, were these protestors
22  sleeping in designated campgrounds or areas
23  that were designated as campgrounds by the
24  corps?
25  A.   I believe they were not, but I'm not

Page 29

1   sure about that.
2   Q.   And sounds like, with the protests, did
3   you have -- well, let me ask this.  How did
4   you get involved in the response to the
5   protests?
6        MR. SCARPATO:  Objection, assumes
7   facts not in evidence.
8        MR. KERLIN:  Okay.
9   BY MR. KERLIN:
10  Q.   Mr. Ward, at some point, did you get
11  involved in the law enforcement response to
12  the protests?
13  A.   Yes and no.  I did not get involved in
14  responding to the scene.  I got involved in
15  management meetings at the command center.
16  Q.   Thank you for that clarification.
17       Can you recall about when you first
18  started attending the meetings at the command
19  center.
20  A.   I don't recall the exact date, but it
21  was at the onset of command center itself.
22  Q.   And where was that command center
23  located?
24  A.   The Morton County Sheriff's Department
25  building.

PAUL   WARD
April 20, 2022

**Page 30**

1    Q.   And is Sheriff Kirchmeier, is he the
2    sheriff for Morton County?
3    A.   Yes.
4    Q.   I'm just trying to understand how you
5    came to be a part of that.  Were you invited
6    to be a part of that, or did you ask to be a
7    part of being able to attend the command
8    center and hear what was going on with
9    respect to the response?
10   A.   I don't recall the particular
11   conversation, but Sheriff Kirchmeier and I
12   spoke quite often, and I'm sure at that point
13   it was brought up, and I attended some of the
14   meetings.
15   Q.   From the onset of when you first
16   attended the command center, were you
17   provided access to that command center if you
18   wanted to attend through the end of your
19   duration as a US Marshal?
20   A.   Yes, but I did not attend the majority
21   of the command center leadership meetings.
22   Q.   Okay.
23   A.   I did, to begin with, but not throughout
24   the whole process.
25   Q.   Did your attendance change at some

**Page 31**

1    point?
2    A.   Yes.
3    Q.   Do you recall about when that would have
4    been?
5    A.   I guess the best term I could say is
6    about halfway through until I retired.  So
7    maybe November, October, late October, early
8    November.
9    Q.   And was there a reason why your
10   attendance changed?
11   A.   The request that was made by the
12   sheriffs at my early onset of attending the
13   meetings pertained to receiving assistance
14   from deputy marshals in the marshal service.
15   When I requested that to our headquarters, I
16   was denied.  There were numerous requests but
17   a continual denial.
18            Once that denial was understood by
19   the sheriffs, the point of me being there was
20   just an added person in a small room.  They
21   had adequate leadership amongst the sheriffs
22   throughout the state, chiefs of police.
23   Unfortunately, they didn't -- I couldn't
24   provide them anything.  No point in me
25   attending anymore.

[31:9-32:14 401-402]

**Page 32**

1    Q.   Were you given a reason for the denial
2    of assistance by -- well, before I get there,
3    let me ask.  To whom did you make that
4    request or requests?  It sounded like you
5    made more than one request; is that accurate?
6    A.   Yes.
7    Q.   And did you make that request to the
8    deputy director?
9    A.   Yes.
10   Q.   Anyone else you made that request to?
11   A.   I had discussions with the office of
12   general counsel, at the direction of the
13   deputy director, that contacted me, and we
14   discussed it, and I was denied again.
15   Q.   Were you given a reason?
16         MR. SCARPATO:  I'd just object for
17   attorney-client privilege.
18         Mr. Ward, to the extent your
19   response would require discussion of
20   communications with marshal service OGC,
21   instruct you not to answer.  But if you can
22   answer without reference to those
23   discussions, you can go ahead.
24         THE WITNESS:  The question remains
25   is was I given a reason why?

**Page 33**

1    BY MR. KERLIN:
2    Q.   If it won't invade discussions that you
3    had with the office of general counsel.
4         MR. KERLIN:  As I understood it,
5    Mr. Scarpato; is that fair?
6         MR. SCARPATO:  That is fair.  Thank
7    you, Paul.
8         THE WITNESS:  I think you need to
9    repeat that if you would, please.
10   BY MR. KERLIN:
11   Q.   Sure.  Were you given a reason why
12   assistance was continually denied after you
13   had requested it?  And, again, I don't want
14   to know about communications that you had
15   with them.  That would be privileged.
16   A.   No.  If I'm not to discuss what OGC told
17   me, then no, I don't have a reason.
18   Q.   Back to your attendance at the command
19   center, especially early on, were you ever
20   denied access to information that the North
21   Dakota law enforcement had regarding
22   developments at the protest?
23   A.   No.  Not that I know of.
24   Q.   Okay.  Did North Dakota provide you
25   access to anything that you would want to

[33:11-23 401-402]

PAUL   WARD
April 20, 2022

**33:24-35:3 401-402**

Page 34

1  see, or if you had questions about things, so
2  it's really -- my question is, were they
3  sharing information with you if you asked?
4  A.   Yes.  Mostly verbally because I was
5  standing there speaking to the sheriffs.  No
6  one ever hesitated in discussing things with
7  me.
8  Q.   But it wasn't like they said, well,
9  we're North Dakota, so you all should be
10  involved, and we're not going to let you in
11  here to hear what's going on; right?
12  A.   That's not the relationship we ever had
13  in law enforcement here in North Dakota.
14  Q.   Would you describe the relationship you
15  had with law enforcement in North Dakota.
16  A.   Very cooperative, to the best of our
17  ability, very cooperative.  There was never a
18  time when, if I needed help from the Bismarck
19  Police Department, that the chief of police
20  wouldn't provide that help.  There was never
21  a time that if they needed assistance from
22  us, that we wouldn't provide it.  Never a
23  time when, if I was traveling in North
24  Dakota, and I saw a trooper on the side of
25  the road that needed help, that I wouldn't

**35:4-8**
**401-402; 602**

Page 35

1  stop and help them.  Or, conversely, that
2  they wouldn't stop and help us.  That's just
3  how it was.  It was a brotherhood.
4  Q.   With respect to the protests, do you
5  think that the federal government provided
6  the law enforcement assistance that was
7  requested by law enforcement of North Dakota?
8  A.   No.

**35:9-11**
**401-402; 602;**
**701/702 calls for**
**legal concl, expert**
**test.**

9  Q.   Do you think that's something they
10  should have done?
11  A.   Yes.
12  Q.   At least early on -- and so I
13  understand, when we were talking earlier that
14  there was a change in your attendance at the
15  command center, I believe you said around
16  October-November, you said about halfway
17  through, which would have been around, I
18  think, October-November; does that sound
19  right?
20  A.   Yes.
21  Q.   Prior to that time period, can you give
22  us an idea about how often you'd attend the
23  command center.
24  A.   Approximately two to three times per
25  week with the understanding that I had other

Page 36

1  duties still running the district, had to
2  attend meetings in Fargo, where the main
3  office was, so I did have other travel
4  involved.  Two to three times per week.
5  Q.   Did you see or have access to drone and
6  plane footage and pictures that were
7  available in the command center?
8  A.   Yes.
9  Q.   Did you ever observe protestors that
10  were on corps land then leave corps land and
11  then protest at a site off of corps land?
12       MR. SCARPATO:  Objection,
13  foundation, lack of personal knowledge.
14       THE WITNESS:  I guess I'm not --
15  Bill, maybe you can advise me.  I'm
16  not sure if I'm supposed to answer the
17  question once you object or just continue on.
18       MR. SCARPATO:  I appreciate the
19  clarification, Mr. Ward.  Unless I instruct
20  you not to answer, you should answer the
21  question.  So you can go ahead and answer
22  this one to the best of your ability, subject
23  to the noted objection.
24       THE WITNESS:  I do believe I did
25  see some video when they left corps land or

Page 37

1  incidents that were off corps land.
2  BY MR. KERLIN:
3  Q.   When you saw some of that footage, in
4  those photographs, would they be using the
5  corps land as a base of operation, in
6  essence?
7       MR. SCARPATO:  Objection, vague.
8       THE WITNESS:  I don't know.
9  BY MR. KERLIN:
10  Q.   But it was your understanding that they
11  were camping out on the corps land; is that
12  correct?
13       MR. SCARPATO:  Objection, misstates
14  the testimony.
15       THE WITNESS:  Could you repeat the
16  question, please.
17  BY MR. KERLIN:
18  Q.   Sure.  At some point did you become
19  aware that protestors were camping out on US
20  Army Corps of Engineers land?
21       MR. SCARPATO:  Objection, lacks
22  personal knowledge.
23       THE WITNESS:  Yes.
24  BY MR. KERLIN:
25  Q.   It sounds like you had personal

PAUL   WARD
April 20, 2022

**Page 38**

1  knowledge of that; is that correct, Mr. Ward?
2  A.   Yes.
3  Q.   You saw them camping out on corps land;
4  right?
5  A.   Not personally.  I wasn't at the scene,
6  but the video and the things that were
7  provided to the command center.
8  Q.   Did you also have an understanding that,
9  after some of the protestors would go out
10  either into the community or to the area
11  where DAPL workers were working, they would
12  then return back to corps land, where they
13  would stay overnight?
14  A.   Please repeat that.
15  Q.   Sure.  With respect to the protestors,
16  did you have an understanding or become aware
17  that protestors would be on corps land and
18  then leave corps land and go somewhere else,
19  either out into the community or to areas
20  where the workers were working or trying to
21  work for the pipeline, and then protest in
22  those areas and then return back to corps
23  land at the end of the day or overnight?
24          MR. SCARPATO:  Objection, vague and
25  compound.

38:25-39:5
602; 611 vague and
compound

**Page 39**

1          THE WITNESS:  Yes, I was aware of
2  that.  I was aware they were in pipeline
3  areas, and I was aware when of it came to the
4  federal courthouse in Bismarck.  They were
5  right outside the front door.
6  BY MR. KERLIN:
7  Q.   When those things happened, when those
8  protestors showed up, to use your example at
9  the federal courthouse, did that require a
10  law enforcement response?
11  A.   Oh, yes.
12  Q.   And simply for public safety; correct?
13  A.   For what?
14  Q.   For public safety and to control the
15  crowd.  I mean, in other words, once these
16  protestors arrived at the courthouse, there
17  has to be some type of law enforcement
18  response, doesn't there?
19  A.   Yes, there was.
20  Q.   And so in your experience in 40 years in
21  law enforcement -- in law enforcement, some
22  form of law enforcement response was required
23  because the protestors had shown up at the
24  courthouse; right?
25  A.   Yes.

**Page 40**

1  Q.   Okay.  Given the size of the protest, I
2  mean, is it your understanding that the
3  protest grew over time and eventually reached
4  many thousands of people?
5  A.   Yes.
6  Q.   Okay.  For instance, at the federal
7  courthouse, can you give us an idea of
8  approximately how many people there would
9  have been that showed up to protest.
10  A.   However many people it would take to be
11  shoulder to shoulder to take up a full city
12  block.  I don't know how many people that is.
13  A lot.
14  Q.   Given that the resources that you had at
15  your disposal, 19 deputies, were you able to
16  keep the federal courthouse secure, or did
17  you require other assistance to do so?
18  A.   19 deputies consisted of all the
19  deputies I had in the district.  That
20  included Fargo, Grand Forks, Minot, and
21  Bismarck.  Bismarck was maybe five.  If it
22  was us five plus me against hundreds, if not
23  thousands, we would be whupped, even with the
24  assistance of the Bismarck Police Department,
25  which we did have.  When myself and one of my

**Page 41**

1  deputies went out to spoke to the commander
2  at the Bismarck Police Department, and I
3  don't remember who it was, but he looked at
4  me, and he said, Marshal, if they want your
5  building, they're going to take it.  We can't
6  stop them.  That's how many there were.  So
7  with the assistance of the Bismarck Police
8  Department and the deputies I had and the
9  court security stuff, we were outnumbered 20
10  to one.  No, more than that, 50 to one.
11  Nothing we could have done.
12  Q.   And the Bismarck Police Department,
13  though, they were willing to provide the
14  support that they could; is that accurate?
15  A.   Yes.  To the best of their ability, yes.
16  Q.   And were they, along with you and the
17  other deputy marshals, able to keep the
18  courthouse safe?
19  A.   Mainly because it was, although loud,
20  the protest was peaceful.
21  Q.   Were you aware of whether coming to the
22  assistance of the US Marshals and helping to
23  keep secure the federal courthouse, that that
24  was a significant -- that that required a
25  significant amount of resources from the

41:21-
42:8
602; 611
vague

PAUL   WARD
April 20, 2022

Page 42

41:21-42:8 602;
611 vague

```
1      Bismarck Police Department?
2           MR. SCARPATO:  Objection, vague,
3      lack of personal knowledge.
4           THE WITNESS:  Significant in the
5      fact that they gave me all they had.  They
6      still had to maintain peace within the city,
7      but whatever was left over, they gave me.  So
8      yes, that's significant.
9      BY MR. KERLIN:
10     Q.   You also mentioned that the
11     protestors -- you were aware that the
12     protestors had mobilized and gone to other
13     areas.  We talked about the federal
14     courthouse, then also at the construction
15     area?
16     A.   Yes.  And I need to clarify that because
17     I'm not 100 percent sure how I became aware
18     of that.
19     Q.   Uh-huh.
20     A.   I may have seen it on the news at night.
21     I may have seen it on the drone video, or
22     they may have told me at the command center,
23     but I was aware of it, yes.
24     Q.   As a law enforcement professional with
25     40 years of service and experience, when the
```

Page 43

43:5-15
602

```
1      protestors showed up at the construction
2      site, did that require law enforcement
3      response and presence?
4      A.   Yes, it certainly did.
5      Q.   With respect to that area, do you know
6      who was the law enforcement -- the chief law
7      enforcement officer that was in charge of
8      that response?
9      A.   I don't know.
10     Q.   Would that have fallen --
11     A.   It ultimately would have been the
12     command center, but I don't know who answered
13     to the command center at the scene.
14     Q.   Would that have been in Morton County?
15     A.   I believe so, but I'm not sure.
16     Q.   After the protests and demonstrations at
17     the federal courthouse, those protestors then
18     went back to US Army Corps of Engineers land;
19     is that correct?
20     A.   I don't know.  They left Bismarck.
21     That's all I know.
22     Q.   Was there any effort, to your knowledge,
23     by any federal agency or law enforcement to
24     remove protestors or to keep them from
25     returning to corps land?
```

Page 44

```
1      A.   Not that I know of.
2      Q.   There weren't any other federal agencies
3      that coordinated with you as the US Marshal
4      that brought up, hey, you know, maybe we
5      should remove these protestors from corps
6      land, they're causing problems here, nothing
7      like that?
8      A.   No.
9      Q.   Do you know why there wasn't a federal
10     law enforcement response to try and remove
11     the violent protestors from corps land?
12          MR. SCARPATO:  Objection, vague.
13          THE WITNESS:  I would have to
14     assume, if there was a request made by any
15     other agency other than the marshal service,
16     that they received the same declination that
17     I received.  I don't know that.  I just know
18     that no one else could respond.
19     BY MR. KERLIN:
20     Q.   Do you know why federal law enforcement
21     didn't do more to try and prevent what was
22     going on US Army Corps of Engineers land?
23     A.   I don't know, no.  I know that I --
24     prior to the influx of protestors, to a
25     magnificent number of people, there was no
```

44:9-45:2
401-402;
602; 611
vague

Page 45

```
1      request made through me, not at the early
2      onset.
3           Can I ask a request, please?  I'd
4      like to take a break, if I could, because I
5      have diabetes, and I need to eat something
6      quick because --
7           MR. KERLIN:  Thank you.  You want
8      to do a ten-minute break?  Is that sufficient
9      time?
10          THE WITNESS:  Ten minutes is fine.
11          MR. KERLIN:  Perfect.  We'll go off
12     the record.
13          THE VIDEOGRAPHER:  Off the record.
14     Universal coordinated time is 1530.  We're
15     off the record.
16          (Pause in proceedings)
17          THE VIDEOGRAPHER:  We're now back
18     on the record.  Universal coordinated time is
19     1540.
20     BY MR. KERLIN:
21     Q.   Mr. Ward, we're back on the record after
22     a short break.  Are you able to continue?
23     A.   Yes.
24     Q.   Okay.  I want to talk to you a little
25     bit about the command center that you
```

PAUL   WARD
April 20, 2022

**Page 46**

1  mentioned.  Can you tell me what that
2  consisted of.
3  A.   I didn't hear the beginning of your
4  question.
5  Q.   Sure.  The command center, can you tell
6  us a little about what the command center was
7  that you had mentioned.
8  A.   Well, it was a large conference-type
9  room with individual stations set up with
10  commanders of the sheriff departments having
11  individual stations and then small meeting
12  rooms off to the sides of that large
13  conference room.
14  Q.   Was Sheriff Paul Laney one of those that
15  was at the command center?
16  A.   Yes.
17  Q.   Were there any other law enforcement
18  from the federal government or any agency in
19  addition to you that attended the command
20  center, to your knowledge?
21  A.   On occasion there were FBI agents in
22  supervision.
23  Q.   How often did those FBI agents attend?
24  A.   I don't know because I wasn't there at
25  each -- on each individual day, so I don't

**Page 47**

1  know how often they were there.
2  Q.   What about any representatives from the
3  US Army Corps of Engineers?  Were any of
4  those ever present?
5  A.   There was on occasion, yes, that I saw.
6  Like I said, I wasn't there for each day, so
7  I don't know.
8  Q.   With respect to the ones that you saw,
9  can you recall the names of any of those
10  individuals?
11  A.   No, I don't know his name.
12  Q.   Of the times that you attended, were the
13  representatives from the Army corps, were
14  they typically there, or were they only there
15  once or twice?  Can you give us an idea about
16  the frequency when you attended that they
17  would be present?
18  A.   I don't know.
19  Q.   Okay.  I'd like to --
20  MR. KERLIN:  Mr. Diaz, if you could
21  bring up Exhibit 311.
22  For the record, we're going to mark
23  this as Exhibit 311 with continued numbering
24  deposition exhibits on behalf of the
25  witnesses that State of North Dakota has

**46:20-49:18**
**602**

**Page 48**

1  taken and picking up where we left off last.
2  (Exhibit 311 marked)
3  BY MR. KERLIN:
4  Q.   Can you see the document that we're
5  trying to display on the screen, Mr. Ward?
6  A.   Yes, I can see it.
7  Q.   Okay.  It says for the "to" line, US
8  and-all.  Would those be email -- that,
9  like, a LISTSERV email account that you would
10  receive as well?
11  A.   Not unless it was forwarded to me.
12  Q.   Okay.
13  A.   I don't think I was.
14  Q.   The date of this email is August 28th,
15  2016.  Do you see that?
16  A.   Yes.
17  Q.   And it says Chris Myers.  Are you
18  familiar with Chris Myers?
19  A.   Yes.
20  Q.   Did you work with him when you were the
21  US Marshal for North Dakota?
22  A.   Yes.  He was the United States Attorney
23  at the time.
24  Q.   The subject matter of this email is
25  update on the Dakota Access Pipeline and

**Page 49**

1  protest matter.  Do you see that?
2  A.   Yes.
3  Q.   Do you recall that with respect to when
4  the protests started that they would have
5  started well before this date, August 28th,
6  2016?
7  MR. SCARPATO:  Objection, vague.
8  THE WITNESS:  I'm sorry?  You'd
9  have to repeat that question, please.
10  BY MR. KERLIN:
11  Q.   Sure.  The subject is an update on the
12  Dakota Access Pipeline and protest matter,
13  and it's dated August 28th, 2016.  To your
14  knowledge, did the protests regarding the
15  Dakota Access Pipeline start prior to that
16  date?
17  A.   I'm not sure when it started.  I don't
18  know when.
19  Q.   In the first paragraph, it says that we
20  met with pipeline company officials and
21  requested they delay their work until the
22  week of September 14th.  Do you see that?
23  A.   Yes.
24  Q.   Do you recall attending a meeting with
25  representatives from the company that was

PAUL   WARD
April 20, 2022

**49:24-51:5 401-402**

Page 50

1   building the Dakota Access Pipeline?
2   A.   Yes, I do.
3   Q.   If we go to the second paragraph, about
4   three lines down it says, Paul Ward was the
5   other federal partner in the meeting, and he
6   was very frustrated too.  Do you recall that?
7   Do you recall going to the meeting?
8   A.   I don't recall that they were present in
9   the room or if it was a video meeting, but I
10  do recall some type of meeting.
11  Q.   I'm going to go up, I kind of skipped
12  ahead a little bit, but I just want to
13  establish, you do recall being present in
14  person or by video with some member of the
15  company; correct?
16  A.   Yes.
17  Q.   The prior sentence it says, I was very
18  stern in my approach, and it even got
19  personal when the company claimed that
20  federal law enforcement was "weak" and should
21  be prosecuting everyone for traveling in
22  interstate commerce for breaking the law.
23         Do you see that?
24  A.   Yes.
25  Q.   Do you agree that the law enforcement

**51:6-14**
**401-402; 403; 611**
**vague**

Page 51

1   response when the protests initially started
2   was weak, that the federal response was weak?
3   A.   Weak wasn't my term.  I didn't say that.
4   Somebody from, apparently, the company said
5   that.
6   Q.   But do you agree with that?  Do you
7   think it was a weak federal law enforcement
8   response?
9          MR. SCARPATO:  Objection, vague.
10         THE WITNESS:  I wouldn't say it was
11  weak.
12  BY MR. KERLIN:
13  Q.   How would you characterize it?
14  A.   Nonexistent.
15  Q.   Then if we go to the -- that sentence we
16  have highlighted, we were the bad cops in
17  this meeting for sure, and in the middle we
18  started to simply walk out.  Do you see that?
19  A.   Yes.
20  Q.   Do you recall that occurring in the
21  meeting that it had kind of reached a level
22  of tension that you and the other attendee,
23  I'm assuming it's Mr. Myers, was he with you
24  at the meeting, or do you recall?
25  A.   I don't recall.  I assume so since he

Page 52

1   wrote this email, but I don't recall.
2   Q.   And then you all started to walk out and
3   then stopped and then continued the meeting.
4   Does that seem familiar at all?
5   A.   Not really.  You have to understand this
6   is almost six years ago for me.  I've done a
7   lot of things -- I've done a lot of things in
8   my life since the last six years that have
9   overtaken my thought process other than this
10  stuff.  This brings back a recollection, but
11  I don't recall specifically anybody walking
12  out, or maybe Chris stood up or someone did.
13  I don't know.
14  Q.   Understand.  And again, if you don't
15  recall, that's a perfectly fine answer too.
16  A.   Okay.
17  Q.   This is my opportunity to ask you
18  questions about it and understand the
19  significant factors.
20         (Exhibit 312 marked)
21         MR. KERLIN:  I'd like to go to 312.
22  This is an email date September 5th of 2016,
23  so about a week later.
24  BY MR. KERLIN:
25  Q.   Do you see that?

Page 53

1   A.   Yes.
2   Q.   From James Thomas.  Do you know who
3   James Thomas is?
4   A.   Yes, I do.
5   Q.   And he's an assistant US Attorney in
6   Bismarck at the time; correct?
7   A.   Yes.
8   Q.   It says, one of the recipients on the
9   email is Paul Ward, do you see that?
10  A.   Yes.
11  Q.   Subject is DAPL corps notes of LE
12  meeting with tribal leaders, September 5,
13  2016, law enforcement sensitive.  Do you see
14  that?
15  A.   Yes.
16  Q.   Okay.  And in the initial email, and I
17  want to go -- it's a forward, but it says,
18  see attached.  Do you see that?
19  A.   Oh, yes, okay.  Yeah, I do.
20  Q.   If we go to the bottom, which is the
21  rest of the email that -- it has this
22  September 5th email, and it says through
23  Rosa, Chairman Archambault.  Do you know who
24  Chairman Archambault is?
25  A.   Yes, I do.

PAUL   WARD
April 20, 2022

**Page 54**

54:4-56:1 401-402

```
1    Q.   Is he part of the Standing Rock Sioux
2    tribe at the time?
3    A.   Yes.
4    Q.   Their chairman.  And it says, they
5    requested a meeting regarding the activities
6    over the past day or two.  Do you recall
7    attending a meeting with the Standing Rock
8    Sioux tribe at the beginning?
9    A.   I do, yes.
10   Q.   Okay.
11        MR. KERLIN:  Can we go to the
12   attachment, which is the next page.  And,
13   again, for the record, this will be marked
14   Exhibit 312.  If you go back one page.  There
15   we go.
16   BY MR. KERLIN:
17   Q.   It's got a number of attendees here.  We
18   go down the list, you're on the list there,
19   US Marshal Paul Ward.  Do you see that?
20   A.   Yes.
21   Q.   And then Jake O'Connell from the FBI.
22   Do you see his --
23        MR. KERLIN:  Oh, we need to go back
24   a page.  Sorry.  To the top, that is.
25
```

**Page 55**

```
1    BY MR. KERLIN:
2    Q.   Do you recall Mr. O'Connell being with
3    the FBI?
4    A.   Yes.
5    Q.   Was he one of the FBI agents that you
6    mentioned earlier that might have attended
7    the command center from time to time?
8    A.   He was the supervisor in the Bismarck
9    office.
10   Q.   How would you characterize this meeting
11   with Standing Rock Sioux tribe
12   representatives?
13        MR. SCARPATO:  Just stepped in here
14   for a moment and note for the record that
15   Mr. Ward has not had an opportunity to review
16   the document in full.
17   BY MR. KERLIN:
18   Q.   Mr. Ward, would you like to --
19   A.   To be honest with you, I don't recall
20   the context of this whole meeting.
21   Q.   Okay.
22   A.   I recall meeting with David Archambault
23   one time alone.  Well, not alone, but that
24   was here in the US Attorney's office.  I
25   don't recall context of this particular
```

**Page 56**

```
1    meeting.
2    Q.   Your counsel's raised an issue.  You
3    haven't had the opportunity to read the whole
4    document.  Would you like to read the whole
5    document?  Then I'll ask a question about it.
6    A.   Okay.  I haven't read it in its
7    entirety, but I perused it.  I guess you can
8    ask your question.
9    Q.   By this time period, September 5th,
10   2016, did you think that the protestors that
11   were active regarding the DAPL pipeline were
12   out of control?
13   A.   Yes.  Seemed to be out of control in
14   that -- if being rebellious at the time
15   consisted of what you would term as out of
16   control, then yes, if that was the time
17   period where the roadblocks needed to be put
18   up and the barricades that they used, that
19   type of thing, if that's the same period,
20   yes.
21   Q.   I'd like to -- did you at some point
22   find out that there was --
23        MR. KERLIN:  You can take this
24   exhibit down.  Before we do --
25
```

56:9-20 602; 611 vague

**Page 57**

```
1    BY MR. KERLIN:
2    Q.   Mr. Ward, with respect to this time
3    period, and I know there's a meeting with
4    Standing Rock Sioux tribe --
5        MR. KERLIN:  And you can stop
6    sharing the screen, Jose.
7    BY MR. KERLIN:
8    Q.   We're talking about September 5th,
9    around that time period of 2016, and I showed
10   you the meeting that occurred with Standing
11   Rock Sioux tribe, and you've already been to
12   the command center.  You've spoken at the
13   command center, I take it, by this time, with
14   Sheriff Laney as well as Sheriff Kirchmeier?
15   A.   I believe so, yes.
16   Q.   As a 40-year law enforcement
17   professional, at this point do you think that
18   there was anything that law enforcement from
19   North Dakota was doing that was causing
20   problems or escalating things?
21        MR. SCARPATO:  Objection, vague,
22   lack of personal knowledge.
23        THE WITNESS:  Absolutely not.  They
24   didn't cause the problem, they reacted to it.
25
```

57:16-25 602; 611 vague 701/702 expert test.

PAUL   WARD
April 20, 2022

Page 58

58:2-20
602; 611 vague and
compound; 701/702
expert test.

BY MR. KERLIN:

1

2    Q.   And as a 40-year law enforcement

3    professional and at the time of these events

4    that we're discussing, you were the US

5    Marshal for North Dakota.  Do you think that

6    the law enforcement response by North Dakota

7    was appropriate and measured?

8            MR. SCARPATO:  Objection, vague,

9    compound.

10           THE WITNESS:  It was not only

11   appropriate, it was professional and needed.

12   BY MR. KERLIN:

13   Q.   Do you have any criticism with North

14   Dakota's law enforcement response at any

15   point during the protests when you were the

16   US Marshal until your retirement?

17   A.   I have no criticism of the local law

18   enforcement or the state law enforcement

19   response; I have a criticism that's on the

20   federal side.

58:21-59:1
602; 701/702
expert test.

21   Q.   If there's assertions in this lawsuit by

22   the United States that law enforcement

23   engaged in excessive force, do you agree with

24   that?

25   A.   No, I don't.  I didn't witness or hear

Page 59

59:10-61:12
602, 701/702 expert
test.

1    about anything that was excessive on the

2    response of law enforcement.

3    Q.   Do you agree with me that the law

4    enforcement activities by the State of North

5    Dakota, especially when it came to your

6    interactions at the courthouse, were

7    collaborative and sought to maintain law and

8    order?

9    A.   Yes.

10   Q.   Do you agree, as the federal marshal for

11   the District of North Dakota, that the US

12   Army Corps of Engineers, by allowing

13   protestors to camp on their lands, extended

14   the protests and the resulting costs of it?

15           MR. SCARPATO:  Objection, vague,

16   assumes facts not in evidence,

17   mischaracterizes the testimony, foundation,

18   lack of personal knowledge.

19           You can answer the question.

20           THE WITNESS:  I do agree, yes.  I

21   think that some type of request for a

22   response to take care of a minimal amount of

23   people first protesting on the land would

24   have been the appropriate action as opposed

25   to waiting until it got out of control.

Page 60

60:2-16
611

BY MR. KERLIN:

1

2    Q.   And that would have been -- would you

3    agree with me that the opportunity to do so

4    would have been early on in the protests?

5            MR. SCARPATO:  Objection, vague.

6            THE WITNESS:  I think that the

7    opportunity they had would have and should

8    have been to request assistance to remove a

9    minimal amount of people at the early

10   onset --

11   BY MR. KERLIN:

12   Q.   When you say --

13   A.   -- opposed to waiting.

14   Q.   I'm sorry.  I didn't mean to interrupt.

15   A.   As opposed to waiting till it got out of

16   control.

17   Q.   And that request, would it be accurate

18   to say that request would have been needed to

19   have been made to North Dakota law

20   enforcement to remove those individuals from

21   the US Army Corps of Engineers land; correct?

22   A.   Yes.  And without -- I have to -- before

23   we answer your question, I'm not 100 percent

24   sure that the request should have been only

25   to local law enforcement in that, if they had

Page 61

1    any rangers that could issue a summons,

2    typically that summons and the response to

3    that summons through the court system would

4    come through the federal court system, and

5    the marshal service would serve that order.

6    If they had made the request.  I'm not

7    100 percent, but if it would have come

8    through, then we would have had to deal with

9    it.  But they didn't.  Whether or not they

10   did it with the local law enforcement or not,

11   I don't believe they did, and that's the

12   result of the numerous people showing up.

13   Q.   Had they made that request, US Army

14   says, hey, you know, there's trespassers on

15   our land, please come remove them, that would

16   have cut down the protests; right?

17           MR. SCARPATO:  Objection, vague,

18   assumes facts not in evidence, foundation.

19           THE WITNESS:  I don't know.

20   BY MR. KERLIN:

21   Q.   Let me ask it a different way.  By not

22   doing so and then allowing them to stay

23   through the spring of 2017, those actions did

24   allow the protests to continue for many

25   months afterwards; correct?

PAUL   WARD
April 20, 2022

Page 62

1          MR. SCARPATO:  Objection, vague,
2   lack of personal knowledge, foundation,
3   mischaracterizes the evidence, and assumes
4   facts not in evidence.
5          THE WITNESS:  I don't know that.  I
6   don't know what could have put a stop to
7   this.
8   BY MR. KERLIN:
9   Q.   Did you become aware at some point that
10  the US Army Corps of Engineers entertained
11  the idea of allowing or issuing what's known
12  as a special use permit?
13  A.   I've heard that term, but I'm not aware
14  of what the procedure was.
15  Q.   Okay.
16          MR. KERLIN:  Jose, would you bring
17  up Exhibit 206, please.
18          (Exhibit 206 referenced)
19  BY MR. KERLIN:
20  Q.   This is a fairly lengthy exhibit, and so
21  I want to show you the first page, and I want
22  to give you an opportunity to go through the
23  whole thing.  It will take a little while.
24  There are portions that are redacted.  That
25  means that there's an assertion of

Page 63

1   attorney-client or work product or privileges
2   by the United States, so that information is
3   blocked out.  To the extent you recall
4   something that was in there, none of my
5   questions are going to be asking about the
6   contents of what's been redacted.  Okay?
7   A.   Okay.
8   Q.   Here on the initial "to" line -- I'm
9   sorry, CC line.  I spoke incorrect.  It looks
10  like you're CCed on the email, and it's
11  September 7th of 2016.  Do you see that?
12  A.   Yes.
13  Q.   It's from James Thomas.  We've talked
14  about him; correct?
15  A.   Yes.
16  Q.   The subject line in this email has FW,
17  forward, special use permit request for
18  additional information, draft, then it has
19  unclassified, MSG, MSG, re DAPL, corps
20  special use permanent and related authority.
21          Do you see that?
22  A.   Yes.
23  Q.   At some point did you become -- I guess
24  this is dated September 7th.  Would you agree
25  that, by then, you became aware that there

**63:8-65:7 401-402; 602**

Page 64

1   was -- the corps was going to provide,
2   potentially, a special use permit or allow
3   the tribe to make an application for the
4   special use permit to be on corps land?
5   A.   Apparently.  I don't know -- I recognize
6   the term, but I don't know -- I don't recall
7   what, particularly, that's about.
8   Q.   If you go down in the document -- I want
9   to go to the end of -- I guess it's page 34,
10  at the end of page 4, this exhibit.  And,
11  again, this is a forward of the thing.  I'm
12  trying to go back through it so I can kind of
13  take you through the time, take you through
14  the entire document.  It's just awkward to do
15  it remotely.  So I apologize for that.
16          MR. KERLIN:  Jose -- Mr. Diaz, if
17  you'll zoom out.
18  BY MR. KERLIN:
19  Q.   I just kind of want to give you an
20  overview of the document.  This is the first
21  in the string, I believe.  And then it's from
22  a -- it's from a James Startzell.  Do you
23  know Mr. Startzell?
24  A.   No, I don't know him.
25  Q.   It mentions that there's no significant

Page 65

1   update on activities related to DAPL,
2   according to our contact with HQ, USACE, the
3   notification for the easement permit has not
4   yet been sent to Congress.
5          Do you know anything about that?
6   A.   I don't know.  I don't recall this.  I
7   don't know.
8   Q.   Okay.
9          MR. KERLIN:  I want to go to the
10  next -- if we can go up one in the chain, so
11  now we're going to the next email here at the
12  bottom.
13  BY MR. KERLIN:
14  Q.   Do you know Keith Fink?
15  A.   No, I don't.
16  Q.   It says, Chairman -- I'm reading this
17  email, and, again, it's directed to James
18  Startzell, Chairman Archambault contacted
19  Eric Stasch at Oahe Project providing a map
20  for his special use permit request.
21  Mr. Stasch replied to the chairman that
22  permit decision has been pulled up to HQ.
23          Again, you don't any knowledge with
24  respect to whether there was any permit or
25  permit application; is that fair to say?

PAUL   WARD
April 20, 2022

Page 66

1    A.   Yes, that's fair to say.  I have no
2    knowledge.
3    Q.   Okay.  The next line says, current
4    estimates at the cannonball protest sites is
5    still 300 to 500 people.
6         To your knowledge, did the protest
7    grow significantly from the 300 to 500 people
8    range?
9    A.   Yes.
10        MR. SCARPATO:  Objection, vague.
11   BY MR. KERLIN:
12   Q.   Would it be fair to say that it
13   increased by an order of magnitude to the
14   3,000 or 5,000 people range or more?
15   A.   I would say potentially more.
16   Q.   And that's based upon your personal
17   observations in the command center as well as
18   being the US Marshal for the District of
19   North Dakota; correct?
20   A.   Yes.
21        MR. KERLIN:  If we go up to the
22   next email -- actually, I'm sorry.  Before we
23   go there, let's take that down.
24   BY MR. KERLIN:
25   Q.   When we were talking earlier about being

Page 67

1    able to potentially stop the protests before
2    they could get out of control, would that
3    have been prior to August of 2016?
4         MR. SCARPATO:  Objection,
5    foundation.
6    BY MR. KERLIN:
7    Q.   I'm sorry.  Prior to the date of this
8    email, so August 21st, 2016?
9         MR. SCARPATO:  Same objection.
10        THE WITNESS:  I assume so.  I don't
11   know that.
12   BY MR. KERLIN:
13   Q.   Okay.  And then this next email, it's a
14   back and forth between Startzell and Fink
15   with a lot of people CCed on it.  Again, it
16   talks about the special use permit.  I just
17   wanted you to have the opportunity to read
18   that.  I don't have a specific question about
19   it because we've discussed your knowledge or
20   lack thereof about the special use permit
21   process application.
22        MR. KERLIN:  If we go to the next
23   email, so, again, this is Wednesday.  Yep.
24   If we go to the next -- yes.  Starts at the
25   bottom.  Now we're -- trying to get it all on

Page 68

1    one page for us here.
2    BY MR. KERLIN:
3    Q.   Now we're at September 6th of 2016, and
4    it mentions a draft of the response to the
5    special -- Standing Rock -- SRST special use
6    permit application.
7         And, again, I understand you don't
8    have a recollection of the specifics
9    regarding the permit, but do you recall any
10   discussion about any bond or liability
11   insurance requirements in any of the
12   discussions you had with anybody besides
13   anybody at the federal agencies?
14   A.   No.
15   Q.   And I take it you don't know whether or
16   not any of those requirements, to the extent
17   there were any with respect to the
18   application, were ever satisfied; is that
19   correct?
20   A.   I think you need to repeat that, please.
21   Q.   Sure.  With respect to any conditions
22   that were required before the permit would be
23   issued, is it fair to say you don't have any
24   knowledge about those?
25   A.   No.

Page 69

1    Q.   Okay.
2         MR. KERLIN:  And then you can take
3    that down, Mr. Diaz.  If we go -- again, we
4    can just go back one page.  There's forwards,
5    and I believe everything else has been
6    redacted, but if we go back to the front
7    page.
8    BY MR. KERLIN:
9    Q.   That's the email that you forwarded.  So
10   it had all of these, the different emails
11   below it that we've gone over, they
12   ultimately did get forwarded to you; right?
13   A.   Yes.
14   Q.   Were you aware --
15        MR. KERLIN:  You can take that down
16   now.
17   BY MR. KERLIN:
18   Q.   I just want to make sure, do you know
19   whether or not a permit was ever issued by
20   the corps?
21   A.   I don't recall.
22   Q.   Do you recall a press release that was
23   issued by the US Army Corps of Engineers
24   stating that a permit had been issued?
25   A.   No, I don't recall that.

ND OBJ:
Introduces
new material

PAUL   WARD
April 20, 2022

Page 70

1     MR. KERLIN:  Could you bring up
2  Exhibit 26, please.
3     (Exhibit 26 referenced)
4  BY MR. KERLIN:
5     Q.   Showing you an exhibit which has been
6  marked as 26, which is an exchange between
7  John Henderson -- do you know who John
8  Henderson is?
9     A.   I don't know him personally, but I know
10  his title.
11    Q.   He was a commander of the US Army of
12  Corps of Engineers for the Omaha District.
13  Were you aware of that, that he was the
14  commander for that district?
15    A.   Yes.
16    Q.   Okay.
17    A.   Yes, I was.
18    Q.   And this is from him to
19  Mr. Archambault -- Chairman Archambault.
20  Were you aware of any of the particulars
21  about what the corps was proposing as far as
22  allowing access for protestors on corps land?
23    A.   I believe so, yes.  It's not a subject
24  that I'm particularly remembering well, to be
25  honest with you.

Page 71

1     Q.   Okay.  Did the Corps of Engineers
2  contact you and let you know, as the US
3  Marshal, that, you know, this is what we are
4  going to do, or did they provide you
5  information, or do you recall anything like
6  that?
7     A.   No, I don't.
8     Q.   In other words, as the US Marshal for
9  the District of North Dakota, did the US Army
10  Corps of Engineers keep the marshal for that
11  jurisdiction in the loop for what they were
12  doing with federal lands?
13    A.   No.  I may have received, like you're
14  seeing, some of these exhibits, you know, a
15  CC copy of an email, but I don't recall ever
16  having been apprised by Colonel Henderson or
17  anyone else in regards to what was going on
18  on federal land.
19    Q.   They didn't, you know, for instance,
20  pick up the phone and call you and say, we
21  just want to make sure you are aware that we
22  have this situation, and we decided to do
23  this, that, or the other thing about allowing
24  them to stay there, camp, or build structures
25  or roads or things like that?

Page 72

1     A.   Any contact I had --
2     MR. SCARPATO:  Objection, facts not
3  in evidence.
4     THE WITNESS:  Any contact that I
5  had in reference to a subject such as what
6  you just mentioned was early on when I was at
7  meetings at the command center, and someone
8  from the Corps of Engineers was on the other
9  end, or someone from the DAPL company was on
10  the other end, which was very minimal
11  because, shortly after that, when I made the
12  request for assistance, I was denied, and,
13  like I said before, was no point in attending
14  the meetings if I couldn't assist them.
15  BY MR. KERLIN:
16    Q.   Someone who has been involved in law
17  enforcement, again, for four decades, do you
18  think it's a good idea not to keep, for
19  instance, the Corps of Engineers with federal
20  land they're permitting to be used or
21  potentially not to be used, not to
22  communicate with the US Marshal for that
23  state?
24    MR. SCARPATO:  Objection, vague and
25  compound.

Page 73

1     THE WITNESS:  I would think it
2  would be a good idea if he knew that
3  potentially I could help them.  Eventually he
4  didn't -- he knew I couldn't help them, so
5  what's the point in telling me?
6  BY MR. KERLIN:
7     Q.   And when you say couldn't help them,
8  that would be because your request for
9  additional federal resources and assets to
10  assist with the federal lawful response had
11  been denied repeatedly; is that correct?
12    A.   Yes.  It would make more sense that he
13  could contact local law enforcement.
14    Q.   And by doing so, if he contacted local
15  law enforcement or state law enforcement,
16  that would then be the burden of the state
17  law enforcement to then pay for that
18  response, that law enforcement response, even
19  though the protestors were camping out on
20  corps land?
21    MR. SCARPATO:  Objection, vague,
22  and assumes fact not in evidence.
23    THE WITNESS:  I don't know an
24  answer to that.  I don't know whose
25  responsibility it would be.

71:1-18 611 vague

71:19-72:14 401-402; 611

PAUL   WARD
April 20, 2022

Page 74

1         MR. KERLIN:  Okay.  We're done with
2    this exhibit now.  Actually, I'm sorry.  Is
3    there an attachment to this, I believe?
4    BY MR. KERLIN:
5         Q.   This is the press release.  Do you ever
6    recall seeing this press release about the US
7    Army Corps of Engineers granting a special
8    use permit?
9         A.   I don't recall seeing that, no.
10        Q.   Okay.
11             MR. KERLIN:  You can go ahead and
12    take that down.
13    BY MR. KERLIN:
14        Q.   Do you recall receiving updates from Tom
15    Doering and others regarding the protests?
16        A.   I'm sorry.  I didn't hear what you said.
17    Receiving what?
18        Q.   Receiving updates regarding the protests
19    from Tom, I believe it's pronounced Doering?
20        A.   I don't recall if I did or not.  I don't
21    know.
22        Q.   Some of the dates we were looking at
23    earlier, so we were looking around the -- we
24    looked at some documents that were around mid
25    to late August, and then September, some of

**ND OBJ:** Introduces new material *(margin note, lines 5–9)*

Page 75

1    the emails we were looking at an September
2    7th.  From that point on, did the protests
3    continue to grow in size and intensity?
4         A.   I know it continued to grow, but I don't
5    know the onset date or the ending date when
6    the growth came to its maximum.  I'm not
7    sure.
8         Q.   Okay.  Do you know if after the
9    protest -- if after the special use permit
10    press release that I showed you, after that
11    came out, that the protest then grew
12    significantly and quickly?
13            MR. SCARPATO:  Objection, vague.
14            THE WITNESS:  I don't know that.  I
15    knew it grew, but I don't know when it
16    started, and I don't know what the cause of
17    it was.
18            MR. KERLIN:  Bring up Exhibit 318,
19    please.
20            (Exhibit 318 marked)
21    BY MR. KERLIN:
22        Q.   Okay.  And this is an email that you're
23    not on, but I want to make that clear.  The
24    date of this is September 25th of 2016.  Do
25    you see that?

**75:20-76:15 103(d); 602; 611** *(margin note)*

Page 76

1         A.   Yes.
2         Q.   This was from James Startzell, it's to
3    Keith Fink and then also John Henderson.  We
4    talked about Mr. Henderson.  Do you see that?
5         A.   Yes.
6         Q.   Says, thanks, Keith.  I'll include some
7    of the highlights in the DAPL update on
8    Monday.  All this information basically
9    confirms the commander's assessment that the
10    camps are growing out of SRST's control, and
11    the chairman is probably going to try to use
12    the SUP as a way to regain control of what he
13    sees as legitimate protestors.
14             Do you see that?
15        A.   Yes.
16        Q.   Were you aware that there were
17    protestors that were on corps land that were
18    not part of the Standing Rock Sioux tribe?
19        A.   That's what the intelligence received by
20    the command center indicated, yes.
21        Q.   And by the end of September, do you
22    agree with the commander's assessments that
23    the camps are growing out of the Standing
24    Rock Sioux tribe's control?
25        A.   It seemed like by the end of September,

**76:21-77:1 602, 611 vague; 701/702 expert test.** *(margin note)*

Page 77

1    it was out of control for everyone.
2         Q.   Now, with respect to keeping control of
3    the protests that were on -- camping on corps
4    land, do you understand that US -- strike all
5    that.
6             Do you understand that the US Army
7    Corps of Engineers land is, I mean, that's
8    federal land; right?  That they're
9    responsible for.
10        A.   Yes.
11        Q.   Okay.
12        A.   Yeah.
13        Q.   At this time period in September of
14    2016, to your knowledge, did the US Army
15    Corps of Engineers or any federal law
16    enforcement take any responsibility for what
17    was happening on corps land?
18            MR. SCARPATO:  Objection, vague.
19            THE WITNESS:  I don't -- no, I
20    don't know if anyone did or not.
21    BY MR. KERLIN:
22        Q.   Were there any, to your knowledge, any
23    federal law enforcement that went onto corps
24    land to try and maintain law and order, to
25    try and get the protest back into control?

**77:22-78:12 602** *(margin note)*

PAUL   WARD
April 20, 2022

**Page 78**

1         MR. SCARPATO:  Objection, vague.

2         THE WITNESS:  I do know that the

3    FBI had sent some agents into the protestors'

4    site in an undercover capacity in an attempt

5    to obtain intelligence.

6    BY MR. KERLIN:

7         Q.   In that activity, was there any other

8    type of federal law enforcement activity on

9    corps land, that you're aware of?

10        MR. SCARPATO:  Objection, vague and

11   foundation, lack of personal knowledge.

12        THE WITNESS:  No.

13   BY MR. KERLIN:

14        Q.   Would you agree with me that in order to

15   get control of the protests, that, since this

16   was federal land, federal law enforcement

17   should have taken some actions to try and

18   control the protestors that had grown out of

19   control?

20        MR. SCARPATO:  Objection, vague,

21   and calls for a legal conclusion.

22        THE WITNESS:  Yes.  From the very

23   onset, when the Corps of Engineers took no

24   action allowing them initially to camp on the

25   land.  And yes, in fact, there was no

**Page 79**

1    assistance provided to local law enforcement.

2    BY MR. KERLIN:

3         Q.   Local law enforcement until they're

4    invited onto federal land, they're not

5    allowed to come onto the corps land to do

6    anything with respect to the protestors;

7    right?

8         MR. SCARPATO:  Objection, calls for

9    a legal conclusion and lack of foundation and

10   misstates the evidence and assumes facts not

11   in evidence.

12        THE WITNESS:  I'm not sure what

13   the -- I do know that at one point there was

14   some type of checkerboard jurisdiction

15   between the sheriff and Bureau of Indian

16   Affairs on reservation land.  And on federal

17   land, I'm not exactly sure what the

18   jurisdiction was for the local sheriff on

19   federal land that's within his county.

20   BY MR. KERLIN:

21        Q.   Fair enough.  If the US Army Corps of

22   Engineers had asked you as the US Marshal to

23   provide a law enforcement response on US

24   Corps of Engineers land, is that something

25   that you would have done?

**Page 80**

1         MR. SCARPATO:  Objection, calls for

2    an incomplete hypothetical.

3         THE WITNESS:  Likely not, only due

4    to a lack of personnel within the district.

5    Like I mentioned before, during a protest

6    outside the federal building, I had four or

7    five deputies in the building.  There's

8    nothing four or five could do when you take

9    the numbers that were needed for the court

10   proceedings and prisoner transportation and

11   operations of the district here in Bismarck.

12   That would have left me with maybe one or two

13   deputies to handle anything.  There was

14   nothing I could do with one or two deputies.

15   I would have to go through the same

16   requesting process, is what I'm getting at.

17   BY MR. KERLIN:

18        Q.   If you were provided resources that you

19   thought were sufficient, and you were asked

20   by the Corps of Engineers to come onto their

21   land to help address the protestors, is that

22   something that you would have done as a federal

23   lawful enforcement officer for the District

24   of North Dakota?

25        MR. SCARPATO:  Objection,

**Page 81**

1    incomplete hypothetical.

2         THE WITNESS:  With the approval of

3    the marshal service headquarters and the

4    director of the marshal service.  He would

5    have provided ample deputies and gave the

6    approval to it, I certainly would have.

7    BY MR. KERLIN:

8         Q.   Okay.  And if it was early on, like when

9    we were talking earlier, at the onset of

10   these protests, do you think that's something

11   that could have been done safely if you were

12   provided the resources and made that request

13        MR. SCARPATO:  Objection, vague,

14   lack of personal knowledge, and calls for a

15   legal conclusion, incomplete hypothetical.

16        THE WITNESS:  Certainly would have

17   been a much easier operation, that's for

18   sure.

19        MR. KERLIN:  Okay.  Let's -- we've

20   been going about another hour.  I know

21   you're -- can we go off the record for a

22   second.

23        THE VIDEOGRAPHER:  Going off the

24   record.  The universal coordinated time is

25   1629.  We are off record.

Margin annotations:

77:22-78:12
602; 611

78:14-79:1
602; 701; 701/702
expert test. and calls
for legal concl.

79:21-81:18
602; 611 incomplete
hypothetical

81:8-18
602;
611 incompl
ete
hypoth
etical;
701/70
2
expert
test.
and
legal
concl.

PAUL   WARD
April 20, 2022

Page 82

1    (Discussion held off record)
2    (Lunch recess taken at 10:30 a.m.
3    MDT)
4    -o0o-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1    A F T E R N O O N   S E S S I O N
2    (Proceedings resumed at 11:32 a.m.
3    MDT)
4    THE VIDEOGRAPHER:  We are now back
5    on the record.  Universal coordinated time is
6    1732.
7    EXAMINATION (continued)
8    BY MR. KERLIN:
9    Q.   Good afternoon, Mr. Ward.  We're back
10   after a break.  Are you able to continue?
11   A.   Yes.  Should we put the screen back the
12   way it was?  There you go.
13   Q.   Okay.  I want to talk to you a little
14   bit about the DAPL protest, continuing our
15   discussion from earlier today.  At some point
16   did you become aware of violence with the
17   protestors?
18   A.   Yes.
19   Q.   One instance did you learn that there
20   was a gunshot or that there was a law
21   enforcement officer that was injured in a
22   shooting?
23   A.   I heard that there was a gunshot, but I
24   don't recall that I heard that there was a
25   shooting.  I thought it went between the

Page 84

1    legs, the discharged projectile went been the
2    legs of two different highway patrolmen, if I
3    remember right.
4    Q.   Yeah.
5    MR. KERLIN:  Could we bring up
6    Exhibit 319.
7    (Exhibit 319 marked)
8    BY MR. KERLIN:
9    Q.   Do you see that on your screen?
10   A.   Yes.
11   Q.   Okay.  So the date of this email, so
12   it's October 27, 2016, so it's, well, about
13   six, seven weeks after some of the emails
14   that we were looking at earlier that was
15   around September, start of September.  Okay?
16   Just to put it into context.
17   It's a string of emails, and we
18   can -- you respond to a part, but I think if
19   maybe we go to the end and work our way up,
20   we can make sure we have an opportunity for
21   you to see the whole thing.
22   The bottom email is an email from
23   Chris Myers, October 27th.  I don't believe
24   you're on that one.  I will ask you if are
25   familiar with the fact that it mentions LE

Page 85

1    has made arrests.  No accurate numbers
2    available yet.  Is that familiar with your
3    recollection or consistent with your
4    recollection that there was a number of
5    arrests that were made of protestors?
6    A.   Yes.
7    Q.   Okay.  Then the email above it is the
8    thank you from a Rita Aguilar.  I don't think
9    you're on that one either.  Then the email
10   above it is from Clare Hochhalter.  Do you
11   know who she is?
12   A.   That's a he.  He's a federal magistrate
13   judge in Bismarck.
14   Q.   Thank you for that correction.
15   It says, the attached map shows the
16   intersection of County 134 and ND 1806, an
17   area just north of the Cannonball River,
18   which river is the northern boundary of the
19   Standing Rock Indian reservation.  This is
20   generally the area where there is now a
21   standoff where shots have been fired.
22   Do you see that?
23   A.   Yes.
24   Q.   Okay.  Then if we go to the email above
25   it, there's a question that's asked.  Again,

PAUL   WARD
April 20, 2022

Page 86

1    I don't believe you're on either one of
2    these, but it says, thanks, Clare.  Do you
3    know if these shots were fired by protestors
4    or LE?
5              And then, the one above it, again
6    from Mr. -- Magistrate Judge Hochhalter, it
7    says, report is that LE did not fire shots.
8    Do you see that?
9              MR. KERLIN:  Below -- I think it's
10   the one below that.  Next one.  Yeah.
11   BY MR. KERLIN:
12   Q.    Then, if we -- the next one says, thank
13   you.  Please keep us posted.  We really
14   appreciate it, and everyone, please stay
15   safe.
16   A.    Okay.
17   Q.    And then above that is your email, which
18   you send to Ronald Davis.  You said, I need
19   to correct this past email.  The gunshot
20   victim is not deceased but wounded.  The
21   police officer who initially was thought to
22   be grazed in the leg by a gunshot was only
23   hit with, apparently, a piece of road
24   material after the road was hit with a
25   gunshot.  Officer has not been shot.

Page 87

1              Do you see that?
2    A.    Yes.
3    Q.    Okay.  And that's -- is that consistent
4    with what you were testifying, consistent
5    with your recollection with what you said
6    earlier that there was a gunshot, but it
7    wasn't anyone that got shot?
8    A.    Yes.
9    Q.    Okay.  Is this indicative of some of the
10   violence that was being carried on by the
11   protestors that were protesting the DAPL
12   pipeline?
13             MR. SCARPATO:  Objection, assumes
14   facts not in evidence and vague.
15             THE WITNESS:  Yes.  That was one
16   instance.
17   BY MR. KERLIN:
18   Q.    You mentioned earlier that there was an
19   FBI -- I'm going to call it an undertaking or
20   an effort to send in a couple of agents that
21   were undercover to the protest camps on corps
22   land.  Do you recall that?
23   A.    Yes.
24   Q.    What was the law enforcement reason --
25   or what was the reason behind doing that?

Page 88

1              MR. SCARPATO:  Objection,
2    foundation, lack of personal knowledge.
3              THE WITNESS:  I don't know -- I
4    don't know what the initial thought process
5    entailed.  I just know that I didn't agree
6    with it.
7    BY MR. KERLIN:
8    Q.    Didn't agree with sending in the
9    undercover officers?
10   A.    Right.  I didn't agree with that.
11   Q.    And why didn't you agree with that?
12   Like, what was your reasoning behind that?
13   A.    The FBI agents that were sent undercover
14   had since returned to Bismarck to man it and
15   had approached me in seeking some assistance
16   because they didn't feel that them being sent
17   down amongst the protestors was the proper
18   thing to do without notification to the
19   command center and the local leadership,
20   consisting of the sheriffs.
21             They knew that -- they knew that
22   the sheriffs didn't know that they were
23   there, which is a bad law enforcement tactic,
24   mainly because of the safety of the
25   undercover officers.  If there has been some

*[margin note: 87:24-88:6 401-402; 602]*

*[margin note: 88:8-89:22 401-402; 602; 802]*

Page 89

1    type of emergency response and a raid
2    required into the protestors, we being, law
3    enforcement on the opposite side, wouldn't
4    know that the undercover officers were within
5    the protestors, and one of us could have
6    gotten hurt.
7    Q.    Was it accurate that not all of the
8    protestors were peaceful that had been
9    camping out on corps land?
10   A.    Yes, that's accurate.
11   Q.    Do you know who made the decision to
12   send the FBI agents undercover?
13   A.    I was told by those agents who made that
14   decision.  I don't know that that's factual
15   or not, but I'm assuming it is.
16   Q.    Who did they tell you?
17   A.    Their supervisor, Jake O'Connell.
18   Q.    Was there concern that the protestors --
19   well, were you aware that the protestors that
20   were camping on corps land, in part, were
21   from out of state?
22   A.    Yes, I was aware of that.
23   Q.    And what --
24   A.    I understood that they --
25   Q.    Sorry.

PAUL   WARD
April 20, 2022

**Margin annotations:**
90:1-16
401-402; 602; 802

for completeness
under 106 if objections
above overruled

93:18-94:2
401-402

Page 90

```
1     A.   I understood that they were from various
2     parts of the country, if not out of the
3     country, but I don't know how much of that
4     was factual, but I heard that.
5     Q.   Was there any concern amongst the law
6     enforcement that you were a part of regarding
7     the protest that the law enforcement efforts,
8     that there were some of these protestors that
9     were coming in from out of state had a
10    history of violence or anarchy?
11         MR. SCARPATO:  Objection to form
12    and foundation.
13         THE WITNESS:  There's always that
14    concern that anyone may have the potential
15    for violence.  You always have to be
16    concerned about that.
17    BY MR. KERLIN:
18    Q.   Do you know if one of the reasons why
19    the FBI agents were sent undercover was
20    because of some of the concern of the
21    protestors being violent, their propensity
22    for violence?
23         MR. SCARPATO:  Objection, calls for
24    speculation.
25         THE WITNESS:  I have no idea what
```

Page 91

```
1     the basis for Jake's decision was.  I have no
2     idea why he did it.
3     BY MR. KERLIN:
4     Q.   Okay.
5     A.   I have to assume that Jake's assumption
6     was for the betterment of the investigation,
7     that he was trying to gather intelligence.  I
8     don't disagree with that decision.  I
9     disagree with the fact that the local law
10    enforcement wasn't notified that he was going
11    to undertake that endeavor.
12    Q.   No whatever intelligence they gathered
13    was ever shared with state law enforcement?
14    A.   I don't know.  I would hope it was, but
15    I don't know.
16    Q.   Were you aware of protestors that killed
17    livestock and wildlife?
18         MR. SCARPATO:  Objection,
19    foundation, lack of personal knowledge.
20         THE WITNESS:  I don't recall that,
21    no.
22         MR. KERLIN:  Could you bring up
23    Exhibit 330, please.  320.  I'm sorry.  320.
24         (Exhibit 320 marked)
25
```

Page 92

```
1     BY MR. KERLIN:
2     Q.   The date of this email is November 1st,
3     so it's a few weeks, a few days after the
4     last email, I guess four, five.  It's from
5     Terry Van Horn.  Are you familiar with Terry?
6     A.   Yes.
7     Q.   It says, at least on the signature block
8     here, he's the National Security Intelligence
9     Specialist, State Law Enforcement Coordinator,
10    District Security Manager, Public Information
11    Officer at the United States Attorney's
12    Office.  Is that consistent with your
13    recollection?
14    A.   Yes.
15    Q.   And his email just said, FYI, and it's
16    forwarded to Chris Myers, Gary DeLorme, James
17    Thomas, and Clare Hochhalter.
18         Okay.  If we scroll to the message
19    that was forwarded, it's dated November 1st,
20    and it's from Lynn Woodall from Morton
21    County.  Do you see that?
22    A.   Yes.
23    Q.   It's sent to Terry Van Horn, a number of
24    individuals, Sheriff Laney, Sheriff
25    Kirchmeier, and then you are CCed on down the
```

Page 93

```
1     page as well.  Do you see that?
2     A.   Yes.
3     Q.   This email says, there are two more
4     missing buffalo.  It says, Ernie and Bev
5     Fisher called the TOC at 1820 and stated they
6     were missing two more buffalo, that the state
7     brand inspector found video.  They stated
8     that "Josue Rivas Fotographer" posted a video
9     on Facebook of two buffalo being butchered.
10    I found the video.  It clearly shows two
11    animals being skinned.  If everything goes as
12    planned, officials are going to round up the
13    herd on the east side of 1806 and transfer
14    them to the Solen area.  They'll let me know.
15         Does this refresh your recollection
16    at all about buffalo being killed?
17    A.   I'm sorry.  What's your question again?
18    Q.   I'm just asking if seeing this email
19    that you were CCed on, does it refresh your
20    recollection that wildlife or animals were
21    being killed by protestors?
22    A.   Yes.  Apparently -- apparently, I was
23    aware at the time.  You gotta remember, I get
24    a lot of emails as the marshal, and I review
25    a lot of them and some of them pertain to me,
```

PAUL   WARD
April 20, 2022

## Page 94

1    some don't.  I'm sure I read this, but I just
2    didn't recall.
3    Q.   Okay.
4         MR. KERLIN:  You can take that
5    down, Mr. Diaz.
6    BY MR. KERLIN:
7    Q.   So in addition to the gunshot incident
8    that we were talking about, there's been
9    animals that had been butchered by the
10   protestors.  Do you recall any other
11   incidents that would be examples of the type
12   of violence that specifically come to mind to
13   you?
14   A.   I do recall one incident where the
15   protestors were on horseback and charging the
16   front line of some troopers who were standing
17   still and being charged by protestors on
18   horseback.
19        I do recall one on incident where
20   there was, it appeared, but I don't think --
21   it didn't happen, but it appeared that a
22   gunshot was, somebody -- they were in, like,
23   a water section, a slough of some sort, and I
24   don't recall who shot a weapon, but they did
25   shoot, and it looked like the other person

**94:19-95:7 602**

## Page 95

1    dropped, like it shot them and killed them
2    dead, but, as it turned out, it wasn't as it
3    appeared.  Apparently the guy fell over or
4    dropped to avoid being shot, and the bullet
5    missed him.  So I do recall seeing that, but
6    I don't recall who it was that did the
7    shooting.
8         MR. KERLIN:  Would you bring up
9    Exhibit 321.
10        (Exhibit 321 marked)
11   BY MR. KERLIN:
12   Q.   This is another string of emails, and if
13   we can start at the bottom and then work our
14   way up so we kind of have it in the
15   appropriate timeline.
16        This involved a situation where the
17   FAA got involved about temporary flight
18   restrictions as a result of the protests.  Do
19   you recall that occurring?
20   A.   I don't really recall.  Like I said, a
21   long time.
22   Q.   Sure.
23   A.   But, apparently, it happened.
24   Q.   The first is, this initial email
25   November 4th to some individuals at the FAA

**95:9-96:3 401-402**

## Page 96

1    regarding temporary flight restrictions over
2    the DAPL protest sites.
3    A.   Okay.
4    Q.   There's your response that's above it.
5    That's what I want to focus on next.  The
6    date of this email is November 4th, and it
7    was sent from you to Mr. Brian Throop of the
8    FAA, and its subject line is North Dakota TFR
9    request.
10        Hello, Brian.  The justification
11   for my support is simply due to officer
12   safety.  In the recent past, protestors have
13   used drones to attempt to crash helicopters
14   who were conducting law enforcement missions
15   You know better than I what type of damage to
16   helicopters and human life would occur if a
17   drone hit an occupied helicopter while in
18   flight.  I do know the pilot and sheriff who
19   occupied the helicopter feared for their
20   lives when the drone came within
21   approximately 50 feet of the helicopter.  On
22   other occasions the drones have been flown
23   within just a few feet of officers' heads and
24   within a few feet of vehicles occupied by law
25   enforcement.  Continuous law enforcement air

**96:4-97:17 602; 802**

## Page 97

1    surveillance needs to be conducted to ensure
2    officer and public safety, including the
3    safety of protestors.  With that in mind, I
4    request you approve the flight restrictions
5    to ensure safety for all involved.
6         Do you see that?
7    A.   Yes.
8    Q.   Okay.  Do you -- do you recall having
9    sent this email?
10   A.   Not specifically sending it, but I do
11   recall the topic.
12   Q.   Okay.  And it mentions -- you mention in
13   the email that there were these attempts by
14   protestors, so they were trying to take
15   drones and fly them into law enforcement
16   vehicles and aircraft?
17   A.   Yes.
18   Q.   But, I mean, was law enforcement doing
19   anything to prevent that response?
20   A.   I think what they did, the best they
21   could, was try to avoid them.
22   Q.   And then you mentioned, you said, I do
23   know the pilot and sheriff.  Do you know
24   which sheriff that is?
25   A.   It was probably the sheriff of Morton

PAUL   WARD
April 20, 2022

**Page 98**

1   County.  Or Sheriff Laney from Cass County.
2   Q.   Okay.  Then, in addition to flying them
3   into vehicles, that they've flown within a
4   few feet of the officers' heads, I guess
5   while the officers are trying to do law
6   enforcement activities?
7   A.   Yes.
8   Q.   Then if we go to the response you
9   received from the FAA, Mr. Throop sends you a
10   response and says -- I'll wait till it's
11   brought up.  Thank you, sir.  I appreciate
12   your candor and insight.  I do have one quick
13   follow-on question.  Not to split hairs, but
14   in your professional judgment, is there an
15   ongoing threat that individuals will continue
16   to use unmanned aircraft in a manner that
17   threatens law enforcement personnel and
18   aircraft?
19        Do you see that?
20   A.   Yes.
21   Q.   Your response --
22        MR. KERLIN:  Go on up next.
23   BY MR. KERLIN:
24   Q.   It says, yes, and this is November 4th,
25   2016, still the same day, yes, without a

*98:2-7 602*

**Page 99**

1   doubt, this is ongoing.
2        Is that your recollection is that
3   at that time, on November 4th, there was an
4   ongoing threat to law enforcement personnel
5   and aircraft, that unmanned aircraft would
6   continue to be used in that manner?
7   A.   Yes.
8   Q.   In your next sentence it says, it has
9   gotten progressively worse for about three
10   months.
11        November 4th, so if we're looking
12   back three months, we're talking about the
13   start of August; right?  August, September.
14   Okay?
15   A.   Yes.
16   Q.   You said protestors have gotten more and
17   more desperate and more violent.  Do you see
18   that?
19   A.   Yes.
20   Q.   Is that consistent with your
21   recollection that the protestors had gotten
22   more desperate and more violent as time went
23   on?
24   A.   Yes, that's what would have been relayed
25   to me by the command center.

*99:2-25 602*

*99:24-25 802*

**Page 100**

1   Q.   And the next one says, gathered
2   intelligence indicates more protestors and
3   more violent acts are to come.  Do you recall
4   that?
5   A.   Yes.
6   Q.   The last sentence you state, we as law
7   enforcement do not see an end to the violent
8   acts in the near future.
9        Is that consistent with your
10   recollection in November of 2016 that that
11   was what you and law enforcement thought?
12        MR. SCARPATO:  Objection, vague.
13        THE WITNESS:  That's what we
14   thought at the time.
15   BY MR. KERLIN:
16   Q.   Okay.  And, actually, the protest didn't
17   end for significantly longer and even after
18   your retirement; correct?
19   A.   Yes.
20   Q.   And then you shared the email chain, you
21   go to the top message, email from you to
22   Sheriff Kirchmeier.  You state, this is the
23   chain of messages I sent to FAA regarding
24   flight restrictions.  I had a long
25   conversation as well prior to the emails.

*100:1-5 602; 802*

*100:5-14 602; 611*

**Page 101**

1        Do you see that?
2   A.   Yes.
3   Q.   Okay.  So in addition to the emails you
4   sent, do you recall having a conversation
5   with FAA about flight restrictions?
6   A.   I don't recall the conversation or
7   having it, but apparently I did.
8   Q.   And why did you share the information
9   with Sheriff Kirchmeier?
10   A.   It likely, like I said before, was as a
11   result of having a discussion with the
12   sheriff either Kyle or Paul Laney.
13   Apparently it was Kyle.  And sharing, as a
14   result of a conversation, sharing the
15   information I learned through an email chain.
16        MR. KERLIN:  Go to the next one,
17   please.  It's 322.
18        (Exhibit 322 marked)
19   BY MR. KERLIN:
20   Q.   This email is, begins, email chain
21   consists of two emails, two messages.
22   Initial email is from Mr. Throop about
23   reissuing the TFR, which I understand to be
24   temporary flight restriction.  Do you see
25   that?

*101:20-102:21 401-402; 611*

PAUL  WARD
April 20, 2022

Page 102

1     A.   Yes.
2     Q.   Okay.  And then they limited the -- it
3  says, it is basically the same size and scope
4  as before, so they're limiting what the
5  flight restrictions are and that they're
6  going to be in effect until the 15th.
7          Do you see that?
8     A.   Can you point that out again.
9     Q.   Sure.  It's in the bottom email.
10    A.   Okay.  Okay.  Yes.
11    Q.   You responded to him, first of all,
12  thank you so much for considering our needs
13  and safety of law enforcement.  It means so
14  much to us.  Can you inform why there is a
15  deadline, and what are the conditions you
16  referenced.
17          Do you see that?
18    A.   Yes.
19    Q.   Okay.  And then you forwarded that,
20  again, to Sheriff Kirchmeier?
21    A.   Yes.
22          MR. KERLIN:  Go to the next
23  exhibit, and it's 323, for the record.
24          (Exhibit 323 marked)
25

Page 103

1  BY MR. KERLIN:
2     Q.   This is picking up where the last email
3  left off.  If we look at the bottom email on
4  this page, the one where you had said, first
5  of all, thank you for considering the safety
6  and needs -- needs and safety -- and the
7  safety of law enforcement.
8          Do you see that?
9     A.   Yes.
10    Q.   Okay.  I want to go to the response from
11  FAA.
12          This is a response from FAA
13  November 4th.  It says, no problem at all.
14  And he explains that this particular type of
15  TFR does require a published begin/end date,
16  and explains the T is for temporary, or
17  that's what he's been informed.
18          If we go the last paragraph, it
19  says, the protestors will also be allowed to
20  fly drones in the air directly over their
21  camp.
22          Do you see that?
23    A.   Yes.
24    Q.   And it says, the North Dakota Department
25  of Homeland Security actually asked for that

Page 104

1  as an olive branch for legitimate protestors
2  who want to document their own activities.
3          Do you see that?
4     A.   Yes.
5     Q.   Were you involved with any of the
6  discussions that might have occurred at the
7  command center with the Department of
8  Homeland Security for North Dakota about
9  extending an olive branch to the legitimate
10  protestors in this regard?
11    A.   Not that I recall.
12    Q.   Would you agree with me that it's
13  an effort to de-escalate things?
14    A.   Seemed to be, yes.
15    Q.   And then at the top of this email, this,
16  again, is something that you forwarded to
17  Sheriff Kirchmeier.
18    A.   Yes.
19    Q.   And is this indicative, you know, we've
20  seen a couple of emails here, the last couple
21  of exhibits where you forwarded information
22  to Sheriff Kirchmeier.  Is that indicative of
23  the type of relationship that you all had
24  with respect to sharing this information
25  during this protest time period?

Page 105

1     A.   I think, because of the relationship we
2  had in sharing information, not just during
3  the protest time period, but any time.
4          MR. KERLIN:  Let's go the next
5  exhibit.  All right.  This should be Exhibit
6  324.  We'll mark it your next exhibit.
7  Sorry.
8          (Exhibit 324 marked)
9  BY MR. KERLIN:
10    Q.   So we're just a couple days past the
11  last email, so this is November 7th of 2016.
12  There's an email from Chris Myers, and it
13  goes out to a long list of individuals, some
14  of which are with the state, some of which
15  are with the federal government.  And he
16  says, with the recent developments in
17  escalating violent criminal activity, I
18  propose an investigation/prosecution
19  coordination meeting to increase efficiency
20  and effectiveness of our investigators and
21  subsequent prosecution.
22          Do you recall attending a meeting
23  regarding investigation and prosecution
24  coordination because of the recent
25  development and escalating violent criminal

PAUL   WARD
April 20, 2022

Page 106

1    activity of the protestors?
2    A.   I don't recall if I did or not.
3    Q.   And then Mr. Myers forwarded that to you
4    and mentioned that he forgot to copy you on
5    it, feel free to attend or send someone else.
6    You don't recall whether you attended that?
7    A.   No, I don't.
8         MR. KERLIN:  If you go to Exhibit
9    325.
10        (Exhibit 325 marked)
11   BY MR. KERLIN:
12   Q.   This is a document, it's dated November
13   10th, 2016.  Looks like it might be some type
14   of a calendar invite or an invite for a
15   conference call, and if we go to the required
16   attendees on the first line, it has you there
17   at the end of the first line, Paul Ward.
18        MR. KERLIN:  All right.  Let me go
19   to the next page so we can get the whole
20   context of it.  Before we do, I was just
21   going to let him read that page and then go
22   to the next page.
23        THE WITNESS:  Can't read that very
24   good.
25        MR. KERLIN:  Yeah.  Let's make that

**106:12-108:8 602; 611**

Page 107

1    a little larger.  There we go.
2    BY MR. KERLIN:
3    Q.   Hello, all.  Sheriff Kirchmeier and DES
4    would like to hold a conference call for all
5    the sheriffs and chiefs in North Dakota to
6    update us all on the protests and discuss the
7    needs and plans for the next phase.  If at
8    all possible, please call in for this update.
9    Conference call and information is listed
10   below in the email from Sean Johnson.  I have
11   included US Attorney Chris Myers, US Marshal
12   Ward, and BCI Director Carlson on the call as
13   they have stood by us through this long
14   incident.  Mike, could you please forward
15   this to the chiefs.
16        MR. KERLIN:  You can take that
17   down.  We'll go to the next page.
18   BY MR. KERLIN:
19   Q.   This is what was forwarded, and it's
20   Sean Johnson, Sheriff Laney, below is call-in
21   information for the sheriffs and police
22   chiefs all call being hosted by Sheriff
23   Kirchmeier, Director Wilz.  We are hoping as
24   many sheriffs and chiefs can join us as
25   possible to discuss the current DAPL protest

Page 108

1    situation and long-term response needs.
2    Thank you for helping to set this up.
3    Call-in information, and provides the call-in
4    information.
5         Mr. Ward, do you recall attending
6    kind of all-hands-on-deck call like this that
7    occurred?
8    A.   I don't, no.
9    Q.   Okay.  Did you have an understanding,
10   especially by November of 2016, that North
11   Dakota state law enforcement was trying to
12   mobilize law enforcement across the entire
13   state to help with the necessary law
14   enforcement response to the DAPL protestors?
15   A.   Yes.  And I -- my recollection, I
16   thought it was long before November.
17   Q.   Oh, absolutely, early on it required an
18   almost an all-state, you know, send every
19   available person that you can spare to help
20   type of ask that went out for the state and
21   then for neighboring states as well, they
22   have offered.
23   A.   Yes.
24   Q.   National guard.
25        MR. SCARPATO:  Misstates the

**108:9-23
602**

Page 109

1    evidence, not in evidence.
2    BY MR. KERLIN:
3    Q.   Were you aware that the national guard
4    was mobilized for North Dakota to try and
5    assist with the law enforcement response?
6    A.   Yes.
7    Q.   Throughout the time period where North
8    Dakota is reaching out to all available law
9    enforcement that are available in the state,
10   asking other states to send assistance and
11   law enforcement, mobilizing the national
12   guard for the state was during this time
13   period when you were asking for federal law
14   enforcement support?
15   A.   I was asking for federal law enforcement
16   assistance throughout this whole process.  It
17   never -- right up until I retired.
18   Q.   And during this whole time, the entire
19   State of North Dakota is trying to mobilize
20   everything they can to deal with this
21   situation that was created on corps land and
22   that has now grown and grown and become more
23   violent.  And on the federal side you're
24   asking; correct?  You're trying to get
25   assistance, and you're not provided any;

**109:7-17
401-402**

**109:18-
111:10
602; 611
vague,
compoun
d,
assumes
facts not
in
evidence**

PAUL   WARD
April 20, 2022

**Page 110**

109:18-111:10
401-402; 602; 611
vague, compound,
assumes facts not in
evidence

```
 1    correct?
 2            MR. SCARPATO:  Objection, vague,
 3    compound, assumes facts not in evidence, and
 4    mischaracterizes the evidence, foundation.
 5            You can answer.
 6            THE WITNESS:  Yes, that's correct.
 7    I didn't --
 8    BY MR. KERLIN:
 9    Q.    And so on one side we have an entire
10    state trying to do everything they can to
11    help deal with this protest that's being
12    encamped on federal land, and the federal
13    response, even when made by -- request made
14    by US Marshal for the District of North
15    Dakota, is they're nonexistent; is that
16    right?
17            MR. SCARPATO:  Objection, vague,
18    compound, foundation, misstates the fact,
19    assumes facts not in evidence.
20            THE WITNESS:  The response was
21    nonexistent.
22    BY MR. KERLIN:
23    Q.    And so --
24    A.    I got --
25    Q.    -- North Dakota bore that entire
```

**Page 111**

```
 1    responsibility by themselves without federal
 2    assistance and without federal enforcement
 3    support to deal with what was created and had
 4    grown on federal land that was controlled by
 5    the US Army Corps of Engineers; is that
 6    correct?
 7            MR. SCARPATO:  Objection, vague,
 8    compound, foundation, mischaracterizes the
 9    evidence, assumes facts not in evidence.
10            THE WITNESS:  Yes, that's true.
11            MR. KERLIN:  All right.  I'd like
12    to turn to the next exhibit we have, which is
13    326.
14            (Exhibit 326 marked)
15    BY MR. KERLIN:
16    Q.    At some point, Mr. Ward, did you become
17    aware of a request for there to be some type
18    of prayer meeting or prayer vigil that was
19    gonna take place?
20    A.    I don't know.  I don't recall that.
21    Could have been, but I don't know.
22    Q.    If we go down, this is another email
23    that you're on first page, you're CCed on
24    this email.  You see at the top it's dated
25    November 14th of 2016.  Sent by James Thomas,
```

111:16-113:6
401-402; 602; 611

**Page 112**

```
 1    and he forwarded that email.  And then if we
 2    go down to what he forwarded, there's an
 3    email from Terry Van Horn that says, this is
 4    what COE was talking about this morning at
 5    the SEOC briefing.
 6            MR. KERLIN:  I want to turn to the
 7    next page.
 8    BY MR. KERLIN:
 9    Q.    There's two emails here.  We start at
10    the bottom, dated Monday, November 14th, and
11    it says, COE granted permission for the
12    Standing Rock to pray.  During the morning
13    briefing at the SEOC, COE announced that the
14    COE granted permission for Standing Rock to
15    pray just east of the DAPL drill pad on COE
16    land tomorrow.  COE advised that COE would
17    have to coordinate with the TOC and law
18    enforcement for an escort through the TCP at
19    the FOB to be escorted to the prayer site.
20    Sheriff K spontaneously responded, no, not
21    going to happen.  COE then immediately sat
22    down.
23            Do you know what COE stands for?
24    A.    There's a lot of acronyms in that email
25    that I don't have a clue what they stand for.
```

**Page 113**

```
 1    But, no, I don't know.
 2    Q.    Okay.  Fair enough.
 3            MR. KERLIN:  Let me go the next
 4    exhibit, 327, and I think you'll have a
 5    little bit more explanation if I put some of
 6    this in context.
 7            (Exhibit 327 marked)
 8    BY MR. KERLIN:
 9    Q.    This email is dated November 14th, 2016.
10    It's from Mr. Thomas, and it has you CCed on
11    it as well.  It says, the Morton County's
12    Sheriff's Department/Unified Command has
13    communicated to the United States Marshal
14    Service and asked us to communicate to you
15    that Morton County Sheriff's
16    Department/Unified Command does not have the
17    resources to maintain the safety of
18    participants or law enforcement in the
19    proposed day of action event on corps land
20    east of the Dakota Access drill pad.  Morton
21    County Sheriff's Department/Unified Command
22    will not support such an event and will not
23    provide an escort for protestors' ingress or
24    egress for the corps land in question.
25            Also, Dakota Access has
```

113:9-
115:2
401-402;
602; 611

PAUL   WARD
April 20, 2022

**113:9-115:2**
**401-402; 602;**
**611**

**115:7-116:2**
**401-402; 602; 611**

**116:7-**
**117:15**
**401-402;**
**602; 611**

**117:16-**
**118:15**
**401-402,**
**602; 611**

Page 114

1   communicated with Morton County Sheriff's
2   Department/Unified Command which relayed
3   that -- which relayed that United States
4   Marshal's Service, that Dakota Access did not
5   agree to allow protestors access across its
6   Cannonball Ranch property to reach corps
7   land, and no approval of access is
8   forthcoming for this event.  Please
9   communicate this to the necessary personnel.
10  I would be happy to put you in touch with
11  leadership at Morton County Sheriff's
12  Office -- Sheriff's Department/Unified
13  Command.  If you would like additional
14  information, I do not know the sheriff -- I
15  do not know the sheriff -- I do know the
16  sheriff is currently engaged in multiple
17  protest events occurring in various
18  locations.  I can get you contact information
19  for Dakota Access if needed.
20          Do you see that?
21      A.   Yes.
22      Q.   Okay.  And do you recall if there was
23  any request to try and egress through other
24  means to reach the corps land for a type of
25  prayer ceremony?

Page 115

1      A.   Apparently there was, according to that,
2   but I don't -- I don't recall it.
3          MR. KERLIN:  Okay.  Go to the next
4   document, please.  You can skip to 328.
5          (Exhibit 328 marked)
6   BY MR. KERLIN:
7      Q.   For this one at the top it says, sir --
8   so this is from John Voeller, and he's CCing
9   you as well but directing it to Mr. Thomas.
10  Sir, the corps is going to allow a prayer
11  ceremony to take place tomorrow on the USACE
12  property to the east of the drill pad.
13  Individuals will be accessing the area by
14  boat instead of land.  Major Startzell will
15  be notifying Sheriff Kirchmeier of this.
16  There will be three USACE personnel escorting
17  the group into the site for the ceremony.
18          Do you see that?
19      A.   Yes.
20      Q.   Okay.  Do you recall at all a boat being
21  allowed to go up the river to where the
22  prayer ceremony was going to take place on
23  corps land?
24      A.   I recall something about the boat being
25  used, but, like I said, the whole issue, I've

Page 116

1   just drawn a blank on this issue.
2      Q.   Okay.  All right.
3          MR. KERLIN:  Let's go to Exhibit
4   331.
5          (Exhibit 331 marked)
6   BY MR. KERLIN:
7      Q.   This is an email that you sent
8   responding to Mr. Voeller.
9          MR. KERLIN:  Let's go to the bo
10  so we can see the rest of the email chain.
11  I'm sorry.  So he'll know what it's in
12  response to.
13  BY MR. KERLIN:
14      Q.   So the one that we just discussed is
15  this one above it, sir, the corp is going to
16  allow a prayer ceremony to take place.  That
17  was what we just discussed.  That was the
18  prior email.
19      A.   Okay.
20      Q.   All right.  Then you respond, dated
21  Monday, November 14th, from you to
22  Mr. Voeller at the US Army Corps -- or,
23  excuse me -- yeah, US Army Corps, you said,
24  with all due respect, this is disappointing,
25  to say the least.  You have just allowed

Page 117

1   protestors behind all law enforcement
2   defenses.  I disagree wholeheartedly, and I
3   am amazed that no one at the corps agrees
4   with law enforcement.
5          Do you see that?
6      A.   Yes.
7      Q.   Does that refresh your recollection at
8   all about your disagreement with what the
9   corps was allowing protestors to do and go
10  behind all law enforcement defenses?
11      A.   Yes, like I said, I just don't -- I just
12  didn't recollect what the issue was about,
13  but reading this, I understand that I wrote
14  that, and I agree with it and all, and I
15  agree with what I wrote then.
16      Q.   And can you tell me about why you were
17  disappointed with this and that you disagreed
18  with what was being allowed to be done.
19      A.   Well, apparently -- apparently, they
20  wanted the -- allowing the permit to allow
21  them to protest and congregate and pray or
22  whatever they wanted to without us having any
23  control of the situation, of the scene, of
24  having them behind our defenses just isn't a
25  good tactical thing to do.  Puts law

PAUL WARD
April 20, 2022

Page 118

1    enforcement at risk.
2    Q.   Do you recall if you got any type of a
3    response or a phone call, or is there anyone
4    that raised any, you know, that your email
5    raised concerns for the corps and that the
6    corps would change course or consider what
7    law enforcement was saying on this issue?
8    A.   I don't recall if I -- to be honest with
9    you, I don't recall sending this email until
10   you showed it to me.  So I don't recall at
11   all if there was any response.
12   Q.   As you sit here today, you do recall
13   this email, and you stand behind your
14   decision, having seen it now; is that fair?
15   A.   Yes.
16        MR. KERLIN:  Okay.  You can take
17   that down.
18        I'd like to bring up the next
19   exhibit, which is 332.
20        (Exhibit 332 marked)
21   BY MR. KERLIN:
22   Q.   I want to say this is another email
23   that's been forwarded, so I want to go to the
24   end and work our way backwards.  Or work our
25   way forward through time, is a better way to

118:22-121:7
401-402

Page 119

1    say it.
2         So the first is an incident
3    notification dated September 8th of 2016, and
4    it talks about DUSM responded to active
5    shooter at HS.  DUSM shot and wounded active
6    shooter.
7         What is -- do you know what DUSM
8    stands for?
9    A.   Deputy United States Marshal.
10   Q.   And then you forwarded this.
11        MR. KERLIN:  If we go up to the
12   next, the next thing above it; right.
13   BY MR. KERLIN:
14   Q.   So it's forwarded from you to William
15   Snelson.  Who is William Snelson?
16   A.   Well, apparently, he's somebody with the
17   marshal service.  I don't know.  I don't
18   know.
19   Q.   I can see on my copy right above it says
20   he's Associate Director for Operations at the
21   United States Marshal Service.
22   A.   Okay.
23   Q.   And you say, Bill, thank you for
24   speaking with me this morning and for your
25   continued support.  As an example of why I

Page 120

1    feel the OGC opinion was wrong, I have
2    attached a significant incident report.  In
3    the report, the DUSM shot an active shooter.
4    This assumable within a high school.  This
5    goes exactly to what I was saying.  He had a
6    duty to respond, and he did, doing the right
7    thing.  I don't see the federal nexus OGC
8    referred to.
9         Again, I don't want to get into
10   OGC, I just want to get into your
11   communication with Mr. Snelson.  Do you
12   recall why you sent this to him?
13   A.   Was that a question?
14   Q.   Yes.  Why did you forward this
15   incident -- I guess you get these incident
16   notifications as a US Marshal that go out
17   when things happen that, I guess, involves
18   the marshal service, and you forwarded that
19   to Mr. Snelson.  Why did you do that?
20   A.   It was indicative of what marshal
21   service has done in recent past and
22   historically since the onset of the marshal
23   service.  It would be the federal law
24   enforcement agency to assist local law
25   enforcement, if and when they're needed.

Page 121

1    Apparently, in this situation, a deputy US
2    Marshal responded to a high school school
3    shooting in assistance of local law
4    enforcement because he was the closest or
5    nearby.  When I had spoke to OGC, they had
6    told me that we didn't have a federal nexus
7    in this situation.
8         MR. SCARPATO:  Mr. Ward, I'm going
9    to step in and ask you not to divulge
10   communications that you had with OGC.  If you
11   can answer the question fairly and truthfully
12   without reference to those communications,
13   you can go ahead.  Thank you.
14        THE WITNESS:  Okay.  What I was
15   trying to explain to Bill was our situation
16   in North Dakota was exactly the same as the
17   situation listed in the significant interest
18   report where the deputy responded to help
19   local law enforcement just because the only
20   difference was his assistance was required in
21   a situation that was fluid at the time, that
22   immediately happened, involved preparation,
23   where ours, you could prepare for it and
24   still provide the assistance.  But the
25   assistance is what was needed.  And the

121:14-122:2
401-402;
602;
701/702
calls for
legal
concl.
and
expert
testimony

PAUL   WARD
April 20, 2022

Page 122

1    declination of the assistance is one I never
2    understood, and I don't understand today.
3            MR. KERLIN:  Go to the next.  So
4    then I just want to go -- even if you just
5    want to zoom in on the dates here.
6    BY MR. KERLIN:
7    Q.   So then we have September 8th, 2016, so
8    shortly after you sent that, hey, Marshal, I
9    contacted DOJ today, but I have not heard
10   back yet.  Have a good night.
11           MR. KERLIN:  Then we go to the next
12   one above it.
13   BY MR. KERLIN:
14   Q.   And so there's a follow-up for you.  We
15   have to go to the previous page to see the
16   start of it.  So now we're -- it's now
17   October 25th, and then you say, good morning,
18   Bill.  Below is a message that I sent you in
19   September regarding providing support to
20   locals.  Am not good with computers, but I
21   don't think I received your response yet.  My
22   message today is the same.  The locals are in
23   need of SOG assistance in regards to the
24   major ops plan starting this week.  An
25   extraction team is needed for emergencies.

Page 123

1    Can you advise me if we can do anything to
2    assist.
3            MR. KERLIN:  And if we go to the
4    response.
5    BY MR. KERLIN:
6    Q.   Do you recall making that follow-up
7    request that I just read you?
8    A.   I don't recall, but, apparently, I did.
9    Q.   But it's consistent with what you were
10   saying earlier, isn't it, that you made
11   repeated requests for assistance; correct?
12   A.   Yes.
13   Q.   Then there's the October -- so we get --
14   you did get a response from Mr. Snelson,
15   Marshal Ward, I apologize for not responding
16   directly to you.  You know, it says in the
17   second paragraph, it says the message that
18   you gathered that it's being denied?
19   A.   Yes.
20           MR. KERLIN:  I want to go to the
21   email at the top.
22   BY MR. KERLIN:
23   Q.   So now it's November 20th of 2016, and
24   you send an email to Mr. Snelson, among some
25   others, and you include Sheriff Kirchmeier on

Page 124

1    this as well, on the CC.  You say,
2    Mr. Snelson, I am sending this message with
3    the utmost urgency.  Local law enforcement in
4    ND is about to be overrun at the protest site
5    located at the DAPL pipeline.  I have been
6    informed by the sheriff that approximately
7    400 protestors have breached barricades and
8    are advancing on law enforcement.  A
9    statewide request for all assistance has gone
10   out, and the US Attorney has sent requests to
11   DC requesting any and all available federal
12   assistance.  All available state resources
13   from ND and surrounding states have been
14   exhausted, and, at this point, we are
15   severely outnumbered.  Please consider
16   providing manpower to assist.  Politics
17   aside, lives are at stake.  Thank you, Paul
18   Ward.
19           Do you see that?
20   A.   Yes.
21   Q.   Do you recall making this request?
22   A.   Yes.
23   Q.   Can you tell me why you included, in the
24   first sentence you said, I am sending this
25   message with the utmost urgency.  Why did you

Page 125

1    say utmost urgency?
2    A.   It was an urgent situation.  Law
3    enforcement was at risk.  Potential for
4    violence was high.
5    Q.   Do you stand by your statements that I
6    read to you in your email, all available
7    resources from ND and surrounding states have
8    been exhausted, and, at this point, we are
9    severely outnumbered; is all that accurate?
10   A.   Yes.
11   Q.   You mentioned in the last line, where it
12   says, please consider providing manpower to
13   assist.  You then say, politics aside, lives
14   are at stake.  What do you mean by politics
15   aside?
16   A.   It seemed to me at the time that a cop
17   is a cop, and we all think the same way, and
18   even if you are a newly appointed deputy
19   marshal right out of the academy, all the way
20   up to supervision to headquarters, right to
21   the director, we all think the same way, and
22   I think, and this is just my opinion, and I
23   know I'm not supposed to give opinions, but
24   what the hell, I'm gonna do it.  He -- if the
25   director was alone in making his decision

PAUL   WARD
April 20, 2022

126:1-127:12
401-402; 602

Page 126

1    with the deputy director and the marshal
2    involved on a conversation, I don't think
3    there would have been hesitation whatsoever
4    in me making a request and him providing me
5    troops from wherever he had extra troops.  He
6    would have sent them from all over the
7    country, if it was up to him.  I don't think
8    it was up to him.  I think he got the
9    direction from -- I don't know.  Attorney
10   general?  I don't know where it came from.
11   Somewhere up above him.  He answered to the
12   attorney general.  Some somewhere up above.
13   Just seemed to me to be political.  That was
14   the assumption of all the sheriffs.  Granted,
15   I was appointed by a Democratic president,
16   most of the sheriffs in North Dakota were
17   Republican, so I was somewhat swayed by their
18   influence.  But the experience of it told me
19   that it was higher up than the marshal
20   service.  But nobody would tell me that.
21            You have to understand, and it
22   seems to me that you have to understand that
23   the difficulty it is for somebody like me to
24   turn another cop down, and on the level at
25   which I had to turn them down wasn't just cop

Page 127

1    to cop.  It was an abundance of cops to an
2    abundance of cops.  You take the abundance of
3    the federal level resources that I should
4    have been able to provide as the US Marshal,
5    as being presidentially appointed, and I'm
6    requested by local sheriffs to provide
7    assistance on federal land on a federal
8    issue, and I have to turn them down because
9    nobody will back me from headquarters.
10   That's one of the most -- not one of -- it's
11   the most disappointing thing I've ever
12   done in 40 years of law enforcement.
13            MR. KERLIN:  We've been going
14   approximately about an hour.  It's probably a
15   good point to take a brief break, and then I
16   think I can probably be completed within --
17   within less than an hour, so we can finish up
18   today.
19            THE VIDEOGRAPHER:  We're going off
20   the record.  Universal coordinated time is
21   1833.  We're off the record.
22            (Pause in proceedings)
23            THE VIDEOGRAPHER:  We are now back
24   on the record.  Universal coordinated time is
25   1840.

Page 128

1    BY MR. KERLIN:
2    Q.   Welcome back after a short break.
3         May I continue?
4    A.   Yes.
5    Q.   All right.  I want to talk to you a
6    little bit about the relationship between the
7    marshal service and the department of
8    justice.  Can you tell me how those interact
9    or relate in the federal government?
10   A.   Marshal service is part of the
11   department of justice.  Like the FBI or DEA,
12   we answer to the direction of the department
13   of justice, the attorney general.
14   Q.   That was going to be my question.
15   Ultimately, the attorney general for the
16   United States is the head of the department
17   of justice; correct?
18   A.   Ultimately, yes.
19   Q.   And, at the time, that was Attorney
20   General Loretta Lynch; is that correct?
21   During the protests in 2016?
22   A.   Yes.
23   Q.   Sorry.  I didn't mean to talk over you.
24        Within the US Marshal Service, is
25   there any type of a rapid response team or

128:5-129:2 401-402

Page 129

1    emergency response team?
2    A.   Yes.
3    Q.   And is that one type of an asset that
4    can be deployed with approval of the US
5    Marshal Service if it's appropriate to do so
6    and approved to do so?
7            MR. SCARPATO:  Objection, calls for
8    a legal conclusion.
9            You can answer.
10           THE WITNESS:  Yes.
11   BY MR. KERLIN:
12   Q.   And what is that type of response team?
13   Can you just provide a little bit of -- just
14   explain kind of what that entails or what
15   that would be if the request came in and was
16   approved for that type of rapid response team
17   or emergency response team.
18   A.   In essence, what you may know as the
19   SWAT team type response, headquarters
20   actually did provide a SOG team, special
21   operations team to Bismarck.  They stationed
22   within the courthouse, but they were
23   restricted to any attacks on the courthouse
24   itself.  They weren't here to respond, to
25   assist local law enforcement at the protest

129:3-10
401-402;
701/702
calls for
legal
conclusion

129:12-
131:1
401-402

PAUL   WARD
April 20, 2022

Page 130

1      site.
2      Q.   And I guess they weren't authorized to
3      then go onto US Army Corps, in essence,
4      federal land, and address issues that might
5      arise on that area?
6      A.   No.  They had to stay within the
7      courthouse.
8      Q.   And just so I'm clear, the acronym for
9      that is SOG?  Is that what it's called?
10     A.   Yes.
11     Q.   And can you give us an idea of how large
12     that type of team can be.
13     A.   The team that responded, I don't know
14     how many guys there were.  There were maybe
15     ten.  Nine guys plus all their equipment.
16     But that's just one regional division of SOG.
17     They had regional teams all over the country.
18     There might have been one, I don't know where
19     they came from, let's say it was Minneapolis.
20     For instance, they were assigned to the
21     Midwest.  And there may be one, maybe, in
22     Portland, Oregon, or that type of place.
23     They handle the Upper Northwest, you know,
24     for their own country.  So their numbers
25     could increase depending on the severity of

Page 131

1      the need.
2      Q.   So if the call went out, and they
3      needed, for instance, more than one of these
4      SOG teams, that's something that could be
5      potentially mobilized to respond to whatever
6      the need is or the call?
7      A.   Yes.
8             MR. SCARPATO:  Objection,
9      foundation, calls for a legal conclusion.
10            You can answer.
11     BY MR. KERLIN:
12     Q.   And then also to have an understanding
13     of -- what about other federal resources for
14     law enforcement that would be available?  Are
15     you familiar with what the FBI would have
16     that would be available if the call was made
17     for FBI assistance?
18     A.   I don't know.  You'd have to ask
19     supervision in FBI.  I don't know what they
20     have.
21     Q.   At some point during the protest, was
22     there ever a request made for an armored
23     Suburban?
24     A.   I recall that we did make that request,
25     yes.

**131:2-7**
**401-402; 602;**
**701/702 calls for a**
**legal conclusion**

Page 132

1      Q.   Okay.  And do you recall why that
2      request was made?
3      A.   I don't recall the exact situation.  I
4      don't recall if there was intel that
5      indicated that they needed that vehicle to --
6      maybe as a rescue vehicle, get somebody out
7      of the protest sites or that type of thing.
8      I'm not sure what the reasonings were.  I
9      just don't recall what they were, but
10     something like that would have been a
11     legitimate reason.
12     Q.   Was that something that was -- was that
13     a US Marshal vehicle that was -- that you
14     allowed to be used?
15     A.   I think so, yes.
16     Q.   Again, you can't remember any of the
17     particulars about to whom you let use that or
18     for what specific reason or occasion or
19     things of that nature?
20     A.   Well, like I said, I know one of the
21     situations would have been if somebody needed
22     to get out of that protest situation quickly,
23     and they would have, you know, sent a bunch
24     of law enforcement along with it to extract
25     somebody.  That's one.  But I don't know.

Page 133

1      There could be other reasons why they wanted
2      it.  I don't know what they used to justify
3      the request.
4      Q.   Do you recall at some point in time,
5      later into the fall and winter, if there was
6      a need for a potential evacuation of some of
7      the protestors on corps land?
8      A.   I don't recall that, no.
9      Q.   And do you recall -- okay.  Fair enough.
10     We'll leave it at that.
11            I want to show you something and
12     see if -- so it's Exhibit 343, but, actually,
13     before we get there, let's -- before I --
14     what was your last day before you retired,
15     your last day as US Marshal?
16     A.   December 31st of 2016.
17     Q.   Any particular reason why you retired?
18     A.   41 years.
19     Q.   Good reason.  Were the protests still
20     continuing with people camping and protestors
21     camping on corps land when you left the
22     marshal service?
23     A.   Yes.  And my retirement plans were in
24     place long before the protests initiated.
25     Q.   Did you have any further involvement

PAUL   WARD
April 20, 2022

Page 134

1   with the protests or law enforcement response
2   after December 31st, 2016?
3   A.   No.
4           MR. KERLIN:  Could we bring up
5   Exhibit 343.
6           (Exhibit 343 marked)
7   BY MR. KERLIN:
8   Q.   This is an email that you're not on.  It
9   went to a lot of Corps of Engineers folks,
10  and it's from James Startzell, Major
11  Startzell, and at the bottom it says, all,
12  please see DAPL daily update below, and it
13  has attachment, LE federal letter final-3
14  PDF.  We'll show that to you in a minute.
15          If we go to the next page, at the
16  top there it says, number of protestors/law
17  enforcement action, estimated counted in the
18  camp -- camps is 1200-1400 people.  No change
19  to law enforcement situation.  Law
20  enforcement submitted the attached press
21  release signed by LE from North Dakota,
22  criticizing the federal government harshly
23  for not aiding the state and local
24  authorities and again calling for action.
25          I want to go to the attachment,

Page 135

1   which is, I believe, that document.  I'm
2   going to show you the whole document, and
3   we'll go through it.  It's a total of three
4   pages, but this is the first page.  It's on
5   the letterhead of Morton County Sheriff
6   Department, Kyle L. Kirchmeier Sheriff, and
7   it's dated December 9th, 2016, directed to
8   President Barack Obama.
9           And if we go to the next page, it
10  continues on, and then at the end I want to
11  show you the signature pages, page with
12  signatures, and it has a number of different
13  law enforcement officers.  Then it's CCed to
14  Loretta Lynch, Attorney General; Sally Jewel,
15  Secretary of the Interior; and Eric Fanning,
16  Secretary of the Army.
17          Mr. Ward, do you recall seeing this
18  open letter that was sent to President Obama?
19  A.   I recall seeing it.  Not before it was
20  sent, I didn't know anything about it until
21  it was sent.
22          MR. KERLIN:  I want to go to the
23  first page, and I just want to go through a
24  couple of parts of it, I'm sorry, of the --
25  there we go.

Page 136

1   BY MR. KERLIN:
2   Q.   So we'll just start with the first
3   paragraph and the first sentence.  It says,
4   as the chief law enforcement officers tasked
5   with managing the ongoing protest actions in
6   North Dakota surrounding the completion of
7   the Dakota Access Pipeline, we are writing to
8   request that the federal government begin
9   supporting North Dakota and North Dakota law
10  enforcement with actions, not words.
11          Do you see that?
12  A.   Yes.
13  Q.   Do you agree with what the various North
14  Dakota law enforcement officers' statement
15  that, as of December 9, 2016, that North
16  Dakota hadn't been supported by the federal
17  government with anything other than words?
18          MR. SCARPATO:  Objection, vague,
19  foundation.
20          THE WITNESS:  I guess the only
21  other thing I can think of other than words
22  were use of those Suburbans as far as the
23  Suburbans were discussed.
24  BY MR. KERLIN:
25  Q.   Fair enough.  Outside of that, nothing

Page 137

1   else comes to mind as far as support; is that
2   accurate?
3   A.   Yes.
4   Q.   The next paragraph, the November 25th
5   letter sent by Colonel Henderson of the US
6   Army Corps of Engineers to Standing Rock
7   Sioux Tribal Chairman David Archambault,
8   informing him of the closure of corps land to
9   public use as of December 5th was an
10  important and heartening step, but this past
11  Sunday's ruling by the USACE against the
12  pipeline's easement has done nothing to ease
13  the tension or alleviate the potential for
14  more violence.
15          Did you become aware that in
16  November, the end of November, that the corps
17  had then closed the land to public use at
18  some point?
19  A.   I don't recall that.
20  Q.   Okay.  Next paragraph.  We cannot
21  express strongly enough our need for
22  financial assistance and additional manpower
23  in order to follow through on the demands
24  made in the November 25th letter and respond
25  to the increasingly dangerous situation

137:4-19
401-402;
602; 611

137:20-1
38:20
401-402;
602; 611;
701

PAUL   WARD
April 20, 2022

**Page 138**

137:20-138:20
401-402; 602; 611;
701/702 expert test.

```
1    developing on federal land owned by the
2    corps.  Specifically, the support of 100
3    border patrol agents and members of the US
4    Marshal Special Operations Group would allow
5    us to maintain effective control over this
6    situation.
7              Do you agree that if 100 border
8    patrol agents and members of the US Marshal
9    Special Operations Group were provided to
10   state law enforcement in North Dakota, that
11   that would have been helpful to maintain
12   effective control over the situation, as
13   stated in this?
14             MR. SCARPATO:  Objection, misstates
15   the evidence and calls for speculation.
16             THE WITNESS:  I believe it would
17   have been helpful.  I don't know that it
18   would have been absolute resolution.  Would
19   have needed more, for all I know, but it
20   would have been helpful.
21   BY MR. KERLIN:
22   Q.    Let's skip the next paragraph, and in
23   the interest of time, we'll go to the next
24   one.
25             Throughout this process, law
```

**Page 139**

138:25-139:11 401-402

```
1    enforcement has acted methodically, safely,
2    and with great restraint.  Our only concern
3    is the safety of our state, its citizens, and
4    those who visit, including those who
5    peacefully exercise their First Amendment
6    rights.  And, yet, instead of embracing us as
7    partners in an effort to defend the rule of
8    law, the federal government has treated us as
9    though we're not to be trusted.
10             Did I read that correctly?
11   A.    Yes.
12   Q.    Want to start with the first part of
13   that paragraph.  Do you agree that,
14   throughout the process, North Dakota law
15   enforcement has acted methodically, safely,
16   and with great restraint?
17             MR. SCARPATO:  Objection,
18   foundation.
19             THE WITNESS:  Yes, I do.
20   BY MR. KERLIN:
21   Q.    Do you agree that the law enforcement
22   for North Dakota that you interacted with as
23   US Marshal, that they expressed their concern
24   is the safety of their citizens, its state,
25   those who visit, and also those who
```

139:12-19
602; 701/702 expert
test. and calls for legal
concl.

139:21-140:3
401-402; 802

**Page 140**

```
1    peacefully exercise their First Amendment
2    rights?
3    A.    Yes.
4    Q.    Do you also agree that, instead of
5    partnering with local -- North Dakota law
6    enforcement, the federal government had
7    treated North Dakota law enforcements as
8    through they were not to be trusted?
9              MR. SCARPATO:  Objection, vague,
10   foundation.
11             THE WITNESS:  I don't know if I can
12   agree with that.  No, I don't necessarily
13   agree that the federal government didn't
14   trust us.  I'm just saying they didn't
15   support them.
16   BY MR. KERLIN:
17   Q.    The next paragraph.  Go to the last
18   sentence.  It says, however, every time we
19   have asked the federal government for
20   assistance, they have instead responded with
21   resistance.  Is that consistent with your
22   requests that you made for federal assistance
23   as a US Marshal?
24             MR. SCARPATO:  Objection, vague.
25             THE WITNESS:  Every time when
```

140:4-15
401-402;
602; 611

if
objections
overruled,
106

140:17-141:9 401-402

**Page 141**

```
1    referring to DAPL protests, certainly not any
2    other time under my direction.  In other
3    words, if the sheriff called my office and
4    said he needed assistance in serving a
5    felonious warrant, an arrest warrant, we
6    would have -- we acted immediately to assist
7    him.  But in the DAPL situation, I would say
8    that he was met by resistance, but certainly
9    not every time in any other situation.
10             MR. KERLIN:  Go to the next
11   paragraph on the next page.
12   BY MR. KERLIN:
13   Q.    Go to the -- it's actually the third
14   sentence, it starts, when protestors take
15   over the lobby of the William Guy federal
16   building in Bismarck, who is asked to
17   respond?  Local law enforcement.
18             Is that consistent with your
19   recollection of when there was some protests
20   that had moved to the federal building in
21   Bismarck?
22   A.    They weren't admitted into the building.
23   They didn't get into the lobby.  Got up to
24   the outside of the doors.  Yes, other than
25   that, that's my recollection.
```

PAUL   WARD
April 20, 2022

Page 142

1    Q.   And local law enforcement, as you
2    mentioned earlier, Bismarck PD came and
3    assisted as much as they had the resources to
4    do so?
5    A.   Yes.
6         MR. KERLIN:  Next paragraph, I'm
7    sorry, the paragraph after that.  We'll go
8    down to the third.
9    BY MR. KERLIN:
10   Q.   On this letter they state, the federal
11   government's response to the events in our
12   community has been appalling, and it is
13   abundantly clear they have no interest in
14   helping the citizens of North Dakota.
15        Based on your experiences, is that
16   consistent with what happened?
17        MR. SCARPATO:  Objection, vague.
18        THE WITNESS:  I guess so, yes.
19        MR. KERLIN:  Go to the
20   second-to-last paragraph.
21   BY MR. KERLIN:
22   Q.   Despite our anger and frustration with
23   federal officials in Washington, DC, their
24   local representatives, specifically US
25   Attorney Chris Myers and US Marshal Paul

*142:10-18*
*602; 611 vague*

Page 143

1    Ward, have been tireless champions of our
2    cause.  They understand the dynamics of what
3    is occurring within their community and have
4    repeatedly communicated this through their
5    chain of command, only to be met with
6    resistance and contempt for their concerns.
7         My question to you is, is what you
8    experienced when you asked for support
9    consistent with what was described in this
10   letter, this paragraph?
11        MR. SCARPATO:  Objection, vague.
12        THE WITNESS:  I don't know that I
13   would use the words as strongly as resistance
14   and contempt for their concerns.  I don't
15   think our administration, including the
16   director, had any contempt whatsoever for my
17   concerns and my requests.  It's just that
18   they couldn't abide by those requests.  I
19   think he understood the need for the
20   requests.  He just couldn't do it.
21   Basically, the words used written by the
22   sheriff are a little stronger than what I
23   would say.
24   BY MR. KERLIN:
25   Q.   Thank you for that clarification.

*143:7-25 401-402*

Page 144

1         MR. KERLIN:  We can take this
2    exhibit down.
3    BY MR. KERLIN:
4    Q.   You mentioned earlier -- I think you
5    mentioned earlier in your deposition that at
6    some point you might have had a sit-down
7    meeting with Chairman Archambault?
8    A.   Yes.
9    Q.   Okay.  Do you recall any particulars
10   about that conversation?
11   A.   You know, it was a very small meeting.
12   It was Chris Myers, myself, maybe James
13   Thomas, Chairman Archambault.  One thing I
14   recall about that specific meeting was
15   chairman looking me square in the eye and
16   telling me that whole thing was the marshal
17   service's fault, which took me aback to some
18   degree.  He referred to back in the 1800s
19   when the marshal service came and kicked the
20   Native Americans off their land and put them
21   on the reservation, which was a bit of an
22   exaggeration, I think, or afar from what we
23   were trying to address at the time.  And that
24   was the only thing that you asked me what
25   specifically in that meeting I recall, that's

Page 145

1    it.
2    Q.   Okay.  Unless you've indicated during
3    the course of this deposition that you didn't
4    understand my questions, have you understood
5    the questions that I've asked today?
6    A.   Yes.
7    Q.   Is there anything further that you would
8    like to add?
9    A.   No.
10   Q.   Have I been respectful and courteous to
11   you throughout this deposition today?
12   A.   Yes.
13   Q.   I wanted to express my -- I wanted to
14   express my personal appreciation for your
15   service over 40 years, both in the Air Force
16   as well as a law enforcement officer.  Thank
17   you for that.
18   A.   You're welcome.  Thank you.
19        MR. KERLIN:  At this time, I don't
20   have any further questions and would pass the
21   witness to counsel for the United States at
22   this time.
23        Mr. Scarpato, we can't hear you.
24
25

*145:10-18 401-402*

PAUL   WARD
April 20, 2022

Page 146

EXAMINATION

BY MR. SCARPATO:

3    Q.   Mr. Ward, what I hope is only five or
4    ten minutes of questions.  Are you okay, or
5    would you like to stretch your legs briefly
6    before we -- before I do that?
7    A.   No.  That's fine.
8    Q.   Okay.  Great.  So at any point you want
9    a break, please just let me know.
10        I'd like to ask about your
11   discussion from earlier today about the
12   director of the marshal service, and the
13   person above the director would have been the
14   attorney general with respect to decision
15   making for whether and where to deploy
16   marshal service resources.
17            Do you recall that conversation
18   from earlier today?
19   A.   Yes.
20   Q.   So was it your belief at the time that
21   decision whether or where to deploy federal
22   law enforcement assets was made by senior
23   political leadership in the executive branch
24   of the federal government?
25   A.   I'm sorry.  I don't know if I understood

**ND OBJ:**
As to 146:3-9,
147:15-149:7,
Relevance

Page 147

1    your question.
2    Q.   Sure.  Was it your impression at the
3    time, based on what you had learned from
4    others in law enforcement and what you were
5    hearing from DC, that the decision whether to
6    deploy federal law enforcement assets was
7    ultimately made by senior political
8    leadership above the director of the marshal
9    service in the executive branch?
10            MR. KERLIN:  Calls for speculation.
11            THE WITNESS:  That was my
12   understanding at the time, yes, that it was
13   out of his hands.
14   BY MR. SCARPATO:
15   Q.   And Mr. Ward, as the United States
16   Marshal for the District of North Dakota,
17   were you an employee of the US Army Corps of
18   Engineers?
19   A.   No.
20   Q.   Were you a part of the Corps of
21   Engineers chain of command?
22   A.   No.
23   Q.   Were you a part of the FBI's chain of
24   command?
25   A.   No.

Page 148

1    Q.   Were you a part of any federal agency's
2    chain of command other than the United States
3    Marshal Service?
4    A.   No, I wasn't.
5    Q.   As the US Marshal, did you have any
6    decision making authority over whether to
7    grant or deny any permit for the use of corps
8    property under that agency's regulations?
9    A.   No.
10   Q.   And as the US Marshal, did you have any
11   decision making authority over any decision
12   concerning the management of the land that
13   sits under the Corps of Engineers authority?
14   A.   No.
15   Q.   Are you familiar with any of the
16   regulations governing the management of Corps
17   of Engineers land?
18   A.   No.
19   Q.   Are you familiar with Executive Order
20   13007 concerning access to Native American
21   sacred sites on federally managed lands?
22   A.   No.
23   Q.   Are you familiar with Executive Order
24   13175 concerning consultation and
25   coordination with federally recognized Indian

Page 149

1    tribes?
2    A.   No.
3    Q.   And do you know the details of where the
4    boundaries of corps land are in the
5    Cannonball River Valley as opposed to tribal
6    land or federal land?
7    A.   No.
8    Q.   My last question is, you mentioned a few
9    times today that you may not remember some
10   things because of the passage of time.  As
11   compared to your memory today, would you say
12   that the documents from the time are a more
13   reliable source of information about the
14   details of what happened during the time
15   period?
16   A.   Yes, I would imagine the documents are
17   more specific, specifically if I sent or
18   received an email, and I don't recall
19   receiving it.  I would assume that the
20   document is the more accurate depiction of
21   from my recollection.
22            MR. SCARPATO:  Thank you.  Those
23   are my questions.  I appreciate your time,
24   Mr. Ward.
25            MR. KERLIN:  I don't have anything

PAUL   WARD
April 20, 2022

Page 150

1  further.
2         THE VIDEOGRAPHER:  All right.  This
3  concludes the videotaped deposition.  We're
4  now going off the record.  Universal
5  coordinated time is 1912.  We're off the
6  record.
7         (End of proceedings at 1:12 p.m.
8         MDT)
9              -o0o-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 151

1         C E R T I F I C A T E
2
3         I, Tracy E. Barksdale, Registered
   Professional Reporter, do hereby certify that
   there came before me via videoconference at
4  the time and place hereinbefore indicated,
   the witness named on the caption sheet
5  hereof, who was by me duly sworn to testify
   to the truth of said witness's knowledge,
6  touching and concerning the matters in
   controversy in this cause; that the witness
7  was thereupon examined under oath, the
   examination taken down by me in shorthand,
8  and later reduced to printed form under my
   supervision and direction, and that the
9  deposition is a true record of the testimony
   given and of all objections interposed.
10
11
12         I further certify that I am neither
   attorney or counsel for, or related to or
13  employed by any of the parties to the action
   in which this deposition is taken, and
14  further that I am not a relative or employee
   of any attorney or counsel employed by the
15  parties hereto or financially interested in
   the action.
16
17         Dated this 29th day of April 2022.
18
19
   ------------------------------------
20  TRACY E. BARKSDALE, RPR
21
22
23
24
25