Jacob O'Connell
August 16, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DISTRICT

Civil No. 1:19-cv-00150-DMT-ARS,
_____

VIDEOTAPE DEPOSITION OF:  JACOB O'CONNELL
                          August 16, 2022
                          (Via RemoteDepo)
_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

_____


        PURSUANT TO NOTICE, the videotape
deposition of JACOB O'CONNELL was taken on behalf of
the Plaintiff in Bismarck, North Dakota, via remote
means, on August 16, 2022, at 8:40 a.m., Mountain
Time, before Tiffany D. Goulding, Registered
Professional Reporter and Notary Public within
Colorado, appearing remotely from Arapahoe County,
Colorado.

Jacob O'Connell
August 16, 2022

Page 2

```
1                    REMOTE APPEARANCES
2   For the Plaintiff:
3           PAUL M. SEBY, ESQ.
            PAUL KERLIN, ESQ.
4           Greenberg Traurig, LLP
            1144 15th Street, Suite 3300
5           Denver, Colorado 80202
            sebyp@gtlaw.com
6
7
    For the Defendant:
8
            JANE BOBET, ESQ.
9           TIMOTHY JAFEK, ESQ.
            Special Attorney to the United States
10          Attorney General
            United States Attorney's Office
11          District of Colorado
            1801 California Street, Suite 1600
12          Denver, Colorado 80202
            jane.bobet@usdoj.gov
13
14  Also Present:
15          John Jensen, Videographer
            Rachel Hymel
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                  I N D E X
2   EXAMINATION OF JACOB O'CONNELL:            PAGE
    August 16, 2022
3
    By Mr. Seby                              5, 228
4
    By Ms. Bobet                                222
5
6                                          INITIAL
7   DEPOSITION EXHIBITS:                   REFERENCE
8   (Exhibits provided electronically to the reporter.)
9   Exhibit 713  E-mail to Carlson, et al. from    165
                 O'Connell, 8/16/16, Subject: FWD:
10               SRST Updates
11  Exhibit 722  Telephonic Meeting Invite, 9/1/16  178
12  Exhibit 724  E-mail to Keegan from Mahmoud,     181
                 9/3/16, Subject: Re: Simple
13               Question?
14  Exhibit 726  E-mail to Mahmoud from Brazaitis,  190
                 9/4/16, Subject: Re: Simple
15               Question?
16  Exhibit 727  E-mail to Gerhart, et al. from     194
                 O'Connell, 9/5/16, subject: FWD:
17               Information
18  Exhibit 730  E-mail to Gerhart, et al. from     196
                 Salamanca, 9/6/16, Subject: Tribal,
19               Oceti Sakowin Unified Nations Camp,
                 and Law Enforcement Discussions
20
    Exhibit 733  E-mail to Kirchmeier from Futch,   205
21               9/30/16, Subject: FWD: Interviews of
                 DAPL Personnel by DOJ Civil Rights
22               Attorney
23  Exhibit 738  E-mail to Seyler, et al. from Hoff, 217
                 12/10/16, Subject: Re: Morton County
24               Request
25
```

Page 4

```
1           WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4              *    *    *    *    *
5           THE VIDEOGRAPHER:  We are now on the
6   record.  This is the remote video-recorded deposition
7   of Jacob O'Connell being taken by counsel for the
8   plaintiff.  Today is August 16, 2022, and the time is
9   2:40 p.m. UTC, 8:40 a.m. Mountain Time.  We are here
10  in the matter of State of North Dakota versus the
11  United States of America.
12          My name is John Jensen, remote video
13  technician on behalf of U.S. Legal Support.  I am not
14  related to any party in this action, nor do I have a
15  financial interest in the outcome.  At this time will
16  the reporter, Tiffany Goulding on behalf of U.S. Legal
17  Support, please enter the statement for remote
18  proceedings into the record.
19          THE REPORTER:  The attorneys
20  participating in this deposition acknowledge that I am
21  not physically present in the deposition room and that
22  I will be reporting this deposition remotely.  They
23  further acknowledge that, in lieu of an oath
24  administered in person, the witness will verbally
25  declare his testimony in this matter is under penalty
```

Page 5

```
1   of perjury.  The parties and their counsel consent to
2   this arrangement and waive any objection to this
3   manner of reporting.
4           Please indicate your agreement by stating
5   your name and your agreement on the record.  Mr. Seby
6   first.
7           MR. SEBY:  Sure.  This is Paul Seby.  I'm
8   counsel for the plaintiff State of North Dakota and we
9   consent.
10          MS. BOBET:  This is Jane Bobet.  I'm
11  counsel for the United States and we agree.
12          THE REPORTER:  Mr. O'Connell, I will ask
13  you to agree and declare that the testimony you are
14  about to give will be under the penalty of perjury.
15          THE DEPONENT:  Yes.
16               JACOB O'CONNELL,
17  having verbally declared that his testimony in this
18  matter is under penalty of perjury, testified as
19  follows:
20               EXAMINATION
21  BY MR. SEBY:
22      Q.  Good morning, Mr. O'Connell.  This is
23  your deposition taken pursuant to prior notice and
24  agreement of counsel.  My name is Paul Seby.  I'm both
25  an attorney with the law firm of Greenberg Traurig and
```

Jacob O'Connell
August 16, 2022

Page 6

1  a special assistant attorney general for the State of
2  North Dakota.  And along with my counsel Paul Kerlin,
3  who's also attending the deposition, we are
4  representing the state.  And today we'll refer to our
5  client collectively as "North Dakota" or "the state."
6  Do you understand, sir, that you have just been sworn
7  in this morning?
8       A.   Yes.
9       Q.   Would you please state your full name for
10  the record.
11       A.   Jacob Wainwright O'Connell.
12       Q.   That's Wainwright?
13       A.   Yes.
14       Q.   Okay.  Before we begin I'd like to go
15  over some ground rules for the deposition, most of
16  which are intended to help the court reporter take
17  down everything we say.  Okay?
18       A.   Yes.
19       Q.   Everything we say -- we are saying today
20  to each other is being written -- both written down
21  and videotaped, and because of that, if you would
22  please verbalize your responses with a yes or a no or
23  other answer as opposed to just nodding your head or
24  making other gesture or sounds.  Also, please don't
25  make any other nonverbal communications, if that's

Object to all
testimony as
hearsay, 802

Page 7

1  acceptable.
2       A.   Yes.
3       Q.   Likewise, it's difficult for the court
4  reporter to take down what we are saying if we
5  inadvertently speak over each other.  So I will do my
6  best to not interrupt you, if you would do the same,
7  try not to interrupt me and let me finish my question,
8  if that's acceptable.
9       A.   Yes.
10       Q.   Okay.  If you need a break, please let me
11  know.  However, if there's a question pending, please
12  first answer it.  Then we can take a break.
13  Otherwise, I'll suggest we take a break approximately
14  on the hour, if that works for you.
15       A.   Yes.
16       Q.   If you happen to not understand a
17  question I've asked, just let me know, sir, and I will
18  do my best to repeat or rephrase it or clarify what
19  I'm trying to ask you.  And if you answer a question
20  I've asked, I'm going to assume that you have
21  understood the question that I'm asking.  Is that
22  understood?
23       A.   Yes.
24       Q.   And do you have anyone with you in the
25  room this morning, Mr. O'Connell?

Page 8

1       A.   I do not.
2       Q.   Okay.  Where are you physically located
3  this morning?
4       A.   Conference room within the United States
5  Attorney's Office in Bismarck, North Dakota.
6       Q.   And you understand, sir, that you are
7  obligated to tell the truth under oath today?
8       A.   Yes, I do.
9       Q.   And do you understand that your
10  deposition today has the same force and effect as if
11  you were in front of a judge or a jury?
12       A.   Yes, I do.
13       Q.   And do you understand that portions of
14  your videotaped deposition may be played to the court
15  if this case were to go to trial?
16       A.   Yes, I do.
17       Q.   And do you understand that if you fail to
18  tell the truth today, that is considered perjury?
19       A.   Yes.
20       Q.   And to that end, Mr. O'Connell, is there
21  anything preventing you today from providing complete,
22  accurate, and truthful testimony?
23       A.   No, there is not.
24       Q.   Okay.  Do you have any questions, sir,
25  about these introductory instructions?

Page 9

1       A.   No.
2       Q.   All right.  With respect to preparing for
3  your deposition today, Mr. O'Connell, what did you do
4  to do those preparations?
5       A.   I shared two conference calls with
6  representatives of the federal government regarding
7  the deposition.  Each was about two hours in length.
8  One was on August 5.  One was on August 12.
9       Q.   And you said they were representatives of
10  the federal government.  Who specifically are you
11  referring to?
12       A.   Ms. Jane Bobet and Tim -- I cannot recall
13  his last name.  I want to say it was Janek.
14       Q.   Jafek, Tim Jafek?
15       A.   Yes.
16       Q.   Okay.  Both of those individuals being
17  with the U.S. Attorney's Office in Colorado?
18       A.   Yes.
19       Q.   And you said those were by telephone
20  call?
21       A.   First one was a telephone call.  The
22  second one was on some form of video platform.
23       Q.   Okay.  Did you talk to anyone else other
24  than your counsel in preparation for your deposition
25  today?

Jacob O'Connell
August 16, 2022

Page 10

1       A.    No, I have not.
2       Q.    Did you review any documents prior to
3    your deposition this morning?
4       A.    No, I have not.
5       Q.    Did you do any research about the issues
6    in this case?
7       A.    No, I have not.
8       Q.    Did you make any notes in preparation for
9    your deposition today?
10      A.    Not for the deposition, but I did take
11   notes during my first call with Tim Jafek.
12      Q.    And do you have those notes with you?
13      A.    I do not.
14      Q.    Do you have any documents there with you
15   this morning?
16      A.    No, I do not.
17      Q.    Mr. O'Connell, are you aware of the case
18   that is the reason why you're being deposed by the
19   State of North Dakota this morning?
20      A.    Yes, in very broad terms.
21      Q.    Okay.  Just to speak a little bit more in
22   detail, so it's clear, this deposition this morning
23   pertains to the State of North Dakota's case against
24   the United States under a statute known as the Federal
25   Tort Claims Act.  And the state's case seeks

Page 11

1    $38 million in damages that North Dakota seeks to
2    recover from the United States as a result of the
3    Corps of Engineers and other federal official's
4    actions associated with the protests against the
5    Dakota Access Pipeline.  Do you understand that, sir?
6       A.    Yes, I do.
7       Q.    Are you aware of the United States
8    District Court for the District of North Dakota's
9    rulings in the case to date?
10      A.    No, I do not.
11      Q.    Okay.  So would that include your not
12   being aware of the court's denial of the United
13   States' motion to dismiss the case?
14      A.    I'm not aware of that.
15      Q.    How about the court's denial of the
16   United States' motion for partial summary judgment?
17      A.    I'm not aware of that.
18      Q.    How about the order by the United States
19   District Court compelling the testimony and discovery
20   against the United States other than representatives
21   of the Corps of Engineers?
22      A.    I'm not aware of that.
23      Q.    That's the reason why you're here as a
24   non-Corps of Engineers federal representative.  Have
25   you spoken to any other people who have been deposed

Page 12

1    in the case to date?
2       A.    I have not.
3       Q.    Do you understand that your deposition
4    today may be up to seven hours in duration on the
5    record?
6       A.    I was informed of that.
7       Q.    All right.  I'd like to ask you,
8    Mr. O'Connell, a couple of questions about your
9    background, if I may.  And would you start by telling
10   me where you're from?
11      A.    I live in the state of North Dakota in
12   Bismarck.
13      Q.    Where are you from, sir, originally?
14      A.    I was born in Hawaii.
15      Q.    Okay.  And you currently reside in
16   Bismarck?
17      A.    Yes.
18      Q.    Would you walk me through, please, your
19   formal education after high school.
20      A.    I attended the United States Military
21   Academy at West Point, and that is almost my entire
22   higher education.
23      Q.    Okay.  And after graduating from West
24   Point -- first of all, what degree did you graduate
25   from West Point with?

Page 13

1       A.    Bachelor of science in general
2    engineering.
3       Q.    And what year was that?
4       A.    1990.
5       Q.    All right.  And after you graduated, what
6    did you do, sir?
7       A.    I was an infantry officer with the United
8    States Army.
9       Q.    Where were you stationed?
10      A.    My first assignment was Fort Benning.
11   Then I went to Hohenfels, Germany, for the remainder
12   of my tour and then returned to the United States in
13   1994 and left active duty in May of 1994.
14      Q.    And after that did you gain employment
15   outside of the military?
16      A.    Yes, I did.  I worked for Military
17   Professional Resources, Incorporated, which is a
18   contracting firm out of Alexandria, Virginia.  For
19   that company I was assigned to the former Yugoslav
20   republic for approximately 18 months.
21      Q.    And what did you do in that position?
22      A.    Tried to confirm that sanctions and
23   actions taken by the former Yugoslav government were
24   in fact accurate.
25      Q.    Could you describe a little bit about

Jacob O'Connell
August 16, 2022

Page 14

1   what that involved.

2       A.   It involved freedom of movement
3   throughout the former Yugoslav republics of Bosnia,
4   Herzegovina, limited portion of Croatia, Serbia,
5   Montenegro.  And basically the focus was to try to
6   show up at the right place at the wrong time to, you
7   could say, observe the Serbians supporting the forces.
8   I don't know which political vein you would support,
9   but that they were not giving military aid to the
10  Bosnians across the border that would be used for the
11  genocide.

12      Q.   I see.  So you were a military contractor
13  to the United States government?

14      A.   No.  I was a contractor for the United
15  States government with military background.

16      Q.   I see.  Thank you.  And what was the
17  duration of that employment?

18      A.   I seem to recall that it was about
19  18 months.

20      Q.   Okay.  And then did you come back to the
21  United States after that function and role?

22      A.   Yes.  I returned to Minneapolis,
23  Minnesota.

24      Q.   And what did you do when you returned to
25  Minneapolis?

Page 15

1       A.   Started looking for a job, which
2   eventually took me to Erie, Pennsylvania, when I was
3   hired by General Electric's transportation division.

4       Q.   And how long were you employed by General
5   Electric?

6       A.   A little over five years.

7       Q.   And during that period of time, you were
8   with the transportation division?

9       A.   Yes.

10      Q.   And what did you do in that capacity?

11      A.   I was responsible for traveling around
12  the United States, setting up service providers who
13  could perform rebuilds of major components that came
14  off the locomotives, in furtherance of General
15  Electric's "power by the mile" program for major U.S.
16  railroads.

17      Q.   Okay.  And after that period of
18  employment, what did you do next?

19      A.   I left GE after I received an offer from
20  the FBI.  And it was a period of about a year and a
21  half because the background check took a long time and
22  then they went to halt hiring because of some issues
23  with the economy and the budget for the FBI.  And then
24  9/11 happened and I came into the Bureau in 2002.

25      Q.   And would you describe your geographic

Page 16

1   location starting with your service in the FBI.

2       A.   My first period of employment with the
3   FBI was at Quantico, which was approximately four
4   months.  And then in June 2002, I officially
5   transferred to the New York field office in Manhattan.

6       Q.   If you'd keep going, please.

7       A.   In regards to my --

8       Q.   How long were you in the New York field
9   office of the FBI?

10      A.   From 2002 to 2007.

11      Q.   And then what role did you take after
12  that?

13      A.   I went to headquarters as a supervisor,
14  which is really headquarter's name for a special
15  agent, where I was working the Iraq program.

16      Q.   And what did that involve?

17      A.   It involved investigative activities that
18  were related to Iraq, both domestic and international,
19  as well as supporting the deployment of FBI resources
20  to the Iraq Theater.

21      Q.   Did you physically live in Iraq at any
22  period of time?

23      A.   I spent six months in Iraq in 2005.

24      Q.   I bet that was an interesting experience.

25      A.   It was very interesting.

Page 17

1       Q.   Yeah.  And then after that,
2   Mr. O'Connell, what did you do?

3       A.   I stayed at headquarters and we made some
4   modifications in the structure within the
5   counterterrorism division that ultimately put the
6   Afghanistan program and the Iraq program together.
7   And so the cases that were monitored out of
8   Afghanistan and the personnel deployed folded in with
9   the Iraq deployment and the Iraq investigations.

10      And so in that capacity we basically had
11  oversight of anywhere between 100 to 200 agents as
12  well as the investigative cases that were related to,
13  you could say, a tie between those theaters as well as
14  domestic divisions.  And that continued until 2009.
15  And then I went to Afghanistan for about 13 months,
16  returning in the middle of 2010.

17      Q.   And what was your title during that
18  period of time?  Were you still a special agent?

19      A.   They have different titles.  I went over
20  there as just a special agent.  Then I became -- they
21  call it the assistant legal attache.  And I stayed in
22  that role for the duration of my deployment.  And then
23  when I left Afghanistan, I went back to headquarters
24  as a supervisory special agent, which again, is a
25  special agent with a different title.  You're just at

Jacob O'Connell
August 16, 2022

Page 18

1   headquarters.
2        Q.   I see.  What did your post in that
3   capacity at that location involve?
4        A.   It was the same.  I was basically working
5   matters related to Afghanistan based on my experience
6   with that theater.  And stayed, I think, in
7   Washington, D.C., until approximately November of 2010
8   before coming to North Dakota.
9        Q.   Okay.  You came to North Dakota
10   transferring within the FBI?
11       A.   Correct.
12       Q.   And then would you describe your
13   transition to the state of North Dakota with the
14   Federal Bureau of Investigation.
15       A.   Really no special transition other than
16   the physicality and also you work Indian country for
17   the most part, but at the same time I investigated
18   matters of public corruption, white collar fraud,
19   counterterrorism, domestic terrorism.  Basically, a
20   small office like Bismarck, you work anything that
21   comes up.
22       Q.   And what was your first position title
23   when you transitioned to the State of North Dakota?
24       A.   Special agent.
25       Q.   Okay.  And you said it was "a small

Page 19

1   office."  When you arrived, how many people were in
2   the office with you?
3        A.   Two agents and two support personnel and
4   myself.  So three agents, two support.
5        Q.   And where was that office based, in the
6   federal building in Bismarck?
7        A.   No.  We're in a standalone building in
8   downtown Bismarck, which is the former JCPenney
9   building that they turned into office space.
10       Q.   Yes.  And you've been with the FBI in
11   North Dakota ever since that time?
12       A.   Yes.
13       Q.   So basically since 2011 to present;
14   right?
15       A.   Yes.
16       Q.   Okay.  And have you changed rank or
17   responsibility in the course of that 2011-to-2022 time
18   frame?
19       A.   Yes.  I was the supervisor for the
20   western half of North Dakota from 2014 to 2017.
21       Q.   Okay.  Then after that?
22       A.   I resumed to the duties of a special
23   agent.
24       Q.   From 2017 to present?
25       A.   Yes.

Page 20

1        Q.   Okay.  Is there a leadership structure
2   within the North Dakota office of the FBI?  Is someone
3   in charge or is everyone an equal?
4        A.   The hierarchy is that you have special
5   agents and then you have one supervisor.  And that
6   supervisor is responsible for the offices that
7   comprise the squad.  And in this case, the squad
8   consists of the Williston RA, the Minot RA, and the
9   Bismarck RA.
10       Q.   Is there a Fargo office of the FBI?
11       A.   Yes, there is.
12       Q.   Okay.  So the FBI has four separate
13   offices in North Dakota?
14       A.   They actually have five because there's
15   an office in Grand Forks.
16       Q.   Grand Forks.  Okay.  But it doesn't sound
17   like -- and correct me if I'm wrong -- that there's a
18   special agent that's assigned to each of the FBI
19   offices, the five offices in North Dakota, or am I
20   missing something?
21       A.   I don't understand that question.
22       Q.   Is there a special agent assigned to each
23   of those five offices or do the number of special
24   agents being limited, do they sort of just float
25   amongst all of the offices?

Page 21

1        A.   It really depends on what year you're
2   talking about, but there's a certain amount of
3   authorized personnel in the division.  The division is
4   free to move them around the offices as they see fit
5   to address whatever threat they feel.  However,
6   there's been consistent staffing in Williston, Grand
7   Forks, Minot, Bismarck, and Fargo since 2015.
8        Q.   Okay.  Would you describe your position
9   today as being the senior FBI official in North
10   Dakota?
11       A.   No.
12       Q.   And who would the senior person be?
13       A.   The supervisor at the time of this
14   deposition is Bryan Van Osprey.
15       Q.   Okay.  Is it fair to in layman's terms
16   refer to him as your boss?
17       A.   Yes, it is.
18       Q.   Okay.  It sounds like from your long
19   career and some very interesting experiences that
20   you've got some background and experience with public
21   protests?
22       A.   I've witnessed quite a few public
23   protests, but I've never been part of a designated
24   response to it such as with DAPL.
25       Q.   And you were in that capacity?

Jacob O'Connell
August 16, 2022

Page 22

1      A.   I did everything I thought was
2  responsible to represent the interests of the FBI and
3  its mission.
4      Q.   Do you have any formal educational or
5  work experience training with violent protests?
6      A.   No.
7      Q.   Armed conflict?
8      A.   Yes.
9      Q.   And what does that consist of, that
10 experience or training?
11     A.   In the military, back when I received the
12 training, it was called "operations other than war."
13 Basically, it was the conduct of operations by the
14 United States government in an area which was less
15 than, you could say, secure.
16     Q.   And your experience in the former
17 Yugoslav republic, there were factions fighting each
18 other and the like; is that fair to say?
19     A.   I would say that's accurate.
20     Q.   And was part of your job responsibilities
21 to maintain order and peace?
22     A.   No, it was not.  We were there to
23 observe.
24     Q.   Okay.  And, again, you were observing on
25 behalf of the United States government?

Page 23

1      A.   Yes, I was.
2      Q.   I see.  All right.  Is it fair to say
3  that there's some similarities between your experience
4  in the Yugoslav republic and what you observed and
5  were close to in the DAPL protest context?
6      A.   There was some similarities, but I
7  wouldn't call it -- when I was looking at DAPL, I did
8  not think of Yugoslavia.
9      Q.   Do you know General Dohrmann in North
10 Dakota?
11     A.   Yes, I do.
12     Q.   Did you ever discuss with him his
13 experiences in that part of the world?
14     A.   No, I did not.
15     Q.   Do you have any plans for post-government
16 service when you ever leave the FBI?
17     A.   Yes, I do.
18     Q.   Do you have any plans to leave the FBI in
19 the near term?
20     A.   Yes, I do.
21     Q.   How soon would that be?
22     A.   I'm hoping to be retired by October of
23 2022.
24     Q.   This year?
25     A.   Correct.

Page 24

1      Q.   Okay.  Do your retirement plans include
2  staying in North Dakota or going somewhere else?
3      A.   I plan to continue to reside in Bismarck,
4  North Dakota.
5      Q.   All right.  Thank you.  Would you please
6  describe your position with the Federal Bureau of
7  Investigation with respect to the protests against the
8  Dakota Access Pipeline in the period of time of
9  2016 -- let's say the start of 2016 to March of 2017.
10 Will you just kind of explain your role and activities
11 as a federal employee for the FBI during that period
12 of time.
13     A.   As the supervisor at the time of the DAPL
14 protests, I prioritized liaison with a wide variety of
15 organizations and government entities and also trying
16 to garner FBI resources to support what would be
17 typical FBI priorities during such an event.
18     Q.   What are those typical FBI priorities
19 during such event?  What do you mean by that, if you'd
20 explain?
21     A.   The FBI investigates violations of
22 federal law and they collect intelligence and react to
23 it.  Those were our priorities during DAPL.
24     Q.   And when you "collect intelligence and
25 react to it," what does that involve?

Page 25

1      A.   It can mean a wide variety of activities,
2  but in the case of DAPL it was primarily focused on
3  understanding who was in the area, what they were
4  doing, where they came from, what was their history,
5  what was their motivation, and who was providing them
6  resources.
7      Q.   And do you think you served at the FBI in
8  doing all of those things during the DAPL protests?
9      A.   We did some things very well, but we also
10 were unable to pursue some of the things that we
11 identified as being very important.
12     Q.   Yeah.  I was just asking, all of those
13 activities and scopes that you described, all of those
14 things were attempted and implemented by you and your
15 colleagues at the FBI in North Dakota?
16     A.   We certainly tried to implement all those
17 activities, but there were times where we just didn't
18 have the resources.
19     Q.   And then when you say -- after collecting
20 intelligence, you went on to say, I believe, you
21 reacted to that.  What did that phase of activities
22 involve, the reaction to the intelligence?  If you'd
23 describe for me, please, what you mean by that.
24     A.   Once you identify information, you
25 evaluate it being something that requires follow up or

Jacob O'Connell
August 16, 2022

Page 26

1  action.  There's a whole host of potential activities
2  that could occur.  There could be sharing of
3  information within a field office that already has an
4  investigation open on a certain individual or
5  organization.
6              It could be picking up the phone and
7  calling the local sheriff to tell him something that
8  is relevant to his area of operations or his security
9  of his staff.  It's a very broad question to answer
10 with a singular response.
11     Q.  Yeah.  I was asking not potential, but
12 what you did in your position with the FBI.  What was
13 actually done under your direction and supervision and
14 involvement, if you'd speak in those terms, please.
15     A.  I would ask that you refine the question
16 because we're talking about an eight-month period and
17 there was a lot of activities almost 16 hours a day,
18 no break for weekends, people coming, people going.
19     Q.  Sure.  Sure.  Could you try to address
20 that talking about your position and role in a
21 chronological fashion during that time.  I'm not
22 asking for a tremendous amount of detail.  I'm trying
23 to understand what the scope of your duties,
24 responsibilities, and involvement was.  We can talk
25 about some more specifics as we go, but I'd appreciate

Page 27

1  getting an overview of what you generally worked on as
2  part of your FBI responsibilities during the DAPL
3  protests.
4      A.  I guess I'll repeat that there was a lot
5  going on and not a lot of resources to do it.  And so
6  my responsibilities during DAPL were very much
7  different than my responsibilities without something
8  like DAPL occurring.
9          The focus on DAPL, my typical day
10 involved typically going down to the camps or down to
11 wherever, let's say, the point of contact was to kind
12 of get a feel for what people on the ground were
13 experiencing, because there was a big difference
14 between what was going on on the ground and what was
15 getting conveyed back to the Emergency Operations
16 Center.
17         Based on what I'd find, I'd either just
18 go back and attend the regular meetings during the day
19 or if there was something that was more active, I
20 would pass that up the chain of command and try to get
21 the appropriate resources to respond to it, or we
22 would, again, go back to collecting intelligence,
23 package it in some type of either document or report
24 that we could forward on to somebody so that they
25 could make a decision or they could provide resources.

Page 28

1              So there wasn't a consistent, you could
2  say, day.  It was whatever was the priority.  And a
3  lot of it had to do with the weather, the political
4  climate, the election cycle.  There were so many
5  variables.  I would think it would be inappropriate
6  for me to try to answer it in a singular fashion.
7      Q.  Okay.  I appreciate that.  And it was
8  complex and very circumstantial.  Let's talk more
9  about your experience in a moment.  When you were
10 involved in the DAPL protests, that period of time --
11 again, 2016 at the start to March of 2017 -- what was
12 the chain of command in the North Dakota office of the
13 FBI?
14     A.  So if you are going to start with an
15 agent in Bismarck, North Dakota, they would respond to
16 me as their supervisor.  And I didn't tell agents what
17 to do on a regular basis, but my goal was to support
18 them in doing what special agents do, which is
19 investigate matters or collect intelligence.
20             Then my next chain of command would be
21 Bob Perry, who -- his title was assistant special
22 agent in charge.  He was in Rapid City.  And then
23 above him was Richard Thornton, who was the special
24 agent in charge.  He sits in an office in Minneapolis,
25 Brooklyn Center being exact.  And then from Richard

Page 29

1  Thornton, the chain of command would go to the deputy
2  director and then to the director of the FBI.
3      Q.  And who was the deputy director of the
4  FBI at that period of time?
5      A.  Andrew McCabe.
6      Q.  And who was the director of the FBI?
7      A.  I believe Andrew McCabe was acting for
8  that duration.  I can't remember if Comey had left by
9  that time or been fired.  No.  So Comey was the
10 director.  We had very little exposure to the
11 director.
12     Q.  Sure.  How about exposure to the deputy
13 director, Andrew McCabe?
14     A.  I've had exposure to Andy McCabe off and
15 on over almost my entire career in the FBI.  He was
16 assigned to --
17     Q.  I'm sorry.  How about during the specific
18 period of the DAPL protests?  Did you have exposure
19 and/or interaction with him in any manner?
20     A.  Indirectly through the chain of command.
21     Q.  Did you ever speak with Mr. McCabe or
22 communicate with him in any manner?
23     A.  Not directly, no.
24     Q.  And because you said "not directly," did
25 you do so indirectly in any manner?

29:21-
30:22
401-402;
802

Jacob O'Connell
August 16, 2022

Page 30

1     A.   I shared a telephone call with Richard
2   Thornton in which he said that some requested
3   resources were being denied, and I asked him who
4   denied them.  He said, The deputy director.  I said,
5   Did you ask him why?  He said, No.
6        Q.   Okay.
7        A.   That's indirect communication.
8        Q.   Sure.  So just so I understand,
9   Mr. O'Connell, you weren't on a call with Andrew
10   McCabe, the deputy director of the FBI.  You were
11   reported by a superior that Mr. McCabe denied some
12   activity?
13        A.   Correct.  Richard Thornton.
14        Q.   Yeah.  And was there something specific
15   that Mr. McCabe was reported to have denied resources
16   or support that you were interested in in North Dakota
17   for the DAPL protests?
18        A.   We had requested the drone unit from
19   Quantico come out to assist the local authorities with
20   maintaining some form of visual surveillance of the
21   protesters in the camp as they would assemble to go
22   out and roam the countryside.
23        Q.   And the drone unit, when you say "from
24   Quantico," that would be Quantico, Virginia, the
25   headquarters of the FBI?

Page 31

1        A.   No.  Quantico was not the headquarters of
2   the FBI, but that is where the Critical Incident
3   Response Group is located and headquartered out of,
4   and that is where the drone unit was located.
5        Q.   I see.  And so the drone unit that you
6   were hoping to get as a resource for you and others,
7   law enforcement in North Dakota, was an FBI resource?
8        A.   Yes.
9        Q.   What kind of equipment was involved in
10   the request for FBI drone unit?  What does the drone
11   unit consist of?
12        A.   At that time it consisted of a number of
13   medium- to large-size drones that had the capability
14   to loiter in an area and provide real-time video.
15        Q.   Medium to large drones.  I picture the
16   kind that the United States military operates in
17   perhaps, say, the Middle East.  A predator drone is
18   something I'm familiar with.  Is that the kind of
19   drone that the FBI drone unit also has?
20        A.   I do not know the answer to that
21   question.  The drones I'm referring to for the purpose
22   of DAPL were -- they go by weight.  A medium-size
23   drone, I want to say, is less than 15 pounds.  Then I
24   think a large is less than 30 or something.  Don't
25   hold me to that.

31:5-8
401-402

Page 32

1        Q.   Okay.
2        A.   These are drones that fit in a suitcase
3   and would be able to operate for 20 to 30 minutes
4   during specific requirements.
5        Q.   I see.  Okay.  So smaller and more agile
6   than the really big ones that I'm envisioning, the
7   predator drone-type thing that the large one -- super
8   large ones.  Yeah.  Do you know anything about the FBI
9   drone unit, its history and purpose?
10        A.   I do not have firsthand knowledge of the
11   drone unit other than conversations I've had with
12   members of the drone unit talking about various
13   capabilities of drones and their potential uses.
14        Q.   And did you seek that out -- the drone
15   unit people out so you could understand the
16   capabilities and potential uses?
17        A.   I did.
18        Q.   And when did you seek them out for
19   understanding capabilities and potential uses of the
20   resources that were part of the FBI drone unit?
21        A.   I do not recall a specific date or
22   timeline.  However, I do recall specifically speaking
23   to I believe the unit chief and a couple of the
24   supervisors assigned to the unit, but I do not have
25   a -- I can't recall when exactly.

Page 33

1        Q.   Do you have a ballpark sense of what time
2   of year it was?
3        A.   I want to say it was November because I
4   remember it was getting cold and we were trying to get
5   the resources in late October or November time frame,
6   I think, because I just remember it was cold when we
7   were out reconnoitering an operational area for them.
8        Q.   And you mentioned that the unit was part
9   of the larger FBI program, if I understood what you
10   said?
11        A.   The FBI by its very nature is a
12   paramilitary organization.  So something is owned by
13   something else, but there wasn't -- I mean, I don't
14   have firsthand knowledge of the structure of the drone
15   unit and how they're organized.
16        All I know is that I just kept calling
17   and calling until I got to somebody who would talk to
18   me.  And I told them what I was after and they'd
19   either refer me to people or tell me to call this
20   number.  And eventually I got to somebody who said,
21   Yes, we can help you.
22        Q.   Okay.  And then from there when you found
23   what you were -- you thought was a suitable match,
24   what did you do once you had the information about
25   potential FBI resources?  What happened next?  Did you

Jacob O'Connell
August 16, 2022

Page 34

1 have to seek approval to get access to those
2 resources?
3          A.   I called the -- I'm trying to remember
4 who it was.  I want to say it was the unit chief of
5 the drone unit.  He basically said, All right, we're
6 good to go.  I told Bob Perry that this is what I was
7 doing.  I think a lot of this was in an e-mail after
8 the initial phone call.
9                And I'm not sure with, again, specificity
10 if I followed the chain of command or just everything
11 started moving at the same time, but I recall that Bob
12 Perry and Rick Thornton were involved in talking to
13 their, you could say, peers within CIRG to get the
14 drones out.  And Rick Thornton had the advantage of
15 having come from that unit before he was the SAC in
16 Minneapolis.  Not the drone unit, but CIRG.
17          Q.   What is CIRG?
18          A.   Critical Incident Response Group.
19          Q.   And the acronym is C-I-R-G?
20          A.   Correct.
21          Q.   Okay.  And Thornton was part of that
22 group?
23          A.   My understanding is that he was an
24 SES-level executive, meaning he would have been
25 section chief or higher of the aviation unit at CIRG

Page 35

1 prior to becoming the SAC in Minneapolis.  I do not
2 know what suborganizations were in or under his direct
3 purview as the section chief back there, but I know in
4 his title it had "aviation" and "chief."
5          Q.   Okay.  And so you mentioned the drone
6 unit leader told you that -- I think your words were
7 things were "good to go."  And why did you seek out a
8 conversation about it after that point from Bob Perry
9 and Rick Thornton to get approval?
10          A.   You've got to keep your chain of command
11 informed of what you're doing.
12          Q.   Yes.
13          A.   But the way things were working during
14 DAPL is that, you know, it was just continuous.  And
15 so if Bob Perry was taking care of something else,
16 that didn't mean you just sit back and wait for him to
17 get back to you.  Go to the next step.
18                So going out and seeking information
19 from -- about the drones or who was the appropriate
20 chain of command back in CIRG or who was going to be
21 the best person to provide requests to, those are all
22 things that I did.  So I talked to a lot of people.
23                And I recall that everybody was on board,
24 but I still think that Bob Perry and Rick Thornton got
25 involved to bless off on it to make sure that they're

Page 36

1 aware of it so that they kind of could speak to it if
2 somebody asked them a question.
3          Q.   So did they then seek to advise the
4 deputy director of the FBI of that?
5          A.   I do not know the answer to that
6 question.
7          Q.   You just were told by them -- by one of
8 them at least that the topic had come up to Andrew
9 McCabe, the deputy director of the FBI, and that --
10 tell me if I don't have this right, but he put the
11 kibosh on it or told Mr. Perry or Mr. Thornton that
12 no, we're not doing that?
13          A.   The events went down and the
14 chronological order was that we knew there was a
15 scarcity of resources that could maintain observation
16 of the protest camp.  I started doing my research.  I
17 identified who at CIRG could provide the resources we
18 were looking for.  We got everybody to
19 agree that this was appropriate.
20                The drones and the personnel who operate
21 them climbed on the FBI G5 and flew from I believe
22 Manassas to Bismarck, offloaded their equipment.  And
23 we loaded them up in vehicles and we drove down to an
24 area just north of the Indian reservation where we
25 could stage the drones from.

36:7-
37:21
401-
402; 802

Page 37

1                And while we're standing there, the unit
2 chief, the head drone guy, his phone rings and it was
3 his boss saying, Hey, the plane is coming back to get
4 you, your mission has been shut down.  And so a lot of
5 head scratching, not knowing what's going on.
6                And then it was later when I had the
7 conversation with Rick Thornton, who relayed to me
8 that Andrew McCabe had called him and told him that we
9 couldn't have the drones.
10          Q.   So the resources were actually on site in
11 the field in Morton County proximate to the protest
12 camps on Corps property and then the plug was pulled?
13          A.   Correct.
14          Q.   Do you recall, is that the same time
15 frame when they arrived, it was late October or
16 November?
17          A.   Correct.
18          Q.   Okay.
19          A.   Best of my recollection.
20          Q.   And that's 2016; right?
21          A.   Correct.
22          Q.   The area that you mentioned where you
23 took your FBI colleagues, the drone unit people that
24 were flown from Manassas, Virginia, to Bismarck and
25 then you drove together down to the site, where

Jacob O'Connell
August 16, 2022

Page 38

1  approximately were you setting up to stage the
2  equipment?
3      A.    It would have been approximately a half
4  mile north of the edge of the protest camp.  There was
5  a knoll that we went down to that had a pretty
6  consistent law enforcement presence.  I forget.  They
7  had a name for it, but I don't recall it now.  But it
8  was on a small knoll where you could oversee the
9  protest camp.
10     Q.    Okay.  And the protest camp you're
11 referring to, would that be the Oceti Sakowin Camp?
12     A.    You could see all three of the camps from
13 this vantage point.  You could see the camp that was
14 north of the Cannonball.  You could see the camp that
15 was south of the Cannonball.  And then you could see
16 the camp that was on the east side -- would have been
17 on the western shore of the Missouri River, but on the
18 eastern side of the other two camps.
19     Q.    Still on the west side, though, of the
20 Missouri?
21     A.    Correct.
22     Q.    Okay.  The camps that you're referring
23 to, the three camps, the one on the north side of the
24 Cannonball River, was that the main camp, the largest
25 of them?

Page 39

1      A.    Correct.
2      Q.    And is that what is commonly referred to
3  as the Oceti Sakowin Camp or the Seven Fires Council
4  Camp?
5      A.    I recall those terms, but it wasn't how
6  we necessarily referred to it within the FBI.
7      Q.    Right.  That camp north of the Cannonball
8  River that you observed, was that known to you as
9  being referred to by some people as the Oceti Sakowin
10 Camp?
11     A.    I heard that term used.  I just
12 considered it the center of gravity for the entire
13 protest because that's where they ran a lot of the
14 services.  So to me that was the camp.
15     Q.    Okay.  And that camp that you're telling
16 me about, did you know that it happened to be on
17 United States Army Corps of Engineers-managed
18 property?
19     A.    I did.
20     Q.    Okay.  So it's public land; right?
21     A.    I have never personally researched a
22 definitive answer to that question.  I've been told
23 that it was Morton County land.  I've been told it was
24 Corps land.  All of that really didn't figure in my
25 calculus for running the FBI during that period.

Page 40

1      Q.    Okay.  And then this camp on the south
2  side of the Cannonball River, it was right
3  underneath -- pardon me -- right to the south of the
4  river?
5      A.    Correct.  There was an old roadbed and a
6  series of sloughs, and they were kind of camped in
7  there where they could, depending on what the weather
8  was doing at the time.
9      Q.    Was that camp much smaller than the north
10 camp, the main camp?
11     A.    I can't answer that question with
12 specificity because it was more shrouded in trees.  It
13 was linear rather than kind of a center of mass, and
14 it was controlled -- or hemmed in by the b[____]
15 to the south.
16     Q.    I see.  And then the camp on the east
17 side, was that right -- east side of those two camps,
18 was that camp very large in size or relative to the
19 other two?  Could you tell?
20     A.    We always considered that camp physically
21 smaller, but sometimes more important in understanding
22 what the motivations at play were.
23     Q.    Why was that?
24     A.    That camp was on land that was owned
25 by -- I believe it was LaDonna Allard, who is now

**ND OBJ:**
Relevance;
Introduces new
material

Page 41

1  deceased, but she had a certain personal gain in
2  sponsoring the camp and bringing people in.  And her
3  acceptance of people to camp on her land sometimes had
4  to match her ideology.
5      Q.    I see.  And so she had criteria for
6  people to be admitted to the camp?
7      A.    Correct.
8      Q.    And what did that seem like to you?
9      A.    It evolved over the course of the
10 protests, where in the beginning I think she was
11 trying to focus on, you know, Native Americans who
12 were Sioux in origin from some of the Sioux
13 reservations and were very focused on the environment,
14 and that her motivation was to foster their activity
15 and their participation in the protests; but then as
16 time went on and the GoFundMe activity took off and
17 the crowd-source funding, well then it became a profit
18 motive to her.  So she would bring in whoever could
19 bring the most equipment and money and resources.
20     Q.    How do you know that?
21     A.    That was information that was provided by
22 a broad array of law enforcement as well as BIA
23 personnel who were talking to her as well as other
24 protesters that we'd interface with, and then also the
25 activity we saw with vehicles entering and exiting and

Jacob O'Connell
August 16, 2022

Page 42

1 deliveries that were made.

2   Q.   Okay.  When you were -- when you set up
3 on the small knoll above the three camps and you were
4 watching the camps, how far had people gotten?  They
5 drove up to the spot, and were you the only ones there
6 at the time you arrived and the group arrived?

7   A.   No.  There was other law enforcement
8 present on a continuous basis.

9   Q.   Such as -- do you recall anybody
10 individual -- senior individuals present at that
11 moment?

12   A.   You'd see Sheriff Laney bouncing around.
13 He was pretty mobile and active and involved.  And so
14 I don't recall all the names at this point, but, you
15 know, there was representatives down there that were
16 either a sergeant or lieutenant or above from various
17 law enforcement organizations that were consistent
18 faces in that area during the large portions of the
19 protests.

20   Q.   Yeah.  Were they aware that you arrived
21 with those FBI resources that you mentioned?

22   A.   I don't recall if they were aware or
23 found out there.  I don't recall going out of my way
24 to coordinate with them other than, I guess,
25 telling -- it was either General Dohrmann or Kyle

Page 43

1 Kirchmeier that we were trying to get those resources
2 on the ground and set up.

3   Q.   Yeah.  And so you pulled up in your
4 vehicles and got to that knoll.  Had you had a
5 chance -- had the FBI drone unit people had a chance
6 to unpack and prepare to deploy?

7   A.   I think we were just in the process of
8 figuring out how we were going to put the equipment
9 there and if not secure it, man it.  And I think
10 the -- about the same time the call came in saying
11 you're coming home was about the same time they'd
12 agreed to come back and start operations the following
13 morning.

14   Q.   I see.  So that trip when you went out
15 there for the first time to the knoll to look down on
16 the camps, it was sort of a reconnaissance to arrange
17 for activities to start the next day?

18   A.   That's how I seem to recall it.  It was
19 very close to them saying yes, we can go live.  And it
20 might have been as simple as them saying, All right,
21 well, we're going to go back, get ourselves situated
22 at a hotel, and then we'll come back here and posture
23 to, you know, go the distance.

24   Q.   Yeah.  What kind of vehicles were you in
25 with this group when you drove down there that day?

Page 44

1   A.   Do you mean what vehicles by organization
2 or which vehicle?

3   Q.   No.  I'm trying to get at --

4   A.   Make and model?

5   Q.   Pardon me.  I'm just trying to understand
6 what did the FBI vehicle convoy look like?  Was it one
7 suburban, three suburbans, a van with monitoring
8 equipment in it?  I'm trying to picture what the group
9 looked like physically.

10   A.   I don't recall.  I know I was driving my
11 vehicle, which is a 2015 Silver Tahoe.  I don't recall
12 the other FBI personnel who were involved.  And I
13 don't know what they were driving.  Typically in
14 Indian country we have either pickup trucks or SUVs,
15 but I do not know the composition of the vehicles.  At
16 least I can't recall the composition of the vehicles
17 on that day.

18   Q.   Did you actually see the drone equipment?

19   A.   I saw all the pelican cases that were
20 reported to have the drone equipment in them.

21   Q.   Sure.  How did it work?  Did the -- how
22 did you understand it would work?  The drones go up
23 and record images?  How do people view those images?
24 Do they get recorded and you view them later or is
25 there ability to real time view what the drone is

Page 45

1 seeing?

2   A.   I do not have specific knowledge of what
3 the plan was going to be had they put a drone in the
4 area, but the capability requested was for live
5 viewing capability with both thermal and night vision.

6   Q.   So what happened next?  The call came in
7 and people -- were people a little surprised by the
8 direction change?

9   A.   I was very surprised and the individuals
10 who were with me were very surprised.  And there was a
11 lot of phone calls made by the drone unit to clarify
12 what was going on to make sure that everything was
13 accurate as reported to them about returning.  But,
14 you know, I've been in this game a long time.  When
15 people say no, they mean no.

16   Q.   Right.  So the individuals from the drone
17 unit, how many of them were there?

18   A.   I think there was four individuals that
19 came out.

20   Q.   And they called back to Quantico to
21 confirm the accuracy of what you were advised?

22   A.   I wasn't part of the notification.  I was
23 just standing there when the phone rang and it was --
24 I don't know if it was the unit chief telling the
25 guy -- the drone personnel on the ground that they

Jacob O'Connell
August 16, 2022

Page 46

1   were coming back or if it was a peer who heard about
2   it sideways.
3        All I know is that it was very quickly
4   after we had established a plan for going forward that
5   the phones rang and there was a flurry of
6   communication trying to figure out what was going on,
7   which then included my conversation with Rick
8   Thornton.

**46:9-18
401-402; 602;
802**

9        Q.   Yeah.  Did any of the other people who
10  made calls to confirm also hear that the deputy or the
11  director of the FBI was the source of the surprising
12  announcement?
13       A.   One of the drone guys from Quantico
14  mentioned it, but he didn't mention Andrew McCabe.  He
15  said the deputy director.
16       Q.   I see.  Which would be Andrew McCabe;
17  right?
18       A.   Correct.

**46:19-24
401-402; 802**

19       Q.   And you also independently heard that
20  from your call with Rick Thornton?
21       A.   Correct.
22       Q.   And McCabe's name specifically, too;
23  right?
24       A.   Correct.

**46:25-47:16
401-402**

25       Q.   So what did you all do, pack up and just

Page 47

1   leave?
2        A.   Correct.  They were told that the G5 was
3   turning around, getting fuel, and heading back to get
4   them and to be at the airport.  I forget.  I don't
5   know if they spent the night or if the G5 came
6   directly back, but, I mean, that was it, end of
7   resources and end of requirement.
8        Q.   And the G5, that's a gulf stream
9   airplane?
10       A.   Yes, it is.
11       Q.   Okay.  A United States government
12  airplane?
13       A.   Correct, operated by the FBI.
14       Q.   And it flew back to Bismarck to get these
15  people?
16       A.   Yes, it did.
17       Q.   All right.  Mr. O'Connell, we've been
18  going for about an hour.  How about a ten-minute
19  break?
20       A.   That would be great.
21            MR. SEBY:  Okay.  Thank you.
22            THE VIDEOGRAPHER:  Going off the record.
23  The time is 3:40p.m. UTC, 9:48 a.m. Mountain Time.
24            (Recess taken, 9:48 a.m. to 10:01 a.m.)
25            THE VIDEOGRAPHER:  Back on the record.

Page 48

1   The time is 4:01 p.m. UTC, 10:01 a.m. Mountain Time.
2        Q.   (BY MR. SEBY)  Mr. O'Connell, we're back
3   on the record after a short break.  Is there anything
4   else you wanted to say or talk about with regards to
5   the drones -- the FBI drones that were dispatched and
6   then withdrawn?
7        A.   No.
8        Q.   Okay.  You mentioned the FBI had a
9   group -- I think I understood you to say the Critical
10  Incident Response Group, or CIRG was the acronym.  Do
11  you know much about that group, what it does, who it
12  is, what its purpose is?
13       A.   I feel I have a fairly decent grasp of
14  the capabilities within CIRG due to my experience
15  throughout the FBI and working different missions.
16       Q.   Sure.  And what context have you come
17  across CIRG in your long, distinguished career with
18  the FBI?
19       A.   A number of, everything from material
20  purchasing to evidence collection to biometrics to
21  dealing with HRT, which is the hostage rescue team,
22  various resources for phone exploitation,
23  communications.  I mean, there's just a wide array of
24  skills and capabilities within CIRG and if you know
25  they're there, you use them.

Page 49

1        Q.   Sure.  So they really have a lot of
2   different attributes to the group?
3        A.   Yes.
4        Q.   How many people are in CIRG?  Is it
5   large?
6        A.   I don't have a specific number, but I
7   would consider it a very large organization within the
8   FBI.
9        Q.   And is it a standalone entity within the
10  FBI that is responsible to the FBI hierarchy and
11  framework or does it function with any manner of
12  independence?
13       A.   No.  There's no independence within the
14  FBI.  CIRG folds under I want to say an executive
15  assistant director or deputy assistant director.  I
16  don't have the org chart, but I would assume that is
17  publicly available information.
18       Q.   And they're based in Quantico, you said?
19       A.   To the best of my knowledge, at the time
20  they were.  The only caveat I would offer is that
21  there's been a transfer of a lot of headquarters'
22  capabilities down to Huntsville, Alabama.  And some of
23  those units, I know, are part of CIRG.
24       Q.   I see.  Does part of the CIRG function
25  include acting as a SWAT unit of sorts or is that

Jacob O'Connell
August 16, 2022

Page 50

1  something not part of the core capabilities of CIRG?
2      A.   That is most definitely not a core
3  capability.  It is a capability, however, with very,
4  very specific requirements where you utilize the
5  hostage rescue team for, you know, hands-on
6  kinetic-type operations for the purpose of resolving a
7  law enforcement situation.
8      Q.   Okay.  So part of the hostage rescue team
9  component of CIRG, is it fair to analogize it to what
10 one views as a SWAT team function?
11     A.   Yes.  That would be the highest order of
12 SWAT team, but they're not similar to, you could say,
13 a SWAT team that you'd find in a regular FBI office.
14     Q.   Okay.  So regular FBI offices often have
15 their own SWAT team component?
16     A.   I believe every FBI division -- I believe
17 there's 56 of them still -- has an enhanced capability
18 referred to as SWAT.  And then within those field
19 offices, there's, I think, seven or eight -- you know,
20 don't quote me, but there's a number of them that have
21 enhanced capabilities.
22          And when I say "enhanced," that means
23 they have aircraft, they have additional equipment
24 that gives them enhanced capabilities versus just a
25 standard -- you know, the SWAT team in Omaha,

Page 51

1  Nebraska, isn't going to be as capable as the SWAT
2  team in North -- or correction -- in New York.
3      Q.   Yeah.  But North Dakota FBI doesn't have
4  a SWAT team, does it?
5      A.   No, we do not.  If we have a situation
6  that involves any form of tactical requirement, then
7  it would be either Minneapolis SWAT or sometimes we'll
8  request assistance from the local law enforcement.
9      Q.   Okay.  So the Minneapolis office of the
10 FBI is referred to again -- I'm sorry -- as a -- what
11 kind of office?  It's senior to the North Dakota
12 office.  I'm just trying to search for the word that
13 you may have used.
14     A.   They call the Minneapolis field office
15 "headquarter city."  So the primary office where the
16 executive team sits would be considered the
17 headquarter city for the division, even though the
18 division comprises of Minnesota, North Dakota, and
19 South Dakota.  I don't know how many RAs there are,
20 but there's quite a few.
21     Q.   Okay.  So within the Minnesota field
22 office, how large is the FBI contingency there?
23     A.   In broad numbers, I want to say it's
24 about 250 with -- I think 150 are agents or somewhere
25 thereabouts, but maybe there's 100 agents and 150

Page 52

1  support.  But it's not considered a large field
2  office.
3      Q.   It's not.  How about getting away from
4  Minnesota, if you were to go down to, say, Denver, how
5  large is the FBI approximately in Denver?
6      A.   I don't know the answer to that question.
7      Q.   Is it much bigger than Minneapolis by
8  your sense?
9      A.   No.  I think Denver would be comparable.
10 It's a typical-sized FBI office for, say, St. Louis or
11 Kansas City, say, middle America.  If you want a big
12 field office, you go to Washington field office, New
13 York field office, Miami, Los Angeles.  Those are --
14 they have a thousand agents in New York or I think
15 1100, maybe even more now, which, you know, makes
16 Minneapolis look like amateur show.
17     Q.   I see.  Yeah.  I agree.  A thousand
18 agents is large.  In the Midwest they're not really
19 that size, are they?
20     A.   No.
21     Q.   Do the large offices or field offices --
22 do they lend support, as needed, to the smaller field
23 offices?
24     A.   That would be purely situational.
25 There's no organized plan that I'm aware of.

Page 53

1      Q.   It would depend upon the circumstances;
2  right?
3      A.   Correct.
4      Q.   But it's something that happens or is it
5  theoretical?
6      A.   No.  It happens quite often based on
7  needs and requirements, but the FBI tries to position
8  its resources so that you don't have to swap resources
9  between field offices unless absolutely necessary.
10     Q.   Yes.  Okay.  All right.  Earlier I think
11 you used the word -- part of your responsibilities for
12 being a special agent and a supervising agent in North
13 Dakota for the FBI included serving as a liaison.  Who
14 did you liaise?
15     A.   Is that the end of the question?
16     Q.   Yes.  I mean, if you'd just elaborate on
17 what you mean, acting as a liaison.  That's a
18 two-or-more-way relationship.  Who were you liaising
19 with, if that's the right word, on behalf of the FBI?
20 What other entities or groups?
21     A.   I liaison with any group within the
22 government, within the business sector, within
23 education within the state, state and county law
24 enforcement.  The motto is, it's not what you know,
25 it's who you know.  And the only way you get to know

Jacob O'Connell
August 16, 2022

Page 54

1  people is to go out and meet with them and talk to
2  them and figure out how you can help each other.
3       Q.   I see.  Is it fair to say that being in
4  the FBI in North Dakota that it's a fairly small
5  community compared to, say, a larger state, more
6  populated state, smaller state?
7       A.   Yes.
8       Q.   And so over your career and service in
9  the FBI, you have established a lot of relationships
10 in North Dakota?
11      A.   Yes.
12      Q.   And that would be in those various
13 sectors you mentioned, federal government entities,
14 business community, educational community, and with
15 state and county and local law enforcement?
16      A.   Yes, as well as DOD and just other
17 significant members of the community.
18      Q.   Yeah.
19      A.   Religious groups.  Pretty broad liaison.
20      Q.   Sure.  And so you served as an FBI
21 liaison, then, with the State of North Dakota; right?
22      A.   For the majority of DAPL, I was the
23 primary point of contact.
24      Q.   Who are the other points of contact with
25 the FBI during DAPL protests?

Page 55

1       A.   You had my boss, Bob Perry, as well as
2  one of his peers, a guy named Joe Weir, who was kind
3  of in between jobs.  So I requested that we have an
4  on-scene commander come up.  So they had Joe Weir
5  come.  And then I think we had one other individual
6  after that.  I don't recall with specificity, but the
7  spirit behind that was to allow me to run the squad
8  and take care of standard FBI requirements and let
9  them deal with DAPL on an ongoing basis.
10      Q.   But it was you that was contacted and
11 invited by North Dakota law enforcement to participate
12 in what started in Morton County with the tactical
13 operational center and then became the State Emergency
14 Operations Center; is that correct?
15      A.   Yes.  For the first couple of months I
16 was the designated primary point of contact to deal
17 with all things DAPL.
18      Q.   Yeah.  Designated point of contact for
19 the FBI?
20      A.   Yes.
21      Q.   So when the North Dakota folks invited
22 you to come into their coordination center, do you
23 recall that you were not the only federal
24 representative who was invited to participate and join
25 in those gatherings?

Page 56

1       A.   I recall there was a broad spectrum of
2  people who were involved.  And I think the most
3  accurate representation would be the call roster that
4  they had all the phone numbers.
5       Q.   Sure.  Otherwise known as the sign-in
6  sheets kind of thing, attendance lists?
7       A.   No.  I'm referring to -- they had, you
8  could say, a roster of law enforcement and government
9  as well as Energy Transfer Partners.  Basically,
10 anybody who was involved with DAPL, they had a call
11 sheet that had everyone's contact information.
12      Q.   I see.  I see.  Okay.  Who instigated the
13 development of that?  Was that a Morton County
14 function or activity?
15      A.   I don't think Morton County started that.
16 I think when the state started to apply resources from
17 the emergency management center, then they started to
18 professionalize some of the support activities
19 associated with the DAPL response.
20      Q.   I see.  The purpose of doing it, though,
21 was so that everybody who had a concerned role from
22 the state or private sector that was being affected by
23 that could communicate with one another, right, and
24 knew who people were?
25      A.   Correct.

Page 57

1       Q.   Did you utilize that -- did you get a
2  copy of the -- was it passed out to each participant
3  so that they could use it in that manner?
4       A.   It was distributed, but I don't know how
5  far or wide.  I know that I had to ask for a copy of
6  it from one of the emergency management
7  administrators, you could say.
8       Q.   And you were provided a copy of it?
9       A.   Yes, an electronic copy.
10      Q.   I see.  Do you know when that time frame
11 was?
12      A.   No.  It was via e-mail, so it would be
13 very easy to track down.
14      Q.   Okay.  Did you utilize your FBI e-mail
15 during the -- during your role in the DAPL protests?
16      A.   Yes, with the exception of a few e-mails
17 that were sent to a personal account erroneously due
18 to what I would guess were just fat fingering which
19 e-mail they wanted to select.
20      Q.   Inadvertent, you'd say?
21      A.   I believe so, because everyone knows to
22 keep work with work.
23      Q.   Yeah.  Do you recall when you began to
24 participate and liaison with North Dakota, Morton
25 County concerning the protests?  Was it early after it

Jacob O'Connell
August 16, 2022

Page 58

57:23-59:8
401-402; 802

1  started in the summer of 2016?
2       A.   It was almost immediately after the
3  confrontation between the highway patrol and the
4  Native Americans on horseback, the picture that was on
5  the cover of the New York Times.  And, I mean, as far
6  as, like, specific dates, I don't recall, but I can
7  recall I was in Salt Lake City at a domestic terrorism
8  training conference.
9            And at lunch one day I'm watching this
10 unfold on TV.  And I think I returned to North Dakota
11 either a day or two later, and that was when I
12 received the first call from the colonel for the
13 highway patrol asking for assistance.
14      Q.   Colonel Gerhart?
15      A.   Yes.
16      Q.   Had you known Colonel Gerhart prior to
17 that date?
18      A.   Yes, through liaison.
19      Q.   Okay.  And what did he ask you to do when
20 he phoned you?
21      A.   He wanted bodies that could assist with
22 the physical presence of law enforcement resources
23 when it came to a variety of responses.
24      Q.   How did he describe what was going on to
25 you?

Page 59

1       A.   He described that he was very concerned
2  for law and order down in the vicinity of the protests
3  and the general vicinity that would extend sometimes
4  30 miles away from the protest camps, and that he just
5  didn't have the manpower to cover such a broad area
6  and he didn't have the ability to resource enough law
7  enforcement officials in a manner that would deter any
8  form of criminal activity.
9       Q.   And did you understand when he was
10 talking to you on that first call that there were
11 protest camps that were already -- had already
12 erected -- had been erected and set up?
13      A.   I loosely recall hearing about it either
14 from the evening news or just, you know, chitchat with
15 various law enforcement officers around Bismarck and
16 Mandan, but it wasn't on my radar as a potential
17 threat because the FBI really tries to shy away from
18 going anywhere near a protected activity such as a
19 protest.
20      Q.   Right.  Was there anything that you
21 learned about these events at that time that made you
22 feel anything different from that typical shying away
23 of protests -- from protests?
24      A.   My interpretation is very black and
25 white, that when you assault a police officer, you've

59:20-60:6
401-402

Page 60

1  committed a crime and I'm going to pay attention.
2       Q.   So that caught your attention because you
3  were aware that allegedly had happened around
4  that time that you were contacted?
5       A.   There was no allegation about it.  I
6  witnessed it on TV in video.
7       Q.   You witnessed it.  Can you describe what
8  you recall witnessing?
9       A.   I recall witnessing I want to say ten to
10 12 law enforcement officers all wearing kind of the
11 same colors, so it was hard to distinguish highway
12 patrol from Morton County deputies, but they were in
13 the ditch and on the approach to the Energy Transfer
14 Partners staging area and that the Native Americans on
15 horseback were using the horses to almost herd them in
16 a direction or to run through and knock them over.
17 And they definitely weren't responding to verbal
18 commands to basically conduct their protests in a
19 peaceful manner.
20      Q.   Were they physically contacting and
21 touching the officers or menacing them?  Could you
22 tell?
23      A.   There was physical contact and it was
24 definitely menacing.
25      Q.   Who were these people; do you know?

60:7-19
Offer if
preced-
ing
testim-
ony
comes
into
eviden-
ce

Page 61

1       A.   I do not recall their specific names, but
2  I do recall that as things started to crank up and the
3  law enforcement resources started to assemble and
4  coordinate and communicate that they were able to
5  identify some of the individuals both on horseback and
6  on the ground.
7       Q.   Do you recall where they were from?
8       A.   I recall that many of them were from out
9  of state, whether it be South Dakota or Montana, some
10 as far as away as New Mexico.
11      Q.   I see.  Did the FBI note any of those
12 people to be known persons with records or persons of
13 interest, concern, that kind of thing?
14      A.   I do not recall that detail.  I know
15 there was -- there was some usual suspects in there
16 who other field officers had dealt with.  And when I
17 say "usual suspects," basically I'm referring to the
18 fact that within our databases we have interview
19 transcripts of previous contact with some of those
20 individuals, but I can't characterize what the nature
21 of that contact was.
22      Q.   Was it concerning to you or the FBI that
23 at that time, I think -- are you referring to -- today
24 is August 16, 2022.  Are you referring to about this
25 time in 2016?

Jacob O'Connell
August 16, 2022

Page 62

1    A.   Could you clarify that question, please?
2  Referring to what, the individuals?
3    A.   No.  The incident that you're recounting,
4  these individuals on horseback that physically
5  assaulted law enforcement in North Dakota, these
6  individuals I think you said were from South Dakota
7  known -- included individuals from South Dakota, New
8  Mexico, and Montana.  Was that about this time in
9  2016, mid-August?
10   A.   Are you referring to just the initial
11 contact that was photographed and videotaped?
12   Q.   Yes.
13   A.   Or are you talking -- yeah.  Then I'm
14 pretty sure -- again, I don't have perfect
15 recollection, but I remember that some of those
16 individuals were identified simply because of the
17 media exposure and then other resources throughout the
18 United States seeing them.
19         And you could just say the networks would
20 fire up and e-mails would go back and forth.  I wasn't
21 part of that communication.  I just recall that it was
22 briefed in the early stages of the daily briefings
23 that, you know, this person is this person and they
24 were trying to identify who was in a leadership
25 position versus just present.

Page 63

1    Q.   Is it a federal crime to assault a police
2  officer or a highway patrolman?
3    A.   No.
4    Q.   Yet you said that -- and notwithstanding
5  that circumstance, when it happens or it's happening,
6  that's something that garners the attention of the
7  FBI?
8    A.   Correct.  Purely because, again,
9  depending on who is drawing the conclusion, depending
10 on the motivation of the individual who's conducting
11 the activity, you know, if it's done with something
12 that's defined as a federal violation, then it would
13 become a federal law violation.  But, you know, again,
14 at that point in time, it was a matter of maintaining
15 awareness of who was involved and what they were doing
16 and trying to figure out, you know, what's our
17 responsibility.
18   Q.   Okay.  Mr. O'Connell, do you happen to
19 know at the time that we're talking about that you saw
20 those images where those people came from?  Where were
21 they -- I understand they were out-of-state people,
22 but where were they staging themselves to do these
23 things?  Do you happen to know?
24   A.   I don't know if you can sharpen that
25 question to, like, a specific day or location, but, I

Page 64

1  mean, all over during different times.  Sometimes it
2  was in the camp.  Sometimes it was at the casino.
3  Sometimes it would be a hotel in Bismarck.  There was
4  a wide variety of incidents that, you know, we paid
5  attention to.
6    Q.   Sure.  Sure.  But to your knowledge, some
7  of those people that were aggressive and assaulting
8  law enforcement and/or entering onto other people or
9  person's properties, private property, they were
10 coming from residing in the camps -- protest camps?
11   A.   Yes.
12   Q.   Would that include, your recollection,
13 about the mid-August time frame?
14   A.   Yes.
15   Q.   You mentioned that sort of a core aspect
16 of your responsibilities as the FBI supervisor that
17 you communicated with federal agencies as well, I
18 think you said; right?
19   A.   Yes.
20   Q.   And did you do that with respect to the
21 DAPL protests?
22   A.   Yes.
23   Q.   Do you recall which federal agencies you
24 served as a liaison on behalf of the FBI with,
25 interacted with, communicated with generally?

Page 65

1    A.   Generally at the federal level it would
2  have included United States Marshals, the U.S.
3  Attorney's Office.  I think the FAA came down and was
4  part of the discussion for a while.  TSA was involved
5  because of the use of the airport.  Department of
6  Homeland Security, you had border protection,
7  Department of Interior, BIA.  Then every once in a
8  while you had representation from the Corps of
9  Engineers.  That's just off the top of my head.
10   Q.   Sure.
11   A.   Again, I'm sure the phone list would tell
12 a better picture.
13   Q.   Sorry to bounce around here, but you
14 mentioned the participating early on in North Dakota's
15 initial and matured response to the protests when were
16 occurring on the Corps of Engineers land.  Did you say
17 that you often would physically participate in those
18 meetings?
19   A.   Meetings where, in the camp or --

ND OBJ:
Introduces new
material

20   Q.   No.
21   A.   Among --
22   Q.   Yeah.  Amongst the -- I guess first it
23 started with the Tactical Operations Center in Morton
24 County at the Law Enforcement Center there.  Did you
25 attend those meetings?

Jacob O'Connell
August 16, 2022

Page 66

1      A.   I would say I attended without fail
2   almost every day up until we had resources structured
3   for someone else to attend them.
4      Q.   When was that transition?
5      A.   I don't recall off the top of my head
6   when that happened.  I can't remember if it was in
7   2016 or the beginning of 2017, but it was a big
8   portion of my life for that entire period.
9      Q.   Yeah.  What was it like on a day --
10  typical day when you were in the -- first the Morton
11  County meeting area?  What did it seem like?  Can you
12  describe what that environment looked like and how you
13  were a part of it?
14     A.   The Morton County operations center was
15  at the sheriff's office.  It was in a room that was
16  approximately I'll say the size of a large courtroom.
17  And it had people arrayed kind of on the perimeter of
18  the room.  And then there was a set of tables up in
19  the front that you'd have the sheriff or kind of the
20  briefers mingling around.  And then there was chairs
21  arrayed in the center that, you know, people who were
22  attending the briefs could sit on.
23     Q.   And so did they last all day?  Were they
24  a couple of hours?  What did that seem like?
25     A.   I don't recall if they started at eight

**ND OBJ:** Introduces new material

Page 67

1   or nine, but my daily rhythm was I'd try to get down
2   to the camps and, you know, see what was going on,
3   collect some kind of real-time intel from the troopers
4   or protesters who were along the road.
5           And then I'd go back to participate in
6   the briefing -- the daily briefing.  And I want to say
7   it was 8 or 9 o'clock every morning.  And they could
8   last a couple hours.  They could go -- depending on if
9   there was some activity that they were tracking, they
10  could go on for, you know, 24 hours.
11          There was no, you could say, regular
12  rhythm other than you knew there was going to be a
13  daily brief.  In the beginning I think there was
14  actually two.  I think there was one at eight or nine
15  in the morning and then one at five or six at night.
16     Q.   You would start -- I think you said if --
17  I want to make sure I understand this.  Your daily
18  rhythm was first going down to the camp?
19     A.   Correct.
20     Q.   So you'd get up pretty early to do that
21  and drive down from Mandan or Bismarck?
22     A.   I would typically get up at 4:30, 5:00
23  and head south to the camp.
24     Q.   And were you staying in Mandan or
25  Bismarck?

Page 68

1      A.   I was staying at my house in Bismarck.
2      Q.   Okay.  You did that for months, sounds
3   like?
4      A.   I did.
5      Q.   Yeah.  When you spoke to the troopers
6   down in the field at the protest camp site and talked
7   to protesters, did you identify yourself as an FBI
8   agent to both groups or just to the troopers?
9      A.   I always identify myself truthfully
10  because to try to deceive somebody might cause you
11  bigger problems in the future.
12     Q.   Yeah.  Did the troopers welcome you or
13  react positively to you, given the fact that you were
14  an FBI representative?
15     A.   The reaction was typically very positive.
16  One team, one fight.  I mean, there were, you know,
17  some times where troopers might be focused on a
18  different threat and you're distracting them from
19  focusing on that threat.  So they could be short or
20  clipped, but all in all, you know, on the street, face
21  to face the relationships were usually very good.
22     Q.   Yeah.  How about what was the nature of
23  the reaction or reactions from protesters that you
24  identified yourself as an FBI agent?
25     A.   It was mixed to -- from general curiosity

Page 69

1   to, you could say, aggressive statements like you're
2   not welcome here, but not being in the good-news
3   business, you kind of learn how to diffuse people.
4   And I'd just ask them outright if I needed to be
5   concerned with my safety, and they'd always say no.
6   And from that point on, it was usually a very
7   respectful confrontation.
8      Q.   In the event someone said to you
9   something not accommodating to respecting your safety,
10  were you prepared to defend yourself?
11     A.   Absolutely.
12     Q.   How would you have done that if someone
13  threatened you, aggressively threatened you?
14     A.   That's a hypothetical I'd prefer not to
15  get into.
16     Q.   Sure.  Let me try and do a better job of
17  asking.  You're a trained law enforcement individual
18  and you know how to use a field weapon if someone were
19  to attack you and threaten your life; correct?
20     A.   I've been trained in the use of deadly
21  force.
22     Q.   Yeah.  Do you carry a firearm?
23     A.   Yes, I do.
24     Q.   On the days that you would go down to the
25  camps and speak with individuals that included

Jacob O'Connell
August 16, 2022

Page 70

1  protesters and you identified yourself as an FBI
2  agent, in those instances were you wearing your
3  federal law enforcement firearm?
4        A.   I would always be armed, but it would be
5  concealed, with the exception of certain events where
6  there was a high risk of physical confrontation versus
7  just regular day-to-day FBI meeting with members of
8  the public.
9        Q.   And when you went down to the camps, you
10  left your home early, early morning to get to the
11  camps, that was often before the sun came up, wasn't
12  it?
13        A.   Correct.
14        Q.   Would you be the only individual in your
15  vehicle traveling down to the camps to do those
16  routine visits and evaluations that you conducted?
17        A.   Correct.
18        Q.   Did some of the people -- the protesters
19  that you're referring to, did they include people that
20  were paid or volunteer sources of information provided
21  to you as a federal official?
22        A.   Can you repeat that question, please.
23        Q.   Yeah.  Let me be more direct.  Did some
24  of the people that you drove down to the camps to meet
25  with or talk to, scheduled or unscheduled -- were they

Page 71

1  people who were either compensated or voluntarily
2  willing to provide you with information about
3  conditions in the camp?
4        A.   I never -- I'm going to ask again if you
5  can clarify the question.  Are you referring to
6  individuals who were considered sources?
7        Q.   Yes.
8        A.   No.  I never -- that was not my job to
9  manage sources.
10        Q.   Whose job was it to manage sources?
11        A.   It would have been the agents I
12  supervise.
13        Q.   How many of those agents were down at the
14  camps monitoring the camps and managing sources in the
15  camps?
16        A.   Typically there would not be a lot of
17  agents down managing sources at the camps because it
18  would be not -- it would not be considered good
19  tradecraft to go meeting a source by the camp.  So we
20  typically never met sources around the camp.
21             As far as, you know, talking to just
22  informal people at the gates or on the road or
23  sometimes even in the camp, that was more out of just
24  seeing what information would come out.  But again,
25  getting that firsthand look at things, that would give

Page 72

1  me the ability to evaluate other information that was
2  presented at the daily briefings.
3        Q.   I see.  I see.  The agents that were
4  supervising sources that were in or around the camps,
5  how did they communicate with those sources?
6        A.   Typically there would be telephone
7  communications, sometimes e-mail depending on the
8  [REDACTED]
9  [REDACTED]
10  [REDACTED]
11        Q.   Was it -- can you describe how sources
12  came to be located in the camps?  Were they recruited
13  or did they seek out the FBI?  How did that work?
14        A.   I don't want to get into specifics of our
15  tradecraft when it comes to specific sources that were
16  in DAPL, but in general terms, I think it's accurate
17  to say that when we look at a situation that's
18  unfolding, we try to identify somebody who's either in
19  a position to assist us and we try to recruit them.
20             Also, we'll go out across the Bureau and
21  look for a specific profile in existing sources and
22  find out if any of them are willing to pursue the
23  collection of information due to whatever attributes
24  they have.
25        Q.   I understand.  When did that program

Page 73

1  begin in terms of people physically -- sources of
2  information and monitoring inside the camp, when did
3  those people first begin to take hold in the camps?
4        A.   I'd say our first source operations
5  started in towards the end of August, maybe the
6  beginning of September.  It was early on.  You know,
7  again, it was nothing -- it was more opportunistic
8  than calculated.
9        Q.   But as of late August of 2016, September
10  time frame, you had sources of information inside the
11  camps on Corps property?
12        A.   Yes.  And I would say the number of
13  active sources would be somewhere between one and ten.
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  always-changing circumstance, I suppose; is that
18  right?
19        A.   I don't understand.
20        Q.   That number would vary from time to time?
21        A.   Yes, very much so.
22        Q.   Can you explain why the variation would
23  occur?
24        A.   Every source is different.  Their level
25  of commitment and their motivation for cooperating

71:13-72:2;
72:11-73:13
401-402

Jacob O'Connell
August 16, 2022

Page 74

▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

10      Q.   Yeah.  And so by participating in the
11 North Dakota response to the protests on the Corps
12 property that you started to tell me about the Morton
13 County and then the State Emergency Operations Center,
14 in your course of doing that on a regular basis that I
15 think you said was the case, you received regular
16 status reports regarding the protesters' occupation of
17 the Corps land?
18      A.   Can you repeat that question?
19      Q.   As part of your participation in the
20 North Dakota-centric law enforcement response to the
21 protests on the Corps property, you were getting
22 status reports from the North Dakota law enforcement
23 group in those meetings regarding the protests; right?
24      A.   Yes.  We participated.  I wouldn't say
25 that -- we relied on other information, but, you know,

Page 75

1 we were part of the response.
2      Q.   Sure.  Sure.  And I understand what
3 you're saying.  You didn't just rely on North Dakota
4 for information, is what I understood you to say;
5 right?
6      A.   Correct.
7      Q.   And I know you've told me about your
8 direct monitoring and going to the camps themselves.
9 And would one camp that you would visit be the main
10 camp, the one that was north of the Cannonball River?
11      A.   I went to all three camps.
12      Q.   Okay.  And you mentioned the source
13 program that the agents that you supervised
14 administered.  So I appreciate you didn't just rely
15 upon North Dakota-provided information, but is it
16 accurate, Mr. O'Connell, that you also saw the live
17 footage from the predator drone that was operated by
18 the Grand Forks office of the United States Customs
19 and Border Patrol?
20      A.   I recall viewing it at certain instances
21 when it would be up on the screen at the Law
22 Enforcement Center, but I didn't have -- I mean, it
23 wasn't part of our regular routine because it was --
24 you know, we weren't in an environment where we needed
25 that level of information.

Page 76

1      Q.   But you saw the footage from those drones
2 as they flew over the protest camps on Corps property?
3      A.   Yes.  I viewed some of the video at
4 times.
5      Q.   Do you recall when -- what period of time
6 you were viewing that footage?
7      A.   Not with specificity.
8      Q.   Do you know what happened to those
9 customs and border patrol drones?
10      A.   Can you expand on that question, please?
11      Q.   Was there a period of time when they were
12 no longer there?
13      A.   There was a period of time where -- I
14 don't recall the actual timeline and everything, but I
15 remember they got pulled back for, you know, whatever
16 the reason was.  I don't know if it was internal to
17 CBP or if it was political beyond that, but there
18 really wasn't that big of a fight about losing them
19 because they weren't as capable as we needed.  They
20 just flew too high.
21      Q.   I see.  So they would not have been as
22 effective or informationally helpful as the ones that
23 you sought from the FBI's CIRG group, the group -- the
24 FBI drone unit?
25      A.   Correct.  Different capabilities,

Page 77

1 different applications.
2      Q.   The ones that you were trying to garner
3 to lend support to the effort, those would have been
4 more suitable, sounds like?
5      A.   Absolutely, because they flew at a lower
6 altitude.
7      Q.   Did you also view in the North Dakota Law
8 Enforcement Center other types of information that was
9 projected on the screen in those briefings, like North
10 Dakota Highway Patrol helicopter footage, FLIR cameras
11 and photography and video, that kind of thing?
12      A.   Yes.  I recall seeing -- I want to say
13 the call sign was 299, and that was their aircraft
14 that has those capabilities.  And they flew the wings
15 off that thing for the initial response to DAPL.  And
16 that would be somewhere around the 3-, 400-foot
17 altitude.  So it was pretty informative, but again, it
18 wasn't specific enough for our uses.
19      Q.   Not specific enough for federal uses for
20 which you sought your own resources?
21      A.   Correct.  We were looking to enhance the
22 state capabilities, not replace their capabilities.
23      Q.   Right.  And you wanted to enhance their
24 capabilities.  Was that just for your benefit and the
25 FBI or was that for your intended benefit to North

Jacob O'Connell
August 16, 2022

Page 78

1   Dakota as well?
2       A.   That was for the benefit of the
3   collective response.  We wanted to be able to have
4   better coverage of our sources, and at the same time
5   we wanted the state to have resources that would allow
6   them to manage their resources in the sake of officer
7   safety and capability.  And it was also for the
8   greater awareness of the law enforcement response.
9       Q.   Do you think all of those objectives that
10  you had in mind were understood by your more senior
11  FBI management?
12      A.   I feel very strongly that they understood
13  exactly why we wanted the resources and what they were
14  for.  And that was articulated both in conversation
15  and in e-mail back and forth.
16      Q.   Do you have any reason to believe that
17  Mr. McCabe did not understand that?
18      A.   Andy McCabe is a very capable
19  professional.  I'd be really surprised if he didn't
20  understand what was going on.
21      Q.   Notwithstanding that, the decision was
22  made to call back those federal resources that were
23  ready to go?
24      A.   Again, I want to stress that I don't have
25  firsthand knowledge because I didn't speak to Andy

**78:21-79:2 Offer if testimony re: FBI drone comes into evidence**

Page 79

1   McCabe, but I do know that the resources were provided
2   and they were prepared and then they were recalled.
3       Q.   Understood.  Thank you.  And you also
4   mentioned -- and I appreciated that.  You told me at
5   the outset that you strive to be a member of your
6   community, a community that you lived in, and that
7   included the federal relationships, the state
8   relationships, and a pretty significant swath of the
9   private sector of the community, educational, which
10  could be public and private, and religious groups and
11  others.  And then you also mentioned the business
12  community as well.  Did that include talking with,
13  seeking out, and communicating with the company that
14  was developing the Dakota Access Pipeline?
15      A.   Yes, it did.
16      Q.   Why did you take an interest in
17  communicating with those folks?
18      A.   As a law enforcement professional, the
19  only way you know what's going on is if you know who's
20  involved.  And it was apparent from my perspective
21  that Energy Transfer Partners through their business
22  operations and satisfied their desire to install that
23  pipeline were the genesis of the entire protest.
24          So they were also the victim in it and
25  they were quite often a source of information.  So to

Page 80

1   me it was just common sense to go out and have a
2   relationship and know who to call and who to ask
3   information of.
4       Q.   Sure.  That makes sense.  Much like if
5   someone's business was broken into or a person was
6   attacked, you would speak to the victim or the person
7   that suffered the event; right?
8       A.   That's probably not the best example, but
9   again, the issue going on with Energy Transfer
10  Partners butted up against an ideology.  And the
11  ideology was what created that potential federal
12  nexus.
13      Q.   Yeah.
14      A.   So there's a distinction, I think, that
15  needs to be acknowledged.
16      Q.   Thank you for clarifying that.  I
17  understand.  With regard to the other federal
18  agencies/entities that you also served in your liaison
19  capacity with the FBI, I believe you mentioned the
20  Corps of Engineers?
21      A.   Yes.
22      Q.   Can you describe what kind of contact and
23  interaction you had with the Corps?
24      A.   During the beginning, the first couple
25  months of the protests, there was a lot of activity

Page 81

1   that involved communication with the Corps.  So while
2   my responsibilities did not include being a primary
3   participant in discussion with the Corps, I was often
4   in the room or subject to witnessing conversations
5   between the Corps and other members of the leadership
6   team for the State of North Dakota.
7       Q.   Okay.  And who was the individual or
8   individuals from the Corps that you spoke with or
9   witnessed speaking with others?
10      A.   I don't recall their names.  I do recall
11  that I think they came out of, like, Omaha or Kansas
12  City or someplace where their headquarters was.
13  Again, the nature of the contact was always focused on
14  jurisdiction and actions that the Corps of Engineers
15  could take to try to lessen the activities of the
16  protesters.
17      Q.   And that was from the Corps' perspective,
18  those things?
19      A.   That's a collective perspective of my
20  own.  Like I said, I wasn't a direct participant
21  because that's not the role of the FBI to, you know,
22  figure out real estate and title rights and what's
23  authorized activity and who has jurisdiction.
24      Q.   Sure.  Were you aware early on -- the
25  phrase you used, I think, in August/September that

**81:24-82:7 602; 802**

Jacob O'Connell
August 16, 2022

Page 82

1    DAPL protesters were physically present on Corps of
2    Engineers-managed land?
3        A.   I was told that land was Corps of
4    Engineers, due to the water rights when they flooded
5    Lake Oahe; but as I also stated, I did not personally
6    sit down and start researching the record to see what
7    my own personal interpretation was.
8        Q.   Protesters were building or built
9    structures and roads in the protest camps, though,
10   right, on the Corps property?
11            MS. BOBET:  Objection; assumes facts.
12   You can answer.
13       A.   I don't know what I'd call a road, but, I
14   mean, there was designated traffic ways in the camp.
15       Q.   (BY MR. SEBY) Gravels roads?
16       A.   Excuse me?
17       Q.   Gravel roads?
18       A.   I wouldn't characterize it as a proper
19   gravel road.  I think they just brought it in to
20   promote trafficability when things started to get wet.
21   I mean, they were fairly organized in how they did
22   things in the beginning, but again, I don't think they
23   had, like, a road construction committee that sat down
24   and said, All right, we're going to start to build out
25   the infrastructure for the camp.  It was more

Page 83

1    commonsensical things that they could do that
2    furthered the effectiveness of the protests.
3        Q.   Structures were built, though; right?
4        A.   My perception is that they were rather
5    primitive, "primitive" meaning, you know, dig a hole,
6    put a post in the ground, nail boards to it.  I didn't
7    see any -- and, again, going through the camps, I
8    never saw anybody digging foundations or bringing in,
9    you could say, manufactured homes or anything.  There
10   was nothing like that that I was aware of.
11       Q.   Large numbers of the DAPL protesters in
12   the camps that you witnessed were not members of the
13   Standing Rock Sioux Tribe; right?
14       A.   Correct.
15       Q.   The FBI learned of certain conditions
16   occurring in the camps?
17            MS. BOBET:  Objection; vague.  You can
18   answer.
19       A.   Could you clarify the question just from
20   a standpoint of sharpening which direction, because we
21   can go in a lot of directions with that question.
22       Q.   (BY MR. SEBY) Yeah.  Yes.  I will do
23   that.  The protest camps that you witnessed and
24   monitored, as you've explained, there was sex
25   trafficking going on in those camps, wasn't there?

Page 84

1            MS. BOBET:  Objection; foundation,
2    assumes facts.  You can answer.
3        A.   There were allegations of such activity.
4    I know that we -- I recall we had a couple of cases
5    that were focused on a couple of claims of such
6    activity, but we couldn't ever define it.  But I want
7    to say that we actually had some child forensic
8    interviews that occurred.
9            That might have even been after DAPL, but
10   we didn't find any widespread criminal activity in the
11   camps beyond, you know, drug use and -- I don't want
12   to say hooliganism because that's kind of hard to
13   define, but, I mean, there was a lot of petty
14   misdemeanor-type activity going on.  But when it came
15   to human trafficking, sex trafficking, I think there
16   was a lot of rumor, innuendo, hyperbole that produced
17   those kind of sensational claims.
18            MS. BOBET:  Just for the record, we'll
19   designate the portion of Mr. O'Connell's response
20   regarding investigative techniques on this topic as
21   confidential.
22       Q.   (BY MR. SEBY) There were drugs in the
23   camp?
24            MS. BOBET:  Objection; foundation.  You
25   can answer.

Page 85

1        A.   I don't have firsthand knowledge of how
2    many drugs and what kind of drugs, but I do know that
3    we had reporting that indicated there was, you could
4    say, personal use-type drugs that were in there,
5    whether it be hallucinogenics or opioids, pills,
6    marijuana, some -- I want to say -- you could say
7    drugs that are specific to the Native American
8    culture, peyote, things like that.  But, you know,
9    again, it wasn't our role to go into the tent and
10   conduct a search and look for that information.  It
11   was purely reference, you could say.
12       Q.   (BY MR. SEBY) Weapons in the camps?
13       A.   Similar to drugs, there was reports of
14   weapons, stockpiles, caches.  However, the more we dug
15   into that, the less we found those reports to be
16   credible.  And then obviously there was open-source
17   reporting regarding a protester who had, I believe, a
18   revolver in her pocket and tried to shoot a trooper
19   and ended up, I think, grazing his leg.
20       Q.   Are you referring to Red Fawn Fallis?
21       A.   I believe so.
22       Q.   She took the service weapon from an FBI
23   individual, didn't she, who was her boyfriend?
24            MS. BOBET:  Objection; foundation,
25   assumes facts.  You can answer.

Jacob O'Connell
August 16, 2022

Page 86

1    A.   Yeah.  You're way off base there in the
2  sense that it was not a service weapon that I'm aware
3  of, meaning it had any ties to a formal law
4  enforcement agency.  It wasn't taken or given.  I'm
5  not sure of how the actual transfer of the firearm
6  went into her possession.
7        I've seen some reports and I don't think
8  it would be proper for me to speak about any type of
9  relationship we have with individuals, whether it be
10  formal or informal, as it relates to that
11  investigative activity.
12    Q.   (BY MR. SEBY)  Okay.  Did you monitor the
13  presence of an individual named Legacy?
14    A.   Name sounds familiar as far as one of the
15  individuals who was, you could say, identified by law
16  enforcement.  As far as, you know, deliberate attempt
17  to conduct surveillance on him on an ongoing basis, it
18  did not occur.
19    Q.   Was he known to the FBI prior to the DAPL
20  protests?
21    A.   I can't answer that question with
22  specificity.  I don't know.  Yeah.  I can't recall
23  with specificity.
24    Q.   How about Faith Spotted Eagle?
25    A.   I do not recall that name.

Page 87

1    Q.   Who are the Red Warriors?
2    A.   I don't think there's a definitive answer
3  to that question.  From our perspective the Red
4  Warriors were -- I would describe them as a wannabe
5  gang who claimed to have a certain allegiance to some
6  of the core values that serve as the foundation of the
7  protest, you know, nature, environmental,
8  ecological-type beliefs and opinions, but they changed
9  so much in structure and organization, personalities
10  who would be identified as, you could say, leadership
11  revolved.
12        There was a lot of infighting.  You had
13  people who would get thrown out of the Red Warriors.
14  So I think to just the layman down there the Red
15  Warriors were considered, you know, kind of the bad of
16  the bad.  But the more we dug into it and the more we
17  tried to understand the ideologies and activities, it
18  became apparent that they were just a loose-knit
19  organization of individuals who had kind of a common
20  desire to participate in an activity that probably was
21  something they had never experienced before in their
22  life.
23    Q.   Most people in the protest camp on Corps
24  property were not from North Dakota; right?
25    A.   We never set up, like, a mass effort to

Page 88

1  try to identify everybody, but one of the things I
2  would always note when I went into the camps would be
3  the license plates.  And, I mean, there was license
4  plates from all over the United States, Canada.  I
5  think we even saw a couple of Mexican plates that were
6  there.
7        You know, sometimes you'd see them a
8  second time.  Sometimes you'd only see them once.
9  Sometimes the car would get abandoned.  There was
10  no -- there wasn't, like, a running roster of who was
11  participating and where they came from.
12    Q.   Did you see horses in the camps?
13    A.   Yes, I did.
14    Q.   And vehicles?
15    A.   Yes, I did.
16    Q.   A couple?  Lots of them?  Hundreds?  How
17  many?
18    A.   I would say hundreds.
19    Q.   So based upon your going down to the
20  camps and talking with your agents that you
21  supervised, field agents who were managing their
22  sources in the camps, you had a pretty good sense of
23  what North Dakota law enforcement was facing from the
24  protesters on the Corps property; right?
25    A.   I feel I had an appreciation for the

88:19-
89:20
401-402

Page 89

1  magnitude of the potential and who was present, but it
2  was anybody's guess as to which way that was going to
3  go just because, you know, we're 50 percent of the
4  equation.
5    Q.   Right.  You became aware that the
6  protesters in the camps on Corps property were using
7  the camp to organize and prepare to conduct activities
8  off of the camp property, protest activities?
9    A.   Yes.  Yes, we did.  Hold on here.  I
10  mean, we weren't focused on protected activities.  In
11  fact, the Bureau would run away as fast as it can from
12  protected activities, but when the potential for
13  criminal activity is there and we can articulate why
14  we believe that, we're there watching.
15        And so, yes, we paid attention to what
16  was going on and we were trying to figure out what was
17  the direction of travel, the purpose, the motivation,
18  and, again, trying to preserve the rule of law, take
19  care of the community, and protect other law
20  enforcement entities.
21    Q.   How did you do those things with just
22  yourself and the handful of special agents that you
23  managed?  How did you think you -- I'm not being
24  critical.  I'm just asking to understand what you
25  meant.  How did your small group serve 50 percent of

89:21-
90:16
Offer if
preceding
testimony
comes
into
evidence

Jacob O'Connell
August 16, 2022

Page 90

1  the mission when the hundreds of North Dakota law
2  enforcement wasn't enough to do it?
3        A.   Again, it comes back to the FBI's nature
4  and capabilities and its mandate.  There's a big
5  difference between the FBI conducting operations in a
6  very deliberate, focused, thoughtful manner versus a
7  uniform patrol officer from whatever jurisdiction
8  reacting to a call on the ground from the bad guy.
9             So when I say "50 percent," I mean that
10 the protesters were the other 50 percent and we
11 couldn't control them other than loosely.  But our
12 focus was helping law enforcement be as aware as
13 possible as to who were the protesters, what their
14 motivation was, how they were resourced, and anything
15 we could to predict where their activities were going
16 to occur.
17       Q.   Okay.  And so you were doing all of those
18 things for the benefit of who?
19       A.   Everybody.  Everybody from FBI
20 headquarters through the Minneapolis division to the
21 Bismarck field office, the FBI personnel over to the
22 Emergency Operations Center and into the, you know,
23 tens of law enforcement agencies that responded
24 through the interstate compact.
25            I forget the exact name for it, but there

Page 91

1  was a lot of resources that came in and we tried to
2  support them with information.  It wasn't always
3  appreciated.  It wasn't always acted upon, but we did
4  our best to fulfill what would be considered our
5  organizational -- organization's capabilities.
6        Q.   So do you agree with me that North Dakota
7  was faced with a really volatile and dangerous
8  situation for many, many months?
9        A.   Absolutely.
10       Q.   Mr. O'Connell, it's an hour later for you
11 in the Central Timezone.  So it's quarter after 12.
12 Do you want to take a lunch break now or keep going a
13 little bit longer and -- maybe for another 20 minutes
14 or so?  What is your desire?  I'm flexible and just
15 want to respect the fact that you're closer to in the
16 noon hour than I am.
17       A.   I'd rather power through.  I want to be
18 as cooperative as possible and just answer your
19 questions fully and get on with my day here in North
20 Dakota.
21       Q.   I understand.  Thank you.  I do wish to
22 take a lunch break, but I can -- I don't need to do
23 that right now.  So let's keep going, as you said.
24            MS. BOBET:  While we're taking a pause, I
25 don't want to interrupt the flow of your questioning,

Page 92

1  Mr. Seby, but I'll note for the record --
2             MR. SEBY:  Why don't we go off the record
3  if we're going to chat about --
4             MS. BOBET:  No.  There's something I want
5  to note for the record, is that we'll designate
6  Mr. O'Connell's responses regarding FBI sources as
7  confidential.  We'll give you those exact lines once
8  we've got the transcript, but I want to make sure to
9  say it on the record.  Please proceed.
10       Q.   (BY MR. SEBY) So, Mr. O'Connell, were you
11 aware of the Standing Rock Sioux Tribe and the other
12 tribes that were parties with it, they sought a
13 preliminary injunction from the United States District
14 Court in Washington, D.C. against the Corps to stop
15 their permitting and approval process for the pipeline
16 construction?
17       A.   I recall that occurrence and I recall the
18 fact that the construction of the pipeline halted
19 within a certain mileage of the Missouri River.
20       Q.   Yeah.  The halting didn't occur, though,
21 as a result of an order by a federal court, though,
22 did it?
23       A.   I don't know.  I wasn't paying attention
24 to it.  That would have been something that General
25 Dohrmann and some of the politicians would have been

Page 93

1  paying attention to.
2        Q.   Do you recall on September 9 -- the
3  morning of September 9 Eastern Time the United States
4  District judge -- Boasberg is his name -- denied the
5  effort by the Standing Rock Sioux Tribe for a
6  preliminary injunction against the Corps, September 9,
7  2016?
8        A.   I don't recall that date with
9  specificity.  I mean, I remember that it went back and
10 forth and, you know, it was the subject of
11 conversation, but again, it wasn't something that I
12 focused on because it really didn't affect how I did
13 business with the FBI.
14       Q.   Did the fact that later that same day the
15 Department of the Army and the Department of Justice,
16 which houses the FBI, and the Department of Interior
17 issued a joint statement?  Do you recall that?
18       A.   I recall that there was a lot of, you
19 could say, beltway political activity that went on
20 regarding policy and reference to the activities
21 ongoing with the protests and the pipeline, but again,
22 I didn't study that aspect.  I recall maybe reading
23 the judgment later just out of personal curiosity, but
24 again, I'm not a student of law.  I simply try to
25 enforce it.

Jacob O'Connell
August 16, 2022

Page 94

1    Q.    You mentioned that you early on -- and I
2    understand that to have been August,
3    mid-August 2016 -- followed the protest camps on Corps
4    land.  You observed them firsthand, then, growing
5    rather quickly, didn't you?
6         MS. BOBET:  Objection; misstates
7    testimony.
8    A.    Yes, I did.
9    Q.    (BY MR. SEBY) I'm sorry.  Mr. O'Connell,
10   your counsel spoke over you.  What were you saying?
11   A.    Yes, I did notice that the camps grew in
12   size.
13   Q.    How would you describe the nature of that
14   growth and increase in camp populations and all the
15   stuff that came with the people?
16   A.    It went from being kind of like a small
17   festival to over the course of days and weeks turning
18   into a very large assembly that became structured and
19   organized.  And, again, you could see it in the
20   license plates that were coming through, but there
21   were records out there of car counts and horse counts
22   and trailer counts and garbage dumpster counts.  I
23   mean, there was a lot of information out there that
24   could answer that question more accurately than I can.
25   Q.    Was it the responsibility of the Standing

Page 95

1    Rock Sioux Tribe to keep control of the protest camps?
2    A.    I do not think there was any statutory
3    obligation for them to try to control the camps.
4    Q.    Did they as a practical matter?
5    A.    I think they were counterproductive to
6    the interests of the community at large.
7    Q.    And why do you say that?
8    A.    I recall Dave Archambault made statements
9    and took actions to actually, I think, motivate
10   additional participants and visitors to the protests.
11   There was a lot of celebrities that came down.  You
12   had the tribal council, I think, pass some referendum
13   or had a tribal council vote about the protests and
14   either supporting them with water.
15        There was a lot of little activities
16   that, from my perspective, it did not help the State
17   of North Dakota.  And, if anything, it exacerbated the
18   ability of law enforcement to try to, again, preserve
19   the interests of the community at large.
20   Q.    Are you aware of the FBI ever
21   communicating to the protesters against the Dakota
22   Access Pipeline on Corps property that they needed to
23   leave that property?
24   A.    I do not recall any such activity by the
25   FBI in an official capacity and in a broad manner.

95:20-96:6
401-402

Page 96

1    I'm sure there would have been either myself or our
2    other agents who in a one-on-one conversation with
3    people would have said, You know, you could probably
4    make things a lot easier if people weren't here or
5    went back home.  I'm not aware of any statement made
6    by the FBI.
7    Q.    Are you aware of any other federal agency
8    that took any steps to communicate to the DAPL
9    protesters on Corps property that they needed to
10   leave?
11   A.    I'm not aware specifically, but, I mean,
12   I recall there was a number of efforts by a broad
13   range of entities that, you know, included the
14   governor's office, General Dohrmann, Kirchmeier.
15   Q.    I'm sorry.  I said any other federal
16   agency or representative, not the state people who
17   obviously did not want them to be there.
18   A.    Yes, I understand that.  What I'm trying
19   to say is that I know they went down and had
20   conversations at certain points, and I do not recall
21   if there were federal representatives with them.  I do
22   seem to think the Corps of Engineers participated in
23   one of those site visites and discussions.
24   Q.    Participated or affirmatively said, Get
25   off our property?

Page 97

1    A.    I can't answer that with specificity.  I
2    don't recall the nature of the communication, but I
3    know at some point the Corps of Engineers issued a
4    statement that, you know, they were not going to stop
5    it or try to push them off the land.  And I don't
6    recall if there was ever something that was contrary
7    to that.
8    Q.    Are you referring to the November 25,
9    2016, letter by Colonel John Henderson, the Omaha
10   district commander, to 16 tribal chairmen?
11   A.    I'd have to see the document that
12   mentioned it, because, again, I recall the Corps of
13   Engineers was involved and widely viewed as being
14   nonsupportive of the rule of law.
15   Q.    Okay.  Are you aware of any federal
16   agency or law enforcement that issued a citation for
17   trespass on federal public lands to any protester?
18   A.    I'm not aware personally.  The FBI
19   doesn't issue citations.
20   Q.    Right.  You mentioned the horse incident
21   early on.  Do you recall a September 3 incident that's
22   apparently commonly referred to as "the dog-bite
23   incident"?
24   A.    I do recall that.
25   Q.    What do you recall about that event,

97:15-19
602

Jacob O'Connell
August 16, 2022

Page 98

1  circumstances and whatnot?
2        A.  There was a private security firm that
3  was hired by -- I want to say Energy Transfer Partners
4  that was down providing overwatch security for the
5  pipeline workers who were there moving dirt.  And I
6  seem to recall there was a number of dozers and some
7  other personnel and trucks.  Then you had the security
8  group there, and they had some dogs.
9            And then when they became visible from
10  Highway 1806, they were basically set upon by a mob
11  who jumped the fence, trespassed on private land and
12  the rancher, and kind of overwhelmed the security to
13  the point where there was kind of an evacuation order
14  given.
15           And in the effort to provide overwatch
16  for the employees to get out of there, the security
17  basically set up a line of confrontation.  And the dog
18  was involved in that and the guy got bit, or girl.  I
19  forget who got bit.  But, you know, we observed it.  I
20  didn't have firsthand observation, but we were kind of
21  over on the road and we could see everything that was
22  going down.  And we just sat there and acted as good
23  witnesses.
24        Q.  Are you aware that the photograph of the
25  young girl bit in the face by a dog did not actually

Page 99

1  occur at that event?
2        A.  I seem to recall -- I do recall that
3  there was some fraudulent social media activity
4  related to that protest, that a Google Image search
5  identified the photo that occurred had been taken, I
6  think, years before the actual protest.
7        Q.  But you said that the incursion was on
8  private land where that event took place?
9        A.  Correct.  It was on the right-of-way that
10  was established for the pipeline, but it was on
11  private land.
12        Q.  And who were these people that entered
13  onto that private land?
14        A.  I don't know their identity with
15  specificity, but I think it's --
16        Q.  Were they -- is it fair to say they were
17  DAPL protesters going to confront the construction
18  crew on the private property?
19        A.  Absolutely.
20        Q.  Yeah.  Did the FBI or any other federal
21  agency develop federal law enforcement plans?
22            MS. BOBET:  Objection; vague, calls for
23  speculation.  You can answer.
24        Q.  (BY MR. SEBY) I can give you an example
25  of the kind of thing that I'm asking about.  Mass

Page 100

1  casualty plan?
2            MS. BOBET:  Objection; calls for
3  speculation.  You can answer.
4        A.  I don't recall a discussion of, like, a
5  mass casualty event.  You know, again, from my
6  perspective, mass casualty is going to be 30, 40, 50,
7  100, a thousand casualties.  And I know we talked
8  about resources for just a regular response to either
9  a vehicle accident or protesters that would be injured
10  by a law enforcement vehicle, what were the resources.
11        I mean, that's standard contingency
12  planning for any type of law enforcement activity.  We
13  participated at various levels, but I don't think
14  "mass casualty" was the vernacular used.
15        Q.  (BY MR. SEBY) How about another type of
16  federal law enforcement plan?  Did you develop any of
17  those, you or any other federal law enforcement
18  agency?
19            MS. BOBET:  Form.
20        A.  I'll just say I need to -- you need to
21  clarify what kind of plan or a name.  I mean, we live
22  and breathe SOPs and plans and doctrine.  So you'd
23  have to sharpen that question, please.
24        Q.  (BY MR. SEBY) Well, I don't know, so I'm
25  asking the question.  Did the FBI develop any written

Page 101

1  plans and SOP -- what's an SOP?
2        A.  Standard operating procedure.
3        Q.  So which standard operating procedures
4  were developed in writing by the FBI with respect to
5  the DAPL protests?
6        A.  I don't recall anything that would be
7  considered an official FBI response plan.  We had
8  unofficial -- what I would consider unofficial
9  documents that tried to, you could say, formalize a
10  basic hierarchy of the resources that were coming in
11  from the FBI and how we would fold into some of the
12  activities that were going on.
13        And, you know, again, there was a big
14  difference between official FBI policies and
15  procedures and a local field office or even Bismarck
16  RA coming up with what would be considered a
17  structured activity.
18        Q.  So they weren't official FBI because they
19  weren't developed outside of the FBI field office in
20  North Dakota?
21        A.  Correct.
22        Q.  But they were still developed using FBI
23  resources by FBI personnel in North Dakota; correct?
24        A.  Correct.
25        Q.  Where are these plans?

Jacob O'Connell
August 16, 2022

Page 102

1    A.   I have no idea.  I mean, everything we
2  had was provided through discovery.  That would be a
3  better question for the U.S. Attorney's Office.
4    Q.   I don't have them.
5    A.   Again, I mean, I'm not aware of anything
6  outside of my area, meaning my recollection, of a
7  specific document from a specific time that would be
8  responsive to your question.
9    Q.   Do you think that the federal government
10  should have helped North Dakota?
11    MS. BOBET:  Objection; vague, calls for
12  speculation.  You can answer.
13    A.   I think the FBI could have done more to
14  support the State of North Dakota.
15    Q.   (BY MR. SEBY) What sorts of things are
16  you thinking about, Mr. O'Connell?  What more could
17  the FBI have done?
18    A.   I think the FBI had a mandate to provide
19  resources at its disposal to include aviation
20  resources, to include technical resources, for
21  communications, for evidence gathering.
22    And I think the FBI should have put a lot
23  more energy into investigating the crowd-source
24  funding.  I think that's something that's going to
25  come back to haunt people with the way the money

Page 103

1  transferred between idealogues who were not
2  participating in the protests to individuals who were
3  basically paid protesters, paid idealogues, almost
4  mercenary in nature.
5    Q.   And it sure seems to me like you
6  certainly wanted to help North Dakota, you personally;
7  is that fair to say?
8    A.   I think myself and the division wanted to
9  help.
10    Q.   And you and the division tried to get
11  that help; is that right?
12    A.   I feel we did.
13    Q.   What happened?
14    A.   I do not know with specificity what
15  happened, but again, my experience in the Bureau and
16  operating and living in the District of Columbia and
17  working at headquarters is that there is a
18  night-and-day difference between the activities of a
19  field office such as Minneapolis and Bismarck versus
20  the, I'd say, structure, direction, and motivation of
21  the headquarters apparatus of the FBI on Pennsylvania
22  Avenue.
23    Q.   Do you think that -- were you satisfied
24  that you and the division leadership communicated
25  circumstances on the ground in North Dakota adequately

Page 104

1  to those above you in the FBI apparatus, as you said?
2    A.   I feel that we went above and beyond to
3  the point where it was a -- I don't want to say
4  career-detracting event, but, you know, if I was
5  somebody who was into pursuing the management side of
6  the FBI, I burned a lot of bridges down and I angered
7  a lot of people because frankly I think they took the
8  easier wrong over the harder right.
9    Q.   You mentioned the significant third-party
10  financial support being provided to protesters in the
11  camps or to get to the camps.  Did I have that right?
12    A.   Yes.
13    Q.   They were paid to be there?  People were
14  paid to come to North Dakota to come onto the Corps of
15  Engineers property and protest and do other stuff?
16    A.   Yes.
17    Q.   They were provided food and shelter?
18    A.   They were provided the means to obtain
19  food and shelter.
20    Q.   Do you think that the payment of the
21  means for food and shelter came within North Dakota or
22  outside of North Dakota?
23    A.   That's what I wanted to determine through
24  investigation.
25    Q.   Is it fair to say that you had a

Page 105

1  reasonable belief that you wanted to investigate
2  further that there was a concerted interstate effort
3  to fund and prolong and agitate the protesters?
4    A.   Absolutely.  It goes down the whole
5  threat continuum from -- you know, North Korea could
6  be putting up a thousand dollars to people to
7  destabilize, create, you know, anarchy, media events
8  or could be, you know, some individual living in
9  Oregon who didn't feel like they wanted to make the
10  trip, but they wanted someone else to do it.
11    So they'd go out on either the dark web
12  or, you know, elsewhere and communicate their desire
13  to support the protest.  And that would turn into
14  crowd-source funding, which ultimately undermined the
15  State of North Dakota and its response.
16    Q.   Did you have any indicia that caused you
17  to think that those things were plausible, that there
18  could be a motive going on to deploy and support this
19  kind of activity?
20    A.   Can you revisit that question, please?
21    Q.   Yeah.  I'm trying to understand -- and I
22  appreciate this is a sensitive topic.  What caused you
23  to believe that those things were even possible?  Why
24  you wanted to investigate to determine more
25  understanding?  Did you have hints or indicia of those

Jacob O'Connell
August 16, 2022

1  kinds of things being possible, plausible?
2       A.   I would say that if you're committed to
3  the rule of law and you take the oath to pursue
4  violations of federal law and you take five minutes a
5  day to read the newspaper and you see reports of, you
6  know, the Wall Street protests, some of the other
7  sit-ins that went on throughout the United States and
8  internationally, you always get down to motivation and
9  resources and a means to conduct such activity.
10      And it was readily apparent that some of
11 the individuals involved in the protests in North
12 Dakota didn't have the means to come to North Dakota
13 and live for four months down in a camp, you know,
14 without some form of support from somewhere.  And, you
15 know, the collection of information, you know,
16 originally was just we kind of have a responsibility
17 to figure out where the money is coming from because,
18 again, it could be international.  It could be
19 domestic.  It could be based on an ideology.
20      So to me that was the responsibility of
21 what the FBI is kind of organized to do.  That said,
22 we would get snippets of information from people,
23 usually through friendly conversation, that, you know,
24 they were being paid.  You know, say, sometimes it was
25 $100 a day.  Sometimes it was $300.  But, I mean,

1  there was a consistent collection and just open-source
2  reference to, hey, you know, if you want to go
3  protest, we'll do everything we can to support you.
4       And you could kind of see it in some of
5  the personalities that would come into the camp, is
6  that at the beginning it was all Native Americans and
7  there was a lot of beads and Native American icon that
8  came with it.  And then as time went on, you went from
9  having star blankets to having North Face sleeping
10 bags.
11      And so it was -- you know, you could see
12 that there was a change in the composition of the
13 protesters and that the motivation for being there was
14 switching from being purely based on the water
15 protectors to, hey, this is kind of a cool thing to
16 do, let's make a ruckus and get the media involved and
17 pursue the ideology.
18      Q.   Do you think the FBI just kept all of
19 this perception to itself or was that also known to
20 other federal agencies or representatives, that
21 circumstance?
22      A.   No.  It was discussed, but talk is cheap.
23 You know, you can sit around this very room talking
24 amongst law enforcement and everyone could nod north
25 and south that, yeah, we probably should look into it;

1  but when you want to take that second step and
2  actually, you know, start developing an intelligence
3  plan to address that gap, as we would call it, it just
4  never got anywhere because there was no desire by our
5  headquarters element or even some of the prosecutors
6  on the ground here to pursue it because it just
7  wasn't -- I have to -- I'm not trying to second guess
8  the individuals I'm referring to.
9       I didn't control their priorities.  So
10 they may not have thought it was a priority, but from
11 my perspective that was something that I think still
12 haunts us in the modern day when you consider some of
13 the activities that have happened with, you know,
14 these very aggressive protests across the United
15 States that are, in my opinion, driven by politics and
16 ideology versus shocking of the conscience.
17      Q.   Whoever and whatever it was that was
18 doing those things that you described, did they
19 include systematically paying bail for people who were
20 arrested for trespass and other offenses?
21      A.   I recall that there was an individual who
22 showed up at the courthouse and was paying bail.  And
23 that individual was known to Bob Perry because -- I
24 can't remember if he was in town and he just saw him
25 on the street or if he saw a picture of him in the

1  paper or read the name on one of the bail receipts,
2  but either way the bottom line was that that
3  individual was being funded to come up to North Dakota
4  and pay bail money and get people out of jail and get
5  them lined up with an attorney who could help them
6  navigate the law enforcement process to where they
7  would be typically released on their own recognizance.
8       Q.   Is it fair to say that you were both told
9  that the federal government would not help North
10 Dakota in instances where it was expressed by the
11 drone unit that came to North Dakota and then was
12 pulled back -- that that's the direct example, but
13 there were also instances that were indirect where you
14 mentioned that things were discussed, talk was cheap,
15 but priorities just never seemed to get it done.
16 Collectively, you would say that those actions are the
17 United States choosing not to help North Dakota beyond
18 your efforts and desires and the division's desires?
19      MS. BOBET:  Objection; foundation; lacks
20 personal knowledge, calls for speculation.  You can
21 answer.
22      A.   I think there's a big difference between
23 the United States government and some, you know,
24 midlevel executive bureaucrats who are in key
25 positions and have the ability to guide, you know, the

resources of the government.

You know, again, I don't have that full-body perspective of what everybody back at our headquarters was thinking or the priorities that were at play in the individuals who I had conversations with; but again, from my perspective as a law enforcement officer with the FBI, that is like a core responsibility, is to understand the motivation and resources of somebody who is trying to undermine the rule of law. It's fundamental.

**Q. (BY MR. SEBY) Yeah. And when you say "undermine the rule of law," what do you mean by that?**

A. Make the law enforcement response less effective than it could be had they been supportive.

**Q. Do you think that a large part of that problem was supported by them having a safe place to retreat to and organize and camp?**

A. To me the location had nothing to do with the resources. The fact that they had the resources to persist on the ground -- to me, if you cut off the money or cut off the access, you would have made a difference. We were prevented from cutting off the access and we didn't, in my opinion, apply enough resources to trying to cut off the money, or at least understand it.

111:1-25
401-402

**Q. Yeah. You also were aware, Mr. O'Connell, that protesters in the camps on Corps property were using those locations to venture off of the federal property, the public lands, to conduct acts of trespass and harassment of DAPL construction?**

MS. BOBET: Objection; assumes facts.

You can answer.

A. I saw it firsthand.

**Q. (BY MR. SEBY) And same question that -- were you aware that the protesters camping on Corps of Engineers land, public lands, were using that land -- those lands to venture off to harass, or worse, bother neighboring North Dakota citizens on farms and ranches in the vicinity of the protests?**

A. I can answer to their activity. It was definitely to harass and upset the standard rhythm of life for the community in the area of the protests. However, I don't think -- I think it's too vague for me to confirm or comment on, again, the spirit of the land, meaning, you know, title and permissions to be there versus trespass. That was -- I mean, I found it a distraction. Even though it was important for the rule of law and the legality and the protected activities, it was -- to me, it wasn't part of my focus at all.

MR. SEBY: All right. It's 11:50, just before the noon hour in the Mountain Timezone. Jane, I'd like to take a lunch break of 35, 40 minutes.

MS. BOBET: Fine here.

MR. SEBY: Okay. We'll resume at -- why don't we say at 12:35 Mountain Time.

THE VIDEOGRAPHER: Going off the record. The time is 5:52 p.m. UTC, 11:52 a.m. Mountain Time.

(Recess taken, 11:52 a.m. to 12:37 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 6:37 p.m. UTC, 12:37 p.m. Mountain Time.

MR. SEBY: Mr. O'Connell, we're back on the record after a short -- well, not so short lunch break, but after an hour or so lunch break. Thank you for accommodating that. I'd like to talk about -- show you just a few exhibits that are e-mails and talk about those for a little bit.

I anticipate we won't need to be using the full seven hours today. Mr. -- actually, Ms. Goulding, could you tell us what the current time on the record is.

THE REPORTER: Actually, John knows that. Three hours and one minute.

THE VIDEOGRAPHER: Counsel, I've been tracking it today. We're at three hours and one

minute.

MR. SEBY: Remaining or used?

THE VIDEOGRAPHER: Used.

MR. SEBY: Okay. Yeah.

**Q. (BY MR. SEBY) All right. I'd like to call up some exhibits. My colleague will post them up on the screen for us to look at and talk about. Before I do that, Mr. O'Connell, I want to ask you -- you mentioned at the outset when I was asking you about the federal agencies that you also interacted with as part of your liaison responsibilities by the -- for the FBI with other federal agencies, you mentioned the Bureau of Indian Affairs and the Department of the Interior. Can you elaborate on what interaction you had with the Department of Interior? Let's start with that.**

A. The Department of Interior provided some, I think, park service agents, park rangers or maybe some of their criminal investigators. I forget. But they were considered Department of Interior, and BIA being a subset of Department of Interior is obviously part of the daily liaison that we have for Indian country.

**Q. Sure. Let's start with the Department of Interior. I appreciate the BIA is part of the**

Jacob O'Connell
August 16, 2022

Page 114

1    department, but there are other bureaus and services
2    as part of the Department of Interior.  You mentioned
3    the National Park Service provided park rangers.  Can
4    you elaborate on what that involved and when?
5         A.   Not with any specificity as far as what
6    their instructions were.  I just remember that we
7    would encounter them during our movement around the
8    area and that basically they were, you know, brought
9    in TDY to support the operation.  I don't have any
10   perspective on what that included, you know, what was
11   their mandate or what they were told they were going
12   to be doing.
13        Q.   What is TDY?
14        A.   TDY stands for temporary duty assignment.
15        Q.   Okay.  When did you first notice those
16   people, the park service people?
17        A.   I do not recall with specificity.
18        Q.   Were they there for just an initial
19   period and then you didn't see them anymore or were
20   they there through a larger period of time?
21        A.   My recollection is it was rather brief.
22   Maybe a month, maybe two months.  And I believe the
23   interaction was down at the staging area that was
24   established at one of the campgrounds immediately
25   north of the protest area.

Page 115

1         Q.   The state created a staging area?
2         A.   Yes, they did.
3         Q.   Did you ever interact with them at all?
4         A.   Who?
5         Q.   The park service rangers that you
6    mentioned.
7         A.   Yes.  We had interaction with them, but
8    it wasn't operational in the sense that, you know, we
9    didn't tell them what to do.  We didn't go out of our
10   way to include them in what we were doing, but we'd
11   see them at the staging area.  We'd see them down
12   closer to the protests.  And they had their vehicles
13   and they were wearing their uniforms that, you know,
14   were distinctive.  So you'd have small talk with them
15   as you would any other law enforcement officer down
16   there.
17        Q.   Right.  So how about the Bureau of Indian
18   Affairs?  What was the nature of the interaction with
19   the BIA with the FBI?
20        A.   We have a standing regular contact with
21   BIA.  And for the purpose of DAPL, we kind of
22   maintained that tempo.  They had a command post that
23   was set up on the south side of the Cannonball River.
24   And so we'd go down there every once in a while and
25   just, you know, let them know we were out there.

Page 116

1         A lot of times we'd be down just doing
2    our normal death investigations or sexual assaults or
3    whatever and we'd touch base to let them know that we
4    were in the area, that the agents were going out to do
5    interviews.  And they had different supervisors that
6    were brought in, almost like the FBI on-scene
7    commander.  And so there was various individuals who
8    came in also TDY that would change throughout the
9    course of the protests.
10        Q.   And what was the nature of their
11   involvement as you understood it?
12        A.   Their involvement was basically to
13   monitor things on the reservation and kind of keep a
14   thumb on the pulse of the protesters' activity from
15   the reservation perspective as well as make sure that
16   there were not any criminal activities pursued by, you
17   know, Native Americans or non-Native Americans on the
18   reservation as it came to the roads and some of the
19   ranchers that are out there.
20        Q.   Did the park service rangers ever go
21   into -- actually go into the camps?
22        A.   I don't recall with specificity.  I seem
23   to recall there was a situation with animals.  I can't
24   remember if it was horses or cows or both, but
25   something had happened.  I think we had some

Page 117

1    assistance from the park rangers to try to figure out
2    if it was natural or accidental or deliberate.  Other
3    than that, I don't recall what they would be doing.
4         Q.   You say something happened with the
5    animals.  Were the animals slaughtered by the
6    protesters belonging to private ranchers and farmers?
7         A.   That was the allegation, but, you know,
8    again, I don't think our looking into it really led to
9    any type of investigative activity.
10        Q.   So it sounds like that those people were
11   assigned to do a job, but never really looked at
12   things physically.  They just kind of -- what did they
13   do, talk to people and did interviews, that kind of
14   thing?  They never actually saw dead animals and then
15   conducted an investigation of how they died or how
16   they were missing?  I'm just trying to connect what
17   you said their role was to what happened, what did
18   they do, and what purpose did they serve and what did
19   they produce as a benefit to North Dakota?
20        A.   I can't answer that with specific
21   knowledge.  Again, I'm drawing on memories that are
22   five years old, but I remember the animals were
23   observed deceased and the theory was that someone had
24   killed them for the sake of feeding the camp.  There
25   was allegations of deer poaching and some other

Jacob O'Connell
August 16, 2022

Page 118

1  activities.
2          I seem to recall, like, the state vet was
3  involved and then I don't know if the park rangers
4  were involved because of their experience and skills
5  that they've developed in managing wildlife in the
6  park, but I recall that after a lot of people looked
7  at it, they felt they couldn't really determine what
8  was going on that caused these animals to die.
9          Q.   Yeah.  Okay.  Was there anything that the
10  FBI or other federal law enforcement did where you did
11  it on your own and there was no state involvement, you
12  just undertook an investigation of any activity
13  alleged or real where the state was not present in
14  some regard?
15          A.   I don't recall off the top of my head.
16          Q.   The BIA, did they go into the camps, any
17  of them?
18          A.   Yes.  They went into the camps.  In the
19  beginning, you know, again, there wasn't an outward
20  conflict that was continuous between law enforcement
21  and the protesters.  In the beginning you could go in
22  there and talk to people and patrol and, you know,
23  make sure that everything was peaceful.
24          But then after a certain time -- and,
25  again, I don't recall when -- basically the camps

Page 119

1  called themselves off limits to law enforcement.  And
2  so BIA, I think, respected that.  But they maintained
3  knowledge through basically their ancestry and their
4  access to the culture that was beneficial to law
5  enforcement in the overall conduct.
6          Q.   Did you -- I know the FBI had its
7  sources.  Are you aware that the BIA had its own
8  sources?
9          A.   I'm not familiar with how BIA operates
10  their sources, if they're formal or informal, no.
11          Q.   The BIA had sources in the camps, though;
12  correct?
13          A.   I do not recall with specificity.
14          Q.   You don't know or you don't recall?  I'm
15  trying to understand.  You don't know or you don't
16  recall?
17          A.   I'm not aware that the BIA operates
18  sources in a formal capacity in a similar fashion to,
19  say, the FBI or DEA.
20          Q.   Okay.  Did any other federal agency or
21  actor have sources separate from the FBI that were
22  present in the camps?
23          MS. BOBET:  Objection; lack of personal
24  knowledge.  You can answer.
25          A.   I don't recall at this point who else was

Page 120

1  operating sources in there.  I know that the private
2  security companies had, you know, people in there,
3  but, you know, whether you call them a source -- you
4  have to understand that the last 20 years, when I say
5  "source," I'm talking about somebody who is formal,
6  like they have -- the organization has knowledge of
7  them and usually the local prosecutor's office will
8  know about them.
9          It's a big difference than, say, BIA or
10  local law enforcement who they're calling a source.
11  So that's why I'm kind of trying to understand your
12  question better.
13          Q.   (BY MR. SEBY) The question was -- I'll
14  say it again -- are you aware of any other federal
15  agency or entity apart from the FBI that had sources
16  of the nature you described inside the camps?
17          A.   No.
18          Q.   Okay.  Were any of your FBI sources
19  arrested during the protests for any activity or
20  conduct?
21          MS. BOBET:  I'll just object to the
22  extent the answer would call to reveal the identity of
23  specific sources.  I'll ask the witness -- instruct
24  the witness not to answer on the grounds of law
25  enforcement privilege, but to the extent you can

Page 121

1  answer without revealing that specific information,
2  please go ahead.
3          A.   Could you repeat the question?
4          Q.   (BY MR. SEBY) I'm not asking for names of
5  individuals.  I'm asking you whether or not any of the
6  sources recruited and under the FBI's wing
7  communicating with people inside the camps -- were any
8  of those individuals arrested by law enforcement for
9  conduct, alleged or real, occurring in the camps?
10          A.   Yes.
11          MS. BOBET:  Same objection.
12          Q.   (BY MR. SEBY) How many individuals?
13          MS. BOBET:  Same objection.
14          Q.   (BY MR. SEBY) Will you be answering the
15  question, sir?
16          A.   I'm only aware of one.
17          Q.   And when was that?
18          A.   I do not recall the specific date.
19          Q.   Do you recall asking any North Dakota
20  state or local law enforcement or other state or local
21  law enforcement that came to North Dakota's aid not to
22  prosecute that individual?
23          A.   Not in those terms.
24          Q.   Was the State of North Dakota law
25  enforcement or any affiliated law enforcement asked by

Jacob O'Connell
August 16, 2022

1 anyone in the federal government not to prosecute the
2 individual you're referencing?
3        MS. BOBET: Objection; calls for
4 speculation, lack of personal knowledge. You can
5 answer.
6        A. No, I don't recall ever going to anyone
7 and saying, Hey, give this guy a break because they're
8 working for us. That's not typically what we do.
9        Q. (BY MR. SEBY) The question was not you.
10 Are you aware of anyone else other than yourself in
11 the federal government at any level who asked state or
12 local law enforcement not to prosecute the source that
13 you've identified as an FBI source in the camps?
14        MS. BOBET: Same objections.
15        A. I don't know how to answer that question
16 because I feel it's very vague. I'm not aware of
17 anyone who asked anything regarding our sources.
18        Q. (BY MR. SEBY) Were you ever told not to
19 pursue criminal investigations of any DAPL protesters?
20        A. You'd have to refine that question. I
21 consider it very broad.
22        Q. Were you ever told by a federal official
23 at any level not to pursue criminal investigations
24 against any protester against the DAPL pipeline?
25        A. Yes.

1        Q. By whom?
2        A. That is what I don't recall other than in
3 broadbrush strokes would be FBI headquarters elements
4 and at times certain prosecutors within the U.S.
5 Attorney's Office here in Bismarck, which is their
6 prerogative.
7        Q. I understand. Do you know why you were
8 told not to do that?
9        MS. BOBET: Objection to the extent the
10 question calls for conversations with attorneys for
11 the United States about these kind of prosecutorial
12 decisions, I'll instruct the witness not to answer on
13 the grounds of privilege. But if you can answer
14 without revealing that material, go ahead.
15        A. As with many initial investigations we
16 bring to either headquarter's attention or to the U.S.
17 Attorney's Office, they're the customer. If they
18 don't want to pursue it, we don't pursue it. So I
19 can't speak to their motive or their goals, but I do
20 recall that the discussions were had, decisions were
21 made, and they were respected even though it was
22 frustrating at times.
23        Q. (BY MR. SEBY) Why were you frustrated?
24        A. As a law enforcement officer, I have a
25 very black-and-white interpretation of what violates

1 the law, but I'm not the one who has to prosecute it
2 in a court. So that's why I can be frustrated, but
3 again, I'm not the person who has to represent it in a
4 court.
5        Q. So you saw -- you as the FBI supervising
6 agent saw conduct that you felt as a law enforcement
7 officer was black-and-white criminal activity and you
8 recommended it to -- for prosecution; is that
9 accurate?
10        A. No. What would be most accurate is that
11 we presented it for consideration and then we'd talk
12 about what was collected and what we needed to collect
13 to maybe get to the next plateau for consideration,
14 but there was always dialogue as to what we wanted to
15 achieve. It was a matter of were we making the
16 threshold, were we meeting what we needed to meet as
17 far as producing evidence.
18        Q. Sure. Was it common in your experience
19 as a law enforcement professional prior to the DAPL
20 events for you to present such cases to your customers
21 and be told, Thank you, but no thank you, we're not
22 going to do anything further? You haven't cut the
23 mustard in your investigation, there's not enough
24 evidence, don't think it's any good, whatever the
25 reason was. Was it common or uncommon in your career

1 to be told that when you made such presentations?
2        A. I would say it's rather common. And,
3 again, it's related to the violations I work or have
4 worked.
5        Q. So it's case specific?
6        A. Very much so.
7        Q. What were the types of things, though, in
8 the DAPL context? When you presented things that you
9 thought of as black and white, what kind of behavior
10 and conduct were you tendering and presenting for
11 consideration?
12        A. We had, I'm going to say, four or five
13 investigations that were all related to the criminal
14 activity, whether it be assault on a federal officer
15 or instances where equipment was destroyed or there
16 was arson involved. Then we had the issue of
17 Ms. Wolensky getting herself injured.
18        So there was a number of cases that were
19 going on that we felt were worthy of consideration,
20 and the U.S. Attorney's Office agreed. And so there
21 was ongoing investigations, but there was other things
22 that were very similar but for whatever reason just
23 didn't meet the level that the U.s. Attorney's Office
24 wanted to see. Again, it wasn't a confrontational
25 situation. It was based on just the overall lack of

Jacob O'Connell
August 16, 2022

**126:3-127:5
401-402; 602**

Page 126

1  evidence to support what would be the elements of the
2  violation.
3      Q.   What kind of federal criminal cases were
4  prosecuted?
5      A.   I believe we had terrorizing.  We had
6  arson.  I think we had destruction of federal
7  property.  Honestly, I don't recall with specificity,
8  but I think when I was briefing headquarters on the
9  cases we had, it was between five and seven cases.  I
10  think there was some drug cases involved also.
11      Q.   Terrorizing, what kind of behavior does
12  terrorizing involve, the cases?
13      A.   I mean, everyone has got a different
14  interpretation, but basically you had this loose
15  connection of protesters who would go out and confront
16  the workers.  They would destroy equipment.  They
17  would block infrastructure to include the railway.
18  They lit a truck on fire on the railroad tracks.
19           They'd be threatening some of the farmers
20  out around the pump stations, which was a big concern.
21  So it wasn't lawlessness to where they were actually
22  invading people's homes, but there definitely was a
23  confrontation between members of the public and the
24  protesters.
25      Q.   And were those protesters in the camps --

Page 127

1  that resided in the camps that were doing those
2  things?
3      A.   The consistent thing was that they
4  originated from the camps and they would typically go
5  back to the camps.
6      Q.   And how many people were charged with
7  terrorizing -- the federal charge of terrorizing?
8      A.   I don't recall with specificity.
9      Q.   One?
10      A.   You know, I don't recall the cases.  Like
11  I said, I didn't do any preparation for this.  So I'm
12  just going to say I can't answer that question.
13      Q.   But you did answer that it occurred,
14  right, that those cases were pursued?
15      A.   There were investigations by the FBI
16  related to DAPL; and beyond that, I don't recall the
17  specifics of each investigation.
18      Q.   How about the one that you mentioned
19  pertaining to arson, a federal case concerning arson?
20      A.   Yes, I do recall that case.
21      Q.   And can you explain to me what happened
22  generally in that context?
23      A.   I cannot in good faith describe it
24  because I don't recall it.  I didn't investigate it
25  personally.  I remember reading the paper, but I do

Page 128

1  not recall the specifics of it, other than I remember
2  a truck being lit on fire on a railroad track.  Then
3  there was another incidence of arson involving, I
4  believe, a bridge down very near the protest camp.
5      Q.   Okay.  Individuals were investigated and
6  charged or just investigated?
7      A.   I believe a combination of both.
8      Q.   How about destruction of federal
9  property?  What did that involve?
10      A.   I don't recall with specificity.  Yeah.
11  I don't recall.
12      Q.   What federal property was there to
13  disturb down there?
14      A.   I believe it related to infrastructure
15  versus property.
16      Q.   So like a car or a truck?
17      A.   No.  I believe it was more like the
18  railway infrastructure, roads, and I believe they were
19  trying to figure out if the pipeline was considered
20  infrastructure.
21      Q.   Who is "they"?
22      A.   It's a collective group of DOJ.
23      Q.   What did they conclude?
24      A.   I believe in regards to the pipeline,
25  because it was not in operation, they couldn't in good

Page 129

1  faith try to identify it as critical infrastructure.
2      Q.   Doesn't matter that it travels between
3  four or five states?
4      A.   There was a distinction.  I also have to
5  caution that I could be referring to some of the
6  activity with the pipeline that comes from Canada down
7  through a portion of North Dakota into Minnesota that
8  at the same time was being tampered with.  And I think
9  the distinction between the two was that was an
10  operational pipeline and that they did something.
11           I think they went in there and shut off
12  the valve, basically caused the sensors to trip that
13  shut it down.  Whereas with the DAPL, because it
14  wasn't complete and in operation, it was a
15  different -- it basically didn't meet the standard,
16  the element.
17      Q.   I see.  What about the drug cases that
18  you mentioned?
19      A.   The drug cases were more of accusations
20  that would fall into, let's see where this goes.  The
21  FBI is not -- at least in the Bismarck office is not
22  big into drug cases because we have local DEA agents
23  who typically will work drugs.  Also, BIA has their
24  own drug unit that has some resources in North Dakota.
25  That's about all I recall.

Jacob O'Connell
August 16, 2022

Page 130

1      Q.    Was the Drug Enforcement Administration
2  or agency involved in the DAPL circumstances, the
3  protest-related circumstances?
4      A.    I do not think they were involved on a
5  regular basis.
6      Q.    How about at all?
7      A.    I recall, again, liaison with DEA, but I
8  don't recall a robust present -- robust or continuing
9  presence of DEA.
10     Q.    Okay.  What did the Department of
11 Homeland Security do in connection with the DAPL
12 protests?
13     A.    I don't have firsthand knowledge.  I
14 dealt with Homeland Security in the form of HSI and
15 then the critical infrastructure piece that they have.
16 Then I dealt with the border patrol office up in Grand
17 Forks.  And, again, that was more of just maintaining
18 awareness and helping each other out as we could with
19 information, but there was never, you know, a huge
20 collective ongoing action between the agencies.
21     Q.    What's HSI?
22     A.    That is the investigative portion of DHS,
23 so Department of Homeland Security, and then you have
24 Homeland Security Investigations.  So the actual
25 investigators are with HSI, but they're part of DHS.

Page 131

1      Q.    And that's called the Homeland Security
2  Investigation; is that right?
3      A.    Yes.
4      Q.    Whose job is it in the federal government
5  when a protest of hundreds to thousands of people pop
6  up in a location and they're there to protest and
7  there's a mixture of people there?  Whose job is it
8  from the federal government to pay attention to that?
9           MS. BOBET:  Objection; vague, calls for a
10 legal conclusion and personal knowledge.  You can
11 answer.
12     A.    I don't know.
13     Q.    (BY MR. SEBY) In your experiences as a
14 decade -- multi-decade law enforcement person, had you
15 ever seen anything like the DAPL protests before?
16     A.    No.  I've seen the physical aspect of the
17 camp, but I've never dealt with that kind of
18 ideology-driven, ideologic-driven activities.
19     Q.    To what degree do you think the Corps
20 appreciated that observation that you just made?
21           MS. BOBET:  Objection; calls for
22 speculation.
23     Q.    (BY MR. SEBY) If you know.
24     A.    I don't know what they were thinking of.
25 I really didn't have enough interaction with them to

Page 132

1  appreciate what their personal or professional opinion
2  was.
3      Q.    Do you think you did a fairly strong job
4  in briefing your FBI superiors about what you saw and
5  were concerned about on the ground?
6      A.    Yes.  I feel I went out of my way to
7  communicate what my concerns were.  And at times I
8  felt that I didn't later on in the deal because we
9  brought the resources in to where I could take my eye
10 off the ball.
11     Q.    The people that you were reporting to and
12 advising, were you ever aware that those individuals
13 were talking with other federal officials outside of
14 the Federal Bureau of Investigation?
15     A.    Yes.  I know that Bob Perry was talking
16 to a wide variety of senior officials at other
17 departments, which would be his responsibility.  I'm
18 not sure what Rick Thornton was doing because he
19 really didn't have any experience in, you could say,
20 incident response or big bureau activities.  So it was
21 really Bob Perry and then some individuals
22 from headquarters who were coordinating things
23 throughout the federal partners.
24     Q.    Is Bob Perry still with the Bureau?
25     A.    No, he is not.

Page 133

1      Q.    He's retired, or what happened?
2      A.    He retired in December of last year.
3      Q.    Is he retired, retired or did he take
4  private sector employment?
5      A.    I do not know.
6      Q.    But it was Mr. Perry who would have been
7  communicating with other federal agencies, to your
8  knowledge?
9      A.    At the next higher level, he would be.
10 You know, I've talked to people in North Dakota.  So I
11 went with the border patrol.  I'd talk to the deputy
12 chief, who technically is above my position, but at
13 the same time, it's North Dakota and it's small and
14 there was familiarity.
15           But when it came to, like, BIA, Bob Perry
16 would be talking to -- I want to say his last name was
17 Cruzan, Darren Cruzan maybe, who I believe was, like,
18 the head of BIA law enforcement or Department of
19 Interior.  I forget what the actual title and role
20 was, but that's an example of how Bob Perry would be
21 dealing with resources outside of North Dakota.
22     Q.    Surely.  Did Mr. Perry -- do you know
23 whether Mr. Perry spoke with the Corps of Engineers?
24     A.    I do not recall.
25     Q.    How about with -- well, BIA being the

Jacob O'Connell
August 16, 2022

Page 134

1  Department of Interior, yes.  What other federal
2  agencies or officials do you have in mind that you
3  were aware Mr. Perry spoke with about the DAPL
4  protests?
5        A.   I don't recall anybody outside of BIA.
6  No, I don't recall.
7        Q.   Okay.  In terms of the statistics you
8  were mentioning before -- camp counts, protester
9  counts, vehicle counts, footprint of the protest camps
10 on Corps property -- did the FBI independently monitor
11 and keep and -- develop and keep those statistics or
12 did you rely upon somebody else for that information?
13       A.   I don't want to say it was trivia, but it
14 wasn't something that we did as part of our core
15 responsibility, our core activities during the
16 protests.  It was something that was nice to know.  It
17 was easy to point at, but it really didn't affect our
18 calculus.
19       Q.   The question was a little different than
20 how you just responded.  I asked did the FBI keep
21 those sources of information by its own or did you
22 rely upon someone else for it?  I'm not asking what
23 degree of regard you gave to it, but I'm asking where
24 your information about that came from, those things?
25       A.   It was published by the EOC and we had an

Page 135

1  individual who was in the EOC.  So they'd bring it
2  back for a series of meetings we'd have.  You know,
3  again, there's a difference between being aware of
4  something and producing it.  So we did not produce
5  anything to do with car counts or estimations of
6  protesters.  However, we were aware of information
7  being collected and it was conversational.
8        Q.   How many people total do you think that
9  the FBI devoted to monitoring the Dakota Access
10 Pipeline protests on the Corps of Engineers land,
11 public land?
12       A.   Can you sharpen that question a little
13 bit, please?  Are you talking FBI resources that
14 showed up or that were assigned or participated?
15       Q.   The latter.
16       A.   I think we had approximately 15 positions
17 that we were focusing on the response and that may be
18 somewhere between 50 and 100 FBI employees rotated
19 through those positions.
20       Q.   Who determined the rotation
21 circumstances?  Was that a decision that you made as a
22 supervisor or Mr. Perry made in his office?
23       A.   There was usually a conversation that was
24 had to discuss the makeup of who we were going to
25 bring in to do what.  Then you had the consideration

[margin note, left of Page 135:]
135:8-136:2
Offer if
testimony re:
FBI resources
comes into
evidence

Page 136

1  of funds that were available to support the temporary
2  duty.
3        Q.   Did you ever work with the people who
4  followed social media with respect to the protests?
5        A.   Within what organization?
6        Q.   Yours.
7        A.   We have elements within the FBI that
8  do -- that exploit social media and then you have,
9  based on individual skill, agents or analysts or
10 whoever have the same capabilities.  I don't recall
11 the difference between the two or if it would have
12 been more of one and less of the other, but yes, we
13 did pursue social media content.
14       Q.   How many people do you think the FBI
15 devoted full time to do that for the DAPL protests?
16       A.   I think you could measure that probably
17 in hours and days rather than months.  So there was
18 nobody assigned full time.  There would be a
19 requirement identified and we'd try to respond to that
20 requirement.
21       Q.   Are you aware that the State of North
22 Dakota at varying times made specific pleas to the
23 United States for help?
24       MS. BOBET:  Objection; vague.  You can
25 answer.

Page 137

1        A.   I think you've got to come up with a
2  better question because there was so many different
3  levels that that could be answered in the affirmative
4  or the negative.
5        Q.   (BY MR. SEBY) Are you aware that the
6  governor of the State of North Dakota wrote letters
7  and made telephone calls asking federal officials,
8  including cabinet officials, for assistance with
9  respect to the ongoing DAPL protests in the state of
10 North Dakota?
11       A.   There were two governors.  Which one are
12 you referring to?
13       Q.   Let's talk about the first one, Governor
14 Dalrymple, who was the governor during the beginning
15 of the protests in 2016.  I'd appreciate you answering
16 my question yes or no.
17       A.   With Governor Dalrymple, no.
18       Q.   Governor Burgum?
19       A.   Yes.
20       Q.   So all of your time that you've told me
21 you spent in the state and Morton County law
22 enforcement coordination center that you were invited
23 to join, you never learned that the State of North
24 Dakota governor, Jack Dalrymple, was pleading for
25 federal assistance?

[margin note, right of Page 137:]
137:5-19
401-402;
602

Jacob O'Connell
August 16, 2022

Page 138

1          MS. BOBET:  Objection; vague,
2   argumentative, asked and answered.  You can answer.
3          A.   I did not know he did that, if in fact he
4   did it.  What I do know is that it was Senator Hoeven
5   who was more aggressive in requesting resources from
6   the federal government.  Again, from my perspective,
7   if Governor Dalrymple was active behind the scenes,
8   then it was not communicated in a manner that I recall
9   it.  I was personally disappointed in Governor
10  Dalrymple's response to the overall protest.
11         Q.   (BY MR. SEBY)  Why is that?
12         A.   Just the protests could have been nipped
13  in day one had, I think, the law enforcement mentality
14  didn't see a political advantage in responding and he
15  chose to somewhat allow the protesters to do their
16  thing as long as it wasn't getting too out of hand,
17  but it was that allowance which led to the increase in
18  numbers.
19
20         Q.   What do you have as evidence in support
21  of that point?
22         A.   Can you define the point?
23         Q.   Your point, the point you just made.  You
24  made the statement that Governor Dalrymple could have
25  nipped things in the bud on day one and because he

> **ND OBJ:**
> As to 138:11-139:20,
> Introduces new
> material

Page 139

1   didn't that led to the increase in protest numbers --
2   protester numbers.
3          A.   Well, I shared a conversation with Al
4   Dohrmann and Kyle Kirchmeier in the very early days of
5   the protest and they expressed frustration that Jack
6   Dalrymple wasn't providing more resources that were
7   available to the State of North Dakota and that --
8   again, I observed this also -- Dalrymple would come
9   down to the EOC and he'd bring his wife and he'd spend
10  more time talking about the great, like, Scotcheroos
11  she brought than talking about the resources they were
12  going to try to provide to address what was going on
13  with the protesters.
14         So from my perspective in looking at
15  Governor Dalrymple, he didn't see an advantage in
16  investing any real effort into providing resources to
17  law enforcement.  And that was something that was
18  affirmed and observed by other law enforcement
19  leaders who were trying to assess the situation and
20  respond.
21         Q.   You're not aware of the letters that the
22  governor wrote to federal representatives or the
23  governor's executive orders or emergency declarations?
24  Are you aware of any of those, Mr. O'Connell?
25         A.   I'm aware that there were declarations

Page 140

1   and requests that were going around, but it didn't
2   strike me as something that was taken seriously by the
3   governor's office.  I think they were done -- and,
4   again, I didn't have firsthand knowledge and having a
5   personal conversation with Jack Dalrymple.
6          However, I did have firsthand access to
7   Al Dohrmann and the sheriffs.  And there was many
8   times where I'd be in the room with Representative
9   Kramer and Senator Hoeven and they would be going over
10  the process and the resources that were available in
11  the request, but I felt that the elected officials,
12  meaning Senator Hoeven and Representative Kramer, were
13  much more interested in gathering support from the
14  federal government than Jack Dalrymple.
15         Q.   So how did the request that those
16  individuals made to the federal government for
17  support -- how did that fare?  How did the federal
18  government come to the State of North Dakota's aid as
19  a result of those pleas by North Dakota officials?
20         MS. BOBET:  Objection; personal
21  knowledge.  You may answer.
22         A.   I was going to say I'm not aware.  It
23  was, again, my perception that this wasn't about the
24  protests.  It was about the politics and the politics
25  of the protest and that there was really at a

> **ND OBJ:**
> As to 140:22
> (beginning
> "It...")-141:3,
> Non-
> Responsive

Page 141

1   high-level meeting presidential, slash, congressional,
2   you know, in the broader spectrum to do anything to
3   change the course of the protests.
4          MR. SEBY:  Okay.  Jane, I'd like to take
5   a short break.  I want to look over some exhibits that
6   I want to turn to next and just kind of get organized
7   so that we don't take more of Mr. O'Connell's time
8   than necessary.
9          MS. BOBET:  Sure.  Fine by me.
10         THE VIDEOGRAPHER:  Going off the record.
11  The time is 7:27 p.m. UTC, 1:27 p.m. Mountain Time.
12         (Recess taken, 1:27 p.m. to 1:43 p.m.)
13         THE VIDEOGRAPHER:  Back on the record.
14  The time is 7:43 p.m. UTC, 1:43 p.m. Mountain Time.
15         Q.   (BY MR. SEBY)  Mr. O'Connell, we're back
16  on the record after a short break.  Did I understand
17  you correctly that you never actually physically met
18  with Governor Dalrymple to discuss the DAPL protests?
19         A.   No.  That is incorrect.  We did meet with
20  Governor Dalrymple, meaning the FBI, and the governor
21  and lieutenant governor.  So you had Rick Thornton,
22  Bob Perry, and myself and Jack Dalrymple and Drew
23  Wrigley all in the same room.
24         Q.   Okay.  When was that?
25         A.   I don't recall the specific date, but it

Jacob O'Connell
August 16, 2022

Page 142

1  would have been end of August, beginning of September.
2         Q.   Who requested the meeting?
3         A.   I believe I did.
4         Q.   And why?
5         A.   I'm a big believer in liaison amongst law
6  enforcement, which included in this case the
7  governor's office.  And I was trying to get Bob Perry
8  and Rick Thornton up to North Dakota so they could see
9  things firsthand, have an appreciation for what was
10 going on.  And part of that included having a
11 conversation with the governor to educate him as to
12 what the FBI could and could not do firsthand and make
13 sure there was, I guess, a unified message that was
14 going out.
15        Q.   And who led the meeting from the FBI,
16 your three-person group?
17        A.   Rick Thornton was the senior FBI person
18 present, but I was probably more involved in the
19 discussion simply because of my knowledge of what was
20 going on firsthand.
21        Q.   Okay.  Good.  Thank you for explaining
22 that.  So by the time you met with Governor Dalrymple,
23 the protests had been going on Corps property for
24 approximately how many weeks?
25        A.   I don't recall the specific date, but

Page 143

1  again, it was end of August, beginning of September.
2         Q.   And you took Mr. Thornton and Mr. Perry
3  to North Dakota.  Did you just go to Bismarck or did
4  you go anywhere else?
5         A.   I don't recall the exact itinerary.  I'm
6  sure it's documented in an e-mail or something, but I
7  recall going over and talking to the sheriff and I
8  believe General Dohrmann and the Mandan police chief,
9  just kind of going over, again, what the FBI could and
10 couldn't provide, what our roles and responsibilities
11 were, what our permissions and restrictions were.
12             Again, it was a meet and greet and give
13 my leadership firsthand awareness of what was going on
14 and exposure.  So we went down to the camp.  I think
15 we -- I don't recall meeting with Energy Transfer
16 Partners because, you know, they're really not a
17 direct customer of ours, but that, I think, is the
18 extent of what we did.  It was Bismarck, the camps.
19 And I can't remember if they flew in or flew out.
20             THE VIDEOGRAPHER:  Counsel, we lost
21 Mr. Seby.
22             MS. BOBET:  Okay.  Well, let's go ahead
23 and go off the record while he hopefully reconnects.
24             THE VIDEOGRAPHER:  Going off the record.
25 The time is 7:48 p.m. UTC, 1:48 p.m. Mountain Time.

Page 144

1             (Recess taken, 1:48 p.m. to 1:56 p.m.)
2             THE VIDEOGRAPHER:  Back on the record.
3  The time is 7:56 p.m. UTC, 1:56 p.m. Mountain Time.
4         Q.   (BY MR. SEBY)  Mr. O'Connell, we're back
5  on the record.  I apologize for the unplanned break.
6  We had a building power outage and we've been out for
7  about ten minutes.  Thank you for your patience.
8  We'll keep going now.
9             You were mentioning to me before all that
10 occurred, that you took Mr. Bob Perry and Mr. Rick
11 Thornton with you for a meeting with Governor Jack
12 Dalrymple and the lieutenant governor, Drew Wrigley.
13 And I believe you told me you were at the capitol in
14 the governor's office; is that correct?
15        A.   Yes, that was correct.
16        Q.   And did I understand the time frame to be
17 the end of August or early September?
18        A.   Somewhere in there.  It was during the
19 initial few weeks of the protests.
20        Q.   Were you asked by anyone to set up that
21 meeting or to sit with the governor?
22        A.   I don't recall if we were asked.  I think
23 the way it went down is that I had told people that I
24 was trying to get Bob Perry and Rick Thornton to North
25 Dakota to get an appreciation of the operating

Page 145

1  environment.
2             And I can't recall if Drew Wrigley said,
3  Hey, it would be great if you could stop by or if I
4  called them.  It wasn't that we just showed up at the
5  offices and said, Hey, have you got a minute?  It
6  was -- there was a deliberate meeting set up.  And I
7  don't recall who initiated it, but I do recall being
8  the one who was setting up the time and communicating
9  where we were in the day.
10        Q.   Okay.  The question, again, was something
11 different.  The question was, were you directed by
12 anyone to do -- to enable or set up the meeting.  Not
13 how it happened, but were you directed to do that?
14        A.   I was not directed by anybody in the FBI
15 to set up that meeting, if that's what you're asking.
16        Q.   Yes.  I'm asking if anyone in the FBI
17 directed you to set up the meeting.
18        A.   No.  Not that I recall, no.
19        Q.   Okay.  Did any other person with the
20 United States government ask you to do that?
21        A.   Not that I recall, no.
22        Q.   Were you discussing that meeting with
23 anyone else in the U.S. government other than your FBI
24 colleagues?
25        A.   I do not recall.

Jacob O'Connell
August 16, 2022

Page 146

1    Q.   Is it possible that you were?
2    A.   It could be possible, yes.
3    Q.   Why would that be possible?
4    A.   Typically a supervisor does not go
5  knocking on a governor's door, and likewise the FBI
6  doesn't traditionally reach out to a governor's office
7  unless there's something critical going on or it
8  affects the governor's office.  So it would be unusual
9  for anybody in the FBI to tell me to go meet with the
10  governor.
11    Q.   Again, sir, the question is something
12  different than you're responding now a couple times.
13  I asked a very specific question.  I'll restate it.
14  Were you asked by anyone outside of the FBI, but a
15  federal representative, to arrange to sit and talk
16  about the DAPL protests with Governor Jack Dalrymple,
17  the governor of the State of North Dakota?
18         MS. BOBET:  Objection; argumentative,
19  asked and answered.
20         MR. SEBY:  It's not been answered.  I'm
21  asking the question for a third time and I'd like an
22  answer, please.
23         MS. BOBET:  The objection stands.  You
24  can answer.
25    A.   The short answer is I do not recall how

Page 147

1  the meeting got set up.
2    Q.   (BY MR. SEBY) Earlier you told me that
3  you thought it was a good idea to take your
4  superiors -- immediate superiors to North Dakota to
5  see what was happening on the ground and that you
6  thought you would include a meeting with the governor
7  in that regard.  And so I'm trying to understand if
8  this meeting occurred solely as a function of an idea
9  that came into the mind of FBI Agent Jacob O'Connell
10  or it was discussed and coordinated that you would do
11  that with some other person.
12         And you've said no one in the FBI asked
13  you to do that, but then I asked you very specifically
14  if any other federal individual or representative
15  asked or discussed you doing that as a possibility.
16  And that's the question that remains and I await an
17  answer for, please.
18         MS. BOBET:  Objection; asked and
19  answered.
20    A.   Counselor, as respectfully has been
21  stated, I've got to push back on you because I feel
22  like you're asking me to recollect something that's
23  probably on record somewhere and that it's somewhat of
24  a loaded question.  I think I've made it very clear
25  that it was my desire to have my supervisors

Page 148

1  understand the operational environment in North
2  Dakota.
3         And whether I set up the meeting or
4  someone else requested the meeting, I do not recall,
5  but I think you probably know that answer based on
6  e-mail traffic that would have been preceding the
7  meeting.
8    Q.   (BY MR. SEBY) I don't have e-mail traffic
9  about this issue.  So I'm not asking you a question
10  that I know the answer to, but I'd like an answer to
11  my question.  And you said that -- let me finish.  You
12  said that it was possible, that you didn't recall.
13  I'm asking you why do you say it's possible?
14    A.   If I'm trying to educate my chain of
15  command, I'm going to get them in front of everyone
16  that I can.  And, again, I did not research anything
17  to do with the DAPL response, but I know how I operate
18  and I operate traditionally in writing or text
19  messages.  And all that would be somewhere.  But I do
20  not want to contradict what is in writing, and that is
21  why I'm saying I do not know, I do not recall.  I
22  cannot answer that question with specificity.
23    Q.   Okay.  I'm not asking you to contradict
24  anything.  I'm just asking you to explain why you said
25  it the way you did.  And I have not still gotten an

Page 149

1  answer.  So I'm going to move on with that being the
2  nature of your video and audio testimony.
3         So when you met with the governor, how
4  did the meeting go?  What did you say to the governor?
5    A.   Again, I don't have a specific
6  recollection.  In broadbrush strokes, the purpose of
7  the meeting was, again, to educate the governor as to
8  what the mission of the FBI is and how it would be
9  appropriate within the overall law enforcement
10  response to the DAPL protesters and that we were aware
11  of what was going on and that they understood the
12  resources on the ground and what we could do.
13         I distinctly remember that he came in and
14  was sitting on his desk.  There was all kinds of
15  pleasantries exchanged, a conversation about trips to
16  North Dakota and things that you could see and do in
17  addition to the task at hand, which was, again, to
18  exchange information so there was an understanding as
19  to what was needed by the State of North Dakota and
20  what the FBI could deliver.
21    Q.   So in that regard what did the governor
22  ask of you and the FBI?
23    A.   I don't recall any specific requests
24  other than to have open communication and regular
25  participation.

Jacob O'Connell
August 16, 2022

Page 150

```
1          Q.   Did he ask for the assistance of the
2   Federal Bureau of Investigation?
3          A.   I don't recall a direct request.
4          Q.   And you mentioned the lieutenant
5   governor, Drew Wrigley, was present; correct?
6          A.   Correct.
7          Q.   Drew Wrigley being the former United
8   States Attorney; right?
9          A.   Correct.
10         Q.   Do you think he has a pretty good
11  understanding and appreciation, having served in that
12  role, as to what the mission and capabilities of the
13  FBI are?
14         A.   I can't answer that question.  You'd have
15  to ask him.
16         Q.   Isn't that who you said your client and
17  customer was?
18              MS. BOBET:  Objection; misstates
19  testimony.
20         Q.   (BY MR. SEBY) You told me earlier that
21  your job is to present proposals and recommendations
22  to the United States Attorney for the District of
23  North Dakota; correct?
24         A.   Correct.
25         Q.   So you don't think that person who is
```

Page 151

```
1   your client and you present proposals for law
2   enforcement and potential prosecution does not already
3   appreciate what your job and role is?
4          A.   I don't think he had a full appreciation
5   of what the FBI's role was in that given circumstance.
6          Q.   Why do you say that?
7          A.   Drew Wrigley was the chief of staff for
8   Senator Hoeven when he was governor.  Then he's the
9   lieutenant governor.  He's in the state of North
10  Dakota.  And even though he was the U.S. Attorney, his
11  exposure to the FBI would have been limited to some of
12  the cases that occurred while he was U.S. Attorney.  I
13  would not have considered him somebody with a
14  firsthand, 360-degree understanding of the FBI's
15  mission, its capabilities, its resources, its
16  structure.  I would not consider him to be that
17  capable.
18         Q.   Do you have a professional issue with
19  Mr. Wrigley?
20         A.   Not at all.  I think he's an extremely
21  talented individual.
22         Q.   Did you work with Mr. Wrigley when he was
23  U.S. Attorney?
24         A.   On a limited basis, because he was U.S.
25  Attorney twice.  So he was U.S. Attorney before I came
```

Page 152

```
1   to North Dakota and then he was lieutenant governor
2   and then he had his situation.  And then he was
3   renominated for U.S. Attorney and took that office
4   briefly before going back to the private sector.
5          Q.   So the only thing you recall then from
6   the meeting is what you presented to the governor; is
7   that correct?
8              MS. BOBET:  Objection; misstates
9   testimony.
10         Q.   (BY MR. SEBY) It's a question.
11             MS. BOBET:  The objection stands.  You
12  can answer.
13         A.   I mean, I don't have minutes to the
14  meeting.  I didn't take minutes.
15         Q.   (BY MR. SEBY) Not my question.  My
16  question was what do you recall you said at the
17  meeting?
18         A.   I recall telling both the governor and
19  lieutenant governor that the FBI's role in situations
20  such as the protests is to conduct investigations of
21  federal law and collect intelligence and share it.
22         Q.   Share it with who?
23         A.   Whoever would be an appropriate
24  recipient.
25         Q.   Would that include the State of North
```

ND OBJ: Introduces new material

Page 153

```
1   Dakota?
2          A.   Sometimes, yes.
3          Q.   Sometimes not?
4          A.   It depends on the nature of the evidence.
5   Do you have an example you'd like to present?
6          Q.   No.  I'm asking you a question.  So what
7   did you tell --
8          A.   Depends on the information.
9          Q.   Okay.  So what limitations did you tell
10  the governor that you had as a Federal Bureau of
11  Investigation, what you could not do for the State of
12  North Dakota given the circumstances that they were
13  facing?
14         A.   The primary limitation was a matter of
15  manpower and statutory authority.  We investigate
16  violations of federal crime and unless there's a
17  violation, you know, we're in the room, we're sharing
18  information that we think we can, but that doesn't
19  mean we're going to join the police line or the
20  response to protesters on a regular basis.
21         Q.   Did the governor explain to you that he
22  had been meeting with officials from the Army Corps of
23  Engineers about the protests occurring on federal
24  property?
25         A.   I don't recall that with specificity, no.
```

Jacob O'Connell
August 16, 2022

Page 154

1      Q.   Do you recall the governor telling you
2  that he was requesting the Corps to take a specific
3  response to their presence on federal property?
4      A.   That may have been discussed, but I don't
5  have recollection of that.
6      Q.   Do you recall the governor telling you
7  that he was in communication with federal officials in
8  the Obama administration pleaing for federal
9  assistance and support?
10     A.   I don't recall that statement in that
11 particular meeting.
12     Q.   So the governor just sat there and looked
13 at you and listened to what you had to say, more
14 pleasantries, more Scotcheroos and all that stuff, and
15 then you left?
16     A.   It was a -- I don't want to say
17 perfunctory, but we didn't get into, like, hard
18 details of what the state was doing or what the
19 political calculus was.  It was, you know, the
20 situation is somewhat unprecedented in North Dakota,
21 you know, this is kind of generally what we're trying
22 to do.
23          And we talked about what the FBI could
24 do, what it couldn't do, how we were going to
25 interact, the resources we were trying to bring in.

Page 155

1  But we didn't -- again, as law enforcement we didn't
2  sit there and say, You know, can you brief us on what
3  the state is doing?  And I don't recall that being a
4  focus of the discussion.
5      Q.   Had you already been present for some
6  period of time?  I know it had just been a few weeks,
7  but you had already been in the state in the Morton
8  County law enforcement coordination center meetings on
9  a daily basis; right?
10     A.   Correct.
11     Q.   And you had already been down to the
12 camps for several times to observe these
13 circumstances?
14     A.   Correct.
15     Q.   And this was prior to your coming up with
16 the idea of asking for FBI drones to be dispatched to
17 North Dakota?
18     A.   Yes.
19     Q.   And North Dakota had already been
20 actively sharing information with you concerning their
21 activities and what they understood to be occurring in
22 the camps; is that correct?
23     A.   Correct.
24     Q.   And then you took these gentlemen, your
25 FBI colleagues and superiors, down to which protest

Page 156

1  camp, the main camp?
2      A.   Yes.
3      Q.   How long did you observe -- were they
4  with you observing the camp?
5      A.   It might have been ten minutes.  I
6  believe at that point 1806 was still open and there
7  wasn't an issue of trafficability.  I seem to recall
8  that we went down past the camp, pointed things out,
9  gave them an idea where the pipeline route was in
10 relation to the camp, and then we continued on to meet
11 with BIA.  I don't recall how long that was.  Then we
12 turned around and came back north.  So they would have
13 seen it a second time.
14     Q.   By that time were you aware that the
15 camps were being used as safe havens for conducting
16 activities off of the property that were the trespass
17 and other menacing activities?
18     A.   I don't recall, again, the exact date of
19 the visit and the exact posture of law enforcement or
20 the exact activity of the protesters at that time.
21 There was a lot of change.
22     Q.   Hadn't the horse event occurred already?
23     A.   The horse event was day two.  There was a
24 lot of --
25     Q.   Is that a yes?

Page 157

1      A.   No.  You need to give me a specific time.
2  The horse event, in my mind, isn't what started the
3  whole thing from a law enforcement response.
4      Q.   So the question was, as of the time of
5  your trip with your FBI bosses and superiors, that
6  event had already occurred.  And that was my question,
7  whether that was the case.
8      A.   Yes, that would have occurred before
9  their visit.
10     Q.   How about the dog-bite incident?
11     A.   I don't recall when that happened.
12     Q.   How about the arrest of Chairman
13 Archambault?
14     A.   I do not recall that timeline.
15     Q.   How about other incursions onto the ETP
16 private property where the pipeline was in the process
17 of being constructed?
18     A.   Again, I'm not familiar with the timeline
19 of events in specificity.
20     Q.   So I'm trying to understand why you
21 thought it was a good idea, to the extent it was just
22 your idea, to bring those people to the state of North
23 Dakota.  Why?
24     A.   Awareness.
25     Q.   Of what?

Jacob O'Connell
August 16, 2022

Page 158

1    A.   The activities on the ground.
2    Q.   Such as?
3    A.   Protester activity.
4    Q.   Including what?
5    A.   Everything from their presence on the
6  land where they had their camp to where their
7  activities were occurring when they threatened
8  pipeline workers, where they tried to impede the
9  installation of the pipeline, to where they were
10  confronting ranchers, to where they were coming up to
11  Bismarck to try to disrupt basically the community.
12        But again, I don't recall the specific
13  dates or the timeline or the specific communication.
14  It was all a big blur and decisions were made that
15  were best at that time.  And when they came up again,
16  which I think I've stated many times, was in, I
17  believe, late August, early September would clearly
18  have been after the incident with the horses.
19    Q.   Good.  All right.  So was that all done
20  in one day or did they stay overnight in Bismarck for
21  at least one evening?
22    A.   I don't recall.
23    Q.   How did they get to Bismarck?
24    A.   I don't recall.  I don't recall if they
25  went on to other areas in North Dakota.  I don't

Page 159

1  recall if they took the opportunity being in North
2  Dakota to conduct other liaison visits or meet with
3  other departments or go to other Indian reservations.
4  I don't recall what happened.
5    Q.   Why did you think to volunteer that?  I
6  didn't ask about that.  So I'm curious now that you
7  volunteered that that -- were they there with other
8  aspects of an itinerary that you were not part of or
9  not?
10    A.   I don't recall.  The reason I volunteer
11  that is that it would be unusual to travel the
12  450 miles from headquarters and not take advantage of
13  the trip.
14    Q.   Headquarters being where?
15    A.   Minneapolis.
16    Q.   Did anyone from the headquarters of the
17  Federal Bureau of Investigation in Washington, D.C.
18  or -- where are the other headquarters that you
19  mentioned?  I said Quantico, but you corrected me.
20  Where is the FBI headquarters based?  Is it in
21  Washington, D.C., downtown Washington, D.C.?
22    A.   Yes.  935 Pennsylvania Avenue.
23    Q.   Any people from headquarters of the
24  Federal Bureau of Investigation in Washington, D.C.
25  come to the state of North Dakota?

Page 160

1    A.   Yes, they did.
2    Q.   Who?
3    A.   Members of CIRG.
4    Q.   Right.  The drone unit people?
5    A.   There was also behavioral science people
6  who came.
7    Q.   What does that mean?
8    A.   There were -- it was a team.  I still
9  don't understand their purpose, but there was a team
10  of, I believe, three or four members from the
11  behavioral science unit that came out to -- I don't
12  know what they were doing.  It seemed kind of odd,
13  but, you know, we did whatever we could to facilitate
14  their movement around North Dakota.
15        And they met with various law enforcement
16  officials and they attended some of the TOC briefings.
17  Like I said, I don't know what they were doing in
18  country -- or not in country, but in North Dakota
19  because I didn't understand their purpose and I didn't
20  understand what they actually contributed to the
21  overall response.
22    Q.   Why were they there?
23    A.   I do not know.
24    Q.   How long did they stay?
25    A.   They made a couple of visits.  I want to

Page 161

1  say they might have stayed, like, three or four days,
2  then left and came back.  They might have stayed a
3  week.  One may have stayed longer than the other.  I
4  don't recall with specificity, but -- it was not a
5  continuous presence, but it was not a single visit
6  either.
7    Q.   Were they there keeping an eye on you?
8  I'm confused by these folks from your same agency
9  there that are a bit unclear in purpose to you, the
10  lead person for the FBI, with respect to this event --
11  these events.  I'm just trying to understand the
12  connection.
13    A.   I agree with you.  I don't know if they
14  were there to check up on me or if they were checking
15  up on the Bureau at large or if they were trying to
16  offer resources to the, you know, law enforcement
17  resources in general.  You know, it wouldn't surprise
18  me if they were there to check up on me.  And it
19  wouldn't surprise me if they were there trying to
20  figure out if there was something in the motivation of
21  the protesters that they could identify that would be
22  of benefit to law enforcement to understand.
23    Q.   Are these the same people that were from
24  the FBI or Department of Justice who were
25  investigating law enforcement?

159:23-160:21;
160:24-161:6
401-402; 602

Jacob O'Connell
August 16, 2022

Page 162

1     A.   No.  This was a different group.

2          Q.   But there was such a group.  That's just

3    a different entity or group of people?

4          A.   Again, my knowledge is they were from the

5    behavioral science unit as far as their specific skill

6    set.  I know that there was a -- there wasn't any

7    consistent appreciation for their presence and it was

8    completely different than some of the civil rights

9    activities that went on.

10         Q.   Did Mr. Perry ever have an opinion about

11   who these people were and why they were there?

12              MS. BOBET:  Objection; calls for

13   speculation.  You can answer.

14         Q.   (BY MR. SEBY) To your knowledge.

15         A.   I honestly can't give you an answer on,

16   you know, what Perry would have shared with them or

17   without them.  I had a somewhat contentious

18   relationship with Bob Perry and so I didn't spend a

19   lot of time trying to understand his mentality.

20   That's about all I have to say on that matter.

21         Q.   Why did you have a contentious

22   relationship with your boss?

23         A.   I thought he was a bit of a -- he didn't

24   like confrontation, and I don't understand how you can

25   be in law enforcement and not accept confrontation as

162:21-164:5
401-402; 403

Page 163

1    part of the job.

2          Q.   Does that mean when confrontation

3    presented itself as a function of issues, he ignored

4    it or disregarded it or shied away from it, neglected

5    it?

6          A.   In certain instances.  My frustration was

7    focused mostly on the organization not holding agents

8    accountable for their conduct.  And Bob Perry was very

9    much a get along, tolerate poor performance, you know,

10   just to keep the waters calm.  And that's just not me.

11   If I see something that's not going right, I'm going

12   to address it.  And it created tension between he and

13   I because my method of dealing with things was

14   different.

15              I also felt that he wasn't experienced in

16   the big bureau's capabilities because he had spent

17   most of his career in Indian country working the

18   reservations in South Dakota.  So when it came time

19   for an event like the DAPL protest, which, you know,

20   was one bad decision from going, you know, in a

21   completely different direction at any given time, I

22   felt it took a long time to get him on board to

23   actually be someone who wanted to see the

24   responsibilities of the FBI actually be fulfilled.

25              And I think we got there eventually, but

Page 164

1    it was a frustrating experience.  And like I said, we

2    were pleasant to each other.  We kept things going in

3    a straight direction, but I know he didn't care for me

4    or my style.  And honestly, I didn't care for him or

5    his style.

6          Q.   Did Mr. Perry say anything to Governor

7    Dalrymple in Governor Dalrymple's office or did he

8    just sit there?

9          A.   I don't recall.  I mean, he would have

10   participated.  Bob Perry is usually the smartest guy

11   in the room, but that doesn't mean he's the one

12   talking.

13         Q.   Does it mean that he's the smartest guy

14   in the room or is he the guy who thinks he's the

15   smartest guy in the room?

16         A.   He's the smartest guy in the room.

17         Q.   Do you recall what he told the governor

18   of North Dakota?

19         A.   I do not.

20         Q.   Do you think Mr. Perry was prepared for

21   the meeting with Governor Dalrymple by anyone other

22   than yourself?

23         A.   I have no knowledge of that.

24         Q.   Okay.  So you're not aware of whether

25   Mr. Perry was advised, directed, suggested,

Page 165

1    recommended by any other FBI or other federal

2    officials to express a certain message to the governor

3    of North Dakota?

4          A.   Not at this time.  I mean, I might

5    have -- you know, there might have been some talking

6    points shared, but it would be really speculation.

7          Q.   But as to my question, you're not aware

8    of whether he was prepared or directed or recommended

9    to say certain things at this particular meeting?

10         A.   No, not that I'm aware of.

11         Q.   Okay.  Did you communicate frequently

12   with Mr. Perry by e-mail concerning DAPL events?

13         A.   Yes, I did.

14         Q.   Like a lot?

15         A.   I don't know how to define "a lot," but

16   there was a lot of e-mail communication.

17              (Deposition Exhibit 713 was remotely

18   introduced and provided electronically to the court

19   reporter.)

20         Q.   Okay.  That's the question.  Thank you.

21   Okay.  I would like to go to Exhibit 713, please.  And

22   this is a multipart e-mail.  The final part of the

23   e-mail is from you on August 16, 2016.  You were kind

24   enough to forward a briefing from the Standing Rock

25   Sioux Tribe and the Bureau of Indian Affairs to a

Jacob O'Connell
August 16, 2022

Page 166

1  number of individuals in the State of North Dakota law
2  enforcement, some with the state, some with Morton
3  County, some with the Bismarck Police Department, and
4  the highway patrol and Burleigh County, which is the
5  seat of -- Bismarck is in Burleigh County.  And then
6  you copied your colleagues in the FBI, Robert Perry
7  and Steven -- is that Takacs?
8      A.   Hungarian.  It's pronounced Takacs.
9      Q.   Takacs.  Who is Mr. Takacs?
10     A.   He's a CBP task force officer who is part
11 of our task force here in Bismarck.
12     Q.   So is he a special agent?
13     A.   He is a border patrol agent.
14     Q.   I see.  Yeah.  I see the Internet domain.
15 Why is the border patrol in Bismarck, North Dakota?
16 Is that because they monitor primarily the Canadian
17 border with the United States?
18     A.   Yes.
19     Q.   So you were working with the border
20 patrol in some degree, it looks like; right?  Because
21 I see his name on a lot of e-mails that we were
22 provided by your counsel.
23     A.   At the time of DAPL, the office was going
24 through a transition in personnel and he was somebody
25 who I had familiarity with and had known for a number

Page 167

1  of years.  And so I kept him in the loop in case I
2  needed something done.  So this e-mail, I'm pretty
3  sure, is something I either would have sent while I
4  was out of town and I was keeping him advised in case
5  I needed something done actually in person.
6      Q.   When you say the office was going through
7  some -- I don't remember the words you used.  Sounded
8  to me like some period of change or alteration.  What
9  office were you referring to?
10     A.   The Bismarck office.
11     Q.   Of what agency?
12     A.   The FBI.
13     Q.   I see.  Now, why do you say that?
14     A.   We had a number of agents who were
15 transferring out or leaving the Bureau.  So I think we
16 had three agents all transfer out that summer and we
17 didn't have all the replacements in yet.
18     Q.   Three agents out of a five-person office?
19     A.   Is that a question or a statement?
20     Q.   It's a question.  You had three agents
21 out of a five-person office leave?
22     A.   We did.
23     Q.   And they did it the summer of 2016?
24     A.   Yes.
25     Q.   What month?

Page 168

1      A.   I want to say it started in actually 2015
2  and we hadn't had replacements.  And then we had
3  additional departures in 2016 and then we had some
4  bodies start to come in.  I think we were missing two
5  agents at the time.  Again, I might have my dates
6  mixed up, but we had agents who were either straight
7  out of the academy or coming in from other divisions
8  and either they were waiting for transfer orders or
9  the clock hadn't started when they had to be there,
10 but we were having some challenges with personnel.
11     Q.   Do you attribute the departure of any of
12 those agents to the DAPL protests?
13     A.   No.
14     Q.   Were they fired or were they just -- they
15 just voluntarily chose to leave the service of the FBI
16 or go somewhere else?
17     A.   All three left to go to other locations
18 within the FBI.
19     Q.   Were they North Dakotans originally or
20 were they sent to North Dakota and just didn't like it
21 there, wanted to go somewhere else; do you know?
22     A.   None of them were native North Dakotans.
23 And they left North Dakota because they had an
24 opportunity to go to someplace they wanted to be more
25 than North Dakota.

Page 169

1      Q.   Yeah.  So you would consider the Bismarck
2  office of the Federal Bureau of Investigation to be
3  significantly understaffed at the time of the DAPL
4  protests starting in August of 2016?
5      A.   Correct.
6      Q.   Was Mr. Perry aware of that circumstance?
7      A.   He was aware of that circumstance.
8      Q.   Do you fault him at all for the duration
9  of that problem going unaddressed?
10     A.   No, I do not.
11     Q.   Who do you fault for the slow walk of
12 getting replacements in there during the middle of a
13 burgeoning crisis?
14     A.   I wouldn't attribute it to any one
15 person.  It's just the bureaucracy of the FBI and
16 headquarters and how it relates to the staffing policy
17 and procedures and the funding of it.
18     Q.   Any relationship between that and the
19 deputy director of the FBI pulling back FBI resources?
20     A.   No, I don't think there's any tie to it.
21 And if there is, I'm not aware of it.
22     Q.   All right.  Let's go back to the exhibit
23 that we just put up on the screen.  You have not had a
24 chance to look at it, but I just wanted to introduce
25 it.  This is something that you were forwarding on to

169:1-21
Offer if other testimony re: FBI resources comes into evidence

Jacob O'Connell
August 16, 2022

Page 170

1  North Dakota law enforcement as of August 16.
2          MR. SEBY:  Rachel, if we could go back to
3  the beginning of the e-mail chain so Mr. O'Connell has
4  a chance to see what it is we're going to talk about.
5          Q.  (BY MR. SEBY) So the e-mail was not
6  produced by the United States to the State of North
7  Dakota.  This is a document that the State of North
8  Dakota produced to the United States, which I'm going
9  to talk about now.  So this chain starts with an
10  e-mail from Darren Cruzan to an individual named Jay,
11  who I don't know who Jay is.  Do you?
12          A.  He might have been the director of, like,
13  the BIA law enforcement service.  I don't recall the
14  name.
15          Q.  So that's Darren Cruzan saying to this
16  Jay fellow that he's asking him to provide a morning
17  and evening briefing on how things are going and he
18  has the assistant --
19          A.  No.  I recall who it is now.  He was BIA
20  ASAC, I believe.  What was his last name?  I don't
21  recall if he was out of Aberdeen or elsewhere in the
22  BIA system, but he was somebody who I knew previously
23  from other BIA/FBI contact.
24          Q.  Aberdeen, South Dakota?
25          A.  Correct.

Page 171

1          Q.  Is there a big BIA presence there?
2          A.  That's where they have their district one
3  headquarters, is in Aberdeen.
4          Q.  So what is an ASAC?  What does that
5  acronym stand for?
6          A.  Assistant special agent in charge.
7          Q.  So he's -- Mr. Cruzan is telling this
8  gentleman Jay that he has the assistant secretary and
9  BIA director cced as they are briefing up to the
10  secretary's office.  So this is happening in the
11  Department of Interior and Cruzan is asking for an
12  evening briefing on August 15, 6:27 p.m.  So in
13  response to that, an individual by the name of
14  Jeremiah Lonewolf -- is that Jay?
15          A.  I believe that is Jay.
16          Q.  Okay.  So Mr. Lonewolf replies to
17  Mr. Cruzan and a number of other individuals in the
18  Bureau of Indian Affairs and also includes a notable
19  person by the name of Lawrence Roberts, who is the
20  assistant secretary of the interior at this time for
21  Indian Affairs, I think.  Does that make sense?  Do
22  you agree with that?  Do you know who he is?
23          A.  I do not.
24          Q.  So he says to Mr. Cruzan on the evening
25  of August 15, 2016, that I, Mr. Lonewolf, Jay, met

Page 172

1  with the Standing Rock Sioux chairman David
2  Archambault, Junior and Greta Baker, the Standing Rock
3  Sioux Tribe internal affairs, earlier in that
4  afternoon, and then talking about the law enforcement
5  coordination efforts regarding the protest and the
6  involvement of state law enforcement, BIA, and tribal
7  programs to come up with some sort of strategy for
8  crowd management.
9          And Ms. Baker apparently stated at that
10  meeting, quote, This is bigger than Standing Rock now
11  and it's growing.  The chairman had some concerns
12  about the non-enrolled members attracted by the
13  protests and that the people in the tribe are scared
14  of them, saying that, quote, Sacred Stone Camp/Spirit
15  Camp and one of the larger number of people started to
16  camp near the Cannonball River.
17          So is that referring to a migration from
18  the small camp that you're referring to, Ms. Brave
19  Bull Allard's camp, an element of that migrating up to
20  the Corps property near the Cannonball River?  That's
21  how I read it.  Do you have any reason to disagree
22  with that?
23          A.  No.
24          Q.  Then the report from Jay goes on.
25  There's now a second camp on the north side of the

Page 173

1  Cannonball River.  Would that be your sense of this
2  the main -- what came to be referred to as "the main
3  camp"?
4          A.  Yes.
5          Q.  And goes on to report they're located on
6  U.S. Army Corps land.  And then it talks about the
7  camp on the south side of the Cannonball River on
8  Standing Rock Reservation.  So that e-mail was copied
9  to Jason Thompson in the BIA.  And Mr. Thompson is the
10  assistant director in the Office of Justice Services.
11  Where is that office located?
12          A.  I do not know.
13          Q.  And then Mr. Weir receives that e-mail
14  from the gentleman in the Bureau of Indian Affairs and
15  forwards it on to Mr. Perry and a Joseph Carpenter.
16  Who is Joseph Carpenter?
17          A.  Joe Carpenter was the headquarters agent
18  in the Indian country unit and I believe he worked for
19  Joe Weir.  And so Joe Weir would have had -- he would
20  have known all those guys.  He was a longtime Indian
21  country guy.  So there was familiarity between Joe
22  Weir, who worked at headquarters, and Carpenter who
23  worked for him, and then Joe Weir and Bob Perry were
24  peers in South Dakota.
25          Q.  I see.  So Mr. Perry, then -- actually,

Jacob O'Connell
August 16, 2022

Page 174

1  he received this e-mail and the report about this is
2  bigger than Standing Rock, et al. information.  It
3  makes its way then from the other person copied on
4  this, Michael Spitzer.  Who is Michael Spitzer?
5       A.   He would have been another agent in the
6  Indian country unit.  CID stands for Criminal
7  Investigation Division.  So I'm thinking he would have
8  been in the Indian -- right there it says "Indian
9  Country Crimes Unit."
10      Q.   You're right.  So Mr. Spitzer forwards
11 this on to another FBI individual by the name of David
12 Schultz.  And do you know -- it's PX.  What does PX
13 stand for?
14      A.   Phoenix field office.
15      Q.   Okay.  Like the Minneapolis office,
16 that's another field office?
17      A.   That's another field office that has a
18 lot of Indian country investigations.
19      Q.   Sure.  And then Mr. Schultz sends it to
20 Mr. Spitzer -- back to Spitzer and says, "I just met
21 with Jason."  Who is Jason; do you know?
22      A.   Let me see here.
23      Q.   Jason Thompson at the BIA?  There's a
24 Jason and Mr. Lonewolf, Jay Lonewolf's original
25 e-mail.

Page 175

1       A.   I think this would have pertained to a
2  meeting at FBI headquarters.
3       Q.   Okay.  So as of August 16, 2016, the
4  issue of the Standing Rock Sioux Tribe and the
5  protest -- the DAPL protests, including a camp that
6  had now been established on the north side of the
7  Cannonball River on Corps of Engineers property, news
8  of that circumstance had reached the FBI headquarters
9  as of August 16, 2016?
10      A.   Correct.
11      Q.   Yes.  So Mr. Schultz is asking
12 Mr. Spitzer, what's going on in terms of planning,
13 what kind of planning is taking events -- has taken
14 concerning the events.  And Spitzer responds saying he
15 spoke with Bob Perry and CHS.  What is CHS?
16      A.   Confidential human source, if that's the
17 context.  Yeah.
18      Q.   So a source/sources "have been tasked
19 with information gathering.  Aside from that and
20 continued communication with law enforcement partners
21 in the area, there is no involvement anticipated at
22 this time."
23           So does this mean that -- Mr. Spitzer
24 says, I spoke with Mr. Bob Perry, your boss, and that
25 as of August 16, 2016, the FBI has tasked confidential

Page 176

1  human sources to gather information in the camps?  Is
2  that the proper interpretation of all this?
3       A.   I mean, I feel like you're asking me to
4  interpret someone else's comments.
5       Q.   Let me caution that.  I'm not doing that.
6  I'm just asking, is that how you read it as well?
7       A.   That, I think, is a reasonable
8  interpretation of what's written in that e-mail.
9       Q.   That's all.  And then carrying forward in
10 the chain, Mr. Schultz that same day, Tuesday,
11 August 16 in the afternoon, passes on information from
12 a briefing that says, 5 to 800 protesters in two
13 camps.  One on the reservation and one off.  And a
14 third camp is in the works.  No camp leaders known.
15           Was this information all passed on to
16 these gentlemen from law enforcement in the state of
17 North Dakota or a mixture of that plus information you
18 think that the FBI's own sources were developing?
19      A.   Can you blow up that section of it?  I'm
20 trying to read it.  From right there.  Okay.  I've
21 read it.
22      Q.   All right.  So Mr. Perry was forwarded
23 that information from Mr. Carpenter.  And below are
24 some bullet points from the BIA meeting today.  And
25 you are brought into the chain as a recipient of the

Page 177

1  e-mail along with Mr. Perry and Joan Pecora.  I
2  believe that's a female.  Who is Ms. Pecora?
3       A.   She is presently Bob Perry's replacement,
4  but I think at the time she was, I think, the
5  supervisor for that portion -- for that area, the
6  Rapid City office.  So she would have been my peer in
7  South Dakota for the Rapid City RA.
8       Q.   Okay.  So Mr. Perry is aware of at least
9  the information in this e-mail that's being reported.
10 Is this e-mail before or after you took Mr. Perry to
11 meet with Governor Dalrymple?
12      A.   I don't know the answer to that question.
13 I would think it's before, but again, I don't know.
14      Q.   Okay.  So I guess the point I want to ask
15 you about is Mr. Perry was getting information from
16 others within the Bureau in addition to yourself that
17 reported the presence of the protest on federal land;
18 correct?
19      A.   Correct.
20      Q.   And then you kindly forwarded this on to
21 the North Dakota group that we've talked about here
22 and tell them that this is for their awareness and
23 insight regarding perspectives from Standing Rock and
24 the Bureau of Indian Affairs and you ask them not to
25 forward it on without stripping off the FBI header

Jacob O'Connell
August 16, 2022

1  information. What FBI header information were you
2  thinking should have been stripped off if they were to
3  forward it? What does that refer to? I'm just trying
4  to understand what you meant.
5      A.  Meaning it's not an official FBI
6  dissemination of information. It was a formal
7  communication. And if they were going to give that to
8  anybody that they felt was a need to know that they
9  take off the FBI portion of it so that it was not
10 something that was interpreted as being an official
11 dissemination by the FBI.
12     (Deposition Exhibit 722 was remotely
13 introduced and provided electronically to the court
14 reporter.)
15     MR. SEBY: Got it. Okay. If we could go
16 to Exhibit 727, please. Excuse me. I'm sorry,
17 Rachel. 722. If we could blow that up a little bit,
18 Rachel, please.
19     Q.  (BY MR. SEBY) So this is a calendar
20 invitation from Mr. Chris Myers, the United States
21 Attorney for the District of North Dakota at the time.
22 The date of the requested telephone conference is
23 nine -- September 1 of 2016. And the subject is
24 "Standing Rock - Federal Partners Teleconference." It
25 provides a dial code and then it says, "Good morning!

1  I would like to host a short telephone conference
2  today for our Federal partners to discuss the ongoing
3  matters regarding DAPL matter and Standing Rock."
4      And the -- Mr. Connor -- Mr. Myers'
5  calendar invitation was sent to a group that's noted
6  as required attendees, Clare Hochhalter in the U.S.
7  Attorney's Office, Gary Delorme.
8      A.  Delorme.
9      Q.  Delorme. There's three ways to say it
10 and I say it the two wrong ones. Mr. Delorme and
11 Mr. Thomas, all three gentlemen with the U.S.
12 Attorney's Office. You know those individuals?
13     A.  Yes, I do.
14     Q.  And yourself and then Mr. Paul Ward with
15 the United States Marshal Service and Dan Orr with the
16 United States Marshal Service, and your other
17 colleagues that we've been talking about, Richard
18 Thornton and Robert Perry, and then lastly Darren
19 Cruzan with the Bureau of Indian Affairs and Terry Van
20 Horn with the U.S. Attorney's Office.
21     So you and your two immediate bosses were
22 on -- or were invited to join this call. Did they
23 attend?
24     A.  I do not recall.
25     Q.  You don't recall this particular call at

1  all?
2      A.  No, I do not.
3      Q.  Was this before or after your trip to see
4  Governor Dalrymple?
5      A.  I do not know.
6      Q.  Did you participate in many calls like
7  this call with this group?
8      A.  We had very consistent communication
9  between Chris Myers, myself, Bob Perry, Paul Ward.
10 And, yeah, that was kind of, you could say, the
11 regular group that would be on the ground
12 participating. Chris Myers was the acting U.S.
13 Attorney at the time and he was doing what he could do
14 in addition to managing his caseload. I don't recall
15 specific meetings or conference calls and who
16 participated, but, you know, there was a lot of
17 communication going on.
18     Q.  So Mr. Perry was in direct communication,
19 sometimes unknown frequency, but sometimes and early
20 on in the protest with the U.S. Attorney's Office and
21 others, right, federal partners?
22     A.  Yes. He was in contact with them.
23     Q.  And you were, too?
24     A.  Yes, I was.
25     Q.  Okay. So it's not like Mr. Perry was not

1  tuned in?
2      A.  No. Bob Perry is very informed.
3      Q.  Yeah. And I know you said you had some
4  friction with him, but one of your criticisms of
5  Mr. Perry is not that he is an improperly or
6  uninformed individual; is that fair to say?
7      A.  That is a fair statement.
8      (Deposition Exhibit 724 was remotely
9  introduced and provided electronically to the court
10 reporter.)
11     Q.  If we could go to Exhibit 724, please.
12 This was an interesting e-mail chain. I apologize.
13 Several of these are long. This one was produced by
14 your counsel to us. So I'm reacting to what I've got
15 to work with. So you've got a chain communication
16 here that starts with a message from you to an --
17 August 31, 2016, to an individual named Joey Mahmoud,
18 and by his e-mail address he's with Energy Transfers.
19 Do you recall that individual?
20     A.  I do.
21     Q.  How did you find -- how did you cross
22 paths with Mr. Mahmoud?
23     A.  When I returned from Salt Lake City and
24 had kind of gone around and talked to a lot of the law
25 enforcement leadership, I then went up and basically

Jacob O'Connell
August 16, 2022

Page 182

1    introduced myself to the Energy Transfer people, just
2    cold-called them, showed up at the office.  And I
3    don't know if the first day I met Joey or if it was
4    the second, but he was basically the senior executive
5    for Energy Transfer Partners with oversight of the
6    pipeline installation.
7        Q.    You showed up at their offices in Houston
8    or Dallas?  I don't know where they're located, but I
9    think it's Texas.
10       A.    No.  They had a satellite office here in
11   Bismarck.
12       Q.    And was he there?
13       A.    I don't recall if he was there when I
14   went in.
15       Q.    Okay.  So you went to the Bismarck office
16   of Energy Transfers, knocked on the door, and then
17   introduced yourself.  That's what you're telling me I
18   misunderstood; right?
19       A.    Yes.
20       Q.    Do I have it correct?  Right?
21       A.    That is correct.
22       Q.    Okay.  So how did you meet Mr. Mahmoud if
23   he wasn't at the office?
24       A.    I don't recall if he was there when I
25   went up or if somebody summoned him or if he flew in

Page 183

1    at a later date.  I forget the exact mechanics of how
2    I came to actually set eyes on him and shake his hand,
3    but nonetheless, we met in person.
4        Q.    And so would you take a moment and read
5    the -- refresh your memory with your e-mail to
6    Mr. Mahmoud on August 31, 2016, at 1:52 p.m.
7        A.    Could you blow it up.  I recall this
8    e-mail.
9        Q.    Why do you recall it?  You're saying, "As
10   this situation continues."  What are you referring to,
11   the situation DAPL protests?
12       A.    Yes.
13       Q.    Okay.  The Bureau continues to collect
14   suggestions that the Standing Rock Sioux Tribe
15   government attempted to solicit a large amount of
16   money from DAPL/ETP in relation to the construction
17   route of the DAPL pipeline.  What is this that you're
18   investigating or looking into?
19       A.    We were looking into allegations that
20   there might have been corruption by some of the tribal
21   government to solicit, in essence, a payoff for their
22   support of the pipeline route and that that's what the
23   protest was created over.
24       Q.    Did that have any merit?
25       A.    We did not investigate it in detail

Page 184

1    because we couldn't really get anybody to confirm it.
2    And, again, there was more going on than worrying
3    about such allegations, even though they're serious.
4        Q.    And then Mr. Mahmoud responds to your --
5    you ask him, Is there any truth to these reports and
6    how do you know, because ETP would have been the party
7    receiving such a shakedown, if you would, if it was
8    true.  And you got a response from Mr. Mahmoud saying,
9    "It was never official."  I've got an e-mail from one
10   of my lawyers.  "It was never an official request.
11   They did ask for a through-put fee at one time."
12   What's a throughput fee?
13       A.    My --
14       Q.    Pardon me.  I didn't mean to interrupt
15   you.
16       A.    My interpretation of the throughput fee
17   would be based on the volume of oil passing through
18   the pipeline as a means to generate revenue for the
19   tribe.
20       Q.    The pipeline doesn't go through the
21   Standing Rock Sioux Tribe Reservation, does it?
22       A.    It does not.
23       Q.    He goes on to say, though, that it "was
24   an unofficial request and not from the Chairman or
25   their leadership."  He never took it seriously.  "And

Page 185

1    yes it was a quid pro quo."  So it sounds like that at
2    least from ETP's standpoint being on the receiving
3    end, something along those lines was presented to them
4    and Mr. Mahmoud is saying it wasn't official from the
5    chairman or their leadership.  Never took it
6    seriously, but he does say it was a quid pro quo;
7    right?
8        A.    That's what's written in the e-mail.
9        Q.    Yeah.  And so then the discussion
10   continues from you.  You ask him who is this
11   unofficial source.  And you don't want to gin things
12   up, you're saying, but we need to understand what's
13   going on.  And I'm paraphrasing your words.  I'm not
14   stating what they are.
15            He writes back and says -- he bears with
16   you and stays in the conversation.  And he mentions an
17   individual -- two individuals associated with this
18   unofficial request for a transfer fee for movement of
19   product through a pipeline that isn't even on this
20   reservation.  And he names an individual named Archie
21   Fool Bear suggested setting up a contingency fund in
22   case of a spill.  He's not a tribal leader, but he
23   aspires to be one.
24            And Mr. Mahmoud goes on to say he's not
25   trying to take advantage, but he's trying to find a

Jacob O'Connell
August 16, 2022

Page 186

1 way to help bring closure and sell it as a protection
2 fund to the tribal members. But then he goes on to
3 say a more direct request and suggestion was from a
4 person named Rob Gayton, who suggested the payment for
5 each thousand gallons that flows through the pipeline,
6 that would provide the tribe skin in the game.
7           Did you ever look into Mr. Gayton, who
8 this fellow is?
9      A.   No, I did not.
10     Q.   You go on to say, Let me know if you have
11 any questions over the weekend regarding any more
12 rumors. Were you ever asked not to do anything on
13 this matter?
14     A.   Not that I recall.
15     Q.   Is it fair to say that you were told to
16 not pursue this kind of thing where you've been given
17 specific names? I mean, Mr. Gayton, his name is
18 offered by ETP as someone who made a direct request
19 for a fee based upon the capacity or volume of oil
20 unit and that money would be paid to the tribes to
21 give them skin in the game. Is it plausible that if
22 someone said, Hey, Mr. O'Connell, Jacob, drop this,
23 you'd remember that?
24     A.   Of course I'd remember that, but more
25 importantly, there's no criminal activity there.

Page 187

1 There's merely a suggestion of a working arrangement.
2      Q.   Yeah. Yeah. I wasn't suggesting
3 criminal conduct or intent or behavior. I'm just
4 asking you about the e-mail as it's stated and if
5 someone asked you not to pursue this further -- and I
6 understand you said you didn't recall, but if someone
7 did, that would be something that would be worthy of
8 being remembered. Is that a fair sum of our exchange
9 just now?
10     A.   I mean, I guess I don't understand the
11 question. Are you looking at more towards my moral
12 character or are you asking me if I remember if
13 somebody asked me to do something that would have been
14 unethical and inappropriate?
15     Q.   I have zero reason to question, nor am I
16 questioning your moral character in the least. I'm
17 asking you if someone told you, Hey, I know you're
18 asking questions about this, stop, that's probably
19 something that would stick in your mind; right?
20     A.   Yes, it would.
21     Q.   That's all I was asking. He goes on to
22 tell you further -- well, you reply to that and say,
23 "We know you have a pipeline to build while law
24 enforcement just wants to avoid autopsies and
25 funerals," and it's going to be an interesting week

Page 188

1 ahead -- couple of weeks ahead.
2           And then Mr. Mahmoud continues and says,
3 "Have you heard that the protesters" -- I'm sorry.
4 I'll give Rachel a chance to catch up. I apologize,
5 Rachel. Mr. Mahmoud asks you if you've heard that the
6 protesters attacked ETP crews while working and trying
7 to get off their right-of-way for the pipeline. They
8 beat up some of the security guards and a dog. And
9 the sheriff responded. "This is out of control and
10 the so called peaceful protest is anything but and is
11 a total fabrication by the opposition." Pretty strong
12 words and developments.
13          And you respond and say, "Yes. We're
14 aware of the situation," September 3. So you were
15 aware that people were coming from the camps on Corps
16 property and attacking the ETP site, at least as of
17 September 3, which I think is the same day as what's
18 known as "the dog incident," I believe. Does that
19 mesh with your understanding or recollection?
20     A.   That's what the e-mail chain seems to
21 suggest, but I don't recall the date independently of
22 this e-mail.
23     Q.   Then Mr. Mahmoud continues and says, "I
24 hear you all are taking the lead on the
25 investigation." Is that correct or not correct?

Page 189

1      A.   That's what the e-mail states, but we
2 never had any intention of investigating anything
3 beyond assessing what we would consider, you know,
4 articulable facts that were somewhat accurate. So
5 this is something that didn't fall into the federal
6 purview.
7      Q.   Why was that?
8      A.   Having the interaction between the two
9 groups was not a federal violation. I mean, you could
10 have -- if you wanted to reach, you could say, there
11 was some form of motivation that would have
12 potentially triggered some form of federal
13 investigation, but I didn't feel it was there. And
14 Joey Mahmoud is a very aggressive personality, very
15 accomplished, and he's used to being the man in
16 charge. And I think he was frustrated that he wasn't
17 in charge of the FBI.
18     Q.   He mentions an individual by the name of
19 Dallas Gold Tooth, who apparently was on social media
20 bragging about the events of the day, the trespass and
21 other things that Mr. Mahmoud is telling you about,
22 and that he's the ring leader making this violent.
23 Did you ever look into who Mr. Gold Tooth was? Not a
24 "Bond, James Bond" character, but this fellow Dallas
25 Gold Tooth?

Jacob O'Connell
August 16, 2022

Page 190

1    A.   I'm sure we would have given him -- you
2  know, we would have queried our systems to see if his
3  name came up, but, you know, again, there's a lot of
4  room between what the FBI's mission is and what we
5  were doing versus what Joey Mahmoud's expectations
6  were.
7    Q.   So these opinions you formed about
8  Mr. Mahmoud, were they present in your mind as of
9  September 3, 2016, hothead, aggressive, wished he had
10 control over the FBI, didn't, that kind of thing?
11   A.   I think it's accurate.  I mean, you are
12 in Denver.  You know what it's like to deal with the
13 oil industry.  Time is money and they make a lot of
14 money.  And their time is valuable and they want
15 everything done now.  And that's just not how the FBI
16 operates.  That's not how law enforcement operates.
17 And so he was very frustrated with everything.
18        (Deposition Exhibit 726 was remotely
19 introduced and provided electronically to the court
20 reporter.)
21   Q.   So if we could go to Exhibit 726, please.
22 So we got a bunch of e-mails from your counsel that
23 are parts of the same communication.  So I am putting
24 this up here to show you because it's a separate
25 document, not one I invented, but because your counsel

Page 191

1  gave it to us that way.
2        So this exhibit is a continuation of the
3  same string that we've been talking about from bottom
4  to top and it includes the one that we were speaking
5  about previously, the e-mail from Mr. Mahmoud to you
6  reporting Dallas Gold Tooth's identity and behavior.
7        And you respond now with this one to
8  Mr. Mahmoud on September 4.  Yes.  There we go.  Let
9  me give you a chance to read it.  I don't want to get
10 ahead of you.
11   A.   I've read the e-mail.
12   Q.   Okay.  So you say that "the FBI is paying
13 very close attention to all facets of the ongoing
14 situation; from the executives in DC to the Agents
15 working the ground in North Dakota, everyone is very
16 aware of the variables."
17        Who are the "executives in DC" that
18 you're referring to in the FBI?
19   A.   Everybody from the director down to Joe
20 Carpenter, who we've been -- the low man on the totem
21 pole at headquarters.
22   Q.   So Director Comey was advised as of
23 September 4 about the protests?
24   A.   I wouldn't know that with specificity,
25 but --

Page 192

1    Q.   I thought you just told me that.
2    A.   I don't know the timeline of when he was
3  first informed of DAPL, but I know that the briefing
4  mechanism in the Bureau would have included DAPL and
5  it would have gone from -- again, through the chain of
6  command up to the director's daily briefing, which
7  every division is going to have the priorities or
8  activities in that briefing document.
9    Q.   So you would not be surprised to learn as
10 a matter of fact that Federal Bureau of Investigation
11 Director James Comey was made aware as of September 4,
12 2016, of the DAPL protests occurring in North Dakota?
13   A.   I don't know the date.  If you took the
14 date out of it, I would say yes.  Was it that specific
15 date?  I do not know.
16   Q.   Okay.  Again --
17   A.   I would be -- I will offer to you that I
18 would be surprised that the director wasn't aware of
19 what was going on in North Dakota prior to
20 September 4.
21   Q.   And do you say that for any particular
22 reason or just because as an institutional way in
23 which the Bureau reported things and brought them up
24 to a point at the top and he was there?
25   A.   I knew from personal experience as being

Page 193

1  part of that process while I was at headquarters that
2  the intelligence product was prepared the night before
3  and that the executives started to digest it and brief
4  it and prepare for the meeting with the director
5  around 4 a.m. every morning.
6    Q.   Okay.  It was Mr. Comey's practice to be
7  up and at work at 4 a.m.?
8    A.   No.  The apparatus below him would be up
9  and working at 4 a.m.  And it was typical that the
10 assistant section chiefs, which would be comparable
11 to, say, Bob Perry at headquarters, would be up
12 digesting the information to identify what they felt
13 was important and the priorities.  And then they'd be
14 briefing their boss, the section chief, who would then
15 meet with the deputy assistant director, who would
16 then meet with the executive assistant director, and
17 then it would be the deputy director, and then finally
18 the director would be involved.
19        So you had that entire mechanism
20 preparing to develop the brief for the director from
21 4 a.m. to whenever the meeting would occur, with the
22 intent that if there was something in there that the
23 director had to bring to the President of the United
24 States, it was fully researched and packaged in a
25 manner that was succinct and worthy of that level.

Jacob O'Connell
August 16, 2022

Page 194

1       Q.   Yeah.  I understand.  Okay.  Thank you
2   for that.  Of course that would include the deputy
3   director, Mr. McCabe; right?
4       A.   Yes.
5            (Deposition Exhibit 727 was remotely
6   introduced and provided electronically to the court
7   reporter.)
8       Q.   Let's see here, if we can go to
9   Exhibit 727.  And if we could blow that up, this is an
10  e-mail that starts from an individual named Brian Hoff
11  reporting to you.  If you would take a moment and read
12  that, please.
13      A.   I've read the e-mail.
14      Q.   Okay.  Up at the top you send this e-mail
15  on to Mike Gerhart, Colonel Mike Gerhart from the
16  North Dakota Highway Patrol, the head of the highway
17  patrol, and Sheriff Kyle Kirchmeier from Morton
18  County, State of North Dakota, copying to your boss
19  Mr. Perry.  But the e-mail that Mr. Hoff sends you
20  says that he and Mr. Takacs are following up on
21  information received about the possibility of long
22  guns at the pipeline camp.  Would you explain to me
23  what a long gun is.
24      A.   Typically a long gun is a reference to
25  some form of rifle or shotgun.

Page 195

1       Q.   And I guess this e-mail is just
2   recounting the types of information that they're
3   getting, direct and indirect, from individuals about
4   long guns and knives, long knives, and people getting
5   excited about it and relating it to Wounded Knee in
6   1973 and that sort of thing.
7            You reported to the sheriff this
8   information, but you characterized it as
9   "unconfirmed."  Is this the only information that the
10  Bureau heard along the way in the pipeline protest
11  saga?  This one is September 4 of 2016.  Is this the
12  only instance where you were told that there could be
13  guns and knives in the camps?
14      A.   No.  There was multiple reports at
15  multiple times throughout the entire incident.
16      Q.   Of what?
17      A.   Of the protest.
18      Q.   That there were knives, long knives, and
19  long guns present in the protest camps; correct?
20      A.   Yes.
21      Q.   It was at least worthy of sharing with
22  North Dakota law enforcement, in your opinion; is that
23  fair to say?
24      A.   Anything that has to do with law
25  enforcement safety is going to be shared in one

Page 196

1   capacity or another.
2       Q.   And that's because while it may be
3   unconfirmed, you don't want to take any chances.  And
4   this information is relayed to you and you were
5   sharing it with North Dakota; is that fair?
6       A.   I think that's accurate.
7            (Deposition Exhibit 730 was remotely
8   introduced and provided electronically to the court
9   reporter.)
10           MR. SEBY:  All right.  If we can go to
11  Exhibit 730, please, Rachel.
12      Q.   (BY MR. SEBY) And this is a report of a
13  September 5 meeting between the Standing Rock Sioux
14  Tribe, the Oceti Sakowin Unified Nations Camp, and law
15  enforcement discussions, meeting summary.  And it's
16  interesting because the person sending this e-mail to
17  Colonel Gerhart, General Dohrmann, Darren Cruzan with
18  the BMA, Mr. Delorme, other individuals, Sheriff
19  Kirchmeier, Paul Ward, the U.S. Marshal -- I'm
20  confused because you're mentioned on this, but I don't
21  see your name in the e-mail.  It just says, "Hello
22  Representatives.  Attached is a summary of yesterday's
23  meeting outcomes."  I guess is this suggesting that
24  you were present at the meeting?  Do you see that?
25      A.   I don't recall.  I see my name.  I don't

Page 197

1   know what the context is or if there was a mistake.  I
2   don't know how to interpret my name there.
3       Q.   Well, let me ask you this:  Did you
4   attend a meeting on September 5 between the Standing
5   Rock Sioux Tribe and this Oceti Sakowin Unified
6   Nations Camp and law enforcement?
7       A.   I do not recall.  We -- at least within
8   the FBI, we considered this Rosa Salamanca to be not
9   somebody that we had complete trust and faith in.
10      Q.   Even though she was -- she's part of your
11  apparent agency, the U.S. Department of Justice.
12  She's probably -- well, yeah.  She's here in Denver,
13  Colorado.  And her title is senior conciliation
14  specialist, community relations service, U.S.
15  Department of Justice.  What do you know about that
16  office and why do they exist?  What's their mission
17  and function?
18      A.   I do not know.
19      Q.   Is this the civil rights group you were
20  telling me about that you were puzzled by them?
21      A.   No, this is not.
22      Q.   This a third DOJ entity, apparently?
23      A.   Correct.
24      Q.   Okay.  So United States Department of
25  Justice was involved in the State of North Dakota and

Jacob O'Connell
August 16, 2022

Page 198

1  Dakota Access Pipeline's issues, but they were
2  involved in these ways; right?  Ms. Salamanca was
3  dispatched to North Dakota to meet with the tribe,
4  which sounds reasonable.  She also apparently met with
5  a group called the Oceti Sakowin Unified Nations Camp.
6  Do you have any idea what that refers to?
7       A.  I do not.  Not offhand, no.
8       Q.  You think it's possible that it's a
9  reference to some individual or individuals in the
10 Oceti Camp, the main camp on Corps of Engineers land
11 north of the Cannonball River, and these people known
12 as the Oceti Sakowin Unified Nations Camp are
13 purporting to be its leadership?
14      A.  It could be.  There was -- you know, as a
15 matter of my perspective, there was -- every week
16 there was a new group claiming to be in charge in the
17 leadership; yet nobody was in charge.  It was
18 basically a disorganized mess.  So for anybody to say
19 they were in charge, you kind of brush it off after a
20 while because they didn't have the capacity to
21 actually change anything.
22      Q.  Was the FBI keeping up with this
23 "leadership group du jour" kind of circumstance?
24      A.  As a matter of process, I'm sure we were
25 doing our due diligence on any name or personality

Page 199

1  that presented itself just based on, again, trying to
2  make sure we understand who was around, what their
3  background was, their criminal history.
4       But no, we did not sit and, you know,
5  figure out whoever was in charge that day and what we
6  were going to do about it.  It wasn't our role.  Our
7  role was not to try to moderate the discussion between
8  elected officials or organizational leaders.  It was
9  to, again, stick to our core responsibility of
10 investigating federal crime and collecting
11 intelligence and disseminating it when appropriate.
12      MR. SEBY:  So if we could turn to the
13 attachment, please.  If we could turn to the end of
14 this document, Rachel, and we'll come back.  I just
15 want to note something at the bottom.
16      There at the very bottom it says -- this
17 is a two-page meeting summary of something that
18 occurred on September 5, 2016.  It says it's prepared
19 by Rosa Salamanca, community relations service, United
20 States Department of Justice.  And now if we could go
21 back up to the top, Rachel, please, and blow up the
22 first two paragraphs.
23      Q.  (BY MR. SEBY) So Ms. Salamanca's notes
24 here -- her report, I should say, meeting summary, she
25 starts by saying on September 4, 2016, the Standing

Page 200

1  Rock Sioux Tribe Chairman requested an opportunity to
2  meet with law enforcement in order to address press
3  inaccuracies and clarify specific details regarding
4  the actions taken by DAPL security during the
5  September 2, 16 altercation.
6       Do you know what that refers to?  What
7  happened on September 2, 19 -- pardon me -- 2016?
8       A.  I'm not aware of what specific events.
9  She might have made a mistake on the day.  I have no
10 idea.
11      Q.  And then it goes on to say Chairman
12 Archambault wasn't able to come to the meeting, so he
13 sent somebody else.  Then it goes on in the second
14 paragraph, from 11 a.m. to 2 p.m. on September 5, the
15 next day -- it says the North Dakota United States
16 Attorney assisted in convening the North Dakota
17 Highway Patrol, Morton County sheriff, United States
18 Marshal, Standing Rock tribal representatives --
19 that's Ms. Baker, Greta Baker, who was referenced
20 earlier -- and camp leadership Taken Alive, Plenty
21 Wolf.  Do you know who these people are, Taken Alive
22 and Plenty Wolf?
23      A.  I do not.  Those are very common last
24 names in Indian country.
25      Q.  Well, September 5, do you know these

Page 201

1  people to be camp leadership?  I'm just curious.
2       A.  They could have called themselves that,
3  but again, there was nobody in charge of that camp.
4       Q.  And the interesting thing is
5  Ms. Salamanca is distinguishing them as a party worthy
6  of representation separate from the Standing Rock
7  Sioux Tribe and the Army Corps of Engineers, who's not
8  even at this meeting or invited apparently and
9  happened to be the landowner.  What's up with that?
10      MS. BOBET:  Objection; calls for
11 speculation.
12      Q.  (BY MR. SEBY) I'm sorry, Mr. O'Connell.
13 Your counsel interrupted.  What were you saying?
14      MS. BOBET:  It's clear for the record I'm
15 making an objection that it calls for speculation.
16 You can answer.
17      A.  My answer is that you should ask them
18 because I don't know why they did what they did.
19      Q.  (BY MR. SEBY) Got it.  And I just note
20 that Mr. Cruzan was present and Mr. Van Horn, who's
21 noted as being affiliated with the FBI, but I believe
22 he's not with the FBI.  He's with the U.S. Attorney's
23 Office; is that correct?
24      A.  That is correct.
25      Q.  But then it goes on to note Mr. -- or

Jacob O'Connell
August 16, 2022

Page 202

1  Sheriff Paul Laney, Cass County, North Dakota, and
2  Special Agent Jacob O'Connell and Major General
3  Dohrmann.  Doesn't even refer to him in his capacity
4  as a State of North Dakota representative.  So
5  according to Ms. Salamanca's report, right or wrong,
6  she attributes you being present in this meeting.  Do
7  you recall that, sir?
8       A.   I do not recall the meeting.  I mean, it
9  says others teleconferencing in were tribal attorneys.
10 So, no, I don't recall any specific meeting with
11 Ms. Salamanca.
12      Q.   You're right.  Thank you for pointing
13 that out.  Your reference is as an other person
14 teleconferencing, I believe, is the way that should
15 read.  Do you recall participating in this by
16 teleconference?
17      A.   I do not.
18      Q.   But you said you didn't meet her.  I
19 appreciate that.  And I wouldn't say I had met a
20 person I spoke to solely on the phone, but did you
21 ever speak with her on the phone individually or as
22 part of a group call like this?
23      A.   I do not recall any one-on-one or
24 subject-specific group meeting with Ms. Salamanca.  I
25 do remember her being present in the room.  I do

Page 203

1  recall her having access to the space.  And I recall
2  her as being somewhat of a controversial figure and
3  that as time went on, she became more and more
4  unwelcome within the environment.  And at some point
5  in time, she left.
6       Q.   More and more unwelcome by whom?
7       A.   The senior leaders.
8       Q.   Of who?
9       A.   The sheriffs, major general.
10      Q.   Okay.  North Dakota law enforcement?
11      A.   Correct.
12      Q.   And I believe -- but correct me because I
13 don't want to say things that are not accurate.  I
14 believe you said that the FBI, at least maybe you and
15 your local FBI colleagues, thought she was a bit
16 unusual, too; is that fair?
17      A.   Other people had more exposure to her
18 than I did.  Again, when I take a step back and look
19 at her, I just didn't feel the need to be part of her
20 orbit or have her be part of mine in the performance
21 of the FBI duties.
22      Q.   The fact that she's a Department of
23 Justice person, a sister agency to yours within the
24 Department of Justice, that didn't carry any weight,
25 credibility, or deference?

Page 204

1       A.   Nothing.  The FBI has a long history of
2  independence from DOJ.
3       Q.   I guess I'm struck by the fact that the
4  United States government sent a representative to
5  convene a meeting with law enforcement busy working
6  with the crisis emanating from federal land and they
7  were all called to convene to listen to this
8  complaining about press reports?
9       A.   Is that a statement or a question?
10      Q.   I'm stating an observation.  It is a
11 question.  I'll just finish it here so you can hear
12 it.  I'm puzzled why a Department of Justice person
13 dispatched by the United States to convene a meeting
14 at the request of a tribe whose property this pipeline
15 doesn't cross and it's convening a meeting of law
16 enforcement who are in the middle a crises emanating
17 from federal land and they include representatives who
18 purportedly tell them that they're the camp
19 leadership.  Do you think that's kind of strange?
20      MS. BOBET:  Objection; vague, misstates
21 evidence, calls for speculation.
22      Q.   (BY MR. SEBY) There's your question,
23 Mr. O'Connell.
24      MS. BOBET:  You can answer.
25      A.   I agree.  I think it's odd.  It's not a

Page 205

1  question I can answer.
2       (Deposition Exhibit 733 was remotely
3  introduced and provided electronically to the court
4  reporter.)
5       Q.   (BY MR. SEBY) I understand.  I
6  understand.  I don't know what to make of it.  It's
7  odd.  It's weird.  It's unusual.  I'll move on.  If we
8  could go to Exhibit 733, please.  This is an e-mail
9  from you to Colonel Michael Gerhart with the -- well,
10 pardon me.  It's an e-mail not from you to Mr. -- or
11 Colonel Gerhart.  It's an e-mail from you dated
12 September 30, 2016, to a gentleman by the name of
13 Michael Futch with Park Forest Partners.  Who is Park
14 Forest Partners; do you know?
15      A.   That was just an e-mail for Michael
16 Futch.  My understanding is that he was basically the
17 project manager for Energy Transfer Partners and he
18 was brought in after Tony whatever his name was,
19 Mahmoud, left the situation.
20      Q.   Joey Mahmoud?
21      A.   I'm sorry.  Yes, Joey Mahmoud.  So Mike
22 Futch came in and was actually a consistent presence
23 on the ground.
24      Q.   Okay.  But he was an ETP representative?
25      A.   He told me that either he was a previous

Jacob O'Connell
August 16, 2022

Page 206

1 employee of Energy Transfer Partners or he was a
2 consultant that had history with them, but that they
3 had basically a productive working relationship
4 historically and that's why he was up there.  He was
5 very capable.
6        Q.   Okay.  How did you find this individual
7 Mr. Futch?
8        A.   I don't recall the first time I was put
9 in contact with him.  I think it was through Joey
10 Mahmoud basically responding to a query saying, I'm
11 not the guy anymore, talk to Michael Futch.
12        Q.   Okay.  So would you take a minute and
13 read your e-mail to Mr. Futch.
14        A.   I've read the e-mail.
15        Q.   So here this e-mail is dated
16 September 30, 2016, and you're asking Mr. Futch "to
17 get access to DAPL contractors who were involved in,
18 or observed the September 3rd melee."  And, again,
19 isn't the September 3 event -- now you're referring to
20 it specifically.  Isn't that the dog-bite event?
21        A.   I believe that is true.
22        Q.   Where basically protesters came from the
23 Corps property and blasted into the ETP private
24 property and attacked the security, the DAPL workers
25 generally, and then, as I think you said, did a social

Page 207

1 media fraud job on purporting to say that the security
2 had security dogs and that they bit a young girl in
3 the face when that was not correct?
4        A.   Again, is that a question or is that a
5 statement?
6        Q.   Yes.  I'm asking you, is that what you
7 recall the September 3 melee to basically involve?
8        A.   Yes.  I believe that's the conflict, the
9 date of that incident.
10        Q.   Okay.  Then as a result of that
11 circumstance, you're going to be escorting -- I'm not
12 suggesting you've got any complicity here.  I'm just
13 saying that you are saying that you'll be escorting a
14 DOJ civil rights attorney, Ms. Dana Mulhauser, the
15 following week and she is coming out to North Dakota.
16 Do you know where Ms. Mulhauser is based?
17        A.   She's the DOJ civil rights section.
18 She's a trial attorney.  She had responsibility for
19 North Dakota.  And I can't remember if this is the
20 first time I've worked with her or the second.
21        Q.   She's in Washington, D.C.?
22        A.   She's based in Washington, D.C., yes.
23        Q.   At the Department of Justice
24 headquarters?
25        A.   Yes.

Page 208

1        Q.   Whose decision was it to dispatch
2 Ms. Mulhauser to come investigate the September 3
3 events, the dog-bite event?
4        A.   I do not know.
5        Q.   So this is yet another DOJ special
6 program.  Ms. Salamanca is one and here's another;
7 right?
8        A.   She's a DOJ civil rights attorney.  You
9 know, in the DOJ brand, the civil rights section is an
10 important one.
11        Q.   No doubt.  No doubt.  But she's
12 responding to a letter that's attached to your e-mail
13 from the chief of the Cheyenne River Sioux, Harold
14 Frazier, to the Attorney General of the United States.
15 So how did it come that a letter to the attorney
16 general was acted upon with such haste to dispatch a
17 federal Department of Justice attorney to come check
18 it out and you're going to escort her?
19        MS. BOBET:  Speculation.
20        Q.   (BY MR. SEBY) I'm asking your opinion,
21 sir, your belief and understanding.  I'm not asking
22 you to speculate.
23        A.   I mean, that's a politicalization of DOJ.
24 Some things get attention and some things do not.
25 That got attention.  I don't know how it received its

Page 209

1 attention.  I don't know how it's communicated and I
2 don't know who was involved in the decision to send
3 Ms. Mulhauser, but either way she called me and I did
4 my job, facilitated her movement.
5        Q.   Are you aware that as of the date of this
6 letter to the attorney general of the United States,
7 the attorney general of the United States had spoken
8 by telephone to the governor of the state of North
9 Dakota wherein pleas were made for assistance by the
10 federal government, including from the Department of
11 Justice, to the State of North Dakota's aid and there
12 was no such response, period, much less the dispatch
13 of a federal justice department lawyer to come
14 investigate?  Are you aware?
15        MS. BOBET:  Objection; assumes facts.
16 You can answer.
17        A.   I was not aware.
18        Q.   (BY MR. SEBY) Okay.  Let's see.  So the
19 date of that -- your e-mail saying that she's coming
20 out is whatever the week after September 3, so the
21 second week of September.  Do you remember escorting
22 Ms. Mulhauser?
23        A.   Yes, I do.
24        Q.   And what did you do?  Who did you talk
25 to?  What did you look at?  Where did you take her?

Jacob O'Connell
August 16, 2022

Page 210

1      A.    I recall that I picked her up from her
2   hotel.  And I don't know the chronology of the events,
3   but I recall that we met with the law enforcement
4   leaders.  I do not recall if she reinterviewed the
5   individuals that I had spoken with, but we did at some
6   point in time go down to the casino to meet with the
7   affiant and her handlers to kind of review things.
8            And then I think we also stopped at the
9   site where the confrontation occurred.  And then, you
10  know, we looked at the camp on our way down to the
11  casino.  Basically everything that I said we were
12  going to try to do in that e-mail is what we did, but
13  I don't recall the exact chronology and how it went
14  down.
15      Q.    So you said that you interviewed
16  individuals about this allegation, the alleged event;
17  right?
18      A.    Correct.
19      Q.    And who are those individuals, just for
20  my benefit?
21      A.    The two individuals named in the e-mail
22  there, Dale McBride and Curtis Allums.
23      Q.    And who are these individuals?
24      A.    They were heavy equipment operators for
25  the contractor actually digging the hole for Energy

Page 211

1   Transfer Partners.
2      Q.    I see.  And you thought you got a fair
3   understanding of things from them?
4      A.    They were very good witnesses.
5      Q.    What were they telling you happened?
6      A.    That they were almost spontaneously set
7   upon by protesters and that their attempts to depart
8   the scene were frustrated by protesters and that the
9   security personnel basically provided enough of a
10  buffer for them to basically run away back down the
11  pipeline route.  I mean, those two individuals were --
12  they feared for their lives.
13      Q.    And the security personnel that
14  intervened and made the difference, it sounds like,
15  were ETP security?
16      A.    I don't think they were ETP employees,
17  but they were under the -- they were retained by ETP.
18      Q.    Okay.  And what is it -- what event is it
19  that Ms. Mulhauser is investigating in that context?
20  Is there an allegation that -- I guess there's an
21  affidavit here by a -- just give me a moment.  I'm not
22  going to purposely mispronounce this, but her name is
23  Ta'Sina Sapa Win Smith?
24      A.    Yeah.  I don't recall her name.
25      Q.    What was the allegation?

Page 212

1      A.    You'd have to consult the affidavit.  I
2   seem to recall that Chairman Frazier was taking the
3   position that her civil rights were violated by the
4   fact that she got bitten by the dog.
5      Q.    While trespassing on somebody else's
6   property.  What did these individuals tell you when
7   you interviewed them?
8      A.    What I stated earlier on the record is
9   that they were basically surprised, overwhelmed, and
10  were trying to get out of there and they couldn't.
11  And the security individuals showed up, provided
12  enough time and space for them to basically run away,
13  and that then I seem to recall that they were able to
14  get into one of the security vehicles that was also
15  trying to get out of there.
16      Q.    I'm trying to understand what's the
17  relationship between the woman who Chairman Frazier is
18  advancing the cause of alleging she got bitten by a
19  dog and the events of these two individuals being
20  attacked fearing for their lives and barely making it
21  out alive.  What's the relationship between those two
22  things?
23      A.    I think Frazier felt he represented Smith
24  as the tribal chairman and she was a member of his
25  tribe.  And in our perspective, we weren't concerned

Page 213

1   with the tribal affiliation.  We were concerned with
2   what happened on the ground and trying to understand
3   what the scenario was in regards to claims by
4   Ms. Smith.
5            So between Mr. McBride and Mr. Allums and
6   the video that was collected both by protesters and
7   individuals associated with Energy Transfer Partners,
8   we were just trying to make sure we were making the
9   right call as it came to her civil rights.
10      Q.    So all this occurred on ETP property?
11      A.    I do not recall if they owned the
12  property at that time.  All I can say is the event
13  occurred on the oil pipeline right-of-way.
14      Q.    What's the federal nexus for Department
15  of Justice to even have involvement here?  You've been
16  very clear with me that the FBI looks at federal stuff
17  and we don't look at nonfederal stuff.  So why in the
18  world is the Department of Justice of the United
19  States sending a civil rights attorney to investigate
20  something that is occurring on private property or  a
21  right-of-way that is not federal property?
22           MS. BOBET:  Objection; calls for a legal
23  conclusion, calls for speculation.  You can answer.
24      A.    I wish I knew the answer to that question
25  myself, but I'd have to refer you to somebody at main

Jacob O'Connell
August 16, 2022

Page 214

1  justice as part of the initial interpretation of the
2  affidavit and the decision to send out a
3  representative.
4      Q.   (BY MR. SEBY) Sounds like we're both
5  puzzled.  So how did your time with Ms. Mulhauser go?
6      A.   It was unremarkable.  It became clear
7  after I tried to talk to Ms. Smith down in the hotel
8  room that things just weren't adding up.  She was a
9  terrible witness.  Almost instantly her credibility
10  was in question.
11           She physically seemed like she might have
12  been doped up.  Her handlers who were in the room were
13  trying to manage her responses and yet they weren't at
14  the event.  So, again, it became apparent that this
15  was kind of either a wild exaggeration or just an
16  outright fabrication of what actually happened.
17      Q.   All of which the attorney general of the
18  United States read in a letter and thought she would
19  dispatch a resource of the United States from
20  Washington, D.C., to check into, but it turned out to
21  be complete nonsense?
22           MS. BOBET:  Objection; argumentative.
23  It's not in the form of a question.
24      Q.   (BY MR. SEBY) Is that off the mark?
25      A.   I think any time you have a presidential

Page 215

1  appointed government cabinet member, logic and common
2  sense and rule of law don't necessarily follow.
3      Q.   I agree.  So did that civil rights
4  investigation pretty much end with your meeting with
5  Ms. Smith in the Standing Rock Sioux Tribe casino
6  hotel room?
7      A.   I don't recall if it was -- you know,
8  that was the last time the matter was discussed, and
9  Ms. Mulhauser, she'd have to go back and brief her
10  chain of command and talk to whoever the supervising
11  attorney is for her section and, you know, they take
12  documentation or her personal view as it reports and
13  they would have that discussion.
14           I mean, I wasn't part of the
15  decision-making process.  I was simply there to
16  facilitate her movement around collecting information.
17  And the reason I chose to do it is I didn't want to
18  take an agent off the line who was running sources or
19  doing real investigations for something like this when
20  it fit into my pattern.
21      Q.   Thank you.  Did anything official come
22  out of this investigation?
23      A.   There was never an investigation opened.
24      Q.   Okay.  The trip, the trip didn't lead to
25  anything further, sounds like?

Page 216

1      A.   Not that I'm aware of.
2      Q.   After Ms. Mulhauser came out was there
3  any further Department of -- excuse me -- Department
4  of Justice civil rights investigations of North
5  Dakota -- in North Dakota concerning anybody's
6  behavior towards the protesters?
7      A.   I seem to recall there was an incident
8  that involved some uniform police, but I don't recall
9  the specifics or even if it involved DOJ and civil
10  rights or if it was just something that was evaluated
11  as potentially they should be consulted on.
12           MR. SEBY:  We've been going well over an
13  hour.  Can we take -- Jane, want to take a ten, 15 --
14  15-minute break and then determine whether I've got
15  anything further to discuss and then wrap things up
16  and call it a day.
17           MS. BOBET:  Sure.  That sounds fine to
18  me.
19           MR. SEBY:  Thank you.  We'll be back in
20  15 minutes, which is 4:25 Mountain Time.
21           THE VIDEOGRAPHER:  Going off the record.
22  The time is 10:10 p.m. UTC, 4:10 Mountain Time.
23           (Recess taken, 4:10 p.m. to 4:24 p.m.)
24           THE VIDEOGRAPHER:  Back on the record.
25  The time is 10:24 p.m. UTC, 4:24 p.m. Mountain Time.

Page 217

1      Q.   (BY MR. SEBY) Mr. O'Connell, I just have
2  one more exhibit to ask you about.  It's Exhibit 738.
3           (Deposition Exhibit 738 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6           MR. SEBY:  Rachel, if you'd pop that up
7  on the screen, please.
8           MS. HYMEL:  Can you see it?
9           MR. SEBY:  No.  I see -- I cannot see it.
10  There it is.
11      Q.   (BY MR. SEBY) If you would -- I'm only
12  going to ask you about the very top e-mail, and that's
13  because I can't ask you about the rest of it because I
14  don't have the message that is the attachment that
15  starts this chain.  So what all the lower part
16  pertains to is not part of my question, which is
17  limited to the very top there.  If you'd read that,
18  please, Mr. O'Connell.
19      A.   I've read the e-mail.
20      Q.   Okay.  Thank you.  Remind me again who
21  Mr. Hoff is.
22      A.   Hoff was a line agent who was assigned to
23  the Bismarck RA.  I don't recall when he arrived, but
24  I want to say it was June, July, August of 2016.
25      Q.   So he was -- trial by fire.  He started

Jacob O'Connell
August 16, 2022

Page 218

1  right when the protest was just about to take off,
2  right, or did take off?
3       A.   Correct.
4       Q.   And did he have any experience prior to
5  that assignment or was he brand-new?
6       A.   If I recall, he transferred in from
7  Boston.  And I think before that he was, like, a
8  teacher or something.
9       Q.   Okay.  And this is December 10, 2016,
10  where he writes an e-mail to a large group of people,
11  which include yourself and a number of other FBI
12  colleagues.  I want to ask you, Mr. Takacs, earlier we
13  looked at an exhibit where he had a border patrol
14  e-mail domain; is that correct?
15       A.   Correct.
16       Q.   And here he's got an FBI address.
17       A.   Correct.
18       Q.   Did he transition jobs?
19       A.   No, he didn't.  TFO means task force
20  officer.  So he had -- basically as a task force
21  officer he's automatically given an unclassified FBI
22  e-mail account, which this is all part of.
23       Q.   I see.  Okay.  So it really doesn't
24  matter, but the point is this was sent to a large
25  number of FBI persons, including yourself, and

Page 219

1  noticeably Robert Perry is cced along with the
2  attorney general for -- pardon me -- the U.S. Attorney
3  for the District of North Dakota.  And Mr. Hoff is
4  reporting to the group, yourself and Mr. Perry
5  included, that "talked to our friend this evening."
6  Do you have any idea who "our friend" is referring to?
7       A.   I'm assuming it's either a formal or
8  informal source.
9       Q.   "And the estimates are as follows."  He
10  gives a persons count in three locations, the main
11  camp, which is the camp north of the -- the Oceti Camp
12  north of the Cannonball River on Corps property has
13  500 people in it, according to this report, and the
14  casino on the reservation is 35, and the little town
15  of Cannonball has 40 people in it.
16       But he goes on to say the camp --
17  assuming that's the Oceti Camp that he was referring
18  to earlier -- "was very busy with construction of
19  buildings continuing and people still committed to
20  staying, though many are experiencing flu symptoms."
21       So here in December in the middle -- or
22  the beginning of a North Dakota winter, you've got a
23  lot of people still out on the Corps property and
24  they're building stuff, presumably preparing for
25  winter, aren't they?

Page 220

1       A.   I agree with that.
2       Q.   Okay.  Well, I don't have any more
3  exhibits.  I appreciate your talking with me about
4  those, but I just want to wrap up with a couple of
5  questions.  It's my understanding from your responses
6  that you pressed for federal resources to help North
7  Dakota when North Dakota was in need of those
8  resources; is that right?
9       A.   I pressed for resources that would allow
10  the FBI to perform its mission effectively.
11       Q.   And did those resources come?
12       A.   Eventually.
13       Q.   When?
14       A.   I can't recall with specificity, but I
15  would say the November/December time frame is when we
16  actually started to have a schedule that I would
17  consider to be accurate that started to predict which
18  bodies would be coming in at what time, how long
19  they'd be staying, and what their primary
20  responsibility would be.
21       Q.   Who are you referring to?
22       A.   FBI personnel that were TDY to support
23  the FBI mission in North Dakota.
24       Q.   Okay.  That's because up until that time
25  frame you were not only getting additional help, you

Page 221

1  were low and were recovering from a low count in the
2  North Dakota office at least; right?
3       A.   That is accurate.
4       Q.   So how long did it take once those -- you
5  got a schedule to predict when you'd get people.  How
6  long did it take for that to fill out the way that
7  brought things up to at least an adequate ability for
8  the FBI to perform its mission?  I understand you got
9  a schedule when it was going to happen, but when did
10  it actually happen?
11       A.   I don't recall the specific date where I
12  would have sat back and said, you know, here we go,
13  we're well organized and able to reasonably fulfill
14  our obligations or at least our mission.  But I seem
15  to recall the Thanksgiving to Christmas time frame
16  being where things started to stabilize.  And a lot of
17  that had to do with the weather as well as the
18  election cycle.
19       Q.   Had the election occurred?
20       A.   It occurred in November.  I forget the
21  exact date, but -- what is it, the second Tuesday of
22  every November or each November?
23       Q.   I understand when the election occurs.
24  I'm asking did that point where you reached the
25  observation -- your observation that you finally were

Jacob O'Connell
August 16, 2022

Page 222

1  getting a schedule about having the resources that you
2  wanted in place, was that before or after the
3  election?
4       A.   It was after the election.
5            MR. SEBY:  All right.  I don't have any
6  other questions for you.  I appreciate your time and
7  comments today.  And, Ms. Bobet, I'm done and pass the
8  witness to you.
9            MS. BOBET:  Thank you, Mr. Seby.  And
10 thanks, Mr. O'Connell, for your time today.  I've got
11 a few questions for you.  I'll try to keep it brief.
12 I know it's been a long day.
13                  EXAMINATION
14 BY MS. BOBET:
15      Q.   First, in your earlier testimony you
16 referenced that the Corps of Engineers was viewed by
17 some as being -- I think you phrased it nonsupportive
18 of the rule of law.  I want to ask what you meant by
19 that in particular?
20      A.   I think they applied themselves as a
21 bureaucratic organization that was trying to figure
22 out how they wanted to treat the protesters.  And it
23 seemed from my perspective that the Corps of Engineers
24 could have joined with the law enforcement perspective
25 that this was a problem that could be remedied by

Page 223

1  removing the protesters from the land north of the
2  Cannonball River and that they dragged their feet and
3  basically confused the situation from a policy and a
4  legal perspective.
5       Q.   I see.  So when you say -- when you talk
6  about the rule of law, fair to say you're talking
7  about the perspective that law enforcement should have
8  cleared out the protest camps?
9       A.   I think North Dakota could have ended
10 this day one had there been an aggressive and
11 responsible law enforcement response to what clearly
12 was a problem.  There was a number of ways that I
13 think that would have been non-confrontational that
14 could have ended it.
15           And due to reasons that I probably can't
16 articulate because I don't have firsthand knowledge,
17 it was allowed to fester.  And I think that hindsight
18 is 20/20 and there was a lot of things that could have
19 happened that would have alleviated the situation,
20 specifically with the rule of law.
21      Q.   What were those ways that -- or steps
22 North Dakota could have taken to have ended the
23 protests early on, in your view?
24      A.   They could have just blocked the road and
25 let people out and not let anybody in.  They could

**ND OBJ:**
Speculation;

As to
223:24-224:3,
Improper Lay
Opinion

Page 224

1  have gone in and I think asked everybody to leave.  I
2  think that the freedom of movement they provided the
3  protesters exacerbated the problem.
4            And I think that Kyle Kirchmeier kind of
5  was out of his depth and then he became overwhelmed by
6  Sheriff Laney.  And then you had a governor who was in
7  the twilight of his political career who didn't want
8  to get his hands dirty.  And then you had an election
9  cycle that was still a few months away.
10           It was just kind of the perfect storm of
11 circumstances that I don't think any one party is
12 responsible for fostering; but at the same time, if
13 you could do it all over again, the roadmap that was
14 followed would be a good way to reach the same
15 outcome.
16           From my perspective, meaning my
17 perspective throughout the Bureau internationally, in
18 conflicts, in law enforcement, my time in New York,
19 law enforcement should not dillydally with execution
20 of law enforcement activities.  You need to be
21 decisive and you need to accept that you're going to
22 be judged, sometimes favorably, sometimes negatively;
23 but you're hired to take the bullet and you've got to
24 do it, and they didn't do it.
25      Q.   When you say Sheriff Kirchmeier was out

Page 225

1  of his depth, in what way?
2       A.   Professionally, in talking to Sheriff
3  Kirchmeier, you know, his background was North Dakota
4  Highway Patrol.  He was a careerist.  He was
5  administrative in the last few years of his career and
6  then he retired and ran for sheriff because, you know,
7  he's from Mandan.  He's a local boy.  He knows people
8  and he's a likeable person.
9            But he just, in my opinion, didn't have
10 the professional exposure in his formative years prior
11 to becoming sheriff that would have prepared him to
12 deal with the just random activity and the
13 disassociated factions that were basically leading up
14 to the protest and kind of guiding its evolution.
15           And just, again, he went from being a
16 careerist with the national -- or with the highway
17 patrol to all of a sudden being the top law
18 enforcement elected official in Morton County tasked
19 to deal with this almost unprecedented activity in
20 North Dakota, certainly in Morton County.
21      Q.   Okay.  You testified earlier about your
22 view that the FBI had a mandate or responsibility to
23 investigate certain things.  I think you talked in
24 particular about the funding sources for the protests.
25 I want to ask, what is the source of that mandate or

Jacob O'Connell
August 16, 2022

Page 226

1  responsibility, in your view?
2       A.   So from my perspective, you always have
3  to -- any time you're going to look at criminal
4  activity, whether it be counterintelligence, criminal
5  counterterrorism, there's always got to be the means.
6  And when it comes to counterterrorism and it comes to
7  basically the almost uncanny ability for these
8  protesters to linger in the camps, it starts to become
9  a question of how are things being manipulated, you
10 know.
11           Is it a foreign actor?  Is it a U.S.
12 citizen who's trying to undermine the political
13 spectrum?  Is it a politician who's trying to do it?
14 Is it a government official?  So following the money
15 is an easy way to try to determine who would be behind
16 such activity.
17           And to me, it was a logical investigative
18 step, and we didn't go down that road.  We brought it
19 up.  We talked about it.  And then it was just never
20 authorized as a direction of travel for an
21 investigation.
22      Q.   Okay.  So fair to say your view in the
23 prior discussion about the mandate or responsibility
24 to investigate certain things, including that funding,
25 that point is kind of based on your view of, let's

Page 227

1  say, how the Bureau's mission or objectives could best
2  be achieved?
3       A.   Yes, and also based on my experience at
4  headquarters when I was in the counterterrorism
5  division.  We had a unit called the terrorist
6  financing unit.  I forget what -- FFFT it's called,
7  foreign fighter finance team or something like that.
8  But their whole purpose was, again, trying to track
9  the money that was supporting counterterrorism.
10           So when you bring that perspective to
11 North Dakota and you have an activity like DAPL where
12 you have people who are, you know, going from living
13 out of their car to all of a sudden being in some of
14 REI's finest winter gear, you think to yourself, How
15 are they affording that?
16           And it's only logical, then, to take it
17 to, well, what should the FBI do?  We should probably
18 understand where the money is coming from, and if this
19 is part of a larger effort to destabilize the agenda
20 or in this case the construction of the pipeline, or
21 is it just, you know, a sincere coagulation of
22 like-minded individuals who really, really, really,
23 really cared about the environment.
24           MS. BOBET:  Thank you.  I appreciate that
25 perspective.  Those are all the additional questions I

Page 228

1  have.  Thanks again for your time.  Mr. Seby, any
2  further follow-up questions on your end?
3           MR. SEBY:  Yeah, I do.
4                 EXAMINATION
5  BY MR. SEBY:
6       Q.   Mr. O'Connell, you said that you were
7  planning on retiring this October; is that correct?
8       A.   That is correct.
9       Q.   That's retiring from federal service with
10 the Bureau of -- Federal Bureau of Investigation?
11      A.   Correct.
12      Q.   Do you have plans lined up for employment
13 after you retire from the United States government?
14      A.   I have a construction business that I'm
15 going to pursue.
16      Q.   Okay.  Is that an existing business or
17 you're going to start one?
18      A.   It's my wife's business.  She's the owner
19 of it and I'm the guy who's going to put it together.
20 It's something we've done for an extended period of
21 time, working on houses.  It's an easy way to generate
22 wealth without having a conflict of interest.
23      Q.   Sure.  That's in Bismarck?
24      A.   Yes, it is.
25           MR. SEBY:  All right.  I don't have any

Page 229

1  further questions.  Thank you.
2           MS. BOBET:  Thank you, sir.
3           THE VIDEOGRAPHER:  Going off the record.
4  This concludes the videotaped deposition of Jacob
5  O'Connell.  The time is 10:45 p.m. UTC, 4:45 p.m.
6  Mountain Time.
7           WHEREUPON, the within proceedings were
8  concluded at the approximate hour of 4:45 p.m. on the
9  16th day of August, 2022.
10           *    *    *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Jacob O'Connell
August 16, 2022

Page 230

```
1              I, JACOB O'CONNELL, do hereby certify
2    that I have read the above and foregoing deposition
3    and that the same is a true and accurate transcription
4    of my testimony, except for attached amendments, if
5    any.
6
             Amendments attached   (  ) Yes   (  ) No
7
8
             _____
9            JACOB O'CONNELL
10
11
12
13           The signature above of JACOB O'CONNELL
14   was subscribed to or affirmed before me in
15   the county of _____, state of North Dakota,
16   this _____ day of _____, 2022.
17
18
19
             _____
20           Notary Public
             My commission expires
21
22
23
24
25   State of North Dakota 8/16/22 (tdg)
```

Page 232

```
1    Errata Sheet
2
3    NAME OF CASE: Plaintiff vs UNITED STATES
4    DATE OF DEPOSITION: 08/16/2022
5    NAME OF WITNESS: Jacob O'Connell
6    Reason Codes:
7        1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25           _____
```

Page 231

```
1              REPORTER'S CERTIFICATE
2    STATE OF COLORADO        )
                              ) ss.
3    COUNTY OF ARAPAHOE       )
4            I, TIFFANY D. GOULDING, Registered
     Professional Reporter and Notary Public ID No.
5    19984028637, State of Colorado, do hereby certify that
     previous to the commencement of the examination, the
6    said JACOB O'CONNELL verbally declared his testimony
     is under the penalty of perjury in relation to the
7    matters in controversy between the parties hereto;
     that the said deposition was taken in machine
8    shorthand by me at the time and place aforesaid and
     was thereafter reduced to typewritten form; that the
9    foregoing is a true transcript of the questions asked,
     testimony given, and proceedings had.
10
             I further certify that I am not employed
11   by, related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.
13           IN WITNESS WHEREOF, I have affixed my
     signature this 1st day of September, 2022.
14
15           My commission expires November 4, 2022.
16   x____ Reading and Signing was requested.
17   _____ Reading and Signing was waived.
18   _____ Reading and Signing is not required.
19
20           _____
21           Tiffany Goulding
             Registered Professional Reporter
22
23
24
25
```