IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil Action No. 19-cv-150-DMT-ARS

_____

RULE 30(b)(6) VIDEOTAPED DEPOSITION OF:
ROBERT C. PERRY JR. - FEDERAL BUREAU OF INVESTIGATION
December 13, 2022
Via RemoteDepoTM
(CONFIDENTIAL AND NONCONFIDENTIAL TRANSCRIPT)

_____

STATE OF NORTH DAKOTA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

_____

        PURSUANT TO NOTICE AND AGREEMENT, the
Rule 30(b)(6) videotaped deposition of ROBERT C. PERRY
JR., FEDERAL BUREAU OF INVESTIGATION, was taken on
behalf of the Plaintiff in Pennington County, South
Dakota, by remote means on December 13, 2022, at
9:01 a.m. Mountain Standard Time, before Tracy C.
Masuga, Registered Professional Reporter and Certified
Realtime Reporter, appearing remotely from Denver
County, Colorado.

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 2

```
 1            REMOTE APPEARANCES
 2  For the Plaintiff:
 3            PAUL M. SEBY, ESQ.
              Greenberg Traurig LLP
 4            1144 15th Street
              Suite 3300
 5            Denver, Colorado 80202
              sebyp@gtlaw.com
 6
              PAUL B. KERLIN, ESQ.
 7            Greenberg Traurig LLP
              1000 Louisiana Street
 8            Suite 6700
              Houston, Texas 77002
 9            kerling@gtlaw.com
10
    For the Defendant:
11
              JANE E. BOBET, ESQ.
12            VICTOR WILLIAM SCARPATO III, ESQ.
              Department of Justice
13            U.S. Attorney's Office
              District of Colorado
14            1800 California Street
              Suite 1600
15            Denver, Colorado 80202
              jane.bobet@usdoj.gov
16            victor.scarpato@usdoj.gov
17            KATHRYN MORRISSEY, ESQ.
              Federal Bureau of Investigation
18            Minneapolis Division
              Minneapolis, Minnesota 55430
19
              DAVID M. SAMONDS, ESQ.
20            Federal Bureau of Investigation
              Office of the General Counsel
21            Washington, D.C. 20535
22
    Also Present:
23
              Jose Diaz
24            Dustin Lamb, Videographer
              Corin Stigall
25
```

Page 3

```
 1              I N D E X
 2  EXAMINATION OF ROBERT C. PERRY JR.:          PAGE
    December 13, 2022
 3
    By Mr. Seby                              6, 87
 4
    By Ms. Bobet                               81
 5
 6  *  CONFIDENTIAL EXCERPT:
       Pages 62 through 66
 7
 8  *  Pursuant to protective order, confidential
       material is filed under separate cover.
 9                                          INITIAL
    DEPOSITION EXHIBIT:                    REFERENCE
10
    (Exhibit provided electronically to the reporter.)
11
    Exhibit 849  Email to Thornton, et al., from    22
12               Perry, 8/18/16, Subject:  Bullet
                 points -- UNCLASSIFIED;
13               FBI_0000011 - FBI_0000012
14
    DEPOSITION EXHIBIT:  (Previously marked)
15
    Exhibit 803  Second Amended Notice of 30(b)(6)    8
16               Deposition of The United States of
                 America, 11/23/22; with
17               attachments
18
19
20
21
22
23
24
25
```

Page 4

```
 1            WHEREUPON, the following proceedings
 2  were taken pursuant to the Federal Rules of Civil
 3  Procedure.
 4       *       *       *       *       *
 5            (Deposition Exhibit 849 was introduced
 6  by Mr. Seby and electronically provided to the court
 7  reporter for marking.)
 8            THE VIDEOGRAPHER:  We are now on the
 9  record.  Participants should be aware that this
10  proceeding is being recorded and, as such, all
11  conversations held will be recorded unless there is a
12  request and agreement to go off the record.
13            Private conversations and/or
14  attorney-client interactions will be held outside
15  the presence of the remote interface.
16            For the purpose of creating a
17  witness-only video recording, the witness is being
18  spotlighted or locked on all video screens while in
19  speaker view.  We ask that the witness not remove the
20  spotlight setting during the deposition as it may
21  cause other participants to appear on the final video
22  rather than just the witness.
23            For anyone who doesn't want the
24  witness's video to take up the large part of your
25  screen, you may click the "Gallery View" button in the
```

Page 5

```
 1  upper right-hand corner of the remote depo interface.
 2            This is the remote video-recorded
 3  30(b)(6) deposition of Robert Perry, being taken by
 4  counsel for the plaintiff.  Today is Tuesday,
 5  December 13, 2022.  The time is now 4:01 p.m. UTC,
 6  9:01 a.m. Mountain.  We are here in the matter of
 7  State of North Dakota v. United States of America.
 8            My name is Dustin Lamb, remote video
 9  technician on behalf of U.S. Legal Support.  I am not
10  related to any party in this, nor am I financially
11  interested in the outcome.
12            At this time, will the reporter, Tracy
13  Masuga on behalf of U.S. Legal Support, please enter
14  the statement for remote proceedings into the record.
15            THE REPORTER:  The attorneys
16  participating in this deposition acknowledge that I am
17  not physically present in the room and that I will be
18  reporting this proceeding remotely.
19            They further acknowledge that in lieu of
20  an oath administered in person, the witness will
21  verbally declare his testimony in this matter is under
22  penalty of perjury.
23            Counsel, please indicate your agreement
24  by stating your name and your agreement on the record.
25            MR. SEBY:  This is Paul Seby, counsel
```

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 6

1  for the State of North Dakota, plaintiff, and we
2  agree.
3          MS. BOBET:  And this is Jane Bobet for
4  the United States, and we agree.
5          THE REPORTER:  Mr. Perry, do you
6  solemnly state that the testimony you are about to
7  give in the cause now pending will be the truth, the
8  whole truth, and nothing but the truth?
9          THE DEPONENT:  Yes.
10          ROBERT C. PERRY JR.,
11  having been first duly sworn to state the whole truth,
12  testified as follows:
13              EXAMINATION
14  BY MR. SEBY:
15      Q.  All right.  Good morning, Mr. Perry.
16          This will be the -- the deposition of
17  Bob Perry taken pursuant to prior notice and agreement
18  of counsel.
19          And my name is Paul Seby.  I'm both an
20  attorney with the law firm of Greenberg Traurig and a
21  Special Assistant Attorney General for the State of
22  North Dakota.  And along with my cocounsel, Paul
23  Kerlin, we represent the State of North Dakota in this
24  matter.
25          Do you understand, sir, that you've been

Page 7

1  sworn in this morning?
2      A.  Yes.
3      Q.  Would you please state your full name
4  for the record.
5      A.  Sure.  Robert C. Perry Jr.
6      Q.  Okay.  Before we begin, just a few
7  ground rules, most of which are intended to help the
8  court reporter take down everything we say.
9          Everything we say is being both written
10  down and videotaped, and because of that, please
11  verbalize your responses with a "yes" or a "no" or
12  another answer as opposed to a nod of your head.
13  Also, no nonverbal responses or uh-huhs or nuh-uhs,
14  that sort of thing.
15          It's difficult for the court reporter to
16  take down everything we're saying if we inadvertently
17  speak over each other; so I'll do my best not to
18  interrupt you if you would do the same, please, and
19  let me finish my question.
20          And if you need a break during this
21  deposition, just let me know; otherwise, we'll try and
22  take one on -- every 60 minutes or so.
23          If you don't understand a question I've
24  asked, just let me know, and I'll repeat or rephrase
25  it, and I'll do my best to clarify what I'm trying to

**Object to all testimony as hearsay, 802** *(margin annotation, lines 3–5)*

Page 8

1  ask you.
2          And if you answer a question I've asked,
3  I am going to assume that you've understood the
4  question I'm asking.  Is that understood?
5      A.  Yes.
6      Q.  Okay.  You've been designated to speak
7  on topics 6, 9, 10, 13, 15, 16, 18, and 20, as they
8  relate to the Federal Bureau of Investigation only.
9  Do you understand that?
10      A.  Yes.
11          MR. SEBY:  Okay.  Jose, would you put up
12  Deposition Exhibit 803.
13      Q.  (BY MR. SEBY)  Mr. Perry, if you would
14  take a minute and just look at that document.  You're
15  on the next page.  I want to make sure that this is
16  the deposition notice that you have had and are aware
17  of in preparation for today.  Can you take a look at
18  that and let me know if you've seen this document
19  before?
20      A.  Yes, I have.
21      Q.  Okay.  Great.  Generally speaking,
22  Mr. Perry, what did you do to familiarize and prepare
23  yourself for the topics that you've been designated
24  today?
25      A.  Good morning.  Yeah.  To start with, I,

Page 9

1  of course, received notification from the FBI that I
2  would be the person presented as the witness today.
3          Subsequent to that, I was contacted --
4  well, at that time, I was contacted by our -- well, I
5  say "our" -- I'm retired now -- but the division
6  counsel from Minneapolis, Katie Morrissey.  She gave
7  me a brief overview on why I was selected.
8          And then we had three practice
9  sessions -- or not practice sessions, I won't call
10  them that -- three -- three deposition sessions with
11  DOJ attorneys or Colorado U.S. -- Denver U.S.
12  Attorney's Office and others.
13          They also provided me with a binder of
14  material I reviewed.
15          And, of course, reflected on my own
16  recollections of the -- of the time frame.
17      Q.  Okay.  Did you speak with anybody in the
18  FBI?
19      A.  Yes.
20      Q.  Who was that?
21      A.  During one of our premeetings, Jamie
22  Rohrbaugh, who was in the Domestic Terrorism Unit at
23  the time, and another participant was Tim Ferguson,
24  who was in the Criminal Division at the time.
25      Q.  Tim Ferguson?

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 10

1      A.   Yes.
2      Q.   And you say "at the time."  What are you
3  referring to with that reference?
4      A.   You're -- you're very choppy there.  If
5  you asked me if I'm referring to the time of the DAPL
6  incident, then that is yes.
7      Q.   Okay.  Are they still with the agency?
8      A.   Yes.
9      Q.   Okay.  Okay.  And all of the materials
10 that you reviewed were -- were what?
11     A.   Oh, they included emails, press
12 releases, court documents, other -- other -- other
13 testimony, and I reviewed Jacob O'Connell's
14 deposition.  That's -- I think that's pretty
15 inclusive:  Deposition, emails, press -- yeah.
16     Q.   Was everything in the binder that your
17 counsel provided to you?
18     A.   There was a separate binder with
19 Mr. O'Connell's deposition and then a separate email
20 with some of my own prior emails.  The rest was in the
21 binder, yes.
22     Q.   Okay.  All right.  Did you speak with
23 anyone outside of the FBI to prepare?
24     A.   No.
25     Q.   Okay.

Page 11

1      A.   I mean, besides the attorneys, you mean?
2  Not besides the attorneys.
3      Q.   In addition to the attorneys.
4      A.   No.
5      Q.   Okay.  And so today, sir, you're
6  testifying in the capacity as a 30(b)(6)
7  representative of the FBI.  Do you understand that?
8      A.   Yes.
9      Q.   Okay.  And do you understand what
10 that -- that means?
11     A.   I believe in general terms, yes.
12     Q.   Is it your understanding that that means
13 that you're testifying -- your answers are on behalf
14 of the FBI as if the agency provided them directly?
15     A.   Yes.
16     Q.   Okay.  And you indicated that you're
17 retired; is that correct?
18     A.   Yes.
19     Q.   When did you retire from the FBI?
20     A.   December 31 of 2021, almost a year ago.
21     Q.   Okay.  Would you describe your position
22 with the FBI during the DAPL-protest period, which is
23 August of 2016 to March of 2017?  Generally describe
24 what your role was at that time.
25     A.   Sure.  I was the -- an executive

Page 12

1  management of the Minneapolis field office.  I was --
2  my title was assistant special agent in charge.  I had
3  management leadership responsibility for North Dakota,
4  South Dakota, and northwestern Minnesota.  Generally,
5  I was an upper-level management official for all
6  things FBI in those areas.
7      Q.   Would you say that you were the senior
8  FBI official responsible for the state of
9  North Dakota?
10     A.   There is an SAC above me that had the
11 whole division, but I think generally the answer to
12 that would be yes.
13     Q.   Okay.  And when -- when you are in
14 charge of that area, what did those responsibilities
15 include?
16     A.   They include everything from
17 investigative oversight to personnel to admin,
18 liaison.  That's what comes to mind right now,
19 basically everything FBI in those areas.
20     Q.   And when you used the word "liaison,"
21 what does -- what are you -- what's the context of
22 your use of that word?
23     A.   Sure.  What I mean is that it was my
24 responsibility to have relationships or initiate or
25 continue relationships with leaders of the -- of the

Page 13

1  various State agencies and sometimes County agencies,
2  local agencies.  It wasn't my sole -- it wasn't solely
3  my responsibility, but that was part of it.
4      Q.   Okay.  What was your chain of command
5  during the DAPL-protest period?
6      A.   Above me, you mean?
7      Q.   Let's -- let's talk about in both
8  directions.  Let's go with who you -- who you reported
9  to.
10     A.   I reported to the special agent in
11 charge of the Minneapolis field office at the time,
12 who was Richard Thornton.
13     Q.   Okay.  Anyone else?
14     A.   No.
15     Q.   Okay.  And then who reported to you?
16     A.   There was about 75 FBI personnel, maybe
17 more than that, in my territory.  Direct reports would
18 have included five supervisors, a firearms instructor,
19 an auditor, the secretary, a polygrapher.  I think I
20 had seven direct reports -- no, nine direct reports.
21 Oh, and the chief security officer as well.
22     Q.   Okay.  So in the -- in the initial -- in
23 the beginning period of the protests, the FBI
24 participated in North Dakota's response to the
25 protests occurring on Army Corps of Engineers

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 14

1  property, correct?
2       A.   Could you define "participated"?
3       Q.   In fact, you -- the FBI had individuals
4  who sat for many days with North Dakota law
5  enforcement and received numerous intelligence updates
6  about the protesting occupation of Corps of Engineers
7  property, right?
8       A.   Correct.
9       Q.   And do you know how that happened?  How
10 did those FBI personnel come to join and participate
11 early on in the State's response to those events?
12      A.   It was -- well, first of all, the event
13 had started to occur, and just generally the
14 supervisor and other agents -- well, there was only
15 one other agent at the time -- became aware of it and
16 had some concern.
17           They were then contacted by -- I'm not
18 sure if it was the State of North Dakota or the
19 sheriff's office, Kyle Kirchmeier, first, but they
20 requested the FBI's participation and assistance.
21      Q.   Okay.  Were you aware of that, when that
22 invitation came from the State of local -- State or
23 local representatives in North Dakota?
24      A.   Eventually.  I'm not sure if it was
25 immediate.

Page 15

1       Q.   Okay.  And then which --
2            So did you authorize those individuals
3  to partici- -- the FBI representatives to go to and
4  participate in the State's law enforcement response?
5       A.   It didn't require my authorization, but
6  I didn't tell them not to either, so . . .
7       Q.   Okay.  Okay.  And who were the
8  individuals from the FBI that -- that participated
9  with the State early on in the DAPL-protest response
10 organized by the State of North Dakota?
11      A.   The Bismarck RA was severely
12 understaffed, so I would say the primary response was
13 provided by the supervisor, SS- -- SSRA, Supervisor
14 Senior Resident Agent Jacob O'Connell.
15      Q.   Okay.  Anyone else?
16      A.   I'm sorry.  You broke up there.
17      Q.   Yeah, your video is doing the same.
18           Was there anyone else besides
19 Mr. O'Connell that participated early on in the -- in
20 the North Dakota law enforcement meetings?
21      A.   Yes.  Pretty quickly we put an
22 intelligence analyst that was stationed in Bismarck,
23 assigned her --
24      Q.   And that individual's name?
25      A.   -- to spend some time at the command

Page 16

1  post.  Eleanor Harris.
2            I apologize.  We're having a -- I'm
3  sorry --
4       Q.   Yeah.  Go ahead.
5       A.   We're having a major snow event here, so
6  that could cause connectivity problems, I guess.
7       Q.   I see.
8            So as the FBI agent in charge of the
9  State of North Dakota, as you said, did you interact
10 with representatives from other federal agencies
11 during the DAPL-protest period?
12      A.   Yes.
13      Q.   And who was that?
14      A.   Primarily, I -- most of my other
15 federal-agency interaction was between the
16 U.S. Attorney's Office, the U.S. Marshals Service, the
17 U.S. Marshal Paul Ward, and, oh, ATF.  That would be
18 the three main federal partners that I interacted
19 with.
20      Q.   What was your interaction with the ATF?
21 What did that involve?
22      A.   The ATF was involved once the event --
23 once federal crimes occurred, they were -- they led
24 the federal side of some of those investigative --
25 some of that investigative activity, so we also were

Page 17

1  involved.  So I communicated with both the agent up
2  in -- the ATF agent in North Dakota, whom I knew, as
3  well as their management.
4       Q.   And who is the FBI agent in
5  North Dakota?
6       A.   I'm sorry.  I only caught the end of
7  that.
8       Q.   Who was the FBI agent in North Dakota
9  that you communicated with?
10      A.   Oh, an ATF agent, I said.  It was Derek
11 Hill.
12      Q.   Okay.  Did you ever interact or
13 communicate with representatives from the
14 United States Army Corps of Engineers?
15      A.   No, I did not, not directly.
16      Q.   And at any time during the -- during the
17 DAPL-protest period?
18      A.   I believe I may have been in the same
19 room at times, but no direct interaction.
20      Q.   Did you ever attend the North Dakota,
21 Morton County or State-led, Emergency Operations
22 Centers?
23      A.   Yes.
24      Q.   On what occasions?
25      A.   I don't believe I could give you exact

Page 18

1  dates.  I was up there an awful lot during the
2  protests, and I was probably in one or the other --
3  one or the other of those centers five to eight times,
4  probably.
5       Q.   Each?
6       A.   No, total.  I did not go to them each
7  time I was there.
8       Q.   Okay.  When you were present on those
9  occasions that you were present in the -- the tactical
10  or the Morton County law enforcement center or the
11  State center, did you happen to observe the -- the
12  footage of the drone provided by the United States
13  Customs and Border Protection agency?
14       A.   I saw some of it.  I don't -- I can't
15  say I've seen all of it.
16       Q.   Okay.  So at least one occasion you
17  watched real-time footage of activities in the protest
18  camps on Corps property?
19       A.   I -- I believe so.  I can't say that
20  they were real time.  I know that I saw video, but if
21  it was real time, the video in the command post,
22  always, then I would have seen some real-time video,
23  yes.
24       Q.   Okay.
25       A.   I didn't ask specifically.

Page 19

1       Q.   All right.  So let's go to the first
2  topic that you've been designated for, topic 6.  I'm
3  going to read it to you so we move along quickly here.
4            So this topic reads, once we get --
5            MR. SEBY:  Jose, there you are, topic 6.
6       Q.   (BY MR. SEBY)  "Public statements made
7  by government officials about any application for DAPL
8  Special Use Permits or any decisions made or actions
9  taken regarding such applications."
10            So on behalf of the Federal Bureau of
11  Investigation, did the FBI make any public statements
12  about any special-use-permit application with the Army
13  Corps of Engineers?

ND OBJ:
Introduces
new material

14       A.   No.
15       Q.   Did the FBI make any public statements
16  about any Corps of Engineers statements?
17       A.   No.
18       Q.   Okay.  Can you let me know specifically
19  what you did to prepare for this topic?
20       A.   Sure.  I read the topic.  I knew
21  instantly what the answer was.  It was no.  I was
22  there at the time to ensure that -- well, we didn't
23  have any public statements throughout the whole
24  process, so I knew we didn't have -- certainly didn't
25  have any when it came to special-use permits.  Just

Page 20

1  the same as I reviewed the paperwork I was provided, I
2  ensured there was nothing in there that surprised me,
3  and there was not.
4       Q.   So does that mean that -- Mr. Perry,
5  that you had no knowledge or did not participate in
6  any development or issuance of public statements which
7  were joined or issued by the Department of Justice as
8  a whole?

ND OBJ:
Introduces
new material

9            MS. BOBET:  Objection, misstates
10  testimony.  You can answer, Mr. Perry.
11       A.   That's correct, not to my recollection;
12  the FBI did not participate in any such statements.
13       Q.   (BY MR. SEBY)  Okay.  All right.  Let's
14  go to topic 9.  I'm going to read this one now as well
15  so we move along here.
16            MR. SEBY:  Jose, I'll give you a chance
17  to put that up on the screen.  Thank you.
18       Q.   (BY MR. SEBY)  So this one pertains to
19  "Encampments on Corps-managed lands associated with
20  the DAPL protests (when -- when it started, location
21  of the encampments, activities conducted on or off
22  Corps-managed land, physical, environmental, health
23  and safety conditions, et cetera)."
24            So what did you do to research into this
25  topic?

Page 21

1       A.   The same:  Basically reviewed my own --
2  thought about my own recollections, reviewed the
3  documents, and discussed it during the meetings we
4  had.
5       Q.   Did that include discussions with your
6  FBI colleagues who were in the positions you mentioned
7  during the DAPL protest?
8       A.   I don't know that we specifically hit
9  this topic.  I don't think they would have had insight
10  on to this topic.
11       Q.   So in addition to whatever personal
12  knowledge you may or may not have, you relied upon the
13  materials provided to you by your counsel?
14       A.   I did.
15       Q.   And more specifically, the binder,
16  right?
17       A.   Right, the binder and Mr. O'Connell's
18  testimony.
19       Q.   Okay.  So the FBI was aware of the
20  protest camp on -- on Corps land in August of 2016,
21  right?
22       A.   Yes, that's correct.
23       Q.   Okay.  When did you personally become
24  aware of the camps located on Corps property in
25  August of 2016?

Page 22

1      A.   I'm not sure I recall the exact date.  I
2  know I put together a summary for my supervisors and
3  headquarters on, I believe it was, the 18th of August,
4  so it would have been sometime before that, a few days
5  before that, at least.
6      Q.   And let's take a minute.  Would you tell
7  me who those headquarter supervisors you're
8  referencing are?
9      A.   I would have to dig out the email.
10  Would that be all right?
11      Q.   Let's -- let's take a moment and see if
12  it's --
13      A.   All right.  I can scroll through that.
14  Let me see.
15      Q.   Would that be Exhibit 849?
16      MR. SEBY:  Let's go there.  Jose?
17      (Deposition Exhibit 849 was remotely
18  introduced.)
19      Q.   (BY MR. SEBY)  Yeah.  Mr. Perry, is this
20  the summary that you're referencing?
21      A.   Yes, sir.
22      Q.   Okay.  So would you tell me who these --
23  I recognize Mr. Thornton as the name that you
24  indicated earlier.  So your boss in Minneapolis,
25  right?

Page 23

1      A.   That's correct.
2      Q.   And then so who is -- I recognize
3  Mr. O'Connell.  Who is Kyle Loven and -- yeah, that's
4  the only other individual on there.
5      A.   Yeah, Kyle was the chief division
6  counsel for Minneapolis field office at the time.
7      Q.   Okay.  I believe you said that you put
8  the summary together for your supervisors at
9  headquarters.  Which headquarters are you -- are you
10  referring to?
11      A.   Too many headquarters in this.
12  Minneapolis.
13      Q.   Minneapolis headquarters.  Okay.
14      All right.  If you look at the third
15  bullet there, there's a reference to "U.S. Attorney
16  conversation with Chairman."  What are you referring
17  to there?
18      A.   At some point, the then U- -- acting
19  U.S. Attorney, Chris Myers, had a conversation with
20  the chairman that he relayed parts of it to me.
21      I don't believe this is the actual
22  meeting they had with him.  This was a -- I think a
23  personal interaction he had.  It may have been --
24  there was a -- there was a meeting that the chairman,
25  and several were involved, but I think there was also

Page 24

1  conversations with the U.S. Attorney prior to that.
2      Q.   And -- and who is the chairman that
3  you're referring to?
4      A.   Mr. Archambault.
5      Q.   The chairman of the Standing Rock Sioux
6  Tribe?
7      A.   Yes, sir.
8      Q.   Okay.  And how -- how do you know about
9  this conversation that you're able to summarize it?
10      A.   I'm trying to remember if it actually
11  came from the meeting or premeeting on the case.  I
12  believe it was a prediscussion, maybe not even a
13  meeting, and it was relayed to me by the then-acting
14  U.S. Attorney Chris Myers.
15      Q.   Okay.  And one of the -- one of the
16  things that your summary recounts you being told by
17  Mr. Myers is that -- the first bullet, it says, "He
18  doesn't have control."  What is that referring to
19  under bullet 3 there, the first subbullet?
20      A.   All right.  The discussion generally was
21  that the chairman started the protest against the
22  pipeline, and then a lot of outside people come in --
23  came in, and he did not feel as he was -- had any
24  control over those -- the larger group.
25      Q.   Okay.  And above this, you reference

Page 25

1  that at least one camp is on Corps land.  And "Corps"
2  is misspelled, but in the first bullet --
3      MR. SEBY:  If we could go up there,
4  Jose.
5      Q.   (BY MR. SEBY)  In that first bullet, the
6  very first one, "Work site is not on Government land
7  but private property - at least one campsite is on
8  Corps land."  You're referring to the United States
9  Army Corps of Engineers?
10      A.   Yes.
11      Q.   Okay.  And how did you know that on the
12  date of this summary, which is August 18, 2016?
13      A.   I don't recall exactly who told me that.
14  I was physically there at one point, so I could see
15  where it was.  And, again, I don't know who, but
16  someone told me that's Corps of Engineers land due to
17  the floodplain.
18      Q.   And so were you in North Dakota
19  around -- on or around this time?
20      A.   I believe so, yes.
21      Q.   Okay.  Okay.  Did you meet with the
22  governor of the state of North Dakota on or about this
23  time?
24      A.   I don't know that it was this early,
25  but, yes, I did meet with the governor of South -- of

25:21-
26:14
401-402

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

Page 26

1  North Dakota.
2       Q.   Okay.  And are you referring to Governor
3  Jack Dalrymple?
4       A.   Yes.
5       Q.   Okay.  What was the pretext of that
6  meeting?  Who -- who set it up and who attended, that
7  sort of thing, and when was it?
8       A.   Again, I don't remember the exact date.
9  It was relatively early on, but not right at the
10  beginning.  I believe it was set up by Mr. O'Connell.
11  The meeting involved -- or included myself; SAC
12  Thornton; Jacob O'Connell; the Governor Jack
13  Dalrymple; and the Lieutenant Governor Drew Wrigley.
14  It was held at their office at the capitol.
15       Q.   Okay.  Do you recall who -- who
16  requested the meeting?
17       A.   I do not.
18       Q.   Okay.  What did you tell the governor at
19  that meeting?
20       A.   The conversation was general --
21  generally what we may or may not be able to --
22       Q.   I'm sorry, Mr. Perry --
23       A.   -- provide, what the plan
24  expectations --
25       Q.   I'm sorry, Mr. Perry, we didn't -- we

26:15-27:21
Offer if prior
testimony
comes into
evidence

Page 27

1  couldn't hear what your answer began with.
2       A.   Okay.  The conversation was pretty
3  general.  We were trying -- we had a discussion about
4  potential things the FBI could assist with.  Largely,
5  we were trying to manage the expectations of the State
6  at this point.  We did not know exactly where we fit
7  in the lane at that point, so it was just a general
8  discussion of potential assistance.
9       Q.   And what -- what -- what did you offer
10  the governor in terms of what the FBI could do for
11  these growing protests occurring on lands belonging to
12  the United States Government managed by the Corps of
13  Engineers?
14       A.   So I want to be clear that I didn't do
15  all the talking.  It was the SAC that did most of the
16  talking, but I was present in the room.
17       Q.   And the SAC is Mr. Thornton?
18       A.   Yes.  I don't -- I wouldn't -- I
19  wouldn't say anything was offered.  We basically
20  discussed what we were doing and would continue to do
21  as things developed.
22       Q.   Before you went to that meeting with the
23  governor, did you or Mr. Thornton speak with anyone at
24  the FBI headquarters to discuss what could be
25  discussed by the FBI at such a meeting with the

Page 28

1  governor of North Dakota?
2       A.   I did not, and Mr. Thornton did not
3  advise me that he had.
4       Q.   At what time did you begin discussions
5  with the FBI headquarters with respect to the DAPL
6  protests occurring on Corps land?
7       A.   The discussions were started with
8  headquarters through Mr. O'Connell first, and then
9  later on by me.  Early September, I would say, maybe
10  mid-September.  Until then -- that doesn't mean that's
11  when discussions were started.  Until then it was
12  handled mostly by Mr. O'Connell.
13       Q.   I see.  Okay.
14       So based upon your personal presence in
15  North Dakota and the presence of FBI intelligence
16  analysts and Mr. O'Connell at the State and local law
17  enforcement centers, the FBI knew about the type of
18  people that were coming into the camps on Corps land,
19  right?
20       A.   I don't know that that would be
21  completely accurate.  We knew there were people
22  coming.  We didn't do backgrounds on them or anything
23  like that.  I don't know exactly what -- how else I
24  can answer that question.
25       Q.   Is it fair to say that the FBI was aware

Page 29

1  that the protesters pouring into the federal land in
2  North Dakota were -- included individuals from out of
3  state?
4       A.   Yes.
5       Q.   Large -- large numbers of them, right?
6       A.   Yes.
7       Q.   And that some of those people were
8  dangerous, known to be dangerous?
9       A.   I can't say that we knew that at the
10  time.
11       Q.   When did you know that?
12       A.   When there was a violent act.  And that
13  was with a -- when Red -- Red Dawn [sic] Fallis -- I
14  forget how you say her name -- fired the weapon at one
15  of the officers.  That's when -- the first time we
16  knew specifically of violent acts.
17       Q.   Okay.  But the FBI also knew that large
18  numbers of the DAPL protesters camping on
19  Corps-managed land were not members of the Standing
20  Rock Sioux Tribe, correct?
21       A.   Yes, that's correct.
22       Q.   Or even members of other tribes,
23  correct?
24       A.   I don't understand -- understand the
25  question, sir.

Page 30

1    Q.   The FBI was aware that the majority of
2  the protesters coming to the state of North Dakota,
3  you've said, were not members of the Standing Rock
4  Sioux Tribe, but they were also not members of other
5  Native American tribes, correct, most of them?
6    A.   I can't really say that.  There were a
7  number of tribal members from other tribes throughout
8  the country, so I don't know the exact breakdown
9  between tribal members and nontribal members.
10    Q.   Okay.  The FBI was aware that the people
11  were camping on Corps lands and building structures
12  and developing roads and having waste pits and
13  vehicles parked in large numbers, and horses, and that
14  kind of thing, right, early on?
15    MS. BOBET:  Objection, compound, vague
16  and ambiguous.  You can answer, sir.
17    A.   To the extent I understood it to be
18  Corps land.  I was told it was Corps land.  I
19  obviously didn't do any research on land rights.  But
20  to the extent I knew it was Corps land, yes.
21    Q.   (BY MR. SEBY)  Okay.  The FBI was also
22  aware that North Dakota law enforcement was facing
23  challenges from protesters using the Corps of
24  Engineers land to travel to the city of Bismarck and
25  the city of Mandan, North Dakota, correct?

Page 31

1    MS. BOBET:  Objection, vague.  You can
2  answer.
3    A.   I knew there was people coming from the
4  area.  Whether they came from the Corps land or the
5  other camp on the Standing Rock Reservation, I mean,
6  we didn't have surveillance enough to see exactly
7  where people came from.
8    Q.   (BY MR. SEBY)  Are you aware that the
9  Army Corps of Engineers manages land within the
10  boundary of the Standing Rock Sioux Tribe adjacent to
11  the southern portion of the Cannonball River?
12    MS. BOBET:  Objection, assumes facts not
13  in evidence.  You can answer.
14    A.   I guess I don't know the answer to that.
15  I -- I don't doubt it, but, again, I didn't do that
16  type of research.
17    Q.   (BY MR. SEBY)  Okay.  It's fair to say
18  the FBI was aware that North Dakota faced a volatile
19  and dangerous situation stemming from the protests on
20  Corps land for many, many months, right?
21    A.   They faced -- they faced potentially
22  dangerous and volatile, and sometimes it was
23  dangerous, so I'm not sure the scope of that question,
24  but generally they had challenges, yes.
25    Q.   Okay.  Let's go to topic 10.  Mr. Perry,

Page 32

1  this topic reads, "Actions considered and taken by the
2  United States," here the FBI, "in response to the use
3  and occupation of Corps-managed land by someone
4  without either written permission or a Special Use
5  Permit."  And it includes the general or typical
6  policies and procedures and practices with respect to
7  this situation, long-term occupation, et cetera.
8    So did you do any research for this
9  specific topic?
10    A.   Yes, the same as the others.
11    Q.   The exact same?
12    A.   Yes.
13    Q.   Okay.  What actions were, quote,
14  considered by the FBI, end quote, in response to the
15  protesters' use and occupation of Corps land?
16    A.   Response to their use and occupation of
17  Corps land, nothing, really.  We don't -- it -- it --
18  where they were physically located didn't have any
19  meaning to us.
20    Q.   It didn't matter to the FBI that the
21  physical location of the protest camp was on federal
22  property?
23    A.   No.
24    Q.   Has the FBI ever faced a situation where
25  federal property was being used by hundreds of people

Page 33

1  as a protest and occupation zone?
2    A.   Yes.
3    Q.   What other instances can you think of?
4    A.   The one that comes to mind was the one
5  that ended just before that out in -- was it
6  Oregon? -- in Bureau of Wildlife Refuge.
7    Q.   The Malheur?
8    A.   The Malheur, sure, yep.
9    Q.   Was the FBI involved in that event?
10    A.   Yes.
11    Q.   And to what degree?
12    A.   I was never physically present, so any
13  of my information would have came from sitreps and
14  things like that.  I know we had a rotating group of
15  agents that would be out there.  What their assignment
16  was, I couldn't tell you.
17    Q.   And where do those agents come from?
18    A.   All over the country.
19    Q.   And how many were there?
20    A.   I couldn't tell you exactly how many
21  were assigned at any given time.
22    Q.   Could you quantify it generally?  Were
23  there a dozen?  Two dozen?
24    A.   I -- I can't.  Like I said, I only know
25  very general information from sitreps and, quite

Margin annotation (right of Page 32): 32:13-19; 35:23-38:14 401-402

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 34

1  frankly, the national media, so I -- I couldn't
2  quantify the number for you.
3       Q.   Why is it that you compare the Malheur
4  wildlife occupation to the DAPL-protest camps?
5       A.   I didn't.  You asked if there was any
6  other time that the FBI responded to an incident on
7  federal land.  I don't think I would compare them.
8       Q.   Okay.  All right.  Thank you.
9            Isn't it correct that the FBI did
10 consider taking certain actions in response to the
11 protests occurring on Corps land specifically?
12      A.   Yes.  Not because they were on Corps
13 land, though.  That had nothing to do with it.
14      Q.   Right.  The topic is suited to Corps
15 land that you're being asked about, so that's why I'm
16 maintaining that top- -- that aspect of the questions.
17           So what were those actions that were
18 considered?  That's the -- that's the question here.
19      A.   Okay.  So initially, the actions were as
20 I discussed earlier.  We ensured that the SSRA --
21 well, the SSRA interacted both, I believe, before and
22 after the requests from the State or County.
23           We were very limited in staffing at that
24 time, so much of the responsibility -- responsibility
25 stayed with the supervisor, Mr. O'Connell.  He made

34:9-35:14
Offer if other
testimony re: FBI
considerations
comes into
evidence

Page 35

1  the decision to attend every meeting, and he ensured
2  that the investigative analyst, the IA, was placed in
3  the command post to help the flow of intel back and
4  forth.
5            We also attempted to obtain our own
6  intelligence to support and provide to the State.
7            We maintained daily contact with law
8  enforcement through those meetings and other means.
9  For instance, Mr. O'Connell would visit the camps, I
10 believe, every morning and talk with law enforcement
11 on-scene.  I don't know how much interaction he had
12 with camp protesters, I'm sure some, but if he did, he
13 would report what he knew back to the command post
14 and, eventually, me, as I got more involved.
15      Q.   So, Mr. Perry, I want to just interrupt
16 you briefly to make sure that this topic asks about
17 actions considered and taken.  And you're -- you're
18 seemingly describing actions taken.
19           So let's start, though, with the
20 question about actions considered by the FBI.  What
21 did -- what did you -- what did the agency -- when I
22 say "you," I'm talking about the FBI.
23           What actions were considered, and taken
24 or not taken, but considered in response to the
25 protests occurring on Corps land?

Page 36

1       A.   All right.  So we considered what type
2  of support we could -- could provide.  Some of the
3  ideas we had were enhanced intelligence gathering.
4       Q.   How did you do that?
5       A.   We requested assistance from
6  headquarters for additional intelligence components.
7            We requested assistance from -- and when
8  I say "headquarters" at this point, I'm referring to
9  FBI headquarters, not Minneapolis.
10      Q.   Right.  The headquarters.
11      A.   Right.  We requested assistance from
12 what's known as CIRG, Critical Incident Response
13 Group, asking them to assist us and reviewing what we
14 could -- what help we could provide.  We requested
15 that they send out agents who were trained in crisis
16 management and crisis-management command post
17 operations.
18           We considered if there were any
19 on-the-ground-type assistance we could provide.  We
20 did not think there was, but we did -- were able to
21 secure those agents for the command post.
22           We actually had -- we considered
23 the issue in the RA of the -- with the understaffing
24 and how we were going to address that and still help,
25 yet still complete our general Bismarck-Southern

Page 37

1  North Dakota mission.
2            That included the -- there were
3  consideration and request and obtaining TDY, temporary
4  duty agents, to travel to Bismarck to assist, at
5  first, the general Indian country matters so that the,
6  quite frankly, one agent in Bismarck who was involved
7  in the protests -- not involved in the protests, of
8  course, but involved in monitoring the DAPL protest,
9  could focus on that.
10           We considered technical assistance, what
11 technical assistance we could provide.  One of the
12 things we did provide were cameras on-site.  Although
13 North Dakota came up with a better system, we provided
14 what we had at the time.
15           We considered the use of our drone unit.
16 That eventually -- we'll get to them (inaudible).  We
17 considered one of the federal --
18      Q.   I'm sorry.  I'm sorry.  There was a
19 technical problem with the -- the audio and
20 video feed.  You were talking about drones.  I did not
21 hear what you said.
22      A.   Okay.
23      Q.   Would you restate what you said?
24      A.   Sure.  We considered the use of drones.
25 That was one of the instances, as I'm sure we'll

Page 38

1   discuss, that was denied.
2          We considered the amount of
3   investigative assistance we could provide outside of a
4   federal investigation, which was also limited.  And
5   then what we would need to assist with any federal
6   criminal violations, investigatively.
7          We considered tasking sources,
8   identifying and tasking sources to help us gather
9   intelligence on the camp.
10         We considered and received additional
11  funding from FBI headquarters for the temporary duty
12  assignments.
13         That's what's on -- that's what comes to
14  the top of my head right now, sir.
15     Q.  Okay.  Thank you.
16         One thing you mentioned was the use of
17  the CIRG was considered, right?
18     A.  Components of CIRG, yes, sir.
19     Q.  And would that include something akin to
20  an FBI SWAT unit?
21     A.  No.  That was not a consideration.
22     Q.  At no time the FBI considered utilizing
23  its SWAT resources?
24     A.  No.  We -- we did not feel that was in
25  the FBI's purview or jurisdiction.

**38:15-25; 40:10-13 Offer if testimony at 39:16-40:9 comes into evidence**

Page 39

1      Q.  The FBI has such resources, though,
2   correct?
3      A.  We have the Hostage --
4      Q.  I'm sorry.  We're not hearing you.
5      A.  -- Rescue Team.  Very -- oh, I'm sorry.
6   Can you hear me now?
7      Q.  Yeah.  I don't think it's a problem with
8   you.  It's the connection here.  We have a problem
9   with your connection.
10     A.  Like I said, there was a blizzard
11  outside, so that could be causing some problems.
12     Q.  Okay.
13     A.  And I live in the country, so it's DSL.
14         The -- could you repeat the last part of
15  that question, please?
16     Q.  Yeah.  I was asking if the FBI has
17  something akin to a SWAT unit.  And it may not be
18  called a SWAT unit, but I -- did you -- do you have a
19  general understanding of what a SWAT unit is and looks
20  like?
21     A.  I do, sir.  And, yes, the FBI does.
22     Q.  Okay.  And where is that resource based?
23  In one or more locations?
24     A.  There are SWAT teams, specifically
25  called that, in each field office.  Some are more

**39:16-40:9 401-402**

Page 40

1   enhanced than others.  Some are larger, some are
2   smaller.  And then there is the Hostage Rescue Team
3   based in Quantico, Virginia.
4      Q.  And the -- does the Minneapolis field
5   office have a SWAT team?
6      A.  Yes.
7      Q.  What does it consist of sizewise?
8      A.  I can't give you an exact number.  I
9   want to say somewhere in the low 20s of operators.
10     Q.  Okay.  And then where would be the next
11  closest field office that has a SWAT team?  Denver?
12     A.  Denver, Omaha.  I'm not quite sure
13  which -- which one is closer.  Probably Denver.
14     Q.  Okay.  What do -- what do the staff
15  resources of those SWAT teams look like?
16     A.  I do not know.
17     Q.  Okay.  You also mentioned FBI drone
18  resources were considered, right?
19     A.  Yes.
20     Q.  So another -- said another way, the FBI
21  considered the deployment of its own drone resources?
22     A.  A big part of that was cut off.  I'm
23  sorry, sir.  Could you repeat it?
24     Q.  Yeah.  Part -- one of the FBI's
25  considerations was the deployment of FBI drone

**40:24-41:2; 42:4-43:15; 44:14-45:4 401-402**

Page 41

1   resources, correct?
2      A.  Yes.
3      Q.  And can you describe those to me?  What
4   are they?  Where are they?  What do they do?  What was
5   the purpose for which they were considered?  That kind
6   of thing.
7          MS. BOBET:  Objection, vague and
8   compound.  You can answer.
9      Q.  (BY MR. SEBY)  Take -- take one at a
10  time.  What are they?
11     A.  So they are medium size, I would say.  I
12  have not physically seen a drone itself.  I saw the
13  cases they came in.
14     Q.  When did you see the case they came in?
15     A.  I don't think I was -- I wasn't
16  physically present when they were there.  I'm sorry.
17  What that -- what was that?
18     Q.  When did you say you saw the case they
19  came in?
20     A.  Yeah.  When I had said I saw it, I
21  don't -- I'm not sure if it was a picture or -- I'm
22  pretty sure it was a picture, because I wasn't
23  physically present in North Dakota when they got
24  there.
25         I don't remember the exact date that

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

Page 42

1 they were deployed, but whenever that was is when I
2 obtained that information of the size and, you know,
3 the picture, I guess, of the Pelican cases.
4    Q.  So they were actually on the ground in
5 North Dakota at one point?
6    A.  Yes.
7    Q.  Tell me about that.
8    A.  Yeah, initially they -- Mr. O'Connell
9 started the discussion with -- I think it's the
10 aviation unit they fall under in CIRG, relative to
11 potential use in support of the -- our efforts in
12 North Dakota.
13      They initially -- there's -- there's a
14 lot of approval processes, so a lot of people have to
15 talk to one another.
16      So Jake's information -- Mr. O'Connell's
17 information back was that they could be of assistance.
18 I then talked to --
19    Q.  I'm sorry.  Could -- could be?
20    A.  Could be, yeah.
21    Q.  Okay.
22    A.  Meaning they could have value, not --
23 yeah.
24    Q.  I understand.
25    A.  So he -- it then worked its way up the

Page 43

1 chain.  I called the section chief of that unit, who
2 also agreed that they may have value to us and agreed
3 to forward deploy them.
4      Our discussion about the value they may
5 have was to monitor events.  For instance, when the
6 sheriff's office line would move, that's usually
7 when -- of the times we saw violence, that's when it
8 was, or when the -- the State law enforcement would
9 take some action.
10      So our belief was if we could monitor
11 that, we would be able to assist North Dakota with
12 real-time intelligence of what was going on.
13      So they were forward deployed.  At some
14 point, they were with -- their mission was canceled by
15 headquarters, FBI headquarters, and they went back.
16    Q.  And so the -- just to process what
17 you're saying, just to make sure I understand, that
18 you participated in the internal requests within the
19 agency to get them to come to North Dakota; they did;
20 they were dispatched to the state, and they arrived;
21 and once they arrived, they were there -- present for
22 some period of time, right?
23    A.  Yes.  Not a long period of time, though.
24    Q.  And what do you mean by that?
25    A.  I believe, my recollection is, that they

Page 44

1 arrived in North Dakota via our own -- via our own
2 aircraft.  I took a few minutes probably to use the
3 bathroom or whatever, and then I had a discussion.
4 Went -- forward deployed down towards the protest
5 sites to try and do some reconnaissance of potential
6 location they could be active from.  And while at that
7 site, they were recalled.
8    Q.  Were you aware that they were going to
9 be recalled?
10    A.  No.
11    Q.  So you learned that it happened after
12 the fact?
13    A.  Yes.
14    Q.  So what do you know about the -- the
15 recalling of those drones?  Who -- who did that?  And
16 I'm not asking you personal knowledge.  I'm asking you
17 on behalf of the FBI, as an entity, who in the FBI
18 canceled the use of those drones in North Dakota and
19 recalled them back to the agency's headquarters
20 moments after they arrived?
21    A.  To my understanding, it was done by the
22 Deputy Director, and I understand that from
23 conversations with both Mr. O'Connell and
24 Mr. Thornton.  I think that was where information for
25 both of us came from Mr. Thornton.

Page 45

1    Q.  And the Deputy Director of the Federal
2 Bureau of Investigation at the time was what
3 individual?
4    A.  Andrew McCabe.
5    Q.  Why did Mr. McCabe withdraw the
6 resources of the FBI that were on the ground in
7 North Dakota, there for the purpose, as you said, to
8 support North Dakota law enforcement in dealing with
9 the protest camps?
10    A.  So he -- I was never told exactly what
11 his words were.  What was eventually passed to me was
12 that they did not feel the mission fell within the
13 parameters of the rules and policies we had for the
14 use of drones.
15    Q.  And how did that strike you at the time,
16 hearing that those resources --
17    A.  At first --
18    Q.  -- that you were part of -- you were
19 part of recruiting and getting permission to do that,
20 then having the Deputy Director, the second most
21 senior person in the FBI, blow the whistle and call
22 them home?
23    A.  At first, I was surprised -- or
24 frustrated, I would say.  However, hindsight being
25 20/20, we did not have an open investigation that the

**ND OBJ:**
As to 45:11 (beginning with "What was...")-14, Hearsay

45:5-46:8 Offer if preceding testimony comes into evidence

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

**Page 46**

1  drones would be monitoring components of, and at that
2  time, we had a lot of -- we got -- had gotten flack
3  from other deployments, and the Bureau was very touchy
4  about the use of drones over protest activity.
5          So I believe the fact that either we did
6  not communicate well, or did not exist a specific
7  well-defined purpose for the use of the drones, I
8  understand their recall.
9      Q.   Why wouldn't there have been some
10 intervening discussion to clarify any questions that
11 Mr. McCabe may have had, short of an abrupt
12 cancellation of a deployment that had already
13 occurred?
14     A.   I believe because both I and Jake were
15 clear what we wanted their deployment for at that
16 time, at least clear as far as headquarters components
17 were probably concerned, and then I can't talk about
18 the discussions that developed in headquarters.
19 There's a lot of layers there.  So I'm sure there was
20 a lot of opinions.  There was probably -- I'm sure
21 there were lawyers involved and -- so I can't really
22 tell you what their discussions were.
23     Q.   Did you ever hear anything further about
24 that instance?
25     A.   No, I don't think I did.

**Page 47**

47:1-10
Offer if other
testimony re: FBI
resources
comes into
evidence

1      Q.   Okay.  When we began this discussion
2  about the drones, you said that the -- you fore- --
3  you foretold we talk about it, and you said that was
4  one instance where a resource was denied.  Why did you
5  say it that way?  What other instances are you
6  referring to?
7      A.   Actually, I think I said it that way
8  because it was pretty much, from my recollection right
9  now, exclusive:  Most of our other requests were
10 approved.
11     Q.   Is it one of the missions of the FBI to
12 work in concert with and support your law enforcement
13 colleagues in the states?
14     A.   Within the parameters of our policies,
15 yes.
16     Q.   Uh-huh.  At the time that you and
17 Mr. O'Connell were taking your time to work the FBI
18 chain of command to seek the FBI drone resources, did
19 you feel like you were acting outside of the policies
20 of the FBI?
21     A.   In the moment, no.
22     Q.   Okay.  What actions -- the second half
23 of this topic is "actions taken," so let's -- let's
24 talk about actions taken by the FBI.
25          What actions were taken by the FBI in

**Page 48**

1  response to the use and occupation of federal property
2  belonging to the -- managed by the Corps of Engineers?
3      A.   So I went through a lot of them.  We
4  enhanced staffing in the Bismarck RA to assist with
5  both the Indian-country mission they had there, to
6  free up the -- the one agent we had to assist with
7  this -- assist the State, along with the supervisor,
8  so that they could focus their time there.
9          We asked for and obtained funding to
10 support that -- those temporary duty assignments.
11 Those assignments, like I said, included investigative
12 support, intelligence support, and command post
13 crisis-management support.
14          Additionally, we --
15     Q.   So let me ask you this:  All those
16 resources, what did they amount to short of taking
17 notes in the State's meetings and going to the protest
18 sites and just sitting and watching what was going on?
19 Apart from those, what else did the FBI do?
20     A.   With -- I'm sorry.  With the current --
21 with the resources we already discussed?
22     Q.   No.  What actions were taken by the FBI,
23 apart from participating and taking notes in meetings
24 and then -- in the State of North Dakota law
25 enforcement centers, response centers, and going to

**Page 49**

1  the protest sites, and looking through binoculars and
2  observing the large protest camp on federal property?
3  Apart from that, what actions were taken?
4      A.   Sure.  So there was investigative
5  assistance when we were able, meaning we just can't
6  open a case on anything.  So when we had a predicated
7  criminal violation, we opened an investigation.
8  Most -- all times, so did the State of North Dakota,
9  and most times ATF, so we worked with them to help
10 investigate those instances of federal legal
11 violations, when able.
12          We did have some trouble if the State
13 would do things without telling us.  So it was
14 sometimes difficult to work alongside the State.  They
15 liked the ATF agent, and sometimes they would conduct
16 a parallel investigation and not keep us included.
17          Beyond that, we would identify --
18     Q.   How do you know that?
19     A.   Talking to the ATF agent and being
20 present in some meetings where a revelation would come
21 out that a certain individual may be -- have been
22 interviewed without our knowledge.
23     Q.   Did you feel like the State had to ask
24 for your permission to do those activities?
25     A.   No, certainly not.

Page 50

1    Q.   Okay.  Let's go to topic 13.
2    Mr. O'Connell [sic], the topic is "Actions taken by
3    the United States," again, actions taken, and -- and
4    this is to you as the FBI representative, and with
5    respect to the DAPL protests occurring again on
6    Corps-managed land or affected by the DAPL protests
7    occurring on Corps land.
8         What -- what actions did the FBI take to
9    protect the health and safety of the protesters on
10   those Corps-managed land protest camps?  Anything?
11   A.   Yes.  And the specific answer to this
12   question, I would tell you the -- the most -- the
13   thing we could do the best was try and obtain --
14   obtain intelligence from within the camp, whether that
15   related to health and safety, environmental.  We were
16   having -- we asked questions like how were they
17   getting rid of their garbage, that type of stuff, and
18   we would provide that to the State.
19        Most times they already knew the
20   information, but we did our best to support them
21   through intelligence gathering, I'll call it.
22   Q.   And is that a reference to the fact that
23   the FBI had informants in the camp, federally
24   sponsored informants?
25   A.   Yes, in part.

Page 51

1    Q.   And how else?
2    A.   When agents would be on the reservation
3    or when Jake would visit, they would make their own
4    observations or talk to people spontaneously who they
5    would run into that might say something that would
6    help, be information that would be good to know.
7         But the proactive part would be the
8    informants.
9    Q.   Sure.  So what actions did the FBI
10   take -- take to protect the health/safety of the
11   protesters on the Corps property?
12   A.   The action we took was to provide the
13   information to the appropriate people who could act on
14   it, which would be the State and investigative
15   agencies or -- the command post, basically, and
16   everyone in there.
17   Q.   Okay.  How about actions taken by the
18   FBI to protect the Corps lands from environmental harm
19   or degradation?
20   A.   None.  It's not in our purview.
21   Q.   Okay.  What actions did the FBI take to
22   prevent unlawful or unsafe activities on the Corps-
23   managed land?
24   A.   I would go back to the intelligence
25   gathering.  "Unlawful," I will tell you, there was

Page 52

1    allegations of certain crimes.  Many of them we
2    couldn't prove either during that time or afterwards.
3    But, basically, it would be intelligence gathering.
4    Q.   Okay.  What actions did the FBI take to
5    tell protesters to leave the federal property?
6    A.   Again, none.  Not in our purview to do.
7    Q.   Okay.  How about actions taken, if any,
8    by the FBI to clear the Corps property in the first
9    quarter of 2017?
10   A.   The same answer:  None.
11   Q.   Were you aware that the Army Corps of
12   Engineers sent a letter expecting the vacation of the
13   Corps -- the protesters to vacate the Corps property?
14   A.   There were a lot of communications.  I'm
15   not quite sure specifically what you're referring to.
16   Q.   Are you aware of whether such a
17   communication occurred?  Mr. Perry?
18   A.   I'm aware there was the -- yeah, I'm
19   thinking.  I'm sorry.
20   Q.   No problem.  I just wanted to make sure
21   we didn't lose you.
22   A.   Yeah, I lost part of that question.  I
23   think it was "aware of any actions by the Corps to
24   tell the people they couldn't be there," essentially;
25   is that correct?

Page 53

1    Q.   Right.
2    A.   I -- I know the discussion of a denial
3    of a permit, that might have been part of a press
4    release or some form of communication, but I am not
5    aware of any detail of what that involved.
6    Q.   Mr. Perry, what actions did the FBI take
7    to prevent the use of the Corps-managed land as a camp
8    or a base or a staging area, by the protesters' use,
9    to conduct activities off of the Corps property?
10   A.   I'm thinking.  I'm not -- I'm still
11   here.

ND OBJ:
Non-Responsive

12        It's not in the FBI's lane to do
13   anything about the Corps of Engineers property.
14   However, if part of that question is criminal activity
15   may occur by people leaving Corps property, it would
16   be the same answer as everything else:  Assist with
17   investigations and intelligence.
18   Q.   The FBI was aware of -- that the Corps
19   property was being used as a base or a safe haven,
20   though, correct?  And the protesters in those camps
21   would organize and prepare and conduct missions to
22   attack or interfere with the protest -- pardon me, the
23   Dakota Access Pipeline construction or the area in
24   North Dakota where this all occurred, correct?
25        MS. BOBET:  Objection, vague, assumes

53:18-
24;
54:2-7
611,
vague,
assu-
mes
facts

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

Page 54

1   facts not in evidence.  You can answer, sir.
2       A.  Yeah.  Eventually, yes.  In the
3   beginning, as I stated to one of your earlier
4   questions, I couldn't really tell where people were
5   coming from, which camp.  But eventually, yes, we were
6   aware that they were moving in and out of that camp to
7   conduct their activities, legal or otherwise.
8       Q.  (BY MR. SEBY)  "Direct action" is a
9   phrase I've heard.  Have you heard that phrase?
10      A.  Yes.
11      Q.  What does it mean to you?
12      A.  It means not just standing around
13  protesting and complaining; actually going to do
14  something to prevent whatever they were trying to
15  prevent.
16      Q.  Uh-huh.  Would you agree with me that
17  there was lots of direct action going on by protesters
18  that were attacking North Dakota cities and the Dakota
19  Access construction site?
20          MS. BOBET:  Objection, vague.  You can
21  answer.
22      A.  "Lots," I don't know how you define
23  "lots."  There was -- there was a significant number
24  of events where there was direct action -- action
25  taken by segments of the protesters.

**54:16-19;
54:22-25
611, vague**

Page 55

1           MR. SEBY:  Okay.  Let's take a 10-minute
2   break -- 10 -- let's take a 15-minute break, if we
3   would, please.  Go off the record.
4           MS. BOBET:  Sure.
5           THE VIDEOGRAPHER:  Going off the record.
6   The time is 5:07 p.m. UTC, 10:07 a.m. Mountain.
7           (Recess taken 10:07 a.m. to 10:26 a.m.
8   Mountain Standard Time.)
9           THE VIDEOGRAPHER:  We are back on the
10  record.  The time is 5:26 p.m. UTC, 10:26 a.m.
11  Mountain.
12      Q.  (BY MR. SEBY)  All right.  Mr. Perry,
13  we're back after a short break, and now I wanted to
14  ask you about topic 15.
15          MR. SEBY:  Jose, if you would pop that
16  up on the screen, and I'll also read it.
17      Q.  (BY MR. SEBY)  Topic 15 reads,
18  "Communications between the United States," meaning
19  the FBI in this -- in this deposition, "and with, to,
20  or from persons on Corps-managed lands related to the
21  DAPL protests, or representatives or spokespersons for
22  such persons."
23          Mr. Perry, what did you do to prepare
24  for this specific topic on behalf of the FBI?
25      A.  The same as the rest:  Reviewed

Page 56

1   materials, thought about my own recollections, had the
2   predeposition meetings.
3       Q.  Okay.  So would you describe the
4   communications the FBI had with the Standing Rock
5   Sioux Tribe or other tribal officials regarding the
6   DAPL protests?
7       A.  So other than any that may have been
8   spontaneous by someone being on the reservation or
9   nearby the protest, the only formal one that comes to
10  mind was Mr. O'Connell's involvement in a meeting with
11  Tribal representatives and State representatives and
12  the U.S. Attorney's Office.  I saw that documented
13  somewhere, but that's the only -- only formal one
14  right now I can think of.
15      Q.  And when was that?
16      A.  I would have to look up the document to
17  see what the date was.
18      Q.  And that's with officials from the
19  Standing Rock Sioux Tribe?
20      A.  Yes, and others.
21      Q.  I'm sorry?
22      A.  And others, including -- I think the
23  sheriff was there; there was State people there; I
24  think the Colonel for National Guard was there;
25  someone from the U.S. Attorney's Office.

Page 57

1       Q.  Okay.  How about -- tell me about
2   communications the FBI had with DAPL protesters.
3           MS. BOBET:  And I'll just note, I think
4   the scope of this topic is communications specifically
5   with, to, or from persons on Corps-managed lands.  It
6   sounds like the question is a bit broader than that.
7   But the witness can answer if he knows the answer.
8       Q.  (BY MR. SEBY)  The question is with
9   respect to the topic, and so it's -- yes, it's
10  communications the FBI had with DAPL protesters who
11  were on Corps property, or their spokespersons.
12      A.  I don't recall having any communications
13  with spokespersons from the protest.  That -- that was
14  a very fluid thing, who was in charge, who was
15  speaking for whom, and often you couldn't really tell
16  who that may be.
17          The only interaction I think we had with
18  people, general protesters, would be spontaneous, and
19  I saw the written document about how there was
20  discussion with someone who wanted to be anonymous,
21  and they met at the casino.  Just spontaneous things
22  like that.  There were no formal -- besides the
23  meeting I described, I don't recall any formal
24  interactions with protest leaders, protest
25  spokespeople.

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 58

1    Q.   Okay.  I thought you told me that the
2  FBI sponsored informants in the camps.
3    A.   Oh, do you mean indirect communication
4  as well?
5    Q.   I'm not qualifying it the way you are.
6  The question is "communications," not -- not subtypes
7  of communications.  Communications.
8         And so you -- you told me you had -- the
9  FBI had informants in the camps, and so those were
10  your informants, and so I want to know about each and
11  all of those communications.
12    A.   All right.  I misunderstood the
13  question.
14         MS. BOBET:  Just one second here.  I'll
15  just lodge an objection.  As we stated in conferral,
16  it's not possible to recount each and every
17  communication over this -- this period of time.
18         The witness is prepared to testify to,
19  and I believe he'll testify about, the -- the
20  communications he can after reasonable preparation and
21  to the best of his knowledge.
22         You can proceed with your answer.
23    Q.   (BY MR. SEBY)  Mr. Perry, who managed
24  the FBI-sponsored informants that you had in the
25  camps?

Page 59

1    A.   Field agents.
2    Q.   And how many -- how many field agents
3  were involved in that?
4    A.   Initially, there was only really one
5  from the Bismarck RA, and then there may have been one
6  or two -- well, two in the RA because of the
7  task-force officer.  And then on -- throughout the TDY
8  status, they assisted with managing informants.
9         To give you a specific number, it was
10  field agents.  Some were assigned to an informant, and
11  some just tried to manage them while they were there.
12    Q.   Who -- who recruited the informant?
13    A.   The same answer:  Field agents,
14  primarily.
15    Q.   So did you speak with the field agents
16  at the time that are still employed by the FBI?
17    A.   I don't understand that question.  I'm
18  sorry.
19    Q.   Did you speak with those individuals to
20  prepare for your deposition today?
21    A.   No.
22    Q.   Why not?
23    A.   I don't think there was anything -- I've
24  read all -- in the past I've read most of the
25  information they've provided.  I remember the

Page 60

1  substantive stuff.
2    Q.   How did they provide it?
3    A.   Sometimes it was in writing; sometimes I
4  received it through a supervisor, Mr. O'Connell, who
5  spoke directly to them; and other times I was in the
6  room when they spoke.
7    Q.   How did the informants provide written
8  information to the field agent?
9    A.   No, the field agent would provide the
10  written information.  The informant would provide it
11  verbally.
12    Q.   I see.  And where -- where is that --
13  where are those written informations from the
14  field-agent summaries and the conversations and
15  feedback from the field operatives?
16    A.   I believe they would be in that
17  informant's informant file.
18    Q.   So there's informant files.  And who
19  manages those?
20    A.   The case agent, the -- the agent that
21  controls the informant.
22    Q.   Okay.  Did you ask to review those in
23  preparation for your deposition?
24    A.   No.
25    Q.   Did -- what instructions were given to

Page 61

1  the FBI-sponsored informants in the DAPL-protest
2  camps?
3         MS. BOBET:  Objection --
4    Q.   (BY MR. SEBY)  What was their charge?
5         MS. BOBET:  This is, I think, outside
6  the scope of this question that's talking about
7  communications with protesters if the question is
8  going to matters beyond that.
9         MR. SEBY:  It's not.
10         MS. BOBET:  If Mr. Perry knows the
11  answer -- if Mr. Perry knows the answer in his
12  personal capacity, he may answer, and we'll designate
13  it as confidential.
14         MR. SEBY:  I'm going to register an
15  objection.  You're limiting the scope of the topic.
16         (Proceedings continued on page 62,
17  confidential excerpt.)
18
19
20
21
22
23
24
25

Page 62

1  (Confidential excerpt follows, continued
2  from page 61, line 17.)
3  Q.  (BY MR. SEBY)  Mr. Perry, I'm going to
4  ask you again the question about communications
5  between the FBI, which includes FBI-sponsored
6  informants, with protesters on Corps property or their
7  spokespersons.  And so the FBI had informants in the
8  camps, and I want to know where those files are and
9  who defined the mission of the informant in the camps
10  while they were communicating with protesters.
11  MS. BOBET:  I'll -- I'll repeat my same
12  objection that the questions, in particular, if
13  they're about where certain records are located and
14  what instructions were given to informants, is outside
15  the scope.
16  But as I said, Mr. Perry may answer in
17  his personal capacity, and we will designate the
18  response as confidential.
19  A.  Okay.  So the tasking of informants
20  would follow a couple of different paths.
21  One would be -- the very first thing we
22  would have a discussion with anybody who went into
23  camp was "We don't want to know about Constitutionally
24  protected activity.  Here are the things we want to
25  know about."  We would give them essentially a list:

Page 63

1  "Violence, potential violence, criminal activity."  To
2  some point it was health and safety as well, because,
3  you know, we had an informant placed and in position
4  where they could report on that.
5  So they would be the taskings given to
6  the informants and the limitations.
7  Q.  (BY MR. SEBY)  Okay.  How many
8  informants total were -- were placed in the camps
9  under the sponsorship of the Federal Bureau of
10  Investigation?
11  A.  I don't -- I don't have a list, nor was
[redacted]
[redacted]
15  MS. BOBET:  We'll -- we'll designate
16  that response as confidential as well.  And note,
17  again, these questions about informants are outside of
18  the scope.
19  But if you choose to keep answering
20  them, Mr. Perry, you can respond, and we'll designate
21  them confidential as appropriate.
22  Q.  (BY MR. SEBY)  So I'm asking you about
23  communications between the FBI and protesters.  And
[redacted]
[redacted]

Page 64

2  with what to look for and to -- and to be on the
3  lookout for and to report back, right?
4  A.  Yeah.  You're limiting it to in the
5  protest camps?  Some of the informants may have never
6  entered the camp, but obtained their information by
7  telephone or email or thirdhand.
8  Q.  Okay.  How many people -- this topic is
9  asking about communications with protesters in the
10  camps.  So how many -- how many informants sponsored
11  by the FBI were in the protest camps?
12  A.  I don't know that I can give you an
13  exact number.  I would say again between five and ten,
14  probably closer to ten.
15  Q.  Okay.  And what sorts of information did
16  they learn from those communications?
17  MS. BOBET:  Objection, vague.  You can
18  answer.
19  A.  We would learn things such as the
20  identified -- identification of people in the camp.
21  We would learn a little bit about physical structure,
22  what type of facilities existed.  We would learn about
23  sometimes potential direct-action plans.  "Plans,"
24  I -- I want to make sure I say, because oftentimes
25  what we heard did not develop.

64:8-14
401-402

Page 65

1  There would be allegations of other
2  criminal activity, such as drugs or sexual assault or
3  weapons.  However, the informants never saw weapons.
4  They would -- that I recall, but they would discuss --
5  they would report how others discussed the weapons.
6  And like I said, we would limit it to
7  potential criminal activity or -- or really -- I say
8  health and safety only because we had an informant
9  placed in the position to do so, but that's, in
10  general terms, what they would report on.
11  Q.  (BY MR. SEBY)  Okay.  What sorts of
12  communications were relayed to protesters on behalf of
13  the FBI?
14  MS. BOBET:  Objection, vague and
15  ambiguous.  You can answer.
16  A.  You're very choppy there.  Do you --
17  Q.  (BY MR. SEBY)  Yeah.  Let me re- --
18  re- -- rephrase the question.
19  Did the FBI ever make statements to the
20  protesters, through your paid informants, assuring the
21  protesters that they would be permitted to stay in
22  their location on Corps property?
23  A.  No, absolutely not.
24  Q.  Did you ever -- did the FBI ever make
25  statements to the protesters, through its sponsored

ND OBJ:
Relevance;
Introduces
new material

Page 66

1  informants, that the federal government expected those
2  people to leave the property?
3      A.  No.  It wouldn't be appropriate in that
4  situation.
5          (End of confidential excerpt.
6  Proceedings continued on page 67.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1          (Proceedings continued from page 66,
2  line 6.)
3      Q.   (BY MR. SEBY)  Do you recall, on behalf
4  of the FBI, the Corps ever making a statement to
5  protesters assuring them that no legal action would be
6  taken against them or eviction operations initiated?
7          MS. BOBET:  Objection, outside the
8  scope, and is asking him to speak for another agency,
9  the Corps of Engineers.  He may answer in his personal
10  capacity.
11      A.   The FBI never made any such statements
12  like -- like that.
13      Q.   (BY MR. SEBY)  Okay.  Let's look at
14  topic 16, Mr. Perry.  Okay.  This topic reads,
15  "Enforcement actions or investigations taken by the
16  United States . . . at any time with respect to
17  any . . . [person] on Corps-managed lands who were
18  associated with the DAPL protests."
19          What did you do to prepare for this
20  topic?
21      A.   The same answer:  Reviewed documents.
22      Q.   Okay.
23      A.   Yeah.
24      Q.   Let's take down the topic, and then
25  we'll talk about it, but I -- I would like to be able

**ND OBJ:**
Introduces
new material

Page 68

1  to see you.
2      A.   Could we leave it there?
3      Q.   Oh, yeah.  Sure.
4          MR. SEBY:  Jose, the witness would like
5  it put back up.
6      Q.   (BY MR. SEBY)  We'll put it back up,
7  Mr. Perry.  No problem.
8          MR. SEBY:  No, we're -- we're on
9  topic 16, Jose.  I'm sorry.  All right.
10      Q.   (BY MR. SEBY)  Is that good, Mr. Perry?
11  Are you ready to have some questions?  Mr. Perry?
12      A.   Yes, I'm ready.
13      Q.   Okay.  So what did you do to research to
14  prepare for this topic?
15      A.   The same as the other topics:  The
16  meetings, the review of paperwork, and recollecting on
17  my own memories.
18      Q.   Okay.  Okay.  The binder and the
19  materials provided by your counsel?
20      A.   Yes, that's correct.
21      Q.   Okay.  Do you have all those -- those
22  things in front of you right now?
23      A.   In front of me?  No.  They're in a box
24  to my left.
25      Q.   Do you have anything open sitting on

Page 69

1  your desk in front of you?
2      A.   I have notes from the prep meetings.
3          MR. SEBY:  Okay.  Ms. Bobet, I would
4  like a copy of those provided this afternoon, please.
5          MS. BOBET:  We can -- we can provide you
6  the notes that we gave the witness that sort of
7  synthesized what we talked about our -- during our
8  discussions.
9          MR. SEBY:  As long as those are the
10  notes that Mr. Perry just referenced, that's fine.  I
11  don't want you changing what you're going to provide
12  me.  I'm asking for what the witness has in front of
13  him right now.
14          MS. BOBET:  Okay.  Mr. Perry, are those
15  the notes that I sent you in connection -- sort of
16  synthesizing what we talked about in our deposition
17  prep sessions, or are those your own notes?
18          THE DEPONENT:  They're the ones you sent
19  me.
20          MS. BOBET:  Okay.  Yeah, no problem.  We
21  can provide those.
22          MR. SEBY:  Thank you.
23      Q.   (BY MR. SEBY)  Do you have anything else
24  there, Mr. Perry?
25      A.   I pulled out, when you pulled up the

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

---

Page 70

1  email, my original email.  That's here.  That's it,
2  then.  Yeah.  I have a blank piece of paper to take
3  notes, but I have taken none.
4       Q.   Okay.  Do you have a video monitor
5  screen open and -- and illuminated?
6       A.   I'm sorry.  I don't understand that
7  question.
8       Q.   Do you have a video monitor that's on
9  and showing anything?
10       A.   Oh, you mean on my screen?  No.  The
11  only thing I have on is this Zoom session.
12       Q.   Okay.  So would you tell me, in response
13  to this topic, what -- what enforcement actions or
14  investigations the FBI took with respect to the DAPL
15  protest concerning protesters on Corps-of-Engineers-
16  managed lands?
17       A.   Sure.  We opened a few investigations.
18  Well, we opened a firearms case when the deputy was
19  shot at during one of the -- but it was by the State.
20            We opened a couple arson cases, one -- I
21  don't know the def- -- if the definition of
22  "Corps-managed lands" includes the bridge there, then
23  I think that would be one.
24            We also opened one on some railroad
25  tracks.  I think it was up near Mandan.

**70:12-71:7;**
**71:15-71:23**
**401-402**

---

Page 71

1            There -- there were a few others.  Oh,
2  the one where Ms. Wilansky was injured by an
3  explosion.
4            They are the -- they are the ones that
5  come to my top -- the top of my head right now.  I do
6  have a paper in the box with kind of a list, if you
7  want me to get it.
8       Q.   No.  No thanks.
9            So -- so the -- the investigations the
10  FBI opened concerned activities both occurring on the
11  Corps land and those occurring off of the Corps land,
12  correct, like the railroad-track incident in Mandan?
13       A.   That's correct.  The Corps land had no
14  bearing in our -- in our case openings.
15       Q.   Okay.  Where did the arson situations
16  occur?
17       A.   On the -- I'm sorry.  Real quick there.
18  On the bridges, bridges or bridge, the one main bridge
19  there when they burned the barricade.
20       Q.   Yeah.
21       A.   They might have done that twice.  I
22  don't recall exactly.  I'm trying to remember if there
23  was another arson.  I know that one.
24       Q.   Was the FBI ever told not to take any
25  investigative actions?

**71:8-14;**
**71:24-72:1**
Offer if other
testimony re:
FBI
investigations
comes into
evidence

---

Page 72

1       A.   No.
2       Q.   Okay.  Were you sharing any of your
3  investigative information with any other agency or
4  actor?
5       A.   Yes.
6       Q.   Who?
7       A.   Primarily North Dakota -- was it their
8  BCI?  And the ATF agent that -- most of the
9  investigations, they were the main groups.  I believe
10  there was a Morton County investigator as well.
11       Q.   Okay.
12       A.   All of our information we gained was
13  shared with them.
14       Q.   Okay.  Topic 18, if we could go to that,
15  please.  Topic 18 reads, "Resources of any sort
16  provided, or decisions or considerations regarding
17  whether or how to provide such resources, to
18  North Dakota from August 1, 2016, to March 1, 2017,
19  related to the DAPL protests and the occupation of
20  Corps-managed [Lake] Oahe Project lands, including the
21  cleanup of such lands after the occupiers
22  left . . . ."
23            What did you do to prepare for this
24  topic?
25       A.   The same as the others.

---

Page 73

1       Q.   Okay.  So what resources did the FBI
2  provide to North Dakota?
3       A.   We provided investigative resources.  We
4  provided technical resources; I mentioned the cameras
5  earlier.  We provided some of the agents that were
6  command-post CIRG trained.  We provided -- well, I'll
7  call it, early on, the -- they came out and consulted
8  on the command-post operations, that type of thing.
9  What else?  That's what's coming to mind right now,
10  sir.
11       Q.   Okay.  Let's look at topic 20.
12            MR. SEBY:  Jose?  20.  It starts on the
13  bottom of the -- the prior page.
14       Q.   (BY MR. SEBY)  Okay.  Topic 20 reads,
15  "Decisions by the United States to provide or withhold
16  law enforcement assistance to the State and local
17  authorities during the DAPL protests."
18            The same preparation as the other
19  topics?
20       A.   Yes, sir.
21       Q.   Did the Corps of Engineers ever
22  communicate to the FBI that the Corps considered the
23  protesters on the Corps-managed land to be
24  trespassers?
25            MS. BOBET:  Objection, outside of the

**73:1-10**
Offer if
prece-
eding
testim-
ony re:
FBI
resour-
ces
comes
into
evid-
ence

---

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 74

1  scope of the question -- or this topic, rather.  But
2  you may answer in your personal capacity, Mr. Perry.
3      A.   I do not know the answer.  They never
4  communicated to me or in anything I saw formally.
5  Whether Mr. O'Connell had conversations with them or
6  not, I don't know, but not directly to me or in any
7  formal sense.
8      Q.   (BY MR. SEBY)  Are you aware of the
9  Corps doing that at any level above you or
10 Mr. Thornton --
11     MS. BOBET:  Same objection.
12     Q.   (BY MR. SEBY)  -- in the FBI?
13     A.   Yeah, I am not.  I probably -- I would
14 have if it had happened.
15     Q.   Okay.  Did the FBI ever ask other
16 federal agencies or entities for law enforcement
17 assistance during the protests?
18     A.   We used task-force officers from a
19 couple different parts of the country, but I don't
20 know if you would say requested it from other
21 agencies.  They were already kind of full-time with
22 the FBI, but they would not have been FBI agents.  I
23 think -- I don't know if that's what you mean, though.
24     Other than that, our main interactions
25 about investigative law enforcement activity with

Page 75

1  other federal agencies would have been ATF, and I
2  believe there was some discussions of things like what
3  lab certain things would go to.
4      We had a lot of interaction with the
5  Bureau of Indian Affairs, although I don't think there
6  was a specific request made one way or another.  And
7  the same with the U.S. Marshals.
8      Q.   Okay.  Did the information that you
9  gathered from your investigative resources that you've
10 been telling me about and you shared those with
11 North Dakota, what was the -- the sharing process of
12 that information up your chain of command within the
13 FBI?
14     MS. BOBET:  Objection, vague.  You can
15 answer.
16     A.   Okay.  I don't understand the last part
17 of it, up the chain -- sharing up the chain to the
18 FBI?  I'm not -- I'm not sure where you're headed
19 there.
20     Q.   (BY MR. SEBY)  Did the F- -- did the
21 Minneapolis field office or office -- I don't know if
22 "field office" is right -- but the Minneapolis FBI
23 office share any information about the Dakota Access
24 Pipeline protests with individuals in the FBI
25 hierarchy above the Minneapolis office?

Page 76

1      A.   Yes.
2      Q.   How did that work, and what was the
3  information shared?
4      A.   Well, it worked via telephone calls, I
5  think emails primarily.
6      And the information shared a lot of
7  times was just general, "This is what's going on at
8  the moment."
9      There were also discussions back and
10 forth of what -- if an action would -- could be
11 construed as a federal criminal violation or not.
12 There was always debate.  Anytime anything happened,
13 we all had the discussion, "Okay.  Is this something
14 we can get involved with or not?"  So that oftentimes
15 it included headquarters components.
16     Q.   Who at headquarters was communicated
17 with?
18     A.   The two people I mentioned earlier that
19 I had met with, Mr. Rohrbaugh and Mr. Ferguson, as
20 well as a couple others.  There were lower-level
21 people as well, program managers, for instance, Joseph
22 Weir and Carpenter -- I can't remember Carpenter's
23 first name.  He was in the Indian country unit.
24 That's where it kind of started.  That's where our
25 communications started.

Page 77

1      Q.   Did -- were you aware of any feedback
2  from the headquarters FBI, from the Assistant
3  Director's office?
4      A.   I did not speak with anyone from the
5  Assistant Direc- -- any -- any Assistant Director.
6  You mean Assistant Director or Deputy Director?
7      Q.   Deputy Director, pardon me.  Mr. McCabe.
8      A.   And then what was the question about him
9  again?
10     Q.   Let me rephrase it.
11     Other than Mr. McCabe's directive to
12 cancel the drones, what other communications or
13 discussions did Mr. McCabe participate in with respect
14 to the DAPL protests?
15     MS. BOBET:  Objection, misstates
16 testimony.  And I think we're outside of the scope of
17 topic 20 here.  Again, he's welcome to answer in his
18 personal capacity.
19     Q.   (BY MR. SEBY)  Did Mr. McCabe have any
20 participation with respect to the consideration of
21 whether to provide or withhold law enforcement
22 assistance to the State of North Dakota?
23     A.   So what I can tell you is not with me.
24 I've never talked directly with Mr. McCabe, that I
25 recall.  I'm -- I'm sure I would recall if I did.  He

Robert C. Perry, Jr. - Full Transcript   30(b)(6), Non-Confidential
December 13, 2022

Page 78

1  may have been in a -- on a telephone call, but
2  probably not.
3          He did (unintelligible) in to
4  Mr. Thornton.  He would -- Mr. Thornton, SAC, would
5  update him occasionally.  He -- they would have
6  contact usually in the evening.  I'm not sure of the
7  substance of that contact.
8          But at no point was I told that
9  Mr. McCabe -- besides the drone time, at no point was
10  I advised that Mr. McCabe was making direct decisions
11  regarding our activity at the protest.
12      Q.  Did you speak with Mr. Thornton to
13  understand the nature of those communications?
14      A.  In a general way, yes.  We would -- I
15  would provide information -- I would update him, and
16  then, as with any SAC, they would have regular calls
17  with the Deputy Director throughout their --
18  throughout the weekend.  That would be part of the
19  things he would talk to Mr. McCabe about.  Specifics,
20  I don't know.
21      Q.  Uh-huh.  How about, who was the Director
22  of the FBI at this time?
23      A.  I want to say it was -- Comey was still
24  there.  There was a -- as you know, a little mess
25  around that -- sometime around there.  I think it was

Page 79

1  either Mr. Comey, or Mr. McCabe was act-- -- acting.
2  Mr. McCabe was acting.  I think Mr. Comey was still
3  there, though.
4      Q.  Okay.  What action did Mr. Comey,
5  Director Comey, have with the DAPL protests?
6          MS. BOBET:  Again, same objection.
7  Outside the scope.
8      A.  I'm sure he was briefed.
9          MS. BOBET:  But the witness -- but the
10  witness can continue to answer in his personal
11  capacity.
12          MR. SEBY:  As soon as you're done
13  interrupting, I mean, he can do that.
14      Q.  (BY MR. SEBY)  Mr. --
15          MS. BOBET:  Mr. Seby, I'm not
16  interrupting.  I'm lodging a perfectly appropriate
17  objection in a nonargumentative way.
18          So you can proceed with your answer,
19  Mr. Perry.
20      A.  I'm -- I'm not aware of his involvement.
21  I'm sure he was briefed, like any -- like an FBI
22  director would be, but there was no communication to
23  me directly or to others that anyone told me this came
24  from the Director.
25      Q.  (BY MR. SEBY)  Okay.  What other --

Page 80

1  apart from the ATF, what other federal -- what other
2  agencies of the United States or officials of the
3  United States Government did the FBI brief and share
4  its intelligence information from the activities that
5  you've told me the FBI took in North Dakota,
6  investigating the protests against the Dakota Access
7  Pipeline?
8          MS. BOBET:  Objection, vague, outside
9  the scope.  But you may proceed with your answer in
10  your personal capacity, sir.
11      A.  The only other federal agency, I think,
12  we would share that type of information directly with
13  would be the U.S. Attorney's Office.
14          I'm trying to remember if there were
15  other agencies involved in different parts of the
16  investigation.  The only one that jumps out at me
17  would be the ATF, although sometimes there was
18  information that was shared with the U.S. Marshals
19  Service as well.
20      Q.  (BY MR. SEBY)  Uh-huh.  Okay.
21          MR. SEBY:  All right.  Mr. Perry, thank
22  you very much.  I don't have any further questions.  I
23  appreciate your time this morning.
24          THE DEPONENT:  Thank you.
25          MS. BOBET:  I will have some follow-up

Page 81

1  questions.  Perhaps we could take a five-to-ten-minute
2  break, so I'll organize my thoughts in hopes of being
3  as efficient as possible.
4          MR. SEBY:  Sure.  Let's take ten minutes
5  for you to do that.
6          MS. BOBET:  Great.
7          THE VIDEOGRAPHER:  Going off the record.
8  The time is 5:57 p.m. UTC, 10:57 a.m. Mountain.
9          (Recess taken 10:57 a.m. to 11:10 a.m.
10  Mountain Standard Time.)
11          THE VIDEOGRAPHER:  We are back on the
12  record.  The time is 6:10 p.m. UTC, 11:10 a.m.
13  Mountain.
14          EXAMINATION
15  BY MS. BOBET:
16      Q.  All right.  We are back.  I have just a
17  couple of various areas of some follow-up questions
18  for you, Mr. Perry.  And I'll say thank you now for
19  your time today.
20          You were asked a number -- excuse me,
21  Mr. Seby asked you a number of questions about the
22  FBI's participation or response or consideration in
23  response to protests on Corps of Engineers land.  And
24  I just want to understand, do I have it right that the
25  FBI took or considered actions with regard to the

79:25-
80:7;
80:11-
19
401-
402; 611
vague,
outside
scope of
30(b)(6)
notice

**Page 82**

1  protests sort of as a whole, independent of where they
2  occurred geographically?
3      A.   That's correct.  The Corps-managed land
4  wasn't any part of our considerations for what we did,
5  or the fact that it was Corps-managed land.
6      Q.   Understood.
7           And, similarly, you were asked a
8  question, I believe, about the challenges of the
9  protests.  From what you saw in your experience during
10  the time, were the challenges associated with the
11  protests for law enforcement solely as a result of the
12  camps on Corps land or from some other aspect?
13      A.   I think the challenges were generally
14  whether they came from tribal land, Corps land, on --
15  what happened on private land.
16      Q.   You testified earlier about the -- the
17  considerations surrounding the potential deployment of
18  CIRG drone aerial-surveillance assets.  Do you recall
19  that?
20      A.   Yes.
21      Q.   Okay.  And I'll represent that in
22  preparation for today's deposition, counsel spoke with
23  the individuals who were, at the time of the protest,
24  the section chief and assistant section chief in
25  charge of unmanned aerial surveillance in CIRG, and

**Page 83**

1  that we passed along some factual information from
2  them to you in -- in our preparation discussions.  Do
3  you recall that?
4      A.   Yes.
5      Q.   And so it's my understanding that, per
6  FBI's bureau policy, drone requests, that is requests
7  to deploy assets like this, need to be approved by
8  unit chiefs of Field Flight Operations Unit, the
9  assistant section chief and a section chief.  Do I
10  have that right?
11      A.   To the best of my knowledge, yes.
12      Q.   And you spoke earlier about these --
13  these drones in this case being forward deployed.
14  What do you mean by that, that they were forward
15  deployed?
16      A.   They travel from Quantico -- Stafford,
17  Virginia, is probably where they are -- to
18  North Dakota.
19      Q.   And is it the case that these were
20  deployed to the area of the protests before the final
21  approval up through that chain of command was
22  complete?
23      A.   That is now my understanding, yes.
24      Q.   So they were -- they were forward
25  deployed to this area.  My understanding is, and

**Page 84**

1  please correct me if I'm wrong, is that it was forward
2  deployed to avoid delay in case they were approved,
3  but recognizing, if they weren't approved, they could
4  be pulled back.  Is that your understanding as well?
5      A.   Personally, my understanding is, and I
6  think as we discussed before, the -- they were forward
7  deployed in anticipation of use.  However, the section
8  chief, which is usually the final stop, took it up a
9  couple more levels because of the environment we were
10  in at the time with the use of aerial surveillance,
11  and it was at those upper levels that it was stopped.
12      Q.   So there -- there was, in fact, never
13  a -- a final approval through that required chain of
14  command, including the section chief, for them to be
15  deployed, right?
16      A.   For them to be used.  There was approval
17  to forward deploy them and not used, yes, that's --
18  that would be correct.
19      Q.   Yeah.  Thank you.  And that --
20  that's probably the better terminology, "deployed"
21  versus "used."  I understand they were deployed and
22  then not used, right?
23      A.   Yes.
24      Q.   Okay.
25      A.   Correct.

**Page 85**

1      Q.   And you spoke a bit about the -- you
2  spoke a bit about the reason that the drones were not
3  used, or why that approved -- that final approval
4  wasn't forthcoming.  You mentioned some -- some
5  concerns about surveilling protest activities.  Could
6  you expand on that a bit?  What were those -- those
7  concerns?
8      A.   Sure.  The concern was, one, the FBI
9  can't monitor First-Amendment-protected activity,
10  really, in any way.
11           When we requested them, we did not have
12  a specific case open on the event we wanted to
13  observe; otherwise, a forward movement or any movement
14  from the sheriff's office or the State.  So I think
15  that's what complicated the decision to deploy -- to
16  use them was that we had to connect it with a specific
17  case, and we did not have a specific case for the
18  event we talked about actually using them for, and --
19  yeah.
20      Q.   Okay.  So I'm -- I'm just going to
21  paraphrase that.  You tell me if I've got it correctly
22  just so I'm understanding this.
23           One of the concerns with the use of the
24  drones in this situation was about surveilling
25  activity that may be First Amendment protected.

**83:5-86:20**
Offer if preceding testimony re: FBI drone comes into evidence

Page 86

1  That's one.
2         And that the second or -- or an
3  additional concern was that this surveillance was not
4  tied to a specific FBI investigation; that is, a sort
5  of broader surveillance of protest activity, not a
6  specific incident that the FBI was investigating.
7         That those were kind of the two areas of
8  concern.  Is that a fair summary?
9     A.  Yes.
10    Q.  And fair to say that a number of
11 different people within the chain of approval for the
12 use of these drones had those concerns?
13    A.  Yes, absolutely.
14    Q.  And that included the then-assistant
15 section chief and the section chief?
16    A.  The -- between the unit chief, the
17 assistant section chief, and the section chief, there
18 were -- they didn't all agree.  I'm not -- I can't say
19 I remember exactly which one agreed, which didn't,
20 that type of thing.
21        MS. BOBET:  All right.  I think those
22 are my -- were my only areas of follow-up, Mr. Perry.
23 I will thank you again for your time today.
24        I'll pass you back to Mr. Seby if he's
25 any got -- if he's got any questions in redirect for

Page 87

1  you.
2         MR. SEBY:  Yeah.  Thank you.  I do.
3               EXAMINATION
4  BY MR. SEBY:
5     Q.  Just -- just really one set of -- like
6  one topic, and that is the -- Ms. Bobet was asking you
7  about the -- your and Mr. O'Connell's advocacy in
8  the -- within the FBI to seek out the resources the
9  FBI maintains nationally with the FBI CIRG, and
10 specifically the drone unit asset -- assets there.
11        So you were an advocate for that, with
12 Mr. O'Connell, who was in the North Dakota law
13 enforcement briefings on a regular basis, and you were
14 briefed about that and kept your command briefed,
15 Mr. Thornton.
16        And you felt as though it was a
17 legitimate use of those FBI assets and requested them.
18 And, in fact, someone on the end of managing those
19 specific assets agreed with you and flew them on a
20 United States Government airplane.
21        How many people were on that airplane
22 with those drones?
23        MS. BOBET:  Objection, compound,
24 misstates testimony.  You may answer.
25    A.  I don't recall exactly how many people

Page 88

1  were on the plane.  I know there were at least two,
2  I'll call them, pilots.  And then an administrative
3  person; it might have been the unit chief.
4         I'm not sure I answered the entire
5  question there, but --
6     Q.  (BY MR. SEBY)  No, how -- how
7  many people from the drone unit who operate the
8  drones, maintain them, whatever, escorted them on to
9  the aircraft, flew to Bismarck, North Dakota, got off
10 the plane with the drones, got into government
11 vehicles, and drove out to the protest site?  How many
12 people in that group?
13    A.  My understanding is at least three, but
14 I wasn't physically present.
15    Q.  Three people to operate and utilize the
16 drones?
17    A.  Yeah.  I believe it was two pilots.  And
18 when I say "pilots," I mean the drone pilots.  I'm not
19 referring to the G5 pilot.
20    Q.  Okay.  Uh-huh.
21    A.  Yeah.  And I think the unit chief or
22 some other agent was there from the unit.  I'm -- I
23 don't recall exactly what his level of --
24    Q.  And then Mr. O'Connell met them at the
25 airport and drove to the protest site, correct?

Page 89

1     A.  I -- yeah, I don't know if --
2  Mr. O'Connell took them to the protest site when they
3  arrived.
4     Q.  All right.  How many drones did they
5  bring with them?
6     A.  I believe it was two.
7     Q.  And why did they pick those two drones
8  in particular?
9     A.  We asked for certain capabilities,
10 mostly visual capabilities.  I assume they were picked
11 because they could provide those capabilities.
12    Q.  What do you mean by "visual
13 capabilities"?
14    A.  We wanted drones that could see faces,
15 license plates; not just overhead act- -- not just a
16 broad group of people.
17    Q.  So those drones were selected to
18 supplement the drone footage provided by the Predator
19 drone from the United States Customs and Border
20 Protection agency, right?
21        MS. BOBET:  Objection, assumes facts.
22 You can answer.
23    A.  I'm not even sure if the Customs and
24 Border Protection drones were still active at that
25 time, but if they were, it wasn't a comparison we

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

Page 90

1  made. We simply wanted the ones that had a certain
2  capability, and the Customs and Border Patrol's did
3  not have that capability.
4      Q.  (BY MR. SEBY)  Okay.  All right.  And so
5  you mentioned some FBI drone policies that came into
6  being, right?
7      A.  Yes, sir.
8      Q.  Where are those policies?
9      A.  In our -- I guess it's called our DIOG,
10  our several-volume book of policies.  I don't know if
11  it's in the original or as a supplement, but we have a
12  lot of policies.  Most of them are --
13      Q.  Did you --
14      A.  Go ahead.
15      Q.  No, pardon me.  I didn't mean to
16  interrupt you.
17          Did you personally read and review those
18  policies at any time?
19      A.  Yes.  I can't recall if it was prior to
20  or subsequent to this, but I believe it was prior
21  to -- yes, I've read the policies, and they are
22  quite -- it was something that was pushed out to make
23  sure everybody understood.
24      Q.  When were those policies created?
25      A.  I don't recall exactly.  That's why I

Page 91

1  say I don't remember for sure if it was prior to or
2  subsequent to the -- this event.
3      Q.  The policies may have been created after
4  the event?
5      A.  The general drone policies -- I
6  shouldn't say "created."  They -- they changed over
7  time.  The drone unit was a relatively new unit at
8  that time, so there was initial policies, and then as
9  things progressed, things changed.
10      Q.  So you mentioned policies were the
11  reasons why the drone unit was called back, right?
12      A.  That's my understanding.
13          MS. BOBET:  Objection.
14      Q.  (BY MR. SEBY)  What specific policy was
15  the basis for the termination of that mission?
16      A.  I just -- I think I just stated.  The
17  policy was that you had to have an open investigation
18  to use the drone; for instance, I don't know, a SWAT
19  op that they could monitor, or tracking a suspect,
20  that type of thing.  Not just an anticipated criminal
21  activity.  I think that's where those of us on the
22  ground got it twisted up a little.
23      Q.  So which policy are you referring to
24  specifically so I can -- I can know what you're
25  talking about?  What -- what document, what policy

Page 92

1  number, was the basis for the division -- decision by
2  the Deputy Director of the Federal Bureau of
3  Investigation to cancel the mission?
4          MS. BOBET:  Objection, misstates
5  testimony.  You may answer.
6      A.  The policy would be found in or as an
7  amendment to the DIOG.  It's a large -- I don't know
8  the section and verse, necessarily.
9      Q.  (BY MR. SEBY)  I'm not asking where it's
10  found.  You've told me that.  But I'm asking you to
11  identify the specific policy that was the basis for
12  the cancellation of the mission already deployed and
13  on the ground in North Dakota.  What document, name,
14  title, date, and number, are you referring to?
15      A.  The document would be what I'm referring
16  to as part of the DIOG.  I don't know the section and
17  verse.  It's not just --
18      Q.  Are you able to identify the document
19  by -- by date and title?
20      A.  It's part of the DIOG.  That's what the
21  document is called.  It's a section within a document
22  called the DIOG.
23      Q.  Okay.  What's the name of that section
24  and number?
25      A.  I don't know.

Page 93

1      Q.  Did you read it at the time you were
2  told that was the basis for the cancellation of the
3  mission when already deployed?
4      A.  No.
5      Q.  Did you read it prior?
6      A.  As I stated, I don't remember if I --
7  I've read it.  I don't remember if it was prior or
8  subsequent to.
9      Q.  Okay.  You said that the unit chief and
10  two pilots of the drone unit came out to North Dakota
11  with the drones in a government airplane, correct?
12      A.  Yes.
13      Q.  Would you believe, in your capacity,
14  that those individuals were already familiar with
15  those policies at the time they were deployed to
16  North Dakota?
17          MS. BOBET:  Objection --
18      A.  Yes.
19          MS. BOBET:  -- foundation, calls for
20  speculation.
21      Q.  (BY MR. SEBY)  Would you not believe
22  that those individuals would have made sure that their
23  pol- -- their mission was consistent with FBI policies
24  at the time?
25          MS. BOBET:  Same objection, foundation,

Page 94

1  calls for speculation, assumes facts.  You can answer.
2      A.   So I don't believe that would be
3  completely accurate.  As you, I'm sure, are aware, the
4  activity we were dealing with was fluid, and there was
5  a chance that the use of the drones would fall within
6  policy and, I guess, a chance that it would not.
7          So they forward deployed them in
8  anticipation, in -- in case they were able to be used,
9  rather than -- the approval processes and those
10  arguments sometimes take a long time in D.C., so
11  rather than waiting for all that, they got them out
12  there and then they would be ready to go.
13          So I would not say that those operators
14  were certain one way or the other whether it fell in
15  the policy at the time they arrived.
16      Q.   (BY MR. SEBY)  Why did you want better
17  visual tools?
18      A.   So as the protest activity would get
19  violent, as you recall, that would lead to a potential
20  opening of a federal criminal violation.  It could.
21          So if we were -- if something were to
22  happen that could be a federal criminal violation, it
23  would provide us real-time identification abilities
24  that we would not have otherwise, as well as -- not
25  only identification, but as well as with video, so to

Page 95

1  say, of the action itself.
2      Q.   What gave you the reason to think that
3  kind of information would be helpful?
4      A.   It's a simple, common investigative
5  sense:  If you can see who the suspect is and see what
6  they did on video, it's a lot better than asking ten
7  people and hoping you have good witnesses.
8      Q.   What was the date that the drones were
9  on the ground and the cancellation occurred?
10      A.   I don't remember the dates, sir.
11      Q.   Didn't you prepare -- prepare to speak
12  to that topic?  It sounds like your counsel
13  anticipated it.
14          And so you -- you don't even know when
15  the event is, but you recall all of the details of the
16  event?
17          MS. BOBET:  Objection, argumentative.
18      Q.   (BY MR. SEBY)  I'm just asking.  It's a
19  question, a nonargumentative question, sir.
20      A.   The answer --
21          MS. BOBET:  You still can -- you can
22  answer.
23      A.   I don't remember dates well.  I'm sure
24  it's in the paperwork or in the binder or in the
25  notes, but I did not page through them to give you a

Page 96

1  date.  I looked at it probably four or five times, but
2  I looked at a lot of dates that many times, so I -- I
3  don't want to misstate the answer.
4      Q.   (BY MR. SEBY)  Was it in August?
5      A.   I do not believe so.
6      Q.   September?
7      A.   No.  I think it was late in 2016 or
8  early 2017.
9      Q.   But you don't know?
10      A.   I -- no.  Not off the top of my head,
11  no.
12          MR. SEBY:  Okay.  All right.  I don't
13  have anything further.  Thank you.
14          MS. BOBET:  Nothing further from me.
15          Thank you very much, Mr. Perry, for
16  taking the time.
17          THE DEPONENT:  Thank you.  Have a great
18  day.
19          THE VIDEOGRAPHER:  Going off the record.
20  This concludes the remote video-recorded 30(b)(6)
21  deposition of Robert Perry.  The time is now 11- --
22  I'm sorry.  The time is now 6:29 p.m. UTC, 11:29 a.m.
23  Mountain.  We are off the record.
24          (At 11:29 a.m. Mountain Standard Time
25  the proceedings were not being videotaped.)

Page 97

1          MS. BOBET:  We'll read and sign the
2  transcript.  I'll make sure Mr. Perry gets a copy to
3  review and sign with any corrections as needed.
4          THE REPORTER:  And is there a hurry on
5  the final transcript?
6          MS. BOBET:  Not from my perspective.  I
7  think regular speed is fine.  If Mr. Seby chooses to
8  order it faster, we'll want it at the same speed.  But
9  from our perspective, no.
10          MR. SEBY:  Regular is fine.
11          WHEREUPON, the within proceedings were
12  concluded at the approximate hour of 11:30 a.m.
13  Mountain Standard Time on the 13th day of December,
14  2022.
15          *       *       *       *       *
16
17
18
19
20
21
22
23
24
25

Robert C. Perry, Jr. - Full Transcript  30(b)(6), Non-Confidential
December 13, 2022

---

Page 98

1                I, ROBERT C. PERRY JR., do hereby
2      certify that I have read the above and foregoing
3      deposition and that the same is a true and accurate
4      transcription of my testimony, except for attached
5      amendments, if any.
6                Amendments attached   ( ) Yes   ( ) No
7
8
9                     _____
                         ROBERT C. PERRY JR.
10
11
12                The signature above of ROBERT C. PERRY
13     JR. was subscribed and sworn or affirmed to before me
14     in the county of _____, state of
15     _____, this _____ day of
16     _____, 2023.
17
18
19                     _____
                              Notary Public
20                       My Commission expires:
21
22
23
24
25     State of North Dakota 12/13/22 (tcm)

---

Page 99

1                   REPORTER'S CERTIFICATE
2      STATE OF COLORADO      )
                              ) ss.
3      CITY AND COUNTY OF DENVER )
4
                 I, TRACY C. MASUGA, Registered
5      Professional Reporter and Certified Realtime Reporter,
       do hereby certify that previous to the commencement of
6      the examination, the said ROBERT C. PERRY JR. was duly
       sworn or affirmed by me to testify to the truth in
7      relation to the matters in controversy between the
       parties hereto; that the said deposition was taken in
8      machine shorthand by me at the time and place
       aforesaid and was thereafter reduced to typewritten
9      form; that the foregoing is a true transcript of the
       questions asked, testimony given, and proceedings had.
10
                 I further certify that I am not employed
11     by, related to, nor of counsel for any of the parties
       herein, nor otherwise interested in the outcome of
12     this litigation.
13               IN WITNESS WHEREOF, I have affixed my
       signature this 4th day of January, 2023.
14
15
16     __X__ Reading and Signing was requested.
17     _____ Reading and Signing was waived.
18     _____ Reading and Signing is not required.
19
20                     _____
21                       Tracy C. Masuga
                         Registered Professional Reporter
22                       Certified Realtime Reporter
23
24
25

---

Page 100

1      Errata Sheet
2
3      NAME OF CASE: Plaintiff vs UNITED STATES
4      DATE OF DEPOSITION: 12/13/2022
5      NAME OF WITNESS: Robert C. Perry, Jr. - Full Transcript
6      Reason Codes:
7           1. To clarify the record.
8           2. To conform to the facts.
9           3. To correct transcription errors.
10     Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
13     From _____ to _____
14     Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
19     From _____ to _____
20     Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
23     From _____ to _____
24
25                     _____

---