**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| State of North Dakota, | |
| Plaintiff, | |
| vs. | Case No. 1:19-cv-00150 |
| The United States of America, | |
| Defendants. | |

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT**

---

**INTRODUCTION AND SUMMARY OF DECISION**

[¶1]    THIS MATTER comes before the Court after a bench trial on the merits.

[¶2]    This is an action by Plaintiff, the State of North Dakota ("North Dakota"), under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., against Defendant, the United States of America ("United States"), by and through the United States Army Corps of Engineers' ("Corps'"), for the Corps' creation of a public nuisance and civil trespass, and the Corps' contributing negligence and gross negligence exacerbating the public nuisance and civil trespass, all stemming from the Corps' failure to conduct certain non-discretionary duties regarding its special use permitting process.  Over the course of eighteen (18) trial days, spanning February 15 to March 14, 2024, the Court heard evidence relating to North Dakota's four claims (public nuisance, negligence, gross negligence, and civil trespass[1]) against the United States.

[¶3]    North Dakota's claims in this matter relate to the damage and destruction caused to North Dakota because of activity by individuals opposing the construction of the Dakota Access Pipeline

---

[1] The Court previously dismissed North Dakota's claim sounding in "Good Samaritan" negligence. *See* ECF No. 38 at 29–32.

("DAPL") in North Dakota from roughly August 2016 through March 2017 (the "DAPL Protests"). The individuals opposing the construction (the "DAPL Protestors") primarily resided in encampments on land managed by the Corps near the confluence of the Cannonball and Missouri Rivers (the "Corps-managed lands").

[¶4]    The Court previously determined that the United States failed to follow its mandatory statutory and regulatory duty to follow the permitting procedures pursuant to 36 C.F.R. Part 327 (and the Army Corps of Engineers' implementing guidance) with respect to those individuals who for months occupied the Corps-managed lands in southern Morton County, North Dakota. *See* ECF No. 383 at 11–14.

[¶5]    From the earliest days of the DAPL Protests in August 2016, the United States knew that the DAPL Protestors residing on the Corps-managed lands contained hostile extremist individuals whom were engaging in unlawful activities. The United States expected that their numbers would grow and that the situation would worsen. Despite these accurate expectations, the United States made no effort to remove the DAPL Protestors when that was a realistic option.

[¶6]    Instead, the United States stood idly by while the DAPL Protests grew in size and ferocity, leaving it to North Dakota to maintain the rule of law. For months, North Dakota dealt with DAPL Protest activity that originated from the Corps-managed lands, emanated to other areas of North Dakota and endangered the health and safety of North Dakota, its citizens, property, and law enforcement tasked with keeping the peace.

[¶7]    As a result, North Dakota suffered significant harm, totaling more than thirty-eight million dollars in damages. These damages principally comprised the costs associated with sourcing law enforcement officers from other states to appropriately respond to and mitigate the DAPL Protests, but also included property damage, equipment costs, and loan interest.

## FINDINGS OF FACT

[¶8]    The Court has previously determined undisputed facts in this matter, which are incorporated by reference herein.  ECF. No. 383.  The Court makes the following specific findings of fact based upon those which are necessary for the disposition of this case.

### I.    Circumstances Leading up to the DAPL Protests.

[¶9]    In 2014, Dakota Access, LLC ("Dakota Access") announced that it would be constructing an underground oil pipeline across four states, including North Dakota.  PX-1440 at 7.[2]  The planned construction route for the DAPL crossed through Morton County, North Dakota and under the Missouri River at Lake Oahe. Tr. Day 9, 1603:5–7,15-17 (Futch).[34]

[¶10]   Dakota Access received all necessary permits for the construction of the DAPL. Tr. Day 9, 1602:22–1603:3 (Futch).

[¶11]   Dakota Access participated in a public proceeding with the North Dakota Public Service Commission on its application for pipeline siting, and as a result of those proceedings the North Dakota Public Service Commission imposed terms and conditions and route modifications to the eventual DAPL route.  Tr. Day 9, 1598:16–1599:12 (Futch).

[¶12]   Dakota Access had public meetings with local community members in North Dakota, including Morton County, when planning the route of the DAPL. Tr. Day 9, 1599:16–1600:5 (Futch).

---

[2] Herein, Plaintiff's Exhibits will be cited to as PX-[XX]; Defendants' Exhibits will be cited to as DX-[XX]; and Joint Exhibits will be cited to as JX-[XX].
[3] Cites to trial testimony transcripts (Tr.) will be in the following format:  Tr. [Day #], [Page]:[Line] ([Witness Last Name]).
[4] The DAPL crossed the Missouri River in North Dakota twice, the first located north of Bismarck. Tr. Day 9 at 1600:23–1601:2 (Futch).  The second crossing, near Bismarck, is the crossing pertinent to this matter.  *Id.* at 1603:4–1605:16.

[¶13]   For example, in the summer of 2015 there were three public hearings regarding the DAPL siting in the late spring and early summer in Killdeer, Mandan, and Williston, North Dakota.  Tr. Day 1, 63:7-14 (Schulz).   Members of the Standing Rock Sioux Tribe were invited to attend these public hearings.  Tr. Day 1, 63:15-23 (Schulz).  The Standing Rock Sioux Tribe also declined to engage with Colonel Henderson regarding the pipeline as they did not want to look like they were a part of the decision on whether to grant Dakota Access a Nationwide 12 Permit to cross Lake Oahe.  Semonite Depo., 106:24 – 107:23 (ECF No. 405-7).[5]

[¶14]   Dakota Access eventually obtained easements across private properties for all of the approximate 1,200 miles of the DAPL, excluding the approximately 1,200 feet that was subject to a federal easement and approval at Lake Oahe.  Tr. Day 9, 1603:18–1604:1 (Futch).

[¶15]   On July 25, 2016, Dakota Access then received final approval for the Lake Oahe crossing on Corps-managed lands when the Corps issued a Nationwide 12 Permit to Dakota Access for the Lake Oahe crossing.  JX-109 at 33.

**II.      The Corps of Engineers' Knowledge and Involvement in the Leadup to the DAPL Protests.**

[¶16]   As District Commander for the Omaha District of the Army Corps of Engineers, Colonel Henderson was responsible for overseeing the Oahe Project, including a floodplain area at the confluence of the Missouri and Cannonball Rivers. Tr. Day 7, 1032:2–8 (Henderson). His responsibilities also included implementing the Clean Water Act, Rivers and Harbors Act, and Mineral Leasing Act for the projects in the Omaha District.  *Id*. at 1032:9-13.

---

[5] Deposition testimony was played into the record during trial, and deposition transcripts were filed with the Court.  Deposition cites herein will be in the form of [Deponent Last Name] Depo. [Page]:[Line] (ECF No. [XX]).

[¶17]   Colonel Henderson, and the Corps, regularly circulated intelligence documenting the nature of developments involving the DAPL Protests on Corps-managed lands, both internally and to other United States agencies in the form of "storyboard" documents that provided an assessment of the situation on the ground, a summary of the last 24 through 72 hours, anticipated actions for the next 24-72 hours, and the "NWO Commanders Assessment" of the current DAPL Protest situation.  PX-1050; Tr. Day 7, 1057:6-20 (Henderson).

[¶18]   Colonel Henderson frequently and regularly reported the status of the DAPL Protests, and the events surround the DAPL Protests, to his superiors within the Corps and the Department of the Army.  Tr. Day 7, 1046:2-13 (Henderson).

[¶19]   The United States also had Federal Bureau of Investigation informants placed in the DAPL Protest camps from whom they received intelligence information and updates.  Tr. Day 3, 500:8–501:8 (Laney).

[¶20]   The Department of Interior deployed an official to Morton County (Harry Humbert, the deputy assistant secretary for the Department of Interior Public Safety Resources Protection Emergency Services) whose role was "strictly to relate information back" regarding the DAPL Protests to United States Department of Interior officials.  PX-1028.  Mr. Humbert was frequently at the State of North Dakota's State Emergency Operations Center. Tr. Day 16, 2661:21 – 23 (Cruzan).

[¶21]   Separately, Darren Cruzan, Senior Law Enforcement Official for the Bureau of Indian Affairs ("BIA"), sent daily briefings to his superiors at the BIA almost every day from August 15, 2016 to the end of the DAPL Protests.  Tr. Day 16, 2564:1–2565:24 (Cruzan).  The briefings also would be forwarded along to Senior Department of Interior officials.  *Id.*

[¶22]   The United States also regularly received situational intelligence updates from North Dakota law enforcement officials and State agencies regarding the activities of the DAPL Protestors throughout the course of the DAPL Protests, including in August 2016. Tr. Day 9, 1479:15 – 1480:14 (Van Horn).

[¶23]   For example, Adjutant General Alan Dohrmann (Adjutant General of the North Dakota National Guard and head of the North Dakota Department of Emergency Services) shared intelligence and logistical information about the DAPL Protest camps obtained in the State Emergency Operations Center with the Corps.  Tr. Day 6, 935:3–936:1 (Dohrmann)

[¶24]   The Corps was aware that DAPL Protestors opposing the DAPL's crossing at Lake Oahe were trespassing on Corps-managed lands as early as May 2016. Tr. Day 7, 1037:24–1039:3 (Henderson).[6]

[¶25]   Eventually, the DAPL Protestors on Corps-managed lands established several camps within the area of the confluence of the Cannonball River and the Missouri River.   These camps included:

   a.   the "Main Camp" (also known as the "Oceti Sakowin Camp", and the "Seven Councils Camp")   – which was the largest DAPL Protest camp located on the northern edge of the Cannonball River and the eastern edge of Highway 1806;

   b.   the "Rosebud Camp" which was south of the Cannonball River and also bordered on the eastern edge by Highway 1806; and

   c.   the "Sacred Stone Camp" (also known as the "Spirit Camp") which was located east of the Rosebud Camp.  *See* JX-174 at 2; JX-266 at 26.

---

[6] Though there were a number of encampments in the area, the principal camp called the "Oceti Sakowin" camp or the "Main Camp" was located on Corps-managed lands.  Tr. Day 9, 1481:22 – 1482:17 (Van Horn)

[¶26]   While several smaller offshoots of these camps during the DAPL Protests were temporary, the three camps (the Main Camp, Rosebud Camp, and Sacred Stone Camp) were constant for the duration of the DAPL Protests and are visible in a map attached to a Corps' November 1, 2016 letter from Colonel Henderson to Morton County Sheriff Kyle Kirchmeier.  JX-174 at 2:



174 - 0002

[¶27]   All three of these DAPL Protest camps were located on Corps-managed lands.

    a.    The Main Camp was located on Corps-managed lands.  Tr. Day 7, 1047:6-16 (Henderson); Tr. Day 8, 1282:18-1283:9 (Henderson); DX-4024 at 2-3; JX-129 at 2, 7; JX-174 at 2; JX-68 at 1.

    b.      The Rosebud Camp was also on Corps-managed lands.  Tr. Day 2, 392:13-18 (Kirchmeier); JX-174 at 2; JX-68 at 1.

    c.      The Sacred Stone Camp was also located on Corps-managed lands.  Tr. Day 16, 2685:1–2687:2 (Cruzan); PX-1030; JX-174 at 2; JX-68 at 1.

[¶28]   During the DAPL Protests, law enforcement observed DAPL Protestors moving freely back and forth between all three DAPL Protest camps on Corps-managed lands.  Tr. Day 3, 571:18–572:2 (Pederson).

[¶29]   As of August 10, 2016, the Corps was aware that DAPL Protestors had established an encampment on the Corps-managed lands at an estimated 500-2000 persons. PX-1050 at 3; JX-61; Tr. Day 7, 1040:3-9 (Henderson); Tr. Day 12, 1904:25–1905:4 (Spellmon).

[¶30]   The Corps information on August 10, 2016, conveyed via a storyboard document, stated the DAPL Protest camp was located "on Corps-property south of [DAPL] pipeline construction". PX-1050 at 3.

### III.    The State of North Dakota's Initial Response to the DAPL Protests.

[¶31]   Cody Schulz was North Dakota's Disaster Recovery Chief at the North Dakota Department of Emergency Services as well as a County Commissioner in Morton County during the DAPL Protests.  Tr. Day 1, 58:21–60:7 (Schulz).

[¶32]   During the DAPL Protests in 2016-2017, Morton County Sheriff's Department had 33 sworn deputies to serve the entire County with a population of 30,000 people covering 1,945 square miles.  Tr. Day 1, 62:7-17 (Schulz); Tr. Day 2, 339:15-18 (Kirchmeier); JX-266 (Native) at 8[7].

---

[7] Certain exhibits throughout trial were introduced and used in their native format (e.g. Excel or PowerPoint), and will be noted as such when referenced herein.

[¶33]   That same day, August 10, 2016, North Dakota State Highway Patrol ("NDHP") Trooper and Pilot Dennis Gallagher began flying the NDHP plane to the DAPL Protests sites to view and report on DAPL Protestor activity.  Tr. Day 1, 201:9–204:7 (Gallagher).

[¶34]   During the DAPL Protests, Trooper Gallagher flew approximately 650 plus hours over the DAPL Protest camps in the NDHP plane, which was a Cessna 206.  Tr. Day 1, 196:12-23 (Gallagher).

[¶35]   During Trooper Gallagher's flights, he would take aerial photos and videos of the DAPL Protest camps, as well as radio information about DAPL Protestor activity to North Dakota law enforcement.  Tr. Day 1, 196:24–197:25 (Gallagher).   Trooper Gallagher took approximately 20,000 photos during the course of the DAPL Protests.  *Id.* at 197:6-8.   Trooper Gallagher also took significant amounts of video of the DAPL Protests, using the NDHP plane's forward looking infrared ("FLIR") camera.  *Id.* at 203:4-9.   Both the photos and videos taken by Trooper Gallagher would maintain metadata, including time stamps, and were downloaded and stored on NDHP's servers.  *Id.* at 202:18 – 204:7.   FLIR videos had additional verification from a Panasonic Arbitrator device in the NDHP plane that would overlay date and time stamps. Tr. Day 2: 233:10-23 (Gallagher).

## IV.   The Corps' Involvement in the Early Months of the DAPL Protests and Events Leading to the Corps "Issuing" a Special Use Permit.

[¶36]   As of August 2016, the United States expected the DAPL Protests to be a large event.  JX-61 at 1.  The United States was aware that individuals traveling to the area of the Corps-managed lands in southern Morton County for the DAPL Protests were potentially dangerous. Tr. Day 9, 1482:18-21 (Van Horn). The United States was aware that extremist groups were present in the encampments on the Corps-managed lands. JX-68, Tr. Day 7, 1051:3-17 (Henderson); Tr. Day 12, 1908:10 – 1909:13 (Spellmon). At this time, the United States was aware that the DAPL Protestors

were already hostile. JX-65 at p. 2. Indeed, the United States expected that the situation would get worse. JX-65 at p. 2. The United States also expected the size and intensity of the DAPL Protests to increase in August 2016. PX-1043 at 2.

[¶37]   The Corps had concerns about trash and human waste impacting the Corps-managed lands as of the middle of August of 2016.  Tr. Day 7, 1040:13 – 1041:12 (Henderson).

[¶38]   Colonel Henderson had the authority to close Corps-managed lands when necessary for public health, public safety, resource protection, or other public interests.  Tr. Day 7, 1148:10-13 (Henderson).

[¶39]   Colonel Henderson had the authority to request members of the public to leave Corps-managed lands when they were being disorderly. Tr. Day 7, 1148:17-20 (Henderson).

[¶40]   The Corps could have used its permitting authority to prohibit the disposal of humane waste, fires, structures, vehicles, and propane tanks.  Tr. Day 7, 1141:3-14 (Henderson).  Despite this, the Corps never imposed any requirements on the DAPL Protests on Corps-managed lands regarding: the entry of vehicles; the disposal of human waste; the provision of medical services; the construction and use of structures; or the prevention of environmental damage.  Stasch Depo. 66:8–68:2 (ECF No. 404-6).

[¶41]   On August 11, 2016, a group of DAPL Protestors set up a protest on the side of Highway 1806 where Dakota Access construction personnel were working on an access entrance near where the DAPL was scheduled to cross under the highway.  Tr. Day 3, 564:18-23; PX-2041 at 8-9. Those DAPL Protestors hampered construction activity, resulting in 13 arrests by North Dakota law enforcement.  *Id.*; JX-265 at 46.

[¶42]   On August 12, 2016, a group of DAPL Protestors again set up a protest on the side of Highway 1806 where Dakota Access construction personnel were working on an access entrance

near where the DAPL was scheduled to cross under the highway.  Tr. Day 2, 233:6 – 234:20 (Gallagher).  On this date, Chairman Archambault of the Standing Rock Sioux Tribe was arrested for disorderly conduct.  Tr. Day 3, 565:12–566:4 (Pederson); Tr. Day 2, 347:24 – 349:4 (Kirchmeier); JX 265 at 46.

[¶43]   In light of these events and the growing DAPL Protest situation, Morton County Sheriff Kyle Kirchmeier requested help from Cass County Sheriff Paul Laney on August 13, 2016.  JX-54; Tr. Day 2, 349:19–350:1 (Kirchmeier).  Cass County Sheriff Paul Laney immediately sent out a Mutual Aid[8] request to other Sheriffs across North Dakota to aid Morton County in policing the growing DAPL Protests.  JX-53.

[¶44]   In light of the growing DAPL Protest situation, Cody Schulz signed an Emergency Declaration for Civil Unrest in Morton County ("Morton County Emergency Declaration") on August 15, 2016.  Tr. Day 1, 71:2-18 (Schulz); JX-59.

[¶45]   On August 15, 2016, DAPL Protestors cut a hole in the fence constructed by the NDHP to separate DAPL Protestors from Dakota Access construction workers, trespassed onto the construction site, and vandalized construction equipment.  Tr. Day 3, 568:8 – 570:15 (Pederson).  Some of those DAPL Protestors were on horseback and charged a law enforcement line separating the DAPL Protestors from Dakota Access construction personnel.  *Id.;* Tr. Day 1, 71:2-10 (Schulz); JX-266 (Native) at 15; JX-265 at 46.  NDHP Captain Pederson felt personally that the DAPL Protestors on horseback put law enforcement officers at risk.  Tr. Day 3, 570:5-15 (Pederson).

---

[8] Mutual Aid refers to relates to political subdivisions within North Dakota providing aid to each other. Tr. Day 6, 925:24-4 (Dohrmann).  *See* FoF 268, *supra.*

[¶46]   The Morton County Emergency Declaration allowed Morton County to set up an Emergency Operations Center ("EOC") at the Morton County Sheriff's Office on August 17, 2016 to have a physical base of operations to organize its emergency response to the DAPL Protests. Tr. Day 1, 72:1-18 (Schulz); Tr. Day 2, 352:18-22 (Kirchmeier).

[¶47]   The Corps had a civilian employee, John Voeller, stationed in the EOC who would gather information reported there and pass it along to his superiors in the Corps.  Tr. Day 3, 561:6-21 (Pederson).

[¶48]   North Dakota law enforcement initially established a National Incident Command System ("NIMS") to manage the law enforcement response to the DAPL Protests.  Tr. Day 3, 482:24–483:12 (Laney).  Cass County Sheriff Paul Laney was made the deputy incident commander under Sheriff Kyle Kirchmeier, who was the incident commander.  Tr. Day 2, 354:2-4 (Kirchmeier); Tr. Day 3, 479:22 – 480:20 (Laney).

[¶49]   North Dakota's NIMS operated under the State's Emergency Operations Plan, developed by the North Dakota Department of Emergency Services and designed to coordinate emergency responses.  Tr. Day 6, 920:4-16 (Dohrmann).

[¶50]   From the encampment on the Corps-managed lands, DAPL Protestors regularly assembled and advanced from Corps-managed lands to state and private land to conduct their often violent and unlawful activities. Tr. Day 2, 228:2 – 229:24, 239:21-25 (Gallagher). At times, these groups consisted of large caravans of vehicles.  *Id.*; PX-2014 at 15-58, 142-147; PX-1658; PX-1819; Tr. Day 4, 673:20 – 674:10 (Gerhart).

[¶51]   As of August 15, 2016, the Corps was in contact via phone and email with the Standing Rock Sioux Tribe's attorney, Peter Capasella, regarding the Standing Rock Sioux Tribe's desire

to obtain a Special Use Permit for the DAPL Protestors encamped on Corps-managed lands.  Tr. Day 7, 1042:22 – 1044:2 (Henderson); JX-62 at 2; Stasch Depo. 114:6-16 (ECF No. 404-6).

[¶52]   A "Special Use Permit" is a mechanism by which a person or people may be permitted to use federal lands managed by the Corps. Tr. Day 9, 1467:6-15 (Kruger); JX 126.

[¶53]   Heath Kruger, the Senior Policy Adviser for Park Ranger Activities in the Corps testified that Engineering Circular ("EC") 1130-2-550, and Appendix E to the same, contains the controlling Corps regulations governing Special Use Permits as required by 36 C.F.R. Part 327. Tr. Day 9, 1439:14–1440:8 (Kruger).

[¶54]   Under EC 1130-2-550, the terms and conditions of a Special Use Permit ensure compliance with the provisions of 36 C.F.R. Part 327 and are designed to ensure that the land and water resources of the United States are protected from harm.  *Id.* at 1440:1-8.

[¶55]   EC 1130-2-550 lists the criteria Corps officials should use to determine whether an activity requires a Special Use Permit, which include: whether the activity will impact project resources beyond ordinary use; whether the activity has a specific purpose; whether the activity may impose crowding or hazards to other project visitors or liability to the government, requiring specific management coordination, and whether the activity is not authorized by other programs or regulations.  EC 1130-2-550, Appendix E at E-1 (ECF No. 8 at 44).

[¶56]   Once it is determined that an activity requires a Special Use Permit, a Special Use Permit is required before a person may engage in that special use activity on Corps-managed lands. Tr. Day 7, 1036:5–7 (Henderson); EC 1130-2-550, Appendix E at E-2 (ECF No. 8 at 45) ("An application *must be obtained, completed and submitted* to the Operations Project Manager within the time frame established by the Operations Project Manager . . ." (emphasis added)); 36 C.F.R. § 327.21.

[¶57]    Outside of a Special Use Permit, the Corps asserted that it at times could utilize "alternative management techniques" for facilitating access to Corps-managed lands, such as providing overflow areas or moving camping locations when a permittee's party exceeds the campground's capacity.    Tr. Day 9, 1465:12 – 1467:5 (Kruger).    However, these "alternative management techniques" typically involve situations where the Corps exercises discretion to allow uses of Corps-managed lands in areas where there were already recognized valid uses of those lands, such as situations where camping was occurring with a valid camping reservation or the public was already authorized to be on Corps-lands, and not instances where there was no lawful reason for persons to be on Corps-managed lands in the first instance. Tr. Day 9, 1465:12 – 1467:5; 1473:22 – 1475:5 (Kruger).

[¶58]    On August 15, 2016, Eric Stasch (Corps Operations Manager, Lake Oahe Project) sent an email to multiple Corps personnel, including Colonel John W. Henderson (Commander of the Corps Omaha District) and Thomas Tracy (Corps District Counsel, Omaha District), which stated that "[p]rotestors are setting up encampments on US Government lands." DX-4024 at 2.    Mr. Stasch then stated that his staff had been "told that as many as 300 people from the Pine Ridge Reservation are on the road to protest." *Id.*  Mr. Stasch stated that this "has the potential to become a major protest" and that he had concerns regarding "[e]nvironmental (trash, human waste, impacting archeological sites)" and personnel "concerns for our people in the area" and that he didn't want to "put anyone in a potentially hostile situation." *Id*.  Mr. Stasch ended the email stating that he "need[ed] guidance" as to how to handle the DAPL Protest situation.  *Id*. at 3.

[¶59]    As of August 15, 2016, Corps officials, including Colonel Henderson, had agreed that a Special Use Permit "was the correct way to address the encampment of [DAPL Protestors] on [Corps-managed] lands."    JX 62 at 1; DX-4024 at 1.    This determination bound the Corps to

following its special use permitting process and showed that the applicability of "alternative management techniques" did not apply to the DAPL Protest situation.  *See* FOF ¶¶ 52-57, *supra*.

[¶60]   As of August 18, 2016, Corps officials again recognized that the DAPL Protestors were trespassing on Corps-managed lands.  Tr. Day 7, 1049:21 – 1050:25 (Henderson); JX-65 at 1-2; JX-68 at 1; PX-1043 at 2.

[¶61]   The Corps received a Special Use Permit application from the Standing Rock Sioux Tribe on August 18, 2016.  Tr. Day 7, 1048:23 – 1049:1 (Henderson); DX-4043 at 1-2.

[¶62]   Corps officials determined that the Special Use Permit application was incomplete and could not be issued as provided by the Standing Rock Sioux Tribe.  Tr. Day 7, 1049:2-4 (Henderson); DX-4043.

[¶63]   After receiving the Special Use Permit application, Corps officials expressed concerns as the "[p]otential for people getting hurt is extremely high."  DX-4043 at 1.  Corps officials also noted it would be necessary to require insurance, and that there would need "to be a detailed plan with staffing to cover security and traffic control."  *Id.*

[¶64]   At all times during the DAPL Protests Colonel Henderson retained the authority to act on the Special Use Permit for the DAPL Protests.  Tr. Day 7, 1036:22–25; 1051:1-2 (Henderson); Tr. Day 8, 1376:7-16; 1378:3-12; 1386:5-15 (Jackson).

[¶65]   On August 19, 2016, North Dakota Governor Jack Dalrymple declared an emergency relating to the emerging situation on the Corps-managed lands.  PX-1031; JX-73.

[¶66]   Governor Dalrymple's August 19, 2016 Emergency Declaration stated that while North Dakota remained "committed to protecting citizens' rights to lawfully assemble and protest . . . unlawful acts associated with the protest near Cannon Ball have led to serious public safety concerns and property damage."  PX-1031 at 2.  Governor Dalrymple explained that "[t]he serious

safety concerns stem from the fact that DAPL Protestors were advancing out of their recently established camps. They were moving onto state highway property. They were moving onto the actual highway itself. There was activity dealing with public and private property that was unlawful and it was clear that the situation was going to require some law enforcement response." Tr. Day 5, 752:23–753:4 (Dalrymple).

[¶67]   Governor Dalrymple's Emergency Declaration authorized Morton County to mobilize and utilize the State of North Dakota's emergency operations plan, and made additional resources available to Morton County to respond to the DAPL Protests including additional law enforcement personnel.  Tr. Day 1, 73:12–74:10 (Schulz).  Adjutant General Dohrmann also testified that the Unified Command structure allowed North Dakota to "access authorities" only available "during times of emergency." Tr. Day. 6, 923:23 – 924:9 (Dohrmann).

[¶68]   On August 22, 2016 Major General Donald E. Jackson (the Corps' Deputy Commanding General for Civil and Emergency Operations) forwarded an email to Jo-Ellen Darcy (Assistant Secretary of the Army for Civil Works) containing Colonel Henderson's notes from a call with North Dakota Governor Jack Dalrymple.  PX-1038.  Colonel Henderson's summary of the call stated that Governor Dalrymple relayed "that his law enforcement officials see this as a less that [sic] peaceful protest based on the level of criminal activity occurring and th[e protestors'] prevention of DAPL work on nearby private property."  *Id*. at 3.  Colonel Henderson also told Governor Dalrymple that the protestors "are technically trespassing at this point" but that the Corps "would assess any threat-related information from [the U.S. Attorney in North Dakota] prior to making any decision on a permit."  *Id*.  Colonel Henderson stated that Governor Dalrymple asked the Corps to "strongly consider denying any permit" because the DAPL "work sites will not be secure."  *Id*.

[¶69]   Later on August 22, 2016, Brigadier General Scott Spellmon (Corps' Northwest Division Commander) provided an assessment of the DAPL Protests to Major General Jackson which stated that "[t]he common assessment from the field is the [DAPL P]rotests have crossed the line and are no longer completely peaceful in nature."  JX 75 at 1; PX-1038 at 1; Tr. Day 8, 1365:8 – 1366:5 (Jackson).

[¶70]   On August 24, 2016, Colonel Henderson sent Major General Jackson an email stating that the Corps "expect[ed] the size and intensity of the protests to grow over the next two days"  and that the location of the DAPL Protest encampments was "on USACE managed lands", was not permitted, and was "considered trespassing and [wa]s effectively preventing DAPL from working" in that area and that Major General Jackson agreed with Colonel Henderson's assessment of the situation.  PX-1047 at 3; Tr. Day 8, 1368:21 – 1369:10 (Jackson).

[¶71]   On August 24, 2016, Major General Jackson sent an email to Assistant Secretary Darcy, Lieutenant General Todd Semonite (Chief of Engineers and Commanding General of the Corps), Lowry Crook (Principal Deputy to the Assistant Secretary of the Army for Civil Works), and other Corps personnel stating that the U.S. District Court for the District of Columbia was expected to issue a ruling on September 9, 2016 on the Standing Rock Sioux Tribe's pending motion for a preliminary injunction against the Corps' grant of a Nationwide Permit 12 to DAPL at Lake Oahe.  PX-1046 at 2.

[¶72]   On August 25, 2016, Colonel Michael James Price (Executive Officer to the Assistant Secretary of the Army) sent an email to Lowry Crook which outlined the current status of the DAPL Protests.  PX-1050 at 2.  Colonel Price's email stated that on August 10, 2016, "protestors began to interfere with the construction on private lands near the Lake Oahe crossing in Cannon Ball, ND.  The number of protestors has grown to approximately 1500 and eventually caused the

construction to cease on 20 August" and stated that "[p]rotestors are currently camping on Corps property south of pipeline construction site [sic]." *Id.* Attached to Colonel Price's email was a "storyboard" document entitled "Dakota Access Pipeline (DAPL) Protests (USACE NWD/NWO)" which outlined the current DAPL Protest situational status. The Corps' storyboard document stated that the camps were on "Corps property" and that "current estimates from Law Enforcement places camps at 500-2000 protestors." *Id.* at 3. The Corps' storyboard document also stated that the Standing Rock Sioux Tribe "special use permit [application] lacked required information for approval; NWO will seek additional information from [Standing Rock Sioux Tribe]." *Id.* Under a heading entitled "Next 24-72 hrs (Way Ahead)" the Corps' storyboard document stated that "NWO will continue to be in contact with federal and state Law Enforcement officials to facilitate actions they determine necessary to stem criminal activity and support health/safety concerns at the site." *Id.*

[¶73]   As of August 30, 2016 North Dakota had received law enforcement Mutual Aid from 10 counties and 3 municipalities. JX-94.

[¶74]   By August 31, 2016, the Main Camp on Corps-managed lands had grown substantially in size and developed substantial infrastructure, including worn earthen roads, a main entrance lined with flags, a large mess hall, and a significant number of DAPL Protestor vehicles including horse trailers. PX-2041 at 14; Tr. Day 2, 218:14–219:23 (Gallagher).

[¶75]   On August 31, 2016, DAPL Protestors trespassed onto a DAPL construction site and attached themselves to construction equipment with "sleeping dragons", a homemade device that affixes a person's hands inside pipe segments around construction equipment and which cannot be removed without special cutting tools. JX-266 (Native) at 28; Tr. Day 1, 82:4–83:17 (Schulz).

These tactics were used repeatedly by DAPL Protestors throughout the DAPL Protests, but particularly in late-August through early-October of 2016.  Tr. Day 1, 93:10-18 (Schulz).

[¶76]   In response to the DAPL Protestors' tactic of using "sleeping dragons," Morton County Commissioner Cody Schulz authorized bringing in out-of-state law enforcement to train North Dakota law enforcement on the safe removal of "sleeping dragons."   Tr. Day 1, 82:4–83:17 (Schulz); PX-1271 at 2.  These trained law enforcement officers were known as "Cut Teams."  *Id.*

[¶77]   On September 2, 2016, Standing Rock Sioux Tribe Chairman Archambault supplemented his Special Use Permit application with a purported map of the DAPL Protest area.  JX-117.  However, at this time, the Standing Rock Sioux Tribe did not have control over the DAPL Protestors residing on the Corps-managed lands. Tr. Day 7, 1103:19 – 1104:6, 1159:5 – 24 (Henderson); Tr. Day 12, 1905:20 – 1906:10 (Spellmon); Tr. Day 15, 2459:12 – 15 (Iron Eyes).

[¶78]   On September 3, 2016, a large group of DAPL Protestors numbering over 100 individuals tore down a fence on private property within the footprint of the DAPL easement north and west of the DAPL Protests Camps, and then trespassed and engaged with and assaulted private construction contractors and vandalized Dakota Access construction equipment.  Tr. Day 1, 94:18– 95:25 (Schulz); JX-266 (Native) at 29; PX-2041 at 15-58; Tr. Day 2, 357:10 – 358:17 (Kirchmeier).  DAPL Protestors were observed caravanning and shuttling from the Main Camp on Corps-managed lands to the protest site.  Tr. Day 3, 572:8–573:10 (Pederson); Tr. Day 2, 238:2– 239:20 (Gallagher); PX-2041 at 15-58; JX-265 at 48-49.

[¶79]   On September 4, 2016, the Standing Rock Sioux Tribe filed a motion for a temporary restraining order ("TRO") seeking to prevent Dakota Access from continuing construction on the DAPL.  PX-1067 at 2-24.

[¶80]   On September 6, 2016, DAPL Protestors again trespassed onto private property where DAPL construction was occurring and vandalized construction equipment.  Tr. Day 1, 96:15-22 (Schulz); JX-266 (Native) at 31.  The Corps was aware of this incident.  JX-108 at 2.   The DAPL Protestors trespassing on private property on this date had caravanned from the DAPL Protest camps on Corps-managed lands, including utilizing horse trailers.  Tr. Day 2, 240:1–243:4 (Gallagher); PX-2041 at 59-74; JX-265 at 49.

[¶81]   On this same day, September 6, 2016, DAPL Protestors held organized horse races in the Main Camp on Corps-managed lands, a violation of the Corps' land use regulations.  Tr. Day 3, 574:1-11 (Pederson).

[¶82]   On September 6, 2016, U.S. District Court Judge James Boasberg granted the Standing Rock Sioux Tribe's TRO request, preventing DAPL construction between Highway 1806 and 20 miles east of Lake Oahe.  PX-1077 at 1.  During the TRO hearing on September 6, 2016, Judge Boasberg indicated he would rule on the Standing Rock Sioux Tribes separate request for a preliminary injunction halting DAPL construction by September 9, 2016.  JX-108 at 2; PX-1077 at 1-2.  During the hearing, counsel for Dakota Access also indicated that the Lake Oahe crossing construction would be completed by the end of the week absent the TRO.  PX-1077 at 2.

[¶83]   The Corps was aware of that proceeding and anticipated that the ruling on temporary relief would impact activity of the DAPL Protestors on Corps-managed lands.  *Id.*  The Corps was also aware of an international Pow Wow scheduled to take place from September 9-11, 2016 in Bismarck, North Dakota with an estimated 10,000 – 20,000 attendees, which could substantially increase the profile of the existing DAPL Protests and potentially bring in new DAPL Protestors to the DAPL Protests Camps.  *Id.*

[¶84]   The United States supported DAPL Protestors in early September 2016 by sending a DOJ "Conciliation Specialist", Rosa Salamanca, who provided "Self Marshal Training" to DAPL Protestors.  PX-1173.  The "Self Marshal Training" was completed on September 6, 2016.  *Id.* After completing the "Self Marshal Training", Ms. Salamanca sought donations and aid including rubber boots, winter boots, walkie talkies, hand and feet warmers, safety vests, goggles, jackets, and security gear for DAPL Protestors.  *Id*.

[¶85]   Cass County Sheriff Paul Laney telephonically attended a meeting with Ms. Salamanca on September 5, 2016, and engaged with her later in September regarding the DAPL Protests.  Tr. Day 3, 495:20–496:18 (Laney).  Ms. Salamanca also requested that North Dakota law enforcement "stage" a mock arrests of DAPL Protestors.  Tr. Day 3, 497:10–498:13 (Laney).  Ms. Salamanca referred to the DAPL Protestors during her conversations with Cass County Sheriff Paul Laney as "we", inferring she was on the side of the DAPL Protestors.  *Id.*

[¶86]   Darren Cruzan testified that he "wouldn't have been in favor" of Self Marshal Training for DAPL Protestors had he been able to provide input on that training and that he "probably would have had a problem with [Ms. Salamanca] being down there."  Tr. Day 16, 2678: 19 – 2679:10 (Cruzan).

[¶87]   On September 7, 2016, Major General Jackson sent an email to multiple Corps leadership, purporting to relay the substance of a telephone call between Assistant Secretary Darcy and North Dakota Governor Dalrymple.  PX-1083.  Major General Jackson stated that during the call, Governor Dalrymple stated that he "believe[d] that tribal gatherings were taking place on Federal land (USACE) that are leased to private parties (presumably for grazing, etc.)."  *Id.* at 3.  Major General Jackson asked the Corps personnel on the email chain if this was true.  *Id*.  Major General Jackson also stated that Governor Dalrymple "is hearing the protestors intend on building

structures in these protest locations, presumably to have shelter for the winter months where he believes they will continue to try and block [DAPL] construction progress." *Id.* Major General Jackson asked what the Corps position was as "to any construction activities (temporary or permanent in nature) on Federal land under our jurisdiction." *Id*. Finally, Major General Jackson stated that Governor Dalrymple said he "believes the protestors are using the Federal lands as a 'safe haven' from which to conduct activities to block construction progress," and asked the Corps personnel copied on the email if this was true. *Id.*

[¶88]   On September 7, 2016, Governor Dalrymple activated the North Dakota National Guard to provide logistical support to North Dakota law enforcement, such as traffic control, in order to allow North Dakota law enforcement to focus on potential flash points and increased violence that was anticipated to occur after U.S. District Judge Boasberg issued a ruling on the Standing Rock Sioux Tribe's request for an injunction on September 9, 2016.  Tr. Day 5, 777:16 – 779:1 (Dalrymple); Tr. Day 1, 97:11–98:2 (Schulz); JX-104; JX-107.   Adjutant General Dohrmann testified that the purpose of the activation of the North Dakota National Guard "was to free up law enforcement from any administrative, religious duties, have guardsmen do that so that law enforcement officers" could focus on the DAPL Protest response.  Tr. Day 6, 929:1-9 (Dohrmann). Governor Dalrymple elaborated on this, stating that activating the National Guard makes "the National Guard Reserve personnel available for assistance, reserve personnel that can be called on but normally would not be practicing Guard" but that "[b]efore that time, regular Guard personnel are always available."  Tr. Day 5, 778:15–779:1 (Dalrymple).

[¶89]   U.S. District Judge Boasberg issued a ruling on September 9, 2016 which denied the Standing Rock Sioux Tribe's request for a preliminary injunction halting DAPL construction, and allowed construction of the DAPL to proceed. JX-109 at 58.   U.S. District Judge Boasberg's

opinion found that the Corps had properly granted a Nationwide 12 Permit to Dakota Access, had properly consulted with the Standing Rock Sioux Tribe, and that the Standing Rock Sioux Tribe would not experience irreparable harm if DAPL construction was allowed to proceed.  JX-109.

[¶90]   Despite U.S. District Judge Boasberg's ruling the same day, the Department of Justice, Department of the Army, and Department of Interior subsequently issued a Joint Statement on September 9, 2016 ("Sept. 9 Joint Statement") regarding the DAPL Protests.  JX-111 at 1.

[¶91]   The Sept. 9 Joint Statement acknowledged U.S. District Judge Boasberg's decision upholding the Corps' Nationwide 12 permit.  JX-111 at 1.  The Sept. 9 Joint Statement went on to state that "[h]owever, important issues raised by the [Standing Rock Sioux Tribe] . . . regarding . . . pipeline-related decision-making . . . remain" and announced that the three federal agencies would take three actions.  *Id*.  First, the Army would halt the DAPL construction "until it c[ould] determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site", despite U.S. District Judge Boasberg's decision the same day allowing construction to continue.  *Id*.  Second, the joint parties stated they would later consider nationwide reform on how tribes are consulted for "these types of infrastructure projects", including under the existing statutory framework and considering whether "new legislation" should be proposed.  *Id*.  Third, joint parties stated that they "fully support the rights of all Americans to assemble and speak freely. We urge everyone involved in the protest or pipeline activities to adhere to the principles of nonviolence . . . In recent days we have seen thousands of demonstrators come together peacefully, with support from scores of sovereign tribal governments, to exercise their First Amendment rights and to voice heartfelt concerns about the environment and historic, sacred sites.  It is now incumbent on all of us to develop a path forward that serves the broadest public interest."  *Id*. at 2.

Separately, the Sept. 9 Joint Statement stated that the "Departments of Justice and the Interior will continue to deploy resources to North Dakota to help state, local, and tribal authorities." *Id*.

[¶92]   Morton County Sheriff Kyle Kirchmeier testified that he observed an increase in the intensity of the DAPL Protests after the Sept. 9 Joint Statement.   Tr. Day 2, 364:14-16 (Kirchmeier).

[¶93]   Adjutant General Dohrmann felt that the Sept. 9 Joint Statement "emboldened" the DAPL Protestors.   Tr. Day 6, 931:23–932:10 (Dohrmann).

[¶94]   The Sept. 9 Joint Statement was interpreted and received by DAPL Protestors as a "win" and that the DAPL Protests were effective.   Tr. Day 7, 1064:5-13 (Henderson).

[¶95]   DAPL Protestor Chase Iron Eyes testified that the Sept. 9 Joint Statement "gave me hope that the Army Corps of Engineers was going to be open to or compelled to open up a bunch other – a bunch more dialogue of the baggage between the Army Corps and the Sioux Nation."  Tr. Day 15, 2464:2-11 (Iron Eyes).    Mr. Iron Eyes also agreed that he had previously testified via deposition that the Sept. 9 Joint Statement made DAPL Protestors "feel like there was a potential that we could win."  Tr. Day 15, 2465:14 – 2468:16 (Iron Eyes).

[¶96]   Lieutenant General Semonite stated in regards to the Sept. 9 Joint Statement that "[w]e felt that this action, if anything, just [] continued to embolden protestors to stay on the ground." Semonite Depo. 69:25–70:14 (ECF No. 405-7).   Lieutenant General Semonite also noted that he was concerned about the trajectory of the DAPL Protests in September and that they were "getting bigger, more unruly, more violent." *Id*.

[¶97]   Colonel Henderson testified that as of September 12, 2016, it was his assessment that the DAPL Protestors would use the "success" of the September 9 Joint Statement to leverage the media and build support for the DAPL Protests and that the September 9 Joint Statement would increase

the duration and intensity of the DAPL Protests. Tr. Day 7, 1068:10-21 (Henderson); PX 1116 at 3.

[¶98]   On September 13, 2016, 22 DAPL Protestors were arrested for trespassing on Dakota Access construction sites on private land west of Glen Ullin and north of Exit 120 near mile marker 106.5.  JX-265 at 50.  Separately, DAPL Protestors vandalized a Dakota Access construction site 5 miles west and 1 mile south of New Salem.  *Id.* at 50-51.

[¶99]   On September 14, 2016, there was an additional trespass action by DAPL Protestors at a Dakota Access construction site, which resulted in eight arrests including arrests for felony reckless endangerment for DAPL Protestors attaching themselves to construction equipment. PX-1151 at 3; JX-265 at 51.  As of September 14, 2016, there had been a total of 69 DAPL Protestors arrested for illegal protest activities.  PX-1151 at 5.

[¶100] While considering the Special Use Permit for the Standing Rock Sioux Tribe, the Corps was aware that the DAPL Protest camps on Corps-managed lands had grown and now included unauthorized structures, vehicles, earthen roads, and a horse track as early as September 7, 2016. Tr. Day 7, 1056:18 – 1057:5, 1069:1-5 (Henderson); PX-1083 at 4.  The Corps was also aware that the Special Use Permit the Standing Rock Sioux Tribe had applied for was for both Standing Rock Sioux Tribe members and non-Standing Rock Sioux Tribe individuals who supported the DAPL Protests.  Stasch Depo. 141:7-17 (ECF No. 404-6).

[¶101] For example, in a September 12, 2016 email string between Lowry Crook (Principal Deputy to the Assistant Secretary of the Army for Civil Works) and Brigadier General Spellmon (among other Corps personnel), Lowry Crook stated that he had talked with North Dakota Governor Dalrymple who stated that if the DAPL Protest timeline was extended he would be asking the Federal government for reimbursement for law enforcement costs.  PX-1118 at 1.

Lowry Crook also conveyed that Governor Dalrymple had asked for U.S. Marshalls to be sent in to the DAPL Protests to assist North Dakota. *Id*. In the September 12, 2016 email chain, Brigadier General Spellmon replied in response to an inquiry from Mr. Crook about the Standing Rock Sioux Tribe's Special Use Permit application submitted August 18, 2016, and acknowledged that "the most significant issue we are dealing with is the information provided on the new application does not match facts on the ground.  For example, at the sites there is ongoing littering, dumping, destruction of grazing land, unauthorized structures, and several hundred more people above and beyond what the application addresses." *Id*. Brigadier General Spellmon then stated that "[a]t this point in time, we would like to tie the way ahead on the Special Use Permit with the overall way ahead as described in the interagency memo [e.g. the September 9 Joint Statement]." *Id*. In the same September 12, 2016 email string, Lowry Crook stated that he had talked with North Dakota Governor Dalrymple who was focused on "reiterating his concern that protestors are considering building more permanent structures on Corps property." *Id*.

[¶102] Leading up to making a decision on the Special Use Permit, Colonel Henderson coordinated with Corps' leadership on a draft press release announcing the Corps had granted the Special Use Permit.  Tr. 1070:13 – 1071:19 (Henderson); PX-1137 at 3.

[¶103] Prior to the Corps issuance of the Sept. 16 Press Release, Governor Dalrymple requested that the permit be denied. Tr. Day 5, 755:22–756:15 (Dalyrmple); PX-1118 at 1.

[¶104] On the morning of September 16, 2016 at 7:27 AM, Colonel Henderson sent an email to Corps leadership and personnel, including Eileen Williamson (Corps Public Affairs Specialist), Lieutenant Colonel James T. Startzell (Deputy Commander of the Corps Omaha District), and Thomas Tracy (Corps District Counsel, Omaha District).  In the email, Colonel Henderson stated that the draft press release for the Special Use Permit "made its way to the White House last night"

and that he "understood that they are reviewing and may ask us to synch [sic] the timing of the release with other events they may have planned." JX-130 at 1.

[¶105] On September 16, 2016 at 5:22 PM, Lieutenant Colonel Startzell emailed Standing Rock Sioux Tribe Chairman Archambault stating "[a]ttached you will find the special use permit for your signature, along with a notification letter, a map of the approved site, and the pamphlet for public use of projects." JX-129 at 1. Lieutenant Colonel Startzell attached a letter and draft Special Use Permit from Colonel Henderson (Commander of the Corps Omaha District) to his email, which informed Standing Rock Sioux Tribe Chairman Archambault that "I have decided to grant a Special Use Permit for the location south of the Cannonball River that you requested . . . so that the Standing Rock Sioux Tribe can gather and engage in free speech demonstration . . . Enclosed for your review and execution is the Special Use Permit." *Id*. at 2. Colonel Henderson's letter cautioned that "all federal, state, and local laws will be followed within the encampment" that there were "several activities that [would] require [Colonel Henderson's] written permission" including any "construction, either temporary or permanent, of any structures." *Id*. Colonel Henderson's letter went on to state that the Corps would "require that [Standing Rock Sioux Tribe Chairman Archambault] obtain a performance bond in the amount of $100,000 and maintain public liability and property damage insurance to cover any and all claims, demands, actions, or suits for damage to property or personal injury, including death, arising from your use of the property for your gathering." Colonel Henderson's letter also mandated that the insurance coverage be not less than $5,000,000 for personal injury, for each occurrence, and $1,000,000 for each occurrence involving property damage, and not less than $5,000,000 covering all claims per occurrence. *Id*. at 2-3. The Corps' letter stated that the enclosed Special Use Permit needed to be executed by Chairman Archambault and returned to the Corps along with the required performance bond and

proof of special event liability insurance, and only then would it be valid for thirty days after Colonel Henderson's signature. *Id*. at 3.  Colonel Henderson's letter also enclosed a map of the area the unexecuted Special Use Permit would authorize for encampments, which area was solely located south of the Cannonball River, and excluded the already existing DAPL Protest encampments on Corps' land north of the Cannonball River.  *Id*. at 7.

[¶106] Attached to Colonel Henderson's letter was an unexecuted Special Use Permit in the EC 1130-2-550 form, which reiterated the permit conditions referenced by Colonel Henderson in his letter. JX-129 at 4-6.  The unexecuted Special Use Permit did not list a total number of authorized participants, but it did state it would be valid for a period of 30 days from the date of signature. *Id*. at 4.  The unexecuted Special Use Permit stated that the holder "will comply with all Federal, state, county and municipal local laws, ordinances and regulations" and required that "No structures, either temporary or permanent, can be constructed on the premises without first obtaining review and approval by the District Commander."  *Id*. at 6.  The unexecuted Special Use Permit also included an "Exhibit A" map of the Special Use Permit area, only authorizing use of Corps lands south of the Cannonball River.  *Id*. at 7.

[¶107] Despite having just provided the unexecuted Special Use Permit to Chairman Archambault at 5:22 PM, and knowing that Chairman Archambault had not returned a signed copy, nor would have time to obtain the required bonding and special event insurance, the Corps then issued a public press release on September 16, 2016 ("Sept. 16 Press Release") noting that "[t]oday, the U.S. Army Corps of Engineers (Corps) issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe."  JX-127 at 2; JX-126.  The Sept. 16 Press Release also stated that "Col. John W. Henderson, informed Standing Rock Sioux Tribal Chairman Dave Archambault II, that the Tribe's Spiritual gathering, located south of the

Cannonball River, has been granted a Special Use Permit.  *Id*.  The Corps' Sept. 16 Press Release further included a quote from Colonel Henderson stating "[a]mong our many diverse missions is managing and conserving our natural resources. I want to encourage those who are using the permitted area to be good stewards and help us to protect these valuable resources." JX-127 at 2; JX-126.

[¶108] The Sept. 16 Press Release was planned and approved by the Corps and other representatives of the United States before the Corps ever sent the unexecuted Special Use Permit to Chairman Archambault.  Earlier on September 16, 2016 at 4:59 PM (twenty-three minutes before the Special Use Permit was transmitted), Colonel Henderson sent an email to Standing Rock Sioux Tribe Chairman Archambault stating "Our staff will be sending you a copy of the permit by email soon; official copy with be sent by certified mail on Monday.  We will send the attached press release out this evening at 7:00 pm. I wanted to give you the courtesy of reviewing it a final time prior our release." JX-127 at 1.  Colonel Henderson's email to Standing Rock Sioux Tribe Chairman Archambault was accompanied by a draft press release substantially identical to the final Sept. 16 Press Release, with a header at the top which stated "For Release at 7PM CDT September 16, 2016. *Id*. at 2.

[¶109] Lieutenant General Semonite stated the Sept. 16 Press Release "was an action to … make the tribes feel that they were getting some degree of accommodation." Semonite Depo. 162:22 – 163:3 (ECF No. 405-7).

[¶110] Colonel Henderson testified that the Corps was not optimistic that the Special Use Permit was going to be completed at that time.  Tr. Day 7, 1080:13-19 (Henderson).

[¶111] Colonel Henderson testified that as of the time of the Sept. 16 Press Release the Corps was aware that DAPL Protestors were not adhering to the Sept. 16 Press Release's stated conditions of not building structures on Corps-managed lands. Tr. Day 7, 1085:23 – 1087:15 (Henderson).

[¶112] Colonel Henderson testified that as of the time of the Sept. 16 Press Release the Corps was aware that the number of DAPL Protestors on Corps-managed lands far exceeded the 300-500 individuals identified in the Special Use Permit application filed by the Standing Rock Sioux Tribe. Tr. Day 7, 1087:20-25 (Henderson); Tr. Day 12, 1923:24 – 1924:7 (Spellmon).

[¶113] At this time in September 2016, the Corps believed the number of DAPL Protestors on Corps-managed lands was in the range of 5,000 persons. DX-4092.

[¶114] Lieutenant General Semonite testified that in September 2016 the DAPL Protestors were in "willfull disobedience of certain functions that were against the way we wanted to manage" the Corps-managed lands. Semonite Depo. 46:19 – 25 (ECF No. 405-7).

[¶115] Despite the Sept. 16. Press Release only stating it was offering a permit for lands south of the Cannonball River, the Corps was aware that DAPL Protestors were primarily encamped north of the Cannonball River.

[¶116] On September 17, 2016, Eileen Williamson sent an email to multiple Corps personnel including Lieutenant Colonel Startzell and Thomas Tracy, in which Ms. Williamson stated that she had received a media inquiry asking "if we would evict [protestors] from the northern property" not covered in the Corps Sept. 16 Press Release announcement about the granted Special Use Permit. JX-133 at 1. Ms. Williamson indicated her response was that DAPL Protestors were "encouraged to relocate to the permitted area" and that if "they remain in place it is as their own risk and at a potential risk to the lessee." *Id.* at 1-2. When asked what recourse the Corps had for enforcing the Special Use Permit terms, Ms. Williamson said that the Corps "are authorized to cite

Title 36 violations" but that ultimately the Corps concern "is for the health and safety of those who have gathered and that the resources are protected." *Id.* at 2.   Ms. Williamson's email noted that the Sept. 16 Press Release had been shared "1,150 times with a reach of about 78,000." *Id.* at 1. By the next Monday, September 19, 2016, the Sept. 16 Press Release had received over 96,000 views.  PX-1171; Tr. Day 7, 1091:14-1092:5 (Henderson).

[¶117]  DAPL Protestor Winona LaDuke testified that she felt the Sept. 16 Press Release "was the right thing for the federal government to do" and that it "was a good thing" that the Corps issued the Sept. 16 Press Release.  Tr. Day 16, 2536:1 – 2537:17 (LaDuke).

[¶118]  The Department of the Army, the Bureau of Indian Affairs, the Department of Justice, the U.S. Attorney's Office, the Federal Bureau of Investigation, and the White House executive office were all involved in the eventual issuance of the Sept. 16 Press Release and provided approval to the Corps for the issuance of the Sept. 16 Press Release.  Tr. 1378:3 – 1386:15 (Jackson); JX-121; PX-1155 Revised.  Lieutenant General Semonite stated that during this time period there was "a lot of [] coordination with echelons above my level," including "other probably political leaders." Semonite Depo. 48:17 – 49:18 (ECF No. 405-7).

[¶119]  On September 19, 2016, Lieutenant Colonel Startzell sent an email to multiple Corps personnel, including Thomas Tracy and Colonel Henderson, where he stated that there "is widespread confusion as to the meaning of the" Special Use Permit, "i.e. that it permits special use for free speech, does NOT permit people to interfere with DAPL Construction."  PX-1171 at 2. Lieutenant Colonel Startzell also stated that "Chairman Archambault has not confirmed receipt of the Special Use Permit package and we are attempting to contact him and the Tribe to ensure that they received the package and understand the stipulations."  *Id.*

[¶120] The Corps leadership and the Department of the Army Leadership was aware as of September 21, 2016 that a valid Special Use Permit had not actually been granted to the Standing Rock Sioux Tribe, despite the Sept. 16 Press Release to the contrary.  JX-135 at 1-2; Transc. 1388:1 – 1389:7 (Jackson); PX-1177 at 3.

[¶121] For example, on September 21, 2016 Major General Jackson sent an email to Assistant Secretary Darcy, Lowry Crook, and various other Corps personnel.  JX-135.   Major General Jackson addressed the email to "Madame Secretary, Chief, and Lowry" and provided an "SPOTREP" received from Colonel Henderson "early this morning."  *Id*. at 3.  The "SPOTREP" summary stated that Colonel Henderson had received a call from North Dakota U.S. Senator Heitkamp who asked the Corps to move the DAPL Protestors off the encampment area north of the Cannonball River, and asked the Corps to "take the lead to find a solution to this mess given all the damage that has already been done," and pressed Colonel Henderson "to establish a timeline for when this all ends."  *Id*.  Major General Jackson's September 21, 2016 email also stated that the Special Use Permit "is only for the south side of the river; with associated conditions" and conceded that "**The Tribe has not signed the acknowledgment for this permit yet nor met the liability requirements, so there is currently no permit in place** [sic]."  *Id*.  Major General Jackson also stated that "[a]nything that appears like an eviction by the Federal Government would likely create" a flash point, and that the "best chances for a peaceful migration to the south side of the river is for the Tribe to own this decision through self-determination. . . the elders must buy in." *Id*. at 3-4.

[¶122] Assistant Secretary Darcy responded to the September 21, 2016 email from Major General Jackson the same day by return email stating "[s]o, there is no permit in place for the south encampment, even though we announced Friday night that there was?"  *Id*. at 3.  Major General

Jackson responded by stating that the "Chairman verbally approved both documents" but that no signature or proof of liability insurance had been returned "as required by permit." *Id.* at 2.  Major General Jackson followed up that Colonel Henderson "is working with the Chairman, and his legal team, to finalize this and hope to have it completed today or tomorrow . . .Sorry for the confusion. Will let you know when it is administratively closed out." *Id.* at 2.

[¶123]  Separately, on September 21, 2016, Joel Ames (Corps' NWO Tribal Liaison) sent an email to Colonel Henderson, Thomas Tracy, Lieutenant Colonel Startzell and multiple other Corps personnel stating that he had been reaching out to Chairman Archambault on a daily basis regarding signing the permit and meeting the other requirements such as bonding and insurance. PX-1176 at 1.

[¶124]  According to EC 1130-2-550 Appendix E and Corps practice, a Special Use Permit must be signed by both the applicant and the issuing Corps official for the Special Use Permit to be in good standing, effective, and considered issued.  Tr. Day 9, 1440:9-21 (Kruger).

[¶125]  For religious ceremonies and spiritual gatherings over 50 people, "liability insurance, obtained by the event holder, that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event, is mandatory before a Special Use Permit can be issued.  Tr. Day 9, 1451:17 – 1453:9 (Kruger); EC 1130-2-550, Appendix E at E-3 (ECF No. 8 at 46).  Similarly, for all events involving mechanical apparatus, such as boats, personal watercraft, motorcycles, bikes, etc., liability insurance, obtained by the event holder, that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event, is mandatory.  *Id.*

[¶126]  According to EC 1130-2-550 Appendix E and Corps practice, "[p]erformance bond(s) and/or proof of liability insurance, if required, must be submitted within time frames established

by the Operations Project Manager, but prior to the start of the event." Tr. Day 9, 1451:17 – 1453:9 (Kruger); EC 1130-2-550, Appendix E at E-3 (ECF No. 8 at 46).   Under the draft Special Use Permit transmitted to the Standing Rock Sioux Tribe, "that the Corps would "require that [Standing Rock Sioux Tribe Chairman Archambault] obtain a performance bond in the amount of $100,000 and maintain public liability and property damage insurance to cover any and all claims, demands, actions, or suits for damage to property or personal injury, including death, arising from your use of the property for your gathering."  JX-129 at 1.  The draft Special Use Permit also mandated that the insurance coverage be not less than $5,000,000 for personal injury, for each occurrence, and $1,000,000 for each occurrence involving property damage, and not less than $5,000,000 covering all claims per occurrence.  *Id.* at 1-2.

[¶127] Under EC 1130-2-550 Appendix E, any person or organization granted a Special Use Permit "must repair any on-site damages caused by the special event."  EC 1130-2-550, Appendix E at E-3 (ECF No. 8 at 46).

[¶128] The administrative process for completing and obtaining a valid, issued, and effective Special Use Permit for the Standing Rock Sioux Tribe was never completed.  Tr. Day 7, 1084:5-7 (Henderson).

[¶129]  Multiple Corps personnel admitted there was never a valid or effective Special Use Permit for the DAPL Protests on Corps lands.  Stasch Depo. 94:12-20 (ECF No. 404-6); Semonite Depo. 49:23–50:7; 53:18-20 (ECF No. 405-7); Tr. Day 7, 1083:23–1084:10 (Henderson); Tr. Day 8, 1387:18–1389:7 (Jackson); JX-135 at 1.

[¶130]  The Corps never issued a press release correcting the erroneous Sept. 16 Press Release.  Tr. Day 7, 1080:20-24 (Henderson).

[¶131]  Mr. Iron Eyes also testified that he viewed the Oceti Sakowin, Sacred Stone, and Rosebud DAPL Protestor camps on Corps-managed lands as a safe haven.  Tr. Day 15, 2468:17-22 (Iron Eyes).

## V.   Corps Management of the DAPL Protests After the Sept. 16 Press Release.

[¶132]  In mid-September of 2016, after the issuance of the Corps' Sept. 16 Press Release, Morton County Commissioner Cody Schulz met with Corps leadership in Governor Dalrymple's office, including Brigadier General Spellmon and requested that (1) the Corps enforce their rules on Corps-managed lands and declare the DAPL Protestors as trespassers and have them arrested or evicted; and (2) requested federal law enforcement support to maintain public safety.  Tr. Day 1, 86:25–87:15 (Schulz)

[¶133]  As of September 21, 2016, U.S. Senator Heitkamp of North Dakota had requested that the Corps develop a plan to move DAPL Protestors off of the Main Camp on Corps-managed lands on the north side of the Cannonball River.  PX-1177 at 2.

[¶134]  In a September 22, 2016 email, Lieutenant Colonel Startzell informed Corps leadership (which included Thomas Tracy and Brigadier General Spellmon) that "[t]here are reports and photos of burn pits/waste lagoons, which is an apparent violation of North Dakota solid waste management laws and rules, and the state is concerned that the sandy soil may allow groundwater impacts. We will need to consider mitigating/fixing these impacts as part of a move of personnel to permitted area."  JX-137 at 2.

[¶135]  On September 22, 2016, Colonel Henderson received an email forwarded from Keith Fink (Omaha District Chief of Operations) which contained pictures showing DAPL Protestors using construction equipment to grade a road at the Main Camp on Corps-managed lands.  PX-1182.

[¶136] On September 25, 2016, NDHP Captain Pederson was the first North Dakota law enforcement officer to arrive on the scene of Dakota Access construction site where DAPL Protestors were trespassing after first caravanning from the Main Camp on Corps-managed lands. Tr. Day 3, 576:15–578:13 (Pederson); PX-1626; JX-265 at 52.  NDHP Captain Pederson was run off the road by a DAPL Protestor in a black Jeep while attempting to arrive to the trespass site.  *Id.* DAPL Protestors ended up causing significant vandalism at the Dakota Access construction site on this day.  Tr. Day 3, 579:8-19 (Pederson).  Later in the day, the DAPL Protestors caravanned to another site, the Morrell Farm, where they were eventually arrested.  Tr. Day 3, 581:2-15 (Pederson); JX-265 at 52.  NDHP Captain Pederson personally observed similar caravanning, trespass, and vandalism events originating from the DAPL Protest camps on Corps-managed lands. Tr. Day 3, 582:4-14, 585:6-11 (Pederson).

[¶137] In a September 25, 2016 email, Lieutenant Colonel Startzell circulated among Corps personnel a daily Morton County Operations Order ("OPORD") update on the status of the DAPL Protest camps, where Lieutenant Colonel Startzell stated that "[a]ll of this information basically confirms the Commander's assessment that the camps are growing out of the [Standing Rock Sioux Tribes's] control, and the Chairman [Archambault] is probably going to try to use the SUP as a way to regain control of what he sees as legitimate protestors."  JX-139 at 1.

[¶138] On September 27, 2016, DAPL Protestors caravanned from the Main Camp on Corps-managed lands to trespass and vandalize another DAPL construction site on private land.  Tr. Day 2, 244:13–246:9 (Gallagher); PX-1658 (Video).

[¶139] As of October 4, 2016, Colonel Henderson did not believe that Chairman Archambault— and by extension the Standing Rock Sioux Tribe—was in control of the DAPL Protestors on the Corps-managed lands.  Tr. Day 7, 1103:19 – 1104:6, 1159:5 – 24 (Henderson).

[¶140] On October 7, 2016, Morton County and the State of North Dakota established a Unified Command structure to streamline internal communication between North Dakota law enforcement agencies and the Department of Emergency Services in responding to the DAPL Protests.  Tr. Day 1, 81:6-17 (Schulz); Tr. Day. 6, 923:23 – 924:9 (Dohrmann); PX-1272 at 2; PX-1211.   The decision to move to this structure was made collectively between these individuals, as well as Governor Dalrymple. Tr. Day 4, 662:11 – 18 (Gerhart).  The Unified Command was collectively led by Adjutant General Dohrmann, Colonel Gerhart, and Sheriff Kirchmeier. Tr. Day 3, 559:20 – 560:1 (Pederson). The decision to move to this enhanced command structure was made collectively between these individuals, as well as Governor Dalrymple. Tr. Day 4, 662:11 – 18 (Gerhart).

[¶141] When establishing the Unified Command structure, Morton County Sheriff Kyle Kirchmeier noted that the current DAPL Protest "situation appears to have no end in sight and the size of the [DAPL P]rotest community is estimated to exceed 3,000 persons."  PX-1211 at 1.  Morton County Sheriff Kyle Kirchmeier also noted that as of October 7, 2016, North Dakota law enforcement had "accrued more than 33,643 hours of overtime" and that total costs to date had exceed $1,400,000.  *Id.*   This resulted in moving the EOC from the Morton County Sheriff's Office to the Fraine Barracks closer to the DAPL Protest camps, and turning the Morton County Sheriff's Office into a Tactical Operations Center ("TOC").   Tr. Day 2, 353:17–354:7 (Kirchmeier).  This also established a new Unified Command structure for managing the DAPL Protests.  Tr. Day 2, 355:12-21 (Kirchmeier); PX-1212.

[¶142] On October 10, 2016, the Department of Justice, Department of the Army, and Department of the Interior released another joint statement ("Oct. 10 Joint Statement") which repeated the joint

parties' "request that the pipeline company voluntarily pause all construction activity within 20 miles east or west of Lake Oahe." PX-1215 at 2.

[¶143] Morton County Sheriff Kyle Kirchmeier reacted to the Oct. 10 Joint Statement with frustration, and felt that it was "more nonaction from the government that is putting more pressure on the County, on me and all other law enforcement to keep [the DAPL Protests] safe with no endgame in place." Tr. Day 2, 393:13-24 (Kirchmeier); PX-1215 at 2.

[¶144] On October 13, 2016, in an internal Corps email communication, Chief of Engineers Lieutenant General Semonite expressly acknowledged the need to control the situation on the Corps-managed lands. He wrote:

> What is our position to Congress … why [the United States Army Corps of Engineers] has allowed trespassing and camping on [Government] land on the north side… effectively condoning the tribes to violate the law both on our land as well as other lands? When is [the United States Army Corps of Engineers] going to do something to get this under control - while many might move to other camps, some will stay just to embolden the effort? . . . Is there some event that will cause us to ask [sic] Sheriff to enforce the law?

PX-1221 at p. 2. He also acknowledged at this time that there was "high potential for increased conflict." *Id*. Lieutenant General Semonite also stated that he didn't want to "get further wrapped into an EXTENDED administration delay or blocking action." PX-1223 (emphasis in original).

[¶145] In the October 13, 2016 email, Lieutenant General Semonite added that Senator Hoeven "will push back on me why hasn't federal GOV'T provided any relief to the state for law enforcement? If the Federal Gov't is putting a hold on this….while North Dakota is assuming a lot of security missions – can't handle without resources?" PX-1223 at 2.

[¶146] In the October 13, 2016 email, Lieutenant General Semonite also asked "what is our talking point on why the easement hasn't been approved" in relation to the Dakota Access Lake Oahe crossing. PX-1221 at p. 2. Ultimately, Lieutenant General Semonite felt that the Corps had done its "due diligence" on its consideration of the easement for DAPL and that delaying a decision on

Dakota Access's requested easement "was not necessarily in keeping with our obligations" to Dakota Access.  Semonite Depo. 68:9 – 69:24 (ECF No. 405-7).

[¶147]  Lieutenant General Semonite stated that by the "middle of October, the Corps was really out of the process of determining how to resolve this" in referring to the DAPL Protests.  Semonite Depo. 98:6-16 (ECF No. 405-7).

[¶148]  On October 17, 2016,  DAPL Protestors travelled to Bismarck, North Dakota and blocked traffic on the Memorial Bridge between Bismarck and Mandan, North Dakota.  Tr. Day 2, 246:11–247:6 (Gallagher); PX-2041 at 92; PX-1704 (Video).

## VI.    The "Big Push".

[¶149]  On October 23, 2016, DAPL Protestors trespassed on private land near the DAPL construction crossing of Highway 1806, one of which was arrested.  Tr. Day 2, 257:21–259:17 (Gallagher); PX-1705 (Video).  After the arrests, DAPL Protestors travelled from the Main Camp on Corps-managed lands to the arrest location to stop North Dakota law enforcement from effectuating any more arrests.  *Id.*

[¶150]  Prior to the DAPL Protestors moving north on October 23, 2016, there had been a small contingent of DAPL Protestors located in the ditch near this location on the Highway 1806 right of way known as the "North Camp".  Tr. Day 2, 372:8-16, 423:1-4 (Kirchmeier).  On this date, however, the DAPL Protestors moved onto private property owned by Dakota Access in the DAPL route.  Tr. Day 3, 506:18 – 507:5 (Laney); Tr. Day 2, 372:8-16, 423:5-7 (Kirchmeier).

[¶151]  In response to the DAPL Protestors occupying private land starting on October 23, 2016, North Dakota received a request from Dakota Access to remove persons from its private property.  Tr. Day 9, 1610:24–1611:20, 1635:2-15 (Futch); Tr. Day 2, 372:17-21 (Kirchmeier); Tr. Day 3, 507:6-10 (Laney).

[¶152]  In response to Dakota Access's request to remove DAPL Protestors trespassing on private property, North Dakota began to organize and coordinate a law enforcement response to remove the trespassing individuals from the North Camp. Tr. Day 2, 372:22-24 (Kirchmeier); Tr. Day 9, 1610:24–1611:20, 1635:2-15 (Futch); Tr. Day 2, 507:6–508:12 (Laney); Tr. Day 4, 682:14 – 683:17 (Gerhart).   This effort would become known as the "Big Push." Tr. Day 2, 372:4-20 (Kirchmeier); Tr. Day 9, 1544:17-19 (Van Horn); PX-2041 at 101-132

[¶153]  The planning process for the Big Push involved requesting law enforcement support through EMAC requests, putting a staging area together north of the North Camp with medical support, food, supplies, and fuel; coordinating with North Dakota state agencies including the Department of Health and Game and Fish; coordinating with the Governor's Office; and planning for contingencies, all of which were done with the goal of protecting both DAPL Protestors and law enforcement.  Tr. Day 3,  595:2–598:4 (Pederson); Tr. Day 4, 683:8 – 11 (Gerhart).

[¶154]  The Unified Command was not able to amass the full amount of law enforcement personnel it felt would be optimal for the Big Push, and made a plea to federal law enforcement for additional manpower, including contacting the U.S. Customs and Border Protection ("Border Patrol") and the U.S. Marshals.  Tr. Day 3, 598:6–600:8 (Pederson).  The U.S. Border Patrol went as far as to prepare to send troopers to North Dakota, but those troopers were stopped on the runway/tarmac of the airport before they could leave.  Tr. Day 3, 599:2-12 (Pederson).

[¶155]  North Dakota law enforcement initially planned to remove the DAPL Protestors from private land on October 26, 2016, but learned that the DAPL Protestors had been made aware of those plans and thus decided to meet with DAPL Protestors one last time to avoid a confrontation and hopefully have them leave the private land peacefully. Tr. Day 3, 507:11–510:10 (Laney).

[¶156] On October 26, 2016, North Dakota law enforcement officials met with DAPL Protest leaders in an effort to convince the trespassing individuals to leave the North Camp peacefully and without the need for a law enforcement action. Tr. Day 2, 374:5 – 375:3 (Kirchmeier); Tr. Day 3, 507:11–510:10 (Laney); Tr. Day 4, 683:18 – 686:21 (Gerhart); Tr. Day 6, 963:12 – 25 (Dohrmann); DX-4256.

[¶157] During North Dakota law enforcement's meetings with DAPL Protestors on October 26, 2016, a leader of the DAPL Protestors, Mekasi, referenced the "20-mile buffer zone that the United States government asked for" through three separate agencies in the Sept. 9 Joint Statement and that the DAPL Protestors wanted Dakota Access to commit and agree to that buffer in writing. DX-4256 (Video) at 20:55; Tr. Day 3, 513:9–514:25 (Laney).

[¶158] The DAPL Protestors ultimately refused to leave the private property they were trespassing on calling that location a "no surrender line". Tr. Day 4, 683:18 - 686:14 (Gerhart); DX-4256 (Video) at 29:20.

[¶159] On October 27, 2016, North Dakota law enforcement officers removed the trespassing individuals from Dakota Access's private property by forming a line and slowly walking the DAPL Protestors back to the Main Camp on Corps-managed lands. Tr. Day 3, 515:19–517:2 (Laney); Tr. Day 4, 682:14-24 (Gerhart). During the Big Push, law enforcement used a methodical police line to move the DAPL Protestors the 2.1 miles back to the Main Camp on Corps-managed lands, which took over eight hours. *Id.*

[¶160] During this process, a DAPL Protestor who was being placed under arrest discharged a firearm three times at law enforcement officers. Tr. Day 2, 375:9-19 (Kirchmeier); Tr. Day 3, 601:22–602:16 (Pederson); Tr. Day 4, 689:7–690:21 (Gerhart); JX-266 at 79 (Video); PX-1436.

[¶161] During the "Big Push," several DAPL Protestors attempted to cause a stampede of a herd of buffalo towards the law enforcement officers. Tr. Day 2, 265:3–270:5. This effort was stopped when NDHP Trooper Gallagher diverted the stampeding buffalo with the NDHP plane, which flew as low as 15 feet off the ground. *Id.*; PX-2041 at 123-126; PX-1258 (Video); Tr. Day 3, 517:3–518:12 (Laney).

[¶162] During the Big Push, DAPL Protestors burned numerous vehicles on Highway 1806, including three vehicles on the Backwater Bridge, as well as DAPL construction equipment. Tr. Day 2, 262:19–263:4, 264:10–265:2, 271:4-19 (Gallagher); PX-2041 at 112-113, 118-121, 128-129; Tr. Day 3, 518:13-14 (Laney).

[¶163] During the Big Push, DAPL Protestors also threw Molotov cocktails, rocks, and fired shots at North Dakota law enforcement officers, and set a roadblock and law enforcement vehicles on fire at a bridge on Morton County Road 134 and the separate Backwater Bridge on North Dakota Highway 1806. Tr. Day 3, 601:5-21 (Pederson); JX-268 at 5.

[¶164] During the Big Push, DAPL Protestors also ran a truck driven by a DAPL security guard off Highway 1806 and forced the DAPL security guard out of his truck. Tr. Day 2, 271:4 – 273:22 (Gallagher): PX-2041 at 128, 131. The security guard had a long rifle, and was backed by DAPL Protestors into a body of water off the highway. *Id.* DAPL Protestors later set the DAPL security guard's truck on fire. PX-2041 at 129.

[¶165] Ultimately, North Dakota law enforcement successfully removed the trespassing DAPL Protestors in accordance with the landowner's (Dakota Access') request with no serious injuries or fatalities. Tr. Day 2, 329:6–330:6 (Johnson); JX-14 at 39.

[¶166] After the Big Push, Highway 1806 remained barricaded north of the Main Camp on Corps-managed lands at the Backwater Bridge, where DAPL Protestors had set on fire several trucks.

North Dakota law enforcement added cement jersey barriers to the Backwater Bridge both due to keep DAPL Protestors off due damage to the bridges structural integrity and to keep DAPL Protestors from heading north from the Main Camp to access the Dakota Access construction site. Tr. Day 2, 377:5-18 (Kirchmeier); Tr. Day 4, 705:9 – 706:6 (Gerhart).  The Backwater Bridge was an important barrier because it was a choke point that kept DAPL Protestors from being able to travel to the Dakota Access drill site or to otherwise overwhelm strained North Dakota law enforcement resources.  Tr. Day 3, 405:10–406:3 (Kirchmeier).  The barriers also helped law enforcement manage the protest activity on the bridge by controlling the flow of DAPL Protestors. Tr. Day 4, 705:9 –22 (Gerhart).

**VII.    Events Leading to the Backwater Bridge Riots.**

[¶167] On October 28, 2016, Brigadier General Spellmon sent an email to Lieutenant General Semonite and other senior Corps personnel, which stated that "based on yesterday's escalation of force incidents, we are going to revoke the Special Use Permit for the [Standing Rock Sioux Tribe] camp effective immediately."  JX-170 at 1.  Brigadier General Spellmon stated that the rationale for the revocation of the Special Use Permit was that "[y]esterday's events proved again this is not a peaceful or prayerful protest" . . . "Life, health, safety for all in the area are at risk" . . . "There has been much reckless endangerment" . . . "There has been damage and destruction of private property."  *Id*. Brigadier General Spellmon also stated that the Corps would "work with the Chairman to set suspenses [sic] for camp movement, issuance of trespass notices, and court orders."  *Id*.

[¶168] On November 1, 2016, the Corps, made one, albeit temporary and quickly rescinded, request to Morton County Sheriff Kyle Kirchmeier to remove individuals from Corps-managed lands *north* of the existing DAPL Protest camps in a letter from Colonel Henderson.  JX 174 ("Nov.

1, 2016 Letter"). This request stated that the Corps had "not provided any permits or permissions" for the DAPL Protestors camped on Corps lands on a new camp "north of the current encampment on the north bank of the Cannonball" River, that the Corps considered those DAPL Protestors "trespassers", and as a "property owner" was "requesting law enforcement assistance in this matter, as needed." *Id*. Colonel Henderson specifically did not request assistance for any of the camps "south of the Cannonball River" or the "Oceti Sakowin Camp" north of the Cannonball River.  JX-174 at 1-2; Tr. Day 2, 389:8-17 (Kirchmeier).

[¶169] North Dakota county law enforcement immediately worked to accommodate that request after November 1, 2016, including stopping DAPL Protestors from accessing "Turtle Hill", a key access point to the Corps-managed lands closed by the Corps' Nov. 1, 2016 Letter on November 2, 2016. Tr. Day 2, 274:23 – 281:8 (Gallagher); Tr. Day 2, 388:4–389:7 (Kirchmeier); PX-2041 at 134-141.    DAPL Protestors were attempting to access Turtle Hill because there was now a barricade on Highway 1806 north of the Main Camp that prevented DAPL Protestors from accessing the DAPL construction cite adjacent to Highway 1806.  *Id.*; Tr. Day 3, 521:11-25 (Laney).

[¶170] Around November 2, 2016, President Obama made public remarks regarding the DAPL Protests, which were to the effect of that the federal government was going to let the DAPL Protests play out for several more weeks.  Tr. Day 1, 143:2–144:15 (Schulz); Tr. Day 2, 394:19-24 (Kirchmeier); Estes Depo. 62:7-23 (ECF No. 404-3); PX-1279.

[¶171] Confrontations between North Dakota law enforcement and DAPL Protestors at Turtle Hill continued throughout November of 2016.  Tr. Day 2, 386:2 – 389:7 (Kirchmeier); PX-1885 (Video); JX-265 at 61-70.  DAPL Protestors would try to build floating bridges and swim across the Cantapeta Creek to gain access to Turtle Hill frequently throughout November.  *Id.*; Tr. Day

3, 611:14–612:5 (Pederson).   While North Dakota law enforcement was busy responding to repeated attempts by DAPL Protestors to cross and summit Turtle Hill, the Corps requested that North Dakota law enforcement not drive up Turtle Hill because a North Dakota law enforcement vehicle had broken a tree branch and the Corps did not want Corps-managed lands to be damaged. Tr. Day 3, 614:21–615:14 (Pederson).

[¶172] On November 3, 2016, DAPL Protestors travelled to the North Dakota State Capitol grounds and entered the judicial wing of the Capitol Building where they refused to leave.  Tr. 602:22–604:8 (Pederson); JX-265 at 62; PX-1783 (Video).  Those DAPL Protestors did not have a permit and were arrested after refusing to leave despite several reasoned requests from North Dakota law enforcement.  Tr. Day 4, 694:12–695:9 (Gerhart).  That same day, NDHP Captain Pederson had to evacuate Governor Dalrymple and the First Lady from the Governor's residence due to the threatening presence of the DAPL Protestors.  *Id.*

[¶173] Doug Burgum was elected to Governor of North Dakota on November 8, 2016 and later assumed that office on December 15, 2016. Tr. Day 6, 838:22 – 839:2 (Burgum).

[¶174] On November 12, 2016, DAPL Protestors caravanned from the Main Camp on Corps-managed lands to private property where DAPL construction equipment was stored known as the Precision Pipeyard. Tr. Day 2, 252:5 – 254:10; PX-1819 (Video).  DAPL Protestors blocked traffic in this area and at one point surrounded a private citizen's vehicle and started to vandalize it, resulting in the citizen pulling a gun.  Tr. Day 2, 254:11–256:18 (Gallagher); PX-1819 (Video).

[¶175] Around November 12, 2016, the Corps transmitted a Special Use Permit to Faith Spotted Eagle to allow a group of DAPL Protestors to have a religious ceremony near the DAPL drill pad that would drill under Lake Oahe for the DAPL crossing.  JX-193; Tr. Day 2, 389:21 – 390:7 (Kirchmeier); JX-193.

[¶176] On November 14, 2016, Lieutenant Colonel Startzell communicated with Morton County Sheriff Kyle Kirchmeier regarding the Faith Spotted Eagle Special Use Permit, in which he admitted the Corps did not have a signed and returned copy of the Special Use Permit.  JX-193 at 1.  Despite a lack of a signed Special Use Permit, Lieutenant Colonel Startzell conveyed to Morton County Sheriff Kyle Kirchmeier that the Corps would allow the event to proceed anyway.  *Id.*

[¶177] Morton County Sheriff Kyle Kirchmeier was opposed to the ceremony and conveyed opposition to the ceremony to the Corps.  Tr. Day 2, 390:8-15 (Kirchmeier).

[¶178] On November 15, 2016, DAPL Protestors again caravanned from the Main Camp on Corps-managed lands and to a railroad crossing near where DAPL construction equipment was stored, where the DAPL Protestors then blocked a railroad track.  Tr. Day 2, 250:8 – 252:3 (Gallagher); Tr. Day 4, 695:10–22 (Gerhart); PX-2041 at 142-147.  A DAPL Protestor placed a rag in the fuel cap of the pickup and attempted to set it on fire, but a North Dakota trooper intervened. Tr. Day 4, 695:23 – 696:10 (Gerhart). This trespass event involved approximately 300 DAPL Protestors.  JX-265 at 66.  Separately, later this day there were also about 100 DAPL Protestors marching in Mandan, which resulted in 25 arrests.  *Id.*

**VIII.     The Backwater Bridge Riot.**

[¶179] On November 20, 2016, there was a large riot by DAPL Protestors attempting to cross the Backwater Bridge and remove the law enforcement barriers that had been in place on the Backwater Bridge since the Big Push on October 27, 2016.   Tr. Day 2, 377:5-18 (Kirchmeier); JX-277.

[¶180] This became known as the Backwater Bridge Riot.  Tr. Day 2, 377:6-14 (Kirchmeier). Officers on the scene testified that the DAPL Protestors' behavior during this altercation constituted a "riot."  Tr. Day 4, 702:12-16 (Gerhart).

[¶181] During the Backwater Bridge Riot, DAPL Protestors were first asked to leave the Backwater Bride via audible law enforcement orders to disperse that were issued to the assembled DAPL Protestors, which they refused. Tr. Day 2, 377:19-22 (Kirchmeier); Tr. Day 3, 406:24–407:17 (Kirchmeier); Tr. Day 4, 700:14-24 (Gerhart). The audible orders to disperse were given via a long-range acoustical device ("LRAD") that was used as a loudspeaker. Tr. Day 3, 406:24–407:17 (Kirchmeier).

[¶182] Morton County Sheriff Kyle Kirchmeier eventually had to issue two "Code Red" alerts to call additional law enforcement officers into the Backwater Bridge location due to the size and intensity of the Backwater Bridge Riot and only having approximately 30 officers on site when the riot began. Tr. Day 2, 377:23–378:11 (Kirchmeier); Tr. Day 3, 404:16–404:15 (Kirchmeier); JX-266 (Native) at 119. The "Code Red" requested all law enforcement officers anywhere in the state of North Dakota to respond to the Backwater Bridge that night. Tr. Day 3, 407:18-24 (Kirchmeier).

[¶183] "Code Red" calls were created for the DAPL Protests due to the frequent need for law enforcement backup. Tr. Day 4, 699:14–700:3 (Gerhart). Approximately 125 "Code Red" calls were issued during the DAPL Protests due to DAPL Protestor conduct. *Id.* Issuing a statewide "Code Red", however, was uncommon, and this was the only time in the eight-month DAPL Protests a statewide "Code Red" was issued. Tr. Day 4, 699:3-9 (Gerhart).

[¶184] During the Backwater Bridge Riot, the Morton County Sheriff's Department requested a fire truck to the Backwater Bridge due to fires being set by DAPL Protestors during the riot. Tr. Day 2, 379:4-10 (Kirchmeier); JX-227 at 2. Due to DAPL Protestors frequent efforts to remove the jersey barriers on the Backwater Bridge, including using a semi-truck to pull the jersey barriers

off the bridge, North Dakota secured the barriers to Backwater Bridge earlier that day using water from the fire truck to ice them to the bridge.  Tr. Day 4, 705:9 – 706:6 (Gerhart).

[¶185]  Eventually, Morton County Sheriff Kyle Kirchmeier authorized the use of the fire truck's water hose due to DAPL Protestors riotous behavior and noncompliance with continued audio orders to disperse, in order to mitigate the Backwater Bridge Riot before the situation got out of hand.  Tr. Day 3, 406:9-23 (Kirchmeier).

[¶186]  During the Backwater Bridge Riot, the law enforcement officers were assailed with rocks, bottles, and Molotov cocktails. PX-1319; Tr. Day 1, 116:4-19 (Schulz); Tr. Day 4, 700:18-24 (Gerhart); JX-166 at 116-117.

[¶187]  The intensity of the altercation caused North Dakota law enforcement officials to fear for the health and safety of the officers present, as DAPL Protestors were attempting to flank law enforcement and get around police lines. Tr. Day 4, 700:25–702:1 (Gerhart); PX-1319; Tr. Day 1, 116:4-19 (Schulz); JX-166 at 116-117. North Dakota's expert David Pearson testified that the use of a water hose during the Backwater Bridge Riot was an "improvised" use of force—which are not set forth in law enforcement policies—and was reasonable given the circumstances. Tr. Day 8, 1333:14 – 1336:10.

## IX. Corps Actions After the Backwater Bridge Riot and "Free Speech Zone" Declaration.

[¶188]  On November 22, 2016, Colonel Henderson sent an email to Brigadier General Spellmon, Major General Jackson, and David Cooper providing a summary of a phone call Colonel Henderson had with Adjutant General Dohrmann, Chris Meyers (U.S. Attorney), and Morton County Sheriff Kyle Kirchmeier where Colonel Henderson stated that the outcome of the call was that the Corps "need to better define and communicate their jurisdiction on Corps land" and that they would "work to provide the Tribes and law enforcement with a letter that states" that the

Corps would close Lake Oahe project lands north of the Cannonball River to the public effective December 5, 2016, which would keep the Corps "out of the business of inconsistently treating people as trespassers based on the changing law enforcement requirements"; the Corps would "strongly encourage the Tribal leaders to move out of this area north of the Cannonball River" and would "state that they are in violation of several title 36 statutes and notify the Tribes that they are assuming the risk for anyone who chooses to remain in this [sic] camps"; the Corps would clarify "what 'proprietary jurisdiction' is for all involved," meaning that "Morton County has jurisdiction to conduct law enforcement activities on Corps land (to include inside of the camps) when enforcing State and local laws (they do not have title 36 authority)"; and the Corps would "identify a 'free speech zone' south of the Cannon Ball River [sic] to ensure that we continue to honor 1st Amendment rights." JX-205 at 2-3.

[¶189]  On November 24, 2016, there were confrontations with DAPL Protestors at Turtle Hill. Tr. Day 2, 386:2 – 389:7 (Kirchmeier); PX-1885 (Video).   DAPL Protestors started fires and shot slingshots and threw rocks at North Dakota law enforcement on this day.  Tr. Day 3, 613:20–614:20 (Pederson).

[¶190]  On November 23, 2016, Governor Dalrymple, Senator Hoeven, and Congressman Cramer sent a request for the Corps to act on the federal easement for Lake Oahe and to provide federal resources "to protect people and property in the area of violent DAPL Protests."  PX-1314.

[¶191]  On November 24, 2016, there were also protests in Mandan that blocked the intersection of Main Avenue and Mandan Ave and 13th Avenue.  Tr. Day 3, 606:20–607:12 (Pederson); JX-265 at 68-69.  The DAPL Protestors in downtown Mandan paraded a pigs head on a stick during their protests.  JX-266 (Native) at 125; Tr. Day 3, 607:25–609:9 (Pederson).

[¶192]  The Friday after Thanksgiving, November 25, 2016, DAPL Protestors also travelled to and protested at the mall in Bismarck on this date and refused to disperse, resulting in 33 arrests.  JX-265 at 69;  Tr. Day 3, 610:3–611:13 (Pederson).   NDHP Captain Pederson identified the protestors at the mall as from the DAPL Protest camps on Corps-managed lands due to the campfire smell they emanated, their "NO-DAPL" chants, and his familiarity with individuals from the DAPL Protest camps.  *Id.*

[¶193]  On November 25, 2016, Colonel Henderson sent a separate email to Lieutenant Colonel Startzell and multiple other Corps personnel, stating that two letters had been developed for circulation: (1) a letter to 16 Tribal Chairmen notifying them the Corps was closing the Corps-managed lands north of the Cannonball River effective December 5th but that the Corps was establishing a free speech zone south of the Cannonball River on Corps land; and (2) a letter to the Morton County Sheriff's Department clarifying "law enforcement jurisdictional questions" on Corps managed federal property.  JX-211 at 1.

[¶194]  On November 25, 2016, Colonel Henderson rescinded the Nov. 1, 2016 Letter request to Morton County Sheriff Kyle Kirchmeier, stating that "[a]t this time, the Corps of Engineers is not seeking any specific assistance for the protection of government lands in the vicinity of the confluence of the Cannonball River and Missouri River with regards to the presence of Dakota Access pipeline protestors occupying such lands."  JX-210 at 1.

[¶195]  On November 25, 2016, the Corps, by and through Colonel Henderson, issued a letter to Standing Rock Sioux Tribe Chairman Archambault establishing a "Free Speech Zone" south of the Cannonball River.  JX-213 ("Free Speech Zone Letter").

[¶196]  The Free Speech Zone Letter also stated that the Corps-managed lands North of the Cannonball River would be closed to public use.  *Id.*

[¶197] This was the first time the Corps issued an order for DAPL Protestors to evacuate lands north of the Cannonball River.  Tr. Day 7, 1121:15-20 (Henderson).

[¶198] Colonel Henderson was not aware of any instance in his 23-year career with the Corps in which a "free speech zone" had been established on Corps-managed lands.  Tr. Day 7, 1121:10-14 (Henderson).

[¶199] Despite having no precedent for a "free speech zone", Colonel Henderson testified that a Special Use Permit was "a worthless piece of bureaucracy" and that a "piece of paper wasn't going to mean anything" in regards to the Free Speech Zone letter.  Tr. Day 8, 1265:10-18 (Henderson).

[¶200] There is no Corps policy, practice, or regulation that authorizes or otherwise recognizes a "free speech zone."  Tr. Day 9, 1443: 10-12 (Kruger).

[¶201] Colonel Henderson testified that his intent for the Free Speech Zone letter was not to request that North Dakota law enforcement remove the DAPL Protestors from Corps-managed lands north of the Cannonball River.  Tr. Day 7, 1131:10-14 (Henderson)

[¶202] On November 26, 2016, the day after issuing the Free Speech Zone Letter, Colonel Henderson corresponded with Faith Spotted Eagle, a recognized leader withing the DAPL Protest camps.  In that email exchange, Colonel Henderson stated that: the Corps was aware of a "more dangerous and non-Tribal" protestor element; that the Corps had "always fully supported the encampments on the south side of the [Cannonball] River that are on Corps land"; that the Corps "fully expect[ed] that most people will choose not to move from this camp on the north side of the [Cannonball R]iver"; and that the Corps was "not advocating for any law enforcement to come in to 'clear out the camps'."  PX 1317 at 1.

[¶203] Army Corps of Engineers Lieutenant General Semonite provided an assessment to Chief of Staff of the United States Army General Mark A. Milley on November 26, 2016, that DAPL

protest activity would remain at the current status quo until there was a decision on the DAPL easement.  JX 218 at 2.

[¶204]  On the same day, November 26, 2016, Morton County Commissioner Cody Schulz issues a press release stating that while Colonel Henderson's Nov. 25 Free Speech Zone Letter was "long overdue", the "decision [to close the Main Camp] means nothing unless the federal government follows up by sending federal law enforcement personnel to enforce the decision."  PX-1319 at 1.

[¶205]  Morton County Commissioner Cody Schulz also testified that the Nov. 25 Free Speech Zone Letter had no measurable impact on DAPL Protestors occupying Corps-managed lands due to the Corps or the federal government failing to request North Dakota law enforcement to remove DAPL Protestors from Corps-managed lands and otherwise failing to provide enforcement.  Tr. Day 1, 183:21–184:11 (Schulz).

[¶206]  On November 28, 2016, Governor Dalrymple issued Executive Order 2016-08 ordering the evacuation of the DAPL Protest camps, which stated that "[a]ny person who chooses to enter, renter, or stay in the evacuation does so at their own risk, and assumes any and all corresponding liabilities for their unlawful presence and occupation of the evacuation area."  JX-220 at 2.

[¶207]  On December 4, 2016, the Corps announced that it would not approve the DAPL crossing easement for the DAPL pipeline. Tr. Day 1, 118:2-5 (Schulz); PX-2027.

[¶208]  The same day, on December 4, 2016, Morton County Commissioner Cody Schulz issued a press release responding to the Department of the Army's easement decision in which Mr. Schulz expressed frustration that it took the Department of the Army so long to make that decision while the federal government had "let the citizens of Morton County, law enforcement officers, and protesters suffer for months."  PX-2027 at 1.  Mr. Schulz also stated that during the "past three months, County and State leaders have been requesting federal law enforcement resources to deal

with issues that are clearly the federal government's responsibility, but those requests have largely been ignored." *Id.*  Mr. Schulz also stated that "[g]iven that this announcement is so contrary to Judge Boasberg's decision and analysis, I fear that it sends the message that if you disagree with a law or policy, you can get your way by shooting at police, throwing explosives at them, starting fires, seizing highways and destroying private property." *Id.*

[¶209] Mr. Iron Eyes testified that DAPL Protestors on Corps-managed lands held a "victory celebration" in regards to the Dec. 4 Army Statement and that DAPL Protestors viewed the Dec. 4 Army Statement as encouraging.  Tr. Day 15, 2469:4-16 (Iron Eyes).

[¶210] Ms. LaDuke testified that she and the DAPL Protestors "were grateful" for the Dec. 4 Army Statement.  Tr. Day 16, 2537:16 – 2539:8 (LaDuke).

[¶211] On December 4, 2016, the population of the DAPL Protest camps swelled to its peak due to approximately 3,000 veterans joining the DAPL Protest camps.  Tr. Day 15, 2469:17-23 (Iron Eyes).

[¶212] On December 9, 2016, a DAPL Protestor rammed a car into the law enforcement barricade at the Backwater Bridge.  Tr. Day 2, 325:19 – 328:1 (Johnson); PX-2025 (Video).

[¶213] There was continued disruptive, violent, and unlawful activities conducted by the DAPL Protesters in December, January, and February 2017, including: DAPL Protestors attempting to circumvent the barrier on the Backwater Bridge multiple times throughout December and January, 2016, including tampering with law enforcement lights and security cameras on the Backwater Bridge and setting fires on the Backwater Bridge on January 18, 2017; DAPL Protestors trespassing on Turtle Hill on December 19, 27, and 31, 2016, January 9, 16,  2016, and lighting fires on December 31, 2016; DAPL Protestors. JX-265 at 71-88.  Many of these events resulted in arrests of DAPL Protestors.  *Id.*

[¶214] In February of 2017, a large group of 40 DAPL Protestors trespassed onto private land owned by Dakota Access on the west side of Highway 1806 directly west of the Main Camp, using a pay loader to clear snow and erecting teepees.  JX-265 at 80-81.  This DAPL Protest camp would come to be known as the Last Child Camp.  Tr. Day 15, 2475:23–2476:2 (Iron Eyes).

[¶215] North Dakota law enforcement attempted to reason with the DAPL Protestors, including Mr. Iron Eyes who was leading the protest group, to have them peacefully leave the private land, but were unsuccessful.  Tr. Day 15, 2476:7–2483:13 (Iron Eyes); JX-265 at 80-81; PX-1903 through PX-1908.

[¶216] Mr. Iron Eyes testified that he "wouldn't characterize" his interactions with North Dakota law enforcement that day as being aggressive or abusive.  Tr. Day 15, 2483:23–2484:10 (Iron Eyes).

## X.    Final Closure and Clearing of the DAPL Protest Camps.

[¶217] The Corps-managed lands received significant snowfall toward the end of November into December 2016 and January 2017.  Tr. Day 1, 123:7-12 (Schulz); Tr. Day 3, 454:22-24 (Kirchmeier); Tr. Day 2, 224:24-225:6 (Gallagher); PX-2041 at 149-156.  In February 2017, temperatures began to warm, resulting in increased melt of the snow present on the ground. Tr. Day 2, 226:13–227:14 (Gallagher); PX-2041 at 155-156; Tr. Day 3, 527:24–528:5 (Laney). The Corps-managed lands are located on a floodplain. Tr. Day 12, 1977:6-8 (Spellmon); Tr. Day 16, 2542:6-9 (LaDuke).

[¶218] On February 3, 2017, Colonel Henderson sent a letter to the Standing Rock Sioux Tribe stating that the Corps-managed lands remained closed and gave DAPL Protestors until February 22, 2017 to retrieve any personal items from the land. JX-247.

[¶219]  On February 15, 2017, Governor Burgum issued an Executive Order to evacuate the Corps-managed lands due to the life safety and environmental issues presented by warming weather.  Tr. Day 6, 875:13 – 877:7 (Burgum): JX-252 at 2.  Protestors still remaining on the Corps-managed lands were ordered to leave by February 22, 2017 at 2:00 P.M.  JX-252 at 2.

[¶220]  On February 23, 2017, the DAPL Protestors remaining in the encampment on the Corps-managed lands were removed primarily by North Dakota law enforcement (including Mutual Aid and EMAC law enforcement), and State Highway Patrol.  Tr. Day 1, 125:8-25 (Schulz).  The North Dakota National Guard also provided logistical support to clearing the DAPL Protests camps.  *Id.* In advance of this effort, Adjutant General Dohrmann requested assistance from federal entities. Tr. Day 6, 970:3 – 7, 971:6 – 13 (Dohrmann); PX-1388.  Adjutant General Dohrmann did not receive federal law enforcement resources for clearing the Main Camp north of the Cannonball River.  Tr. Day 6, 971:6-18 (Dohrmann).

[¶221]  In clearing the DAPL Protests camps on Corps-managed lands, North Dakota law enforcement formed a long line of law enforcement officers on foot and on ATVs to move through the camps.  Tr. Day 3, 619:4–620:10 (Pederson).  Law enforcement had to check and clear each building and structure in the DAPL Protest camps on Corps-managed lands to ensure DAPL Protestors were not hiding in those structures.  *Id.*

[¶222]  Trash and debris removal from the Corps-managed lands totaled approximately 5,000 tons, with Morton County's contractors' portion approximately 3,400 tons. In addition to the gross tonnage of trash and debris, there were also approximately 46 "apparatuses," including cars, snowblowers, pieces of equipment and other large objects that had to be either towed or moved. Tr. Day 1, 138:1-15 (Schulz); PX-1946, PX-1951, PX-1940, PX-1983, PX-1985, PX-1990, PX-1991, PX-1996, PX-1997, PX-1999, PX-2001.

[¶223] During the clearing of the DAPL Protest camps, DAPL Protestors set fires to many structures, and some DAPL Protestors had to be forcibly evicted.  Tr. Day 1, 128:13 – 129:3 (Schulz); Tr. Day 3, 414:23–415:4 (Kirchmeier); Tr. Day 3, 529:16–530:1 (Laney).

[¶224] During the clearing of the DAPL Protest camps on Corps-managed lands, North Dakota used bulldozer and excavators to tear down structures that had been constructed on Corps-managed lands so that the trash removal process could being.  Tr. Day 3, 413:24–414:24 (Kirchmeier).

[¶225] When Morton County and North Dakota law enforcement surveyed the cleared DAPL Protest camps on Corps-managed lands, they observed significant amounts of garbage and human waste and a spoiled environment.  Tr. Day 3, 617:18–618:8 (Pederson).

[¶226] Morton County then began the process of cleaning up the camps, which ultimately resulted in removing approximately 10 million pounds of trash and debris from the DAPL Protest camps. Tr. Day 1, 137:1-18 (Schulz) ; PX-1942 to PX-1951, PX-1953-1991.  Morton County contracted for the trash removal, which cost approximately $430,000 and was completed by February 27, 2017.  Tr. Day 1, 137:1-25.

[¶227] During the cleanup of the DAPL Protest camps on Corps-managed lands, several hundred to over a thousand propane canisters were present. Tr. Day 6, 869:16-20 (Burgum); Tr. Day 12, 1976:9-22 (Spellmon). Human waste from the DAPL Protestors had not been properly disposed of and had been pooled in waste "lagoons" left on Corps-managed lands.  Tr. Day 7, 1096:25 – 1098:2 (Henderson).  Vehicles were abandoned at the Main Camp on Corps-managed lands. Tr. Day 12, 1977:2-3 (Spellmon).

[¶228] Once the DAPL Protest camps were cleared, NDHP maintained traffic control points and only allowed access to Highway 1806 via monitored pilot cars to ensure the DAPL Protest camps on Corps-managed lands would not be repopulated.  Tr. Day 3, 620:23–621:20 (Pederson).

[¶229] After the DAPL Protest camps were cleared, the North Dakota Department of Transportation was then able to safely conduct a structural analysis of the Backwater Bridge after the closure of the DAPL Protest camps in order to determine if there was any permanent damage. Ketterling Depo. 8:7–11-5 (ECF No. 405-6); Tr. Day 3, 415:5-11 (Kirchmeier).

## XI.    Summary of the DAPL Protests.

### A.  Records of the DAPL Protests.

[¶230] The State of North Dakota, through the Department of Emergency Services, kept records of vehicle counts during the DAPL Protests, which vehicle counts were compiled using aerial imagery of the DAPL Protest camps.  Tr. Day 2, 307:3–315:9 (Johnson); JX-164; JX-181.  These resulted in estimates of the DAPL Protest camp populations from October 14, 2016 through February of 2017, with a high estimate of 6,000 persons in the DAPL Protest camps around December 4, 2016.  JX-164 at Chart 2.

[¶231] Those DAPL Protest population estimates were also provided to Corps' officials.  Tr. Day 2, 314:4–315:1 (Johnson)

[¶232] Other DAPL Protest camp populations ranged from 1,500 to 10,000 people throughout the DAPL Protests.  JX-13 at 13; JX-213 at ps. 2, 6, 10 and 29; *see also* JX-9.

[¶233] During the DAPL Protests, the North Dakota Department of Emergency Services compiled a daily summary of events that was eventually incorporated into North Dakota's "After Action Review" ("AAR") of the DAPL Protests.  Tr. Day 2, 324:14–325:18 (Johnson); JX-265 at 46-88; Tr. Day 6. 991:21–992:3 (Dohrmann).

[¶234] During the DAPL Protests, the Morton County Sheriff's Office created and produced "Know the Truth" videos in order to combat misinformation about North Dakota law

enforcement's handling of the DAPL Protests spreading on social media.  Tr. Day 3, 416:4–417:2 (Kirchmeier).

[¶235]  Despite the almost eight-month long DAPL Protests, and frequently unsafe and challenging conditions and unlawful conduct, there were zero deaths during the DAPL Protests.  Tr. Day 2, 329:6–330:6 (Johnson); JX-14 at 39.

[¶236]  Ultimately, arrest records in North Dakota showed that of the total of 761 arrests made during the DAPL Protests, only 51 individuals (6.7%) were from North Dakota, with the remaining arrests of individuals from 47 states and four other countries.  JX-268 at 2.

### B.  The Corps' Lack of Enforcement and Support During the DAPL Protests.

[¶237]  Corps Park Rangers have the authority to issue written citations for violations of Title 36 C.F.R. Part 327, including requirements for a mandatory court appearance, for violations occurring on Corps-managed lands.   Tr. Day 9, 1461: 5-23 (Kruger).

[¶238]  Not a single citation was issued to a DAPL Protestor by any Corps official or Park Ranger during the entirety of the DAPL Protests.  Semonite Depo. 92:9-93:6 (ECF No. 405-7); Tr. Day 7, 1179:4– 6 (Henderson).

[¶239]  During the DAPL Protests, neither Colonel Henderson nor the Corps requested that North Dakota state or local law enforcement remove the DAPL Protestors from Corps-managed lands north of the Cannonball River where the Main Camp was located.   Tr. Day 7, 1085:2-12 (Henderson) JT-210; Tr. Day 12, 1952:5 – 1954:10 (Spellmon).

[¶240]  North Dakota law enforcement would not remove trespassers from private land without a request from the landowner to do so.  Tr. Day 3, 522:15–523:20 (Laney); Tr. Day 1, 183:21–185:7 (Schulz) Tr. Day 6, 1002:15-18 (Dohrmann).

[¶241] During the DAPL Protests, the Corps never contacted Morton County Sheriff Kyle Kirchmeier or informed him that the DAPL Protestors were trespassing on Corps-managed lands and they were requesting North Dakota law enforcement to remove the DAPL Protestors from Corps-managed lands, with the exception of a Nov. 1, 2016 Letter from Colonel Henderson to Sheriff Kirchmeier requesting that North Dakota law enforcement remove DAPL Protestors attempting to cross the Turtle Hill area northeast of where the DAPL Protest camps were located, which request North Dakota provided law enforcement support for.  Tr. Day 2, 370:1-9, 386:2–388:1 (Kirchmeier); JX-174.  That Nov. 1, 2016 Letter was later rescinded by Colonel Henderson on November 25, 2016.  *See* FoF 194, *supra*.

[¶242]  During the DAPL Protests, Morton County law enforcement did receive, and respond to, a 911 call to aid a group of reporters that was in the DAPL Protest Main Camp that were not being allowed to leave the camp.  Tr. Day 3, 408:3-16 (Kirchmeier).  This event did not require Morton County law enforcement to enter the Main Camp, but only to respond to the entrance of the Main Camp.

[¶243] Prior to the DAPL Protests, the Corps had contacted Morton County Sheriff Kyle Kirchmeier to remove persons from Corps-managed lands that were not authorized to be there, including a group of Canadians camping on Corps-managed lands around the time period of 2014. Tr. Day 1, 92:10-20 (Schulz); *Id.* at 149:18–151:3.

[¶244] During the DAPL Protests, North Dakota law enforcement provided law enforcement support to secure Corps offices in Bismarck when there were DAPL-related protests taking place in front of those offices, after the Corps requested assistance. Tr. Day 3, 591:5-18 (Pederson).

[¶245] Morton County Sheriff Kyle Kirchmeier testified that he made numerous requests to the federal government for law enforcement support, which he never received.  Tr. Day 2, 379:18–

380:1 (Kirchmeier).   These requests included: a telephone call with U.S. Attorney General Loretta Lynch where Morton County Sheriff Kyle Kirchmeier requested federal law enforcement support, to which he received no response (Tr. Day 2, 384:21–386:1 (Kirchmeier)); a request to President Obama on December 9, 2016, for federal assistance, including financial assistance and manpower (Tr. Day 2, 393:14-22 (Kirchmeier); PX-1332); a request to President-elect Trump on December 21, 2016 (Tr. Day 2, 396:1-12 (Kirchmeier); JX-231); and a letter request to U.S. Attorney General Lynch, U.S. Secretary of Interior Jewell, and U.S. Secretary of Homeland Security Johnson (Tr. Day 2, 396:13 – 398:6 (Kirchmeier); PX-1349).  Morton County Sheriff Kyle Kirchmeier received no response to any of these requests.  Tr. Day 2, 398:7-14 (Kirchmeier).

[¶246] NDHP Captain Eric Pederson made multiple requests to the Corps, through John Voeller, for the Corps to enforce their own rules and disperse the DAPL Protestors, which requests were never answered.  Tr. Day 3, 562:10-16 (Pederson).

[¶247] Morton County Sheriff Kyle Kirchmeier testified he never received the resources he requested from the U.S. Department of Justice or the U.S. Department of Interior.  Tr. Day 2, 364:10-13 (Kirchmeier).

[¶248] North Dakota Governor Dalrymple testified that he asked U.S. Secretary of Interior Sally Jewell and U.S. Attorney General Loretta Lynch for supportive resources: including federal law enforcement manpower to assist with the DAPL Protests and financial resources, but that both declined to provide resources for the reason that none where at their disposal.  Tr. Day 5, 764:16–786:4 (Dalrymple).

[¶249] North Dakota Governor Doug Burgum testified that he spoke with U.S. Secretary of Interior Sally Jewell as his first call to a federal cabinet official, in which Secretary Jewell incorrectly told Governor Burgum that North Dakota had caused the problem by "voting" to move

the pipeline on top of the Standing Rock Sioux Tribe, and in which Secretary Jewell was unaware that the DAPL crossed the Missouri River in more than one location. Tr. Day 6, 863:20–866:23 (Burgum). During the call, Governor Burgum also requested federal law enforcement support, which Secretary Jewell denied. Tr. Day 6, 865:24–866:5 (Burgum).

[¶250] The federal government never provided law enforcement support or federal funds to Morton County during the duration of the DAPL Protests. Tr. Day 1, 142:21–143:1 (Schulz).

[¶251] During the entirety of the DAPL Protests, no DOI or BIA officials ever removed, took actions to remove, or even considered taking actions to remove DAPL protestors from Corps-managed lands for being on Corps-manages lands without a Special Use Permit or written permission. O'Neal Depo. 69:9-15 (ECF No. 405-11).

[¶252] The Corps never made any requests to DOI, or the BIA: to take action in response to DAPL Protestors occupying Corps-managed lands without written permission or a Special Use Permit (O'Neal Depo. 69:9-15; 70:25-71:14 (ECF No. 405-11)); to protect Corps lands from environmental degradation (*Id.* at 71:15-21); to prevent the use of Corps-managed lands as a base camp and staging area from which to conduct illegal or dangerous activities off of Corps-managed lands (*id.* at 72:10-16); or, to take action to clear Corps-managed lands in the first quarter of 2017 when the DAPL Protestors were finally evicted from Corps-managed lands (*Id.* at 71:22 – 72:9).

[¶253] Darren Cruzan testified that it was "very common that [BIA] would enter into cross-deputization agreements with county law enforcement partners" to allow BIA and local law enforcement to performance law enforcement functions on BIA lands when encountering non-Indian citizens. Tr. Day 16, 2687:23 – 2688:20 (Cruzan). Mr. Cruzan testified that cross-deputization was a "fairly routine practice" throughout the United States, but that this did not occur in North Dakota during the DAPL Protests. Tr. Day 16, 2690:20 – 2691:1 (Cruzan).

[¶254] The United States Marshal Service has a Special Operations Group (the "SOG") which is a SWAT-team style law enforcement response force. Ward Depo. 129:18–130:7 (ECF No. 429-1); PX-1443; Orr Depo. 62:04–63:02, 63:15-65:06 (ECF No. 405-12).  The SOG is a "specially trained and equipped tactical unit deployed in high-risk and sensitive law enforcement situations, national emergencies, civil disorder and natural disasters." PX-1443.  The members of the SOG are specially trained and are the agency's "primary response force for any critical incident nationally." *Id*.  The SOG was not deployed by the United States to control DAPL Protestors on the Corps-managed lands at any time during the DAPL Protests despite being requested by Colonel Henderson. Orr Depo. 37:24–38:14 (ECF No. 405-12); Ward Depo. 122:12–127:18 (ECF No. 429-1); PX-1310; *see also* Tr. Day 7, 1139:15–1140:7 (Henderson).

[¶255] When U.S. Marshal Paul Ward requested from U.S. Marshal's headquarters that he be allowed to provide deputy Marshals to North Dakota, those requests were repeatedly denied.  Ward Depo. 31:9–32:17 (ECF No. 429-1)

[¶256] U.S. Marshal Paul Ward stated that the felt the federal governments law enforcement response to the DAPL Protests was "nonexistent" and that the federal government did not provide the law enforcement assistance requested by North Dakota.  Ward Depo. 51:8-22; 35:9-13 (ECF No. 429-1).

[¶257] At one of the last meetings with the North Dakota Unified Command that U.S. Marshall Paul Ward attended, he apologized for the lack of federal response from federal law enforcement and federal agencies.  Tr. Day 2, 303:19–304:14 (Johnson).

**C.  Impacts of the DAPL Protests on North Dakota Citizens and Law Enforcement.**

[¶258] During the DAPL Protests, the citizens of North Dakota were impacted through frequent acts of trespass and vandalism, traffic stoppages, being run off public roads, stolen property, and harassment.  Tr. Day 3, 409:10–410:15 (Kirchmeier); Tr. Day 3, 606:2-21 (Pederson).

[¶259] During the duration of the DAPL Protests, multiple North Dakota public official and law enforcement personnel were personally doxed and threatened with violence.  Tr. Day 1, 78:15 – 79:14 (Schulz); Tr. Day 3, 410:16–411:10 (Kirchmeier); Tr. Day 3, 524:19–526:5 (Laney); JX-266 at 92-94; Tr. Day 4, 708:20-710:20 (Gerhart); Tr. Day 6, 857:19-858:9 (Burgum).

[¶260] Due to constant personal threats, Morton County Sheriff Kyle Kirchmeier allowed law enforcement officers to cover and/or remove their name badges.  Tr. Day 3, 410:16–411:10 (Kirchmeier).

[¶261] NDHP Pilot and Trooper Dennis Gallagher personally had DAPL Protestors tail his car from the NDHP airfield in Bismarck after returning from flying over the DAPL Protests, which resulted in him buying a second vehicle to avoid being followed.  Tr. Day 1, 198:22–199:22 (Gallagher).  Trooper Gallagher also had issues with DAPL Protestors flying aerial drones too close to the NDHP plane he was piloting, as well as DAPL Protestors shining LASERS at his plane, both of which posed threats to his life and safety.  *Id.* at 198:22–201:8.  At times, Trooper Gallagher feared enough for his safety to line the floor of the NDHP Plane with ballistic body armor equipment.  *Id.* at 200:22–201:8.

[¶262] Morton County Sheriff Kyle Kirchmeier had deputies assigned to his family due to regular threats.  Tr. Day 3, 524:22–525:2 (Laney).

[¶263] Cass County Sheriff Paul Laney had the addresses of his home in west Fargo and his lake house in Minnesota posted online with a picture of a bullet. Tr. Day 3, 525:10-14 (Laney).

[¶264] Due to Trooper Gallaghers' issues with drones from the DAPL Protest camps flying too close to his plane, North Dakota sought and obtained a temporary flight restriction ("TFR") from the Federal Aviation Administration ("FAA") which restricted drone flights to below 400 feet.  Tr. Day 2, 316:21–318:11 (Johnson).  The DAPL Protestors did not comply with this TFR.  *Id.*

[¶265] Cass County Sheriff Paul Laney missed the death of his mother because he felt obligated to stay at the DAPL Protests in February of 2017 to clear out the DAPL Protest camps.  Tr. Day 3, 552:13 – 553:11 (Laney).

### D. The Corps Ability to End the DAPL Protests and North Dakota Law Enforcement's Willingness to Aid in Ending the DAPL Protests.

[¶266] Cass County Sheriff Paul Laney testified that having access to a physical space on Corps-managed lands, a "base of operations" or a "safe haven" allowed the DAPL Protests to grow.  Tr. Day 3, 551:12–552:4 (Laney).

[¶267] NDHP Captain Pederson testified that the DAPL Protest camps on Corps-managed lands provided a safe haven for DAPL Protestors from which they could conduct unlawful activities. Tr. Day 3, 588:3–589:10 (Pederson).

[¶268] As an expert in the field of law enforcement, including law enforcement tactics, crowd control and the use of force, Cass County Sheriff Paul Laney was of the opinion that the DAPL Protests could have been stopped in the first couple weeks if the Corps had followed their own rules and requested Sheriff Kirchmeier to evict the DAPL Protestors.  Tr. Day 3, 526:14–527:7 (Laney).

[¶269] NDHP Colonel Gerhart believed the DAPL Protestors could have been removed by the NDHP and Morton County as of mid-August of 2016.  Tr. Day 4, 673:6-14, 717:19-23 (Gerhart).

[¶270] Morton County Sheriff Kyle Kirchmeier believed that the DAPL Protests would not have gotten as big as they did if Morton County had received federal assistance.  Tr. Day 3, 418:18–

419:5 (Kirchmeier).  Sheriff Kirchmeier also testified that, had the Corps requested, he would have responded to illegal activity on Corps-managed lands (*i.e.* trespassing). Tr. Day 3, 472:19-24 (Kirchmeier).

[¶271] Both Governors Dalrymple and Burgum felt that North Dakota law enforcement could have removed the DAPL Protestors from the Corps-managed lands in mid-August had the Corps requested them to do so.  Tr. Day 5, 772:15–773:3 (Dalrymple); Tr. Day 6, 902:10-25 (Burgum). Instead of asking North Dakota law enforcement to remove the DAPL Protestors, the Corps allowed, in the words of Governor Burgum, "an armed occupation camp on federal land."  Tr. Day 7, 859:25–860:5 (Burgum).

[¶272]  Scott Davis, the Director of the North Dakota Indian Affairs Commission, testified that the DAPL Protest camps "could have been nipped in the bud very quickly within the first two or three days" if the Corps had exercised policing authority at the beginning of the DAPL Protests, but that the Corps "failed to do that" and that "the enormous [DAPL Protest] camp would not have grown or been established."  Davis Depo., 231:11 –233:5 (ECF No. 404-2)

[¶273] Morton County Commissioner Cody Schulz believed that the DAPL Protestors having been allowed to have a sanctioned location (safe haven) on Corps-managed lands created problems during the DAPL Protests and contributed to the DAPL Protests duration and intensity, and that he wished would not have existed.  Tr. Day 1, 146:10-17 (Schulz).

[¶274]  Morton County Commissioner Cody Schulz was "very disappointed in the Corps' response to the" DAPL Protests. Tr. Day 1, 148:20–149:2 (Schulz).

[¶275] As an expert in the field of law enforcement, including law enforcement tactics, crowd control and the use of force, Cass County Sheriff Paul Laney felt that North Dakota's law

enforcement response to the DAPL Protests was reasonable and consistent with standards in law enforcement.  Tr. Day 3, 525:15–526:5 (Laney).

### E.  North Dakota's Emergency Response Costs Attributable to the DAPL Protests.

[¶276] NDHP Captain Pederson testified, based on his direct involvement in planning for and requesting the resources and manpower utilized in the State of North Dakota's emergency response to the DAPL Protests, that the resources and manpower used in the emergency response were necessary.  Tr. Day 3, 622:1-3 (Pederson).

[¶277] During the DAPL Protests, North Dakota allocated expenditures to several different categories of intrastate and interstate aid, including Mutual Aid, State Agencies Assistance, Emergency Management Compact Assistance ("EMAC"), and internal North Dakota Department of Emergencies Services and National Guard Equipment.  The North Dakota Department of Emergency Services was in charge of tracking and verifying all of these expenses.  Tr. Day 6, 948:11-23 (Dohrmann).

[¶278] Mutual Aid relates to political subdivisions within North Dakota providing aid to each other. Tr. Day 6, 925:24-4 (Dohrmann).  Mutual Aid is provided through bilateral agreements between counties and is also facilitated by the North Dakota Department of Emergency Services. Tr. Day 6, 926:5-12 (Dohrmann).

[¶279] State Agencies Assistance is assistance provided by North Dakota State Agencies to political subdivisions, such as the NDHP aiding Morton County.  Tr. Day 6, 926:24–927:17 (Dohrmann).

[¶280] The North Dakota Department of Emergency Services would track expenses provided under State Agencies Assistance and Mutual Aid during emergency situations and would review expenses for accuracy and validity.  Tr. Day 6, 926:24–928:11 (Dohrmann).

[¶281] The EMAC was initially active in October of 2016 and continued into November and December of 2016.  Tr. Day 6, 944:23–946:21 (Dohrmann).   The North Dakota Department of Emergency Services would draft EMAC requests and approve and track expenses for EMAC Requests.  Tr. Day 6, 945:14–948:12 (Dohrmann).

[¶282] When making an Emergency Management Assistance Compact ("EMAC") request, the state requesting aid is required to cover all costs from responding law enforcement officers, including wages, vehicle depreciation, and transportation.  Tr. Day 3, 594:16-23 (Pederson).

[¶283] In creating plans for managing the DAPL Protestors, North Dakota's Incident Command determined that it needed additional manpower and resources. Tr. Day 3, 593:18–594:15 (Pederson).

[¶284] Unified Command was always looking for way to ensure its spending on its emergency response was as efficient as possible in attempt to be a good steward of the State of North Dakota's public funds.  Tr. Day 3, 616:21–617:11 (Pederson).

[¶285] When the protests against the DAPL began to intensify in August 2016, North Dakota did not have the law enforcement resources necessary to address the developing situation in Morton County. Tr. Day 2, 349:8-18 (Kirchmeier); Tr. Day 3, 471:11-14 (Kirchmeier); Tr. Day 1,  73:25–74:10 (Schulz); Tr. Day 4, 570:13-15 (Pederson); Tr. Day 4, 674:21-675:11 (Gerhart); JX-53; JX-54.

[¶286] Morton County Sheriff Kyle Kirchmeier had only 32 sworn deputies and an area of 1,945 square miles of land for which he was responsible. Tr. Day 2, 339:8–18 (Kirchmeier).

[¶287] Initially, the Morton County Sherriff's Office requested law enforcement assistance from other North Dakota law enforcement resources, such as Cass County (via the Cass County Sheriff's Office) and the NDHP.  Tr. Day 2, 346:6-11; 349:8–18 (Kirchmeier).  When Cass County Sheriff

Paul Laney received a call from Sheriff Kirchmeier in mid-August 2016 requesting assistance, he immediately contacted his command staff who began preparing to mobilize to Morton County to assist.  Tr. Day 3, 447:22–481:16 (Laney).

[¶288] The following North Dakota counties provided law enforcement assistance to the DAPL Protest response: Barnes, Benson, Billings, Bottineau, Bowman, Burke, Burleigh, Cass, Cavalier, Dickey, Divide, Dunn, Eddy, Emmons, Foster, Golden Valley, Grand Forks, Grant, Kidder, LaMoure, Logan, McHenry, McIntosh, McKenzie, McLean, Mercer, Mountrail, Oliver, Pembina, Pierce, Richland, Rolette, Stark, Stutsman, Traill, Walsh, Ward, Wells, and Williams. JX-267 at 64.

[¶289] Further, the following North Dakota cities provided law enforcement assistance to the DAPL Protest response: Beulah, Bismarck, Cando, Carrington, Devils Lake, Dickinson, East Grand Forks, Ellendale, Fargo, Grafton, Grand Forks, Hazen, Jamestown, Kenmare, Killdeer, Kulm, Mandan, Minot, Rolla, Steele, Underwood, Wahpeton, Watford, West Fargo, Williston, Wishek, and Valley City. JX-267 at 64. Fire departments from Bismarck, Mandan, and Williston also responded with assistance. *Id.*

[¶290] North Dakota state agencies also provided law enforcement assistance to the DAPL Protest response, including the: NDHP, North Dakota State University Police Department, University of North Dakota Police Department, North Dakota Game and Fish Department, North Dakota Parks & Recreation, and North Dakota Corrections and Rehabilitation.  *Id.*

[¶291] As the DAPL Protests continued to grow in August and September 2016, North Dakota's law enforcement resources were not sufficient to protect the safety of the citizens of North Dakota, their property, or ensure that public order could be maintained. *See* Tr. Day 1, 94:18–95:21, 97:13–

98:2 (Schulz); Tr. Day 2, 340:11–25 (Kirchmeier); Tr. Day 3, 523:21–524:11 (Laney); 558:3–559:19, 570:5-15, 579:8-19 (Pederson).

[¶292] NDHP had to expend resources to equip troopers with protective gear to ensure their safety during DAPL Protests, as well as purchase less-than-lethal munitions.  Tr. Day 4, 676:1 –677:14 (Gerhart).

[¶293] Two of the NDHP's greatest expenses were the salary dollars associated with trooper response and overtime, and the hours incurred on the NDHP plane piloted by Trooper Gallagher. Tr. Day 4, 675:11-18 (Gerhart).

[¶294] The North Dakota Department of Emergency Services tracked all expenses and costs attributable to the DAPL Protests, and kept a master spreadsheet documenting those costs.  PX-1455.  That spreadsheet was admitted into evidence as fairly summarizing voluminous trial material under *Vogt v. State Farm Life Ins. Co.* 963 F.3d 753 (8th Cir. 2020).  Tr. Day 10, 1690:11-25 (Gaugler).

[¶295] For costs and expenses attributable to the DAPL Protests incurred by Morton County, they were reviewed by an elected County auditor and three temporary administrative and finance individuals before being submitted to the North Dakota Department of Emergency Services.  Tr. Day 1, 144:16–145:20 (Schulz).  Holly Gaugler, the Chief Financial Officer for the North Dakota National Guard and Department of Emergency Services primarily tracked North Dakota's emergency response costs to the DAPL Protests.  Tr. Day 6, 951:15–952:3 (Dohrmann).

[¶296] North Dakota invoked the multi-state Emergency Mutual Aid Compact ("EMAC") to seek law enforcement assistance from other States. Tr. Day 5, 779:2–25 (Dalrymple).  The EMAC allows North Dakota to request voluntary law enforcement assistance from counter-signatory states. *See generally* JX-26; *see also* Tr. Day 4, 592:9–21 (Pederson); Tr. Day 5, at 780:1–11

(Dalrymple).  The State requesting mutual aid via the EMAC is responsible for the salary (including overtime pay) of law enforcement personnel responding to the request.  JX-26 at 2.  For any personnel responding to the EMAC request, North Dakota was also responsible for providing their housing, travel costs, and a per diem for food.  *Id.*

[¶297] The costs and expenses associated with out-of-state law enforcement assistance under EMAC were tracked by the North Dakota Department of Emergency Services in a spreadsheet that was maintained in the normal course of business. *See generally* PX-1455; Tr. Day 10, 1665:25–1666:10, 1673:5-13 (Gaugler).  The EMAC expenses in PX-1455 matched up to actual physical EMAC vouchers kept by the North Dakota Department of Emergency Services at the Fraine Barracks that were examined by both the State of North Dakota and the United States expert accounting witnesses.  *See* PX-1429; Tr. Day 10, 1670:22 – 1673:20 (Gaugler); Tr. Day 10, 1720:11–1721:12 (Tolstad).

[¶298]  Pursuant to the EMAC, North Dakota paid $19,963.28 to the State of Alabama for its costs incurred responding to the DAPL Protests. PX-1455 at cells K7156, K7166.

[¶299]  Pursuant to the EMAC, North Dakota paid $1,189,403.45 to the State of Indiana for its costs incurred responding to the DAPL Protests.  *Id.* at cells K7160-61, K7163.

[¶300]  Pursuant to the EMAC, North Dakota paid $6,165.65 to the State of Kentucky for its costs incurred responding to the DAPL Protests.  *Id.* at cells K7155-56.

[¶301]  Pursuant to the EMAC, North Dakota paid $247,273.06 to the State of Minnesota for its costs incurred responding to the DAPL Protests.  *Id.* at cell K7127.

[¶302]  Pursuant to the EMAC, North Dakota paid $128,456.05 to the State of Montana for its costs incurred responding to the DAPL Protests.  *Id.* at cell K7135.

[¶303] Pursuant to the EMAC, North Dakota paid $307,273.10 to the State of Nebraska for its costs incurred responding to the DAPL Protests.  *Id.* at cell K7152-54, K7159.

[¶304] Pursuant to the EMAC, North Dakota paid $574,527.13 to the State of Ohio for its costs incurred responding to the DAPL Protests.  *Id.* at cell K7134.

[¶305] Pursuant to the EMAC, North Dakota paid $616,475.70 to the State of South Dakota for its costs incurred responding to the DAPL Protests.  *Id.* at cells K7123-24, K7126, K7129-31, K7133, K7145-47, K7151, K7157.

[¶306] Pursuant to the EMAC, North Dakota paid $138,451.42 to the State of Wisconsin for its costs incurred responding to the DAPL Protests.  *Id.* at cell K7125, K7128.

[¶307] In total, North Dakota paid $4,045,088.39 to fellow States for the law enforcement assistance provided to North Dakota by other states pursuant to the EMAC relating to North Dakota's emergency response to the DAPL Protests.  PX-1439 at cell D8.

[¶308] North Dakota incurred $6,422,757.05 in payroll expenses attributable to North Dakota law enforcement officers and Department of Emergency Services employees for North Dakota's emergency response to the DAPL Protests. PX-1439 at cell D5; PX-1455 at cells 2-245.

[¶309] North Dakota also incurred $2,799,478.47 in travel expenses attributable to North Dakota law enforcement officers and Department of Emergency Services employees for North Dakota's emergency response to the DAPL Protests. PX-1439 at cell D6; PX-1455 at cells 246-6523.

[¶310] North Dakota incurred $3,201,650.75 in equipment, supplies, and materials expenses related attributable to the Department of Emergency Services and the North Dakota National Guard for North Dakota's emergency response to the DAPL Protests. PX-1439 at cell D7; PX-1455, cells 6524–7122.

[¶311]  North Dakota incurred $12,385,795.98 in North Dakota Mutual Aid expenses attributable to political subdivision aiding Morton County for North Dakota's emergency response to the DAPL Protests. PX-1439 at cell D9; PX-1455, cells 7123–7166.

[¶312]  North Dakota incurred $8,348,350.31 in North Dakota State Agencies Assistance expenses related to its emergency response to the DAPL Protests. PX-1439, cell D10; PX-1455, cells 7474–7570.

### F.  North Dakota's Loans Necessary to Fund the Emergency Response to the DAPL Protests.

[¶313]  North Dakota is unique in that state agencies are funded by the legislature as a part of a two-year biennial period.  Tr. Day 9, 1575:1-20 (Morrissette).

[¶314]  Emergency budgetary needs outside of the two-year biennial funding can be funded in one of two ways: (1) through an emergency commission process where a group of four legislators, the Secretary of State, and the Governor can approve emergency funding; or (2) obtaining approval from the emergency commission for a loan from the Bank of North Dakota.  Tr. Day 9, 1576:5 – 1577:15 (Morrissette).

[¶315]  In order to pay for the extraordinary costs of the DAPL Protest response, the North Dakota Department of Emergency Services obtained funding through a loan from the Bank of North Dakota after obtaining authorization from the emergency commission initially, and later the North Dakota legislature to do so.  Tr. Day 9, 1592:1-12 (Morrissette); Tr. Day 6, 920:17–921:17 (Dohrmann).

[¶316]  Adjutant General Dohrmann of the North Dakota National Guard and North Dakota Department of Emergency Services signed for the loans necessary to fund North Dakota's emergency response, along with Holly Gaugler and Greg Wilz.  Tr. Day 6, 950:4-8 (Dohrmann); Tr. Day 10, 1647:11 -1652:13 (Gaugler); PX-1209; PX-1208.

[¶317]  In total, seven loans totaling $43,000,000 were taken out by the North Dakota Department of Emergency Services from the Bank of North Dakota. Tr. Day 6, 950:9-11 (Dohrmann); Tr. Day 10, 1651:18–1652:1 (Gaugler). However, North Dakota did not utilize all of this credit. *Id*. at 1652:2-7.

[¶318]  Per North Dakota state law, these loans were required to be obtained from the Bank of North Dakota. Tr. Day 9, 1573:3-13 (Morrissette).

[¶319]  When the Bank of North Dakota loans money to state agencies, that money is guaranteed by the full faith and credit of the State of North Dakota, and not the Federal Deposit Insurance Corporation.  Tr. Day 9, 1594:24–1595:5 (Morrissette).

[¶320]  When loans made by the Bank of North Dakota are paid off by the legislature, including interest, that revenue must be reduced by Bank of North Dakota operating expenses, salaries of bank employees, and other overhead.  Tr. Day 9, 1593:22–1594:20 (Morrissette).

[¶321]  Revenue from loans made by the Bank of North Dakota to state agencies can either be allocated to North Dakota's state budget or allowed to remain as capital in the bank to be used for additional loan activity.  Tr. Day 9, 1595:6-22 (Morrissette).

[¶322]  The interest rates charged on these loans by the Bank of North Dakota were reasonable and comparable to similar loans made by the Bank of North Dakota to other state agencies. Tr. Day 10, 1750:25 – 1751:4 (Tolstad); PX-2034 at 15.

[¶323]  As of May 4, 2018, interest on these loans totaled $651,746.35. PX-1439 at cell D12.

[¶324]  North Dakota received a fifteen million dollar ($15,000,000) gift from Dakota Access in October 2017. Tr. Day 9, 1618:9-24 (Futch).  There were no conditions placed upon this gift, which Dakota Access considered "no strings attached" and it was not required to be used by North Dakota in any specific manner nor to offset any specific costs. Tr. Day 9, 1618:22 – 1619:2 (Futch).

Dakota Access made gifts to other states in which the Dakota Access Pipeline was constructed totaling $12 million. Tr. Day 9, 1619:3-21 (Futch).  Dakota Access would make gifts to other States or political subdivisions in which it operates in acknowledgment of the extra man hours and resources expended in siting and routing a pipeline.  Tr. Day 9, 1620:7-17 (Futch).

### G. North Dakota's Total Emergency Response Costs.

[¶325] In total, North Dakota's expenses related to the DAPL Protest emergency response amounts to $37,864,867.30 broken down into the following categories:

    a.  Payroll -- $6,422,757.05;

    b.  Travel – $2,799,478.47;

    c.  Equipment/Supplies/Materials (Department of Emergency Services & the North Dakota National Guard) – $3,201,650.75;

    d.  EMAC States – $4,045,088.39;

    e.  North Dakota Mutual Aid – $12,385,795.98;

    f.  State Agencies Assistance -- $8,348,350.31; and

    g.  Interest Accrued -- $651,746.30.

PX-1439 at cells 4–10, 12.

[¶326] During the tracking, these expenses were reviewed numerous times. Tr. Day 10, 1676:13–1677:10 (Gaugler). These expenses were also audited by the North Dakota State Auditor, who did not identify any issues. *See generally* PX-1440; Tr. Day 10, 1676:8–12 (Gaugler); 1711:22–1712:5, 1725:13–1726:23 (Tolstad).

[¶327] Holly Gaugler testified that she had "100 percent confidence" in North Dakota's emergency response costs totaling $37,203,120.95.  Tr. Day 10, 1688:2-10 (Gaugler).

[¶328] North Dakota's expert, Ronald Tolstad (CPA), testified that North Dakota's damages, as represented in PX-1439 (Native) and PX-1455 (Native) were properly documented and properly approved under North Dakota's state procedures for emergencies.  PX-2034 at 2.  Mr. Tolstad testified that North Dakota's damages were reasonable under auditing standards for what a "prudent person" would have made under similar circumstances.  Tr. Day 10, 1728:5-17 (Tolstad).

[¶329] According to Adjutant General Dohrmann, the expenses North Dakota incurred in responding to the activity by the DAPL Protestor were necessary and properly accounted for.  Tr. Day 6, 956:23–957:1, 958:8–17 (Dohrmann).

## **LEGAL ARGUMENT**

I.    **The Court already found the United States Violated its Non-Discretionary Duty to Follow its Special Use Permitting Processes, and the Facts Adduced at Trial Verify these Findings.**

[¶330] On August 19, 2020, the Court decided that the United States failed to meet a non-discretionary duty to require a Special Use Permit be issued for the DAPL Protestors' to be able to lawfully use Corps-managed lands.  ECF No. 38 at ¶¶ 51-58.

[¶331] On December 13, 2023 the Court confirmed this finding in granting North Dakota's motion for partial summary judgment, holding that the Corps had violated a non-discretionary duty by failing to follow its mandatory special use permitting process.  ECF No. 383 at ¶¶ 22-28.

[¶332] It remains the law of the case that the Corps had a mandatory duty to follow the special use permitting procedures prior to issuing a Special Use Permit.  ECF No. 383, ¶ 24.  Once it is determined that an activity requires a Special Use Permit, a Special Use Permit is required before a person may engage in that activity on Corps-managed lands.[9]  FoF ¶ 56.  At trial, Corps' Senior

---

[9] For this reason, the "alternative management techniques" discussed by Mr. Kruger (FoF ¶ 59) are inapplicable, because the Corps determined early on that a Special Use Permit was required for the DAPL Protestors occupation of Corps-managed lands.  FoF ¶ 56.

Policy Adviser for Park Ranger Activities, Mr. Heath Kruger, confirmed that a Special Use Permit is not considered valid or issued without a signature and the required bonding and insurance. FoF ¶ 124.

[¶333] The undisputed facts adduced at trial proved that this law of the case remains unchanged. Multiple Corps officials admitted that no valid Special Use Permit was ever issued.  FoF ¶ 129. The undisputed facts show: (1) once DAPL Protestors began assembling on Corps land, the Corps began discussions with the Standing Rock Sioux Tribe to get them a Special Use Permit to lawfully be on Corps-managed lands (FoF ¶¶ 51, 58, 61, 77); (2) the Corps provided the requirements to the Standing Rock Sioux Tribe to obtain a Special Use Permit, which requirements included needing a $100,000 bond and liability insurance coverage not less than $5,000,000 for personal injury, for each occurrence, and $1,000,000 for each occurrence involving property damage, and not less than $5,000,000 covering all claims per occurrence, and requirements that unauthorized structures not be built on Corps-managed lands (FoF ¶¶ 105-106); (3) the Corps was aware of unlawful conduct being conducted from Corps-managed lands that were the subject of the Special Use Permit (FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114); (4) the Corps was aware the Standing Rock Sioux Tribe had not met the terms of the Special Use Permit, including obtaining insurance and signing the Special Use Permit prior to and at the time of issuing their Sept. 16 Press Release (FoF ¶¶ 101, 105-108, 110-116); (5) despite the not having a completed Special Use Permit, including no required insurance or signature, the Corps issued the Sept. 16 Press Release stating it had, in fact, issued a Special Use Permit (FoF ¶¶ 107-108); (6) the Standing Rock Sioux Tribe never returned the application for the Special Use Permit, including never signing the Special Use Permit or providing proof of required insurance (FoF ¶¶ 120-123, 128-129); (7) on November 12, 2016 the Corps transmitted a Special Use Permit to Faith

Spotted Eagle to allow a group of DAPL Protestors to have a religious ceremony, which Special Use Permit the Corps ultimately informed North Dakota they were honing when the Corps aided DAPL Protestors in holding that religious ceremony, despite never receiving a signed and valid Special Use Permit from Faith Spotted Eagle (FoF ¶¶ 175-177); and (8) Colonel Henderson later sent Chairman Archambault Nov. 25, 2016 Free Speech Zone Letter further creating an area on Corps-managed lands on which DAPL Protestors could assemble, despite knowing the majority of DAPL Protestors were located on the Main Camp on Corps-managed lands not covered by the Free Speech Zone Letter (FoF ¶¶ 188, 195, 202).

[¶334] While discussions about the special use permitting process occurred, the process was abandoned ultimately abandoned by the Corps, with Colonel Henderson considering a Special Use Permit "a worthless piece of bureaucracy".  FoF ¶¶ 199.

[¶335]  The September 16, 2016 Press Release, the November 14 Faith Spotted Eagle Special Use Permit, and November 25, 2016 Free Speech Zone announcements violated the Corps' non-discretionary special use permitting processes by falsely announcing or implying that a Special Use Permit had been issued when no such permit had been issued, and doubled down on that failure by continuing to encourage and enable the unlawful occupation and use of Corps-managed lands. The Corps never corrected these false announcements, which were de facto violations of the Corps Special Use Permit process as required by EC 1130-2-5, Appendix E.

[¶336]  Further, the undisputed facts adduced at trial provide no reason for the Court to reconsider its prior conclusion that the United States' subsequent discretionary actions do not remedy the Corps failure to follow its special use permitting process discretionary.  *See* ECF No. 383, ¶¶26-27.

[¶337] This case continues to be supported by *Appley Bros. v. United States¸*7 F.3d 720 (8th Cir. 1993). In *Appley Bros.*, the plaintiffs sued the United States "for losses as a result of the United States Department of Agriculture's negligent inspection of the Bird Grain Company warehouse, a federally licensed warehouse." *Id*. at 721. USDA policy "required that a new form be issued" when a federally licensed grain company did not correct a reported shortfall from an initial grain inspection. *Id*. at 725. Ultimately, the enforcement decision to close the warehouse for such a violation was a discretionary function of the USDA. *Id*. However, prior to exercising that discretion, the USDA was required to "check to see if Bird Grain had cured the deficiencies found on April 1 and to issue a new TW-125 reporting information." *Id*. The failure to perform a mandatory duty, even though subsequent actions were discretionary, did not place this case in the realm of discretionary function. *Id*.

[¶338] The Eighth Circuit later reversed the district court's discretionary function finding and remanded for further proceedings, where on remand the facts significantly changed during summary judgment and ultimately warranted a finding of discretionary function. *Appley Bros. v. United States*, 924 F. Supp. 944, 949 (D.S.D. 1996) ("The government has produced evidence substantially different than what was before Judge Jones and the Eighth Circuit, and more importantly, the government's evidence is uncontroverted."). Here, the undisputed facts adduced at trial have not significantly changed to alter the Court's prior legal conclusions.

[¶339] Here, the Corps' subsequent discretionary decisions are irrelevant under *Appley Bros.* because failure to perform the initial non-discretionary requirement renders subsequent discretionary decisions ineffective in this regard. *See* 7 F.3d at 725-26 ("Although the revocation order itself is discretionary, the inspectors' failure to see if Bird Grain cleared the violations noted

in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license.").

[¶340]  The Corps failed to follow its non-discretionary special use permitting process, and as such the Corps' subsequent discretionary decisions whether or not to issue citations to DAPL Protestors, and whether or not to request that North Dakota law enforcement evict the DAPL Protestors from Corps-managed lands, and whether the Corps could have employed "alternative management techniques" to allow DAPL Protestors to occupy Corps-manage lands have no bearing on the Corps' liability.   While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protesters' conduct, the Corps failure to comply with the mandatory Special Use Permit process tainted all other decisions made by the Corps.   Here, the maxim continues to apply: "You break it, you bought it."   ECF No. 38 at ¶ 55.

[¶341]  In conclusion, "[t]he purpose of the discretionary function exception is to prevent judicial second-guessing regarding administrative decisions grounded in social, economic, and political policy."  ECF No. 38 at ¶ 58 (citing *Herden v. United States*, 726 F.3d 1042, 1047 (8th Cir. 2003)). "It is not a bar to decisions made without regard to mandatory procedures and the bad consequences resulting from not following those mandatory procedures."   ECF No. 38 at ¶ 58. The Corps violated a non-discretionary duty in failing to follow its mandatory Special Use Permit process.

[¶342]  There were no superseding discretionary decisions by the Corps that somehow shield the Corps from the consequences of its fundamental decision to not comply with the non-discretionary special use permitting regulations and allow the unpermitted occupation of public lands by the DAPL Protesters.

II.     **The Relevant Tort Duties under North Dakota Law for North Dakota's Negligence, Gross Negligence, Civil Trespass, and Public Nuisance Claims are found in the Restatement (Second) of Torts.**

[¶343]  In North Dakota, "negligence cases have focused on both foreseeability of injury and the relationship of the parties in deciding whether a duty exists." *Palmer v. 999 Que., Inc*., 2016 ND 17, 874 N.W.2d 303.  Civil trespass is a common law tort in North Dakota, not statutorily defined, that occurs when "a person 'intentionally and without a consensual or other privilege . . . enters land in possession of another . . . or causes a thing or third person to do so.'" *Tibert v. Slominski*, 2005 ND 34, ¶ 15, 692 N.W.2d 133, 137 (citation omitted).

[¶344]  The Court has previously determined that the relevant duty of care for North Dakota's negligence, gross negligence, and civil trespass claims, is the standard set out by the Restatement (Second) of Torts section 318, which provides:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> (a) Knows or has reason to know that he has the ability to control the third person, and
> (b) Knows or should know of the necessity and opportunity for exercising such control.

ECF No. 38 at ¶¶ 64-66; ECF No. 283 at ¶¶ 14-17.

[¶345]  The Restatement can be broken down into a three "prong" analysis: (1) whether an actor "permits a third person to use lands or chattel;" (2) whether that actor "knows of or has reasons to know that he has the ability to control the third person;" and (3) whether the actor "knows of or should know of the necessity and opportunity for exercising such control."   If those elements are met, then the question turns to whether the actor met his or her duty to exercise "reasonable care" so as to control the conduct of the third person.

[¶346]  The elements of nuisance in North Dakota are specified by statute, although "common law remains relevant" to nuisance claims when not in conflict with the statute. *See Rassier v. Houim*, 488 N.W. 2d 635, 636 (N.D. 1992). N.D. CENT. CODE § 42-01-01 provides:

[¶347]  A nuisance consists of unlawfully doing an act or omitting to perform a duty, which act or omission:

1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;

2. Offends decency;

3. Unlawfully interferes with, obstructs [or] renders dangerous for passage, any lake, navigable river, . . . public park, square, street or highway; or

4. In any way renders other persons insecure in life or in the use of property.

[¶348]  Although the statute "defines nuisance in part as 'omitting to perform a duty,' the type of 'duty' which gives rise to a claim of nuisance may differ from the 'duty' implicated in a negligence action." *Knoff v. Am. Crystal Sugar Co*., 380 N.W.2d 313, 317 (N.D. 1986).  Specifically, "'[n]uisance is a condition and not an act or failure to act, so that if a wrongful condition exists, the person responsible for its existence is liable for resulting damage to others.'" *Id*. (citation omitted).  Thus, the "duty" involved is simply the duty not to take action or create conditions that cause a nuisance, and need not even constitute "negligence." *See id*.

[¶349]  Based on this, the Court has also determined that the basis for liability under North Dakota's public nuisance claim is set forth in section 838 of the Restatement (Second) of Torts, which provides:

A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and

(a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and

(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

ECF No. 38 at ¶¶ 64-66; ECF No. 283 at ¶¶ 14-17.

[¶350] Similar to the torts analysis for the negligence, gross negligence, and civil trespass claims discussed above, this can be broken down into two elements of duty: whether the actor (1) knew or had reason to know that the activity is being carried on; and (2) that it is causing or will involve an unreasonable risk of causing the nuisance.   Further, this Court has previously determined that under the FTCA, North Dakota's public nuisance claim requires a negligence-based analysis as to whether the United States has "fail[ed] to exercise reasonable care to prevent the nuisance."  ECF No. 38 at ¶ 68; ECF No. 283 at ¶ 12.

[¶351] Thus, the Court should determine the United States' liability under Sections 318 and 838 based on the evidence adduced at trial.

### A.   The United States knew, or had reason to know, that it had the ability to control the DAPL Protestors encamped on the Corps-managed lands.

[¶352] Having allowed the DAPL Protestors to occupy Corps-managed lands by failing to follow its special use permitting process, the analysis for North Dakota's negligence, gross negligence, third-party trespass, and public nuisance claims turns to whether the Corps knew of or had reason to know that they had the ability to control the DAPL Protestors.

[¶353] Throughout the Restatement (Second) of Torts, the phrase "reason to know" means "the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists."  *Collette v. Clausen,* 667 N.W.2d 617,621 (N.D. 2003) (citing Restatement (Second) of Torts § 12(1) (1965)).

[¶354] The undisputed facts demonstrate that the Corps knew of their authority, obligation, and ability to control the DAPL Protestors.   The Corps had ample intelligence about the dangerous,

violent, and unlawful DAPL Protest situation unfolding on Corps-managed lands.  FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114.

[¶355] Colonel Henderson, as the District Commander of the Omaha Office of the Corps, had the authority to close land when necessary for public health, public safety, resource protection, or other public interests.  FoF ¶¶ 38-39.

[¶356]  Colonel Henderson, and the Corps, was aware that a Special Use Permit's terms and conditions provided mechanisms for the United States to control the behavior of the DAPL Protestors, and "was the correct way to address the encampment" of DAPL Protestors.  FoF ¶¶ 52-57, 59.

[¶357] Requiring that the DAPL Protestors have a Special Use Permit to utilize the Corps-managed land would have ensured that a liability insurance policy was secured, which would have indemnified the United States and allowed the United States to require the DAPL Protest organizers to restore the DAPL Protest sites.  FoF ¶¶ 63, 105, 107, 122-27.  Insurance would have assisted with covering the costs associated with remediating the damage caused by the Protestors.  FoF ¶¶ 125-127.  Further, a Special Use Permit would have allowed the United States to enforce terms relating to the prohibition against construction of permanent structures, limiting the number of individuals present on the Corps-managed land, and requiring that adequate human waste services were provided.  FoF ¶¶ 40, 105.

[¶358] Further, both of these conditions would have put pressure on the permit applicant, the Standing Rock Sioux Tribe, to manage the DAPL Protestor population.

[¶359] At a minimum, the denial of a Special Use Permit would have sent a clear message to the DAPL Protestors that they were violating the Corps regulations and were not lawfully camped on

the Corps-managed lands, instead of inviting, enabling, encouraging, and emboldening them to continue occupying Corps-managed lands in an unlawful manner.

[¶360] Witnesses for the United States testified that the Special Use Permit would not have given them any recourse. Colonel John Henderson—the US Army Corps' officer with primary responsibility for the Oahe Reservoir system and the Corps-managed lands—testified that the Special Use Permit was a "worthless piece of bureaucracy" and that it "wasn't going to mean anything." FoF ¶ 199. Even indulging Colonel Henderson's position, he ignores the power a Special Use Permit would have had *before* the United States allowed matters to spiral out of control. In essence, if the Special Use Permit had no ability to control the DAPL Protestors, it was only because the United States allowed it to become so ineffective through complete inaction to blatantly unlawful conduct (*see infra* at FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114).

[¶361] Moreover, had a Special Use Permit been issued and the DAPL Protestors been found not to have been in compliance, the United States could have requested that North Dakota remove the Protestors from the Corps-managed lands. In mid-August 2016, before the situation metastasized, North Dakota could have cleared the Main Camp and the Corps-managed lands of the DAPL Protestors. FoF ¶¶ 266-275.

[¶362] Further, at any time, but especially early in the DAPL Protests, the United States itself could have cleared the DAPL Protests camps by issuing an order closing all Corps-managed lands, but the Corps never did so. Closing the Corps-managed lands *would* have had an impact, as is evidenced by the eventual clearing of the DAPL Protest camps in February of 2017 once Colonel Henderson finally backed North Dakota efforts to clear the camps by issuing his February 3, 2017, letter finally closing all Corps-managed lands. FoF ¶ 218.

[¶363] The Corps also had the ability to control the conduct of the DAPL Protestors through the Corps Title 36 enforcement powers, but again the Corps declined to exercise that available control option.  FoF ¶¶ 238-239.

[¶364] The Corps undoubtedly had the ability to control the conduct of the DAPL Protestors encamped on Corps-managed lands.

**B.**  **The United States knew of the necessity for exercising control over the DAPL Protestors encamped on the Corps-managed lands because of the foreseeable risk created by the DAPL Protestors and their activities.**

[¶365] Having had the ability to control the conduct of the DAPL Protestors through the Corps' special use permitting process and Title 36 enforcement powers, the analysis for North Dakota's negligence, gross negligence, and third-party trespass claims turns to whether the United States "knows of or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts section 318.

[¶366] Again, under the Restatement (Second) of Torts, the phrase "reason to know" means "the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists."  *Collette v. Clausen,* 667 N.W.2d 617,621 (N.D. 2003) (citing Restatement (Second) of Torts § 12(1) (1965)).

[¶367] The undisputed facts show that the United States, by and through the Corps, knew of the necessity for exercising control over the DAPL Protestors.  Prior to the Corps' issuance of the Sept. 16 Press Release, the Corps (and other agencies of the United States) knew that: (1) DAPL Protestors were trespassing on Corps-managed land (FoF ¶¶ 24, 60, 68, 70); (2) that dangerous, extremist, and violent individuals were present (FoF ¶¶ 36, 58, 66, 68-70, 72, 87)); (3) that DAPL Protestors were engaging in activities violating the Corps' regulations for use of federal public lands, including building unauthorized structures, roads, and improperly disposing of waste (FoF

¶¶ 58, 74, 87, 100-101); (4) that the DAPL Protestors were not under the control of the Standing Rock Sioux Tribe, the entity seeking a Special Use Permit (FoF ¶¶ 77, 137, 139); and (5) that the DAPL Protestors were using the Corps-managed lands as a base of operations and "safe haven" for illegal protest activities conducted outside of Corps-managed lands in North Dakota (FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114, *supra*).

[¶368] At the earliest days of the DAPL Protests, the United States expected that the DAPL Protests would grow and increase in intensity. FoF ¶¶ 58, 70, 72, 83. The United States expected the situation to get worse, and knew it had the "potential to become a major protest." FoF ¶ 58.

[¶369] Further, the United States was aware that a Special Use Permit "was the correct way to address the encampment of [DAPL Protestors] on [Corps-managed] lands." FoF ¶ 59.

[¶370] The United States knowledge of the necessity to exercise control only increased throughout the duration of the DAPL Protests.  Virtually every day after the Sept. 16 Press Release, DAPL Protestors would organize in the Main Camp on the Corps-managed land, go out into Morton County and other portions of North Dakota and conduct their protest activity.  FoF ¶¶ 136-138, 149, 159-165, 168, 171-172, 174, 178-187, 189, 191-192, 212-214. Much of the time, this involved acts of unlawful protest, outright aggression, and disruption to the life of local citizens. *Id*.  Further, the DAPL Protestors remained in violation of the terms of the Special Use Permit originally offered to the Standing Rock Sioux Tribe.  FoF ¶¶ 134-135, 144-145.

[¶371] Moreover, North Dakota made repeated entreaties to the United States, as well as public emergency declarations and statements, which made clear to the United States there was an increasingly growing public danger presented by the DAPL Protestors on and emanating from the Corps-managed land.  FoF ¶¶ 44, 65-66, 67, 87, 121, 133.  Governor Dalrymple declared an emergency on August 19, 2016. FoF ¶¶ 65-66.  This public declaration specifically noted the

"public safety risks associated with the ongoing protest of the Dakota Access Pipeline." FoF ¶ 66.

During trial, Governor Dalrymple further explained these risks:

> The serious safety concerns stem from the fact that protestors were advancing out of their recently established camps. They were moving onto state highway property. They were moving onto the actual highway itself. There was activity dealing with public and private property that was unlawful and it was clear that the situation was going to require some law enforcement response.

*Id.*

[¶372] In an internal Corps email communication on October 13, 2016, Chief of Engineers Lieutenant General Semonite expressly acknowledged the need to control the situation on the Corps-managed lands. He wrote:

> What is our position to Congress … why [the United States Army Corps of Engineers] has allowed trespassing and camping on [Government] land on the north side… effectively condoning the tribes to violate the law both on our land as well as other lands? When is [the United States Army Corps of Engineers] going to do something to get this under control - while many might move to other camps, some will stay just to embolden the effort? . . . Is there some event that will cause us to ask [sic] Sheriff to enforce the law?

FoF ¶¶ 144-146.  Lieutenant General Semonite also acknowledged at this time that there was "high potential for increased conflict." FoF ¶ 144.  Lieutenant General Semonite also stated that he didn't want to "get further wrapped into an EXTENDED administration delay or blocking action." *Id.* (emphasis in original).   Ultimately, Lieutenant General Semonite felt that the Corps had done its "due diligence" on its approval of the easement for DAPL and that delaying a decision on Dakota Access's requested easement "was not necessarily in keeping with our obligations" to Dakota Access.  FoF ¶ 146.

[¶373] The United States was also aware that the DAPL Protestors' continued activity posed a danger to the health and safety of the law enforcement officers responding to the protest behavior. In at least one instance during the "Big Push," a DAPL Protestor who was being placed under arrest discharged a firearm three times in the immediate vicinity of North Dakota law enforcement

officers. FoF ¶ 160. Also during the "Big Push," DAPL Protestors attempted to stampede a herd of buffalo at North Dakota law enforcement. FoF ¶ 161. The stampede and potential loss of life was only averted due to the intervention of the NDHP plane. *Id.*.

[¶374] Further, in November 2016 there was a significant confrontation between DAPL Protestors and law enforcement officers. On the night of November 20, 2016, the Main Camp located on the Corps-managed lands emptied out and DAPL Protestors advanced on a physical barrier (composed of burnt vehicles, concrete jersey barriers, and concertina wire) that had been created on the Backwater Bridge just north of the Main Camp on highway 1806.[10] FoF ¶¶ 179-187.

[¶375] The confrontation at the Backwater Bridge on the night of November 20, 2016 was intense, with DAPL Protestors throwing dangerous objects at law enforcement officials, including Molotov cocktails, bottles, and rocks. FoF ¶ 186.

[¶376] During this confrontation a statewide "Code Red" was issued—that being a request to every law enforcement officer within the State of North Dakota to respond to the situation and assist. FoF ¶¶ 182-183. This statewide "Code Red" was only issued once during the entirety of the DAPL Protests, marking how severe this altercation was. *Id.*

[¶377] These noteworthy confrontations, both of which occurred after August 2016, presented a very real risk to the safety of the responding law enforcement officers.

[¶378] The United States was well aware of the general daily DAPL Protest activity, as well as the events of the "Big Push" and the Backwater Bridge because it regularly received intelligence briefings from North Dakota law enforcement. FoF ¶¶ 16-24, 47.

---

[10] The Backwater Bridge had been damaged by DAPL Protestors during the Big Push and North Dakota was unable to determine whether it was safe. FoF ¶ 166

[¶379]  The United States knew from the very beginning of the DAPL Protests that violence by the DAPL Protestors encamped on the Corps-managed lands was not only a possibility due to the presence of hostile and extremist elements therein, but was an *actuality* due to the unlawful and violent protests events that occurred prior to the Corps Sept. 16 Press Release. As a matter of law, the United States, by and through the Corps, had knowledge of the necessity for exercising control over the DAPL Protests.

### C.   The United States failed to exercise reasonable care to prevent the risk of harm created by the DAPL Protestors' activity.

[¶380]  Under North Dakota law, there is no distinction to the duty of care owed to licensees or invitees, and a landowner "must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the burden of avoiding the risk."  *O'Leary v. Coenen,* 251 N.W.2d 746, 751 (N.D. 1977).

[¶381]  It is well-established under North Dakota nuisance law that a possessor of land may be held liable for acts it authorizes or allows that result in harm to adjacent landowners.  For example, in *Kinnischtzke v. City of Glen Ullin*, the city maintained a sewage treatment plant discharging into a creek which ran through plaintiff's property off-premises from the sewage treatment plant, damaging plaintiff's land and cattle.  79 N.D. 495, 499 (N.D. 1953).  The North Dakota Supreme Court held that "where a municipality purposely or negligently so operates a sewage plant that it becomes a nuisance which results in injury to property, the municipality is liable."  *Id*. at 596-597; *see also Messer v. City of Dickinson*, 71 N.D. 568, 568 (N.D. 1942) (Where the municipality discharged sewage in a manner that damaged adjacent landowner, the North Dakota Supreme Court held that "acts which may result in injury if improperly or negligently done does not immunize the municipality against all claims of damages resulting from the exercise of the

power."); *State v. Hafner*, 587 N.W.2d 177 (N.D. 1998) (North Dakota Supreme Court holding a private party could be liable for livestock permitted to run at large off of defendant's property); *Flynn v. Hurley Enterprises, Inc*., 860 N.W.2d 450 (N.D. 2015) (North Dakota Supreme Court recognizing a landowner could be liable for a public nuisance created by an oil field service business, affecting plaintiff's abutting property by way of excess dust, noise, diesel smoke, lights and sewage odor.); *Kukowski v. Simonson Farm*, 507 N.W.3d 68 (N.D. 1993) (North Dakota Supreme Court holding that defendants had a duty to "exercise ordinary care when actively working the land" to avoid injury to neighboring property); *Herring v. Lisbon*, 823 N.W.2d 493, 500 (N.D. 2012) (North Dakota Supreme Court finding that "[i]t is the duty of a landowner to utilize his property in a reasonable manner so as not to cause injury to adjoining property.").

[¶382] Similarly, as to civil trespass law, the United States may be held liable for the DAPL Protestors conduct.  Under North Dakota law, civil trespass occurs when "a person 'intentionally and without a consensual or other privilege . . . enters land in possession of another . . . *or causes a thing or third person to do so*.'" *Tibert v. Slominski*, 2005 ND 34, ¶ 15, 692 N.W.2d 133, 137 (emphasis added); *see also Hector v. Metro Ctrs*., 498 N.W.2d 113, 115 (N.D. 1993), (affirming a jury verdict in favor of property owners who brought a trespass action for damages that resulted from the unauthorized placement of dirt on the property owner's adjacent land by a construction company at the direction of the landowner); *Wilson v. City of Fargo*, 141 N.W.2d 727, 732 (N.D. 1966) (reversing judgment that dismissed adjacent property owners' complaint against the city for trespass and negligence when the city's hired contractors trespassed on their property and removed support for the residence resulting in property damage because liability fell upon the public corporation which authorized the project to be constructed); *Kopka v. Bell Tel. Co*., 371 Pa. 444, 91 A.2d 232 (1952) (finding defendant liable even though it did not enter plaintiff's land because

under section 158 of the Restatement (Second) of Torts, comment j, "[a] person who 'authorizes or directs' another to trespass 'is himself liable as a trespasser to the same extent as if the trespass were committed directly by himself.'").

[¶383]  Thus here, the United States' liability extends to injuries that occurred off-premises where they were reasonably foreseeable and the United States failed to exercise reasonable care.  *O'Leary v. Coenen*, 251 N.W.2d 746, 752-53 (N.D. 1977) (whether the attack of a postman by a farm dog was foreseeable and what the landowner could have done to alleviate the danger would determine liability)); *Zueger v. Carlson*, 542 N.W.2d 92, 96-97 (N.D. 1996) ("If the place or character of [a possessor of land's] business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.").

[¶384]  As established above, it was not only reasonably foreseeable, but *abundantly* foreseeable that the United States failure to exercise control over the DAPL Protestors would result in harms to North Dakota.

[¶385]  Here, the Corps authorized the DAPL Protestors to operate on its land, despite the daily intelligence briefings provided by North Dakota law enforcement informing the Corps of the various disruptive, unlawful, and illegal activities engaged in by the DAPL Protestors on and off Corps Lands. FoF ¶¶ 16-24, 47.  Indeed, Governor Dalrymple and U.S. Senator Heitkamp both directly informed the Corps repeatedly of the public nuisance the DAPL Protestors were creating in North Dakota.  FoF ¶¶ 68, 87, 101, 103, 121.  These undisputed facts show that the Corps knew that the DAPL Protestors that the Corps negligently allowed on public lands were creating tortious

conditions and a public nuisance on and off those public lands, that these actions posed a danger to public safety and the environment and must be controlled, yet did nothing.

[¶386] Thus, the Corps failed in its duty "to utilize [its] property in a reasonable manner so as not to cause injury to adjoining property." *Herring*, 823 N.W.2d at 500.

[¶387]  As the Corps improperly authorized the presence and activities of the DAPL Protestors in violation of its own procedures, the Corps had a duty as the possessor of land on which the DAPL Protestors organized and launched their illegal activities "to use reasonable care" to protect North Dakota from injury.  Further, given the "likelihood of injury," "seriousness of the injury," and "burden of avoiding the risk," the Corps had a duty under "general negligence principles" to use reasonable care to prevent harm to North Dakota from the DAPL Protestors. *Redford*, 2014 U.S. Dist. LEXIS 97327 at *2

> **i.  The United States took no steps to control the hostile, extremist factions that were known to be present in the camps on Corps-managed lands from the outset of the DAPL Protests.**

[¶388] Despite being aware that the DAPL Protestors were present on the Corps-managed lands, knowing that they posed a danger, and with the belief that the situation would intensify and grow, the United States took no efforts to control the DAPL Protestors on Corps-managed lands in August 2016 when it was feasible to do so.

[¶389]  At the time the Corps tendered the proposed Special Use Permit to the Standing Rock Sioux Tribe for signature on September 16, 2016, DAPL Protestors had constructed permanent structures on the land in violation of the terms of the Special Use Permit.  FoF ¶¶ 58, 74, 87, 100-101. Further, the proposed Special Use Permit only allowed for a maximum of 500 persons at the location, and DAPL Protestors present on Corps-managed lands already exceeded that limit, and the United States was aware the DAPL Protestor population far exceeded these numbers.  FoF ¶ 112.  These same violations would persist throughout the entirety of the relevant time period.  FoF

¶¶ 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114, 136-138, 149, 159-165, 168, 171-172, 174, 178-187, 189, 191-192, 212-214.

[¶390] When the Corps never received a signed or effective Special Use Permit back from the Standing Rock Sioux Tribe, it abandoned the special use permitting process and instead falsely announced the Corps had granted a Special Use Permit to the DAPL Protestors in violation of its non-discretionary and mandatory special use permitting process.

[¶391] This complete failure to act led to a situation which Governor Burgum accurately described as "an armed occupation camp on federal land." FoF ¶ 266.

### ii. Actions by the United States invited, encouraged, and supported the DAPL Protestors' and their problematic behavior.

[¶392] The United States also took actions which evidence showed strengthened the resolve of the DAPL Protestors. By way of example, the Sept. 9 Joint Statement—which reflected that that construction of the Dakota Access Pipeline would "not go forward at this time"—was viewed by DAPL Protestors as a victory. FoF ¶¶ 93-96.

[¶393] Dr. Katherine Kuhlman, North Dakota's forensic psychology expert, testified that the United States' actions "encouraged [and] supported protestors to remain and be at the [Dakota Access Pipeline] protests." Tr. Day 11, 1801:14–19 (Kuhlman). Dr. Kuhlman noted that DAPL Protestors viewed the Corps' September 9, 2016 Joint Statement as a victory and it caused the DAPL Protestors to believe "their concerns were being heard and their illegal conducted was being tolerated, which was a direct result of protest camps being illegally present on [the Corps-managed lands]." PX-2030 at p. 7. During trial, Dr. Kuhlman described the Joint Statement as a "message of support" to the DAPL Protestors. Tr. Day 11, 1802:8–21 (Kuhlman). Individual DAPL Protestors also viewed the Sept. 9 Joint Statement as encouraging to their cause. FoF ¶¶ 93-96.

North Dakota law enforcement observed an increase in the intensity of the DAPL Protests after the Sept. 9 Joint Statement.  FoF ¶ 92.

[¶394]  A week later on September 16, 2016, the Corps sent out the Sept. 16 Press Release which reflected that a Special Use Permit had been "issued" to the DAPL Protestors.  FoF ¶ 107.  Internal communications reflect that this statement resulted in "widespread confusion as to the meaning of the permit (i.e. that it permits special use for free speech, does NOT permit people to interfere with DAPL construction.)."  FoF ¶ 119.  Put simply, by the United States' own estimation, some subset of people viewing that statement understood it to be an endorsement of the DAPL Protestors' unlawful actions invading the private property of local landowners.

[¶395]  Dr. Kuhlman also identified the Sept. 16 Press Release as an act which "provided positive support, encouragement, and positive reinforcement" to the Protestors. PX-2030 at p. 7.  This was because the statement would have led the DAPL Protestors to believe they could remain on the Corps-managed lands. Tr. Day 7, 1808:2–12 (Kuhlman).

[¶396]  On November 25, 2016, the Corps sent the Free Speech Zone Letter to the Standing Rock Sioux Tribe which reflected the Corps-managed lands would be closed to public use.  FoF ¶¶ 195-196.  But when DAPL Protestors remained on the Corps-managed lands, the United States made no effort to have them removed.  FoF ¶¶ 199, 201-202.  Further, at this time, Colonel Henderson did not believe that Chairman Archambault—and by extension the Standing Rock Sioux Tribe—was in control of the DAPL Protestors on the Corps-managed lands.  FoF ¶ 77, 137, 139.  And whatever this letter said, Colonel Henderson's personal communications with DAPL Protestor leadership reflected that he knew it would make no difference, and in fact he informed Faith Spotted Eagle that the Corps "fully expect[ed] that most people will choose not to move from this camp on the north side of the [Cannonball R]iver"; and that the Corps was "not advocating for any

law enforcement to come in to 'clear out the camps'." FoF ¶ 202. The Free Speech Zone Letter, even in the Colonel Henderson's eyes, was largely meaningless and there was no true belief it would spur the DAPL Protestors to vacate the Corps-managed lands.

[¶397] The United States made multiple other public statements during the DAPL Protests that encouraged and supported the DAPL Protestors, including the Oct. 10 Joint Statement (FoF ¶ 142) and announcing on December 4, 2016 that the Corps would not approve the Lake Oahe easement for Dakota Access (FoF ¶¶ 207-211).

[¶398] Finally, the United States wholly failed to provide *any* sort of a law enforcement response to the DAPL Protests, implicitly supporting the DAPL Protestors while denying North Dakota the resources it needed to address the unlawful DAPL Protest situation. FoF ¶¶ 237-257.

[¶399] As such, the Corps actions cannot be considered an effort to take "reasonable care" under the totality of the circumstances.

[¶400] Dr. Katherine Kuhlman testified that the United States' actions throughout the DAPL Protests "encouraged [and] supported protestors to remain and be at the [DAPL] protests." Tr. Day 11, 1801:14–19 (Kuhlman); PX-2030; PX-2031.

[¶401] Dr. Kuhlman also opined that the United States' failure and inaction in enforcing Corps regulations on Corps lands normalized and reinforced DAPL Protestor behavior, including DAPL Protestor occupation of Corps lands. PX-2030 at 8.

### iii. The United States' evidence that North Dakota law enforcement would not attempt to or comply with a request to remove the DAPL Protestors from the Corps-managed lands is not credible – and either way is not relevant to the issue of liability and damages.

[¶402] Many of the United States' witnesses testified that North Dakota law enforcement officials agreed that no North Dakota law enforcement officials wanted to remove the DAPL Protestors from the Corps-managed lands, as it was too difficult or dangerous a task to accomplish. In these

witnesses' view, this was (at least partially) the reason the United States didn't request that the DAPL Protestors be removed—allegedly because no North Dakota law enforcement was willing to remove DAPL Protestors.

[¶403] As a threshold matter, the United States liability stems from the Corps failure to follow its mandatory, non-discretionary special use permitting process. Once the Corps failed to follow that process, subsequent discretionary decisions such as whether, or how, to remove the DAPL Protestors from Corps-managed lands became irrelevant – as this Court has already explained once – the Corps failure to comply with the mandatory Special Use Permit process tainted all other decisions made by the Corps. Here, the maxim continues to apply: "You break it, you bought it." ECF No. 38 at ¶ 55.

[¶404] Even if the willingness of North Dakota law enforcement to evict DAPL Protestors was relevant (which it is not), the United States assertions are not credible. A number of law enforcement officials for North Dakota stated that they would have met a request to remove the DAPL Protestors from the Corps-managed lands in August 2016. FoF ¶¶ 266-275. They also testified that the Corps granting the DAPL Protestors a base camp or "safe haven" from which to conduct unlawful activities was the main impetus and driver for the DAPL Protests duration and intensity. *Id.*

[¶405] Further, the evidence at trial shows only one instance where the United States requested that North Dakota law enforcement remove DAPL Protestors from (a portion of) the Corps-managed lands: on November 1, 2016 Colonel Henderson sent a letter to Morton County Sheriff Kyle Kirchmeier requesting assistance with individuals the United States "consider[ed] … trespassers" in the area called "Turtle Hill." FoF ¶¶ 168-171, 189. Notably, Colonel Henderson's Nov. 1, 2016 Letter stated that the United States was "not asking for assistance … regarding the

inhabitants … at the Seven Councils Camp (Oceti Sakowin Camp)." FoF ¶ 168; JX-174.  North Dakota responded to the United States' request with law enforcement resources and removed the individuals throughout the month of November.  FoF ¶¶ 168-171, 189.  Later, the United States would "rescind" this request, though North Dakota law enforcement would remain on Turtle Hill to ensure that DAPL Protestors did not utilize it to attempt to illegally interfere with pipeline construction activities.  FoF ¶ 194.

> ### D.   Because the United States allowed the creation of an out-of-control situation through complete inaction in August 2016, subsequent events which may have further inflamed the situation were reasonably foreseeable.

[¶406] During trial, the United States adduced evidence attempting to show that other actors (including North Dakota itself) were responsible for the increase in DAPL Protestor activity. Colonel Henderson stated a September 3, 2016 interaction between DAPL Protestors and a private security company caused the DAPL Protests to immediately become "more violent and more active." Tr. Day 7, 1207:20–1208:5 (Henderson).

[¶407]  Dr. Edward Maguire, an expert for the United States, testified that North Dakota's law enforcement response was at times "excessively militaristic."[11] Tr. Day 15, 2413:1–5 (Maguire). Another of the United States' experts, Dr. Noam Yuchtman, testified that the "Big Push" "led to persistent protest participation." Tr. Day 17, 2915:16–2916:12 (Yuchtman).

[¶408] Ultimately, however, this type of evidence does not change the calculus of this matter. These aggravating events and behaviors never would have occurred but-for the United States

---

[11] North Dakota's experts offered differing opinions on the subject.  In David Pearson's estimation, the equipment and tactics deployed by North Dakota during the "Big Push" were necessary to ensure the safety of the officers conducting that operation. Tr. Day 8, 1324:18–1325:20 (Pearson). Robert Handy felt that the "Big Push" was "well-planned" and the use of armored vehicles was "appropriate in a setting like that to protest the officers." Tr. Day 13, 2068:9–2069:8 (Handy). Both of these experts had practical experience in responding to large-scale events during their time in law enforcement, while Dr. Maguire did not. Tr. Day 15, 2346:10–19 (Maguire)..

allowing the DAPL Protestors to remain on Corps-managed lands without a Special Use Permit. It remains that the United States never attempted to control the DAPL Protestors on Corps-managed lands when it had the opportunity to exercise that control starting on August 10, 2016 when it became aware of the DAPL Protestors trespassing on Corps-managed lands. The United States did not attempt to exercise control over the DAPL Protestors on Corps-managed lands until November 1, 2016, and that request did not concern any of the DAPL Protests camps, but instead the area on Corps-managed lands around Turtle Hill. Instead, the United States, with affirmative knowledge of the hostility of many within the DAPL Protestors' ranks, failed to attempt to control the situation in any reasonable manner.

[¶409] Moreover, the assertion that North Dakota is to blame (at least in part) for any increased DAPL Protest activity because of the character of its law enforcement response to the dangerous situation is misguided.

[¶410] Robert Handy, North Dakota's expert in law enforcement police practices and tactics with over 30 years of comprehensive law enforcement experience, testified regarding North Dakota's law enforcement response throughout the DAPL Protests. Ultimately, Mr. Handy opined that North Dakota's overall response to the DAPL Protests was "reasonable, measured, was consistent with best practices, and … was a very good overall response given the circumstances and challenges [North Dakota] faced." Tr. Day 13, 2079:2–9 (Handy); *see also* PX-2028 at 17 ("I believe the overall law enforcement response to the DAPL protest was lawful, objectively reasonable given the totality of circumstances, and within best practices for law enforcement.").

[¶411] With respect to the "Big Push," Mr. Pearson testified that the use of mobile field force tactics during the operation was reasonable and appropriate" and consistent with law enforcement practices in 2016. Tr. Day 8, 1324:11–17 (Pearson); PX-2032 at 10. Mr. Pearson also stated that

the use of protective equipment (e.g., shields, chest protestors, helmets) was reasonable and appropriate. Tr. Day 8, 1324:18–1325:2 (Pearson). Mr. Pearson also believed the use of tactical teams and armored vehicles during the "Big Push" was reasonable. Tr. Day 8, 1326:10–1327:2 (Pearson).

[¶412] There was also criticism of the use of a water hose on the night of the Backwater Bridge incident. *See* FoF ¶ 185. However, the Court heard testimony from North Dakota's use of force and tactical operations expert David L. Pearson on this matter.[12] Mr. Pearson testified that the use of water that night was an "improvised" use of force, which is typically not set forth in a policy or procedure. FoF ¶ 187. Mr. Pearson testified that based on the threat presented that night, including that the officers were responding to DAPL Protestors' criminal acts, he determined that the use of water at the night of the Backwater Bridge incident was reasonable. *Id.*; Tr. Day 8, 1333:1–11, 1336: 7–9 (Pearson).

[¶413] The United States also adduced evidence suggesting the activation of the North Dakota National Guard may have served to inflame matters.

[¶414] But as Governor Dalrymple testified at trial, the North Dakota National Guard was activated "not as law enforcement providers but as support personnel to fill roles that were not directly related to law enforcement." Tr. Day 5, 778:3–6 (Dalrymple). Adjutant General Dohrmann similarly testified the North Dakota National Guard was activated to free up law enforcement from more administrative duties. FoF ¶ 88. Ultimately, Governor Dalrymple's

---

[12] Mr. Pearson, a law enforcement professional with 32 years of experience, was certified in multiple areas dealing with uses of force and less lethal munitions. Tr. Day 8, at 1302:6–11 (Pearson). He was personally involved in the response to 17 riot-like events, including as a field commander. *Id.* at 1303:19–1304:4.

activation only made the North Dakota National Guard Reserve personnel available for assistance, as the regular National Guard personnel were always available. *Id.*

## IV.   The United States Tortious Conduct Proximately Caused North Dakota's Damages.

[¶415] Under North Dakota law, to constitute actionable negligence, "there must be a causal connection between the negligence and the injury sustained; for the negligence to be the proximate cause of the injury, the defendant must owe to the plaintiff a duty, and the injury to the plaintiff must have resulted as a direct consequence of the negligent breach of that duty." *Moum v. Maercklein,* 201 N.W.3d 399, 402 (N.D. 1972) (citing *Bowers v. Great Northern Ry. Co*., 65 N.D. 384, 259 N.W. 99, 99 A.L.R. 1443 (1935)). "Proximate cause" of an injury is a cause which in natural and continuous sequence, unbroken by any controlling, intervening cause, produces injury, and without which it would not have occurred. *Id.*

[¶416] Further, under negligence law, "it must appear not only that the injury complained of was a natural and probable consequence of the negligent act of the defendant, but that such consequence ought reasonably to have been anticipated by a person of ordinary intelligence in the light of attending circumstances." *Moum v. Maercklein*, 201 N.W.2d 399 at 402 (N.D. 1982).

[¶417] As established herein, the United States owed a duty to North Dakota to exercise control over the DAPL Protestors by following the Corps mandatory, non-discretionary Special Use Permitting process.

[¶418] And as established herein, the United States, by and through the Corps, not only negligently failed to follow the mandatory special use permitting process in light of clearly foreseeable harm that would fall on North Dakota, but instead actively and negligently subverted that mandatory special use permitting process by falsely claiming it had granted a Special Use Permit to the DAPL Protestors, and then continuing to invite, enable, and encourage the DAPL Protestors by never revoking it's the Sept. 16 Press Release and instead issuing continual statements that supported

the DAPL Protestors goals, and taking continual actions (through a lack of enforcement) that supported the DAPL Protestors.

[¶419] The overwhelming and undisputed facts adduced at trial show that "but for" the Corps failure to follow its non-discretionary special use permitting process created an unlawful, unmanageable, and dangerous situation in North Dakota, including a massive public nuisance and continuing instances of civil trespass in the State.  "But for" the Corps' invitation and encouragement of the DAPL Protestors to occupy Corps-managed lands, and the Corps' subsequent failure to follow its mandatory special use permitting process, the DAPL Protestors would not have arrived in the numbers they did, nor would they have been emboldened to continue their occupation of the Corps-managed public lands for as long as they did.

[¶420] By inviting, encouraging, and enabling the DAPL Protestors to remain on Corps lands without limitation, the Corps negligently failed to follow its special use permitting process and failed to exercise reasonable care to prevent harm to North Dakota.  The Corps' negligent actions created a public nuisance in North Dakota, enabling countless instances of civil trespass to occur during the DAPL Protests, subjecting the United States (through the Corps and the action of other agencies) to liability under North Dakota tort law.

### III.   North Dakota's Claimed Damages Remain Recoverable under North Dakota Tort Law.

[¶421] North Dakota's damages stem from emergency response costs, physical damage to state property and equipment, and loan interest.

[¶422] N.D.C.C. § 32-03-20 states that "[f]or the breach of an obligation not arising from contract, the measure of damages, except when otherwise expressly provided by law, is the amount which will *compensate for all the detriment proximately caused thereby*, whether it could have been

anticipated or not." (emphasis added).  Under N.D.C.C. § 32-03-20, "detriment" is "a loss or harm suffered in person or property."

[¶423] This Court previously concluded that N.D.C.C. § 32-03-20 permits the recovery of emergency response costs and physical damage to state property and equipment as a "loss or harm suffered in person or property", subject to "the fact-finder's determination that the United States proximately caused the emergency response when it allowed and encouraged protestors on federal land without requiring the requisite permit."  ECF No. 106 at ¶ 43 (citing to N.D.C.C. § 32-03-02; § 32-03-20); ECF No. 280 at ¶ 12 (The simple failure to follow the permitting procedures is the basis for liability but is not the only basis for damages in this matter. The USACE's failure to follow the permitting procedures permits North Dakota to seek damages from the resulting tortious conduct— the gigantic federally created mayhem—as previously discussed in the Court's Order Denying the United States' Motion to Dismiss.").

[¶424] The undisputed facts adduced at trial and set forth herein show that "but for" the Corps failure to follow its mandatory, non-discretionary special use permitting process, the DAPL Protestors' occupation of Corps-managed lands would have been significantly lessened and North Dakota's emergency response would not have been necessary.

[¶425] As to loan interest, this Court previously held that further factual development as trial was necessary to determine whether the loan interest charged to North Dakota by the Bank of North Dakota should be considered allowable damages or disallowable "prejudgment interest."

[¶426] The Court held that if the loan interest incurred by North Dakota was an actual loss attributable to the United States negligence, and not an interest rate awarded by the fact finder, the loan interest "may be part of North Dakota's claims for actual damages."  ECF No. 106 at ¶52.

[¶427]  As established at trial, due to the unique nature of North Dakota's funding of state agencies and emergency responses, North Dakota was forced to take out loans to cover the significant emergency response cost caused by the United States negligent creation of a public nuisance and civil trespass in North Dakota.  FoF ¶¶ 315-317.

[¶428]  The interest North Dakota incurred funding the emergency response was thus directly and proximately caused by the United States' tortious actions, and is in fact damages, and not "prejudgment interest" under the FTCA.

[¶429]  As such, the facts adduced at trial as discussed herein show that but for the Corps violation of its non-discretionary permitting duty, and the United States subject actions inviting, encouraging, and enabling the DAPL Protestors, North Dakota would not have incurred its emergency response costs and physical damage to state property and equipment.

[¶430]  The Court finds North Dakota's damages to be credible and established based on the findings of fact and conclusions of law set forth herein, in the amount of $37,854,867.30.

## CONCLUSIONS OF LAW

[¶431]  The Court makes the following conclusions of law.

[¶432]  North Dakota has brought suit against the United States under the Federal Tort Claims Act. *See* 28 U.S.C. § 2671, *et seq.* As set forth previously by this Court and herein, the Corps had a non-discretionary duty to follow its special use permitting procedures, and Corps failed to do so. ECF Nos. 38 at 22–25; 383 at 13.

[¶433]  The Corps violated it non-discretionary special use permitting process by failing to require the DAPL Protestors to obtain a valid Special Use Permit.

[¶434] The Corps further violated its non-discretionary special use permitting process by falsely issuing the Sept. 16 Press Release that stated a special use permit had been granted to the DAPL Protestors on September 16, 2016.

[¶435] The Corps further violated its non-discretionary special use permitting process by failing to ever correct the Sept. 16 Press Release.

[¶436] The Corps further violated its non-discretionary special use permitting duty by issuing a Special Use Permit for a prayer ceremony on November 14, 2016, despite not having obtained a valid Special Use Permit from Faith Spotted Eagle.

[¶437] The Corps further violated its non-discretionary special use permitting duty by issuing the Free Speech Zone Letter announcing a "Free Speech Zone" *de facto* permit to the DAPL Protestors on November 25, 2016.

[¶438] Accordingly, this Court has jurisdiction to hear North Dakota's claims.

[¶439] North Dakota has set forth four claims against the United States: public nuisance (Claim One), negligence (Claim Two), gross negligence (Claim Four), and civil trespass (Claim Five). Compl. ¶¶ 108–133.

[¶440] Section 318 of the Restatement (Second) of Torts (1965) provides the relevant duty of care for North Dakota's negligence, gross negligence, and civil trespass claims.

[¶441] The United States knew or had reason to know that it had the ability to control the Protestors encamped on the Corps-managed lands through the special use permitting process and via requesting the DAPL Protestors be removed.

[¶442] The United States knew or had to reason know of the necessity and opportunity for exercising such control over the DAPL Protestors encamped on the Corps-managed lands, as it

knew violent persons were among the DAPL Protestors from the outset of the DAPL Protests and believed the situation would get worse.

[¶443] Accordingly, the United States is found liable with respect to North Dakota's negligence, gross negligence, and civil trespass claims.

[¶444] Section 838 of the Restatement (Second) of Torts (1965) provides the basis of liability for North Dakota's public nuisance claim.

[¶445] The United States knew or had reason to know that the DAPL Protestors encamped on the Corps-managed lands were engaging in activity that posed an unreasonable risk of causing a nuisance, as it knew violent persons were among the DAPL Protestors from the outset of the DAPL Protests and believed the situation would get worse.

[¶446] The United States failed to exercise reasonable care to prevent the nuisance by negligently failing to exercise control over the DAPL Protestors through the Corps mandatory special use permitting process.

[¶447] Accordingly, the United States is found liable with respect to North Dakota's public nuisance claim.

[¶448] For North Dakotas' negligence, gross negligence, civil trespass, and public nuisance claims, the United States failure to exercise reasonable care was the direct and proximate cause of North Dakota's emergency response costs and damages.  By inviting, encouraging, and enabling the DAPL Protestors to remain on Corps lands without limitation, the Corps negligently failed to follow its special use permitting process and failed to exercise reasonable care to prevent harm to North Dakota.  The Corps' negligent actions and inactions created a public nuisance in North Dakota, enabling countless instances of civil trespass to occur during the DAPL Protests,

subjecting the United States (through the Corps and the action of other agencies) to liability under North Dakota tort law and exacerbating the harms that were visited upon North Dakota.

[¶449] The Court finds the State of North Dakota's damages calculations for emergency response costs as set forth in PX-1439 (Native) at cell D11, totaling $37,203,120.95, and as more fully documented in PX-1455, as reasonable, accurate, and attributable the tortious actions of the United States.

[¶450] The Court further finds that the interest attributable to Bank of North Dakota loans taken out by North Dakota to fund the emergency response costs to the DAPL Protests, totaling $651,746.35 as set forth in PX-1439 (Native) at cell D12, are a sum certain amount of damages arising from the agreement between North Dakota and its Bank that are direct and proximate result of the United States tortious actions.

[¶451] The Court therefore finds that North Dakota's damages, totaling $37,854,867.30 as set forth in PX-1439 (Native) at cell D13, are the direct and proximate result of the United States tortious actions.

## <u>ORDER FOR JUDGMENT</u>

[¶452] Based on the foregoing factual findings and legal conclusions, the Court concludes that North Dakota is entitled to the damages established at trial, as set forth above, in the amount of $37,864,867.30.

[¶453] **IT IS SO ORDERED.**

[¶454] **LET JUDGMENT BE ENTERED ACCORDINGLY.**


_____
Daniel M. Traynor, District Judge
United States District Court