**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| State of North Dakota, | | |
| | Plaintiff, | |
| vs. | | Case No. 1:19-cv-00150 |
| The United States of America, | | |
| | Defendant. | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT**

<u>C</u>ONTENTS

**INTRODUCTION AND SUMMARY OF DECISION** ............................................................. 5

**FINDINGS OF FACT** ................................................................................................ 6

   **I.**   **The Corps and Its Mission** .......................................................................... 6

      **A.**  **The Corps's Management of Water Resource Projects and Its Trust Relationship with Native American Tribes**.................................................... 6

      **B.**  **The Corps Does Not Have Law Enforcement Capabilities**......................... 8

   **II.**  **The Corps's Lake Oahe Project and the Surrounding Area**......................... 11

      **A.**  **History of the Area**.............................................................................. 11

      **B.**  **The Lake Oahe Project**......................................................................... 14

      **C.**  **Political Geography and Jurisdiction in the Area**................................... 16

      **D.** **Locations of DAPL Protest Camps**........................................................ 17

   **III.**  **The Corps's Processes for Permitting Use of Its Land**.............................. 21

   **IV.**  **The Dakota Access Pipeline and the** *Standing Rock Sioux Tribe* **Litigation**...............28

   **V.**  **DAPL Protest Events** ............................................................................. 32

      **A.**  **The Start of the DAPL Protests**........................................................... 32

      **B.**  **The DAPL Protests Escalate Quickly and Unexpectedly**......................... 37

      **C.**  **As the Protests Escalated, Law Enforcement Sought to Accommodate the Protestors**........................................................................................... 41

      **D.**  **State and Local Officials Declare an Emergency, and the State Deploys the National Guard**............................................................................... 44

      **E.**  **The September 3, 2016, "Dog Bite" Incident and Further Escalation of the Protests** .........................................................................................45

      **F.**  **The Joint Statements by the U.S. Departments of Justice, the Interior, and the Army**............................................................................................ 48

      **G.**  **The Standing Rock Sioux Tribe's Request for a Special Use Permit and the Corps's Response**.............................................................................. 49

      **H.**  **The North Camp and the "Big Push" Operation**.................................... 55

      **I.**  **Faith Spotted Eagle's Request for a Prayer Ceremony**........................... 61

      **J.**  **The Backwater Bridge Incident**............................................................ 62

      **K.**  **The Corps's November 2016 Letters to Law Enforcement and Tribal Leaders** ........................................................................................65

      **L.**  **The Protests Continue into Winter 2016**............................................... 72

**M. Protest Activity Decreases, and the Remaining Protestors Are Eventually Evacuated**………………………………………………………………….. 73

**N. Cleanup of the Protest Encampment Areas**……………………………78

**VI. The Majority of the Protestors Were Peaceful; a Minority Engaged in Illegal Activity**……………………………………………………………………………80

**VII. Factors that Contributed to the Protests' Growth and Duration**……………………83

**VIII. Statements and Permissions by the Corps Did Not Increase the Protests**………………95

**IX. Corps Officials Made Reasonable Decisions in a Difficult Situation with the Limited Resources at Their Disposal** ………………………………………………101

**A. Corps Officials Needed to Consider Many Factors**………………………101

**B. Corps Officials Communicated Regularly with State and Local Officials**….. 103

**C. Corps Officials Attempted to Mitigate the Situation by Working Closely with Tribal Leadership**………………………………………………………… 105

**D. Corps Officials Coordinated with Other Federal Officials and Sought Federal Law Enforcement Assistance**………………………………………………109

**E. COL Henderson Decided Not to Ask the State to Forcibly Remove the Protestors**………………………………………………………………………111

**X. Federal Agencies Other than the Corps Provided Law Enforcement Support to the State Throughout the Protests, but Not to the Extent the State Requested** ………….112

**XI. The State Chose Not to Forcibly Remove Protesters En Masse** ……………………120

**A. The State Viewed the Protestors on Corps Land as Trespassers and Knew Some Protestors Were Violating State and Local Laws**…………………………...   121

**B. State and Local Law Enforcement Had Jurisdiction to Enforce Violations of State and Local Laws but Often Chose Not to**………………………………………122

**C. State and Local Law Enforcement Recognized the Need to Accommodate Protestors and Believed Forcible Removal Was a Bad Idea**…………………124

**D. The State Lacked the Manpower to Forcibly Remove All Protestors**………..130

**XII. The State's Protest Expenditures** ………………………………………………138

**XIII. The State Has Already Received $25 Million to Cover Its Protest Expenses**………143

**A. $10 Million Grant from the Federal Government**……………………………..143

**B. $15 Million Payment from Dakota Access**………………………………… 144

**XIV. The State's Administrative Tort Claim** ………………………………………146

**LEGAL ARGUMENT** ………………………………………………………………… 148

**I. Jurisdiction** …………………………………………………………………148

**A. The FTCA's Jurisdictional Limits**………………………………………148

**B. Article III Standing**………………………………………………..….. 188

**C. Political Question Doctrine**………………………………………………..…192

**II.    The State's Tort Claims**........................................................................194

**A. Burden of Proof**………………………………………………. 194

**B. Duty**………………………………………………………………196

**C. Breach**………………………………………………………214

**D. Causation**………………………………………………. 228

**E. Damages**………………………………………………..250

**CONCLUSIONS OF LAW** ....................................................................... 273

**ORDER FOR JUDGMENT** ....................................................................... 281

## INTRODUCTION AND SUMMARY OF DECISION

[¶1]    THIS MATTER comes before the Court after a bench trial on the merits.

[¶2]    The protests against the Dakota Access Pipeline in North Dakota in 2016-2017 (referred to here as "the protests" or "the DAPL protests") were unique, unprecedented, and largely uncontrollable.  They involved thousands of determined protestors, each with his or her own motivations, and each making decisions based on a variety of factors.  But the evidence does not show that the Corps's allegedly tortious actions caused the protests to begin, grow larger, last longer, or increase in intensity.

[¶3]    The protests started off of Corps land, on an area within the Standing Rock Indian Reservation.  Protestors eventually spilled onto Corps land without the Corps's prior knowledge or permission.  Throughout the protests, protestors stayed not only on Corps land but on Reservation land, private land, State-owned land, and at hotels and private residences in the area.

[¶4]    Almost immediately after State and local law enforcement and Corps officials realized the protests might be a cause for concern, the protests had grown to number hundreds of people and were beyond the point where a forcible eviction was feasible or advisable.  Subsequent events— such as a confrontation on Labor Day 2016 between protestors and private security contractors hired by the pipeline company—caused tensions to increase and the protests to balloon in size.

[¶5]    Throughout the protests, State and Corps officials took essentially the same approach.  They emphasized that peaceful protestors' First Amendment rights were important.  They strived to contain the protestors to a safe area where resources could be made available, out of the road and away from the pipeline's construction activities.  And they tried to identify and work with protest leaders to deescalate tensions, in hopes of avoiding injuries and loss of life.  That approach succeeded: though officials had serious concerns that people could die given the scale and intensity

of the protests, no one did.  That is a testament to the reasonableness of the deescalation approach that the Corps and the State both adopted.

[¶6]    The State claims approximately $38 million in damages—all of its law enforcement protest-response costs.  The State has already received $25 million to reimburse the bulk of those costs, including $10 million from the federal government.  To the extent anyone is liable for the State's protest-response costs, it is the people who caused those costs to be incurred: the protestors.

[¶7]    For the reasons discussed below, the State has not adduced sufficient evidence to establish that the Court has jurisdiction, that the Corps breached a duty, that the State's claimed damages were caused by the Corps, or that the State is entitled to recover its protest-response costs.  The Court finds that the United States is not liable, and the State is not entitled to a damages award.

## FINDINGS OF FACT

[¶8]    The Court makes the following specific findings of fact which are necessary for the disposition of this case.

### I.    The Corps and Its Mission

#### A.  The Corps's Management of Water Resource Projects and Its Trust Relationship with Native American Tribes

[¶9]    Congress has granted the Corps sweeping authority to operate Corps-managed land.  "The Chief of Engineers, under the supervision of the Secretary of the Army, is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army. . . ."  16 U.S.C. § 460d. Federal regulations issued under that authority provide that the Corps's policy is to "manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and

healthful recreational opportunities while protecting and enhancing these resources." 36 C.F.R. § 327.1(a); *see generally* 36 C.F.R. Part 327.

[¶10] The Corps manages land around its water resource projects in accordance with congressional authorization. Tr. 1455:14-21 (Day 9; Kruger).[1] Within those authorizations, members of the public generally have an interest in recreating on and enjoying Corps land as a public resource. *Id.* at 1455:22-1456:2.

[¶11] Every year, there are approximately 270 million visitors to Corps land across the country. *See id.* at 1456:3-5. On any given day, there are hundreds of unauthorized encroachments onto Corps land. Tr. 1905:10-15, 1983:23-1984:5, 2024:16-24 (Day 12; Spellmon).

[¶12] The Corps has a trust relationship with Native American Tribes, which requires Corps officials to work diligently to maintain good relationships with Native American Tribes, to communicate with them, and to take great care to understand their perspectives and concerns. Tr. 1426:17-1427:6 (Day 8; Jackson); Tr. 1456:15-19 (Day 9; Kruger). This trust relationship is extremely important for the Corps. Tr. 2013:16-24 (Day 12; Spellmon). It is not limited to particular areas of land, but in working with Native American Tribes on issues of access to Corps lands, Corps officials consider this trust relationship. *See* Tr. 1081:12-20, 1165:2-5, 1283:2-4 (Days 7-8; Henderson) (discussing the significance of a federally recognized Tribe, with whom the Corps has a special trust relationship, requesting a Special Use Permit and the need to work with them in good faith); Tr. 2014:7-16 (Day 12; Spellmon) (discussing the need to give due diligence to the Standing Rock Sioux Tribe's Special Use Permit application for lands off the Standing Rock Indian Reservation that were of cultural importance to the Tribe). When an issue involves a federally

---

[1] Cites to trial testimony are indicated herein as: "Tr. page:line (Day; Witness)." Cites to designated deposition testimony heard at trial are indicated herein as: "ECF No. [X], Dep. Tr. page:line (Witness)."

recognized Tribe, the District Commander for the area will often decide to retain decision-making authority over that issue.  *See* Tr. 1458:15-24 (Day 9; Kruger).

[¶13]   The Corps is a standalone unit within the Department of the Army.  *See* ECF 405-7, Dep. Tr. 18:16-18 (Semonite).  The head of the Corps reports to the Army Vice Chief of Staff, who in turn reports to the Army Chief of Staff, who reports to the Secretary of the Army.  *See id.* at 18:16-19:19, 20:5-22.  The Secretary of the Army has several Assistant Secretaries, including the Assistant Secretary of the Army for Civil Works.  *Id.* at 20:15-17.  Corps leaders do not report to the Assistant Secretary of the Army for Civil Works, but they may listen to his or her guidance.  *See id.* at 20:17-20; Tr. 1405:6-8 (Day 8; Jackson); Tr. 1147:19-23 (Day 7; Henderson).  On the flip side, Corps officials do not direct the activities of the Department of the Army or its personnel.  *See* Tr. 1213:24-1214:2 (Day 7; Henderson).

[¶14]   The Corps itself is headquartered in Washington, D.C. and is headed by the Chief of Engineers.  Tr. 1405:8-11 (Day 8; Jackson); ECF No. 405-7, Dep. Tr. 18:23 (Semonite).  Additionally, the Corps has eight divisions across the country (plus one that is entirely international), each of which is led by a Division Commander and includes the geographic area of multiple states.  *See* ECF No. 405-7, Dep. Tr. 18:25-19:3 (Semonite).  Below the division level are 43 districts, each of which is led by a District Commander.  *See id.* at 19:3-9; Tr. 1147:1-15 (Day 7; Henderson).  District Commanders are "responsible for ensuring adequate order, discipline and protection of resources at Corps projects."  ECF No. 6-2, ER 1130-2-550 § 6-2(a).

[¶15]   The vast majority of the Corps's 35,000-plus personnel are civilians.  ECF 405-7, Dep. Tr. 19:11-12 (Semonite).

### B.  The Corps Does Not Have Law Enforcement Capabilities

[¶16]   The Corps is not a law enforcement entity, and it has no organic law enforcement capability.

Tr. 1152:11-14 (Day 7; Henderson); Tr. 1424:25-1425:2 (Day 8; Jackson); ECF No. 6-2, ER 1130-2-550 § 6-2(e). It employs park rangers, who are not law enforcement officers. Tr. 1460:13-15 (Day 9; Kruger); Tr. 1152:11-14 (Day 7; Henderson); ECF No. 6-2, ER 1130-2-550 § 6-2(e). Corps park rangers do not have the authority to make arrests, they are not armed, and they do not carry handcuffs. Tr. 1460:16-1461:4 (Day 9; Kruger); ECF No. 6-2, ER 1130-2-550 § 6-2(e). Park rangers' primary responsibility is visitor assistance and safety, and their secondary priority is ensuring visitors' compliance with the Corps's Title 36 rules and regulations. *Id.* at 1456:24-1457:9, 1461:24-1462:5.

[¶17] It is within the Corps park rangers' discretion to decide what, if any, steps to take to gain visitors' compliance with Corps rules and regulations, and park rangers are never required to take any particular steps to enforce those rules and regulations. *Id.* at 1462:6-10, 1463:21-25, 1464:3-7. Park rangers are trained to gain voluntary compliance using the lowest level of their enforcement authority possible. *Id.* at 1463:21-1464:2; *see* ECF No. 6-2, ER 1130-2-550 § 6-2(f).

[¶18] Generally, to ensure that members of the public follow the Corps's rules and regulations, park rangers first try to gain voluntary compliance through outreach, education, and discussion. Tr. 1461:5-11 (Day 9; Kruger); ECF No. 6-2, ER 1130-2-550 § 6-2(f). They can also issue written warnings and written citations. Tr. 1457:8-9, 1461:12-16 (Day 9; Kruger); ECF No. 6-2, ER 1130-2-550 § 6-2(f). Finally, they can issue a citation with a mandatory court appearance, which is the highest level of enforcement action available to Corps park rangers. Tr. 1461:16-18 (Day 9; Kruger); ECF No. 6-2, ER 1130-2-550 § 6-2(f). The decision whether to prosecute any citation written by Corps park rangers rests with the local U.S. Attorney's Office. Tr. 1462:16-19 (Day 9; Kruger).

[¶19]   State and local law enforcement have jurisdiction to enforce state and local laws on Corps land.  *Id.* at 1462:23-1463:2; Tr. 1151:15-1152:6 (Day 7; Henderson); DX 4004 at USA 00000227[2] (Corps's Lake Oahe Master Plan stating that "enforcement of state and local laws and ordinances will be handled by the appropriate state and local law enforcement agencies"); 42 U.S.C. § 3112(a) ("It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires."); *id.* § 3112(c) ("It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section."); 36 C.F.R. § 327.26 (Corps Title 36 regulation providing that "state and local laws and ordinances shall apply on project lands and waters" and "are enforced by those state and local enforcement agencies established and authorized for that purpose."); ECF No. 6-2, ER 1130-2-550 § 6-2(c) (Corps implementing guidance stating that "[i]n the acquisition of land at Civil Works installations, the Corps of Engineers obtains proprietary interests only. Individual states and their political subdivisions retain the statutory authority, and inherent responsibility, to enforce state and local laws").

[¶20]   The Corps relies on State and local law enforcement to enforce state and local laws on its lands.  *See* Tr. 1462:23-1463:2 (Day 9; Kruger); Tr. 1151:15-1152:6 (Day 7; Henderson); DX 4004 at USA 00000227; 42 U.S.C. § 3112(a), (c); 36 C.F.R. § 327.26; ECF No. 6-2, ER 1130-2-550 § 6-2(c); ECF No. 6-3, EP 1130-2-550 § 6-5. The Corps cannot order another federal entity or agency to deploy law enforcement on Corps land.  *See* Tr. 1201:18-21 (Day 7; Henderson); Tr. 1394:2-6 (Day 8; Jackson).  The Corps's decision-making about how to handle unlawful conduct on its lands depends on the approach taken by state and local law enforcement, and the resources they make available.  *See* Tr. 1472:17-22 (Day 9; Kruger).

---

[2] All pincites to exhibits herein refer to the documents' internal pagination.

## II.    The Corps's Lake Oahe Project and the Surrounding Area

[¶21]   The Corps manages federal land at the confluence of the Cannonball and Missouri Rivers in North Dakota as part of the Lake Oahe Flood Control Project.  DX 4004 at USA_00000125-28.  The Cannonball River travels along a roughly east-west line and makes a T-intersection with the west bank of the Missouri River, which generally runs north-south.  *Id.* at USA_00000128.  To the north of the Cannonball River is the Heart River, which joins with the Missouri River in Mandan.  *See*  DX  4217  at  7-8;  Google  Maps,  https://www.google.com/maps/@46.8111783,-100.9600144,12.17z?entry=ttu (last visited Aug. 1, 2024); *see also, e.g.*, Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately  and  readily  determined  from  sources  whose  accuracy  cannot  reasonably  be questioned."); *Deutch v. United States*, 367 U.S. 456, 470 (1961) (noting courts may take judicial notice of geographic facts); *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (taking  judicial  notice  of  a  Google  map  "as  a  source  whose  accuracy  cannot  reasonably  be questioned" (alterations omitted)).

### A.  History of the Area

[¶22]   The area around Lake Oahe is important in the history of the Sioux Tribes.  Beginning in the 1830s, non-Native Americans began traveling west in large numbers through the Central Great Plains.  DX 4217 at 9.  In 1851, in an effort to keep the travel corridor across the Plains open and with the aim of gaining land concessions and confining the Tribes to specific geographic areas, the United States gathered various Native American Tribes at Fort Laramie to negotiate a treaty.  *Id.* The area between the Heart and the Cannonball Rivers fell within Sioux territory as it was described in the 1851 Treaty of Fort Laramie.  *Id.* at ii.

[¶23]   In 1868, a second Treaty of Fort Laramie provided for part of the 1851 Treaty territory to

become a reservation for the "different Tribes of Sioux Indians," bounded on the east by the east bank of the Missouri River, and on the north by the forty-sixth parallel. *Id.* at 7. The reservation did not include the area between the forty-sixth parallel and the Heart River. *Id.* The 1868 Treaty provided that other areas north of the North Platte River and east of the summits of the Big Horn Mountains not designated as a reservation would be "held and considered to be unceded Indian territory." *Id.* at 7, 12. White persons were prohibited from settling on, occupying, or passing through the unceded territory without the Tribe's consent. *Id.* at 12.

[¶24]   The treaties between the United States and the Sioux were of great importance to many DAPL protestors. *See* Tr. 2437:5-9 (Day 15: Iron Eyes) (testifying that from his point of view, treaties between the Sioux Nation and the United States are not ancient history but "are still sacred covenants that we uphold with the United States of America"); *id.* at 2446:23-2447:3 (testifying about protestors' decision to call the area also known as the North Camp "the 1851 Treaty Camp"); Tr. 623:11-13 (Day 3; Pederson) (testifying that when he responded to protests on the first day, August 10, 2016, the protestors gave him a copy of the Treaty of 1851); ECF No. 404-1, Dep. Tr. 22:6-14 (Bachmeier) (testifying that, "when the protest itself started in August . . . it was a coalition of—of many different individuals who held sincere, honest beliefs about treaty rights of our indigenous neighbors" as well as beliefs about the pipeline being routed through land with sacred artifacts); ECF No. 404-2, Dep. Tr. 195:20-196:1 (Davis) (testifying about a heated conversation Davis had with a protestor, in which the protestor said "This is treaty land we're—you're—you're on"); *see also* JX 10 at ND_000137422 (State-created After Action Report on the DAPL protests, listing the 1851 and 1868 Fort Laramie treaties as significant events); JX 13 at ND_000253221 (State presentation on "Impacts and Lessons" of the DAPL protests identifying "Issues regarding Fort Laramie Treaties of 1851 and 1868" as "Contributing Factors" to the protests); JX 266 at

ND_000253594, ND_000253602 (Morton County Sherriff's presentation identifying the 1851 and 1868 treaties as part of the "Perfect Storm" of factors contributing to the protests and stating that "[t]he Standing Rock Sioux saw DAPL as an encroachment on their treaty lands, and believed they had rights to that land").

[¶25]   Many Sioux believe that the land lying between the Cannonball and Heart Rivers was never ceded.  *See, e.g.*, DX 4217 at 7-8; Tr. 2584:9-19 (Day 16; Greenwald); ECF No. 404-3, Dep. Tr. 11:8-12 (Estes); *see also* DX 4256 (at video timestamp 18:29-18:40, a leader of a protest camp on State and private land north of the Cannonball River says that, following the 1851 treaty, "this is still Oceti Sakowin land that we're camped on").  As a result, many believe that the Corps does not have the right to say who belongs on this land.  *See* ECF No. 404-3, Dep. Tr. 23:17-25 (Estes).

[¶26]   The DAPL pipeline crosses the area between the Cannonball and Heart Rivers, and many Sioux and supporters believed that the pipeline route trespassed on unceded Sioux land.  DX 4217 at i, 1-4; ECF No. 404-3, Dep. Tr. 22:1-6 (Estes) (testifying that it is common knowledge that the area where the protest camps were on Corps land was unceded treaty territory belonging to the Sioux); Tr. 2508:24-2509:8 (Day 16; LaDuke) (testifying that she understood that where she camped in the Main Camp was Lakota Land); Tr. 2421:16-19 (Day 15: Iron Eyes) (testifying that in his mind, when one crosses to the south of the Heart River, one is in the Sioux Nation); JX 266 (presentation by Sheriff Kirchmeier about the protests noting that "[t]he Standing Rock Sioux saw DAPL as an encroachment on their treaty lands, and believed they had rights to that land").  Significant portions of the DAPL protests took place in this disputed area.  DX 4217 at 8.

[¶27]   DAPL protestors and their supporters connected the DAPL pipeline route to other historical trespasses on Native American land, including the Pick-Sloan takings and the taking of the Black Hills.  *Id.* at 1-3, 12-15, 20-23.

[¶28]   Additionally, the Sioux and other Native American Tribes have a long history of contesting perceived incursions into their territory by the government.  *See* DX 4217 at 1-5, 24-29; *see also* DX 4053 at USACE_00068809-USACE_00068810 (Chairman Archambault said at the outset of the protests that the protests were important for the Sioux Nation, and that their significance went beyond the present encampment).

### B.  The Lake Oahe Project

[¶29]   The Lake Oahe project was authorized by the Flood Control Act of 1944, with construction of the Oahe Dam on the Missouri River beginning in 1948.  *See* DX 4004 at USA_00000125.  Lake Oahe extends roughly 231 miles from its southern tip at the Oahe Dam six miles north of Pierre, South Dakota to its northern tip near Bismarck, North Dakota.  *See id.*

[¶30]   The Corps's Lake Oahe project provides for flood control, navigation, water supply, hydropower generation, recreation, fish and wildlife, and other purposes designated by Congress.  Tr. 1899:2-10 (Day 12; Spellmon); DX 4004 at USA_00000126-USA_00000130.

[¶31]   The Corps does not have a commercial interest in the Lake Oahe project property.  *See* DX 4004 at USA_00000124-USA_00000130 (describing the establishment of the Lake Oahe project as part of the Flood Control Act of 1944 and the Corps's authorized purposes in operating the project); *see also* Tr. 1149:20-24 (Day 7; Henderson) (testifying that the Corps was not engaged in any type of commercial activity on the land at the time of the protests that might suggest people would be drawn to protest there).

[¶32]   The Lake Oahe project lies within the Corps's Omaha District.  *See* DX 4004; Tr. 1031:22-1032:8 (Day 7, Henderson).  During the time of the DAPL protests, the Omaha District Commander was COL John Henderson.  *See* Tr. 1024:21-1025:2, 1031:22-1032:1 (Day 7; Henderson).

[¶33]   COL Henderson was responsible for day-to-day decision making regarding the protests, including whether to grant any permits for protestors to use Corps lands and public statements about such permits.  Tr. 1029:11-14, 1155:2-11 (Day 7; Henderson); Tr. 1376:10-16, 1378:5-12 (Day 8; Jackson).

[¶34]   COL Henderson is a 23-year U.S. Army veteran.  Tr. 1023:24-1024:1 (Day 7; Henderson).  He served with the Corps in a variety of capacities, including a tour of duty in Iraq in 2004 to reconstruct the areas around Baghdad, Fallujah, Abu Ghraib, Taji, Ramadi, and Baqubah as that country experienced a violent insurgency.  *Id.* at 1143:14-18.  In addition to his years with the Corps, he served as an officer in the Army, including as a platoon leader in the Demilitarized Zone (DMZ) in South Korea and as the leader of an 800-soldier construction battalion in Afghanistan.  *Id.* at 1024:7-20.  Throughout his military career, COL Henderson received three Bronze Star Medals for extraordinary service in combat, as well as a Legion of Merit, a Combat Action Badge, seven Meritorious Service Medals, a Humanitarian Service Badge, and other commendations and awards.  *Id.* at 1143:19-1144:5.  After he left the Corps, COL Henderson was appointed by President Trump as Assistant Secretary of the Air Force.  *Id.* at 1145:11-15.

[¶35]   As the Corps's Omaha District Commander, COL Henderson reported to the Corps's Northwestern Division Commander, who, at the time of the protests, was Brigadier General (now Lieutenant General) Scott Spellmon.  Tr. 1025:3-7, 12-17 (Day 7; Henderson); Tr. 1898:13-16, 1899:18-23 (Day 12; Spellmon).  (LTG Spellmon is now the Chief of Engineers and has served in that position for almost four years.  Tr. 1897:9-12 (Day 12; Spellmon).)

[¶36]   At the time of the DAPL protests, just two Corps park rangers were assigned to the Lake Oahe project area.  *See* Tr. 1098:16-18 (Day 7; Henderson).

15

### C.  Political Geography and Jurisdiction in the Area

[¶37]   The land north of the Cannonball River and west of the Missouri River sits within Morton County.  DX 4004 at USA 00000128; JX 13 at ND_000253225.  The land south of the Cannonball River and west of the Missouri River sits within Sioux County.  DX 4004 at USA 00000128; JX 13 at ND_000253225.  Sioux County is coextensive with the portion of the Standing Rock Indian Reservation that sits within North Dakota.  DX 4004 at USA 00000128.  (The reservation also extends into South Dakota.  *Id.*)  That is, the Cannonball River forms the northern border of the Standing Rock Indian Reservation, and the land south of the Cannonball is part of the Reservation. *See* Tr. 1286:6-17 (Day 8; Henderson); Tr. 1552:6-10 (Day 9; Van Horn); Tr. 2604:5-7 (Day 16; Cruzan); JX 87 at MYERS_00000033.

[¶38]   Highway 1806 runs north-south through Sioux and Morton Counties.  *See* JX 87 at MYERS_00000033; JX 265 at ND_000204145-ND_000204146.  It crosses Cantapeta Creek, a northern tributary of the Cannonball River, via the Backwater Bridge.  *See* JX 265 at ND_000204146; JX 129 at USACE_00023974; JX 13 at ND_000253225; Tr. 452:21-23 (Day 3; Kirchmeier).

[¶39]   In Morton County, the Morton County Sheriff's Office has law enforcement jurisdiction. *See* Tr. 426:1-11 (Day 3; Kirchmeier).  This jurisdiction includes the authority to enforce state and local laws on Corps land.  *See* 42 U.S.C. § 3112(a), (c); 36 C.F.R. § 327.26; ECF No. 6-2, ER 1130-2-550 § 6-2(c); JX 204 at USACE_00009350-USACE_00009351 (email from COL Henderson discussing the Corps's "proprietary jurisdiction" and explaining "this means that Morton County has jurisdiction to conduct law enforcement activities on Corps land (to include inside of the camps) when enforcing State and local laws . . . .  Therefore, they do not need to ask permission to come on to public lands to enforce local laws.  This has always been the case").

[¶40]   On the Standing Rock Indian Reservation, the Bureau of Indian Affairs (BIA) has law enforcement jurisdiction.   The BIA has law enforcement jurisdiction over tribal land, but not on land outside the Reservation.  Tr. 2602:4-8, 2603:7-11 (Day 16; Cruzan).  Because the Cannonball River marks the northern border of the Standing Rock Indian Reservation, the BIA has no jurisdiction north of the Cannonball.  *Id.* at 2604:5-14; *see* Tr. 74:21-22 (Day 1; Schulz) (the Cannonball River is the jurisdictional boundary between Standing Rock and Morton County). Further, the BIA cannot assign its law enforcement personnel to areas off of the Reservation.  Tr. at 2666:19-21, 2669:8-9 (Day 16; Cruzan).   The parties presented no evidence of any cross-deputization agreement between the BIA and Morton County.  *See id.* at 2688:11-2689:8, 2693:22-2694:1; *see also* Tr. 1180:4-9 (Day 7; Henderson) (testifying that BIA law enforcement "eventually agreed to help out with [non-tribal] areas south of the Cannonball River," but there was never any agreement in place for BIA to police Corps land to the north of the Cannonball River).

### D. Locations of DAPL Protest Camps

[¶41]   From late summer 2016 through early 2017, several different encampments of individuals protesting the DAPL pipeline were established in areas north and south of the Cannonball River, to the west of the Missouri River, in North Dakota.  Those encampments included the following:

a. The Sacred Stone camp (initially known as the Spirit Camp), located primarily on non-Corps land that was part of the Standing Rock Indian Reservation south of the Cannonball River, though a small sliver of the camp eventually spilled over onto Corps-managed land south of the River.   DX 4053 at USACE_00068809; Tr. 140:18-20 (Day 1; Schulz); 1491:17-25 (Day 9; Van Horn); JX 266-N at slides 9-10, 26.

b.  The Oceti Sakowin Camp (also known as the Main Camp, the Seven Councils Camp, or the Seven Council Fires Camp), located on Corps-managed land to the north of the Cannonball River. Tr. 2604:19-2605:2 (Day 16; Cruzan); Tr. 1514:2-5 (Day 9; Van Horn); JX 266-N at slides 9-10, 26. This came to be the largest of the various protest encampments in the area. *See* Tr. 1482:11-17 (Day 9; Van Horn).

c.  The Rosebud Camp, located on Corps-managed land south of the Cannonball River. Tr. 2604:19-2605:2 (Day 16; Cruzan); JX 266-N at slides 9-10.

d.  The North Camp (also known as the 1851 Treaty Camp), located off of Corps land, approximately one to two miles to the north of the Main Camp near the pipeline crossing point, and which sat partially on private land at the Cannonball Ranch and partially on State-owned land in the right-of-way of Highway 1806. Tr. 2436:11-14 (Day 15; Iron Eyes); Tr. 312:2-3 (Day 2; Johnson); Tr. 159:5-17 (Day 1; Schulz); Tr. 1488:7-12, 1513:24-1514:1, 1514:6-20, 1515:24-1516:4 (Day 9; Van Horn); DX 4091 at MYERS_00042040.

e.  The Black Hoop, Cordova, and a number of other camps located on Reservation land south of the Cannonball River. Tr. 1524:10-15 (Day 9; Van Horn); Tr. 2604:20-2605:2 (Day 16; Cruzan); JX 266-N at slide 10.

[¶42] The following maps depict the geographical location of the various DAPL protest encampments.

a. Demonstrative map 1:



b.   Map 2, from JX 266-N, slide 9:



c.  Map 3, from DX 4091 at MYERS_00042040:



## III.  The Corps's Processes for Permitting Use of Its Land

[¶43]   The primary way the public makes requests to hold events on Corps land is through the Special Use Permit process.  *See* Tr. 1153:13-19 (Day 7; Henderson).  When a member of the public makes such a request, the Secretary of the Army (or those to whom he or she delegates authority) "may issue special permits for uses such as group activities, recreation events, . . . and such other specialized recreation uses as the Secretary determines to be appropriate, subject to such terms and conditions as the Secretary determines to be in the best interest of the Federal Government."  33 U.S.C. § 2328a(a)(1); *see also* 16 U.S.C. § 460d (the Secretary can also issue and enforce regulations and rules concerning Corps-managed property, within the limits set by Congress, and the Corps Chief of Engineers can exercise and delegate authority to enforce those rules and

regulations); 36 C.F.R. § 327.25 (Corps District Commanders can further delegate authority to issue citations for violations of Corps regulations).

[¶44]   The regulations governing the public use of land around Corps-managed water resource projects are found at 36 C.F.R. Part 327.  These regulations direct Corps officials to manage water resource projects consistent with the public interest, and they delegate significant authority and discretion to the District Commander who oversees a particular project to make decisions about use of the land.  For example, Section 327.1(a) outlines the policy behind the Corps's management of water resource projects:  "It is the policy of the Secretary of the Army, acting through the Chief of Engineers, to manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources."  Section 327.7 applies to camping, providing, *inter alia*, that "[c]amping is permitted only at sites and/or areas designated by the District Commander," "[c]amping at one or more campsites at any one water resource project for a period longer than 14 days during any 30-consecutive-day period is prohibited without the written permission of the District Commander," and "the digging or leveling of ground or the construction of any structure without written permission of the District Commander is prohibited."  Section 327.12 provides that "The District Commander may close or restrict the use of a project or portion of a project when necessitated by reason of public health, public safety, maintenance, resource protection or other reasons in the public interest."

[¶45]   The Corps's implementing guidance for Special Use Permits are outlined in Corps Engineering Regulations ("ER") 1130-2-550 (Nov. 15, 1996 (as updated)), ECF No. 6-2; Engineering Circular ("EC") 1130-2-550 (Nov. 30, 2015), ECF No. 8; and Engineering Pamphlet ("EP") 1130-2-550 (Nov. 15, 1996 (as updated)); ECF No. 6-3.

[¶46]   The purpose of a Special Use Permit is multifold.  It clarifies the intended use of the land, and it ensures accountability and liability for the members of the public who are using the land.  Tr. 1153:20-1154:13 (Day 7; Henderson).

[¶47]   The decision whether to grant a Special Use Permit is within the discretion of Corps officials.  *Id.* at 1036:8-12; Tr. 1467:6-15 (Day 9; Kruger).  There is no rule or guidance directing when a Corps official must grant a Special Use Permit.  *See* Tr. 1469:18-20 (Day 9; Kruger); *cf., e.g.*, ECF No. 8, EC 1130-2-550 Appendix E § E-1 ("*Consideration* will be given to allowing special events on Federal lands and waters managed by the USACE on a first-come, first-serve basis.  Special Use Permits *may be issued* to authorize special events . . . ." (emphases added).

[¶48]   The Corps has the authority to attach certain conditions to a grant of a Special Use Permit.  What conditions are included generally depends on the circumstances of the event.  *Id.* at 1469:24-1470:5.

[¶49]   The Corps's implementing guidance includes a number of provisions to limit the United States' liability for events held on Corps land, including conditions that may be placed on events on Corps land.  *See* ECF No. 8, EC 1130-2-550 Appendix E § E-6.  As to liability insurance, Section E-6(c) states that the Corps "Operations Project Manager will determine if a proposed event requires liability insurance."  *Id.*;  *see id.* § E-6(c)(4) ("Liability insurance *may* be required at any event, *at the discretion of the Operations Project Manager*, when there is an increased possibility for an accident or the activity has a high potential for involving other lake visitors." (emphasis added)).  The guidance further states:

> [l]iability insurance for events such as religious ceremonies, social ceremonies (weddings, etc), club fishing tournaments or family reunions that involve less than 50 participants, *may* be required at the discretion of the Operations Project Manager. *For the above listed events*, when the expected group is over 50 participants, liability insurance, obtained by the event holder, that names the United States Government

as an additional insured in the minimum amount of $1,000,000 for each event is mandatory.

*Id.* § E-6(c)(1) (emphases added).  The Standing Rock Sioux Tribe's gathering on Corps land did not fall into any of the specifically listed events over 50 participants for which liability insurance is mandatory; therefore, the discretion whether to require such insurance remained with Corps officials.  *See id.* §§ E-6(c), E-6(c)(4).  As to a performance bond, the guidance provides that "a performance bond *may* be required, prior to the event, to cover maintenance, damage and restoration costs for government resources and facilities.  Performance bonds *may* be required for events conducted by non-profit organizations, if warranted."  *Id.* § E-6(a) (emphases added).  There is no indication in the guidance—or from the evidence presented at trial—that either liability insurance or a performance bond in connection with the protests would have accrued to the benefit of the State or permitted the State to seek its law-enforcement costs from the Corps.

[¶50]   If a Special Use Permit includes a requirement for insurance or performance bond, and the applicant does not timely provide proof those conditions have been met, Corps officials have the discretion to deny the permit.  *See id.* § E-9(i) ("The Operations Project Manager *has the authority to deny an event*" if the applicant refuses to agree to the permit conditions or fails to provide proof of any required insurance or a performance bond (emphasis added)).

[¶51]   A Special Use Permit-holder's failure to perform the terms and conditions of a permit may result in the permit being voided.  Tr. 1443:3-6 (Day 9; Kruger); *see* 36 C.F.R. § 327.21(b) ("The District Commander shall have *authority* to revoke permission, require removal of any equipment, and require restoration of an area to pre-event condition, upon failure of the sponsor to comply with terms and conditions of the permit/permission or the regulations in this part 327." (emphasis added)).

[¶52]   The process of securing a Special Use Permit often requires significant back-and-forth communications between the applicant and Corps officials, regarding the applicable rules and regulations, the means the permitholder will use to ensure compliance with those rules and regulations, and the purpose of the proposed event.  *See* Tr. 1469:4-10 (Day 9; Kruger).

[¶53]   Members of the public who want to use Corps land for activities that would ordinarily require a Special Use Permit often fail to secure a Special Use Permit beforehand.  *See id.* at 1468:1-23; Tr. 1905:10-15, 1983: 23-1984:5, 2024:16-24 (Day 12; Spellmon).

[¶54]   When members of the public enter Corps land without authorization, Corps officials respond to the unauthorized use by exercising their best judgment and employing the tools at their disposal.  *See* Tr. 1464:20-1465:5, 1467:16-1468:17 (Day 9; Kruger).  Sometimes the Corps will notify state or local law enforcement about an unauthorized use of its land, but often (particularly in rural areas), law enforcement is the first to know about such a situation and are the ones who reach out to the Corps with that information.  *Id.* at 1471:2-19 (discussing an instance when Kansas state law enforcement became aware that Corps land at Melvern Lake was being used for an illegal marijuana grow operation; law enforcement monitored the situation and only informed the Corps of the issue the day before they planned to make arrests).  Input from law enforcement is a "primary factor" in considering the potential options the Corps has to respond to a problem on Corps land. *Id.* at 1472:17-22.

[¶55]   The decision whether to grant a Special Use Permit is often made by the local Operations Project Manager, but it can be elevated to the District Commander level.  *See* Tr. 1458:7-24 (Day 9; Kruger) (using the acronym "OPM" to refer to Operations Project Manager).  In the case of the DAPL protests, then-Omaha District Commander COL Henderson retained the decision-making authority on the Standing Rock Sioux Tribe's application for a Special Use Permit and was the

ultimate decision-maker on it and the press release that accompanied its issuance.  Tr. 1036:22-25, 1215:9-14 (Day 7; Henderson); Tr. 1378:11-12, 1418:19-1420:7 (Day 8; Jackson); Tr. 1376:10-16, 1378:5-12 (Day 8; Jackson); ECF 405-5, Dep. Tr. 85:7-10; (Gipe); *see* JX 65 at USACE_00011547 (August 17, 2016, email from COL Henderson to his team stating that "I am retaining the authority to make any decision on special use permits (if we receive an application for one) based on life, health, and safety concerns and on available information about potential extremist group involvement at these camps").

[¶56]   Corps officials are never *required* to seek removal of people on its land for not complying with the terms of a Special Use Permit.  Tr. 1470:13-16 (Day 9; Kruger).

[¶57]   The Special Use Permit Process is not the only way in which a District Commander may permit people to be on Corps land.  Corps guidance recognizes that Corps officials have authority and discretion to use "alternative management techniques" in connection with people using its land. Tr. 1447:7-13, 1465:12-1466:18 (Day 9; Kruger); *see* ECF No. 6-3, EP 1130-2-550 § 6-3(j) ("There are many alternative management techniques in addition to the issuance of citations that should be considered . . . ."); ECF No. 6-3, EP 1130-2-550 Appendix G (providing a list of such alternative management techniques); *see also* Tr. 1468:5-23 (Day 9; Kruger) (groups of people will often show up to hold events on Corps-managed land, and Corps officials' approach is generally to work with them to accommodate their use of the land while specifying conditions for that use).  Alternative management techniques may include creating overflow space for gatherings of the public, separating different types of users of Corps land, or establishing areas for special uses.  ECF No. 6-3, EP 1130-2-550 Appendix G; Tr. 1465:15-1466:3 (Day 9; Kruger) (testifying about an instance where there were large crowds at a campground that were creating a hazard, so Corps officials established an overflow zone out of the campground on another area); *id.* at 1466:4-18, 1468:20-

21 (testifying about an instance where a wedding party of 150 people were relocated to a different area on Corps land so the wedding could continue without bothering other campers).

[¶58]   The District Commander also has the discretion to permit people to be on Corps land without a formal Special Use Permit.  Tr. 1148:17-20, 1154:17-21 (Day 7; Henderson); *see also* ECF No. 6-3, EC 1130-2-550 Appendix E § E-1 ("Special Use Permits *may* be issued to authorize special events such as water carnivals, fishing tournaments, boat regattas, music festivals, dramatic presentations and other special programs or activities." (emphasis added)).  The Corps regularly uses its discretion to allow individuals on its lands around the country, such as to host events for the public, without requiring the participants to have a permit.  *See, e.g.*, Carlyle Lake Summer Series, U.S. Army Corps of Engineers (last visited August 2, 2024), *available at* https://www.mvs.usace.army.mil/Missions/Recreation/Carlyle-Lake/Events/Leisure-Summer-Series/; News Release: Coralville Lake to Host Halloween Haunted Trail Event, U.S. Army Corps of Engineers (Oct. 23, 2018), *available at* https://www.mvr.usace.army.mil/Media/News-Releases/Article/1670109/coralville-lake-to-host-halloween-haunted-trail-event/.

[¶59]   The District Commander has the authority to close Corps land as necessary for public health and safety, resource protection, or other reasons in the public interest.  36 C.F.R. § 327.12(a); Tr. 1148:10-13 (Day 7; Henderson).  But the Corps's rules and regulations do not require the District Commander to refuse public access to Corps-managed land at any time.  *See* 36 C.F.R. § 327.12(a) ("The District Commander *may* close or restrict the use of a project or portion of a project . . . ." (emphasis added)); Tr. 1148:21-25 (Day 7; Henderson) (as District Commander, COL Henderson was vested with the authority to close Corps-managed land).

[¶60]   Providing a "free speech zone" for protestors on Corps land could be considered an "alternative management technique" under the Corps's guidance, and it is within the District

Commander's authority to permit people to be on Corps land via a free speech zone. *Id.* at 1447:7-13; *see* Tr. 1423:11-1424:16 (Day 8; Jackson); Tr. 2010:7-2011:5 (Day 12; Spellmon).

## IV.    The Dakota Access Pipeline and the *Standing Rock Sioux Tribe* Litigation

[¶61]   The Dakota Access Pipeline is a nearly 1,200-mile-long, domestic oil pipeline that is designed to move over a half-million gallons of crude oil per day. JX 10 at ND_000137422; *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, 205 F. Supp. 3d 4, 7 (D.D.C. 2016). It runs through four states, originating in North Dakota, crossing South Dakota and Iowa, and ending in Illinois. *See* JX 10 at ND_000137422; JX 13 at ND_000253223; *Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 7.

[¶62]   The pipeline route crosses under Lake Oahe, through Corps-managed land. JX 9 at ND_000135616. Its route also crosses Highway 1806 in Morton County, north of Corps land and west of Lake Oahe. *See* JX 87 at MYERS_00000033. The pipeline route does not cross Standing Rock Indian Reservation land, but it runs within a half-mile of the Reservation. *Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 7; *see* JX 13 at ND_000253224.

[¶63]   Corps permission under the Rivers and Harbors Act of 1899 was required for the construction of the portion of the pipeline below Lake Oahe, as well as a real estate easement for the pipeline to cross Corps land under the Mineral Leasing Act. *See* Tr. 1032:14-1033:4 (Day 7; Henderson); Tr. 1600:15-19 (Day 9; Futch); 33 U.S.C. §§ 403, 408; 30 U.S.C. § 185; *Standing Rock Sioux Tribe*, 205 F. Supp.3d at 7. The regulatory decision for the permits and easement fell within the Corps's Civil Works authority, as delegated by the Corps Chief of Engineers. Tr. 1026:5-12 (Day 7; Henderson). However, the ultimate decision on whether to grant the pipeline easement rested with the Assistant Secretary of the Army for Civil Works. ECF No. 405-2, Dep Tr. 18:6-9 (Darcy).

[¶64]   Between 2014 and mid-2016, the Corps had (or sought to have) multiple consultations with Standing Rock Sioux tribal leadership regarding the pipeline.  *See Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 14-24.

[¶65]   On December 8, 2015, the Corps issued a draft Environmental Assessment for the proposed pipeline crossing at Lake Oahe.  *See Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 20.  On July 25, 2016, the Corps issued a final Environmental Assessment and finding of no significant impact and it granted the Rivers and Harbors Act permission.  *See id.* at 24.

[¶66]   COL Henderson approved the necessary permits for the DAPL pipeline crossing on July 25, 2016. Tr. 1032:14-1033:4, 1158:20-24 (Day 7; Henderson).

[¶67]   Once COL Henderson had approved the permits for the pipeline crossing, the next step was congressional notification of the Corps's intent to issue an easement for the pipeline to cross Lake Oahe.  *See* Tr. 1032:20-1033:4, 1034:8-12 (Day 7; Henderson); 30 U.S.C. § 185(w)(2).  For larger oil pipelines like DAPL, this step was done through the Assistant Secretary of the Army for Civil Works.  *See* Tr. 1034:8-12 (Day 7; Henderson).

[¶68]   Approximately a month to six weeks after COL Henderson's approval of the permits, he received a letter from Jo Ellen Darcy, who was then the Assistant Secretary of the Army for Civil Works.  ECF No. 405-2, Dep Tr. 17:8-11 (Darcy); Tr. 1035:6-10 (Day 7; Henderson).  The letter stated that COL Henderson's environmental analysis supporting the easement recommendation would be reviewed further.  *See* Tr. 1035:6-10 (Day 7; Henderson).  At that point, COL Henderson and other Corps officials did not have any control over the granting of an easement for the pipeline to cross Lake Oahe.  *See* Tr. 1262:25-1263:6 (Day 8; Henderson).

[¶69]   Meanwhile, shortly after COL Henderson approved the permits for the pipeline in July 2016, the Standing Rock Sioux Tribe filed a lawsuit in the U.S. District Court for the District of Columbia,

challenging the approval. *See* Complaint, *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, No. 16-cv-1534, ECF No. 1 (D.D.C.) (filed July 27, 2016).

[¶70]   On August 4, 2016, the Standing Rock Sioux Tribe filed a motion for a preliminary injunction, seeking an order requiring the Corps to withdraw the pipeline authorization. *See Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, No. 16-cv-1534, ECF Nos. 5-6. A hearing on the Tribe's preliminary injunction motion was held on August 24, 2016. *See Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, No. 16-cv-1534, ECF No. 27 (hearing transcript).

[¶71]   On September 9, 2016, the district court issued an order denying the Tribe's preliminary injunction motion. *Standing Rock Sioux Tribe*, 205 F. Supp. 3d 4.

[¶72]   The Tribe appealed to the U.S. Court of Appeals for the D.C. Circuit, which initially entered an administrative injunction pending its consideration of the Tribe's emergency motion for inunction pending appeal. *See* Per Curiam Order, *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, No. 16-5259 (D.C. Cir. Sept. 16, 2016). On October 9, 2016, the D.C. Circuit dissolved the administrative injunction and denied the Tribe's emergency motion. *See id.*, Per Curiam Order (entered October 9, 2016).

[¶73]   On December 4, 2016, the Assistant Secretary of the Army for Civil Works determined that the easement for the pipeline to cross under Lake Oahe would not be approved until further review was completed. *See* Tr. 1063:7-10 (Day 7; Henderson); *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, 255 F. Supp. 3d 101, 119 (D.D.C. June 14, 2017).

[¶74]   On January 18, 2017, the Department of the Army published a notice of its intent to prepare an Environmental Impact Statement as to the pipeline. *See* Notice of Intent to Prepare an

Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, 82 Fed. Reg 5,543-5,544 (Jan. 18, 2017).

[¶75]   On January 24, 2017, shortly after he took office, President Trump issued a presidential memorandum directing the Army to instruct the Corps to act quickly to review and approve the pipeline easement.  *See* Presidential Documents, Construction of the Dakota Access Pipeline, Memorandum for the Secretary of the Army, 82 Fed. Reg. 11,129 (presidential memorandum dated Jan. 24, 2017, originally published in Federal Register Jan. 30, 2017, corrected republication Feb. 17, 2017).

[¶76]   The Department of the Army issued a decision to terminate the notice of intent to perform an Environmental Impact Statement, and on February 8, 2017, the Corps granted the necessary easement for the pipeline to cross under Corps land at Lake Oahe.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 120; Notice of Termination of the Intent To Prepare an Environmental Impact Statement in Connection With Dakota Access, LLC's Request for an Easement To Cross Lake Oahe, North Dakota, 82 Fed. Reg. 11,021 (Feb. 17, 2017).

[¶77]   Construction of the DAPL pipeline—including the section that passes beneath Lake Oahe—was concluded in March 2017, and oil began flowing through the pipeline later that year.  *See* Tr. 1616:17-1617:1, 1617:13-15 (Day 9; Futch); *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 120.

[¶78]   After nearly a year of litigation, the judge in the District of Columbia litigation determined that the Corps's analysis that the pipeline would not have a significant impact was lacking in some respects.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 112.  Ultimately, the court ordered the Corps to conduct an Environmental Impact Statement.  *See Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Engineers et al.*, 440 F. Supp. 3d 1, 26 (D.D.C. 2020); *affirmed*, 985 F.3d 1032 (D.C. Cir. 2021).

[¶79]   While the Corps prepares a final Environmental Impact Statement, the DAPL pipeline does not have a valid easement to cross Corps-managed land beneath Lake Oahe.  Tr. 1622:1-4 (Day 9; Futch); Tr. 2015:4-6 (Day 12; Spellmon).  Nonetheless, the DAPL pipeline is currently operational, and oil is flowing through it beneath Lake Oahe, on Corps land.  Tr. 1621:22-25 (Day 9; Futch); Tr. 2015:7-9 (Day 12; Spellmon).  Though the pipeline is technically trespassing on Corps land at Lake Oahe—inasmuch as it does not have the necessary permission from the Corps to be there—the Corps has not required Dakota Access to remove the pipeline from its land nor sought assistance from State or local authorities to do so.  Tr. 1622:5-7 (Day 9; Futch); Tr. 2015:10-12 (Day 12; Spellmon).

V.    **DAPL Protest Events**

A.  **The Start of the DAPL Protests**

[¶80]   The first encampment of individuals protesting the DAPL pipeline in the vicinity of Lake Oahe appeared in late April 2016.  DX 4053 at USACE_00068809.  This first encampment was located to the south of the Cannonball River, on land claimed by Standing Rock Sioux member LaDonna Brave Bull Allard and adjacent Standing Rock Indian Reservation land.  *See id.*; ECF No. 404-6, Dep. Tr. 42:8-18 (Stasch); Tr. 341:6-14 (Day 2; Kirchmeier); Tr. 1557:25-1558:5 (Day 9; Van Horn).  At some point, a portion of this first, small camp crossed into Corps-managed land to the south of the Cannonball River, though it remained right on the border of Corps and non-Corps land.  Tr. 1038:6-9, 1156:13-23 (Day 7; Henderson).

[¶81]   As of May 2016, the camp numbered approximately 12 people, who were there to pray and show their opposition to the pipeline.  DX 4053 at USACE_00068809; *see* Tr. 1157:6-13 (Day 7; Henderson) ("Initially they were protesting, first of all, even whether we even had the authority over the land.  They were praying for a good outcome with the consultation.  They were protesting

fossil fuels and oil and a number of those types of things that were going along with the permit. But essentially they were protesting the Corps' action, regulatory action, and trying to get a voice heard on a more continual basis outside of the consultation process.").

[¶82]   The Corps was aware of this first protest encampment as of approximately May 2016.  Tr. 1038:4-14, 1156:8-12 (Day 7; Henderson).

[¶83]   At the outset, the protests were made up of local tribal members, who were residents of the Standing Rock Indian Reservation and known to tribal leadership.  *See* Tr. 1157:14-20 (Day 7; Henderson); Tr. 2439:9-11 (Day 15; Iron Eyes).

[¶84]   The DAPL protest camp remained small and peaceful until mid-August 2016.  *See* DX 4053 at USACE_00068809.  Witnesses for both sides agreed that, prior to mid-August 2016, the protest encampment did not seem like anything to worry about.  *See* Tr. 1038:6-14 (Day 7; Henderson) (the protests started off with a "prayer camp" comprised of a "small, quiet group of people" who weren't doing any harm); Tr. 1522:5-9 (Day 9; Van Horn) (testifying the protests were originally quiet and peaceful until the Standing Rock powwow in late August 2016); Tr. 160:19-161:4 (Day 1; Schulz) (testifying that the protests began as a peaceful exercise of First Amendment rights, and there were about four months of peaceful protest activity from April to August 2016); Tr. 341:6-14, 345:5-12 (Day 2; Kirchmeier) (Morton County Sheriff Kyle Kirchmeier learned about the protest camp in April 2016 and assigned a deputy to monitor it, but did nothing about it until August 10, 2016); Tr. 428:16-429:2 (Day 3; Kirchmeier) (Sheriff Kirchmeier testifying he had no concerns about the protests from April 2016 to August 10, 2016, and no idea that protests would become what they did); Tr. 793:15-25 (Day 5; Dalrymple) (the Governor first learned of the protests from Chairman Archambault in summer 2016, and he did not take any action about the protests at that time because they did not seem particularly out of the ordinary); *see also* PX 1253 at 0002 (letter

33

from the National Sheriffs' Association stating that when the protests began earlier in the summer of 2016, "Sheriff Kirchmeier and other supporting law enforcement agencies willingly obliged the protesters who wanted to plan peaceful protests").

[¶85]  Early in the protests, the Chairman of the Standing Rock Sioux Tribe, Dave Archambault, made multiple public calls inviting people to come protest and support the Tribe's cause.  *See* Tr. 1041:2-6, 1159:5-24 (Day 7; Henderson) (noting that after the Corps approved the permits for the pipeline in late July 2016, the Tribe started calling for protestors to come and protest that decision and noting that the Tribe had hired a public relations firm to "incite and foment" protest activity on social media); Tr. 1519:17-1520:19, 1520:24-1521:3 (Day 9; Van Horn) and PX 1470 at 0007 (noting that Chairman Archambault called for protest help and spoke at the United Nations and that other Tribes, members of the American Indian Movement, and outside groups all responded as a result of those calls); Tr. 1522:17-23 (Day 9; Van Horn) (the Chairman's calls for support got significant attention).  Those calls caused some people to come to the area and participate in protest activity.  *See* ECF No. 404-3, Dep. Tr. 100:1-9 60:1-11 (Estes) (testifying that he understood his participation in the protests to be as a guest of the Standing Rock Sioux Tribe); Tr. 545:13-16 (Day 3; Laney) (Chairman Archambault's call to action caused people to join the protests); Tr. 448:6-9 (Day 3; Kirchmeier) (the Chairman's invitation was one reason why the protests grew so much larger); *see also* Tr. 171:7-19, 171:23-172:1 (Day 1; Schulz) and DX 4174 at ND_000255240 (Schulz stated that the people participating in unlawful protest activity were Chairman Archambault's "friends and guests").  State officials believed that, as a result of these calls to join the protests, Chairman Archambault bore "some level of responsibility . . . for the protest camps and the actions of those staying there."  JX 144 at ND_000255264-ND_000255265; *see* Tr. 167:15-168:1 (Day 1; Schulz).

[¶86]   Initially, the Standing Rock Sioux Tribe had led and promoted the DAPL protests.  *See, e.g.*, Tr. 166:7-10, 167:15-168:1 (Day 1; Schulz) and JX 144 at ND_000255264-ND_000255265; ECF No. 422, Dep. Tr. 24:20-24 (Perry).  The protests were something the Tribe wanted to own and sponsor.  Tr. 1041:21-1042:1 (Day 7; Henderson).  Tribal leaders picked the protest camp site and took steps to provide for basic needs there, such as water and sanitary facilities.  *See* DX 4053 at USACE_00068809.  The Tribe provided resources within the Main Camp on Corps-managed land to the north of the Cannonball River as the protests continued into the fall of 2016, including distributing food, clothing, medicine, and information inside the camp.  *See* JX 150 at ARMY_00110827.

[¶87]   As more people joined the protests, Chairman Archambault and the Tribe recognized that they did not have control over the larger group.  *See* ECF No. 422, Dep. Tr. 24:20-24 (Perry) ("The discussion generally was that the chairman started the protest against the pipeline, and then a lot of outside people come in—came in, and he did not feel as he was—had any control over . . . the larger group."); Tr. 1103:22-1104:1 (Day 7; Henderson) (by October 2016, even by Chairman Archambault's own admission, he did not have control over all the different factions in the protest camp); Tr. 775:13-776:10 (Day 5; Dalrymple) (testifying that his office was in communication with Chairman Archambault very early on in the protests and continued to coordinate with him as the protests went on, even as the Chairman acknowledged that "he was no longer in control of the situation"); Tr. 847:25-848:4 (Day 6; Burgum) (testifying that the Tribe was not in control of the protest camps by mid-December 2016).

[¶88]   It ultimately became difficult, if not impossible, to identify the leaders of the protests.  *See* Tr. 847:9-24 (Day 6; Burgum) (testifying that Chairman Archambault told the Governor in mid-December 2016 the Chairman did not know who the leaders of the camp were, but they did not

involve Standing Rock Sioux Tribe leaders); JX 8 at DOI_00026799 (report from the BIA dated September 17, 2016, stating that "[i]n recent days, the communication between [law enforcement] and the camps have become confusing as to who is speaking on behalf of the camps"); Tr. 2626:16-21, Tr. 2640:7-10, Tr. 2630:22-2631:5 (Day 16; Cruzan) (testifying that BIA law enforcement tried to find the leaders of the Main Camp to deal with but never did).

[¶89]    As the protests continued, protestors spread to and stayed at a variety of locations.  *See, e.g.*, JX 164 (State-produced vehicle counts and population estimates for various camps).  Some protestors stayed off of Corps land.  They stayed in the Sacred Stone Camp and other camps on Standing Rock Indian Reservation land.  Tr. 2604:24-2605:2 (Day 16; Cruzan); DX 4053 at USACE_00068809; Tr. 140:18-20 (Day 1; Schulz); 1491:17-25 (Day 9; Van Horn); JX 266-N at slides 9-10, 26.  Some protestors also stayed at the tribal-owned Prairie Knights Casino on Reservation land, using that as a base of operations.  Tr. 159:25-160:2 (Day 1; Schulz); Tr. 2613:8-16 (Day 16; Cruzan) (testifying that Cruzan was at the casino three or four times a week and saw hundreds and hundreds of protestors there eating, staying there, showering, and resting); Tr. 461:1-6, 465:19-466:1 (Day 3; Kirchmeier) (testifying that protestors stayed at the casino and used it for planning protest activities).  Protestors also stayed at camps on Corps land, both north and south of the Cannonball River.  *See* Tr. 2604:20-2605:2 (Day 16; Cruzan); Tr. 1514:2-5 (Day 9; Van Horn); JX 266-N at slides 9-10, 26.  They camped on private property, and in the adjacent right-of-way for State Highway 1806.  Tr. 429:25-430:5 (Day 3; Kirchmeier); Tr. 1513:24-1514:20 (Day 9, Van Horn); Tr. 1988: 12-22 (Day 12; Spellmon).  They stayed at hotels in Bismarck and Mandan.  Tr. 159:21-24 (Day 1; Schulz); Tr. 460:24-25 (Day 3; Kirchmeier); Tr. 2512:22-23 (Day 16; LaDuke).  Some stayed with friends and family in the area.  Tr. 160:3-5 (Day 1; Schulz).  Finally, protestors who lived locally came from their own homes and communities.  *See* Tr. 2439:3-6, 2440:6-11 (Day

15; Iron Eyes).

[¶90]   Protestors came not just from Corps land, but also from camps off of Corps land, hotels, the casino, or from the houses of their friends and family to engage in direct protest action.  Tr. 160:11-18 (Day 1; Schulz).

### B.  The DAPL Protests Escalate Quickly and Unexpectedly

[¶91]   On August 10, 2016, the first law enforcement response to the protests occurred.  *See* Tr. 345:11-20 (Day 2; Kirchmeier).  Sheriff Kirchmeier's office received a call that protestors were blocking pipeline company surveyors from going onto the private land known as the Cannonball Ranch to do their survey.  *See id.* at 345:14-346:5.  Law enforcement did not arrest any of the protestors that day.  *See id.* at 346:12-347:8; JX 51 (spreadsheet reflecting arrests throughout the protests, which does not record any arrests on August 10, 2016).  The next day, after protestors again blocked the pipeline company's construction activities at the Cannonball Ranch site, law enforcement made the first arrests of protestors.  *See* Tr. 346:16-347:23 (Day 2; Kirchmeier); JX 9 at ND_000135658.  The day after that, August 12, 2016, law enforcement arrested Chairman Archambault and a Standing Rock Sioux Tribal Council member during another protest at the pipeline construction site.  *See* JX 9 at ND_000135658; JX 51 (rows 449 and 453).

[¶92]   Sheriff Laney estimated that, on August 10, 2016, the first day of law enforcement's protest response, there were 30-40 protestors present.  *See* Tr. 504:1-8 (Day 3; Laney).  The total number of arrests from the next day, August 11, 2016, was 13 people.  *See* JX 9 at ND_000135658; JX 51 (arrests spreadsheet, filtered by date for August 11, 2016, reflects 13 arrestees on that date).

[¶93]   The State erroneously asserts that the estimate of the total population of the protest camps was 500-2,000 people as of August 10.  *See* ECF No. 450-1 at 8 ¶ 29.  In fact, that estimate was from two weeks later, on August 24, 2016.  *See* PX 1050 at 0003.

[¶94]   As of mid-August 2016, State officials did not know the protests would grow as large or last as long as they ultimately did.  *See* Tr. 156:9-12 (Day 1; Schulz); Tr. 428:22-429:2 (Day 3; Kirchmeier); Tr. 534:5-7 (Day 3; Laney); Tr. 794:5-8, 797:17-798:8 (Day 5; Dalrymple); Tr. 980:2-18 (Day 6; Dohrmann); ECF No. 404-2, Dep. Tr. 55:1-56:2 (Davis).  Sheriff Kirchmeier testified that, as of August 12, 2016, after he spoke with protestors about giving them the opportunity to protest while ensuring that legal construction work could continue, "it was all pretty good at that point."  Tr. 348:9-13 (Day 2; Kirchmeier).

[¶95]   On approximately August 15, 2016, the protest encampment spilled over onto Corps-managed land north of the Cannonball River.  *See* DX 4024 at USACE_00031883 (email from Lake Oahe Operations Project Manager dated August 15, 2016, stating that "[p]rotestors are setting up encampments on US Government lands"); JX 266-N at slide 26 (containing aerial images of the area as of August 16); Tr. 430:19-22 (Day 3; Kirchmeier) (testifying that the Main Camp on Corps land started on August 15 or 16, five or six days after the first arrests of protestors on August 10); Tr. 481:17-18 (Day 3; Laney) (testifying that he first saw protestors on Corps-managed land on August 16).

[¶96]   COL Henderson first learned of the protest encampments on Corps land to the north of the Cannonball River on August 15, 2016.  Tr. 1162:3-7 (Day 7; Henderson).  That same day or very soon after, he and his team were in communication with the Morton County Sheriff.  *See id.* at 1174:4-23.  They were also in communication with BIA law enforcement at that time.  *See id.* at 1174:23-25.  And COL Henderson was in communication with the U.S. Attorney's Office.  *See id.* at 1178:6-1180:3; JX 65 at USACE_00011546 (discussing phone calls COL Henderson had with U.S. Attorney's Office personnel on and around August 17, 2016).

[¶97]   When he first heard that the protests were growing in size and had spilled onto Corps land

north of the Cannonball River, COL Henderson thought the reports of "thousands" of people coming from all over the country "may be a little exaggerated." JX 61 at USACE_00002235; Tr. 1045:11-19 (Day 7; Henderson); *see also id.* at 1149:11-19. He believed that the protest activity might increase leading up to a hearing scheduled for August 25, 2016, in the *Standing Rock Sioux Tribe* litigation in Washington, D.C., but he thought that it would likely decrease after the court issued a decision. *See* JX 68 at USACE_00031828 (email from COL Henderson to BG Spellmon dated August 18, 2016, stating that he anticipated the protests "will continue to be a problem for the next week or two (until after the PI hearing)"); PX 1043 at 0002 (email from COL Henderson to other Corps officials dated August 23, 2016, stating that "[w]e expect the size and intensity of this protest activity to grow over the next few days leading into the PI hearing scheduled for 25AUG16"); JX 108 at USACE_00058412 (Corps storyboard update stating that "the results of the injunction determination" in that litigation "will likely impact upcoming activity at the protest/camp sites"); Tr. 1054:17-22, 1059:24-1060:1, 1168:22-1169:5, 1203:7-12 (Day 7; Henderson) (discussing COL Henderson's assessment, based on his discussions with Chairman Archambault, was that the population of the camps would wane following the injunction decision and the protests would taper off before the winter). Other Corps officials also did not know the protests would grow as large or last as long as they ultimately did as of mid-August 2016. *See* Tr. 1407:10-16 (Day 8; Jackson); Tr. 1982:17-22 (Day 12; Spellmon).

[¶98]    COL Henderson was not alone in his view that protest activity would wane following the decision in the *Standing Rock Sioux Tribe* litigation; State and other federal officials also viewed that decision as a potential turning point. At a meeting on August 23, 2016, involving State and federal officials and tribal elders as representatives of the protest camps, the group discussed a "four day period of celebration or mourning" following the court's decision, after which it was proposed

the Tribe would stop providing support to the protests.  JX 8 at DOI_00026790-DOI_00026791; *see also id.* at DOI_00026797 (at another meeting of the same group, on September 9, 2016, a tribal elder communicated that Chairman Archambault did not agree with ending the Tribe's support to the protests after the four-day grace period, feeling instead that the protestors "would leave when they are ready").

[¶99]    After it was first established on August 15 or 16, 2016, the Main Camp on Corps land north of the Cannonball River grew extremely rapidly.  *See* Tr. 218:4-13 (Day 2; Gallagher) (testifying that the Rosebud and Sacred Stone Camps grew somewhat around this time, but it was the Main Camp on Corps land to the north of the Cannonball River that grew the most).  As Sheriff Kirchmeier put it, that camp "blew up pretty quick."  Tr. 430:23-25 (Day 3; Kirchmeier).  On August 15 at 11:17 AM, the Lake Oahe Operations Project Manager told COL Henderson that "as many as 300 people from the Pine Ridge Reservation" were on the road to join the protest.  DX 4024 at USACE_00031883.  Pine Ridge is approximately a five-hour drive to the Corps land in question.  *See* Tr. 1162:12-14 (Day 7; Henderson).  As of late morning that day, the State estimated the number of people coming from the Pine Ridge Reservation could be "as many as 800 protesters," with additional protesters en route from the Spirit Lake Reservation "along with logistical support and bail money."  JX 60.  An aerial photo of the Main Camp area from August 16, 2016, shows that there were already dozens of teepees, tents, and vehicles present on the site by that date.  *See* JX 266-N at slide 26.  As of August 18, 2016, the protest encampments numbered an estimated 1,500 people.  *See* Tr.  1049:9-13 (Day 7; Henderson); JX 68 at USACE_00031828; *see also* Tr. 550:22-551:2 (Day 3; Laney) (less than a week after the Main Camp was first established, it had reached over a thousand people).

### C.  As the Protests Escalated, Law Enforcement Sought to Accommodate the Protestors

[¶100] From the start—and even after law enforcement began arresting protestors on August 10—State and local law officials made clear that they supported the protestors' exercise of their First Amendment rights, and they made accommodations for protestors.  Early in the protests, State or local officials closed public roads to allow protestors to march and ride horses from the North Camp to where the pipeline crossed the highway.  *See* Tr. 161:17-21, 162:17-20 (Day 1; Schulz); JX 13 at ND_000253231; JX 69 at MYERS_00001792.  On August 10, Sheriff Kirchmeier told protestors that they could protest in certain areas that did not block entrances to private property; he wanted to encourage people to exercise their First Amendment rights so long as it wasn't interfering with other people.  *See* Tr. 430:9-18 (Day 3; Kirchmeier).  On August 16, Sheriff Kirchmeier gave a quote to the *Bismarck Tribune* about options for deescalating the protests, stating that those options included giving protestors more land and more comfort, room for tents, water, and a dumpster.  *Id.* at 431:21-433:7.  That same day, August 16, Sheriff Kirchmeier attended a meeting with Standing Rock Sioux Tribe members about how to deescalate tensions, discussing options including offering more land, comfort, and amenities to the protestors.  *Id.* at 432:2-5433:14.  On August 18, 2016, State officials again closed a public roadway to allow protestors to demonstrate, this time in Bismarck near the State capitol.  *See* JX 8 at ND_000135659.  A set of public-facing talking points from the State Department of Emergency Services dated August 19, 2016, emphasized that "[t]here are constitutional rights to assemble to protest.  Law enforcement is here to enable and support those rights."  JX 69 at MYERS_00001793.  From approximately August 19-22, 2016, the North Dakota Department of Health provided assets on-site at the protest encampment on Corps land to the north of the Cannonball River, including a first aid station and potable water.  JX 9 at ND_000135659; JX 69 at MYERS_00001792; *see* Tr. 819:6-9 (Day 5; Dalrymple); Tr. 981:10-

982:2 (Day 6; Dohrmann).  Those assets were removed after the camps "grew rather rapidly" and "resources . . . were really not an issue."  Tr. 1017:22-1018:2 (Day 7; Dohrmann).

[¶101]  Sheriff Kirchmeier thought it was a good idea to give protestors more space as a matter of public safety, and he discussed with protestors potential areas that could be provided for their use, including the Cannonball Ranch area.  Tr. 433:21-434:9, 434:15-17 (Day 3; Kirchmeier) (testifying that it was only when protestors moved off public property or into the roadway that they became a problem).  North Dakota Indian Affairs Commission Executive Director Scott Davis opined that a free speech zone can be a helpful tool to limit the spread of protest to a more dangerous area, such as a highway, and that creating a safe space for protestors to go can help reduce clashes with law enforcement.  *See* ECF No. 404-2, Dep Tr. 114:17-21, 116:22-117:19 (Davis).  In fact, on August 11, 2016, law enforcement provided protestors with a place to protest, telling protestors they could be in the ditch along the highway if they wanted, so long as they were not blocking private property.  Tr. 346:16-347:8 (Day 2; Kirchmeier); *see also* Tr. 2429:17-2430:2 (Day 15: Iron Eyes) (testifying that initially, state law enforcement allowed protestors to be in the highway right of way).  Other State officials agreed it was a good idea to give protestors a safe place to exercise their First Amendment rights.  *See* Tr. 164:7-12 (Day 1; Schulz).

[¶102]  In their conversations, law enforcement officials communicated to COL Henderson and his team that law enforcement was reluctant to take actions that could further incite the protestors or create a confrontation between the Tribe and law enforcement.  Tr. 1175:17-1176:9, 1180:13-1181:12 (Day 7; Henderson).  COL Henderson understood that Morton County Sheriff's Office was taking "essentially a containment approach" to the protestors, whereby local law enforcement would ensure protestors were confined to an area separate from the pipeline workers and law enforcement and would respond to protest activity outside the camps on a case-by-case basis.  *Id.*

at 1176:10-1177:1, 1203:23-1204:6; *see* JX 68 at USACE_00031828 (COL Henderson email to BG Spellmon dated August 18, 2016, reporting that "[l]aw enforcement appears to be taking more of a containment posture (as opposed to intervening)"); DX 4052 at USACE_00002575 (COL Henderson email to the Corps's Deputy Commanding General for Civil and Emergency Operations, MG Ed Jackson, dated August 26, 2016, noting that "[l]aw enforcement is keeping their distance" from the protest camps).

[¶103] Officials with the U.S. Attorney's Office also told COL Henderson that it would not be worthwhile to issue trespassing citations to protestors on Corps land, because any such citations would not be enforced or brought to court.  Tr. 1179:8-16 (Day 7; Henderson).

[¶104] COL Henderson was aware that the Corps had little to no control over the decisions of hundreds of people to come to occupy the Corps-managed land north of the Cannonball River in mid-August.  *See* Tr. 1165:12-19, 1279:10-12 (Days 7-8; Henderson).

[¶105] Informed by his discussions with federal and local law enforcement officials, COL Henderson decided not to ask law enforcement to remove the individuals camped on Corps land. *See id.* at 1181:25-1182:15, 1204:12-16, 1205:8-17.  His judgment was that such an approach would likely be a provocation that could cause injuries or deaths, and therefore it was "essentially not an option" for him.  *Id.* at 1182:4-15; *see id.* at 1193:14-1194:23 (explaining the considerations COL Henderson discussed with law enforcement officials in coming to this decision); *see also* 1237:16-20, 1238:16-20 (Day 8; Henderson) (testifying that reports COL Henderson received in early October 2016 about the presence of weapons in the camp, as well as his own tour of the camp on October 7, reinforced his decision not to seek forcible removal to avoid a potentially violent confrontation).  Additionally, COL Henderson understood that requesting removal of all the protestors was "totally unenforceable." Tr. at 1197:13-25 (Day 7; Henderson).

### D. State and Local Officials Declare an Emergency, and the State Deploys the National Guard

[¶106]  On August 15, 2016, the Chairman of the Morton County Commission, Cody Schulz, signed an Emergency Declaration in connection with the DAPL protests.  *See* JX 59; Tr. 71:17-18 (Day 1; Schulz).  That Emergency Declaration recognized the "civil unrest occurring at the location of the Dakota Access Pipeline construction site which will require extraordinary manpower and other resource expenditures."  JX 59.

[¶107]  On August 17, 2016, an Emergency Operations Center ("EOC") was established in the Morton County Sheriff's Office.  Tr. 72:14-23 (Day 1; Schulz); Tr. 352:18-22 (Day 2; Kirchmeier).  That later became the State EOC, located at Fraine Barracks.  Tr. 353:18-23 (Day 2; Kirchmeier).

[¶108]  On August 19, 2016, Governor Dalrymple signed an Emergency Declaration in connection with the DAPL protests.  JX 71.  The Governor issued that Emergency Declaration because it became clear "that local law enforcement will not have sufficient resources to deal with" the emergency situation, so the State declared it would assist with providing resources.  Tr. 750:24-751:7 (Day 5; Dalrymple); *see* JX 71 at ND_000134182.

[¶109]  On September 7, 2016, Governor Dalrymple activated the North Dakota National Guard in response to the DAPL protest situation. Tr. 777:23-778:1 (Day 5; Dalrymple); JX 104.

[¶110]  The decision to activate the National Guard was a difficult one for Governor Dalrymple. *See* Tr. 806:24-807:6 (Day 5; Dalrymple).  The Governor was concerned about the appearance of people in military uniforms being mobilized to deal with protestors, and he wanted to be sure the State was not appearing heavy handed in its response or "messaging the wrong thing to people in terms of how we're going to maintain order."  Tr. 778:23-779:1, 807:7-12 (Day 5; Dalrymple).  His successor, Governor Burgum, shared the desire to avoid the "optics that might have come from a[n] overly heavy-handed sort of military-type operation to sort of march through and, 'clear the

camps.'"  Tr. 908:22-25, 911:20-23 (Day 6; Burgum).  MG Dohrmann was specifically concerned about the "optics" of deploying military units onto historically tribal land, because of the history of conflict between the Army and Native American Tribes.  Tr. 985:16-986:1 (Day 6; Dohrmann); *see also* JX 266 at USA_00001737 (noting that the North Dakota National Guard was originally formed to respond to the historical Sioux Uprising).  He worried that such a deployment could spark backlash and increase the size of the protest camps.  *See* Tr. 985:16-986:1 (Day 6; Dohrmann).  And Sheriff Laney understood that bringing in the National Guard could send a counterproductive message or trigger outsize ramifications, particularly given the history between the Standing Rock Sioux Tribe and the State of North Dakota.  *See* Tr. 540:3-9, 541:2-6 (Day 3; Laney).  Their concerns were well-founded: protestor Chase Iron Eyes testified that the use of the National Guard in response to the DAPL protests "made [him] think that the Indian Wars had never ended."  Tr. 2434:3-10 (Day 15: Iron Eyes).

[¶111] Ultimately, the National Guard was tasked with maintaining traffic checkpoints and assisting law enforcement in backfilling other duties.  Tr. 778:3-22 (Day 5; Dalrymple); Tr. 930:1-18 (Day 6; Dohrmann).

[¶112]  In his order activating the National Guard, Governor Dalrymple emphasized that "[c]itizens have the right to peacefully assemble and protest, and those rights need to be protected."  JX 104.

### E.  The September 3, 2016, "Dog Bite" Incident and Further Escalation of the Protests

[¶113]  On September 3, 2016, a clash occurred between protestors and DAPL personnel and private security at the DAPL construction site on private land, at the entrance to the Cannonball Ranch

45

approximately two miles north of the Cannonball River. Tr. 236:25-237:3 (Day 2; Gallagher); Tr. 357:16-17 (Day 2; Kirchmeier); DX 4091 MYERS_00042039-MYERS_00042040.

[¶114] The day before, the Standing Rock Sioux Tribe's Historic Preservation Officer, Tim Mentz, had submitted a declaration in the Washington D.C. litigation. *See Standing Rock Sioux Tribe*, No. 16-cv-1534, ECF No. 29 (filed Sept. 2, 2016). That declaration described a survey of tribal sacred sites on the land north of the Cannonball River near the pipeline construction route. *See id.*

[¶115] DAPL protestors believed that, just after this declaration was filed, the pipeline company moved heavy equipment to the area and started to destroy sacred sites. *See* Tr. 2442:3-18 (Day 15; Iron Eyes); *see also* ECF No. 405-4, Dep. Tr. 27:8-14 (Chairman Archambault conveyed to Secretary Jewell concerns that the pipeline route would damage sacred sites that were off the Reservation but in ancestral tribal homelands); Tr. 449:7-14 (Day 3; Kirchmeier) (protestors believed that the land north of the Cannonball River was unceded tribal land and that sacred sites on the land would be harmed by the pipeline's construction). A group of protestors traveled to the location where the pipeline construction route crossed Highway 1806 and saw DAPL workers doing construction activity there. Tr. 2442:19-2443:3 (Day 15; Iron Eyes). Some of the protestors crossed the fence surrounding the construction site, and there was a physical altercation between some protestors and DAPL workers. *Id.* at 2443:4-12.

[¶116] The pipeline company had a number of private security personnel on-site, and those private security contractors quickly deployed attack dogs in response to the protestors. *Id.* at 2443:13-24; Tr. 1516:11-19 (Day 9; Van Horn); JX 266-N at slide 29. Some protestors sustained bites from the dogs. *See* JX 266-N at slide 29 (embedded video of the encounter, at timestamp 2:46-3:55).

[¶117] Later, an image that was said to show a young child who was bitten by a dog during the September 3 incident was shared widely on social media. Tr. 1517:2-9 (Day 9; Van Horn); JX 25S.

In reality, that image had been taken years previously and had no connection with the DAPL protests. Tr. 1517:2-9 (Day 9; Van Horn).

[¶118] Law enforcement was not present as the September 3 altercation was happening. Tr. 357: 19-22, 358:14-17 (Day 2; Kirchmeier); Tr. 544:3-5 (Day 3; Laney); ECF No. 404-2, Dep. Tr. 102:6-10 (Davis).

[¶119] The September 3 incident was an inflection point in the protests, and it garnered significant attention on social media and in the national news media. Tr. 94:18-95:1, 96:1-9 (Day 1; Schulz); Tr. 1208:6-8 (Day 7; Henderson). Soon after the events of September 3, the protests became more violent and active, and they attracted much larger numbers of people. Tr. 989:14-18 (Day 6; Dohrmann); Tr. 1208:2-5, 13-22 (Day 8; Henderson); Tr. 1514:25-1515:3, 1517:10-15, 1569:15-25 (Day 9; Van Horn); Tr. 2443:25-3 (Day 15; Iron Eyes); DX 4075 at USACE_00177754. Additionally, the focus of the protests grew to encompass not only the pipeline itself, but concerns of police brutality and government oppression. Tr. 1208:13-22 (Day 8; Henderson). As a State-produced presentation about the protests stated, the protests were "forming" from August 10 through September 3, 2016, and while they included "some illegal activity," they were "rarely violen[t] and tone was not overtly antagonistic" during that time. JX 13 at ND_000253218. After September 3, the "violence escalate[d]" and the "social media narrative and false information" grew. *Id.*

[¶120] Following the events of September 3, Morton County conducted an investigation into the pipeline company's private security contractor's use of dogs. Tr. 448:14-24 (Day 3; Kirchmeier). Morton County determined that the private security contractor was not properly licensed to do security work in the State of North Dakota. *Id.*; JX 161 at ET-ND-SUBPOENA-00011794.

Without that license, the contractors should not have been performing security services within the State. *See* Tr. 1625:4-7 (Day 9; Futch).

### F. The Joint Statements by the U.S. Departments of Justice, the Interior, and the Army

[¶121] On September 9, 2016, the Department of Justice, the Department of the Interior, and the Department of the Army issued a joint public statement in response to the court's denial of the preliminary injunction in the Washington, D.C. litigation. *See* JX 111.

[¶122] The September 9 joint statement said that the Department of the Army would not authorize the pipeline's construction on Corps land at Lake Oahe until it determined whether it was necessary to reconsider its prior approval decisions. JX 111 at MYERS_00009883.

[¶123] With regard to the DAPL protests, the September 9 joint statement said that "we fully support the rights of all Americans to assemble and speak freely. We urge everyone involved in protest or pipeline activities to adhere to the principles of nonviolence. Of course, anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities." *Id.* at MYERS_00009884.

[¶124] The purpose of the September 9 joint statement was to inform the public about the review of the pipeline's permitting that the Department of the Army planned to conduct, and to deescalate tensions and potential escalated violence following the court's ruling against the Standing Rock Sioux Tribe. ECF No. 405-3, Dep. Tr. 60:17-61:4, 63:10-64:6, 71:17-72:3 (Hornbuckle).

[¶125] The Corps was not a party to the September 9 joint statement, and Corps officials responsible for making decisions about the protests were not aware of it in advance and would have had no decision-making authority over it in any event. Tr. 1061:25-162:4, 1213:10-23 (Day 7; Henderson); Tr. 1422:9-13 (Day 8; Jackson); Tr. 1912:8-1913:5 (Day 12; Spellmon); ECF No. 413-

3 at 5 ¶ k.  COL Henderson testified the September 9 joint statement came as a "surprise" to him. Tr. 1062:25-1062:4 (Day 7; Henderson).

[¶126]  Approximately a month later, on October 10, 2016, the same three federal agencies issued a second joint statement, in response to the D.C. Circuit's order denying the Tribe's request for an emergency injunction in the *Standing Rock Sioux Tribe* litigation.  *See* PX 1216; Per Curiam Order, *Standing Rock Sioux Tribe*, No. 16-5259 (D.C. Cir. Oct. 9, 2016).

[¶127]  The October 10 joint statement said that the Army continued to review issues raised by the Tribe, and that in the meantime, the Army would not authorize DAPL's construction on Corps land at Lake Oahe.  PX 1216.

[¶128]  As to the DAPL protests, the October 10 joint statement said that "[w]e continue to respect the right to peaceful protest and expect people to obey the law."  *Id.*

[¶129]  The October 10 joint statement was intended to inform the public about the D.C. Circuit's decision and the Army's ongoing review.  ECF No. 405-3, Dep. Tr. 95:6-20 (Hornbuckle).

[¶130]  As with the September 9 joint statement, the Corps was not a party to the October 10 joint statement, though unlike the September 9 joint statement, COL Henderson was made aware of the October 10 joint statement shortly before it was publicized.  *See* Tr. 1288:18-19 (Day 8; Henderson).

[¶131]  There is no evidence that the October 10, 2016, joint statement had any meaningful impact on the protests.  *See* Tr. 1289:5-12 (Day 8; Henderson) (testifying that the October 10 statement "was a nonevent" that "really [didn't] register with us").

### G.  The Standing Rock Sioux Tribe's Request for a Special Use Permit and the Corps's Response

[¶132]  On August 15, 2016, an attorney for the Standing Rock Sioux Tribe approached COL Henderson's team about permission for a spiritual encampment on Corps land.  DX 4024 at

49

USACE_00031883; Tr. 1160:3-17, 1163:3-5 (Day 7; Henderson); ECF No. 404-6, Dep. Tr. 114:6-16; 116:6-10-16 (Stasch).  The attorney told the Lake Oahe Operations Project Manager that the Tribe wanted "to cover the encampment" including non-tribal members who were coming to participate in the protest.  *See* DX 4024 at USACE_00031883.

[¶133] COL Henderson believed that it was necessary to engage with the Tribe in good faith regarding its Special Use Permit request, to honor the Corps's trust responsibilities to the Tribe.  Tr. 1108:16-23, 1165:11 (Day 7; Henderson).  COL Henderson's team and the Tribe engaged in a good-faith discussions about the Tribe's request beginning on August 15, 2016, and continuing for approximately a month.  *See id.* at 1160:24-1161:3, 1166:16-23; DX 4024 at USACE_00031883.

[¶134] In response to the initial outreach from the Tribe's attorney on August 15, COL Henderson responded to his team that same day that the Tribe should seek a Special Use Permit.  DX 4024 at DX 4024 at USACE_00031882.  COL Henderson's team told the Tribe that it should seek a Special Use Permit for the gathering, whereby the Tribe would accept responsibility for the protest gathering, would bond and insure it, and would clean up any mess that may result from it.  Tr. 1160:18-24, 1165:20-1166:2 (Day 7; Henderson); ECF No. 404-6, Dep. Tr. 114:6-16; 116:6-16 (Stasch); *see* DX 4024 at USACE_00031883.  The attorney for the Tribe responded that they would seek a Special Use Permit.  *See* Tr. at 1160:24-1161:3 (Day 7; Henderson).

[¶135] The Tribe submitted a Special Use Permit application to the Corps on August 18, 2016.  *See* DX 4043.[3]  The Corps rejected the Tribe's first application and explained what would be required as far as insurance, bonding, and a description of the event.  *See* Tr. 1186:21-1187:4 (Day 7; Henderson).  The Tribe then re-submitted its request for a Special Use Permit.  *See* JX 114 at

---

[3] The State's proposed Findings of Fact and Conclusions of Law cites a portion of this exhibit that was not admitted into evidence.  *See* ECF 450-1 at p. 15 ¶ 63; Tr. 1184:5-1186:9 (Day 7; Henderson).  The Court does not consider that portion of the exhibit in rendering its decision.

USACE_00014661 (Corps storyboard summary dated September 11, 2016, noting that "Chairman Archambault again requested a Special Use Permit (SUP) on Friday"); JX 117 at USACE_00052124 (email among Corps officials, noting that the Tribe had supplemented its Special Use Permit request on September 2, 2016, with information including a map). The Corps continued to discuss this re-submitted Special Use Permit application with the Tribe, including how it related to the changing conditions on the ground with the protests. *See* DX 4053 at USACE_00068809; ECF No. 404-6, Dep. Tr. 141:7-10 (Stasch); Tr. 1166:12-23 (Day 7; Henderson).

[¶136] At the time the Corps was discussing the Special Use Permit application with the Tribe, the Tribe had committed to handling sanitary logistics at the camps, including waste disposal. Tr. 1227:24-1228:8 (Day 7; Henderson). COL Henderson understood that in the initial weeks of the protests, the Tribe was making a good-faith effort to handle these logistics, but those efforts later failed as the protest camps grew larger. *See id.* at 1228:16-25.

[¶137] COL Henderson ultimately decided to offer the Standing Rock Sioux Tribe a Special Use Permit to peacefully protest on Corps land to the south of the Cannonball River, which he did on September 16, 2016. *See* JX 129. The offered Special Use Permit explicitly did not include the area to the north of the Cannonball River, because that area was already leased for grazing. *See id.* at USACE_00023969, USACE_00023974; Tr. 1219:11-15 (Day 7; Henderson).

[¶138] The offered Special Use Permit included certain conditions, including that the Tribe must secure a performance bond in the amount of $100,000 to remediate any damage to Corps property, as well as insurance of at least $1 million for each occurrence of property damage, $5 million for personal injuries, or a single-limit policy of $5 million covering all claims per occurrence. JX 129 at USACE_00023969-USACE_00023972. The proposed bond would have accrued to the benefit

of the Corps, and the proposed insurance would have named the Tribe as the primary insured and the United States as a secondary insured. *See* Tr. 1082:2-7 (Day 7; Henderson) ("The Tribe was going to own the responsibility, the liability, the cost of cleanup, that they were going to bond it, that they were going to insure it."); Tr. 1473:2-9 (Kruger; Day 9) (the primary insured would be the event holder who was taking out the insurance policy); ECF No. 8, EC 1130-2-550 Appendix E § E-6(c)(1) (discussing potential for imposing a liability insurance requirement, naming the United States government as an "additional insured").

[¶139] COL Henderson's hope in offering the Tribe the Special Use Permit was that the Tribe would help facilitate a peaceful move of protestors off the Corps land north of the Cannonball, as he had been discussing with Chairman Archambault. *See* Tr. 1219:16-1220:8 (Day 7; Henderson).

[¶140] COL Henderson viewed the Special Use Permit as a way to separate the protestors from the pipeline workers and to prevent potentially dangerous confrontations between the two. Tr. 1207:6-11 (Day 7; Henderson). He also intended for it to clarify the Tribe's responsibility for the protests that were ongoing, and to emphasize where and what activity was permitted. *Id.* 1222:1-16; DX 4095 at ARMY_00115852.

[¶141] COL Henderson also thought it was important for the Corps to make a statement to address widespread public confusion about where protestors could and could not be, what they could and could not do on Corps land, and whether the Corps was denying protestors' First Amendment rights. Tr. 1081:3-1083:22, 1217:11-20, 1223:20-1224:7 (Day 7; Henderson). He further wanted to make clear that the Standing Rock Sioux Tribe was taking ownership of the protests and the associated liability and cleanup, as indicated in communications the Corps had with tribal leadership during the SUP permitting application process. *Id.* at 1081:21-1082:7, 1082:16-23, 1217:11-20.

[¶142] On September 16, 2016, the Corps issued a press release regarding the Tribe's SUP application. *See* JX 128. The press release was titled "U.S. Army Corps of Engineers grants Special Use Permit to Standing Rock Sioux Tribe," and it stated as follows:

> Today the U.S. Army Corps of Engineers (Corps) issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe.
>
> Omaha District Commander, Col. John W. Henderson, informed Standing Rock Sioux Tribal Chairman Dave Archambault II, that the Tribe's Spiritual gathering, located south of the Cannonball River, has been granted a Special Use Permit, which allows the Tribe to gather to engage in a lawful free speech demonstration on Federal lands designated in the permit.
>
> The Tribe's Special Use Permit application requested use of lands to the north and south of the mouth of the Cannonball River; however, because the northern property is subject to an existing grazing lease, this portion of the application is not being acted on at this time.
>
> The Special Use Permit allows the Tribe to use Federal lands subject to Federal rules and regulations including Title 36 of the Code of Federal Regulations Part 327, Title 33 of the United States Code, Section 408, and applicable Federal, state and local regulations. Per Title 36, several activities require written permission from the District Commander. Additional permission will be required for activities identified in Title 36 such as construction, either temporary or permanent, of any structures within areas identified in the Special Use Permit.
>
> "Among our many diverse missions is managing and conserving our natural resources. I want to encourage those who are using the permitted area to be good stewards and help us to protect these valuable resources," said Henderson.
>
> The purpose for requesting and granting a Special Use Permit under Title 36 is to provide applicants temporary use of federal lands for lawful purposes. In turn, the applicant assumes responsibility for maintenance, damage and restoration costs, ensures the health, welfare, safety, supervision, and security of participants and spectators, and provides liability insurance. This permit requires that the Standing Rock Sioux Tribe work with its supporters to ensure that the land is restored to its previous state so that others may benefit from use in the future.
>
> "Thousands of people have peacefully gathered in prayer and solidarity against the Dakota Access Pipeline," said Dave Archambault II, Chairman of the Standing Rock Sioux Tribe. "We appreciate the cooperation of the Corps in protecting the First Amendment rights of all water protectors."

"The U.S. Army Corps of Engineers has a deep respect for the traditions, culture, and concerns of all Native American Tribes, and we are committed to strengthening our enduring partnership with the Standing Rock Sioux Tribe," said Henderson.

*Id.*

[¶143] COL Henderson believed it was important that the press release specify that only lawful protest activity was permitted, because the Corps did not condone unlawful activity. Tr. 1226:22-24 (Day 7; Henderson). The press release stated that the SUP allowed the Tribe to use the specified area of Corps-managed land "subject to Federal rules and regulations including Title 36 of Code of Federal Regulations Part 327, Title 33 of the United States Code, Section 408, and applicable Federal, state and local regulations." JX 128.

[¶144] The press release made clear that the permission to gather on Corps land was limited. It stated that the Tribe's Special Use Permit application had sought permission to gather on Corps land to the north and south of the Cannonball River, but the Special Use Permit would not be granted for Corps land to the north of the river because that area was already subject to an existing grazing lease. *See id.* It also stated that written permission from the District Commander would be required for activities such as construction of structures within the permitted area. *See id.*

[¶145] The Corps's September 16, 2016, press release statement that a Special Use Permit had been "granted" was inaccurate. The Standing Rock Sioux Tribe did not fulfill the conditions for the Special Use Permit, and a final, signed Special Use Permit was never in place. *See* Tr. 1224:10-11 (Day 7; Henderson); JX 135 at ARMY_00070506-ARMY_00070507.

[¶146] There is no evidence that the Corps's September 16 press release caused the protests to grow larger, become more disruptive, or last longer. *See* Tr. 1234:23-1235:4 (Day 7; Henderson) (the statement "deflated some of the angst" among protestors, but generally did not have much of an impact on the protests' "size or growth or . . . nature"); ECF No. 404-3, Dep. Tr. 58:11-23 (Estes)

(protestor testifying that the September 16 press release did not cause him to come to the protest camps and did not have any bearing on anything that was going on for him); Tr. 2516:7-12 (Day 16; LaDuke) (another protest attendee testifying that as for the September 16 press release, she did not require permission from Corps to go on her own land, and that other protestors felt the same); Tr. 2445:1-12 (Day 15; Iron Eyes) (testifying that as for the September 16 press release, what the Corps was doing "wasn't really relevant to . . . what [the protestors] were doing," and it did not make any difference to him in making his decisions about whether to engage in protests); *id.* at 2445:25-2446:4 (another protestor testifying that based on his participation in and observation of the protests, he did not observe any impact from the September 16 press release on protests). Indeed, the State's expert emphasized that the September 16 press release was not widely viewed on social media as compared to the September 9 joint statement (which the Corps was not a party to). *See* Tr. 2947:25-2949:12 (Day 18; Warner) (testifying that the Corps's September 16 statement was only posted 36 times on Facebook; by contrast, the September 9 statement was posted over 500 times and had over 100,000 interactions).

### H. The North Camp and the "Big Push" Operation

[¶147] In mid-August 2016, a camp that came to be known as the North Camp or the 1851 Treaty Camp formed at the main entrance to the Cannonball Ranch from Highway 1806. Tr. 217:3-19 (Day 2; Gallagher); Tr. 2446:23-2447:3 (Day 15; Iron Eyes); DX 4091 at MYERS_00042040; *see* Tr. 201:9-25, 215:15-23, 216:16-24, 217:12-15 (Days 1-2; Gallagher) (Gallagher saw protestors gathering around the Cannonball Ranch entrances and alongside Highway 1806 on approximately August 10, 2016); PX 2041 at 0006 (aerial photo Gallagher took on August 10, 2016, which shows protestors erecting teepee structures at the north entrance to the Cannonball Ranch as of that date); Tr. 542:23-25 (Day 3; Laney) (testifying that the North Camp was established in the first few days

of the protests). The purpose of the North Camp, from protestors' perspective, was to "protect and pray at the . . . grave sites that were desecrated by DAPL heavy equipment." JX 8 at DOI_00026798. At its inception, the camp numbered 20-30 individuals. JX 8 at DOI_00026804 (noting that the Standing Rock Sioux Tribe and local law enforcement were "concerned" with the group that set up the North Camp).

[¶148] The North Camp was not on Corps property. *See* Tr. 474:6-12 (Day 3; Kirchmeier); DX 4091 at MYERS_00042040. It was located on State property, in the right-of way ditch adjacent to Highway 1806, for several weeks. Tr. 474:6-12 (Day 3; Kirchmeier); DX 4091 at MYERS_00042039-MYERS_00042040; *see* JX 8 at DOI_00026805, DOI_00026807 (as of September 13, 2016, the North Camp numbered 50-75 people and was located on the shoulder of the highway). This was the same location that Sheriff Kirchmeier had offered to protestors to gather on August 11, 2016. *See* Tr. 347:2-6 (Day 2; Kirchmeier).

[¶149] Eventually, the North Camp shifted slightly, to sit mostly on private property (at the entrance to the Cannonball Ranch) and partially on State property (the land near the Cannonball Ranch entrance on highway right-of-way). *See* Tr. 331:19-24 (Day 2; Johnson); Tr. 372:9-16, 423:1-7, 474:6-12 (Days 2-3; Kirchmeier); Tr. 507:3-5 (Day 3; Laney); Tr. 595:6-8 (Day 3; Pederson); Tr. 1488:7-12, 1513:24-1514:1, 1514:6-20, 1515:24-1516:4 (Day 9; Van Horn); DX 4091 at MYERS_00042040. The North Camp was located approximately one to two miles north of the Main Camp. Tr. 1488:7-9 (Day 9; Van Horn); DX 4091 at MYERS_00042039-MYERS_00042040.

[¶150] State and local law enforcement were aware that at least some protestors at the North Camp were breaking the law and were potentially dangerous. *See* PX 1126 at 0002 (Joint Intelligence Update from the North Dakota State and Local Intelligence Center and Morton County DAPL

56

Intelligence Group dated September 13, 2016, describing a traffic stop of individuals coming from the North Camp who were found to be carrying marijuana, paraphernalia, and a variety of weapons including three handguns, an AK-47, three throwing knives, an expandable baton, and multiple types of ammunition); Tr. 595:11-15 (Day 3; Pederson) (protest activities around the North Camp had blocked the State highway entirely); ECF No.404-2, Dep. Tr. 107:14-108:21 (Davis) (the North Camp was the location that was more likely to be violent, or where protesters were more likely to break the law, because of its proximity to the pipeline construction site); JX 21 (at video timestamp 0:28-0:52, Sheriff Kirchmeier discussing protestors camping on private land and putting up roadblocks along the highway); *see also* JX 8 at DOI_00026816 (BIA law enforcement report discussing that, on September 28, 2016, protestors were observed lining up at the North Camp and departing toward DAPL construction sites and tearing down concertina wire).

[¶151] Nonetheless, State and local law enforcement did not arrest or forcibly disperse the protestors at the North Camp. Instead, they met repeatedly with the North Camp's leaders, attempting unsuccessfully to convince protestors to move to the Main Camp on Corps land. *See, e.g.*, JX 8 at DOI_00026804 (on September 10, 2016, local law enforcement and BIA law enforcement met and agreed law enforcement would continually reach out to the protestors at the North Camp to tell them the camp on the side of the highway was in violation of State law and ask them to move to the Main Camp on Corps land); DOI_00026809-DOI_00026811 (discussing a meeting with MG Dohrmann, COL Gerhart, BIA officials, and protest leaders from the North Camp on September 19, 2016); *id.* at DOI_00026811 (Sheriff Kirchmeier had a call with one of the camp leaders, Mekasi, about the same topic on September 20, 2016; law enforcement had "an agreement to wait an[d] see if camp leadership can convince north camp to move to main camp on its own"); *see also id.* at DOI_00026815 (State police had a meeting with protestors at the North Camp on

September 24, 2016, about the theft of a no-trespassing sign); *id.* at DOI_00026817 (MG Dohrmann and COL Gerhart had a meeting with North Camp leadership on September 29, 2016, facilitated by an official from the Department of Justice's Community Relations Service). Local law enforcement also communicated to leaders of the North Camp that they wanted protestors from that camp to stop walking in the highway to the construction site, as that necessitated a closure of Highway 1806 that was disruptive for locals and Tribal commerce. *See id.* at DOI_00026804.

[¶152] Protestors remained camped at the North Camp through September 2016 and for most of October 2016. *See, e.g.*, Tr. 1514:21-23 (Day 9; Van Horn) (testifying that Terry Van Horn first learned about the existence of the North Camp in early September 2016); DX 4091 at MYERS_00042039 (email from Van Horn dated September 12, 2016, inquiring about including the North Camp on a map); JX 164 (State-produced spreadsheet with estimated vehicle counts beginning on October 14, 2016, which includes entries for the North Camp as of that date and through late October).

[¶153] Prior to September 20, 2016, the private land that part of the North Camp sat on was owned by an individual named Dave Meyers. Tr. 506:22-24 (Day 3; Laney). On September 20, 2016, Mr. Meyers sold the land to the pipeline company. *Id.*; Tr. 1635:9-11 (Day 9; Futch); *see* JX 9 at ND_000135663-ND_000135664 (on September 22, 2016, it was announced that a deed documenting the sale had been recorded).

[¶154] Immediately after the September 20 sale, the pipeline company notified state and local law enforcement that the protestors on private property at the North Camp were trespassing, and the company asked that they be removed. Tr. 372: 17-21 (Day 2; Kirchmeier); Tr. 507:6-10 (Day 3; Laney); Tr. 1635:9-15 (Day 9; Futch). By that point, the camp had grown to include dozens or

hundreds of people, with structures such as tents, outhouses, and storehouses for provisions.  Tr. 1612:1-10 (Day 9; Futch).

[¶155]  Over a month later, on October 27, 2016, State and local law enforcement moved the North Camp protestors south, away from their encampment on private and State land and into the Main Camp on Corps land north of the Cannonball River.  *See, e.g.*, Tr. 178:17-23 (Day 1; Schulz); Tr. 450:15-17, 450:25-451:6 (Day 3; Kirchmeier); 589:15-19 (Day 3; Pederson); Tr. 1544:17-19 (Day 9; Van Horn).  That operation came to be known as the "Big Push."  *See id.*

[¶156]  The day before the Big Push operation, October 26, 2016, the North Camp numbered approximately 300-360 people.  *See* JX 164 (State-produced vehicle count spreadsheet and population estimate, at column M, rows 15-20).  The State knew that they would need hundreds of law enforcement officers to move that number of protestors safely.  Tr. 507:21-24 (Day 3; Laney). In the end, the Big Push operation involved 400-500 law enforcement officers, many more law enforcement officers than the number of protestors present.  Tr. 1004:13-19 (Day 7; Dohrmann); *see* JX 164 at column M, rows 15-20.

[¶157]  State and local law enforcement officials initially hoped that they could convince protestors to voluntarily move out of the North Camp to Corps land north of the Cannonball River.  *See* Tr. 374:15-23 (Day 2; Kirchmeier); Tr. 515:6-18 (Day 3; Laney).  Sheriffs Kirchmeier and Laney and MG Dohrmann and COL Gerhart met with a leader of the camp named Mekasi on October 26.  *See* Tr. 374:9-12 (Day 2; Kirchmeier); Tr. 515:6-18 (Day 3; Laney).  They "communicated over and over again that this does not have to be a confrontation" and urged the protestors to go to the Main Camp on Corps land where State and local law enforcement would not arrest them.  *Id.*  In a video of the conversation, Sheriff Laney can be heard telling Mekasi that protestors could stay at the Main Camp on Corps land "for a year . . . we don't care."  DX 4256 (at video timestamp 16:35-17:02).

[¶158]  State and local law enforcement's efforts to convince the protestors to leave the North Camp voluntarily were unsuccessful.  Law enforcement thus opted to forcibly disperse the protestors from the North Camp on private property and the State highway right-of-way.  *See* Tr. 595:11-15 (Day 3; Pederson).

[¶159]  The purpose of the Big Push operation was not to arrest or remove all the protestors from the area of the North Camp, but rather to move them.  *See* Tr. 450:15-20 (Day 3; Kirchmeier); 600:15-16 (Day 3; Pederson).

[¶160]  Law enforcement formed a line across Highway 1806 and, marching slowly, moved protestors south down the highway until they reached the Main Camp on Corps land.  Tr. 450:24-451:6 (Day 3; Kirchmeier); Tr. 515:21-517:2 (Day 3; Laney).

[¶161]  Throughout the Big Push operation, law enforcement officers repeatedly told protestors that they were "free to go" and instructed protestors "to walk south to the 7 Council fires camp and they would not be arrested."  JX 166 at USACE_00005409 (a Morton County press release regarding the Big Push operation); *see also* Tr. 619:12-18 (Day 3; Pederson) (officers told protestors to "go south" to the Main Camp on Corps land as they cleared the North Camp); Tr. 453:16-24 (Day 3; Kirchmeier) (law enforcement told protestors to go to the Main Camp on Corps land because he thought that announcement would deescalate tensions and he believed protestors were likely to go there anyway).

[¶162]  It took law enforcement the entire day of October 27, 2016, to move protestors just over two miles.  Tr. 517:1-2 (Day 3; Laney); Tr. 598:6-22 (Day 3; Pederson).

[¶163]  In the course of the Big Push operation, a protestor named Red Fawn Fallis fired a gun while being arrested by law enforcement officers, nearly injuring one of the officers.  Tr. 375:13-19 (Day 2; Kirchmeier); JX 167 at ND_000095815.  Protestors from the North Camp also threw Molotov

cocktails and debris at officers.  JX 167 at ND_000095815.

[¶164]  Completing the Big Push operation stretched law enforcement's resources to their limit.  *See* Tr. 507:15-508:3 (Day 3; Laney) (testifying that "[w]e knew we needed hundreds of law enforcement officers to do this if we were going to do this the right way, to do it safely" and that law enforcement put out a call to entities around the country to assist with the operation); Tr. 598:6-22 (Day 3; Pederson) (testifying that law enforcement had planned to split officers into a day and a night shift during the Big Push, but ultimately "had to use everybody during the day" and still "had to put out another emergency call to every agency in the state that had already given up resources for more").  The Governor had invoked the Emergency Management Assistance Compact earlier in October 2016, to solicit additional law assistance from other states.  *See* Tr. 779:2-15 (Day 5; Dalrymple).  State and local law enforcement needed these additional law enforcement officers to complete the Big Push operation.  Tr. 964:1-14 (Day 6; Dohrmann) (testifying that law enforcement was "conscious of the fact that we would need significant resources" for the Big Push and that they needed to execute it while law enforcement from other states were available, before the EMAC agreements expired).  Ultimately, the force used to conduct the Big Push—an operation that did not fully evict protestors, but simply moved them approximately two miles south to the Main Camp on Corps land—was the largest that law enforcement deployed at any single time during the entire period of the protests.  Tr. 450:21-24 (Day 3; Kirchmeier); *see* JX 266 at ND_000253662 ("[I]t took law enforcement 8 hours to push the protesters 2.18 miles.").

## I.   Faith Spotted Eagle's Request for a Prayer Ceremony

[¶165]  In mid-November 2016, Faith Spotted Eagle—a Yankton Sioux tribal leader and a leader within the DAPL protests—reached out to the Corps seeking permission to conduct a prayer ceremony on Corps-managed land near the DAPL drill site.  Tr. 1108:24-1109:5, 1109:25-1110:3,

1132:13-17 (Day 7; Henderson); Tr. 2462:8-14 (Day 15; Iron Eyes); PX 1302. The ceremony would be attended by a group of tribal elders and spiritual leaders, totaling no more than 30 people. *See* PX 1302 at 0001; JX 193 at USACE_00026983.

[¶166] COL Henderson decided to facilitate that request because Ms. Spotted Eagle was working with a group of peaceful protestors. Tr. 1254:8-16 (Day 8; Henderson). He viewed it as an act of diplomacy and a means of keeping the trust of tribal members who could potentially assist in steering the protests toward non-violence. *See id.*

[¶167] Ms. Spotted Eagle sought a Special Use Permit for this activity, and COL Henderson communicated with her about completing that form. *See* PX 1302 at 0001-0002; JX 193. However, no Special Use Permit was finalized for the prayer ceremony Ms. Spotted Eagle sought to hold. *See* Tr. 1110:14-18 (Day 7; Henderson). COL Henderson gave permission for the prayer ceremony to proceed, within his authority as District Commander. *Id.* at 1110:14-21.

[¶168] To reach the location of the prayer ceremony, Ms. Spotted Eagle and the other participants took a boat. Tr. 1111:23-1112:1 (Day 7; Henderson). When their boat broke down, Corps officials towed it with their boat. *See id.* at 1112:4-6.

[¶169] The prayer ceremony event occurred peacefully and without incident. It did not lead to any confrontation with law enforcement, nor to any illegal activity. Tr. 1253:23-1254-7 (Day 8; Henderson).

[¶170] There is no evidence that State or local law enforcement responded to the prayer ceremony organized by Ms. Spotted Eagle.

### J. The Backwater Bridge Incident

[¶171] On the night of November 20-21, 2016, there was a large clash between protestors and law enforcement on the Backwater Bridge. *See, e.g.*, JX 9 at ND_000135679-ND_000135680. The

protestors on the bridge that night came from the Main Camp on Corps land, and also from the casino on Standing Rock Indian Reservation land.  *See* JX 227 at ND_000256396; Tr. 465:3-466:1 (Day 3; Kirchmeier).

[¶172] The Backwater Bridge forms a part of Highway 1806, to the north of Corps land on the north side of the Cannonball River.  *See* JX 266-N at slides 10, 101; JX 265 at ND_000204146.  It served as a point of separation between protestors and the DAPL drill site, so it was important for law enforcement that protestors not cross the bridge.  *See* Tr. 405:10-406:3 (Day 3; Kirchmeier).

[¶173] The night of November 20-21, protestors began moving onto the Backwater Bridge in increasing numbers.  *Id.* at 405:1-2.  Law enforcement directed them to leave the bridge, and they did not comply.  *Id.* at 405:2-4, 407:15-17.  The crowd continued to grow, and protestors were hostile towards the law enforcement officers.  *See id.* at 405:5-7.  The protestors were determined and "very committed to their cause," and they placed themselves in physical danger.  Tr. 721:10-14 (Day 4; Gerhart).

[¶174] During the confrontation, a protestor named Sophia Wilansky sustained a severe injury to her arm.  *See* Tr. 2453:23-2454:18 (Day 15; Iron Eyes); JX 266-N at slide 118.  Ms. Wilansky and other protestors contended that her injury was caused by an impact from a less-lethal munition that law enforcement launched toward protestors.  *See* Tr. 2454:4-18 (Day 15; Iron Eyes); Complaint, *Wilansky v. Morton Cnty. et al.*, No. 18-cv-00236-DMT-ARS, ECF No. 1 (D.N.D. filed Nov. 19, 2018).

[¶175] In the course of the night, protestors started fires on the Backwater Bridge, and a fire truck was deployed to the area to control them.  Tr. 379:4-10 (Day 2; Kirchmeier); Tr. 264:14-23 (Day 2; Gallagher).

[¶176] The temperatures that night were below freezing.  *See* Bismarck, ND Weather History,

63

*Weather          Underground*,          https://www.wunderground.com/history/daily/us/nd/cannon-ball/KBIS/date/2016-11-20 (last visited Aug. 8, 2024) (listing the temperature measured at a weather station in Bismarck the night of November 20 as between 22-24 degrees Fahrenheit).[4]

[¶177] At some point during the night, Sheriff Kirchmeier authorized the use of the fire truck's water hose on protestors, for crowd-control purposes. *See* Tr. 406:12-23 (Day 3; Kirchmeier).

[¶178] Using the fire hose was not something law enforcement officers are trained on or generally have experience with. *See* Tr. 1345:13-1346:15 (Day 8; Pearson). Using a fire hose on protestors at the Backwater Bridge, in freezing cold weather, had the potential to create health issues. *See id.* at 1350:4-8, 1351:4-12. And, as the State's law enforcement expert noted, the use of fire hoses on protestors in particular creates poor optics, given the history of law enforcement using fire hoses against civil rights protestors in the 1960s. *See id.* at 1352:10-19.

[¶179] Protestors viewed the Backwater Bridge incident as an example of excessive force and an inappropriately militarized response by the State. *See* Tr. 2518:19-2519:21 (Day 16; LaDuke).

[¶180] This incident was another flashpoint in the protests. *See* Tr. 1259:6-16 (Day 8; Henderson). It made it more difficult for the Tribe to persuade protestors to move off of Corps land. *See id.* And, for at least some protestors, it deepened their resolve to participate in the protests. *See* Tr. 2519:22-2520:9, 2532:14-18 (Day 16; LaDuke).

[¶181] Immediately following the Backwater Bridge incident on the night of November 20-21, the population of the protest encampments grew quickly. *See* JX 164 (State-produced vehicle count

---

[4] The Court takes judicial notice of the fact of the temperature that night, as it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *see, e.g.*, *Ramirez v. Birkholtz*, No. 5:20-02036 GW (ADS), 2023 WL 6164471, at *2 (C.D. Cal. Aug. 25, 2023) (taking judicial notice of the temperature on a particular day, as reported by a website, and noting that "[o]ther district courts have routinely taken judicial notice of weather temperatures under similar circumstances"), *recommendation adopted*, 2023 WL 6163984 (C.D. Cal. Sept. 20, 2023).

and population estimate spreadsheet, at columns DI and DS and rows 53 and 55, indicating that the estimated total number of protestors at locations on and off Corps land grew from approximately 1,875-2,250 people on November 20, 2016, to approximately 4,315-5,178 people on November 25, 2016).

### K. The Corps's November 2016 Letters to Law Enforcement and Tribal Leaders

#### i.      November 1, 2016, Letter to Sheriff Kirchmeier

[¶182] On November 1, 2016, COL Henderson sent a letter to Sheriff Kirchmeier requesting law enforcement support at the Turtle Hill area on Corps land.  *See* JX 174; Tr. 281:6-8 (Day 2; Gallagher).  Protestors had attempted to build a bridge from the Main Camp across Cantapeta Creek into the Turtle Hill area and attempted to access it via small boats, which would have put them past the line law enforcement had established and close to the area where the pipeline crew was working. *See* Tr. 1118:9-15; 1250:6-14 (Days 7-8; Henderson); Tr. 275:3-21 (Day 3; Gallagher); JX 266_N at slides 101-105, 107-108; JX 9 at ND_000135673.  State and local enforcement were concerned that if protestors got past the Turtle Hill area, they would have a clear path to the construction area. Tr. 388:13-25 (Day 2; Kirchmeier); *see* Tr. 275:3-12 (Day 3; Gallagher).

[¶183] COL Henderson wrote the letter to Sheriff Kirchmeier after local law enforcement requested that he specifically ask for their assistance to keep protestors out of the Turtle Hill area and away from the DAPL worksite.  Tr. 1129:5-14, 1250:1-25 (Days 7-8; Henderson).  In a video taken during COL Henderson's visit to Standing Rock Sioux tribal headquarters a few days after he wrote the November 1 letter, a protestor is seen confronting COL Henderson about the letter.  *See* PX 1290 (email and native video attachment file); Tr. 1252:2-1253:6 (Day 8; Henderson) (discussing that meeting and COL Henderson's interaction with protestors).  The protestor asks COL Henderson why he made the request for Morton County's law enforcement assistance; COL Henderson

responds, "I did it at their request." *See id.* (video timestamp 1:01-1:11)); *see also* JX 218 at USACE_00125816 (email from LTG Semonite dated November 26, 2016, noting that COL Henderson made the request "at the request of law enforcement" to prevent protestors from outflanking law enforcement and interfering with the pipeline construction activity).

[¶184] COL Henderson made the request to Sheriff Kirchmeier in writing, so that the Corps would have responsibility for that decision, in the event there was a confrontation between protestors and law enforcement or other collateral consequences from that decision. *See* Tr. 1129:5-14, 1250:15-25 (Days 7-8; Henderson).

[¶185] The letter did not request law enforcement support for any other area of Corps land because COL Henderson understood from discussions with State and local law enforcement officials that they did not want to initiate a mass removal of protestors on Corps land, and that it would be a bad idea to do so. *Id.* at 1251:8-20.

### ii.    November 25, 2016, Letter to Sheriff Kirchmeier

[¶186] On November 22, 2016, COL Henderson had a telephone call with MG Dohrmann, Sheriff Kirchmeier, and U.S. Attorney Chris Myers. *See* JX 204 at USACE_00009350 (email from COL Henderson to his leadership and other Corps officials summarizing the meeting); *see also* JX 205 at USACE_00009354 (a different email chain reflecting the same summary).

[¶187] As a result of that discussion, COL Henderson believed it was necessary to better define and communicate State and local law enforcement's jurisdiction to enforce the law on Corps land: that is, that State and local law enforcement did not need to ask the Corps's permission to come onto Corps land to enforce state and local laws. *See* JX 204 at USACE_00009350-USACE_00009351 (COL Henderson's email explaining that "proprietary jurisdiction" means that "Morton County has jurisdiction to conduct law enforcement activities on Corps land (to include

inside of the camps) when enforcing State and local laws . . . .  Therefore, they do not need to ask permission to come on to public lands to enforce local laws.  This has always been the case"); Tr. 1260:7-1261:6, 1261:17-1262:2 (Day 8; Henderson) (recalling that COL Henderson, MG Dohrmann, Sheriff Kirchmeier, and U.S. Attorney Myers discussed this on their November 22 call).

[¶188]  On the November 22 telephone call, COL Henderson discussed with MG Dohrmann, Sheriff Kirchmeier, and U.S. Attorney Myers that he would be issuing two letters: one to Sheriff Kirchmeier clarifying the jurisdictional questions they had discussed, and another to tribal leadership closing the Corps land north of the Cannonball River and encouraging protestors to move out of that area.  *See* JX 205 at USACE_00009354-USACE_00009355; Tr. 1264:10-1265:6 (Day 8; Henderson).  General Dohrmann and Sheriff Kirchmeier expressed their support for the plan to issue those letters.  Tr. 1265:7-9 (Day 8; Henderson).

[¶189]  On November 25, 2016, COL Henderson sent the letter to Sheriff Kirchmeier that they had discussed three days previously.  *See* Tr. 1265:3-6 (Day 8; Henderson); JX 210.  The letter had two purposes: first, to memorialize the discussion COL Henderson had with State and local law enforcement officials and the U.S. Attorney on November 22 regarding law enforcement's jurisdiction to enforce the law on Corps land; and second, to inform the Sheriff about the Corps's closure of the land to the north of the Cannonball River.  Tr. 1131:2-8 (Day 7; Henderson).  COL Henderson understood that law enforcement entity was interested in going into the camp and forcibly removing protestors, and his letter was not intended as a request that they do so.  *See id.* at 1125:5-11, 1131:10-14.

[¶190]  COL Henderson's November 25 letter to Sheriff Kirchmeier stated that he was rescinding his November 1 request for law enforcement support because it was not required, as State and local

law enforcement already had jurisdiction go onto Corps land to enforce state and local laws without prior permission from the Corps.  JX 210 at USACE_00009574.  Specifically, he wrote:

> With the Corps of Engineers having proprietary jurisdiction over its property, rather than exclusive or concurrent jurisdiction, the State of North Dakota retains criminal jurisdiction over these lands.  Therefore, the State and its political subdivisions, such as Morton County, already have the necessary jurisdiction to enforce state and local laws as it deems appropriate.  *See* 40 U.S.C. § 3112.

> Through its criminal jurisdiction, Morton County law enforcement has the right to conduct law enforcement activities on these Corps lands when enforcing State and local laws and does not need to seek permission from the Corps to enter Corps lands to enforce such laws. . . . In 36 C.F.R. § 327.26, the State's criminal jurisdiction over these federal lands is further acknowledged, as it reaffirms that state and local law enforcement have the authority to enforce and protect against, *inter alia*, acts of "[c]ivil disobedience and criminal acts" occurring on these Corps' project lands by applying "state and local laws."

*Id.*; *see* 40 U.S.C. § 3112(a) ("It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires."); *id.* § 3112(c) ("It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section."); 36 C.F.R. § 327.26(a) ("Except as otherwise provided in this part or by Federal law or regulation, state and local laws and ordinances shall apply on project lands and waters."); *id.* § 327.26(b) ("These state and local laws and ordinances are enforced by those state and local enforcement agencies established and authorized for that purpose.").

[¶191] As COL Henderson testified, the Corps's proprietary jurisdiction over the area meant that "there was no reason for me to have that [November 1] request out there.  I didn't need to do it in the first place."  Tr. 1271:6-16 (Day 8; Henderson) (testifying that he, MG Dohrmann, Sheriff Kirchmeier, and U.S. Attorney Myers discussed this and came to "a consensus" on what proprietary jurisdiction meant during their November 22 conversation).  Thus, the November 25 letter did not change or limit law enforcement's abilities to enforce state and local laws on Corps-managed land:

the decision whether to enter onto Corps land to enforce those laws still rested within the discretion of State and local law enforcement. *See id.*

[¶192] Sheriff Kirchmeier testified that he knew Morton County law enforcement had jurisdiction to enforce state and local laws on Corps land without prior permission from the Corps, so COL Henderson's November 25 letter explaining this was not news to him. Tr. 466:15-23 (Day 3; Kirchmeier). Notwithstanding that understanding, Sheriff Kirchmeier continued to make public comments after receiving COL Henderson's November 25 letter that State and local law enforcement "lack jurisdiction" and that the protests were a "federal problem." *See* JX 228 at USACE_00011018. COL Henderson reached out to MG Dohrmann about this, noting that "these statements are not helpful" and querying whether Sheriff Kirchmeier's public suggestions that the protests were solely a "federal problem" meant that Morton County Sheriff's Office would "just ignore" their law enforcement jurisdiction in other areas of Corps-managed land in the County, such as the Oahe and Garrison recreation areas. *See id.*

[¶193] After Sheriff Kirchmeier received COL Henderson's November 25 letter, he did not inform COL Henderson that he disagreed with COL Henderson's understanding of law enforcement's jurisdiction on Corps land. *See id.* at 466:15-467:9. Nor did he think to tell COL Henderson that Morton County law enforcement could only remove protestors from Corps land if the Corps specifically asked them to. *Id.* at 467:7-16. There is no evidence that any other law enforcement official informed the Corps that they disagreed with COL Henderson's explanation of State and local law enforcement's jurisdiction in the November 25 letter. *See* Tr. 185:8-12 (Day 1; Schulz); Tr. 2013:2-13 (Day 12; Spellmon); *cf.* JX 220 (evacuation order from Governor Dalrymple dated November 28, 2016, ordering "a mandatory evacuation of all persons located in areas under the proprietary jurisdiction of the United States Army Corps of Engineers located in Morton County"

69

as described in COL Henderson's November 25 letter to Sheriff Kirchmeier); JX 252 (evacuation order from Governor Burgum dated February 15, 2017, ordering a "mandatory evacuation of all persons occupying and residing in the evacuation area, specifically defined as the areas in Morton and Sioux Counties adjacent to the Cannonball River, under the proprietary jurisdiction of the United States Army Corps of Engineers").

[¶194] Law enforcement remained in the Turtle Hill area on Corps land, ensuring protestors did not illegally interfere with pipeline construction activities, even after COL Henderson rescinded his written request of November 1 for law enforcement assistance in that area. *See* ECF 450-1 at 97, ¶ 405; Tr. 519:17-520:10, 521:11-4 (Day 3; Laney).

### iii.    November 25, 2016, Letter to Tribal Leaders

[¶195] On November 22, 2016, COL Henderson had a telephone call with Chairman Archambault. *See* JX 204 at USACE_00009351.  They discussed the ongoing effort to move protestors from the Main Camp on Corps land north of the Cannonball River to another location for the winter, and Chairman Archambault explained that this effort was moving slowly because of internal problems with the tribal council.  *Id.*

[¶196] On November 25, 2016, COL Henderson sent a letter to the sixteen tribal leaders of the Great Plains Tribal Chairmen's Association.  *See* JX 213; Tr. 1266:14-17 (Day 8; Henderson).

[¶197] COL Henderson's letter to tribal leadership stated that the Corps-managed land to the north of the Cannonball River was closed effective December 5, 2016, and "no member of the general public, to include Dakota Access pipeline protestors, can be on these Corps' lands."  JX 213 at USACE_00089654.  It stated that "[a]ny person found to be on the Corps' lands north of the Cannonball River after December 5, 2016, will be considered trespassing and may be subject to prosecution under federal, state, and local laws."  *Id.*

[¶198] The letter also stated that the Corps was establishing a free speech zone on Corps-managed land to the south of the Cannonball River "for anyone wishing to peaceably protest the Dakota Access pipeline project, subject to the rules of 36 C.F.R. Part 327." *Id.*; *see* Tr. 1267:1-6 (Day 8; Henderson).

[¶199] COL Henderson's letter to tribal leadership attached a map, which identified the area to the north of the Cannonball River that was being closed to protestors, as well as the free speech zone to the south of the river where peaceful, lawful protests would be allowed. *See* JX 213 at USACE_00089654; JX 211 at USACE_00009614-USACE_00009616.

[¶200] The November 25 letter to tribal leaders was part of the Corps's effort to "strongly encourag[e] Tribal leaders to move out of this area in an effort to prevent loss of life and indemnify the [U.S. government] from liabilities assumed by trespassers." JX 204 at USACE_00009351. It was meant to support the Tribe's efforts to persuade protestors to leave that area. *See* Tr. 1124:22-1125:11 (Day 7; Henderson). Corps officials hoped that, with leadership from the Tribe, protestors would be willing to leave the Main Camp area voluntarily. *See id.* at 1127:21-22. Those protestors who chose to stay would be those who did not respond to tribal leadership, so the letter would serve the purpose of separating the two groups. Tr. 1128:2-21, 1268:14-20 (Days 7-8; Henderson).

[¶201] COL Henderson explained that he had not closed the Corps-managed land north of the Cannonball River earlier for multiple reasons. *See* Tr. 1269:24-1270:20 (Day 8; Henderson). The dynamic of the protestors and the surrounding conditions had changed significantly from mid-August to late November 2016. *See id.*; *see also, e.g.*, FoF [¶171]-[¶181], *supra* (discussing the significant confrontation between protestors and law enforcement on the Backwater Bridge on the night of November 20-21, 2016). And the effort to close the area of the Main Camp in late

71

November was part of a coordinated effort among the Corps, State and local law enforcement, and the Standing Rock Sioux Tribe. *See* Tr. 1269:24-1270:20 (Day 8; Henderson).

[¶202]  Many State officials saw COL Henderson's November 25 letter to tribal leaders as a positive development. *See* Tr. Tr. 456:9-12 (Day 3; Kirchmeier) and PX 1332 (Sheriff Kirchmeier viewed the letter as "an important and heartening step"); Tr. 994:16-25 (Day 6; Dohrmann) (MG Dohrmann supported the Corps trying to establish a free speech zone as a way to keep the protests within an area where it could be managed); PX 1319 (Morton County Commission Chairman Schulz called the announcement in the November 25 letter that the Main Camp area would be closed "the first step toward a peaceful resolution to the situation"); *see also* ECF No. 404-2, Dep. Tr. 114:17-21 (Davis) (North Dakota Indian Affairs Commission Executive Director Davis opining that a free speech zone can be a helpful tool to limit the spread of protest to a more dangerous area, such as a highway).

### L.  The Protests Continue into Winter 2016

[¶203] On November 28, 2016, Governor Dalrymple issued an evacuation order for the area of Corps land north of the Cannonball River, where the Main Camp had been established.  JX 220. The Governor's order required "a mandatory evacuation of all persons located in areas under the proprietary jurisdiction of the United States Army Corps of Engineers located in Morton County."

[¶204] The Governor issued the order because the conditions in the camp were becoming dangerous, due to winter weather.  Tr. 783:22-784:13 (Day 5; Dalrymple); *see also* JX 14 at DOI_00013277 (State-produced incident report about the protests including a chart of the estimated camp populations and winter storm/extreme cold events).

[¶205] The Governor's evacuation order was not predicated in any way on any action or statement by the federal government.  *Id.* at 819:21-24; *see* JX 220 at ND_000152408 (list of authorities and

reasons for the Governor's issuance of the order, which list does not include any statement or action by the federal government); Tr. 1011:16-22 (Day 6; Dohrmann) (none of the listed authorities are contingent on an approval from the Corps). Indeed, the order explicitly stated that the evacuation area "shall remain in effect even if the United States Army Corps of Engineers redefines or removes" the closure of the Corps-managed land north of the Cannonball River. JX 220 at ND_000152407.

[¶206] The Governor's Office stated publicly that the State would not take any means to enforce the evacuation order. Tr. 820:24-821:1 (Day 5; Dalrymple).

[¶207] The Governor's order did not cause the protestors to voluntarily leave the camp. *Id.* at 821:16-20.

[¶208] The protest encampments reached their peak population in early December 2016. *See* JX 164 at columns EC, rows 51-56. This swell in the camps' population coincided with a group of veterans who arrived at the camps in support of the protestors on December 4. Tr. 988:22-989:13 (Day 6; Dohrmann). Estimates of the total number of people in the camps at the time ranged as high as 10,000 people. *See* Tr. 2469:24-1270:3 (Day 15; Iron Eyes); Tr. 538:13-15 (Day 3; Laney).

## M. Protest Activity Decreases, and the Remaining Protestors Are Eventually Evacuated

[¶209] At the end of December 2016, the population of the protest camps began to wane. As of December 28, 2016, the high estimate of the total population of the protest camps was approximately 900 people. *See* JX 164 (State-produced vehicle count and population estimate spreadsheet, at column FL, row 55). Throughout January 2017, the high estimate total camp population ranged from approximately 750 to 900 people. *See id.* (columns FQ-HE, row 55). As of February 1, 2017, the total number of people in the camps was estimated to be between approximately 700-840 people. *See id.* (column HE, rows 53 and 55); *see also* Tr. 469:8-11 (Day

3; Kirchmeier) (by February 2017, the number of people in the camps was a lot smaller than it had been in the fall); Tr. 944:6-7, 1021:24-25 (Days 6-7; Dohrmann) (same).

[¶210] In early February 2017, State and federal officials decided together that the remaining protestors in the camps should be removed. *See* Tr. 966:13-22 (Day 6; Dohrmann). As MG Dohrmann testified, State and local law enforcement did not contemplate clearing the camps any earlier because of the number of people who had been there earlier, the size of the force that would have been required to clear so many protestors, and the high potential for injury and loss of life. *See* Tr. 1002:25-1003:16 (Day 7; Dohrmann) (testifying that it would not have been feasible to clear the camps prior to February 2017); *see also* Tr. 469:15-470:3 (Day 3; Kirchmeier) (by that time, the protest camps were much smaller and the State was therefore more able to effect a removal with the manpower they had, without as much concern for safety or escalated tensions that it could cause); Tr. 1278:6-13 (Day 8; Henderson) (the number of people at the camps was much smaller and more manageable by February 2017, and there were more resources available at that time to effectuate a closure of the area); PX 1388 at 0001 (email from MG Dohrmann to a federal official with the National Security Council dated February 10, 2017, opining that an evacuation of the camps should be completed while the population was "down to the hundreds" from their prior, larger numbers).

[¶211] The fact that the camps' population had reduced made it much easier to plan an eviction, because it required less law enforcement manpower and posed less of a risk of a violent confrontation. *See* Tr. 469:8-24 (Day 3; Kirchmeier); Tr. 1003:1-10 (Day 7; Dohrmann); *see also* Tr. 1137:17-22 (Day 7; Henderson) (by February 2017, law enforcement was willing to remove people from the camps).

[¶212] Another factor affecting the decision to remove protestors from the camps in February 2017 was that weather conditions had changed significantly by then. Weather had caused the camps' population to decline. *See* Tr. 454:19-21 (Day 3; Kirchmeier) (weather had impact on decreasing the size and intensity of the protests); Tr. 1539:6-13 (Day 9; Van Horn) (same); Tr. 785:1-8 (Day 5; Dalrymple) (the protest situation "was certainly winding down" as he left office in mid-December 2016, and he attributed much of that winding down to "the conditions of the North Dakota winter"); JX 14 at DOI_00013277 (chart in a State-produced incident report showing that the estimated camp population dropped precipitously after the first winter storm). And there was a large chance of flooding in the area of the camps at that time of year, which would put people in danger and risk debris from the camp being washed into the river. *See, e.g.*, Tr. 123:22-124:22; 186:11-18 (Day 1; Schulz); Tr. 413:6-8, 469:8-11 (Day 3; Kirchmeier); Tr. 875:23-876:24 (Day 6; Burgum); Tr. 1277:23-1278:5 (Day 8; Henderson); JX 14 at DOI_00013268-DOI_00013270. As one State-produced After Action Report opined, the protests could have continued "almost indefinitely" were it not for the harsh North Dakota winter weather and prospect of spring flooding intervening to bring them to an end. JX 9 at ND_000135646. Governor Burgum testified that the primary reason he issued his evacuation order in February 2017 was "a real concern about life safety and the timeframe" of potential flooding in the area of the camps. Tr. 875:23-877:7 (Day 6; Burgum).

[¶213] Finally, the decision to remove the remaining protestors from the protest camps in February 2017 was impacted by the change in presidential administrations. President Trump was inaugurated on January 20, 2017. With the new administration came a change in attitude toward the DAPL pipeline, and a directive to issue the pending easement. *See* Tr. 993:1-10 (Day 6; Dohrmann); ECF No. 404-1, Dep. Tr. 22: 16-23:6 (Bachmeier); *see also* PX 1388 at 0001 (February 10, 2017, email

from MG Dohrmann stating that "with the return of warmer weather and the issuance of the easement, we believe time is of the essence" to evacuate the protest camps).  The change in presidential administrations also signaled a change in "tone" from the federal government in Washington, D.C. towards the protestors, and a willingness from the federal government to provide additional law enforcement resources, which was important to law enforcement's decision to clear the camps at that time.  Tr. 970:6-15, 1020:15-21, 1022:4-6 (Days 6-7; Dohrmann).

[¶214] On February 3, 2017, COL Henderson sent a letter to Chairman Archambault, stating that the Corps was extending the closure of its land to include not just the area north of the Cannonball River that was the subject of COL Henderson's November 25 letter, but the Corps-managed land to the south of the river as well.  JX 247 at MYERS_00044667.  COL Henderson noted that there was "a high potential for spring flooding at the mouth of the Cannonball River due to spring runoff and ice jams," which posed risks to safety and the environment.  *Id.*  The letter gave February 22, 2017, as the deadline by which protestors must collect their personal property from the camps.  *See id.* at MYERS_00044668.

[¶215] On February 15, 2017, Governor Burgum issued a mandatory evacuation order for "the areas in Morton and Sioux Counties adjacent to the Cannonball River, under the proprietary jurisdiction of the United States Army Corps of Engineers."  JX 254 at ND_000112818-ND_000112819.  The Governor's order gave February 22, 2017, as the deadline for protestors to leave the area.  *Id.* at ND_000112819.

[¶216] As with Governor Dalrymple's evacuation order of November 28, 2016, Governor Burgum's issuance of the evacuation order was not dependent on any prior action or statement by the federal government.  *See* JX 254 at ND_000112819 (list of authorities and reasons for the Governor's issuance of the order, which list does not include any statement or action by the federal

government); Tr. 1013:16-20 (Day 7; Dohrmann) (none of the listed authorities are contingent on an approval from the Corps); Tr. 877:24-878:22 (Day 6; Burgum) (testifying that the State had the authority to issue the evacuation order for Corps-managed lands, but not Reservation land). Governor Burgum's evacuation order specifically stated that it would remain in effect "even if the United States Army Corps of Engineers redefines the prohibited areas." JX 254 at ND_000112819.

[¶217] COL Henderson did not issue a specific authorization for State and local law enforcement to enter Corps land to clear the protest camps, beyond his November 25, 2016, and February 2, 2017, letters that made clear which areas protestors were not permitted to be in. *See* Tr. 1137:13-22 (Day 7; Henderson), JX 213; JX 247.

[¶218] COL Henderson's letter and the Governor's evacuation order were coordinated, as they included the same deadlines to evacuate the camps. Tr. 1137:10-12 (Day 7; Henderson); JX 247 at MYERS_00044668; JX 254 at ND_000112819.

[¶219] Following the Corps's and the Governor's evacuation orders in February 2017, some protestors left voluntarily. Tr. 128:22-25 (Day 1; Schulz). On February 23, law enforcement began clearing those protestors who remained from the Main Camp on Corps land. *Id.*; Tr. 527:14-528:5 (Day 3; Laney).

[¶220] State and federal officials worked together to clear the different protest camps on and off Corps land. The clearing effort was done by local law enforcement, mutual aid law enforcement, the North Dakota Highway Patrol, and the BIA. Tr. 125:14-25 (Day 1; Schulz). State and local law enforcement were primarily responsible for clearing protestors from the Main Camp and the Rosebud Camp on Corps-managed land. *See* Tr. 971:9-12 (Day 6; Dohrmann). And BIA law enforcement cleared protestors from the Sacred Stone camp on Reservation land. Tr. 2648:1-13, 2650:12-14 (Day 16; Cruzan); ECF No. 405-11, Dep. Tr. 23:6-13 (O'Neal). COL Henderson and

members of his team were onsite for the evacuation, and they assisted with facilitating the cleanup of the floodplain.  Tr. 971:14-18 (Day 6; Dohrmann).

[¶221]  A number of federal law enforcement agencies assisted with the evacuation effort, including Customs and Border Patrol, which provided aerial surveillance of the protest camp areas from its unmanned drone and via helicopter; and the National Park Service, Bureau of Land Management, and Fish and Wildlife Service, which provided personnel to assist the BIA with removing protestors from Reservation land.  ECF No. 405-14, Dep. Tr. 34:12-35:8-16, 35:10-16, 46:15-20, 130:1-17 (Walker); ECF No. 405-11, Dep. Tr. 20:9-15, 22:5-20 (O'Neal); Tr. 2648:1-13 (Day 16; Cruzan).

[¶222]  The protest camps were cleared of people as of February 23, 2017.  Tr. 125:8-11 (Day 1; Schulz).

[¶223]  There was a "great potential" for loss of life during the protests.  JX 14 at DOI_00013275; Tr. 329:20-330:6 (Day 2; Johnson).   But in the end, there were no deaths related to the law enforcement response at any time throughout the protests.  *Id.* Tr. 724:8-18 (Day 4; Gerhart) (testifying that this was a great accomplishment); *see* Tr. 329:20-330:6 (Day 2; Johnson) (testifying that it was "remarkable" and a testament to law enforcement's response that there were no deaths); JX 9 at ND_000135620 (State-created After Action Report noting "[t]he most important statistic of all: ZERO deaths related to the law enforcement response.  There was one death of a protestor who fell through the ice on the Cannonball River.").

### N.  Cleanup of the Protest Encampment Areas

[¶224] When COL Henderson announced the closure of Corps lands in February 2017, his expectation was that the Corps and the Standing Rock Sioux Tribe would be responsible for the cleanup of the encampment areas.  Tr. 1278:22-24 (Day 8; Henderson).  The Corps was prepared to complete that cleanup itself.  *Id.* at 1278:25-1279:2.  In fact, as of February 23, 2017, the Corps

had lined up a contractor to clean up the Main Camp area to the north of the Cannonball River, as well as the Rosebud Camp on Corps-managed land to the south of the river.  PX 1405 at 0003; Tr. 468:18-469:6 (Day 3; Kirchmeier).

[¶225]  But the State decided to clean up the area of the Main Camp on Corps land itself.  This was because the State was not confident the Corps could get the cleanup completed prior to the spring snowmelt; thus, the State took it upon themselves to do the cleanup instead.  Tr. 188:16-25 (Day 1; Schulz); Tr. 884:1-7 (Day 6; Burgum).  The evidence does not indicate whether that belief by the State that the Corps might not get the cleanup completed prior to the spring snowmelt was reasonable, or how delayed the State thought the Corps would be, or whether the amount of delay the State thought there could be would have made any difference.

[¶226]  The State's cleanup of the Main Camp area began on February 23, 2017, and was largely completed by February 27, 2017.  Tr. 137:17-18 (Day 1; Schulz).

[¶227]  The State also cleaned up areas on private property and along Highway 1806, where trash was left behind from the North Camp.  Tr. 187:7-14. (Day 1; Schulz).  The State did not do any cleanup in any other areas besides the Main Camp and the North Camp locations.  *Id.* at 187:15-18.

[¶228]  The State engaged contractors to do the cleanup of the Main Camp and North Camp areas.  *Id.* at 187:19-188:1 (those contractors were named Dakota Sanitation and Peanut Pie).  The total cleanup cost to the State was $428,601.85.  *Id.* at 187:19-188:9; *see id.* at 137:22-25.  There is no evidence as to what proportion of that amount was for cleaning up the Main Camp area on Corps-managed land versus the North Camp area on State and private land.

[¶229]  The Corps handled the cleanup of the camps south of the Cannonball River, engaging contractors to complete that work.  *See id.* at 188:11-15.  The Standing Rock Sioux Tribe and its contractors also provided some assistance in cleaning those areas.  *See id.*

[¶230] The cleanup effort for the Main Camp on Corps land to the north of the Cannonball River was complete as of March 3, 2017. *See* JX 9 at ND_000135698. The cleanup of the Rosebud Camp area to the south of the Cannonball River was completed as of March 6, 2017, and the cleanup of the Sacred Stone camp area was completed shortly thereafter. *See id.* at ND_000135698-ND_000135699.

[¶231] March 31, 2017, was the last day that law enforcement actively patrolled in connection with the DAPL protests. Tr. 416:1-3 (Day 3; Kirchmeier). After that date, normal operations in the area were restored, and the protest event was considered officially closed. *Id.*; JX 9 at ND_000135700.

## VI. The Majority of the Protestors Were Peaceful; a Minority Engaged in Illegal Activity

[¶232] Many of the protestors remained peaceful and non-violent during the entirety of the DAPL protests. *See, e.g.*, Tr. 1570:1-4 (Day 9; Van Horn) (throughout the protests, there was a component of the protestors that remained peaceful); Tr. 490:23-491:2 (Day 3; Laney) (there were some "peaceful, prayerful protestors" and other protestors who were violent); JX 22 (public-facing video produced by the State, in which Sheriff Laney says "many of the people in [the camp] are peaceful and prayerful. . . . We either meet those people and have good conversations, or they do their ceremony and they leave. We never have any confrontations with them."); Tr. 984:4-8 (Day 6; Dohrmann) (some protestors were there to follow the law and protest peacefully, despite being present on Corps land without a Special Use Permit). Indeed, State officials testified that a large majority of the protestors were peaceful and did not pose a threat to public safety or property. *See* Tr. 161:7-16; 163:10-16, 163:20-164:6 (Day 1; Schulz) (estimating that only twenty percent of protestors were non-peaceful, while the other eighty percent were peaceful); Tr. 809:8-24 (Day 5; Dalrymple) (estimating that there were approximately 200 or 250 to 300 law-breaking individuals in the camps, but that the other protesters in the camps were peaceful and not causing a threat to

public safety); JX 69 at MYERS_00001793 (State-created, public-facing talking points dated August 19, 2016, stating that law enforcement "is here to enable and support" the constitutional rights to assemble and protest, and that "[p]eaceful protestors are not the issue"); PX 2027 (Morton County press release dated December 4, 2016, quoting Schulz as saying that "a majority of the people who have participated in this protest have been peaceful" and it was "an active minority" that posed a threat to law enforcement).

[¶233] Some of the protestors' activity off of Corps land was peaceful. For example, on August 24, 2016, protestors held a "walk and prayer service involving 25 horseback riders, 30 pedestrians and 30 vehicles," which "concluded without incident." JX 8 at DOI_00026803. Another peaceful protest event occurred at the State capitol in fall 2016 for which protestors obtained a permit in advance, and which did not involve any lawbreaking. Tr. 638:14-639:16 (Day 4; Pederson); Tr. 504:14-19 (Day 3; Laney), *see also* 723:17-18 (Day 4; Gerhart) (there were multiple peaceful, lawful protests at the capitol). As another example, a group of protestors gathered outside the Morton County/Mandan PD Law Enforcement Center following the arrest of a protestor. Tr. 491:4-492:5 (Day 3; Laney). In a video of the event, protestors hold signs, chant, and drum. JX 266-N (video, at slide 27). A representative of the protestors speaks with Sheriff Laney, explaining that the protestors are not there to be arrested. The representative passes along the Sheriff's instructions about where the protestors can and cannot gather to the rest of the group. *Id.* Sheriff Laney tells the protestor representative that law enforcement is "here to protect everybody's right to protest . . . they're exercising their rights as Americans." *Id.* On November 12, 2016, a caravan of approximately 100 vehicles traveled to a pipeline yard in Mandan and "engaged in protest activities that included marching, speaking, and ceremonial/prayer activities." JX 8 at DOI_00026777. State

and local law enforcement "responded to the site and monitored the situation" but made no arrests, and protestors eventually departed of their own accord without incident. *See id.*

[¶234] But some protestor activity off of Corps land was unlawful. At various times throughout the protests, some protestors would leave the camps on Corps land—and the locations other than Corps land where some protestors were staying—and conduct protest activity elsewhere. *See* Tr. 160:11-18 (Day 1; Schulz); Tr. 229:2-9 (Day 2; Gallagher); Tr. 326:10-24 (Day 2; Johnson); Tr. 486:18-487:2, 489:2-24 (Day 3; Laney); Tr. 943:19-944:2, 1007:1-3 (Days 6-7; Dohrmann). That activity sometimes included illegal acts, such as vandalism and blocking public roads and bridges. *See, e.g.*, Tr. 79:4-11, 82:8-18; 86:17-19, 93:10-94:3, 94:4-14, 148:1-7, 148:15-17 (Day 1; Schulz); Tr. 229:10-20 (Day 2; Gallagher); Tr. 326:10-24 (Day 2; Johnson); Tr. 409:14-410:15, 411:15-17, 425:6-20 (Day 3; Kirchmeier); Tr. 487:6-488:3, 488:8-13, 493:15-494:3 (Day 3; Laney); Tr. 754:22-24, 7554:25-755:4 (Day 5; Dalrymple); Tr. 872:16-21, 873:10-18 (Day 6; Burgum); PX 1253.

[¶235] Most of the protestors who left Corps land to protest came from the Main Camp on the land north of the Cannonball River. *See, e.g.*, Tr. 286:8-13 (Day 2; Gallagher); Tr. 582:4-20 (Day 3; Pederson); Tr. 1502:1-6 (Day 9; Van Horn).

[¶236] Some protestors also broke the law on Corps land, engaging in conspiracy to commit various crimes elsewhere, off of Corps property. *See* N.D.C.C. § 12.1-06-04.

[¶237] However, the activity the State was primarily concerned with was protest activity that occurred off of Corps land, when protestors engaged in violent or otherwise illegal activity. Tr. 93:19-94:3 (Day 1; Schulz); Tr. 433:21-434:9, 434:15-17 (Day 3; Kirchmeier); JX 9 at ND_000135658-ND_000135700 (State After-Action Report's day-by-day summary of events, detailing the actions of protestors and the corresponding law enforcement response); JX 10 at

ND_000137425-ND_000137426 (another State-produced After-Action Report, summarizing the problematic "tactics, techniques, and procedures" used by some DAPL protestors). Peaceful protestors were not an issue for the State; it was the minority of protestors who acted violently or broke the law that were the problem. *See* Tr. 984:1-3 (Day 6; Dohrmann); PX 2027; JX 69 at MYERS_00001793.

### VII. Factors that Contributed to the Protests' Growth and Duration

[¶238] The DAPL protests were unique and unprecedented. *See, e.g.*, Tr. 158:11-15 (Day 1; Schulz); Tr. 428:22-429:2 (Day 3; Kirchmeier); Tr. 622:20-25 (Day 3; Pederson); Tr. 723:5-10 (Day 4; Gerhart); Tr. 980:2-18 (Day 6; Dohrmann); Tr. 797:17-798:8 (Day 5; Dalrymple); Tr. 900:12-14 (Day 6; Burgum); ECF No. 404-2, Dep. Tr. 76:7-77:3 (Davis); ECF No. 421, Dep. Tr. 131:13-18 (O'Connell); ECF No. 405-14, Dep. Tr. 183:4-8 (Walker); JX 9 at ND_000135621. As a State-produced After-Action Report noted, "[b]ecause an event of this scope and magnitude had never occurred in North Dakota history, all levels of government were slow to recognize the enormity of the situation." JX 9 at ND_000135621. "Civil unrest of this magnitude and duration, in a rural county, was never imagined to be a realistic threat." *Id.* at ND_000135628 (discussing how this "lack of pre-planning for a civil unrest incident" increased the amount of work for the State in its response). Morton County Commission Chairman Cody Schulz wrote that "[a]t the start of the DAPL protest, law enforcement and county leaders never expected the activity to shift so quickly—and to remain for so long." JX 272 at 1. Many different factors contributed to the start, growth, and continuation of the protests.

[¶239] *The protestors' own beliefs and independent motivations.* The protestors themselves each had their own motives and made independent decisions about how and whether to protest. Many were driven by their own sincere beliefs. *See, e.g.*, Tr. 2523:7-2524:6 (Day 16; LaDuke) (protest

attendee Winona LaDuke testifying that she believed the protestors shared her commitment to being a water protector); ECF No. 421, Dep. Tr. 131:13-18 (O'Connell) (FBI agent testifying that in his many years of law enforcement experience, he had never dealt with the kind of "ideology-driven" activities of the DAPL protestors); ECF No. 404-1, Dep. Tr. 22:6-9, 23:7-18 (Bachmeier) (there was coalition of protestors with deeply held, honest beliefs regarding treaty rights of indigenous neighbors who were willing to go through a lot to remain and protest). Others were paid to participate in the protests. *See* Tr. 1501:10-18 (Day 9; Van Horn); JX 196; ECF No. 404-2, Dep. Tr. 82:19-84:8 (Davis). As then-Policy Advisor to Governor Burgum, Levi Bachmeier, testified, the DAPL protests "drew different people in for different reasons." ECF No. 404-1, Dep. Tr. 16:18-25 (Bachmeier). As MG Dohrmann testified, each of the individual protestors had his or her own motivations for being at the camps. Tr. 982:8-14 (Day 6; Dohrmann). And Scott Davis testified that, based on his experience protestors would not listen to instruction about where to protest. ECF No. 404-2, Dep. Tr. 149:2-6 (Davis). As such, protestors' actions were often unpredictable. Tr. 156:23-157:1 (Day 1; Schulz); Tr. 1630:14-16 (Day 9; Futch).

[¶240] The protest camps themselves were not a monolith, and they included various factions. *Id.* at 982:15-17; *see also id.* at 966:2-9 (testifying that COL Henderson's November 25 letter was an attempt to defuse the situation that did not work because of the decentralized nature of the protest camps); PX 1223 at 0002 (email from BG Spellmon, discussing what different factions of the protest camps might do in reaction to a decision on the pipeline easement); JX 66 at FBI_0000011 (FBI summary of the protest situation dated August 18, 2016, stating that the protests had no specific leader and were "a very fragmented group" with a variety of concerns). What started as a Native American effort to protect the water near the Standing Rock Indian Reservation morphed into all manner of non-Native groups joining the camps. Tr. 982:18-21 (Day 6; Dohrmann); *see*

*also* JX 13 at ND_000253221 (discussing the variety of sociopolitical and socioeconomic issues protestors were concerned with).

[¶241] *The decision-making on the DAPL pipeline easement.*  Initially, the protests were about the DAPL pipeline and the Corps's authority to grant the pipeline permission to cross the portion of land at Lake Oahe.  Tr. 1159:5-24 (Day 7; Henderson) (the protests were, in part, an attempt to influence the Corps's decision making about the pipeline as well as the Standing Rock Sioux Tribe's litigation); *id.* at 1039:10-20 (Day 7; Henderson) ("[P]art of their protest was decision authority over the land itself . . . .  Part of it was this feeling that they didn't need permission to be there . . . ."); *id.* at 1153:6-10 (during consultations, tribal members expressed that "this was their historic land that had been taken from them" and that the Corps "didn't necessarily have the authority to determine how it would be used going forward"); Tr. 1283:21-1284:3 (Day 8; Henderson) (Chairman Archambault told COL Henderson that protestors wanted to demonstrate on the Tribe's former treaty land, as opposed to BIA land); ECF No. 404-2, Dep. Tr. 93:20-94:17 (Davis) (the Corps has a trust relationship with the Tribes, and that was significant in the Tribe's grievances associated with the pipeline construction).

[¶242] Protestors were concerned about the potential environmental impacts of the DAPL pipeline, and that concern was a primary motivating factor for the protests.  *See* Tr. 2512:1-9 (Day 16; LaDuke) (testifying that her primary reason for protesting the pipeline was to hold the pipeline company accountable and reveal the issues with public safety and water quality the pipeline posed); ECF No. 404-2, Dep. Tr. 35:10-20, 79:15-80:7 (Davis) (testifying that the reason "bad actors" came to the protests was "environmental," due to concerns with the potential impact of the pipeline on the Standing Rock Sioux Tribe's water source); Tr. 449:3-6 (Day 3; Kirchmeier) (the controversial nature of the pipeline contributed to growth of protests); Tr. 545:9-12 (Day 3; Laney) (same).

Relatedly, protestors were concerned that the pipeline would disrupt sacred tribal sites.  *See* PX 1470 at 0007.

[¶243] Delays in consideration of the easement for the pipeline by the Department of the Army fueled the protests to grow and continue.  Tr. 158:1-6 (Day 1; Schulz); Tr. 1931:6-12 (Day 12; Spellmon); PX 1223 at 0002.

[¶244] *Historical and cultural factors*.  History and cultural context were also factors that led the protests to grow.  ECF No. 404-2, Dep. Tr. 92:12-93:19 (Davis).  Sioux people have a long history of taking actions when their territory or sovereignty is infringed upon.  *See* DX 4217 at ii.  Those actions have included physically occupying land, filing lawsuits, lobbying the federal government, and other tactics.  *See id.*  In particular, when Sioux people believed their treaty rights were being infringed upon, they have often reacted to that encroachment via spiritual movements, institutional channels, and armed responses.  Tr. 2577:2-12, 2579:25-2580:8  (Day 16; Greenwald).

[¶245] The DAPL protestors drew upon this history of Native occupation and protests.  *See id.* at 2562:1-10.   Native Americans participating in the DAPL protests explicitly connected those protests to key historical events in Sioux and Native American history, such as the taking of the Black Hills, the Grattan Affair, the 1862 Dakota conflict, the occupation of Alcatraz Island in 1969-1971, and the 1973 occupation of Wounded Knee.  *See id.* at 2583:14-2584:1, 2558:16-2560:25; DX 4217 at 4, 9-18, 25-31; *see also* Tr. 2581:6-19 (Day 16; Greenwald) (the occupation of Alcatraz Island was an example of occupying a symbolically important place by Indians of various Tribes, which gained a lot of attention from the media and celebrities); *id.* at 2582:18-24 (the occupation

of Wounded Knee in 1973 was of a symbolically important place, that is, where the massacre of Wounded Knee happened in 1890).

[¶246]  This history, coupled with the belief of many Sioux and their supporters that the area of the protests was unceded Sioux territory, contributed to the protests' start, growth, and duration.  *See* DX 4217 at i, 1-4, 8; DX 4256 (video at timestamp 17:30-18:56); Tr. 541:10-21 (Day 3; Laney); Tr. 985:5-15 (Day 6; Dohrmann); Tr. 2508:24-2509:8 (Day 16; LaDuke); Tr. 2421:16-19 (Day 15; Iron Eyes);  ECF No. 404-3, Dep. Tr. 22:1-6 (Estes); JX 13 at ND_000253221; JX 266 at USA_00001706.

[¶247]  The presence of law enforcement—and the North Dakota National Guard in particular—at sites of historical significance to the Sioux also increased protestors' resolve.  *See* Tr. 2433:2-13, 2434:6-2435:13 (Day 15; Iron Eyes) (testifying that the National Guard set up at Fort Abraham Lincoln, which was where Custer departed from to go to the Battle of the Little Big Horn, and that he felt like Fort Lincoln was being "reactivated as a military fort").

[¶248]  *Calls for support from the Standing Rock Sioux Tribe.*  Calls from leadership of the Standing Rock Sioux Tribe to support the protests also contributed to the protests' beginning, and to their growth.  *See* Tr. 2424:2-2426:13 (Day 15; Iron Eyes) (testifying that the idea of occupying the land north of the Cannonball River in opposition to the pipeline came about at a traditional ceremony led by a legendary medicine man, Leonard Crow Dog, in summer 2016); Tr. 545:13-16 (Day 3; Laney) (Chairman Archambault's call to action caused people to join the protests); Tr. 1519:18-1521:11, 1522:17-23 (Day 9; Van Horn) and PX 1470 at 0007 (discussing calls by tribal leadership for people to help protests to stop the pipeline); DX 4053 at USACE_00068809 (tribal leaders picked the protest camp site and took steps to provide for basic needs there, such as water and sanitary facilities); JX 150 at ARMY_00110827 (the Tribe provided resources within the Main

Camp on Corps-managed land to the north of the Cannonball River as the protests continued into the fall of 2016, including distributing food, clothing, medicine, and information inside the camp); JX 4043 at USACE_00058026 (Tribe's August 18, 2106 Special Use Permit application, stating that the Tribe is providing "in-kind donations relating to water, sewer, etc.").

[¶249] Protestor and Lower Brule Sioux Tribe member Nicholas Estes testified that he was at the protest camps because there was a call to bring together the Oceti Sakowin.  ECF No. 404-3, Dep. Tr. 8:24-25, 15:14-20; 16:4-7 (Estes) (confirming that call did not come from the Corps); *see also id.* at 60:20-61:5 (Estes took his guidance on whether he was welcome on the land of the protest camps from the Standing Rock Sioux tribal leadership, not the Corps.   And Winona LaDuke, a member of the Mississippi Band of Anishinaabe who attended the protests as a self-described water protector, testified that she was aware of Chairman Archambault's call early in the protests for people to come and act as water protectors, and that that call reaffirmed her decision to come to protest.  Tr. 2506:18-21, 2512:10-14 (Day 16; LaDuke).

[¶250] *The Standing Rock Sioux Tribe's litigation against the Corps.*   Another factor that contributed to the protests was the Standing Rock Sioux Tribe's litigation against the Corps to stop the pipeline easement from being approved.   Developments in that lawsuit—particularly the September 9, 2016, ruling denying the Tribe's preliminary injunction motion—were a flashpoint in the protests.  *See* Tr. 485:5-7 (Day 3; Laney) (law enforcement was aware of court hearings in the litigation, including on the Tribe's request for injunctive relief); Tr. 96:23-97:10; 97:17-19 (Day 1; Schulz) (the North Dakota National Guard was activated in preparation for the court's ruling in that lawsuit on September 9); *id.* at 102:10-21 (in the week after the September 9 ruling, there were arrests for trespassing and vandalism, and "enhanced" protest activity); Tr. 484:16, 485:11-18 (Day 3; Laney) (law enforcement knew that if the court issued a ruling on the injunction that the pipeline

company could continue construction, the protesters would "up their game and try to stop [the construction] from happening"); JX 94 at ND_000158168 (email from Sheriff Laney dated August 30, 2016, stating that "[w]hile it has been quiet this week, if the judge issues his ruling, things will change rapidly" and citing multiple intelligence reports that "if the judge rules against the tribe, the protestors will become unruly"); DX 4040 at MYERS_00032883 (report of EOC briefing of August 22, 2016, which stated that intelligence "continues to indicate" that if the ruling in the Standing Rock Sioux Tribe litigation went in favor of Dakota Access, "significant protests will be violent"); Tr. 1534:15-1536:4 (Day 9; Van Horn) (discussing DX 4040 and explaining that if the ruling went for Dakota Access, intelligence indicated that "it would definitely solicit more people to come for the cause to support stopping the pipeline from being built").

[¶251] The joint statement issued by the Departments of Justice, Interior, and Army on September 9, 2016, following the court's decision also bolstered some protestors' feeling that their concerns were being heard and the protests were having an impact. *See* Tr. 931:23-932:2, 992:11-25 (Day 6; Dohrmann); Tr. 2463:16-24 (Day 15: Iron Eyes) (testifying that the September 9 statement made him feel that there would be additional dialogue by the federal government with the DAPL protestors); *see also* Tr. 2947:25-2949:12 (Day 18; Warner) (State's expert witness testifying that the September 9 joint statement was widely interacted with on social media—approximately 25 times as much as the Corps's September 16 press release about the Tribe's Special Use Permit); PX 2036 at 0016 (State expert's report stating that the social-media interactions for the September 16 press release "pales in comparison" to the September 9 joint statement).

[¶252] Not all protestors viewed the September 9 joint statement as impactful. *See* ECF No. 404-3, Dep. Tr. 56:12-12 (Estes) (testifying that the Sept. 9 statement did not cause him to come to the protest camp or engage in any sort of civil disobedience in opposition to the pipeline).

[¶253] *Social media*.  Social media also played an important role in the protests' growth and continuation.  *See, e.g.*, Tr. 910:11-14 (Day 6; Burgum) and JX 268 at ND_000149565  ("Biased, inaccurate, and falsified social media accounts were used to recruit protestors throughout the nation and the world."); Tr. 448:25-449:2 (Day 3; Kirchmeier) (social media caused the protests to grow); Tr. 987: 11-14 (Day 6; Dohrmann) (same); ECF No. 404-2, Dep. Tr. 77:13-20, 78:10-22 (Davis) (same); Tr. 545:5-8 (Day 3; Laney) (the portrayal of protests on social media "definitely added fuel to the fire").

[¶254]  Terry Van Horn, a National Security Intelligence Specialist with the U.S. Attorney's Office who collected intelligence to provide to law enforcement throughout the protests, testified that social media activity had a "direct" correlation with protest activity on the ground.  Tr. 1524:25-1525:12 (Day 9; Van Horn).

[¶255] *The perception that State and local law enforcement were being heavy-handed.*  Closely tied to the important role of social media was the widespread perception among protestors that State and local law enforcement were being heavy handed in their response to the protests.  *See* Tr. 2519:14-23 (Day 16; LaDuke); ECF No. 404-3, Dep. Tr. 28:9-18 (Estes); ECF No. 404-2, Dep. Tr. 99:17-20 (Davis).  That perception—based in part on misinformation some protestors spread via social media—was "used to solicit more people to come stop the pipeline from being built."  Tr. 1529:23-1530:4, 1531:7-16 (Day 9; Van Horn); *see* Tr. 910:15-20 (Day 6; Burgum) (testifying that images were circulated on social media that suggested law enforcement was using too much force against protestors).  As one State official testified, the impact of law enforcement's decisions on the protests was "simply undeniable."  ECF No. 404-1, Dep. Tr. 16:13-17 (Bachmeier).  As an After-Action Report by the State observed, "[t]he mere presence" of law enforcement SWAT teams "helped feed the protesters['] narrative of a vast government-military-industrial-conspiracy."  JX 9

at ND_000135637.

[¶256]  Law enforcement's decision to arrest Chairman Archambault in the early days of the protest response, on August 12, 2016, led to increased scrutiny on law enforcement's actions and a "larger call to action by protestors."  Tr. 627:1-3 (Day 3; Pederson); *see also* Tr. 2545:9-12 (Day 16; LaDuke) (testifying that she thought that it was very bad judgment by the State to arrest a tribal chairman; it showed great disrespect by the State for tribal people).

[¶257]  The Big Push operation that law enforcement planned and executed also led to an influx of additional protestors.  *See, e.g.*, Tr. 2452:13-20 (Day 15: Iron Eyes); JX 181 at ND_000112446 (email from Sean Johnson, then the Planning Chief from the State Department of Emergency Services, dated November 7, 2016, stating that the numbers of protestors at the time were "twice as high as we were before the big push on 10/27"); JX 164 (State-produced vehicle count and population estimate spreadsheet, indicating (at column R, rows 53 and 55), that the estimated total population of the camps on October 27 was 1053-1263 people; and indicating (at column BK, rows 53 and 55), that the estimated total population on November 7 was 2013-2415).  As the United States' law enforcement expert explained, the Big Push operation was designed in such a way that protestors viewed it as "exceedingly . . . militarized," and such militarized responses "provoke defiance and rebellion."  Tr. 2408:8-25 (Day 15; Maguire).

[¶258]  The Backwater Bridge incident on November 20-21, 2016, also caused the number of protestors to increase.  Tr. 989:22-25 (Day 6; Dohrmann).  Protestor Winona LaDuke testified that she saw the incident as a rapid escalation of militarization by the State in its protest response.  Tr. 2518:22-23 (Day 16; LaDuke).  The State's law enforcement expert acknowledged that the use of a fire hose on protestors in cold weather presented poor optics.  *See* Tr. 1352:10-19 (Day 8; Pearson); *see also id.* at 1345:13-1346:15 (testifying that he, as a law enforcement professional, has

never used water against a crowd, never trained other officers regarding the use of water on a crowd, and never received such training himself); JX 9 at ND_000135637-ND_000135638 (State's After-Action Report observing that law enforcement had "no formal, pre-planned policies on the use of less-than-lethal munitions and agents," and that "[t]he historical lack of experience with large scale violent protests meant that little planning had gone into the use of less-than-lethal munitions and agents."). The United States' law enforcement expert, who reviewed extensive video evidence of the incident, opined that State and local law enforcement's use of a fire hose to spray protestors on a frigid night was contrary to accepted police practices, and that it is not something that law enforcement usually do because it is an indiscriminate and potentially dangerous use of force. *See* Tr. 2333:14-2336:4 (Day 15; Maguire).

[¶259] Law enforcement's decisions regarding the use of equipment caused a negative response among protestors. For example, law enforcement's use of riot gear in responding to the protests created bad feelings among members of the Standing Rock Sioux Tribe. ECF No. 404-2, Dep. Tr. 138:2-18 (Davis). And the State faced further backlash for deploying an unarmed air defense missile system, such that the asset was eventually removed from the protest response. Tr. 986:2-18 (Day 6; Dohrmann).

[¶260] There were also many instances in which State and local law enforcement chose *not* to arrest all protestors who were engaged in illegal activities. *See infra* FoF [¶342]. Law enforcement publicized the fact that they would not make mass arrests of protestors. *See, e.g.*, JX 225 at video timestamp 0:01-0:45; JX 166 at USACE_00005409; DX 4256 (at video timestamp 16:35-17:02).

[¶261] *Actions by the pipeline company*. Certain decisions and actions by the pipeline company caused protest activity to increase in volume and intensity. For example, the "dog bite" confrontation between protestors and DAPL private security personnel on September 3, 2016,

precipitated a swell in the protest camp population.  Tr. 989:14-25 (Day 6; Dohrmann); Tr. 448:10-13 (Day 3; Kirchmeier); Tr. 2439:7-9 (Day 15: Iron Eyes); *see* Tr. 544:15-545:4 (Day 3; Laney) (testifying that thousands of people came to join the protests after that incident, the protests became considerably more confrontational, and the way the incident was portrayed on social media fueled the protests); Tr. 2514:3-13, 2515:5-8 (Day 16; LaDuke) (testifying that she felt that, by using dogs in the confrontation with protestors on September 3, 2016, the State and DAPL brutalized and traumatized her people, and further testifying that those events strengthened her resolve to protest). That incident was a major flashpoint in the protests.  *See* Tr. 94:18-95:1, 96:1-6 (Day 1; Schulz); Tr. 989:14-18 (Day 6; Dohrmann); Tr. 1208:2-8, 1208:13-22 (Day 7; Henderson).  Tr. 1514:25-1515:3, 1517:10-15, 1569:15-25 (Day 9; Van Horn); Tr. 2443:25-3 (Day 15; Iron Eyes).  As Sheriff Laney testified, when he saw the video of the September 3 dog bite incident on social media, he knew "everything was going to change.  And we all saw that."  Tr. 496:7-10 (Day 3; Laney).

[¶262]  As another example, the pipeline company's decision to do construction activities in an area where the Tribe had identified sacred sites caused the protests to increase in intensity.  *See* Tr. 2442:3-25 (Day 15: Iron Eyes); ECF No. 404-2, Dep. Tr. 68:18-69:5 (Davis); JX 8 at DOI_00026798.  North Dakota Indian Affairs Commission Executive Director Davis testified that he asked the pipeline company to back off of construction because it seemed the company was purposely building the pipeline quickly, which would cause more people to come and increase the potential for violence, thus requiring a law enforcement response.  ECF No. 404-2, Dep. Tr. 66:5-67:11, 68:4-14, 69:6-20 (Davis).  The pipeline company was not open to that request.  *Id.* at 67:12-19; *see also* Tr. 1996:3-20 (Day 12; Spellmon) (Dakota Access's statement of intent to continue constructing pipeline close to Lake Oahe "added additional fuel to the protest community in the camps"); PX 1223 at 0004 (same).

[¶263] For its part, the pipeline company has sought to place the blame for the protests on environmental advocacy organizations including Greenpeace and Earth First.  The company filed two lawsuits alleging that those organizations entered into a criminal conspiracy in connection with the DAPL protests, which was intended to—and did—incite violence, property destruction, and criminal sabotage.  Tr. 1632:12-1633:8, 1633:14-20 (Day 9; Futch); *see* Complaint, *Energy Transfer Equity, L.P. et al. v. Greenpeace Int'l et al*, No. 17-cv-173-BRW, ECF No. 95 (D.N.D. filed Aug. 22, 2017); Complaint, *Energy Transfer Equity, L.P. et al. v. Greenpeace Int'l et al.*, No. 30-2019-CV-00180, Index # 2 (N.D. Dist. Ct. Morton Cnty. filed Feb. 21, 2019).  The company claims that Earth First provided $500,000 in seed money to form the Red Warrior Camp, which was an offshoot of the Main Camp on Corps-managed land north of the Cannonball River.  Tr. 1633:9-13 (Day 9; Futch); *see also* Tr. 1491:9-16 (Day 9; Van Horn).  The company did not include the Corps (or the United States) as a defendant in those cases, and it has no evidence that the Corps directed the protestors or the organizations that were named as defendants to commit the alleged bad acts.  *See* Tr. 1634:15-1635:1 (Day 9; Futch).

[¶264] *Online donations*.  Additionally, millions of dollars in online donations supported the protests, causing them to grow and to continue.  *See* JX 9 at ND_000135646 (State-created After Action Report stating that the "vast, ongoing funding streams" from online crowdsource donations meant the protests could "last almost indefinitely, unless other factors intervene, in this case, the harsh North Dakota winter and potential for spring flooding"); Tr. 987:15-988:6 (Day 6; Dohrmann).  An estimated $12 million to $19 million in total was donated to support the DAPL protestors, via websites such as GoFundMe.  *See* PX 1470 at 0017; Tr. 1528:9-18, 1528:22-23 (Day 9; Van Horn); ECF No. 404-1, Dep. Tr. 15:25-16:8 (Bachmeier).

[¶265] Some individuals who participated in the DAPL protests were paid directly for their protest

activities. *See* ECF No. 404-2, Dep. Tr. 82:19-84:8 (Davis) (Davis strongly suspected that there were paid protesters who were there to stir the pot and incite violence); Tr. 1501:10-18 (Day 9; Van Horn) and JX 196 at MYERS_00024230 (discussing protestors being paid for participation in certain protest activities, including for being arrested).

[¶266] There is no evidence that any of the money donated to the protestors came from officials with the Corps. *See* Tr. 1532:7-12 (Day 9; Van Horn); ECF No. 404-2, Dep. Tr. 88:13-15 (Davis).

[¶267] *Celebrity involvement*. Throughout the protests, a number of celebrities came to the camps and otherwise expressed their support. For example, actress Shailene Woodley participated in a peaceful protest at the DAPL construction site, livestreaming her activities on social media. *See* Tr. 2326:6-13 (Day 15; Maguire). Shortly after concluding her live stream, as she was leaving the protest and returning to her vehicle, Ms. Woodley was arrested for trespassing. *See id.* at 2326:6-18, 2327:11-24; Tr. 1533:3-20 (Day 9; Van Horn) and PX 1470 at 0028. That arrest received significant media attention. *See* Tr. 2326:21-23 (Day 15; Maguire). Other celebrities including Mark Ruffalo, Susan Sarandon, and Jesse Jackson were present at the protests at various times. JX 13 at ND_000253290.

[¶268] The involvement of celebrities lent credibility to protestors' cause and increased public attention on the protests. Tr. 1532:23-1533:2 (Day 9; Van Horn); Tr. 991: 14-17 (Day 6; Dohrmann); ECF No. 404-2, Dep. Tr. 96:18-25 (Davis).

## VIII.   Statements and Permissions by the Corps Did Not Increase the Protests

[¶269] In contrast to the various factors discussed above, there is no evidence that statements or permission by the Corps increased the protests' size, duration, or intensity. As an initial matter, Corps officials never permitted protestors to erect structures, dig pits, or create roads on Corps land; nonetheless, protestors did those things regardless. Tr. 1086:7-14 (Day 7; Henderson); JX 128

(September 16 press release stating that the Tribe was permitted to use the designated Corps land "subject to Federal rules and regulations including Title 36 of the Code of Federal Regulations Part 327," further stating that "[a]dditional permission will be required for activities identified in Title 36 such as construction, either temporary or permanent, of any structures within areas identified in the Special Use Permit"); JX 213 at USACE_00089654 (COL Henderson's November 25, 2016, letter to tribal leadership stating that "[t]here are currently many Title 36 violations occurring on the Corps' lands north of the Cannonball River, including, but not limited to, unauthorized structures, fires, improper disposal of waste, and camping," that "any tribal government that sponsors such illegal activity is assuming the risk for those persons who remain on these lands," and emphasizing that people were permitted to peacefully protest in the free speech zone south of the Cannonball River "subject to the rules of 36 C.F.R. Part 327"). The Corps also never stated that protestors were allowed to camp on Corps land to the north of the Cannonball River. *See* Tr. 1115:13-14, 1115:24-1116:6 (Day 7; Henderson) (COL Henderson never supported a Special Use Permit or even considered granting one for the area north of the Cannonball River because it was the subject of a grazing lease that was never canceled); DX 4095 at ARMY_00115852 (September 13, 2016, email from COL Henderson reporting that he told Chairman Archambault about "our limitation for providing a permit in the area north of the Cannonball" and discussed a move out of the area, to the south); JX 128 (September 16 press release, stating a Special Use Permit would not be granted for Corps land to the north of the river because that area was already subject to an existing grazing lease); JX 133 at USACE_00084338-USACE_00084339 (in response to media inquiries about protestors on the land to the north of the river, the Corps's answer was "that they are encouraged to relocate to the permitted area. If they remain in place it is at their own risk and at a potential risk to the lessee"); JX 213 at USACE_00089654 (November 25 letter to tribal

leadership formally closing the area north of the Cannonball).  Nonetheless, protestors gathered there, establishing the "Main Camp" that came to be the largest of all the various protest encampments.  *E.g.*, Tr. 1482:11-17 (Day 9; Van Horn).

[¶270] There is no evidence that the Corps's September 16, 2016, press release or COL Henderson's November 25, 2016, letter to tribal leadership caused the protests to grow larger, last longer, or be more disruptive than they otherwise would have.  The only evidence from protestors themselves is that those statements did *not* cause protestors to come to the area or stay longer once they were there.  *See* ECF No. 404-3, Dep. Tr. 100:1-9 (Estes) (testifying that neither statement caused him to come to North Dakota or stay in North Dakota during the protests); *id.* at 58:11-23 (testifying that September 16 press release did not cause him to come to the protest camps and did not have any bearing on anything that was going on for him); *id.* at  61:19-62:1 (testifying that the November 25 letter did not cause him to come to the protest camps or stay any longer than he otherwise would have); Tr. 2516:7-12 (Day 16; LaDuke) (testifying that as for the September 16 press release, she did not require permission from Corps to go on her own land, and that other protestors felt the same); *id.* at 2522:15-23 (testifying that the November 25 letter did not cause her to engage in any civil disobedience or stay any longer at the camps); Tr. 2445:1-12 (Day 15: Iron Eyes) (testifying that as for the September 16 press release, what the Corps was doing "wasn't really relevant to . . . what [the protestors] were doing," and it did not make any difference to him in making his decisions about whether to engage in protests); *id.* at 2445:25-2446:4 (testifying that based on Iron Eyes's participation in and observation of the protests, he did not observe any impact from the September 16 press release on protests).  Scott Davis, the North Dakota Indian Affairs Commission Executive Director, similarly testified that the people he personally knew who were participating in the DAPL protests never mentioned the September 16 press release, and that they

never talked with him about the November 25 letter.  ECF No. 404-2, Dep. Tr. 21:6-10, 21:15-20 (Davis).

[¶271] Contemporaneous estimates of the camps' population and counts of vehicles at the camps did not show a meaningful increase in protest activity immediately following either statement by the Corps, or any large-scale movement of protestors from the area of Corps-managed land to the north of the Cannonball River onto the area south of the Cannonball River.  *See* DX 4225 at 57-62 (United States' marketing research and consumer behavior expert's report, plotting the available camp population estimates and vehicle count information over time and discussing those findings); JX 8 (a compilation of contemporaneous summaries of protest events created by BIA law enforcement, including estimates of the protest camps' population); JX 164 (State-created estimates of camp populations, beginning in mid-October 2016).  Nor was there an increase in social media activity, which generally correlated strongly with protest activity on the ground, following those statements.  *See* Tr. 1524:25-1525:12 (Day 9; Van Horn); DX 4225 at 62-119; Tr. 2765:8-15 (Day 17; Steckel).  Nor did State and local law enforcement observe a change in the protest situation on the ground following either statement.  *See* Tr. 463:7-9 (Day 3; Kirchmeier) (Sheriff Kirchmeier did not notice any change in activity on ground following the September 16 press release); Tr. 546:20-547:3 (Day 3; Laney) (Sheriff Laney recalled the protests growing after the Standing Rock Sioux Tribe's call to join the protests early on, the Standing Rock powwow in late August 2016, and the dog bite incident of September 3, but he did not recall the September 16 press release being a catalyst for the protests' growth); Tr. 463:20-24 (Day 3; Kirchmeier) (Sheriff Kirchmeier saw no change in the protests following COL Henderson's November 25 letter to tribal leadership).

[¶272] The State itself did not consider either of these Corps statements to be significant at the time.  After-action reports produced by the State shortly after the protests did not include the

98

September 16 press release or the establishment of the free speech zone on November 25 as significant events. *See* JX 9 at ND_000135663, ND_000135681 (an After-Action Report produced by the North Dakota Department of Emergency Services that includes a 40-plus-page summary of the protest events with day-by-day entries from August 10, 2016, through March 31, 2017, which does not mention the September 16 press release at all, and mentions the November 25 letter only to say that it "primarily advis[ed] that effective December 5, 2016 the Corps managed federal property north of the Cannonball River is closed to all public use and access"); JX 265 at ND_000204152, ND_000204170 (a different version of that report, containing nothing different as to those two statements); JX 10 at ND_000137422-ND_000137424 (another After-Action Report, produced by the North Dakota State and Local Intelligence Center, that does not mention the September 16 statement or the November 25 letter in its summary of protest events); *see* Tr. 991:25-992:3 (Day 6; Dohrmann) (testifying that the after-action reports accurately analyzed the events that were substantial factors in causing the protests to occur); *see also* JX 13 at ND_000253226-ND_000253227 (a State-produced presentation about the protests that also does not include the September 16 press release or November 25 letter's statement regarding a free speech zone in its "Timeline of Significant Events"); JX 14 at DOI_00013244, DOI_00013249, (a State-produced Incident Overview about the protests that does not include the September 16 statement in its list of "Major Events" during the protests, and only mentions the November 25 statement to say that the Corps had "ordere[d] occupants of Oceti Sakowin evicted"). Sheriff Laney did not even recall the issuance of the September 16 press release. Tr. 546:1-9 (Day 3; Laney).

[¶273] More broadly, there is no evidence that the Corps's granting or denying permission to the protestors to be on its land made any difference for protestors. COL Henderson believed that even if the Tribe had a finalized Special Use Permit, it would not have stopped what had already been

ongoing for a month before the Corps's September 16 statement. *See* Tr. 1141:19-23 (Day 7; Henderson). The only evidence from protesters themselves about the significance of permission from the Corps is that such permission was *not* relevant to their decision-making on whether and where to protest. *See* Tr. 2517:9-12 (Day 16; LaDuke) (testifying that it would have made no difference whether the Corps issued a Special Use Permit or not; she was at the camp at the request of the Lakota people and that was all the authority she needed to be there); Tr. 2426:25-2427:2 (Day 15: Iron Eyes) (testifying that the decision to locate the Main Camp on Corps land to the north of the Cannonball River was not influenced by any kind of permission or consent from federal government); *id.* at 2455:13-17 (testifying that at no time did it make any difference to him whether or not protestors had a permit from the Corps to be on Corps land, and in his observation of other protestors, it did not make any difference to anyone else involved); *see also* ECF No. 404-3, Dep. Tr. 15:14-20; 16:4-8 (Estes) (testifying that he was at the camps because there was a call to bring together the Oceti Sakowin, a call that was not made by the Corps); *id.* at 63:8-14 (testifying that he could not think of any statement from the federal government during the time of the protests that caused him to come to the protest camps or stay at them). As Sheriff Kirchmeier put it in a presentation about the protests, "although the federal government doesn't recognize the land the pipeline is on as Sioux territory, other people disagree. So, while the government might say, 'hey, you're trespassing,' other groups can come back and say 'no, you're trespassing and we're not leaving.'" JX 266 at USA_00001706.

[¶274] Protestors testified that they did not even view the Corps as having the authority to grant or deny permission for the protests in the area. *See* ECF No. 404-3, Dep. Tr. 23:17-25 (Estes) (testifying that he did not believe that the Corps had a right to say who belonged on the land where the protests camps were located); *id.* at 60:20-61:5 (Estes took his guidance on whether he was

welcome on the land of the protest camps from the Standing Rock Sioux tribal leadership, not the Corps); Tr. 2516:25-2517:2 (Day 16; LaDuke) (testifying that she did not believe Corps had any authority to tell her where she could do her activities as a water protector); *id.* at 2545:15-21 (testifying that she did not believe the Corps had any authority to tell her as a water protector what she could do and where she could do it because she is an Indigenous person and her land and water are her responsibility). As COL Henderson put it, the Special Use Permit was a "piece of paper" that "wasn't going to mean anything" to protestors, nor would it stop what was already happening on Corps land. Tr. 1141:19-23, 1265:14-18 (Days 7-8; Henderson).

[¶275] Practically, the Corps did not have the ability to control protestors' activities. MG Dohrmann testified that, by September 2016, the protest camps were not responsive to what the Corps said could or could not be done on Corps land, and by that point it would not have mattered what the Corps wanted to do with the land. Tr. 983:8-11, 1004:24-1005:4 (Days 6-7; Dohrmann) (opining that if protestors wanted to protest on Corps land, they were going to find a way to do it, no matter what authorities did in response). COL Henderson also testified that Corps officials did not have control over where protestors congregated or what they did. Tr. 1279:10-12 (Day 8; Henderson).

## IX. Corps Officials Made Reasonable Decisions in a Difficult Situation with the Limited Resources at Their Disposal

### A. Corps Officials Needed to Consider Many Factors

[¶276] COL Henderson recognized that the DAPL protests presented a difficult and complex situation. Tr. 1071:11-15 (Day 7; Henderson). While protestors were indeed trespassing on Corps land, they were also engaged in First-Amendment-protected protest activity on public land. *Id.* at 1050:2-17, 1167:22-1168:3, 1190:12-1191:3, 1191:21-1192:5. And the protests involved a federally recognized Native American Tribe with which the Corps had a trust relationship and with

which it was engaging in consultations regarding the pipeline.  *See id.* at 1157:21-1158:19; Tr. 2460:14-15 (Day 15: Iron Eyes) (testifying that there were a lot of non-Native people at protests, but at no point did they outnumber the Native protestors).

[¶277] Moreover, Corps officials knew that, had the Corps attempted to remove everyone from their land, that action would not have ended the protests; rather, it would pose the risk that protestors would form new camps "on adjacent private property, or state lands, where additional damage would be incurred," which "would only worsen the problem."  PX 1223 at 0001 (email from BG Spellmon dated October 13, 2016); *see also* Tr. 470:8-17 (Sheriff Kirchmeier knew from his experience during the protests that if there was one camp in existence and another camp was cleared, the protestors who weren't arrested tended to migrate from the cleared camp to the one that was still in existence).

[¶278] This situation was different from the usual situation where there are trespassers on Corps land, which typically involve small numbers of people who are not there to conduct First Amendment activities and are not sponsored by a federally recognized Native American Tribe, and which would not require a massive exercise of force by law enforcement to remove them from the area.  *See* Tr. 427:20-428:4 (Day 3; Kirchmeier), *cf.* Tr. 149:18-150:18; 151:19-152:2, 152:21-24, 153:5-18, 153:24-154:1 (Day 1; Schulz) (discussing a prior instance of trespassing in the years before the DAPL protests, when a single Canadian individual was camping on Corps land in Morton County; that person was not engaged in any kind of free speech activity and left voluntarily after law enforcement requested he do so).

[¶279] The Corps only had two park rangers assigned to the entire Lake Oahe project area, who did not have law enforcement authority.  *See* Tr. 1098:16-18, 1152:11-14 (Day 7; Henderson); Tr.

1460:13-15 (Day 9; Kruger). COL Henderson was concerned about making a decision that could jeopardize their safety. *See* Tr. 1098:14-20, 1139:3-10 (Day 7; Henderson).

[¶280] Corps officials needed to be sensitive to all of these realities, and in their decisions about how to respond to the protests they wanted to avoid creating a conflict or flash point that would exacerbate the situation. Tr. 1050:2-25 (Day 7; Henderson); Tr. 1910:13-1911:2 (Day 12; Spellmon). Given his prior experience in active combat zones, COL Henderson was aware of the need to build coalitions and evaluate potential courses of action in such difficult situations, to avoid injuries or loss of life. *See* Tr. at 1144:6-1145:8 (Day 7; Henderson); *see also* Tr. 1279:23-7 (Day 8; Henderson) (COL Henderson was concerned and worried that the situation in which thousands of protestors were in a standoff with law enforcement would lead to people being hurt).

### B. Corps Officials Communicated Regularly with State and Local Officials

[¶281] During the protests, COL Henderson and his team "were in constant coordination" with State and local officials. Tr. 1138:25-1139:2 (Day 7; Henderson); *see, e.g.*, Tr. 87:14-17, 165:12-16 (Day 1; Schulz) (COL Henderson personally communicated with Morton County Commission Chairman Cody Schulz 15-20 times throughout the protests; Schulz also met in person with BG Spellmon during the protests); Tr. 934:15-24, 993:14-19, 993:25-994:6 (Day 6; Dohrmann) (COL Henderson spoke with MG Dohrmann often during the protests, including about what actions could be taken in response and their potential consequences; BG Spellmon also met and spoke with MG Dohrmann during the protests); Tr. 1411:11-23 (Day 8; Jackson) (MG Jackson testifying that he and MG Dohrmann both participated in National Security Council meetings about the protests).

[¶282] COL Henderson communicated with State officials regarding the protests on Corps land. He discussed with law enforcement the need to find a safe place to keep protestors separated from law enforcement and DAPL workers, and to avoid actions that could become a flashpoint in the

protests.  Tr. 1074:11-1075:2 (Day 7; Henderson).

[¶283] COL Henderson also communicated with State leadership regarding the Tribe's request for a Special Use Permit after the Corps first received it in mid-August and as he was deciding how to respond.  *Id.* at 1187:5-8, 1221:17-21.  Corps officials provided the Governor's office with an advance copy of the draft press release announcing the Corps was offering the Tribe a Special Use Permit; the Corps did not receive any objection to the draft release from the Governor's office.  *Id.* at 1221:1-8.

[¶284] COL Henderson assigned dedicated Corps personnel to liaise with State and local law enforcement at the Morton County and State Emergency Operations Centers during the protests. *See* Tr. 1030:11-13, 1030:19-1031:1, 1031:8-11 (Day 7; Henderson); Tr. 971:20-23 (Day 6; Dohrmann).  The purpose of assigning those liaisons was to ensure a good flow of communication, and those Corps individuals both received information from the State and provided the State with information about decisions the Corps was making.  *Id.* at 1031:12-21.

[¶285] The opinion that State and local law enforcement shared with COL Henderson was that forcibly removing the protestors from Corps land would be a very bad idea.  Tr. 1085:17-22, 1180:13-1181:12, 1204:12-16, 1272:17-1273:2 (Days 7-8; Henderson); *see also* Tr. 1279:3-9 (Day 8; Henderson) (at no point in the protests up until the camps' closure in February 2017 did any State or local official express to COL Henderson that it would have been a good idea to enter Corps land and remove protestors by force).

[¶286] Further, COL Henderson understood that State and local law enforcement were not equipped or willing to enforce a mass eviction.  *See* Tr. 1052:4, 1052:24-1053:1, 1197:13-25, 12:05:13-17, 1212:10-21 (Day 7; Henderson); *see also* DX 4075 at USACE_00177754 (Corps storyboard summary dated September 7, 2016, reporting that the U.S. Attorney for the District of

North Dakota "indicated that there is little local desire to enforce an eviction of protestors from the site upon a permit denial"); DX 4095 at ARMY_00115852 (email from COL Henderson to his superiors dated September 13, 2016, stating that "I don't think anyone is willing to force an eviction"); DX 4136 at USACE_00178842 (on October 27, 2016, Captain Pederson of the North Dakota Highway Patrol told Corps officials that the State would not put any law enforcement resources on Corps land, that federal law enforcement would be required to conduct all enforcement activities on federal land, and that the State's "resources will not be available" and were "depleted"); Tr. 1248:23-1249:6 (Day 8; Henderson) (that message from Captain Pederson was consistent with the information the Corps had been receiving from State and local law enforcement since the beginning of the protest response in mid-August 2016).

### C. Corps Officials Attempted to Mitigate the Situation by Working Closely with Tribal Leadership

[¶287] COL Henderson communicated regularly with Chairman Archambault and other tribal leaders throughout the protests, in an attempt to deescalate tensions and to negotiate compliance with the Corps's requests.  *See* Tr. 1105:18-1106:1 (Day 7; Henderson); *e.g.*, *id.* (discussing the back-and-forth communications COL Henderson and his team had in mid-August to mid-September 2016 after the Tribe submitted its Special Use Permit application); PX 1345 (email embedding COL Henderson's text message communications with Chairman Archambault between September 15, 2016, and December 12, 2016; JX 8 at DOI_00026779, DOI_00026809 (discussing meetings and conversations COL Henderson had with tribal leadership in September and November 2016); PX 1202 at 0001-0002 (discussing a lengthy conversation COL Henderson had with Chairman Archambault on October 3, 2016); JX 150 at ARMY_00110826-ARMY_00110827 (discussing COL Henderson's meetings with Chairman Archambault and LaDonna Bravebull

Allard on October 7, 2016).

[¶288] COL Henderson and his team worked with the Tribe on their Special Use Permit application for a month, from August 15, 2016, until the Corps offered the Tribe the Special Use Permit and issued the related press release on September 16, 2016. *See* DX 4024 at USACE_00031882; Tr. 1165:20-1166:2, 1166:16-23 (Day 7; Henderson).

[¶289] As of at least early October 2016, tribal leaders and Corps officials were actively working towards a move of protestors off of Corps land to the north of the Cannonball River—which was not included in the area that would be authorized under the offered Special Use Permit—to an area south of the river closer to the town of Cannonball. Tr. 1103:3-14 (Day 7; Henderson); PX 1202 at 0001-0002; JX 150 at ARMY_00110825-ARMY_00110827; PX 1223 at 0001; *see* JX 129. By that point, Chairman Archambault also wanted protestors to leave, and the Corps did what it could to support a tribal-led effort to move the protestors off of the land. Tr. 1117:5-10 (Day 7; Henderson). The Corps supported a move of protestors off of Corps land north of the Cannonball River to the area south of the River because they believed there were better options for emergency response and BIA law enforcement in the south area. Tr. 1127:22-1128:1 (Day 7; Henderson).

[¶290] Corps officials continued to work with the Tribe toward a move off of Corps land in the following weeks. In early November 2016, at a meeting between COL Henderson and tribal leadership, the Tribe suggested a 30-day pause in the pipeline's work in the area to allow the Tribe to facilitate the move. *See* Tr. 1252:2-23 (Day 8; Henderson). COL Henderson supported the plan for the Tribe to lead the move, as opposed to the Corps or law enforcement, in hopes the Tribe could convince protestors to voluntarily leave the area of the Main Camp. *See id.* The pipeline company was strongly opposed to the idea, despite the fact that it would not have the required permission to construct the pipeline on Corps land in that timeframe. *See* 1258:1-13 (Day 8;

Henderson) (describing this as an "unforced error" on the part of the pipeline company that "further inflam[ed] tensions with the protestors").

[¶291] COL Henderson recognized that Chairman Archambault had more control than any other person or entity did during the protests. *See* Tr. 1103:22-1104:6 (Day 7; Henderson).  COL Henderson and his team also believed that protestors would have responded more positively to a statement from tribal leadership telling them to leave Corps land than one from the Corps or law enforcement. *Id.* at 1117:11-19, Tr. 1235:8-14 (Day 8; Henderson).

[¶292]  In his discussions with tribal leadership, COL Henderson emphasized the need for the Tribe to discourage violence, trespassing on private land, and provoking confrontations with law enforcement. *Id.* at 1236:22-1237:15; PX 1202 at 0001 (email from COL Henderson dated October 4, 2016, recounting a conversation he had with Chairman Archambault in which he emphasized these points).

[¶293]  In COL Henderson's conversations with tribal leadership—and in the Corps's statements to the public—he made clear that protestors were not permitted on Corps land to the north of the Cannonball River.  *See* PX 1345 at 0009 (text message from COL Henderson to Chairman Archambault dated October 28, 2016, stating that COL Henderson "can't condone the continued occupation of the land north of the Cannonball River"); JX 128 (September 16 press release, stating that a Special Use Permit would not be granted for Corps land to the north of the Cannonball River because that area was already subject to an existing grazing lease); JX 213 at USACE_00089654 (November 25 letter to tribal leadership formally closing the area north of the Cannonball).

[¶294]  The Corps's approach in working with tribal leadership mirrored the State's approach.  The State often negotiated with protest leaders in an attempt to seek voluntary compliance.  *See, e.g.*, Tr. 172:14-20 (Day 1; Schulz) (State officials met with members of the protest camps they believed

to have influence many times throughout the protests); *id.* at 85:16-18 (Morton County officials kept an open line of communication with the Standing Rock Sioux Tribe during the protests); Tr. 502:10-16 (Day 3; Laney) (when State law enforcement encountered protesters blocking roadways, they would have dialogue with them to try and get the protest to break up); JX 8 at DOI_00026790-DOI_00026793, DOI_00026795-DOI_00026797, DOI_00026799 (describing several meetings that State, local, and BIA officials had with representatives of the protest camps in late August to mid-September 2016 to discuss options for peacefully concluding the protests); JX 266-N (video, at slide 27) (video in which law enforcement officials discuss where protestors may gather with a protest representative); Tr. 374:9-23 (Day 2; Kirchmeier) and Tr. 515:6-18 (Day 3; Laney) (discussing the meeting with a North Camp protest leader named Mekasi the day before the Big Push, in which law enforcement hoped to convince protestors to voluntarily leave the area). And State officials were in regular communication with Standing Rock Sioux Tribe leaders throughout the protests. *See* Tr. 432:2-433:14 (Day 3; Kirchmeier) (on August 16, 2016—one day after the Corps first learned about protestors being on Corps land north of the Cannonball River—Sheriff Kirchmeier attended a meeting with Standing Rock Sioux Tribe members about how to deescalate tensions, discussing options including offering more land, comfort, and amenities to the protestors); Tr. 539:1-4 (Day 3; Laney) (State officials considered their relationship with the Standing Rock Sioux Tribe in formulating their protest response); Tr. 775:13-776:9 (Day 5; Dalrymple) (testifying that the Governor's office was in communication with Chairman Archambault very early on in the protests and continued to coordinate with him as the protests went on, even as it became clear the protests were no longer within his control); *id.* at 786:21-787:7, 807:19-23 (testifying that the Governor worked with Chairman Archambault and the Standing Rock Sioux tribal council to defuse tensions and practice diplomacy); Tr. 846:10-25 (Day 6; Burgum) (testifying that one of Governor

Burgum's first acts when he took office was to call Chairman Archambault to get his perspective and engage in diplomacy); Tr. 984:15-25 (Day 6; Dohrmann) (in deciding how to respond to the protests, MG Dohrmann considered the need to maintain the relationship between the State and the Standing Rock Sioux Tribe); Tr. 166:1-6 (Day 1; Schulz) (Morton County Commission Chairman Schulz talked with Chairman Archambault 15-20 times throughout the protests, met with tribal council members on multiple occasions, and kept an open line of communication with the Standing Rock Sioux Tribe).

[¶295] As MG Dohrmann testified, the State implemented the "DIME" model: employing diplomatic, information, military/law enforcement, and economic measures, with law enforcement force being used as a last resort. Tr. 937:11-18 (Day 6; Dohrmann). The State's expert agreed that trying to defuse a difficult situation by negotiating with protest leaders or organizers is a good strategy. *See* Tr. 2094:21-24, 2095:13-18 (Day 13; Handy).

[¶296] The pipeline company also took a similar approach to the Corps and the State in attempting to work with the Tribe to deescalate the protests. At one point in late fall or winter 2016, the company offered to donate the Cannonball Ranch land to the Standing Rock Sioux Tribe in exchange for the Tribe's assistance in controlling the activities of protestors. Tr. 1629:7-25 (Day 9; Futch).

### D. Corps Officials Coordinated with Other Federal Officials and Sought Federal Law Enforcement Assistance

[¶297] In addition to communicating regularly with State officials and tribal leadership, Corps officials also coordinated with members of federal law enforcement agencies about how best to respond to the protests. In mid-August, individuals with the U.S. Attorney's Office told COL Henderson that it would not be worthwhile to issue trespassing citations to protestors on Corps land because any such citations would not be enforced. Tr. 1179:8-16 (Day 7; Henderson). That

message from the U.S. Attorney's Office was the same as the protests continued into fall of 2016. *See* Tr. 1242:2-1243:18 (Day 8; Henderson); JX 150 at ARMY_00110828.  Darren Cruzan, the Director of the BIA's law enforcement branch, advised Corps officials on September 15, 2016, that "[a]ny attempt to forcefully remove the camp or even allude to that being an option at this time in my opinion could derail any progress that we have made to this point."  JX 122 at DOI_00022359 (the top email in this chain notes that Director Cruzan's request was passed along to the Corps that day); *see* Tr. 2599:14-16 (Day 16; Cruzan).

[¶298] Corps officials requested federal law enforcement assistance to deal with the protests.  In August 2016, COL Henderson spoke with officials from the U.S. Attorney's Office in North Dakota to understand the law enforcement jurisdiction over the area of the protest encampments and how to request federal law enforcement support.  Tr. 1099:25-1100:13 (Day 7; Henderson).    COL Henderson went on to request federal law enforcement support through his own chain of command and from various federal law enforcement agencies informally on several occasions throughout the protests.  *See* Tr. 1120:9-23, 1140:3-15, 1265:21-23, 1297:9-13 (Days 7-8; Henderson).  Those requests either went unanswered, or COL Henderson received the response that other federal agencies were not willing to make their law enforcement resources available.  *Id.* at 1100:24-1101:2, 1140:12-16.

[¶299] In December 2016, COL Henderson made a written request to the Department of Justice, via the U.S. Attorney General, for federal law enforcement support.  *Id.* at 1100:17-1101:7, 1296:24-1297:8;  *see* DX 4172 (draft of COL Henderson's written request for federal law enforcement assistance).  He made this formal request—after having made several similar, informal requests previously—to create a written record of the request and to ask for a written response.  Tr. 1265:21-1266:1 (Day 8; Henderson).    Before the request was submitted, COL Henderson

110

coordinated it jointly with MG Dohrmann, so that it would be sent via multiple channels. *Id.* at 1274:3-1275:4; DX 4172 at USACE_00024756 (emails between COL Henderson and his team, discussing that MG Dohrmann was willing to sign the letter and that he had suggested that other State law enforcement officials should sign it as well). COL Henderson completed the request and submitted it to his superior, BG Spellmon. Tr. 1296:7-20 (Day 8; Henderson); Tr. 1971:9-13 (Day 12; Spellmon). BG Spellmon passed the request on to LTG Semonite, who was then the Chief of Engineers for the Corps, and he also sent the request via letter to the U.S. Attorney General. Tr. 1972:6-14 (Day 12; Spellmon).

[¶300] The Department of Justice ultimately did not grant the Corps's request for federal law enforcement assistance. *See* Tr. 1275:5-7 (Henderson; Day 8); *see also* ECF No. 405-3, Dep. Tr. 25:24-26:18, 28:5-18, 38:17-39:7, 39:25-40:16 (Hornbuckle).

### E. COL Henderson Decided Not to Ask the State to Forcibly Remove the Protestors

[¶301] In deciding how to respond to the protests, COL Henderson took into account the input he received from stakeholders, as well as concerns about health, safety, sanitation, the right to free speech and assembly, and other factors in deciding how to respond to the protests. Tr. 1196:22-1197:7, 1199:7-12 (Day 7; Henderson); *see* JX 76 at USACE_00045055 (COL Henderson told Governor Dalrymple in a discussion on August 22 that he "would balance the life/health/safety/sanitation/risk information with freedom of speech and freedom of assembly rights").

[¶302] COL Henderson considered a range of options. He did not view doing nothing as a viable option, because that was creating confusion. Tr. 1211:10-16 (Day 7; Henderson). He also did not view seeking the removal of all protestors as trespassers as a viable option, because he feared it would spark violence, he wanted to respect the First Amendment rights of those who were there to

peacefully protest, and he knew law enforcement would not enforce such an edict in any event. *See id.* at 1193:14-1194:23, 1197:13-25, 1211:17-22, 1212:10-1213:2, 1222:4-9. In coordination with law enforcement, and taking into account their assessment of the situation, COL Henderson also decided not to ask law enforcement to forcibly remove protestors *en masse* from Corps land. Tr. 1085:5-8, 1085:17-22, 1167:10-19, 1181:25-1182:15, 1204:12-16, 1205:8-17. (Day 7; Henderson). Ultimately, COL Henderson decided to take a different approach: offering a Special Use Permit to the Tribe for a specified area south of the Cannonball River, for protestors to peacefully and lawfully exercise their First Amendment rights, in a way that would make clear the Tribe took responsibility for the protest gathering. *See id.* at 1211:23-1212:9; Tr. 1219:16-1220:8.

[¶303] The United States' law enforcement expert, Professor Ed Maguire, agreed that not attempting to clear the camps at an early stage was a wise decision, because it allowed an opportunity for tensions to calm and for law enforcement to begin establishing relationships with protestors. *See* Tr. 2341:11-15 (Day 15; Maguire); *see also id.* at 2345:16-18 (opining that the Corps did a good job of trying to consider various sensitivities and complexities of the protests and formulate a thoughtful response).

[¶304] MG Dohrmann testified that COL Henderson did "a very good job" in responding to the protests based on the authority COL Henderson had. Tr. 993:20-22 (Day 6; Dohrmann).

## X.    Federal Agencies Other than the Corps Provided Law Enforcement Support to the State Throughout the Protests, but Not to the Extent the State Requested

[¶305] Several federal agencies other than the Corps contributed to the law enforcement response to the protests in a variety of ways. *See, e.g.*, Tr. 560:23-561:3 (Day 3; Pederson) (testifying that the EOC had representatives from U.S. Attorney's Office, BIA, the Corps, the FBI, HSI or CBP, and, at times, the U.S. Marshals Service); Tr. 958:21-959:4 (Day 6; Dohrmann) (similar). (None of these other federal agencies were under the direction of the Corps. *See* Tr. 1201:18-21 (Day 7;

Henderson); Tr. 1394:2-6 (Day 8; Jackson); Tr. 1462:16-19 (Day 9; Kruger).)

[¶306] *BIA*.   Throughout the duration of the protests, the BIA policed the protest camps on the Sioux County side of the Cannonball River.   Tr. 421:4-6 (Day 3; Kirchmeier) and JX 99 at MYERS_00000092- MYERS_00000094.

[¶307] The BIA deployed as many additional officers as it could from across the country to the Standing Rock Indian Reservation, to maintain peace and enforce the law there.   ECF No. 405-4, Dep. Tr. 115:22-25, 194:11-17, 255:11-13 (Jewell); ECF No. 405-11, Dep. Tr. 24:3-8, 62:25-63:8 (O'Neal); Tr. 2606:16-23 (Day 16; Cruzan).   However, BIA law enforcement was understaffed at the Standing Rock Indian Reservation and across the country at the time of the protests, and historically.   ECF No. 405-11, Dep. Tr. 39:12-17 (O'Neal); Tr. 2606:1-8, 2652:1-7 (Day 16; Cruzan).

[¶308] As of August 18, 2016, 12 BIA police officers from other reservations were detailed to the Standing Rock Indian Reservation; those details continued throughout the protests.   *Id.* at 2609:19-25, 2610:21-24.   And Darren Cruzan, the head of the BIA's Office of Justice Services (the BIA's law enforcement arm), spent three to four months on the ground and served as the BIA Incident Commander during the DAPL protests.   *See* Tr. 2599:7-20; 2605:14-16, 2606:16-23, 2607:12-21, 2612:18-2613:1 (Day 16; Cruzan).   Detailing BIA law enforcement to the Standing Rock Indian Reservation to respond to the protests strained BIA's resources nationwide, creating more staffing shortages in the areas from which officers were reassigned.   *See id.* at  2610:11-16; JX 270 at DOI_00007712.

[¶309] The BIA also assigned program analysts to the Tactical Operations Center, to work with and share information among State and local law enforcement and federal partners.   *See* ECF No. 405-11, Dep. Tr. 17:7-10, 17:18-25, 18:16-19:4 (O'Neal).

[¶310] The BIA also deployed a Unified Command Vehicle from Oklahoma to the DAPL protests, which remained deployed throughout the protests.  Tr. 2606:16-23, 2612:18-2613:1 (Day 16; Cruzan).

[¶311] *CBP*.  Customs and Border Protection provided aerial surveillance support throughout the protests.  CBP deployed an MQ-9 drone from August 22, 2016, through December 23, 2016, and again from January 4, 2017, through approximately February 20, 2017.  ECF No. 405-14, Dep. Tr. 35:10-16, 46:15-20 (Walker).  The MQ-9 drone provides a secure video feed that is viewable by authorized users on the ground in real time.  *Id.* at 30:18-31:6.  The operator and those viewing the feed can communicate in real time via a chat function.  *Id.* at 31:6-8.  CBP provided the drone feed directly to the EOC, and State and local law enforcement at the EOC could and did request the drone move to particular locations in real time.  *Id.* 47:8-16, 81:10-82:14; *see* Tr. 961:22-962:16 (Day 6; Dohrmann).  CBP also provided an intelligence agent who consulted and liaised with the State and the EOC to ensure information was coming through via the secure video feed.  ECF No. 405-14, Dep. Tr. 129:14-19 (Walker).

[¶312] In total, the CBP drone flew almost 281 hours of flight time in support of the State in connection with the protests.  *Id.* at 129:7-13.  Ordinarily, when CBP deploys its drone assets to assist another agency, CBP would request and receive reimbursement from the other agency.  *Id.* at 157:17-158:11.  The total reimbursement amount for the flight time CBP provided to the State for the DAPL protests would have been approximately $1.5 million.  *Id.* at 158:12-23.  But CBP did not seek reimbursement for its flight time from the State.  *Id.* at 158:24-159:3.

[¶313] CBP provided additional aerial surveillance assistance via helicopter, during the Big Push operation and during the evacuation of the protest camps in February 2017.  *Id.* at 34:12-35:8, 130:1-17.

[¶314] CBP also provided approximately ten officers for on-the-ground assistance at observation posts and traffic control points for approximately four weeks in October to November 2016. *Id.* at 87:2-24, 88:3-7, 90:13-23, 129:20-25.  During that time, some CBP officers additionally assisted State and local law enforcement in responding to a group of protestors who were attempting to outflank a line of law enforcement personnel.  *See id.* at 89:8-17, 119:4-9.

[¶315] CBP also provided camera equipment for on-the-ground surveillance of the camps on Corps, tribal, and State land.  *Id.* at 87:24-88:2.

[¶316] *FBI.*  The FBI's role in responding to protest situations is limited; it conducts investigations of violations of federal law and collects and shares intelligence.  ECF No. 421, Dep. Tr. 152:18-153:2 (O'Connell); *see also* ECF No. 422, Dep. Tr. 26:18-27:8 (Perry) (FBI officials communicated to State officials, including the Governor, the limits of assistance the FBI could provide).  The FBI did not feel that using its SWAT or similar resources in response to the DAPL protests was within the FBI's purview or jurisdiction. ECF No. 422, Dep. Tr. 38:19-25 (Perry).

[¶317] Additionally, the FBI's Bismarck office was significantly understaffed during the time of the DAPL protests.  ECF No. 421, Dep. Tr. 169:1-5 (O'Connell); ECF No. 422, Dep. Tr. 15:7-12 (Perry).  It assigned temporary duty agents to backfill the regular responsibilities of the Bismarck office to free up time for another agent to focus on the DAPL protests. ECF No. 422, Dep. Tr. 36:22-37:9, 38:10-12 (Perry).

[¶318] Despite the understaffing at the Bismarck office, the FBI supervisor for that office, Jacob O'Connell, was present at the protest camps on a daily basis to gather information which he would pass up his chain of command to try to obtain resources to respond, or report to others. ECF No. 421, Dep. Tr. 27:9-25 (O'Connell).  O'Connell participated in daily briefings with State and local law enforcement. *Id.* 67:1-15.  Robert Perry, who was then the Assistant Special Agent in Charge

of the FBI Field Office in Minneapolis with leadership responsibility for the North Dakota area, also attended meetings at the State Emergency Operations Centers several times.  ECF No. 422, Dep. Tr. 11:21-12:12, 17:20-18:4 (Perry).

[¶319] The FBI assigned an intelligence analyst to spend time at the law enforcement command post.  *Id.* at 15:18-16:1.

[¶320] The FBI provided agents who were trained on command-post operations, to consult with State and local officials.  ECF No. 422, Dep. Tr. 73:5-8 (Perry).

[¶321] In total, the FBI assigned approximately 15 positions to the DAPL protest response, with between 50 and 100 FBI employees rotating through those positions. ECF No. 421, Dep Tr. 135:8-19 (O'Connell).

[¶322] The FBI also provided cameras on-site to monitor the protests.  ECF No. 422, Dep. Tr. 37:10-14 (Perry).

[¶323] The FBI also opened investigations into violations of federal criminal law, and it worked with the State of North Dakota and other federal agencies to help investigate instances of federal legal violations.  ECF No. 422, Dep. Tr. 49:4-11, 70:12-71:19 (Perry).  The FBI also shared the investigative information it received with State and local law enforcement.  *Id.* at 72:2-13.  Most often, State officials already knew the information the FBI was sharing through its intelligence gathering.  *Id.* at 50:8-21.

[¶324] *U.S. Marshals Service*.  The Marshals Service does not have general policing duties.  *See* ECF No. 429-1, Dep. Tr. 23:17-24:1 (Ward).  The Marshals Service's authority to participate directly in the law enforcement response to the protests was limited, absent a directive from the Attorney General or initiation of the Stafford Act by the Office of the President.  *See* ECF No. 405-12 Dep. Tr. 83:10-18, 85:2-8 (Orr); PX 1310, at ND_000110337.

[¶325] The Marshals Service's resources in the area of the protests were limited. *See* ECF *id.* at 80:14-81:6 (testifying that if the Corps had asked him as the U.S. Marshal to provide a law-enforcement response on Corps land, he likely would not have granted that request because he only had four or five deputies, and they were responsible for other tasks).

[¶326] Nonetheless, various officials of the U.S. Marshals Service deployed to assist with the protest response at different times, including individuals from the Judicial Security Division and an incident management team. *See* ECF No. 405-12, Dep. Tr. 106:10-110:7 (Orr). Marshals Service officials taught Morton County deputies how to do a security survey for Sheriff Kirchmeier's residence, and the Marshals Service provided two armored SUVs for Morton County's use for a time. *See id.* The Marshals Service also met with officials of the Federal Protective Service to facilitate increased Federal Protective Service staffing at courthouses in the area, in order to free up State and local law enforcement resources. *See id.*; *see also* Tr. 1570:7-22 (Day 9; Van Horn) (explaining that Federal Protective Service's role is to protect federal buildings and courthouses and their occupants).

[¶327] *Department of Justice*. Other components of the Department of Justice provided a variety of resources in response to the protests, including from the Department's Office of Community Oriented Policing Services, Community Relations Service, Office of Tribal Justice, and the Civil Rights Division. ECF No. 405-3, Dep Tr. 15:17-18:2, 18:8-19:9, 21:8-21:19, 22:1-4, 22:21-23:4, 26:7-26:12, 28:19-29:18 (Hornbuckle).

[¶328] The Department of Justice's Office of Community Oriented Policing Services ("COPS") assists law enforcement at the state, local, and tribal levels. ECF No. 405-3, Dep. Tr. 16:11-16 (Hornbuckle). COPS has expertise in mass-protest events and constitutional policing, and provides information to local law enforcement dealing with significant issues like the DAPL protests. *Id.* at

16:18-17:2.  In September 2016, DOJ deployed individuals from the COPS office to the State law enforcement command center to meet with local sheriffs and suggest strategies to deescalate tensions.  *Id.* at 17:3-14.

[¶329] The Department of Justice's Community Relations Service ("CRS") provides facilitated dialogue and mediation services.  *Id.* at 18:11-21.  Beginning in August 2016, the Department of Justice deployed individuals from CRS's regional offices with experience working with Native American Tribes to the Standing Rock Reservation to facilitate dialogue and seek to deescalate the protest situation.  *Id.* at 18:22-19:9.  Those individuals were onsite on multiple occasions, including for a meeting on September 5, 2016, that included stakeholders from various groups: law enforcement, the Tribe, and protest camp leaders.  *Id.* at 20:2-11.  CRS personnel also sought to assist in the coordinated planning effort by State and federal officials to evacuate the remaining protesters at the camps in February 2017.  *Id.* at 33:2-14.  One of the CRS officials who was deployed to assist with the protest response was an individual named Rosa Salamanca.  *Id.* at 50:7-10; Tr. 961: 9-21 (Day 6; Dohrmann).  Ms. Salamanca arranged a number of meetings with representatives from State and local law enforcement, BIA Office of Justice Services Director Cruzan, and representatives from the various protest camps.  *See, e.g.*, JX 8 at DOI_00026790-DOI_00026791, DOI_00026817.

[¶330] The Office of Tribal Justice is DOJ's point of contact with federally recognized Native American Tribes, and it provides advice on legal and policy matters relating to the Tribes.  ECF No. 405-3, Dep. Tr. 22:21-25 (Hornbuckle).  The Director of the Office of Tribal Justice traveled to North Dakota in September of 2016 and met with tribal members and protestors, and he attended the State law enforcement command center.  *Id.* at 23:1-4.

[¶331] An official with the Department's Civil Rights Division also traveled to North Dakota in

September 2016 to investigate complaints the Department of Justice had received that protestors' civil rights had been violated by DAPL's private security personnel and State and local law enforcement.  *Id.* at 21:12-19, 21:17-19, 22:5-7.  The Civil Rights Division continued to monitor the protest situation thereafter, given the concerns that were raised about potential violations of First Amendment rights.  *Id.* at 22:1-4.

[¶332] The U.S. Attorney's Office for the District of North Dakota also provided resources in connection with the protest response effort.  Terry Van Horn, a National Security Intelligence Specialist with the U.S. Attorney's Office, was assigned to the EOC and then the Tactical Operations Center to assist Morton County law enforcement with the protest response.  Tr. 1477:24-1479:14, 1507:2-5 (Day 9; Van Horn).  Mr. Van Horn collected intelligence via social media, drone footage, protestors who were arrested, and other sources; he then provided that information to State and local law enforcement.  *Id.* at 1507:6-1508:16.   Mr. Van Horn was physically present at one or the other of these State operations centers for six and a half days a week throughout the protests, from mid-August 2016 to March 2017.  *Id.* at 1479:15-19.

[¶333] The ultimate decision-makers as to whether to deploy more federal law enforcement resources to assist with the protest response were DOJ officials, not the Corps.  *See* ECF No. 405-3, Dep. Tr. 101:19-25 (Hornbuckle).

[¶334] The Department of Justice did not provide the State with all of the on-the-ground law enforcement personnel, equipment, and monetary support the State requested.  *See* JX 236, PX 1332, PX 1349, and Tr. 423:13-20, 455:5-10 (Day 3; Kirchmeier) (Sheriff Kirchmeier requested federal law enforcement manpower and financial assistance; those requests were not answered); Tr. 772:13-14 (Day 5; Dalrymple) (the State wanted "hundreds" of federal law enforcement officers to assist, "not one or two").   The Department of Justice determined, as a result of deliberative

discussions among numerous of its components, not to grant those requests. *See* ECF No. 405-3, Dep. Tr. 28:5-29:13 (Hornbuckle); *see also* ECF No. 429-1, Dep. Tr. 147:15-148:1 (Ward) (testifying that it was his impression that the decision whether to deploy federal law enforcement assets was made by senior political leadership above the Director of the Marshals Service). Department of Justice officials recognized that federal law enforcement officers are limited in their jurisdictional authority, and that State and local law enforcement had the primary responsibility for policing the areas in Morton County where the protests occurred. ECF No. 405-3, Dep. Tr. 24:9-13 (Hornbuckle); *see* Tr. 1462:23-1463:2 (Day 9; Kruger); Tr. 1151:15-1152:6 (Day 7; Henderson); DX 4004 at USA_00000227. The Department of Justice was also limited by resource constraints. *See* ECF No. 405-3, Dep. Tr. 24:13-15 (Hornbuckle). Department of Justice officials also had concerns that deploying federal law enforcement personnel to the protests could escalate an already tense situation and cause more harm than good. *Id.* at 24:1-8; *see also* Tr. 2344:19-2345:8 (Day 15; Maguire) (opining that the decision not to mobilize federal law enforcement personnel to the protests was a good one because, given the complexities of the protests and the varying concerns at issue, doing so likely would have led to increased violence and conflict and ultimately increased the protests' duration).

### XI.    The State Chose Not to Forcibly Remove Protesters En Masse

[¶335] The State's protest response effort was led initially by Sheriff Kirchmeier, as Incident Commander. Tr. 661:19-23 (Day 4; Gerhart). Eventually the State transitioned to a Unified Command structure, made up of Sheriff Kirchmeier, MG Dohrmann, and COL Gerhart. *Id.* at 661:23-662:10. However, the final say on the law enforcement response to the protests remained with Sheriff Kirchmeier. *See* Tr. 979:17-21 (Day 6; Dohrmann).

### A. The State Viewed the Protestors on Corps Land as Trespassers and Knew Some Protestors Were Violating State and Local Laws

[¶336] At the time of the DAPL protests, both State and federal officials viewed the protestors camped on Corps land to be trespassers.  *See, e.g.*, Tr. 1050:2-5, 1085:2-4, 1197:22-25 (Day 7; Henderson) ("They were trespassing.  They didn't have permission to be there, and any way you look at it, they were trespassing.  We knew they were trespassing.  Law enforcement knew they were trespassing.  They were trespassing."); PX 1047 at 0003 (email from COL Henderson dated August 24, 2016, attaching storyboard summarizing updates regarding the protest situation, which stated that protestors on Corps-managed lands were "considered trespassing"); Tr. 180:7-13 (Day 1; Schulz) (testifying that Schulz understood that protestors camped on Corps land were not allowed to be there and that he did not think protestors had a permit to camp anywhere on Corps land near the Cannonball River); Tr. 859:9-860:6 (Day 6; Burgum) (recalling driving by the protest camps and characterizing the people in the camps as "trespassers basically taking over federal land"); *id.* at 879:6-7 ("I wouldn't call them 'campers.'  I'd call them 'trespassers.'").  In particular, State and local law enforcement recognized that the Corps had never permitted protestors to be on Corps land to the north of the Cannonball River.  *See* Tr. 424:6-8 (Day 3; Kirchmeier) (testifying that the Corps never formally or informally sanctioned the Main Camp on Corps land north of the Cannonball River).

[¶337] State and local law enforcement knew that some protestors who were staying at the protest camps—in particular, at the Main Camp on Corps land to the north of the Cannonball River—were leaving the camps to violate state and local laws elsewhere.  *See* Tr. 229:2-9 (Day 2; Gallagher); Tr. 326:10-24 (Day 2; Johnson); Tr. 486:18-487:2, 489:2-24 (Day 3; Laney); Tr. 582:4-20 (Day 3; Pederson); Tr. 943:19-944:2, 1007:1-3 (Days 6-7; Dohrmann).

[¶338] The crimes committed by some protestors included, *inter alia*, vandalism and property

damage; trespassing on State and private property; rioting; blocking bridges, highways, and roadways; theft of agricultural products and livestock; arson; threats; and assaults on DAPL workers and law enforcement personnel. *See, e.g.*, JX 10 at ND_000137425-ND_000137426; Tr. 79:4-11, 82:8-18; 86:17-19, 93:10-94:3, 94:4-14, 148:1-7, 148:15-17 (Day 1; Schulz); Tr. 229:10-20 (Day 2; Gallagher); Tr. 326:10-24 (Day 2; Johnson); Tr. 409:14-410:15, 411:15-17, 425:6-20 (Day 3; Kirchmeier); Tr. 487:6-488:3, 488:8-13, 493:15-494:3  (Day 3; Laney); Tr. 754:22-24, 754:25-755:4 (Day 5; Dalrymple); Tr. 872:16-21, 873:10-18 (Day 6; Burgum); JX 266-N at ND_000253619 and ND_000253622; PX 1253 at 0002-0003; PX 1319 at 0001.  Each of those offenses is a crime under North Dakota law. *See* N.D. Cent. Code § 12.1-21-05 (criminal mischief, applicable to acts of vandalism); *id.* § 12.1-22-03 (criminal trespass – noncriminal offense on posted property); *id.* §§ 12.1-25-01, 12.1-25-03, 12.1-25-04 (inciting and engaging in a riot and disobedience of public safety orders under riot conditions); *id.* § N.D.C.C. § 39-10-49 (stopping, standing, or parking prohibited in specified places, including intersections and bridges); *id.* § 12.1-23-02 (theft of property); *id.* § 12.1-21-01 (arson); *id.* §§  12.1-17-05, 12.1-17-04, 12.1-17-07, 12.1-17-07.1 (menacing; terrorizing; harassment, including making threats to injure via electronic communication; and stalking); *id.* § 12.1-17-01 (simple assault and assault on peace officers).  To the extent some protestors conspired together to commit these offenses, that was also a crime under State law.  *See* N.D. Cent. Code § 12.1-06-04.

**B.  State and Local Law Enforcement Had Jurisdiction to Enforce Violations of State and Local Laws but Often Chose Not to**

[¶339] State and local law enforcement had jurisdiction to enforce violations of State and local law on Corps land.  *See* Tr. 1462:23-1463:2 (Day 9; Kruger); Tr. 1151:15-1152:6 (Day 7; Henderson); DX 4004 at USA_00000227; JX 204 at USACE_00009351; JX 210 at USACE_00009574; 40 U.S.C. § 3112; 36 C.F.R. § 327.26.  The exercise of that general policing jurisdiction was not

dependent on permission from the Corps for law enforcement to enter its land, a fact which the Corps communicated to law enforcement officials and which Sheriff Kirchmeier already knew. *See* Tr. 1260:7-1261:6, 1261:17-1262:2 (Day 8; Henderson); Tr. 466:18-23 (Day 3; Kirchmeier); JX 204 at USACE_00009351; JX 210 at USACE_00009574; *see also* Tr. 543:7-9 (Day 3; Laney) (Sheriff Laney was told that Morton County enforces state laws on Corps land). MG Dohrmann acknowledged that State and local law enforcement "don't need Corps permission to enforce—or for us to enforce a law on Corps land where there's proprietary jurisdiction," but nonetheless he testified that law enforcement officers "don't go onto land unless the landowner asks us to enforce a law there." Tr. 1019:11-14 (Day 7; Dohrmann).

[¶340] On multiple occasions during the protests, State and local officials entered the Corps's land without prior permission, for a variety of reasons. At the beginning of the protests, the State deployed water and first aid stations and a mobile command post trailer to the area of the Main Camp on Corps land without the Corps's prior permission. *See* JX 9 at ND_000135659; JX 69 at MYERS_00001792; Tr. 819:6-9 (Day 5; Dalrymple); Tr. 981:10-982:2 (Day 6; Dohrmann); JX 69 at MYERS_00001792. Later in the protests, State officials entered Corps land to clear snow to create an emergency evacuation route, despite being notified by Corps officials that they may need a permit to do so. *See* Tr. 120:20-121:24 (Day 1; Schulz) (testifying that he "had the legal authority given the county and state emergency declaration to make that . . . decision and do that," and that he told the Corps he would not wait to fill out a permit and "the snow was getting moved").

[¶341] During the Big Push operation, State and local law enforcement did not consult the Corps before they pushed protestors from the North Camp on private and State property onto the Main Camp on Corps land. *See* Tr. 450:25-451:6, 453:12-15 (Day 3; Kirchmeier) (Sheriff Kirchmeier instructed protestors to go to the Main Camp on Corps land, even though he knew they did not have

a legal right to be there); Tr. 1246:7-18 (Day 8; Henderson); JX 166 at USACE_00005409.

[¶342] Though law enforcement had the authority to enforce state and local laws in Morton County—both on and off Corps land—they often chose not to exercise that jurisdiction. State and local law enforcement repeatedly encountered groups of protestors who were breaking the law off of Corps land and exercised their discretion not to arrest those individuals. *See, e.g.*, Tr. 285:20-286:4 (Day 2; Gallagher); Tr. 730:22-731:9 (Day 4; Gerhart) (testifying that protestors were blocking the east end of Memorial Bridge on October 17, 2016; the protestors were breaking the law and could have been arrested); JX 265 at ND_000204147 (State-created After Action Report does not list any protestor arrests on that day); Tr. 642:8-644:21 (Day 4; Pederson) and JX 265 at 66 (testifying that at a protest at a federal building in Bismarck on November 14, 2016, protestors did not have a permit and were blocking traffic; law enforcement decided not to disperse the protestors); JX 8 at DOI_00026779 (on November 6, a group of protestors "attempted to gain access to the drill pad site by crossing the river and climbing up Sacred Mound/Turtle Hill"; law enforcement "thwarted" the protestors efforts but only arrested one individual, not the entire group); Tr. 608:3-24 (Day 3; Pederson) and JX 9 at ND_000135680-81 and JX 265 at ND_000204169-ND_000204170 (on November 24, 2016, officers from at least three different law-enforcement agencies responded to protestors blocking an intersection in Mandan from approximately 9:40 a.m. to 11:20 a.m.; only two protestors out of a group from a caravan of approximately 200 vehicles were arrested).

### C.  State and Local Law Enforcement Recognized the Need to Accommodate Protestors and Believed Forcible Removal Was a Bad Idea

[¶343] State officials recognized that many protestors attended the protests to peacefully exercise their First Amendment rights. *See, e.g.*, Tr. 418:5-10 (Day 3; Kirchmeier); Tr. 486:2-9, 535:21-23 (Day 3; Laney); Tr. 983:16-25 (Day 6; Dohrmann). State officials believed they needed to respect

and enable the exercise of those protestors' rights. *See, e.g.*, Tr. 440:17-441:1 (Day 3; Kirchmeier); 486:2-9, 490:8-15 (Day 3; Laney); Tr. 983:16-25 (Day 6; Dohrmann). From the early days of the protests, the State conveyed to the public that law enforcement would enable and support protestors' constitutional rights. *See* Tr. 441:6-442:7 (Day 3; Kirchmeier) and JX 69 at MYERS_00001793 (public-facing State-created talking points dated August 19, 2016, stating that "[t]here are constitutional rights to assemble to protest. Law enforcement is here to enable and support those rights").

[¶344] State and local law enforcement took a containment posture towards the protest encampments, rather than removing protestors. *See* Tr. 1130:2-5 (Day 7; Henderson) (testifying that, although State and local law enforcement always had jurisdiction to enforce the law on Corps land, "[n]obody thought it was a good idea to go in and create or incite or inflame the situation further than it already was"); PX 1051 at ARMY_00115672 (August 26, 2016, email in which Assistant Secretary for the Army Darcy states that "we are deferring to Federal, state, and local law enforcement in the region, who to date have counseled a strategy of containment rather than confrontation"); *see also* Tr. 816:15-19, 817:5-14 (Day 5; Dalrymple) (Governor Dalrymple never heard any of the State and local law enforcement officers leading the State's protest response express a desire to take a less accommodating approach to the protestors). State and local law enforcement preferred to keep the protestors contained on Corps land. *See* Tr. 1180:13-1181:24 (Day 7; Henderson) (testifying about law enforcement's concern about provoking protestors further and desire to "keep it contained into the Corp-managed areas"); *id.* at 1194:5-23 (explaining concerns COL Henderson and law enforcement officials discussed regarding where protestors would go if they were evicted from Corps land); JX 68 at USACE_00031828 (COL Henderson email dated August 18, 2016, reporting this containment approach by law enforcement to his

commanding officer); JX 122 (September 15, 2016, email from BIA law enforcement official stating that "[f]rom the outset, the Sheriff from Morton County has stated that he is fine if the people camp all winter long, his contention is that they move out of the ditches on both sides of highway 1806, and back into the camp"); DX 4256 (at video timestamp 16:35-17:02) (in a meeting with leaders of the North Camp the day before the Big Push operation, Sheriff Laney emphasized that protestors could stay at the Main Camp on Corps land "for a year . . . we don't care"); JX 223 (Morton County Sheriff's Office press release dated December 3, 2016, announcing that to deescalate tensions, law enforcement agreed to move away from the north side of the Backwater Bridge—where the large conflict between protestors and law enforcement occurred two weeks before—if protestors stayed in the "identified protest area which is the main camp and south of the Backwater Bridge, not on it").  MG Dohrmann believed it was safer to have protestors on Corps land or the Reservation than near the area of the pipeline construction, and he supported the Corps trying to establish a free speech zone as a way to keep the protests within an area where it could be managed.  Tr. 994:16-25, 1006:23-25, 1008:6-14 (Days 6-7; Dohrmann).

[¶345] Consistent with its approach of containing protestors on Corps land, the State did not bar the entry/exit points to the Main Camp on Corps land—both of which passed over the State Highway Department's right of way.  *See* Tr. 724:19-725:6, 727:23-728:16 (Day 4; Gerhart).

[¶346] The pipeline company also favored a containment approach to the protests, which would put distance between the company's work activity and the protestors and preserve the safety of people and property.  Tr. 1626:12-1627:3 (Day 9; Futch).  In late July or early August, the company offered the Standing Rock Sioux Tribe a zone where people could peacefully protest the pipeline.  *Id.* at 1625:23-1626:11.  Chairman Archambault declined the offer at that time, because the protestors were already comfortable at the camp on the Standing Rock Indian Reservation on the

south side of the Cannonball River. *See id.* at 1629:3-6. The pipeline company also made another offer to Tribe in late fall or winter of 2016, to give the Tribe the Cannonball Ranch land in exchange for the Tribe's help in controlling the protests. *See id.* at 1629:7-25. Again, Chairman Archambault declined the offer, this time because he did not think it would be a good idea to accept something from Dakota Access given that the Tribe was in litigation against the pipeline project. *See id.* at 1629:22-1630:13.

[¶347] Generally, the view of State and local law enforcement—which they expressed to Corps officials, other federal officials, and the general public—was that attempting to remove protestors *en masse* from Corps land was a bad, and risky, option. *See* Tr. 1098:21-1099:4, 1176:10-1177:1, 1180:13-1181:24, 1272:17-1273:2, 1279:3-9 (Days 7-8; Henderson) (law enforcement expressed to COL Henderson that attempting to remove protestors from Corps land was a bad idea that would risk violence and potentially injury or death); DX 4075 at USACE_00177754 (Corps storyboard summary document dated September 7, 2016, stating that there was "little local desire to enforce an eviction of protestors from the site upon a permit denial"); JX 225 at video timestamp 0:01-0:45 (State-produced public-facing video from a December 4, 2016, briefing in which Sheriff Laney said the idea that law enforcement would go and "push a whole lot of people off Corps land for camping without a permit" was "ludicrous"). From the outset of the protests, Sheriff Kirchmeier told federal officials "that he is fine if the people camp all winter long, his contention is that they move out of ditches on both sides of highway 1806, and back into the camp." JX 122 at DOI_00022359 (email from the Director of BIA's Office of Justice Services, Darren Cruzan, dated September 15, 2016).

[¶348] State officials recognized the potential for a dangerous situation if a forcible eviction were attempted. As Governor Burgum put it in a meeting with COL Henderson, the Governor did not want a clearing out of the camps because he did not want "a 'Wounded Knee' to be part of North

Dakota's history." JX 235 at USACE_00001781; Tr. 1276:16-19 (Day 8; Henderson); *see* Tr. 909:4-12 (Day 6; Burgum) (Governor Burgum testifying about his keen awareness of the historic events of Wounded Knee in the 1880s and the Second Wounded Knee in the 1970s, at which people died, and stating that "we didn't want this to inflate into a conflict where there was the possibility that someone could actually get killed over this conflict"); *id.* at 908:22-25, 911:20-23, 913:11-16 (testifying that the State was "trying to avoid the confusing misinformation and optics that might have come from a overly heavy-handed sort of military-type operation to sort of march through and, 'clear the camps'"); *see also* Tr. 454:14-17 (Day 3; Kirchmeier) (law enforcement did not take enforcement action against the Main Camp at the time of the Big Push operation due to concerns about officers' safety).

[¶349] State officials also recognized that writing citations for camping without a permit—or just going into the camps and *telling* protestors to disperse—would not induce the protestors to leave the general area of the protests. *See* JX 225 at video timestamp 0:01-0:45; Tr. 522:7-20 (Day 3; Laney); Tr. 454:3-6, 464:21-23 (Day 3; Kirchmeier); *see also* Tr. 177:2-13 (Day 1; Schulz) (the State asked protestors to leave voluntarily dozens of times during the protests, and protestors rarely left in response to those requests); Tr. 1006:8-11 (Day 7; Dohrmann) (testifying that it would have been a bad idea to make a pronouncement that law enforcement was not prepared to back up and enforce). Sheriff Laney acknowledged that issuing citations to the protestors "doesn't mean they're going to leave. Doesn't mean they're going [to] do anything other than get more agitated." Tr. 523:8-12 (Day 3; Laney). He emphasized that law enforcement's decision not to issue such citations was a "sign of our trying to deescalate" the protest situation and to show that "we're not trying to be aggressive." *Id.* at 523:13-20. And Sheriff Kirchmeier explained that if one camp were

cleared, protestors who were not arrested would simply move to a different camp.  Tr. 470:13-17 (Day 3; Kirchmeier).

[¶350]  Forcibly removing protestors from Corps land was not a potential course of action that law enforcement considered in August 2016, at the start of the protest response.  *See* Tr. 345:5-12, 437:5-9 (Days 2-3; Kirchmeier); Tr. 1002:25-1003:16 (Day 7; Dohrmann).

[¶351]  Law enforcement did not view a forcible eviction as a viable option at any point in the protests until February 2017.  MG Dohrmann testified that, before February 2017 when the camps were eventually cleared, it would have been ill advised to remove the protestors from the camps.  Tr. 1003:11-16 (Day 7; Dohrmann); *see id.* at 1002:6-1003:5 (testifying that the size of the camps, coupled with the law enforcement force that would be needed to remove them, meant that the potential for injury and loss of life was too high to contemplate a forcible removal until the very end of the protests); *id.* at 1003:17-1004:12 (testifying that it would have been ill advised to forcibly clear the camps in September 2016 since it would have taken a very large force and there were concerns about safety and negative optics).

[¶352]  State and local law enforcement recognized that deescalating tensions with protestors was the better course of action than attempting to remove them, and they tried to deescalate tensions as much as possible.  *See, e.g.*, Tr. 432:2-433:14, 439:19-25 (Day 3; Kirchmeier); Tr. 490:6-22, 494:6-20 (Day 3; Laney); Tr. 724:4-7 (Day 4; Gerhart).  This deescalation approach to the protests was essentially the same as the Corps's.  *See* Tr. 1989:18-24 (Day 12; Spellmon) (BG Spellmon observed as much to MG Dohrmann and Sheriff Kirchmeier in discussing the camp that was located in part on State land along the highway; they were silent in response); PX 1223 at 0001 (October 13, 2016, email from BG Spellmon noting "[t]here is already at least one smaller camp off corps property that the state has not dealt with for the same challenges I outline here").

### D. The State Lacked the Manpower to Forcibly Remove All Protestors

[¶353] Another reason the State did not attempt to initiate a forcible eviction of protestors from Corps land prior to February 2017 was its lack of law enforcement manpower.  From the start of the protest response on August 10, 2016, the Morton County Sheriff's Office lacked the personnel to handle the protests.  *See* Tr. 62:7-14. (Day 1; Schulz) (the Morton County Sheriff's Office had just 33 sworn deputies to serve a "very geographically large county"); ECF No. 404-2, Dep. Tr. 54:20-55:2 (Davis) (when Davis first heard of the protests, he was worried about violence and the fact that the State didn't have enough resources to manage a potentially large crowd); JX 66 at FBI_0000011 (email from FBI official dated August 18, 2016, writing that State law enforcement "have no ability to address the problem of 100s of violent protesters at the site.  Retreated 3-4 times").  And Morton County had no specialized equipment, training, or prior experience to deal with a large-scale civil disturbance such as the protests.  Tr. 426:19-427:13 (Day 3; Kirchmeier). MG Dohrmann thought that Morton County needed immediate help following the August 10 incident that marked the beginning of the State's protest response.  Tr. 922:20-23 (Day 6; Dohrmann).

[¶354] Throughout the protests, the State lacked the law enforcement resources to effect a forcible removal of protestors from the encampments.  As Sheriff Laney noted in an email dated August 30, 2016, simply protecting the pipeline worksite—*not* effecting a full-scale eviction of the protest camps—"will require a VERY large deployment of law enforcement."  JX 94 at ND_000158168-ND_000158169 (Sheriff Laney went on to observe that the available law enforcement resources throughout the entire State might not be sufficient).  When the Governor activated the North Dakota National Guard on September 7, 2016, law enforcement "were already spread incredibly thin."  Tr. 97:17-22 (Day 1; Schulz); *id.* at 157:2-7 ("[W]e had limited resources and the size and scope of the

protest continued to grow and it was unbalanced in terms of—the numbers of protestors versus the numbers of law enforcement officers made that hard.").  Even after the State invoked the EMAC in October 2016, the available law enforcement resources were insufficient to clear protestors from the Main Camp.  Tr. 1564:15-1565:7 (Day 9; Van Horn).  Captain Pederson testified that "[t]here was not a time during these protests where I felt that we had adequate law enforcement resources or adequate resources as a whole."  Tr. 598:9-11 (Day 3; Pederson).  Sheriff Kirchmeier testified that the State never had excess manpower or equipment during the protests, and they were typically short on those things.  Tr. 471:7-14 (Day 3; Kirchmeier).  MG Dohrmann believed that, due to the large size of the camps and the level of force that would have been required to clear them, a forcible eviction of the camps was not possible until February 2017.  Tr. 943:13-15, 1003:1-10 (Days 6-7; Dohrmann).  And Governor Dalrymple testified that the State requested federal law enforcement resources because "this was not something that local law enforcement or State Highway Patrol would be able to handle.  We simply did not have the manpower or the expertise to deal with it."  Tr. 767:13-17 (Day 5; Dalrymple).

[¶355] Removing protestors from an area would have required a large ratio of law enforcement officers to protestors.  *See* PX 1908 (in a video of a discussion between a law enforcement officer and protestor Chase Iron Eyes, at timestamp 0:29-0:34, the officer says that "when you got 50 [protestors] up there, that means we have to come with over 100 [law enforcement officers]").  For example, it took 400-500 law enforcement officers an entire day to move 300-360 protestors out of the North Camp area during the Big Push operation.  *See* Tr. 517:1-2 (Day 3; Laney); JX 164 at rows 15-20, column M; Tr. 1004:13-19 (Day 6; Dohrmann).

[¶356] State and local enforcement were keenly aware that attempting a mass eviction without sufficient manpower would pose serious risks to officers' safety.  *See, e.g.*, Tr. 454:14-17, 469:8-

131

470:7 (Day 3; Kirchmeier); Tr. 1002:19-1003:5 (Day 6; Dohrmann).

[¶357] The potential window of time between when State and federal officials recognized the protests required a response and when the protests were small enough for law enforcement to safely conduct a mass eviction of protestors from Corps land was extremely brief and early in the protests. Sheriff Laney testified that he believed Sheriff Kirchmeier could have put together a law enforcement team of the right size to stop the protests if the Corps had asked him to "from day one, when we [sic] were 30 to 40 people out there."  Tr. 526:14-22 (Day 3; Laney); *see also* Tr. 717:8-23 (Day 4; Gerhart) (testifying that the State had the resources to remove protestors at some unspecified date after August 10, but only if the total number of protestors was 15-20 people); Tr. 813:4-16 (Day 5; Dalrymple) (testifying that it would have been "theoretically feasible" to tell protesters to vacate Corps land if the protestors numbered 30 people, but that evicting 3,000 protestors would have been "a big, big challenge").

[¶358] By August 10, 2016, when the State first responded to protest activity (which was occurring on private property at the Cannonball Ranch, and not on Corps property), approximately 30-40 protestors were present.  *See* Tr. 504:1-8 (Day 3; Laney); Tr. 345:13-346:5 (Day 2; Kirchmeier); Tr. 215:17-23 (Day 2; Gallagher).  The State chose not to arrest all of those individuals, and the number of protestors in the Cannonball Ranch area increased from August 10 through 12.  *See* Tr. 348:14-16 (Day 2; Kirchmeier); JX 8 at DOI_00026804, DOI_00026809-DOI_00026811, DOI_00026811 (discussing multiple meetings State and local law enforcement had with protestors from the North Camp throughout September 2016, in which law enforcement discussed that they were requesting protestors to move out of the North Camp area voluntarily).

[¶359] On or about August 15, protestors began gathering on Corps land just north of the Cannonball River; that camp very shortly numbered in the hundreds of people.  *See* DX 4024 at

USACE_00031883; JX 266-N at slide 26; Tr. 1162:3-7 (Day 7; Henderson). By August 18, the protest encampments numbered an estimated 1,500 people. *See* Tr. 1049:9-13 (Day 7; Henderson); JX 68 at USACE_00031828; Tr. 550:22-551:2 (Day 3; Laney). There was simply no evidence that State and local law enforcement had the time or ability to muster a sufficient force before the number of protestors grew beyond their control—even if the Corps had requested law enforcement to remove protestors in mid-August. As the State's own After-Action report noted, "[b]ecause an event of this scope and magnitude had never occurred in North Dakota history, all levels of government were slow to recognize the enormity of the situation." JX 9 at ND_000135621.

[¶360] The risk presented by the possibility of forcibly clearing the camps on Corps land was compounded by reports that some protestors in the camps were armed. *See, e.g.*, Tr. 351:15-19 (Day 2; Kirchmeier) (Sheriff Kirchmeier heard reports of possible weapons and pipe bombs in the protest camps as of August 17, 2016); Tr. 361:17-23 (Day 2; Kirchmeier) (the Sheriff also heard repeated reports of long guns in the camps); Tr. 1483:1-7 (Day 9; Van Horn) (there were intelligence reports throughout the protests that some people in the Main Camp had weapons). Indeed, during the Big Push operation, a protestor from the North Camp shot a weapon in the direction of law enforcement as she was being arrested, nearly injuring one of the officers. *See* Tr. 375:13-19 (Day 2; Kirchmeier); JX 167. The fact that some protestors had weapons reinforced COL Henderson's concern about making a decision that could turn into "a flash point where somebody got hurt or killed." Tr. 1237:16-20, 1238:16-20 (Day 8; Henderson).

[¶361] The State communicated to Corps officials that State and local law enforcement did not have the capacity to forcibly remove the protestors from Corps land. *See, e.g.*, Tr. 1197:13-25 (Day 7; Henderson) (testifying that no local or State authorities had the capability to enforce an eviction notice for protestors, though "[w]e all knew they were trespassing"). On multiple occasions, State

and local officials informed the Corps that the State lacked sufficient law enforcement resources to respond to the protests. *See* Tr. 1052:4, 1052:24-1053:2 (Day 7; Henderson) (Governor Dalrymple told COL Henderson there were limited law enforcement resources to deal with the protest situation as of August 18-20, 2016); DX 4136 at USACE_00178842 (North Dakota Highway Patrol Captain Pederson told Corps officials on October 27, 2016, that the State would not put any law enforcement resources on Corps land, that federal law enforcement would be required to conduct all enforcement activities there, and that the State's "resources will not be available" and were "depleted" (capitals in original)); Tr. 1248:23-1249:6 (Day 8; Henderson) (that message from Captain Pederson was consistent with the information the Corps had been receiving from State and local law enforcement since the beginning of the protest response in mid-August 2016).

[¶362] In their communications with Corps officials and other federal officials, State and local officials regularly emphasized that they wanted the federal government to deploy federal law enforcement resources to assist with the on-the-ground response to the protests. *See, e.g.*, Tr. 381:24-382:1 (Day 2; Kirchmeier) (testifying about an ongoing request for federal law enforcement assistance that was discussed a lot but not fulfilled); *id.* at 385:1-12, 385:24-386:1, 395:14-22, 397:17-24, 398:7-14 (discussing requests for federal law enforcement support made to President Obama, Attorney General Lynch, Secretary Jewell, and Secretary Johnson); JX 223 at ND_000136414; JX 150 at ARMY_00110828 (describing a meeting with COL Henderson, Governor Dalrymple, and others, at which there were "no new requests, but a reiteration" of the State's requests that the Corps stay in touch and "advocating for federal support for their law enforcement activities"); Tr. 87:14-88:11 (Day 1; Schulz) (Morton County Commission Chairman Schulz met with BG Spellmon on October 3, 2016, and made "two specific requests": first, that the Corps "proclaim the individuals trespassers and have them arrested or evicted," and second, "I

134

requested federal law enforcement support to maintain public safety"); Tr. 970:3-15 (Day 6; Dohrmann) and PX 1388 (State officials asked federal officials with the National Security Council for more federal law enforcement resources in February 2017 to assist with clearing the camps); ECF No. 404-2, Tr. 220:2-10, 220:21-221:23 (Davis) (opining that the Corps should have exercised policing authority to remove people from Corps land). State officials believed that the Corps simply announcing the closure of its land would not suffice; they wanted the federal government to provide law enforcement resources to assist with an eviction and the protest response more generally. *See* Tr. 181:4-14 (Day 1; Schulz) (testifying that the Corps denying the Special Use Permit alone would not have had an impact on protestors, it needed to be coupled with a federal law enforcement effort); Tr. 112:20-113:5, 115:11-116:3 (Day 1; Schulz) and PX 1319 (stating that the Corps's closure of the area of the Main Camp "means nothing unless the federal government follows up by sending federal law enforcement personnel to enforce the decision").

[¶363] State officials made clear that they viewed the protests on Corps land as the result of an insufficient response by federal law enforcement, and as a federal problem that was the federal government's responsibility to solve. *See, e.g.*, JX 225 at video timestamp 0:01-0:45 (State-produced public-facing video from a December 4, 2016, briefing in which Sheriff Laney says State and local law enforcement would not move to evict protestors *en masse* from Corps land but that they hoped "the federal government will come in and start dealing with the federal Reservation on federal Corps land"); ECF No. 404-2, Dep. Tr. 86:1-19 (Davis) (testifying that the protests would never have grown to the magnitude that they did if the federal government had deployed law enforcement resources to manage the protests); DX 4143 and Tr. 1542:10-1543:17 (Day 9; Van Horn) (recounting a conversation in which Sheriffs Kirchmeier and Laney expressed that "absolutely no way will they send State/local officers" to enforce an anticipated request from the

Corps to evict protestors from Corps land, and "if the [Corps of Engineers] wants them [the protestors] off, they (feds) can enforce the eviction order and move them off"); PX 1319 (press release from Morton County Commission Chairman Schulz dated November 26, 2016, stating that "[d]uring the past three months, County and State leaders have been requesting federal law enforcement resources to deal with issues that are clearly the federal government's responsibility, but those requests have been largely ignored"); JX 144 at ND_000255264 (Chairman Schulz writing that decisions by federal officials in Washington, D.C. had "made the situation worse, by creating increased uncertainty and by flat out refusing additional assistance requested by our [law enforcement] leaders"). State witnesses repeatedly testified about their frustration with the federal government for not providing more federal law enforcement support, particularly in the form of federal personnel on the ground. *See, e.g.*, Tr. 180:18-24 (Day 1; Schulz); Tr. 423:13-20, 455:5-10 (Day 3; Kirchmeier); Tr. 772:13-14 (Day 5; Dalrymple). And the evidence showed that the State was not prepared to initiate a mass eviction of protestors without additional federal law enforcement resources. *See, e.g.*, JX 235 at USACE_00001782 (COL Henderson observed after his meeting with Governor Burgum in early January 2017 that the Governor was "very interested in the status of our request for federal law enforcement assistance as the extent of federal support writ large essentially drives what COAs [courses of action] are feasible to the State"); DX 4136 at USACE_00178842 (on October 27, 2016, Captain Pederson of the North Dakota Highway Patrol told Corps officials that the State would not put any of its law enforcement resources on Corps land, that federal law enforcement would be required to conduct all enforcement activities on federal land, and that the State's "resources will not be available" and were "depleted"); Tr. 1248:23-1249:6 (Day 8; Henderson) (that message from Captain Pederson was consistent with information the Corps had been receiving from State and local law enforcement since the beginning of the

protest response in mid-August 2016); *see also* Tr. 1564:15-21 (Day 9; Van Horn) (testifying that a lack of law enforcement resources to evict protestors was part of the State's unwillingness to attempt an eviction); Tr. 772:13-14 (Day 5; Dalrymple) (the State wanted "hundreds" of federal law enforcement officers to assist, "not one or two"); JX 219 (press release from Morton County Commission Chairman Schulz dated November 26, 2016, stating that COL Henderson's decision to close the Corps land north of the Cannonball River "means nothing unless the federal government follows up by sending federal law enforcement personnel to enforce the decision").

[¶364] Given the realities of their resource constraints, State and local law enforcement communicated to Corps officials that they did not want the Corps to ask them to conduct a full-scale forcible removal of the protestors.  *See* Tr. 1129:5-14 (Day 7; Henderson).

[¶365]  In fact, there is no evidence that law enforcement ever asked the Corps to request the forcible removal of protestors, as trespassers, from the encampments on Corps land.  *See* Tr. 1246:19-22, 1253:20-22 (Day 8; Henderson) (at no point during the protests did Sheriff Kirchmeier ask COL Henderson to declare the protestors as trespassers and seek to have law enforcement remove them); Tr. 1006:12-14 (Day 7; Dohrmann) (MG Dohrmann never asked the Corps for permission to move in and clear protestors off of Corps-managed land); *see also* Tr. 488:23-489:1 (Day 3; Laney) (testifying that law enforcement "wanted [the Corps] to ask protestors to leave," but not that law enforcement ever asked the Corps to request their assistance to forcibly remove the protestors).

[¶366] As discussed in Section I.V.M above, it was not until February 2017—when the camps' population had waned significantly, and the prospect of spring flooding imminently threatened those who remained—that the State contemplated a forcible eviction from the camps.

### XII.    The State's Protest Expenditures

[¶367] The State is seeking to recover its costs related to the DAPL protests, for its expenditures on law enforcement payroll, travel, and equipment. *See* PX 1439; PX 1455; ECF No. 450-1 at p. 74 ¶ 325.  Those costs total $37,203,120.95.  *See* PX 1455 (sum of amounts in column K); ECF No. 450-1 at p. 74 ¶ 327.

[¶368] The State is seeking the full amount of its protest-response expenditures, throughout the entirety of the period from August 10, 2016, through the end of the protests and beyond. *See, e.g.*, Tr. 147:5-7, 160:23-25 (Day 1; Schulz) (the State considers August 10, 2016, through March 31, 2017, to be the incident period of the protest that required State officials to respond); Tr. 1664:25-1665:20 and PX 1455 (the State damages calculation spreadsheet lists all of the State's DAPL response costs for this time period, totaling approximately $37.2 million); Tr. 2230:10-17 (Day 14; Wilson) ("The State's damages calculation accumulates all of the costs that . . . were incurred to respond to the protests, not just those costs that were caused directly by the . . . Corps' actions.").

[¶369] The State's damages claim, as stated in its proposed Findings of Fact and Conclusions of Law, includes various inconsistencies.  First, the State inconsistently lists its total claimed damages as $37,8**64**,867.30 in some places, and $37,8**54**,867.30 in others. *See* ECF No. 450-1 at pp. 74, 103, 106 ¶¶ 325, 430, 449, 451.  This appears to be a typographical error.  Based on the amount reflected in the State's damages documentation, *see* PX 1439 and PX 1455, the Court assumes the total damages amount the State is seeking is in fact $37,854,867.30.  Second, the State's proposed Findings of Fact and Conclusions of law inconsistently record the amount claimed for EMAC expenditures. *Compare* ECF No. 450-1 at pp. 70-71 ¶¶ 298-306 (claimed EMAC expenses adding up to $3,227,988.84) *with id.* at p. 74 ¶ 325 (identifying claimed EMAC expenses as totaling $4,045,088.39).  And it erroneously cites to entries in PX 1455 regarding EMAC expenses. *See,*

*e.g.*, ECF No. 450-1 at p. 70 ¶¶ 298, 300 (listing the same entry in PX 1455 as including expenses for two different EMAC states, Alabama and Kentucky); *id.* at p. 71 ¶ 306 (identifying cells K7125 and K7128 as EMAC expenses for the State of Wisconsin when those cells in fact refer to the State of Wyoming).

[¶370] The State's calculation of its damages does not exclude expenses not attributable to the actions of Corps officials that are at issue in this case. The State's damages calculation does not exclude expenses incurred before the Corps's September 16, 2016, press release. *See* Tr. 2231:1-13, 2232:16-20 (Day 14; Wilson). Nor does the State's damages calculation reduce the amount of damages sought from the United States to include only its costs associated with protestors on federal land, as opposed to Reservation land, private land, or State-owned land. *See* DX 4218 at 11; Tr. 2231:14-2232:1, 2232:16-20 (Day 14; Wilson); *see also* Tr. 1757: 19-23 (Day 10; Tolstad) (State's damages expert did not categorize the State's claimed expenses based on whether they were incurred responding to protest activity on federal land as opposed to other land). And the State's damages calculation does not distinguish between response costs associated with protestors staying on Corps land to the south of the Cannonball River versus the north, and thus does not exclude expenses associated with protestors staying in the area to the north. Tr. 2232:2-7, 2232:16-20 (Day 14; Wilson).

[¶371] The State's damages calculation also does not take into account the fact that some of the protest activity State officials responded to (and incurred expenses for) was peaceful, First Amendment-protected activity. *See* DX 4218 at 11; Tr. 2232:8-20 (Day 14; Wilson); *see also* Tr. 1757:14-18 (Day 10; Tolstad) (State's damages expert did not attempt to categorize expenses according to those that may have been incurred responding only to such activity as opposed to illegal activity).

[¶372] The State's damages calculation also does not account for the fact that individuals or entities besides the United States may be responsible for those damages. *See* DX 4218 at 11; Tr. 2232:21-2233:4 (Day 14; Wilson); *see also* Tr. 1757:5-8 (Day 10; Tolstad) (State's damages expert did not assess whether anything the Corps did or did not do was the actual cause of the State's damages).

[¶373] None of the State's damages documentation provides information sufficient to make any of the differentiations discussed above. *See* DX 4218 at 11-12; Tr. 2229:8-2233:22 (Day 14; Wilson). It is not possible to make these differentiations based on the evidence presented at trial. Further, as the United States' damages expert observed after conducting an extensive review of the backup documentation that underlies the State's damages calculation, it is not possible to make those differentiations based on the State's underlying damages documentation, either. *See* DX 4218 at 11-12; Tr. 2172:2-17, 2230:10-17, 2231:1-2233:4 (Day 14; Wilson); *see also* Tr. 1757:9-23 (Day 10; Tolstad) (State's damages expert did not endeavor to make such differentiations).

[¶374] As to the state's claim for damages in the form of equipment costs, some of the equipment items the State purchased in connection with the DAPL protests were used after the protests ended. *See, e.g.*, Tr. 459:3-10, 459:15-20 (Day 3; Kirchmeier) (the Morton County Sheriff's Office purchased several Chevy Tahoe vehicles as part of the protest response, which were still in the Sheriff's Office's fleet as of February 2024); *id.* at 459:11-15 (the Morton County Sheriff's Office also purchased riot gear as part of the protest response, which it turned in to the State Department of Emergency Services when the protest period concluded); Tr. 1662:2-8, 1698:2-12 (Day 10; Gaugler) (after the protests concluded, durable goods purchased for the protests continued to be used; such items—including, for example, radios—considered to be owned by Adjutant General's office, and the Department of Emergency Services then distributed to local law enforcement agencies within the State that needed them). Moreover, as a State-produced After-Action Report

noted, some of the State's protest-related equipment expenditures appeared to be the result of "agencies . . . taking the opportunity to get the state to buy them items that were lacking in their departments before the event ever began."  JX 9 at ND_000135645 ("Examples of questionable purchases include gun racks for patrol vehicles, binoculars, and outer wear for individual officers."). The State's claimed equipment cost damages do not include any reduction for scrap, salvage, or future use value—that is, value the State would have gotten for disposing of the equipment, or value it got from the continued use of the equipment after the protests ended.  *See* Tr. 1698:17-20 (Day 10; Gaugler); Tr. 2214:14-2215:21 (Day 14; Wilson); DX 4218 at 8-11.

[¶375]  The State's claimed damages also includes $2,256,484.56 in regular payroll expenses—that is, payroll that agencies or entities within the State would have incurred regardless of whether the protests had occurred.  *See* Tr. 2194:4-2206:11 (Day 14; Wilson); DX 4218 at 6-7 & Exhibits 4-5. This includes regular, non-overtime payroll for employees of State-wide agencies, as well as local entities for which the State seeks to recover damages.  *See* Tr. 2204:19-2205:6 (Day 14; Wilson); DX 4218 at 6-7 & Exhibits 4-5.  The State only hired three individuals specifically for the protest response, all of whom were terminated after the protests ended, in spring 2017.  Tr. 1691:20-1692:11 (Day 10; Gaugler).

[¶376]  Additionally, the State is seeking to recover interest charged on the Bank of North Dakota loans through May 4, 2018, totaling $651,746.35.  *See* Tr. 27:3-4 (Day 1; State's opening statement); ECF No. 450-1 [¶¶ 323, 450].

[¶377]  The State funded its protest response by taking out loans from the Bank of North Dakota, via the State Office of Adjutant General.  Tr. 949:24-950:7 (Day 6; Dohrmann); Tr. 1592:2-6 (Day 9; Morrissette); Tr. 1701:17-20 (Day 10; Gaugler).  These loans from the Bank of North Dakota were essentially lines of credit that the Adjutant General could draw from up to a certain amount,

and the Bank of North Dakota would deposit the funds into the Adjutant General's account.  Tr. 1648:16-1649:5 (Day 10; Gaugler).  There was no repayment schedule for those loans.  Tr. 1582:13-20, 1591:18-25 (Day 9; Morrissette).

[¶378] The Bank of North Dakota is unique in that it is State-owned.  Tr. 192:10-11 (Day 1; Schulz); Tr. 1573:5-6, 1585:15-19, 1586:1-3 (Day 9; Morrissette); ECF No. 404-1, Dep. Tr. 48:15-16 (Bachmeier); *see also* N.D.C.C. § 6-09-01 ("[T]he state of North Dakota shall engage in the business of banking . . . under the name of the Bank of North Dakota.").  The Bank itself is a State agency.  Tr. 1585:20-21 (Day 9; Morrissette).  Its funds can be withdrawn by the State legislature as needed, and its dividends typically form part of the State's general revenues.  *Id.* at 1586:16-1587:24.

[¶379] State agency operating and special funds are required to be on deposit at the Bank.  *Id.* at 1573:8-11.  Any interest that State agencies pay on loans from the Bank of North Dakota form part of the Bank's profits, which can be transferred into the State's general fund by the legislature.  *Id.* at 1589:10-16.  Thus, in the case of the Office of Adjutant General's loans for the DAPL protest response, any interest paid on those loans would become profits of the Bank of North Dakota, which the State legislature could transfer to the State's general fund.  *Id.* at 1593:5-11.

[¶380] There is no evidence that the Bank of North Dakota was forced to forego any loan opportunities or other uses of its capital in order to extend the loans to the Office of Adjutant General in connection with the DAPL protests.  *See* Tr. 2212:21-25 (Day 14; Wilson) (review of State's damages documentation did not reveal any evidence of any lost opportunity cost to the Bank of North Dakota as a result of extending the loans for the protest response); Tr. 1765:25-1766:7 (Day 10; Tolstad) (the Bank has no capital requirements, and the State's damages expert did not examine whether the Bank forewent any revenue based on issuing the loans).  In fact, in 2016 and

142

2017, the Bank's lending to State agencies was a "fraction" of the amount of loans the Bank extended for other purposes such as agriculture, student loans, and commercial loans. Tr. 1747: 9-14 (Day 10; Tolstad).

[¶381] In addition to law-enforcement protest-response costs and prejudgment interest, the State has suggested it is seeking to recover costs for property damage and cleanup of certain protest camp areas, *see* Tr. 26:22-27:7 (Day 1; State's opening statement); ECF No. 450-1 at p. 2 ¶ 7, p. 101 ¶ 421, but the State's evidence of its protest expenditures did not include documentation of such expenses, *see* PX 1439; PX 1455.

### XIII. The State Has Already Received $25 Million to Cover Its Protest Expenses

#### A. $10 Million Grant from the Federal Government

[¶382] In 2017, the State received $10 million via an Emergency Federal Law Enforcement Assistance ("EFLEA") grant from the federal government. Tr. 189:5-15 (Day 1; Schulz); Tr. 1699:15-19 (Day 10; Gaugler).

[¶383] The EFLEA program is run by the federal government. *Id.* at 189:14-18. The program provides federal grant funds to state and local governments for emergency law enforcement assistance. *Id.* 189:19-24. It is funded through federal appropriations from the United States Treasury, and states do not contribute any funds to receive awards under EFLEA. *See, e.g.*, Joint Resolution, Pub. L. No. 98-473, Title II § 609Y, 98 Stat. 1837 (authorizing appropriation of federal funds to provide monetary assistance to states under the EFLEA program); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 137, Sec. 5 & 131 Stat. 229, Sec. 542 (authorizing appropriation of sums from the United States Treasury in Fiscal Year 2017, including "15,000,000 for emergency law enforcement assistance for events occurring during fiscal years 2016 and 2017" as part of the EFLEA program).

[¶384] The State sought EFLEA funds through the North Dakota Attorney General's office to "partially reimburse North Dakota for emergency law enforcement costs" associated with the DAPL protests. Tr. 189:25-190:3, 191-8 (Day 1; Schulz); Tr. 1656:9-16 (Day 10; Gaugler); JX 28 at USA_00001581.  That is, the entirety of the $10 million EFLEA grant the State received was meant as reimbursement for some of the State's DAPL-related costs—the same costs it is seeking to recover in this litigation.  Tr. 191:10-17 (Day 1; Schulz); Tr. 1699:20-23 (Day 10; Gaugler);  Tr. 2180:4-2182:13 (Day 14; Wilson).

[¶385] The State applied the $10 million in EFLEA funds to repay some of the loans it took out from the Bank of North Dakota in connection with the protest response.  PX 1439; Tr. 191:25-192:9 (Day 1; Schulz); Tr. 1699:20-23, 1700:19-24 (Day 10; Gaugler); Tr. 1766:12-18 (Day 10; Tolstad); Tr. 2182:25-2183:5 (Day 14; Wilson); *see* Tr. 192:14-23 (Day 1; Schulz) (the EFLEA funds passed through the North Dakota Department of Emergency Services before being transferred to the Bank of North Dakota).

[¶386] The State's damages claim in this litigation does not include an offset or other reduction for the $10 million it previously received from the federal government in connection with the DAPL protests.  Tr. 191:18-24 (Day 1; Schulz); Tr. 2183:16-19 (Day 14; Wilson).

### B.  $15 Million Payment from Dakota Access

[¶387] The State also received a payment of $15 million from the pipeline company in October 2017.  Tr. 1618:9-18 (Day 9; Futch).  The company made the payment in recognition of the impact that the protests had on the State, and as a reimbursement for the State's costs associated with the protests.  *See* JX 251 at ET-ND-SUBPOENA-00002915;  ECF No. 404-1, Dep. Tr. 30:1-3, 14-16 (Bachmeier).  The CEO of Energy Partners, the parent company of Dakota Access, said in February 2017 that "I feel that we somehow have caused" the stress on the State from the protests, and that

the pipeline company would like to assist financially in alleviating that stress.  JX 251 at ET-ND-SUBPOENA-00002915.

[¶388] The recipient of the payment was the State Department of Emergency Services, and the place of deposit was the Bank of North Dakota.  ECF No. 404-1, Dep. Tr. 44:16-20 (Bachmeier).  The pipeline company wired the $15 million directly to the Bank of North Dakota.  *Id.* at 44:10-20.

[¶389] Before this $15 million payment, the pipeline company had not made any other nonroutine payments to the State, or any donations at all to the State, in at least the preceding five years.  *See* Tr. 1631:18-1632:3 (Day 9; Futch).  The State received various donations in connection with the DAPL protest, but none as much as the $15 million payment from the pipeline company—nor even in the $1 million range.  ECF No. 404-1, Dep. Tr. 46:22-47:13 (Bachmeier).  The pipeline company made donations in various areas along the pipeline's route, but all of those donations in total—to different entities across four states—totaled less than this single $15 million payment to the State in connection with the DAPL protests.  *See* Tr. 1619:5-21 (Day 9; Futch).

[¶390] A witness for the pipeline company characterized the payment as a no-strings-attached donation.  *See id.* at 1618:22-24.  But the company did not treat the payment as a charitable contribution for tax-reporting purposes.  *Id.* at 1631:14-17.

[¶391] The pipeline company recorded the payment to the State as a capital expenditure associated with the Dakota Access pipeline project.  Tr. 2184:3-2185:17 (Day 14; Wilson).  That is, the pipeline company recorded it as an expense that was necessary to build the pipeline.  *Id.* at 2185:15-19.

[¶392] Other evidence indicates the $15 million payment from the pipeline company was intended as a partial reimbursement for the State's protest-response costs.  *See* Tr. 431:8-17 (Day 3; Kirchmeier) (based on discussions with pipeline company officials in mid-August 2016, Sheriff

Kirchmeier understood that the company was planning to reimburse law enforcement for their protest-response expenses); JX 263 (email from MG Dohrmann to a pipeline company official dated March 22, 2017, attaching an estimate of the State's protest-response costs). The State treated the payment as a reimbursement of the State's costs related to unlawful activity in opposition to construction of the DAPL pipeline. *See* N.D. House Bill 1024, Section 8. Legislative Intent – Cost Reimbursement – Loan Payments (2017) (declaring that the Governor and the Department of Emergency Services will "accept reimbursement . . . for state costs incurred relating to unlawful activity associated with the construction of the Dakota access pipeline" and requiring that "[a]ny reimbursements received be used to repay the Bank of North Dakota loans . . . obtained to provide the funding necessary to respond to the unlawful activity associated with the construction of the Dakota access pipeline"); ECF No. 404-1, Dep. Tr. 41:6-12, 42:21-43:12 (Bachmeier) (this was the authorizing language that allowed the Governor to accept the funds from the pipeline company); *see also* DX 4218 at 4-6 (internal pagination) (report of United States' damages expert discussing the payment from the pipeline company).

[¶393] The State did in fact apply the $15 million from the pipeline company to repay a portion of the loans the State took out from the Bank of North Dakota to pay for its protest response. *See* PX 1439; Tr. 1700:25-1701:11, 1701:23-25, 1702:8-10 (Day 10; Gaugler); Tr. 1766:22-1767:1 (Day 10; Tolstad); Tr. 2190:5-23 (Day 14; Wilson).

[¶394] The State's damages claim in this litigation does not include any reduction to account for the $15 million it received from the pipeline company. *See* Tr. 1702:11-19 (Day 10; Gaugler); DX 4218 at 4-5 (internal pagination).

### XIV.  The State's Administrative Tort Claim

[¶395] The State submitted an administrative tort claim to the Corps on July 19, 2018.  JX 274.

That claim listed a sum certain amount of $38,005,071.66. *Id.* at USA_00000002, USA_00000030.

[¶396] The State's administrative tort claim was not presented to any federal agency other than the Corps. *See* JX 274 at USA_00000001 (cover letter from State Attorney General directed solely to the Corps and referencing "North Dakota's Federal Tort Claims Act claim against the U.S. Army Corps of Engineers"); *id.* at USA_00000002 (claim form listing only the Corps as the "appropriate federal agency" for the claim to be submitted to); *see also id.* at USA_00000008 ¶ 15 ("If the USACE does not approve the claim within six months, North Dakota expressly reserves the right to file suit under the FTCA.").

[¶397] The State's administrative tort claim stated that it "presents a claim for damages under the Federal Tort Claims Act . . . for negligence, gross negligence, creation of a public nuisance, and civil trespass stemming from the actions and inactions of the United States of America, by and through its executive agency the United States Army Corps of Engineers ("USACE")." *Id.* at USA_00000004 ¶ 1; *see id.* at USA_000004-USA_00000005 ¶¶ 2-4 (discussing "USACE's tortious conduct" and "[a]ctions and inactions by USACE"). The State's claim alleged liability of the United States "by and through its agency the USACE" only, and it did not identify any other federal agencies whose actions the State claimed were a basis for liability. *See id.* at USA_00000008 ¶ 13; USA_00000030-USA_00000033 ¶¶ 100-118; *see also id.* at USA_00000015 ¶ 41 (the State's administrative claim mentions other federal agencies besides the Corps in only one sentence, to emphasize the Corps's awareness of protest activity based on intelligence reports from the FBI and BIA).

147

## LEGAL ARGUMENT

### I.     Jurisdiction

#### A.  The FTCA's Jurisdictional Limits

[¶398] The FTCA provides a limited waiver of the government's sovereign immunity for suits arising out of certain tortious conduct of federal employees acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b)(1); *Brownback v. King*, 592 U.S. 209, 212 (2021); *Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir. 1993).

[¶399] The plaintiff in an FTCA action must establish six elements.  These are that the claim is "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (quoting Section 1346(b)).

[¶400] All of the six FTCA elements are jurisdictional.  *Brownback*, 592 U.S. at 217.  The application of the various exceptions to the FTCA's waiver of sovereign immunity is also a question of jurisdiction.  *See Sheridan v. United States*, 487 U.S. 392, 398 (1988); *Mound v. United States*, __ F.4th __, 2023 WL 3911505, at *1 (8th Cir. June 9, 2023).

[¶401] "Subject-matter jurisdiction can never be waived or forfeited."  *Auer v. Trans Union, LLC*, 902 F.3d 873, 877 (8th Cir. 2018); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Federal courts have the "obligation" to satisfy themselves of their own jurisdiction at all stages of a litigation.  *Auer*, 902 F.3d at 877; *see, e.g.*, *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388-89 (3d Cir. 2002).  As the party invoking the federal court's jurisdiction, the burden rests with the State to prove

that subject-matter jurisdiction—and a waiver of the United States' sovereign immunity—exists. *See, e.g.*, *Barnes v. United States*, 448 F.3d 1065, 1066 (8th Cir. 2006); *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000).

[¶402] A lawsuit against the United States is the exclusive remedy for claims arising out of the allegedly tortious conduct of federal employees. *See* 28 U.S.C. § 2679(b)(1). By statute, the United States must be named as the defendant in an FTCA action. *See id.* § 2674. The FTCA's use of a nominal defendant is similar to other statutes, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c), which require that the head of the agency whose employees' conduct is at issue be named as the defendant—though that agency head's own conduct is very rarely at issue.

### i. Only Acts or Omissions by Individual Employees May Form the Basis for Liability

[¶403] Liability under the FTCA must be premised on acts or omissions by federal employees. 28 U.S.C. § 1346(b)(1) grants federal courts jurisdiction over claims for "injury or loss of property . . . caused by the negligent or wrongful act or omission *of any employee of the Government* while acting within the scope of his office or employment.'" (emphasis added). The statute further provides that the United States may be liable only "if a private person" or "a private individual" would be liable to the plaintiff in the same circumstances. *Id.* §§ 1346(b)(1), 2674.

[¶404] The FTCA's waiver of sovereign immunity thus does not extend to all claims for injuries that might be attributed to the federal government writ large, or to any entity or agency of the government. Rather, the FTCA waives sovereign immunity where an *individual employee or employees* committed a tort while acting within the scope of their employment. *See St. John v. United States*, 240 F.3d 671, 676 (8th Cir. 2001); *see also Haceesa v. United States*, 309 F.3d 722, 728 (10th Cir. 2002) (Section 1346(b)'s language "unmistakably is couched in the language of an employer's respondeat superior liability"—*i.e.*, liability for the wrongful acts and omissions of the

United States' employees); 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.").  Because the United States is not an individual employee but only an employer, the FTCA's "private person" and "private individual" language "suggests that the only shoes that the Government stands in under the FTCA are those of private employers." *Haceesa*, 309 F.3d at 728-29 (explaining that this conclusion is consistent with the conclusion reached by the Eighth Circuit in *St. John*).

[¶405] Liability under the FTCA turns on the "law of the place" where the alleged tort occurred. 28 U.S.C. § 1346(b)(1).  Under North Dakota law, an employer may be vicariously liable for the negligence of its employees while the employees are acting within the scope of their employment. *E.g.*, *Riemers v. Grand Forks Herald*, 688 N.W.2d 167, 171 (N.D. 2004).  However, the release of the employee from liability—through the application of a privilege, immunity, or otherwise—also releases the master from liability.  *See id.*

[¶406] Thus, the State's claims can be based only on the negligent acts or omissions of federal employees, acting within the scope of their employment.  The State cannot recover for actions or inactions by "the United States" as a whole, or by one of its agencies.  And, to the extent an individual employee would not be liable, the United States also cannot be held liable, consistent with principles of *respondeat superior* liability under North Dakota law.

### ii.    Only Acts or Omissions by Corps Employees May Form the Basis for Liability

[¶407] An FTCA suit "shall not be instituted . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency . . . ."  28 U.S.C. § 2675(a).  The presentment requirement is jurisdictional: if it is not satisfied, the

plaintiff's claims must be dismissed.  *See, e.g.*, *McNeil v. United States*, 508 U.S. 106, 111, 113 (1993) (affirming dismissal for lack or jurisdiction because an administrative-tort claim had not been filed, and holding that "[t]he FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies"); *Mader v. United States*, 654 F.3d 794, 805-08 (8th Cir. 2011) ("[S]trict compliance with § 2675(a) is a jurisdictional prerequisite to suit under the FTCA."); *Bellecourt*, 994 F.2d at 430 ("Presentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant.").

[¶408]  An administrative-tort claim "shall be presented to the Federal agency whose activities give rise to the claim."  28 C.F.R. § 14.2(b)(1).  Here, the State submitted its administrative-tort claim to the Corps and no other federal agency.  FoF [¶395], [¶396].  The claim made clear that the State's claims were premised on the actions of the Corps only.  FoF, [¶396], [¶397].

[¶409]  Consistent with the State's administrative-tort claim, the State's Complaint—which it never sought to amend—asserts claims that are based on acts or omissions of the Corps only.  *See generally* ECF No. 1 (seeking to recover from the United States "by and through its executive agency USACE," discussing the Corps's actions throughout the protests in detail, and mentioning the Corps over 200 times, while mentioning other federal agencies in passing only four times); *see also Provancial v. United States*, 454 F.2d 72, 74 & n.1 (8th Cir. 1972) (noting that "[t]here was nothing contained in the claim to alert the Department of Justice to believe that any other agency was involved" and denying request to amend complaint to add claims against U.S. Public Health Service because the administrative claim submitted to the Department of Justice "did not mention the names of nor allege any negligence against" Public Health Service officers).

[¶410] The State has stated that "the federal involvement" in the DAPL protest response "was broader than just the Corps or the Department of the Army or just a couple of public statements

made by the Corps." Tr. 18:23-25 (Day 1; State's opening statement). In particular, the State has suggested liability may be based on actions other than those of Corps employees, such as the Department of Justice, Department of Interior, and Department of the Army issuing two joint statements about the *Standing Rock Sioux Tribe* litigation and the pipeline permitting action; the decision of the Department of the Army's Assistant Secretary of the Army of Civil Works to delay the final decision on the pipeline's permission to cross federal land at Lake Oahe; President Obama's public statements or other decisions in connection with the protests; and the decision of the Department of Justice not to deploy more federal law enforcement resources in response to the protests. *See, e.g.*, Tr. 15:15-17 (Day 1; State's opening statement); Tr. 2157:15-21 (Day 14; State's response to United States' Rule 52(c) motion[5]); ECF No. 450-1 (State's proposed Findings of Fact and Conclusions of Law) at p. 2 ¶ 5, pp. 23-25 ¶¶ 90-97, pp. 37-38 ¶¶ 142-143, pp. 51-53 ¶ 203, ¶¶ 207-211, pp. 59-62 ¶¶ 245-251, ¶¶ 254-257, pp. 93-95 ¶ 393, ¶¶ 397-398. But as the Court recognized before trial, while "other federal agencies[] may have been involved in the factual scenario relating to the DAPL protests, . . . the alleged liability has always been based on the USACE's tortious conduct," and "the liability of the United States in this matter flows directly from the USACE's actions, not the actions of the other agencies." ECF No. 280 at pp. 8-9 ¶¶ 15-16; *see id.* at p. 9 ¶ 15 (noting that if the State sought to include the separate actions of non-Corps agencies, "it would have to amend its Complaint accordingly").

[¶411] Consistent with that prior ruling, the Court declines to impose liability on the United States for the actions of non-Corps officials that the State raises. There is no evidence that Corps

---

[5] In denying the United States' Rule 52(c) motion, the Court stated that it "agrees [with] and adopts the State's arguments in total." Tr. 2169:2-3 (Day 14). Given the flaws in the State's reasoning discussed herein, the Court does not adopt the State's arguments in its Conclusions of Law and Order for Judgment.

employees issued the September 9 or October 10 joint statements; made the decision to delay the decision on the pipeline easement; or made the decision not to deploy more federal law enforcement resources to respond to the protests.  *See* FoF [¶125] (the Corps was not a party to the September 9 joint statement, and Corps officials were not even aware beforehand that it would be issued); FoF [¶130] (the Corps was also not a party to the October 10 joint statement); FoF  [¶67], [¶68], [¶73] (Corps officials had completed their portion of the approval process for the pipeline crossing when the Secretary of the Army for Civil Works informed them that the Corps's permitting decisions would be reviewed further and the pipeline permitting would be delayed); FoF [¶300], [¶333] (it was the Department of Justice that ultimately decided not to grant requests by State and Corps officials to deploy additional federal law enforcement resources to the DAPL protests).  Nor is there any evidence that Corps officials controlled the actions of those other federal agencies or officials. *See* FoF [¶13] (Corps officials do not direct the activities of the Department of the Army or its personnel, and they do not report to the Assistant Secretary of the Army for Civil Works); FoF [¶20] (the Corps cannot order another federal entity or agency to deploy law enforcement on Corps land).

[¶412] Because the State presented its administrative claim to the Corps only, and because that claim alleged tortious conduct on the part of the Corps alone, the State cannot recover for claims based on the acts of other federal agencies or non-Corps officials.

### iii.    The United States Is Not Subject to Strict Liability

[¶413] The FTCA's waiver of sovereign immunity does not extend to claims for absolute or strict liability.  *See* 28 U.S.C. § 1346(b).  Absolute or strict liability "are imposed automatically when any damages are sustained as a result of the decision to engage" in a risky activity; the FTCA, by contrast, "requires a negligent act."  *Dalehite v. United States*, 346 U.S. 15, 44–45 (1953); *see Laird*

*v. Nelms*, 406 U.S. 797, 803 (1972) (confirming that the FTCA does not permit the imposition of strict liability "of any sort" on the United States, even where state law provides for it).

[¶414] For nuisance claims, North Dakota law incorporates an absolute liability standard. *See Rassier v. Houim*, 488 N.W.2d 635, 637 (N.D. 1992) ("[O]rdinarily, a person who creates or maintains a nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised to avoid the injury." (quoting *Knoff v. Am. Crystal Sugar Co.*, 380 N.W.2d 313, 636-37 (N.D. 1986)). This standard applicable to nuisance claims—imposition of liability based on the fact of an injury, regardless of whether a standard of care was breached—is different from the standard for negligence claims, which involves the "violation of a relative duty, the failure to use the degree of care required under particular circumstances in connection with an act or omission which is not of itself wrongful." *Id.* In other words, "a nuisance may be created wholly without negligence." *Id.* (quoting *Knoff*, 380 N.W.2d at 317). Thus, in a nuisance action under North Dakota law, "[p]roof of absence of negligence is not a defense to an action grounded in nuisance, because the focus is upon the condition created and not upon the exercise of care or skill by the defendant." *Knoff*, 380 N.W.2d at 317.

[¶415] Because the FTCA imposes liability only for torts under the "law of the place" that involve a negligent act, and the State's nuisance claim does not require a showing of a negligent act under North Dakota law, the United States cannot be held liable under the FTCA as to the State's nuisance claim. The United States argued in its motion to dismiss that, insofar as the State's nuisance claim relied on an absolute liability theory, the claim should be dismissed. ECF No. 6 at 25-26. The Court ruled that it would "limit any liability to 'negligent or wrongful act or omission' of the Corps." ECF No. 38 at p. 29 ¶ 68. But in an FTCA action, a court must assess liability based on the "law of the place." 28 U.S.C. § 1346(b)(1). A court, therefore, cannot avoid the FTCA's bar on liability

for state torts based on absolute or strict liability by judicially amending a state nuisance claim to add a new element of negligence, and then looking to this new negligence-based nuisance cause of action under state law.

[¶416]  In any event, even if the State can pursue a negligence-based nuisance claim, the Court has determined that the United States cannot be liable on such a claim absent a showing of a "'negligent or wrongful act or omission' of the Corps."  ECF No. 38 at p. 29 ¶ 68.  Accordingly, the United States cannot be held liable simply based on the fact that some DAPL protestors camped on Corps-managed land, or simply based on the fact that some of the protestors on Corps land engaged in unlawful activity.  The State must establish that Corps officials acted negligently in connection with the DAPL protests.

### iv.    The United States Cannot be Held Liable for Discretionary Functions

[¶417] The FTCA's waiver of sovereign immunity does not extend to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This discretionary function exception applies when: (1) the challenged conduct or omission is discretionary, meaning that it "involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations'"; and (2) "that judgment is of the kind the discretionary function exception was designed to shield."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

[¶418] "The applicability of the discretionary function exception to a particular 'claim' turns on what it is 'based upon' and whether *that* specific wrongful action involves 'a discretionary function or duty.'"  *Miller v. United States*, 992 F.3d 878, 887 (9th Cir. 2021) (emphasis in original). Whether a claim is "based upon" a discretionary function or duty depends on whether the

discretionary act caused the injuries at issue.  If a plaintiff's claimed injuries "were caused" by a discretionary act, then, "as a matter of law," the claims are "based upon" those decisions and barred by the exception.  *Fisher Bros. Sales Inc. v. United States*, 46 F.3d 279, 286 (3d Cir. 1995); *cf. Clark v. United States*, 695 F. App'x 378, 386 (10th Cir. 2017) (unpublished) ("To circumvent the discretionary function exception, the mandatory duty alleged must be one whose breach bears a causal relationship to the Plaintiffs' injuries, thereby giving rise to their cause of action against the government." (citing cases)).

[¶419] To overcome the discretionary function exception, a plaintiff must therefore identify a specific non-discretionary act that proximately caused the plaintiff's injury.  For example, in *Berkovitz*, the federal government approved the release of a particular lot of a polio vaccine.  *See* 486 U.S. at 533.  The federal Communicable Disease Center determined that a dose of the vaccine from that lot caused the plaintiff, an infant, to contract polio.  *See id.*  The Supreme Court held that the discretionary function exception barred judicial review of the government's discretionary decision as to the appropriate *method* for regulating the release of vaccine lots, but it did not bar the plaintiff's claim that the agency released a vaccine lot without complying with the mandatory safety standards.  *See id.* at 533, 546-48 & n.13.  In *Berkovitz*, the causal chain was clear: the federal government did not comply with mandatory safety standards, and, as a result, the plaintiff received a vaccine that caused him to suffer harm.  There was no suggestion that an intervening discretionary decision occurred between the non-compliance with mandatory standards and the plaintiff's injury.

[¶420] Similarly, in *Appley Brothers v. United States*, the Eighth Circuit concluded at the motion-to-dismiss stage that the discretionary function exception did not apply when the challenged non-discretionary decision led directly to the claimed harm, and that harm was not caused by any later agency exercise of discretion.  In that case, the plaintiffs, who stored grain at a warehouse, claimed

that they were harmed after a grain shortage at the warehouse and that their harm was the direct result of a federal grain inspector's failure to comply with a mandatory handbook provision governing the inspection of grain warehouses.  *See* 7 F.3d 720, 725-26 (8th Cir. 1999).  The government argued that, even if an inspection had been conducted, it would not have necessarily resulted in suspension of the license—that is, that the non-discretionary act was not the cause of the harm alleged.  *See id.* at 726.  Observing that the case presented "a very close question," the Eighth Circuit rejected that argument.  *See id.* at 725-26.  The court explained that, once the federal inspector failed to comply with the handbook's mandatory provisions, that failure "prevented" the agency "from exercising discretion to decide" whether to revoke the warehouse's license.  *Id.*  The court reasoned that the inspector's failure to comply with the manual meant that the agency did not have the information necessary "to make an informed exercise of discretion."  *Id.* at 726.  The court rejected the government's argument that an inspection would not necessarily have led to closure of the warehouse as being "simply inconsistent" with the evidence, which showed that the agency eventually *did* shut down the warehouse after a later inspection discovered deficiencies.  *Id.*

[¶421] The *Appley Brothers* court cited, with approval, an earlier decision where a federal employee's omission left the agency with no discretion on how to act.  *See id.* at 724-25 (discussing *McMichael v. United States*, 856 F.2d 1026, 1033-34 (8th Cir. 1988)).  In *McMichael*, the plaintiff challenged a federal employee's failure to evacuate a munitions plant as a thunderstorm approached, which led to a deadly explosion.  *See* 856 at 1029, 1033.  The claim was based on a federal inspector's failure to complete a checklist, which prescribed a specific course of action the inspector must follow in the event of an electrical storm.  856 F.2d at 1033.  The court held that, because the inspector "had no choice but to adhere to that directive," the discretionary function exception did not apply.  *Id.*

[¶422] The Eighth Circuit reviewed the *Appley Brothers* case again following summary judgment. It emphasized that the plaintiff's claim could proceed because the plaintiff's injuries were the direct result of the non-discretionary act (failing to comply with handbook provisions about how to a warehouse inspection). *See Appley Bros. v. United States*, 164 F.3d 1164, 1168-69, 1171-73 (8th Cir. 1999). The court found that, if the federal inspector had conducted an investigation, as he was required to do, "it is highly likely [the inspector] would have discovered the massive shortages of grain" and revoked the warehouse's license, as it did when a shortage was discovered in a subsequent inspection. *Id.* at 1173.

[¶423] In *Buckler v. United States*, the Eighth Circuit again recognized that, for an FTCA claim to proceed, the alleged non-discretionary act—and not a later discretionary decision—must be the direct cause of the plaintiff's injuries. *See* 919 F.3d 1038, 1053-54 (8th Cir. 2019) ("[W]hat matters for our analysis is the nature of the [relevant agency policy] provision material to the challenged decision." (citing *Compart's Boar Store, Inc. v. United States*, 829 F.3d 600, 605 (8th Cir. 2016)). In *Buckler*, the Eighth Circuit addressed whether the discretionary function exception barred a claim that a federal mine inspector failed to fulfill his mandatory duty to inspect training records. *See id.* at 1054. Discussing *Appley Brothers*, the court stated that "parsing a government employee's duties" as "thinly" as the court did in that case "is confusing to say the least." *Id.* at 1053. Analyzing the facts in *Buckler*, the court found that most of the claims were barred by the discretionary function exception. *See id.* at 1046-53. The one claim that could proceed involved the failure to inspect training records, and the plaintiff's allegation that the inspection records had been falsified, which the court declined to dismiss "without further factual development of this threshold jurisdictional question." *Id.* at 1054 (noting that failing to conduct an investigation was arguably "a simple abuse of discretion" that would be encompassed by the discretionary function exception,

but "[f]alsifying records . . . would seem to be more than a mere abuse of discretion").

[¶424] These cases reflect the principle that the discretionary function exception does not bar a claim if the plaintiff shows that the claimed harm resulted directly from a non-discretionary, negligent act by a federal employee, and *not* from an intervening discretionary act. But a plaintiff's claim *is* barred by the discretionary function exception when "a robust exercise of discretion intervenes between an alleged government wrongdoer and the harm suffered by a plaintiff." *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1285 (9th Cir. 1998). For example, in *General Dynamics*, the court held that the discretionary function exception barred a corporation's suit because its claimed injuries were not directly caused by the purported non-discretionary act—a government audit that reported the corporation's alleged fraud—but by the prosecutor's intervening discretionary decision to indict and prosecute the corporation for fraud. *Id.* at 1282, 1286. Thus, even if the government violates a mandatory duty, a plaintiff's claims are barred by the discretionary function exception if the harm "actually flows" from some intervening discretionary act. *Id.* at 1286.

[¶425] *The Court held that the Corps's September 16, 2016, and November 25, 2016, statements were the non-discretionary acts upon which liability may be based.* In denying the United States' motion to dismiss, the Court determined that the Corps "has discretion to decide whether to grant or deny a special use permit." ECF No. 38 at p. 16 ¶ 40. But the Court found the Corps violated a mandatory, non-discretionary duty by not following the Special Use permitting process when it: (1) issued the September 16, 2016, press release inaccurately announcing that a Special Use Permit had been granted to the Tribe; and (2) wrote the November 25, 2016, letter to tribal leadership that announced the establishment of a free speech zone on Corps land to the south of the Cannonball River. *See* ECF No. 38 at pp. 16-19 ¶¶ 38, 42-45, p. 19 ¶ 45, pp. 21-22 ¶ 50. As the Court found,

159

"[b]oth of these were written permission granted to the protestors to use Corps land, which circumvented the mandatory permit requirements." *Id.* at p. 19 ¶ 45.  The Court held that, while the Corps "may have had discretion in how to enforce permit violations on its property," it did not have discretion "to forego the permitting process entirely and issue a de facto permit" in the form of those two statements.  *Id.*

[¶426] The Court's Order did not hold that any other actions by the Corps besides the statements on September 16 and November 25, 2016, violated a mandatory duty.  *See id.* at p. 19 ¶ 45; *id.* at 21-22 ¶ 50 ("[T]he Corp[s] simply gave written permission *in the form of a press release and a letter* allowing the protestors to use Corps-managed land.").  The Court noted that it was not clear from the Complaint *which* of the two statements by the Corps allegedly "invited, enabled, and encouraged" the DAPL protestors' activity, but the Court stated that "*both* actions by the Corp[s] were a 'written permission granted by the District Commander,' *neither* of which were predicated by a properly-submitted permit application."  *Id.* at p. 15 ¶ 35 (citation and alteration omitted) (emphases added).  That is, the Court made clear that the statements of September 16 and November 25—and those two statements alone—were the non-discretionary acts for which liability could be imposed.

[¶427]  In contrast, the Court expressly recognized that the Corps's decisions as to how to enforce violations of Title 36 on Corps-managed land were discretionary.  *See id.* at 19 ¶ 45 (the Corps "may have had discretion in how to enforce permit violations on its property"); *id.* at 24 ¶ 55 ("36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protestors' conduct . . . .").

[¶428]  The Court then determined that the State could proceed with its claim on the ground that the Corps's "failure to comply with the mandatory permitting process tainted all other decisions made

by the Corp[s].  Here, the maxim applies: 'You break it, you bought it.'"  *Id.* at 24 ¶ 55.  That is, the Court held that the State could proceed on a theory that the Corps "broke" a duty when it issued the September 16 and November 25 statements, and it therefore "bought" the consequences of all the decisions it made afterwards.  *See id.* at 24 ¶ 55; *id.* at 25 ¶ 58 (holding the discretionary function exception "is not a bar to decisions made without regard to mandatory procedures and *the bad consequences resulting from* not following those mandatory procedures" (emphasis added)).[6]

[¶429] The case was allowed to proceed to discovery, and ultimately to trial, on the reasoning outlined in the Court's Order on the motion to dismiss.  That is, the case proceeded on the basis of the Court's holding that the Corps "failed to follow a mandatory permit process" by issuing the September 16 and November 25 statements and that those statements and the Corps's decisions that followed could be a basis for liability, if the State met its burden of proof on each element of its claims.  *Id.* at p. 22 ¶ 50, *see id.* at pp. 19 ¶ 45, 21-22 ¶ 50.

[¶430] This Court thus determined that the State's claims could proceed based on two specific actions by the Corps that it found to be a breach of a non-discretionary duty: the Corps's September 16, 2016, press release and COL Henderson's November 25, 2016, letter to tribal leaders.  *See* ECF

---

[6] The United States respectfully disagrees with the Court's decision that the September 16 and November 25 statements were non-discretionary actions under the Corps's rules and guidance, for the reasons discussed in the United States' briefs on its motion to dismiss and motion for summary judgment, and in response to the State's partial motion for summary judgment.  *See* ECF Nos. 6, 16, 30, 350, 364, 369.  The United States will not repeat those arguments in these proposed Findings of Fact and Conclusions of Law, but specifically preserves them and urges the Court to reconsider its prior rulings on this issue in light of the full record after trial.  *See Berkovitz*, 486 U.S. 547-48 (emphasizing that the plaintiffs had merely alleged, but not proved, their factual allegations as to the applicability of the discretionary function exception at the motion to dismiss stage, and holding that the case could proceed based on what evidence might be adduced in discovery on that issue); *see also, e.g.*, FoF [¶43]-[¶60] (discussing the Corps's Special Use Permit process and the discretion it leaves to Corps officials, including in connection with imposing conditions such as liability insurance and performance bonds); FoF [¶132]-[¶146] (discussing the Standing Rock Sioux Tribe's request for a Special Use Permit and the Corps's response to that request).

No. 38 at pp. 16-19 ¶¶ 38, 42-45, p. 19 ¶ 45, pp. 21-22 ¶ 50.  As to those two statements, the Court rejected the discretionary function defense based on the record then before the Court on the United States' motion to dismiss.  *Cf. Berkovitz*, 486 U.S. at 547-48 (emphasizing that the plaintiffs had merely alleged, but not proved, their factual allegations as to the applicability of the discretionary function exception at the motion to dismiss stage, and holding that the case was permitted to proceed based on what evidence might be adduced in discovery on that issue); *Buckler*, 919 F.3d at 1054 (declining to dismiss a claim based on the discretionary function exception without "further factual development of this threshold jurisdictional question").

[¶431]  At this stage, the Court must re-assess whether the State has shown, on the record following trial and in accordance with the legal principles set forth above, that the harms it complains of resulted directly from those acts, and not from a later intervening discretionary act by the agency.  *See, e.g.*, *Auer*, 902 F.3d at 877 (federal courts have "an obligation to satisfy" themselves that jurisdiction exists); *U.S. Express Lines Ltd.*, 281 F.3d at 388-89 (that obligation applies "at all stages of the litigation").  As reflected in the facts set forth above, the State has not made this showing.

[¶432]  As discussed in more detail in Section II.D below, the State does not show that the harms it suffered—the expenditure of money to mount a law-enforcement response to the protests—were directly and proximately caused by either of the Corps's statements on September 16 or November 25, 2016.  The September 16 and November 25 statements informed protestors that they could gather for a peaceful demonstration on Corps land to the south of the Cannonball River (and not the north), so long as protestors obeyed the Corps's Title 36 regulations and state, local, and federal laws.  *See* FoF [¶142], [¶197]-[¶198], [¶269].  Despite those statements, protestors acted otherwise: protestors remained camped in large numbers on Corps land to the north of the river, where they had not been told they could gather.  *See* FoF [¶271].

[¶433] Instead, the evidence shows that a variety of other factors, including protestors' own convictions and decisions, history and culture, calls for support from the Standing Rock Sioux Tribe, decisions on the pipeline easement, and social media and online donations, were the primary motivators of protest activity on the ground. *See* FoF [¶238]-[¶268].

[¶434] The State's claimed harms also involved numerous intervening acts of discretion by Corps officials and others. *See, e.g.*, FoF [¶59] (discussing the Corps District Commander's discretion to close Corps land); FoF [¶17], [¶56] (noting that Corps officials have discretion as to whether to issue citations, to seek removal of people from Corps land, or to take other steps to ensure visitors' compliance with Corps rules and regulations); FoF [¶66], [¶68], [¶73], [¶243] (discussing the Department of the Army's decision to seek further review and delay the decision on the easement for the pipeline to cross Lake Oahe); FoF [¶300], [¶334] (discussing the Department of Justice's decision not to deploy more federal law enforcement resources in response to the protests). That is, unlike the plaintiffs' claims in *Appley Brothers*, a robust exercise of discretion intervened here between the two statements by the Corps and the harms the State alleges. And unlike the non-discretionary conduct in *Appley Brothers*, the Corps's September 16 and November 25 statements did not deprive agency officials of information necessary to make an informed exercise of their discretion.

[¶435] That the Corps's statements of September 16 and November 25, 2016, preceded some of the discretionary decisions that form the basis of the State's claims is not enough to conclude that the State's harms were directly caused by those statements, and were not caused by the discretionary decisions that followed. The only acts the State alleges would have remedied or prevented its harm are discretionary—specifically, the Corps closing its land or seeking forcible removal of protestors, or the federal government deploying more law enforcement resources. *See, e.g.*, ECF No. 450-1 at

p. 35 ¶ 132, pp. 59-61 ¶¶ 245-51, p. 65 ¶ 271, p. 79 ¶¶ 340-342, p. 84-85 ¶¶ 361-63.  Those were

all "robust exercise(s) of discretion" that intervened between the Corps's alleged wrong (the

issuance of the statements) and the harm suffered by the State (expending protest-response costs).

*Gen. Dynamics Corp.*, 139 F.3d at 1285.  Because the trial record shows that the State's claimed

harm is "based upon" discretionary functions, the State's claims are barred by the discretionary

function exception.

[¶436] *The State now offers a different theory, that liability can be based on the Corps's not seeking*

*removal of protestors on its land in mid-August 2016.*   The State now seeks to pursue a theory of

liability that is different from the claim the Court permitted to proceed at the motion to dismiss

stage.  The State contends that the Corps erred by making "no effort to remove the DAPL protestors

when that was a realistic option" in mid-August 2016.  ECF No. 450-1 at p. 2 ¶ 5 (State's proposed

Findings of Fact and Conclusions of Law); *see id.* at pp. 64-65 ¶¶ 269, 271; *id.* at p. 84 ¶ 361; *id.* at

p. 96 ¶ 404; *see also id.* at p. 92 ¶ 388 (contending the time "when it was feasible" to control the

protestors or Corps-managed land was "in August 2016"); *see also* FoF [¶368] (the State is seeking

to recover the full amount of its protest-response expenses as damages, including expenses incurred

from August 10, 2016, onward).  This theory fails, for at least two reasons: first, because the State

claims the Corps's error occurred a month before the first non-discretionary act at issue, and second,

because the State's claimed harms are not "based upon" either of the non-discretionary acts the

Court identified.  *See* 28 U.S.C. § 2680(a).

[¶437] *First*, the State's new theory is based on the Corps's decision not to seek removal of

protestors from its land in mid-August 2016—a month *before* September 16, 2016, the date of the

first statement the Court found to be non-discretionary and a potential basis for liability.  In essence,

the State contends the United States is liable based on a situation that was already "broken" beyond

repair by the time the Corps "bought it" by violating a non-discretionary duty.  *See* ECF No. 38 at 24 ¶ 55.

[¶438]  As an initial matter, the State's theory is not based on a fair reading of the evidence.  The State erroneously claims the Corps was aware protestors had spilled onto Corps land in large numbers as of August 10, 2016.  *See* ECF No. 450-1 at p. 8 ¶ 29, p. 98 ¶ 408.  To support this assertion, the State cites PX 1050, a Corps storyboard document dated August *24*, 2016—two weeks after the August 10 date the State identifies.  *See* ECF No. 450-1 at p. 8 ¶ 29.  The State also cites JX 61, a chain of several emails among Corps officials that notes, on the afternoon of August *15*, 2016, that "there appears to be significant protest activity brewing at SRST today in addition to the smaller protests that are ongoing at a DAPL work site near their reservation and at our Oahe office today. . . .  It's hard to say what will actually happen . . . my assessment is that their claims of 'thousands' of people coming for [sic] all over the country may be a little exaggerated."  JX 61 at USACE_00002235.  The email chain contains no mention of protests on August 10, or on any day prior to August 15, 2016.  *See id.* at USACE_00002235-USACE_00002241.  The State also cites record testimony that does not establish that the Corps knew large numbers of protestors were gathering on its land as of August 10, 2016.  *See* ECF No. 450-1 at p. 8 ¶ 29 (citing COL Henderson's testimony at Tr. 1040:3-9 and BG Spellmon's testimony at Tr. 1904:25–1905:4).  Neither witness testified as to the August 10 date the State asserts.  *See* Tr. 1040:3-9 (Day 7; Henderson) (testifying that protestors were camping on Corps-managed lands north of the Cannonball River "by the middle of August 2016"); Tr. 1904:25-1905:4 (Day 12; Spellmon) (testifying that he first learned protestors were camping on Corps-managed land in North Dakota sometime "in the middle of August of 2016").

[¶439]  In fact, the evidence shows that it was on August *15*, 2016, when Corps officials first learned

protestors were gathering on Corps land to the north of the Cannonball River in greater numbers than they had previously gathered elsewhere.  *See* FoF [¶94]-[¶99].  Previously, the protests had consisted of approximately 12 local Standing Rock Sioux Tribe members, who had been peacefully gathered on Reservation land to the south of the Cannonball River, occasionally spilling over onto adjacent Corps land south of the river.  *See*  FoF [¶80]-[¶84].  Prior to mid-August 2016, State and local law enforcement and Corps officials all thought that encampment was nothing to worry about. *See* FoF [¶84].

[¶440] At 11:17 AM on August 15, 2016, when COL Henderson first learned that protestors had spilled onto Corps land north of the Cannonball River, an estimated 300 people were already on the road to join the camp within a matter of hours.  *See* FoF [¶96].  Estimates from the State put that number of people coming to join the protests as high as 800.  *See id.*  That same day or very soon after, COL Henderson reached out to Sheriff Kirchmeier, BIA law enforcement officials, and the U.S. Attorney's Office to discuss the protest situation.  *See* FoF [¶96].

[¶441] Also on August 15, 2016, very soon after he learned protestors were gathering on Corps land to the north of the Cannonball River, COL Henderson learned that a representative of the Standing Rock Sioux Tribe had contacted COL Henderson's team, seeking permission for a spiritual encampment on Corps land.  *See* FoF [¶132].  That same day, COL Henderson told his team that the Tribe should seek a Special Use Permit for the encampment.  *See* FoF [¶134].  Responding to the Tribe's inquiry, COL Henderson's team told the Tribe's representative that the Tribe should seek a Special Use Permit.  *See id.*

[¶442] Three days later, on August 18, 2016, the Tribe submitted an application for a Special Use Permit.  FoF [¶135].  The Corps rejected that application because it did not include insurance and bonding provisions or a description of the event.  *See id.*  In early September 2016, the Tribe re-

166

submitted its application. *See id.* After that, Corps officials continued to discuss the re-submitted Special Use Permit application with the Tribe, including how it reflected the changing conditions on the ground with the protests. *See* FoF [¶135].

[¶443] On September 16, 2016, COL Henderson offered the Special Use Permit to the Tribe. *See* FoF [¶137]. That same day, the Corps issued the press release that incorrectly stated that the Special Use Permit had been granted (not merely offered). *See* FoF [¶142], [¶145].

[¶444] The evidence shows that, immediately upon learning that protestors were gathering on Corps land in significant numbers, that protestors had spilled onto Corps land to the north of the Cannonball River, and that the protest situation might pose a concern, COL Henderson and his team began working to get a Special Use Permit in place. The evidence further shows that Corps officials continued to work with the Tribe in an attempt to secure a valid Special Use Permit that reflected the situation on the ground and would include the necessary conditions. In sum, from August 15 to September 16, 2016, the Tribe obtained, completed, and submitted a Special Use Application to the Corps, and the Corps assessed the application and determined what conditions should apply to the Special Use Permit. These are exactly the steps the Court found the Corps was required to take under its implementing guidance. *See* ECF No. 38 at p. 16 ¶ 38; p. 17-19 at ¶¶ 42-44.

[¶445] The Corps did not violate any mandatory duty with regard to the permitting process until September 16, 2016 (if at all). At the time the State alleges the Corps wrongfully did not act to seek removal of protestors—sometime in mid-August 2016—the Corps was doing precisely what this Court has held it should do when faced with an unauthorized use of its land: receive an application for a Special Use Permit, consider that application, and impose certain conditions if the Special Use Permit is to be granted. *See* ECF No. 38 at p. 16 ¶ 38; p. 17-19 ¶¶ 42-44.

[¶446] The Corps's decision in mid-August not to announce the closure of its land, or to seek the

forcible removal of protestors cannot be the basis for liability, because the Corps had not breached any mandatory duty at that point. *See* 28 U.S.C. § 2680(a); ECF No. 38 at p. 16 ¶ 38, pp. 17-19 ¶¶ 42-44; *see also* FoF [¶53] (members of the public who want to use Corps land for activities ordinarily requiring a Special Use Permit often do not submit an application before entering Corps land); FoF [¶52] (the process of securing a Special Use Permit often involves significant back-and-forth between the applicant and Corps officials); FoF [¶54] (when members of the public enter Corps land without authorization, Corps officials respond by exercising their best judgment and the tools at their disposal); FoF [¶59] (the District Commander may close Corps land as necessary for the public interest, but he is under no mandatory obligation to do so).

[¶447] The State does not identify the date in mid-August 2016 on which it thinks a mass forcible eviction of protestors would have been "feasible" and on which it contends the Corps should have sought that eviction. But it was at some point before August 18, 2016, when the number of protestors in the camps had grown to an estimated 1,500 people, *see* FoF [¶99], and State and local law enforcement were stretched beyond their capacity to simply manage the protests, even without attempting a full-scale eviction, *see* FoF [¶353], [¶357]. In fact, it was almost certainly even earlier, before August 15, 2016, when the number of protestors was already swelling into the hundreds. *See* FoF [¶96].

[¶448] The evidence shows that as of mid-August 2016, State and local law enforcement were not willing or prepared to evict protestors. Rather, they were focused on containing the protests and accommodating protestors as much as possible, as reflected by their actions during this period. On August 11, Sheriff Kirchmeier told protestors that they could protest in certain areas (including the ditch along the public highway) that did not block entrances to private property; he testified that he wanted to encourage people to exercise their First Amendment rights so long as it was not

interfering with other people. FoF [¶91], [¶101]. On August 12, Sheriff Kirchmeier spoke with protestors about giving them an opportunity to protest without disrupting the pipeline construction activities, testifying that the situation with protestors was "all pretty good" as of that point. FoF [¶92][¶93]. On August 16, Sheriff Kirchmeier gave a quote to the *Bismarck Tribune*, discussing options for deescalating the protests, including giving protestors more land, more comfort, room for tents, water, and a dumpster. FoF [¶100]. That same day, Sheriff Kirchmeier met with Standing Rock Sioux Tribe members about how to deescalate tensions, talking about options such as giving protestors more land, comfort, and amenities. *Id.* From approximately August 19 through 22, the North Dakota Department of Health was providing a first aid station, potable water, and other assets on-site at the protest camps.

[¶449] Removing hundreds of protestors would have required hundreds, if not thousands, of law enforcement officers. For example, the Big Push operation on October 27, 2016—which moved just 300-360 protestors two miles south, from the North Camp on private and State property to the Main Camp on Corps land—took 400-500 law enforcement officers an entire day and stretched law enforcement's resources to their limit. *See* FoF [¶355]; *see also id.* (at video timestamp 0:29-0:34, a police officer tells protestor Chase Iron Eyes that "when you got 50 [protestors] up there, that means we have to come with over 100 [law enforcement officers]"). The evidence did not show that State and local law enforcement had the ability to muster a force of that size at any point in mid-August 2016. *See* FoF [¶353], [¶357]. And State officials knew that attempting a mass eviction without sufficient manpower would have posed serious risks to officers' safety. FoF [¶356].

[¶450] The State concedes that State and local law enforcement did not have the manpower to effect a forcible removal of the protest camps as the protests began to grow and intensify in August and September 2016. *See, e.g.*, ECF No. 450-1 at p. 67 ¶ 285 ("When the protests against the DAPL

began to intensify in August 2016, North Dakota did not have the law enforcement resources necessary to address the developing situation in Morton County."); *id.* at p. 68 ¶ 291 ("As the DAPL Protests continued to grow in August and September 2016, North Dakota's law enforcement resources were not sufficient to protect the safety of the citizens of North Dakota, their property, or ensure that public order could be maintained."); *see also* FoF [¶353]-[¶366] (discussing evidence of State's lack of sufficient manpower throughout the protests).

[¶451]  In any event, the State's contention that the Corps should have sought the forcible removal of protestors at some point in mid-August 2016 cannot be the basis for liability.  As the Court held, the first of the Corps's non-discretionary acts that can form a basis for liability was not until a month later, on September 16, 2016.  *See* ECF No. 38 at pp. 16-19 ¶¶ 38, 42-45, p. 19 ¶ 45, pp. 21-22 ¶ 50.  The Corps's decisions and actions *prior* to September 16, 2016, obviously did not lead to or "proximate[ly] cause" the State's alleged harms.  *Buckler*, 919 F.3d at 1054.

[¶452]  *Second*, the State's new theory of liability—that the Corps erred by not seeking the removal of protestors in mid-August 2016—fails because there is no evidence that the State's claimed damages associated with this alleged failure resulted from the two later statements the Court identified as non-discretionary acts on which liability may be based.  This latest theory of the State's appears to rest on the Corps's law enforcement decisions, but the Court has ruled, and the State explicitly acknowledges, that the Corps's enforcement-related decisions were discretionary.  *See, e.g.*, ECF No. 38 at p. at 24 ¶ 55 ("36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protestors' conduct . . . ."); ECF No. 450-1 at p. 77 ¶ 335 (State's proposed Findings of Fact and Conclusions of Law stating that "the United States' subsequent *discretionary* actions do not remedy the Corps[s'] failure to follow its special use permitting process" (emphasis added)); *id.* at p. 79 ¶ 340 ("The Corps' subsequent

*discretionary* decisions whether or not to issue citations to DAPL Protestors, and whether or not to request that North Dakota law enforcement evict the DAPL Protestors from Corps-managed lands, and whether the Corps could have employed 'alternative management techniques' to allow DAPL Protestors to occupy Corps-manage[d] lands have no bearing on the Corps' liability." (emphasis added)); *id.* at p. 96 ¶ 403 ("[S]ubsequent *discretionary* decisions such as whether, or how, to remove the DAPL Protestors from Corps-managed land became irrelevant . . . ." (emphasis added)).

[¶453] The State's new theory—that the Corps erred in not seeking removal of protestors in mid-August 2016—is clearly based on the United States' discretionary law-enforcement decisions.  The State objects to the federal government's not providing more law enforcement resources to assist with the DAPL protests, to the Corps's decision not to issue citations to protestors for Title 36 violations, and to the Corps's decision not to ask State and local law enforcement to remove protestors from Corps land.  *See, e.g.*, *id.* at p. 2 ¶ 5 ("[T]he United States made no effort to remove the DAPL Protestors when that was a realistic option."); *id.* at pp. 58-62, 64-65 ¶¶ 237-257, 268, 270 (discussing evidence presented at trial regarding the federal government's lack of law enforcement assistance, the Corps not asking law enforcement to engage in a full-scale clearing of the camps, and the Corps not writing citations for Title 36 violations); *id.* at pp. 84-85, ¶ 362 ("[T]he United States itself could have cleared the DAPL Protests [sic] camps by issuing an order closing all Corps-managed lands, but the Corps never did so."); *id.* at p. 85 ¶ 363 ("The Corps . . . had the ability to control the conduct of the DAPL Protestors through the Corps Title 36 enforcement powers, but again the Corps declined to exercise that available control option."); *id.* at p. 95 ¶ 398 ("[T]he United States wholly failed to provide *any* sort of a law enforcement response to the DAPL Protests, implicitly supporting the DAPL Protestors while denying North Dakota the resources it needed to address the unlawful DAPL Protest situation.") (emphasis in original)).  The evidence at

171

trial made clear that, while the federal government did exercise its discretion to provide law enforcement assistance in a variety of ways, *see* FoF [¶305]-[¶332], the State's primary complaint was that the United States did not provide *as much* federal law enforcement assistance as the State wanted in response to the protests, *see* FoF [¶333]-[¶334], [¶363].

[¶454] *The State's other theories of liability are similarly based upon discretionary decisions*.  The State also seems to suggest two other theories to support its claim, in addition to federal officials' discretionary enforcement decisions—one based on the Assistant Secretary of the Army's decision to delay the decision on the pipeline easement, and another based on actions President Obama took during the protests.  The discretionary function exception bars the State from recovering on both theories.

[¶455] *First*, the State seems to suggest that liability can be based on the Assistant Secretary of the Army's decision to delay the decision on the pipeline easement.  *See, e.g.*, ECF No. 450-1 at pp. 23-25 ¶¶ 90-97 (discussing the joint statement by the Departments of the Army, Justice, and Interior dated September 9, 2016, which announced that the Army would not authorize construction of the pipeline on Corps land until the Army determined whether it needed to reconsider its previous decisions permitting the pipeline's crossing); *id.* at pp. 93-95 ¶ 393 (discussing testimony of State's expert that the September 9 joint statement could be viewed as supporting protestors' cause); *id.* at pp. 37-38 ¶¶ 142-43 (discussing the October 10, 2016, joint statement by the same three federal agencies, which requested the pipeline company voluntarily pause construction activity within 20 miles of Lake Oahe and local law enforcement's reaction that joint statement); *id.* at p. 49 ¶ 190 (discussing request from North Dakota's congressional delegation that the Corps act on the pipeline easement and provide federal law enforcement resources), pp. 51-53 ¶ 203 (citing LTG Semonite's assessment that protest activity would continue at the status quo until there was a decision on the

DAPL easement); *id.* at pp. 52-53 ¶¶ 207-211 (discussing the December 4, 2016, announcement by the Assistant Secretary of the Army that the easement for the pipeline would not be approved and its impact on protestors and State and local law enforcement); *id.* at p. 95 ¶ 397 (stating that the October 10 joint statement by the Departments of the Army, Justice, and Interior and the December 4 statement that the easement would not be approved "encouraged and supported the DAPL Protestors").

[¶456] The decision by the Assistant Secretary of the Army for Civil Works to seek additional analysis and delay a final decision on the easement for the pipeline to cross Lake Oahe was discretionary. As to the first prong of the discretionary function analysis, the Army and the Corps were not under an obligation to issue an easement for the pipeline, so the Assistant Secretary's decision necessarily involved "an element of judgment or choice." *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013). As to the second prong, the Army's decision on the pipeline easement was susceptible to a public policy analysis and was therefore the type of judgment the discretionary function exception was intended to shield from judicial review. *See Berkovitz*, 486 U.S. at 536; *Herden*, 726 F.3d at 1047. It therefore cannot form the basis for the United States' liability. *See* 28 U.S.C. § 2680(a).

[¶457] Additionally, the decision to delay the pipeline easement was not made by Corps officials. *See* FoF [¶13], [¶68], [¶73]. For that reason, too, this decision cannot be a basis upon which liability can be imposed, as discussed in Section I.A.ii above.

[¶458] *Second*, the State contended at trial that "the United States' conduct with regard to the protests flowed from the executive office of the President of the United States." Tr. 15:15-17 (Day 1; State's opening statement). The State also offered evidence about public comments then-President Obama made about the DAPL protests and the pipeline in fall of 2016. *See, e.g.*, PX 1084

and ECF No. 405-4, Dep. Tr. 157:21-158:17, 159:17-160:6 (Jewell); Tr. 143:2-144:3 (Day 1; Schulz); Tr. 394:19-24 (Day 3; Kirchmeier); Tr. 1809:2-25 (Day 11; Kuhlman); PX 1280 and Tr. 1943:5-1949:17 (Day 12; Spellmon); Tr. 2974:8-2975:11 (Day 18; Warner).  But the State has not shown the FTCA permits the Court to impose liability on the United States for those statements, which are entirely discretionary.

[¶459]  "The President possesses 'extraordinary power to speak to his fellow citizens and on their behalf.'"  *Trump v. United States*, 603 U.S. __, 144 S. Ct. 2312, 2339 (quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)).  And "[a]s the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life."  *Id.* at 2339-40.  Given this discretion, the actions and statements of the President relating to the protests cannot serve as a basis for liability, and any claim the State asserts based on those actions is barred by the discretionary function exception.

*        *        *

[¶460]  Unlike the plaintiffs *Appley Brothers*, the State has not shown that the relevant acts here—the Corps's September 16 and November 25 statements, and the fact that the Special Use Permit was never finalized—deprived the agency of any further discretion as to how to proceed.  To the contrary, the Corps retained extensive discretion on how to proceed even after those statements were issued.  *See* FoF [¶54] (when members of the public enter Corps land without authorization, Corps officials exercise their best judgment and consider the tools at their disposal in determining how to respond); FoF [¶56] (Corps officials are never required to seek removal of people on Corps land for not complying with the terms of a Special Use Permit); FoF [¶57], [¶60] (Corps officials can use alternative management techniques in response to people using Corps land); FoF [¶59] (the

174

District Commander may close Corps land as necessary for the public interest, but he is under no mandatory obligation to do so). And the evidence—including all of the testimony from protestors themselves—points to the fact that no statement of the Corps, or permission or lack thereof from the Corps, made any material difference in the protest situation on the ground. *See* FoF [¶269]-[¶275]. In other words, the State has not met its burden to show that its claims were not caused by (are not "based upon") a discretionary act by the Corps. *See* 28 U.S.C. § 2680(a).

[¶461] Because the State's claims (and its alleged damages) are not "based upon" a non-discretionary function, the Court lacks jurisdiction under the FTCA and cannot find the United States liable.

### v.    The United States Cannot be Held Liable for Misrepresentations

[¶462] Setting aside the State's claims about discretionary enforcement decisions and the decision about the pipeline easement, *see* Section I.A.iv, *supra*, what remains is the State's argument that the Corps violated its non-discretionary permit regulations when it inaccurately stated that a Special Use Permit had been granted. The State contends that the Corps violated its permitting regulations by "falsely announcing or implying that a Special Use Permit had been issued when no such permit had been issued," and that the Corps "never corrected these announcements," which the State claims were "de facto violations of the Corps Special Use Permit process." ECF No. 450-1 at p. 77 ¶ 335; *see id.* at p. 93 ¶ 390 (arguing that these statements by the Corps were false and thus violated the permitting process); *id.* at p. 100 ¶ 418 (same); *id.* at p. 104 ¶ 434 (arguing that failing to correct the false statement violated the permitting process).

[¶463] A claim premised on false statements, or the failure to correct false statements, is barred by the FTCA's misrepresentation exception. The FTCA does not waive sovereign immunity for "[a]ny claim arising out of . . . misrepresentation . . . ." 28 U.S.C. § 2680(h). "[T]he essence of an action

for misrepresentation . . . is the communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). The intent of the misrepresentation exception is "to except from the [FTCA] cases where mere 'talk' or failure to 'talk' on the part of a government employee is asserted as the proximate cause of damage sought to be recovered from the United States." *National Mfg. Co. v. United States*, 210 F.2d 263, 276 (8th Cir. 1954). The Eighth Circuit has held that "misrepresentation" has a broad meaning: "[t]o misrepresent means to give a false, improper or imperfect representation." (internal quotations omitted). *Id.* at 275.

[¶464] The exception applies even if the claim is based on an erroneous representation, even if the error was not intentional. *Block,* 460 U.S. at 296-97 (holding that the exception applied to a claim based on an "erroneous appraisal," as "the alleged conduct that was the basis" of the claim "was in essence a negligent misrepresentation"). The FTCA's misrepresentation exception thus encompasses negligent misstatements, as well as omissions. *See United States v. Neustadt*, 366 U.S. 696, 702-03 (1961); *Green v. United States*, 629 F.2d 581, 584 (9th Cir. 1980) (collecting cases). In *Neustadt*, the plaintiffs claimed that the Federal Housing Administration negligently performed an inspection and appraisal of a property, that the plaintiffs received a statement reporting the results of the inspection and appraisal, and that in reliance on that statement they overpaid for the property. *See id.* at 696-701. The Supreme Court rejected the Court of Appeals' reasoning that an FTCA claim could be maintained based on the underlying alleged negligence, holding that the plaintiffs' claim arose out of a misrepresentation and was therefore not actionable. *See id.* at 704-06, 711; *cf. Appley Bros.*, 7 F.3d at 728 (holding that the misrepresentation exception did not apply where the plaintiffs' claim did "not depend on the transmission of erroneous information as an essential element").

[¶465] The misrepresentation exception applies even where federal employees are under a specific

176

statutory or regulatory duty to provide information. *See Neustadt*, 366 U.S. at 710-11; *National Mfg. Co.*, 210 F.2d at 269, 275-76.

[¶466] The misrepresentation exception has been applied in numerous contexts. *See, e.g.*, *Tompkins v. United States*, No. 8:21-cv-2286-TPB-CPT, 2022 WL 1155294, at *3 (M.D. Fla. Apr. 19, 2022) (collecting cases). In particular, the exception has been held to bar claims alleging damages associated with injuries to persons or property. *See, e.g.*, *National Mfg. Co.*, 210 F.2d at 266-67, 275-76 (misrepresentation exception barred recovery for flood damage to property resulting from reliance on inaccurate information about the course and action of the flood waters of the Kansas River disseminated by federal officials); *Hamre v. United States*, 799 F.2d 455, 456 (8th Cir. 1986) (misrepresentation exception barred recovery for injuries to homeowners' property and children's illness resulting from presence of bats in the home, which was not disclosed in the government's appraisal); *Tompkins*, 2022 WL 1155294, at *1, *3 (misrepresentation exception barred recovery for lasting injuries suffered by a VA-contracted home health aide who had a severe allergic reaction to cats at her place of work, after erroneously being told the cats were hypoallergenic); *Diaz Castro v. United States*, 451 F. Supp. 959, 960, 962-63 (D.P.R. 1978) (misrepresentation exception barred recovery for injuries a police officer suffered when he was shot by a prisoner whom government employees had assured him was sedated and not dangerous); *Vaughn v. United States*, 259 F. Supp. 286, 286, 289 (N.D. Miss. 1966) (citing *Neustadt* and holding that the misrepresentation exception barred recovery for personal injury resulting from an explosion allegedly caused by reliance on a government map that did not show the correct placement of a gas pipeline).

[¶467] Courts must examine the substance of the claim at issue to determine whether the claim is one "arising out of" an alleged misrepresentation. *See, e.g.*, *Neustadt*, 366 U.S. at 703 (courts must

look "beyond the literal meaning of the language to ascertain the real cause of complaint");

*Omnipol, A.S. v. Multinational Defense Servs., LLC*, 32 F.4th 1298, 1306 (11th Cir. 2022) ("[I]t is the substance of the claim and not the language used in stating it which controls. . . . A plaintiff cannot, therefore, circumvent the misrepresentation exception simply through artful pleading of its claims." (citations and internal quotations omitted)). For example, in *Hamre*, the plaintiffs argued their claim was based on simple state-law negligence, and not on the appraiser's misrepresentation. *See* 799 F.2d at 456. But the Eighth Circuit held that the misrepresentation exception barred the plaintiffs' claim because the property defect was present before the government's appraisal, but the proximate cause of plaintiffs' injury was their reliance on representations made by the government appraiser about the property. *See id.* at 457. In *Preston v. United States*, the plaintiffs claimed they were induced to store grain at a facility based on a federal agency's approval of that facility, though in fact the facility was in dire financial straits and eventually sold off grain belonging to the farmers that it was not entitled to sell. 596 F.2d 232, 234-36 (7th Cir. 1979). Holding that the FTCA's misrepresentation exception barred plaintiffs' claim, the Seventh Circuit emphasized the need to "look[] behind the plaintiff's characterization" of its claim to see if what the plaintiff is actually complaining about is "an implied misrepresentation." *Id.* at 237-38.

[¶468] Here, the Court previously identified two non-discretionary acts that can be the source of liability: the issuance of a September 16, 2016, press release regarding the issuance of a Special Use Permit, and the November 25, 2016, letter COL Henderson wrote to tribal leadership closing Corps land to the north of the Cannonball River and establishing a free speech zone in the area to the south of the river. *See* ECF No. 38 at 19 ¶ 45, 21-22 ¶ 50.

[¶469] The first of these statements, the September 16 press release, inaccurately stated that the Standing Rock Sioux Tribe had been "granted" a Special Use Permit. *See* FoF [¶142], [¶145]. In

fact, the Corps had *offered* the Tribe a Special Use Permit, but the Tribe did not complete the requirements for the permit, so no valid Special Use Permit was ever in place. *See* FoF [¶145].

[¶470] The Court previously mentioned the misrepresentation exception but did not analyze its application in detail, stating in its ruling on the motion to dismiss that "the announcements by the Corps were written permissions or permits and were not misrepresentations." ECF No. 38 at 4 n.1. The Court did not have the benefit of briefing on the application of the misrepresentation exception, nor of the fulsome evidentiary record that was developed at trial. Reconsideration of this issue is warranted, particularly given that the issue implicates the Court's subject-matter jurisdiction. *See, e.g.*, *Auer*, 902 F.3d at 877 (federal courts have an "obligation" to satisfy themselves that jurisdiction exists); *U.S. Express Lines Ltd.*, 281 F.3d at 388-89 (that obligation exists "at all stages of the litigation").

[¶471] Examining the substance of the State's claims leads to the conclusion that—to the extent the State's claims do not arise out of the federal government's discretionary decisions in connection with the DAPL protests, as discussed in Section I.A.iv above—they arise from misrepresentations.

[¶472] The State has repeatedly made clear that its claims arise from misrepresentations. For example, the State argued in its motion for partial summary judgment that "[t]he United States violated its mandatory special use permitting process-related duties" by "represent[ing] to the public that an effective SUP had been granted" and "never correcting that mis-representation." ECF No. 352 at 39-40; *see* ECF No. 373 at 8 (State's reply in support of its motion for partial summary judgment, arguing the Corps "attempted to circumvent . . . mandatory procedures when it issued the September 16, 2016, press release, which falsely stated that the Corps had granted a special use permit to the Standing Rock Sioux Tribe 'SRST' and thus implicitly and unlawfully allowed the occupation . . . .").

[¶473]  At trial, too, the State emphasized its theory is that the Corps violated permitting regulations by falsely announcing that a Special Use Permit had been granted.  The State argued that "[r]ather than removing the 'trespassing protestors,' eventually the Corps decided to [publicly] announce that it granted a Special Use Permit to allow some of the protestors to remain.  We, of course, know, and the Court has already ruled, that there was never a Special Use Permit."  Tr. 23:6-10 (Day 1; State's opening statement); *see id.* at 15:20-24 (emphasizing that the Corps "never attempted to correct" the "claim[] that a Special Use Permit had been granted to allow the DAPL protestors to occupy federal lands managed by the Army Corps of Engineers"); *id.* at 23:16-18 ("[T]he Corps compounded the problem by failing to . . . correct their incorrect press release that a Special Use Permit had been issued.").  The State made clear that its claims are based on various statements by Corps and other federal agencies that constituted a breach of the duty to exercise reasonable care.  *See* Tr. 2156:13-2157:14 (Day 14; State's argument on United States' Rule 52(c) motion) (identifying various public statements by the Corps and other agencies and arguing that the Corps did not exercise reasonable care because it "never corrected any of these incorrect public-facing statements, instead holding out to the public for the duration of the entire DAPL protest that the protestors had a valid Special Use Permit on Corps-managed land"); *id.* at 2159:7-8, 10-17 (arguing that the Corps "consented to the creation of the public nuisance" by making and "never correct[ing] public-facing statements" about granting a Special Use Permit).

[¶474]  In its post-trial brief, the State relies on the same theory.  *See, e.g.*, ECF No. 450-1 at p. 76 ¶ 333 (State's proposed Findings of Fact and Conclusions of law stating that "despite . . . not having a completed Special Use Permit, including no required insurance or signature, the Corps issued the Sept. 16 Press Release stating it had, in fact, issued a Special Use Permit"); *id.* at p. 93 ¶ 390 ("When the Corps never received a signed or effective Special Use Permit back from the

Standing Rock Sioux Tribe, it abandoned the special use permitting process and instead falsely announced the Corps had granted a Special Use Permit to the DAPL Protestors in violation of its non-discretionary and mandatory special use permitting procedures."); *id.* at pp. 100-01 ¶ 418 ("[T]he Corps, not only negligently failed to follow the mandatory special use permitting process in light of clearly foreseeable harm that would fall on North Dakota, but instead actively and negligently subverted that mandatory special use permitting process by falsely claiming it had granted a Special Use Permit to the DAPL Protestors and then . . . never revoking it's [sic] the Sept. 16 Press Release and instead issuing continual statements that supported the DAPL Protestors['] goals . . . ."); *id.* at p. 104 ¶¶ 434-435 ("The Corps further violated its non-discretionary special use permitting process by falsely issuing the Sept. 16 Press Release that stated a special use permit had been granted to the DAPL protestors . . . .  The Corps further violated its non-discretionary special use permitting process by failing to ever correct the Sept. 16 Press Release.").

[¶475] The State's theory primarily centers on the September 16 press release that inaccurately stated a Special Use Permit had been granted.  Additionally, the State suggests that COL Henderson's November 25 letter to tribal leaders, and another statement in November 2016 that Faith Spotted Eagle had permission to go on Corps land despite the fact she did not have a finalized Special Use Permit, were false statements for which liability can be imposed.[7]  The State argues that these three statements "falsely announc[ed] or impl[ied] that a Special Use Permit had been issued when no such permit had been issued."  ECF No. 450-1 at p. 77 ¶ 335.  The State further argues that the Corps erred by "never correct[ing] these false announcements, which were de facto violations of the Corps Special Use Permit process."  *Id.*  The State's theory of liability turns on the

---

[7] The Court did not identify the statement that Faith Spotted Eagle had permission to go on Corps land as a non-discretionary act on which liability could be based in its Order on the United States' motion to dismiss.  *See generally* ECF No. 38.

statements the Corps made about the existence of a Special Use Permit and the impact those statements had on protestors (allegedly encouraging and enabling them to participate in the protests). *See id.* at p. 77 ¶ 335, pp. 100-01 ¶ 418.

[¶476] To the extent the State's claims are not based on discretionary acts, they are based on the false statement that the Corps had been granted a Special Use Permit. That is, the State alleges the Corps made statements that communicated "misinformation" on which protestors relied. *Block*, 460 U.S. at 296. The FTCA does not waive the United States' sovereign immunity for claims such as this that arise out of misrepresentations. *See* 28 U.S.C. § 2680(h). The Court therefore lacks jurisdiction to impose liability on the United States.

### vi. The United States May Be Held Liable Only to the Extent a Private Party Would Be Liable Under North Dakota Law

[¶477] The United States may be held liable for the negligent or wrongful acts or omissions of its employees only to the extent a private party "would be liable to the claimant" under state tort law in the same circumstances. 28 U.S.C. § 1346(b)(1); *see id.* § 2674. If a private person acting in similar circumstances would not be liable to the State under North Dakota law for the harm the State alleges, then there is no private analog, the FTCA does not waive the United States' sovereign immunity, and the Court lacks jurisdiction. *See Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (citing 28 U.S.C. § 1346(b)(1)).

[¶478] Even if there is a *federally* imposed duty of some kind, that alone does not form the basis of an actionable duty under *state* tort law. *See Klett v. Pim*, 965 F.2d 587, 589 (8th Cir. 1992) ("Federally imposed obligations, whether general or specific, are irrelevant to our inquiry under the FTCA, unless state law imposes a similar obligation upon private persons." (citation omitted)).

[¶479] The Court has previously held that the Corps violated a non-discretionary federal duty in "forego[ing]" or "circumvent[ing]" the Corps's Special Use Permit process and "issu[ing] a de facto

permit to the protestors." ECF No. 38 at p. 19 ¶ 45; *see also, e.g.*, ECF No. 1 at pp. 2-3 ¶¶ 5-8, p. 36 ¶¶ 110-12, p. 37 ¶¶ 116-17, p. 39 ¶¶ 125-27, p. 40 ¶¶ 130-32 (Complaint alleging the Corps "did not fulfill its mandatory obligations set forth in regulations at 36 C.F.R. Part 327 that require USACE to issue and enforce use permits that persons must have to conduct organized activities on federal lands" and that this alleged failure "directly led" to the State's claims and caused its damages); ECF No. 450-1 at p. 93 ¶¶ 390-91, p. 96 ¶ 403, p. 101 ¶ 419, p. 102 ¶ 424 (State's proposed Findings of Fact and Conclusions of law, arguing that "the United States liability stems from the Corps failure to follow its mandatory, non-discretionary special use permitting process"). But that determination of the federal duty is distinct from the determination the Court must make about the state-law duty—that is, when a private party (*i.e.*, a landowner) would be liable to the State under North Dakota law under the same circumstances.

[¶480] In this analysis of a state law analogue, the Corps's authorities to enforce federal law or regulatory violations is irrelevant, because a private party cannot enforce such laws or regulations. While State and local law enforcement have jurisdiction to enforce state and local laws on Corps land, *see* FoF [¶19], [¶39], [¶339], Corps officials alone have the authority to enforce the Corps's Title 36 regulations, through the issuance of Special Use Permits and citations and the use of other tools at their disposal, *see* FoF [¶16], [¶18]. The Corps's decisions as to how to effectuate its Title 36 authority do not have an analog under North Dakota law—that is, there is no state-law duty for a private landowner to follow Special Use Permitting regulations. *See Barnes*, 448 F.3d at 1066-67 (finding no private analog to support liability under the FTCA where there was a *federal* duty to follow inspection standards set by the federal agency's administrator, but state law set no corresponding duty "to inspect and advise"); *cf. Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 857 (8th Cir. 2005) (holding that because "the Corps alone has the authority to enforce

the Clean Water Act and to make permit decisions" under that Act, "no private analogue exists," and the FTCA's waiver of sovereign immunity did not apply).

[¶481]  Because a private party would not be liable under North Dakota law for failing to effectuate and enforce the Corps's Title 36 regulations, no private-party tort-law analog exists for that failure, and the FTCA's waiver of sovereign immunity does not apply to claims arising from those actions.[8]

### vii.   The FTCA Limits Any Recovery by the State to Damages for Injury or Loss of Property

[¶482]  In the FTCA, Congress waived the United States' sovereign immunity in certain circumstances, for particular types of damages only.  The statute permits "claims against the United States, *for money damages . . . for injury or loss of property, or personal injury or death*."  28 U.S.C. § 1346(b)(1) (emphasis added).

[¶483]  Here, the State seeks damages for the money it spent on law enforcement payroll, travel, and equipment, as well as prejudgment interest on loans from the Bank of North Dakota to fund those expenditures.  *See* [¶367].  Aside from the prejudgment interest—which the State is not entitled to recover, as discussed in Section II.E.vii, *infra*—all of the State's claimed damages are made up of these "emergency-response costs."

[¶484]  The United States has previously argued that the State's emergency-response costs do not constitute "money damages" for "injury or loss of property," such that they can be compensable under the FTCA.  *See* ECF Nos. 63-64, 91.  The Court rejected this argument, observing that the State had alleged property damage at the DAPL protest sites that "necessitated North Dakota's emergency response, which included taking out the loan from the State-owned Bank of North Dakota."  ECF No. 106 at 8-9, ¶ 24; *see id.* at 4-15.  The Court now reconsiders that conclusion in

---

[8]  The asserted state-law duty for other actions of Corps officials—such as a duty to ask law enforcement to forcibly remove all protestors from Corps land—is addressed in Section II.B, *infra*.

light of the trial record, and particularly in light of the fact that the State's damages calculation and supporting documentation presented at trial include *only* damages for emergency-response costs and *no* specific evidence of damages in the form of cleanup costs or other property damage, *see* FoF [¶367], as discussed in further detail below.

[¶485] The State has organized its damages into the following categories:

    a.  Payroll: $6,422,757.05;

    b.  Travel: $2,799,478.47;

    c.  Equipment/Supplies/Materials (Department of Emergency Services & the North Dakota National Guard): $3,201,650.75;

    d.  EMAC States: $4,045,088.39;

    e.  North Dakota Mutual Aid: $12,385,795.98;

    f.  State Agencies Assistance: $8,348,350.31; and

    g.  Interest Accrued: $651,746.30.

ECF No. 450-1 at p. 74 ¶ 325; *see also id.* at pp. 70-72 ¶¶ 298-312. The State's total damages claim is $37,854,867.30. *See id.* at p. 74 ¶ 325, p. 106 ¶¶ 451-452.

[¶486] The State's damages expert testified the State is not seeking to recover any expense meant to compensate for personal injury to any human being or for loss of property. Tr. 1760:1-11 (Day 10; Tolstad). Nonetheless, the State has suggested its damages claim includes "property damage." *See* Tr. 26:22-23 (Day 1; State's opening statement) (stating that the State's damages include "repair costs for property damage caused by the protestors"); Tr. 2161:3-4 (Day 14; State's response to United States' Rule 52(c) motion) (same). But the State has adduced no evidence as to the nature of any alleged damage to State property, how it was caused, or the associated amount of economic damages specific to purported "property damage." Moreover, none of the damages categories

identified by the State appear to pertain to remediation of or compensation for damage to property, and the State has provided the Court no guidance with how to locate any such line items in its voluminous damages documentation summary spreadsheet, PX 1455. A review of the descriptions of expenditures included in the spreadsheet, as well as several individual exemplar line items, did not suggest that the spreadsheet includes expenditures relating to anything other than emergency-response costs. The State has not established any damages associated with "property damage." *See* North Dakota Jury Instructions – Civil, § C - 70.06 - Burden of Proving Damages 2004 (2023 ed.) ("The burden rests upon the [Plaintiff] . . . to prove the elements of damages, if any, by the greater weight of the evidence.").

[¶487] The State further suggests its damages claim includes amounts it spent on "cleanup costs." Tr. 27:4-5 (Day 1; State's opening statement); Tr. 2161:12-13 (Day 14; State's response to United States' Rule 52(c) motion). This presumably refers to the approximately $430,000 total that Morton County paid to two contractors to clean up the areas of the Main Camp and the North Camp after protestors were cleared from the area. *See* FoF [¶228].

[¶488] Again, the State's evidence to support these purported "cleanup costs" damages is lacking. *See* North Dakota Jury Instructions – Civil, § C - 70.06 - Burden of Proving Damages 2004. The State has not adduced evidence that would permit the Court to determine whether—or how much— it is entitled to recover in cleanup costs. The State did not offer any evidence identifying how much of the $430,000 was spent cleaning the Main Camp on Corps land, as opposed to the North Camp on private- and State-owned land. *See* FoF [¶226]-[¶228]. Nor did the State provide invoices or any supporting documentation showing the amounts paid or enabling the Court to assess their reasonableness. (The State's summary of damages expenditures, PX 1455, does not include any line items referencing either of the contractors Morton County hired—Dakota Sanitation and Peanut

Pie—nor any line items with the amounts corresponding to the amounts Morton County Commission Chairman Schulz testified the contractors were paid, *see* FoF [¶228].)

[¶489] Further, the State did not prove it was necessary for the State to conduct the cleanup of the Main Camp on Corps land, when the Corps was prepared to complete that cleanup itself and had a contractor lined up to do so as of at least February 23, 2017. *See* FoF [¶224]. While the State has suggested that time was of the essence given the impending spring flooding, and that State officials simply did not think the Corps could get the cleanup done quickly, such an argument is mere conjecture, as the State did not establish the reasonableness of its belief that the Corps wouldn't move quickly enough, nor how delayed the State thought the Corps would be, nor whether that amount of delay would have made any difference. *See* FoF [¶225]. The State thus has not proved that it (instead of the Corps) was required to handle the cleanup as the result of any negligent, non-discretionary delay by the Corps in cleaning up after the protestors were removed.

[¶490] The State also cannot assert that it is entitled to recover the approximately $430,000 in cleanup costs *on top of* the emergency-response and prejudgment interest amounts that make up the $37,854,867.25 total it claims in damages, because that would run afoul of the FTCA's sum certain requirement. The FTCA bars a plaintiff from recovering in an FTCA action more than the sum-certain amount that was listed in the administrative tort claim presented to the relevant federal agency. *See* 28 U.S.C. § 2675(b). Here, the State's administrative claim listed a sum certain of $38,005,071.66. *See* FoF [¶395]. The State now seeks $37,854,867.30 total in damages; adding the approximately $430,000 in cleanup costs to that amount would put the total above the sum-certain listed in the State's administrative tort claim. *See* FoF [¶367].

[¶491] The Court thus cannot find that the State has established by a preponderance of the evidence that it is entitled to recover damages for its costs in cleaning up protest encampment areas.

## B. Article III Standing

[¶492] Article III of the Constitution confines the federal courts' jurisdiction to "Cases" and "Controversies." Under Article III, a case or controversy exists only if the plaintiff has standing to sue. *E.g.*, *United States v. Texas*, 599 U.S. 670, 675 (2023). The burden rests with the plaintiff to show "an injury in fact caused by the defendant and redressable by a court order." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). While monetary costs are an injury, they are not necessarily a "legally and judicially cognizable" one. *Id.* (citation omitted).

### i. The State Lacks Standing to Challenge the United States' Law Enforcement Decisions

[¶493] As reflected in the Complaint, the State's claims in this case rest on the theory that the State suffered harm due to the federal government's failure to enforce the law, specifically by not forcibly evicting protestors from Corps land or deploying more federal law enforcement personnel to the area. *See, e.g.*, ECF No. 1 ¶ 6 (Complaint alleging that the Corps's conduct, "which included outright abdication of federal law enforcement responsibility," caused the State to incur the damages sought in this litigation); *id.* ¶ 7 ("As a result of [the Corps's] failure to remove or control the trespassers and enforce the law, North Dakota was obligated to step in to protect public safety and provide necessary law enforcement, sanitation services, and first responder services, resulting in the significant costs and damages incurred by North Dakota); *id.* ¶ 13 (discussing the Corps's alleged "abdication of the responsibility it undertook to maintain public safety at the protest site"); *id.* ¶ 14 ("Because of [the Corps's] overwhelming failure to fulfill its legal obligations to enforce the law and protect public safety and the environment on federal land, North Dakota was required to mobilize its resources . . . ."); *id.* ¶ 36 (alleging protestors used Corps land "as a safe haven due to the failure of the [Corps] to enforce the law"); *id.* ¶ 38 (alleging the Corps has "a legal responsibility, and specific mandatory legal duties, to enforce the law, protect public safety and the

environment, and maintain public order on these public lands"); *id.* ¶ 78 (alleging the Corps "abdicated its responsibility to prevent and then close the illegal encampments on federal land, and otherwise to enforce law and order"); *id.* ¶ 107 ("North Dakota incurred $38,005,071.66 that it was forced to expend due to the federal government's refusal to enforce the law, prevent illegal conduct that was openly conducted on and from federal property, and respond for over eight months to an increasingly dangerous emergency."); *id.* ¶ 117 (alleging the Corps "continued to negligently breach its duty every day that it stood by while trespassers brazenly and openly violated federal law that USACE was responsible to enforce").

[¶494] The State advanced the same theory—that its harm resulted from federal decisions about enforcing the law—at trial and in its proposed Findings of Fact and Conclusions of Law.  *See* FoF [¶333] (discussing evidence that the federal government did not provide all of the law enforcement resources that the State wanted); FoF [¶362]-[¶363] (discussing evidence that, throughout the protests, State officials repeatedly expressed that they viewed the protests as a problem for federal law enforcement to solve, and that the State wanted the federal government to deploy law enforcement resources to the protests to do so); ECF No. 450-1 at p. 2 ¶ 5, pp. 64-65 ¶¶ 269, 271,  p. 84 ¶ 361, p. 96 ¶ 404 (asserting the Corps erred by not seeking removal of protestors in mid-August 2016); *id.* at pp. 58-62, 64-65 ¶¶ 237-257, 268, 270, pp. 84-85, ¶ 362, p. 95 ¶ 398 (discussing evidence presented at trial regarding the federal government's lack of law enforcement assistance, the Corps not asking law enforcement to engage in a full-scale clearing of the camps, the Corps not writing citations for Title 36 violations, and the Corps not closing all of its land to protestors).

[¶495]  In *United States v. Texas*, the Supreme Court held that federal district courts lack jurisdiction over claims by a state against the federal government challenging how the federal government chose

to enforce the law.  *See* 599 U.S. 670 (2023).  In that case, two states claimed that the Department of Homeland Security violated federal statutes stating that it "shall" arrest certain noncitizens, and that DHS's failure to strictly enforce those laws imposed costs on them since they needed to incarcerate or supply services to noncitizens.  *Id.* at 674.

[¶496] The Supreme Court held that Article III bars district courts from exercising jurisdiction over claims by states amount to challenges to federal discretion in enforcing the law.  *See id.* at 686.  The Court pointed to a host of reasons that barred Article III district courts from exercising jurisdiction over such claims, which it explained amounted to challenges to federal enforcement decisions about whether to pursue arrest and prosecution.  *See id.* at 675-85.  The Court explained that such claims "run up against the Executive's Article II authority to enforce federal law."  *Id.* at 678.  It further explained that "bedrock Article III constraints" bar states from relying on the "indirect effects on . . . state spending" to challenge federal enforcement decisions.  *Id.* at 680 n.3 (citing cases and noting that "this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions").  The Court also explained  id. at 1972 n.3, that "courts lack meaningful standards" for assessing enforcement choices the federal government must make in light of "resource constraints and regularly changing public-safety and public-welfare needs."  *Id.* at 679-78.  Finally, the Court explained that exercising jurisdiction over such claims would improperly permit similar challenges to "Executive Branch under-enforcement" of other laws.  *Id.* at 681.

[¶497] These principles bar this Court from exercising jurisdiction over the State's claims here.  As in the *Texas* case, the State here seeks to rely on the indirect effects of federal enforcement decisions on state spending as a basis to challenge the federal government's decisions about enforcing federal law against the protestors.  *See* ECF No. 450-1 at p. 2 ¶ 5, pp. 58-62, 64-65 ¶¶ 237-257, 268, 270,

pp. 64-65 ¶¶ 269, 271, p. 84 ¶ 361, p. 96 ¶ 404 (discussing evidence presented at trial regarding the lack of federal law enforcement assistance, the Corps not asking law enforcement to engage in a full-scale clearing of the camps, and the Corps not writing citations for Title 36 violations); FoF [¶367] (the State is seeking to recover its protest-response costs as damages). The Supreme Court has held that such a case cannot proceed. Accordingly, even if the FTCA did waive sovereign immunity for the State's claims, Article III bars the Court from hearing such claims.

### ii. The State Lacks Standing to Sue the United States in a *Parens Patriae* Capacity to Recover for Any Harms to the State's Citizens

[¶498] The State has suggested that it is bringing this suit not only to recover for injuries to the State itself, but also in a *parens patriae* capacity, on behalf of the citizens of North Dakota. *See* ECF No. 78 at 23 n.6 (State's brief in response to the United States' motion for partial summary judgment stating that "North Dakota brought this FTCA action to protect its citizens['] interests as *parens patriae*"); *see also* ECF No. 450-1 at p. 63 ¶ 258 (State's proposed Findings of Fact and Conclusions of Law discussing the impact of the DAPL protests on North Dakota citizens); *id.* at 89-92 (arguing that the State can recover for acts that impacted land adjacent to the Corps's land); ECF No. 1 ¶¶ 7, 14-15, 107 (confirming the State brings this suit as a sovereign governmental entity to recover protest-response costs, and not as a landowner itself).

[¶499] A state cannot assert standing to sue the United States as a third party on behalf of the state's citizens, who are also citizens of the United States. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1996-97 (2024) (citing *Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023)) ("States do not have 'standing as *parens patriae* to bring an action against the Federal Government.'" (quoting *Brackeen*, 599 U.S. at 295). "[I]t is the United States, and not the state, which represents [citizens] as parens patriae, when such representation becomes appropriate." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923). Thus, the State lacks standing to seek recovery in a *parens patriae* capacity from the

United States for any harms allegedly caused to the citizens of North Dakota.

## C.  Political Question Doctrine

[¶500] As discussed above, the State has suggested its claims go beyond the two purportedly non-discretionary acts by Corps officials at issue (the statements of September 16 and November 25, 2016, *see* ECF No. 38 at 19 ¶ 45, 21-22 ¶ 50) to include such acts by non-Corps officials as failing to deploy more law enforcement personnel to remove or otherwise respond to the DAPL protesters. *See* Section I.A.iv, *supra*.  The State never sought to amend its Complaint and is not now permitted to expand the scope of potential liability beyond the acts alleged in the Complaint and identified in the motion to dismiss, which allowed the case to proceed.  In any event, to the extent the State's claims purport to be based on the federal government's decision not to deploy law enforcement or military resources in response to the DAPL protests, those claims present a non-justiciable political question.

[¶501] "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Non-justiciable political questions arise where there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).

[¶502] The political question doctrine has been held to preclude judicial review of many foreign

relations, national security, and military decisions; Presidential declarations of national emergency; certain decisions regarding Indian Tribes; and a President's decision whether to sign a bill into law. *See, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281-82 (11th Cir. 2009); *Schneider v. Kissinger*, 412 F.3d 190, 193-98 (D.C. Cir. 2005); *Jicarilla Apache Tribe v. United States*, 601 F.2d 1116, 1126 (10th Cir. 1979); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31-34 (D.D.C 2020); *South Dakota v. U.S. Dep't of Interior*, 775 F. Supp. 2d 1129, 1135-36 (D.S.D. 2011); *Hershey Foods Corp. v. USDA*, 158 F. Supp. 2d 37, 41 (D.D.C. 2001).

[¶503] Courts have held that the political question doctrine bars claims that challenge the federal government's response (or non-response) to civil disturbances and protests. *See Gilligan v. Morgan*, 413 U.S. 1, 3, 10-11 (1973) (holding that a lawsuit arising out of the National Guard's efforts to "to preserve civil order and protect public property" in response to "civil disorder" at a college campus presented a nonjusticiable political question); *Monarch Ins. Co. of Ohio v. District of Columbia*, 353 F. Supp. 1249, 1258 (D.D.C. 1973) (finding that FTCA claims arising out of the United States' alleged negligence in preparing for and responding to civil disturbances and rioting following the assassination of Dr. Martin Luther King involved not only the discretionary function exception, but also "political questions which are beyond the jurisdiction of this Court"), *aff'd*, 497 F.2d 683 (D.C. Cir. 1974); *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1160-61 (D.D.C. 1991) (holding that an FTCA claim arising out of the alleged "failure by the United States personnel . . . to assign sufficient military police after the civil disorders in Panama City occurred" "presents a clear nonjusticiable political question").

[¶504] Here, the State's claims are premised on the federal government's decision not to deploy law enforcement or military resources to respond to the DAPL protests. *See, e.g.*, ECF No. 1 ¶¶ 6-7, 13-14, 36, 38, 78, 107; ECF No. 450-1 at p. 2 ¶ 5, pp. 58-62 ¶¶ 237-257, pp. 64-65 ¶¶ 269, 271,

p. 84-85 ¶¶ 361-62, p. 95 ¶ 398, p. 96 ¶ 404, 268, 270.  Those claims "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n*, 478 U.S. at 230.  Thus, the State's claims present a political question that is non-justiciable.

## II.    The State's Tort Claims

### A.  Burden of Proof

[¶505]  The State bears the burden to establish all elements of its claims by a preponderance of the evidence.  *See Investors Real Estate Trust Properties, Inc. v. Terra Pacific Midwest, Inc.*, 686 N.W.2d 140, 144 (N.D. 2004); 58 Am. Jur. 2d Nuisances §§ 171-72; North Dakota Jury Instructions – Civil, Burden of Proof Requirements (2023 ed.); *id.* § C - 70.06 - Burden of Proving Damages 2004.

[¶506]  The FTCA's jurisdictional grant, discussed above, does not extend to claims for absolute or strict liability.  *See* 28 U.S.C. § 1346(b); *Dalehite*, 346 U.S. at 44-45; *Laird*, 406 U.S. at 803; *Duff v. United States*, 999 F.2d 1280, 1282 n.6 (8th Cir. 1993).  Thus, as the Court has previously held, the State must establish Corps officials' negligent conduct as to each of the State's claims, for those claims to be actionable.  *See* ECF No. 38 at 29 ("[T]he Court will limit any liability to 'negligent or wrongful act or omission' of the Corps.").

[¶507]  To establish a negligence claim under North Dakota law, the plaintiff bears the burden of demonstrating (1) a duty, (2) a breach of that duty, (3) causation, and (4) damages.  *E.g.*, *Investors Real Estate Trust Properties*, 686 N.W.2d at 144.

[¶508]  Before trial, the Court had not yet determined whether the State has carried its burden to establish these elements through evidence.  In a prior order during discovery, the Court stated that the Corps's "failure to follow the permitting procedure opened the gates to North Dakota being

damaged by the United States, its agencies, and third parties.  The [Corps] created a liability mess."  ECF No. 280 at pp. 6-7 ¶ 12.  The Court further stated that the Corps's "failure to follow the permitting procedures permits North Dakota to seek damages from the resulting tortious conduct— the gigantic federally created mayhem."  *Id*.  In making those statements, the Court cited its Order on the United States' motion to dismiss, which denied the motion and allowed the case to proceed to discovery, on the premise that "the Corps failure to comply with the mandatory permitting process tainted all other decisions made by the Corp[s].  Here, the maxim applies: 'you break it, you bought it.'"  ECF No. 38 at p. 24 ¶ 55.

[¶509]  The Court's Order on the motion to dismiss did not determine that the State has carried its burden to show negligence.  In ruling on the motion to dismiss, the Court accepted the allegations in the Complaint as true, as it was required to do.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Park Irmat Drug Corp. v. Express Scripts Holding Company*, 911 F.3d 505, 512 (8th Cir. 2018).  That is, the Court's decision whether to grant the United States' motion to dismiss the State's claims based on the discretionary function exception was based on the allegations in the State's Complaint.  *Cf. Berkovitz*, 486 U.S. at 547-48 (emphasizing that the plaintiffs "ha[d] not proved their factual allegations" at the motion-to-dismiss stage and holding that the United States' motion to dismiss should be denied because plaintiff "may yet show, on the basis of materials obtained in discovery or otherwise," that the discretionary function exception did not apply).  The Court's Order on the United States' motion to dismiss was not a fact-based determination that the United States breached a duty or caused the State's damages.  *See* ECF No. 383 at p. 9 ¶ 19 (clarifying that that the Court had resolved the legal question of the existence of a duty in its Order on the motion to dismiss, but not the "factual questions" of breach and causation, which would be resolved at trial).  The Court did not resolve,

before trial, whether the State carried its burden to prove the elements of negligence through evidence.

[¶510] Significant evidence was adduced at trial, including on the issues of duty, breach, causation, and damages. As the factfinder, the Court must assess the evidence presented at trial to determine whether the State has established each of the required elements of its claims. *See, e.g.*, *Knorr v. K-Mart Corp.*, 300 N.W.2d 47, 50 (N.D. 1980) (proximate cause is a separate element from duty and breach; all of those elements must be proved separately).

### B. Duty

[¶511] As discussed above, the United States may be held liable for the negligent acts or omissions of its employees only to the extent a private person would be held liable in the same circumstances under state tort law. *See* 28 U.S.C. § 1346(b). Thus, the Court must determine whether a private landowner in the Corps's position would owe a duty to the State in the circumstances of the DAPL protests. If it would not, there is no actionable claim. *See id.*; *Kappenman v. Klipfel*, 765 N.W.2d 716, 720 (N.D. 2009).

[¶512] The Court previously held that the Restatement (Second) of Torts, Sections 318 and 838, supply the relevant duty here. *See* ECF No. 38 at pp. 27-29 ¶¶ 64-68; ECF No. 383 at pp. 7-8 ¶¶ 14-16. Specifically, the Court held that Restatement Section 318 applies to the State's negligence, gross negligence, and trespass claims; and Restatement Section 838 applies to the State's nuisance claim. *See id.* The Court found that the duties outlined in these sections of the Restatement "are consistent with North Dakota tort law for purposes of concluding that North Dakota's claims for public nuisance, gross negligence, and third-party trespass claims satisfy the FTCA's requirement that the claims be 'in accordance with the law of the place where the act or omission occurred.'" ECF No. 38 at p. 28 ¶ 66 (citation omitted). The Court has also decided that the United States owed

these duties in this situation.  *See* ECF No. 383 at pp. 7-10 ¶¶ 14-21 & n.1 (Court's Order on the parties' motions for summary judgment, relying on its prior Order on the motion to dismiss).  The Court's prior rulings could be read to conclude that there was "a duty upon the United States to protect North Dakota from harm."  ECF No. 383 at p. 8 ¶ 17 (noting that this conclusion was based on "the facts as articulated in discovery").  But the Court did not specifically identify any authority establishing that showed that under North Dakota negligence law, a private landowner owed a duty to the State.

[¶513] Because the Court's prior rulings expressly ruled on the record in discovery, not on the trial record, and because those rulings did not identify authority showing that under North Dakota negligence law, a private landowner owed a duty to the State, the Court finds it should reexamine its prior conclusions based on the trial record.  The Supreme Court and the Eighth Circuit have both recognized that it is appropriate to reexamine such threshold questions on a fuller evidentiary record.  *See, e.g.*, *Berkovitz*, 486 U.S. at 547-48 (emphasizing that the plaintiffs "ha[d] not proved their factual allegations" at the motion-to-dismiss stage, and holding that the United States' motion to dismiss should be denied because plaintiff "may yet show, on the basis of materials obtained in discovery or otherwise," that the discretionary function exception did not apply); *Appley Bros.*, 164 F.3d at 1166 (after previously addressing an order on a motion to dismiss, the appeals court re-examined issues of discretionary function and duty in a tort case "on the expanded record" that existed following summary judgment).

[¶514] The North Dakota Supreme Court has not adopted Restatement Sections 318 or 838 to define a landowner's duty.  But whether the source of the applicable duty is North Dakota state law or the Restatement, the Corps did not owe a duty to the State under the circumstances, as discussed below.

i.    **A Private Landowner Under Like Circumstances Would Not Owe a Duty to the State to Compensate It for Emergency Protest-Response Expenses**

[¶515]  The State brings this suit to recover damages connected with its emergency protest-response costs, particularly its law-enforcement expenses.  *See, e.g.*, ECF No. 1 ¶¶ 7, 14, 107.  That is, the State brings this suit as a sovereign, not as a landowner, seeking its protest-response expenses.  *See id.* ¶ 15.

[¶516]  The FTCA requires the Court to determine whether a private party under like circumstances would be liable "to the claimant"—here, to the State.  28 U.S.C. § 1346(b)(1).  Under North Dakota law, the existence of a duty depends on the identity of the injured party; that is, "the plaintiff must show that the defendant had a duty to protect *the plaintiff* from injury."  *Saltsman v. Sharp*, 803 N.W. 2d 553, 558 (N.D. 2011) (emphasis added) (quoting *Botner v. Bismarck Parks & Rec. Dist.*, 782 N.W. 2d 662 (N.D. 2010)); *see Hale v. Ward Cnty.*, 848 N.W.2d 245, 252 (N.D. 2014) (discussing adverse decision in prior appeal to the North Dakota Supreme Court and emphasizing that a private party cannot base a public nuisance claim on "the risk of special injury to the property of *other* third persons" (emphasis added)).  Negligence requires "a duty on the part of an allegedly negligent person to protect *the plaintiff* from injury." *Hurt v. Freeland*, 589 N.W. 2d 551, 555 (N.D. 1999) (quoting *Diegel v. City of West Fargo*, 546 N.W. 2d 367, 370 ((N.D. 1996) (emphasis added)).  As discussed in Section I.A.vi above, the existence of a *federal* duty for federal officials to take some action does not alone establish that the federal officials owed a duty to *the plaintiff* in an FTCA case under state law.  *See, e.g.*, *Barnes*, 448 F.3d at 1066-67.

[¶517]  No cases from the North Dakota Supreme Court suggest that private landowners owe a common-law duty to exclude or control third parties who may engage in off-premises unlawful conduct in order to protect the State from expending resources in response.  That is, even assuming

North Dakota tort law would hold a private landowner liable to another person for injuries to that person or their property caused by individuals staying on the landowner's property, it does not follow that the private landowner has a duty to pay the State for its expenses associated with responding to such actions.  Nor does it follow that the State has a right to seek those costs.

[¶518] To the contrary, under the widely adopted, common-law free-public-services doctrine, "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984) (citation omitted); *see, e.g.*, *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323-24 (9th Cir. 1983); *Canyon Cnty. v. Sygenta Seeds, Inc.*, No. CV05–306–S–EJL, 2005 WL 3440474, at *2-3 (D. Idaho Dec. 14, 2005); *City of Phila. v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 894-95 (E.D. Pa. 2000); *Walker Cnty. v. Tri-State Crematory*, 284 Ga. App. 34, 36-37 (Ga. Ct. App. 2007).

[¶519] No North Dakota case has explicitly endorsed or rejected the free-public-services doctrine, but it is likely the North Dakota Supreme Court would apply it here.  The doctrine is widely accepted for good reason.  The decision to provide tax-supported services such as law enforcement and emergency response "is a legislative policy determination," and "[i]t is not the place of the courts to modify such decisions." *Air Florida*, 750 F.2d at 1080.  Courts are "especially reluctant to reallocate risks where a governmental entity is the injured party." *Id.*  And the State's legislature has the power to "protect itself from extraordinary emergency expenses by passing statutes or regulations that permit recovery from negligent parties." *Id.*; *see, e.g.*, *United States v. Chesapeake & O. Ry. Co.*, 130 F.2d 308, 309-10 (4th Cir. 1942) (discussing United States' ability to recover fire-fighting costs under a Virginia law that specifically provided that a person who sets a fire "shall be liable for the full amount of all expenses incurred in fighting the fire").

[¶520]  The North Dakota Legislative Assembly has done just that in certain specific circumstances. *See, e.g.*, N.D.C.C. § 12.1-17-07 (providing that a person who is convicted of harassment based on contacting emergency responder communication systems or making false reports to a public safety agency "is also liable for all costs incurred by any unnecessary emergency response," in addition to any criminal penalty).  If the widely accepted free-public-services doctrine did *not* apply in North Dakota, it would not have been necessary for the legislature to have made such a carveout allowing for the recovery of emergency-response costs in particular circumstances.[9]  The State has not identified any similar statutory provision that allows it to recover its emergency-response expenses (including payroll and equipment expenses) from a private landowner under like circumstances.

[¶521]  Accordingly, under North Dakota law, a private landowner does not owe a duty to the State under like circumstances to control third parties to prevent the State from incurring emergency-response expenses.  Given the lack of such a duty to the State, the State does not have the right to recover its emergency-response costs in this FTCA action.

### ii.    No Tort Liability for First Amendment-Protected Conduct

[¶522]  A state may not impose tort liability in a way that intrudes on First Amendment rights.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982).  Thus, as relevant here, the First Amendment imposes a limitation on the scope of any duty that a state may impose on a landowner who invites and host individuals who seek to engage in activity protected by the First Amendment.

[¶523]  Actions related to protest activity implicate the First Amendment. "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and

---

[9] The United States suggested, in its request that the Court certify a question to the North Dakota Supreme Court about the applicable duty, that the North Dakota Supreme Court could also consider whether the State should be permitted to recover its protest-response costs in light of the free public services doctrine.  *See* ECF No. 350 at 39 n.7.

social changes desired by the people.'" *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (citation omitted). State and federal officials all agreed that the DAPL protests involved the exercise of First Amendment rights. *See, e.g.*, FoF [¶84], [¶101], [¶302], [¶330], [¶343]; *see also* FoF [¶232]-[¶233] (the evidence shows that a significant number of the DAPL protestors were engaged in a non-violent exercise of their First Amendment rights, and only a minority of protestors acted violently and unlawfully). At least two First Amendment rights were implicated by the protestors' conduct during the DAPL protests: freedom of speech and freedom of assembly. The right of assembly is regarded "not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980). The freedom of assembly is also unique among the First Amendment rights in that it is the only one that requires a group to exercise.

[¶524] The location *where* a First Amendment right is exercised may be of great significance. For example, in *City of Ladue v. Gilleo*, the Supreme Court found that a ban on the placement of political signs at a house implicated the First Amendment right to free speech. 512 U.S. 43, 56-57 (1994). As the Court noted, "[d]isplaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." *Id*. at 56. The location of the speech provides information about the identity of the speaker, which "is an important component of many attempts to persuade." *Id*. (citing Aristotle 2, Rhetoric, Book 1, ch. 2, in 8 Great Books of the Western World, Encyclopedia Brittanica 595 (M. Adler ed., 2d ed. 1990)). "[T]he Supreme Court has recognized that the specific place where a message is communicated may be important to the message and, consequently, of constitutional significance itself." *Nationalist Movement v. City of Bos*., 12 F. Supp. 2d 182, 192-93 (D. Mass. 1998) (citing *City of Ladue*, 512 U.S. at 56, and holding that a city violated the First Amendment

rights of parade organizers by attempting to force them to change the location of the parade). As the *Nationalist Movement* court observed, "[t]o change the location . . . was to change the character of the message. . . . The *place* of the event was a substantive feature of the message." *Id.* (emphasis in original).

[¶525] For the DAPL protestors, their desire to enter and remain on Corps land was part of their First Amendment rights to free speech. Protestors believed that the area of the Main Camp on Corps land to the north of the Cannonball River belonged to the Sioux by treaty. *See* FoF [¶22]-[¶26]. The idea of occupying Corps land north of the Cannonball River in opposition to the pipeline arose during a traditional ceremony lead by a legendary medicine man, Leonard Crow Dog, in the summer of 2016. FoF [¶248]. And protestors saw the occupation of Corps land, in particular, as a way of expressing opposition to the Corps's decision-making and to the Corps in general. *See* FoF [¶27], FoF [¶81]; DX 4217 at 2 (Chairman Archambault wrote in an op-ed in the *New York Times*, "When the Army Corps of Engineers damned the Missouri River in 1958, it took our riverfront forests, fruit orchards and most fertile farmland to create Lake Oahe. Now the Corps is taking our clean water and sacred places by approving this river crossing"). That is, the location of the protest on Corps land was, as in *City of Ladue*, 512 U.S. at 56-57, central to the expression of the protestors' message.

[¶526] In short, the Corps faced a situation where protestors were seeking to engage in speech and to assemble on its land. The State's theory is that the Corps—in the position of a private landowner—should be held liable for allegedly inviting those protestors to its land and then not evicting them from its land. *See, e.g.*, ECF No. 450-1 at p. 58 ¶ 239, p. 94 ¶ 396, p. 100 ¶ 418. But the First Amendment does not permit the imposition of such tort liability.

[¶527] As the Supreme Court has held, state may not impose tort liability in a way that intrudes on

First Amendment rights, including the right to peaceably assemble.  *See Claiborne Hardware Co.*, 458 U.S. at 913.  *Claiborne* involved tort claims relating to a boycott of white-owned businesses in protest of segregationist policies.  *See id.* at 888-89.  Some of the boycott participants peacefully picketed, while others engaged in violence.  *See id.* at 903-05.  The business owners brought a tort claim that sought damages from the boycott organizers and other boycott participants, among others.  The Supreme Court held that tort liability could be imposed only based on the subset of protest actions that were violent, but could not be based on peaceful organizing or picketing activities, which are protected by the First Amendment.  *See id.* at 918.  As the Court explained, "[w]hile the State legitimately may impose damages for the consequences of violent conduct [by recognizing a tort claim], it may not award compensation for the consequences of nonviolent, protected activity. *Only those losses proximately caused by unlawful conduct may be recovered*." *Id.* (emphasis added).

[¶528] The Supreme Court stressed this limitation more recently, in *Mckesson v. Doe*, a tort case brought against a protest organizer.  *See* 592 U.S. 1, 2-4 (2020).  The Court cited *Claiborne* in explaining that "[w]hen violence occurs during activity protected by the First Amendment, that provision mandates 'precision of regulation' with respect to 'the grounds that may give rise to damages liability' as well as 'the persons who may be held accountable for those damages.'" *Id.* at 4 (quoting *Claiborne*, 458 U.S. at 916-17)).

[¶529] The Supreme Court again emphasized the limitations the First Amendment places on imposing liability in *Counterman v. Colorado*, where it held that the First Amendment prohibits the use of "an objective standard," like negligence, to punish speech.  600 U.S. 66, 78-79 & n.5 (2023).  The Court relied on the general principle reflected in *Claiborne* to hold that imposing liability can chill lawful expression "given the ordinary citizen's predictable tendency to steer wide of the

unlawful zone," and it concluded that "the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* at 76-78. The Court's analysis in *Counterman* confirms that the First Amendment bars the imposition of liability on those engaged in protected conduct. *See Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) (Sotomayor, J.) (statement regarding the denial of certiorari in a case involving tort claims against the organizer of a protest, emphasizing that the district court in that case did not have the benefit of the Supreme Court's decision in *Counterman*, and that in the future, district courts should be sure to "give full and fair consideration to arguments regarding *Counterman*'s impact").

[¶530] The principles explained in *Claiborne*, *Mckesson*, and *Counterman*—that the First Amendment bars a negligence-based liability scheme that would chill conduct protected by the First Amendment—bar the imposition of liability on the Corps here.

[¶531] Here, the State challenges the Corps's decision to allow protestors onto its land and then not to seek their eviction. The Corps permitted individuals to peacefully protest on certain areas of Corps-managed land, acknowledging that protestors were seeking to engage in activities protected by the First Amendment, including peaceable assembly and free speech. *See* FoF [¶142], [¶198], [¶276]. There is no evidence that the Corps's conduct was intended to produce disorder. To the contrary, the Corps's decisions were meant to deescalate the protest situation and protect the safety of all involved. *See* FoF [¶279], [¶280], [¶287].

[¶532] Under these circumstances, the First Amendment bars the imposition of tort liability as the State's theory calls for. The tort rule the State proposes would impermissibly chill the First Amendment rights of any landowner who sought to host protestors planning to engage in peaceable assembly and free speech protected by the First Amendment. A rule that imposes tort liability on

a landowner who informed protestors that they could peacefully exercise their First Amendment rights on its land would chill conduct protected by the First Amendment. The same is true for a rule that imposes liability on a landowner for not evicting protestors from its land. In short, the First Amendment protects a private landowner from tort liability for such alleged conduct.

[¶533] This approach—focusing on the specific wrongful conduct alleged by the State—is consistent with the approach taken in *Mckesson*. That case confirms that a court must assess each alleged negligent or wrongful action in determine whether allowing liability to be imposed based on that action would intrude on the First Amendment rights at issue.

[¶534] *Mckesson* involved tort claims against the organizer of a Black Lives Matter protest in Louisiana, which were brought by a police officer who was injured when an unidentified protestor threw a piece of concrete at a group of law enforcement officers. *See* 71 F.4th 278, 282-83 (5th Cir. 2023), *cert. denied* 144 S. Ct. 913 (2024). Given the "novelty" of the plaintiff's theory of liability, the Supreme Court initially vacated the Fifth Circuit's decision and remanded the case to certify to the Louisiana Supreme Court the question whether the conduct at issue was even cognizable under state tort law. 592 U.S. at 5-6 ("[T]he Fifth Circuit should not have ventured into so uncertain an area of tort law—one laden with value judgments and fraught with implications for First Amendment rights—without first seeking guidance on potentially controlling Louisiana law from the Louisiana Supreme Court."). Here, the United States similarly asked that this Court certify to the North Dakota Supreme Court the question whether the State's claims are cognizable under State tort law, given the important public policy and First Amendment considerations at issue. *See* ECF Nos. 337 at 1; ECF No. 350 at 1, 5, 27, 33, 37-39. The Court denied that request, reasoning that this is a tort case, not a constitutional one. *See* ECF No. 383 at pp. 9-10 ¶ 21 & n.1. But the same was true in *Mckesson*: the plaintiff brought tort claims following a protest that involved First

Amendment activity and a subset of protestors who became violent, just as the State does here. *See* 71 F.4th at 282-84.

[¶535] The Fifth Circuit's approach on remand in *Mckesson* illustrates the need to examine the alleged wrongful conduct to determine whether the First Amendment bars imposing tort liability for such conduct. On remand, the Fifth Circuit certified the case to the Louisiana Supreme Court, which determined that the state's tort law did recognize tort liability for the actions alleged in the *Mckesson* complaint. *See* 71 F.4th 278. The Fifth Circuit then determined that the question whether the First Amendment bars tort liability must be assessed "action-by-action," based on the specific circumstances. *Id.* at 292. The court considered the particular wrongful conduct alleged by plaintiff: (1) the defendant had specifically organized the protest to begin in front of the police station, obstructing access to the building; (2) the defendant "deliberately led the assembled protest onto a public highway, in violation of Louisiana criminal law"; and (3) he "personally assumed control of the protest's movements" but "failed to take any action whatsoever to prevent or dissuade his fellow demonstrators once they began to loot a grocery store and throw items at the assembled police" who tried to stop that crime *Id.* at 281-82, 292. After examining each alleged wrongful act, the Fifth Circuit concluded that the defendant-protest organizer could be held liable in tort for the plaintiff-police officer's injuries. *See id.* at 282.

[¶536] None of the types of actions the *Mckesson* court found important for imposing tort liability are present here. The Corps did not organize the DAPL protests; the protests sprung up in April 2016, and eventually in mid-August 2016 escalated to the point of requiring a law enforcement response, all without any direction or permission from the Corps. *See* FoF [¶80], [¶82], [¶94]-[¶99], [¶104]; [¶336]. The protests did not begin on Corps land, and the Corps did not plan them to occur there in particular, unlike *McKesson*. *See* FoF [¶80] (the protests began on Standing Rock Indian

Reservation land and land claimed by LaDonna Brave Bull Allard); FoF [¶336] (COL Henderson testified that protestors camped on Cops land "were trespassing. They didn't have permission to be there, and any way you look at it, they were trespassing. We knew they were trespassing. Law enforcement knew they were trespassing. They were trespassing"). Nor did the Corps take any actions to lead protestors to block a public highway or encourage them to commit any other crimes. *Cf., e.g.*, FoF [¶142] (Corps's September 16, 2016, press release stated that the Tribe was allowed "to gather to engage in a *lawful free speech demonstration* on Federal lands designated in the permit" subject to "applicable Federal, state and local regulations" (emphasis added)); FoF [¶198] (COL Henderson's November 25, 2016, letter to tribal leaders stating that the free speech zone south of the Cannonball River was meant "for anyone wishing to peaceably protest the Dakota Access pipeline project, subject to the rules of 36 C.F.R. Part 327"); FoF [¶292] (in conversations with tribal leadership, COL Henderson emphasized the need for the Tribe to discourage violence, trespassing on private land, and provoking confrontations with law enforcement). Finally, unlike in *Mckesson*, the Corps took various actions to try to dissuade protestors from breaking the law— even though the Corps ultimately could not control the actions of protestors. *See* FoF [¶104], [¶273]-[¶299].

[¶537] In sum, application of the principles in *Claiborne*, *Mckesson*, and *Counterman* shows that tort liability may not be imposed based on the conduct that forms the basis of the State's claims: informing protestors that they may stay on a particular area of Corps land to peacefully demonstrate, and then not evicting those protestors. The First Amendment bars imposing liability on a landowner for such actions, especially where, as here, the landowner did not organize the protests, control protestors' movements, or encourage protestors to break the law; and where the landowner's actions in connection with the protests were not intended to produce imminent disorder. Because the First

Amendment protects a private landowner from tort liability under these circumstances, the Corps cannot be held liable under the FTCA.

### iii.    North Dakota Tort Law Duty

[¶538]  As the United States noted in its motion for summary judgment, no decision from the North Dakota Supreme Court has imposed a duty on a private landowner to exclude (or not invite) protestors from their land because some of the protestors might engage in unlawful conduct on other land, which conduct might cause the State to respond.  *See* ECF No. 350 at 27-30; ECF No. 369 at 8-12.  The North Dakota Supreme Court has, however, adopted several principles when deciding whether a landowner has a duty for another's injuries, and those principles apply here. *See* 28 U.S.C. § 1346(b)(1) (liability under the FTCA may be imposed "where the United States, if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred").  The Court must apply these principles of state tort law as set forth by the North Dakota Supreme Court, even if those principles differ from general principles of tort law as reflected in the Restatement (Second) of Torts.

[¶539] First, landowners in North Dakota cannot ordinarily be liable for wrongful conduct by third parties on their land, where the landowner is not itself engaged in the wrongful activity and does not have a commercial interest in it.  *See Bjerk v. Anderson*, 911 N.W.2d 343, 345, 349, 351 (N.D. 2018) (declining to impose liability on a landowner for the death of a man who was using illegal drugs in the landowner's house, because there was no precedent to "extend premises liability to a person in control of property who was not engaged in the activity that caused the harm," and because "[a] landowner does not reasonably expect to become the police officer or probation officer for all who live on—or merely enter—his property," and because imposing such liability on a landowner is "a policy-laden question better suited to legislative judgments"). There is no evidence that Corps

officials engaged in protest activity themselves, or that the Corps had any commercial interest in the public lands in question. *See* FoF [¶31].

[¶540] Second, landowners in North Dakota generally are not liable for conduct that occurs off-premises. *See Saltsman*, 803 N.W.2d at 559 ("Under premises liability law, a defendant must have had control over the property where the injury occurred in order to find the defendant owed a duty to an injured party." (quoting *Groleau v. Bjornson Oil Co.*, 676 N.W. 2d 763 (N.D. 2004)). Here, the protest activity the State complains about occurred off of Corps land, when protestors left the areas where they were staying (on and off of Corps land) to conduct "direct action" protest activity and, sometimes, to violate the law elsewhere. FoF [¶90], [¶234], [¶237].

[¶541] Third, landowners in North Dakota generally do not have the duty to ask the authorities to control activity that occurs off of the landowner's land. *See Bjerk*, 911 N.W.2d at 351 (declining to make a landowner a "mandatory reporter of all suspected dangerous illegal activity"); *Holter v. City of Sheyenne*, 480 N.W.2d 736, 738 (N.D. 1992) (business was not required to ask the city to restrict parking or change traffic signs off the business's property, on the public highway, property to change the behavior of drivers in vehicles over which the business had no control). Given that the protest activity that necessitated the State's protest response occurred off of Corps land, Corps officials did not have a duty under North Dakota law to ask State and local law enforcement to control that activity.

### iv.    Restatement Duty

[¶542] The Court has determined that the Restatement (Second) of Torts supplies the duties applicable to the State's claims. *See* ECF No. 38 at pp. 28-29 ¶¶ 66-68; ECF No. 383 at p. 9 ¶ 21. Several principles from the Restatement are relevant here.

[¶543] *Negligence, gross negligence, and third-party trespass claims.* The Restatement (Second)

of Torts § 315 provides that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless" a special relationship exists between the actor and the third person or the actor and the injured person.  North Dakota law is aligned with the Restatement in this respect.  *See Saltsman*, 803 N.W.2d at 557 (citing Restatement (Second) of Torts § 315 (1965)); *Hurt v. Freeland*, 589 N.W.2d 551, 558–59 (N.D. 1999).

[¶544]  Under the Restatement, a landowner may have a duty to exercise reasonable care to control the conduct of a licensee or invitee if the landowner "knows or has reason to know that he has the ability to control the third person, and knows or should know of the necessity and opportunity for exercising such control."  Restatement § 318.  But the rule stated in Section 318 does *not* address whether a duty exists to control the conduct of trespassers, and courts have been reluctant to extend the rule to trespassers.  *Id.* (explaining in caveat that the Restatement does not address whether there is a duty of reasonable care to control conduct of a third person "where the third person is a trespasser"); *see also, e.g., Flynn v. Nickerson Cmty. Ctr.*, 177 A.3d 468, 477 (R.I. 2018) (holding no duty of care existed to control conduct of thief who broke in to community center and who was trespassing when he stole vehicle); *Pierce v. Staley*, 587 N.W.2d 484, 488 (Iowa 1998) ("[T]he duty to control third persons under section 318 of the Restatement is directed at those coming on the property with consent.").  No North Dakota cases extend the duty stated under section 318 to the conduct of trespassers.

[¶545]  The Court previously stated that it was "not inclined to dismiss North Dakota's claims based on the use of a misnomer" in the Complaint—that is, the State's repeatedly referring to the DAPL protestors as "trespassers" in its Complaint.  ECF No. 38 at 26-27, ¶¶ 62-63; *see* ECF No. 1, *passim* (State's Complaint does not use the words "invitee" or "licensee" at all, but it uses the word "trespassers," "trespasser," "trespassing," or "trespass" nearly 100 times).  Evidence at trial showed

the State's use of this terminology was not merely inartful pleading. It reflected the reality of what State and federal officials believed at the time: that the protestors on Corps land were trespassing. *See* FoF [¶336]. Given that, Restatement Section 318 does not apply to the protestors, and the Corps did not have a duty to control the protestors' conduct.

[¶546] Even if protestors are viewed as licensees or invitees, as discussed in Section II.C below, the Corps did not breach the duty outlined in Restatement Section 318.

[¶547] Under Section 318, an actor can face liability for negligence under limited circumstances for harm caused by a third-person's use of a possessor's land. In full, Section 318 states:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> (a) Knows or has reason to know that he has the ability to control the third person, and
>
> (b) Knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts (Am. Law Inst. 1965).

[¶548] Essentially, a possessor of land cannot be held liable under Section 318 unless: (1) it granted a third party permission to use its land; (2) it could control the third party's harmful conduct and knew or had reasons to know of that ability to control the conduct; and (3) it failed to use reasonable care to stop the third party's harmful conduct.

[¶549] Two principles further limit when liability can be imposed on a possessor under Section 318. First, the harmful third-party conduct must occur *on* the possessor's land. *Id*. cmt. b (Section 318 is "applicable where the possessor . . . of land is present when . . . the activity is being carried on with his permission"). Second, the possessor must have the ability to control the third party's conduct. *Id*. cmt. a ("The mere fact that the possessor . . . of land permits a third person to . . .

conduct an activity upon the land is not regarded as sufficient to make the possessor liable for the manner in which the third person … carries on the activity.").  The Reporter's Notes to Section 318 confirm those principles, describing "the basis" for liability as "the possessor's responsibility for what is done upon his land, together with his opportunity for exercising control."

[¶550] *Nuisance claim*.  To support its public-nuisance claim, the State must prove that, to the extent the protestors caused a public nuisance under North Dakota law by affecting a "considerable number" of other persons, N.D. Cent. Code § 42-01-06, the Corps violated a negligence-based duty under Section 838 in causing that nuisance, *see* ECF No. 383 at p. 6 ¶ 12 ("[T]his Court has already determined the public nuisance claim requires a negligence-based duty").

[¶551] Liability under Section 838 requires a showing that the nuisance was caused by conduct on a possessor's land.  In full, it states:

> A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
>
> (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and
>
> (b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

Restatement (Second) of Torts § 838 (Am. Law Inst. 1979).

[¶552] First, this provision focuses on the location of the activity at issue—the "land upon which a third person carries on an activity that causes a nuisance."  *Id.*; *see also, e.g.*, *City of St. Louis v. Varahi, Inc.*, 39 S.W.3d 531, 537-38 (Mo. Ct. App. 2001) (discussing Section 838 and declining to hold hotel owner liable for prostitution that occurred on adjacent street because there was no evidence that the owner controlled the prostitutes).

[¶553] Second, the provision requires a showing of negligence.  The possessor is not liable merely because he permitted the third party to come onto the land.  The comments to Section 838 explain

that a possessor is not liable for "[t]he mere fact that he permits the third person to be upon the land or to do something there, or that he knows of his presence or even of the particular activity."  *See id.* cmt. g.

[¶554]  Under Section 838, a possessor of land seeking to reasonably address third party conduct must "at most" inform law enforcement of the activity on the land.  *See id.* cmt. g (explaining a possessor of land is "not required in all cases to put a stop to the activity," but may be in a position to stop the activity, "*at most* by calling the police" (emphasis added)).

[¶555]  As discussed in Section II.C below, the State has not established either of these elements of its nuisance claim under Restatement Section 838.

> ### v.    Because There Is No Duty to Support the State's Negligence Claim, Its Nuisance and Trespass Claims Also Fail

[¶556]  The Court has held that the State's trespass and nuisance claims both incorporate a negligence element.  *See* ECF No. 38 at 28-29 ¶ 67 (stating, with respect to the State's trespass claim, that Restatement Section 318 provides a landowner is under a duty to "exercise reasonable care" to control third parties' conduct as specified in that Section); *id.* 29 ¶ 68 (noting that Restatement Section 838, regarding nuisance, "incorporates a negligence standard" inasmuch as it imposes liability for a possessor of land to "exercise reasonable care to prevent the nuisance"); *see also* Restatement (Second) of Torts § 282 (defining negligence as "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm").

[¶557]  As discussed in Sections II.B above, there is no duty to support the State's claim for negligence against the United States, and that claim is not actionable.  Because the State's other claims include a negligence standard, there is no duty to support the State's trespass or nuisance claims, either.  *See Kappenman*, 765 N.W.2d at 729 (explaining that, where a party "owed no duty as a landowner under the[] circumstances," it was appropriate to dismiss the nuisance claim against

the landowner).

### C. Breach

[¶558] As discussed in Section II.B.iii above, North Dakota state law would not impose a duty on Corps officials under the circumstances at issue here. Assuming—as the Court has previously held, *see* ECF No. 38 at p. 28 ¶ 66; ECF No. 383 at pp. 7-8 ¶¶ 14-16—that the Restatement would impose a duty to support the State's claims, the State has not shown that Corps officials breached that duty.

### i. Negligence Claim

[¶559] The State has not shown a breach of the duties outlined in Restatement Section 318 to support its negligence claim, for several reasons. The Corps did not permit protestors to be on Corps-managed land north of the Cannonball River, where the largest camp came to be located. Nor did the Corps permit protestors to engage in the unlawful behavior that caused the State to incur protest-response costs. Additionally, the Corps did not have the ability to control protestors' unlawful conduct, and did not know or have reason to know it could control that conduct. And protestors' harmful conduct occurred off of Corps land. Finally, given the limited options available to them, Corps officials acted as a reasonable landowner.

[¶560] *The Corps did not permit protestors to be on its land north of the Cannonball River, or to engage in any unlawful activity.* The evidence showed that the largest number of protestors camped at the area north of the Cannonball River on Corps land, which came to be known as the Main Camp. FoF [¶ 41.b]. The evidence also showed that, of the subset of protestors who left the protest camps to engage in illegal activity, most came from the Main Camp. *See* FoF [¶235]. But the Corps never permitted protestors to camp in the area north of the Cannonball. FoF [¶269], [¶336]. The Corps's public statements made that clear. The September 16 press release regarding the issuance of the Special Use Permit to the Standing Rock Sioux Tribe said the Special Use Permit

would *not* include Corps land north of the Cannonball because it was the subject of an existing grazing lease.  FoF [¶142].  And, when protestors ignored that statement and continued to stay at the Main Camp north of the Cannonball,  the Corps's November 25 letter to tribal leaders said that area would be closed as of December 5, 2016, and "no member of the general public, to include Dakota Access pipeline protestors, can be on these Corps' lands."  FoF [¶198].

[¶561]  Additionally, the Corps never permitted protestors to engage in the illegal activity to which the State responded.  The Corps consistently emphasized the need for protestors to obey the law.  *See* FoF  [¶139] (the Corps's September 16, 2016, press release stated that the Tribe was allowed "to gather to engage in a *lawful* free speech demonstration on Federal lands designated in the permit" subject to "*applicable Federal, state and local regulations*" including Title 36 and other regulations and laws (emphasis added)); FoF [¶193] (COL Henderson's November 25, 2016, letter to tribal leaders stating that the free speech zone south of the Cannonball River was meant "for anyone wishing to peaceably protest the Dakota Access pipeline project, *subject to the rules of 36 C.F.R. Part 327*"); FoF [¶288] (in conversations with tribal leadership, COL Henderson emphasized the need for the Tribe to discourage violence, trespassing on private land, and provoking confrontations with law enforcement).

[¶562] *The Corps did not know it could control protestors' unlawful conduct*.  The evidence shows the Corps did not have the ability to control the protestors' conduct, and did not know or have reason to know it had that ability, for at least three reasons.

[¶563] *First*, the Corps itself has no law enforcement capability.  FoF [¶16].  Corps park rangers could not arrest protestors.  *Id.*  At most, they could issue citations for violations of the Title 36 regulations, but it would have been within the discretion of the U.S. Attorney's Office for the District of North Dakota whether to enforce such citations by prosecuting them.  *See* FoF [¶18].

And the U.S. Attorney's Office told COL Henderson that it would not be worthwhile for the Corps to issue citations to protestors on Corps land, because they would not be enforced. *See* FoF [¶297].

[¶564] COL Henderson had the discretion to close the Corps-managed land where protestors were camped. *See* FoF [¶59]. But State and local law enforcement would have needed to enforce such an order. *See* FoF [¶19]-[¶20]. As discussed in more detail below, State and local law enforcement gave COL Henderson no indication that was something they were willing to do, so this did not seem like a feasible option to him. *See* [¶285]-[¶286], [¶302], [¶342], [¶344]-[¶345].

[¶565] Even if COL Henderson had closed the Corps-managed lands to the public and law enforcement had enforced that closure, it was not likely that doing so would have controlled the protestors. COL Henderson and law enforcement shared concerns about where protestors would go if they were forcibly evicted. *See* FoF [¶344]. And when the Corps did announce that protestors were permitted only in a designated area south of the Cannonball River, and formally closed the area of Corps land to the north of the River, those announcements did not cause protestors to move south. *See* FoF [¶271]; *see also* FoF [¶203], [¶207] (Governor Dalrymple's November 28, 2016, order closing Corps land north of the Cannonball River also did not cause protestors to leave that area). And COL Henderson was aware that protestors did not believe the Corps had the authority to tell them not to be on Corps land, and that protestors' decisions to be on the land did not depend on any permission from the Corps. *See* FoF [¶104], [¶273]-[¶275]; *see also* FoF [¶80], [¶82]-[¶83] (protestors from the initial, small gathering of local Standing Rock Sioux members spilled onto Corps land south of the Cannonball River sometime after April 2016, without the Corps's prior knowledge or permission). Based on all of this, COL Henderson had no reason to believe that announcing Corps land was closed would control protestors' actions or cause them to leave.

[¶566] *Second,* the Corps lacked authority to direct any other federal agency to enforce the law on Corps-managed land.  Corps officials do not direct the activities of the Department of the Army, and they cannot order any other federal agency to deploy law enforcement personnel to Corps land. FoF [¶13], [¶20].  Corps officials could only request support from other federal agencies—which COL Henderson did on multiple occasions throughout the protests.  *See* FoF [¶298]-[¶299].  The decision to deny his requests (and the requests State officials made for law enforcement assistance from the federal government) was made by the Department of Justice, in the exercise of its discretion.  *See* FoF [¶300], [¶334].

[¶567] *Third,* the Corps did not know or have reason to know it could exercise control over the protestors by asking State and local law enforcement to evict protestors from its land.  State and local law enforcement were well aware that protestors were camped on Corps land—and off of it— and that some protestors were breaking state laws by, for example, committing vandalism, theft, blocking roads and bridges, making threats, and conspiring to commit crimes.  *See* FoF [¶234]-[¶236], [¶338].  The State had the authority to enter Corps land and arrest the protestors who were causing the problems that concerned State and local officials—that is, the protestors who were breaking *other* laws besides trespassing—without the Corps's prior permission.  *See* FoF [¶237], [¶338], [¶339].  State officials testified they were aware they had that authority throughout the protests.  FoF [¶192], [¶339].  Nonetheless, State and local law enforcement chose not to arrest all of those lawbreaking protestors.  *See* FoF [¶339]-[¶342], [¶344]-[¶345], [¶352].  Moreover, State and local law enforcement regularly chose not to arrest all lawbreaking protestors they encountered *off* of Corps land.  *See* FoF [¶342]; *see also* FoF [¶154]-[¶155] (instead of arresting the protestors who were trespassing on private land at the North Camp, the State moved them to the Main Camp on Corps land).  The State's argument that the protestors used the Main Camp on Corps land to the

north of the Cannonball River as a "safe haven" is thus unavailing.  *See, e.g.*, ECF No. 450-1 at p. 64 ¶¶ 266-267, p. 65 ¶ 273, pp. 86-87 ¶ 367, p. 96 ¶ 404.  State and local law enforcement had the authority to arrest lawbreaking protestors on Corps land or off it, and they often chose not to do so—even when those protestors were *away* from Corps land.

[¶568] Corps officials knew the State was exercising its discretion not to arrest all protestors who broke the law.  Corps officials were in constant communication with State officials throughout the protests.  FoF [¶281]-[¶284].  Corps officials were aware of State and local law enforcement's jurisdiction.  And Corps officials were further aware that, instead of effecting mass arrests of protestors who broke the law, State and local law enforcement had adopted the strategies of communicating with protest leadership to try to deescalate the situation, and seeking to contain protestors to Corps land.  FoF [¶102], [¶286], [¶344], [¶347], [¶352].

[¶569] The State repeatedly told Corps officials throughout the protests that State and local law enforcement did not have the manpower to effect a mass eviction of protestors from Corps land, and that this was not something State and local law enforcement wanted to do.  FoF [¶286], [¶361], [¶347].  Regardless whether the State in fact *could* have mustered sufficient resources to complete such an eviction, what State officials communicated to the Corps—what the Corps knew at the time—was that the State was not willing or able to remove the protestors from Corps land.  *See id.*

[¶570] The State suggests the Corps should have asked State and local law enforcement to remove all of the protestors from Corps land.  *See, e.g.*, ECF No. 450-1 at pp. 58-59 ¶¶ 239-241, p. 65 ¶ 271, p. 84 ¶¶ 361-362, p. 104 ¶ 441.  But State witnesses testified that peaceful protestors were not an issue for State and local officials.  FoF [¶237].  Many protestors staying on Corps land were simply peacefully exercising their First Amendment rights and were not breaking any laws.  FoF [¶232]-[¶233].  For a significant portion of the protestors, the only crime they would have been guilty of

was trespassing, but only if the Corps declared them to be trespassers. *Cf.* N.D.C.C. § 12.1-22-03 ("An individual is guilty of a class B misdemeanor if, knowing the individual is not licensed or privileged to do so, the individual enters or remains in any place as to which notice against trespass is given by actual communication to the actor by the owner or an individual authorized by the owner or by posting in a manner reasonably likely to come to the attention of intruders."). As discussed in Section II.B.ii above, the Corps was under no duty to seek to evict the protestors as trespassers.

[¶571] The State's premise—that State and local law enforcement would have had to wait for a landowner's permission to go onto the land to enforce violations of state law *other* than trespassing—would yield absurd results. Under the State's reasoning, if a police officer is in hot pursuit of a criminal who runs onto private property, the officer would have to stop at the boundary of the property and contact the landowner to get permission before continuing his pursuit. Or if a police officer happens to be present at a bank that is being robbed, he could not detain the robber until he got confirmation from a bank employee with sufficient authority (whatever that might be) that the bank wanted the officer to do so.

[¶572] Even less credible is the suggestion that the State would need a landowner's permission to arrest protestors who committed crimes *off* of the landowner's property. Even if the State's premise that State and local law enforcement could not enter onto a landowner's land to enforce any state law without the landowner's prior permission were correct (which it is not), state and local law enforcement surely had the authority to arrest any problematic protestors while those protestors were committing crimes *off* of Corps land, if law enforcement was inclined to do so. *See* FoF [¶150][¶151] (State and local law enforcement were aware that the North Camp, which was located on State land, included some protestors who were breaking the law and were dangerous, but State and local law enforcement chose not to disperse the individuals from the North Camp area for over

two months); *id.* [¶337]-[¶339] (State and local law enforcement were aware that some of the protestors staying on Corps land were leaving to commit acts that violated State law elsewhere, off of Corps land).

[¶573] The Court declines to adopt the State's theory, which is unsupported by North Dakota law and which that would lead to absurd results. The more reasonable conclusion—and the one most consistent with the text and comments to the Restatement—is that where a landowner knows the police are already aware of a condition such as lawbreakers staying on the landowner's property, and where the police have the authority to enforce that law on the property, the landowner does not breach a duty by not calling the police to make them aware of the condition *again*.

[¶574] The Court finds that the Corps did not know or have reason to know that it was able to control the protestors on Corps-managed land.

[¶575] *The harmful third-party conduct occurred off of Corps land.* The protest activity the State complains about occurred off of Corps land, when protestors left the areas where they were staying (on and off of Corps land) to conduct "direct action" protest activity and, sometimes, to violate the law elsewhere. *See* FoF [¶90], [¶237]. State officials testified that peaceful protestors were not an issue, and protestors only became a problem when they moved off public property into the roadway or engaged in illegal activity. FoF [¶101]; [¶237]; *see also* FoF [¶100]-[¶101], [¶344] (State officials sought to accommodate protestors' First Amendment rights and agreed it was important for them to have a safe place to protest).

[¶576] *Given its limited options, the Corps exercised reasonable care.* COL Henderson, the Corps official responsible for deciding how the Corps would respond to the protests, recognized that the protests presented an unprecedented, unique situation that was difficult, if not impossible, for anyone to control. FoF [¶55], [¶104], [¶238], [¶275]-[¶277]. The protests started without the

Corps's prior permission or knowledge, and, as of mid-August 2016, they rapidly grew to be much larger than anyone expected. *See* FoF [¶80], [¶82], [¶94], [¶97]. The protests centered around the decision whether the pipeline would be granted an easement to cross Corps land—which COL Henderson had already approved, and which decision was entirely out of his hands by the time the protests began to ramp up. FoF [¶66], [¶68]. They involved concerns about First Amendment rights and the Corps's trust relationship with the Standing Rock Sioux Tribe. *See* FoF [¶12], [¶276]. As COL Henderson testified, if there was an easy, right answer, he would have made that decision. Tr. 1190:24-1191:3 (Day 7; Henderson). But no such course of action was available to him. *See id.*

[¶577] To determine how to respond to the protests, COL Henderson worked to understand the resources available. He had only two park rangers assigned to the entire Lake Oahe project area, and those park rangers were not law enforcement officers, did not carry guns or handcuffs, and were directed and trained to look for compromises and not to present an aggressive presence to members of the public who broke the Corps's rules. FoF [¶16], [¶279]. COL Henderson was concerned about making a decision that would jeopardize their safety. FoF [¶279]. Immediately after the protests became a matter of concern in mid-August 2016, COL Henderson reached out to federal law enforcement officials, as well as Sheriff Kirchmeier. FoF [¶96]. Among those were officials with the U.S. Attorney's Office for the District of North Dakota. *Id.* The U.S. Attorney's Office told COL Henderson that it was not worthwhile for Corps officials to issue citations, as they would not be enforced. FoF [¶103].

[¶578] COL Henderson made multiple requests for federal law enforcement assistance with the protests, throughout the fall and into early December 2016. FoF [¶298]-[¶299]. Those requests were not granted. FoF [¶300].

[¶579] COL Henderson himself was in "constant coordination" with State officials throughout the protests, and he assigned another Corps official as a dedicated liaison with State and local law enforcement.  FoF [¶281]-[¶283].  State officials told COL Henderson that a forcible eviction of protestors was a very bad idea.  FoF [¶285].  COL Henderson understood that State and local law enforcement did not have the law enforcement personnel necessary to effect such an eviction, even if they were inclined to do so.  FoF [¶286].

[¶580] COL Henderson was also in regular communication with leaders of the Standing Rock Sioux Tribe.  FoF [¶287].  He and his team discussed the requirements of the proposed Special Use Permit between mid-August 2016 through September 16, 2016.  FoF [¶288].  After the Tribe failed to meet the conditions of the Special Use Permit the Corps offered, COL Henderson explored other ways to promote safety for all involved and accountability for the Tribe, including the creation of a "free speech zone" for peaceful, lawful protests and a proposed Tribe-led move of protestors to land south of the Cannonball River where it was believed more resources would be available to respond to the protestors.  *See* FoF [¶195], [¶198], [¶289]-[¶290].

[¶581] This approach—attempting to contain protestors to a particular area and trying to work with protest leaders to promote safety—was consistent with the approaches taken by the State and by the pipeline company.  The State took a similar approach to the North Camp that started on State-owned land in the right-of-way to Highway 1806 and later spread onto private land.  *See* FoF [¶151].  The State allowed protestors to remain at the North Camp for weeks, until the pipeline company purchased the private property and insisted that State and local law enforcement remove the protestors from its land.  *See* FoF [¶147], [¶152]-[¶154].  Even after that request from the pipeline company, it took State and local law enforcement over a month to remove the protestors from the North Camp area.  *See* FoF [¶154]-[¶155].  When it eventually did evict the protestors from the

North Camp, the State's containment approach remained essentially the same; law enforcement simply pushed the protestors from the North Camp to the Main Camp on Corps land, two miles south. *See* FoF [¶155], [¶159]-[¶162]. COL Henderson and other Corps officials were well aware of the State's containment approach to the protests. *See* FoF [¶102], [¶344], [¶352]. The pipeline company advocated for a similar containment approach. At one point in late fall or winter 2016, the company offered to donate the Cannonball Ranch land to the Standing Rock Sioux Tribe in exchange for the Tribe's assistance in controlling the activities of protestors, in hopes that would deescalate the protest situation. FoF [¶296].

[¶582] Ultimately, considering the complexities of the situation and feedback from the stakeholders he was in communication with, COL Henderson was faced with three possible options: do nothing, seek to have protestors forcibly removed from Corps land, or offer the Tribe a Special Use Permit. *See* FoF [¶301]-[¶302]. Believing it was necessary to do something to mitigate public confusion and where protestors could be and what they could do, he chose the third option and decided to offer the Tribe the Special Use Permit and make a public announcement about it. FoF [¶302]; *see* FoF [¶137]-[¶144]. Later, he decided to exercise his authority to authorize a free speech zone for lawful protests, in conjunction with his announcement that he would be closing the Corps land to the north of the Cannonball River where the largest number of protestors were camped. *See* FoF [¶196]-[¶200]. COL Henderson decided not to ask State and law enforcement to attempt a mass eviction of protestors from Corps land, given what he knew about the protestors' determination, the State's resources and lack of appetite to conduct such an operation, and the potential that attempting it could result in increased tensions and injuries or the loss of life. *See* FoF [¶301]-[¶302]; *see also* FoF [¶276]-[¶277], [¶280], [¶361].

[¶583] Given the serious potential for injury or loss of life, the deescalation strategy adopted by the

Corps was reasonable.  *See* FoF [¶223].  As MG Dohrmann testified, COL Henderson did "a very good job" in responding to the protests based on the authority he had.  FoF [¶304].  The Court finds the State has not established that COL Henderson acted without reasonable care.

### ii.    Gross Negligence Claim

[¶584] The State claims that the Corps's response to the DAPL protests constituted gross negligence.  *See* ECF No. 1 ¶¶ 124-28.  As with the elements of its ordinary negligence claim, the State bears the burden to prove gross negligence.  *See, e.g.*, *Jacobs v. Nelson*, 268 N.W. 873, 877 (N.D. 1936).

[¶585] Under North Dakota law, gross negligence is defined as "the want of slight care and diligence."  N.D. Cent. Code § 1-01-17.  "'Gross negligence' is, to all intents and purposes, no care at all.  It is the omission of the care which even the most inattentive and thoughtless seldom fail to take of their own concerns.  It evinces a reckless temperament.  It is a lack of care which is practically willful in its nature."  *Bjerke v. Heartso*, 183 N.W.2d 496, 501 (N.D. 1971) (quoting *Rubbelke v. Jacobsen*, 268 N.W. 675, 676 (N.D. 1936)) (a motorist who drifted to the wrong side of the road, causing an accident, was not necessarily grossly negligent if he was inattentive, or momentarily dozing, or even intoxicated while driving).  Evidence of "mental attitude" is necessary to establish gross negligence.  *See, e.g.*, *id.*

[¶586] The State has not established that Corps officials acted with "reckless temperament" or willfulness.  To the contrary, the evidence shows that Corps officials considered the available options carefully and took many actions to deescalate and mitigate the impacts of the DAPL protests.  *See* FoF [¶276]-[¶280], [¶301]-[¶302].  They repeatedly, publicly urged protestors to obey the law and remain peaceful.  *See* FoF [¶140], [¶142], [¶198].  They talked and met with officials of the State dozens of times about the protest response.  *See* FoF [¶281]-[¶286].  They negotiated

with tribal leadership in hopes of securing a Special Use Permit, lowering tensions, and effecting a voluntary move of protestors out of the area (or at least to a safer zone).  *See* FoF [¶199], [¶287]-[¶296].  They coordinated with other federal officials and requested federal law enforcement resources to help manage the situation on the ground, through both formal and informal channels. *See* FoF [¶297]-[¶299].  As to Corps officials' "mental attitude," COL Henderson, the ultimate Corps decision-maker on how to respond to the protests, testified that he was "worried" and "genuine[ly] concerned" that the situation could lead to injury or loss of life, and that those feelings informed his decision-making.  FoF [¶280].

[¶587] The State has not established that the Corps was negligent at all, let alone that it acted with the willfulness and total want of care that constitutes gross negligence.

### iii.    Nuisance Claim

[¶588] The State's nuisance claim also fails.  *First*, a party asserting a claim of public nuisance must show, as a threshold matter, that the conduct it contends constituted the public nuisance occurred on the landowner's land.  Restatement Section 838 limits the landowner's liability to the "*land upon which* a third person carries on an activity that causes a nuisance." *Id.* (emphasis added). The State cannot make this showing.  The protestor conduct that the State complains of—leaving Corps land and conducting "direct action" protest activities, including, at times, breaking the law— occurred *off* of Corps land.  FoF [¶90], [¶237].  Indeed, protestors did not only camp on Corps land. *See* FoF [¶41].  The activity the State complains of was caused by protestors who stayed at a variety of locations, including at the North Camp on private and State-owned land, at camps and the casino on the Reservation, at hotels, and at private residences in the area.  FoF [¶89]-[¶90], [¶171], [¶237].

[¶589] *Second*, the Corps did not "consent" to the protestors' activity of which the State complains. As the comments to Restatement Section 838 explain, "[f]ailure to stop an activity is not alone

sufficient to warrant a finding of consent.  There must be knowledge of the facts plus some manifestation of acquiescence or approval in respect to the persons in question."  Restatement (Second) of Torts § 383, cmt. f.  "Moreover, it is not enough that the possessor has merely consented that others act upon his land in some way.  It must be shown that he *consented to the activity involving the invasion*."  *Id.* (emphasis added).  That is, even if the Corps consented to protestors being on its land (which it did not, at least with respect to the Main Camp on Corps land north of the Cannonball River), the State must show the Corps consented to *the protest activity the State complains of.*  Specifically, the State must show the Corps consented to protestors leaving Corps land to break the law (the activity the State complains of).  *See* FoF [¶237].  The State has not made this showing.  *Cf.* FoF [¶142] (the Corps's September 16, 2016, press release stated that the Tribe was allowed "to gather to engage in a *lawful free speech demonstration* on Federal lands designated in the permit" subject to "applicable Federal, state and local regulations" (emphasis added)); FoF [¶198] (COL Henderson's November 25, 2016, letter to tribal leaders stated that the free speech zone south of the Cannonball River was meant "for anyone wishing to *peaceably* protest the Dakota Access pipeline project, *subject to the rules of 36 C.F.R. Part 327*" (emphases added)); FoF [¶292] (in conversations with tribal leadership, COL Henderson emphasized the need for the Tribe to discourage violence, trespassing on private land, and provoking confrontations with law enforcement).  Without such a showing, the State must establish that the possessor of land failed to act with reasonable care; as discussed above, the State has not established this.  *See* Restatement (Second) of Torts § 838, cmt. g.

[¶590] *Third,* the State has not made a showing of negligence.  The Court has explained that it will limit any liability for nuisance to "negligent or wrongful act[s] or omission[s] of the Corps."  ECF No. 38 at p. 29 ¶ 68.  Here, under Restatement Section 838, a possessor of land is not liable for

"[t]he mere fact that he permits the third person to be upon the land or to do something there, or that he knows of his presence or even of the particular activity."  Restatement (Second) of Torts § 838, cmt. g.  As the comments to Restatement Section 838 explain, a landowner seeking to reasonably address the conduct of third parties on its land must "*at most*" alert law enforcement to the situation.  *Id.*  (explaining that a possessor of land is "not required in all cases to put a stop to the activity," but may be in a position to stop the activity, "at most by calling the police").  The State has not shown that the Corps failed to comply with this standard.  The Corps did not fail to alert State and local law enforcement; rather, Corps officials knew State and local law enforcement were already aware of the protest situation and had decided to adopt an approach based on deescalation and containment, instead of making mass arrests of protestors.

[¶591] The State has not proven its nuisance claim.

### iv.  Trespass Claim

[¶592] The State has failed to prove its trespass claim.  As an initial matter, the Court has determined that this claim requires proof that the Corps's conduct violated Restatement Section 318.  *See* ECF No. 38 at pp. 28-29 ¶¶ 66-67; ECF No. 383 at p. 7 ¶ 15.  As discussed above, the State has not carried its burden to make that showing.  Additionally, the State's trespass claim fails under North Dakota law because the State has not established that the Corps intentionally caused third parties to trespass on State land.

[¶593] Under North Dakota law, civil trespass is defined as "an intentional harm, where a person intentionally and without a consensual or other privilege . . . enters land in possession of another or any part thereof or causes a thing or third person so to do." *Tibert v. Slominski*, 692 N.W.2d 133, 137 (N.D. 2005) (internal quotations and citation omitted).  "If there is no intent or 'affirmative voluntary act' by the alleged wrongdoer, there cannot be a claim for trespass." *Id.* (citation omitted)

(emphasis added). And the plaintiff must show that the trespass was onto the plaintiff's land. *See, e.g.*, *McDermott v. Sway*, 50 N.W.2d 235, 240 (N.D. 1951) (reversing a district court finding of trespass where the evidence showed that the defendant "had no intention of trespassing on plaintiff's land or of causing anyone else to do so," and thus the evidence failed to show "that there was a trespass by the defendant upon the plaintiff's land").

[¶594] The State's evidence did not show that Corps officials took intentional, affirmative voluntary acts that caused, and were intended to cause, protestors to go onto the State's land. Corps officials responded to protestors who came onto Corps land unannounced. *See* [¶80], [¶82], [¶336] (the protests started off of Corps land and then spilled onto Corps land without the Corps's permission); [¶93]-[¶99] (discussing how the protests expanded quickly and unexpectedly in mid-August 2016). When the Corps made statements in attempt to manage and deescalate tensions within the groups that were already on Corps land for their own reasons, those statements did not encourage protestors to go onto State land. *See* FoF [¶139]-[¶141], [¶302]. And the Corps emphasized in its public statements the need for protestors to obey the law and act peacefully. *See* FoF [¶142], [¶198].

[¶595] Because the State has not established that Corps officials intentionally caused third parties to trespass on the State's land, the State's trespass claim must fail.

### D.  Causation

[¶596] As the North Dakota Supreme Court has made clear, finding duty and a breach of that duty does not automatically establish causation. Proximate cause is a separate element from duty and breach, and the plaintiff must prove it separately. *See Knorr*, 300 N.W.2d at 50 (rejecting trial court's determination that "once a breach of duty (negligence) is found, in the absence of a subsequent, independent or unforeseeable act the proximate cause necessarily follows from that

breach"). Thus, the State bears the burden to prove that Corps officials' actions caused the damages seeks—*independent from* a showing that a duty was owed and breached, discussed above.

[¶597] The Court has held that two statements by the Corps were non-discretionary acts that may be the basis for liability: the September 16, 2016, press release and the November 25, 2016, letter to tribal leadership. *See* ECF No. 38 at pp. 16-19 ¶¶ 38, 42-45, p. 19 ¶ 45, pp. 21-22 ¶ 50. The State has not established that either of these statements caused its claimed damages in the form of protest-response costs. To the contrary, the evidence shows that other events and other factors were the cause of the protests and the State's corresponding law-enforcement response and associated costs.

###        i.        Showing But-For Causation in the Context of Protest Activity

[¶598] A plaintiff claiming that its injury resulted from protest-related activity must show that the plaintiff "would not have been injured but for" the defendant's actions in connection with the protests. *Mckesson*, 71 F.4th at 292. This requires more than just a showing that the defendant's actions "encouraged or committed unlawful-but-nonviolent actions that preceded violence." *Id.* at 302 (Willett, J., concurring in part and dissenting in part). Showing causation in these circumstances "is a tall task, and the standard will only be met in the exceptional cases where . . . the well-pleaded allegations support the inference that the leader's specific actions caused the plaintiff's injuries." *Id.* at 71 F.4th at 292 (majority opinion). "In most cases," altercations in high-intensity situations "would have occurred regardless" of how the leader of the protest event or the owner of the event venue acted. *Id.* at 292 n.8. "Only seldomly will a plaintiff be able to prove that the specific actions taken by the defendant caused the alleged injury." *Id.*

[¶599] Moreover, in assessing causation, courts cannot treat disparate individual actors "as a unified whole." *Murthy v. Missouri*, __ U.S. __, 144 S. Ct. 1972, 1987-94 (2024). In *Murthy*, two

states and several individuals alleged that various federal Executive Branch officials and agencies violated their rights by pressuring social-media platforms to censor speech. *See id.* at 1983-84. The Supreme Court held that, "in a sprawling suit like this one," where the social-media platforms had "independent incentives" to act, "often exercised their own judgment," and took certain actions before the government's challenged communications started, it was "critically important" to "untangle the mass" of the plaintiff's injuries and the government's actions to determine whether the government's actions specifically caused the social-media platforms to impose allegedly wrongful restrictions on particular individuals. *Id.* at 1987-89. The Court held that the plaintiffs could not "gloss[] over complexities in the evidence" by attributing all of the social-media platforms' restrictions to the federal government's actions. *Id.* at 1988. The Court then examined the evidence and concluded that the plaintiffs had not made the requisite causation showing because: (1) the social-media platforms had moderated conduct long before any of the challenged acts by the federal government; (2) the platforms did not only speak with the federal government about content moderation but also regularly consulted with outside experts; and (3) the platforms had other incentives to moderate content, outside of the actions of the federal government, and they often exercised their own judgment about content moderation. *See id.* at 1987-88. Thus, the Court concluded the plaintiffs lacked standing because they failed to show that the government's actions specifically caused the social-media platforms to restrict the plaintiffs' speech. *See id.* at 1989-97. [¶600] Under *Mckesson* and *Murthy*, the Court here must examine the specific evidence to determine whether protestors would not have engaged in unlawful activity but for the Corps's alleged wrongful conduct. In this analysis, the Court cannot treat the protestors as a unified whole, and cannot gloss over complexities in the evidence by attributing all of the protest events to actions of the Corps.

[¶601]  The evidence shows that the protestors were not a unified whole.  They included a multitude of factions with shifting and uncertain leadership.  *See* FoF [¶87], [¶88], [¶240].  Even if the evidence showed that Corps officials actions caused some activity by protestors that harmed the State—which it does not—that evidence would not establish that the *entirety* of the protests were caused by the Corps.

[¶602]  As discussed below, the protests began several months before the Corps's statements at issue.  *See* FoF [¶80], [¶84]-[¶92], [¶99], [¶113]-[¶119]; ECF No. 38 at 14, 19.  The evidence does not show that the protests increased in size or intensity immediately after either of the non-discretionary acts identified by the Court.  *See* FoF [¶270]-[¶272].  And protestors regularly communicated with other entities, including State officials, throughout the protests.  *See, e.g.*, FoF [¶151], [¶294], [¶296], [¶352].  Protestors also exercised their own independent judgement and were driven by a variety of motivations and external factors, separate from any actions by the Corps. *See* FoF [¶238]-[¶268].

### ii.    Showing Proximate Causation

[¶603]  To prevail, the State must also show that actions by Corps officials proximately caused the State's damages.  Proximate cause is "a cause which, as a natural and continuous sequence, unbroken by any controlling intervening cause, produces the injury, and without which it would not have occurred." *Johnson v. Mid Dakota Clinic, P.C.*, 864 N.W.2d 269, 275 (N.D. 2015) (cleaned up).  To be a proximate cause, "the injury must be the natural and probable result of the conduct and must have been foreseen or reasonably anticipated by [the defendant] as a probable result of the conduct." *Cichos v. Dakota Eye Institute*, 5 N.W.3d 796, 804 (N.D. 2024) (quoting *Kimball v.*

*Landeis*, 652 N.W.2d 330, 334 (N.D. 2002)).  The proximate-cause standard thus looks to whether the injury was foreseen or reasonably anticipated by the alleged tortfeasor.

[¶604] Under North Dakota law, a plaintiff raising a negligence claim must present "affirmative evidence of proximate cause, and may not establish causation solely by discrediting other possible causes." *Investors Real Estate Trust Properties*, 686 N.W.2d at 144.  Causation may not be based on mere speculation.  *Id.*

[¶605] As the Restatement frames it, an actor's conduct is the legal cause of the claimed harm only if "his conduct is a substantial factor in bringing about the harm."  Restatement (Second) of Torts § 431 (Am. Law Inst. 1965).  An actor's conduct is not a substantial factor "if the harm would have been sustained even if the actor had not been negligent."  *Id.* § 432(1).  In addition, Restatement Section 433 lists "considerations . . . important in determining whether the actor's conduct is a substantial factor" in causing the alleged harm, including:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts § 433 (Am. Law Inst. 1965).

[¶606] A cause is not a "substantial factor" if other actions had a "predominant effect" of bringing about the harm.  *Id.* cmt. d.; *see also Bellflower v. Pennise*, 548 F.2d 776, 778 (8th Cir. 1977) (stating that a landowner is not ordinarily liable for nuisance "where his property is, by the act of independent third parties, made the instrumentality of a nuisance, since *their* act is the proximate cause" (emphasis added)).

[¶607] Under these standards, the State has not established that the Corps's actions at issue were

the proximate cause of the State's damages, as discussed below.

### iii.   The Protests' Rapid Growth and Extended Duration Was Not Foreseen or Reasonably Anticipated by the Corps

[¶608] The rapid growth and extended duration of the protests was not "foreseen or reasonably anticipated by" Corps officials "as a probable result of the conduct." *Cichos*, 5 N.W.2d at 804. Corps witnesses, and State witnesses as well, all agreed that the protests were unique and unprecedented, and that the protestors' actions were unpredictable. FoF [¶238]-[¶239].

[¶609] When COL Henderson first learned the protests were growing and had spilled over onto Corps land north of the Cannonball River, he did not believe they would grow as large or last as long as they ultimately did. FoF [¶97]. He anticipated that the protests might increase somewhat leading up to the preliminary injunction hearing on August 25, 2016, in the *Standing Rock Sioux Tribe* litigation in the U.S. District Court for the District of Columbia, but that the protests would fade after the court issued a decision shortly after. *See id.* His expectation was reasonable. *Cf.* FoF [¶238] (State's After-Action Report acknowledging that "[b]ecause an event of this scope and magnitude had never occurred in North Dakota history, all levels of government were slow to recognize the enormity of the situation."); JX 272 at 1 (Morton County Commission Chairman Cody Schulz wrote that "[a]t the start of the DAPL protest, law enforcement and county leaders never expected the activity to shift so quickly—and to remain for so long."). When State and federal officials met with tribal elders as representatives of the protest camps on August 23, 2016, they discussed a "four day period of celebration or mourning" following the court's decision, after which it was proposed the Tribe would stop providing support to the protests. *Id.* State officials viewed the pending *Standing Rock Sioux Tribe* decision as a potential flashpoint, and protest activity did in fact increase after the court issued its decision denying the Tribe's motion for a preliminary injunction. *See id.*

[¶610] Ultimately, COL Henderson's reasonable expectation that the protests would fade away after the *Standing Rock Sioux Tribe* decision was issued was incorrect.  Instead, a number of unexpected, intervening factors caused the protests to rapidly grow in size and intensity.  One such factor was the confrontation between the pipeline company's private security contractors and protestors on September 3, 2016.  *See* FoF [¶113]-[¶119].  Another was the decision by the Department of the Army, Department of Justice, and Department of the Interior on September 9, 2016, to announce that, notwithstanding the court's decision denying the preliminary injunction in the *Standing Rock Sioux Tribe* litigation, the Army would not authorize the pipeline's construction for the time being.  *See* [¶121]-[¶124]; *see also* [FoF] [¶125] (COL Henderson and other Corps officials were not made aware of that planned statement in advance, and they were surprised by it).  Yet another was the clash between State and local law enforcement on the Backwater Bridge on November 20-21, 2016.  *See* FoF [¶171]-[¶181].  Another was the Department of the Army's decision on December 4, 2016, to delay the decision on the easement for the pipeline to cross Lake Oahe.  *See* FoF [¶73], [¶243]; *see also* FoF [¶68] (by that point, COL Henderson had already completed his approval of the necessary permits for the pipeline crossing, and he other Corps officials did not have any control over the easement decision).  The evidence indicates that each of those events contributed far more to the growth in size and intensity of the protests, and to the protests lasting as long as they did, than either of the statements by the Corps at issue.

### iv.    The State Would Have Incurred Protest-Response Costs Regardless of the Corps's Statements

[¶611] The State seeks to recover its protest-response costs as damages.  *See* FoF [¶367]-[¶368], [¶381].  The evidence indicates that, even without the two Corps statements at issue, the State would have incurred significant protest-response costs, for several reasons.  First, the State's law-enforcement response to the protests began over a month before the first of the Corps's statements.

FoF [¶91], [¶142].  This timing undermines the State's claim that its response costs were caused by the Corps's statements.

[¶612] Second, throughout the protests, protestors were not only located on Corps land, but also at camps on Reservation, State, and private land; at hotels; and with friends and family in the area. FoF [¶41].  Some of the protestors who broke the law, necessitating the State's law-enforcement response, came from areas other than Corps land.  *See, e.g.*, FoF [¶89] (protestors used the Prairie Knights Casino, located off of Corps land on Standing Rock Indian Reservation land, as a base of operations and to plan protest activities); FoF [¶90] (protestors came from not only Corps land, but also from hotels, the casino, and the houses of friends and family to engage in direct protest actions); FoF [¶150]-[¶151] (some protestors at the North Camp on State and private land broke the law by, for example, possessing drugs and unauthorized weapons, camping alongside and obstructing the State highway, and tearing down concertina wire near the pipeline construction site); FoF [¶171] (some of the protestors at the Backwater Bridge incident on the night of November 20-21, 2016, came from the casino on Reservation land).  The presence of numerous protestors at locations *other* than Corps land—including some protestors who broke the law—undermines the State's claim that its harms were caused by the Corps's decisions in connection with the protests on Corps land.  The State has not sought to recover any of its protest-response costs from any of those other landowners, nor has it made any reduction in its claimed damages to account for the fact that not all protestors were staying on Corps land.

[¶613] Third, even if the Standing Rock Sioux Tribe had completed the conditions such that a final Special Use Permit was in place, that would not have eliminated the State's damages.  The performance bond would have been in the amount of $100,000, and it would have accrued to the benefit of the *Corps*—not the State—to remediate damage to Corps property.  FoF [¶49], [¶138].

The liability insurance would have provided for $1 million in coverage for each occurrence of *property damage*, $5 million for occurrences of *personal injury*, or $5 million for all claims per occurrence. FoF [¶138]. It would have named the Tribe as the primary insured with the United States government (not the State) named as a secondary insured. FoF [¶138]. That is, the bond and insurance would have protected the Tribe and the United States from expenses associated with damage to Corps property or injury to persons on Corps property. *See id.* There is no evidence that, even if the Tribe had secured the performance bond and liability insurance, the State would have had the ability to recover its *law-enforcement protest-response costs* based on events *off* of Corps land, which are the damages it seeks in this litigation. *See* FoF [¶49], [¶138], [¶237], [¶367]-[¶368], [¶381].

[¶614] Finally, even accepting *arguendo* the State's latest theory that the Corps erred by not seeking the forcible removal of protestors in mid-August 2016, the State still would have incurred protest-response costs. The most reasonable inference from the evidence adduced at trial was that, even if the Corps had been able to remove all the protestors from its land and had chosen to do so, that would not have resolved the protest situation. State and Corps officials were reasonably concerned that, if protestors were evicted, they might simply relocate to another location in the area. *See* FoF [¶277]; *see also* DX 4222 at p. 48 ¶ 81 (report of United States' expert, Dr. Noam Yuchtman, observing that there was a range of alternative camp sites available, besides the areas of the encampments on Corps land, which protestors might have used if the Corps had sought to evict them); FoF [¶273] (COL Henderson believed that even if the Tribe had a finalized Special Use Permit, that would not have stopped what was already happening on the ground for a month before the Corps's September 16, 2016, statement). The protestors' behavior showed that they were generally determined and reluctant to obey orders from law enforcement to disperse. *See* FoF

[¶157]-[¶[158], [¶163], [¶173], [¶239].  As the then-Executive Director of the North Dakota Indian Affairs Commission Davis testified, protestors would not listen to instruction about where to protest.  FoF [¶239].  As FBI Agent O'Connell testified, it was the resources—in particular, monetary support—that were available to protestors that made a difference, and not the location of where protestors were camped.  ECF No. 421, Dep. Tr. 110:15-25 (O'Connell).

### v.    The Corps's Actions Did Not Cause the Protests

[¶615] *The September 16 and November 25, 2016, Statements.*  The State contends the Corps's statements "invited" and "encouraged" protestors.  *E.g.*, ECF No. 450-1 at p. 77 ¶ 335, pp. 93-94 ¶ 393, p. 95 ¶ 400, p. 100 ¶ 418.  But even if that were so, it would not necessarily follow that those statements *caused* a change in the protest activity on the ground.  To the extent the statements can be construed as an "invitation"—and not a response to an extant situation that was rapidly spiraling out of anyone's control—the evidence shows that protestors either did not hear that invitation, or simply ignored it.

[¶616] Though it is the State's burden to establish causation, it has not offered any evidence that the two statements by the Corps actually changed anything about the protest situation on the ground, or the amount of money the State spent in response.  The most the State offers on this point is testimony from a retained expert, Dr. Katherine Kuhlman.  Dr. Kuhlman testified about "reinforcement theory," the idea that action or lack of action increases or decreases the probability of an individual behaving in a particular way.  *See* Tr. 1795:10-1797:19 (Day 11; Kuhlman).  She opined that the actions of the Corps, and other federal officials, "reinforced the actions of protestors."  *Id.* at 1799:6-11.

[¶617] The Court finds that Dr. Kuhlman's testimony is not credible and does not establish causation, for several reasons.  First, Dr. Kuhlman conceded that she was not opining that any

actions of the federal government *caused* any protest behavior or *caused* protestors to be present at the protests. *Id.* at 1828:25-1829:5. In fact, she testified that "I do not believe [actions of the federal government] caused protest behavior." *Id.* at 1828:24-1829:2.

[¶618] Second, Dr. Kuhlman acknowledged that if a person was not aware of a statement, then the statement could not motivate that person one way or another; that is, the application of reinforcement theory depends on the premise that individual actors are aware of the statement in question. *See id.* at 1832:13-22. She also acknowledged that a statement's impact might differ from person to person, and different people might interpret the same potential reinforcements differently. *See id.* at 1840:15-19, 1841:1-12 (testifying that to determine whether something is a reinforcement for a particular person, one must consider how that person subjectively perceives that potential reinforcement). With regard to the DAPL protests, Dr. Kuhlman testified that she could not determine whether different protestors perceived potential reinforcements differently based on the information she had. *See id.* at 1842:13-25.

[¶619] Third, though Dr. Kuhlman testified that the best source of understanding protestors' motivations is their deposition testimony, she did not review all the available depositions from protestors in this case—she only read two of the three transcripts from protestors' depositions. *See id.* at 1850:15-21.

[¶620] Fourth, Dr. Kuhlman's analysis of the two protestor depositions she did review was not consistent with that evidence. She concluded that the testimony of those two protestors established that the September 16 press release "[p]rovided positive support, encouragement, and positive reinforcement to the SRST and DAPL protestors." PX 2030 at 0007 (Dr. Kuhlman's expert report). But she acknowledged that one of the protestors testified in his deposition that the September 16 press release did *not* impact his decision to protest against the pipeline, and the other protestor

testified that the September 16 press release did *not* cause her to come to the protest camps, did *not* cause her or any other protestors to stay any longer, did *not* cause her or other protestors to engage in any civil disobedience in opposition to the pipeline, and that she was *not* aware of anyone opposed to the pipeline who cared whether or not the Corps granted permission to gather on Corps-managed land. *See* Tr. 1846:2-1847:8 (Day 11; Kuhlman).

[¶621] Fifth, Dr. Kuhlman based her opinion on actions by non-Corps federal officials that are simply irrelevant to the question of what the specific statements of the Corps caused. Those actions by non-Corps officials included, among other things, a photo of President Obama with Chairman Archambault that was taken two years before the protests, and the decision of an attorney for the Department of the Interior as to which side of the courtroom gallery to sit on at a hearing. *See* PX 2030 at 8, 10; Tr. 1834:15-23 (Day 11; Kuhlman). Dr. Kuhlman acknowledged that she had no evidence as to whether protestors were aware of these events, or the impact the events had on protestors if so. Tr. 1835:6-8; 1836:18-24 (Day 11; Kuhlman).

[¶622] The Court observes that Dr. Kuhlman's reinforcement-theory reasoning would apply with equal force to decisions State officials made in connection with the protests as it would to decisions of the Corps or other federal officials. For example, Dr. Kuhlman testified that the State's decisions to provide life-support assets at the camps on Corps land would serve as reinforcement for the protestors. *See id.* at 1839:4-11. So, too, would State officials' statements around the time of the Big Push that protestors should remain at the Main Camp to peacefully protest. *See id.* at 1861:22-1862:8, 1865:20-1866:17. And so would State and local law enforcement's decisions not to arrest protestors for breaking the law when they have the authority to do so. *See id.* at 1862:11-22, 1862:23-1868:19 (discussing examples of occasions where State and local law enforcement chose not to arrest lawbreaking protestors).

[¶623] It is not the United States' burden to prove a negative—that the actions of Corps officials did *not* cause the State's damages. *Cf., e.g.*, *Investors Real Estate Trust Properties, Inc.*, 686 N.W.2d at 144 (the State bears the burden of proving all of the elements of its claims). Nonetheless, the evidence overwhelmingly supports that conclusion.

[¶624] Testimony from protestors themselves uniformly showed that the two Corps statements did not cause them to come to the protests. To the contrary, the only evidence from protestors is that those statements did *not* cause protestors to come to the area, to stay longer once they were there, or to engage in more civil disobedience. *See* FoF [¶270]. Dr. Nicholas Estes testified that neither statement caused him to come to North Dakota or stay there during the protests, that the September 16 press release did not cause him to come to the protest camps and did not have any bearing on his actions, and that the November 25 letter did not cause him to come to the protest camps or stay any longer than he otherwise would have. *See id.* Winona LaDuke testified that as for the September 16 press release, she did not view herself as needing permission from Corps to go on her own land, and that other protestors felt the same. *Id.* As for the November 25 letter, Ms. LaDuke testified that it did not cause her to engage in any civil disobedience or stay any longer at the camps. *Id.* Chase Iron Eyes testified that the September 16 press release "wasn't really relevant to . . . what [the protestors] were doing," and it did not make any difference to him in deciding about whether to engage in protests. *Id.* He also testified that, based on his own participation in and observation of the protests, he did not observe any impact from the September 16 press release on protests. Relatedly, Scott Davis, the North Dakota Indian Affairs Commission Executive Director, similarly testified that the people he personally knew who were participating in the DAPL protests never mentioned the September 16 press release, and that they never talked with him about the November 25 letter. *Id.*

[¶625] Contemporaneous estimates of the protest camps' population did not increase immediately following either of the two Corps statements at issue.  FoF [¶271].  And the State itself did not view either statement as significant when it created After-Action Reports shortly after the protests concluded.  *See* FoF [¶272] (one such After-Action Report created by the State included a 40-plus page summary of protest events, with daily entries beginning on August 10, 2016; the summary did not mention the September 16 press release or the November 25 letter's creation of a free speech zone).

[¶626] Testimony from two experts offered by the United States further supports the conclusion that the Corps's statements were neither the but-for nor the proximate cause of the protests.  The first expert is Dr. Joel Steckel, who is an expert in marketing research and consumer behavior.  Tr. 2721:9-16 (Day 17; Steckel).  Dr. Steckel conducted a study encompassing a broad set of data: contemporaneous vehicle counts from the State, protestor population estimates from the BIA, online donation amounts, and an enormous volume of social media data culled from Facebook and Twitter.[10]  *See* DX 4225 at 5.

[¶627] Dr. Steckel found that the reported measures and the large-volume data from social media

---

[10] The Court raised questions at trial as to the availability of internet access at the protest camp sites. *See* Tr. at 2827:6-2829:4 (Day 17; Steckel).  The evidence shows that, while internet service may have been unreliable at times in the areas of the camps, protestors who were staying at the camps were nonetheless able to regularly post and even live-stream on social media.  *See, e.g.*, Tr. 78:9-14 (Day 1; Schulz) ("[P]rotestors themselves would live stream these direct actions on Facebook and we could see it happening, literally getting in cars leaving, and returning while those live streams were happening."); Tr. 1507:16-1508:9 (Day 9; Van Horn) (testifying that he gathered "extremely abundant information/intelligence" via Facebook throughout the protests, including "live feeds" from protestors on the ground, and that he verified the accuracy of that information through sources such as drone footage and interviews of arrestees); *id.* at 1524:23-1525:12 (testifying that he observed a "direct" correlation between activity on social media and protest activity on the ground); Tr. 2517:13-21 (Day 16; LaDuke) (Ms. LaDuke learned of the events on the Backwater Bridge of November 20-21, 2016, "[v]ia Facebook feed"); PX 1126 at 0002 (State law enforcement report reflecting a social-media post from a protestor at the North Camp who went to the casino to "borrow their wifi in the parking lot").

had statistically significant correlations. DX 4225 at 175-76. Those correlations show that the reported measures and the social media are measures of the same underlying phenomenon. *Id*. at 175. That is, the reported measures and the social media measures are all tapping into the same underlying construct, which was the behavior of the protestors and their supporters. Tr. 2746:7-11 (Day 17; Steckel).

[¶628] For each of the two Corps statements at issue, Dr. Steckel considered whether the data supported the three essential conditions to establish a causal relationship: (1) covariation, that a change in behavior coincided with a Corps statement at issue; (2) precedence, that a Corps statement at issue preceded the observed change in behavior; and (3) elimination of alternative explanations, that there was not a more likely reason for the observed change in behavior. DX 4225 at 5. If the Corps statement at issue had a causal impact, then one would expect evidence that the three conditions were met for the Corps statements at issue. *Id*. And one would expect that the context of the social media posts themselves would contain corroborative evidence. *Id*.

[¶629] Dr. Steckel found no significant evidence to support a causal claim for the September 16 press release. *Id*. The BIA population estimates, Twitter volume, and Facebook volume data all indicate that those behavioral measures either remained stable or declined on the date of and shortly after that press release. *Id*. The time period of the September 16 statement was unremarkable in both the Twitter and Facebook data, ranking low in overall volume and when controlling for short-term trends. *Id*. An examination of the social media posts showed no significant evidence that the September 16 press release motivated DAPL protestors or their supporters. *Id*. While the BIA population estimates were fairly elevated during this time period, they actually are in decline from the week prior to the press release. *Id*. Thus, the September 16 press release fails the first two conditions necessary to establish causality (covariation and precedence). *Id*.

[¶630] As for the November 25 letter, there is a mild indication of some elevated behavioral measures during that time period. *Id.* at 6. In particular, November 25 is fairly highly ranked in terms of BIA population estimates, vehicle counts, and social media. *Id.* However, Dr. Steckel was unable to attribute those elevated measure to the November 25 letter, for at least two reasons.

[¶631] First, those behavioral measures were already elevated and rising prior to the November 25 letter. *Id.* For example, November 21 was the third-highest volume day on Twitter and the sixth-highest volume day on Facebook; that day coincided with the clashes between protestors and law enforcement at the Backwater Bridge. *Id.* The BIA population estimates and vehicle counts data were similarly elevated just prior to the statement. *Id.* Because these behavioral changes already existed prior to the November 25 letter, the precedence condition for causality was not met, and so no causation was established. *Id.*

[¶632] Second, the content of the social media posts during relevant time period also shows no evidence of causality. *Id.* Dr. Steckel considered the content of the social media posts the day of and the day after the November 25 letter. *Id.* He found that: (a) the November 25 letter was not a significant subject within the overall social media conversation; and (b) the small portion of the conversation that did concern the November 25 letter was overwhelmingly critical rather than supportive. *Id.* In contrast, the clashes between DAPL protestors and law enforcement not only exhibited stronger correspondence with the onset of elevated behavioral measures, but their importance was further corroborated by their dominance of the social-media conversation during this time period. *Id.* Therefore, the data did not allow Dr. Steckel to rule out those alternative explanations for the observed trend (the third condition for causation) and thus, there is a lack of evidence for a causal link between the November 25 letter and the behavioral measures. *Id.*

[¶633] In summary, after examining a variety of sources of evidence using several modern data-

analysis methods, Dr. Steckel concluded that there is no evidence that either the September 16 press release or the November 25 letter had a substantial impact on the behavior of DAPL protestors or their supporters. *Id*. The convergence of results using multiple techniques across multiple data sources supports a high degree of scientific certainty for those conclusions. *Id*.

[¶634] The State offered an expert witness in rebuttal to Dr. Steckel, Gary Warner. Mr. Warner took issue with some of Dr. Steckel's data collection methods. But Mr. Warner himself did not conduct any social media study of his own. *See* Tr. 2984:12-18 (Day 18; Warner). He did not offer any opinion about the cause of the protests, or the cause of the State's damages. *Id*. at 2984:19-24. Mr. Warner's testimony, then, does not establish that the Corps statements at issue caused the State's claimed damages. *Cf., e.g.*, *Investors Real Estate Trust Properties, Inc.*, 686 N.W.2d at 144 (the burden rests on the State, as the plaintiff, to prove each element of its claims—not on the United States, as the defendant, to disprove them).

[¶635] The second United States expert whose testimony supports the conclusion that the Corps's statements did not cause the State's damages is Dr. Noam Yuchtman. Dr. Yuchtman is a political economist who has written about people's decisions to protest. *See* Tr. 2849:12-2851:20 (Day 17; Yuchtman); DX 4222 at p. 6 ¶ 4.

[¶636] Dr. Yuchtman evaluated whether: (1) the September 16 press release or November 25 letter had an effect on the level of participation in, or intensity of, the protests; (2) the Corps' decision not to pursue an immediate eviction of protestors had an effect on protest participation or intensity; and (3) other causal factors may have contributed to protest participation or intensity. DX 4222 ¶ 1. He used quantitative and qualitative evidence to reach his conclusions. The quantitative evidence he used was from Dr. Steckel's report. DX 4222 ¶ 12. The qualitative evidence he used included, among other things, 43 deposition transcripts, social media, and the expert reports from

Dr. Steckel and Dr. Greenwald.  DX 4222 at 105-114; Tr. 2856:5-2857:11 (Day 17; Yuchtman).

[¶637]  Dr. Yuchtman found that neither the September 16 press release nor the November 25 letter affected the level of participation in, or intensity of, the protests.  From a quantitative perspective, he applied the event-study methodology and considered Dr. Steckel's analysis and data.  DX 4222 ¶¶ 56-60.  Dr. Yuchtman reviewed Dr. Steckel's methods and conclusions and agreed that the qualitative evidence showed no substantial effect from the September 16 press release, and there is no clear evidence of a causal effect of the November 25 letter on protestor activity.  DX 4222 ¶¶ 58, 60.

[¶638]  Nor did Dr. Yuchtman find from a qualitative perspective that that the September 16 press release or the November 25 letter had a causal effect on the protests.  To evaluate the qualitative evidence, Dr. Yuchtman applied a framework derived from academic literature that considers what makes people protest.  DX 4222 at pp. 21-34 ¶¶ 36-54.  This framework recognizes that protestors are both "born" (that is, have a set of preferences and ideologies that shape their decision to protest) and "made" (that is, precipitating causal factors help determine whether an individual will protest).  *Id.* at p. 21 ¶ 36.  To evaluate whether something was a causal factor for protest, Dr. Yuchtman derived five questions from academic literature that consider the "born" and "made" elements.  Tr. 2903:16-20 (Day 17; Yuchtman); DX 4222 at pp. 23-24 ¶ 40 & Figure 3.  Those are: (1) how did the proposed cause shape the protestors' fundamental preferences and the ideologies of potential protest participants; (2) how did the proposed cause shape political action through the creation or activation of social networks; (3) how did the proposed cause affect the "public good" that the protest was aimed at achieving; (4) how did the proposed cause affect coordination costs; and (5) how did the proposed cause affect expectations of crackdown, and other anticipated costs of protest participation?  DX 4222 at p. 30 ¶ 50 & Figure 4.  These five questions evaluate what actually

happened versus a "counterfactual," that is, a hypothetical world that is identical to the world that actually happened except for the removal of the proposed causal factor. Tr. 2866:15-19 (Day 17; Yuchtman). So, to evaluate whether the September 16 press release or November 25 letter caused an increase in protest size or intensity, Dr. Yuchtman compared the actual world where the September 16 press release and November 25 letter were issued versus a counterfactual hypothetical one where they were not. *Id*.

[¶639] Analyzing the qualitative evidence regarding the September 16 press release and the November 25 letter through these five questions, Dr. Yuchtman found that those statements had no meaningful effect on protest size or intensity. DX 4222 at pp. 37-44 ¶¶ 61-74 & Figure 7.

[¶640] The evidence shows that the Corps statements of September 16, 2016, and November 25, 2016, did not cause the protests to start, to grow in size or intensity, or to last longer than they otherwise would have.

[¶641] *The Corps's Decision Not to Pursue an Immediate Eviction of Protestors.* The State also has not established causation to support its latest theory of liability, which is that the Corps should have pursued an eviction of protestors as of mid-August 2016. *See* ECF No. 450-1 at p. 2 ¶ 5, pp. 64-65 ¶¶ 269, 271, p. 84 ¶ 361, p. 96 ¶ 404, p. 92 ¶ 388. (To be clear, this theory is foreclosed by the Court's Order on the motion to dismiss and the discretionary function exception, among other reasons. *See* Section I.A.iv., *supra*. It is discussed here in the interest of completeness.)

[¶642] Dr. Yuchtman found that the Corps' decision not to forcibly remove protestors from Corps land early in the protests made the likelihood of protest participation *less* likely. In the counterfactual he considered, the Corps would have evicted protestors from Corps land, with the assistance of law enforcement, on August 23, 2016 (a date chosen because that is the day after the Governor of North Dakota asked the Corps to deny the protestors the right to camp on Corps land).

Tr. 2874:16-2875:1 (Day 17; Yuchtman); DX 4222 ¶ 77.  If protestors were pushed off of Corps land, the counterfactual recognizes that they could have moved elsewhere; indeed, protestors were staying at other locations at the time.  DX 4222 ¶¶ 80-81.  The use of those other locations suggests that forced eviction from Corps land would have simply moved protestors to other locations.  Tr. 2927:17-21 (Day 18; Yuchtman).

[¶643] Furthermore, social media would have been available wherever the protestors were physically located to coordinate among protestors and solicit support.  DX 4222 ¶ 97.  Evaluating the five questions, Dr. Yuchtman concluded the Corps not evicting protestors early on made protest participation less likely, because, among other things, the protestors still would have been in the area, likely clashes with law enforcement would have given protestors more to protest about, and protestors would have been able to leverage the image of law enforcement removing Native Americans *en masse f*rom historically Native land to garner further support for their cause.  DX 4222 ¶¶ 97-99.

[¶644] The evidence adduced at trial does not show that protestors were any more or less likely to break the law if they were camped on Corps land, as opposed to staying elsewhere.  *See* FoF [¶89]-[¶90] (protestors stayed at a variety of locations, and they came from not just Corps land, but also from other camps off of Corps land, hotels, the casino, and from the houses of family and friends to engage in direct action protest activities).

[¶645] Moreover, the evidence did not show that permission from the Corps to be on Corps-managed land made a difference for protestors' decisions to participate in the protests.  *See* FoF [¶273].  Ms. LaDuke testified that it would have made no difference whether the Corps issued a Special Use Permit or not; she was at the camp at the request of the Lakota people and that was all the authority she needed.  *Id.*  Dr. Estes testified that he was at the camps because there was a

call to bring together the Oceti Sakowin, a call that was not made by the Corps, and that he could not think of any statement from the federal government during the time of the protests that caused him to come to the protest camps or stay at them. *Id.* And Mr. Iron Eyes testified that the decision to locate the Main Camp on Corps land to the north of the Cannonball River was not influenced by any kind of permission or consent from federal government, that at no time did it make any difference to him whether or not protestors had permit from Corps to be on Corps land, and in his observation of the protests it did not make any difference to anyone involved in protests.

[¶646] In sum, the evidence does not show that actions of the Corps—whether in issuing the September 16 or November 25 statement, or in deciding not to evict the protestors in mid-August 2016—caused the protests, or caused the State to incur the protest-response costs it seeks to recover as damages.

### vi.     Other Factors Besides the Corps's Actions Caused the Protests

[¶647] If the "combined effect" of other events have a "predominant effect in bringing" about the plaintiff's harm, those other factors can "prevent" the defendant's conduct "from being a substantial factor" in the plaintiff's harm. Restatement (Second) of Torts § 433 cmt. d; *see* Restatement (Second) of Torts § 431 (an actor's conduct is the legal cause of the claimed harm only if "his conduct is a substantial factor in bringing about the harm"). The evidence at trial showed that other factors besides actions of Corps officials had a "predominant effect" of bringing about the State's harm. Those other factors included the protestors' own, independent beliefs and motivations, the Assistant Secretary of the Army for Civil Works' decision-making on the pipeline easement, the historical and cultural context, the Standing Rock Sioux Tribe's early calls for support for the protests and its litigation against the Corps, social media and online donations, celebrity involvement, the perception that State and local law enforcement were being heavy-handed in their

response to the protests, and actions by the pipeline company. *See* FoF [¶238]-[¶268]. As discussed above, each of those factors had a significant impact on the protest events on the ground, causing the protests to grow larger, last longer, and be more intense than they otherwise would have. *See id.*

[¶648] For example, the September 9, 2016, joint statement announcing that the Department of the Army would not permit construction of the pipeline to proceed at that time—which the Corps was not a party to, and which took Corps officials by surprise—was a much larger contributor to the growth of the protests than the September 16 press release. *See* FoF [¶250]-[¶251]. As the State's social media analytics expert Mr. Warner testified, the September 9 joint statement was "the most significant event" in the month of September 2016 as far as social-media interaction. Tr. 2979:10-14 (Day 18; Warner); *see* PX 2036 at 0012. He likened the September 9 joint statement to a "big earthquake," while the Corps's September 16 press release was merely "an aftershock" of the September 9 joint statement. Tr. 2980:22-2981:7 (Day 18; Warner); *see also* PX 2036 at 0015 (Mr. Warner's expert report, noting that the September 9 joint statement was shared over 500 times and was interacted with over 100,000 times on Facebook, while the September 16 press release was only shared 36 times and interacted with far less than the September 9 joint statement).

[¶649] The evidence shows that many factors external to the Corps had a combined effect that had the predominant effect of bringing about the State's claimed harm in having to respond to the protests. The State has not shown that the conduct of Corps officials—whether in issuing the two statements at issue, or in deciding not to seek eviction of the protestors by mid-August 2016—was a substantial factor in causing the State's claimed injury. The State thus has not shown that the Corps was the proximate cause of its injury.

### E.  Damages

[¶650] Even if a plaintiff proves the elements of duty, breach, and causation, it remains the plaintiff's burden to prove each element of its claimed damages by a preponderance of the evidence. *See* North Dakota Jury Instructions – Civil, § C - 70.06. Burden of Proving Damages 2004 (2023 ed.).  Any damages awarded must be "adequate to fairly compensate the Plaintiff for all detriment proximately caused by the acts or omissions of those . . . at fault."  North Dakota Jury Instructions – Civil, § C – 70.10. Adequate Compensation (Tort).  In this case, as discussed in Sections I.A.i-ii, *supra*, any damages awarded must have been proximately caused by acts or omissions of individual employees of the Corps, and not any other federal agency or official.

### i.      The State's Damages Must Be Reduced to Include Only Those that Are Recoverable

[¶651] If the Court were to find the United States liable—which it does not—the Court may award only those damages that are recoverable under the FTCA and North Dakota tort law.  *See supra* Section I.A (discussing limits of the FTCA's waiver of sovereign immunity, as relevant for these purposes); *supra* Section II.D (discussing the showing the State must make to demonstrate actions or omissions of Corps employees caused its claimed damages).

[¶652] *First*, as discussed in Sections I.A.i-ii above, the State cannot recover damages for injuries resulting from the allegedly tortious actions of any entity or individual other than individual Corps employees, acting within the scope of their employment.  The Court cannot award the State damages based on other conduct—such as the Assistant Secretary of the Army's decision to delay deciding on the easement for the pipeline, or the Department of Justice's decision not to provide on-the-ground law enforcement resources.  The State is seeking to recover the entirety of its protest-response expenses in this litigation.  FoF [¶367]-[¶368].  The State's damages documentation evidence does not separate out those protest-response costs that were incurred as a result of the

actions of Corps officials in issuing the two statements at issue, as opposed to the actions of other entities or persons. *See* FoF [¶370], [¶373].

[¶653] *Second*, the State is not entitled to recover for protest-response costs associated with activities of protestors who were not camped on Corps land. *See, e.g.*, FoF [¶89] (some protestors stayed at the casino and used that space to plan protest activities); FoF [¶150] (protestors from the North Camp on State and private land broke the law and necessitated a law-enforcement response); FoF [¶171] (some of the protestors who participated in the Backwater Bridge incident came from the casino on Reservation land); FoF [¶90] (protestors came not just from Corps land, but from camps off of Corps land, the casino, hotels, and from the houses of friends and family to engage in direct protest actions). Nor can the State recover for damages associated with protestors who stayed on Corps land to the north of the Cannonball River, where the Corps never stated protestors were permitted to be. *See* FoF [¶269], [¶336]. The State's evidence does not distinguish between protest-response costs incurred because of protestors who were staying on Corps land versus elsewhere, nor for costs incurred based on activity by protestors on Corps land to the north of the Cannonball River, where the Corps never indicated they were permitted to be. *See* FoF [¶336], [¶370].

[¶654] *Third*, the State is not entitled to recover for protest-response costs it incurred before the first of the Corps's statements at issue, on September 16, 2016. *See* ECF No. 38 at p. 19 ¶ 45, pp. 21-22 ¶ 50. The State is claiming damages for its protest-response costs beginning on August 10, 2016—well over a month before the first statement by the Corps at issue. *See* FoF [¶142], [¶368]. The Court previously held that the Corps violated a mandatory federal permitting duty when it issued the September 16 statement despite the fact that no Special Use Permit was in place. *See* ECF No. 38 at pp. 16-19 ¶¶ 38, 42-45, p. 19 ¶ 45, pp. 21-22 ¶ 50. But in the month leading up to that date, the Corps was doing precisely what the Special Use Permitting regulations and

guidance contemplate: it received an inquiry from the Standing Rock Sioux Tribe, responded with information about seeking a Special Use Permit, and continued to engage in discission with tribal leaders regarding terms and conditions of the anticipated Special Use Permit. *See* FoF [¶132]-[¶135]. That is, to the extent the Corps violated a non-discretionary duty (which, as discussed in Section I.A.iv above, it did not), the violation did not occur until September 16, 2016, and the State cannot recover for protest-related expenses it incurred *before* that date.

[¶655] *Fourth*, as discussed in Section II.B.ii above, the State is not entitled to recover for its costs incurred in responding to conduct protected by the First Amendment—which at least some of the State's protest-response costs were. *See* FoF [¶232]-[¶233]. Again, the evidence provided by the State provides no basis to distinguish which of its protest-response costs were incurred as a result of monitoring peaceful First Amendment activity versus responding to violent or similarly illegal protest activity. *See* FoF [¶370].

[¶656] The State's damages documentation does not provide enough information for the Court to determine how much of the State's claimed damages were incurred after September 16, 2016. The State introduced a spreadsheet summarizing its protest-response expenditures, but the dates of the expenditures it lists do not correspond closely with the dates of the State's protest response. *Compare* FoF [¶231], [¶368] (the State considers the protest time period to be August 10, 2016, through March 31, 2017) *with* PX 1455, column D (dates of State's claimed protest-response expenditures range from August 31, 2016, through April 3, 2018).

*     *     *

[¶657] The State has not provided sufficient evidence for the Court to determine what of its claimed damages amounts were recoverable—that is, were not based on the actions of anyone besides individual Corps officials; did not arise from activities of protestors staying off of Corps land, or

252

on Corps land to the north of the Cannonball River where they were never permitted to be; did not arise before the first of the Corps's non-discretionary actions at issue; and did not arise out of protected First Amendment activity. The information is not available from the evidence the State introduced at trial. It also would not be discernable from the documentation that underlies the State's damages calculation, which was not introduced into evidence. *See* [¶373].

[¶658] Nonetheless, the evidence at trial makes clear that the vast majority of the State's claimed expenses fall into one of these non-recoverable categories. *See, e.g.*, FoF [¶41]b (the Main Camp on Corps land to the north of the Cannonball River—where the Corps never said protestors were permitted to be—came to be the largest); FoF [¶235], [¶337] (most of the protestors who left Corps land to protest came from the Main Camp north of the Cannonball River, a fact that State and local law enforcement knew); FoF [¶89] (protestors used the Prairie Knights Casino, located off of Corps land on Standing Rock Indian Reservation land, as a base of operations and to plan protest activities); FoF [¶90] (protestors came from not only Corps land, but also from hotels, the casino, and the houses of friends and family to engage in direct protest actions); FoF [¶147]-[¶152] (protestors were camped on State and private land at the North Camp for over two months, violating State laws in a variety of ways); FoF [¶232]-[¶233] (a significant proportion of the protestors were peacefully exercising their First Amendment rights). For the reasons discussed elsewhere herein, the United States is not liable, and the State is not entitled to recover damages from the United States. The Court therefore need not attempt to guess what proportion of the State's claimed damages might be recoverable given the limited evidence presented by the State.

### ii. The State's Damages Must Be Reduced to Account for the Existing Value of Equipment It Purchased

[¶659] Throughout the course of the DAPL protests, the State made various equipment purchases, some of which had usefulness or value beyond the period of the State's protest response. *See* FoF

[¶367].  After the protests ended in March 2017, some of those items were transferred within the State, and others continued to be used by the agency that purchased them.  FoF [¶374]; *see also* PX 1455 (State's damages spreadsheet for equipment purchases, reflecting that these purchases were not made by the federal government but by the State or its subdivisions).  The State's damages calculation does not include any reduction for scrap, salvage, or future use value of these items. FoF [¶374].

[¶660] Because the State obtained value and received a benefit from that equipment beyond its use during the protests (or because the State could have mitigated its damages by selling the equipment for scrap or salvage value), the State's claimed equipment damages should be reduced to account for this retained value.  Such a reduction is warranted under North Dakota law, which permits recovery only for the detriment to the plaintiff.  *See* N.D.C.C. § 32-03-20 (the measure of damages in tort is "the amount which will compensate for all the detriment proximately caused" by the breach of a duty); *id.* § 32-03-02 (defining "detriment" to mean "a loss or harm suffered in person or property"); North Dakota Jury Instructions – Civil, § C - 74.25 Duty to Avoid or Minimize Damages 2016 (2023 ed.) ("One who has been injured in person or property has the duty to exercise ordinary care to avoid loss or minimize the resulting damages." (alterations omitted)).

[¶661] The State has not provided any suggested method as to how the Court should reasonably account for the scrap, salvage, or future use value of the equipment it purchased during the DAPL protests that continued to be useful or have value after the protests concluded.  *See* PX 2035 at 0004.  Nor did the State produce records detailing what equipment in particular was used or disposed of after the protests.  *See* DX 4218 at 10; Tr. 2222:14-16 (Day 14; Wilson).

[¶662] Nonetheless, the United States' damages expert, Brad Wilson, conducted a detailed review of the State's equipment expenditure documentation, and identified those expenditures for

equipment that appeared to have some scrap, salvage, or future use value. *See id.* at 8-9 & Exhibit 6. Mr. Wilson offered two alternative approaches for the equipment that would have had a use beyond the protests, both of which the Court finds to be reasonable: (1) exclude the entire value of those equipment purchases from any damages award because the State has not accounted for scrap, salvage, or future use value; (2) estimate a useful life of the equipment and assume a straight-line depreciation in value assuming the equipment was used from the date of purchase until the end of the protests. *See id.* at 9-11 & Exhibit 3; Tr. 2222:12-2223:6, 2258:10-2259:7 (Day 14; Wilson). Adopting option (1) would yield a reduction of $1,095,097.25, and option (2) would yield a reduction of $824,153.28. *See* DX 4218 at Exhibit 3.

[¶663] While the State's damages expert does not offer his own suggestion for how the Court should perform the depreciation analysis, he does quibble with Mr. Wilson's option (2)—incorporating a straight-line depreciation. *See* Tr. 1736:21-1737:3, 1771:8-10 (State's expert did not inspect any of the equipment, and his opinion was based on an interview and his own personal recollection of the harshness of the weather in winter 2016). (Day 10; Tolstad). This overlooks the fact that the United States' expert's proposal is presented as a proxy for what would likely happen to the equipment, on average—that is, the proposal to incorporate straight-line depreciation is a reasonable substitute for information the State did not provide. *See* Tr. 2258:18-2259:7 (Day 14; Wilson); DX 4218 at 10-11. The State's expert also argues that straight-line depreciation simply should not apply because equipment purchased with federal funds is treated differently, *see* PX 2035 at 0004; however, the equipment at issue was *not* purchased with federal funds, *see* FoF [¶374], so that argument is unavailing.

[¶664] The Court finds that any damages award to the State must be reduced to account for the scrap, salvage, or future-use value of equipment purchased in connection with the protests. The

Court finds that incorporating a straight-line depreciation as the United States' damages expert suggests is reasonable, and it will therefore reduce any damages award by $824,153.28.

### iii. The State's Damages Must Be Reduced to Account for Regular Payroll Expenditures

[¶665] The State's claimed damages include $2,643,104.84 in regular payroll expenses—that is, non-overtime payroll expenses for regular, permanent employees.  FoF [¶375].  This amount includes regular payroll expenses for employees of State agencies, as well as employees of local entities within the State.  *See id.*

[¶666] The State's regular payroll expenditures—*not* including overtime or payroll for employees who were hired to backfill during the protests—would have been incurred regardless of the DAPL protests.  *See* DX 4218 at 6-8 & Exhibits 4-5.  Awarding those expenditures as damages is not warranted under North Dakota law, which permits damages to be awarded only as "adequate to fairly compensate the Plaintiff for all detriment proximately caused by the acts or omissions of those . . . at fault."  North Dakota Jury Instructions – Civil, § C – 70.10. Adequate Compensation (Tort) 2015 (2023 ed.); *see* N.D.C.C. § 32-03-01 ("Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages.").  Thus, the Court finds the State has not shown its damages for those expenditures were caused by the protests, or by Corps officials' response to the protests, and any damages award to the State will accordingly be reduced by $2,643,104.84.

### iv. Any Damages Must Be Apportioned Among the Entities and Persons at Fault

[¶667] *The Court must apportion fault and damages among parties and non-parties*.  In accordance with North Dakota law, United States requests that the Court make separate findings determining the amount of damages and the percentage of fault attributable to parties and non-parties who

contributed to the State's alleged injuries, and it further requests that the Court award damages according to that determination.

[¶668]  Pursuant to N.D.C.C. § 32-03.2-02, upon the request of a party the Court must make separate findings "determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury."   "Fault" includes, *inter alia*, negligence, reckless or willful conduct, assumption of risk, and failure to avoid injury.  *Id.* Assumption of risk is present where a person (1) has actual knowledge of a risk of injury or loss, (2) has freedom of choice to avoid the risk, (3) voluntarily encounters the risk, and (4) the injury or loss is proximately caused by the encounter.  North Dakota Jury Instructions – Civil, § C – 2.75. Assumption of Risk 2002 (2023 ed.); *see also Green v. Mid Dakota Clinic*, 673 N.W.2d 257, 260 (N.D. 2004) ("[A]ssumption of risk is no longer an affirmative defense in North Dakota, but, rather, is one part of the analysis in determining comparative fault." (citation omitted)).

[¶669]  After making the determination of the percentages of fault attributable to parties and non-parties, the Court must award damages commensurate with that determination, because "each party is liable only for the amount of damages attributable to the percentage of fault of that party." N.D.C.C. § 32-03.2.02.   That is, North Dakota law incorporates a modified comparative fault scheme that allows for several, and not joint, liability.

[¶670]  This apportionment of fault and the corresponding damages apportionment should be done *after* the Court determines the amount of damages, but *before* any damages offsets are applied.  *See* N.D.C.C. § 32-03.2-02 (providing that the court must "direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury. The court shall *then* reduce the amount of such damages in proportion" to the fault attributable to other parties and non-parties besides the

defendant (emphasis added)); *id.* § 32-03.2-06 ("*After an award of economic damages*, the party responsible for the payment thereof is entitled to and may apply to the court for a reduction of the economic damages to the extent that the economic losses presented to the trier of fact are covered by payment from a collateral source." (emphasis added)); ECF No. 106, at 18 (Court's order denying the United States' motion for partial summary judgment, stating that the Court "will consider a request for reduction in damages only *after* a damages amount has been determined." (emphasis added)).

[¶671] *All of the fault is properly apportioned to the protestors.*  As discussed above, the United States is not liable for the State's claimed damages.  But even if it were, the Court finds that the amount of fault that should be apportioned to the United States based on actions by Corps officials—as opposed to other people or entities—is none.  Instead, the evidence at trial showed that 100% of the fault for the State's damages from responding to the protests falls on the protestors themselves.

[¶672] Some protestors engaged in illegal activities, including vandalism, blocking public roads and highways, threats and harassment, and more.  *See, e.g.*, FoF [¶234]-[¶236], [¶336]-[¶338] (summarizing evidence of the illegal and wrongful conduct that some protestors engaged in).  The conduct that caused the State to incur the emergency law enforcement response costs that make up its damages claim was when protestors left the protest encampments to engage in violent or illegal activity on public or private property elsewhere.  *See* FoF [¶237]; *see also, e.g.*, ECF No. 450-1 at 1-2 ¶ 3 ("North Dakota's claims in this matter relate to the damage and destruction caused to North Dakota because of activity by individuals opposing the construction of the Dakota Access Pipeline . . . in North Dakota from roughly August 2016 through March 2017 . . . .").

[¶673] There is no evidence that Corps officials encouraged protestors to act violently or illegally,

or to make plans to do so while on Corps land. On the contrary, the Corps urged the protestors to act lawfully and peaceable. *See* FoF [¶142] (Corps's September 16, 2016, press release stated that the Tribe was allowed "to gather to engage in a *lawful free speech demonstration* on Federal lands designated in the permit" subject to "applicable Federal, state and local regulations" (emphasis added)); FoF [¶198] (COL Henderson's November 25, 2016, letter to tribal leaders stating that the free speech zone south of the Cannonball River was meant "for anyone wishing to peaceably protest the Dakota Access pipeline project, subject to the rules of 36 C.F.R. Part 327"); FoF [¶292] (in conversations with tribal leadership, COL Henderson emphasized the need for the Tribe to discourage violence, trespassing on private land, and provoking confrontations with law enforcement). Indeed, there is no evidence that protestors on Corps land were the only ones engaging in the unlawful behavior that triggered the need for the State to expend costs in response. *Cf.* FoF [¶89] (protestors stayed not only at the camps on Corps land, but at camps on Reservation land, private- and State-owned land, at hotels in the area, and with family or friends); FoF [¶89] (protestors stayed at the Prairie Knights Casino on Reservation land, using the casino as a base of operations to plan protest activities); FoF [¶90] (protestors came not just from Corps land, but also from hotels, the casino, and the houses of family and friends to engage in direct protest action); FoF [¶150] (protestors staying at the North Camp on State land were breaking the law). Protestors acted out of their own independent motivations and for their own reasons, and their actions were often unpredictable and uncontrollable. *See* FoF [¶87], [¶104], [¶238]-[¶239], [¶275], [¶294].

[¶674] In sum, the State's claimed damages arise entirely out of the unlawful actions of a subset of the protestors, who stayed on and off of Corps land. The protestors bear all of the fault for those actions, and for the damages the State incurred in responding to the protests.

[¶675] One exception to North Dakota's rule disallowing joint liability is when persons "act in

concert in committing a tortious act or aid or encourage the act, or ratif[y] or adopt[] the act for their benefit." N.D.C.C. § 32-03.2-02. In those situations, the persons at fault may be jointly liable for all damages. *Id.* But to show that two people or entities were "acting in concert," "there must be an express or tacit agreement to commit the wrongful act." North Dakota Jury Instructions – Civil, § C - 2.17. Acting in Concert 2000 (2023 ed.) It is not enough to show merely that one person knew what the other was doing, or was present at the commission of the wrong, or failed to object to it. *Id.*; *see Hurt v. Freeland*, 589 N.W.2d 551, 553-54, 556-59 (N.D. 1999) (no joint liability because the passengers and intoxicated driver of a vehicle were not "acting in concert," where they had all been drinking together throughout the evening, and the passengers asked the driver to drive them to a destination, but they did not provide him more alcohol or encouraged him to drink during the drive); *Reed v. Univ. of N.D.*, 589 N.W.2d 880, 888 (N.D. 1999) (rejecting an attempt to impose joint liability on the University of North Dakota and the sponsor of a race in which the plaintiff was required to participate as a U.N.D. athlete, because the evidence that U.N.D. and the race sponsor knew of each other's activities, were both present at the race, and failed to object was not enough to show "a common plan or design necessary for in concert action").

[¶676] There is no evidence the Corps had an "express or tacit agreement" with protestors to commit the acts that caused the State to incur damages. The protests started off of Corps land, without the Corps's prior knowledge or permission. FoF [¶80], [¶82]. They continued to grow and eventually spilled onto Corps land, again without the Corps's prior permission. FoF [¶80], [¶94]-[¶99], [¶104]; [¶336]. The Corps, reacting to the situation that had been thrust upon it, attempted to respond in a way that would deescalate tensions and keep the situation from getting worse. *See* FoF [¶140]-[¶141], [¶200], [¶280], [¶301]-[¶302]. Given that the Corps's public statements emphasized the need to obey the law, those statements did not encourage protestors to take illegal

actions off of Corps land.  *See* FoF [¶142], [¶198].  At most, the Corps knew of the illegal activities of some protestors.  But that knowledge alone—even if the Corps was also present where the wrongs were being committed, or failed to object—is not sufficient to show the Corps acted "in concert" with the protestors such that it should be subject to joint liability for their wrongdoing.

[¶677]  In short, 100% of the fault rests with those protestors whose unlawful conduct caused the State to incur costs in responding to the protests.  The Court will not apportion any fault to the Corps or award any damages against the United States.

[¶678]  *If the protestors do not bear all of the fault, other entities besides the Corps bear some fault.*  As discussed above, the Court apportions all fault to the protestors.  But even assuming the Court did not apportion all the fault to the protestors, the evidence shows that other entities besides the Corps bear some fault.  There is no evidence the Corps acted "in concert" with any of these entities in connection with their wrongful acts detailed below, such that it would be jointly liable for these other entities' share of fault.

[¶679]  *First*, if the Court were to assess whether any entities or individuals besides the protestors bear fault for the start of the protests and their increased size, the Court would conclude that the Standing Rock Sioux Tribe bears some fault.  The protests began on Standing Rock Indian Reservation land, and they later spilled onto Corps land north of the Cannonball River.  FoF [¶80], [¶248].  Early in the protests, tribal leaders called for the public to support the protests—calls which increased the protest activity on the ground.  FoF [¶85], [¶248].  The protests were something the Tribe sought to own and sponsor from the outset, and the Tribe provided resources to the Main Camp on Corps-managed land as the protests continued into fall 2016.  FoF [¶86].

[¶680]  State officials recognized as the protests were happening that Standing Rock Sioux Tribe leaders shared a measure of responsibility for the protests and the activities of protestors.  *See*

FoF [¶85] (Morton County Commission Chairman Schulz wrote on October 1, 2016, that Chairman Archambault bore "some level of responsibility . . . for the protest camps and the actions of those staying there.").

[¶681] Because of the role Standing Rock Sioux Tribe leadership played in organizing, encouraging, and willingly hosting the protests on Reservation land and elsewhere, the Court would conclude that the Tribe bears a portion of fault for causing the State to incur damages in response to the protests.

[¶682] *Second*, the pipeline company also bears some fault for the damages the State incurred. The protests would not have happened but for the pipeline being constructed adjacent to Standing Rock Sioux tribal land, and across land that many Sioux consider to be unceded treaty land. *See* FoF [¶242], [¶246]. The pipeline company's CEO felt that the company had "somehow caused" the impact on the State from the protests, and the company paid $15 million to the State to reimburse part of the protest-response expenses that the State now seeks as damages. *See* FoF [¶387], [¶392].

[¶683] Decisions by the pipeline company and its contractors caused the protests to grow and intensify. The September 3, 2016, confrontation between pipeline company private security contractors and protestors was widely acknowledged to be a turning point in the protests, which caused the protests to gain enormous attention, to grow much larger in size, and to get more violent. FoF [¶119]. The pipeline company decided to carry out construction in an area that had been identified as having sacred sites by the Standing Rock Sioux Tribe shortly beforehand was concerning to protestors. *See* FoF [¶114]-[¶115]. And the company's private security contractors' use of dogs in the ensuing confrontation was not only galvanizing, but wrongful. *See* FoF [¶116]-[¶117], [¶119]. In fact, the private security contractors who participated in that confrontation were not licensed to do security work in North Dakota, and they should not have been performing security

work without that license.  FoF [¶120].

[¶684] The pipeline company, in deciding to work on the pipeline's construction in the area identified as having sacred sites, and employing an unlicensed security contractor who used dogs in a confrontation with protestors, assumed the risk that those actions would lead the protests to protests would increase in size and intensity.  Those events did in fact cause the protests to increase. FoF [¶119].  The pipeline company therefore bears some fault for the State's damages incurred in responding to the protests.

[¶685] *Third*, the State itself bears some fault for the damages it incurred.  The State took a "containment" approach to the protests, allowing protestors to remain on Corps land despite the knowledge that some protestors there were leaving Corps land to break the law.  FoF [¶102], [¶344]-[¶352].  The State also allowed protestors to remain at the North Camp on State land alongside Highway 1806 for over two months, despite State officials' awareness that some of the protestors at that camp were breaking the law.  FoF [¶147]-[¶155].  And the State often chose not to arrest protestors, even when they broke the law.  *See* FoF [¶150]-[¶151], [¶260], [¶336]-[¶342].  As the State's own expert testified, this decision by the State not to arrest lawbreaking protestors could be a form of "reinforcement" that encouraged protestors.  *See* Tr. 1862:11-22 (Day 11; Kuhlman).

[¶686] The State communicated that it was taking this containment approach to the Corps many times, and those communications informed the Corps's own decision-making.  FoF [¶105]; *see also* FoF [¶54] (input from law enforcement is a "primary factor" in how Corps officials decide how to respond to a problem on Corps land, such as unauthorized occupants).  Essentially, the State (1) assumed the risk of allowing protestors to remain in the area, though they knew some were breaking the law, and (2) failed to mitigate its damages by not arresting all of the protestors who they were aware were engaging in illegal activity.  *See, e.g.*, *Green*, 673 N.W.2d at 260

(consideration of assumption of the risk is part of the comparative-fault determination); *Swanson v. Sheppard*, 445 N.W.2d 654, 658 (N.D. 1989) ("In all actions where a plaintiff is seeking to recover damages, the plaintiff has a duty to minimize or mitigate damage and may not recover for damage which could have been avoided by reasonable efforts under the existing circumstances." (citation omitted)).

[¶687] Additionally, the State's law enforcement response was viewed as heavy-handed by many protestors. *See* FoF [¶247], [¶255]. There is evidence that this increased the size and intensity of the protests, which, predictably, increased the State's deployment of resources and money expended in response. *See* FoF [¶255]. Again, with those decisions, the State assumed the risk the protests would increase and the State would need to expend more money and resources in response.

[¶688] Thus, to the extent any fault should *not* be assigned to the protestors, other parties besides the Corps would bear some percentage of fault in addition to the protestors.

### v.    The State's Damages Must Be Reduced to Account for the $10 Million It Already Received from the United States

[¶689] The State has already received $10 million from the federal government to cover a portion of its protest-response costs, in the form of an Emergency Federal Law Enforcement Assistance ("EFLEA") grant. *See* FoF [¶382]-[¶383]. The State applied for the grant specifically to seek partial reimbursement for its emergency law-enforcement response costs. FoF [¶384]. Ultimately the State did apply the $10 million it received in EFLEA funds to repay some of the loans it took out from the Bank of North Dakota to pay for the State's protest response. FoF [¶385].

[¶690] Those protest-response costs are the same costs the State seeks to recover in this litigation. *See* FoF [¶367], [¶384]. The State's claim for $37,854,867.30 in damages includes no offset for the $10 million it already received from the federal government. FoF [¶386].

[¶691] "[T]he government should not be forced to compensate [the State] twice," once via the

EFLEA grant and again through an adverse judgment in this FTCA case. *Overton v. United States*, 619 F.2d 1299, 1308 (8th Cir. 1980). This is not a question of offsetting a payment the State received from a separate, "collateral source." *See* N.D.C.C. § 32-03.2-06 (the party against whom damages are awarded may apply for a setoff for payments from any "collateral source," meaning a payment the recovering party received from "any *other source* paid or to be paid to cover an economic loss which need not be repaid" (emphasis added)). Rather, in an FTCA suit, prior that "[s]ources of aid also provided by the United States . . . are thus not collateral but primary in nature, and may be offset" from the damages awarded to the plaintiff. *Anderson v. United States*, 731 F. Supp. 391, 402 (D.N.D. 1990). Here, the *same source* (the United States) is being asked to compensate the State twice: once via payment of the EFLEA grant, and again in the State's claimed damages for all of its protest-response costs. The principles restricting double recovery in FTCA cases discussed in *Overton* and *Anderson* do not permit this double payment.

[¶692] The one exception to this general rule against a plaintiff's double recovery, for instances where the plaintiff made a "special payment" to the scheme from which it was already compensated, is not applicable here. *Overton*, 619 F.2d at 1308. The EFLEA grant did not come from any fund to which the State contributed; instead, it was funded by United States Treasury appropriations. *See* FoF [¶383]. Judgments against the United States under the FTCA are also paid from appropriations to the United States Treasury. *See* 28 U.S.C. § 2414; 31 U.S.C. § 1304; *see also* Justice Manual § 4-10.100 – Payment and Satisfaction of Judgment Against the Government. That is, the EFLEA grant is not "attributable to a special levy or premium that [the State] has paid." *Overton*, 619 F.2d at 1309.

[¶693] Accordingly, the United States is entitled to a set-off of $10 million in any damages awarded against it, to account for the funds the federal government already paid the State in the form of the

EFLEA grant.

### vi. The State's Damages Must Be Reduced to Account for the $15 Million It Already Received from the Pipeline Company

[¶694] In addition to the $10 million it received from the federal government to reimburse part of its protest-response costs, the State also received $15 million from the pipeline company. FoF [¶387]. The $15 million payment was wired directly to the Bank of North Dakota and was used to repay a portion of the loans the State's Office of Adjutant General took out to pay for the State's protest response. FoF [¶376], [¶387]-[¶388], [¶393].

[¶695] Under the common-law collateral-source rule, a defendant would not be entitled to a reduction in its liability based on the fact that the plaintiff's damages were reduced by payments received from outside sources. *See, e.g.*, *Gill v. Maciejewski*, 546 F.3d 557, 564 (8th Cir. 2008). But North Dakota law abrogates that common-law rule, providing that the party against whom damages are awarded "is entitled to and may apply to the court for a reduction of the economic damages to the extent that the economic losses presented to the trier of fact are covered by a payment from a collateral source." N.D.C.C. § 32-03.2-06. The statute defines a "collateral source" payment as "any sum from any other source paid or to be paid to cover an economic loss which need not be repaid by the party recovering economic damages." *Id.* The statute goes on to carve out from the definition of "collateral source" certain types of outside payments "purchased by the party recovering economic damages" (such as insurance), thus restoring the common-law rule against collateral source offsets for those specified types of payments. *Id.*

[¶696] Under the plain language of North Dakota's collateral source statute, the $15 million payment from the pipeline company was a collateral source payment for which the United States would be entitled to an offset. The payment came from an outside source, to which the State did not contribute—that is, the statute's carve-out from the statutory rule does not apply. *See id.*; FoF

[¶387]; *see also* FoF [¶391] (the pipeline company recorded the $15 million payment as a capital expenditure necessary to complete the Dakota Access pipeline project).

[¶697] The North Dakota Supreme Court has determined that an additional carve-out to the statutory collateral-source rule applies, for "charitable gifts," which are not a sum "paid to cover an economic loss" because it is "given out of love and a sense of community." *Dewitz v. Emery*, 508 N.W.2d 334, 340-41 (N.D. 1993). In *Dewitz*, the plaintiff, who was involved in a motorcycle accident, received $1,500 from the Aid Association for Lutherans. *See id.* at 335, 340. There was no suggestion the Aid Association was involved in causing the accident or plaintiff's damages. The court found that the payment from the Aid Association was a charitable gift, rather than an amount "paid on account of a legal obligation triggered by economic loss." *Id.* at 341. It emphasized that charitable gifts are those "intended to compensate families for expenses which have not and cannot be paid from any other source." *Id.* On this basis, the court held that the charitable gift from the Aid Association should not be offset from the damages awarded against the defendant. *Id.* at 341.

[¶698] Here, the State and the pipeline company have characterized the $15 million payment as a "donation" or "gift." *See* FoF [¶390]; ECF No. 450-1 at pp. 73-74 ¶ 324. But this payment from the pipeline company does not qualify as a "charitable gift" like the one in *Dewitz*, for multiple reasons.

[¶699] First, as discussed in Section II.E.iv above, actions by the pipeline company caused the protests to increase in size and intensity. As the company's CEO recognized, the company was a cause of the impact of the protests on the State. *See* FoF [¶387]. This is unlike the situation in *Dewitz*, where a charitable organization that was totally uninvolved with the events that caused plaintiff's damages and gifted plaintiff's family money out of "love and a sense of community" rather than an "obligation triggered by economic loss." 508 N.W.2d at 341.

[¶700] Second, the pipeline company is not a charitable organization like a religious-aid association; it is a for-profit enterprise. While there was evidence that the pipeline company made smaller donations in areas around the pipeline route, all of those donations added together did not equal the $15 million payment to the State in connection with the State's protest-response costs. FoF [¶389]. Before the $15 million payment, the pipeline company had made no donations or other non-routine payments to the State for at least five years. *Id.* And none of the donations the State received in connection with the protests came anywhere near the amount of the payment from the pipeline company. *See id.*

[¶701] Finally, evidence suggests the pipeline company and the State considered the $15 million payment to be compensation or reimbursement, and not a charitable gift. The pipeline company did not treat it as a charitable contribution for tax-reporting purposes. *See* FoF [¶390]. Instead, the company and the State discussed early in the protests that the company would "reimburse" the State for protest-related law enforcement costs, and the State provided the company with an accounting of its estimated expenditures, apparently to facilitate that reimbursement. *See* FoF [¶392]. And the bill that authorized the State to accept the payment from the pipeline company referred to "reimbursement . . . for state costs incurred relating to unlawful activity associated with the construction of the Dakota Access Pipeline" that was required to be used to repay the Office of Adjutant General's Bank of North Dakota loans. *Id.* These facts show that the pipeline company intended to compensate the State for its losses. *Cf.* Restatement (Second) of Torts § 885 (Am. Law Inst. 1979), "Effect of Release of or Payment by or on Behalf of One of Several Tortfeasors," cmt. f (recognizing that "payments are commonly made by one who fears that he may be held liable as a tortfeasor and who turns out not to be" and that the general common law rule is that "if compensation was intended," the payment "will go to diminish the claim of the injured person

against others responsible for the same harm").

[¶702] Because the $15 million payment appears to be a payment seeking to reimburse and compensate the State for some of its protest-response costs that were incurred, in part, as the result of actions by the pipeline company, the payment is not a charitable gift under the *Dewitz* exception, and North Dakota's statutory collateral-source rule applies. To the extent damages are awarded against the United States, the United States is entitled to an offset in the amount of $15 million to account for the payment the State received from the pipeline company in partial reimbursement for protest-response costs.

### vii.    The State is Not Entitled to Recover Interest on Its Bank of North Dakota Loans

[¶703] The State seeks to recover $651,746.35 in interest charged on loans the State Office of Adjutant General received from the Bank of North Dakota to fund the State's protest response. *See* FoF [¶376]. The State is not entitled to recover this amount because the FTCA does not waive sovereign immunity for such a prejudgment interest claim, and because the interest charged by the State-owned Bank of North Dakota does not represent a loss to the State.

[¶704] *First*, the FTCA expressly provides that the United States "shall *not* be liable for interest prior to judgment." 28 U.S.C. § 2674 (emphasis added). Under that provision, the United States is immune from any interest award "[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit." *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986), *superseded by statute as stated in Landgraf v. USI Film Prod.*, 511 U.S. 244, 251 (1994) (explaining that Congress, in the Civil Rights Act of 1991, abrogated this rule as it applies to employment discrimination cases in particular).

[¶705] "Interest" generally refers to "the amount which one has contracted to pay for the use of borrowed money." *Southern Pac. Transp. Co. v. United States*, 471 F. Supp. 1186, 1196 (E.D. Cal.

1979) (quoting *Deputy v. du Pont*, 308 U.S. 488, 498 (1940)).

[¶706] In *Shaw*, the Supreme Court rejected an argument that this limitation on sovereign immunity can be avoided "by devising a new name for an old institution." 478 U.S. at 321. "[T]he character or nature of 'interest' cannot be changed by calling it" by another name such as "'damages,' 'loss,' 'earned increment,' 'just compensation,' . . . or any other term, because it is still interest and the no-interest rule still applies to it." *Id.* (quoting *United States v. Mescalero Apache Tribe*, 518 F.2d 1309, 1322 (Ct. Cl. 1975)); *see Barrett v. United States*, 660 F. Supp. 1291, 1319-20 (S.D.N.Y. 1987) (rejecting plaintiff's "attempt at an end run around th[e FTCA's] express prohibition" on recovery of prejudgment interest by including a calculation of "the time value of money" in damages estimate).

[¶707] The no-interest rule does not bar compensating the plaintiff for income or other amounts the plaintiff would otherwise have received but "with which defendant's wrongdoing has interfered." *Manko v. United States*, 830 F.2d 831, 837 (8th Cir. 1987) (explaining that the rule did not bar an award to the plaintiff for lost pension earnings prior to judgment that the plaintiff would otherwise have earned because those earnings were not prejudgment interest but "serve[d] the same purpose as" lost pension contributions and lost wages). But courts have recognized that the "no-interest rule" *does* bar claims for an amount where the plaintiff borrows money and then seeks "interest costs incurred on money borrowed as a result of the government's breach or delay in payment." *Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1310-11 (Fed. Cir. 2012) (affirming "trial court's denial of the cost of borrowed funds"); *see England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) (barring damages request for "the interest [the plaintiff] paid on the extra money it was forced to borrow as a result of the Navy's delay"); *Komatsu Mfg. Co. v. United States*, 131 F. Supp. 949, 950 (Ct. Cl. 1955) (denying claim "for the amounts actually paid out by

[plaintiffs] for interest on the borrowed money" because of an alleged "delay in payment" by the United States).

[¶708] This reasoning makes sense. Were this not the case, every plaintiff could evade the FTCA's prohibition on prejudgment interest simply by taking out a loan to cover the economic harm the plaintiff allegedly suffered pending the government's payment on the plaintiff's claim, and then include the loan interest in the damages demand. That is, every plaintiff could claim that the interest incurred prior to judgment was not "prejudgment interest" as the FTCA encompasses, but rather a damages element from a new "contractual relationship" that exists between borrower and lender. The FTCA's plain language does not permit such a result.

[¶709] Moreover, even if there were ambiguity in whether the FTCA's plain language barred such payment, that ambiguity would bar payment. In *Shaw*, the Supreme Court recognized that whether Congress has authorized the payment of prejudgment interest requires determining whether Congress has clearly waived sovereign immunity to allow such payment. *See* 478 U.S. at 314-15. And in *FAA v. Cooper*, the Court explained that in reading a waiver of sovereign immunity, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity," and "[a[]mbiguity exists if there is a plausible interpretation of the statute that would not authorize" the award of damages against the federal government. 566 U.S. 284, 290-91 (2012). Here, Section 2674 of the FTCA does not unambiguously show that the type of payment the State seeks here is not prejudgment interest, so sovereign immunity bars the payment.

[¶710] Even if denying a claim for prejudgment interest may result in under-compensating a plaintiff for its harms, that result does not change the analysis under Section 2674. As an initial matter, there is no evidence that the Bank of North Dakota was forced to forego any other lending opportunities or other uses of its extending loans to the State Office of Adjutant General to fund the

State's DAPL protest response. FoF [¶380]. Even if there were evidence of such harms, that in and of itself would not justify an award that amounts to payment of prejudgment interest. "Compensation for the use of money damages prior to judgment would clearly be an award of prejudgment interest, which is barred by the [FTCA]." *Preston v. United States*, 776 F.2d 754, 760 (7th Cir. 1985) (citations omitted) (rejecting a claim for damages for loss of the use of converted grain because it was in fact an impermissible claim for an award of interest); *see Shaw*, 478 U.S. at 321-22 ("[W]hether the loss to be compensated by an increase in a fee award stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule."); *Mescalero*, 518 F.2d at 1322 (where an award of interest against the United States was not authorized by Congress, it was error to "include[e] an additional factor in [the] judgment to make up for the income which should have been, but was not, earned on reinvested interest."); *Bah v. United States*, No. 21-cv-2993, 2022 WL 22279109, at *1 n.1 (E.D. Pa. Sept. 22, 2022) ("[R]ecoupment of opportunity cost damages is equivalent to recovery of prejudgment interest." (citation omitted)); *S. Pac. Transp.*, 471 F. Supp. at 1197, 1199 (plaintiff sought to recover for the "loss of use of corporate capital," but the court found "compensation for the loss of use of money is, by definition, interest" prior to judgment that is barred by the FTCA).

[¶711] That state law may allow for an award of prejudgment interest in a tort case, *see* N.D.C.C. § 32-03-05, does not override this express limitation on the United State's sovereign immunity. Only Congress—not state legislatures and not the courts—can waive the United States' sovereign immunity. *See, e.g.*, *S. Rehab. Grp., P.L.L.C. v. Sec'y of HHS*, 732 F.3d 670, 676 (6th Cir. 2013); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992). And Congress expressly chose to carve out claims for prejudgment interest from the FTCA's waiver of sovereign immunity. *See* 28 U.S.C. § 2674.

[¶712]  *Second*, an award of prejudgment interest based on interest for loans the State took out from the Bank of North Dakota is not warranted for another reason: the State has not shown it suffered any harm in incurring the prejudgment interest amounts.  Here, the State is the plaintiff and the entity that charged the claimed interest is simply an agency of the State.  The Bank of North Dakota is entirely State-owned, and it is itself a State agency.  FoF [¶378].  Its funds are available to the State legislature, and its dividends form part of the State's general revenues.  *See id.*

[¶713]  In this case, interest paid by the State Office of Adjutant General on the DAPL protest-related loans became profits of the Bank of North Dakota, which the State legislature could transfer to the State's general fund.  FoF [¶379].  That is, the State's interest payments on loans from the Bank of North Dakota were simply transferred from one State agency to another and do not represent a loss or "damages" resulting from the alleged tortious conduct.  *See* DX 4218 at 7-8; Tr. 2211:17-2212:5 (Day 14; Wilson).

[¶714]  The State is not entitled to recover its claimed damages for the interest on its Bank of North Dakota loans totaling $651,746.35.

## CONCLUSIONS OF LAW

[¶715]  The Court makes the following conclusions of law.

[¶716]  The State brings this case under the FTCA, 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671 *et seq.*  The State asserts claims for negligence, gross negligence, trespass, and public nuisance.  It seeks to recover $37,854,867.30 in damages.

### I.  Jurisdiction

#### A.  Jurisdiction Under the FTCA

[¶717]  The FTCA's waiver of the United States' sovereign immunity is limited.  The Court lacks jurisdiction over claims for which sovereign immunity is not waived.  *See* 28 U.S.C. § 1346(b)(1).

[¶718] The Court finds the State's claims are barred by sovereign immunity.  First, the State's claims are barred because they are premised—at least in part—on actions by federal agencies or other federal entities, rather than individual federal employees.  *See id.* §§ 1346(b)(1), 2674. Second, because the State only presented its administrative tort claim to the Corps, the State's claims are barred to the extent they are based on the acts of non-Corps officials and other federal agencies.  *See* 28 U.S.C. § 2675(a).  Third, the FTCA's waiver of sovereign immunity does not extend to claims for absolute or strict liability, so any finding of liability must be premised on a negligent act.  *See* 28 U.S.C. § 1346(b)(1).  Fourth, the State's claims are based upon, and its alleged damages arise out of, discretionary functions and therefore do not fall within the FTCA's waiver of sovereign immunity.  Fifth, to the extent the State's claims are not based upon discretionary functions, they are based on misrepresentations and do not fall within the FTCA's waiver of sovereign immunity.  Sixth, the United States may be held liable under the FTCA for the negligent and wrongful omissions of its employees in the scope of their employment only to the extent a private party would be liable in similar circumstances under North Dakota law.  Because there is no private-party analog under state law for the wrong the State asserts—the Corps's decisions how to effectuate its Title 36 authority—there is no waiver of sovereign immunity for the State's claims. Finally, the FTCA allows an award of money damages against the United States only for injuries or loss of property, or personal injury or death.  28 U.S.C. § 1346(b)(1).  The State's claims are based entirely on its monetary expenditures for its law-enforcement response to the protests and are not money damages for injury to property.  The State is therefore not entitled to recover those damages under the FTCA.

### B.  Standing

[¶719] In addition, the Court finds that the State lacks standing to bring this suit.  The State does not have standing to challenge the United States' law enforcement decisions, as it purports to do. *See United States v. Texas*, 599 U.S. 670, 675, 678-79, 684-85 (2023).  The State also lacks standing to sue the United States on behalf of its citizens in a *parens patriae* capacity.  *See Murthy v. Missouri*, 144 S. Ct. 1972, 1996-97 (2024); *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923).

### C.  Political Question Doctrine

[¶720] The State's claims also present a non-justiciable political question, inasmuch as they are based on the federal government's decisions about whether and how to deploy law enforcement or military resources in response to the protests.  *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Gilligan v. Morgan*, 413 U.S. 1, 3, 10-11 (1973); *Monarch Ins. Co. of Ohio v. District of Columbia*, 353 F. Supp. 1249, 1258 (D.D.C. 1973), *aff'd*, 497 F.2d 683 (D.C. Cir. 1974); *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1160-61 (D.D.C. 1991).

## II.     State-Law Tort Claims

[¶721] Assuming the Court did have jurisdiction over the State's claims (which it does not), the State's claims also fail as a matter of North Dakota tort law.  As noted above, the State must prove that the Corps, if a private person, would be liable in like circumstances to the State based on the negligent or wrongful conduct of its employees, under North Dakota law.  28 U.S.C. § 1346(b)(1).

[¶722] The State bears the burden to establish all elements of its tort claims by a preponderance of the evidence.  *See, e.g.*, *Investors Real Estate Trust Properties, Inc. v. Terra Pacific Midwest, Inc.*, 686 N.W.2d 140, 144 (N.D. 2004); 58 Am. Jr. 2d Nuisances §§ 171-72; North Dakota Jury

Instructions – Civil, Burden of Proof Requirements (2023 ed.); *id.* § C - 70.06 - Burden of Proving Damages 2004.  The Court finds the State has not met that burden.

### A. Duty

[¶723]  The Corps cannot be liable here because North Dakota law has not recognized a duty that a landowner owes to the State not to allow protestors to be on its land, or to seek their forcible eviction.  *See Saltsman*, 803 N.W. 2d at 558-59; *Hurt v. Freeland*, 589 N.W. 2d 551, 555 (N.D. 1999).  North Dakota law does not impose a duty on a landowner, like the Corps, to the State to exclude or control third parties who may be engaged in unlawful conduct off of the landowner's property, and North Dakota law does not grant the State the right to recover from a landowner its costs in responding to such conduct.  Additionally, tort liability may not be imposed in this situation, where doing so would make a landowner liable for allowing protestors seeking to exercise their First Amendment rights to gather on its land, or for failing to evict them.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918 (1982); *Counterman v. Colorado,* 600 U.S. 66, 76, 78-79 & n.5 (2023); *Mckesson v. Doe*, 71 F.4th 278, 281-82, 292 (5th Cir. 2023).

[¶724]  Because there is no duty under North Dakota state law to support the State's negligence claim, its nuisance and trespass claims also fail.

[¶725]  Alternatively, if the Court looks to the Restatement (Second) of Torts for the relevant duty, the Restatement does not establish the Corps owed a duty because the protestors were trespassers, not licensees or invitees.  *See* Restatement (Second of Torts) §§ 315, 318.

[¶726]  If the protestors are, instead, considered licensees or invitees, the Restatement duties at issue are as follows.  For the State's negligence, gross negligence, and trespass claims, Corps officials owed a duty if (1) they granted a third party permission to use its land; (2) they could control the third party's harmful conduct and knew or had reason to know they had the ability to do so; (3) they

failed to use reasonable care to stop the third party's harmful conduct, and (4) the harmful third-party conduct occurred on Corps land. *See* Restatement (Second) of Torts § 318 and Reporter's Notes. For the State's nuisance claim, Corps officials owed a duty if (1) the harmful activity occurred on Corps land and (2) Corps officials failed to exercise reasonable care to prevent the activity. *See* Restatement § 838 and Comments.

### B. Breach

[¶727] If a duty applied, the Court finds the Corps did not breach that duty, for several reasons. As to the State's negligence claim, the Corps never permitted protestors to be on its land north of the Cannonball River, where the largest encampment of protestors came to be located. And the Corps did not permit protestors to engage in unlawful activity. Corps officials did not know or have reason to know they had the ability to control protestors' unlawful conduct. And the protestor conduct that caused the State's harms occurred off of Corps land. Also, the Court finds that Corps officials exercised reasonable care in responding to the protests, given the difficulty of the situation and the options available to them.

[¶728] As to the State's gross negligence claim, in addition to the lack of showing a breach constituting negligence, the State also has not shown that Corps officials acted with "reckless temperament" or "willfulness."

[¶729] As to the State's nuisance claim, the Court finds that this claim fails because (1) the wrongful conduct by some protestors that caused the State to respond occurred off of Corps land, (2) the State did not prove that the Corps consented to the protestors' wrongful activity, and (3) the State has not made the requisite negligence showing.

[¶730] As to the State's trespass claim, the State has not shown a breach constituting negligence, and it also has not shown that Corps officials took intentional, affirmative voluntary acts to cause protestors to come on its land or to engage in the wrongful conduct at issue.

[¶731] In sum, the Court finds the State has not established that Corps officials breached a duty to support any of the State's claims.

### C. Causation

[¶732] Even if the Court had jurisdiction (it does not), the only two actions by Corps officials that can be the basis for liability are the September 16, 2016, press release and the November 25, 2016, letter to tribal leadership.

[¶733] The State has not established that either statement by the Corps caused the protests to start, or to grow larger, last longer, or involve more unlawful activity than they otherwise would have. The protests' growth was unforeseeable, and the State would have incurred protest-response costs regardless of the Corps's statements. The Court finds, based on the overwhelming weight of evidence, that the Corps's statements did not proximately cause the State's damages.

[¶734] The State also has not shown that Corps officials' decision not to close its lands to the public and seek removal of protestors in mid-August caused the State's damages. (Though, to be clear, this is a discretionary decision upon which liability may not be based in any event.)

[¶735] The Court further finds that other, external factors had the predominant effect of bringing about the State's harm, and that the Corps's statements at issue were not a substantial factor in bringing about the State's claimed injuries, and thus were not a proximate or legal cause of those claimed injuries. *See* Restatement (Second) of Torts § 433 cmt. d.

### D. Damages

[¶736] Even if the United States were held liable in this case (it is not), the Court finds the State

has not established that it is entitled to recover the damages it seeks, for several reasons.

[¶737] First, the State's damages must be reduced to include only those that are recoverable—that is, not based on the wrongful actions of any individual or entity other than individual Corps employees, not for expenses incurred responding to protected First Amendment activity, not for expenses associated with responding to protestors staying off of Corps land or on the area of Corps land to the north of the Cannonball River where the Corps never informed protestors they were permitted to be, and not for expenses incurred prior to the Corps's September 16, 2016, statement. Because the State has not provided sufficient evidence for the Court to determine what reductions would be appropriate, the Court finds the State has not met its burden to establish it is entitled to recover any damages.

[¶738] Second, even if the State were entitled to recover damages (it is not), any award of damages must be reduced to account for the scrap, salvage, or future use value of the durable equipment the State purchased in connection with the protests, which it continued to use or disposed of after the protests ended. The Court concludes a reduction based on straight-line depreciation in the amount of $824,153.28 is reasonable, and any damages award to the State would be reduced by that amount.

[¶739] Third, any damages award to the State must be further reduced to account for regular payroll expenditures that the State and its political subdivisions would have incurred regardless of the protests. This reduction amounts to $2,643,104.84.

[¶740] Fourth, the Court must apportion fault and damages among the parties and non-parties who contributed to the State's claimed injuries in responding to the protests. Based on the evidence presented, the Court finds that 100% of the fault is attributable to the protestors. The State therefore is not entitled to recover damages from the United States.

[¶741] Fifth, even if the Court were to conclude that the United States must pay damages (which it does not), the United States is entitled to offsets of that damages-award amount. It is entitled to an offset of $10 million to account for the money the federal government paid to the State via an EFLEA grant to reimburse part of the State's protest-response costs. And it is entitled to a further offset of $15 million to account for the money the pipeline company paid to the State to reimburse and compensate the State for another portion of the State's protest-response costs. The Court finds this $15 million payment was not a charitable gift but is a collateral source subject to offsetting pursuant to N.D.C.C. § 32-03.2-06.

[¶742] Finally, the Court finds that the State is not entitled to recover prejudgment interest on loans it took out from the Bank of North Dakota. The FTCA bars recovery of prejudgment interest from the United States, *see* 28 U.S.C. § 2674, and here, the State's claim for interest on the loans amounts to prejudgment interest. Moreover, the Bank of North Dakota is owned by the State and is itself a State agency. Loan interest payments that amount to a transfer of funds from one agency of the State to another do not represent a loss or damages to the State.

*     *     *

[¶743] In sum, the Court holds that it lacks jurisdiction over the State's claims, that in any event the State has not proven its claims under North Dakota tort law, and that the State is not entitled to recover damages.

///

///

///

///

///

## ORDER FOR JUDGMENT

[¶744]  Based on the foregoing findings of fact and conclusions of law, judgment should be entered

in favor of the United States.

[¶745]  **IT IS SO ORDERED**.

[¶746]  **LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED _____.

Daniel M. Traynor, District Judge
United States District Court