# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| State of North Dakota, | |
| Plaintiff, | |
| vs. | Case No. 1:19-cv-00150 |
| The United States of America, | |
| Defendant | |

## THE STATE OF NORTH DAKOTA'S REPLY TO THE UNITED STATES' PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT (ECF No. 451-1) AND PROPOSED ADDITIONAL FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

[¶1]     Pursuant to the Court's briefing Order (ECF No. 427), North Dakota submits this Reply to the United States' Proposed Findings of Fact, Conclusions of Law, and Order for Judgment, addressing the United States' Findings of Fact and Conclusions of Law.

[¶2]     North Dakota is only replying to the portions of the United States' Findings of Fact and Conclusions of Law meriting specific response.  However, North Dakota's decision not to address any specific Findings of Fact or Conclusions of Law herein is not an admission or acceptance of any such fact or argument, and North Dakota specifically reserves the right to contest any additional facts or legal argument as necessary.

## REPLY INTRODUCTION AND SUMMARY OF DECISION

[¶3]     THIS MATTER comes before the Court after a bench trial on the merits.

[¶4]     This is an action by Plaintiff, the State of North Dakota ("North Dakota"), under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*., against Defendant, the United States of America ("United States"), by and through the United States Army Corps of Engineers'

("Corps'"), for creation of a public nuisance and civil trespass, and the United States' contributing negligence and gross negligence exacerbating the public nuisance and civil trespass, all stemming from the Corps' failure to conduct certain non-discretionary duties regarding its permitting process. Over the course of eighteen (18) trial days, spanning February 15 to March 14, 2024, the Court heard evidence relating to North Dakota's four claims (public nuisance, negligence, gross negligence, and civil trespass[1]) against the United States.

[¶5]    North Dakota seeks compensation for the damage and destruction caused to North Dakota by individuals opposing the construction of the Dakota Access Pipeline ("DAPL") in North Dakota from roughly August 2016 through March 2017 (the "DAPL Protests"). These individuals (the "DAPL Protestors") primarily resided in encampments on land managed by the Corps near the confluence of the Cannonball and Missouri Rivers (the "Corps-managed lands").

[¶6]    The Court previously determined that the United States failed to follow its mandatory statutory and regulatory duty to follow the permitting procedures pursuant to 36 C.F.R. Part 327 (and the Army Corps of Engineers' implementing guidance) with respect to those individuals who for months occupied the Corps-managed lands in southern Morton County, North Dakota, which means those individuals were not lawfully present on Corps-managed lands. *See* ECF No. 383 at 11–14.

[¶7]    Having reexamined that prior determination in light of the evidence adduced at trial, the Court reaffirms its prior holdings and finds yet again that the United States failed to follow its mandatory statutory and regulatory duty to follow its permitting procedures. That violation of a non-discretionary duty opens up the United States to liability under North Dakota law.

---

[1] The Court previously dismissed North Dakota's claim sounding in "Good Samaritan" negligence. *See* ECF No. 38 at 29–32.

[¶8]    Further, the Court finds that the United States violation of its non-discretionary permitting process was the proximate and the but for cause of North Dakota's injuries.

[¶9]    From the earliest days of the DAPL Protests in August 2016, the United States knew that the DAPL Protestors residing on the Corps-managed lands contained hostile extremist individuals who were engaging in unlawful activities. The United States expected that their numbers would grow and that the situation would worsen.  The United States was also aware that the DAPL Protestors were not abiding by the Corps land use regulations while located on Corps-managed lands, including that the DAPL Protestors did not have a valid permit to camp on the Corps-managed lands and were unlawfully disposing of trash and building structures on Corps-managed lands.

[¶10]   Despite the United States knowledge of and expectations for the unlawful and violent situation developing on Corps-managed lands, the United States failed to control the conduct of the DAPL Protestors and instead allowed  them to unlawfully occupy Corps-managed lands in violation of the Corps mandatory permitting procedures, effectively, but unlawfully, creating a *de facto* Special Use Permit.  This emboldened and enabled the DAPL Protestors to engage in an eight-months long violent public nuisance event in North Dakota.

[¶11]   Further, the United States stood idly by while the DAPL Protests spawned from the unlawful occupation of Corps-managed lands grew in size and ferocity, leaving it to North Dakota to maintain the rule of law.  Far from attempting to assert control over the DAPL Protestors, the United States invited them onto Corps-managed lands, and then stood by while DAPL Protestors wreaked havoc in North Dakota.

[¶12]   For months, North Dakota was forced to respond, by itself, to the DAPL Protests originating from the Corps-managed lands, which spread to other areas of North Dakota and

endangered the health and safety of North Dakota, its citizens, property, and the law enforcement personnel tasked with keeping the peace.

[¶13]   As a result, North Dakota suffered significant harm, totaling more than thirty-eight million dollars in damages. These damages principally comprised the costs associated with sourcing law enforcement officers from other states to appropriately respond to and mitigate the DAPL Protests, but also included property damage, equipment costs, and loan interest.

## ADDITIONAL FINDINGS OF FACT

[¶14]   In addition to the undisputed facts the Court has previously determined in this matter (ECF. No. 383) and those set forth in North Dakota's Findings of Fact, Conclusions of Law, and Order for Judgment (ECF No. 450-1), the following Additional Findings of Fact ("AFoF") are necessary to correct proposed Findings of Fact proposed by the United States.

[¶15]   In the interest of brevity and the Court's time, the specific facts set forth below are not intended to be inclusive of all proposed Findings of Fact submitted by the United States.  Any Findings of Fact proposed by the United States not specifically addressed in the AFoF herein are not admitted by North Dakota.

## I.   Errors With The United States' Proposed Findings Of Fact.

[¶16]   The United States' FoF ¶ 49 incorrectly claims that the "Standing Rock Sioux Tribe's gathering on Corps land did not fall into any of the specifically listed events over 50 participants for which liability insurance is mandatory; therefore, the discretion whether to require such insurance remained with Corps officials."  EC 1130-2-550 states that "liability insurance for events such as religious ceremonies, social ceremonies (weddings, etc.) . . . when the expected group is over 50 participants . . .is mandatory."  EC 1130-2-550, Appendix E at E-3 (ECF No. 8 at 46); *see also* ECF No. 450-1, FoF ¶ 125 (Tr. Day 9, 1451:17–1453:9 (Kruger)).  The Standing Rock Sioux

Tribe's Special Use Permit application specifically contemplated "[d]aily prayers" and "ceremonies" fitting this definition.  DX-4043 at 4.  On this basis, the Corps determined that liability insurance would be required for the Standing Rock Sioux Tribe's Special Use Permit, and the Corps' 30(b)(6) witness Heath Kruger, the Senior Policy Adviser for Park Ranger Activities in the Corps, admitted this requirement was mandatory.  ECF No. 450-1, FoF ¶ 126 (Tr. Day 9, 1451:17–1453:9 (Kruger); EC 1130-2-550).

[¶17]   The United States' FoF ¶¶ 57 and 60 incorrectly claim that the Corps has discretion to use "alternative management techniques" in place of a required Special Use Permit, including establishing a "free speech zone."  As established at trial, alternative management techniques allow flexible uses of Corps-managed lands where the public is already authorized to lawfully be on Corps-managed lands, such as in designated campgrounds.  ECF No. 450-1 at ¶ 57 (Tr. Day 9, 1465:12–1467:5; 1473:22–1475:5 (Kruger)).   The Engineering Pamphlet ("EP") 1130-2-550, Appendix G which the Corps relies upon specifically discusses "alternative management techniques" in the context of closing areas where capacities have been reached, managing the appropriate use of facilities such as restricting vehicles "to designated roads and parking facilities and camping to designated sites."  EP 1130-2-5 Appendix G, G-1.  Further, "alternative management techniques" are discussed in EP 1130-2-550 in the context of the Visitor Assistance Program as techniques that may be used "in addition to the issuance of citations" as "effective in reducing visitor problems."  *Id.* at Chapter 6.  "Alternative management techniques" clearly contemplate instances where persons are already authorized and invited to be upon designated recreation areas, and not areas otherwise closed to the public in the first instance.  "Alternative management techniques" are not an alternative to, and cannot replace, the Special Use Permit

permitting process.  Where a Special Use Permit is required, the United States cannot avail itself of "alternative management techniques" to evade liability.

[¶18]   The United States FoF ¶¶ 102, 157, 185, and 343-352 incorrectly assert that North Dakota's law enforcement (and North Dakota generally) did not want to and were not willing to have the DAPL Protestors removed from Corps-managed lands, and that North Dakota was willingly taking a "containment approach" to the DAPL Protestors.  North Dakota frequently did not have the resources, personnel, or space, to arrest all DAPL Protestors engaging in unlawful actions across the State.  Tr. Day 2, 285:22–286:4 (Gallagher); Tr. Day 3, 579:9-19, 598:6-22 (Pederson). However, North Dakota law enforcement was willing to remove the DAPL Protestors early on in the DAPL Protests, and thought it was a possibility.  ECF No. 450-1 at ¶¶ 266-275; *see also* Tr. Day 1, 87:10–88:11 (Schulz); Tr. Day 12, 199:7-14 (Spellmon); PX-1223.  Even United States law enforcement thought removing the DAPL Protestors was viable early on and would have been appropriate.  Ward Depo., 59:10–60:10 (ECF No. 429-1).  Cass County Sheriff Paul Laney testified that while the Corps had allowed protestors to stage on their land since August, law enforcement wasn't in favor of allowing the DAPL Protestors to remain on Corps-managed lands, but that law enforcement "couldn't do anything about the thousands that were in the" camps on Corps-managed lands because "the Corps wouldn't let us."  Tr. Day 3, 512:3–512:16 (Laney).  A request from the Corps to North Dakota law enforcement to remove the DAPL Protestors never happened.  ECF No. 450-1, FoF ¶ 239.

[¶19]   The United States' FoF ¶¶ 125 and 130 incorrectly claim that the Corps was not a party to the September 9 Joint Statement ("Sept. 9 Joint Statement") issued by the Department of Justice, Department of the Army, and Department of Interior.  At trial it was established that the Corps is a part of the Department of the Army.  Tr. Day 8, 1392:1-3 (Jackson) (Corps is a part of the

Department of the Army); Tr. Day 7, 1214:1-2 (Henderson) (Corps is a "subordinate entity of the Department of the Army"); *see also* 16 U.S.C. § 406d (The Chief of Engineers . . . is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control *of the Department of the Army* (emphasis added)). The Department of the Army was also heavily involved in the issuance of the Sept. 16 Press Release and Special Use Permit decision. Semonite Depo. 48:24–50:7 (ECF No. 405-7). This is confirmed by the Corps draft Special Use Permit offered to the Standing Rock Sioux Tribe, which stated that the permit holder was required to "hold harmless, defend, and indemnify the United States, Department of Defense, *Department of the Army*, USACE, and all officers, agents and employees thereof" harmless "against all claims demands, actions and suits" such as "damages to property or injuries to persons aris[ing]" from the Special Event. JX-129 at 0004 (emphasis added). The Special Use Permit clearly treated the Corps and the Department of the Army as legally related entities.

[¶20]   The United States' FoF ¶¶ 135-136, and 139-140[2] incorrectly assert that the Corps' felt the Standing Rock Sioux Tribes' August 18, 2016 Special Use Permit application presented a viable path forward under the Corps' permitting requirements. At the time of submission, the Corps determined the Special Use Permit application was incomplete. ECF No. 450-1, FoF ¶ 62 (Tr. Day 7, 1049:2-4 (Henderson)). The Corps had significant concerns with the permit application received by the Corps on August 18, 2016, including that: the application "significantly under estimated" the number of participants, vehicles, and locations in only listing 300 participants, and did not accurately describe the full scope of areas DAPL Protestors currently occupied. DX-4053

---

[2] In North Dakota's Findings of Fact, FoF ¶¶ 62 and 63 erroneously cited to the first two pages of DX-4043 not in evidence. This AFoF is also a replacement for those paragraphs.

at 1. Further, when discussing the Special Use Permit application with Chairman Archambault (the Chairman of the Standing Rock Sioux Tribe) on August 25, 2016, Eric Stasch (the Corps Operations Manager, Lake Oahe Project) stated that "the phone call did not get into the specifics of the permit application" (*id.*), that Chairman Archambault admitted there were "professional" protestors on Corps-managed lands not associated with the Standing Rock Sioux Tribe (*id.* at 2); and that he informed Chairman Archambault that the information in the Standing Rock Sioux Tribe's supplemental application "was way off" (*id.*). The District Commander for the Omaha District of the Army Corps of Engineers, Colonel Henderson, also viewed the Special Use Permit as a "worthless piece of bureaucracy" and "[t]hat piece of paper wasn't going to mean anything." ECF No. 450-1, FoF ¶ 199. In any event, regardless of the Corps' opinions about the Standing Rock Sioux Tribe's Special Use Permit application, it remained that: just an application. A Special Use Permit allowing the DAPL Protestors to occupy Corps-managed land was never lawfully finalized or issued.

[¶21] The United States' FoF ¶ 138 is incorrect to the extent it implies that the requirements for the offered Special Use Permit (including bonding and insurance) would only benefit the Corps and not North Dakota. This is not accurate. First, the bonding and insurance requirements in the Special Use Permit offered to the Standing Rock Sioux Tribe (which followed the Appendix E Special Use Permit Form) acknowledged that the Special Use Permit holder will "hold harmless, defend, and indemnify the United States, Department of Defense, Department of the Army, USACE, and all officers, agents and employees thereof" harmless "against all claims demands, actions and suits" such as "damages to property or injuries to persons aris[ing]" from the Special Event. JX-129 at 0004. This would have obligated the Standing Rock Sioux Tribe, through its insurance, to indemnify the United States for a portion of the damages claimed by North Dakota

in this action, and thus benefitted North Dakota.  Second, the Special Use Permit would have required the Standing Rock Sioux Tribe to "pay all costs for removal of said property and restoration of the premises," (*id.*), which included a performance bond to "cover potential maintenance, damage and restoration costs . . . and/or removal of personal property" (*id.* at 0004-0005).  Part of the damages North Dakota seeks include the cost of restoring and cleaning up the DAPL Protest areas.  Third, the Special Use Permit would have required the Standing Rock Sioux Tribe to "provide sufficient services to ensure the health, welfare, safety, supervision and security of all participants and spectators."  *Id.* at 0005.  These security and supervision services would have benefitted North Dakota by providing additional controls and supervision over the lawless elements of the DAPL Protestors, thus decreasing the damages suffered by North Dakota.  As such, the comprehensive terms of a Special Use Permit, which included the insurance and bonding requirements, are designed to ensure that the land and water resources of the United States are protected from harm, which benefits would have accrued to North Dakota.  ECF No. 450-1 at ¶ 54.  The United States' failure to issue a Special Use Permit with all of its required elements deprived North Dakota of these benefits and caused it significant damages.

[¶22]   The United States' FoF ¶¶ 146 and 273 incorrectly claim that "there is no evidence that the Corps's [sic] granting or denying permission to the [DAPL P]rotestors to be on its land made any difference for protestors" in several regards.  There was significant evidence adduced at trial that Corps was aware its lack of adhering to its permitting process was emboldening the DAPL Protestors, and that its September 16, 2016 Press Release (Sept. 16 Press Release) would enable and accommodate the DAPL Protestors.  ECF No. 450-1 at ¶¶ 96, 109 (Sept. 16 Press Release "was an action to … make the tribes feel that they were getting some degree of accommodation."), 266-275.   Dr. Katherine Kuhlman, North Dakota's forensic psychology expert, testified

extensively as to how the Sept. 16 Press Release (and other Corps actions) enabled and emboldened the DAPL Protestors. *See* ¶ 145, 161, 174, and 196, *infra*. Further, the United States' experts, Dr. Joel Steckel and Dr. Noam Yuchtman, took an unduly narrow approach to analyzing the effects of the Corps' actions granting permission for DAPL Protestors to be and remain on Corps-managed lands by only analyzing the two statements themselves, and not how the Corps comprehensive actions since early August spurred DAPL Protestor conduct throughout the DAPL Protests. *Id.* Gary Warner testified that the Sept. 16 Press Release statement had a total number of interactions of 4,965 and the number one place that people interacted with it on Facebook was the U.S. Army Corps of Engineers Omaha District website, where it was interacted with over 2,000 times, and the second place was the Sacred Stone Camp with 2,031 interactions. Tr. Day 18, 2948:4–2949:3 (Warner).

[¶23]   The United States' FoF ¶¶ 146 and 273 are further incorrect to the extent the United States relies on DAPL Protestors statements.  First, only three DAPL Protestors provided any testimony regarding their motivations, and all three DAPL Protestors admitted they did not speak for the DAPL Protestors as a whole.  *See* Tr. Day 11, 2459:3-7 (Iron Eyes); Tr. Day 16, 3530:6-8 (LaDuke); Estes Depo., 80:7-13; 83:13–83:15 (ECF No. 404-3).  Second, DAPL Protestor Winona LaDuke viewed the Sept. 16 Press Release as positive.  ECF No. 450-1 at FoF ¶¶ 117 (Tr. Day 16, 2536:1–2537:17 (LaDuke)).   DAPL Protestor Chase Iron Eyes testified that he thought the Sept. 16 Press Release would relieve DAPL Protestors' anxiety.  Tr. Day 11, 2446:4-10 (Iron Eyes). Third, DAPL Protestor Chase Iron Eyes testified that he viewed the DAPL Protestor camps on Corps-managed lands as a safe haven.  *Id.* at ¶ 131 (Tr. Day 15, 2468:17-22 (Iron Eyes)).

[¶24]   The United States FoF ¶¶ 147-154 are incorrect to the extent they imply that the North Camp included "hundreds" of people who had moved out of the Highway 1806 right-of-way onto

the Cannonball Ranch private property as of September 20, 2016.  ECF No. 450-1, FoF ¶¶ 149-151.  North Dakota State Highway Patrol ("NDHP") Trooper and Pilot Dennis Gallagher testified as to the mass migration from the Main Camp to the North Camp that took place on October 23, 2016 after individuals were arrested for crossing over the Highway 1806 right-of-way onto private land.  *Id.* at ¶ 149; *see also* PX-1705 (10:30-12:00 timestamp).

[¶25]    The United States FoF ¶¶ 187, 193, 339-342 incorrectly assert that the Corps was not aware it needed to request North Dakota law enforcement to remove DAPL Protestors from Corps-managed lands under North Dakota law.  Colonel Henderson knew the Corps needed make a request for North Dakota law enforcement to remove trespassers.  Tr. Day 7, 1137:17-22 (Henderson).  Lieutenant General Todd Semonite (Chief of Engineers and Commanding General of the Corps) acknowledged in October the Corps needed to ask Morton County law enforcement to remove DAPL Protestors from the Main Camp.  ECF No. 450-1, FoF ¶ 144 ("When is [the United States Army Corps of Engineers] going to do something to get this under control - while many might move to other camps, some will stay just to embolden the effort? . . . Is there some event that will cause us to ask [sic] Sheriff to enforce the law?").  Colonel Henderson's actions in issuing the November 1, 2016 letter to Sheriff Kyle Kirchmeier specifically requesting law enforcement support, and then rescinding it on November 25, 2016, is additional evidence of the Corps awareness of the law in North Dakota, and the games the Corps was playing.  *Id.* at ¶¶ 168-169, 193-196.  Further, the United States assertions in these FoF are contradicted by its separate arguments that Colonel Henderson made a conscious decision *not* to ask North Dakota law enforcement to forcibly remove the DAPL Protestors.  *See* ECF No. 451-1 at ¶¶ 301-304.

[¶26]    The United States' FoF ¶ 225 incorrectly implies that North Dakota's belief that the Corps could not timely clean up the DAPL Protests camps, and had to clean up the camps itself, was

unreasonable.  North Dakota decided to mitigate any possible negative impacts of imminent flooding that would wash the waste and garbage left by protestors on Corps lands traveling downstream.  Tr. Day 1, 186:11–186: 22; 188:16-25 (Schulz).  Since the State had little to no confidence that the Corps would or could get that clean-up completed prior to the spring snow melt, Morton County Commissioner Cody Schulz made the decision to move forward with cleanup as soon as possible and contracted for the debris and waste removal with contractors.  *Id.*

[¶27]   The United States' FoF ¶¶ 257 and 258 are not credible to the extent the United States relies upon Dr. Maguire's opinions to assert that North Dakota's response was "heavy-handed" and overly militarized.  Dr. Maguire's experience as a law enforcement office was limited to three summers between 1988 and 1990.  Tr. Day 15, 2346:5–2346:19 (Maguire).  Dr. Maguire had no training in mobile field force tactics, use of less lethal force, nor has he ever used those law enforcement tactics.  *Id.* at 2346:20–2347:1.   Dr. Maguire had never previously been involved in a review of police officers' use of force in a peer capacity.  *Id.* at 2348:4-25.  Dr. Maguire's experience with law enforcement responses to protests lasted one evening for a matter of hours and involved fifty to a hundred protesters during one of his summers as a law enforcement officer. *Id.* at 2347:2–2347:25.  Dr. Maguire had never been responsible for coordinating mobile field force tactics, such as were utilized in the Big Push, or determined the appropriateness of armored vehicles to use in a mobile field force tactical engagement.  *Id*. at 2377:4–2377:12.   While he had been involved in academic studies of law enforcement practices, Dr. Maguire admitted that published materials he relied upon in part to formulate his opinions critical of North Dakota law enforcement and its response, were not available to North Dakota law enforcement in 2016. *Id*. at 2349:7–2349:16, 2350:6–2350:15 (referring to "Rethinking the Police Response to Mass Demonstrations, 9 Recommendations," published in 2022, see also Police Executive Research

Forum, dated 2022, International Association of Chiefs of Police, from 2019). Dr. Maguire has never had to determine the appropriateness of armored vehicles used in a mobile field force tactical engagement with officers. *Id*. at 2377:4–2377:12. Dr. Maguire's opinions about the propriety of the North Dakota law enforcement response, their uses of force, and tactics, are not credible when he has never been involved in the very types of law enforcement interactions with protestors that he now critiques.

[¶28]    The United States' FoF ¶¶ 257 and 258 are further not credible because Dr. Maguire's testimony contradicted itself. Dr. Maguire testified that law enforcement during the Big Push operation over-accommodated protestors, establishing an overly permissive environment that tolerated illegal and riotous behavior. Tr. Day 15, 2367:10–2367:18 (Maguire). Dr. Maguire continued that law enforcement should have taken more enforcement action during the Big Push. *Id*. at 2367:19–2367:24. While Dr. Maguire testified that the operation was militarized, he also testified that law enforcement should have made more arrests after protestors were not obedient to formal dispersal orders. *Id*. at 2367:19–2369:11. Moreover, Dr. Maguire was critical of a law enforcement officer displaying a semiautomatic rifle moments after Red Fawn Fallis, a protestor, had discharged a firearm three times in the immediate vicinity of law enforcement officers when she was being arrested. *Id*. at 2370:1–2370. Even though he was critical of law enforcement for a "militarized" response, he agreed that it was appropriate to have some type of up-armored vehicle so there could be high cover with a rifle, which may have the appearance of a military-style vehicle. *Id*. at 2374:9–2374:24. Dr. Maguire also agreed that the use of Humvees during the Big Push was appropriate, as was the use of surveillance aircraft. *Id*. at 2374:25–2375:22. Finally, Dr. Maguire admitted he was not critical of the use of protective gear officers were using during the Big Push. *Id*. at 2376:5–2376:14. For those reasons, Dr. Maguire's testimony is not credible. Further, Dr.

Maguire's testimony is directly controverted by the testimony of North Dakota's law enforcement experts, who found North Dakota's protests response to be objectively reasonable, consistent with professional policing standards, and necessary. *See* Section V.D, *infra*.

[¶29]    The United States' FoF ¶ 392 incorrectly claims that the $15 million donation from Dakota Access, LLC ("Dakota Access") was intended to reimburse North Dakota's emergency response costs. Sheriff Kirchmeier testified that while he discussed potential reimbursement with Dakota Access in the early to mid-August 2016 timeframe, those conversations ended shortly after they began. Tr. Day 3, 431:8-20. Further, Adjutant General Dohrmann, when asked about an email he provided to Dakota Access detailing North Dakota's emergency response costs to date, stated he was not aware of the email's purpose but had been asked to send it by the Governor's office. Tr. Day 6, 952:12-5 (Dohrmann); JX-263. Further, the language in North Dakota's legislative enactment to accept the $15 million donation was not an indication of Dakota Access' intent in providing the donation, but rather a logistical requirement in that a legislative enactment is necessary for the State to accept *any* gifts or donations (Bachmeier Depo., 29:11–31:1 (ECF No. 404-1)) in order to direct where the donated funds would be allocated (*Id.* at 44:10–46:10).

## II.    Additional Findings Of Fact Related To North Dakota's Damages.

North Dakota's damages can properly be delineated between those that were incurred before and after September 16, 2016.

[¶30]    North Dakota is seeking $37,854,867.25 in damages.[3]    Contrary to the United States contention, these damages are distinguishable by time-period during the DAPL Protests.

---

[3] North Dakota's Findings of Fact, Conclusion of Law, and Order for Judgment included a typographical error in ¶¶ 325 and 452, listing the incorrect damages amount. $37,854,867.25 is the correct damages figure.

[¶31]   Holly Gaugler, the Chief Financial Officer for the North Dakota National Guard and Department of Emergency Services, primarily tracked North Dakota's emergency response costs to the DAPL Protests.  ECF No. 450-1, at FoF ¶ 295.  In discussing how North Dakota's emergency funding of the DAPL Protests was organized, Ms. Gaugler testified that the North Dakota Department of Emergency Services would accumulate expenses from the DAPL Protests, and then would periodically request a drawdown against a line of credit available from the State of North Dakota.  Tr. Day 10, 1647:5–1648:21 (Gaugler).  The very first such draw down, which was authorized on October 6, 2016, covered the period of August 19 through September 30, 2016, and totaled $305,600.25.  *Id.*; PX-1209 at 1.  Ms. Gaugler testified that this drawdown coincided with costs starting after Governor Dalrymple's emergency declaration on August 19, 2016.  Tr. Day 10, 1648:5-12 (Gaugler); ECF No. 450-1 at ¶ 66.  These drawdowns would include expenditures that had posted to the accounting system prior to the draw down date.  Tr. Day 10, 1651:6-17 (Gaugler).

[¶32]   After the initial drawdown, it was the North Dakota Department of Emergency Service's practice to make additional drawdowns approximately every two weeks.  *Id.* at 1649:14–1650:4.  The second such draw down correspondingly covered the period of October 1, 2016 through October 14, 2016 and was for a total of $138,363.01.  *Id.* at 1650:5–1651:1.  This second drawdown represented all expenditures to post to the North Dakota Department of Emergency Service's accounting system between October 1 and 14, 2016.  *Id.* at 1651:6-17.  This process continued throughout the DAPL Protests.  *Id*. at 1651:6–1652:7.

[¶33]   This is verified by North Dakota's summary exhibit of the voluminous amount of emergency response costs attributable to the DAPL Protests.  PX-1455 (Native).  That summary of North Dakota's emergency response costs included all reimbursement requests submitted by North Dakota to the North Dakota Department of Emergency Services, which where individually

verified by Ms. Gaugler and her accounting team. ECF No. 450-1 at ¶ 294-295; Tr. Day 10, 1664:25–1674:6 (Gaugler). For every row entry in North Dakota's PX-1455 (Native), there was corresponding paperwork submitted to the Department of Emergency Services. Tr. Day 10, 1673:5-20 (Gaugler).

[¶34]    In describing how individual payment vouchers would be represented in PX-1455 (Native), Ms. Gaugler was able to verify individual emergency response costs through their Voucher ID, reimbursement amount, and accounting date, all of which were reflected in PX-1455 (Native). *Id.* at 1666:25–1673:6 (Ms. Gaugler discussing reimbursement requests/vouchers represented in JX-1, PX-1429, and PX-1459, verifying their entries in PX-1455 (Native)).

[¶35]    The date and descriptive columns in PX-1455 (Native) also allow for the Court to separate damages before and after September 16, 2016 by sorting PX-1455 (Native), column D (Date), chronologically. To do so, the Court first sorted PX-1455 (Native) by column D (Date) chronologically, and then identified each row entry which conservatively was attributable to time period before the Sept. 16 Press Release based on the column D (Date), column L (Line Desr), and columns M (Descr) and N (Descr2), which provided contextual information including expense processing dates and descriptions of expenses, often including dates, respectively.

[¶36]    To determine which row entries were attributable to North Dakota's damages incurred before September 16, 2016 in PX-1455 (Native), the Court sorted PX-1455 (Native) chronologically by column D (date). The Court then determined that the first 416 chronological rows were primarily attributable to pre-September 16, 2016 expenses (row 416 is the last row chronologically listing an expense prior to September 16, 2016 in the column M description, with the exception of some scattered entries past row 416). The Court then assumed all chronological rows before row 416 were pre-September 16, 2016 expenses, and only excluded a row before row

416 if it specifically referenced post September 16, 2016 expenses, or the row was discussed during trial and demonstrated that it involved post September 16, 2016 expenses. For example, row 244 of the chronological sorting of PX-1455 (Native) (Original PX-1455 Native row number 6897) was discussed during trial as the entry representing JX-1, and identified as an October 10, 2016 invoice, so it was not included in the pre-September 16, 2016 expenses. Tr. Day 10, 1666:3–1667:19 (Gaugler). Similarly, rows 93 and 96 of the chronological sorting of PX-1455 (Native) (original PX-1455 (Native) row numbers 250 and 6275) explicitly reference travel expenses from September 29, 2016 through October 1, 2016 in the column M (Descr), and were therefore not included in the pre-September 16, 2016 expenses. Based on this sorting, the Court determined that the following rows (the listed rows here correspond to the rows in the original version of PX-1455 (Native)) were for pre-September 16, 2016 expenses: 5-10, 37-40, 220-223, 246-249, 347-370, 372-376, 379-384, 386-402, 404-408, 412, 420, 422-423, 484-495, 4017-4065, 4067-4071, 4073-4091, 4092-4095, 4104, 4110, 5917-5920, 5929-5934, 6276-6287, 6290-6295, 6524-6525, 6540-6561, 6584, 6630-6650, 6885-6890, 6898-6899, 6903, 6934-6936, 7012, 7044, 7114, 7120, 7167-7168, 7296-7299, 7472-7473, and 7478-7495.

[¶37]    Then, the Court reviewed the remaining rows in the chronological sorting of PX-1455 (Native) for any entries indicating they may have been lagging invoices from before September 16, 2016, and included those as damages incurred before September 16, 2016. For example, rows 6999, 7000, and 7312 of the chronological sorting of PX-1455 (Native) (Original PX-1455 (Native) row numbers 7529, 7530, and 7555, respectively) were processed on March 30, 2017 (rows 6999 and 7000), and June 9, 2017 (row 7312). This indicates they were likely for post-September 16, 2016, expenses. However, their descriptions indicated they were for January, February, and April <u>2016</u> expenses (which is likely just a typographical error, as North Dakota had

not incurred expenses in those early 2016 months prior to the DAPL Protests starting in August of 2016).    Regardless, the Court conservatively included them in the pre-September 16, 2016 expenses group.    These additional rows (the listed rows here correspond to the rows in the original version of PX-1455 (Native)) conservatively determined to be attributable to expenses incurred before September 16, 2016 are: 7169-7171, 7301-7310, 7496-7497, 7518, 7529-7530, and 7555

[¶38]    Totaling all rows the Court determined to be conservatively attributable to pre-September 16, 2016 expenses results in a total of: $1,711,073.99.

[¶39]    Totaling all rows the Court determined to be conservatively attributable to post-September 16, 2016 expenses results in a total of: $35,492,046.96.

<u>North Dakota has established that its damages include damage to state property</u>.

[¶40]    North Dakota established at trial that it sustained damages to state property, including damage to the Backwater Bridge (also known as the Cantapeta Bridge), guardrail posts on the Backwater Bridge, a separate county bridge, two snowplow trucks, and a digital message board. Ketterling Depo., 8:13–10:14 (ECF No. 405-6).    The damage to the Backwater Bridge required inspection, core samples, and re-asphalting of the bridge. *Id.* at 20:2–21:5, 25:3-20, 26:5–27:7. The damages to the Backwater Bridge also required repair of the guardrail posts.    *Id.* at 14:4-10, 16-20.    The two snowplow trucks were in a fully burned-out state.    *Id.* at 12:1-5.    The digital message board was also burned down to nothing.    *Id.* at 18:10-15.  *Id.* at 25:10-15.

## **REPLY LEGAL ARGUMENT**

**I.    The Court Already Found Jurisdiction Under The FTCA's Jurisdictional Requirements, And The Facts Adduced At Trial Confirm The Court's Prior Finding That The United States Violated Its Non-Discretionary Duty To Follow Its Mandatory Permitting Processes.**

[¶41]    The Court has "an obligation to satisfy" itself that jurisdiction exists as all stages of litigation. *Auer v. Trans Union, LLC*, 902 F.3d 873, 877 (8th Cir. 2018); Fed. R. Civ. P. 12(h)(3);

*U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388-89 (3rd Cir. 2002). As such, the Court has re-examined and confirmed its prior determination that jurisdiction exists under the FTCA.

[¶42]   The plaintiff in an FTCA action must establish six elements. The claim must be "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

[¶43]   As a threshold matter, it is already the law of the case that the Corps had a mandatory duty to follow its permitting procedures prior to issuing a permit to the DAPL Protestors. ECF No. 38, ¶¶ 20-58. The Corps' regulations state that special events "are prohibited unless written permission has been granted by the District Commander." 36 C.F.R. § 327.21. The Court has already held that this regulation, and the Corps' Implementing Guidance for the handling of Special Use Permits found, in part, in Engineering Circular 1130-2-550, and Appendix E to the same, show that while the Corps has discretion on whether to grant or deny a Special Use Permit, the Corps does not have discretion to disregard the requirements of the permitting process altogether. ECF No. 38 at ¶¶ 40-45.

[¶44]   The Corps' permitting regulations include several mandatory requirements concerning the issuance of a Special Use Permit, including a completed permit application. ECF No. 450-1 at FoF ¶ 56 (Citing EC 1130-2-550, Appendix E at E-2 (ECF No. 8 at 45) ("An application *must be obtained, completed and submitted* to the Operations Project Manager within the time frame established by the Operations Project Manager . . ." (emphasis added)); 36 C.F.R. § 327.21). Once

it is determined that an activity requires a Special Use Permit, a Special Use Permit is required *before* a person may engage in that activity on Corps-managed lands.[4]  ECF No. 450-1, FoF ¶ 56. At trial, Corps' Senior Policy Adviser for Park Ranger Activities, Mr. Kruger, confirmed that a Special Use Permit is not considered valid or issued without a signature and the required bonding and insurance.  ECF No. 450-1, FoF ¶ 124.

[¶45]    The Corps also has a "*responsibility* to determine if the requested activity is a special event; to assure the activity is consistent with current project land use classifications…and to specific general criteria and site-specific stipulations based upon criteria in [Appendix E]." *See* ECF No. 38 at ¶ 43 (citing EC 1130-2-550, Appendix E, § E-6).  Further, for religious ceremonies and spiritual gatherings over 50 people, liability insurance, obtained by the event holder, that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event, is mandatory before a Special Use Permit can be issued.  ECF No. 450-1, FoF ¶ 125 (citing Tr. Day 9, 1451:17–1453:9 (Kruger); EC 1130-2-550, Appendix E at E-3 (ECF No. 8 at 46)).  When required, bonding and proof of insurance must be submitted *prior* to the start of any special event activities.  ECF No. 450-1, FoF ¶ 126.  Finally, a Special Use Permit must be signed by both the applicant and the issuing Corps official to be in good standing, effective, and issued. ECF No. 450-1 at ¶ 124 (Tr. Day 9, 1440:9-21 (Kruger)).

[¶46]    It therefore remains the law of the case that the Corps had a mandatory duty to follow its permitting procedures prior to issuing a Special Use Permit.  ECF No. 383, ¶ 24.

[¶47]    The undisputed facts adduced at trial proved that the Corps did not follow its permitting requirements.  Multiple Corps officials admitted that no Special Use Permit that complied with the

---

[4] For this reason, the "alternative management techniques" discussed by Mr. Kruger (ECF No. 450-1, FoF ¶ 59) are inapplicable, because the Corps determined early on that a Special Use Permit was required for the DAPL Protestors occupation of Corps-managed lands.  FoF ¶ 56.

Corps' mandatory permitting requirements was ever issued. ECF No. 450-1, FoF ¶ 129. The undisputed facts show: (1) after DAPL Protestors began assembling on Corps land, which occurred well before a Special Use Permit application was even submitted, the Corps began discussions with the Standing Rock Sioux Tribe to obtain a Special Use Permit so that they could lawfully be present on Corps-managed lands (ECF No. 450-1, FoF ¶¶ 51, 58, 61, 77); (2) the Corps communicated the mandatory Special Use Permit requirements to the Standing Rock Sioux Tribe, which included needing a $100,000 bond and liability insurance coverage not less than $5,000,000 for personal injury, for each occurrence, and $1,000,000 for each occurrence involving property damage, and not less than $5,000,000 covering all claims per occurrence, and requirements that unauthorized structures not be built on Corps-managed lands (ECF No. 450-1, FoF ¶¶ 105-106); (3) the Corps was aware of unlawful conduct emanating from Corps-managed lands that were subject to Special Use Permit requirements (ECF No. 450-1, FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114); (4) the Corps was aware the Standing Rock Sioux Tribe had not met the requirements of the Special Use Permit, including obtaining insurance and signing the Special Use Permit prior to and at the time of the Corps issuing the Sept. 16 Press Release (ECF No. 450-1, FoF ¶¶ 101, 105-108, 110-116); (5) despite the Standing Rock Sioux Tribe not having a completed Special Use Permit, including not having obtained the required insurance or providing a signed permit, the Corps issued the Sept. 16 Press Release granting a Special Use Permit despite the knowledge that doing so would violate the Corps' permitting requirements (ECF No. 450-1, FoF ¶¶ 107-108); (6) the Standing Rock Sioux Tribe never returned the application for the Special Use Permit, including never signing the Special Use Permit or providing proof of required insurance (ECF No. 450-1, FoF ¶¶ 120-123, 128-129).

[¶48]   Additionally, around November 12, 2016 the Corps transmitted a Special Use Permit to Faith Spotted Eagle to allow a group of DAPL Protestors to have a religious ceremony, that Special Use Permit was never finalized, but Colonel Henderson gave permission for the prayer ceremony anyway.  ECF No. 450-1, FoF ¶¶ 175-177; ECF No. 451-1 at ¶¶ 165-167.

[¶49]   Later, Colonel Henderson sent Chairman Archambault the November 25, 2016 (the Nov. 25 Free Speech Zone Letter") purporting to create an area on Corps-managed lands on which DAPL Protestors could assemble, despite knowing the majority of DAPL Protestors were located on the Main Camp on Corps-managed lands not covered by the Nov. 25 Free Speech Zone Letter (ECF No. 450-1, FoF ¶¶ 188, 195, 202).

[¶50]   While discussions about the permitting process occurred, the process was ultimately, and unlawfully, abandoned by the Corps, with Colonel Henderson considering a Special Use Permit "a worthless piece of bureaucracy."  ECF No. 450-1, FoF ¶¶ 199.

[¶51]   The Court finds that the Sept. 16 Press Release, the November 14 Faith Spotted Eagle Special Use Permit, and Nov. 25 Free Speech Zone Letter announcements violated the Corps' non-discretionary permitting processes by announcing that Colonel Henderson was granting written permission, and a *de facto* Special Use Permit in each instance.  The Corps then doubled down on the violation of its non-discretionary permitting requirements by continuing to encourage and enable the unlawful occupation and use of Corps-managed lands.  The Corps never revoked these *de facto* written permissions, which were clear violations of the Corps Special Use Permit process required by EC 1130-2-5, Appendix E.

[¶52]   The undisputed facts adduced at trial provide no reason for the Court to reconsider its prior determination that the United States' subsequent discretionary actions do not remedy the Corps failure to follow its permitting regulations discretionary.  *See* ECF No. 383, ¶¶ 25-27; ECF No. 38

at ¶ 55 ("While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protesters' conduct, the Court concludes the Corps failure to comply with the mandatory permitting process tainted all other decisions made by the Corps.  Here, the maxim applies: 'You break it, you bought it.'").

A. **The Court Rejects the Corps' Arguments that its Permitting Process was Discretionary Due to the Existence of Alternative Management Techniques.**

[¶53]  The United States contests that its permitting requirements were non-discretionary, claiming that it was within the Corps' discretionary authority to employ "alternative management techniques" in connection with persons using Corps-managed lands.  ECF No. 451-1 at ¶¶ 57, 60, 452, 460.  The Court rejects this argument.

[¶54]  It is indisputable that Colonel Henderson, the Corps' official whom assumed responsibility for the Standing Rock Sioux Tribe's Special Use Permit application, admitted that a Special Use Permit "was the correct way to address the encampment of [DAPL Protestors] on [Corps-managed] lands." ECF No. 450-1, FoF ¶ 59 (JX 62 at 1; DX-4024 at 1).  Having recognized that a Special Use Permit was required for the DAPL Protestors' activities, the Corps was then bound to follow its mandatory permitting processes.

[¶55]  Further, the "alternative management techniques" discussed by the Corps were established at trial to only be relevant in situations where the public is already lawfully authorized to be on Corps-managed lands.  AFoF ¶ 17.  EP 1130-2-550 is clear that "alternative management techniques" may be employed in addition to, but not as a substitute for, the Corps non-discretionary permitting processes.  *Id.*

[¶56]  In other words, "alternative management techniques" are tools the Corps can employ to accommodate flexible uses of otherwise allowable activities in established recreation areas, and not a substitute that allows the Corps to circumvent its non-discretionary permitting processes.

"Alternative-management techniques" are not alternatives to the Corps' mandatory permitting requirements when a Special Use Permit is required.

[¶57]   The Court also rejects the United States' contention that establishing a "free speech zone" is a discretionary substitute for following the Corps mandatory permitting process.

[¶58]   There is no Corps policy, practice, or regulation that authorizes or otherwise recognizes a "free speech zone." ECF No. 450-1, FoF ¶ 200.  Colonel Henderson testified that he was not aware of any instance in his 23-year career with the Corps in which a "free speech zone" had been established (ECF No. 450-1, FoF ¶ 198); that there is no Corps policy, practice, or regulation that authorizes or otherwise recognizes a "free speech zone" (*id.* at ¶ 199); and that the Corps had determined that a Special Use Permit was the correct way to handle the DAPL Protest situation (*id.* at ¶ 59).

[¶59]   The Court therefore rejects the United States' assertion that establishing a "free speech zone" in the face of the undisputed knowledge that the DAPL Protestors were occupying Corps-managed land without a required Special Use Permit, and still further were actively violating the terms of the Special Use Permit that had been offered but not granted, was a permissible "alternative management technique" under the Corps own mandatory and non-discretionary permitting requirements.

> **B.    The Court Disagrees that North Dakota has Premised the United States' Liability on Any Action other than Those of the Corps.**

[¶60]   The United States argues that North Dakota has asserted that the *liability* of the United States is based on actions made by federal actors other than the Corps.  *See* ECF No. 451-1 at ¶¶ 410, 436-461.

[¶61]   The Court disagrees.  The United States' liability in this action, as limited by the Court's prior orders, has always hinged on the Corps' violation of its mandatory and non-discretionary permitting requirements.  ECF No. 280 at pp. 8-9 ¶¶ 12, 15-16.

[¶62]   However, separate from the issue of the United States' *liability* for in this action is whether other United States agencies contributed to North Dakota's damages.  *Id.* at ¶ 12 ("The USACE's failure to follow the permitting procedure opened the gates to North Dakota being damaged by the United States, its agencies, and third parties . . . The simple failure to follow the permitting procedures is the basis for liability but is not the only basis for damages in this matter. The USACE's failure to follow the permitting procedures permits North Dakota to seek damages from the resulting tortious conduct— the gigantic federally created mayhem."); ECF No. 38 at ¶ 55 ("While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protesters' conduct, the Court concludes the Corps failure to comply with the mandatory permitting process tainted all other decisions made by the Corps.'"); *Id.* at ¶ 58 ("The purpose of the discretionary function exception is to prevent judicial second-guessing regarding administrative decisions grounded in social, economic, and political policy. It is not a bar to decisions made without regard to mandatory procedures and the bad consequences resulting from not following those mandatory procedures." (internal citation omitted)).

[¶63]   The Court's earlier conclusion continues to be supported by *Appley Bros. v. United States,* 7 F.3d 720 (8th Cir. 1993). In *Appley Bros.*, the plaintiffs sued the United States "for losses as a result of the United States Department of Agriculture's negligent inspection of the Bird Grain Company warehouse, a federally licensed warehouse." *Id*. at 721.  USDA policy "required that a new form be issued" when a federally licensed grain company did not correct a reported shortfall

from an initial grain inspection. *Id*. at 725. Ultimately, the enforcement decision to close the warehouse for such a violation was a discretionary function of the USDA. *Id*. However, prior to exercising that discretion, the USDA was required to "check to see if Bird Grain had cured the deficiencies found on April 1 and to issue a new TW-125 reporting information." *Id*. The failure to perform a mandatory duty, even though subsequent actions were discretionary, did not place this case in the realm of discretionary function. *Id*.

[¶64]   The Eighth Circuit later reversed the district court's discretionary function finding and remanded for further proceedings, where on remand the facts significantly changed during summary judgment and ultimately warranted a finding of discretionary function. *Appley Bros. v. United States*, 924 F. Supp. 944, 949 (D.S.D. 1996) ("The government has produced evidence substantially different than what was before Judge Jones and the Eighth Circuit, and more importantly, the government's evidence is uncontroverted."). Here, the undisputed facts adduced at trial have not significantly changed to alter the Court's prior legal conclusions.

[¶65]   The Corps' subsequent discretionary decisions are irrelevant under *Appley Bros.* because failure to perform the initial non-discretionary requirement renders subsequent discretionary decisions ineffective in this regard. *See* 7 F.3d at 725-26 ("Although the revocation order itself is discretionary, the inspectors' failure to see if Bird Grain cleared the violations noted in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license.").

[¶66]   Further, the Court finds the United States' reliance on *Buckler v. United States* for the proposition that it was the United States actions subsequent to the violation of its permitting requirements – and not issuance of the *de facto* Special Use Permit itself – that were the proximate cause of North Dakota's injuries, to be misplaced. ECF No. 451-1 at ¶ 423 (citing *Buckler v.*

*United States,* 919. F.3d 1038 (8th Cir. 2019)).  In *Buckler*, the discretionary function at issue revolved around a federal mine inspector's mandatory non-discretionary duty to inspect training records.  919. F.3d at 1054.  In examining that duty, the Court found that although the mine inspector "possessed discretion as to the manner in which he reviewed documentation . . . he was wholly without discretion to not conduct at least some review of training materials."  *Id.*  The Eighth Circuit went on to explicitly find, relying on *Appley Bros.*, that "it is permissible, when analyzing the discretionary-function exception, to recognize that some duties are mandatory in that they must be performed *in some fashion*, even if the manner in which they are performed involves protected discretion."  *Id.* at 1053.  The Eighth Circuit went on to conclude that because the factual allegations and record to date showed it was possible the federal mine inspector had wholly failed to inspect training records, a non-discretionary duty, the Plaintiff's claims could proceed.  *Id.* at 1054.  *Buckler* therefore supports the law of the case to date and the origin of the United States' liability – the Corps had a mandatory duty to follow its permitting process, and while the Corps had discretion in whether to ultimately issue a Special Use Permit, it could not do so in contravention of its mandatory permitting regulations.

[¶67]   The Corps failed to follow its non-discretionary permitting process, and as such the Corps' subsequent discretionary decisions whether or not to issue citations to DAPL Protestors, and whether or not to request that North Dakota law enforcement evict the DAPL Protestors from Corps-managed lands, and whether the Corps could have employed "alternative management techniques" to allow DAPL Protestors to occupy Corps-manage lands, have no bearing on the Corps' liability under *Appley Bros.* and *Buckler*.  While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protesters' conduct, the Corps' failure to comply with the mandatory Special Use Permit process

tainted all other decisions made by the Corps.  Here, the maxim continues to apply: "You break it, you bought it."  ECF No. 38 at ¶ 55.

[¶68]   As noted herein, the Corps violated that non-discretionary process by issuing a *de facto* Special Use Permit to the Standing Rock Sioux Tribe, despite internally acknowledging that the Tribe's application was not complete, that the application did not match the facts of the protest on the ground, and that the Tribe had not obtained the mandatory insurance required by the Corps own regulations for religious events over 50 persons.

[¶69]   Additionally, the Corps' mandatory permitting regulations require that any event "must contribute to the enjoyment of the visiting public and be consistent with established land use classifications."  EC 1130-2-550, Appendix E, E-3.  The Court finds that at the time of Chairman Archambault's Special Use Permit application, it was negligent for the Corps to have determined that the ongoing unlawful DAPL Protest situation occurring on Corps-managed lands could comply with this requirement.

### C.    The Court Rejects the United States' FTCA Misrepresentation Exception Arguments.

[¶70]   The United States argues that it cannot be held liable for its *de facto* issuance of a Special Use Permit to the Standing Rock Sioux Tribe under the FTCA's misrepresentation exception.  ECF No. 451-1 at ¶¶ 462-476.   The Court, however, previously held that the Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter "were written permission or permits and were not misrepresentations" pursuant to the FTCA's misrepresentation exception.   ECF No. 38, n. 1.  The Court finds based on the undisputed evidence adduced at trial that the FTCA's misrepresentation exception does not apply to exempt the United States from liability.

[¶71]   The FTCA does not waive sovereign immunity for "[a]ny claim arising out of . . . misrepresentation . . . ."  28 U.S.C. § 2680(h).  As the United States notes, "[T]he essence of an

action for misrepresentation . . . is the communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). The intent of the misrepresentation exception is "to except from the [FTCA] cases where mere 'talk' or failure to 'talk' on the part of a government employee is asserted as the proximate cause of damage sought to be recovered from the United States." *National Mfg. Co. v. United States*, 210 F.2d 263, 276 (8th Cir. 1954). The Eighth Circuit has held that "misrepresentation" has a broad meaning: "[t]o misrepresent means to give a false, improper or imperfect representation." (internal quotations omitted). *Id.* at 275. However, the FTCA's misrepresentation exception "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." *Block*, 460 U.S. at 297. As such, where "one aspect of the Government's conduct is not actionable under the 'misrepresentation' exception" to the FTCA, a claimant is not "barred from pursuing a distinct claim arising out of other aspects of the Government's conduct." *Id.* at 298.

[¶72]    In *Block*, the Supreme Court examined a plaintiff's Good Samaritan claims under the FTCA involving the Farmers Home Administration ("FmHA") had negligently failed to supervise the construction of her home, which resulted in several material defects in the construction. 460 U.S. at 293. The United States claimed that the plaintiff's claims arose out of a misrepresentation – chiefly that the United States had negligently misrepresented the quality of the work in its construction inspections and FmHA appraisal. *Id.* at 295-296. However, the Supreme Court found that the plaintiff's claims could proceed because they were not based on the government's negligent misrepresentations in the various construction inspections and final FmHA appraisal of the home, but rather on the United States' failure of a separate duty to supervise the construction of her house according to plan. *Id.* at 297-298.

[¶73]   Contrastingly, the cases on which the United States rely all hinge on a plaintiff's reliance on a misrepresentation by the United States, which *reliance* resulted in injury.  *See* ECF No. 451-1 at ¶ 466 (citing *National Mfg. Co.*, 210 F.2d at 266-67, 275-76 (Plaintiff relied on inaccurate information about the course and action of the flood waters of the Kansas River disseminated by federal officials); *Hamre v. United States*, 799 F.2d 455, 456 (8th Cir. 1986) (Plaintiff relied on government's appraisal which failed to disclose bats in a home, resulting in illness); *Tompkins*, 2022 WL 1155294, at *1, *3 (Plaintiff relied on government's misrepresentation that cats were hypoallergenic, suffering an allergic reaction); *Diaz Castro v. United States*, 451 F. Supp. 959, 960, 962-63 (D.P.R. 1978) (Plaintiff injured after relying on government's assurance that a prisoner was sedated and not dangerous); *Vaughn v. United States*, 259 F. Supp. 286, 286, 289 (N.D. Miss. 1966) (Plaintiff relied on a government map that did not show the correct placement of a gas pipeline, resulting in an explosion).  In none of the cases cited by the United States had the government been alleged to have violated a separate, non-discretionary duty that resulted in the plaintiffs' injuries.

[¶74]   Here, the Court finds North Dakota's claims most analogous to those in *Block*.  North Dakota is not seeking damages for any actions the State took in reliance on the Corps' Sept. 16 Press Release, November 12 Special Use Permit granted to Faith Spotted Eagle, or the Nov. 25, 2016 Free Speech Zone Letter.  Rather, North Dakota's claims arise out of the United States' negligent failure to "fulfill its mandatory [permitting] duties pursuant to 36 C.F.R. Part 327 and Implementing Guidance" which led to a public nuisance and civil trespass in North Dakota.  *See* ECF No. 1 at ¶ 112; *id.* at ¶¶ 116-117, 125-126, 130-131.  North Dakota's claims thus sound in the United States *de facto* issuance of a Special Use Permit, which purported to grant the DAPL Protestors a sanctioned status as invitees on Corps-managed lands, spawning the "gigantic

federally created mayhem" that took the form of months-long civil trespass, lawlessness, and unrest in North Dakota.  Further, the United States had already violated its non-discretionary duty to follow the Special Use Permitting regulations and process by allowing the DAPL Protestors to occupy Corps-managed lands without a Special Use Permit that the Corps knew its own procedures required.

[¶75]    The gravamen of North Dakota's claims, and the United States' liability, is not any "misrepresentation" contained in the Corps Sept. 16 Press Release or subsequent public announcements, but the *de facto* grant of a Special Use Permit that conferred a right to be on Corps-managed lands in violation of the Corps' non-discretionary permitting regulations (in addition to the fact that the United States had begun violating those non-discretionary permitting regulations at the outset of the DAPL Protestors' unlawful occupation of Corps-managed lands).  The Court therefore finds that North Dakota's claims "focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty," namely the violation of the Corps' non-discretionary permitting regulations.  *Block*, 460 U.S. at 297.

[¶76]    Finally, the United States misconstrues the FTCA's misrepresentation exception in asserting that North Dakota is claiming liability based on the fact that "*protestors relied*" on the Corps Sept. 16 Press Release.  ECF No. 451-1 at ¶ 476 (emphasis added).  However, the Court has already found that the Sept. 16 Press Release was a grant of written permission to the DAPL Protestors, so the DAPL Protestors' reliance on the Sept. 16 Press Release is not a reliance on a misrepresentation.

[¶77]    As such, the Court reaffirms its prior holding that the FTCA's misrepresentation exception is inapplicable to the basis for United States' liability in this action.

**D.    North Dakota's Damages, Including Emergency Response Costs Damages, are Recoverable under North Dakota Tort Law.**

[¶78]    The United States asserts, without substantive supporting legal argument, that the Court's prior orders require that North Dakota prove corresponding physical damages to be recoverable under the FTCA's definition of damages.  ECF No. 451-1 at ¶¶ 482-491.  However, in previously analyzing whether North Dakota's emergency response costs were cognizable under the FTCA, 28 U.S.C § 1346(b)(1), as "money damages . . . for injury or loss of property," this Court examined the text of  28 U.S.C § 1346(b)(1) and found that North Dakota's emergency response costs were recoverable under the FTCA even if there was not associated physical damages.  ECF No. 106 at ¶¶ 16-44.    That is, North Dakota's emergency response costs did represent an injury for loss of property.  That analysis is summarized briefly below.

[¶79]    First, Section 1346(b)(1) allows individuals to recover "money damages . . . for injury or loss of property" arising out of the United States' negligence.   Nowhere in this provision or elsewhere does "for injury or loss of property" require the injured person suffer only a physical injury. This is bolstered by the fact that Congress has exempted some but not all intangible torts. See 28 U.S.C. § 2680 (the waiver of sovereign immunity at 28 U.S.C. § 1346(b) does not apply to "malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.").  Congress also specifically exempted awards of both punitive damages and prejudgment interest. 28 U.S.C. § 2674.  The inclusion of these exemptions show that if Congress wished to exempt claims for emergency response damages such as those at issue, it could have chosen to exclude those claims under 28 U.S.C. §§ 2674 or 2680.  Because Congress created a list of specific exceptions to claims and damages allowed under the FTCA, this Court declines to insert one onto the general waiver of sovereign immunity at 28 U.S.C. § 1346(b)(1). *See Consumer Product Safety Commission v. GTE Sylvania, Inc*., 447 U.S. 102, 109 (1980) (declining to create

an exception to the Freedom of Information Act when "§6(a)(1) specifically incorporated by reference the nine exemptions of the FOIA, 5 U.S.C. § 552(b)."). The language of 28 U.S.C. § 1346(b)(1) is clear. Money damages for any injury or any loss of property are permissible unless they are specifically exempted by another provision of the FTCA. There is no specific exemption for claims for emergency response costs as damages for injury or loss of property.

[¶80]   Furthermore, the plain language of "injury" and "loss of property" allow North Dakota to pursue its damages under the FTCA. Black's Law Dictionary defines "injury" as "[t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice." Black's Law Dictionary (11th ed. 2019). North Dakota's emergency response costs are clearly an injury. North Dakota suffered economic losses due to having to expend significant financial resources responding to the DAPL protests to protect North Dakotans' property and physical safety because the United States failed to follow its own rules and regulations relating to the use of Corps land. North Dakota has the right to use its resources, including money, as it sees fit. North Dakota's economic injuries were tied directly to North Dakota's efforts to prevent physical injuries to persons and property (i.e., these are not merely contractual injuries). The United States can hardly argue that North Dakota would have had a more viable FTCA case if North Dakota had stood by and allowed more harm to persons and property. By refusing to follow its own rules and regulations, the United States caused North Dakota to suffer economic loss due to the United States' negligence. Therefore, North Dakota's expenditure of money to pay for the emergency response costs is an "injury."

[¶81]   North Dakota also suffered a "loss of property" through its economic expenditures. Black's Law Dictionary defines "property" as "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised." Black's Law Dictionary (11th ed. 2019). The emergency

response costs fit this definition. The money, while intangible (that is, not concrete), is a thing over which North Dakota had the right of possession to use. It took out a loan from the State-owned Bank of North Dakota for the specific purpose of responding to the DAPL Protests. The United States' negligence forced North Dakota to use that money to pay for the emergency response costs, thereby causing North Dakota to lose that property. North Dakota, therefore, has suffered a loss of property under the plain meaning of 28 U.S.C. § 1346(b)(1).

[¶82]    The Court's approach is supported by *Tri-State Hospital Supply Corp. v. United States*, 341 F.3d 571 (D.C. Cir. 2003).  In *Tri-State*, the D.C. Circuit Court of Appeals carefully analyzed the nature of the damages allowed under 28 U.S.C. §1346(b)(1). 341 F.3d at 572, 575-580.  In that case, Tri- State Hospital Supply Corp. ("Tri-State") was the subject of a criminal investigation by the United States.  Tri-State eventually sued the United States for malicious prosecution seeking to recover $3.2 million in damages as injury or loss of property it had to pay in attorneys' fees over the course of the six-year criminal investigation.  *Id*. at 572.  The district court held such fees were not recoverable as injury or loss of property.  *Id*.  The D.C. Circuit disagreed, holding "attorney's fees *qua* damages are recoverable against the United States for abuse of process and malicious prosecution if 'the law of the place' where the tort occurred so provides."  *Id*. (quoting § 1346(b)(1)).  *Tri-State* was a case of purely economic damages without any reference to property damage (in sharp contrast to this case, where North Dakota suffered economic damages precisely to prevent physical injury to persons and property).

[¶83]    In determining whether the expenses Tri-State spent on attorneys' fees defending itself was "for injury or loss of property," the D.C. Circuit explained such expenses "may properly be characterized as damages 'for injury or loss of property' within the meaning of the third statutory element of section 1346(b)(1)."  *Id*. at 576. In making this determination, the D.C. Circuit

bifurcated "for injury or loss of property." *Id*. The D.C. Circuit found the attorneys' fees could be "considered as damages for 'injury'—actionable injury other than 'personal injury' (here, for example, being subjected to indictment, trial, penalties, etc.)." *Id*. Alternatively, the D.C. Circuit noted the claims could also be "viewed as damages for 'loss of property' (that is, of the funds necessarily expended to defend against the wrongful legal proceeding)." *Id*. Under either part of the statutory provision, the D.C. Circuit found the loss of money paid out to another in response to the United States' negligence constitutes damages "for injury or loss of property." *Id*. The D.C. Circuit further reasoned that "[w]hen the Congress wished to except a class of damages from the FTCA, it had no difficulty doing so specifically and unambiguously." *Id*.

[¶84]   The D.C. Circuit in *Tri-State* was unpersuaded by the Ninth Circuit's analysis in several cases previously relied upon by the United States at the motion to dismiss stage involving emergency response costs. *See* ECF No. 106 at ¶¶ 19-23 (discussing *People of California v. United States*, 307 F.2d 941 (9th Cir. 1962), *Oregon v. United States*, 308 F.2d 568, (9th Cir. 1962), *Idaho ex rel. Trombley v. U.S. Dep't of Army, Corps of Eng'rs*, 666 F.2d 444 (9th Cir. 1982), and *City of Imperial v. Dep't of the Navy*, 2016 WL 3419220 (S.D. Cal. June 22, 2016). In examining those Ninth Circuit cases, the *Tri-State* court held, "[t]o the extent that the Ninth Circuit's firefighting expenses decisions require a physical injury to recover "money damages" under the FTCA, we decline to follow them." *Tri-State*, 341 F.3d at 580. This is because "[n]o such requirement appears on the face of section 1346(b)(1) and we decline to engraft one." *Id*.

[¶85]   The Court's conclusion is that the FTCA's statutory language is plain on its face. What the FTCA requires is the money damages be for an "injury" or "loss of property." *See Loper Bright Enterprises v. Raimondo, Secretary of Commerce,* 603 U.S. ____ (2024) at 23 ("In the business of statutory interpretation, if it is not the best, it is not permissible."). This, as the D.C.

Circuit concluded, includes economic damages without any requirement in the statute calling for corresponding physical damages (though in this case, there is a direct relationship between the economic damages suffered by North Dakota and the prevention of corresponding physical damages).  As previously held in the Court's prior Order Denying Motion for Partial Summary Judgment, the Court finds the D.C. Circuit's reasoning in *Tri-State* persuasive, and rejects the United States' arguments to the contrary.  ECF No. 106 at ¶ 33.

[¶86]   Finally, even if the FTCA's damages definition did require corresponding physical damages, North Dakota has adequately proven physical damages to state property including physical damage to the Backwater Bridge, two snow plows, a digital road sign, and an additional county bridge in the vicinity of the DAPL protests that were all damaged to various degrees during the DAPL Protests.  AFoF ¶ 40.  The Backwater Bridge required repaving, and the two snowplows were complete losses.  *Id.*

[¶87]   Further, testimony was adduced at trial regarding the need to cleanup the environmental destruction left behind at trial, including items left in the right-of-way of Highway 1806, which is state property.  Tr. Day 1, 129:16-20 (Schulz); PX-1936;

[¶88]   Finally, the United States ignores that North Dakota's remaining emergency response costs were specifically incurred in the *abatement* of the public nuisance created by the United States. This entire case is about physical damage: DAPL Protestors inflicting it, North Dakota attempting to prevent it at great cost, and the United States doing nothing.  The Court has previously held that North Dakota's claims satisfy the FTCA's sixth jurisdictional element ("law of the place") under 28 U.S.C § 1346(b)(1) because N.D.C.C. § 32-03-02 and 32-03-20 permits recovery of emergency response costs as a "loss or harm suffered in person or property."  ECF No. 106 at ¶¶ 42-43.

## II.      North Dakota Has Article III Standing To Bring This Action.

[¶89]   The United States asserts that North Dakota's legal theory in its Complaint, as carried through to trial, is that North Dakota suffered harm due to the United States failure to enforce the law and not forcibly evict protestors from Corps-managed lands.  ECF No. 450-1 at ¶ 493.  As such, the United States asserts that the Court lacks jurisdiction to hear North Dakota's claims under Supreme Court precedent barring federal district courts from hearing claims by a State against the federal government challenging how the federal government chooses to enforce the law (ECF No. 451-1 at ¶ 495 (*United States v. Texas,* 599 U.S. 670 (2023))), and barring North Dakota's claims that sound in a *parens patriae* capacity (*id.* at ¶¶ 498-499).  The Court rejects both contentions and finds that North Dakota has Article III standing.

[¶90]   <u>First</u>, as to the United States' discretion to enforce federal law, the United States argument is misplaced.  *Texas* dealt directly with States' challenges to the Department of Homeland Security's promulgation of guidelines governing immigration enforcement, claiming the guidelines contravened federal statutes that required the Department of Homeland Security to arrest *more* noncitizens than would otherwise occur under the guidelines.  599 U.S. at 673-674. The case did not involve a FTCA claim, and in analyzing the States' claims, the Supreme Court explicitly discussed the Executive Branch's longstanding discretionary "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law'." *Id.* at 678 (citing *TransUnion LLC v. Ramirez,* 594 U. S., at ____, 141 S.Ct. 2190, 2207 (2021). *Texas* thus did not involve injury based on a federal officer's violation of a non-discretionary duty, but instead involved injury based on the federal government's longstanding discretionary authority to implement and enforce immigration policy.

[¶91]   As discussed later herein, the United States' focus on the trial testimony and evidence relating to the Corps, and other contributing federal agencies' law enforcement decisions and

positions separate from the Corps' violation of its non-discretionary permitting obligations go not to North Dakota's standing to bring this action, but to both the foreseeability that harm would result from violating the Corps' permitting regulations, the reasonableness (or lack thereof) of the Corps' actions in violating its mandatory permitting regulations, and the subsequent harms North Dakota endured.

[¶92]    From the beginning, North Dakota's Complaint based North Dakota's injuries on the Corps' negligent failure to "fulfill its mandatory [permitting] duties pursuant to 36 C.F.R. Part 327 and Implementing Guidance" which led to a public nuisance and civil trespass in North Dakota. *See* ECF No. 1 at ¶ 112; *id.* at ¶¶ 116-117, 125-126, 130-132.

[¶93]    The Court has continually limited North Dakota's claims, and the United States' liability in this action, to those non-discretionary actions of the Corps.  *See* ECF No. 38, 280, 383.  The Court thus rejects the United States' contention that North Dakota's claims are based on "the indirect effects of federal enforcement decisions on state spending as a basis to challenge the federal government's decisions about enforcing federal law against the protestors," such as would be barred by *Texas*.  ECF No. 451-1 at ¶ 497.

[¶94]    Further, North Dakota's injuries from the Corps' violation of its non-discretionary permitting process produced harms that occurred to the State, including damage to State property (AFoF ¶ 40), and the public nuisance that plagued the State for the duration of the DAPL protests causing North Dakota's emergency response (*See* ECF No. 106 at ¶¶ 35-38, concluding North Dakota's emergency response costs are simply the suggested measure of damages to North Dakota's property).

[¶95]    <u>Second</u>, for the reasons state above, the Court rejects the United States' suggestion that North Dakota has brought this action in a *parens patriae* capacity that defeats Article III standing.

*See* ECF No. 451-1 at ¶¶ 498-499. The Complaint provisions cited by the United States make clear that North Dakota is suing for injuries sustained by the State, including to public property. *See* ECF No. 1 ¶¶ 7 (the unlawful activities of the Corps "cause[d] damage to State and private land."), 14-15 (identifying North Dakota's need to engage in emergency response costs), 107 (referencing environmental and property damages to North Dakota); *see also id* at ¶¶ 1 ("This is an action seeking damages under [the FTCA] . . for . . damages to the State of North Dakota."); 114 (describing North Dakota's damages from abating a public nuisance).

[¶96] Further, even if elements of North Dakota's claims involve a *parens patriae* element (which they do not), the Court finds the cases relied upon by the United States to be inapposite. ECF No. 451-1 at ¶ 499 (citing *Murthy v. Missouri*, 144 S. Ct. 1972 (2024); *Haaland v. Brackeen*, 599 U.S. 255 (2023); *Massachusetts v. Mellon*, 262 U.S. 447 (1923)). *Murthy*, *Haaland*, and *Massachusetts* all involved States attempting to enforce intangible harms to their citizens, rather than concrete harms to the State itself. *See Murthy*, 144 S. Ct. at 1995-96 (discussing the State attempting to enforce First Amendment rights); *Haaland*, 599 U.S. at 294-295 (discussing Texas attempting to bring equal protection claims on behalf of its citizens); *Massachusetts*, 262 U.S. at 486 (discussing Massachusetts challenging the constitutionality of a federal enactment on behalf of its citizens). Here, North Dakota is alleging actual harms to the State's own quasi-sovereign interests in the protection of its public lands and damages to its property in the form of emergency response costs. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (When States are protecting a quasi-sovereign interest, they are "entitled to special solicitude" in a standing analysis).

[¶97] The Court is satisfied that North Dakota has Article III standing to proceed on its claims that the Corps violated non-discretionary permitting regulations.

III.    **North Dakota's Action Is Not Barred By The Political Question Doctrine Because North Dakota's Complaint Challenges A Non-Discretionary Duty.**

[¶98]    For the first time, the United States now asserts the Political Question Doctrine as a bar to North Dakota's claims, arguing that North Dakota's claims "are premised on the federal government's decision not to deploy law enforcement or military resources to respond to the DAPL protests" such that would be barred by the Political Question Doctrine.  ECF No. 451-1 at ¶ 504.

[¶99]    "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Non-justiciable political questions arise where there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  Unless one of these elements "is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.*  As such, the doctrine is "one of 'political questions,' not one of 'political cases.'"  *Id.*  This requires a "discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." *Id.*

[¶100] As already determined by this Court, North Dakota's claims (and the United States' liability) in this matter are based on the Corps' failure to adhere to its non-discretionary permitting

regulations, and not the subsequent decisions by the United States on how to manage the lawless situation created by the Corps' violation of its permitting regulations.  At a facial level, this case does not involve political questions supporting the invocation of the Political Question Doctrine. The various cases relied upon by the United States confirm this.

[¶101]  In *Gilligan v. Morgan*, the Supreme Court dismissed students' claims that alleged the Ohio National Guard violated their civil rights in policing civil disorder during the Kent State Massacre. 413 U.S. 1, 3 (1973).  One claim remained before the Supreme Court for resolution: whether the Ohio National Guard had a pattern of training which made it inevitable that the use of fatal force in suppressing civil disobedience would occur.  *Id.* at 4.  In holding the claims nonjusticiable under the Political Question Doctrine, the Supreme Court noted that the case did not involve damages for injuries sustained during the massacre, nor a restraining order against any specified and imminently unlawful action, but instead a "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard."  However, in dismissing those claims, the Supreme Court tempered its opinion, noting that "it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief. We hold only that no such questions are presented in this case."  *Id.* at 11-12.

[¶102]  Similarly, in *Monarch Ins. Co. of Ohio v. District of Columbia*, the plaintiff's complaint was based on the alleged negligence of the United States and the District of Columbia in their preparation and implementation of plans to suppress any riot or civil disturbance in the District of Columbia, arguing that their delay in sending in police and troops and their failure to assign forces properly constituted negligence and a taking of plaintiff's property.  353 F. Supp. 1249, 1251

(D.D.C. 1973).  Notably, plaintiffs argued a Good Samaritan theory (that the United States, once having taken on the responsibility to diffuse the riot, was required to do so using due care) which the Court has already found inapplicable to this case.  *Id.* at 1257 (citing *Indian Towing Co. v. United States*, 350 U.S. 61 (1955)); *see also* ECF No. 38 at ¶ 72 (dismissing North Dakota's Good Samaritan claim).  Ultimately, the D.C. Circuit rejected liability for the United States under the FTCA and the Political Question Doctrine, noting that the government had "discretion in formulating and implementing a riot control program" that "pervade[d] every phase of planning and execution" and that plaintiffs were unable to point to any non-discretionary duty the United States had violated.  *Id.* at 1258.

[¶103] These, and the other cases relied upon by the United States, are thus inapplicable here, where the Corps violated a non-discretionary permitting duty.

[¶104] The United States confuses the subsequent actions by other Federal Agencies which worsened the gigantic federally created mayhem created by the Corps' violation of its non-discretionary permitting duties which are the nexus for North Dakota's claim, standing, and the United States liability.  This case continues to be supported by *Appley Bros.*  The United States' subsequent discretionary decisions are irrelevant under *Appley Bros.* because failure to perform the initial non-discretionary requirement renders subsequent discretionary decisions ineffective in this regard.  *See* 7 F.3d at 725-26 ("Although the revocation order itself is discretionary, the inspectors' failure to see if Bird Grain cleared the violations noted in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license."); ECF No. 398. at ¶ 58 ("The purpose of the discretionary function exception is to prevent judicial second-guessing regarding administrative decisions grounded in social, economic, and political policy. It

is not a bar to decisions made without regard to mandatory procedures and the bad consequences resulting from not following those mandatory procedures." (internal citation omitted)).

## IV.    North Dakota Has Proven Each Element Of Its Tort Claims.

[¶105]  The State bears the burden to establish all elements of its claims by a preponderance of the evidence. *See Investors Real Estate Trust Properties, Inc. v. Terra Pacific Midwest, Inc.*, 686 N.W.2d 140, 144 (N.D. 2004); 58 Am. Jur. 2d Nuisances §§ 171-72; North Dakota Jury Instructions – Civil, Burden of Proof Requirements (2023 ed.); *id.* § C - 70.06 - Burden of Proving Damages 2004.

[¶106]  To establish a negligence claim under North Dakota law, the plaintiff bears the burden of demonstrating (1) a duty, (2) a breach of that duty, (3) causation, and (4) damages. *Investors Real Estate Trust Properties*, 686 N.W.2d at 144.

[¶107]  Based on the evidence adduced at trial, the Court concludes that North Dakota has met its burden as to each element of a negligence claim under North Dakota law.

### A.    The Court's Prior Determination that the United States Owed North Dakota a Duty to Protect North Dakota from Harm is Verified by the Facts Adduced at Trial.

[¶108]  The Court has already concluded as a matter of law that the United States owed a duty to North Dakota under the circumstances of this case.  Doc. No. 38, ¶¶ 64-66.  That decision became the law of the case. *See Thompson v. C.I.R.*, 821 F.3d 1008, 1010- 11 (8th Cir. 2016) (the law-of-the-case doctrine "'prevents relitigation of a settled issue in a case and requires that courts follow decisions made in earlier proceedings to insure uniformity of decisions, protect the expectations of the parties[,] and promote judicial economy.'" (quoting *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784 (8th Cir. 1996))).

[¶109]  The undisputed facts adduced at trial proved that this law of the case remains unchanged. Multiple Corps officials admitted that no valid Special Use Permit was ever issued.  ECF No. 450-

1, FoF ¶ 129.  The undisputed facts show: (1) once DAPL Protestors began assembling on Corps land, the Corps began discussions with the Standing Rock Sioux Tribe to have them obtain a Special Use Permit to lawfully be on Corps-managed lands (ECF No. 450-1, FoF ¶¶ 51, 58, 61, 77); (2) the Corps provided the requirements to the Standing Rock Sioux Tribe to obtain a Special Use Permit, which requirements included needing a $100,000 bond and liability insurance coverage not less than $5,000,000 for personal injury, for each occurrence, and $1,000,000 for each occurrence involving property damage, and not less than $5,000,000 covering all claims per occurrence, and requirements that unauthorized structures not be built on Corps-managed lands (ECF No. 450-1, FoF ¶¶ 105-106); (3) the Corps was aware of unlawful conduct being conducted from Corps-managed lands that were the subject of the Special Use Permit (ECF No. 450-1, FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114); (4) the Corps was aware the Standing Rock Sioux Tribe had not met the terms of the Special Use Permit, including obtaining insurance and signing the Special Use Permit prior to and at the time of issuing their Sept. 16 Press Release (ECF No. 450-1, FoF ¶¶ 101, 105-108, 110-116); (5) despite the not having a completed Special Use Permit, including no required insurance or signature, the Corps issued the Sept. 16 Press Release stating it had, in fact, issued a Special Use Permit (ECF No. 450-1, FoF ¶¶ 107-108); (6) the Standing Rock Sioux Tribe never returned the application for the Special Use Permit, including never signing the Special Use Permit or providing proof of required insurance (ECF No. 450-1, FoF ¶¶ 120-123, 128-129); (7) on November 12, 2016 the Corps transmitted a Special Use Permit to Faith Spotted Eagle to allow a group of DAPL Protestors to have a religious ceremony, which Special Use Permit the Corps ultimately informed North Dakota they were honing when the Corps aided DAPL Protestors in holding that religious ceremony, despite never receiving a signed and valid Special Use Permit from Faith Spotted Eagle (ECF No.

450-1, FoF ¶¶ 175-177); and (8) Colonel Henderson later sent Chairman Archambault Nov. 25, 2016 Free Speech Zone Letter further creating an area on Corps-managed lands on which DAPL Protestors could assemble, despite knowing the majority of DAPL Protestors were located on the Main Camp on Corps-managed lands not covered by the Free Speech Zone Letter (ECF No. 450-1, FoF ¶¶ 188, 195, 202).

[¶110] While discussions about the permitting process occurred, the process was ultimately abandoned by the Corps, with Colonel Henderson considering a Special Use Permit "a worthless piece of bureaucracy".  ECF No. 450-1, FoF ¶¶ 199.

[¶111]  The Sept. 16 Press Release, the November 14 Faith Spotted Eagle Special Use Permit, and Nov. 25 Free Speech Zone Letter  announcements violated the Corps' non-discretionary permitting processes as required by EC 1130-2-5, Appendix E, and the Corps then doubled down on that failure by continuing to encourage and enable the unlawful occupation and use of Corps-managed lands.

[¶112]  Further, the undisputed facts adduced at trial provide no reason for the Court to reconsider its prior conclusion that the United States' subsequent discretionary actions do not remedy the Corps failure to follow its permitting process discretionary.  *See* ECF No. 383, ¶¶ 26-27.

[¶113]  In other words, the Court has found the United States owed North Dakota a duty for the remaining claims in the Complaint. The applicability of those duties to the facts of this case go to the question of breach and causation, not the existence of a duty in the first place.

[¶114]  In challenging whether a duty exists, the United States rehashes several arguments long-settled in this case, including that: (1) a private landowner would not owe a duty to North Dakota to prevent conduct occurring off its property (ECF No. 451-1 at ¶¶ 515-517); (2) a private landowner would not owe a Duty to North Dakota under the federal common law "free public

service" doctrine (ECF No. 451-1 at ¶¶ 518-521); (3) there cannot be tort liability for First Amendment-protected conduct (ECF No. 451-1 at ¶¶ 522-537); (4) landowners cannot be liable for wrongful conduct by third parties on their land when the landowner itself is non engaged in the wrongful activity and does not have a commercial interest in that activity (ECF No. 451-1 at ¶¶ 538-541); and (5) Sections 318 and 838 of the Restatement fail to impose a duty on the United States for various reasons, including that the DAPL Protestors were trespassers, that (some) of their conduct occurred of Corps-managed lands, and that North Dakota has not proven the negligence elements required by the Restatement (ECF No. 451-1 at ¶¶ 541-557).

[¶115] Again, the Court is not inclined to reconsider these settled issues, which are the law of the case. Further, each of these arguments has been resolved in the past. Regardless, the Court addresses each contention briefly in turn.

[¶116] **<u>First</u>**, it is well-established under North Dakota nuisance law that a possessor of land may be held liable for acts it authorizes or allows that result in harm to adjacent landowners. For example, in *Kinnischtzke v. City of Glen Ullin*, the city maintained a sewage treatment plant discharging into a creek which ran through plaintiff's property off-premises from the sewage treatment plant, damaging plaintiff's land and cattle. 79 N.D. 495, 499 (N.D. 1953). The North Dakota Supreme Court held that "where a municipality purposely or negligently so operates a sewage plant that it becomes a nuisance which results in injury to property, the municipality is liable." *Id.* at 596-597; *see also Messer v. City of Dickinson,* 71 N.D. 568, 568 (N.D. 1942) (Where the municipality discharged sewage in a manner that damaged an adjacent landowner, the North Dakota Supreme Court held that "acts which may result in injury if improperly or negligently done does not immunize the municipality against all claims of damages resulting from the exercise of the power."); *State v. Hafner,* 587 N.W.2d 177 (N.D. 1998) (North Dakota Supreme Court holding

a private party could be liable for livestock permitted to run at large off of defendant's property); *Flynn v. Hurley Enterprises, Inc.*, 860 N.W.2d 450 (N.D. 2015) (North Dakota Supreme Court recognizing a landowner could be liable for a public nuisance created by an oil field service business, affecting plaintiff's abutting property by way of excess dust, noise, diesel smoke, lights and sewage odor.); *Kukowski v. Simonson Farm,* 507 N.W.3d 68 (N.D. 1993) (North Dakota Supreme Court holding that defendants had a duty to "exercise ordinary care when actively working the land" to avoid injury to neighboring property); *Herring v. Lisbon*, 823 N.W.2d 493, 500 (N.D. 2012) (North Dakota Supreme Court finding that "[i]t is the duty of a landowner to utilize his property in a reasonable manner so as not to cause injury to adjoining property."). Accordingly, the United States had a duty to control the conduct of the DAPL Protestors on Corps managed lands. As such, the United States can be held liable from the public nuisance emanating from Corps-managed lands.

[¶117] **<u>Second</u>**, the United States' reliance on cases applying the "free public service doctrine" under federal common law is misplaced, as it is North Dakota law that controls the measure of FTCA damages in this case. 28 U.S.C. § 1346(b)(1). In any event, the United States' effort to apply the "free public services doctrine,"[5] which holds that emergency response costs are not recoverable in a tort action, falls short since it has long been recognized that "it is fully within the power of the government to protect itself from extraordinary emergency expenses *by passing statutes or regulations that permit recovery from negligent parties.*" *District of Columbia v. Air Florida, Inc.* 750 F.2d 1077, 1080 (D.C. Cir. 1984) (emphasis added); *City of Flagstaff v. Atchison,*

---

[5] The "municipal cost recovery rule" or "free public services doctrine" provides that "absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." Barbara J. Van Arsdale, J.D., Construction and Application of "Municipal Cost Recovery Rule," or "Free Public Services Doctrine," 32 A.L.R. 6th 261 (2008).

*Topeka, and Santa Fe Ry. Co.,* 719 F.2d 322 (9th Cir. 1983) ("This is not to say that a governmental entity may never recover the cost of its services. Recovery is permitted where it is authorized by statute or regulation."); *United States v. Denver & Rio Grande Western Ry. Co.*, 547 F.2d 1101 (10th Cir. 1977); *Town of East Troy v. Soo Line Railroad Co.*, 653 F.2d 1123 (7th Cir.1980) (recovery for expense in abating ground water pollution). Similarly, "[e]xceptions to this general common-law rule have been made where the government incurs expenses to protect its own property." *District of Columbia,* 750 F.2d at 1080.

[¶118] Further, North Dakota has specifically authorized recovery for abatement of a public nuisance. North Dakota statutory law provides that the remedies for negligence which creates a public nuisance include "[a]batement." *See* N.D.C.C. § 42-01-07; *see also* N.D.C.C., § 42-01-09 ("A public nuisance may be abated by any public body or officer authorized thereto by law."). In *City of Minot v. Freelander*, 426 N.W.2d 556 (N.D. 1988), the North Dakota Supreme Court upheld governmental authority to abate a public nuisance, which involved demolishing a house that threatened public safety. Similarly, in *Mountrail Cty. v. Hoffman*, 2000 ND 49, 607 N.W.2d 901 (N.D. 2000), the North Dakota Supreme Court recognized governmental police power authority to abate a public nuisance where a junkyard was in operation too close to a public highway. North Dakota was exercising its sovereign police power to protect public safety and property from the consequences of the United States' months long tortious conduct that invited and encouraged the illegal occupation of federal lands by thousands of DAPL Protestors. Therefore, North Dakota's clearly defined statutory definitions of tort damages supports the conclusion that those costs qualify as "damages . . . for injury or loss of property" within the meaning of 28 U.S.C. § 1346(b)(1). North Dakota law further specifically states that "[t]he

abatement of a nuisance does not prejudice the right of any person to recover damages for its past existence." N.D.C.C. § 42-01-11.

[¶119] Further, recovery of abatement costs is neither unique to North Dakota nor unusual in FTCA or nuisance cases. *See, e.g., New York v. United States*, 620 F. Supp. 374, 378-79 (E.D.N.Y 1985) (allowing recovery of abatement costs in FTCA action involving negligence and nuisance claims); *see also Town of East Troy v. Soo Line R.R. Co*., 653 F.2d 1123 (7th Cir. 1980) (same in non-FTCA case); Rest. 2d Torts, § 202, titled "Abatement of a Public Nuisance by Public Official (recognizing a general right to abate public nuisances).

[¶120] **<u>Third</u>**, North Dakota's claims do not involve First Amendment protected conduct. Rather, the claims presented in North Dakota's Complaint are tort claims brought against the United States, stemming from the Corps' violation of its non-discretionary permitting duties. That the DAPL Protestors were assertedly exercising First Amendment speech has no bearing on the United States duties. ECF No. 383 at ¶ 21. Even if it did, *Doe v. Mckesson*, on which the United States cites to, confirmed that First Amendment concerns will not bar liability in protests situations that otherwise involve protected speech because the "First Amendment does not protect violence." 71 F.4th 278, 289 (5th Cir. 2023).

[¶121] **<u>Fourth</u>**, North Dakota law establishes that the United States can be liable for injuries occurring to North Dakota off of Corps-managed lands. The cases relied upon by the United States support the principle that a landowner in North Dakota can be liable for injuries that occur off-premises. North Dakota tort law demonstrates that when a landowner has "control" over its own property, or a third party it has authorized to be on its property, the landowner has a duty to avoid damage to other parties whether on or off premises.

[¶122] For example, in *Saltsman v. Sharp*, the North Dakota Supreme Court considered whether a landowner violated a duty of care to a pedestrian when he constructed a dangerous fence around a parking lot that blocked drivers' view of a sidewalk that led to a collision between an exiting driver and the pedestrian as she rode by on a bicycle. 803 N.W. 2d 553, 556 (N.D. 2011). The district court granted summary judgment, holding a landowner does not owe a duty to protect a passerby on a sidewalk adjacent to the landowner's property from the acts of an independent negligent driver. *Id.* The North Dakota Supreme Court reversed, noting that "[t]he district court erred in deciding only that [the landowner] did not owe [the plaintiff] a duty to protect her from [the driver]'s presumed negligence and in failing to analyze whether [the landowner] owed a separate duty toward [the plaintiff] under general negligence principles or under premises liability law. *Id.* at 560. Similarly, this case revolves around whether the Corps violated a duty when it negligently invited, encouraged, and enabled the protestor's occupation of Corps-managed lands leading to North Dakota's injuries, both on and off of Corps-managed land.

[¶123] In *Holter v. City of Sheyenne,* the North Dakota Supreme Court held that "[t]he key factor to finding that a property owner owes no duty to an injured party is that the owner has no control over the property where the injury occurred *or the instrumentality causing the injury*." 480 N.W.2d 736, 738 (N.D. 1992) (emphasis added). In *Holter*, the North Dakota Supreme Court concluded that the defendants did not have "control" over pedestrians who would cross the street to access the ice cream business and therefore could not be held liable for injuries suffered on the street. *Id.* at 741. However, the Court noted that liability had been found in other circumstances where the ice cream vendors were operating in a public location and the "vendors had invited children into and about the public streets to conduct business there" by way of "the tinkling of bells and flashing of lights." *Id.* at 739. The United States misses the central import of *Holter*: the existence of

control. The Corps *did* have "control" over both the public lands under its management and the instrumentality causing the injury – the DAPL protestors it negligently invited, encouraged, and enabled to stay on Corps-managed lands – and it thus should be held liable.[6]

[¶124] For the same reasons, the United States' reliance on *Bjerk v. Anderson* supports a finding that the Corps owed, and violated, a duty of care to North Dakota to control the DAPL protestors. 911 N.W.2d 343 (N.D. 2018). In *Bjerk*, the North Dakota Supreme Court held that a defendant could be liable if they were "engaged in the activity that caused the harm." *Id.* at 349. This is consistent with Section 318 Restatement (Second) of Torts (1965) and Section 838 Restatement (Second) of Torts which recognize a possessor of land that knows of or has reason to know of an ability to control a third person and knows of the necessity and opportunity for exercising said control and then fails to exercise reasonable care can be held liable.

[¶125] The *Bjerk* Court's analysis of *Castaneda v. Olsher*, 41 Cal.4th 1205 (2008) is instructive. The *Bjerk* Court noted that there could be a set of circumstances where observed third party behavior would rise to a level that it was "highly foreseeable" that the third party conduct would result in injury thus creating a duty on behalf of a defendant. 911 N.W.2d at 350. Thus, this issue relates to the foreseeability of harm to North Dakota, as discussed in regards to breach and causation herein.

---

[6] *See* ECF No. 38 at ¶ 67 ("[H]ere, the Corps, 'is under a duty to exercise reasonable care so ***to control the conduct of the third person as to prevent him from intentionally harming*** others.'" (citing Restatement (Second) Torts § 318) (emphasis in original)). This aligns with the Reporter Notes to § 318 that point to cases involving *on-premises* misconduct, such as "trespassing boys . . . playing ball . . . in a manner dangerous to the neighbors" or "trespassing children . . . throwing missiles and lime into the highway." Restatement (Second) of Torts, § 318, Reporters Notes. Here, the DAPL Protestors were "throwing missiles" into the public every time they launched an unlawful action from Corps-managed lands.

[¶126] For these reasons, *Fla. Fish & Wildlife Conservation Comm'n v. Daws*, 256 So.3d 907 (Fla. Dist. Ct. App. 2018) and *Bellflower v. Pennise*, 548 F.2d 776 (8th Cir. 1977) also weigh in favor of finding a duty owed under North Dakota tort law.  In *Fla. Fish & Wildlife Conservation Comm'n*, the Court's holding centered on the fact that there "is no common law duty to prevent the misconduct of third persons" where the Commission had *followed its permitting process* and granted valid hunting permits to third-parties who then violated the terms of those permits.  256 So.3d at 916.  Here though, North Dakota has established that the Corps *did* have a duty under North Dakota tort law specifically because the Corps knew of its ability to control the third-party DAPL protestors and knew of the necessity of exercising such control.  The Corps did have the ability to "control" the conduct of the DAPL protestors by following its mandatory permitting process, creating the duty in which North Dakota's torts sound.  *See also Bellflower,* 548 F.2d at 778 ("a landowner is not civilly liable for a nuisance caused or promoted by others *over whom he has no control*." (emphasis added)).

[¶127] **Fifth**, contrary to the United States' assertions, the Court does not find that the Corps' decision to violate its non-discretionary permitting requirements was a reasonable attempt at de-escalation.  To the contrary – the Court finds that the United States' decision to issue a *de facto* Special Use Permit to the DAPL Protestors was negligent in that it removed one of the few tools the Corps had for controlling the DAPL Protestors, and instead constituted an explicit statement of support for the DAPL Protestors ongoing unlawful and destructive actions, actions of which the Corps was well informed.

[¶128]  The Corps remained under a duty not to injure North Dakota under North Dakota tort law by exercising control over the DAPL Protestors which the United States invited onto Corps-managed lands, assuming responsibility for those DAPL Protestors.

**B.    The United States Breached its Duty to Protect North Dakota from Harm.**

[¶129] The Court has previously determined that the relevant duty of care for North Dakota's negligence, gross negligence, and civil trespass claims, is the standard set out by the Restatement (Second) of Torts, Section 318, which provides:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> (a) Knows or has reason to know that he has the ability to control the third person, and
> (b) Knows or should know of the necessity and opportunity for exercising such control.

> ECF No. 38 at ¶¶ 64-66; ECF No. 283 at ¶¶ 14-17.

[¶130] The Restatement can be broken down into a three "prong" analysis: (1) whether an actor "permits a third person to use lands or chattel;" (2) whether that actor "knows of or has reasons to know that he has the ability to control the third person;" and (3) whether the actor "knows of or should know of the necessity and opportunity for exercising such control."   If those elements are met, then the question turns to whether the actor met his or her duty to exercise "reasonable care" so as to control the conduct of the third person.

[¶131] The elements of nuisance in North Dakota are specified by statute, although "common law remains relevant" to nuisance claims when not in conflict with the statute. *See Rassier v. Houim*, 488 N.W. 2d 635, 636 (N.D. 1992). N.D.C.C. § 42-01-01 provides:

> A nuisance consists of unlawfully doing an act or omitting to perform a duty, which act or omission:
> 1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
>
> 2. Offends decency;

3. Unlawfully interferes with, obstructs [or] renders dangerous for passage, any lake, navigable river, . . . public park, square, street or highway; or

4. In any way renders other persons insecure in life or in the use of property.

[¶132] Although the statute "defines nuisance in part as 'omitting to perform a duty,' the type of 'duty' which gives rise to a claim of nuisance may differ from the 'duty' implicated in a negligence action." *Knoff v. Am. Crystal Sugar Co*., 380 N.W.2d 313, 317 (N.D. 1986). Specifically, "'[n]uisance is a condition and not an act or failure to act, so that if a wrongful condition exists, the person responsible for its existence is liable for resulting damage to others.'" *Id*. (citation omitted). Thus, the "duty" involved is simply the duty not to take action or create conditions that cause a nuisance, and need not even constitute "negligence." *See id*.

[¶133] Based on this, the Court has also determined that the basis for liability under North Dakota's public nuisance claim is set forth in the Restatement (Second) of Torts, Section 838, which provides:

> A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
>
> (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and
> (b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.
>
> ECF No. 38 at ¶¶ 64-66; ECF No. 283 at ¶¶ 14-17.

[¶134] Similar to the torts analysis for the negligence, gross negligence, and civil trespass claims discussed above, this can be broken down into two elements of duty: whether the actor (1) knew or had reason to know that the activity is being carried on; and (2) that it is causing or will involve an unreasonable risk of causing the nuisance. Further, this Court has previously determined that under the FTCA, North Dakota's public nuisance claim requires a negligence-based analysis as to

whether the United States has "fail[ed] to exercise reasonable care to prevent the nuisance."  ECF No. 38 at ¶ 68; ECF No. 283 at ¶ 12.

[¶135]  The United States argues several reasons for why it has not breached the duties outlined by the Court under the Sections 318 and 838 of the Restatement (Second) of Torts.  Specifically, the United States argues that it: (1) did not permit the DAPL Protestors to be on portions of Corps-managed lands, including the location of the Main Camp north of the Cannonball River, nor to engage in unlawful activity; (2) the Corps did not have the ability to control the DAPL Protestors; and (3) that the Corps acted reasonably.  For the reasons set forth below, the Court rejects the United States' arguments and finds the United States breached its duty to prevent harm to North Dakota.

[¶136]  <u>The Court rejects the United States' contention that it did not authorize DAPL Protestors to be on lands north of the Cannonball River nor to engage in illegal conduct.</u>  The Court does not find the United States' argument that the Corps did not permit protestors to be on its lands north of the Cannonball River (where the Main Camp was located) nor to engage in illegal conduct dispositive or credible.  From the onset of the DAPL Protests in August of 2016, the Corps had ample intelligence about the dangerous, violent, and unlawful DAPL Protest situation unfolding on Corps-managed lands.  ECF No. 450-1, FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114.  Prior to the Corps' issuance of the Sept. 16 Press Release, the Corps (and other agencies of the United States) knew that: (1) DAPL Protestors were trespassing on Corps-managed lands, including the area where the Main Camp was located (ECF No. 450-1, FoF ¶¶ 24, 60, 68, 70, 115-116); (2) that dangerous, extremist, and violent individuals were present (ECF No. 450-1, FoF ¶¶ 36, 58, 66, 68-70, 72, 87)); (3) that DAPL Protestors were engaging in activities violating the Corps' regulations for use of federal public lands, including building

unauthorized structures, roads, and improperly disposing of waste (ECF No. 450-1, FoF ¶¶ 58, 74, 87, 100-101); (4) that the DAPL Protestors were not under the control of the Standing Rock Sioux Tribe, the entity seeking a Special Use Permit (ECF No. 450-1, FoF ¶¶ 77, 137, 139); and (5) that the DAPL Protestors were using the Corps-managed lands as a base of operations and "safe haven" for illegal protest activities conducted outside of Corps-managed lands in North Dakota (ECF No. 450-1, FoF ¶¶ 16-24, 30, 37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114).

[¶137] At the earliest days of the DAPL Protests, the Corps expected that the DAPL Protests would grow and increase in intensity.  ECF No. 450-1, FoF ¶¶ 58, 70, 72, 83. The Corps expected the situation to get worse, and knew it had the "potential to become a major protest." ECF No. 450-1, FoF ¶ 58.

[¶138] Colonel Henderson, and the Corps, was aware that a Special Use Permit "was the correct way to address the encampment of [DAPL Protestors] on [Corps-managed] lands." ECF No. 450-1, FoF ¶¶ 52-57, 59.

[¶139] Further, the Corps was aware that the Standing Rock Sioux Tribes' August 18, 2016 Special Use Permit application (and subsequent supplement to that application) could not comply with or presented a viable path forward under the Corps' permitting requirements.  AFoF ¶ 20.  At the time of submission, the Corps determined the Special Use Permit application was incomplete. *Id*.  The Corps had significant concerns with the permit application received by the Corps on August 18, 2016, including that: the application "significantly under estimated" the number of participants, vehicles, and locations in only listing 300 participants, and did not accurately describe the full scope of areas DAPL Protestors currently occupied.  *Id*.  Further, when discussing the Special Use Permit application with Chairman Archambault on August 25, 2016, Corps official Eric Stasch stated that "the phone call did not get into the specifics of the permit application" (*id.*),

that Chairman Archambault admitted there were "professional" protestors on Corps-managed lands not associated with the Standing Rock Sioux Tribe; and that he informed Chairman Archambault that the information in the Standing Rock Sioux Tribe's supplemental application "was way off." *Id.* Further, when Chairman Archambault provided a map to supplement the Special Use Permit application, it specifically outlined the area of the Main Camp north of the Cannonball River where the majority of DAPL Protestors were already located. ECF No. 450-1, FoF ¶ 77.

[¶140] While the Corps' Sept. 16 Press Release did not specifically authorize the DAPL Protestors to be on the lands north of the Cannonball River where the Main Camp was located, that announcement came in the face of overwhelming evidence at trial that the Corps knew the main contingent of DAPL protestors was already located at the Main Camp, and that the issuance of the *de facto* Special Use Permit would not affect any migration of the DAPL Protestors south of the Cannonball River. Further, by issuing the *de facto* Special Use Permit, the Corps explicitly sanctioned the presence of DAPL Protestors north of the Cannonball River by granting them a lawful status on Corps-managed lands, despite the overwhelming evidence of DAPL Protestors' ongoing unlawful conduct. It is clear to the Court that the Corps' Sept. 16 Press Release was merely the culmination of the Corps violation of its non-discretionary permitting process, which violations began when the Corps declined to act on the DAPL Protestors presence on Corps-managed lands as early as May of 2016.

[¶141] By issuing the Sept. 16 Press Release and granting the DAPL Protestors a *de facto* Special Use Permit in the face of the DAPL Protestors' ongoing unlawful activities, the Court finds that the Corps' "consent[ed] to the activity or" and "fail[ed] to exercise reasonable care to prevent" the ongoing unlawful conduct. Restatement (Second) of Torts, Section 838.

[¶142]  <u>The Court rejects the United States' assertion that it did not know it could control the DAPL Protestors</u>.  The United States' contention that it did not know it could control the conduct of the DAPL Protestors is not credible.  First, Colonel Henderson, and the Corps, were aware that a Special Use Permit's terms and conditions provided mechanisms for the United States to control the behavior of the DAPL Protestors, and "was the correct way to address the encampment" of DAPL Protestors.  ECF No. 450-1, FoF ¶¶ 52-57, 59.

[¶143] Requiring that the DAPL Protestors have a Special Use Permit to utilize the Corps-managed land would have ensured that a liability insurance policy was secured, which would have indemnified the United States and allowed the United States to require the DAPL Protest organizers to restore the DAPL Protest sites.  ECF No. 450-1, FoF ¶¶ 63, 105, 107, 122-27.  Insurance would have assisted with covering the costs associated with remediating the damage caused by the Protestors.  ECF No. 450-1, FoF ¶¶ 125-127.  Importantly, requiring the DAPL Protestors to have obtained the required bonding and insurance would have put pressure on DAPL Protest leaders to manage the ongoing conduct of the DAPL Protestors.

[¶144] Further, a Special Use Permit would have allowed the United States to enforce terms relating to the prohibition against construction of permanent structures, limiting the number of individuals present on the Corps-managed land, and requiring that adequate waste management services were provided.  ECF No. 450-1, FoF ¶¶ 40, 105.

[¶145] Second, the Court does not find it credible for the Corps to claim that its lack of law enforcement capabilities meant it did not have the ability to control the DAPL Protestors.  As discussed above, the Corps had a much more significant tool to control the DAPL Protestors – the permitting process itself.

[¶146] The United States admitted the Corps had additional tools to control the DAPL Protestors, including the authority to issue citations to the DAPL Protestors (ECF No. 451-1 at ¶ 18) and to close the Corps-managed lands (ECF No. 451-1 at ¶ 44).  While the Corps argues that the U.S. Attorney's office told Colonel Henderson that it would not be worthwhile to issue trespassing citations because any such citations would not be enforced (ECF No. 451-1 at ¶ 103), and that it had no reason to believe that closing the Corps-managed lands would have had any effect on the DAPL Protestors (ECF No. 451-1 at ¶ 565), this ignores the reinforcement effect that the Corps' decision *not* to use any of the tools at its disposal had on the DAPL Protestors.  Dr. Kuhlman testified that the United States' actions "encouraged [and] supported protestors to remain and be at the [Dakota Access Pipeline] protests."  Tr. Day 11, 1801:14–19 (Kuhlman).  Dr. Kuhlman noted that DAPL Protestors viewed the Corps' Sept. 9, 2016 Joint Statement as a victory and it caused the DAPL Protestors to believe "their concerns were being heard and their illegal conducted was being tolerated, which was a direct result of protest camps being illegally present on [the Corps-managed lands]." PX-2030 at p. 7.  Dr. Kuhlman also identified the Sept. 16 Press Release as an act which "provided positive support, encouragement, and positive reinforcement" to the Protestors. PX-2030 at p. 7.  This was because the statement would have led the DAPL Protestors to believe they could remain on the Corps-managed lands. Tr. Day 7, 1808:2–12 (Kuhlman).  Dr. Kuhlman also opined that the United States' failure and inaction in enforcing Corps regulations on Corps lands normalized and reinforced DAPL Protestor behavior, including DAPL Protestor occupation of Corps lands.  PX-2030 at 8.  In other words, by not even attempting to control the conduct of the DAPL Protestors, the United States both assented to the DAPL Protestors' presence and conduct on Corps-managed lands, but also normalized and reinforced that presence and conduct.

[¶147] <u>Based on the foregoing, the Corps did not exercise reasonable care to control the conduct of the DAPL Protestors</u>.  Despite the Corps' recognizing that it had "limited options" for controlling the conduct of the DAPL Protestors, the Corps eschewed the singular most important tool for controlling the DAPL protestors – its permitting process – and issued a *de facto* Special Use Permit to the DAPL Protestors despite the knowledge of the ongoing unlawful conduct emanating from Corps-managed lands.

[¶148] It was not only reasonably foreseeable, but *abundantly* foreseeable that the United States' failure to exercise control over the DAPL Protestors through its permitting process would result in harms to North Dakota.

[¶149] Here, the Corps authorized the DAPL Protestors to operate on its land, despite the daily intelligence briefings provided by North Dakota law enforcement informing the Corps of the various disruptive, unlawful, and illegal activities engaged in by the DAPL Protestors on and off Corps Lands. ECF No. 450-1, FoF ¶¶ 16-24, 47.  Indeed, Governor Dalrymple and U.S. Senator Heitkamp both directly informed the Corps repeatedly of the public nuisance the DAPL Protestors were creating in North Dakota.  ECF No. 450-1, FoF ¶¶ 68, 87, 101, 103, 121.  These undisputed facts show that the Corps knew that the DAPL Protestors that the Corps negligently allowed on public lands were creating tortious conditions and a public nuisance on and off those public lands, that these actions posed a danger to public safety and the environment and must be controlled, yet the Corps then publicly authorized the DAPL Protestors to be and remain on Corps-managed lands through the issuance of a Special Use Permit.

[¶150] Thus, the Corps failed in its duty "to utilize [its] property in a reasonable manner so as not to cause injury to adjoining property." *Herring*, 823 N.W.2d at 500.

[¶151]  As the Corps improperly authorized the presence and activities of the DAPL Protestors in violation of its own procedures, the Corps had a duty as the possessor of land on which the DAPL Protestors organized and launched their illegal activities "to use reasonable care" to protect North Dakota from injury.  Further, given the "likelihood of injury," "seriousness of the injury," and "burden of avoiding the risk," the Corps had a duty under "general negligence principles" to use reasonable care to prevent harm to North Dakota from the DAPL Protestors. *Redford*, 2014 U.S. Dist. LEXIS 97327 at *2

### C.    The Court Finds that the Corps' Violation of its Non-Discretionary Permitting Process was the Proximate Cause of North Dakota's Injuries.

[¶152] Under North Dakota law, to constitute actionable negligence, "there must be a causal connection between the negligence and the injury sustained; for the negligence to be the proximate cause of the injury, the defendant must owe to the plaintiff a duty, and the injury to the plaintiff must have resulted as a direct consequence of the negligent breach of that duty."  *Moum v. Maercklein,* 201 N.W.3d 399, 402 (N.D. 1972) (citing *Bowers v. Great Northern Ry. Co.*, 65 N.D. 384, 259 N.W. 99, 99 A.L.R. 1443 (1935)).  "Proximate cause" of an injury is a cause which in natural and continuous sequence, unbroken by any controlling, intervening cause, produces injury, and without which it would not have occurred.  *Id.*

[¶153] Under North Dakota negligence law, "it must appear not only that the injury complained of was a natural and probable consequence of the negligent act of the defendant, but that such consequence ought reasonably to have been anticipated by a person of ordinary intelligence in the light of attending circumstances."  *Moum v. Maercklein*, 201 N.W.2d 399 at 402 (N.D. 1982).

[¶154] "[P]roximate cause may be proved by the circumstances of a case if such circumstances permit a reasonable inference of a cause of injury for which the defendant is responsible, and at

the same time exclude equally reasonable inferences of other causes for which the defendant is not responsible." *Investors Real Estate Trust Properties*, 686 N.W.2d at 144.

[¶155] Under the Restatement, an actor's conduct is the legal cause of the claimed harm only if "his conduct is a substantial factor in bringing about the harm." Restatement (Second) of Torts. The Restatement of Torts, Section 433, lists "considerations . . . important in determining whether the actor's conduct is a substantial factor" in causing the alleged harm, including:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts § 433 (Am. Law Inst. 1965).

[¶156] The Court has held that the correct inquiry here is whether "the United States proximately caused the emergency response when it allowed and encouraged protestors on federal land without requiring the requisite permit." ECF No. 106 at ¶ 43; ECF No. 383 at ¶ 29.

[¶157] For the following reasons, the Court finds that the Corps' violation of its non-discretionary permitting regulations was the proximate cause of North Dakota's emergency response costs.

> ### i.     The Court rejects the United States' argument that the Corps' violation of its non-discretionary permitting regulations was not a substantial factor causing North Dakota's emergency response costs.

[¶158] The United States argues that multiple other factors besides the Corp's violation of its non-discretionary duties and grant of a Special Use Permit to the DAPL Protestors were responsible for North Dakota's emergency response costs, including: the DAPL Protestors own independent beliefs; the Assistant Secretary of the Army for Civil Works' decision-making on the pipeline easement; the historical and cultural context; the Standing Rock Sioux Tribe's early calls for

support for the protests and its litigation against the Corps, social media and online donations; celebrity involvement; and the perception that State and local law enforcement were being heavy-handed in their response to the protests, and actions by the pipeline company.  ECF No. 451-1 at ¶ 647.

[¶159]  Again, the United States misses the key focus of the proximate cause inquiry in this case, which is whether the "the United States proximately caused the emergency response when it allowed and encouraged protestors on federal land without requiring the requisite permit."  ECF No. 106 at ¶ 43; ECF No. 383 at ¶ 29.  By sanctioning and inviting the DAPL Protestors to be on Corps-managed lands through the violation of its permitting regulations, the Corps created the DAPL Protestors status as lawful invitees or licensees (*See* ECF No. 38 at ¶ 63 – noting North Dakota has abandoned a legal distinction between invitees and licensees) on Corps-managed lands, and assumed responsibility for controlling the DAPL Protestors.

[¶160]  While the DAPL Protestors may have had independently held beliefs and motivations, they were supported and enabled by the Corps' grant of a *de facto* Special Use Permit, which provided the DAPL Protestors safe-haven from which to conduct their ongoing illicit activities.  Significant evidence was adduced at trial as to the pervasive adverse effect the safe-haven on Corps-managed lands had in enabling the DAPL Protestors' conduct.  ECF No. 450-1 at ¶ 131 (Chase Iron Eyes noting he viewed the camps on Corps-managed lands as a safe haven); ¶ 266 (Sheriff Paul Laney testifying that having access to a physical space on Corps-managed lands as a "base of operations" and "safe haven" allowed the DAPL Protests to grow; ¶ 267 (North Dakota Highway Patrol Captain Pederson's stating the same); ¶ 273 (Morton County Commissioner Cody Schulz stating the same).

[¶161] Further, the United States incorrectly focuses on subsequent discretionary decision of the Corps, such choosing not to close the Corps-managed lands, choosing not to seek federal or state law enforcement support, and failing to seek forceable removal of the DAPL Protestors as defeating proximate cause because they are the "only acts" which would have remedied North Dakota's incurred harms in the emergency response costs to the DAPL Protests. ECF No. 451-1 at ¶ 435. Instead, it was the Corps' violation of its permitting procedures, at first implicitly, and later explicitly sanctioning the DAPL Protestors to be and remain on Corps managed lands, that created an untenable situation which cause North Dakota's harms. ECF No. 38, at ¶¶ 55, 58.

[¶162] Similarly, North Dakota's expert, Dr. Kuhlman, testified extensively as to the effect the Corps' granting of a Special Use Permit had in enabling and encouraging the DAPL Protestors. Tr. Day 11, 1801:14–19 (Kuhlman); PX-2030; PX-2031; AFoF ¶ 22.

[¶163] The Court does not find the United States' arguments credible that North Dakota would have incurred its emergency response costs regardless of the Corps' decision to grant the DAPL Protestors a *de facto* Special Use Permit.

### ii. The Court rejects the United States argument that North Dakota's harms were not the reasonably foreseeable consequence of the Corps' actions.

[¶164] The Court finds that the United States argument that it was not reasonably foreseeable that granting a Special Use Permit to the DAPL Protestors would cause North Dakota's harms is not credible. ECF No. 451-1 at ¶¶ 608-610.

[¶165] The undisputed facts show that the United States, by and through the Corps, knew of the necessity for exercising control over the DAPL Protestors. Prior to the Corps' issuance of the Sept. 16 Press Release, the Corps (and other agencies of the United States) knew that: (1) DAPL Protestors were trespassing on Corps-managed land (ECF No. 450-1, FoF ¶¶ 24, 60, 68, 70); (2) that dangerous, extremist, and violent individuals were present (ECF No. 450-1, FoF ¶¶ 36, 58,

66, 68-70, 72, 87)); (3) that DAPL Protestors were engaging in activities violating the Corps'
regulations for use of federal public lands, including building unauthorized structures, roads, and
improperly disposing of waste (ECF No. 450-1, FoF ¶¶ 58, 74, 87, 100-101); (4) that the DAPL
Protestors were not under the control of the Standing Rock Sioux Tribe, the entity seeking a Special
Use Permit (ECF No. 450-1, FoF ¶¶ 77, 137, 139); and (5) that the DAPL Protestors were using
the Corps-managed lands as a base of operations and "safe haven" for illegal protest activities
conducted outside of Corps-managed lands in North Dakota (ECF No. 450-1, FoF ¶¶ 16-24, 30,
37, 41-42, 45, 51, 58, 60, 63, 68-70, 74-75, 78, 80, 87, 98-101, 114).

[¶166] At the earliest days of the DAPL Protests, the United States expected that the DAPL
Protests would grow and increase in intensity. ECF No. 450-1, FoF ¶¶ 58, 70, 72, 83. The United
States expected the situation to get worse, and knew it had the "potential to become a major
protest." ECF No. 450-1, FoF ¶ 58.

[¶167] Further, the United States was aware that a Special Use Permit "was the correct way to
address the encampment of [DAPL Protestors] on [Corps-managed] lands." ECF No. 450-1, FoF
¶ 59.

[¶168] The United States' knowledge of the necessity to exercise control only increased
throughout the duration of the DAPL Protests.  Virtually every day after the Sept. 16 Press Release,
DAPL Protestors would organize in the Main Camp on the Corps-managed land, go out into
Morton County and other portions of North Dakota and conduct their protest activity.  ECF No.
450-1, FoF ¶¶ 136-138, 149, 159-165, 168, 171-172, 174, 178-187, 189, 191-192, 212-214. Much
of the time, this involved acts of unlawful protest, outright aggression, and disruption to the lives
of local citizens.  *Id.*  Further, the DAPL Protestors remained in violation of the terms of the Special

Use Permit originally offered to the Standing Rock Sioux Tribe.  ECF No. 450-1, FoF ¶¶ 134-135, 144-145.

[¶169] Moreover, North Dakota made repeated entreaties to the United States, as well as public emergency declarations and statements, which made clear to the United States there was an increasingly growing public danger presented by the DAPL Protestors on and emanating from the Corps-managed land.  ECF No. 450-1, FoF ¶¶ 44, 65-66, 67, 87, 121, 133.  Governor Dalrymple declared an emergency on August 19, 2016. ECF No. 450-1, FoF ¶¶ 65-66.  This public declaration specifically noted the "public safety risks associated with the ongoing protest of the Dakota Access Pipeline." ECF No. 450-1, FoF ¶ 66. During trial, Governor Dalrymple further explained these risks:

> The serious safety concerns stem from the fact that protestors were advancing out of their recently established camps. They were moving onto state highway property. They were moving onto the actual highway itself. There was activity dealing with public and private property that was unlawful and it was clear that the situation was going to require some law enforcement response.

*Id.*

[¶170] Further, the United States' references to expectations that the DAPL Protests "would fade away" leading up to the DAPL Protests is not credible.  ECF No. 451-1 at ¶ 610.  Even if that assumption was reasonable in the earliest days of August (which the Court finds it was not), that assumption quickly became unreasonable and unsupportable as the DAPL Protests gained significant steam from mid-August to September of 2016.  *See e.g.* ECF No. 451-1 at ¶ 610 (United States admitting awareness of the DAPL Protestors clashes with private security on September 3, 2016).

[¶171] The United States knew from the very beginning of the DAPL Protests that violence by the DAPL Protestors encamped on the Corps-managed lands was not only a possibility due to the presence of hostile and extremist elements therein, but was an *actuality* due to the unlawful and

violent protests events that occurred prior to the Corps Sept. 16 Press Release. As a matter of law, the United States, by and through the Corps, had knowledge of the necessity for exercising control over the DAPL Protests, and should have foreseen the DAPL Protests potential for violence.

### iii. The Court rejects the United States' reliance on protest related proximate cause case law.

[¶172] The United States relies upon *Doe v. Mckesson* to support the proposition that there is a heightened proximate cause showing required when protest activity is involved in a plaintiff's harm. ECF No. 451-1 at ¶¶ 598-602. However, *Mckesson* involved circumstances not analogous to North Dakota's case, whereby the Court was determining whether a protest leader could be held liable for a protest they organized where rogue participants were then responsible for the plaintiff's harm, and where the protest organizer's actions involved First Amendment concerns. 71 F.4th 278, 291-293 (5th Cir. 2023).

[¶173] North Dakota is not seeking to impose liability on the United States by claiming the United States was a protest leader such as in *Doe v. Mckesson*. Instead, North Dakota's torts sound from the United States' negligent creation of a public nuisance when it violated its non-discretionary permitting process and invited and encouraged the DAPL Protestors to be and remain on Corps-managed lands by issuing them a *de facto* Special Use Permit. As such, this liability sounds in United States negligent administration of Corps-managed lands, and not the organization of DAPL Protest activity. Additionally, the United States' conduct here, as previously determined by the Court, does not involve First Amendment considerations. ECF No. 383 at ¶ 21.

[¶174] Further, in *Mckesson* the protest organizer was ultimately found to have proximately caused the plaintiff's injuries by creating an "unreasonably dangerous condition[]" in organizing the protest that was "likely to incite lawless action" sufficient to establish proximate cause. 71 F.4th at 293-294. Thus to the extent *Mckesson* does apply to North Dakota's claims, the Court has

found that the United States was negligent in issuing a *de facto* Special Use Permit to the DAPL Protestors in light of the known unlawful situation unfolding on Corps-managed lands sufficient to show that the United States "create[d] unreasonably dangerous conditions" in issuing a *de facto* Special Use Permit that allowed the DAPL Protestors occupation of Corps-managed lands, which both "ratified" DAPL Protestor conduct by sanctioning their presence on Corps-managed lands and created a situation "likely to incite lawless action" which resulted in North Dakota's injuries. 71 F.4th at 294.

[¶175] Similarly, the Court is not persuaded by the United States' reliance on *Murthy v. Missouri*, __ U.S. __, 144 S. Ct. 1972, 1987-94 (2024).[7] While the Court agrees that the individual DAPL Protestors motivations and actions must be untangled from the United States (by and through the Corps) actions causing North Dakota's harms, the analysis required under Sections 318 and 838 of the Restatement (Second) of Torts is materially different than that the Supreme Court undertook in *Murthy*. In *Murthy*, two states and several individuals alleged that various federal Executive Branch officials and agencies violated their rights by pressuring social-media platforms to censor speech. *See id.* at 1983-84. The Supreme Court was tasked with determining whether the Governments' pressuring of social-media platforms was the *but for cause* of the social media platforms' ultimate decision to censor the plaintiffs' speech. *Id.* at 1987-1989. Here, the "but for" analysis is not whether the Corps' actions caused the DAPL Protests to occur in the first place, or caused individual persons to decide to protest the DAPL construction, but whether the Corps' failure to exercise control over the DAPL Protests through its mandatory permitting process was

---

[7] The United States citation to *Murthy* for the proposition that courts cannot treat disparate individual actors "as a unified whole" is misplaced, as that language by the Supreme Court related to determining plaintiffs standing as to each individual defendant, and not causation. ECF No. 451-1 at ¶ 599 (Citing 144 S. Ct. at 1987-1984 ).

the "but for" cause of the DAPL Protests location, duration, and intensity.  As discussed herein, the weight of evidence adduced at trial shows that the presence of a safe-haven sanctioned base of operations on Corps-managed lands drastically increased the duration and intensity of the DAPL Protests, emboldening and enabling the DAPL Protestors.  While the DAPL Protestors had independent motivations and arrived in North Dakota prior to the issuance of the Sept. 16 Press Release, the Court finds that "but for" the Corps issuing a *de facto* permit to the DAPL Protestors, the intensity and duration of the DAPL Protests would have been dramatically lessened.  Tr. Day 11, 1801:14–19 (Kuhlman); PX-2030; PX-2031.

                iv.        **The Court rejects the United States' argument that the Corps' actions did not cause the DAPL Protests to increase as not relevant to the issue of proximate cause.**

[¶176] The United States makes extensive arguments that its Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter did not "*cause* a change in protest activity on the ground," and that as such, the United States is not proximately liable for North Dakota's emergency response costs.

[¶177] Yet again, these arguments disregard the relevant inquiry, which is whether "the United States proximately caused the emergency response when it allowed and encouraged protestors on" Corps-managed lands in violation of its permitting regulations.  ECF No. 383 at ¶ 29, ECF No. 106, ¶ 43.

[¶178] Additionally, the United States' line of reasoning is misplaced, because it is not relevant whether the Corps' actions *increased* the size of the DAPL Protest camps, but instead whether the Corps' actions caused the DAPL Protestors to be and remain on Corps-managed lands – necessitating North Dakota's emergency response.  Even if it was relevant, the Court does not find the evidence credible that the Corps' Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter had no impact on the DAPL Protests credible.

[¶179]  To support its claims that the Corps' Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter did not impact the presence of DAPL Protestors on Corps-managed lands, the United States leans heavily on two of its experts:  Dr. Steckel and Dr. Yuchtman.

[¶180]  Dr. Steckel presented expert opinion that based on a social media analysis, there was not a causal link between the Corps' Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter and increased activity by the DAPL Protestors.  Dr. Steckel's opinion had significant limitations that cause the Court to reject his expert opinion.

[¶181]  More specifically, Dr. Steckel had never previously done an analysis of protest and protest behavior.  Tr. Day 17, 2678:1-12 (Steckel).  Dr. Steckel also recognized that he was not providing direct opinions on causation.  *Id.* at 2678:13–2679:16.

[¶182]  In creating his analysis, Dr. Steckel excluded arrest data because he did not think it was relevant to DAPL Protestor behavior.  *Id.* at 2773:18–2774:5.  Dr. Steckel did not assess DAPL Protestor behavior and intensity, including violence.  *Id.* at 2774:8–2775:7.  Dr. Steckel failed to analyze the impact of having a camp or safe haven on Corps-managed lands had on the DAPL Protests.  *Id.* at 2776:16-23.[8]  Dr. Steckel limited his analysis to the Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter, and did not analyze any other Corps or federal statements or actions.  *Id.* at 2777:5–2778:10.  Dr. Steckel admitted that his analysis did not provide any indication about the resolve of the DAPL Protestors.  *Id.* at 2812:4-10.  Dr. Steckel did not reach any conclusion about potential alternative cause for increases in DAPL Protestor behavior and intensity.  *Id.* at 2823:6-21.  Dr. Steckel admitted that he was unaware of whether the DAPL Protestors had internet access at the DAPL Protest camps, and that a lack of internet access could

---

[8] Dr. Maguire, the United States' law enforcement expert, agreed that providing the protestors a place to stay was support.  Tr. Day 15, 2401:7–2401:21 (Maguire).

have had an effect in depressing the number of social media posts by actual DAPL Protestors. *Id.* at 2827:13–2829:4. Dr. Steckel admitted that he had no way of knowing whether the social media data he analyzed was actually made by DAPL Protestors on the ground on Corps-managed lands and was apparently unaware whether such an analysis could be performed. *Id.* at 2840:8-17.

[¶183] To assess the impact of the Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter on the DAPL Protests, Dr. Steckel relied on three "reported measures" of DAPL Protestor behavior: camp population estimates, camp vehicle counts, and donations. Tr. Day 17, 2724:13-17 (Steckel).

[¶184] In creating this dataset of reported measures, Dr. Steckel relied upon Bureau of Indian Affairs ("BIA") data that only encompassed the camp south of the Cannonball River, and not the Main Camp where the vast majority of DAPL Protestors were located. *Id.* at 2778:11–2779:10. Further, Dr. Steckel recognized that those camp population estimates were purely subjective and not based on actual counts. *Id.* at 2780:15-17; 2624:2–2624:12 (Cruzan testified that BIA estimates of protestor populations "wasn't scientific, for sure."). In fact, Dr. Steckel admitted he had no objective reported measures for any date for the Sept. 16 Press Release. *Id.* at 2781:5-17. Dr. Steckel also did not use the population count estimates created by North Dakota in forming his analysis. *Id.* at 2782:8-19. Dr. Steckel treated all vehicles as equally for purposes of his analysis, despite having data on whether the vehicles were cars, pickups, minivans, and buses. *Id.* at 2782:20–2783:1. Dr. Steckel relied upon donation data that was collected from a Gmail address, and did not independently verify that data. *Id.* at 2785:20–2786:6. Dr. Steckel did not utilize GoFundMe data in his analysis. *Id.* at 2786:7-19. Dr. Steckel was not aware whether the donation data he relied upon in his analysis was objective. *Id.* at 2787:16-22.

[¶185]  After obtaining data on the three "reported measures," Dr. Steckel obtained a second set of social media data from both Facebook and Twitter.  *Id.* at 2724:18-24.  That social media dataset was compiled by a firm called Voluble that spent over 1,300 hours compiling the data under Dr. Steckel's direction.  *Id.* at 2720:9–2721:20.  Dr. Steckel did not compile the social media dataset himself.  *Id.*[9]

[¶186]  For his Facebook social media data, Dr. Steckel solely analyzed 21 Facebook groups containing more than 10,000 people.  *Id.* at 2789:12-15. Dr. Steckel's Facebook data set could not account for persons who had joined or left those Facebook groups prior to his data collection in 2022.  *Id.* at 2790:14–2791:11.  Dr. Steckel did not weight his Facebook data set by how frequently a post was shared, meaning that a post that was shared 400,000 times was treated with the same weight as a post shared zero times.  *Id.* at 2792:1-16.  Dr. Steckel had no idea where the people posting in the Facebook groups were located, including whether they were actually at the DAPL Protests.  *Id.* at 2797:22–2798:17.  Dr. Steckel did not analyze DAPL related posts on Facebook pages for news sources.  *Id.* at 2799:3-5.

[¶187]  North Dakota's rebuttal witness, Mr. Gary Warner, explained that the location where a social media post was made could be determined.  Mr. Warner explained that you could perform a geofence search where the search is limited to a range within a specific latitude and longitude where all of the tweets within the geofenced area could be determined.  Tr. Day 18, 2963:6–2963:20 (Warner).  Mr. Warner also confirmed that Dr. Steckel's data did not reflect the use of geofenced searches in his data and that Dr. Steckel thought it was not possible.  *Id.* at 2963:4–2963:8.  Mr. Warner also explained that it is common to use an "influence score" which is the

---

[9] The Court is skeptical of the Voluble social media dataset given that the actual persons at Voluble who compiled that dataset were not present at trial and subject to cross-examination on their methodology or the reliability of the dataset.

combination of the number of times something is reacted to, shared, and commented on. *Id.* at 2967:7–2967:10. Mr. Warner explained that depending on the investigation, he may assign different weightings to reactions, shares, and comments and then use a combination of weighing and numbers of reactions, comments and shares to reach the influence score. *Id.* at 2967:7–2967:15. This allows Mr. Warner to ascertain the objective of the search which is to determine the posts that he should pay the most attention to. *Id*. Mr. Warner also demonstrated the limitations of the donations data set that Dr. Steckel used as Dr. Steckel did not specific the number of donors. When donations are used as proxy of the amount of protester activity as Dr. Steckel attempted to do so, Mr. Warner explained that it is important to understand whether one person contributed a large amount or whether many people contributed a small amount. *Id.* at 2970:1–2970:13. However, Dr. Steckel only analyzed the amount of donations. Mr. Warner also testified that the requests for donations were not being made to individuals who were located in the camps but to those outside the camps to contribute. *Id.* 2970:23–2971:5.

[¶188] Dr. Steckel's Twitter dataset had similar problems, including that he did not know the location of the people making the tweets he included and did not weight the tweets based on how often they were shared. *Id.* at 2799:25 – 2800:24.

[¶189] Dr. Warner testified that based on the limitations in Dr. Steckel's dataset, including inadequate data for Dr. Steckel's three reported measures (vehicles, attendance, and donations), "the design [Dr. Steckel] began with could not reach valid conclusions." Tr. Day 18, 2982:4-18 (Warner).

[¶190] Given the limitations of Dr. Steckel's dataset and methodology, the Court does not find Dr. Steckel's expert opinion reliable or relevant to the issue of whether the Corps' grant of *de facto* Special Use Permit to the DAPL Protestors proximately caused North Dakota's harm.

[¶191] Dr. Yuchtman, an expert for the United States, provided opinion regarding whether (1) the Sept. 16 press release or Nov. 25 Free Speech Zone Letter had an effect on the level of participation in, or intensity of, the protests; (2) the Corps' decision not to pursue an immediate eviction of protestors had an effect on protest participation or intensity; and (3) other causal factors may have contributed to protest participation or intensity. DX 4222 at ¶ 1.  Dr. Yuchtman provided an opinion that that Corps' Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter did not have a meaningful effect on the DAPL Protests size or intensity.  DX 4222 at pp. 37-44 ¶¶ 61-74 & Figure 7.

[¶192] In reaching this opinion, Dr. Yuchtman based his opinions on quantitative and qualitative data.  As to quantitative data, Dr. Yuchtman relied entirely upon Dr. Steckel's data analysis in reaching his conclusions, as so, his expert opinion is equally flawed to the extent is relies upon that data.  DX 4222 ¶¶ 56-60; Tr. Day 17, 2901:3-12 (Yuchtman).

[¶193] As to qualitative analysis, Dr. Yuchtman created a five-question framework which had never been evaluated before in a single academic paper, including his prior research in Hong Kong. Tr. Day 17, 2902:14–2903:24.

[¶194] Dr. Yuchtman's opinion was based on his five-question framework, including weighting each of his five questions, was subjective and based on Dr. Yuchtman's context-specific interpretation of evidence.  *Id.* at 2904:17–2905:11.  Dr. Yuchtman admitted that his opinion did not "exhaustively describe the causes of protest participation" and left open "the possibility that there are other individuals with other motivations – and who presumably may have other causal drivers of protest participation." *Id.* at 2906:19–2907:1.

[¶195] Dr. Yuchtman did not analyze the impacts of any other federal statements, or Corps actions in reaching his opinions including the Sept. 9 Joint Statement, the Oct. 10 Joint Statement, a

November 2 statement by President Obama, a December 4, 2016 Statement by the Corps, or the February 3, 2017 letter from Colonel Henderson.  *Id.* at 2194:5–2195:7.

[¶196]  Further, when asked about his opinion that a forced eviction of DAPL Protestors would not have reduced DAPL Protestors participation, Dr. Yuchtman acknowledged that he only looked at one point in time as of August 23, 2016, and was not aware of whether suitable alternative campsites were available, nor if they were farther away from the Corps-managed lands.  *Id.* at 2191:1–2913:19.   Dr. Yuchtman also agreed that a lack of suitable campsites in proximity to the pipeline would have presented a barrier to the DAPL Protestors coordination.  *Id.*  Dr. Yuchtman agreed that if the DAPL Protestors had had no alternate location to go to after an eviction, that would have suppressed DAPL Protestor activity.  *Id.* at 2196:13-24.[10]

[¶197]  On whole, the Court does not find Dr. Yuchtman's expert opinion persuasive or controlling on the issue of proximate cause.  Like Dr. Steckel, Dr. Yuchtman relied upon flawed data that did not take a comprehensive look at the DAPL Protests and the Corps' (and other United States Agencies') actions.

---

[10] For similar reasons, the Court is not persuaded by the United States' arguments that the presence of DAPL Protestors at other locations off of Corps-managed lands, such as at the North Camp off of Highway 1806, the Prairie Knights Casino, and the Standing Rock Sioux Reservation indicate North Dakota's emergency response costs would have occurred regardless of the Corps-violation of its non-discretionary duties.  Sheriff Paul Laney testified that the DAPL Protestors having access to a physical space on Corps-managed lands, a "base of operations" or a "safe haven" allowed the DAPL Protests to grow.  ECF No. 450-1, FoF ¶ 266.  Multiple North Dakota witnesses testified to the significant organization and caravanning of unlawful activities from Corps-managed lands, the Court finds was the primary and foremost location from which unlawful activities were emanating from during the duration of the DAPL Protests.  *Id.* at ¶¶ 50, 78, 80, 136-138, 159-165, 168, 171-172, 174, 178-187, 189, 191-192, 212-214; ECF No. 451-1 at ¶ 277 (Sheriff Kirchmeier testifying that unless all camps were cleared, including the Main Camp on Corps-managed lands, DAPL Protestors would just migrate from one closed camp to another).  It is clear that while there may have been minority populations of DAPL Protestors at locations off Corps-managed lands, they were not a substantial or predominant factor in the DAPL Protests which were fueled by the sanctioned encampments on Corps-managed lands.

[¶198] By limiting their analysis to solely the Sept. 16 Press Release and Nov. 25 Free Speech Zone Letter, both Dr. Steckel and Dr. Yuchtman failed to consider critical contextual evidence that lead up to the issuance of both public facing Corps actions.  As the United States admits, the Sept. 9 Joint Statement was shared over 500 times and was interacted with over 100,000 times on Facebook, causing Mr. Warner to refer to the Sept. 9 Joint Statement as the "big earthquake" and the Sept. 16 Press Release as the "aftershock."  ECF No. 451-1 at ¶ 648.  By excluding the Sept. 9 Joint Statement – a key catalyzing event – from their analysis, Dr. Steckel and Dr. Yuchtman did not have the ability to adjust for the Sept. 9 Joint Statement's potential impact on their analysis of the Sept. 16 Press Release.[11]  Nor did they have the ability to adjust for any other significant events in the DAPL Protests.   As Dr. Warner testified, "it didn't make sense" that the Sept. 16 Press Release and November 25 Free Speech Zone Letter "would be the only two [statements Dr. Steckel] would've been asked to consider."  Tr. Day 18, 2981:15-20 (Warner).

[¶199] Further, the evidence adduced at trial showed that the Corps, despite knowing that the Standing Rock Sioux Tribe was unlikely to be able to comply with the terms of a Special Use Permit, that DAPL Protestors were actively violating the Corps land use regulations, and that unlawful activity was occurring emanating from Corps-managed land, continued conversations with the Standing Rock Sioux Tribe continuously indicated that a permit would be granted.  ECF No. 450-1, FoF ¶¶ 61-, 63, 72, 77, 84-86, 91, 96-97, 101, 103-109.  The United States even sent a conciliation specialist who worked to train and outfit the DAPL Protestors in early September.  *Id.* at ¶¶ 84-86.  These types of supporting actions prior to the Sept. 16 Press Release were beginning

---

[11] The Court also rejects the United States' assertion that the Corps was not a party to the Sept. 9 Joint Statement.  AFoF ¶ 19.

of the Corps' violation of its permitting processes, ignoring early on that they could not ratify the DAPL Protestors presence on Corps-managed lands without a valid Special Use Permit.

[¶200]  The evidence adduced at trial showed that Colonel Henderson was in communication with DAPL Protestors and leaders around the time of the Nov. 25 Free Speech Zone Letter, and communicated that the Corps would not follow through on enforcing the closure of the Main Camp referenced in that letter.  *Id.* at ¶¶ 201-202.  The Corps, and Colonel Henderson also indicated to DAPL Protestors that they would not issue citations nor enforce the terms of the Special Use Permit by never issuing a single citation for the duration of the DAPL Protests.  *Id.* at ¶ 238.

[¶201]  Behind the scenes, from the earliest stages of the DAPL Protests, the Corps was supporting the DAPL Protestors and indicating to them that they would be allowed to stay on Corps-managed lands with impunity.  It is thus not surprising that there were not immediately evident increases in DAPL Protestor activity or populations surrounding the Sept. 16 Press Release and the Nov. 25 Free Speech Zone Letter, chiefly because the Corps had already made the decision it would not follow its permitting regulations and would authorize the DAPL Protestors to be and remain on Corps-managed lands, and communicated that information to the DAPL Protestors both explicitly and through the Corps actions, which decision the United States (and the Corps) conveyed to DAPL Protestors on a continuing basis before and after the Sept. 16 Press Release.

[¶202]  For this reason, the Court finds Dr. Kuhlman's expert opinion to carry more weight.  Dr. Kuhlman looked more comprehensively at the Corps actions leading up to, and after, the Sept. 16 Press Release to conclude that the United States' actions throughout the DAPL Protests "encouraged [and] supported protestors to remain and be at the [DAPL] protests."  Tr. Day 11, 1801:14–19 (Kuhlman); PX-2030; PX-2031.  Dr. Kuhlman based her opinion on established theories in forensic psychology including Reinforcement Theory and Mimicry Theory, for which

she was recognized as an expert.  Tr. Day 11, 1791:1-8.  Those fields are well supported within the field of psychology, have been subject to peer review, and are not exploratory or novel such as the theories Dr. Yuchtman relied upon.  *Id.* at 1799:12–1800:1.  Further, Dr. Kuhlman's opinions were corroborated by the evidence introduced at trial, which showed that protestors viewed the Corps' (and other United States' Agencies') conduct as supportive of the DAPL Protests and that the camps on Corps-managed lands were a safe haven.  ECF No. 450-1, FoF ¶¶ 84, 91, 95, 97, 107, 117, 131, 209-211.

[¶203] For these reasons, the Court is not persuaded by the United States' remaining arguments that the "combined effect" of other events had a "predominant effect in bringing" about North Dakota's harms.  ECF No. 451-1 at ¶ 647.  For the reasons state above, the Court has already found that it was the Corps' actions that were the "substantial factor" in the DAPL Protests, causing North Dakota's harms.

[¶204] Instead, the Court finds that the most predominant effect in bringing about the DAPL Protests was the Corps violation of its non-discretionary permitting process, which allowed DAPL Protestors to be and remain on Corps-managed lands.

**V.    North Dakota Is Entitled To The Entirety Of Its Claimed Damages.**

    **A.    The Law of the Case Shows that North Dakota's Damages Should Not be Reduced.**

[¶205] The United States argues that North Dakota's damages must be reduced by tortious actions of entities or individuals other than individual Corps employees acting within their scope of employment.  In arguing so, the United States asserts that: (1) statements from other federal agencies contributed to North Dakota's damages, and must be offset; (2) North Dakota cannot recover emergency response costs for DAPL Protestors located off Corps-managed lands; and (3) North Dakota cannot recover emergency response costs incurred prior to the Corps' Sept. 16 Press

Release; and (4) North Dakota cannot recover costs for conduct protected by the First Amendment. ECF No. 451-1 at ¶¶ 651-658. The Court rejects each argument in turn.

[¶206] <u>First</u>, North Dakota's damages are not limited only to the USACE's failure to follow the permitting procedure. The Court's Order on the United States' Motion to Dismiss was clear. The USACE's failure to follow the permitting procedure opened the gates to North Dakota being damaged by the United States, its agencies, and third parties. The USACE created a liability mess. It let protestors and other hapless federal agencies exacerbate the damages and then left North Dakota to clean it up. As alleged, the tortious conduct occurred after or during the USACE's decision to forego requiring the protestors to have the necessary permits to be on USACE managed land. The resulting damages to property and the need for law enforcement at the protest sight was unprecedented in North Dakota. The simple failure to follow the permitting procedures is the basis for liability but is not the only basis for damages in this matter. The USACE's failure to follow permitting procedures permits North Dakota to seek damages from the resulting tortious conduct— the gigantic federally created mayhem. ECF No. 280 at ¶ 12.

[¶207] <u>Second</u>, under the Court's proximate cause analysis, the Court has found that the DAPL Protestors would not have been and remained on Corps-managed lands, including lands outside of those covered in the Sept. 16 Press Release and *de facto* accompanying Special Use Permit, absent the Corps' abdication of its permitting process. This created a public nuisance to which North Dakota was constantly responding, and from which DAPL Protestors were emanating to cause harms in other areas of the State. For example, the North Camp surged in population in the days leading up to the Big Push after North Dakota law enforcement attempted to arrest some DAPL Protestors crossing from the right-of-way area onto the Cannonball Ranch. ECF No. 450-1, FoF ¶¶ 149-151; AFoF ¶ 24. North Dakota can recover damages for DAPL Protestor actions occurring

off Corps-managed land, including the North Camp in the Highway 1806 right-of-way, because the camps on Corps-managed lands constantly fed, supplied, and galvanized DAPL Protestor actions elsewhere.

[¶208]  Third, North Dakota can recover emergency response costs occurring prior to September 16, 2016.  As stated herein, the Corps' non-discretionary permitting process is clear that special events "are prohibited unless written permission has been granted by the District Commander." 36 C.F.R. § 327.21.   Further, the Corps also has a "*responsibility* to determine if the requested activity is a special event; to assure the activity is consistent with current project land use classifications…and to specific general criteria and site specific stipulations based upon criteria in [Appendix E]." *See* ECF No. 38 at ¶ 43 (citing EC 1130-2-550, Appendix E, § E-6).  Appendix E of EC 1130-2-550 sets forth a myriad of requirements before a Special Use Permit can be issued, and before the Corps can allow persons engaging in an activity requiring a Special Use Permit to be on Corps-managed lands.

[¶209]  As of May of 2016, DAPL Protestors had already "spilled over" onto Corps-managed lands.  Tr. Day 7, 1156:24–1157:3 (Henderson).  Colonel Henderson, and the Corps, made the decision as of this early date not to require a permit from the DAPL Protestors, characterizing the decision as "honoring the special trust relationship with the tribes" and not wanting to create an unforced error.  *Id.* at 1158:1-13.

[¶210]  As of August 15, 2016, the Corps was aware that the occupation of DAPL Protestors on Corps-managed lands had the potential to become a major protest, that the DAPL Protestors were hostile, and that there was environmental degradation occurring on Corps-managed lands, and had agreed a Special Use Permit was the correct way to handle the DAPL Protestors encampments. ECF No. 450-1 at ¶¶ 58-59.

[¶211]  From the very first application submitted by the Standing Rock Sioux Tribe on August 18, 2016, the Corps was aware that the application could not comply with the Corps' mandatory permitting regulations.  AFoF ¶ 20.

[¶212]  At this early stage, the Court finds that it was indisputably already apparent to the Corps that Chairman Archambault's application for a Special Use Permit could not meet the Corps' mandatory permitting obligations, including the requirements of EC 1130-2-550, Appendix E, E-6(a) that "[t]he land or facilities where the event was held will be fully restored to prior conditions by the event holder following the event" given that the application submitted did not purport to cover all current DAPL Protestors.

[¶213]  Further, even if the Standing Rock Sioux Tribe could have complied with the Corps' requirements for issuing a Special Use Permit, the Corps was aware that the Standing Rock Sioux Tribe's application did not cover all DAPL Protestors already on Corps-managed lands, and thus any Special Use Permit could not adequately address the entire DAPL Protest situation that was increasingly deteriorating.  AFoF ¶ 20.  Importantly, that included DAPL Protestors that had spilled over to Corps-managed lands in *May of 2016*.  Tr. Day 7, 1156:24–1157:3 (Henderson).

[¶214]  While the Corps' grant of a *de facto* Special Use Permit on September 16, 2016 was the culmination of the Corps' violation of its non-discretionary permitting processes, those violations started much earlier in May of 2016 when Colonel Henderson, and the Corps, made the decision as of this early date not to require a permit from the DAPL Protestors, characterizing the decision as "honoring the special trust relationship with the tribes" and not wanting to create an unforced error.  *Id.* at 1158:1-13.

[¶215]  As such, the Court finds that the Corps "intentionally disregard[ed] the permitting process altogether" as early as May of 2016 when it did not address the DAPL Protestors spilling over onto

Corps-managed lands, and finds that North Dakota can properly recover the entire scope of its claimed damages that reach into August of 2016.  ECF No. 38 at ¶ 40.[12]

[¶216]  Fourth, because the Court has already disposed of the United States' claims that the DAPL Protests involved aspects of First Amendment conduct, North Dakota's damages are not reduced due to any First Amendment concerns.  *See* ECF No. 383 at note 1.

### B.    North Dakota's Damages Should Not Be Reduced to Account for the Value of Equipment.

[¶217] The Court rejects the United States' argument that North Dakota's damages should be reduced by $824,153.28 for the scrap or salvage value of purchased equipment.

[¶218] First, as the Court has held, North Dakota tort law allows North Dakota to recover abatement costs for preventing the public nuisance caused by the United States.  *See* Section IV.A, *supra*.  As to the specific damages alleged here, the standard for damages for tort claims in North Dakota "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." N.D.C.C. § 32-03-20.

[¶219] Further, under North Dakota law, North Dakota had a duty to "mitigate or minimize the damages and must protect himself if he can do so with reasonable exertion or at trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided." *Hanson v. Boeder*, 727 N.W.2d 280, 283 (N.D. 2007).  That is exactly what North Dakota did here, by attempting to reduce the impact the gigantically created federal mess was creating in the State by bringing in law enforcement personnel to mitigate the impacts of unlawful DAPL Protestor actions.

---

[12] Further, contrary to the United States' claims, North Dakota's documentation of the DAPL expenses in PX-1455 allow the Court to parse pre and post September 16 expenses.  *See* AFoF ¶¶ 30-39.  However, for the reasons stated herein, that is not necessary.

[¶220] At trial, there was significant testimony regarding damages. Holly Gaugler, the Chief Financial Officer for the North Dakota National Guard and Department of Emergency Services, testified that it was customary in emergency situations to distribute leftover equipment to political subdivisions and municipalities. Tr. Day 10, 1663:8-14 (Gaugler).

[¶221] Further, North Dakota's damages are linked only to equipment that was required to be purchased for the DAPL Protests. Adjutant General Alan Dohrmann (Adjutant General of the North Dakota National Guard and head of the North Dakota Department of Emergency Services) testified that the North Dakota National Guard contributed already existing equipment to the emergency response effort, including Humvees, a Black Hawk helicopter, and at one point in time an Avenger air defense missile system used solely for its optical capabilities. Tr. Day 7, 930:6-18; 986:2-7 (Dohrmann). Additional equipment was only procured when necessary to respond to the DAPL Protests. *Id.* at 949:8-13. North Dakota's damages expert, Ronald Tolstad (CPA), testified that North Dakota was also required to reimburse the United States for the use of equipment belonging to the federal government, including the use of the Humvees. Tr. Day 10, 1732:15–1733:8 (Tolstad).

[¶222] Adjutant General Dohrmann also testified that he felt that all expenses for the North Dakota National Guard's response to the DAPL Protests were necessary and proper to maintain a safe and secure environment during the DAPL Protests. Tr. Day 7, 958:8-17 (Dohrmann). Morton County Sheriff Kyle Kirchmeier and North Dakota Highway Patrol Captain Eric Pederson testified that the equipment sourced for North Dakota's emergency response was necessary for the emergency response and that North Dakota did not purchase excess equipment, and in fact was normally short on equipment. Tr. Day 3, 470:24–471:14 (Kirchmeier); *see also* Tr. Day 4, 622:1-3 (Pederson). North Dakota's expert, Ronald Tolstad (CPA), testified that North Dakota's damages, as

represented in PX-1439 (Native) and PX-1455 (Native) were properly documented and properly approved under North Dakota's state procedures for emergencies. PX-2034 at 2. Mr. Tolstad testified that North Dakota's damages were reasonable under auditing standards for what a "prudent person" would have made under similar circumstances. Tr. Day 10, 1728:5-17 (Tolstad).

[¶223] Mr. Tolstad also testified that North Dakota followed procedures for past emergency response actions, whereby the federal government allows local governments to follow their own procurement rules for disposing of purchased equipment at the conclusion of an emergency, and that North Dakota's procurement rules do not capitalize equipment under $5,000. *Id.* at 1736:19–1738:2. Mr. Tolstad explained that the states can then follow their own procedures, rules and regulations for the disposition of equipment, such as the items obtained by the State for the DAPL protest response. In North Dakota, this threshold amount of $5,000 coincides as the same as the threshold that the federal government utilizes. *Id.* at 1736:19–1738:2. As such, there would be no depreciation or salvage value for those items that were less than the $5,000 threshold under both North Dakota Century Code and the United States GAO.

[¶224] Mr. Tolstad was familiar with the GAO Yellow Book and the North Dakota Century Code. Mr. Tolstad explained that North Dakota capitalization policy is $5,000, so that if an item's cost is below the threshold, then it is "supplies, materials, just to be expended." *Id.* at 1737:18–1738:2.

[¶225] USA's expert, Brad Wilson, had never performed an audit of a state or city government. Tr. Day 14, 2235:9–2235:22 (Wilson). Although he did not use it formulate his opinions, Mr. Wilson was familiar with and agreed that the Yellow Book published by the United States GAO was authoritative regarding standards for auditing governments. *Id.* at 2235:23–2236:6. Prior to his engagement for this case, Mr. Wilson had not previously evaluated damages that were alleged by a state government. *Id.* at 2236:12–2236:15. Mr. Wilson had no experience before this case

with the North Dakota Century Code or the North Dakota Office of Management and Budget policies. *Id.* at 2236:12–2236:19. Because of his lack of familiarity with North Dakota Century Code, the North Dakota Office of Management and Budget policies, and had never evaluated damages alleged by a state government, his testimony was not credible regarding the expenses incurred by the State and its alleged damages and whether salvage value or depreciation should be considered.

[¶226] Multiple North Dakota witnesses testified that extensive wear and tear was placed on State equipment. Tr. Day 10, 1736:19–1737:3 (Tolstad); Tr. Day 7, 1014:12-17 (Dohrmann). Similarly, multiple witnesses talked about the harsh winter conditions during the latter parts of the DAPL Protests. Tr. Day 1, 116:20–117:10 (Schulz); Tr. Day 10, 1736:19–1737:3 (Tolstad); Tr. Day 6, 965:15-20 (Dohrmann); Tr. Day 7, 1019:2-9 (Dohrmann).

[¶227] The United States also references Morton County's purchase of 2017 Tahoe vehicles that were still in service, or being retired, at the time of trial. ECF No. 451-1 at ¶ 374. However, no Tahoe vehicles are apparent in the United States claimed salvage reductions. *See* DX-4218 at Exhibit 6. This is explained by the fact that the Tahoes were likely purchased with reimbursements from DES for ongoing wear and tear on existing vehicles, which reimbursement monies local governments are free to use as they see fit. Tr. Day 10, 1664:17-21 (Gaugler); Tr. Day 14, 2252:10-23 (Wilson).

[¶228] Based on the foregoing, and the Court's prior proximate cause determination, the Court finds that North Dakota's emergency response costs are the "amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." N.D.C.C. § 32-03-20. The Court finds that it is not appropriate to reduce North Dakota's emergency response costs attributable to equipment purchases for several reasons.

[¶229] First, North Dakota would not have purchased that equipment but for the need to create an emergency response. Morton County, which was the primary responder to the DAPL Protests, only had 33 sworn deputies at the time the DAPL Protests started. ECF No. 450-1, FoF ¶ 32. North Dakota's law enforcement personnel, and equipment, were stretched thin throughout the DAPL Protests and North Dakota only purchased the equipment necessary to facilitate its emergency response. Tr. Day 3, 470:24–471:14 (Kirchmeier).

[¶230] Second, North Dakota's own policies and procedures do not require the State to treat equipment under $5,000 as equipment for purposes of capitalization and salvage. The United States' expert's salvage calculations are almost entirely composed of equipment that is below this $5,000 threshold. *See* DX-4218 at Exhibit 6 (only the line with descriptions of Hartley's Used Bus Sales; MVS System with Near IR CCTV Camera; ARM-PROM335 Thermal Imaging; Outsert Assembly; Truck, Snow Removal Equipment; and Airplane Engine Overhall appear to reasonably be over $5,000, for a total depreciation of $83,261.01).[13]

[¶231] Third, the majority of this equipment appears to be for law enforcement riot response, which has little to no ongoing utility to the State of North Dakota. *Id.* The few remaining items, such as the airplane engine overhaul to the State Patrol airplane, were only incurred as the result of there being significant hours flown on that airplane (which had been in service since late 2007) to respond to the DAPL Protests. Tr. Day 1, 196:15-23 (Gallagher).

[¶232] For these reasons, the Court does not find it appropriate to offset North Dakota's damages for depreciation.

---

[13] The United States' expert, Mr. Wilson, admitted the Exhibit 6 to his report (DX-4218) did not provide details on the number of units purchased for each entry in the Exhibit (Tr. Day 14, 2250:17-24 (Wilson)), and so the Court is forced to discern which line items are logically and reasonably not singular equipment purchases.

C.    **North Dakota's Regular Wages Included in its Damages Calculation are Recoverable as Emergency Response Costs Attributable to the DAPL Protests.**

[¶233] The United States argues that North Dakota's damages should be offset by $2,643,104.84 in regular payroll expenses—that is, non-overtime payroll expenses for regular, permanent employees.  ECF No. 450-1 at ¶ 375.  The Court rejects this argument.

[¶234] At trial, it was established that the North Dakota Department of Emergency Services generally did not include regular wages (wages for employees already hired in their normal scope of business).  Tr. Day 10, 1674:13-16; 1675:9-19 (Gaugler).  In limited circumstances, regular wages were included in North Dakota's damages, including for employees paid under a federal grant that did not allow payment of wages for activities outside of the federal grant, or for employees incurring nonscheduled shifts such as on State holidays, and when agencies had to backfill positions when personnel was pulled to assist with the DAPL Protest.  *Id.* at 1674:17–1675:1; 1676:2-7; 1704:4-11.   This included North Dakota Fish and Game employees who were paid under a federal grant.  *Id.* at 1675:20–1676:7 (Gaugler); Tr. Day 10, 1734:21–1735:22 (Tolstad); Tr. Day 14, 2243:7-16 (Wilson).  North Dakota's expert testified that reimbursement for regular payroll in these circumstances were consistent with State policy. Tr. Day 10, 1732:1-4 (Tolstad).

[¶235] Although not explicit in the United States' trial brief, at trial the United States' expert, Mr. Wilson, argued that these regular wages were improper transfers between state agencies, which accrued the benefit of North Dakota.  Tr. Day 14 2194:4-8 (Wilson); *see also* DX-4218 at 6-7.  However, Mr. Wilson admitted he was not familiar with North Dakota's rules and regulations governing these types of reimbursements between state agencies.  Tr. Day 14, 2243:7–2245:22 (Wilson).  Further, Mr. Wilson could not articulate a rational reason to exclude this regular payroll.

*Id.* at 2261:10–2263:16.  Accordingly, Mr. Wilson's testimony regarding payroll expenditures and reimbursements between state agencies was not credible.

[¶236]  Based on the foregoing, the Court finds that the regular wages included in North Dakota's damages calculations were actual wages attributable to the DAPL Protests response, and are recoverable.

> ### D. The Court Finds the United States Wholly Responsible for North Dakota's Damages.

[¶237] The United States argues that it should bear no fault for North Dakota's emergency response costs, and that damages in this action should be apportioned to: the (1) DAPL Protestors; (2) the Standing Rock Sioux Tribe; (3) North Dakota; and (4) the Dakota Access Pipeline Company.  ECF No. 451-1 at ¶¶ 667-688.  For the reasons set forth below, the Court finds the United States wholly responsible for North Dakota's damages.

[¶238] Pursuant to N.D.C.C. § 32-03.2-02, upon the request of a party the Court must make separate findings "determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury."  "When two or more parties are found to have contributed to the injury, the liability of each party is several only, and is not joint, and each party is liable only for the amount of damages attributable to the percentage of fault of that party, *except that any persons who act in concert in committing a tortious act or aid or encourage the act, or ratifies or adopts the act for their benefit*, are jointly liable for all damages attributable to their combined percentage of fault."  *Id.* (emphasis added).

[¶239] "Fault" includes, inter alia, negligence, reckless or willful conduct, assumption of risk, and failure to avoid injury.  *Id*.  Assumption of risk is present where a person (1) has actual knowledge of a risk of injury or loss, (2) has freedom of choice to avoid the risk, (3) voluntarily encounters the risk, and (4) the injury or loss is proximately caused by the encounter.  North Dakota Jury

Instructions – Civil, § C – 2.75. Assumption of Risk 2002 (2023 ed.); *see also Green v. Mid Dakota Clinic*, 673 N.W.2d 257, 260 (N.D. 2004) ("[A]ssumption of risk is no longer an affirmative defense in North Dakota, but, rather, is one part of the analysis in determining comparative fault." (citation omitted)).

[¶240] <u>Any damages attributable to the DAPL Protestors are jointly attributable to the United States.</u>  The United States' liability in this action is controlled by Sections 318 and 838 of the Restatement (Second) of Torts.   Both sections delineate when a person who permits others to use his land will become liable, and responsible, for that third-parties' actions – when the owner of land permits another to use his land, knows of the ability and necessity to exercise control, and fails to exercise reasonable care in doing so.  For example, the comments to Section 318 states:

> If the third person permitted to use the actor's chattel persistently uses it in a manner dangerous to others, the possessor may be required to terminate his consent to its use in order to escape liability for any harm done by the further dangerous use of the chattel. By failing to terminate his consent to its use, he in effect permits the other to continue his use knowing that he is likely to use the chattel in a manner dangerous to others.

[¶241] As previously determined, the United States explicitly permitted the DAPL Protestors to be and remain on Corps-managed lands for the duration of the DAPL Protests, despite knowledge of the ongoing dangerous and destructive behavior the DAPL Protestors were causing throughout the State.

[¶242] Based on the duties provided in the Restatement, the Court does not find the cases relied upon by the United States as determinative in this matter. Both *Hurt v. Freeland* and *Reed v. Univ. of N.D.* involve differing factual circumstances.  In *Hurt*, passengers in a vehicle with a drunk driver were not found to be acting in concert with that drunk driver sufficient to impose joint liability.  589 N.W.2d 551, 553-54, 556-59 (N.D. 1999).  However, that case was resolved based on the generally accepted rule that passengers in a car owe no duty to injured parties.  *Id.* at 555.

Similarly in *Reed*, the North Dakota Supreme Court declined to find joint liability for the University of North Dakota when the University allowed the race organizer to hold a race on campus in which the Plaintiff was injured, but where there was no evidence that the University participated in the negligent planning or supervision of the race. 589 N.W.2d 880, 888 (N.D. 1999).

[¶243] The Court therefore finds that the United States both *"*aid[ed] or encourage[d] the [tortious] act[s]" and "ratifie[d] or adopt[ed]" the tortious acts of the DAPL Protestors, establishing that the United States is a joint-torfeasor that both consented to and ratified the DAPL Protestors conduct. N.D.C.C. § 32-03.2-02.

[¶244] <u>The Standing Rock Sioux Tribe and Dakota Access do not bear fault in this matter</u>. As a threshold matter, North Dakota law "places the burden of proof as to the appropriate apportionment on the party seeking to limit his liability on the ground that the harm is capable of apportionment." *Lang v. Wonneberg*, 455 N.W.2d 832, 838 (N.D. 1990). The United States has not provided any discernible formula or metric for the Court to reduce the damages supposedly attributable to the Standing Rock Sioux Tribe, Dakota Access, or North Dakota sufficient to allow the Court to make an apportionment of damages.

[¶245] Further, even had the United States supplied the necessary information, the Court finds that comparative fault is not attributable to any of these entities.

[¶246] *First*, while the Standing Rock Sioux Tribe had some leadership role in the early stages of the DAPL Protests, the United States tethered itself to any attributable liability of the Standing Rock Sioux Tribe by permitting the DAPL Protests to occur on Corps managed lands.

[¶247] *Second*, the Court does not find it credible to claim that the Dakota Access bears fault for North Dakota's damages. ECF NO. 451-1 at ¶¶ 682-684. The United States did not adduce any

evidence at trial that Dakota Access acted negligently, or that Dakota Access was responsible for (let alone consented to and ratified) the DAPL Protests.  Further, the United States' argument that the Dakota Access assumed the risk of North Dakota's harms falls short, because the Company had no "freedom of choice" to avoid the DAPL Protestors emanating from Corps-managed lands and wreaking havoc on its construction sites.

[¶248]  <u>North Dakota does not bear apportionable fault in this matter</u>.  The Court rejects the United States' arguments that fault is apportionable to North Dakota.  ECF No. 451-1 at ¶¶ 685-687.

[¶249]  First, the United States' argument that North Dakota's "containment" approach assumed a responsibility for the risk here falls short, because North Dakota did not have any "freedom of choice" in managing the emergency response to the DAPL Protests that the United States permitted to occur on Corps-managed lands.  Once the United States permitted the DAPL Protestors to have a safe haven on Corps-managed lands, North Dakota was left with limited options for abating the public nuisance those DAPL Protestors were engaging in across the State.  North Dakota could not remove the DAPL Protestors from Corps-managed lands without a request from the United States, which request never came.  ECF No. 450-1, FoF ¶¶ 239-241.  North Dakota also frequently did not have the resources, personnel, or space, to arrest all DAPL Protestors engaging in unlawful actions across the State.  AFoF ¶ 18.  In short, North Dakota was an unwilling participant seeking to manage the DAPL Protest situation, and did not assume responsibility for its damages.

[¶250]  Second, the Court rejects the United States' arguments that North Dakota's law enforcement response was "heavy-handed" sufficient to assign any comparative fault to North Dakota.  As discussed above, North Dakota did not have a "freedom of choice" in assuming the risk of abating the raging DAPL Protests emanating from Corps-managed lands. Further, the Court heard extensive testimony from two experts for North Dakota that establish that North Dakota's

law enforcement response to the DAPL Protests was more than reasonable. Robert Handy, an expert in law enforcement police practices and tactics with over 30 years of comprehensive law enforcement experience, found that North Dakota's law enforcement response was "reasonable, measured, was consistent with best practices, and … was a very good overall response given the circumstances and challenges [North Dakota] faced." Tr. Day 13, 2079:2–9 (Handy); see also PX-2028 at 17; AFoF ¶¶ 27-28.

[¶251] Similarly, David Pearson, an expert in law enforcement, including the use of force and tactical operations, found that (1) there was a need for a law enforcement presence during the DAPL Protests (PX-2032 at 4); (2) a large number of law enforcement personnel was necessary for North Dakota's law enforcement response (*id.* at 7); (3) the need for bringing in additional personnel was reasonable; (4) North Dakota's use of mobile field force tactics, equipment, and less lethal tools was reasonable and consistent with contemporary professional police tactics (*id.* at 10, 13, 15, 16, 19).[14]

### E.    The $15 Million Gift from Dakota Access is Not a Collateral Source Subject to Reduction.

[¶252] The United States argues that a $15 million gift the State received from Dakota Access should be offset from any damages aware as a collateral source under N.D.C.C. § 32-03.2-06. ECF No. 451-1 at ¶¶ 694-702.

[¶253] Under the common-law collateral-source rule, a defendant would not be entitled to a reduction in its liability based on the fact that the plaintiff's damages were reduced by payments received from outside sources. *See, e.g., Gill v. Maciejewski*, 546 F.3d 557, 564 (8th Cir. 2008).

---

[14] United States' law enforcement and use of force expert Dr. Maguire's opinions and testimony were not credible. AFoF ¶¶ 27-28.

[¶254] However, North Dakota has partially legislated that common-law rule in N.D.C.C. § 32-03.2-06, which provides:

> After an award of economic damages, the party responsible for the payment thereof is entitled to and may apply to the court for a reduction of the economic damages to the extent that the economic losses presented to the trier of fact are covered by payment from a collateral source. A "collateral source" payment is any sum from any other source paid or to be paid to cover an economic loss which need not be repaid by the party recovering economic damages, but does not include life insurance, other death or retirement benefits, or any insurance or benefit purchased by the party recovering economic damages.

[¶255] While N.D.C.C. § 32-03.2-06 prohibits *most* collateral sources, there are carve outs for collateral sources such as insurance benefits, which shows the legislatures intent to adhere to some extent to the prior common-law rule.

[¶256] The North Dakota Supreme Court has interpreted N.D.C.C. § 32-03.2-06 to limit the application of North Dakota's collateral source rule to similar collateral sources such as gifts. In *Dewitz v. Emory*, the Court declined to reduce a plaintiff's award by a gift received from an aid association, finding that "the legislature did not change the common law rule as to charitable gifts when it passed N.D.C.C. § 32–03.2–06." 508 N.W.2d 334, 341 (N.D. 1993).

[¶257] In doing so, the Court held that the legislative history of N.D.C.C. § 32–03.2–06 indicates the legislature's intent, as part of tort reform, was to change the collateral source rule "to eliminate double recovery from sources such as Workers Compensation and Social Security," but not "charitable gifts." *Id.* (citing to House Judiciary Committee, Report of Tort Reform Subcommittee, HB 1571, February 10, 1987, p. 4.). As such, the Court did not consider gifts a sum "paid or to be paid to cover an economic loss," because those types of gifts are not paid on account of a legal obligation, but "are given out of love and a sense of community." *Id.*

[¶258] At trial, Dakota Access' representative Michael Futch testified that the $15 million payment to North Dakota was a "no strings attached" "donation" made based on Dakota Access'

"mission to be a good corporate citizen." Tr. Day 9, 1618:22–1619:13.  Mr. Futch elaborated that Dakota Access is aware that pipeline projects are large infrastructure projects that, due to siting and routing and logistics, "take[] a lot of extra man hours, a lot of extra resources to accomplish" and that the pipeline projects are "a big drain on the state agencies . . . to walk through the defined process of considering the permit application, reviewing material, taking public input, and then ultimately issuing a permit" for the pipeline. *Id.* at 1620:7-24.   Given the close coordination needed with state agencies, Dakota Access "become[s] a part of the communities" the pipeline crosses. *Id.*

[¶259] Mr. Futch also testified that Dakota Access made similar donations in the amount of approximately $12 million to States "up and down" the pipeline.  *Id.* at 1619:17-21.

[¶260] Given the above, the Court finds that the $15 million gift from Dakota Access is not a collateral source.

[¶261] First, Dakota Access' testimony made it clear that the $15 million gift was a donation related to the construction and citing of the DAPL Pipeline, and not the DAPL Protests.  As such, it is plainly not a collateral source subject to reduction in the first instance.

[¶262] Second, even if the payment from Dakota Access was a collateral source, the Court finds that it would be considered a gift under *Dewitz*, as Dakota Access provided the $15 million donation (and similar donations to other States along the pipeline's route) out of a sense of community and good stewardship.

[¶263] Third, the Court rejects the United States' argument that Dakota Access considered the $15 million dollar payment to be compensation for the DAPL Protests, and not a gift.  The United States relies upon statements made by Sheriff Kirchmeier and Adjutant General Dohrmann, and not Dakota Access itself to reach this conclusion.  *See* ECF No. 451-1 at ¶¶ 390, 392, 701.

However, both Sheriff Kirchmeier and Adjutant General Dohrmann were not involved in the ultimate donation received from Dakota Access. AFoF ¶ 29. The Court finds that Dakota Access own statements are the best evidence of the company's intent in providing the $15 million donation to North Dakota.

[¶264] Fourth, for the same reasons, the Court rejects the United States' argument that the bill that authorized North Dakota to accept the $15 million donation is evidence of Dakota Access' intent. Further, Levi Bachmeier, the Policy Director to Governor Burgum who helped coordinate the acceptance of the donation, noted that the State needed a legislative enactment to accept even the smallest of gifts in order to direct where the funds would be allocated after they were sent to the Bank of North Dakota. AFoF ¶ 29.

[¶265] The Court therefore finds that the $15 million gift from Dakota Access was not a collateral source subject to offset under N.D.C.C. § 32-03.2-06.

**F.    The Interest on North Dakota's Loans from the Bank of North Dakota are Not Prejudgment Interest and May be Properly Recovered.**

[¶266] During the DAPL Protests, North Dakota was required to take out loans from the State owned and operated Bank of North Dakota to fund its efforts to mitigate the DAPL Protests. ECF No. 450-1 at ¶¶ 317-320.

[¶267] North Dakota now seeks to recover that $651,746.35 in interest on loans taken from the State-owned Bank of North Dakota to cover its emergency response costs as part of its damages in this case. The parties dispute whether this should be considered prejudgment interest under the FTCA, which provides that the United States "shall *not* be liable for interest prior to judgment." 28 U.S.C. § 2674.

[¶268] The United States makes two arguments as to why North Dakota's loan interest should be excluded: that the loan interest meets the definition of prejudgment interest under the FTCA, and

that North Dakota did not actually suffer harms from the loans because the interest was paid back to the Bank of North Dakota, which is owned and operated by the State.[15]

[¶269] As to the first, the United States argues that courts have recognized that the "no-interest rule" bars claims for an amount where the plaintiff borrows money and then seeks "interest costs incurred on money borrowed as a result of the government's breach or delay in payment." ECF No. 451-1 at ¶ 707 (citing to *Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1310-11 (Fed. Cir. 2012); *England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004); *Komatsu Mfg. Co. v. United States*, 131 F. Supp. 949, 950 (Ct. Cl. 1955)).

[¶270] The Court does not find these cases on point as each involved the United States delay on making payments under contract, which then necessitate the plaintiffs in those actions to borrow money to continue under their contractual obligations. *England*, 384 F.3d at 1379 (involving "interest costs incurred on money borrowed as a result of the government's breach or delay in payment."); *Sys. Fuels, Inc.*, 666 F.3d at 1310-11 (citing to same language in *England*); *Komatsu Mfg. Co.*, 131 F. Supp. at 950 ("Because of the delay in payment it was necessary for the plaintiffs to borrow money in order to continue their operations for the defendant.").

[¶271] Instead, the Court finds *Energy Northwest v. U.S.* on point here. In *Energy Northwest*, plaintiffs had contracts with the Department of Energy for the disposal of spent nuclear waste, whereby plaintiffs were required to pay fees, and the Department of Energy was required to accept the plaintiffs spent nuclear waste. 91 Fed. Cl. 531, 537-538 (Fed. Cl. 2010). The Department of Energy later notified plaintiffs it would be breaching the contracts because it could not accept spent

---

[15] The United States does not raise any challenges regarding the reasonableness of the interest rates on the loans taken out by North Dakota.

nuclear waste, and the plaintiffs then took steps to mitigate their damages which included taking

out loans to cover the costs of finding alternative disposal and storage solutions. *Id.* at 554-555.

[¶272] In allowing the plaintiffs to recover the interest accrued on those loans, the court went on

to examine both *England* and *Komatsu* found that "that interest claims on borrowings directly

traceable to the Government's breach, incurred not simply as a result of a delay in payments . . .

are outside the reach of the no-interest rule." 91 Fed. Cl. at 559. That was because the interest

costs were not incurred as any sort of contractual obligations, but rather "in connection with" the

plaintiff's "legal obligation to mitigate damages in light of the Government's impending breach."

*Id.*; *See also Sys. Fuels, Inc.*, 666 F.3d at 1311 (recognizing that *Energy Northwest* constituted a

different factual situation and rule).

[¶273] The Court also finds *Manko v. United States* instructive. 830 F.2d 831, 837 (8th Cir. 1987)

("Prejudgment interest is normally taken to refer to an award imposed by law to compensate

someone for the loss of use of money that he or she would have had but for the defendant's

wrongdoing."). In *Manko*, the Eighth Circuit explained, "[t]his remedial incident does not depend

on contract, either on a contract between the plaintiff and the defendant, or on a contract between

the plaintiff and someone else, with which defendant's wrongdoing has interfered." *Id.* Typically,

"prejudgment interest" is an award on top of the economic damages that looks back over the course

of the litigation. *See id.* The Circuit has thus already rejected the argument that any interest prior

to judgment is impermissible prejudgment interest under 28 U.S.C. § 2674. *See id.* ("Since the

award of lost pension earnings here covers the time before judgment, the government argues that

the award is, literally, 'interest prior to judgment.' We disagree with this characterization.").

[¶274] On balance, the Court finds that North Dakota's loan interest was incurred as a result of

North Dakota's attempts to mitigate and abate the public nuisance caused by the United States and

are allowable under *Energy Northwest* and *Manko*. *See* N.D.C.C. § 42-01-07; N.D.C.C., § 42-01-09 ("A public nuisance may be abated by any public body or officer authorized thereto by law.").

[¶275] As to the United States second argument – that North Dakota benefited from the interest paid on the loans – the Court is not persuaded.

[¶276] Testimony at trial established that the Bank of North Dakota lends monies to both State agencies and individual North Dakota citizens. Tr. Day 9, 15889-15 (Morrissette). When a State agency receives a loan from the Bank of North Dakota, the agency is then required to go to the North Dakota legislature to seek an appropriation to repay the loan. *Id.* at 1591:13-17. In making loans, the Bank of North Dakota has operating expenses that reduce its ultimate revenues on principal and interest collected. *Id.* at 1594:6-15. Further, the Bank of North Dakota revenues are not universally applied to North Dakota's state budget, but are also used to generate additional loan activity. *Id.* at 1595:6-22. In short, loans taken from, and eventually repaid to the Bank of North Dakota (including interest) are a reduction in the States available funds for other endeavors.

[¶277] The United States essentially argues that because the interest on the loans taken to fund the DAPL Protests was eventually repaid to the State-owned Bank of North Dakota, North Dakota was the beneficiary of those interest payments and not ultimately harmed. However, if the Court were to exclude the interest payments on those loans on the basis that they did not represent a harm to North Dakota, it would be hard pressed not to also exclude the principal of those loans on the same basis. The Court declines to do so here. The loans (both principal and interest) taken by the State were necessary to fund North Dakota's emergency response to the DAPL Protests.

## **ORDER FOR JUDGMENT**

[¶278] Based on the foregoing factual findings and legal conclusions, the Court concludes that North Dakota is entitled to the damages established at trial, as set forth above, in the amount of $37,854,867.30.

[¶279] **IT IS SO ORDERED.**

[¶280] **LET JUDGMENT BE ENTERED ACCORDINGLY.**

_____
Daniel M. Traynor, District Judge
United States District Court