## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

State of North Dakota,

                    Plaintiff,

vs.                                                        Case No. 1:19-cv-00150

United States of America,

                    Defendant.

---

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

[¶ 1]    THIS MATTER comes before the Court after a bench trial on the merits held from February 15, 2024, to March 14, 2024. See Doc. No. 430. At the close of trial, the Court ordered the parties to submit proposed findings of facts and conclusions of law. Doc. No. 427. The Plaintiff, State of North Dakota ("State" or "North Dakota"), filed its proposed Findings of Fact and Conclusions of Law on June 28, 2024. Doc. Nos. 450, 450-1. The Defendant, United States of America ("United States"), filed its proposed Findings of Fact and Conclusions of Law on August 12, 2024. Doc. Nos. 451, 451-1. North Dakota filed Supplemental Findings and Conclusions on September 11, 2024. Doc. Nos. 452, 452-1.

### INTRODUCTION AND SUMMARY OF DECISION

[¶ 2]    This case is about the rule of law or "[t]he supremacy of regular as opposed to arbitrary power" and "the absence of an arbitrary power on the part of government." Rule of law, Black's Law Dictionary (12th ed. 2024). The United States Army Corps of Engineers ("Corps") is bound by a set of regulations that require it to follow certain procedures before issuing a Special Use Permit for land under its control. Approved permits carry requirements for the permit holders regarding insurance, bonding, prohibitions on building structures, and waste disposal. Without

going through this process, the Corps lacks authority to allow large groups of individuals to enter or conduct activity on government property.

[¶ 3]    In 1946, Congress passed the Federal Tort Claims Act ("FTCA"). See 28 U.S.C. §§ 2671–80. The FTCA waived sovereign immunity for those moments when the federal government or its employees transgress the law. 28 U.S.C. § 1346(b) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."). The discretionary function exception precludes liability where the act or omission by the federal government or its employees was ultimately a discretionary decision. 28 U.S.C. § 2680(a); see also Appley Bros. v. United States, 7 F.3d 720, 722 (8th Cir. 1993) (quoting the same). Together, these laws mean plaintiffs can hold the government liable for failure to abide by the rule of law when a mandatory duty is imposed.

[¶ 4]    The Founding Fathers put great importance on the rule of law when forming a new nation. The people of the United States were to be a people of order, unity, justice, tranquility, and freedom. See U.S. Const. pmbl. The Framers intended the Union to bring out "the peace and liberty of the States, [and act] as a barrier against domestic faction and insurrection." The Federalist No. 9 (Alexander Hamilton). A "faction" is "a number of citizens . . . united and actuated by some common impulse of passion, or of interest, adversed to the rights of other citizens." The Federalist No. 10 (James Madison). Factions cannot be avoided. They arise because we have liberty and the freedom of differing beliefs. Id. Instead, our government was structured to control the effects of

factions as much as possible. Id. In a republic, a minority faction "may clog the administration, it may convulse the society; but it will be unable to execute and mask its violence under the forms of the Constitution." Id. However, when the majority (e.g., the federal government) is included in the faction, "both the public good and the rights of other citizens" are inevitably "sacrifice[d] to its ruling passion or interest." Id.

[¶ 5]    Throughout recent history violent and tumultuous protests, riots, and so-called "movements" have plagued the United States, especially during the delicate time leading up to presidential election years: the "Long, Hot Summer of 1967" and the 1968 riots in response to the assassination of Rev. Dr. Martin Luther King, Jr.; the Rodney King Riots of 1992; the Occupy Wall Street movement in 2011; the 2015 Baltimore Protests; the George Floyd Riots and Portland Riots in 2020. All of these led up to contested presidential elections.

[¶ 6]    Unfortunately, the events in this case are yet another chronicle in the long history of violent and chaotic demonstrations. In 2016, the executive branch, through the Corps, decided it did not have to play by the rule of law and permitted a lawless faction to trample, injure, and disrupt the peace and tranquility of North Dakota. During that time, the Corps intentionally avoided its duty to require a mandatory Special Use Permit, which would have significantly restricted the actions of individuals opposing the construction ("DAPL Protestors" or "Protestors") of the Dakota Access Pipeline ("DAPL" or "Pipeline") in Morton County, North Dakota. Instead, the Corps announced in a press release that a Special Use Permit had been granted when it had not, issuing what this Court has dubbed a "de facto" permit. This de facto permit prevented any enforcement against Protestor violations. Essentially, the Corps invited and encouraged the DAPL Protestors and their violent and tumultuous behavior on and off Corps-managed land, and North Dakota had to clean up the mess.

- 3 -

[¶ 7]    The State of North Dakota needed the power of the federal government to protect its citizens from danger. The federal government abandoned its duty. See Federalist No. 45 (James Madison) ("The operations of the federal government [are] most extensive and important in times of . . . danger."). Throughout the DAPL Protests, the United States routinely played both sides against the middle. On the one hand, the government claimed it would abide by a federal district judge's order granting the easement for the DAPL, but then it aligned itself with a violent minority by issuing the de facto permit. When the D.C. District Court denied a preliminary injunction to halt construction of the Pipeline, three federal agencies issued a press release contrary to the court's decision. The Executive Branch disregarded the rule of law and encouraged the protests to continue. The United States left North Dakota alone to defend itself from the violent and tumultuous protests. The damage to state and private property in this case is unfathomable. Human excrement pits, shoddily constructed structures used for housing, makeshift roadways, burnt public vehicles, and violent clashes with law enforcement were common throughout the events of this case. North Dakota paid a significant cost responding to and repairing the damage.

[¶ 8]    North Dakota also made frequent requests for federal assistance throughout the Protests, including requests from United States Senator John Hoeven and then-United States Senator Heidi Heitkamp to the Corps to remove Protestors from the Main Camp. However, the United States refused to provide any law enforcement response or other practical measures to ensure safety to North Dakota and private property. The United States also refused to ensure that the protests occurred in a lawful manner. The Corps of Engineers internally referred to Protestors as "trespassers," but refused to authorize law enforcement to remove them. Instead, the Department of Justice sent in a "conciliation expert" to "assist" North Dakota in its response. In reality, this "expert" also played both sides against the middle. On the one hand, she offered criticism of the

State's emergency response. On the other hand, she essentially aligned herself with the Protestors and their cause by seeking donations and aid on their behalf. What no federal expert provided was the desperately needed law enforcement to help manage the growing crisis. While North Dakota was drowning in the chaos of the Protests, the United States dropped an anvil into the pool and turned up the turmoil.

[¶ 9]    To hold the government accountable for its failure to abide by its mandatory permitting procedures and for causing the subsequent chaos, North Dakota brought several FTCA claims against the United States. Doc. No. 1. North Dakota alleged the United States, by and through the Corps, created a public nuisance and civil trespass. North Dakota also alleged the Corps specifically exacerbated the public nuisance and civil trespass through contributing and gross negligence. To support this claim under the FTCA, North Dakota alleged all the resulting torts stemmed from the Corps' failure to conduct certain non-discretionary duties regarding its special use permitting process. Over the course of the bench trial, the Court heard evidence relating to four claims: public nuisance, negligence, gross negligence, and civil trespass.[1]

[¶ 10]    North Dakota's claims relate to the damage and destruction caused by the DAPL Protestors as a result of the Corps' failures from roughly August 2016 through March 2017. The Protestors primarily stayed in encampments on land managed by the Corps near the confluence of the Cannonball and Missouri Rivers ("Corps-managed land").[2]

[¶ 11]    The Court finds the United States liable to North Dakota on all claims and North Dakota

---

[1] The Court previously dismissed North Dakota's claim sounding in "Good Samaritan" negligence. Doc. No. 38, ¶¶ 69–72.

[2] The Court also previously decided on summary judgment that the United States failed to follow its mandatory statutory and regulatory duty to follow the permitting procedures pursuant to 36 C.F.R. Part 327 (and the Corps' implementing guidance) with respect to those individuals who for months occupied Corps-managed land in southern Morton County, North Dakota. See Doc. No. 383, ¶¶ 22–28.

is entitled to reimbursement for damages in the amount of $27,854,867.30.[3] From the earliest days of the Protests in August 2016, the United States knew the Protestors residing on Corps-managed land included hostile extremist individuals engaging in violent, destructive, and unlawful activities. The United States expected the number of Protestors to grow and the situation to worsen. Despite these accurate expectations, the United States made no effort to remove the Protestors when removal was a realistic option. Instead, the United States stepped aside after inviting Protestors onto government land while the Protests grew in size and ferocity. North Dakota was left alone to maintain the rule of law. For months, North Dakota dealt with Protest activity that originated from Corps-managed land, spread to other areas of North Dakota, and endangered the health and safety of North Dakota, its citizens, its property, and its law enforcement officers who kept the peace at the Protests.

[¶ 12]   The bottom line: United States had a mandatory procedure, it did not follow that procedure, and harm occurred to the state of North Dakota. The law allows reimbursement for this harm. More than that, the rule of law requires this Court to hold the United States liable to remind it of its role in the larger picture of ensuring peace, not chaos.

## **FINDINGS OF FACT**

[¶ 13]   The Court has previously determined undisputed facts in this matter, which are incorporated by reference herein. See Doc. No. 383. The Court makes the following additional findings of fact which are necessary for the disposition of this case:

### I.    The Corps of Engineers

1.    Congress has given the Corps the authority to operate the various Corps-managed land:

---

[3] North Dakota suffered significant harm, totaling more than $38 million in costs associated with pulling in law enforcement officers from other states to appropriately respond to and mitigate the Protests, property damage, equipment costs, and loan interest. To help allay these costs, the Department of Justice ("DOJ") issued a grant of approximately $10 million to North Dakota, which was reduced from the full award.

"The Chief of Engineers, under the supervision of the Secretary of the Army, is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of Army." 16 U.S.C. § 460d.

2.     The regulations issued under this authority state the Corps' policy is to "manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." 36 C.F.R. § 327.1(a).

3.     The Corps is headquartered in Washington, D.C. and led by the Chief of Engineers. Doc. Nos. 439, p. 175:8–11; 405-7, p. 6:18:16–23.[4]

4.     The Corps divides the United States into divisions generally consisting of several states and led by Division Commanders. Doc. No. 405-7, p. 6:18:25–19:3.

5.     Under the divisions, there are forty-three districts led by a District Commander. Doc. No. 405-7, p. 6:19:3–9.

6.     District Commanders are "responsible for ensuring adequate order, discipline and protection of resources at Corps projects." Doc. No. 6-2, p. 28, § 6-2(a).

7.     The Corps manages land around its water resource projects according to congressional authorization. Doc. No. 440, p. 22:14–21.

8.     The public has an interest in recreating on and enjoying Corps land as a public resource. Id. at 22:22–23:2.

9.     On any given day, there may be hundreds of unauthorized intrusions of Corps-managed land. Doc. No. 443, p. 13:10–15, 91:23–92:5, 132:16–24.

10.    The Corps, like the United States at large, has a trust relationship with Native American tribes, which is very important to the Corps and encompasses issues relating to accessing Corps-managed land. Doc. Nos. 443, p. 121:16–24, 122:7–16; 438, p. 85:12–20, 169:2–5; 439, p. 53:2–4.

11.    District Commanders for the various areas will often retain decision-making authority of issues involving federally recognized tribes. Doc. No. 440, p. 25:15–24.

12.    While the Corps employs park rangers, the Corps is not a law enforcement entity, and the rangers are not law enforcement officers. Doc. Nos. 438, p. 156:11–14; 439, p. 194:25–195:2; 440, p. 27:13–15; 6-2, p. 29, § 6-2(e).

13.    The rangers can issue written warnings and citations, including citations with a mandatory court appearance. Doc. Nos. 440, p. 24:6–9, 28:12–18; 6-2, p. 29, § 6-2(f).

---

[4] Deposition testimony was played into the record during trial, and transcripts were filed with the Court. Deposition cites are Doc. No. [XX] [docket page]:[deposition page]:[line].

14.    Local United States Attorney's Offices determine whether to prosecute those citations. Doc. No. 440, p. 29:16–19.

15.    State and local law enforcement can enforce state and local laws on Corps land. Doc. Nos. 8, p. 28, § 6-2(c) (Corps implementing guidance: "In the acquisition of land at Civil Works installations, the Corps of Engineers obtains proprietary interests only. Individual states and their political subdivisions retain the statutory authority, and inherent responsibility, to enforce state and local laws."); 440, p. 29:23–30:2; 438, p. 155:15–156:6; DX-4004, p. 2-94[5] (Lake Oahe Master Plan: "Enforcement of state and local laws and ordinances will be handled by the appropriate state and local law enforcement agencies."); 40 U.S.C. § 3112(a) ("It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires."); 40 U.S.C. § 3112(c) ("It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section."); 36 C.F.R. § 327.26 (Corps Title 36 regulation: "[S]tate and local laws and ordinances shall apply on project lands and waters" and "are enforced by those state and local enforcement agencies established and authorized for that purpose.").

16.    The Corps relies on state and local law enforcement to enforce state and local laws on its land. Doc. Nos. 440, p. 29:23–30:2; 438, p. 155:15–156:6; DX-4004, p. 2-94.

17.    Corps decision-making concerning unlawful conduct on its land depends on the approach taken by state and local law enforcement and the resources they make available. Doc. No. 440, p. 39:11–22.

## II.    Special Use Permits Generally

18.    The Corps utilizes Special Use Permits, which allow individuals or groups to use federal land managed by the Corps. Doc. Nos. 440, p. 34:6-15; 438, p. 157:13–19; JX-126 (Corps News Release concerning Standing Rock Special Use Permit).

19.    The Corps' Engineering Circular ("EC") 1130-2-550 and its Appendix E are the Corps' governing regulations for Special Use Permits as required by 36 C.F.R. Part 327. Doc. No. 440, p. 6:14–7:8. See also Doc. No. 8.

20.    Special Use Permits ensure compliance with the provisions of 36 C.F.R. Part 327 and are designed to safeguard land and water resources of the United States protect them from harm by containing specific requirements. Id. at 7:1-8.

21.    EC 1130-2-550 lists the criteria Corps officials should use to determine whether an activity requires a Special Use Permit: (1) whether the activity will impact project resources beyond ordinary use; (2) whether the activity has a specific purpose; (3) whether the activity may impose crowding or hazards to other project visitors or liability to the government,

[5] Plaintiff's Exhibits are PX-[XX]; Defendants' Exhibits are DX-[XX]; and Joint Exhibits are JX-[XX].

requiring specific management coordination; and (4) whether the activity is not authorized by other programs or regulations. Doc. No. 8, p. 44, § E-1.

22.    A Special Use Permit is required before a person may engage in that special use activity on Corps-managed land. Doc. Nos. 438, p. 40:5–7; 8, p. 45, § E-4 ("An application must be obtained, completed and submitted to the Operations Project Manager within the time frame established by the Operations Project Manager . . . ."); 36 C.F.R. § 327.21.

23.    Once an application has been received, Corps officials decide whether to grant a Special Use Permit. Doc. Nos. 438, p. 40:8–12.

24.    The Corps can require certain conditions to a grant of a Special Use Permit, which are determined based upon the circumstances of the event. Doc. No. 440, p. 36:24–37:5.

25.    The Corps can utilize "alternative management techniques" for facilitating access to Corps-managed land, such as providing overflow areas or moving camping locations when a permittee's party exceeds the campground's capacity. Id. at 32:12–33:5.

26.    However, these "alternative management techniques" typically involve situations where the Corps exercises discretion to allow use of Corps-managed land in areas with already recognized valid use of that land, including situations when camping occurred with a valid camping reservation and not when there was no lawful reason for persons to be on Corps-managed land. Id. at 32:12–34:5; 40:22–42:5.

27.    At all times during the Protests Colonel John Henderson ("Col. Henderson") (District Commander for the Omaha District of the Army Corps of Engineers)[6] retained the authority to act on the Special Use Permit for the Protests. Doc. Nos. 438, p. 40:22–25, 55:1–2; 439, p. 146:7–16; 148:3–12; 156:5–15.

### III.    Lead-up to the Protests

28.    In 2014 it was announced that Dakota Access, LLC ("Dakota Access") planned to construct an underground oil pipeline across four states, including North Dakota. PX-1440, p. 7.

29.    The land at issue in this case is Corps-managed land located at the confluence of the Cannonball and Missouri Rivers in North Dakota as part of the Lake Oahe Flood Control Project. DX-4004, §§ 1-2 to 1-5.

30.    Relevant to the present dispute, the designated route for the DAPL crossed through Morton County, North Dakota and under the Missouri River at Lake Oahe. Doc. No. 440, p. 170:5–7, 15–17.[7]

---

[6] Col. Henderson oversaw the Oahe Project, which included the floodplain area at the confluence of the Missouri and Cannonball Rivers. Doc. No. 438, p. 35:22–36:8. Col. Henderson's responsibilities included implementing the Clean Water Act, Rivers and Harbors Act, and Mineral Leasing Act for the various projects within the Omaha District. Id. at 36:9–13.

[7] The DAPL crossed the Missouri River in North Dakota twice, the first located north of Bismarck.

31.    As part of the permitting process, Dakota Access participated in a public proceeding with the North Dakota Public Service Commission on its application for pipeline siting. Id. at 165:16–166:12.

32.    As a result, the North Dakota Public Service Commission imposed terms and conditions and route modifications to the eventual DAPL route. Id.

33.    Dakota Access also had public meetings with local community members in North Dakota, and specifically Morton County, when planning the route of the DAPL. Id. at 166:16–167:5.

34.    For example, in the summer of 2015 three public hearings were held in Killdeer, Mandan, and Williston, North Dakota regarding the DAPL siting. Doc. No. 432, p. 63:7–14.

35.    Members of the Standing Rock Sioux Tribe ("Tribe") were invited to attend these public hearings. Id. at 63:15–23.

36.    The Tribe also declined to engage with Col. Henderson regarding the pipeline, stating they did not want to look like they were a part of the decision whether to grant Dakota Access a Nationwide 12 Permit to cross Lake Oahe. Doc. No. 405-7, p. 28:106:24–107:23.

37.    Ultimately, Dakota Access received all necessary permits and easements to start construction of the 1,200 miles of DAPL, including the federal easement and approval for traversing under the Missouri River at Lake Oahe. Doc. No. 440, p. 169:22–171:1; JX-109 at 33 (Memorandum Opinion finding Dakota Access received final approval on July 25, 2016, for the Lake Oahe crossing on Corps-managed land).

### IV.    Initial Moments of the Protests and Formation of Encampments

38.    As early as May 2016, the Corps was aware Protestors, opposing the DAPL's crossing at Lake Oahe, were present on Corps-managed land. Doc. No. 438, p. 41:24–42:14.

39.    In the course of his work, Col. Henderson and the Corps regularly circulated intelligence documenting the developments concerning the Protests on Corps-managed land. PX-1050, p. 2; Doc. No. 428, p. 61:6–20.

40.    This intelligence was distributed internally and to other United States agencies in the form of "storyboard" documents. Id.

41.    Relevant here, the storyboards provided information of the situation on the ground; they summarized the previous twenty-four to seventy-two hours, gave anticipated actions for the next twenty-four to seventy-two hours, and offered the Corps' Omaha District "Commanders Assessment" of the Protest situation. PX-1050, p. 3; Doc. No. 438, p. 61:6–

Doc. No. 440, p. 167:23–168:2. The second crossing, nearing Bismarck, is the crossing pertinent to this matter. See id. at 170:4–171:16.

20.

42.  Col. Henderson regularly reported to his superiors regarding the status of the Protests and related events. Id. at 50:2–13.

43.  FBI informants were placed in Protest camps and provided intelligence information and updates. Doc. No. 434, p. 101:8–102:8.

44.  The Department of the Interior ("DOI") sent Jim Gallagher (Assistant Director of the DOI Office of Law Enforcement Safety) to Morton County, whose role was "strictly to relate information" about the Protests to DOI officials. PX-1028, p. 1; Doc. No. 447, p. 168:5–10, 18–20.

45.  Gallagher was frequently at North Dakota's State Emergency Operations Center. Doc. No. 447, p. 168:21–23.

46.  Darren Cruzan ("Cruzan") (Deputy Bureau Director for the Bureau of Indian Affairs ("BIA") at the time of the Protests) also sent near-daily briefings to his superiors from August 15, 2016, to the end of the Protests. Doc. No. 447, p. 107:4–108:5, 112:5–22, 129:16–131:1.

47.  These briefings were forwarded to other senior officials in the DOI. Id.

48.  North Dakota law enforcement officials and State agencies also routinely updated the United States on situational intelligence updates regarding the activities of the Protestors throughout the course of the Protests, including in August 2016. Doc. No. 440, p. 46:15–47:14.[8]

49.  Protestors on Corps-managed land eventually established several camps within the area of the confluence of the Cannonball and Missouri Rivers, including (1) the largest Protest camp called "Main Camp" (also known as "Oceti Sakowin Camp" and "Seven Councils Camp"), located on the northern edge of the Cannonball River and the eastern edge of Highway 1806; (2) "Rosebud Camp," south of the Cannonball River and bordered on the eastern edge by Highway 1806; and (3) "Sacred Stone Camp" (also known as "Spirit Camp"), located east of Rosebud Camp. Doc. No. 440, p. 48:22–49:17. See JX-174; JX-266, p. 26.

50.  These three Protest camps (Main, Rosebud, and Sacred Stone) were located on Corps-managed land. Doc. No. 438, p. 51:11-16; 439, p. 52:18–53:9; 433, p. 182:13–18; 447, p. 193:4–194:2; DX-4024, p. 2–3; JX-129, p. 2, 7; JX-174, p. 2; JX-68, p. 1; PX-1030.

51.  Law enforcement officials saw Protestors moving freely back and forth between all three

---

[8] By way of example, then-Adjutant General of the North Dakota National Guard, Alan Dohrmann ("Gen. Dohrmann"), who was also led the North Dakota Department of Emergency Services ("NDDES") shared intelligence and logistics about Protest camps obtained in the State Emergency Operations Center with the Corps. Doc. No. 437, p. 102:3–103:1.

Protest camps on Corps-managed land throughout the Protests. Doc. No. 434, p. 172:18–173:2.

52.     As discussed in more detail below, from the encampment on Corps-managed land, Protestors frequently assembled and moved from Corps-managed land in large groups of vehicles to State and private land to conduct often violent and unlawful activities. Doc. Nos. 433, p. 18:2–19:24, 28:2–29:25; 435, p. 43:20–44:10 PX-2041, p. 15–58, 142–47; PX-1658; PX-1819.

53.     By August 10, 2016, the Corps and local law enforcement estimated approximately 500–2,000 Protestors were camped on Corps-managed land. PX-1050, p. 3; JX-61; Doc. Nos. 438, p. 44:3–9; 443, p. 12:25–13:4.

54.     Also on August 10, 2016, North Dakota State Highway Patrol ("NDHP") Trooper and Pilot Dennis Gallagher ("Trooper Gallagher") flew the NDHP plane to the Protest sites to observe and report on Protestor activity.[9] Doc. No. 432, p. 201:9–204:7.

55.     During Trooper Gallagher's subsequent flights, he took aerial photos and videos of Protest camps, as well as radioed information about Protestor activity to North Dakota law enforcement. Id. at 196:24–197:25.

56.     Trooper Gallagher took approximately 20,000 photos and numerous aerial videos during the Protests. Id. at 197:6–8; 203:4–9.

57.     By August 15, 2016, the United States expected there to be "significant protest activity" at the DAPL site. JX-61, p. 1.

58.     The United States was aware of several things: (1) individuals traveling to the area of Corps-managed land in southern Morton County for the Protests were potentially dangerous (Doc. No. 440, p. 49:18–21); (2) extremist groups were present in the encampments on Corps-managed land (JX-68; Doc. Nos. 438, p. 55:3–17; 443, p. 16:10–17:13); and (3) Protestors already exhibited hostility (JX-65, p. 2).

59.     At that time, the United States expected the situation would get worse. JX-65, p. 2 ("Based on the events of the past few days and concerns brought to our attention by the US Attorney's Office in ND this afternoon, the hostility of these crowds will likely continue to get worse before they improve.").

60.     The United States also expected the size and intensity of the Protests to increase in August 2016. PX-1043, p. 2 ("We expect the size and intensity of this protest activity to grow over the next few days leading into the PI hearing scheduled for 25AUG16.").

61.     By mid-August 2016, the Corps had concerns about trash and human waste impacting Corps-managed land. Doc. No. 438, p. 44:17–21.

---

[9] Throughout the Protests, Trooper Gallagher flew the NDHP plane—a Cessna 206—over 650 hours to observe and report on Protest activities. Doc. No. 432, p. 196:12–23.

62.    Col. Henderson had authority to: (1) close Corps-managed land for public health and/or safety concerns, resource protection, or other public interests, and (2) request members of the public to leave Corps-managed land when they became disorderly. Id. at 152:10–16.

63.    In the ordinary course of things, the Corps could have used its permitting authority to prohibit the disposal of human waste, fires, structures, vehicles, and propane tanks. Id. at 145:3–14.

64.    Despite this, the Corps did not impose any requirements on Protestors concerning the health and safety at Protest sites on Corps-managed land, including disquieting matters such as (1) the entry of vehicles, (2) the disposal of human waste, (3) the provision of medical services, (4) the construction and use of structures, or (5) the prevention of environmental damage. Doc. No. 404-6, p. 18:66:8–68:2.

### V.    Protests Escalate

65.    On August 11, 2016, a group of individuals opposing the DAPL began protesting on the side of Highway 1806 at the site where Dakota Access construction personnel were working on an access entrance near the Pipeline's crossing point under the highway. Doc. No. 434, p. 165:12–23.

66.    North Dakota law enforcement arrested thirteen Protestors that day for obstructing construction activity. JX-265, p. D-1.

67.    The next day, a group set up another protest on the side of Highway 1806 where Dakota Access construction personnel were working on an access entrance near where the DAPL was scheduled to cross under the highway. Doc. No. 433, p. 23:6–24:20; PX-1497.

68.    At this protest, the Tribe's chairman David Archambault ("Chairman Archambault") was arrested for disorderly conduct. Doc. Nos. 434, p. 166:12–167:4; 433, p. 137:24–139:4.

69.    Considering the two protests, and the fact the situation was growing, Sheriff Kirchmeier requested help from Cass County Sheriff Paul Laney ("Sheriff Laney") on August 13, 2016.[10] Doc. No. 433, p. 139:19–140:1; JX-54.

70.    Sheriff Laney immediately sent out a Mutual Aid[11] request to other sheriffs across North Dakota to help police the growing Protests. JX-53.

71.    On August 15, 2016, Cody Schulz[12] ("Schulz") signed an Emergency Declaration for Civil

_____

[10] During the Protests, Morton County Sheriff's Department had 33 sworn deputies to serve the entire county with a population of 30,000 people and covering approximately 1,945 square miles. Doc. Nos. 432, p. 62:7–17; 433, p. 129:15–18; JX-266, p. 8.

[11] A Mutual Aid request is when political subdivisions within North Dakota ask for help from each other. Doc. No. 437, p. 92:24–93:4.

[12] Schulz was North Dakota's Disaster Recovery Chief at NDDES, as well as, a County Commissioner in Morton County during the Protests. Doc. No. 432, p. 58:21–60:7.

Unrest in Morton County ("Morton County Emergency Declaration") to address the growing Protests. Doc. No. 432, p. 71:2–18; JX-59.

72.     Pursuant to this Declaration, Morton County set up an Emergency Operations Center ("EOC") at the Morton County Sheriff's Office on August 17, 2016, as to organize its emergency response. Doc. Nos. 432, p. 72:1–18; 433, p. 142:18–22.

73.     John Voeller (a civilian employee with the Corps) was stationed in the EOC and reported to his superiors at the Corps regarding information gathered from the EOC. Doc. No. 434, p. 162:6–21.

74.     The same day the Morton County Emergency Declaration was issued, Protestors escalated their destructive behaviors by: (1) cutting a hole in the fence constructed by the NDHP to separate Protestors from Dakota Access construction workers, (2) trespassing onto the construction site, and (3) vandalizing construction equipment. Id. at 169:8–25.

75.     Protestors on horseback charged a law enforcement line separating the Protestors from Dakota Access construction personnel, putting law enforcement officers at risk. Id. at 170:1–171:15 (noting he personally considered the Protestors on horseback were a risk to law enforcement officers); Doc. No. 432, p. 71:2–10; JX-266, p. 15; JX-265, p. D-2.

76.     North Dakota law enforcement also set up a National Incident Management System ("NIMS") to manage the law enforcement response to the Protests. Doc. No. 434, p. 83:24–84:12.

77.     Sheriff Kirchmeier was the incident commander, and Sheriff Laney was the deputy incident commander. Doc. Nos. 433, p. 144:2–4; 434, p. 80:22–82:9.

78.     NIMS operated under North Dakota's Emergency Operations Plan, developed by NDDES and designed to coordinate the emergency response. Doc. No. 437, p. 87:4–16.

## VI.     The Tribe's Application for Special Use Permit

79.     As of August 15, 2016, the Corps and Peter Capasella (the Tribe's attorney) were communicating about the Tribe's desire to obtain a Special Use Permit for Protestors camped on Corps-managed land. Doc. Nos. 438, p. 46:22–48:2; 404-6, p. 30:114:6–16; JX-62, p. 2.

80.     That same day, Eric Stasch ("Stasch") (Corps Operations Manager, Lake Oahe Project) sent an email to multiple Corps personnel, including Col. Henderson and Thomas Tracy (Corps District Counsel, Omaha District), which stated that "Protestors are setting up encampments on US Government lands." JX-62, p. 1–2; Doc. Nos. 198-3, ¶ 1; 404-6, p. 5:17:20–6:6.

81.     In the email Stasch stated: (1) his staff had "been told that as many as 300 people from the Pine Ridge Reservation are on the road to protest"; (2) "[t]his has the potential to become

a major protest," he had concerns regarding "trash, human waste, impacting archeological sites" and personnel "concerns for our people in the area," and he didn't want to "put anyone in a potentially hostile situation"; and (3) he "need[ed] guidance" in handling the situation. JX-62, p. 1–3.

82.  Also on August 15, 2016, Corps officials, including Col. Henderson, agreed a Special Use Permit was "the correct way to address the encampment [of Protestors] on [Corps-managed] lands." Id. at 1.

83.  This determination bound the Corps to follow its special use permitting process and showed "alternative management techniques" did not apply to the Protest situation.[13] See supra ¶ 13.25–26.

84.  Corps officials knew Protestors were trespassing on Corps-managed land. Doc. No. 438, p. 53:21–54:25; JX-65; JX-68, p. 1; PX-1043, p. 2.

85.  On August 18, 2016, the Corps received the Tribe's application for a Special Use Permit. Doc. No. 438, p. 52:23–53:1.

86.  Mere submission was insufficient because Corps officials determined the Tribe's Special Use Permit application was incomplete and the required Special Use Permit could not be issued based on the information provided. Doc. No. 438, p. 53:2–4; DX-4043.

87.  The Corps had several noteworthy concerns with the permit application, including: (1) the application "significantly underestimated" the number of participants, vehicles, and locations (it only listed 300 participants); (2) the application did not accurately describe the area Protestors currently occupied; and (3) Chairman Archambault's admission that professional protestors were present on Corps-managed land who were not associated with the Tribe. DX-4053, p. 1.

88.  Corps officials had concerns about the Protests: "Potential for people getting hurt is extremely high." DX-4043, p. 1.

89.  Corps officials also noted it would be necessary to require insurance, and there "need[ed] to be a detailed plan with staffing to cover security and traffic control." Id.

## VII.  North Dakota's August 19, 2016, Emergency Declaration and Subsequent Related Events

90.  On August 19, 2016, then-North Dakota Governor Jack Dalrymple ("then-Governor Dalrymple") declared an emergency relating to the developing situation on Corps-managed land. JX-73; PX-1031.

91.  The press release accompanying the emergency declaration quoted then-Governor

---

[13] The Court has repeatedly come to the same conclusion and granted summary judgment on this issue. Doc. No. 383, ¶¶ 22–28.

Dalrymple: "North Dakota remains committed to protecting citizens' rights to lawfully assemble and protest, but . . . unlawful acts associated with the protest near Cannon Ball have led to serious public safety concerns and property damage." PX-1031, p. 2.

92.    Then-Governor Dalrymple explained, "The serious safety concerns stem from the fact that protestors were advancing out of their recently established camps. They were moving onto state highway property. They were moving onto the actual highway itself. There was activity dealing with public and private property that was unlawful and it was clear that the situation was going to require some law enforcement response." Doc. No. 436, p. 11:21–12:4.

93.    This emergency declaration allowed Morton County to employ North Dakota's emergency operations plan and made other resources available to Morton County for the Protest response including additional law enforcement personnel. Doc. No. 432, p. 73:12–74:10.

94.    Under what would become the Unified Command structure, North Dakota could "access to certain authorities" only available "during times of emergency." Doc. No. 437, p. 90:23–91:9.

95.    On August 22, 2016, Major General Donald E. Jackson (Corps' Deputy Commanding General for Civil and Emergency Operations) ("Maj. Gen. Jackson") forwarded an email to Jo-Ellen Darcy (Assistant Secretary of the Army for Civil Works) ("Asst. Sec. Darcy") containing Col. Henderson's notes from a call with then-Governor Dalrymple, indicating "his law enforcement officials see this as a less that [sic] peaceful protest based on the level of criminal activity occurring and [the Protestors'] prevention of DAPL work on nearby private property." PX-1038, p. 1, 3.

96.    Col. Henderson also admitted to then-Governor Dalrymple the Protestors "are technically trespassing at this point" and that the Corps "would assess any threat-related information from [the U.S. Attorney in North Dakota] prior to making any decision on a permit." Id. at 3.

97.    Col. Henderson stated then-Governor Dalrymple asked the Corps to "strongly consider denying any permit" because of security concerns for the DAPL work sites. Id.

98.    Later that day, Brigadier General Scott Spellmon (Corps' Northwest Division Commander) ("Brig. Gen. Spellmon") provided an assessment of the Protests to Maj. Gen. Jackson stating, "The common assessment from the field is the [P]rotests have crossed the line and are no longer completely peaceful in nature." JX 75, p. 1; Doc. No. 439, p. 135:8–136:5.

99.    On August 24, 2016, Col. Henderson sent Maj. Gen. Jackson an email stating, (1) "We expect the size and intensity of the protests to grow over the next two days"; (2) "[t]he location of [Protest camps was] on USACE managed lands– without a special use permit"; and (3) Protest encampments were "considered trespassing and [wa]s effectively preventing DAPL from working in [that] area." PX-1047, p. 3; Doc. No. 439, p. 138:21–139:7.

100. Maj. Gen. Jackson agreed with Col. Henderson's assessment of the situation. Doc. No. 439, p. 139:8–10.

101. Also on August 24, 2016, Maj. Gen. Jackson sent an email to Asst. Sec. Darcy, Lieutenant General Todd Semonite (Chief of Engineers and Commanding General of the Corps) ("Lt. Gen. Semonite"), Lowry Crook (Principal Deputy to the Assistant Secretary of the Army for Civil Works), and other Corps personnel stating that the U.S. District Court for the District of Columbia was expected to issue a ruling on September 9, 2016, regarding the Tribe's pending motion for a preliminary injunction against the Corps' grant of a Nationwide Permit 12 to DAPL at Lake Oahe. PX-1046, p. 2. See also JX-109 (Memorandum Opinion filed on September 9, 2016, as discussed in the email).

102. Colonel Michael James Price ("Col. Price") (Executive Officer to the Assistant Secretary of the Army) sent an email to Lowry Crook on August 25, 2016, explaining that on August 10, 2016, "[P]rotestors began to interfere with the construction on private lands near the Lake Oahe [crossing] in Cannon Ball, ND," "[t]he number of protestors [grew] to approximately 1500 and eventually caused the construction to cease on 20 August," and "Protestors are currently camping on Corps property south of pipeline construction site." PX-1050, p. 2.

103. Attached to Col. Price's email was a storyboard entitled "Dakota Access Pipeline (DAPL) Protest (USACE NWD/NWO)," which specified the camps were on "Corps property" and "current estimates from Law Enforcement place[d] camps at 500–2000 protestors." Id. at 3.

104. This storyboard stated, "Standing Rock Sioux Tribe . . . special use permit [application] lacked required information for approval; NWO will seek additional information from [the Tribe]." Id.

105. Under a heading entitled "Next 24-72 hrs (Way Ahead)" the storyboard stated, "NWO will continue to be in contact with federal and state Law Enforcement officials to facilitate actions that they determine necessary to stem criminal activity and support health/safety concerns at the site." Id.

106. On August 25, 2016, Stasch had a phone call with Chairman Archambault and after the call Stasch indicated: (1) Chairman Archambault admitted professional protestors unassociated with the Tribe were present; (2) the Tribe's supplemental application was "way off." DX- 4053, p. 1–2.

107. As of August 30, 2016, North Dakota received law enforcement Mutual Aid from ten counties and three municipalities. JX-94.

## VIII.   Protest Activities Beginning August 31, 2016

108. By August 31, 2016, Main Camp grew substantially in size and developed significant

- 17 -

infrastructure, such as earthen roads, a main entrance designated with flags, a large mess-style hall, and a profusion of Protestor vehicles and horse trailers. Doc. No. 433, p. 8:14–9:23; PX-2041, p. 14.

109.    On August 31, 2016, Protestors trespassed onto a DAPL construction site and attached themselves to construction equipment with "sleeping dragons," a homemade device that fastens a person's hands inside piping that cannot be removed without special cutting tools.[14] Doc. No. 432, p. 82:4–83:17; JX-266, p. 28.

110.    In response to Protestors' use of "sleeping dragons," Schulz authorized bringing in out-of-state law enforcement to train North Dakota law enforcement on the safe removal of these improvised devices.[15] Doc. No. 432, p. 82:4–83:17; PX-1272, p. 2.

111.    On September 2, 2016, Chairman Archambault supplemented his Special Use Permit application with an alleged map of the Protest area. JX-117.

112.    However, the Tribe did not have any control over the Protestors residing on Corps-managed land. Doc. Nos. 446, p.191:12–15; 443, p. 13:20–14:10.

113.    On September 3, 2016, over 100 Protestors (1) ripped down a fence on private property within the DAPL easement north and west of the Protest camps; (2) trespassed, engaged, and assaulted private construction contractors; and (3) vandalized Dakota Access construction equipment. Doc. Nos. 432, p. 94:18–95:25; 433, p. 147:10–148:17; JX-266, p. 29; PX-2041, p. 15–58.

114.    Caravans and shuttling were observed, taking Protestors from the Main Camp to the Protest site off Corps' land. Doc. Nos. 434, p. 173:8–1724:10; 433, p. 28:2–29:20; PX-2041, p. 15–45; JX-265, p. D-4–D-5.

115.    The Tribe filed a motion for a temporary restraining order ("TRO") on September 4, 2016, to prevent Dakota Access from continuing DAPL construction. PX-1067, p. 2–24.

116.    On September 6, 2016, Protestors again trespassed onto private property where DAPL construction was happening and vandalized construction equipment. Doc. No. 432, p. 96:15–22; JX-266, p. 31.

117.    The Corps knew this incident occurred. JX-108, p. 2.

118.    Protestors involved in trespassing on private property on September 6, 2016, caravanned from their camps on Corps-managed land, including using horse trailers. Doc. No. 433, 30:1–33:4; PX-2041, p. 60–73; JX-265, p. D-4.

119.    That same day, Protestors held horse races at the Main Camp, which violated the Corps'

---

[14] Protestors repeatedly used "sleeping dragons" throughout the Protests, but particularly in late-August through early-October 2016. Doc. No. 432, p. 93:10–18.

[15] These law enforcement officers were known as "Cut Teams." Id. at 82:4–21; PX-1272, p. 2.

land use regulations. Doc. No. 434, p. 175:1–11.

120.    On September 6, 2016, the United States District Court for the District of Columbia[16] granted, in part, and denied, in part, the Tribe's TRO request, preventing further DAPL construction between Highway 1806 and twenty miles east of Lake Oahe but allowing it to continue elsewhere. PX-1077, p. 1.

121.    At the TRO hearing, the court indicated it would rule on the Tribe's separate motion for a preliminary injunction by September 9, 2016. JX-108, p. 2; PX-1077, p. 1–2.

122.    Counsel for Dakota Access indicated the Lake Oahe crossing construction would be completed by the end of the week absent Protest activity (referred to by that court as "stoppages"). PX-1077, p. 2.

123.    The Corps was aware of the TRO hearing and expected the ruling granting the TRO would influence the Protestors on Corps-managed land. JX-108, p. 2.

124.    The Corps also knew an international Pow Wow was scheduled for September 9–11, 2016, in Bismarck, North Dakota that could (1) draw approximately 10,000–20,000 people; (2) considerably increase the profile of the Protests; and (3) potentially bring in new protestors to the Protest camps. Id.

125.    Sheriff Laney joined in a telephone meeting with DOJ "Senior Conciliation Specialist," Rosa Salamanca ("Salamanca") on September 5, 2016, and later in September, Sheriff Laney engaged with her regarding the Protests. Doc. No. 434, p. 96:20–97:22; PX-1173, p. 4.

126.    At one point, Salamanca asked North Dakota law enforcement to "stage" mock arrests of Protestors. Doc. No. 434, p. 98:10–99:13.

127.    During conversations with Sheriff Laney, Salamanca referred to the Protestors as "we," which signaled to him she sided with Protestors. Id.

128.    As of September 6, 2016, Salamanca "completed Self Marshal Training for the" Protestors at the Protest camps. PX-1173, p. 3.

129.    Salamanca sought donations and aid for Protestors that included rubber boots, winter boots, walkie talkies, hand and foot warmers, safety vests, goggles, jackets, and security gear. Id.

130.    Cruzan was not consulted about Salamanca's training and "wouldn't have been in favor of it" and "probably would have had a problem with [Salamanca] being down there." Doc. No. 447, p. 185:14–186:10.

131.    On September 7, 2016, Maj. Gen. Jackson sent an email to multiple Corps leadership, claiming to relay the substance of a telephone call between Asst. Sec. Darcy and then-

---

[16] United States District Judge James Boasberg.

Governor Dalrymple. PX-1083.

132.    According to Maj. Gen. Jackson, then-Governor Dalrymple said he "believe[d] that tribal gatherings [we]re taking place on Federal lands (USACE) that are leased to private parties (presumably for grazing, etc)." Id. at 3.

133.    In the email chain, Maj. Gen. Jackson sought to confirm from Corps personnel the veracity of then-Governor Dalrymple's statement. Id.

134.    Also according to Maj. Gen. Jackson, then-Governor Dalrymple "hear[d] the protestors intend on building structures in these protest locations, presumably to have shelter for the winter months where he believes they will continue to try and block [DAPL] construction progress." Id.

135.    Maj. Gen. Jackson asked about Corps' "position/reaction to any construction activities (temporary or permanent in nature) on Federal land under [its] jurisdiction." Id.

136.    Finally, Maj. Gen. Jackson indicated then-Governor Dalrymple "believes the protestors are using Federal lands as a 'safe haven' from which to conduct activities to block construction progress," and asked Corps personnel if this was true. Id.

137.    Then-Governor Dalrymple activated the North Dakota National Guard on September 7, 2016, to provide logistical support to law enforcement at Protest sites and to focus on potential flash points of conflict and increased violence that was anticipated to occur after the D.C. District Court's ruling on the Tribe's request for an injunction. Doc. Nos. 436, p. 36:16–38:1; 432, p. 97:11–98:2; JX-104; JX-107.

138.    According to Gen. Dohrmann, this activation of the North Dakota National Guard "was to free up law enforcement from any administrative, religious duties, have guardsmen do that so that law enforcement officers" could focus on Protest response. Doc. No. 437, p. 96:1–9.

139.    According to then-Governor Dalrymple, activating the National Guard makes "the National Guard Reserve personnel available for assistance, reserve personnel that can be called on but normally would not be practicing Guard" but that "[b]efore that time, regular Guard personnel are always available." Doc. No. 436, p. 37:15–38:1.

IX.    **Denial of Motion for Preliminary Injunction and Aftermath**

140.    While the Tribe's Special Use Permit application was under consideration, the Corps knew Protest camps on Corps-managed land had grown to include unauthorized structures, vehicles, earthen roads, and a horse track as early as September 7, 2016. Doc. No. 438, p. 60:18–61:5, 73:1–5; PX-1083, p. 4.

141.    The Corps also knew the Tribe's Special Use Permit application included both tribal members and non-tribal individuals who supported the Protests. Doc. No. 404-6,

p. 63:141:7–17.

142. As anticipated, the D.C. District Court issued its ruling on September 9, 2016, denying the Tribe's request for a preliminary injunction to halt DAPL construction, and allowed construction of the DAPL to proceed. See JX-109, p. 58.

143. The court held the Corps properly granted a Nationwide 12 Permit to Dakota Access, properly consulted with the Tribe, and the Tribe would not experience irreparable harm if construction continued. JX-109, p. 38–57.

144. After the D.C. court's ruling and on the same day, the Departments of Justice, Army, and the Interior issued a Joint Statement ("Sept. 9 Joint Statement") regarding the Protests:

> We appreciate the District Court's opinion on the U.S. Army Corps of Engineers' compliance with the National Historic Preservation Act. However, important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline specifically, and pipeline-related decision-making generally, remain. Therefore, the Department of the Army, the Department of Justice, and the Department of the Interior will take the following steps.

> The Army will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws. Therefore, construction of the pipeline on Army Corps land bordering or under Lake Oahe will not go forward at this time. The Army will move expeditiously to make this determination, as everyone involved—including the pipeline company and its workers—deserves a clear and timely resolution. In the interim, we request that the pipeline company voluntarily pause all construction activity within 20 miles east or west of Lake Oahe.

> Furthermore, this case has highlighted the need for a serious discussion on whether there should be nationwide reform with respect to considering tribes' views on these types of infrastructure projects. Therefore, this fall, we will invite tribes to formal, government-to-government consultations on two questions: (1) within the existing statutory framework, what should the federal government do to better ensure meaningful tribal input into infrastructure-related reviews and decisions and the protection of tribal lands, resources, and treaty rights; and (2) should new legislation be proposed to Congress to alter that statutory framework and promote those goals.

> Finally, we fully support the rights of all Americans to assemble and speak freely. We urge everyone involved in protest or pipeline activities to adhere

- 21 -

to the principles of nonviolence. Of course, anyone who commits violent or destructive acts may face criminal sanctions from federal, tribal, state, or local authorities. The Departments of Justice and the Interior will continue to deploy resources to North Dakota to help state, local, and tribal authorities, and the communities they serve, better communicate, defuse tensions, support peaceful protest, and maintain public safety.

In recent days, we have seen thousands of demonstrators come together peacefully, with support from scores of sovereign tribal governments, to exercise their First Amendment rights and to voice heartfelt concerns about the environment and historic, sacred sites. It is now incumbent on all of us to develop a path forward that serves the broadest public interest.

JX-111.

145.    Sheriff Kirchmeier noticed an increase in the intensity of the Protests after this Sept. 9 Joint Statement and Gen. Dohrmann thought this Sept. 9 Joint Statement "emboldened" the Protestors. Doc. Nos. 433, p. 154:14–16; 437, p. 98:23–99:10.

146.    The Sept. 9 Joint Statement was perceived by Protestors as a "win" and that the Protests were effective. Doc. No. 438, p. 68:5–13.

147.    To Protestor Chase Iron Eyes ("Iron Eyes"), the Sept. 9 Joint Statement "gave [him] hope that the Army Corps of Engineers was going to be open to or compelled to open up a bunch other – a bunch more dialogue of the baggage between the Army Corps and the Sioux Nation." Doc. No. 446, p. 196:2–11.

148.    Iron Eyes also agreed that he had previously testified via deposition that the Sept. 9 Joint Statement made Protestors "feel like there was a potential that we could win." Id. at 198:14–15.

149.    When discussing the Sept. 9 Joint Statement, Lt. Gen. Semonite said, "We felt that this action, if anything, just . . . continued to embolden protestors to stay on the ground." Doc. No. 405-7, p. 18:69:25–19:70:14.

150.    Lt. Gen. Semonite also said he was concerned about the trajectory of the Protests in September because they were "getting bigger, more unruly, more violent." Id.

151.    For example, on September 12, 2016, an email string between Principal Deputy to the Assistant Secretary of the Army for Civil Works Lowry Crook ("Crook"), Brig. Gen. Spellmon, and other Corps personnel stated that Crook had talked with then-Governor Dalrymple, who said he would ask the federal government to reimburse law enforcement costs if the Protest timeline was extended. PX-1118, p. 1.

152.    Crook also said then-Governor Dalrymple asked for U.S. Marshals Service ("Marshals Service") assistance at the Protests and he was focused on "reiterating his concern that protestors are considering building more permanent structures on Corps property." Id.

153.    Brig. Gen. Spellmon responded to Crook's statement about the Tribe's Special Use Permit application: "The most significant issue we are dealing with is the information provided on the new application does not match facts on the ground. For example, at the sites there is ongoing littering, dumping, destruction of grazing land, unauthorized structures, and several hundred more people above and beyond what the application addresses." Id.

154.    Brig. Gen. Spellmon went on to say, "At this point in time, we would like to tie the way ahead on the Special Use Permit with the overall way ahead as described in [the September 9 Joint Statement]." Id.

155.    According to Col. Henderson's assessment, as of September 12, 2016, the Protestors would use the "success" of the Sept. 9 Joint Statement to leverage the media to build support for the Protests and would increase the duration and intensity of the Protests. Doc. No. 438, p. 72:10–21; PX 1116, p. 3.

156.    Twenty-two Protestors were arrested on September 13, 2016, for trespassing on private land for the Dakota Access construction sites west of Glen Ullin and north of Exit 120 near mile marker 106.5. JX-265, p. D-5.

157.    Another incident occurred five miles west and one mile south of New Salem, North Dakota, where other Protestors vandalized a Dakota Access construction site. Id. at D-5–D-6.

158.    Another trespass by Protestors at a Dakota Access construction site occurred on September 14, 2016, which resulted in eight arrests including arrests for felony reckless endangerment in which Protestors attached themselves to construction equipment. Id. at D-6; PX-1151, p. 3.

159.    By September 14, 2016, a total of sixty-nine Protestors had been arrested for illegal protest activities. PX-1151, p. 5.

### X.    September 16, 2016, Press Release

160.    For religious ceremonies and spiritual gatherings over fifty people, "liability insurance obtained by the event holder that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event, is mandatory" before a Special Use Permit can be issued. Doc. Nos. 8, p. 46; 440, p. 18:17–20:9.

161.    "For all events involving mechanical apparatus, such as boats, personal watercraft, motorcycles, bikes, etc., liability insurance, obtained by the event holder, that names the United States Government as an additional insured in the minimum amount of $1,000,000 for each event, is mandatory." Doc. No. 8, p. 46.

162.    "Performance bond(s) and/or proof of liability insurance, if required, must be submitted within time frames established by the Operations Project Manager, but prior to the start of the event." Id.

163. Any person or organization granted a Special Use Permit "must repair any on-site damages caused by the special event." Id.

164. Col. Henderson coordinated with Corps leadership on a draft press release announcing that the Corps granted the Special Use Permit. Doc. No. 438, p. 74:13–75:19; PX-1137, p. 3.

165. Before the press release was issued, then-Governor Dalrymple asked the Corps to "strongly consider denying any permit." Doc. No. 436, p. 14:22–15:15; PX-1118, p. 1.

166. On the morning of September 16, 2016, Col. Henderson sent an email to Corps leadership and personnel, including Eileen Williamson, Lieutenant Colonel James T. Startzell ("Lt. Col. Startzell") (Deputy Commander of the Corps Omaha District), and Tracy. JX-130, p. 1.

167. In the email, Col. Henderson stated the draft press release for the Special Use Permit "made its way to the White House last night" and that he understood "that they are reviewing and may ask us to synch [sic] the timing of the release with other events they may have planned." Id.

168. Later on September 16, 2016, Lt. Col. Startzell emailed Chairman Archambault stating, "Attached you will find the special use permit for your signature, along with a notification letter, a map of the approved site, and the pamphlet for public use of projects." JX-129, p. 1.

169. The attached letter reads:

Dear Chairman Archambault:

I have reviewed your special event request dated August 18, 2016, including the map you provided on September 2, 2016 of the proposed event grounds, for the Spiritual encampment to protest the Dakota Access Pipeline (DAPL). I have decided to grant a Special Use Permit for the location south of the Cannonball River that you requested from the United States Army Corps of Engineers, so that the Standing Rock Sioux Tribe can gather and engage in a free speech demonstration. You also requested to include an additional area, north of the Cannonball River. However, that area cannot be approved for a Special Use Permit as the Corps of Engineers already has granted an exclusive grazing lease on it pursuant to 10 U.S.C. § 2667, where a private party lessee has paid consideration to the Government to graze and hay the land. Therefore, the Corps does not have the right to grant a permit on these privately leased lands.

Enclosed for your review and execution is the Special Use Permit. The area which has been approved and designated under this Special Use Permit for this Free Speech Zone protest assembly is identified on the map attached to

and incorporated by reference into the Permit.

I understand that no vendors, entrance fees, or access restrictions are part of these assemblies and all federal, state, and local laws will be followed within the encampment, including, but not limited to, 36 CFR § 327 (a copy of which is enclosed). Furthermore, per 36 CFR § 327, there are several activities that will require my written permission. For example, there can be no construction, either temporary or permanent, of any structures within this identified and approved Free Speech Zone as identified in the Special Use Permit without my express written permission. Please review 36 CFR § 327 to identify those activities that will require additional permissions, should you choose to pursue those activities.

We are waiving the administration fee of $75 and the non-applicable recreation fees. The Corps of Engineers does require that you obtain a performance bond in the amount of $100,000 and maintain public liability and property damage insurance to cover any and all claims, demands, actions, or suits for damage to property or personal injury, including death, arising from your use of the property for your gathering. The insurance shall provide coverage for not less than $5,000,000 for personal injury to each person, $5,000,000 for each occurrence, and $1,000,000 for each occurrence involving property damage, or a single limit policy of not less than $5,000,000 covering all claims per occurrence.

Once you have executed the enclosed Special Use Permit and returned it to me, along with the performance bond and proof of special event liability insurance coverage, such Permit will be valid for thirty (30) days after my signature.

If you have any further questions please feel free to contact Mr. Eric Stasch or Mr. Phillip Sheffield at (605) 224-5862.

Id. at 2–3.

170.    A draft Special Use Permit was included with the letter, as well as, "Exhibit A" map of the proposed Special Use Permit area, only authorizing use of Corps-managed land south of the Cannonball River (yellow indicating the Special Use Permit Area). Id. at 4–7.



USACE_00023974

171.   The unexecuted Special Use Permit reiterated the permit conditions referenced by Col. Henderson in his letter. Id. at 4–6.

172.   The unexecuted Special Use Permit did not list a total number of authorized participants. Id.

173.   A Special Use Permit must be signed by both the applicant and the issuing Corps official for the Special Use Permit to be in good standing, effective, and considered issued. Doc. No. 440, p. 7:9–21.

174.   Despite (1) having only sent the email with the unexecuted Special Use Permit, (2) without receiving it back as executed by Chairman Archambault, and (3) knowing Chairman Archambault would not have time to obtain the required bonding and special event insurance, the Corps issued a public press release the same day on September 16, 2016 ("Sept. 16 Press Release"), which provided:

> **Today the U.S. Army Corps of Engineers (Corps) issued a Special Use Permit to the Standing Rock Sioux Tribe to use Federal lands managed by the Corps near Lake Oahe.**
>
> **Omaha District Commander, Col. John W. Henderson, informed the Standing Rock Sioux Tribal Chairman Dave Archambault II, that the Tribe's Spiritual gathering, located south of the Cannonball River, has been granted a Special use Permit, which allows the Tribe to gather to engage in lawful free speech demonstration of Federal lands designated in the permit.**
>
> The Tribe's Special Use Permit application requested use of lands to the north and south of the mouth of the Cannonball River; however, because the northern property is subject to an existing grazing lease, this portion of the application is not being acted on at this time.
>
> The **Special Use Permit allows the Tribe to use Federal lands** subject to Federal rules and regulations including Title 36 of the Code of Federal Regulations Part 327, Title 33 of the United States Code, Section 408, and applicable Federal, state and local regulations. Per Title 36, several activities require written permission from the District Commander. Additional permission will be required for activities identified in Title 36 such as construction, either temporary or permanent, of any structures within areas identified in the Special Use Permit.
>
> **"Among our many diverse missions is managing and conserving our natural resources. I want to encourage those who are using the permitted area to be good stewards and help us to protect these valuable resources," said Henderson.**

The purpose for requesting and grating a Special Use Permit under Title 36 is to provide applicants temporary use of federal lands for lawful purposes. In turn, the applicant assumes responsibility for maintenance, damage and restoration costs, ensures the health, welfare, safety, supervision, and security of participants and spectators, and provides liability insurance. This permit requires that the Standing Rock Sioux Tribe work with its supporters to ensure that the land is restored to its previous state so that others may benefit from use in the future.

"Thousands of people have peacefully gathered in prayer and solidarity against the Dakota Access Pipeline," said Dave Archambault II, Chairman of the Standing Rock Sioux Tribe. "We appreciate the cooperation of the Corps in protecting the First Amendment rights of all water protectors."

"The U.S. Army Corps of Engineers has a deep respect for the traditions, culture, and concerns of all Native American tribes, and we are committed to strengthening our enduring partnership with the Standing Rock Sioux Tribe," said Henderson.

JX-126 (emphasis added).

175. The Press Release was planned and approved by the Corps and other representatives of the United States before the Corps sent the unexecuted Special Use Permit to Chairman Archambault. JX-127, p. 1.

176. At 4:59 PM (twenty-three minutes before the Special Use Permit was transmitted), Col. Henderson emailed Chairman Archambault stating, "Our staff will be sending you a copy of the permit by email soon; official copy with be sent by certified mail on Monday. We will send the attached press release out this evening at 7:00pm. I wanted to give you the courtesy of reviewing it a final time prior our release." Id.

177. This email was accompanied by a draft press release substantially identical to the final Press Release, with a header at the top: "For Release at 7PM CDT September 16, 2016." Id. at 2.

178. According to Lt. Gen. Semonite, the Press Release "was an action to . . . make the tribes feel that they were getting some degree of accommodation." Doc. No. 405-7, p. 42:162:22–163:3.

179. The Corps, however, was not optimistic that the Special Use Permit was going to be completed. Doc. No. 438, p. 84:13–19.

180. At that time, the Corps was aware Protestors were not adhering to the stated conditions of not building structures on Corps-managed land. Id. at 89:23–91:18.

181. The Corps was also aware the number of Protestors on Corps-managed land greatly

exceeded the 300–500 individuals identified in the Tribe's application. <u>Id.</u> at 91:20–25; 443, p. 31:17–32:7.

182. Instead, the Corps estimated approximately 5,000 Protestors were on Corps-managed land at that time. DX-4092.

183. In September 2016 the Protestors were in "willful disobedience of certain functions that were against the way we wanted to manage" Corps-managed land. Doc. No. 405-7, p. 13:46:19–25.

184. On September 17, 2016, Eileen Williamson sent an email to multiple Corps personnel including Lt. Col. Startzell and Tracy stating:

> Media coverage has been limited. This reporter called me last night. . . . The post on Facebook had been shared more than 400 times by midnight. This morning, it has been shared 1,150 times with a reach of about 78,000.
>
> Comments are varied but indicate no concerns. There is skepticism about what it means but generally the response is balanced.
>
> **<u>Media asked if we would evict from the northern property. Predominant question is what happens with people on land to the north. The answer has been that they are encouraged to relocate to the permitted area.</u>**
>
> If they remain in place it is at their own risk and at a potential risk to the lessee.
>
> When asked what recourse USACE has, I've said **<u>we are authorized to cite Title 36 violations but ultimately the concern is for the health and safety of those who have gathered and that the resources are protected.</u>**

JX-133, p. 1–2 (emphasis added).

185. Despite the Press Release stating the Permit was only for land south of the Cannonball River, the Corps knew Protestors were primarily encamped in the northern unauthorized land. <u>See</u> JX-133.

186. By September 19, 2016, the Press Release had received over 96,000 views. PX-1171, p. 1–2; Doc. No. 438, p. 95:14–96:5.

187. Protestor Winona LaDuke believed the Press Release "was a good thing" and "the right thing for the federal government to do." Doc. No. 447, p. 43:1–44:17.

188. The Press Release was credited to the Corps; however, the Department of the Army, BIA, DOJ, U.S. Attorney's Office, FBI, and the White House executive office were all involved

in the approval and issuance of the Press Release. Doc. No. 439, p. 148:3–156:15; JX-121; PX-1155.

189.  Coordinating the Press Release and other responses during this time was no simple task and required "a lot of . . . coordination with echelons above [Lt. Gen. Semonite's] level," including "other probably political leaders." Doc. No. 405-7, p. 13:48:17–49:18.

190.  On September 19, 2016, Lt. Col. Startzell emailed multiple Corps personnel, including Tracy and Col. Henderson, saying, "There is widespread confusion as to the meaning of the [Special Use Permit] (i.e. that it permits special use for free speech, does NOT permit people to interfere with DAPL Construction)." PX-1171, p. 2.

191.  Lt. Col. Startzell further stated, "Chairman Archambault has not confirmed receipt of the [Special Use Permit] package and we are attempting to contact him and the Tribe to ensure that they received the package and understand the stipulations." Id.

192.  As of September 21, 2016, both the Corps and Department of the Army leadership knew a valid Special Use Permit had not actually been granted to the Tribe, despite the Sept. 16 Press Release to the contrary.[17] JX-135, p. 2; Doc. No. 439, p. 158:1–159:7; PX-1177, p. 3.

193.  Asst. Sec. Darcy responded the same day stating, "So, there is no permit in place for the south encampment, even though we announced Friday night that there was?" JX-135, p. 3.

194.  Maj. Gen. Jackson responded to Asst. Sec. Darcy stating, "The Chairman verbally approved both documents," but no signature or proof of liability insurance had been returned "as required by permit." Id. at 2.

195.  Maj. Gen. Jackson also noted Col. Henderson "is working with the Chairman, and his legal team, to finalize this and hope to have it completed today or tomorrow. Sorry for the confusion. Will let you know when it is administratively closed out." Id.

196.  In a separate email on September 21, 2016, the Corps' NWO Tribal Liaison Joel Ames wrote to Col. Henderson, Tracy, Lt. Col. Startzell, and other Corps personnel stating he

---

[17] On September 21, 2016, Maj. Gen. Jackson emailed Asst. Sec. Darcy, Lowry Crook, and other Corps personnel saying North Dakota U.S. Senator Heidi Heitkamp called Col. Henderson asking the Corps to move the Protestors off the encampment area north of the Cannonball River and to "take the lead to find a solution to this mess given all the damage that has already been done," and "pressed Col. Henderson to establish a timeline for when this all ends." JX-135, p. 3. Maj. Gen. Jackson's September 21, 2016, email also stated that the Special Use Permit "is only for the south side of the river; with associated conditions" and conceded that "the Tribe has not signed the acknowledgment for this permit yet nor met the liability requirements, so there is currently no permit in place." Id. Maj. Gen. Jackson also stated, "Anything that appears like an eviction by the Federal Government would likely create [a] flash point," and "[t]he best chances for a peaceful migration to the south side of the river is for the Tribe to own this decision through self-determination... the elders must buy in." Id. at 3–4.

reached out daily to "Chairman Archambault regarding signing the permit and the other requirements." PX-1176, p. 1.

197.   Iron Eyes testified he thought of the Oceti Sakowin, Sacred Stone, and Rosebud Protestor camps on Corps-managed land as a safe haven. Doc. No. 446, p. 200:17–22.

198.   The administrative process for completing and obtaining a valid, issued, and effective Special Use Permit for the Tribe was never completed. Doc. No. 438, p. 88:5–10.

199.   Multiple Corps personnel admitted there was never a valid or effective Special Use Permit for the Protests on Corps-managed land. Doc. Nos. 404-6, p. 25:94:12–17; 405-7, p. 13:49:19–14:50:7, 14:53:18–20; 438, p. 87:23–88:10; 439, p. 157:18–159:7; JX-135, p. 1.

200.   The Corps never corrected the erroneous Press Release. Doc. No. 438, p. 84:20–24.

## XI.   Corps Management of the Protests After the Press Release

201.   As of September 21, 2016, U.S. Senator Heidi Heitkamp of North Dakota requested the Corps develop a plan to move Protestors off of the Main Camp. PX-1177, p. 2.

202.   On September 22, 2016, Lt. Col. Startzell emailed Corps leadership (which included Tracy and Brig. Gen. Spellmon) saying, "There are reports and photos of burn pits/waste lagoons, which is an apparent violation of North Dakota solid waste management laws and rules, and the state is concerned that the sandy soil may allow groundwater impacts. We will need to consider mitigating/fixing these impacts as part of a move of personnel to permitted area." JX-137, p. 2.

203.   On September 22, 2016, Keith Fink (Omaha District Chief of Operations) forwarded Col. Henderson an email containing pictures showing Protestors using construction equipment to grade a road at the Main Camp. PX-1182, p. 1, 7–10.

204.   On September 25, 2016, NDHP Captain Eric Pederson ("Captain Pederson") was the first North Dakota law enforcement officer to arrive on the scene of Dakota Access construction site where Protestors were trespassing after caravanning there from the Main Camp. Doc. No. 434, p. 177:15–179:13; PX-1626; JX-265, p. D-7.

205.   A Protestor driving a black Jeep ran Captain Pederson off the road while Captain Pederson was trying to arrive at the trespass site. Doc. No. 434, p. 177:15–179:13; PX-1626.

206.   That day, the Protestors significantly vandalized the construction site. Doc. No. 434, p. 180:8–19; JX-265, p. D-7.

207.   Later that day, the Protestors caravanned to another site, the Morrell Farm, where they were eventually arrested. Doc. No. 434, p. 182:2–15.

208.    Captain Pederson personally saw similar caravanning, trespass, and vandalism events originating from Protest camps on Corps-managed land. Id. at 183:4–14, 186:6–11.

209.    Lt. Col. Startzell emailed Corps personnel a Morton County Operations Order ("OPORD") daily update regarding Protest camps on September 25, 2016, and stated, "All of this information basically confirms the Commander's assessment that the camps are growing out of [the Tribe's] control, and [Chairman Archambault] is probably going to try and use the [Special Use Permit] as a way to regain control of what he sees as legitimate protestors." JX-139, p. 1.

210.    On September 27, 2016, Protestors caravanned from the Main Camp to trespass and vandalize another DAPL construction site on private land. Doc. No. 433, p. 34:13–36:9; PX-1658.

211.    By October 4, 2016, Col. Henderson did not think Chairman Archambault (and by extension the Tribe) had control of Protestors on Corps-managed land. Doc. No. 438, p. 107:19–108:6, 163:5–24.

212.    On. October 3, 2016, Schulz met with Corps leadership, including Brig. Gen. Spellmon and made two requests: (1) that the Corps enforce its rules on Corps-managed land, declare the Protestors as trespassers, and have them arrested or evicted; and (2) that federal law enforcement support local efforts to maintain public safety. Doc. No. 432, p. 86:25–88:11.

213.    On October 7, 2016, Morton County and North Dakota established a Unified Command structure to streamline internal communication between State law enforcement agencies and NDDES in responding to the Protests. Doc. Nos. 432, p. 81:6–17; 437, p. 90:23–91:9; PX-1272, p. 2; PX-1211.

214.    The move from an "Incident Command structure" to a "Unified Command structure" changed the decision-making leadership from one individual—Sheriff Kirchmeier—to three people—Sheriff Kirchmeier, Gen. Dohrmann, and Colonel Michael Gerhart ("Col. Gerhart"). Doc. No. 435, p. 31:17–24.

215.    The decision to move to this structure was a collective decision between Sheriff Kirchmeier (Morton County), Gen. Dohrmann (Department of Energy Services), and Col. Gerhart (North Dakota) with support from then-Governor Dalrymple (North Dakota). Id. at 32:11–18.

216.    In the end, the Unified Command was collectively led by Gen. Dohrmann, Col. Gerhart, and Sheriff Kirchmeier. Doc. No. 434, p. 160:20–161:1.

217.    At the time, Sheriff Kirchmeier noted the Protest "appears to have no end in sight and the size of the protest community is estimated to exceed 3,000 persons." PX-1211, p. 1.

218.    North Dakota law enforcement had, according to Sheriff Kirchmeier, "accrued more than 33,643 hours of overtime" and total costs as of October 7, 2016, exceeded $1.4 million. Id.

219.    Once the State got involved in the Protest response, the EOC moved from the Morton County Sheriff's Office to the Fraine Barracks, and the Sheriff's Office was repurposed as the Tactical Operations Center ("TOC"). Doc. No. 433, p. 143:17–144:1.

220.    On October 10, 2016, the Departments of Justice, Army, and the Interior released another joint statement ("Oct. 10 Joint Statement"), repeating their "request that the pipeline company voluntarily pause all construction activity within 20 miles east or west of Lake Oahe." PX-1215, p. 2.

221.    The Oct. 10 Joint Statement frustrated Sheriff Kirchmeier, who felt it was "more nonaction from the government that is putting more pressure on the County, on [him] and all other law enforcement to keep [the Protests] safe with no endgame in place." Doc. No. 433, p. 183:13–24; PX-1215, p. 1.

222.    On October 13, 2016, Lt. Gen. Semonite sent an internal Corps email expressly acknowledging the need to control the situation on Corps-managed land, stating:

>    What is our position to Congress (SEN H)[18] why [the Corps] has allowed trespassing and camping on GOV'T land on the north side…effectively condoning the tribes to violate the law both on our land as well as other lands? When is [the Corps] going to do something to get this under control - while many might move to other camps, some will stay just to embolden the effort? Is there some event that will cause us to ask Sheriff to enforce the law?

PX-1221 at p. 2 (footnote added).

223.    Lt. Gen. Semonite saw a "high potential for increased conflict" at the Protests and asked, "What is our talking point on why the easement [for the Dakota Access Lake Oahe crossing] hasn't been approved . . . ?" Id.

224.    In another email on October 13, 2016, Lt. Gen. Semonite wrote, Senator Hoeven "will push me on why hasn't federal GOV'T provided any relief to the state for law enforcement? If the Federal Gov't is putting a hold on this...while North []Dakota is assuming a lot of security missions – can't handle without resources?" PX-1223, p. 2.

225.    On October 14, 2016, Lt. Gen. Semonite stated he wanted to "ensure that [the Corps] doesn't get further wrapped into an EXTENDED administration delay or blocking action." Id. at 1.

226.    Ultimately, Lt. Gen. Semonite felt the Corps did its "due diligence" by considering the easement for DAPL and that delaying a decision on Dakota Access's requested easement "was not necessarily in keeping with our obligations" to Dakota Access. Doc. No. 405-7,

---

[18] Earlier in the email, Lt. Gen. Semonite refers to "SEN Ho[e]ven." PX-1221, p. 2. The Court presumes SEN H refers to United States Senator John Hoeven.

p. 18:68:9–69:24.

227.    Lt. Gen. Semonite stated that by the "middle of October, the Corps was really out of the process of determining how to resolve this" in referring to the Protests. Id. at 26:98:2–16.

228.    The destructive and disruptive Protests were not confined to the DAPL construction site and on October 17, 2016, Protestors travelled to Bismarck, North Dakota, to block traffic on the Memorial Bridge between Bismarck and Mandan, North Dakota. Doc. No. 433, p. 36:11–37:6; PX-2041, p. 92; PX-1704.

**XII.    The "Big Push"**

229.    On October 23, 2016, one Protestor was arrested from a group trespassing on private land near the DAPL construction crossing of Highway 1806. Doc. No. 433, p. 47:21–49:17; PX-1705.

230.    In response, more Protestors travelled from the Main Camp to the arrest site. Doc. No. 433, p. 47:21–49:17; PX-1705.

231.    A small contingent of Protestors camped in the ditch near the arrest area on the Highway 1806 right of way, known as the "North Camp." Doc. Nos. 433, p. 162:8–16; 434, p. 24:1–4.

232.    The same day, Protestors moved onto Dakota Access-owned property in the DAPL route. Doc. Nos. 433, p. 162:8–16; 434, p. 24:5–7, 107:18–108:5.

233.    Dakota Access requested North Dakota remove those individuals from its property. Doc. No. 434, p. 108:6–10.

234.    Answering this request, North Dakota organized and coordinated a law enforcement response to remove the trespassing individuals from the North Camp, called the "Big Push." Doc. Nos. 433, p. 162:4–24; 434, p. 108:6–109:12; 435, p. 52:14–53:17; 440, p. 111:12–25, 177:24–178:25, 202:2–15; PX-2041, p. 101–32.

235.    The planning process for the Big Push involved: (1) requesting law enforcement support through the Emergency Management Assistance Compact ("EMAC"), putting a staging area together north of the North Camp with medical support, food, supplies, and fuel; (2) coordinating with North Dakota state agencies including the Department of Health and Game and Fish; (3) coordinating with the Governor's Office; and (4) planning for contingencies; and all planning was done with the goal of protecting both Protestors and law enforcement. Doc. Nos. 434, p. 196:2–199:5; 435, p. 53:8–11.

236.    Because Unified Command was unable to accrue a full complement of law enforcement personnel it deemed necessary for the Big Push, Unified Command "ma[d]e one more plea for help" from federal law enforcement for additional manpower, including contacting the U.S. Customs and Border Protection ("Border Patrol") and Marshals Service. Doc. No. 434, p. 199:6–201:8.

237.    Border Patrol attempted to send troopers to North Dakota, but the plane was stopped on the tarmac before it could depart. Id. at 200:1–12.

238.    North Dakota law enforcement initially planned to conduct the Big Push on October 26, 2016, but learned Protestors knew of the plan. Id. at 108:11–111:10.

239.    On October 26, 2016, North Dakota law enforcement officials met with Protest leaders to convince the trespassers to leave the North Camp peacefully and without the need for a law enforcement action. Doc. Nos. 433, p. 164:5–165:3; 434, p. 108:11–111:10; 435, p. 53:18–56:21; 437, p. 130:12–25; DX-4256.

240.    During this meeting, Mekasi (a leader of the Protestors) asked Dakota Access to agree in writing to the "20-mile buffer zone that the United States government asked for" in the Sept. 9 Joint Statement. DX-4256, at 20:55; Doc. No. 434, p. 114:9–115:25.

241.    The negotiations failed, Protestors chose to continue their trespass and refused to leave the private property, calling the location their "no surrender line." DX-4256, at 29:20; Doc. No. 435, p. 53:18–56:14.

242.    On October 27, 2016, North Dakota law enforcement officers initiated the Big Push and removed the trespassing Protestors from Dakota Access's private property by forming a line and slowly, over the course of eight hours, walking the Protestors 2.1 miles back to the Main Camp. Doc. Nos. 434, p. 116:19–118:2; 435, p. 52:14–24.

243.    During this process, a Protestor who was being placed under arrest caused significant risk to law enforcement by discharging a firearm three times at officers. Doc. Nos. 433, p. 165:9–19; 434, p. 202:22–203:16; 435, p. 59:5–60:19; JX-266n, p. 79; PX-1436.

244.    Several Protestors attempted to cause a stampede of a herd of buffalo towards the law enforcement officers during the Big Push. Doc. No. 433, p. 55:3–60:5; PX-2041, p. 123–26; PX-1258.

245.    Trooper Gallagher stopped any harm to the officers by diverting the stampeding buffalo with the NDHP plane, flying as low as fifteen feet off the ground. Doc. Nos. 433, p. 55:3–60:5; 434, p. 118:3–119:12; PX-2041, p. 123–26; PX-1258.

246.    During the Big Push, Protestors burned numerous vehicles on Highway 1806, including three on Backwater Bridge, and DAPL construction equipment. Doc. Nos. 433, p. 52:19–53:4, 54:10–55:2, 61:4–62:14; 434, p. 119:13–14; PX-2041, p. 112–13, 118–21, 128–29.

247.    Protestors threw Molotov cocktails, rocks, and fired shots at North Dakota law enforcement officers; they set a roadblock; and lit law enforcement vehicles on fire at a bridge on Morton County Road 134 and on the Backwater Bridge on North Dakota Highway 1806. Doc. No. 434, p. 202:5–21; JX-268, p. 5.

248.  Protestors also ran a truck driven by a DAPL security guard off Highway 1806 and forced the guard out of his truck, and later set the truck on fire. Doc. No. 433, p. 61:4–63:22; PX-2041, p. 128–31.

249.  The guard had a long rifle and was backed into a body of water off the highway by Protestors. Doc. No. 433, p. 61:4–63:22; PX-2041, p. 128–31.

250.  In the end, North Dakota law enforcement was successful in removing the trespassing Protestors from Dakota Access's land per its request and without serious injuries or deaths. Doc. No. 433, p. 119:6–120:6; JX-14, p. 39.

251.  After the Big Push, Highway 1806 remained barricaded north of the Main Camp at the Backwater Bridge, where Protestors set on fire several trucks on fire. Doc. Nos. 433, p. 167:5–18; 435, p. 75:9–76:6; JX-227.

252.  North Dakota law enforcement added barriers to Backwater Bridge both to keep Protestors off, due damage to the bridge's structural integrity, and to keep Protestors from heading north from the Main Camp to access the construction site. Doc. Nos. 433, p. 167:5–18; 435, p. 75:9–76:6.

253.  The Backwater Bridge was important to law enforcement because it was a choke point that kept Protestors from being able to travel to the drill site or to otherwise overwhelm strained North Dakota law enforcement resources. Doc. No. 434, p. 6:10–7:3.

254.  The barriers also helped law enforcement control the flow of Protestors. Doc. No. 435, p. 75:9–22.

### XIII.  Post-Big Push and the Events Leading to the Backwater Bridge Riot

255.  On October 28, 2016, Brig. Gen. Spellmon emailed Lt. Gen. Semonite and other senior Corps officials stating, "[B]ased on yesterday's escalation of force incidents, we are going to revoke the Special Use Permit for the [Tribe] camp effective immediately." JX-170, p. 1.

256.  Brig. Gen. Spellmon justified revoking the non-existent Special Use Permit by noting Protest activity continued to not be prayerful and peaceful; that life, health and safety of those in the area were all at risk; Protestor behavior encouraged reckless endangerment; and private property was damaged and destroyed. Id.

257.  Brig. Gen. Spellmon further pledged the Corps would "work with the Chairman to set suspenses [sic] for camp movement, issuance of trespass notices, and court orders." Id.

258.  In the Nov. 1, 2016, Letter, the Corps asked Sheriff Kirchmeier to remove individuals from Corps-managed land **north** of the existing Protest camps, stating:

> The Corps of Engineers has not provided any permits or permissions for anyone to access that area of the federal property we manage. It is an area

that has not been opened for use by the public for recreational or camping purposes. As such, the Corps of Engineers would consider these individuals to be trespassers. On behalf of the Corps of Engineers, as a property owner, I am requesting law enforcement assistance in this matter, as needed.

JX-174.

259. Importantly, Col. Henderson explicitly did not request assistance for any of the camps "south of the Cannonball River" or the "Oceti Sakowin Camp." Id.; Doc. No. 433, p. 179:8–17.

260. North Dakota law enforcement responded to the Corps' request, by stopping Protestors on November 2, 2016, from accessing "Turtle Hill," which was a key access point to Corps-managed land closed by the Nov. 1, 2016, Letter. Doc. No. 433, p. 64:23–71:8, 178:4– 179:7; PX-2041, p. 134–41.

261. Protestors wanted to access Turtle Hill to have a better vantage point for the Dakota Access drill site because the Backwater Bridge was barricaded. Doc. Nos. 433, p. 64:23–71:8, 178:4–179:7; 434, p. 122:11–25; PX-2041, p. 134–41.

262. Throughout November 2016, confrontations between North Dakota law enforcement and Protestors at Turtle Hill regularly occurred. Doc. No. 433, p. 176:2–179:7; PX-1885; JX-265, p. D-16–D-17.

263. With law enforcement protecting access to Turtle Hill on land, Protestors would try to build floating bridges and swim across the Cantapeta Creek to gain access. Doc. Nos. 433, p. 176:2–179:7; 434, p. 212:14–213:5; JX-174; JX-265, p. D-16–D-17; PX-1885.

264. During this time, the Corps did not allow vehicles on Turtle Hill but asked North Dakota law enforcement to honor the vehicle restriction after a law enforcement vehicle ran into a tree and broke a tree limb. Doc. No. 434, p. 215:21–216:14.

265. President Barak Obama made public remarks regarding the Protests around November 2, 2016, essentially admitting the federal government was going to let the Protests play out for several more weeks. Doc. Nos. 432, p. 143:2–144:15; 433, p. 184:19–24; 404-3, p. 18:62:7–23; PX-1279, p. 2–3.

266. On November 3, 2016, Protestors traveled to the North Dakota State Capitol grounds, entered the judicial wing of the Capitol Building, and refused to leave. Doc. No. 434, p. 203:22–205:8; JX-265, p. D-17; PX-1783.

267. Protestors did not have a permit and were arrested after refusing to leave despite several reasoned requests from North Dakota law enforcement. Doc. No. 435, p. 64:12–65:9; PX-1783.

268. That same day, Captain Pederson evacuated then-Governor Dalrymple and then-First Lady

from the Governor's residence due to the threatening presence of the Protestors. Doc. No. 434, p. 203:22–205:8.

269.    On November 12, 2016, Protestors caravanned from the Main Camp to private property where DAPL construction equipment was stored known as the Precision Pipeyard. Doc. No. 433, p. 42:5–44:10; PX-1819.

270.    Protestors blocked traffic in this area, at one point surrounded a private citizen's vehicle and trailer hauling a Bobcat, and vandalized the equipment, resulting in the citizen pulling a gun. Doc. No. 433, p. 44:11–46:18; PX-1819.

271.    Around November 12, 2016, the Corps transmitted a Special Use Permit to Faith Spotted Eagle ("Spotted Eagle") (known leader within the camps) to allow a religious ceremony near the DAPL drill pad that would drill under Lake Oahe for the DAPL crossing. JX-193; Doc. No. 433, p. 179:21–180:7.

272.    On November 14, 2016, Lt. Col. Startzell told Sheriff Kirchmeier the Corps did not have a signed and returned copy of the Spotted Eagle Special Use Permit. JX-193.

273.    Despite a lack of a signed Special Use Permit, Lt. Col. Startzell told Sheriff Kirchmeier the Corps would allow the event to proceed. Id.

274.    Sheriff Kirchmeier opposed the decision to allow the ceremony and conveyed this opinion to the Corps. Doc. No. 433, p. 180:8–15.

275.    Another Protestor caravan from the Main Camp occurred on November 15, 2016, during which about 300 Protestors blocked a railroad crossing near the DAPL construction equipment storage area with a pickup truck. Doc. Nos. 433, p. 40:8–42:3; 435, p. 65:10–22; PX-2041, p. 142–47; JX-265, p. D-21.

276.    A Protestor placed a rag in the fuel cap of the pickup and attempted to set it on fire, but a North Dakota trooper intervened. Doc. No. 435, p. 65:23–66:10.

277.    Separately, later that day about 100 Protestors marched in Mandan, which resulted in twenty-five arrests. JX-265, p. D-21.

XIV.    **Backwater Bridge Riot**

278.    A significant Protestor riot[19] (later coined the Backwater Bridge Riot) (the "Riot") occurred on November 20, 2016, during which the Protestors attempted to cross the Backwater Bridge and remove the barriers that had been in place since the Big Push. Doc. No. 433, p. 167:5–168:11; JX-227.

279.    At the beginning, Protestors refused to leave the Backwater Bridge when given audible

_____

[19] Col. Gerhart testified the Protestors' actions during this conflict constituted riotous behavior. Doc. No. 435, p. 72:12–16.

orders from a long-range acoustical device (LRAD) to do so by law enforcement. Doc. Nos. 433, p. 167:19–22; 434, p. 7:24–8:17; 435, p. 70:14–24.

280. When the Riot began, there were only approximately thirty law enforcement officers on scene and, due to the Riot's quick escalation, Sheriff Kirchmeier eventually had to issue two "Code Red" alerts to call in additional law enforcement. Doc. Nos. 433, p. 167:23–168:11; 434, p. 5:16–6:9; JX-266, p. 119.

281. The "Code Red" requested all law enforcement officers anywhere in North Dakota to respond to Backwater Bridge that night. Doc. No. 434, p. 8:18–24.

282. Even though roughly 125 Code Red calls were issued due to the tumultuous behavior of Protestors during the Protests, this instance was the only time in the eight-month Protest a statewide Code Red was issued. Doc. No. 435, p. 69:3–70:3.

283. During the Riot, Protestors set multiple fires, which prompted the Morton County Sheriff's Department to request a fire truck to the area. Doc. No. 433, p. 169:4–10; JX-227, p. 2.

284. Earlier in the day on November 20, 2016, law enforcement secured barriers to the bridge with water from the fire truck because the Protestors frequently tried to remove the previous barriers, including using a semi-truck to pull the barriers off. Doc. No. 435, p. 75:9–76:6.

285. Eventually, to diffuse the Riot before it escalated out of control, Sheriff Kirchmeier approved the use of the fire truck's water hose on Protestors[20] due to riotous behavior and obstinate noncompliance with the lawful audible orders to disperse. Doc. No. 434, p. 7:9–23.

286. Rioters repeatedly assaulted law enforcement officers with rocks, bottles, and Molotov cocktails. Doc. Nos. 432, p. 116:4–19; 435, p. 70:18–24.

287. Due to the intensity of the altercations, North Dakota law enforcement officials feared for the health and safety of the officers on scene as Protestors attempted to get around police lines. Doc. Nos. 432, p. 116:4–19; 435, p. 70:25–72:1; PX-1319.

## XV.    "Free Speech Zone" Declaration and the Corps' Other Actions after the Riot

288. On November 22, 2016, Col. Henderson emailed Brig. Gen. Spellmon, Maj. Gen. Jackson, and David Cooper summarizing a phone call Col. Henderson had with Gen. Dohrmann, Chris Meyers (North Dakota United States' Attorney's Office), and Sheriff Kirchmeier. JX-205.

---

[20] North Dakota's expert David Pearson testified the use of water on Protestors during the Riot was an "improvised" use of force not set out in law enforcement policies and was reasonable given the circumstances. Doc. No. 439, p. 103:14–106:10.

289.    In this email, Col. Henderson wrote:

> Outcome here was the need to better-define and communicate their jurisdiction on Corps land. We will work to provide the Tribes and law enforcement with a letter that states the following.
>
> - Oahe project lands north of the Cannonball River is closed to the public (effective 05DEC16). This keeps us out of the business of inconsistently treating people as trespassers based on the changing law enforcement requirements. It also publically [sic] states our position with regard to the trespass violations on our grazing lease.
>
> - We will strongly encourage the Tribal leaders to move out of this area north of the Cannonball River as the current situation presents a serious risk of life and safety for those staying in the camps. Additionally, we'll officially state that they are in violation of several title 36 statutes and notify the Tribes they are assuming the risk for anyone who chooses to remain in this camps [sic].
>
> - Clarification of what "proprietary jurisdiction" is for all involved. Essentially this means that Morton County has jurisdiction to conduct law enforcement activities on Corps land (to include inside of the camps) when enforcing State and local laws (they do not have title 36 authority). Therefore, they do not need to ask permission to come on to public land to enforce local laws. This has always been the case.
>
> - We will identify a "free speech zone" south of the Cannon Ball River to ensure that we continue to honor 1st Amendment rights.
>
> - Finally, any request for the use of "control measures" on Corps land for the use of law enforcement activities to protest adjacent private land must be requested and approved by the DE.

Id. at 2.

290.    On November 23, 2016, then-Governor Dalrymple, Senator Hoeven, and Congressman Cramer sent a request for the Corps to act on the federal easement for Lake Oahe and provide federal resources "to protect people and property in the area of violent Protests." PX-1314, p.2.

291.    On November 24, 2016, protests in Mandan blocked the intersection of Main Avenue, Mandan Avenue, and 13th Avenue, and Protestors paraded a pig's head on a pike. Doc. No. 434, p. 207:20–210:9; JX-265, p. D-23–D-24; JX-266, p. 125.

292.    Also on November 24, 2016, law enforcement confronted Protestors at Turtle Hill where

Protestors started fires, fired slingshots, and threw rocks at North Dakota law enforcement. Doc. Nos. 433, p. 176:2–179:7; 434, p. 214:20–215:20; JX-174; PX-1885.

293. Several events occurred on November 25, 2016:

    i. Protestors travelled to and protested at the mall in Bismarck and refused to disperse when ordered, resulting in thirty-three arrests of people identified by Captain Pederson as from the Protest camps due to his familiarity with individuals from the camps, the campfire smell on their persons, and the "NO-DAPL" chants. Doc. No. 434, p. 211:3–212:13; JX-265, p. D-24.

    ii. Col. Henderson sent an email to Lt. Col. Startzell and other Corps personnel, stating two letters were written for circulation: (1) a letter to sixteen Tribal Chairmen notifying them the Corps was closing Corps-managed land north of the Cannonball River effective December 5th but that the Corps was establishing a "free speech zone" south of the Cannonball River on Corps land; and (2) a letter to the Morton County Sheriff's Department clarifying "law enforcement jurisdictional questions" on Corps managed federal property. JX-211, p. 1, 4.

    iii. Col. Henderson rescinded the Nov. 1, 2016, Letter request to Sheriff Kirchmeier, stating, "At this time, the Corps of Engineers is not seeking any specific assistance for the protection of government lands in the vicinity of the confluence of the Cannonball River and Missouri River with regards to the presence of Dakota Access pipeline protestors occupying such lands." JX-210.

    iv. The Corps, by and through Col. Henderson, issued a letter to Chairman Archambault ("Free Speech Zone Letter") establishing a "free speech zone" south of the Cannonball River and stated Corps-managed land north of the Cannonball River would be closed to public use, the first time the Corps issued an order for Protestors to evacuate that land. Doc. No. 438, p. 125:15–20; JX-213.

294. In his twenty-three-year career with the Corps, Col. Henderson had never seen nor heard of the Corps establishing a "free speech zone" on Corps-managed land. Doc. No. 438, p. 124:24–125:14.

295. Despite lacking any precedent for a "free speech zone," Col. Henderson independently concluded a Special Use Permit was "a worthless piece of bureaucracy" and a "piece of paper wasn't going to mean anything" regarding the Free Speech Zone Letter. Doc. No. 439, p. 35:10–18.

296. There is no Corps policy, practice, or regulation that authorizes or otherwise recognizes a "free speech zone." Doc. No. 440, p. 10:10–12.

297. Col. Henderson testified his intent for the Free Speech Zone Letter was not to request that North Dakota law enforcement remove the Protestors from Corps-managed land north of

the Cannonball River. Doc. No. 438, p. 135:10–14.

298.    On November 26, 2016, the day after the Free Speech Zone Letter, Col. Henderson emailed Spotted Eagle stating:

> As you can imagine, this is a very difficult decision. While we completely support the right for lawful and peaceful protest, and mean absolutely no disrespect to Tribes who are advocating for this, it is apparent that there exists a more dangerous non-Tribal out-of-State group which continues to provoke conflict (in spite of pleas from Tribal leaders and elders to do otherwise). Unfortunately, it is very hard for us to fairly delineate between these different factions. With the conflicts escalating and the recent severe injuries, I would be remiss in my duties if we didn't clearly articulate the rule of law as it applies here and work to protect the general public in these areas. For instance, it is not safe to go fishing or hunting [in] these areas which are normally open to fishing and hunting this time of year.
>
> Also, please know that these letters to our Tribal leaders [are] really more of a public acknowledgement of the existing laws and status quo; nothing has changed except that we are stating this publically [sic] now. For instance, we have never been able to issue permission to anyone on the north side of the Cannonball River because of the pre-existing lease to Dave Meyer for grazing in this area, although we have always fully supported the encampments on the south side of the River that are on Corps land. In this area, BIA police have jurisdiction, and emergency response can be provided from Fort Yates.
>
> We fully expect that most people will choose not to move from the camp on the north side of the river; we understand that. Additionally, please know that we are not advocating for any law enforcement to come in to "clear out the camps." Alternatively, we are just clarifying for everyone publically [sic], that they are considered to be trespassing on the north side of the Cannonball River. If they choose to remain there, they are to do so at their own risk. In other words, we can no longer assume the liabilities for risk of injury on Corps land for those who were not allowed to be there in the first place... which has always been the case.

PX-1317, p. 1.

299.    That same day, Lt. Gen. Semonite advised the Chief of Staff of the United States Army General Mark A. Milley that Protest activity would remain at the current status quo until there was a decision on the DAPL easement. JX-218, p. 2.

300.    Also on November 26, 2016, Schulz issued a press release calling the Free Speech Zone Letter "long overdue" and stating, "[T]his decision [to close the Main Camp] means nothing unless the federal government follows up by sending federal law enforcement personnel to enforce the decision." PX-1319, p. 1.

301. According to Schulz, the Free Speech Zone Letter had no measurable impact on Protestors occupying Corps-managed land due to the Corps' failure to request North Dakota law enforcement remove Protestors and otherwise failing to provide enforcement. Doc. No. 432, p. 183:21–184:11.

302. On November 28, 2016, then-Governor Dalrymple issued Executive Order 2016-08 ordering the evacuation of the Protest camps: "Any person who chooses to enter, renter, or stay in the evacuation does so at their own risk, and assumes any and all corresponding liabilities for their unlawful presence and occupation of the evacuation area." JX-220, p. 2.

## XVI.    The Corps Denies the DAPL Easement

303. On December 4, 2016, the Corps announced it would not approve the DAPL crossing easement for the DAPL pipeline, and Cody Schulz—North Dakota's Disaster Recovery Chief at NDDES, as well as, a County Commissioner in Morton County during the Protests—issued a press release criticizing the Department of the Army for taking so long to make a decision while "let[ting] the citizens of Morton County, law enforcement officers, and protesters suffer for months." Doc. No. 432, p. 118:2–12; PX-2027; Doc. No. 432, p. 58:21–60:7.

304. Cody Schulz also stated, "During the past three months, County and State leaders have been requesting federal law enforcement resources to deal with issues that are clearly the federal government's responsibility, but those requests have largely been ignored." PX-2027, p. 1.

305. Schulz also said, "Given that this announcement is so contrary to Judge Boasberg's decision and analysis, I fear that it sends the message that if you disagree with a law or policy, you can get your way by shooting at police, throwing explosives at them, starting fires, seizing highways and destroying private property." Id.

306. According to Chase Iron Eyes, Protestors viewed the denial as encouraging and held a "victory celebration." Doc. No. 446, p. 201:4–16.

307. Winona LaDuke and other Protestors "were grateful" the Department of the Army denied Dakota Access the DAPL crossing easement. Doc. No. 447, p. 44:18–46:8.

308. On December 4, 2016, the population of the camps swelled to its peak due to approximately 3,000 veterans joining the Protests. Doc. No. 446, p. 201:17–23.

## XVII.   More Chaos Ensues

309. A Protestor rammed a car into the law enforcement barricade at Backwater Bridge on December 9, 2016. Doc. No. 433, p. 115:19–118:1; PX-2025.

310. Protestors conducted continued disruptive, violent, and unlawful activities in December

2016 and January and February 2017, including (1) attempting to circumvent the Backwater Bridge barrier multiple times throughout December and January, including tampering with law enforcement lights and security cameras and setting fires on January 18, 2017; (2) trespassing on Turtle Hill on December 19, 27, and 31, 2016, January 9 and 16, 2016; and (3) lighting fires on December 31, 2016. JX-265, p. D-26–D-40.

311.    Many of these events resulted in arrests of Protestors. Id.

312.    In February 2017, around forty Protestors trespassed onto private land owned by Dakota Access on the west side of Highway 1806—directly west of the Main Camp—using a pay loader to clear snow, erecting teepees, and establishing the Last Child Camp. Id. at D-35–D-36; Doc. No. 446, p. 207:23–208:2.

313.    North Dakota law enforcement unsuccessfully attempted to convince the Protestors, including their leader, Chase Iron Eyes, to peacefully leave the private land. Doc. No. 446, p. 208:7–215:13; JX-265, p. D-35–D-36; PX-1903–PX-1908.

314.    According to Iron Eyes, he "wouldn't characterize" his interactions with North Dakota law enforcement that day as being aggressive or abusive. Doc. No. 446, p. 215:23–216:10.

## XVIII.  Final Closure and Clearing of Protest Camps

315.    The Corps-managed land at issue is located on a floodplain. Doc. Nos. 443, p. 85:6–8; 447, p. 49:6–9.

316.    From the end of November into December 2016 and January 2017, the Protest area, including Corps-managed land, received significant snowfall. Doc. Nos. 432, p. 123:2–18; 433, p. 14:24–15:6; 434, p. 55:22–24; PX-2041, p. 149–56.

317.    Temperatures began warming up in February 2017, which predictably resulted in melting snow. Doc. Nos. 433, p. 16:13–17:14; 434, p. 128:24–129:5; PX-2041, p. 155–56.

318.    On February 3, 2017, Col. Henderson wrote to the Tribe stating Corps-managed land remained closed and Protestors had until February 22, 2017, to retrieve any personal items from the land. JX-247.

319.    Then-Governor Doug Burgum[21] issued an Executive Order on February 15, 2017, requiring Protestors to evacuate Corps-managed land by February 22, 2017, due to the safety and environmental issues Protestors could face in the warming weather. Doc. No. 437, p. 42:13–43:7; JX-252, p. 2.

320.    To enforce this Executive Order, North Dakota law enforcement officers and Highway

---

[21] Doug Burgum was elected to be Governor of North Dakota on November 8, 2016, and assumed office on December 15, 2016. Doc. No. 437, p. 5:22–6:2. On January 30, 2025, the Senate confirmed his nomination as United States Secretary of the Interior. Roll Call Vote for the 1st Session, Vote No. 26, 119th Cong. (2025).

Patrol (assisted by Mutual Aid and EMAC law enforcement) removed the remaining Protestors from Corps-managed land on February 23, 2017. Doc. No. 432, p. 125:8–25.

321.   The North Dakota National Guard provided logistical support to clearing Protest camps during this time. Id.

322.   Prior to the Guard's involvement, Gen. Dohrmann requested assistance from federal entities but did not receive any federal law enforcement resources for clearing the Main Camp. Doc. No. 437, p. 137:3–7, 138:6–18. See also PX-1388.

323.   To clear out the camps, North Dakota law enforcement formed a long line of officers to move through the camps both on foot and on ATVs. Doc. No. 434, p. 219:23–221:10.

324.   Each building or structure in the Protest camps had to be checked and cleared by law enforcement to ensure no one was hiding in them. Id.

325.   During the clearing, Protestors set fires to several structures, which required officers to forcibly remove some Protestors. Doc. Nos. 432, p. 128:13–129:3; 434 p. 15:23–16:4, 130:16–131:1.

326.   The State had to use a bulldozer and excavators to raze structures that had been erected so the trash removal process could begin. Doc. No. 434, p. 14:24–15:22.

327.   The Protestors left significant observable amounts of garbage and human waste, and a spoiled environment. Doc. No. 434, p. 218:12–219:8.

328.   Morton County contracted for the cleanup, completed by February 27, 2017, resulting in the removal of about 10 million pounds of trash and debris and costing the county approximately $430,000. Doc. No. 432, p. 137:1–25; PX-1942–PX-1951, PX-1953–PX-1991.

329.   Trash and debris removal totaled approximately 5,000 tons, with Morton County contractors' portion totaling approximately 3,400 tons; there were also approximately 46 "apparatuses" towed or moved, including abandoned cars, snowblowers, various equipment and other large objects. Doc. Nos. 432, p. 138:1–15; 443, p. 85:2–3; PX-1940–PX-1951; PX-1983–PX-2001.

330.   During the cleanup, crew found several hundred to over a thousand propane canisters. Doc. Nos. 437, p. 36:6–20; 443, p. 84:9–22.

331.   Protestors had not properly disposed of human waste, which pooled in waste "lagoons." Doc. No. 438, p. 100:25–102:2; JX-137, p. 2.

332.   To ensure Protest camps were not repopulated once cleared, NDHP maintained traffic control points and only allowed access to Highway 1806 by way of monitored pilot cars. Doc. No. 434, p. 221:20–222:20.

333.  Once the camp was cleared out, the North Dakota Department of Transportation safely conducted a structural analysis of Backwater Bridge, looking for any permanent damage. Doc. Nos. 405-6, p. 5:8:7–11:5; 434, p. 16:5–20.

## XIX.   The Number of Protestors and Arrests

334.  The State of North Dakota, through NDDES, kept records of vehicle counts during the Protests using aerial imagery of Protest camps, which estimated populations from October 14, 2016, through February 2017, with a high estimate of 6,000 people in the camps on December 4, 2016, and provided these estimates to Corps' officials. Doc. No. 433, p. 97:3–105:9; JX-181.

335.  Other population estimates ranged from 1,500–10,000 people throughout the Protests. JX-13, p. 13; JX-9, p. 1, 5, 9, 29.

336.  NDDES compiled a daily summary of events that was eventually incorporated into North Dakota's After Action Review of the Protests. Doc. Nos. 433, p. 114:14–115:18 437, p. 158:21–159:3; JX-265, p. D-2–D-43.

337.  During the Protests, the Morton County Sheriff's Office created and produced "Know the Truth" videos to combat misinformation about law enforcement's handling of the Protests spreading on social media. Doc. No. 434, 17:4–18:2; JX-2019.

338.  No deaths occurred despite the almost eight-month long Protests having frequently unsafe, unsanitary, and hazardous conditions and unlawful conduct. Doc. No. 433, 119:6–120:6; JX-14, p. DOI_00013275.

339.  North Dakota arrest records showed only fifty-one of the 761 total arrests—or 6.7% of the total arrests—made during the Protests were from North Dakota, with the remaining arrests of individuals from forty-seven states and four other countries. JX-268, p. 2.

## XX.   The Corps Failed to Provide Enforcement of Its Own Rules and Regulations

340.  Corps park rangers have the authority to issue written citations for violations occurring on Corps-managed land under Title 36 C.F.R. Part 327, including requirements for a mandatory court appearance. Doc. No. 440, p. 28:5–23.

341.  The Corps failed to issue even a single citation to a Protestor during the entirety of the Protests. Doc. Nos. 405-7, p. 24:92:9–93:6; 438, p. 183:4–16.

342.  Prior to the Protests, the Corps had contacted Sheriff Kirchmeier to remove persons from Corps-managed land that were not authorized to be there, including a group of Canadians camping on Corps-managed land around 2014. Doc. No. 432, p. 92:10–20, 149:18–151:3.

343.  Despite these prior requests, during the Protests neither Col. Henderson nor the Corps

requested that North Dakota state or local law enforcement remove the Protestors from the Main Camp, except for the Nov. 1, 2016, Letter requesting North Dakota remove Protestors from Turtle Hill. Doc. Nos. 433, p. 160:1–9, 176:2–179:17; 438, p. 89:2–12; 443, p. 60:5–62:10; JX-174; JX-210.

344.    North Dakota law enforcement does not remove trespassers from private land without a request from the landowner to do so. Doc. Nos. 432, p. 183:21–184:25; 434, p. 123:15–124:20; 438, p. 6:14–18.

345.    During the Protests, Morton County law enforcement received, and responded to, a 911 call to aid a group of reporters in the Main Camp that were not being allowed to leave. Doc. No. 434, p. 408, p. 3–16.

346.    At the Corps' request, North Dakota law enforcement helped to secure Corps offices in Bismarck when DAPL-related protests took place in front of those offices. Id. at 192:5–18.

347.    Sheriff Kirchmeier never received support from the federal government, despite multiple requests including

      i.    a telephone call with U.S. Attorney General Loretta Lynch ("AG Lynch") where Sheriff Kirchmeier requested federal law enforcement support, to which he received no response, Doc. No. 433, p. 174:21–176:1;

      ii.    a request to President Obama on December 9, 2016, for federal assistance, including financial assistance and manpower, Id. at 185:14–22, PX-1332;

      iii.   a request to President-elect Trump on December 21, 2016, Doc. No. 433, p. 186:1–12, JX-231, p.2; and

      iv.   a letter to AG Lynch, U.S. Secretary of the Interior Jewell ("Secretary Jewell"), and U.S. Secretary of Homeland Security Johnson requesting mutual aid assistance from the Marshals Service, Border Patrol, and BIA, Doc. No. 433, p. 186:13–188:6, PX-1349.

Doc. No. 433, p. 154: 10–13, 169:18–170:1, 188:7–14.

348.    Captain Pederson, through John Voeller, also made multiple requests for the Corps to enforce its own rules and disperse Protestors; requests which were never answered. Doc. No. 434, p. 163:10–16.

349.    Then-Governor Dalrymple asked Secretary Jewell and AG Lynch for supportive resources, including both manpower and financial resources, but both declined and claimed those resources were not at their disposal. Doc. No. 436, p. 23:12–27:4.

350.    Governor Burgum spoke with Secretary Jewell as his first call to a federal cabinet official, in which Secretary Jewell incorrectly told Governor Burgum that North Dakota caused the problem by "voting" to move the pipeline on top of the Tribe and was unaware DAPL

crossed the Missouri River in more than one location. Doc. No. 437, p. 30:20–32:23.

351.    During the call, Governor Burgum also asked for federal law enforcement support, which Secretary Jewell declined. Id. at 32:24–33:5.

352.    The federal government never provided law enforcement support or federal funds to Morton County during the Protests. Doc. No. 432, p. 142:21–143:1.

353.    During the entirety of the Protests, no federal officials removed, took actions to remove, or even considered taking actions to remove Protestors from Corps-managed land for being on that land without a Special Use Permit or written permission. Doc. No. 405-11, p. 18:69:9–15.

354.    The Corps never made any requests to DOI or the BIA to: (1) take action in response to Protestors occupying Corps-managed land without written permission or a Special Use Permit; (2) protect Corps-managed land from environmental degradation; (3) prevent the use of Corps-managed land as a base camp and staging area from which to conduct illegal or dangerous activities off Corps-managed land; or (4) take action to clear Corps-managed land in the first quarter of 2017 when the Protestors were finally evicted from Corps-managed land. Doc. No. 405-11, p. 18:69:9–15, 19:70:25–72:10–16.

355.    Cross-deputization agreements between BIA and local law enforcement are "very common" and a "fairly routine practice" to allow BIA and local law enforcement to performance law enforcement functions on BIA land when encountering non-Indian citizens but did not occur in North Dakota during the Protests. Doc. No. 447, p. 194:23–195:20, 197:20–198:1.

356.    The Marshals Service has a Special Operations Group ("SOG") which is a SWAT-style "specially trained and equipped tactical unit deployed in high-risk and sensitive law enforcement situations, national emergencies, civil disorder and natural disasters" and the agency's "primary response force for any critical incident nationally." Doc. Nos. 405-12, p. 17:62:04–63:02, 63:15–65:06; 429-1, p. 33:129:18–34:130:7; PX-1443.

357.    SOG was not deployed at any time to respond to the Protestors' presence on Corps-managed land despite Col. Henderson's request for such a response. Doc. Nos. 405-12, p. 10:37:24–11:38:14; 429-1, p. 32:122:12–33:127:18; 438, p. 143:15–144:7; PX-1310.

358.    The Marshals Service's headquarters repeatedly denied U.S. Marshal Paul Ward's ("Marshal Ward") requests that he be allowed to provide deputy marshals to North Dakota. Doc. No. 429-1, p. 9:31:9–32:17.

359.    Marshal Ward felt the federal government law enforcement response to the Protests was "nonexistent" and the federal government did not provide the law enforcement assistance requested by North Dakota. Id. at 10:35:9–13, 14:51:8–22.

360.    At one of the last meetings with the North Dakota Unified Command that Marshal Ward attended, he apologized for the lack of federal response from federal law enforcement and

federal agencies. Doc. No. 433, p. 93:19–94:14.

**XXI.    Protest Impact on North Dakota Citizens and Law Enforcement**

361.    North Dakota citizens were impacted throughout the Protests by the frequent trespass, vandalism, traffic stoppages, being run off public roads, stolen property, and harassment. Doc. No. 434, p. 10:10–11:15, 207:2–19.

362.    Indeed, multiple North Dakota public officials and law enforcement personnel were personally doxed[22] and threatened with violence. Doc. Nos. 432, p. 78:15–79:14; 434, p. 11:16–12:10, 125:19–127:5; 435, p. 78:20–81:20; 437, p. 24:17–858:9; JX-266, p. 92–94.

363.    Due to these personal threats, Sheriff Kirchmeier permitted law enforcement officers to cover and/or remove their name badges. Doc. No. 434, p. 11:16–12:10.

364.    Protestors tailed Trooper Gallagher's car from the NDHP airfield in Bismarck after returning from flying over the Protests, which resulted in him buying a second vehicle to avoid being followed. Doc. No. 432, p. 198:22–199:22.

365.    Trooper Gallagher also had issues with Protestors flying aerial drones too close to the NDHP plane he was piloting and shining lasers at his plane, both of which posed threats to his life and safety. Id. at 199:23–201:8.

366.    North Dakota sought and obtained a temporary flight restriction from the FAA, which restricted drone flights to below 400 feet; however, Protestors did not comply. Doc. 433, p. 106:21–108:11.

367.    At times, Trooper Gallagher feared enough for his safety to line the floor of the NDHP Plane with ballistic body armor equipment. Doc. No. 432, p. 200:22–201:8.

368.    Because Sheriff Kirchmeier was receiving regular personal threats, Sheriff Laney had deputies assigned to protect Sheriff Kirchmeier and his family, which required the deputies "to escort [Sheriff Kirchmeier's] family, his wife everywhere they went because of the threats." Doc. No. 434, p. 125:23–126:2.

369.    The addresses of Sheriff Laney's home in West Fargo and his lake house in Minnesota were posted online with a picture of a bullet, and he ended up having to move his family. Id. at 126:3–14.

370.    Sheriff Laney missed the death of his mother because he felt obligated to stay at the Protests in February 2017 to clear out Protest camps. Id. at 153:5–154:11.

---

[22] To "dox" means "[t]o document or expose (a person's identity)" specifically, "to search for and publish private or identifying information about (an individual) on the internet, typically with malicious intent." Dox, Oxford English Dictionary, (July 2023), https://www.oed.com/dictionary/dox_v?tab=meaning_and_use#1316834520.

## XXII.   The Corps Chose Not to End the Protests

371.   Having a physical space on Corps-managed land, a "base of operations" or "safe haven," allowed the Protests to grow and from which they could conduct unlawful activities. Doc. Nos. 432, p. 146:10–17; 434, p. 152:12–153:4, 189:3–190:10.

372.   The Protests could have been stopped in the first couple weeks had the Corps followed its rules and requested Sheriff Kirchmeier to evict the Protestors. Id. at 127:14–128:7.[23]

373.   Col. Gerhart believed Protestors could have been removed by the NDHP and Morton County in mid-August 2016. Doc. No. 435, p. 43:6–14, 87:19–23.

374.   Sheriff Kirchmeier believed that the Protests would not have gotten as big as they did if Morton County had received federal assistance.  Doc. No. 434, p. 19:18–20:5.

375.   Had the Corps requested, Sheriff Kirchmeier would have responded to illegal activity (i.e., trespassing) on Corps-managed land. Id. at 73:19–24.

376.   Both then-Governors Dalrymple and Burgum felt North Dakota law enforcement could have removed Protestors from Corps-managed land in mid-August had the Corps requested them to do so. Doc. Nos. 436, p. 31:15–32:3; 437, p. 69:10–25.

377.   Instead of asking North Dakota law enforcement to remove the Protestors, however, the Corps allowed, as Governor Burgum put it, "an armed occupation camp on federal land." Doc. No. 437, p. 26:25–27:6.

378.   Scott Davis (Director of the North Dakota Indian Affairs Commission) testified that if the Corps had exercised its policing authority, the Protest camps "could have been nipped in the bud very quickly within the first two or three days" and "that enormous camp would not have grown or been established there." Doc. No. 404-2, p. 60:231:11–61:233:5.

379.   Commissioner Cody Schulz was "very disappointed in the Corps' response to the [Protests]." Doc. No. 432, p. 148:20–149:2.

380.   As an expert in the field of law enforcement tactics, crowd control, and the use of force, Sheriff Laney thought North Dakota's law enforcement response to the Protests was reasonable and consistent with law enforcement standards. Doc. No. 434, p. 126:15–127:5.

## XXIII.   North Dakota's Damages

### A.   General Costs

381.   Based on his direct involvement, Captain Pederson concluded the resources and manpower

---

[23] Sheriff Laney testified as to this information as an expert in the field of law enforcement, including tactics, crowd control, and use of force. Doc. No. 434, p. 127:14–128:7.

used in North Dakota's emergency response were necessary. Doc. No. 434, p. 222:21–223:3.

382. During the Protests, North Dakota allocated expenditures to intra- and interstate aid, including Mutual Aid,[24] State Agencies Assistance,[25] EMAC,[26] and internal NDDES and National Guard equipment, all of which NDDES tracked for accuracy and verified. Doc. No. 437, p. 93:19–95:11, 115:11–23.

383. The EMAC began in October 2016 and continued into December 2016. Id. at 111:23–113:24.

384. North Dakota's Incident Command decided additional manpower and resources were required, when creating the Protest management plan. Id. at 194:18–195:15.

385. When the Incident Command changed to a Unified Command, Unified Command always sought to ensure its spending on the emergency response was as efficient as possible to be a good steward of North Dakota's public funds. Id. at 217:21–218:11.

386. In August 2016 as the Protests intensified, North Dakota did not have the needed law enforcement resources to address the growing situation in Morton County. Doc. Nos. 432, p. 73:25–74:10; 433, p. 139:8–18; 434, p. 72:11–14, 171:5–15; 435, p. 44:21-45:11; JX-53; JX-54.

387. Morton County only employed thirty-two sworn deputies to cover an area of 1,945 square miles of land. Doc. No. 433, p. 129:8–18.

388. Initially, the Morton County Sherriff's Office requested law enforcement assistance from other North Dakota law enforcement agencies, such as from the Cass County Sheriff's Office and NDHP. Id. at 136:6–11; 139:8–18.

389. When Sheriff Laney received a call from Sheriff Kirchmeier in mid-August 2016 requesting assistance, he immediately had his command staff begin the preparation to mobilize to assist Morton County. Doc. No. 434, p. 80:22–82:16.

390. The North Dakota counties that provided law enforcement to Morton County in relation to the Protest response include Barnes, Benson, Billings, Bottineau, Bowman, Burke,

---

[24] Mutual Aid relates to political subdivisions within North Dakota providing aid to each other. Doc. No. 437, p. 92:24–93:4. Mutual Aid is provided through bilateral agreements between counties and is also facilitated by NDDES. Id. at 93:5–12.

[25] State Agencies Assistance is provided by North Dakota State agencies to political subdivisions, for example, when NDHP provided aid and assistance to Morton County during the Protests. Id. at 93:24–94:18.

[26] NDDES would draft, approve expenses, and track expenses for EMAC Requests. Id. at 112:11–115:13. When making an EMAC request, the state requesting aid must cover all costs for responding law enforcement officers, such as wages, vehicle depreciation, and transportation, among others. Doc. No. 434, p. 195:16–23.

Burleigh, Cass, Cavalier, Dickey, Divide, Dunn, Eddy, Emmons, Foster, Golden Valley, Grand Forks, Grant, Kidder, LaMoure, Logan, McHenry, McIntosh, McKenzie, McLean, Mercer, Mountrail, Oliver, Pembina, Pierce, Richland, Rolette, Stark, Stutsman, Traill, Walsh, Ward, Wells, and Williams. JX-267, p. 63.

391.    These North Dakota cities provided law enforcement assistance to Morton County: Beulah, Bismarck, Cando, Carrington, Devils Lake, Dickinson, East Grand Forks, Ellendale, Fargo, Grafton, Grand Forks, Hazen, Jamestown, Kenmare, Killdeer, Kulm, Mandan, Minot, Rolla, Steele, Underwood, Wahpeton, Watford, West Fargo, Williston, Wishek, and Valley City. Id.

392.    Fire departments from Bismarck, Mandan, and Williston provided assistance. Id.

393.    State agencies in North Dakota also provided law enforcement assistance, including National Guard, North Dakota State University Police Department, University of North Dakota Police Department, North Dakota Game and Fish Department, North Dakota Parks & Recreation, and North Dakota Corrections and Rehabilitation. Id.

394.    As the Protests grew in August and September 2016, it became clear the response from the various law enforcement agencies and fire departments in North Dakota was not enough to protect the safety of North Dakota citizens, their property, or ensure public order could be maintained. See Doc. No. 432, p. 94:18–95:21, 97:13–98:2; 433, p. 130:10–25; 434, p. 124:21–125:18, 159:3–160:19, 171:5–15, 180:8–19.

395.    NDHP purchased additional protective gear to ensure trooper safety and less-than-lethal munitions during the Protests. Doc. No. 435, p. 46:11–47:14.

396.    Two of NDHP's greatest monetary expenses were salaries and overtime for troopers, including hours for the NDHP plane piloted by Trooper Gallagher. Id. at 45:11–18.

397.    As previously noted, NDDES tracked all expenses and costs attributable to the Protests and kept a master spreadsheet documenting those costs.[27] PX-1455.

398.    Before submitting to NDDES, Morton County costs and expenses attributable to the Protests incurred were reviewed by the elected county auditor and three temporary administrative and finance individuals.[28] Doc. No. 432, p. 144:16–145:20.

399.    North Dakota invoked the multi-state EMAC to seek voluntary law enforcement assistance from certain other states. Doc. Nos. 434, p. 193:9–12, 436, p. 38:2–25, 39:1–11; JX-26.

---

[27] The spreadsheet was admitted into evidence as fairly summarizing voluminous trial material under Vogt v. State Farm Life Ins. Co., 963 F.3d 753 (8th Cir. 2020). Doc. No. 441, p. 52:11–25.

[28] Holly Gaugler (Chief Financial Officer for the North Dakota National Guard and NDDES) was primarily responsible for tracking North Dakota's emergency response costs to the Protests. Doc. No. 437, p. 118:15–119:3.

400. For any personnel responding to the EMAC request, North Dakota was also responsible for housing, travel, and a per diem rate for food. JX-26, p. 2.

401. EMAC costs and expenses were tracked by NDDES in a spreadsheet maintained in the normal course of business. Doc. No. 441, p. 26:25–28:10, 35:5–13; PX-1455.

402. State of North Dakota and the United States expert accounting witnesses matched actual physical EMAC vouchers kept by NDDES at the Fraine Barracks to expenses in the master spreadsheet. Doc. No. 441, p. 32:22–35:20, 82:11–83:12; PX-1455; PX-1429.

403. North Dakota paid $4,045,088.39 to fellow states pursuant to the EMAC. PX-1455, cells K7123–K7166.

404. North Dakota paid North Dakota law enforcement officers and NDDES employees: $6,422,757.05 for payroll, Id. at K2–K245; $2,799,478.47 for travel, Id. at K246–K6523; and $3,201,650.75 for equipment, supplies, and materials, Id. at K6524–K7122.

405. North Dakota paid $12,385,795.98 in North Dakota Mutual Aid. Id. at K167–K7473.

406. North Dakota paid $8,348,350.31 in North Dakota State Agencies Assistance. Id. at K7474–K7570.

### B. Funding for Bank of North Dakota Loans

407. In North Dakota, state agencies are funded by the legislature as a part of a two-year biennial budget period. Doc. No. 440, p. 142:1–20.

408. Emergency budgetary needs outside of the two-year period can be funded by approval from an emergency commission consisting of four legislators, the North Dakota Secretary of State, and the governor for an allocation of money or for a loan from the Bank of North Dakota. Id. at 143:3–144:15.

409. NDDES secured approval for the emergency funding from the emergency commission (and later the North Dakota legislature) to receive a total of seven loans totaling $43 million from the Bank of North Dakota, which were ultimately signed by Gen. Dohrmann, Holly Gaugler, and Greg Wilz. Doc. Nos. 437, p. 87:17–88:17, 117:4–11; 440, p. 159:1–12; 441, p. 9:11–14:15; PX-1209; PX-1228.

410. North Dakota did not utilize all this credit. Doc. No. 441, p. 14:2–7.

411. The full faith and credit of the State of North Dakota (and not the Federal Deposit Insurance Corporation) guarantees the money for loans to state agencies under these situations. Doc. No. 440, p. 161:24–162:5.

412. When loans made by the Bank of North Dakota are paid off by the legislature, including

interest, that revenue must be reduced by Bank of North Dakota's operating expenses, salaries of bank employees, and other overhead. Id. at 160:22–161:20.

413. Revenue from loans made by the Bank of North Dakota to state agencies can either be allocated to North Dakota's state budget or allowed to remain as capital in the bank to be used for additional loan activity. Id. at 162:6–22.

414. The interest rates charged on these loans by the Bank of North Dakota were comparable to similar loans made by the Bank to other state agencies. Id. at 112:25–113:4; PX-2034, p. 15.

415. As of May 4, 2018, interest on these loans totaled $651,746.35. PX-1439, cell D12; see also PX-2034, p. 2.

## C. North Dakota's Emergency Response Costs

416. In total, North Dakota's expenses related to Protest emergency response amounts to $37,854,867.30. PX-1439.

417. During the tracking, these expenses were reviewed numerous times. Doc. No. 441, p. 38:13–39:10.

418. These expenses were also audited by the North Dakota State Auditor, who did not identify any issues. Id. at 38:8–12, 73:22–74:5, 87:13–88:23; PX-1440.

419. Holly Gaugler had "100 percent confidence" in North Dakota's emergency response costs totaling $37,203,120.95. Doc. No. 441, p. 50:2–10.

420. North Dakota's expert, Ronald Tolstad (CPA) testified that North Dakota's damages were properly documented and properly approved under North Dakota's state procedures for emergencies. Id. at 78:9–79:8; PX-2034, p. 2; PX-1439; PX-1455.

421. Tolstad also testified North Dakota's damages were reasonable under auditing standards for what a "prudent person" would have made under similar circumstances. Doc. No. 441, p. 90:5–17.

422. According to Gen. Dohrmann, the expenses North Dakota incurred in responding to the activity by the Protestors were necessary and properly accounted for. Doc. No. 437, p. 123:23–125:17.

## D. Damage to North Dakota property

423. Included in North Dakota's damages are specific injuries to state property, including Backwater Bridge (a/k/a Cantapeta Bridge), guardrail posts on the Bridge, a separate county bridge, two snowplow trucks, and a digital message board. Doc. No. 405-6, 5:8:7–10:14.

424.  The Backwater Bridge damage required an inspection, core samples, and re-asphalting of its roadway surface. Id. at 8:20:2–21:5, 9:25:3–20, 9:26:5–27:7.

425.  The two snowplow trucks were complete incinerated, the digital message board was burned to nothing, and the Bridge's guardrail posts required additional repair. Id. at 6:12:1–5, 6:14:4–10, 7:18:10–15, 9:25:10–15.

### E. Federal Grant

426.  In 2017, North Dakota received a $10 million grant from the federal government called an Emergency Federal Law Enforcement Assistance grant ("EFLEA"). Doc. No. 432, p. 189:5–15; 441, p. 61:12–19.

427.  The EFLEA program provides federal grant funds to state and local governments for emergency law enforcement assistance. Doc. No. 432, p. 189:19–24.

428.  The U.S. Treasury funds EFLEA grants and states do not contribute any funds to receive such awards. Joint Resolution, Pub. L. No. 98-473, § 609Y, 98 Stat. 1837 (1984); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 5, 542, 131 Stat. 135 (2017).

429.  North Dakota sought EFLEA funds through the North Dakota Attorney General's office to "partially reimburse North Dakota for emergency law enforcement costs" associated with the Protests. Doc. Nos. 432, p. 189:25–190:3, 191:10–17; 441, p. 18:9–16, 61:20–23; 445, p. 50:4–52:13; JX-28, p. 1.

430.  North Dakota used the EFLEA grant to repay some of the loans it borrowed from the Bank of North Dakota in connection with the protest response. Doc. Nos. 432, p. 191:25–192:9; 441, p. 61:20–23, 62:9–24, 128:12–18; 445, p. 52:25–53:5; PX-1439. See also Doc. No. 432, p. 192:14–23 (noting the EFLEA funds passed through NDDES before being transferred to the Bank of North Dakota).

### F. $15 million Dakota Access gift

431.  North Dakota received $15 million as a gift from Dakota Access in October 2017. Doc. No. 440, p. 185:9–24.

432.  There were no conditions placed upon this gift, which Dakota Access considered "no strings attached." The gift was not required to be used by North Dakota in any specific manner nor to offset any specific costs and was a "donation" to further Dakota Access's "mission to be a good corporate citizen." Id. at 185:22–186:13.

433.  Dakota Access made gifts to other states in which the Dakota Access Pipeline was constructed totaling $12 million in acknowledgment of the extra man hours and resources expended in siting and routing a pipeline. Id. at 186:3–187:24.

434.    The State used the gift to repay a portion of the loans the State took from the Bank of North Dakota for the Protest response. Doc. Nos. 441, p. 62:25–64:10, 128:22–129:1); 445, p. 60:5–23; PX-1439.

## DISCUSSION

[¶ 14]   The Court will address the United States' arguments concerning jurisdiction, standing, and the political question doctrine before turning to North Dakota's state tort claims.

### I.    Jurisdiction

[¶ 15]   The United States argues at length that the discretionary function exception acts as a jurisdictional bar to the claims subject to the bench trial. The State argues the Court has already decided this issue and the facts of this case only confirm the Court's prior decisions.

[¶ 16]   Pursuant to FTCA:

> [C]laims against the United States, for money damages . . . [or] for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "The FTCA serves as a limited waiver of sovereign immunity, opening the door to state-law liability claims against the federal government for harm caused by government employees." Buckler v. United States, 919 F.3d 1038, 1044 (8th Cir. 2019).

[¶ 17]   This waiver is, however, subject to the so-called discretionary function exception, which provides sovereign immunity survives this waiver on claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused." 28 U.S.C. § 2680(a). See also Herden v. United States, 726 F.3d 1042, 1046 (8th Cir. 2013) (referring to this exception as the discretionary function exception). This exception "is a jurisdictional bar to suit." Id. (quoting Walters v. United States, 474 F.3d 1137, 1139 (8th Cir. 2007)).

### A. Discretionary Function Exception

[¶ 18]   The Court has already found as a matter of law on two occasions that the United States failed to follow its mandatory duties in the permitting process before issuing a de facto permit to the Protestors to set up encampments on Corps-managed land. Doc. Nos. 38, ¶¶ 20–58; 383, ¶¶ 22–28. Indeed, the Court granted summary judgment on this issue, and it was not subject to the trial on the merits. Doc. No. 383, ¶ 28. The facts at trial still show (1) the Corps was subject to a mandatory, non-discretionary permitting process that (2) they failed to follow before (3) permitting Protestors to camp on Corps-managed land and (4) from which Protestors wreaked havoc on the surrounding public and private property. The discretionary function exception does not apply, and the Court adopts its prior reasoning in full here. See Doc. Nos. 38, ¶¶ 20–58; 383, ¶¶ 22–28.

[¶ 19]   The United States also argues the permitting process was discretionary due to the existence of alternative management techniques after they issued the de facto permit in this case.

[¶ 20]   This issue was likewise discussed at the motion to dismiss stage and the facts at trial do not change the analysis. There, like here, the United States argued the myriad of enforcement or management alternatives available to the Corps put this case within the discretionary function exception. Doc. No. 38, ¶¶ 52–55. The Court disagreed concluding, "While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct by the Corps in response to the protestors' conduct, the Court concludes the Corps failure to comply with the mandatory permitting process tainted all other decisions made by the Corp[s]." Id. ¶ 55. The Court adopts its prior reasoning that the various discretionary enforcement options available to Corps personnel to manage the Protestors did not remove its mandatory duty. See id. ¶¶ 51–58.

[¶ 21]   Col. Henderson, the Corps official responsible for the Tribe's Special Use Permit application, admitted a Special Use Permit "was the correct way to address the encampment of

[Protestors] on [Corps-managed] lands." JX 62, p. 1. The Corps was bound to follow the mandatory permitting process. The alternative management techniques were only available when members of the public were lawfully authorized to be on Corps-managed land. Doc. No. 440, p. 32:12–34:5, 40:22–42:5. Corps regulations are clear such techniques are available only in addition to the non-discretionary permitting processes, not as a substitute for them. Doc. No. 8, p. 44, § E-1. No Corps policy, practice, or regulation exists that authorizes or recognizes "free speech zones" as a means of permitting individuals to be on Corps-managed land for group gatherings of the magnitude seen here without a Special Use Permit. Doc. No. 440, p. 10:10–12.

[¶ 22]  The Court concludes the "free speech zone" was not a valid alternative management technique available to the Corps when they knew the Protestors were occupying Corps-managed land without the required Special Use Permit under the Corps' mandatory and non-discretionary permitting requirements. The Court further finds the Sept. 16 Press Release, November 14 Spotted Eagle Special Use Permit, and Free Speech Zone Letter violated the Corps' non-discretionary permitting process by announcing the Tribe had a valid Special Use Permit for Protest activities. In reality, Col. Henderson created a de facto Special Use Permit in each instance. The Corps then supported its decision to violate its non-discretionary permitting requirements by encouraging and enabling the unlawful occupation and use of Corps-managed land. The de facto Special Use Permit was never revoked by the Corps. These were clear violations of the Corps Special Use Permit process required by EC 1130-2-500, Appendix E. Doc. No. 8.

[¶ 23]  The United States additionally argues North Dakota's claims for liability are premised on the actions of individuals other than the United States or its employees.

[¶ 24]  Liability in this case has always hinged on the Corps' violation of its non-discretionary permitting requirements. Doc. No. 280, ¶¶ 12, 15-16. The Court has already decided and the law

of the case is that "North Dakota's damages are not limited only to the [Corps'] failure to follow the permitting procedure. . . . The [Corps'] failure to follow the permitting procedure opened the gates to North Dakota being damaged by the United States, its agencies, and third parties." Id. ¶ 12. Nothing from trial changes the Court's conclusion.[29]

[¶ 25]  Contrary to the United States' position, the discretionary function conclusions continue to be supported by Appley Bros. v. United States. 7 F.3d 720 (8th Cir. 1993). In Appley Bros., the plaintiffs sued "the United States for losses as a result of the United States Department of Agriculture's [("USDA")] negligent inspection of the Bird Grain Company warehouse, a federally licensed warehouse." Id. at 721. USDA "policy required that a new form be issued" when a federally licensed grain company did not correct a reported shortfall from an initial grain inspection. Id. at 725. Ultimately, the enforcement decision to close the warehouse for such a violation was a discretionary function of USDA. Id. However, prior to exercising that discretion, USDA was required to "check to see if Bird Grain had cured the deficiencies . . . and to issue a new TW-125 reporting that information." Id. The failure to perform a mandatory duty, even though subsequent actions were discretionary, did not place this case in the realm of discretionary function. Id. at 725–26. The Eighth Circuit reversed and remanded. Id. at 728.

[¶ 26]  On remand, the facts in Appley Bros. significantly changed during summary judgment and ultimately warranted a finding of discretionary function. Appley Bros. v. United States, 924 F. Supp. 944, 949 (D.S.D. 1996) ("The government has produced evidence substantially different

---

[29] The United States also argues it can be liable only for the acts or omissions of particular individual actions within the scope of employment and that North Dakota cannot recover for actions or inactions by "the United States" as a whole or one of its other agencies. As discussed previously in this case, liability under the FTCA has always been premised on the issuance of the Press Releases and Free Speech Zone Letter. See Doc. Nos. 38, ¶¶ 20–58; 383, ¶ 25. The question of damages is distinct from liability as previously discussed in this case. See Doc. No. 106, ¶¶ 13–44. Nothing from trial changes the Court's prior holdings and they remain the law of the case.

than what was before Judge Jones and the Eighth Circuit, and more importantly, the government's evidence is uncontroverted."). Here, the undisputed facts adduced at trial have not significantly changed or altered the Court's prior legal conclusions.

[¶ 27]   The Corps' subsequent discretionary decisions are irrelevant under Appley Bros. because failure to perform the initial non-discretionary requirement renders subsequent discretionary decisions ineffective in this regard. See 7 F.3d at 725–26 ("Although the revocation order itself is discretionary, the inspectors' failure to see if Bird Grain cleared the violations noted in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license.").

[¶ 28]   The Corps failed to follow its non-discretionary special use permitting process, and as such, the Corps' subsequent discretionary decisions—whether to: issue citations to Protestors, request North Dakota law enforcement evict Protestors from Corps-managed land, and employ "alternative management techniques" to allow Protestors to occupy Corps-manage land—have no bearing on the Corps' liability. While 36 C.F.R. Part 327 and the Implementing Guidance do not require any specific enforcement conduct, the Corps' failure to comply with the mandatory Special Use Permit process tainted all other Corps decisions. See Doc. No. 38, ¶ 55.

[¶ 29]   The United States relies on Buckler to argue subsequent actions after violating the permitting requirements were not the proximate cause of North Dakota's injuries.

[¶ 30]   Rather than detract from the Court's conclusion, Buckler supports the application of Appley Bros. In Buckler, the discretionary function at issue was a federal mine inspector's non-discretionary duty to inspect training materials. 919 F.3d at 1054. The court found the mining inspector had some discretion as to how he reviewed but was "wholly without discretion" to conduct no review. Id. The Buckler court, discussing Appley Bros., concluded, "[I]t is permissible,

- 60 -

when analyzing the discretionary-function exception, to recognize that some duties are mandatory in that they must be performed *in some fashion*, even if the manner in which they are performed involves protected discretion." Id. at 1053. Because the inspector in Buckler completely failed to inspect training records, which the Eighth Circuit held was non-discretionary, the plaintiff could proceed with the claims against the United States. Id. at 1054.

[¶ 31]  Like Buckler and Appley Bros., here the Corps failed to abide by a mandatory duty, namely the permitting requirements. The Corps violated the non-discretionary duty, as already determined by this Court, by issuing the de facto Special Use Permit to the Tribe despite internally acknowledging the Tribe's application: was incomplete, did not match the facts of the Protests on the ground, and lacked any insurance required by the Corps' own regulations for religious events with more than fifty people.[30]

[¶ 32]  In conclusion, "[t]he purpose of the discretionary function exception is to prevent judicial second-guessing regarding administrative decisions grounded in social, economic, and political policy." Doc. No. 38, ¶ 58 (citing Herden, 726 F.3d at 1047). "It is not a bar to decisions made without regard to mandatory procedures and the bad consequences resulting from not following those mandatory procedures." Id. The Corps violated a non-discretionary duty in failing to follow its mandatory Special Use Permit process.

### B. Strict Liability

[¶ 33]  The United States argues the FTCA does not waive the United States' sovereign immunity for absolute or strict liability claims and North Dakota's public nuisance law imparts an absolute liability standard.

---

[30] The Court also notes the mandatory permitting regulations provide that any event "must contribute to the enjoyment of the visiting public and be consistent with the established land use classifications." Doc. No. 8, p. 44. The Corps was negligent to decide the Protests could remotely comply with this requirement.

[¶ 34]  The Court has ruled on this issue twice and it is settled for this case. In the Order on the

United States' Motion to Dismiss, the Court reasoned:

> The United States also contends it has not waived sovereign immunity to absolute
> or strict liability claims, as may be at issue in the public nuisance claim. Section
> 838, in fact, incorporates a negligence standard with respect to the liability of the
> possessor of land who "fails to exercise reasonable care to prevent the nuisance."
> Restatement (Second) of Torts § 838. In light of the United States' concerns, the
> Court will limit any liability to "negligent or wrongful act or omission" of the
> Corps. Accordingly, dismissal of the public nuisance claim is not warranted based
> on failure to waive sovereign immunity for strict or absolute liability claims.

Doc. No. 38, ¶ 68. At the summary judgment stage, the Court likewise rejected this argument for

a second time:

> The Court has already determined this "preliminary question of law" at the Motion
> to Dismiss stage. The Court found the disputes in this matter were governed by
> Sections 318 and 838 of the Restatement (Second) of Torts, which are consistent
> with standards under North Dakota law. Doc. No. 38, ¶¶ 64-66. This Court has
> made two crucial conclusions as to these provisions that remain in effect. First,
> "North Dakota state law supports the duties asserted by North Dakota in the public
> nuisance, negligence, gross negligence, and civil trespass claims." Doc. No. 38, p.
> 26. Second, "the duties outlined in sections 838 and 318 of Restatement (Second)
> of Torts are consistent with North Dakota law for purposes of concluding that North
> Dakota's claims for public nuisance, negligence, gross negligence, and third-party
> trespass claims satisfy the FTCA's requirement that the claims be 'in accordance
> with the law of the place where the act or omission occurred.'" Id. at p. 28 (quoting
> 28 U.S.C. § 1346(b)(1)).

Doc. No. 383, ¶ 14.

[¶ 35]   The Court adopts its prior reasoning here and will limit application of Section 838 to the

negligence of the United States relating to North Dakota's claim for public nuisance.

### C.  Liability for Misrepresentations

[¶ 36]  The United States argues it cannot be liable for the alleged misrepresentations it made when

issuing the press release.

[¶ 37]  The FTCA's waiver of sovereign immunity does not include claims arising from a

misrepresentation. 28 U.S.C. § 2680(h). The misrepresentation exception "does not bar negligence

actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." <u>Block v. Neal</u>, 460 U.S. 289, 297 (1986).

[¶ 38]   This Court has already concluded the Sept. 16 Press Release and Free Speech Zone Letter "were written permission or permits and were not misrepresentations" pursuant to the FTCA's misrepresentation exception. Doc. No. 38, ¶ 8 n.1. The Press Release and Free Speech Zone Letter, as discussed throughout the Findings, was a de facto permit. They constituted the written permission or permits for the Protestors to occupy Corps-managed land without consequence. The issue here is not some falsehood; it's the failure to follow the mandatory permitting process before issuing the de facto permit or written permission in the Sept. 16 Press Release and Free Speech Zone Letter. Nothing from the trial has changed the Court's prior conclusion in this matter.

### D.  Liability to the Extent a Private Party would be Liable under North Dakota Law

[¶ 39]   The United States argues the FTCA only permits liability for acts for which a private citizen could be found liable. According to the United States, North Dakota's claims fail because a private person would not be found liable for failing to enforce the Corps' Title 36 regulations and there is no private party analogue for such failure.

[¶ 40]   The failure to enforce Title 36 regulations is beside the point. While there may be no special use permitting regulations governing how private landowners use their property, as has been discussed in prior orders and will be detailed further below, it is the Corps' negligence under the circumstances that forms the basis for liability.

### E.  Limits on Damages for Injury or Loss of Property

[¶ 41]   The United States asks the Court to reconsider its prior denial of partial summary judgment on the issue of whether North Dakota's money damages are "for injury or loss of property" as

required under 28 U.S.C. § 1346(b).

[¶ 42]  The Court previously determined the damages at issue here are recoverable because Section 1346(b) does not have a physical harm requirement for "injury or loss of property" and "property" necessarily includes money. Doc. No. 106, ¶ 25–28. The Court will not reconsider, and the previous decision remains the law of this case. North Dakota is allowed to pursue its claim for damages against the United States under 28 U.S.C. § 1346(b) and the Court adopts in whole its prior reasoning on this issue. See Doc. No. 106.

## II. Standing

[¶ 43]  The United States argues North Dakota Lacks Article III standing on two fronts. First, relying on United States v. Texas, 599 U.S. 670 (2023), the United States argues North Dakota is prohibited from bringing this suit because it is a challenge to how the United States enforces its own laws. Second, the United States argues North Dakota's claims sound in a *parens patriae* capacity and thus fail for lack of Article III standing.

### A. Standing under United States v. Texas

[¶ 44]  Federal courts only have power to resolve "Cases" and "Controversies." U.S. Const. art. III. Plaintiffs must suffer "an injury in fact caused by the defendant and redressable by a court order." Texas, 599 U.S. at 676. Plaintiffs must show they have, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561, U.S. 139, 149 (2010)). The plaintiff "bears the burden of establishing standing as of the time [the plaintiff] brought th[e] lawsuit and maintaining it thereafter." Carney v. Adams, 592 U.S. 53, 59 (2020) (citing Lujan v. Defs. Of Wildlife, 504 U.S. 555, 561 (1992)). The plaintiff must support each element of standing "with the

manner and degree of evidence required at the successive stages of the litigation." <u>Lujan</u>, 504 U.S. at 561. The Supreme Court "has long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" <u>Texas</u>, 599 U.S. at 674 (quoting <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973)). In <u>Texas</u>, the Supreme Court held States lack standing to bring a suit seeking to force the executive branch to modify its arrest policy. <u>Id.</u> at 673–74. The Supreme Court held States lacked standing to bring such a case because of the executive branch's longstanding discretionary "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" <u>Id.</u> at 678 (quoting <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 429 (2021)).

[¶ 45]   North Dakota is not challenging a discretionary law enforcement action. While such actions may be part of the surrounding facts and circumstances, this case has always been based on North Dakota's injuries arising out of the Corps' negligent failure to follow its mandatory permitting procedures. This case differs significantly from <u>Texas</u>. In <u>Texas</u>, the Supreme Court was tasked with resolving the question of whether states can challenge the Executive Branch's arrest policy when enforcing the immigration laws. 599 U.S. at 673–74. Here, the federal law enforcement decisions are separate from the Corps' violation of its non-discretionary duties. Law enforcement decisions perhaps go to foreseeability of harm resulting from violating the mandatory duties, reasonableness of the Corps' actions in violating that duty, and the actual harms North Dakota suffered as a result. Liability has always been premised on the Corps' violation of its non-discretionary duties. <u>See</u> Doc. Nos. 38, 280, 383. The harms suffered by North Dakota are particularized, concrete, and redressable by the Court in terms of monetary damages, all of which are discussed in more detail below.

### B. *Parens Patriae*

[¶ 46]   The United States argues North Dakota has indicated it brought this case in a *parens patriae* capacity. Doc. No. 451-1, p. 191. In North Dakota's Response brief on a motion for partial summary judgment, the State notes "North Dakota brought this FTCA action to protect its citizen[s] interests as *parens patriae*." Id. (quoting Doc. No. 78, p. 23 n.6). North Dakota now disclaims this contention. Doc. No. 452-1, p. 38–39.

[¶ 47]   Under the common-law standing doctrine of *parens patriae*, states may "commence an action to protect a public interest, like the safety, health or welfare of its citizens." Lynch v. Nat'l Prescription Adm'rs, Inc., 787 F.3d 868, 872 (8th Cir. 2015) (quoting People ex rel. Spitzer v. Grasso, 893 N.E.2d 105, 107 n.4 (N.Y. 2008)). States must have a "quasi-sovereign interest distinct from that of a particular party and injury to a substantial segment of the state's population." Id.

[¶ 48]   North Dakota did not bring this action in a *parens patriae* capacity. Rather, the State brought this action to hold the United States responsible for North Dakota's injuries, including damage to public property. See Doc. No. 1, ¶¶ 7 ("Though the unlawful activities and structures began on federal land, [the harms] expanded to envelop, contaminate and cause damage to State and private land as well."); 107 (noting the Corps' failures resulted in "the environmental and property damages that North Dakota is still remedying due to this lack of response"). In addition, the cases relied upon by the United States all involve States seeking to rectify intangible harms to their citizens, not concrete harms to the States themselves. See Murthy v. Missouri, 603 U.S. 43, 73–75 (2024) (rejecting Missouri's attempt to enforce its citizens' First Amendment rights); Haaland v. Brackeen, 599 U.S. 255, 294–95 (2023) (rejecting Texas's attempt to bring an equal protection claim on behalf of its citizens); Massachusetts v. Mellon, 262 U.S. 447, 486 (1923)

(denying Massachusetts's challenge of a federal enactment's constitutionality on behalf of its citizens).

[¶ 49]  North Dakota suffered significant injury to its land and property in the form of emergency response cost. North Dakota seeks approximately $38 million in damages. There has been an injury in fact fairly traceable to the United States' conduct that can be redressed in the form of a judgment for an appropriate amount in damages. See Texas, 599 U.S. at 676.

### III.  Political Question Doctrine

[¶ 50]  The United States raises the political question doctrine to claim the Court lacks jurisdiction over this matter.

[¶ 51]  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986). Non-justiciable political questions arise where there is

> [1] a textually demonstrable constitutional commitment of the issue to coordinate a political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

Baker v. Carr, 369 U.S. 186, 217 (1962).

[¶ 52]  The United States argues North Dakota's claims are non-justiciable political questions because they involve the federal government's decision not to deploy law enforcement or miliary resources as a response to the Protests.

[¶ 53]  Again, the United States obscures the subsequent actions by other federal agencies, standing, and the United States liability. This case is controlled by Appley Bros. The United States' subsequent discretionary decisions are largely irrelevant to the issue of liability under the FTCA because failure to perform the initial non-discretionary requirements renders subsequent discretionary decisions ineffective. Appley Bros., 7 F.3d at 725–26. See also Doc. No. 398, ¶ 58.

[¶ 54]  Thus, this case is distinguishable from the cases relied upon by the United States. See Gilligan v. Morgan, 413 U.S. 1, 3, 9–11 (1973) (concerning a lawsuit arising out of the National Guard's efforts to "preserve civil order and protect public property" in response to "civil disorder" at a college campus presented a nonjusticiable political question); Monarch Ins. Co. of Ohio v. District of Columbia, 353 F. Supp. 1249, 1258 (D.D.C. 1973) (finding the United States' preparation for and response to civil disturbances and rioting following the assassination of Dr. Martin Luther King, Jr. involved a discretionary function and were "political questions which are beyond the jurisdiction of this Court"); Industria Panificadora, S.A. v. United States, 763 F. Supp. 1154, 1160–61 (D.D.C. 1991) (holding that "failure by the United States personnel . . . to assign sufficient military police after the civil disorders in Panama City occurred . . . presents a clear nonjusticiable political question"). None of these cases involved a violation of a non-discretionary duty of the United States that forms the basis for liability. Therefore, this case does not present non-justiciable political questions.

## IV.    State Tort Claims

[¶ 55]  Under the FTCA, the United States is liable "under circumstances where the United States,

if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Under North Dakota law, North Dakota has the burden to establish each element of its tort claims against the United States by a preponderance of the evidence. Barbie v. Minko Const., Inc., 2009 ND 99, ¶ 9, 766 N.W.2d 458 (quoting W. Page Keaton et al., Prosser and Keeton on the Law of Torts § 39 (5th ed. 1984)). See also 58 Am. Jur. 2d Nuisances §§ 171–72. In North Dakota, "[t]o prove negligence, a plaintiff must establish [1] the existence of a duty, [2] breach of that duty, and [3] an injury proximately caused by the breach of duty." Schmidt v. Hess Corp., 2024 ND 72, ¶ 6, 5 N.W.3d 787 (citing Bjerk v. Anderson, 2018 ND 124, ¶ 10, 911 N.W.2d 343). Plaintiff also bears the burden of proving damages. Invs. Real Estate Trust Props., Inc. v. Terra Pac. Midwest, Inc., 2004 ND 167, ¶ 7, 686 N.W.2d 140.

[¶ 56]   North Dakota claims the United States is liable for damages under North Dakota law for negligence, gross negligence, civil trespass, and public nuisance. The United States claims North Dakota has failed to meet its burden to prove the elements for each cause of action. Based upon the evidence at trial, the Court concludes North Dakota has established each of the elements for its claims as alleged in the Complaint.

[¶ 57]   The Complaint alleges four causes of action subject to trial in this matter: Claim One: Public Nuisance; Claim Two: Negligence; Claim Four[31]: Gross Negligence; and Claim Five: Civil Trespass. Doc. No. 1, ¶¶ 108–18, 124–33. The United States contends each claim fails in light of the evidence at trial. North Dakota argues the facts of this case support each of its claims against the United States. Because each claim is related ultimately to negligence, the Court will begin with Claim Two (Negligence), proceed to Claims Four (Gross Negligence) and Five (Civil Trespass), and conclude with Claim One (Public Nuisance).

---

[31] Claim Three: Negligence – Good Samaritan was dismissed early in the litigation. Doc. No. 38, ¶¶ 72, 75.

## A. Claim Two: Negligence

[¶ 58]  In North Dakota, negligence is the "want of ordinary care and diligence." N.D.C.C. § 1-01-17. To prove negligence in North Dakota, a "plaintiff must prove (1) duty; (2) breach of that duty; (3) causation and (4) damages." Chegwidden v. Evenson, 2015 ND 131, ¶ 18, 863 N.W.2d 843 (quoting Barbie, 2009 ND 99, ¶ 8, 766 N.W.2d 458). Absent a legal duty, "there is no negligence." Id. Because damages is a common element to each claim, the Court will discuss this element in consolidated fashion.

### 1. Negligence – Duty

[¶ 59]  Whether a duty exists is a preliminary question of law for the Court to decide. Bjerk, 2018 ND 124, ¶ 10, 911 N.W.2d 343. The Court previously found North Dakota law imposes a duty here under Section 318 of the Restatement (Second) of Torts for North Dakota's negligence, gross negligence, and third-party trespass claims. Doc. Nos. 38, ¶¶ 64–66; 383, ¶ 14. See also Bradford v. O'Malley, 104 F.4th 1055, 1059 (8th Cir. 2024) ("The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings . . . ." (quoting Brachtel v. Apfel, 132 F.3d 417, 419 (8th Cir. 1997))). The Restatement can be broken down into a three-prong analysis of whether an actor: (1) "permits a third person to use land or chattel"; (2) "knows of or has reasons to know that he has the ability to control the third person"; and (3) "knows of or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 318 (Am. L. Inst. 1965). When those elements are met, courts look to whether the actor met the duty to exercise "reasonable care" to control the conduct of third persons.

[¶ 60]  The evidence at trial confirms Section 318 of the Restatement (Second) of Torts provides the relevant duty in this case:

1.  No Corps official issued a valid Special Use Permit to the Tribe or Protestors (Doc. Nos. 404-6, 25:94:12–20; 405-7, 13:49:19–14:50:7, 14:53:18–20; 438, 87:23–88:10; 439, 157:18–159:7; JX-135, p. 2);

2.  Once Protestors assembled, the Corps began to discuss with the Tribe the need for a Special Use Permit to lawfully be present on Corps-managed land (Doc. Nos. 404-6, p. 30:114:6–16; 438, p. 46:22–48:2, 52:23–53:4, 107:22–108:6, 163:5–24; 443, p. 13:20–14:10; 446, p. 191:12–15; JX-62; JX-117; DX-4043, p. 1–2);

3.  The Corps provided the requirements to the Tribe for the Special Use Permit, including a $100,000 bond and liability insurance coverage not less than $5 million for each occurrence of personal injury, $1 million for each occurrence involving property damage, not less than $5 million covering all claims per occurrence, and building unauthorized structures was prohibited on Corps-managed land (JX-129, p. 1–6);

4.  The Corps knew unlawful conduct was conducted from Corps-managed land subject to the Special Use Permit (See, e.g., Doc. Nos. 434, p. 101:8–102:8; 437, p. 102:3–103:1; 438, p. 41:25–43:3, 44:13–45:12, 50:2–13; 61:6–20; 440, p. 46:15–47:14; PX-1028; PX-1050, p. 3);

5.  The Corps knew the Tribe (1) never returned a signed and executed Special Use Permit and (2) had not met the terms of the Special Use Permit, including obtaining insurance and signing the Special Use Permit prior to and at the time of issuing the Sept. 16 Press Release (Doc. Nos. 405-7, p. 13:46:19–25; 438, p. 84:13–24, 89:23–91:25, 95:14–96:5; 443, p. 31:17–32:7; JX-126; JX-127; JX-129; JX-133; DX-4092);

6.  The Tribe never returned the application for the Special Use Permit, including never signing the Special Use Permit or providing proof of required insurance (Doc. Nos. 404-6, p. 25:94:12–20; 405-7, p. 13:49:19–14:50:7, 14:53:18–20; 438, p. 87:23–88:10; 439, p. 157:18–159:7; JX-135; PX-1176; PX-1177);

7.  On November 12, 2016, the Corps transmitted a Special Use Permit to Spotted Eagle to allow Protestors to have a religious ceremony, which Special Use Permit the Corps ultimately informed North Dakota they were honing when the Corps aided Protestors in holding that religious ceremony, despite never receiving a signed and valid Special Use Permit from Spotted Eagle (Doc. No. 433, p. 179:21–180:15; JX-193); and

8.  Col. Henderson later sent Chairman Archambault the Free Speech Zone Letter, further creating an area on Corps-managed land on which Protestors could assemble despite knowing the majority of Protestors were located in the Main Camp on Corps-managed land not covered by the Free Speech Zone Letter (JX-205; JX-213; PX-1317).

[¶ 61]  The United States urges the Court to reconsider its holdings regarding the relevant legal duties at issue in this case, arguing the factual record at trial should drive a different conclusion

regarding the United States' legal duties under the circumstances because: (1) a private landowner would not owe North Dakota a duty under similar circumstances;[32] (2) there is no tort liability for protected conduct under the First Amendment; (3) North Dakota tort law for duty does not impose liability under the circumstances; (4) the Restatement does not impose a duty under the circumstances; and (5) since there is no duty to support North Dakota's negligence claim, its nuisance and trespass claims fail.

[¶ 62]  First, the Court has found North Dakota would likely adopt Section 318 of the Restatement (Second) of Torts to impose a duty on the United States under the circumstances of this case. The evidence at trial does not support reconsideration of this conclusion.

[¶ 63]  Second, North Dakota's claims do not involve First Amendment protected conduct. The claims presented at trial were North Dakota's tort claims brought against the United States for its wanton disregard for the rule of law under the circumstances of this case. The Protestors, some of which may have engaged in protected activity, are not parties to this action and their actions do not bear on the duty of the United States to North Dakota. See Doc. No. 383, ¶ 21 (distinguishing between the Protestors' First Amendment activities and North Dakota's tort claims). Even assuming the Protestors' First Amendment rights are relevant, the "First Amendment does not protect violence." Doe v. Mckesson, 71 F.4th 278, 289 (5th Cir. 2023) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982)). The damages here were caused by tumultuous, unsanitary, and otherwise horrific conditions that caused significant violence to the land and responding law enforcement officers.

[¶ 64]  Third, under North Dakota law, the United States can be held liable for injuries occurring

---

[32] The United States argues there is no duty to compensate for emergency response costs. This argument goes to damages not duty. The Court construes it as an argument that private landowners do not owe North Dakota a duty under similar circumstances.

to North Dakota for activities that occurred off Corps-managed land.

[¶ 65]   In <u>Saltsman v. Sharp</u>, Sharp backed out of a landowner's property and injured Saltsman, a bicyclist. 2011 ND 172, ¶¶ 1–3, 803 N.W.2d 553. The landowner had erected a fence that obstructed the view of the road. <u>Id.</u> ¶ 2. The North Dakota Supreme Court held the district court erred in concluding a landowner did not owe a duty to protect a passerby from the negligence of a visitor on the landowner's property. <u>Id.</u> ¶ 16.

[¶ 66]   In <u>Holter v. City of Sheyenne</u>, the North Dakota Supreme Court held an individual had no duty to an injured party when the property owner "has no control over the property where the injury occurred **or the instrumentality causing the injury**." 480 N.W.2d 736, 738 (N.D. 1992) (emphasis added).

[¶ 67]   Finally, in <u>Bjerk</u>, the North Dakota Supreme Court discussed premises liability in relation to whether a homeowner owes a duty to stop illegal drug activity on his property. 2018 ND 124, ¶ 14, 911 N.W.2d 343. The North Dakota Supreme Court noted the defendants "owed a duty to maintain his property in a safe condition" and "a duty not to engage in dangerous activities on his property that might result in foreseeable harm to other people who enter the property." <u>Id.</u> ¶ 17. The North Dakota Supreme Court specifically stated, "No case has been cited to us, and we have found none that would extend premises liability to a person in control of property who has not engaged in the activity that cause the harm." <u>Id.</u> Ultimately, the North Dakota Supreme Court rejected the plaintiff's request to extend "premises liability law beyond the owner-conducted activities we have previously recognized to activities conducted by others who enter or occupy the property." <u>Id.</u>

[¶ 68]   <u>Bjerk</u> is consistent with Sections 318 and 838 of the Restatement (Second) of Torts, which the Court concluded creates a duty for the United States under the circumstances of this case. The

issue is whether the Corps violated a duty when it negligently invited, encouraged, and enabled the Protestors' occupation on Corps-managed land which resulted in North Dakota's injuries both on and off Corps-managed land. The key to this case is control. A duty was owed here because the United States, as discussed throughout, had control over its public land and the instrumentality causing the injury, namely the Protestors, by negligently inviting, encouraging, and enabling their destructive behaviors by permitting them to stay on Corps-managed land without an actual Special Use Permit.

[¶ 69]   Fourth, the Court already found the Corps had a legal "duty to exercise reasonable care to control the conduct of the third person as to prevent him from intentionally harming others" under the Restatement (Second) of Torts Section 318. Doc. No. 38, ¶ 67. Likewise, the Court limited United States' liability to "'negligent or wrongful act or omission' of the Corps" under Section 838 of the Restatement (Second) of Torts. Nothing in the United States' current attempt to avoid this duty changes the Court's prior analysis.

[¶ 70]   Fifth, the Court concludes the Corps' decision to violate its non-discretionary permitting duties was not a reasonable attempt to de-escalate the situation. Indeed, the Court has concluded the United States issued a de facto Special Use Permit to Protestors, which was negligent in that it removed the very tools at the Corps' disposal to handle and control the Protestors. Instead, the press releases were explicit statements of support for ongoing unlawful, destructive, and chaotic actions and as demonstrated by the voluminous record. The Corps was well aware of the disastrous nature of its decisions.

[¶ 71]   Accordingly, the United States owed North Dakota a duty under Section 318 of the Restatement (Second) of Torts for North Dakota's claim for negligence.

### 2. Negligence – Breach

[¶ 72]   The United States first argues North Dakota has failed to establish the relevant breach of duty for several reasons. The Corps first argues it did not permit the Protestors to be on its land north of the Cannonball River or to engage in unlawful activity. This is betrayed by the facts of this case.

[¶ 73]   In August 2016, the Corps had abundant information and intelligence about the Protests devolving into violence and unlawfulness as it unfolded on Corps-managed land. See supra ¶ 13.38–.64. Before the Sept. 16 Press Release, which gave the Protestors a de facto Special Use Permit, the Corps and other federal agencies knew Protestors were actively trespassing on Corps-managed land, including in the Main Camp. See supra ¶ 13.48, .84, .95–.100, .183–.184. The Corps knew dangerous, extreme, and violent individuals were present at Protest sites and Protestors were not under the control of the Tribe which sought the Special Use Permit. See supra ¶ 13.57–.60, .80–.81, .90–.112, .131–.136, .208–.211. Finally, the Corps knew Protestors used Corps-managed land as a base of operations and safe haven for illegal activities conducted outside Corps-managed land in North Dakota. See supra ¶ 13.38–.64, .103–.105.

[¶ 74]   The Corps expected from the beginning the Protests would grow, intensify, and have the "potential to become a major protest." Supra ¶ 13.81. See also supra ¶ 13.80, .99–.102, .122–.124. Col. Henderson and the Corps understood the Special Use Permit was "the correct way to address the encampment of [Protestors] on [Corps-managed lands]." Supra ¶ 13.82. Likewise, the Corps knew the Tribe's August 18, 2016, Special Use Permit application and its supplement could in no way comply with the permitting requirements because (1) they were incomplete; (2) they "significantly underestimated" the number of Protest participants, vehicles, and locations—they only listed 300 participants and did not remotely describe the Protest occupation areas adequately;

(3) Corps official Eric Stasch willfully "did not get into the specifics of the permit application" on a phone call with Chairman Archambault on August 25, 2016; (4) on that call, the Chairman admitted to the presence of professional protestors on Corps-managed land who were not associated with the Tribe; (5) Eric Stasch told Chairman Archambault the Tribe's application was "way off"; and (6) the map provided to the Corps to supplement the Tribe's Special Use Permit application specifically indicated the Main Camp was not an authorized location. See supra ¶ 13.87, .106, .111–.112.

[¶ 75]   Considering all these facts, the Court concludes the United States breached its duty of care as set forth in Section 318 of the Restatement (Second) of Torts. While the Sept. 16 Press Release "technically" did not authorize Protestors to be on Corps-managed land north of the Cannonball River, in the face of the overwhelming evidence at trial, it is clear the Corps knew most Protestors were already located at the Main Camp and the Press Release functioned as a de facto Special Use Permit the Corps knew would not affect any change in the Protestors' location. By issuing this de facto permit, the Corps expressly sanctioned the Protestor's presence north of the Cannonball River. Effectively, the Corps granted them lawful status on Corps-managed land despite the unlawful, violent, tumultuous, and utterly chaotic situation developing at Protest sites. The Sept. 16 Press Release was the grand finale of the clear dereliction of the Corps' non-discretionary permitting process. Indeed, these violations began when the Corps declined to act on the Protestors presence on Corps-managed land as early as August 2016, if not going back to May 2016.

[¶ 76]   The United States argues North Dakota has failed to establish the relevant breach of duty because the Corps did not know it could control Protestors' unlawful conduct.

[¶ 77]   "Reason to know" in the Restatement (Second) of Torts means "the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would

infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." Collette v. Clausen, 2003 ND 129, 667 N.W.2d 617 (quoting Restatement (Second) of Torts § 12(1)).

[¶ 78]   The Corps' Col. Henderson was aware a Special Use Permit could be used to control the Protests and stated it was "the correct way to address the [Protest] encampment." Supra ¶ 13.82. Had a Special Use Permit been in place, an appropriate liability insurance and bond amount would have been set to provide indemnification to the United States and help cover the remediation costs from Protestor damage. See supra ¶ 13.160–.163. A Special Use Permit also would have allowed the Corps to mandate Protestors clean up the catastrophe they created at Protest sites. See supra ¶ 13.163. Insurance and mandates would have pressured Protest leaders to manage conduct and mitigate damages to land and private property. See supra ¶ 13.160–.163. An authorized Special Use Permit would have also prohibited the erection of permanent structures and could have limited the number of people present on Corps-managed land. See supra ¶ 13.63–.64, .169, .174. A permit would have required adequate waste management services, significantly more sanitary than excrement pits. See supra ¶ 13.63–.64. None of this was in place because the Corps chose not to enforce its permitting requirements. This conduct is a breach of the duty.

[¶ 79]   The Corps knew it had appropriate mechanisms to control Protestors by violating citation and by closing Corps-managed land. The Corps contends it is not liable because the U.S. Attorney's Office advised that issuing citations would be useless. This sidestep disregards the obvious fact the Corps' decision not to use any tool at its disposal impacted Protestors' actions.

[¶ 80]   Dr. Kuhlman—which the Court found to be a credible and qualified witness at trial— testified the United States' decisions "encouraged [and] supported protestors to remain and be at the DAPL Protests." Doc. No. 442, p. 23:14–19. According to Dr. Kuhlman, the September 9,

2016, Joint Statement was seen as a triumph by Protestors and caused them to think "their concerns were being heard and their illegal conduct was being tolerated, which was a direct result of protest camps being illegally present on Corps[-managed] land." PX-2030, p. 7. Likewise, the September 16 Press Release—the de facto permit—"provided positive support, encouragement, and positive reinforcement" to Protestors because it led them to believe they could stay on Corps-managed land despite not having the mandatory Special Use Permit. Id.; Doc. No. 442, p. 30:2–12. Based upon Dr. Kuhlman's opinions, the Court concludes the United States, through the Corps' lack of any actual effort to control the conduct of the Protestors, normalized, reinforced, encouraged, and assented to the destructive behavior by the Protestors and consented to their occupation on Corps-managed land. PX-2030, p. 8.

[¶ 81]   The United States argues North Dakota has failed to establish the relevant breach of duty because the harmful conduct by the Protestors (third parties) happened off Corps land. The Court addressed this issue when it determined the United States can be liable for actions occurring off Corps-managed land under North Dakota law. See supra ¶¶ 65–69.

[¶ 82]   Finally, the United States argues North Dakota has failed to establish the relevant breach of duty because the Corps exercised reasonable care in light of its "limited options." For the same reasons discussed above, however, the Court concludes the Corps did not exercise reasonable care to control Protestor conduct. The Corps eschewed its most forceful tool: the mandatory Special Use Permit process. The Corps' actions were not reasonable under the circumstances because requiring a Special Use Permit would have guaranteed adequate insurance and bonding coverage, restoration of the land to its original state, prohibition of permanent structures on site, and reasonable human waste disposal. None of this was required, which was a clear breach of the United States' duty under the circumstances.

[¶ 83]   In conclusion, the issuance of the Sept. 16 Press Release constituted a de facto Special Use Permit despite the ongoing illegal and destructive Protest activities. The Corps (1) permitted Protestors to use its land; (2) was present by virtue of on-going collaboration with local authorities; (3) failed "to exercise reasonable care so as to control the conduct of [the Protestors] as to prevent [them] from intentionally harming others or from so conducting [themselves] as to create and unreasonable risk of bodily harm"; (4) knew or had reason to know it was able to control the Protestors; and (5) knew or should have known of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 318. Accordingly, the Court finds the United States breached its duty of care.

### 3.   Negligence – Causation

[¶ 84]   North Dakota has the burden of showing the United States' breach was the proximate cause of North Dakota's injuries. Miller v. Diamond Res., Inc., 2005 ND 150, ¶ 10, 703 N.W.2d 316 ("Actionable negligence consists of a duty on the party of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge that duty, and a resulting injury proximately caused by the breach of that duty."). "A proximate cause is a cause which, as a natural and continuous sequence, unbroken by any controlling intervening cause, produces the injury, and without which it would not have occurred." Id. To determine whether conduct is the proximate cause of an injury, North Dakota courts look to (1) whether the injury was "the natural and probable result of the conduct" and (2) whether the result was "foreseen or reasonably anticipated by [that person] as a probable result of the conduct." Jones v. Ahlberg, 489 N.W.2d 576, 581–82 (N.D. 1992). Whether a tortfeasor's act in North Dakota constituted the proximate cause of the alleged injury is fundamentally a question of fact to be resolved at trial. Id. at 581.

[¶ 85]   The United States argues North Dakota has failed to establish it caused the damages in

question on several fronts.

### a.  Independent Factors

[¶ 86]  The United States contends factors separate from the de facto Special Use Permit were responsible for North Dakota's damages such as: (1) the Protestors' beliefs; (2) the decision on the pipeline easement; (3) historical context; (4) the Tribe's early requests for protest and litigation support, social media, and online donations; (5) the presence of national celebrities; and (6) perception of heavy-handed law enforcement response tactics.

[¶ 87]  The dispositive question, as framed previously, is whether "the United States proximately caused the emergency response when it allowed and encouraged protestors on federal land without requiring the requisite permit." Doc. No. 106, ¶ 43. See also Doc. No. 383, ¶ 29 ("Indeed, reading the facts in the light most favorable to North Dakota on this issue, a reasonable fact finder could conclude the Corps actively encouraged and invited the protestors onto its land thereby encouraging the destructive behavior at issue in this case.").

[¶ 88]  Certainly, Protestors had their own independent incentives for why they protested, but as discussed above, the facts as adduced at trial show Protestors were supported, enabled, and encouraged by the Corps' granting of the de facto Special Use Permit that gave Protestors a refuge from which they could conduct repeated illegal and illicit activities. See supra ¶ 13.197 (Iron Eyes indicating he viewed the camps on Corps-managed land as safe havens), .371 (the camps on Corps-managed land acted as a "base of operations" and "safe haven" for Protestors that allowed their numbers to increase).

[¶ 89]  Likewise, the Corps' decision on the pipeline easement in the first place, historical context, the various requests by the Tribe, presence of national celebrities, and perception of law enforcement as being heavy-handed are all immaterial to the Court's consideration. What was once

alleged now in the light of trial has proven true: the Corps' violation of its mandatory permitting procedures created the indefensible situation that caused significant harm to North Dakota. As noted by Dr. Kuhlman, the Corps' granting of the de facto Special Use Permit enabled and encouraged the Protestors. Doc. No. 442, 23:14–19; PX-2030; PX-2031.

[¶ 90]   The independent factors the United States argues are red herrings. It was the Corps failure to go through the mandatory permitting process that proximately caused North Dakota's damages.

### b.  Reasonably Foreseeable Harms

[¶ 91]   The United States contends the harm to North Dakota was not reasonably foreseeable to the United States when it granted the de facto Special Use Permit to the Protestors.

[¶ 92]   The evidence shows the harms were reasonably foreseeable to the United States. Even before the issuance of the de facto Special Use Permit, the United States knew: (1) Protestors trespassed on Corps-managed land (see supra ¶ 13.38, .84, .95–.99); (2) violent and dangerous extremists were present at the Protests (see supra ¶ 13.58); (3) the Protestors actively broke Corps regulations by building unauthorized structures and roads as well as improperly disposing of refuse and human waste (see supra ¶ 13.140); (4) the Tribe had no authority over Protestors even though the Tribe sought the Special Use Permit (see supra ¶ 13.111–.112); and (5) Protestors used Corps-managed land as their headquarters for the illegal activities conducted off Corps-managed land in North Dakota (see supra ¶ 13.38–.64, .185, .371). The United States anticipated the Protests would grow in intensity and get worse with the possibility of it becoming a "major protest." See supra ¶ 13.57, .80–.81, .99–.100, .102, .124. The United States also knew the proper way of handling the illegal encampments was to follow the Special Use Permit procedures. See supra ¶ 13.82–.83.

[¶ 93]   After the Sept. 16 Press Release, Protestors organized on a nearly daily basis in the Main Camp to go into Morton County and other parts of North Dakota to protest. See supra ¶ 13.204–

.10, .229–.234, .239–.250, .258–.262, .269–.270, .275, .278–.293, .308–.313. During these protests, Protestors spent significant time committing unlawful acts, outright aggression to law enforcement and others, and disrupting the daily lives of ordinary local citizens. See ¶ 13.204–.10, .229–.234, .239–.250, .258–.262, .269–.270, .275, .278–.293, .308–.313.

[¶ 94]   North Dakota frequently made requests to the United States for assistance and issued public emergency declarations and statements which, at a minimum, put the United States on notice the Protest situation was deteriorating into uncontrollable chaos. See supra ¶ 13.71, .90–.94, .131–.136, .149–.159, .202. Then-Governor Dalrymple's August 19, 2016, emergency declaration specifically delineated the risks to public safety caused by the Protests; he testified at trial, stating:

> The serious safety concerns stem from the fact that protestors were advancing out of their recently established camps. They were moving onto the state highway property. They were moving onto the actual highway itself. There was activity dealing with public and private property that was unlawful and it was clear that the situation was going to require some law enforcement response.

See supra ¶ 13.92. The United States claims there was some level of expectation the Protests would fade into the history books, but this does not negate the reasonable foreseeability of the damages at issue here. If anything, it shows the United States knew what was occurring during the Protests.

[¶ 95]   In short, the United States was well aware of the devolving situation of the Protests and the reasonably foreseeable damages that would result. The United States did nothing to curb the situation. The Corps failed to require a Special Use Permit, and this failure resulted in the significant damages North Dakota suffered.

### c.  Corps actions in relation to Protest Activities

[¶ 96]   The United States argues Corps actions did not increase Protest activities. The question relating to the Corps' Sept. 16 Press Release and Free Speech Zone Letter is not whether they caused an increase to Protest activities. The question is whether they proximately caused North

Dakota's damages by allowing and encouraging Protestors on Corps-managed land in violation of the Corps' mandatory permitting regulations. The inquiry centers not on the Protests' size and development but, rather, on the Corps' actions that caused Protestors to use and remain on Corps-managed land as their base of operations for the illegal and destructive activities which necessitated North Dakota's emergency response. Even so, the Court finds the Sept. 16 Press Release and Free Speech Zone Letter did have an impact on Protest activities.

[¶ 97]   The United States principally relies on the opinions of Dr. Steckel and Dr. Yuchtman to argue the Corps actions did not cause North Dakota's injuries. North Dakota argues Dr. Kuhlman's expert opinion carries more weight on the issue of proximate causation.

### d. Dr. Joel Steckel

[¶ 98]   Dr. Joel Steckel relied on three measures to look at Protestor behavior before and after the Sept. 16 Press Release: (1) camp population estimates, (2) camp vehicle counts, and (3) donations. Doc. No. 448, p. 22:11–17. There were, however, several problems with the three measures: (1) Dr. Steckel relied on data from the Bureau of Indian Affairs relating only to the camp south of the Cannonball River and not the Main Camp where most of the protest activity occurred (Id. at 76:11–77:10); (2) Dr. Steckel admitted his camp population estimates were purely subjective and did not rely on objective reported measures for the population data (Id. at 78:15–17; 79:5–17); (3) Dr. Steckel did not use the population estimates created by North Dakota based upon the vehicle counts (Id. at 80:8–19); (4) all vehicles were treated equally in Dr. Steckel's analysis even though varying types were present at the camps such as cars, pickups, minivans, and even buses, which could account for more or less people present based upon the type of vehicle (Id. at 80:20–81:1); (5) Dr. Steckel used data collected from Gmail email addresses, which he did not independently verify, to arrive at his donations calculations (Id. at 83:20–84:6); (6) Dr. Steckel did not use

GoFundMe data in his analysis (Id. at 84:7–19); and (7) Dr. Steckel did not know if the donation data he used was objective (Id. at 85:16–22). With all this information lacking, the Court concludes Dr. Steckel's measures for estimating Protest growth before and after the Sept. 16 Press Release and Free Speech Zone Letter are insufficient to sustain the United States' argument.

[¶ 99]    Dr. Steckel also reviewed social media to conclude there was no causal link between the Corps' Sept. 16 Press Release and Free Speech Zone Letter and the increase Protest activities. Id. at 63:8–15. Dr. Steckel's opinion, however, is significantly limited. First. Dr. Steckel has never analyzed protest and protestor behavior. Id. at 66: 1–12. Second, he openly admitted he was not providing direct opinions on causation. Id. at 66:13–67:16. Third, he excluded arrest data as irrelevant and did not look at Protestor behavior, intensity, and violence. Id. at 71:18–73:17. Fourth, Dr. Steckel did not analyze the importance of having camps on Corps-managed land as safe havens and the impact that had on Protestors. Id. at 75:6–76:10. Fifth, Dr. Steckel did not indicate anything regarding the Protestors' resolve under the circumstances. Id. at 110:4–10. Importantly, Dr. Steckel admitted he did not know whether Protestors had internet access and admitted a lack of access would have depressed the number of social media posts by actual Protestors. Id. at 125:13–127:4. Finally, Dr. Steckel was unable to determine whether the social media data was made by on-the-ground Protestors or from others not at the Protest sites. Id. at 138:8–17.

[¶ 100] Looking specifically to his Facebook analysis, Dr. Steckel confined himself to twenty-one groups having more than 10,000 people. Id. at 87:12–15. He weighed all posts equally and did not account for the frequency of sharing posts. Id. at 90:1–16. For example, if a post was shared 400,000 times and another was not shared at all, they were afforded the same weight. Id. Dr. Steckel also could not account for the location of where the posts came from. Id. at 95:22–96:17.

Dr. Steckel's Twitter (now known as X) analysis suffered from similar problems in that he did not know the location of individuals making tweets and did not weigh the tweets based on how they were shared. Doc. No. 448, p. 98:25–99:24.

[¶ 101] In addition, the Court finds North Dakota's rebuttal witness on this issue, Mr. Gary Warner, to be persuasive. According to Mr. Warner, Dr. Steckel did not perform a geofence search on Twitter which would have limited the search to a specified latitude and longitude to review the tweets from that area. Doc. No. 449, p. 43:2–44:8. Mr. Warner used a weighted system and looked at reactions, shares, and comments on posts to determine the reach of influence in order to score the collected data, which creates an objective standard to determine the posts most important for his analysis. Id. at 47:14–48:15. Because Dr. Steckel did not specify the number of donors, when looking at the donations factor, Mr. Warner noted Dr. Steckel's data was limited in this respect. Id. at 51:1–13. When Dr. Steckel looked at donations to determine the level of Protestor activity, it would have been important for him to know whether a contribution was a single large amount or several small donations. Id. Dr. Steckel, however, only looked at the amount of donations. See id. Donation requests were also not necessarily made to individuals in the camps but were made to people outside the camps. Id. at 51:23–52:5.

[¶ 102] These limitations diminish the usefulness of Dr. Steckel's opinions. The Court concludes Dr. Steckel's opinions based upon social media and donations are insufficiently supported to consider for whether the de facto Special Use Permit proximately caused North Dakota's harms in this case.

### e.  Dr. Noam Yuchtman

[¶ 103] The United States relies on the testimony of Dr. Noam Yuchtman to argue North Dakota has failed to show the United States proximately caused North Dakota's damages.

- 85 -

[¶ 104] Dr. Yuchtman opined the Sept. 16 Press Release and Free Speech Zone Letter did not have a meaningful impact on Protest size or intensity. DX-4222, ¶¶ 61–74, Fig. 7. Dr. Yuchtman relied on Dr. Steckel's data and analysis as to the quantitative data. Id. ¶¶ 56–60; Doc. No. 448, p. 199:3–12. The Court rejects Dr. Yuchtman's analysis based on Dr. Steckel's data for the same reasons the Court rejected Dr. Steckel's analysis.

[¶ 105] Dr. Yuchtman also analyzed certain qualitative factors and created a five-question framework. Doc. No. 448, p. 199:15–201:24. Dr. Yuchtman's qualitative analysis is flawed. While parts of this framework have been subject of academic papers, this framework as a whole has not, and Dr. Yuchtman did not even use it in his previous research concerning protests in Hong Kong. Id. at 200:14–201:24. Dr. Yuchtman's analysis was a context-specific subjective interpretation of the evidence. Id. at 202:17–203:11. Unlike Dr. Kuhlman discussed below, Dr. Yuchtman's analysis looked at the Sept. 16 Press Release and Free Speech Zone in isolation without considering the broader context and other actions by the United States. Id. at 212:5–213:7. Other statements he did not consider included the Sept. 9 Joint Statement, Oct. 10 Joint Statement, President Obama's statement on November 2, a December 4 Corps statement, and Col. Henderson's letter from February 3, 2017. Id.

[¶ 106] Because of the limited and subjective data used, the Court finds Dr. Yuchtman's opinions are unpersuasive on the issue of proximate cause.

### f.    Dr. Katherine Kuhlman

[¶ 107] The United States contends Dr. Katherine Kuhlman's testimony is not credible and fails to establish causation because she conceded her analysis did not answer whether the United States caused any protest behavior.[33] Doc. No. 451-1, ¶ 617.

---

[33] The United States puts forth other arguments against Dr. Kuhlman (Doc. No. 451-1, ¶¶ 618–21) that are ultimately beside the point because the Court has concluded Dr. Kuhlman's expert analysis

[¶ 108] Dr. Kuhlman, however, provided an expert opinion on whether "the actions of the U.S. government increased the resolve of the protesters and their perceived legitimacy for their protest actions." PX-2030, p. 1. She concluded:

> Yes, it is my opinion that the actions of the federal government increased the resolve of the protesters and their perceived legitimacy for their protest actions. When protesters believed their cause to be just based on reinforcement from the U.S. Government, they were emboldened, engaged in aggressive and violent behavior, and their numbers increased.

Id. See also Doc. No. 442, p. 41:5–9; PX-2031.

[¶ 109] Dr. Kuhlman looked at the comprehensive circumstances surrounding the Corps' actions before and after the Sept. 16 Press Release. Doc. No. 442, p. 41:22–25, 42:14–46:13; PX-2030; PX-2031. Her opinion was based on Reinforcement Theory and Mimicry Theory, both of which are established forensic psychology theories. Doc. No. 442, p. 17:2–18:2, 21:12–14, 93:3–8. Dr. Kuhlman's opinion is corroborated by trial evidence showing Protestors saw the Corps' and other United States Agencies' conduct as supportive of the Protests' cause and that the camps on Corps-managed land were safe havens.

[¶ 110] Accordingly, the Court finds Dr. Kuhlman's testimony is more persuasive than Dr. Steckel's and Dr. Yuchtman's on the issue of causation. The Court finds the United States' actions increased the resolve of the Protestors and perceived legitimacy. This testimony, therefore, supports the Court's conclusion the United States caused North Dakota's damages.

### g.  Conclusion as to Causation

[¶ 111] The Court rejects the United States' remaining arguments relating to the "combined effect" of other events having a "predominant effect" on North Dakota's harms. See Doc. No. 451-1, ¶¶ 647–49. North Dakota clearly established the United States increased Protestor resolve and

---

is comprehensive and supported by the Reinforcement Theory and Mimicry Theory which are established forensic psychological theories. See supra ¶¶ 107–10.

encouraged their behavior by allowing Protestors to remain on Corps-managed land.

[¶ 112] Based the totality of the evidence at trial, the Court finds the Corps' Sept. 16 Press Release and Free Speech Zone Letter were the proximate cause of North Dakota's damages. The Court also finds the Corps' violation of its non-discretionary permitting process allowed Protestors to remain on Corps-managed land without the required Special Use Permit, had the predominant effect of increasing Protest size, violence, and destructive behavior. North Dakota has, therefore, established the United States proximately caused damages in this case.

### 4. Negligence - North Dakota's independent responsibility

[¶ 113] The United States contends North Dakota would bear the cleanup costs even without the various Corps statements.

[¶ 114] The United States first argues the State began its response a month prior to the Corps' first statement. But the increase in the Protest size and violence was due to the Corps' statements. See supra ¶¶ 96, 107–12. The fact that the State began responding prior to the Corps' first statement does not alleviate the United States from liability for North Dakota's damages. The Corps should have requested forceable eviction due to the flagrant violations of its mandatory permitting policies. This argument, therefore, fails.

[¶ 115] Second, the United States argues some Protestors were not located on Corps-managed land and came to cause chaos from locations not on Corps-managed land. This, however, does not negate the fact that the Corps' statements emboldened and encouraged the lawless behavior of all Protestors regardless of their location of origin. See supra ¶¶ 107–112. Because North Dakota has shown the Corps' statements were the proximate cause of its injuries and that the Protestors used Corps-managed land as a homebase for their violent, tumultuous, and destructive behavior, the fact that some Protestors came from off Corps-managed land is speculative and immaterial. See

supra ¶¶ 111–12.

[¶ 116] Third, the United States argues even if the Tribe had a valid Special Use Permit, the Permit would not have eliminated North Dakota's injury. A majority of the injuries, however, would have been avoided because (1) it would have required (a) $1 million in coverage for each occurrence of property damage and there was significant property damage throughout, (b) $5 million for personal injury, or (c) $5 million for all other claims per occurrence; (2) it would have required proper waste disposal which covered a significant amount of the response costs; (3) it would have required appropriate bonding in place; and (4) it would have prohibited erection of the structures and roads that were throughout the campsites. See supra ¶¶ 13.63–.64, .160–.162, .169. Each of these aspects would have been enforceable and the United States could have prevented the damages in this case. See id.

[¶ 117] Finally, the United States argues that even if it forcibly removed Protestors in August 2016, the State would have incurred protest-response costs. This hypothetical argument, however, does not account for the subsequent destruction and utter lawlessness that occurred due to the issuance of the de facto Special Use Permit. Had there been a forceable removal of the Protestors in August 2016, a significant amount of North Dakota's injuries would have been avoided. The United States chose to sit on its hands and let the Protestors destroy State and private property while using Corps-managed land as the Protestors' base of operations. See supra ¶ 13.38–.64, .103–.105, .371–80. This was an egregious dereliction of the Corps' duty.

[¶ 118] In short, had the Corps not issued the de facto Special Use Permit, the damages would be significantly reduced if not eliminated. But that is not the reality of this case. As discussed above, the Corps proximately caused North Dakota's injuries here.

### 5.  Conclusion as to Negligence

[¶ 119] As discussed above, the Court finds North Dakota has proven each element of its claim for negligence against the United States. As noted, the Court will discuss damages as to all claims separately.

**B.  Claim Four: Gross Negligence**

[¶ 120] The same duty applies In North Dakota, gross negligence is the "want of slight care and diligence." N.D.C.C. § 1-01-17. Gross negligence "'is the omission of the care which even the most inattentive and thoughtless seldom fail to take of their own concerns. It evinces a reckless temperament.'" Bjerke v. Heartso, 183 N.W.2d 496, 501 (N.D. 1971) (quoting Rubbelke v. Jacobsen, 268 N.W. 675, 676 (N.D. 1936)). In short, gross negligence lacks any care whatsoever. Id. Circumstantial evidence alone is insufficient to prove gross negligence unless "the circumstances are inconsistent with any other theory." Id. "Where the inferences to be found in the circumstantial evidence support a theory of ordinary negligence equally as well as one of gross negligence, then gross negligence fails." Id.

**1. Gross Negligence – Duty**

[¶ 121] The United States argues North Dakota has failed to establish a duty for gross negligence for the same reasons it contends North Dakota failed to establish a duty for negligence. For the same reasons Section 318 of the Restatement (Second) of Torts applies to North Dakota's negligence claim, the same section applies to North Dakota's claim for gross negligence.

**2.  Gross Negligence – Breach**

[¶ 122] The United States argues it did not breach its duty of care for gross negligence because North Dakota failed to establish Corps officials acted with a "reckless temperament" or willfulness. The Court has found the United States breached its duty of care under Section 318 of the Restatement (Second) of Torts as it applies to North Dakota's negligence claim. The same facts

support a breach for gross negligence. In addition, the Court further finds the Corps not only acted willfully, but it also acted intentionally in decided to forgo the required permitting procedures in breach of the United States duty of Section 318. The Corps knew of the problems arising with the Protestors, law enforcement, and private property owners in North Dakota. The Corps also knew they could have had an enforcement mechanism to control the protests had a Special Use Permit been in place. The Corps intentionally disregarded its mandatory permitting processes, and then misled the Protestors and public at large that a Special Use Permit was, in fact issued. This is a clear breach of the duty outlined at Section 318 of the Restatement (Second) of Torts and constitutes the required "reckless temperament" and willfulness under North Dakota law.

### 3. Gross Negligence – Causation

[¶ 123] The United States levies the same challenge to causation for North Dakota's gross negligence claim as it does for the ordinary negligence claim. For the same reasons causation is present in North Dakota's negligence claim, causation is likewise present for North Dakota's gross negligence claim. See supra ¶¶ 84–112

### 4. Conclusion as to Gross Negligence

[¶ 124] For these reasons, the Court finds North Dakota has proven the United States is liable for its gross negligence claim. As with North Dakota's claim for negligence, because damages is interrelated to all of the State's claims, the Court will discuss North Dakota's damages separately.

### C. Claim Five: Civil Trespass

[¶ 125] Ordinarily, civil trespass occurs when "a person 'intentionally and without consensual or other privilege . . . enters land in possession of another . . . or causes a thing or third person to do so.'" Tibert v. Slominski, 2005 ND 34, ¶ 15, 692 N.W.2d 133. The Court, however, has found North Dakota's Civil trespass law is consistent with Section 318 of the Restatement (Second) of

Torts. Doc. No. 38, ¶¶ 66–67. In doing so, the Court found the Corps was "under a duty to exercise reasonable care so *to control the conduct of the third person as to prevent him from intentionally harming others*." Id. ¶ 67 (quoting Restatement (Second) of Torts § 318). Because the Corps was under a duty to exercise reasonable care, North Dakota's Civil Trespass claim essentially sounds in negligence. Accordingly, the Court will follow the framework adopted by the parties: duty, breach, and causation. Doc. No. 451-1, ¶¶ 511–649, Doc. No. 452-1, ¶¶ 108–204. As with negligence and gross negligence, North Dakota's damages will be discussed separately.

### 1. Civil Trespass – Duty

[¶ 126] The United States argues that because the duty for North Dakota's third-party trespass claim sounds in negligence, and because they claim North Dakota has failed to establish a duty in negligence, then North Dakota's third-party trespass claim fails. See Doc. No. 451-1, ¶¶ 556–57. The Court has found Section 318 of the Restatement (Second) of Torts supplies the negligence-based duty in this case. For the same reasons that duty applies to North Dakota's negligence claim, it also applies to North Dakota's claim for third-party trespass.

### 2. Civil Trespass – Breach

[¶ 127] In addition to the same arguments challenging North Dakota's claim the United States breached its duty under Section 318 of the Restatement (Second) of Torts in the negligence claim, the United States argues North Dakota has failed to establish breach for its trespass claim because North Dakota has not shown the Corps intentionally caused third parties to trespass on State land. Doc. No. 451-1, ¶¶ 592–95.

[¶ 128] The Court adopts its reasoning for breach as set forth under the negligence discussion. See supra ¶¶ 72–83. As to whether intentional conduct was required, the Court notes Section 318 of the Restatement (Second) of Torts does not require intentionality on the part of the United States.

The intentionality requirement under Section 318 is on the Protestors, not the United States. The United States was required to exercise reasonable care to prevent the Protestors from using their land to then intentionally harm others. The record is clear the Protestors repeatedly intended to cause harm to both public and private property as part of the violent and tumultuous actives throughout the Protest. As discussed under the negligence analysis, the United States breached its duty of care under Section 318, which applies equally to North Dakota's third-party trespass claim.

### 3. Civil Trespass – Causation

[¶ 129] The United States levies the same challenge to causation for North Dakota's civil trespass claim as it does for the ordinary negligence claim. For the same reasons causation is present in North Dakota's negligence claim, causation is likewise present for North Dakota's civil trespass claim.

### 4. Conclusion as to Civil Trespass

[¶ 130] Based upon the foregoing, the Court finds North Dakota has proven the United States is liable for its civil trespass claim. The Court will address damages collectively for each claim.

### D. Claim One: Nuisance

[¶ 131] North Dakota law provides:

> A nuisance consists of unlawfully doing an act or omitting to perform a duty, which act or omission:
> 1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
> 2. Offends decency;
> 3. Unlawfully interferes with, obstructs . . . or renders dangerous for passage, any lake, navigable river, . . . public park, square, street, or highway; or
> 4. In any way renders other persons insecure in life or in the use of property.

N.D.C.C. § 42-01-01.

[¶ 132] While these elements are specified by statute, "common law remains relevant" to nuisance claims when not in conflict with the statute. Rassier v. Houim, 488 N.W.2d 635, 636 (N.D. 1992).

"Although Section 42-01-01, N.D.C.C., defines nuisance in part as 'omitting to perform a duty,' the type of 'duty' which gives rise to a claim of nuisance may differ from the 'duty' implicated in a negligence action . . . ." Knoff v. Am. Crystal Sugar Co., 380 N.W.2d 313, 317 (N.D. 1986). Specifically, "[n]uisance is a condition and not an act or failure to act, so that if a wrongful condition exists, the person responsible for its existence is liable for resulting damage to others." Id. (quoting 58 Am. Jur. 2d Nuisances § 3 (1971)). Putting all this together, the "duty" involved in a claim for nuisance is best stated in the negative as the duty not to take actions or create conditions that cause a nuisance. Creation of a nuisance need not meet the standard for "negligence." See id.

### 1. Nuisance – Duty

[¶ 133] The United States urges the Court to reconsider its holdings regarding the relevant legal duty for North Dakota's nuisance claim arguing the factual record at trial should drive a different conclusion because a private landowner would not owe North Dakota a duty under similar circumstances.[34] The United States also argues that because duty for negligence has not been established, the claim for a duty in nuisance necessarily fails. Doc. No. 451-1, ¶¶ 556–57.

[¶ 134] Insofar as the Court has determined there is a duty for North Dakota's negligence claim, the same analysis applies here. The Court has also determined the basis for liability under North Dakota's public nuisance claim is set forth in Section 838 of the Restatement (Second) of Torts. Doc. Nos. 38, ¶¶ 65–66; 283, ¶¶ 15–17.

> A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and
>
> (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and

---

[34] The United States' arguments as to the relevant duties are essentially combined in its proposed order. Doc. No. 451-1, ¶¶ 511–56. The Court addressed all of the United States arguments in discussing the relevant duty under North Dakota's negligence claim. The Court addresses one issue in particular to North Dakota's nuisance claim.

(b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.

 Restatement (Second) of Torts § 838.

[¶ 135] North Dakota's nuisance law holds a possessor of land or landowner liable for acts the possessor authorizes or allows that result in harm to adjacent owners in both the civil and criminal context. Herring v. Lisbon Partners Credit Fund, Ltd. P'ship, 2012 ND 226, ¶ 21, 823 N.W.2d 493. Herring involved overhanging tree limbs damaging a neighbor's property. Id. ¶ 1. The North Dakota Supreme Court held landowners have a duty "to utilize [their] property in a reasonable manner so as not to cause injury to the adjoining property." Id. ¶ 21 (quoting Abbinet v. Fox, 703 P.2d 177, 181 (N.M Ct. App. 1985)). In Kukowski v. Simonson Farm, Inc., the North Dakota Supreme Court found landowners, particularly farmers, "must exercise ordinary care when actively working the land" to control or remove weeds to protect neighboring properties. 507 N.W.2d 68, 70 (N.D. 1993). In State v. Hafner, a criminal public nuisance case, the North Dakota Supreme Court held permitting livestock to run outside a rancher's fence onto the public highway constitutes a public nuisance in North Dakota as defined by N.D.C.C. Section 42-01-01. 1998 ND 220, ¶¶ 4, 28–29, 587 N.W.2d 177. Finally, in Kinnischtzke v. City of Glen Ullin, the North Dakota Supreme Court held, "We reach the conclusion that where a municipality purposely or negligently operates a sewage plant that it becomes a nuisance which results in injury to property, the municipality is liable for damages in an amount sufficient to compensate for the injury." 57 N.W.2d 588, 596–97 (N.D. 1953).

[¶ 136] The Court's imposition of a duty, and as it has stood since the beginning of this case, conforms to these long-standing North Dakota holdings. Each case arose from the use of one party's property resulting in damage to another's property. In each case, the North Dakota Supreme

Court held the offending landowner had a duty to use the land in such a way as to not cause damages to nearby property. The same rationale applies to this case and there is nothing in North Dakota law that would suggest private landowners are immune from a claim for nuisance or negligence for injury caused to North Dakota's land.[35]

[¶ 137] The Court already found the Corps had a legal "duty to exercise reasonable care to control the conduct of the third person as to prevent him from intentionally harming others" under the Restatement (Second) of Torts Section 838. Doc. No. 38, ¶ 67. Likewise, the Court limited United States' liability to "'negligent or wrongful act or omission' of the Corps" under Section 838 of the Restatement (Second) of Torts. Nothing in the United States' current attempt to avoid this duty changes the Court's prior analysis.

[¶ 138] Accordingly, the United States owed North Dakota a duty under North Dakota's nuisance claim.

## 2.  Nuisance – Breach[36]

[¶ 139] The United States argues North Dakota has failed to establish its nuisance claim because (1) North Dakota failed to establish the conduct it claims was a nuisance occurred on Corps-managed land; (2) the Corps did not consent to the Protestor activity; and (3) North Dakota has

---

[35] As to the United States' reliance on the "free public service doctrine" or "municipal cost recovery rule," the Court concludes these rules do not apply here. They are federal common law doctrines that hold emergency response costs are unrecoverable in tort cases absent authorizing legislation by the state in question. District of Columbia v. Air Fla., Inc., 750 F.2d 1077, 1080 (D.C. Cir. 1984). However, under the FTCA, North Dakota law governs this dispute. See 28 U.S.C. § 1346(b)(1). When a negligent actor creates a nuisance in North Dakota, the State's law provides abatement as a remedy. N.D.C.C. § 42-01-07. When it is a public nuisance, it "may be abated by any public body or officer authorized thereto by law." N.D.C.C. § 42-01-09. This question ultimately goes to damages not to whether the United States owed North Dakota a duty under the circumstances of this case.

[36] The Court addresses an element of breach for nuisance based on the Court's prior order limiting North Dakota's nuisance claim to the "negligent or wrongful act or omission" of the Corps." Doc. No. 38, ¶ 68.

not shown negligence.

[¶ 140] The North Dakota Century Code states:

> A nuisance consists of unlawfully doing an act or omitting to perform a duty, which act or omission:
> 1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
> 2. Offends decency;
> 3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
> 4. In any way renders other persons insecure in life or in the use of property.

N.D.C.C. § 42-01-01. While the North Dakota Supreme Court has held "the common-law nuisance concept does not apply in North Dakota," it is equally true that if "there is no conflict between the common law and a statute, common law remains relevant." Rassier, 488 N.W.2d at 636. The North Dakota Supreme Court has explained:

> Although Section 42–01–01, N.D.C.C., defines nuisance in part as "omitting to perform a duty," the type of "duty" which gives rise to a claim of nuisance may differ from the "duty" implicated in a negligence action:
>
>> "To render a person liable on the theory of either nuisance or negligence there must be some breach of duty on his part, but liability for negligence is based on a want of proper care, while ordinarily, a person who creates or maintains a nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised to avoid the injury. The creation or maintenance of a nuisance is a violation of an absolute duty, the doing of an act which is wrongful in itself, whereas negligence is a violation of a relative duty, the failure to use the degree of care required under particular circumstances in connection with an act or omission which is not of itself wrongful. Nuisance is a condition and not an act or failure to act, so that if a wrongful condition exists, the person responsible for its existence is liable for resulting damage to others."

Knoff, 380 N.W.2d at 317 (quoting 58 Am. Jur. 2d Nuisances § 3).

[¶ 141] As the Court previously concluded, Section 838 of the Restatement (Second) of Torts provides the relevant duty for claims of nuisance in North Dakota. See supra ¶ 33–35; Doc. Nos.

38, ¶ 65; 383, ¶ 16.

[¶ 142] The question for the Court to resolve from trial is whether the United States, acting through the Corps, violated the duty as set forth at Section 838 of the Restatement (Second) of Torts. Because the Court previously concluded it would employ a "negligent or wrongful act or omission" standard for the negligence claim, the analysis is functionally the same as stated under the negligence, gross negligence, and civil trespass discussion. See Doc. No. 38, ¶ 68.

[¶ 143] The United States first argues North Dakota has not established a nuisance claim because North Dakota failed to show the nuisance conduct occurred on Corps-managed land. North Dakota tort law permits recovery for injuries arising from a landowner's property occurring off that property. Supra ¶¶ 64–68. The conduct here arose from Corps-managed land and spilled onto state and private property, which caused significant destruction. The Court finds the Corps was negligent under the circumstances when it issued the de facto permit.

[¶ 144] The United States next argues the Corps did not consent to the Protestors' presence on Corps-managed land by issuing the September 16, 2016, Press Release. But the Court has found the United States issued a de facto Special Use Permit. See supra ¶¶ 18, 22, 31, 38. See also Doc. Nos. 38, ¶¶ 20–58; 383, ¶¶ 22–28. By doing so the United States, through the Corps, encouraged, invited, and consented to Protestors being on Corps-managed land. The Press Release was an explicit statement that Protestors had the Corps' permission to use its land as the launching point for violent and tumultuous Protests. Consistent with Section 838 of the Restatement (Second) of Torts, the Court finds the United States consented to the destructive Protests and the Corps "failed to exercise reasonable care to prevent the nuisance."

[¶ 145] Third, the United States argues because North Dakota has failed to establish its claim for negligence, the State's nuisance claim necessarily fails. The Court, however, has found for North

Dakota on its negligence claim against the United States. See supra ¶¶ 58–119. Because North Dakota has established negligence, this argument fails.

[¶ 146] In light of all of the evidence at trial and for the same reasons set forth in the breach discussion on negligence, gross negligence, and trespass, the Court finds: (1) the United States, through the Corps was a possessor of land upon which Protestors carried on activities that caused a nuisance; (2) the United States, through the Corps knew or had reason to know the Protests were occurring and were causing or would "involve an unreasonable risk of causing the nuisance"; and (3) by issuing the September 16 Press Release, the United States, through the Corps consented to the unlawful Protest activities and this was a failure to exercise reasonable care to prevent the nuisance. Restatement (Second) of Torts § 838.

### 3.  Conclusion as to Nuisance

[¶ 147] The Court finds North Dakota has proven the United States is liable for its nuisance claim. As with the other claims, the Court will address damages separately.

### E.  Damages

[¶ 148] The United States argues North Dakota's damages must be reduced to account for: (1) third party actions; (2) existing value of purchased equipment; and (3) regular payroll expenses; (4) apportionment between entities and persons at fault; because (5) the $10 million federal grant and the $15 million gift received by North Dakota; and finally, (6) the interest on North Dakota's Bank of North Dakota loans, which it is not entitled to recover.

### 1.  No Reduction in Damages

[¶ 149] The Court has already decided the damages North Dakota seeks are recoverable under both North Dakota law and the FTCA. Doc. No. 106, ¶¶ 13–44. Essentially, the United States contends (1) because other federal agency statements contributed to the damages, there must be an offset;

(2) North Dakota cannot recover emergency response costs for Protestors who were located off Corps-managed land; (3) emergency response costs before the Sept. 16 Press Release are unrecoverable; and (4) North Dakota cannot recover damages associated with protected by the First Amendment.

[¶ 150] First:

> North Dakota's damages are not limited only to the [Corps'] failure to follow the permitting procedure. The Court's Order on the United States' States Motion to Dismiss was clear. The [Corps'] failure to follow the permitting procedure opened the gates to North Dakota being damaged by the United States, its agencies, and third parties. The [Corps] created a liability mess. It let protestors and other hapless federal agencies exacerbate the damages and then left North Dakota to clean it up. As alleged [and now proven], the tortious conduct occurred after or during the [Corps'] decision to forego requiring the protestors to have the necessary permits to be on [Corps-]managed land. The resulting damages to property and the need for law enforcement at the protest [site] was unprecedented in North Dakota. The simple failure to follow the permitting procedures is the basis for liability but it is not the only basis for damages in this matter. The [Corps'] failure to follow the permitting procedures permits North Dakota to seek damages from the resulting tortious conduct—the gigantic federally created mayhem—as previously discussed in the Court's Order Denying the United States' Motion to Dismiss.

Doc. No. 280, ¶ 12. See also id. ¶¶ 13 (noting the United States has been on notice of other federal agency actions relevant to North Dakota's damages), 14 (citing Goble v. Ward, 628 Fed. Appx. 692, 698 (11th Cir. 2015)) (noting the FTCA's waiver of sovereign immunity applies to the United States and not to agencies within the federal government specifically).

[¶ 151] The evidence at trial showed the United States, acting through the Corps, created a horrendous situation for the State of North Dakota and its citizens by issuing the de facto Special Use Permit. Other agencies and third parties were present and acted throughout the case, but this does not relieve the United States from liability. It is the United States that is the entity liable in this case, not its other agencies.

[¶ 152] Second, the Court found Protestors would not have been on or remained on Corps-managed

land, including land outside of the area covered in the Sept. 16 Press Release and the accompanying de facto Special Use Permit, if the Corps had not abdicated its mandatory permitting process. See supra ¶¶ 115–16. North Dakota had to constantly respond to the public nuisance these actions created, and Protestors originated from the point of nuisance to cause harms in other areas of North Dakota. For example, the Main Camp population quickly increased after North Dakota law enforcement officers tried to arrest several Protestors during the "Big Push." See supra ¶ 13.229–.254. Furthermore, because the camps on Corps-managed land fed, supplied, and galvanized Protestor activity elsewhere, North Dakota law permits the State to recover damages for the Protestors' actions off Corps-managed land, including the Main Camp settled in the right-of-way on Highway 1806. See supra ¶¶ 64–68.

[¶ 153] Third, North Dakota is permitted to recoup its emergency response costs prior to September 16, 2016. The non-discretionary permitting process the Corps must follow is clear that special events "are prohibited unless written permission has been granted by the District Commander." 36 C.F.R. § 327.21. The Court held, "The Corps has a '*responsibility* to determine if the requested activity is a special event; to assure the activity is consistent with current project land use classifications . . . and to specific general criteria and site-specific stipulations based upon the criteria in [Appendix E]." Doc. No. 38, ¶ 43 (quoting Doc. No. 8, p. 45). Appendix E provides numerous requirements that must be met before the issuance of a Special Use Permit and before a person with a Special Use Permit is allowed to be on Corps-managed land for their stated purpose.

[¶ 154] As early as May 2016, it was clear a special event was occurring and Protestors had already "spilled over"—as Col. Henderson put it—onto Corps-managed land. Supra ¶ 13.38; Doc. No. 438, p. 160:13–161:3. Col. Henderson's decision to require a Special Use Permit was made as early as May 2016 and he characterized this decision as "honoring the special trust relationship

- 101 -

with the tribes." Doc. No. 438, p. 161:21–162:19. Col. Henderson did not want to any unforced error under the circumstances. Id. By August 15 of that year, the Corps was very much aware of Protestor occupation of Corps-managed land and the occupation was likely to become a major protest. See supra ¶ 13.57, .81. The Corps was likewise aware Protestors were hostile and their occupation degraded Corps-managed land. The Corps also agreed a Special Use Permit was the appropriate way to handle the situation. As of the Tribe's first application for a Special Use Permit, the Corps knew the application did not and could not comply with the Corps' mandatory permitting regulations' requirements under Corps regulations that "[t]he land or facilities where the event was held will be fully restored to prior conditions by the event holder following the event" given that the application for the Special Use Permit did not cover all Protestors at that time. Doc. No. 8, p. 45.

[¶ 155] In short, the Corps issued the de facto Special Use Permit with the Sept. 16 Press Release, which was a violation of the Corps' non-discretionary permitting process. See supra ¶¶ 18–32. These violations began in May 2016 when Col. Henderson and the Corps decided not to require a permit from Protestors. Doc. No. 438, p. :1–13. Therefore, North Dakota can properly recover the entire scope of its claimed damages.

[¶ 156] Finally, the Court has already disposed of the United States claim relating to the First Amendment conduct at issue in this case. See supra ¶ 63. North Dakota's damages will not be reduced due to First Amendment concerns.

## 2. Equipment Value

[¶ 157] The United States asks the Court to reduce the damages amount by $824,153.28 for the scrap or salvage value of purchased equipment and this equipment's future use. The Court will not reduce the judgment by this amount for several reasons.

[¶ 158] North Dakota law allows the State to recover damages in "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." N.D.C.C. § 32-03-20. North Dakota's claim for damages as to the equipment relates only to those reasonably necessary for Protest response. See Doc. No. 437, p. 97:6–18, 116:8–20 (explaining equipment was only ever procured as necessary for Protest response), 153:2–18 (explaining the North Dakota National Guard contributed already existing equipment to the emergency response, including Humvees, a Black Hawk helicopter, and an Avenger air defense missile system used for its optical capabilities only); 441, p. 94:15–95:8 (explaining North Dakota's requirement to reimburse the United States for use of federal equipment, including Humvees).

[¶ 159] The question boils down to whether North Dakota would have purchased the equipment absent the Protests happening as they did, with the Corps' actions at the heart of the matter. The answer is no. North Dakota had no need to purchase the equipment. If North Dakota has found the equipment useful after the fact is irrelevant. The State would not have expended funds to purchase equipment for the emergency response absent the conditions present in this case. Therefore, the United States must pay for those damages.

### 3. Wages

[¶ 160] The United States requests the Court offset North Dakota's damages by $2,643,104.84 in regular payroll expenses. In other words, the United States contends this amount is the regular payroll North Dakota had to pay its employees, regardless of the Protests.

[¶ 161] NDDES did not generally include the regular wages when determining damages. Doc. No. 441, p. 36:13–37:19. There were instances where regular wages were included but those were under limited circumstances. Id. For example, if employees were paid under a federal grant—such

as North Dakota's Game and Fish employees—and the response was outside of the federal grant, or regular wages for nonscheduled shifts such as State holidays, or when an agency had to backfill positions when personnel was pulled to help with the Protest response. Id. 36:17–38:7, 66:4–11, 96:21–97:22; 445, p. 113:7–16. The reimbursement request under the circumstances is consistent with North Dakota policy. Doc. No. 441, p. 94:1–4.

[¶ 162] The Court asks whether the expenses would have been paid absent the Protests, and the answer is no. North Dakota paid these wages solely because of the Protests. North Dakota's Game and Fish employees are paid by federal grant that does not allow the State to use grant funds for work outside the scope of ordinary business. See Id. 36:17–38:7, 66:4–11, 96:21–97:22; 445, p. 113:7–16. Protest response was outside ordinary business and thus required the State to pay those employees their regular wages. Absent the emergency response, the federal grant would have covered those wages, not the State treasury. The requirement to pay nonscheduled shifts and backfilling positions likewise would not have occurred without the Protests. Accordingly, the Court will not reduce North Dakota's damages for the regular wages included in its damages calculation.

### 4.   Apportionment of Damages

[¶ 163] The United States argues damages should be apportioned to Protestors, the Tribe and Dakota Access, and North Dakota.

[¶ 164] Under North Dakota's modified comparative fault statute, when a party requests, courts must have separate findings of fault attributable to each possible person or entity who contributed to the injury. N.D.C.C. § 32-03.2-02.[37] "The modified comparative fault provisions significantly

---

[37] The Court notes North Dakota's Modified Comparative Fault statute indicates the court must "direct the **jury** to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury" if requested by a party. N.D.C.C. § 32-03.2-02 (emphasis added). Both parties agree this

revised tort liability in North Dakota and shifted the focus from traditional tort doctrines to the singular inclusive concept of 'fault.'" Rodenburg v. Fargo-Moorhead Young Men's Christian Ass'n, 2001 ND 139, ¶ 25, 632 N.W.2d 407. Ordinarily, liability is several—not joint—only when two or more parties contributed to the injury. N.D.C.C. § 32-03.2-02. However, if two or more parties "act in concert in committing a tortious act or **aid or encourage the act**," then the parties "are jointly liable for all damages attributable to their combined percentage of fault." Id. (emphasis added). Relevant here, fault includes negligence, reckless or willful conduct, assumption of risk, and failure to avoid injury. Id. The North Dakota Supreme Court has "identified the elements of the assumption-of-risk defense as knowledge of abnormal danger, voluntary exposure to it, freedom of choice to avoid it, and injury proximately caused by the abnormal danger." Olson v. A.W. Chesterton Co., 256 N.W.2d 530, 538 (N.D. 1977).[38] In North Dakota, assumption of risk is not an affirmative defense; rather it "is one part of the analysis in determining comparative fault." Green v. Mid Dakota Clinic, 2004 ND 12, ¶ 6, 673 N.W.2d 257.

### a. Protestor Liability

[¶ 165] The United States argues the Court should apportion all fault for North Dakota's damages to the Protestors.

[¶ 166] The Court has already found the United States actively encouraged Protestors in their destructive and unlawful activities by issuing the de facto Special Use Permit. See supra ¶¶ 80,

---

statute governs this portion of the dispute. Even though the plain language of the statute requires a jury to make this determination, the Court presumes jury to mean "fact finder" in the context of this bench trial.

[38] Both Parties rely on North Dakota Jury Instructions to provide North Dakota law on assumption of risk in North Dakota. See Doc. No. 451-1, ¶ 668; 452-1, ¶ 239. Under this pattern instruction, assumption of risk occurs when a "person (1) has actual knowledge of a risk of [injury] [loss], (2) has freedom of choice to avoid the risk, (3) voluntarily encounters the risk, and (4) [injury] [loss] is proximately caused by the encounter." North Dakota Jury Instructions – Civil, § C – 2.75, Assumption of Risk 2002 (2023 ed.). This is essentially the same standard articulated in Olson, 256 N.W.2d at 538.

86–90, 111, 115, 144. This finding alone justifies joint liability. <u>See</u> N.D.C.C. § 32-03.2-02. In addition, the Court found Sections 318 and 838 of the Restatement (Second) of Torts attach liability when a person permits others to use his land and those others then engage in destructive activity, which occurred in this case. <u>See</u> <u>supra</u> ¶¶ 34–35, 64–71, 134–138, 140–47. This finding also justifies joint liability under N.D.C.C. § 32-03.2-02.

[¶ 167] The United States relies principally on two North Dakota cases. In <u>Hurt v. Freeland</u>, a drunk driver crashed into the plaintiff's vehicle, killing three and injuring two others. 1999 ND 12, ¶¶ 2–3, 589 N.W.2d 551. Plaintiff sued the drunk driver and passengers for negligence. <u>Id.</u> ¶ 4. The question relevant to this case was whether the passengers were jointly liable under N.D.C.C. § 32-03.2-02 for the damages caused by the driver. <u>Id.</u> ¶ 18. The North Dakota Supreme Court first concluded the amended complaints did not allege the driver and passengers acted in concert with one another, that the passengers aided or encouraged the driver, or the passengers ratified or adopted the driver's actions. <u>Id.</u> ¶ 19. Next, the North Dakota Supreme Court held "N.D.C.C. § 32-03.2-02 does not create an independent basis of liability, rather it deals with the allocation of damages among those at fault." <u>Id.</u> ¶ 21.

[¶ 168] In <u>Reed v. University of North Dakota</u>, the University of North Dakota allowed a race to occur on campus during which the plaintiff suffered injuries. 1999 ND 25, ¶ 2, 589 N.W.2d 880. However, while the university may have been concurrently negligent with another party, "N.D.C.C. § 32-03.2-02 was clearly intended to limit the application of joint liability to persons who act in concert." <u>Id.</u> ¶ 34. Because there was no evidence the university acted in concert with the wrongdoer, the North Dakota Supreme Court concluded the university was not jointly responsible for the plaintiff's damages. <u>Id.</u> ¶ 33–35.

[¶ 169] This case is distinguishable from <u>Hurt</u> and <u>Reed</u>. Here, there is significant evidence the

United States aided and encouraged Protestors. See supra ¶¶ 80, 86–90, 111, 115, 144. The Amended Complaint explicitly alleges the United States, through the Corps, actively encouraged the Protestors in their destructive behavior by issuing the de facto permit. The Court found the United States liable under North Dakota law for each of North Dakota's claims. The question then becomes who bears the fault for damages. The answer is the United States, even if jointly with the Protestors.

[¶ 170] Accordingly, the Court finds the United States "aid[ed] or encourage[d] the [tortious] act[s]" and "ratifie[d] or adopt[ed]" the tortious acts of the Protestors, establishing the United States as a joint tortfeasor—rather than a several tortfeasor—that both consented to and ratified the Protestors' conduct. N.D.C.C. § 32-03.2-02.

### b.  Liability for the Tribe and Dakota Access

[¶ 171] The United States next argues the Tribe and Dakota Access are liable in this matter.

[¶ 172] "[T]he burden of proof as to the appropriate apportionment [is] on the party seeking to limit his liability on the ground that the harm is capable of apportionment." Lang v. Wonneberg, 455 N.W.2d 832, 838 (N.D. 1990). The United States has failed to provide a measurable metric for determining the apportionable fault to either the Tribe or Dakota Access.

[¶ 173] As for the Tribe, even though the Tribe had some leadership role early in the Protests, it was ultimately the United States who permitted the Protests to occur on Corps-managed land by issuing the de facto Special Use Permit. See supra ¶¶ 18–19, 22, 31, 38. See also Doc. Nos. 38, ¶¶ 20–58; 383, ¶¶ 22–28.

[¶ 174] As for Dakota Access, no evidence at trial showed Dakota Access acted negligently or was responsible in any way. This argument blames one of the victims for the harm they suffered at the hands of lawless Protestors. Further, Dakota Access could not assume the risk of the Protests

because it had no ability to avoid Protestors from Corps-managed land wreaking havoc on its construction sites. Accordingly, neither Dakota Access nor the Tribe bear any fault in this matter.

### c.  North Dakota Liability

[¶ 175] The United States argues North Dakota is ultimately at fault because its response was "heavy-handed." To support this argument, the United States relies on Dr. Ed Maguire to conclude North Dakota's response was excessive under the circumstances. The Court finds the United States expert on use of force during protest responses, Dr. Maguire, to be inconsistent and wholly unreliable. Dr. Maguire testified North Dakota's law enforcement response was "exceedingly sort of militarized" which would "provoke defiance and rebellion." Doc. No. 446, p. 140:13–15. He was also critical of law enforcement's display of a semiautomatic rifle after Red Fawn Fallis—a notorious protestor who had discharged a firearm three times near law enforcement officers—was being arrested. Doc. No. 446, p. 102:1–103:21; see also id. at 105:2–6. However, he agreed it was appropriate to have armored vehicles present to provide cover with a rifle, which also was a militaristic response. Id. at 106:9–24.

[¶ 176] The Court finds Dr. Maguire's opinions were inconsistent and pollyannaish evaluations of North Dakota's response. His testimony was classic second-guessing in the bright light of hindsight of a law enforcement response to a highly volatile situation created by the Corps and perpetuated by the Protestors. This is unsurprising given his lack of credentials. Dr. Maguire's only practical experience as a law enforcement officer was limited to three summers between 1988 and 1990. Id. at 78:5–19. He has never reviewed law enforcement's use of force in a peer capacity. Id. at 80:4–25. He has never had training in the tactics used by law enforcement here, including less lethal force. Id. at 78:20–23. He also never been responsible for coordinating responses such as those here. Id. at 109:4–12. In short, Dr. Maguire's evaluation of law enforcement response is

- 108 -

more likely to result in the death of an officer or members of the public, including protestors.

[¶ 177] The facts demonstrate North Dakota had no choice but to respond to the unprecedented chaos at the Protests that the United States permitted to occur on Corps-managed land. The State had few options available to abate the public nuisance without an affirmative request to vacate Protestors by the Corps. North Dakota was an unwilling participant trying to control an unprecedented situation.

[¶ 178] In this regard, the Court finds North Dakota's law enforcement experts, Robert Handy and David Pearson, to be credible. See PX-2028; PX-2032. Robert Handy concluded North Dakota's response "was reasonable, was measured, was consistent with best practices, and . . . was a very good overall response given the circumstances and challenges [North Dakota] faced." Doc. No. 444, p. 44:2–9; see also PX-2028. David Pearson found the significant number of law enforcement officers—including additional personnel—were reasonable and necessary for Protest response; and North Dakota's mobile field force tactics, equipment, and less lethal tools was reasonable and consistent with professional police tactics. PX-2032, p. 4, 7, 10, 13, 15–16, 19.

[¶ 179] Accordingly, North Dakota's response was reasonable under the circumstances and not heavy handed.

### 5.  Other Offsets

[¶ 180] The United States contends two payments received by North Dakota constitute collateral source payments that subject the final judgment amount to a reduction by $25 million: a $10 million federal grant given to defray the emergency response costs and a $15 million gift from Dakota Access. North Dakota appears to have abandoned its prior argument that it is entitled to recover the amount of the federal grant but does argue the gift should not be considered as an offset.

[¶ 181] "[T]he government should not be forced to compensate plaintiff twice, once with money funneled through a special compensation scheme, and again with expenditures from general revenues." Overton v. United States, 619 F.2d 1299, 1308 (8th Cir. 1980). "Sources of aid also provided by the United States . . . are thus not collateral but primary in nature, and may be offset." Anderson v. United States, 731 F. Supp. 391, 402 (D.N.D. 1990). Awarding North Dakota $10 million already paid by the federal government for the specific purpose of helping with response costs would result in the United States paying the State twice. Therefore, the $25 million will be reduced by $10 million.

[¶ 182] As to the $15 million Dakota Access gift, at common law, "a negligent defendant was held responsible for the plaintiff's damages and could not take advantage of the fact the injured party received assistance or compensation from independent sources."[39] Dewitz ex rel. Nuestel v. Emory, 508 N.W.2d 334, 340 (N.D. 1993). Under the common law rule, charitable gifts "were treated no differently than other collateral source payments." Id. at 341.

[¶ 183] Section 32-03.2-06 of the North Dakota Century Code allows reduction of damages "to the extent that the economic losses presented to the trier of fact are covered by payment from a collateral source."

> A "collateral source" payment is any sum from any other source **paid or to be paid to cover an economic loss** which need not be repaid by the party recovering economic damages, but does not include life insurance, other death or retirement benefits, or any insurance or benefit purchased by the party recovering damages.

Id. (emphasis added). However, the North Dakota Supreme Court held "the legislature did not change the common law rule as to charitable gifts when it passed N.D.C.C. § 32-03.2-06." Dewitz, 508 N.W.2d at 341. Indeed, "for the purposes of N.D.C.C. § 32-03.2-06, a charitable gift is not a

---

[39] The Court has already concluded Dakota Access was a victim and not a party responsible for the Protests. See supra ¶ 174.

sum 'paid or to be paid to cover an economic loss'" because it is not "paid on account of a legal obligation triggered by economic loss." Id.

[¶ 184] The question regarding Dakota Access's $15 million gift is whether it is a charitable gift to the State. At trial, Dakota Access representative Michael Futch gave uncontroverted testimony the $15 million had "no strings attached" and was a donation rooted in Dakota Access's "mission to be a good corporate citizen." Doc. No. 440, p. 185:22–186:16. As such, the $15 million was a charitable gift for purposes of N.D.C.C. § 32-03.2-06 and, according to the North Dakota Supreme Court, is not considered a collateral source. See Dewitz, 508 N.W.2d at 341.

[¶ 185] The United States contends North Dakota and Dakota Access had conversations about the payment, relying on statements from Sheriff Kirchmeier and Gen. Dohrmann, not Dakota Access.

[¶ 186] There was no evidence Sheriff Kirchmeier or Adjutant General Dohrmann were involved in the ultimate decision by Dakota Access to provide the gift to North Dakota. The fact that North Dakota enacted legislation to accept this money and ultimately used it to repay the Bank of North Dakota loans for the State's emergency response costs (Doc. No. 440, p. 156:17–160:17) is not the point of reference to determine the gift's applicability under the collateral source rule. Under North Dakota law, the Court looks at the intent of the giver to determine whether a payment is a collateral source. See N.D.C.C. § 32-03.2-06 (defining collateral sources as payments made to cover economic loss). The State could have used it in any manner, not for the economic loss alone. Further, while the gift was made in recognition of economic loss, it was not "paid on account of a legal obligation triggered by economic loss." Dewitz, 508 N.W.2d at 341. Not allowing recovery of this money would sanction an economic loss to North Dakota.[40] Accordingly, the $15 million

---

[40] The United States also claims the Dakota Access gift should not be considered charitable because Dakota Access is not a charitable organization but, rather, is a for-profit enterprise. The Court interprets the statute to mean charitable giving and not only gifts by charitable organizations. The United States offers no support for its claim for-profit enterprises cannot engage in charitable

gift from Dakota Access is not a collateral source of recover for North Dakota's damages.

### 6. Loan Interest

[¶ 187] The United States argues North Dakota should not recover $651,746.35 in interest because (1) this amount is prohibited prejudgment interest under the FTCA and (2) North Dakota did not suffer harm from the loan interest since the interest was paid back to the State-owned Bank of North Dakota.

[¶ 188] The FTCA bars recovery of "interest prior to judgment." 28 U.S.C. § 2674. In discussing what constitutes "interest prior to judgment," the Eighth Circuit has explained, "Prejudgment interest is normally taken to refer to an award imposed by law to compensate someone for the loss of use of money that he or she would have had but for the defendant's wrongdoing." Manko v. United States, 830 F.2d 831, 837 (8th Cir. 1987). In other words, under the ordinary understanding of prejudgment interest, "[t]he law imposes this additional burden on a defendant in order that compensation may be fully made." Id. Importantly, the traditional understanding of prejudgment interest "does not depend on contract, either on a contract between the plaintiff and the defendant, or on a contract between the plaintiff and someone else, with which defendant's wrongdoing has interfered." Id. The Eighth Circuit used this example: "If A is indebted to B on a note, bearing interest at an agreed rate, and A does not pay, B may have judgment for the unpaid principal and interest accrued to the date of judgment." Id. This is not "prejudgment interest" rather, it is an interest in contract. Id.

[¶ 189] The interest North Dakota seeks to collect is not the typical prejudgment interest barred by the FTCA as noted in Manko. It is an amount born of a contract between North Dakota and the Bank of North Dakota which contract is a direct and proximate result of the United States wrongful

---

giving. Therefore, the Court finds the gift can be considered charitable. See Dewitz, 508 N.W.2d at 341.

conduct in this case. See id. North Dakota could not have received the loan absent paying the interest. The interest is a direct damage suffered by the State due to the United States' unlawful actions. North Dakota does not seek any "compensat[ion] for the loss of use of [its] money" between the time it expended the funds and when judgment will be entered in this court. See id. It is seeking a sum certain that arises from a contract that is unincreased by the passage of time.

[¶ 190] As to the lack of harm, the Bank of North Dakota is in the business of loaning its money to both State agencies and individual North Dakotans. Doc. No. 440, p. 155:9–15. If the Bank of North Dakota approves a loan for a state agency, the agency must then go to the legislature to get an appropriation for repayment of the loan. Id. at 158:13–17. The Bank's revenues are not universally applied to the State's budget but are used for additional loan activities. Id. at 162:6–22.

[¶ 191] Even though a state agency loaned the State money, it lost any benefit from having those funds to use in other profit-generating activities. Therefore, the Court concludes the loans North Dakota had to take from its state-owned Bank—including the interest charged—were necessary to fund the Protest emergency response and the interest is recoverable under the FTCA.

### 7.  Conclusion as to Damages

[¶ 192] Based upon the foregoing, the Court concludes the United States is liable to North Dakota for a total of $27,854,867.30 in damages.

## CONCLUSIONS OF LAW

[¶ 193] The Court makes the following conclusions of law:

    (A)    North Dakota brought suit against the United States under the Federal Tort Claims Act. See 28 U.S.C. § 2671.

    (B)    As set forth previously by this Court and herein, the Corps had a non-discretionary duty to follow its special use permitting procedures and failed to do so. Doc. Nos. 38, ¶¶ 22–25; 383, ¶ 13.

(C)　The Corps violated its non-discretionary special use permitting process by:

　　1.　failing to require the Protestors to obtain a valid Special Use Permit;

　　2.　falsely issuing a Press Release that stated a Special Use Permit was granted to Protestors on September 16, 2016;

　　3.　failing to correct the errors in the Sept. 16 Press Release;

　　4.　by allowing a prayer ceremony on November 14, 2016, despite not having obtained a valid Special Use Permit from Spotted Eagle; and

　　5.　issuing the Free Speech Zone Letter announcing a "Free Speech Zone" de facto permit to Protestors on November 25, 2016.

(D)　Because of this violation of a non-discretionary duty, this Court has jurisdiction to hear North Dakota's claims.

(E)　Section 318 of the Restatement (Second) of Torts provides the relevant duty of care for North Dakota's negligence, gross negligence, and civil trespass claims, which is: if an actor permits a third person to use land, with the knowledge that the actor can control the third person and the knowledge of the necessity and opportunity for exercising such control, then the actor has a duty to exercise reasonable care to control the third party's conduct.

(F)　The United States knew it had the ability to control Protestors encamped on Corps-managed land through the special use permitting process and via requesting local law enforcement remove the Protestors.

(G)　The United States knew of the necessity and opportunity for exercising such control over Protestors encamped on Corps-managed land, as it knew violent persons were among them from the outset of the Protests and believed the situation would get worse.

(H)　The United States did not exercise reasonable care in controlling the conduct of Protestors when it encouraged the Protests to continue, even though illegal activity already occurred.

(I)　The United States is, therefore, found to have breached its duty with respect to North Dakota's negligence, gross negligence, and civil trespass claims.

(J)　Section 838 of the Restatement (Second) of Torts provides the basis of liability for North Dakota's public nuisance claim, which is: the actor knew the activity was occurring and causing a nuisance, and the actor consented to the activity or did not exercise reasonable care to prevent the nuisance.

(K)     The United States knew or had reason to know Protestors engaged in activity that posed a nuisance, as it knew violent persons were among Protestors from the outset of the Protests and believed the situation would get worse.

(L)     The United States failed to exercise reasonable care to prevent the nuisance by negligently failing to exercise control over the Protestors through the Corps mandatory special use permitting process.

(M)     Accordingly, the United States is found to have breached its duty with respect to North Dakota's public nuisance claim.

(N)     For North Dakota's negligence, gross negligence, and civil trespass[41] claims, the United States' failure to exercise reasonable care was the direct and proximate cause of North Dakota's emergency response costs and damages.

(O)     By inviting, encouraging, and enabling Protestors to remain on Corps-managed land without limitation, the Corps negligently failed to follow its special use permitting process and failed to exercise reasonable care to prevent harm to North Dakota.

(P)     The Corps' negligent actions and inactions created a public nuisance in North Dakota, enabling countless instances of civil trespass to occur during the Protests, subjecting the United States (through the Corps and the actions of other agencies) to liability under North Dakota tort law and exacerbating the harms that were visited upon North Dakota.

(Q)     The Court finds the State of North Dakota's damages calculations for emergency response costs totaling $37,203,120.95 are reasonable, accurate, and attributable the tortious actions of the United States. PX-1439; PX-1455.

(R)     The Court finds the interest, attributable to Bank of North Dakota loans taken out by North Dakota to fund the emergency response costs to the Protests totaling $651,746.35, is a sum certain amount of damages arising from the agreement between North Dakota and its Bank and are direct and proximate result of the United States tortious actions. PX-1439.

(S)     The Court finds the interest attributable to the Bank of North Dakota loans is not impermissible prejudgment interest under the FTCA.

(T)     The Court therefore finds North Dakota's damages, totaling $37,854,867.30, include both costs and interest and are the direct and proximate result of the United States tortious actions.

---

[41] Section 42-01-01 of the North Dakota Century Code does not impose a causation requirement for a public nuisance claim, nor does Section 838 of the Restatement (Second) of Torts. See also supra ¶¶ 131–47.

(U)     The Court finds the $15 million gift from Dakota Access is a gift and is not a collateral source subject to a reduction in the judgment.

(V)     The Court finds the $10 million grant from the United States was paid specifically to defray the costs of the State's emergency response to the Protests and North Dakota will not be permitted to double-recover this amount.

(W)     Therefore, the total recovery will be reduced by $10 million.

(X)     The Court concludes the final amount awardable to North Dakota in this case shall be $27,854,867.30.

## CONCLUSION AND ORDER FOR JUDGMENT

[¶ 194] Political winds may change with administrations, they may ebb and flow over time, but the rule of law remains constant for a reason. Executive agencies must scrupulously follow the law, so the rule of law is not overtaken by the political factions of the day. The United States, through its Army Corps of Engineers, abandoned the rule of law in this case. The Corps' abject failure to abide by mandatory duties tainted all subsequent discretionary decisions by the Corps. Under the FTCA, the executive branch has no authority to abandon its mandatory duties—in this case, the duty to require a Special Use Permit for the DAPL Protestors. Indeed, it was this decision that emboldened the Protestors and ultimately caused millions of dollars in damage to North Dakota. The FTCA, as applied in this case, upholds the United States' responsibility to the States and upholds the correct application of the rule of law.

[¶ 195] Accordingly, based on the foregoing findings of fact and conclusions of law, the Court finds by a preponderance of the evidence that North Dakota has established its claims for Negligence, Gross Negligence, Civil Trespass, and Public Nuisance against the United States. The Court further concludes North Dakota is entitled to damages established at trial, as set forth above, in the amount of $27,854,867.30. The Clerk of Court is directed to enter judgment consistent with this Order.

[¶ 196] **IT IS SO ORDERED**.

[¶ 197] **LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED April 23, 2025.

_____

Daniel M. Traynor, District Judge
United States District Court